**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina Griffin

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>            Plaintiff-Applicant, <br><br>         v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>            Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>            Plaintiff, <br><br>         v. <br><br> FRANK J. AVELLINO, *et al.*, <br><br>            Defendants. | Adv. Pro. No. 10-05421 (CGM) |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF TRUSTEE'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     Trustee's Appointment and Liquidation ........................................................... 1

II.    BLMIS's Business ........................................................................................... 2

III.   The Guilty Pleas, Criminal Proceeding and Convictions of Former BLMIS
Employees ....................................................................................................... 5

     A.    Madoff .................................................................................................. 5

     B.    Frank DiPascali ................................................................................... 6

     C.    David Kugel ......................................................................................... 7

     D.    Irwin Lipkin ........................................................................................ 8

     E.    Eric S. Lipkin ...................................................................................... 8

     F.    Enrica Cotellessa-Pitz ......................................................................... 9

     G.    The Criminal Conviction of Five Former BLMIS Employees ............... 9

IV.   The Trustee's Experts .................................................................................... 10

V.    Avellino's and Bienes' Roles in the Origin and Perpetuation of the Ponzi
Scheme .......................................................................................................... 11

     A.    Avellino and Bienes Partnered with Madoff's Father-in-Law to Operate
Madoff's First Feeder Fund ............................................................... 11

     B.    Avellino and Bienes Had a Symbiotic Relationship with Madoff ........ 13

          1.    Avellino and Bienes Provided Madoff With a Steady Source of
Cash to Sustain the Ponzi Scheme ........................................... 13

          2.    Avellino and Bienes Profited Every Single Year From the Returns
Madoff Guaranteed Them ........................................................ 14

     C.    Avellino and Bienes Worked with Madoff to Deceive the SEC in 1992 ............. 16

          1.    Avellino Returned A&B's Original Customer Statements between
1989 and 1992 to BLMIS, and BLMIS Altered Them to Match
Avellino's and Bienes' Testimony ........................................... 19

i

2.      Avellino Prepared Handwritten Ledgers Which Matched the
        Fraudulently Revised A&B Customer Statements and Produced
        Them to the SEC .................................................................................... 22

3.      To End the SEC Investigation, Madoff Had to Pay Out Nearly
        $460 Million to Avellino and Bienes, But Had to Borrow
        Hundreds of Millions of Dollars to Do So ............................................. 23

D.      Madoff Compensated Avellino and Bienes for Referring their Investors
        Directly to BLMIS ............................................................................................. 24

1.      Madoff Agreed to Provide Commissions and Guaranteed Rates of
        Return to Avellino and Bienes and Did So Through the Schtupping
        Process .................................................................................................... 25

E.      Madoff Used the A&B "Pooled Account" Arrangement as his Model for
        Future Feeder Funds .......................................................................................... 27

VI.     Madoff Was Operating a Ponzi Scheme ......................................................................... 27

A.      BLMIS Did Not Engage in the Trades on Customers' Statements ..................... 27

1.      Madoff Did Not Execute the Convertible Arbitrage Transactions ........... 28

        (a)     The Process Used to Create the Convertible Arbitrage
                Transactions Resulted in Market Impossibilities and Trading
                Anomalies .................................................................................... 32

        (b)     Impossible Market Volumes and Prices ....................................... 33

        (c)     Additional Anomalies on the Customer Statements ..................... 34

        (d)     Madoff Did Not Execute the Convertible Arbitrage
                Transactions for the A&B Accounts.............................................. 36

2.      The Buy and Hold Transactions Were Fictitious...................................... 37

        (a)     BLMIS Employees Manipulated the Transactions in the Buy
                and Hold Accounts to Meet Targeted Rates of Returns .............. 39

        (b)     Dubinsky Identified Numerous Market Impossibilities and
                Trading Anomalies in the Buy and Hold Accounts...................... 40

        (c)     The Buy and Hold Transactions in the A&B Accounts Were
                Fictitious ...................................................................................... 41

3.      The Split-Strike Conversion Transactions on Customer Statements
        Were Fictitious.......................................................................................... 42

(a)      Impossible Equity and Options Volumes ...................................... 43

(b)      Equity and Options Trades Priced Outside Daily Price Range..... 45

(c)      Volume Weighted Average Price Analysis .................................. 45

(d)      Consistently Positive Annual Rates of Return............................. 46

(e)      Securities Listed on the IA Business Customer Statements Did
Not Reconcile with DTC Records ................................................ 48

(f)      Reported Options Trades Could Not be Reconciled to OCC
Records ........................................................................................ 50

(g)      The IA Business Did Not Purchase Treasuries for IA Business
Customer Accounts ...................................................................... 51

(h)      The Brokerage Accounts Did Not Hold T-Bills for the IA
Business Customers ..................................................................... 51

(i)      No T-Bills Were Purchased by the Proprietary Trading
Business For the IA Business Customers ..................................... 53

(j)      The Aggregate Volume of Purported IA Business Treasuries
Far Exceeded the Volume of Treasuries in the Brokerage
Accounts and the Proprietary Trading Business........................... 54

(k)      DiPascali Confirmed that the Purported Treasury Transactions
on the Customer Statements Were Fictitious............................... 55

(l)      The Split Strike Conversion Transactions in the Post-1993
Entity Accounts Were Fictitious.................................................. 58

4.      Additional Proof that BLMIS Never Engaged in the Securities
Transactions on Customer Statements ....................................... 59

(a)      The IA Business' Computer Programs Were An Integral Part
of How the Ponzi Scheme Was Perpetuated................................ 59

(b)      The IA Business Used a Fake Single Counterparty for All
Purported Securities Transactions................................................ 62

(c)      The Schtup Transactions.............................................................. 64

(d)      The Proprietary Trading Business Did Not Execute Trades for
IA Business Customers ................................................................ 69

(e)      BLMIS Falsified Its Financial and Regulatory Statements .......... 72

B.    Cash Deposits of IA Customers Were Commingled in the 703 Account, and Were the Source of Payments to Other Customers ....................................... 74

C.    The IA Business Had No Other Source of Funds ................................................. 76

VII.   The Transfers to the Post-1993 Entity Accounts ........................................................ 78

A.    The Post-1993 Entities and Their General Partners ............................................. 78

1.    Mayfair Ventures ........................................................................ 78

2.    Grosvenor Partners ...................................................................... 78

3.    Aster Associates ........................................................................... 79

4.    St. James Associates .................................................................... 80

5.    The General Partners of the Summary Judgment Entity Defendants ....... 81

B.    Greenblatt's Principal Balance Calculation ......................................................... 82

1.    Principal Balance Calculation for Mayfair Ventures Account 1ZB032 ........................................................................................ 83

2.    Principal Balance Calculation for the Grosvenor Partners Account 1ZB046 ........................................................................................ 84

3.    Principal Balance Calculation for the Aster Associates Account 1ZB509 ........................................................................................ 87

4.    Principal Balance Calculation for the St. James Associates Account 1ZB510 ........................................................................... 88

C.    Collura's Reconciliation Analyses ....................................................................... 89

D.    Collura's Tracing Analyses .................................................................................. 91

1.    Tracing Results of Mayfair Ventures Account No. 1ZB032 ................... 92

2.    Tracing Results of Grosvenor Partners Account No. 1ZB046 ................ 92

3.    Tracing Results of Aster Associates Account No. 1ZB509 ..................... 93

4.    Tracing Results of St. James Associates Account No. 1ZB510 .............. 93

E.    The Transfers to Defendants Were Made by Bernard L. Madoff Investment Securities LLC ................................................................................... 94

iv

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), in support of his motion for partial summary judgment in the above-referenced proceeding against (i) Defendants Mayfair Ventures, G.P. ("Mayfair"), Grosvenor Partners, Ltd. ("Grosvenor"), Aster Associates ("Aster"), and St. James Associates ("St. James") (collectively, the "Summary Judgment Entity Defendants"), and (ii) their general partners (the "Summary Judgment General Partner Defendants", and together with the "Summary Judgment Entity Defendants", the "Summary Judgment Defendants"), respectfully submits this statement of material facts for which there is no genuine issue to be tried under Local Rule 7056-

## I.    Trustee's Appointment and Liquidation

1.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Compl., *United States v. Madoff*, No. 08-mj-02735 (S.D.N.Y. 2008), ECF No. 1.

2.      Contemporaneously, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of New York. Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.

3.      On December 15, 2008, under 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5.  Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by the Securities Investor Protection Act ("SIPA").  *Id.* at 2–3.

1

4.       Also, on December 15, 2008, the district court granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

- appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

- appointed Baker and Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

- removed the case to the Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4). Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("SIPC Liquidation Order").

5.       By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate. Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF No. 69.

6.       On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, the Bankruptcy Court substantively consolidated the Chapter 7 estate of Madoff into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1; Consent Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 9, 2009), ECF No. 252.

## II.    BLMIS's Business

7.       In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC. He was assigned registrant number 8-8132.  Through that registration, the broker-dealer became a member of SIPC when SIPA was enacted in 1970.  SIPC Liquidation Order; Declaration of

2

Regina Griffin, dated February 3, 2022 ("Griffin Decl."), Ex. 1 (SEC Form BD for Bernard L.

Madoff dated Dec. 31, 1959 (PUBLIC0003607)).

8.    Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole

proprietorship.  Declaration of Bruce G. Dubinsky in Support of the Trustee's Motion for Partial

Summary Judgment dated February 3, 2022 ("Dubinsky Decl."), Attach. A (Expert Report of

Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Global Report") at ¶ 36.  During its

existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment

Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.  *Id*. at ¶ 38.

9.    Effective as of January 1, 2001, BLMIS was registered as a New York single

member limited liability company.  On January 12, 2001, BLMIS amended its SEC Form BD to

reflect its change in corporate form from a sole proprietorship to a single member limited

liability company and all the assets and liabilities of the sole proprietorship were transferred to

the limited liability company.  Griffin Decl. Ex. 2 ("Amended Form BD" dated January 12,

2001).

10.    In response to the direction in the Amended Form BD to "[b]riefly describe

details of the *succession* including any assets or liabilities not assumed by the *successor*

[BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO
> SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES,
> RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT
> RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Griffin Decl. Ex. 2 (Amended Form BD) at Question 5 (emphasis in original).  No assets or

liabilities of the sole proprietorship were listed as "not assumed by the successor."  *Id*.

11.    Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." *Id.* at Question 8(c) (emphasis in original).

12.    Also effective January 1, 2001, BLMIS's Amended and Restated Operating Agreement transferred all assets—including bank accounts—held by the sole proprietorship to the LLC:

> 3. **Purpose**. The Company is formed to receive as at January 1, 2001, all of the assets, subject to liabilities, associated with the business being conducted by Bernard L. Madoff, as sole proprietorship (the "Business") and to thereafter conduct such Business, and any further extension therefor, in such manner and form as determined by the Member in his sole discretion, to the extent permitted by the [Limited Liability Company Law of the State of New York] or by the laws of any jurisdiction which the Company may do business.

Griffin Decl. Ex. __ (BLMIS's Amended and Restated Operating Agreement).

13.    BLMIS's change from a sole proprietorship to an LLC was reflected on BLMIS documents, including customer statements sent to the Summary Judgment Entity Defendants and customer agreements, which included "LLC" in the top left corner starting in 2001. *See, e.g.*, Griffin Decl. Exs. 4, 7-11.

14.    In 2006, BLMIS registered as an investment advisor with the SEC claiming to have only 23 accounts and $11.7 billion in assets under management. Griffin Decl. Ex. 12 (2006 Form ADV); *see also* Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶ 39. Madoff used the same SEC registrant number (8-8132) and signed the Form ADV on behalf of "Bernard L. Madoff Investment Securities LLC." Griffin Decl. Ex. 12 (2006 Form ADV).

15.    BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the investment advisory business (the "IA Business"). Dubinsky Decl. Attach. A, Dubinsky Global Report at ¶ 36.

4

16.     The proprietary trading business traded for its own account to make money for

BLMIS.  *Id.* ¶¶ 36, 46.

17.     The market-making business made markets in certain stocks, bonds, warrants and

rights.  *Id. at 46.*

18.     The proprietary trading and market-making businesses were referred to within

BLMIS as "House 5" (collectively referred to herein as the "Proprietary Trading Business."  *Id.*

at ¶ 36.

19.     The IA Business purportedly traded stocks and options on behalf of its customers.

*Id.* ¶¶ 41–44.

20.     The Proprietary Trading Business and the IA Business were units of BLMIS

operated by Madoff.  *Id.* ¶¶ 36, 48.

**III.    The Guilty Pleas, Criminal Proceeding and Convictions of Former BLMIS Employees**

**A.    Madoff**

21.     At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against

him by the United States Attorney for the Southern District of New York.  Plea Allocution of

Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the

"Madoff Allocution"), ECF No. 57, (Griffin Decl. Ex. 13).

22.     Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  *Id*. at 23:14–23; 31:25–32:1.

23.     Madoff further admitted that he never invested his clients' funds in securities, that

he used funds on hand in the JP Morgan account to pay customer redemptions, and that he

created false trading confirmations and client account statements to cover up the fact that he had

not executed trades on behalf of BLMIS IA clients.  Madoff stated:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts
> with me that I would invest their money in shares of common stock, options, and
> other securities of large well-known corporations, and upon request, would return
> to them their profits and principal. Those representations were false for many
> years. Up until I was arrested on December 11, 2008, I never invested these funds
> in the securities, as I had promised. Instead, those funds were deposited in a bank
> account at Chase Manhattan Bank. When clients wished to receive the profits they
> believed they had earned with me or to redeem their principal, I used the money
> in the Chase Manhattan bank account that belonged to them or other clients to pay
> the requested funds. The victims of my scheme included individuals, charitable
> organizations, trusts, pension funds, and hedge funds.

*Id.* at 24:9–24.

### B.    Frank DiPascali

24.    Frank DiPascali ("DiPascali"), a BLMIS employee since 1975 and Madoff's

right-hand man, pleaded guilty to a ten-count criminal action charging him with participating in

and conspiring to perpetuate the Ponzi scheme at BLMIS.  Griffin Decl. Ex. 14 (Plea Allocution

Transcript of Frank DiPascali Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS), ECF No. 12,

hereinafter "DiPascali Plea") at 44:25-25, 65:6-8.

25.    At a plea hearing on August 11, 2009, in the case captioned *United States v.

DiPascali*, No. 09-CR-764 (RJS), DiPascali admitted that no purchases or sales of securities took

place in connection with the IA Business customer accounts.  DiPascali testified:

> From at least the early 1990s through December of 2008, there was one simple
> fact that Bernie Madoff knew, that I knew, and that other people knew but that we
> never told the clients nor did we tell the regulators like the SEC. No purchases of
> [sic] sales of securities were actually taking place in their accounts. It was all
> fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

*Id.* at 45:21–46:15.

6

26.    At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that securities trading was occurring in their investment accounts when in fact, no trades were being made.  DiPascali stated:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

(*Id.* at 46:21–25).

\*\*\*

> Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in real time. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

> *Id.* at 47:5–22.

\*\*\*

> … I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

*Id.* at 52:2–5.

27.    DiPascali gave testimony at a criminal trial of five former BLMIS employees (the "Criminal Trial") in which he confirmed that the securities transactions on the IA Business customer statements were fake.  Griffin Decl. Ex. 15 (DiPascali Cr.) at 4517:14-24.

**C.    David Kugel**

28.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel ("Kugel"), another long-time BLMIS employee, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud.   Griffin Decl. Ex. 16 (Plea Allocution of David

L. Kugel, *United States v. Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011 hereinafter

"Kugel Plea") at ECF No. 188.

29.    Kugel admitted in his plea allocution:

[B]eginning in the early '70s, until the collapse of BLMIS in December 2008, I
helped create fake, backdated trades. I provided historical trade information . . . to
create fake trades that, when included on the account statements and trade
confirmations of Investment Advisory clients, gave the appearance of profitable
trading when in fact no trading had actually occurred.

*Id.* at 32:4-12.

30.    Kugel also testified at the Criminal Trial, where he admitted that by 1977, he

knew definitively that those trades reported on account statements for customers of the IA

Business were fake, and detailed his role in creating those fake transactions.   Griffin Decl. Ex. 17

(Kugel Tr.) at 1804:9-1817:8, 1860:25-1861:11.

### D.    Irwin Lipkin

31.    At a plea hearing on November 8, 2012, Irwin Lipkin, BLMIS's first employee

and controller, pleaded guilty to a two-count criminal action charging him with securities fraud,

falsifying the records of BLMIS, and making false statements in relation to documents required

by ERISA.  Griffin Decl. Ex. 17 (Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*,

No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012).

32.    Irwin Lipkin admitted that beginning in the 1970s, BLMIS's revenue was falsely

inflated through fraudulent bookkeeping entries and annual audited reports. *Id.* at 30:23–31:3,

31:10–18, 31:24–32:5.

### E.    Eric S. Lipkin

33.    At a plea hearing on June 6, 2011, Eric Lipkin, a former BLMIS payroll clerk,

pleaded guilty to a six-count criminal action charging him with, among other things, bank fraud,

8

falsifying the records of BLMIS, conspiracy, and making false statements.  Griffin Decl. Ex. 18

(Plea Allocution of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS)

(S.D.N.Y. June 6, 2011), ECF No. 148).

34.    Eric Lipkin admitted that BLMIS created fake reports that replicated those of the

Depository Trust Corporation ("DTC"), which provides clearance for nearly all equity, bond,

government securities, mortgage-backed securities, money market instruments, and over-the-

counter derivative transactions in the U.S. Market.  The purpose of these fake DTC reports was

to purportedly confirm non-existent positions in the IA Business accounts, and the fake reports

were given to auditors and the SEC to mislead them.  *Id.* at 32:4–10, 33:22–34:8.

### F.    Enrica Cotellessa-Pitz

35.    At a plea hearing on December 19, 2011, Enrica Cotellessa-Pitz, BLMIS's former

controller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify

the records of BLMIS, conspiracy to obstruct the Internal Revenue Service in the collection of

income taxes, and conspiracy to make false filings with the SEC.  Griffin Decl. Ex. 19 (Plea

Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS)

(S.D.N.Y. Dec. 19, 2011), ECF No. 1512).

36.    Cotellessa-Pitz admitted that IA Business customer money was funneled to the

Proprietary Trading Business to falsely inflate their revenue and hide their losses.  *Id.* at 31:12–

32:12.

### G.    The Criminal Conviction of Five Former BLMIS Employees

37.    On March 24, 2014, five former BLMIS employees who were the defendants in

the Criminal Trial – Daniel Bonventre, Annette Bongiorno ("Bongiorno"), Jo Ann "Jodi" Crupi

("Crupi"), George Perez and Jerome O'Hara – were convicted of fraud, securities violations, and

other crimes in connection with their participation in the Ponzi scheme at BLMIS.  Griffin Decl.

9

Ex. 20 (Verdict Form in *United States v. Bonventre, et al.,* No. 10-CR-228 (LTS) (S.D.N.Y.

March 24, 2014), ECF No. 800).

## IV.    The Trustee's Experts

38.    The Trustee retained Bruce Dubinsky ("Dubinsky"), a forensic accountant and

certified fraud examiner with more than 30 years' experience in financial fraud investigations.

Dubinsky performed a forensic examination of BLMIS, and detailed the results of his findings in

an expert report on the proof of fraud and insolvency at BLMIS, dated January 16, 2019.

Dubinsky Decl. Attach A (Dubinsky Global Report).  In that Report, Dubinsky rendered certain

opinions related to BLMIS's operations and financial condition.   Among Dubinsky's opinions

were his conclusions that Madoff did not execute any trades for its IA Business customers, the

IA Business was operating a Ponzi scheme from at least the 1970s, and the Proprietary Trading

Business was part of the fraudulent scheme.

39.    In a separate expert report, dated June 5, 2020, Dubinsky analyzed the

transactions in the IA Business accounts held by Avellino and Bienes and their related entities.

Dubinsky Decl. Attachment B ("Dubinsky A&B Report").   Dubinsky determined that these IA

Business accounts contained fictitious transactions consistent with the indicia of fraud he

identified as part of Madoff's operation of the Ponzi scheme.

40.    The Trustee also retained Lisa Collura, a forensic accountant and certified fraud

examiner who proffered two reports: a global report dated January 16, 2019 (Collura Decl.

Attach. A ("Collura Report")), and a report specific to this proceeding dated June 5, 2020.

Collura Decl. Attach. B ("Collura A&B Report").

41.    In her global report, Collura analyzed the cash transactions on all IA Business

customer statements and BLMIS bank records.  In the Collura A&B Report, Collura determined,

among other things, that from the late 1980s to the early 1990s, balances in the IA Business bank

accounts were overdrawn, and analyzed the initial transfers made by BLMIS to the Defendants.

42.     The Trustee also retained Matthew Greenblatt, a forensic accountant and certified

fraud examiner.  In a global report dated November 15, 2012, Greenblatt identified the

methodology he used for the principal balance calculations he applied to each IA Business

account from April 1, 1981 through December 11, 2008.  Greenblatt Decl. Attach. A

("Greenblatt Report").  In a separate report for this case, Greenblatt applied the methodology of

the principal balance calculation to the Defendants' IA Business accounts.  Greenblatt Decl.

Attach. B ("Greenblatt A&B Report").

## V.     Avellino's and Bienes' Roles in the Origin and Perpetuation of the Ponzi Scheme

### A.     Avellino and Bienes Partnered with Madoff's Father-in-Law to Operate Madoff's First Feeder Fund

43.     In 1958, Avellino began working as an accountant for Madoff's father-in-law,

Saul Alpern ("Alpern").  Griffin Decl. Ex. 21 (Deposition of Frank Avellino dated November 20,

2019 Volume 1, hereinafter "Avellino Dep. Vol. 1") at 15:6-20 and 21:14-22:19; Griffin Decl.

Ex. 23 (Defendants' Amended Responses to Request for Admissions, hereinafter "Defts. Am.

Resp. to Req. for Admissions") at ¶¶ 3-4.

44.     In 1960, Madoff began operating his business from Alpern's accounting firm,

Alpern & Heller.  It was at that time that Avellino met Madoff.  Griffin Decl. Ex. 21 (Avellino

Dep. Vol 1), at 21:14-22:7; Griffin Decl.Ex. 23 (Defts. Am. Resp. to Req. for Admissions) at ¶ 6.

45.     In or about 1968, Bienes joined Alpern's firm as an accountant.  Griffin Decl. Ex.

21 (Avellino Dep. Vol. 1) at 24:6 – 25:1 and 29:2 – 22:7; Griffin Decl. Ex. 23 (Defts. Am. Resp.

to Req. for Admissions) at ¶ 11.

46.     Alpern & Heller became Alpern & Avellino in or about 1968, Alpern, Avellino & Bienes in 1970, and when Alpern retired in 1975, the accounting firm became known as Avellino & Bienes (hereinafter "A&B").  Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 22:24-23:12; 23:21-24:5; and 29:8-29:20; Griffin Decl.Ex. 23 (Defts. Am. Resp. to Req. for Admissions) at ¶¶ 5 and 18.

47.     In the early 1960s, Madoff's father-in-law, Alpern, formed his own group of investors from his friends, family, and accounting clients to provide money to Madoff's IA Business.  Griffin Decl.Ex. 21 (Avellino Dep. Vol. 1) at 25:8 – 26:1; 28:2 – 28:10; 34:13-34:18.

48.     In an interview on PBS's Frontline, Bienes stated that Madoff's early customers were "[Saul's] clients, family, friends."  Griffin Decl. Ex. 24 (Transcript of Frontline Interview of David Bienes for "The Madoff Affair, 10-05421-BIENES__006304 – 006349, hereinafter "Bienes Frontline Interview") at 10-05421-BIENES_006308.

49.     In the 1960s, Alpern told Bienes he should invest with Madoff's IA Business, telling him that Madoff would get him 20% returns.  Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006306 and 006347; Griffin Decl. Ex. 23 (Defts. Am. Resp. to Req. for Admissions) at ¶ 17.

50.     Alpern provided the funds he received from his investors to Madoff to deposit into a pooled IA Business account in the name of Avellino & Alpern.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 24; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006306 and 006308-6309; Griffin Decl. Ex. 23 (Defts. Am. Resp. to Req. for Admissions) at ¶ 9.

51.     Alpern's pooled IA account arrangement simplified the accounting for Madoff, because Alpern performed all accounting services for the investors.  Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶ 24; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 25:8-26:16,

29:21-32:19; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006309.

52.     By the 1970s, Avellino and Bienes both joined Alpern in operating, through their

entity A&B, what ultimately became Madoff's first feeder fund.  Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶ 25; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 29:25-30:15.

53.     In or about 1975 when Alpern retired, he transferred management of the pooled

IA Business accounts to Avellino and Bienes.  Dubinsky Decl. Attach. B (Dubinsky A&B

Report) at ¶ 25; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 29:21–30:15, and 32:3-32:19.

54.     After Alpern's retirement, Avellino and Bienes continued to collect moneys from

investors – their friends, clients, families – and sent the funds to Madoff.  Griffin Decl. Ex. 21

(Avellino Dep. Vol. 1) at 30:10-31:1; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-

05421-BIENES__006309-6311.

55.     Avellino and Bienes attracted prospective investors by touting virtually "riskless"

investments.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 20, 82 and n.72; Griffin

Decl. Ex. 25, (King Arthur Account Fact Sheet, MADOFF_EXHIBITS-02862-02863); Griffin

Decl. Ex. 26 (Deposition of Avellino and Bienes dated July 7, 1992, *In the Matter of King

Arthur*, SEC file No: MNY-149) at 74:18 - 75:18.

**B.      Avellino and Bienes Had a Symbiotic Relationship with Madoff**

**1.      Avellino and Bienes Provided Madoff With a Steady Source of Cash
to Sustain the Ponzi Scheme**

56.     For decades, Avellino and Bienes provided Madoff with what every Ponzi scheme

requires: a continuous source of cash.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶

29.

57.     Bienes stated that in the 1970s, A&B was Madoff's sole feeder fund, providing

new investor cash to the IA Business:

> [*Question*]:  At the time, were you the only people that you were aware of
> that were feeding Bernie Madoff money?
> [*Bienes:*] Yes.  Yes.
> [*Question:*] This is the 1970s?
> [*Bienes:*] Yes.  Yes.  We thought we were the only ones, that we were the
> elect, that we were Saul's [Alpern's] partners.

Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006311.

58.     Through A&B's pooled IA Business accounts, Avellino and Bienes funneled

hundreds of millions of dollars from thousands of investors to the IA Business.  Dubinsky Decl.

Attach. B (Dubinsky A&B Report) at ¶ 29.

59.     Like Alpern had previously done for Madoff, Avellino and Bienes performed all

accounting services for their investors.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶

24-25; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 29:25 - 31:1; 32:3 – 32:19.

60.     Bienes admitted he and Avellino were Madoff's "front men" for years.  Griffin

Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006340.

61.     As the source of some of the earliest BLMIS customers, Avellino and Bienes

helped Madoff build the infrastructure of his fraudulent business operations.  Dubinsky Decl.

Attach. B (Dubinsky A&B Report) at ¶ 23; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 18:5-18:12.

## 2.     Avellino and Bienes Profited Every Single Year From the Returns Madoff Guaranteed Them

62.     Avellino and Bienes made substantial profits from the returns Madoff guaranteed

them, and they structured their entire business operations around these guaranteed returns.

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 27-29; 83.

63.     Avellino and Bienes promised fixed rates of return to their investors that were lower than the returns Madoff had guaranteed them.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 28, 83.

64.     Avellino's and Bienes' compensation for feeding other investors' funds to Madoff's IA Business was to retain the difference between the rate of returns Madoff guaranteed them in advance and the lower rates of return they promised their investors.  Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 48:5 – 49:14; Griffin Decl. Ex. 23 (Defts. Am. Resp. to Req. for Admissions) at ¶ 23; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES_006310-11, 006322-6323; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4626:8-4626:22.

65.     Avellino admitted that A&B made a profit every year going as far back to 1962, and never had a loss.  Griffin Decl. Ex. 26 (Dep. of Avellino and Bienes dated July 7, 1992, *In the Matter of King Arthur*, SEC file No: MNY-1490) at 44:25 – 47:9; *Id.* at 75:14 – 75:18.

66.     Bienes separately confirmed A&B never had a down year in its IA Business Accounts:

[*Question:*] How many years were you investing with him [Madoff]?
[*Bienes:*] Bernie, from the beginning about 35 years.
[*Question:*] Did you ever have a down year?
[*Bienes*:] Never. Not once.

Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006314 and 006348.

67.     Bienes described the profits he received from Madoff as "[e]asy, easy-peasy, like a money machine.  I always said I never lifted any heavy weights."  Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006313.

68.    Bienes conceded that his financial success was built on Madoff: "Bernie was the well.  I just turned the spigot, sent him the fax, the money came."  Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES_006348.

69.    Avellino and Bienes compensated certain business associates for feeding money to them that they ultimately sent to Madoff, thereby enhancing their own profits.  Griffin Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 26 and 28; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES_006321-23; Griffin Decl. Ex. 28 (Deposition of Andrew Copperman dated Jan. 10, 2020) at 25:21-25.

70.    Bienes admitted that in the 1970s and 1980s, he and Avellino were "running a big business" with Madoff:

> [*Question*:] You talked a little bit about Bernie in the early, early days.
> But by the '70s, into the '80s, you had a lot of contact with Bernie.  You
> got to know him?
> [*Bienes*:] Had to have a lot of contact.  We were running – in our
> estimation – a big business with him.  We had to know what was going on.

Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006315.

71.    In or about 1984, Avellino and Bienes ceased all accounting services and focused solely on their pooled IA Business accounts at BLMIS.  Griffin Decl. Ex. 23 (Defts.' Am. Resp. to Req. for Admission) at ¶¶ 24-25; Griffin Decl. Ex. 26 (Dep. of Avellino and Bienes dated July 7, 1992, *In the Matter of King Arthur*, SEC file No: MNY-1490) at 35:1 – 38:3; Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006313.

## C.    Avellino and Bienes Worked with Madoff to Deceive the SEC in 1992

72.    By June of 1992, when Avellino and Bienes had funneled nearly one half billion dollars of other people's money to the IA Business, the SEC began investigating them for operating an "unregistered investment company" and for "engag[ing] in the unlawful sale of unregistered securities."  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 89;

16

Griffin Decl. Ex. 24 (Bienes Frontline Interview) at 10-05421-BIENES__006319.

73.    DiPascali testified that Madoff became upset when he learned of the SEC

investigation.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 4623:4 – 4623:21.

74.    DiPascali explained that Madoff's concern with the SEC's investigation was that

it could eventually lead to the discovery of BLMIS's fraud:

> Q.  And what concerns did Madoff discuss relating to the SEC, now
> looking at Avellino and Bienes?
>
> A.  He wanted to keep that episode in Avellino and Bienes' office.  He did
> not want the SEC to look any further than the minor violation of failing to
> register the notes that they were issuing.  He needed to – He could not
> afford for the investigation to dig any deeper because, as you kept peeling
> away the onion that would start with Avellino and Bienes, the fraud would
> have been disclosed.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4627:16 – 4627:24.

75.    During the SEC investigation, Avellino and Bienes gave sworn testimony about

their IA Business accounts.  Griffin Decl. Ex. 26 (SEC Dep. of Avellino and Bienes dated July 7,

1992); Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 89.

76.    Avellino and Bienes testified under oath that their IA Business accounts held total

assets of approximately $440 million.  Griffin Decl. Ex. 26 (SEC Dep. of Avellino and Michael

Bienes dated July 7, 1992) at 83:1 – 84:6.

77.    Avellino and Bienes also testified that Madoff purportedly employed a hedged

investment strategy for the A&B Accounts:

> Q.    …Are you aware of the strategy that Mr. Madoff utilizes?
> WITNESS AVELLINO:  Oh, yes.
>
> Q.    Could you describe that to me?
> WITNESS AVELLINO:.  Yes.  What we basically have is, of course, long
> positions.  He buys securities for the accounts of Avellino & Bienes, and
> the strategies that have been highly successful over the years, which Mr.
> Madoff, by the way, happens to be an expert in, all of the derivative
> hedges that the market affords.  We sell short against the box, we use

hedges of the Standard & Poor's 500, Fortune 500 …. Mr. Madoff uses
the hedges basically as S&P's, puts and calls.  Every security that we have
in the long position has a hedge, every single one of them.

Griffin Decl. Ex. 26 (SEC Dep. of Avellino and Bienes dated July 7, 1992) at 40:13-41:3.

78.     Dubinsky compared the testimony given by Avellino and Bienes to the SEC to the

transactions appearing on the original A&B customer statements, and concluded that Avellino's

and Bienes' testimony was inconsistent with the transactions reflected on their original customer

statements.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 88-96.

79.     Dubinsky's analyses show that the original A&B IA Business customer

statements had a balance of only $364 million in securities in 1992, which was $76 million less

than the $440 million in total equity Avellino and Bienes claimed in their sworn testimony.

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 95-96.

80.     Dubinsky's analyses also revealed that A&B's original customer statements did

not reflect any purported investment strategy hedged with S&P 100 options like the strategy

Avellino and Bienes described under oath to the SEC.  In fact, the original customer statements

had no options transactions at all.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 92-

94.

81.     DiPascali confirmed that it would have been "problematic" if Avellino and Bienes

produced their original customer statements to the SEC, because the transactions on those

statements were inconsistent with their testimony, and so Madoff directed a "redo" of the

statements:

Q.  What did Madoff say his concerns were?

A.  Well, to a certain amount of the clients that Avellino had been dealing
with for many, many years, he was explaining to them that they were
doing some sort of a hedged arbitrage.  Well, quite frankly, the accounts
had morphed into something completely different than hedged arbitrage
for whatever reason….So they needed to change the complexions of what

[customer statements] was previously issued to Avellino because if you
looked at the Avellino accounts, like when the music stopped on the date
that the SEC would get them, they were very problematic to Bernie. They
did not indicate in any way, shape or form that these accounts were
hedged in any way, shape or form….

    And they weren't worth nearly what the liabilities that Avellino and
Bienes had to their clients, or if you added up, or the SEC added up….it
didn't add up. There wasn't enough cushion there to cover what was out
here. Very problematic for Frank Avellino, but anything that's
problematic for Frank Avellino at this point is extremely problematic to
Bernie Madoff.

    So it was circle the wagons and let's redo all of this stuff so that Frank
Avellino can give the SEC a more cohesive investment picture that is
worth considerably more money, that is clearly hedged, and all of that is
now consistent with what he's been telling his clients.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4628:13- 4628:16; 4629:3 - 4630:7.

82.    DiPascali admitted that the purpose of redoing the original A&B customer

statements before producing them to the SEC was ultimately to deceive regulators. Griffin Decl.

Ex. 15 (DiPascali Tr.) at 4639:2 – 4639:7.

83.    As with all of the purported securities transactions that appeared on the A&B

original customer statements, the purported transactions on the redone statements were fake, and

never took place. Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 113, 115, 122, 134,

135, and 140; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4630:8 – 4630:17.

**1.    Avellino Returned A&B's Original Customer Statements between
1989 and 1992 to BLMIS, and BLMIS Altered Them to Match
Avellino's and Bienes' Testimony**

84.    In 1992, BLMIS significantly manipulated the transactions on the original A&B

customer statements so that when the revised statements were produced to the SEC, they would

match Avellino's and Bienes' sworn testimony before the SEC. Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at pages 44-80.

85.     As part of the redo of the A&B customer statements, Avellino returned three

years (1989-1992) of the original customer statements to BLMIS.  Griffin Decl. Ex. 27

(Bongiorno Dep.) at 143:6 – 143:24 and 144:7 – 145:18.

86.     BLMIS maintained these original statements in an envelope marked "These were

returned," in handwriting that Bongiorno confirmed under oath was hers.  Griffin Decl. Ex. 27

(Bongiorno Dep.) at 145:4 – 145:18 and Griffin Decl. Ex. 30 (Trustee's Deposition Ex. 42);

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 97-98.

87.     DiPascali testified at the Criminal Trial:

Q.     Now, what steps were then taken to deal with the [SEC
investigation into Avellino and Bienes] internally at Madoff Securities?

A.     We basically circled the wagons and pitched in in any way we can,
depending on what abilities you had, to bail Bernie out of a problem.

Q.     Who were some of the people that were involved in circling the
wagons?

A.     Annette's department.  Annette, myself, clearly Bernie, and then
there were some fringe players that dropped what they were doing and ran
some tapes for us to balance things out…. they were basically trying to do
was *create an entirely new set of books and records that they can give to
Avellino and Bienes, that Avellino could then give to the SEC and,
hopefully, this whole problem would go away.*

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4627:25 – 4628:16 (emphasis added).

88.     Among the changes BLMIS made to A&B's original customer statements were a

new set of customer account statements which retroactively inserted $86 million in fake US

Treasuries to A&B IA Business account 1-00125-3.  Dubinsky Decl. Attach. B (Dubinsky A&B

Report) at ¶¶ 103-113 and Figures 21-25.

89.     BLMIS retroactively created a new IA Business account for A&B, 1A0053, and

manufactured three years of statements back to 1989 for this fake account.  BLMIS employee

Bongiorno confirmed that this account was not "opened" until June 1992.  Dubinsky Decl.

20

Attach. B (Dubinsky A&B Report) at ¶¶ 114-127 and Figs. 29-37; Griffin Decl. Ex. 27

(Bongiorno Dep.) at 180:4 –180:16; 184:15-187:3; Griffin Decl. Ex. 31 (Trustee Dep. Ex. 71).

90.     BLMIS also altered A&B's original customer statements in 1992 to conceal inter-

account transfers made between their accounts and those of other IA Business customers before

they were produced to the SEC.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 128-

134 and Figs. 38-42; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4640:22-4641:15.

91.     Madoff also added fictitious backdated transactions to A&B account 1-00125-7 to

generate over $134.3 million in cash.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶

135-140 and Figs. 45-48.

92.     Avellino, on behalf of A&B, produced the revised A&B customer statements to

the SEC during the 1992 investigation as if they were the original statements issued by BLMIS

three years prior.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 112 and n. 116, 122,

and 125; Griffin Decl. Ex. 32 (Trustee Dep. Ex. 39) at FRANK AVELLINO_000010-12; Griffin

Decl. Ex. 27 (Bongiorno Dep.) at 139:14-142:6; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4627:16-

4630:7.

93.     Dubinsky concluded that BLMIS's retroactive changes to the A&B customer

statements that were ultimately produced to the SEC in 1992 had two effects: (i) purportedly

increased the equity reflected on the A&B customer statements, and thereby reduced the

substantial shortfall between the amounts Avellino and Bienes represented to the SEC that they

owed to their clients and the purported equity recorded on the original A&B customer

statements; and (ii) reflected a more conservative investment portfolio.  Dubinsky Decl. Attach.

B (Dubinsky A&B Report) at ¶¶ 103, 112, 125-126, and 135.

21

94.     Dubinsky opined that "[i]n the real investment world, transactions cannot be inserted into accounts three years after the fact."  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 140; *see also* ¶¶ 113, 122, 127 134.

> ## 2.    Avellino Prepared Handwritten Ledgers Which Matched the Fraudulently Revised A&B Customer Statements and Produced Them to the SEC

95.     In 1992, Avellino prepared handwritten ledgers for A&B based on the redone customer statements and produced to them to SEC on behalf of A&B.  Griffin Decl. Ex. 32 (Trustee Dep. Ex. 39) at FRANKAVELLINO_000010; Griffin Decl. Ex. 33 (Trustee Dep. Ex. 40).

96.     Avellino admitted under oath that he prepared these handwritten accounting ledgers for A&B.  Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 168:14-171:22; Griffin Decl. Exs. 32 (Trustee Dep. Ex. 39) and 33 (Trustee Dep. Ex. 40).

97.     Avellino received copies of the fraudulently revised statements from the IA Business and later returned them to Madoff, along with the matching handwritten ledgers he prepared.  These statements and handwritten ledgers were among BLMIS's books and records in an envelope marked: "CONFIDENTIAL    FOR: BERNIE MADOFF    FROM: FRANK AVELLINO."  Dubinsky Decl. Attach. B (Dubinsky A&B Rept.) at ¶¶ 110-111 and Figures 26-28; Griffin Decl. Ex. 34 (MADTBB03348258, 8312-8325, 8346-8354).

98.     Dubinsky analyzed these handwritten ledgers prepared by Avellino and concluded they included all of the fraudulent adjustments and modifications BLMIS made retroactively to A&B's original customer statements.  Dubinsky Decl. Attach. B (Dubinsky A&B Rept.) at ¶¶ 149-159.

99.     For example, the handwritten A&B ledgers matched the customer statements that BLMIS had fraudulently revised so that the total balance of one of A&B's IA Business accounts

22

had increased by nearly *$240 million* from what had been on its original customer statements. Dubinsky Decl. Attach. B (Dubinsky A&B Rept.) at ¶ 154 and Fig. 57.

100.    In another example, the handwritten ledgers included entries as of December 31, 1989 for A&B account 1A0053 – but that account was the one for which BLMIS had retroactively created three years of statements in 1992 that had never existed before.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 155-156; and ¶¶ 114-127.

### 3.    To End the SEC Investigation, Madoff Had to Pay Out Nearly $460 Million to Avellino and Bienes, But Had to Borrow Hundreds of Millions of Dollars to Do So

101.    To end the SEC's investigation and lawsuit against them, the SEC ordered Avellino and Bienes to close their IA Business accounts and pay back their investors under SEC scrutiny.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 4700:8 – 4703:6; Dubinsky Decl. Attach. B (Dubinsky A&B Rept.) at ¶ 162.

102.    Because the IA Business was a fraud, BLMIS did not have any securities to liquidate in order to pay out the amounts owed to A&B's clients.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 4700:8 – 4701:6; *see generally* Dubinsky Decl. Attach. A (Dubinsky Global Rept.) at ¶¶ 83-324; *see also* ¶¶ 35, 113, 115, 127, 134, 140, 147.163-164.

103.    Collura reviewed BLMIS's available books and records and concluded that the IA Business did not have sufficient cash to payout the $457 million A&B owed to its investors. Collura Decl. Attach. B (Collura A&B Report) at ¶¶ 15-28, 33, 35-36, Figs. 1-7 and Ex. 3.

104.    From her analyses, Collura concluded that, for the majority of time from 1988 until October 1992, the average available balance of the IA Business bank accounts was *overdrawn* – meaning that the accounts had a *negative* balance, or were only slightly above zero. *Id.*

23

105.    Collura identified the primary sources of funds that BLMIS used to make the

payout to Avellino and Bienes as loans BLMIS obtained from financial institutions illegitimately

collateralized with securities belonging to other customers and not the IA Business, and a few

large cash deposits from certain IA customers.  Collura Decl. Attach. B (Collura A&B Report) at

¶¶ 34, 39, 42, 44-48, 51, Fig. 8, and Exs. 4.1, 4.2, 4.3, 4.4, and 4.5; Griffin Decl. Ex. 15

(DiPascali Tr.) at 4700:8-4701:1; 4705:18 – 4709:8.

> **D.    Madoff Compensated Avellino and Bienes for Referring their Investors
> Directly to BLMIS**

106.    After the SEC closed its investigation, Avellino and Bienes advised their clients

to open customer accounts directly with BLMIS, providing an influx of customers and funds to

the IA Business.  Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 244:12 – 245:12; Dubinsky

Decl. Attach. B (Dubinsky A&B Report) at ¶ 165 and Fig. 60; Collura Decl. Attach. B (Collura

A&B Report) at ¶ 62 and Fig. 13.

107.    The IA Business opened nearly 1100 new accounts for former A&B investors at

the end of 1992 into 1993.  Griffin Decl. Ex. 29 (Crupi Dep.) at 168:23 – 169:8; Griffin Decl.

Ex. 15 (DiPascali Tr.) at 4717:17 – 4723:6; Dubinsky Decl. Attach. B (Dubinsky A&B Report)

at ¶ 174 and Fig. 62.

108.    From November 1992 through 1993, Avellino, Bienes, and their former investors

collectively deposited more than $500 million with BLMIS, which constituted nearly 42.25% of

all customer deposits for the IA Business during that time.  Collura Decl. Attach. B (Collura

A&B Report) at ¶ 62 and Ex. 6.

109.    Avellino and Bienes also created a series of new entities to continue profiting

from the IA Business (the "Post-1993 Entities").  (Bienes Frontline Interview) at 10-05421-

24

BIENES_006329-631; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 168-169; Griffin

Decl. Ex. 21 (Avellino Dep. Vol. 1) at 83:5 -88:2 and 236:2 – 237:1.

110.    Avellino, Bienes, and their wives opened seven new IA Business accounts in the

names of their new entities (the "Post-1993 Entity Accounts"), which included the accounts for

the Summary Judgment Entity Defendants.  Griffin Decl. Ex. 24 (Bienes Frontline Interview) at

10-05421-BIENES_006329-631; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 168-

169; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 83:5 -88:2 and 236:2 – 237:1.

> **1.    Madoff Agreed to Provide Commissions and Guaranteed Rates of Return to Avellino and Bienes and Did So Through the Schtupping Process**

111.    In exchange for referring their former clients back to invest directly with BLMIS

in 1993, Madoff agreed to provide annual commissions to Avellino and Bienes that included a

fixed percentage of the total amount of former investor cash they successfully referred to BLMIS

in 1992, and a guaranteed rate of return in the accounts of their newly formed entities.  Dubinsky

Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 170-172; Griffin Decl. Ex. 15 (DiPascali Tr.) at

4885:25 – 4887:5, 5776:9-5776:23.

112.    The annual commissions and guaranteed rates of return Madoff promised to

Avellino and Bienes were not paid in cash.  Rather, Madoff delivered on his promises by

manufacturing additional fake trades in the Post 1993 Entity Accounts – a process DiPascali

contemporaneously dubbed as "schtupping" the accounts.   Dubinsky Decl. Attach. B (Dubinsky

A&B Report) at ¶¶ 171, 179 – 206; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4889:11 – 4890:21.

113.    BLMIS applied this "schtup" process starting as early as 1994.  Dubinsky Decl.

Attach. B (Dubinsky A&B Report) at ¶ 195.

114.    Avellino admitted that Madoff did not provide the promised remuneration through

checks or cash, but rather "through transactions that Madoff created in my personal accounts, our

25

personal accounts." Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 253:9-14; Griffin Decl. Ex.

22 (Avellino Dep. Vol. 2) at 270:1-271:20; 275:22-276:2; Griffin Decl. Ex. 23 (Defts.' Am.

Resp. to Req. for Admission) at ¶ 50.

115.    Avellino monitored the returns in the Post-1993 Entity Accounts, and would

advise DiPascali when the commissions or the rates of return fell "short" of the amount Madoff

promised.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 207-218; Griffin Decl. Ex.

35 (Trustee Dep. Ex. 51).

116.    For example, in a December 1998 letter to DiPascali, Avellino wrote:

> Yes, it's that time of year again.  Just a note to touch base about the accounts.
> Please make necessary trades in <u>all</u> of the accounts:  1. Grosvenor Partners, Ltd., 2
> May Fair Ventures and Mayfair Ventures Pension Plan.  I believe the total base of
> the three accounts will be enough to even up the balances due.  My calculations
> show that BLM was <u>short</u> (for 12/31/97) approx. <u>$2,500,000</u>.

Griffin Decl. Ex. 35 (Trustee Dep. Ex. 51) [emphasis in original].

117.    In analyzing the schtup transactions in the Post-1993 Entity Accounts, Dubinsky

determined that between 1994 and 2007, Madoff added fictitious trades totaling approximately

$60 million to these accounts using the schtupping process.  Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶ 219 and Fig. 88.

118.    Dubinsky opined that "commissions paid to investment advisor representatives

are paid in cash, not in trades made on their behalf."  Dubinsky Decl. Attach. B (Dubinsky A&B

Report) at ¶ 184.

119.    Like the other fraudulent transactions in all the IA Business accounts, none of

these transactions took place, and schtupping was, as Dubinsky concluded, "an integral part of

the fraud."  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 195.

E.      **Madoff Used the A&B "Pooled Account" Arrangement as his Model for Future Feeder Funds**

120.    After closing out the A&B accounts, Madoff needed a new source of continuous funds to sustain his Ponzi scheme. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 348-349, Figure 53; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 32, 173, n.195.

121.    Since Madoff had found success with the A&B feeder fund model, he transitioned to implementing this infrastructure on a much larger scale with other institutional feeder funds. Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 32, 173, n.195; Collura Decl. Attach. B. (Collura A&B Report) at ¶¶ 58, 63, Exs. 5 and 6.

122.    For example, in 1998 alone, the deposits by these feeder funds exceeded $1.6 billion and represented approximately 61% of all cash deposits into BLMIS. Collura Decl. Attach. B. (Collura A&B Report) at ¶ 63, Figures 11 and 14, Ex. 6.

123.    This trajectory continued to escalate throughout the 2000s, and in 2007, these feeder funds deposited over $5.5 billion in cash deposits to BLMIS, which amounted to nearly 77% of total cash deposits. Collura Decl. Attach. B. (Collura A&B Report) at ¶ 63, Figures 11 and 15, Ex. 6; *see also* Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 173, n.195.

**VI.    Madoff Was Operating a Ponzi Scheme**

A.      **BLMIS Did Not Engage in the Trades on Customers' Statements**

124.    Customers of the IA Business would deposit cash with BLMIS, and Madoff promised to invest those funds pursuant to certain investment strategies, but as the Trustee's certified fraud examiner concluded, from at least the 1970s, the IA Business did not engage in the securities transactions on customer statements. *See generally* Dubinsky Decl. Attach. A (Dubinsky Global Report) at Section VI.A.

27

### 1. Madoff Did Not Execute the Convertible Arbitrage Transactions

125. Between the 1970s and the 1990s, Madoff purported to trade for his IA Business customers pursuant to a convertible arbitrage investment strategy. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 88; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4542:21-4543:10.

126. The "strategy" involved convertible securities, which are fixed income (such as bonds) and/or preferred equity instruments (such as convertible preferred shares) that permit the purchaser to convert that security to shares of stock under pre-specified conditions and timeframes set forth by the issuer. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 83-84; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 20:18-21:1; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4543:11-4544:10.

127. Dubinsky analyzed BLMIS's books and records, third-party market data, and the purported convertible arbitrage transactions that appeared on IA Business customer statements between November 1978 and July 1992 and concluded that Madoff did not execute any of the trades for his IA Business customers pursuant to this strategy. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 90-146; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35-52, 57-62, 63-65.

128. Madoff instead promised specific rates of returns to his IA Business customers, and to meet those targeted, predetermined returns, he directed his employees to manufacture fake trades using historical market data. Griffin Decl. Ex. 27 (Bongiorno Dep.) at 53:25-54:3; Griffin Decl. Ex. 29 (Crupi Dep.) at 43:1-10; 45:5-11; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 90-93 and Figure 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35; 39.

129. These fake trades were always profitable, but the purported profits were not derived from contemporaneous market conditions, but rather from the specific rates of return

Madoff dictated for each convertible arbitrage IA Business account. Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 90-93; 96-97; 100; Dubinsky Decl. Attach. B (Dubinsky A&B

Report) at ¶¶ 35; 39-41; 52.

130.    BLMIS employees confirm the fictitious nature of these transactions and their

role in inputting these transactions on the IA Business customer statements. *See, e.g.*, Griffin

Decl. Ex. 16 (Kugel Plea Allocution) at 32:1-14; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 20:18-

21:11; Griffin Decl. Ex. 29 (Crupi Dep.) at 25:1-22.

131.    Kugel, BLMIS's head arbitrageur, in his plea allocution, admitted his role in

fabricating the convertible arbitrage transactions that appeared on the customer statements:

> I provided historical trade information to other BLMIS employees, which was
> used to create false, profitable trades in the Investment Advisory clients' accounts
> at BLMIS. Specifically, beginning the early '70s, until the collapse of BLMIS in
> December 2008, I helped create fake, backdated trades. I provided historical
> trade information – sorry – first to Annette Bongiorno, and later to Joanne Crupi,
> and others which enabled them to create fake trades that, when included on the
> account statements and trade confirmations of Investment Advisory clients, gave
> the appearance of profitable trading when in fact no trading had actually occurred.

Griffin Decl. Ex. 16 (Kugel Plea Allocution) at 32:1-12.

132.    Bongiorno and Crupi, the employees responsible for managing these accounts,

testified at their depositions that they did not execute any of the convertible arbitrage transactions

that appeared on the customer statements. Griffin Decl. Ex. 27 (Bongiorno Dep.) at. 20:18-

21:11; 25:8-12; 44:2-46:2; 66:1-5; Griffin Decl. Ex. 29 (Crupi Dep.) at 24:1-14; 25:15-22; 27:6-

9; 35:20-36:2; 57:9-23.

133.    Dubinsky detailed the step-by-step mechanical process the BLMIS employees

used to reverse engineer the fake convertible arbitrage trades. Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 89-146, Figures 1-23 and Exs. 1-10.

29

134. Bongiorno and Crupi gave detailed testimony about the internal procedures used for creating the convertible arbitrage transactions, confirming Dubinsky's analysis. Griffin Decl. Ex. 27 (Bongiorno Dep.) at 53:25-54:3; 81:6-10; Griffin Decl. Ex. 29 (Crupi Dep.) at. 43:1-45:11; 57:19-23; 60:3-6; 79:12-80:5; 82:2-83:5.

135. Dubinsky analyzed notebooks maintained by former BLMIS employees, Betty Mazzone and Jo Ann Crupi (the "Employee Notebooks"). These Employee Notebooks set forth the process the employees used to create the fictitious convertible arbitrage transactions that ultimately ended up on the customer statements. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 93; 96-97; 100-101; Dubinsky Decl. Attach B (Dubinsky A&B Report) at ¶¶ 39; 41-42; Griffin Decl. Ex. 36 (Dep. Ex. 59) and Ex. 37 (Dep. Ex. 108); Griffin Decl. Ex. 27 (Bongiorno Dep.) at 52:5-7 ("I think [Madoff] asked everybody to write down exactly what they do and the order they do it in.").

136. At the outset of every purported trade, Madoff provided the IA Business employees with parameters consisting of the specific rates of return that he had preordained for each of the convertible arbitrage accounts. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 90-93 and Figure 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35, 39; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 53:25-54:3, 81:6-10; Griffin Decl. Ex. 29 (Crupi Dep.) at 43:1-10; 44:24-45:11.

137. Bongiorno and Crupi testified that Madoff's predetermined profits were locked in at the beginning of each convertible arbitrage transaction. Griffin Decl. Ex. 27 (Bongiorno Dep.) at 80:22-25, 81:6-10; Griffin Decl. Ex. 29 (Crupi Dep.) at 45:5-11, 57:9-23.

30

138.    Specifically, Bongiorno testified that "[i]n the arbitrage days, as soon as the account was set up, it was set up with that return that he [Madoff] promised customers."  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 53:13-53:15.

139.    The IA Business employees would then give Kugel the specific customer's account, the rate of return Madoff had set for that account, a dollar value for the purported investment, and the duration of that trade.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 93-94; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 39; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 51:10-54:3; Griffin Decl. Ex. 29 (Crupi Dep.) at 42:15-43:10; Griffin Decl. Ex. 36 (Dep. Ex. 59); Griffin Decl. Ex. 37 (Dep. Ex. 108).

140.    Kugel selected historical market price data from Bloomberg and *The Wall Street Journal* to facilitate the IA Business employees' fabrication of convertible arbitrage transactions consistent with Madoff's stipulated parameters for each customer account.  Griffin Decl. Ex. 29 (Crupi Dep.) at 79:12-80:5; Griffin Decl. Ex. 38 (Dep. Ex. 109); Griffin Decl. Ex. 15 (DiPascali Tr.) at 4546:5-4548:20, 4681:3-15; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 94.

141.    Kugel then reverse engineered this historical trade information based on Madoff's preordained rates of return and provided this data to IA Business employees in the form of trading tickets.  Griffin Decl. Ex. 29 (Crupi Dep.) at 27:6-9; 57:9-23; 61:12-24; 65:12-66:10.

142.    The IA Business employees used this historical trade data from Kugel to perform the step-by-step calculations on adding machine tapes using the prescribed formulas to determine how many securities to purportedly "buy" and "sell" in accordance with Madoff's directives. *See* Griffin Decl. Ex. 27 (Bongiorno Dep.) at 54:18-23; 56:4-57:23; Griffin Decl. Ex. 29 (Crupi Dep.) at 27:6-23; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 96-97, 100; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 41-42; 45.

31

143.    To ensure that the same fake trades would not be added to the customer statements too frequently, the IA Business employees recorded the names, date ranges, and conversion factors for each of these securities on index cards.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 60:7-61:25; Griffin Decl. Ex. 29 (Crupi Dep.) at 82:2-83:25; Griffin Decl. Ex. 39 (Trustee Dep. Ex. 60); Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 95; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 39, 43, 46.

144.    Bongiorno testified that "we just kept a record of every arbitrage he gave us and we kept it in a box because Bernie didn't want the trades done over and over again.  He wanted a certain amount of time before doing it again."  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 61:3-8.

145.    Ultimately, the IA Business employees added the fictitious convertible arbitrage transactions to the customer statements and trade confirmations that they sent to the IA Business customers.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 34:21-35:1; 67:17-20; Griffin Decl. Ex. 29 (Crupi Dep.) at 27:6-23; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 94, 98-102; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 40-46.

146.    Bongiorno testified that the mechanical process to create the convertible arbitrage trades described in internal BLMIS books and records was in place from the 1970s.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 65:17-22.

(a)    <b>The Process Used to Create the Convertible Arbitrage<br>Transactions Resulted in Market Impossibilities and Trading<br>Anomalies</b>

147.    Since the IA Business created the convertible arbitrage trades manually, human error during this process resulted in mistakes.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶115; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 33, 63.

148.    As part of his global fraud investigation, Dubinsky compared the convertible arbitrage transactions in (i) all IA Business accounts for certain time periods between October

1979 and December 1992 (the "Monthly Time Period") and (ii) A&B accounts between

November 1978 through July 1992 ("A&B Time Period") to historical, independent market

trading records. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 89, 112-115;

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 38, 64.

149.    Dubinsky identified extensive trading anomalies in the convertible arbitrage

accounts from which he concluded that it was impossible for BLMIS to have engaged in those

transactions. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 114-146; Dubinsky

Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 38, 64-65.

**(b)    Impossible Market Volumes and Prices**

150.    Dubinsky found numerous instances where the volume of convertible arbitrage

trades reflected on the IA Business customer statements (both in the aggregate and on an

individual customer account basis over time) exceeded the *entire* publicly reported market

volume for those particular securities on the days they were supposedly traded. Dubinsky Decl.

Attach. A (Dubinsky Global Report) at ¶¶ 116-120, Figures 13 - 15, Table 2, and Exs. 3-5.

151.    Dubinsky therefore concluded that BLMIS could not have actually executed those

trades in the securities marketplace. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶

116-120, Figures 13 - 15, Table 2, and Exs. 3-5.

152.    For the Monthly Time Period, 94% of the purported transactions exceeded the

daily market volume by an average of over 200 times the entire reported daily volume for all

market trades of those securities. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 117,

Figure 13, and Ex. 3.

153.    Similarly, Dubinsky found that *over 90%* of the total purported transactions in the

A&B Time Period exceeded the daily market volume for those securities by an average of nearly

30 times the actual daily volume. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 118, Figure 14, and Ex. 5; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 64 and Ex. 3.

154.    Dubinsky further found that 41% of the purported transactions in the Monthly Time Period and 44% of the purported transactions in the A&B Time Period reflected trade dates on which the market did not report any trading in that particular security for that particular day. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 117-120, Figures 13-15, Table 2, and Exs. 3 and 5.

155.    Dubinsky also determined that there were several instances where the purported trading volume in convertible bond and preferred stock transactions reflected on the customer statements for convertible arbitrage accounts exceeded the total amount of issuance outstanding in the market or exceeded at least 85% as of each respective transaction date. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 120-123.

156.    Dubinsky identified numerous instances of purported trades that were recorded at impossible prices, as they were outside the range of market-reported trading prices on those given days. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 124-126 and Exs. 6-8.

157.    Specifically, Dubinsky determined that 76% of the securities with unique prices in the Monthly Time Period and the A&B Time Period were outside the actual reported daily market price range, thus confirming that the prices were fictitious. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 124-125, Table 2, and Exs. 7 and 8; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 64 and Ex. 4.

### (c)    Additional Anomalies on the Customer Statements

158.    Dubinsky determined that the IA Business failed to report dividend payments and/or accrued interest for the purported convertible arbitrage transactions reflected on customer statements, even though the actual convertible securities paid dividends or interest. Dubinsky

34

Decl. Attach. A (Dubinsky Global Report) at ¶¶ 129-132 and Figure 16; Attach. B (Dubinsky

A&B Report) at ¶ 64.

159.    Dubinsky concluded that the absence of these dividends further confirms that the

IA Business never executed the convertible arbitrage transactions.  Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 129 and 132.

160.    Dubinsky also identified numerous transactions on IA Business customer

statements that purportedly occurred on dates *after* those specific securities had already been

called for conversion by the issuing company, confirming the fictitious nature of these

transactions.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 127-128 and Table 2;

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 64.

161.    Additionally, Dubinsky did not identify any independent transfer records

evidencing that the IA Business ever converted the purported convertible securities into common

shares, despite the IA Business customer statements reflecting the conversion of these securities.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 133-142, Tables 2-4, and Figures 17

and 18.

162.    Absent the supporting documentation and/or communications with transfer

agencies regarding conversion, Dubinsky concluded that the IA Business could not have

converted the underlying shares into common stock for any of the thousands of purported

transactions in its convertible arbitrage accounts.  Dubinsky Decl. Attach. A (Dubinsky Global

Report) at ¶ 138.

163.    The IA Business consistently did not report the correct conversion factors and did

not "pay out" fractional shares on the required conversion date.  Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 138-142; Figures 17-18; and Table 4.

35

164.    Further, Dubinsky determined that the trade confirmations the IA Business fabricated in connection with its manufacturing of the purported convertible arbitrage transactions were prepared backwards, evidencing the fictitious nature of the convertible arbitrage transactions.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 143-146; and Figures 19-23.

**(d)    Madoff Did Not Execute the Convertible Arbitrage Transactions for the A&B Accounts**

165.    Dubinsky analyzed the purported convertible arbitrage transactions in the A&B accounts and concluded that they were no different from all other IA Business convertible arbitrage accounts, as they followed the same fraudulent patterns and exhibited similar market impossibilities.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35, 37-52, 57-62, 63-65; *see also* Griffin Decl. Ex. 27 (Bongiorno Dep.) at 123:12-124:14, 130:1-131:1; Griffin Decl. Ex. 29 (Crupi Dep.) at 55:10-15, 62:24-63:10; 64:17-19.

166.    As with all other convertible arbitrage accounts, the IA Business implemented a mechanical process driven by preordained rates of return to manufacture the convertible arbitrage transactions in the A&B accounts.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35, 37-52 and Figures 1-6; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 123:12-124:4, 130:1-131:1.

167.    Dubinsky found that the returns reflected on the customer statements for the A&B accounts were impossibly consistent year-after-year and always profitable.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 47-52.

168.    Specifically, Dubinsky examined all 1,428 convertible arbitrage transactions reflected in the A&B accounts over a 15-year period and found that 99% of the purported transactions were reported as if they generated total returns between 2.5 and 4.5 percent, and that

36

97% of all the purported transactions reflected monthly returns between 1.5% and 2%. Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 48 - 50 and Figures 7 and 8.

169.    Dubinsky opined that given the fluctuations and volatility in the actual securities market, the abnormally high degree of consistency in the returns for the A&B accounts for over nearly 15 years was virtually impossible. Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 48; 50-52.

### 2.    The Buy and Hold Transactions Were Fictitious

170.    From at least the 1970s, the accounts of certain of Madoff's employees, family members, and long-time customers, did not follow either the purported convertible arbitrage strategy or the split-strike conversion strategy. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 25, 182; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 69:4-12.

171.    For those customers, Madoff purportedly purchased securities (typically equities), held these securities for certain periods of time, and then purportedly sold them for a profit (the "Buy and Hold Accounts"). Griffin Decl. Ex. 27 (Bongiorno Dep.) at 69:4-12; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 25, 182; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 53.

172.    These Buy and Hold Accounts were sometimes referred to internally at BLMIS as the "long position" accounts. Griffin Decl. Ex. 27 (Bongiorno Dep.) at 23:21-24:8; Griffin Decl. Ex. 29 (Crupi Dep.) at 15:18-19.

173.    Dubinsky analyzed the transactions in these Buy and Hold Accounts between 1978 and 2008 and concluded that they were not executed in the securities market, but were based on historical market data and reverse engineered to meet targeted rates of return. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 25; 182-193; Dubinsky Decl. Attach. B (A&B Report) at ¶¶ 53-55.

174.    BLMIS employees also gave testimony about the fictitious nature of these

transactions.  For example, DiPascali testified at the Criminal Trial that none of the trades in the

Buy and Hold Accounts was real:

> Q.     And what is a long position account?
> A.     Typically an array of securities of various portfolios, sometimes
> hedged, sometimes not, but it could be a portfolio of one stock, it could be
> a portfolio of stocks, depending on the account.
> Q.     And who was it that was in charge of putting in the trades for Ms.
> Bongiorno's accounts?
> A.     She was.
> Q.     Were any of those trades real?
> A.     No.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4916:18-4917:2.

175.    Kugel also admitted to his role in creating fictitious trades beginning in the 1970s.

Griffin Decl. Ex. 16 (Kugel Plea Allocution) at 32:1-14.

176.    Bongiorno and Crupi, who were responsible for managing the Buy and Hold

Accounts, testified that they never executed those trades.  Griffin Decl. Ex. 27 (Bongiorno Dep.)

at 72:2-9; 76:22-77:1; Griffin Decl. Ex. 29 (Crupi Dep.) at 24:1-8, 71:4-9.

177.    Instead, all the securities transactions that appeared on the customer statements

for the Buy and Hold accounts were based on trading information from Madoff and Kugel.

Griffin Decl. Ex. 29 (Crupi Dep.) at 24:8-14; 25:15-22; 35:20-36:2; Griffin Decl. Ex. 27

(Bongiorno Dep.) at 73:23-74:10.

178.    Bongiorno and Crupi testified about the process that they and other BLMIS

employees followed to input those transactions on the customer statements for the Buy and Hold

Accounts.  Griffin Decl. Ex. 29 (Crupi Dep.) at 24:8 - 25:22; 35:20-36:2; Griffin Decl. Ex. 27

(Bongiorno Dep.) at 73:23-74:10.

38

179.    For each new Buy and Hold Account, Madoff set a targeted rate of return and

promised that return to his customers.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 77:16-20;

Griffin Decl. Ex. 29 (Crupi Dep.) at 71:11-14; 72:7-17; Dubinsky Decl. Attach. B (Dubinsky

A&B Report) at ¶¶ 53-54; 56.

180.    Madoff and Kugel provided historical trade information from Bloomberg that

Bongiorno and Crupi ultimately input on the customer statements.  Bongiorno testified that:

> The trading information came mostly from Bernie [Madoff] or David [Kugel].
> They would have us look up bridges – Bloomberg sheets and bridge sheets. They
> would give me the stock and tell me the range and have me look up a Bloomberg
> sheet to get the exact dates and amounts on them and tell me how much was done
> during the particular day and how much I could do during that particular day, and
> then I would break it down based on the money that came in.

Griffin Decl. Ex. 27 (Bongiorno Dep.) at 72:20-73:5.

### (a)    BLMIS Employees Manipulated the Transactions in the Buy and Hold Accounts to Meet Targeted Rates of Returns

181.    Madoff targeted rates of return for customers with Buy and Hold Accounts but

rewarded his longest customers with the highest returns.  Griffin Decl. Ex. 27 (Bongiorno Dep.)

at 78:18-24.

182.    Bongiorno testified that: "I think like some of the old-timers, like, for example,

the Avellino group and the Steinbergs and Picowers and the Chase's [sic], they got all got more,

a higher return than most of the other customers. And I think that's because they were with him

the longest." Griffin Decl. Ex. 27 (Bongiorno Dep.) at 78:18-24.

183.    To ensure that the performance of these Buy and Hold Accounts matched

Madoff's promised returns, the employees would monitor and track the accounts' purported

performance on a monthly basis through the use of internal reports called the Portfolio

Management Reports.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 79:23-80:12; Griffin Decl. Ex.

29 (Crupi Dep.) at 70:5-72:24; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 55.

184.    If the purported performance of a specific account did not reflect the specific rate of return Madoff had stipulated, the IA Business employees would retroactively add other fictitious trades to the account to meet the desired returns through a process the employees termed "getting accounts in line."  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 81:17-82:7, 87:3-88:1; Griffin Decl. Ex. 29 (Crupi Dep.) at 138:20-23; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4735:5-25; 5943:22-5944:1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 55-56.

185.    Bongiorno explained the mechanics of the "getting accounts in line":

 [W]ell, the process would just be – this is what I was told – to see what his return was on the stock that he [Madoff] was doing.  And so let's say he [Madoff] owed somebody some extra gains to bring the account in line, he would tell me put through the trades on this and this in order to bring that up, if it was under where it should be.

Griffin Decl. Ex. 27 (Bongiorno Dep.) at 83:1-9.

186.    Dubinsky opined that adjustments to securities transactions "cannot be performed retroactively in the real world; real trades must be executed and settled through actual market mechanisms and at the time of actual performance."  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 113 and ¶140.

187.    The IA Business engaged in similar trade manipulation efforts to get the A&B accounts "in line" and increase their value in response to the 1992 SEC investigation of Avellino and Bienes.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 137:7-140:9; Griffin Decl. Ex. 29 (Crupi Dep.) at 138:6-141:11; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4629:1-4630:7; 4658:3-4661:1.

### (b)    Dubinsky Identified Numerous Market Impossibilities and Trading Anomalies in the Buy and Hold Accounts

188.    Dubinsky identified trading anomalies and market impossibilities in the Buy and Hold Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 25; 183-193.

189.    Specifically, from October 1979 to November 2008, the transactions in the Buy

and Hold Accounts exceeded the entire daily market volume, contained prices that were outside

the daily price range, settled on holidays or weekends when the markets were closed, and

contained backdated transactions.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 25;

183-193; 300; Exs. 17-20, 30.

**(c)    The Buy and Hold Transactions in the A&B Accounts Were Fictitious**

190.    Dubinsky also concluded that the purported Buy and Hold transactions in the

A&B accounts were no different from all other IA Business Buy and Hold Accounts, as they

followed the same fraudulent patterns and exhibited similar market impossibilities.  Dubinsky

Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 35; 53-62; 66-73; Griffin Decl. Ex. 27 (Bongiorno

Dep.) at 123:12-124:14; 129:9-17; 131:2-10.

191.    Madoff targeted specific rates of return for the A&B accounts and promised those

returns to Avellino and Bienes.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 78:12-24; 131:25-

132:5; 139:14-140:9; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 54.

192.    BLMIS employees tracked and monitored the rates of return for these accounts by

using Portfolio Management Reports, which they provided to Avellino and Bienes in addition to

the monthly customer statements.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 34:21-35:1; 88:3-

91:6; Griffin Decl. Ex. 40 (Trustee Dep. Ex. 62); Attach. B (Dubinsky A&B Report) at ¶¶ 55, 56.

193.    Dubinsky also concluded that because the Buy and Hold transactions in the A&B

accounts were never executed in the securities markets they also exhibited similar trading

anomalies and market impossibilities as the fictitious transactions across all Buy and Hold

Accounts.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 66-67.

41

194.    Dubinsky identified purported purchases and sales of securities at prices that were
beyond the daily market highs or lows, aggregate IA Business transaction volumes exceeding
daily market volumes, and backdated transactions.  Dubinsky Decl. Attach. B (Dubinsky A&B
Report) at ¶¶ 57-62, 66-73; Exs. 2; 5-6.

### 3.    The Split-Strike Conversion Transactions on Customer Statements Were Fictitious

195.    By 1992, after the SEC investigation and the influx of nearly 1100 new IA
Business customer accounts for former A&B clients, the IA Business changed its primary
purported investment strategy to the split-strike conversion strategy.  Dubinsky Decl. Attach. A
(Dubinsky Global Report) at Section VI.A.(1)(b), specifically ¶ 155; Dubinsky Decl. Attach. B
(Dubinsky A&B Report) at ¶¶ 30-33; 173-175.

196.    The split-strike conversion strategy was borne out of the IA Business' need for a
more scalable and efficient trading strategy in the face of the increased number of customer
accounts, including the Post-1993 Entity Accounts.  Dubinsky Decl. Attach. B (Dubinsky A&B
Report) at ¶¶ 30-33; 173-175 and Figure 62; Griffin Decl. Ex. 29 (Crupi Dep.) at 37:15; 169:2-
170:3; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4712:21-4713:14; 4727:6-11.

197.    Dubinsky's analysis showed that the split-strike conversion strategy, as
purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the
Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against
price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills ("T-
Bills") when the money was "out of the market."  Dubinsky Decl. Attach. A (Dubinsky Global
Report) at Section VI.A.(1)(b).

198.    The strategy was purportedly set up by BLMIS so that the purchase of put options

and the sale of call options would create a collar around the stock to reduce the volatility of

BLMIS's portfolio.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 156–58.

199.    Dubinsky concluded that BLMIS did not conduct this strategy on behalf of its

customers.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at Section VI.A.(1)(b).

200.    Dubinsky based his conclusion on (a) the impossible reported volume of equity

and options trades; (b) the impossible equity and options trades reported outside the daily price

range; (c) the low volatility in its reported daily trading performance compared to the actual

market behavior and the performance achieved by BLMIS in the Proprietary Trading Business

unit as measured by the volume weighted average prices for its sales and purchases; (d) the

consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack

of any DTC records to confirm the reported IA Business equity or treasury trades; and (f) a lack

of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options

trades.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at Section VI.A.(1)(c)(i)-(vi),

A.(1)(e)(i)-(iv).

(a)    **Impossible Equity and Options Volumes**

201.    Dubinsky analyzed equity and options trades that the IA Business reportedly

made pursuant to the split-strike conversion strategy between January 2000 and November 2008

("Analyzed Time Period").  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 159.

202.    Dubinsky compared the daily volumes for certain stocks reported as purchased or

sold by the IA Business on the aggregated customer statements with the actual market volumes

sold as reported by Bloomberg.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 159–

60.

203.    Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded for the entire market.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 159–60.

204.    For example, on July 14, 2000, the aggregated IA Business customer statements reported purchases of 2,822,680 shares of AIG but the total market volume that traded that day for all of AIG shares in the market was only 1,692,800.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 159, and Ex. 11 thereto.

205.    Similarly, the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total market volume that traded that day for GE shares in the market was only 7,604,800.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 159, Ex. 11 thereto.

206.    Additionally, Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of options traded for the entire market.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶160.

207.    Specifically, 71.1% of the unique purported options contracts traded above the daily market volume, and 62% of that universe had purported volumes that were 10 times above the daily market volume.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ Ex. 12.

208.    Dubinsky concluded that BLMIS's purported trading in excess of market volumes demonstrated that the IA Business did not execute these transactions for its customers.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at Section VI.A.(1)(c), ¶¶ 159–60 and Exs. 11–12 thereto.

44

**(b)**      **Equity and Options Trades Priced Outside Daily Price Range**

209.    For the Analyzed Time Period (2000-2008), Dubinsky determined that there were

99,972 purported equity transactions executed outside the daily market traded price range.  The

purported prices for these transactions exceeded the daily high price by as much as $8.96 and

were below the daily low by as much as $105.04.  Dubinsky Decl. Attach. A (Dubinsky Global

Report) at ¶ 161 and Ex. 13 thereto.

210.    Dubinsky concluded that there was no evidence in the BLMIS books and records

that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing

that the trades were actually executed.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at

¶¶ 161–63.

211.    Dubinsky opined that equity trades that were reported as having been executed

outside the daily price range of the entire U.S. equities market could not have occurred.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 161–62, and Ex. 13 thereto.

212.    Dubinsky performed the same analysis on options trades for the same time period

and identified 34,501 options transactions traded outside of the daily price range.  He found that

the options traded above the daily high price by as much as $15.25 higher and by as much as

$6.05 below the daily low price.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 164–

66, and Ex. 14 thereto.

213.    Dubinsky opined that, as with the equity trades, the purported options trades that

were executed outside the daily price range could not have occurred.  Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 164–67, Ex. 14.

**(c)**      **Volume Weighted Average Price Analysis**

214.    The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Dubinsky

45

conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases and sales reported by the IA Business and the Proprietary Trading Business. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 168–72.

215.    VWAP is a trading benchmark that gives the average price a security has traded throughout the day, based on both volume and price. VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 168–69.

216.    Based on his analysis, Dubinsky determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume below the VWAP, and 72% of the daily sell transactions by share volume above the VWAP. In other words, BLMIS had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 170.

217.    Dubinsky further compared the IA Business's purchases and sales of the same stocks actually traded by the Proprietary Trading Business on the same days. The Proprietary Trading Business matched average VWAP of traders. The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 171–72.

218.    Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 170–72.

### (d)    Consistently Positive Annual Rates of Return

219.    To further test whether the IA Business engaged in trading, Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by

46

Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 177–78.

220.    Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index. In other words, if the market goes down, the returns should have gone down and vice versa. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶177.

221.    Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices. The IA Business rates of return stayed within a small range, generally between 10-12% for most years and going up to 20% for the year of 1999. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 178, 180.

222.    Dubinsky found that the returns for the major market indices ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely from a high of 31% to a low of -37%, and the Dow Jones from a high of 25% to a low of -34%). Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 179.

223.    While the returns available in the major indices went up and down, representing the volatility in the market, the IA Business returns stayed steady for the twelve-year period examined, never having a negative year or month (even throughout 2008). Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 180–81.

224.    Dubinsky concluded that the lack of volatility in the IA Business demonstrated that the IA Business was not engaged in trading.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 181.

**(e)    Securities Listed on the IA Business Customer Statements Did Not Reconcile with DTC Records**

225.    Dubinsky compared the trades purportedly executed for the customer accounts in the IA Business with the records maintained by the DTC.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at Section VI.A.(1)(e).

226.    When equity trades are recorded at the DTC, it creates the official record of where that stock is held.  The ownership of the stock can be confirmed with the DTC.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 194–95.

227.    BLMIS had a single account with the DTC, the "646 account."  All equity trades made by BLMIS would have been reflected in the DTC records pertaining to its account. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 209.

228.    Dubinsky's analysis confirmed that the securities that were cleared through BLMIS's DTC account, the 646 account, were traded by the Proprietary Trading Business. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 209.

229.    No IA Business trades were cleared through BLMIS's DTC account.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 209–13.

230.    The Proprietary Trading Business shares reflected in the DTC records matched the BLMIS records evidencing those trades.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 209, 211, 213.

231.    Dubinsky concluded that the Proprietary Trading Business actually executed those trades in the marketplace, as confirmed by the DTC records.  For the IA Business,

48

however, Dubinsky could not account for the stock purportedly traded for the customers in the IA Business in any DTC records. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 209.

232. Based on his analysis, Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 212.

233. Because there were no records from the DTC showing that BLMIS owned the securities listed on the IA Business customer statements, BLMIS created fake DTC records for the IA Business. Dubinsky uncovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 199–208.

234. BLMIS installed software on the IA Business computer system that recreated fake DTC reports that were meant to look like official reports. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 206–07.

235. Dubinsky explained that there would be no reason, if one were doing legitimate trading and had owned the stocks, to go into a computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because there would instead be a real DTC report. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 208. Dubinsky made this determination by examining the metadata of the fake DTC screens, the code embedded in the document to record characteristics of the document, including when it was created. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 199–205.

236. Based on Dubinsky's analysis of the DTC records, Dubinsky concluded that BLMIS was not trading equities for its IA Business customers. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 208.

## (f)  Reported Options Trades Could Not be Reconciled to OCC Records

237.    The options purportedly executed for the customer accounts in the IA Business

could not be reconciled with the records of the OCC, an organization that clears and settles

options transactions in the U.S. market.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at

¶¶ 196–98.

238.    Dubinsky explained that BLMIS had a single account with the OCC, and the IA

Business purportedly traded S&P Index options ("OEX"), which are "proprietary options" traded

exclusively on the Chicago Board of Option Exchange ("CBOE").  These proprietary options can

only be traded on the CBOE, but there would be a record of them both from the CBOE and the

OCC.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 166, 219.

239.    Dubinsky reviewed the OCC records for the BLMIS account from October 31,

2002 through October 31, 2008.  Based on his review of those records, Dubinsky was able to

reconcile and confirm the options that were traded by the Proprietary Trading Business but could

not account for the options purportedly traded for the customers in the IA Business.  *Id.* at ¶¶

220–22.

240.    Dubinsky found that the options purportedly traded on behalf of the IA Business

customers, as recorded in the IA Business trading records, were not shown on OCC records and

were not cleared through the OCC.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶

222.

241.    For example, on October 31, 2005, records for the Proprietary Trading Business

and the OCC indicate that 20 options described as "S&P 100 INDEX NOVEMBER 590 CALL"

were purchased and held by BLMIS.  The aggregate number of "S&P 100 INDEX NOVEMBER

590 CALL" options reported on IA Business customer statements for the same date totaled

658,342.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 223.

242.    Based on his analyses, Dubinsky concluded that BLMIS did not conduct any

options trading on behalf of its IA Business customers.  Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶ 222.

> **(g)     The IA Business Did Not Purchase Treasuries for IA Business
> Customer Accounts**

243.    In addition to purportedly purchasing stocks and options collars, BLMIS claimed

it would intermittently invest IA Business customer funds in treasuries as part of the split-strike

conversion strategy.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 44.

244.    Dubinsky performed two separate analyses to determine whether BLMIS

purchased Treasuries on behalf of IA Business customers: he (i) compared the T-Bills purchased

with customer funds from the JPMC '703 Account and/or through various brokerage accounts

(collectively, the "Brokerage Accounts") to the positions reflected on the IA Business customer

statements; and (ii) compared the Treasury positions in the Proprietary Trading Business to the

positions reflected on the IA Business customer statements.  Dubinsky Decl. Attach. A

(Dubinsky Global Report) at ¶¶ 224, 228.

245.    Each of these analyses conclusively found that Madoff did not purchase treasuries

on behalf of his IA Business customers.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at

¶¶ 224, 228.

> **(h)     The Brokerage Accounts Did Not Hold T-Bills for the IA
> Business Customers**

246.    Dubinsky reviewed BLMIS's books and records to identify the trade date,

volume, price, security description, and maturity date for each of the T-Bills held in the

Brokerage Accounts and compared that information to the T-Bills reflected on the IA Business customer statements.  *Id.* at ¶ 228, n.213.

247.    Dubinsky's analysis confirmed that the T-Bills held in the Brokerage Accounts did not "match" the (i) trade date, (ii) volume, (iii) price, (iv) security description, and (v) maturity date for every purported treasury position on the IA Business customer statements. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 232-40; n. 217.

248.    More specifically, Dubinsky found that approximately 71% of the T-Bills on the IA Business customer statements did not have the same maturity date as any of the T-Bills held in the Brokerage Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 233, and Ex. 23 thereto.

249.    Of the remaining 29% of the T-Bills on the customer statements - 4,660 unique transactions - that did have the same maturity dates as those held on the Brokerage Accounts, there were only 20 unique instances in which the IA Business customer accounts purportedly purchased and sold a treasury on the same dates as the Brokerage Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 234-36.  In each of the 20 instances, the purported volume of the T-Bills purchased and sold in the aggregate by the IA Business was higher than the actual volume purchased and sold in the aggregate by the Brokerage Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 239-40.

250.    Dubinsky concluded that none of the T-Bills identified on customer statements was the same T-Bills held in the Brokerage Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 240.

251.    Dubinsky opined that the IA Business' limited purchases of T-Bills with funds from the Brokerage Accounts were not for any IA Business customer account, but rather were

for the purpose of investing the IA Business' excess cash—*i.e.,* cash management.   Dubinsky

Decl. Attach. A (Dubinsky Global Report) at ¶ 228.

251.    Collura similarly reached the same conclusion: that the T-Bills purchased through

the IA Business bank accounts were not for the IA Business customers but were instead used for

cash management purposes.  Collura Decl. Attach A (Collura Report) at ¶ 62.

253.    Specifically, Collura found no reference to specific BLMIS customers in the

transaction descriptions for short-term investments in the 703 Account or any investment activity

in the Brokerage Accounts.  Collura Decl. Attach A (Collura Report) at ¶ 62.

**(i)      No T-Bills Were Purchased by the Proprietary Trading
Business For the IA Business Customers**

254.    For the period of 2002 through 2007, Dubinsky reviewed the BLMIS books and

records to identify the unique T-Bills held by the Proprietary Trading Business on December 31

of each of those years.  He then compared those holdings to (i) those T-Bill positions held at

BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries,

and (ii) the T-Bills purportedly held by the IA Business for its customers.  Dubinsky Decl.

Attach. A (Dubinsky Global Report) at ¶¶ 225–27.

255.    Dubinsky prepared a summary chart of his review of these voluminous records,

which accurately represents his comparison of the treasuries in the Proprietary Trading Business

and the positions purportedly purchased by the IA Business for its customers:

**Table 5**
**Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA
Business**

| Year-End | Proprietary Trading Business | IA Business | | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | | 0.27% |

53

| 2003 | $70,000,000 | $33,643,020,000 | | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | | 0.14% |

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 227, Table 5.

256.    The amount of T-Bills held by the Proprietary Trading Business was negligible compared to those purportedly held on behalf of customers of the IA Business.  For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in treasury positions purportedly held by the IA Business.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 227 and Table 5.

257.    Dubinsky concluded it was not possible that the T-Bills purportedly held by IA Business customers actually existed.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 226-227 and Table 5.

> **(j)    The Aggregate Volume of Purported IA Business Treasuries Far Exceeded the Volume of Treasuries in the Brokerage Accounts and the Proprietary Trading Business**

258.    Dubinsky additionally determined that even if one were to add up all the treasuries in the Brokerage Accounts and the Proprietary Trading Business, they would be short of what was reported on the IA Business customer statements.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 230–31, Figure 36 and Ex. 22 thereto.

259.    As shown below in Figure 36 from the Dubinsky Global Report, the total volume

of T-Bills purportedly held in the IA Business at year-end from 1998-2007 dwarfed the volume

held in the Brokerage Accounts and the Proprietary Trading Business:

**FIGURE 36**



Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 227-231; Table 5; and Ex. 22 thereto.

**(k)    DiPascali Confirmed that the Purported Treasury
Transactions on the Customer Statements Were Fictitious**

260.    DiPascali gave testimony at the Criminal Trial in which he confirmed Dubinsky's

and Collura's conclusions that the T-Bills purchased with the IA Business money were for

BLMIS's cash management and were not purchased for any customer account.  Griffin Decl. Ex.

15 (DiPascali Tr.) at 4931:12–23; 4921:7–12; 4930:6–4931:5; and 5345:1–5346:3.

261.    DiPascali further testified that the T-Bill purchases in the Brokerage Accounts

were made at the direction of Madoff to earn interest on the cash held in the 703 Account.

Griffin Decl. Ex 15 (DiPascali Tr.) at 4961:15–4962:22.

55

262.    DiPascali differentiated between the process he followed for treasuries fabricated

from historical market data for customers of the IA Business and T-Bills actually purchased for

cash management purposes.   Griffin Decl. Ex. 15 (DiPascali Tr.) at 4931:24-4934:13.

263.    For those transactions that were fabricated using historical market data, DiPascali

testified as follows:

> Q.      As part of this strategy, the IA business would do what was
> referred to as going into the market and purport to buy securities, is that
> right?
> A.      Correct.
> Q.      Were you really buying securities?
> A.      No.
> Q.      Was this all just on paper?
> A.      Yes.
> Q.      Then, when you got out of the market, the IA business would
> purport to buy treasury securities, right?
> A.      That's correct.
> Q.      Did you really buy treasury securities?
> A.      No.
> Q.      Were those all fake?
> A.      Yes.
> Q.      When that activity happened, would there be communications sent
> to customers?
> A.      Every time.
> Q.      Are you familiar with the term "trade confirmation"?
> A.      Sure.
> Q.      Would trade confirmations be sent to customers?
> A.      Yes.
> Q.      Would that reflect the fake trades that you just described?
> A.      Exactly that.
> Q.      Would account statements that we have looked at be sent to
> customers?
> A.      Yes.
> Q.      Would those account statements reflect the fake trading that you
> testified about?
> A.      Yes.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4803:23-4805:2.

264.    DiPascali specifically explained that he used historical prices to manufacture the

treasury bill transactions on the IA Business customer statements.  Griffin Decl. Ex. 15

(DiPascali Tr.) at 4931:24–4934:13.

265.    DiPascali explained the nuts and bolts of his process that resulted in T-Bill

transactions showing up on the IA Business customer statements, and further confirmed that they

were all fake:

> Q.    Now can we go to the second page of this document. What is this
> that we are looking at?
> A.    It's a spreadsheet that I created that was going to be the nuts and
> bolts of this exercise. It was going to do a lot of the calculation for me and
> allow the process to progress swiftly instead of from month to month to
> month and client to client to client calculate all sorts of stuff, and then
> have to then create another side to that. This spreadsheet, which is an
> Excel-based spreadsheet, is identifying certain treasury bills across the top
> column. The top row is the CUSIP of treasury bills and options. The
> second row are the symbols of options and then a string of treasury bills.
> Going on the far left column are a string of account numbers. Those are
> the accounts that Bernie told us he wanted to use to be the counterparties
> of the customer option positions. What this is doing is it's allowing me to
> randomly assign, once I know the total of my customer option positions, a
> quantity to each of those counterparties. Then, once I've randomly defined
> what each counterparty's position is, this is calculating what its margin or
> collateral requirement would be. Once I established that, this spreadsheet
> allows me to randomly pick a group of treasuries that were going to
> represent that collateral, and then the whole total number would circle
> back to what I needed. It's fairly complicated, but it did all the grind work
> necessary to accomplish what Bernie wanted.
> Q.    Were any of the treasury bills that are reflected on this real?
> A.    No.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 5344:24–5346:3.

266.    DiPascali also confirmed that the Proprietary Trading Business did not have an

inventory of treasuries "that was equivalent to the amount that was on the statements" for IA

Business customers.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 6950:25–6951:9; *see also* at 4931:6–

11.

    **(l)**   **The Split Strike Conversion Transactions in the Post-1993
Entity Accounts Were Fictitious**

  267.  Dubinsky determined that the customer statements for the Post-1993 Entity

Accounts reflected transactions purportedly pursuant to the split-strike conversion strategy.

Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 178.

  268.  Dubinsky opined that these purported split-strike conversion strategy transactions

in the Post-1993 Entity Accounts were similarly fraudulent.  They followed the same fraudulent

patterns and exhibited similar market impossibilities as all other split-strike conversion accounts

held by IA Business customers.  *Id.* at ¶ 178.

  269.  Dubinsky identified numerous trading anomalies and market impossibilities in the

Post-1993 Entity Accounts, including: (i) option volumes exceeding daily market volumes; (ii)

equity and option prices exceeding daily market prices; (iii) weekend trades; and (iv) backdated

trades.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶ 178 and Exs. 7-11 thereto.

  270.  Dubinsky also found that the Post-1993 Entity Accounts received remarkably

consistent, positive annual rates of return.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at

¶¶ 220-225; and Figures 89 - 92.

  271.  Contrary to the significant volatility of returns recorded in the major market

indices and despite the split-strike conversion's supposed correlation with these indices,

Dubinsky's analysis showed that the annual rates of return for the Post-1993 Entity Accounts

were *always positive*.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 221-222 and

Figure 89.

4.     **Additional Proof that BLMIS Never Engaged in the Securities Transactions on Customer Statements**

(a)     **The IA Business' Computer Programs Were An Integral Part of How the Ponzi Scheme Was Perpetuated**

272.     Dubinsky analyzed and compared the computer systems and underlying programming codes for the IA Business and the Proprietary Trading Business.  He concluded that for all time periods, the IA Business computer environment only supported the operation of a fraud, and not a legitimate business.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 81-82; 103-111; 199-208; 271-289; 292-296; and Table 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 33-34.

273.     Dubinsky compared the programs and systems found in the IA Business to those in the Proprietary Trading Business.  He determined that the capabilities of the computer systems of the Proprietary Trading Business were vastly different than those of the IA Business. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 79-82; 271-275, Figure 45 and Table 1.

274.     Dubinsky concluded that the Proprietary Trading Business systems contained components typically found in a broker-dealer environment where actual trades were being executed.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 79-82; 271-272; 274, Figure 45 and Table 1.

275.     In contrast, Dubinsky found that none of the systems necessary for the execution of securities trades were found in the IA Business computer environment.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 271-275; Figure 45; and Table 1.

276.     Dubinsky determined that the IA Business computer system was not connected to any of the standard platforms used in a legitimate trading environment, such as NASDAQ or

DTC.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 81, n.92; 271-275; Dubinsky A&B Report ¶ 34.

277.    Dubinsky also did not find any evidence that the IA Business computer systems communicated with any of the standard trading platforms or any of the connections available to the Proprietary Trading Business systems.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 275.

278.    Dubinsky determined that the computer systems and programs were a core part of how the IA Business perpetuated the Ponzi scheme.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 79-82; 103-111; 199-208; 271-289; 292-296; and Table 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 33-34.

279.    Dubinsky's analysis revealed that the IA Business had custom-made programs developed to backdate and backfill trade data that no legitimate business engaged in trading activities with the securities market would ever use.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 82, 103-111, 199-208, 271-275, 278-289; 292-296.

280.    The IA Business relied on the computer systems - run from an IBM AS/400 (and its predecessors) with code and software originating from programs written in the 1970s and 1980s - to create the fake securities transactions, generate the documentation that supported the Ponzi scheme, and keep track of the customer cash in and cash out.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 81-82; 101-111; 199-208; 276-289; 292-296; Figures 30-34; 48-50; and Table 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 33-34; Griffin Decl. Ex. 29 (Crupi Dep.) at 88:16-89:17, 101:4-16.

281.    For each of the purported trading strategies (convertible arbitrage, split strike conversion, and buy and hold), the IA Business developed custom-made computer programs to

facilitate the Ponzi scheme by automating the process of creating fictitious trades from historic

trade data.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 81-82; 103-111; 256; 260-

261; 264; 267; 278-289; and Table 1; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶

33-34; 175; 190-192; and 213.

282.    For example, for the convertible arbitrage accounts, the IA Business hardcoded

the formulaic process into the AS/400, and predecessor computer systems, based on a

preordained set of protocols to ultimately create the fabricated transactions and a full suite of

supporting documents.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 103-111; and

Figures 8-12; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 45:7-11, 57:15-19, 77:2-6; Griffin Decl.

Ex. 29 (Crupi Dep.) at 77:24-78:12; 78:20-79:4.

283.    Similar to the convertible arbitrage process, Bongiorno testified that the IA

Business ultimately automated the steps that the employees previously used with the manual

system to fabricate the transactions reflected on the customer statements for the Buy and Hold

Accounts.  Griffin Decl. Ex. 27 (Bongiorno Dep.) at 76:17-77:6.

284.    As the Ponzi scheme progressed, with the influx of nearly 1100 new customers

starting in 1992, Madoff adjusted his infrastructure and relied heavily on his computer systems to

implement the fraudulent split-strike conversion transactions.  Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶¶ 33-34; 175; Dubinsky Decl. Attach. A (Dubinsky Global Report)

at ¶¶ 278-279; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4712:21-4717:17-20; 4727:6-11; 4817:21-

4819:1; 5865:1-11; and Griffin Decl. Ex. 29 (Crupi Dep.) at 37:15; 169:2-170:3.

285.    Dubinsky determined that a key component of creating the fraudulent split strike

conversion trades was a custom-made program referred to as a "Random Order Generator."

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 278-289.

61

286.     This program allowed the IA Business employees to use historical market data to determine the prices and volumes of the securities transactions that ultimately appeared on the customer statements.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 278-289.

287.     Dubinsky opined that a legitimate business would have no need for a random order generation program because all the orders would have a record generated from an external party at the time the trade was properly executed.  *Id*. at ¶ 289.

288.     Dubinsky further analyzed an internal software called "STMTPro" that was part of the IA Business computer programs.  Through this program, the IA Business retroactively changed security transactions on customer statements that were already issued – including the purported purchase or sale of additional backdated securities, or the purported payment of a dividend – and then printed those revised customer statements.  *Id*. at ¶¶ 292-296.

289.     In Dubinsky's opinion, the IA Business could only redo these statements and retroactively add new transactions because the original securities transactions were fictitious and never executed in the first place.  Id. at ¶¶ 19, 292-296, 331-335.

> **(b)**     **The IA Business Used a Fake Single Counterparty for All Purported Securities Transactions**

290.     At least as early as 1978 through 2008, the IA Business purported to use a single counterparty for every one of the securities transactions reflected on the IA Business customer statements, including those for the A&B accounts and the Post-1993 Entity Accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 243-245; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 75-76, 80; and Figures 13-15.

291.     Dubinsky reviewed every IA Business Stock Record Summary by security from 1978 through 1992, as well as AS/400 computer programming code, trade date blotters, and IA Business instruction manuals, and determined that because the IA Business was not executing

securities transactions in the actual marketplace, it pre-selected fake counterparties to

purportedly take the opposite side of these transactions. Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶¶ 243-244, n.219, n.220; Dubinsky Decl. Attach. B (Dubinsky A&B Report)

at ¶¶ 75-79, and Figures 13-15; Griffin Decl. Ex. 41 (Madoff Investment Securities House 17

Manual) at MADTSS00336530.

292.    The name of the fictitious counterparty varied throughout the years across internal

BLMIS documents: National Bank of North America ("NBNA") from 1978-1983, National

Westminster Bank from 1983-1987, and the generic "Clearing Banks" from 1987-2008.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 243-244; and Dubinsky Decl. Attach.

B (Dubinsky A&B Report) at ¶¶ 75, 79; and Figure 15.

293.    But, at any particular point in time, the IA Business preordained at the outset of

every single purported transaction the assignment of the exact same fictitious counterparty.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 243, 244; and Dubinsky Decl. Attach.

B (A&B Report) at ¶¶ 75, 76, 79; and Figures 13 and 15; and Griffin Decl. Ex 41 (Madoff

Investment Securities House 17 Manual).

294.    The IA Business even developed custom-made AS/400 programming code that

automatically pre-assigned the same single counterparty for every purported trade. Dubinsky

Decl. Attach. A (Dubinsky Global Report) at ¶¶ 243-244; Dubinsky Decl. Attach. B (Dubinsky

A&B Report) at ¶¶ 76, 78; Griffin Decl. Ex. 27 (Bongiorno Dep.) at 205:10-23; Griffin Decl. Ex.

29 (Crupi Dep.) at 189:10-191:3.

295.    Dubinsky confirmed that in a legitimate trading environment, the broker would

execute transactions with any number of counterparties that would be willing to take the opposite

side of those transactions.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 241; 245;

Dubinsky Decl. Attach. B (A&B Report) at ¶ 80.

296.    Dubinsky concluded that the IA Business' use of only a single, predetermined

counterparty for every trade, during each respective time period for at least thirty years,

demonstrates that no such counterparty existed, and the securities transactions reflected on the IA

Business customer statements were never executed.  Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶¶ 242; 245; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 74-76,

80.

297.    Dubinsky also confirmed from his review of the bank account records for the IA

Business that it never received any cash payments from any purported counterparty (identified

above or any other) for any of the securities transactions reflected on the IA Business customer

statements.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 243, 246.

### (c)    The Schtup Transactions

298.    As part of the scheme to deliver his promised rates of returns and commissions to

certain IA Business customers, Madoff engaged in a process of propping up certain customers'

accounts with extra fake trades that were intended to generate additional fictitious gains.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 27, 256-270; Dubinsky Decl. Attach.

B (Dubinsky A&B Report) at ¶¶ 179, 195; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4890:11-21;

4892:8-13; Griffin Decl. Ex. 42 (Lipkin Dep.) at 44:7-8; 60:7-8; 76:20-25; Griffin Decl. Ex. 29

(Crupi Dep.) at 173:2-174:1.

299.    This process, in place between 1994 and 2007, was referred to internally at

BLMIS as "Schtupping."  Griffin Decl. Ex. 29 (Crupi Dep.) at 173:2-177:16; Griffin Decl. Ex.

15 (DiPascali Tr.) at 4887:12-13; Griffin Decl. Ex. 42 (Lipkin Dep.) at 32:10-25.

300.    Schtupping was typically performed at the end of the year and enabled the IA

Business to "true up" certain customers' accounts - including the Post-1993 Entity Accounts -

whose fictitious trades throughout the year had not purportedly yielded the predetermined rates

of return and/or commissions that Madoff had guaranteed and promised to his customers.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 27, 256, n.231, 257, 270; Dubinsky

Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 167, n.182, 170, n.188, 179, n.202, 180-181,

n.204; Griffin Decl. Ex. 15 (DiPascali Tr.) at 4887:6-25; 4890:19-4893:8; Griffin Decl. Ex. 42

(Lipkin Dep.) at 32:10-25, 43:20-25, 115:7-9; Griffin Decl. Ex. 29 (Crupi Dep.) at 173:2-177:16.

301.    The schtup transactions typically appeared on customer statements and trade

confirmations at the end of the year, and consisted of fake S&P Index, non-hedged options that

were always profitable and notably inconsistent with the split strike conversion strategy.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 256-258; Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶¶ 171, 181-182, n.204, n.205, 183, 188-189; Griffin Decl. Ex. 15

(DiPascali Tr.) at 4890:10 – 4890:21.

302.    Dubinsky analyzed the books and records and confirmed that like all other

transactions reflected on the IA Business customer statements and trade confirmations, these

transactions never took place and constituted an integral part of the fraud.  Dubinsky Decl.

Attach. A (Dubinsky Global Report) at ¶¶ 27, 256, 267, 269-270; Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶¶ 179, 195.

303.    Dubinsky further opined that in the investment management industry, it is not

appropriate to retroactively adjust the performance of an account through the addition of trades

manipulated to reflect the amount of profits needed to meet previously promised returns and/or

commissions.  Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 184, 218.

304.    At his plea allocution, DiPascali confirmed the fraudulent nature of the schtup

transactions: "On a regular basis I added fictitious trade data to account statements of certain

clients to reflect the specific rate of earn [sic] return that Bernie Madoff had directed for that

client."  Griffin Decl. Ex. 14 (DiPascali Plea) at 47:19-22.

305.    DiPascali testified that the schtup process was borne out of the need to incentivize

and ultimately compensate Avellino and Bienes with guaranteed rates of return and commissions

for continuing to direct their former clients to the IA Business after the SEC shutdown of the

A&B accounts.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 4887:6-4890:9 and 4893:9-12.

306.    Many additional customers on the "schtup" list to receive the extra fake trades in

their IA Business accounts at the end of each year were customers who, like Avellino and

Bienes, brought in new investors to BLMIS.  Griffin Decl. Ex. 15 (DiPascali Tr.) at 4890:22 –

4893:12.

307.    Dubinsky detailed the step-by-step mechanical process by which IA Business

employees created these fictitious schtup transactions that appeared on customer statements and

trade confirmations.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 27, 256-270;

Figures 38-44; and Ex. 25; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 15, 171,

179-219; and Figures 63-88.

308.    To determine which accounts fell short of the promised rates of returns and/or

commissions, the IA Business employees monitored and tracked account performance similar to

the internal process used for the Buy and Hold Accounts.  Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶¶ 27, 256-257, 265-267, and Figures 42 and 43; Dubinsky Decl. Attach. B

(Dubinsky A&B Report) at ¶¶ 55, 180, 181, n.204, 185, 194, and Figure 63; Griffin Decl. Ex. 29

(Crupi Dep.) at 71:15-19; Griffin Decl. Ex. 42 (Lipkin Dep.) at 32:10-33:6.

309.    Using the Portfolio Management Reports, the IA Business employees would engage in various reconciliation efforts typically at the end of the year to calculate the amount of additional profits necessary to increase a customer's rate of return and/or commissions in accordance with Madoff's directives.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 27, 256-257, 265-267, 270; and Figures 42 and 43; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 180-181, 183, and Figure 63; Griffin Decl. Ex. 29 (Crupi Dep.) at 173:17-174:1.

310.    The IA Business employees created internal, handwritten schtup schedules to track the specific dollar amount of extra profits to add to particular accounts.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 258-264, 269, n.235, Figures 38-41, and Ex. 25; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 180, n.203, 183, 187, 197-201, 212; and Figures 64, 70, 73, and 81; Griffin Decl. Ex. 42 (Lipkin Dep.) at 48:19-49:9; Griffin Decl. Ex. 29 (Crupi Dep.) at 199:13-200:2.

311.    The schtup schedules identified the particular IA Business customer accounts and "money needed" for each account, along with the corresponding amount ("units") of the purported options trades necessary to generate those additional fictitious profits.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 258-264, 269, n.235, and Ex. 25; Dubinsky Decl. Attach. B (Dubinsky A&B Report) at ¶¶ 180, n.203, 183, 187, 197-201, 212.

312.    To reverse engineer the specific S&P index options trades with the preordained profits dictated by Madoff, the IA Business employees used historical pricing trade data from Bloomberg.  Attach. B (Dubinsky A&B Report) at ¶¶ 188; 189; n.209; 190-192; and Figures 65 and 67; Griffin Decl. Ex. 42 (Lipkin Dep.) at 71:8-72:22; Griffin Decl. Ex. 29 (Crupi Dep.) at 205:14-206:23.

313.    The IA Business employees would input the historical market data into the special

basket trading computer program, labeled "B.SCHUPT," to manufacture the fictitious trades and

generate the requisite additional profits in connection with the implementation of the schtup

process.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 256; 260-267 and Figure 40;

Attach. B (Dubinsky A&B Report) at ¶¶ 190-192; 213 and Figures 66 and 71; Griffin Decl. Ex.

29 (Crupi Dep.) at 204:4-21; Griffin Decl. Ex. 42 (Lipkin Dep.) at 80:8-21.

314.    In addition to the B.SCHUPT computer program, IA Business employees also

used other computer programs and/or files and handwritten records, including "B.XTRAPL",

batch trade slips, and Batch Stock Record Activity Reports, to manipulate the purported options

basket trading and fabricate the supporting documentation.  Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶ 262; and Figure 41; Attach. B (Dubinsky A&B Report) at ¶¶ 213-214;

Figures 82-84; Griffin Decl. Ex. 42 (Lipkin Dep.) at 128:19-130:20; Griffin Decl. Ex. 29 (Crupi

Dep.) at 186:5-191:3; 194:1-199:9.

315.    DiPascali summarized the mechanics of the schtup process to create the

additional, fictitious transactions as follows:

> We would design an option transaction, typically an index option, and we would
> calculate what the payment should be.  These numbers over the years changed
> somewhat.  But once we identified what the number was, then we would write a
> fictitious buy ticket and a subsequent fictitious sell ticket that would create P&L
> in their accounts, and the value of their account would therefore increase equal to
> the amount of theoretical commission [and/or guaranteed rate of return] Bernie
> owed them.

Griffin Decl. Ex. 15 (DiPascali Tr.) at 4890:11-18.

316.    Ultimately, the IA Business employees recorded the fictitious schtup transactions

on the customer statements and trade confirmations that they then sent to IA Business customers,

such as the accounts of the Post-1993 Entities.  Dubinsky Decl. Attach. A (Dubinsky Global

Report) at ¶¶ 261; 267; 270; and Figure 44; Dubinsky Decl. Attach. B (Dubinsky A&B Report)

68

at ¶¶ 180-181, n.204, 193, 200-217; Figures 68, 72, 74-76, 79, 85-87; Griffin Decl. Ex. 42

(Lipkin Dep.) at 30:10-17; Griffin Decl. Ex. 29 (Crupi Dep.) at 205:1-13; 212:7-16.

317.    The IA Business employees engaged in similar trade manipulation efforts when

revising the composition and rates of return for the A&B accounts during the 1992 SEC

investigation of Avellino & Bienes.  *See supra* at ¶¶ 72-94.

### (d)    The Proprietary Trading Business Did Not Execute Trades for IA Business Customers

318.    Dubinsky analyzed the trading activities, general operations, and financial

condition of the Proprietary Trading Business as part of his forensic investigation of BLMIS.

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 30-32, 46, 168-172, 194-227, 351-

409, Figures 30-36, and Table 5.

319.    Dubinsky determined that the Proprietary Trading Business either made markets

for institutional, broker-dealer clients or traded for its own account to increase BLMIS's profits.

It did not service retail customers like those in the IA Business.  *Id*. at ¶ 46.  Nor did it, as

Dubinsky concluded, execute any equity, option, or Treasury trades on behalf of the IA Business

customers.  *See supra*, Stmt. ¶¶ 225-242; 254-259; and 266.

320.    Instead, Dubinsky found that the Proprietary Trading Business engaged in

fraudulent activities and was not a profitable concern.  Dubinsky Decl. Attach. A (Dubinsky

Global Report) at ¶¶ 30-32; 351-409, 419-420.

321.    The Proprietary Trading Business relied on fraudulent infusions of cash from the

IA Business for its operations and to hide ongoing, significant net losses.  *Id*. at ¶¶ 30-32; 351-

408, 419-420.

322.    Beginning as early as the 1970s and continuing through 2008, the IA Business

transferred significant amounts of customer funds to the Proprietary Trading Business.

69

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 30, 352-358, 366-369; and Figures 63 and 64; Griffin Decl. Ex. 17 (Irwin Lipkin Plea Allocution) at 30:23; 31:10; 31:24-32:5; Griffin Decl. Ex. 19 (Cotellessa-Pitz Allocution) at 31:12-32:12.

323.    Between 1999 and 2008, for example, the IA Business transferred approximately $800 million from the 703 Account or IA Business-funded brokerage accounts to the Proprietary Trading Business' bank account held at the Bank of New York (the '621 Account). Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 353-354; 442; Table 15; and Ex. 34; Collura Declaration, Attach. A (Collura Report) at ¶¶ 37; 47 n.28; 57 n.34; and Ex. 4.

324.    Dubinsky's investigation confirmed that these cash infusions from the IA Business were intended to "prop up" the Proprietary Trading Business and make it appear as if it was generating profits, when in fact it was not profitable. Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 30-31, 351-408 and Figures 56-64, 80-84, 87-89.

325.    Dubinsky determined that a significant percentage of the Proprietary Trading Business purported revenue was derived from the improper transfer of customer funds from the IA Business. *Id*. at ¶ 339.

326.    None of the funds transferred from the IA Business was used to purchase securities on behalf of the IA Business customers. *Id*. at ¶¶ 30, 352-404, 419, 420, n.334-335.

327.    Dubinsky found that in order to make their internal records appear legitimate, the Proprietary Trading Business manually input fake trades and corresponding fictitious profits into its computer systems and trading records in amounts equal to the funds transferred from the IA Business. *Id*. at ¶¶ 355-390; 395-398; 402-404; and Figures 55-79; 84-86; and 90-92.

70

328.    Dubinsky concluded that these "profits" were not connected to any actual trading in the securities markets. *Id.* at ¶¶ 355-390; 395-398; 402-404; and Figures 55-79; 84-86; and 90-92.

329.    Dubinsky's analysis also revealed that BLMIS aggregated these associated fictional profits into the Proprietary Trading Business' overall profits and reported these inflated numbers on BLMIS's audited financial statements and regulatory reports, such as FOCUS Reports, to paint a better financial picture. *Id.* at ¶¶ 30-31; 353-408; and Figures 55-62; 80-84; 87-89; and 92-95.

330.    One of BLMIS's former controllers, Cotellessa-Pitz, confirmed Dubinsky's conclusion at her plea hearing:

> I booked the transfers of funds [from the IA Business] at times into specific securities or trading positions and accounts that were part of the firm's Proprietary Trading and Market Making businesses. I knew that the transfers bore no relation to these securities or positions, and that the funds did not result from trading in these securities through the firm's Proprietary Trading and Market Making businesses and, therefore, that my entries were false. I understood that my entries falsely inflated the revenue, increased the profits, and hid the losses of the Proprietary Trading and Market Making businesses and at the same time did not accurately report the financial condition of BLMIS as a whole.

Griffin Decl. Ex. 19 (Cotellessa-Pitz Allocution) at 32:1-12 (emphasis added); *id.* at 30:19-31:4.

331.    Cotellessa-Pitz further testified that she "transferred the same inaccurate record entries into FOCUS Reports and annual financial statements that I knew would be sent to the SEC." *Id.* at 31:2-4; 31:12-15.

332.    Collura analyzed the activity in the IA Business '703 Account and confirmed Dubinsky's findings.  Collura concluded that there were no inflows from sales of securities for the IA Business customer accounts from any source, including from the Proprietary Trading Business.  Collura Declaration, Attach. A (Collura Report) at ¶¶ 24; 32; 44; Figure 1; and Ex. 4.

71

333.    Collura determined that 97% of the inflows into the '703 Account were from IA
Business customers and the remaining 3% were from cash management activities derived from
the use of customer funds.  *Id*. at ¶¶ 24; 47; 62; Figure 1; and Ex. 4.

334.    Collura found that none of the 3% of inflows was generated from profits relating
to the sales of securities reflected on the IA Business customer statements.  *Id*. at ¶¶ 24; 47; 62;
Figure 1; and Ex. 4.

### (e)    BLMIS Falsified Its Financial and Regulatory Statements

335.    Dubinsky's forensic investigation showed that BLMIS falsified its financial and
regulatory statements from at least the 1970s.  Dubinsky Decl. Attach. A (Dubinsky Global
Report) at ¶¶ 301-313; n.250; 352-353.

336.    Based on his analysis of BLMIS's FOCUS Reports, Annual Audited Reports, and
Form ADV registration statements, Dubinsky concluded that these documents mispresented the
actual financial state of BLMIS's affairs.  *Id*. at ¶¶ 301-313; n.250; 352-353.

337.    In addition to including falsified "profits" based on the funds the IA Business
funneled to the Proprietary Trading Business (*see supra* ¶¶ 320-331), Dubinsky determined that
the FOCUS Reports and Annual Audited Reports revealed inconsistencies in BLMIS's purported
business activities, as well as material misstatements in its financial statements.  *Id*. at ¶¶ 306-
313, and Table 10.

338.    Specifically, Dubinsky determined that BLMIS inaccurately reported the amount
of cash it held, failed to properly reflect its liabilities (such as loans), falsely documented
commissions, and did not reflect certain activity typical of a broker conducting trades for
investment advisory customers (such as customer receivables, customer payables, and Rule
15c3-3 reserve requirements) on the FOCUS Reports and Annual Audited Reports.  *Id*. at ¶¶
306-313, and Table 10.

339.    BLMIS's Chief Compliance Officer, Peter Madoff, and its two Controllers, Irwin

Lipkin, and Enrica Cotellessa-Pitz, pled guilty to manipulating and falsifying its financial records

and regulatory filings.  Griffin Decl. Ex. 43 (Peter Madoff Plea) at 33:24-34:5; 35:20-25; 36:15-

38:6; 39:11-40:19; Griffin Decl. Ex. 17 (Irwin Lipkin Plea) at 30:4-5, 30:23-31:3, 31:6-32:11;

Griffin Decl. Ex. 19 (Cotellessa-Pitz Allocution) at 30:19-31:4; 31:12-15; 32:1-12.

340.    Irwin Lipkin, BLMIS's first employee (who began working at BLMIS in the

1960s) and first Controller, admitted at his plea allocution:

> While working for Bernie Madoff, I made accounting entries in financial records
> that I knew were inaccurate.  Moreover, I knew the documents containing these
> false entries were to be filed with various regulatory authorities.  These filings
> helped Mr. Madoff run the Ponzi scheme that harmed thousands of people.

Griffin Decl. Ex. 17 (Irwin Lipkin Plea Allocution) at 30:23-31:3; s*ee also id. at* 30:4-5, 31:6-

32:11.

341.    This practice of falsifying records continued at BLMIS for decades.  For example,

DiPascali and Eric Lipkin also testified during their plea allocutions about falsifying BLMIS's

books and records and creating fake reports to mislead the SEC and auditors.  Griffin Decl. Ex.

14 (DiPascali Plea Allocution) at 49:8-21); Griffin Decl. Ex. 18 (Eric Lipkin Plea Allocution) at

32:2-10; 33:22-34:8.

342.    BLMIS also failed to register as an investment adviser with the SEC at any time

between 1979, when registration became a requirement, and when Madoff finally registered in

August of 2006.  Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 301-302.

343.    BLMIS misrepresented the numbers of clients and never filed a Form ADV

before August 2006.  *Id.* at ¶¶ 301-303.

344.    Once BLMIS registered as an investment adviser with the SEC in August 2006,

Madoff continued his practice of falsifying his financial reports.  Madoff falsified *every* Form

ADV he filed by misrepresenting the number of accounts BLMIS maintained and customer

assets under management.  *Id*. at ¶¶ 302-303.

345.    Further Madoff admitted at his plea allocution:

[W]hen I recently caused my firm in 2006 to register as an investment adviser
with the SEC, I subsequently filed with the SEC a document called the form ADV
uniform application for investment adviser registration. On this form I
intentionally and falsely certified under penalty of perjury that Bernard L. Madoff
Investment Securities had custody of my advisory clients' securities. That was not
true, and I knew it when I completed and filed the form with the SEC …

Griffin Decl. Ex. 13 (Madoff Plea) at 28:10-19.

**B.      Cash Deposits of IA Customers Were Commingled in the 703 Account, and
Were the Source of Payments to Other Customers**

346.    During at least the ten-year period before its collapse on December 11, 2008,

BLMIS primarily used three bank accounts for the IA Business: the 703 Account; JPMorgan

account #xxxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan

Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Dubinsky Decl.

Attach. A (Dubinsky Global Report) ¶ 340 n.285; Attach. A (Collura Report) at ¶17.

347.    IA Business customers' cash deposits were deposited and commingled into the

703 Account.  Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶ 340; Collura Decl. Attach.

A (Collura Report) at ¶¶ 20–24.

348.    IA Business customer withdrawals were made through the JPMorgan Accounts

and the BT Account, which was a checking account entirely funded by the 703 Account during

the period for which bank records are available.   Collura Decl. Attach. A (Collura Report) at ¶¶

25–30.

349.    The 703 and 509 Accounts were linked commercial business accounts.  The 509

Account was a controlled disbursement account that was entirely funded by the 703 Account. *Id.*

¶ 25.

350.    Cash deposited in the Post-1993 Entity Accounts was deposited in the '703 and

'509 accounts, and cash withdrawals for the Post-1993 Entity Accounts were made from the '703

and '509 accounts.  Collura Decl. Attach. B (Collura A&B Report) at ¶¶ 68, 82, 86, and Exs. 7, 9

and 10.

351.    An analysis of the 703 Account showed that the money in that account consisted

almost entirely of customer deposits.   Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶

340 n.285; Collura Decl. Attach. A (Collura Report) at ¶ 27.

352.    Ninety-seven percent of all cash additions into the 703 Account came directly

from IA Business customers.   Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶ 340 n.285,

Figure 52; Collura Decl. Attach. A (Collura Report) at ¶ 24, Figure 1.

353.    The other three percent of inflows into the 703 Account came from income earned

on (1) short-term investment activity made directly from the 703 Account (including overnight

sweeps, overnight deposits, commercial paper, Certificates of Deposit and Treasury Bills); and

(2) investments of BLMIS customer funds made through bank and brokerage accounts held in

the name of BLMIS or Madoff.   Collura Decl. Attach. A (Collura Report) at ¶¶ 45–62;

Dubinsky Decl. Attach. A (Dubinsky Global Report) at Figure 52 & n.286.

354.    Because the short-term investments, including overnight sweeps, were made

directly out of the 703 Account, the source of the money for those investments was customer

funds.   Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 340; Collura Decl. Attach. A

(Collura Report) at ¶¶ 24, 46–47.

355.    For the period prior to December 1998, BLMIS employees maintained

handwritten documents going back to 1990 to keep track of cash deposits and withdrawals from

the IA Business bank accounts.  Collura Decl. Attach. A (Collura Report) at ¶ 41; 44; Griffin

Decl. Ex. 29 (Crupi Dep.) at 28:1-7, 29:13-31:20, 90:19-9:3, 106:2-7, 109:7-21.

356.    Collura determined that the handwritten documents maintained by BLMIS

employees were a reliable indicator of cash activity in the IA Business bank accounts in the

absence of bank records because she reconciled them to both BLMIS bank records and BLMIS

customer statements.  Collura Decl. Attach. A (Collura Report) at ¶¶ 15, 36, 40, 43; *see also*

Griffin Decl. Ex. 29 (Crupi Dep.) at 112:19-113:1.

357.    The handwritten documents maintained by BLMIS employees going back to 1990

reflect that all IA customer cash was deposited in the commingled IA bank account, and

customer withdrawals were paid from these commingled funds.  *Id.* at ¶ 44; Griffin Decl. Ex. 29

(Crupi Dep.) at 90:10-92:3.

358.    Crupi confirmed that the IA Business commingled customer cash deposits and

withdrawals in the IA Business bank account going back to at least 1983, if not before.  Griffin

Decl. Ex. 29 (Crupi Dep.) at 29:13-31:6, 52:22-53:2, 90:10-92:3.

**C.    The IA Business Had No Other Source of Funds**

359.    There were no inflows into the 703 Account from sales of securities for customer

accounts.   Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶ 340; Collura Decl. Attach. A

(Collura Report) at ¶¶ 24, 32.

360.    There were no outflows from the 703 Account to purchase securities for customer

accounts.   Dubinsky Decl. Attach. A (Dubinsky Global Report) ¶ 350; Collura Decl. Attach. A

(Collura Report) at ¶ 32.

361.    Apart from two short-term loans BLMIS received from JPMorgan totaling $145

million in November 2005 and January 2006—both of which were repaid by June 2006—the IA

Business did not obtain loans from third parties or from the Proprietary Trading Business

sufficient to pay the IA Business customer withdrawals.   Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶¶ 342–44.

362.    The IA Business also did not receive payments of any cash dividends. According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends. *Id.* at ¶¶ 247–55.

363.    Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account. *Id.* at ¶¶ 253–54.

364.    There is no record of any dividends being received by the IA business. *Id.* at ¶ 248.

365.    Dubinsky concluded that the IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account. *Id.* at ¶¶ 330–37.

366.    These transactions rendered BLMIS insolvent. By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. *Id.* at Section VII., ¶¶ 432–33, Table 13.

367.    In December 2008, BLMIS's capital had dwindled to the point where customer redemptions or withdrawal requests grossly exceeded the amounts it had on hand.  The customer property on hand at BLMIS as of December 11, 2008 was not sufficient to pay the claims of its customers. *Id.* at ¶¶ 40, 440–41.

77

368.    Based on his review of BLMIS's books and records, and his evaluations of the IA

Business' liabilities to customers, Dubinsky also determined that it was reasonable to conclude

that BLMIS was insolvent back to at least 1983.  *Id.* at ¶ 434 and Table 14.

**VII.    The Transfers to the Post-1993 Entity Accounts**

**A.    The Post-1993 Entities and Their General Partners**

369.    Four of the Post-1993 Entities received fictitious profits in the two-year period for

which the Trustee seeks summary judgment on this motion:  Mayfair Ventures, Grosvenor

Partners, Aster Associates and St. James Associates.  Greenblatt Decl. Attach. B (Greenblatt

A&B Report) at Exs. 7H, 7I, 7L, and 7M.

**1.    Mayfair Ventures**

370.    Mayfair Ventures was a customer of the IA Business. Griffin Decl. Ex. 44 (Frank

Avellino's Answer) at ¶ 31, 63; Griffin Decl. Ex. 45 (Defendant Entities' Ans. to Amended

Complaint) at ¶¶ 31, 63 and 346; Griffin Decl. Ex. 6 (Customer Agreements for Mayfair);

Greenblatt Declaration Attach. B (Greenblatt A&B Report) at ¶ 24.

371.    Mayfair Ventures held IA Business Account No. 1ZB032 ("Mayfair Ventures

Account").  Griffin Decl. Ex. 10 (BLMIS customer statement for Mayfair ); Greenblatt

Declaration Ex. B (Greenblatt A&B Report) at ¶ 24.

372.    Mayfair Ventures was a general partnership formed under the laws of the State of

Florida.  Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶¶ 63 and 346.

373.    Defendants Avellino, Nancy Avellino, Bienes, and Dianne Bienes were general

partners of Mayfair Ventures.  Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 347.

**2.    Grosvenor Partners**

374.    Grosvenor Partners was a customer of the IA Business.   Griffin Decl. Ex. 44

(Frank Avellino Answer) at ¶ 31; Griffin Decl. Ex. 45(Defendant Entities' Answer) at ¶ 31;

Griffin Decl. Ex. 7 (Customer Agreements for Grosvenor); Greenblatt Declaration Ex. B
(Greenblatt A&B Report) at ¶ 24.

375.    Grosvenor Partners held IA Business Account No. 1ZB046 ("Grosvenor Partners
Account"). Greenblatt Declaration Ex. B (Greenblatt A&B Report) at ¶ 24; Griffin Decl. Ex. 10
(Customer Statement for Grosvenor).

376.    Grosvenor Partners was a limited partnership formed under the laws of the State
of Florida.  Griffin Decl. Ex. 49 (Declaration of Frank Avellino, dated May 15, 2009).

377.    Avellino admitted he was a general partner of Grosvenor Partners.
 Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 227:13-19.

378.    Mayfair Ventures was a general partner of Grosvenor Partners, and Avellino,
Nancy Avellino, Bienes and Dianne Bienes were general partners of Mayfair Ventures.  Griffin
Decl. Ex. 23 (Defts' Am. Resp. to Req. for Admission) at ¶ 60; Griffin Decl. Ex. 45 (Defendant
Entities' Answer) at ¶ 347; Griffin Decl. Ex. 44 (Frank Avellino Answer) at ¶ 347.

### 3.    Aster Associates

379.    Aster Associates was a customer of the IA Business.  Griffin Decl. Ex. 44 (Frank
Avellino Answer) at ¶ 31; Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 31; Griffin
Decl. Ex. 4 (Customer Agreements for Aster Associates).

380.    Aster Associates held IA Business Account No. 1ZB509 ("Aster Associates
Account").  Griffin Decl. Ex. 8 (Customer Statement for Aster Associates Account);  Greenblatt
Declaration Ex. B (Greenblatt A&B Report) at ¶ 24.

381.    Aster Associates was a Florida general partnership.  Griffin Decl. Ex. 44 (Frank
Avellino Answer) at ¶¶ 64 and 347; Griffin Decl. Ex. 45 (Defendant Entities' Answer to
Amended Complaint) at ¶¶ 64 and 364.

382.    Avellino was a general partner of Aster Associates.  Griffin Decl. Ex. 44 (Avellino Answer) at ¶ 365; Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 365.

383.    Nancy Avellino was a general partner of Aster Associates.  Griffin Decl. Ex. 46 (Nancy Avellino Answer) at ¶ 365.

384.    Heather Lowles was a general partner of Aster.  Griffin Decl. Ex. 44 (Defendant Frank Avellino's Answer) at ¶ 80; Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 80.

385.    Rachel A. Rosenthal, also known as Rachel Liersch, was a general partner of Aster Associates.  Griffin Decl. Ex. 47 (Defendant Rachel A. Rosenthal's Answer) at ¶ 77.

386.    Rachel Anne Rosenthal Trust U/A dated June 29, 1990 was a general partner of Aster Associates.  Griffin Decl. Ex. 47 (Defendant Rachel A. Rosenthal's Answer) at ¶ 78; Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 78.

387.    Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992 was a general partner of Aster Associates.  Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 79.

### 4.    St. James Associates

388.    St. James Associates was a customer of the IA Business.   Griffin Decl. Ex. 7 (Customer Agreements for St. James Associates);   Greenblatt Decl. Ex. B (Greenblatt A&B Report) at ¶ 24.

389.    St. James Associates held IA Business Account No. 1ZB510 ("St. James Associates Account").  Greenblatt Declaration Ex. B (Greenblatt A&B Report) at ¶ 24; Griffin Decl. Ex. 11 (Customer Statement for St. James).

390.    St. James Associates was a general partnership formed under the laws of the State of Florida.  Griffin Decl. Ex. 23 (Defts' Am. Resp. to Req. for Admission) at ¶ 52; Griffin Decl. Ex. 48 (Bienes' and St. James Answer) at ¶ 65.

391.    Bienes and Dianne Bienes were general partners of St. James Associates. Griffin Decl. Ex. 23 (Defts' Am. Resp. to Req. for Admission) at ¶ 53.

### 5.    The General Partners of the Summary Judgment Entity Defendants

392.    Avellino was a general partner of Mayfair Ventures, Grosvenor Partners, and Aster Associates. Griffin Decl. Ex. 45 (Defendant Entities' Answer to Amended Complaint) at ¶ 347; Griffin Decl. Ex. 21 (Avellino Dep. Vol. 1) at 227:13-19; Griffin Decl. Ex. 44 (Avellino Answer) at ¶ 365; Griffin Decl. Ex. 50 (Excerpt of Grosvenor 2005 Tax Return).

393.    Nancy Avellino is a general partner of Mayfair Ventures and Aster Associates. Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 347; Griffin Decl. Ex. 46 (Nancy Avellino Answer) at ¶ 365; Griffin Decl. Ex. 50 (Excerpt from Grosvenor Tax Return).

394.    Heather Lowles is a general partner of Aster Associates. Griffin Decl. Ex. 44 (Defendant Frank Avellino's Answer) at ¶ 80.

395.    On November 16, 2017, Bienes was substituted with the Estate of Michael S. Bienes, and Dianne K. Bienes, in her capacity as Personal Representative for the Estate of Michael S. Bienes. Stipulation and Order for Substitution of the Estate of Michael S. Bienes and Dianne K. Bienes, in her Capacity as Personal Representative of the Estate of Michael S. Bienes, in Place of Deceased Defendant Michael S. Bienes, dated November 16, 2017, ECF No. 170.

396.    Bienes was a general partner of Mayfair Ventures and St. James Associates. Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 347; Griffin Decl. Ex. 23 (Defts. Am. Resp. to Request for Admission) at ¶ 53.

397.    Dianne Bienes is a general partner of Mayfair Ventures and St. James Associates. Griffin Decl. Ex. 45 (Defendant Entities' Answer) at ¶ 347; Griffin Decl. Ex. 23 (Defts. Am. Resp. to Req. for Admission) at ¶ 53.

398.    Mayfair Ventures was a general partner of Grosvenor Partners.  Griffin Decl. Ex.

23 (Defts. Am. Resp. to Req. for Admission) at ¶ 60.

B.    **Greenblatt's Principal Balance Calculation**

399.    Greenblatt calculated the principal balance for each IA Business account (the

"Principal Balance Calculation").  In his Principal Balance Calculation, Greenblatt applied the

Net Equity Investment Method (the Trustee's cash in/cash out net equity methodology), which

takes into account all of the principal and cash transactions into and out of the IA Business

accounts.  Declaration of Matthew B. Greenblatt, dated February 3, 2022 ("Greenblatt Decl."),

Attach. A (Expert Report of Matthew G. Greenblatt, CPA/CFF, CFE dated November 15, 2012

("Greenblatt Report")) at ¶¶ 4-5.

400.    Greenblatt prepared a chronological listing of cash and principal transactions

reflected in the BLMIS customer statements.  Greenblatt relied on the customer statements

because they are the most comprehensive and complete accounting of the debtor's books and

records with respect to transaction-by-transaction line item detail of the cash and principal

transactions and because the customer statements were sent to customers, giving customer the

opportunity to correct errors on the statements.  Greenblatt Decl. Attach. A (Greenblatt Report)

at ¶¶ 10-12, 40-43.

401.    The first monthly customer statement which reported dollar amounts for any

securities allegedly held at month end was March of 1981.  Therefore, the full period in which

the Principal Balance Calculation could be performed covered the time period from April 1,

1981 through December 11, 2008.  *Id.* at ¶ 5 n.1.

402.    Greenblatt identified that, over the course of forty years, the Defendants

maintained 18 different accounts with the IA Business:  the seven Post-1993 Entity Accounts,

which include the accounts held by the Summary Judgment Entity Defendants, and eleven

accounts that were held prior to January 1, 1993 (the "Pre-1993 A&B Accounts"). *Id.* at ¶¶ 22-24. Greenblatt applied the principal balance calculation to all of these accounts. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 25-68.

### 1.    Principal Balance Calculation for Mayfair Ventures Account 1ZB032

403.    For Greenblatt's analysis with respect to Mayfair Ventures Account 1ZB032, his Principal Balance Calculation covered the period from the account opening through December 11, 2008. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 54-64, and Exs. 3A and 7H thereto.

404.    Greenblatt determined that on February 11, 1993, the Mayfair Ventures Account 1ZB032 was opened with a cash deposit of $26,000,000, which represented principal. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 58 and Ex. 7H thereto.

405.    On March 28, 1995, there was an additional cash deposit of $2,000,000. Both of the cash deposits represent principal of $28,000,000. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 59, 60, and Ex. 3A thereto.

406.    During the life of the Mayfair Ventures Account 1ZB032, there were 29 cash withdrawals of $27,850,000. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 61, Exs. 3A and Ex. 7H.

407.    In addition, on July 3, 1995, there was an inter-account transfer of $18,000,000 from the Mayfair Ventures Account 1ZB032 to the Grosvenor Partners Account 1ZB046. Greenblatt determined that at the time of the transfer, the Mayfair Ventures Account had only $4,500,000 of principal available, and thus the remaining balance of that reported inter-account transfer from Mayfair Ventures Account to the Grosvenor Partners Account 1ZB046 consisted of fictitious profits. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 62 and Exs. 7H and & 7I thereto.

408.    Between April 1, 2002 and March 1, 2005, Greenblatt identified five additional

inter-account transfers from the Mayfair Ventures Account 1ZB032 to the Grosvenor Partners

Account 1ZB046 in the aggregate amount of $22,003,827.  Greenblatt determined that at the

time of the transfer, the Mayfair Ventures Account had a negative principal balance and there

was no principal available to be transferred into the Grosvenor Partners Account.  Accordingly,

they were not credited as principal to the Grosvenor Partners Account.  Greenblatt Decl. Attach.

B (Greenblatt A&B Report) at ¶ 63 and Exs. 7H and 7I thereto.

409.    The Principal Balance Calculation for the Mayfair Ventures Account

demonstrates that between February 11, 1993 and December 11, 2008, $32,350,000 was

withdrawn from or transferred within BLMIS, which consisted of $28,000,000 of principal and

an additional $4,350,000 of funds withdrawn in excess of principal, representing fictitious profits

over the life of the Mayfair Ventures Accounts.  Greenblatt Decl. Attach. B (Greenblatt A&B

Report) at ¶ 64 and Exs. 3A and 7H thereto.

410.    Within the Two-Year Period prior to December 11, 2008, $2,500,000 in fictitious

profits was withdrawn from the Mayfair Ventures Account 1ZB032.  Greenblatt Decl. Attach. B

(Greenblatt A&B Report) at ¶ 64 and Ex. 7H thereto.

## 2.    Principal Balance Calculation for the Grosvenor Partners Account 1ZB046

411.    For Greenblatt's analysis with respect to the Grosvenor Partners Account

1ZB046, his Principal Balance Calculation covered the period from the account opening through

December 11, 2008.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 65-116 and Exs.

3A and 7I thereto.

412.    Greenblatt determined that the Grosvenor Partners Account 1ZB046 was opened

with three cash deposits via wires were made into the Grosvenor Partners Account on February

26, 1993 which totaled $1,740,000, representing principal.   Greenblatt Decl. Attach. B

(Greenblatt A&B Report) at ¶¶ 65 and 108, and Ex. 7I thereto.

413.    Subsequent to these initial cash deposits, there were 23 additional cash deposits

via checks and wires into the Grosvenor Partners Account in the aggregate amount of

$29,411,600, all representing principal.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at

¶ 109 and Ex. 7I thereto.

414.    On July 3, 1995 and May 3, 2001, there were two inter-account transfers from the

Mayfair Ventures Account 1ZB032 and IA Business Account 1J0049 into the Grosvenor

Partners Account: $18,000,000 from the Mayfair Ventures Account on July 3, 1995; and

$5,603,255 from IA Business Account 1J0049 on May 3, 2001.  However, the Grosvenor

Partners Account 1ZB046 was only credited with $4,500,000 and $1,700,000 of principal

respectively for these transfers, because the remaining balance of the transfers constituted

fictitious profits.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 110 and Exs. 7G-7I

thereto.

415.    Between July 25, 2001 and March 1, 2005, there were six inter-account transfers

from IA Business Account 1J0049 and Mayfair Ventures Account 1ZB032 into the Grosvenor

Partners Account in the aggregate amount of $22,006,701.  However, these amounts were not

credited as principal into the Grosvenor Partners Account because they constituted fictitious

profits.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 111 and Exs. 7G-7I thereto.

416.    In addition, on March 3, 2004, there was an inter-account transfer from IA

Business Account 1ZB262 into Grosvenor Partners Account in the amount of $6,000,000.

Greenblatt determined that at the time of the transfer, Account 1ZB262 had sufficient principal

to transfer the full amount to Grosvenor Partners Account, and therefore $6,000,000 was credited

as principal to this account.   Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 112 and Ex. 7I and 7J thereto.

417.    In total, Greenblatt identified 26 cash deposits and nine inter-account transfers which provided the Grosvenor Partners Account with a total of $43,351,600 of principal. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 113, and Exs. 3A and 7I thereto.

418.    During the life of the Grosvenor Partners Account, there were a total of 131 cash withdrawals totaling $101,603,000.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 114 and Exs. 3A and 7I thereto.

419.    There were also 16 inter-account transfers made by the Grosvenor Partners Account to other related IA Business accounts in the aggregate amount of $77,763,276. However, these sums were not credited as principal to those accounts because there was no principal available to be transferred due to the negative principal balances in the Grosvenor Partners Account at the time of these inter-account transfers.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 115 and Exs. 3A and 7I thereto.

420.    The Principal Balance Calculation for the Grosvenor Partners Account demonstrates that between February 26, 1993 and December 11, 2008, $101,603,000 was withdrawn from or transferred within BLMIS, which consisted of $43,351,600 of principal and an additional $58,251,400 of funds withdrawn in excess of principal, representing fictitious profits over the life of the Grosvenor Partners Accounts.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 116 and Exs. 3A and 7I thereto.

421.    Within the Two-Year Period prior to December 11, 2008, $2,500,000 of fictitious profits was withdrawn from the Grosvenor Partners Account.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 116 and Ex. 7I thereto.

### 3.    Principal Balance Calculation for the Aster Associates Account 1ZB509

422.    For Greenblatt's analysis with respect to the Aster Associates Account 1ZB509, his Principal Balance Calculation covered the period from the account opening through December 11, 2008.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 142-151 and Exs. 3A and 7L thereto.

423.    The Aster Associates Account 1ZB509 was opened on June 30, 2004.   Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 142, 148, and Ex. 7L thereto.

424.    The account was opened with an inter-account transfer of $5,000,000 on June 30, 2004 from the Grosvenor Partners Account 1ZB046.  However, this amount was not credited to the Aster Associates Account 1ZB509 as principal because it constituted fictitious profits. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 148 and Exs. 3A, 7I and 7L thereto.

425.    Subsequent to the initial inter-account transfer, there were three additional inter-account transfers from the Grosvenor Partners Account 1ZB046 to the Aster Associates Account 1ZB509 in the aggregate amount of $16,496,288.  However, none of these were credited into the Aster Associates Account because these inter-account transfers constituted fictitious profits. Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 149 and Exs. 3A, 7I and 7L thereto.

426.    During the life of the Aster Associates Account, there were 12 cash withdrawals in the aggregate amount of $7,000,000.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 150, Exs. 3A and 7L thereto.

427.    The Principal Balance Calculation for the Aster Associates Account demonstrates that between June 30, 2004 and December 11, 2008, $7,000,000 was withdrawn from BLMIS, which consisted entirely of funds withdrawn in excess of principal, representing fictitious profits

over the life of the Aster Associates Account.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 151 and Exs. 3A and 7L thereto.

428.    Within the Two-Year Period prior to December 11, 2008, $3,500,000 in fictitious profits was withdrawn from Aster Associates Account 1ZB509.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 151 and Ex. 7L thereto.

### 4.    Principal Balance Calculation for the St. James Associates Account 1ZB510

429.    For Greenblatt's analysis with respect to the St. James Associates Account 1ZB510, his Principal Balance Calculation covered the period from the account opening through December 11, 2008.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶152-162 and Exs. 3A and 7M thereto.

430.    St. James Associates Account 1ZB510 was opened on June 30, 2004.   Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶¶ 152 and 158 and Ex. 7M thereto.

431.    The St. James Associates Account was opened with an inter-account transfer of $5,000,000 from the Grosvenor Partners Account 1ZB046.  However, this amount was not credited as principal because the inter-account transfer constituted fictitious profits.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 158 and Exs. 3A, 7I and 7M thereto.

432.    Subsequent to the initial inter-account transfer, there were three additional inter-account transfers from the Grosvenor Partners Account 1ZB046 in the aggregate amount of $40,886,988.  However, none of these were credited as principal into the St. James Associates Account 1ZB510 because these inter-account transfers constituted fictitious profits.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 159 and Exs. 3A, 7I and 7M thereto.

433.    In addition, on July 29, 2008, there was a cash deposit via wire into the St. James

Associates Account in the amount of $1,000,000, representing principal.  Greenblatt Decl.

Attach. B (Greenblatt A&B Report) at ¶ 160 and Exs. 3A and 7M thereto.

434.    During the life of the St. James Associates Account 1ZB510, there were 22 cash

withdrawals in the aggregate amount of $18,450,000.  Greenblatt Decl. Attach. B (Greenblatt

A&B Report) at ¶ 161 and Exs. 3A and 7M thereto.

435.    The Principal Balance Calculation for the St. James Associates Account

demonstrates that between June 30, 2004 and December 11, 2008, $18,450,000 was withdrawn

from BLMIS, which consisted of $1,000,000 in principal and an additional $17,450,000 of funds

withdrawn in excess of principal, representing fictitious profits over the life of the St. James

Associates Account.  Greenblatt Decl. Attach. B (Greenblatt A&B Report) at ¶ 162 and Exs. 3A

and 7M thereto.

436.    Within the Two-Year Period prior to December 11, 2008, $8,700,000 in  fictitious

profits was withdrawn from the St. James Associates Account 1ZB510.  Greenblatt Decl. Attach.

B (Greenblatt A&B Report) at ¶ 162 and Ex. 7M thereto.

437.    Greenblatt determined that between February 1993 to December 2008, the Pre-

1993 A&B Accounts and the Post-1993 Entity Accounts received more than $900 million in total

transfers, of which more than $572 million constituted fictitious profits.  Greenblatt Decl. Attach.

B (Greenblatt A&B Report) at ¶¶ 22-25, 50, 51, 64, 116, 129, 151 and 162, chart on page 17, and

exhibits cited therein.

## C.    Collura's Reconciliation Analyses

438.    Collura reconciled the cash transactions reflected on the statements of the BLMIS

customer accounts with available records and trace the flow of those funds.  Collura Decl.

Attach. A. (Collura Report) at ¶ 7; Collura Decl. Attach. B ("Collura A&B Report") at ¶ 10,
Assignment III.

439.    For her reconciliation and tracing analyses, Collura reviewed available third-party
bank records.  These bank records include hundreds of thousands of pages of BLMIS bank
statements, wire transfer data, cancelled checks, and deposit slips.  Collura Decl. Attach. A
(Collura Report) at ¶ 10.  The reconciliation of the customer statements and bank records was
conducted to determine whether the cash transactions on the IA Business customer statements
were accurately reflected as cash transactions—cash deposits or cash withdrawals. *Id.* ¶¶ 15, 31.

440.    Collura confirmed that the deposit and withdrawal transactions identified on the
BLMIS customer statements corresponded to transactions on the available third-party bank
records in the same amount, on or around the same date, and to or for the benefit of the same
customer.  *Id.* ¶ 22, Collura Decl. Attach. B (Collura A&B Report) at ¶ 68.

441.    Collura reviewed over 225,000 transactions on the customer statements, and over
150,000 transactions on the bank records.  She kept track of these transactions by assigning a
unique identifier to each of the cash transactions on the customer statements and a different
unique identifying number to all of the transactions in the bank records.   Collura Decl. Attach. A
(Collura Report) at ¶¶ 10, 23.

442.    Of the over 225,000 transactions reflected on BLMIS customer statements from
December 1998 to December 2008, Collura was able to reconcile 99% of these cash transactions
to BLMIS bank records.  *Id.* ¶¶ 15, 31.

443.    Collura also conducted a reconciliation analysis with respect to the cash
transactions in the accounts of the Summary Judgment Entity Defendants.  From the
chronological listing of all cash and principal transactions for every BLMIS customer account

compiled by FTI, she identified 298 cash deposit and withdrawal transactions in the customer

statements for the accounts of the Post-1993 Entities.  Collura Decl. Attach. B (Collura A&B

Report) at ¶ 67.

444.    Collura reconciled the 298 cash transactions in the accounts of the Post-1993

Entities to available BLMIS bank records, documents contained in BLMIS customer files, and/or

documents produced to the Trustee related to the A&B Entity Defendants.  *Id.* at ¶ 67.

445.    From her analyses, Collura reconciled a total of 289 of the 298 cash transactions

in the accounts of the Post-1993 Entities (including the Summary Judgment Entity Defendants),

or approximately 97% to available BLMIS bank records, documents contained in BLMIS

customer files, and/or documents produced to the Trustee related to the Post-1993 Entities.  *Id.* at

¶¶ 68-76.  She was unable to reconcile the remaining cash transactions due to the unavailability

of records related to transactions dated between March 1993 and June 1995.  *Id.* at ¶ 78.

446.    Based on her review of documents contained in the customer files maintained at

BLMIS, Collura did not find any instance of the Post-1993 Entities (including the Summary

Judgment Entity Defendants) communicating to BLMIS any disagreement with respect to the

accuracy of any cash transaction reflected on the customer statements for those accounts. *Id.* at ¶

78.

### D.    Collura's Tracing Analyses

447.    Collura was also asked to determine whether transfers of BLMIS funds during the

Post January 2001 Period could be traced to bank accounts held by the Summary Judgment

Entity Defendants, by following the flow of funds from one bank account to another.  Collura

Decl. Attach. B (Collura A&B Report) at ¶ 80 and Ex. 9.

448.    To perform her tracing analyses, Collura reviewed the available BLMIS records,

as well as bank records produced to the Trustee by third-party financial institutions related to

bank accounts held by the Summary Judgment Entity Defendants.   Collura Decl. Attach. B

(Collura A&B Report) at ¶¶ 81-85.

449.    As detailed below, from her analyses, Collura was able to trace 100% of the

transfers BLMIS made in the Post January 2001 Period to bank accounts held in the name of the

Post-1993 Entities, including the transfers of the $17.2 million in fictitious profits made to the

Summary Judgment Entity Defendants in the Two-Year Period.  Collura Decl. Attach. B

(Collura A&B Report) at ¶ 86 and Exs. 9 and 10.

### 1.    Tracing Results of Mayfair Ventures Account No. 1ZB032

450.    For Collura's tracing analysis with respect to Mayfair Ventures, she analyzed the

cash withdrawals from the Mayfair Account during the Post January 2001 Period.  Collura Decl.

Ex. B (Collura A&B Report) at ¶ 86, and Exs. 9 and 10.

451.    Based on available bank records from BLMIS, Collura traced 100% of the total

amount of cash withdrawals reflected on the customer statements for the Mayfair Ventures

Account 1ZB032 during the Post January 2001 Period, including the $2.5 million in fictitious

profits transferred in the Two-Year Period, to a bank account held by or for the benefit of

Mayfair.  *Id.*

### 2.    Tracing Results of Grosvenor Partners Account No. 1ZB046

452.    For Collura's tracing analysis with respect to Grosvenor, she analyzed the cash

withdrawals from the Grosvenor Partners Account 1ZB046 during the Post January 2001 Period.

Collura Decl. Attach. B (Collura A&B Report) at ¶ 86, and Exs. 9 and 10.

453.    Based on available bank records from BLMIS, Collura traced 100% of the total

amount of cash withdrawals reflected on the customer statements for the Grosvenor Partners

Account 1ZB046 during the Post January 2001 Period, including the $2.5 million in fictitious

profits transferred in the Two-Year Period, to a bank account held by or for the benefit of Grosvenor Partners. *Id.*

### 3.    Tracing Results of Aster Associates Account No. 1ZB509

454.    For Collura's tracing analysis with respect to Aster Associates, she analyzed the cash withdrawals from the Aster Associates Account 1ZB509 during the Post January 2001 Period.  Collura Decl. Attach. B (Collura A&B Report) at ¶ 86, and Exs. 9 and 10.

455.    Based on available bank records from BLMIS, Collura traced 100% of the total amount of cash withdrawals reflected on the customer statements for the Aster Associates Account 1ZB509 during the Post January 2001 Period, including the $3.5 million in fictitious profits transferred in the Two-Year Period, to a bank account held by or for the benefit of Aster Associates. *Id.*

### 4.    Tracing Results of St. James Associates Account No. 1ZB510

456.    For Collura's tracing analysis with respect to St. James Associates, she analyzed the cash withdrawals from the St. James Associates Account 1ZB510 during the Post January 2001 Period.  Collura Decl. Attach. B (Collura A&B Report) at ¶ 86, and Exs. 9 and 10.

457.    Based on available bank records from BLMIS, Collura traced 100% of the total amount of cash withdrawals reflected on the customer statements for the St. James Associates Account 1ZB510 during the Post January 2001 Period, including the $8.7 million in fictitious profits transferred in the Two-Year Period, to a bank account held by or for the benefit of St. James Associates.  *Id.*

E.     **The Transfers to Defendants Were Made by Bernard L. Madoff Investment Securities LLC**

458.    BLMIS operated as a sole proprietorship prior to 2001.  In January 2001, the sole proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-8132.  Griffin Decl. Ex. 1 (Amended Form BD).

459.    The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities."   Collura Decl. Attach. A (Collura Report) at ¶¶ 20 n.7, and 25 n.9.

460.    For the time period for which bank records were available (December 1998 through December 2008), the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business.  *Id.* at ¶¶ 24–30; Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 340 n.285, Figure 52.

461.    For the time period for which bank records were available, the face of the bank statements for the 703 Account and 509 Account showed they were designated as "Commercial Checking" accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York. None of the statements were addressed to Madoff personally.  Griffin Decl. Ex. 51 (Exemplar BLMIS Bank Statements 1998-2008);

Dubinsky Decl. Attach. A (Dubinsky Global Report) at ¶ 340, Exs. 31 and 32.

Dated: February 3, 2022                    /s/ Regina L. Griffin
New York, New York                         BAKER & HOSTETLER LLP
                                           45 Rockefeller Plaza
                                           New York, New York 10111
                                           Telephone: (212) 589-4200
                                           Facsimile: (212) 589-4201
                                           David J. Sheehan
                                           Email: dsheehan@bakerlaw.com
                                           Regina L. Griffin
                                           Email: rgriffin@bakerlaw.com

                                           *Attorneys for Irving H. Picard, Trustee
                                           for the Substantively Consolidated SIPA
                                           Liquidation of Bernard L. Madoff Investment
                                           Securities LLC and the Chapter 7 Estate of
                                           Bernard L. Madoff*