**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05345 (CGM) |
| Plaintiff, | |
| v. | |
| Citibank N.A., Citicorp North America, Inc., and Citigroup Global Markets Limited, | **AMENDED COMPLAINT** |
| Defendants. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa *et seq.* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against

Citibank N.A. ("Citibank"), Citicorp North America, Inc. ("Citicorp"), and Citigroup Global

Markets Limited ("CGML") (together, the "Defendants"), alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive

Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover at least $443,084,590

of BLMIS customer property that Defendants received as subsequent transfers.

3.    Defendants Citibank and Citicorp received at least $343,084,590 in subsequent

transfers of BLMIS customer property from Rye Select Broad Market Prime Fund, L.P. ("Prime

Fund") that the Trustee seeks to recover with this Amended Complaint.  Citibank and Citicorp

received these subsequent transfers in connection with a credit agreement they entered into with

Prime Fund on or about June 15, 2005.

4.    Defendant CGML received at least $130,000,000 in subsequent transfers of

BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), $100,000,000 of

which the Trustee seeks to recover with this Amended Complaint.[1]

---

[1] The original complaint sought $130,000,000 from CGML.  The District Court (Rakoff, J.) previously dismissed the Trustee's claim to recover a $30,000,000 transfer CGML received on or around October 14, 2005.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 505 B.R. 135, 150-51 (S.D.N.Y. 2013).

5.    Prime Fund and Fairfield Sentry were among the various investment vehicles that invested all or substantially all of their assets with BLMIS's investment advisory business.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

6.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

7.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

8.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

9.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

10.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

11.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation

3

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

12.     Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to
        SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA §
        78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

13.     By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

14.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA Proceeding.

15.     At a plea hearing on March 12, 2009, in the case captioned *United States v.

Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

16.     At a plea hearing on August 11, 2009, in the case captioned *United States v.

DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

guilty to a ten-count criminal information charging him with participating in and conspiring to

perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took

place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

17.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

18.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

19.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

5

21.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    DEFENDANTS AND NON-PARTIES

### A.  Defendant Citibank N.A.

22.     Defendant Citibank is a commercial bank and has its principal place of business at 399 Park Avenue, New York, NY 10022.

23.     In 2005, Citibank had approximately 900 branches in the United States and a net income of approximately $8.8 billion.

24.     Citibank is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York by, among other things, having its primary office in New York.

25.     Citibank derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

26.     Citibank should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

27.     Citibank is a wholly owned subsidiary of Citigroup Inc. ("Citigroup"), which is also the ultimate parent corporation to Defendants and non-defendant Citigroup Global Markets, Inc. ("CGMI").

**B.  Defendant Citicorp North America, Inc.**

28.     Defendant Citicorp is a Delaware corporation and has its principal place of business at 388 Greenwich Street, New York, NY, 10013.  Citicorp is a non-bank holding company and a subsidiary of Citicorp Banking Corporation.  Citicorp Banking Corporation is a subsidiary of Citigroup.

29.     Citicorp is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York by, among other things, having its primary office in New York.

30.     Citicorp derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

31.     Citicorp should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

**C.  Defendant Citigroup Global Markets Limited**

32.     CGML is an investment banking and securities brokerage company with principal offices at Citigroup Centre, 33 Canada Square, Canary Wharf, London E14 5LB, United Kingdom.  CGML has additional offices throughout Europe.

33.     CGML is a subsidiary of Citigroup Global Markets Europe Limited, a subsidiary of Citigroup Global Markets Europe Finance Limited, which is owned by Citigroup Global Markets Switzerland Holdings GmbH, which is owned by Citigroup Financial Products, Inc., a wholly owned subsidiary of Citigroup Global Markets Holding, Inc., a wholly owned subsidiary of Citigroup.  CGML is one of two Citigroup subsidiaries principally responsible for conducting Citigroup's securities operations abroad.

34.     As a Citigroup subsidiary with a focus and expertise in derivative products including forwards and futures, swaps, and options (using both exchange-listed and OTC), CGML personnel were sophisticated and experienced in the derivatives industry.

35.     CGML is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York and knowingly accepted the rights, benefits, and privileges of conducting business in the United States and New York.

36.     CGML invested in Fairfield Sentry knowing that it was created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a New York based *de facto* partnership, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

37.     CGML knew that any return on its investments in Fairfield Sentry would purportedly be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options, and Treasurys.

38.     To invest in Fairfield Sentry, CGML executed a Fairfield Sentry subscription agreement through which it affirmed having received and read Fairfield Sentry's private placement memorandum ("PPM") and agreed to be bound by the terms set forth in the PPM. Based on the October 1, 2004 Fairfield Sentry PPM, which was the operative document when CGML began investing in Fairfield Sentry in April 2005, and other materials CGML received from FGG, CGML knew that:

    (a)    Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS;

    (b)    BLMIS was Fairfield Sentry's investment adviser;

    (c)    BLMIS was the executing broker for Fairfield Sentry's investments and purportedly operated and executed the split strike conversion strategy ("SSC Strategy") on the fund's behalf;

8

(d)     BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills") traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

(e)     BLMIS was the custodian of Fairfield Sentry's assets invested with BLMIS; and

(f)     BLMIS was registered with the SEC.

39.     Through its execution of the Fairfield Sentry subscription agreement, CGML voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.  A New York based managing director of CGMI executed a Fairfield Sentry subscription agreement on CGML's behalf and the agreement was faxed to Fairfield Sentry's administrator, Citco Fund Services (Europe) B.V., from a New York fax number.

40.     When CGML executed its Fairfield Sentry subscription agreement on April 28, 2005, CGML (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

41.     CGML and CGMI personnel met with FGG personnel at FGG's New York City headquarters in connection with CGML's investments in Fairfield Sentry.

42.     CGML instructed Fairfield Sentry to direct all written communications regarding its investments in Fairfield Sentry to CGMI personnel at 390 Greenwich St., 4th Floor, New York, NY 10013; telephone communications regarding the investments to 212-723-****, a New

York based telephone number; and fax communications regarding the investments to 646-291-****, a New York based fax number.

43.     Additionally, CGML directed FGG to send information regarding BLMIS and CGML's investments in Fairfield Sentry to CGML in New York at: Hybrid Derivatives Trading, 390 Greenwich St., 4th Floor, New York, NY 10013.

44.     CGML used a New York based fax number, 646-291-****, to receive confirmation that Fairfield Sentry had received CGML's requests to redeem its investments in Fairfield Sentry, which resulted in the subsequent transfers of customer property the Trustee seeks to recover from CGML in this action.

45.     CGML maintained its own bank account in its own name at JP Morgan Chase National Association in New York (the "New York Account").  CGML used the New York Account to receive the redemption payments from Fairfield Sentry, including the subsequent transfers of customer property the Trustee seeks to recover in this action.

46.     CGML thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

47.     CGML should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

### D.  Non-Party Citigroup Global Markets, Inc.

48.     Non-party CGMI is Citigroup's primary United States-based brokerage and securities arm and has its principal offices at 390-388 Greenwich Street, New York, NY 10013. CGMI is incorporated and headquartered in New York.  CGMI is an indirect wholly owned

subsidiary of Citigroup Global Markets Holdings, Inc., which is a wholly owned subsidiary of
Citigroup.

49.      CGMI, acting as agent for Defendants, performed many of the material aspects of
the Defendants' BLMIS-related business, including their business with Prime Fund and Fairfield
Sentry.  This included serving in key roles such as business managers, business sponsors, and
portfolio managers; evaluating, negotiating, and executing agreements and communicating with
third-parties on Defendants' behalf.

50.      CGMI personnel had significant expertise in the derivatives industry.  For
example, CGMI personnel, including individuals involved in Defendants' BLMIS-related
business, prepared and published a comprehensive guide to equity derivatives for fund managers,
analysts, investors, and other financial professionals (the "Derivatives Guide").  The Derivatives
Guide contains a detailed discussion of equity derivatives and covers topics regarding forwards
and futures, equity swaps, options, option applications, hedging with derivatives, and the risks
associated with derivatives.

51.      CGMI performed various tasks and functions related to Defendants' BLMIS-
related business for the unified benefit of Defendants and acted within the scope of its agency at
the direction of, on behalf of, for the benefit of, and/or with the consent of Defendants.

**E.  Non-Party Tremont Partners, Inc.**

52.      Non-party Tremont Partners, Inc. ("Tremont Partners"), a Connecticut
corporation, was Prime Fund's general partner and investment manager.  Tremont Partners'
parent company is Tremont Capital Management, Inc. ("TCM"), located in Rye, New York.
TCM's parent company is Oppenheimer Funds, Inc. ("Oppenheimer"), and Oppenheimer's
parent company is Massachusetts Mutual Life Insurance Company, headquartered in
Massachusetts.

### F. Non-Party Prime Fund

53.    Non-party Prime Fund[2] is a Delaware limited partnership organized in May 1997

with its registered office in Rye, New York.  Prime Fund was operated and controlled by

Tremont Partners and invested substantially all of its assets with BLMIS.

### G. Non-Party Fairfield Greenwich Group

54.    Non-party FGG is a New York company that operated and managed Fairfield

Sentry.  In 1983, United States citizen and resident, Walter Noel, founded FGG, a New York-

based *de facto* partnership.  At all relevant times, Fairfield Sentry was operated almost entirely

by personnel at FGG's New York City headquarters who maintained ultimate control of Fairfield

Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers,

including Fairfield Sentry's investments with BLMIS.

### H. Non-Party Fairfield Sentry

55.    Non-party Fairfield Sentry is a hedge fund incorporated in the British Virgin

Islands and had its headquarters and primary business operations in New York.  Fairfield Sentry

was the largest BLMIS feeder fund, and filed a SIPA customer claim against the BLMIS estate

for over $6.2 billion.  By orders dated June 7 and June 10, 2011, this Court approved a settlement

among the Trustee, Fairfield Sentry, and others.

## V.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

56.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a

broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole

---

[2] Prime Fund's original name was "American Masters Broad Market Prime Fund, LP."  It was renamed "American Masters Broad Market Prime Fund, LP" in or around 1999, and then took its current name, "Rye Select Broad Market Prime Fund, LP," in or around 2006.

proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled

BLMIS first as its sole member, and thereafter as its chairman and chief executive.

57.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless

of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public

records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority, Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its

operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management

System database also reflects BLMIS's registration with the SEC as a securities broker-dealer

beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC

when SIPC was created and continued its membership after 2001 without any change in status.

SIPC membership is contingent on registration of the broker-dealer with the SEC.

58.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units:  a proprietary

trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

59.    BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

60.    For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

61.      In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in

AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.  The Ponzi Scheme**

62.      At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

63.      BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required

fraudulent infusions of cash from the IA Business to continue operating.

64.      To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted

BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements

and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person

14

accounting firm based out of a strip mall in Rockland County, New York.  Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was

a semi-retired accountant living in Florida.

65.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

Madoff's Investment Strategy

66.     In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group

of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff

also purportedly purchased securities that were held for a certain time and then purportedly sold

for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any

of these strategies.

67.     All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

68.     The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets.  Investors were told they would gain profits from a change in the expectations

for the stock or convertible security over time.  In the 1970s this strategy represented a

significant portion of the total BLMIS accounts, but by the early 1990s the strategy was

purportedly used in only a small percentage of BLMIS accounts.

15

69.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

70.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

71.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

72.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

73.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

74.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

16

75.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

76.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

77.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

BLMIS's Fee Structure

78.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

<u>BLMIS's Market Timing</u>

79.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

80.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

81.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

<u>BLMIS Execution</u>

82.     BLMIS's execution, as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

<u>No Evidence of BLMIS Trading</u>

83.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS

18

could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

84.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

The Collapse of The Ponzi Scheme

85.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

86.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

87.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**VI.     TREMONT KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD**

88.     On December 7, 2010, the Trustee commenced an adversary proceeding against, among others, Tremont Group Holdings, Inc. and its predecessors ("Tremont Group"), Tremont Partners (together with Tremont Group, "Tremont"), and several Tremont funds invested wholly or in part with BLMIS (collectively, the "Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute Customer Property under SIPA.  The

Trustee incorporates by reference the factual allegations in the Trustee's complaint against the Tremont Feeder Funds[3] (the "Tremont Complaint"), as supplemented below.

89.    Tremont created, managed, and operated a number of feeder funds that invested directly and indirectly with BLMIS.

90.    In a September 22, 2011 order, the Bankruptcy Court approved a settlement between the Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its affiliates, and a former Tremont chief executive (collectively, the "Tremont Settling Defendants") that obligated the Tremont Settling Defendants collectively to pay the Trustee $1.025 billion for the benefit of the Customer Property estate (the "Tremont Settlement"). The Tremont Settlement also provides that the transfers made to the Tremont Feeder Funds were "deemed avoided."

## A. Tremont's Senior Executives Had a Close Relationship with Madoff

91.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or around 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, helping to select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

92.    Manzke and Schulman met and had regular calls with both Madoff and his top lieutenant, Frank DiPascali. Schulman had a special relationship with Madoff, which Tremont described as its "competitive edge." In fact, Tremont touted Schulman's unusually close relationship with Madoff, stating that his "long-standing relationships with the principals of our existing managers [BLMIS listed first among them] is clearly an edge over any firm contemplating a similar business as our ability to negotiate preferential terms is related directly

---

[3] *Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010). *See* the Tremont Complaint at ¶ 2 for the full names of the defendants.

to the strength and longevity of the relationships." Emphasizing Schulman's special relationship

with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's

unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities

throughout the year . . . ." At least once, Madoff even sought Schulman's advice on hiring

decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a

potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year

relationship."

93.    Investors took notice of the relationship between Schulman and Madoff. For

example, a prospective investor had a call with Tremont in May 2007 where he referenced the

"friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back

to the relationship . . . Bob has been there many times and has worked w/ Bernie is [sic] business

since the 1980s."

> **B. Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business**

94.    Tremont received warnings of BLMIS's fraudulent IA Business from clients as

early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman:

"I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors."

The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used

such a "small" firm as its auditor.

95.    Less than a month later, Tremont became aware of the Barron's and Mar/Hedge

articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering

to its clients BLMIS feeder funds. On May 7, 2001, Tremont Group's Chief Operating Officer

(and later President) Barry Colvin emailed a number of Tremont employees alerting them to the

articles and instructing them to direct third-party questions to Tremont's management.

21

96.     On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a

discussion Mitchell had with an investor about "associating Madoff with broker-dealer

wrongdoing of late."  The following month, Mitchell, Schulman, and the investor visited Madoff.

The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation

as "controversial" and expressed numerous concerns that included:  (i) Madoff's unwillingness

to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at

every year end; (iv) the absence of a third-party custodian; and (v) BLMIS's "exceptionally

stable" returns "with only 7 negative months since 1990."

97.     Mitchell retained these notes and years later forwarded them to Tremont vice

president and manager responsible for product line management and oversight, Darren Johnston,

cautioning:  "Don't attach this – but it's an interesting set of notes from a meeting years back…."

98.     In March 2004, the investor who emailed Schulman in 2001 about the "Bernie

fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments,

explaining:

> My motivation for doing this is not due to some new buzz out there
> for as you know that is a constant din but rather that I can no
> longer ignore my core instincts as an investor in which I have the
> [sic] battle the fact that I really don't know what is going on, what
> a [sic] do know is I am in an investment program that no one else
> in history has been able to make work, return series is flat out too
> good given how efficient the underlying securities are priced and
> he doesn't charge a fee all compounded by it seems every stone I
> turn over is another multi billion $ [M]adoff feeder.  I . . . found
> that my inability to rationalize & be intellectually honest on why I
> was invested bothered me more than it has in the past ….

99.     When Madoff's scheme collapsed, that investor circulated an email among certain

of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!!!! THE WORLD IS

NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail

over this…."  (Emphasis in original.)

100.    In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum

that RogersCasey (the investment advisory firm where Tremont personnel, including Manzke,

previously worked), was "concerned about Tremont's relationship with Madoff" and would thus

recommend that its client not invest with Tremont.  Cichella said RogersCasey would not

reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont.

. . ."

101.    In 2005, James Purnell, who represented a prospective institutional investor,

raised concerns to Stuart Pologe, Tremont's head of Product Management and Investment

Advisory board member.  Purnell was specifically concerned about what he dubbed "the Madoff

black box" including, among other things, whether BLMIS's assets were segregated and being

verified by a third-party, how Madoff was paid, and whether any written Tremont materials

existed mentioning Madoff.  Pologe responded that there were no such materials nor would there

ever be.  After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell

emailed him and boasted that they were "finally vindicated on Madoff.  If it looks too good to be

true . . . ."

102.    In March 2007, representatives from Tremont's potential client, Agile Group

("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and

portfolio manager Brian Marsh as part of its due diligence.  Agile's notes from the meeting (the

"Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding

operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades.

This included queries about its auditors, the lack of information on options trading, identity of

counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use

of paper trade tickets and account statements, the inability to verify BLMIS's assets, and

BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

103.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme.  Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved.  During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious.  But if it is a Ponzi scheme, every dollar profit has been realized."

104.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS.  Addressing Agile's request, Johnston instructed internally:  "We should give answers by phone rather than email . . . ."  After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

105.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 Barron's article.

106.    Between 2005 and 2008, three major banks that provided leverage to the Tremont BLMIS Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws.  As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third-party controls and how he executes his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

24

107.    Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 Barron's article, this time forwarding it to Mitchell, stating, "Enjoy!"

### C. Tremont's Own Reporting Showed that BLMIS's Purported Trades Were Impossible

108.    Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded. Tremont created reports and marketing materials of its own highlighting the impossible trading and performance. For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences in 2006 alone.

109.    Tremont also estimated in its reports the amount BLMIS had in AUM and calculated whether or not there was sufficient volume in each instrument for Madoff to be able to execute such trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont

knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete.

### D.  Tremont Exempted BLMIS From Its High Due Diligence Standards

110.    The majority of Tremont's business involved placing its clients' assets with third-party managers.  For managers other than Madoff, Tremont implemented due diligence procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

111.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff.  Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

112.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS from its due diligence standards.  In fact, Tremont's executives deliberately prevented transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.  To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya don't ask" about:  (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's auditors.

113.    According to the SEC—which investigated Tremont after Madoff's arrest—Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers.  The SEC concluded that because "Schulman

26

conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

114.    Tremont also did not conduct due diligence on Friehling & Horowitz.  Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors."  In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

115.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business."  Pologe noted:  "We make a lot of money off this, though."

### E.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

116.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical.  Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

117.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

118.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties.  Yet, the SEC noted, Tremont continued its investment

with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

119.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification.  This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?"  This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy."  Mitchell took the conversation off-line, replying, "What is your telephone number?"

120.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid."  Cichella replied:  "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form. . . . it would be great if you could convince them" that the assets existed.

121.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS feeder funds.  Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff."  Evidencing that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

### F.  Tremont Consistently Shielded Madoff From Third-Party Due Diligence

122.    Tremont consistently shielded Madoff from questions by third-parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access.  On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff.  Schulman responded:  "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table."  (Emphasis in original.)

123.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [sic] agreement," before sending vague, one-word answers to the questions.

124.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

125.    In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

126.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

127.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional.  We should discourage this . . . ."  Another Tremont employee

relayed this to the investor and assured others internally that "this would never happen and we

told [the investor] that we have never had an on site meeting with a client and BM."

128.     Tremont even restricted which of its employees could contact BLMIS.  In a

September 2002 email, the message was relayed internally:  "DON'T SEND ANY

CORRESPONDENCE TO BERNARD MADOFF.  ONLY [Tremont executives Soares,

Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!"  (Emphasis in

original.)

129.     Tremont also refused to allow its administrator to receive the Tremont Feeder

Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its

other managers.  Tremont also intervened to limit contact between Madoff and Tremont's

auditor, E&Y.  In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's

"internal control letter" and questioning whether an audit report was prepared for Madoff

revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people

contacting Madoff."  In so doing, Tremont also misled E&Y, telling it that "Bob Schulman

periodically visits [BLMIS's] facilities throughout the year and watches the company trade

according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business

never executed any trades.

130.     This deliberate shielding of Madoff continued when Tremont replaced E&Y with

KPMG and reported to potential clients that, other than minimal verification, "there is no

contact" between KPMG and BLMIS.

131.     Tremont also lied to investors when presented with concerns about BLMIS's

auditors.  As set forth in a 2006 internal memo, Tremont's top investment managers knew that

Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and]

broker/dealers."  Nevertheless, Johnston and others from Tremont told Agile that Friehling &

Horowitz was "usually a name you hear [with] medium size broker dealers."

### G. Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

132.    Tremont's senior management knew that the options trades were a central part of

the SSC Strategy and were well aware of how the options trading for the strategy worked.  In

fact, Schulman bragged internally that he taught Madoff how to trade options.  Nevertheless, in

response to evidence on the face of BLMIS trade tickets that included suspect options trading,

Tremont tried to explain away these issues by giving inconsistent and false explanations.

### 1.    Divergent Answers on Over-the-Counter/Listed Trading Questions

133.    As described in the Tremont Complaint, Tremont knew that Madoff could not be

trading options OTC as he represented, in light of (i) the CUSIP numbers on BLMIS's trade

confirmations, which indicated the options were traded on an exchange, and (ii) the lack of

counterparty information that should be on all OTC trade confirmations.

134.    Tremont also knew that Madoff had not entered into any ISDA agreements with

any counterparties—a basic requirement for all OTC options trades.

135.    Rather than openly acknowledge the options trading impossibilities—which were

clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of

whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

136.    For example, a November 2006 Due Diligence Questionnaire ("DDQ") for one of

the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange."  In

contrast, in November 2007, in response to a statement by HSBC Bank that it was under the

impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they

are OTC."  On yet another occasion, Rye Select Broad Market Fund LP's ("Rye Broad Market")

July 2007 DDQ equivocated, stating options "may be either listed or OTC."

137.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both

OTC and listed options for his strategy, and that Madoff has used OTC options since the

beginning.  Tremont even went so far as to make up a rationale for Madoff's use of one or the

other, telling Agile that Madoff will go to listed options depending on price and that most of the

time OTC options have a better price.

### 2.    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth With Fabrications

138.    Tremont failed to conduct any diligence on the lack of OTC counterparties on

BLMIS's trade confirmations because it knew there was no legitimate explanation.

139.    Tremont senior management stated on certain occasions that Madoff purportedly

traded options with the counterparties as agent for the Tremont Feeder Funds.  This meant that

the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with

those purported counterparties.

140.    Tremont senior management knew it had to conduct counterparty due diligence to

insulate against default risk.  A JPMorgan Chase ("JPM") representative even pointed out to

Johnston that the trading counterparties should all have been known to Tremont if Madoff

supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and

not in BLMIS's name.  But Tremont never spoke with a single counterparty for Madoff's

purported options trading, because there were none.

141.    Tremont instead covered up for Madoff's fabrications with fabrications of its

own, which changed depending on who was asking.  In a March 24, 2006 email, Kelly told

Schulman that "Citi", one of Tremont's leverage providers, had "asked around" and could not

32

"find anyone who admit[ted] to being [BLMIS's] counterparty."  Schulman replied, "He

[Madoff] has not disclosed [any counterparty names] to us."  Kelly nevertheless later told Agile

that Schulman "has seen the counterparty names – he just does not want to disclose it."

142.    In October 2006, Soares emailed Fortis Bank, relaying information provided by

Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use

in relation to his put options trades."  Schulman, however, later admitted in sworn testimony that

Tremont had never tried to identify any purported counterparties.

143.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder

Fund investment, that "we do know the [counterparties'] general characteristics such as number

and minimum credit rating."  A month later, Mitchell told a different investor, "[o]ption

counterparties are typical banks," and named JPM—who had just inquired on the identity of the

counterparties—as one of them.

144.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in

the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has

checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS]

in the relevant instruments."

145.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's

counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]."  Johnston

"confirm[ed]" that Tremont had "[a]bsolutely no exposure" to those companies, which did not

make any sense in light of prior statements unless Johnston knew Madoff was not trading options

as he purported.

146.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and

subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the

time—led to industry and investor panic. Many Tremont clients worried about their Lehman exposure in light of BLMIS's purported billions of dollars in options holdings.

147.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

148.    Tremont worked to avoid discussions with investors regarding the Lehman collapse. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

149.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that … [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

150.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk. If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

### H. Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

151.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont Feeder Funds' AUM increasing rapidly.

For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM

increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

152.    Tremont's revenues grew along with its AUM; during this period, Tremont

received at least $255 million in fees from its BLMIS-facing products.

153.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly

dependent" on Madoff, which accounted for "all of the profits of the firm."  Cichella said Prime

Fund's "only reason for being is as a $2b feeder into Madoff."  Pologe said BLMIS was

Tremont's "crack addiction business."

154.    Tremont's parent company concluded that "the economics of Tremont's business

[was] Madoff."  Tremont did nothing more to earn its fees through its Tremont Feeder Funds

than provide access to BLMIS.  Pologe acknowledged Tremont "just sell[s] access [to BLMIS]

for 2% management fee . . . We make a lot of money off this."  As Schulman told Mitchell, for

some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for

them to access Madoff."

155.    Fees were a powerful reason for funds like Tremont to close their eyes and hide

what they knew about BLMIS's fraud.  As noted by Albourne in late 2008, "[w]e have been

advised by some of the [funds invested in BLMIS] that they are not interested in knowing more

about the product due to the fees they are earning on the product."

**I.    Tremont Co-Managed Kingate Global**

156.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship

with the Kingate-related feeder funds and management.

157.    From the inception of their respective BLMIS investment accounts, Federico

Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager,

Kingate Management Limited (collectively, "Kingate").

158.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti

and Grosso as a Kingate Global director and manager from 1995 until 2004.

159.    The Tremont-Kingate relationship continued through the revelation of Madoff's

fraud.  Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont

(Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through,"

which delegated management responsibilities to Tremont in New York and shared officers and

directors with Tremont Partners, including Schulman and Manzke.  Specifically, in or around

March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate

Global.  Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked

with evaluating and monitoring BLMIS and providing necessary management services to

Kingate Global.  Manzke and Hammond were listed as "principal decision-makers" in May

2005.

160.    As part of this deal, Kingate Management and Tremont Bermuda also split

Kingate Global's management fees, which provided Tremont with a significant revenue.

Between 1998 and 2008, Tremont received over $40 million in fees for funneling investor assets

to Kingate Global.

161.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global

through their conduct and the operation of the various agreements entered into between the

parties.  As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed

to Tremont. *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL

4734749, at *13-15 (Bankr. S.D.N.Y. Aug. 11, 2015).

## VII.    RECOVERY OF SUBSEQUENT TRANSFER TO DEFENDANTS

### A.  Fairfield Sentry

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

162.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry

and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv.

Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property

from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield

Sentry Initial Transfers").

163.    By orders dated June 7 and June 10, 2011, this Court approved a settlement

among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent

judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000

("Judgment Amount") [ECF No. 109].

164.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and

B.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the

meaning of SIPA § 78*lll*(4).

165.    On August 28, 2020, the Trustee filed a second amended complaint in the

*Fairfield Sentry Ltd.* proceeding (the "Second Amended Complaint") [ECF No. 286] seeking in

part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and

entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the

Judgment Amount are avoided.

166.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of

the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a

minimum, while aware of suspicious facts that should have led Fairfield Sentry to inquire further

into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the

Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs

1-10, 79-313, 315-16.

167.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry

during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each

of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code

and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA,

particularly § 78fff-2(c)(3).

168.    Of the Fairfield Sentry Six Year Transfers, approximately $1,600,000,000 was

transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield

Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable

under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly §

78fff-2(c)(3).

### 2.    Subsequent Transfers from Fairfield Sentry to CGML

169.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the

Fairfield Sentry Initial Transfers to CGML.  Based on the Trustee's investigation to date, the

subsequent transfers to CGML total at least $130,000,000, of which the Trustee seeks to recover

$100,000,000 (the "Fairfield Sentry Subsequent Transfers").  A chart setting forth the presently

known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

170.    The Trustee commenced this proceeding on December 8, 2010.

171.    The Fairfield Sentry Subsequent Transfers are recoverable from CGML under

section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-

2(c)(3).

172.    The Fairfield Sentry Subsequent Transfers represent a redemption of equity interest by CGML as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Subsequent Transfers to CGML upon redemption of its interests.

173.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the Fairfield Sentry Initial and Subsequent Transfers discussed above, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

### B.  Prime Fund

### 1.    Initial Transfers from BLMIS to Prime Fund

174.    The Trustee commenced a separate adversary proceeding against Prime Fund, and other defendants in the Bankruptcy Court, under the caption, *Picard v. Tremont Group Holdings, Inc., et al.*, No. 10-05310 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Prime Fund in the approximate amount of $1.01 billion (the "Prime Fund Initial Transfers").

175.    Of the Prime Fund Initial Transfers, $945 million was transferred to Prime Fund during the six years prior to the Filing Date (the "Prime Fund Six Year Transfers").  Each of the Prime Fund Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

176.    Of the Prime Fund Six Year Transfers, $495 million was transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two Year Transfers").  Each of the Prime Fund Two Year Transfers is avoidable under Bankruptcy Code section 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

177.    Charts setting forth the Prime Fund Initial Transfers are included as Exhibits D and E.  The Prime Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

> **2.    Subsequent Transfers from Prime Fund to Defendants Citibank and Citicorp**

178.    Prior to the Filing Date, Prime Fund subsequently transferred a portion of the Prime Fund Initial Transfers to Defendants Citibank and Citicorp.  Based on the Trustee's investigation to date, the subsequent transfers from Prime Fund to Citibank and Citicorp total $343,084,590 (the "Prime Fund Subsequent Transfers").  A chart setting forth the presently known Prime Fund Subsequent Transfers is attached as Exhibit F.

179.    The Trustee commenced this proceeding on December 8, 2010.

180.    The Prime Fund Subsequent Transfers are recoverable under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

181.    Because Prime Fund invested all or substantially all of its assets into the BLMIS Ponzi scheme, Prime Fund was insolvent when it made the Prime Fund Subsequent Transfers.

182.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the Prime Fund Initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

<u>**COUNT ONE**</u>
**RECOVERY OF THE SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a) - CGML**

183.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

184. The Fairfield Sentry Subsequent Transfers are recoverable from CGML under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

185. CGML is an immediate or mediate transferee of the Fairfield Sentry Subsequent Transfers totaling $100,000,000.

186. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against CGML: (a) recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, from CGML for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT TWO
## RECOVERY OF THE SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a) - CITIBANK AND CITICORP

187. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

188. The Prime Fund Subsequent Transfers are recoverable from Citibank and Citicorp under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

189. Citibank and Citicorp are immediate or mediate transferees of the Prime Fund Subsequent Transfers totaling $343,084,590 from Fairfield Sentry.

190. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Citibank and Citicorp: (a) recovering the Prime Fund Subsequent Transfers, or the value thereof, from Citibank and Citicorp for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Counts One and Two in favor of the Trustee and against Defendants as follows:

41

a)      Recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, from CGML for the benefit of the estate;

b)      If CGML challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(a) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

c)      Awarding the Trustee prejudgment interest from the date on which the Fairfield Sentry Subsequent Transfers were received by CGML; and

d)      Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

e)      Recovering the Prime Fund Subsequent Transfers, or the value thereof, from Citibank and Citicorp for the benefit of the BLMIS estate;

f)      If Citibank or Citicorp challenges the avoidability of the Prime Fund Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Prime Fund Subsequent Transfers pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

g)      Awarding the Trustee prejudgment interest from the date on which the Prime Fund Subsequent Transfers were received by Citibank and Citicorp; and

h)      Awarding the Trustee fees and all applicable costs and disbursements, and such

other, further, and different relief as the Court deems just, proper, and equitable.


/s/ Matthew D. Feil
**Baker & Hostetler LLP**

Dated:  February 11, 2022
        New York, New York

45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Amy Vanderwal
Email:  avanderwal@bakerlaw.com
Chardaie C. Charlemagne
Email:  ccharlemagne@bakerlaw.com
Frank M. Oliva
Email:  foliva@bakerlaw.com
Elizabeth G. McCurrach
Email:  emccurrach@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Chapter 7*
*Estate of Bernard L. Madoff*