# EXHIBIT 11

## (REVISED)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Adv. Pro. No. 08-01789(SMB)
Adv. Pro. No. 10-04468(SMB)

SECURITIES INVESTOR PROTECTION
CORPORATION,
          Plaintiff-Applicant,
  v.
BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC,
          Defendant.
- - - - - - - - - - - - - - - - - - x
In re:
BERNARD L. MADOFF,
          Debtor.
- - - - - - - - - - - - - - - - - - x
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities, LLC,
          Plaintiff,
v.
KEN-WEN FAMILY LIMITED PARTNERSHIP;
KENNETH W. BROWN, in his capacity
as a General Partner of the
Ken-Wen Family Limited Partnership;
and WENDY BROWN,
          Defendants.
- - - - - - - - - - - - - - - - - - x

                 DEPOSITION OF
              KENNETH WILLIAM BROWN
          Taken on Behalf of the Plaintiff
          DATE TAKEN:  Monday, January 27, 2020
          TIME:  10 a.m. - 12:30 p.m.
          PLACE:  Daughters Reporting, Inc.
                  101 Northeast 3rd Avenue
                  Suite 1500
                  Fort Lauderdale, Florida 33301

       Examination of the witness taken before:

              Felecia Curreri, RPR
            Daughters Reporting, Inc.
             101 Northeast 3rd Avenue
                   Suite 1500
            Fort Lauderdale, Florida 33301

```
 1    APPEARANCES:

 2    Appeared for the Plaintiff

 3         Young Conaway Stargatt & Taylor, LLP
           1000 North King Street
 4         Wilmington, DE 19801
           BY:  JACYLN C. MARASCO, ESQUIRE
 5         Tel:  302-571-6741
           Email:  jmarasco@ycst.com
 6

 7

 8    Appeared for the Defendant KENNETH W. BROWN

 9         Law Office of Mark S. Roher
           150 S. Pine Island Road
10         Suite 300
           Plantation, Florida 33324
11         BY:  MARK S. ROHER, ESQUIRE
           Tel:  954-353-2200
12         Email:  mroher@markroherlaw.com

13

14
      Appeared for the Defendant WENDY BROWN
15
           Bernfeld, DeMatteo & Bernfeld, LLP
16         600 Third Avenue
           15th Floor
17         New York, New York 10016
           BY:  DAVID B. BERNFELD, ESQUIRE
18         Tel:  212-661-1661
           Email:  davidbernfeld@bernfeld-dematteo.com
19

20

21    Also Present:

22         WENDY BROWN

23

24                      -   -   -

25
```

3

1                            INDEX

2                                                      Page

3    Direct Examination
     By Ms. Marasco                                    5
4
     Certificate of Oath                               105
5
     Certificate of Reporter                           106
6

7

8

9

10                            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       EXHIBITS
 2     PLAINTIFF'S
       EXHIBIT           DESCRIPTION            PAGE
 3
       1                 Agreement              15
 4
       2                 Ken Brown's Answer     24
 5
       3                 Wendy Brown's Answer   24
 6
       4                 Agreement              28
 7
       5                 Tax Information        31
 8
       6                 Ken-Wen Investments    40
 9
       7                 Agreement              46
10
       8                 Request for Deposit    50
11
       9                 BLMIS Statement        52
12
       10                Fax                    56
13
       11                Check                  60
14
       12                Bank Statement         62
15
       13                Fax Request            68
16
       14                Request for Transfer   68
17
       15                Bank Statement         74
18
       16                Check                  75
19
       17                Bank Statement         77
20
       18                Amended Complaint      83
21
       19                Answers                83
22
       20                File Maintenance       95
23
24
25
```

```
 1            Deposition of KENNETH WILLIAM BROWN, taken
 2       before Felecia Curreri, RPR and Notary Public in
 3     and for the State of Florida at Large, in the above
 4                           cause.
 5            THE COURT REPORTER:  Raise your right
 6         hand, please.  Do you swear or affirm that the
 7         testimony you are about to give will be the
 8         truth, the whole truth, and nothing but the
 9         truth?
10            THE WITNESS:  I do.
11     Thereupon--
12               KENNETH WILLIAM BROWN,
13     having been first duly sworn or affirmed, was
14     examined and testified as follows:
15                  DIRECT EXAMINATION
16     BY MS. MARASCO:
17       Q.   Mr. Brown, I'm sure you know I represent
18     Irving Picard, the trustee in the lawsuit entitled
19     Picard v. Ken-Wen.
20            I'm going to be asking you some questions
21     today.  If I ask you a question that you don't
22     understand, just let me know and I'll do my best to
23     rephrase the question.  Don't guess at your
24     answers.  If you don't know, that's an acceptable
25     answer as well.
```

1          The court reporter is going to be taking

2     down my questions and your answers, so your answers

3     have to be audible.  Please just say "yes" or "no"

4     rather than nodding.  Also, to help our court

5     reporter transcribe our conversation, we should try

6     not to talk over each other.  So please wait for me

7     to finish my question before you answer and I'll

8     not interrupt you while you are answering.

9          Your counsel may object to certain

10    questions that I ask, but unless your counsel

11    directs you not to answer, you should answer the

12    question.

13         You can ask to take a break whenever you

14    need, as long as there isn't a question pending.

15    If you need a break at any time, please finish your

16    response to an outstanding question and just let me

17    know.

18         Does that work?

19    A.   Yes.

20    Q.   Before we begin, are you taking any

21    medication or anything that may impair your ability

22    to answer questions today accurately and

23    truthfully?

24    A.   No.

25    Q.   Mr. Brown, have you ever been deposed

```
 1    before?

 2         A.    Yes.

 3         Q.    How many times?

 4         A.    Numerous times.

 5         Q.    And in what types of matters have you been

 6    deposed?

 7         A.    Well, I was in the securities business, so

 8    it has a litigious nature to it, so I might have

 9    been deposed 50 times maybe.

10         Q.    And was that in connection with a business

11    that you owned?

12         A.    A business that I owned and subsequent

13    litigation.

14         Q.    And what business was that?

15         A.    I had a firm called K. W. Brown

16    Investments and one called 21st Century Advisors.

17         Q.    Do you understand that you are here today

18    to provide testimony in connection with the

19    Adversary Proceeding 10-04468 SMB in which you are

20    personally named as a defendant?

21         A.    Yes.  I thought I was named as a general

22    partner.

23         Q.    That's correct.  My apologies.

24               So, to clarify the record, you are named

25    as a general partner, but you are not here as a
```

1    30(b)(6) witness, you are here in your individual

2    capacity.

3            MR. ROHER:  That's right.

4            THE WITNESS:  Okay.

5    BY MS. MARASCO:

6        Q.   Just to aid in the deposition today, just

7    so you don't have to keep saying long names over

8    and over, I'm going to define just a few terms so

9    that we can see if we can agree to that definition.

10           So "BLMIS" should mean Bernard L. Madoff

11   Investment Securities.  Do you understand?

12       A.   Yes.

13       Q.   "Madoff" is Bernard L. Madoff, the person,

14   but may be used interchangeably with BLMIS.

15       A.   Yes.

16       Q.   If I use the word "account," I'm talking

17   about BLMIS Account 1-EM226-3 and I'll make it

18   clear if I'm talking about a different account.

19           Does that make sense?

20       A.   The number doesn't make any sense to me,

21   but if you say it's Ken-Wen FLP, that would be the

22   account.

23       Q.   Okay, understood.

24           Did you meet with anyone to prepare for

25   today's deposition?

```
 1        A.    No.

 2        Q.    Did you speak with anyone to prepare for

 3   this deposition today?

 4              MR. ROHER:  Other than counsel?

 5              MS. MARASCO:  Anyone at all.

 6              THE WITNESS:  No.  Other than what you

 7        just saw now, maybe a couple of months ago

 8        with Mark a cursory discussion, nothing

 9        detailed.

10   BY MS. MARASCO:

11        Q.    Did you review any documents or materials

12   to prepare for this deposition?

13        A.    I started to, but I didn't get too far.

14        Q.    So I see you have a pile of documents

15   there.

16        A.    Just a bunch of printouts that I have.

17        Q.    From where did you obtain those printouts?

18        A.    I think they were mostly the responses to

19   the pleadings that were provided in this case.

20        Q.    Provided to you?

21        A.    No, provided by us to opposing counsel.

22        Q.    Do you recall when they were provided to

23   opposing counsel?

24        A.    2018.  Approximately 2019.

25              MS. MARASCO:  This request would probably
```

10

```
 1        go to counsel, but to the extent that anything
 2        was provided to opposing counsel that has not
 3        been provided to the trustee, I would make a
 4        request for that.
 5             MR. ROHER:  That's fine, but if you could
 6        clarify.  My understanding is we've only
 7        produced documents to you that you've asked
 8        for.  We didn't produce separate documents to
 9        anyone else.
10             THE WITNESS:  Could I be more specific for
11        you?
12   BY MS. MARASCO:
13        Q.   Please do.
14        A.   If you don't mind.
15             Things like admissions production.
16             MR. ROHER:  Discovery request.
17             THE WITNESS:  Discovery request.  That's
18        what I basically was reviewing.
19   BY MS. MARASCO:
20        Q.   So your responses to the trustee's request
21   for admissions and interrogatories; is that
22   correct?
23        A.   Yeah, that's more accurate.  Right, yes.
24        Q.   Just for purposes of the record, can you
25   please state your full name.
```

```
 1        A.    Kenneth William Brown.

 2        Q.    And where do you currently reside,

 3   Mr. Brown?

 4        A.    I'm in between residences, but my current

 5   address that you have on record is 6340

 6   Breckenridge Circle.

 7        Q.    And where is that?

 8        A.    Lake Worth, Florida.

 9        Q.    Lake Worth?

10        A.    Yes.

11        Q.    Are you currently employed?

12        A.    No.

13        Q.    When were you last employed?

14        A.    I think it was, like, March of 2008.

15              MS. MARASCO:  Let me go off the record for

16        a moment.

17              (Discussion held off the record).

18              MS. MARASCO:  We can go back on the

19        record.

20   BY MS. MARASCO:

21        Q.    So we are back on the record.  We just

22   discussed that you were last employed in

23   approximately 2008.  And where were you last

24   employed?

25        A.    At the two firms that I founded.
```

1       Q.   What firms were they?

2       A.   K. W. Brown Investments and 21st Century

3  Advisers.

4       Q.   And those were investment advisement

5  firms?

6       A.   Yes.

7       Q.   What is your educational background?

8       A.   I have an MBA in business from University

9  of Miami and I have Bachelor's Degree from Temple

10 University.

11      Q.   A bachelor's degree, did you say in

12 accounting?

13      A.   I had more general business.

14      Q.   Do you have any accounting certifications?

15      A.   No.

16      Q.   Do you have any investment advisory

17 certifications?

18      A.   Yes.

19      Q.   What kind of certifications?

20      A.   I had a certification called a Registered

21 Investment Advisor.

22      Q.   When did you obtain that certification as

23 a Registered Investment Advisor?

24      A.   Probably the early '90s.

25      Q.   Do you have any other specialized

1    training?

2        A.    I have an honorary degree in finance from

3    Florida Atlantic University.

4        Q.    When did you obtain your honorary degree

5    from Florida Atlantic University?

6        A.    2017, 2018 -- say 2018.

7        Q.    Congratulations.

8        A.    Thank you.

9        Q.    How long was K. W. Brown Investments

10   operational?

11       A.    From 1986 to 2008.

12       Q.    And what about 21st Century?

13       A.    From 1992 to 2008.

14       Q.    So is it accurate to say that you owned

15   both businesses and they were operational

16   simultaneously?

17       A.    They were.  They were associated.

18       Q.    They were associated?

19       A.    Yes.

20       Q.    Can you explain that?  In what way were

21   they --

22       A.    In the securities business, you have a

23   broker/dealer and RIA, registered investment

24   advisor, that need to be followed as associated

25   businesses for purposes of regulation if it's

1    common ownership.

2        Q.    So both of those businesses were under

3    common ownership?

4        A.    Yes.

5        Q.    Is that by you or by you and someone else?

6        A.    By myself and my spouse.

7        Q.    And who was that?

8        A.    And my sons.  Wendy Brown, formally known

9    as -- currently known as Wendy Werner.

10       Q.    Just so I'm clear, you and Wendy Werner

11   both owned K. W. Brown Investments?

12       A.    No.  Our sons trusted.  We have three sons

13   and they had a revocable trust that owned it and we

14   were the trustees.  So that would be considered

15   common ownership for securities purposes.

16       Q.    Understood.

17             Was it the same situation for 21st

18   Century?

19       A.    No, 21st Century was owned -- I want to

20   say 50/50, but I think I might have had 51.  I

21   don't remember.  But I think it was 50/50 or maybe

22   it was 75/25, but it was common ownership between

23   the two of us.

24             MS. MARASCO:  I'm going to hand, what I'll

25        mark as Exhibit 1, to the court reporter.

```
 1              (Plaintiff's Exhibit 1, Agreement, was
 2       marked for identification.)
 3  BY MS. MARASCO:
 4       Q.   Do you recognize this document?
 5       A.   Yes.
 6       Q.   What is it?
 7       A.   This is the limited partnership agreement,
 8  as it says, for Ken-Wen Family Limited Partnership.
 9       Q.   Do you see a date on that document?
10       A.   June 14, 2000.
11       Q.   If you'll turn to the last page.  Do you
12  see your signature on this document?
13       A.   Yes, that's my signature.
14       Q.   And in what capacity did you sign the
15  document?
16       A.   General partner.
17       Q.   So it's accurate to say that you were a
18  general partner of Ken-Wen?
19       A.   Yes.
20       Q.   And then on that same page to the right,
21  do you see Wendy Brown's signature?
22       A.   I do.
23       Q.   Was Wendy also a general partner?
24       A.   Yes.
25       Q.   Other than Wendy and you, were there ever
```

1   any other general partners of Ken-Wen?

2         A.   Not while I was a general partner.

3         Q.   Can you explain that answer?

4         A.   Yes.  I resigned on February 29th, 2008.

5   So Wendy Brown was the sole general partner

6   subsequently for the period of time that the

7   partnership existed.

8         Q.   And why did you resign on February 29th,

9   2008?

10        A.   It was according to an agreement that I

11  had entered into for me to resign and I then became

12  -- my 1 percent general partner interest became an

13  interest as a limited partner.

14        Q.   You already had a limited interest as a

15  partner; is that right?

16        A.   Yes.  49 percent of my interest was

17  limited partnership and 1 percent general

18  partnership split that later became a limited

19  partnership interest after February 29th, 2008.

20        Q.   Why was the partnership initially formed?

21        A.   I was -- on the advice of counsel.

22        Q.   What was its primary purpose?

23        A.   To segregate certain assets with certain

24  different business functions that we had as a

25  family at the time.

1        Q.    What type of assets?

2        A.    Well, this was an asset that really was

3    provided from my spouse's family that later rolled

4    into Ken-Wen Family Limited Partnership.  So I

5    tried to keep it separate from the assets that I

6    had earned.

7        Q.    You said this was an asset that came from

8    Wendy Brown's family.  What asset are you referring

9    to?

10       A.    The Ken-Wen asset.

11       Q.    Are you referring to the partnership?

12       A.    Yes.  It was funded with a former trust

13   that matured for my spouse because of her age, so

14   rather than have it individually owned, we decided

15   to put it in a family limited partnership for all

16   the legal reasons of estate planning and

17   distribution purposes later on.  That was the

18   advice of counsel.

19       Q.    And do you recall what was the amount that

20   funded the partnership?

21       A.    Don't recall.

22       Q.    In you'll turn to Section 1.6 of the

23   agreement that you have in front of you, Exhibit 1,

24   that is on page 2.

25       A.    Page 2, got it.

1        Q.   Do you see 1.6 there?

2        A.   I do.

3        Q.   And the heading is "purpose".  It says,

4    "The purpose of the partnership's business is to

5    own, acquire, sell, and lease real estate,

6    marketable securities and other investment property

7    of any type, kind or description."

8             Did I read that first fragment correctly?

9        A.   Yes.

10       Q.   Okay.  Did Ken-Wen own, acquire, sell, and

11   lease real estate?

12       A.   No.

13       Q.   Did it own, acquire -- strike that.

14            Did it own real estate?

15       A.   No.

16       Q.   Did it sell real estate?

17       A.   You know, can I reflect back a little bit?

18       Q.   Certainly.

19       A.   It's been a long time, but there may have

20   been real estate, limited partnerships that also

21   were created at Wendy's family level.  So the

22   genesis of those would have been Werner family

23   assets that may have gone in there.  They may have

24   been some limited partnerships in there, but we

25   didn't acquire, sell or lease any real estate, it

1    would have been transferred.

2         Q.   So your recollection is that the

3    partnership may have transferred certain real

4    property?

5         A.   May have had limited partnership interest

6    in other projects that were acquired or generated

7    during Wendy's family's investment experiences.  So

8    the partnership did not acquire anything other than

9    what would have been transferred to it by the

10   formulation of the partnership.

11        Q.   Did the partnership sell marketable

12   securities?

13        A.   Well, the only securities that it had sold

14   would have been with the Madoff organization.

15        Q.   Can you explain that?

16        A.   Well, the partnership was setup primarily

17   to transfer the Madoff account into that

18   partnership.  There may have been, like I said,

19   transfers of other real estate, limited

20   partnerships' interest that were also my spouse's,

21   origination from her family, nothing that I

22   acquired or did.  Neither was the Madoff thing,

23   that anything that I acquired or did.

24        Q.   So am I understanding correctly that the

25   partnership was formed to transfer the Madoff

1   account into the partnership?

2       A.   I think the partnership was formed through

3   these various things, but what took place was the

4   Madoff account became Ken-Wen and whatever limited

5   partnership interests that were owned by this trust

6   that Wendy had had would have -- may have gone into

7   this also.  I'm not clear.  It's 2008 to today.  I

8   have a memory like a steel trap with sports.

9       Q.   What was your role in the Ken-Wen

10  partnership?

11      A.   Basically monitoring the -- overseeing and

12  looking at the account.  I had no investment

13  influence on the account whatsoever, as compared to

14  my business, which I had investment influences

15  over.

16      Q.   When you say "your business," are you

17  referring to K. W. Brown Investments?

18      A.   And 21st Century, yes.

19      Q.   When you say "my business," you are

20  referring to both entities?

21      A.   That would be good, yeah.  We can keep it

22  that way.

23      Q.   Was there any relationship between the

24  business that we just defined and the partnership?

25      A.   None.

1      Q.   Just to take a step back.  You indicated

2  that your role in the Ken-Wen partnership was

3  essentially monitoring the account.  What does that

4  involve?

5      A.   From time to time, I would review the

6  statements as they came in, you know, they were

7  mailed to the house and essentially Madoff was a

8  competitor, but nothing with any decision making

9  effort.  It was all just, well, this is what he did

10  this month, okay.  So it was just like a review,

11  nothing specific, nothing in detail.  It was all

12  very casual and I didn't like his statements.

13      Q.   Why?

14      A.   I don't know.  I just didn't like them.  I

15  thought they were just plain statements without a

16  lot of description.

17      Q.   In your experience is it -- was it an

18  unusual statement?

19      A.    It was just plain Jane without really any

20  information or backup.  I would like to have more

21  transparency with my clients and what their

22  statements look like.

23      Q.   Did you ever have reason to suspect that

24  something was amiss because the statements were so

25  "plain Jane" as you said?

1      A.   No, I never had any suspicion that was

2    amiss or could find fault with anything that would

3    have been fraudulent or illegal.  I just question

4    the investment philosophy in my mind.  That's it.

5    But that was because I was distant.  I had no

6    influence on it because it was an account that was

7    briefly established and the whole purpose of the

8    partnership was to provide a vehicle for it to

9    operate.

10      Q.   Did you have authority to make trades on

11   the account?

12      A.   No.  You mean with Madoff?  No.

13      Q.   What did you have authority to do, if

14   anything?

15      A.   Well, I had the authority to do any of

16   these things outside of the Madoff business or the

17   limited partnerships, but nothing was ever done

18   that way because we also had another family limited

19   partnership which I had specific control over.

20   This was passive.

21      Q.   What do you mean when you say "passive"?

22      A.   I had no activity with it.  Passive.

23         MS. MARASCO:  I'll just note for the

24      record it's 10:21.  We have two individuals

25      who just walked in, who I suspect being

```
 1        Ms. Werner and Mr. Bernfeld; is that correct?

 2            MR. BERNFELD:  Correct.

 3            MS. MARASCO:  We'll just go off the record

 4        very briefly.

 5            (Discussion held off the record).

 6            MS. MARASCO:  I'm ready to go back on the

 7        record.  All set?  Okay.

 8   BY MS. MARASCO:

 9        Q.   We are back on the record.  It's

10   10:26 a.m.

11            We just completed discussions about the

12   partnership agreement.  You can put that to the

13   side for now.  I don't have anymore questions for

14   that document at this time.

15            We just discussed that Ken-Wen had an

16   investment account at BLMIS; is that correct?

17        A.   Yes.

18        Q.   And we discussed that Ken-Wen held that

19   account in the partnership name; is that correct?

20        A.   Yes.

21        Q.   Okay.  And you may have mentioned this

22   before, but do you recall the account number?

23        A.   No.

24        Q.   Okay.  Was there more than one account?

25        A.   No.
```

1       Q.    Did you ever use the account in connection

2    with the operations of the partnership?

3       A.    No.

4       Q.    And when I say "use the account," what do

5    you understand that to mean?

6       A.    The account was inactive in any other

7    function other than for the investment account with

8    the Madoff firm, which was passively done.  It was

9    not operated by myself or anyone else, other than

10   Madoff had full discretion.

11           MS. MARASCO:  Okay.  I am going to hand to

12       the court reporter and ask her to mark two

13       exhibits.  One is Mr. Brown's answer to the

14       amended complaint and the other one is Wendy

15       Brown, a/k/a Wendy Werner's answer to the

16       complaint.  I'll ask them to be marked as

17       Exhibits 2 and 3, respectively.

18           (Plaintiff's Exhibit 2, Ken Brown's

19       Answer, was marked for identification.)

20           (Plaintiff's Exhibit 3, Wendy Brown's

21       Answer, was marked for identification.)

22           MR. ROHER:  Which one is two?

23           MS. MARASCO:  Two is the one on top.  It

24       is Mr. Brown's.

25   BY MS. MARASCO:

1        Q.   So I'm looking at Exhibit 2 now which is

2   your answer to the amended complaint.   Look at the

3   second page of your answer, Item Number 2.

4          It states that "defendant adopts the

5   affirmative defenses asserted by Ken-Wen Family

6   Limited Partnership and Wendy Brown DE89 to the

7   extent applicable to defendant?"

8          Did I read that correctly?

9        A.   Yes.

10        Q.   Okay.   With that said, I want to turn to

11   Exhibit 3, and this is the answer filed by the

12   limited partnership.   Turn to Page 13, paragraphs

13   69 to 70.   Just let me know when you are there.

14        A.   Which page again?

15        Q.   Page 13, Paragraph 69.

16        A.   69.   Okay, Got it.

17        Q.   Looking at 69, this is under the caption

18   Sixth Affirmative Defense.   69 reads, "Upon

19   information and belief throughout the time that

20   defendants maintained their account, their customer

21   funds, along with customer funds of other victims,

22   were frequently invested in various

23   income-producing securities, including treasury

24   instruments."

25          Did I read that correctly?

1        A.    That's what it says, yes.

2        Q.    So does this mean that Ken-Wen invested

3    customer funds in the account?

4        A.    No, it does not.

5        Q.    What do you understand this to mean?

6        A.    That part of the investment objective of

7    Ken-Wen was to have assets that produced income

8    that may have included treasury instruments, but

9    all at the full discretion of what Madoff did with

10    the various investments during the time period that

11    he was managing the account.

12        Q.    So if I'm understanding correctly, the

13    partnership invested -- strike that.

14            The partnership held the account and

15    customer funds were invested simultaneously in

16    different income-producing securities; is that

17    correct?

18        A.    No, the customer funds would have been our

19    -- would have been the account that Madoff held and

20    we would have been the customer.  We had no other

21    customers in Ken-Wen.  And the only other

22    income-producing assets that might have been there,

23    like I said previously with a qualification, is

24    that there may have been some limited partnership

25    interest that were acquired from Wendy's family's

1   investment decisions and assets.  I don't know if

2   they were part of Ken-Wen or not, but Ken-Wen

3   specifically was a customer of Madoff and had no

4   other customer funds.

5        Q.   So when you refer to "customer funds,"

6   you're referring to the Ken-Wen partnership?

7             MR. BERNFELD:  To what?

8             MS. MARASCO:  The Ken-Wen partnership.

9             THE WITNESS:  Yes, I'm adopting this as

10        Ken-Wen was the customer and it's related in a

11        broad stroke as to all other victims that were

12        of Madoff's who -- Madoff had other customers,

13        but Ken-Wen was just a customer of Madoff.

14   BY MS. MARASCO:

15        Q.   Did the account generate income for the

16   partnership?

17        A.   There was distributions made that were

18   taken and at times there was treasury instruments

19   and there was dividend producing stocks within the

20   -- within the selection of assets.  So, yes, it

21   would have produced income for the account.

22        Q.   You can put those exhibits to the side.

23             I'm going to hand another document to the

24   court reporter to mark as Exhibit 4.

25

28

```
 1              (Plaintiff's Exhibit 4, Agreement, was
 2         marked for identification.)
 3    BY MS. MARASCO:
 4         Q.   Do you recognize this document?
 5         A.   It's my handwriting, but I don't know what
 6    relationship the document is.
 7         Q.   So this appears to be a partnership
 8    account agreement; is that correct?
 9         A.   I don't know.  Is there a date on it?
10         Q.   It does appear to be undated.
11         A.   I have no idea what this is and when it
12    was done.
13         Q.   Do you see the --
14         A.   This might have been the liquidating of
15    the account, but I don't know.  The account was
16    liquidated.  It doesn't have an account number or
17    anything.
18         Q.   If you look at the top of the page, do you
19    see that writing?  It says "1EM22630-40".
20         A.   Yeah, I see that.
21         Q.   Is that the account number?
22         A.   I would not know.
23         Q.   I'll represent to you that that is the
24    account number and then underneath it, do you see
25    where it says "Ken-Wen Family LP Limited"?
```

```
1          A.    I see that.

2          Q.    And you said you recognized your

3    handwriting.  Do you also see your signature at the

4    bottom of the page?

5          A.    Yes, I also see Wendy Brown's signature.

6          Q.    And you see her signature right beneath

7    yours, right?

8          A.    Yes.

9          Q.    So looking at this document now, do you

10   have any understanding of what the purpose of this

11   document might be?

12         A.    I had no idea when this document was

13   signed and sent.

14         Q.    If you look at the last paragraph, it

15   says, "Bernard L. Madoff Investment Securities,

16   a/k/a BLMIS, is instructed to direct all notices or

17   communications, including demands, notices,

18   confirmations, reports and statements of account

19   for the partnership in connection with the

20   partnership account as follows."

21               Did I read that correctly?

22         A.    Yes.

23         Q.    Did you receive notices or communications

24   from BLMIS?

25         A.    Yes.  Madoff Securities would have had to
```

1   open the account with the Ken-Wen partnership

2   agreement.  So -- and the address in which they

3   would have sent their reports, notices and

4   statements would have been 405 Southwest Atlantic.

5       Q.   Was that a personal address or was that a

6   business address?

7       A.   That was a family address.

8       Q.   When demands, notices or confirmations or

9   reports or any of those things were sent to this

10  address, is it your testimony that you reviewed

11  those documents?

12      A.   Well, I went -- at the time I received the

13  notices and documents at the time I was living

14  there, I may have reviewed them, but it wasn't

15  anything other than just a cursory, casual review,

16  because we had no decision making power over the

17  account.

18      Q.   How long did you reside at the address 405

19  Southwest Atlantic Drive?

20      A.   I think I had left after a hurricane,

21  2005, maybe 2006.

22      Q.   Did you ever change your address with the

23  BLMIS?

24      A.   No.

25      Q.   Did you ever -- after leaving that address

1   in 2005, did you subsequently obtain a different

2   address?

3        A.   I did.

4        Q.   And did you ask BLMIS to send

5   communications to that new address?

6        A.   No, I did not.  I had no reason to.

7        Q.   You can put that document to the side.

8             I'm going to hand another document to the

9   court reporter and this will be Exhibit 5.

10            (Plaintiff's Exhibit 5, Tax Information,

11        was marked for identification.)

12   BY MS. MARASCO:

13        Q.   Here you go (handing).

14             Sir, I've handed you a document marked as

15   Exhibit 5.  At the top it says "important new tax

16   information."

17             Have you seen this document before?

18        A.   I signed it, so I must seen it, but I

19   don't know anything about it.

20        Q.   If you take a second to look at it, would

21   that help?

22        A.   No.

23        Q.   Does this document appear to be dated?

24        A.   No.

25        Q.   Looking at this document, do you have any

1   understanding of what its purpose might be?

2       A.   I guess something in the securities rules

3   changed that they had to start reporting

4   withholding.  I don't know.  That could have been

5   any time during the early part of -- the year 2000

6   or something.

7       Q.   Do you see the line that says "account

8   number"?

9       A.   Yes.

10      Q.   What does it say there?

11      A.   1EM22630/40, whatever that means.

12      Q.   Is that Ken-Wen, the partnership's tax

13  identification number there?

14      A.   It is.

15      Q.   Did --

16      A.   I think.  It looks like the number,

17  because I think it was on the front of the

18  partnership, if I remember right.

19           It was written on top of that.  That's how

20  it's reflected.  It looks like the same.

21      Q.   And I will actually give -- that's the

22  actual exhibit --

23      A.   So that would correspond to what's written

24  there, but I don't know.

25      Q.   Did Ken-Wen file tax returns?

1      A.   It did.

2      Q.   Did it regularly file tax returns?

3      A.   Yes.

4      Q.   Did the accountant -- I'm sorry.

5           Did the partnership use an accountant to

6  prepare tax returns?

7      A.   Yes, it did.

8      Q.   What was the name of the accountant?

9      A.   Shaw and Associates.

10     Q.   Other than preparing tax returns, did Shaw

11  and Associates provide any other services to the

12  Ken-Wen partnership?

13     A.   It was at Shaw's recommendation that the

14  partnership -- and corroborated with her as to, you

15  know, staying with the Madoff organization and the

16  profitability or the return -- the account status,

17  she was very satisfied with.  Her name was Kara

18  Shaw and she kind of addressed the issue and was

19  very positive about the relationship.  So taking

20  advice of the C.P.A. is the -- essentially what I

21  think the partnership trustees did.

22     Q.   How did the relationship between Ken-Wen

23  and Shaw and Associates come to be?

24     A.   It was -- again, it was primarily because

25  of the relationship with the Werner family and the

1    assets that were involved in Ken-Wen that Kara Shaw

2    was also the family C.P.A. for the Weners, so

3    therefore it carried over into our tax counsel and

4    Shaw and Associates providing that service to Ken

5    and Wendy as a married couple.

6        Q.    So my understanding that Shaw and

7    Associates provided potentially tax services to the

8    Werner family and that's how you came to meet

9    Ms. Shaw?

10        A.    Yes.

11        Q.    And it's my understanding that Ms. Shaw is

12    currently deceased; is that --

13        A.    Yes.

14        Q.    And do you recall when she passed away?

15        A.    I want to say 2016.  I'm not sure.  2017.

16    Something like that.

17        Q.    When Shaw and Associates prepared tax

18    returns for the partnership, who provided the

19    information to Ms. Shaw?

20        A.    I don't recall, but Ms. Brown would

21    probably have provided the information, if Kara

22    Shaw didn't get it directly as a duplicate

23    statement.  She may have gotten duplicate

24    statements as far as I know.

25        Q.    When you say "duplicate statements," you

1    mean copies of statements sent to you would also be

2    sent to Ms. Shaw from BLMIS?

3         A.   Yes.  She was very familiar with the

4    account.

5         Q.   Did Ms. Shaw have any decision making

6    authority with respect to the account?

7         A.   Just advising us.  She made no decisions

8    on the account, just advising us to -- as to the

9    general tax information and the overall account

10   status family with Madoff.  She was, like I said,

11   very happy with Madoff.

12        Q.   When the partnership provided Ms. Shaw

13   with documents for tax preparation purposes, do you

14   recall whether those documents were returned?

15        A.   No.

16        Q.   No, you don't recall?

17        A.   No, I don't recall.

18        Q.   Did you personally pay taxes on BLMIS'

19   income?

20        A.   We filed a joint tax return, so, yes.

21        Q.   Do you recall how much you paid the IRS

22   annually between 2006 and 2008?

23        A.   From just the -- this account or from our

24   overall?

25        Q.   From just this account.

```
 1              MR. BERNFELD:  "This" meaning BLMIS?
 2              MS. MARASCO:  The "account" was defined at
 3         the beginning of the deposition to include
 4         account 1-EM226-3.
 5              MR. BERNFELD:  Okay.
 6              THE WITNESS:  I think our taxes could have
 7         ranged anywhere from 60,000 to 100,000.
 8    BY MS. MARASCO:
 9         Q.   Each year?
10         A.   Yes, because we had other income that was
11    also portfolio income, so that would have been in a
12    high tax range during that period.
13         Q.   Do you recall where your tax returns for
14    that period might be located?
15         A.   I think -- for the Ken-Wen company?
16         Q.   Correct.
17         A.   I wouldn't have those, that I'm aware of.
18    Personal tax returns, I think we may have, but I
19    don't think I have -- I don't know about the tax
20    returns for Ken-Wen.
21         Q.   Do you recall the last time that the
22    Ken-Wen partnership filed a tax return?
23         A.   No.
24         Q.   And you testified earlier that you
25    resigned from the partnership in 2008; is that
```

1    correct?

2        A.    Yes, February 29, 2008.

3        Q.    Okay.

4        A.    I think there would be tax returns or tax

5    reporting done after that.

6        Q.    Did you ever receive a tax refund in

7    connection with the taxes paid on behalf of the

8    partnership?

9        A.    I doubt it.

10       Q.    You can put that document to the side.

11             Did you personally withdraw funds from the

12    BLMIS account?

13       A.    Can you clarify what you mean?

14       Q.    In your capacity as a general partner, did

15    you withdraw funds from the account?

16       A.    Yes, as a general partner funds were

17    withdrawn from the account.

18       Q.    And how did you go about making a

19    withdrawal?

20       A.    It was generally a letter or a

21    correspondence to the Madoff organization and there

22    was one specific guy there who did most of the --

23    Frank or somebody did most of the transactions.

24       Q.    And how did you know that Frank did most

25    of the transactions?

 1      A.   Because he would take the call.  I don't

 2   know if that's the right name.  I'm just trying to

 3   remember.

 4      Q.   Right, understood.

 5           You said he would take the call.  What

 6   call?

 7      A.   If a distribution was going to be made,

 8   generally, I think, it was casually done by picking

 9   up the phone and calling the organization and

10   asking how they could facilitate the transfer and

11   we had to do something where they -- a form that

12   would be signed and sent to his -- a specific

13   person at the firm.  If I remember right, it was

14   faxed or mailed.  I don't remember.

15      Q.   So if I understand correctly, you would

16   call BLMIS and receive instruction about how to

17   make a written request?

18      A.   Yes.

19      Q.   Okay.  As between you and Wendy, who would

20   make the withdrawal request?

21      A.   Well, up until 2008, it would have been

22   jointly.

23      Q.   Right, but when you call -- say when you

24   called BLMIS, did you pick up the phone or was it

25   more likely Wendy?

```
 1        A.    I don't remember.

 2        Q.    Did you both have authority to make a

 3   withdrawal?

 4        A.    Yes.

 5        Q.    So, for example, if Wendy were to make a

 6   request for withdrawal, would you receive notice of

 7   that?

 8        A.    Yes.

 9        Q.    How?

10        A.    Well, the money would probably have gone

11   into our personal accounts.

12        Q.    And what personal accounts would that have

13   been?

14        A.    A joint account or another account or an

15   investment or something.  It was always used for

16   specific purposes to try to do something for -- in

17   the way of a business transaction or an investment

18   transaction.

19        Q.    You said "the funds might be deposited

20   into a joint account" and I know you reference a

21   couple of accounts.  Where might those accounts

22   have been held?

23        A.    At a bank.

24        Q.    Do you recall which bank?

25        A.    I think we did business with Bank of
```

1    America at the time and other banks.  We had, like,

2    three or four banks.  I don't know.  I didn't do

3    the banking, Ms. Werner did.

4        Q.   You said you would receive confirmation of

5    any request for withdrawal, because you would see

6    the money in the account.  Am I recalling that

7    correctly?  In your bank account.

8        A.   No, no.  It would be -- the withdrawal

9    would have been directed to have the withdrawal

10   done.  Myself and my spouse would have directed the

11   Madoff organization to send a withdrawal.  So, I

12   don't know which account it would go into, but it

13   would come to as a family asset.

14       Q.   And you don't know where the funds would

15   be deposited?

16       A.   No, not at this time.

17       Q.   Did the partnership have a separate bank

18   account?

19       A.   I think so, yes.

20       Q.   Where?

21       A.   Probably Bank of America.

22       Q.   I'm going to hand to the court reporter

23   another exhibit to mark as Exhibit 6.

24            (Plaintiff's Exhibit 6, Ken-Wen

25            Investments, was marked for identification.)

```
 1    BY MS. MARASCO:

 2        Q.   All right.  You have in front of you a

 3    document that's been marked as Exhibit 6.

 4             Do you see the heading on that document?

 5        A.   Yes.

 6        Q.   And what is the heading?

 7        A.   Ken-Wen Investments.

 8        Q.   And we discussed earlier, that was one of

 9    the two businesses that you owned; is that correct?

10        A.   Yes, that's right.

11        Q.   Okay.  Do you see a date on this document?

12        A.   I don't.

13        Q.   If you --

14        A.   Oh, yes, I do.  Now I see it.

15        Q.   And what date is that?

16        A.   April 20th, 2005.

17        Q.   And this appears to be a letter signed by

18    you to BLMIS; is that correct?

19        A.   Yes.

20        Q.   Did you prepare this document?

21        A.   Probably.

22        Q.   Do you recall whether anyone assisted you?

23        A.   I didn't type.  I never typed.

24        Q.   So someone would have helped you type up

25    the letter?
```

08-01789-cgm   Doc 21118-1   Filed 02/14/22   Entered 02/14/22 12:02:47   Exhibit 11
(Revised)   Pg 43 of 122
42

```
1       A.   Yes, yes, and probably proofread it and I
2   probably just signed it.
3       Q.   So it would have been, you know, someone,
4   just a typist and not an attorney or someone like
5   that; is that right?
6       A.   It could have been Wendy or somebody in
7   the office, but anyway, I didn't type.
8       Q.   Okay.
9       A.   I don't think we would have let somebody
10  in the office do this.  I think it would have been
11  probably between her and myself.  She was a very
12  good typist.
13      Q.   And that is your signature at the bottom,
14  right?
15      A.   It is.
16      Q.   And I see you signed it Ken Brown, GP,
17  Ken-Wen FLP; is that correct?
18      A.   Yes.
19      Q.   And who is this letter addressed to?
20      A.   "Attention Frank."  There we go.
21      Q.   And just to clarify.  How did you know to
22  address this letter to Frank Pascali?
23      A.   Like I said, it was known when you call
24  the office that he would be the one you would be
25  directed to, not that I had any conversations with
```

1   him, I just remember -- I don't know Frank.

2        Q.   And taking a look at this document here,

3   do you know what the purpose of it is?

4        A.   The purpose is probably for a securities

5   interest reason, because of the businesses that we

6   were in, that we had to copy, as it says,

7   interested party agreement with RBC Santora, which

8   was another bank that we did primarily a lot of our

9   business accounts with.  It was probably directed

10  because of some kind of securities purpose.  So it

11  was really a -- it's a disclaimer that was probably

12  required by the Madoff organization because of our

13  business is being similar.  I'm guessing.  I don't

14  know.  I don't know why we would do whatever we

15  were asked to do.  It wouldn't be something that we

16  were asked to do.  It wouldn't be something that we

17  would do, I don't think.  It wasn't directed by us.

18       Q.   So looking at this letter, is it accurate

19  to say that this is adding RBC Santora as a

20  beneficial party to the account?

21       A.   It may have been because RBC Bank may have

22  had a litigation interest against us.  Maybe that's

23  why, I don't know, or it could have been a

24  securities purpose, but I don't recall anything

25  about this agreement or this letter.

1        Q.   Do you see handwriting on this paper as

2    well?

3        A.   No, other than -- not handwriting I

4    recognize.

5        Q.   But you do see the handwriting?

6        A.   Yes.

7        Q.   That's not your handwriting?

8        A.   None of it, no.

9        Q.   Do you see at the top where it says "no

10   shot" (indicating)?

11       A.   Yes.

12       Q.   What do you understand that to mean, if

13   anything?

14            MR. ROHER:  Object to form.

15            THE WITNESS:  I have no idea.  I don't.

16       None of this writing makes any sense to me.

17   BY MS. MARASCO:

18       Q.   Okay.  And so we discussed the date

19   before.  Right above the date, do you see a

20   reference number?

21       A.   Yes.

22       Q.   What does that say?

23       A.   1EM2264-0.

24       Q.   And so we discussed previously that there

25   were documents with the identification

1    1-EM22630-40.  Do you recall that?

2         A.   I see that, yes.

3         Q.   Why might this say 1-EM226-4-0?

4         A.   I can only guess, okay, it would seem like

5    the 4-0 would be a specific account within the

6    Madoff account structure.  One might be a cash

7    account.  One might be a special option account.

8    One might be a margin account, all under the same

9    account number, because you have various divisions.

10   If you have a securities account and you have only

11   cash account, in our firm it would come out dash

12   one.  Maybe because of the Madoff organization they

13   had one, two, three, four, and they made it, like,

14   30, 40 for their own accounting purposes.

15        Q.   So I understand that this is your

16   understanding or your attempt at an explanation,

17   but is it correct to understand that it would be

18   one account that would be sectioned off?

19        A.   No, it's just one specific account with

20   different subsections within.  It could be a cash

21   account, margin account, options account,

22   securities, treasury bond account, something like

23   that.  Why it was listed dash four, I don't know.

24   It was only one account, though.

25        Q.   And how might you know to distinguish as

1    between 1-EM226-4-0 or -3-0?

2         A.    I wouldn't have no distinction.

3         Q.    So to your recollection, when you prepared

4    this letter or dictated this letter, how did you

5    know the account number to include?

6         A.    Probably Mr. -- let's say Frank probably

7    would have defined what account -- what the number

8    would have been, because it wouldn't just come out

9    because I never recognize 30/40.  I don't ever

10   recalling that.  I remember an account number, but

11   I don't know what that distinction would be.

12        Q.    Okay.  I'm going to hand another document

13   to the court reporter to mark as Exhibit 7.

14             (Plaintiff's Exhibit 7, Agreement, was

15        marked for identification.)

16   BY MS. MARASCO:

17        Q.    You've just been handed what's now been

18   marked Exhibit 7.

19             Do you recognize this document?

20        A.    No.

21        Q.    Was does it say at the top?

22        A.    RBC Santora account control agreement.

23        Q.    And then when I look down to the

24   agreement, number one, do you see an account number

25   filled in there on the first page?

1        A.    I do.

2        Q.    What account number is that?

3        A.    It has the 3-0 instead of the 4-0.

4        Q.    And so if you can just take a minute to

5    just take a look at this document, to the extent

6    you're not familiar with it.

7        A.    Okay.  It would appear now that it says

8    "pledgor".  Perhaps the Ken-Wen account was pledged

9    to RBC Santora Bank, for some reason that I cannot

10    recall, so that's why they have this letter over

11    here as a disclaimer that would match something

12    like this.  Like I said, I didn't know for

13    securities purposes or for the purposes of, I

14    guess, a lending agreement.  That's how this letter

15    was originated.  And that's what this form would

16    back up.  Pledgor's rights on the account.

17    Pledgor's bank's securities interest.  Basically

18    it's saying that RBC Santora has a security

19    interest in the values of this account should,

20    whatever the purpose of this whole thing was about,

21    should have -- would have been default.  In other

22    words, it's pledged.

23        Q.    And why might Ken-Wen have pledged the

24    account to RBC Santora?

25        A.    Today I don't know.

```
 1        Q.   Just at the top of the page for clarity,
 2   would you mind just telling me what the date is on
 3   this document?
 4        A.   April 15, 2005.
 5        Q.   Does that comport with the date on the
 6   letter that's been marked Exhibit 6?
 7        A.   It does.
 8        Q.   Well, the letter actually was dated
 9   April 20th, 2005; is that correct?
10        A.   Yes.
11        Q.   And then this is dated April 15th, 2005?
12        A.   Yes.
13        Q.   If the account was pledged to RBC --
14   Strike that.
15             Did the partnership also hold a bank
16   account at RBC Santora?
17        A.   Not that I recall.
18        Q.   In your individual capacities, did you
19   hold a bank account at RBC Santora?
20        A.   I believe I did.
21        Q.   In your individual capacity or as --
22        A.   Joint account, perhaps.
23        Q.   And do you recall the purpose of that
24   account?
25        A.   I think for just general business
```

1   purposes.  Like I said, we had several different

2   banks that we worked with.  We liked to have more

3   than one bank that we could rely on, so that would

4   have been one of them.  I think we had a

5   relationship with a banker there that took a

6   special interest in our accounts, so that's the

7   only thing I remember.

8      Q.  Would that account have been used in

9   connection with the business which we defined

10  earlier to be 21st Century or K. W. Brown

11  Investment?

12     A.  Most likely not.  Most likely it was

13  personal, but I'm not sure.

14     Q.  Who might have had access to the RBC

15  Santora account?

16     A.  It would have been myself or Wendy.

17     Q.  Do you recall whether you received

18  contemporaneous bank statements?

19     A.  I am sure we would have got statements,

20  sure.

21     Q.  Did you review them?

22     A.  Casually, yes.

23     Q.  You can put that document to the side.

24         I'm going to hand to the court reporter

25  another document which can be marked Exhibit 8.

```
 1              (Plaintiff's Exhibit 8, Request for

 2         Deposit, was marked for identification.)

 3    BY MS. MARASCO:

 4         Q.   Do you recognize this document?

 5         A.   Yeah, it's in my handwriting.  Done

 6    4-11-2006.

 7         Q.   What does it appear to be?

 8         A.   An instruction to Madoff Securities to

 9    deliver $600,000 to a bank account.

10         Q.   And what bank account is that?

11         A.   I guess it would be a Ken-Wen bank

12    account.

13         Q.   At the second half of the page, do you see

14    where it says, "Please forward $600,000 by wire

15    transfer to RBC Santora"?

16         A.   Yes.

17         Q.   So do you understand this to be a request

18    for deposit into the RBC Santora Bank account?

19         A.   Yes, that would probably explain why we

20    had the other two letters in reverse order.  Now

21    it's more clear.

22         Q.   And did you sign this document?

23         A.   Yeah, I did.

24         Q.   And you signed it as GP; is that correct?

25         A.   At that time I was, yes.
```

1        Q.   And this document appears to have been

2   faxed?

3        A.   Yes.

4        Q.   Do you see at the top of the page it looks

5   like it said "attention," it may have been crossed

6   out, but it says "Robert".  Do you see that?

7        A.   I do.

8        Q.   Who's Robert?

9        A.   I don't know.

10       Q.   Do you know why you would send this

11  request to Robert and not Frank?

12       A.   Don't know.

13       Q.   So might you have -- consistent with your

14  testimony before, would it be accurate to say that

15  you would have called BLMIS and they would have

16  instructed you who to send the request to?

17       A.   Yes, that's true.  Just clerical

18  direction.  That's all.

19       Q.   Did you confirm that these funds were

20  deposited into the account at RBC?

21       A.   I'm sure.  I don't remember now, but I

22  guess they would have been.

23       Q.   How might you confirm?

24       A.   No way for me to confirm anything right

25  now.  I would think they went though because --

1    probably have another letter in there that didn't.

2        Q.    Just at the top of the page, it says, K.

3    W. Brown; do you see that?

4        A.    Yes.

5        Q.    Would that be because it was faxed from

6    your business or does it mean something else?

7        A.    No, that would just be because it was

8    faxed from the business.

9        Q.    I'm going to hand to the court reporter

10   what will be marked as Exhibit 9.

11           (Plaintiff's Exhibit 9, BLMIS Statement,

12           was marked for identification.)

13   BY MS. MARASCO:

14       Q.    You've been handed what's been marked

15   Exhibit 9.

16           Do you recognize this document?

17       A.    No, I don't.

18       Q.    Is it accurate to say that it appears to

19   be a BLMIS statement?

20       A.    It does.

21       Q.    And it's at JPMorgan Chase?

22       A.    Yes, which I'm not familiar with.

23       Q.    I would represent to you that this is the

24   account statement for BLMIS at JPMorgan Chase.  The

25   account number is 140-081703.  And the date on this

1    statement, if you see in the top right-hand corner

2    of the page, April 1, 2006 to 28 April 2006; is

3    that correct?

4         A.   Yes, but I don't know anything about it.

5         Q.   Okay.  If you can turn to Page 31 of 54.

6    Page numbers are in kind of the center part of the

7    page.

8         A.   Okay.

9         Q.   If you look at the first entry there, do

10   you see the 17th April?

11        A.   Yes.

12        Q.   And do you see that it appears to be a

13   "$600,000 debit with an AC Ken-Wen Family LP

14   Limited"?

15        A.   Okay.

16        Q.   Did I read that correctly?

17        A.   Yes.

18        Q.   And do you see at the -- just above that

19   it says "via RBC Santora FL"?

20        A.   Yes.

21        Q.   And the account number there is 067012882;

22   is that correct?

23        A.   Yes.

24        Q.   If you refer back to Exhibit 8, do you see

25   the ABA number?  Does that match?

1        A.    The ABA number does match.

2        Q.    Okay.  So is it fair to say that the funds

3   were transferred from the BLMIS account to the RBC

4   Santora account held by Ken-Wen?

5        A.    Yes.

6        Q.    So is it accurate to say that Ken-Wen held

7   the account at RBC Santora?

8        A.    Yes.

9        Q.    We discussed earlier that you thought it

10   may have been held in your individual capacities.

11       A.    Yes.

12       Q.    Do you still believe that to be true?

13       A.    No, I believe we still may have individual

14   bank accounts there, but clearly we had a Ken-Wen

15   bank account there.

16       Q.    And when those funds -- when you made the

17   request for the withdrawal, what was the purpose of

18   the request?

19       A.    Probably to fund another asset purchase

20   for Ken-Wen.

21       Q.    Like what?

22       A.    Don't know.

23       Q.    At the beginning of this deposition we

24   said that the partnership had an identified purpose

25   and that it was your recollection that Ken-Wen

1    never purchased assets, it purchased -- it

2    transferred certain limited interests, limited

3    partnership interest, but did not purchase assets;

4    is that still correct?

5         A.   No, ma'am.  After all this time, it looks

6    like we may have purchased other assets in the name

7    of Ken-Wen.

8         Q.   Apologies if you answered this, but do you

9    recall what assets you purchased?

10        A.   At that time we were doing two things.  We

11   were buying insurance policies and golf courses.

12        Q.   Did you say "golf courses"?

13        A.   Yes.

14        Q.   And what did the partnership do with golf

15   courses?

16        A.   I don't know if the partnership did

17   anything with golf courses.  You have something

18   else for me to see, because I don't remember

19   whether it did or it didn't at this point.

20   Primarily they were in KBCB, if I remember right.

21        Q.   You said KBCB?

22        A.   Yes.

23        Q.   What is that?

24        A.   That's another family limited partnership.

25   Remember when I said to you at the beginning that

1    one separated earned assets from essentially the
2    inherited assets or transferred assets.
3        Q.    Why might Ken-Wen have bought insurance
4    policies?
5        A.    At the time I think we bought a
6    substantial life insurance policy on Violet Werner.
7    May have -- retirement planning or estate planning.
8    That's the only thing we were doing.  That's what
9    that money was for, retirement planning and estate
10   planning.
11       Q.    And golf courses?
12       A.    No.  I don't think so.  I said the golf
13   courses, I believe, were KBCB, but then again, you
14   know, you're helping me, reminding me of things, so
15   it's nothing intentional.
16       Q.    I'm going to hand another document to the
17   court reporter, if she'll please mark it as
18   Exhibits 10.
19           (Plaintiff's Exhibit 10, Fax, was marked
20       for identification.)
21   BY MS. MARASCO:
22       Q.    Have you seen this document before?
23       A.    I assume I did, because it's in my
24   handwriting again.
25       Q.    Okay.  And did you sign this document?

```
 1        A.   I did.

 2        Q.   And you signed it in your capacity as a

 3   GP, correct?

 4        A.   Right.  I don't see any date on it,

 5   though.

 6        Q.   Do you see the fax number at the top of

 7   the page?

 8        A.   Yes.

 9        Q.   And to whom is this fax addressed?

10        A.   Frank at Madoff Securities.

11        Q.   And do you see the account number there?

12        A.   I do.

13        Q.   What account number is that?

14        A.   1EM226-3- -- it looks like zero.

15        Q.   And this is a request to wire 150,000 and

16   it looks like there was a request that it be sent

17   to Paradise Bank?

18        A.   Yes.

19        Q.   And that appears to be crossed out; is

20   that correct?

21        A.   There's an X through it.  Why, I don't

22   know.  There's other writing here.  It says, "spoke

23   to client, no wire."

24        Q.   And what's the -- you see 6-21 written

25   after that?
```

1      A.    Yeah, it's not in my handwriting.  I don't
2  know what that is.
3      Q.    Did Ken-Wen ever switch from using RBC
4  Santora to Paradise Bank?
5      A.    We may have switched or we may just had
6  the accounts setup simultaneously.  Like I said, we
7  had different banks that we worked with and this, I
8  think, was business practices, different.
9      Q.    And if they were in existence
10  simultaneously, why might the request be for
11  deposit into Paradise Bank instead of RBC?
12      A.    For whatever reason it was at the time, I
13  don't know.  It's, like I said, it's been a while,
14  so I don't know.
15      Q.    To your recollection, was the Paradise
16  Bank account also held by the Ken-Wen partnership?
17      A.    I believe so, because he has an account
18  number there.
19      Q.    And then it -- the deposit request, it
20  says, "To Ken-Wen Family Limited Partnership," is
21  that correct?
22      A.    Yes.
23      Q.    Okay.  Who may have had access to the
24  Paradise Bank account?
25      A.    Wendy Brown and Ken Brown.

```
 1        Q.    Would anyone else have had access to the
 2   Paradise Bank account?
 3        A.    No.
 4        Q.    Do you recall whether you received
 5   contemporaneous account statements from Paradise
 6   Bank?
 7        A.    We got statements, sure, regularly.
 8        Q.    And you do at least a cursory review of
 9   them, to your recollection?
10        A.    Probably, yes.
11        Q.    Do you recall whether you executed a new
12   account control agreement?
13        A.    I don't know what you mean by that.
14        Q.    We discussed earlier that Ken-Wen had
15   pledged the account to RBC Santora; do you recall
16   that?
17        A.    I don't know if the whole account was
18   pledged or a portion of the account.  Yes, there
19   was a pledge agreement with RBC Bank, but they had
20   no influence over the account, other than there may
21   have been a securities interest at the time.  Maybe
22   the $600,000 paid them off, I don't know.
23        Q.    To your recollection, did Paradise Bank
24   ever have a security interest in the account?
25        A.    No.  Then again, I don't remember.  I'm
```

1    sorry, I don't remember.

2        Q.   So you mentioned earlier that this has a

3    notation that says "spoke to client, no wire," and

4    there's an X through it.

5            Do you recall speaking to someone at BLMIS

6    about this request?

7        A.   No, I don't.

8        Q.   Do you know why the funds would not be

9    wired?

10       A.   No.

11       Q.   Do you recall receiving the funds by

12   another means?

13       A.   No.

14       Q.   Okay.  I'm going to hand another document

15   to the court reporter to mark as Exhibit 11.

16           (Plaintiff's Exhibit 11, Check, was marked

17       for identification.)

18   BY MS. MARASCO:

19       Q.   Have you seen this document before?

20       A.   No.

21       Q.   Can you tell me what it is?

22       A.   It's a check.

23       Q.   From whom?

24       A.   B. L. Madoff.

25       Q.   And to whom is it addressed?

1      A.   Ken-Wen Family Limited Partnership.

2      Q.   And what is the date of the check?

3      A.   6-26-2007.

4      Q.   Okay.  And what is the amount of the

5  check?

6      A.   $150,000.

7      Q.   Do you see a reference number in the

8  bottom left-hand corner of the check?

9      A.   Yes, 1EM226-3.

10      Q.   And then if you turn to the second page,

11  do you see the endorsement there?

12      A.   Yes.

13      Q.   And which bank does it appear to have been

14  deposited in?

15      A.   It looks like it's stamped Paradise Bank.

16      Q.   Why might Mr. Madoff be writing a check

17  for $150,000 to the Ken-Wen Family Limited

18  Partnership?

19      A.   Probably a distribution.

20      Q.   So when we talked about -- when we talked

21  about Exhibit 10 before, that was the fax with the

22  request for $150,000?

23      A.   Right.

24      Q.   And there was the notation that says "no

25  wire/6/21," right?

1       A.   Yes.

2       Q.   And here we have a check dated 6/26/2007

3   for $150,000 to Paradise Bank account.  Suggests to

4   me that the funds were sent by check instead of

5   wire; does that sound like --

6       A.   I have no reason to dispute that, sure.

7   It looks like the money was sent by check, yes.

8       Q.   Do you know why the money would be sent by

9   check as opposed to wire?

10      A.   No.

11      Q.   So when you spoke to someone at BLMIS in

12  connection with this request that we marked as

13  Exhibit 10, it says "spoke to client, no wire."

14  Did they inform you that they would not be sending

15  a wire?

16      A.   I don't know.  I don't recall any of it,

17  but, for whatever reason, the document speaks for

18  itself.  That's apparently what happened.

19      Q.   Okay.  I'm going to hand another document

20  to the court reporter.  This will be Exhibit 12.

21           (Plaintiff's Exhibit 12, Bank Statement,

22      was marked for identification.)

23           MR. ROHER:  Can we go off the record?

24           (Discussion held off the record).

25  BY MS. MARASCO:

63

```
 1        Q.   Are you all right to continue, sir?

 2        A.   I'm exhausted.  I'm really tired.  I

 3  really want to go home and go to sleep.

 4        Q.   I hear you.

 5        A.   Okay.

 6        Q.   Let me know if you need a break.

 7        A.   No, I'm fine.

 8        Q.   Thank you.

 9             So this has been marked as Exhibit 12.

10  This is another account statement for BLMIS at

11  JPMorgan Chase.  The account number is 140081703.

12             Is that consistent with what you see in

13  front of you?

14        A.   It is consistent with what I see, yes.

15        Q.   What is the date on this statement that

16  you have in front of you?

17        A.   It looks like month end statement of

18  December 31st, 2007.

19        Q.   If we'll turn to Page 51, it's just about

20  the last page.

21        A.   Got it.

22        Q.   So you actually have the highlighted

23  version.  It is the $500,000 transfer.  It's in the

24  middle there.

25             Do you see where it says "12-31 fed wire
```

1    debit via Paradise Bank AC Ken-Wen Family Limited

2    Partnership"?

3        A.   Right.

4        Q.   And that's a $500,000 debit; is that

5    correct?

6        A.   Yes.

7        Q.   So it's fair to say, based on this, that

8    it looks like $500,000 was wired from BLMIS to the

9    Paradise Bank account held by Ken-Wen?

10       A.   That's what the document says.

11       Q.   Do you recall requesting a $500,000 wire

12   in December 2007?

13       A.   No, I don't, but I just generally recall

14   that at the time of 2007 I wanted to be getting out

15   of the stock market.  I didn't like the market

16   conditions.  That's what my business was

17   forecasting, so that was probably a liquidation

18   effort to get out of the stock market.

19       Q.   When you made these requests, did you know

20   how much was left in the account?

21       A.   I had a fair idea.

22       Q.   Based on what?

23       A.   The statement.

24       Q.   So the statement that was sent to you from

25   BLMIS would reflect the balance of funds in the

1    account?

2        A.    Generally, yes.

3        Q.    We discussed earlier that you left the

4    address that was identified on -- with respect to

5    Exhibit 4, we discussed that there was an address

6    at 405 Southwest Atlantic Drive.

7              Do you recall talking about that?

8        A.    Yes.

9        Q.    And you testified that you left that

10   address in about 2005?

11       A.    '06.

12       Q.    Okay.  You did say 2005, but now --

13       A.    '06.

14       Q.    -- it could be 2006?

15       A.    I said 2005 or 2006.  After the hurricane.

16       Q.    And you told me that you had not provided

17   an updated address to BLMIS; do you recall that?

18       A.    No, Ken-Wen's address was 405 Southwest

19   Atlantic.  I didn't have any other address that I

20   know of.

21       Q.    When you said you left that address in

22   2005, how did you receive correspondence sent to

23   that address?

24       A.    It went to the address because that's

25   where it always went to that address.  That's the

1    account address for the account, not my alternative

2    address.

3              MR. ROHER:  Are you talking personally?

4    BY MS. MARASCO:

5       Q.   Let me take a step back.

6              We just discussed account statements that

7    you reviewed to determine the account -- the

8    balance left in the account, right?

9       A.   Yes.

10      Q.   Okay.  And how did you -- where were those

11   account statements sent?

12      A.   To 405 Southwest Atlantic.

13      Q.   Were they always sent to that address?

14      A.   Yes.

15      Q.   So you said that you left in about 2005 or

16   2006; is that right?

17      A.   That's correct.

18      Q.   So for documents sent to that address

19   after 2005 or 2006, how did you access them?

20      A.   I didn't.

21      Q.   So when you made a request to withdraw

22   $500,000 in 2007, how would you have known how much

23   was left in the account?

24      A.   I would -- I would have been generally

25   informed, plus I file tax returns jointly, so I was

 1    fairly well-informed as to the value levels of the

 2    account.

 3         Q.    By whom would you be informed?

 4         A.    Ms. Brown.  We talked.

 5         Q.    Did you receive account statements as

 6    well?

 7         A.    Or I would go to the house and review them

 8    from time to time, but the address was always 405.

 9    I wasn't trying to be ignorant of them, no.  We

10    just had no decision making over them, other than

11    we could make withdrawals.  That's the only

12    decisions we could make.

13         Q.    So when you would have made a request in

14    December 2007 to withdraw $500,000 from the

15    account, would you have conferred with Ms. Brown?

16         A.    Yes.

17         Q.    Would you need her consent to make that

18    request?

19         A.    I think so.  Yes, I think, because we were

20    both general partners at the time.  Certainly if

21    there was a disagreement, then I think that there

22    would have been a disagreement, but it didn't

23    happen, so --

24         Q.    For example, what might have happened, if

25    you know, if you had made a request for a

1    withdrawal that exceeded the amount in the account?

2        A.   It would not have happened.  First of all,

3    Madoff would not have sent a withdrawal greater

4    than the amount that's in the account.  It's just

5    not going to happen in the securities business.

6        Q.   Would that have been discussed?  Would you

7    have made a phone call to determine how much was

8    left in the account?

9        A.   Probably.

10       Q.   I'm going to hand another document to the

11   court reporter to mark as Exhibit 13.

12            (Plaintiff's Exhibit 13, Fax Request, was

13       marked for identification.)

14   BY MS. MARASCO:

15       Q.   So this is going to be a little bit out of

16   order.  Put that to the side for now.  This is

17   going to be Exhibit 14.

18            (Plaintiff's Exhibit 14, Request for

19       Transfer, was marked for identification.)

20   BY MS. MARASCO:

21       Q.   So now you have what's in front of you as

22   Exhibit 14.  We'll talk about Exhibit 13 in just a

23   minute.

24            Do you recognize this document?

25       A.   Which exhibit am I on?

```
 1        Q.    This is 14.

 2        A.    You want me to talk about that one?

 3        Q.    Yes.

 4        A.    Okay.

 5        Q.    Do you recognize this document?

 6        A.    It's in my handwriting.

 7        Q.    Okay.  And what does it appear to be?

 8        A.    A transfer of $500,000.

 9        Q.    It's a request for a transfer of 500,000;

10   is that right?

11        A.    "Please wire transfer 500,000 to Ken-Wen

12   Family Limited Partnership."

13        Q.    Do you see the address there?

14        A.    I do.

15        Q.    And is that the address we were just

16   discussing before?

17        A.    Yes.

18        Q.    That's 405 Southwest Atlantic Drive?

19        A.    Yes.

20        Q.    To what account is the request seeking a

21   deposit?

22        A.    Ken-Wen Family Limited Partnership at

23   Paradise Bank.

24        Q.    Okay.  And you signed this document in

25   your capacity as GP; is that right?
```

```
 1        A.   I did.

 2        Q.   And then at the top in the bottom -- I'm

 3   sorry, at the top left-hand corner there's a note

 4   that says "free hand," do you see that?

 5        A.   I do.

 6        Q.   What does that mean?

 7        A.   I don't know.

 8        Q.   Is that your handwriting as well?

 9        A.   No.

10        Q.   And then in the right-hand side in that

11   big blank space there it says "3.6 million," do you

12   see that?

13        A.   I do.

14        Q.   Does that sound like that may have been

15   the balance?

16        A.   I think so.

17        Q.   And then you see the bottom, it looks like

18   a little symbol there, and it says "12/31"?

19        A.   Yes.

20        Q.   Now, I will turn to what was previously

21   marked as Exhibit 13 that everyone should have.

22   And this appears to be another fax request; is that

23   correct?

24        A.   Yes, it is.

25        Q.   And is this your handwriting?
```

```
 1        A.    Yes, it is.

 2        Q.    And to whom is the fax addressed?

 3        A.    Frank at Madoff.

 4        Q.    Do you see the reference number there?

 5        A.    Yes.

 6        Q.    What account is that?

 7        A.    Ken-Wen Family Limited Partnership.

 8        Q.    And the account number?

 9        A.    1EM226-3-0.

10        Q.    And then what does it say just beneath

11   that?

12        A.    "Please liquidate $3 million from the

13   account and wire transfer proceeds to Ken-Wen

14   Family Limited Partnership, Paradise Bank."

15        Q.    Do you recall why you made a request to

16   liquidate the account?

17        A.    Yes.

18        Q.    Why?

19        A.    I was troubled by the stock market.  I

20   wanted to get liquidity as quickly as possible and

21   at the time we decided we wanted to have greater

22   control over our moneys, rather than have a

23   discretionary account, which we had no control

24   over, if we were looking at hard times coming in

25   the marketplace, which eventually did.  It was
```

1    called the financial crisis of 2008, 2009, 2010,

2    2011, 2012.  That's why we got out of the

3    marketplace.

4        Q.   And you said you were troubled by the

5    market.  What caused you to be troubled?

6        A.   The policy at the fed and the misstated

7    conditions of our banking system.  Something called

8    subprime loans.  I can go on and on.  Our

9    disappointments over trade and the way we were not

10   being able to accomplish anything in Congress to do

11   anything about stimulating growth.

12       Q.   And you were in tune with this.  Was that

13   in connection with your business?

14       A.   Yes, yes, religiously.

15       Q.   And K. W. Brown Investments and 21st

16   Century were still operating?

17       A.   Yes.

18       Q.   Okay.  Did you tell me when they stopped

19   operating?

20       A.   March of 2008.

21       Q.   So with the request to liquidate the 3

22   million, was it your understanding that that

23   withdrawal would wipe out the account?

24       A.   I think that -- if I may proceed ahead of

25   you.  It says 3.1 down at the bottom.  I thought a

1   small residual would be there to keep the account

2   open, in case we wanted to come back.

3        Q.    And do you recall receiving the funds, the

4   $3 million in funds?

5        A.    Yes.

6        Q.    Do you recall where they were deposited?

7        A.    At Paradise Bank.

8        Q.    And what did you do with those funds?

9        A.    We had established some sophisticated

10   financial planning and estate planning by creating

11   an offshore trust so that we could trade in foreign

12   currencies.  With the U.S. dollar at any of the

13   relationship of what the banking system was telling

14   me, the Australian dollar was at $0.55 to the

15   dollar.  The Canadian dollar was at $0.62 to the

16   dollar and I could see our dollar falling the same,

17   so I wanted to get out of U.S. currency for a

18   safety feature.

19        Q.    Was the full 3 million invested into the

20   offshore?

21        A.    I think 3.8 million was.

22        Q.    Where did the other .8 come from?

23        A.    I don't know now.  It's a long time, but

24   the other statements I think show that somewhere

25   along the line.

74

1        Q.   And you said it was a trust?

2        A.   Yes.

3        Q.   What was the name of the trust?

4        A.   South Pack.

5        Q.   Just to close the loop on that, I'm going

6    to hand to the court reporter to mark as

7    Exhibit 15.

8             (Plaintiff's Exhibit 15, Bank Statement,

9             was marked for identification.)

10   BY MS. MARASCO:

11       Q.   If you'll turn to Page 47 of 63.

12            Are you there?

13       A.   Yes.

14       Q.   Do you see in the middle of the page

15   there's an entry -- sorry.  Just to take a step

16   back.

17            Do you recognize this document?

18       A.   I don't recognize the document.

19       Q.   What do you understand it to be?

20       A.   I understand it to be Madoff's Baton Rouge

21   statement at Chase Bank, Chase Morgan.

22       Q.   And what is the date on this statement?

23       A.   Ending date is January 31st, 2008.

24       Q.   And then the account number is 140081703;

25   is that correct?

75

```
 1        A.   Yes, same as the previous one.

 2        Q.   So turning back to Page 47 of 63, now that

 3   we've established what it is.  I'm looking at the

 4   middle of the page, entry on January 24th, 2008.

 5             Do you see "fed wire debit via Paradise

 6   Bank AC Ken-Wen Family Limited Partnership transfer

 7   for ref Ken-Wen for $3 million"?

 8        A.   Yes.

 9        Q.   And is that consistent with the request

10   that you made to liquidate the account that we just

11   discussed in Exhibit 13?

12        A.   Yes.

13        Q.   Okay.  So it's accurate to say that the

14   funds would have been transferred from BLMIS to the

15   Paradise Bank account?

16        A.   Yes.

17        Q.   This will be Exhibit 16.

18             (Plaintiff's Exhibit 16, Check, was marked

19        for identification.)

20   BY MS. MARASCO:

21        Q.   Do you recognize this document?

22        A.   No.

23        Q.   Looking at it now, can you tell me what it

24   is?

25        A.   It's a check from B. L. Madoff to Ken-Wen
```

1   Family Limited Partnership.

2        Q.   And what's the date on the check?

3        A.   11-17-2003 or is that 2008?  I can't make

4   it out.

5        Q.   Actually, if you look on the left-hand

6   side under the star 031, there's a date there

7   that's a little more clear.

8        A.   11-25-2008.

9        Q.   Okay.  And do you see the account number

10  referenced in the bottom left-hand corner?

11       A.   I do.

12       Q.   And what is the account number?

13       A.   1EM226-3.

14       Q.   And then on the back page, do you see

15  whether or not -- can you tell me whether this

16  check was endorsed?

17       A.   It was.

18       Q.   By whom?

19       A.   It would appear to be Ms. Brown's

20  handwriting to Paradise Bank.

21       Q.   But it says Ken-Wen Family; is that right?

22       A.   Yes.

23       Q.   We discussed earlier you made a request to

24  liquidate the account for 3 million and I said,

25  "Did that wipe out the account?"  And you said,

1     "You would guess that, because the bottom of the

2     page said 3.1, that there would be 100,000 left in

3     the account to keep it open," do you recall that?

4          A.    I do recall that.

5          Q.    Okay.  This check appears to be in the

6     amount of 200,000; is that correct?

7          A.    Yeah, it's 200,000.

8          Q.    Why might this check exceed the balance

9     that you believe to be in the account?

10         A.    Well, whatever was -- I don't know if this

11    is the last check or the liquidating check.

12    Further, we left a small balance in the account.  I

13    don't remember what the residual was because the

14    3.1 was not my handwriting.  So I wanted to

15    liquidate the account and just leave the vestige of

16    the money there and my wife also agreed with that.

17         Q.    Do you recall requesting $200,000?

18         A.    No.  I was no longer a general partner

19    then.

20         Q.    This will be Exhibit 17.

21               (Plaintiff's Exhibit 17, Bank Statement,

22         was marked for identification.)

23    BY MS. MARASCO:

24         Q.    Do you recognize this document?

25         A.    Yes.

```
 1        Q.   Can you tell me what it is?

 2        A.   It's a handwritten document by me for

 3   200,000.  I don't know what the date is.

 4        Q.   Do you see the account number there?

 5        A.   I do.

 6        Q.   What account number is that?

 7        A.   Same as always, EM226-3.

 8        Q.   It says, "Please mail check to Ken-Wen FLP

 9   Limited for 200,000 as requested."  Am I reading

10   that correctly?

11        A.   Yes.

12        Q.   And to whom is this request addressed?

13        A.   Irwin at Madoff.

14        Q.   I'm reading that as Aaron.

15        A.   Aaron?  Okay.  At Madoff, yes.

16        Q.   Do you recall speaking with Aaron?

17        A.   No.

18        Q.   How did you know to send the request to

19   Aaron?

20        A.   Most likely by discussing it.

21        Q.   And did you sign this document?

22        A.   I did.

23        Q.   And how did you sign this document?

24        A.   Kenneth Brown FLP.

25        Q.   And we just discussed the $200,000 check
```

1   and I asked you if you had requested it and you

2   said you don't recall, but you weren't a general

3   partner at that time.

4         A.   That's right.

5         Q.   Is that still correct?

6         A.   Yes.

7         Q.   Do you see the handwritten notation at the

8   bottom left-hand corner, the 11/17?

9         A.   Yes.

10        Q.   Looking now at Exhibit 16, can you just

11  tell me again the date on the check?

12        A.   11-17-2008.

13        Q.   Okay.  So is it likely that that check was

14  a result of this request?

15        A.   Yes.

16        Q.   Okay.  But it's your testimony that you

17  were not a general partner at that time?

18        A.   That's right.

19        Q.   And so why did you make a request for a

20  $200,000 withdrawal?

21        A.   Probably to facilitate a transfer of the

22  money out of the account.

23        Q.   And how did you know that there was

24  $200,000 left in the account?

25        A.   I don't recall, but it went to 405

```
 1    Southwest Atlantic where I wasn't living at the
 2    time.
 3         Q.   Do you recall conferring with Ms. Werner
 4    with respect to this request?
 5         A.   I'm sure we would have discussed it.
 6         Q.   And then at the bottom corner of the
 7    account, do you see handwriting there?
 8         A.   I do.
 9         Q.   And that's not your handwriting; is that
10    correct?
11         A.   No, it's not.
12         Q.   Can you tell me what it says?
13         A.   "Asterisk will be refunding account with
14    brackets three million in."
15         Q.   Okay.  And did you ever refund the
16    account?
17         A.   No.
18         Q.   We discussed earlier that it was -- you
19    were troubled by the market and that you wanted to
20    get out of the market; do you recall that?
21         A.   Yes, absolutely.  That's exactly right.
22         Q.   Why might this notation indicate that you
23    would be refunding the account?
24         A.   Well, market conditions improved.  Right
25    now, my philosophy was to be more aggressive with
```

1   the investments, whereas my spouse was very

2   conservative.  So it was an idea that maybe Madoff

3   was good because it was the first time my

4   investment balance differently, but at this time I

5   think I was overpowering and said we got to get out

6   of the market, doesn't look good to me, and she

7   would trust my judgment as to market conditions.

8        Q.   Over the life of the account, did you ever

9   invest money into the account?

10       A.   No, not that I know of.  Again, you could

11  help me with memory, because I don't recall doing

12  it.

13       Q.   When I say "you" obviously I mean the

14  partnership or you in your general partnership

15  capacity.

16       A.   No, I think it was primarily all the

17  assets that were originating from my spouse's

18  family investments and interest that were in this

19  account.

20       Q.   And when you made this $200,000

21  withdrawal, how did you use those funds?

22       A.   Don't know.

23       Q.   Did you ever reinvest funds from a

24  withdrawal back into the account?

25       A.   They were always in the account that I

1    know of.

2         Q.    When --

3         A.    Somewhere within -- somewhere with the

4    name Ken-Wen on it.  At the time I was general

5    partner or some influence like that, but then again

6    they may have been used for personal assets,

7    personal expenditures at the household or something

8    like that.  I don't know.  I kind of did -- I kind

9    of did the management of the businesses for the

10   investment service circumstances and my spouse,

11   Wendy, was primarily doing most of the accounting

12   and bookkeeping, record keeping, and kept

13   everything straight.

14        Q.    Did you confer with anyone other than

15   Ms. Werner about your decision to withdraw the

16   funds from the account?

17        A.    Most likely, no.

18        Q.    And to your knowledge, was this $200,000

19   withdrawal, did that wipe out the account?

20        A.    I don't know if it wiped it out, because

21   we wanted to try to keep some residual there in

22   case we wanted to do something later.

23        Q.    Did you receive resistance to your request

24   to liquidate the account?

25        A.    I think I might have at this last thing

1    here with -- we will be refunding with the 3

2    million, but the financial crisis hadn't matured in

3    November of 2008 yet.  It was only another couple

4    of months later it just fell apart.

5        Q.   You can put that to the side for now.

6             So I handed you at the very start of the

7    deposition a copy of our amended complaint.  I

8    don't know if you still have that or not.

9        A.   Document 82?

10       Q.   Very good.

11            Okay.  I'm just going to have her mark

12   that as Exhibit 18 and I'll give it back to you.

13            (Plaintiff's Exhibit 18, Amended

14       Complaint, was marked for identification.)

15   BY MS. MARASCO:

16       Q.   So this is the amended complaint.  And

17   then at the same time I'm going to hand to you a

18   document that will be marked as Exhibit 19.

19            (Plaintiff's Exhibit 19, Answers, was

20       marked for identification.)

21   BY MS. MARASCO:

22       Q.   So you should have in front of you now,

23   which I'm handing you, both Exhibits 18 and 19 and

24   I want you to turn in Exhibit 18 to the last page.

25   It's the chart all the way at the back.

```
 1        A.    Can you tell me what the difference is
 2   between the two documents?
 3        Q.    Sure.
 4              So Exhibit 18, if you look, if you flip to
 5   the first page, like after the caption, the first
 6   amended complaint.
 7        A.    Right.
 8        Q.    So this was the complaint that the
 9   trust -- the amended complaint that the trustee
10   filed against the Ken-Wen partnership.
11        A.    Right.
12        Q.    Exhibit B of the amended complaint, which
13   is all the way in the back of this one, it looks
14   like this, that chart.  That's what I want you to
15   keep out in front of you.
16        A.    Okay.
17        Q.    So while you are looking at that chart,
18   we're going to get a little confusing, but 19 is
19   the other document that you have there.
20        A.    Yes.
21        Q.    That is the answers to the trustee's first
22   request for admission by the Ken-Wen Limited
23   Partnership.
24              Do you see that at the top?
25        A.    Yes.
```

1        Q.   Okay.  So in Exhibit 19, which is the

2    response, I want you to turn to the response -- I'm

3    sorry, it's on Page 6.  There's admission number

4    five and answer to admission number five at the

5    top.

6            Do you see that there?

7        A.   Yes.

8        Q.   Okay.  So admission number five says,

9    "Admit that column five of Exhibit B to the

10   complaint, which is defined as the amended

11   complaint, accurately reflects the withdrawals from

12   the account."

13           Did I read that correctly?

14       A.   Yes.

15       Q.   And then the answer to admission number

16   five says, "Admit upon information and belief," do

17   you see that?

18       A.   Yes.

19       Q.   So looking at this Exhibit B, that this

20   admission is referring to, do you see column five

21   where it says "withdrawals"?

22       A.   Yes.

23       Q.   Okay.  So do you agree that this document

24   here, that column five accurately reflects the

25   withdrawals from the account?

86

```
 1        A.   I don't know.
 2        Q.   Did you work with your attorney to
 3    prepare?
 4             MR. ROHER:  I'm going to object.  This
 5        isn't our response.  This is a -- Ken-Wen
 6        responded to these.
 7             MS. MARASCO:  Did you provide a separate
 8        response?
 9             MR. ROHER:  I don't represent Ken-Wen.  I
10        don't know why you're asking him about this.
11        I represent -- this is Ken Brown.
12             MS. MARASCO:  He's the general partner of
13        Ken-Wen partnership.
14             MR. ROHER:  No, he's no longer a general
15        partner.
16             MS. MARASCO:  He was at the time.
17             MR. ROHER:  At the time of what?
18             MS. MARASCO:  At the time of the transfer.
19             MR. ROHER:  Of the transfers?
20             MS. MARASCO:  Correct.
21             MR. ROHER:  First of all, I don't even --
22             MS. MARASCO:  I'm going to ask you, if you
23        want to have a discussion, we can discuss, but
24        I'm going to ask you not to do this in the
25        middle of a deposition.
```

1            MR. ROHER:  So I object to this whole line

2       of questioning.

3            Do you realize who filed this?

4            MS. MARASCO:  I do.

5            MR. ROHER:  Just so I'm -- just so I'm on

6       the same page with you --

7            MS. MARASCO:  This is not a deposition of

8       me.

9            MR. ROHER:  Okay, but I don't know why you

10      are asking him questions about this.  It's not

11      his answers to the admissions.  You are asking

12      the wrong party.

13           MS. MARASCO:  He was a general partner

14      but --

15           MR. ROHER:  Honestly, this is making no

16      sense to me.  He was a general partner as of

17      2008.  This isn't even --

18           MS. MARASCO:  I'm going to note for the

19      record that counsel is making a very lengthy

20      speaking objection and I would just ask that

21      we could have this discussion off the record.

22           MR. ROHER:  That's fine.  We can go off

23      the record.  I never refuse to go off the

24      record.

25           MS. MARASCO:  I'm going to ask you then

```
 1        questions using Exhibit 19, which is the --
 2        which is this Exhibit B here, this chart.
 3        This is a complaint that was filed against the
 4        Ken-Wen Limited Partnership and names
 5        Mr. Brown as general partner and a defendant,
 6        so I'm going to proceed with using this
 7        document.
 8   BY MS. MARASCO:
 9        Q.   When we are looking at this document,
10   column five identifies certain withdrawals; do you
11   see that?
12        A.   Yes.
13        Q.   And these are withdrawals that were made
14   from the account.  If you see at the top, BLMIS
15   account 1EM226, Ken-Wen Family Limited Partnership
16   Limited.  Do you see that?
17        A.   Yes.
18        MR. ROHER:  Object to form.
19   BY MS. MARASCO:
20        Q.   Okay.  So at the bottom, let's start from
21   the very bottom.  Do you see that there is a date
22   11-17-2008, a check for $200,000, and do you see
23   that amount as a withdrawal?
24        A.   Yes.
25        MR. ROHER:  Object to form.
```

```
 1    BY MS. MARASCO:

 2        Q.   And so that was the $200,000 check that we

 3    just discussed from Mr. Madoff?

 4            MR. ROHER:  Object to form.

 5            THE WITNESS:  It's the same date, yes.

 6    BY MS. MARASCO:

 7        Q.   Okay.  And then going one above to the

 8    January 24th, 2008 check wire and you see that

 9    $3 million withdrawal?

10        A.   Yes.

11        Q.   And we discussed that was the request to

12    liquidate the account?

13            MR. ROHER:  Object to form.

14            THE WITNESS:  Yes.

15    BY MS. MARASCO:

16        Q.   Okay.  And then one above, 12-31-2007

17    check wire, $500,000 withdrawal.  Do you see that

18    as well?

19        A.   Yes.

20        Q.   And do you recall us discussing that as a

21    wire into the Paradise Bank account?

22        A.   Yes.

23            MR. ROHER:  Object to form.

24            MS. MARASCO:  I would just ask that you

25        not interrupt your client when he's answering.
```

```
 1              MS. ROHER:  So let me object.

 2              THE WITNESS:  I will.

 3              MR. ROHER:  Ken, let me object.

 4              THE WITNESS:  I understand.  I understand

 5      now.

 6   BY MS. MARASCO:

 7      Q.   And then just one further up, 6-26-2007,

 8   check, $150,000.  Do you recall discussing that

 9   check from Mr. Madoff?

10              MR. ROHER:  Object to form.

11              THE WITNESS:  I recall, yes.

12   BY MS. MARASCO:

13      Q.   Okay.  So is it accurate to say, at least

14   with respect to those four transfers, that this

15   chart accurately reflects withdrawals from the

16   account?

17              MR. ROHER:  Object to form.

18              THE WITNESS:  It comports with what we

19      discussed today, yes.

20   BY MS. MARASCO:

21      Q.   Okay.  And we discussed that when those

22   withdrawals were made, they were deposited into an

23   account held by the Ken-Wen Family Partnership; is

24   that correct?

25      A.   Those three deposits, yes.
```

1        Q.    The four?

2        A.    Four deposits, yes.

3        Q.    Okay.  We discussed earlier that the

4   accounts at either RBC or Paradise Bank was held in

5   the name of the partnership; is that right?

6        A.    Yes.

7        Q.    We discussed that only you or Wendy had

8   access to the RBC Bank; is that correct?

9        A.    That's my understanding, yes.

10        Q.    Only you and Wendy had access to the

11   Paradise Bank account; is that correct?

12        A.    That would be my understanding, yes.

13        Q.    Do you have any reason to believe that

14   anyone else would have accessed or would have had

15   access to the four withdrawals that we just

16   discussed?

17        A.    No.

18        Q.    Okay.  We discussed earlier that you

19   called BLMIS and spoke with someone on the phone

20   when you wanted to make a withdrawal; is that

21   correct?

22        A.    I think so, yes.

23        Q.    Did you ever meet with anyone at BLMIS in

24   person?

25        A.    No, never did.

1      Q.   Never?

2      A.   I wanted to meet with Madoff, but it never

3   happened.

4      Q.   Did you ever meet Mr. Pascali?

5      A.   No.

6      Q.   And so how do you know who to call when

7   you wanted to make a withdrawal?

8      A.   They would answer the phone.

9      Q.   So it was just a general line and you were

10   directed to whomever answered the phone?

11      A.   Yes, and I would say "I want to do a

12   transfer."

13      Q.   There were no extensions or anything like

14   that?

15      A.   No, it seemed like a very small firm at

16   the time.

17      Q.   Okay.

18      A.   Which made it seem personal.

19      Q.   And then when you spoke to someone on the

20   phone, they would give you instruction about how to

21   make the withdrawal request; is that correct?

22      A.   Precisely.

23      Q.   Did BLMIS send written correspondence to

24   your recollection?

25      A.   No.

1      Q.   So most of your dealings were over the

2   phone or through the fax request that we just

3   discussed?

4      A.   Yes.

5      Q.   And you said earlier that you received

6   account statements, right?

7      A.   There was account statements sent to the

8   house monthly, quarterly.  I don't know whether

9   quarterly or monthly, I forget, but statements were

10  sent.

11     Q.   And those, from your cursory review of

12  those statements, which I think you said earlier

13  they purported to represent the trading in the

14  account?

15     A.   Yes.

16     Q.   Okay.  And did they also receive --

17  identify the balance in the account?

18     A.   Yes.

19     Q.   Did you ever receive any sort of trade

20  confirmation other than the account statements?

21     A.   Occasionally.  I don't remember receiving

22  them as often as they looked like there was trades.

23  So I remember receiving.  I thought we received

24  some trade confirmations, but I don't remember

25  seeing the detail of all of the trade

1    confirmations.

2         Q.   Okay.  We discussed earlier that Ken-Wen

3    came to hold the account because it was transferred

4    when a trust expired.  Did I state that correctly?

5         A.   Essentially it was a rollover from a

6    previous trust that was in Wendy's name personally

7    prior to our being married and then her age, I

8    think, caused it to mature.

9         Q.   Okay.  So whatever funds were in the

10   account at the time, just prior to rollover, were

11   transferred to the account post rollover?

12        A.   That's right.

13        Q.   Do you recall what the balance was?

14        A.   No idea.

15        Q.   So still looking at that chart that we've

16   been looking at that was marked Exhibit 18.  Do you

17   see at the top "1-4-1993 trans from EM2"?  Do you

18   see that?

19        A.   Yes.

20        Q.   And then column three identifies 535,163?

21        A.   I'm sorry, what are you looking at?

22   535,163?

23        Q.   I may have misstated that.  Column three

24   has 535,163.

25        A.   Okay.

```
 1        Q.   And then transfers in $340,000.  Do you

 2   see that, what's in column six?

 3        A.   Yes.

 4        Q.   Does it sound accurate?

 5        A.   I have no idea whether that's accurate or

 6   not.

 7        Q.   Okay.  Now, you can put that one to the

 8   side.

 9             This will be Exhibit 20.

10             (Plaintiff's Exhibit 20, File Maintenance,

11        was marked for identification.)

12   BY MS. MARASCO:

13        Q.   Do you recognize this document, Mr. Brown?

14        A.   No.

15        Q.   Do you see the top?  It says, "Name and

16   address file maintenance"?

17        A.   Yes.

18        Q.   And do you see the account number there?

19        A.   Yes.

20        Q.   What is that account number?

21        A.   EM22630/40.

22        Q.   And then Line 1, do you see where it says

23   Ken-Wen Family Limited?

24        A.   Yes.

25        Q.   And then there's the 405 Southwest
```

```
 1    Atlantic Drive?

 2         A.   Yes.

 3         Q.   And then the date at the bottom, it says

 4    1/10/93 DK, do you see that?

 5         A.   Okay.

 6         Q.   If you turn to the second page, the top,

 7    it says "Mr. or Mrs. H. Werner".  All the way at

 8    the bottom, it says "Wendy E. Brown" and then the

 9    middle it says what appears to be "Melvin Mander".

10    Who's Melvin Mander?

11         A.   I don't know.

12         Q.   So I think this is probably the closing of

13    the loop that we discussed before.

14              If you look at the bottom of the page on

15    the first page?

16         A.   Yes.

17         Q.   You see how it says type, Type 1, 2, 3, 4,

18    5, 6, 7, 8, 9, all the way to the column?

19         A.   Yes.

20         Q.   And then 3 and 4 are circled.  Do you see

21    that?

22         A.   Yes.

23         Q.   I think that's consistent with our

24    discussion before about why the accounts might be

25    ending in 3 or 4.
```

```
 1        A.    I think so.  It doesn't explain the zero.

 2        Q.    Exactly.  I just wanted to point that out.

 3              Okay.  I just wanted to --

 4        A.    The further you go down from the 1 to the

 5   7, 8, 9, there's disclosures that the brokerage

 6   firm is making to the client as to what their

 7   authority is and what trading levels and risk

 8   levels they can take, essentially what that is, as

 9   to what type of accounts they could have.  Maybe 9

10   would be commodities or something.  Who knows.  Or

11   certain things.

12              But anyway, 1 generally would be cash

13   only.  No margin.  No leverage.  2 could provide

14   some leverage.  Maybe 3 would have all the

15   functions of options, margin and any other type of

16   leverage and maybe 4 would include maybe short

17   sales or something like that.  So it's a degree of

18   sophistication for the account.

19        Q.    Okay.

20        A.    We were not a 5, 6, 7, 8 or 9.  We didn't

21   have that as a distinction as to the sophistication

22   of the account.

23        Q.    And you said 3 might be short sales?

24        A.    I'm just saying.

25        Q.    It could be an example?
```

```
 1      A.   I'm broad stroking with you.  3 could be
 2  maybe options.  4 may be including riskier
 3  transactions as to short sales, short options,
 4  things like that.  Much higher level or maybe
 5  foreign securities, maybe 5, I don't know.
 6      Q.   Okay.
 7      A.   But it's all within the same account.
 8      Q.   So you said that you left the partnership
 9  or your general partnership interest was
10  transferred to a limited partnership interest on or
11  about February 29th, 2008 --
12      A.   Yes.
13      Q.   -- is that correct?
14          Okay.  When did you first hear that BLMIS
15  was a fraud?
16      A.   In the news.
17      Q.   Do you recall when?
18      A.   Was it, like, December of 2009 or
19  something like that?
20      Q.   I think I'm just asking was it before or
21  after you transferred your general partnership
22  interest.
23      A.   Oh, it was after.
24      Q.   And you said you heard it from the news?
25      A.   Yes.
```

1      Q.   Do you recall whether there were any funds

2   in the account at the time your general partnership

3   interest was transferred?

4      A.   I don't think there was, but I don't

5   recall.

6           When the account was transferred?  What do

7   you mean?  Try that again.

8      Q.   Tell me how you came to no longer be a

9   general partner.

10     A.   On February 29th, 2008, I resigned because

11  of a subsequent document where my interest was

12  transferred as to the 1 percent general partner

13  interest to a limited partner interest which added

14  to me with my 49 percent limited partner interest.

15  So I no longer had any managerial or residual

16  decisions on the accounts, the direction of the

17  accounts.  Wendy was the sole general partner at

18  that point because of documentation.

19     Q.   On February 29th, 2008, do you recall

20  whether there were funds left in the account?

21     A.   Nominal amounts of funds.  I don't know.

22  We're seeing later that November there was 200,000,

23  so I don't know what was in there at the time.  We

24  just left -- at the time the $3 million was

25  withdrawn was to leave a vestige of money in there

1    just to have the relationship to continue.  That's

2    the only reason that was done, the last

3    distribution of -- what was it, January 31st?

4        Q.    200,000?

5        A.    The 3 million.  That was essentially, I

6    would say, that's more than the lion's share of the

7    accounts, that's really closing the account except

8    for leaving back a residual of money, small amount.

9    Whether it was 200,000, 100,000, 50,000, 10,000, I

10   don't know.

11       Q.    When you resigned as partner, do you

12   recall taking any distributions from the balance in

13   the account?

14       A.    No.

15       Q.    Did you receive part of the $200,000 that

16   was withdrawn in November 17, 2008?

17       A.    No.

18       Q.    If you were no longer a general partner of

19   Ken-Wen as of February 29th, 2008, why did you make

20   the request for a withdrawal on November 17th,

21   2008?

22       A.    I probably was requested to.

23       Q.    By whom?

24       A.    Probably by Ms. Brown at the time.

25       Q.    Did she also have authority to request a

1   withdrawal?

2      A.   Of course.  She was a sole general

3   partner.  She was in charge, so she might have

4   asked me to do it.  I might have convinced her to

5   do it.  I don't know, but I don't think there was

6   any notice or any indication that Madoff was

7   committing frauds at that time.  Certainly that was

8   not even within our scope of imagination.  We

9   thought that he was almost walking a water as a

10  principal and as an untouchable guy of integrity.

11     Q.   So years later when you saw the complaint

12  as against the partnership and the trustee made

13  certain requests for documents, what steps, if any,

14  did you take to try and locate documents?

15     A.   I had never seen the complaint.  I was

16  never noticed or serviced (sic) the complaint.  I

17  was aware that there had been a complaint filed,

18  but I was not -- I never received a summons or

19  process or anything about the complaint personally.

20     Q.   So in your capacity as general partner,

21  you responded to certain discovery requests from

22  the trustee or a response was provided.

23        Did you confer with counsel?

24     A.   No, because I didn't have a response

25  formulated until like 2015 or '16, '17.  I wasn't

1    even aware I received some correspondence that I

2    was in default on the first complaint, not the

3    amended complaint, and I hit the ceiling.   Scared

4    as hell.   How could that happen?   I had already

5    filed Chapter 11 on February 14th, 2013, so I don't

6    know how I was even a part of any of this.

7         Q.   Were you --

8         A.   I didn't receive the fruits, nor the

9    harvest.

10        Q.   What do you mean by that?

11        A.   The fruits no longer were in my possession

12   and the stock market is up 300 percent since this

13   time period.   So if it was 3 million, 4 million,

14   whatever was taken from the account, that would be

15   close to 9 million today.   It's not.   I don't know

16   where it is.   So I don't have the fruit, nor the

17   harvest because the moneys didn't stay with me.

18        Q.   We discussed earlier that certain funds

19   were invested into an offshore trust.   Do you

20   recall that?

21        A.   Yes.

22        Q.   Are those funds still there?

23        A.   No.

24        Q.   Do you recall where they went?

25        A.   No, they were transferred back to her

1    family accounts.

2        Q.   We discussed earlier that certain account

3    statements were mailed to your address.  Do you

4    recall that?

5        A.   They were mailed to 405 Southwest

6    Atlantic.

7        Q.   Correct.

8             Was there ever a time that they were

9    emailed or sent by other means?

10       A.   Not that I can remember.  Never, if ever.

11   I can't -- I don't remember that.

12       Q.   What year did you say you filed

13   Chapter 11?

14       A.   February 14th, 2013.

15            MS. MARASCO:  Okay.  I can pass the

16       witness.  I don't know if either of you have

17       any questions.

18            MR. BERNFELD:  I'm sorry, I didn't hear

19       what you said.

20            MS. MARASCO:  I'm going to pass the

21       witness.

22            THE WITNESS:  That means we can take a

23       bathroom break?

24            MS. MARASCO:  We certainly can, if that's

25       all right.

1           THE WITNESS:  If I may speak out.

2           MS. MARASCO:  Yes.

3           MR. BERNFELD:  You are finished?

4           MS. MARASCO:  I may have some follow-up

5      based on any other questions that are asked.

6           (Brief recess from 12:23 p.m. to 12:29

7      p.m.)

8           MS. MARASCO:  Do you want to be able to

9      review the transcript of the deposition in

10     order to review for any --

11          MR. ROHER:  He'll waive.

12          (Deposition concluded at 12:30 p.m.)

13

14                    -  -  -

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

 4    COUNTY OF BROWARD

 5

 6           I, the undersigned authority, certify

 7    that the witness, KENNETH WILLIAM BROWN, personally

 8    appeared before me on the 27th day of January,

 9    2020, and was duly sworn.

10

11    Signed this 30th of January, 2020.

12

13

14

15           FELECIA CURRERI, RPR
             Notary Public - State of Florida
             My Commission Expires:  12-19-2023
16           Commission No. GG 933850

17

18

19

20

21

22

23

24

25
```

```
 1                  CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF BROWARD

 5

 6              I, FELECIA CURRERI, Registered
     Professional Reporter, State of Florida at Large,
 7   do hereby certify that the aforementioned witness
     was by me first duly sworn or affirmed to testify
 8   to the whole truth; that I was authorized to and
     did report said deposition in stenotype; and that
 9   the foregoing pages, numbered from 5 to 104,
     inclusive, are a true and correct transcription of
10   my shorthand notes of said deposition.
                I further certify that said
11   deposition was taken at the time and place
     hereinabove set forth and that the taking of said
12   deposition was commenced and completed as
     hereinabove set out.
13              I further certify that I am not an
     attorney or counsel of any of the parties, nor am I
14   a relative or employee of any attorney or counsel
     of any party connected with the action, nor am I
15   financially interested in the action.
                The foregoing certification of this
16   transcript does not apply to any reproduction of
     the same by any means unless under the direct
17   control and/or direction of the certifying
     reporter.
18
                IN WITNESS WHEREOF, I have hereunto
19   set my hand this 30th day of December, 2020.

20

21

22
                Felecia Curreri, RPR
23              Notary Public - State of Florida
                My Commission Expires:  12-19-2023
24              Commission No. GG 933850

25
```

**A**

**a.m** 1:18 23:10
**a/k/a** 24:15
  29:16
**Aaron** 78:14,15
  78:16,19
**ABA** 53:25 54:1
**ability** 6:21
**able** 72:10 104:8
**absolutely** 80:21
**AC** 53:13 64:1
  75:6
**acceptable** 5:24
**access** 49:14
  58:23 59:1
  66:19 91:8,10
  91:15
**accessed** 91:14
**accomplish**
  72:10
**account** 8:16,17
  8:18,22 19:17
  20:1,4,12,13
  21:3 22:6,11
  23:16,19,22,24
  24:1,4,6,7
  25:20 26:3,11
  26:14,19 27:15
  27:21 28:8,15
  28:15,16,21,24
  29:18,20 30:1
  30:17 32:7
  33:16 35:4,6,8
  35:9,23,25
  36:2,4 37:12
  37:15,17 39:14
  39:14,20 40:6
  40:7,12,18
  43:20 45:5,6,7
  45:7,8,9,10,11
  45:18,19,21,21
  45:21,22,24
  46:5,7,10,22
  46:24 47:2,8
  47:16,19,24
  48:13,16,19,22

48:24 49:8,15
50:9,10,12,18
51:20 52:24,25
53:21 54:3,4,7
54:15 57:11,13
58:16,17,24
59:2,5,12,15
59:17,18,20,24
62:3 63:10,11
64:9,20 65:1
66:1,1,6,7,8,11
66:23 67:2,5
67:15 68:1,4,8
69:20 71:6,8
71:13,16,23
72:23 73:1
74:24 75:10,15
76:9,12,24,25
77:3,9,12,15
78:4,6 79:22
79:24 80:7,13
80:16,23 81:8
81:9,19,24,25
82:16,19,24
85:12,25 88:14
88:15 89:12,21
90:16,23 91:11
93:6,7,14,17
93:20 94:3,10
94:11 95:18,20
97:18,22 98:7
99:2,6,20
100:7,13
102:14 103:2
**accountant** 33:4
  33:5,8
**accounting**
  12:12,14 45:14
  82:11
**accounts** 39:11
  39:12,21,21
  43:9 49:6
  54:14 58:6
  91:4 96:24
  97:9 99:16,17
  100:7 103:1
**accurate** 10:23

13:14 15:17
43:18 51:14
52:18 54:6
75:13 90:13
95:4,5
**accurately** 6:22
  85:11,24 90:15
**acquire** 18:5,10
  18:13,25 19:8
**acquired** 19:6
  19:22,23 26:25
**action** 106:14,15
**activity** 22:22
**actual** 32:22
**added** 99:13
**adding** 43:19
**address** 11:5
  30:2,5,6,7,10
  30:18,22,25
  31:2,5 42:22
  65:4,5,10,17
  65:18,19,21,23
  65:24,25 66:1
  66:2,13,18
  67:8 69:13,15
  95:16 103:3
**addressed** 33:18
  42:19 57:9
  60:25 71:2
  78:12
**admission** 84:22
  85:3,4,8,15,20
**admissions**
  10:15,21 87:11
**Admit** 85:9,16
**adopting** 27:9
**adopts** 25:4
**Adv** 1:2,2
**Adversary** 7:19
**advice** 16:21
  17:18 33:20
**advisement** 12:4
**Advisers** 12:3
**advising** 35:7,8
**advisor** 12:21,23
  13:24
**Advisors** 7:16

**advisory** 12:16
**affirm** 5:6
**affirmative** 25:5
  25:18
**affirmed** 5:13
  106:7
**aforementioned**
  106:7
**age** 17:13 94:7
**aggressive** 80:25
**ago** 9:7
**agree** 8:9 85:23
**agreed** 77:16
**agreement** 4:3,6
  4:9 15:1,7
  16:10 17:23
  23:12 28:1,8
  30:2 43:7,25
  46:14,22,24
  47:14 59:12,19
**ahead** 72:24
**aid** 8:6
**alternative** 66:1
**amended** 4:20
  24:14 25:2
  83:7,13,16
  84:6,9,12
  85:10 102:3
**America** 40:1,21
**amiss** 21:24 22:2
**amount** 17:19
  61:4 68:1,4
  77:6 88:23
  100:8
**amounts** 99:21
**and/or** 106:17
**annually** 35:22
**answer** 4:4,5
  5:25 6:7,11,11
  6:22 16:3
  24:13,15,19,21
  25:2,3,11 85:4
  85:15 92:8
**answered** 55:8
  92:10
**answering** 6:8
  89:25

**answers** 4:21
  5:24 6:2,2
  83:19 84:21
  87:11
**anymore** 23:13
**anyway** 42:7
  97:12
**apart** 83:4
**apologies** 7:23
  55:8
**apparently**
  62:18
**appear** 28:10
  31:23 47:7
  50:7 61:13
  69:7 76:19
**APPEARAN...**
  2:1
**appeared** 2:2,8
  2:14 105:8
**appears** 28:7
  41:17 51:1
  52:18 53:12
  57:19 70:22
  77:5 96:9
**applicable** 25:7
**apply** 106:16
**approximately**
  9:24 11:23
**April** 41:16 48:4
  48:9,11 53:2,2
  53:10
**asked** 10:7
  43:15,16 79:1
  101:4 104:5
**asking** 5:20
  38:10 86:10
  87:10,11 98:20
**asserted** 25:5
**asset** 17:2,7,8,10
  40:13 54:19
**assets** 16:23
  17:1,5 18:23
  26:7,22 27:1
  27:20 34:1
  55:1,3,6,9 56:1
  56:2,2 81:17

82:6
**assisted** 41:22
**associated** 13:17
    13:18,24
**Associates** 33:9
    33:11,23 34:4
    34:7,17
**assume** 56:23
**Asterisk** 80:13
**Atlantic** 13:3,5
    30:4,19 65:6
    65:19 66:12
    69:18 80:1
    96:1 103:6
**attempt** 45:16
**attention** 42:20
    51:5
**attorney** 42:4
    86:2 106:13,14
**audible** 6:3
**Australian**
    73:14
**authority** 22:10
    22:13,15 35:6
    39:2 97:7
    100:25 105:6
**authorized**
    106:8
**Avenue** 1:19,23
    2:16
**aware** 36:17
    101:17 102:1

———————
            **B**
**B** 2:17 60:24
    75:25 84:12
    85:9,19 88:2
**bachelor's** 12:9
    12:11
**back** 11:18,21
    18:17 21:1
    23:6,9 47:16
    53:24 66:5
    73:2 74:16
    75:2 76:14
    81:24 83:12,25
    84:13 100:8

102:25
**background**
    12:7
**backup** 21:20
**balance** 64:25
    66:8 70:15
    77:8,12 81:4
    93:17 94:13
    100:12
**bank** 4:14,17,19
    39:23,24,25
    40:7,17,21
    43:8,21 47:9
    48:15,19 49:3
    49:18 50:9,10
    50:11,18 54:14
    54:15 57:17
    58:4,11,16,24
    59:2,6,19,23
    61:13,15 62:3
    62:21 64:1,9
    69:23 71:14
    73:7 74:8,21
    75:6,15 76:20
    77:21 89:21
    91:4,8,11
**bank's** 47:17
**banker** 49:5
**banking** 40:3
    72:7 73:13
**BANKRUPT...**
    1:1
**banks** 40:1,2
    49:2 58:7
**based** 64:7,22
    104:5
**basically** 10:18
    20:11 47:17
**bathroom**
    103:23
**Baton** 74:20
**beginning** 36:3
    54:23 55:25
**behalf** 1:17 37:7
**belief** 25:19
    85:16
**believe** 48:20

54:12,13 56:13
58:17 77:9
91:13
**beneath** 29:6
    71:10
**beneficial** 43:20
**Bernard** 1:5,8
    1:10 8:10,13
    29:15
**Bernfeld** 2:15
    2:15,17 23:1,2
    27:7 36:1,5
    103:18 104:3
**best** 5:22
**big** 70:11
**bit** 18:17 68:15
**blank** 70:11
**BLMIS** 4:11
    8:10,14,17
    23:16 29:16,24
    30:23 31:4
    35:2 36:1
    37:12 38:16,24
    41:18 51:15
    52:11,19,24
    54:3 60:5
    62:11 63:10
    64:8,25 65:17
    75:14 88:14
    91:19,23 92:23
    98:14
**BLMIS'** 35:18
**bond** 45:22
**bookkeeping**
    82:12
**bottom** 29:4
    42:13 61:8
    70:2,17 72:25
    76:10 77:1
    79:8 80:6
    88:20,21 96:3
    96:8,14
**bought** 56:3,5
**brackets** 80:14
**break** 6:13,15
    63:6 103:23
**Breckenridge**

11:6
**Brief** 104:6
**briefly** 22:7 23:4
**broad** 27:11
    98:1
**broker/dealer**
    13:23
**brokerage** 97:5
**BROWARD**
    105:4 106:4
**Brown** 1:12,14
    1:16 2:8,14,22
    5:1,12,17 6:25
    7:15 11:1,3
    12:2 13:9 14:8
    14:11 16:5
    20:17 24:15
    25:6 34:20
    42:16 49:10
    52:3 58:25,25
    67:4,15 72:15
    78:24 86:11
    88:5 95:13
    96:8 100:24
    105:7
**Brown's** 4:4,5
    15:21 17:8
    24:13,18,20,24
    29:5 76:19
**bunch** 9:16
**business** 7:7,10
    7:12,14 12:8
    12:13 13:22
    16:24 18:4
    20:14,16,19,24
    22:16 30:6
    39:17,25 43:9
    43:13 48:25
    49:9 52:6,8
    58:8 64:16
    68:5 72:13
**businesses** 13:15
    13:25 14:2
    41:9 43:5 82:9
**buying** 55:11

———————
            **C**

**C** 2:4
**C.P.A** 33:20
    34:2
**call** 38:1,5,6,16
    38:23 42:23
    68:7 92:6
**called** 7:15,16
    12:20 38:24
    51:15 72:1,7
    91:19
**calling** 38:9
**Canadian** 73:15
**capacities** 48:18
    54:10
**capacity** 1:12
    8:2 15:14
    37:14 48:21
    57:2 69:25
    81:15 101:20
**caption** 25:17
    84:5
**carried** 34:3
**case** 9:19 73:2
    82:22
**cash** 45:6,11,20
    97:12
**casual** 21:12
    30:15
**casually** 38:8
    49:22
**cause** 5:4
**caused** 72:5 94:8
**ceiling** 102:3
**center** 53:6
**Century** 7:16
    12:2 13:12
    14:18,19 20:18
    49:10 72:16
**certain** 6:9
    16:23,23 19:3
    55:2 88:10
    97:11 101:13
    101:21 102:18
    103:2
**certainly** 18:18
    67:20 101:7
    103:24

**Certificate** 3:4,5
105:1 106:1
**certification**
12:20,22
106:15
**certifications**
12:14,17,19
**certify** 105:6
106:7,10,13
**certifying**
106:17
**change** 30:22
**changed** 32:3
**Chapter** 102:5
103:13
**charge** 101:3
**chart** 83:25
84:14,17 88:2
90:15 94:15
**Chase** 52:21,24
63:11 74:21,21
**check** 4:13,18
60:16,22 61:2
61:5,8,16 62:2
62:4,7,9 75:18
75:25 76:2,16
77:5,8,11,11
78:8,25 79:11
79:13 88:22
89:2,8,17 90:8
90:9
**Circle** 11:6
**circled** 96:20
**circumstances**
82:10
**clarify** 7:24 10:6
37:13 42:21
**clarity** 48:1
**clear** 8:18 14:10
20:7 50:21
76:7
**clearly** 54:14
**clerical** 51:17
**client** 57:23 60:3
62:13 89:25
97:6
**clients** 21:21

**close** 74:5
102:15
**closing** 96:12
100:7
**column** 85:9,20
85:24 88:10
94:20,23 95:2
96:18
**come** 33:23
40:13 45:11
46:8 73:2,22
**coming** 71:24
**commenced**
106:12
**Commission**
105:15,16
106:23,24
**committing**
101:7
**commodities**
97:10
**common** 14:1,3
14:15,22
**communicatio...**
29:17,23 31:5
**company** 36:15
**compared** 20:13
**competitor** 21:8
**complaint** 4:20
24:14,16 25:2
83:7,14,16
84:6,8,9,12
85:10,11 88:3
101:11,15,16
101:17,19
102:2,3
**completed** 23:11
106:12
**comport** 48:5
**comports** 90:18
**Conaway** 2:3
**concluded**
104:12
**conditions** 64:16
72:7 80:24
81:7
**confer** 82:14

101:23
**conferred** 67:15
**conferring** 80:3
**confirm** 51:19
51:23,24
**confirmation**
40:4 93:20
**confirmations**
29:18 30:8
93:24 94:1
**confusing** 84:18
**Congratulatio...**
13:7
**Congress** 72:10
**connected**
106:14
**connection** 7:10
7:18 24:1
29:19 37:7
49:9 62:12
72:13
**consent** 67:17
**conservative**
81:2
**considered**
14:14
**consistent** 51:13
63:12,14 75:9
96:23
**contemporane...**
49:18 59:5
**continue** 63:1
100:1
**control** 22:19
46:22 59:12
71:22,23
106:17
**conversation** 6:5
**conversations**
42:25
**convinced** 101:4
**copies** 35:1
**copy** 43:6 83:7
**corner** 53:1 61:8
70:3 76:10
79:8 80:6
**CORPORATI...**

1:4
**correct** 7:23
10:22 23:1,2
23:16,19 26:17
28:8 36:16
37:1 41:9,18
42:17 45:17
48:9 50:24
53:3,22 55:4
57:3,20 58:21
64:5 66:17
70:23 74:25
77:6 79:5
80:10 86:20
90:24 91:8,11
91:21 92:21
98:13 103:7
106:9
**correctly** 18:8
19:24 25:8,25
26:12 29:21
38:15 40:7
53:16 78:10
85:13 94:4
**correspond**
32:23
**correspondence**
37:21 65:22
92:23 102:1
**corroborated**
33:14
**counsel** 6:9,10
9:4,21,23 10:1
10:2 16:21
17:18 34:3
87:19 101:23
106:13,14
**COUNTY** 105:4
106:4
**couple** 9:7 34:5
39:21 83:3
**course** 101:2
**courses** 55:11,12
55:15,17 56:11
56:13
**court** 1:1 5:5 6:1
6:4 14:25

24:12 27:24
31:9 40:22
46:13 49:24
52:9 56:17
60:15 62:20
68:11 74:6
**created** 18:21
**creating** 73:10
**crisis** 72:1 83:2
**crossed** 51:5
57:19
**currencies** 73:12
**currency** 73:17
**current** 11:4
**currently** 11:2
11:11 14:9
34:12
**Curreri** 1:22 5:2
105:14 106:6
106:22
**cursory** 9:8
30:15 59:8
93:11
**customer** 25:20
25:21 26:3,15
26:18,20 27:3
27:4,5,10,13
**customers** 26:21
27:12

**D**
**dash** 45:11,23
**date** 1:18 15:9
28:9 41:11,15
44:18,19 48:2
48:5 52:25
57:4 61:2
63:15 74:22,23
76:2,6 78:3
79:11 88:21
89:5 96:3
**dated** 31:23 48:8
48:11 62:2
**Daughters** 1:19
1:23
**DAVID** 2:17
**davidbernfeld...**

2:18
**day** 105:8
106:19
**DE** 2:4
**DE89** 25:6
**dealings** 93:1
**debit** 53:13 64:1
64:4 75:5
**Debtor** 1:8
**deceased** 34:12
**December** 63:18
64:12 67:14
98:18 106:19
**decided** 17:14
71:21
**decision** 21:8
30:16 35:5
67:10 82:15
**decisions** 27:1
35:7 67:12
99:16
**default** 47:21
102:2
**defendant** 1:6
2:8,14 7:20
25:4,7 88:5
**defendants** 1:14
25:20
**Defense** 25:18
**defenses** 25:5
**define** 8:8
**defined** 20:24
36:2 46:7 49:9
85:10
**definition** 8:9
**degree** 12:9,11
13:2,4 97:17
**deliver** 50:9
**demands** 29:17
30:8
**DeMatteo** 2:15
**deposed** 6:25
7:6,9
**deposit** 4:10
50:2,18 58:11
58:19 69:21
**deposited** 39:19

40:15 51:20
61:14 73:6
90:22
**deposition** 1:15
5:1 8:6,25 9:3
9:12 36:3
54:23 83:7
86:25 87:7
104:9,12 106:8
106:10,11,12
**deposits** 90:25
91:2
**description** 4:2
18:7 21:16
**detail** 21:11
93:25
**detailed** 9:9
**determine** 66:7
68:7
**dictated** 46:4
**difference** 84:1
**different** 8:18
16:24 26:16
31:1 45:20
49:1 58:7,8
**differently** 81:4
**direct** 3:3 5:15
29:16 106:16
**directed** 40:9,10
42:25 43:9,17
92:10
**direction** 51:18
99:16 106:17
**directly** 34:22
**directs** 6:11
**disagreement**
67:21,22
**disappointme...**
72:9
**disclaimer** 43:11
47:11
**disclosures** 97:5
**discovery** 10:16
10:17 101:21
**discretion** 24:10
26:9
**discretionary**

71:23
**discuss** 86:23
**discussed** 11:22
23:15,18 41:8
44:18,24 54:9
59:14 65:3,5
66:6 68:6
75:11 76:23
78:25 80:5,18
89:3,11 90:19
90:21 91:3,7
91:16,18 93:3
94:2 96:13
102:18 103:2
**discussing** 69:16
78:20 89:20
90:8
**discussion** 9:8
11:17 23:5
62:24 86:23
87:21 96:24
**discussions**
23:11
**dispute** 62:6
**distant** 22:5
**distinction** 46:2
46:11 97:21
**distinguish**
45:25
**distribution**
17:17 38:7
61:19 100:3
**distributions**
27:17 100:12
**DISTRICT** 1:1
**dividend** 27:19
**divisions** 45:9
**DK** 96:4
**document** 15:4
15:9,12,15
23:14 27:23
28:4,6 29:9,11
29:12 31:7,8
31:14,17,23,25
37:10 41:3,4
41:11,20 43:2
46:12,19 47:5

48:3 49:23,25
50:4,22 51:1
52:16 56:16,22
56:25 60:14,19
62:17,19 64:10
68:10,24 69:5
69:24 74:17,18
75:21 77:24
78:2,21,23
83:9,18 84:19
85:23 88:7,9
95:13 99:11
**documentation**
99:18
**documents** 9:11
9:14 10:7,8
30:11,13 35:13
35:14 44:25
66:18 84:2
101:13,14
**doing** 55:10 56:8
81:11 82:11
**dollar** 73:12,14
73:15,15,16,16
**doubt** 37:9
**Drive** 30:19 65:6
69:18 96:1
**duly** 5:13 105:9
106:7
**duplicate** 34:22
34:23,25

--- **E** ---

**E** 96:8
**earlier** 36:24
41:8 49:10
54:9 59:14
60:2 65:3
76:23 80:18
91:3,18 93:5
93:12 94:2
102:18 103:2
**early** 12:24 32:5
**earned** 17:6
56:1
**educational** 12:7
**effort** 21:9 64:18

**either** 91:4
103:16
**EM2** 94:17
**EM226-3** 78:7
**EM22630/40**
95:21
**Email** 2:5,12,18
**emailed** 103:9
**employed** 11:11
11:13,22,24
**employee**
106:14
**endorsed** 76:16
**endorsement**
61:11
**entered** 16:11
**entities** 20:20
**entitled** 5:18
**entry** 53:9 74:15
75:4
**ESQUIRE** 2:4
2:11,17
**essentially** 21:3
21:7 33:20
56:1 94:5 97:8
100:5
**established** 22:7
73:9 75:3
**estate** 17:16
18:5,11,14,16
18:20,25 19:19
56:7,9 73:10
**eventually** 71:25
**exactly** 80:21
97:2
**Examination**
1:21 3:3 5:15
**examined** 5:14
**example** 39:5
67:24 97:25
**exceed** 77:8
**exceeded** 68:1
**executed** 59:11
**exhausted** 63:2
**exhibit** 4:2
14:25 15:1
17:23 24:18,20

28:1 31:9,10
31:15 32:22
40:23,23,24
41:3 46:13,14
46:18 48:6
49:25 50:1
52:10,11,15
53:24 56:19
60:15,16 61:21
62:13,20,21
63:9 65:5
68:11,12,17,18
68:22,22,25
70:21 74:7,8
75:11,17,18
77:20,21 79:10
83:12,13,18,19
83:24 84:4,12
85:1,9,19 88:1
88:2 94:16
95:9,10
**exhibits** 4:1
24:13,17 27:22
56:18 83:23
**existed** 16:7
**existence** 58:9
**expenditures**
82:7
**experience**
21:17
**experiences** 19:7
**expired** 94:4
**Expires** 105:15
106:23
**explain** 13:20
16:3 19:15
50:19 97:1
**explanation**
45:16
**extensions** 92:13
**extent** 10:1 25:7
47:5

**F**

**facilitate** 38:10
79:21
**fair** 54:2 64:7,21

**fairly** 67:1
**falling** 73:16
**familiar** 35:3
47:6 52:22
**family** 1:12,13
15:8 16:25
17:3,4,8,15
18:21,22 19:21
22:18 25:5
28:25 30:7
33:25 34:2,8
35:10 40:13
53:13 55:24
58:20 61:1,17
64:1 69:12,22
71:7,14 75:6
76:1,21 81:18
88:15 90:23
95:23 103:1
**family's** 19:7
26:25
**far** 9:13 34:24
**fault** 22:2
**fax** 4:12,15
56:19 57:6,9
61:21 68:12
70:22 71:2
93:2
**faxed** 38:14 51:2
52:5,8
**feature** 73:18
**February** 16:4,8
16:19 37:2
98:11 99:10,19
100:19 102:5
103:14
**fed** 63:25 72:6
75:5
**Felecia** 1:22 5:2
105:14 106:6
106:22
**fell** 83:4
**file** 4:22 32:25
33:2 66:25
95:10,16
**filed** 25:11 35:20
36:22 84:10

87:3 88:3
101:17 102:5
103:12
**filled** 46:25
**finance** 13:2
**financial** 72:1
73:10 83:2
**financially**
106:15
**find** 22:2
**fine** 10:5 63:7
87:22
**finish** 6:7,15
**finished** 104:3
**firm** 7:15 24:8
38:13 45:11
92:15 97:6
**firms** 11:25 12:1
12:5
**first** 5:13 18:8
46:25 53:9
68:2 81:3 84:5
84:5,21 86:21
96:15 98:14
102:2 106:7
**five** 85:4,4,8,9
85:16,20,24
88:10
**FL** 53:19
**flip** 84:4
**Floor** 2:16
**Florida** 1:20,24
2:10 5:3 11:8
13:3,5 105:3
105:15 106:3,6
106:23
**FLP** 8:21 42:17
78:8,24
**follow-up** 104:4
**followed** 13:24
**follows** 5:14
29:20
**forecasting**
64:17
**foregoing** 106:9
106:15
**foreign** 73:11

98:5
**forget** 93:9
**form** 38:11
44:14 47:15
88:18,25 89:4
89:13,23 90:10
90:17
**formally** 14:8
**formed** 16:20
19:25 20:2
**former** 17:12
**formulated**
101:25
**formulation**
19:10
**Fort** 1:20,24
**forth** 106:11
**forward** 50:14
**founded** 11:25
**four** 40:2 45:13
45:23 90:14
91:1,2,15
**fragment** 18:8
**Frank** 37:23,24
42:20,22 43:1
46:6 51:11
57:10 71:3
**fraud** 98:15
**frauds** 101:7
**fraudulent** 22:3
**free** 70:4
**frequently** 25:22
**front** 17:23
32:17 41:2
63:13,16 68:21
83:22 84:15
**fruit** 102:16
**fruits** 102:8,11
**full** 10:25 24:10
26:9 73:19
**function** 24:7
**functions** 16:24
97:15
**fund** 54:19
**funded** 17:12,20
**funds** 25:21,21
26:3,15,18

27:4,5 37:11
37:15,16 39:19
40:14 51:19
54:2,16 60:8
60:11 62:4
64:25 73:3,4,8
75:14 81:21,23
82:16 94:9
99:1,20,21
102:18,22
**further** 77:12
90:7 97:4
106:10,13

**G**

**general** 1:13
7:21,25 12:13
15:16,18,23
16:1,2,5,12,17
35:9 37:14,16
48:25 67:20
77:18 79:2,17
81:14 82:4
86:12,14 87:13
87:16 88:5
92:9 98:9,21
99:2,9,12,17
100:18 101:2
101:20
**generally** 37:20
38:8 64:13
65:2 66:24
97:12
**generate** 27:15
**generated** 19:6
**genesis** 18:22
**getting** 64:14
**GG** 105:16
106:24
**give** 5:7 32:21
83:12 92:20
**go** 10:1 11:15,18
23:3,6 31:13
37:18 40:12
42:20 62:23
63:3,3 67:7
72:8 87:22,23

97:4
**going** 5:20 6:1
8:8 14:24
24:11 27:23
31:8 38:7
40:22 46:12
49:24 52:9
56:16 60:14
62:19 68:5,10
68:15,17 74:5
83:11,17 84:18
86:4,22,24
87:18,25 88:6
89:7 103:20
**golf** 55:11,12,14
55:17 56:11,12
**good** 20:21
42:12 81:3,6
83:10
**gotten** 34:23
**GP** 42:16 50:24
57:3 69:25
**greater** 68:3
71:21
**growth** 72:11
**guess** 5:23 32:2
45:4 47:14
50:11 51:22
77:1
**guessing** 43:13
**guy** 37:22
101:10

**H**

**H** 1:9 96:7
**half** 50:13
**hand** 5:6 14:24
24:11 27:23
31:8 40:22
46:12 49:24
52:9 56:16
60:14 62:19
68:10 70:4
74:6 83:17
106:19
**handed** 31:14
46:17 52:14

83:6
**handing** 31:13
83:23
**handwriting**
28:5 29:3 44:1
44:3,5,7 50:5
56:24 58:1
69:6 70:8,25
76:20 77:14
80:7,9
**handwritten**
78:2 79:7
**happen** 67:23
68:5 102:4
**happy** 35:11
**hard** 71:24
**harvest** 102:9,17
**He'll** 104:11
**heading** 18:3
41:4,6
**hear** 63:4 98:14
103:18
**heard** 98:24
**held** 11:17 23:5
23:18 26:14,19
39:22 54:4,6
54:10 58:16
62:24 64:9
90:23 91:4
**hell** 102:4
**help** 6:4 31:21
81:11
**helped** 41:24
**helping** 56:14
**hereinabove**
106:11,12
**hereunto** 106:18
**high** 36:12
**higher** 98:4
**highlighted**
63:22
**hit** 102:3
**hold** 48:15,19
94:3

**home** 63:3
**Honestly** 87:15
**honorary** 13:2,4
**house** 21:7 67:7
93:8
**household** 82:7
**hurricane** 30:20
65:15

**I**

**idea** 28:11 29:12
44:15 64:21
81:2 94:14
95:5
**identification**
15:2 24:19,21
28:2 31:11
32:13 40:25
44:25 46:15
50:2 52:12
56:20 60:17
62:22 68:13,19
74:9 75:19
77:22 83:14,20
95:11
**identified** 54:24
65:4
**identifies** 88:10
94:20
**identify** 93:17
**ignorant** 67:9
**illegal** 22:3
**imagination**
101:8
**impair** 6:21
**important** 31:15
**improved** 80:24
**inactive** 24:6
**include** 36:3
46:5 97:16
**included** 26:8
**including** 25:23
29:17 98:2
**inclusive** 106:9
**income** 26:7
27:15,21 35:19
36:10,11

**income-produ...**
25:23 26:16,22
**INDEX** 3:1
**indicate** 80:22
**indicated** 21:1
**indicating** 44:10
**indication** 101:6
**individual** 8:1
48:18,21 54:10
54:13
**individually**
17:14
**individuals**
22:24
**influence** 20:13
22:6 59:20
82:5
**influences** 20:14
**inform** 62:14
**information** 4:7
21:20 25:19
31:10,16 34:19
34:21 35:9
85:16
**informed** 66:25
67:3
**inherited** 56:2
**initially** 16:20
**instructed** 29:16
51:16
**instruction**
38:16 50:8
92:20
**instruments**
25:24 26:8
27:18
**insurance** 55:11
56:3,6
**integrity** 101:10
**intentional**
56:15
**interchangeably**
8:14
**interest** 16:12
16:13,14,16,19
19:5,20 26:25
43:5,22 47:17

47:19 49:6
55:3 59:21,24
81:18 98:9,10
98:22 99:3,11
99:13,13,14
**interested** 43:7
106:15
**interests** 20:5
55:2
**interrogatories**
10:21
**interrupt** 6:8
89:25
**invest** 81:9
**invested** 25:22
26:2,13,15
73:19 102:19
**investment** 1:5
1:10 8:11 12:4
12:16,21,23
13:23 18:6
19:7 20:12,14
22:4 23:16
24:7 26:6 27:1
29:15 39:15,17
49:11 81:4
82:10
**investments** 4:8
7:16 12:2 13:9
14:11 20:17
26:10 40:25
41:7 72:15
81:1,18
**INVESTOR** 1:3
**involve** 21:4
**involved** 34:1
**IRS** 35:21
**Irving** 1:9 5:18
**Irwin** 78:13
**Island** 2:9
**issue** 33:18
**Item** 25:3

**J**

**JACYLN** 2:4
**Jane** 21:19,25
**January** 1:18

74:23 75:4
89:8 100:3
105:8,11
**jmarasco@yc...**
2:5
**joint** 35:20
39:14,20 48:22
**jointly** 38:22
66:25
**JPMorgan**
52:21,24 63:11
**judgment** 81:7
**June** 15:10

―――――――
**K**
**K** 7:15 12:2 13:9
14:11 20:17
49:10 52:2
72:15
**Kara** 33:17 34:1
34:21
**KBCB** 55:20,21
56:13
**keep** 8:7 17:5
20:21 73:1
77:3 82:21
84:15
**keeping** 82:12
**Ken** 4:4 24:18
34:4 42:16
58:25 86:11
90:3
**Ken-Wen** 1:12
1:13 4:8 5:19
8:21 15:8,18
16:1 17:4,10
18:10 20:4,9
21:2 23:15,18
25:5 26:2,7,21
27:2,2,6,8,10
27:13 28:25
30:1 32:12,25
33:12,22 34:1
36:15,20,22
40:24 41:7
42:17 47:8,23
50:11 53:13

54:4,6,14,20
54:25 55:7
56:3 58:3,16
58:20 59:14
61:1,17 64:1,9
69:11,22 71:7
71:13 75:6,7
75:25 76:21
78:8 82:4
84:10,22 86:5
86:9,13 88:4
88:15 90:23
94:2 95:23
100:19
**Ken-Wen's**
65:18
**Kenneth** 1:12,16
2:8 5:1,12 11:1
78:24 105:7
**kept** 82:12
**kind** 12:19 18:7
33:18 43:10
53:6 82:8,8
**King** 2:3
**know** 5:17,22,24
6:17 18:17
21:6,14 25:13
27:1 28:5,9,15
28:22 31:19
32:4,24 33:15
34:24 36:19
37:24 38:2
39:20 40:2,12
40:14 42:3,21
43:1,3,14,14
43:23 45:23,25
46:5,11 47:12
47:25 51:9,10
51:12 53:4
54:22 55:16
56:14 57:22
58:2,13,14
59:13,17,22
60:8 62:8,16
63:6 64:19
65:20 67:25
70:7 73:23

77:10 78:3,18
79:23 81:10,22
82:1,8,20 83:8
86:1,10 87:9
92:6 93:8
96:11 98:5
99:21,23
100:10 101:5
102:6,15
103:16
**knowledge**
82:18
**known** 14:8,9
42:23 66:22
**knows** 97:10

―――――――
**L**
**L** 1:5,8,10 8:10
8:13 29:15
60:24 75:25
**Lake** 11:8,9
**Large** 5:3 106:6
**Lauderdale** 1:20
1:24
**Law** 2:9
**lawsuit** 5:18
**lease** 18:5,11,25
**leave** 77:15
99:25
**leaving** 30:25
100:8
**left** 30:20 64:20
65:3,9,21 66:8
66:15,23 68:8
77:2,12 79:24
98:8 99:20,24
**left-hand** 61:8
70:3 76:5,10
79:8
**legal** 17:16
**lending** 47:14
**lengthy** 87:19
**let's** 46:6 88:20
**letter** 37:20
41:17,25 42:19
42:22 43:18,25
46:4,4 47:10

47:14 48:6,8
52:1
**letters** 50:20
**level** 18:21 98:4
**levels** 67:1 97:7
97:8
**leverage** 97:13
97:14,16
**life** 56:6 81:8
**liked** 49:2
**limited** 1:12,13
15:7,8 16:13
16:14,17,18
17:4,15 18:20
18:24 19:5,19
20:4 22:17,18
25:6,12 26:24
28:25 53:14
55:2,2,24
58:20 61:1,17
64:1 69:12,22
71:7,14 75:6
76:1 78:9
84:22 88:4,15
88:16 95:23
98:10 99:13,14
**line** 32:7 73:25
87:1 92:9
95:22
**lion's** 100:6
**liquidate** 71:12
71:16 72:21
75:10 76:24
77:15 82:24
89:12
**liquidated** 28:16
**liquidating**
28:14 77:11
**liquidation** 1:10
64:17
**liquidity** 71:20
**listed** 45:23
**litigation** 7:13
43:22
**litigious** 7:8
**little** 18:17
68:15 70:18

76:7 84:18
**living** 30:13 80:1
**LLC** 1:6,10
**LLP** 2:3,15
**loans** 72:8
**locate** 101:14
**located** 36:14
**long** 6:14 8:7
13:9 18:19
30:18 73:23
**longer** 77:18
86:14 99:8,15
100:18 102:11
**look** 21:22 25:2
28:18 29:14
31:20 43:2
46:23 47:5
53:9 76:5 81:6
84:4 96:14
**looked** 93:22
**looking** 20:12
25:1,17 29:9
31:25 43:18
71:24 75:3,23
79:10 84:17
85:19 88:9
94:15,16,21
**looks** 32:16,20
51:4 55:5
57:14,16 61:15
62:7 63:17
64:8 70:17
84:13
**loop** 74:5 96:13
**lot** 21:16 43:8
**LP** 28:25 53:13

―――――――
**M**
**ma'am** 55:5
**Madoff** 1:5,8,10
8:10,13,13
19:14,17,22,25
20:4 21:7
22:12,16 24:8
24:10 26:9,19
27:3,12,13
29:15,25 33:15

35:10,11 37:21
40:11 43:12
45:6,12 50:8
57:10 60:24
61:16 68:3
71:3 75:25
78:13,15 81:2
89:3 90:9 92:2
101:6
**Madoff's** 27:12
74:20
**mail** 78:8
**mailed** 21:7
38:14 103:3,5
**maintained**
25:20
**maintenance**
4:22 95:10,16
**making** 21:8
30:16 35:5
37:18 67:10
87:15,19 97:6
**management**
82:9
**managerial**
99:15
**managing** 26:11
**Mander** 96:9,10
**Marasco** 2:4 3:3
5:16 8:5 9:5,10
9:25 10:12,19
11:15,18,20
14:24 15:3
22:23 23:3,6,8
24:11,23,25
27:8,14 28:3
31:12 36:2,8
41:1 44:17
46:16 50:3
52:13 56:21
60:18 62:25
66:4 68:14,20
74:10 75:20
77:23 83:15,21
86:7,12,16,18
86:20,22 87:4
87:7,13,18,25

88:8,19 89:1,6
89:15,24 90:6
90:12,20 95:12
103:15,20,24
104:2,4,8
**March** 11:14
72:20
**margin** 45:8,21
97:13,15
**mark** 2:9,11 9:8
14:25 24:12
27:24 40:23
46:13 56:17
60:15 68:11
74:6 83:11
**marked** 15:2
24:16,19,21
28:2 31:11,14
40:25 41:3
46:15,18 48:6
49:25 50:2
52:10,12,14
56:19 60:16
62:12,22 63:9
68:13,19 70:21
74:9 75:18
77:22 83:14,18
83:20 94:16
95:11
**market** 64:15,15
64:18 71:19
72:5 80:19,20
80:24 81:6,7
102:12
**marketable** 18:6
19:11
**marketplace**
71:25 72:3
**married** 34:5
94:7
**match** 47:11
53:25 54:1
**materials** 9:11
**matters** 7:5
**mature** 94:8
**matured** 17:13
83:2

**MBA** 12:8
**mean** 8:10 22:12
22:21 24:5
26:2,5 35:1
37:13 44:12
52:6 59:13
70:6 81:13
99:7 102:10
**meaning** 36:1
**means** 32:11
60:12 103:9,22
106:16
**medication** 6:21
**meet** 8:24 34:8
91:23 92:2,4
**Melvin** 96:9,10
**memory** 20:8
81:11
**mentioned**
23:21 60:2
**Miami** 12:9
**middle** 63:24
74:14 75:4
86:25 96:9
**million** 70:11
71:12 72:22
73:4,19,21
75:7 76:24
80:14 83:2
89:9 99:24
100:5 102:13
102:13,15
**mind** 10:14 22:4
48:2
**minute** 47:4
68:23
**misstated** 72:6
94:23
**moment** 11:16
**Monday** 1:18
**money** 39:10
40:6 56:9 62:7
62:8 77:16
79:22 81:9
99:25 100:8
**moneys** 71:22
102:17

**monitoring**
20:11 21:3
**month** 21:10
63:17
**monthly** 93:8,9
**months** 9:7 83:4
**Morgan** 74:21
**mroher@mar...**
2:12

**N**
**name** 10:25
23:19 33:8,17
38:2 55:6 74:3
82:4 91:5 94:6
95:15
**named** 7:20,21
7:24
**names** 8:7 88:4
**nature** 7:8
**need** 6:14,15
13:24 63:6
67:17
**Neither** 19:22
**never** 22:1 41:23
46:9 55:1
87:23 91:25
92:1,2 101:15
101:16,18
103:10
**new** 1:1 2:17,17
31:5,15 59:11
**news** 98:16,24
**nodding** 6:4
**Nominal** 99:21
**North** 2:3
**Northeast** 1:19
1:23
**Notary** 5:2
105:15 106:23
**notation** 60:3
61:24 79:7
80:22
**note** 22:23 70:3
87:18
**notes** 106:10
**notice** 39:6

101:6
**noticed** 101:16
**notices** 29:16,17
29:23 30:3,8
30:13
**November** 83:3
99:22 100:16
100:20
**number** 8:20
23:22 25:3
28:16,21,24
32:8,13,16
44:20 45:9
46:5,7,10,24
46:24 47:2
52:25 53:21,25
54:1 57:6,11
57:13 58:18
61:7 63:11
71:4,8 74:24
76:9,12 78:4,6
85:3,4,8,15
95:18,20
**numbered** 106:9
**numbers** 53:6
**Numerous** 7:4

**O**
**Oath** 3:4 105:1
**object** 6:9 44:14
86:4 87:1
88:18,25 89:4
89:13,23 90:1
90:3,10,17
**objection** 87:20
**objective** 26:6
**obtain** 9:17
12:22 13:4
31:1
**obviously** 81:13
**Occasionally**
93:21
**office** 2:9 42:7
42:10,24
**offshore** 73:11
73:20 102:19
**Oh** 41:14 98:23

**okay** 8:4,23
 18:10 21:10
 23:7,21,24
 24:11 25:10,16
 36:5 37:3
 38:19 41:11
 42:8 44:18
 45:4 46:12
 47:7 53:5,8,15
 54:2 56:25
 58:23 60:14
 61:4 62:19
 63:5 65:12
 66:10 69:4,7
 69:24 72:18
 75:13 76:9
 77:5 78:15
 79:13,16 80:15
 83:11 84:16
 85:1,8,23 87:9
 88:20 89:7,16
 90:13,21 91:3
 91:18 92:17
 93:16 94:2,9
 94:25 95:7
 96:5 97:3,19
 98:6,14 103:15
**open** 30:1 73:2
 77:3
**operate** 22:9
**operated** 24:9
**operating** 72:16
 72:19
**operational**
 13:10,15
**operations** 24:2
**opposed** 62:9
**opposing** 9:21
 9:23 10:2
**option** 45:7
**options** 45:21
 97:15 98:2,3
**order** 50:20
 68:16 104:10
**organization**
 19:14 33:15
 37:21 38:9

40:11 43:12
 45:12
**originated** 47:15
**originating**
 81:17
**origination**
 19:21
**outside** 22:16
**outstanding**
 6:16
**overall** 35:9,24
**overpowering**
 81:5
**overseeing**
 20:11
**owned** 7:11,12
 13:14 14:11,13
 14:19 17:14
 20:5 41:9
**ownership** 14:1
 14:3,15,22

—————————
**P**
**p.m** 1:18 104:6,7
 104:12
**Pack** 74:4
**page** 3:2 4:2
 15:11,20 17:24
 17:25 25:3,12
 25:14,15 28:18
 29:4 46:25
 48:1 50:13
 51:4 52:2 53:2
 53:5,6,7 57:7
 61:10 63:19,20
 74:11,14 75:2
 75:4 76:14
 77:2 83:24
 84:5 85:3 87:6
 96:6,14,15
**pages** 106:9
**paid** 35:21 37:7
 59:22
**paper** 44:1
**Paradise** 57:17
 58:4,11,15,24
 59:2,5,23

61:15 62:3
 64:1,9 69:23
 71:14 73:7
 75:5,15 76:20
 89:21 91:4,11
**paragraph**
 25:15 29:14
**paragraphs**
 25:12
**part** 26:6 27:2
 32:5 53:6
 100:15 102:6
**parties** 106:13
**partner** 1:13
 7:22,25 15:16
 15:18,23 16:2
 16:5,12,13,15
 37:14,16 77:18
 79:3,17 82:5
 86:12,15 87:13
 87:16 88:5
 99:9,12,13,14
 99:17 100:11
 100:18 101:3
 101:20
**partners** 16:1
 67:20
**partnership**
 1:12,13 15:7,8
 16:7,17,18,19
 16:20 17:4,11
 17:15,20 19:3
 19:5,8,10,11
 19:16,18,25
 20:1,2,5,10,24
 21:2 22:8,19
 23:12,19 24:2
 25:6,12 26:13
 26:14,24 27:6
 27:8,16 28:7
 29:19,20 30:1
 32:18 33:5,12
 33:14,21 34:18
 35:12 36:22,25
 37:8 40:17
 48:15 54:24
 55:3,14,16,24

58:16,20 61:1
 61:18 64:2
 69:12,22 71:7
 71:14 75:6
 76:1 81:14,14
 84:10,23 86:13
 88:4,15 90:23
 91:5 98:8,9,10
 98:21 99:2
 101:12
**partnership's**
 18:4 32:12
**partnerships**
 18:20,24 22:17
**partnerships'**
 19:20
**party** 43:7,20
 87:12 106:14
**Pascali** 42:22
 92:4
**pass** 103:15,20
**passed** 34:14
**passive** 22:20,21
 22:22
**passively** 24:8
**pay** 35:18
**pending** 6:14
**percent** 16:12
 16:16,17 99:12
 99:14 102:12
**period** 16:6
 26:10 36:12,14
 102:13
**person** 8:13
 38:13 91:24
**personal** 30:5
 36:18 39:11,12
 49:13 82:6,7
 92:18
**personally** 7:20
 35:18 37:11
 66:3 94:6
 101:19 105:7
**philosophy** 22:4
 80:25
**phone** 38:9,24
 68:7 91:19

92:8,10,20
 93:2
**Picard** 1:9 5:18
 5:19
**pick** 38:24
**picking** 38:8
**pile** 9:14
**Pine** 2:9
**place** 1:19 20:3
 106:11
**plain** 21:15,19
 21:25
**Plaintiff** 1:11,17
 2:2
**Plaintiff's** 4:2
 15:1 24:18,20
 28:1 31:10
 40:24 46:14
 50:1 52:11
 56:19 60:16
 62:21 68:12,18
 74:8 75:18
 77:21 83:13,19
 95:10
**Plaintiff-Appl...**
 1:4
**planning** 17:16
 56:7,7,9,10
 73:10,10
**Plantation** 2:10
**pleadings** 9:19
**please** 5:6 6:3,6
 6:15 10:13,25
 50:14 56:17
 69:11 71:12
 78:8
**pledge** 59:19
**pledged** 47:8,22
 47:23 48:13
 59:15,18
**pledgor** 47:8
**Pledgor's** 47:16
 47:17
**plus** 66:25
**point** 55:19 97:2
 99:18
**policies** 55:11

56:4
**policy** 56:6 72:6
**portfolio** 36:11
**portion** 59:18
**positive** 33:19
**possession** 102:11
**possible** 71:20
**post** 94:11
**potentially** 34:7
**power** 30:16
**practices** 58:8
**Precisely** 92:22
**preparation** 35:13
**prepare** 8:24 9:2 9:12 33:6 41:20 86:3
**prepared** 34:17 46:3
**preparing** 33:10
**Present** 2:21
**previous** 75:1 94:6
**previously** 26:23 44:24 70:20
**primarily** 19:16 33:24 43:8 55:20 81:16 82:11
**primary** 16:22
**principal** 101:10
**printouts** 9:16 9:17
**prior** 94:7,10
**Pro** 1:2,2
**probably** 9:25 12:24 34:21 39:10 40:21 41:21 42:1,2 42:11 43:4,9 43:11 46:6,6 50:19 52:1 54:19 59:10 61:19 64:17 68:9 79:21 96:12 100:22

100:24
**proceed** 72:24 88:6
**Proceeding** 7:19
**proceeds** 71:13
**process** 101:19
**produce** 10:8
**produced** 10:7 26:7 27:21
**producing** 27:19
**production** 10:15
**Professional** 106:6
**profitability** 33:16
**projects** 19:6
**proofread** 42:1
**property** 18:6 19:4
**PROTECTION** 1:3
**provide** 7:18 22:8 33:11 86:7 97:13
**provided** 9:19 9:20,21,22 10:2,3 17:3 34:7,18,21 35:12 65:16 101:22
**providing** 34:4
**Public** 5:2 105:15 106:23
**purchase** 54:19 55:3
**purchased** 55:1 55:1,6,9
**purported** 93:13
**purpose** 16:22 18:3,4 22:7 29:10 32:1 43:3,4,10,24 47:20 48:23 54:17,24
**purposes** 10:24 13:25 14:15

17:17 35:13 39:16 45:14 47:13,13 49:1
**put** 17:15 23:12 27:22 31:7 37:10 49:23 68:16 83:5 95:7

**Q**
**qualification** 26:23
**quarterly** 93:8,9
**question** 5:21,23 6:7,12,14,16 22:3
**questioning** 87:2
**questions** 5:20 6:2,10,22 23:13 87:10 88:1 103:17 104:5
**quickly** 71:20

**R**
**Raise** 5:5
**range** 36:12
**ranged** 36:7
**RBC** 43:7,19,21 46:22 47:9,18 47:24 48:13,16 48:19 49:14 50:15,18 51:20 53:19 54:3,7 58:3,11 59:15 59:19 91:4,8
**read** 18:8 25:8 25:25 29:21 53:16 85:13
**reading** 78:9,14
**reads** 25:18
**ready** 23:6
**real** 18:5,11,14 18:16,20,25 19:3,19
**realize** 87:3

**really** 17:2 21:19 43:11 63:2,3 100:7
**reason** 21:23 31:6 43:5 47:9 58:12 62:6,17 91:13 100:2
**reasons** 17:16
**recall** 9:22 17:19 17:21 23:22 34:14,20 35:14 35:16,17,21 36:13,21 39:24 41:22 43:24 45:1 47:10 48:17,23 49:17 55:9 59:4,11 59:15 60:5,11 62:16 64:11,13 65:7,17 71:15 73:3,6 77:3,4 77:17 78:16 79:2,25 80:3 80:20 81:11 89:20 90:8,11 94:13 98:17 99:1,5,19 100:12 102:20 102:24 103:4
**recalling** 40:6 46:10
**receive** 29:23 37:6 38:16 39:6 40:4 65:22 67:5 82:23 93:16,19 100:15 102:8
**received** 30:12 49:17 59:4 93:5,23 101:18 102:1
**receiving** 60:11 73:3 93:21,23
**recess** 104:6
**recognize** 15:4 28:4 44:4 46:9 46:19 50:4

52:16 68:24 69:5 74:17,18 75:21 77:24 95:13
**recognized** 29:2
**recollection** 19:2 46:3 54:25 58:15 59:9,23 92:24
**recommendati...** 33:13
**record** 7:24 10:24 11:5,15 11:17,19,21 22:24 23:3,5,7 23:9 62:23,24 82:12 87:19,21 87:23,24
**ref** 75:7
**refer** 27:5 53:24
**reference** 39:20 44:20 61:7 71:4
**referenced** 76:10
**referring** 17:8 17:11 20:17,20 27:6 85:20
**reflect** 18:17 64:25
**reflected** 32:20
**reflects** 85:11,24 90:15
**refund** 37:6 80:15
**refunding** 80:13 80:23 83:1
**refuse** 87:23
**registered** 12:20 12:23 13:23 106:6
**regularly** 33:2 59:7
**regulation** 13:25
**reinvest** 81:23
**related** 27:10
**relationship**

20:23 28:6
33:19,22,25
49:5 73:13
100:1
**relative** 106:14
**religiously** 72:14
**rely** 49:3
**remember** 14:21
32:18 38:3,13
38:14 39:1
43:1 46:10
49:7 51:21
55:18,20,25
59:25 60:1
77:13 93:21,23
93:24 103:10
103:11
**reminding** 56:14
**rephrase** 5:23
**report** 106:8
**reporter** 3:5 5:5
6:1,5 14:25
24:12 27:24
31:9 40:22
46:13 49:24
52:9 56:17
60:15 62:20
68:11 74:6
106:1,6,17
**reporting** 1:19
1:23 32:3 37:5
**reports** 29:18
30:3,9
**represent** 5:17
28:23 52:23
86:9,11 93:13
**reproduction**
106:16
**request** 4:10,15
4:16 9:25 10:4
10:16,17,20
38:17,20 39:6
40:5 50:1,17
51:11,16 54:17
54:18 57:15,16
58:10,19 60:6
61:22 62:12

66:21 67:13,18
67:25 68:12,18
69:9,20 70:22
71:15 72:21
75:9 76:23
78:12,18 79:14
79:19 80:4
82:23 84:22
89:11 92:21
93:2 100:20,25
**requested** 78:9
79:1 100:22
**requesting**
64:11 77:17
**requests** 64:19
101:13,21
**required** 43:12
**reside** 11:2
30:18
**residences** 11:4
**residual** 73:1
77:13 82:21
99:15 100:8
**resign** 16:8,11
**resigned** 16:4
36:25 99:10
100:11
**resistance** 82:23
**respect** 35:6
65:4 80:4
90:14
**respectively**
24:17
**responded** 86:6
101:21
**response** 6:16
85:2,2 86:5,8
101:22,24
**responses** 9:18
10:20
**result** 79:14
**retirement** 56:7
56:9
**return** 33:16
35:20 36:22
**returned** 35:14
**returns** 32:25

33:2,6,10
34:18 36:13,18
36:20 37:4
66:25
**reverse** 50:20
**review** 9:11 21:5
21:10 30:15
49:21 59:8
67:7 93:11
104:9,10
**reviewed** 30:10
30:14 66:7
**reviewing** 10:18
**revocable** 14:13
**RIA** 13:23
**right** 5:5 8:3
10:23 15:20
16:15 29:6,7
32:18 38:2,4
38:13,23 41:2
41:10 42:5,14
44:19 51:24
55:20 57:4
61:23,25 63:1
64:3 66:8,16
69:10,25 76:21
79:4,18 80:21
80:24 84:7,11
91:5 93:6
94:12 103:25
**right-hand** 53:1
70:10
**rights** 47:16
**risk** 97:7
**riskier** 98:2
**Road** 2:9
**Robert** 51:6,8
51:11
**Roher** 2:9,11 8:3
9:4 10:5,16
24:22 44:14
62:23 66:3
86:4,9,14,17
86:19,21 87:1
87:5,9,15,22
88:18,25 89:4
89:13,23 90:1

90:3,10,17
104:11
**role** 20:9 21:2
**rolled** 17:3
**rollover** 94:5,10
94:11
**Rouge** 74:20
**RPR** 1:22 5:2
105:14 106:22
**rules** 32:2

**S**

**S** 2:9,9,11
**safety** 73:18
**sales** 97:17,23
98:3
**Santora** 43:7,19
46:22 47:9,18
47:24 48:16,19
49:15 50:15,18
53:19 54:4,7
58:4 59:15
**satisfied** 33:17
**saw** 9:7 101:11
**saying** 8:7 47:18
97:24
**says** 15:8 18:3
26:1 28:19,25
29:15 31:15
32:7 43:6 44:9
47:7 50:14
51:6 52:2
53:19 57:22
58:20 60:3
61:24 62:13
63:25 64:10
70:4,11,18
72:25 76:21
78:8 80:12
85:8,16,21
95:15,22 96:3
96:7,8,9,17
**Scared** 102:3
**scope** 101:8
**second** 25:3
31:20 50:13
61:10 96:6

**Section** 17:22
**sectioned** 45:18
**securities** 1:3,6
1:10 7:7 8:11
13:22 14:15
18:6 19:12,13
25:23 26:16
29:15,25 32:2
43:4,10,24
45:10,22 47:13
47:17 50:8
57:10 59:21
68:5 98:5
**security** 47:18
59:24
**see** 8:9 9:14 15:9
15:12,21 18:1
28:13,19,20,24
29:1,3,5,6 32:7
40:5 41:4,11
41:14 42:16
44:1,5,9,19
45:2 46:24
50:13 51:4,6
52:3 53:1,10
53:12,18,24
55:18 57:4,6
57:11,24 61:7
61:11 63:12,14
63:25 69:13
70:4,12,17
71:4 73:16
74:14 75:5
76:9,14 78:4
79:7 80:7
84:24 85:6,17
85:20 88:11,14
88:16,21,22
89:8,17 94:17
94:18 95:2,15
95:18,22 96:4
96:17,20
**seeing** 93:25
99:22
**seeking** 69:20
**seen** 31:17,18
56:22 60:19

101:15
**segregate** 16:23
**selection** 27:20
**sell** 18:5,10,16
  18:25 19:11
**send** 31:4 40:11
  51:10,16 78:18
  92:23
**sending** 62:14
**sense** 8:19,20
  44:16 87:16
**sent** 29:13 30:3
  30:9 35:1,2
  38:12 57:16
  62:4,7,8 64:24
  65:22 66:11,13
  66:18 68:3
  93:7,10 103:9
**separate** 10:8
  17:5 40:17
  86:7
**separated** 56:1
**service** 34:4
  82:10
**serviced** 101:16
**services** 33:11
  34:7
**set** 23:7 106:11
  106:12,19
**setup** 19:16 58:6
**share** 100:6
**Shaw** 33:9,10,18
  33:23 34:1,4,6
  34:9,11,17,19
  34:22 35:2,5
  35:12
**Shaw's** 33:13
**she'll** 56:17
**short** 97:16,23
  98:3,3
**shorthand**
  106:10
**shot** 44:10
**show** 73:24
**sic** 101:16
**side** 23:13 27:22
  31:7 37:10

**sign** 15:14 50:22
  56:25 78:21,23
**signature** 15:12
  15:13,21 29:3
  29:5,6 42:13
**signed** 29:13
  31:18 38:12
  41:17 42:2,16
  50:24 57:2
  69:24 105:11
**similar** 43:13
**simultaneously**
  13:16 26:15
  58:6,10
**sir** 31:14 63:1
**situation** 14:17
**six** 95:2
**Sixth** 25:18
**sleep** 63:3
**small** 73:1 77:12
  92:15 100:8
**SMB** 7:19
**sold** 19:13
**sole** 16:5 99:17
  101:2
**somebody** 37:23
  42:6,9
**sons** 14:8,12,12
**sophisticated**
  73:9
**sophistication**
  97:18,21
**sorry** 33:4 60:1
  70:3 74:15
  85:3 94:21
  103:18
**sort** 93:19
**sound** 62:5
  70:14 95:4
**South** 74:4
**SOUTHERN**
  1:1
**Southwest** 30:4
  30:19 65:6,18

66:12 69:18
  80:1 95:25
  103:5
**space** 70:11
**speak** 9:2 104:1
**speaking** 60:5
  78:16 87:20
**speaks** 62:17
**special** 45:7 49:6
**specialized**
  12:25
**specific** 10:10
  21:11 22:19
  37:22 38:12
  39:16 45:5,19
**specifically** 27:3
**split** 16:18
**spoke** 57:22
  60:3 62:11,13
  91:19 92:19
**sports** 20:8
**spouse** 14:6
  17:13 40:10
  81:1 82:10
**spouse's** 17:3
  19:20 81:17
**stamped** 61:15
**star** 76:6
**Stargatt** 2:3
**start** 32:3 83:6
  88:20
**started** 9:13
**state** 5:3 10:25
  94:4 105:3,15
  106:3,6,23
**statement** 4:11
  4:14,17,19
  21:18 34:23
  52:11,19,24
  53:1 62:21
  63:10,15,17
  64:23,24 74:8
  74:21,22 77:21
**statements** 21:6
  21:12,15,22,24
  29:18 30:4
  34:24,25 35:1

49:18,19 59:5
  59:7 66:6,11
  67:5 73:24
  93:6,7,9,12,20
  103:3
**states** 1:1 25:4
**status** 33:16
  35:10
**stay** 102:17
**staying** 33:15
**steel** 20:8
**stenotype** 106:8
**step** 21:1 66:5
  74:15
**steps** 101:13
**stimulating**
  72:11
**stock** 64:15,18
  71:19 102:12
**stocks** 27:19
**stopped** 72:18
**straight** 82:13
**Street** 2:3
**strike** 18:13
  26:13 48:14
**stroke** 27:11
**stroking** 98:1
**structure** 45:6
**subprime** 72:8
**subsections**
  45:20
**subsequent** 7:12
  99:11
**subsequently**
  16:6 31:1
**substantial** 56:6
**Suggests** 62:3
**Suite** 1:20,24
  2:10
**summons**
  101:18
**sure** 5:17 34:15
  49:13,19,20
  51:21 59:7
  62:6 80:5 84:3
**suspect** 21:23
  22:25

**suspicion** 22:1
**swear** 5:6
**switch** 58:3
**switched** 58:5
**sworn** 5:13
  105:9 106:7
**symbol** 70:18
**system** 72:7
  73:13

**T**

**take** 6:13 21:1
  31:20 38:1,5
  47:4,5 66:5
  74:15 97:8
  101:14 103:22
**taken** 1:17,18,21
  5:1 27:18
  102:14 106:11
**talk** 6:6 68:22
  69:2
**talked** 61:20,20
  67:4
**talking** 8:16,18
  65:7 66:3
**tax** 4:7 31:10,15
  32:12,25 33:2
  33:6,10 34:3,7
  34:17 35:9,13
  35:20 36:12,13
  36:18,19,22
  37:4,4,6 66:25
**taxes** 35:18 36:6
  37:7
**Taylor** 2:3
**Tel** 2:5,11,18
**tell** 60:21 72:18
  75:23 76:15
  78:1 79:11
  80:12 84:1
  99:8
**telling** 48:2
  73:13
**Temple** 12:9
**terms** 8:8
**testified** 5:14
  36:24 65:9

testify 106:7
testimony 5:7
  7:18 30:10
  51:14 79:16
Thank 13:8 63:8
Thereupon--
  5:11
thing 19:22
  47:20 49:7
  56:8 82:25
things 10:15
  20:3 22:16
  30:9 55:10
  56:14 97:11
  98:4
think 9:18 11:14
  14:20,21 20:2
  30:20 32:16,17
  33:21 36:6,15
  36:18,19 37:4
  38:8 39:25
  40:19 42:9,10
  43:17 48:25
  49:4 51:25
  56:5,12 58:8
  67:19,19,21
  70:16 72:24
  73:21,24 81:5
  81:16 82:25
  91:22 93:12
  94:8 96:12,23
  97:1 98:20
  99:4 101:5
Third 2:16
thought 7:21
  21:15 54:9
  72:25 93:23
  101:9
three 14:12 40:2
  45:13 80:14
  90:25 94:20,23
time 1:18 6:15
  16:6,25 18:19
  21:5,5 23:14
  25:19 26:10
  30:12,13 32:5
  36:21 40:1,16

50:25 55:5,10
56:5 58:12
59:21 64:14
67:8,8,20
71:21 73:23
79:3,17 80:2
81:3,4 82:4
83:17 86:16,17
86:18 92:16
94:10 99:2,23
99:24 100:24
101:7 102:13
103:8 106:11
times 7:3,4,9
  27:18 71:24
tired 63:2
today 5:21 6:22
  7:17 8:6 9:3
  20:7 47:25
  90:19 102:15
today's 8:25
told 65:16
top 24:23 28:18
  31:15 32:19
  44:9 46:21
  48:1 51:4 52:2
  53:1 57:6 70:2
  70:3 84:24
  85:5 88:14
  94:17 95:15
  96:6
trade 72:9 73:11
  93:19,24,25
trades 22:10
  93:22
trading 93:13
  97:7
training 13:1
trans 94:17
transaction
  39:17,18
transactions
  37:23,25 98:3
transcribe 6:5
transcript 104:9
  106:16
transcription

106:9
transfer 4:16
  19:17,25 38:10
  50:15 63:23
  68:19 69:8,9
  69:11 71:13
  75:6 79:21
  86:18 92:12
transferred 19:1
  19:3,9 54:3
  55:2 56:2
  75:14 94:3,11
  98:10,21 99:3
  99:6,12 102:25
transfers 19:19
  86:19 90:14
  95:1
transparency
  21:21
trap 20:8
treasury 25:23
  26:8 27:18
  45:22
tried 17:5
troubled 71:19
  72:4,5 80:19
true 51:17 54:12
  106:9
trust 14:13
  17:12 20:5
  73:11 74:1,3
  81:7 84:9 94:4
  94:6 102:19
trusted 14:12
trustee 1:9 5:18
  10:3 84:9
  101:12,22
trustee's 10:20
  84:21
trustees 14:14
  33:21
truth 5:8,8,9
  106:8
truthfully 6:23
try 6:5 39:16
  82:21 99:7
  101:14

trying 38:2 67:9
tune 72:12
turn 15:11 17:22
  25:10,12 53:5
  61:10 63:19
  70:20 74:11
  83:24 85:2
  96:6
turning 75:2
two 11:25 14:23
  22:24 24:12,22
  24:23 41:9
  45:13 50:20
  55:10 84:2
type 17:1 18:7
  41:23,24 42:7
  96:17,17 97:9
  97:15
typed 41:23
types 7:5
typist 42:4,12

U

U.S 73:12,17
undated 28:10
underneath
  28:24
undersigned
  105:6
understand 5:22
  7:17 8:11 24:5
  26:5 38:15
  44:12 45:15,17
  50:17 74:19,20
  90:4,4
understanding
  10:6 19:24
  26:12 29:10
  32:1 34:6,11
  45:16 72:22
  91:9,12
understood 8:23
  14:16 38:4
UNITED 1:1
University 12:8
  12:10 13:3,5
untouchable

101:10
unusual 21:18
updated 65:17
use 8:16 24:1,4
  33:5 81:21

V

v 1:5,11 5:19
value 67:1
values 47:19
various 20:3
  25:22 26:10
  45:9
vehicle 22:8
version 63:23
vestige 77:15
  99:25
victims 25:21
  27:11
Violet 56:6

W

W 1:12 2:8 7:15
  12:2 13:9
  14:11 20:17
  49:10 52:3
  72:15
wait 6:6
waive 104:11
walked 22:25
walking 101:9
want 14:19
  25:10 34:15
  63:3 69:2
  83:24 84:14
  85:2 86:23
  92:11 104:8
wanted 64:14
  71:20,21 73:2
  73:17 77:14
  80:19 82:21,22
  91:20 92:2,7
  97:2,3
wasn't 30:14
  43:17 67:9
  80:1 101:25
water 101:9

**way** 13:20 20:22
22:18 39:17
51:24 72:9
83:25 84:13
96:7,18
**we'll** 23:3 63:19
68:22
**we're** 84:18
99:22
**we've** 10:6 75:3
94:15
**well-informed**
67:1
**Wendy** 1:14
2:14,22 4:5
14:8,9,10
15:21,23,25
16:5 17:8 20:6
24:14,15,20
25:6 29:5 34:5
38:19,25 39:5
42:6 49:16
58:25 82:11
91:7,10 96:8
99:17
**Wendy's** 18:21
19:7 26:25
94:6
**Weners** 34:2
**went** 30:12
51:25 65:24,25
79:25 102:24
**weren't** 79:2
**Werner** 14:9,10
18:22 23:1
33:25 34:8
40:3 56:6 80:3
82:15 96:7
**Werner's** 24:15
**whatsoever**
20:13
**WHEREOF**
106:18
**wife** 77:16
**William** 1:16
5:1,12 11:1
105:7

**Wilmington** 2:4
**wipe** 72:23
76:25 82:19
**wiped** 82:20
**wire** 50:14 57:15
57:23 60:3
62:5,9,13,15
63:25 64:11
69:11 71:13
75:5 89:8,17
89:21
**wire/6/21** 61:25
**wired** 60:9 64:8
**withdraw** 37:11
37:15 66:21
67:14 82:15
**withdrawal**
37:19 38:20
39:3,6 40:5,8,9
40:11 54:17
68:1,3 72:23
79:20 81:21,24
82:19 88:23
89:9,17 91:20
92:7,21 100:20
101:1
**withdrawals**
67:11 85:11,21
85:25 88:10,13
90:15,22 91:15
**withdrawn**
37:17 99:25
100:16
**withholding**
32:4
**witness** 1:21
5:10 8:1,4 9:6
10:10,17 27:9
36:6 44:15
89:5,14 90:2,4
90:11,18
103:16,21,22
104:1 105:7
106:7,18
**word** 8:16
**words** 47:22
**work** 6:18 86:2

**worked** 49:2
58:7
**Worth** 11:8,9
**wouldn't** 36:17
43:15,16 46:2
46:8
**writing** 28:19
44:16 57:22
61:16
**written** 32:19,23
38:17 57:24
92:23
**wrong** 87:12

---

**X**

**x** 1:7,9,15 57:21
60:4

---

**Y**

**yeah** 10:23
20:21 28:20
50:5,23 58:1
77:7
**year** 32:5 36:9
103:12
**years** 101:11
**York** 1:1 2:17
2:17
**Young** 2:3

---

**Z**

**zero** 57:14 97:1

---

**0**

**0.55** 73:14
**0.62** 73:15
**031** 76:6
**06** 65:11,13
**067012882**
53:21
**08-01789(SMB)**
1:2

---

**1**

**1** 4:3 14:25 15:1
16:12,17 17:23
53:2 95:22
96:17 97:4,12

99:12
**1-4-1993** 94:17
**1-EM226-3** 8:17
36:4
**1-EM226-4-0**
45:3 46:1
**1-EM22630-40**
45:1
**1.6** 17:22 18:1
**1/10/93** 96:4
**10** 1:18 4:12
56:18,19 61:21
62:13
**10-04468** 7:19
**10-04468(SMB)**
1:2
**10,000** 100:9
**10:21** 22:24
**10:26** 23:10
**100,000** 36:7
77:2 100:9
**1000** 2:3
**10016** 2:17
**101** 1:19,23
**104** 106:9
**105** 3:4
**106** 3:5
**11** 4:13 60:15,16
102:5 103:13
**11-17-2003** 76:3
**11-17-2008**
79:12 88:22
**11-25-2008** 76:8
**11/17** 79:8
**12** 4:14 62:20,21
63:9
**12-19-2023**
105:15 106:23
**12-31** 63:25
**12-31-2007**
89:16
**12/31** 70:18
**12:23** 104:6
**12:29** 104:6
**12:30** 1:18
104:12
**13** 4:15 25:12,15

68:11,12,22
70:21 75:11
**14** 4:16 15:10
68:17,18,22
69:1
**140-081703**
52:25
**140081703**
63:11 74:24
**14th** 102:5
103:14
**15** 4:3,17 48:4
74:7,8
**150** 2:9
**150,000** 57:15
61:6,17,22
62:3 90:8
**1500** 1:20,24
**15th** 2:16 48:11
**16** 4:18 75:17,18
79:10 101:25
**17** 4:19 77:20,21
100:16 101:25
**17th** 53:10
100:20
**18** 4:20 83:12,13
83:23,24 84:4
94:16
**19** 4:21 83:18,19
83:23 84:18
85:1 88:1
**19801** 2:4
**1986** 13:11
**1992** 13:13
**1EM226** 88:15
**1EM226-3** 61:9
76:13
**1EM226-3-**
57:14
**1EM226-3-0**
71:9
**1EM22630-40**
28:19
**1EM22630/40**
32:11
**1EM2264-0**
44:23

**2**

**2** 4:4 17:24,25
 24:17,18 25:1
 25:3 96:17
 97:13
**20** 4:22 95:9,10
**200,000** 77:6,7
 77:17 78:3,9
 78:25 79:20,24
 81:20 82:18
 88:22 89:2
 99:22 100:4,9
 100:15
**2000** 15:10 32:5
**2005** 30:21 31:1
 41:16 48:4,9
 48:11 65:10,12
 65:15,22 66:15
 66:19
**2006** 30:21
 35:22 53:2,2
 65:14,15 66:16
 66:19
**2007** 63:18
 64:12,14 66:22
 67:14
**2008** 11:14,23
 13:11,13 16:4
 16:9,19 20:7
 35:22 36:25
 37:2 38:21
 72:1,20 74:23
 75:4 76:3 83:3
 87:17 89:8
 98:11 99:10,19
 100:16,19,21
**2009** 72:1 98:18
**2010** 72:1
**2011** 72:2
**2012** 72:2
**2013** 102:5
 103:14
**2015** 101:25
**2016** 34:15
**2017** 13:6 34:15
**2018** 9:24 13:6,6

**2019** 9:24
**2020** 1:18 105:9
 105:11 106:19
**20th** 41:16 48:9
**212-661-1661**
 2:18
**21st** 7:16 12:2
 13:12 14:17,19
 20:18 49:10
 72:15
**24** 4:4,5
**24th** 75:4 89:8
**27** 1:18
**27th** 105:8
**28** 4:6 53:2
**29** 37:2
**29th** 16:4,8,19
 98:11 99:10,19
 100:19

**3**

**3** 4:5 24:17,20
 25:11 71:12
 72:21 73:4,19
 75:7 76:24
 83:1 89:9
 96:17,20,25
 97:14,23 98:1
 99:24 100:5
 102:13
**3-0** 46:1 47:3
**3.1** 72:25 77:2
 77:14
**3.6** 70:11
**3.8** 73:21
**30** 45:14
**30(b)(6)** 8:1
**30/40** 46:9
**300** 2:10 102:12
**302-571-6741**
 2:5
**30th** 105:11
 106:19
**31** 4:7 53:5
**31st** 63:18 74:23
 100:3
**33301** 1:20,24

**33324** 2:10
**340,000** 95:1
**3rd** 1:19,23

**4**

**4** 4:6 27:24 28:1
 65:5 96:17,20
 96:25 97:16
 98:2 102:13
**4-0** 45:5 47:3
**4-11-2006** 50:6
**40** 4:8 45:14
**405** 30:4,18 65:6
 65:18 66:12
 67:8 69:18
 79:25 95:25
 103:5
**46** 4:9
**47** 74:11 75:2
**49** 16:16 99:14

**5**

**5** 3:3 4:7 31:9,10
 31:15 96:18
 97:20 98:5
 106:9
**50** 4:10 7:9
**50,000** 100:9
**50/50** 14:20,21
**500,000** 63:23
 64:4,8,11
 66:22 67:14
 69:8,9,11
 89:17
**51** 14:20 63:19
**52** 4:11
**535,163** 94:20
 94:22,24
**54** 53:5
**56** 4:12

**6**

**6** 4:8 40:23,24
 41:3 48:6 85:3
 96:18 97:20
**6-21** 57:24
**6-26-2007** 61:3

90:7
**6/26/2007** 62:2
**60** 4:13
**60,000** 36:7
**600** 2:16
**600,000** 50:9,14
 53:13 59:22
**62** 4:14
**63** 74:11 75:2
**6340** 11:5
**68** 4:15,16
**69** 25:13,15,16
 25:17,18

**7**

**7** 4:9 46:13,14
 46:18 96:18
 97:5,20
**70** 25:13
**74** 4:17
**75** 4:18
**75/25** 14:22
**77** 4:19

**8**

**8** 4:10 49:25
 50:1 53:24
 73:22 96:18
 97:5,20
**82** 83:9
**83** 4:20,21

**9**

**9** 4:11 52:10,11
 52:15 96:18
 97:5,9,20
 102:15
**90s** 12:24
**933850** 105:16
 106:24
**95** 4:22
**954-353-2200**
 2:11