**Hearing Date: June 15, 2022**
**Objection Date: April 15, 2022**
**Reply Date: May 16, 2022**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 12-01695 (CGM) |
| v. | |
| BORDIER & CIE, | |
| Defendant. | |

**BORDIER & CIE'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    Background ......................................................................................... 3

    B.    The Trustee's Actions Against the Fairfield Funds ............................... 4

    C.    The Actions Brought by the Fairfield Liquidators................................. 6

    D.    The Present Complaint against Bordier .............................................. 7

    E.    The Trustee's Complaints Against Other Alleged Subsequent
        Transferees ..................................................................................... 9

ARGUMENT ...................................................................................................... 9

I.    THE COMPLAINT FAILS TO PLEAD ADEQUATELY THAT
    BORDIER RECEIVED CUSTOMER PROPERTY. .......................................... 9

    A.    The Trustee Has Not Plausibly Alleged That Any of the Alleged
        Subsequent Transfers Contain Customer Property. .............................. 9

    B.    The Trustee's Complaint Seeks to Recover Transfers Made by
        Sentry at Times When the Trustee Alleges There was no Money
        Left From BLMIS. ........................................................................... 14

II.    RECOVERY OF ALLEGED SUBSEQUENT TRANSFERS OF INITIAL
    TRANSFERS MADE OUTSIDE THE TWO-YEAR LOOKBACK IS
    BARRED BY THE SAFE HARBOR OF 11 U.S.C. § 546(E)........................ 16

    A.    The Alleged Initial Transfers Were Made by, to, or for the Benefit
        of, a Covered Entity. ....................................................................... 17

        1.    The Alleged Initial Transfers Were Made by a Stockbroker. ................... 18

        2.    The Alleged Initial Transfers Were Made to a Financial
            Institution. ............................................................................ 18

        3.    The Alleged Initial Transfers Were Allegedly Made "for
            the Benefit of" a Financial Institution, Bordier. ........................ 19

    B.    The Alleged Initial Transfers Were Settlement Payments and Made
        "in Connection With" a Securities Contract. ...................................... 21

i

III.    THE COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN
STATEMENT OF THE CLAIM". ................................................................................... 24

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................10, 14

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)...........................................................................................23

*Fairfield Sentry Ltd. (In Liquidation) v. Migani*,
[2014] UKPC 9 ..........................................................................................................6, 21

*In re Bernard L. Madoff Inv. Sec. LLC*,
12 F.4th 171 (2d Cir. 2021) ............................................................................................16

*In re Bernard L. Madoff Inv. Sec. LLC*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014)......................................................................13, 15

*In re Bernard L. Madoff Inv. Sec. LLC*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015)............................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Revocable Trust)*,
773 F.3d 411 (2d Cir. 2014)..................................................................................... *passim*

*In re CIL Ltd.*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018).............................................................................7, 8

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018)...............................................................................7

*In re Fairfield Sentry Ltd.*,
No. 10-13164, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ...............7, 18, 19

*In re Khan*,
No. 10-46901, 2014 WL 4956676 (Bankr. E.D.N.Y. Sept. 30, 2014) ..........................15

*In re Level 8 Apparel, LLC*,
No. 16-13164, 2021 WL 279620 (Bankr. S.D.N.Y. Jan. 26, 2021) ................................7

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
917 F.3d 85 (2d Cir. 2019)...............................................................................................4

*In re Trib. Co. Fraudulent Conv. Litig.*,
10 F.4th 147 (2d Cir. 2021) ............................................................21

*In re Trib. Co. Fraudulent Conv. Litig.*,
946 F.3d 66 (2d Cir. 2019)........................................................2, 17

*Kennedy v. Mondelez Glob. LLC*,
No. 19-CV-302, 2020 WL 4006197 (E.D.N.Y. July 10, 2020)....................16

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)..........................................................3

*New Hampshire v. Maine*,
532 U.S. 742 (2001)....................................................................19

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)........................................................13

*Sapia v. Home Box Off., Inc.*,
No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018)................13

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
476 B.R. 715 (S.D.N.Y. 2012)......................................................18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
505 B.R. 135 (S.D.N.Y. 2013)......................................................20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........................ *passim*

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005)..........................................24

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Fairfield Inv. Fund Ltd.)*,
No. 08-01789, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021).................3, 17, 22

*Sullivan v. Kodsi*,
373 F. Supp. 2d 302 (S.D.N.Y. 2005)............................................10

*Taylor v. Sturgell*,
553 U.S. 880 (2008)....................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)......................................................................3

*U.S. v. Int'l Longshoremen's Ass'n*,
518 F. Supp. 2d 422 (E.D.N.Y. 2007) ..........................................25

*Verhagen v. Saperstein*,
No. 93 CIV. 7441, 1994 WL 330055 (S.D.N.Y. July 11, 1994) ....................................................14

<u>Statutes</u>

11 U.S.C. § 101(22)(A) ....................................................................................................................18

11 U.S.C. § 101(53A)(B) ................................................................................................................18

11 U.S.C. § 546(e) ................................................................................................................. *passim*

11 U.S.C. § 548(a)(1)(A) .........................................................................................................16, 24

11 U.S.C. § 550 ..................................................................................................................................9

11 U.S.C. § 550(a) ....................................................................................................................15, 16

11 U.S.C. § 551 ..................................................................................................................................7

11 U.S.C. § 741(7)(A)(i) .................................................................................................................21

11 U.S.C. § 741(8) ...........................................................................................................................24

15 U.S.C. § 78fff-2(c)(3) .............................................................................................................9, 12

New York Debtor & Creditor Law § 278 .........................................................................................7

New York Debtor and Creditor Law .........................................................................................10, 15

Securities Investor Protection Act ...............................................................................7, 9, 10, 12

<u>Rules</u>

Fed. R. Civ. P. 8(a) ....................................................................................................................14, 25

Fed. R. Civ. P. 8(a)(2) ................................................................................................1, 14, 24, 25

Fed. R. Civ. P. 8(b)(1) ....................................................................................................................25

Fed. R. Civ. P. 12(b)(6) ............................................................................................1, 3, 17, 25

Fed. R. Civ. P. 12(f) .......................................................................................................................25

Fed. R. Civ. P. 15 ............................................................................................................................25

Defendant Bordier & Cie ("Bordier" or "Defendant"), by its undersigned counsel, respectfully submits this memorandum of law in support of its motion to dismiss the Complaint (the "Complaint") of Irving Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In the Trustee's pursuit of claims against alleged foreign subsequent transferees of the feeder funds Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds"), he has asserted a right to "recover" every dollar ever received by anyone from any party with any connection to the Ponzi scheme run by Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Madoff") even if the dollar never belonged to the customers of BLMIS.  In so alleging, the Trustee ignores principles of basic arithmetic, by improperly suing Bordier for the recovery of so-called "subsequent transfers" it received from Sentry, when he simultaneously alleges that Sentry transferred to investors and others approximately $2 billion more of BLMIS customer property than Sentry ever received from BLMIS in alleged initial transfers.  Further, the Trustee disregards the statutory safe harbor Congress created to promote certainty and finality in the securities markets, which bars all but approximately $200,000 of his subsequent transfer claims.  Finally, the Trustee disregards Federal Rule of Civil Procedure 8(a)(2)'s pleading requirements and therefore leaves Bordier to guess at what, exactly, is the basis for the Trustee's claims.  The Trustee's claims are fatally flawed and should be dismissed.

First, basic arithmetic dictates that recoverable subsequent transfers from Sentry cannot exceed the approximately $3 billion in initial transfers BLMIS made to Sentry.  In this and other proceedings, the Trustee nonetheless seeks to recover approximately *$5 billion* in claims from

defendants that allegedly redeemed shares from Sentry or received other transfers from Sentry. That massive disparity alone renders the Trustee's subsequent transfer claims entirely implausible. Specific transfers alleged in the Complaint drive home this point. For instance, the Trustee seeks to recover a transfer from Sentry to Bordier that was made in January 2005. This is nearly a year and a half after Sentry had last received any funds from BLMIS, by which time, according to the Trustee's own allegations, Sentry had already transferred all of those funds from BLMIS to other recipients; this means that any transfer to Bordier could not possibly have included BLMIS customer funds. Such allegations violate the most basic pleading standards, which demand that the Trustee tie all subsequent transfers he seeks to recover to an initial transfer (which he fails to do), and that those ties be plausible. The Trustee's pleading failures are even more striking because, for over a decade, the Trustee has had the very records from Sentry that would demonstrate which subsequent transfers contain money from Madoff, if any – and which did not. That the Trustee has nonetheless put forth such impossible allegations prevents Bordier from evaluating the claims against it for purposes of defending or settling the litigation and requires that the Complaint be dismissed.

Second, Congress recognized the importance of certainty, speed and finality in securities transactions and thus created the safe harbor of 11 U.S.C. § 546(e). *See In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019), *cert. denied,* 141 S. Ct. 2552 (2021) ("*Tribune I*") ("Unwinding settled securities transactions . . . would seriously undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract capital."). As the Second Circuit has explained, "[p]ermitting the clawback of millions, if not billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder funds—would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *In re*

2

*Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Revocable Trust)*, 773 F.3d 411, 420

(2d Cir. 2014), *cert. denied*, 576 U.S. 1044 (2015) (*"Fishman"*) (citation omitted).  Here, the

initial transfers that the Trustee seeks to recover from Bordier as an alleged subsequent transferee

were, according to his own allegations, settlement payments made by, to, or for the benefit of

"covered entities" in connection with securities contracts.  Despite this, and despite no allegation

that Bordier had any knowledge that Madoff was running a Ponzi scheme, the Trustee seeks to

recover transfers as far back as 2003, which, if allowed, would lead to the very disruption of the

securities market that the statute was designed to avoid.

<u>Finally</u>, Defendant is entitled to a "short and plain statement" of the claims against it.

Instead, the Trustee's 17-page Complaint, which he has failed to amend for a decade, purports to

"incorporate by reference" another 217-page complaint that was filed in another adversary

proceeding and has since been amended, rendering the iteration purportedly incorporated into the

Trustee's Complaint superseded and moot.  This does not provide Bordier with fair notice of the

claims against it, and the Complaint should be dismissed on this basis as well.

## STATEMENT OF FACTS[1]

### A.    Background

From the 1990s through BLMIS's collapse in December 2008, Sentry sold shares directly

---

[1] These facts are taken from allegations in the Complaint – which Defendant neither admits nor concedes – and documents incorporated by reference therein, as well as the Trustee's pleadings in other Madoff proceedings and other items of which the Court may take judicial notice.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Fairfield Inv. Fund Ltd.*), No. 08-01789, 2021 WL 3477479, at *2 (Bankr. S.D.N.Y. Aug. 6, 2021) (on motion under Rule 12(b)(6), "courts must consider … matters of which a court may take judicial notice", quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).  Here, the Court may take judicial notice of the Trustee's pleadings in other adversary proceedings, and Bordier respectfully requests that it do so.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings").

to foreign investors.  *See* First Amended Complaint (the "Trustee's Fairfield Amended

Complaint"), *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. 09-01239 (Bankr. S.D.N.Y.) (the

"Fairfield Action"), Dkt. No. 23 ¶¶ 32, 33 (Pincus Dec. Ex. 2).  Sigma and Lambda were "feeder

funds" for Sentry that also accepted investments and then invested those funds in Sentry.  Sentry

in turn, invested with BLMIS.  *See id.* ¶ 22; Compl. ¶ 2.  This action is one of more than six

dozen proceedings in which the Trustee seeks to recover from the defendants alleged payments

they received when they redeemed shares in Sentry; here, the Trustee seeks to recover

approximately $8 million that Bordier received in redemptions from Sentry.  Compl. ¶¶ 57-61.[2]

The Trustee's claims are best understood in the context of related proceedings, some

initiated by the Trustee, and some by the liquidators for the Fairfield Funds (the "Fairfield

Liquidators").  We describe these briefly below.

### B.    The Trustee's Actions Against the Fairfield Funds

Madoff's massive fraud was revealed in December 2008.  On or about May 18, 2009, the

Trustee commenced an action against the Fairfield Funds and others seeking the avoidance and

recovery of over $3.5 billion of initial transfers they received from BLMIS.  Trustee's Twenty-

Sixth Interim Report for the Period April 1, 2021 through September 30, 2021, *In re Bernard L.*

*Madoff Inv. Secs. LLC,* Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y.), Dkt. No. 20821 ¶ 167.  On

July 20, 2010, the Trustee filed the Trustee's Fairfield Amended Complaint in which he named

additional defendants, including entities and individuals (the "FGG Defendants") associated with

the Fairfield Greenwich Group ("FGG"), which formed, managed, and marketed the Fairfield

---

[2] While the Complaint against Bordier was initially dismissed under principles of comity, it was
subsequently reinstated following appeal.  *See In re Picard, Tr. for Liquidation of Bernard L.*
*Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019), *cert. denied sub. nom. HSBC Holdings PLC v.*
*Picard*, 140 S. Ct. 2824 (2020).

Funds, alleging that BLMIS made approximately $3 billion in initial transfers to Sentry during

the six-year look-back period, from December 11, 2002 to December 11, 2008.  Trustee's

Fairfield Amended Complaint ¶ 536.

On May 9, 2011, the Trustee settled with the Fairfield Liquidators.  *See* Settlement

Agreement (the "Fairfield Settlement"), Fairfield Action, Dkt. No. 69-2 (Pincus Dec. Ex. 3).  On

July 13, 2011, this Court entered consent judgments in favor of the Trustee against Sentry for

$3.054 billion (Consent Judgment, Fairfield Action, Dkt. No. 109), Sigma for $752.3 million

(Consent Judgment, Fairfield Action, Dkt. No. 110) and Lambda for $52.9 million (Consent

Judgment, Fairfield Action, Dkt. No. 108).  In the Fairfield Settlement, the Trustee and the

Fairfield Liquidators "each agree[d] to provide reasonable access to the other's documents, data,

and other information relating to, or beneficial to the pursuit of, the Sharing Claims."  Fairfield

Settlement ¶ 14.  "Sharing Claims" includes the present action, as well as the Fairfield

Liquidators' action against Bordier.  *Id*. ¶¶ 4, 7, 11.  The Trustee and the Fairfield Liquidators

also each agreed to provide the other with "reasonable cooperation and assistance … in

connection with the prosecution of the Sharing Claims".  *Id.* ¶ 14.  Thus, the Trustee has had

access to Fairfield's documents and cooperation (including, presumably, the documents pursuant

to which the Trustee brought many of the Sentry Redeemer Actions, including this one filed in

2012) since 2011.

On August 28, 2020, the Trustee filed a second amended complaint in the Fairfield

Action (Second Amended Complaint, Fairfield Action, Dkt. No. 286 (the "Second Amended

Complaint")), seeking to recover, as BLMIS customer property, *inter alia*, approximately $1

billion in amounts allegedly paid by Sentry to certain FGG Defendants (*i.e.*, one-third of the total

amount of customer property BLMIS allegedly transferred to Sentry).  *See* Exhibits 8, 10, 12, 13,

14 and 21 to the Second Amended Complaint, Fairfield Action, Dkt. Nos. 286-8, 286-10, 286-12, 286-13, 286-14, 286-21 (Pincus Dec. Ex. 4).

### C.    The Actions Brought by the Fairfield Liquidators

Shortly after Madoff's fraud was revealed, the Fairfield Funds entered liquidation proceedings before the Eastern Caribbean Supreme Court in the High Court of Justice of the Virgin Islands.  Fairfield Settlement at 2-3.  The Fairfield Liquidators commenced actions in the British Virgin Islands ("BVI") against a number of the Fairfield Funds' alleged investors seeking repayment of redemption payments made by the Funds to these investors prior to BLMIS's collapse.  *See* Exhibit G to the Fairfield Settlement ("Settlement Exhibit G"), Fairfield Action, Dkt. No. 69-9 (Pincus Dec. Ex. 3), at 6-7; *see also Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani*") (*available at* https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf).  The Fairfield Liquidators discontinued their claims in the BVI litigation following a final appellate decision in April 2014 issued by the U.K. Privy council in favor of defendants.  *See Migani*.

Starting in or about April 2010, the Fairfield Liquidators had separately commenced actions in New York against hundreds of the Funds' shareholders, including many that had been sued unsuccessfully in the BVI.  *See* Settlement Exhibit G (listing 209 actions seeking to recover redemption payments against Sentry investors brought by the Fairfield Liquidators and pending as of May 11, 2011).[3]  Bordier is named as a defendant in one of these.  *See Fairfield Sentry Ltd.*

---

[3] While there is substantial overlap, these actions by the Fairfield Liquidators also include defendants who are not being sued by the Trustee.  *See, e.g.*, Third Amended Complaint, *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Piguet & Cie S.A.*, Adv. Pro. No. 10-03514 (Bankr. S.D.N.Y.), Dkt. No. 72.

*(In Liquidation), et al. v. Bordier & Cie, et al.*, Adv. Pro. No. 10-03873 (Bankr. S.D.N.Y.)[4]

Pursuant to a series of decisions by this Court (which are currently subject to appeal), all of the Fairfield Liquidators' New York claims against Bordier have been dismissed.  *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 282, 305, 316 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*"); *In re Fairfield Sentry Ltd.*, No. 10-13164, 2020 WL 7345988, at *22-*35 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*").

### D.    The Present Complaint against Bordier

The Trustee brings this proceeding pursuant to his statutory authority under the Securities Investor Protection Act ("SIPA").  Compl. ¶ 4.  The Complaint alleges that Bordier is a "Swiss private bank" specializing in asset management and securities trading.  Compl. ¶¶ 3, 22. According to the Complaint, Bordier received approximately $8 million in redemptions from Sentry, which the Trustee attempts to characterize as supposed "subsequent transfers" of BLMIS "customer property."  *Id.* ¶ 2, 41.[5]  The Trustee invokes Section 550 of the Bankruptcy Code and Section 278 of the New York Debtor & Creditor Law ("NYDCL").  Compl. ¶ 61.[6]

---

[4] As set forth in footnote 1, above, this Court may take judicial notice of pleadings in other actions.  This is especially true here where the Trustee is in privity with the Fairfield Liquidators in actions to recover alleged BLMIS customer property and the Trustee and Fairfield Liquidators have stipulated to a joint interest between them in this respect.  *See infra* at 19, n.13.

[5] The Trustee also originally sought recovery of certain alleged redemption payments Bordier received from Kingate Global Fund and Kingate Euro Fund (together, "Kingate"), but those claims were dismissed as a result of a June 26, 2019, settlement between the Trustee and Kingate's joint liquidators.  *See* Stipulation and Order dated December 13, 2021, Dkt. No. 81.

[6] Although Section 278 of the NYDCL was amended, effective April 4, 2020, the amended statute only "applies to transactions occurring on or after April 4, 2020" and is therefore inapplicable to the alleged transfers at issue in this case.  *In re Level 8 Apparel, LLC*, No. 16-13164, 2021 WL 279620, at *5 n.8 (Bankr. S.D.N.Y. Jan. 26, 2021).

The Complaint also purports to assert claims pursuant to 11 U.S.C. § 551.  Section 551, however, does not provide for an independent cause of action.  *See In re CIL Ltd.*, 582 B.R. 46,

The Trustee alleges that BLMIS made numerous initial transfers over six years to Sentry (Compl. Ex. B) totaling "approximately $3 billion" (*id.* ¶ 36) and that Sentry, on certain days during those six years, transferred $7,928,454 in total to Bordier (*id.* ¶ 41, Ex. C).  The Trustee does not identify which portions of these initial transfers from BLMIS to Sentry were supposedly subsequently transferred to Bordier as redemptions—not a date, not an amount, not anything from which Bordier or this Court might discern the supposed source of the funds that were transferred from Sentry to Bordier.  Instead, the Trustee breezily alleges:

> 36.     During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). . . .

> 37.     The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). . . .

> 38.     The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). . . .

> 41.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Bordier . . . . Based on the Trustee's investigation to date, approximately $7,928,454 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Bordier (the "Fairfield Sentry Subsequent Transfers") . . . .

Compl. ¶¶ 36-38, 41.

Other than the conclusory statements set forth above, the Complaint utterly fails to identify which of the BLMIS initial transfers, if any, were the actual source of the Sentry transfers to Bordier.  As explained below, this pleading failure is dispositive, particularly because at the time he filed the Complaint, the Trustee long had access to the Fairfield Funds' records.

---

97 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

E.      **The Trustee's Complaints Against Other Alleged Subsequent Transferees**

Besides the claims in this action against Bordier, the Trustee also has filed approximately six dozen actions against other Sentry investors.  In those actions, combined with the Trustee's action against Sigma and Lambda, the Trustee seeks to recover, in the aggregate, alleged subsequent transfers of BLMIS customer property totaling approximately $4 billion from defendants who allegedly received redemption payments from Sentry.  *See* Pincus Dec. Exs. 5, 6, ¶ 9.  And on top of that $4 billion in supposed "subsequent transfers", the Trustee also seeks to recover *another* approximately $1 billion in amounts paid by Sentry to the FGG Defendants.  *See* Pincus Dec. Ex. 4, ¶ 10.  In short, the Trustee is trying to recover roughly $5 billion in alleged "subsequent transfers" that flowed out of Sentry, even though he simultaneously alleges that BLMIS made initial transfers of only $3 billion that flowed in to Sentry.

## ARGUMENT

I.      **THE COMPLAINT FAILS TO PLEAD ADEQUATELY THAT BORDIER RECEIVED CUSTOMER PROPERTY.**

A.      **The Trustee Has Not Plausibly Alleged That Any of the Alleged Subsequent Transfers Contain Customer Property**.

In order to state a claim under SIPA, the Trustee must plausibly allege that a specific redemption payment Bordier received was a subsequent transfer of BLMIS customer property that had been fraudulently transferred from BLMIS to Sentry.  *See* 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11").  To state a claim under 11 U.S.C. § 550, the Trustee must allege not just that the initial transfer is avoidable, but that the initial transfer (or subsequent transfers of the initial transfer) was transferred to the subsequent transferee.  *In re Bernard L.*

9

*Madoff Inv. Sec. LLC*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) ("*Shapiro*").[7]  And of course,

the claim must be "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In the context of a claim to set aside subsequent transfers under SIPA, this Court has held

that barebones allegations – such as the Trustee's allegations here – that customer funds were

transferred to the subsequent transferee do not suffice:

> The Trustee must allege facts that support the inference that the funds at issue
> originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when,
> and how much" of the transfers to establish that an entity was a subsequent transferee of
> the funds.  At the pleading stage, the Trustee is not required to provide a "dollar-for-
> dollar accounting" of the exact funds at issue. However, barebones allegations that the
> funds at issue were transferred to the Subsequent Transferees, without more detail, are
> insufficient.

*Shapiro*, 542 B.R. at 119.  In *Shapiro*, the Court dismissed as conclusory a subsequent transferee

claim, noting that the complaint "does not tie any initial transfer to any subsequent transfer or

Subsequent Transferee."  *Id.*

As in *Shapiro*, the Trustee's Complaint fails to plead the "necessary vital statistics".

Rather, it merely alleges that during the six years preceding the petition, BLMIS transferred

approximately $3 billion to Sentry, and that "[a] portion of [those transfers] was subsequently

transferred either directly or indirectly to, or for the benefit of, Defendant".  Compl. ¶¶ 20, 36,

41.  The Trustee does not cure this insufficient allegation by attaching exhibits (73 pages worth

in small font) that list thousands of transactions recorded in Sentry's accounts at BLMIS, *id.* Ex.

B, and exhibits that list alleged subsequent transfers from Sentry to Defendant, *id.* at Ex. C.  To

---

[7] Equally, under the New York Debtor and Creditor Law, "as to claims of both actual and
constructive fraud, New York law permits money damages to be recovered only against parties
who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries
of the conveyance."  *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 309 (S.D.N.Y. 2005) (emphasis,
citation, and internal quotation marks omitted).

the contrary, the Complaint fails to identify which, if any, of the 73 pages of transactions – many

of which fall outside the statute of limitations – constitute initial transfers of BLMIS customer

property that were allegedly subsequently transferred to Bordier and does nothing to tie the two

together.  Essentially, the Trustee is asking the Court to infer that because BLMIS transferred a

large amount of money to Sentry over a long period of time, to the extent Sentry subsequently

transferred *any* money to Bordier, *all* of that money must have come from BLMIS and can be

recovered.

Not only do the Trustee's "barebones allegations" fail to plead the "necessary vital

statistics", but they are facially implausible – indeed, they are mathematically impossible.  For

instance, the Trustee alleges that BLMIS transferred approximately $3 billion to Sentry (Compl.

¶ 36); yet at the same time, he asserts the right to "recover" an aggregate of nearly $4 billion of

alleged subsequent transfers of customer property in the form of redemption payments made to

dozens of defendants who redeemed from Sentry, including Sigma and Lambda themselves.  *See*

Pincus Dec. Exs. 5, 6, ¶ 9.  Additionally, the Trustee seeks to recover, again as alleged

subsequent transfers of customer property from Sentry, *another* approximately $1 billion in

money allegedly paid by Sentry to FGG Defendants.  *See* Pincus Dec. Ex. 4, ¶ 10.  In other

words, the Trustee is endeavoring to recover, all as subsequent transfers from Sentry, roughly $2

billion more than the total amount that the Trustee himself alleges that BLMIS transferred to

Sentry.  As such, the Trustee's theory that all of the redemption payments are customer property

is not merely implausible, it is impossible.

The reason that the amount BLMIS transferred to Sentry is at least $2 billion lower than

the amount Sentry distributed is because transfers from BLMIS were not Sentry's sole source of

money for redemptions and other payments.  The Trustee himself pleads that Sentry also

continuously received funds not just from BLMIS, but from investor subscriptions.  *See, e.g.*,
Compl. ¶ 7 (alleging that Bordier wired funds to Sentry for subscriptions).  Numerous
complaints are rife with similar allegations regarding other redeemer defendants.  The
transaction details the Trustee has provided to this Court in his numerous complaints – alleging
that Sentry paid out more than it received from BLMIS – lead to the inescapable conclusion that
Sentry paid redemptions to its investors with money that could not possibly have originated with
BLMIS.

This is about more than the Trustee's disregard of simple arithmetic.  The Trustee's own
allegations demonstrate that at least approximately $2 billion in funds that he seeks to "recover"
indisputably are not "customer property" under 15 U.S.C. § 78fff-2(c)(3).  There is nothing in
SIPA that authorizes the Trustee to recover funds that were not "customer property" and never
belonged to BLMIS.

The Trustee's failure to allege the "necessary vital statistics" of the transfers he seeks to
put at issue is particularly inexcusable in this case, in which the plaintiff, rather than the
defendant, possesses all the records relevant to establishing whether, and to what extent, any
alleged transfers to Bordier contain customer property.  As noted above, the Trustee sued and
settled with the Liquidators of Sentry, who in 2011 stipulated to the entry of a judgment in favor
of the BLMIS Estate (in the amount of approximately $3 billion).[8]  Fairfield Settlement ¶ 1;
Compl. ¶ 40.  Pursuant to that Settlement Agreement, the Trustee has had access to Sentry's
records for over a decade.  *See* Fairfield Settlement ¶ 14 (Trustee and Fairfield Liquidators "each

---

[8] This Court approved the Fairfield Settlement Agreement on June 7, 2011, *id.* at Bench
Memorandum and Order Granting Trustee's Motion for Entry of Order Approving Agreement,
Fairfield Action, Dkt. No. 92, and it was incorporated into the Consent Judgment entered against
Sentry on July 13, 2011.  Consent Judgment, Fairfield Action, Dkt. No. 109, ¶ 2; Compl. ¶ 40.

agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims."). Moreover, the Fairfield Liquidators "agree[d] to provide reasonable cooperation and assistance" to the Trustee "in connection with the prosecution of the Sharing Claims". *Id*. ¶ 14.

Thus, this case is nothing like *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin*"), where this Court granted the Trustee "greater latitude" in pleading where – having "specifie[d] numerous inter-defendant transfers" showing that "defendants commingled their assets, transferring their funds into and out of each other's accounts" – the Trustee faced special "difficulties" because "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants". *See Merkin*, 515 B.R. at 150-51. No such latitude is warranted here. Not only does the Trustee allege no inter-defendant transfers in this action, but, for over a decade, the Trustee has had every piece of data he needs to determine whether an alleged subsequent transfer contains customer property, and from which initial transfer that transfer originates, yet he has failed to so allege here – because to do so would lead to the inescapable conclusion that the Trustee is pursuing billions of dollars to which, as a matter of simple math, he is not entitled. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 722 (2d Cir. 2013) (affirming dismissal and finding that "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*, No. 18 CIV. 1317, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing claim where plaintiffs failed to precisely plead necessary facts that were "uniquely in [p]laintiffs' possession").

13

The Complaint's pleading failure not only imposes substantial discovery and litigation

costs on defendants, it fails to provide Bordier with fair notice of the claims against it. This

failure deprives Bordier of the ability to evaluate those claims for the purposes of defense and

settlement, in violation of Rule 8(a) (a pleading problem which, as set forth in Point III below, is

endemic to the Complaint). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (Fed. R.

Civ. P. 8(a)(2) requires that the plaintiff "give the defendant fair notice of what the claim…is and

the grounds upon which it rests") (citation omitted); *see also Verhagen v. Saperstein,* No. 93

CIV. 7441, 1994 WL 330055, at *2 (S.D.N.Y. July 11, 1994) (Rule 8(a) requires pleader to

provide adverse party with fair notice of the claim "in order to answer and prepare a defense").

This pleading deficiency is not just on some trivial matter; given the lack of "necessary vital

statistics" contained in the pleading here, Bordier is hard-pressed to discern exactly what the

Trustee claims is "customer property", let alone whether such claims are legitimate, or whether

these ill-defined claims are time barred or shielded by the application of the safe harbor of 11

U.S.C. § 546(e) (*see* Point II, below). No defendant should have to guess about what claims it is

facing.

**B.** **The Trustee's Complaint Seeks to Recover Transfers Made by Sentry at Times When the Trustee Alleges There was no Money Left From BLMIS.**

The implausibility – and in many instances impossibility – of the Trustee's subsequent

transferee claims against Bordier is underscored by the fact that the Complaint repeatedly seeks

to recover transfers from Bordier during time periods when, according to the Trustee's own

pleadings, the amounts paid out by Sentry to defendants, all allegedly as subsequent transfers of

customer property, vastly exceeded the amounts BLMIS transferred to Sentry.

14

For example, the Trustee alleges that in the period from December 11, 2002 (*i.e.*, six

years preceding the filing of the petition (Compl. ¶¶ 11, 20[9])) through March 31, 2005, BLMIS

transferred a total of $120 million to Sentry in three separate transfers made May 9, 2003

through July 22, 2003.  *See* Compl. Ex. B p. 19 ("CHECK WIRE" entries).  The Trustee further

alleges that from the time of that first BLMIS transfer on May 9, 2003, through December 31,

2003, Sentry paid more than $200 million of alleged customer property to redeeming

shareholders, including Sigma, and Lambda.  *See* Pincus Dec. Exs. 5, 6, ¶ 11.  So when the

Trustee alleges that Bordier received a redemption payment from Sentry in January 2005, *that*

*redemption payment cannot possibly be BLMIS customer property* because the amount of money

Sentry had already paid to other defendants by December 31, 2003 far exceeded the total amount

it took in from BLMIS.[10]  That this redemption payment to Bordier took place a year and a half

after Sentry last received funds from BLMIS further underscores the implausibility that the

redemption payment contains BLMIS "customer property."  *Cf. Merkin*, 515 B.R., at 150-51

---

[9] Since the statute of limitations under New York's Debtor and Creditor Law for fraudulent conveyances is six years, *see In re Khan*, No. 10-46901, 2014 WL 4956676, at *52 (Bankr. E.D.N.Y. Sept. 30, 2014), the Trustee cannot avoid transfers from BLMIS to Sentry that occurred before December 11, 2002 (the "lookback period").  Thus, he cannot recover any subsequent transfers of those transfers under Section 550(a).  Accordingly, the Court may only consider alleged initial transfers after December 11, 2002 (the first of which was on May 9, 2003) in determining whether an alleged subsequent transfer was in fact a transfer of recoverable customer property; any earlier initial transfers alleged in the Complaint must be excluded from consideration.  In any event, as set forth in Point II below, pursuant to the safe harbor of 11 U.S.C. § 546(e), the Trustee is barred from recovering alleged subsequent transfers of initial transfers which took place prior to two years before the petition date.

[10] Specifically, the Trustee alleges that on May 9, 2003, BLMIS transferred $40 million to Sentry, which was spent by no later than June 2003; on July 11, 2003, BLMIS transferred $55 million to Sentry, which was spent by no later than July 16, 2003; and on July 22, 2003, BLMIS transferred $25 million to Sentry, which was spent by no later than September 2003.  *See* Pincus Dec. Exs. 5, 6, ¶ 11.

(inferring linkage where alleged "subsequent transfers took place contemporaneously or shortly after an initial transfer" or at most two or three months later).

This is just one of many examples of the Trustee's impossible, internally contradictory allegations.  Even if the Trustee, who has Fairfield's records and cooperation, were entitled to avail himself of liberal pleading rules designed for plaintiffs without access to such records, such allegations must be dismissed as a matter of law.  *See Kennedy v. Mondelez Glob. LLC,* No. 19-CV-302, 2020 WL 4006197, at *9 (E.D.N.Y. July 10, 2020) ("where the allegations of a complaint are materially inconsistent with the evidence a plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss.") (citation omitted).

## II.    RECOVERY OF ALLEGED SUBSEQUENT TRANSFERS OF INITIAL TRANSFERS MADE OUTSIDE THE TWO-YEAR LOOKBACK IS BARRED BY THE SAFE HARBOR OF 11 U.S.C. § 546(E).

Section 550(a) of the Bankruptcy Code provides that, to the extent a transfer is avoided under certain sections of the Code, a trustee may recover the property transferred, or its value, from the initial transferee or any subsequent transferee.  However, Section 546(e) of the Bankruptcy Code bars a trustee from avoiding a transfer (other than under Section 548(a)(1)(A), which has only a two-year lookback period[11]) if that transfer, as relevant here, (1) was made "by

---

[11] Under 11 U.S.C. § 548(a)(1)(A), a trustee may avoid transfers made within two years before the petition date (here, December 11, 2008 (*see* Compl. ¶¶ 11, 20)), if the debtor made such transfer with actual intent to hinder, delay or defraud.  Because of the Ponzi scheme presumption, and actual intent is generally a factual issue, Defendant, at this stage, does not seek dismissal under Section 546(e) of claims based on initial transfers made within the two years prior to the petition date (the "Two Year Transfers").  Further, in a recent concurring opinion, Judge Menashi of the United States Court of Appeals for the Second Circuit cast doubt on the validity of the presumption, *see In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 201-04 (2d Cir. 2021) (Menashi, J., concurring).  Accordingly, Defendant reserves the right to challenge the avoidability of the Two Year Transfers should this action proceed beyond the motion to dismiss stage.

or to (or for the benefit of)" a covered entity, such as a stockbroker or financial institution; and

(2) was either a settlement payment or a transfer in connection with a securities contract.

11 U.S.C. § 546(e).[12]   The United States Court of Appeals for the Second Circuit has recognized

that Section 546(e) is an "important exception to a trustee's clawback powers" designed to

minimize market disruption.  *Fishman*, 773 F.3d at 414, 420.  The Section 546(e) safe harbor is

available as a defense to alleged subsequent transferees, even where, as here, the alleged initial

transferee agreed to a consent judgment.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC* (*Picard*

*v. Fairfield Inv. Fund Ltd.*), No. 08-01789, 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6,

2021) (Morris, C.J.) ("Where the initial transferee fails to raise a § 546(e) defense against the

Trustee's avoidance of certain transfers, … the subsequent transferee is nonetheless entitled to

raise a § 546(e) defense against recovery of those funds.").

　　　As set forth below, both elements of a defense under Section 546(e) are established as a

matter of law.  Accordingly, any claim by the Trustee against Bordier as Sentry's alleged

subsequent transferee based on an initial transfer made prior to September 6, 2007 (the first of

the Two Year Transfers) – *i.e.*, all but approximately $200,000 of claims, which should be

dismissed as set forth in Points I and III in any event – must be dismissed.  *See Fishman*, 773

F.3d at 415 (affirming dismissal of relevant claims under Rule 12(b)(6) because they were

shielded by 11 U.S.C. § 546(e)).

### A.　　The Alleged Initial Transfers Were Made by, to, or for the Benefit of, a Covered Entity.

　　　Here, the alleged initial transfers were made by, to, or for the benefit of, an entity covered

by Section 546(e) for three independently sufficient reasons, namely, because the alleged initial

---

[12] 11 U.S.C. § 546(e) also preempts state law claims seeking to unwind redemptions.  *Tribune I*,
946 F.3d at 81, 90.

17

transfers were made (1) by a stockbroker, (2) to a financial institution, and (3) allegedly for the benefit of another financial institution.

### 1.    The Alleged Initial Transfers Were Made by a Stockbroker.

The Code defines "stockbroker" to include entities "engaged in the business of effecting transactions in securities."  11 U.S.C. § 101(53A)(B).  As the District Court found, BLMIS "qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (footnote and citation omitted), *aff'd sub nom. Fishman*, 773 F.3d at 417 ("It is not disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e).").

### 2.    The Alleged Initial Transfers Were Made to a Financial Institution.

Sentry, the initial transferee, is also a "financial institution" under the Code, which defines "financial institution" to include both "an entity that is a commercial or savings bank," and the bank's customer "when [the bank] entity is acting as agent or custodian for a customer … in connection with a securities contract."  11 U.S.C. § 101(22)(A).  In *Fairfield III*, this Court held that the Fairfield Funds were "financial institutions" because they were customers of a financial institution, Citco Bank Nederland N.V. Dublin Branch ("Citco Bank"), which acted as their agent in connection with the securities contracts pursuant to which the redemption payments were made.  *Fairfield III*, 2020 WL 7345988, at *7.

18

This Court's holding in *Fairfield III* is equally applicable here and, indeed, is binding on the Trustee because he was in privity with the Fairfield Liquidators, who were litigating that action partly for the Trustee's benefit.[13]

### 3.    The Alleged Initial Transfers Were Allegedly Made "for the Benefit of" a Financial Institution, Bordier.

Under the Trustee's theory, the initial transfers were made "for the benefit of" a financial institution, namely Bordier.  As Judge Rakoff explained, where an investment fund withdraws funds because a financial institution seeks redemption of its investment in the fund, "that situation appears to fit within the plain terms of Section 546(e)".  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").  Although implausible (*see* Point I, above), the Trustee alleges just that situation.

It is indisputable that Bordier was a financial institution at the relevant time.  The Complaint alleges that Bordier "was a Swiss private bank specializing in asset managing and Securities trading".  Compl. ¶ 3.  As a bank, Bordier was plainly a "financial institution".  *See Cohmad,* 2013 WL 1609154, at *8 ("where the Trustee alleges that the defendant is 'a banking

---

[13] Under the Fairfield Settlement, the Fairfield Liquidators will pay the Trustee 15% of net recoveries from their claims against redeemers from the Fairfield Funds until the Trustee has been paid $1.924 billion.  Fairfield Settlement ¶¶ 4, 11.  Further, "[t]he Trustee and the Liquidators agree and stipulate that a joint interest exists between them with respect to the Sharing Claims." *Id.* at ¶ 14.  This agreed joint interest in pursuing alleged BLMIS customer property is a "preexisting 'substantive legal relationship,'" focused on a successive or concurrent interest in property, of a kind that gives rise to nonparty issue preclusion in *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008).  As such, and because the issue of Sentry's status as a "financial institution" status was "actually litigated" and "essential" to the final judgments dismissing numerous such actions on grounds of the Section 546(e) safe harbor, this Court's finding in *Fairfield III* that Sentry was a "financial institution" in connection with redemption payments from Sentry to its subscribers is binding on the Trustee.  *See New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) (stating requirements for issue preclusion).

institution'… the defendant may be deemed to constitute a protected 'financial institution' … for

the purposes of Section 546(e) on the face of the complaint.")

The Trustee's theory of recovery against Bordier as a subsequent transferee amounts to

an allegation that the initial transfers from BLMIS to Sentry were made "for the benefit of"

Bordier. The term "for the benefit" is interpreted broadly – for a transfer to be "for the benefit

of" a covered entity, there must be "some intent-to-benefit on the part of either the initial

transferee or the debtor: that is, either of the parties to the initial transfer must have contemplated

that defendants would benefit from the transfer." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC,* 505 B.R. 135, 149 (S.D.N.Y. 2013) ("*ABN Amro Bank*").

Here, as the Trustee would have it, the funds Bordier received were withdrawn from

BLMIS by Sentry "in order to pay" redemption payments by Sentry to investors, including

Bordier. *See, e.g.*, Trustee's Fairfield Amended Complaint ¶ 53 ("Between 2003 and 2008,

Sigma redeemed approximately $752.3 million from Fairfield Sentry. … Upon information and

belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS

accounts."); *see also id.* ¶ 58 (similar allegations as to Lambda's alleged redemption of "over

$52.9 million from Fairfield Sentry"); *id.* ¶¶ 63, 71, 76, 80, 85, 100, 104, 109, 129, 141, 159.

Since, according to the Trustee's own theory, "the funds' withdrawals were directly caused by

the defendants' request for redemptions, these initial transfers were 'for the benefit' of

defendants as redeeming investors." *ABN Amro Bank,* 505 B.R., at 149-50; *see also Cohmad*,

2013 WL 1609154, at *9 (where Trustee alleges withdrawal of funds by investment fund

because financial institution sought to redeem its investment, that situation fits within Section

546(e)).

20

### B.    The Alleged Initial Transfers Were Settlement Payments and Made "in Connection With" a Securities Contract.

In analogous circumstances, the Second Circuit has concluded that Section 546(e) shields

transfers from BLMIS to its account holders from the Trustee's avoidance powers. *Fishman*,

773 F.3d at 415.  The *Fishman* court concluded that the documents governing BLMIS

customers' accounts constituted securities contracts, and that the payments BLMIS made to

those customers were made "in connection with" those contracts, and also constituted

"settlement payments," *id.* at 418-23 — either of which findings would have sufficed to invoke

the safe harbor.  The court rejected the Trustee's argument that the safe harbor did not apply

because Madoff did not actually carry out the promised securities transactions.  *Id.* at 419-20.

The same reasoning applies to the transfers that the Trustee alleges BLMIS made to

Sentry "in order to pay" investors' redemption requests.  Those alleged transfers were clearly "in

connection with" both (a) the securities contracts Sentry had entered into with BLMIS, *see*

*Fishman*, 773 F.3d at 418-23, and (b) according to the Trustee (although lacking in plausible

support), the separate securities contract under which Bordier made its redemptions, *see* Point

II.A.3 above, namely, Sentry's Articles of Association (Pincus Dec. Ex. 7).  *See Migani* ¶ 10

("the terms of the subscriber's membership of the Fund, which govern the redemption of its

shares . . . are to be found in the Articles of Association of the Fund").[14]

The definition of "securities contract" includes "a contract for the purchase, sale, or loan

of a security," 11 U.S.C. § 741(7)(A)(i), and, as relevant here, "includes . . . redemption

---

[14] This Court may consider the Articles of Association on this motion because, as the basis for the challenged redemption, they are integral to the Complaint.  *See In re Trib. Co. Fraudulent Conv. Litig.,* 10 F.4th 147, 176 (2d Cir. 2021) ("*Tribune II*") ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").  A petition for certiorari with respect to *Tribune II* was docketed on January 14, 2022.

requests." *Cohmad*, 2013 WL 1609154, at *8.  Further, all Section 546(e) requires is that the

transfer be "in connection with *a* securities contract" (emphasis added), even if not the securities

contract between the initial transferor and transferee.  *See Fishman*, 773 F.3d at 422 ("Section

546(e) sets a low bar for the required relationship between the securities contract and the transfer

sought to be avoided"; "a transfer can be connected to, and can be made in relation to, multiple

documents or purposes simultaneously"); *Cohmad*, 2013 WL 1609154, at *9 (under the safe

harbor, transfer from debtor to initial transferee may qualify as having been made "in connection

with a securities contract" between initial transferee and subsequent transferee).  The conclusion

that the alleged initial transfers were made in connection with a securities contract does not

change even if the initial transferee, Sentry, allegedly knew of Madoff's fraud.[15]

　　　　First, there was a securities contract between Sentry and its investors, even if there was

none between BLMIS and Sentry, and Sentry's alleged knowledge of the BLMIS fraud would

not preclude the straightforward application of Section 546(e) as being "in connection with"

Sentry's agreement with its investors.  In *Cohmad*, Judge Rakoff agreed that securities contracts

other than the initial transferee's securities contract with BLMIS could independently satisfy

Section 546(e).  2013 WL 1609154, at *8-9.  Judge Rakoff ruled that so long as the initial

transferee withdrew funds from BLMIS to make a payment under a securities contract between

the initial transferee and the subsequent transferee, then the withdrawal from BLMIS would be a

---

[15] In *Fairfield Investment Fund Ltd.*, the Court accepted that Sentry's knowledge had been adequately pled in a later version of the complaint in the Fairfield Action than the one incorporated by reference into the instant Complaint.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Fairfield Inv. Fund Ltd.*), No. 08-01789, 2021 WL 3477479, at *4-5 (Bankr. S.D.N.Y. Aug. 6, 2021) (citing to the Second Amended Complaint).  Defendant respectfully disagrees with that conclusion and reserves for appeal or a later stage of this action all arguments that the Trustee has not adequately pled Sentry's actual knowledge of Madoff's fraud either in the Second Amended Complaint or the earlier pleadings in that action and that Sentry did not in fact have such actual knowledge.

transfer made in connection with the securities contract between the initial transferee and the

subsequent transferee and thus would not be avoidable:

> Take, for example, a hypothetical situation in which the Trustee alleges that a
> withdrawal of funds by an investment fund from its Madoff Securities customer
> account occurred because an investor in that fund sought redemption of its
> investment under the terms of its investment contract.  Assuming that either the
> investment fund or the investor qualifies as a financial institution or financial
> participant, and barring other circumstances that may appear on the facts of a
> given case, that situation appears to fit within the plain terms of Section 546(e):
> an initial transfer that was "made by or to (or for the benefit of) a . . . financial
> institution [or] financial participant . . . in connection with a securities contract."

*Id.* at *9 (footnote omitted).[16]  The logic of Judge Rakoff's hypothetical applies directly here,

where the investment fund was Sentry, a financial institution as shown above, and the investor

was Bordier, also a financial institution.  And the Complaint is devoid of any allegation that

Bordier knew of Madoff's fraud.

Second, while this Court and the District Court have previously ruled that Section 546(e)

cannot be invoked by a defendant with actual knowledge of Madoff's fraud, and while, as set

forth above, those rulings are inapplicable here, Defendant respectfully submits that there is

nothing in the language of Section 546(e) that supports creating an exception to its applicability

based on the knowledge of any transferee, as opposed to the debtor-transferor.[17]  That section

provides for only one exception to the safe harbor:  a claim under Section 548(a)(1)(A), which

---

[16] Judge Rakoff also observed that "[t]o the extent that, for example, an initial transfer from
Madoff [S]ecurities to an investment fund customer and the subsequent transfer from the
investment fund to its redeeming investors may together comprise a 'settlement payment' under
*Enron [Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011)], that
transfer may fall within the purview of Section 546(e), assuming it meets the statute's other
requirements." *Id*. at *9 n.5.

[17] This is an open question at the Circuit level, and Bordier expressly preserves it.  Although the
Second Circuit in *Fishman* noted that the defendants there had "every reason to believe that
BLMIS was actually engaged in the business of effecting securities transactions," 773 F.3d at
420, it did not state that the result would have been different had that not been the case.

requires the Trustee to allege and prove intentional fraud by the transferor, and which only has a

two year lookback period.  *See Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs.

Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the

transferor and not the transferee that is relevant") (citations omitted).[18]  Thus, the exception to

the safe harbor articulated in *Cohmad*, *i.e.*, that if the transferee from whom the Trustee seeks to

recover knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section

546(e) (*Cohmad*, 2013 WL 1609154, at *7), is not supported by the text of the statute.

## III.    THE COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN STATEMENT OF THE CLAIM".

Beyond the Complaint's many infirmities, it fails for the overarching reason that it does

not contain "a short and plain statement of the claim showing that the pleader is entitled to relief"

as required under Rule 8(a)(2).  In particular, although the Trustee has had nearly a decade to

amend his pleadings to provide Bordier with sufficient notice of the claims it faces, the Trustee

instead depends on incorporating by reference an entire separate complaint filed in another

proceeding.  *See* Compl. ¶ 35 ("The Trustee incorporates by reference the allegations contained

in the [Trustee's Fairfield Amended Complaint] as if fully set forth herein.").  That complaint, in

turn, is 217 pages and 798 paragraphs, and contains allegations and claims against parties other

than Sentry which bear no relevance to this case.  In contrast, the Complaint here is a mere 17

pages and 71 paragraphs (much of which addresses now-dismissed Kingate claims).

The complaint the Trustee purports to incorporate into his pleadings has also since been

superseded by a further amended complaint.  Thus, Bordier is left to guess not only which

allegations of the incorporated pleading it must respond to, but even *which pleading*:  the

---

[18] Nor does transferee knowledge play any role in the definitions of "settlement payment," 11 U.S.C. § 741(8), or "securities contract," *id*. 741(7).

24

complaint referenced in paragraph 35; or the amended one.  Neither alternative is acceptable under the Federal Rules.[19]

Such wholesale incorporation of since mooted pleadings in another action is "a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a short and plain statement of the claim showing that the pleader is entitled to relief."  *U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007) (internal quotations omitted).  Indeed, "if all of the allegations in the prior pleadings are deemed to be incorporated into the [Complaint], then the [Complaint] would become an unintelligible morass of self-contradictory allegations" and "would in itself be grounds for dismissing the [Complaint pursuant] to Rules 12(b)(6) and 8(a)(2)."  *Id.* 462 n.72.

Accordingly, the Complaint should be dismissed for failure to comply with Rule 8(a).  In addition, paragraph 35 of the Complaint should be stricken pursuant to Rule 12(f).

## CONCLUSION

For the foregoing reasons, Bordier respectfully requests that the Court dismiss the Complaint in its entirety.

---

[19] If the former, Bordier would be unreasonably forced to answer allegations that the Trustee no longer stands by.  *Cf.* Fed. R. Civ. P. 8(b)(1) (requiring response to "a pleading").  If the latter, the Complaint would in effect become automatically self-amending, in contravention of Federal Rule of Civil Procedure 15's dictates governing the amendment of pleading.

Dated: February 14, 2022
New York, New York

Respectfully Submitted,

ALLEGAERT BERGER & VOGEL LLP

By: /s/ John F. Zulack
John F. Zulack
Lauren J. Pincus
111 Broadway, 20th Floor
New York, New York 10006
Tel. No.: 212-571-0550
Email: jzulack@abv.com
Email: lpincus@abv.com

*Counsel for Defendant Bordier & Cie*