**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01205 (CGM) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| MULTI-STRATEGY FUND LIMITED, | |
| Defendant. | |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against defendant Multi-Strategy Fund Limited ("Defendant"),[1] alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover a single subsequent transfer of $25,763,374 in BLMIS customer property that Defendant received from Fairfield Sentry Limited ("Fairfield Sentry").

3.    Defendant invested in Fairfield Sentry and Kingate Global Fund Limited ("Kingate Global" and, with Fairfield Sentry, the "BLMIS Feeder Funds"), knowing that those funds invested all or substantially all of their assets with BLMIS.[2]

4.    CDP Capital was Defendant's investment manager and directed Defendant's investments in and redemptions from the BLMIS Feeder Funds.

---

[1] The Trustee's initial complaint names CDP Capital Tactical Alternative Investments ("CDP Capital") as a defendant. *See generally* Compl., *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 12-01205 (CGM) (Bankr. S.D.N.Y. Mar. 22, 2012), ECF No. 1. Defendant and CDP Capital represented to the Trustee that Defendant, not CDP Capital, received the subsequent transfer of customer property from Fairfield Sentry Limited the Trustee seeks to recover with this Amended Complaint. *See* Stipulation, *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 12-01205 (CGM) (Bankr. S.D.N.Y. Dec. 28, 2021), ECF No. 88, ¶ 2. Based on this representation, the Trustee agreed to dismiss his claim against CDP Capital without prejudice. *See id*.

[2] This Amended Complaint removes claims that have been resolved by the Trustee's Court-approved settlement in *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Aug. 6, 2019), ECF No. 417. Specifically, pursuant to the single satisfaction rule set forth in 11 U.S.C. § 550(d), the Trustee is not seeking to recover subsequent transfers that Defendant received from Kingate Global.

5.      On February 10, 2005, Mario Therrien—president of CDP Capital and president, director, and authorized signatory of Defendant—met with Simon Ruddick.  Ruddick was the managing director of Albourne Partners Limited, an alternative investment consulting firm. Therrien and Ruddick "discussed Madoff and the potential ponzi [sic] scheme," and Therrien "[g]ot so scared" that less than a week later, Defendant requested redemptions of all its holdings in the BLMIS Feeder Funds.

6.      Therrien recounted this course of events the day after Madoff was arrested in a December 12, 2008 email to Ruddick:

> I remember a conversation you and I had in February of 2005 in a restaurant of London (reviewed my notes last night).  We had discussed Madoff and the potential ponzi [sic] scheme.  Got so scared on my way back to Montreal that we redeemed on March 31st of 2005.
>
> This is called triangulation my friend… and a little bit of luck.

7.      Defendant was "so scared" BLMIS was operating a Ponzi scheme that it redeemed all of its investments in the BLMIS Feeder Funds at the earliest possible date.  For its shares in Kingate Global specifically, Defendant asked for and received a waiver of the required 35-day notice period for redemptions, effectively halving the normal waiting time.

8.      Defendant sought to urgently redeem its investments in the BLMIS Feeder Funds before the scheme inevitably collapsed, despite the fact that this meant Defendant would, and did, receive the proceeds of a Ponzi scheme.  By doing so before the fraud was revealed to the public, Defendant not only avoided shouldering the loss associated with the Ponzi scheme, it received a windfall of over $4 million more than what it invested in the BLMIS Feeder Funds.

9.      The Trustee brings this proceeding to recover the subsequent transfer of BLMIS customer property that Defendant received from Fairfield Sentry for the benefit of the estate.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

10.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791 (the "District Court Proceeding"), and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

11.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

12.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

13.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

14.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

15.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

16.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

17.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

18.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

19.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

20.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in

connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS

since at least the 1980s.

21.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

22.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

23.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

24.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

25.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

26.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

27.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority, Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

28.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

29.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted its IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

30.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

31.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

32.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

33.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

34.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

35.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.    Madoff's Investment Strategy

36.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

37.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

38.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

39.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

40.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

41.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

42.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

10

43.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

44.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

45.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

46.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

47.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times

significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 2.    BLMIS's Fee Structure

48.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.    BLMIS's Market Timing

49.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

50.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.  Yet this is precisely what BLMIS's customer statements reported.

51.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

4.    BLMIS Execution

52.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

5.    No Evidence of BLMIS Trading

53.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

54.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

6.    The Collapse of the Ponzi Scheme

55.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

56.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

57.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

13

IV.    **DEFENDANT AND OTHER RELEVANT ENTITIES**

58.    Defendant is a company organized under the laws of the Cayman Islands that invested in Fairfield Sentry and Kingate Global. Defendant is a wholly owned subsidiary of Caisse de dépôt et placement du Quebec ("Caisse"), and Defendant's address is listed as Caisse's headquarters in Montreal, Canada.

59.    Non-party CDP Capital Tactical Alternative Investments (previously defined as "CDP Capital") was a "société par actions ou compagnie," or joint-stock corporation, organized under the laws of Quebec, Canada. CDP Capital was Defendant's investment manager at all relevant times. Like Defendant, CDP Capital was a wholly owned subsidiary of Caisse, and its address was listed as Caisse's headquarters in Montreal, Canada.

60.    Non-party Caisse is a Canadian institutional fund manager—an entity that pools money from various institutions and invests it—with more than CAD 539 billion in total AUM. Caisse primarily manages public and private pension funds. Caisse is headquartered at 1000, place Jean-Paul-Riopelle, in Montreal, Quebec.

61.    Non-party Fairfield Sentry was a BLMIS Feeder Fund incorporated in the British Virgin Islands that invested substantially all of its assets with BLMIS in New York. Despite having a registered address in the British Virgin Islands, Fairfield Sentry had no physical offices, had no employees, and transacted no meaningful business there.

62.    Non-party Fairfield Greenwich Group ("FGG") was a de facto partnership based in New York. At all relevant times, Fairfield Sentry was operated almost entirely by personnel at FGG's New York City headquarters, who maintained final control of Fairfield Sentry's bank accounts, relationships with Fairfield Sentry's back office service providers, and Fairfield Sentry's investments with BLMIS.

63.    Non-party Kingate Global was a BLMIS Feeder Fund that invested exclusively with BLMIS in New York.  Despite having a registered address in the British Virgin Islands, Kingate Global had no physical offices, had no employees, and transacted no meaningful business there.

64.    Non-party Tremont (Bermuda) Limited, a co-manager of Kingate Global for approximately ten years, was formed in Bermuda but was managed by employees of Tremont Partners, Inc., a Connecticut corporation.  The parent company of Tremont (Bermuda) Limited and Tremont Partners, Inc. was Tremont Group Holdings, Inc., a Delaware corporation (collectively, "Tremont").

## V.    **IMPUTATION**

65.    CDP Capital and its officers, directors, employees, and agents acted as agents for Defendant, and their conduct and knowledge are imputed to their principal, Defendant.

66.    CDP Capital was the investment manager for and agent of Defendant.  The agent-principal relationship between CDP Capital and Defendant was exercised through the acts that CDP Capital's officers, directors, employees, and agents performed on behalf of Defendant.

67.    With no officers, directors, or employees separate from CDP Capital, Defendant relied fully on CDP Capital and its officers, directors, employees, and agents to act as decision-makers for Defendant and to conduct Defendant's business.

68.    CDP Capital and its officers, directors, employees, and agents made investment decisions for Defendant and actively directed and controlled the daily activities of Defendant, including its dealings with the BLMIS Feeder Funds.

69.    CDP Capital indicated to the BLMIS Feeder Funds that it was authorized to act on behalf of Defendant, identifying Defendant as a "CDP entity" to FGG and even holding itself out as the "subscriber" in a Kingate Global subscription agreement.

15

70.    On June 22, 2004, a CDP Capital employee emailed FGG's New York-based employee Lauren Ross to inform her that "[t]he CDP entity investing [in Fairfield Sentry] will be on [sic] of our Cayman based offshore Fund-of-Funds by the name of MULTI-STRATEGY FUND LIMITED."

71.    In a subscription agreement for Kingate Global, CDP Capital was listed as the subscriber, while Defendant was identified as the registered shareholder and signed as the relevant entity.  Defendant and CDP Capital were also identified "on [Kingate Global's] books as Multi Strategy Fund (aka CDP Capital)" and as "CDP Tactical (MULTI STRATEGY)."

72.    CDP Capital's Therrien and Joelle Verdon were authorized by Defendant to, and did, give and receive instructions on behalf of Defendant, including making the subscriptions to and redemption from Fairfield Sentry.

73.    CDP Capital's investment committee, which included Therrien, was responsible for overseeing Defendant's investments in the BLMIS Feeder Funds.

74.    Therrien and Verdon executed two Fairfield Sentry subscription agreements on Defendant's behalf, identifying Defendant as the subscriber and Therrien in his role as president of CDP Capital as the "advisor."

75.    In a fax dated February 17, 2005, a CDP Capital employee requested a "full and final redemption" as of February 28, 2005 from Kingate Global "on behalf of Multi-Strategy Fund Limited."  In the corresponding Kingate Global redemption request form, CDP Capital's address was listed as the mailing address for Defendant.

76.    Therrien himself acted as agent of Defendant in two ways: first, as president, director, and authorized signatory of Defendant, and second, as president of Defendant's advisor, CDP Capital.  For example, Therrien executed the subscription agreements through which

16

Defendant invested in Fairfield Sentry in his capacity as Defendant's "Director." In the same agreements, Therrien was identified as Defendant's "Advisor" and CDP Capital was identified as the Advisor's organization or firm.

77.    As "Director" of Defendant, Therrien also executed Defendant's redemption request forms for both BLMIS Feeder Funds.

78.    CDP Capital's Verdon was an agent for Defendant as well, serving as an authorized signatory and authorized person in the Fairfield Sentry subscription agreements and as a signatory in Defendant's redemptions from Fairfield Sentry and Kingate Global.

79.    Other CDP Capital personnel acted as agents of Defendant by corresponding with New York-based FGG and Tremont personnel regarding the BLMIS Feeder Funds on Defendant's behalf, including sending documents pertaining to Defendant's subscriptions in and redemptions from the BLMIS Feeder Funds.

80.    Because CDP Capital and its officers, directors, employees, and agents performed these and other tasks and functions for Defendant's benefit and acted within the scope of their agency at the direction of, on behalf of, and/or with the consent of Defendant, their conduct and knowledge are imputed to their principal, Defendant.

## VI.    DEFENDANT AND ITS AGENTS ARE SOPHISTICATED INVESTORS WITH EXPERTISE IN ASSET MANAGEMENT AND INVESTMENT FUNDS

81.    Defendant and its officers, directors, employees, and agents have been active in the global financial services industry for decades and have considerable experience and expertise in wealth management and investment fund distribution.

82.    Defendant and CDP Capital are subsidiaries of Caisse, which has been recognized as one of North America's leading financial institutions and as the largest institutional fund manager in Canada. Caisse was created in 1965 and specializes in managing assets and providing

17

financing and operational guidance to its clients.  Caisse had more than CAD 174 billion in AUM in 2004, and by 2005 had more than CAD 216 billion in AUM.

83.    CDP Capital was the asset manager for Caisse's clients, including institutional investors.

84.    CDP Capital was a leader in the investment management industry, participating in organizations created to provide due diligence instruction and guidance.  For example, in 2004, CDP Capital was a member of the Canadian chapter of the Alternative Investment Management Association, an organization that provided publications and other resources to the alternative investment community to "[i]ncrease investor education[ and] transparency and promote due diligence and related best practices."

85.    CDP Capital's officers, directors, and employees were highly credentialed, sophisticated, and experienced.  For example, Therrien served as a vice president of Caisse in addition to his leadership roles at CDP Capital and Defendant, and has worked at Caisse and its related entities since 1993.  Therrien's initial responsibilities at Caisse included managing a tactical asset allocation strategy, and thereafter he created an internal global macro hedge fund.  As part of his participation in a 2009 hedge fund conference, Therrien was identified on a list of "The Most Influential And Seasoned End-Investors" in the alternative investment industry.

86.    Through its officers, directors, employees, and agents, Defendant affirmed in its subscription agreements with the BLMIS Feeder Funds that it was sophisticated and possessed the requisite "knowledge and experience" in financial and business matters to evaluate the risks and merits of investing in those funds.

VII.    **PERSONAL JURISDICTION**

87.    Defendant is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York,

18

and knowingly accepted the rights, benefits, and privileges of conducting business in the United States and the state of New York.

### A.    Defendant Purposefully Invested with Madoff in New York

88.    Defendant invested in the BLMIS Feeder Funds with the specific purpose of having funds invested with BLMIS in New York.  Defendant knew and intended that its investments in the BLMIS Feeder Funds were ultimately investments with New York-based BLMIS.

89.    From Defendant's first subscription in Kingate Global no later than 1999 through its subscriptions in Fairfield Sentry beginning in 2004, Defendant purchased shares in the BLMIS Feeder Funds intending to direct funds to New York-based BLMIS.

90.    Prior to subscribing to Fairfield Sentry, Defendant affirmed having "received and read" a Fairfield Sentry private placement memorandum (the "PPM"), dated July 1, 2003, which provided that "approximately 95% of the Fund's assets" were under the custody of New York-based BLMIS.

91.    Shortly after Defendant invested in Fairfield Sentry, Philip Toub, an FGG partner and a member of FGG's executive committee, remarked to others at FGG that Defendant should be "add[ed] to the long list of Madoff addicts who need a fix."  Indeed, Therrien later asked Toub about additional capacity for Fairfield Sentry on at least seven occasions.

92.    Defendant's knowledge and intention that its investments in Fairfield Sentry and Kingate Global were investments with BLMIS are reflected in Defendant's total redemption of its investments in both BLMIS Feeder Funds after Therrien "discussed Madoff and the potential ponzi [sic] scheme" with Ruddick.  This is further reflected in a conversation between Therrien and Toub regarding Defendant's redemption from Fairfield Sentry, during which they discussed "the rumors [about] Madoff."

19

93.     Defendant's knowing and intentional investments with Madoff in New York also explain why CDP Capital personnel asked FGG, in connection with Defendant's Fairfield Sentry investments, for "info that you've got on Madoff," including asking "how Maddoff [sic] made money" and for help "understand[ing] when Maddoff [sic] was invested."

94.     Throughout its investments in Kingate Global (including three subscriptions and two redemptions), Defendant and its agents "received, reviewed, and understood" several versions of the Kingate Global information memorandum, which revealed Kingate Global's reliance on "an Investment Advisor who is based in the United States" and "a New York based NASD [National Association of Securities Dealers] registered broker-dealer employing approximately 350 people."

**B.     Defendant's Activities in Connection with Its BLMIS Feeder Fund Investments Were Directed to New York and the United States**

95.     Defendant and its agents undertook purposeful acts aimed at New York and the United States as part of Defendant's BLMIS Feeder Fund investments.

96.     Defendant's primary contact at FGG was Toub, who managed FGG's relationship with Defendant. Defendant's agents, including Therrien and possibly one or two of his CDP Capital colleagues, met with Toub and other senior FGG personnel at FGG's office in New York shortly after Defendant began investing in Fairfield Sentry. At the meeting, FGG provided Defendant with Fairfield Sentry tear sheets and reports prepared by FGG consultant Gil Berman "to show [Defendant] how [FGG is] monitoring" Fairfield Sentry's performance and to "avoid [Defendant] feeling the need to go see Madoff."

97.     Defendant directed communications to Ross, who was based in FGG's New York headquarters. Within these communications, Defendant sent wiring instructions specifically designating a New York-based bank account to which Defendant directed FGG to wire

Defendant's redemption payments from Fairfield Sentry, and from which Defendant was going to fund its subscriptions in Fairfield Sentry.

98.    Defendant's agents traveled to New York on at least one occasion to meet with Tremont personnel regarding Defendant's investment in Kingate Global.

99.    Defendant's agents also communicated with Tremont personnel about Defendant's subscriptions in and redemptions from Kingate Global.  This included sending at least one subscription agreement and submitting Defendant's request to have the required notice period for redemptions waived in February 2005 after Therrien's discussion with Ruddick about "Madoff and the potential ponzi [sic] scheme."  Defendant's agents knew that the Tremont personnel were in New York and purposely directed communications to them in New York.

**C.    Defendant Intended Its BLMIS Feeder Fund Investments to Be Investments in U.S.-Based Securities**

100.    Defendant intended for the funds it invested in the BLMIS Feeder Funds to be used to purchase securities in the United States.  By investing in this way, Defendant purposely undertook investment activities in the United States.

101.    The Fairfield Sentry PPM, which Defendant affirmed having received and read, explained that the SSC Strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of "approximately 35 to 45 stocks in the S&P 100 [Index]," as well as "the sale of out-of-the-money S&P 100 Index call options" and "the purchase of an equivalent number of out-of-the-money S&P 100 Index put options."

102.    The documents provided to Defendant at the meeting with FGG in New York in 2004 confirmed that the SSC Strategy relied upon investments in the United States.  The Fairfield Sentry tear sheets reiterated that Fairfield Sentry's positions typically "will consist of the

ownership of 40-50 S&P100 stocks most correlated to that index, the sale of out-of-the-money

[call options] on the index and the purchase of out-of-the-money [put options] on the index."

103.    The Gil Berman reports provided to Defendant at the meeting with FGG in New

York also reflected the purported trading activity by BLMIS, including "portfolios of S&P 100

[Index] stocks," S&P 100 Index option puts and calls, and cash positions such as U.S. Treasury

Bills.  The most recent report drafted by Berman in advance of Defendant's meeting with FGG in

New York explicitly referenced "fully invested positions in S&P 100 [Index] split-strike

conversions" in the beginning of June 2004.

104.    FGG personnel also repeatedly told Defendant's agents that Fairfield Sentry was at

times invested in U.S. Treasury Bills, and that Defendant's investment had earned money based

on these U.S.-based holdings.  This was confirmed in a Fairfield Sentry monthly update sent by

New York-based Ross to a CDP Capital employee at the CDP Capital employee's request.  The

monthly update stated that Fairfield Sentry "was invested in short-dated U.S. Treasury Bills at the

end of September [2004] and maintained this position for the entire month [of October 2004]."

105.    FGG also gave CDP Capital personnel information about Fairfield Sentry's "profit

attribution" that reflected Fairfield Sentry's U.S.-based investments.

106.    Two Kingate Global information memoranda that Defendant received from

Tremont stated that BLMIS's SSC Strategy entailed purportedly "(i) purchasing a basket of thirty

(30) to forty (40) large-capitalization S&P 100 [Index] stocks (*e.g.*, General Electric, Microsoft,

Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson &

Johnson, etc.) . . . ; (ii) selling out-of-the-money S&P 100 Index call options . . . ; [and] (iii)

purchasing out-of-the-money or at-the-money S&P [100] Index put options."

107.    Both of these information memoranda made clear that BLMIS "invests primarily in the United States," and that Kingate Global may "hold cash or invest in cash equivalents," including "obligations of the United States Government," "U.S. Government Securities," and "U.S. Treasury Bills."

**D.      Defendant Executed Fairfield Sentry Subscription Agreements with New York Jurisdiction, Forum Selection, Service of Process, and Choice of Law Provisions**

108.    By executing each of the Fairfield Sentry subscription agreements, Defendant "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding and consent[ed] that service of process as provided by New York law may be made upon [Defendant] in such [p]roceeding . . . ."

109.    Defendant also agreed that its investments in Fairfield Sentry would "be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

**E.      Defendant Used New York Bank Accounts for Its BLMIS Feeder Fund Investments**

110.    By executing the Fairfield Sentry subscription agreements, Defendant agreed to direct its investment funds to an HSBC Bank USA correspondent bank account in New York for ultimate deposit in Fairfield Sentry's bank account.  Defendant directed funds to this New York-based HSBC Bank USA account in connection with its investments in Fairfield Sentry.

111.    Defendant provided wiring instructions to FGG and Tremont directing that redemptions from the BLMIS Feeder Funds be "PA[ID] THROUGH" an account at The Bank of New York, in New York.  As per Defendant's instructions, Defendant received the subsequent transfer from Fairfield Sentry that the Trustee seeks to recover in this account.

112.    Defendant derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

113.    Defendant, as a result, should reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFER FROM FAIRFIELD SENTRY TO DEFENDANT

### A.    Initial Transfers from BLMIS to Fairfield Sentry

114.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd. et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

115.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

116.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

117.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a

declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

118.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-16.

119.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

### B.    Subsequent Transfer from Fairfield Sentry to Defendant

120.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to Defendant (the "Fairfield Sentry Subsequent Transfer").  Based on the Trustee's investigation to date, the Fairfield Sentry Subsequent Transfer totaled $25,763,374.  A chart setting forth the presently known Fairfield Sentry Subsequent Transfer is attached as Exhibit C.

121.    On March 22, 2012, the Trustee filed this action seeking recovery of the Fairfield Sentry Subsequent Transfer.

122.    The Fairfield Sentry Subsequent Transfer is recoverable from Defendant under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

123.    The Fairfield Sentry Subsequent Transfer represents a redemption of equity interest by Defendant as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or

substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry Subsequent Transfer to Defendant upon redemption of Defendant's interests.

124.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial transfers and Fairfield Sentry Subsequent Transfer discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**COUNT ONE**

**RECOVERY OF THE FAIRFIELD SENTRY SUBSEQUENT TRANSFER
11 U.S.C. §§ 105(a) AND 550(a)**

125.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

126.    The Fairfield Sentry Subsequent Transfer is recoverable from Defendant under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

127.    Defendant is an immediate or mediate transferee of the Fairfield Sentry Subsequent Transfer from Fairfield Sentry.

128.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the Fairfield Sentry Subsequent Transfer, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

_____

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendant as follows:

a)      Recovering the Fairfield Sentry Subsequent Transfer, or the value thereof, from Defendant for the benefit of the estate;

b)      If Defendant challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Fairfield Sentry Subsequent Transfer pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

c)      Awarding the Trustee prejudgment interest from the date on which the Fairfield Sentry Subsequent Transfer was received by Defendant; and

d)      Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: February 18, 2022
     New York, New York

*/s/ David J. Sheehan*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Matthew B. Friedman
Email:  mfriedman@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*