# ATTACHMENT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05421 (SMB) |
| Plaintiff, | |
| v. | |
| FRANK J. AVELLINO, individually, and as Trustee for FRANK J. AVELLINO REVOCABLE TRUST NUMBER ONE AS AMENDED AND RESTATED JANUARY 26, 1990, AS AMENDED, *et al.*, | |
| Defendants. | |

## EXPERT REPORT OF BRUCE G. DUBINSKY
## MST, CPA, CFE, CVA, CFF, MAFF, CAMS
## FOR THE *FRANK J. AVELLINO, ET AL.* ACTION

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 1 of 128**

## TABLE OF CONTENTS

I.    The Assignment ................................................................................................4

II.   Expert Background and Qualifications ............................................................5

III.  Sources of Information ....................................................................................7

IV.   Summary of Expert Opinions ..........................................................................8

V.    Factual Background ..........................................................................................8

    A.    Avellino, Bienes, and their IA Business Accounts ........................................9

    B.    As BLMIS's first major "feeder fund," A&B and Madoff had a symbiotic relationship ................................................................................................10

    C.    After the SEC prohibited A&B from providing pooled funds to BLMIS, Madoff changed his trading strategies and infrastructure in response .........................11

VI.   Opinion No. 1: The securities transactions reflected on the customer statements for the Pre-1993 Accounts between the 1970s and 1992 were fictitious, and Avellino and Bienes structured their entire business operations on these fictitious transactions ....................................13

    A.    The purported trading strategies across the Pre-1993 Accounts are consistent with all other BLMIS accounts ........................................................................13

      1.    The convertible arbitrage transactions in the Pre-1993 Accounts followed the same fraudulent patterns as all convertible arbitrage transactions in the IA Business ...........13

        a.    The convertible arbitrage transactions in the Pre-1993 Accounts followed internal procedures that relied upon historical market data ................................13

        b.    The preordained rates of return for the purported convertible arbitrage transactions in the Pre-1993 Accounts were consistent and always profitable .....20

      2.    The buy and hold transactions in the Pre-1993 Accounts followed the same fraudulent patterns as all buy and hold transactions in the IA Business .........................22

    B.    Backdating of transactions in the Pre-1993 Accounts is further evidence of a Ponzi scheme ...............................................................................................24

    C.    The Pre-1993 Accounts reflected numerous market impossibilities in connection with the IA Business's purported trading strategies ...........................................25

      1.    Convertible arbitrage strategy .................................................................25

      2.    Buy and hold strategy ............................................................................27

        a.    Out-of-range prices ...............................................................................27

        b.    Out-of-range volume.............................................................................28

    D.    The use of a single counterparty for all purported transactions in the IA Business is evidence that no securities transactions were executed .................................29

    E.    Avellino and Bienes promised their investors virtually riskless investments using pre-set rates of interest based entirely on their guaranteed rates of return in the Pre-1993 Accounts ..............................................................................................33

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 2 of 128**

F.     Avellino and Bienes routinely reviewed and analyzed the securities transactions on the customer statements for the A&B Accounts, and Avellino, on behalf of A&B, acknowledged their accuracy by signing the statements annually ................................. 34

VII. Opinion No. 2: My examination of the evidence, including the IA Business's books and records, shows that: (1) During the 1992 SEC Investigation, the IA Business manufactured different versions of the original customer statements for the Pre-1993 Accounts for a three-year period and created an entirely new A&B account back to 1989; and (2) Avellino, on behalf of A&B, participated in this process. ........................................................................................... 37

A.     Avellino and Bienes gave sworn joint testimony to the SEC in 1992 about the purported strategies for the Pre-1993 Accounts that was inconsistent with the customer statements Avellino and Bienes analyzed, and Avellino, on behalf of A&B, acknowledged and signed ..................................................................................................................... 38

B.     Avellino's and Bienes's sworn testimony concerning the equity in the Pre-1993 Accounts was inconsistent with the original customer statements for the Pre-1993 Accounts that Avellino and Bienes analyzed, and that Avellino, on behalf of A&B, acknowledged ..................................................................................................... 41

C.     Avellino returned the original A&B customer statements to BLMIS and the statements were re-done, thereby matching the SEC testimony concerning the purported securities transactions and the equity in the Pre-1993 Accounts .................................................. 42

D.     The IA Business retroactively changed the original A&B customer statements, which then ultimately matched Avellino's and Bienes's joint SEC testimony, to (1) reflect different purported securities transactions and account balances; and (2) create an entirely new A&B account ............................................................................... 44

    1.   $86 million in US Treasuries were added to the 1-00125-3 account ............................. 45

    2.   A&B account 1A0053 was created by BLMIS in 1992 with newly fabricated statements going back to 1989 to help resolve a shortfall of purported equity in the Pre-1993 Accounts ........................................................................................................... 54

    3.   The IA Business removed certain account transfers to eliminate references to other IA Business customers ........................................................................................... 63

    4.   The IA Business retroactively generated short sales in a subaccount to reflect positive cash balances in the Pre-1993 Accounts ......................................................... 71

    5.   The IA Business altered the purported counterparties listed for the A&B transactions from the generic "Clearing Banks" to more specific bank names ................................. 77

E.     A&B accounting ledgers prepared by Avellino and produced to the SEC by A&B show that Avellino, on behalf of A&B, worked with IA Business employees to revise and/or create the transactions on the original customer statements and the newly-created account 1A0053 ..................................................................................................... 80

F.     A&B produced the revised A&B customer statements to the SEC and those statements were different from the statements Avellino and Bienes analyzed and that Avellino, on behalf of A&B, initially signed and acknowledged ......................................................... 88

VIII.  Opinion No. 3:  My examination of the books and records of the IA Business shows that after the 1992 SEC Investigation: (1) Avellino and Bienes received guaranteed rates of return

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 3 of 128**

and commissions from the IA Business; (2) the IA Business engaged in the "schtupping" process to meet those guaranteed rates of return and commissions; and (3) Avellino participated in this schtupping process. ..................................................................................................................89

A.  The Pre-1993 Accounts were liquidated, and former A&B clients were reinvested directly into BLMIS ........................................................................................................89

B.  Avellino and Bienes created various entities to re-invest with BLMIS, through which they received guaranteed rates of return and commissions ...........................................92

  1.  Avellino and Bienes created a series of new corporate entities for the purpose of continuing to profit from the IA Business after the SEC injunction..............................92

  2.  Avellino and Bienes met with Madoff after the SEC injunction to discuss reinvesting with BLMIS and to negotiate the structure of their commission payments and the guaranteed rates of return that the Post-1993 Entity Accounts would purportedly earn 92

C.  With the influx of thousands of individual customers, BLMIS changed its purported investment strategy for its IA Business customers, including the Post-1993 Entities, from convertible arbitrage to the Split Strike Conversion strategy; the purported Split Strike Conversion transactions in the IA Business did not occur, including those in the Post-1993 Entity Accounts .............................................................................................94

D.  Through the schtupping process, BLMIS assigned fictitious options trades in the Post-1993 Entity Accounts to meet the guaranteed rates of return and promised commission payments ..................................................................................................................96

  1.  Overview of the schtup process ....................................................................................96

  2.  The schtup process was applied to the Post-1993 Entity Accounts to meet the guaranteed rates of return and commission payments ....................................................97

    a.    Example: The schtup process in 2003 ...................................................................98

    b.    Example: The schtup process in 2004 .................................................................106

    c.    Example: The schtup process in 2005 .................................................................109

    d.    Commission payments were occasionally paid at mid-year, outside of the regular year-end schtup process ......................................................................................112

E.  Avellino monitored and tracked the customer statements for the Post-1993 Entity Accounts and participated in the schtup process to ensure that these accounts received their guaranteed rate of return and commission payments ...........................................113

  1.  May 1996 Letter..........................................................................................................114

  2.  December 1998 Letter..................................................................................................116

F.  Between 1994 and 2007, BLMIS added fictitious options trades totaling approximately $60 million to the Post-1993 Entity Accounts using the schtupping process...............123

G.  The Post-1993 Entity Accounts received remarkably positive annual rates of return..125

IX.  CONCLUSION .....................................................................................................................128

## I.   The Assignment

1.   In June 2011, I was retained by the law firm of Baker & Hostetler LLP ("Baker"), counsel
     for Irving H. Picard, Trustee for the substantively consolidated liquidation of Bernard L.
     Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), to
     provide forensic accounting analyses and render certain expert opinions and conclusions
     related to the Ponzi scheme at BLMIS ("the Initial Assignment"). My opinions in the Initial
     Assignment are rendered in my expert report (the "Proof of Fraud/Insolvency Expert
     Report") dated January 16, 2019. The opinions set forth in that report include an opinion that
     the investment advisory business (the "IA Business") at BLMIS was a Ponzi scheme.

2.   At the time of my retention in connection with the Initial Assignment, Madoff had already
     confessed[1] to running a $64 billion Ponzi scheme and several of his key employees were
     indicted for their roles in the operation of that Ponzi scheme. Since that time, several other
     former employees pleaded guilty, and I served as an expert witness in a criminal trial where
     five others were convicted for their participation in the Ponzi scheme.[2] In the course of the
     Initial Assignment, my investigation revealed that by the time the Ponzi scheme collapsed in
     December 2008, BLMIS's bank account balance was dwarfed by its liabilities to the
     customers of the IA Business and the Depository Trust Clearing Corporation, which should
     have held the securities in the customer accounts, did not hold the securities Madoff reflected
     on the customer statements.

3.   At the request of Baker, my assignment in this report (the "A&B Report") is to analyze and
     render opinions related to the IA Business accounts associated with Defendants Frank
     Avellino ("Avellino") and Michael Bienes ("Bienes"). This assignment is an extension of
     my opinion that the IA Business was a Ponzi scheme because the analysis of the Defendants'
     accounts was a critical component of my conclusion in the Proof of Fraud/Insolvency Expert
     Report.[3] As set forth in my Proof of Fraud/Insolvency Expert Report, Avellino and Bienes

---

[1] Madoff Plea Allocution, *United States v. Madoff*, 09-CR-213, at 4-8 (S.D.N.Y. Mar 12, 2009).

[2] *United States v. Bonventre* (the "Criminal Trial"). For example, David Kugel Plea Allocution, *United States v. David Kugel*, 10-CR-228 (LTS), at 35-36 (S.D.N.Y. Nov. 21, 2011), Enrica Cotellessa-Pitz Plea Allocution, *United States v. Enrica Cotellessa-Pitz*, S5 10-CR-228 (LTS), at 30-31 (S.D.N.Y. Dec. 19, 2011), Irwin Lipkin Plea Agreement, *United States v. Irwin Lipkin*, S9 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012).

[3] An analysis of the absence of trading in the A&B Accounts in the 1970s through 1992 was a significant part of my conclusion that the Ponzi scheme was in operation from at least the 1970s. This was also the subject of my testimony at the Criminal Trial and is consistent with my testimony regarding convertible arbitrage trading back to

were early investors in the IA Business and, through a pooled account structure, provided a

significant source of funds to Madoff to help sustain his Ponzi scheme.[4]  As such, this A&B

Report should be read in conjunction with the Proof of Fraud/Insolvency Expert Report. My

underlying analyses and documents considered in connection with the Proof of

Fraud/Insolvency Expert Report are all incorporated by reference into this report.

4.     In the A&B Report, I render opinions related to:

- The transactions in the customer statements for the IA Business accounts associated with Avellino and Bienes (the "A&B Accounts"),[5] and the purported trading strategies that were recorded on those customer statements;

- Whether the A&B Accounts contained fictitious transactions consistent with the indicia of fraud I identified as part of Madoff's operation of the Ponzi scheme;

- The different versions of customer statements for certain of the Pre-1993 Accounts that were manufactured during the Securities and Exchange Commission ("SEC") investigation of A&B in 1992 (the "1992 SEC Investigation"), and whether Avellino, on behalf of A&B, participated in that re-creation;

- The A&B general ledgers that Avellino prepared and sent to BLMIS, and that A&B sent to the SEC; and

- The guaranteed rates of return and commissions received by Avellino and Bienes through the schtupping process after the 1992 SEC Investigation, and Avellino's participation in that process.

## II.     Expert Background and Qualifications

5.     I am a Managing Director in the Disputes practice at Duff & Phelps, LLC ("D&P").  My

practice at D&P places special emphasis on providing forensic accounting and dispute

analysis services to law firms litigating commercial cases, as well as corporations,

governmental agencies and law enforcement bodies in a variety of situations.

6.     I earned a Bachelor of Science Degree in Accounting from the University of Maryland,

College Park, MD and a Master's in Taxation ("MST") from Georgetown University,

---

the 1970s in *Picard v. Carol Nelson and Stanley Nelson*.  Adv. Pro. Nos. 10-04658, 10-04377 (Bankr. S.D.N.Y. May 8, 2019), Trial Transcripts at ECF Nos. 181, 178.

[4] *See* Proof of Fraud/Insolvency Expert Report ¶¶ 147-154.

[5] A&B Accounts, together, include "Pre-1993 Accounts" (accounts 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050, 1A0051, 1B0018) and "Post-1993 Entity Accounts" (accounts 1ZB032, 1ZB046, 1ZB249, 1ZB262, 1ZB509, 1ZB510, 1ZA879). The Post-1993 Entity Accounts are inclusive of accounts open as of 1993.

Washington, D.C.  I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFE"), Certified Valuation Analyst ("CVA"), Certified in Financial Forensics ("CFF"), Master Analyst in Financial Forensics ("MAFF"), and a Certified Anti-Money Laundering Specialist ("CAMS"), all in good standing, and was formerly licensed as a Registered Investment Advisor Representative.

7.  I have been qualified and testified as an expert in over 65 cases in various federal and state courts, as well as other legal tribunals, in the areas of forensic accounting and fraud investigations; bankruptcy; solvency; economic damages; business valuations; investment theory; federal and state income taxation; abusive tax shelters; accounting ethics and standards; accounting malpractice; investment advisory issues; and a variety of other accounting, financial and tax matters.  Additionally, I have professional experience in computer forensics and related computer investigations.

8.  A current and accurate copy of my curriculum vitae and listing of trial testimonies are attached hereto as Appendix A.

9.  My opinions and conclusions expressed herein are based upon my understanding of the facts in this case, as well as information gained during the course of D&P's performance of the Initial Assignment and this Assignment.  Further, I relied upon my education, training and more than 37 years of professional experience, and my opinions and conclusions herein are stated to a reasonable degree of accounting certainty.[6]

10. Litigation and forensic service engagements performed by CPAs are deemed to be consulting services as defined by the American Institute of Certified Public Accountants ("AICPA").  As such, my work on this Assignment was performed in accordance with the applicable general standards as set forth in the Standards for Consulting Services established by the AICPA, as well as the specific standards enumerated in the AICPA Statement on Standards for Forensic Services No. 1. Further, as a result of having other relevant professional certifications, as more fully described herein, I adhered to the

---

[6] I have defined a "reasonable degree of accounting certainty" to mean that level of certainty that would likely be attained by a group of my professional peers, with the same or similar education, training and experience, given access to the same information, in reaching the same or similar conclusions.  *See* generally, Lanham, Susan W. and Keri E. Lucas, '"Reasonable Degree of Certainty" During Expert Testimony,' *Journal of Forensic and Investigative Accounting*, Vol. 9, no. 3 (2017).

applicable standards of those governing organizations in the performance of my work in this matter and the rendering of these opinions.

11.    This report is based upon the information available to me and reviewed to date. I specifically reserve the right to supplement this report as necessary to respond to any additional information obtained through discovery or issues raised by experts retained by the parties in this matter, if any. In addition, I reserve the right to prepare additional exhibits, charts, graphs, tables, demonstratives, and diagrams to summarize or support the opinions and analyses set forth in this report.

12.    D&P is being paid at hourly rates based on the level of personnel involved in the Assignment. My hourly billing rate charged by D&P is $915. D&P's fees for this engagement are not contingent on the conclusions reached or ultimate resolution of the case. I have no direct or indirect financial interest in the outcome of this case or in the parties to this matter.

### III.    Sources of Information

13.    The work I conducted in connection with the Assignment was planned, supervised, and staffed in accordance with applicable professional standards.[7] The work included, but was not limited to, a review and analysis of the following documents found within BLMIS's books and records and/or produced by certain Defendants or third parties in the above action:

- Customer statements, customer ledgers, trade confirmations, portfolio management reports, and other related documents for the A&B Accounts (as defined above);

- Original and revised customers statements for the A&B Accounts;

- Documents provided to the SEC by A&B and/or BLMIS;

- Correspondence between the Defendants and IA Business employees;

- A&B's general accounting ledgers for certain time periods;

- Transcript of the deposition taken by the SEC of Avellino and Bienes;

- Transcript of the Frontline interview of Michael Bienes;

- Deposition transcripts and related exhibits for depositions taken in the above-referenced adversary proceeding;

- Transcripts of criminal trial testimony of five former BLMIS employees in the

---

[7] These sources of information are in addition to my review and analysis of materials considered in my Proof of Fraud/Insolvency Expert Report.

proceeding styled *United States v. Bonventre*; and

- The SEC Office of Inspector General Report of Investigation, dated August 31, 2009, and related exhibits.

14.     A complete listing of the materials I considered in forming the opinions and conclusions rendered in this report is attached hereto as Appendix B.

## IV.     Summary of Expert Opinions

15.     In this report, I have concluded that, among other things:

- There is no evidence that any of the trades reflected on all versions of the customer statements for the A&B Accounts were ever executed;

- During the 1992 SEC Investigation of A&B, BLMIS manufactured different versions of the original customer statements for the Pre-1993 Accounts for a three-year period and Avellino, on behalf of A&B, participated in that recreation;

- The IA Business created a new A&B account in 1992, which reflected trades backdated to 1989, and A&B submitted those newly created account statements to the SEC in 1992 as if those transactions were legitimate;

- Avellino prepared accounting ledgers on behalf of A&B based on the securities transactions reflected on the account statements manufactured during the 1992 SEC Investigation; and

- The IA Business "propped up" the annual investment returns of the Post-1993 Entity Accounts and paid commissions to Avellino and Bienes by adding additional fictitious transactions (known as "schtupping") that resulted in gains equal to a predetermined dollar amount needed to achieve a certain target annual rate of return, and Avellino participated in that process.

## V.     Factual Background

16.     Using my experience gained over three decades working as a forensic accountant and fraud examiner to review and analyze the materials pertaining to the Defendants, their associates, and the operations of BLMIS, I have identified certain facts that provide relevant context for my expert opinions rendered in this report.  In my capacity as a fraud examiner, I have

considered various sources of information in reaching my opinions, and the specific facts set forth below are a subset of the information I considered.  These facts do not represent the totality of the universe of the information I reviewed and analyzed in connection with rendering my opinions here.

### A.  Avellino, Bienes, and their IA Business Accounts

17.  Frank Avellino began his career as an accountant at Madoff's father-in-law's firm, Alpern & Heller, in 1958.[8] In 1960, Madoff, who was already a stockbroker, began to occupy office space at Alpern & Heller.[9]

18.  In 1968-69, Bienes joined the firm which had been renamed Alpern & Avellino.[10]  The firm later changed its name to Alpern, Avellino & Bienes, and when Alpern retired in the mid-1970s, the firm became Avellino & Bienes ("A&B").[11]

19.  A&B opened its first account with the IA Business in the 1960s through its predecessor firm, Alpern & Avellino.[12]  Until its liquidation in 1992, A&B maintained eight different accounts at the IA Business.[13]  Over the next three decades, A&B pooled funds from their clients and invested those funds with Madoff.

20.  A&B attracted investor funds by promising guaranteed rates of return (typically ranging from 14 percent to 20 percent) on money collected from individuals and entities and ultimately labeling the transactions as loans.[14]  A&B in turn invested customer funds with the IA Business and retained the difference between the "returns" the IA Business paid to A&B and the returns A&B promised to its underlying investors.[15]

21.  A&B was originally an accounting firm, but developed exclusively into a "private investing" firm in the mid-1980s.[16]  By 1984, A&B decided to end its accounting practice and focus

---

[8] Deposition of Frank Avellino dated Nov. 20, 2019 at 15:8-11.

[9] Deposition of Frank Avellino dated Nov. 20, 2019 at 21:14-22:14.

[10] Deposition of Frank Avellino dated Nov. 20, 2019 at 29:2-7.

[11] Deposition of Frank Avellino dated Nov. 20, 2019 at 29:8-20.

[12] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 44:8 -14; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

[13] As discussed above, the Pre-1993 Accounts include: 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050, 1A0051, 1B0018.

[14] A&B Loan Detail by Investor (SECSDK0000325- SECSDK0000834).

[15] Deposition of Frank Avellino dated Nov. 20, 2019 at 48:5-49:11.

[16] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 35:1-20; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

08-01789-cgm   Doc 21157-40   Filed 02/23/22   Entered 02/23/22 15:32:28   Attach. B
Pg 12 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 10 of 128

exclusively on investing with Madoff.[17]   As of 1992, A&B had three partners: Avellino was a
50 percent partner, and Bienes and Diane Bienes were each 25 percent partners.[18]

22.   The Pre-1993 Accounts ended pursuant to a court mandated liquidation following an SEC
Investigation in 1992.  Despite an SEC injunction closing the Pre-1993 Accounts at BLMIS,
Avellino and Bienes, individually, owned and operated numerous personal accounts with the
IA Business on behalf of themselves, their families and their related entities through 2008
(the Post-1993 Entity Accounts).[19]

**B.   As BLMIS's first major "feeder fund," A&B and Madoff had a symbiotic
relationship**

23.   Shortly after forming BLMIS in 1960, Madoff received some of his earliest investors from
his father-in-law, Saul Alpern.[20]   Madoff initially opened individual accounts for these early
investors, but later transitioned to a pooled account structure because of the administrative
challenges in managing individual accounts.[21]

24.   To assist Madoff, Alpern simplified the accounting for Madoff by performing all accounting
and recording functions for the investors through his firm Alpern & Heller.  Under this
pooled account structure, Alpern managed the accounts and provided Madoff with critical
services and a stream of customer funds that was essential to maintaining the Ponzi scheme.[22]

25.   Initially, Avellino worked with Alpern on the management of this pooled account, but by the
1970s, Avellino and Bienes inherited Alpern's customers and continued managing through
A&B what was ultimately BLMIS's first feeder fund.[23]

26.   A&B not only fed its individual clients' funds to Madoff, but also created a structure
whereby it compensated its business associates, such as Edward and Richard Glantz, Stephen
Mendelow, and Aaron Levey, for feeding money to A&B, which A&B ultimately sent to

---

[17] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 31:1-6, 39:3-8; In the Matter of King
Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).
[18] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 86:13-15; In the Matter of King Arthur,
SEC file No: MNY-1490 (OIG Exhibit 0117).
[19] As noted above, the Post-1993 Entity Accounts include: 1ZB032, 1ZB046, 1ZB049, 1ZB262, 1ZB509, 1ZB510,
1ZA879.
[20] These investors were "Saul's clients, Saul's friends, Saul's family."  *Michael Bienes,* Frontline (May 12, 2009),
https://www.pbs.org/wgbh/frontline/film/madoff
[21] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff
[22] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff; Deposition of Frank
Avellino dated Nov. 20, 2019 at 25:8-26:16, 29:21-32:19.
[23] Deposition of Frank Avellino dated Nov. 20, 2019 at 29:25-30:15.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 13 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 11 of 128**

Madoff.[24]

27.    By the mid-1980s, A&B was so profitable that Avellino and Bienes ceased all accounting work, and thereafter their sole source of revenue was entirely derived from their feeder fund investments with Madoff.[25]    As BLMIS continued to grow and rely on the funds of A&B's clients to fuel the Ponzi scheme, A&B also profited.    As explained by Bienes, the IA Business investments were "easy-peasy, like a money machine" and Madoff "was the well. [Bienes] just turned the spigot, sent [Madoff] the fax, the money came. Easy money."[26]

28.    Just as Madoff provided guaranteed rates of return to A&B to incentivize that relationship, Avellino and Bienes in turn targeted friends, family, and clients and promised them guaranteed rates of return.    Avellino and Bienes promised higher interest rates to those clients that loaned larger sums of money for investment with Madoff.    Avellino and Bienes, like Madoff, also paid commissions to those who referred investors.[27]

29.    Over the life of the Madoff relationship, Avellino and Bienes ran one of the IA Business's largest feeder funds, funneling hundreds of millions of dollars from approximately 3,200 of their clients into the IA Business.    As A&B continued to grow, the IA Business continued to benefit from a steady stream of deposits of customer funds.    Avellino testified at a deposition before the SEC in 1992 that: "I could honestly say, and you could check any record that you want with me from 1962 to today, in thousands of transactions . . .  there has never been a loss."[28]

## C.  After the SEC prohibited A&B from providing pooled funds to BLMIS, Madoff changed his trading strategies and infrastructure in response

30.    On November 17, 1992, after its investigation, the SEC filed a complaint against A&B, and Avellino and Bienes individually, seeking, among other things, a permanent injunction for having unlawfully operated as an unregistered investment company.[29]    As a result, A&B was

---

[24] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff

[25] Deposition of Frank Avellino dated Nov. 20, 2019 at 19:2 – 9.

[26] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff

[27] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff; Deposition of Andrew Copperman dated Jan. 10, 2020 at 25:21-25; SECSDK0005526-531 at 526.

[28] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 75:14-18; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

[29] *See generally* Complaint, *SEC v. Avellino & Bienes*, No. 92-CV-08314(JES) (S.D.N.Y. Nov. 17, 1992) ("Avellino & Bienes SEC Complaint").

forced to discontinue its pooled investments into Madoff and close its operations.  As described below and in my Proof of Fraud/Insolvency Expert Report, many of the A&B investors re-invested with BLMIS directly.

31.    In 1992 to 1993, with thousands of former A&B investors opening their own separate accounts (in place of only a few pooled A&B accounts), Madoff had to find a way to continue his Ponzi scheme in a manner that was scalable to thousands of investors.  As described more fully in my Proof of Fraud/Insolvency Expert Report, with the influx of these direct customers, Madoff switched his then purported primary strategy of convertible arbitrage to a split strike conversion ("SSC") strategy.

32.    Madoff's reliance on A&B for hundreds of millions of dollars needed to be replaced to continue the Ponzi.  Not only was it critical to have A&B's former clients reinvest in BLMIS, Madoff attracted increasingly greater amounts of cash from a very large network of feeder funds[30] who, like the A&B pooled accounts, managed the accounts and provided Madoff with critical services and a stream of customer funds that were essential to maintaining the Ponzi scheme.

33.    After the Pre-1993 Accounts closed, Madoff also adjusted BLMIS's infrastructure to rely more heavily on computers to assist in handling the volume of new accounts.  Madoff used the computers to create the millions of fake trades necessary for the purported execution of the SSC trades[31] which helped to eliminate some of the data input errors that resulted from the manual process the employees used to create the fake trades in the 1970s-80s.[32]

34.    As discussed in my Proof of Fraud/Insolvency Expert Report, though Madoff sought to modernize his operations through the use of a AS/400 computer system, the IA Business had very limited connectivity capabilities that basically consisted of an internet connection and a File Transfer Protocol. The IA Business had no connection to the DTC or any of the

---

[30] *See* Proof of Fraud/Insolvency Expert Report at ¶¶ 348-349.  Some of the large feeder funds that began or increased their investments with Madoff after the 1992 SEC Investigation include Fairfield Sentry Ltd., Ascot Partners LP, Rye Select Broad Market Fund LP, and Kingate Euro Fund Ltd.

[31] All discussion and opinions related to trading activities or positions held in the IA Business are assumed herein to be purported, including, but not limited to, all references to "trades," "securities held," or "trading."  *See* Proof of Fraud/Insolvency Expert Report at n. 93.

[32] *See* Proof of Fraud/Insolvency Expert Report at ¶¶ 276-289; Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 69:3-13.

exchanges.[33]

**VI.    Opinion No. 1: The securities transactions reflected on the customer statements for the Pre-1993 Accounts between the 1970s and 1992 were fictitious, and Avellino and Bienes structured their entire business operations on these fictitious transactions**

35.    The transactions purportedly executed in the Pre-1993 Accounts were fictitious. As explained more fully below and in my Proof of Fraud/Insolvency Expert Report:

- The convertible arbitrage trades followed a mechanical process to hit preordained rates of return, were always profitable, and were reverse engineered using historical market prices;

- The buy and hold transactions used historical market prices to meet promised rates of return;

- The purported convertible arbitrage and buy and hold trades consisted of numerous transactions that would have been impossible to execute in the securities market; and

- The IA Business reported backdated trades and did not use legitimate counterparties for the trades purportedly executed for the Pre-1993 Accounts.

36.    As discussed more fully below, Avellino and Bienes monitored and analyzed the fictitious securities transactions reflected on the customer statements for these accounts. Avellino and Bienes, in essence, guaranteed their clients pre-set rates of interest based on the purported performance of their IA Business accounts.

**A.    The purported trading strategies across the Pre-1993 Accounts are consistent with all other BLMIS accounts**

37.    During the 1970s to 1992, BLMIS purportedly executed trades for the Pre-1993 Accounts using the convertible arbitrage strategy and/or buy and hold strategy.

**1.    The convertible arbitrage transactions in the Pre-1993 Accounts followed the same fraudulent patterns as all convertible arbitrage transactions in the IA Business**

**a.    The convertible arbitrage transactions in the Pre-1993 Accounts followed internal procedures that relied upon historical market data**

---

[33] *See* Proof of Fraud/Insolvency Expert Report at ¶¶ 81, 271-275.

38.     I analyzed the 1,428 purported convertible arbitrage transactions in the Pre-1993 Accounts that occurred between November 1978[34] and July 1992 to determine (i) whether the IA Business created these purported trades by following the formula set forth in my Proof of Fraud/Insolvency Expert Report; and (ii) the consistency of the rates of return for the convertible arbitrage transactions in these accounts.

39.     I determined that the IA Business followed a formulaic process for setting up the purported convertible arbitrage trades in the Pre-1993 Accounts, which demonstrates that these transactions were not being executed in the securities market.[35]  The IA Business's internal process of fabricating a convertible arbitrage trade was described more fully in my Proof of Fraud/Insolvency Expert Report.  That process began by selecting a specific customer account, the dollar value to be invested, and the rate of return that the IA Business sought to generate on the trade for that specific account.[36]  David Kugel,[37] a former BLMIS employee, then provided the IA Business with historical price information that was used to fabricate these convertible arbitrage transactions for IA Business customers.[38]  The IA Business then recorded the names and dates of the convertible securities used to create the fictitious trades on separate index cards so that they could keep track of which securities were added to the customer statements and not repeat the same securities transactions too frequently.[39]

40.     One example that demonstrates how the convertible arbitrage transactions were inputted onto the customer statement for the Pre-1993 Accounts is the Ramada Inns Inc. convertible subordinated debt transaction in the 1-00125 account (the "125 Account," which includes the

---

[34] Though the Pre-1993 Accounts opened in the early 1960s, the earliest customer data for the Pre-1993 Accounts that I found in BLMIS's books and records date back to November 1978, the start date of my analysis.

[35] *See* Proof of Fraud/Insolvency Expert Report at ¶¶ 92-111.  My conclusion that the convertible arbitrage trading was all fictitious is based in part upon the evidence of achieving the pre-ordained rates of return.

[36] MADTSS00976593-595.

[37] David Kugel, a trader in the Proprietary Trading business, stated in his sworn testimony at the criminal trial and in his criminal plea allocution that he received "regular requests, probably one a week, asking for certain dollar amount trades that would earn a certain percent" and that he provided historical trade information to the IA Business "which enabled them to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred." (*See* Trial Transcript at 1809:1-3, *United States v. Daniel Bonventre, Jerome O'Hara, George Perez, Annette Bongiorno, Joann Crupi*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Oct. 31, 2013).  *See also*, Plea Allocution at 32:8-12, *United States v. David Kugel*, 10 CR 228 (LTS) (S.D.N.Y. Nov. 21, 2011).

[38] Criminal Trial, Feb. 25, 2014, Trial Transcript at 10247:3 - 10248:12. *See, e.g.*, Deposition of Annette Bongiorno dated Dec. 12, 2019 at 44:2-46:2. *See, e.g.*, Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 43:10-44:10.

[39] *See* Proof of Fraud/Insolvency Expert Report at ¶ 95. Deposition of Annette Bongiorno dated Dec. 12, 2019 at 60:4-62:3. Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 80:14-80:16; 82:3-83:6.

1-00125-1 and 1-00125-3 subaccounts).  As shown in **Figure 1**, the August 1983 customer
statement for the 125 Account reflects a convertible arbitrage transaction for the purchase of
$101,000 par value of Ramada Inns Inc. subordinated debt at a price of $137, the sale of
9,540 shares of Ramada Inns Inc. common stock at 11 1/8 ($11.125), another sale of 3,492
shares at 11 1/4 ($11.25), and the recording of $2.89 in fractional shares.  The profit
supposedly generated from this transaction was $5,928.17, as shown in **Figure 1** and **Figure
2**.  This profit equates to a total return of 4.25 percent ($5,928.17 divided by $139,492.22).

### Figure 1[40]
#### A&B Account (1-00125-1-0) Statement – August 1983



MF00368932:MF00368934

---

[40] MF00368932-934.

**Figure 2**
Profit Calculation

| | | | | | | |
|---|---|---|---|---|---|---|
| Sell | 9,540 shares | x | $ 11.125 | = | $ 106,132.50 |
| Sell | 3,492 shares | x | $ 11.25 | = | $ 39,285.00 |
| Fractional Shares | | | | | $ 2.89 |
| **Sell Total** | | | | | **$ 145,420.39** |
| | | | | | |
| Buy | $101,000 Par value | x | $137.00 | = | $ 138,370.00 |
| Interest | $101,000 Par value | x | 1.11% | = | $ 1,122.22 |
| **Buy Total** | | | | | **$ 139,492.22** |

Profit = ($106,132.50 + $39,285.00 + $2.89) - $139,492.22
Profit = $145,420.39 - $139,492.22
Profit = $5,928.17

41.   The calculations above in **Figure 2** detailing how the IA Business created this transaction to meet the predetermined profit of $5,928.17 were found on an adding machine tape among handwritten notes[41] used by the IA Business in following the step-by-step processes of the convertible arbitrage trade set-ups.  Below, in **Figure 3**, is the actual adding machine tape (with IA Business handwritten notes) that was used to calculate the values associated with the fictitious Ramada Inns Inc. transaction, with each calculation corresponding to one of the steps detailed in my Proof of Fraud/Insolvency Expert Report.[42]

---

[41] MADTSS00976536-583 at 559; *see also*, Proof of Fraud/Insolvency Expert Report Exhibit 9.
[42] *See* Proof of Fraud/Insolvency Expert Report at ¶¶ 96-97.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 17 of 128**

**Figure 3**[43]
Adding Machine Tape



**Steps 1-3**: Calculating the par value to purchase - $101.54

**Step 4**: Calculating the value purchased - $138,370.00 plus interest of $1,122.22 = $139,492.22

**Step 5**: Calculating the profit that will be generated by the transaction based on a predetermined 2.125% monthly return - $5,928.42

**Step 6**: Calculating number of shares to sell using the conversion factor - 7.75 shares

**Step 7**: Calculating the ideal share price at which to sell all shares - $11.16

**Step 8**: Calculating the difference between selling all the shares at the closest 1/8 above the ideal price ($11.25) and the closest 1/8 below the ideal price ($11.125)

**Step 9**: Calculating the number of shares to sell at the lower of the two sale prices – 9,538

**Step 10**: Calculating the number of shares to sell at the higher of the two sale prices – 3,492

42.    The following IA Business handwritten note shows a summary of the purported buy and sell sides of the Ramada Inns Inc. transaction, including the value of the fractional shares, all of which correspond to the numbers calculated on the adding machine tape.[44] (*See* **Figure 4**.)

---

[43] MADTSS00976536-583 at 559.
[44] *Id.*

**Figure 4**
Ramada Inns Inc Transaction Summary



43.    Consistent with the internal process for creating fictitious convertible arbitrage transactions, the IA Business recorded the names and dates of the convertible securities used on separate index cards. [45] In the Ramada Inns Inc. example, the corresponding index card shows a transaction using this security that could be completed between August 10, 1983 and October 17, 1983. (*See* **Figure 5**.)

---

[45] *See* Proof of Fraud/Insolvency Expert Report at ¶ 95.

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 19 of 128

**Figure 5[46]**
Ramada Inns Inc IA Business Index Card



MADWAA00492878

44.    The beginning date of August 10, 1983 matches with the settlement date on the customer statement and the date the purported fractional share was issued on the August account statement. (*See* **Figure 1**.)  The August 10th date also matches up with the purported accrued interest of 1.1111 percent shown in step 4 of the adding machine tape.  (*See* **Figure 3**.)

45.    The same process was also followed with convertible preferred transactions (and not only with subordinated debt or bonds, as reflected in the Ramada Inns Inc. example above) on the customer statement for the Pre-1993 Accounts.  For example, the March 1983 customer statement for the 1-00121-1-0 account[47] reflects a convertible arbitrage transaction for the purchase of 8,609 shares of Ogden Corp. $1.875 convertible preferred stock at a price of $64 1/2 ($64.50), the sale of 11,388 shares of Ogden Corp. common stock at $28 7/8 ($28.875), another sale of 8,520 shares at $29, and the recording of $21.37 in fractional shares.  The IA Business followed the step-by-step process detailed in the example above to create fictitious convertible arbitrage transactions that were then reflected on the customer statement.[48]

46.    In the Ogden Corp. example, the corresponding index card shows a transaction using this security that could be completed between March 16, 1983 and May 10, 1983. (*See* **Figure 6**.)

---

[46] MADWAA00492878.

[47] MF00366068-72 at 69.

[48] *See* MADWAA00492796 for the corresponding index cards which show a transaction using this security that could be completed between March 16, 1983 and May 10, 1983, and MF00366068-72 at 69 for the March 1983 customer statement for the 121 Account.

**Figure 6**
Ogden Corp. IA Business Index Card



MADWAA00492796

**b.  The preordained rates of return for the purported convertible arbitrage
transactions in the Pre-1993 Accounts were consistent and always profitable**

47.    In order to examine the returns of the purported convertible arbitrage strategy employed in the
Pre-1993 Accounts, each individual purported convertible arbitrage trade was analyzed to
determine: 1) the purported total return of the trade; 2) the purported duration of the trade; and
3) the purported monthly or four-week return for the trade (*i.e.*, the total return divided by the
number of weeks for which the trade was purportedly active and then multiplied by four).

48.    Based on this analysis, I determined that the purported convertible arbitrage transactions in
the Pre-1993 Accounts reported a profit in every single instance and the transactions reported
specific rates of return with remarkable consistency.  As shown in **Figure 7**, 1,414 of the
1,428 trades, or <u>99 percent of all trades</u>, were reported as if they generated between a 2.5 and
4.5 percent total return.  Said differently, almost every trade, over a decade and a half time

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 21 of 128**

period, was reported having produced returns within 2.0 percent of each other.[49] Given the fluctuations in the real market, this degree of consistency over nearly 15 years is virtually impossible and an indication that these transactions were fake. (*See* **Exhibit 1** – "Convertible Arbitrage Total and Monthly Returns for the A&B Accounts, Pre-1993 Period").

**Figure 7**
Breakdown of A&B Purported Trades – Total Return



49.    In analyzing the A&B convertible arbitrage trades on a monthly basis, the range of monthly returns generated by the purported trades is also exceptionally narrow.  The process for determining the <u>monthly</u> return consisted of dividing the number of days the trade was put on for by 7 in order to obtain the number of weeks for each trade.  In the Ramada Inns Inc. example, the monthly return would be the following:[50]

$$\big(4.25 \text{ percent Total Return} \div (65 \text{ days} \div 7 \text{ weekdays})\big) \times 4 \text{ weeks}$$

50.    As shown in **Figure 8**, 1,383 of the 1,428 trades or nearly 97 percent of all trades resulted in returns that were between 1.5 percent and 2.5 percent. Once again, this ability to achieve

---

[49] This narrow range of the returns is not merely a coincidence, but rather the result of the utilization of the preordained rates of return discussed previously.  The vast majority of the trades within this range (approximately 97 percent) were based on the exact same preordained monthly return of 2.125 percent prior to 1986 and a preordained monthly return of 2 percent from 1986 and after.
[50] The trade was purportedly unwound on October 7, 1983, which equates to a duration of 65 days from when the trade was first purportedly executed.  MF00145460.

such a narrow consistency of returns over an extended period of time, considering the
volatility in the real investment world, underscores the predetermined and fraudulent nature
of these trades.

**Figure 8**
Breakdown of A&B Purported Trades – Monthly Return



51. Based on this analysis, I determined that the IA Business purportedly achieved an abnormally
high level of a consistent monthly rate of return for the vast majority of the convertible
arbitrage transactions that purportedly occurred over a decade within the Pre-1993 Accounts.

52. The entire process of generating specific rates of return and producing such consistent returns
was virtually impossible and only achievable because all of the transactions were fake.[51]
These purported trades were fabricated using historical market data to reportedly realize a
predetermined high rate of return.

**2. The buy and hold transactions in the Pre-1993 Accounts followed the same
fraudulent patterns as all buy and hold transactions in the IA Business**

53. As described in my Proof of Fraud/Insolvency Expert Report, certain IA Business customer
accounts, including the Pre-1993 Accounts, followed a purported buy and hold strategy,
whereby securities (typically equities) were purportedly purchased, held for a certain

---

[51] *See* Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 16:4-8 and 59:10-13.

duration, and then purportedly sold for a profit. Similar to the process described above for the convertible arbitrage strategy (and the SSC strategy described below), the trades in the purported buy and hold strategy were fabricated to achieve a preordained rate of return.[52]

54.     The IA Business followed a standard process for setting up fictitious buy and hold trades for the purpose of achieving each account's preordained rate of return. As a starting point, Madoff would assign each new buy and hold account a target annual rate of return, which could fluctuate from customer to customer based on when the account was opened and the specific customer.[53] Madoff followed these same procedures for the buy and hold transactions in the A&B Accounts.[54]

55.     After an account was opened, Annette Bongiorno ("Bongiorno") would monitor the purported rate of return that each buy and hold account was "earning" and compare it to the predetermined rate of return that Madoff had targeted for the account. As part of this process of monitoring the performance of the accounts, the IA Business employees created and used the Portfolio Management Reports ("PMR"), which tracked an account's performance to date and the targeted rate of return set by Madoff. Based on this review, if the account was purportedly earning less than its target rate of return, the IA Business would record additional (fake) profitable trades in order to bring the account "in-line" with the rate of return that was promised.

56.     This process of tracking and monitoring the rates of return was true for the Pre-1993 Accounts.[55] Avellino and Bienes received PMRs for the Pre-1993 Accounts, which reflected the performance of the accounts and the expected and/or benchmark rates of return.[56] For example, the 125 Account as of December 31, 1989 received an expected rate of return of 27 percent and the account would be adjusted accordingly to attain this return.[57] (*See* **Figure 9**.)

---

[52] *See* Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 16:21-25.
[53] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 78:16-24.
[54] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 123:12 – 124:4; 129:18-22; 131:2-10.
[55] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 131:25-132:5.
[56] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 88:3-91:6; MADTSS00378757-MADTSS00378758 (Trustee Exhibit 62).
[57] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 84:1-88:1; Portfolio Management Report for December 31, 1989 MADTSS00201065 (Trustee Exhibit 61).

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 24 of 128**

**Figure 9**
IA Business Portfolio Management Report A&B Account (1-00125-3) – December 1989



## B. Backdating of transactions in the Pre-1993 Accounts is further evidence of a Ponzi scheme

57.    As detailed throughout my Proof of Fraud/Insolvency Expert Report, every trade purportedly executed in the IA Business was a backdated trade using historical pricing information.[58] Specifically, the IA Business used historical trade information to create false trades for IA Business customers and reported those fake trades on customer statements.  In addition, certain accounts, including the Pre-1993 Accounts, had further backdated trades by the IA Business (hereinafter referred to as "prior month backdated trades").

58.    "Prior month backdated trades" were identified and defined as such if the month of the trade date and settlement date were different than the month listed on the customer statement.  I analyzed whether any of the transactions for the Pre-1993 Accounts were backdated through such a process.  I concluded that the IA Business followed the same practice of prior month backdating for the Pre-1993 Accounts as it did with the other IA Business accounts.

59.    For example, a September 1979 customer statement for A&B account 1-00121-1-0 (which later became part of account 1-A0045) listed several transactions that purportedly settled in the prior July. (*See* **Figure 10**.)

---

[58] *See, e.g.*, Proof of Fraud/Insolvency Expert Report at ¶¶290-300.  *See also* Criminal Trial, Feb. 27, 2014, Trial Transcript at 10556:1-10556:23.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 25 of 128**

Figure 10[59]

A&B Account (1-00121-1-0) Statement – September 1979



60.    If these transactions had actually occurred on the stated dates, they would have appeared on
their respective monthly statements (*i.e.*, a transaction in July 1979 should have appeared on
the July 1979 monthly statement).

61.    Customer statements for the Pre-1993 Accounts were analyzed for instances of such
backdating by comparing the date of the customer statement to the security trade date and
settlement date. A full list of the additional backdated trades that I identified across the Pre-
1993 Accounts between November 1978 and November 1992 are included on **Exhibit 2**
("Backdated Trades in the A&B Accounts, Pre-1993 Period").[60]

62.    The backdating of trades in the Pre-1993 Accounts provides further evidence that the
purported trades did not actually occur as ultimately reported.

### C.  The Pre-1993 Accounts reflected numerous market impossibilities in connection with the IA Business's purported trading strategies

#### 1.  Convertible arbitrage strategy

63.    As detailed in my Proof of Fraud/Insolvency Expert Report, because the convertible arbitrage
trades were not actually executed, but rather created manually by BLMIS employees,
mistakes occurred in the execution of the fraud.[61] These mistakes resulted in the reporting of

---

[59] MF0085378.
[60] The backdated trades analysis was performed from the date each account was opened until the end of November
1992, which corresponds to the SEC injunction against A&B.
[61] *See also*, Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 69:3-12.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 26 of 128**

trades on the customer statements that would have been impossible to execute in the market, thereby proving the fictitious nature of the trades.

64.    I analyzed IA Business customer accounts, including the Pre-1993 Accounts, that purportedly employed the convertible arbitrage strategy and compared them with historical independent market trading records for the applicable securities.[62]  Specifically, the daily price range, total daily volume, and corporate actions (*e.g.*, dividends) of each security in question were analyzed in comparison to those identified on the customer statements.  My analysis of the Pre-1993 Accounts concluded that the convertible arbitrage trades reflect market impossibilities as summarized below:

- Of the 1,081 convertible securities analyzed, over 90 percent of the total exceeded the daily volume on the transaction day by an average of nearly 30 times the actual daily volume (*See* **Exhibit 3** – "Convertible Arbitrage IA Business Volume Analysis, A&B Accounts, Pre-1993 Period");

- Of the 1,118 securities with unique prices tested, 76 percent (848 securities) were outside the actual reported daily market price range (*See* **Exhibit 4** – "Convertible Arbitrage IA Business Price Analysis, A&B Accounts, Pre-1993 Period");

- Transactions that were traded even after they were called for conversion;[63] and

- Transactions that did not account for dividend payments and/or accrued interest on the convertible securities.  For example, Textron Inc. Preferred Convertible security paid a quarterly dividend of $0.52/share to record holders as of June 15, 1982.[64]  A&B account 1-00125 (1A0045) was an account holder as of this record date and should have received a dividend payment worth $6,592.56. This payment did not appear on the A&B account 1-00125 ledger.

65.    Given these market impossibilities, the purported securities trades underlying the convertible arbitrate strategy for the Pre-1993 Accounts in the IA Business could not have been legitimate.

---

[62] Proof of Fraud/Insolvency Expert Report at ¶¶112-146.

[63] *See* Macmillan Inc. example in the Proof of Fraud/Insolvency Expert Report at ¶128.  Macmillan Inc. was recorded on customer statements for the Pre-1993 Accounts.

[64] *Textron Inc.*, Moody's Industrial Manual 1982 at 4493.

### 2.  Buy and hold strategy

66.  Similarly, as with the convertible arbitrage trades, the transactions purportedly executed using the buy and hold strategy were not legitimate.  These trades were created manually by BLMIS employees, resulting in the reporting of trades on the customer statements that would have been impossible to achieve in the market, thereby demonstrating the fictitious nature of the trades.

67.  The transactions purportedly executed under the buy and hold strategy also reflected similar trading impossibilities that were identified for those transactions following the purported convertible arbitrage strategy.  That is, these transactions also showed (1) purported purchases and sales of securities at prices that were beyond the daily market highs or lows, and (2) aggregate IA Business transaction volume for certain securities purportedly traded in the Pre-1993 Accounts that exceeded the daily market volume on the specific days these trades purportedly occurred.  Such trading discrepancies are further evidence that these purported transactions also could not have occurred and were fake.

### a.  Out-of-range prices

68.  The transaction prices for the purported trades as stated on the customer statements for the Pre-1993 Accounts were tested against the historical market prices to determine if the purported transactions fell within the actual daily market trading range.[65]

69.  From November 1978 to November 1992, the purported transaction prices for 80 security transactions reported in the Pre-1993 Accounts were outside the actual daily market trading price range.[66]  (*See* **Exhibit 5** – "A&B Equity Price Analysis in the Buy and Hold Accounts, Pre-1993 Period").

70.  For example, the customer statement for A&B account 1-00135-3 reflects that 5,600 shares of Boise Cascade Corp. were purchased on 3/12/1987 at a price of $76.00 (*see* **Figure 11**).  However, the actual daily market trading price range for this security on 3/12/1987 was between $79.00 and $80.00.  This transaction could not have been legitimately completed as

---

[65] Historical market trading prices based on CRSP data.
[66] The market impossibilities analysis was performed from the date each account was opened until the end of November 1992, which corresponds to the SEC injunction against A&B.

indicated on the customer statement given that shares of Boise Cascade Corp. did not trade in the actual market at $76.00 on the purported transaction date.

**Figure 11**[67]
A&B Account (1-00135-3) Statement – March 1987



b. **Out-of-range volume**

71.    I reviewed the aggregate volume (*i.e.*, the volume purportedly traded across all IA Business customer accounts) for each purported security transaction reported on the customer statements for the buy and hold Pre-1993 Accounts.  Based on this analysis, I determined that the aggregate IA Business volume for certain securities purportedly traded for the Pre-1993 Accounts using the buy and hold strategy exceeded the daily market volume on the specific days these trades purportedly occurred. This is impossible in the securities market. A full list of these trades across the Pre-1993 Accounts between November 1978 and November 1992 are included on **Exhibit 6**. ("A&B Equity Volume Analysis in the Buy and Hold Accounts").

72.    For example, the December 1985 customer statement for A&B account 1-00126-3 (which became 1-A0050) indicates that 6,900 shares of General Foods Corp. were traded on November 1, as shown in **Figure 12** below.[68]  However, the aggregate volume of shares purportedly traded across all IA Business customer accounts for General Foods Corp. was 62,400 on this date, which exceeds the actual daily market volume of only 14,500 shares by

---

[67] MF00058279.

[68] This transaction is also included in the prior-month backdated trades analysis, as discussed above. MF00160802.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 29 of 128**

over 4.0 times.

**Figure 12**
A&B Account (1-00126-3) Statement – December 1985



73.   Therefore, these purported securities transactions for the Pre-1993 Accounts did not occur as
the aggregate IA Business volume for these securities exceeded the actual daily market
volume.

**D.   The use of a single counterparty for all purported transactions in the IA Business is
evidence that no securities transactions were executed**

74.   As detailed throughout my Proof of Fraud/Insolvency Expert Report, there is no evidence
that any legitimate securities transactions occurred in the IA Business. Legitimate securities
transactions require a counterparty (which refers to the individual or entity on the other side
of the transaction) on the opposite side of that transaction. For example, if an investor wants
to purchase 100 shares of Apple stock, the counterparty would be the seller who is willing to
sell shares of Apple to the investor. Similarly, for an investor who is looking to sell
securities, the counterparty would be the buyer purchasing it. Given that the IA Business
was not executing real securities transactions, fictitious counterparties were created in order
to give the appearance that a trade actually occurred between two parties.

75.   The IA Business generated fake counterparties for every purported transaction starting at
least as early as 1978 and running through December 2008. In fact, from 1978 through 1992,
which corresponds to the convertible arbitrage period, the IA Business used a single
counterparty for every transaction purportedly executed for all IA Business customers,
including for the Pre-1993 Accounts. The name of this counterparty changed over time, from

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 32 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 30 of 128**

"National Bank of North America" to "National Westminster Bank USA" or just the generic term "Clearing Banks."

76.  The pattern of assigning the same counterparty to every IA Business trade did not occur by happenstance—in fact, the counterparties to each IA trade were pre-ordained by IA Business instruction manuals (*see* **Figure 13**) and were actually hard coded into the internal AS/400 computer system code that generated the fictitious trade reports for the convertible arbitrage transactions.

**Figure 13[69]**
IA Business Keypunch Instructions



77.  The counterparty account that IA Business manuals pre-ordained for convertible arbitrage transactions was the 3-00000-1 account.  (*See* **Figure 13**.)  Based on a review of the IA Business trading records, such as Trade Date Blotters, in December 1986, the 3-00000-1

---

[69] MADTSS00378403.

account, which was named "Clearing Banks," was the purported counterparty to **every single trade** in the IA Business. (*See*, for example, **Figure 14**.)

**Figure 14**
Recreated IA Business Trade Date Blotter Printout



78.    The AS/400 was also set up to <u>automatically assign</u> "Clearing Banks" as the counterparty for non-convertible arbitrage transactions.  In other words, the counterparty was not an actual third-party on the opposite side of the transaction, rather the AS/400 computer program pre-populated the counterparty with the generic term of "Clearing Banks."

79.    Furthermore, I analyzed every IA Business Stock Record Summary from 1979 through 1992, and I determined that for <u>every single transaction</u>, regardless of whether the purported transaction was a purchase or sale, that one of the three fictitious counterparties listed above ("Clearing Banks," "National Westminster" or "NBNA") was the purported counterparty to the IA Business transaction. However, no counterparty agreements between BLMIS and any of these named purported entities were identified. (*See* **Figure 15**.)

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 32 of 128**

### Figure 15[70]
**IA Business Stock Record Summary**



80. Given the enormity of the trading volume purportedly being executed by the IA Business, it would not be reasonable to transact with just three counterparties over this time period. In a real security transaction, the investor or broker would complete the trade with any number of counterparties that were willing to take the opposite side of the transaction. The fact that the same predetermined counterparties were assigned to each purported trade during the trade generation process shows that the counterparties were predetermined, and the trades were fictitious.

---

[70] MF01122202; MF01152742-800 at 743; MF01134634-730 at 652.

81.    As will be described in greater detail below, at the time of the 1992 SEC Investigation, the
IA Business was requested to produce certain trade documentation, including those that
would reflect the counterparties to the A&B transactions.  As a result, the IA Business
inserted the names of real banks as counterparties into the fake A&B transactions.

### E.    Avellino and Bienes promised their investors virtually riskless investments using pre-set rates of interest based entirely on their guaranteed rates of return in the Pre-1993 Accounts

82.    A&B's business model, as it related to its clients, consisted of issuing promissory notes to
their investors, which were treated as loans to A&B.  All of the funds received by A&B from
their various clients were then pooled together, transferred to A&B's IA Business accounts
and purportedly invested pursuant to the strategies described above.[71] According to an
investment advisor, who directed funds to A&B, Avellino and Bienes described their
operations as follows:

> How does it work?
>
> The funds you send to Avellino & Bienes are treated as a "loan" by them. All of
> these funds are send [*sic*] to a New York broker who invests same on behalf of
> Avellino & Bienes. The underlying trades, made for the account of Avellino &
> Bienes are, in general made as simultaneous purchases of convertible securities and
> its short sale of the common stock, locking in a profit. Other forms of riskless
> trading are also used.[72]

83.    A&B paid its clients guaranteed rates of interest on a quarterly basis.[73] A&B profited by
retaining the difference between the purported return on the IA Business investments and the
return promised by A&B to the owners of the promissory notes.[74]  A&B would also pay a

---

[71] Proof of Fraud/Insolvency Expert Report at ¶148. *See* also, King Arthur Account Fact Sheet,
MADOFF_EXHIBITS-02862-02863 (OIG Exhibit 0115).

[72] King Arthur Account Fact Sheet, MADOFF_EXHIBITS-02862-02863 (OIG Exhibit 0115); Deposition of Frank
Avellino and Michael Bienes dated July 7, 1992 at 75:14-18, 77:2-78:25; In the Matter of King Arthur, SEC file No:
MNY-149 (OIG Exhibit 0117).

[73] King Arthur Account Fact Sheet, MADOFF_EXHIBITS-02862-02863 (OIG Exhibit 0115); Deposition of Frank
Avellino and Michael Bienes dated July 7, 1992 at 71:6-23; In the Matter of King Arthur, SEC file No: MNY-149
(OIG Exhibit 0117).

[74] Proof of Fraud/Insolvency Expert Report at ¶148. *See also*, Deposition of Andrew Copperman dated Jan. 10, 2020
at 51:24-52:5. Andrew Copperman was a former investment advisor, who directed client funds to A&B and was

commission to those who referred investors to A&B.[75] In doing so, A&B established themselves as the first large entity to direct investors and funds to the IA Business. The success of A&B and the guaranteed returns to their investors were entirely dependent on the constant and consistent returns received from the IA Business.  (*See* **Figure 16**.) Such uniformity in returns that were derived from the IA Business could not be produced given the actual volatility that was, and continues to be, prevalent in the real securities market.  Basing returns to clients using guaranteed rates of interest was possible entirely due to the arrangement A&B had with the IA Business.

**Figure 16**



F.   **Avellino and Bienes routinely reviewed and analyzed the securities transactions on the customer statements for the A&B Accounts, and Avellino, on behalf of A&B, acknowledged their accuracy by signing the statements annually**

84.   In the normal course of its business, the IA Business issued customer statements to its IA Business customers.  Like other IA Business customers, A&B received monthly customer statements which reflected the convertible arbitrage and buy and hold transactions discussed above.[76]

---

instructed by the California Department of Corporations to return client funds sent to A&B because he was dealing with unregistered securities. Deposition of Andrew Copperman, Jan. 10, 2020 at 15:11-17, 16:16-21:24, 56:8-57:1.
[75] Deposition of Andrew Copperman dated Jan. 10, 2020 at 25:21-25.
[76] Deposition of Annette Bongiorno dated December 12, 2019 at 34:8-12.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 35 of 128**

85.    Avellino and Bienes reviewed and analyzed these customer statements for the Pre-1993

Accounts. Avellino explained how "we examine this and do our due diligence on a monthly

basis, we look at our fair market value of all of these securities that are being held at Bernard

L. Madoff on behalf of Avellino & Bienes."[77]    Bienes further detailed the process of

monitoring the activity in these accounts: "Well, we knew, because we got transactions. We

saw the stocks being bought and sold. We saw the profits and the spreads."[78] Indeed,

Avellino's handwritten notations on certain customer statements for the A&B Accounts

reveal calculations of the market value of the purported securities positions.[79] This would be

consistent with my experience as a CPA and investment advisor when investing clients'

money.

86.    Further, on an annual basis, BLMIS requested that IA Business customers confirm receipt of

the customer statements and that customers "kindly examine th[e] statement immediately and

sign, noting exceptions, if any" and return the signed document to BLMIS's accountant,

Jerome Horowitz.[80]    Responding to this request, Avellino would annually sign and return

A&B's October statements, an example of which is shown in **Figure 17** for the 125 Account

as of October 31, 1985.

---

[77] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 77:13-16; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

[78] *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff

[79] *See* Deposition of Frank Avellino dated No. 20, 2019 at 192:116-199:21; *see*, for example, MADTBB02397167, MADTBB02397179, MADTBB02397183 (Trustee Exhibit 42).

[80] *See*, for example, MADTBB03237693. *See also*, Deposition of Annette Bongiorno dated Dec. 12, 2019 at 98:23-105:21.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 36 of 128**

**Figure 17**[81]
Signed A&B Account (1-00125-1-0) Statement – October 1985



I (we) acknowledge receipt of the statement(s) of my (our) accounts with (Bernard L. Madoff) as of (10/31/85), and hereby advise you that it is correct, except as noted on the reverse side hereof.

11/14/85

Frank Avellino's signature

87.    Avellino, through his signature, acknowledged contemporaneously on an annual basis both

his receipt of the IA Business customer statements and that he reviewed the statements for

---

[81] MADTBB03237678- MADTBB03237693.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 39 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 37 of 128

accuracy.[82] Year after year, Avellino attested that the customer statements for the Pre-1993 Accounts were correct and he testified that he never noted any exceptions.[83] Based on my experience as a CPA, signing audit confirmation requests such as the ones Avellino did is a serious audit step and one that is not undertaken without proper due diligence.[84] Avellino (also a CPA) should have understood the importance of the attestation process he was being asked to undertake, paying particular attention to any transaction anomalies recorded on the statements.

**VII.    Opinion No. 2: My examination of the evidence, including the IA Business's books and records, shows that: (1) During the 1992 SEC Investigation, the IA Business manufactured different versions of the original customer statements for the Pre-1993 Accounts for a three-year period and created an entirely new A&B account back to 1989; and (2) Avellino, on behalf of A&B, participated in this process.**

88.    Based on my analysis of the books and records of BLMIS, documents generated by A&B, and other evidence, coupled with my professional experience and background as a certified fraud examiner and forensic accountant, I have concluded that:

- Avellino's and Bienes's joint testimony to the SEC in 1992 regarding the purported equity and investment strategy in the Pre-1993 Accounts was inconsistent with the purported equity and investment strategy reflected on the original A&B customer statements for the Pre-1993 Accounts that Avellino and Bienes routinely analyzed, and that Avellino and Dianne Bienes acknowledged and signed as correct;

- The IA Business altered the original A&B customer statements for a three-year period resulting in transactions in those re-done statements that ultimately matched the testimony Avellino and Bienes gave to the SEC and what A&B told its investors;

- Avellino, on behalf of A&B, participated in re-doing the original A&B customer statements by (i) returning the original A&B customer statements to BLMIS; and (ii) analyzing the activity in the re-done A&B customer statements and preparing accounting

---

[82] Avellino testified that the signature on the customer statements was his signature. Deposition of Frank Avellino dated Nov. 20, 2019 at 97:25-98:25.

[83] *See* Deposition of Frank Avellino dated Nov. 21, 2019 at 98:5-14.

[84] Public Company Accounting Oversight Board. The Confirmation Process. In General Auditing Standards (AS 2310). Retrieved from https://pcaobus.org/Standards/Auditing/Pages/AS2310.aspx

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 38 of 128**

ledgers based on those re-done statements;

- The IA Business created an entirely fake account, 1A0053, in or about June 1992 with fabricated customer statements going back to 1989, which created at least $54 million in fictitious gains;

- Avellino, on behalf of A&B, participated in the creation of the fake account by (i) preparing accounting ledgers listing the fake account and its "balances" going back to 1989; and (ii) producing to the SEC these accounting ledgers and fabricated customer statements prepared by BLMIS going back to 1989; and

- A&B produced the re-done customer statements (and not the original, signed statements), the statements for newly created account 1A0053, and accounting ledgers that matched those redone customer statements and the newly created statements for account 1A0053 to the SEC (and sent a copy to BLMIS).

**A. Avellino and Bienes gave sworn joint testimony to the SEC in 1992 about the purported strategies for the Pre-1993 Accounts that was inconsistent with the customer statements Avellino and Bienes analyzed, and Avellino, on behalf of A&B, acknowledged and signed**

89.    As detailed in my Proof of Fraud/Insolvency Expert Report, in June 1992, the SEC commenced an investigation of A&B to determine if the firm was operating as an "unregistered investment company" and "engaged in the unlawful sale of unregistered securities."[85]   As part of this investigation, Avellino and Bienes gave sworn joint deposition testimony before the SEC.

90.    During the SEC deposition, Avellino emphasized the concept of a hedged portfolio as it relates to the purported trading strategy at BLMIS:

> Yes. What we basically have is, of course, long positions. He buys securities for the accounts of Avellino & Bienes, and the strategies that have been highly successful over the years, which Mr. Madoff, by the way, happens to be an expert in, all of the derivative hedges that the market affords. We sell short against the box, we use hedges of the Standard & Poor's 500, Fortune 500. . . .Mr. Madoff uses the hedges basically as S&P's, puts and calls.  Every security that we have in

---

[85] *See* Avellino & Bienes SEC Complaint; *see also*, Proof of Fraud/Insolvency Expert Report at ¶¶147-154.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 39 of 128**

the long position has a hedge, every single one of them.[86]

91.    As part of my forensic analysis, I compared the testimony given by Avellino and Bienes to the transactions appearing on the original customer statements for the Pre-1993 Accounts.

92.    Although Avellino and Bienes were outwardly describing the IA Business strategy as hedged, the original IA Business customer statements received by A&B did not reflect a purported hedged investment strategy. First, although the testimony references options as an investment hedge, the purported convertible arbitrage investment strategy did not entail the use of any options as part of the trading strategy (as described in this report); therefore, the testimony was inconsistent with the reported transactions.[87] Second, the remaining long position transactions recorded on the customer statements were absent any hedge.

93.    As shown in **Figure 18**, for example, A&B's February 1990 IA Business customer statement for the 125 Account reflects several long securities with no corresponding short hedge. Consequently, if these were real unhedged long positions, any decline in the market of the underlying security would result in a decline in the A&B account of an equal amount.  More glaring is the fact that there were no corresponding option accounts that would hold the "hedges of Standard & Poor's index" as put forward by Avellino and Bienes.[88]

---

[86] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 40:13-41:3, 76:13-78:25, 85:11-20, 137:23-138:7; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).
[87] Further, discussed above, the purported convertible arbitrage transactions could not have happened.
[88] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 77:11-12; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

**Figure 18[89]**
Returned A&B Account (1-00125-3-0) Statement – February 1990



94.   I reviewed the A&B IA Business customer statements and each position held in these

accounts was similarly unhedged; that is, there were no S&P index options hedging these

---

[89] MADTBB02397171-175.

transactions.[90]  As a result, the concept of a hedged investment strategy promoted by A&B to its customers and the sworn testimony provided to the SEC by Avellino and Bienes regarding this issue were in direct contrast to the reality of the original IA Business customer statements sent to A&B.[91]

**B. Avellino's and Bienes's sworn testimony concerning the equity in the Pre-1993 Accounts was inconsistent with the original customer statements for the Pre-1993 Accounts that Avellino and Bienes analyzed, and that Avellino, on behalf of A&B, acknowledged**

95.    As part of my forensic examination, I analyzed and compared Avellino's and Bienes's testimony about the equity in their accounts to the equity reflected on the original A&B customer statements.  Here, too, Avellino and Bienes presented a conflicting narrative to the SEC.  In their sworn testimony, Avellino and Bienes claimed that they had "$400 million that we owe to lenders" and that "[w]e determine the fair market value at the end of each month and . . . we make sure that that value is always in excess of the loans payable."[92]  Although as of the SEC testimony in July 1992 the A&B loans outstanding from A&B investors totaled approximately $414 million,[93] the amount of purported equity in the Pre-1993 Accounts was not "in excess" of this $414 million.[94]  As part of my analysis, I determined that the purported equity in the Pre-1993 Accounts reflected only $364 million, leaving a shortfall of nearly $50

---

[90] My analysis indicated that from 1978-1992, only one month (April 1990) for one A&B account (1A0049) reflected an S&P option.  Moreover, as will be discussed in detail below, the apparent "hedging" in the 1-00125-7 account as of 1990 was the result of the retroactive creation in July 1992 of backdated trades to give the impression of a hedged portfolio.

[91] Frank DiPascali testified that,
  "Well, to a certain amount of the clients that Avellino had been dealing with for many, many years, he was explaining to them that they were doing some sort of a hedge arbitrage.  Well, quite frankly, the accounts had morphed into something completely different than hedged arbitrage for whatever reason.  So Bernie couldn't afford for Frank Avellino to be accused of, basically, a securities fraud by lying to your clients.  So they needed to change the complexion of what was previously issued to Avellino because if you looked at the Avellino accounts, like when the music stopped on the date that the SEC would get them, they were very problematic to Bernie.  They did not indicate in any way, shape or form that these accounts were hedged in any way, shape or form."
Criminal Trial, December 2, 2013, Trial Transcript at 4629:4-16.

[92] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 77:6-20 In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).

[93] MADTBB03344569; see also, Letter to the United States Securities and Exchange Commission from Squadron, Ellenoff, Plesent & Lehrer, August 4, 1992, confirming the delivery of the loan balances to the SEC (FRANKAVELLINO_000010-12).

[94] As of June 18, 1992, the balance owed to investors was $399,819,455. A&B Loans Detail by Investor, SECSDK0000325- SECSDK0000834.

million.[95]  This nearly $50 million deficit is despite the fact that: (i) Avellino and Bienes testified that: "We owe, say 400 million. The value of our investment with the broker is 440-some-odd-million. We always have approximately 20 percent more with the broker than what we owe, it could be even bigger than that. . . .We usually always will be covered by 20 percent more than what we owe lenders,"; and (ii) Avellino signed and acknowledged the securities recorded on the Pre-1993 Accounts' customer statements.[96]

96.    Given that the equity value in the Pre-1993 Accounts was only $364 million, there existed a shortfall of at least approximately $76 million ($440 million – $364 million).

**C.    Avellino returned the original A&B customer statements to BLMIS and the statements were re-done, thereby matching the SEC testimony concerning the purported securities transactions and the equity in the Pre-1993 Accounts**

97.    Providing the original A&B customer statements to the SEC would have revealed that (i) the Pre-1993 Accounts did not contain enough purported equity to pay back the amount owed to A&B's investors (let alone the additional 20% cushion) to which Avellino and Bienes jointly testified; and (ii) the original customer statements were inconsistent with the purported trading strategies to which Avellino and Bienes jointly testified and communicated to the A&B investors.  Avellino, however, returned the original IA Business customers statements to BLMIS and, as detailed below, wholly new A&B customer statements, reflecting different transactions and account balances spanning a three-year period, were created.  I analyzed these newly created statements and conclude that they matched Avellino's and Bienes's testimony regarding BLMIS's purported investment strategy and the equity value of the Pre-1993 Accounts.[97]

98.    I reviewed BLMIS's books and records and found evidence that Avellino returned certain customer statements to BLMIS.  These statements were part of Bongiorno's files with a cover note stating, "These were returned."[98] (*See* **Figure 19**.)

---

[95] Arbitrage Portfolio Transaction Reports (MF00545002-MF00545003); Portfolio Management Reports as of June 30, 1992 (MF00011542-MF00011551). Deposition of Annette Bongiorno, Dec. 12, 2019 at 88:22-91:5.
[96] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 84:12-85:1; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117); Deposition of Frank Avellino, Nov. 20, 2019 at 97:25-98:20.
[97] Deposition of Annette Bongiorno, Dec. 12, 2019 at 143:6-24.
[98] MADTBB02397106. *See also*, Deposition of Annette Bongiorno dated Dec. 12, 2019 at 144:7-145:18.

**Figure 19**
Annette Folder Cover



99.   I analyzed the 132 pages of documents that were part of this file, which included customer

statements for certain Pre-1993 Accounts between 1989 and 1991 that Avellino returned to

BLMIS.  The first page of each of the returned customer statements was marked with an "X,"

which Bongiorno testified was an indication that the statements had been returned to BLMIS

so that Avellino and Bienes could then receive a different set of customer statements. [99]  (*See*

**Figure 20**, which shows pages 1 and 2 of the January 31, 1990 customer statement for A&B

account 1-00125-3.)  Also included in these returned documents were original A&B

customer statements containing Avellino's handwriting, which indicated not only that

Avellino had original possession of the statements, but also that he reviewed and analyzed

them.[100]

---

[99] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 146:2-11.
[100] *See*, for example, MADTBB02397165-170 at 165, 167; MADTBB02397177-182 at 179; MADTBB02397183;
Deposition of Frank Avellino dated Nov. 20, 2019 at 192:11-199:21.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 44 of 128**

**Figure 20**[101]

Returned A&B Account (1-00125-3-0) Statement – January 1990



D.  **The IA Business retroactively changed the original A&B customer statements, which then ultimately matched Avellino's and Bienes's joint SEC testimony, to (1) reflect different purported securities transactions and account balances; and (2) create an entirely new A&B account.**

100.    My forensic examination of the books and records of the IA Business shows the step-by-step

---

[101] MADTBB02397165-170 at 165, 167 and Deposition of Frank Avellino dated Nov. 20, 2019 at 217:7-16.

process of how the customer statements signed by Avellino, on behalf of A&B, were altered and ultimately matched Avellino's and Bienes's joint SEC testimony.

101.    As noted above, I conclude that the testimony provided by Avellino and Bienes to the SEC was inconsistent with the securities transactions reflected on, and purported equity value of, the Pre-1993 Accounts.  To generate customer statements that would reflect the purported IA Business investment strategy as described by Avellino's and Bienes's joint SEC testimony and to resolve the appearance of the equity balance shortfall, the IA Business made several significant modifications to certain original A&B customer statements including: (1) adding $86 million in US Treasuries to account 1-00125-3 to show a more conservative portfolio and to cover an equity shortfall; (2) creating an entirely new A&B account in 1992 with statements going back to 1989 to resolve the remaining equity shortfall; (3) changing certain transaction descriptions to eliminate references to other IA Business accounts; and (4) retroactively adding additional short positions to further reflect hedged positions. The statements containing these modifications were later provided by A&B to the SEC.

102.    Furthermore, the IA Business manufactured documents reflecting new "counterparties" to replace the hard coded "Clearing Banks" entry used on each purported A&B transaction. Each of these actions is described in detail below.

### 1.    $86 million in US Treasuries were added to the 1-00125-3 account

103.    The original A&B IA Business account statements did not reflect a purported investment approach that protected the portfolio from market volatility—in other words, the portfolios were not hedged. To provide the appearance of a more stable investment strategy and to eliminate a gap between the liability owed to A&B customers and the equity purportedly held in the Pre-1993 Accounts, the IA Business retroactively inserted $86 million in fake US Treasuries to A&B account 1-00125-3. US Treasuries are considered to be virtually "risk free" investments[102] and would therefore be a counterbalance to the fluctuations of purported long equity positions recorded on the customer statements.[103] In particular, the IA Business

---

[102] Shannon P. Pratt and Roger J. Grabowski, *Cost of Capital, Applications and Examples* (5th ed.) 2014 at 92-93.
[103] Frank DiPascali testified that, "The purpose of the treasury instrument was to get a certain amount of – or one of the purposes was to change the complexion of the account, to make it appear that a certain part of this account, a good-size part of it, was insulated from all market risk because it was a treasury instrument.  It was literally a

chose to record the purported purchase of a US Treasury Separate Trading of Registered Interest and Principal of Securities (STRIPS), which pays an investor only one time upon maturity.[104] This structure was beneficial to the IA Business as it was a long-term instrument and eliminated the need to track future interest payments on the revised customer statements.[105]

104. The original customer statement for A&B account 1-00125-3 dated December 31, 1989 (which was part of those customer statements that Avellino returned) did <u>not</u> include any US Treasury STRIPS as a security in the investment portfolio. (*See* **Figure 21**.)

**Figure 21**[106]
A&B Account (1-00125-3-0) Original Statement – December 1989



No US Treasury STRIPS

105. In fact, US Treasury STRIPS were not included as a security in the investment portfolio in

---

short—it was a U.S. Treasury note." Criminal Trial, December 2, 2013, Trial Transcript at 4631:12-17. *See also*, Criminal Trial, December 2, 2013, Trial Transcript at 4653:12-4654:1.
[104] *See* Treasury Direct at: treasurydirect.gov/instit/marketables/strips/strips htm (last accessed Feb. 6, 2020).
[105] Criminal Trial, December 4, 2013, Trial Transcript at 4693:10-4694:2.
[106] MADTBB02397157-239 at 163. *See*, Deposition of Annette Bongiorno, Dec. 12, 2019 at 145:19-149:17.

any of the original customer statements for A&B account 1-00125-3 dated after December 1989 that were part of those Avellino returned to BLMIS that contained his handwriting.[107]

106.    IA Business handwritten notes indicate the need to "show" a large US Treasury position ("Show Lg Treas Posit") in December 1989 for account 1-00125-30.[108] (*See* **Figure 22**.)

**Figure 22**
IA Business Handwritten Notes



"Dec 89 Show Lg Treas Posit"

107.    Additional handwritten notes from the IA Business show that $86 million in fake US Treasuries was to be added to the December 1989 statement.[109] (*See* **Figure 23**.)

---

[107] *See* A&B customer statements from December 31, 1989 through April 30, 1991 at MADTBB02397157- 239; Deposition of Frank Avellino dated Nov. 20, 2019 at 192:22-199:9.
[108] MADTBB02397396-404 at 399.
[109] Frank DiPascali testified that the handwritten notes regarding the fake US Treasuries reflected his handwriting. Criminal Trial, December 2, 2013, Trial Transcript at 4657:2-17.

**Figure 23**[110]
### IA Business Handwritten Notes



"Add to Dec 89 Statement"          86,000,000 UST INT

108.    An interim customer statement for account 1-00125-3 reflects that $86 million in US
Treasuries were handwritten on the original customer statement. (*See* **Figure 24**.)

---

[110] MADTBB02397341-347 at 346; Deposition of Annette Bongiorno dated Dec. 12, 2019 at 150:1-155:24.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 49 of 128**

**Figure 24**[111]

A&B Account (1-00125-3-0) Interim Statement – December 1989



109.    In the end, a revised customer statement for account 1-00125-3 included a purported $86
million in US Treasuries, as shown in **Figure 25**.

---

[111] MADTBB02391973-974 at 974.

**Figure 25**[112]

A&B Account (1-00125-3-0) Revised Statement – December 1989



$86,000,000 in US Treasury Notes STRIPS

110. My examination of the evidence shows that after these customer statements were re-done, Avellino received them from the IA Business. Later, Avellino returned a copy of these statements, along with his handwritten ledgers, to the IA Business in a BLMIS envelope which was stamped CONFIDENTIAL and addressed to "Bernie Madoff" from "Frank Avellino." This envelope, as shown in **Figure 26**, was found among BLMIS's books and records.[113]

---

[112] SECSDK0000862-865 at 865.
[113] MADTBB03348258-354 at 258; Deposition of Frank Avellino dated Nov. 20, 2019 at 184:6-12.

**Figure 26**
IA Business Envelope From Frank Avellino



111.    For example, the re-done December 31, 1989 customer statement shown in **Figure 27** below
        was found in the envelope sent from Avellino and located at BLMIS. On this version of the
        re-done customer statement, there was a circled handwritten number "30" and the new
        balance for this account reads $76,940,453.51.[114] This "30" corresponds to the account
        number on Avellino's handwritten ledgers (also included in the envelope to Madoff), which
        also show an ending balance of $76,940,453.51.[115] (*See* **Figure 28**.) As will be discussed
        more fully below, Avellino testified to having prepared these handwritten ledgers.

---

[114] MADTBB03348340-343 at 342.
[115] MADTBB03348346-354 at 346.

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 52 of 128

**Figure 27**
A&B Account (1-00125-3-0) Revised Statement – December 1989



Handwritten "30"

**Figure 28**
Frank Avellino Handwritten Notes

Handwritten "30"



Account balance of
$76,940,453.51

112.    Ultimately, this new December 31, 1989 statement was provided by A&B to the SEC during

their 1992 investigation.[116] The fictitious $86 million in US Treasuries was reported as being

---

[116] SECSDK0000862-865 at 865; *see*, Letters to the United States Securities and Exchange Commission from
Squadron, Ellenoff, Plesent & Lehrer, July 15, 1992 and August 4, 1992 (FRANKAVELLINO_000010-12).

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 55 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 53 of 128

held in this account through at least December 1990.[117]  My analysis shows that the impact of this addition was twofold:

- A&B conveyed to the SEC that its customer liabilities were approximately $245 million and $300 million as of December 31, 1989 and December 31, 1990, respectively.[118] However, the original A&B account statements showed equity values that were significantly less than these amounts—approximately $15 million less at year-end 1989 and approximately $20 million less at year-end 1990.[119]  The retroactive addition of the fraudulent $86 million in US Treasuries (with a market value of approximately $40 million) on the re-done December 31, 1989 and 1990 statements, however, eliminated this gap.  Specifically, the added $86 million resulted in a nearly $40 million increase in the account balance in the Pre-1993 Accounts of approximately $255 million as of December 31, 1989 and approximately $320 million as of December 31, 1990;[120] and

- Avellino's and Bienes's SEC testimony, as previously discussed, emphasized the "conservative" nature of its invested portfolio.  The fictitious $86 million in US Treasuries helped to provide the appearance of a more balanced (*i.e.*, "conservative") portfolio.

113.    Adjustments such as the addition of the $86 million in US Treasuries cannot be performed retroactively in the real world; real trades must be executed and settled through actual market mechanisms and at the time of actual performance—not backdated several years prior. The absurdity of this action alone underscores the magnitude of the fraud in these accounts.

---

[117] *See* the December 31, 1990 customer statement for account 1-00125-3. SECSDK0000878-883 at 883. An additional approximately $250 million in US Treasury Bills were also included on the revised December 31, 1990 customer statement.

[118] MADTBB03344569; SECSDK0010169-70; *see also*, Letter to the United States Securities and Exchange Commission from Squadron, Ellenoff, Plesent & Lehrer, August 4, 1992, confirming the delivery of the loan balances to the SEC (FRANKAVELLINO_000010-12).

[119] As of December 31, 1989, total equity in the Pre-1993 Accounts was approximately $230 million; as of December 31, 1990, the total equity in the A&B Accounts was approximately $280 million. MF00052726-731, MF00052736, MF00052740-742, MF00052758-760, MF00053044-49, MF00053819, MF00024361-370, MF00024377-378, MF00024385-390, MF00024420-424, MF00024806-820 and MF00025881-882.

[120] SECSDK0000858-924, SECSDK0010181.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 54 of 128**

2. **A&B account 1A0053 was created by BLMIS in 1992 with newly fabricated statements going back to 1989 to help resolve a shortfall of purported equity in the Pre-1993 Accounts**

114. The Proof of Fraud/Insolvency Expert Report details that in 1992, the Pre-1993 Accounts had a shortfall between what was owed to A&B investors and what was purportedly held in the Pre-1993 Accounts and A&B's bank accounts.[121] Specifically, the Pre-1993 Accounts had a gap of nearly $50 million as of June 30, 1992 between the loans outstanding to A&B customers and the aggregate purported equity balance in the Pre-1993 Accounts in the IA Business.

115. The Proof of Fraud/Insolvency Expert Report further details how A&B account 1A0053 was newly created in mid-1992 to resolve this funding gap through the use of backdated transactions. Further, the report explains how IA Business account numbers were generated sequentially and that account 1A0052 was established in May 1992 and account 1A0054 was established in September 1992, leaving the creation of 1A0053 somewhere in between.[122] Yet despite the fact that account 1A0053 was created in June 1992, customer statements for this account were created going back to 1989, which reflected fictitious transactions that were manufactured for the three-year period of 1989 to 1992. This evidence supports my conclusion that the 1A0053 account was fabricated by the IA Business and the recorded transactions were created to eliminate the account shortfall in light of the SEC investigation.

116. For this report, consistent with my role as a fraud examiner, I performed additional analyses of BLMIS's books and records that further support the conclusion that the 1A0053 account was created in June 1992, and all the purported transactions appearing on the customer statements for that account were entirely fictitious. Among the IA Business documents I analyzed were handwritten notes listing accounts that were "Not opened in 1991." On this list is account 1A0053 (formerly identified as account 1-00156-3). (*See* **Figure 29**.)

---

[121] Proof of Fraud/Insolvency Expert Report at ¶¶150-152.
[122] Proof of Fraud/Insolvency Expert Report at ¶¶152-153.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 55 of 128**

**Figure 29**[123]
IA Business Handwritten Notes



117.   I also reviewed the IA Business Account Maintenance Form for account 1A0053.  Account
       Maintenance Forms are typically used by the IA Business to record the name and address of
       the account owner at the time an account is opened by the IA Business.  In this instance, the
       Account Maintenance Form for the 1A0053 account was annotated with handwriting that
       states, "Done 6-23-92", thereby indicating that the account was not opened with the IA
       Business until that date.[124] (*See* **Figure 30**.)

---

[123] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 185:8-187:3; MADTBB02391256 (Trustee Exhibit 71).
See additional handwritten notes pertaining to A&B account 1-A0053 at MADTBB02397396-404 at 402;
MADTBB01737079-093 at 090; MADTBB02397406.
[124] *See* Deposition of Annette Bongiorno dated Dec. 12, 2019 at 184:1-25.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 56 of 128**

**Figure 30**[125]
Account Maintenance Form for A&B Account (1-A0053)



118.    My review of additional IA Business reports supports my conclusion that before June 1992,
account 1A0053 did not exist.  For example, the Group Buying Power report was a report
used by the IA Business to track the universe of IA Business accounts at a certain point in
time, and indicate the level of funds available for purported investments.[126]  As shown in
**Figure 31**, the Group Buying Power reports for May and June 1992 show amounts for A&B
accounts up through 1A0051 and then 1B0018; these reports, however, do <u>not</u> show data for
A&B account 1A0053.

---

[125] Deposition of Annette Bongiorno datedd Dec. 12, 2019 at 180:4-11, 184:1-25; Name and Address File for
Maintenance folders AMF00309516-517 at 517 (Trustee Exhibit 70).
[126] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 95:8-19.

**Figure 31**[127]
IA Business Group Buying Power – May and June 1992



Group Buying Power 5/31/92

Account# 1-A0051-7
Account# 1-B0018-3



Group Buying Power 6/30/92

Account# 1-A0051-7
Account# 1-B0018-3

119.    Consistent with being created around July 1992, account 1A0053 first appears on the July
        1992 Group Buying Power report. (*See* **Figure 32**.)

---

[127] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 94:11-18, 96:19-97:25; Group Buying Power Report
MF00545247-266 at 247 (Trustee Exhibit 63), MF00545267-287 at 267.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 58 of 128**

**Figure 32**[128]
IA Business Group Buying Power – July 1992



120.    Similarly, the PMR used by the IA Business show no record of account 1A0053 until July 1992.[129] The PMR as of June 30, 1992 reflects data for A&B account 1A0051, Carol Achenbaum account 1A0052, and then jumps to Basil Venture Partners account 1B0005. (*See* **Figure 33**.)

---

[128] MF00545288.
[129] As defined in my Proof of Fraud/Insolvency Expert Report, a PMR is a year-to-date IA Business report providing summary level information by customer account. Proof of Fraud/Insolvency Expert Report at ¶265.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 59 of 128**

### Figure 33[130]
#### IA Business Portfolio Management Report – June 1992



No 1-A0053 account →

121.     However, as of July 31, 1992, the 1A0053 account was added to the PMR. (*See* **Figure 34**.)
This evidence further supports my conclusion that the 1A0053 account did not exist until
mid-1992 and the transactions reflected in the account were fictitious.[131]

---

[130] MF00789668-861 at 675.

[131] Frank DiPascali testified that A&B account 1-A0053 was not established until after 1991 and was populated with
fake trades. Criminal Trial, December 2, 2013, Trial Transcript at 4657:18-4658:7, 4658:15-4659:20.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 60 of 128**

**Figure 34**[132]
IA Business Portfolio Management Report – July 1992



Portfolio Management
Report as of 7/31/92

Account# 1-A0053-3
Avellino & Bienes #5

122.    Given that account 1A0053 was not established until the summer of 1992, no purported
trades could have been executed in this account until *after* it was opened. Yet A&B provided
to the SEC the IA Business customer statements for account 1A0053 as of December 31,
1989, nearly 3 years before the account was even established.[133]  A&B also provided to the
SEC the IA Business customer statements for account 1A0053 as of December 31, 1991, and
as of January 31, February 29, March 31, April 30, and May 31, 1992 - all prior to when the
account was created by the IA Business in July 1992.[134]  In addition, since the account was
not opened until 1992, the purported initial funding of the account in 1989 could not have
been derived from A&B, or any other source; it was entirely made up.[135]

---

[132] MF00010956. Deposition of Annette Bongiorno dated Dec. 12, 2019; MADTBB01737079-093 at 090 (Trustee Exhibit 72).

[133] *See* the December 31, 1989 account statement for account 1-00156-4 (1-A0053-4). SECSDK0010189.

[134] *See* SECSDK0000045-46 and SECSDK0000035 (December 31, 1991 account statement); SECSDK0000137-140 at 139-140 and SECSDK0000143-149 (January through May 1992 account statements).

[135] As will be discussed below, A&B also provided to the SEC handwritten accounting ledgers for 1989, 1990, and 1991 that listed the 1-A0053 account and its purported equity balance as of December 1989, December 1990, and December 1991, which matched the balances reflected on the fabricated IA Business customer statements for this account – all despite the fact that BLMIS did not create the account until June 1992. Deposition of Frank Avellino dated November 20, 2019 at 171:1-22; SECSDK0000835-1013 (Trustee Exhibit 40) at 967, 971, 993, 997 (A&B accounting ledgers showing 1-A0053 account balances for 1989 and 1990); SECSDK 0000046; MADTBB03344638 (A&B accounting ledgers showing 1-A0053 account balance for 1991).

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 63 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 61 of 128**

123.    Handwritten customer statements from the IA Business show the "work in progress" and the
"drafting" of the new 1A0053 account statements. For example, **Figure 35**, shows the work
in progress for the December 31, 1991 customer statement, including an ending balance of
$77,111,768.

**Figure 35**[136]
Handwritten A&B Account (1-A0053-3) Statement – December 1991



---

[136] MADTBB02390998-1006 at 0998-999. *See also*, MADTBB02397300-302 for additional handwritten customer statements for this account.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 62 of 128**

124.    Once these statements were actually produced, the IA Business noted their completion. (*See*
Figure 36.)

**Figure 36[137]**
**IA Business Handwritten Notes**



"12/91 Created new pos 77111768"

125.    These purported trades were added to the customer statements produced by A&B to the SEC.
(*See* Figure 37.)

---

[137] MADTBB02397406.

08-01789-cgm   Doc 21157-40   Filed 02/23/22   Entered 02/23/22 15:32:28   Attach. B
Pg 65 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 63 of 128

**Figure 37[138]**

A&B Account (1-00156-3-0) Statement – December 1991



126.    The purpose of the creation of the 1A0053 account was to retroactively create enough fake equity to resolve the nearly $50 million equity shortfall in the Pre-1993 Accounts. Through the creation of customer statements that included purported realized and unrealized gains from securities and options transactions for this account from 1989 through 1992, the IA Business created at least $54 million in instant gains for A&B, thereby eliminating the equity deficiency.[139]

127.    In the securities industry, new accounts are not created retroactively with backdated trades. If these trades, or any of the IA Business purported trades, actually occurred in real time, there would have been no need to generate this fictitious account with fake trades.

**3.     The IA Business removed certain account transfers to eliminate references to other IA Business customers**

128.    In addition to the purported securities listed on the A&B account customer statements, the

---

[138] SECSDK0000046.
[139] SECSDK0000045-46, SECSDK0000139-149, SECSDK0010189. *See also* the July 1992 PMR at MF00010957.

statements would also reflect purported transfers into and out of the A&B accounts to/from other IA Business accounts.  As will be shown below, the original A&B customer statements that Avellino signed reflected several of these types of transfers from other named IA Business accounts.  However, providing these statements to the SEC could have generated additional questions for the IA Business, including SEC inquiries into the other IA Business accounts listed on the A&B statements.[140]  To avoid this possibility, the IA Business modified the transaction descriptions on the original A&B customer statements and A&B subsequently provided these revised statements that no longer referenced other IA Business accounts to the SEC.

129.     For example, on December 14, 1989, account 1-00124-1, held under the name of Avellino & Alpern ("A&A"), purportedly transferred $145,318.34 to A&B account 1-00125-3. (*See* **Figure 38**.)

---

[140] Frank DiPascali testified: "One of the key issues in Bernie Madoff's fraud was to never discuss with anyone the entire scope of his client base, because simply do the math, add it up, you know it's a fraud. It's just too large to be real.  So, whenever discussing who his clients were, he was always very, very, very careful to only put forward a small group of clients that made sense in the listener's mind.  It would not be in his best interest to have the SEC get a document from Mr. Avellino that says transferred from A&A, because it would simply bode the question who was A&A, and he would have to say another one of my clients. OK, let me see three years' worth of their statements. That process, in Bernie's mind, could mushroom into something, could mushroom into an area he does not want to go. So, if the SEC is asking to see three years' worth of statements of Avellino and Bienes, that is exactly what they are going to get and not a second more. If you have on one of those statements transfers from A&S, they will ask for that as well, and he didn't want to give it to them." Criminal Trial, December 2, 2013, Trial Transcript at 4640:22-4641:15.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 65 of 128**

**Figure 38**[141]
A&B Account Transfers- December 1989

TRANS TO 1-00125-3-0

TRANS FROM A&A



130.  Since the A&B customer statement identified A&A, the IA Business revised the original
December 1989 statement to remove that reference.  My review of internal IA Business
notes, which contain Bongiorno's handwriting, shows that the transfer from A&A would be
changed to a dividend from General Motors on the November 1989 statement. (*See* **Figure
39**.)[142]

---

[141] MADTBB02391950; MADTBB02397157.
[142] *See also*, Criminal Trial, December 2, 2013, Trial Transcript at 4642:2-4644:1.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 68 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
**June 5, 2020**
**Page 66 of 128**

**Figure 39**[143]
IA Business Handwritten Notes



131.    Although the original November 1989 statement for account 1-00125-3, that Avellino, on
behalf of A&B, acknowledged as being accurate, did not list a dividend from GM (*see*
**Figure 40**), the revised customer statement for this account was altered to reflect a dividend
from GM (*see* **Figure 41**).  Further, the amount of the purported dividend was exactly the
same as the amount of the transfer from A&A as reflected on the original December 1989
statement (*i.e.*, $145,318.34).

---

[143] MADTBB02397405.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 67 of 128**

**Figure 40[144]**
A&B Account (1-00125-3-0) Original Statement – November 1989



Original
November 1989
Statement

[144] MADTBB02392022.

**Figure 41**[145]

A&B Account (1-00125-3-0) Revised Statement – November 1989



132.    In the end, the original December 1989 customer statement was revised to eliminate the
capital addition from A&A. (*See* **Figure 42**.)

---

[145] MADTBB02391924.

**Figure 42**[146]

A&A Account (1-00124-1-0) Revised Statement – December 1989



Original A&A Transfer

A&A Transfer Removed

133.    In addition to reviewing the books and records of BLMIS, I also analyzed market data
reflecting GM's actual dividend distribution as of November 1989. This analysis further
confirms my conclusion that the GM dividend on the re-done statement was fictitious. Based
on my analysis, GM declared a dividend on November 6, 1989, that was issued at $0.75 per

---

[146] MADTBB02391950; MADTBB03348340.

share.[147] (*See* **Figure 43**.)  Given the 260,000 GM shares purportedly held in the 1-00125-3 account, this would have resulted in a total dividend distribution to A&B of $195,000, not the $145,318.34 that appeared on the A&B customer statement.  Alternatively, the $145,318.34 translates into a dividend per share of only $0.56.  Furthermore, the "payable" date for this dividend was December 9, 1989, not November 22, 1989, as shown on the revised A&B customer statement, another indication that this GM dividend was fictitious.[148]

**Figure 43**
General Motors Dividend History 1989 - 1990



134.    In the securities industry, book entries, such as the transfers described above, cannot be revised without an actual change in the movement of funds from one account to another.  The fact that the IA Business needed to alter these statements, which A&B then provided to the

---

[147] Bloomberg Finance, LP.
[148] Bloomberg Finance, LP.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 71 of 128**

SEC,[149] underscores the fact that the revised customer statements sent to the SEC were false.

4.   **The IA Business retroactively generated short sales in a subaccount to reflect positive cash balances in the Pre-1993 Accounts**

135.   Avellino and Bienes jointly testified to the SEC that their IA Business accounts always reflected a _positive_ "cushion."[150] Yet, based on my analysis of the evidence,  the original A&B customer accounts as of December 31, 1989 reflected a _negative_ cash balance of approximately $133 million.[151]  This discrepancy was rectified by the IA Business creating numerous fictitious backdated transactions that generated over $134.3 million in cash in A&B subaccount 1-00125-7.[152]  These fake transactions eliminated the $133 million in debt (_i.e._, negative cash) owed to BLMIS.

136.   Handwritten notes created by Bongiorno in the _summer of 1992_ outline the various steps taken to revise the 1-00125 account.[153]  For example, as shown in **Figure 44** below, the handwritten notes reflect that the IA Business "created" a short position of $134,304,343.75 as of November 30, 1989.[154]

[149] Letters to the United States Securities and Exchange Commission from Squadron, Ellenoff, Plesent & Lehrer, July 15, 1992 and August 4, 1992 (FRANKAVELLINO_000010-000012).
[150] Deposition of Frank Avellino and Michael Bienes dated July 7, 1992 at 78:8-14; In the Matter of King Arthur, SEC file No: MNY-1490 (OIG Exhibit 0117).
[151] _See_ MF00052726-731, MF00052736, MF00052740-742, MF00052758-760, MF00053044-49 and MF00053819.
[152] SECSDK0000860.
[153] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 198:17-199:8.
[154] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 198:9-99:8; MADTBB02397405-407 at 405 (Trustee Exhibit 73).

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 72 of 128**

**Figure 44**
IA Business Handwritten Notes



137.    Additionally, another handwritten Bongiorno note states that certain A&B account statements were "done over."  Specifically, for the 1-00125-7 account, the note indicates that statements were "done over" for the months of November 1989 through February 1990.[155] (*See* **Figure 45**.)

---

[155] Deposition of Annette Bongiorno dated Dec. 12, 2019 at 197:5-12; MADTBB01737079-093 at 090 (Trustee Exhibit 72).

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 73 of 128**

**Figure 45**
IA Business Handwritten Notes



138.    The output generated based on these notes are reflected in the November 1989 and December 1989 internal handwritten customer account statements for the 1-00125-7 account. (*See* **Figure 46** and **Figure 47**).  As shown in **Figure 46**, the first line on the November 1989 account statement is "No Balance Forward" and the ending cash balance was $134,304,343.75, which ties to the handwritten note in **Figure 45** above.[156]

---

[156] MADTBB02391825-837 at 825,837.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 74 of 128**

**Figure 46**
A&B Account (1-00125-7-0) Handwritten Statement – November 1989



**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 75 of 128**

**Figure 47**[157]
A&B Account (1-00125-7-0) Handwritten Statement – December 1989



139.    After the IA Business entered the transactions listed on these handwritten account statements
into the computer system, the IA Business generated a "new" December 1989 statement, as
shown in **Figure 48** below.  A&B then produced this new customer statement to the SEC.

---

[157] MADTBB02391849.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 78 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 76 of 128

**Figure 48[158]**

"NEW" December 1989 Statement for A&B Account 1-00125-7



140.    If the original cash balances in the Pre-1993 Accounts were accurate, as Avellino and Bienes testified to the SEC, there would be no need in the summer of 1992 to generate new (fake) transactions going back nearly three years to produce a larger cash balance. In the real investment world, transactions cannot be inserted into accounts three years after the fact. The "new" retroactive transactions were fictitious.

141.    In the end, the re-done A&B customer statements reflected numerous changes, including, but not exclusively, the following (*see* **Figure 49**):

---

[158] SECSDK0000860.

**Figure 49**

| Adjustments to customer statements | Original customer statements | Customer statements sent to SEC |
|---|---|---|
| $86 million in US Treasuries in 1-00125-3 account | NO | YES |
| Any transactions in 1-A0053 account | NO | YES |
| Replacement of transfers from other IA Business customer with GM dividend | NO | YES |
| Short sales in 1-00125-7 account | NO | YES |

**5.    The IA Business altered the purported counterparties listed for the A&B transactions from the generic "Clearing Banks" to more specific bank names**

142.    During the 1992 SEC Investigation, in addition to manufacturing different versions of the customer statements for the Pre-1993 Accounts, the IA Business altered the counterparties for the A&B transactions from the previously pre-determined generic term "Clearing Banks" to more specific bank names.  Specifically, the IA Business altered the purported transactions by replacing the term "Clearing Banks" with a predetermined list of actual financial institutions.  Each of the assigned counterparties can be traced to the list of specific counterparties shown in **Figure 50** below.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 78 of 128**

**Figure 50[159]**
Internal List of New Counterparties



143.    To further create the illusion that the transactions on the A&B revised statements actually took place, the IA Business also inserted an intermediary account, *i.e.*, a market maker, named "BLM Trading" between the IA Business customer and the counterparty. This process can be shown in the following example of a purported transaction in A&B account 1-A0045-3 on November 16, 1992.

144.    The November 1992 customer statement for this account reflects the purported sale of 15,500 shares of Atlantic Richfield Co. at a price of $108.50.

---

[159] MADTBB02391256-262 at 262.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 79 of 128**

**Figure 51**[160]
A&B Account (1-A0045-3) Statement – November 1992



145.    As shown in the Trade Date Blotter in **Figure 52** below in November 1992, the generic
"Clearing Banks" was listed as the original purported counterparty for the Atlantic Richfield
Co. transaction in the 1-A0045-3 account.

**Figure 52**[161]
Original IA Business Trade Date Blotters



MADTSS00013748

146.    However, in response to the 1992 SEC Investigation, the IA Business assigned "new" foreign
financial institutions as the purported counterparties for the A&B transactions. (*See* **Figure
50** above.) As shown in the revised Trade Blotters, in **Figure 53** below, the 2-90000 account
(renamed "BLM Trading") purported to purchase 15,500 shares from A&B account 1-
A0045-3 at a price of $108.50.  The IA Business then purportedly sold 15,500 shares to a
randomly generated foreign account named "Credit Suisse Geneva" at a price of $108.52.
(Credit Suisse Geneva is number 16 on the handwritten list in **Figure 50** above.)

---

[160] MF00450047.
[161] MADTSS00013725-4260 at 3748.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 80 of 128**

**Figure 53[162]**
Revised Trade Date Blotter



147.    The retroactive assignment of counterparties to the revised A&B transactions in November

1992 illustrates the fictitious nature of this process, because, if these were real transactions,

an actual counterparty would have been assigned in real-time during the trading transaction,

eliminating the need for a retroactive assignment.  The only reason to retroactively assign

counterparties during the SEC's investigation of A&B would be to cover up the fact that no

legitimate counterparties existed from the beginning.

148.    In fact, DiPascali testified that Madoff was "very uncomfortable" that the generic term

"clearing banks," which appeared as purported counterparties on the IA Business's books

and records, would not pass review by an outside party.[163]

**E.  A&B accounting ledgers prepared by Avellino and produced to the SEC by A&B show
that Avellino, on behalf of A&B, worked with IA Business employees to revise and/or
create the transactions on the original customer statements and the newly-created
account 1A0053**

149.    Avellino testified that he prepared handwritten internal accounting ledgers for the revised

customer statements that include all of the fraudulent adjustments and modifications

described above.[164]

150.    For example, an internal handwritten accounting ledger for year-end December 1989

prepared by Avellino reflects an account balance for account 1-00125-3 of $76,940,453.51,

[162] MADTBB01732989.
[163] DiPascali Criminal Trial testimony, December 5, 2013 Trial Transcript at 4981:3-19; 4997:2-10; 4997:18-4998:1.
[164] Deposition of Frank Avellino dated Nov. 20, 2019 at 171:10-22.

which matches exactly to the balance of the <u>revised</u> customer statement for this account that was provided to the SEC. This was also the account that no longer reflected the transfer from A&A and now recorded $86 million in fictitious US Treasuries, as described above. (*See* **Figure 54**.)

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 82 of 128**

**Figure 54**[165]

A&B Account (1-00125-3-0) Revised Statement – December 1989 with Avellino's
Handwritten Notes



151.    Furthermore, as discussed above in this report, Avellino's handwritten ledgers included a
handwritten account number—in the example in **Figure 54** above, the account number is
"30." This account number corresponds to the handwritten number included on the revised
customer statements returned to the IA Business by Avellino.

---

[165] MADTBB03348342; SECSDK0000958-986 at 968. This ledger also indicates that Avellino tracked the short
positions created in the 1-00125-7 account. SECSDK0000860.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 83 of 128**

152.    Due to the alterations made by the IA Business, the <u>revised</u> account balance (as reflected in

   Avellino's handwritten ledger and in the revised statements A&B produced to the SEC)

   differs from the <u>original</u> account balance (as reflected in the original customer statements

   returned to BLMIS by Avellino) by approximately \$430,000.[166] (*See* **Figure 55**.)

**Figure 55**

Original 12/31/89 Statement          Revised 12/31/89 Statement



$76,940,453.51 - $76,508,359.52 = $432,094

153.    The same holds true for the account balance as of December 31, 1990.  The account balance

   for 1-00125-3 on Avellino's handwritten accounting ledger matches exactly to the account

   balance on the revised customer statement sent to the SEC. (*See* **Figure 56**.) The revised

   account balance comes from the revised customer statement that also included the fictitious

   \$86 million in US Treasuries.

---

[166] MADTBB02397159; SECSDK0000864.

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 84 of 128

**Figure 56[167]**

A&B Account (1-00125-3-0 Revised Statement – December 1990 with Avellino's Handwritten Notes



154.    Due to the alterations made by the IA Business, the revised account balance (as reflected in Avellino's handwritten ledger and in the revised statements A&B produced to the SEC) differs from the <u>original</u> account balance as reflected in the original customer statements returned to BLMIS by Avellino, by nearly $240 million.[168] (*See* **Figure 57**.)

---

[167] SECSDK0000879-883 at 882; SECSDK0000987-1013 at 0994. As noted above, Avellino's handwritten ledgers included an account number, which in this example is "30." The revised December 31, 1990 customer statement for account 1-00125-3 returned by Avellino to the IA Business also had a handwritten "30" on the statement. *See*, MADTBB03348276.

[168] Avellino testified that his handwriting was on the original December 31, 1990 customer statement for account 1-00125-3. Deposition of Frank Avellino dated Nov. 20, 2019 at 211:24-212:6.

**Figure 57[169]**



| Original 12/31/90 Statement | Revised 12/31/90 Statement |

($242,501,351.80) − ($2,502,151.80) = ($239,999,200)

155.    Moreover, as detailed above, Avellino analyzed the account balances for A&B's IA Business accounts and attested to their accuracy on an annual basis.[170] Because the 1A0053 account was not in existence until 1992, Avellino could not have analyzed any transactions in this account until at least mid-1992.  However, Avellino's handwritten accounting ledgers reflect that he was monitoring an account balance for 1A0053 as of December 31, 1989.  (*See* **Figure 58**, for example, which shows that the account balance as of year-end 1989 for 1-00156-4 (1A0053) on the fabricated customer statement was identical to the account balance on Avellino's handwritten accounting ledger.)

---

[169] MF00024362; SECSDK0000882.
[170] Deposition of Frank Avellino dated Nov. 20, 2019 at 97:25-98:20.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 86 of 128**

**Figure 58**[171]

A&B Account (1-00156-4-0) Revised Statement – December 1989 with Avellino's
Handwritten Notes



156.    This same process of monitoring the 1A0053 account also occurred, for example, in 1991.
Avellino's handwritten ledgers for this account match the balances on the December 31,
1991 customer statement that was sent to the SEC. As discussed above, and shown, in
particular, with the handwritten IA Business customer statements, this account and these
statements were created retroactively in 1992 during the 1992 SEC Investigation. (*See*
**Figure 59**.)

---

[171] SECSDK0000958-986 at 971; SECSDK0010189; MADTBB03348337.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 87 of 128**

### Figure 59[172]
A&B Account (1-00156-3-0) Revised Statement – December 1991 with Avellino's
Handwritten Notes



157.    Based upon the analysis and discussion above, I conclude that it would have been impossible
        for Avellino to analyze the 1A0053 account as of December 1989 (or at any time prior to its
        creation in 1992) and that the appearance of customer statements and transactions in 1A0053
        prior to 1992 would have indicated that the purported transactions contained in that account
        were fictitious.

158.    In sum, on an annual basis, Avellino acknowledged through his signature that the original
        customer statements he received from the IA Business were accurate.  Those signed
        statements reflected the original transactions and original account balances as presented

---

[172] SECSDK0000046; MADTBB03344638.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 90 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 88 of 128**

contemporaneously by the IA Business.  In 1992, however, during the SEC investigation, Avellino provided to the SEC a set of IA Business customer statements that:

- Included $86 million in US Treasuries that did not previously exist;

- Reflected an entirely new fabricated account;

- Reflected modified transaction descriptions; and

- Mirrored the account balances on Avellino's handwritten ledgers, but did not match the original account balances initially analyzed by Avellino (and returned by Avellino to BLMIS)—with account balance differences sometimes varying by over $240 million.

159.    In other words, the documentation and supporting evidence reflects that Avellino, on behalf of A&B: (i) received the revised customers statements for the A&B IA Business accounts and the fabricated customer statements for the 1A0053 account; (ii) created internal A&B records that A&B produced to the SEC that reflected the balances on those revised and fabricated statements; and (iii) those customer statements produced to the SEC differed from the balances contained on the original customer statements Avellino returned to BLMIS.

**F.    A&B produced the revised A&B customer statements to the SEC and those statements were different from the statements Avellino and Bienes analyzed and that Avellino, on behalf of A&B, initially signed and acknowledged**

160.    After Avellino and Bienes testified under oath to the SEC in July 1992, Avellino and Bienes provided to the SEC in July and August 1992 numerous requested documents, including the revised IA Business customer statements for the Pre-1993 Accounts.[173]  Included in these revised customer statements were all of the newly added fraudulent trades detailed above and the customer statements for the entirely fraudulent 1A0053 account.  Also included in these documents were the accounting ledgers prepared by Avellino, which reflect these revisions (including the creation of the 1A0053 account).

161.    My analysis of the documents and evidence regarding the activities surrounding the 1992 SEC Investigation of A&B supports a conclusion that Avellino, on behalf of A&B, participated in the (i) re-creation of the A&B customer statements from 1989 to 1992, and (ii)

---

[173] Letters to the United States Securities and Exchange Commission from Squadron, Ellenoff, Plesent & Lehrer, July 15, 1992 and August 4, 1992 (FRANKAVELLINO_000010-12).

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 91 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 89 of 128**

the creation of the fake 1A0053 account in 1992 that added at least $54 million in gains to the Pre-1993 Accounts.  That is, A&B, Avellino and/or Bienes:

- Received the original Pre-1993 Accounts customer statements;

- Avellino, on behalf of A&B, signed and acknowledged on an annual basis the veracity of the original statements;

- Jointly testified to the SEC about their review of the customer statements and the overall purported trading strategy, including the hedging of the trades, and the equity position of the Pre-1993 Accounts;

- Returned the original customer statements to the IA Business, which did not reflect the purported trading strategy or equity position of the accounts as explained in the testimony by Avellino and Bienes;

- Provided the revised customer statements and the statements created for the entirely fabricated 1A0053 account to the SEC; and

- Created handwritten A&B accounting ledgers from 1989, 1990, and 1991 that matched up with the account balances in the revised customer statements and those of the entirely fabricated 1A0053 account (that was not created until 1992), and provided those ledgers to the SEC.

VIII.    **Opinion No. 3:  My examination of the books and records of the IA Business shows that after the 1992 SEC Investigation: (1) Avellino and Bienes received guaranteed rates of return and commissions from the IA Business; (2) the IA Business engaged in the "schtupping" process to meet those guaranteed rates of return and commissions; and (3) Avellino participated in this schtupping process.**

A.    **The Pre-1993 Accounts were liquidated, and former A&B clients were reinvested directly into BLMIS**

162.    As detailed in my Proof of Fraud/Insolvency Expert Report, following the 1992 SEC Investigation, the SEC filed a complaint against A&B, Avellino and Bienes, alleging that they had operated an unregistered investment company and engaged in the unlawful sale of unregistered securities through the loans they offered to their investors.[174]  Subsequently, on November 18, 1992, a preliminary injunction was entered against A&B which, among other

---

[174] *See* Avellino & Bienes SEC Complaint.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 92 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 90 of 128**

things, appointed a trustee to perform a liquidation of A&B in which all funds would be returned to the A&B investors.[175]

163.    In order to liquidate the purported A&B portfolio, BLMIS purportedly sold the securities in the Pre-1993 Accounts to other IA Business customers.[176]  In particular, the securities were allegedly sold to four significant customers: Stanley Chais, Norman Levy, Jeffrey Picower and Carl Shapiro.  However, a review of the IA Business customer statements during the liquidation period related to these four customers' accounts shows that these transactions never occurred.[177]  I compared all November 1992 transactions in the Pre-1993 Accounts (which correspond to the liquidation of the Pre-1993 Accounts) with the customer statements related to these four customers' accounts for November 1992, December 1992 and January 1993 (the "Liquidation Period").

164.    In order to compare the transactions, I aggregated all shares of the same security purportedly acquired by these four customers' accounts during the Liquidation Period and compared them to the total amount "liquidated" from the Pre-1993 Accounts.  For example, 19,600 shares of American International Group Inc. ("AIG") were purportedly sold on behalf of the Pre-1993 Accounts in November 1992.  However, between November 1992 and January 1993, no shares of AIG were purportedly acquired by these four customers' accounts, demonstrating that these four customers could not have been the counterparty to these transactions.  In total, I found that there were no securities in the accounts related to the four customers identified above that had the equivalent volume on the same date as any of the purported A&B transactions.  Based upon this analysis, the purported A&B securities could not have been legitimate as these securities were not sold in the open market (where, if they were, evidence would show they were real) and were not sold to these four customers.

165.    Nevertheless, after the liquidation, many of A&B's former investors reinvested their returned funds directly with BLMIS, leading to the creation of a significant number of new BLMIS accounts.[178]  (*See* **Figure 60** below, which highlights the dramatic increase in the IA Business customer accounts after the liquidation of A&B in 1992.)

---

[175] *Securities and Exchange Commission v. Avellino & Bienes, Frank J. Avellino, and Michael S. Bienes*, 92 Civ, Order of Preliminary Injunction and Other Equitable Relief on Consent (OIG Exhibit 0121).
[176] Deposition of Bernard L. Madoff, Nov. 13, 2019 at 33:14-34:24; Deposition of Bernard L. Madoff dated Oct. 19, 2015 at 64-67, *P&S Associates v. Jacob*, No. 12-034123 (07) (Cir. Ct., 17th Judicial Circuit, Broward County, FL).
[177] All accounts grouped to these individuals in the A.NAME SQL table were included.
[178] *See* Portfolio Netcap Totals by Group-A&B dated March 31, 1993 (MADTBB03079814-MADTBB03079910).

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 91 of 128**

**Figure 60**[179]



166.    This direct reinvestment into BLMIS by former A&B customers was realized at the direction of A&B, as detailed in Avellino's testimony:

> "Because I was told to direct their funds to BLM.  I had some knowledge of the fact that they would be going to BLM anyhow, but the first one I believe went to BLM and everybody else followed through and went directly to him"[180]…"I was told by Bernie Madoff that if anybody wanted to open up an account, that I would have to be the one to say you could go to Bernie, not him, he wouldn't do it."[181]

167.    In exchange for former A&B investors reinvesting their returned funds directly with BLMIS, Madoff agreed to provide Avellino and Bienes with certain financial incentives.[182]  The amount of these financial incentives, or commission payments, were calculated by multiplying (a) the applicable commission rate (the "Commission Rate") by (b) the total

[179] SQL Compilation of BLMIS Data.
[180] Deposition of Frank Avellino dated Nov. 20, 2019 at 244:17-21.
[181] Deposition of Frank Avellino dated Nov. 20, 2019 at 244:25-245:3.
[182] Criminal Trial, December 5, 2013, Trial Transcript 4886:2-4887:5; MADTSS01124128.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 94 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 92 of 128

amount of funds that the former A&B investors had reinvested with BLMIS as of March 31, 1993 (the "Commission Base").[183]

**B. Avellino and Bienes created various entities to re-invest with BLMIS, through which they received guaranteed rates of return and commissions**

**1. Avellino and Bienes created a series of new corporate entities for the purpose of continuing to profit from the IA Business after the SEC injunction**

168.    In order to continue investing with—and receiving commissions from—the IA Business, Avellino and Bienes created a series of new corporate entities that continued to funnel money into the IA Business.  These new entities included the following: Grosvenor Partners, Mayfair Ventures, Aster, St. James, and Strattham (together with Kenn Jordan Associates, the "Post-1993 Entities").[184]

169.    In February 1993, which is approximately two-and-a-half months after the SEC injunction, Avellino and Bienes opened new IA Business accounts for Grosvenor Partners (1ZB046) and Mayfair Ventures (1ZB032).[185] Thereafter, Avellino and Bienes continued to open new IA Business accounts for the other Post-1993 Entities (collectively, as defined above, the Post-1993 Entity Accounts).  For example, Avellino and Bienes opened new IA Business accounts for Strattham (1ZB262) in 1995, and Aster (1ZB509) and St. James (1ZB510) in 2004.[186]

**2. Avellino and Bienes met with Madoff after the SEC injunction to discuss reinvesting with BLMIS and to negotiate the structure of their commission payments and the guaranteed rates of return that the Post-1993 Entity Accounts would purportedly earn**

170.    Despite the SEC injunction after the 1992 SEC Investigation, Avellino and Bienes met with Madoff to discuss how they could continue investing with BLMIS.[187]  Madoff agreed to provide certain financial incentives to Avellino and Bienes in the form of commission payments based on the amount of funds that their former clients reinvested directly with

---

[183] The A&B Commission Base was calculated as of 1993 as follows: Total A&B invested capital as of 1993 ($372 million) less direct investments by Avellino and Bienes ($36 million) less the amount of commission payments that Madoff promised to certain other parties.
MADTSS01124224-228 at 225. MADTSS01124119; MADTSS01124128.
[184] Deposition of Frank Avellino dated Nov. 20, 2019 at 83:5-88:2 and 236:2-237:1.
[185] MF00438889 and MF00438850.
[186] MF00144505, MDPTPP07036725 and MDPTPP07037337.
[187] Deposition of Frank Avellino dated Nov. 21, 2019 at 332:16-334:23; *Michael Bienes,* Frontline (May 12, 2009), https://www.pbs.org/wgbh/frontline/film/madoff.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 93 of 128**

BLMIS.[188]  Specifically, Avellino and Bienes would receive payments based on the amount of cash reinvested by the former A&B investors directly with BLMIS as of March 31, 1993—which totaled $372 million—less the $36 million that was invested by Avellino and Bienes with BLMIS through Grosvenor Partners and Mayfair Ventures.[189]  Pursuant to the agreement, Avellino and Bienes would receive annual commission payments equal to 2 percent of the $336 million ($372 million less $36 million) or $6.72 million per year (minus the annual commission payment to certain other parties).[190]

171.    As discussed further below, these commission payments were not paid out to Avellino and Bienes in cash.  Instead, they were "paid" by adding additional fake profitable transactions into the specific IA Business accounts listed above through both the regular year-end "catch-up" process (called the "schtup" process) as well as occasional mid-year fake trades.[191]

172.    Madoff also agreed that the Post-1993 Entity Accounts would receive a guaranteed annual rate of return, which was initially set at 17 percent.[192]  As shown in **Figure 61** below, Madoff periodically reduced the guaranteed rate of return, and the commission payment rate, that the Post-1993 Entity Accounts purportedly earned.

**Figure 61[193]**

| Year | Commission Rate | Guaranteed Rate of Return |
|---|---|---|
| 1993—2001 | 2.0% | 17% |
| 2002 | 1.0% | 14% |
| 2003 | 1.0% | 11% |
| 2004—2007 | 0.5% | 11% |

---

[188] Criminal Trial, December 5, 2013, Trial Transcript at 4885:6-4890:18.

[189] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 177:18-181:9.  *See also*, Deposition of Jo Ann Crupi dated Jan. 30, 2020; MADTSS01155318 and MADTSS01124128 (Trustee Exhibits 120-121). The $372 million includes approximately $3.5 million in funds from the original A&B Accounts. MADTBB03079814.

[190] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 177:18-181:9.  *See also*, Deposition of Jo Ann Crupi dated Jan. 30, 2020; MADTSS01155318 and MADTSS01124128 (Trustee Exhibits 120-121); MADTSS01124224-228 at 226.

[191] Frank DiPascali testified that A&B received commission payments from the IA Business, paid via fictitious "schtup" trades to A&B personal accounts, for bringing in new customers. Criminal Trial, December 5, 2013, Trial Transcript at 4885:21-4890:18.  *See also*, Deposition of Frank Avellino, Nov. 21, 2019 at 282:1-283:6.

[192] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 177:18-181:9.  *See also*, Deposition of Jo Ann Crupi, Jan. 30, 2020; MADTSS01155318 and MADTSS01124128 (Trustee Exhibits 120-121).

[193] MADTSS01124128, MADTSS01124224-26, MADTSS01124253-54, MADTSS01124115, MADTSS01124119, MADTSS01124249 and MADTSS01124091.

C. **With the influx of thousands of individual customers, BLMIS changed its purported investment strategy for its IA Business customers, including the Post-1993 Entities, from convertible arbitrage to the Split Strike Conversion strategy; the purported Split Strike Conversion transactions in the IA Business did not occur, including those in the Post-1993 Entity Accounts**

173.    After the liquidation of A&B, the subsequent inflow of funds to the IA Business from former A&B customers, in aggregate, remained a significant portion of the total IA Business invested funds. As of March 31, 1993, the $366 million in funds derived from Avellino, Bienes, and former A&B customers represented 22.5 percent of the $1.6 billion total net invested funds in the IA Business.[194] The IA Business continued to rely heavily on the A&B directed funds and other similar funds, such as Fairfield Sentry Limited, throughout its existence. In total, the A&B directed funds and 64 other large funds represented 56.4 percent of the nearly $8.5 billion net invested in the IA Business by 2000.[195]

174.    However, unlike the Pre-1993 Accounts, which funneled the A&B customer investments into a limited number of IA Business accounts, the reinvested money was implemented through hundreds of new individual accounts. As shown in **Figure 62**, the number of accounts in the IA Business nearly doubled between November and December 1992, from 1,328 accounts to 2,409 accounts.

---

[194] Net Loser Amounts by Account - 09302011.xlsx (MOTTAA00000922). This file reflects the principal available in each IA Business account that had principal remaining at a particular point in time.
[195] A.NAME table in SQL Compilation of BLMIS data; Net Loser Amounts by Account - 09302011.xlsx (MOTTAA00000922); *Securities Investor Protection Corporation v Bernard L Madoff Investment Securities LLC*, Adv. Pro. Nos. 10-05356 (ECF Nos. 27, 33), 10-04287 (ECF No. 118), 10-05229 (ECF No. 1), 10-04457 (ECF No. 2), 12-01576 (ECF No. 100), 09-01239 (ECF Nos. 1, 187), 09-01364 (ECF No. 567), 09-01187 (ECF No. 1), 09-01161 (ECF No. 100), 10-05286 (ECF No. 112), 10-04471 (ECF No. 1), 10-04285 (ECF No. 210), 10-05208 (ECF No. 1), 10-05311 (ECF No. 221), 10-05342 (ECF No. 4), 09-01182 (ECF No. 151), 10-05123 (ECF No. 1), 10-05120 (ECF No. 1), 10-04284 (ECF No. 1), 10-04330 (ECF No. 167), 09-01365 (ECF No. 20), 10-05310 (ECF Nos. 1, 4), 09-01154 (ECF No. 115); 10-04338 (ECF No. 25); *HSBC Fights Madoff Claim: New Settlement Reached*, Reuters, December 5, 2010; *Santander, a 'Feeder,' Pays the Price*, WSJ, May 27, 2009.

**Figure 62[196]**



175.    This change in composition and influx of accounts within the IA Business necessitated a change in the purported investment strategy.  As stated in the Proof of Fraud/Insolvency Expert Report, the IA Business claimed that the convertible arbitrage trading strategy afforded only limited trading opportunities (a claim I refuted in the Proof of Fraud/Insolvency Expert Report).  As a result, the IA Business switched its primary purported investment strategy from convertible arbitrage, to the much more scalable split-strike conversion ("SSC") strategy, which allowed for large-scale and more frequent purported trading in the ever-increasing number of customer accounts.

176.    As described in the Proof of Fraud/Insolvency Expert Report, the SSC investment strategy reflects the buying of a basket of stocks closely correlated to an index, while concurrently selling call options on the index and buying put options on the index.  For the IA Business, the purported SSC strategy was based on the (fake) purchase of a basket of stocks and options based on the S&P 100 equity index, which included the 100 largest U.S. stocks as determined by the S&P Index Committee.[197]

177.    A true SSC strategy implements a "collar strategy," which reduces a portfolio's volatility (*i.e.,* risk) by limiting the investor's possible gains and losses.  This is achieved through the

---

[196] SQL Compilation of BLMIS data.
[197] Michael Ocrant, *Madoff tops charts; skeptics ask how* at 1, 89 MAR/Hedge, May 2001; *see also S&P 100*, Standard & Poors, https://us.spindices.com/indices/equity/sp-100 (last visited May 12, 2020).

purchase of a put option to provide protection on the downside; this protection is then partially paid for by selling a call option that limits the upside gain.

178.    However, as detailed in my Proof of Fraud/Insolvency Expert Report, the evidence shows that the purported transactions under the SSC strategy were also all fictitious.[198]  These trades were made up by BLMIS employees, resulting in the reporting of many trades on the customer statements that would have been impossible to achieve in the market.  These trades exhibited a series of market impossibilities (*e.g.*, out of range daily pricing, aggregate trading volumes beyond the daily market volume, weekend trading, backdated trades, among others), which confirm that the SSC trading in the IA Business did not occur, including in the Post-1993 Entity Accounts.  The SSC strategy transactions in the Post-1993 Entity Accounts were no different from all other IA Business customer accounts invested in this strategy—the Post-1993 Entity Accounts followed the same fraudulent patterns and exhibited the same market impossibilities. (*See* Split-Strike Conversion Market Impossibility Exhibits 7-11.)[199]

### D. Through the schtupping process, BLMIS assigned fictitious options trades in the Post-1993 Entity Accounts to meet the guaranteed rates of return and promised commission payments

#### 1. Overview of the schtup process

179.    As detailed in my Proof of Fraud/Insolvency Expert Report, the IA Business was propping up, or "schtupping," certain IA Business customers' purported investment returns by providing these customers with extra fake trades that were intended to generate additional fictitious gains.[200]  This was done in order to reach a certain predetermined guaranteed annual rate of return in the customer's IA Business account.[201]  Thus, the schtupping process allowed for a "truing up" of these customers' accounts, including the Avellino and Bienes accounts, whose fictitious trades throughout the year had not yielded the predetermined rate

---

[198] Proof of Fraud/Insolvency Expert Report at ¶¶155-181.
[199] **Exhibit 7**- A&B Option Volume Analysis in the Split-Strike Conversion Accounts, Post-1993 Period, **Exhibit 8**- A&B Equity Price Analysis in the Split-Strike Conversion Accounts, Post-1993 Period, **Exhibit 9**- A&B Option Price Analysis in the Split-Strike Conversion Accounts, Post-1993 Period, **Exhibit 10**- A&B Weekend Trade Detail in the Split-Strike Conversion Accounts, Post-1993 Period and **Exhibit 11**- A&B Backdated Trades in the Split-Strike Conversion Accounts, Post-1993 Period.
[200] Proof of Fraud/Insolvency Expert Report at ¶27, ¶¶256-270.
[201] Proof of Fraud/Insolvency Expert Report at ¶27.

08-01789-cgm    Doc 21157-40    Filed 02/23/22    Entered 02/23/22 15:32:28    Attach. B
Pg 99 of 130

Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action
June 5, 2020
Page 97 of 128

of return that had been guaranteed by the IA Business.[202] The schtupping process was an entire fraud in and of itself.

180.    As detailed above, the IA Business created an internal process for keeping track of certain customers' purported investment performance versus that customer's guaranteed rate of return.  This process would typically occur around year-end and involved performing handwritten reconciliations to determine the dollar amount of additional profit needed in order to attain the promised rate of return.  Once the dollar amount of extra profit owed to a particular customer was calculated, the IA Business would create internal handwritten "schupt" schedules, which detailed the specific fake trades needed to deliver the predetermined dollar amount required to pay the guaranteed rate of return to the customer.[203]

### 2.    The schtup process was applied to the Post-1993 Entity Accounts to meet the guaranteed rates of return and commission payments

181.    To effectuate the guaranteed annual rate of return and commission payments to the Post-1993 Entity Accounts, certain IA Business employees created an internal process to track and reconcile (1) the "actual" purported performance of the Post-1993 Entity Accounts versus their guaranteed rate of return; and (2) the amount of commission payments due, which typically occurred in December.[204]  The process would involve the use of handwritten calculations that reflected the amount of extra fictitious gains—in the form of highly profitable "non-hedged" option transactions—that would need to be recorded in the Post-1993 Entity Accounts to compensate Avellino and Bienes for their guaranteed rate of return and commission payments.  A non-hedged option transaction refers to the purported purchase and/or sale of an option without any additional simultaneous transaction to mitigate the risk or volatility in the price of the option position.

182.    As will be shown in greater detail below, these fictitious non-hedged option transactions were inconsistent in appearance and purpose as compared to the "normal" split-strike conversion trades reported in the Post-1993 Entity Accounts.  In fact, Avellino even testified that his understanding of the purported split-strike strategy involved the purchase of put

---

[202] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 173:3-175:2.

[203] While the overall process was called "schtupping" many internal IA Business programs spelled it as "schupt."

[204] Eric Lipkin testified that schtupping would occur "typically in December, near the end of the year, because then you would have an idea of what the return was, so then from there, you would be able to make – Frank would be able to make a trade to increase that return." Deposition of Eric Lipkin dated Jan. 14, 2020 at 43:20-43:25.

options together with a corresponding sale of call options, and that it would be inconsistent with his understanding of the strategy if the IA Business had purchased a put option without a corresponding sale of a call option because "you had both sides to it."[205]  However, while the SSC strategy involved the purported purchase of equity securities and a put option along with the simultaneous sale of a call option, the schtup process involved the purported purchase (or sale) and then sale (or purchase) of a non-hedged option.

183.  As part of the schtup process, once the IA Business had determined the dollar amount owed to Avellino and Bienes, the handwritten calculations (as will be shown below) would be prepared and finalized.  These calculations indicated the specific type and amount of option transactions that would need to be recorded on the account statements in order to "pay" the amount owed.  The transactions were typically composed of fake S&P Index options, and the profits associated with these trades were specifically engineered to deliver the predetermined dollar amount needed to pay Avellino and Bienes to arrive at their guaranteed rate of return and commission payment.

184.  Subject to SEC regulations, and in my professional experience, commissions paid to investment advisor representatives are paid in cash not in trades made on their behalf.[206]  This fact again, underscores the fraudulent nature of this entire scheme.

### a.  Example: The schtup process in 2003

185.  As noted above, the schtup process typically began towards the end of each year, because by that point the IA Business would have a nearly complete picture of the account's rate of return for the year.  For example, by the end of November 2003, the PMR for Mayfair Ventures account 1ZB032-3 showed an 11.38% annualized return for the current year. While the guaranteed rate of return in 2003 was 11 percent, the projected annualized rate of return for this account as of November 2003 was 10.36%. (*See* **Figure 63**.)

---

[205] Deposition of Frank Avellino dated Nov. 20, 2019at 129:5-130:13.
[206] SEC Rule 206(4)-3 under the Investment Advisers Act of 1940.

**Figure 63[207]**

IA Business Portfolio Management Report Mayfair Ventures Account (1-ZB032-3) – November 2003



```
ACCOUNT #   1-ZB032-3 MAYFAIR VENTURES          REPORT FOR THE PERIOD FROM 1/01/03 TO 11/30/03
                      INITIAL INVESTMENT                            36,920,818.76
                      PROFITS IN EXCESS OF BENCHMARK RETURN FOR PREVIOUS YEAR  51,977,387.42-
                      ADJUSTMENTS
                      CAPITAL ADDITIONS
                      CAPITAL WITHDRAWALS
                      NET WORKING CAPITAL                           36,920,818.76
                      BENCHMARK RATE OF RETURN              17.00 %
                      BENCHMARK RETURN FOR 334 DAYS                  5,743,463.26
                      CAPITAL GAINS AND LOSSES                       1,424,726.61CR
                      DIVIDENDS AND INTEREST                           143,209.99CR
                      REALIZED P/L                                  1,567,936.60CR
                      UNREALIZED P/L                                     754.00CR
                      PROFITS WITHDRAWN
                      OVER/UNDER BENCHMARK RETURN FOR CURRENT YEAR    7,312,153.86
                      CURRENT CASH BALANCE                                 .51CR
                      NET MARKET VALUE OF OPEN SECURITIES POSITIONS 16,625,258.75
                      TOTAL EQUITY                                  16,625,259.26CR
                      TRADE YEAR END EQUITY                         16,625,259.26CR
                      ANNUALIZED RETURN FOR CURRENT YEAR          11.38 %
                      PROJECTED ANNUALIZED RATE OF RETURN         10.36 %
                      BUYING POWER       16,625    OVER/UNDER      $9,290

                                                          MDPTQQ00790899
```

186.  In order to show that the Mayfair Ventures account "earned" its guaranteed rate of return by year end, the IA Business prepared handwritten schedules to calculate the amount of additional profit that would need to appear on the December account statement. These calculations also factored in the amount of commission due to Avellino and Bienes for the year, which equaled in aggregate for all accounts, approximately $2.6 million in 2003.

187.  As shown in **Figure 64** below, handwritten notes contain instructions and details regarding the "schtup" program that was to be run in December 2003 for this purpose.[208] The instructions were signed by DiPascali and include 29 accounts, including the Mayfair Ventures account (1ZB032), that were to receive the additional fictitious profits of the special option trades.

---

[207] MDPTQQ00790899.
[208] MADTSS01124263-268; *see also*, MADTSS01124115 (which includes handwritten notes next to account 1ZB032 stating, "2600 extra P+L +  to bring to 11%.").

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 100 of 128**

**Figure 64**
IA Business Handwritten Schtup Notes



MADTSS01124263

MADTSS01124265

188.    Once the amount owed to Avellino and Bienes was determined, the IA Business would use *post-facto* market trading data from Bloomberg to select the specific option contracts that would be used to generate, on paper, the particular gain needed to "pay" Avellino and Bienes for their guaranteed rate of return and commission.

189.    For example, on December 31, 2003, the IA Business used Bloomberg printouts to identify historical S&P 100 Index option prices from December 15, 2003 to December 31, 2003 (*see* Figure 65).[209]  The Bloomberg printout contains handwritten notes with instructions to purchase S&P 100 Index option OEBAJ at a price of $1.80 on November 28 (settling on December 1) and then to sell the option at a price of $6.50 on  December 30 (settling on December 31).

---

[209] Deposition of Jo Ann Crupi, Jan. 30, 2020, MADTSS01124269 (Trustee Exhibit 130).

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 102 of 128**

**Figure 65**
IA Business Bloomberg Printout



190.    Using this after-the-fact market data, the IA Business determined that the Mayfair Ventures
account needed to receive 319.0 units of the special option basket trade in order to generate
the requisite additional profit.  The options associated with the B.SCHUPT file are shown in
**Figure 66**:

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 103 of 128**

**Figure 66[210]**
IA Business B.SCHPT Basket Trade List Printout



191. Using the information in **Figure 64** and **Figure 66** above for the Mayfair Ventures account, and the "Quant" value of 319.0, the IA Business generated fictitious transactions for the purchase of 3,190 contracts (319.0 times the QTY figure of 10) of S&P Index OEBAJ option on 11/28/2003 (settling on 12/01/2003)—which ties exactly to the historical Bloomberg printout in **Figure 65** above.

192. The basket trade listed above also directed for the purchase of 6,380 contracts (319.0 times the QTY figure of 20) of S&P Index OEBAK option on 12/17/2003 (settling on 12/18/2003). The Bloomberg printout in **Figure 67** contains handwritten notes with instructions to purchase S&P 100 Index option OEBAK at a price of $1.10 on December 17 (settling on December 18) and then to sell the option at a price of $3.80 on December 30 (settling on December 31).

---

[210] MADTSS01124272.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 104 of 128**

**Figure 67**[211]
IA Business Bloomberg Printout



193.    The December 2003 customer account statement for Mayfair Ventures reflects the purchase

and sale of 3,190 "S&P 100 Index January 550 Call" options and 6,380 "S&P 100 Index

January 555 Call" options, which, as intended, generated $3,202,760 in fictitious gains and

represented a total return of nearly 250% for just the month of December.[212] (*See* Figure 68.)

---

[211] MADTSS01124270-271 at 270.
[212] The purported purchase of the options total $577,390 + $708,180 = $1,285,570. The purported sale of these options total $2,070,310 + $2,418,020 = $4,488,330. The purported profit, therefore, is $4,488,330 - $1,285,570 = $3,202,760.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 105 of 128**

Figure 68[213]
Mayfair Ventures Account (1-ZB032-4-0) Statement – December 2003



194.    The outcome of the schtup process is reflected in the December 2003 PMR for the Mayfair
Ventures account.  As shown in **Figure 69** below, the annualized return increased from
11.38% in November (*see* **Figure 63** above) to 31.92% just one month later.[214]  Similarly,
the total equity balance in the account increased from $16.6 million in November to $19.9
million in December, reflecting the approximately $3.3 million in gains from the schtup
process described above. This fulfilled the promise of the guaranteed rate of return of 11%
plus the approximately $2.6 million in commission due.

---

[213] MDPTPP06705315.
[214] Avellino testified that he received the summary Portfolio Management Report on an annual basis and used them
to reconcile the returns.  Deposition of Frank Avellino dated Nov. 20, 2019 at 105:2 – 108:17, MV_000001-
MV_000003 (Trustee Exhibit 32), MF00002577.

**Figure 69[215]**

IA Business Portfolio Management Report Mayfair Ventures Account (1-ZB032-3) – December 2003



```
ACCOUNT #   1-ZB032-3  MAYFAIR VENTURES              REPORT FOR THE PERIOD FROM 1/01/03 TO 12/31/03
                       INITIAL INVESTMENT                                      36,920,818.76
                       PROFITS IN EXCESS OF BENCHMARK RETURN FOR PREVIOUS YEAR 51,977,387.42-
                       ADJUSTMENTS
                       CAPITAL ADDITIONS
                       CAPITAL WITHDRAWALS
                       NET WORKING CAPITAL                                     36,920,818.76
                       BENCHMARK RATE OF RETURN                      17.00 %
                       BENCHMARK RETURN FOR 365 DAYS                            6,276,539.19
                       CAPITAL GAINS AND LOSSES                                 4,644,344.61CR
                       DIVIDENDS AND INTEREST                                     162,442.62CR
                       REALIZED P/L                                            4,806,787.23CR
                       UNREALIZED P/L
                       PROFITS WITHDRAWN
                       OVER/UNDER BENCHMARK RETURN FOR CURRENT YEAR            11,083,326.42
                       CURRENT CASH BALANCE                                           .89CR
                       NET MARKET VALUE OF OPEN SECURITIES POSITIONS           19,863,355.00
                       TOTAL EQUITY                                            19,863,355.89CR
                       PRIOR YEAR END EQUITY                  15,056,568.66CR
                       ANNUALIZED RETURN FOR CURRENT YEAR               31.92 %
                       PROJECTED ANNUALIZED RATE OF RETURN              31.75 %
                       BUYING POWER        19,863    OVER/UNDER        63,061
                                                                               MDPTQQ00790900
```

195.    The schtup process described above occurred across the numerous other Avellino and Bienes accounts commencing as early as 1994.[216]  These purported trades never actually occurred and were an integral part of the fraud.

**b.  Example: The schtup process in 2004**

196.    Similarly, at the end of 2004, BLMIS created a schtup schedule that listed entries for each of the Post-1993 Entity Accounts—indicating, for example, that Aster and St. James were each owed $42,000 and Strattham was owed $26,000 in fictitious gains to bring the accounts up to the guaranteed rate of return of 11% then in effect.

197.    The schtup schedule, as shown in **Figure 70** below, indicates that Aster and St. James needed 29 Units of the basket trade executed in each of their accounts, and that Strattham was to have 18 Units executed in its account.[217]

---

[215] MDPTQQ00790900.

[216] For examples of the schtup process in other years, refer to the following: Deposition of Jo Ann Crupi, Jan. 30, 2020, MADTSS01124249 (Trustee Exhibit 128), MDPTQQ00792917-218, MDPTPP06705216 and MDPTPP06715366, MADTSS01124108-109, MADTSS01124112, MADTSS01124316-320, MDPTPP07037369, MDPTPP07036749-754 and MDPTPP06847857; Deposition of Frank Joseph Avellino, Nov. 20, 2019; Grosvenor Partners Statement GROSVENOR-0397-GROSVENOR-0407 (Trustee Exhibit 35), Deposition of Jo Ann Crupi, Jan. 30, 2020; MADTSS01124091-092 (Trustee Exhibit 132), MDPTPP07036859, MDPTPP07037515-516 and MDPTPP06847935; Deposition of Frank Joseph Avellino, Nov. 20, 2019; Mayfair Ventures Statement MAYFAIR-0230 – MAYFAIR-0241 (Trustee Exhibit 36) and MADTSS01124097-100.

[217] *See also*, Deposition of Jo Ann Crupi, dated Jan. 30, 2020 at 208:19 – 212:17.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 107 of 128**

**Figure 70[218]**

IA Business Handwritten Notes



MADTSS01124091-92

198.    Based on the information listed in the 2004 schtup schedule, the IA Business created

fictitious options transactions that would generate the requisite amount of gains needed for

each account.  The specific options associated with the 2004 schtup process are shown in

**Figure 71**:

---

[218] MADTSS01124091-092.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 108 of 128**

**Figure 71**[219]
IA Business B.SCHUPT Basket Trade List Printout



199.    Using the information in the 2004 schtup schedule and the basket trade list for the Aster account, the IA Business generated fictitious transactions for the purchase of 29 contracts (29.0 units times the QTY figure of 1) of S&P Index OEBAO option on 11/30/2004 (settling on 12/01/2004) and the sale of 29 contracts of S&P Index OEBMM option on 12/01/2004 (settling on 12/02/2004).

200.    The December 2004 customer account statement for Aster reflects the purchase and sale of 29 "S&P 100 Index January 575 Call" options and 29 "S&P 100 Index January 565 Put" options, which, as intended, generated $41,934 in fictitious gains—which nearly matches the $42,000 in gains that the schtup schedule indicated was needed. (*See* **Figure 72**.)

---

[219] MADTSS01124108.

**Figure 72[220]**

Aster Associates Account (1-ZB509-4-0) Statement – December 2004



### c. Example: The schtup process in 2005

201.    As in prior years, at the end of 2005, BLMIS once again generated additional fictitious gains in certain IA Business accounts through the schtup process to bring the accounts up to their guaranteed rate of return.  As shown in **Figure 73** below, the schtup schedule for 2005 indicates that each of the Post-1993 Entity Accounts were included on this list to receive fictitious gains for this purpose.

---

[220] MDPTPP07036754.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 110 of 128**

**Figure 73[221]**
IA Business Handwritten Notes



202.   The December 2005 customer statement for Grosvenor Partners, for example, reflects the purchase and sale of several non-hedged S&P 100 Index options, generating approximately $1.7 million in fictitious gains (*see* **Figure 74**), which approximates the $1,680 in the "$ Needed" listed on the schtup schedule in **Figure 73** above.

---

[221] MADTSS01124095.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 111 of 128**

Figure 74[222]

Grosvenor Partners Account (1-ZB046-4-0) Statement – December 2005



203.    The December 2005 statement shown in **Figure 74** above, which reflects a series of purported transactions, also contains handwritten calculations from Avellino; Avellino testified that these show the profits and losses that the IA Business transactions purportedly generated.[223]

204.    Similarly, the St. James Associates Account was also listed as one of the accounts selected to receive fictitious gains in 2005.  As shown in **Figure 75**, the December 2005 customer statement for St. James includes handwritten notes and reflects the purchase and sale of several non-hedged S&P 100 Index options.  These fictitious trades collectively generated a profit of $282,464, which approximates the "284" in the "$ Needed" listed on the previously referenced schtup schedule for the 1ZB510 Account. (*See* **Figure 73**.)

---

[222] Deposition of Frank Joseph Avellino, Nov. 20, 2019; Grosvenor Partners Statement GROSVENOR-0397-GROSVENOR-0407 at 407 (Trustee Exhibit 35).
[223] Deposition of Frank Avellino dated Nov. 20, 2019 at 125:9-128:25.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 112 of 128**

**Figure 75**[224]
St James Associates Account (1-ZB510-6-0) Statement – December 2005



d. **Commission payments were occasionally paid at mid-year, outside of the regular year-end schtup process**

205.    Under certain circumstances, the IA Business would effectuate commission payments by generating the necessary additional profit through extra fictitious trades at mid-year rather than waiting to take corrective action during the regular year-end schtup process.

206.    For example, the June 1996 customer statement for Avellino and Bienes account 1-ZB046-4-0 shows that 750 S&P 100 Index June 650 Put options were purchased on June 12, 1996 and then sold about a week later on June 21 for a profit of $620,375.[225] (*See* **Figure 76**.) Discussed below, this $620,375 "payment" occurred directly after Avellino's May 1996 letter to DiPascali identifying a "shortfall" in Avellino's commissions. Furthermore, the transaction numbers for each of these trades on the customer statement are listed in consecutive order. Transactions that purportedly occurred over a week apart should not have consecutive transaction numbers, further evidencing the fictitious nature of these transactions.

---

[224] Deposition of Frank Avellino dated Nov. 20, 2019, MADTSS01124093-95 (Trustee Exhibit 37).
[225] MDPTPP06714628.

**Figure 76**[226]
Grosvenor Partners Account (1-ZB046-4-0) Statement – June 1996



### E. Avellino monitored and tracked the customer statements for the Post-1993 Entity Accounts and participated in the schtup process to ensure that these accounts received their guaranteed rate of return and commission payments

207.    As detailed in this report, Avellino routinely reviewed and analyzed the monthly customer statements for the Avellino and Bienes accounts and would certify to them on an annual basis.[227]  In addition to simply "reviewing" the purported trading activity, Avellino actively monitored the accounts to ensure that the purported investment performance reflected therein achieved the guaranteed rates of return and the full amount of commission due from BLMIS. If the accounts reflected a rate of return that was less than what Madoff had promised, or if the proper amount of commission had not been paid, Avellino would communicate the shortfall to DiPascali and direct him to place additional schtup transactions in order to make up the difference.[228]

---

[226] MDPTPP06714628.
[227] Deposition of Frank Avellino dated Nov. 20, 2019 at 90:13-90:25 and 171:10-171:22.
[228] Avellino testified that he communicated with the IA Business and DiPascali, in particular, with respect to payments from former A&B customers. Deposition of Frank Avellino dated Nov. 21, 2019 at 278:11-281:17.

### 1. May 1996 Letter

208. In May 1996, Avellino delivered a letter to DiPascali along with a handwritten spreadsheet regarding BLMIS's calculation of the commission payment and guaranteed rate of return that was promised to Avellino and Bienes. (*See* **Figure 77**.)

**Figure 77**[229]
Avellino Letter to DiPascali



209. The supporting schedule that Avellino sent accompanying this letter provides his calculation of what the Post-1993 Entity Accounts should have returned, based on a 17 percent guaranteed rate of return, and the commission payments due (*see* **Figure 78**). This letter and supporting spreadsheet from Avellino are evidence that both he and DiPascali were tracking

---

[229] MADTSS01124224.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 115 of 128**

the rate of return in the Post-1993 Entity Accounts and the commission payments as early as 1994.

**Figure 78[230]**
IA Business Handwritten Spreadsheet



210.   As a result of Avellino's letter and notice of the shortfall, the IA Business generated several fictitious options trades on the June 1996 customer statement for Grosvenor Partners account 1-ZB046-4.  As already discussed above, this statement shows that 750 S&P 100 Index June

---

[230] Deposition of Frank Avellino dated Nov. 21, 2019, MADTSS01124225 (Trustee Exhibit 50).

08-01789-cgm   Doc 21157-40   Filed 02/23/22   Entered 02/23/22 15:32:28   Attach. B
Pg 118 of 130

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 116 of 128**

650 Put options were purchased on June 12, 1996 and then sold about a week later on June 21 for a profit of $620,375.[231] (*See* **Figure 79**.) This $620,375 "payment" occurred directly after Avellino's May 1996 letter to DiPascali identifying a "shortfall" in Avellino's commissions.

**Figure 79**
Grosvenor Partners Account (1-ZB046-4-0) Statement – June 1996



### 2.   December 1998 Letter

211.   In December 1998, Avellino sent another letter to DiPascali in which he stated the following: "Yes, it's that time of year again . . . . My calculations show that BLM was short (for 12/31/97) approx. $2,500,000."[232] (*See* **Figure 80**.)

---

[231] MDPTPP06714628.
[232] Deposition of Jo Ann Crupi dated Jan. 30, 2020, MADTSS01124183 (Trustee Exhibit 123); *see also*, Deposition of Jo Ann Crupi, dated Jan. 30, 2020 at 184:14-185:5.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 117 of 128**

**Figure 80**
**Avellino Letter to DiPascali**



Yes, it's that time of year again:
Just a note to touch base about the accounts.
Please make necessary trades in all of the accounts:

1. Grosvenor Partners, Ltd.
2. Mayfair Ventures and
3. Mayfair Ventures Pension Plan.

I believe the total base of the three accounts will be enough to even up the balances due.
My calculations show that BLM was short (for 12/31/97) approx. $2,500,000.

212.    Having received this letter in December 1998, the IA Business executed on Avellino's

directions through the regular year-end schtup process for 1998.  The handwritten notes

shown below indicate that, in addition to the calculated schtup payments for 1998, an

additional $2.5 million in payments would need to be included.  This resulted in

approximately $8 million in non-hedged option gains added to the Post-1993 Entity Accounts

to "true up" the accounts. (*See* **Figure 81**.)

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 118 of 128**

**Figure 81[233]**
IA Business Handwritten Notes



213.   Once the IA Business determined that the Post-1993 Entity Accounts needed to receive an additional $8.0 million in schtup payments, a special option basket trade, as shown in **Figure 82** and **Figure 83** below, was created to generate the requisite additional profit.

**Figure 82[234]**
IA Business B.XTRAPL Basket Trade List Printout

**Figure 83[235]**
IA Business Batch Trade Slip



214. The Batch Stock Record Activity report, as shown in **Figure 84** below, indicates that the IA Business accounts for Mayfair Ventures, Grosvenor Partners and Mayfair Pension Plan each purportedly purchased and sold S&P 100 Index December 570 Call options on December 15, 1998.[236]

---

[235] MADTSS01124189.
[236] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 186:4-191:4.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 120 of 128**

**Figure 84**[237]
Purchase of December 570 Call Options



MADTSS01124175

Sale of December 570 Call Options



MADTSS01124174

215.    The December 1998 account statement for Mayfair Ventures, for example, reflects the

purchase of 315 "S&P 100 Index December 570 Call" options on December 15, which

matches the entry in the Batch Stock Record Activity report above, and is consistent with the

date of Avellino's letter.  These options were subsequently sold on December 21 and

generated, as intended, a fictitious gain of $500,220 for the account (*see* **Figure 85**), which

---

[237] MADTSS01124175, MADTSS01124174. I also note that the purported counterparty for all of these trades is
"Clearing Banks."

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 121 of 128**

matches the gain listed in the handwritten notes in **Figure 81** above. These fake gains were part of the $8 million in total schtup payments in 1998.

**Figure 85[238]**
Mayfair Ventures Account (1-ZB032-4-0) Statement – December 1998



216. The December 1998 account statement for Grosvenor Partners also reflects the purchase of 3,950 "S&P 100 Index December 570 Call" options on December 15. These options were subsequently sold on December 21 and generated, as intended, a fictitious gain of $6,272,600 for the account (*see* **Figure 86**), which matches the gain listed in the handwritten notes in **Figure 81**. These fake gains were part of the $8 million in total schtup payments in 1998.

---

[238] MDPTPP06704782.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 122 of 128**

**Figure 86**[239]
Grosvenor Partners Account (1-ZB046-4-0) Statement – December 1998



217.    Further, the December 1998 account statement for Mayfair Pension Plan reflects the
purchase of 755 "S&P 100 Index December 570 Call" options on December 15.  These
options were subsequently sold on December 21 and generated, as intended, a fictitious gain
of $1,198,940 for the account (*see* **Figure 87**), which matches the gain listed in the
handwritten notes in **Figure 81**.  These fake gains were also part of the $8 million in total
schtup payments in 1998.

[239] MDPTPP06714854-855.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 123 of 128**

**Figure 87**[240]
Mayfair Pension Plan Account (1-ZB249-4-0) Statement – December 1998



218.    Unlike Avellino's actions with BLMIS, investors in the real securities market cannot request predetermined or targeted gains in an amount to cover a specific return or commission and subsequently receive the identical requested gain on their customer statement. More so, such increases in an investment account certainly cannot be achieved through backdated transactions based on after-the-fact historical trading information.

**F. Between 1994 and 2007, BLMIS added fictitious options trades totaling approximately $60 million to the Post-1993 Entity Accounts using the schtupping process**

219.    The schtupping process was applied to the Post-1993 Entity Accounts, increasing the earnings in their accounts through fictitious trades when the accounts had not yielded the predetermined rate of return that had been guaranteed by the IA Business.[241] In total, Avellino and Bienes received nearly $60 million across seven accounts in additional profits through the schtupping process from 1993 - 2007. (*See* **Figure 88.**)

---

[240] MDPTPP06831435.
[241] Deposition of Jo Ann Crupi dated Jan. 30, 2020 at 173:3-175:2.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 124 of 128**

**Figure 88**[242]
Yearly Schtup Payments By Account

| Account Name | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Kenn Jordan Associates | - | - | - | - | - |
| Mayfair Ventures | - | 2,297,700 | 486,500 | - | 428,670 |
| Grosvenor Partners Ltd | - | 1,357,575 | 164,400 | 5,577,228 | 1,948,500 |
| Mayfair Bookkeeping Serv Inc | - | - | - | - | 2,922,750 |
| Strattham | - | - | - | - | - |
| Aster Associates | - | - | - | - | - |
| St James Associates | - | - | - | - | - |
| **Total SCHTUP Transactions** | $       - | $3,655,275 | $   650,900 | $5,577,228 | $5,299,920 |

| Account Name | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Kenn Jordan Associates | - | - | - | - | - |
| Mayfair Ventures | 500,220 | 1,005,875 | 5,372,000 | 8,172,800 | 2,164,320 |
| Grosvenor Partners Ltd | 6,272,600 | 2,011,750 | 1,074,400 | - | 1,743,480 |
| Mayfair Bookkeeping Serv Inc | 1,198,940 | 2,518,120 | 537,200 | - | - |
| Strattham | - | - | - | - | - |
| Aster Associates | - | - | - | - | - |
| St James Associates | - | - | - | - | - |
| **Total SCHTUP Transactions** | $   7,971,760 | $5,535,745 | $6,983,600 | $8,172,800 | $3,907,800 |

| Account Name | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Kenn Jordan Associates | - | 20,244 | 57,036 | - | - |
| Mayfair Ventures | 3,202,760 | 1,785,810 | 108,640 | 1,679,230 | 1,685,480 |
| Grosvenor Partners Ltd | - | 66,516 | 2,266,242 | - | - |
| Mayfair Bookkeeping Serv Inc | - | 270,402 | 146,664 | - | - |
| Strattham | - | 26,028 | 179,256 | - | - |
| Aster Associates | - | 41,934 | 353,080 | - | - |
| St James Associates | - | 41,934 | 282,464 | - | - |
| **Total SCHTUP Transactions** | $   3,202,760 | $2,252,868 | $3,393,382 | $1,679,230 | $1,685,480 |

| **Total SCHTUP Transactions** | $  59,968,748 |
|---|---|

---

[242] MF00298812, MF00283046, MF00336698, MF00266136, MF00298853, MF00283082, MF00336735, MF00266172, MF00203035, MF00106570, MDPTPP06704708, MDPTPP06704782, MDPTPP06704862, MDPTPP06704951, MDPTPP06705055, MDPTPP06705216, MDPTPP06705315, MDPTPP06705404, MDPTPP06705474, MDPTPP06705556, MDPTPP06705622, MDPTPP06714665, MDPTPP06714748, MDPTPP06714854, MDPTPP06714965, MDPTPP06715090, MDPTPP06715366, MDPTPP06715716, MDPTPP06715731, MDPTPP06715813, MDPTPP06831354, MDPTPP06831435, MDPTPP06831548, MDPTPP06831673, MDPTPP06832286, MDPTPP06832430, MDPTPP06581042, MDPTPP06847857, MDPTPP07036754, MDPTPP07037369, MDPTPP06581112, MDPTPP06847935, MDPTPP07036859, MDPTPP07037515, MDPTPP06848330, MDPTPP07037253, MDPTPP07037911, MDPTPP06714610, MDPTPP06714628, MDPTPP06714642, MDPTPP06714659.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 125 of 128**

### G.  The Post-1993 Entity Accounts received remarkably positive annual rates of return

220.    The Post-1993 Entity Accounts' purported annual investment returns were calculated from January 1996 through November 2008.  As shown in **Figure 89**, the average annual rates of return for the Post-1993 Entity Accounts were consistently positive. The Post-1993 Entity Accounts received at least the guaranteed rate of return (with limited exceptions) and in some instances, received returns far in excess of those guaranteed rates.

221.    **Figure 89** also shows a comparison of the purported average annual rate of return of the Post-1993 Entity Accounts with the average annual returns of the S&P 100 Index.  As indicated in the chart, the annual rate of return for the S&P 100 Index fluctuates between a high of 31% to a low of -37%.

**Figure 89**

| Year | Annual Rate of Return | | | | | | |
|------|--------|--------|--------|--------|--------|--------|--------------|
|      | 1ZB046 | 1ZB032 | 1ZA879 | 1ZB262 | 1ZB509 | 1ZB510 | S&P 100 Index |
| 1996 | 37.7%  | 17.1%  | 17.3%  | 15.3%  | N/A    | N/A    | 22.9%        |
| 1997 | 27.1%  | 38.5%  | 21.3%  | 19.6%  | N/A    | N/A    | 27.8%        |
| 1998 | 33.4%  | 34.7%  | 18.4%  | 19.0%  | N/A    | N/A    | 31.3%        |
| 1999 | 22.6%  | 43.9%  | 20.8%  | 20.2%  | N/A    | N/A    | 31.3%        |
| 2000 | 17.0%  | 94.4%  | 14.5%  | 14.4%  | N/A    | N/A    | -13.4%       |
| 2001 | 13.6%  | 80.6%  | 14.3%  | 14.7%  | N/A    | N/A    | -14.9%       |
| 2002 | 14.8%  | 26.7%  | 13.9%  | 13.9%  | N/A    | N/A    | -23.9%       |
| 2003 | 10.8%  | 31.9%  | 10.7%  | 11.0%  | N/A    | N/A    | 23.8%        |
| 2004 | 10.1%  | 23.2%  | 11.1%  | 11.2%  | 6.5%   | 6.3%   | 4.5%         |
| 2005 | 24.1%  | 11.0%  | 11.0%  | 11.0%  | 11.0%  | 11.0%  | -0.9%        |
| 2006 | 13.5%  | 26.2%  | 13.4%  | 13.5%  | 13.2%  | 13.3%  | 15.9%        |
| 2007 | 11.6%  | 21.9%  | 11.5%  | 11.0%  | 10.9%  | 10.9%  | 3.8%         |
| 2008 | 10.7%  | 11.8%  | 10.7%  | 9.4%   | 9.3%   | 9.3%   | -36.9%       |

222.    Unlike the major market indices, which show significant volatility in returns over the 13-year period, the annual rates of return on the Post-1993 Entity Accounts were always positive.  Because the IA Business SSC strategy was supposedly engineered around the S&P 100, the returns the strategy would have necessarily generated should have been highly positively correlated to the relevant indices discussed above.  This clearly was not the case.

223.    These returns defied the market and were possible as a result of the schtupping process.  In fact, the schtup process occasionally resulted in returns that significantly exceeded the guaranteed rate of return in certain years.  As shown in **Figure 90** below, the Mayfair

Ventures account PMR as of November 2000, reflected the "Annualized Return for Current

Year" of 13.54%.

### Figure 90[243]

IA Business Portfolio Management Report Mayfair Ventures Account (1-ZB032-3) –
November 2000

```
ACCOUNT #   1-ZB032-3 MAYFAIR VENTURES              REPORT FOR THE PERIOD FROM 1/01/00 TO 11/30/00
                      INITIAL INVESTMENT                                        14,809,832.69
                      PROFITS IN EXCESS OF BENCHMARK RETURN FROM PREVIOUS YEAR  21,437,168.15-
                      ADJUSTMENTS
                      CAPITAL ADDITIONS
                      CAPITAL WITHDRAWALS
                      NET WORKING CAPITAL                                       14,809,832.69
                      BENCHMARK RATE OF RETURN                     17.00 %
                      BENCHMARK RETURN FOR 335 DAYS                              2,310,739.65
                      CAPITAL GAINS AND LOSSES                                   1,186,783.96CR
                      DIVIDENDS AND INTEREST                                        21,153.50CR
                      REALIZED P/L                                              1,207,937.46CR
                      UNREALIZED P/L                                              384,305.20
                      PROFITS WITHDRAWN
                      OVER/UNDER BENCHMARK RETURN FOR CURRENT YEAR              3,134,371.91
                      CURRENT CASH BALANCE                                             .49CR
                      NET MARKET VALUE OF OPEN SECURITIES POSITIONS             7,450,967.23
                      TOTAL EQUITY                                              7,450,967.72CR
                      PRIOR YEAR END EQUITY                        6,627,335.46CR
                      ANNUALIZED RETURN FOR CURRENT YEAR              13.54 %
                      PROJECTED ANNUALIZED RATE OF RETURN             12.36 %
                      BUYING POWER        7,451    OVER/UNDER       24,572
                                                                               MDPTQQ00790863
```

224.    However, as shown in **Figure 91**, fictitious non-hedged option transactions created in

December 2000 through the schtup process for the 1-ZB032-4 account resulted in profits of

$5.4 million.  The total purported profits from these fake trades in the 1-ZB032-4 account

were then transferred to the 1-ZB032-3 account (*see* "TRANS TO 30 ACCT"), thereby

significantly increasing the yearly profit for the Mayfair Ventures equity account.  As a

result, the total Annualized Return for Current Year rose from 13.54% in November to

94.12% in December. (*See* **Figure 92**.)[244]

---

[243] MDPTQQ00790863.

[244] Another example of this increase in the Annualized Return for Current Year also occurred in the Mayfair Ventures account at year-end 2001. The November annualized return reflected 13.91%; after several fake non-hedged option transactions in the December 2001 account statement, the December 2001 annualized return increased to 80.56%. MDPTQQ00790875, MDPTQQ00907677, MDPTPP06705055.

**Expert Report of Bruce G. Dubinsky for the Frank J. Avellino, et al. Action**
**June 5, 2020**
**Page 127 of 128**

Figure 91[245]

Mayfair Ventures Account (1-ZB032-4-0) Statement – December 2000



Figure 92[246]

IA Business Portfolio Management Report Mayfair Ventures (1-ZB032-3) – December 2000

225.    The fact that the annual rates of return never exhibited a negative period and exceeded the guaranteed rates of return, sometimes by extraordinary amounts, lend further support that the trades in the Post-1993 Entity Accounts never occurred.

---

[245] MDPTPP06704951.
[246] MDPTQQ00790864.

## IX.    CONCLUSION

226.    Based on my analysis of the documents I have reviewed in this matter and on my education and experience, I conclude that:

- There is no evidence that any of the trades reflected on the customer statements for the A&B Accounts (including all versions of those customer statements) were ever executed;

- During the 1992 SEC Investigation of A&B, BLMIS manufactured different versions of the original A&B IA Business customer statements for a three-year period and Avellino, on behalf of A&B, participated in that fabrication;

- The IA Business created a new A&B account in 1992, which reflected trades backdated to 1989, and A&B submitted those newly created account statements to the SEC in 1992 as if those transactions were legitimate;

- Avellino prepared accounting ledgers on behalf of A&B based on the securities transactions reflected on the account statements manufactured during the SEC investigation; and

- The IA Business "propped up" the annual investment returns of the Post-1993 Entity Accounts and paid commissions to Avellino and Bienes by adding additional fictitious transactions (known as "schtupping") that resulted in gains equal to a predetermined dollar amount needed to achieve a certain target annual rate of return, and Avellino participated in that process.



_____

Bruce G. Dubinsky

MST, CPA, CFE, CVA, CFF, MAFF, CAMS

_June 5, 2020_