**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Adv. Pro. No. 10-04285 (CGM) |
| Defendant. | **SECOND AMENDED COMPLAINT** |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | |
| UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, | |

ACCESS PARTNERS SA as represented by its
Liquidator MAÎTRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE
LA VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole
beneficiary under the Will of THIERRY MAGON
DE LA VILLEHUCHET (a/k/a RENE THIERRY
DE LA VILLEHUCHET), PIERRE
DELANDMETER, THEODORE DUMBAULD,
LUXALPHA SICAV as represented by its
Liquidators MAÎTRE ALAIN RUKAVINA and
PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA
AND PAUL LAPLUME, in their capacities as
liquidators and representatives of LUXALPHA,
GROUPEMENT FINANCIER LTD.,

Defendants.

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7

estate of Bernard L. Madoff ("Madoff") (collectively, the "Debtors"), individually, under the

Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, by and through his

undersigned counsel, as and for his Second Amended Complaint alleges the following:

## NATURE OF THE PROCEEDING

1.      The two BLMIS feeder funds at issue in this action, Defendants Luxalpha SICAV

("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier") (collectively, the

"Feeder Fund Defendants"), trace their origins to the close friendship between Defendant Patrick

Littaye and Bernard Madoff dating back to at least 1985.

2.      Littaye ran an investment business that was dependent on its connection to

BLMIS to attract investors.  That business, which Littaye started in 1994 with the late Thierry

Magon de la Villehuchet, was comprised of a series of investment companies—Access

International Advisors, Inc., Access International Advisors, LLC, Access International Advisors,

Ltd., Access Management (Luxembourg), S.A., and Access Partners, S.A.—that operated as a

single entity.  Together, they comprised an investment firm known as Access International

Advisors ("Access," and collectively with Defendants Littaye, Villehuchet, Delandmeter, and

Dumbauld, the "Access Defendants").  Luxalpha and Groupement Financier were among the

feeder funds Access established to direct investors into BLMIS.

3.      Luxalpha's creation came about as a direct result of concerns of impropriety at

BLMIS—it replaced a prior Access fund, Oreades SICAV, that was closed because of its

sponsor's unwillingness to continue to operate a fund that illegally breached EU regulatory

requirements.

1

4.      Shut down in 2004, Oreades was a significant "net winner."  Luxalpha was established with no less than $135 million in fictitious profits withdrawn from BLMIS through Oreades.  None of the regulatory issues that led to Oreades's closure were corrected by Luxalpha's creation.  But there was at least one striking difference between the funds: Luxalpha took even greater care than Oreades did to shield UBS from potential liability.

5.      Littaye and Access partnered with Defendants UBS AG, UBS (Luxembourg) S.A., UBS Fund Services (Luxembourg) S.A., and UBS Third Party Management Company S.A. ("UBS," or the "UBS Defendants").

6.      The next year, certain of the UBS Defendants also began to service Groupement Financier.  Together, the UBS Defendants and the Access Defendants operated both Luxalpha and Groupement Financier, regularly sharing information, officers, and directors.  As a result of the UBS Defendants' and Access Defendants' activities, Defendants knew BLMIS was operating a fraud.

7.      The directors, managers, and agents of both Luxalpha and Groupement Financier reviewed the funds' respective account statements and knew from those documents that Madoff could not be executing all the securities transactions reported therein because it was impossible to do so.

8.      Specifically, Luxalpha and Groupement Financier knew that the volume of options trades Madoff purported to execute on their behalf was impossible, and that Madoff lied about the identity of his purported options counterparties.  Luxalpha and Groupement Financier also knew that the returns BLMIS claimed to produce were impossible given its stated trading strategy and that the volume of assets purportedly under management by BLMIS was too large to

implement that strategy.  And Luxalpha and Groupement Financier knew that BLMIS reported

trades as having been made at impossible times and prices.

9.      Aware of these and other indicia of fraud, the Access Defendants shielded Madoff

and BLMIS from scrutiny.  At the same time, they touted their rigorous due diligence process

and a series of antifraud measures that, in reality, never applied to the Feeder Fund Defendants.

Luxalpha and Groupement Financier were treated differently from other funds and were allowed

to operate as an exception to the Access Defendants' normal policies and procedures regarding

the due diligence of funds and their manager.

10.     The Access Defendants and the UBS Defendants operating the funds also

recognized the glaring warning signs at BLMIS, as did outside consultants who bluntly and

unequivocally warned the funds' directors and managers of a high risk of fraud at BLMIS.

Indeed, UBS's own Private Wealth Management Group reportedly put BLMIS on a "non-

approved" list and BLMIS-related funds were not recommended to its clients.

11.     Not only were Luxalpha's and Groupement Financier's directors, managers, and

agents aware of these and other signs of fraud at BLMIS, Littaye actively impeded any inquiry

into these signs of fraud by quashing or deflecting questions and by purposely omitting the

names "BLMIS" and "Madoff" from prospectuses and regulatory filings.

12.     Similarly, the UBS Defendants intentionally misled both U.S. and Luxembourg

regulators concerning BLMIS's roles, responsibilities, and options trading partners.  UBS

concealed Madoff's involvement with Luxalpha from the Luxembourg regulator, the

Commission de Surveillance du Secteur Financier (the "CSSF"), knowingly omitting any

reference to Madoff or BLMIS when identifying Luxalpha's custodians and managers to the

CSSF.  UBS knew that Madoff could not pass CSSF scrutiny.  The Access Defendants and the

UBS Defendants also established and acceded to abnormal practices and procedures for handling Luxalpha's and Groupement Financier's accounts and fictitious trade statements.

13.     Luxalpha's and Groupement Financier's awareness of BLMIS's impossible trading activity and performance, their demonstrable awareness of fraud, and their directors' and managers' deliberate actions to protect Madoff, establish Defendants' knowledge of fraud at BLMIS, which requires the subordination or disallowance of the Customer Claims and/or the avoidance of any transfers of Customer Property they received. Defendants' willingness to actively impede further investigation rose to the level of actual knowledge of fraud at BLMIS and supports the avoidance and recovery of all fraudulent transfers the Defendants received.

14.     Luxalpha and Groupement Financier together withdrew initial transfers from BLMIS totaling approximately $796 million in the ninety days preceding BLMIS's bankruptcy filing and roughly $1.12 billion in the preceding six years. This action seeks the avoidance and recovery of those initial transfers from the Feeder Fund Defendants, recovery of subsequent transfers that went to the other Defendants, and equitable subordination and disallowance of related Defendant customer claims.

15.     The Access Defendants and the UBS Defendants worked together to extend Madoff's fraud to European investors, enriching themselves through the receipt of millions of dollars' worth of fees that—unlike their clients' funds—were not subject to the obvious fraud risk that Defendants knew Madoff posed.

16.     Together, the Feeder Fund Defendants channeled over two billion dollars into BLMIS, funds Madoff used to grow and perpetuate his Ponzi scheme. And even more money was fed into Madoff's scheme through other non-defendant feeder funds that were opened or

introduced by the Access Defendants, including Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd.

17.      Notwithstanding the massive harm to investors occasioned by the UBS-sponsored Feeder Fund Defendants, UBS Wealth Management congratulated itself after the revelation of Madoff's fraud by publicly flaunting the fact that it had "no material exposure" to BLMIS.

## SUBJECT MATTER JURISDICTION AND VENUE

18.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

19.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

20.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

21.      This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq. (McKinney 2001)), the

New York Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other

applicable law.[1]

## PERSONAL JURISDICTION

22.     This Court has personal jurisdiction over each of the Defendants under N.Y.

C.P.L.R. 301 and 302, and Federal Rule of Bankruptcy Procedure 7004.  Each defendant has

maintained minimum contacts with New York in connection with the claims in this adversary

proceeding.  As further alleged herein, the Defendants have or had offices in New York, are

doing or did business in New York, and/or transact or transacted business in New York during

the time periods addressed herein.  For some, New York is or was their principal place of

business.  The Feeder Fund Defendants had accounts with BLMIS in New York.  The UBS

Defendants, the Access Defendants, the Feeder Fund Defendants, and the Feeder Fund Director

Defendants (defined below), delivered agreements or caused agreements to be delivered in New

York, relating to BLMIS.  In addition, certain of the UBS Defendants and Access Defendants

communicated regularly with persons in New York regarding the Feeder Fund Defendants and/or

BLMIS, and also sent and/or received funds to and/or from BLMIS in New York, utilizing New

York banks.  In addition, Customer Claims were filed in the SIPA Proceeding, purportedly on

behalf of Luxalpha.

## BACKGROUND, THE TRUSTEE, AND STANDING

23.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

---

[1] To preserve all claims until a final determination on appeal, the Trustee asserts avoidance claims arising under sections 548(a)(1)(B) and 544(b)(1) of the Bankruptcy Code in this proceeding, and objections to claims under sections 502(a) and (b)(1), and on equitable grounds.

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

24.    On December 15, 2008, under SIPA § 78eee(a)(4)(B), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

25.    Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA
§ 78eee(b)(3);

b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA
§ 78eee(b)(3); and

c)    removed this case to this Court pursuant to SIPA § 78eee(b)(4).

26.    By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

27.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated Madoff's chapter 7 estate into the

SIPA Proceeding.

28.    At a plea hearing on March 12, 2009, in the case captioned *United States v.
Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

7

29.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

30.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

31.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

32.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

33.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

34.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

35.     The Trustee has standing to object to customer and creditor claims under SIPA §§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a distribution *pari passu* with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

## BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

36.     Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

37.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

38.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue, New York, New York, where Madoff operated three principal business units:  a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

39.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

40.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

41.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in

AUM.  At all times, BLMIS's Form ADVs were publicly available.

   **B.     The Ponzi Scheme**

   42.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others who pleaded guilty to, or were found guilty

of, assisting Madoff in carrying out the fraud.

   43.     BLMIS proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required

fraudulent infusions of cash from the IA Business to continue operating.

   44.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted

BLMIS's fraudulently reported trading revenues and/or commission on its financial statements

and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person

accounting firm based out of a strip mall in Rockland County, New York.  Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was

a semi-retired accountant living in Florida.

45.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

Madoff's Investment Strategy

46.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers:  the convertible arbitrage strategy and the Split Strike Conversion ("SSC")

Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close

friends and their families, Madoff also purportedly purchased securities that were held for a

certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no

legitimate business operations using any of these strategies.

47.    All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

48.    The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets.  Investors were told they would gain profits from a change in the expectations

for the stock or convertible security over time.  In the 1970s this strategy represented a

significant portion of the total BLMIS accounts, but by the early 1990s the strategy was

purportedly used in only a small percentage of BLMIS accounts.

49.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

50.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

51.     By 1992, the SSC strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

52.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

53.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

54.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

55.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

56.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC strategy.

57.    Madoff could not be using the SSC strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC strategy.

No Evidence of BLMIS Trading

58.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

59.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared trades in any exchange-listed options.

The Collapse Of The Ponzi Scheme

60.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

61.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through the IA Business as a Ponzi scheme.

62.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE DEFENDANTS AND THEIR AGENTS

A.     **The UBS Defendants**

63.     Defendant UBS AG is a Swiss public company with registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS AG is the parent company of the global UBS bank, and is present in New York, with offices at 299 Park Avenue, New York, NY 10171 and 1285 Avenue of the Americas, New York, NY 10019.  It also conducts daily business activities in Stamford, Connecticut and other locations in the United States.

64.     Defendant UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("UBS SA"), a wholly owned subsidiary of UBS AG, is a Societas Europaea, incorporated in Germany and registered with the Register of Commerce of Frankfurt (HRB 107046), with a registered office at

Bockenheimer Landstraße 2-4, 60306 Frankfurt am Main.  On or about December 1, 2016, UBS

(Luxembourg) S.A. merged with and was absorbed into UBS Europe SE.  UBS (Luxembourg)

S.A.'s business operations continue to be carried out by UBS Europe SE, Luxembourg Branch,

with a place of business at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, and an R.C.S.

Luxembourg number of B209123.

65.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly owned

subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a *société*

*anonyme*.  Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

66.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), a wholly

owned subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a

*société anonyme*.  Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

67.    The UBS Defendants presented themselves to the public as a unified global entity

operating as "a coherent and effective whole."  UBS shared a centralized structure for core

enterprise functions including finance, risk, legal, compliance, and shared services such as

human resources, information technology, communication and branding, and corporate

development.  Upon information and belief, this organizational structure is designed to ensure

UBS AG's centralized control of global business strategy and reporting obligations for UBS

group companies.  UBS AG subsidiaries market themselves as part of a "worldwide financial

network," providing "an international network of experts" that "can propose truly global

investment solutions" based on "the experience, know-how and substantial resources provided

by the UBS Group as a whole."

68.     UBS SA and UBSFSL worked closely with several of the Access Defendants—including AIA LLC, AIA Ltd. and AML (f/k/a AIA (Lux))—in the management, supervision and administration of Luxalpha and Groupement Financier.

69.     The UBS Defendants' deep involvement with Madoff and the BLMIS-feeder funds was far-reaching, extended well beyond Luxalpha and Groupement Financier, and involved billions of dollars being funneled into BLMIS.  UBS entities also sponsored, managed, administered or served as custodian for several other BLMIS-feeder funds that the Trustee is pursuing or has pursued through separate actions.  For example, UBS AG served as sponsor of Luxembourg Investment Fund ("LIF").  UBS SA also served as LIF's custodian, main paying agent and, for a time, as its portfolio manager.  UBSTPM ultimately replaced UBS SA as portfolio manager of LIF, and UBSFSL served as administrator of LIF.  LIF directed investments of approximately $759 million into BLMIS.  UBS SA also served as the custodian for Plaza Investments International Limited, which directed investments of approximately $534 million into BLMIS.  And at various times, UBS SA served as portfolio manager and custodian for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited and Thybo Stable Fund Limited, which collectively directed investments of over $200 million into BLMIS.

70.     All account opening papers and agreements were completed and executed by UBS SA employees, including Managing Director Viviane DeAngelis and Director Serge Karp. UBS SA employees regularly corresponded with Frank DiPascali of BLMIS for purposes of managing Luxalpha's investments and redemptions.  All redemptions UBS SA requested for the Luxalpha fund were processed through an account held at UBS AG's Stamford, Connecticut branch.

17

71.     Luxalpha Directors Hartmann, Schroeter, Stiehl, Egger, Hondequin, and Kranz were all UBS SA employees.

72.     UBS SA served as Defendant Groupement Financier's prime bank and non-defendant Groupement Financier Levered Ltd.'s ("Groupement Levered") custody bank. Groupement Levered did not have a direct account at BLMIS, but offered leveraged returns based on investments in the underlying Groupement Financier fund that was directly invested with BLMIS.  As prime bank for Groupement Financier, UBS SA was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank.  UBS SA was also responsible for maintaining a mirror book-keeping of all transactions reported by BLMIS so as to enable UBSFSL, the fund's administrator, to calculate the fund's net asset value ("NAV").

**B.      The Access Defendants**

73.     Littaye and Villehuchet were sophisticated investment professionals who, before founding Access, had long held senior positions at major financial institutions.

74.     Before founding Access, Littaye worked in a number of positions in the securities industry.  From 1968 until 1971, he was an Assistant Vice-President at Banque Paribas in the Corporate Finance Department.  From 1971 until 1977, he was responsible for the Capital Market Products division at Crédit Agricole Segespar.  From 1977 until 1985, he was Senior Vice President at Banque NSM (ABN Group) responsible for corporate finance for fixed income issues, including "high tech" swaps for bond issues in foreign currencies.  From 1985 until 1992, he was Managing Director for brokerage activities at Banque Pallas France.  From 1993 through 1994, he was Chief Operating Officer at Crédit Lyonnais Securities (USA) responsible for syndication, brokerage activities, back-office/operations and systems.

75.    Similarly, Villehuchet also worked in several positions in the securities business before founding Access.  From 1970 until 1983, Villehuchet worked in the Capital Markets division of Banque Paribas in Paris.  Villehuchet founded, and from 1983 until 1987, was President of Interfinance, an international brokerage firm.  In 1987 he founded Crédit Lyonnais Securities (USA) in New York, and from 1987 through 1994, served as its Chairman and CEO.

76.    Littaye and Villehuchet co-founded Access in 1994, first establishing Access International Advisers, Inc. ("AIA Inc.").  Thereafter, they founded various other Access entities—Defendants AIA LLC, AIA Ltd., AML, and AP (Lux) (all as defined herein)—and arranged for them to act as service providers to the Feeder Fund Defendants.

77.    Although formally distinct and separately organized in their various jurisdictions, AIA Inc., AIA LLC, AIA Ltd., AML, and AP (Lux) were, in reality, a single business enterprise or alter egos of each other.  At all times relevant herein, Littaye and Villehuchet coordinated, dominated, and controlled that enterprise.  Littaye and Villehuchet marketed and used the network of Access entities as a collective whole to service Luxalpha and Groupement Financier, among other BLMIS-feeder funds.  Many of the Access entities were shell companies with no employees of their own.

78.    Littaye and Villehuchet also co-owned all of the Access Defendants.  And Littaye and Villehuchet were also executives and directors of all of the Access Defendants.  Villehuchet was Founder, Chairman, and Chief Executive Officer of AIA Inc., and Littaye was Founder and Consultant to AIA Inc. They both acted as AIA LLC's Partner, Chairman, and Chief Executive Officer.  They served as AIA Ltd.'s, AML's, and AP (Lux)'s directors.  Littaye also served as Director, Chairman, and Managing Director of AIA (Lux).  Villehuchet was also AIA Inc.'s President and AIA Inc. was AIA LLC's sole member.

79.     Madoff was integral to Access's business. Access's BLMIS-related investments (which, at their peak, exceeded $2 billion), dwarfed its non-Madoff holdings. By February 2008, 79% of Access subscriptions were invested with BLMIS, accounting for 92% of Access's total net revenue.

80.     Littaye visited with Madoff at Madoff's New York office quarterly. During these meetings, Littaye raised questions that Access or its clients had with respect to the BLMIS-related funds. He would then relay Madoff's answers to Access's New York employees.

81.     Littaye also would meet with Madoff in the south of France when Madoff vacationed there. During these visits in France, Madoff and Littaye would play tennis together, which provided further opportunities for Littaye and Madoff to discuss business and Access's investments with BLMIS.

82.     The Access Defendants had a staff of 20 to 30 employees spread among its New York and European offices responsible for the sales, operation, due diligence and monitoring for its multiple fund offerings. However, any issues, questions or concerns regarding the several Access funds that maintained accounts at BLMIS were addressed by and had to be run through Littaye.

83.     Claudine Magon de la Villehuchet, a/k/a Claudine de la Villehuchet, is named in her capacity as executrix under the November 6, 2000 last will and testament of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet. Ms. Villehuchet is also named individually as the sole beneficiary under Villehuchet's last will and testament. At the time of his death, Villehuchet and Ms. Villehuchet resided in New Rochelle, New York, and both were U.S. citizens.

84.    Defendant Pierre Delandmeter, a Belgian citizen, was a member of AML's board. He was both a Director and Legal Advisor of Luxalpha, and an advisor to Littaye, Villehuchet, and the other Access Defendants.  Delandmeter was a Legal Advisor to Groupement Financier and Groupement Levered.  In addition, Delandmeter was a Director of AML, AP (Lux), and AIA Inc.

85.    Defendant Theodore Dumbauld, a resident of Connecticut, also served the Access Defendants in various roles.  Dumbauld was a Partner at AIA LLC beginning in 2002 and then became the Chief Investment Officer of AIA LLC.  Dumbauld held both of these positions until his 2006 departure.  Dumbauld was also a director of AIA LLC.

**AIA LLC**

86.    Founded in 2001, Defendant Access International Advisors LLC ("AIA LLC") is a Delaware limited liability company wholly owned by AIA Inc.  During the relevant period, its principal place of business was at 509 Madison Avenue, 22nd Floor, New York, New York 10022.

87.    AIA LLC was Luxalpha's portfolio adviser from August 11, 2004 until August 1, 2006.  As portfolio adviser, AIA LLC oversaw UBS SA in its role as Luxalpha's portfolio manager.  AIA LLC also served as Groupement Financier's sponsor.

**AIA Ltd.**

88.    Defendant Access International Advisors Ltd. ("AIA Ltd.") is a Bahamas limited company.  Its registered address is MMG Bahamas Ltd., P.O. Box CB – 13937, 50 Shirley Street, Nassau, Bahamas.

89.    AIA Ltd. was nominally Groupement Financier's investment manager until July 2007, though in practice it performed no such services, because they were delegated to BLMIS. At various times, AIA Ltd. was also identified as Groupement Financier's operator and

investment adviser.  AIA Ltd. also served as Groupement Levered's official investment manager, and as Luxalpha's official consultant and exclusive introducing agent.  As investment manager, AIA Ltd. was required to "keep the net assets of the Fund[s] under surveillance and constant review; carry out reviews and controls of the portfolio."

90.     AIA Ltd. held itself out as Groupement Financier's and Groupement Levered's investment manager, although as its own accountants recognized, it was never licensed to act as an investment manager.  AIA Ltd. nevertheless received the vast majority of the fees Access collected from Luxalpha and Groupement Financier.

91.     As of at least 2004, AIA Ltd. was a shell entity that had no physical presence in any jurisdiction.  AIA Ltd. is described in Access's internal documents as an offshore "money box" set up for the "prime purpose [of] … the receipt of fees" on behalf of Access.  According to Access, AIA Ltd. was incorporated offshore in the Bahamas to accommodate "Bernie Madoff[, who] want[ed] to only deal with offshore entities related to [the Access] accounts."

**AML**

92.     Defendant Access Management Luxembourg S.A. ("AML") (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")) is a Luxembourg limited liability company incorporated as a *société anonyme*.  Its registered office is at 34a, rue Philippe II, L-2340 Luxembourg.  AML is in liquidation in Luxembourg.  Maître Fernand Entringer, with offices at 34a, rue Philippe II, L-2340, Luxembourg, is AML's liquidator.

93.     AML was nominally Luxalpha's portfolio manager from November 17, 2008 through its liquidation, but entered into an Investment Advisory Agreement with AP (Lux). AML ultimately delegated the management of Luxalpha's portfolio to BLMIS.  AML also served as Luxalpha's portfolio adviser from February 5, 2004 until August 11, 2004, purporting

to advise UBS SA in connection with UBS SA's role as Luxalpha's portfolio manager.  Until

2007, AML also served as Groupement Financier's and Groupement Levered's investment

adviser.

94.    A September 2004 questionnaire regarding Luxalpha completed by Access states

that AIA (Lux) has "[n]o regular employees" and "no full-time employees," lists Littaye and

Delandmeter as the only investment professionals at the firm, and identifies only Littaye and

Delandmeter as carrying out the firm's responsibilities.  The questionnaire also indicates that

AIA (Lux) "outsourced" the functions of trading, research and development, IT/programming,

administration, and marketing and business development.  Notes from an Access meeting

confirm AIA (Lux)'s purpose as an overseas shell entity for the receipt of funds, stating that a

"[s]ervice agreement will have to be put in place between the companies of AIA group, to spread

the AIA Lux incomes."

**AP (Lux)**

95.    Defendant Access Partners S.A. (Luxembourg) ("AP (Lux)") is a Luxembourg

limited liability company incorporated as a *société anonyme*.  Its registered office is at 34a, rue

Philippe II, L-2340 Luxembourg.  AP (Lux) is in liquidation in Luxembourg.  Maître Fernand

Entringer, with offices at 34a, rue Philippe II, L-2340, Luxembourg, is AP (Lux)'s liquidator.

96.    From February 13, 2007 through Madoff's collapse, AP (Lux) was Luxalpha's

investment adviser.  In that role, it purported to advise UBSTPM, and later AML, in connection

with Luxalpha.  Beginning in 2007, AP (Lux) was also the nominal adviser of Groupement

Financier and Groupement Levered.

97.    Access used AP (Lux) as a shell entity to protect Luxalpha and BLMIS from U.S.

regulatory scrutiny.  Littaye acknowledged in an internal meeting that Access had already taken

"a small risk for Luxalpha" by helping BLMIS evade the SEC when it had New York-incorporated AIA LLC serve as Luxalpha's investment adviser.  Access created AP (Lux) to replace AIA LLC in that role.

## C.    The Feeder Fund Defendants

### *Luxalpha*

98.    Defendant Luxalpha was founded under Luxembourg law.  It was organized as a "UCITS" fund pursuant to the EU directive entitled, "Undertakings for Collective Investments in Transferable Securities," under which open-ended investment schemes were regulated. Luxembourg, like other EU member states, enacted legislation implementing various EU UCITS directives.  Luxalpha's registered office was at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, which is the same address as three of the four UBS Defendants.

99.    Luxalpha was subject to the regulatory authority of the CSSF.  Luxalpha was placed in liquidation by the District Court of Luxembourg on April 2, 2009 and is represented by its court-appointed liquidators, Maître Alain Rukavina, barrister (avocat á la Cour) and Paul Laplume, company auditor.

100.    Me. Rukavina and Mr. Laplume are defendants in their capacity as the court-appointed liquidators and representatives of Luxalpha, and as representatives of Luxalpha's investors and creditors, according to the provisions of the District Court of Luxembourg judgment dated April 2, 2009.  References to defendant Luxalpha herein include Me. Rukavina and Mr. Laplume.

### *Luxalpha Director Defendants*

101.    Defendant Patrick Littaye, a French citizen, was a Director of Luxalpha from June 26, 2006 until it entered liquidation.

102.    Defendant Pierre Delandmeter, a Belgian citizen, was a Director of, and the Legal Adviser to, Luxalpha from February 2004 until it entered liquidation.

103.    Defendants Littaye and Delandmeter are referred to collectively as the "Luxalpha Director Defendants."

### Groupement Financier

104.    Defendant Groupement Financier is a British Virgin Islands ("BVI") investment fund that invested 100% of its assets directly with BLMIS.  Groupement Financier's registered agent is Maples & Calder and its registered office is at Sea Meadow House, P.O. Box 173, Road Town, Tortola VG 1110, BVI.

105.    In June 2003, Access created Groupement Levered, which was later known as Groupement II Limited fund.  Groupement Levered was a BVI investment fund that invested all of its assets with Groupement Financier.  Groupement Financier's BLMIS account remained open until Madoff's arrest in December 2008.

### Groupement Financier Director Defendants

106.    Littaye and Villehuchet comprised the board of directors of both Groupement Financier and Groupement Levered.

107.    Delandmeter was a Legal Adviser to Groupement Financier and Groupement Levered.

108.    The Luxalpha Director Defendants and the Groupement Financier Director Defendants are collectively referred to herein as the "Feeder Fund Director Defendants."

## THE ACCESS PRINCIPALS' CLOSE RELATIONSHIP WITH MADOFF EXPOSED THEM TO MYRIAD INDICIA OF FRAUD AT BLMIS

109.    Littaye and Madoff had a close social and professional relationship, dating back to at least 1985, which allowed Access to occupy integral positions with many BLMIS feeder

funds.  The relationship benefited both Access and Madoff, introducing Madoff to new sources

of investment capital, which he needed to keep his Ponzi scheme alive.

110.    Littaye helped found Trotanoy Investment Company Ltd. and Citrus Investment

Holdings Ltd., feeder funds that together invested over $200 million with BLMIS.  Littaye

opened or introduced at least eight other BLMIS managed accounts.  Access functioned as the

manager and/or portfolio adviser for a number of BLMIS feeder funds.

111.    Littaye's and Madoff's relationship also allowed Access to obtain fees derived

from BLMIS investments, through which Littaye and Villehuchet enriched themselves.

112.    Littaye and Access, together with BNP Paribas, operated Oreades, a Madoff

feeder fund that predated Groupement Financier and Luxalpha.  Oreades's BLMIS accounts

were opened in November 1997.  As detailed below, Oreades was shut down in March 2004 as a

result of BNP Paribas's discomfort with Oreades's relationship with BLMIS.  Luxalpha was

opened as Oreades's successor.

113.    In July 2003, BNP Paribas told Littaye that it was particularly concerned that

BLMIS's role as asset manager had not been properly disclosed.  BNP Paribas noted with alarm

that because of this failure to disclose, BLMIS "does not exist" in the eyes of the CSSF.  BNP

Paribas knew that it would bear the risk of any liability associated with Oreades's management

and told Littaye of concerns "that the risk [to] BNP Paribas is very extensive."  BNP Paribas also

observed that, because BLMIS was not a bank, its role as custodian created concern, as did its

additional roles of broker-dealer and investment adviser.

114.    Another concern for BNP Paribas was that it could not confirm the existence of a

segregated Oreades account at BLMIS.  As a result, BNP Paribas could not determine where

Oreades's assets were actually being held.

115.    BNP Paribas also advised Access of its concern that BLMIS reports of trading activity and positions for Oreades were delivered only by fax and mail, seven or eight days after the reported trades, inconsistent with industry customs and practices. BNP Paribas and Access knew that this process failed to provide any opportunity to verify trades.

116.    Of all the funds whose investment portfolios Access managed, BLMIS was the lone investment for which Access did not have immediate or next-day transparency, either through website access or next-day batch reports.

117.    Such practices deviated from BNP Paribas's standard operating procedures, which provided for order transmission by fax or electronic communication on the day of the trade, followed by settlement confirmation by the depository bank within one to three days thereafter. This made it very difficult to verify that deals were posted to the correct clients. During internal audits, BNP Paribas's risk and ethics department highlighted this concern. A senior executive at BNP Paribas Securities Services, Lionel Trouvain, noted "it would seem that B. Madoff does not ever want to improve its order transmission methods."

118.    In August 2003, Trouvain and other BNP Paribas employees met with Access's management to discuss whether it was possible to bring their relationship with BLMIS into standard compliance with BNP Paribas's internal rules. According to the minutes of that meeting, BNP Paribas deemed BLMIS's hidden role as both custodian and investment adviser for Oreades to be "unconscionable" and understood that it violated BNP Paribas's internal "security rules" and Luxembourg law.

119.    Communicating with BLMIS through Littaye, BNP Paribas asked Madoff for permission to include his name in a disclosure to the CSSF. Madoff refused. Access told BNP Paribas that Madoff's refusal stemmed (at least in part) from the fact that BLMIS was not

registered as an investment adviser in the United States and deliberately wanted to avoid regulatory scrutiny.

120.    As an alternative, BNP Paribas requested that its securities services unit or Access be granted real-time access to BLMIS's trade confirmations to allow them to confirm the validity of BLMIS's purported trades.  Of course, no such access was granted.

121.    In spring 2004, shortly after BNP Paribas raised its concerns about BLMIS to Access, Oreades was shut down and the Oreades BLMIS accounts were closed.

122.    In January 2008, an Access employee recounted the story behind BNP Paribas's liquidation of Oreades, stating that BNP Paribas did not want to be liable to Oreades's investors and believed it had to exit or "destroy" Oreades.

## ACCESS AND UBS ESTABLISHED LUXALPHA AND GROUPEMENT FINANCIER DESPITE OVERWHELMING EVIDENCE OF FRAUD AT BLMIS

### A.    Access and UBS Worked Together to Open Luxalpha Even Before Oreades Was Shut Down

123.    BNP Paribas's decision to extricate itself from Oreades's operations threatened to leave Access without a prime bank, administrator, and nominal custodian to administer the investments it directed into BLMIS.  Before Oreades was even closed, Villehuchet and Littaye were working to establish Luxalpha as its successor.

124.    Luxalpha would allow Villehuchet and Littaye to continue their professional and personal relationship with Madoff and provide a vehicle into which Oreades's assets could be transferred.  Access's principals sought and found new partners to replace BNP Paribas—the UBS Defendants—even before Oreades ceased operations in 2004.

125.    In March 2004, just one week after Oreades was closed, UBS SA opened BLMIS Account 1FR108 and executed the BLMIS account opening documents, including a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales

of Securities and Options (collectively, "BLMIS Account Opening Agreements") on behalf of

Luxalpha, and as its agent.

126.    UBS SA formally served as Luxalpha's custodian.  UBS SA also entered into a

separate agreement with BLMIS that explicitly designated BLMIS as the sub-custodian of

Luxalpha's assets, unbeknownst to Luxalpha's investors and the Luxembourg regulators.

127.    UBS SA held the BLMIS Account in the name of "UBS (Luxembourg) S.A. for

the benefit of Luxalpha."  Luxalpha's BLMIS Account was still open when Madoff was arrested

on December 11, 2008.

128.    Luxalpha was initially funded largely by Oreades withdrawals.  At least eleven of

Oreades's investors withdrew approximately $330 million from Oreades and promptly re-

invested those sums in Luxalpha.

129.    Internal Access documents note that certain Access employees were designated to

handle the "switch" of Oreades investors over to Luxalpha.  Access employees referred to it as

simply a "name change."

130.    Access and UBS created Luxalpha to invest with BLMIS despite knowing of the

concerns at BNP Paribas and despite many other persistent warnings of fraud at BLMIS.

131.    In the transition from Oreades to Luxalpha, a UBS AG employee expressed deep

reservations about Madoff's role as both broker and custodian, which was, standing alone,

sufficient reason to decline to step in for BNP Paribas:

> [W]e normally have to give "NO" as the answer in cases like
> Madoff.  In doing so, we make reference to the following principles:
> no broker as depository, and the broker may under no circumstances
> also be a depository at the same time!  Such a NO is easy to
> comprehend for both business policy reasons and risk reasons.

And this did not appear to take into account that Madoff held yet a third role—investment

adviser—which further heightened the risk of fraud.

29

132.    UBS SA was aware of and dismissed these and other concerns and concluded that even though "[t]he risk [of investing with BLMIS] should not be underestimated . . . [investing with BLMIS] would be advantageous on the income side."

133.    The internal message imparted by high-level UBS employees was clear: potential fraud at BLMIS should not stand in the way of UBS profits.  Bernd Stiehl, a Luxalpha director and a UBS SA managing director, subordinated the above-referenced negative reports on BLMIS to UBS's desire to capitalize on Madoff.  "Business is business," Stiehl wrote.  "We cannot permit ourselves to lose 300 million.  Accept client."

134.    When Luxalpha was founded, UBS stocked Luxalpha's board of directors with senior UBS and Access personnel, and its service providers were UBS and Access entities.  The composition of its board and its organizational structure are set forth in the following chart:



**B.    Access Created Groupement Financier and Engaged UBS as a Service Provider**

135.    Access established Groupement Financier in February 2003, opening BLMIS account 1FR096 in April 2003.  Littaye executed Groupement Financier's BLMIS Account Opening Agreements.

136.    In 2005, UBS began to service Groupement Financier and Groupement Levered. UBS SA was Groupement Financier's official prime bank and Groupement Levered's official custodian.  UBS SA did not exercise any actual custodial authority over the money invested with Groupement Financier, as this responsibility was contractually delegated to BLMIS.  From February 2005, UBSFSL served as Groupement Financier's and Groupement Levered's official administrator and was responsible for accounting functions, keeping the register of shareholders, handling subscriptions and redemptions, communications with investors, and preparations of financial statements for the funds.  It also calculated the funds' respective NAV.

137.    In connection with the services they provided to Groupement Financier, UBSFSL and UBS SA artfully avoided any direct legal or contractual links to BLMIS and Madoff.  In a combined Groupement Financier and Groupement Levered Operating Memorandum dated July 12, 2005, § 3.5 entitled "Not to do," contains this admonition in extra-large, bold font: **"Neither UBS [SA] nor UBSFSL should ever enter into a direct contact with Bernard Madoff!!!"**

138.    Groupement Financier and Groupement Levered were formally managed and supervised by UBS SA and UBSFSL, in conjunction with several of the Access Defendants, including AIA Ltd., AIA (Lux), and AP (Lux).  AIA Ltd. was Groupement Financier's and Groupement Levered's investment manager.  AIA (Lux), and then AP (Lux), served nominally as Groupement Financier's and Groupement Levered's purported investment advisers, but in reality, this role was allocated to Madoff.

139.    The following chart sets forth the organizational structure of Groupement Financier and Groupement Levered:



### C.    Before, During, and After Luxalpha's Creation, UBS AG and Its Affiliates Consistently Rejected BLMIS for Investment by Its Clients

140.    Before UBS created Luxalpha and began servicing Groupement Financier, UBS Wealth Management, a UBS AG business division, considered and rejected BLMIS as a vehicle for direct investment and derivative financial products.

141.    Several other UBS entities also analyzed BLMIS and as early as 2002 at least one UBS affiliate noted that [t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible."  The UBS analysts assessing the strategy stated "[w]e consider ourselves pretty

smart and no one in their firm [BLMIS] has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

142.    Although several UBS entities rejected BLMIS as an unsuitable investment for UBS clients, UBS recognized that it could nonetheless make money from others' BLMIS investment.

143.    Assessing BLMIS again in 2004—the same year that UBS established Luxalpha—one UBS subsidiary reiterated its prior conclusions that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990." The prior analysis also flagged lack of transparency and impossibly stable returns as reasons for concern, highlighting that since 1990 there had been only a handful of negative months, and that BLMIS's strategy generated incredibly consistent returns each year.

144.    In addition to concluding that BLMIS's returns were impossible under the SSC strategy, Madoff's practice of not charging fees, choosing to earn revenue only from commissions, was identified as a red flag under the portion of the analysis entitled "Thoughts and Rationale for NOT Investing,": "The simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter."

145.    In a separate email, also dated March 5, 2004, a UBS AG employee echoes the aforementioned concerns about the UBS Defendants doing business with BLMIS, stating:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of cap[a]city . . . .

34

146.    Upon reading the above email, USB Managing Director Viviane DeAngelis responded: "[t]hanks, does not contribute to me having a better feeling. I have inquired about additional insurance."

147.    But just a few days after these UBS analysts reaffirmed their prior conclusion that BLMIS's returns were "IMPOSSIBLE," a UBS SA executive confirmed "[w]e have formed [Luxalpha]." DeAngelis and another UBS employee personally forwarded Luxalpha's account opening documents to BLMIS just a few weeks later.

148.    By 2005, the year after Luxalpha was up and running, a UBS subsidiary, concluded that Madoff was engaging in fraud to generate his returns.

149.    In 2006, armed with knowledge of concerns about BLMIS, DeAngelis and Littaye worked to protect Luxalpha from any inquiry that threatened to disrupt the fund and the fees it generated for UBS and Access. In July 2006, Littaye entered into Access's internal database the following note regarding conversations among himself, DeAngelis and an individual named Lila Seirafi. The internal database was commonly used by individuals at Access to share details of meetings or conversations. Littaye's note reads:

> LS HAD CALLED ME TO ASK IF THEY COULD STRUCTURE
> A NOTE WITH LEVERAGE ON LUX. FOR ONE OF THEIR
> CLIENTS. THINKING THEY CAME TO US THROUGH UBS
> LUXEMB[O]URG, I SENT QUITE A DOC TO HER, THOUGH
> NON [sic] MENTIONING B[L]MI[S].    V DE ANGELIS
> STOPPED ME, EXPLAINING THAT THIS COULD CAUSE
> THE END OF OUR FUND, BECAUSE, IF THE ANALYSTS OF
> ZURICH FIND OUT B[L]MI[S] IS BEHIND THE STORY, WE
> WOULD BE KILLED.

150.    Later, in September of 2006, Littaye entered a note into the internal Access database which reads in part:

> M. Neiman had a bid last July from Ixis concerning a leveraged
> position in Luxalpha (Leverage 3). One way of [sic] the other, he

35

contacted UBS structured product department – Geneva to get a second bid. This department was very excited.

Now V. d Angelis had told her hierarchy that Luxalpha was a sicav dedicated to a family. She entered in a fundamental risk on her own position, because of this movement, which shows that the sicav is evidently not a dedicated sicav (huge internal compliance risk).

151.    Subsequently, in June of 2007, Littaye entered the following note into Access's internal database:

> V DE ANGELIS IS RESPONSIBLE OF [sic] THE UBS DEPARTMENT[]ADMINISTRATING THE FUNDS DEDICATED TO A FAMILY OR SOME GROUP. UBS INTERNAL AUDIT ON THESE FUNDS WAS COMPLETED 6 WEEKS AGO. WE FEARED FOR LUXALPHA SURVIVAL DUE TO THE MULTIPLICITY OF SUBSCRIBERS. []IT SEEMS TODAY THAT NO HARM WILL BE DONE. AN A[U]DIT ON THE DEPT ITSELF STARTS IN ONE WEEK. VDA IS HIGHLY CONFIDENT. IT SEEMS WE SHOULD BE TOTALLY COMFORTED AT THE END OF JULY.

152.    Taken together, these internal notes, which offer only a glimpse of the relationship between Littaye and Viviane DeAngelis, show that Access and UBS SA were concerned that investments into Luxalpha would be stopped because of BLMIS's involvement.

153.    To approve investments in BLMIS-related products, UBS AG required its analysts to obtain more information on the underlying fund manager, Madoff. One of the due diligence requirements was a "face to face meeting with the manager and a site visit to the HQ of the firm where money is managed." This task was assigned to a UBS AG analyst in London, Mary Kleckner. In preparation for such a meeting, Kleckner asked her team for a list of specific questions or topics that they would like answered. The team responded with concerns about the total assets BLMIS was managing and whether there was a point at which these assets would be large enough to deteriorate the strategy's performance. Additionally, Kleckner's team raised

questions about the potential misuse of information between BLMIS's marketing and investment

advisory arms. These questions were never answered.

154.    In conducting due diligence on another BLMIS-related investment, Madoff

refused to meet with Kleckner. In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting. His simple
> explanation was that if he meets with one client he would be
> obligated, perhaps even from a regulatory standpoint now that he is
> an RIA, to meet with all of them, and he would literally be forced to
> build an infrastructure to support meetings and devote a huge
> amount of time to it.

155.    Kleckner also reached out to others for their opinions on Madoff. On October 31,

2007, in response to her question, "What are your feelings on [M]adoff," Kleckner received the

following response:

> I think [M]adoff is one of the most controversial funds out there.
> The historic returns and low vol[atility] make the [M]adoff feeders
> look very attractive for leveraged structured products and FAs love
> it. In addition, [M]adoff is very involved with the [NASD] and on
> a number of committees there. We get asked about sp's on these
> feeders all the time, but there are a lot of folks who are concerned
> about the fund. Everything is probably fine, but there are a number
> of things that are odd or different than the norm. Like no prime
> broker, all trades done through [M]adoff securities through an
> ordinary brokerage account. It's also unclear which dealers are
> executing the [OTC] collars for him? They are pretty big, but no
> one seems to know who is trading them.

**D.** **The UBS Defendants Insulated Themselves From Liability Through a Series of Undisclosed Indemnity Agreements With the Access Defendants**

156.    Because their analysis had already identified BLMIS as a fraud risk, the UBS Defendants recognized that their connection to Luxalpha exposed them to liability for BLMIS. The UBS Defendants therefore sought to protect themselves through a series of indemnity agreements with the Access Defendants.

157.    Through these indemnity agreements, the UBS Defendants sought to disown the risks associated with Luxalpha's creation and management.  From UBS's perspective, such agreements were necessary to avoid the "worst case scenario": BLMIS's failure and UBS SA's resulting liability to Luxalpha investors.

158.    On or about February 5, 2004, AIA (Lux), entered into a series of indemnity agreements with Luxalpha directors who were also UBS SA employees.  The agreements purported to indemnify and hold harmless the directors and UBS SA for any liabilities resulting from their involvement with Luxalpha.

159.    In the indemnity agreement between AIA (Lux) and UBS SA, the parties acknowledged and agreed that AIA (Lux) "requested [UBS SA] to act as a figure head to third parties in the sponsorship and in the managementship [sic] of the Fund."  AIA (Lux) also agreed that it would assume UBS SA's liability for "damages resulting from proved irregularities, inadequacies, or omissions in the administration or management" of Luxalpha.

160.    UBS SA took other measures to limit its liability in the event of BLMIS's failure. UBS SA demanded that Access provide a "hold harmless" letter from Luxalpha's investors for loss resulting from BLMIS's failure.  UBS SA also required Access to obtain and pay for an insurance policy covering Luxalpha's risks.

161.    Upon AML's appointment as Luxalpha's manager in November 2008, it entered

into substantially similar indemnity agreements with UBS SA and the Luxalpha directors.

Through these indemnity agreements, the UBS Defendants continued to limit the liability to

which Luxalpha exposed them.

## UBS AND ACCESS KNOWINGLY VIOLATED THEIR OWN POLICIES AND APPLICABLE REGULATIONS TO CONCEAL BLMIS'S ROLE WITH THE FUNDS

### A.    Luxalpha and Access Used UBS as a "Front" and Mere "Window Dressing" to Avoid Regulatory Scrutiny

162.    A UCITS fund, such as Luxalpha, allows a collective investment scheme once

approved and authorized by a single member state, to operate throughout the EU.

163.    UCITS funds are subject to a strict regulatory framework to protect retail

investors, to whom such funds are directed.

164.    To establish Luxalpha as a Madoff feeder fund, UBS had to give BLMIS

"'special' handling," granting exceptions to UBS policies.

165.    Many of the policy exceptions UBS made for BLMIS violated Luxembourg's

UCITS regulations.  A UBS SA executive acknowledged that this client still "do[es]n't feel

right."

166.    Under applicable Luxembourg law, Luxalpha, as a UCITS fund, had to have a

promoter, or sponsor, playing a key role in the creation, launch, and management/administration

of the fund.  Because of its overall involvement, the promoter would be liable to third parties for

damages in the event faults, omissions, or deficiencies were committed in the management or

administration of the fund.

167.    A UCITS fund promoter must be a regulated entity with sufficient financial

resources.  For the CSSF to authorize a UCITS fund, the fund's promoter must meet certain

requirements concerning experience and financial soundness, determined in part by the adequacy of its capital base.

168.    UBS AG and UBS SA served as Luxalpha's co-sponsors and co-promoters.  With those roles, UBS AG and UBS SA created the appearance, both with the CSSF and with potential investors, that the fund was backed by a highly capitalized, stable bank.

169.    UBS's role as a "front" for Luxalpha was widely acknowledged and freely discussed among Access insiders.  The minutes of Access's February 2007 Quarterly Executive Meeting state that "Luxalpha UCITS is a strange entity; UBS is window dressing or a front." Philip Wogsberg, AIA LLC's Director of Research and the point person for due diligence efforts, testified about these minutes: "[T]he rules are one thing, but also there is [sic] some winks and nods in regulation in Europe, and I think this was a wink and a nod to Patrick [Littaye] please sanitize this and get it all Luxembourgy-looking …."

170.    Dumbauld, a former Access partner and AIA LLC's Chief Investment Officer, testified that "Access was using its [i.e., UBS's] balance sheet or its reputation in order to be compliant with the regulations in Luxembourg."

171.    UBS's role then was to create the appearance of UCITS compliance and to deflect regulatory scrutiny by interposing a large, reputable, international bank between Luxalpha and BLMIS.

**B.    Access Knowingly Violated Its Own Policies When Doing Due Diligence on Madoff**

172.    Access touted its rigorous due diligence processes, which were designed "to avoid the three main risk[s] linked to the hedge fund industry": (1) " [r]isk of fraud by doing an extensive due diligence"; (2) "[r]isk of drift by the implementation of an on going qualitative, operational and quantitative monitoring"; and (3)"[r]isk of dilution of the performances by controlling the flow of investment."

173.    The Access marketing materials stated:

**Qualitative Review (on a monthly basis)**

Each month, at least one member of Access' portfolio and risk management department (i.e. Stephane Pinon and/or Phil Wogsberg) visits each fund manager at their offices to review investment strategy, trading activity and market conditions.  Access continuously analyzes the investment style employed by the manager and the investments implemented in their underlying portfolio.

Access reviews the methods that the manager employs in identifying different investment opportunities and the trading techniques used to establish desired positions. Access also questions the manager and examines the necessary documents to ensure that they are adhering, at all times, to the stated investment discipline.

All individuals influencing the strategies are evaluated including portfolio managers, traders, research staff and administrative employees. This assessment helps determine whether the company can effectively produce the products and results they have indicated.

Access's monitoring process allows to answer [sic] the following two questions:

1.  Does the manager follow the stated investment guidelines for the fund?

2.   Are there any warning signs that should trigger an exit by investors?

174.    As part of its stringent background checks, Access also required every potential manager to complete extensive background questionnaires and to submit to handwriting analyses by a graphologist in Paris.  But Access made an exception for Madoff.

175.    In his Bankruptcy Rule 2004 examination, Wogsberg testified that he was unaware of any other manager whom Access excused from its background questionnaire requirement.  Wogsberg suggested that it was because Madoff was a "special manager" whom Littaye treated differently that Access excused Madoff from this requirement.

176.    Access also boasted that its due diligence and monitoring process required that each fund manager permit monthly visits by the Access staff.

177.    But Madoff and BLMIS were not subject to these monthly visits—a fact never made known to the public.  The regular Access due diligence team never met with Madoff or anyone else at BLMIS.  With the exception of one manager in Paris, whom Access's due diligence team declined to visit monthly because it would have required frequent transatlantic travel, Madoff was the only fund manager whom Access excused from monthly qualitative visits and reviews from the Access team.

178.    Littaye "designated" himself Access's sole Madoff contact, and took great pains to preserve and guard the relationship.  No other person at Access had—or was permitted to have—any real contact with BLMIS.  With the exception of Villehuchet, who attended some meetings, and a select few investors permitted a rare visit with BLMIS, only Littaye was permitted to deal directly with Madoff.

179.    BLMIS was the only one of Access's fund managers for whom Littaye assumed responsibility for due diligence.

**C.    In Coordination With Access, UBS, Luxalpha and Groupement Financier Intentionally Violated the Law and Misled Regulators By Concealing the Delegation of Their Duties to BLMIS**

180.    As the authorized custodian for a UCITS fund, UBS SA was, by law, responsible for both the safekeeping and the supervision of the fund's assets.  UBS SA delegated its core custodial functions to BLMIS.  It did so knowing that BLMIS was also Luxalpha's investment manager, and knowing that this structure violated applicable laws and regulations.

181.    Under Luxembourg law, the sub-delegation by UBS of custodial authority to BLMIS was illegal.  BLMIS was not an accredited custodian and could never have met Luxembourg's strict requirements for either custodians or investment managers.

42

182.    The appointment of BLMIS as both custodian and investment manager was not in compliance with the regulations governing UCITS funds at the time Luxalpha was created and throughout its operations.  Indeed, this was known by Access even before Luxalpha was created when BNP Paribas, referring to Oreades, noted that its own sub-delegation of custodial and advisory authority to BLMIS "must remain 'private' that is, the CSSF . . . must remain unaware of it."  This approach led one concerned BNP employee to warn, "if the CSSF asks me . . . I will have to tell the truth."

183.    The sub-delegation of custodial authority to BLMIS also violated UBS's internal policies.

184.    The delegation of these functions was not disclosed either to the CSSF or in Luxalpha's sales prospectus.

185.    The purpose of the UCITS regulations was to protect against fraud.  Yet UBS, together with Access, built a structure designed to circumvent those UCITS regulations.  Their actions stood in contrast to those of BNP Paribas, which abandoned Oreades when it became uncomfortable with the fraud risk.

186.    UBS SA was Luxalpha's nominal portfolio manager from February 2004 until August 2006, even though throughout this time the management of the fund's assets was delegated to BLMIS.

187.    As Luxalpha's manager, UBS SA executed an agreement with BLMIS entitled "Trading Authorization Limited to Purchases and Sales of Securities and Options."  Under the agreement's terms, UBS and Luxalpha delegated management of the fund's assets to BLMIS, designating BLMIS as their "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities."

43

188.    UBS SA entered into a Sub-Custodian Agreement with BLMIS, which delegated UBS SA's custodial duties to BLMIS "with the function of safekeeping holder and settlement and corporate agent of United States securities, cash, derivatives instruments and other assets" and noted that the "US assets of the Fund" would be invested with BLMIS.  The Sub-Custodian Agreement was not disclosed to the CSSF or in any prospectus.

189.    The Sub-Custodian Agreement put in place could not have met the CSSF's approval because BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund.

190.    The lack of an independent custodian at BLMIS made it impossible to independently verify the existence of assets at BLMIS.  Dumbauld confirmed that within Access "[i]t was observed that there was no independent custodian, but any concerns or red flags that raised was always answered by the fact that Madoff was an SEC registered broker-dealer and therefore the SEC was in there doing their monitoring and that was perceived to be sufficient."

191.    Luxalpha's prospectuses dated February 2004, August 2004, August 2006, March 2007, and November 2008 each misleadingly state that UBS SA had assumed Luxalpha's custodial rights and duties, failing to disclose the delegation of custodial responsibilities to BLMIS.  Each of those prospectuses touted UBS SA's banking experience.

192.    Even after the undisclosed delegation of myriad functions to BLMIS, UBS SA represented to the CSSF and potential investors that it actively managed Luxalpha's assets and monitored and adjusted the fund's investments "under the supervision and responsibility of the fund's Board of Directors."

193.    Documents submitted to the CSSF on UBS SA's behalf also misrepresented UBS SA's custodial function.  In a report dated January 15, 2008 entitled "Controls' Report of the

44

Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular

02/81," to meet CSSF requirements, UBS SA purported to set forth complete lists of the funds

for which it served as custodian and the sub-custodians that it used worldwide.  Although

Luxalpha was included in the list of funds in the report, neither Madoff nor BLMIS was

identified as a sub-custodian and are nowhere to be found in the report.  The report falsely lists

Brown Brothers Harriman as the only sub-custodian that UBS SA used in the United States.

194.    If the Sub-Custodian Agreement had been disclosed to the CSSF, it would not

have been approved, because neither Madoff nor BLMIS complied with Luxembourg law

governing fund custodians.  BLMIS received no specific compensation for serving as *de facto*

manager and sub-custodian.

195.    In an August 14, 2009 interview given to *Les Echos*, a French financial

publication, the General Director of the CSSF confirmed that Luxalpha and UBS SA never

disclosed—either to the CSSF or in sales prospectuses—that they had ultimately delegated

custody of the fund's assets to BLMIS, and that the non-disclosure violated UCITS law.

196.    The 2009 Annual Report of the CSSF further confirms that the documents

submitted to it on behalf of Luxalpha, upon which the CSSF based its decision to approve

Luxalpha as a UCITS fund:

> did not contain any reference either to the identity of B[L]MIS or to
> the multiple responsibilities carried on *de facto* by one entity.
> Between the launch of [Luxalpha] and the breakout of the Madoff
> affair in December 2008, the CSSF was never informed in a
> transparent manner, by the professionals involved, of the structure
> actually set in place nor of the role played in practice by B[L]MIS
> at different levels of this structure.

197.    UBS knew that their failure to disclose Madoff and BLMIS in the sales

prospectus was illegal under Luxembourg law.  UBS AG admitted as much, with one employee

stating, "[a]s far as I understand it, the bottom line seems to be that what the fund does is not in

line with what the prospectus says (???)." Knowing that Luxalpha was neither structured nor

managed as represented in its prospectuses, many UBS employees complained that the

irregularities and non-disclosures put UBS at risk. UBS SA silenced the dissenting voices.

198.     Following the delegation of custodial and management functions to BLMIS, UBS

SA remained in regular contact with BLMIS. In addition to receiving account statements and

trade confirmations from BLMIS, UBS SA communicated regularly with BLMIS via mail, fax,

and telephone to request withdrawals from Luxalpha's account and to address a variety of issues,

including erroneous trade tickets, tax issues, and missing account statements.

199.     Luxalpha's account statements and trade confirmations were sent from BLMIS to

UBS SA, who then shared its contents with UBSFSL. BLMIS also sent Luxalpha's account

statements and trade confirmations to Access's New York and London offices.

200.     UBSFSL was Luxalpha's administrator. In this role, UBSFSL was responsible

for calculating Luxalpha's NAV, which is the total market value of each share of the fund, by

independently verifying the execution of trades and prices at which those trades took place. In

so doing, UBSFL calculated NAV based solely on data provided by BLMIS, with no

independent verification.

201.     Without any independent verification, UBSFSL was creating meaningless

accounting records that just repeated the trade confirmations and account statements that it

received from BLMIS. UBSFSL thereby facilitated the concealment of BLMIS's true

involvement and perpetuated the fraud.

202.     With regard to the calculation of Luxalpha's NAV, the Operating Memorandum

specifically notes that: "[d]ue to the considerable delay in the dispatching of the trade

confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL

issues the NAV with a delay of up to 10 business days."

203.    The Operating Memorandum also provides that BLMIS, as sub-custodian, will

"promptly report by fax as of each trade date the transactions entered into the Account."  These

daily faxes were supposed to be sent to UBS SA.  Upon information and belief, this procedure

was not followed.  Instead, BLMIS only reported trades in a delayed, hard copy-only manner.

204.    The net effect of the operating procedures put in place for Luxalpha was to allow

UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be

directly involved in the operation of Luxalpha, to earn fees for serving in roles that actually

provided no real oversight or protection for Luxalpha's assets, and which provided BLMIS with

the freedom to manipulate reports as needed to perpetuate the Ponzi scheme.

205.    UBSTPM replaced UBS SA as Luxalpha's nominal portfolio manager from

August 2006 to November 2008.  UBSTPM represented to the CSSF that it managed,

administered, and monitored the fund's investment policies and restrictions.

206.    When UBSTPM became Luxalpha's management company, UBS continued to

conceal the delegation of the fund's management to BLMIS.  Luxalpha's August 2006

prospectus states that UBSTPM:

> is responsible for the management, the administration and the
> distribution of the Fund's assets but is allowed to delegate, under its
> supervision and control, all or part of these duties to third parties.  In
> case of changes or appointment of additional third parties, the
> prospectus will be updated accordingly.

207.    No such "updated" prospectus disclosing Luxalpha's delegation of management

to BLMIS was ever provided.  Nor did UBSTPM ever attempt to exercise any "supervision" or

"control" over BLMIS.

208.    Such a complete abdication of UBS SA's asset management responsibilities came as a surprise to the then-Head of Portfolio Management at UBS SA, Christian Schoen, who stated in a March 22, 2004 email to another UBS SA employee:

> I am wondering how this is supposed to work and how one can argue that we are officially the portfolio manager but do not have a cent posted on our books. To date I had assumed that Madoff certainly makes the trades and executes them, but that the assets lie with us and that in the end we settle the trades with Madoff. This way I would have been in a position to exercise a certain oversight function.

209.    As with Luxalpha, BLMIS had custody of Groupement Financier's assets and served as its exclusive trader, and all transactions involving the assets of Groupement Financier were permitted to be executed and settled solely by BLMIS. The NAV for Groupement Financier was calculated by UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS SA. There was no third-party verification of the information provided by BLMIS. The UBS Defendants' Operating Memorandum for Groupement Financier also accepted the "considerable delay" with which BLMIS dispatched trade confirmations and provided for the "issu[ance of] the NAV with a delay of up to 9 business days." Groupement Financier's account statements and trade confirmations were sent from BLMIS to Access's New York and London offices. The Access Defendants shared Groupement Financier's account statements and trade confirmations with UBS SA and UBSFSL.

**D.    Access Knowingly Made Misrepresentations About Groupement Financier in Violation of Applicable Regulations**

210.    Access prepared marketing materials that included a chart detailing which French anti-fraud regulations Groupement Financier satisfied.

211.    In the chart, Access represented that Groupement Financier satisfied the French regulation requiring "custody of the assets . . . be held by one or more companies which are

48

separate from the management company[.]"  Access made this representation despite internal

discussions regarding the falsity of the representation.  An Access executive noted that "the same

entity is both the custodian of the assets . . . and the management company," and that "the

prospectus does not identify Bernard L. Madoff or Bernard L. Madoff Securities LLC [as]

either."

212.    Access also represented that the fund's "assets in bank accounts are controlled by

the directors of the fund," but Groupement Financier's directors, Littaye and Villehuchet, had

delegated complete custody and control of the fund's assets to BLMIS.

213.    Another anti-fraud measure within the French regulations required a fund's

manager to be registered with, and under the regulatory supervision of, a governmental financial

regulatory agency.  When an Access executive suggested satisfying this regulation by using AIA

LLC, a New York entity registered with the SEC, Littaye immediately rejected the idea because

it was "too risky (cf B[ernard] M[adoff])."

**E.    Luxalpha Served as the Blueprint for Future BLMIS Feeder Funds, Furthering the Fraud**

214.    Luxalpha's ability to establish itself as a BLMIS feeder fund, by successfully

circumventing the regulatory standards set forth by the CSSF, created a roadmap for the

formation of other BLMIS feeder funds seeking that same advantage.

215.    By December 2004, UBS was in discussions with another entity regarding the

formation of a new BLMIS feeder fund, which it described as "a fund sub-fund along the lines of

the 'Luxalpha SICAV' model."  On August 18, 2005, LIF was formed, with the UBS Defendants

serving as LIF's official sponsor, administrator, and custodian.

216.    The UBS Defendants handled LIF "similar to the Luxalpha SICAV with regards

to registrar activities, subscription forms, etc." and acknowledged internally that LIF had the

"same strategy as for [sic] Luxalpha Sicav." UBS SA even went as far as to take the risk

management section from Luxalpha's Long Form Report and use the same description for LIF.

LIF was simply a reproduction of Luxalpha.

217. LIF's non-UBS service providers followed the UBS Defendants' lead and

leveraged the knowledge they obtained in creating a BLMIS feeder fund to launch still more

BLMIS feeder funds. From LIF, and by association Luxalpha, two new BLMIS feeder funds

were formed: Landmark Investment Fund (sometimes called LIF Ireland) and Defender Limited

Fund. Defender, which referred to LIF as its "sister fund," was created to accept new investors

at a time when LIF had been temporarily closed to new investment.

218. These funds, like LIF, funneled additional funds into BLMIS, furthering the fraud

and deepening BLMIS's insolvency, and like Luxalpha, created a false appearance of regulatory

compliance.

## THE DEFENDANTS WERE AWARE OF OBJECTIVE MARKET IMPOSSIBILITIES FOR WHICH THERE WAS NO PLAUSIBLE EXPLANATION OTHER THAN FRAUD

219. Once Luxalpha and Groupement Financier were operational, the Defendants

quickly became aware of numerous trading impossibilities at both funds. These were objective

impossibilities—quantitative evidence that Luxalpha's and Groupement Financier's customer

statements and trade confirmations reported non-existent securities transactions. These

impossibilities were seen and understood by various Access-related professionals, including

Defendant Dumbauld, and Chris Cutler, a third-party consultant hired by Access to examine

signs of fraud. When Cutler presented the evidence of fraud he had observed, the very people

who had hired him suppressed his findings, even as those findings were corroborated by internal

Access analysts.

A.    **Diligence Professionals Working for Access Identified Impossible Volumes of Options Trades and Other Serious Problems at BLMIS**

220.    Madoff's SSC strategy required the purchase and sale of vast numbers of S&P 100 Index options—volumes so large they raised serious concerns at Access.

221.    In 2006, spurred by these concerns, Villehuchet asked Theodore Dumbauld, a Partner at AIA LLC and its Chief Investment Officer, to look at the options purportedly being traded by BLMIS.  Dumbauld proceeded to take the trade confirmations received from BLMIS and compared them to the information reflected in the OCC database. Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in the OCC database.

222.    Dumbauld then inquired of his industry sources whether there was an explanation for reported options trades not appearing in the OCC database.  Dumbauld's sources confirmed that if options were, in fact, exchange- traded, they would appear in the OCC database.  BLMIS claimed that the options trades were being traded on the market: BLMIS trade confirmations contained the unique ticker symbols and CUSIP numbers (i.e., "Committee on Uniform Securities Identification Procedures" number) associated solely with exchange-traded options.

223.    Dumbauld reported his findings to Villehuchet, yet Villehuchet steadfastly refused to accept that conclusion and demanded that Dumbauld get a second opinion.

224.    Access then hired Cutler, a consultant doing business as Manager Analysis Services LLC, to provide a second opinion.  Cutler specialized in performing due diligence services on hedge funds and had previously done work for Access relating to non-Madoff funds.

225.    It took Cutler the equivalent of just four days' work to determine that there were serious problems with BLMIS.  Cutler reviewed generally available information on BLMIS's business, its auditor, audit reports, available trade tickets, and descriptions of the SSC strategy. Access, however, forbade him from speaking to Madoff or anyone at BLMIS.

51

226.    Cutler easily confirmed Dumbauld's concerns about reported options trades. Indeed, these were not marginal impossibilities.  More often than not, BLMIS's reported options trades exceeded the volume of such options trades on the CBOE.  This occurred hundreds of times.

227.    Faced with this information, Access's procedures should have required further inquiry and demanded an explanation from Madoff.  But rather than thoroughly and independently verifying the legitimacy of BLMIS's and Madoff's options trading, the Access Defendants, including Littaye and Delandmeter—who sat on Luxalpha's Board of Directors with UBS executives—purposely concealed the problem.

228.    Upon discovering the significant disparity between what BLMIS was reporting and actual market activity, the Access Defendants declined to press Madoff for an explanation or to exit the relationship with BLMIS.  Instead, the Access Defendants quashed any discussion of the issue and hid behind a disclaimer stating that Access does not validate the accuracy of the monthly portfolio movements reported by BLMIS.  Access's long-time director of research, Wogsberg, never knew whether Cutler ever finished the due diligence he was asked to undertake.

229.    The options discrepancy was stark.  As shown below in charts 1(a) and 1(b), the volume of S&P 100 put options BLMIS purported to trade on behalf of Luxalpha and Groupement Financier (red bars) dwarfs the total volume of the respective S&P 100 put options traded on the CBOE (black bars).

**Chart 1(a)**



**Chart 1(b)**



230.    Charts 2(a) and 2(b) below depict the volume of S&P 100 call options BLMIS purportedly traded on behalf of Luxalpha and Groupement Financier (blue bars) as compared to the entire CBOE exchange volume (black bars) for the respective options contracts.

**Chart 2(a)**



**Chart 2(b)**



231.    There were 473 instances over the lifetime of Luxalpha and Groupement Financier where BLMIS's purported trading for Luxalpha and Groupement Financier exceeded the total CBOE volume.  In 362 of these instances, the volume traded was at least twice the CBOE; in 151 instances, the volume traded was at least *ten times* the volume traded on the CBOE.

232.    The statements and trade confirmations revealed that in 52% of the instances when Madoff purported to trade options for Luxalpha, or Groupement Financier, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day.  This is, of course, impossible.  Even one instance of such a trade should have been a major red flag.  But there was not one instance, there were many—hundreds of incidents where purported purchases or sales of options with the same strike price and expiration date for Luxalpha and Groupement Financier exceeded the entire volume of such options traded on the CBOE.

233.    Access knew that BLMIS was purportedly trading the same options for hundreds of other accounts, underscoring the implausibility of Madoff's claims about options trading.

234.    The problems Cutler discovered were not limited to options volumes.  He also identified, among other things: (i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper confirmation—the only way in which trades were reported to Access.

**B.    Cutler Recognized That the SSC Strategy Simply Could Not Work as Madoff Claimed, a Fact That Access Already Knew**

235.    In conducting his review of BLMIS, Cutler saw significant problems that went far beyond options trades.  Looking at BLMIS as a whole, Cutler came to the same conclusion that UBS had several years earlier and testified that he believed that the strategy itself didn't make

sense.  In his 2006 analysis, Cutler observed, "EITHER extremely sloppy errors OR serious

omissions in tickets.  That's the best case ... arithmetic errors in the founder's [Madoff's]

strategy description (found at another source), which is so basic that it suggests that the founder

doesn't really understand the costs of the option strategy."

236.    The SSC strategy purported to be a "collared" investment strategy that was

supposed to track the S&P 100 while also tempering returns in volatile markets.  But the virtual

elimination of volatility would have been impossible under the SSC strategy.  Properly

implemented, the SSC strategy should have yielded results for Luxalpha and Groupement

Financier that were closely correlated to the S&P 100, but with less dramatic downswings and

upswings.

237.    The S&P 100 index options ("OEX Options") collars attached to BLMIS's stock

purchases should, in theory, have ensured that when the S&P 100 dropped, it would not drop as

much for BLMIS investors.  Collapses in stock price would be hedged by put contracts funded

by the sale of call options.  The effect of that strategy, however, would also limit gains when the

S&P 100 went up.

238.    Had BLMIS been deploying the SSC strategy, it would have been impossible for

Luxalpha or Groupement Financier to post gains on their BLMIS investments when the S&P 100

was significantly down.  This is because downswings were only hedged by put options.

Exercising those options would not have turned losses into gains, it would simply have put a

floor on losses.

239.    Similarly, outperforming the S&P 100 during a major upswing should also have

been impossible, as call options sold by BLMIS would have been exercised during a significant

market upswing, putting a ceiling on gains.

240. Luxalpha's and Groupement Financier's respective account statements consistently show gains when the market was down. When the market was up, Luxalpha and Groupement Financier appeared to outperform the market. This is objectively impossible under the SSC strategy and reflects the same "IMPOSSIBLE" returns UBS previously identified.

241. The following chart, which reflects the performance of a theoretical $100 investment, shows the complete and impossible lack of correlation between BLMIS and the S&P 100 index:



242.    That Access was aware of these impossibly consistent returns is not in debate, as shown in the performance chart below that Access shared with investors:

**ACCESS INTERNATIONAL ADVISORS LLC**





243.    BLMIS's returns purported to be immune to any market instability, enjoying consistently positive rates of return at all times, even during catastrophic market downturns such as the "dot com" bubble bursting of 2000, the 2000–2002 bear market, and the disastrous and unforeseeable market impact of September 11, 2001.  The following table demonstrates the consistency of the Luxalpha and Groupement Financier returns and their lack of correlation to the S&P 100:

| Year | Luxalpha Account Rate of Return | Groupement Financier Account Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|
| 2004 | 8.1% (partial year) | 9.4% | 4.5% |
| 2005 | 10.5% | 10.4% | (0.9%) |
| 2006 | 13.1% | 13.3% | 15.9% |
| 2007 | 11.0% | 10.7% | 3.8% |
| 2008 (through Nov) | 9.4% | 9.3% | (36.9%) |

244.    During its 68-month operational life, Groupement Financier's BLMIS account had a negative rate of return in only one month.  In the same period, the S&P 100 had a negative rate of return in 26 months.  Likewise, Luxalpha's BLMIS account had only one month of negative performance during its 57-month operational life, whereas in the same period, the S&P 100 had a negative rate of return in 25 months.

245.    Even before Cutler's analysis, an internal Access review of Oreades's returns conducted in 1999 identified and acknowledged the irregularity of BLMIS having "no negative months and very stable positive performance."  The same impossible returns were repeated with Luxalpha and Groupement Financier.

246.    Over the lifetime of Luxalpha's and Groupement Financier's accounts, BLMIS account statements and trade confirmations show that almost always, the trades beat the market—an impossibility.  Approximately 83% of (reported) stock purchases occurred below the

volume-weighted average price. Approximately 74% of (reported) stock sales occurred above the volume-weighted average price. Access and UBS possessed clear evidence that the frequency with which BLMIS purported to trade at the optimal price point was statistically impossible.

247.    Prior to Cutler's analysis, there was skepticism that Madoff could legitimately achieve the consistent returns he reported through implementation of the SSC strategy. Access inquired whether Madoff was illicitly using his market-making operation for insight as to when the market would move.

248.    Littaye suppressed Access's concerns regarding Madoff's suspected market-timing edge. Littaye reported that BLMIS had three models—short-, middle-, and long-term models of the market—that Madoff used in making decisions of when to enter and exit the market. Access's research staff, including Wogsberg, was never provided with any detail concerning these purported models, yet Access accepted them as an explanation of Madoff's market-timing ability. The notion of short-, middle-, and long-term market models made no sense, especially because Madoff purported to move customer funds out of the market at quarter-end and into the market at the beginning of each quarter, regardless of the market's prevailing performance—an act that was itself at odds with the SSC strategy.

## C.    Cutler and Others Understood That BLMIS's Volume of Assets Under Management Was Too Large to Properly Implement the SSC Strategy

249.    Even beyond the impossible options trades, Cutler concluded that "the size of his [Madoff's] trades were so large that I did not see a way he could actually implement the trades without moving the market against him." Madoff's assets under management were simply too large to properly execute the SSC strategy—the strategy was not scalable.

250.    In connection with financial markets, "scalability" refers to an investment strategy's ability to handle higher trading volumes or growing assets under management.  As assets under management increase, it becomes more difficult for a manager to find opportunities of a scale proportional to a fund's growing size.

251.    The SSC strategy, which purported to capitalize on market inefficiencies, was limited because there were fewer opportunities in S&P 100 Index companies because they were so efficiently traded.  The purported strategy was further restricted by the limited volumes of stock in the S&P 100 Index companies and in the S&P 100 Index options relative to BLMIS's purported assets under management.

252.    The SSC strategy was not scalable for the amount of BLMIS's purported assets under management.  As early as October 2002, a memo Access prepared and shared with UBS states: "assets in [BLMIS's trading] accounts are estimated to exceed $10 billion in the aggregate."  Thus, even before the creation of Luxalpha and Groupement Financier, Access and UBS SA knew that BLMIS purportedly held more than $10 billion of assets under management. To execute the SSC strategy with at least $10 billion of assets under management, BLMIS would need $10 billion of notional value in call options.

253.    In December 2004, an Access client, a Swiss bank, demanded an explanation for how BLMIS could be trading at more than triple the daily volume for the entire publicly traded index.  No satisfactory explanation was ever provided.

254.    In February and May 2006, the same Access client continued to express concerns and seek explanations concerning the volume of Madoff's purported options trading.

255.    In 2006, BLMIS began publicly disclosing its assets under management in Form ADVs filed with the SEC, reporting that it had approximately $11.7 billion as of July 2006,

$13.2 billion as of December 2006, and $17.1 billion as of December 2007.  Access and UBS SA reviewed BLMIS's filings.

256.    Between 2000 and 2008, there was no time when there were enough options on the listed market to implement Madoff's purported SSC strategy.

**D.    Cutler and Access Could Not Identify Any of Madoff's Counterparties, Marking a Significant Risk to Luxalpha and Groupement Financier**

257.    Despite Cutler's efforts to understand how, and with whom, Madoff entered into options contracts, Cutler could not explain it, stating, "I just can't find the other side of the trade."

258.    Madoff initially purported to trade options contracts on the CBOE.  But when customers questioned whether there was adequate volume on the CBOE, Madoff changed his story and claimed to be trading options contracts over-the-counter.  This created a new problem for Madoff, as options trades executed via the CBOE are guaranteed by that exchange.  Over-the-counter trades, however, require willing counterparties, whose performance is not guaranteed.  Cutler correctly recognized that the inability to identify counterparties created a major risk for Luxalpha and Groupement Financier.

259.    BLMIS thus purported to enter into vast numbers of private options contracts as Luxalpha's and Groupement Financier's agent.  Had the counterparties to those contracts defaulted or otherwise failed to perform, Luxalpha and Groupement Financier would have been exposed to substantial losses.

260.    It was not just Cutler who understood the problem with BLMIS's counterparties. In August, September, and October of 2006, representatives of one of Access's clients, a Swiss private bank, requested disclosure of the counterparties due to credit risk concerns raised by their auditors.

261.    The inquiry from the Swiss private bank prompted Madoff to call Littaye at Access.  Littaye's notes of that call indicate that Madoff stated he would not identify the counterparties for the options trades unless there was a default, and that there was no risk because the options were part of "portfolio assurance programs."  Littaye's notes further indicate that he had never heard of a "portfolio assurance program" and had no idea what such a program was.

262.    Littaye then conveyed Madoff's response to the Swiss private bank.  In internal notes and emails, the bank observed that Littaye "did not understand the reply from [Madoff] and was unable to elaborate on it."  At least one of the explanations Littaye conveyed was deemed "not very credible."  Faced with this troubling response from Madoff, Villehuchet called an employee of the Swiss bank and asked that the bank not send any more inquiries directly to Madoff.

263.    Madoff refused to identify the counterparties, claiming he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were "proprietary."  The Defendants never reviewed any form of draft or final counterparty agreement or OTC transaction confirmation.  Indeed, the Defendants never knew the identities of these options counterparties because they did not exist.

264.    U.S. regulators were also eager to identify Madoff's counterparties.  On June 16, 2006, the SEC's Enforcement Staff sent a draft document request to UBS's offices in the U.S. in an attempt to verify whether any of UBS's European affiliates had served as one of Madoff's purported OTC option counterparties.  Instead of providing the SEC with a direct answer, UBS's U.S. offices claimed to be unable to access the relevant data from Europe and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from

Europe.  However, UBS knew in 2006 that no UBS entity had ever acted as a counterparty to an options trade with BLMIS's IA business.

265.    In 2004 and 2005, Luxalpha also falsely reported in Risk Approach Memos prepared for Luxalpha's auditors that BLMIS's option counterparties were approved by UBS AG as Luxalpha's promoter.  No such counterparties were ever identified to, or approved by, UBS AG.  Of course, no such counterparties ever existed.

**E.    Cutler Concluded in 2006 That Access Should Exit All of Its Investments With BLMIS—But His Conclusions Were Suppressed**

266.    Upon completing his review, Cutler's ultimate conclusion was unequivocal: in an April 20, 2006, email to Dumbauld, Cutler said, "Ted, if this [BLMIS] were a new investment prospect, not only would it simply fail to meet due dili standards: **you would likely shove it out the door.**" (Emphasis added.)

267.    Cutler further concluded that BLMIS certainly did not meet his standards and recommended that Access exit all of its investments with BLMIS.  Despite the obvious significance of his conclusions, Cutler was not asked to produce a formal report or to put his findings in writing, despite having done so in the past when advising Access with regard to other investments.

268.    Cutler conveyed his conclusions in an oral report given to Access's inner circle. In late April or early May 2006, Cutler attended a lunch meeting at the University Club in New York.  Present at the meeting were Littaye, Villehuchet, Dumbauld, and Chantal Lanchon, a long-time, trusted adviser to Littaye and Villehuchet who worked for Access from time to time. Cutler conveyed his conclusion at this meeting that Access should exit BLMIS and concentrate on building other aspects of its business.

269.    As Cutler was conveying his conclusion, he was interrupted by Littaye, who said

that he questioned Cutler's "business judgment" given that Access's BLMIS business was

"going well," while the other parts of its business were not going well.

270.    On May 9, 2006, Cutler sent an email to Dumbauld concerning the University

Club lunch which stated in relevant part:

> Ted, I did my best to inject doubt in a courteous yet effective
> manner.  I would actually like to follow up with Patrick via phone.

On May 10, 2006, Dumbauld replied:

> I believe you handle[d] the lunch perfectly.  As you could tell,
> Patrick is highly sensitive and defensive of the situation.  We have
> not had a chance to discuss post lunch; I will give you some
> feedback when I have it.  I will also let you know about a call with
> Patrick.

271.    There was never any follow-up conversation; Cutler was never given any

feedback on the fraudulent options volume that he so easily identified.

272.    Cutler's findings were not shared with anyone else at Access, including its

research and marketing staff.  In his Rule 2004 examination, Cutler testified that it was

"understood" that his conclusion would not be shared beyond those who attended the University

Club lunch meeting.

273.    On May 12, 2006, the Access Products Committee held a meeting that was

attended by, among others, Littaye, Villehuchet, Dumbauld, and Lanchon.  The minutes from

that meeting state:

> As a result [sic] the conversations we had recently with various
> sources, it was decided we need to add additional disclosures to the
> monthly report describing monthly portfolio movements.  **The
> disclosure needs to make clear that AIA is dependent on the
> information provided to us by BMI and that we do not validate
> the accuracy of that information.**  (Emphasis added.)

## EVEN BEYOND CUTLER'S ANALYSIS, BLMIS'S STRUCTURE AND OPERATIONS PROVIDED AMPLE EVIDENCE OF FRAUD

### A.    Madoff's Unusual Fee Structure

274.    The customary investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of profits earned by the investment.  Fees normally run higher for investment advisers with a history of success.  BLMIS did not charge investors any traditional management or performance fees.  Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $0.04 per equity share traded.  Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table.  As UBS O'Connor noted, the "simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter," and was reason enough to stay away from BLMIS investment.

275.    Other industry professionals also realized that BLMIS's highly unusual fee structure was a serious warning sign.

### B.    Madoff's Insistence on Secrecy

276.    Madoff insisted that his name not appear in any official offering document relating to the Feeder Fund Defendants.  Access acquiesced to that request even when the absence of Madoff's name from such documents would violate applicable laws.

277.    Madoff's name was not allowed to appear as the custodian, primary broker, or manager for any fund.  The Feeder Fund Defendants' offering documents reflected only that an Access entity was the fund manager.

278.     In 2000 Access instructed that "[Madoff] should not appear in any official
document." In a 2004 document, Littaye wrote, "[w]e underline the confidentiality of the
product, and insist on the fact that [Madoff's] name must never be published."

279.     During a May 10, 2006 lunch, Madoff asked Littaye if his name was mentioned in
Luxalpha's prospectus. In his notes on the meeting, Littaye wrote that he assured Madoff that
"BY NO MEANS" did Madoff's name appear in the prospectus.

280.     UBS also complied with Madoff's demand for secrecy. In addition to omitting
Madoff's name from Luxalpha's offering documents and the Control Report on custodian bank
functions submitted to the CSSF, UBS SA also took steps to remove all references to Madoff
from UBS audit reports prepared by Ernst & Young. Ernst & Young agreed to remove Madoff's
name from its reports after "very long discussions . . . concerning the subject" with a UBS SA
executive. That same executive later cautioned another UBS SA executive that "[o]ne has to be
careful about everything" when it comes to ensuring Madoff's name remains undisclosed. UBS
SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship
with BLMIS.

281.     UBS created the façade that Luxalpha's custodial and managerial duties were
divided between two Luxembourg companies, UBS SA and UBSTPM, when in fact, from the
first day of Luxalpha's operation, both roles rested solely with BLMIS in New York.

## C.   Madoff's Auditor Was Neither Qualified nor Capable of Auditing a Global Investment Management Company With Billions of Dollars Under Management

282.     BLMIS's auditor was Friehling & Horowitz, a three-person accounting firm based
out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was
a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant
living in Florida.

283.    Access knew that BLMIS was using a small, unknown auditing firm for the

reports it filed with the SEC and provided to investors.  Wogsberg expressed concern after

preliminary research on Friehling & Horowitz, stating:

> I was quite worried, and so I said, Patrick, look at what we have here.
> It appears that he may have some conflicts and he certainly is tiny and
> it's always better to have a large audit firm do this sort of thing. And
> Patrick's response was if this audit firm is good enough for the SEC,
> it's good enough for Access.  Don't go further.

Littaye quashed any further inquiry.

284.    Access was aware that Friehling & Horowitz was incapable of providing auditing

services to a global investment adviser of BLMIS's purported size, with billions of dollars under

management.

285.    As sophisticated market participants, Access, along with UBS, also had to know

that all accounting firms that perform audit work must enroll in the American Institute of

Certified Public Accountants' ("AICPA") peer review program.  This program involves having

experienced auditors assess a firm's audit quality periodically.  The results of these peer reviews

are on public file with the AICPA.  Friehling & Horowitz never appeared on the public peer

review list because Friehling and Horowitz had notified the AICPA that it did not perform audits.

### LUXALPHA'S AND GROUPEMENT FINANCIER'S TRADE STATEMENTS ALSO CONTAINED OTHER INDICIA OF FRAUD

**A.    BLMIS Purported to Trade Equities Outside the Daily Reported Price Range**

286.    BLMIS trade confirmations showed the prices for every purported purchase and

sale of stocks and options.  The Luxalpha and Groupement Financier BLMIS trade confirmations

showed many trades executed outside the daily price range.  Over the lifetime of these accounts,

there were no fewer than 74 instances where BLMIS purported to execute an equity trade at a

price that fell outside the publicly reported daily price range.  These 74 impossibly priced

transactions represented more than 4.7 million shares of stock.  Even one such instance should have been sufficient to reveal the existence of a fraud.

287.    Both Access and UBS, who each received and reviewed copies of BLMIS's trade confirmations for Luxalpha and Groupement, were aware of these impossibilities.  For example, a UBS employee in 2006 requested confirmation of "the price of the maturity of the option SP100 P595 0506 which has been settled to 8.99 which is not the range from BB for that day."

288.    Luxalpha's account statements and trade confirmations report the sale of 127,275 shares of Merck on December 22, 2006.  Groupement Financier's account statements and trade confirmations also report the sale of 20,953 shares of Merck on December 22, 2006.  The account statements reflect that these shares were sold for $44.61.  This was impossible given that the actual price range for Merck on December 22, 2006 ranged from $42.78 to $43.42.

**B.    Luxalpha and Groupement Financier Regularly Had Negative Cash Balances With BLMIS**

289.    On at least 28 occasions, for a total of 73 days, Luxalpha's cash balance with BLMIS had a negative value.  When Luxalpha's cash balance was negative, its average value was negative $7,342,851.

290.    On at least 43 occasions, for a total of 122 days, Groupement Financier's cash balance with BLMIS had a negative value.  When the Groupement Financier cash balance was negative, its average value was negative $4,495,183.

291.    In one such instance, on March 3, 2006, Littaye sent a fax to BLMIS requesting a $16,000,000 withdrawal from Groupement Financier's account.  The request from Littaye asked that securities be redeemed to fund the withdrawal.  On March 8, 2006, BLMIS issued a $16,000,000 wire to Groupement Financier's account at the Bank of Bermuda.

292.    The account statements sent to and reviewed by Access and UBS show that, as of the time of Littaye's request, the cash balance at the beginning of the month in Groupement Financier's BLMIS account was $0.88, no securities were redeemed before the withdrawal, and that after the withdrawal the account cash balance was negative $15,435,156.36 and was not returned to a positive balance until March 16, 2006, when equities and call options were purportedly sold.

293.    UBSFSL, as the administrator to not only Luxalpha and Groupement Financier, but also LIF, tracked the funds' cash balance, and noted that, from time to time, the funds had a negative cash balance.  For example, in July 2006, UBSFSL recognized that LIF had been in an "overdraft position" for several weeks and attempted to obtain an explanation for that "leverage situation."

294.    In another example, on July 1, 2004, UBS SA employees sent a fax to BLMIS requesting a $4,000,000 withdrawal from Luxalpha's account.  On July 6, 2004, BLMIS issued a $4,000,000 wire to Luxalpha's account at UBS AG.  The account statements sent to and reviewed by Access and UBS showed that, as of the time of the request, the cash balance in Luxalpha's BLMIS account was $0.47.  After the withdrawal, the account cash balance was negative $3,952,257.79.  The account was not returned to a positive balance until July 12, 2004, when Treasury Bills were purportedly sold.

295.    Luxalpha and Groupement Financier did not have margin accounts with BLMIS and BLMIS never charged Luxalpha or Groupement Financier any interest for its margin trades, effectively providing millions of dollars of interest-free loans.  No legitimate institution would have advanced the funds millions of dollars at zero percent interest.

C.      **The Dividend Activity Shown on Luxalpha's and Groupement Financier's Statements Was Impossible**

296.    At various times when not in the market, BLMIS customer funds were purportedly invested in a money market fund that also paid dividends.  Typically, money market funds declare dividends daily and pay them monthly.  If an entity transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid once per month.

297.    Luxalpha's and Groupement Financier's customer statements and trade confirmations reflected numerous anomalies relating to dividends.  Ninety-nine percent of the money market dividends purportedly received were noted as being received on dates different than the disclosed dividend payment date.  In addition, in more than sixty percent of months in which money market dividends were paid, the statements noted multiple payments in the same month—even though the money market funds at issue paid dividends only once a month.

D.      **BLMIS Reported Trades for Luxalpha and Groupement Financier That Were Inconsistent With the SSC Strategy**

298.    Madoff's options trades on behalf of Luxalpha and Groupement Financier often showed significant gains from speculative options trades that were inconsistent with the SSC strategy.  Some of these reported transactions involved short-term options trading that resulted in substantial gains for Luxalpha and Groupement Financier.  For example, in 2008, Luxalpha and Groupement Financier each participated in two of these trades, which generated gains of approximately $17.5 million and $4.7 million, respectively.  These gains were purportedly achieved through speculation in the options market, leaving the underlying basket of securities exposed to potentially significant losses, and contradicting the inherently conservative premise of the SSC strategy.  Between 2003 and 2008, Luxalpha and Groupement Financier together benefited in excess of $30 million from such trades.

299.    Also inconsistent with the SSC strategy were multiple instances in which Madoff purported to sell a specific stock or stocks from a basket before the rest of the basket was liquidated.  Not only was the premature sale of stock inconsistent with the SSC strategy, but the liquidation of these positions should have caused Madoff to adjust the options collar for the basket, which he almost always failed to do.  When purported hedges were not adjusted based on changes in the value of the equity position, the BLMIS accounts were left exposed to market risk, and this additional risk was not an element of the SSC strategy.  For example, Luxalpha's account statements indicate that in April 2007, BLMIS purported to purchase a basket of S&P 100 Index stocks that included shares of 3M Company and CVS Caremark Corp.  The shares of 3M Company and CVS Caremark Corp. were sold in May 2007 whereas the other equities contained in the basket were not sold until June 2007.  In light of the early sale of the 3M and CVS shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk.  No such adjustment was reflected in the customer statements or trade confirmations.

300.    Both of these trading activities contradicted the SSC strategy and were known to Access and UBS, who regularly reviewed Madoff's account statements and trade confirmations.

**E.    Madoff's Practice of Providing Only Hard Copy Trade Confirmations Defied Industry Practice and Facilitated Fraud**

301.    Access knew that the trade confirmations received from BLMIS were only in a hard copy, paper format and were delayed because they were sent via regular mail, sometimes several days after the purported trade.

302.    Access also knew that it was "abnormal" in the mid-2000s not to have more prompt, electronic access to such information.

303.    As a result of BLMIS's delays in providing trade information, AML provided UBS SA with backdated monthly investment recommendations for Luxalpha.

304.    In addition to the oddity of "paper only" trade confirmations, Cutler also highlighted the fact that the confirmations did not have time stamps on them, which he believed was a standard practice of all broker/dealers.

**F.    BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies in Purported Options Transactions**

305.    According to industry standards, the settlement date for exchange-listed options is the business day following the trade date, referred to as "T+1." Trade confirmations produced by BLMIS and sent to UBS and Access regularly showed options transactions that settled more than one day after execution. All of the options trade confirms showed CBOE-traded OEX Options, which would have been subject to the T+1 settlement date.

306.    Approximately 51% of Luxalpha's, and 48% of Groupement Financier's, purported options transactions settled at least three business days after execution and therefore did not comply with standard market practices.

**G.    BLMIS Avoided Reporting Requirements by Consistently Claiming to Be Out of the Market at Quarter-End and Year-End Even Though Such Behavior Was Inconsistent With the SSC Strategy**

307.    Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year. To evade these reporting requirements, Madoff purported to liquidate all investments at those times, and invest the proceeds in Treasury Bills.

308.    Luxalpha's and Groupement Financier's account statements showed no equity positions at quarter- and year-end.

309.    Madoff's practice of exiting the market according to the calendar, rather than market or economic indicators, was a badge of fraud.  Defendants knew that Madoff touted "market timing" as a cornerstone of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter- and year-end contravened that strategy because it meant that Madoff was locked into whatever market conditions existed at those times, regardless of whether they were favorable.  Such trading circumstances were inconsistent with the SSC strategy.

## H.    Post-Fraud Inquiries From Access Investors Reveal the Diligence Access Should Have Done Was Understood and Expected

310.    Post-fraud inquiries reveal that Access investors understood and expected Access to take the necessary steps to protect their investments, i.e., to ensure the segregation of funds; to comply with UCITS regulations, to be aware of and disclose the existence of sub-accounts or sub-agreements, and to conduct vigorous due diligence.  For example, on December 11, 2008 Prince Michel of Yugoslavia, an Access salesperson, forwarded questions from Luca Vaiani asking: "The assets of [L]uxalpha are segregated and their [sic] should be no risk. True? Are you liquidating the positions to be in cash?"  Luxalpha's customers believed Luxalpha to be UCITS compliant and that their assets were projected under that regulatory structure.

311.    A subsequent email from Mr. Vaiani to Prince Michel of Yugoslavia states: "I would like to understand if Luxalpha American Selection is in some way (and if yes how much) involved in the Madoff fraud; if affected in any way I would like to understand what is the legal structure of the relation between the Sicav [i.e., Luxalpha] and Madoff."

312.    Another customer inquiry asked, "Was Access aware of the creation of sub-accounts by Ubs in favour of a company related to Madoff . . . How long ago did the business relations start between Madoff and Access; Can we have a copy of the CSSF circular that

outlines the obligations of custodian banks towards the investors?  Was Access aware of

who[]audited Madoff Investment Securities?"

313.    Yet another customer asked, "can you confirm that all assets of Luxalpha Sicav—

American Selection have been duly kept segregated from any other asset or accounts? . . . [C]an

you confirm the integrity of all such assets, irrespective of their current evaluation?"

314.    Perhaps most damning is the December 16, 2008 email from Manfredo Radicati

of Trendtrust SA, which states:

> Dear Michel,
>
> Like all frauds, the collapse of Madoff is a disgrace.  What is astonishing
> is that no one, especially firms such as AIA that pride themselves on the
> thoroughness of their due diligence didn't see any warning sign.  This
> is all the more disturbing since a number of "red flags" should have been
> seen … even more so since you had full transparency on the portfolios.
> Looking at the situation at hand, AIA, together with UBS, in their role
> as sponsor, investment manager and custodian of Luxalpha, should
> answer a number of questions as to why nothing was detected earlier.
> The most pressing task however, is to explain to investors how the
> holdings in the portfolio proved to be virtual or nonexistent.  Can one
> speak of negligence or complicity on the part of UBS in this matter?

Of course, all of the Defendants did indeed see the warning signs they should have seen, but they

were too driven by greed to act.

## IMPUTATION OF KNOWLEDGE FROM UBS AND ACCESS TO LUXALPHA AND GROUPEMENT FINANCIER

315.    The Access Defendants and UBS Defendants were intertwined with respect to

BLMIS feeder funds and worked closely together for purposes of creating and growing

Luxalpha's and Groupement Financier's investments in BLMIS.

316.    At all times, the Access Defendants and UBS Defendants dominated and

controlled Luxalpha and Groupement Financier.  Neither Luxalpha nor Groupement Financier

ever had any employees or office space. Rather, the Access Defendants and UBS Defendants

operated the funds as a single enterprise, of which they were the constituent parts.

317.    Littaye and Villehuchet co-founded and co-owned Access. Littaye and

Villehuchet were executives and directors of Access. Access operated under the direction and

control of Littaye and Villehuchet at all times.

318.    The Access Defendants and the UBS Defendants created Luxalpha. The UBS

Defendants served as Luxalpha's official sponsor, custodian, administrator, and manager, while

the Access Defendants served in official advisory and managerial roles. Both the Access

Defendants and the UBS Defendants received Luxalpha's BLMIS account statements and trade

confirmations.

319.    Luxalpha's board of directors was at all times composed of UBS SA and Access

principals, including Littaye and Delandmeter. As directors of Luxalpha, Littaye's and

Delandmeter's conduct and/or direct knowledge of fraud at BLMIS is imputed to the fund.

320.    Likewise, the Access Defendants created Groupement Financier. UBS SA served

as the official prime bank and UBSFSL served as the administrator of Groupement Financier,

while the Access Defendants served in official management and advisory roles. Both the Access

Defendants and UBS Defendants received Groupement Financier's BLMIS account statements

and trade confirmations.

321.    The board of directors of Groupement Financier was at all times composed of

Access founders Littaye and Villehuchet. Littaye and Villehuchet carried out actions as directors

and officers of Groupement Financier, and their conduct and/or direct knowledge of fraud at

BLMIS is imputed to Groupement Financier.

322.    Further, Littaye and Villehuchet carried out actions as directors and officers of the Access Defendants, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to the Access Defendants.

323.    The Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.

## THE TRANSFERS

**The Initial Transfers**

324.    Before the Filing Date, Luxalpha maintained BLMIS account no. 1FR108 and Groupement Financier maintained BLMIS account no. 1FR096 (collectively, the "Accounts"), as set forth on Exhibit A. Each Feeder Fund Defendant executed, or caused to be executed, BLMIS Account Opening Agreements (as defined herein) for its account, and delivered, or caused those documents to be delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

325.    The BLMIS Account Opening Agreements were to be performed in New York through securities trading activities that would take place there. The Accounts were held in New York and the Feeder Fund Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase in New York, Account No. xxxxxxxxxxx1703 (the "703 Account"), for application to the Accounts and the purported conducting of trading activities.

326.    The Feeder Fund Defendants collectively invested approximately $2 billion with BLMIS through more than 150 separate transfers via check and wire directly into the 703 Account.

327.    During the six years preceding the Filing Date, BLMIS made transfers to or for the benefit of the Feeder Fund Defendants in the collective amount of at least $1.1 billion (the

"Six Year Transfers"). The Six Year Transfers include transfers of approximately $752 million

to Defendant Luxalpha and $352 million to Defendant Groupement Financier. The Six Year

Transfers are avoidable and recoverable under §§ 544(b), 550(a), and 551 of the Bankruptcy

Code, applicable provisions of SIPA, particularly SIPA §78fff- 2(c)(3), and §§ 273-279 of New

York Debtor and Creditor Law.

328.    Of the Six Year Transfers, BLMIS transferred to or for the benefit of the Feeder

Fund Defendants approximately $1.01 billion during the two years preceding the Filing Date,

(the "Two Year Transfers").  The Two Year Transfers included transfers of approximately $735

million to Luxalpha and approximately $275 million to Groupement Financier.  Each of the Two

Year Transfers is avoidable under § 548 of the Bankruptcy Code, and applicable provisions of

SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).  Each of the Two Year Transfers is recoverable

under § 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly §

78fff-2(c)(3).

329.    The Six Year Transfers and the Two Year Transfers, are referred to herein as

"Initial Transfers."  Numerous indicia of fraud concerning BLMIS gave the Feeder Fund

Defendants knowledge of BLMIS's fraud.  These indicia of fraud, and the Feeder Fund

Defendants' willful and deliberate decision to continue investing with BLMIS despite them,

demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or

recklessness amounting to fraudulent intent.  Given the Feeder Fund Defendants' knowledge of

these indicia of fraud, the Feeder Fund Defendants were neither innocent nor good faith

investors.

330.    The Feeder Fund Defendants had information that put them on actual and/or

inquiry notice of fraud at BLMIS, or that BLMIS was insolvent and/or that the transfers were

being made with a fraudulent purpose, and strategically chose to ignore that information in order to continue to enrich themselves through their relationship with Madoff and BLMIS.

331.    Charts setting forth the Initial Transfers are included as Exhibits B and C.  The Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**The Subsequent Transfers**

332.    Based on the Trustee's investigation to date, the Feeder Fund Defendants subsequently transferred some of the Initial Transfers to the Access Defendants and UBS Defendants (the "Subsequent Transferee Defendants") as payment for their alleged service of the Feeder Fund Defendants.  In addition, some of the initial transfers to Groupement Financier were subsequently transferred to Groupement Levered.  Groupement Levered then subsequently transferred the initial transfers to Access.  All of these payments constitute subsequent transfers of Initial Transfers.  All avoidable transfers from BLMIS to the Feeder Fund Defendants, which they subsequently transferred, either directly or indirectly, to the Subsequent Transferee Defendants (the "Subsequent Transfers"), are recoverable from the Subsequent Transferee Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA and N.Y. Debt. & Cred. Law §§ 273-279.

333.    Based on the Trustee's investigation to date, the UBS Defendants received Subsequent Transfers, including but not limited to:

   a.    UBS SA received at least $32.8 million in fees from Luxalpha for serving as the official custodian and official manager of Luxalpha from February 2004 to August 2006, and an additional $6.6 million in fees from Luxalpha for serving as the official custodian of Luxalpha from August 2006 to December 2008.  UBS SA also received at least $1 million in fees from Groupement Financier for serving as the official prime bank of Groupement Financier from 2005 to December 2008, and at least $500,000 in fees from Groupement Levered for serving as the official custodian of Groupement Levered from 2005 to December 2008.

b.     UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the official administrator of Luxalpha from February 2004 to December 2008. UBSFSL also received at least $497,000 from Groupement Financier for serving as the official administrator of Groupement and Groupement Levered from 2005 to December 2008.

c.     UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the official manager of Luxalpha from August 2006 to November 2008.

334.    Based on the Trustee's investigation to date, AIA Ltd., AIA LLC, AP (Lux), and

AML (f/k/a AIA (Lux)) received at least $100.6 million in Subsequent Transfers, including but

not limited to:

a.     AIA Ltd. received at least $25.4 million in fees from UBS SA pursuant to a February 5, 2004 "Consulting and Exclusive Introducing Agreement," which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. also received at least $28.5 million in fees from UBSTPM under an August 1, 2006 "Client Introducer Agreement," which consisted of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. further received at least $15 million in fees from Groupement Financier for serving as the official manager of Groupement Financier from 2003 to December 2008. AIA Ltd. received at least $400,000 in fees for serving as the official manager of Groupement Levered from 2003 to December 2008.

b.     AIA LLC received at least $189,000 in fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from August 2004 to August 2006, which consisted of fees received by UBS SA for serving as Luxalpha's official manager. These fees were pursuant to a contract entered into between UBS SA and AIA LLC which contains a New York choice of law provision.

c.     AP (Lux) received at least $17.8 million in fees from UBSTPM for serving as the investment adviser to Luxalpha from 2007 to December 2008, consisting of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AP (Lux) also received at least $8.4 million in fees from Groupement Financier for serving as the official investment adviser to Groupement Financier from 2007 to December 2008. AP (Lux) received an additional $2.5 million in fees from Groupement Levered for serving as the official investment adviser to Groupement Levered from 2007 to December 2008.

d.     AML (f/k/a AIA (Lux)) received at least $2.4 million in fees from Groupement Financier for serving as the investment adviser to Groupement Financier from 2003 to 2007, and received at least $50,000 for serving as the investment adviser to Groupement Levered from 2003 to 2007.  In addition, AML (f/k/a AIA (Lux)) received fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from February 2004 to August 2004, which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager, in an amount to be proven at trial.

335.     Based on the Trustee's investigation to date, Littaye, Villehuchet, and Ms. Villehuchet received millions of dollars of Subsequent Transfers, in an amount to be proven at trial.  At all relevant times, each of AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was either completely or nearly completely owned by Littaye and Villehuchet.  At various times, Littaye and Villehuchet each also served as a director of AIA Ltd., AP (Lux), and AML (f/k/a AIA (Lux)).  A significant amount of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was subsequently transferred to Littaye and Villehuchet, either directly or indirectly, in the form of distributions, payments, or other transfers of value.  Among other transfers, Villehuchet received $6.5 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2008, and, upon information and belief, his co-owner Littaye received at least the same amount of compensation paid from other Access-controlled bank accounts.  The transfers Villehuchet received are recoverable from Ms. Villehuchet, as the executrix and sole beneficiary of Villehuchet's will.

336.     Based on the Trustee's investigation to date, Delandmeter received approximately $350,000 in Subsequent Transfers from Luxalpha, in connection with Delandmeter's purported provision of legal services to Luxalpha.  Delandmeter also received Subsequent Transfers from Groupement Financier in connection with Delandmeter's purported provision of legal services to Groupement Financier, in an amount to be proven at trial.  Upon information and belief, a portion of the Luxalpha, Groupement Financier, and Groupement Levered-related Subsequent

81

Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Delandmeter, directly or indirectly, in compensation for Luxalpha, Groupement Financier and Groupement Levered-related services Delandmeter provided to Access, in an amount to be proven at trial.

337.    Based on the Trustee's investigation to date, a portion of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Dumbauld, in an amount to be proven at trial.  At minimum, Dumbauld received $1.25 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2007.  Dumbauld received these transfers as distributions, payments, or other transfers of value in connection with his role as Access partner and Chief Investment Officer.

338.    To the extent that any of the avoidance and recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

339.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

340.    The following chart summarizes the Initial Transfers and the Subsequent Transfers:

**[This Space Intentionally Left Blank]**

# Transfers from BLMIS to Defendants



### CUSTOMER CLAIMS

341.    On or about March 2, 2009, a customer claim was filed with the Trustee and designated as Claim No. 004419.  On March 3, 2009, a customer claim was filed with the Trustee and designated as Claim No. 005725.  Claim Nos. 004419 and 005725 were signed by Ralf Schroeter and Alan Hondequin and each claim was in the amount of $1,537,099,731.  Messrs. Schroeter and Hondequin were UBS employees as well as Luxalpha directors.  In addition, on or about March 2, 2009, UBS SA filed with the Trustee an additional customer claim on behalf of Luxalpha, designated as Claim No. 005025, also in the amount of $1,537,099,731.  These customer claims are collectively referred to herein as the "Customer Claims."  The Trustee objected to the Customer Claims.

342.    Luxalpha has taken the position that a factual dispute exists with regard to whether Luxalpha itself maintained an account at BLMIS or filed the Customer Claims.

343.    Specifically, Luxalpha has asserted that Account 1FR108 was maintained and legally owned by UBS SA.

344.    Luxalpha has also disavowed the Customer Claims by asserting that UBS SA, and not Luxalpha, filed the Customer Claims and that UBS SA did so only for purposes of protecting its own interests, not in Luxalpha's interest, and limiting UBS's potential liability to Luxalpha in Luxembourg.

345.    There continues to be an ongoing litigation between Luxalpha and UBS in Luxembourg.

346.    Luxalpha has further asserted that neither its BLMIS account nor the Customer Claims can be attributed to Luxalpha for purposes of determining whether Luxalpha had contact with or otherwise availed itself of the privileges of conducting activities within this jurisdiction.

347.     Although Luxalpha has acknowledged that UBS SA was an agent of Luxalpha, it has asserted that there is a question as to whether UBS SA, as such agent, was acting within the scope of its authority when it filed the Customer Claims.

## COUNT ONE
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

### *Against Luxalpha*

348.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

349.     Luxalpha engaged in inequitable conduct, including the conduct described in this Complaint.

350.     Based on Luxalpha's inequitable conduct, BLMIS's customers were misled as to the true financial condition of BLMIS and were induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

351.     Luxalpha's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on Luxalpha.

352.     Luxalpha inflicted harm to the estate far in excess of the fraudulent transfers that it received.  Luxalpha's investment into the Ponzi scheme included no less than $135 million in fictitious profits its management redeemed from Oreades and immediately reinvested on behalf of the same investors.  Furthermore, Luxalpha harmed the estate by directing $1.5 billion into the Ponzi scheme during a time it knew or was willfully blind to the fraud at BLMIS, which significantly contributed to the Ponzi scheme's expansion.

353.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha directly or indirectly against the estate—and only to the extent such claims are allowed—are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

354.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

355.    To the extent that Luxalpha has denied ownership of the Customer Claims, or alternatively has made a judicial admission that the Customer Claims do not belong to Luxalpha, this provides another basis for subordination of those claims.

### COUNT TWO
### FRAUDULENT TRANSFERS
### 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551

#### *Against the Feeder Fund Defendants*

356.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

357.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

358.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

359.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

360.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the

Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

361.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year

Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year

Transfers or the value thereof, for the benefit of the estate of BLMIS; (d) disallowing any claim

that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year

Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Feeder Fund

Defendants; and (g) awarding any other relief the Court deems just and appropriate.

**COUNT THREE**
**FRAUDULENT TRANSFERS**
**11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551**

***Against the Feeder Fund Defendants***

362.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully realleged herein.

363.    Each of the Two Year Transfers was made on or within two years before the

Filing Date.

364.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in

property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

365.    BLMIS received less than a reasonably equivalent value in exchange for each of

the Two Year Transfers.

366.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became

insolvent as a result of each of the Two Year Transfers.

367.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business

or a transaction, or was about to engage in a business or a transaction, for which any property

remaining with BLMIS was an unreasonably small capital.

368.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or

believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts

matured.

369.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the

Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

370.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year

Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year

Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) disallowing any claim

that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year

Transfers are repaid to the Trustee; (e) awarding attorneys' fees and costs from the Feeder Fund

Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**COUNT FOUR**
**FRADULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278, and 279, 11 U.S.C. §§ 105(a), 502(d), 544, and 551**

*Against the Feeder Fund Defendants*

371.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

372.    At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

373.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under NYDCL§ 270.

374.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

375.    Each of the Six Year Transfers was received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Six Year Transfers.

376.    As a result of the foregoing, and pursuant to NYDCL §§ 276, 276-a, 278, and 279, sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable

by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding

attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the

Court deems just and appropriate.

### COUNT FIVE
### FRADULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273, 278, and 279, 11 U.S.C. §§ 105(a), 502(d), 544, and 551

#### *Against the Feeder Fund Defendants*

377.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully realleged herein.

378.    At all times relevant to the Six Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under section

502(e) of the Bankruptcy Code.

379.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

380.    BLMIS did not receive fair consideration for the Six Year Transfers.

381.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

382.    As a result of the foregoing, and pursuant to NYDCL §§ 273, 278, and/or 279,

sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and

preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c)

recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the

benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable

by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding

attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the

Court deems just and appropriate.

## COUNT SIX
## FRADULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278, and 279, 11 U.S.C. §§ 105(a), 544, 550(a), and 551

### *Against the Feeder Fund Defendants*

383.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully realleged herein.

384.    At all times relevant to the Six Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under section

502(e) of the Bankruptcy Code,

385.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

386.    BLMIS did not receive fair consideration for the Six Year Transfers.

387.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts

matured.

388.    As a result of the foregoing, and pursuant to NYDCL §§ 275, 278, and/or 279,

sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and

preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c)

recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the

benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable

by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding

attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the

Court deems just and appropriate.

### COUNT SEVEN
### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) and 550(a)

*Against the Subsequent Transferee Defendants*

389.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully realleged herein.

390.    The Subsequent Transfers are recoverable from the Subsequent Transferee

Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

391.    Each of the Subsequent Transferee Defendants is an immediate or mediate

transferee of the Initial Transfers.

392.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15

U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee

Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent

Transferee Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief

as the Court deems appropriate.

### COUNT EIGHT
### OBJECTION TO AND DISALLOWANCE OF CLAIMS

*Against Luxalpha*

393.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully realleged herein.

394.    Luxalpha is the recipient of initial transfers of BLMIS's property which are avoidable and recoverable under SIPA section 78fff-2(c)(3), Bankruptcy Code sections 544(b), 547, 548(a) and 550(a) of the Bankruptcy Code, and N.Y. Debt. & Cred. Law sections 273, 274, 275 and 276, and it has not returned the initial transfers to the Trustee.  As a result, pursuant to Bankruptcy Code section 502(d), the Customer Claim must be disallowed unless and until Luxalpha returns the initial transfers to the Trustee.

395.    Luxalpha was not an innocent investor at the time it invested with BLMIS and provided no consideration to the estate.

396.    The Customer Claim seeks credit for at least $135 million in fictious profits withdrawn from Oreades that was deposited into Luxalpha as purported principal.  The Trustee objects to that portion of the Customer Claim.  As a result, the Customer Claim must also be disallowed to the extent of the $135 million fictious profits deposit.

397.    Luxalpha knew or was willfully blind to numerous and serious indications of fraudulent activity at BLMIS, as described in this Second Amended Complaint.  This enabled Madoff to perpetuate the fraud at BLMIS.

398.    As a result of Luxalpha's conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code and section 78fff-2 of SIPA, the Trustee objects to any and all claims of Luxalpha against the BLMIS estate, which should be disallowed, and not entitled to receive a distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

399.    To the extent that Luxalpha has denied ownership of the Customer Claims, or alternatively has made a judicial admission that the Customer Claims does not belong to Luxalpha, this provides another basis for disallowing those claims.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)        On the First Claim for Relief, pursuant to this Court's equitable powers, subordinating all claims of Luxalpha for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to Luxalpha's inequitable conduct pursuant to sections 105(a) and 510(c) of the Bankruptcy Code, such that no claim of Luxalpha is paid ahead of the allowed claim of any customer or creditor of BLMIS;

(ii)       On the Second Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (e) recovering attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate;

(iii)      On the Third Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (e) recovering attorneys' fees and costs from the Feeder Defendants; and (f) awarding any other relief the Court deems just and appropriate;

(iv)     On the Fourth Claim for Relief, pursuant to NYDCL §§ 276, 276-a, 278, and 279, sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate;

(v)  On the Fifth Claim for Relief, pursuant to NYDCL §§ 273, 278, and/or 279, sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate;

(vi)  On the Sixth Claim for Relief, pursuant to NYDCL §§ 275, 278, and/or 279, sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of

BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate;

(vii)   On the Seventh Claim for Relief, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate;

(viii)   On the Eighth Claim for Relief, sustaining the Trustee's objections to the Customer Claims pursuant to section 502(a) of the Bankruptcy Code, and disallowing such claims pursuant to section 502(b)(1) of the Bankruptcy Code;

(ix)   On all Claims for Relief, establishing a constructive trust over all of the Initial Transfers and Subsequent Transfers and their proceeds, product, and offspring in favor of the Trustee for the benefit of the estate;

(x)   On all Claims for Relief, pursuant to federal common law and/or N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Initial Transfers were received;

(xi)   On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding; and

(xii)   Granting the Trustee such other, further and different relief as the Court deems

just, proper and equitable.

Dated:   February 28, 2022
         New York, New York

Respectfully submitted,

s/ *Oren J. Warshavsky*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
Email: gzeballos@bakerlaw.com
Benjamin D. Pergament
Email: bpergament@bakerlaw.com
Geoffrey A. North
Email: gnorth@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Chapter 7 Estate of Bernard*
*L. Madoff*