Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Dielai Yang (dyang@fklaw.com)
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

**Hearing Date:  May 18, 2022**
**Response Date:  April 4, 2022**
**Reply Date:  May 4, 2022**

*Attorneys for Defendant Multi-Strategy Fund Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>          Plaintiff,<br><br>v.<br><br>MULTI-STRATEGY FUND LIMITED,<br><br>          Defendant. | Adv. Pro. No. 12-01205 (CGM) |

## DEFENDANT MULTI-STRATEGY FUND LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................1

WHAT DISTINGUISHES THIS CASE .........................................................................2

ARGUMENT ...................................................................................................................4

I.      THE TRUSTEE'S CLAIM IS BARRED BY 11 U.S.C. § 546(e) ......................4

        A.      The Alleged Initial Transfer Was Made by or to a Covered Entity.......................6

                1.      The alleged initial transfer was made by a stockbroker..............................6

                2.      The alleged initial transfer was made to a financial institution ..................7

        B.      The Alleged Initial Transfer Was a Settlement Payment
                and Made in Connection with a Securities Contract...............................................10

II.     THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT
        MULTI-STRATEGY RECEIVED BLMIS CUSTOMER PROPERTY .........................16

III.    THE COURT LACKS PERSONAL JURISDICTION
        OVER MULTI-STRATEGY .............................................................................23

        A.      Relevant Jurisdictional Facts ................................................................23

        B.      Multi-Strategy Did Not Consent to Jurisdiction, and
                Is Not Subject to General Jurisdiction, in New York ...........................................24

        C.      Multi-Strategy Is Not Subject to Specific Jurisdiction in New York ..................26

                1.      Applicable law ........................................................................................26

                2.      The Trustee's claim does not arise out of or relate to any
                        purposeful conduct of Multi-Strategy in the United States ......................27

CONCLUSION................................................................................................................40

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*5-Star Mgmt., Inc. v. Rogers*,
    940 F. Supp. 512 (E.D.N.Y. 1996) ..................................................8

*Alki Partners, L.P. v. Vatas Holding GmbH*,
    769 F. Supp. 2d 478 (S.D.N.Y. 2011), *aff'd sub. nom Alki Partners, L.P. v.
    Windhorst*, 472 F. App'x 7 (2d Cir. 2012)..............................................29

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
    409 B.R. 737 (Bankr. E.D.N.C. 2009)...................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................17

*Beacon Enters., Inc. v. Menzies*,
    715 F.2d 757 (2d Cir. 1983)..............................................................38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................17, 21

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)..............................................................26

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..............................................................26, 30, 31

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018)............................................................29, 39

*City of Long Beach v. Total Gas & Power N. Am. Inc.*,
    465 F. Supp. 3d 316 (S.D.N.Y. 2020)..........................................28, 29, 39

*Cooper v. Parsky*,
    1997 WL 242534 (S.D.N.Y. Jan. 8, 1997), *aff'd in relevant part, vacated in
    part on other grounds*, 140 F.3d 433 (2d Cir. 1998) ...............................28

*Ctr. for Reprod. Law & Policy v. Bush*,
    304 F.3d 183 (2d Cir. 2002)................................................................3

*Daimler AG v. Bauman*,
    517 U.S. 117 (2014).......................................................................25

*Dean St. Cap. Advisors, LLC v. Otoka Energy Corp.*,
    2017 WL 476720 (S.D.N.Y. Feb. 2, 2017)..............................................................25

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
    323 B.R. 857 (Bankr. S.D.N.Y. 2005) .....................................................................7

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011)...................................................................................14

*Fairfield Sentry Ltd. v. Migani*,
    [2014] UKPC 9 ...............................................................................................10, 25

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ...............................................25

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)..................................7, 8, 9, 10

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
    26 N.Y.2d 280 (1970) .....................................................................................28, 31

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
    2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ..........................................................21

*Giuliano v. Barch*,
    2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) .........................................................31

*Hanson v. Denckla*,
    357 U.S. 235 (1958)................................................................................................26

*Harris v. N.Y. State Dep't of Health*,
    202 F. Supp. 2d 143 (S.D.N.Y. 2002)......................................................................8

*Hau Yin To v. HSBC Holdings PLC*,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*,
    700 F. App'x 66 (2d Cir. 2017) ................................................................33, 34, 37

*Heinert v. Bank of Am. N.A.*,
    835 F. App'x 627 (2d Cir. 2020) ............................................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)..........................................................................................26, 30

*In re Roco Corp.*,
    701 F.2d 978 (1st Cir. 1983)...................................................................................15

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019)........................................................................5, 7, 8, 11

3648213.1

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  10 F.4th 147 (2d Cir. 2021), *cert. denied sub nom. Kirschner v. FitzSimons*,
  2022 WL 516021 (U.S. Feb. 22, 2022)............................................................................9, 11

*Int'l Customs Assocs. v. Ford Motor Co.*,
  893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999).........................31, 38

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
  140 S. Ct. 768 (2020)...................................................................................................12

*Jackson v. Broadcast Music, Inc.*,
  2006 WL 250524 (S.D.N.Y. Feb. 1, 2006).........................................................................8

*Jonas v. Estate of Leven*,
  116 F. Supp. 3d 314 (S.D.N.Y. 2015)..........................................................................27, 31

*Law v. Siegel*,
  571 U.S. 415 (2014)......................................................................................................16

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
  2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017)....................................................................33

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)..........................................................................................35

*Maranga v. Vira*,
  386 F. Supp. 2d 299 (S.D.N.Y. 2005)..........................................................................37-38

*McKee Elec. Co. v. Rauland–Borg Corp.*,
  20 N.Y.2d 377 (1967)...................................................................................................37

*Merit Mgmt. Grp., LP v. FTI Consulting Inc.*,
  138 S. Ct. 883 (2018)...................................................................................................16

*Metals Alliance Corp. v. Beshay*,
  1998 WL 811788 (S.D.N.Y. Nov. 19, 1998).....................................................................38

*Metzeler v. Bouchard Transp. Co. (In re Metzeler)*,
  66 B.R. 977 (Bankr. S.D.N.Y. 1986)..............................................................................39

*Mortg. Funding Corp. v. Boyer Lake Pointe, LC*,
  379 F. Supp. 2d 282 (E.D.N.Y. 2005)............................................................................31

*Nastasi & Assocs. v. Bloomberg, L.P.*,
  2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021).....................................................................8

*New Hampshire v. Maine*,
  532 U.S. 742 (2001).....................................................................................................10

iv

3648213.1

*Norton v. Mathews*,
   427 U.S. 524 (1976)....................................................................................................3

*O'Connor v. DL-DW Holdings, L.L.C. (In re Extended Stay, Inc.)*,
   2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ..........................................19

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
   549 B.R. 56 (S.D.N.Y. 2016)................................................................................35

*Parke-Bernet Galleries, Inc. v. Franklyn*,
   26 N.Y.2d 13 (1970)..............................................................................................38

*Picard v. BNP Paribas S.A. (In re Madoff)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018)..................................................................32

*Picard v. Bureau of Lab. Ins. (In re Madoff)*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012)............................................................31, 32

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   12 F.4th 171 (2d Cir. 2021), *cert. denied*, 2022 WL 585915 (U.S. Feb. 28,
   2022) .....................................................................................................................15

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC)*,
   2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ...................................5, 6, 12, 14

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
   773 F.3d 411 (2d Cir. 2014)......................................................................... *passim*

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................12, 18

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
   542 B.R. 100 (Bankr. S.D.N.Y. 2015)..................................................................17

*RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*,
   2021 WL 230194 (S.D.N.Y. Jan. 22, 2021) .........................................................38

*Roper Starch Worldwide, Inc. v. Reymer & Assocs.*,
   2 F. Supp. 2d 470 (S.D.N.Y. 1998)................................................................31, 33

*Rosenblatt v. Coutts & Co. AG*,
   2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) ......................................................33

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)......................................................................................8

*Rushaid v. Pictet & Cie*,
   28 N.Y.3d 316 (2016) ............................................................................................35

v

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
 337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...................................................................15

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
 476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman*
 *Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d
 Cir. 2014) ...............................................................................................................6

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
 490 B.R. 46 (S.D.N.Y. 2013)..................................................................................2

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................11, 12, 13, 14

*SPV Osus Ltd. v. UBS AG*,
 114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ............37

*SPV Osus Ltd. v. UBS AG*,
 882 F.3d 333 (2d Cir. 2018).....................................................................................3

*Steinberg v. A Analyst Ltd.*,
 2009 WL 806780 (S.D. Fla. Mar. 26, 2009).........................................................36

*SunLight Gen. Cap. LLC v. CJS Invs. Inc.*,
 114 A.D.3d 521 (1st Dep't 2014) .........................................................................31

*Taylor v. Sturgell*,
 553 U.S. 880 (2008)................................................................................................9

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
 477 F. Supp. 3d 241 (S.D.N.Y. 2020), *appeal withdrawn*, 2021 WL 4190722
 (2d Cir. Apr. 14, 2021).................................................................................... 36-37

*Walden v. Fiore*,
 571 U.S. 277 (2014)........................................................................................30, 32

*Waldman v. Palestine Liberation Org.*,
 835 F.2d 317 (2d Cir. 2016)..................................................................................26

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
 543 B.R. 127 (Bankr. S.D.N.Y. 2016) ..................................................................28

## Statutes and Rules

11 U.S.C. § 101(22) .......................................................................................................7

11 U.S.C. § 101(22)(A)...............................................................................................7, 8

11 U.S.C. § 101(53A) ...................................................................................................6

11 U.S.C. § 544(b) ..........................................................................................1

11 U.S.C. § 546(e) ..................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ........................................................................... *passim*

11 U.S.C. § 550(a) ................................................................................1, 4, 18

11 U.S.C. § 741(7)(A)(i) ..............................................................................11

11 U.S.C. § 741(7)(A)(vii) ...........................................................................11

11 U.S.C. § 741(8) .......................................................................................15

15 U.S.C. § 78fff-2(c)(3) .............................................................................16

Fed. R. Bankr. P. 7004 .................................................................................26

Fed. R. Bankr. P. 7004(f) .......................................................................26, 27

Fed. R. Civ. P. 4 ..........................................................................................27

Fed. R. Civ. P. 12(b)(2) ..........................................................................1, 27

Fed. R. Civ. P. 12(b)(6) ................................................................................1

CPLR § 213 .................................................................................................18

CPLR § 301 .................................................................................................25

CPLR § 302 .................................................................................................26

CPLR § 302(a) .............................................................................................26

CPLR § 302(a)(1) ......................................................................26, 27, 36, 37

**Other**

Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank
    Nederland NV Dublin Branch*,
    http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=
    C27278 (last visited Mar. 3, 2022) .........................................................7

De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*,
    https://www.dnb.nl/en/public-register/information-detail/?registerCode=
    WFTDG&relationNumber=B0275 (last visited Mar. 3, 2022) ...............7

Defendant Multi-Strategy Fund Limited ("Multi-Strategy") respectfully submits this memorandum of law, together with the accompanying Declarations of Robert J. Lack and Mario A. Therrien ("Lack Decl." and "Therrien Decl."), in support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss the Amended Complaint ("Am. Compl.," No. 12-1205 ECF 97) filed on February 18, 2022 by plaintiff Irving H. Picard, Trustee (the "Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Chapter 7 Estate of Bernard L. Madoff.[1]

## PRELIMINARY STATEMENT

The sole count in the Amended Complaint alleges that Multi-Strategy, a foreign investment fund, received a transfer of $25,763,374 from Fairfield Sentry Limited ("Sentry") on March 15, 2005, more than three years before BLMIS filed for bankruptcy. *See* Am. Compl. ¶¶ 2, 120 & Ex. C. The Trustee seeks to recover this transfer under 11 U.S.C. § 550(a) as a subsequent transfer of an alleged fraudulent conveyance of funds from BLMIS to Sentry. *See* Am. Compl. ¶ 122. However, because the alleged initial transfer from BLMIS occurred more than two years before BLMIS's December 11, 2008 bankruptcy petition, the Trustee cannot seek to avoid the transfer under 11 U.S.C. § 548(a)(1)(A), but instead seeks to do so under New York state law pursuant to 11 U.S.C. § 544(b). *See* Am. Compl. ¶ 119. As a result, the initial transfer falls outside the exception to the safe harbor in Section 546(e) of the Bankruptcy Code, which applies to trustee actions seeking to avoid certain types of transfers, "except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

---

[1] On January 28, 2022, Multi-Strategy moved to dismiss the Trustee's original Complaint, making substantially the same arguments it makes here. *See* Mem. in Supp. of Mot. to Dismiss, No. 12-1205 ECF 94. The Trustee responded to the motion by filing the Amended Complaint.

Under this Circuit's controlling law, the Trustee's allegations establish that the alleged initial transfer from BLMIS to Sentry is covered by Section 546(e) because it was made by or to a stockbroker or financial institution and was a settlement payment or transfer in connection with a securities contract. Thus, the Trustee cannot recover the alleged subsequent transfer from Sentry to Multi-Strategy, and the Amended Complaint should be dismissed.

The Amended Complaint also should be dismissed on additional grounds. The Trustee is limited to recovering BLMIS customer property. In light of the allegations the Trustee has made in the Amended Complaint and in the series of other complaints he has filed in these consolidated proceedings, he cannot plausibly allege that the money Multi-Strategy received from Sentry constituted BLMIS customer property, as opposed to subscription money Sentry had received from its other investors. The Amended Complaint also fails to allege facts sufficient to support personal jurisdiction over Multi-Strategy, a Cayman Islands fund operating from Canada, based on its redemption from Sentry, a British Virgin Islands company, which sent the redemption payment from its bank in Ireland to Multi-Strategy's bank in Canada.[2]

## WHAT DISTINGUISHES THIS CASE

This case has two distinguishing characteristics that make this motion to dismiss easier for this Court to decide—and easier for this Court to dismiss the Amended Complaint in its entirety—compared to most motions to dismiss the Trustee's subsequent transfer claims that are or will be pending before the Court. First, the case involves a single transfer made in March 2005, more than two years before BLMIS's bankruptcy. Accordingly, as shown in Point I below, the entire case can be dismissed based on the Section 546(e) safe harbor. Second, as

---

[2] By making this motion, Multi-Strategy is not waiving its right to have an Article III court enter a final judgment in this proceeding. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 490 B.R. 46, 58 (S.D.N.Y. 2013).

3648213.1

shown in Point II, none of the amount transferred to Multi-Strategy by Sentry could plausibly

have been BLMIS customer property, and the case also can be dismissed on that basis.[3]

        Multi-Strategy does share a characteristic in common with many of the other

moving defendants in that it is a foreign entity that contests this Court's personal jurisdiction

over it.  To the extent that there are other subsequent transferee cases pending before the Court

that present the Section 546(e) and/or customer property issues and do not present a

jurisdictional challenge,[4] this Court has the discretion to decide those issues in those cases and

apply its rulings to this one without having to reach Multi-Strategy's jurisdictional defense.[5]

Furthermore, because the Trustee contends that personal jurisdiction over Multi-Strategy exists

because it allegedly received a "subsequent transfer [of BLMIS customer property] from

Fairfield Sentry" through a New York correspondent bank, Am. Compl. ¶ 111, the determination

of jurisdiction depends on the customer property issue.  For these reasons, we brief the Section

546(e) and customer property issues first, before addressing personal jurisdiction.

---

[3] The Amended Complaint's first footnote incorrectly states that in a stipulation between the parties, Multi-Strategy represented that it "received the *subsequent transfer of customer property* from Fairfield Sentry Limited the Trustee seeks to recover."  Am. Compl. at 2 n.1 (emphasis added).  Rather, the stipulation represented only that Multi-Strategy "received the transfer from Fairfield Sentry Limited."  Stip. & Order ¶ 2, Dec. 28, 2021 (No. 12-1205 ECF 88).

[4] *E.g.*, Barclays Defs.' Mem. in Supp. of Mot. to Dismiss, *Picard v. Barclays Bank (Suisse) S.A.*, No. 11-2569 (CGM) (Bankr. S.D.N.Y. Feb. 25, 2022) (ECF 126).

[5] *See Norton v. Mathews*, 427 U.S. 524, 528-31 (1976) (avoiding a jurisdictional question, and instead dismissing on the merits, because Court had already decided the merits question in a companion case); *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 194 (2d Cir. 2002) (allowing courts to assume jurisdiction "in those peculiar circumstances where the outcome on the merits has been foreordained by another case such that the jurisdictional question could have no effect on the outcome") (internal quotation marks omitted); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring).  We note that this approach is in effect the one taken by Judge Rakoff and Judge Bernstein in addressing common issues like extraterritoriality earlier in these proceedings, which has conserved judicial resources by deferring issues whose decision might prove unnecessary.

3648213.1

## ARGUMENT

### I.    THE TRUSTEE'S CLAIM IS BARRED BY 11 U.S.C. § 546(e)

Section 550(a) of the Bankruptcy Code provides that to the extent a transfer is avoided under certain sections of the Code, the trustee may recover the property transferred, or its value, from the initial transferee or any subsequent transferee. Section 546(e), however, bars a trustee from avoiding a transfer (other than under Section 548(a)(1)(A), which has only a two-year lookback period) if the transfer, *inter alia*, (1) was made by or to a covered entity such as a stockbroker, financial institution, or financial participant; and (2) was either a settlement payment or a transfer in connection with a securities contract:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

The Second Circuit has instructed that courts should enforce Section 546(e)'s safe harbor whenever it applies by its terms, specifically including in actions brought by the Trustee here. In construing Section 546(e) in the context of avoidance actions by the Trustee, the Second Circuit has explained that, "in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality." *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014). In particular, "by enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important

4

that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers

under § 548(a)(1)(A)." *Id.* "Unwinding settled securities transactions . . . would seriously

undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract

capital." *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90 (2d Cir. 2019)

("*Tribune I*"). "Permitting the clawback of millions, if not billions, of dollars from BLMIS

clients—many of whom are institutional investors and feeder funds—would likely cause the very

'displacement' that Congress hoped to minimize in enacting § 546(e)." *Fishman*, 773 F.3d at

420.

　　　　When such a clawback action is brought against a subsequent transferee of a

BLMIS client, the subsequent transferee can assert any defenses against the Trustee that the

initial transferee could have asserted, including Section 546(e). This includes the situation

where, as here, the alleged initial transferee, Sentry, settled with the Trustee and agreed to a

consent judgment.[6] *See Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec.*

*LLC*), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) ("Where the

initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain

transfers, as is the case here . . . , the subsequent transferee is nonetheless entitled to raise a

§ 546(e) defense against recovery of those funds."). Accordingly, because the Trustee is seeking

to recover from Multi-Strategy as a subsequent transferee of a BLMIS transfer to Sentry, his

---

[6] On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with Sentry's Liquidators. *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), ECF 69-2. This Court approved the Fairfield Settlement Agreement on June 7, 2011, *id.* ECF 92, and it was incorporated into the Consent Judgment entered against Sentry on July 13, 2011 (the "Consent Judgment"), *id.* ECF 109, ¶ 2; Am. Compl. ¶ 115.

3648213.1

Amended Complaint must be dismissed if BLMIS's transfer to Sentry was protected by Section

546(e).[7]  As shown below, it was.

## A.    The Alleged Initial Transfer Was Made by or to a Covered Entity

Here, the alleged initial transfer was made by or to an entity covered by

Section 546(e) both because the alleged initial transfer was made by a stockbroker and because it

was made to a financial institution, though either of those facts alone would be sufficient.[8]

### 1.    The alleged initial transfer was made by a stockbroker

The Code defines "stockbroker" to include entities that "engage[ ] in the business

of effecting transactions in securities."  11 U.S.C. § 101(53A).  As the District Court has noted:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC,
> clearly engaged in securities transactions. . . .  [E]ven assuming the truth of the
> allegation that Madoff Securities' investment advisory division never traded
> securities on behalf of clients, Madoff Securities nonetheless qualifies as a
> stockbroker by virtue of the trading conducted by its market making and
> proprietary trading divisions.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd sub nom.*

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411

(2d Cir. 2014).  As the Second Circuit noted in the ensuing appeal, "It is not disputed [by the

Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)."  773 F.3d at 417; *see* Br.

for Pl.-Appellant Irving H. Picard, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 12-2557 (2d Cir.

May 15, 2013), ECF 145, at i-ii, 5 (not challenging stockbroker finding on appeal).

---

[7] Although Section 546(e) is an affirmative defense, a court can dismiss based on Section 546(e)
if its applicability is established on the face of the complaint or documents incorporated by
reference into or integral to the complaint.  *See Fairfield Inv. Fund*, 2021 WL 3477479, at *2.

[8] Multi-Strategy reserves for later consideration, if necessary, the question whether the transfer
also was "made by or to (or for the benefit of) a . . . financial participant."  11 U.S.C. § 546(e).

3648213.1

## 2.    The alleged initial transfer was made to a financial institution

Section 101(22) of the Code defines "financial institution" to include not only "an entity that is a commercial or savings bank," but also the customer of such a bank "when [the bank] is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A).  In *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"), this Court held that Sentry and its affiliated funds Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda") were "financial institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch ("Citco Bank"), which acted as their agent in connection with the securities contracts pursuant to which the redemption payments were made.  *Id*. at *7.

Citco Bank is a bank regulated by the Central Bank of the Netherlands and registered with the Central Bank of Ireland.  *Fairfield III*, 2020 WL 7345988, at *6 & n.11.[9]  In a document filed with this Court proffering additional allegations pertaining to Multi-Strategy ("Proffer," ECF 57), the Trustee alleged that Walter Noel and Jeffrey Tucker, the founders of Fairfield Greenwich Group ("FGG"), which organized Sentry, "contracted Citco Global Custody N.V. . . . to nominally serve as the custodian of the Fairfield Sentry assets" and "opened bank

---

[9] *See* De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTDG&relation Number=B0275 (last visited Mar. 3, 2022) (identifying Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber= C27278 (last visited Mar. 3, 2022) (classifying Citco Bank as a "credit institution . . . whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account").  This Court can take judicial notice of information from such public registries. *See Tribune I*, 946 F.3d at 78; *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).

7

3648213.1

accounts at Citco Bank Nederland, N.V. Dublin Branch." Proffer ¶ 37.[10]  Sentry thus was a

customer of Citco Bank.  *See Tribune I*, 946 F.3d at 78-79 (for purposes of Section 101(22)(A),

"customer" must be given its "ordinary meaning," which includes "someone who buys goods or

services" and "a person . . . for whom a bank has agreed to collect items"); *Fairfield III*, 2020

WL 7345988, at *7.

In *Tribune I*, the Second Circuit applied the common-law meaning of "agency"

for purposes of Section 101(22)(A) and Section 546(e):

> Agency is the fiduciary relationship that arises when one person (a "principal")
> manifests assent to another person (an "agent") that the agent shall act on the
> principal's behalf and subject to the principal's control, and the agent manifests
> assent or otherwise consents so to act. . . .  Establishment of an agency
> relationship requires facts sufficient to show (1) the principal's manifestation of
> intent to grant authority to the agent, and (2) agreement by the agent.  In addition,
> the principal must maintain control over key aspects of the undertaking.

946 F.3d at 79 (cleaned up).

In this case, the Trustee alleges that the initial transfers from BLMIS to Sentry

were made from BLMIS accounts entitled "Citco Global Custody N.V. FBO Fairfield Sentry

Ltd." (account numbers 1FN012 and 1FN045), Am. Compl. Exs. A, B, and that Sentry personnel

"maintained final control of Fairfield Sentry's bank accounts," Am. Compl. ¶ 62; *see also*

Proffer ¶¶ 37, 39 (FGG personnel "controlled all of Fairfield Sentry's relationships with the

various Citco entities" and "controlled and approved all subscriptions into and redemptions from

the fund").  These allegations are sufficient to establish that Citco Bank was Sentry's agent in

---

[10] This Court may take judicial notice of admissions in documents in the public record filed by
the Trustee, particularly where the Trustee does not dispute their accuracy.  *See Rothman v.
Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Nastasi & Assocs. v. Bloomberg, L.P.*, 2021 WL
3541153, at *4-5 (S.D.N.Y. Aug. 11, 2021); *Jackson v. Broadcast Music, Inc.*, 2006 WL 250524,
at *7 (S.D.N.Y. Feb. 1, 2006); *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 173
n.13 (S.D.N.Y. 2002); *5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 518-19 (E.D.N.Y. 1996).

3648213.1

connection with the redemptions at issue.  To paraphrase the Second Circuit in *In re Tribune Co.
Fraudulent Conveyance Litigation*, 10 F.4th 147 (2d Cir. 2021) ("*Tribune II*"), *cert. denied sub
nom. Kirschner v. FitzSimons*, 2022 WL 516021 (U.S. Feb. 22, 2022), "Here, [Sentry] entered
into an agreement with [Citco Bank] whereby [Citco Bank] was hired to be a steward of
[Sentry]'s money . . . .  It was clearly acting on behalf of [Sentry], which is enough to satisfy
§ 546(e)."  *Id*. at 176.

    This Court came to the same conclusion in *Fairfield III*:

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco
> Bank establishes the necessary agency.  It is implausible to infer that Citco Bank
> made the redemption payments to specific redeemers in specific amounts absent
> the [Fairfield] Funds' directions to do so.  Moreover, Citco Bank accepted those
> directions by executing the redemption payments.
>
>     Based on the foregoing, the Funds were customers of Citco Bank who
> acted as their agents in connection with the securities contracts pursuant to which
> the redemption payments were made, and the Funds were, therefore "financial
> institutions" within the meaning of 11 U.S.C. § 546(e).

2020 WL 7345988, at *7.  This Court's holding in *Fairfield III* is binding on the Trustee because
he was in privity with the Fairfield Liquidators who were litigating the consolidated Fairfield
redeemer actions partly for the Trustee's benefit.[11]

---

[11] Pursuant to the Fairfield Settlement Agreement that was incorporated into the Consent
Judgment on which the Trustee relies, *see* Am. Compl. ¶ 115 & note 6, *supra*, the Fairfield
Liquidators will pay the Trustee 15% of their net recoveries from all claims the Liquidators
assert against redeemers from the Fairfield funds (included in the definition of "Sharing Claims")
until the Trustee has been paid $1.924 billion.  Fairfield Settlement Agreement, No. 09-1239
ECF 69-2, ¶¶ 1, 4, 11.  The Fairfield Settlement Agreement states that "[t]he Trustee and the
Liquidators agree and stipulate that a joint interest exists between them with respect to the
Sharing Claims." *Id*. ¶ 14.  The Trustee and the Liquidators' agreed joint interest in any such
recovered BLMIS customer property constitutes a "preexisting 'substantive legal relationship,'"
focused on a successive or concurrent interest in property, of the kind recognized by the Supreme
Court to give rise to nonparty issue preclusion in *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008).
Because the Trustee is in privity with the Liquidators in actions to recover alleged BLMIS
customer property, such as the actions at issue in *Fairfield III*, and because the issue of Sentry's

3648213.1

**B.      The Alleged Initial Transfer Was a Settlement Payment
and Made in Connection with a Securities Contract**

In *Fishman*, the Second Circuit held that Section 546(e) shielded transfers from

BLMIS to its account holders from the Trustee's avoidance powers.  773 F.3d at 417.  The Court

of Appeals concluded that the documents governing BLMIS customers' accounts constituted

securities contracts, and that the payments BLMIS made to those customers were made "in

connection with" those contracts, and also constituted "settlement payments," *id*. at 418-23—

though either of those findings would have sufficed to invoke the safe harbor.  The Court

rejected the Trustee's argument that the safe harbor did not apply because Madoff did not

actually carry out the promised securities transactions.  *Id*. at 419-20.

The same reasoning and result doubly apply to the transfer that the Trustee alleges

BLMIS made to Sentry for the purpose of funding Multi-Strategy's redemption request.  That

alleged transfer from BLMIS to Sentry was clearly *both* "in connection with" the securities

contracts Sentry had entered into with BLMIS, as in *Fishman*, *and* "in connection with" the

allegedly related securities contract Multi-Strategy had with Sentry through Sentry's Articles of

Association,[12] pursuant to which Multi-Strategy made its redemption.  *See Fairfield Sentry Ltd.*

*v. Migani*, [2014] UKPC 9, ¶ 10, https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf

---

"financial institution" status was "actually litigated" and "essential" to the final judgments
dismissing numerous such actions on ground of the Section 546(e) safe harbor, this Court's
finding in *Fairfield III* that Sentry was a "financial institution" in connection with redemption
payments from Sentry to its subscribers is binding on the Trustee.  *See New Hampshire v. Maine*,
532 U.S. 742, 748-49 (2001) (stating requirements for issue preclusion).

[12] *See Fairfield Sentry Ltd. v. Multi-Strategy Fund Ltd.*, No. 11-1576 (Bankr. S.D.N.Y. Oct. 27,
2016), ECF 14-6, excerpt attached as Lack Decl. Ex. A.

3648213.1

("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund").[13]

The definition of "securities contract" includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), and "[t]he term 'redemption,' in the securities context, means 'repurchase,'" *Tribune I*, 946 F.3d at 80. The definition of "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii). Accordingly, "the definition of a securities contract . . . includes . . . redemption requests." *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 2013 WL 1609154, at *8 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). Furthermore, all Section 546(e) requires is that the transfer be "in connection with *a* securities contract," not in connection with the securities contract between the transferor and initial transferee. *See Fishman*, 773 F.3d at 422 (holding that "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided" and that "a transfer can be connected to, and can be made in relation to, multiple documents or purposes simultaneously"); *Cohmad*, 2013 WL 1609154, at *9 (explaining that a transfer from a debtor to an initial transferee may qualify as having been made "in connection with a securities contract" between the initial transferee and a subsequent transferee, and thus be covered by the safe harbor on that basis).

Implicit in the Trustee's subsequent transfer claim is the allegation that the funds Multi-Strategy received were transferred from BLMIS to Sentry in order that Sentry could then

---

[13] This Court may consider the Articles of Association in connection with this motion because, as the basis for the challenged redemption, they are integral to the Complaint. *See Tribune II*, 10 F.4th at 176 ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

satisfy Multi-Strategy's redemption request. Although, as demonstrated in Point II *infra*, this allegation lacks plausible support, its assertion necessarily involves the allegation of a connection between the initial transfer from BLMIS to Sentry and Multi-Strategy's contract with Sentry that authorized the redemption. Accordingly, the Section 546(e) safe harbor applies to the initial transfer, and thus also bars recovery of the subsequent transfer.

The Trustee may argue that the safe harbor does not apply here because the initial transferee, Sentry, allegedly knew of Madoff's fraud, *see* Am. Compl. ¶ 118, and thus knew that there was no actual "settlement payment" or "securities contract" between BLMIS and Sentry. In *Fairfield Investment Fund*, this Court accepted that Sentry's knowledge had been adequately pleaded in the *Fairfield* Second Amended Complaint that is incorporated by reference into the instant Amended Complaint. *See* 2021 WL 3477479, at *4-5 (citing Second Am. Compl., No. 09-1239, ECF 286).[14] It then quoted Judge Rakoff's statement that "if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Id.* at *4 (quoting *Cohmad*, 2013 WL 1609154, at *7).

---

[14] Multi-Strategy respectfully disagrees with that conclusion and reserves for a later stage of this action or appeal all arguments that the Trustee has not adequately pleaded Sentry's actual knowledge of Madoff's fraud in the Amended Complaint in this case or in the Second Amended Complaint in *Fairfield Investment Fund* and/or that Sentry did not in fact have such actual knowledge. *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776-77 (2020) (holding that "to have 'actual knowledge' of a piece of information, one must in fact be aware of it" and distinguishing between actual knowledge and constructive knowledge); *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 631 (2d Cir. 2020) ("allegations [of actual knowledge of misrepresentations] do not suffice to show that [the bank] had actual knowledge of the [account holders'] Ponzi scheme, the fraud on which the [plaintiffs'] claim relies"); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 140 (Bankr. S.D.N.Y. 2014) (refusing to equate "strong suspicion" with "actual knowledge").

3648213.1

That argument does not defeat the application of the safe harbor here for several reasons. *First*, as noted above, even if Sentry's alleged knowledge that BLMIS was not actually trading securities meant that Sentry knew there was no actual "securities contract" between BLMIS and Sentry and would preclude Sentry from invoking Section 546(e), that would not affect the separate securities contracts between Sentry and its investors, including Multi-Strategy.  Nor would Sentry's alleged knowledge of the BLMIS fraud preclude applying Section 546(e) for the benefit of a Sentry investor if the initial transfer was "in connection with" Sentry's agreement with a Sentry investor.  In *Cohmad*, Judge Rakoff agreed that securities contracts other than the initial transferee's securities contract with BLMIS could independently satisfy Section 546(e)'s requirement that the initial transfer be in connection with a securities contract. 2013 WL 1609154, at *8-9.  Judge Rakoff ruled that so long as the initial transferee withdrew funds from BLMIS to make a payment under a securities contract between the initial transferee and a subsequent transferee, then the withdrawal from BLMIS would be a transfer made in connection with a securities contract—namely, the contract between the initial transferee and the subsequent transferee—and would not be avoidable on a subsequent transferee claim:

> Take, for example, a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract.  Assuming that either the investment fund or the investor qualifies as a financial institution or financial participant, and barring other circumstances that may appear on the facts of a given case, that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

3648213.1

*Id*. at *9 (footnote omitted).[15]  As applied to the facts here, the investment fund was

Sentry (which was a financial institution as shown above) and the investor was Multi-

Strategy (or some other Sentry investor).

       *Second*, the Trustee has not pleaded that Multi-Strategy actually knew of

Madoff's fraud.  Since the applicability of Section 546(e) is clear on the face of the Amended

Complaint and documents integral to it, if the Trustee advances a theory of transferee actual

knowledge as an exception to the safe harbor, it is incumbent on him to plead such actual

knowledge.  But nothing in the Amended Complaint even suggests that Multi-Strategy had actual

knowledge of Madoff's fraud.[16]  And "actual knowledge," *Cohmad*, 2013 WL 1609154, at *1—

not "mere suspicion," *id*. at *3, or inquiry notice—is what Judge Rakoff repeatedly stated was

necessary to defeat the safe harbor.  *See, e.g., id.* at *4 ("the Trustee must show, at a minimum,

that the transferee had actual knowledge that there were no actual securities transactions being

conducted"); *id*. at *1, 3, 6, 7, 10.  Furthermore, there is no allegation that Multi-Strategy

actually knew of any fraud at Sentry either.  Because the initial transfer was made in connection

with the securities contract between Sentry and Multi-Strategy and Multi-Strategy is not alleged

---

[15] Judge Rakoff also observed that "[t]o the extent that, for example, an initial transfer from Madoff [S]ecurities to an investment fund customer and the subsequent transfer from the investment fund to its redeeming investors may together comprise a 'settlement payment' under *Enron* [*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011)], that transfer may fall within the purview of Section 546(e), assuming it meets the statute's other requirements." *Cohmad*, 2013 WL 1609154, at *9 n.5.

[16] Thus, this case is unlike *Fairfield Investment Fund*, in which this Court held the allegations against most of the subsequent transferee defendants were sufficient to show they actually knew about Madoff's fraud.  *See* 2021 WL 3477479, at *5-6.  Furthermore, many of the subsequent transfers there were not in connection with securities contracts, but rather management contracts. *See, e.g.*, Am. Compl. ¶ 138, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 ECF 23 (Fairfield Greenwich Limited received $3,844,000 in management fees and $83,591,000 in performance fees from Sentry in 2002); Second Am. Compl. Ex. 12, at 5, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 ECF 286-12 (showing these same amounts as subsequent transfers from Sentry).

14

to have had actual knowledge of the Madoff fraud, the Court can and should, on those grounds alone, dismiss the Amended Complaint based on the safe harbor in Section 546(e).

*Finally*, Section 546(e) also applies here for a separate and independently sufficient reason. While we recognize that this Court and the District Court have previously ruled that Section 546(e) cannot be invoked by a transferee with actual knowledge of Madoff's fraud, and while, for the reasons discussed above, this Court does not need to reject that ruling in order to give Multi-Strategy the benefit of the safe harbor, we note that nothing in Section 546(e) supports making its applicability turn on the knowledge of the transferee, as opposed to the debtor-transferor.[17]  That section provides for only one exception to the safe harbor: namely, for a claim under Section 548(a)(1)(A), which requires the Trustee to allege and prove intentional fraud by the *transferor*.  *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181 (2d Cir. 2021) ("Voidability under § 548(a)(1)(A) focuses on the fraudulent intent of the debtor-transferor."), *cert. denied*, 2022 WL 585915 (U.S. Feb. 28, 2022); *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant"). Nor does transferee knowledge play any role in the definitions of "settlement payment," 11 U.S.C. § 741(8), or "securities contract," *id*. § 741(7).

---

[17] This is an open question at the Circuit level, and Multi-Strategy expressly preserves it. Although the Second Circuit in *Fishman* noted that the defendants there had "every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions," 773 F.3d at 420, it did not state that the result would have been different had that not been the case. The only circumstances in which the knowledge of the transferee would be relevant would be if it could be imputed to the transferor, such as where the transferee, "as the [transferor]'s president, director, and sole shareholder, . . . was in a position to control the disposition of [the transferor's] property," *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983).

15

3648213.1

To hold that transferee knowledge defeats the safe harbor is thus inconsistent with Section 546(e)'s language. Where the Code creates an exemption or safe harbor, and specifies exceptions, a court is not free to create additional exceptions even when doing so is motivated by a party's alleged wrongdoing. *See Law v. Siegel*, 571 U.S. 415, 424-25 (2014). The courts must, instead, adhere to "the plain meaning of the language" of the statute. *Merit Mgmt. Grp., LP v. FTI Consulting Inc.*, 138 S. Ct. 883, 897 (2018). Considering the Second Circuit's admonitions in *Fishman* that, in enacting Section 546(e) and its single exception for claims under Section 548(a)(1)(A), Congress struck a balance favoring the securities markets' interest in finality over creditors' interests in recovery, and that the courts "are obliged to respect the balance Congress struck among these complex competing considerations," 773 F.3d at 423, the safe harbor should apply here according to its plain language regardless of the initial transferee Sentry's alleged knowledge. Accordingly, the Amended Complaint should be dismissed on that ground as well.

## II.   THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT MULTI-STRATEGY RECEIVED BLMIS CUSTOMER PROPERTY

In order to state a claim against Multi-Strategy under SIPA, the Trustee must plausibly allege that the $25.8 million Multi-Strategy received from Sentry on March 15, 2005 was a subsequent transfer of BLMIS customer property fraudulently transferred from BLMIS to Sentry. *See* 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11").

The Amended Complaint fails to do this. All it alleges is that during the six years preceding the petition date, BLMIS transferred approximately $3 billion to Sentry, and that "a portion" of those transfers was subsequently transferred to Multi-Strategy. Am. Compl. ¶¶ 119-20. Although one of the Amended Complaint's exhibits contains 73 pages of small type listing

thousands of transactions recorded in Sentry's accounts at BLMIS, *id*. Ex. B, it fails to identify

which, if any, of these transactions constituted initial transfers of BLMIS customer property that

were allegedly subsequently transferred to Multi-Strategy. Essentially, the Trustee is asking the

Court to infer that because BLMIS transferred a large amount of money to Sentry over a long

period of time, to the extent Sentry transferred money during that time to Multi-Strategy, *all* of

that money *must* have come from BLMIS.

        As the Supreme Court has made clear, the Federal Rules of Civil Procedure do

not permit such speculative and conclusory pleading. To survive a motion to dismiss, a claim

must not merely be possible, but must be plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

(2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007). As this Court stated in

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100 (Bankr. S.D.N.Y.

2015), barebones allegations that customer funds were transferred to the subsequent transferee

do not suffice to make the claim plausible:

> The Trustee must allege facts that support the inference that the funds at issue
> originated with . . . BLMIS, and contain the "necessary vital statistics"—the
> "who, when, and how much" of the transfers to establish that an entity was a
> subsequent transferee of the funds. At the pleading stage, the Trustee is not
> required to provide a "dollar-for-dollar accounting" of the exact funds at issue.
> However, barebones allegations that the funds at issue were transferred to the
> Subsequent Transferees, without more detail, are insufficient.

*Id*. at 119. In *Shapiro*, the Court dismissed a conclusory subsequent transferee claim, noting that

the complaint "does not tie any initial transfer to any subsequent transfer or Subsequent

Transferee." *Id*. The same is true for the instant Amended Complaint, which does not tie the

Multi-Strategy transfer to any particular transfer from BLMIS to Sentry. *Compare* Second Am.

Compl. ¶¶ 108, 110, 162-66 in *Picard v. Shapiro*, No. 10-5383, ECF 33 (Bankr. S.D.N.Y. July 8,

2014) *with* Am. Compl. ¶¶ 119-20, 126-28 (Lack Decl. Ex. B); *see also Angell v. Ber Care, Inc.

(In re Caremerica, Inc.)*, 409 B.R. 737, 750-51 (Bankr. E.D.N.C. 2009).

3648213.1

The Trustee's failure to tie the Multi-Strategy transfer to any particular transfer from BLMIS to Sentry cannot be excused on the ground that the Trustee lacks access to sufficient information, since the Trustee, by virtue of the document-sharing provisions of the Fairfield Settlement Agreement, had access to Sentry's records at the time he filed the original Complaint and for nearly a decade since.  *See* Fairfield Settlement Agreement, No. 09-1239 ECF 69-2, ¶ 14 (Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims").[18]  The Trustee's failure is even more inexcusable because he filed his Amended Complaint after Multi-Strategy made the same arguments made here in its original motion to dismiss.  *See* Mem. in Supp. of Mot. to Dismiss, No. 12-1205 ECF 94, at 16-23.

The Amended Complaint's conclusory allegation that Multi-Strategy's redemption from Sentry consisted of BLMIS customer property is, moreover, not plausible. When one sums all the transfers from BLMIS to Sentry from the earliest transfer within the six-year period before the petition date[19] through the date of Multi-Strategy's redemption (*i.e.*, from

---

[18] Thus, this case is unlike *Merkin*, where this Court allowed the Trustee "greater latitude" in pleading the required tie because the subsequent transfer claims there had to "be proved through the books and records of the defendants," 515 B.R. at 151 (internal quotation marks omitted).

[19] Since the statute of limitations under New York's Debtor and Creditor Law for fraudulent conveyances is six years, CPLR § 213, the Trustee could not recover transfers from BLMIS to Sentry that occurred before December 11, 2002 as initial transfers even if Section 546(e) did not apply.  Thus, he cannot recover any subsequent transfers of those transfers under Section 550(a). The only subsequent transfers the Trustee can even potentially recover under Section 550(a) are subsequent transfers of customer property that was initially transferred after December 11, 2002. So, the Court may only consider alleged initial transfers after December 11, 2002 (the first of which was on May 9, 2003) in determining whether an alleged subsequent transfer was a transfer of recoverable customer property; any earlier initial transfers alleged in Am. Compl. Ex. B must be excluded from consideration.  The Trustee recognized this when in other cases he dismissed claims for subsequent transfers that occurred before May 9, 2003.  *See, e.g.*, Stip. & Order ¶ 1, *Picard v. Quilvest Fin. Ltd.*, No. 11-2538 (CGM) (Bankr. S.D.N.Y. Mar. 1, 2022) (ECF 105); Stip. & Order ¶ 1 & Sch. 1, *Picard v. Crédit Agricole (Suisse) S.A.*, No. 12-1022 (CGM) (Bankr.

18

December 11, 2002 through March 15, 2005), and compares that amount to the sum of

redemptions from Sentry alleged in the Trustee's subsequent transferee complaints during the

same period, it appears that *Sentry distributed approximately $770 million more than it received

from BLMIS* during that time.  *See* Lack Decl. ¶¶ 7-16 & Exs. C-E.[20]  Specifically, BLMIS made

$120,000,000 of transfers into Sentry during that period, *id.* ¶¶ 8, 11, 13, while Sentry made

$888,268,729 of transfers out as redemptions to its investors and to its related entities Sigma,

Lambda, Fairfield Greenwich Advisors, Fairfield Greenwich (Bermuda) Limited, Fairfield

Investment Fund Limited, and FIF Advanced Limited (collectively, the "Fairfield Affiliated

Entities"), *id.* ¶¶ 9-10, 12, 14-16.  Because the amount of money Sentry paid out dwarfed the

amount it took in from BLMIS, and the funds it received from BLMIS had long run out before

Sentry made its transfers to Multi-Strategy, Sentry's transfers to Multi-Strategy could not have

been BLMIS customer property.

       How could Sentry have paid out more than it received from BLMIS?  Sentry has

stated that "[f]rom time to time, to make Redemption Payments, Sentry . . . utilized subscription

monies of other investors on hand that were directed for investment in BLMIS."  First Am.

Compl. ¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-1122 (Bankr. S.D.N.Y.

Nov. 26, 2019), ECF 19.  This procedure made perfect sense during a period when investor

subscriptions into Sentry exceeded investor redemptions; there would have been no point in

---

S.D.N.Y. Feb. 24, 2022) (ECF 110); Stip. & Order ¶ 3 & Sch. 1, *Picard v. Schroder & Co. Bank
AG*, No. 12-1210 (CGM) (Bankr. S.D.N.Y. Feb. 22, 2022) (ECF 89).

[20] These exhibits consist of the Trustee's pleadings in other proceedings in this Court; the Court
can take judicial notice of their contents.  *See* note 10, *supra*; *O'Connor v. DL-DW Holdings,
L.L.C. (In re Extended Stay, Inc.)*, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020)
("In the context of bankruptcy litigation, the public records of which the court may take judicial
notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and
the underlying bankruptcy case.").

3648213.1

sending money to BLMIS while simultaneously withdrawing a lesser amount.  Indeed, Exhibit B

to the Amended Complaint shows that during the period December 11, 2002 to March 15, 2005,

Sentry transferred hundreds of millions of dollars more cash into BLMIS than it withdrew:

| Date | Description | Account No. | Cash Deposits from Sentry to BLMIS | Cash Withdrawals from BLMIS to Sentry | Am. Compl. Source |
|---|---|---|---|---|---|
| 5/9/2003 | CHECK WIRE | 1FN012 | | ($40,000,000) | Ex. B, at 18 |
| 7/11/2003 | CHECK WIRE | 1FN012 | | (55,000,000) | Ex. B, at 19 |
| 7/22/2003 | CHECK WIRE | 1FN012 | | (25,000,000) | Ex. B, at 19 |
| 10/23/2003 | CHECK WIRE | 1FN045 | $20,000,000 | | Ex. B, at 50 |
| 11/14/2003 | CHECK WIRE | 1FN045 | 50,000,000 | | Ex. B, at 51 |
| 1/21/2004 | CHECK WIRE | 1FN012 | 50,000,000 | | Ex. B, at 20 |
| 3/10/2004 | CHECK WIRE | 1FN012 | 50,000,000 | | Ex. B, at 20 |
| 8/31/2004 | CHECK WIRE | 1FN012 | 100,000,000 | | Ex. B, at 21 |
| 12/28/2004 | CHECK WIRE | 1FN045 | 100,000,000 | | Ex. B, at 53 |
| **Totals** | | | **$370,000,000** | **($120,000,000)** | |

As shown below, the transaction details the Trustee has provided to this Court in his numerous

complaints lead to the inescapable conclusion that, in the case of Multi-Strategy and many other

investors, Sentry paid redemptions to its investors with subscription money it received from

Sentry's other investors, not with money it received from BLMIS.

As alleged by the Trustee, at the time Multi-Strategy redeemed, BLMIS had not

transferred funds to Sentry for almost two years.  Prior redemptions from Sentry exceeded the

total of all potentially recoverable transfers from BLMIS to Sentry alleged by the Trustee.  Thus,

all potentially recoverable initial transfers from BLMIS to Sentry had already been exhausted in

making redemptions to other investors before Sentry paid Multi-Strategy.

Specifically, as demonstrated in paragraphs 7-16 of the Lack Declaration and its

Exhibits C-E, the Trustee's complaints show the following transaction history:

- On May 9, 2003, BLMIS transferred $40 million to Sentry.  That is the earliest initial transfer alleged by the Trustee after the six-year statute of limitations cutoff date (December 11, 2002), and thus the earliest transferred customer property that could even potentially be recovered by the Trustee.

3648213.1

- From May 14 to May 20, 2003, Sentry paid out $46.7 million, $6.7 million more than it had received from BLMIS, thus more than exhausting the funds it had received from BLMIS on May 9, 2003.

- On June 16 and June 18, 2003, Sentry paid out an additional $10.4 million in redemptions.

- On July 11, 2003, BLMIS transferred $55 million to Sentry.

- From July 14 to July 16, 2003, Sentry paid out $92.4 million, $37.4 million more than it had received from BLMIS, thus more than exhausting the July 11, 2003 transfer from BLMIS.

- On July 22, 2003, BLMIS transferred $25 million to Sentry.

- From July 23 to September 18, 2003, Sentry paid out $42.8 million, $17.8 million more than it had received from BLMIS, thus more than exhausting the July 22, 2003 transfer from BLMIS.

- From September 19, 2003 to March 14, 2005, Sentry paid out $590.8 million, without receiving any more money from BLMIS.

- On March 15, 2005, Sentry paid out $25.8 million to Multi-Strategy, as well as $62.5 million to others, again without receiving any more money from BLMIS.

Accordingly, the Trustee's conclusory allegation that the money sent by Sentry to Multi-Strategy came from BLMIS is implausible in light of the Trustee's own detailed, specific allegations of cash flows into and out of Sentry, and cannot be credited on a motion to dismiss. Put another way, because "[t]here is an 'obvious alternative explanation'" for the source of the redemption, "that explanation renders [plaintiff's] competing explanation 'conceivable [but not] plausible.'" *Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (quoting *Twombly*, 550 U.S. at 567, 570).

While the preceding analysis considers data drawn from all the Trustee's complaints in Sentry subsequent transferee cases, the Court also can conclude that the Trustee's allegation that Multi-Strategy received BLMIS customer property is implausible, based solely on documents attached to or incorporated by reference into the Amended Complaint in this case.

21

In particular, pages 18-19 of Exhibit B to the Amended Complaint (Lack Decl. Ex. C, at 18-19) show that the three cash withdrawals (labeled "Check Wire") from Sentry's BLMIS accounts that occurred both within the six-year statute of limitations period and before Multi-Strategy's March 15, 2005 redemption—namely, the withdrawals that occurred on May 9, July 11, and July 22, 2003—totaled $120 million. But between those dates and the day before the Multi-Strategy redemption, more than $300 million was transferred from Sentry just to the Fairfield Affiliated Entities, without even considering the hundreds of millions of dollars transferred to other investors that redeemed in the interim as alleged in other Trustee complaints. The more than $300 million sent to the Fairfield Affiliated Entities can be seen in exhibits to the Second Amended Complaint in *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF 286 (Lack Decl. Ex. E) that are expressly incorporated by reference in paragraph 118 of the Amended Complaint against Multi-Strategy.[21] These transfers are summarized below and listed in detail in paragraph 17 of the Lack Declaration:

| Dates | Recipient | Total Amount | Source | Ex., Page |
|---|---|---|---|---|
| 5/14/2003 - 1/20/2005 | Fairfield Investment Fund | ($27,082,812) | 09-1239 ECF 286-10 | E, at 5 |
| 7/14/2003 - 1/12/2005 | Fairfield Greenwich Advisors | (23,014,322) | 09-1239 ECF 286-14 | E, at 8 |
| 9/17/2003 - 2/16/2005 | Fairfield Lambda | (16,159,317) | 09-1239 ECF 286-6 | E, at 3 |
| 9/18/2003 - 2/25/2005 | Fairfield Sigma | (52,942,051) | 09-1239 ECF 286-5 | E, at 2 |
| 10/14/2003 - 1/12/2005 | Fairfield Greenwich (Bermuda) | (174,659,121) | 09-1239 ECF 286-13 | E, at 6-7 |
| 4/21/2004 - 2/16/2005 | FIF Advanced | (10,260,000) | 09-1239 ECF 286-8 | E, at 4 |
| **Total** | | **($304,117,623)** | | |

---

[21] *See* Am. Compl. ¶ 118 ("The Trustee incorporates by reference the allegations contained in the [*Fairfield*] Second Amended Complaint as if fully set forth herein."). The relevant transfers incorporated by reference from the *Fairfield* Second Amended Complaint are, overall, larger than the relevant transfers listed in the *Fairfield* First Amended Complaint, which was incorporated by reference into the Trustee's original Complaint against Multi-Strategy.

The transfers referred to above are sufficient to show the implausibility of the
Trustee's allegation that Multi-Strategy's $25.8 million redemption was BLMIS customer
property, because the prior BLMIS transfers into Sentry were more than exhausted before that
redemption, even when one considers only the intervening transfers from Sentry to the Fairfield
Affiliated Entities, and without even considering the money transferred to other Sentry investors
or the $370 million transferred from Sentry to BLMIS (*see* pp. 20-21, *supra*).  Thus, whether the
Court considers all the complaints the Trustee has filed, or just the Amended Complaint against
Multi-Strategy, it is plain that *none* of the money Multi-Strategy received from Sentry came from
BLMIS.  Because the Trustee's customer property allegations concerning Multi-Strategy do not
meet the *Iqbal-Twombly* plausibility standard even after amendment, the Amended Complaint
should be dismissed without leave to amend.

### III.    THE COURT LACKS PERSONAL JURISDICTION OVER MULTI-STRATEGY

In this case, the Trustee seeks to recover a payment made by a BVI company
(Sentry) from its Irish bank account to the Canadian bank account of a Cayman Islands company
run from Canada (Multi-Strategy).  None of the recognized bases for personal jurisdiction—
consent, general jurisdiction, or specific jurisdiction—exists here with respect to Multi-Strategy.

### A.    Relevant Jurisdictional Facts

Multi-Strategy is an investment fund organized as an exempted company under
the laws of the Cayman Islands, with its registered office in Grand Cayman.  Therrien Decl.
¶¶ 2-3.  Throughout the time it was invested in Sentry, Multi-Strategy's affairs were conducted
by its investment manager CDP Capital – Tactical Alternative Investments ("CDP"), a Canadian
corporation with its principal place of business in Montreal.  *Id*. ¶¶ 4-5.  Neither Multi-Strategy
nor CDP ever had an office or employees in the United States.  *Id*. ¶ 5.  Multi-Strategy used an

23

account at the Montreal branch of Caisse Centrale Desjardins ("Desjardins"), a Canadian bank, to make its investments in, and to receive its redemption from, Sentry. *Id.* ¶¶ 6, 8, 10, 17-18. It has never held a bank account in the United States. *Id.* ¶ 6.

Sentry is a company organized under the laws of the BVI. Am. Compl. ¶ 61. Sentry's administrator, Citco Fund Services (Europe) B.V., is a Dutch company located in Amsterdam. Proffer ¶ 37; Therrien Decl. Ex. A, at 1. Sentry maintained a bank account at the Dublin, Ireland branch of a Dutch bank, Citco Bank Nederland N.V. Proffer ¶ 37.

On June 25, 2004, Multi-Strategy subscribed to shares in Sentry by signing a Subscription Agreement in Canada and faxing it to Sentry's administrator in the Netherlands, along with a $20 million wire transfer from Multi-Strategy's Canadian bank account to Sentry's Citco Bank account in Ireland. Therrien Decl. ¶¶ 8-9. On January 25, 2005, Multi-Strategy subscribed to additional Sentry shares by signing another Subscription Agreement in Canada and faxing it to Citco's Netherlands office, along with a $5 million wire transfer to Sentry's Citco Bank account in Ireland. *Id.* ¶¶ 10-11. On February 15, 2005, Multi-Strategy requested a redemption of its Sentry shares by faxing and mailing a request form from CDP's office in Canada to Citco's Netherlands office. *Id.* ¶¶ 14-15. On March 15, 2005, Citco wired $25.8 million from Sentry's Citco Bank account in Ireland to Multi-Strategy's account in Canada. *Id.* ¶¶ 17-18. Neither the Subscription Agreements nor the redemption request was negotiated or executed in the United States, *see id.* ¶¶ 12-18, and the Trustee does not allege otherwise.

## B.    Multi-Strategy Did Not Consent to Jurisdiction, and Is Not Subject to General Jurisdiction, in New York

The Trustee contends that in Multi-Strategy's Subscription Agreements with Sentry, Multi-Strategy agreed to a choice of New York law and consented to the personal jurisdiction of New York courts with respect to claims to recover redemptions (*see* Am. Compl.

24

¶¶ 108-09), but controlling precedent forecloses that argument.  In *Migani*, the UK Privy Council held that the Subscription Agreement does not govern redemptions from Sentry nor does it make New York law applicable to redemptions; instead, the redemptions are governed by Sentry's Articles of Association and BVI law.  [2014] UKPC 9, ¶¶ 10, 17, 20.  Following *Migani*, this Court held that a suit by the Liquidators of Sentry, a party to the Subscription Agreement, to recover a redemption payment is not a suit "with respect to [the Subscription] Agreement" and therefore not within the scope of its forum selection clause.  *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 2018 WL 3756343, at *11-12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*").[22]  Accordingly, the Subscription Agreements do not provide a consent to suit for claims over redemptions by the Trustee.  Moreover, the Trustee is not a party to or a third-party beneficiary of the agreements, and therefore is not entitled to invoke their forum selection clauses in any event.  *See Dean St. Cap. Advisors, LLC v. Otoka Energy Corp.*, 2017 WL 476720, at *2, 4, 5 (S.D.N.Y. Feb. 2, 2017).

Although the Trustee appears to suggest that Multi-Strategy is subject to general jurisdiction in this Court by invoking CPLR § 301 and making a conclusory allegation that Multi-Strategy "derived significant revenue from New York and maintained general business contacts with the United States and New York," Am. Compl. ¶¶ 112-13, general jurisdiction exists only when the defendant is "at home" in the forum, either by being incorporated under the laws of the forum or having its principal place of business there.  *Daimler AG v. Bauman*, 517 U.S. 117, 136-37 (2014).  As noted above, Multi-Strategy is organized under Cayman Islands

---

[22] The Sentry subscription agreements signed by Multi-Strategy are identical in all relevant respects to the form of Sentry subscription agreement analyzed in *Fairfield I*.  *Compare* Therrien Decl. Exs. A & B, both at ¶ 19, *with Fairfield I*, 2018 WL 3756343, at *8 n.17, *and* Decl. of Thomas J. Moloney, Ex. A, ¶ 19, *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*, No. 10-3496 (Bankr. S.D.N.Y. Jan. 13, 2017) (ECF 961-1).

law, and its principal place of business is in Canada.  Accordingly, Multi-Strategy is not "at

home" in New York or the United States.

**C.    Multi-Strategy Is Not Subject to Specific Jurisdiction in New York**

The Trustee must show both a statutory basis for specific jurisdiction and that the

exercise of such jurisdiction comports with due process, *Waldman v. Palestine Liberation Org.*,

835 F.2d 317, 327-28 (2d Cir. 2016), but neither requirement is met here.

**1.    Applicable law**

Taking those requirements in reverse order, the exercise of specific jurisdiction

over a nonresident defendant will be consistent with due process only if (1) the defendant

"purposefully availed itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958);

(2) the plaintiff's claim "arise[s] out of or relate[s] to the foreign corporation's activities in the

forum State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); and

(3) the exercise of jurisdiction is reasonable under the circumstances, *Burger King Corp. v.

Rudzewicz*, 471 U.S. 462, 477-78 (1985).

As a statutory basis for specific jurisdiction, the Amended Complaint (¶ 113)

invokes CPLR § 302 and Bankruptcy Rule 7004.  As relevant here (where plaintiff does not

allege a tortious act or ownership of New York real property by defendant), CPLR § 302(a)

provides personal jurisdiction over an out-of-state defendant only if (i) the defendant "transacts

any business within the State" of New York and (ii) the plaintiff's claim "arises from" such

business activity.  CPLR § 302(a)(1).  As interpreted by the New York Court of Appeals, the two

prongs of CPLR § 302(a)(1) are largely coextensive with the first two cited requirements of the

due process test.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-49 (2d Cir. 2007)

(examining New York Court of Appeals cases).  Similarly, Bankruptcy Rule 7004(f) provides for

3648213.1

personal jurisdiction in an adversary proceeding, upon service of process under Fed. R. Civ. P. 4, if "the exercise of jurisdiction is consistent with the Constitution and laws of the United States."

Thus, under either CPLR § 302(a)(1) or Bankruptcy Rule 7004(f), the statutory analysis largely collapses into the constitutional analysis, albeit with one difference: Under the CPLR, defendant must have the required minimum contacts with New York, whereas under the Bankruptcy Rule, the required contacts are those with the United States as a whole.

**2.      The Trustee's claim does not arise out of or relate to any purposeful conduct of Multi-Strategy in the United States**

Considering the nonconclusory factual allegations in the Amended Complaint, as well as the underlying facts,[23] the alleged contacts identified by the Trustee either do not constitute purposeful availment by Multi-Strategy or else have no substantial connection to the Trustee's claim to recover Sentry's redemption payment to Multi-Strategy.

***Knowledge that Sentry purported to invest subscription funds with New York- based BLMIS and that BLMIS purported to engage in U.S. securities trading.***  The Trustee alleges that Multi-Strategy is subject to personal jurisdiction in this Court because it purchased shares in Sentry believing that Sentry would invest its money with New York-based BLMIS and that, in turn, BLMIS would engage in a trading strategy involving U.S. securities.  Am. Compl. ¶¶ 88-94, 100-07.  The Trustee contends that BLMIS's anticipated securities trading in the United States can be imputed to Multi-Strategy so that Multi-Strategy itself "purposefully undertook investment activities in the United States," *id*. ¶ 100.  But since the Trustee admits that BLMIS never engaged in any such U.S. securities trading, *id.* ¶ 37, there were no "investment

---

[23] In deciding a Rule 12(b)(2) motion, the court may consider materials outside the pleadings, including affidavits and other written materials.  *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015).

3648213.1

activities in the United States" that could be imputed to Multi-Strategy.  Even leaving that basic, fatal defect aside, the Trustee's theory fails for another fundamental reason.

The fact that a foreign defendant owns shares in, or has a contractual relationship with, a New York-based company that purposefully avails itself of the privilege of conducting business in New York, does not suffice to attribute the New York company's jurisdictional contacts to the foreign defendant without additional facts that the Trustee has not and cannot plead here.  As shown below, under either line of analysis—*i.e.*, based on the shareholder relationship or based on contractual relationships, the Trustee's allegations fall far short.

*First*, both federal and New York law respect the separate legal personalities of company and shareholder when determining whether each has sufficient jurisdictional contacts. *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016).

Because the corporate form is respected for jurisdictional purposes, a company's jurisdictional contacts will not be attributed to a shareholder, *see id.*, unless the company was an alter ego of the shareholder or acted as its agent.  *See City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 316, 437-39 (S.D.N.Y. 2020) (alter ego or agent); *Cooper v. Parsky*, 1997 WL 242534, at *14 (S.D.N.Y. Jan. 8, 1997) (alter ego), *aff'd in relevant part, vacated in part on other grounds*, 140 F.3d 433 (2d Cir. 1998); *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 283 (1970) ("The mere fact that respondent is a controlling shareholder in . . . a corporation concededly doing business in New York . . . , will not subject respondent . . . to in personam jurisdiction . . . unless the record would justify our piercing the corporate veil.").

An alter ego finding requires grounds for piercing the corporate veil, *see id.*; *Blavatnik*, 543 B.R. at 141-43, which have not and cannot be alleged here.  *See Cooper*, 1997 WL 242534, at *14 (merely alleging investment in a New York-based company "does not justify

piercing the corporate veil"). An agency finding requires the plaintiff to show that the

corporation "acted in New York for the benefit of, with the knowledge and consent of, and under

some control by," the defendant shareholder. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883

F.3d 68, 85 (2d Cir. 2018). In absence of such control, a company's jurisdictional contacts are

not imputed to a defendant shareholder. *See City of Long Beach*, 465 F. Supp. 3d at 439; *Alki*

*Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 484-85, 490-91 (S.D.N.Y. 2011),

*aff'd sub. nom Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012).

Here, even leaving aside the fact that BLMIS never undertook any trading

activities in the United States for the benefit of Multi-Strategy, Sentry, or anyone else, *see* Am.

Compl. ¶¶ 37, 53, the Trustee does not and cannot allege that Multi-Strategy had any control

whatsoever over the investment activities of Sentry and thus fails to show that Sentry conducted

those activities as its agent. To the contrary, the Trustee alleges that "personnel at FGG's New

York headquarters . . . maintained final control of . . . Fairfield Sentry's investments with

BLMIS." *Id*. ¶ 62. Much less did Multi-Strategy have any control over the purported U.S.

trading activities of Sentry's sub-custodian BLMIS. In the absence of such control, the Trustee's

allegations are insufficient to impute Sentry's or BLMIS's jurisdictional contacts with New York

or the United States to Multi-Strategy and do not establish specific jurisdiction over it.

*Second*, the same conclusion follows if the Trustee's allegations are analyzed

under the case law addressing whether a foreign defendant becomes subject to jurisdiction as a

result of a contract with a person residing or performing in the forum. The law is clear that an

anticipated performance in New York by a third party two steps removed from the defendant

does not show the purposeful availment necessary for specific jurisdiction. Indeed, even when a

foreign defendant contracts *directly* with a forum resident, that alone does not suffice to show

29

purposeful availment. *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").

The fact that a third party would perform in New York under a contract or subcontract is at most "unilateral activity" by the third party, and cannot show that the *defendant* had the required contact with the forum. *See Walden v. Fiore*, 571 U.S. 277, 291 (2014) ("'[U]nilateral activity' of a third party . . . 'cannot satisfy the requirement of contact with the forum State.'"); *Helicopteros,* 466 U.S. at 417 ("unilateral activity of another party or a third person is not an appropriate consideration"). The Supreme Court has made clear that specific jurisdiction must be established by "contacts that the 'defendant *himself*' creates with the forum State," *not* by "contacts between the plaintiff (or third parties) and the forum State," and *not* by "the defendant's contacts with persons who reside there*.*" *Walden*, 571 U.S. at 284-85. Thus, the actual or anticipated activities of BLMIS or Sentry in New York cannot be considered in determining whether Multi-Strategy engaged in purposeful conduct in New York.

Even alleging that a defendant *knew* of a third party's "strong forum connections" does not change the unilateral nature of another party's activities in the forum and make them a permissible consideration in assessing whether the defendant itself had sufficient contacts with the forum. *Id*. at 289 (when court of appeals "looked to petitioner's knowledge of respondents' 'strong forum connections,'" it "impermissibly allow[ed] a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis" and "improperly attribute[d] a plaintiff's forum connections to the defendant").

In accord with these fundamental principles, New York federal and state courts have routinely refused to find specific jurisdiction over a nonresident defendant based on

30

allegations that the defendant contracted with a New York plaintiff that performed or was
expected to perform under the contract in New York.[24]  The case law makes clear that the
pertinent question is, instead, whether and to what extent the defendant performed or was
obligated to perform in New York under the contract.[25]

Here, Multi-Strategy was simply an investor in Sentry, and Sentry's Subscription
Agreement and Articles of Association did not require Multi-Strategy to provide any good,
service, or other performance in New York or the United States, much less did they envision
"continued and wide-reaching contacts," *Burger King*, 471 U.S. at 479-80, between Multi-
Strategy and New York or the United States sufficient to create specific jurisdiction.

When weighed against these converging lines of well-established authority,
*Picard v. Bureau of Labor Insurance (In re Madoff)*, 480 B.R. 501, 516-18 (Bankr. S.D.N.Y.

---

[24] *See, e.g., Giuliano v. Barch*, 2017 WL 1234042, at *9 (S.D.N.Y. Mar. 31, 2017) ("Plaintiff's
contention that the Court has personal jurisdiction because Plaintiff performed *his* obligations
under the Agreements in New York is also unavailing."); *Jonas*, 116 F. Supp. 3d at 327
(plaintiff's "unilateral activity in the forum state would be insufficient to establish jurisdiction");
*Roper Starch Worldwide, Inc. v. Reymer & Assocs.*, 2 F. Supp. 2d 470, 474 (S.D.N.Y. 1998)
(defendant's "knowledge of, and acquiescence in," New York plaintiff's performance in New
York of services under the parties' contract did not suffice to establish personal jurisdiction over
nonresident corporation); *SunLight Gen. Cap. LLC v. CJS Invs. Inc.*, 114 A.D.3d 521, 522 (1st
Dep't 2014) ("Plaintiff's actions within New York" in connection with contract with out-of-state
defendant could not "be imputed to [defendant] for jurisdictional purposes"); *see also Ferrante*,
26 N.Y.2d at 285 ("The mere receipt by a nonresident of benefit or profit from a contract
performed by others in New York is clearly not an act by the recipient in this State sufficient to
confer jurisdiction under our longarm statute.").

[25] *See Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 288 (E.D.N.Y.
2005) ("Even though the Plaintiff may have expended time, energy and resources in New York
. . . carrying out [its] obligations under the alleged contract, the Plaintiff's business interactions
with New York are not at issue when assessing personal jurisdiction.  Rather, the Court must
evaluate the Defendants' activities and conduct" in New York."); *Int'l Customs Assocs. v. Ford
Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995) ("contention that the majority of
[plaintiff]'s performance under the contract would occur in New York" did not establish
jurisdiction, because "appropriate focus . . . is on what the non-domiciliary defendant did in New
York and not on what the plaintiffs did"), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

31

2012) ("*BLI*"), and *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 190-92 (Bankr.

S.D.N.Y. 2018), do not support a finding of minimum contacts based on knowledge of Sentry's

investment in New York-based BLMIS.  *BLI* did not address any of the arguments made above,

and predated the Supreme Court's opinion in *Walden*.[26]  *BNP Paribas* is likewise inconsistent

with the governing case law and is readily distinguishable, including by the fact, emphasized by

Judge Bernstein, that many of the subsequent transfers alleged in that case "were largely the

result of" the activities in New York of BNP Paribas's Fund Derivative Group, which "operated

from New York."  594 B.R. at 192.  By contrast, the Trustee does not allege that Multi-Strategy

engaged in any activities in New York in connection with its redemption.

   *Alleged receipt of a subsequent transfer of BLMIS customer property.*  The

Trustee asserts that personal jurisdiction exists because Multi-Strategy allegedly received a

subsequent transfer of BLMIS customer property from Sentry.  Am. Compl. ¶ 111.  But as

shown in Point II, the Trustee's own filings show this conclusory allegation to be implausible.

   Moreover, even if the redemption money received by Multi-Strategy from Sentry

had originated from BLMIS in New York, that would not qualify as a purposeful contact by

Multi-Strategy with New York under the facts here.  It is well established that sending payments

into and/or receiving payments from New York, *even in the hundreds of millions of dollars*, does

---

[26] The *BLI* defendant's argument on specific jurisdiction was limited to two pages asserting that it was not responsible for how Sentry invested its subscription monies and that it could not reasonably be subjected to suit in New York because its investment happened to "end up" with BLMIS.  *See BLI*, No. 11-2732 (Bankr. S.D.N.Y.), ECF 10, at 10-11.  The briefing in *BLI* made it appear that the dispositive issue was whether the defendant's investment ended up in a  BLMIS account "merely . . . as a result of happenstance or coincidence," 480 B.R. at 517, or whether the Trustee adequately alleged that the defendant knew that Sentry's investment strategy consisted of placing money with BLMIS.  But Multi-Strategy's argument here is, instead, that knowledge of what another party such as Sentry did (or said it was going to do) in the forum is jurisdictionally irrelevant under *Walden* and many other cases never presented to Judge Lifland.

3648213.1

not constitute purposeful availment if the payments were made in order to comply with the terms

of a contract negotiated and executed outside New York, as were the contracts here.[27]

For example, in *Hau Yin To*, foreign investors in certain Madoff feeder funds

brought suit in New York against various foreign HSBC affiliates that acted as administrator,

custodian, or payee bank for the feeder funds.  The plaintiffs argued that personal jurisdiction

was established over the defendants in New York because they had "directed and transferred

hundreds of millions of dollars to and from BLMIS New York" and "received and facilitated the

transfer of Madoff's criminal proceeds out of BLMIS in New York for the benefit of certain

Feeder Funds, and vice versa from the Feeder Funds to BLMIS."  2017 WL 816136, at *2.

The District Court held that these allegations failed to establish "'purposeful

availment' of the laws of New York."  *Id*. at *6.  The District Court explained that "a foreign

defendant's communications with a party in New York or sending of monies into New York are

not sufficient to establish personal jurisdiction" if the "communications with and payments to

New York were made merely to ensure compliance with contract terms negotiated and executed

outside of New York."  *Id*. at *5.  Because the plaintiffs did not allege the defendants'

---

[27] *See Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136, at *5 (S.D.N.Y. Mar. 1, 2017) (holding that "communications with and payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction over it"), *aff'd*, 700 F. App'x 66 (2d Cir. 2017); *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (fact that contract negotiated and executed outside New York required payments to New York bank account did not confer specific jurisdiction); *Rosenblatt v. Coutts & Co. AG*, 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant sending payment to plaintiff's New York bank account pursuant to agreement negotiated and executed outside the United States was not purposeful availment); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2016) (facts that "Foreign Defendants communicated with and transmitted . . . funds to and from BLMIS located in New York" did not show purposeful availment since these "communications and payments were incidental consequences of fulfilling a foreign contract"); *Roper*, 2 F. Supp. 2d at 474-75 ("merely sending payment to New York" pursuant to contract negotiated and executed in Illinois or Michigan is not sufficient for personal jurisdiction).

33

agreements with BLMIS or the funds were negotiated or executed in New York, the fact that

"the Foreign Defendants have communicated with and transmitted information and funds to and

from BLMIS located in New York, in connection with their fund administration and/or custodial

duties under agreements negotiated with BLMIS" were only "incidental consequences of

fulfilling a foreign contract" and would not defeat dismissal for lack of personal jurisdiction. *Id*.

at *6. On appeal, the Second Circuit affirmed.

       Similarly here, the two subscription payments from Multi-Strategy and the one

redemption payment to it were made pursuant to contracts with Sentry, which the Trustee does

not allege were negotiated or executed in New York, and thus do not suffice to establish personal

jurisdiction regardless of whether the payments passed to, from, or through New York.

       ***Nonparty foreign banks' use of correspondent bank accounts in New York.*** The

Trustee alleges that Multi-Strategy entered into subscription agreements with Sentry under which

it agreed to and did wire the money for its Sentry shares through a correspondent bank account in

New York for ultimate deposit in Sentry's Irish bank account. Am. Compl. ¶ 110. The

Subscription Agreement indeed contains wire transfer instructions, indicating that Sentry

maintained a bank account at Citco Bank's Dublin branch and that Citco Bank in turn maintained

a correspondent account in Citco Bank's own name at HSBC Bank USA in New York. *See*

Therrien Decl. Exs. A & B, ¶ 3. The Trustee also alleges that Multi-Strategy provided wiring

instructions to Sentry specifying that redemptions from Sentry should be "'PA[ID]

THROUGH'" an account at the Bank of New York in New York. Am. Compl. ¶ 111. Multi-

Strategy's Canadian bank (Desjardins) had a correspondent account in New York at Bank of

New York, Therrien Decl. ¶ 15 n.2, and the wiring instructions referenced in the Amended

Complaint clarify that what Multi-Strategy asked Sentry to do was to "PAY THROUGH"

Desjardin's correspondent account at Bank of New York "FOR CREDIT TO" Multi-Strategy's

account at Desjardins, *id*. Ex. A at 13 & Ex. B at 13.  The Trustee does not allege that *Multi-*

*Strategy itself* held a bank account in New York or that any funds received in a correspondent

account were held there rather than passed on to destination accounts outside New York.

　　　　　The facts that Sentry and Multi-Strategy each used nonparty foreign banks (Citco

Bank and Desjardins, respectively) that in turn wanted U.S.-dollar wire transfers routed to them

through accounts that Citco Bank and Desjardins had at New York banks, does not show

purposeful availment of New York law by Multi-Strategy.  Opinions that have found the use of

correspondent bank accounts to be relevant to personal jurisdiction, such as *Licci ex rel. Licci v.*

*Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), *Official Comm. of Unsecured*

*Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016), and *Rushaid v.*

*Pictet & Cie*, 28 N.Y.3d 316 (2016), all involved cases where *the defendant was the foreign bank*

*that maintained the correspondent account in New York*.  The defendant foreign bank was held

subject to specific jurisdiction because, in those cases, its use of the New York correspondent

account was both purposeful and essential to an element of the claim against the foreign bank.[28]

　　　　　None of those cases suggests that a non-bank defendant, such as Multi-Strategy,

purposefully avails itself of New York law if it or another party or a nonparty maintains a foreign

bank account at a foreign bank, and that foreign bank chooses to maintain and use a New York

---

[28] *See Licci*, 732 F.3d at 169, 172 (defendant foreign bank's use of New York correspondent account to funnel money to Hezbollah was directly related to plaintiffs' claim that bank financed terrorist organization by executing U.S.-dollar-denominated wire transfers on its behalf); *Arcapita*, 549 B.R. at 68-69 (defendant foreign banks themselves "selected U.S. dollars as the currency" for the transaction and "designated New York correspondent bank accounts to receive the funds from Arcapita," and receipt of funds into those accounts was "precisely . . . the activity that the cause of action seeks to have avoided"); *Rushaid*, 28 N.Y.3d at 327 (defendant foreign bank's use of correspondent account was "essential step in the money-laundering scheme").

3648213.1

correspondent account to facilitate U.S.-dollar wire transfers.  When courts have addressed

whether a bank's maintenance of a correspondent account should be imputed to a customer of

the bank for purposes of specific jurisdiction, the answer, not surprisingly, has been no.  *See*

*Steinberg v. A Analyst Ltd.*, 2009 WL 806780, at *6 (S.D. Fla. Mar. 26, 2009) (no jurisdiction

under CPLR § 302(a)(1) to recover redemption payment made to foreign hedge fund where fund

did not maintain a bank account in the United States, even though fund used a foreign bank that

had a correspondent bank account in New York in connection with redemption).

> The Trustee's allegations about Citco Bank's and Desjardins' correspondent New

York bank accounts also fail to establish specific jurisdiction for the independent reason that his

claim does not "arise out of or relate to" the fact that Sentry and Multi-Strategy each had a bank

account with a nonparty foreign bank that in turn maintained and used a correspondent bank

account in New York.  Neither the existence of Madoff's Ponzi scheme, nor any alleged initial

transfer from BLMIS to Sentry, nor any alleged subsequent transfer from Sentry to Multi-

Strategy relates in any way, causally or logically, to the mechanics of how Sentry received

subscription payments from or made redemptions to Multi-Strategy.  All elements of the

Trustee's claim and its asserted injury would be exactly the same if Sentry or Multi-Strategy had

used a foreign bank that preferred to have U.S.-dollar wire transfers to it routed through an

intermediary bank in Katmandu or Timbuktu, or if they had eschewed wire transfers altogether

and specified that subscription and redemption payments should be made by mailing checks to

their respective administrators in the Netherlands and Ireland.  *See Vasquez v. Hong Kong*

*& Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 262 (S.D.N.Y. 2020) (no specific jurisdiction

over foreign bank defendant based on its use of correspondent bank account in New York for the

36

transfers at issue, where use of the account was not necessary to the Ponzi scheme), *appeal withdrawn*, 2021 WL 4190722 (2d Cir. Apr. 14, 2021).

   ***CDP's communications with FGG personnel located in New York.***  The Trustee alleges that personnel of Multi-Strategy's investment manager CDP met with "senior FGG personnel at FGG's office in New York shortly after Defendant began investing in Fairfield Sentry," Am. Compl. ¶ 96; *see* Therrien Decl. ¶ 19, and that CDP personnel in Canada emailed or otherwise "directed communications" to FGG employees in New York about Multi-Strategy and Sentry, Am. Compl. ¶¶ 70, 91, 93, 97; *see* Therrien Decl. ¶ 20.

   A single in-person visit to New York, after the contract was already formed, is too sporadic and attenuated to establish purposeful availment.  *See, e.g., SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170-71 (S.D.N.Y. 2015) (no personal jurisdiction where defendants had only "sporadic or indirect contacts with the United States"), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 380, 382 (1967) (fact that Illinois corporation's representatives traveled to New York and spent one day there conferring with plaintiff over contract dispute did not rise to purposeful availment under CPLR § 302(a)(1)). Nor does the Trustee's claim arise out of or relate to that isolated contact with New York.

   The alleged email and other "communications" with FGG do not qualify as purposeful availment either.  As the courts held in *Hau Yin To* and the other cases cited in note 27 above, an out-of-state person communicating electronically or telephonically into the state with a forum resident, in connection with a contract negotiated and executed outside New York, is not purposeful availment.  More generally, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York.'"  *Maranga v. Vira,* 386 F. Supp. 2d 299, 306

(S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983));

*accord Int'l Customs Assocs*., 893 F. Supp. at 1261 ("Telephone calls and correspondence sent

into New York, by a non-domiciliary defendant who is outside New York, generally are

insufficient to establish personal jurisdiction.") (collecting cases); *RBC Cap. Mkts., LLC v.

Garcia Hamilton & Assocs., LP*, 2021 WL 230194, at *4 (S.D.N.Y. Jan. 22, 2021) (same).

Instead, "[o]nly in cases where the telephone call or communication clearly shows

that the defendant intends to project itself into ongoing New York commerce, such as where a

defendant directly conducts market activity or securities transactions in New York over the

telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile

transmissions alone." *Metals Alliance Corp. v. Beshay*, 1998 WL 811788, at *2 (S.D.N.Y.

Nov. 19, 1998).  For example, in *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13 (1970),

a California resident participated in a live auction in New York by means of an open telephone

line, thus "project[ing] himself into the auction room," "invok[ing] the benefits and protections

of [New York's] laws relating to the conduct of auctions," and establishing personal jurisdiction

when the auction house later sued him in New York for failing to pay his winning bids. *Id.* at 18

(cleaned up).  In such cases, the communication is itself the transaction of business in New York.

By contrast, here, none of the emails or communications with Sentry personnel

alleged in the Amended Complaint constitutes the kind of direct conduct of market activity or

securities transactions in New York that amounts to purposeful availment.  Nor does the

Trustee's claim arise out of or relate to those emails and communications.

***Alleged contacts related to the Trustee's separate and now dismissed claim to

recover redemption payments from Kingate.***  The Trustee also alleges that once, on some

unspecified date, "Defendant's agents" traveled to New York to meet with personnel of a

3648213.1

different fund manager (Tremont) regarding Multi-Strategy's investment in a different feeder

fund (Kingate), Am. Compl. ¶ 98, that "Defendant's agents" also communicated with Tremont

personnel in New York about subscriptions to and redemptions from Kingate, *id*. ¶¶ 79, 99, 111,

and that Multi-Strategy knew Kingate would rely on a New York-based broker-dealer that

purported to use an investment strategy involving trading in U.S. securities, *id*. ¶¶ 94, 106.  The

Trustee's original complaint had included a separate claim to recover the redemption payments

Multi-Strategy received from Kingate, but the Trustee stipulated to the dismissal of that claim

and omitted it from the Amended Complaint.  *Id*. ¶ 3 n.2.

   Under established law, the Trustee's allegations regarding Tremont and Kingate

cannot constitute jurisdictional contacts with respect to his separate claim for recovery of Multi-

Strategy's redemption from Sentry.  Each fraudulent transfer is a separate claim, *cf. Metzeler v.

Bouchard Transp. Co. (In re Metzeler)*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986), and the

Trustee "must establish the court's jurisdiction with respect to each claim asserted."  *Charles

Schwab*, 883 F.3d at 83; *accord City of Long Beach*, 465 F. Supp. 3d at 432.  Here, the Trustee's

claim to recover a redemption from Sentry does not arise out of or relate to any contacts by

Multi-Strategy with New York in connection with its subscription to and redemption from the

separately organized and managed Kingate fund.

   Moreover, even if the alleged Kingate-related contacts could be considered in

connection with the separate Sentry-related claim, they would add nothing to the Trustee's case

for jurisdiction.  The Trustee's allegations of communications with Tremont personnel in New

York and allegations that Multi-Strategy knew Kingate would invest with BLMIS are

jurisdictionally irrelevant for the same reasons discussed above with respect to similar alleged

contacts with respect to Sentry.  *See* pp. 27-32, 37-38, *supra*.

3648213.1

Because no contacts alleged by the Trustee constitute purposeful, in-forum conduct by Multi-Strategy from which his claim arose or to which it is related, he has not alleged a prima facie case of personal jurisdiction, and his Amended Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, the Trustee's Amended Complaint against Multi-Strategy should be dismissed.

Dated: New York, New York
      March 4, 2022

Respectfully submitted,

s/ Robert J. Lack
Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Dielai Yang (dyang@fklaw.com)
FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Attorneys for Defendant
Multi-Strategy Fund Limited*

3648213.1