**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff,<br><br>                    Plaintiff,<br><br>          v.<br><br>KOOKMIN BANK,<br><br>                    Defendant. | Adv. Pro. No. 12-01194 (CGM) |

**DECLARATION OF HOON-MI PARK, MANAGER OF**
**DEFENDANT KOOKMIN BANK'S CUSTODY BUSINESS DEPARTMENT**
**IN SUPPORT OFKOOKMIN BANK'S MOTION TO DISMISS**

Hoon-mi Park, a Manager in the Custody Business Department of Kookmin Bank, declares as

follows:

    1.      I am a manager in the Custody Business Department of Kookmin Bank

(hereinafter "KB"), the defendant in the captioned action. KB has duly authorized me to make

this declaration on its behalf in support of its motion to dismiss this action. I make this

1

declaration on personal knowledge as informed by review of KB corporate records and discussions with KB personnel.

## I.   KB Is a Korean Commercial Bank

1.      KB is a commercial bank established in 2001 under the laws of the Republic of Korea. It results from a merger between KB and Housing & Commercial Bank on November 1, 2001. KB's headquarters office is in Seoul, Republic of Korea. The Bank's Custody Business Department, in which I am employed, was the only part of KB that was involved in purchases and redemptions of shares of Fairfield Sentry Ltd. (hereinafter, "Fairfield").

## I.   KB's Role Was Only to Execute Purchase and Redemption Orders When Instructed to Do So By Independent Asset Management Companies

2.      KB's sole connection with Fairfield and its shares was in the capacity of trustee for Korean trusts with solely administrative duties.  In that capacity, KB purchased, held, and redeemed Fairfield shares between 2004 and 2006, with the last Fairfield shares redeemed on January 19, 2006. The trusts of which KB served as trustee were formed and directed by two third-party asset managers, namely, Korea Investment Management Co., Ltd., and Samsung Asset Management.  KB did not control, manage, or direct any of the trusts and it was not affiliated with either of the asset managers. KB's role as trustee was simply to execute the asset managers' instructions to purchase, hold in custody, and sell or redeem trust assets. That was KB's only role and activity with respect to the Fairfield shares.

3.      KB's did not, and was not required to, perform due diligence on, investigate, or monitor the trust's assets, including the Fairfield shares it was directed to purchase.

4.      KB did not invest money in, own any shares of, or have any other contact with Fairfield. KB also did not invest money in or own any beneficial interest in any of the trusts. It

did not know the identities of the trust beneficiaries. KB had no investment discretion over what

assets the trusts purchased, held, or sold or redeemed or when to do so. It was not an advisor to

the trusts or asset managers. It did not identify or give advice on assets that trusts should buy or

sell or redeem or when or why they should or should not do so. KB provided only administrative

"back office" execution services for a nominal fee. KB's role as trustee was made clear on

transaction documents.

## II. KB Had No Knowledge of Fairfield's Business, Its Investment Activities, BLMIS, or Madoff

5.      KB's role as trustee did not call for it to know the characteristics or activities of

issuers of securities it purchased, held, or redeemed for the trusts at the asset managers'

instructions. Consequently, KB had very little knowledge about Fairfield or the Fairfield shares.

During the period 2004-2006, KB knew that Fairfield was a corporate entity organized under

British Virgin Island laws and that its address was in the British Virgin Islands. It was aware that

purchases and redemptions of Fairfield's shares were handled by a Citco Netherlands BV with its

offices in Amsterdam, and that Fairfield's shares were purchased and redeemed in U.S. Dollars.

And it knew the administrative steps for purchasing and redeeming Fairfield shares.

6.      KB did not know information about Fairfield's activities or shares or that Bernard

L. Madoff Investment Securities (hereinafter "BLMIS") or Bernie Madoff had any role in

Fairfield's investment decisions or activities. KB did not investigate or monitor Fairfield or its

shares and it had no duty or responsibility to do so; that was the asset managers' job. It did not

have knowledge about Fairfield's business and did not communicate or interact with BLMIS,

Madoff, Fairfield Greenwich, or their affiliates. As the subscription agreements directed, KB

may have sent copies of the Agreements to Fairfield's Bermudan Investment Manager, namely,

3

Fairfield Greenwich (Bermuda) Ltd. in Hamilton, Bermuda. Consequently, as I explain in detail

below, KB did not know the information that the complaint incorrectly asserts that KB had. The

complaint states no source for its incorrect allegations. The same is true for the allegations in a

document the plaintiff filed as "Proffered Allegations," which I am informed this Court did not

allow to be added to the complaint but which I also address in detail below.

### 1. The Fairfield Private Placement Memorandum Did Not Disclose That Fairfield Had Any New York or U.S. Connections

7.      Inquiries made into KB's records and personnel by me and by others at my

direction show that KB received only one Fairfield Confidential Private Placement

Memorandum, which is dated October 1, 2004 (the "PPM"). A true and correct copy is attached

hereto as Exhibit 1. KB received it more likely than not from an asset manager rather than

Fairfield or Citco. KB would have reviewed only the requirements for KB to follow to execute

the asset managers' purchase and redemption instructions. Other parts of the PPM were not

relevant to KB's duties or responsibilities.

8.      Even if KB had read the entire PPM, however, it would not have learned anything

about BLMIS or Bernard Madoff relevant to this motion or lawsuit. The PPM does not mention

Bernard Madoff at all. It mentions BLMIS only twice in consecutive paragraphs under the

caption "Escrow Bank and Custodian," in discussing custodians for Fairfield's assets:

> The Fund's escrow account is maintained at Citco Bank Nederland
> N.V. ("Citco Bank"). Citco Global Custody ("Citco Custody") has agreed
> to act as custodian of the Fund's assets. Bernard L. Madoff Investment
> Securities ("BLM" and, together with other qualified entities with which
> sub-custodial arrangements may be made, the "Sub-Custodians," and
> each, singularly, a Sub-Custodian") serve as sub-custodians for certain
> assets of the Fund. The underlying assets of the Non-SSC Investments
> managers are held pursuant to custodial arrangements with Goldman,
> Sachs & Co., Refco, LLC and other qualified entities.

4

> Citco Custody has been appointed custodian to the Fund pursuant
> to a brokerage and custody agreement dated September 20, 1994 between
> and among the Fund, Citco Bank and Citco Custody (the "Custody
> Agreement"). Citco Custody currently has U.S.$36 billion under custody.
> Currently BLM has approximately 95% of the Fund's assets under
> custody. Citco Custody will be responsible for all of the assets of the
> Fund, other than the assets deposited with the Sub-Custodians. All assets
> under custody will be held by Citco Custody and/or a Sub-Custodian, as
> the case may be, in a separate client account and will be separately
> designated in the books and records of Citco Custody and the Sub-
> Custodians. Assets deposited as margin need not be segregated and may
> become available to the creditors of brokers.

Ex. 1 at 14-15 (emphasis added). The PPM does not disclose where BLMIS was organized, had is

offices, or conducted its activities.

9.      Nothing in the PPM informs a reader that any activity relating to Fairfield or its

investments would take place in the United States, and KB had no knowledge that any would. All

the entities identified as having been involved with Fairfield were organized and had their

addresses outside the U.S., namely in Bermuda, the British Virgin Islands, the Cayman Islands,

Ireland, and The Netherlands. The PPM mentions that Fairfield's Bermuda investment manager

had an affiliated company with its principal office in New York and a significant presence in

London, but the PPM does not say that the affiliate had or would have any role concerning

Fairfield or its shares. Rather, it says:

> The Manager [Fairfield Greenwich (Bermuda) Ltd.] and its affiliates currently
> serve as investment or administrative manager to approximately twenty funds,
> and have exclusive distribution arrangements with several others. FGG maintains
> its principal office in New York, with a significant presence in London.
> Marketing and client support offices are located elsewhere in the United States,
> Europe, and Latin America. FGG's London entity is licensed and subject to the
> supervision of FSA, and another FGG-affiliated entity is registered as a broker-
> dealer in the United States.

5

Ex. 1 at 6. Neither this disclosure nor anything else in the PPM says or suggests that <u>any</u>

<u>activity</u> relevant to Fairfield or its shares would occur in New York or the U.S.. In fact,

the PPM says exactly the opposite, stating:

> The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because <u>the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States</u>, or treated as a personal holding company, for United States federal income tax purposes.

Ex. 1 at 30 (emphasis added).

### 2. The Citco/Fairfield Subscription Agreement Did Not Disclose That Fairfield Had Any New York or U.S. Connections

10.     In order for KB as trustee to be able to execute the asset managers' purchase

orders for Fairfield shares, KB signed several substantively identical Subscription Agreements

with Fairfield. A true and correct copy of one, representative of the others, is attached hereto as

Exhibit 2 (hereinafter the "Agreement).

11.     Like the PPM, the Agreement says nothing about investment activities being

conducted in or from New York or the U.S. To the contrary, the Agreement indicates that

everything would be handled outside the U.S.:

   a.   the Agreement is addressed to "Fairfield Sentry Limited, c/o Citco Fund Services

(Europe) B.V." at a street address in Amsterdam, The Netherlands. (Ex. 2 p. 1.)

   b.   the Agreement says Fairfield was "an international business company organized

under the laws of the Territory of the British Virgin Islands." (Ex. 2 ¶ 1.)

   c.   the Agreement says that Fairfield's "Investment Manager is Fairfield Greenwich

(Bermuda) Ltd., at Par La Ville Place, 14 Par La Ville road, 3rd Floor, Hamilton,

Bermuda." (Ex. 2 ¶¶ 2, 4.)

d.   the Agreement directs KB to send subscription money to "Citco Bank Nederland,

N.V., Telestone 8—Teleport, Nariaweg 165, 1043 BW Amsterdam, The Netherlands, via

its HSBC New York correspondent bank, a go-between for the U.S. Dollar investment.

(Ex. 2 ¶ 3.) It directs redemption payments to be paid to KB's account in Seoul, Korea, via

a New York correspondent bank for the same unremarkable reason. (Ex. 2 ¶ 30, at 11, 12.)

e.   the Agreement designates New York law for contract interpretation and

enforcement, as do many international agreements because that body of commercial law,

like English law, is universally recognized as well-developed and fair. The Agreement

commits the signatories to accept litigation in New York but at the same time recognizes

that lawsuits could be by either party against the other in <u>any jurisdiction</u> in the world,

not only New York. (Ex. 2 ¶¶ 16, 19.)

12.   Nothing in the Agreement alerts a reader that an investment in Fairfield would

directly or indirectly involve investment in or management by an entity or individual in New

York or the U.S.

### III. KB Had No Dealings with Individuals or Companies in New York or the U.S. or Knowledge that Anyone in New York or the U.S. was Involved in Fairfield's Operations or Investment Activities

#### A. The Allegations in the Complaint Are Untrue and Have No Basis

13.   The complaint contains allegations that attempt to show that KB had contacts with

New York in connection with the redemptions of Fairfield shares that make it subject to personal

jurisdiction in this action. A true and correct copy of the complaint against KB filed in this Court

on March 12, 2012, is attached hereto as Exhibit 3. The complaint does not disclose any sources

for most allegations because they are untrue and, therefore, there are no sources. The allegations

and the contrary, true facts are:

7

a.  Allegation: KB "knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield." (Ex. 3 ¶ 6.)

The Truth: KB did not have that knowledge; it was not aware of BLMIS or its having any role in the Fairfield investment, that it was a New York entity, or that Fairfield invested funds in, with, or through BLMIS.

b.  Allegation: KB "knowingly received subsequent transfers from BLMIS by withdrawing money from Fairfield." (Ex. 3 ¶ 6.)

The Truth: KB did not have that knowledge; it was not aware of BLMIS or its having any role in the Fairfield investment. It did not know that any redemption payments came from any source other than Fairfield, if in fact redemption payments came from another source.

c.  Allegation: KB "entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction. (Ex. 3 ¶ 7.)

The Truth: The Agreement actually provides that either party "may" bring litigation in New York "or in <u>any</u> other jurisdiction." (Ex. 2 ¶ 19.) (Emphasis added.)

d.  Allegation: KB "sent a copy of the [subscription] agreement to FGG's New York City office." (Ex. 3 ¶ 7.)

The Truth:  The Agreement actually directs KB to "fax and mail an executed, completed copy of this agreement to [Fairfield's] Administrator [Citco Funds Services (Europe) BV] at" its specified Netherlands facsimile number and address, "with a copy to [Fairfield's Investment] Manager … Fairfield Greenwich (Bermuda) Ltd." at its address in Hamilton, Bermuda." (Ex. 2 ¶ 4.) The Agreement is between KB as trustee and "Fairfield c/o Citco Fund Services (Europe) B.V." at a street address in Amsterdam. (Id.

8

1.) Although KB has found no record of having, at some unstated time for some unstated reason, sent a copy of the executed Agreement to a New York office of an affiliate of Fairfield's Bermudan Investment Manager; if it did so, it would not be unusual or significant.

e.   Allegation: KB "wired funds to Fairfield Sentry through  a  bank in  New York." (Ex. 3 ¶ 7.)

The Truth: KB wired the purchase price for Fairfield shares to Citco's account in The Netherlands as the Subscription Agreement specified. (Ex. 2 ¶ 3 at 2-3.) The Agreement required the price to be made paid in U.S. Dollars (id. ¶1), and KB complied with the specification in the Agreement that the money go to Citco's Netherlands account through Citco's correspondent bank in New York. (Id. ¶ 3.) For the same reason, Fairfield sent redemption payments to KB's account as trustee in Seoul, Korea, with the dollars passing through a correspondent bank in New York en route to Korea. (Id. ¶ 30.)

f.   Allegation: KB "regularly communicated via email with its FGG account representatives in FGG's New York City office." (Ex. 3 ¶ 7.)

The Truth:  KB did not have "FGG account representatives" and did not communicate, regularly or otherwise, with FGG in New York or elsewhere.

g.  Allegation: "Representatives of [KB] also travelled to New York City to meet with its FGG account representatives." (Id.)

The Truth: KB did not have "FGG account representatives" and no KB representative traveled to New York City to meet with FGG.

14.     Therefore, the allegations in the complaint are not factual, accurate, or supported, and they cannot be credited or given any weight.

9

B. The Plaintiff's Proffered Allegations about
KB's Role and Knowledge Are Untrue and Without Basis

15.     In June 2015, while consolidated motions were pending to dismiss the plaintiff's

subsequent transfer complaints, the plaintiff filed a document it called "The Trustee's Proffered

Allegations Pertaining to the Extraterritoriality Issue as to Kookmin Bank." (Dkt. No. 47, filed

June 27, 2015). A true and correct copy of the Proffered Allegations is attached hereto as Exhibit

4. I am informed that the Court did not allow the complaint to be amended to include any of the

proffered allegations. However, even though they are not part of the complaint, KB addresses the

plaintiff's Proffered Allegations in case the Court were to allow them to be considered on this

motion. Like the allegations of the complaint, the proffered allegations are incorrect,

unsupported, and irrelevant.

   a.  Proffered Allegation:  KB "invested in Fairfield Sentry to profit from BLMIS in

New York, and Fairfield Sentry was merely the means to that end." (Ex. 4 ¶ 3.)

   The Truth: KB did not know that Fairfield invested in BLMIS or that an

investment in Fairfield would profit or lose because of BLMIS. Not knowing of BLMIS,

KB did not know it was in New York.

   b.  Proffered Allegation:  "BLMIS was the investment advisor, broker-dealer, and

custodian for Fairfield Sentry and for any investments made by [KB] in Fairfield

Sentry." (Ex. 4 ¶ 4.)

   The Truth: Whether the allegation is true or not, KB had no knowledge of

BLMIS' having a purported role with Fairfield.

   c.  Proffered Allegation: KB "relinquished all control of its investments underlying

the subject transfers to Madoff and fully understood and intended that those

10

subscription funds would be invested in U.S. securities." (Ex. 4 ¶ 4.)

The Truth: KB had no control of, or even any say about, the trusts' investments in Fairfield, did not know of Madoff having any role with Fairfield, and did not know or intend that the trusts' investments in Fairfield would be reinvested in U.S. securities.

d.  Proffered Allegation: KB "had a business relationship with FGG as early as 2004 when it began investing with Fairfield Sentry." (Ex. 4 ¶ 4.)

The Truth: KB had no business relationship with FGG in 2004 or at any time.

e.  Proffered Allegation: "To invest in Fairfield Sentry, [KB] executed subscription agreements wherein it acknowledged having received and read a copy of Fairfield Sentry's Private Placement Memorandum, as amended from time to time." (Ex. 4 ¶ 5.)

The Truth: This is a correct recitation from the PPM but KB did not read any more of the PPM than the instructions for sending and receiving money, if even that, which is the only part that would have been relevant to its duties as trustee. The asset managers were responsible for selecting the trusts' assets and deciding when and why to purchase, hold, and redeem them. Furthermore, as I have explained above in ¶¶ 8 & 9, even if KB had read the PPM in its entirety, it still would have been unaware that an investment in Fairfield had any link to New York, the United States, BLMIS, or Madoff.

f.  Proffered Allegation: "According to the PPM, 'The services of [BLMIS]'s principals and key employees are essential to the continued operations of the Fund. If their services were no longer available, their absence would have an adverse impact on an investment in the Fund.'" (Ex. 4 ¶ 5.)

The Truth: The plaintiff has improperly changed the quotation by substituting the term "[BLMIS]" for the word "Manager." The difference is dramatic. "Manager" is

11

defined in the PPM <u>not</u> as BLMIS but as "Fairfield Greenwich (Bermuda) Ltd. ("FGBL"
or the "Manager"), a corporation organized under the laws of Bermuda, [which] serves as
the Fund's investment manager." (Ex. 1 at 6 & 17.) Therefore, even if KB had read this
sentence in the PPM, it would have understood that the Bermuda company acted as
Fairfield's Manager, not BLMIS.

   g.  Proffered Allegation: "Based on the PPM, [KB] knew that Fairfield Sentry
invested a minimum of 95% of its assets with BLMIS in New York, and that BLMIS
purported to execute a so-called 'split-strike conversion strategy' ('SSC Strategy')
involving the purchase and sale of U.S. securities and U.S. Treasuries over U.S.
exchanges." (Ex. 4 ¶ 6.)

   The Truth: Again, the PPM does not say what the plaintiff claims it says. It does
not say Fairfield "invested with" BLMIS; instead, it says BLMIS was a "custodian" of
approximately 95% of Fairfield's assets. Ex. 1 at 15. Investors do not "invest with"
custodians. The PPM also does not say that BLMIS was in New York. Therefore, the
PPM would not give a reader any reason to believe that an investment in Fairfield with a
Bermudan investment manager was really an investment with BLMIS in New York. (Ex.
1 at 2, 8, 9, 19, & 21.)  Finally, the PPM does not refer to BLMIS or Bernie Madoff in
connection with Fairfield's use of the split strike conversion strategy the PPM says
Fairfield used, and KB did not know either of them had any connection with it.

   h.  Proffered Allegation: "The PPM stated, 'The Split Strike Conversion strategy
is implemented by Bernard L. Madoff Investment Securities LLC ('BLM'), a
broker-dealer registered with the Securities and Exchange Commission, through
accounts maintained by the Fund at that firm … BLM is authorized to determine the

12

price and timing of stock and option transactions in the account.'" (Ex. 4 ¶ 8.)

The Truth: This quoted language <u>does not appear</u> in the PPM (Ex. 1) and, as noted

immediately above, BLMIS is not identified in the PPM as the implementer of the split

strike conversion strategy. BLMIS is mentioned only briefly as a sub-custodian of

Fairfield's assets (see ¶ 9 above; Ex. 1 at 14, 15), and BLMIS never described otherwise,

including as a broker-dealer.

i.   Proffered Allegation: KB "knew BLMIS maintained custody of its investments in

Fairfield Sentry in New York. The PPM represented BLMIS "has approximately 95% of

the Fund's assets under custody." (Ex. 4 ¶ 9.)

The Truth:  As I explained in ¶¶ 8 and 9 above, which quote the PPM, the PPM

does not say, and KB did not know, where BLMIS was located or holding custody of

Fairfield assets. A reader would see in the PPM that BLMIS served as a custodian, but

not where it was located or did business.

j.   Proffered Allegation: KB "knew that BLMIS acted as the investment advisor,

broker-dealer, and custodian for Fairfield and that control over Fairfield rested entirely

with BLMIS in New York." (Ex. 4 ¶ 10.)

The Truth: As I have already explained, KB knew none of this, assuming it is true,

except that, if it read the PPM, it would have known that BLMIS was a custodian of

Fairfield assets without knowing where.

k.   Proffered Allegation: "FGG personnel in New York approved each request

for a subscription or redemption made by [KB]." (Ex. 4 ¶ 11.)

The Truth:  KB made no subscription or redemption requests to FGG in New

York or elsewhere and it had no knowledge of any role of FGG or FGG personnel in

13

approving subscription or redemption requests. What KB knew was what is stated in the Subscription Agreements, which is that all subscriptions were accepted or rejected irrevocably by Fairfield, Fairfield's Board of Directors, and Fairfield's Investment Manager, Fairfield Greenwich (Bermuda) Ltd. (Ex. 2 ¶ 2.)

l.   Proffered Allegation: "The Fairfield Sentry subscription agreements, which [KB] executed to invest with Fairfield Sentry, were governed by New York law and included a New York venue provision and a covenant to submit to the jurisdiction of New York courts." (Ex. 4 ¶¶ 12, 13, 14.)

The Truth: The Agreement designates New York law for contract interpretation and enforcement, as do many international agreements because that body of contract law, like English law, is universally recognized as well-developed and fair. While the Agreement commits the signatories to accept litigation in New York it also it recognizes that either party could bring litigation against the other in <u>any jurisdiction</u> of the world, not only New York. (Ex. 2 ¶¶ 16, 19.)

m.   Proffered Allegation: "As specified in the subscription agreements executed by [KB], all subscription payments to Fairfield Sentry were to be deposited in an HSBC Bank USA, N.A. correspondent bank account in New York. All redemption payments from Fairfield Sentry to [KB] were deposited in an HSBC account in New York. [KB] received transfers from this HSBC account on at least 33 occasions over a 1-year period." (Ex. 4 ¶ 15.)

The Truth:  The Agreement actually directs KB to send subscription money to "Citco Bank Nederland, N.V., Telestone 8—Teleport, Nariaweg 165, 1043 BW Amsterdam, The Netherlands, via its HSBC New York correspondent bank as a go-

14

between for the U.S. Dollar transactions. (Ex. 2 ¶ 3.) It directs redemption payments to be paid to KB's account in Seoul, Korea, via a New York correspondent bank for the same unremarkable reason. (Ex. 2 ¶ 30, at 11, 12.) KB followed this process for all purchases and redemptions of Fairfield shares.

        n.     Proffered Allegation: KB "made subscription and redemption requests on FGG in New York, and New York personnel approved all such subscriptions and redemptions." (Ex. 4 ¶ 15.)

The Truth:  KB made no subscription or redemption requests on FGG in New York or elsewhere, and KB had no knowledge of any role of FGG or FGG personnel in approving subscription or redemption requests. What KB knew was what the Subscription Agreement stated, namely that Fairfield, Fairfield's Board of Directors, and Fairfield's Investment Manager, Fairfield Greenwich (Bermuda) Ltd., irrevocably accepted or rejected all subscriptions. (Ex. 2 ¶ 2.)

## DECLARATION

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct. Executed in Seoul, Republic of Korea, on March 7, 2022.

 

_____
**Hoon-mi Park, Manager of Custody**
**Business Department, Kookmin Bank**

15