**CHAITMAN LLP**
Helen Davis Chaitman
hchaitman@chaitmanllp.com
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114

*Attorneys for Defendants Jacob M. Dick Rev Living Trust, Article 8.1 Trust, Estate of Jacob M. Dick, and Andrea J. Marks, as trustee and beneficiary of the Jacob M. Dick Rev Living Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                          Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                          Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>                          Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                          Plaintiff,<br><br>          v.<br><br>JACOB M. DICK LIVING TRUST DTD 4/6/01,<br><br>                          Defendants. | Adv. Pro. No. 10-04570 (CGM) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

{00048120 2 }

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 3

    Defendants' Madoff Accounts ........................................................................................ 3

    Withdrawals from the Living Trust Account – Madoff Transfers to Defendants ..................... 4

    The JPMC Accounts ....................................................................................................... 6

    Form BD and the Operating Agreement ......................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    THE COURT LACKS JURISDICTION TO ENTER A FINAL JUDGMENT ..................................................................................................... 8

    II.    THE LAW OF THE CASE DOCTRINE SHOULD NOT APPLY ............................. 8

    III.    THE TRUSTEE HAS NOT PROVEN A TRANSFER OF PROPERTY OF THE LLC ..................................................................................... 9

        A.    The JPMC Accounts Were Never Transferred to the LLC ............................. 9

        B.    The Content of Form BD Is Inadmissible ...................................................... 16

        C.    Even if Form BD Is Admissible, It Proves that Madoff Did Not Transfer the JPMC Accounts to the LLC ....................................................... 18

        D.    The Trustee's Reliance on the LLC Operating Agreement Is Unavailing ..................................................................................................... 20

    IV.    THE COURT SHOULD REJECT THE TRUSTEE'S "CUSTOMER PROPERTY" ARGUMENT AND FOLLOW *AVELLINO* ....................................... 21

    V.    THE PONZI SCHEME PRESUMPTION SHOULD NOT APPLY ......................... 29

    VI.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT INTEREST ................................................................................................... 32

CONCLUSION ................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dept. Stores, Inc.*,
    274 B.R. 600 (Bankr. S.D.N.Y. 2002) ...................................................................12

*In re Bauman*,
    535 B.R. 289 (Bankr. C.D. Ill. 2015) ....................................................................27

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019) .................................................................................16

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011) ...........................................................................34, 35

*In re Bernard L. Madoff Inv. Sec. LLC*,
    779 F.3d 74 (2d Cir. 2015) ...................................................................................35

*Board of County Comm'rs of the County of Jackson v. United States*,
    308 U.S. 343 (1939) ..............................................................................................33

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
    567 F.3d 1291 (11th Cir. 2009) ............................................................................33

*City of New York v. Venkataram*,
    2011 WL 2899092 (S.D.N.Y. July 13, 2011) ......................................................12

*Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*,
    249 B.R. 55 (Bankr. S.D.N.Y. 2000) ..................................................................15

*In re Deltacorp, Inc.*,
    179 B.R. 773 (Bankr. S.D.N.Y. 1995) ................................................................28

*In re Int'l Pharmacy & Disc. II, Inc.*,
    443 F.3d 767 (11th Cir. 2005) ..............................................................................12

*Kramer v. Mahia (In re Khan)*,
    2016 WL 6652724 (E.D.N.Y. Nov. 10, 2016) ....................................................33

*LaBarre v. Werner Enters.*,
    2015 U.S. Dist. LEXIS 162598 (N.D.N.Y. Dec. 4, 2015) ...................................17

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    2012 U.S. Dist. LEXIS 18503 (S.D.N.Y. Feb. 14, 2012) ....................................17

*Mecca v. Gibraltar Corp. of Am.*,
    746 F. Supp. 338 (S.D.N.Y. 1990) ......................................................................33

*In re Murray Industries, Inc.*,
125 B.R. 314 (Bankr. M.D. Fla. 1991) .................................................................28

*Paige v. Faure*,
229 N.Y. 114 (1920) ............................................................................................15

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL
6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ....................................................1, 7, 8

*Picard v. Cohen (In re BLMIS)*,
No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ........35

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
773 F.3d 411 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015)...........34

*Picard v. Legacy Capital, Ltd.*,
603 B.R. 682 (Bankr. S.D.N.Y. 2019).................................................................9

*Picard v. Lowrey (In re BLMIS)*,
Nos. 10-04387, 10-04488, 10-04350, 10-05110 (SMB), 2018 WL 1442312
(Bankr. S.D.N.Y. Mar. 26, 2018).........................................................................35

*Picard v. Mann*,
608 B.R. 165 (Bankr. S.D.N.Y. 2019)...................................................................9

*Redfield v. Bartels*,
139 U.S. 694 (1891)................................................................................................34

*Ward v. GM LLC (In re GM LLC Ignition Switch Litig.)*,
2017 U.S. Dist. LEXIS 103890 (S.D.N.Y. July 5, 2017) ..................................12, 17

*Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
AFL-CIO*,
955 F.2d 831 (2d Cir. 1992)...........................................................................33, 34

**Statutes**

11 U.S.C. § 548..........................................................................................................33

11 U.S.C. § 548(a)(1)(A) ......................................................................................9, 34

11 U.S.C. § 550..........................................................................................................33

15 U.S.C. § 80a–51, et seq........................................................................................18

28 U.S.C. § 1961..................................................................................................32, 34

Investment Company Act of 1940 .............................................................................18

**Other Authorities**

Fed. R. Civ. P. 26 ...............................................................................................................12, 17

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................................................12

Fed. R. Civ. P. 37(c)(1)........................................................................................................12, 17

Fed. R. Civ. P. 56(c)(2)(e) .........................................................................................................16

Fed. R. Evid. 703 .......................................................................................................................17

*https://www.fincen.gov/resources/fincens-mandate-congress* ......................................................10

Defendants Jacob M. Dick Rev Living Trust, Article 8.1 Trust, Estate of Jacob M. Dick, and Andrea J. Marks, as trustee and beneficiary of the Jacob M. Dick Rev Living Trust (together "Defendants")[1] submit this memorandum of law in opposition to the motion for summary judgment (the "Motion") filed by Plaintiff, Irving H. Picard, as trustee ("Trustee") for Bernard L. Madoff Investment Securities LLC (the "LLC"). Defendants also rely on their response to the Trustee's statement of material facts ("RMF"), their counterstatement of material facts ("CMF"), and the Declaration of Helen Davis Chaitman, Esq. with exhibits ("Chaitman Decl.").

## PRELIMINARY STATEMENT

The Trustee is not entitled to summary judgment. Defendants are entitled to a jury trial on the disputed and material factual issue of whether the funds paid to them were the property of the LLC, or were the property of Mr. Madoff and/or of his Sole Proprietorship, Bernard L. Madoff Investment Securities (together "Madoff"), in which event the Complaint would fail to state a claim. The issue is seminal. As the Bankruptcy Court twice held, in decisions the Trustee did not seek to appeal, the Trustee has standing to recover transfers by the LLC but only Madoff's individual trustee has standing to recover transfers by Madoff. *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016) ("[o]nly the Madoff trustee, [Alan Nisselson], can recover actual transfers by the sole proprietorship") ("*Avellino*"), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ("*Avellino II*").

The Motion should be denied for the following reasons:

*First*, law of the case is does not control the outcome of this Motion. That doctrine is not mandatory and relevant decisions are contrary to some of the Trustee's arguments. *See* Point II, *infra*.

---

[1] The remaining defendants named in this action were dismissed. *See* footnotes 3 and 4 of Trustee's Brief in Support of the Motion.

1

_Second_, the central question in this case is whether the debtor, the LLC, owned the property that was transferred out of the Defendants' account with Madoff. The question is central because the Trustee only has the power to recover transfers by the LLC of the LLC's own money. _Avellino_, 557 B.R. at 108 and n.4, 110. As such, to obtain summary judgment, the Trustee would have to show beyond material factual dispute that the transfers at issue were of funds owned by the LLC. Otherwise, the Trustee has no standing to avoid or seek the return of such funds. Whether the funds were in an account owned by the LLC or by Madoff is a material factual dispute precluding summary judgment. Defendants are entitled to a trial on that issue. _See_ Point III, _infra_.

_Third_, aware that he has no credible arguments that the JPMC Accounts belonged to the LLC, the Trustee argues that, as long as the funds at issue constitute "customer property" under SIPA, the he can avoid the transfer and recover these funds even if the JPMC Accounts, and the funds on deposit in those accounts, were not owned, or transferred, by the LLC, the debtor in this SIPA liquidation. But SIPA does not give such capacious authority to a trustee. To be recoverable by the Trustee, the funds at issue had to be "customer property" of the Trustee's debtor, the LLC. _Avellino II_, 2016 Bankr. LEXIS 3757 at *10-11. The Court should reject the Trustee's SIPA customer property argument and follow _Avellino_. _See_ Point IV, _infra_.

_Fourth_, the Trustee argues that the debtor's intent to defraud can be supplied by the Ponzi scheme presumption, but a recent Second Circuit concurrence in _Picard v. Citibank, N.A._, 12 F.4th 171 (2d Cir. 2021) questions the applicability of the presumption. The applicability and effect of the presumption was not contested and the court made no findings in respect of it. _Id._, at 181-82. As the concurring opinion makes plain, the Ponzi scheme presumption is inconsistent with federal and state fraudulent conveyance law and Judge Menashi's well-reasoned analysis compels the conclusion that it should not be applied here. _Id._ at 200-04. _See_ Point V, _infra_.

*Fifth*, assuming the Trustee prevails, he is not entitled to a final judgment. This Court lacks jurisdiction to enter a final judgment without Defendants' consent. Disposition of the Motion can only be a report and recommendation. *Stern v. Marshall*, 564 U.S. 562 (2012). *See* Point I, *infra*. Furthermore, again assuming the Trustee is entitled to any relief, he is not entitled to 4% prejudgment interest from when this proceeding was filed. This is 400% more than the statutory post-judgment interest rate under 28 U.S.C. § 1961. There is no statutory basis for an award of interest here. The Trustee sued under 11 U.S.C. § 548, which does not provide for an award of interest. In addition, prejudgment interest is inappropriate where, as here, the Defendants did nothing wrong and there is a good faith basis for contesting liability. Further, prejudgment interest should not be imposed where the plaintiff is responsible for any delay. Here, the Trustee delayed unconscionably. Finally, even assuming interest could be awarded at all, a rate of 4% is excessive and punitive. At most, the rate should be consistent with 28 U.S.C. § 1961. *See* Point VI, *infra*.

## BACKGROUND

### Defendants' Madoff Accounts

On April 5, 1995, Jacob M. Dick and June Dick, TIC opened an account with Madoff (the "Dick Account" and "Account 1CM325") with a combined $1,000,000. *See* Chaitman Decl. **Ex**. **AB** [Account Opening documents [AMF00254458-69]]; *see also* Compl., Ex. B, line 1. Subsequently, Account No. 1CM883 (the "Living Trust Account") was opened on May 26, 2004, with a transfer in the amount of $1,044,484 from Madoff account no. 1CM325, a C & M Trading Account (the "Transferor Account"). *See* Chaitman Decl. **Ex**. **AC** [April 1995 Statement for the Jacob M. Dick Account as of April 28, 1995 reflecting an initial investment of $1,000,000] [MF00197053]; *see* Chaitman Decl. **Ex**. **AD, AE** [May 2004 and March 2005 Statements for the Transferor Account reflecting a combined transfer to the Living Trust Account in the amount of $1,044,484 on May 26, 2004 and $1,518 on March 7, 2005 [MDPTPP01153999 and

MDPTPP01154026]]; *and see* Chaitman Decl. **Ex**. **AF** [Portfolio Management Reports for the

Living Trust Account as of May 31, 2004 reflecting a starting equity of $1,044,483.98 as of May

26, 2004 [MDPTQQ00183407]]; *see also* Compl., Ex. B, line 1. However, the Trustee has failed

to fully credit this transfer. *See infra* at ¶¶ 33-34; *see e.g.* Greenblatt Report, Ex. 4A, ECF No. 108-

15.

For every year through 2007, the Living Trust was issued its Form 1099 for tax purposes

by Bernard L. Madoff. *See* Chaitman Decl. **Ex**. **AG** compilation of 1099s.  It was never issued a

1099 by the LLC.

**<u>Withdrawals from the Living Trust Account – Madoff Transfers to Defendants</u>**

Throughout the life of the Living Trust Account, withdrawals were paid by checks drawn

from Madoff's "509 Account" at JPMorgan Chase Bank, N.A. ("JPMC") in the name of "Bernard

L. Madoff" (*see* Chaitman Decl. **Ex. Z** [Compilation of Withdrawal Checks for the Living Trust

Account [multiple bates nos.])  The Living Trust never received any payments from the LLC.  *See*

*id*.

The 509 Account was owned by Madoff from the 1980's through December 2008.  For the

entire time period following January 2001 – when Madoff formed the LLC to operate the

legitimate trading businesses managed by his sons – the documentary evidence is irrefutable that

Madoff continued to operate his investment advisory business (the "IA Business") through his

Sole Proprietorship, whose bank accounts remained at JPMC.

The Trustee concedes that Madoff used the trade name of the Sole Proprietorship since the

early 1960s.  Trustee's Memorandum of Law, ECF No. 103 ("T.Br.") at 26.  Through 2000, the

Sole Proprietorship consisted of two businesses: (1) a legitimate trading business (the "LTB"),

which employed approximately 180 people and consisted of proprietary trading ("PT"), *i.e.* trading

securities for its own account, and market-making ("MM"), which created a market in certain

securities and acted as a broker-dealer for those securities, servicing all of the world's major securities firms (CMF ¶1); and (2) the IA Business, which employed approximately five people and provided investment advisory services to its customers. The Trustee has conceded that the PT and MM Businesses were legitimate businesses. CMF ¶1. The IA Business was the business through which Madoff perpetrated his fraud. CMF ¶¶3, 18.

In January 2001, Madoff formed the LLC and transferred to it the LTB which was managed by his sons. CMF ¶9. Madoff wrote letters to the SEC, the Depository Trust Company (the "DTC"), the Bank of New York ("BNY") which serviced the LTB, and others, that the LTB would operate through the LLC. CMF ¶10. The LTB operated on the 18th and 19th floors of the Lipstick Building in Manhattan. However, Madoff never transferred the IA Business to the LTB. Instead, he continued to operate the IA Business as his Sole Proprietorship on the 17th floor of the Lipstick Building. CMF ¶3. Although the LTB maintained its bank accounts with BNY, Madoff maintained the IA Business' accounts at JPMC, whose records contain no evidence that Madoff ever transferred those accounts to the LLC or even notified JPMC of the formation of the LLC. CMF ¶11.

Defendants are listed by the Trustee as a good faith customers of Madoff. See ECF No. 71 at 16 n.48; ECF No. 71-1 at 2 (#48). The Second Circuit limited the Trustee's claims against good faith customers to those seeking to recover withdrawals in the last two years before Madoff's confession, pursuant to 11 U.S.C. § 546(e). *See Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015). The Complaint seeks recovery of $1,681,299.00 in withdrawals that Defendants allegedly received in the two-year period prior to Madoff's confession.

## The JPMC Accounts

The funds of all IA customers were deposited into the JPMC "703 Account" and all checks written to customers of the IA Business were written from the JPMC "509 Account" (together, the "JPMC Accounts") CMF ¶¶23, 29. Through August 2002, the 703 Account statements indicated that the account was held in the name of "Bernard L. Madoff." CMF ¶22. From September 2002 on, the 703 Account statements indicated the customer as Bernard L. Madoff Investment Securities, the trade name Madoff had used for his Sole Proprietorship since the 1970's. *Id.* All customer deposits were placed into the 703 Account and, until the date Madoff confessed, the endorsement stamp for the 703 Account read: "For deposit only; Bernard L. Madoff." CMF ¶23. There is not a single JPMC document indicating that the 703 Account was ever owned by the LLC.

Similarly, the name on the 509 Account was changed in September 2002, from Madoff individually to Bernard L. Madoff Investment Securities, without the LLC designation, although the checks drawn on that account simply bore the name of Bernard L. Madoff. CMF ¶30. As noted above, all checks written to Defendants had "Bernard L. Madoff" printed on the top. CMF ¶29. Defendants never received funds from an account owned by the LLC. CMF ¶36.

The Trustee admits that he has no documentary evidence that the 509 Account was ever owned by the LLC. CMF ¶27. There is incontrovertible evidence that both the 509 Account and the 703 Account were always owned by Madoff individually. *See e.g.* CMF ¶¶25-31. The Trustee's experts admitted they never saw a bank statement for either of the JPMC Accounts in the name of the LLC. CMF ¶28.

In the month of January 2001, approximately $5 billion passed through the 703 Account. See Chaitman Decl. **Ex Q**. Yet, the Trustee claims that the 703 account was transferred to the LLC, despite the fact that there is no evidence of any instruction by Madoff to JPMC to change the name on the accounts from Madoff or the Sole Proprietorship to the LLC.

**Form BD and the Operating Agreement**

The Trustee relies heavily on the argument that, by an unsigned form filed with the SEC by Madoff in 2001, Madoff transferred ownership of the JPMC Accounts to the LLC. T.Br. at 20-22; 32-33; Declaration of Nicholas Cremona ("Cremona Decl."), ECF No. 102, Ex. 3 (SEC Amended Form BD), ECF No. 102-3 ("Form BD"). There is no assertion that this document went to JPMC, and none of the Trustee's experts opines on Form BD in their reports. The contents of Form BD are unreliable and inadmissible hearsay. The source of the information – Bernard L. Madoff – plainly lacks sufficient trustworthiness for the documents admission into evidence for any purpose. Fed. R. Evid. 803(6)(E).

Indeed, the Trustee's reliance on the document is absurd. The Trustee's experts, from inception, have claimed that Madoff's records are "permeated with fraud." Expert Report of Bruce G. Dubinsky (*In re Bernard L. Madoff*, S.D.N.Y. Adv. Pro. No. 08-1789 (SMB) ("company's books and records could not be relied upon" because "fraud permeated [the LLC") Chaitman Decl. **Ex. BF**, [2015 Expert Report of Bruce G. Dubinsky at 12-26]; (referring to fraudulent and "fictitious" notations in the customer statements that "were irreconcilable with any trading records" and warning against giving "undue credence to fictitious amounts engineered by Madoff"); *see* Chaitman Decl. **Ex. BG**, Trustee's Supplemental Memorandum of Law in Support of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions, *SIPC v. BLMIS,* 08-01789 (CGM), filed August 12, 2016, ECF No. 13876. It is, therefore, preposterous for the Trustee to ask this Court to accept for its truth an unsigned document submitted by Madoff to the SEC in January 2001. But that is what the Trustee does.

Similarly, the Trustee relies on another inadmissible document authored by Madoff, the LLC Operating Agreement, as proof that Madoff transferred all his Sole Proprietorship assets, including the JPMC Accounts – to the LLC in 2001. In addition to the fact that the Operating

Agreement is inadmissible for the same reasons as Form BD, the document does not prove that

Madoff transferred anything.  Madoff saying in an Operating Agreement that he is going to transfer

anything, let alone all his business assets, hardly proves that he actually did so.  He is a liar.  He

lied.  There is not a single piece of paper from JPMC indicating that Madoff ever asked the bank

to transfer his accounts and no evidence, such as bank account statements, indicating that the

transfer actually occurred.

## ARGUMENT

### I.      THE COURT LACKS JURISDICTION TO ENTER A FINAL JUDGMENT

Defendants did not consent to entry of a final judgment by this court, either expressly or

impliedly.  Under *Stern v. Marshall*, 564 U.S. 562 (2012), the Court cannot issue such a non-

consensual judgment.  As a Constitutional matter,  its disposition of the Motion  can only be in the

form of a report and recommendation to the  District Court.  *Picard v. Epstein*, No. 1:21-cv-02334-

CM, 2022 U.S. Dist. LEXIS 29201, at *28-30 (S.D.N.Y. Feb. 17, 2022).

### II.     THE LAW OF THE CASE DOCTRINE SHOULD NOT APPLY

While acknowledging that the law of the case doctrine is not mandatory, the Trustee argues

the Court should follow the decisions of other courts which are in his favor, while ignoring

decisions which are adverse to his interests.  T Br. at 4-6.  But the decisions which the Trustee asks

this Court to follow all rest upon the courts' reliance on Form BD – a document which is clearly

fraudulent and inadmissible.

Further, there are decisions by which the Trustee is bound, and those the Court cannot

ignore.  For example, the Trustee is bound by the law of the case in the two *Avellino* decisions that

he has not sought to appeal.  *Avellino* holds that only Madoff's trustee, Alan Nisselson, not Mr.

Picard, can seek to avoid transfers made by Madoff individually.  *Avellino*, 557 B.R. at 110.  As

demonstrated in Point II, *infra*, Madoff, not the LLC, owned the 509 Account from which the

Defendants received withdrawals.  Mr. Picard has no standing to seek to avoid those transfers.

Likewise, the Trustee cannot explain why the Court should not rule, consistent with Judge

Bernstein's repeated holdings, that these cases could not be disposed of on summary judgment as

to the principal defenses but, instead, require a trial.  *See e.g. Picard v. Legacy Capital, Ltd.*, 603

B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann*, 608 B.R. 165 (Bankr. S.D.N.Y. 2019);

Chaitman Decl. Ex. __, *Picard v. Savin*, Adv. Pr. No. 10-04889 ("[y]ou know my view on these

summary judgment . . . , motions, particularly on the issues I've identified, [whether the JPMC

Accounts] were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme,

and if so, when it began, and whether the LLC was allocating T-bills purchased by the proprietary

trading arm to customers of the IA business.] . . . I have to try it.").

## III.    THE TRUSTEE HAS NOT PROVEN A TRANSFER OF PROPERTY OF THE LLC

The first element of the Trustee's claim pursuant to 11 U.S.C. §548(a)(1)(A) is transfer of

an interest of the debtor in property.  The Trustee's debtor is the LLC.  The property at issue is the

money transferred from the 509 Account which, the Trustee has conceded, was never in the name

of the LLC.  CMF ¶11.

### A.    The JPMC Accounts Were Never Transferred to the LLC

The evidence shows that the LLC did not own the JPMC Accounts and the IA Business

was not transferred from the Sole Proprietorship to the LLC.  Hence, the Trustee failed to establish

an essential element of his claim because he seeks to avoid and recover property in which his

debtor, the LLC, had no interest.  At a minimum, there are material issues of fact sufficient to

compel denial of the Trustee's summary judgment motion.

First, obviously, a bank account cannot be transferred without the knowledge and consent

of the bank.  No bank could comply with its "know your customer" obligations if the owner of a

bank account could transfer it without the knowledge and consent of the bank. *See, e.g.,* Customer

Due Diligence Rule (CDD) Final Rule.[2]

> The CDD Rule, which amends Bank Secrecy Act regulations, aims to improve financial transparency and prevent criminals and terrorists from misusing companies to disguise their illicit activities and launder their ill-gotten gains. The CDD Rule clarifies and strengthens customer due diligence requirements for U.S. banks, mutual funds, brokers or dealers in securities, futures commission merchants, and introducing brokers in commodities. The CDD Rule requires these covered financial institutions to identify and verify the identity of the natural persons (known as beneficial owners) of legal entity customers who own, control, and profit from companies when those companies open accounts.

> The CDD Rule has four core requirements. It requires covered financial institutions to establish and maintain written policies and procedures that are reasonably designed to:

> 1.  identify and verify the identity of customers
> 2.  identify and verify the identity of the beneficial owners of companies opening accounts
> 3.  understand the nature and purpose of customer relationships to develop customer risk profiles
> 4.  conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information

> With respect to the requirement to obtain beneficial ownership information, financial institutions will have to identify and verify the identity of any individual who owns 25 percent or more of a legal entity, and an individual who controls the legal entity.

There is no evidence that JPMC was ever asked, or ever consented, to change the ownership

of the JPMC Accounts. Indeed, there is unrefuted evidence to the contrary.

While the LLC was formed in January 2001 and the Trustee claims that the JPMC Accounts

were transferred to the LLC in January 2001, Madoff changed the names on the JPMC Accounts

---

[2] CDD Rule is posted at Financial Crimes Enforcement Network ("FinCEN") website: *https://www.fincen.gov/resources/fincens-mandate-congress*, last visited Aug. 13, 2021. FinCEN is a bureau of the U.S. Department of the Treasury.

in September 2002, from his own name to the Sole Proprietorship. The endorsement stamp on the

703 Account checks remained "For deposit only Bernard L. Madoff' (CMF ¶23) and the 509

Account checks continued to bear Madoff's personal name until the day he confessed (CMF ¶¶25-

31). Madoff made no reference to the LLC when he changed the name on the JPMC Accounts in

2002. All checks paid to Defendants indicated the account was owned by "Bernard L. Madoff."

CMF ¶29. Defendants never received funds from an account owned by the LLC. CMF ¶36. There

is no evidence that the LLC ever owned the 703 or 509 Account. CMF ¶27.

Indeed, it is preposterous to suggest that the JPMC Accounts could have been transferred

without any document signed by Madoff and by JPMC. The 703 Account had approximately $5

billion of deposits in January 2001. Chaitman Decl. Ex. Q at 1. Any argument that ownership of

a bank account containing $5 billion could be transferred without the exchange of any document

to or from the bank is absurd.

The absence of any such documentation is readily explainable. When Madoff formed the

LLC to own the LTB operated by his sons, he made clear that he was transferring only the LTB to

the LLC. He wrote letters only to entities that did business with the LTB to inform them of the

transfer. Madoff sent a letter to BNY, the bank that had been servicing the LTB; he wrote to the

DTC; he wrote to the NSCC, and others. CMF ¶10. Madoff's letter to BNY stated that the LLC

had been formed and that ownership of Madoff's BNY accounts should be re-titled in the name of

the LLC. However, Madoff wrote no such letter to JPMC, or to anyone else who did business with

the IA Business. Madoff continued to use the JPMC Accounts for the IA Business and he never

re-titled the JPMC Accounts from Madoff to the LLC. CMF ¶¶11-13. To the contrary, some 18

months after the LLC was formed, Madoff changed the name on the JPMC Accounts from his

personal name to the trade name for the Sole Proprietorship. CMF ¶21.

Against all this evidence, the Trustee cannot produce a single document from JPMC's records indicating that the account holder of the JPMC Accounts was ever the LLC; and the Trustee's experts have admitted that they never saw a JPMC bank statement in the name of the LLC. Indeed, the Trustee conceded "We have not identified any specific document requesting a change in the ownership of the "509 Account.") CMF ¶21; Chaitman Decl. Ex. F [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]. The undisputed facts prove that the LLC never owned the JPMC Accounts and that the money the Trustee seeks to recover was transferred from the 509 Account by Madoff, not by the LLC.

The Trustee mentions that Defendants did not depose his experts and did not serve rebuttal expert reports. T.Br. at 4, 20. But nothing in the Trustee's expert reports is relevant to the issue of ownership of the JPMC Accounts. None of the experts purported to opine on this issue and they are barred, under Fed. R. Civ. P. 26(a)(2)(B), from doing so now. *See,*. Dubinsky Report January 16, 2019, ECF No. 104-1. *See, e.g., Ward v. GM LLC (In re GM LLC Ignition Switch Litig.*), 2017 U.S. Dist. LEXIS 103890, at *338-48 (S.D.N.Y. July 5, 2017) (granting *in limine* motion and holding that failure to make prompt disclosure under Rule 26 warranted preclusion under Rule 37(c)(1)).

Further, the issue of ownership of a bank account is not appropriate for expert testimony because it is totally within the experience of the average juror. "[O]nce funds are deposited in a bank account, the account holder has title to and control over those funds." *In re Ames Dept. Stores, Inc.*, 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002); *accord City of New York v. Venkataram*, 2011 WL 2899092, at *5 n.6 (S.D.N.Y. July 13, 2011) (holding that party who possesses property is presumed to be owner); *see also In re Int'l Pharmacy & Disc. II, Inc.*, 443 F.3d 767, 771 (11th

Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the title-holder.").

Defendants are entitled to a jury trial on the issue of whether the money it received belonged to the LLC or to Madoff, in which event the Trustee lacks standing to recover the funds. The Trustee claims that the Sole Proprietorship had transferred all of its assets and lines of business to the LLC in 2001, including the IA Business through which Madoff operated his fraud. At a minimum, however, the evidence creates a factual dispute on the issue of whether the IA Business was transferred to the LLC. The evidence shows that the Sole Proprietorship retained the IA Business and JPMC Accounts from which the monies paid to Defendants came. The following evidence shows that Trustee had not proven as a matter of law that the LLC owned the JPMC Accounts:

(a)     The IA Business received customers' deposits in the 703 Account, and customer withdrawals were made from the 509 Account both held by Madoff.

(b)     Through 2008 – seven years after the LLC was formed – the endorsement stamp on all customer checks deposited into the 703 Account read "For deposit only Bernard L. Madoff," again without reference to the LLC.

(c)     Checks sent to IA customers from the 509 Account listed "Bernard L. Madoff" as the account holder;

(d)     The monthly statements for the 509 Account and the 703 Account showed the customer to be "Bernard L. Madoff Investment Securities" through the date Madoff confessed; the designation "LLC" never appeared on the statements for either of the JPMC Accounts.

(e)     While Madoff sent letters to BNY — where the accounts for the PT and MM businesses were maintained — as well as several governmental agencies, notifying them of the formation of the LLC, there is no evidence of any such letter being sent to JPMC.

(f)     Madoff did **not** indicate on Form BD (defined below) filed with the SEC in 2001, that the LLC was going to be engaged in the business of "investment advisory services." Form BD is inadmissible hearsay, but if the Court considers it for any purpose on this Motion, then it proves that Madoff did not transfer the IA Business to the LLC.

In light of that evidence, and drawing all inferences in favor of Defendants, it cannot be said that no reasonable factfinder could conclude that Madoff retained ownership over the JPMC Accounts even after the LLC's formation in 2001. The evidence before the Court creates a genuine issue of fact sufficient to defeat summary judgment. "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harrah's Atl. City Operating Co., LLC v. Lamonica (In re JVJ Pharmacy Inc.),* 630 B.R. 388, 399 (S.D.N.Y. 2021) ("*Harrah's*") (emphasis added) (cleaned up; quoting and citing Supreme Court and Second Circuit decisions). "A court must review the evidence in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Thus, the Trustee's summary judgment motion should be denied for failure to prove an essential element of his prima facie case, namely, transfer of property in which his debtor – the LLC – had an interest. .

Additionally, pursuant to SEC requirements, Madoff filed monthly "FOCUS" Reports with FINRA through 2008. Every one of these reports indicates that the LLC received no revenue from

investment advisory business services.  In each year, the revenue line is blank although investment services were rendered by Madoff to Defendants.  CMF ¶14 [2007 – 2008 FOCUS reports]

And there is more.  Defendants' contracts for investment advisory services was with Madoff personally.  CMF ¶16.  Defendants never had contracts with the LLC.  Nor, under New York law, could Madoff assign Defendants' contracts to the LLC without their consent, which consent was never sought or obtained. *See Paige v. Faure*, 229 N.Y. 114, 118 (1920) ("No bilateral contract for personal services can be assigned by either party to it, without the consent of the other."); *Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*, 249 B.R. 55, 57-58 (Bankr. S.D.N.Y. 2000) (holding that personal service contract "could not be assigned under New York law without the other party's consent").  Thus, the Defendants were never customers of the LLC.

Against this avalanche of evidence, the Trustee relies, almost entirely, on Form BD, a document the Trustee contends Madoff submitted to the SEC in January 2001, when the Trustee alleges Madoff transferred the IA Business to the LLC.  T.Br. at 9.  Aside from the fact that Madoff pled guilty to filing false documents with the SEC, it is indisputable that the document is incomplete, is unsigned, and references schedules that are not attached.  It is undisputed that Madoff did not list, as a line of business the LLC would engage in, the IA Business.  Cremona Decl. Ex. 3 (Form BD) at §12 (S).  It is also undisputed that the SEC did nothing to verify the contents of Form BD.  Apparently, the SEC did not even require that Madoff sign the form.

The Trustee points to other decisions in which Form BD was accepted by other courts.  But the fact that other courts have made obvious errors does not mean that this Court should join in those errors.  As set forth below, Form BD is not admissible for the truth of the matters asserted. It is telling that the Trustee is forced to rely upon a document which is facially insufficient by

virtue of being unsigned and prepared by Madoff and Peter Madoff, both of whom pled guilty to filing false documents with the SEC.

### B.  The Content of Form BD Is Inadmissible

"[I]t is axiomatic that, when reviewing a summary judgment determination, [a court] may only consider admissible evidence." *Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019); see also Fed. R. Civ. P. 56(c)(2)(e).  The Trustee cannot rely on Form BD to prove that Madoff transferred the JPMC Accounts from the Sole Proprietorship to the LLC in 2001 because the content of Form BD is inadmissible hearsay.  Its content, provided by Madoff, does not fall within the business records exception because the SEC did nothing to verify the information that Madoff put on the form, including his statement that the assets of the Sole Proprietorship would be transferred to the LLC.  Indeed, the submission to the SEC was patently ineffective because Madoff did not even sign it.

Form BD, like any document submitted to the SEC by Madoff or his brother, is plainly lacking in trustworthiness because those two individuals have a demonstrated history of submitting false information to the SEC.  The document is, therefore, inadmissible under Fed. R. Evid. 803(6)(E).  Even if Form BD could be admitted through the Trustee's experts for some limited purpose, it cannot be admissible evidence for the truth of the matters asserted in the Madoff-authored document:  "[A] party cannot call an expert simply as a conduit for introducing hearsay." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal quotation marks omitted); *accord United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).  Moreover, the Trustee cannot rely on hearsay admitted under Rule 703 as substantive evidence of the facts underlying the expert's opinion.  *See, e.g., United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007) (noting that where an expert witness "form[s] an opinion by applying her expertise to otherwise

inadmissible evidence . . . , the evidence is not being presented for the truth of the matter asserted"); *accord* Fed. R. Evid. 703 advisory committee's note to 2000 amendments.

Further, Form BD is not admissible under Fed. R. Evid. 703 because it was not the subject of an expert report timely served by the Trustee. *See, e.g., Ward v. GM LLC (In re GM LLC Ignition Switch Litig*.), 2017 U.S. Dist. LEXIS 103890, at *338-48 (S.D.N.Y. July 5, 2017) (granting *in limine* motion and holding that failure to make prompt disclosure under Rule 26 warranted preclusion under Rule 37(c)(1)); *LaBarre v. Werner Enters*., 2015 U.S. Dist. LEXIS 162598, at *1-9 (N.D.N.Y. Dec. 4, 2015) (granting *in limine* motion precluding expert from testifying as to information, conclusions, and opinions that were not contained within his expert report); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.,* 2012 U.S. Dist. LEXIS 18503, at *24-26 (S.D.N.Y. Feb. 14, 2012) (granting motion *in limine* and holding that "expert's report operates to limit the scope of the testimony that can be elicited from the expert. Opinions that are not disclosed in the expert's report cannot be offered.").

It would be clear error to rely on incomplete, unsigned documents prepared by a notorious fraudster who was convicted of lying to the SEC and whose books were permeated with fraud. As such, the Trustee tries to bolster his reliance on Form BD by referencing an LLC Operating Agreement which he says evidences Madoff's intent to transfer all the business and the assets of the Sole Proprietorship to the LLC as of January 1, 2001. T.Br. at 28, see Point III.D. *infra*.

But Madoff was a fraudster. He had concealed the IA Business from the SEC for 30 years as of January 2001. He certainly wasn't going to go to the trouble of forming an LLC, operated by his sons, to continue the illegal IA business through the LLC. Moreover, whatever Madoff's intent might have been, the document suffers from many of the same deficiencies as Form BD. There is no foundation, it is hearsay when offered against the Defendants, and the information in

it apparently came from Madoff, which destroys any semblance of reliability.  Accordingly, neither

Form BD nor the Operating Agreement should be considered on this motion for the truth of the

matters asserted.

Finally, there is third party documentary evidence proving that Madoff continued to operate

the IA Business because he continued, for many years after 2001, to invest IA customers' funds in

T-bills that he purchased through various investment firms.  CMF ¶¶62-_88.

### C.    Even if Form BD Is Admissible, It Proves that Madoff Did Not Transfer the JPMC Accounts to the LLC

If Form BD is admissible to prove anything, it shows that the LLC did **not** acquire the IA

Business; that stayed with the Sole Proprietorship.  For example, Question No. 12 on the form lists

various forms of businesses in which the applicant may engage.  Madoff checked the boxes for

market making and proprietary trading (C) and (V); he did not check the box for investment

advisory services (S).  Cremona Decl. Ex. 3 (Form BD) §12 (S).  Since the Investment Company

Act of 1940 requires registration by an investment advisor, this omission could not be inadvertent.

*See* 15 U.S. Code § 80a–51, et seq.  Not checking the "S" box proves that the LLC was not

acquiring the IA Business.

Madoff had been conducting the IA Business since the 1960's and he had never registered

as an investment advisor.  The reason, undoubtedly, is because he did not want SEC auditors

examining the records of the IA Business.  Why, then, would he transfer the IA Business to the

LLC, run by his sons?  Cremona Decl. Ex. 3 (Form BD) §12 (C), §12 (V) (compare Form BD

Items 12 (C) and (V) with item 12(S)).  Form BD indicates that he did not do so:

> 5.    Is applicant at the time of this filing succeeding to the business of a currently registered broker/dealer?
>
> * * * *
>
> If "Yes," contact CRD prior to submitting form; **complete appropriate items on Schedule D, Page 1, Section III.**

*Id.* (Form BD) at §5 (emphasis added).

Since Madoff was a registered broker/dealer, he clearly was obligated to "complete appropriate items on Schedule D, Page 1, Section III if it was his intention for the LLC to succeed to or acquire the interests of the IA Business, which at the time was indisputably operated through the Sole Proprietorship. Yet, the Form BD that the Trustee relies on contains no Schedule D.

Form BD also requires disclosure of common control:

> 10 (a).   Directly or indirectly, does applicant control, is applicant controlled by, or is applicant under common control with, any partnership, corporation, or other organization **that is engaged in the securities or investment advisory business**?
>
> If "Yes" to Item 10A, **complete appropriate items on Schedule D, Page 2, Section V, Firm Affiliates.**

*Id.* (Form BD) at §4. Again, Madoff was obligated to disclose, on Schedule D, whether he had a control relationship with an investment advisory business. And again, the Form BD contains no Schedule D.

These specific answers to specific questions over-ride the general statement upon which the Trustee relies – that Madoff was transferring all of his businesses to the LLC. Madoff was transferring all of the businesses the SEC knew about and that were disclosed in the Form BD; that is, his two legitimate businesses that were run by his sons. He did not transfer the illegitimate IA Business in which his sons were not involved.

The explanations required on the missing Schedule D would particularize any relationship between the IA Business, on the one hand, and the LLC on the other, and eliminate any alleged ambiguity in respect of this critical issue. But there is no Schedule D and no explanation as to its absence. And, without Schedule D, the incomplete Form BD should not serve as the linchpin for

the Trustee's argument that, as a matter of law, the IA Business, along with the JPMC Accounts, were acquired by the LLC in 2001.

Despite the missing Schedule D, without which Form BD lacks any probative value, the Trustee argues that Madoff's failure to describe assets or liabilities that were **not** assumed by the LLC on Question 5 of Form BD is proof that the JPMC Accounts were transferred to the LLC. The Trustee's argument is illogical and assumes against the evidence that Madoff transferred the IA Business to the LLC (which Form BD refutes) along with the lines of business that Madoff did explicitly state were being transferred to and succeeded by the LLC, *i.e.,* the PT and the MM. The fact that Madoff did not describe assets not transferred to the LLC proves that the IA Business and the JPMC Accounts were not transferred.

In sum, if Form BD is admissible to prove anything, it proves that the IA Business was never transferred to the LLC.

### D.     The Trustee's Reliance on the LLC Operating Agreement Is Unavailing

Next, the Trustee relies on another document prepared by Madoff:  the LLC Operating Agreement. T.Br. at 28; Cremona Decl. Ex. 5. The Trustee argues that the Operating Agreement proves that Madoff transferred all assets – including bank accounts held by the Sole Proprietorship – to the LLC. *Id*. The Operating Agreement is inadmissible for the truth of its contents for all the same reasons as set forth above concerning Form BD.

Moreover, the Trustee's arguments that the Operating Agreement proves any actual transfer of anything, let alone the JPMC Accounts, is not supported by any evidence, including the Operating Agreement itself. The Operating Agreement states that the LLC was "formed to receive as at January 1, 2001, all of the assets[.]" T.Br. at 28 (quoting Operating Agreement). But, there is no proof that the assets were transferred from the Sole Proprietorship or received by the LLC. Madoff, the fraudster, is simply saying that the LLC was formed to receive assets. It does not

mean that any assets were actually transferred. Under New York law, "once funds are deposited in a bank account, the account holder has title to and control over those funds." *In re Ames Dept. Stores, Inc.,* 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002); *accord City of New York v. Venkataram,* 2011 WL 2899092, at *5 n.6 (S.D.N.Y. July 13, 2011). In the bankruptcy context, courts presume that funds in an account belong to the entity in whose name the account was opened, which indisputably in this case was Madoff, not the LLC. *See McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC),* 439 B.R. 47, 70 (Bankr. S.D.N.Y. 2010). The Operating Agreement cannot effect a transfer of the JPMC Accounts. And, of course, there is no evidence—none—that JPMC ever transferred the Madoff accounts to the LLC.

Finally, the Operating Agreement must be read, if at all, with Form BD, which reflects that Madoff was not transferring the IA Business to the LLC. Taken together, the Operating Agreement has to be read as saying Madoff intended to transfer the assets of the two business lines he was transferring – PT and MM -- not the IA Business.

## IV.    THE COURT SHOULD REJECT THE TRUSTEE'S "CUSTOMER PROPERTY" ARGUMENT AND FOLLOW *AVELLINO*

The Trustee admits that SIPA allows him to recover "property transferred by the debtor." T.Br. at 10, 25 (quoting SIPA §78fff-2(c)(3)). The "debtor" for the Trustee is the LLC, not Madoff. SIPA does not permit the Trustee to recover property transferred by Madoff because such property is not property of customers of the LLC. Here is the critical and plain language of SIPA that ends the inquiry:

> **(3) Recovery of transfers**
>
> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any **property transferred by the debtor** which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11. Such recovered property shall be treated as

> customer property. For purposes of such recovery, the property so
> transferred shall be deemed to have been the property of the debtor
> and, if such transfer was made to a customer or for his benefit, such
> customer shall be deemed to have been a creditor, the laws of any
> State to the contrary notwithstanding.

SIPA §78fff-2(c)(3) (emphasis added).

SIPA does not provide that, regardless of who transfers the property, it shall be treated as customer property or that it shall be deemed to have been property of the debtor. Only property transferred "by the debtor" can be so treated or so deemed. The critical limiting principle of the statute, ignored by the Trustee, is that it applies only to property transferred by the debtor. There is no ambiguity in the statute. Hence, all arguments by the Trustee about the legal fictions of what may be treated as customer property or what may be deemed property in which the LLC had an interest must fail unless they first establish beyond a genuine dispute that the Defendants' withdrawals were transfers by the LLC as opposed to Madoff. They have made no such showing. The evidence is all to the contrary: the transfers to Defendants were made by Madoff from his JPMC Accounts, which were never in the name of the LLC.

The money Defendants received was never "customer property" of the LLC because the indisputable evidence is that Madoff continued to operate his Sole Proprietorship, through 2008, and the money transferred to Defendants was customer property of Madoff, *i.e.*, property of Madoff's customers. That distinction eviscerates the Trustee's SIPA argument. The Trustee cannot avoid transfers by Madoff to Madoff's customers from Madoff's JPMC Accounts.

Only Madoff's individual trustee, Alan Nisselson ("Nisselson"), has standing to recover transfers by Madoff. *Avellino*, 557 B.R. at 109, 110, *reconsideration denied*, *Avellino II* ("[o]nly [Alan Nisselson], can recover actual transfers by the sole proprietorship"). The Court should follow *Avellino*, which specifically rejected the Trustee's customer property argument, because it

cannot be squared with the plain language in SIPA. *Avellino II*, 2016 Bankr. LEXIS 3757 at \*18 ("While one purpose of SIPA is to protect investors from a broker's insolvency . . . this does not give license to ignore the plain meaning of statutes and orders and interpret them in a manner to reach a result that is perceived to be equitable."); *accord Picard v. Mendelow*, 560 B.R. 208, 227 (Bankr. S.D.N.Y 2016) (holding that claims to avoid transfers from the Sole Proprietorship are futile for the reasons stated in *Avellino*).

Accordingly, the Trustee cannot use SIPA as a substitute for failing to establish the first element of his prima facie case under §548, *i.e.*, that the transfers at issue were transfers of an interest of the debtor. SIPA explicitly states that the Trustee's power to recover transfers made by the SIPA debtor are no broader than transfers that can be avoided under Chapter 11 of the Bankruptcy Code. Nothing in the text of SIPA circumvents the limitations on the Trustee's avoidance powers: he can avoid only transfers by the debtor of the estate for which he was appointed, namely the LLC. Here, the Trustee is clearly seeking to avoid transfers made by a non-debtor, Madoff. He has no power to do so.

The Trustee's theory that SIPA authorizes him to pursue claims he could not otherwise bring was soundly rejected in *Picard v. HSBC Bank PLC*, 454 B.R. 25, 30 (S.D.N.Y. 2011) ("To say this argument is a stretch would be to give it more credence than it deserves."). Judge Rakoff found that SIPA does not confer a "vast power on such a trustee to commence lawsuits he could not otherwise bring." *Id.*, 454 B.R. at 29-31. The plain language of the statute, SIPA §78fff-2(c)(3), limits the Trustee's power to "recover any property transferred by the debtor." This does not refer to any "debtor," but only to the Trustee's debtor – the LLC. Tellingly, the Trustee does not address *HSBC* in his brief.

The Trustee cites several inapplicable cases to support his SIPA customer property arguments. None of them should be accepted over *Avellino*. *Hill v. Spencer S&L Ass'n (In re Bevill, Bresler & Schulman)*, 83 B.R. 880, 893 (D.N.J. 1988) (T.Br. at 10), does not help the Trustee avoid the limits on his avoidance powers under the plain meaning of SIPA or the consequence of his failure to prove that the withdrawals were transfers by the LLC. In *Hill*, it was undisputed that BBS, the SIPA debtor, transferred the property at issue to Spencer, the customer sued by Hill, the SIPA trustee. *Id*. at 883 (finding that "BBS transferred . . . [securities] in the face amount of $19,000,000 from a BBS safekeeping account to an account of Spencer.").

*Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296 (11th Cir. 2000) ("*Focht*") (T.Br. at 35) is completely inapposite. In *Focht* the court stated:

> Whether a claimant "deposited cash with the debtor," . . . does not . . . depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited. Instead, the question is whether there was "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation [, here the LLC]."

*Focht*, 223 F.3d at 1302 (cleaned up).

The facts of *Focht* show the decision is inapplicable. In *Focht* the issue was whether several investors, the claimants, were "customers" within the meaning of SIPA. The claimants had intended to place their investment with Old Naples Securities Inc. ("Securities"), a broker-dealer. One of the brokers along with one of the principals of Securities, Zimmerman, instructed them to make their checks payable to Old Naples Financial Services ("Services"), a non-broker dealer under common ownership with Securities. The investors were given assurances their money was being invested with Securities, that the two companies were one and the same and told other falsehoods respecting their investments. When their money was stolen by Zimmerman, the investors lodged claims with the SIPA trustee. The trustee rejected the claims on the ground that

the investors, having made their investment with Services and not Securities, were not customers under SIPA. *See Focht*, 223 F.3d at 1299-301. The *Focht* court disagreed. It found the investors were defrauded into believing they were investing with a registered broker. "Given this evidence, we are satisfied that the debtor brokerage acquired control over all of the claimants' funds." *Focht*, 223 F.3d at 1304.

Here, there was no such deception. On the contrary, Defendants were told by Madoff that he was their investment advisor; their funds were always deposited into an account owned by Madoff and they always received withdrawals from Madoff. Further, there is no evidence that the LLC took the funds entrusted to Madoff and used them for its own purposes. The transactions at issue were done by and for Madoff. The Trustee's power to avoid transfers of customer property "wherever it lies" derives from and is limited by SIPA § 78fff-2(c)(3). As noted, that section provides that the Trustee may only recover "property transferred by the debtor." Nothing in *Focht* alters or affects that limit on the Trustee's avoidance powers.

The Trustee also cites *Peloro v. United States*, 488 F.3d 163, 170, 173–74 (3d Cir. 2007), for the proposition that courts construe customer property to include assets in a non-debtor bank account. T.Br. at 35. But *Peloro* has nothing to do with a SIPA trustee's avoidance powers; it involved a claim by a customer for conversion against the SIPA trustee and others and there is nothing to indicate the facts and circumstances as to how any party came into possession of the securities or who transferred the securities.

On reply the Trustee may cite another inapplicable decision – *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397, 400-01 (8th Cir. 2004). That case did not involve any actual avoidance claims by a SIPA trustee; rather, there were claims against the trustee by a creditor of the debtor (MJK) to funds that were in MJK's accounts. *Id*. at 401 (describing

trustee's argument that he could use §544 to avoid creditor's "interest in monies held in MJK's accounts"). Nothing in the decision indicates the SIPA trustee was attempting to avoid transfers received by a customer of MJK from accounts owned by anyone other than MJK, and nothing in the decision indicates that the Eighth Circuit held that customer property necessarily includes funds in non-debtor bank accounts, or that a SIPA trustee could avoid transfers from non-debtor accounts made by anyone other than his debtor under §544 or any other provision.

Defendants have established that the withdrawals were transfers they received from Madoff, not the LLC. Accordingly, under the plain words of SIPA, the property transferred cannot be deemed customer property of the LLC or treated as property in which the LLC had an interest.

Next, the Trustee tries to avoid *Avellino* and the plain language of SIPA by mischaracterizing his authority over transfers of Madoff property to Madoff customers from Madoff's JPMC Accounts by citing to the consent order the Trustee signed and entered in this proceeding in 2009. *SIPC v. Bernard L. Madoff Investment Securities LLC*, No. 08-01789 ("*SIPA Liquidation*") (Bankr. S.D.N.Y. June 1, 2009), ECF No. 252 (the "Consent Order"). Contrary to the Trustee's arguments (T.Br. at 31-36), the Consent Order does not give the Trustee powers to avoid transfers by anyone other than the LLC, and the Consent Order certainly did not authorize the Trustee to avoid Madoff transfers. As correctly held in *Avellino*, the plain language of the Consent Order reserves Nisselson's exclusive standing to pursue Madoff transfers.

The Consent Order expressly provided that only Madoff's trustee had standing to recover transfers voidable under Chapter 5 of the Bankruptcy Code made by Madoff while only Picard had standing to recover transfers made by the LLC:

> 4.      Notwithstanding the substantive consolidation of the Madoff estate into the [*SIPA Liquidation*], the [Madoff] Chapter 7 Trustee shall remain Chapter 7 trustee of the Madoff estate and shall continue to have all powers, rights, claims and interests of a Chapter

> 7 trustee to bring claims under Chapters 5 and 7 of the Bankruptcy Code in consultation with [Picard] and SIPC. **Further, all powers, rights, claims and interests of the Madoff estate are expressly preserved, including without limitation all Chapter 5 and Chapter 7 powers, rights, claims and/or interest**.

* * * *

> 6.    [Picard] shall continue to have the duties and powers of the SIPA Trustee and, in addition, he shall have all duties and powers of a Chapter 7 trustee for the Madoff estate **other than those set forth in paragraph 4 hereof**.

Consent Order ¶¶ 4, 6 (emphasis added).

Nothing in the Consent Order authorizes the Trustee to recover "customer property" of a non-debtor (Madoff).  Only Madoff's individual trustee has standing to recover transfers made by Madoff.  *See Avellino,* 557 B.R. at 108-10 (holding Consent Order, ¶4 limited powers of Picard; only Trustee Nisselson can avoid transfers made by Madoff); *Avellino II*, 2016 Bankr. LEXIS 3757 at *10-12 (confirming rejection of Trustee's argument that protective decree commencing *SIPA Liquidation* covered Madoff, and rejecting again Trustee's argument that Consent Order grants Picard avoidance powers reserved for Nisselson under Consent Order ¶¶ 4 and 6).  Remarkably, not only did the Trustee sign the Consent Order, but ,in the ten years after its entry, the Trustee never sought to amend it – even after Judge Bernstein handed down the *Avellino* decisions, which specifically rejected the same arguments the Trustee makes here about customer property and the Consent Order.  The Trustee is thus bound by it.

Moreover, substantive consolidation of the LLC's estate and Madoff's estate does not merge the debtors or retroactively transform property of someone other than the debtor into property of the debtor.  *See, e.g., In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) ("Most significantly, substantive consolidation should not be deemed to have a retroactive effect of transforming property owned by an entity separate from a debtor into property of that debtor as of

the prepetition date of the challenged transfer . . . The facts of property ownership as they existed prepetition remains unchanged, as do the elements of proof under sections 548 and 544."); *In re Murray Industries, Inc.,* 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("[S]ubstantive consolidation of several estates means one thing and one thing only—that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights.  It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation."); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y. 1995) ("[E]states are merged for the purposes of bankruptcy administration, but the consolidation alone does not effect a corporate merger.")

Once cannot ignore the important statutory limitation on the Trustee's avoidance powers, namely, that he can only recover "property transferred by the debtor which, except for the transfer, would have been customer property[.]"  SIPA § 78fff-1(a) makes clear that the Trustee's powers are limited to the debtor:  "(a) Trustee Powers.  A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11."  The plain terms of the Consent Order – signed by the Trustee – proves that he recognized the difference between "customer property" of the LLC and property belonging to Madoff.  The Court should reject all of the Trustee's SIPA customer property arguments and his substantive consolidation arguments in favor of Judge Berstein's *Avellino* decisions.

Defendants have established that the withdrawals were transfers they received from Madoff, not the LLC.  Accordingly, under the plain words of SIPA, the property transferred cannot be deemed customer property of the LLC or treated as property in which the LLC had an interest.

## V.    THE PONZI SCHEME PRESUMPTION SHOULD NOT APPLY

The Trustee relies on the Ponzi scheme presumption to satisfy the third element of his §548 claim requiring proof of intent to defraud.  T.Br. at 11-20.  A concurrence in the recent Second Circuit decision in *Picard v. Citibank, N.A.*, 12 F.4th 171, 200-04 (2d Cir. 2021) holds that the Ponzi scheme presumption is inconsistent with federal and state fraudulent conveyance law.  As Judge Menashi's concurrence  illustrates, the Second Circuit has never adopted the Ponzi scheme presumption.  *Id.*  Many other courts have rejected it.  *Id.* at 201 ("Some courts have rejected the Ponzi scheme presumption on the ground that it improperly treats preferences as fraudulent transfers.")  As such, its validity should be examined in light of that concurrence.  *Id.* at 204 n.10 ("[W]e commonly identify issues that merit further consideration.") (Menashi, J., concurring).

Judge Menashi's well-reasoned analysis compels the conclusion that the Ponzi scheme presumption should not be applied here.  In *Picard v. Citibank*, the applicability of the presumption was just assumed; it was not contested.  The majority of the court neither discussed, nor made any rulings about, it.  *Id.* at 181 and n.7.  The concurrence, however, casts significant doubt on the vitality of the presumption in fraudulent transfer cases. There is a well-recognized distinction between fraudulent transfer and preference law.  As Judge Menashi observed:

> Normally, when a creditor receives a payment from a debtor—even if the creditor knows that the debtor is insolvent and the payment will prevent other creditors from being repaid—that payment is considered a preference, not a fraudulent transfer.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005) ("A conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.") (alteration omitted) (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (N.Y. App. Div. 1st Dep't 1993)).  Under these normal principles, creditors such as [defendants] would be able to retain the repayments despite knowledge of the debtor's insolvency

> as long as the transfers occurred outside the relatively brief period
> in which preferential transfers may be avoided and the creditor is
> not participating in a fraudulent scheme by holding the funds on the
> debtor's behalf.  (footnote omitted).

*Picard v. Citibank*, 12 F.4th at 200-01.

Judge Menashi contrasted this with the effect of applying the Ponzi scheme presumption

in fraudulent transfer cases:

> By treating preferential transfers to creditors as fraudulent transfers
> in the context of a Ponzi scheme, the Ponzi scheme presumption
> obscures the essential distinction between fraudulent transfers and
> preferences.  It uses fraudulent transfer law rather than the law
> relating to preferences to promote an equal distribution among
> creditors.

*Id*. at 202.

"This use of the fraudulent transfer statute is questionable."  *Id.* at 202 (citing *In re Unified*,

260 B.R. 343, 350 (Bankr. W.D.N.Y 2001):

> By forcing the square peg facts of a 'Ponzi' scheme into the round
> holes of the fraudulent conveyance statutes in order to accomplish a
> further reallocation and redistribution to implement a policy of
> equality of distribution in the name of equity, I believe that many
> courts have done a substantial injustice to these statutes and have
> made policy decisions that should be made by Congress.

Judge Menashi noted that some courts have suggested that repayments such as those the

Defendants received "occur as part of the fraud" and therefore do not qualify as "repayment of a

debt that was antecedent to the company's fraud.  *Picard v. Citibank*, 12 F.4th at 203 (quoting *In*

*re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007)).  Nonetheless he pointed out that

in the Second Circuit's "net equity" decision, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d

229, 233, 242 (2d Cir. 2011), the court described BLMIS profits as fictitious but treated the

investments of principal as valid contractual antecedent debts.  Accordingly, he concluded,

But it is unclear that the statutory phrase "intent to hinder, delay, or defraud" would by itself include repayments to creditors simply because such repayments are a critical part of the Ponzi scheme. Preferences generally "hinder" payments to other creditors yet are not for that reason considered fraudulent transfers. *See Richardson v. Germania Bank*, 263 F. 320, 325 (2d Cir. 1919) ("A very plain desire to prefer, and thereby incidentally to hinder creditors, is (1) not as a matter of law an intent obnoxious to [the fraudulent transfer provision]; and (2) is not persuasive in point of fact that such intent, evil in itself, ever existed."). A contrary argument would "obliterate" the preferential transfer provision "from the statute." *Irving Trust Co. v. Chase Nat'l Bank,* 65 F.2d 409, 411 (2d Cir. 1933).

*Picard v. Citibank*, 12 F.4th at 203.

Here, if Madoff had failed to honor a customer's request for a withdrawal, the customer would have sued in New York Supreme Court, which undoubtedly would have ordered Madoff to honor the request. This is so because Madoff had a contractual obligation to honor a customer's withdrawal request. Thus, the Trustee's reliance on the Ponzi scheme presumption fails. After 2001, Madoff purchased large amounts of T-Bills for customers and held them throughout the time they were credited to the customers' accounts. CMF ¶ 89, ECF No. 113. Madoff's purchase of T-Bills is not immaterial. Since Madoff bought billions of dollars of T-Bills for his IA Business customers for years after the LLC was formed, the Sole Proprietorship continued after the formation of the LLC, conducted legitimate business, and was not a Ponzi scheme. Hence, the Trustee is not entitled to the presumption.

On reply, the Trustee may argue that the Ponzi scheme presumption should apply in this case because *Picard v Gettinger* 976 F.3d 184 ( 2d Cir. 2020), determined, *inter alia*, that recipients of initial transfers of fictitious profits were not owed an antecedent debt. But that is precisely the point. Judge Menashi wrote that use of the Ponzi scheme presumption reflects multiple deviations from the statutory prescription. *See e.g., id*. at 203 (Menashi, J., concurring). [I]n interpreting a

statute a court should always turn to one cardinal canon before all others. . . .[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 112 S. Ct. 1146, 1149 (1992). *Gettinger* does violence to the statutory scheme and should be reconsidered in light of Judge Menashi's carefully reasoned concurrence.

Absent the Ponzi scheme presumption, for which there is no statutory basis, the Trustee must prove beyond genuine factual dispute that the IA Business was not merely a fraud but very specifically a Ponzi scheme beyond a genuine dispute of material fact. As he has not done so, the Motion should be denied.

## VI.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT INTEREST

The Trustee seeks 4% prejudgment interest from December 2008. T.Br. at 38-40. This is 400% more than the statutory post-judgment interest rate to which the Trustee is entitled under 28 U.S.C. § 1961. Yet, the Trustee has not shown any basis for treating innocent victims of Madoff's fraud so punitively, particularly when he has not recognized a right to any appreciation or cost-of-living adjustment for any Madoff customer from 1980 through today. *See* 28 U.S.C. §1961.

Defendants are innocent victims of Madoff's fraud and the SEC's incompetence. Awarding any prejudgment interest only compounds their injury for doing nothing wrong besides assuming the SEC was competent to regulate Madoff. Further, if an award of interest were appropriate, the Court should not award 4% interest based on the prime interest rate on December 11, 2008 – the date of the bankruptcy filing. T.Br. at 38. Nor should the Court award interest for a period before the Defendants were served with the complaint. And then, at most, the Court should award the federal statutory interest rate from the dates the Complaint was served on Defendants in 2011. *See* ECF Nos. 4, 8, 12 (proof of service).

There are many reasons why interest should not be awarded at all, let alone at a 4% rate. First, there is no statutory basis for an award of interest here. The Trustee sued Defendants under 11 U.S.C. § 548 which does not provide for an award of interest. Bankruptcy Code § 550 prescribes the remedy for the avoidance of a fraudulent transfer: the statute limits the recovery to the property transferred or the value of that property. The plain language of the provision does not include an award of interest. Surely, if Congress had intended that the plaintiff be awarded interest, Congress would have so mandated.

Second, prejudgment interest is plainly inappropriate where the Defendants did nothing wrong and there is a good faith basis for contesting liability. *See Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*, 955 F.2d 831, 834 (2d Cir. 1992); *see also Board of County Comm'rs of the County of Jackson v. United States*, 308 U.S. 343, 352 (1939) ("[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable"); *Mecca v. Gibraltar Corp. of Am.*, 746 F. Supp. 338, 349 (S.D.N.Y. 1990) (same); *see also Kramer v. Mahia (In re Khan),* 2016 WL 6652724 at *2-3 (E.D.N.Y. Nov. 10, 2016) (declining to impose prejudgment interest in a case where the transferee was innocent of any fraudulent intent); *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1300 (11th Cir. 2009) (affirming bankruptcy court's denial of prejudgment interest where defendant's position was reasonable, parties' dispute was genuine, and there was no evidence that either party was responsible for delaying dispute's resolution.).

Third, prejudgment interest should not be imposed where it is the plaintiff who is responsible for any delay. *Wickham Contracting*, 955 F.2d at 834; *see also Redfield v. Bartels*, 139 U.S. 694 (1891) (suit to recover duties wrongfully imposed; interest denied since plaintiff

neglected to bring suit for years).  Here, Judge Rakoff dismissed six of the seven claims the Trustee

asserted in his complaint and the Second Circuit affirmed.  The Trustee filed suit against

Defendants in December 2010, but it was not until June 2015, that the Supreme Court denied the

Trustee's cert. petition seeking review of the Second Circuit's decision dismissing all of the

Trustee's claims under New York law and under provisions of the Bankruptcy Code other than 11

U.S.C. § 548(a)(1)(A). *See Picard v. Ida Fishman Revocable Trust (In re BLMIS),* 773 F.3d 411,

423 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015).  Thus, five years were wasted

because the Trustee grossly over-reached in drafting the complaint; and during this time period the

Trustee repeatedly moved to extend Defendants' time to answer the complaint.  *See, e.g.,* ECF

Nos. 17-27(stipulations extending Defendants' time to answer).

After issue was joined on September 16, 2015, (ECF #48, Answer) the Trustee also delayed

discovery unconscionably by engaging in a protracted effort to avoid disclosing the material

evidence that Madoff (not the LLC) owned the JPMC accounts from which Defendants were paid

and that Madoff actually purchased securities with IA customers' money.  Even running interest

from 2015 would reduce by half the prejudgment interest imposed.

Fourth, even assuming interest could be awarded at all, a rate of 4% is excessive and

punitive.  At most, the rate should be consistent with 28 U.S.C. § 1961.  Four percent gives the

Trustee a windfall that is not the purpose of interest in this context.  Prejudgment interest should

not result in overcompensation of the plaintiff, such as when the statute, as here, fixes damages

deemed fully compensatory.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011).

This principle is particularly relevant here because the Trustee's position throughout these

cases is that no Madoff customer is entitled to any interest or appreciation since 1980, and the

Second Circuit has approved the Trustee's position.  *Id*.  Consistent with that view, although the

Trustee allowed some claims in 2009, the Trustee has refused to credit any allowed claimant with any appreciation or cost-of-living adjustment since 1980. Thus, in the Trustee's view, allowed claimants who invested in 1980 are entitled to receive, by 2020 (40 years later), only their net investment. Indeed, when customers sought allowance of appreciation, since 1980, in the form of an inflation adjustment, the Trustee successfully opposed that relief. *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74 (2d Cir. 2015).

In each year, Defendants paid state and federal taxes on the purported short term gains in their accounts at the highest tax rate. It would be inequitable and punitive to add prejudgment interest on top of the loss of the investment proceeds which they believed they had fairly earned and, furthermore, on top of the full taxes paid on those proceeds. Moreover, Judge Bernstein, who had these cases for ten years, never imposed prejudgment interest. *See Picard v. Cohen (In re BLMIS),* No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ("*Cohen*"), *adopted by,* No. 16 CV 5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2017) (judgment in the amount of two-year liability without interest); *Picard v. Lowrey (In re BLMIS),* Nos. 10-04387, 10-04488, 10-04350, 10-05110 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 26, 2018) (report and recommendation) ("*Lowrey*") (same). Thus, the award of prejudgment interest should be vacated.

## CONCLUSION

For the foregoing reasons, the Trustee's motion for summary judgment should be denied

in its entirety.

Dated:    New York, New York                    **CHAITMAN LLP**
          March 18, 2022

                                        By:    */s/ Helen Davis Chaitman*
                                               Helen Davis Chaitman
                                               hchaitman@chaitmanllp.com
                                               465 Park Avenue
                                               New York, New York 10022
                                               Phone & Fax: 888-759-1114

                                               *Attorneys for Defendants Jacob M. Dick Rev*
                                               *Living Trust, Article 8.1 Trust, Estate of Jacob*
                                               *M. Dick, and Andrea J. Marks, as trustee and*
                                               *beneficiary of the Jacob M. Dick Rev Living*
                                               *Trust*