# EXHIBIT O

Page 1

1                   UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
2
3
      In re:                          )
4                                     )
      SECURITIES INVESTOR             )
5     PROTECTION CORPORATION,         )
                                      )
6          Plaintiff-Applicant,       )
                                      )
7     vs.                             )   08-01789 (SMB)
                                      )
8     BERNARD L. MADOFF               )
      INVESTMENT SECURITIES, LLC,     )
9                                     )
           Defendant.                 )
10                                    )
                                      )
11    In re:                          )
                                      )
12    BERNARD L. MADOFF,              )
                                      )
13         Debtor.                    )
                                      )
14
15
16           Videotaped Deposition of BERNARD L.
17    MADOFF, VOLUME I, taken on behalf of the Customers,
18    before K. Denise Neal, Registered Professional
19    Reporter and Notary Public, at the Federal
20    Correctional Institution, 3000 Old Highway 75,
21    Butner, North Carolina, on the 26th day of April,
22    2017, commencing at 9:07 a.m.
23
24                        * * * * *
25

Page 2

1    APPEARANCES OF COUNSEL:

2        On Behalf of the Customers:

3                HELEN DAVIS CHAITMAN, Esq.

4                Chaitman, LLP

5                465 Park Avenue

6                New York, New York  10022

7                (908) 303-4568

8                hchaitman@chaitmanllp.com

9

10       On Behalf of the Trustee:

11               DAVID J. SHEEHAN, Esq.

12               AMANDA E. FEIN, Esq.

13               Baker Hostetler

14               45 Rockefeller Plaza

15               New York, New York  10111-0100

16               (212) 589-4621

17               afein@bakerlaw.com

18

19       On Behalf of the Deponent:

20               PETER A. GOLDMAN, Esq.

21               12 Fairlawn Parkway

22               Rye Brook, New York  10573

23               (914) 935-6857

24               pagoldman@gmail.com

25

Page 3

1    APPEARANCES OF COUNSEL:

2        Videographer:

3            Ken Morrison, CLVS

4

5                    * * * * *

6

7                    CONTENTS

8    THE WITNESS:  BERNARD L. MADOFF        EXAMINATION

9            BY MS. CHAITMAN                    6

10           BY MR. SHEEHAN                   132

11

12                   * * * * *

13

14               INDEX OF EXHIBITS

15   FOR THE CUSTOMERS:                      PAGE

16   Exhibit Number 15, Copies of Bloomberg    38

17     trade tickets

18   Exhibit Number 16, JPMorgan Chase         52

19     statement - 2-2001

20   Exhibit Number 17, 703 account statement  58

21     - 6-2001

22   Exhibit Number 18, JPMorgan Chase         60

23     statement - 10-2002

24   Exhibit Number 19, JPMorgan Chase         61

25     statement - 12-2003

Page 4

1              INDEX OF EXHIBITS (Continued)

2    FOR THE CUSTOMERS:                            PAGE

3    Exhibit Number 20, JPMorgan Chase            61

4       statement - 12-2004

5    Exhibit Number 21, JPMorgan Chase            62

6       statement

7    Exhibit Number 22, Bear Stearns statement    64

8       - 8-1-05

9    Exhibit Number 23, Documents - composite     67

10   Exhibit Number 24, Morgan Stanley statement  70

11   Exhibit Number 25, JPMorgan Chase position   72

12      summary

13   Exhibit Number 26, Fidelity statement -      73

14      1-31-99

15   Exhibit Number 27, Clothmasters statement    74

16      - 8-31-91

17   Exhibit Number 28, Account Canada document   75

18   Exhibit Number 29, Appendix to Dubinsky      92

19      report

20   Exhibit Number 30, Copies of correspondence  94

21   Exhibit Number 31, Bill Feingold expert      109

22      report

23

24                      * * * * *

25

Page 5

1              THE VIDEOGRAPHER:  My name is Ken Morrison

2      representing Veritext Legal Solutions.  The date

3      today is April 26th, 2017 and the time is 9:07 a.m.

4      This is the deposition being held at Butner Federal

5      Correctional Facility located at 3000 Old 75

6      Highway, Butner, North Carolina 27509 and is taken

7      by counsel for the Plaintiffs in the case of

8      Securities Investor Protection Corporation,

9      Plaintiff-Applicant, versus Bernard L. Madoff

10     Investment Securities, LLC, Defendant.

11             This case is being held in the United

12     States Bankruptcy Court, Southern District of New

13     York, Case Number Adversary Proceeding 08-01789

14     (SMB).  The name of the witness is Bernard L.

15     Madoff.  At this time would the attorneys present in

16     the room identify themselves and the parties you

17     represent and then our court reporter, Denise Neal,

18     representing Veritext Legal Solutions, will swear in

19     the witness and we can proceed.

20             MS. CHAITMAN:  Helen Davis Chaitman on

21     behalf of a great number of claw-back Defendants.

22     And, in fact, I'm taking the deposition.  It's not

23     the Trustee who's taking it.

24             MR. SHEEHAN:  Right.

25             MR. GOLDMAN:  Peter A. Goldman.  I

```
                                            Page 6
 1    represent Bernard Madoff.

 2              MR. SHEEHAN:  David J. Sheehan with Baker

 3    Hostetler, counsel to the Trustee.

 4              MS. FEIN:  Amanda Fein, Baker Hostetler,

 5    for the Trustee.

 6              (The witness was duly sworn by the court

 7    reporter.)

 8              MR. GOLDMAN:  Keep your voice up.

 9                   BERNARD L. MADOFF,

10    having been first duly sworn, was examined and

11    testified as follows:

12                        EXAMINATION

13    BY MS. CHAITMAN:

14         Q.  Good morning, Mr. Madoff.

15         A.  Good morning.

16         Q.  Irving Picard has argued to Judge Bernstein

17    that you're not a credible witness and I want to ask

18    you a few questions about that.  At the time you

19    confessed on December 11th, 2008 had you been

20    indicted?

21         A.  No.

22         Q.  At the time you confessed was there a

23    criminal investigation against you?

24         A.  No.

25         Q.  At the time you confessed was there an SEC
```

Page 7

1   investigation against you?

2        A.  No.

3        Q.  At the time you confessed was there any

4   limitation on your ability to transfer funds?

5        A.  No.

6        Q.  At the time you confessed was there any

7   limitation on your ability to travel abroad?

8        A.  No.

9        Q.  So is it fair to say that you had the

10  option of taking a couple of hundred million dollars

11  and moving with your wife to Switzerland and living

12  out your life in Switzerland the way Mark Rich did?

13       A.  I'm --

14          MR. SHEEHAN:  Objection to form.  Let's

15  get this geared up because I don't want to

16  interrupt.  I apologize.  So I'm just going to say

17  objection.  When I say that, it means as to form.

18  That's it.

19          MS. CHAITMAN:  Okay.

20          MR. SHEEHAN:  But just to preserve.

21          MS. CHAITMAN:  Sure, sure.

22          MR. SHEEHAN:  Okay.  All right.  I'll shut

23  up.

24          MS. CHAITMAN:  I'm going to rephrase the

25  question because I was rudely interrupted.

Page 8

1                    (Laughter on the record.)

2                    MR. SHEEHAN:  I apologize for that.  I

3      apologize.  Go right ahead.  Go ahead.

4                    MS. CHAITMAN:  I'm kidding.

5          Q.  (By Ms. Chaitman)  Okay.  At the time you

6      confessed you knew who Mark Rich was; didn't you?

7          A.  Yes.

8          Q.  And did you understand that Mark Rich had

9      escaped prosecution by moving to Switzerland?

10         A.  Yes.

11         Q.  And did you recognize that you could have

12     done the same thing, just moved to Switzerland with

13     Ruth with a couple of hundred million dollars and

14     lived out your life?

15         A.  Yes.

16         Q.  Now, at the time you confessed the global

17     economy had collapsed.  Do you recall that?

18         A.  Yes.

19         Q.  Bear Stearns had collapsed in March 2008;

20     isn't that true?

21         A.  Correct.

22         Q.  And Lehman filed in bankruptcy in

23     October 2008?

24         A.  Correct.

25         Q.  And the stock market lost half its value

Page 9

1    when Lehman filed in bankruptcy; isn't that true?

2         A.   Just about, yes.

3         Q.   And you had a lot of wealthy people who

4    owed you about $10 billion; isn't that true?

5         A.   Correct.

6         Q.   So instead of confessing to a crime which

7    would inevitably result in your spending the rest of

8    your life in prison, why didn't you move to

9    Switzerland or try to work out a negotiated

10   liquidation of your business?

11        A.   Well, first of all, I knew that I was

12   guilty.  I felt responsible.  Secondly, I had made a

13   decision that the best thing that I could do for the

14   -- you know, to make restitution to my clients was

15   to try and convince certain people that were

16   responsible for creating my problem to threaten them

17   with turning them in with their complicit behavior

18   if they did not return the money that they owed me.

19        Q.   Okay.  And I just want to caution you.

20   We're going to speak a little bit about the four

21   families, but I don't want you to mention the names

22   of any of the people.

23        A.   Okay.

24        Q.   Now, when you met with the U.S. Attorney's

25   Office in December 2008, did you tell them the

Page 10

1    complete truth about what happened?

2         A.  Yes.

3         Q.  Since that time have you ever been

4    dishonest when you testified about what happened?

5         A.  No.

6         Q.  Now, as I just mentioned, you've testified

7    previously about the four families who had been your

8    clients from the 1960s on.  And, again, I don't want

9    you to mention the names of any of those four

10   families, but I just want to ask you a question.

11   Was there a period prior to 1990 when Annette

12   Bongiorno backdated trades from members of the four

13   families?

14        A.  Yes.

15        Q.  Was that done without the knowledge of the

16   members of the four families?

17        A.  No.  They were aware of it.  They had

18   instructed her to do it.

19        Q.  They instructed her to backdate trades?

20        A.  Yes.

21             MS. CHAITMAN:  Okay.

22             MR. SHEEHAN:  Excuse me.  What time period

23   was that?

24             MS. CHAITMAN:  Before the 1990s.

25             MR. SHEEHAN:  Okay.

Page 11

1          Q.   (By Ms. Chaitman)   Now, to your knowledge

2     has the Trustee settled with each of these four

3     families?

4          A.   I believe so.

5          Q.   Okay.   You testified the last time you were

6     deposed by me that the fraud did not begin until you

7     began doing the split strike conversion strategy in

8     1992?

9          A.   Correct.

10         Q.   Now, was it, as Judge Bernstein used the

11    expression, a light switch?   When you started doing

12    a split strike, did you stop buying any securities

13    for the split strike customers?

14         A.   No.   I had started -- I had started buying

15    -- doing the strategy for probably through 1993; but

16    as more money came in, that's when my problem began

17    because I couldn't put it all to work in the

18    strategy.   And I had committed that I would keep all

19    the money working.

20         Q.   Okay.   I just want to say one thing.   I

21    have seen statements as early as July 1991 which

22    seem to be in split strike.   Are you saying that it

23    wasn't -- I'd like you to give me your best

24    recollection of when you stopped buying securities

25    for the split strike customers.

Page 12

1          A.   Sometime post-'92.  As I started, you know,

2     I was still buying it in '92 and also through most

3     of '93.  After that, that's when I stopped buying

4     securities for split strike.

5          Q.   Okay.  Now, you continued to have some

6     customers who were in convertible arbitrage?

7          A.   Correct.

8          Q.   Did you continue so long as people were in

9     convertible arbitrage, did you actually buy those

10    securities?

11         A.   Yes.

12         Q.   Okay.  So it was only in the split strike

13    that you stopped buying the securities?

14         A.   Correct.

15         Q.   Okay.  Do you derive any kind of benefit

16    from your testimony as to when the fraud started?

17         A.   No.

18         Q.   Does it benefit anyone in your family?

19         A.   No.

20         Q.   If the Trustee claims you're lying as to

21    when the fraud started, is there any conceivable

22    benefit that you enjoy by virtue of that testimony?

23         A.   No.

24         Q.   Does this testimony benefit any of your

25    family members?

Page 13

1          A.   No.

2          Q.   Now, you testified that at some point in

3     1992 you leased the 17th floor of the Lipstick

4     Building?

5          A.   Yes.

6          Q.   And you bought a separate computer system

7     for the people you moved to the 17th floor; is that

8     right?

9          A.   Correct.

10         Q.   And that was called the IBM AS/400?

11         A.   Yes.

12         Q.   Now, was the IBM AS/400 on the 17th floor

13    linked to outside sources, like other investment

14    firms or DTC?

15         A.   No.

16         Q.   Now, the computers that were used on the

17    18th and the 19th floors by the traders --

18         A.   Right.

19         Q.   -- were those Bloomberg terminals?

20         A.   Well, we have Bloomberg terminals all over

21    the firm, yes.

22         Q.   Okay.  Were the Bloomberg terminals linked

23    to outside sources?

24         A.   Yes.

25         Q.   What outside sources were they linked to?

Page 14

1          A.  I can't probably tell you all of them, but

2     they -- Bloomberg generally is linked to --

3     basically, Bloomberg terminal gets information from

4     other information providers.  They're also -- I'm

5     not sure, but they're also linked to probably the

6     depositories as well.  They're not linked to other

7     brokerage firms.

8          Q.  Okay.  Now, when you testified that Annette

9     Bongiorno prior to 1990 had backdated trades for the

10    four families, were those carried out on the AS/400?

11         A.  Yes.

12         Q.  Okay.  But before -- before you bought the

13    AS/400 in 1992, what kind of computer was she using

14    that she would backdate trades?

15         A.  We had other small like, you know,

16    computers, what you would call them, just like, you

17    know, what you would use at home, you know, word

18    processors and, you know, NASDAQ terminals and

19    things of that sort.

20         Q.  They were not linked to outside sources?

21         A.  No.  They were not linked, right.

22         Q.  Now, was it -- you testified last time, and

23    correct me if my recollection is incorrect, but I

24    think what you testified last time is that it was

25    not illegal for you to sell short?

Page 15

1          A.   Correct.

2          Q.   And that was because -- can you explain?

3          A.   It's an obligation if you're -- if

4     you're -- first of all, any brokerage firm can sell

5     short, you know, just as any client can sell short.

6     That's a typical way of doing business, you know.

7     So you as a client could instruct your broker to --

8     to execute a short sale.

9               Brokerage firms more routinely go short

10    stock to complete their customer orders at times if

11    they don't have them in their inventory.  If you're

12    a market making firm like I was, you're obligated to

13    honor your market, which requires you to go short,

14    you know, at times.

15              So going short is a regular, every day

16    business.  A firm like ours, you know, regular

17    trading inventory typically would have hundreds of

18    millions of dollars, probably $500 million short all

19    the time.

20         Q.   Okay.  But a naked short is where you're

21    selling short but you don't own the security; right?

22         A.   The definition of a short sale is naked.

23    It means that you're selling something that you

24    don't own at the current time.

25         Q.   Okay.  And as a market maker did you have

Page 16

1      an unlimited right to sell naked shorts?

2            A.  Correct.

3            Q.  So was it illegal for you to send a

4      statement say beginning in '94 or whenever you

5      stopped buying the securities shown on the split

6      strike, was it illegal for you to send a statement

7      to a split strike customer that indicated that the

8      customer owned certain Fortune 100 company stocks

9      when you hadn't purchased them?

10           A.  No.  It was not illegal.

11           Q.  Okay.  So if it was not illegal for you to

12     sell unlimited naked shorts, what was illegal about

13     the split strike activity?

14           A.  Well, what was illegal and what we did was

15     not reflect our short positions to the clients on

16     our audited financials.

17           Q.  Because you had a debt to each client to

18     whom you sold naked shorts --

19           A.  Correct.

20           Q.  -- in the amount -- the present value of

21     those securities; is that correct?

22           A.  Correct.

23           Q.  And that was a fraud on anyone to whom you

24     gave your financial statements; is that right?

25           A.  Well, depends upon how you define fraud.

Page 17

1    It was a bookkeeping violation.  I don't think

2    anybody initially would consider it a fraud.  You

3    know, that's -- well, I just don't know.  I would

4    say that it clearly was an SEC violation.

5         Q.  And is it fair to say that the SEC reviewed

6    the financial information that you submitted in your

7    focus reports on a monthly basis?

8         A.  Regularly, yes.

9         Q.  And if you showed a massive debt to your

10   customers, your investment advisory customers, what

11   would they have done?

12        A.  It would have been a violation.  You

13   probably would have been suspended.

14        Q.  You would have been suspended as a broker?

15        A.  Correct.

16        Q.  Okay.  So in your view was the crime simply

17   that you didn't properly disclose the debt to your

18   customers on your financial statements?

19        A.  Correct.

20        Q.  Now, you've testified this morning that you

21   think either at the end of '93 or early '94 you

22   stopped buying securities for your customers, and I

23   just want to get a better understanding of why that

24   occurred at that time.  You had -- I think you said

25   you made a commitment to your clients to put them in

Page 18

1    this strategy?

2         A.   Correct.

3         Q.   And what happened at the end of '93 or

4    early '94 that you could no longer do that?

5         A.   The markets had gone into a -- into a slump

6    because of a number of things, you know, starting

7    with the Mideast Crisis at that time.  So there was

8    a lack of liquidity.  This particular strategy that

9    we used, the split strike strategy, requires certain

10   market conditions to be able to execute it properly.

11   And we didn't have those conditions.

12          So because I had committed when I took in

13   the money from the clients, primarily they were

14   hedge funds, I had made a commitment to keep the

15   money working constantly.  Because I couldn't do

16   that, I started to short the securities, which was

17   as I said, not a violation at the time I was

18   shorting the stock.  It only became a violation when

19   I filed my financial reports.

20          I thought that would just be a temporary

21   situation for the market to, you know, recover and

22   improve and then I would have started doing the

23   strategy.  In the interim the money that the

24   customers came in, I basically kept it located in

25   Treasury bills.

Page 19

1          Q.   Okay.  So you took the money --

2          A.   Which is part of the strategy as well.

3          Q.   Right.  So you basically took the money

4     that went into the 703 account?

5          A.   Correct.

6          Q.   Which was the investment advisory

7     customers' money?

8          A.   Correct.

9          Q.   And you purchased Treasury bills with that?

10         A.   Correct.

11         Q.   And in the early '90s the Treasury bills

12    were bearing an interest rate of about six percent;

13    isn't that true?

14         A.   No.  They probably were -- you know, they

15    were short-term T bills, so they were probably, you

16    know, closer to three to four percent.

17         Q.   Okay.  And that three to four percent was

18    money that was earned by the customers --

19         A.   Correct.

20         Q.   -- whose money you were using?

21         A.   Correct.

22         Q.   And, in fact, the statements reflected the

23    ownership of those Treasury securities?

24         A.   Correct.  And they -- well, they also, you

25    know, reflected the ownership of the securities that

Page 20

1    I wasn't buying.

2         Q.  Right.  Now, in late 1993 or early 1994 was

3    your business, you were operating at that point as a

4    sole proprietorship; is that right?

5         A.  Yes.

6         Q.  Was your business insolvent?

7         A.  No.

8         Q.  At what point in time did you become

9    insolvent?  And when I say you, I mean your sole

10   proprietorship or the limited liability company.

11        A.  I would say probably in the early 2000s,

12   maybe somewhere between let's say '98 and 2002.

13        Q.  Okay.  And what --

14             MR. SHEEHAN:  Can I just -- before you get

15   an answer, two things.  One is I don't know what

16   insolvency means.

17             MS. CHAITMAN:  Oh, okay.

18             MR. SHEEHAN:  I'm going to ask to define

19   that.

20             MS. CHAITMAN:  Okay.

21             MR. SHEEHAN:  And I'm not going to

22   interrupt you again because I'm just going to have a

23   continuing objection to leading questions, which is

24   you're testifying more than he is, but I don't care

25   about that.  Just objecting.  All right.

Page 21

1          Q.   (By Ms. Chaitman)  Okay, okay.  When you

2     say that your business became insolvent at some

3     point between '98 and what did you say?  2000 --

4          A.   2002.

5          Q.   Okay.  What are the events that you're

6     thinking about that --

7          A.   Well, because I was also returning -- there

8     were client -- part of the strategy was to return

9     profits that were earned to clients.  So in order to

10    do that, I was returning money from the 703 account

11    to clients and, therefore, I wasn't able to buy

12    either the securities or the treasuries.  So there

13    was a deficit.

14            So because that wasn't reflecting the

15    liabilities and I didn't have assets to back them up

16    at some point, I would say that would be -- the firm

17    would be insolvent.

18         Q.   Okay.  So would it be fair to say that the

19    insolvency arose from the differential between what

20    the investment advisory customers' money was earning

21    in Treasury bills versus the return you were paying

22    them?

23         A.   Correct.

24         Q.   Did your formation of the limited liability

25    company in -- it became effective January 2001, did

Page 22

1    that relate in any way to your feeling that your

2    firm had become insolvent?

3         A.   I realize that that -- yeah, that there

4    were problems brewing, yes, I would say.

5         Q.   Well, what motivated you to form a limited

6    liability company since you had been operating as a

7    sole proprietorship since 1960?

8         A.   Well, I was always -- I had always been

9    advised to incorporate since I started my firm.  I

10   never felt the need to do that because I was not

11   worried about, you know, ever being in a situation

12   that, you know, I would have any exposure.  The firm

13   was always successful and, you know, it just never

14   really entered my mind.

15           So I just didn't do it, but then because

16   of what was going on with the stock market, the

17   market had -- had crashed in 2000 because of the --

18   there was the bubble of the technology stocks, so

19   everybody became very nervous about the market in

20   general.

21           So there was a rush to incorporate or go

22   into an LLC type of mode.  And the regulators had

23   also sort of started recommending to the industry

24   that everybody should basically do that.

25         Q.   Now, Mr. Madoff, according to Mr. Dubinsky

Page 23

1    the three areas of your firm functioned as totally

2    separate legal entities, that is, market making,

3    proprietary trading and investment advisory.  Is

4    that correct that each of these groups functioned as

5    a separate legal entity?

6         A.  No.

7         Q.  Were the expenses for -- the operating

8    expenses for each group paid solely out of the

9    revenues generated by that group?

10        A.  They were -- all the expenses were paid

11   through a -- through the firm, but the money came

12   out of an expense account that was held at Bank of

13   New York.

14        Q.  So there was one Bank of New York account

15   which covered all of the say overhead expenses?

16        A.  All the operations of the firm.  There was

17   a JP Morgan account.  We referred to it as a 703

18   account.  And that was exclusively used for client

19   monies in and client monies out --

20        Q.  Okay.  And --

21        A.  -- for the investment advisory side.

22        Q.  Okay.  So all of the rent, personnel

23   expenses, general overhead was paid out of the Bank

24   of New York account?

25        A.  Everything.  Salaries, everything.

Page 24

1           Q.   For all of the employees at first the sole
2      proprietorship?
3           A.   Right, right.
4           Q.   And then all of the employees at the LLC?
5           A.   Yes.  It never changed, right.
6           Q.   Okay.  And is it fair to say that at times
7      money went from the 703 account to the Bank of New
8      York account?
9           A.   Yes.  There were some instances that --
10     that I used that, but the issue is because all of
11     these clients had margin accounts because they were
12     short securities, whether it be convertible
13     securities or whether it be the split strike trades,
14     their -- the assets of the client is fungible with
15     the firm because the long positions, whether it be
16     Treasury bonds or whatever, is the collateral for
17     the exposure on the short side of the firm.
18              So there were sometimes where relatively
19     small amounts of money, I think, in the late '90s
20     went from the 703 account into the Bank of New York
21     account to cover -- what was not, I don't think,
22     understood in the Dubinsky report among a lot of
23     other things was that customers have short
24     positions.  They're mark to market from the clearing
25     corporation every day and short position being the

Page 25

1    difference in the market.  As the stock market goes

2    up, the short position goes up.  The customer gets a

3    call which is called a margin call.

4              So typically the money would come from the

5    customer account to meet those margin calls.  So we

6    had -- we had margin calls that we had to make to

7    the clearing corporation, which all that which was

8    done through the Bank of New York account.

9              So by taking the money from the client

10   account, putting it into the Bank of New York

11   account, that allowed us to meet the margin calls of

12   the clearing corporation.  That is typical of the

13   industry.

14        Q.  Okay.  Now, I want to ask you something

15   else since you've mentioned the margin.  If you --

16   if someone had a margin loan and you bought stock

17   for them --

18        A.  Right.

19        Q.  -- would that stock be segregated in a

20   clearing or custody account for that customer?

21        A.  No.

22        Q.  Why is that?

23        A.  Because margin, the whole concept of a

24   margin account is the firm is allowed to use those

25   securities to borrow money to cover, you know, what

Page 26

1    the customer is requesting to be able to purchase

2    securities.  The brokerage firm also has to deliver

3    securities if the firm that he sold it to for the

4    customer who needs delivery.

5             So he has to go out and borrow securities.

6    And to borrow the securities to make the delivery,

7    he has to -- he has to borrow them from another

8    brokerage firm.  He has to pay them for those

9    securities.  So the only -- the only securities that

10   are segregated for a customer are what's called

11   fully paid for securities where there is no

12   liability or debt involved in the firm.

13        Q.  Okay.  Now, you've explained that the fraud

14   was in the split strike, but if you had an

15   investment advisory customer who instructed you to

16   buy a specific position for them and you gave them a

17   margin loan to do that, did you actually execute

18   those sales?

19        A.  We always execute the sales.  Whatever was

20   reflected on the customer statement, we executed.

21   We executed the sales to the customer.  You know, we

22   wouldn't have executed them in the market unless we

23   were doing a strategy, unless we were also buying

24   securities.

25        Q.  Okay.  But where a customer made a specific

Page 27

1    instruction to you to buy a specific stock, are you

2    saying that you always executed those instructions?

3         A.   The customer didn't usually give us

4    instructions.   These accounts are handled basically

5    as sort of discretionary accounts.   So once the

6    customer opened the account to go into this

7    particular strategy, the firm had the -- had the,

8    you know, allowance to be able to execute the

9    strategy whenever he saw fit.

10         Q.   No, but I'm thinking of customers who were

11    not in split strike, investment advisory customers

12    who had you as their investment advisor but they

13    instructed you as to what stocks to buy and sell.

14         A.   We didn't -- we basically did not do that

15    kind of business.

16         Q.   Now, in the government's deferred

17    prosecution agreement with JPMorgan Chase, the

18    government and the bank stipulated that during the

19    period from 2003 to 2008 you maintained on deposit

20    at JPMorgan Chase three to six billion dollars.   Is

21    that correct?

22         A.   Yes.

23         Q.   Did that amount -- was that only between

24    2003 or 2008 or had you done that earlier than 2003?

25         A.   Well, there were certain -- we started

Page 28

1    buying treasuries when we start the split strike

2    conversions.  So that would have been, you know, in

3    the '90s.

4         Q.  Okay.  And to the best of your recollection

5    at any given time how much investment advisory

6    customers' money was held in U.S. treasuries?

7         A.  Well, I would say basically the maximum

8    that we had was between five firms we had about

9    two-and-a-half billion dollars between Morgan

10   Stanley, Lehman Brothers, Bear Stearns and Fidelity.

11   Was that five firms?  Four firms.  And JP Morgan.

12        Q.  Okay.

13        A.  So I would say probably the maximum was

14   probably about $6 billion held in treasuries.

15        Q.  Okay, okay.  Did it fluctuate or did you

16   instruct your staff to maintain that amount?

17        A.  No.  It pretty much fluctuated depending

18   upon the monies that came in and the monies that --

19   monies that came out.

20        Q.  What percentage of the investment advisory

21   customers' money was put in Treasury securities, if

22   you can estimate that?

23        A.  Well, I mean, the most we had -- I mean,

24   the customer statements depending, you know, at the

25   end was 60 some odd billion dollars.

Page 29

1          Q.   Not what the statements showed, but what
2     you actually did.
3          A.   What we actually did?
4          Q.   Yeah.  How --
5          A.   I don't understand your question.
6          Q.   Let me step back a minute.  Were the people
7     on the 17th, were any of the people on the 17th
8     floor authorized to buy Treasury securities?
9          A.   Yes.
10         Q.   Who was authorized to buy Treasury
11    securities?
12         A.   Frank DiPascali, Eric Lipkin and a fellow
13    by the name of Robert Romer.
14         Q.   And they were -- what money were they
15    authorized to use to buy the Treasury securities?
16         A.   Whatever -- they followed the instructions
17    of basically Frank DiPascali, who was the manager of
18    that department.  And the money, the money to buy
19    the securities always came from customer money
20    except for a small amount of treasuries or financial
21    instruments that came from the operating operations
22    of the market making proprietary trading side.
23         Q.   Okay.  So the money came from the 703
24    account, is that what you're saying, except for
25    the --

Page 30

1          A.   For the most part, yes.

2          Q.   Except for the money that came from the BNY

3     account?

4          A.   Right.

5          Q.   Okay.  Now, did you ever have a lock-in

6     period like hedge funds would have which would

7     prevent a customer from immediately demanding a

8     redemption on their money?

9          A.   No.

10         Q.   Was there any period of time from the end

11    of 1993 to 2008 when you were unable to honor a

12    customer redemption?

13         A.   No.

14         Q.   Was there anytime between 1993 and 2008

15    when you felt that you couldn't redeem a customer's

16    account unless you brought in new investment

17    advisory customers?

18         A.   No.  Well, I would say during -- in 2008

19    probably that half the market was -- was collapsing.

20    There would have been -- had customers requested

21    money, I wouldn't have been able to do it, but no

22    one had ever requested it.

23         Q.   Okay.  So, well, you did have significant

24    redemptions in 2008?

25         A.   Yes, at the very end in December.

Page 31

1          Q.   Okay.  And prior to December 2008 --

2          A.   But there was always -- there was -- you

3     know, I never got an official request for redemption

4     that I didn't have money to cover it to my

5     recollection other than maybe the last week in

6     December.

7          Q.   Okay.

8          A.   The last, you know, week that I was in

9     business.

10         Q.   Okay.  So in the entire period when you

11    were not buying the split strike securities starting

12    say late 1993 or early 1994, had you ever received a

13    redemption request where you thought oh, my God,

14    I've got to bring in a new customer to have the

15    money to pay this?

16         A.   No.

17         Q.   Did you actively solicit new investment

18    advisory customers?

19         A.   No.

20         Q.   Why not?

21         A.   Because the firm was in a position that we

22    were always turning away investors.  We never --

23    never solicited, you know, new monies coming in.  As

24    a matter of fact, we tried to return monies at times

25    but met resistance with clients.

Page 32

1          Q.   We talked last time about the fact that you

2     maintained clearing accounts with various banks?

3          A.   Correct.

4          Q.   And can you just review the banks with

5     which you had clearing accounts?

6          A.   Well, first of all, the firm itself was a

7     self-clearing firm, which meant we had the ability

8     to clear transactions.  That was starting with the

9     firm in 1960 through the very end, but most firms

10    also had clearing arrangements with a number of

11    banks to be able to service different types of the

12    operations of the firm.

13              So the firm at one point had clearance

14    facilities with -- initially with Meadowbrook

15    National Bank, then, you know, also Commercial Bank

16    of North America.  There was then Irving Trust

17    Company, Bank of New York, Bankers Trust,

18    Manufacturers Hanover, Chase Manhattan Bank, Marine

19    Midland Bank, Chemical Bank, JP Morgan Bank,

20    Continental Illinois Bank.  I think that pretty much

21    covers it.

22         Q.   M&T?

23         A.   M&T, yes.  M&T Bank.

24         Q.   Now, what services did these banks provide

25    to you?

Page 33

1          A.   Both loans, brokered and unbrokered loans,

2     conversion, instructions to convert securities,

3     drafts for election, you know, checking accounts,

4     typical usually broker day loans, things -- you

5     know, whatever, complete clearance facilities.

6          Q.   Did they have custodial accounts where you

7     maintained securities for customers?

8          A.   Not that I'm aware of, no.

9          Q.   Did you have custodial accounts with anyone

10    where securities were maintained for customers?

11         A.   Well, the -- we had securities at

12    depositories, but they were not basically segregated

13    for customers.  That was the practice, quite

14    frankly, that most brokerage firms never did any

15    longer when securities -- as the industry progressed

16    and you didn't have full physical securities in your

17    own vaults.

18              We always had some securities in our vault

19    we had, but those are from many, many years ago.

20    They were a relatively small amount of securities

21    that we were holding or that we bought, you know;

22    but for the most part all the securities were

23    commingled, which was typical for a firm that

24    operated the way we did where you had customers that

25    were short securities.

Page 34

1           Whether or not we executed the transaction
2    or not, they had opened up, you know, accounts, what
3    would be deemed as a margin account, and that
4    automatically allows you to commingle the
5    securities.
6           Q.   Okay.  So you did have -- you did have
7    physical possession of the securities with the
8    margin accounts?
9           A.   When we were buying them, yes.
10          Q.   Okay.  Now, you referenced the change from
11   physical securities to electronic securities.  Can
12   you pinpoint when that occurred?
13          A.   I don't remember any longer.  I would say
14   sometime during the '90s.
15          Q.   Would it help if I told you that the
16   Securities Investor Protection Act was enacted in
17   1970?
18          A.   No.
19          Q.   Okay.  Now, when you were doing the
20   convertible arbitrage, did you ever use a strategy
21   called legging in?
22          A.   Always.
23          Q.   Okay.  And can you explain what legging in
24   means?
25          A.   Legging in means that when you're doing a

Page 35

1   strategy, whether it be for convertible securities

2   or for the split strike, you go in and you don't buy

3   everything typically in one day.

4          You start -- when the firm makes a decision

5   to effect a strategy, whether it be convertible

6   bonds or whether it be a basket strategy and a split

7   strike where you're buying, you know, a portfolio of

8   securities, the skill of the strategy is to being

9   able to judge the market.

10         So you -- if when you're going out and

11  buying securities, you would start buying it let's

12  say on a Monday, Tuesday, Wednesday, Thursday.

13  Typically you would buy it over a four-day period

14  was basically what our practice is.  And you would

15  have different prices during the four-day period.

16         And all of our strategies use what's

17  defined as an average price transaction, which means

18  we would then take the average price that we bought

19  stock during that four-day period and that would be

20  the -- you know, we'd figure what the average was

21  that we paid and then we would -- we would send the

22  customer a confirmation on the last day.

23         So let's say on a Thursday, we started on

24  Monday.  And if you start -- to make a simple

25  example, let's say you did it over four days and you

Page 36

1     paid -- you started buying stock at 50 and you wound

2     up buying it at, you know, up to 51 and you had an

3     average of 50-and-a-half, you would -- you would

4     place five-and-a-half.

5          Q.  Was that unique to you or was this

6     something --

7          A.  No.  That's typical for any firm that is

8     investing in a strategy and treating -- you know,

9     that's treatable to customers the same in a

10    particular strategy.

11         Q.  Now, you testified last time that Mr.

12    Dubinsky apparently lacked an understanding of that

13    strategy?

14         A.  Well, he -- he must have.  He must have not

15    understood the strategy because his report failed to

16    -- failed to state that.  So, for example, where

17    Dubinsky, when he was trying to analyze the prices

18    that a customer paid in relationship to the market,

19    he would look on whatever the trade date was on the

20    confirmation.

21              And the trade date on the confirmation, for

22    example, would be -- an example I use would be the

23    trade date would be Thursday's trade date.  If the

24    stock had traded at 51 and on that day if that was

25    the higher, the lower the stock and the average was

Page 37

1    50-and-a-half for the customer, there would be a

2    difference.  So it wouldn't match up.  Now, the

3    customer, the customer confirmation always stated --

4    there was a legend on it that said that the

5    transactions effected for the customer was an

6    average price transaction.

7          So right away that would -- that would

8    illustrate that he wasn't accounting for the -- for

9    the fact that the transaction was an average price

10   transaction.

11         The same thing would happen when you -- the

12   same error he made when he accounted for volume

13   because he would just look at the volume that

14   occurred on the one day, on the date of the trade

15   date, as opposed to the volume that happened on the

16   four days.  So, obviously, he's looking at the

17   volume on one day when you should be looking at the

18   volume on four days.

19        Q.  Now, Mr. Madoff, Mr. Dubinsky testified at

20   the Bonventry trial that the Trustee paid him over

21   $30 million to do his report.  Did he at any time

22   ever seek to talk to you?

23        A.  No.

24        Q.  To your knowledge did he or anyone on his

25   behalf ever seek to meet with you to discuss how you

Page 38

1    operated the business?

2         A.  No.

3         Q.  Did anyone working with the Trustee ever

4    ask you any questions about how your convertible

5    arbitrage trades were done?

6         A.  No.

7         Q.  Did anyone working with the Trustee ever

8    question you about any activity of the firm that

9    predated 1992?

10        A.  No.

11        Q.  Now, you mentioned with respect to the

12   purchase of Treasury securities with the investment

13   advisory customers' money that the purchases were

14   done through Bear Stearns, Morgan Stanley, Fidelity,

15   Lehman Brothers and JPMorgan Chase?

16        A.  Right.

17        Q.  Were there also purchases done directly by

18   Frank DiPascali, Eric Lipkin and Robert Romer?

19        A.  Correct.

20             MS. CHAITMAN:  I'm going to mark as

21   Exhibit 15, which is the next number from our last

22   deposition, a compilation of trade tickets.  I have

23   two if you each want one.

24             (Customers Exhibit 15 was marked for

25   identification.)

Page 39

1           MS. FEIN:  Thank you.

2           MR. SHEEHAN:  Thank you.

3      Q.  (By Ms. Chaitman)  Mr. Madoff, do you

4  recognize what these documents are?

5      A.  Yes.  They're -- they're a copy of the

6  Bloomberg terminal execution, meaning a trade that

7  was executed through a Bloomberg terminal.

8      Q.  Okay.  Now, could this be a phony document?

9      A.  No.

10      Q.  Why is that?

11      A.  Because we've got the ability to -- to

12  create something like this.

13      Q.  Is that because it's a Bloomberg terminal?

14      A.  Yes.

15      Q.  So if we look at the first one, this was

16  the trader was Eric Lipkin; right?

17      A.  Uh-huh.

18      Q.  The date was September 26, 2002; right?

19      A.  Uh-huh.

20      Q.  And the -- it was the purchase of a

21  Treasury bill with a cost of $998,461.94; is that

22  right?

23      A.  Yes.

24      Q.  And this would have been purchased with

25  money from the 703 account?

Page 40

1          A.   Yes.

2          Q.   And it would have been held for the benefit

3    of the investment advisory customers?

4          A.   It would have been -- it would have been

5    held at the firm for the benefit of the firm.  We

6    didn't segregate, you know, these securities.

7          Q.   But if the money that was used to purchase

8    this --

9          A.   Uh-huh.

10         Q.   -- came from the 703 account, would this

11   show up, for example, on your focus reports?

12         A.   This particular -- I don't know.  I mean,

13   the only trades that -- if it went through the

14   Bloomberg terminal, typically that would show up --

15   I don't know if it would show up on the focus

16   report.

17              It depends upon whether the trade was

18   bought for -- there were some trades that were

19   bought -- well, not if it was bought by the people

20   that you mentioned.  They only have the authority to

21   execute trades for client accounts, not for the

22   firm's account.

23         Q.   Okay.  So I'm confused.

24         A.   These securities would be held either at --

25   typically it would be held at DTC or the Bank of New

Page 41

1    York.

2        Q.  Okay.

3        A.  I mean, I can't tell from that.  It depends

4    upon where the trade would settle.  Any of these

5    Bloomberg trades that went through the Bloomberg

6    terminal, it would actually be a money settlement

7    for the transaction.  Otherwise, you couldn't -- you

8    couldn't do it.

9        Q.  Okay.  And that would be done through some

10   ins --

11       A.  It would be done through some -- typically

12   through Bank of New York.

13       Q.  Okay.

14       A.  It could also have been done through JP

15   Morgan as well in delivery.

16       Q.  Okay, okay.  You didn't have the ability

17   yourself to clear Treasury security purchases?

18       A.  Correct.  We didn't have the authority to

19   execute and clear.

20       Q.  Treasury security purchases?

21       A.  Right.

22           MS. CHAITMAN:  Okay.

23           MR. SHEEHAN:  Helen, just for the record,

24   this seems to be -- you did call it a compilation,

25   but since there were different productions, one is

Page 42

1    AMF, another one is MAD Trustee, are you going to

2    for the record tell us how this was put together or

3    is that going to happen through your testimony?

4          MS. CHAITMAN:  It's not, but I don't think

5    that we have to take up his time to do that.

6          MR. SHEEHAN:  Okay.  We can do it later.

7          MS. CHAITMAN:  Yeah, sure.

8          MR. SHEEHAN:  All right.  Just take care

9    of it.

10          MS. CHAITMAN:  They were all produced by

11    the Trustee.

12          MR. SHEEHAN:  Okay.

13       Q.  (By Ms. Chaitman)  If you -- these are not

14    in continuous order.  They didn't come from one

15    place, but I'm showing you one that was done where

16    the trader is Erin Reardon.

17       A.  Ellen Reardon?

18       Q.  Erin Reardon.

19       A.  Erin, yes.

20          MR. SHEEHAN:  What's the Bates number on

21    that?

22          MS. CHAITMAN:  It's MAD TEE 00118284.

23          MR. SHEEHAN:  Okay.

24       Q.  (By Ms. Chaitman)  Did she work under Frank

25    DiPascali?

Page 43

1          A.  Yes.

2          Q.  And then two pages on there is one executed

3     by Robert Romer?

4          A.  Yes, same.

5          Q.  He worked for Frank DiPascali?

6          A.  Yes.

7          Q.  Now, I'm skipping to a page which is

8     Public-USAO 0960973.  Can you identify why that

9     format is different?  Is that a different kind of

10    transaction?

11         A.  I don't know what this is.  I mean, I'm not

12    that familiar with it.  It looks like a ticket for

13    -- for a treasury, trading of a treasury, but it's

14    actually from the Bloomberg terminals on here.  So

15    it must be --

16         Q.  Okay.  A different format?

17         A.  -- a different format, right.

18         Q.  Okay.  And then on the next page, which is

19    Public-USAO 0961013, it indicates that the trader is

20    Frank?

21         A.  Right.

22         Q.  Is that Frank DiPascali?

23         A.  Yes.

24         Q.  And was it Frank's responsibility to

25    maintain the portfolio Treasury securities for the

Page 44

1    703 account customers?

2         A.  Yes.

3         Q.  Is it fair to say that he would direct the

4    work of Eric Lipkin and Robert Romer?

5         A.  Yes.

6         Q.  And they reported to Frank?

7         A.  Yes.

8         Q.  Now, what was your purpose in instructing

9    Frank to maintain a portfolio of Treasury securities

10   up to $6 billion using the 703 account money?

11        A.  We had to put the money somewhere, so if we

12   were -- if it wasn't -- we would never keep the

13   money in cash.  So if we weren't buying the

14   securities, we would put it into -- we would put it

15   into treasuries.

16        Q.  Okay.  And did you have some thought that

17   the three to six billion -- that was at JPMorgan

18   Chase.  That the up to six billion in Treasury

19   securities was intended to protect any of your

20   customers?

21        A.  Well, if it was -- it was customer money,

22   you know, yes.

23        Q.  Okay.  And in your mind over the years did

24   you have customers, investment advisory customers

25   that you wanted to protect more than others?

Page 45

1          A.   No.

2          Q.   Were you concerned about protecting the

3     European investors?

4          A.   No.

5          Q.   Why is that?

6          A.   Well, because I was aware of the fact that,

7     first of all, they really weren't my customers.

8     They were customers of hedge funds.  I was aware of

9     the fact that the -- that most of the hedge funds,

10    if not all of them, had structured product

11    arrangements with banks that they were guaranteed,

12    their principal was guaranteed and they were sharing

13    in the profits of the transaction.

14              So it was as far as -- I mean, basically,

15    they were all my customers.  So I was obligated from

16    a legal standpoint whether -- you know, whether I

17    wanted to or not; but I would say that the -- I

18    looked at the individual clients which would -- who

19    had direct accounts with me differently than I did

20    with the hedge funds, particularly because the hedge

21    fund money that was pouring in was the thing that

22    caused me the problem.

23         Q.   What about the feeder funds?  Are you

24    putting them in the category of the hedge funds?

25         A.   The who?

Page 46

1          Q.   The feeder funds?

2          A.   Those are the hedge funds.

3          Q.   Those are the hedge funds.  Okay.  So were

4    you buying the Treasury securities then to protect

5    the private customers as opposed to the hedge funds?

6          A.   I didn't look at it, you know.  I didn't

7    isolate it one over the other because I knew I was

8    basically obligated for -- you know, for all of it.

9          Q.   Okay.  Now, you said that you purchased

10   Treasury securities with the 703 account money

11   through the five institutions that you named?

12         A.   Right.

13         Q.   Bear Stearns, Fidelity, Lehman Brothers,

14   JPMorgan Chase and Morgan Stanley --

15         A.   Right.

16         Q.   -- is that right?

17         A.   Yes.

18         Q.   Okay.  It was only those five firms?

19         A.   Yes.

20         Q.   Okay.  And did you maintain a consistent

21   portfolio of Treasury securities at each of those

22   institutions?

23         A.   They were rarely sold unless they matured

24   and then we repurchased, you know, different, you

25   know, Treasury bills.  Yes, I mean, for the most

Page 47

1    part the monies in those accounts built and became,

2    you know, more and more up to the maximum, which

3    was, I think, $500 million pretty much in each

4    account.

5          Q.   So you maintained 500 million of Treasury

6    securities at each of those five firms?

7          A.   Pretty much, yes.

8          Q.   Okay.  And then in addition you had the

9    portfolio that was purchased directly --

10         A.   Correct.

11         Q.   -- by the 17th floor people?

12         A.   Right.

13         Q.   Now, the market making and proprietary

14   trading people were buying and selling securities;

15   right?

16         A.   Yes.

17         Q.   And what kind of records were kept of the

18   securities that were held by the firm as of say

19   month end of each month?  Was there a record kept of

20   an inventory of securities that were owned by the

21   firm as of the end of each month?

22         A.   That the firm was long you're talking

23   about?

24         Q.   Yes.

25         A.   Yeah.  That was -- you know, you were

Page 48

1    required to -- you had trading ledgers that

2    reflected what was long by the market makers or the

3    proprietary traders in the firm's investment

4    account.  There were trading ledgers and then there

5    were -- there's what's called a securities record,

6    stock record.

7         Q.  Is it called a trade blotter?

8         A.  There's trade blotters, yes.

9         Q.  Is that the same thing?

10        A.  Same thing.

11        Q.  Okay.  So if I -- if I --

12        A.  Trade blotters basically reflect also

13   monies -- monies in and monies out for the payment

14   of the securities.  The trading ledgers just shows

15   the inventory long and short, and same for the stock

16   record.  Stock record would reflect where the

17   securities are held.

18        Q.  Okay.  So I just want to get the terms.

19   There are trade blotters?

20        A.  Trading ledgers.

21        Q.  And it's called a trading ledger?

22        A.  Correct.

23        Q.  Okay.

24        A.  You know, which would -- trading ledgers

25   would be for the market making, proprietary trading

Page 49

```
 1    and the investment account, investment ledger.
 2            Q.  Okay.
 3            A.  And then there's what's known as a stock
 4    record, which breaks down by each security.
 5            Q.  So each of those reports was done as of
 6    month end?
 7            A.  Daily.
 8            Q.  They were done daily?
 9            A.  The reports were effected daily.
10            Q.  Okay.  And did you -- through
11    December 11th, 2008 did you maintain those records?
12            A.  Yes.
13            Q.  So they should have been there for the
14    Trustee when he took over?
15            A.  They would be, yeah.
16            Q.  Okay.  And were they all electronic records
17    or were they paper records?
18            A.  No.  They were -- well, they were all done
19    through computers.
20            Q.  Okay.  Who was responsible within the firm
21    for generating these reports?
22            A.  Well, depends upon, you know, where they
23    were executed.  Basically, Dan Bonventry was the
24    operations director, so he had the final
25    responsibility.  The records themselves were
```

Page 50

1     generated by the systems people.  And depending upon

2     whether it was generated by the Stratus system,

3     which handled basically all the -- all the market

4     making, proprietary trading side of the firm, or

5     whether it was done by the investment advisory side,

6     that would have been through the AS/400.

7          Q.   Okay.  But the investment advisory side

8     would show -- would it show securities that actually

9     hadn't been purchased?  In other words, the split

10    strike securities that weren't purchased, would

11    they -- would that be listed on that report?

12         A.   That's correct.

13         Q.   Okay.  So that's the trading ledger?

14         A.   Right.

15         Q.   Okay.  So --

16         A.   It would be -- it would be the customer

17    ledger.  There's a customer ledger.

18         Q.   There's a customer ledger.  So if I wanted

19    to get an accurate picture of what securities the

20    firm actually held as of any given day, what would

21    be the best document to look at?

22         A.   You would have to look at the -- the

23    trading ledgers.

24         Q.   The trading ledgers.  Okay.  Now, at

25    JPMorgan Chase did you have an account or accounts

Page 51

1    other than the 703 account?

2         A.   Yeah.   They had what they called a

3    controlled disbursements account, which most

4    brokerage firms maintain, so that the money was only

5    transferred -- it was part of the 703 account, but

6    it was so that they didn't take the money out of the

7    account until the checks would hit from the checks

8    that you issued it to.   So it was like a flow of

9    funds account.

10        Q.   Was there a 509 account?   Do you remember

11   that?

12        A.   I don't remember the number.

13        Q.   You don't remember.   Okay.

14        A.   I mean, it was related to the 703 account.

15             MS. CHAITMAN:   Okay.

16             MR. GOLDMAN:   I'm going to direct this to

17   the reporter.   Do you need a break?   Okay.

18             MR. SHEEHAN:   I could use a bio break in

19   about five minutes.

20             THE WITNESS:   A what break?

21             MR. SHEEHAN:   Bio break.

22             THE WITNESS:   Bio break?

23             MR. SHEEHAN:   Men's room.

24             THE WITNESS:   Oh, okay.

25             MS. CHAITMAN:   I'm going to mark as

Page 52

1    Exhibit 16 a JPMorgan Chase account statement for

2    the 703 account dated February 2001.

3              MR. GOLDMAN:  I want to clear something up

4    just so we know where they are.

5              MS. CHAITMAN:  Yeah.

6              MR. GOLDMAN:  The trading ledgers or

7    customer accounts that we were talking about that

8    you were just being asked about --

9              THE WITNESS:  I don't understand the

10   question.

11             MR. GOLDMAN:  I just want to ask you some

12   questions about where you could look at the end of

13   the month to see what was held by the company.

14             THE WITNESS:  Right.

15             MR. GOLDMAN:  Okay.  Were those

16   electronically maintained?

17             THE WITNESS:  Yes.

18             MR. GOLDMAN:  Okay.

19             MR. SHEEHAN:  That's all right.

20             (Customers Exhibit Number 16 was marked

21   for identification.)

22        Q.  (By Ms. Chaitman)  Bernie, do you recognize

23   this as a 703 account statement?

24        A.  Yes.

25        Q.  And if you'd turn to page four of

Page 53

1    thirty-two?

2         A.   Four of thirty-two?

3              MS. CHAITMAN:   Yeah.

4              MS. FEIN:   Is that the last Bates?   It's

5    777; is that right?

6              MS. CHAITMAN:   Yes.

7              THE WITNESS:   Uh-huh.

8         Q.   (By Ms. Chaitman)   If you look at the entry

9    on the 1st of February for $55 million and it says

10   debit memorandum, reference purchase of ticket

11   number.   Do you see that?   It's down here, 55

12   million?

13        A.   Yeah, okay.   Uh-huh.

14        Q.   Do you know what that is?

15        A.   It's a debit, so I'm assuming it's -- I'm

16   assuming it's a check.

17        Q.   Were you investing through JPMorgan Chase

18   funds that you had on account?

19        A.   Purchase of -- I'm not sure what the

20   question is.

21        Q.   Were you -- that $55 million, were you

22   instructing Chase to invest that money in some

23   interest earning security?

24        A.   Oh, they -- we must have, but they -- I

25   don't know if that was a sweep account.   It was 55

Page 54

1    million.  What did they purchase?  I can't tell from

2    here.

3           Q.  Well, you would have to look at the ticket,

4    001478.

5           A.  Well, basically they wouldn't purchase

6    anything unless we instructed them to do it, but

7    they had -- all banks have what they call a sweep

8    account, you know, where they swept the money that

9    was cash that was in an account, they put it into a

10   financial instrument so that it was an interest

11   bearing account.

12          Q.  Okay.  And would you tell them what to

13   invest in it?

14          A.  No.  They would do that themselves.

15          Q.  Okay.  If you'd just look up a little bit,

16   there's a $13 million entry on February 1st?

17          A.  Right.

18          Q.  And it says --

19          A.  Nassau.

20          Q.  -- Nassau deposit taken?

21          A.  Right.

22          Q.  Attention, Tony Tiletnick?

23          A.  Right.

24          Q.  And it says to establish your deposit for

25   purchase or sale of Chemical commercial paper?

Page 55

1        A.   Commercial paper, right.

2        Q.   Right.  Do you see that?

3        A.   Yes.

4        Q.   Who was Tony Tiletnick?

5        A.   He was the -- around the cashiering

6    department.

7        Q.   Was he responsible for dealing with

8    JPMorgan Chase?

9        A.   Yes, uh-huh.

10       Q.   Was he responsible to make sure that the

11   money was invested so that it was earning money?

12       A.   Yes.

13       Q.   Okay.  So was it your general practice to

14   make sure that the money in the 703 account was

15   always invested in securities so that it was earning

16   money?

17       A.   Yes.  We would never keep it just in cash.

18   That's what that -- that's why I'm referring to a

19   sweep account.  They would sweep their money into an

20   interest bearing account.

21       Q.   Okay.  But if it's Chemical commercial

22   paper --

23       A.   Right.

24       Q.   -- was that -- would that have had to be a

25   specific instruction?

Page 56

1              A.   No.   They would have -- they would do that.
2       You know, well, I mean, Tony would tell them -- you
3       know, Tony knew that they were investing it, but
4       they were -- he, obviously, would have had a
5       conversation with someone at the bank because at one
6       point we told them not to use -- that we didn't want
7       money going into Nassau because it was a -- it
8       wasn't -- there was concern that, you know,
9       commercial paper that was not, you know, in the U.S.
10      was more at risk.   Turned out never to be a problem,
11      but it was an issue at one point.
12             Q.   So where -- if I look at page nine of
13      thirty-two, let me show you which one that is.
14      There's a hundred million dollar debit memorandum on
15      February 5th.   Do you see that?
16             A.   Uh-huh.
17             Q.   It's Bates number 1458787.
18             A.   Right, uh-huh.
19                  MS. FEIN:   Thanks.
20                  MR. SHEEHAN:   Yeah.
21             Q.   (By Ms. Chaitman)   So do you know what that
22      would have been purchasing?
23             A.   It would have -- if it's not a -- it,
24      obviously, must have been a financial instrument.
25      Whether it would be a CD or whether it be a

Page 57

1    Treasury, I can't tell.

2         Q.   Okay.  Did Tony Tiletnick consult with you

3    on a daily basis --

4         A.   No.

5         Q.   -- or did he have authority to make these

6    decisions?

7         A.   No.  He had authority to do it himself.

8         Q.   And in essence what were his instructions?

9         A.   He was in charge of paying securities, you

10   know, and settling up with the clearing houses.

11        Q.   But in terms of the investment of deposits

12   that were in the 703 account?

13        A.   He would put whatever money that wasn't

14   being -- he typically wouldn't buy treasuries

15   himself.  He was not someone that would normally buy

16   treasuries.  He would basically be involved with

17   purchasing financial instruments like CDs or

18   treasuries for the sweep account.  They weren't

19   typically large amounts.  I mean by large amounts,

20   they weren't billions of dollars.

21             MS. CHAITMAN:  Okay.  All right.  You want

22   to take a break?

23             MR. SHEEHAN:  Sure.

24             THE VIDEOGRAPHER:  Going off the record.

25   This ends disc number one.  The time is 10:20 a.m.

```
                                            Page 58
 1              (A recess was taken and Customers Exhibit
 2      Number 17 was marked for identification.)
 3              THE VIDEOGRAPHER:  Back on the record.
 4      This begins disc number two.  The time is 10:35 a.m.
 5          Q.  (By Ms. Chaitman)  Okay.  I've marked as
 6      Exhibit 17 a June 2001 statement for the 703
 7      account.
 8              THE VIDEOGRAPHER:  Ms. Chaitman, your
 9      microphone.
10              MS. CHAITMAN:  It's on.
11              THE VIDEOGRAPHER:  Okay.  Raise it up
12      higher.  It's being covered.
13          Q.  (By Ms. Chaitman)  And I'm going to just
14      take a look at page seven of forty-four.  Mr.
15      Madoff --
16              MR. SHEEHAN:  What's the Bates number?
17              MS. CHAITMAN:  The Bates number is -- it
18      ends --
19              MR. SHEEHAN:  Oh, we have it, seven of
20      forty-four.  I'm sorry.
21              MS. CHAITMAN:  Sorry.
22              MR. SHEEHAN:  Okay.  Go ahead.
23          Q.  (By Ms. Chaitman)  If you look at --
24      there's on June 4th at the bottom of the page,
25      there's a $50 million debit?
```

Page 59

1          A.   Uh-huh.

2          Q.   And it says purchase of slash sale of

3    JPMorgan Chase.  Is that commercial paper?

4          A.   Yes.

5          Q.   And then reference purchase of Chemical

6    commercial paper?

7          A.   Uh-huh.

8          Q.   Okay.  And then above that there's a

9    $35 million debit memorandum for purchase of ticket

10   and then it's redacted?

11         A.   Uh-huh.

12         Q.   Okay.  And then above that it's

13   12-and-a-half million and it says Nassau deposit

14   taken account?

15         A.   Right.

16         Q.   Can you describe what these are?

17         A.   Those are just financial instruments that

18   are invested so that the money is not just sitting

19   there not earning any interest overnight.

20         Q.   Okay, okay.  And, again, was Tony Tiletnick

21   authorized to do this on a daily basis?

22         A.   Yes.

23         Q.   Okay.  And is it fair to say that the goal

24   was to earn money on the investment advisory

25   customers' money?

Page 60

1           A.   Yes.

2                (Customers Exhibit Number 18 was marked

3      for identification.)

4           Q.   (By Ms. Chaitman)   I'm marking as

5      Exhibit 18 a 703 account statement for October 2002.

6      And Mr. Madoff, I'm going to open this to Bates

7      number 576, which is page eight of fifty-five.   Mr.

8      Madoff, we're looking at a statement for

9      October 2002.

10                And if we look at the entry on

11     October 1st, there's a $279 million entry for --

12     it's a debit for the purchase of slash sale of JP

13     Morgan commercial paper --

14          A.   Right.

15          Q.   -- is that right?

16          A.   Uh-huh.

17          Q.   And, again, was this done on -- by Tony

18     Tiletnick under your instructions?

19          A.   Correct, yes, yes.

20          Q.   Okay.   Now, were there times of the year

21     when you tended to have more cash to invest than

22     others or was this a general?

23          A.   No, no.   It was just -- was just a normal

24     flow of funds.

25                (Customers Exhibit Number 19 was marked

Page 61

1    for identification.)

2         Q.   (By Ms. Chaitman)  Okay.  We'll go through

3    a few more of these just because they cover

4    different periods.  This is -- will be Exhibit 19

5    and this covers the period of November -- of

6    December 2003.  And if you could look at page 41 of

7    65?  Let me open it up for you.

8         A.   Uh-huh.

9         Q.   There are two entries for December 22nd

10   where $50 million --

11        A.   Right.

12        Q.   -- is being invested; is that right?

13        A.   Yes.

14             MS. CHAITMAN:  Okay.  I'm going to mark as

15   Exhibit 20 the statement for December 2004.

16             (Customers Exhibit Number 20 was marked

17   for identification.)

18             MS. FEIN:  Thanks.

19        Q.   (By Ms. Chaitman)  Some of them I have -- I

20   don't know why some of them I have four and some of

21   them I don't, but if you look at page 35 of 63,

22   which bears Bates stamp number 1486?  Now, this is

23   -- this is December of 2004 and do you see that

24   there's a $30 million --

25        A.   Right.

Page 62

1          Q.   -- Nassau deposit ticket?

2          A.   Uh-huh.

3          Q.   And then there's a $90 million purchase?

4          A.   Right.

5          Q.   Is it fair to say that those are again --

6          A.   Uh-huh.

7          Q.   -- investments?

8          A.   Yes.

9          Q.   So that the investment advisory customers

10    were earning money on their money?

11         A.   Uh-huh.

12         Q.   And can you explain what the Nassau deposit

13    is?

14         A.   It's a CD, commercial paper of the -- I

15    don't know how to describe it to you, but it's no

16    different than JP Morgan.  It's their branch in

17    Nassau.

18              MS. CHAITMAN:  Okay, okay.  I've just got

19    two more of these.  I'm marking as Exhibit 21 a

20    June 2007 statement from JPMorgan Chase.

21              (Customers Exhibit Number 21 was marked

22    for identification.)

23              MS. FEIN:  Thank you.

24         Q.   (By Ms. Chaitman)  And if you look on page

25    16 of 66 which bears Bates numbers 3654, this has an

1    entry for 50 million on June 6th, which is AIP

2    overnight investment?

3          A.   Uh-huh.

4          Q.   Purchase of JPMorgan Chase commercial

5    paper?

6          A.   Right, uh-huh.

7          Q.   And then the next one is 150 million and

8    that's -- can you explain what that is?  It seems to

9    have an interest rate of 5.1407 percent; is that

10   right?

11         A.   Yes.

12         Q.   Can you tell what that is?

13         A.   You know, I don't know.  I mean, it must be

14   some sort of commercial paper of JP Morgan.

15         Q.   Okay.  And then the next entry on June 6th

16   is 600 million and that's invested in short-term

17   derivatives; is that right?

18         A.   Where is that?  Six hundred million?

19         Q.   Six hundred million is -- it's June 6th.

20         A.   It says JP Morgan short-term derivatives.

21   I don't know what that is.  It must be a -- you

22   know, it must be some sort of commercial paper that

23   is a financial instrument.

24         Q.   Okay.  And, again, is it fair to say that

25   even in 2007 it was Tony Tiletnick who had handled

Page 64

1    these investments?

2         A.  I don't -- he died at one point.  It might

3    have been his brother, Walter Tiletnick, took over

4    his job at one point.  I think in 2007 he was

5    already -- he had already died.

6              MS. CHAITMAN:  Okay, okay.

7              MR. GOLDMAN:  I didn't know whether you

8    could hear with the microphone.

9              THE WITNESS:  Uh-huh.

10             MS. CHAITMAN:  I'm going to mark as

11   Exhibit 22 a Bear Stearns statement dated April --

12   dated August 1, 2005.

13             MR. SHEEHAN:  Twenty-three?

14             MS. FEIN:  Twenty-two.

15             MR. SHEEHAN:  Twenty-two.  My fault.

16             (Customers Exhibit Number 22 was marked

17   for identification.)

18        Q.  (By Ms. Chaitman)  Twenty-two.  Can you

19   identify this document, Mr. Madoff?

20        A.  It's Bear Stearns' account statement.

21        Q.  Did you -- what was the time period that

22   you transacted business with Bear Stearns?

23        A.  I transacted business with Bear Stearns,

24   you know, from the time I started my firm over the

25   years.  So it was probably the 1960s on, you know,

Page 65

1    through 2008.

2        Q.  What kind of business did you do with Bear

3    Stearns?

4        A.  My market makers and proprietary traders

5    traded with them, you know, on a regular basis.  We

6    executed trades for their customers for -- you know,

7    we were a wholesaler, a market maker.  So we did

8    business with, you know, hundreds of brokerage

9    firms, Bear Stearns being one of them.

10        Q.  Is it fair to say that you did billions of

11    dollars a year in business with Bear Stearns?

12        A.  With Bear Stearns, yes, certainly.  I mean,

13    I think we probably traded a trillion dollars a year

14    in general with Wall Street.

15        Q.  With everyone?

16        A.  Yes.

17        Q.  Now, did you have more than one account at

18    Bear Stearns?

19        A.  No.  We only had one -- well, I guess my

20    wife had an account at Bear Stearns, you know, just

21    a brokerage account for herself; but the firm, you

22    know, only had -- they had Treasury -- an account

23    where we bought Treasury bonds and then we had -- we

24    executed trades on the exchanges through Bear

25    Stearns because they were the clearing broker for

Page 66

1    Cohmad Securities, which is a firm that we owned.

2    We were the owners of that.

3         Q.  For Cohmad?

4         A.  For Cohmad.

5         Q.  Okay, okay.  So is this a statement for the

6    securities account because on the second page it

7    lists different securities?

8         A.  Yeah, yes.  It must have been -- yeah.

9    This is the securities.

10        Q.  Now, why would -- I mean, these seem to

11   indicate that the transactions were sold, bought,

12   received, delivered?

13        A.  Uh-huh.

14        Q.  Why would you have used Bear Stearns to buy

15   securities instead of buying them yourself?

16        A.  Because we're not a member of the New York

17   Stock Exchange.  Bear Stearns was.  So if we bought

18   an executed trade on the floor of the exchange and

19   we weren't a market maker in that security, we would

20   go through Bear Stearns.  It could have been

21   probably for like proprietary traders.

22        Q.  Okay.  Now, you've testified that you had

23   two accounts at Bear Stearns.  One was to hold the

24   Treasury securities that were purchased and one was

25   trading?

Page 67

1          A.   It would have been for proprietary and

2     market making trading activity.

3          Q.   Okay, okay.   So if I wanted to get the

4     evidence of the Treasury securities that were

5     purchased with the 703 account money, I would have

6     to get the statements relating to the Treasury

7     securities?

8          A.   Correct.

9          Q.   Okay.   And did you maintain those records?

10          A.   Yeah.   They would have been at the firm,

11     yeah.

12               (Customers Exhibit Number 23 was marked

13     for identification.)

14          Q.   (By Ms. Chaitman)  Okay.   I'm going to mark

15     as Exhibit 23 a document which was produced by the

16     Trustee.   Now, this document consists of a number of

17     different pages.   And if you would, Mr. Madoff, I'd

18     like you to explain to me to the best of your

19     ability what each of these pages represents.

20          A.   Well, the first page is -- is an account

21     for Cohmad Securities, which is an account -- which

22     is a firm that we used to execute certain trades for

23     Bear Stearns.   If it was a -- if it was what's

24     called a dot trade, a trade that they had a dot

25     machine that went directly down the floor to Bear

Page 68

1      Stearns, that would be a firm that -- that would be

2      part of our market making or proprietary trading

3      business.

4              Q.   Okay.   And the second page?

5              A.   The same.

6              Q.   Okay.   So this is the -- the second page,

7      which is Bates numbered ending in 14, says buy SEG?

8              A.   Uh-huh.

9              Q.   That's a stock; right?

10             A.   Right.

11             Q.   Okay.   And then on the sell line it says

12     hold PR something, OUS.   Do you know what that is?

13             A.   No.

14             Q.   Okay.   So is this a document that would

15     have been generated by Bear Stearns or --

16             A.   Yes.   This is.

17             Q.   Okay, okay.   If you look at page 16, which

18     -- do you recognize the handwriting on this page?

19             A.   No.

20             Q.   This is dated November 11th, '94 and the

21     handwritten note says open account for Madoff.   Do

22     you see that?   Here.   Open account?

23             A.   Oh, handwritten, yeah.

24             Q.   Do you know what that is?

25             A.   No.   This looks like Miller, you know,

Page 69

1    Tabak and Hirsch.  It probably is probably an option

2    account.

3          Q.  Were they clients of yours?

4          A.  No.  They must have been -- this isn't Bear

5    Stearns.  This is the -- they're another

6    broker-dealer --

7          Q.  Okay.

8          A.  -- that we must have done.  It's an option

9    account --

10         Q.  Okay.

11         A.  -- that was part of our hedging, probably

12   our proprietary trading department.

13         Q.  If you look at the third to the last page

14   of this collection of documents --

15         A.  Uh-huh.

16         Q.  -- this is dated January 30th, 1985 and it

17   seems to -- it says please install a restricted

18   centrex line to existing Turret equipment at Bernard

19   Madoff.  Do you have any idea what that was about?

20         A.  No.  It's the communications department.

21   So it must be, you know, one of numerous, you know,

22   systems lines that we had to -- you know, we had

23   hundreds of these types of lines to different

24   brokerage firms so that we could route orders

25   directly through them for our market making and

Page 70

1    proprietary trading.

2              (Customers Exhibit Number 24 was marked

3    for identification.)

4         Q.  (By Ms. Chaitman)  Okay.  I'm going to mark

5    as Exhibit 24 a statement of account, and I'm

6    wondering if you can identify that.  It bears a

7    Bates number MS 236.  Is this a Morgan Stanley

8    statement?  You can --

9         A.  I'm trying.  Everything seems to be

10   redacted.  I don't know.

11        Q.  Right.  I believe that the MS means it was

12   produced to the Trustee by Morgan Stanley.

13        A.  Okay.  It probably is because it's Treasury

14   bills.

15              MR. GOLDMAN:  I think it is because if you

16   look on the last page, they have a note about

17   retirement accounts and review with your Morgan

18   Stanley financial advisor.  It's unlikely one bank

19   is soliciting for another bank, so I think you can

20   conclude it's a Morgan Stanley statement.

21              THE WITNESS:  Uh-huh.

22        Q.  (By Ms. Chaitman)  So am I correct that

23   this is showing that you had one-and-a-half million

24   dollars in income from this account as of March 8th,

25   2003?  Am I reading that correctly?

Page 71

1          A.   What page are you on?

2          Q.   On the first page.

3          A.   On the first page?

4          Q.   It looks like -- it looks like Morgan

5     Stanley is holding Treasury bills; right?

6          A.   Uh-huh, right.

7          Q.   Okay.  And then it has a liquid asset fund

8     of about 9.7 billion.  Do you see that?

9          A.   Nine point seven billion?  No.

10         Q.   No, million.  Excuse me.

11         A.   Nine million, right.

12         Q.   Excuse me, excuse me.  Yes, of course.

13         A.   Yeah.  Right.  A million five hundred

14    thousand dollars was the yearly income.

15         Q.   Okay.  To the best of your recollection did

16    you have more than one account at Morgan Stanley?

17         A.   Not for treasuries.  We would have had only

18    one account.

19         Q.   One account for treasuries?

20         A.   Right.

21         Q.   But you would have had accounts for

22    something --

23         A.   Well, we also executed trades for Morgan

24    Stanley.

25              (Customer Exhibit Number 25 was marked for

Page 72

1    identification.)

2         Q.   (By Ms. Chaitman)  Okay.  I'm going to mark

3    as Exhibit 25 a document which is a JPMorgan Chase

4    position summary.  So Mr. Madoff, did you have a

5    separate account at JPMorgan Chase which held the

6    Treasury bills for the --

7         A.   Yes.

8         Q.   -- 703 account customers?

9         A.   Uh-huh.

10        Q.   Can you identify this document?  Is it in a

11   form that you've seen before?

12        A.   I don't know what -- I mean, I typically

13   wouldn't look at these statements, so looks to me

14   just like a -- you know, a typical Treasury bond

15   account where we bought treasuries.  It lists all

16   the activity as of April 2008.

17        Q.   Okay.  So if you had at JPMorgan Chase, you

18   had about 2.8 billion, right, in Treasury

19   securities?

20        A.   Let me see.  Yes.

21        Q.   And then you maintained about 500 million

22   at each of those other four institutions?

23        A.   Right.

24        Q.   So that would have been 2.8 and then it

25   would have been 4.8; right?

Page 73

```
 1           A.  Right.
 2           Q.  And then you had Treasury securities that
 3      were purchased directly by --
 4           A.  Right.
 5           Q.  -- Frank DiPascali?
 6           A.  Right.  It would be at DTC.  Those would
 7      have been -- no.  Those would have been by -- those
 8      would have been bought by Frank.
 9               (Customers Exhibit Number 26 was marked
10      for identification.)
11           Q.  (By Ms. Chaitman)  Okay.  I'm going to mark
12      as Exhibit 26 what I believe is a Fidelity
13      statement.  Can you identify this?
14           A.  Uh-huh.
15           Q.  Is it a Fidelity statement?
16           A.  Yes.
17           Q.  So they use the trade name Premium
18      Services?
19           A.  Uh-huh.
20           Q.  And this statement is dated January 31,
21      1999.  So what does the statement show that Fidelity
22      was holding in U.S. Treasury securities?
23           A.  Looks like 205 million.
24           Q.  Okay.  And these were bearing interest of
25      5.25 percent and 5.375 percent?
```

Page 74

1          A.   Right, uh-huh.

2          Q.   And was this purchased with money from the

3    703 account?

4          A.   Yes.

5               (Customers Exhibit Number 27 was marked

6    for identification.)

7          Q.   (By Ms. Chaitman)   I've marked as

8    Exhibit 27 an August 31, 1991 statement of

9    Clothmasters, Inc.   Mr. Madoff, was Clothmasters an

10   investment advisory customer?

11         A.   I would assume so, yes.

12         Q.   Okay.   And this statement is dated August

13   31, 1991.   Can you tell what trading strategy this

14   statement reflects?

15              MR. GOLDMAN:   I'm going to step out for a

16   second.

17              MS. CHAITMAN:   Sure.

18              THE WITNESS:   This looks like a -- it

19   looks like a split strike trade via equity.   It

20   looks like a basket of securities that were part of

21   the split strike transaction.

22         Q.   (By Ms. Chaitman)   Okay.   And as of

23   August 31, 1991 were you actually purchasing the

24   securities?

25         A.   Yes.

Page 75

1            (Customers Exhibit Number 28 was marked
2     for identification.)
3            Q.  (By Ms. Chaitman)  I'm marking as
4     Exhibit 28 a document which is called Account
5     Canada.  Can you tell me what this is?
6            A.  Looks like it says Canadian dollars, so
7     this must have been part of our proprietary trading,
8     I think.  I doubt whether this is -- I doubt whether
9     this is a customer.
10           Q.  So this is a record of investments that the
11    firm made in Canadian dollars?
12           A.  Right.
13           Q.  Is this a report that was regularly
14    prepared by your firm?
15           A.  I don't know what this is.  I mean, you
16    know, I'm not familiar with this, so, you know --
17           Q.  Okay.  I don't want you to guess if --
18           A.  No.  I don't know.
19               MS. CHAITMAN:  Okay.
20               MR. GOLDMAN:  Do you need to eat?
21               THE WITNESS:  Yeah.  Whenever you're --
22               MR. GOLDMAN:  They have your food outside.
23               THE WITNESS:  Huh?
24               MR. GOLDMAN:  I checked.  They have your
25    food outside.

Page 76

1                    THE WITNESS:  All right.  I'm okay for

2      now.

3                    MS. CHAITMAN:  Do you want to?  Do you

4      want to?

5                    THE WITNESS:  No.  It's all right.

6                    MS. CHAITMAN:  You sure?

7                    MR. SHEEHAN:  Whenever you're ready, just

8      tell us.

9                    THE WITNESS:  Okay.

10                   MR. SHEEHAN:  We're not going anywhere.

11                   THE WITNESS:  I don't know how long she's

12     going to be with this.  What are you doing?

13                   MS. CHAITMAN:  Well, I --

14                   MR. SHEEHAN:  I think we're looking at all

15     day.

16                   CHAITMAN:  No, but if you want -- do you

17     want to take a break?  Is this when you normally eat

18     lunch?  Why don't we --

19                   MR. SHEEHAN:  Why don't we just do it?

20                   MS. CHAITMAN:  Yeah.

21                   THE WITNESS:  Okay.

22                   THE VIDEOGRAPHER:  Going off the record.

23     The time is 11:09 a.m.

24                   (A luncheon recess was taken.)

25                   THE VIDEOGRAPHER:  Back on the record.

Page 77

1    The time is 11:29 a.m.

2         Q.   (By Ms. Chaitman)   Just to review, Mr.

3    Madoff, if I wanted to get a full picture of the

4    Treasury securities that were purchased with money

5    from the 703 account as of any point in time from

6    say 1994 on when you say that the split strike,

7    that's when you stopped writing securities for the

8    customers, I would have to get the statements from

9    Bear Stearns; right?

10        A.   (Witness nods head.)

11        Q.   The statements from Morgan Stanley?

12        A.   Right.

13        Q.   The statements from Fidelity?

14        A.   Right.

15        Q.   The statements from Lehman Brothers?

16        A.   Right.

17        Q.   And I would have to get the JPMorgan Chase

18   statements like the one we looked at, which was the

19   account that held the Treasury securities?

20        A.   Correct.

21        Q.   Okay.   And if I wanted to get a complete

22   picture of the securities that your firm held that

23   were long positions that you actually held, I would

24   have to look at the DTC records?

25        A.   Correct.

Page 78

1          Q.  I'd have to look at -- were there other

2     places that you held securities?  Would I have to

3     look at, say, your account at Bear Stearns?

4          A.  You would have to look at the banks if

5     there were -- if there were bank loans.

6          Q.  Because if you borrowed from a bank, you

7     would have pledged the securities to the bank?

8          A.  Right.  Typically they would be held at

9     DTC, but they would be in the bank's account at DTC.

10    They would be journaled over to the bank.  So you'd

11    have to look at the DTC -- you'd have look at the --

12    you would have to get that from the bank themselves

13    because DTC would not give them to you.

14         Q.  What banks did you borrow money from where

15    you pledged the securities to the banks?

16         A.  It could be JP Morgan.  It could be Bank of

17    New York, you know, depending on what period; but if

18    you were looking at 2008 or 2000s, it would be

19    typically Bank of New York, M&T, it could be JP

20    Morgan.  I think that's -- those are the banks that

21    we used at that time.

22         Q.  And if it's earlier?

23         A.  You'd have to look at any one of the -- you

24    probably couldn't get them, you know, but it would

25    be the banks that I mentioned to you.

Page 79

1          Q.   All the clearing accounts?

2          A.   Right, right.

3          Q.   So if I wanted -- let's say I'm talking

4     about 2003.

5          A.   Right.

6          Q.   I would have -- in order to determine what

7     securities were held by your firm, I would have to

8     look at the DTC records for each of the banks that

9     you listed before?

10         A.   Right.

11         Q.   Plus your own DTC --

12         A.   Right.

13         Q.   -- correct?  And would that give me a

14    complete picture of all the securities you owned as

15    of a given point in time?

16         A.   Uh-huh.

17         Q.   Yes?

18         A.   Yes.

19         Q.   Now, again, I don't want you to mention any

20    individual names, but you testified previously that

21    the four families entered into hold harmless

22    agreements with you?

23         A.   Right.

24         Q.   Do you recall who was involved in drafting

25    those hold harmless agreements?

Page 80

1          A.   One of the partners at Price Waterhouse.

2          Q.   Do you remember who?

3          A.   Ed Kostin, Edward Kostin.

4               MR. GOLDMAN:   Could you spell the name?

5               THE WITNESS:   K-o-s-t-i-n.   He's deceased

6      now.

7          Q.   (By Ms. Chaitman)   And, again, I don't want

8      you to mention any names, but were the hold harmless

9      agreements signed by members of all the four

10     families?

11         A.   Yes.

12         Q.   And what was the total amount of the debt

13     that the hold harmless agreements obligated the four

14     families together to pay you?

15         A.   Well, it varied depending upon the

16     fluctuation of the -- of the securities because the

17     hold harmless agreements basically stated that they

18     were holding me harmless for any loss involved in

19     the naked part of their securities because of the

20     short positions that had been maintained.   So it

21     could have -- probably was a maximum of probably I

22     would say at one point probably $9 million --

23     $9 billion.

24         Q.   Okay.   As of December 11th, 2008 do you

25     have any sense of how much it was?

1        A.  As of when?

2        Q.  December 11th, 2008.

3        A.  I couldn't give you an exact figure.  You

4   know, the --

5        Q.  Don't mention any names.

6        A.  Not counting the 6 billion, there was one

7   debit balance of 6.3 billion.

8        Q.  Okay.  So one person had a -- was that a

9   margin loan?

10       A.  Yes.

11       Q.  So ones customer had a margin loan of six

12  billion?

13       A.  Right, right.

14       Q.  And then --

15       A.  Then I would say the others were probably

16  -- there was probably an additional $5 billion in

17  exposure that they caused me.

18       Q.  Okay.  So it was approximately $11 billion

19  at the time you confessed?

20       A.  Approximately, yes.

21       Q.  Okay.  Now, Mr. Madoff, you've testified

22  that the investment advisory fraud did not begin

23  until either late 1993 or early 1994.  Are you aware

24  that David Kugel testified that the fraud began in

25  the 1970s?

Page 82

```
 1          A.  Yes.
 2          Q.  Mr. Kugel testified at the Bonventry trial
 3     that in the 1970s he gave Annette Bongiorno
 4     arbitrage trades for the accounts of Stanley, Chase
 5     and for Avellino and Bienes.  Were you defrauding
 6     Chase and Avellino and Bienes in the 1970s?
 7          A.  No.
 8          Q.  Did you read Mr. Kugel's testimony?
 9          A.  Yes.
10          Q.  Do you think it's accurate?
11          A.  No.
12          Q.  Can you explain why?
13          A.  First of all, I think that --
14              THE VIDEOGRAPHER:  Microphone, microphone,
15     microphone.
16              MS. CHAITMAN:  You took care of the
17     microphone.
18              MR. GOLDMAN:  Want me to remove the
19     microphone?  Sorry.
20              MS. CHAITMAN:  I'm sorry, Mr. Madoff.
21              THE WITNESS:  I guess the best way to
22     describe -- from what I've been able to piece
23     together from the -- what I've read from the
24     testimony and what I've been told and what I've seen
25     is that this so-called smoking gun I would refer to
```

Page 83

1    it is that David Kugel, who is one of my convertible

2    bond traders, used to -- at our -- at my request

3    used to generate a convertible bond formula that he

4    would give to either Annette Bongiorno or Jodi, all

5    right, that would lay out what the proper conversion

6    ratio was on a particular convertible security.

7            In other words, it was a formula that he

8    would write on a scrap of paper that would say MCI

9    convertible bond would be bought 100 bonds, you

10   would short let's say a thousand shares of stock at

11   a certain price.  And they would take that formula

12   and they would use that when they were going to now

13   generate a trade for a client.

14           All right.  Now, that was so that they --

15   because they were not traders, they were not

16   familiar with what the proper conversion ratios

17   were.  All right.  So typically what would happen,

18   the step used to be if Annette would come to them

19   with a convertible bond and say okay, I have a

20   million dollars worth of convertible bonds, that

21   typically would be a million because we traded in

22   much larger numbers.

23           So she would say there's $10 million

24   available to be invested in convertible securities.

25   What securities would you recommend that would put

Page 84

1    for the customers in?  All right.  So he would pick

2    out a security that we were trading and he would

3    give him the correct formula.  Once they got that

4    formula, that scrap of paper, the next step would be

5    to go and search our trading records, which would be

6    what the market maker or the firm's investment

7    account bought and sold over a period of let's say

8    for four days.

9            And then they would -- he would by running

10   a run of what we bought and sold, then Annette or

11   Jodi, not David, you know, Annette or Jodi would

12   look through the trading records and pick out a

13   certain number of shares in stock and they would

14   come up with an average price and the appropriate

15   number of shares.

16           All right.  So this David Kugel had no

17   access to any of those records.  He wouldn't be able

18   to do that.  He was just giving them -- he was just

19   giving them what the correct formula would be.

20           So by -- for some reason the Trustee, all

21   right, because he had this piece of paper which they

22   showed me when they first came down here years ago

23   and asked me what it was, I told them it was a

24   formula, exactly what I just said.  They determined

25   from that that David was generating the trade and

Page 85

1    that we weren't actually buying.  He was just making
2    up the trade, which I laughed at at the time because
3    it didn't make any sense, you know, for him to do
4    that.  He couldn't possibly generate the trade
5    because he had no access to the records to pick that
6    out.  He was just looking at one trade.
7            That is why -- and that was why Dubinsky,
8    you know, you know, did not have the -- couldn't
9    match up the number of shares or the price properly.
10   So David's testimony -- and I don't know why he
11   would even say that.  I don't think that he would --
12   if he believed that he was actually generating a
13   trade, I can't believe that he would even think that
14   he was generating a trade because he knows that.
15           I mean, it just didn't make any sense.  So
16   either he was -- either the Trustee or whoever it
17   was that was determining that, you know, just didn't
18   understand it, which is probably the most likely
19   situation or they were just trying to create a
20   situation.  Just doesn't make any sense.
21           And anybody that if you call anybody in
22   for the industry, another person that ran a trading
23   desk that was familiar with how you did these types
24   of transactions would tell you the same thing.  I
25   mean, it made absolutely no sense.

Page 86

1          Q.   (By Ms. Chaitman)   Now, when you confessed

2    you weren't in the process of negotiating a plea

3    agreement; right?

4          A.   No, no.

5          Q.   When David Kugel gave his testimony --

6          A.   Uh-huh.

7          Q.   -- he had negotiated a plea agreement;

8    right?

9          A.   From what I understand, yes.

10         Q.   So he had to give the prosecutor something

11    that the prosecutor wanted; right?

12         A.   I don't know.  It looks like it.  I mean, I

13    just -- you know, I don't think David Kugel was a --

14    you know, a devious type of person.  David Kugel was

15    not a good communicator.  I mean, he was known in

16    the firm as having a very hard time telling anybody

17    anything.  Nobody ever wanted to speak to David

18    Kugel.  He was a very nice guy and he was actually a

19    talented trader himself, but he could not

20    communicate with anybody.

21              I mean, and so that's the only thing I can

22    think of is he didn't understand the question, he

23    got nervous.  I just don't know, but it made

24    absolutely -- it made absolutely no sense, his

25    testimony.

Page 87

1          And another example of this was there was

2     a testimony by Irwin Lipkin, all right, about -- you

3     know, first of all, you have to understand that the

4     only one that ever saw a completed focus report in

5     our firm or that ever signed a completed focus

6     report was me.  Nobody -- nobody in our firm knew

7     what the actual P&L was.  The traders -- and this is

8     not by accident.

9          In other words, the securities industry

10    has very strict requirements so that there's no

11    conflict of interest between market makers, the

12    trading department and so on.  You're required to

13    keep your records separate.

14         The trade -- the market makers are not

15    allowed to see another market maker's, you know,

16    trading positions or P&L.  As a matter of fact, you

17    have to have supervisors that are different.  For

18    example, my brother -- my one son was in charge of

19    the market making department.  The other son was in

20    charge of the proprietary trading department.  They

21    had to be separate.

22         And you couldn't have a system -- the

23    traders are not allowed to see what this other

24    trader has a position of because of what they call

25    Chinese walls between your market making, your

Page 88

1    client business and your proprietary trading

2    department.  The -- now, when do our -- when a firm

3    like ours that is a market maker and is doing an

4    arbitrage business, whether it be split strike or

5    whether it be convertible bonds and is trading

6    baskets and options and all sorts of hedging

7    strategy, which is what our firm specialized in,

8    when you do -- when you prepare your financial

9    reports, your focus reports at the end of any month,

10   you are allowed to net all of your positions.

11             So, for example, if you have -- in our

12   firm we could have ten traders trading the same

13   security.  So some traders would have long positions

14   in IBM.  Some would be short positions in IBM.  Some

15   would have option positions on in IBM.  What you

16   have to do at the end of every month is you net all

17   the positions, the option positions, to come up with

18   a net exposure or net position.

19             So you could have, for example, one trader

20   may be long a thousand shares.  Another trader is

21   long -- is short 500 shares of stock so that the net

22   would be 500 shares.  All right.  The person that

23   instructs -- there's one person that instructs, you

24   know, how you do all of this.  Now, Irwin Lipkin

25   even before he retired was very -- was not the most

Page 89

1    efficient person.  Irwin Lipkin started with me when

2    he first came out of the Army, but as the firm grew,

3    as the firm became more and more sophisticated and

4    was trading in the old strategies, it was beyond

5    Irwin Lipkin's grasp, which was fine because he was

6    a bookkeeper.

7              He only had to know specific things.  At

8    the end of each month when you had to net all these

9    different positions, Irwin Lipkin didn't do that.

10   So what would happen is if Irwin Lipkin and the

11   records that he was looking at showed a thousand

12   shares of stock but didn't -- he wouldn't know what

13   the rest of the firm's were.  So somebody had to net

14   all of this out.

15             And it was a very complicated procedure

16   and each firm depending upon the type of business

17   you had had certain what they called no action

18   letters from the SEC, which told you how you could

19   -- you know, how you could handle each security.

20             And as a matter of fact, because I was the

21   chairman of the trading committee for the industry,

22   I had to work with the SEC when we formulated all of

23   these different regulations and rules.  So I was

24   aware of the fact that the typical accountant or

25   lawyer, for example, would not be familiar with any

Page 90

1    of that.  So I was not the least bit surprised that,

2    for example, Dubinsky's errors that he had because

3    he, obviously, was not that familiar with how -- you

4    know, how you did this.  Now, it doesn't mean you

5    couldn't find out.

6            If you went -- if you got someone that

7    really was familiar with all of these things, they

8    would be able to understand that; but if you ask the

9    typical accountant because, look, I worked with

10   every major accounting firm in the country, you

11   know, over the years.  So I was familiar with what

12   they did, what they understood and what they -- it's

13   not surprising.  It's a typical problem in the

14   industry.

15           So David Kugel's testimony as far as I'm

16   concerned as with Annette and as with any of these

17   people in my firm, whether it be Enriqua Pitz or

18   anyone else because I read all of their depositions.

19   And, you know, none of that was really valid because

20   they were looking at only what their specific job

21   was.  They didn't know what the rest -- they weren't

22   familiar with the whole picture of the firm.

23           The only ones that would know that would

24   be Dan Bonventry in my firm, who was the director of

25   all operations, or myself.  It wouldn't have been

Page 91

1    David Kugel.  It wouldn't have been Enriqua Pitz and

2    so on.

3         Q.  Did you believe that the focus reports were

4    accurate prior to 1994 when you stopped buying the

5    split strike securities?

6         A.  Yes.  And you see, you're using the '94,

7    '93, '92, so I want to make sure there.  I said that

8    the fraud began in '92 because that was when we

9    weren't completing all of the transactions in this

10   split strike.  All right.  There was some -- there

11   were some transactions in the split strike done, you

12   know, through 1993.

13              All right.  But I'm not comfortable saying

14   that everything was done -- was done -- I'm

15   comfortable saying that everything was done

16   correctly, you know, prior to '92.

17              Other than the fact there was some back

18   trading of -- of customer transactions for the

19   accounts, for the four large accounts that started

20   like in 1990, that was -- because of what happened

21   was after the crash in 1987, the four big clients,

22   you know, forced me to liquidate some of their

23   positions.  And that's when the hold harmless

24   agreements started.

25         Q.  Okay.  But --

Page 92

1          A.  Focus reports were accurate because that

2     wouldn't have affected the focus reports anyhow.

3     The focus reports were accurate through 1992 for

4     sure.

5          Q.  Through 1992?

6          A.  Yes.

7          Q.  Okay.  So I know it's a long time ago and I

8     don't want you to say anything unless it's your best

9     recollection, but you testified earlier today that

10     you were doing the split strike trades until late

11     1993 or early 1994?

12          A.  Right.

13          Q.  But are you unsure of it?  I mean, do

14     you --

15          A.  No.  I was -- I didn't do it for all of the

16     clients, you know.  That's what I said.  There were

17     some clients that I did do the trades through 1993

18     for.

19          Q.  Is there any way that we could determine

20     now which clients you did the trades for and which

21     ones you didn't?

22          A.  No.  I couldn't remember that for sure.

23          (Customers Exhibit Number 29 was marked

24     for identification.)

25          Q.  (By Ms. Chaitman)  Okay.  I'm up to

Page 93

1    Exhibit 29.  I'm handing you what I've marked as

2    Exhibit 29, which is an appendix to Mr. Dubinsky's

3    report in which he lists the documents that he

4    considered.  Have you seen this document before?

5         A.  No.

6         Q.  Now, you've testified that Mr. Dubinsky did

7    not interview you and no one on his behalf

8    interviewed you; is that right?

9         A.  Yes.

10        Q.  Okay.  And if you look at page eight of

11   this document, it lists a number of people who have

12   been -- whose deposition transcripts Mr. Dubinsky

13   said that he read.  Can you look through this list

14   and tell me if any of these people -- it begins on

15   the bottom of page eight --

16        A.  Uh-huh.

17        Q.  -- and then it goes on to page nine.  Can

18   you look at these names and tell me if any of these

19   people would have known how you executed the

20   convertible arbitrage trades in the 1980s?

21        A.  You're looking at the depositions you're

22   saying?

23        Q.  Yeah.  The names of the people.  Do you

24   recognize any of these people as people who had

25   knowledge about convertible arbitrage trading from

Page 94

1    the 1980s?

2         A.   None.

3              (Customers Exhibit Number 30 was marked

4    for identification.)

5         Q.   (By Ms. Chaitman)  Okay.  Now, I'd like to

6    mark as Exhibit 30 an August 20th, 2010 letter that

7    was written by Scott Garrett to Stephen Harbeck and

8    then a September 7th, 2010 letter from Mr. Harbeck

9    to Scott Garrett, which is the response.  I'll just

10   have to find the one that I marked up.  Just give me

11   one second.  I should have one more of these.  Let

12   me just see.

13             MS. FEIN:  That's all right.  We'll share.

14             MR. SHEEHAN:  It's all right.  Go ahead.

15             MR. GOLDMAN:  This may be the marked up

16   one.

17             MS. CHAITMAN:  Oh, yeah.  Thank you.

18        Q.   (By Ms. Chaitman)  Have you seen this

19   document before?

20        A.   No.

21        Q.   If you'd be good enough to turn to page 18?

22   And the numbers are on the top of the left-hand side

23   of the page.  The numbers are right up there.

24        A.   Uh-huh.

25        Q.   SIPC is telling Scott Garrett that you had

Page 95

1   all together -- you had the 703 account, you had two

2   custody accounts at JPMorgan Chase and you had an

3   additional 127 accounts.  Do you see that?

4       A.  Right.

5       Q.  Does that sound accurate to you?

6       A.  A hundred and twenty-seven accounts why?

7       Q.  Held by -- I'm reading from the top of the

8   page.  It says in addition to the Madoff 703 account

9   and the two BLMIS custody accounts held at JPMorgan

10  Chase as discussed in response to section two,

11  question 1(a) above, an additional 127 accounts held

12  by Madoff, BLMIS or other Madoff-related entities

13  have been identified to date as a result of the

14  investigation.

15      A.  Well, I'm not sure which accounts he's

16  referring to when he says 127 accounts.  What is

17  that?  Customer accounts or what is it?

18      Q.  Accounts in the name of your firm, either

19  you or in the name of either you or BLMI.

20          MR. SHEEHAN:  Helen, it might be a good

21  idea if Mr. Madoff read question to question that's

22  being answered here, the page before.

23          MS. CHAITMAN:  Sure.

24          MR. SHEEHAN:  It might be a little bit

25  helpful.

Page 96

 1              MS. CHAITMAN:  Sure.

 2              THE WITNESS:  I'm still confused as to

 3      what the question is.  I don't know.  Maybe it's

 4      just me right now, but I don't -- when he's talking

 5      about how many accounts, he's talking about -- what

 6      is he talking about?  Customer accounts or accounts

 7      we had at other brokerage firms or what?

 8          Q.  (By Ms. Chaitman)  Well, the question was,

 9      and I'm reading from the bottom of page 17, if for

10      the same period, which is --

11          A.  Right.

12          Q.  -- December 1998 through December 2008,

13      Madoff, BLMIS or other Madoff controlled businesses

14      had other accounts at U.S. or foreign banks or other

15      financial institutions provide annual balance data

16      for these accounts?

17          A.  Okay.  Well, again, if he's talking about

18      accounts that we had, you know, if he's talking

19      about that we had -- for example, if the Union Bank

20      in Switzerland handled an account for a hedge fund,

21      they may have had ten hedge fund accounts because

22      they have been the custodian for those accounts.  As

23      far as we're concerned, we never had an account with

24      these entities.  So again, it depends on how you

25      define we have an account.

                                          Page 97

1           We trade for -- we had -- we were hooked

2      into hundreds of other broker-dealers, whether it be

3      Charles Schwab or Merrill Lynch or Fidelity.  You

4      know, we didn't have a -- we don't consider that we

5      had an account there.  We did business with them, so

6      we had transactions that went through that.  We were

7      executing Charles Schwab's customers' accounts but,

8      you know, Charles Schwab was our customer, not a

9      customer of Charles Schwab.

10          Q.  Okay.

11          A.  So I don't know --

12          Q.  Is it fair to say that you don't believe

13     that you, Madoff or BLMIS maintained 127 different

14     accounts?

15          A.  No, no.  Again, it depends on how you

16     define an account.  I mean, we had hundreds, you

17     know, of accounts.  We had much more than 127

18     accounts depending upon what your definition of an

19     account is.  We did 10 percent of all the trading in

20     the United States.

21              So, you know, we had -- we transacted five

22     or six hundred thousand transactions every day, you

23     know; but as I say, if you were a customer of

24     Fidelity or Charles Schwab, you had an account

25     there.  All right.  You weren't my customer.

Page 98

1     Fidelity or Schwab was my customer.  Now, they did

2     business with us, Fidelity.  We don't consider that

3     we had an account with them.

4          Q.  Right.

5          A.  Because when we executed transactions for

6     them, those transactions went through the clearing

7     corporation.  They were settled every day.  We

8     didn't keep money at Fidelity.  They didn't keep

9     money at our account.  Those all went through the

10    clearing accounts.

11              Now, they would say that they -- they could

12    say they have an account with us because they did

13    business with us.  So they would have a -- they

14    would show that -- what business they did with

15    Madoff on a particular day the same way that if you

16    were a customer of ours, Sean Jones, it would say

17    you have an account with us; but that's not what a

18    firm --

19         Q.  Right.

20         A.  So I don't know exactly how they're

21    defining an account.

22         Q.  Okay.  If you look at the back of the

23    document and you go in one, two, three, four, five

24    -- let's see.  From the back of the document six

25    pages, you see you get to this from the back of the

Page 99

1    document.  You've got it.

2              MR. SHEEHAN:   Okay.

3         Q.  (By Ms. Chaitman)  You're in the wrong

4    document.

5         A.  Oh, I'm in the wrong --

6         Q.  That will make it even harder.

7         A.  No wonder why you people charge $700 an

8    hour.

9         Q.  Okay.  Sorry to confuse you.

10        A.  Uh-huh, right.

11        Q.  So these are -- this lists three Bank of

12   New York accounts; right?

13        A.  Right.

14        Q.  One was for you and Ruth and then one was

15   just for you and one was for BLMIS; right?

16        A.  Right.

17        Q.  And then there's a Bankers Trust account in

18   your name?

19        A.  Uh-huh.

20        Q.  Was that used for the firm?

21        A.  Yes.

22        Q.  Okay.  And there was a Barclays account?

23        A.  Right.

24        Q.  There were two -- actually, three Barclays

25   accounts; right?

Page 100

1            A.   Uh-huh.

2            Q.   One Bear Stearns account?

3            A.   Right.

4            Q.   One Fidelity account?

5            A.   Uh-huh.

6            Q.   One M&T account?

7            A.   Right.

8            Q.   And one Morgan Stanley account?

9            A.   Right.

10           Q.   Okay.  Now, this is captioned Madoff

11   related accounts, year-end balances and annual

12   earnings accounts with transfers to and from the

13   Madoff 703 account.  Do you see that in the upper

14   left-hand corner?

15           A.   Uh-huh.

16           Q.   So these were -- is it fair to say that

17   these were all accounts which received transfers

18   from the 703 account?

19           A.   If that's what it says, yeah.

20           Q.   Well, do you recall -- I mean, you've

21   testified that Treasury securities were purchased

22   with 703 account money by Fidelity, Bear Stearns,

23   Morgan Stanley and Lehman; right?

24           A.   Uh-huh.

25           Q.   And Barclays is Lehman?

Page 101

1          A.   No.   Barclays is Barclays.

2          Q.   Well, if you look at the entry for

3     Barclays, underneath it says Lehman?

4               MR. SHEEHAN:   Could Lehman -- I'll stop.

5               THE WITNESS:   Okay.   I mean, Barclays we

6     use -- Madoff Securities in London cleared their

7     transactions through Barclays.

8               MS. CHAITMAN:   Okay.

9               THE WITNESS:   So but I don't know what

10    Lehman did with Barclays.   They may have used

11    Barclays as well.

12         Q.   (By Ms. Chaitman)   Okay.   When money was

13    transferred from the 703 account to MSIL in

14    London --

15         A.   Uh-huh.

16         Q.   -- was that money used to purchase

17    securities?

18         A.   It was used to purchase usually treasuries.

19         Q.   From -- by MSIL?

20         A.   Right.

21         Q.   Okay.   And were those treasuries also held

22    for the benefit of the investment advisory

23    customers?

24         A.   Probably.

25         Q.   Do you remember approximately how much MSI

Page 102

1      held in Treasury securities?

2            A.   No.

3            Q.   And for us to determine that, we'd have to

4      get the Barclays Bank statements, is that -- for the

5      Treasury account?

6            A.   Correct.

7            Q.   If you look on the next page, which is page

8      19 -- let me help you.  Under paragraph two, what

9      appears in bold is the question that was asked by --

10           A.   Right.

11           Q.   -- Congressman Garrett.  It said during the

12     period 1992-2008 when Madoff was actively pursuing

13     his Ponzi fraud, he was engaged in market making and

14     proprietary trading.  For each of these years

15     provide data on trading volumes and the annual gross

16     and net revenues from this trading activity.

17                And then the answer is a table, which SIPC

18     says the table below includes annual revenue, net

19     income and trading volumes as reported in the focus

20     reports filed by Madoff with regulatory authorities.

21     Madoff focus reports were available back to 1983.

22           A.   Uh-huh.

23           Q.   Was this information on the focus reports

24     accurate after 1992?

25           A.   I assume so.  The revenue, yeah.

Page 103

1          Q.   So, for example, where it says average

2     monthly reported trade ticket executions, do those

3     numbers look accurate to you?

4          A.   It would be under focus reports, yes.

5          Q.   Okay.  And would the focus reports

6     accurately reflect the monthly trade ticket

7     executions?

8          A.   Uh-huh.

9          Q.   And what -- if you can answer this, what

10    was the average volume of each trade ticket?  I

11    mean, I assume you wouldn't do a trade for three

12    shares of IBM?

13         A.   No.  These would be -- this is not -- I'm

14    assuming these are not customer transactions.  These

15    are -- on the focus reports these were just

16    reflecting the market making proprietary trading

17    business.

18         Q.   What you were doing for your own account?

19         A.   Right.

20         Q.   Right.

21         A.   Yeah.  So --

22         Q.   Do these numbers look accurate to you?

23         A.   I would -- I would assume so.  If we run

24    the focus reports, the focus reports were accurate

25    all the time.

Page 104

1          Q.  So what would -- if there's a -- if you can

2     quantify this.  If you can't, just say you can't,

3     but what would be the average number of shares that

4     you would do on one ticket?

5          A.  On a ticket?

6          Q.  Yeah.

7          A.  It varies.  I just -- no way to be able to

8     tell you that.  I know how many trades they were

9     doing.  They were doing, you know, anywhere from a

10    low of 250,000 transactions a day to 600,000

11    transactions a day.  I mean, you know, how the

12    shares were, you know, I don't -- you know, I don't

13    know.  I didn't pay attention to that.

14         Q.  Okay.

15         A.  Why is it relevant?

16         Q.  I'm just trying to get a sense of the

17    volume.  In other words, let's say if we take in

18    1983 you did a reported -- average monthly reported

19    trade tick at executions was 8,135.

20         A.  Well, let me put it to you this way.  The

21    industry kept records, transactions of how many

22    transactions we did because they were reported, you

23    know, to -- you know, to the NASD.  I mean, it was

24    reported all over the industry basically.  These

25    were not numbers that we generated.  That went

Page 105

1    through the systems, the clearance and settlement

2    systems and the reporting, trade reporting systems

3    that we did anywhere from typically of a low of five

4    to ten percent of the actual number of transactions

5    were executed in the United States.  That's not

6    something that I made up.

7            That was something that's been reported

8    all over the -- all over the industry.  It's been

9    reported by the NASD and the SEC.  I mean, by

10   anybody's scope it was a huge amount of business.

11           As a matter of fact, when we -- when we

12   developed this Primex trading system and my partners

13   were Goldman Sachs, Merrill Lynch, Lehman Brothers

14   and Citicorp, the five -- all five firms that were

15   the partners in Primex handled 50 percent of all the

16   trading in the United States.  Again, this is not

17   numbers that we generated.  This is what the

18   industry reported.

19       Q.   Okay.  But if I had been your customer,

20   would you have taken an order from me to buy five

21   shares of IBM?

22       A.   No.

23       Q.   So what was the low --

24       A.   We didn't -- if a customer called us up to

25   buy stock for them, we never took an order.  In

Page 106

1    other words, you couldn't as a customer, our firm

2    policy was to not handle a typical retail order for

3    a client.  We either -- you either had to be a

4    broker-dealer or a bank to be a client of Madoff or

5    if you were a customer, you had to have -- when you

6    opened an account, you had to have a minimum of

7    500,000, which is at the very earliest $500,000 in

8    the account.  Typically it was then 2 million.  That

9    was if you were an individual client.

10             So but if you called us up and you said

11   you want to buy 20 shares of IBM or you want to buy

12   a thousand shares of IBM, we would not do that

13   order.  If it wasn't -- the only customer business

14   that we did was where we managed the entire account

15   and we made the decisions.

16        Q.   Okay.  Now, if you'd look on page 23 at the

17   bottom of the page, the question was how many

18   accounts under consideration for avoidance action

19   were established with Madoff prior to the inception

20   of the Ponzi scheme?

21             In making the net investment method

22   determination net equity from these accounts, has

23   the Trustee used any of the pre-Ponzi disbursements?

24   If so, provide details, et cetera.  And the response

25   says based on the Trustee's investigation and upon

Page 107

1   review of the earliest records available to him, the

2   Trustee has found no evidence indicating that the

3   BLMIS investment advisory business has been operated

4   as anything but a Ponzi scheme.

5           A.   Right.

6           Q.   Now, did anyone on behalf of the Trustee

7   ever talk to you about the trades that you did in

8   the 1980s?

9           A.   No.

10          Q.   Did the Trustee ever disclose to you that

11  he, in fact, had some trading records from the

12  1980s?

13          A.   No.

14          Q.   Now, when SIPC is using here the phrase

15  Ponzi scheme, if you accept for a moment that a

16  Ponzi scheme is a nonexistent business in which

17  people invest where the sole source of paying

18  returns on their investments is investments from new

19  investors --

20          A.   Uh-huh.

21          Q.   -- on that definition was the split strike

22  ever a Ponzi scheme?  In other words, did you ever

23  need new cash from new customers in order to redeem

24  other customers?

25          A.   No.

Page 108

1          Q.  Did you ever need new cash from new

2     customers to pay the earnings that were reported on

3     the statements?

4          A.  No.  Let me make a statement that I have

5     never to my recollection ever had a conversation

6     with a Trustee, ever.  The Trustee never met with

7     me, never spoke to me, never asked me anything from

8     the date of my arrest until currently.  I've had

9     meetings with the attorneys when the attorneys came

10    down here after, you know, I don't know whether that

11    was 2010 or some year in that, but there was

12    nothing; but the Trustee, the only time I ever saw

13    the Trustee was at my proffer meeting with the SEC.

14         Q.  In December 2008?

15         A.  December of 2008.  And as far as I recall,

16    he never asked me anything and I never said anything

17    to him.

18         Q.  Okay.  But did anyone from the Trustee's

19    law firm --

20         A.  No.  The law firm, yes.  They came down at

21    one period of time.  David Sheehan could -- was

22    present.

23         Q.  Okay.  But did they ever ask you whether

24    you actually executed the trades that were done in

25    the convertible arbitrage strategy?

Page 109

1          A.   I don't think they ever asked me that.   The

2     only conversation I had with them about trade at all

3     was the David Kugel scrap of paper that I mentioned

4     before.

5          Q.   Okay, okay.   Did they ever ask you exactly

6     when the -- when you stopped buying the securities

7     for the split strike?

8          A.   No.

9          Q.   Did they ever ask you whether you needed

10    the money from new investors in order to pay old

11    investors?

12         A.   No.

13              (Customers Exhibit Number 31 was marked

14    for identification.)

15              MS. CHAITMAN:   I'm up to Exhibit 31, and

16    this is the expert report of Bill Feingold.   That's

17    okay.

18              MR. GOLDMAN:   I'll take it easy.

19         Q.   (By Ms. Chaitman)   Okay.   Have you seen

20    this document before?

21         A.   Yes.

22         Q.   Okay.   Do you know Bill Feingold?

23         A.   No.

24         Q.   Did you ever hear about him?

25         A.   No.

                                              Page 110

1            Q.  I'd like to go through the substantive

2     portion of this report and I'd like you to give me

3     your insights on it; okay?

4            A.  Uh-huh.

5            Q.  So if you'd be good enough to turn to page

6     two?

7            A.  Uh-huh.

8            Q.  And if you could just read paragraph 12 and

9     then if you have any comments on that, I'd like you

10    to tell me what they are.

11           A.  Yes.

12           Q.  Okay.  Can you tell me what they are?

13           A.  What?  What did you ask me?

14           Q.  Did you have any comments on this?  Do

15    you -- do you --

16           A.  Yeah.  I think, you know, he pointed out,

17    you know, the fallacy of what Dubinsky used, made

18    statements about volume and so on.  He's

19    criticizing -- I think there were 41 points that he

20    made that Dubinsky was incorrect in his analysis,

21    which was basically very similar to all my comments

22    when I analyzed the Dubinsky report.

23           Q.  Okay.  In paragraph 13 he says that most

24    trading and bonds, unlike stocks, takes place in the

25    over-the-counter market and that's something you had

Page 111

1     testified to; right?

2          A.   Right.

3          Q.   And then he quotes the SIFMA website for

4     the statement, quote, the OTC market is much larger

5     than the exchange markets and the vast majority of

6     bond transactions, even those involving exchange

7     listed issues, take place in this market?

8          A.   Correct.  I think this is -- he's

9     reflecting very similar to the last time we had a

10    deposition and I produced a very large book that was

11    written.  I gave -- you took as evidence --

12         Q.   Yes.

13         A.   -- that stated all of this.

14         Q.   Right.

15         A.   That was in complete contrast to Dubinsky's

16    report.

17         Q.   Right.  And if Dubinsky had spoken to

18    anyone who did trading and convertible bonds in the

19    1980s, would they have found this information out?

20         A.   Yes.

21         Q.   In paragraph 14 Feingold says in an OTC

22    market investors do not trade directly with each

23    other but with many individual dealers who

24    continuously make markets, paren, buy and sell.  As

25    such, OTC markets are much less centralized and data

Page 112

1     are less readily available.  Is that accurate?

2          A.   That's correct.

3          Q.   If you'd just take a look at paragraph 15

4     and if you'd just take a moment to read that and

5     then I'd like your comments on it.

6          A.   Right.  He's basically saying that, you

7     know, that -- that convertible bonds and bonds in

8     general do not trade for the most part on the floor

9     of an exchange.  They trade over the counter between

10    dealers.  Madoff is one of the largest convertible

11    bond dealers in the country.  We made more markets

12    in convertible bonds than any other firm.  He

13    doesn't state that, but that was common knowledge.

14         And he's saying that you couldn't get

15    accurate information, you know, until 2002 because

16    that was when TRACE came in.  And even when TRACE

17    came in, there was question as to whether or not the

18    correct volume was reported even then.  Bond dealers

19    in general do not like to report their transactions

20    or their volume because they consider it proprietary

21    information.

22         The SEC would like -- look, the SEC would

23    like everything to be transparent.  That's been a --

24    in the 50 years I've been in this industry, that has

25    been a debate that went on and still has not been

Page 113

1    resolved.  And to a certain extent, you know, they

2    blame me for a lot of -- a lot of this because of

3    the fact that we were the ones that pioneered the

4    form of electronic trading.

5              Right now all of these problems that you

6    have with this what they call that book that came

7    out, Flash Boys, all the trading is done in dark

8    pools and not -- when I came into this industry,

9    98 percent of the business in securities was traded

10   on the floor of an exchange and listed securities.

11             The SEC was unhappy with that and I was

12   given the responsibility for developing a more

13   competitive marketplace.  And that's how we started

14   this electronic trading and that's how I developed

15   NASDAQ originally.  The volume on the -- on New York

16   Stock Exchange's list of securities today is only

17   about 30 percent on the floor of the exchange and

18   70 percent if it is done over the counter.

19             So and that's a constant problem.  The

20   whole marketplace has changed and will probably

21   never go back to the way it was.  And nobody wants

22   to -- the goal of the industry is to have less

23   transparency because people always -- always want to

24   trade against somebody else.  They're all competing

25   with each other.

Page 114

1            So the idea is to conceal what you're

2    doing, what you're buying, what you're selling.  And

3    because of what the SEC would like to do, they'll

4    never change that.  Business is done more in Europe

5    now than ever before and it's -- that's where the

6    industry is.

7            Q.  In paragraph 19 Mr. Feingold says, thus,

8    when Mr. Dubinsky cites data from the New York Stock

9    Exchange to support his arguments about bond volume,

10   he is treating approximately one percent of the

11   activity as indicative of the entire market.

12           A.  Really?

13           Q.  Is that --

14           A.  Yes.

15           Q.  In fact, I think that the book that you

16   brought to the last deposition --

17           A.  Right, right.

18           Q.  -- said that one percent of the convertible

19   bond trading was done on the New York Stock

20   Exchange?

21           A.  Right.

22           Q.  And if Mr. Dubinsky or someone working for

23   him had spoken to anyone who did convertible bond

24   trading in the 1980s, would they have learned that?

25           A.  Look, without trying to be cruel, the

Page 115

1    Dubinsky report is an embarrassment.  I mean, I just

2    -- that's the only way to describe it.  Quite

3    frankly, I don't understand it because if you look

4    at his background, you know, as an accountant and

5    his so-called fraud order, I don't understand how --

6    to me it's a mystery and would be for anybody a

7    mystery that would read that report would be

8    stunned, you know, at his -- at the report.

9              I don't understand it.  I mean, Feingold's

10   background is certainly equal, if not better, than

11   Dubinsky's and it's certainly more current.  So but,

12   quite frankly, you could find anybody that was

13   familiar with the marketplaces that would be able to

14   write the same kind of report that Feingold wrote

15   that was critical of Dubinsky's report.

16             He does state in the report if you read

17   through the Dubinsky report, he does make comments

18   that he doesn't have -- he doesn't have access to

19   certain information.  He can't find it, but that

20   didn't prevent him from still coming -- drawing

21   conclusions.

22             So if you're going to -- if you're going

23   to say, well, I only looked at the New York Stock

24   Exchange volume, you know, and, therefore, I'm

25   determined that Madoff could not have bought

Page 116

1    securities because he -- you know, it didn't match

2    the volume of the New York Stock Exchange when

3    everybody knows that you don't -- you can't just

4    look at the New York Stock Exchange volume.

5           I mean, how could you write a report that

6    said that?  What he should have said is I do not

7    have access to the information to make a

8    determination of whether these transactions took

9    place or not.  That's what -- that's what -- you

10   know, that's what I would have done or anybody would

11   have done.

12      Q.   In paragraph 27 Mr. Feingold writes in

13   paragraph 99 Mr. Dubinsky inaccurately describes the

14   process by which convertible securities become

15   common shares.  He writes that, quote, many

16   convertible securities have the option for the

17   company to call the security at a predetermined date

18   or at the company's discretion, that is, the company

19   has the right to convert the convertible securities

20   into common shares.

21          In instances where the bond or preferred

22   equity is called, the shares are converted on the

23   record date at a determined amount, end quote.  In

24   fact, except for a specific subcategory known as

25   quote, mandatory, end quote, convertible securities,

Page 117

1    the securities are convertible at the investor's

2    discretion, not the issuing company's.  When a

3    company calls a security, the investor is then given

4    a period typically between 20 and 120 days in which

5    to decide whether to convert the security into

6    common shares or to accept the cash call price

7    stipulated in the company's call notice.  Do you

8    agree with Mr. Feingold on that?

9         A.  Yes.

10        Q.  Now, in paragraph 30 Mr. Feingold writes

11   footnote one of two of Mr. Dubinsky's report

12   contends that a significant percentage of the short

13   positions reported by Madoff customers exceed the

14   amount of short interest in those stocks as reported

15   at month end by the stock exchange.  I found this

16   very dubious.

17            Going through the list I noticed that

18   Pfizer, one of the world's largest drug companies,

19   had short interests according to Mr. Dubinsky's

20   table of 826,162 shares at the end of March 1992.

21   Pfizer's closing price that month was $69.50 per

22   share according to Yahoo Finance.

23            Average daily trading volume in Pfizer was

24   10.74 million shares.  If Mr. Dubinsky's data are

25   correct, the short interest in Pfizer then

Page 118

1    constituted less than eight percent of an average

2    day's volume.

3          A.   I don't know what you -- I don't know what

4    you're asking me.  I mean, as I say, I'm at a loss

5    to explain this whole Dubinsky report.  I know, it's

6    -- if it wasn't such a -- if his accusations weren't

7    so serious, it would almost be comical.

8          Q.   Well, is it difficult to find out what the

9    average daily volume in Pfizer was?

10         A.   Yes, I mean, because volumes were reported.

11   The over the -- he's looking at volume that was

12   reported on the exchange when over-the-counter

13   dealers don't report the volume.  I mean, you know,

14   so you can't -- it's like adding apples and oranges.

15   You can't -- you can't -- you can't find the

16   information.

17              Again, as I said before, the business of

18   an exchange is to try and let people know exactly

19   what has happened.  That's what they advertise.  You

20   know, an exchange wants to make everything public

21   because in theory, you know, the SEC would love, you

22   know, the public to understand everything that goes

23   on, how many shares trade, where they trade, at what

24   price they trade.  Institutions who do the majority

25   of the business want to do just the opposite.

Page 119

1           They do not want to let, you know,
2    everybody know what they're doing because it's no
3    different than like insider trading.  You know, the
4    idea is you're in an industry where everybody is
5    competing against each other, including -- including
6    the public customers.  You have to understand that
7    the person who buys stock thinks he knows something
8    that the person who's selling it doesn't understand.
9           It's not a zero sum gain.  Someone is
10   going to be a winner, someone is going to be a
11   loser.  And it's the same.  So information is the
12   key.  People are trying to get less information out
13   as possible, you know, but that's the way the
14   industry is done now.  The markets are not --
15   they're much less transparent today than they were
16   20 years ago, you know.
17           So you can't -- it's not an accident that
18   people can't -- that Dubinsky can't find this
19   information that he's trying to do because it's not
20   available.  I mean, quite frankly, I think that what
21   happened was in fairness -- fairness to me, not the
22   Trustee -- the Trustee drew conclusions from day one
23   of what he thought he wanted to -- he wanted the
24   outcome to be.  He wanted the outcome to be that I
25   was a fraud from the very beginning, that I never

Page 120

1    did any transactions.  He made statements like

2    because he couldn't find confirmations, therefore,

3    from other broker-dealers.  Therefore, the

4    transaction never took place.

5            All right.  Him not understanding that the

6    industry stopped producing confirmations to

7    noncustomers.  So when I bought stock from -- you

8    know, in the open market from Merrill Lynch, we

9    didn't send confirmations to each other.  The

10   industry discontinued that.

11           Picard drew a conclusion because he

12   couldn't produce a confirmation.  Therefore, the

13   trade never took place.  He totally ignored the fact

14   that, number one, confirmations weren't even

15   generated any longer, which is something that is

16   very obvious to anybody in the industry.  Also, he

17   totally eliminated the fact that nobody keeps

18   records past six years any longer.

19           They're destroyed, you know.  So he -- you

20   know, but he had a conclusion that he drew from day

21   one very similar to what the U.S. Attorney did when

22   he asked me do I ever short stocks and I said yes,

23   of course, I short stocks.  You know, he said did

24   you ever sell to a customer that didn't know?  Of

25   course, I did.

Page 121

1          You know, and I had to explain to the U.S.

2    Attorney that that's what the business of market

3    makers are doing, you know; but so he wanted to

4    determine, well, since I always shorted stock back

5    in 1962, that I might have never bought stock.  I

6    mean, you know, I don't -- I think that what

7    happened was Dubinsky was -- you know, the Trustee

8    must have told Dubinsky this is what my conclusion

9    was.  This is what my theory is.

10         And Dubinsky, whether he did it in a

11   devious way or not, I don't think so.  I just think

12   that he just did the best he could.  He wanted to

13   get information, so he took whatever information was

14   available.  The fact that the information didn't

15   exist didn't mean that, you know -- that, you know,

16   the conclusion they drew, it didn't make any sense.

17   I don't know what else to say.

18        Q.  Okay.  Now, Mr. Dubinsky opined that you

19   were insolvent as far back as 1983.

20        A.  I saw that.

21        Q.  Do you agree with him?

22        A.  No.  I can tell you he stated how he came

23   to that conclusion, you know.  He just took whatever

24   the -- you know, whatever -- he made the conclusion

25   that I never did any transactions in '83.  So,

Page 122

1  therefore, he said since the customer showed that,

2  you know, balances in the account from transactions,

3  he figured, okay, that was a liability that Madoff

4  had.  He totally eliminated the fact that I was

5  doing business, you know, back in 1983 and so on.

6  So, therefore, I had the assets to cover that.

7          So he said, well, he knew what the

8  liabilities were because it was a customer

9  statement.  He had no way of knowing what the assets

10  that I had were because he didn't have any records

11  going back then.  I mean, who would possibly make a

12  statement like that?  I mean, the biggest mistake I

13  made was not going to trial.

14          Had I gone to trial rather than just

15  saying okay, I'm going to eliminate the government

16  spending millions of dollars and years in a trial

17  with me, I'm just going to admit that I was guilty

18  because I was from 1992 on, which was bad enough.

19  You know, they for some reason, the Trustee wanted

20  to determine that I was guilty from 1963.

21          All right.  Had I gone to trial, I would

22  have called in any number of expert witnesses like

23  this Feingold or anything else and the judge would

24  have totally laughed the Trustee out of court.  Why

25  he even bothered writing -- 90 percent of his report

Page 123

1  deals with after 1992.  I already admitted that I

2  didn't do the transactions after '92.  So why spend

3  all that time on that, you know?  What he did prior

4  to that made absolutely no sense anyhow.

5       Q.  Now, did Dubinsky acknowledge that you held

6  securities at Lehman, Bear Stearns, Morgan

7  Stanley --

8       A.  No.

9       Q.  -- Fidelity and JPMC?

10      A.  No, no.  That's not true.  He did state

11  that I had an account at Morgan Stanley, yeah.  He

12  stated that.  He didn't give any details on it but,

13  I mean, it was he had a copy of the Morgan Stanley

14  report in his information here.  So, therefore, he

15  had to know that I had securities over there.  He

16  did state that I had securities at those -- at other

17  firms, yeah.  He did state that.

18      Q.  But did he acknowledge that you had

19  purchased those securities --

20      A.  No.

21      Q.  -- with 703 account money?

22      A.  No.

23      Q.  Now, Mr. Dubinsky also opined that your

24  firm was insolvent from 2002 on.  Do you agree that

25  you were insolvent as of 2002?

Page 124

1          A.   In 2002 I did not have -- if he's -- I

2     would say yes, I was insolvent because I did not

3     have enough assets to cover the liabilities that I

4     had with the customers in 2002.

5          Q.   If you had -- if everyone had demanded

6     payment at one time?

7          A.   Yes.  You have to assume that if I show the

8     customers had a liability on that, whether they

9     asked me for it or not, I was insolvent.  You have

10    to make the assumption that if you owe the money

11    out, whether you have the ability -- if you don't

12    have the ability to pay if called, you're insolvent.

13         Q.   Okay.  Now, as of 2002 if the four families

14    had paid you the money they owed you, would you

15    still have been insolvent?

16         A.   In 2002?  Yes, because the fund business

17    was -- I wouldn't have been able to cover all my

18    direct accounts, you know, other than the funds

19    because the customers only had a liability of $5

20    billion whereas the funds had $14 billion.

21              So, you know, I wouldn't have enough money

22    to cover, you know, $19 billion; but I certainly

23    wouldn't have had enough money to cover all my

24    individual clients but, quite frankly, it doesn't

25    make a difference.  They're both the same.

Page 125

1          Q.   Looking at paragraph 39 of Mr. Feingold's

2     report, he says an active trader would likely have

3     held many convertible arbitrage positions for

4     substantially less than the period until the next,

5     paren, usually, end paren, semi-annual coupon was

6     paid.  Most likely, bonds were either converted or

7     sold into the open market.

8               Again, an investor who sells a corporate

9     bond receives accrued interest from the buyer

10    instead of collecting on the coupon date from the

11    issuer and the interest is built into the total cash

12    inflow.

13         A.   Right.

14         Q.   Do you agree with that?

15         A.   Yes.

16         Q.   Is that the -- is that the strategy that

17    you used?

18         A.   Yeah.  It's what anybody would use at

19    TRACE.  It's not unique to Madoff.  It's, you

20    know -- it's, you know, standard operating

21    procedure.

22              MS. CHAITMAN:  Okay.  All right.  We have

23    to take a break because they have to change the

24    disc.

25              THE VIDEOGRAPHER:  Going off the record.

Page 126

1    The time is 12:46 p.m.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:  Back on the record.

4    This begins disc number three.  The time is

5    1:00 o'clock p.m.

6         Q.  (By Ms. Chaitman)  Mr. Madoff, I just have

7    one other area that I want to cover with you and

8    that is Mr. Dubinsky's conclusion that the

9    proprietary trading aspect of your business never

10   made money.

11        A.  Yeah.  I'm sort of at a loss for that

12   because when I read that in his report, his own

13   information was, and I don't -- do you have his

14   report?

15        Q.  I do.

16        A.  And as I say, I'm overly sensitive to

17   anybody criticizing the side of the firm that my

18   sons ran, which was the proprietary and market

19   making side.  So where is the section --

20              MS. CHAITMAN:  I think it's at the very

21   end.

22              MR. SHEEHAN:  I think there is an index.

23              THE WITNESS:  Don't try to be -- don't try

24   to be accurate.  I'm not used to that.

25              MR. SHEEHAN:  All right.

Page 127

1          THE WITNESS:  Oh, here it is.

2          MR. GOLDMAN:  Bernie, tell us what page

3    you're on.  I'm sorry.

4          MS. CHAITMAN:  Just tell us, yeah.

5          THE WITNESS:  Page 116.  He correctly

6    states that the firm from 2000 to 2008 showed

7    revenue of a billion three hundred thousand dollars

8    in proprietary trading, but of that -- during that

9    period it was 714, $715 million worth of income that

10   came in from the 703, from the customer account.

11          So if you eliminate that, the proprietary

12   trading only had legitimate profits of $573 million,

13   you know, after you eliminated the money that came

14   from the customer accounts into the proprietary

15   trading.  So it still showed the firm made 572

16   million, $573 million of profit.

17          Stating that, how does he determine that

18   proprietary trading was not profitable?  I don't

19   understand it.  It's like saying one and one equals

20   three.

21     Q.  (By Ms. Chaitman)  Do you agree that 716 --

22   $714 million was transferred from the 703 account to

23   the proprietary trading?

24     A.  I agree with that.  That really, you know,

25   if you want to eliminate all the customer money that

Page 128

1    was -- that was funneled into the firm, you know,

2    was from customers, was not from proprietary

3    trading, I would say that would be correct; but that

4    in itself is not really correct because what he has

5    no way of knowing is he -- is that the big four

6    accounts that owed me all this money, for example,

7    with one account that had a six point some odd

8    billion dollar out, you know, debit balance, when

9    those accounts put me in a short -- what's called a

10   naked short position, which is what created my

11   problem why I had to start the fraud in '92, all

12   right, those short positions were mark to market,

13   got mark to market at the clearing house every day,

14   which typically happened.

15          So I was called for money to cover those,

16   that deficit all the time.  That was money that I

17   was taking, so I did that by -- you know, part of it

18   by transferring the money from the customer 703

19   account to be able to meet those margin calls, which

20   was -- which I would have done normally had I been

21   showing all the figures correctly.

22          So, you know, realistically, what I did

23   was I penalized my proprietary traders' income, you

24   know, but my proprietary traders as far as they're

25   concerned, they made a million -- a billion two.

Page 129

1           And when I paid -- when I paid my -- the

2       percentage of their -- when I paid their bonuses

3       based upon their profits, I paid it on a billion

4       three because proprietary traders, I had no reason

5       to penalize my proprietary traders because of the

6       problem that I put myself in with those big four

7       clients.  You understand what I'm saying?

8           Q.  I just want to clarify something.  Staying

9       on that page, the 714 --

10          A.  Million dollars.

11          Q.  -- million that Dubinsky found went from

12      the 703 account, now, the proprietary trading didn't

13      have their own bank account; right?

14          A.  No.

15          Q.  It went into the BNY account?

16          A.  Right.

17          Q.  Okay.  So you agree that 714 million from

18      the 703 account went into the BNY account?

19          A.  Right.

20          Q.  And as I understand your testimony, what

21      you're saying is that some portion of that money was

22      used by you to meet the margin calls --

23          A.  Right.

24          Q.  -- on the portfolio that you assumed from

25      the four families?

Page 130

```
 1          A.   Correct.

 2          Q.   That was subject to the hold harmless?

 3          A.   Right.  Which normally I would have done

 4     had I shown that that was going on, but I didn't.

 5     So Dubinsky is not -- Dubinsky is correct.  That

 6     money did come from the 703 account, but what he

 7     doesn't have anything to do with, which he doesn't

 8     know about, was the whole problem that I had

 9     occurred -- you know, that created that problem.

10          Q.   But if the money went from the 703 account

11     to the BNY account, then wasn't it commingled with

12     all the money in the BNY account?

13          A.   Yeah.

14          Q.   So what is the basis of saying that any of

15     it went to proprietary trading?

16          A.   Because the problem, the margin calls that

17     I got was because of customer account.  In other

18     words --

19          Q.   But was that charged to the proprietary

20     trading business?

21          A.   No.  It was.  It wasn't on the focus report

22     because it shouldn't have been.  In other words, had

23     I shown all of this stuff properly, that's what the

24     SEC would have said yeah, of course, you can take

25     them.  That money in the 703 account is actually
```

Page 131

1    part of that money is due me, was due Madoff.  Not

2    all of it, but part of it was.  In other words, the

3    monies that the four clients owed me, you know, from

4    the hold harmless agreements, that money, part of

5    that, the 703 account was their monies.

6            So I was not wrong.  Under normal

7    circumstances I would have taken that money.  The

8    reason why I paid my traders, my proprietary traders

9    on the billion three, because that's what they made.

10   The proprietary traders made a billion three.  They

11   didn't only make 573 million.  They made a billion

12   three.

13           And if my -- if I didn't pay my traders

14   properly, they would have said -- they get

15   25 percent of their trade.  They would have said to

16   me, listen, because you made this ridiculous

17   agreement with your four big clients and they cost

18   you all that money, don't penalize us.  That's your

19   problem, which would have been true.

20           MS. CHAITMAN:  Okay.  I have no further

21   questions.  Thank you, Mr. Madoff.

22           MR. SHEEHAN:  You're done?

23           MS. CHAITMAN:  Yeah.  I'm done.  You want

24   to change seats or --

25           MR. SHEEHAN:  No.  I'm fine.  I do need to

Page 132

1    get an outline out, but it will take just a second.

2                         EXAMINATION

3    BY MR. SHEEHAN:

4         Q.   Mr. Madoff, before we get started, I just

5    want to ask you a question that wasn't quite asked

6    the way I wanted it to be.  That is, are you on any

7    medications that would impair your ability to

8    testify here today?

9         A.   No, no.

10        Q.   Okay.  That's not particularized towards

11   you.  It's asked at every deposition.

12        A.   Yeah.  No.  I understand.

13        Q.   Because people do take medications that

14   sometimes doesn't render --

15        A.   No.  I'm on lots of medication, but nothing

16   that would impair my --

17        Q.   Okay.  All right.  Just so you and I agree

18   on that.  Okay.  Let me sort of go back over some of

19   the testimony --

20        A.   Right.

21        Q.   -- this afternoon before we get into some

22   other stuff I want to talk about.  On November 30,

23   2008 your customer statements showed you to be owed

24   your customers $64.6 billion, thereabouts; right?

25        A.   Right.

Page 133

1          Q.  And when the Trustee looked at all of your

2     bank accounts and stock they had available at that

3     point, you had a little over 300 million left?

4          A.  Right.

5          Q.  So in the course of -- you're kind of

6     short, yeah, like 64.3 billion dollars; right?

7          A.  Right.

8          Q.  Are you saying that that disappeared over

9     -- that you actually could have covered everybody

10    prior to 2002?

11         A.  No, no.

12         Q.  Okay.  So what you did do, though, is that

13    in 2008 according to our calculations you actually

14    paid redemptions of close to $12 billion?

15         A.  Uh-huh.

16         Q.  About 11.7, I think, is what it was?

17         A.  Right.

18         Q.  Does that sound accurate to you?

19         A.  I guess so, yeah.

20         Q.  So there was a lot of money going out

21    during 2008; right?

22         A.  Right.

23         Q.  But it wasn't anywhere near $64 billion --

24         A.  No.

25         Q.  -- that you said you were long?

Page 134

1        A.   No.

2        Q.   And is it your testimony that that $64

3   billion shortfall occurred from 1992 through 2008?

4        A.   Yeah.

5        Q.   All right.  Do you know what at the end of

6   1992 you showed on your books and records assuming

7   all trading is as you say it was, what was on your

8   books and records then as what you were -- you

9   yourself were long?

10        A.   Well, first of all, you have to understand

11   that the -- there was -- the losses that I incurred

12   from the short positions of the big four accounts,

13   all right, that occurred from the 1987 through 1992

14   when the market had recovered from the crash in

15   1987.  That was -- that was substantial.  That could

16   have been, you know, as I said, I don't know how

17   many billions of dollars it was at the time; but you

18   have to take that into consideration, you know.

19        Q.   Right.

20        A.   So, you know, the $64 billion, don't

21   forget, is -- the reason that number got so large

22   was that I was generating falsely like 12 percent

23   return on all the -- on the principal money that was

24   invested.  Let's say the total of almost

25   $19 billion, you know, at 12 percent return from

Page 135

1     nineteen ninety -- from 1992 through 2008.  That's

2     where the $64 billion came in.

3          Q.  Okay.

4          A.  It was the profits that were being

5     generated, the false profits that were being

6     generated.

7          Q.  I understand that, but let's go back to the

8     beginning.

9          A.  Uh-huh.

10         Q.  I think sometimes chronologically it helps

11    when we talk about this stuff.

12         A.  Right.

13         Q.  So you started the business in 1960; right?

14         A.  '60, right.

15         Q.  That's when you first registered.  And did

16    you start out as a market maker --

17         A.  Yes.

18         Q.  -- or as a retail business?

19         A.  Well, I started, I did a retail business

20    for the first three years until 1963.  Then I became

21    a market maker.  After the market I had the 1962 new

22    issue break, which was during the Cuban Missile

23    Crisis and so on.  When I had my first bad

24    experience where I lost about $30,000 for some

25    family accounts --

Page 136

1        Q.  Right.

2        A.  -- then I had to borrow $30,000 worth of

3    bonds from my father-in-law to be able to make my

4    clients whole because I felt responsible for the

5    losses that they incurred.  That's why in like 1963

6    I decided I didn't really want to be in the retail

7    business.  I wanted to be a market maker.  So I

8    start making markets from 1963 on.

9        Q.  When did -- did there come a time when you

10   went back into retail business?

11       A.  No.

12       Q.  When did you start what we call the

13   investment advisory business?

14       A.  Probably '70s.

15       Q.  And you would not characterize that as a

16   customer oriented business?

17       A.  Not really.  I knew, yes, it would be.

18       Q.  Right.

19       A.  It would be, but it was never -- I never

20   had a business where a customer would call me up and

21   say I want to buy stock or what should I buy.  In

22   other words, when I started my business it was

23   always sort of like a discretionary-type business

24   where people would give me -- you know, basically it

25   was family and friends who would give me a certain

Page 137

1   amount of money.  And I would invest, started doing

2   convertible bond arbitrage.  I never did retail

3   business, like if you called me up and said I want

4   to buy IBM.

5           Q.  Right.

6           A.  It was always a hedge type of trading that

7   I started doing.

8           Q.  So in the early '70s you started into the

9   IA business?  Let's just call it that.

10          A.  From starting with the big four accounts

11  plus some family and friends.

12          Q.  Okay.  So the big four accounts started

13  with you in the early '70s?

14          A.  Yes.

15          Q.  Now, the strategy --

16          A.  Some of them.

17          Q.  Okay.  We'll get into that later if it's

18  important.

19          A.  Right.

20          Q.  But what were the strategies you initially

21  engaged in?  You mentioned convertible arbitrage.

22  Were you doing that right away?

23          A.  Yes.  That was right.

24          Q.  Okay.  Were you doing other investment

25  strategies at the same time?

Page 138

1           A.   No.

2           Q.   Okay.   I'm going to ask you some

3    definitions just for --

4           A.   Uh-huh.

5           Q.   -- you know, the record.   What's a discount

6    arb?

7           A.   A discount arb is when -- well, a discount

8    convertible it would be.

9           Q.   Yeah.   A discount convertible.

10          A.   Yeah.   A discount convertible is a

11   convertible is selling at a discount to what it's

12   worth, the stock.   In other words, if a bond is

13   convertible into stock let's say at $10 a share and

14   you're able to buy there would be a hundred -- the

15   bond would be trading at a hundred and the stock

16   would be trading at let's say ten.   All right.

17   That's what they call on the money.

18          Q.   Right.

19          A.   If the convertible bond, if you could buy

20   the convertible bond below par, below 100, let's say

21   you bought it at 98 and sold the stock at 10, you're

22   doing a discount arbitrage because you can make --

23   you're making two points on it.   So you would buy

24   the bond, short the stock at 10 and you lock in a

25   bona fide profit of two points.

Page 139

1          Q.   In terms of convertible securities, there
2     are different kinds of those; are there not?
3          A.   Well, for the most part they're all the
4     same.
5          Q.   Well, they may have the same features, but
6     some are --
7          A.   Some are trade in premiums.
8          Q.   Yeah, but what I meant by that is this.
9     Some are bonds.  Some are warrants.  Some are
10    rights.  Some are preferred securities?
11         A.   Yeah.  Well, they're not bonds, though.
12    Arbitrage securities could be convertible bonds,
13    convertible preferreds, units, warrants, rights.
14         Q.   All right.
15         A.   That's all hedge type of trading.
16         Q.   Right.  And did you in your convertible
17    arbitrage strategy use all of those types?
18         A.   All of those, yes.
19         Q.   You used all of those?
20         A.   Right.
21         Q.   And do you know whether bonds were a
22    minority or a majority of the trades you engaged in?
23         A.   They were -- well, depending upon when it
24    was, particularly bonds would be the majority of it.
25         Q.   Okay.  What does that mean, when it was?

Page 140

1          A.   I mean, when I -- when I was doing it,
2     there was always more volume in convertible bonds
3     than there would be let's say in warrants, units or
4     rights; but depending upon when it was, depending
5     on, you know, for example, when AT&T split up and --
6     and, you know, and became all the baby Bells that
7     they traded, we made a market.
8               We were the primary market maker.  As a
9     matter of fact, I have a copy in my records here of
10    an ad that we ran in the Wall Street Journal that
11    said that we made markets, you know, to banks,
12    brokers and institutions in all of the convertible
13    securities.  We did a very big business --
14         Q.   Right.
15         A.   -- trading all the various AT&T break-up
16    issues.
17         Q.   In the normal course in the '70s, let's
18    give it a time frame, are discount arbitrage
19    opportunities plentiful?
20         A.   Yes.  There were convertible bonds traded
21    -- first of all, you have to understand that most
22    convertible arbitrage trading did not go through the
23    conversion process, which he even -- Dubinsky even
24    states that in his report.  In other words --
25         Q.   You mean you didn't go through the -- I'm

Page 141

1    sorry to interrupt you, but just to clarify, you

2    didn't go through the conversion process or the

3    industry?

4         A.   The industry.  In other words, typically

5    most convertible bonds should always trade at a

6    premium.  In other words, when a bond trades at a

7    discount, it's sort of a freak.

8         Q.   That was my question.  Thank you.

9         A.   Yeah, yes.

10        Q.   Okay.

11        A.   So that, you know, obviously, if you can

12   buy a convertible bond at a discount, you would

13   typically buy it and convert it because you have a

14   guaranteed profit and you lock it up.  All right.

15   But most convertible bonds create premiums because

16   nobody in their right mind should -- you know,

17   should ever, you know, buy a -- should buy common

18   stock if you could buy a convertible bond at a

19   discount.

20        Q.   Right.

21        A.   All right.  So typically, in other words,

22   look, to give you an example, when I hired David

23   Kugel when he -- David Kugel used to work for a firm

24   of mine, for a friend of mine whose name was Mike

25   Lieberbaum, all right, who had a firm called

Page 142

1    Lieberbaum & Company.  When I first went into

2    business we were friends.  We went to high school

3    together, college together, and his father had a

4    business, Lieberbaum & Company.  And David Kugel

5    happened to work for him as a convertible bond

6    trader, you know.

7            So what happened was, but that firm went

8    out of business.  They decided to liquidate the firm

9    and they all retired, you know.  David Kugel was

10   working for that firm and looking for a job.  Now, I

11   was trading convertible securities at that time, so

12   Lieberbaum said to me can you do me a favor and hire

13   David Kugel?

14       Q.  Right.

15       A.  And I said I don't really want to hire

16   David Kugel.  I'm not looking for another trader.

17   And, quite frankly, David Kugel was sort of a pain

18   in the ass.  You know, nice guy, but he was very

19   difficult to deal with because you couldn't have a

20   conversation with him that made any sort of sense;

21   but -- and we used to kid about that, you know.

22           This friend said look -- he was my good

23   friend, went to school.  He said look, I'm trying to

24   find this guy a job.  You know, I feel bad we're

25   closing the firm.  Why don't you hire him?  So I

Page 143

1    said I don't really want to hire him, Michael.  So

2    he said -- you know, so I said look, he had a Friden

3    -- you probably are -- how old are you?

4         Q.   Seventy-three.

5         A.   All right.  So you remember what Friden

6    calculators were?

7         Q.   Sure.

8         A.   The old with the hand crank?  This is

9    before computers.  Okay.  Mike Lieberbaum's firm, he

10   had a Friden calculator, which was expensive.  And I

11   was, you know, relatively young in the business.  So

12   I said I want -- if you're liquidating the firm, I'd

13   like your Friden calculator because we used to use

14   it to figure out all the convertibles, you know, you

15   know.

16             So he said I'll tell you what.  Take David

17   Kugel and I'll give you the Friden calculator.  So

18   we always used to tease David Kugel and say the only

19   reason that we hired you is for the Friden

20   calculator.  He used to be very sensitive to that,

21   but that was really a true story.

22             Now, I came up with a concept of -- I said

23   to David, I said this is your job.  I said I want

24   you to track every convertible security that exists,

25   okay, and I want you to track and see what the

                                              Page 144

1    historical prices of the convertibles.  Most

2    convertibles, we trade at premiums.  So we used to

3    have a -- and we used to have to do all this by

4    hand, you know, before computers with this Friden

5    calculator.  We would track every convertible bond

6    and see when it was trading at a discount or when it

7    was trading at a premium.

8              So historically if you knew that a

9    particular convertible security traded let's say

10   typically at a three point premium but now all of a

11   sudden it went to a ten point premium, all right,

12   you would know that that premium is too high.  It

13   should go back to historically to a three point

14   premium.

15             So we would go ahead and we would set up

16   the trade.  We'd buy the convertible, short the

17   stock, all right, and then wait, hold them open,

18   which immediately had a loss.  So you're setting up

19   a trade where you had a loss, but historically the

20   bond would close up and go back to a three point

21   premium.

22             You would then unwind the transaction, all

23   right, and you'd make a three point profit.  It's

24   called Chinese arbitrage.  Don't ask me why it was

25   called that.  It was just ass backwards.  So for

Page 145

1    some reason that was what the industry -- so most

2    convertible trading went on at premiums, you know,

3    where you set it up.  You had a loss, but you knew

4    what your loss was.

5              It was no more than three points.  And

6    David Kugel used to have a huge spreadsheet

7    literally like this long that had tracked all the

8    convertibles.  And we would just -- and that's what

9    we would do.  So we would do business with our

10   customers, you know, doing this kind of trading.

11             I was doing it for the big four clients

12   and, quite frankly, it was like bending down and

13   picking up money.  All right.  Now, most people on

14   Wall Street didn't want to trade convertibles like

15   that because your profit was limited, you know.  You

16   know, your loss was limited, but your profit was

17   limited.

18        Q.  How scalable was that kind of trading?

19        A.  It was -- well, it was -- everything was

20   relative.  You know, when I first started in the

21   business my -- you know, what I considered to be a

22   great profit was different than let's say Goldman

23   Sachs did.  All right.  So in that -- when I went

24   into business all the convertible securities were

25   handled by a handful of European arbitrageurs.

Page 146

1          The whole business was handled by Goldman

2     Sachs, Rouss & Company.  There were maybe ten

3     foreign convertible firms.  The joke in the industry

4     was that when you called up and asked a convertible

5     bond market maker what the price was, he would say

6     what do you want to do?  You know, that was what --

7     they all had this heavy Jewish accent, but these

8     guys were all money arbitrageurs in Europe.

9          Q.  Right.

10          A.  You know, and when they came to this

11     industry, they started trading the convertible

12     securities.  All right.  So after I got my brains

13     beat in, which to me, $30,000 loss in 1963 was a

14     lot, I said listen, I can't possibly -- you know,

15     can't stay in this business like this because my

16     father-in-law is not going to keep on lending me

17     money to bail myself out.

18          So I said I can't do retail business.  As a

19     matter of fact, the SEC said to me, Bernie, when

20     they examined my firm, the first examination and

21     they saw that I paid back the customers $30,000

22     because they lost money, they said, you know, you

23     really can't keep doing this because how many times

24     are you going to do this?  He said if you're going

25     to be responsible for your clients, you know, that's

Page 147

1    not a business you want.  So I said you know what?

2    I looked around for what I could do that had limited

3    risk.  And convertible securities to me, I decided

4    that that was a business I wanted to be in.

5           So but the problem was it was controlled,

6    that business, by Goldman Sachs, by all these

7    handful of firms, by Bear Stearns and so on.  So at

8    that time I went and I had -- I went to see Gus

9    Levy, who was the chairman of Goldman Sachs, you

10   know, and I went to Bear Stearns, Cy Lewis, who was

11   the chairman of that, and I said to them, you know,

12   I did things that probably people today would think

13   were stupid.

14          I had them -- I went up there and I said --

15   made an appointment with them and I said listen, I

16   would like to trade convertible securities.  And

17   they said Bernie, you know, this is not a business

18   for you.  This is our business.  You can't go into

19   this business.  And I told them the story and they

20   -- I know it's hard for you to appreciate this now,

21   but I was appealing to them in those days.

22          And I said look, give me a break.  Let me

23   make something.  I told them my tale of woe and they

24   said okay.  Look, you know what?  If you want to

25   trade, if you want to trade convertible bonds, he

Page 148

1    says I'll tell you what we'll do.  We'll give you

2    the odd lot pieces.  We don't want to trade -- we

3    don't want to buy ten convertible bonds and eight

4    convertible bonds.  We only want to buy 100 bonds

5    and so on.  So if you want the small ones, if you're

6    willing to do the small pieces, you trade them.

7    We'll send the customers to you.

8              And I said that's fine with me because

9    whatever I made was good business for me.  So I

10   started doing that and I developed this relationship

11   with these European arbitrageurs and they started

12   sending me the odd lot business.  And then, of

13   course, kept on doing -- you know, I grew the

14   business and that's how I got started in the

15   business.

16        Q.  I'll give you a break in a minute here.

17   When you give an answer like that, and I'm not going

18   to interrupt you because -- but it takes the court

19   reporter a while to recover from that.

20        A.  Oh, I didn't realize you were still doing

21   it.

22        Q.  She's constantly --

23        A.  I didn't realize.  I didn't realize this

24   was on the record.

25        Q.  Yeah.  This is on the record.

Page 149

1           A.  I thought it was just curiosity.  I'm
2      sorry.
3           Q.  No, no, no.  Everything is on the record.
4      Okay.  Let's go back, though, just to the -- so
5      we're back in 1970.  You told us how this all got
6      started, and the majority of your business at that
7      point was premium arbitrage?
8           A.  Both.  Whenever I --
9           Q.  Both.  You were doing discounts, but you
10     called discounts freaks just a moment ago; right?
11          A.  Right.
12          Q.  So when you spotted a discount opportunity
13     by watching it as you did, did you not immediately,
14     simultaneously, isn't that, you know, buy the stock
15     or short the stock, I should say?
16          A.  Well, you always sort of did what's called
17     legging.  In other words, when you -- you would buy
18     even -- you would always buy the -- if you thought
19     the bond was -- the mark was going to go up and you
20     thought the bond was going to appreciate, the stock
21     was going to appreciate because you know how to do
22     it, you would buy the bond first and then you'd sell
23     the stock later.  You'd sell the stock on the way
24     up.  You know, depending upon which way you thought
25     the market was going to go, that's how you determine

Page 150

1    which piece to buy first.

2         Q.   But --

3         A.   You couldn't normally --

4         Q.   I'm sorry.

5         A.   You couldn't normally go in and buy the

6    bond and short the stock and lock in the profit

7    immediately.  You had to take some degree of risk

8    while you're setting it up.

9         Q.   Isn't the classic definition of a discount

10   arbitrage simultaneous buying and selling?

11        A.   No.

12        Q.   No?

13        A.   I mean, no.  That's not the way it

14   realistically works.  There's always -- I mean, if

15   you could do it that way, that would be fine, but

16   you're totally limiting your --

17        Q.   Profit.

18        A.   You're not only limiting your profit.

19   You're limiting your ability to do it because you --

20   you have to be able to judge the market as well.

21   It's not just a simple of just going in and having a

22   guaranteed locked-in profit because the arbitrageurs

23   would close that up immediately.  In other words,

24   you're competing against these guys.  Obviously, if

25   you can do a trade and have a guaranteed immediate

Page 151

1   profit, that's the most -- that's the most ideal

2   situation; but so you can do that, but even if you

3   could do that, if you really want to be a good

4   trader, you would buy it at a discount, you know.

5           You start -- you buy the bond when it's a

6   discount, but if historically it would always go to

7   a premium, you wait, what's called lifting a leg, in

8   other words, so you have a risk involved and then

9   you'll unwind the transaction.

10          MR. SHEEHAN:  I want to get to that later.

11  I agree with that.

12          MS. CHAITMAN:  I'm sorry to hear that.

13          MR. SHEEHAN:  No.  I agree with what he

14  just said.

15      Q.  (By Mr. Sheehan)  If you hang onto it, that

16  can happen, but isn't -- well, I won't say isn't.

17  What's a fractional share?

18      A.  A fractional share is less than 100 shares.

19      Q.  When does that occur in an arbitrage

20  situation?

21      A.  Not very often.

22      Q.  When you convert the bond, preferred,

23  whatever you're converting, does it not always have

24  a fractional share?

25      A.  Sometimes yes and sometimes no.

Page 152

1          Q.  Do you credit a fractional share or what do
2      you do with it?
3          A.  Yeah.  I mean, if, in fact -- if, in fact,
4      a customer -- depends upon if you're talking about
5      doing it for a customer or doing it for the firm?
6          Q.  I'm talking about a customer here.  Okay.
7      You're now selling this arbitrage strategy to a
8      customer.  You go in.  You buy the arb.  I'm calling
9      it an arb.
10         A.  Right.
11         Q.  And then you short the stock and you do it
12     simultaneously.  And when you do that, you get a
13     fractional share?
14         A.  Yeah.  Typically if customers do a
15     fractional share, you would give them the fractional
16     share.
17         Q.  Do you give them the stock or cash?
18         A.  You could do either, both.
19         Q.  There are actually fractional shares that
20     trade on the exchange?
21         A.  You make a fractional share.  Typically you
22     would give them a cash credit for the fractional
23     share.
24         Q.  Typical, right?
25         A.  Yeah.

Page 153

1          Q.  But more likely cash a fractional share?

2          A.  Yeah.

3          Q.  Okay.  When does that fractional share

4     occur?

5          A.  I don't know when.  I'm not sure.

6          Q.  Let me rephrase it.  Does the fractional

7     share not only occur when you sell the convertible

8     security?

9               MS. CHAITMAN:  Objection to form.

10              THE WITNESS:  Does the fractional share

11    ever occur?

12         Q.  (By Mr. Sheehan)  No.  I said does the

13    fractional share only occur after you sell the

14    convertible security?

15         A.  I'm not sure.  I don't know the answer to

16    that.

17         Q.  Well, if you don't sell the convertible

18    security, there can't be a fractional share; can

19    there?

20         A.  If you don't sell the security?

21         Q.  Yeah.  So I'm not selling the convertible

22    security.  Can there be a fractional share?

23         A.  Probably not.

24         Q.  Okay.  That was my point.  Let me see.  So

25    let's go back to 1970.  Again, you know, you were

Page 154

1    doing -- let me ask you, where were you doing the --

2    and what I mean by this is market making or IA.

3    Where were you initially doing the convertible

4    arbitrage strategy.

5        A.   Where?

6        Q.   Yeah.  Either market making -- where did it

7    start, market making or IA?

8            MS. CHAITMAN:  Objection to form.

9            THE WITNESS:  Objection to form?

10           MR. SHEEHAN:  Yeah.  She can do that, too.

11   She can do that.

12           THE WITNESS:  Oh.  It was one firm.  You

13   know, it was all done -- you know, at that time I

14   was the only one doing it.  It was I was the only

15   trader when I first started, so it was me.  It

16   wasn't -- I didn't have -- David Kugel came in.  You

17   know, I don't remember when he came in, in '70

18   something or other, but the whole firm was me.  I

19   was doing it.

20       Q.   (By Mr. Sheehan)  I know it's one firm, but

21   my point is you had the market making, which is you

22   as a wholesale market maker; right?

23       A.   Right.

24       Q.   Over here you've got your IA business,

25   which is your discretionary trading?

Page 155

1          A.   It was -- but it was all done by me as one

2     firm.  It was always one firm.  It may have been --

3     you know, it was only later on when we had like

4     different departments because the rules required you

5     to have sort of different departments with different

6     compliance procedures and so on and different

7     supervisors, but when I started it was me.

8          Q.   Okay.  Just trying to figure out how this

9     worked.  Okay.  So you used the market making

10    inventory.  I think this is your testimony.  Tell me

11    if I'm wrong.  You used a market making inventory

12    and used that inventory of stock in connection with

13    the convertible arbitrage strategy in the IA

14    business?

15         A.   Correct.

16         Q.   Okay.  So the initial purchase would take

17    place in the IA business -- I mean, the market

18    making business?

19         A.   Yeah, but if I was doing -- it was sort of

20    one and the same.  In other words, I was making a

21    market around the customer security that I had.

22         Q.   Right.

23         A.   It depends upon sometimes if I -- sometimes

24    I would just do the business for the market making

25    for the profit and sometimes I would get a customer

Page 156

1    order and I would do it for the customer.

2         Q.  Right.

3         A.  It depends upon -- you know, it was sort of

4    all mixed in together, but it depends upon what was

5    available.

6         Q.  Well, when you're buying the stock in the

7    market making business and, as you say, you're a

8    market maker.  You have to buy the stock.  I

9    understand how market making works.

10        A.  Well, the firm had a limited amount of

11   capital.

12        Q.  Right.

13        A.  So I could only -- you know, once I used up

14   the capital of the firm, all right, obviously, let's

15   say my capital could have been $20,000 in the firm's

16   capital.  So I could only -- I could only -- once I

17   finished buying -- I used that $20,000 up, you know,

18   if Carl -- let's say if one of my clients gave me

19   $100,000 to trade with, obviously, I would use that

20   hundred thousand dollars for the client to do

21   business.

22            I might do also 20,000 for the firm's

23   capital, but it was -- you know, I'm -- obviously, I

24   was limited to what I can do for the firm.

25        Q.  So Shapiro, just use him.  I know we're not

Page 157

1    supposed to name names --

2          A.   That's all right.

3          Q.   -- but that doesn't apply to me.  It only

4    applies to you.

5               MS. CHAITMAN:  Thank you.

6          Q.   (By Mr. Sheehan)  So anyway -- because I'm

7    not suing the Picowers, so there you go.

8          A.   Doesn't matter.

9          Q.   Can yell at me if she wants.  All right.  I

10   don't know how we're supposed to comply with this.

11   So Carl Shapiro comes to you, gives you a hundred

12   grand, invest it at your discretion --

13         A.   Right.

14         Q.   -- right?  How do you deal with that?  So

15   how would you take that hundred grand and put it

16   into a convertible arbitrage strategy?

17              MS. CHAITMAN:  Objection to form.

18              THE WITNESS:  I would buy whatever was

19   available, you know, for 50,000 or 100,000, whatever

20   was available.

21         Q.   (By Mr. Sheehan)  Of what?

22         A.   In whatever security that I was trading

23   when that was available.

24         Q.   Available in what sense?  As a preferred or

25   as a discounted arbitrage?

Page 158

1              A.  It could be any one of them.  There was

2      no -- it was up to me.  It was usually -- sometimes

3      it would be at a discount since it would be at a

4      premium, sometimes doing a unit, a warrant or a

5      right.  It could be anything.

6              Q.  Would you take that hundred grand and buy

7      that security we just talked about from your market

8      making account?

9              A.  Well, it depends.  You know, if it was --

10     if it was the market making -- if it was trading

11     with the firm's capital, you know, it would be for

12     the market making account.

13             Q.  Right.

14             A.  If I was working a customer order, you

15     know, or with the customer's money, it would go into

16     his account.

17             Q.  Okay.  Were you clearing those trades prior

18     to DTCC yourself?

19             A.  Clearing them myself, yeah.

20             Q.  And how would you do that?

21             A.  Those days the bonds would come in over the

22     window.  It was a physical delivery.

23             Q.  Right.

24             A.  You would pay for it.  And then if it was

25     convertible, typically we would use -- we would have

Page 159

1    the bank convert the security.  We would never

2    convert the security ourselves physically because

3    the convertible -- the clearing agent, the

4    convertible agent may have been in Chicago.  So we

5    weren't going to get our trade until the Chicago.

6         Q.  Right.

7         A.  So we would use one of the banks.  We would

8    take the convertible security, send it over to the

9    bank, give them instructions to convert.

10        Q.  All right.  At the beginning then you have

11   a fairly active box?

12        A.  Everything is relative.  What do you

13   consider active?

14        Q.  Well, with no DTCC and you're

15   self-clearing --

16        A.  No.

17        Q.  -- so you had physical possession of all

18   your securities?

19        A.  That's correct, right.

20        Q.  Right.  So and you used the banks just to

21   -- you know, to exchange as you say when you were

22   buying and selling?

23        A.  Right.

24        Q.  All right.  You didn't use banks as

25   depositories?

Page 160

1          A.   No.   Well, if you were going to convert the

2     security and use the bank to do that, you would send

3     the security over to the bank and let them --

4          Q.   Convert?

5          A.   They would hold it.   They would actually

6     convert it.   What the bank did depends upon what the

7     bank's position was.   The bank may have -- the banks

8     may have been handling other customer accounts also,

9     so they could actually borrow the securities,

10    deliver you the securities.

11              There's all sorts of various, you know,

12    mechanisms of how they would handle it; but in the

13    pure sense the bank would then take the security and

14    deliver it, you know, to whatever method they use to

15    Chicago or whatever it is.

16         Q.   Yeah.

17         A.   You know, they would what they call draft a

18    collection.   And then they would do the conversion,

19    get the stock and they would deliver you the stock

20    and then you would deliver the stock out.

21         Q.   To cover your short?

22         A.   Well, it wouldn't be covering -- yeah.   It

23    would be your fail to deliver.

24         Q.   Right.

25         A.   Right.

Page 161

1        Q.  Okay.  So how many customers did you -- in

2    the IA, I'm calling it IA, in the IA business did

3    you have to start?

4        A.  Probably, you know, let's say 25.

5        Q.  Okay.  By 1980 how big was the IA and how

6    many customers did you have then?

7        A.  Well, I had, you know, the four big clients

8    for sure.  I had European clients in France.  I was

9    dealing business with the Rothchilds with, you know,

10   a number of French big clients.  And then I had my

11   father-in-law had sent up this account, Avellino &

12   Alpern, which was a limited partnership where they

13   had their clients.

14           And they could have had typically probably

15   50 or 60 of their clients in his limited partnership

16   that I traded for that limited partnership.

17       Q.  Avellino & Alpern.  Alpern is your

18   father-in-law?

19       A.  Yeah.

20       Q.  Whose first name is Sam?

21       A.  Saul.

22       Q.  Saul, okay.  And he had an account?

23       A.  Yes.

24       Q.  All right.  Avellino, did he have an

25   account?

Page 162

1          A.  Well, they had -- he didn't have an

2    individual account himself.  I don't recall that he

3    did.  They had it -- they just had this limited

4    partnership account and he was part of it.

5          Q.  What was the nature of the limited

6    partnership, if you know?

7          A.  They had -- they had this -- they had a

8    bunch of their accounts.  They were all sort of, you

9    know, somewhat wealthy individuals that they did the

10   accounting work for.  So they -- they formed a

11   limited partnership.  It was sort of like an

12   investment club where they -- let's say they had

13   $100 million.  It's a round number.

14         Q.  Right.

15         A.  That might have had, you know, fifty

16   clients.  They couldn't have more than 100 clients

17   because the regulations were that in order for you

18   to not be an investment company, you had to have

19   less than 100 clients, which they clearly had -- you

20   know, that was never a problem for them.  So let's

21   say they had 50 or 60 different clients in there.  I

22   would -- I opened up an account.

23              I had an Alpern and Avellino or Avellino

24   and Alpern, whatever it was.  That was the account.

25   I would then treat that as one account, as a limited

Page 163

1    partnership account.  I would buy, you know, various

2    convertible bonds for them.  I would then, you know,

3    send them the confirmation on the transaction.  They

4    would get the -- they would then split that up.

5              If they had 25 or 50 accounts, they would

6    based upon the amount of money that each client had,

7    that would be what percentage each client had of

8    that -- of the limited partnership.  And they would

9    -- they would actually report the individual

10   transactions.  And each client would file his own on

11   his tax return, which Avellino and Alpern would

12   handle for them, being their accountant.

13       Q.  Right.

14       A.  They would show short-term capital gains,

15   you know, on each -- on the transaction.

16       Q.  So from the beginning were you aware that

17   there were all these people behind Avellino and --

18       A.  Oh, yeah, yeah, yeah.  I knew them all.

19       Q.  Okay.

20       A.  That was before Mike Bienes got involved

21   and my father-in-law retired.  And then they went to

22   that.  That's how their problem started.  They

23   made -- he made a decision on his own without even

24   telling me, you know, that they were issuing notes.

25   They decided they would just pay them interest and

Page 164

1    they would, you know, take all the actual

2    transactions themselves.

3         Q.  Let's talk about those notes.  Would those

4    notes guarantee interest to your knowledge?

5         A.  The first time I found out about that was

6    in 1992 when the SEC, you know, told me that they

7    had all of these, that they had a number of -- as

8    far as I knew, they had like I don't remember

9    whether it was three accounts or four accounts.  All

10   different Avellino and Alpern accounts, but they had

11   like maybe three limited partnership accounts, but I

12   wasn't aware of the fact that they were actually

13   issuing notes --

14        Q.  Right.

15        A.  -- you know, to them because I had already

16   told them that you can only have 100 clients in a

17   limited partnership.  Otherwise, you would have to

18   register as a -- as an investment company.  They

19   claim that they thought that they were okay because

20   they were -- although they think they had like maybe

21   300 accounts as it turned out what the SEC said, but

22   they were a lot of family accounts.

23            So they said they were counting each family

24   as one account, even though there could be a

25   son-in-law, a son and so on and so forth.  The SEC

Page 165

1    basically's position was that they said look, as a

2    matter of fact, when they called me up to tell me,

3    they said -- you know, they asked me, you know, I

4    got a phone call from the SEC to say, you know, you

5    have this account, you know, these accounts, these

6    accountants, you know, and they have too much money.

7    They have too much money, too many clients on there.

8    It's an investment company.

9         And I said -- and I told them how I was

10   handling it and they said yeah, okay, that's fine,

11   but these guys are paying notes.  You know, it's

12   different.  So I said, well -- you know, I was upset

13   with them.  I said what the hell?  They never told

14   me.  So when I called them up I said listen, I'm

15   closing these accounts.  I'm sending back the money.

16        The SEC said to me at the time, you know,

17   you don't have to do that.  He said, you know, you

18   can just tell them to register, but I said no.  I

19   don't want to do that.  So, you know, I sent them

20   back all their money, closed their accounts.  As a

21   matter of fact, the SEC when they -- as soon as this

22   happened the SEC came up for the whole examination.

23        They sent up the group chief from New York.

24   They looked at the accounts.  They saw that all the

25   money was there.  They saw that I was actually

Page 166

1    buying the securities because they were able to --

2    they looked at the -- at my stock record.  They

3    looked at DTC.  They saw that I had the securities

4    and so on.  And, you know, I said I'm closing the

5    accounts, and I did.  And I returned all the money.

6    And then I took in the accounts.

7           My father-in-law called me up and he said

8    look, you know, these people are all crazy.  They're

9    sending -- they're hysterical.  You know, they're

10   relying upon the money to live on, these clients.

11   And they said they didn't do anything wrong.  This

12   was all Mike Bienes's stupid -- so I said okay,

13   fine.  I'll open up individual accounts, you know,

14   but I only want like $500,000.  I don't want an

15   account for 50,000 or 75,000.

16           So I said the account -- each account

17   could be 500,000 was the minimum.  I said if they

18   want to take a five -- if they want to form a family

19   partnership, that's fine, but it can only be their

20   family.  I don't want anybody -- I don't want to

21   have more limited partnerships.  So they said fine

22   and that was what we did.  And they opened up a

23   whole bunch of accounts, you know, like a few

24   hundred accounts.

25           Q.  The three partnerships of Avellino and

Page 167

1    Bienes before the SEC, were you guaranteeing a

2    return to them?

3         A.  No, no, no.

4         Q.  Were you trying to predetermine the amount

5    that you would give them?

6         A.  No.  They had -- I told them what the

7    expected return was.  In other words, look, when you

8    did arbitrage, anybody did arbitrage, there was a --

9    you had a what you would consider to be what would

10   be the reasonable rate of return for doing

11   arbitrage.  It's no different than if you do a

12   covered option right, which was like the split

13   strike conversion was.

14        Q.  Right.

15        A.  You know, you're not going to do it for --

16   you know, typically you would do it for double the

17   long bond rate.  So if long bonds and Treasury bonds

18   were playing let's say five percent, you would

19   expect to make like 10 percent return; but, you

20   know, it depends.

21             In 1980, for example, interest rates were

22   12 percent.  So, you know, unless you could do it

23   for 25, 30 percent return, you wouldn't do the

24   trade.

25        Q.  Weren't you asking David Kugel to actually

Page 168

1    look at convertible arb, arbitrage opportunities, to

2    guarantee an outcome?

3         A.  Not -- there wasn't such a thing as a

4    guarantee of return.  It's what you expected to

5    make, called an expect return.

6         Q.  Didn't David Kugel actually look

7    historically backwards to take trades that had

8    already happened --

9         A.  No, no.

10        Q.  -- and manufacture those into guaranteed

11   results?

12        A.  No.

13        Q.  Why would he have testified to that?

14        A.  I have no idea.  I told you that.

15        Q.  Why whatever the Trustee said or did

16   influence David Kugel's testimony?

17        A.  I don't know what happened between the

18   Trustee and David Kugel.  You know, as I said, it

19   was -- you know, I was -- my clients all knew, you

20   know, there was no secret as to what our strategy

21   was or what it was.  It was a very common strategy.

22   It wasn't rocket scientists.

23             So people knew that if you're going to do

24   hedge type of trading, whether it be any one of the

25   different kinds of arbitrage or hedge trading, what

Page 169

1    your return would be.  You wouldn't do it if you

2    didn't make at least double the bond rate.  It

3    wouldn't pay to do it.  So clearly David Kugel knew.

4    All my traders know we're not going to tie up the

5    firm's capital for ourselves or for a client unless

6    we can -- we have a good reason to believe at least

7    our goal was to make double the long bond rate.

8            So depending upon whether the bond rate

9    was -- let's say in 1980, for example, unless I

10   thought I could make, you know, 25 or 30 percent

11   return, you know, I wouldn't -- wouldn't do the

12   trade.  If the interest rates were five percent,

13   then ten percent looked attractive to do it.

14           So if I -- David Kugel or any of my traders

15   knew, you know, don't tie up the firm's capital,

16   don't do a trade for making two or three percent,

17   might as well put your money in bonds.

18       Q.  Right.

19       A.  So, you know, David Kugel knew even if he's

20   trading for his own account, if David Kugel or any

21   of the traders came to me and said, well, okay, I'm

22   tieing up the firm's capital and I'm making five

23   percent return, I'd say what are you?  Crazy?  I

24   mean, you know, we didn't do that.  As a matter of

25   fact, we used to send our client, we had what they

Page 170

1    call a portfolio evaluation report where we would --

2    a customer -- would send them when we were doing

3    arbitrage what the expected return was, what their

4    actual return or how much was their over and under.

5    You must have seen that these reports, they were

6    part of our records that were generated.

7            You saw that we said expected return, over

8    and under return and so on and so forth.  And

9    depending upon the strategy and what you wanted to

10   do, that's what you made.  So all of our -- when

11   people came to do arbitrage for us, it was always

12   from day one that the return was going to be -- that

13   the goal was to make double the long bond rate.

14        Q.  How could you guarantee that?

15        A.  We didn't guarantee it.  It's what we

16   expected.  We didn't guarantee anybody.

17        Q.  Did you ever not do it?

18        A.  Of course.  What do you mean did we ever

19   not do it?

20        Q.  Did you ever not do what you expected?

21        A.  Sure, at times.

22        Q.  So if we go through your records, you will

23   have losing periods of time?

24        A.  Look, let me -- I see where you're going.

25   Let me -- let me tell you something.  Let me give

Page 171

1    you an example; okay?

2        Q.   Yeah.

3        A.   When --

4            MR. SHEEHAN:  Are you okay?

5            MS. CHAITMAN:   Yeah.

6            MR. SHEEHAN:  All right.

7            THE WITNESS:  When we were doing --

8    because nothing I'm telling you is not something

9    that was widely known and was given to reporters, to

10   people that wrote the books and so on.  Nothing in

11   Madoff is really a mystery.  All right.  When we did

12   -- the only mystery was that we weren't actually

13   doing the trades, but our strategy was always very

14   clear.

15           So I'm going to tell you an example, give

16   you an example of one.  The chairman of UBS, Union

17   Bank of Switzerland, one of the world's great Nazis

18   if you ever met him --

19           MR. SHEEHAN:  I did.

20           THE WITNESS:  -- came up to my office.

21   All right.  And because when we were doing the split

22   strike trades, all right, everyone said, well,

23   listen, you know, Madoff is making double -- he's

24   making -- you know, you know, he's making like a

25   12 percent return, which in those days, you know,

Page 172

1    was a very good return.  And the guy never has -- he

2    very rarely has a losing quarter, okay, which was

3    true.  He very rarely had a losing quarter.

4            And he would say, well, how the hell do

5    you always -- you know, how does that happen?  I

6    said wait a minute.  You understand that -- you

7    understand how the transaction works.  And now

8    literally the Chairman of Union Bank of Switzerland

9    in my office and chairman of almost most of these

10   banks along with the guys that ran their trading

11   desk because when they were doing the due diligence,

12   everyone wanted it figured out.  Madoff can't be

13   this smart, so what is the strategy, you know?

14   Explain it to me.

15           So I'd say okay, fine.  And I would, you

16   know, show them what the strategy was, very vanilla

17   covered right with a quick wrapper.  So that was

18   something that we sort of started, but everyone

19   understood what it was.  They said -- I said and,

20   all right, so you understand that your loss is going

21   to be limited because the put is going to kick in.

22           So your loss is limited basically to one

23   or two percent on each trade and your profit is

24   typically, let's say, three percent.  So you have a

25   two-to-one sort of ratio, all right, but you

Page 173

1    definitely from the day we start the trade, you

2    definitely can lose.  If the market goes against us

3    and we're guessing wrong, we're going to lose one or

4    two percent.  If we're right, we're going to make

5    three percent.

6              You're never going to make really more

7    than that because then you're going to be called

8    away.  Then that was the strategy.  So let's say one

9    percent loss, three percent, and everyone understood

10   that.  We said okay.  Now, typically the strategy is

11   like a three-month strategy because of the 90-day

12   options and so on and so forth.

13             We said so if you look at, you know, over

14   the course of a year, maybe we'll have three or four

15   losing quarters and the rest of it, you know, we

16   have gains, which everybody said, well, that's still

17   pretty good, you know.  And we said you understand

18   the reason why you don't -- that the whole -- the

19   key to the strategy is that you're never forced to

20   liquidate the strategy even -- you're going to be

21   wrong.

22             We're going to set it up and we think the

23   market is going to go up.  We may be wrong.  You

24   know, two days after we set the strategy up, the

25   market may go against us and we may have a loss, but

Page 174

1    we don't have to sell it out because we have the

2    put.  Until the put expires we can keep the trade

3    open, waiting for the market to reverse and go up.

4    If the market goes up, then we're fine and we're

5    going to make a profit.

6            If the market doesn't go up and continues

7    to go down, we're going to have a loss; but the big

8    key is you're not forced to sell prematurely unless

9    it happens within three months.

10        Q.  Can I ask you a question?

11        A.  Yeah.

12        Q.  Didn't all your puts expire?

13        A.  Huh?

14        Q.  Didn't all your puts expire?

15        A.  Eventually.  Eventually they expired.

16        Q.  Because you never lost?

17        A.  No.  What do you mean never?  Wait a

18    minute, wait a minute.  Let me finish.

19        Q.  Then you never lose?

20        A.  Yes, of course, we lost.

21        Q.  But you -- all your puts expired.  Saul

22    Katz said to me that he asked you one time why are

23    we buying puts, because we never lose.  Do you

24    remember that?

25        A.  Oh, a lot of my traders would say let's not

Page 175

1    buy the puts because why are we going to pay the

2    premium on the puts?

3         Q.   Yeah.

4         A.   And I would say because that the key to the

5    strategy is to be able to limit your loss.

6         Q.   Right.

7         A.   You know, you're not forced to sell.

8         Q.   So we're on the split strike now, and I

9    want to go back to convertible arb, but just one

10   thing.  Isn't split strike strategy, which is

11   common, it's not unknown, a conservative strategy?

12        A.   Yes.

13        Q.   Right.  And you don't expect big returns

14   from that; do you?

15        A.   No.

16        Q.   Because you capture --

17        A.   Right.

18        Q.   Yeah, okay.

19        A.   So let me finish --

20        Q.   Sure.

21        A.   -- the story; okay?

22        Q.   Didn't mean to cut you off.

23        A.   When they said -- you know, I said did you

24   ever look at the strategy, you know, on a day-to-day

25   basis and see what happened?  So the guy said, well,

Page 176

1    no.  I'm only looking at it, you know, over the

2    course of a year or the course of months.  And I

3    noticed that over the course of a year we had three

4    losing quarters, we had one losing quarter or we had

5    one losing month.

6              MR. SHEEHAN:  Bless you.

7              THE WITNESS:  Really, we had very few

8    losing quarters, but we did have losing months I

9    said if we close the trade out.  So I said let me

10   show you -- let me show you a chart that shows you

11   what the strategy did on a daily basis.  And they

12   would look and they would see that they had the

13   strategy set up for 90 days, but it could be ten

14   days where we actually had a loss had we closed it

15   out.

16             So if I was forced to close it out because

17   the option was going to expire, the put was going to

18   expire or not, I said there are lots of -- I said if

19   you look at the trade, you would see that this --

20   you would see it looks like this.  Okay.  Now, we

21   would only close it out hopefully when we had it

22   here, but if we closed it out when we were not here,

23   we'd have a loss.

24        Q.   Right.

25        A.   So then he said ah.  So there are loss --

Page 177

1   there would be loss trades.  If they called me up

2   and said to me I want my money back, close out the

3   strategy, which no one -- very rarely did anyone do

4   that except in 2008 when people were getting margin

5   calls all over the place; but before that nobody

6   ever called up and said sell it out because I would

7   then say to them, listen, if you force me to sell it

8   out, I'll sell it out.  I'm sending your money back.

9   Don't come back.  Okay.

10          Q.  I want to go back to the -- but I want

11   to --

12          A.  And let me just tell you one other thing.

13          Q.  Sure.

14          A.  You've heard of Jim Simons; right?

15          Q.  Of course.

16          A.  Okay.  Now, I handled Jim's private

17   account, his foundation account.

18          Q.  Yeah.

19          A.  Now, when Jim Simons, who's probably one of

20   the smartest traders on Wall Street today, all

21   right, you know, called me up and he said to me,

22   look, he said, Bernie, he said you know what?  He

23   said I'd like you to handle all of Renaissance

24   business as a dealer.  Your market -- I want your

25   market makers to trade because we're sending our

Page 178

1    business down on the floor of the exchange of the

2    two Bear Stearns and, you know, they're clipping us

3    left and right on commissions and so on.  So Madoff

4    has the fastest execution in the industry.  I'm

5    going to let you do our business.

6              So I said really, Jim, I don't want your

7    business because your traders are too good.  So I

8    don't really want Renaissance business.  So he said

9    come on, come on.  We'll give you the good business.

10   I said don't tell me you'll give me the good

11   business.  You aren't giving me all your business

12   and I don't want my traders competing against yours

13   because we're going to lose money.

14             So he convinced me.  He said look, just

15   take it, you know, but also I also want you do my --

16   handle my foundation personal account.  So he set up

17   an account, I don't remember, that was two million,

18   ten million.  I don't remember it anymore.  You

19   know, it wasn't a big account, but let's say I think

20   it was in the neighborhood of 10 or $20 million.

21             So he understood as every one of my

22   clients understood the transaction.  They saw it

23   because they got the confirmations.  They saw what

24   was buying and selling.  They had the ability to see

25   whether or not the trades could be done or couldn't

Page 179

1    be done, and they -- so they saw the trade and the

2    trade made sense.  If you'll remember going back

3    when you came down to visit me, I said to you when

4    you told me we're going to sue all these funds and

5    this, I said do yourself a favor.

6            If you think -- if you're going to believe

7    Harry Markopolos, who's one of the big idiots in our

8    industry, the great whistleblower, and believe him

9    that this strategy did not make any sense and if

10   you're going to say the reason your funds should

11   close out, you know, should have noticed a red flag,

12   don't say the strategy didn't make sense because I'm

13   telling you we had virtually every important trader

14   on Wall Street and the chairman of every firm had a

15   client -- had accounts with Madoff.

16           They knew the transaction made sense to do

17   it.  They knew what my advantage was of being a

18   market maker and doing all this volume.

19       Q.  But they also knew you weren't doing split

20   strike; isn't that true?

21       A.  No.

22       Q.  Didn't they all know you weren't doing

23   split strike?

24       A.  No, no.

25       Q.  They knew you were telling them that?

Page 180

1          A.   No.  And if you believe that anybody

2     thought that I would -- why would anybody give me

3     money thinking that I was committing a fraud?

4          Q.   Why did Jim Simon take his money out?

5          A.   Because I'll tell you why Jim Simons --

6     because Jim --

7          Q.   You know, he's testified so I have sworn

8     testimony of why he did, so let's hear what you

9     think.

10         A.   Yeah.  I know why.  I'll tell you why he's

11    closing money out.  Because he had -- he got wind

12    that the SEC was investigating me because they were

13    investigating him.  What happened was the SEC was

14    investigating all of the hedge funds, had nothing to

15    do with Madoff.  All right.

16              And the -- and Jim Simons, you know, was

17    getting -- had an inquiry about his firm.  All

18    right.  And one of the things was Madoff, was doing

19    business with Madoff.  So Jim Simons knew that the

20    SEC was questioning me and, therefore, he wanted to

21    close out the transactions.

22              He had no idea that I wasn't doing the

23    trades because -- and none of them did.  I don't

24    care what anybody says now.  Well, I always knew.

25    Believe me, none of these guys would have done --

Page 181

1      they're not crazy.  Why would they want to be giving

2      money to a firm that was committing a fraud?  They

3      didn't know.  Now, there were some firms that didn't

4      care whether I shorted the stock to them.

5               As a matter of fact, as I -- as I told

6      people, all right, I got a call from Switzerland

7      once.  This was -- I don't remember what year it

8      was.

9          Q.  I think we're drifting from Jim Simons, but

10     you're going to connect that up or --

11         A.  No, no.

12         Q.  Okay.

13         A.  This was from -- I get a call from

14     Switzerland from one of the hedge fund managers in

15     Switzerland and he says hey, Bernie, you know what?

16     He said there's a rumor going around Switzerland

17     that the reason that you are -- you're able to do

18     these trades so successfully, which I never

19     considered being so successful, was that you're

20     front running -- you're front running all your --

21     your market making orders, which, by the way, that's

22     what Markopolos told the SEC.

23               You know, because, obviously, you know,

24     if, in fact, I was front running the orders, you

25     know, that would be a great thing.  It would have

Page 182

1    been, unfortunately, illegal and very easy to check

2    whether anybody is front running.  And believe me, I

3    know that because I know what the rules are in the

4    industry.  And when Markopolos went to the SEC and

5    said you're front running, the SEC said Bernie

6    wouldn't be front running.

7              So when they -- when they looked at it and

8    they looked at all the information, they said no,

9    no, this guy is not front running.  And the reason I

10   wasn't front running, because I wasn't doing the

11   orders.  So, of course, I wasn't front running

12   because I wasn't actually doing the trades.  So the

13   SEC looked at that.  They didn't know who was doing

14   the trades, but they knew I wasn't front running.

15   Now, let me finish.  Switzerland thought I was front

16   running.

17        Q.   I've been very good here.

18        A.   You know what they said, front running?

19   They said if you're front running, that's great

20   because front running isn't illegal in Switzerland.

21   We don't care if you're front running.  If the SEC

22   closes you down for an SEC violation, so you'll give

23   us our money back.  We're happy.  That's not our

24   problem.

25        Q.   I'm aware of that.

Page 183

1          A.   And I said I'm not front running.  I wasn't

2     front running because I wasn't doing the trades.

3          Q.   Right.  And the reason you were always

4     successful is you were using yesterday's newspapers;

5     correct?  You weren't actually trading, so you made

6     those trades based on yesterday's newspapers?

7          A.   When I wasn't doing the trades, yes.

8          Q.   Yes.

9          A.   Yeah.  That's no secret.  I said that.

10         Q.   So, therefore, no one, including Jamie

11    Simon, could replicate that; could he?

12         A.   He could have if he was a market maker,

13    yeah.

14         Q.   How could he do it without yesterday's

15    newspaper?

16         A.   Let me ask you, don't you think that

17    they -- that they knew that I -- don't you think

18    that they originally thought that I was doing the

19    trades?  Do you really believe that anybody gave me

20    money and knew that I was committing a fraud?

21         Q.   People do it every day, Bernie.

22         A.   Not these guys.

23         Q.   All right.  People do it every day.

24         A.   Not these guys.  Don't believe that, David.

25              MS. CHAITMAN:  Is that what Simons

Page 184

1   testified to?

2           MR. SHEEHAN:   Simons testified he couldn't

3   replicate what you were doing and got out.

4           THE WITNESS:   Yeah.

5           MR. SHEEHAN:   That's what he said.

6           THE WITNESS:   Yeah, but do you know why he

7   couldn't?  Because he wasn't a market making firm.

8   He wasn't doing the volumes that we were doing.

9   That's why he couldn't do it.

10          Q.   (By Mr. Sheehan)  I mean, yours was all

11  fictitious?

12          A.   Wait a minute.  It was fictitious because

13  -- all right.  Let me --

14          Q.   It never happened.

15          A.   Since you want to know this.

16          Q.   No, no.  Let's go back.  We've got all day

17  tomorrow to talk about this.

18          A.   Okay.

19          Q.   I want to get back to the early '80s.  All

20  right?

21          A.   But let me just finish.  Let me explain

22  something to you.

23          Q.   All right.  Go right ahead.  I won't cut

24  you off.

25          A.   Okay.

Page 185

1          Q.  I won't cut you off.

2          A.  The people always wanted to know how much

3     volume I was doing.  Okay.  That was the big secret.

4     How much money is Bernie Madoff doing?  Okay.  And

5     typically they thought that I was doing $20 million,

6     $20 billion.

7          Q.  Billion, yeah.

8          A.  That was the -- that was the consensus.  I

9     was doing 20 billion; okay?

10         Q.  Yeah.

11         A.  So it was about 20 billion because that --

12    because when I filed an ADV report, the most I

13    showed was 16 billion.

14         Q.  Right.

15         A.  All right.  But so they thought that it was

16    20 billion, but let's say it was when they finally

17    got the ADV report in 2006, it showed 16 billion.

18    So everybody said, well, 16 billion, that's a lot of

19    money; but this is -- how does Bernie Madoff do the

20    trades?

21            Okay.  Number one, typically he never had

22    more than 50 percent of the money invested.

23    Fifty percent was in T bills, 50 percent was in the

24    marketplace.  Sometimes it was 100 percent, but it

25    most of the time was not 100 percent, but let's

Page 186

1    assume it takes 16 billion.  Let's assume I invested

2    16 billion at the most, which is what they thought.

3    Okay.  The $16 billion was invested over a period of

4    four days, you know.  So, you know, it's 4 billion a

5    day, all right, at most, was 4 billion or 2 billion

6    depending upon how you want to look at it.

7         Q.  Without an ounce of volatility?

8         A.  Huh?

9         Q.  No volatility?

10        A.  Four billion dollars, for me to invest $4

11   billion when you're doing 10 percent of the volume

12   of the business is nothing.  So the people that --

13   believe me, everything that you're saying, when guys

14   first came in, everybody figured, well, this guy

15   must have -- must be doing something wrong because

16   how could he possibly be making this profit?  All

17   right.  So then I -- but I heard that all from day

18   one when I was doing the trades, you know.

19        Q.  In the '80s?

20        A.  No.  I wasn't doing this in the '80s.

21        Q.  You said you were doing the trades?

22        A.  You're doing convertible bonds.

23        Q.  Right.

24        A.  I wasn't doing split strike.

25        Q.  Right.

Page 187

1          A.   I'm talking about when I was doing

2     convertible bond trades, I wasn't doing it for

3     funds.  I was doing it for -- just for my clients,

4     and that was no big deal for me to do that.  I mean,

5     you're not -- now, you can sit here and say that I

6     never did the convertible bond trades because

7     that -- I wasn't doing the convertible bonds trades

8     to be a problem at all.

9               I mean, I was the largest convertible bond

10    trader in Wall Street at that time.  Nobody thinks

11    that I was -- I wasn't managing that much money in

12    convertible bond trades even with the four big

13    clients because I wasn't doing convertible bonds for

14    them in 1980.

15         Q.   When did the big four start the margin

16    accounts?

17         A.   What happened was I was doing the big four

18    accounts when I started doing business for them.

19    I've been doing -- it started in the '70s.  Someone

20    like Levy came in in the '90s and so on, and so but

21    let's assume I started doing it let's say in the

22    '80s when I was doing it.  All right.  And everybody

23    was doing convertible bond trades.  And in those

24    days they were making, you know, 25, 35 percent.  It

25    was no big deal to do that.

Page 188

1          Q.  All through the '80s, I just want to be

2     clear, the big four did convertible bond?  They

3     didn't do different strategies besides that?

4          A.  No.  Because what happened was --

5          Q.  Okay.

6          A.  -- you know, you know, in 1980, before that

7     up to 1980 I was doing convertible bonds with them.

8     All right.  The four big accounts were doing

9     convertible bonds.  And what happened was in 1980

10    they came to me.  They were doing straddles.

11    Everybody that was doing short-term trading in Wall

12    Street was hedging their trades using commodity

13    straddles.

14         Q.  Right.

15         A.  You remember, you know what commodity

16    straddles, silver straddles?

17         Q.  Yeah, of course.

18         A.  Okay.  So they were doing silver straddles

19    through Bear Stearns and through E. F. Hutton and so

20    on.

21         Q.  The big four?

22         A.  Big four.  All right.  They were hedging

23    because the arbitrage was all short-term capital

24    gains.  So they were making short-term capital gains

25    making, you know, nice returns; but they -- you

Page 189

1    know, tax rates, you know, were 80-some odd percent,

2    you know.  So they -- they were using the silver

3    straddles to hedge themselves.  And that was fine

4    until the IRS started challenging the silver

5    straddles saying that there was no risk.  These were

6    sham transactions and so on.

7         Q.  Right.

8         A.  And they were doing them through -- we

9    didn't do that business, but I was doing it for

10   these clients.  I had recommended them to Bear

11   Stearns and Carl Shapiro had a son-in-law at E. F.

12   Hutton, so they were doing the straddles.

13            So in 1980 they came to me and they said

14   look, you know, Bernie, isn't there anything we can

15   make long-term capital gains, you know, because the

16   short-term, the arbitrage, the profits are great,

17   but the tax rates are killing us.  And now we can't

18   use the straddles because the IRS is challenging the

19   commodity straddles for us.

20            So what can you do to generate long-term

21   gains?  So I said wait a minute.  Look, forget about

22   the real estate shelters because that was being

23   charged -- that was being -- that was being

24   threatened.  Picower was doing the leasing things.

25   He had his leasing companies, cockamamie thing that

Page 190

1   he was doing.  You know, everybody had their -- you

2   know, was doing something.  All right.  So they came

3   to me.  Can you do -- what can you do to generate

4   long-term gains?  I said the only thing you can do

5   for long-term gains is actually to put on long-term

6   positions, not do the arbitrage.

7           You can just -- you've got to buy

8   portfolio of stocks, but in order for that to work,

9   the market has to go up.  And I can't tell you

10  whether the market is going to go up, you know,

11  from, you know, 1980.

12      Q.  Right.

13      A.  I said so you want to -- you know, that's

14  the only thing that's available.  I don't want to do

15  any real estate tax shelters.  I don't want you to

16  do any silver straddles anymore.  You know, this is

17  the only game in town if you want to do that; but,

18  you know, I don't know if the market is going to go

19  up.  I said I can put together a portfolio of

20  stocks, a diversified portfolio.  I happened to like

21  the market, you know, in 1980, but there's no

22  guarantee.

23          And, you know, so I don't know what to

24  tell you.  So they said, well, can't you hedge it?

25  You're supposed to be the great hedger.  Can't you

Page 191

1   hedge it?  I said yeah.  You can hedge it.  There

2   are certain ways you can do it.  You can go short

3   against the box.  You know, you can do, you know,

4   pairs trading; but, again, you have to hold them for

5   a one-year period.  That was the holding period.

6        So I, you know, explained to them all this

7   stuff and I said and there's no guarantee.  You want

8   to do it, but, you know, it's better than nothing if

9   you want to do it.  So they said fine.  Let's do

10  that, you know.  So I said so all right.  Now,

11  coincidentally at the same time they were doing

12  that, I was doing a hedging strategy for a group of

13  European investors.

14        Q.  I remember you telling this already.

15        A.  Yeah.  So they as it turned out, it would

16  have been -- they would have been a great

17  counterparty for these other traders because they

18  were doing the hedging strategy.  As I explained to

19  you, they had to be in -- they had to be in U.S.

20  securities in order to hedge the French franc and so

21  on and so forth.  So, you know, I said to them okay,

22  look, this is the deal.

23        I can set up portfolios or strategies for

24  you guys for the big four.  I said I have

25  counterparties that supply the liquidity to you on

Page 192

1     the other side, put you guys together.  The only

2     problem is you have to all understand that you can't

3     unwind these strategies prematurely because these

4     guys, you know, you're going to screw them up.  So

5     if you're going to unwind, you both have to be

6     agreed to unwind at the same time.

7              So Shapiro and the rest of these guys, you

8     know, Picower, said okay, fine.  It's a risk, but

9     it's better than what we were doing anyhow.  We have

10    no other choice, so let's do it.  So I put the

11    portfolio on for the four big clients, which is not

12    difficult to do.

13         Q.  When did you do that?

14         A.  1980 I started doing that with them.

15         Q.  Okay.

16         A.  I put the portfolio on for them.  You know,

17    the portfolio and the French guys were doing it.

18    Their side was great.  It was fine.  And the market,

19    of course, started to march up from 1980 to 1987.

20    Everything was going along fine.  And, of course, my

21    four big clients, being the greedy people that they

22    were, never wanted to close out the transaction.

23              They wanted to keep rolling it, which is

24    very typical because everybody -- nobody wanted to

25    close out the money.  They just -- let's roll it,

Page 193

1    you know, just keep rolling it and because why

2    should I pay the tax?  Why do I have to pay the tax

3    money?  The rate was still, you know, even on those

4    long-term gains were better than short-term gains.

5             They didn't even want to pay that, so but

6    the market accommodated everybody.  So from 1980 to

7    1987 everybody was making a lot of money doing this

8    strategy and everything was fine.  Comes the crash

9    in 1987.  The shit hit the fan or forget about

10   repeating that, you know, and these -- my four big

11   clients said holy cow.  We've now, you know, had

12   seven years of long-term gains.

13            You know, we're going to get killed.

14   We're going to give all that up with the market

15   going down.  I said relax.  Don't worry about it.

16   The market eventually will turn, I said, and you

17   guys made a commitment to us.  We have this

18   commitment to, you know, to the French people.  And

19   I'm not going to unwind.  I can't unwind them, you

20   know.

21            So these guys -- that's when they started

22   to hold on.  They said close out the -- sell the

23   longs, don't worry about the shorts.  The market is

24   going to go -- continue to go down.  We're not

25   worried about it.  We'll hold you harmless for any

Page 194

1    losses.

2              MR. SHEEHAN:  Okay.  You want to take two

3    minutes?  I thought you would.

4              THE COURT REPORTER:  Yes.

5              MR. SHEEHAN:  All right.  I know we have

6    to leave soon, but I --

7              MS. CHAITMAN:  Yeah.  No.  Whatever you

8    want, yeah.

9              MR. SHEEHAN:  I don't want this young lady

10   to have her hands fall off because when you get on a

11   roll, Bernie.

12             THE VIDEOGRAPHER:  Going off the record.

13   The time is 2:14 p.m.

14             (A recess was taken.)

15             THE VIDEOGRAPHER:  Back on the record.

16   This beginning disc number four.  The time is

17   2:25 p.m.

18        Q.  (By Mr. Sheehan)  Do you recall when you

19   started using DTC?

20        A.  No.

21        Q.  Would it help if I called it NSCC instead?

22        A.  What year?  Certainly before DTC because,

23   you know, I don't remember the year.  It's in the

24   report somewhere.

25        Q.  Right.  Early '80s?  That work for you?

Page 195

1          A.   Yes, yeah.

2          Q.   Early '80s.  We'll work with that.

3          A.   Yeah, because I was -- I was chairman of

4     NSCC 1984 through 1987, so --

5          Q.   Right.  At that point you're still

6     obviously -- were your stocks then on deposit at

7     NSCC?

8          A.   No.  NSCC didn't hold.  They weren't a

9     depository.

10         Q.   Okay.  What function did they perform?

11         A.   Just the clearing and settlement, the

12    settlement, money settlement, the netting.  So

13    securities weren't delivered there.

14         Q.   Uh-huh, okay.  So were you still holding

15    your securities physically at that point?

16         A.   Yeah.  We were holding them physically or

17    down at the banks.

18         Q.   Uh-huh, okay.  Where were you located in

19    the early '80s?

20         A.   110 Wall Street probably.  We moved up in

21    sometime in the mid-'80s, I think, to 110 Wall -- I

22    mean, to 885 3rd.

23         Q.   Okay.  I wanted to clarify something else,

24    too.  You talked earlier about DTCC; right?  You had

25    a -- the account there was 646?

Page 196

1        A.   Yes.

2        Q.   Did you have any other account?

3        A.   No.

4        Q.   Okay.  You talked about all your stocks

5   would be there except for bank loans.  Do you

6   remember that?

7        A.   Right.

8        Q.   All right.  Would not the fact that there

9   was a bank loan with regard to certain stocks also

10   show in your account?

11        A.   There would be a what?

12        Q.   If you had a stock loan?

13        A.   Right.

14        Q.   All right.  To the bank and the bank,

15   therefore, had your stocks pledged --

16        A.   At DTC.

17        Q.   Yeah, DTC.  It would also show in your

18   account that you had so pledged those stocks; would

19   it not?

20        A.   Yes, probably.

21        Q.   Okay.  Could you pledge customer stocks?

22        A.   Could we?

23        Q.   Could you?

24        A.   Yeah.

25        Q.   You could use that for stock loan purposes?

Page 197

1           A.   Yes.

2           Q.   Okay.

3           A.   Either at -- it depends upon whether we did

4      it at DTC or we did it at our banks, at one of the

5      banks.

6           Q.   Okay.  So let's go back to the 1980s and

7      the long strategy that you started --

8           A.   Right.

9           Q.   -- for the big four.  The big four at the

10     same time, were they still doing convertible arb --

11          A.   No.

12          Q.   -- at that point?

13          A.   They were -- some of -- I think Stanley

14     Chase was doing it for some of his accounts.  He was

15     doing -- he was still doing convertible bonds.  Oh,

16     in 1980 you're talking about?

17          Q.   In the '80s when you started the long

18     strategy.

19          A.   In the '80s.  He may have been doing it.

20     They may have been doing it for some of their

21     accounts, some of their family accounts, you know,

22     the kids' accounts and so on.

23          Q.   Yeah.  Would you say the majority of your

24     convertible arbitrage strategy in the '80s was

25     premium trading?

Page 198

1           A.   I don't know.  Probably, probably.

2           Q.   Okay.  And how many customers?  You know,

3      let's count Avellino and Bienes as one.

4           A.   Right.

5           Q.   And then you've got the big four.  That's

6      five.  How many more customers did you have up to

7      1987?  I know that's hard, but just your best

8      thought on that.

9           A.   My brain is a little fried to begin with --

10          Q.   Yeah.

11          A.   -- so but I don't know.  Probably I would

12     say no more than 50, I would say.  I'm guessing.

13          Q.   Okay.  So in 1987 there's a crash and

14     you've testified to this.  I'm not going to repeat

15     it.  You may, but I'm not going to; but seriously,

16     why did you feel compelled to cover those shorts?

17          A.   Which shorts?

18          Q.   Well, when you were saying you would cover

19     the short positions of the big four and they

20     indemnified you, they were big boys.  Why wouldn't

21     you just say to them hey, you're in the game?

22          A.   Do you know how many times I ask myself

23     that now?

24          Q.   Yeah.

25          A.   I mean, look, I'm not proud that I did what

Page 199

1    I did, you know.  I spent a lot of hours with a

2    psychologist here trying to analyze why I did what I

3    did or I -- I had a -- a very special relationship

4    with the big four clients, all right, particularly,

5    you know, with Carl Shapiro and Norman Levy and Stan

6    Chase.

7            Picower was a little bit different, but

8    look, one of my problems was I always wanted to

9    please everybody.  You know, that was my thing

10   forgetting about whether it was my -- you know,

11   whether, you know --

12       Q.  But this was a billion dollars, a billion

13   dollars that you were going to go at risk for?

14       A.  Well, I was -- I had very special

15   relationships with the people in France.  I had a

16   special relationship with Shapiro, and I had given

17   my word.  You know, something about the securities

18   business, you know, the -- we -- everybody did

19   business on trust.

20           I know it sounds strange coming from me,

21   all right, but when I went into business the first

22   thing I learned from both Cy Lewis and Gus Levy is

23   they said to me, Bernie, whatever you do, you know,

24   in this business, never break your word because

25   there was no such thing as written contracts in the

Page 200

1    securities industry.  When everybody called you up

2    and said I want to sell -- when Merrill Lynch called

3    you and said I'm selling you a thousand shares of

4    IBM or a thousand shares of Intel, there was no

5    contract.

6              You did the trade over the phone.  You

7    waited until you got your confirmation, which may

8    have been, you know, two days later or it may have

9    been five days later, and you waited and you assumed

10   that they were going to deliver on time.  And if

11   they didn't, you were screwed.  There was no written

12   contract.

13             And in 50 years that I was in business, I

14   never, ever had anyone not honor their contract.

15   You never thought about it.  It was something that,

16   you know, if you're in this industry, your word was

17   your bond literally and that was it.  You trusted

18   everybody.  And that's the way the industry operated

19   and for the most part still operates that way today

20   but not as much.

21             All right.  So when I started doing

22   business with all my clients, I was a little guy

23   with nothing.  No one had any reason -- and Carl

24   Shapiro always tells this story famously.  When he

25   gave me $100,000, people thought he was crazy.  Why

Page 201

1    would anybody give me?  I was this little kid from

2    Brooklyn, didn't go to Harvard or so on.  Why would

3    anybody trust me to give me business, you know, turn

4    their money over to me on a discretionary basis

5    basically and, you know, and go with it?

6              All right.  They did.  And because they

7    showed -- he showed faith in me and guys like Levy

8    and so on did, all right, I felt obligated to keep

9    my word.  And it was the same thing when I did

10   business in Europe, you know.  People showed a lot

11   of faith in me.  Now, I made them a lot of money.

12   They weren't doing it, you know, as a philanthropy,

13   but there was a special relationship I had with

14   them.

15             And all of these clients, I was like a son

16   to them and they were like surrogate fathers to me.

17   All right.  So when the crash came in '87 -- and

18   also I had went from nothing.  You know, I started

19   my business with literally $500, you know.  You

20   know, all of a sudden, you know, by '87 I was a rich

21   guy.

22             At least I thought I was very successful

23   and everybody in the industry thought I was like,

24   you know, this terrific, terrific success story,

25   which I was.  All right.  So when the crash came in

Page 202

1      '87 and these guys panicked on me, which is not a

2      surprise in hindsight because the one thing every

3      one of them was, which is everybody in the industry

4      is, they're greedy.  All right.  So they all

5      panicked.  They didn't want to give up their returns

6      and I made the mistake.  What I should have said to

7      them was look, this is the agreements you have.

8              Now, could I have sued them?  There was no

9      -- there was no written contract, all right, when we

10     made these agreements to, you know, to not unwind,

11     you know, prematurely.  This was all, you know,

12     arm's length agreements.  These were not -- there

13     were no contracts in that.  So I didn't have the

14     right to litigate with Carl Shapiro and Jeff Picower

15     and say listen, you can't sell.

16             You know, if they wanted to sell

17     regardless of whether they were short, I could have

18     said no, you've got to sell.  I could have said

19     cover your shorts, too, in other words, but I

20     didn't.  All right.

21         Q.  That was my question.  Why didn't you tell

22     them cover your own shorts?

23         A.  Because they said to me -- after we argued

24     and argued for days, everybody says don't panic.

25     Now, you have to understand also that everybody that

Page 203

1    was trading convertible bonds through me when the

2    crash came in '87, they had a windfall because every

3    convertible bond went to premiums.  So the guys that

4    were doing convertible bonds, they thought I was a

5    goddamned codified genius because the market

6    crashed, but all convertible bonds, you know, which

7    you would expect them to do, went to premiums.

8           These guys weren't doing convertible bonds

9    except for some of their accounts, as I said, so

10   they didn't -- you know, everybody said -- I said

11   now, look, don't panic.  The market will go up.  We

12   knew Reliant went down because of the United

13   Airlines bust and the merger and so on.  You know,

14   they didn't want to.  They just said look, let's

15   sell and get out of it.

16          All right.  I didn't -- I couldn't force

17   them to cover the shorts because I had the

18   Europeans, the French guys on the other side of the

19   trades.  I couldn't close them out prematurely.  So

20   that's why I didn't unwind.

21          So and then they said to me, look, as much

22   as I -- all I can use is moral-suasion.  And they

23   didn't want to screw me either generally because,

24   number one, we had a close, family-type

25   relationship.  And also I made them a lot of money.

Page 204

1    They didn't want to kill the goose that laid the

2    golden egg.  And they were so sure that the market

3    was -- the shorts were not going to be a problem.

4    So they said fine.  We'll hold you harmless.  Close

5    out, sell the longs out so we get the advantage of

6    the long-term gains.

7            Let's not worry about the shorts.  We'll

8    take responsibility of the shorts because I said all

9    right, the market eventually is recovered.  You're

10   going to lose money on the shorts.  They said we're

11   not worried about it.  That's why.  In hindsight now

12   it looks like a stupid thing to do and it was.

13       Q.  You know, we've looked everywhere.  Ellen

14   has actually asked us for the hold harmless

15   agreements.  We can't find them.  Would Price

16   Waterhouse Cooper as you mentioned have yours?  The

17   likelihood, it's a long time ago so when it

18   happened.

19       A.  No.  I mean, you know, Ed Kostin,

20   unfortunately, has been dead a long time by now.  He

21   did it.  I don't know.  You know, look, I mean, if

22   you looked for the trust agreements, you would see

23   that I was the -- I was the Trustee and the executor

24   of all of their trust agreements.  Now, they've

25   probably changed it by now.

Page 205

```
 1          Q.  Right.
 2          A.  But they -- look, there was meetings with,
 3     for example, I don't know whether -- Paul
 4     Konigsberg, did he ever go to jail or did he not go
 5     to jail?
 6               MR. GOLDMAN:  He's in jail.
 7               THE WITNESS:  He did not go to jail?
 8               MR. GOLDMAN:  Konigsberg went to jail.
 9               MR. SHEEHAN:  No.  He walked.
10               MR. GOLDMAN:  Not Konigsberg.  I'm
11     thinking of someone else.  Okay.
12               THE WITNESS:  Okay.
13               MR. SHEEHAN:  He should have gone to jail.
14               THE WITNESS:  Huh?  Look, well, I don't
15     think anybody should go to jail, but --
16               MR. SHEEHAN:  But anyway --
17               THE WITNESS:  -- look, these people, there
18     were meetings held, you know, where the family
19     because, look, when these guys made these agreements
20     with me, all right, I said look, these guys were
21     old.  They were -- you know, Carl Shapiro thought he
22     was going to die.  He's still alive as far as I
23     know.
24               MR. SHEEHAN:  He is.
25               THE WITNESS:  Carl, he must be 104, for
```

Page 206

1    crying out loud, but when he was 60 some odd years

2    old he called me up hysterical when he had his first

3    Bell's palsy attack to Boston and said look, I'm

4    going to die and so on and so forth.

5            And that's when I made Paul Konigsberg his

6    accountant because, you know, at that time Coopers

7    and -- PaineWebber, who is Coopers and Lybrand

8    really, was his accounting firm; but he wanted, you

9    know, a closer relationship with Paul Konigsberg,

10   who became his accountant.

11       Q.  (By Mr. Sheehan)  Who's he?  I'm sorry.

12       A.  Carl Shapiro.

13       Q.  Oh, I'm sorry.

14       A.  All right.  So all of these guys, most of

15   them except for Picower, but Picower was unhealthy

16   to begin with.  He'd had three heart attacks and

17   he'd had, you know -- what does he have?  I forgot

18   what the disease is, you shake all the time.

19           MR. GOLDMAN:  Parkinson's.

20           THE WITNESS:  Parkinson's, right.  I said

21   look, you know, we have these agreements.  I said I

22   want the family to make -- I want to make sure your

23   children know this.  They weren't really children.

24   They weren't much younger than -- you know, younger

25   than me, so I said -- but everybody knew of these

Page 207

1    agreements, these arrangements that they were

2    responsible for any losses.  And we had meetings and

3    everyone knew that.  So I wasn't even worried about

4    having, you know, written agreements.  We had them,

5    but when I said to them, look, you know what?  When

6    you die, I said I want -- who's -- you know, you

7    tell me I'm still handling your investments.

8                So they -- Levy, for example, took JP

9    Morgan off -- it wasn't JP Morgan.  It was Chemical

10   at the time.  Took Chemical and its Trustee and

11   executor of his estate off and he made me that.  I

12   was going to get to handle all and their kids had to

13   sign agreements that I was the one that was going to

14   handle, you know, all of their monies and I had no

15   responsibility.  So this was -- you know, that's

16   what the agreements were.  They all knew what was

17   going on.

18       Q.  We're going to end with this today, all

19   right, and we'll start tomorrow morning.

20       A.  Uh-huh.

21       Q.  Early in December you had a meeting in your

22   office.  The big four was there.  Fred was there.

23   Other people were there.  What was the purpose of

24   that meeting?

25                MS. CHAITMAN:  Early December of what

Page 208

1    year?

2             MR. SHEEHAN:  '08.

3             THE WITNESS:  Oh, that was the foundation

4    -- that was for the charitable thing that we had.  I

5    was -- we had -- I was raising the money for cancer

6    then, you know, and Andy had been diagnosed --

7             MR. SHEEHAN:  Right.

8             THE WITNESS:  -- with cancer.  And I

9    forgot the name of our -- the Madoff foundation we

10   had.  And I -- they were on the board.  It was a

11   board meeting.

12        Q.  (By Mr. Sheehan)  Did you not discuss the

13   status of BLMIS that day?

14        A.  No, no.

15        Q.  You'd just paid out $11 billion.  Two days

16   later you're going to get turned into the FBI, and

17   you didn't mention anything?

18        A.  Paying out $11 billion?

19        Q.  Pardon?

20        A.  What do you mean paying out 11 billion?

21        Q.  You had just paid out over the past year

22   $11 billion in redemptions?

23        A.  Oh, yeah.

24        Q.  Here's the big four, Fred and other people

25   as you're sitting here?

Page 209

1        A.   No.   The only one that was there was Fred.

2    Shapiro wasn't there.   One of his -- Bob Jaffey was

3    there.   I don't think Jeff Picower was there.   I

4    don't know if his wife was there.   I don't think

5    Picower was there.   Either he may have been in

6    Florida.   No.   We didn't -- I mean, I knew that I

7    was in trouble, but no one else did, including my

8    wife.

9              MR. SHEEHAN:   Okay.

10             MS. CHAITMAN:   When you say Fred, are you

11   referring to Fred Wilpon?

12             THE WITNESS:   Yeah.   He was on the board.

13   He was on the board, my board.

14             MR. SHEEHAN:   Okay.   Let's end it there.

15             THE VIDEOGRAPHER:   Okay.   This concludes

16   the deposition.   Going off the record at 2:42 p.m.

17             (The deposition was adjourned at 2:42

18   p.m.)

19                    *  *  *  *  *

20

21

22

23

24

25

Page 210

1                 C E R T I F I C A T E

2    NORTH CAROLINA:

3    GUILFORD COUNTY:

4          I hereby certify that the foregoing

5    deposition was reported, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to the written page under my direction; that the

8    foregoing pages 1 through 209 represent a true and

9    correct transcript of the evidence given.  I further

10   certify that I am not in any way financially

11   interested in the result of said case.

12          I have no written contract to provide

13   reporting services with any party to the case, any

14   counsel in the case, or any reporter or reporting

15   agency from whom a referral might have been made to

16   cover this deposition.  I will charge my usual and

17   customary rates to all parties in the case.

18          This, the 10th day of May, 2017.

19

20

21                    K. Denise Neal

22

23              K. Denise Neal, RPR

                Registered Professional Reporter

24              Notary Public No. 200517500101

25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.