**CHAITMAN LLP**
Helen Davis Chaitman
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Defendants*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>     Plaintiff,<br><br>v.<br><br>JACOB M. DICK REV LIVING TRUST DTD 4/6/01, et al,<br><br>     Defendants. | Adv. Pro No. 10-04570 (CGM) |

## DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Defendants Jacob M. Dick Rev Living Trust, Article 8.1 Trust, Estate of Jacob M. Dick, and Andrea J. Marks, as trustee and beneficiary of the Jacob M. Dick Rev Living Trust (together "Defendants")[1], submit this counterstatement of material facts in opposition to the motion for summary judgment of the Plaintiff, Irving H. Picard (the "Trustee"), the Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC (the "LLC"), pursuant to Local Rule 56.1, and in support of Defendants' cross-motion for summary judgment dismissing the complaint.

## Madoff's Business

1.      From the 1960s on, Madoff operated two separate business units through his sole proprietorship called Bernard L. Madoff Investment Securities (the sole proprietorship "Sole Prop"). Madoff operated a legitimate trading business which, at times, executed trades equal to 10% of the daily volume on the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading Business included both proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM"), which created a market in certain securities and acted as a broker-dealer for all of the major investment firms. Declaration of Helen Chaitman ("Chaitman Decl.") **Ex. A** [Nelson Tr.[2] 5/8/19 at 63:6:11; 63:14-1], and an investment advisory business ("IA"). Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 63:3-4].

2.      The Legitimate Trading Business was known internally as "House 5." Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 62:18-19].

3.      The IA business was known internally as "House 17" since it was located on the 17th floor of the Lipstick Building. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 63:4-6].

4.      There were approximately 172 employees who worked in the Legitimate Trading

---

[1] The remaining defendants named in this action were dismissed.  *See* footnotes 3 and 4 of Trustee's Brief in Support of the Motion.

[2] *Picard v. Carol & Stanley Nelson*, ("*Nelson*"), Adv. Pro. Nos. 10-04377 and 10-04658. The trial of this consolidated case was held on May 8 and 9, 2019 and references to the transcript of the trial appear as "Nelson Tr. [date] at [page reference]."

Business and only 6 to 8 people who worked in the IA business. Chaitman Decl. **Ex. A** [Nelson

Tr. 5/8/19 at 168:14-17].

5.         All of the banking activity of the Legitimate Trading Business was conducted at

the Bank of New York ("BNY").  Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8].

6.         The PT and MM Businesses were legitimate and were not involved in an alleged

Ponzi scheme, as admitted to by Picard's expert witness, Bruce Dubinsky, at the Nelson trial.

Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and MM] of

the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So, the

proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The

investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business

had a trading platform? A. It had a trading platform and it actually traded. That's what it did.");

122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period?

A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for

the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in

fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme,

"Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your

opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

7.         Madoff operated his entire business as a sole proprietorship until January 2001.

Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681; *see e.g.* Complaint

("Compl.") at ¶ 25, Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y. November 30, 2010), ECF No. 1.

8.         Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole

proprietorship from at least the 1970's, as admitted to by Dubinsky. Chaitman Decl. **Ex. A** [Nelson

Tr. 5/8/19 172: 9:17 (Q. You're aware, are you not, that Mr. Madoff used the tradename Bernard

L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on many

documents, yes."]; Chaitman Decl. **Ex. B** [Confirmation Slips dating from 1979 showing the trade

name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]][3]; *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019). Even the account statement for the 703 account for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff Investment Securities" without any reference to the LLC. Chaitman Decl. **Ex. C** [703 Account Statement for December 2008].

9.      In January 2001, Madoff formed the LLC to which he transferred the PT and MM businesses, managed by his two sons. *See* Chaitman Decl. **Ex**. **D** [SEC Amended Form BD]; *see* Compl. at ¶ 25.

10.      In January 2001, Madoff notified BNY and the governmental agencies with which the Legitimate Trading Business dealt that the LLC was formed and would operate the Legitimate Trading Business. *See* the following notification letters all dated January 1, 2001:  Chaitman Decl. **Ex. E** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; and Letter from the LLC to the Depository Trust Company].

11.      Neither JPMC nor Madoff has any record of any such letter ever being sent to JPMC. Chaitman Decl. **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman].

12.      Madoff did not transfer the IA Business to the LLC.  In the unsigned Amended Form BD that Madoff submitted to the SEC, he did not check off the boxes indicating that the LLC would engage in investment advisory services.  *See e.g.* Chaitman Decl. **Ex. D** [SEC Amended Form BD at 8-10].

---

[3] Attached to the Chaitman Declaration as **Ex. B** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

13. Madoff did not register with the SEC as an investment advisor until August 2006. *Id.; In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011).

14. Even after Madoff registered with the SEC as an investment advisor in August 2006, the LLC's FOCUS reports all indicated no investment advisory activities. *See e.g.* Chaitman Decl. **Ex**. **G,** FOCUS report dated 9/2/07 at 9 (MADTEE00461879) answer 7; Chaitman Decl. **Ex**. **H,** FOCUS report dated 10/20/07 at 9 (MADTEE00462042) answer 7; Chaitman Decl. **Ex**. **I,** FOCUS report dated 12/2/07 at 9 (MESTAAT00005373) answer 7. Chaitman Decl. **Ex**. **J,** FOCUS report dated 1/31/08 at 7 (PUBLIC0002923) answer 7; Chaitman Decl. **Ex**. **K,** FOCUS report dated 3/31/08 at 7 (PUBLIC0002965) answer 7; Chaitman Decl. **Ex**. **L,** FOCUS report dated 5/30/08 at 7 (PUBLIC0003007) answer 7.

15. Customers of the LLC received their Form 1099s directly from the LLC, not from Bernard L. Madoff. *See e.g.* Chaitman Decl. **Ex**. **M** [Misc. 1099 form].

**The Bank Accounts**

**The LLC Account**

16. As set forth above at ¶¶ 5 and 10, the Legitimate Trading Business maintained an account with BNY. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8]. In January 2001, Madoff notified BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman Decl. **Ex. E** [Letter from the LLC to BNY]. BNY required the LLC to fill out an account services form for the LLC in which Madoff indicated that the LLC was a "broker/dealer." There is no mention in the form of the LLC providing investment advisory services. Chaitman Decl. **Ex**. **N** [BNY Due Diligence Form].

17. The LLC account at BNY was used to fund all of the expenses of the Legitimate Trading Business, including the purchase of securities. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:14-16].

18.     Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-162-:2 (Q. "[I]n the period from 2000 through 2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

19.     The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes. Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry." Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/2017 at 24:6-25:13]; *see also, e.g.* Chaitman Decl. **Ex. P** [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives]. In the month of January 2001, over $5 billion passed through the 703 Account. Chaitman Decl. **Ex. Q** [703 Account Statement for January 2001].

### **The 703 Account**

20.     The IA Business placed its customer deposits into an account at JPMC ending in "703" (the "703 Account"). Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

21.     As of December 2001, almost a year after the LLC was formed, JPMC customer statements for the 703 Account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman Decl. **Ex. R** [703 Account Statement for December 2001]. Thereafter, the 703 Account name was in Madoff's trade name, Bernard L. Madoff Investment Securities. The 703 Account was never in the name of the LLC and there is not a single document produced by JPMC which suggests that the LLC owned

the 703 Account. *See e.g.* Chaitman Decl. **Ex. F** [Email dated June 12, 2018 from counsel to

Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman Decl. **Ex. S** [Compilation of

509 Account Statements [multiple bates nos.]]; Chaitman Decl. **Ex. T** [Compilation of 703

Account Statements [multiple bates nos.]]; Chaitman Decl. **Ex. E** [Letter from the LLC to BNY;

Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the

Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

22.     Moreover, through August 2002, the JPMC customer statements for the 703

account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman Decl.

**Ex. U** [703 Account Statement August 1 – August 30, 2002 in the name of "Bernard L. Madoff"].

In September 2002, the 703 account statements from JPMC indicated the customer as owned by

the sole proprietorship, without any reference to the LLC. Chaitman Decl. **Ex. V** [703 Account

Statement August 31-September 30, 2002 in the trade name of "Bernard L. Madoff Investment

Securities"].

23.     Through 2008, the endorsement stamp for checks deposited into the 703 Account

read "For deposit only Bernard L. Madoff." Chaitman Decl. **Ex. W** [Check dated July 16, 2008 [4]

paid to "Bernard Madoff Securities" [JPMSA10013257].

24.     As late as December 2008, the statements for the 703 Account continue to list the

account as owned by the sole proprietorship, without any reference to the LLC. Chaitman Decl.

**Ex. C** [703 Account Statement for December 2008].

**The 509 Account**

25.     Madoff held an account at JPMC ending in "509" (the "509 Account"). Chaitman

Decl. **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

---

[4] The deposit check referenced is merely an example, and belongs to the account of Zieses Investment
Partnership.

26.    The 509 Account was opened and held by Madoff's sole proprietorship long before the LLC came into existence in 2001. *See e.g.* Chaitman Decl. **Ex. X** [509 Account Statement from 1998].

27.    There is not a shred of evidence that either the 703 or the 509 Account was ever held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts were always held by Madoff individually. *See e.g.* Chaitman Decl. **Ex.  F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. T** [Compilation of 703 Account Statements]; Chaitman Decl. **Ex. Y** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-10:5-21, 12:5-18:6; 26:24-29:11].

28.    The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura (whose firm was paid over $40 million by the Trustee) have never seen a bank statement for either the 509 Account or the 703 Account in the name of the LLC. Chaitman Decl. **Exs. A** and **Y** [Nelson Tr. 5/8/19 at 171:23-172:8, Nelson Tr. 5/9/19 at 13:7-20].

29.    The 509 account statements and checks were always in the name of Bernard L. Madoff. *See* Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. Z** [Compilation of Checks written from "Bernard L. Madoff" to Defendants].

30.    The designation "LLC" never appeared on the statements for either the 703 or the 509 Account. Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. T** [Compilation of 703 Account Statements].

31.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship interchangeably with the name "Bernard L. Madoff", (Chaitman Decl. **Ex. Y** [Nelson Tr. 5/9/19 at 18:23-19:10]; Chaitman Decl. **Ex. B** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]]; Chaitman Decl. **Ex. AA** [July 17, 1991 letterhead of Bernard L. Madoff Investment

Securities]), and for years prior to the formation of the LLC. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 172:9-12].

**Account No. 1CM883 (the "Living Trust Account")**

32.     On April 5, 1995, Jacob M. Dick and June Dick, TIC opened an account with Bernard L. Madoff (the "Dick Account" and "Account 1CM325") with a combined $1,000,000. *See* Chaitman Decl. **Ex**. **AB** [Account Opening documents [AMF00254458-69]]; *see also* Compl., Ex. B, line 1.

33.     Subsequently, the Living Trust Account was opened on May 26, 2004 with a transfer in the amount of $1,044,484 from the Sole Prop account no. 1CM325, a C & M Trading Account (the "Transferor Account"). *See* Chaitman Decl. **Ex**. **AC** [April 1995 Statement for the Jacob M. Dick Account as of April 28, 1995 reflecting an initial investment of $1,000,000 [MF00197053]; *see* Chaitman Decl. **Ex. AD, AE** [May 2004 and March 2005 Statements for the Transferor Account reflecting a combined transfer to the Living Trust Account in the amount of $1,044,484 on May 26, 2004 and $1,518 on March 7, 2005 [MDPTPP01153999 and MDPTPP01154026]]; *and see* Chaitman Decl. **Ex**. **AF** [Portfolio Management Reports for the Living Trust Account as of May 31, 2004 reflecting a starting equity of $1,044,483.98 as of May 26, 2004 [MDPTQQ00183407]]; *see also* Compl., Ex. B, line 1. However, the Trustee has failed to fully credit this transfer. *See infra* at ¶¶ 33-34; *see e.g.* Greenblatt Report, Ex. 4A, ECF No. 108-15.

34.     For every year through 2007, the Living Trust was issued its Form 1099 for tax purposes by Bernard L. Madoff. *See* Chaitman Decl. **Ex**. **AG** compilation of 1099s.  It was never issued a 1099 by the LLC.

**Withdrawals from the Living Trust Account**

35.     Throughout the life of the Living Trust Account, withdrawals were paid by checks drawn from the 509 Account in the name of "Bernard L. Madoff" (*see* Chaitman Decl. **Ex. Z**

[Compilation of Withdrawal Checks for the Living Trust Account [multiple bates nos.])

36.    The Living Trust never received any payments from the LLC. *See id.* ¶¶

**T-Bill Purchases**

37.    Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills." . . .

Chaitman Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

38.    Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley. *See* Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

39.    Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third-party records in the Trustee's possession. *See* Chaitman Decl. **Ex**. **AI** [Compilation of Bear Stearns Statements and 703 Account Statements].

40.    Madoff explained that these bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

41.    While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the

purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

42.     Madoff testified that "by the time we were finished in 2008 . . . we [the LLC] represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." Chaitman Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 54:21-56:25, quote at 56:8-17].

43.     The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff [the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New York Stock Exchange as a whole. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 162:7-11].

44.     Madoff testified that he never required the deposits of other customers to pay out existing customers, until late 2008 when the financial markets were in a state of global collapse. *See* Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 30:10-22; 31:2-25].

45.     Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

46.     Madoff testified that Frank DiPascali purchased T-Bills with IA customers' money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

47.     The receipts from the sale or redemption of T-bills were paid into the 703 Account by the brokerage houses, including Bear Stearns and JPMC.  Chaitman Decl. **Ex. AI** [Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005; Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30, 2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

48.     Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman Decl. **Ex. AJ** [Crupi Tr. 165:6-22].

49.    Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See generally,* Chaitman Decl. **Ex. AK** [DiPascali Trial Testimony, 12/10/13 at 5344:9-5346:2; 5345:7-25].

50.    DiPascali further testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral." Chaitman Decl. **Ex. AK** [DiPascali Tr. at 5345:7-25]; and Chaitman Decl. **Ex. AL** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

51.    Madoff testified that, as with other entities in the industry, he maintained records for only six years, so there would not always be trade confirmations in their records. Chaitman Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]. Madoff testified that, during the 1980's, there would not always be third party confirmations because there were clearing houses that issued continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

52.    Madoff testified that when he was dealing as principal there was no counterparty since he was on both sides of the trade. *Id.* at 128:7-12.

**Dubinsky's Testimony**

53.    On direct examination at the *Nelson* trial, Dubinsky repeatedly testified that no securities were ever purchased with IA customers' money.

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
> A. Absolutely.
> Q. The investment advisory side?
> A. Never.

Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14; 74:1-3; 74:19-23; 75:17-20].

> Q. I think you've answered this question but based on your review of the computer systems at BLMIS, were you able to determine if any trades were being processed through the investment advisory business computers?

A. I was able to make that determination and the answer is they were not. There was no evidence, Your Honor, of any trades being executed through the IA business computer systems whatsoever.

*Id*. at 80:4-15.

Q. So, to wrap up this issue, please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?

A. Customer money. Just other customers' money.

Q. Did your conclusion that the BLMIS investment advisory business did not have a connected trading platform have anything to do with your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. Absolutely.

Q. Why?

A. Because without the ability to actually connect to the market and trade and no evidence of those trades ever occurring, coupled with what I just testified about, that the only money I saw was customer money in and customer money out, no accretion to that 703 account from any sort of trading profit dividends -- that's the classic example of a Ponzi. There's nothing going on. You're taking money from people, you're promising that you're going to do something with it, and then you pay them back as if you're fulfilling your promise.

Q. So, in addition to the not-connected trading platform, did your conclusion that the customer deposits were used to pay customer redemptions have any bearing on your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. It did. As I just said, the lack of other funds from trading profits, from dividends, from real results of actual trading -- the lack of that played into the conclusion that this was simply a Ponzi. Just taking money in and paying it back.

*Id*. at 94:6 – 95:11.

Q. Were you able to obtain DTC treasury records for BLMIS?

A. I was. For the period of 2002 through 2007, I was able to obtain those records, and then I performed an analysis, identified the -- first I went and identified the unique treasury bills held by the prop trading business on December 31 of every year. I compared those holdings to the holdings at DTC, and I also compared those holdings to the IA business. And what I found, similar to the equities, is that the prop trading that the -- and the treasury bills weren't a big part of the prop trading, but the treasury bills that were held by the prop trading matched to the DTC records, and that was based on the treasury CUSIP, and in contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id*. at 128:19 – 129:12.

> Q. . . .please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?
> A. Customer money. Just other customers' money."

*Id*. at 92:16-93:3.

> Q. Based on your review of the BLMIS Investment Advisory books and records, were you able to determine if Mr. Madoff's allocation concerning treasuries was accurate?
> A. It confirmed my analysis in finding that no treasuries were bought or traded for any of the investment advisory clients.

*Id*. at 129:9-14.

> A. There was no evidence of treasuries being purchased for the IA business customers, plain and simple.

*Id*. at 132:9-14.

54.     Dubinsky testified on direct examination that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps, *id*. at 83:3-15; 85:3-21. He swore that there was "never any addition to the 703 Account that [he] saw when [he] examined the bank accounts to show that money was coming from trading profits." *Id.* at 84:1-3.

55.     Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." *Id*. at 153:14-16.

56.     On cross examination, however, Dubinsky admitted that reliable third-party records show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. Those T-bills paid interest.").

57.     Dubinsky admitted at the Nelson trial that Madoff maintained several brokerage accounts through which he purchased T-bills using investment advisory customers' money taken

from the 703 Account. *Id.* at 90:25-91:2 ("A. No. There were several brokerage accounts, that

money was taken from the 703 account and put into, that purchased some treasuries."); 155:2-4

("A. There was money taken out of the 703 account, transferred to these accounts, these various

accounts, and then these securities were purchased, yes.").

58.    Dubinsky admitted that Madoff purchased T-bills at the following Wall Street

firms:  Lehman Brothers, Bear Stearns, JPMorgan Chase and Morgan Stanley. *Id.* at 154:2-9" *Id.*

at 154:2-9; 166:17-18.

> Q. But in any event, you're now telling us that you're aware that there were
> approximately eight accounts at which Madoff was using investment advisory
> customers' money to purchase T bills. Isn't that true?
> A. That is correct, yes.
> Q. Okay. And those accounts included Lehman Brothers.
> A. Correct.
> Q. Bear Sterns.
> A. That's correct.
> Q. JP Morgan Chase.
> A. Correct.
> Q. Morgan Stanley.
> A. There was a Morgan Stanley account, yes.

*Id.* at 154:2-9.

59.    And he acknowledged that "those T-bills paid interest," isn't that true.  *Id.* at

166:17-18.

> Q. And those T-bills paid interest, right?
> A. Those T-bills paid interest.

60.    While, on direct examination, Dubinsky testified that he found no evidence of IA

customer T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities

with the financial institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position,
> you went only to the DTC records.
> A. Correct.
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions
> from which he bought them?
> A. As in the eight brokerage accounts, yes.

*Id.* at 177:16-18-21.

61.      Additionally, while another analysis allegedly performed by Dubinsky addresses the T-bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g.* Dubinsky Report ¶ 227, Table 5; and ¶¶ 232-240, ECF No. 104-1.

**Lehman Brothers transfers to 703 account**

62.      The Lehman Brothers Statement for the period ending December 31, 2001 – almost a year after the LLC was formed- shows that on December 27, 2001, Mr. Madoff wired $50 million to the 703 account. Chaitman Decl. **Ex. AM** [Chart, Tab 1 at bates number BARC\SIPCMAD18952]

63.      The 703 account statement for December 2001 reflects that on December 27, there was a $50 million credit from Lehman Brothers to Mr. Madoff.  Chaitman Decl. **Ex. AM** [Chart, Tab 1 at bates number JPMSAB0000040].

64.      The September 30, 2002 statement from Lehman Brothers on an account in the name of Bernard L. Madoff shows a wire transfer to JPMorgan Chase of $42 million. Chaitman Decl. **Ex. AM** [Chart, Tab 2 at bates number SECSAH0001205].

65.      The JPMorgan Chase statement for the 703 account reflects that on September 30, 2002, the account was credited with a transfer from Lehman Brothers of $42 million. Chaitman Decl. **Ex. AM** [Chart, Tab 2 at bates number JPMSAB0000669].

66.      On the first page the December, 2002 statement from Lehman Broth there is a $75 million transfer from the account in the name of Bernard L. Madoff to the 703 account at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 3 at bates number BARSAA0018966].

67.      The second document shows that the 703 account was credited on December 27, 2002 with a wire transfer of $75 million from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 3 at bates number JPMSAB0000202].

68.    A June 26, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $50 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 4 at bates number BARSAA0020468].

69.    The second document shows that on June 28, 2003, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $50 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 4 at bates number JPMSAB0001091].

70.    A September 26, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $20 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 5 at bates number BARSAA0020650].

71.    The second document shows that on September 28, 2003, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $20 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 5 at bates number JPMSAB0001343].

72.    A December 30, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $70 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 6 at bates number BARSAA0020321].

73.    The second document shows that on December 30, 2003, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $70 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 6 at bates number JPMSAB0001343].

74.    A December 31, 2005 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $48 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 7 at bates number BARSAA0020348].

75.    The second document shows that on December 31, 2005, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $48 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 7 at bates number JPMSAB0002133].

76.    A January 9, 2006 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $16 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 8 at bates number BARSAA0020418].

77.    The second document shows that on January 9, 2006, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $16 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 8 at bates number JPMSAB0002883].

78.    An April 30, 2006 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $12,095,012.70 to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 9 at bates number SECSAH0000386].

79.    The second document shows that on April 18, 2006, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $12,095,012.70 wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 9 at bates number JPMSAB0002668].

**Bear Stearns**

80.    A Bear Stearns statement dated 6/30/98 for an account in the name of Mr. Madoff shows a balance of $403,677,933.  The account contains only T-bills.  Chaitman Decl. **Ex. AN** [Bear Stearns ("BS") Statement June 1, 1998 through June 30, 1998].

81.    There is a Bear Stearns statement for the account numbered 037-72698 for the period ending March 30, 2001.   Under the section called "Your Portfolio at a Glance," it states that Mr. Madoff's net equity for this period was $545 million dollars. Chaitman Decl. **Ex. AO** [BS Statement February 24, 2001- March 30, 2001].

82.    A Bear Stearns statement for the period ending July 26, 2002 for the same Bear Stearns account shows net equity this period of $371, 919,108. Chaitman Decl. **Ex. AP** [BS Statement June 29, 2002 - July 26, 2002].

83.     A statement for the same account, still in the name of Bernard L. Madoff as of January 30, 2004 indicates net equity this period of $335,202,211. Chaitman Decl. **Ex. AQ** [BS Statement January 1, 2004- January 30, 2004].

**Bank of New York**

84.     A statement from the Bank of New York dated October 31, 2005 for an account in the name of Bernard L. Madoff shows a balance of $226,100,000.  Chaitman Decl. **Ex. AR** [Bank of New York Statement for period ending October 31, 2005].

**Fidelity**

85.     A   Fidelity account statement for January 1999 shows a balance of $205 million.  Chaitman Decl. **Ex. AS** [Fidelity Investments ("FI") statement for period January 1, 1999 through November 30, 1999].

86.     A Fidelity statement for the period ending January 31, 2002 shows a balance of $343,219,506. Chaitman Decl. **Ex. AT** [FI statement for period January 1, 2002 through December 31, 2002].

87.     A Fidelity statement for the period ending January 31, 2005 shows an ending market value as of January 31, 2005 of $185,441,573. Chaitman Decl. **Ex. AU** [FI statement for period January 1, 20052 through December 31, 2005].

 **Morgan Stanley**

88.     A Morgan Stanley account statement for the period ending September 30, 2005 for an account in the name of Bernard L. Madoff shows that, on September 1, 2005, Mr. Madoff bought $98 million worth of a United States T-bill maturing on February 16, 2006 which bore an interest rate of 3.6%. Chaitman Decl. **Ex. AV** [Morgan Stanley statement for period ending September 30, 2005 at bates number MSYSAB0000332].

**Defendants Paid Taxes on Alleged Fictitious Profits in the Living Trust Account**

89.     In the years from 1995 through 2002, Defendants paid taxes totaling $886,842 on

the investment income from the Jacob M. Dick Account. *See* Chaitman Decl. **Ex**. **AW** [Declaration

of Ira Schall, C.P.A. dated August 21, 2017 at ¶ 4 and Ex. A].

90.     For these years Defendants paid $886,842 in unrefunded taxes on gains in the

Account. *See id.* at Ex. A.

**The Trustee's Misrepresentations**

91.     The Trustee has consistently represented, from 2008 to the present, that Madoff

never purchased any securities with IA customers' money.  Declaration of Helen Davis Chaitman

dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

92.     The Trustee has refused to produce trading records and all of the customers'

account statements.  Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*,

Adv. Pro. No. 10-04377, ECF No. 86-1; *see also* Trustee Response to Defendants' Document

Demands and Interrogatories served in Adv. Pro. No. 10-04995 and dated April 8, 2016, [Response

to Request No. 2], *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2].

**This Court's View That Summary Judgment is Not Appropriate**

93.     Judge Bernstein held that summary judgment is not appropriate in the claw back

cases, *see e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v.

Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

94.     Judge Bernstein expressed the same concerns at a recent hearing regarding the

Trustee's announced intention to move for summary judgment in another, similar case, *Picard v.

Savin,* Adv. Pro. No. 10-04889.  *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, *id.* at ECF

No. 96 ("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues

I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC,

whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating

T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and

withdrawals] . . . I have to try it.").

March 18, 2022
New York, New York

**CHAITMAN LLP**
By:  */s/ Helen Davis Chaitman*
Helen Davis Chaitman
hchaitman@chaitmanllp.com
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
*Attorney for Defendants*