**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05354 (CGM) Adv. Pro. No. 11-02760 (CGM) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK N.V. (presently known as NATWEST MARKETS N.V.), | **CONSOLIDATED SECOND AMENDED COMPLAINT** |
| Defendant. | |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated chapter 7 estate of

Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15

U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, for this Consolidated Second

Amended Complaint against ABN AMRO Bank N.V. (presently known as NatWest Markets

N.V.) ("Defendant") alleges the following:

## I.    **NATURE OF THE ACTION**

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive

Ponzi scheme perpetrated by Madoff and others.

2.    With this Consolidated Second Amended Complaint, the Trustee seeks to recover

at least $308,113,826 that Defendant received as subsequent transfers of BLMIS customer

property in connection with two sets of transactions, the "Tremont Transactions" and the "Harley

Transaction." The Tremont Transactions have been the subject of this proceeding and the Trustee

previously alleged the transfers related to the Harley Transaction in *Picard v. ABN AMRO Bank*

*N.V.*, No. 11-02760 (CGM), which the Trustee consolidates into this proceeding.

3.    As alleged in this Consolidated Second Amended Complaint, the Tremont

Transactions involved at least $286,313,906 of customer property Defendant received from four

investment funds operated and managed by Tremont Group Holdings, Inc. (the "Tremont

Group"), and its management arm, Tremont Partners, Inc. ("Tremont Partners," and together

with the Tremont Group, "Tremont"). All four of the Tremont investment funds solicited money

from clients to invest with BLMIS.

4.    Two of the Tremont investment funds—Rye Select Broad Market Portfolio

Limited ("Rye Portfolio Limited") and Rye Select Broad Market Fund L.P. ("Rye Broad

Market," and collectively with Rye Portfolio Limited, the "Rye Funds")—invested all or substantially all of their assets with BLMIS's investment advisory business (the "IA Business") and were part of a group of funds known as BLMIS feeder funds.

5.    The other two funds—Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited"), and Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and collectively with XL Portfolio Limited, the "XL Funds")—did not have direct BLMIS accounts but were established to provide investors with three-times levered returns linked to the performance of BLMIS.

6.    The subsequent transfers from the Tremont Transactions comprised payments that Defendant received from two separate leverage deals involving the XL Funds and Rye Funds. Each of the leverage deals followed this basic structure. Each XL Fund was required to provide cash collateral to Defendant. Defendant agreed to provide each XL Fund with returns generated by the Rye Funds, based on investments in the Rye Funds equal to three times the amount of collateral the XL Funds provided to Defendant. For structuring these leverage deals, known as "total return swaps," the XL Funds paid Defendant millions of dollars in fees.

7.    Because Defendant's payment obligations to the XL Funds were directly tied to the performance of the Rye Funds (and thus, BLMIS), Defendant hedged its risk under the leverage deals by investing three times the collateral it received from the XL Funds in the Rye Funds, which invested Defendant's funds with BLMIS.

8.    In September 2006, Defendant entered into a swap agreement with XL Portfolio Limited (the "2006 Tremont Swap Agreement," and the underlying transaction, the "2006 Tremont Transaction"). In connection with the 2006 Tremont Swap Agreement, by December 2008, Defendant had received at least $217 million in collateral payments from XL Portfolio

Limited. XL Portfolio Limited received at least $84,616,573 in BLMIS customer property from Rye Portfolio Limited and Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance LDC"), another Tremont BLMIS feeder fund, as well as transfers from other Tremont-related entities.

9.      Defendant hedged its exposure by investing three times the collateral value it received from XL Portfolio Limited in Rye Portfolio Limited. Defendant redeemed at least $104,464,000 of BLMIS customer property from Rye Portfolio Limited, which Rye Portfolio Limited satisfied by withdrawing funds from its BLMIS customer account.

10.     In November 2007, Defendant entered into a swap agreement with XL Broad Market (the "2007 Tremont Swap Agreement," and the underlying transaction, the "2007 Tremont Transaction"). In connection with this swap agreement, Defendant received at least $95,833,333 of BLMIS customer property representing collateral payments from XL Broad Market, which originated from fraudulent transfers BLMIS made to, among others, Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund"), another Tremont BLMIS feeder fund, and Rye Broad Market, which in turn transferred the funds to XL Broad Market.

11.     Similar to the 2006 Tremont Transaction, Defendant hedged its exposure by investing three times the collateral value it received from XL Broad Market in Rye Broad Market. Defendant ultimately redeemed at least $1.4 million of BLMIS customer property from Rye Broad Market, which Rye Broad Market satisfied by withdrawing funds from its BLMIS customer account.

12.     In 2008, Defendant entered into a third BLMIS feeder fund transaction to provide a leveraged return under a derivatives contract (the "Harley Derivatives Contract," and the underlying transaction, the previously referenced "Harley Transaction") on investments in

3

Harley International (Cayman) Ltd. ("Harley"), which invested all of its assets with BLMIS.

Under the Harley Derivatives Contract, in exchange for millions of dollars in interest and fees,

Defendant sold to a counterparty the future performance over three years of a 3.7 times levered

exposure to Harley, less the costs of financing such an investment in Harley and less a profit

margin. In order to hedge its exposure, Defendant invested in Harley and, in December 2008,

redeemed $21,799,920 in subsequent transfers of customer property, which Harley satisfied by

withdrawing funds from its BLMIS customer account.

13.     At all relevant times, Defendant was a sophisticated multinational bank and an

industry leader in derivative transactions. Between at least 2006 and December 2008, Defendant

targeted BLMIS feeder funds, sending its structuring brochure to (or otherwise contacting) at

least a half dozen BLMIS feeder fund managers pitching its structuring capabilities and appetite

for "Madoff risk."

14.     Madoff sustained his scheme with massive capital infusions largely from BLMIS

feeder funds, which in turn obtained their funds from investors such as Defendant. Defendant is

liable for the return of BLMIS customer property it received.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

15.     This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is

pending. The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities and Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

16.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

17.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

18.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

19.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission

(the "SEC") commenced the District Court Proceeding.

20.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

21.     Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

22.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

23.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

24.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

25.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

26.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades within BLMIS customer accounts beginning in the early 1970s.

27.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

28.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

29.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

30.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

IV.   **DEFENDANT AND NON-PARTIES**

A.   **Defendant ABN AMRO Bank N.V. (presently known as NatWest Markets N.V.) and Non-Parties ABN AMRO Incorporated and ABN AMRO Holding N.V.**

31.   ABN AMRO Bank N.V. ("ABN AMRO") was a financial institution organized under the laws of the Netherlands and maintained a number of branches, agencies, offices, or subsidiaries in the U.S., including, at all relevant times, a branch and representative office in New York, New York. ABN AMRO received each of the subsequent transfers at issue in this action. ABN AMRO also was the party to each of the underlying agreements in the Tremont Transactions and the Harley Transaction.

32.   Non-defendant ABN AMRO Incorporated ("ABN Inc.") was an indirect, wholly owned subsidiary of ABN AMRO. ABN Inc. was incorporated in New York, and, at all relevant times, maintained its principal office at 55 East 52nd Street, New York, New York. ABN Inc. was a registered securities broker-dealer and futures commission merchant in the U.S. providing professional brokerage, investment banking, execution and clearance services, including for options trades, and related services to financial institutions, corporations, governments, professional investors, and securities and commodities dealers.

33.   ABN AMRO worked closely with, and acted through, ABN Inc. in New York to handle the work associated with ABN AMRO's leverage deals, including negotiation of the transaction structures, terms, and amendments.

34.   ABN AMRO was a wholly owned subsidiary of ABN AMRO Holding, N.V. ("ABN Holding"), a public company whose shares were traded on several major stock exchanges, including the New York Stock Exchange. On October 17, 2007, RFS Holdings B.V., which is 97.72% owned by The Royal Bank of Scotland Group plc ("RBS"), purchased the

assets and liabilities of ABN Holding, including subsidiaries ABN AMRO and ABN Inc. (the "Acquisition").

35.    Upon the Acquisition, many of the same individuals who cultivated ABN AMRO's relationships with BLMIS feeder funds remained employed with the bank. For example, (i) David Schwartz, ABN Inc.'s Executive Director, Fund Linked Derivatives of Structured Credit Products, who was identified by Tremont as its "main contact" for its transactions with ABN AMRO, (ii) George Turner, who worked in Structured Products at ABN AMRO in London, and (iii) Stephen Kingham, Global Head of Fund Derivatives Marketing who also worked at ABN AMRO in London, remained employed at the bank after the Acquisition and continued to manage its relationships with BLMIS feeder funds. Following the Acquisition, ABN Inc. continued its role as authorized agent of ABN AMRO. Any and all information or materials regarding BLMIS, Madoff, or the various BLMIS feeder funds obtained by ABN AMRO (including its subsidiary, ABN Inc.) or by RBS (including its subsidiaries and/or affiliates) independently prior to the Acquisition remained at or were subsequently shared amongst ABN AMRO and RBS after the Acquisition.

36.    Until February 6, 2010, when it changed its name to "The Royal Bank of Scotland N.V." ("RBS N.V."), ABN AMRO continued its operations, including with respect to its BLMIS feeder fund investments, under the ABN AMRO name. ABN Inc. continued operations under the ABN Inc. name until it went through additional corporate restructuring in December 2011.

37.    On April 30, 2018, RBS N.V. changed its name to NatWest Markets N.V. This corporate name change was effectuated to comply with certain Brexit-related ring-fencing rules and did not result in any legal change to RBS N.V.

### B.     Non-Party Tremont Funds

38.     Tremont operated, managed, and controlled a number of investment funds,

including several BLMIS feeder funds, from its Rye, New York headquarters.

39.     As relevant to this Consolidated Second Amended Complaint, Tremont managed,

controlled, and maintained BLMIS accounts for four feeder funds that invested directly with

BLMIS: the Rye Funds, Rye Insurance LDC, and Rye Prime Fund. Each of these Tremont

BLMIS feeder funds maintained accounts with BLMIS's IA Business and received initial

transfers of customer property from BLMIS (the "Tremont Initial Transfer Funds"). At all

relevant times, nearly all of the monies invested in each of the Tremont Initial Transfer Funds

was invested directly or indirectly with BLMIS.

40.     Tremont also managed and controlled two indirect BLMIS feeder funds, the XL

Funds. The XL Funds each provided investors with three-times leveraged returns linked to the

economic performance of certain Tremont Initial Transfer Funds. The XL Funds invested their

assets in swap transactions with a designated counterparty, including Defendant, as explained

above. In return, the counterparty (here, Defendant) was obligated to provide the relevant XL

Fund the return referenced at three times the investment in a specified Tremont Initial Transfer

Fund.

41.     The XL Funds each sought to provide investors with returns equal to

approximately three times those of Rye Portfolio Limited and Rye Broad Market, respectively.

The XL Funds each issued a Confidential Private Placement Memorandum ("PPM") to potential

investors that described its "Counterparties," including Defendant, as highly rated financial

institutions. In addition, each PPM specified that the Counterparty "is expected, but is not

obligated, to invest directly in [Rye Portfolio Limited or Rye Broad Market, respectively] in

order to hedge its obligations to the [XL Portfolio Limited] Fund [or XL Broad Market, respectively]."

42.     While the Tremont funds at issue in the 2006 Tremont Transaction were registered in the Cayman Islands, the Tremont funds involved in the 2007 Tremont Transaction were registered in Delaware. At all relevant times, all of the Tremont funds, including those registered in the Cayman Islands, operated out of Rye, New York and were managed from Tremont's New York headquarters.

### C.     Non-Party Harley

43.     Harley maintained a customer account at BLMIS and was also one of BLMIS's largest feeder funds and sources of investor principal. Harley invested all of its assets with BLMIS in New York.

44.     Harley did not conduct any meaningful business in the Cayman Islands. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law: "The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." As such, Harley was registered as an exempt company under Cayman Islands law and was not permitted to solicit investors in the Cayman Islands.

45.     In its subscription agreements, Harley directed investors to wire U.S. dollars to bank accounts in New York held by its administrator. For example, the agreements required funds to be wired to an account at the Northern Trust Banking Corporation ("Northern Trust"), located at 40 Broad Street, New York, New York. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York.

46.     Harley had no employees or offices of its own. It acted primarily through Fix

Asset Management Services, Inc., an institutional fund of funds manager with a principal place

of business in New York and incorporated under New York law.

## V.    PERSONAL JURISDICTION

47.     Defendant is subject to personal jurisdiction in this judicial district because it

purposely availed itself of the laws and protections of the United States and the State of New

York, and knowingly accepted the rights, benefits, and privileges of conducting business in the

United States and New York.

48.     As an initial matter, New York-based BLMIS was at the core of Defendant's

Tremont and Harley Transactions.

49.     In connection with the Tremont Transactions, Defendant invested in the Rye

Funds, which were created, operated, and controlled by Tremont in New York, with the specific

purpose of having funds invested with BLMIS in New York. Defendant knew that the Rye Funds

invested all or substantially all of their assets in accounts managed by New York-based BLMIS.

Defendant knew that any return on its investments in the Rye Funds would be earned in New

York by BLMIS purportedly engaging in the purchase and sale of U.S. securities, options, and

U.S. Treasuries.

50.     In April 2006, Defendant began discussing its "appetite for single manager

lending" with representatives from Tremont in New York. Defendant's interactions with Tremont and

negotiations with Tremont were led by Schwartz, who was based in New York. On behalf of

Defendant, Schwartz had primary responsibility for communications with Tremont concerning

the Tremont Transactions.

51.     Schwartz (and other Defendant employees) and Tremont employees located in

New York engaged in numerous email communications and telephone calls regarding the

Tremont Transactions. Tremont employees in New York sent information regarding Tremont's

BLMIS feeder funds to Schwartz. Schwartz and other Defendant employees also met with

representatives of Tremont in Rye, New York in connection with the Tremont Transactions.

52.     Prior to entering into the Tremont Transactions, Tremont also provided Rye

Portfolio Limited's prospectus to Schwartz, which disclosed the following information:

- The fund "attempts to accomplish [its] investment objective by investing the majority of the assets with one Manager who employs a 'split strike conversion' strategy (the 'Account Manager')";

- As of September 1, 2006, when Defendant executed the 2006 Tremont Transaction, "[c]urrently, the majority of the [fund's] assets are allocated to the Account Manager," i.e., BLMIS;

- "[T]he 'split strike conversion' investment strategy consists of: (i) the purchase of a group or basket of equity securities, at least 80% of which belong to the S&P 100, that is highly correlated to the S&P 100 Index, (ii) the purchase of out-of-the money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities or maintains investments in USD cash, USD money market fund or US Treasury Securities."

53.     Schwartz also asked for and received Rye Portfolio Limited's BLMIS account

opening documents, which provided that all securities transactions in the fund's account would

be subject, where applicable, to the (1) provisions of the Securities Exchange Act of 1934, as

amended, and the Commodities Exchange Act, as amended; and (2) rules and regulations of the

SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures

Trading Commission. The BLMIS account opening documents further provided for mandatory

arbitration before the American Arbitration Association or before the New York Stock Exchange

or the National Association of Securities Dealers in the event of any controversies arising

between BLMIS and Rye Portfolio Limited in connection with the account.

54.     Although it never consummated any BLMIS-related swap transactions with
Fairfield Greenwich Group ("Fairfield"), a *de facto* partnership based in New York City that
created, operated, and controlled investment vehicles, Defendant communicated with, and
received additional BLMIS information from, Fairfield as well, including information about its
BLMIS feeder fund, Fairfield Sentry Limited.

55.     Both Tremont and Fairfield informed Defendant, through materials, emails, and
phone conversations, that: (i) the BLMIS feeder funds that it was considering for its investments
and swap transactions were "single strategy funds" under the sole control of BLMIS, a New
York-based investment advisor; (ii) BLMIS in New York simultaneously was the investment
adviser, custodian, and prime broker for the BLMIS feeder funds; (iii) the proposed transactions
with Tremont and Fairfield provided that Defendant's own capital (together with the collateral it
was to receive from the respective swap counterparties) would be invested with BLMIS in New
York; and (iv) BLMIS was registered with the SEC.

56.     The documentation associated with the Tremont Transactions confirmed the
central role of BLMIS and the transactions' connections to the United States and New York. In
fact, Defendant considered BLMIS in New York so "central" to its transactions with the Tremont
funds, that it negotiated provisions specifically conditioned upon BLMIS-related events.

57.     The terms and conditions of the 2006 Tremont Transaction are set forth in the
2006 Tremont Swap Agreement and its amendments, a September 1, 2006 "Side Letter"
agreement, and a subscription agreement (the "2006 Tremont Subscription Agreement") that
Defendant executed with Rye Portfolio Limited to become an investor.

58.     As described above, Defendant received and reviewed Rye Portfolio Limited's
prospectus, which indicated that the fund's objective was to achieve capital appreciation through

investments by one unidentified "Account Manager," who executed a split strike conversion

strategy (the "SSC Strategy"). Through its communications with and other documents obtained

from Tremont, Defendant knew that BLMIS served as the Account Manager for Rye Portfolio

Limited and insisted that BLMIS be identified formally as the Account Manager. Defendant

advised Tremont: "We do need to see Madoff named somewhere (albeit not necessarily in the

prospectus or Supplement). Madoff's role as account manager is central to the whole transaction

. . . ."

59.    Accordingly, Defendant negotiated the Side Letter to the 2006 Tremont Swap

Agreement that identified BLMIS as Rye Portfolio Limited's Account Manager. The Side Letter

was executed between Defendant and Tremont executive Darren Johnston in New York on

behalf of Rye Portfolio Limited.

60.    Defendant negotiated special rights that would be triggered if BLMIS were no

longer the "Account Manager" or able to carry out the SSC Strategy. Specifically, the 2006

Tremont Swap Agreement permitted Defendant to terminate the agreement if it determined that

"the manager employing the split strike conversion strategy [BLMIS] . . . ceases to be the

Account Manager."

61.    Defendant also insisted as a term of its subscription with Rye Portfolio Limited

that it have priority redemption rights over other investors that would be triggered if BLMIS in

New York failed to utilize its U.S.-based SSC Strategy. Defendant negotiated for itself a special

class of shares—"Class D Shares" that Tremont created especially for Defendant as a leverage

provider. Specifically, a September 1, 2006, "Supplement to Amended and Restated Prospectus"

issued by Tremont included events related to BLMIS and Madoff's use of the SSC Strategy that

would trigger Defendant's special redemption rights: "a) The Investment Manager ceases to

invest the majority of its assets with the Account Manager [BLMIS] employing the 'split strike conversion' strategy; or b) There is a change in the management or control of the Account Manager [BLMIS]; or . . . d) The Account Manager [BLMIS] no longer employs the 'split strike conversion' investment strategy." In addition, under the terms of the 2006 Tremont Swap Agreement, if any of those events occurred, Defendant could terminate the swap agreement without penalty.

62.    Subsequently, Defendant and Tremont agreed that Defendant also could exercise its special redemption rights: "If the Account Manager [BLMIS] becomes the subject of a formal investigation by a U.S. court, governmental or regulatory body or agency related to a specific breach of a U.S. securities law or regulation and the effect of such a breach would, as reasonably determined by the Calculation Agent [Defendant], have a material adverse effect on the Account Manager and its ability to conduct its investment management business . . . ."

63.    The 2007 Tremont Transaction operated substantially in the same manner as the 2006 Tremont Transaction, with Defendant obtaining many of the same relevant termination and early redemption rights that focused on BLMIS, including based on BLMIS continuing to be the Account Manager for Rye Broad Market, continuing to employ the SSC Strategy, and not being subject to a formal U.S. governmental investigation related to a specific breach of a U.S. securities law or regulation that would materially impact it and its ability to conduct its investment management business.

64.    Defendant invested in Harley with the specific purpose of having funds invested with BLMIS in New York as well. Defendant knew that Harley invested all of its assets with BLMIS in New York and that BLMIS would use the SSC Strategy.

65.     Similar to the Tremont Transactions, the Harley Derivatives Contract identified BLMIS as Harley's "Account Manager," stipulated that Harley's funds would be invested in BLMIS's SSC Strategy, and provided Defendant with special rights that would be triggered if BLMIS were no longer the Account Manager, no longer able to carry out the SSC Strategy, or became subject to any material claim, charge, or commencement of any proceeding by any governmental authority which alleged any wrongdoing related to the performance of its services.

66.     Investors in Harley, like Defendant, were required to execute subscription agreements with Harley as a precondition to making any investments. By executing the subscription agreements, Harley's investors affirmed having read, understood, and accepted the terms set forth in the Harley Confidential Explanatory Memorandum (the "Harley PPM"). As set forth in the Harley PPM, shareholders like Defendant also received copies of the fund's annual audited financial statements.

67.     As set forth in the Harley PPM and Harley's audited financial statements for years 2003 through 2007 (collectively, the "Audited Financial Statements"), Defendant understood that any returns on its investments in Harley were to be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options, and U.S. Treasuries. The 2007 Harley Audited Financial Statements disclosed that Harley's investments with BLMIS included U.S. Treasury Bills as well as U.S. traded equity securities. The 2007 Harley Audited Financial Statements reflected that on December 31, 2007, all of Harley's over $3 billion of assets invested with BLMIS were purportedly invested in U.S. Treasury Bills.

68.     The 2007 Harley Audited Financial Statements also disclosed that BLMIS in New York acted as the "Custodian" for all of Harley's assets. Specifically, those statements disclosed that:

17

(a)     "The company holds cash with . . . Bernard L. Madoff Investment Securities LLC;" and

(b)     "Bernard L. Madoff Investment Securities LLC holds assets worth $3,329,129,954."

69.     Additional elements of the Tremont and Harley Transactions demonstrated their connection to the United States and New York as well. During the relevant time period, Defendant maintained a bank account ending in 1541 at ABN AMRO's New York, New York branch (the "1541 Account"). Defendant utilized this account to receive collateral and redemption payments from the XL Funds and Rye Funds, respectively, from Tremont bank accounts located in New York.

70.     The Harley Derivatives Contract required that any payments to Defendant under the contract be made to the 1541 Account. Defendant also received all of the $21,799,920 in subsequent transfers of customer property from Harley into the 1541 Account.

71.     The documentation associated with the Tremont Transactions confirmed that Defendant would make payments under the Tremont swap agreements to Tremont bank accounts in New York from the 1541 Account. Similarly, Defendant made its subscription payments for its investments in the Rye Funds from the 1541 Account to Tremont New York bank accounts.

72.     The Harley Derivatives Contract directed that Defendant would make any payments under the contract to the Northern Trust bank account in New York. Similarly, Harley instructed its shareholders to make subscription payments to a New York bank account at Northern Trust in the name of Fortis Prime Fund Solutions (IOM), the administrator, banker, and nominal custodian to Harley. As an investor in Harley, Defendant would have complied with these instructions.

73.     In addition:

18

a.    The 2006 Tremont Swap Agreement required that any communication or notice to XL Portfolio Limited be directed to Tremont's headquarters in New York, and Johnston signed the 2006 Tremont Swap Agreement on XL Portfolio Limited's behalf.

b.    The 2006 Tremont Subscription Agreement was addressed to the attention of Harry Hodges, Supervisor of Investor Services, at Tremont in New York.  Defendant faxed subscription applications to Tremont using its Rye, New York fax number.

c.    Defendant entered into the 2007 Tremont Swap Agreement and corresponding subscription agreement with Tremont funds located in Rye, New York, and agreed to submit itself to the jurisdiction of New York in both agreements.

74.    Similarly, as set forth in the Harley PPM, Harley shareholders, like Defendant, agreed that their investments in Harley would be governed by the fund's articles of association (the "Harley Articles of Association"). The Harley Articles of Association, in turn, provided that all disputes among Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association.

75.    Defendant should also reasonably expect to be subject to New York jurisdiction because it filed claims in New York against the Rye Funds in a consolidated class action in the District Court, commenced by Tremont investors involving the various Tremont funds, *In re Tremont Sec. Law, State Law and Ins. Litig.*, No. 1:08-cv-11117-TPG (S.D.N.Y.). Upon information and belief, according to publicly available documents, thus far, Defendant has received an estimated $165.5 million in distributions as a result of its claims.

76.    Defendant thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Defendant should therefore expect to be, and is,

19

subject to the jurisdiction of the Bankruptcy Court pursuant to Bankruptcy Rule 7004 and the

United States Constitution, as well as N.Y. C.P.L.R. § 302.

## VI.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

77.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a

broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole

proprietorship to a New York limited liability company. At all relevant times, Madoff controlled

BLMIS first as its sole member, and thereafter as its chairman and chief executive.

78.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless

of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its

operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management

System database also reflects BLMIS's registration with the SEC as a securities broker-dealer

beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC

when SIPC was created and continued its membership without any change in status. SIPC

membership is contingent on registration of the broker-dealer with the SEC.

79.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and the IA Business.

80.    BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

81.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

82.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in

AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.     The Ponzi Scheme**

83.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities. The IA Business had

no legitimate business operations and produced no profits or earnings. Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

84.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity. It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS. The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

85.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

86.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.    *Madoff's Investment Strategy*

87.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

88.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank ("JPM"). These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

22

89.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

90.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

91.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

92.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

93.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

94.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

95.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

96.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

97.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

98.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 2.    BLMIS's Fee Structure

99.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.    BLMIS's Market Timing

100.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury Bills or mutual funds invested in U.S. Treasury Bills.

101.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

102.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4. *BLMIS Execution*

103.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5. *No Evidence of BLMIS Trading*

104.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

105.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation (the "OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### 6. *The Collapse of the Ponzi Scheme*

106.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

107.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that its IA Business operated as a Ponzi scheme.

108.    At all relevant times, BLMIS was insolvent because: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

VII.    <u>THE AVOIDANCE OF THE INITIAL TRANSFERS FROM BLMIS TO
TREMONT</u>

A.    **Tremont Knew That BLMIS's IA Business Was a Fraud**

109.    On December 7, 2010, the Trustee commenced an adversary proceeding against,
among others, Tremont, the Rye Funds, the XL Funds, and several other Tremont funds invested
wholly or in part with BLMIS (collectively, the "Tremont Feeder Funds"), seeking to avoid and
recover $2.1 billion of initial transfers from BLMIS that constitute customer property under
SIPA (the "Tremont Complaint"). The Trustee incorporates by reference the factual allegations
in the Tremont Complaint, as supplemented below.

110.    Tremont created, managed, and operated a number of feeder funds that invested
directly and indirectly with BLMIS.

111.    In a September 22, 2011 Order, the Bankruptcy Court approved a settlement
between the Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its
affiliates, and a former Tremont chief executive (collectively, the "Tremont Settling
Defendants") that obligated the Tremont Settling Defendants collectively to pay the Trustee
$1.025 billion for the benefit of the customer property estate (the "Tremont Settlement"). The
Tremont Settlement also provides that the transfers made to the Tremont Feeder Funds were
"deemed avoided."

*1.    Tremont's Senior Executives Had a Close Relationship with Madoff*

112.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or
around 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO,
helping to select money managers, including Madoff. Robert Schulman joined Tremont in 1994
and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

113.    Manzke and Schulman met and had regular calls with both Madoff and his top

lieutenant, Frank DiPascali. Schulman had a special relationship with Madoff, which Tremont

described as its "competitive edge." In fact, Tremont touted Schulman's unusually close

relationship with Madoff, stating that his "long-standing relationships with the principals of our

existing managers [BLMIS listed first among them] is clearly an edge over any firm

contemplating a similar business as our ability to negotiate preferential terms is related directly

to the strength and longevity of the relationships." Emphasizing Schulman's special relationship

with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's

unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities

throughout the year. . ." At least once, Madoff even sought Schulman's advice on hiring

decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a

potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year

relationship."

114.    Investors took notice of the relationship between Schulman and Madoff. For

example, a prospective investor had a call with Tremont in May 2007 where he referenced the

"friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back

to the relationship . . . Bob has been there many times and has worked w/ Bernie is [sic] business

since the 1980s."

      2.    *Tremont Received Repeated, Direct Fraud Warnings About BLMIS's IA
         Business*

115.    Tremont received warnings of BLMIS's fraudulent IA business from clients as

early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I

know you are sick of answering this but man is it hot out there with the Bernie fraud rumors."

The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

116.    Less than a month later, Tremont became aware of the Barron's and Mar/Hedge articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering to its clients BLMIS feeder funds. On May 7, 2001, Tremont's Chief Operating Officer (and later President) Barry Colvin emailed a number of Tremont employees alerting them to the articles and instructing them to direct third party questions to Tremont's management.

117.    On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a discussion Mitchell had with an investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at every year end; (iv) the absence of a third-party custodian; and (v) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

118.    Mitchell retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight, Darren Johnston, cautioning: "Don't attach this – but it's an interesting set of notes from a meeting years back . . . ."

119.    In March 2004, the investor who emailed Schulman in 2001 about the "Bernie fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments, explaining:

> My motivation for doing this is not due to some new buzz out there
> for as you know that is a constant din but rather that I can no

longer ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past . . . .

120.    When Madoff's scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail over this . . . ." (Emphasis in original.)

121.    In May 2004, Cichella emailed the senior vice president Rob Rosenbaum at that investment advisory firm, RogersCasey (where Tremont personnel, including Manzke, previously worked), was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ." Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member Stuart Pologe about what he dubbed "the Madoff black box" including, among other things, whether BLMIS' assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff (the response was that there was not and there never would be). After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff. If it looks too good to be true . . . ."

122.    In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and

portfolio manager Brian Marsh as part of its due diligence. Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

123.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme. Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved. During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

124.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

125.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 Barron's article.

126.    Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and

31

received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws. As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third-party controls and how he executes on his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

127.    Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 Barron's article, this time forwarding it to Mitchell, stating, "Enjoy!"

> 3.    *Tremont's Own Reporting Showed that BLMIS's Purported Trades Were Impossible*

128.    Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded. Tremont created reports and marketing materials of its own highlighting the impossible trading and performance. For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from

prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont

more than 20 such differences in 2006 alone.

129.    Tremont also estimated in its reports the amount BLMIS had in AUM and

calculated whether or not there was sufficient volume in each instrument for Madoff to be able to

execute such trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in

AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont

knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to

complete.

### 4.    *Tremont Exempted BLMIS From Its High Due Diligence Standards*

130.    The majority of Tremont's business involved placing its clients' assets with third-

party managers. For managers other than Madoff, Tremont implemented due diligence

procedures, investigated the quality of the management personnel, assessed key risk factors

associated with the investment, and continuously monitored the investment and the managers.

131.    As a sophisticated manager with industry-leading due diligence standards,

Tremont positioned itself at the forefront of initiatives to improve monitoring of investment

managers in light of frauds that preceded Madoff. Tremont claimed that its comprehensive

operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent

activity.

132.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS

from its due diligence standards. In fact, Tremont's executives deliberately prevented

transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship. To ensure

that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff,

Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya

don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's auditors.

133.    According to the SEC—which investigated Tremont after Madoff's arrest—Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers. The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

134.    Tremont also did not conduct due diligence on Friehling & Horowitz. Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors." In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

135.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

> 5.    *BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff*

136.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical. Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

137.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the

information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

138.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

139.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell took the conversation off-line, replying, "What is your telephone number?"

140.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form . . .  it would be great if you could convince them" that the assets existed.

141.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS feeder funds. Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime

broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Evidencing that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

> 6.    *Tremont Consistently Shielded Madoff From Third Party Due Diligence*

142.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.)

143.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [sp] agreement," before sending vague, one-word answers to the questions.

144.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

145.    In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

146.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

147.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional. We should discourage this . . . ." Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and we told [the investor] that we have never had an on site meeting with a client and BM."

148.    Tremont even restricted which of its employees could contact BLMIS. In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

149.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y. In May 2006, internal Tremont emails discussing EY's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff." In so doing, Tremont also misled EY, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

150.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

151.    Tremont also lied to investors when presented with concerns about BLMIS's auditors. As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers." Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

> 7.    *Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading*

152.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked. In fact, Schulman bragged internally that he taught Madoff how to trade options. Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

> a)    ***Divergent Answers on Over-the-Counter/Listed Trading Questions***

153.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over the counter ("OTC") as he represented, in light of (i) the Committee on Uniform Securities Identification Procedures (CUSIP) numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

154.    Tremont also knew that Madoff had not entered into any International Swaps and Derivatives Association (ISDA) agreements with any counterparties—a basic requirement for all OTC options trades.

155.    Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

156.    For example, a November 2006 Due Diligence Questionnaire ("DDQ") for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange." In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

157.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

### b)    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth with Fabrications

158.    Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

159.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds. This meant that the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

160.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk. A JPM representative even pointed out to Johnston that the trading counterparties should all have been known to Tremont if Madoff supposedly traded in the name of the account holder (*i.e.*, Tremont's Feeder Funds), and not in BLMIS's name. But Tremont

never spoke with a single counterparty for Madoff's purported options trading, because there were none.

161.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed depending on who was asking. In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not disclosed [any counterparty names] to us." Kelly nevertheless later told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it."

162.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

163.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM—who had just inquired on the identity of the counterparties—as one of them.

164.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

165.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston

"confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

166.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the time—led to industry and investor panic. Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

167.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

168.    Tremont worked to avoid discussions with investors regarding the Lehman collapse. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

169.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that . . . [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure.'"

170.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk. If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

8. *Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff*

171.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont Feeder Funds' AUM increasing rapidly. For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

172.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

173.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm." Cichella said Rye Prime Fund's "only reason for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack addiction business."

174.    Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff." Tremont did nothing more to earn its fees through its Tremont Feeder Funds than provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee . . . We make a lot of money off this." As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

175.    Fees were a powerful reason for funds like Tremont to close their eyes and hide what they knew about BLMIS's fraud. As noted by Albourne in late 2008, "[w]e have been advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

9.    *Tremont Co-Managed Kingate Global*

176.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship with the Kingate-related feeder funds and management.

177.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, "Kingate").

178.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

179.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud. Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke. Specifically, in or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global. Manzke and Hammond were listed as "principal decision-makers" in May 2005.

180.    As part of this deal, Kingate Management and Tremont Bermuda also split Kingate Global's management fees, which provided Tremont with significant revenue. Between 1998 and 2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

181.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global through their conduct and the operation of the various agreements entered into between the

parties. As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont.

## VIII.    RECOVERY OF THE TREMONT SUBSEQUENT TRANSFERS

### A.    The Initial Transfers to the Tremont Initial Transfer Funds

182.    The Trustee commenced a separate adversary proceeding against the Tremont Initial Transfer Funds and other funds directly or indirectly invested with BLMIS that were managed by Tremont, in the Bankruptcy Court under the caption, *Picard v. Tremont Group Holdings, Inc. et al*, Adv. Pro. No. 10-05310 (CGM) (the "Tremont Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS in the approximate amount of $2,140,297,364 (the "Tremont Initial Transfers"). The Trustee incorporates by reference the allegations contained in the Tremont Avoidance Action complaint (the previously defined "Tremont Complaint") as if fully set forth herein. *Id.*, ECF No. 1.

183.    The Tremont Initial Transfers are set forth in the attached Exhibit B (reflecting Tremont Initial Transfers to Rye Broad Market, the "Rye Broad Market Initial Transfers"), Exhibit F (reflecting Tremont Initial Transfers to Rye Prime Fund, the "Rye Prime Fund Initial Transfers") Exhibit I (reflecting Tremont Initial Transfers to Rye Portfolio Limited, the "Rye Portfolio Limited Initial Transfers"), and Exhibit M (reflecting Tremont Initial Transfers to Rye Insurance LDC, the "Rye Insurance LDC Initial Transfers"). The Tremont Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

184.    By the Order dated September 22, 2011, this Court approved a settlement among the Trustee, the Tremont Funds, and other defendants in the Tremont Avoidance Action (the previously defined "Tremont Settlement") and entered a consent judgment granting the Trustee a judgment in the amount of $1,025,000,000 (ECF Nos. 17, 38).

185.    The Tremont Settlement specifically provides that the transfers made to the various feeder fund defendants in the Tremont Complaint, including the Tremont Initial Transfers, were "deemed avoided."

186.    As alleged above in paragraphs 109-181, Tremont received each of the Tremont Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Tremont to inquire further into the BLMIS fraud. *See also* Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al*, Adv. Pro. No. 09-1364 (CGM), ECF No. 399 (detailing Tremont's relationship with BLMIS).

## B.    Initial Transfers from BLMIS to Rye Broad Market

187.    Of the Tremont Initial Transfers, $252,000,000 was transferred to Rye Broad Market, Account Number 1T0027, in the six years preceding the Filing Date (the "Rye Broad Market Six Year Transfers"). Exhibit B. The Rye Broad Market Six Year Transfers are avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

188.    Of the Rye Broad Market Six Year Transfers, $60,000,000 was transferred to Rye Broad Market during the two years preceding the Filing Date (the "Rye Broad Market Two Year Transfers"). Exhibit B. The Rye Broad Market Two Year Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

189.    The Rye Broad Market Six Year Transfers and the Rye Broad Market Two Year Transfers are collectively defined as the "Rye Broad Market Initial Transfers."

## C.    Initial Transfers from BLMIS to Rye Prime Fund

190.    Of the Tremont Initial Transfers, $945,000,000 was transferred to Rye Prime Fund, Account Number 1C1260, in the six years preceding the Filing Date (the "Rye Prime Fund Six Year Transfers"). Exhibit F. The Rye Prime Fund Six Year Transfers are avoidable under

section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law,

particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

191.    Of the Rye Prime Fund Six Year Transfers, $495,000,000 was transferred to Rye

Prime Fund during the two years preceding the Filing Date (the "Rye Prime Fund Two Year

Transfers"). Exhibit F. The Rye Prime Fund Two Year Transfers are avoidable under section 548

of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

192.    The Rye Prime Fund Six Year Transfers and the Rye Prime Fund Two Year

Transfers are collectively defined as the "Rye Prime Fund Initial Transfers."

### D.    Initial Transfers from BLMIS to Rye Portfolio Limited

193.    Of the Tremont Initial Transfers, $609,000,000 was transferred to Rye Portfolio

Limited, Account Number 1FR080, in the six years preceding the Filing Date (the "Rye Portfolio

Limited Six Year Transfers"). Exhibit I. The Rye Portfolio Limited Six Year Transfers are

avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. &

Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

194.    Of the Rye Portfolio Limited Six Year Transfers, $350,000,000 was transferred to

Rye Portfolio Limited during the two years preceding the Filing Date (the "Rye Portfolio

Limited Two Year Transfers"). Exhibit I. The Rye Portfolio Limited Two Year Transfers are

avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA,

particularly § 78fff-2(c)(3).

195.    The Rye Portfolio Limited Six Year Transfers and the Rye Portfolio Limited Two

Year Transfers are collectively defined as the "Rye Portfolio Limited Initial Transfers."

### E.    Initial Transfers from BLMIS to Rye Insurance LDC

196.    Of the Tremont Initial Transfers, $90,650,000 was transferred to Rye Insurance

LDC, Account Number 1FR010, in the six years preceding the Filing Date (the "Rye Insurance

LDC Six Year Transfers"). Exhibit M. The Rye Insurance LDC Six Year Transfers are avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

197.    Of the Rye Insurance LDC Six Year Transfers, $48,750,000 was transferred to Rye Insurance LDC during the two years preceding the Filing Date (the "Rye Portfolio Limited Two Year Transfers"). Exhibit M. The Rye Insurance LDC Two Year Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

198.    The Rye Insurance LDC Six Year Transfers and the Rye Insurance LDC Two Year Transfers are collectively defined as the "Rye Insurance LDC Initial Transfers."

F.    **The 2006 Tremont Transaction: Subsequent Transfers of Collateral Payments and Redemption Payments**

199.    The Trustee seeks to recover at least $189,080,573 in subsequent transfers of customer property to Defendant in connection with the 2006 Tremont Transaction.

200.    During the six years prior to the Filing Date, from the Rye Portfolio Limited Initial Transfers, Rye Portfolio Limited transferred at least $74,298,573 to XL Portfolio Limited. *See* Exhibit K.

201.    During the six years prior to the Filing Date, from the Rye Insurance LDC Initial Transfers, Rye Insurance LDC transferred at least $10,318,000 to XL Portfolio Limited. *See* Exhibit N.

202.    XL Portfolio Limited transferred to Defendant at least $217,000,000 in collateral pursuant to the 2006 Tremont Transaction. *See* Exhibit P. XL Portfolio Limited received at least $84,616,573 in customer property from Rye Portfolio Limited and Rye Insurance LDC (the "XL

Portfolio Limited Subsequent Transfers"), as well as additional transfers from other Tremont-related entities.[1]

203.    Defendant hedged its obligations to XL Portfolio Limited pursuant to the 2006 Tremont Transaction by investing in Rye Portfolio Limited. Because it purchased shares of Rye Portfolio Limited, Defendant was entitled to redeem from the fund. From September 2007 until the Filing Date, Defendant redeemed from Rye Portfolio Limited at least $104,464,000 (the "Rye Portfolio Limited Subsequent Transfers"). *See* Exhibit J. This is a portion of the $609 million of customer property that Rye Portfolio Limited received from BLMIS during the six years preceding the Filing Date.

### G.    The 2007 Tremont Transaction: Subsequent Transfers of Collateral Payments and Redemption Payments

204.    The Trustee seeks to recover at least $97,233,333 in subsequent transfers of customer property to Defendant in connection with the 2007 Tremont Transaction.

205.    During the six years before the Filing Date, from the Rye Broad Market Initial Transfers, Rye Broad Market subsequently transferred at least $48,387,616 to XL Broad Market. *See* Exhibit D.

206.    During the six years before the Filing Date, from the Rye Prime Fund Initial Transfers, Rye Prime Fund subsequently transferred at least $292,472,765 to XL Broad Market. *See* Exhibit G.

207.    Using the funds received from Rye Broad Market and Rye Prime Fund, XL Broad Market transferred to Defendant at least $95,833,333 in collateral pursuant to the 2007

---

[1] The Trustee's investigation is ongoing. Upon complete discovery and review of comprehensive bank records of XL Portfolio Limited, which are not currently available to the Trustee, additional transfers of customer property to XL Portfolio Limited, and/or from XL Portfolio Limited to Defendant, may be identified.

Transaction, *see* Exhibit O, all of which constituted customer property that XL Broad Market received from Rye Broad Market and Rye Prime Fund (the "XL Broad Market Subsequent Transfers").

208.    Defendant hedged its obligations to XL Broad Market pursuant to the 2007 Tremont Transaction by investing in Rye Broad Market. Because it purchased shares of Rye Broad Market, Defendant was entitled to redeem from the fund. On November 3, 2008, Defendant received from Rye Broad Market a subsequent transfer of customer property totaling at least $1,400,000 (the "Rye Broad Market Subsequent Transfers"). *See* Exhibit C. This is a portion of the $252 million of customer property that Rye Broad Market received from BLMIS during the six years preceding the Filing Date.

* * *

209.    The XL Portfolio Limited Subsequent Transfers, Rye Portfolio Limited Subsequent Transfers, XL Broad Market Subsequent Transfers, and Rye Broad Market Subsequent Transfers (collectively, the "Tremont Subsequent Transfers") collectively total at least $286,313,906.

210.    The Tremont Subsequent Transfers are recoverable from Defendant under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

211.    The Trustee's investigation is ongoing, and the Trustee reserves his right to: (i) supplement the information on the initial and subsequent transfers discussed and any additional transfers; and (ii) seek recovery of such subsequent transfers of BLMIS customer property to Defendant.

## IX.    RECOVERY OF THE HARLEY SUBSEQUENT TRANSFERS

### A.    Initial Transfers from BLMIS to Harley

212.    The Trustee filed an adversary proceeding against Harley in the Bankruptcy Court

under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL) (the

"Harley Avoidance Action"), in which, in part, the Trustee sought to avoid and recover initial

transfers of customer property from BLMIS to Harley in the amount of approximately

$1,072,800,000. The Trustee incorporates by reference the allegations contained in the Harley

Avoidance Action complaint as if fully set forth herein.

213.    On November 10, 2010, the Bankruptcy Court entered a default judgment against

Harley in the amount of $1,072,820,000 (ECF No. 15). Of this amount, $1,066,800,000 was

awarded in a default summary judgment against Harley. The Trustee has not recovered any

monies as a result of the November 10, 2010 judgment.

214.    During the six years preceding the Filing Date, $1,072,800,000 was transferred to

Harley, Account Number 1FN094 (the "Harley Six Year Initial Transfers"). Exhibit R. The

Harley Six Year Initial Transfers are avoidable and recoverable under section 544 of the

Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279,

and of SIPA, particularly § 78fff-2(c)(3).

215.    Of the Harley Six Year Initial Transfers, approximately $1,066,800,000 was

transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year

Initial Transfers"). Exhibit R. The Harley Two Year Initial Transfers are avoidable under section

548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

216.    The Harley Six Year Initial Transfers and Harley Two Year Initial Transfers are

collectively defined as the "Harley Initial Transfers."

B.        **Subsequent Transfers from Harley to Defendant**

217.    Prior to the Filing Date, a portion of the Harley Initial Transfers was subsequently

transferred either directly or indirectly to, or for the benefit of, Defendant. Based on the Trustee's

investigation to date, the subsequent transfer to, or for the benefit of, Defendant total

$21,799,920 (the "Harley Subsequent Transfers").  A chart setting forth the presently known

Harley Subsequent Transfers is attached as Exhibit S.

218.    The Harley Subsequent Transfers are recoverable from Defendant under section

550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

219.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the

right to: (i) supplement the information on the Harley Initial Transfers, Harley Subsequent

Transfers, and any additional subsequent transfers, and (ii) seek recovery of such transfers.

**COUNT ONE**

**RECOVERY OF RYE PORTFOLIO LIMITED SUBSEQUENT TRANSFERS**

**11 U.S.C. §§ 105(a) AND 550(a)**

220.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Consolidated Second Amended Complaint as if fully rewritten herein.

221.    Defendant received the Rye Portfolio Limited Subsequent Transfers totaling at

least $104,464,000. The Rye Portfolio Limited Subsequent Transfers are recoverable pursuant to

section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

222.    Defendant is an immediate or mediate transferee of the Rye Portfolio Limited

Subsequent Transfers.

223.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Defendant: (a) recovering the Rye Portfolio Limited Subsequent Transfers, or the value thereof,

from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT TWO

### RECOVERY OF XL PORTFOLIO LIMITED SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550(a)

224.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Consolidated Second Amended Complaint as if fully rewritten herein.

225.    Defendant received the XL Portfolio Limited Subsequent Transfers, totaling approximately $84,616,573. The XL Portfolio Limited Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

226.    Defendant is an immediate or mediate transferee of the XL Portfolio Limited Subsequent Transfers.

227.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the XL Portfolio Limited Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT THREE

### RECOVERY OF RYE BROAD MARKET SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550(a)

228.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Consolidated Second Amended Complaint as if fully rewritten herein.

229.    Defendant received the Rye Broad Market Subsequent Transfers totaling at least $1,400,000. The Rye Broad Market Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

230.    Defendant is an immediate or mediate transferee of the Rye Broad Market Subsequent Transfers.

231.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the Rye Broad Market Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT FOUR

## RECOVERY OF XL BROAD MARKET SUBSEQUENT TRANSFERS

## <u>11 U.S.C. §§ 105(a) AND 550(a)</u>

232.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Consolidated Second Amended Complaint as if fully rewritten herein.

233.    Defendant received the XL Broad Market Subsequent Transfers totaling at least $95,833,333. The XL Broad Market Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

234.    Defendant is an immediate or mediate transferee of the XL Broad Market Subsequent Transfers.

235.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the XL Broad Market Subsequent Transfers, or the value thereof, from

Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**COUNT FIVE**

**RECOVERY OF HARLEY SUBSEQUENT TRANSFERS**

**11 U.S.C. §§ 105(a) AND 550(a)**

236. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Consolidated Second Amended Complaint as if fully rewritten herein.

237. Defendant received the Harley Subsequent Transfers totaling at least $21,799,920. The Harley Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

238. Defendant is an immediate or mediate transferee of the Harley Subsequent Transfers.

239. As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the Harley Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems just and appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant as follows:

i.      On the First Claim for Relief, recovering the Rye Portfolio Limited Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate;

ii.     On the Second Claim for Relief, recovering the XL Portfolio Limited Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate;

54

iii.    On the Third Claim for Relief, recovering the Rye Broad Market Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate;

iv.    On the Fourth Claim for Relief, recovering the XL Broad Market Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate;

v.    On the Fifth Claim for Relief, recovering the Harley Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate;

vi.    If Defendant challenges the avoidability of the Tremont Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Tremont Initial Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Tremont Subsequent Transfers pursuant to section 550 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3);

vii.    If Defendant challenges the avoidability of the Harley Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Harley Initial Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Harley Subsequent Transfers pursuant to section 550 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3);

viii.    On all Claims for Relief, awarding the Trustee prejudgment interest from the date on which the Tremont Subsequent Transfers or the Harley Subsequent Transfers were received by Defendant, respectively;

ix.    On all Claims for Relief, awarding the Trustee fees and all applicable costs and

disbursements, and such other, further, and different relief as the Court deems just, proper, and

equitable.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Trustee demands trial by

jury in this action of all issues so triable.


Dated:    March 22, 2022                    /s/ Patrick T. Campbell
          New York, New York            **Baker & Hostetler LLP**
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone:   (212) 589-4200
                                        Facsimile:   (212) 589-4201
                                        David J. Sheehan
                                        dsheehan@bakerlaw.com
                                        Patrick T. Campbell
                                        pcampbell@bakerlaw.com
                                        Camille C. Bent
                                        cbent@bakerlaw.com
                                        Matthew K. Cowherd
                                        mcowherd@bakerlaw.com
                                        Elizabeth G. McCurrach
                                        emccurach@bakerlaw.com


                                        *Attorneys for Irving H. Picard, as*
                                        *Trustee for the Substantively Consolidated*
                                        *SIPA Liquidation of Bernard L. Madoff*
                                        *Investment Securities LLC and the Estate of*
                                        *Bernard L. Madoff*