**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

              Plaintiff-Applicant,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

              Defendant.

In re

BERNARD L. MADOFF,

              Debtor.

Adv. Pro. No. 08-01789 (CGM)

SIPA LIQUIDATION

(Substantively Consolidated)

IRVING H. PICARD, Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L. Madoff,

              Plaintiff,

v.

JACOB M. DICK REV LIVING TRUST DTD 4/6/01,
individually and as tenant in common,

ESTATE OF JACOB M. DICK, as grantor of the Jacob
M. Dick Rev Living Trust Dtd 4/6/01,

ANDREA J. MARKS, as trustee and beneficiary of the
Jacob M. Dick Rev Living Trust Dtd 4/6/01, as
executor and beneficiary of the Estate of Jacob M.
Dick, and as trustee of the Article 8.1 Trust created
under the Jacob M. Dick Rev Living Trust Dtd 4/6/01,

REID DORAL ASHLEY, as beneficiary of the Article
8.1 Trust created under the Jacob M. Dick Rev Living
Trust Dtd 4/6/01,

RIO JOCELYN BREEN, as beneficiary of the Article
8.1 Trust created under the Jacob M. Dick Rev Living
Trust Dtd 4/6/01,

ARTICLE 8.1 TRUST,

SUZANNE BREEN, as beneficiary of the Estate of
Jacob M. Dick and the Jacob M. Dick Rev Living Trust
Dtd 4/6/01, and

DOUGLAS J. STURLINGH, as beneficiary of the
Estate of Jacob M. Dick and the Jacob M. Dick Rev
Living Trust Dtd 4/6/01,

              Defendants.

Adv. Pro. No. 10-04570 (CGM)

**TRUSTEE'S RESPONSES AND OBJECTIONS TO DEFENDANTS'
COUNTERSTATEMENT OF MATERIAL FACTS**

Plaintiff Irving H. Picard (the "Trustee"), the Trustee[1] for the liquidation of Bernard L. Madoff Investment Securities LLC and the substantively consolidated chapter 7 estate of Bernard L. Madoff, respectfully submits, pursuant to Local Rule 56.1, his responses and objections to the Counterstatement of Material Facts ("CMF") submitted by Jacob M. Dick Rev Living Trust Dtd 4/6/01 (the "Living Trust"), Estate of Jacob M. Dick (the "Estate"), as grantor of the Living Trust, Article 8.1 Trust created under the Living Trust, and Andrea J. Marks, as trustee of the Living Trust, as executor of the Estate, and as trustee of the Article 8.1 Trust created under the Living Trust (collectively, the "Defendants")[2] in Opposition to the Trustee's Motion for Summary Judgment, ECF No. 115.

**Madoff's Business**

1.      From the 1960s on, Madoff operated two separate business units through his sole proprietorship called Bernard L. Madoff Investment Securities (the sole proprietorship "Sole Prop").  Madoff operated a legitimate trading business which, at times, executed trades equal to 10% of the daily volume on the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading Business included both proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM"), which created a market in certain securities and acted as a broker-dealer for all of the major investment firms.  Declaration of Helen Chaitman ("Chaitman Decl.") **Ex. A** [Nelson Tr.[3] 5/8/19 at 63:6:11; 63:14-1], and an investment advisory business ("IA"). Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 63:3-4].

---

[1] Defined terms shall have the same meaning prescribed in the Trustee's Statement of Material Facts in Support of Motion for Summary Judgment ("Stmt."). *See Picard v. Jacob M. Dick Rev Living Trust Dtd 4/6/01*, Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y.  February 28, 2022), ECF No. 104.

[2] Not disputed that the remaining defendants named in this action were dismissed.  Stmt. n.3.

[3] *Picard v. Carol & Stanley Nelson*, (*"Nelson"*), Adv. Pro. Nos. 10-04377 and 10-04658. The trial of this consolidated case was held on May 8 and 9, 2019 and references to the transcript of the trial appear as "Nelson Tr. [date] at [page reference]."

**RESPONSE:** Not disputed that beginning in 1960 and until January 1, 2001, BLMIS operated as a sole proprietorship.  Not disputed that BLMIS operated a proprietary trading business and a market-making business as two of its three business units.  Disputed to the extent these statements are inconsistent with Stmt. ¶¶ 8–20, ECF No. 104.  Disputed that the proprietary trading business and the market-making business executed trades equal to 10% of the daily volume on the New York Stock Exchange as immaterial and lacking evidentiary support.

2.     The Legitimate Trading Business was known internally as "House 5."  Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 62:18-19].

**RESPONSE:**  Not disputed that the proprietary trading and market-making businesses were referred to within BLMIS as "House 5."  Stmt. ¶ 18.

3.     The IA business was known internally as "House 17" since it was located on the 17th floor of the Lipstick Building. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 63:4-6].

**RESPONSE:**  Not disputed.

4.     There were approximately 172 employees who worked in the Legitimate Trading Business and only 6 to 8 people who worked in the IA business.  Chaitman Decl**. Ex. A** [Nelson Tr. 5/8/19 at 168:14-17].

**RESPONSE:**  Disputed as immaterial.  In addition, the evidence cited by Defendants states that there were approximately 180 or so employees for the "whole operation" and eight to ten employees involved in the "Ponzi scheme."

5.     All of the banking activity of the Legitimate Trading Business was conducted at the Bank of New York ("BNY"). Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8].

**RESPONSE:** Disputed to the extent that the statement is not supported by admissible

evidence.[4]  Not disputed that the primary banking activity of the proprietary trading business was conducted at BNY.  Bruce Dubinsky's expert report states: "In the Proprietary Trading Business, the primary operating account was the Bank of New York ('BONY') account number 8661126621 (the '621 Account')."  Dubinsky Decl., Attach. A (Dubinsky Report)) ¶ 78, ECF No. 104-1; *see also* Collura Decl., Attach. A (Collura Report)) ¶ 17 n.2, ECF No. 103-1.

6.    The PT and MM Businesses were legitimate and were not involved in an alleged Ponzi scheme, as admitted to by Picard's expert witness, Bruce Dubinsky, at the Nelson trial. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and MM] of the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So, the proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business had a trading platform? A. It had a trading platform and it actually traded. That's what it did."); 122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period? A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme, "Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

**RESPONSE:** Disputed to the extent the statement is not supported by admissible evidence.  *See* n.4.  The proprietary trading business was engaged in pervasive fraudulent

---

[4] The Trustee does not dispute the admissibility of testimony by his experts.  However, Defendants routinely mischaracterize the testimony by selectively citing to or quoting language from counsel's questions rather than the actual testimony of the witness.

activity. *See* Dubinsky Decl., Attach. A (Dubinsky Report) Part IV.C.

7.      Madoff operated his entire business as a sole proprietorship until January 2001.

Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681; *see e.g.* Complaint

("Compl.") at ¶ 25, Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y. November 30, 2010), ECF No. 1.

**RESPONSE**: Not disputed.

8.      Madoff used the trade name "Bernard L. Madoff Investment Securities" for his

sole proprietorship from at least the 1970's, as admitted to by Dubinsky.  Chaitman Decl. **Ex. A**

[Nelson Tr. 5/8/19 172: 9:17 (Q. you're aware, are you not, that Mr. Madoff used the tradename

Bernard L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on

many documents, yes."]; Chaitman Decl. **Ex. B** [Confirmation Slips dating from 1979 showing

the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]],[5]

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y.

2019).  Even the account statement for the 703 account for December 2008, the final month of

the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff

Investment Securities" without any reference to the LLC.  Chaitman Decl. **Ex. C** [703 Account

Statement for December 2008].

**RESPONSE:**  Not disputed that "Madoff Securities frequently used the trade name

'Bernard L. Madoff Investment Securities' in the course of its business." *Picard v. Nelson*, 610

B.R. 197, 206 (Bankr. S.D.N.Y. 2019).

9.      In January 2001, Madoff formed the LLC to which he transferred the PT and MM

---

[5] Attached to the Chaitman Declaration as **Ex. B** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

businesses, managed by his two sons. Chaitman Decl. **Ex**. **D** [SEC Amended Form BD]; *see*

Compl. at ¶ 25.

**RESPONSE:** Not disputed that Madoff transferred the assets and liabilities of the

proprietary trading business and the market making business from the sole proprietorship to a

single member limited liability company in January 2001. Stmt. ¶ 9. Along with "House 5,"

Madoff also transferred "House 17." Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38;

*see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business

units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment

advisory business.").

10.    In January 2001, Madoff notified BNY and the governmental agencies with which

the Legitimate Trading Business dealt that the LLC was formed and would operate the

Legitimate Trading Business. *See* the following notification letters all dated January 1, 2001:

Chaitman Decl. **Ex**. **E** [Letter from the LLC to BNY; Letter from the LLC to the National

Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation;

Letter from the LLC to the Depository Trust Company].

**RESPONSE:** Not disputed that Madoff notified BNY and governmental agencies of the

formation of the LLC in January 2001 but disputed that the LLC would only operate the market

making business and proprietary trading business. BLMIS operated as a "single enterprise."

Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206

("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading

business; (ii) a market-making business; and (iii) an investment advisory business."). The

documents speak for themselves.

11.    Neither JPMC nor Madoff has any record of any such letter ever being sent to

7

JPMC. Chaitman Decl. **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian

Shifrin to Helen Davis Chaitman].

    **RESPONSE:** Not disputed that such a letter has not been located to date in BLMIS's

books and records.

    12.    Madoff did not transfer the IA Business to the LLC. In the unsigned Amended

Form BD that Madoff submitted to the SEC, he did not check off the boxes indicating that the

LLC would engage in investment advisory services. See e.g. Chaitman Decl. **Ex. D** [SEC

Amended Form BD at 8-10].

    **RESPONSE:** Disputed. *See* Stmt. ¶¶ 9–13.

    13.    Madoff did not register with the SEC as an investment advisor until late 2006.

*Id.; In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd*

654 F.3d 229 (2d Cir. 2011).

    **RESPONSE:** Not disputed.

    14.    Even after Madoff registered with the SEC as an investment advisor in August

2006, the LLC's FOCUS reports all indicated no investment advisory activities. *See e.g.*

Chaitman Decl. **Ex. G,** FOCUS report dated 9/2/07 at 9 (MADTEE00461879) answer 7;

Chaitman Decl. **Ex. H,** FOCUS report dated 10/20/07 at 9 (MADTEE00462042) answer 7;

Chaitman Decl. **Ex. I,** FOCUS report dated 12/2/07 at 9 (MESTAAT00005373) answer 7.

Chaitman Decl. **Ex. J,** FOCUS report dated 1/31/08 at 7 (PUBLIC0002923) answer 7; Chaitman

Decl. **Ex. K,** FOCUS report dated 3/31/08 at 7 (PUBLIC0002965) answer 7; Chaitman Decl. **Ex.**

**L,** FOCUS report dated 5/30/08 at 7 (PUBLIC0003007) answer 7.

    **RESPONSE:** Not disputed that in nearly all instances BLMIS's FOCUS reports

improperly excluded "customer receivables, customer payables, and customer account balances in their computation for the 15c3-3 reserve requirements." Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 316; *see also id.* ¶ 304 ("As a registered broker-dealer operating through 2008, BLMIS was required to file FOCUS reports with the SEC . . . that set forth, among other information, assets, liabilities, revenues, and expenses of the company."). As a result, "the reports and financial statements filed with federal regulators were false, misleading, and grossly inaccurate." *Id.* ¶ 31; *see also id.* ¶¶ 304–317, Table 10; 352–53.

15. Customers of the LLC received their Form 1099s directly from the LLC, not from Bernard L. Madoff. *See e.g.* Chaitman Decl. **Ex. M** [Misc. 1099 form].

**RESPONSE:** Not disputed that BLMIS issued Form 1099s for tax purposes to customers that held BLMIS accounts, but disputed as to the distinction made between the LLC and "Bernard L. Madoff." Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001, but BLMIS continued to issue checks and Form 1099s with "Bernard L. Madoff" as the entity name. Stmt. ¶¶ 9 (citing Cremona Decl., Ex. 3 (2001 SEC Amended Form BD)); 88 (citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).

**The Bank Accounts**

**The LLC Account**

16. As set forth above at ¶¶ 5 and 10, the Legitimate Trading Business maintained an account with BNY. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8]. In January 2001, Madoff notified BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman Decl. **Ex. E** [Letter from the LLC to BNY]. BNY required the LLC to fill out an account services form for the LLC in which Madoff indicated that the LLC was a

"broker/dealer." There is no mention in the form of the LLC providing investment advisory services. Chaitman Decl. **Ex. N** [BNY Due Diligence Form].

**RESPONSE:** The Trustee's response to ¶¶ 5 and 10 are incorporated herein. Not disputed that the banking activity of the market making business and proprietary trading business was conducted at BNY. *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78 ("In the Proprietary Trading Business, the primary operating account was the Bank of New York ("BONY") account number 8661126621 (the "621 Account")."). Not disputed that Madoff notified Bank of New York of the formation of the LLC in January 2001 but disputed that the LLC would only operate the market making business and proprietary trading business. BLMIS operated as a "single enterprise." *Id.* ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.").

17.    The LLC account at BNY was used to fund all of the expenses of the Legitimate Trading Business, including the purchase of securities. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:14-16].

**RESPONSE:** Disputed as irrelevant and lacking evidentiary support that "all of" the expenses were funded out of the account at BNY for House 5. Not disputed that the BNY account was used for expenses. *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78.

18.    Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008. Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-

162-:2 (Q. "[I]n the period from 2000 through 2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

**RESPONSE:** Disputed to the extent the statement is not supported by admissible evidence and is incomplete. *See* n.4; *see also* Declaration of Seanna R. Brown ("Brown Decl."), Ex. 1 (Trial Testimony of Bruce G. Dubinsky in *Picard v. Nelson* dated May 8, 2019 ("Nelson Tr.")) at 160:24–162:2, 139:18–141:14; Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 338–39 & Table 11; ¶ 354.

19.    The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes. Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry." Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/2017 at 24:6-25:13] *see also, e.g.* Chaitman Decl. **Ex. P** [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives at p. 20]. In the month of January 2001, over $5 billion passed through the 703 Account. Chaitman Decl. **Ex. Q** [703 Account Statement for January 2001].

**RESPONSE:** Not disputed that funds transferred from the IA Business were used for margin calls, but Dubinsky further explained that:

> As previously detailed, the Proprietary Trading Business was improperly subsidized and propped up by numerous cash infusions of IA Business Customer Money from the IA Business. Over the ten-year period for which bank statements and corresponding data were available, over 185 separate cash infusions were made to the Proprietary Trading Business from the IA Business (directly or indirectly), totaling approximately $800 million. (*See* Exhibit 34 – "Cash Infusions of IA Business Customer Money from the IA Business to the Proprietary Trading Business, July 1999 to November 30, 2008".) Initially, cash was transferred via check or wire from the IA Business to the Proprietary Trading Business directly from the 703 Account or from an IA Business-funded brokerage

account; later cash infusions were effectuated through a more complex scheme that purported to reflect securities transactions.

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 354; *see also id.* ¶ 355 ("In connection with the cash infusions, fictitious securities transactions were recorded on three Proprietary Trading Business trading accounts . . . .", ¶¶ 338–39.

### The 703 Account

20.    The IA Business placed its customer deposits into an account at JPMC ending in "703" (the "703 Account"). Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:** Not disputed.  Stmt. ¶ 72.

21.    As of December 2001, almost a year after the LLC was formed, JPMC customer statements for the 703 Account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman Decl. **Ex. T** [703 Account Statement for December 2001]. Chaitman Decl. Ex. R [703 Account Statement for December 2001]. Thereafter, the 703 Account name was in Madoff's trade name, Bernard L. Madoff Investment Securities. The 703 Account was never in the name of the LLC and there is not a single document produced by JPMC which suggests that the LLC owned the 703 Account. *See e.g.* Chaitman Decl. **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements [multiple bates nos.]]; Chaitman Decl. **Ex. T** [Compilation of 703 Account Statements [multiple bates nos.]]; Chaitman Decl. **Ex. E** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

**RESPONSE:** Not disputed to the extent the documents speak for themselves.  At all times, the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 87–90.

22.    Moreover, through August 2002, the JPMC customer statements for the 703 account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman Decl. **Ex. U** [703 Account Statement August 1 – August 30, 2002 in the name of "Bernard L. Madoff"].  In September 2002, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship.  Chaitman Decl. **Ex. V** [703 Account Statement August 31 - September 30, 2002 in the trade name of "Bernard L. Madoff Investment Securities"].

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  At all times, the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 87–90.

23.    Through 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff." Chaitman Decl. **Ex. W** [Check dated July 16, 2008[6] paid to "Bernard Madoff Securities" [JPMSA10013257]].

**RESPONSE:**  Disputed as not supported by the evidence cited.  Disputed further as irrelevant because Ex. W involves a check from a different BLMIS customer.

24.    As late as December 2008, the statements for the 703 Account continue to list the account as owned by the sole proprietorship, without any reference to the LLC. Chaitman Decl. **Ex. C** [703 Account Statement for December 2008].

**RESPONSE:**  Disputed to the extent Defendants characterize the sole proprietorship as BLMIS, not "Bernard L. Madoff."  Disputed as to the distinction made between the LLC and "Bernard L. Madoff."  Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶ 9 (citing Cremona Decl., Ex. 3 (2001 SEC Amended Form

---

[6] The deposit check referenced is merely an example, and belongs to the account of Zieses Investment Partnership.

BD)).

**The 509 Account**

25.    Madoff held an account at JPMC ending in "509" (the "509 Account").  Chaitman

**Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:**  Not disputed that BLMIS held the 509 Account.  Stmt. ¶ 69.  The

JPMorgan Accounts were linked commercial business accounts.  *Id.* ¶ 72.  At all times, these

accounts held customer money.  *See id.* ¶¶ 87–90.

26.    The 509 Account was opened and held by Madoff's sole proprietorship long

before the LLC came into existence in 2001.  *See e.g.* Chaitman Decl. **Ex. X** [509 Account

Statement from 1998 [MADWAA00378495-98]].

**RESPONSE:**  Not disputed that the 509 Account was opened and held by the sole

proprietorship prior to 2001.  The JPMorgan Accounts were linked commercial business

accounts.  Stmt. ¶ 72.  At all times, these accounts held customer money.  *See id.* ¶¶ 87–90.

27.    There is not a shred of evidence that either the 703 or the 509 Account was ever

held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts

were always held by Madoff individually. *See e.g.* Chaitman Decl. **Ex. F** [Email dated June 12,

2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman Decl.

**Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. T** [Compilation of 703

Account Statements]; Chaitman Decl. **Ex. Y** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-10:5-21, 12:5-

18:6; 26:24-29:11].

**RESPONSE:**  Disputed.  *See* Stmt. ¶¶ 87–90.

28.    The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura (whose firm was paid over $40 million by the Trustee) have never seen a bank statement for either the 509 Account or the 703 Account in the name of the LLC.  Chaitman Decl. **Exs. A and Y** [Nelson Tr. 5/8/19 at 171:23-172:8, Nelson Tr. 5/9/19 at 13:7-20].

**RESPONSE:**  Disputed to the extent the amount paid to the Trustee's expert witnesses is irrelevant.  Not disputed that the Trustee's expert witnesses have not seen a bank statement for either the 509 Account or the 703 Account showing the word "LLC."

29.    The 509 account statements and checks were always in the name of Bernard L. Madoff. *See* Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. Z** [Compilation of Checks written from "Bernard L. Madoff" to Defendants].

**RESPONSE:**  Disputed as the 509 Account was held in the name of Bernard L. Madoff until September 2002.  At that point, the account holder was changed to Bernard L. Madoff Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff" listed as the holder.  Stmt. ¶ 88 (citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).  Disputed as the 509 Account statements were also addressed to Bernard L. Madoff Investment Securities.  *See* Chaitman Decl., Ex. Z. *But see* Stmt. ¶¶ 87–90.

30.    The designation "LLC" never appeared on the statements for either the 703 or the 509 Account Chaitman Decl. **Ex. S** [Compilation of 509 Account Statements]; Chaitman Decl. **Ex. T** [Compilation of 703 Account Statements].

**RESPONSE:**  Not disputed. *But see* Stmt. ¶¶ 87–90.

31.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship interchangeably with the name "Bernard L. Madoff", (Chaitman **Ex. Y**

[Nelson Tr. 5/9/19 at 18:23-19:10]; Chaitman **Ex. B** [Confirmation Slips dating from 1979

showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_

0002412-13]]; Chaitman **Ex. AA** [July 17, 1991 letterhead of Bernard L. Madoff Investment

Securities]), and for years prior to the formation of the LLC. Chaitman **Ex. A** [Nelson Tr. 5/8/19

at 172:9-12].

**RESPONSE:** Disputed as irrelevant and lacking evidentiary support. Not disputed that

a trade name was used. *See Nelson*, 610 B.R. at 206 ("Madoff Securities frequently used the

trade name 'Bernard L. Madoff Investment Securities' in the course of its business.").

**Account No. 1CM883 (the "Living Trust Account")**

32.    On April 5, 1995, Jacob M. Dick and June Dick, TIC opened an account with

Bernard L. Madoff (the "Dick Account" and "Account 1CM325") with a combined $1,000,000.

*See* Chaitman Decl. **Ex. AB** [Account Opening documents [AMF00254458-69]]; *see also*

Compl., Ex. B, line 1.

**RESPONSE:** Not disputed to the extent that the "Dick Account" refers to BLMIS

account number 1CM325 in the name of "Jacob M. Dick Rev. Living Trust Dtd 4/6/01 And June

Dick TIC," which was opened with five deposits totaling $1,000,000 on April 5, 1995. *See* Stmt.

¶ 114 (citing Greenblatt Decl., Attach. B (Greenblatt Dick Living Trust Report)) at n. 2, Ex. 4A).

.

33.    Subsequently, the Living Trust Account was opened on May 26, 2004 with a

transfer in the amount of $1,044,484 from the Sole Prop account no. 1CM325, a C & M Trading

Account (the "Transferor Account"). *See* Chaitman Decl. Ex. **AC** [April 1995 Statement for the

Jacob M. Dick Account as of April 28, 1995 reflecting an initial investment of $1,000,000]

[MF00197053]; *see* Chaitman Decl. Ex. **AD, AE** [May 2004 and March 2005 Statements for the

Transferor Account reflecting a combined transfer to the Living Trust Account in the amount of

$1,044,484 on May 26, 2004 and $1,518 on March 7, 2005 [MDPTPP01153999 and

MDPTPP01154026]]; and *see* Chaitman Decl. Ex. **AF** [Portfolio Management Reports for the

Living Trust Account as of May 31, 2004 reflecting a starting equity of $1,044,483.98 as of May

26, 2004 [MDPTQQ00183407]]; see also Compl., Ex. B, line 1. However, the Trustee has failed

to fully credit this transfer. *See infra* at ¶¶ 33-34; *see e.g.* Greenblatt Report, Ex. 4A, ECF No.

108-15.

    **RESPONSE:** Not disputed to the extent that the Living Trust Account was opened on

May 26, 2004 with an inter-account transfer from BLMIS Account 1CM325 in the amount of

$1,044,484, but disputed as to the nature of the inter-account transfer. Due to the negative

principal balance in BLMIS Account 1CM325 at the time of the inter-account transfer, there was

no principal available to be transferred. Stmt. ¶¶ 131–33 (citing Greenblatt Decl., Attach. B

(Greenblatt Dick Living Trust Report)) ¶¶ 15–19, Exs. 3, 4A–4B). The inter-account transfer

comprised fictitious profits. *Id.* Disputed further to extent Defendants characterize the inter-

account transfer as one made from the sole proprietorship. Madoff transferred all assets and

liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶ 9 (citing Cremona

Decl., Ex. 3 (2001 SEC Amended Form BD)).

    34.    For every year through 2007, the Living Trust was issued its Form 1099 for tax

purposes by Bernard L. Madoff. *See* Chaitman Decl. **Ex. AG** compilation of 1099s. It was never

issued a 1099 by the LLC.

    **RESPONSE:** Not disputed that BLMIS did issue Form 1099s for tax purposes to the

Defendants, but disputed as to the distinction made between the LLC and "Bernard L. Madoff."

Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January

2001, but BLMIS continued to issue checks and Form 1099s with "Bernard L. Madoff" as the

entity name.  Stmt. ¶¶ 9 (citing Cremona Decl., Ex. 3 (2001 SEC Amended Form BD)); 88

(citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).

## **Withdrawals from the Living Trust Account**

35.    Throughout the life of the Living Trust Account, withdrawals were paid by

checks drawn from the 509 Account in the name of "Bernard L. Madoff" (*see* Chaitman Decl.

**Ex. Z** [Compilation of Withdrawal Checks for the Living Trust Account [multiple bates nos.])

**RESPONSE:**  Not disputed that BLMIS sent checks from the 509 Account to

Defendants, but disputed that the account holder of the 509 Account was "Bernard L. Madoff"

for all time periods.  The 509 Account was held in the name of Bernard L. Madoff until

September 2002.  At that point, the account holder was changed to Bernard L. Madoff

Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff" listed as the

holder.  Stmt. ¶ 88 (citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).

36.    The Living Trust never received any payments from the LLC. *See id.* ¶¶.

**RESPONSE:**  Disputed.  Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001, Stmt. ¶¶ 9 (citing Cremona Decl., Ex. 3 (2001

SEC Amended Form BD)), and BLMIS operated as a "single enterprise" at all times.   Dubinsky

Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Picard v. Nelson*, 610 B.R. 197, 206

(Bankr. S.D.N.Y. 2019) ("BLMIS was a single enterprise that operated three business units: (i) a

proprietary trading business; (ii) a market-making business; and (iii) an investment advisory

business.").  Defendants received payments from BLMIS of customer money from the 703

Account for all withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.

**T-Bill Purchases**

37. Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills." . . .

Chaitman Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

**RESPONSE:** Not disputed that Madoff so testified but disputed as incomplete.

Chaitman Decl., Ex. AH at 161:17–22 ("Q. It went into U.S. treasury bills? A. Well, some of it went into treasury bills. Some of it went back to customers when they withdrew profits – Q. Okay. A. –that didn't exist."). *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

38. Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley. *See* Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

**RESPONSE:** Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

39.    Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third party records in the Trustee's possession. *See* Chaitman Decl. **Ex. AI** [Compilation of Bear Stearns Statements and 703 Account Statements].

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

40.    Madoff explained that these bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

41.    While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

42.     Madoff testified that "by the time we were finished in 2008 . . . we [the LLC]
represented ten percent of the United States' volume in – in [legitimate, market-making]
transactions."  Chaitman Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 54:21-56:29, quote at 56:8-
17].

**RESPONSE:**  Disputed as incomplete and an inaccurate modification of Madoff's
testimony, which speaks for itself.

43.     The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff
[the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New
York Stock Exchange as a whole.  Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 162:7-11].

**RESPONSE:**  Not disputed that Dubinsky so testified as to the market making business
and proprietary trading business but disputed because the statement is incomplete.  Dubinsky
testified that he "d[id]n't know for a fact" about the daily volume traded by the market making
business and proprietary trading business.  Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 162:7–11.
Disputed further as irrelevant.

44.     Madoff testified that he never required the deposits of other customers to pay out
existing customers, and until the market was collapsing when no one ever requested it. *See*
Chaitman Decl. **Ex. O** [Madoff Dep. Tr. 4/26/17 at 30:10-22; 31:2-25].

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 72–82 ("The only
source of cash available for the IA Business to pay purported investment profits as well as
redemption requests from its customers was from cash that other IA Business customers
deposited in the 703 Account.")

45.     Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

**RESPONSE:** Not disputed that Madoff so testified but disputed as irrelevant.

46.    Madoff testified that Frank DiPascali purchased T-Bills with IA customers'
money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

**RESPONSE:** Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 66–70 ("In his
criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA
Business money was for BLMIS's cash management and were not purchased for any customer
account.").

47.    The receipts from the sale or redemption of T-bills were paid into the 703
Account by the brokerage houses, including Bear Stearns and JPMC. Chaitman Decl. **Ex. AI**
[Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005;
Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30,
2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for
December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

**RESPONSE:** Not disputed that the eight brokerage accounts were used by BLMIS for
cash management purposes, received funds solely from the 703 Account, invested those funds
primarily in money market funds, T-Bills, and other low-risk, U.S. government securities and
then transferred funds back to the 703 Account. Collura Decl., Attach. A (Collura Report) ¶ 57;
*see also* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury
bills purchased with the IA Business money was for BLMIS's cash management and were not
purchased for any customer account.").

48.    Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman Decl. **Ex. AJ** [Crupi Tr. 165:6-22].

**RESPONSE:** Not disputed that Crupi so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

49.    Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See generally,* Chaitman Decl. **Ex. AK** [DiPascali Tr. 5344:9-5346:2; 5345:7-25].

**RESPONSE:** Not disputed that DiPascali so testified. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

50.    DiPascali further testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral." Chaitman Decl. **Ex. AK** [DiPascali Trial Testimony, 12/10/13 at 5345:7-25]; and Chaitman Decl. **Ex. AL** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

**RESPONSE:** Not disputed that DiPascali so testified.

51.     Madoff testified that, as with other entities in the industry, he maintained records

for only six years, so there would not always be trade confirmations in their records. Chaitman

Decl. **Ex. AH** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]). Madoff testified that, during the

1980's, there would not always be third party confirmations because there were clearing houses

that issued continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

    **RESPONSE:** Not disputed that Madoff so testified.  *See* Stmt. Part II (BLMIS Operated

a Ponzi Scheme Through Its Investment Advisory ("IA") Business).


52.     Madoff testified that when he was dealing as principal there was no counterparty

since he was on both sides of the trade. *Id.* at 128:7-12.

    **RESPONSE:** Not disputed that Madoff so testified.  *See* Stmt. Part II (BLMIS Operated

a Ponzi Scheme Through Its Investment Advisory ("IA") Business).


**Dubinsky's Testimony**

53.     On direct examination at the Nelson trial, Dubinsky repeatedly testified that no

securities were ever purchased with IA customers' money.

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
> A. Absolutely.
> Q. The investment advisory side?
> A. Never.

Chaitman Decl. **Ex. A** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14;

74:1-3; 74:19-23; 75:17-20].

> Q. I think you've answered this question but based on your review of the
> computer systems at BLMIS, were you able to determine if any trades were being
> processed through the investment advisory business computers?
> A. I was able to make that determination and the answer is they were not. There
> was no evidence, Your Honor, of any trades being executed through the IA
> business computer systems whatsoever.

*Id.* at 80:4-15.

24

Q. So, to wrap up this issue, please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?

A. Customer money. Just other customers' money.

Q. Did your conclusion that the BLMIS investment advisory business did not have a connected trading platform have anything to do with your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. Absolutely.

Q. Why?

A. Because without the ability to actually connect to the market and trade and no evidence of those trades ever occurring, coupled with what I just testified about, that the only money I saw was customer money in and customer money out, no accretion to that 703 account from any sort of trading profit dividends -- that's the classic example of a Ponzi. There's nothing going on. You're taking money from people, you're promising that you're going to do something with it, and then you pay them back as if you're fulfilling your promise.

Q. So, in addition to the not-connected trading platform, did your conclusion that the customer deposits were used to pay customer redemptions have any bearing on your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. It did. As I just said, the lack of other funds from trading profits, from dividends, from real results of actual trading -- the lack of that played into the conclusion that this was simply a Ponzi. Just taking money in and paying it back.

*Id.* at 94:6 – 95:11.

Q. Were you able to obtain DTC treasury records for BLMIS?

A. I was. For the period of 2002 through 2007, I was able to obtain those records, and then I performed an analysis, identified the -- first I went and identified the unique treasury bills held by the prop trading business on December 31 of every year. I compared those holdings to the holdings at DTC, and I also compared those holdings to the IA business. And what I found, similar to the equities, is that the prop trading that the -- and the treasury bills weren't a big part of the prop trading, but the treasury bills that were held by the prop trading matched to the DTC records, and that was based on the treasury CUSIP, and in contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id.* at 128:19 – 129:12.

Q. . . .please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?

A. Customer money. Just other customers' money."

*Id*. at 92:16-93:3.

Q. Based on your review of the BLMIS Investment Advisory books and records,
were you able to determine if Mr. Madoff's allocation concerning treasuries was
accurate?
A. It confirmed my analysis in finding that no treasuries were bought or traded for
any of the investment advisory clients.

*Id*. at 129:9-14.

A. There was no evidence of treasuries being purchased for the IA business
customers, plain and simple.

*Id*. at 132:9-14.

**RESPONSE:** Not disputed that Dubinsky so testified but disputed to the extent the cited

testimony is incomplete and does not support the statement. *See* Brown Decl., Ex. 1 (Nelson Tr.

5/8/19) at 64:10–14, 72:10–75:20, 80:4–15, 95:6–96:11, 129:19–130:12, 95:6–10, 129:9–14,

132:9–14; *see also* Stmt. ¶¶ 66–70.

54.    Dubinsky testified on direct examination that there is "no evidence [of activity in

the 703 account] other than money coming in from customers and money going out to

customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account)

from overnight sweeps, *id*. at 83:3-15; 85:3-21.   He swore that there was "never any addition to

the 703 Account that [he] saw when [he] examined the bank accounts to show that money was

coming from trading profits." *Id.* at 84:1-3.

**RESPONSE:** Disputed as misrepresenting the testimony; statements are not supported

by the evidence.  Dubinsky testified:

Q Is that why you have the big red Xes on all of those possible incoming
sources of funds?

A It is. I was trying again to see where the money was coming in, how it was
being earned, was there -- you know, maybe Mr. Madoff said he was going to

trade stocks but he, you know, just invested in gold bars somewhere. And while that would've have been right, maybe there was an investment somewhere else, and then he was selling those gold bars and producing some income. So, that's the other income producing box in the upper right.

There was no evidence other than money coming in from customers and money going out to customers. A little bit of the sweep, the overnight sweeps to kind of create more money for the Ponzi to enable it to go a little bit longer, in other words. And that's why I have Xes on all of those.

Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 92:6–21.

55.     Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." *Id.* at 153:14-16.

**RESPONSE:** Disputed as misrepresenting the testimony. Dubinsky testified:

Q Now, I typed word verbatim what you said this morning on direct examination, and you said that you, quote, "Scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." That was your testimony this morning.

A If that's what you typed down. I think I also testified this morning that three [sic] was money for other treasuries and brokerage accounts.

Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 153:12–20.

56.     On cross examination, however, Dubinsky admitted that reliable third party records show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. Those T-bills paid interest.").

**RESPONSE:** Not disputed that Dubinsky so testified but disputed to the extent the cited testimony is incomplete. Dubinsky testified:

Q Now, you testified that you saw no evidence of any income earned on investment advisory customers money. But now you've acknowledged that you were aware that money was taken from the 703 accounts and invested in T-bills, right?

A Well, let me correct that, the two things. I've always been aware that money left the 703 to be invested. I think what I testified to is no money was made in the investment advisory customer accounts on the purported trades that were promised to them.

Q So you're not -- you weren't -- you didn't seek to convince Judge Bernstein that money hadn't been made on the investment advisory customers money to the extent that it was invested in T-bills.

A I'm not sure I understand your question.

Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with investment advisory customers money earned interest?

A Are you talking about the overnight sweeps?

Q No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that Madoff purchased T-bills through with investment advisory customers money.

A So --

Q And those T-bills paid interest, right?

A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep. I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 165:20–167:4.

57.    Dubinsky admitted at the Nelson trial that Madoff maintained several brokerage accounts through which he purchased T-bills using money taken from the 703 Account. *Id.* at 90:25-91:2 ("A. No. There were several brokerage accounts, that money was taken from the 703 account and put into, that purchased some treasuries."); 155:2-4 ("A. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.").

28

**RESPONSE:** Not disputed that Dubinsky so testified but disputed to the extent the cited

testimony is incomplete.  Dubinsky testified:

> Q In fact, in your review of the BLMIS books and records, did you identify any
> other income-producing activities for the investment advisory business, other
> than the short-term sweeps and the BLMIS interest-bearing accounts that were
> funded by 703 customer deposits, what you just discussed?
>
> A No. There were several brokerage accounts, that money was taken from the
> 703 account and put into, that purchased some treasuries. But other than -- and
> those weren't purchased in connection with any split strike conversion strategy.
> But, no, other than that, there was absolutely no evidence of any trading
> whatsoever going on in the IA business.

Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 90:20–91:6.

> Q Okay. And you recall that these were investments of securities that were made
> with investment advisory customers' money, right?
>
> A There was money taken out of the 703 account, transferred to these accounts,
> these various accounts, and then these securities were purchased, yes.

*Id.* at 154:24–155:4.

58.    Dubinsky admitted that Madoff purchased T-bills at the following Wall Street

firms: Lehman Brothers, Bear Stearns, JPMorgan Chase and Morgan Stanley. *Id.* at 154:2-9" Id.

at 154:2-9; 166:17-18.

> Q. But in any event, you're now telling us that you're aware that there were
> approximately eight accounts at which Madoff was using investment advisory
> customers' money to purchase T bills. Isn't that true?
> A. That is correct, yes.
> Q. Okay. And those accounts included Lehman Brothers.
> A. Correct.
> Q. Bear Sterns.
> A. That's correct.
> Q. JP Morgan Chase.
> A. Correct.
> Q. Morgan Stanley.
> A. There was a Morgan Stanley account, yes.

*Id.* at 154:2-9.

**RESPONSE:**  Not disputed that Dubinsky so testified but disputed to the extent the cited

testimony is incomplete.  *See* Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 153:21–154:9.

Dubinsky testified:

> Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with investment advisory customers money earned interest?
>
> A Are you talking about the overnight sweeps?
>
> Q No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that Madoff purchased T-bills through with investment advisory customers money.
>
> A So --
>
> Q And those T-bills paid interest, right?
>
> A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep.  I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

*Id.* at 166:9–167:4.


59.    And he acknowledged that "those T-bills paid interest," isn't that true. *Id.* at

166:17-18.

> Q And those T-bills paid interest, right?
> A Those T-bills paid interest.

**RESPONSE:**  Not disputed that Dubinsky so testified but disputed to the extent the cited

testimony is incomplete.  *See* Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 153:21–154:9.

Dubinsky testified:

> Q And those T-bills paid interest, right?
>
> A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did

acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep. I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

*Id.* at 166:17–167:4.

60.    While, on direct examination, Dubinsky testified that he found no evidence of IA customer T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities with the financial institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position, you went only to the DTC records.
> A. Correct.
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions from which he bought them?
> A. As in the eight brokerage accounts, yes.

*Id.* at 177:16-18-21.

**RESPONSE:** Not disputed that Dubinsky so testified but disputed to the extent the cited testimony is incomplete. Dubinsky testified:

> Q Yes. And you didn't -- you didn't calculate the securities that he had in those brokerage accounts; isn't that true?
>
> A The securities in those brokerage accounts were for the prop trading business. And those were accounted for in the DTC because those records, even if somebody -- the DTC records the trade of the equity. And so they would have been there as I went through on the prop trading, whether he held them, in custody of them, or they were with somebody else, they would have been recorded. On the IA business, those records didn't exist. We've talked about the eight brokerage accounts, but as I said, even if you add up all the treasuries in those eight brokerage accounts, they're woefully short of what Mr. Madoff or BLMIS was showing on a customer statements for a particular day for all of the treasuries.

Brown Decl., Ex. 1 (Nelson Tr. 5/8/19) at 177:22–178:12.

61.     Additionally, while another analysis allegedly performed by Dubinsky addresses the T-bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g.* Dubinsky Report ¶ 227, Table 5; and ¶¶ 232-240, ECF No. 118-1.

**RESPONSE:** Disputed as not supported by the evidence cited and vague. Dubinsky's analysis confirmed that (i) IA Business T-Bills were not held at the DTC (Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 224–27); (ii) T-Bills purchased using money from the 703 Account were not purchased for the IA Business Customers (*id.* ¶¶ 228–29); (iii) the aggregate volume of purported IA Business T-Bills as reported on the customer statements far exceeds the volume of T-Bills in the brokerage accounts and the proprietary trading business (*id.* ¶¶ 230–31); and (iv) the T-Bills held in the brokerage accounts do not match the T-Bills reported on the IA Business customer account statements (*id.* ¶¶ 232–40).

**Lehman Brothers transfers to 703 account**

62.     The Lehman Brothers Statement for the period ending December 31, 2001 – almost a year after the LLC was formed- shows that on December 27, 2001, Mr. Madoff wired $50 million to the 703 account. Chaitman Decl. **Ex. AM** [Chart, Tab 1 at bates number BARC\SIPCMAD18952]

**RESPONSE:** Disputed to extent that the December 2001 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

63.     The 703 account statement for December 2001 reflects that on December 27, there was a $50 million credit from Lehman Brothers to Mr. Madoff. Chaitman Decl. **Ex. AM** [Chart, Tab 1 at bates number JPMSAB0000040].

**RESPONSE:** Disputed to extent that the December 27, 2001 credit was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

64.     The September 30, 2002 statement from Lehman Brothers on an account in the name of Bernard L. Madoff shows a wire transfer to JPMorgan Chase of $42 million. Chaitman Decl. **Ex. AM** [Chart, Tab 2 at bates number SECSAH0001205].

**RESPONSE:** Disputed to extent that the September 2002 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

65.     The JPMorgan Chase statement for the 703 account reflects that on September 30, 2002, the account was credited with a transfer from Lehman Brothers of $42 million. Chaitman Decl. **Ex. AM** [Chart, Tab 2 at bates number JPMSAB0000669].

**RESPONSE:** Disputed to extent that the September 30, 2002 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

66.    On the first page the December, 2002 statement from Lehman Broth there is a $75

million transfer from the account in the name of Bernard L. Madoff to the 703 account at

JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 3 at bates number BARSAA0018966].

**RESPONSE:** Disputed to extent that the December 2002 wire transfer was to the 703

Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

67.    The second document shows that the 703 account was credited on December 27,

2002 with a wire transfer of $75 million from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart,

Tab 3 at bates number JPMSAB0000202].

**RESPONSE:** Disputed to extent that the December 27, 2001 wire transfer was to the

703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

68.    A June 26, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $50 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 4 at bates number BARSAA0020468].

**RESPONSE:**  Disputed to extent that the June 2003 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

69.    The second document shows that on June 28, 2003, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $50 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 4 at bates number JPMSAB0001091].

**RESPONSE:**  Disputed to extent that the June 28, 2003 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

70.    A September 26, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $20 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 5 at bates number BARSAA0020650].

**RESPONSE:** Disputed to extent that the September 2003 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

71.    The second document shows that on September 28, 2003, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $20 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 5 at bates number JPMSAB0001343].

**RESPONSE:** Disputed to extent that the September 28, 2003 wire transfer was to the 703 Account as held by the LLC, a as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

72.    A December 30, 2003 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $70 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 6 at bates number BARSAA0020321].

**RESPONSE:** Disputed to extent that the December 2003 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

73.    The second document shows that on December 30, 2003, the 703 account in the

name of the Madoff's Sole Proprietorship was credited with $70 million wired from Lehman

Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 6 at bates number JPMSAB0001343].

**RESPONSE:** Disputed to extent that the December 30, 2003 wire transfer was to the

703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

74.    A December 31, 2005 statement from Lehman Brothers in the name of Bernard L.

Madoff shows a wire transfer of $48 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl.

**Ex. AM** [Chart, Tab 7 at bates number BARSAA0020348].

**RESPONSE:** Disputed to extent that the December 2005 wire transfer was to the 703

Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

75.    The second document shows that on December 31, 2005, the 703 account in the name of the Madoff's Sole Proprietorship was credited with $48 million wired from Lehman Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 7 at bates number JPMSAB0002133].

**RESPONSE:** Disputed to extent that the December 31, 2005 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

76.    A January 9, 2006 statement from Lehman Brothers in the name of Bernard L. Madoff shows a wire transfer of $16 million to Mr. Madoff at JPMorgan Chase. Chaitman Decl. **Ex. AM** [Chart, Tab 8 at bates number BARSAA0020418].

**RESPONSE:** Disputed to extent that the January 2006 wire transfer was to the 703 Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions.

77.    The second document shows that on January 9, 2006, the 703 account in the name
of the Madoff's Sole Proprietorship was credited with $16 million wired from Lehman Brothers.
Chaitman Decl. **Ex. AM** [Chart, Tab 8 at bates number JPMSAB0002883].

**RESPONSE:** Disputed to extent that the January 9, 2006 wire transfer was to the 703
Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole
proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman
Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient
witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support
Defendants' contentions.

78.    A April 30, 2006 statement from Lehman Brothers in the name of Bernard L.
Madoff shows a wire transfer of $12,095,012.70 to Mr. Madoff at JPMorgan Chase. Chaitman
Decl. **Ex. AM** [Chart, Tab 9 at bates number SECSAH0000386].

**RESPONSE:** Disputed to extent that the April 2006 wire transfer was to the 703
Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole
proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.  The Trustee objects to Chaitman
Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient
witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support
Defendants' contentions.

79.    The second document shows that on April 18, 2006, the 703 account in the name
of the Madoff's Sole Proprietorship was credited with $12,095,012.70 wired from Lehman
Brothers. Chaitman Decl. **Ex. AM** [Chart, Tab 9 at bates number JPMSAB0002668].

**RESPONSE:** Disputed to extent that the April 18, 2006 wire transfer was to the 703
Account as held by the LLC, as Madoff transferred all assets and liabilities of the sole

proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20. The Trustee objects to Chaitman

Decl., Ex. AM as inadmissible on the grounds that Defendants have not identified a percipient

witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support

Defendants' contentions.

**Bear Stearns**

80.     A Bear Stearns statement dated 6/30/98 for an account in the name of Mr. Madoff

shows a balance of $403,677,933. The account contains only T-bills. Chaitman Decl. **Ex. AN**

[Bear Stearns ("BS") Statement June 1, 1998 through June 30, 1998].

**RESPONSE:** Not disputed to the extent the document speaks for itself. *But see* Stmt.

¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased

with the IA Business money was for BLMIS's cash management and were not purchased for any

customer account."). The Trustee further objects to Chaitman Decl., Ex. AN as inadmissible on

the grounds that Defendants have not identified a percipient witness or expert witness in

accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that

treasuries were purchased on behalf of any customer accounts.

81.     There is a Bear Stearns statement for the account numbered 037-72698 for the

period ending March 30, 2001. Under the section called "Your Portfolio at a Glance," it states

that Mr. Madoff's net equity for this period was $545 million dollars. Chaitman Decl. **Ex. AO**

[BS Statement February 24, 2001- March 30, 2001].

**RESPONSE:** Disputed as to use of the phrase "net equity" in this context, which differs

from the Trustee's cash in/cash out net equity methodology to calculating the net investments of

BLMIS customers. Disputed further to extent the brokerage account at Bear Stearns was held by

the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20.

82.     A Bear Stearns statement for the period ending July 26, 2002 for the same Bear Stearns account shows net equity this period of $371,919,108. Chaitman Decl. **Ex. AP** [BS Statement June 29, 2002 - July 26, 2002].

**RESPONSE**: Disputed as to use of the phrase "net equity" in this context, which differs from the Trustee's cash in/cash out net equity methodology to calculating the net investments of BLMIS customers. Disputed further to extent the brokerage account at Bear Stearns was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20.

83.     A statement for the same account, still in the name of Bernard L. Madoff as of January 30, 2004 indicates net equity this period of $335,202,211. Chaitman Decl. **Ex. AQ** [BS Statement January 1, 2004- January 30, 2004].

**RESPONSE**: Disputed as to use of the phrase "net equity" in this context, which differs from the Trustee's cash in/cash out net equity methodology to calculating the net investments of BLMIS customers. Disputed further to extent that the brokerage account at Bear Stearns was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20.

**Bank of New York**

84.     A statement from the Bank of New York dated October 31, 2005 for an account in the name of Bernard L. Madoff shows a balance of $226,100,000. Chaitman Decl. **Ex. AR** [Bank of New York Statement for period ending October 31, 2005].

**RESPONSE:**  Disputed to extent that the brokerage account at Bank of New York was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001.  Stmt. ¶¶ 8–20.

**Fidelity**

85.     A Fidelity account statement for January 1999 shows a balance of $205 million. Chaitman Decl. **Ex. AS** [Fidelity Investments ("FI") statement for period January 1, 1999 through November 30, 1999].

**RESPONSE:**  Not disputed to the extent the document speaks for itself.  *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").  The Trustee further objects to Chaitman Decl., Ex. AS as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were purchased on behalf of any customer accounts.

86.    A Fidelity statement for the period ending January 31, 2002 shows a balance of $343,219,506. Chaitman Decl. **Ex. AT** [FI statement for period January 1, 2002 through December 31, 2002].

**RESPONSE:** Disputed to extent that the brokerage account at Fidelity was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20.

87.    A Fidelity statement for the period ending January 31, 2005 shows an ending market value as of January 31, 2005 of $185,441,573. Chaitman Decl. **Ex. AU** [FI statement for period January 1, 20052 through December 31, 2005].

**RESPONSE:** Disputed to extent that the brokerage account at Fidelity was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC as of January 2001. Stmt. ¶¶ 8–20.

**Morgan Stanley**

88.    A Morgan Stanley account statement for the period ending September 30, 2005 for an account in the name of Bernard L. Madoff shows that, on September 1, 2005, Mr. Madoff bought $98 million worth of a United States T-bill maturing on February 16, 2006 which bore an interest rate of 3.6%. Chaitman Decl. **Ex. AV** [Morgan Stanley statement for period ending September 30, 2005 at bates number MSYSAB0000332].

**RESPONSE:** Not disputed to the extent the document speaks for itself. *But see* Stmt. ¶¶ 66–70 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account."). Disputed to extent that the brokerage account at Morgan Stanley was held by the LLC, as Madoff transferred all assets and liabilities of the sole proprietorship to the LLC

43

as of January 2001. Stmt. ¶¶ 8–20. The Trustee further objects to Chaitman Decl., Ex. AV as

inadmissible on the grounds that Defendants have not identified a percipient witness or expert

witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions

that treasuries were purchased on behalf of any customer accounts.

## Defendants Paid Taxes on Alleged Fictitious Profits in the Living Trust Account

89.    In the years from 1995 through 2002, Defendants paid taxes totaling $886,842 on

the investment income from the Jacob M. Dick Account. *See* Chaitman Decl. **Ex. AW**

[Declaration of Ira Schall, C.P.A. dated August 21, 2017 at ¶ 4 and Ex. A].

**RESPONSE:** Disputed as irrelevant and not based on admissible evidence. Disputed

further because the purported amount of taxes Defendants allegedly paid is not supported by any

evidence showing returns filed or actual payments to the U.S. or state taxing authorities.

90.    For these years Defendants paid $886,842 in unrefunded taxes on gains in the

Account. *See id.* at Ex. A.

**RESPONSE:** Disputed as irrelevant and not based on admissible evidence. Disputed

further because the purported amount of taxes Defendants allegedly paid is not supported by any

evidence showing returns filed or actual payments to the U.S. or state taxing authorities.

## The Trustee's Misrepresentations

91.    The Trustee has consistently represented, from 2008 to the present, that Madoff

never purchased any securities with IA customers' money. Declaration of Helen Davis Chaitman

dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

**RESPONSE:** Disputed. Counsel has already been sanctioned by the Bankruptcy Court

for these spurious accusations. In another matter in this liquidation, counsel for Defendants

made a third motion to compel the production of trading records on the premise that the Trustee hid the records because they would prove that BLMIS used customer funds to purchase securities and allocated those purchases (and the profits from subsequent sales) to customers. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2020 WL 1488399, at \*1 (Bankr. S.D.N.Y. Mar. 20, 2020). After the Discovery Arbitrator denied the motion to compel and the Bankruptcy Court affirmed, the Trustee sought reimbursement of his attorneys' fees and the Discovery Arbitrator's fees under Federal Rule of Civil Procedure 37(a)(5)(B). *Id.* The Bankruptcy Court described that counsel for the defendants' "entire approach" to the dispute for the trading records is based on the "false narrative that the Trustee is a liar who hid the fact" that BLMIS used the funds deposited with BLMIS by IA Business customers to purchase securities and allocated those purchases to customers. *Id.* at \*2; *see also id.* at \*10 ("[T]o justify placing the burden on the Trustee, she falsely accused him of deliberately concealing the use of IA customer funds to purchase securities when she knew, had she read it, that the Dubinsky Report disclosed that precise fact."). The Bankruptcy Court determined that an award of attorneys' fees and expenses was justified against counsel personally as "[s]he perpetuated the myth that the Trustee hid BLMIS's use of IA customer money to buy securities, when, in fact, this was fully disclosed in the Dubinsky Report, and then tried to leverage the Trustee's perceived dishonesty plus his greater resources to force the Trustee to review 30 million documents in the BLMIS Database and the contents of 13,000 boxes without regard to any notion of proportionality." *Id.* at \*19. Despite the Bankruptcy Court's strong language and award of monetary sanctions, counsel for Defendants continues to brazenly misrepresent the Trustee's obligation to produce these documents.

92.    The Trustee has refused to produce trading records and all of the customers'

account statements. Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*,

Adv. Pro. No. 10-04377, ECF No. 86-1; *see also* Trustee Response to Defendants' Document

Demands and Interrogatories served in Adv. Pro. No. 10-04995 and dated April 8, 2016,

[Response to Request No. 2], Picard v. Wilenitz, Adv. Pro. No. 10-04995 ECF No. 70-2].

**RESPONSE:** Disputed.  Counsel has already been sanctioned by the Bankruptcy Court

for these spurious accusations.  *See* Response to CMF ¶ 98; *In re Bernard L. Madoff*, 2020 WL

1488399, at *19.

**This Court's View That Summary Judgment is Not Appropriate**

93.    Judge Bernstein held that summary judgment is not appropriate in the claw back

cases, *see e.g. Picard v. Legacy Capital, Ltd.*, 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v.

Mann*, 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

**RESPONSE:** Disputed as immaterial and not a factual statement.  It is also an

inaccurate statement as the Bankruptcy Court did consider and resolved certain issues on

summary judgment.  *See, e.g.*, *Legacy*, 603 B.R. at 695–98 (finding summary judgment to be

appropriate on all but (i) the start date of the BLMIS Ponzi scheme; and (ii) whether the profits

reported on the Defendants' BLMIS account statements arising from BLMIS's purported U.S.

Treasury Bill trades were real and resulted from BLMIS's purchase of those U.S. Treasury Bills

for the Defendants' benefit); *Mann*, 608 B.R. at 176 (narrowing the scope of the trial to

determine whether the Two-Year Transfers were transfers by the debtor within the meaning of

SIPA § 78fff-2(c)(3) and Bankruptcy Code § 548(a)(1)(A)).

94.    Judge Bernstein expressed the same concerns at a recent hearing regarding the

Trustee's announced intention to move for summary judgment in another, similar case, *Picard v.*

*Savin*, Adv. Pro. No. 10-04889. *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, id. at

ECF No. 96 ("[y]ou know my view on these summary judgment . . . , motions, particularly on

the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the

LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was

allocating T-bills purchased by the proprietary trading arm to customers of the IA business,

deposits and withdrawals] . . . I have to try it.").

    **RESPONSE:** Disputed as immaterial and not a factual statement. *See also Picard v.

Palmedo*, No. 20-cv-01926 (PGG) (S.D.N.Y. July 8, 2020), ECF No. 5 (district court denied

motion to withdraw the reference as "premature," finding the case not to be "trial-ready" given

the Trustee's forthcoming motion for summary judgment, and referred the case back to the

bankruptcy court for proposed findings of fact and conclusions of law on the motion); *Picard v.

Est. of Allen Meisels*, No. 20-cv-01278 (GHW) (S.D.N.Y. June 8, 2020), ECF No. 17 (same).


 Dated: March 25, 2022
        New York, New York

                                        */s/ Nicholas J. Cremona*
                                        BAKER & HOSTETLER LLP
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        Nicholas J. Cremona
                                        ncremona@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee
                                        for the Substantively Consolidated SIPA
                                        Liquidation of Bernard L. Madoff Investment
                                        Securities LLC and the Chapter 7 Estate of
                                        Bernard L. Madoff*