**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 12-01693 (CGM) |
| v. | |
| BANQUE LOMBARD ODIER & CIE SA, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT BANQUE LOMBARD ODIER & CIE SA'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS............................................3

II.     THE FAIRFIELD FUNDS ...............................................................................................4

III.    LOMBARD AND ITS INVESTMENTS IN THE BLMIS FEEDER FUNDS...................6

ARGUMENT ..........................................................................................................................7

I.      THIS COURT HAS PERSONAL JURISDICTION OVER LOMBARD ..........................7

        A.     Lombard Purposefully Availed Itself of the Laws and Privileges of
               Conducting Business in New York by Investing in the BLMIS Feeder
               Funds ..............................................................................................................9

               1.     Lombard's Investments in BLMIS through the BLMIS Feeder
                      Funds Establish Minimum Contacts .........................................................10

                      a.     *BLI* Establishes this Court's Jurisdiction Over Lombard ..............10

                      b.     *Walden* Does Not Save Lombard from this Court's
                             Jurisdiction .................................................................................12

               2.     Lombard's Contacts with BLMIS and FGG in New York Establish
                      Minimum Contacts....................................................................................14

               3.     Lombard's Purposeful Use of New York Correspondent Bank
                      Accounts Establishes Specific Jurisdiction.................................................17

                      a.     Lombard's Repeated Use of the Citibank and the HSBC
                             USA Accounts Are Contacts with New York that Supports
                             Jurisdiction .................................................................................18

                      b.     The Trustee's Claims Relate to Lombard's Repeated Use of
                             the Citibank and the HSBC USA Accounts...................................20

               4.     Lombard's Arguments Against Jurisdiction Are Not Persuasive .............20

        B.     The Exercise of Personal Jurisdiction Over Lombard Is Reasonable...................23

        C.     In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery.................23

II.     THE COMPLAINT PLEADS THAT LOMBARD RECEIVED BLMIS
        CUSTOMER PROPERTY UNDER SECTION 550(A) ...................................................24

        A.      Lombard Misstates the Trustee's Pleading Burden ...............................................25

        B.      Lombard's Tracing Arguments Fail on a Motion to Dismiss ...............................26

        C.      Lombard's Claims of Double Recovery Are Premature........................................29

III.    THE COMPLAINT SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE
        FAIRFIELD FUND INITIAL TRANSFERS .....................................................................30

IV.     SECTION 546(E) DOES NOT BAR RECOVERY FROM LOMBARD........................31

        A.      The Fairfield Funds Had Actual Knowledge of Madoff's Fraud .........................32

        B.      Lombard Is Precluded from Relitigating the Actual Knowledge Exception .........32

        C.      Lombard Is Precluded from Arguing that Section 546(e) Applies
                Independently to Recovery Actions......................................................................33

CONCLUSION...............................................................................................................................37

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                          **Page(s)**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) .............................................................................24, 25

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996).........................................................................................................9

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .....................................................................................................18, 19

*Am. Casein Co. v. Geiger (In re Geiger)*,
    446 B.R. 670 (Bankr. E.D. Pa. 2010) ...................................................................................30

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California*,
    480 U.S. 102 (1987).................................................................................................................13

*Ayyash v. Bank Al-Madina*,
    No. 04 Civ. 9201(GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ..................................24

*Bartlett v. Société Générale de Banque Au Liban SAL*,
    No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25,
    2020) .......................................................................................................................................18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).......................................................................................................8, 9, 16

*Burlington Indust., Inc. v. Salem Int'l Co.*,
    645 F. Supp. 872 (S.D.N.Y. 1986) .........................................................................................14

*Chase Manhattan Bank v. Banque Generale Du Commerce*,
    No. 96 CIV 5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997)..............................16

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)...........................................................................................7, 9, 23

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) .................................................................................29

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001).......................................................................................7

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)..................................................................................................................8

*Dandong v. Pinnacle Performance Ltd.*,
    966 F. Supp. 2d 374 (S.D.N.Y. 2013).....................................................................................17

*DeMasi v. Benefico*,
  567 F. Supp. 2d 449 (S.D.N.Y. 2008)........................................................31

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013)........................................................................7

*Eldesouky v. Aziz*,
  No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ...............17

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
  343 B.R. 75 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds*, 388 B.R. 489
  (S.D.N.Y. 2008) ........................................................................................37

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011)......................................................................35

*Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
  397 F. Supp. 3d 323 (S.D.N.Y. 2019).......................................................9, 19

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
  596 B.R. 275 (Bankr. S.D.N.Y. 2018) .........................................................33

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
  Adv. Pro. No. 10-13164 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. Dec.
  14, 2020) .............................................................................................33, 34

*Ferrari v. Cnty. of Suffolk*,
  790 F. Supp. 2d 34 (E.D.N.Y. 2011) ..........................................................31

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021).................................................................16, 20, 21, 22

*Fowler v. Caliber Home Loans, Inc.*,
  277 F. Supp. 3d 1324 (S.D. Fla. 2016) .......................................................27

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
  Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
  S.D.N.Y. Jan. 3, 2014).............................................................................29

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005)........................................................................9

*Gucci Am., Inc. v. Li*,
  135 F. Supp. 3d 87 (S.D.N.Y. 2015)............................................................19

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)..................................................................................13

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
    601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021)..........................29

*Hill v. HSBC Bank plc*,
    207 F. Supp. 3d 333 (S.D.N.Y. 2016)..............................................................................21, 22

*HSH Nordbank AG N.Y. Branch v. Street*,
    No. 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012)..........................17, 20

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)............................................................................................................8, 21

*Kelley v. Westford Special Situations Master Fund, L.P.*,
    No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151 (D. Minn. June 10, 2020)............26, 27, 28

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16,
    2009)..................................................................................................................................23, 24

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
    No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013)..............................22

*Licci v. Lebanese Can. Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)....................................................................................................18

*Licci v. Lebanese Can. Bank, SAL*,
    20 N.Y.3d 327 (2012) .......................................................................................................18, 19

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)........................................................................................................9

*Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In
    re Motors Liquidation Co.)*,
    565 B.R. 275 (Bankr. S.D.N.Y. 2017)..............................................................................16, 20

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)................................................................................................................22

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic
    Bank*,
    549 B.R. 56 (Bankr. S.D.N.Y. 2016)................................................................................18, 20

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)......................................................................................32

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................................ *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................ *passim*

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) ............................................................................................................ 33

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
    Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514 (Bankr.
    S.D.N.Y. Mar. 14, 2012) ............................................................................... 24, 27

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d. Cir. 2021) .............................................................................. 3

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) ............................................................................................................ 33

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ............................................................ *passim*

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
    525 B.R. 871 (Bankr. S.D.N.Y. 2015) ............................................................ 17, 20

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021) ............................................................ 8, 9, 20

*Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*,
    Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6,
    2021) ............................................................................................................ 3, 31, 32

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014) ............................................................................ 33, 35

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
    Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10,
    2014) ............................................................................................................ 11

*Picard v. Lowrey (In re BLMIS)*,
    596 B.R. 451 (S.D.N.Y. 2019) .......................................................................... 30

*Picard v. Magnify, Inc. (In re BLMIS)*,
    583 B.R. 829 (Bankr. S.D.N.Y. 2018) .............................................................. 32

*Picard v. Maxam Absolute Return Fund, L.P.*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011) ............................................................ 8, 10, 23

*Picard v. Mayer (In re BLMIS)*,
     Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct.
     27, 2021) ...........................................................................................................................25

*Picard v. Mendelow (In re BLMIS)*,
     560 B.R. 208 (Bankr. S.D.N.Y. 2016) ....................................................................32

*Picard v. Merkin (In re BLMIS)*,
     515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................ *passim*

*Picard v. Merkin (In re BLMIS)*,
     581 B.R. 370 (Bankr. S.D.N.Y. 2017) ...............................................................27, 28

*Picard v. Shapiro (In re BLMIS)*,
     542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...............................................................26, 33

*Picard v. Square One Fund Ltd.*,
     Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2019), ECF No. 181 ..............32

*In re Picard*,
     917 F.3d 85 (2d Cir. 2019)...................................................................10, 22, 23, 34

*Rothman v. Gregor*,
     220 F.3d 81 (2d Cir. 2000)......................................................................................31

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
     624 F.3d 123 (2d Cir. 2010)......................................................................................7

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
     245 F. Supp. 2d 543 (S.D.N.Y. 2003).....................................................................14

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
     379 B.R. 5 (Bankr. E.D.N.Y. 2007)...................................................................25, 26

*SIPC v. BLMIS (In re Madoff Sec.)*,
     No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)........31, 35, 36

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
     531 B.R. 439 (Bankr. S.D.N.Y. 2015).....................................................................33

*SIPC v. BLMIS (In re Madoff Sec.)*,
     501 B.R. 26 (S.D.N.Y. 2013)............................................................................30, 34

*Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*,
     548 B.R. 300 (Bankr. C.D. Cal. 2016).....................................................................27

*SPV Osus Ltd. v. UBS AG*,
     882 F.3d 333 (2d Cir. 2018)...............................................................................21, 22

*Strauss v. Credit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ....................................................................19

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020) .........................................................35, 36

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)...............................................................................16

*Taylor v. Sturgell*,
    553 U.S. 880 (2008).........................................................................................22

*To v. HSBC Holdings plc*,
    No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017)............21, 22

*United States v. Henshaw*,
    388 F.3d 738 (10th Cir. 2004) ........................................................................27

*In re Viropharma, Inc.*,
    No. CIV.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...................27

*Walden v. Fiore,*
    571 U.S. 277 (2014)..........................................................................12, 13, 14

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)............................................................................23

**Statutes**

11 U.S.C. § 546(e) ...................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ...............................................................................31, 34

11 U.S.C. § 550.............................................................................................33, 34

11 U.S.C. § 550(a) ...................................................................................... *passim*

11 U.S.C. § 550(a)(2)...........................................................................................24

11 U.S.C. § 550(d)...............................................................................................29

**Rules**

Fed. R. Civ. P. 10(c) ...........................................................................................30

Fed. R. Civ. P. 12(b)(2)..........................................................................................1

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 27

viii

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law and declaration of Torello H. Calvani ("Calvani Decl.") in opposition to defendant Banque Lombard Odier & Cie SA's ("Lombard") motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

This action seeks to recover approximately $95 million in subsequent transfers of stolen BLMIS customer property that Lombard received from Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma," and together, the "Fairfield Funds"). For over ten years Lombard invested in BLMIS through BLMIS feeder funds—investment funds created for the express purpose of feeding their investors' money to BLMIS in New York. Nonetheless, Lombard moves to dismiss the Trustee's Complaint, arguing that (i) this Court does not have jurisdiction, (ii) Lombard did not receive any transfers of customer property, (iii) the safe harbor under Section 546(e) bars recovery, and (iv) the Trustee has failed to provide sufficient notice of his claims. All of Lombard's arguments fail.

There is no question that this Court has personal jurisdiction over Lombard. Lombard purposefully invested in the Fairfield Funds, knowing that BLMIS in New York was the *de facto* investment manager, broker dealer, and custodian of the Fairfield Funds' investments. Lombard knew the Fairfield Funds fed substantially all of their funds into BLMIS and that BLMIS was essential to the funds' investments. Investing in BLMIS was the entire point. Why else would Lombard employees travel to BLMIS's offices in New York to visit Madoff in 2001 and 2008? These facts, plus the additional contacts discussed herein, establish jurisdiction.

The Trustee has plausibly alleged that Lombard received customer property under Section 550(a) by outlining the relevant pathways through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to Lombard. The Trustee has also alleged the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer Lombard received. At this stage of the litigation, nothing more is required. In response, Lombard argues that the Trustee must show a dollar-for-dollar accounting at the pleading stage and argues that the Trustee's claims are implausible under a fact-bound and undisclosed tracing methodology. Lombard's arguments are plainly inappropriate on a motion to dismiss and run contrary to well established case law in this liquidation.

The Trustee has also plausibly alleged the avoidability of the initial transfers from BLMIS based on the Fairfield Funds' actual knowledge of fraud, and therefore the safe harbor for settlement payments pursuant to securities contracts under Section 546(e) is inapplicable and does not bar recovery from Lombard. In its Motion Lombard argues that there is no actual knowledge exception and, in the alternative, Lombard's knowledge as a subsequent transferee should determine the avoidability of the initial transfers from BLMIS. These arguments conflict with the plain language of the statute and precedent in this liquidation establishing that Section 546(e) does not independently safe harbor the recovery of avoidable fraudulent transfers from a subsequent transferee.

Finally, the Trustee's Complaint provides a "short and plain statement" showing that the Trustee is entitled to relief. Lombard objects that the Trustee has violated Rule 8 of the Federal Rules of Civil Procedure by incorporating by reference his complaint against the Fairfield Funds.[1]

---

[1] After the Trustee filed his Complaint against Lombard, the Trustee filed a Second Amended Complaint against the Fairfield Greenwich Group ("Fairfield" or "FGG") defendants. *See* Second Am. Comp., *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

This argument conflicts with precedent from the District Court, and regardless, this Court may take judicial notice of the operative complaint and its opinion in *Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021), in which the Court held that the Trustee plausibly alleged the Fairfield Funds' actual knowledge of fraud.

The Trustee respectfully requests that the Court deny Lombard's Motion.

## STATEMENT OF FACTS

## I.   THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Compl. ¶ 23, ECF No. 1.[2]  BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.*  For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 24–25.  In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶ 26.  On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 11.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created to funnel investors' monies into BLMIS. *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021).  Lombard knowingly invested in a number of

---

[2] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM) (Bankr. S.D.N.Y.).

these funds, including the Fairfield Funds, Kingate Global Fund, Ltd. ("Kingate Global"), Kingate

Euro Fund, Ltd. ("Kingate Euro"), and Luxalpha SICAV ("Luxalpha"). Calvani Decl., Ex. 1.

## II.    THE FAIRFIELD FUNDS

The Fairfield Funds were controlled by FGG, a *de facto* partnership with its principal place

of business in New York. *Id.*, Exs. 2–6. Sentry was a U.S. dollar-denominated fund that invested

95% of its assets with BLMIS. Compl. ¶ 2. Sigma accepted subscriptions in Euros, converted the

Euros into U.S. dollars, and wholly invested its funds in Sentry. *Id.*; *see also* Calvani Decl., Ex. 7.

Until 2003, FGG represented that the Fairfield Funds were managed from New York.

Calvani Decl., Exs. 7–8. In 2003, FGG designated a Bermuda entity known as Fairfield

Greenwich Bermuda Limited ("FG Bermuda") as manager. *Id.*, Ex. 9. However, FGG continued

to conduct key operations from its New York office. *Id.*, Exs. 4–6. For example, Sentry

subscriptions were approved or rejected by a New York-based FGG partner. *Id.*, Ex. 10. FGG's

Finance Group, which was responsible for processing subscriptions and redemptions, performing

due diligence, communicating with investors, and providing investor support, was also located in

New York. *Id.*, Ex. 2.

Investors in the Fairfield Funds were required to execute subscription agreements, in which

investors acknowledged their sophistication and that they had "such knowledge and experience in

financial and business matters that [they were] capable of evaluating the risks of this investment."

*Id.*, Exs. 11–13, ¶ 5.c. The subscription agreements also incorporated the Fairfield Funds' Private

Placement Memoranda ("PPMs"), and by signing, investors warranted that they "received and read

a copy of the [PPMs]." *Id.* ¶ 7.

The PPMs explicitly disclosed BLMIS's multiple roles as the *de facto* investment manager,

broker dealer, and custodian for the Fairfield Funds. Regarding BLMIS's role as the funds' actual

investment manager, the PPMs disclosed:

> The Manager has allocated the predominant portion of the Fund's assets to a managed account at Bernard L. Madoff Investment Securities. As a result, the Fund is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

*Id.*, Ex. 14 at p. 12. The PPMs also disclosed how "[t]he services of BLM[IS] and its personnel are essential to the continued operation of [Sentry], and its profitability, if any." *Id.*, Ex. 15 at p. 10.

Regarding BLMIS's roles as the Fairfield Funds' broker dealer and custodian, the PPMs disclosed:

> As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM[IS]") as execution agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM[IS] will be a sub-custodian of the Fund.

*Id.* at p. 16. Thus, the PPMs specifically informed investors that BLMIS—not the Fairfield Funds or their service providers—would have custody of Sentry's assets in the United States and would execute the funds' purported investment strategy involving the purchase and sale of U.S. securities.

The subscription agreements included additional connections to New York. The agreements contained a New York choice of law provision: "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." *Id.*, Exs. 11–13, ¶ 16. Under a heading titled *New York Courts*, the agreements also contained a New York venue and forum selection clause:

> Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, may not claim that a Proceeding has been brought in an inconvenient forum.

5

*Id.* ¶ 19. The agreements also instructed investors to send subscription payments to a bank account with HSBC Bank USA in New York (the "HSBC USA Account"). *Id.*

Following BLMIS's collapse, the Trustee filed an adversary proceeding against the Fairfield Funds and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. Compl. ¶ 35. In 2011, the Trustee settled with the Fairfield Funds. *Id.* ¶ 40. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS customer property estate. *Id.* The Trustee then commenced a number of adversary proceedings against defendants like Lombard to recover the approximately $3 billion in missing customer property.

## III.    LOMBARD AND ITS INVESTMENTS IN THE BLMIS FEEDER FUNDS

Lombard is the result of a 2002 merger between Lombard Odier & Cie and Darier Hentsch & Cie, two of Switzerland's oldest private banks. Calvani Decl., Ex. 16. Lombard Odier & Cie and Darier Hentsch & Cie began investing in BLMIS feeder funds, including the Fairfield Funds, in the 1990s. *Id.*, Ex. 1. Prior to BLMIS's collapse, Lombard received approximately $175 million in transfers from the Fairfield Funds and Kingate Global. Compl., Exs. C, E, & H.

Lombard knew that it was engaging with New York when it invested in the Fairfield Funds. Lombard knew that FGG purported to manage the Fairfield Funds from New York. Calvani Decl., Exs. 7–8. Lombard executed at least three subscription agreements in which it acknowledged that it received and read the PPMs and thus knew that BLMIS was the intended recipient of its investments with the Fairfield Funds. *Id.*, Exs. 11–15. Lombard also agreed to these agreements' New York choice of law, jurisdiction, and forum clauses. *Id.*, Exs. 11–13.

Lombard likewise knew that BLMIS operated from New York—indeed Lombard employees visited BLMIS in New York on at least two known occasions. Frederic Lebel, an executive vice president at Lombard, met with Madoff in his BLMIS office in New York in

6

October 2001. *Id.*, Exs. 17–18. Nassif Michel, also an executive vice president at Lombard, and Thomas Chladek, a hedge funds portfolio manager at Lombard, visited BLMIS's offices in October 2008. *Id.*, Exs. 18–19.

Moreover, Lombard used the New York banking system to subscribe into and redeem from the Fairfield Funds. Lombard sent subscription payments from its designated correspondent account at Citibank N.A. in New York (the "Citibank Account") to Sentry's HSBC USA Account. *See, e.g., id.*, Exs. 20–21. In subscription agreements and redemption requests with the Fairfield Funds, Lombard identified and designated the same Citibank Account to receive redemptions from the Fairfield Funds. *Id.*, Exs. 11–13, ¶ 30.g. Lombard used the Citibank Account to receive redemptions from the Fairfield Funds on at least five occasions. *See, e.g., id.*, Exs. 22–26.

## ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER LOMBARD

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established solely by allegations." *Id.* at 84–85 (finding "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction"). A plaintiff also may establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits are to be construed in the light most favorable to the plaintiff, resolving all doubts in plaintiff's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Depending on the nature of a defendant's contacts with the forum, a court may exercise general or specific jurisdiction. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473

(S.D.N.Y. 2001).  Specific jurisdiction exists where the defendant purposely directs its activities

into the forum and the underlying cause of action arises out of or relates to those activities.  *See*

*Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 566 (Bankr.

S.D.N.Y. 2021).[3]

The specific jurisdiction analysis is a two-step inquiry.  First, the court assesses whether

the defendant purposefully established "minimum contacts" in the forum, such that the defendant

purposefully availed itself of the privilege of conducting activities with the forum.  *See Int'l Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 475–76 (1985).  The defendant's activities need not have taken place within the forum, "and

a single transaction with the forum will suffice."  *Picard v. Maxam Absolute Return Fund, L.P.*,

460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011).  Moreover, minimum contacts may be found when a

"defendant's allegedly culpable conduct involves at least in part financial transactions that touch

the forum."  *In re Fairfield Sentry Ltd.*, 627 B.R. at 566.

Second, the court conducts a "reasonableness" inquiry to determine that its exercise of

jurisdiction will not offend traditional notions of "fair play and substantial justice."  *Int'l Shoe*,

326 U.S. at 320.  To determine whether jurisdiction is reasonable, courts consider the following:

> (1) the burden that the exercise of jurisdiction will impose on the
> defendant; (2) the interests of the forum state in adjudicating the
> case; (3) the plaintiff's interest in obtaining convenient and effective
> relief; (4) the interstate judicial system's interest in obtaining the
> most effective resolution of the controversy; and (5) the shared
> interest of the states in furthering social policies.

---

[3] General jurisdiction is based on the defendant's general business contacts with the forum and permits a court to exercise jurisdiction where the claims are unrelated to those contacts.  *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014).  Here, the Trustee's claims arise out of Lombard's specific contacts with the forum and a finding of general jurisdiction is unnecessary.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).  Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable.  *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's contacts establish personal jurisdiction, the court must look at "the totality of the circumstances" rather than analyze each contact in isolation.  *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also Chloé*, 616 F.3d at 164 (analyzing totality of defendants' contracts to determine jurisdiction under New York's long-arm statute and the Due Process Clause); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's contacts* with the forum state must indicate that the exercise of jurisdiction would be proper.").

### A.      Lombard Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York by Investing in the BLMIS Feeder Funds

Lombard had numerous contacts with New York that establish this Court's jurisdiction. Lombard (1) invested in the Fairfield Funds and other BLMIS feeder funds, which were managed and custodied by BLMIS in New York; (2) had direct connections with New York through its Sentry subscription agreements and meetings with Madoff; and (3) used New York banks to transact with the Fairfield Funds.  Many of these contacts independently establish jurisdiction.  In their totality, these contacts plainly establish that Lombard purposefully directed its activities to New York. *See Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [defendant]'s Agreement-related contacts are considered together, it is clear [the defendant] purposely availed itself of the forum.").

1.    **Lombard's Investments in BLMIS through the BLMIS Feeder Funds Establish Minimum Contacts**

Lombard's intentional investment with BLMIS in New York through known BLMIS feeder funds establishes personal jurisdiction over Lombard.  Regardless of Lombard's other contacts that support jurisdiction, Lombard's deliberate targeting of BLMIS and the New York securities market—through entities expressly constituted for that purpose—is dispositive.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also Maxam*, 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended that funds invested with BLMIS feeder fund would be sent to BLMIS in New York for investment).  Indeed, by executing the subscription agreements and affirming that it received and read Sentry's PPM, Lombard knew that: (i) Sentry invested at least 95% of its assets with BLMIS, and Sigma invested substantially all of its assets in Sentry; (ii) BLMIS performed all investment management duties for these assets; (iii) BLMIS was registered with the U.S. Securities and Exchange Commission; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. treasury bills; (vi) the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS; and (viii) BLMIS was "essential to the continued operation of" Sentry.  *See supra* pp. 4–6.

a.    ***BLI* Establishes this Court's Jurisdiction Over Lombard**

Based on the reality of the Fairfield Funds' investment structure, this Court has already concluded that investors like Lombard are subject to personal jurisdiction in *Picard v. Bureau of*

*Labor Insurance (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.)

("*BLI*").    There, as here, the Trustee's suit was "based upon [the subsequent transferee's]

investment of tens of millions of dollars in Fairfield Sentry with the specific goal of having funds

invested in BLMIS in New York, with intent to profit therefrom." *BLI*, 480 B.R. at 506.    There,

as here, the subsequent transferee was provided with identical PPMs and executed identical

subscription agreements establishing the investment's BLMIS-centric purpose. *Id.* at 507–08.

And there, as here, the subsequent transferee argued that the foreseeability of its investment ending

up in a BLMIS account was insufficient to support personal jurisdiction. *Id.* at n.14.    Not only did

the Court reject this argument, Judge Lifland called it "disingenuous," explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an
> account at BLMIS as a result of happenstance or coincidence.
> Rather, BLI purposefully availed itself of the benefits and
> protections of New York laws by knowing, intending and
> contemplating that the substantial majority of funds invested in
> Fairfield Sentry would be transferred to BLMIS in New York to be
> invested in New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. No. 08-99000

(SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation

have already "confirmed that defendants who invested directly or indirectly with BLMIS and

received payments from BLMIS as an initial transferee or subsequent transferee of those initial

transfers were subject to the Court's personal jurisdiction").    As framed by this Court, "BLI

intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money

orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506.

Because Lombard is identically situated to the defendant in *BLI* with respect to the

fundamental purpose of its investment, *BLI* is controlling and resolves Lombard's personal

jurisdiction defense without the need for inquiry into its additional New York contacts.    In fact,

the evidence that Lombard purposefully targeted the New York securities market is considerably

stronger here because Lombard invested in at least three other BLMIS feeder funds—Kingate

Global, Kingate Euro, and Luxalpha—all similarly constituted to feed foreign investments directly

to BLMIS in New York. *See supra* pp. 3–4, 6–7.

Faced with the obvious weight of *BLI*, Lombard relegates the case to a footnote and half-

heartedly asserts that it was BLI's *other* "extensive contacts" that mattered, including BLI's use

of a New York bank account for subscriptions and redemptions and the choice of forum clause in

the Subscription Agreement.  Motion at n.9.  Lombard's reading of *BLI* is wrong.  Although there

were other contacts between BLI and New York—other contacts that are also present here—the

Court did not rely on these contacts in reaching its holding.  Rather, the Court was unequivocal

throughout its opinion that BLI's intentional investment with a BLMIS feeder fund expressly

designed to funnel those investments to BLMIS in New York was sufficient to establish personal

jurisdiction.  *See BLI*, 480 B.R. at 517 ("In a nutshell, BLI invested tens of millions of dollars in

Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York, and

intended to profit from this U.S.-based investment.").  In fact, in addressing BLI's separate

argument concerning its New York bank accounts, the Court expressly noted that its decision was

not "rooted in the mere existence of these accounts. Instead . . . BLI directed its investment towards

the forum State, thereby purposefully availing itself of the benefits and protections of New York

laws." *Id.* at 515, n.14.  In short, *BLI* controls.

> **b.**      ***Walden* Does Not Save Lombard from this Court's Jurisdiction**

Having given short shrift to *BLI*, Lombard cites *Walden v. Fiore* to frame the jurisdictional

analysis through a false lens of "foreseeability."  571 U.S. 277 (2014).  However, the facts and

applicable law of *Walden* are significantly different from those here.  The defendant in *Walden*, a

Georgia police officer, had no purposeful minimum contacts with the forum state of Nevada.  *Id.*

at 288–89.  The officer had "never traveled to, conducted activities within, contacted anyone in,

or sent anything or anyone to Nevada," nor was the officer's seizure of funds predicated in any way on the fact that their intended destination was Nevada. *Id.* at 289. Nevertheless, the Court of Appeals applied the "effects" test applicable in intentional tort cases and found jurisdiction because the officer had seized money in Georgia from a Nevada resident and therefore the seizure would have some foreseeable effect in Nevada. *Id.* at 290–91. The Supreme Court disagreed, finding that the defendant had "formed no jurisdictionally relevant contacts with Nevada" and that he could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiff resided in Nevada. *Id.* at 289–91. In reversing the Court of Appeals' holding that the officer's knowledge of plaintiff's Nevada connections and the "foreseeable harm" that plaintiff suffered there were dispositive, the Court simply reaffirmed the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *Id.* at 284 & 289 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

This case is nothing like *Walden*. As a preliminary matter, the Trustee's allegations implicate the Supreme Court's "purposeful availment" framework (not the "effects" test), a concept that the Court in *Walden* did not reference, let alone apply. Nor is the police officer's lack of "any jurisdictionally relevant contacts with Nevada" remotely analogous to Lombard intentionally directing investments for over a decade to a New York investment manager, broker dealer, and custodian through feeder funds formed for this express purpose. *Id.* at 289–91. Quoting from *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, Lombard argues "[t]he 'substantial connection' . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*." Motion at 16 (quoting 480 U.S. 102, 112 (1987)). This is exactly what Lombard

13

did when it knowingly sent millions of dollars to the Fairfield Funds with BLMIS as the ultimate intended recipient.

Lombard's efforts to downplay its investment's New York destination as just a "foreseeable" consequence rather than a deliberate and purposeful targeting of the forum is the same "disingenuous" argument this Court rejected in *BLI*. The fact that Lombard employees travelled to New York to meet with Madoff, as detailed below, shows just how disingenuous this argument really is. Here, Lombard's contacts with New York were "intertwined with [its] transactions or interactions with the plaintiff or other parties," *Walden*, 571 U.S. at 286, and thus support jurisdiction.

This Court should reaffirm *BLI* and hold that Lombard's purposeful targeting of New York and its laws by intentionally investing with BLMIS through the Fairfield Funds establishes personal jurisdiction over Lombard.

## 2. Lombard's Contacts with BLMIS and FGG in New York Establish Minimum Contacts

Lombard directed activity into the forum through its contacts with BLMIS and FGG in New York. Lombard employees traveled to New York to meet with Madoff at BLMIS in 2001 and 2008. Calvani Decl., Exs. 17–19. These visits support jurisdiction. *See SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for meeting to develop business relationship); *see also Burlington Indust., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in New York).

Moreover, by investing with the Fairfield Funds, Lombard knowingly transacted business with FGG in New York. When Lombard first invested in the Fairfield Funds, FGG represented that Fairfield Greenwich Limited, a New York entity, managed the Fairfield Funds. Calvani Decl.,

14

Exs. 7–8.  And after FGG formed FG Bermuda in 2003, FGG continued to conduct key operations from its New York office.  *See supra* pp. 4–6.  Under similar facts, this Court in *BNP* found jurisdiction over an investor defendant based on the U.S. contacts inherent in doing business with the Tremont funds.  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) ("*BNP*") (finding *prima facie* showing of jurisdiction "over any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds").

Lombard's subscription agreements with the Fairfield Funds further evidence a "strong nexus with New York" that supports jurisdiction.  *See BLI*, 480 B.R. at 517, n.15.  When Lombard invested in Sentry, it signed a subscription agreement through which it submitted to venue in New York, the jurisdiction of the New York courts, and the application of New York law.  Specifically, Lombard agreed to the subscriptions agreements' clauses in which it (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," and (iii) agreed that disputes over the agreement "shall be governed and enforced in accordance with the laws of New York," and that if litigating here, it "may not claim that a Proceeding has been brought in an inconvenient forum."  Calvani Decl., Exs. 11–13, ¶ 19.

Lombard argues that these provisions are irrelevant because the Trustee is not a party to the subscription agreements and the Trustee's claims do not arise under the subscription agreements.  Lombard's argument misses the mark.  The Trustee is not arguing this Court has jurisdiction based on Lombard's consent.  Rather, Lombard's agreements to New York law, New York jurisdiction, and New York venue show that Lombard purposefully directed its activities toward New York and provide another strong jurisdictional contact with New York.

"[A] choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank v. Banque Generale Du Commerce*, No. 96 CIV 5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Burger King*, 471 U.S. at 482 ("Although such a [choice of law] provision standing alone would be insufficient to confer jurisdiction . . . it reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law."). For example, in *BLI*, the Court, without addressing the issue of whether defendants consented to jurisdiction, found that the clauses in the subscription agreements "further evidenc[e] the strong nexus with New York." 480 B.R. at 517, n.15. Similarly, in *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, the court held that, even if defendant's agreement to New York forum and choice of law provisions did not constitute consent, the provisions helped establish minimum contacts to support specific jurisdiction. 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017) (finding agreement provisions under New York law plus correspondent banking in New York evidenced a relationship "centered in New York").

Moreover, the Fairfield Funds' subscription agreements plainly "relate to" the Trustee's claims and evidence a strong nexus between this case and New York. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (finding that plaintiffs' claims related to defendant's in-state activity and rejecting "strict causal relationship between the defendant's in-state activity and the litigation"). Lombard's subscriptions in and redemptions from Sentry are

two sides of the same coin. Lombard could not invest in and profit from Sentry without a subscription agreement. Accordingly, Lombard executed at least three agreements with Sentry. Calvani Decl., Exs. 11–13. Because Lombard's subscription agreements were necessary predicates to its receipt of customer property through Sentry, the subscription agreements are sufficiently related to the Trustee's claims to recover that customer property from Lombard.

### 3. Lombard's Purposeful Use of New York Correspondent Bank Accounts Establishes Specific Jurisdiction

This Court has jurisdiction because Lombard purposefully used the New York banking system to subscribe into and redeem from Sentry. Courts have often held that a defendant's use of a domestic bank account is sufficient to establish personal jurisdiction.[4] *See, e.g.*, *Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction under New York long-arm statute based solely on defendants' use of a New York account to receive fraudulent conveyances at issue); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction in New York based solely on defendant's use of New York accounts to facilitate alleged fraud). In this liquidation, this Court has also found jurisdiction where initial and subsequent transferee defendants received transfers from U.S. bank accounts. *See BNP*, 594 B.R. at 191 (finding jurisdiction over subsequent transferee defendants that sent subscriptions to, and received redemptions from, feeder funds' New York bank account); *Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871,

---

[4] Certain cases discussed herein address jurisdiction under New York's long-arm statute. Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g.*, *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405(DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous" (citations omitted)).

884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction over initial transferee defendants who received

transfers from BLMIS's New York bank account).

Courts reach the same conclusion where the account at issue is a correspondent bank

account. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of

Appeals held that a defendant's use of a correspondent bank account in New York supports a

finding of jurisdiction "even if no other contacts between the defendant and New York can be

established" provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012); *see also Licci*

*v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 165, 171 (2d Cir. 2013) (finding jurisdiction over

defendant with "no operations, branches, or employees in the United States" based on repeated use

of New York's banking system); *Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v.*

*Bahrain Islamic Bank*, 549 B.R. 56, 67–69 (Bankr. S.D.N.Y. 2016) (finding jurisdiction based on

designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet*

*& Cie*, 28 N.Y.3d 316, 322–29 (2016) (same). What matters is that the use was "purposeful," and

not coincidental or passive. *See Licci*, 20 N.Y.3d at 338–39 (finding jurisdiction where use of

correspondent account was not "coincidental," and distinguishing case where defendant passively

received funds due entirely to another party's actions).

### a.   Lombard's Repeated Use of the Citibank and the HSBC USA Accounts Are Contacts with New York that Supports Jurisdiction

In its subscription agreements and redemption documents, Lombard designated its

Citibank Account in New York through which it sent and received payments from Sentry.[5] *See*

Calvani Decl., Exs. 11–13, ¶ 30.g; *see also Bartlett v. Société Générale de Banque Au Liban SAL*,

No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *5 n.2 (E.D.N.Y. Nov. 25, 2020) ("A

---

[5] Lombard also designated its Citibank Account to receive redemptions from Sigma. Calvani Decl., Ex. 26.

single transaction is sufficient to satisfy this [jurisdictional] requirement, provided the relevant claims arise from that transaction."). Without any discovery from Lombard, the Trustee already identified four transfers from Sentry that were sent to and deposited in Lombard's Citibank Account, consistent with Lombard's subscription agreements. *See* Calvani Decl., Exs. 22–25; *see also Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (finding jurisdiction even though defendant executed only five of 280 relevant transfers through a U.S. bank account).

In addition, Lombard sent and received dozens of payments to and from Sentry's HSBC USA Account in accordance with its subscription agreements. *See, e.g.*, Calvani Decl., Exs. 20–21. Lombard received at least 131 transfers from the Fairfield Funds in the Six-Year Period. Compl., Exs. C & E. All of these transfers went through the HSBC USA Account. Where, like here, there has been repeated use of a correspondent account, purposeful availment may be inferred from the sheer volume of transactions. *See Licci,* 20 N.Y.3d at 340 (routing several million dollars through correspondent account dozens of times indicates desirability and lack of coincidence); *Al Rushaid*, 68 N.E.3d at 5–6 (finding transfer to correspondent accounts at least 12 times for $4 million sufficient for personal jurisdiction); *Gucci Am., Inc. v. Li*, 135 F. Supp. 3d 87, 94–96 (S.D.N.Y. 2015) (transfers nearly a dozen times through correspondent account sufficient to support personal jurisdiction).

The fact that the HSBC USA Account was Sentry's account does not change the analysis, because Lombard agreed to use it. *See Esso*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."). That Sentry's subscription agreement required subscribers use the HSBC USA Account is irrelevant, because Lombard voluntarily entered into that agreement. Calvani Decl., Exs. 11–13. Lombard could have chosen not to invest in BLMIS through Sentry.

But by investing through Sentry, Lombard voluntarily agreed to use Sentry's HSBC USA Account

for its subscriptions into, and redemptions from, the fund. Each transaction was thus a volitional

act that supports jurisdiction.[6]  *See In re Motors Liquidation Co.*, 565 B.R. at 288–89 (finding

defendant's use of a correspondent account to be purposeful even where payment in New York

was dictated by agreement).

> **b.      The Trustee's Claims Relate to Lombard's Repeated Use of the
> Citibank and the HSBC USA Accounts**

Lombard's purposeful use of the Citibank and HSBC USA Accounts supports jurisdiction

because the Trustee's claims "arise out of or relate to" Lombard's use of the accounts. As the

Supreme Court recently held, this prong does not require a causal relationship. *See Ford Motor*,

141 S. Ct. at 1026–30. Rather, this prong may be satisfied if defendant's conduct involves

"financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also*

*Arcapita*, 549 B.R. at 68–71 (requiring only that claim is not completely "unmoored" from

transaction). Because the Trustee's causes of action in this proceeding relate to the very transfers

that came through the accounts, Lombard's use of these accounts supports jurisdiction. *See, e.g.*,

*HSH Nordbank*, 2012 WL 2921875, at *4 (finding "claims against [defendants] arise directly out

of the transfer of funds into [defendant's] New York accounts").

> **4.      Lombard's Arguments Against Jurisdiction Are Not Persuasive**

To evade jurisdiction, Lombard argues that the Trustee must allege that "each individual

transfer [he] seeks to recover" was received in New York for this Court to have jurisdiction.

Motion at 11–12 (citing *BNP*, 594 B.R. at 190). But Lombard misconstrues the requirements for

---

[6] It makes no difference if a Citco entity chose to use the U.S. correspondent account on behalf of Sentry, as various
Citco entities acted as FGG's agents. *See Igoin*, 525 B.R. at 884 ("Whether [defendant] dealt with BLMIS directly or
her mother or another acted on her behalf makes no difference because the conduct of her agents is attributed to her
for purposes of the jurisdictional analysis.").

personal jurisdiction and this Court's decision in *BNP*.  Courts have personal jurisdiction over *defendants*, not *transfers*.  *See, e.g.*, *Int'l Shoe*, 326 U.S. at 316.  Likewise, courts must assess the defendant's contacts with the forum, not the transfer's.  *BNP*, 594 B.R. at 189 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.").  And provided that the court finds that defendant's minimum contacts with the forum support specific jurisdiction, the court may adjudicate any claims, provided they are sufficiently related to those contacts.  *See Ford Motor*, 141 S. Ct. at 1026–28, 1032.

This is exactly what this Court did in *BNP*.  The Court did not look at each transfer to determine jurisdiction; the Court assessed each defendant, focused on the overall relationship with the initial transferees, and determined it had jurisdiction.  *BNP*, 594 B.R. at 191 (finding jurisdiction for "any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds" where "[t]he Tremont Funds were managed from offices in New York, and in their capacity as investors, the Defendants sent subscription agreements to New York, wired funds in U.S. dollars to New York, sent redemption requests to New York and received redemption payments from a Bank of New York account in New York" (citations omitted)).

Equally unavailing is Lombard's reliance on a trio of cases asserting common law claims brought against fund service providers.  *See* Motion at 18–19 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016); *To v. HSBC Holdings plc*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017).  This Court has already determined that this line of cases is not relevant to the Trustee's actions against defendants like Lombard who invested in BLMIS's feeder funds.  *See BNP*, 594 B.R. at 192 ("*Hill*

has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). This is not a dispute between two parties about services owed under a foreign contract, like the breach of fiduciary duty and other claims in *SPV*,[7] *Hill*, and *To*. This action is brought by a U.S. Trustee to recover fraudulent transfers from an investor whose transfers of funds to and from U.S. correspondent accounts evidence an intent to direct activity towards the U.S. securities markets. *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between BLI and Fairfield Sentry.").

This Court should also reject Lombard's claim that the transfers the Trustee seeks to recover "occurred entirely outside of the United States" and were "purely foreign." *See* Motion at 14–16. Lombard bases this claim on arguments made by the Fairfield liquidators in a different case that turns on whether the Section 546(e) safe harbor applies to claims brought under B.V.I. law by foreign liquidators in a chapter 15 proceeding—an issue plainly not relevant here.[8] In *this* case, by contrast, the Second Circuit has already found, "These transfers are domestic activity." *In re Picard*, 917 F.3d at 100 ("When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States.").

---

[7] Lombard's reliance on *SPV*, which found no specific jurisdiction because plaintiff's injury was not caused by defendants' contacts, is suspect following the Supreme Court's decision in *Ford Motor*, which held that causation is not a prerequisite for jurisdiction. 141 S. Ct. at 1026–30.

[8] Lombard's argument that the Trustee is in privity with the Fairfield liquidators and is therefore bound by any rulings in the Fairfield liquidation is creative—but wrong. *See* Motion at 31, n.16. Lombard cites no relevant authority for this argument because none exists. *New Hampshire v. Maine*, 532 U.S. 742 (2001) does not even involve nonparty preclusion. And if *Taylor v. Sturgell*, 553 U.S. 880 (2008) "stands for anything, it is for the need to narrow and regularize the use of preclusion against nonparties." *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *11 (S.D.N.Y. Mar. 25, 2013).

In summary, Lombard's purposeful use of the Citibank and HSBC USA Accounts establishes this Court's jurisdiction.

### B.    The Exercise of Personal Jurisdiction Over Lombard Is Reasonable

Lombard fails to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. Indeed, this Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188.

This is not that "rare" case. The burden on Lombard is minimal. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). The United States has a strong interest in applying U.S. law in the BLMIS liquidation. *See id.*; *see also In re Picard*, 917 F.3d at 103 (noting "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a strong interest in litigating in the United States. *See Maxam*, 460 B.R. at 119. Accordingly, this Court's exercise of jurisdiction over Lombard is more than reasonable.

### C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction. *Kiobel v. Royal*

*Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009). The Trustee has shown how Lombard, *inter alia*, met with Madoff in New York, purposefully invested with BLMIS through Madoff's feeder funds, and relied upon U.S. bank accounts to receive BLMIS customer property. *See supra* pp. 6–23. At a minimum, these facts establish a "threshold showing" of jurisdiction. *Kiobel*, 2009 WL 3817590, at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

## II. THE COMPLAINT PLEADS THAT LOMBARD RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)

The Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that Lombard received subsequent transfers of BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–150 (Bankr. S.D.N.Y. 2014) ("*Merkin I*"). No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id*. at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019). In addition, the Trustee must allege "'the necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as

a subsequent transferee of the funds." *Merkin I*, 515 B.R. at 150 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).

The Trustee's Complaint meets these requirements. The Complaint alleges that Lombard received transfers, identified by date and amount, from Sentry, and that Sentry invested substantially all of its funds with BLMIS. Compl. ¶¶ 2, 35–42, Exs. A–C. The Complaint likewise alleges that Lombard received transfers, identified by date and amount, from Sigma, and that Sigma invested all of its funds with Sentry. *Id.* ¶¶ 2, 35–40, 43–45, Exs. A–E. Thus, the Complaint plausibly alleges that Lombard received subsequent transfers of customer property by (a) outlining the relevant pathway through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to Lombard and (b) providing the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer. Nothing more is required. *See, e.g.*, *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that subsequent transfer claim was not pled "with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### A.     Lombard Misstates the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the relevant pleading burden, Lombard argues for a new one, asserting that the Trustee must tie each subsequent transfer Lombard received to a specific initial transfer from BLMIS. Motion at 22. However, the Court already rejected this argument in *Merkin I*, where the Court refused to dismiss subsequent transfer claims even though the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). Likewise, the Court already rejected the argument that the

Trustee must detail which and what portion of each subsequent transfer comprises customer property. *See Merkin I*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also In re Allou Distribs., Inc.*, 379 B.R. at 30 (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

Lombard's reliance on *Picard v. Shapiro* is unavailing because *Shapiro* did not change the pleading burden for recovery under Section 550(a). In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and that "upon information and belief" these defendants subsequently transferred this same amount to other defendants. *See Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 104, 109, 119 (Bankr. S.D.N.Y. 2015). However, that complaint did not detail *any* of the necessary vital statistics of the subsequent transfers. *Id*. at 119. There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers, and consequently this Court granted defendants' motion to dismiss the subsequent transfer claim. *Id*. Here, where the Trustee has alleged the vital statistics of each transfer Lombard received, *Shapiro* supports denying the motion to dismiss.

### B. Lombard's Tracing Arguments Fail on a Motion to Dismiss

Lombard's other fact-based tracing arguments fare no better and are inappropriate on a motion to dismiss. First, Lombard claims the transfers it received from the Fairfield Funds comprise subscriptions from other investors. Motion at 23–24. In other words, Lombard argues that Sentry commingled customer property with other funds, and this commingling will defeat the Trustee's ability to trace the transfer of customer property from BLMIS. *Id*. Again, Lombard is wrong. "The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing." *Kelley v. Westford Special*

*Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151, at \*4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at \*3) (citation omitted).

Second, Lombard claims that Sentry paid other investors with the customer property it received from BLMIS prior to making any transfers to Lombard. Motion at 27–28.[9] However, Lombard does not disclose what tracing methodology or methodologies it relies upon to reach this conclusion. And why not? Because it is for this Court to decide—after fact and expert discovery— the appropriate tracing methodology under the circumstances of this case. *See Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*") ("[T]he Court's selection of an appropriate methodology is committed to the Court's discretion."); *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at \*3, n.7 ("Courts have broad discretion to determine which monies of commingled funds derive from fraudulent sources.") (citing *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (finding "courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them")).[10]

The Trustee is a stranger to the transactions between Sentry and Lombard and is entitled to discovery on this issue. "[I]n a case such as this one, where 'the Trustee's lack of personal

---

[9] The declaration of Lombard's counsel (Pincus Decl.) includes three "calculations" of various transfers from BLMIS to Sentry and Sentry to its investors. *See* Pincus Decl. ¶¶ 12–14, ECF No. 90. These calculations add and subtract transfers from over 90 proceedings, amounts that have in some cases changed since the filing of the Trustee's complaints and with no explanation for the methodology behind the calculations. Lombard's undefined tracing methodology, which it uses to contest the transfers in this proceeding, serves as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context." *Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss); *see also Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) (assessment of valuation that "almost certainly will require expert testimony" is inappropriate for a motion to dismiss); *In re Viropharma, Inc.*, No. CIV.A. 02-1627, 2003 WL 1824914, at \*2 (E.D. Pa. Apr. 7, 2003) ("The [party's] submission of an expert report at [the motion to dismiss] stage is entirely improper.").

[10] This Court has recognized different tracing methodologies offered by the Trustee in this liquidation to assist the trier of fact, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality. These "methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer form a commingled fund." *Merkin II*, 581 B.R. at 386.

knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded." *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011). This is one reason why this Court in *Merkin I* denied defendants' motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." 515 B.R. at 151. And even after fact discovery, expert opinion is necessary to determine what portion of the subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts. *Merkin II*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5 (denying summary judgment because trustee introduced expert report and associated documents from which a jury could infer that defendants received subsequent transfers of customer property).

For the same reasons, this Court should reject Lombard's argument that the Trustee's claims should be dismissed because "the Trustee has had the very records from Sentry and Sigma that would demonstrate" which transfers contain customer property. Motion at 3. The Trustee does not have all of the Fairfield Funds' books and records, and discovery in the Trustee's actions against the FGG defendants continues. *See, e.g.*, Stipulated Case Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.*, Ad. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec. 6, 2021), ECF No. 353 (setting November 22, 2022 deadline for fact discovery and August 22, 2023 deadline for expert discovery). Lombard also no doubt has records it can provide on these same transactions.

Third, Lombard argues that it could not have received any customer property because of the amount of time that elapsed between Sentry's receipt of certain initial transfers from BLMIS

and Sentry's subsequent transfers to Lombard.  Motion at 27.[11]  This is a variation of Lombard's

tracing argument that the Fairfield Funds transferred BLMIS's customer property to other

investors.  Again, this argument is inappropriate on a motion to dismiss.  And even if it may prove

more difficult for the Trustee to trace all of the subsequent transfers sought here, this is not grounds

for dismissal at the pleading stage.  *See Merkin I*, 515 B.R. at 152 (finding it "premature to cut off

the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because

the tracing may prove difficult); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv.

Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3,

2014) ("[T]he [subsequent transferees'] speculation that tracing is 'not likely' to reveal a

subsequent transfer . . . hardly justifies granting [their cross-motion for summary judgment].").

### C.      Lombard's Claims of Double Recovery Are Premature

Finally, Lombard argues the Trustee's claims are "facially implausible" because the

Trustee is seeking more money from all of Sentry's subsequent transferees than the fund withdrew

from BLMIS.  Motion at 23.  There is no dispute that the Trustee is limited to "a single satisfaction"

under Section 550(a).   11 U.S.C. § 550(d).   However, the Trustee "can recover from any

combination of [transferees]" up to the amount avoided.  *Helms v. Metro. Life Ins. Co. (In re

O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021).  And

under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those

funds, without the necessity for allocation among all [the] subsequent transferees."  *CNB Int'l Inc.

v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008).  Thus, until the

Trustee recovers the full amount of the $3 billion in fraudulent transfers received by Sentry, the

---

[11] To the extent the Court finds it relevant, Lombard conveniently ignores many of the alleged transfers in the Trustee's
Complaint where the initial and subsequent transfers are close in time.

Trustee may simultaneously seek recovery from Lombard in this action and from defendants in other actions, even in an aggregate amount that exceeds initial transfers.

## III.    THE COMPLAINT SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE FAIRFIELD FUND INITIAL TRANSFERS

Lombard argues that the Trustee's incorporation of the then-operative complaint against the Fairfield Funds violates Rule 8(a)(2)'s requirement to include a "short and plain statement" showing the Trustee is entitled to relief.  Motion at 36–37.  However, there is no doubt that the Trustee may incorporate the Fairfield complaint under Rule 10(c) to demonstrate the avoidability of the initial transfers from BLMIS.  *See Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010) (allowing incorporation by reference under Rule 10(c) of pleadings in different adversary proceeding within the same liquidation).

Lombard's argument conflicts with the District Court's prior opinion on whether under Section 550(a) the Trustee must avoid an initial transfer or plead its avoidability in a subsequent transfer action.  *SIPC v. BLMIS (In re Madoff Sec.)*, 501 B.R. 26 (S.D.N.Y. 2013).  Holding that Section 550(a) only "requires that the Trustee show that the transfer he seeks to recover is avoidable in each recovery action," *id*. at 29, the District Court found sufficient the Trustee's incorporation by reference of the then-operative Fairfield complaint:

> [T]he Trustee's complaint against Standard Chartered Financial Services incorporates by reference the complaints against Kingate and Fairfield, including the allegations concerning the avoidability of the initial transfers, and further alleges the avoidability of these transfers outright. *See* Standard Chartered Compl. ¶¶43–46, 50–53. Thus, the avoidability of the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes of section 550(a).

*Id*. at 36.  Lombard withdrew on the Section 550(a) issue.  *See* Mot. to Withdraw the Reference, ECF No. 6.  And this decision—allowing for incorporation by reference—is law of the case.  *See Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019).

In any case, Lombard's argument is much ado about nothing, because this Court may take judicial notice of the Fairfield complaint and its prior decision holding that the complaint sufficiently alleges the avoidability of the initial transfers from BLMIS. *See Fairfield Inv. Fund*, 2021 WL 3477479. On a motion to dismiss, "a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011). "Included among such matters are decisions in prior lawsuits." *DeMasi v. Benefico*, 567 F. Supp. 2d 449, 453 (S.D.N.Y. 2008). Finally, the fact that the noticed complaint was filed after this Complaint against Lombard is of no moment. *See Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (noticing later filed complaint in related proceeding).

The Trustee has complied with the Federal Rules in pleading the avoidability of the initial transfers, and regardless, this Court may take judicial notice of its opinion in *Fairfield Investment Fund*. If this Court holds otherwise, the Trustee respectfully requests the opportunity to replead.

## IV.    SECTION 546(E) DOES NOT BAR RECOVERY FROM LOMBARD

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added). However, in *SIPC v. BLMIS (In re Madoff Securities)*, the District Court held that an initial transferee's actual knowledge of Madoff's fraud precludes application of the safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year period. No. 12-MC-115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

In its Motion, Lombard now argues that Section 546(e) bars all of the Trustee's claims to avoid or recover transfers made by BLMIS prior to the two-year period, even though the Trustee

has pled the Fairfield Funds' actual knowledge. As discussed below, Lombard's argument has already been rejected in other adversary proceedings and is based on a tortured misreading of Section 546(e) and *Cohmad*.

### A.      The Fairfield Funds Had Actual Knowledge of Madoff's Fraud

Lombard wastes pages setting forth the requirements of Section 546(e) and how they are supposedly met in this case with respect to the initial transfers from BLMIS. None of this matters. As Lombard concedes, this Court has previously held that the Trustee has pled Sentry's actual knowledge of fraud. *See* Motion at 34, n.18; *Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5.[12] As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from Lombard regardless of whether Sentry and Lombard qualify as financial institutions, their agreements qualify as securities contracts, or their transfers qualify as settlement payments.

### B.      Lombard Is Precluded from Relitigating the Actual Knowledge Exception

Lombard is precluded from arguing that *Cohmad* is wrong and relitigating whether actual knowledge bars the application of Section 546(e). The District Court issued *Cohmad* following consolidated proceedings on the application of Section 546(e). As Lombard concedes, *Cohmad* held that a transferee with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e). Motion at 35–36. The District Court then remanded to this Court, and this Court has since applied the actual knowledge "exception" on numerous occasions.[13]

---

[12] Although Lombard says it disagrees with this Court's opinion in *Fairfield Investment Fund*, Motion at 34, n.18, not even Lombard argues that the Fairfield Funds had good faith or that the Trustee has not plausibly alleged the funds' actual knowledge of Madoff's fraud.

[13] *See, e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (applying actual knowledge exception); Bench Ruling on Mot. to Dismiss, *Picard v. Square One Fund Ltd.*, Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2019), ECF No. 181 (same); *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (same); *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Avellino (In re BLMIS)*, 557 B.R.

Lombard participated in the District Court proceedings. *See* Mot. to Withdraw the Reference, ECF No. 6 (raising Section 546(e) as grounds for withdrawal). Given its participation, Lombard is bound by *Cohmad*. *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case.").

In its Motion, Lombard relies heavily on *Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014). Motion at 3, 30, 33, 34, 35 n.20. However, as this Court has recognized, the Second Circuit's decision in *Ida Fishman* did not address the actual knowledge holding from *Cohmad*. *See Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016) ("The Court did not address the exception to the safe harbor regarding those investors who had actual knowledge that BLMIS was not trading securities.").

### C.    Lombard Is Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions

Lombard is wrong that the Trustee must allege that a subsequent transferee had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Specifically, Lombard argues that under *Cohmad*, its subscription agreement with Sentry is the relevant "securities contract" (in lieu of BLMIS's customer agreement with Sentry), and as such, in a Section 550 recovery action against Lombard, the court must look solely to Lombard's actual knowledge to determine whether the initial transfer is avoidable.[14] Motion at 34–35. But *Cohmad*

---

89, 112 (Bankr. S.D.N.Y. 2016) (same); *Shapiro*, 542 B.R. at 100 (same); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *Merkin I*, 515 B.R. at 117 (same).

[14] This Court's *Amsterdam* decision in the Fairfield Chapter 15 liquidation proceedings does not support Lombard's position that its agreements with the Fairfield Funds require the Trustee to plead Lombard's actual knowledge in order to avoid the initial transfer from BLMIS. *See* Motion at 30–31 (citing *Fairfield Sentry Ltd. v. Theodoor GGC*

does not stand for this proposition, and Lombard's argument just repackages the previously rejected argument that the Section 546(e) safe harbor should independently apply to actions under Section 550.

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550.  *See* 11 U.S.C. § 546(e) ("the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title." (emphasis added)); *see also BNP*, 594 B.R. at 197 ("The Trustee does not … 'avoid' the subsequent transfer; he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550.").  The safe harbor's limitation to avoidance is consistent with the well-established principle that "the concepts of avoidance and recovery are separate and distinct."  *In re Madoff Sec.*, 501 B.R. at 30.  It is also consistent with the understanding that the Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place."  *See In re Picard*, 917 F.3d at 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees.  The District Court withdrew the reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section

---

*Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-13164 (SMB), 2020 WL 7345988, at *6–7 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Amsterdam*").  That decision did not involve recovery of subsequent transfers under the Bankruptcy Code.  Rather, the Court held that Section 546(e) barred the Fairfield liquidators' claims for unfair preference and undervalue transactions under the B.V.I. Insolvency Act, which the Court analogized to avoidance provisions in the Bankruptcy Code.  *See id.* at *5 (citing *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 302, 314 (Bankr. S.D.N.Y. 2018)).  The *Amsterdam* decision is currently on appeal in District Court.  *See In re Fairfield Sentry Ltd.*, No. 19-CV-03911 (VSB) (consolidated) (S.D.N.Y.).

550.[15]  However, in its decision, the District Court specifically limited the safe harbor to avoidance

claims based on the plain language of Section 546(e).  *See Cohmad*, 2013 WL 1609154, at *4, 9

(applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees

can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial transferees and

subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to

the *initial* transfer from Madoff Securities." (emphasis added)).    And though the court

hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial

transferee feeder fund, and related agreements and transactions, might under certain circumstances

constitute relevant "securities contracts," and that certain subsequent transferee defendants might

qualify as "financial institutions" or "financial participants," the decision is clear that the focus of

the safe harbor is still on the *initial* transfers.[16]  *See id.* at *9 ("[T]he question . . . is whether the

Trustee has alleged that that *initial transfer* was made in connection with (*i.e.,* related to) a covered

securities contract . . ." (emphasis added)).[17]

    Based on *Cohmad*, this Court held in *BNP* that Section 546(e) applies only to avoidance,

not recovery, and that a subsequent transferee cannot assert the protections of Section 546(e) where

the Trustee has adequately pled the initial transferee's actual knowledge.  *See BNP*, 594 B.R. at

197; *see also SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 514

---

[15] *See* Section 546(e) Briefing Order, *In re Madoff Sec.*, No. 12-MC-115 (S.D.N.Y. May 16, 2012), ECF No. 119 (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

[16] For this same reason, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011), which the District Court cites in *Cohmad* solely to support its reading of what constitutes a "securities contract," does not change this outcome.  The focus is still on the initial transfers, which for purposes of Section 546(e) are the transfers from BLMIS to its feeder funds. *See Ida Fishman*, 773 F.3d at 422–23.

[17] Lombard contends that, by alleging that the subsequent transfers were customer property, the Trustee has conceded that the initial transfers were "in connection with" Sentry's agreements with Lombard.  Motion at 29–31.  However, showing that the subsequent transfers can be traced through the "relevant pathways" is irrelevant to the issue of whether the initial transfers were "in connection with" any transaction or contract between Sentry and Lombard for purposes of the securities safe harbor.

(Bankr. S.D.N.Y. 2020) ("[T]he safe harbor defense only applies by its terms to the initial transfer."). In *BNP*, the Court explicitly rejected the argument that the "*only* way the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the [subsequent transferee defendants] actually knew of the Madoff Ponzi scheme." *BNP*, 594 B.R. 196–97.

Lombard seeks to relitigate this point, arguing that to the extent this Court relies on Lombard's agreements with Sentry as the relevant "securities agreements," this Court must look to Lombard's actual knowledge. Motion at 35. But the District Court did not conclude this, nor did it state that the actual knowledge exception should be applied any differently if the feeder fund agreements were to be used for Section 546(e). Based on *BNP*, a subsequent transferee is protected to the same extent as the initial transferee, that is, only when the initial transferee did not have actual knowledge of Madoff's fraud. *Id*. at 197.

Lombard's interpretation would eliminate the point of the actual knowledge exception— which is to restrict transferees with actual knowledge from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments'"). Adopting Lombard's position means the safe harbor would apply even where the initial transferee *knew* there were no securities transactions to protect. It would also allow an initial transferee—who had knowledge of the fraud and was unable to satisfy a judgment (like Sentry)—to place fraudulently transferred moneys with a subsequent transferee and out of the reach of a trustee. *See Cohmad*, 2013 WL 1609154, at *1, 7 ("A defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e).").

Expanding the safe harbor as Lombard proposes would also result in subsequent transferees being afforded more protection as to avoidance than the initial transferee, which does not reflect Congress' intent. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75, 83 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds*, 388 B.R. 489 (S.D.N.Y. 2008) ("Upon consideration of the initial transferee's defenses and once the amount of its liability is established, that amount can be sought from any of the transferees, including subsequent transferees, subject to any of their additional defenses."). Conversely, providing subsequent transferees with the same defenses to avoidance as available to the initial transferee does not unfairly bias subsequent transferees.

## **CONCLUSION**

The Trustee respectfully requests that the Court deny Lombard's Motion.

Dated:  March 29, 2022
       New York, New York

/s/ Torello H. Calvani
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Torello H. Calvani
Email: tcalvani@bakerlaw.com
Joanna F. Wasick
Email: jwasick@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com
Tara E. Turner
Email: tturner@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*