# EXHIBIT 3

*For the Exclusive Use of:* _____  *Copy No.* _____

### Confidential Private Placement Memorandum

## FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager:**
*Fairfield Greenwich Limited*

**Administrator:**
*Citco Fund Services (Europe) B.V.I.*

THE DIRECT OR INDIRECT SALE OF SHARES OF FAIRFIELD SENTRY LIMITED TO CITIZENS, NATIONALS OR RESIDENTS OF, OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN, THE UNITED STATES OF AMERICA IS EXPRESSLY PROHIBITED.

THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SHARES ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

*The date of this Private Placement Memorandum is June 15, 2002*

**Fairfield Greenwich Limited**

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122117

FGGSAC0016079

## CERTAIN GENERAL INFORMATION

The shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sentry Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent the Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator or Investment Manager (Fairfield Greenwich Limited) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized under the provisions of the BVI Act. Such recognition does not necessarily entail supervision of the investment performance or portfolio constitution of the Fund by the Government of the British Virgin Islands (the "BVI") or the Registrar of the BVI Act, which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Government of the BVI in favor of or available to the investors in the Fund.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122118

FGGSAC0016080

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Registrar of Mutual Funds in the BVI, who is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which he deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act. The BVI Act provides that any information, material or document furnished to or filed with the Registrar is privileged from disclosure, except by order of a court of competent jurisdiction in criminal proceedings and in certain other cases.

The BVI Act provides that the Fund's certificate of recognition may be cancelled or made subject to conditions if, among other things, the Fund has breached the BVI Act or any subsidiary legislation or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of a majority of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only by delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122119

FGGSAC0016081

## TABLE OF CONTENTS

Page

CERTAIN GENERAL INFORMATION ................................................................................................. ii

FUND DIRECTORY ............................................................................................................................... v

THE FUND ............................................................................................................................................. 4

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ..................................................... 4

INVESTMENT POLICIES ..................................................................................................................... 6

OFFERING OF THE SHARES ............................................................................................................... 8

FEES, COMPENSATION AND EXPENSES ......................................................................................... 10

ESCROW BANK AND CUSTODIAN .................................................................................................... 11

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT .............................................................. 11

RISK FACTORS ..................................................................................................................................... 11

POTENTIAL CONFLICTS OF INTEREST ............................................................................................ 15

PRIOR TRADING RESULTS ................................................................................................................. 16

DESCRIPTION OF SHARES ................................................................................................................. 20

DIVIDEND POLICY .............................................................................................................................. 21

TRANSFERS, REDEMPTIONS AND TERMINATION ......................................................................... 21

ANTI-MONEY LAUNDERING REGULATIONS .................................................................................. 22

BRITISH VIRGIN ISLANDS ANTI-MONEY LAUNDERING POLICIES ............................................ 23

TAX CONSIDERATIONS AND EXCHANGE CONTROL .................................................................... 23

LEGAL MATTERS ................................................................................................................................. 24

MISCELLANEOUS ................................................................................................................................ 24

COUNTRY-SPECIFIC NOTICES........................................................................................................... 24


APPENDIX A        FINANCIAL STATEMENTS

APPENDIX B        SUBSCRIPTION DOCUMENTS

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122120

FGGSAC0016082

## FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Citco B.V.I. Limited<br>P.O. Box 662<br>Road Town, Tortola<br>British Virgin Islands<br>Telephone: (284) 494-2217<br>Facsimile: (284) 494-3917 |
| INVESTMENT MANAGER | Fairfield Greenwich Limited<br>Charles Adams, Ritchie & Duckworth<br>Second Floor<br>Zephyr House, Mary Street<br>George Town, Grand Cayman<br>Cayman Islands<br>British West Indies<br><br>Address for Correspondence:<br>399 Park Avenue, 36th Floor<br>New York, New York 10022<br>Telephone: (212) 319-6060<br>Facsimile: (212) 319-0450 |
| ADMINISTRATOR; REGISTRAR<br>AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>P.O. Box 7241  1007 JE Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2100<br>Facsimile: (31-20) 572-2476 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>909 Third Avenue, 18th Floor<br>New York, New York 10022<br>USA |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>The Netherlands Amsterdam |
| PAYMENT BANK AND CUSTODIAN | Citco Bank Nederland, N.V.<br>Telestone 8 – Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2200<br>Telecopier: (31-20) 572-2625 |

v

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122121

FGGSAC0016083

# SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.*

## THE OFFERING

**Issuer**

Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI.

**Securities Offered**

Shares of the Fund's Common Stock (the "Shares") were sold on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been sold at a price equal to the Net Asset Value (as defined) as of the date of issuance. The Net Asset Value per Share on May 31, 2002 was $845.52, with total assets of $3,716,977,465.

**Offerees**

Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF SHARES".

**Minimum Subscription**

The minimum initial subscription per investor is U.S. $100,000 unless the Fund deems it advisable to permit subscriptions for a lesser amount. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000.

**Maximum Capitalization**

The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 5,000,000. As of May 31, 2002, the Fund had 4,396,071 shares outstanding.

**Subscription Procedures**

It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary.

**Solicitation of Subscriptions**

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents or other intermediaries. Such unaffiliated placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich Limited, as Investment Manager, which they may rebate to their clients. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

**Business Objective**

The Fund will seek to achieve capital appreciation of its assets principally by allocating its assets to an account at Bernard L. Madoff Investment Securities, Inc., a registered broker-dealer,

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122122

FGGSAC0016084

which employs an options trading strategy describes as "split strike conversion". See "INVESTMENT POLICIES".

| | |
|---|---|
| **Investment Manager** | Fairfield Greenwich Limited ("FGL" or the "Manager"), a corporation organized under the laws of the Cayman Islands, serves as the Fund's investment manager. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND"). |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is a Director of the Manager. |
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of Curacao International Trust Fund, N.V., acts as escrow agent, administrator, registrar and transfer agent for the Fund. The Fund's escrow account is maintained at Citco Bank Nederland, N.V. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## SALE AND REDEMPTION OF SHARES

| | |
|---|---|
| **Redemption at the Option of a Shareholder** | A shareholder of the Fund, on fifteen (15) business days' notice, may cause his Shares to be redeemed as of the end of any month. There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares. |
| **Compulsory Redemption** | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| **Sales** | Subscriptions received during any monthly period prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first day of the following monthly period, i.e., subscriptions received between January 1 and January 25 will be accepted as of February 1. |
| **Exchange Listing** | The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995. The Fund was issued SEDOL number 0-334-934. There can be no assurance that a public trading market will develop for the Fund's shares and none has developed to date. Shareholder redemption rights are not affected by this listing. |

## COMPENSATION AND EXPENSES

| | |
|---|---|
| **Expenses** | The Fund's initial organization and offering expenses were approximately $5,000. Such expenses were paid by the Fund and were amortized among the Fund's shareholders during a period of five years from November 30, 1990, the date the Fund commenced operations. The Fund will bear, for each year, all |

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122123

FGGSAC0016085

continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities. In addition, the Fund will reimburse the Manager on a quarterly basis in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value of the Fund as of the last day of each calendar quarter for bearing certain of the internal accounting and operational costs incident to the Fund's activities.

The Manager will receive, for each calendar quarter, a performance fee with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of any New High Net Profits, subject to reduction in connection with certain offsets (as defined under "FEES, COMPENSATION AND EXPENSES - Performance Fee") with respect to each Share. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a performance fee only for the portion of the calendar quarter during which such Shares were outstanding. The performance fee will only be paid on "new appreciation" in the Fund's Net Asset Value.

The Manager and the Fund may enter into an agreement pursuant to which the Manager may elect to defer payment of all or a portion of its performance fees.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122124

FGGSAC0016086

# THE FUND

Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business Fund on October 30, 1990.  The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares, or purchase additional shares, as of the last day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund.  None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over thirty years of experience in the investment business.  From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm.  From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland.  In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank.  Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business.  He co-founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich Limited, in 1983.  Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo.  From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm.  In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989.  In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development Fund, which merged with Northern Navigation International Limited ("NNI") in 1991.  Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets and which is the investment manager of The Navigation Fund Limited.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968.  Mr. Schmid was employed by Credit Suisse from 1968 to 1986.  From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich.  After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984.  From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva.  Mr. Schmid has been an independent investment adviser since April

316364.2

4

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122125

FGGSAC0016087

1986.  He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A.  Mr. Schmid is a Director of Inter Asset Management Inc.

**The Investment Manager**

The Fund's investment manager is Fairfield Greenwich Limited, a corporation organized under the laws of the Cayman Islands ("FGL" or the "Manager"), which was incorporated on October 24, 2001.  It is responsible for the management of the Fund's investment activities, including the allocation of the Fund's assets to a managed account maintained at Bernard L. Madoff Investment Securities, Inc., the selection of the Fund's other investments, monitoring those investments and maintaining the relationship between the Fund and its escrow agent, custodian, administrator, registrar and transfer agent.  The Manager has an office at 399 Park Avenue, New York, New York 10022; telephone number (212) 319-6060.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has over $4.7 billion employed in alternative asset management funds.  Throughout its history, the firm has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others.  FGG maintains its principal office in New York, with a significant presence in London.  Marketing and client support offices exist in other locations in the United States, Europe, and Latin America.  FGG's London entity is licensed and subject to the supervision of FFA, and another FGG-affiliated entity is registered as a broker- dealer in the United States.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.**, co-founded FGG in 1983.  His background is summarized above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997.  Mr. Piedrahita directs the Group's European and Latin American activities.  Mr. Piedrahita has over fifteen years of experience in the investment business.  Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997).  He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990).  Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987).  He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** is managing partner of FGG's activities.  He has over twenty years of experience in investment related businesses.  Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978.  From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program.  Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globerman & Feinsand, where he remained until 1987.  He specialized in securities and transactional matters, with a principal focus on limited partnership offerings.  Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker dealer.  At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds.  FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122126

FGGSAC0016088

Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. In 1989, Mr. Tucker introduced the Madoff Securities relationship to FGG, which became the basis for FGG's Fairfield Sentry Limited.  Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Robert Blum** assists in all aspects of FGG's activities and focuses on product creation as well as operational and legal matters.  Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena.  He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel. At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas.  Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989).  Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law School.

**Gregory Bowes** focuses on all aspects of new business development including manager selection.  He has eighteen years of experience in capital markets.  Before joining FGG in 2000, Mr. Bowes advised large pools of private capital at Morgan Stanley (1999-2000).  He previously managed the proprietary trading and broker-dealer operations for Greenwich NatWest in Europe (1997-1999).  Before that, he was responsible for Greenwich International (1993-1997), a fixed income arbitrage business and the European-based broker-dealer operation for Greenwich Capital Markets.  The combined businesses managed in excess of $10 billion in positions, long and short, across all G10 interest rate and derivative markets.  Previously, he worked in institutional sales and proprietary trading for Greenwich Capital (1987-1993).  Mr. Bowes began his career at Bankers Trust (1983-1987) in a variety of institutional capital markets positions.  He received his Bachelor of Arts degree from Bowdoin College.

**Harold Greisman** focuses on manager selection and risk oversight.  Mr. Greisman has over fifteen years of experience in the investment business.  Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity & venture capital operation controlled by Den Norske Bank.  Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982).  Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

The Manager and certain of its principals have beneficial interests in the Fund.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of nontraditional options trading strategies.  The Manager has established a discretionary account for the Fund at Bernard L. Madoff Investment Securities, Inc. (sometimes referred to as "BLM"), a registered broker-dealer in New York, who utilizes a strategy described as "split strike conversion", to which it allocates the predominant portion of the Fund's assets.  This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established.  All investment decisions in the account at BLM are effected by persons associated with BLM.  The firm, which employs approximately 300 people, acts primarily as a market-maker in stocks and convertible securities.  Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange.  Set forth below is a description of the "split strike conversion" strategies.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122127

FGGSAC0016089

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that together will highly correlate to the S&P 100 Index (the "OEX"), (ii) the sale of out of the money OEX call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money OEX put options. A call option is out of the money when its strike price is greater than the current price of the stock; a put option is out of the money when the strike price is lower than the current price of the stock. The basket typically consists of approximately 35 stocks in the OEX.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the OEX puts and calls. The further away the strike prices are from the price of the OEX, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

BLM acts as a principal in connection with its sale of equity securities to the Fund and the purchase of equity securities from the Fund. BLM acts as a market-maker in the stocks purchased and sold by the Fund. These market making activities enable BLM to trade with the Fund as principal.

The options transactions executed for the benefit of the Fund are effected, primarily, in the over-the-counter market, not on a registered options exchange. See "POTENTIAL CONFLICTS OF INTEREST."

## Other Investments

The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than the account at BLM ("the "Non-BLM Investments"). It is anticipated that the Non-BLM Investments will be allocated among several managers, with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines. The Fund will pay fees with respect to the Non-BLM Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-BLM Investment managers). The Manager and its affiliates may separately benefit from these Non-BLM Investment arrangements. See "POTENTIAL CONFLICTS OF INTEREST".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122128

FGGSAC0016090

federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

## OFFERING OF THE SHARES

The Fund is offering up to 5,000,000 Shares. The initial offering price was U.S. $200 per Share on November 30, 1990. The Shares are currently offered at a price equal to the Net Asset Value per Share (as defined) as of the date of issuance. As of May 31, 2002, the Net Asset Value per Share was $845.52, with 4,396,071 Shares outstanding. The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Fund. See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers."

The minimum initial purchase by each subscriber is U.S. $100,000, unless the Fund deems it advisable to permit subscriptions for a lesser amount. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's escrow agent, Citco Fund Services (Europe) B.V. ("Citco").

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and other intermediaries, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the date of issuance of such Shares. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will be accepted, subject to the sole discretion of the Manager, as of the first day of the following month. Thus, for example, subscriptions received between January 1 and January 25 shall be accepted as of February 1. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995. The Fund was issued SEDOL number 0-330-934. There can be no assurance that a trading market in the Fund's Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122129

FGGSAC0016091

## Net Asset Value Defined

Net Asset Value is defined as the Fund's total assets, including (i) all cash and cash equivalents, including bank deposits and interest bearing obligations (valued at cost plus accrued interest and discount), (ii) securities positions (valued at closing prices) and (iii) the liquidation value of all options positions, less total liabilities of the Fund (utilizing generally accepted accounting principles as a guideline, consistently applied under the accrual method of accounting), except to the extent set forth below:

> (i)  In the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Manager shall determine; and

> (ii)  The amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

## Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition.  The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000 and is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity.  Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Confidential Private Placement Memorandum and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport,

316364.2

9

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122130

FGGSAC0016092

1043BW Amsterdam, P.O. Box 7241 1007 JE Amsterdam, The Netherlands; fax number (31-20) 572-2476. Subscription funds should be wire transferred to the Fund's escrow account at:

|  | HSBC Bank USA |
|---|---|
|  | 452 Fifth Avenue |
|  | New York, NY 10018 |
|  | U.S.A. |
|  | SWIFT: [REDACTED]US33 |
|  | ABA: 021 001 088 |
| For Account | Citco Bank Nederland N.V. |
| and under Swift | Telestone 8 - Teleport |
| advice to: | P.O. Box 7241 |
|  | Amsterdam, The Netherlands |
|  | SWIFT: [REDACTED]NL2A |
| Account No.: | [REDACTED]4212 |
| Reference: | Fairfield Sentry Limited |
|  | Account No. [REDACTED]3.797 |
| By Order of: | (Name of Subscriber) |

In the event a subscriber cannot wire transfer funds, a check payable to "Fairfield Sentry Limited--Escrow Account" in U.S. dollars-denominated funds for the full purchase price of the Shares should be mailed to the Fund with the Share Application Form.

## FEES, COMPENSATION AND EXPENSES

### Start-up Expenses

The initial offering and organization expenses (including legal and accounting fees), of approximately U.S. $5,000 were paid by the Fund. Such expenses were amortized among the Fund's shareholders during a period of five years from the commencement of the Fund's operations (November 30, 1990).

### Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities, all insurance expenses, all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund. The Fund pays a quarterly expense reimbursement to the Manager in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value (ten basis points per annum) of the Fund in consideration of the Manager bearing certain of the internal accounting and operational costs incident to the Fund's activities.

### Performance Fee

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the amount of any New High Net Profits earned by the Fund. Shares which are purchased or redeemed during a calendar quarter shall be subject to the payment of the Performance Fee only for the portion of the quarter during which such Shares were outstanding. New High Net Profits are defined as the excess, if any, of, respectively, (A) the Net Asset Value as of the last day of a calendar quarter (before the deduction of the current Performance Fee, if any, paid or payable) over (B) the difference between (i) the sum of (a) the highest Net Asset Value of the Company as of the last day of any

10

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122131

FGGSAC0016093

preceding calendar quarter during which such Share was outstanding, or the date of the initial closing of this offering (or if such Share was issued thereafter, as of the date of such issuance, whichever date the Net Asset Value was higher), and (b) the amount of any subscription proceeds for Shares issued as of, or subsequent to, the date thereof, and (ii) the amount of dividends, distributions and redemptions payable as of, or subsequent to, the date thereof, and losses, if any, associated with redeemed shares. IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE FUND. No Share will be subject to the payment of a Performance Fee until all Shares have recouped their respective loss carryovers, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share. The Manager will reduce any Performance Fees otherwise payable to it by offsetting it against an amount equal to the Shared Cash Flow Amount attributable to Non-BLM Investments (as defined in POTENTIAL CONFLICTS OF INTEREST", below).

Pursuant to its agreement with the Fund, the Manager may elect to defer payment of all or a portion of its Performance Fee.

### Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The Directors not affiliated with the Manager, of which there are at the present time two, will each be paid a fee of $5,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## ESCROW BANK AND CUSTODIAN

The Fund's escrow account is maintained at Citco Bank Nederland N.V. Citco Global Custody ("Citco Custody") has agreed to act as custodian of the Fund's assets. BLM has entered into an agreement with Citco Custody pursuant to which BLM will serve as a sub-custodian of the Fund's assets.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

## RISK FACTORS

Among the substantial risk factors involved in a purchase of Shares in the Fund are the following:

1.    **Trading Risks.** Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities,

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122132

FGGSAC0016094

particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affects securities and options prices, as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options. A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed on behalf of the Fund cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2.    **Securities Trading is Speculative**.  Options and, sometimes, stock prices, are highly volatile.  Price movements are influenced by, among other things, changing supply and demand relationships, governmental trade programs and policies, and national and international political and economic events.  The value of an option depends largely upon the likelihood of favorable price movements in the underlying interest in relation to the exercise price during the life of the option.

3.    **Trading Strategies May Not be Successful**.  There can be no assurance that any trading method employed on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability.  Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

4.    **Dependence Upon Principals and Key Employees of the Manager and Bernard L. Madoff Investment Securities**.  The services of the Manager's principals and key employees and Bernard L. Madoff Investment Securities are essential to the continued operations of the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund.  The Manager has allocated the predominant portion of the Fund's assets to a managed account at Bernard L. Madoff Investment Securities.  As a result, the Fund is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

5.    **Conflicts of Interest**.  The Manager, Bernard L. Madoff Investment Securities and the other alternative investment vehicles receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide

12

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122133

FGGSAC0016095

other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund. Such activities could detract from the time that the Manager, Bernard L. Madoff Investment Securities and their respective principals allocate to the affairs of the Fund.

6.    **Conflicts of Interest-Transaction Executions**.    Bernard L. Madoff Investment Securities, in its role as a market-maker, effects transactions in equity securities with the Fund as principal. The firm also makes the investment decisions on behalf of the Fund through a grant of discretionary authority over the Fund's account at Bernard L. Madoff Investment Securities. As a result of this discretionary authority, Bernard L. Madoff Investment Securities has the ability to use the Fund's assets to enhance its equities market-making function and no arm's-length relationship exists between the Fund and Bernard L. Madoff Investment Securities in the execution of stock transactions for the Fund's account.

7.    **Competition**.    The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

8.    **Regulated Industries**. The securities industry is highly regulated. The Fund will not be directly subject to regulation by the SEC, national securities exchanges or the Federal Reserve Board. However, the SEC regularly reviews the practices and procedures of the securities industry, and the market place in general, and from time to time revises rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 will not adversely impact the Fund.

9.    **Clearing Firm Loss or Insolvency**.    If a clearing firm utilized in connection with accounts maintained on behalf of the Fund were to become insolvent, the Fund could have some or all of theses positions closed out without its consent. All of Fund's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency could result in substantial losses to the Fund.

10.    **Over-the-Counter Options Transactions**.    A portion of the options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-market is subject to counter-party risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered options exchange.

11.    **Call Options**. The Fund may purchase and sell call options. There are risks associated with the sale and purchase of call options. The seller (writer) of a call option which is covered (e.g., the writer holds the underlying security) assumes the risk of a decline in the market price of the underlying

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122134

FGGSAC0016096

security below the purchase price of the underlying security less the premium received, and gives up the opportunity for gain on the underlying security above the exercise price of the option. The seller of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security above the exercise price of the option.

The buyer of a call option assumes the risk of losing his entire investment in the call option. If the buyer of the call sells short the underlying security, the loss on the call will be offset in whole or in part by any gain on the short sale of the underlying security (if the market price of the underlying security declines).

12.    **Put Options**.  The Fund will effect transactions in put options.  There are risks associated with the sale and purchase of put options.  The seller (writer) of a put option which is covered (e.g., the writer has a short position in underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security plus the premium received, and gives up the opportunity for gain on the underlying security below the exercise price of the option. If the seller of the put option owns a put option covering an equivalent number of shares with an exercise price equal to no greater than the exercise price of the put written, the position is "fully hedged" if the option owned expires at the same time or later than the option written. The seller of an uncovered put option assumes the risk of a decline in the market price of the underlying security below the exercise price of the option.

The buyer of a put option assumes the risk of losing his entire investment in the put option.  If the buyer of the put holds the underlying security, the loss on the put will be offset in whole or in part by any gain on the underlying security.

13.    **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

14.    **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially  significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

15.    **Combination Transactions**.  At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

16.    **Straddle Writing Involves the Risk of Unlimited Loss**.  In the case of straddle writing, where the investor writes both a put and a call on the same underlying interest at the same exercise price

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122135

FGGSAC0016097

in exchange for a combined premium on the two writing transactions, the potential risk is unlimited. To the extent that the price of the underlying interest is either above or below the exercise price by more than the combined premium, the writer of a straddle will incur a loss when one of the options is exercised. If the writer is assigned an exercise on one option position in the straddle and fails to close out the other position, subsequent fluctuations in the price of the underlying interest could cause the other option to be exercised as well, causing a loss on both writing positions.

17.    **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

18.    **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

19.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

20.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Net Asset Value per Share is determined in U.S. dollars.  Non-dollar investments are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, Bernard L. Madoff Investment Securities, the Non-BLM Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities.  Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs. See also "RISK FACTORS".  In connection with the investment of Fund assets in Non-BLM

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122136

FGGSAC0016098

Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-BLM Investment strategies, which may be made available to other clients of the Manager, (ii) compensation from Non-BLM Investment managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Non-BLM Investment managers. The Manager will share with the Fund, through Performance Fee offset, a portion of the benefits described in clauses (ii) and (iii) of the preceding sentence (the "Shared Cash Flow Amount"). Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because the Fund was organized by the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund. If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction, out of the fees the Manager receives from the Fund. You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

The legal counsel to the Fund were retained by the Manager and does not represent the interests of the investors in the Fund.

## PRIOR TRADING RESULTS

The Fund's securities trading activities are directed by the Manager. Set forth below are the prior trading results of the Fund since its inception. The trading results of the other entities for which FGL or its affiliates have directed trading, or with which they have otherwise been affiliated, may be obtained upon request.

### The Fund

The Fund allocates its assets to an account at Bernard L. Madoff Investment Securities (not affiliated with the Fund's Directors or FGL) which employs a strategy described as "split strike conversion". This strategy has defined risk and profit parameters which may be ascertained when the position is established. The transactions for a typical position would be (i) the purchase of a group or basket of equity securities that together will highly correlate to the OEX, (ii) the sale of out of the money OEX call options in an equivalent contract value dollar amount to the basket of equity securities purchased, and (iii) the purchase of an equivalent number of out-of-the-money OEX put options. A call option is out-of-the-money when its strike price is greater than the current price of the stock. The basket typically consists of approximately 35 stocks in the S&P Index. The Fund issued its shares at $200 per share as on November 30, 1990. As of May 31, 2002, Net Asset Value per Share was $845.52 (subject to audit). Prior performance is shown below on a monthly basis through May 2002.

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| **1990** | | | | | | | |
| December | 4,363,400 | 8,157,216 | 0 | 123,779 | 12,644,395 | 2.84% | 61,478 |

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122137

FGGSAC0016099

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| **1991** | | | | | | | |
| January | 12,644,395 | 0 | 0 | 388,941 | 13,033,336 | 3.08% | 61,478 |
| February | 13,033,336 | 0 | 0 | 190,582 | 13,223,918 | 1.46% | 61,478 |
| March | 13,223,918 | 605,364 | 315,447 | 77,222 | 13,591,057 | 0.58% | 62,818 |
| April | 13,591,057 | 1,799,968 | 0 | 189,610 | 15,580,635 | 1.40% | 71,023 |
| May | 15,580,635 | 0 | 0 | 293,006 | 15,873,641 | 1.88% | 71,023 |
| June | 15,873,641 | 4,848,334 | 0 | 58,587 | 20,780,562 | 0.37% | 92,636 |
| July | 20,780,562 | 0 | 0 | 423,819 | 21,204,381 | 2.04% | 92,636 |
| August | 21,204,381 | 0 | 0 | 226,959 | 21,431,340 | 1.07% | 92,636 |
| September | 21,431,340 | 5,533,746 | 793,533 | 170,115 | 26,341,668 | 0.79% | 112,964 |
| October | 26,341,668 | 0 | 0 | 742,835 | 27,084,503 | 2.82% | 112,964 |
| November | 27,084,503 | 0 | 0 | 21,668 | 27,106,171 | 0.08% | 112,964 |
| December | 27,106,171 | 5,514,647 | 21,703 | 441,219 | 33,040,334 | 1.63% | 135,489 |
| | | **RATE OF RETURN: 18.57%** | | | | | |
| **1992** | | | | | | | |
| January | 33,040,334 | 0 | 0 | 161,245 | 33,201,579 | 0.49% | 135,489 |
| February | 33,201,579 | 0 | 0 | 925,390 | 34,126,969 | 2.79% | 135,489 |
| March | 34,126,969 | 6,245,218 | 1,891,095 | 343,980 | 38,825,072 | 1.01% | 152,603 |
| April | 38,825,072 | 0 | 0 | 1,110,950 | 39,936,022 | 2.86% | 152,603 |
| May | 39,936,022 | 0 | 0 | -76,302 | 39,859,720 | -0.19% | 152,603 |
| June | 39,859,720 | 9,184,966 | 52,912 | 512,808 | 49,504,582 | 1.29% | 187,121 |
| July | 49,504,582 | 0 | 0 | -1,721 | 49,502,861 | 0.00% | 187,121 |
| August | 49,502,861 | 0 | 0 | 456,575 | 49,959,436 | 0.92% | 187,121 |
| September | 49,959,436 | 20,978,110 | 26,806 | 199,047 | 71,109,787 | 0.40% | 265,279 |
| October | 71,109,787 | 0 | 0 | 995,069 | 72,104,856 | 1.40% | 265,279 |
| November | 72,104,856 | 0 | 0 | 1,026,781 | 73,131,637 | 1.42% | 265,279 |
| December | 73,131,637 | 4,636,235 | 0 | 1,043,369 | 78,811,241 | 1.43% | 281,860 |
| | | **RATE OF RETURN: 14.66%** | | | | | |
| **1993** | | | | | | | |
| January | 78,811,241 | 0 | 0 | -3,185 | 78,808,056 | 0.00% | 281,860 |
| February | 78,808,056 | 0 | 0 | 1,522,044 | 80,330,100 | 1.93% | 281,860 |
| March | 80,330,100 | 8,400,171 | 174,175 | 1,491,518 | 90,047,614 | 1.86% | 310,197 |
| April | 90,047,614 | 0 | 0 | 49,104 | 90,096,718 | 0.05% | 310,197 |
| May | 90,096,718 | 0 | 0 | 1,550,985 | 91,647,703 | 1.72% | 310,197 |
| June | 91,647,703 | 21,630,468 | 894 | 789,049 | 114,066,326 | 0.86% | 382,781 |
| July | 114,066,326 | 0 | 0 | 98,107 | 114,164,433 | 0.09% | 382,781 |
| August | 114,164,433 | 0 | 0 | 2,028,739 | 116,193,172 | 1.78% | 382,781 |
| September | 116,193,172 | 20,148,879 | 30,460 | 403,068 | 136,714,659 | 0.35% | 448,829 |
| October | 136,714,659 | 0 | 0 | 2,422,330 | 139,136,989 | 1.77% | 448,829 |
| November | 139,136,989 | 0 | 0 | 359,063 | 139,496,052 | 0.26% | 448,829 |
| December | 139,496,052 | 20,144,941 | 5,522,656 | 632,176 | 154,750,513 | 0.45% | 495,664 |
| | | **RATE OF RETURN: 11.66%** | | | | | |
| **1994** | | | | | | | |
| January | 154,750,513 | 2,499,475 | 0 | 3,373,291 | 160,623,279 | 2.18% | 503,499 |
| February | 160,623,279 | 3,744,520 | 300,070 | -575,550 | 163,492,179 | -0.36% | 514,335 |
| March | 163,492,179 | 11,896,109 | 1,747,663 | 2,478,735 | 176,119,360 | 1.52% | 545,785 |
| April | 176,119,360 | 0 | 0 | 3,198,300 | 179,317,660 | 1.82% | 545,785 |
| May | 179,317,660 | 6,489,179 | 0 | 945,192 | 186,752,031 | 0.53% | 565,536 |

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122138

FGGSAC0016100

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| June | 186,752,031 | 19,912,627 | 10,049,903 | 513,368 | 197,128,123 | 0.27% | 595,215 |
| July | 197,128,123 | 2,644,775 | 3,306,812 | 3,510,400 | 199,976,486 | 1.78% | 593,251 |
| August | 199,976,486 | 3,502,115 | 0 | 838,982 | 204,317,583 | 0.42% | 603,597 |
| September | 204,317,583 | 11,949,985 | 8,944,492 | 1,678,318 | 209,001,394 | 0.82% | 612,412 |
| October | 209,001,394 | 3,009,728 | 165,160 | 3,936,829 | 215,782,791 | 1.88% | 620,593 |
| November | 215,782,791 | 4,272,314 | 1,342,682 | -1,194,329 | 217,518,094 | -0.55% | 629,065 |
| December | 217,518,094 | 8,349,741 | 13,253,982 | 1,437,665 | 214,051,518 | 0.66% | 614,975 |

RATE OF RETURN: 11.49%

**1995**

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| January | 214,051,518 | 6,531,360 | 0 | 1,965,645 | 222,548,523 | 0.92% | 633,569 |
| February | 222,548,523 | 4,036,226 | 5,746,065 | 1,690,996 | 222,529,680 | 0.76% | 628,738 |
| March | 222,529,680 | 5,847,319 | 2,605,471 | 1,875,588 | 227,647,116 | 0.84% | 637,821 |
| April | 227,647,116 | 3,703,035 | 541,500 | 3,841,022 | 234,649,673 | 1.69% | 646,532 |
| May | 234,649,673 | 2,689,810 | 19,566 | 4,033,842 | 241,353,759 | 1.72% | 653,765 |
| June | 241,353,759 | 3,704,370 | 6,314,199 | 1,213,061 | 239,956,991 | 0.50% | 646,731 |
| July | 239,956,991 | 2,150,152 | 2,805,737 | 2,598,436 | 241,899,842 | 1.08% | 644,983 |
| August | 241,899,842 | 7,987,906 | 1,397,472 | -381,765 | 248,108,511 | -0.16% | 662,583 |
| September | 248,108,511 | 1,282,270 | 9,927,218 | 4,226,087 | 243,689,650 | 1.70% | 639,883 |
| October | 243,689,650 | 6,278,096 | 5,869,513 | 3,891,193 | 247,989,426 | 1.60% | 640,939 |
| November | 247,989,426 | 11,786,986 | 6,303,763 | 1,259,638 | 254,732,287 | 0.51% | 655,039 |
| December | 254,732,287 | 3,504,248 | 7,797,963 | 2,803,763 | 253,242,335 | 1.10% | 644,118 |

RATE OF RETURN: 12.96%

**1996**

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| January | 253,242,335 | 5,112,706 | 8,125,743 | 3,770,800 | 254,000,098 | 1.49% | 636,552 |
| February | 254,000,098 | 4,326,423 | 2,796,660 | 1,852,111 | 257,381,973 | 0.73% | 640,358 |
| March | 257,381,973 | 7,631,216 | 5,905,689 | 3,159,206 | 262,266,706 | 1.23% | 644,599 |
| April | 262,266,706 | 8,582,153 | 1,596,537 | 1,679,848 | 270,932,170 | 0.64% | 661,660 |
| May | 270,932,170 | 14,474,663 | 1,167,224 | 3,811,955 | 288,051,564 | 1.41% | 693,708 |
| June | 288,051,564 | 42,775,784 | 4,014,666 | 623,922 | 327,436,607 | 0.22% | 786,854 |
| July | 327,436,607 | 8,106,296 | 5,108,487 | 6,288,688 | 336,723,104 | 1.92% | 793,922 |
| August | 336,723,104 | 36,219,104 | 2,654,122 | 919,606 | 371,207,692 | 0.27% | 872,846 |
| September | 371,207,692 | 62,038,406 | 3,235,919 | 4,531,387 | 434,541,566 | 1.22% | 1,009,444 |
| October | 434,541,566 | 12,036,849 | 709,111 | 4,782,259 | 450,651,563 | 1.10% | 1,035,472 |
| November | 450,651,563 | 30,780,959 | 6,293,629 | 7,097,233 | 482,236,126 | 1.57% | 1,090,865 |
| December | 482,236,126 | 29,746,295 | 11,515,954 | 2,297,036 | 502,763,503 | 0.48% | 1,131,908 |

RATE OF RETURN: 12.97%

**1997**

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| January | 502,763,503 | 43,243,168 | 9,536,924 | 12,300,790 | 548,770,537 | 2.45% | 1,205,981 |
| February | 548,770,537 | 39,643,333 | 1,057,113 | 4,014,291 | 591,371,048 | 0.73% | 1,290,157 |
| March | 591,371,048 | 64,512,292 | 6,494,470 | 5,097,281 | 654,486,151 | 0.86% | 1,415,649 |
| April | 654,486,151 | 42,440,532 | 4,216,998 | 7,629,767 | 700,339,452 | 1.17% | 1,497,373 |
| May | 700,339,452 | 31,659,013 | 787,664 | 4,421,919 | 735,632,720 | 0.63% | 1,562,964 |
| June | 735,632,720 | 69,112,559 | 6,804,423 | 9,893,080 | 807,833,936 | 1.34% | 1,693,613 |
| July | 807,833,936 | 52,481,196 | 8,178,631 | 6,041,458 | 858,177,959 | 0.75% | 1,785,804 |
| August | 858,177,959 | 36,666,097 | 21,752,715 | 2,965,872 | 876,057,213 | 0.35% | 1,816,730 |
| September | 876,057,213 | 27,840,464 | 9,288,074 | 20,947,631 | 915,557,234 | 2.39% | 1,854,305 |
| October | 915,557,234 | 29,687,157 | 4,818,657 | 5,081,365 | 945,507,099 | 0.56% | 1,904,394 |

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122139

FGGSAC0016101

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| November | 945,507,099 | 24,605,224 | 9,721,179 | 14,717,179 | 975,108,323 | 1.56% | 1,933,913 |
| December | 975,108,323 | 30,971,574 | 24,902,843 | 4,122,122 | 985,299,175 | 0.42% | 1,945,897 |
| **RATE OF RETURN: 14.00%** | | | | | | | |
| **1998** | | | | | | | |
| January | 985,299,175 | 64,128,161 | 4,125,194 | 8,991,182 | 1,054,293,324 | 0.91% | 2,063,329 |
| February | 1,054,293,324 | 54,230,671 | 11,143,328 | 13,636,704 | 1,111,017,371 | 1.29% | 2,146,992 |
| March | 1,111,017,371 | 95,721,424 | 26,362,202 | 19,466,433 | 1,199,843,026 | 1.75% | 2,278,277 |
| April | 1,199,843,026 | 106,333,505 | 13,744,299 | 5,071,899 | 1,297,504,131 | 0.42% | 2,453,347 |
| May | 1,297,504,131 | 79,146,772 | 10,310,446 | 22,781,809 | 1,389,122,266 | 1.76% | 2,581,258 |
| June | 1,389,122,266 | 116,150,874 | 5,809,650 | 17,825,450 | 1,517,288,940 | 1.28% | 2,783,083 |
| July | 1,517,288,940 | 118,183,377 | 13,707,714 | 12,612,398 | 1,634,377,001 | 0.85% | 2,973,907 |
| August | 1,634,377,001 | 46,389,989 | 36,074,223 | 4,555,854 | 1,649,248,621 | 0.28% | 2,992,510 |
| September | 1,649,248,621 | 40,386,702 | 98,307,437 | 17,204,958 | 1,608,532,844 | 1.04% | 2,888,457 |
| October | 1,608,532,844 | 41,783,296 | 103,128,044 | 31,021,732 | 1,578,209,828 | 1.93% | 2,780,384 |
| November | 1,578,209,828 | 70,996,507 | 17,958,632 | 13,314,829 | 1,644,562,531 | 0.85% | 2,873,218 |
| December | 1,644,562,531 | 104,933,982 | 22,984,058 | 5,415,708 | 1,731,928,163 | 0.33% | 3,013,350 |
| **RATE OF RETURN: 13.42%** | | | | | | | |
| **1999** | | | | | | | |
| January | 1,731,928,163 | 45,092,968 | 18,524,174 | 35,594,045 | 1,794,091,002 | 2.06% | 3,061,038 |
| February | 1,794,091,002 | 111,903,663 | 20,600,407 | 3,148,148 | 1,888,542,407 | 0.18% | 3,126,576 |
| March | 1,888,542,407 | 91,072,350 | 128,559,324 | 43,277,106 | 1,894,332,539 | 2.29% | 3,154,158 |
| April | 1,894,332,539 | 111,884,699 | 4,451,465 | 6,774,495 | 2,008,540,268 | 0.36% | 3,332,402 |
| May | 2,008,540,268 | 58,868,950 | 18,051,157 | 30,391,176 | 2,079,749,237 | 1.51% | 3,399,115 |
| June | 2,079,749,237 | 62,267,285 | 19,845,772 | 36,687,904 | 2,158,858,654 | 1.76% | 3,466,605 |
| July | 2,158,858,654 | 59,033,936 | 19,938,726 | 9,189,869 | 2,207,143,733 | 0.43% | 3,529,768 |
| August | 2,207,143,733 | 45,330,076 | 9,376,222 | 20,742,718 | 2,263,840,305 | 0.94% | 3,589,145 |
| September | 2,263,840,305 | 42,067,369 | 41,179,552 | 16,517,273 | 2,281,245,395 | 0.73% | 3,587,770 |
| October | 2,281,245,395 | 77,425,625 | 17,954,855 | 25,426,891 | 2,366,143,055 | 1.11% | 3,680,638 |
| November | 2,366,143,055 | 57,783,705 | 31,873,529 | 38,078,419 | 2,430,131,650 | 1.61% | 3,720,304 |
| December | 2,430,131,650 | 47,002,695 | 21,613,195 | 9,506,086 | 2,465,027,236 | 0.39% | 3,759,022 |
| **RATE OF RETURN: 14.19%** | | | | | | | |
| **2000** | | | | | | | |
| January | 2,465,027,236 | 64,235,939 | 27,573,080 | 54,317,122 | 2,556,007,217 | 2.20% | 3,813,277 |
| February | 2,556,007,217 | 91,327,878 | 113,405,417 | 5,086,674 | 2,539,016,352 | 0.20% | 3,780,849 |
| March | 2,539,016,352 | 108,078,165 | 127,090,606 | 46,758,544 | 2,566,762,455 | 1.84% | 3,753,050 |
| April | 2,566,762,455 | 61,042,682 | 56,082,334 | 8,679,314 | 2,580,402,117 | 0.34% | 3,760,278 |
| May | 2,579,848,257 | 110,459,522 | 52,948,330 | 35,235,908 | 2,672,595,357 | 1.37% | 3,841,931 |
| June | 2,672,595,357 | 101,530,419 | 66,558,421 | 21,295,802 | 2,728,863,156 | 0.80% | 3,892,028 |
| July | 2,729,207,613 | 81,613,273 | 34,447,095 | 17,611,761 | 2,793,985,552 | 0.65% | 3,959,359 |
| August | 2,793,985,552 | 73,391,209 | 30,460,213 | 36,993,561 | 2,879,910,109 | 1.32% | 4,027,863 |
| September | 2,879,910,109 | 104,779,206 | 35,286,623 | 7,288,186 | 2,956,690,877 | 0.25% | 4,124,810 |
| October | 2,956,690,877 | 90,181,025 | 45,966,847 | 27,324,857 | 3,028,229,913 | 0.92% | 4,185,928 |
| November | 3,028,229,913 | 85,384,090 | 71,253,618 | 20,728,720 | 3,063,089,104 | 0.68% | 4,205,328 |
| December | 3,063,089,104 | 67,674,660 | 42,216,458 | 13,044,480 | 3,101,591,786 | 0.43% | 4,240,131 |
| **RATE OF RETURN: 11.55%** | | | | | | | |
| **2001** | | | | | | | |
| January | 3,101,591,786 | 62,278,433 | 27,649,620 | 68,561,629 | 3,204,782,228 | 2.21% | 4,286,448 |

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122140

FGGSAC0016102

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out Standing |
|---|---|---|---|---|---|---|---|
| February | 3,204,782,228 | 52,531,167 | 33,018,838 | 4,568,911 | 3,228,863,468 | 0.14% | 4,312,508 |
| March | 3,228,863,468 | 79,380,350 | 104,005,191 | 6,575,710 | 3,240,814,337 | 1.13% | 4,279,988 |
| April | 3,240,814,337 | 76,560,499 | 34,333,422 | 42,918,485 | 3,325,959,900 | 1.32% | 4,335,026 |
| May | 3,325,959,900 | 95,021,952 | 45,442,877 | 10,765,692 | 3,386,304,666 | 0.32% | 4,339,439 |
| June | 3,386,304,666 | 9,379,518 | 120,612,949 | 7,919,722 | 3,365,966,958 | 0.23% | 4,362,812 |
| July | 3,365,966,958 | 88,048,536 | 46,396,925 | 14,912,075 | 3,422,530,644 | 0.44% | 4,416,561 |
| August | 3,422,530,644 | 16,431,369 | 38,447,533 | 34,398,818 | 3,434,913,298 | 1.01% | 4,388,433 |
| September | 3,434,913,298 | 11,206,536 | 27,034,199 | 25,001,765 | 3,444,087,399 | 0.73% | 4,368,358 |
| October | 3,444,087,399 | 41,274,678 | 40,829,146 | 44,190,756 | 3,488,723,687 | 1.28% | 4,368,916 |
| November | 3,488,723,687 | 27,125,482 | 27,125,543 | 42,195,913 | 3,530,919,539 | 1.21% | 4,368,916 |
| December | 3,530,919,539 | 47,352,122 | 30,412,928 | 6,646,084 | 3,554,504,763 | 0.19% | 4,389,875 |
| | | | **RATE OF RETURN: 10.69%** | | | | |
| **2002** | | | | | | | |
| January | 3,554,504,763 | 50,956,862 | 27,476,760 | 1,128,253 | 3,579,113,117 | 0.03% | 4,418,874 |
| February | 3,579,113,117 | 20,411,839 | 22,326,660 | 21,371,287 | 3,598,569,582 | 0.60% | 4,416,510 |
| March | 3,598,569,582 | 37,040,351 | 14,197,008 | 16,499,072 | 3,637,911,997 | 0.46% | 4,444,545 |
| April | 3,637,911,997 | 45,842,039 | 28,057,623 | 42,370,556 | 3,698,066,968 | 1.16% | 4,466,273 |
| May | 3,698,066,968 | 18,283,875 | 76,412,970 | 77,039,592 | 3,716,977,465 | 2.12% | 4,396,071 |
| | | | **RATE OF RETURN: 4.43% (five months)** | | | | |

## NOTES TO TABLE

1) Beginning Net Asset Value represents the sum of cash, cash equivalents and equity balances in trading accounts accounted for at fair market value. Beginning Net Asset Value is the same as the previous reporting period's Ending Equity.

2) Additions are the sum of capital contributions as of the last day of the reporting period.

3) Withdrawals are the sum of partial or total withdrawals of capital as of the last day of the reporting period.

4) Net Profit/Loss is the sum of the profits and losses realized from trading activities during the reporting period net of the quarterly performance fee (20% of new high net profits) and other expenses for the reporting period, which has been allocated monthly for purposes of this chart.

5) Ending Equity is the sum of Beginning Net Asset Value plus additions, minus withdrawals, and Net Profit/(Loss) for the reporting period. Ending Equity is the Beginning Net Asset Value for the following reporting period.

6) Rate of Return is calculated by dividing Net Profit/(Loss) for the reporting period by the Beginning Net Asset Value for that reporting period. The cumulative Rate of Return figures which appear at the end of each year are calculated by applying on a compound basis each of the monthly or quarterly rates of return for such year to the Beginning Net Asset Value at the beginning of such year, not by adding or averaging the rates of return.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 5,000,000 Shares of common stock in one class with a par value of U.S. $.01 each. The Fund has an authorized share capital of U.S. $50,000. The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122141

FGGSAC0016103

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.

## TRANSFERS, REDEMPTIONS AND TERMINATION

### Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH CALENDAR MONTH ON FIFTEEN (15) BUSINESS DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund, which consent may be withheld in the sole and exclusive discretion of the Fund, will constitute grounds for compulsory redemption of the Shares concerned as of the next permissible redemption date (as described below) and the imposition of a processing charge of 2% of the Net Asset Value with respect to such redemption. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.

THE DISPOSITION OF SHARES TO U.S. PERSONS (AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

### Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last day of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) business days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

### Compulsory Redemption

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or no reason. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

21

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122142

FGGSAC0016104

**Redemptions - General Information**

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above.  If notice of intent voluntarily to redeem is not received by the Fund within the prescribed period of time, then in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption.  With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date.  The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in total within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date.  In addition, the Fund reserves the right temporarily to suspend any redemption if the effect of substantial redemptions would seriously impair the Fund's ability to operate.  Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Information Memorandum.

**Termination**

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time.  If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the normal ownership of the Shares and the source of the payment for the Shares.

The Fund and the Manager reserve the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund.  In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Fund may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund.  The Fund, by written notice to any shareholder, may suspend the redemption rights of such shareholder if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that amounts contributed by it to the Fund were not directly or indirectly derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122143

FGGSAC0016105

## BRITISH VIRGIN ISLANDS ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or Citco (referred to at times as the "Administrator") will require a detailed verification of a prospective investor's identity. Depending on the circumstances of each application, a detailed verification may not be required if:

(a) the applicant makes the payment from an account in the applicant's name at a recognized financial institution;

(b) the application is made through a recognized intermediary.

These exceptions will apply only if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti money-laundering regulations.

An individual may be required to produce a copy of a passport or identification card certified by a notary public. Corporate applicants or other legal entities may be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or equivalent), the names, occupants, dates of birth and residential and business addresses of all directors and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts, or similar organizational units without a specified beneficial owner, which subscribe to the Fund must demonstrate organizational documents which verify their existence and the authority of one or more signatories to sign subscriptions on their behalf.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti-money laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL

Under current legislation in the British Virgin Islands (the "BVI"), there should be no income tax, capital gains or withholding tax, estate duty or inheritance tax payable by the Fund or its shareholders who are not residents or citizens of the BVI, in respect of their Shares.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122144

FGGSAC0016106

withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund. The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 909 Third Avenue, 18th Floor, New York, New York 10022.

## MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund is placed in liquidation. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive unaudited quarterly letters with respect to the Fund's financial performance.

### Documents Available for Inspection

The Fund's books of account and all material documents, including copies of the Fund's Memorandum of Association and Articles of Association, the Fund's Agreement with the Administrator, Registrar and Transfer Agent shall each be kept at the Fund's business office in the British Virgin Islands and each shareholder (or any duly constituted designee of a shareholder) shall have, at all times during reasonable business hours, free access to such documents.

## COUNTRY-SPECIFIC NOTICES

Australia. No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law. Accordingly, the Memorandum has not been lodged with the Australian Securities Commission. Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122145

FGGSAC0016107

**Bahamas**.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

**Belgium**.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

**Brazil**.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

**British Columbia and Ontario, Canada**.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser.  The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

**British Virgin Islands**.  The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

**Cayman Islands**.  No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange.  Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

**Chile**.  The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except

25

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122146

FGGSAC0016108

in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain the prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

France. "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse. Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France. Les investisseurs doivent agir pour leur propre compte. Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant." This Memorandum has not been submitted to the Commission des Operations de Bourse in France. Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account. The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany. Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany. Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany. Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece. The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong. No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an

26

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122147

FGGSAC0016109

invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy.  The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other that the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part.  The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person.  Furthermore, disclosure under the SEL has not been made.  The Shares will not be registered under the SEL.  The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey.  The Memorandum relates to a private placement and does not constitute an offer to the public of Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought to the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122148

FGGSAC0016110

person.  The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.  The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.  Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.  The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.  The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122149

FGGSAC0016111

not be accepted. Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama. The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia. The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore. The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa. The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain. This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland. This Memorandum has been prepared for private information purposes of interested investors only. It may not be used for and shall not be deemed a public offering of Shares. No application has been made under Swiss law to publicly market the Fund in or out of Switzerland. The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly may not be advertised publicly. Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland. This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom. The Fund is an unregulated collective investment scheme as defined in the Financial Services UK Act of 1986 of the United Kingdom (the "UK Act"). The promotion of the Fund in the United Kingdom is restricted by Section 76 of the UK Act. The Fund has not been authorized or otherwise approved by the Securities and Investments Board and, as an unregulated scheme, it accordingly cannot be marketed in the United Kingdom to the general public. Shares in the Fund may not be offered or sold by an authorized person, as defined under the UK Act, in the United Kingdom by means of this Memorandum other than to persons authorized to carry on investment business under the UK Act, persons whose ordinary business involves the acquisition and disposal of property of the same kind as the property or a substantial part of the property in which the Fund invests and persons permitted to receive this Memorandum under the Financial Services (Promotion of Unregulated Schemes) Regulations 1991. The Fund has not authorized any offer to the public of Shares in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995. The Shares may not be offered or sold to persons within the United Kingdom except in circumstances which do not result in an offer to

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122150

FGGSAC0016112

the public in the United Kingdom within the meaning of such regulations or otherwise in compliance with all applicable provisions of such regulations.  The Fund is not regulated by the Securities and Investment Board or any other United Kingdom self-regulatory organization and investors will not have the benefit of the Investors Compensation Scheme and other protection afforded by United Kingdom legislation.

Uruguay.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122151

FGGSAC0016113

**APPENDIX A**

**FINANCIAL STATEMENTS**

**FAIRFIELD SENTRY LIMITED**

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122152

FGGSAC0016114

**APPENDIX B**

**SUBSCRIPTION DOCUMENTS**

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122153

FGGSAC0016115

### FAIRFIELD SENTRY LIMITED SUBSCRIPTION DOCUMENTS

**Instructions**

    A. **All subscribers**.  Provide all information requested in the Subscription Agreement and execute in the appropriate place on the signature page.

    B. **Items to be delivered by All Subscribers**.

        (i)  Completed and signed Subscription Agreement.

        (ii)  U.S. dollar denominated funds in the amount of the full purchase price for Shares. Wire transfer funds for the full amount of the subscription to the Fund's escrow account at:

> HSBC Bank USA
> 452 Fifth Avenue
> New York, NY 10018
> U.S.A.
> SWIFT: [REDACTED]US33
> ABA: 021 001 088

| | |
|---|---|
| **For Account** | Citco Bank Nederland, N.V. |
| **and under Swift** | SWIFT: [REDACTED]NL2A |
| **advice to:** | P.O. Box 7241 |
| | Amsterdam, The Netherlands |

| | |
|---|---|
| **Account No.:** | [REDACTED]4212 |
| **Reference:** | Fairfield Sentry Limited |
| | Account No:[REDACTED]3.787 |
| **By Order of:** | (Name of Subscriber) |

    (iii) Subscription documents should be delivered or sent by courier to Fairfield Sentry Limited, c/o  Citco Fund Services (Europe) B.V., Telestone 8 –Teleport, Naritaweg 165 1043 BW Amsterdam, P.O. Box 7241, 1007 JE Amsterdam,  The Netherlands; fax no.: (31-20)572-2476.

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122154

FGGSAC0016116

Name of Subscriber: _____

Amount of Subscription: $_____

## SUBSCRIPTION AGREEMENT
## FAIRFIELD SENTRY LIMITED

Fairfield Sentry Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 –Teleport,
Naritaweg 165
1043 BW Amsterdam
P.O. Box 7241 1007 JE Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile:  (31-20) 572-2476

Dear Sirs:

1.    Subscription.  The undersigned ("Subscriber") hereby subscribes for redeemable, voting shares, par value U.S. $0.01 per share (the "Shares"), of Fairfield Sentry Limited (the "Fund"), an international business company organized under the laws of the British Virgin Islands (the "BVI"), at a subscription price per Share equal to the Fund's Net Asset Value per Share as of the effective date of purchase.  All capitalized terms used in this Agreement that are not defined herein have the meanings set forth in the Fund's confidential private placement memorandum dated June 15, 2002 (the "Memorandum").  Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above.  Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents").

2.    Acceptance or Rejection.  If the Fund accepts this Subscription, Subscriber shall become a Shareholder of the Fund and bound by the Fund Documents.  The Fund may reject this subscription, in whole or in part, for any reason.  If rejected, the Fund will promptly return the subscription funds, with any interest actually earned thereon, and this Agreement will be void.

3.    Payment of Subscription Funds.  Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Agreement to the Fund.

<table>
<tr><td>For Account and<br>under Swift advice to:</td><td>HSBC Bank USA<br>452 Fifth Avenue<br>New York, New York 10018<br>U.S.A.<br>SWIFT: REDACTED US33<br>ABA: 021 001 088</td></tr>
<tr><td></td><td>Citco Bank Nederland, N.V.<br>Telestone 8 –Teleport,</td></tr>
</table>

A-1

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122155

FGGSAC0016117

Naritaweg 165
1043 BW Amsterdam
The Netherlands
SWIFT [REDACTED]OL2A

Account No.:               [REDACTED]0304
Reference:                Fairfield Sentry Limited
                                Account No. [REDACTED]3.797
By Order of:            (Name of Subscriber)

4.       Delivery of Subscription Agreement.   Subscriber should fax and mail an executed, completed copy of this Agreement to the Fund at the above facsimile number and address, with a copy to the Investment Manager at the following address: Fairfield Greenwich Limited, 399 Park Avenue, 36th Floor, New York, New York  10022-4690.

5.       Status Representations.

a.       Non-U.S. Person.  The Shares hereby subscribed for are not being (i) acquired directly or indirectly by, and (ii) will not be transferred directly or indirectly to, (A) a natural person who is a citizen, national or resident of, or an institution or other entity organized, created, formed, chartered or resident in, the United States of America ("U.S. Person"), (B) an entity as to which any person or entity described in (A) above is, directly or indirectly, a beneficiary, fiduciary, grantor or decedent, or (C) institutions or other entities owned, in whole or in part, directly or indirectly, by the persons or entities described in (A) or (B) above.

b.       Professional Investor Status.  Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI, because Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund.

6.       Related Professionals.
(Subscriptions cannot be accepted if this section is not completed)

(i)      Please indicate the name of the person at the Fairfield Greenwich Group with whom this subscription is associated.

Name: _____

(ii)     Please indicate the name, if applicable, of the person and/or entity who acts as an advisor with respect to this subscription.

Name of Advisor:

_____

Name of Advisor's firm or organization:

_____

Not Applicable: _____

7.       Receipt of Memorandum.  Subscriber has received and read a copy of the Memorandum.

A-2

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122156

FGGSAC0016118

Subscriber has relied solely on the Memorandum, the other Fund Documents, and any independent investigation it has conducted. (Subscriber has had an opportunity to obtain any additional information about the Fund that it has requested.) Subscriber has not relied on any representation inconsistent with the information in the Fund Documents.

8.      Subscriber Sophistication and Financial Condition. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has determined that the Shares are a suitable investment for it. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity. Subscriber can afford a complete loss of this investment, and can afford to hold the Shares for an indefinite time.

9.      Investment Intent. Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

10.     Subsequent Subscriptions. If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares.

11.     Registration of Shares; Certificates. The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee. Share certificates will not be issued to Subscriber unless it so requests in writing.

12.     Binding Nature of Agreement. This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns. The Agreement shall survive the acceptance of the subscription. If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

13.     Governing Law. This Agreement shall be governed and enforced in accordance with New York law, without giving effect to its conflict of laws provisions.

14.     Authority. Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber. The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

15.     New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding, by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122157

FGGSAC0016119

Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

16.    Anti Money-Laundering.    Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other criminal activity, including activities that contravene the anti-money laundering laws and regulations of any country.  Subscriber understands that, as part of the responsibility of the Fund and the Administrator for protection against money-laundering, the Administrator may require a detailed verification of Subscriber's identity.  Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary.  These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations.  For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth.  In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), the names, occupations, dates of birth and residential and business addresses of all directors.  The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber.  In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided.  Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption if such information as has been required by the parties referred to has not been provided by Subscriber.

18.    Confidentiality.    The Fund may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

19.    Indemnification.    Subscriber agrees to indemnify and hold harmless the Fund and any other service provider to it, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription.

20.    Enforceability.    If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

21.    Non-U.S. Currencies.    If Subscriber subscribes in a currency other than that of the U.S., Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

22.    Appointment of Revocable Proxy.    Subscriber hereby designates and appoints the Administrator with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by Shareholders present in person at that meeting.  This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently

A-4

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122158

FGGSAC0016120

executed proxy at any meeting of Shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a Shareholder) received before the meeting.

23.  **If Subscriber is acting as a Representative**.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.

24.  **Country-Specific Disclosures**.  Subscriber has reviewed the country-specific disclosures in the Memorandum.

25.  **Subscriber Information and Execution**.

a.  **Amount of Subscription.** U.S. $_____.

b.  **Registration of Shares**.  The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

_____

_____

c.  **Written Communications**.  All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

d.  **Telephone, Fax and Email**.  Telephone: _____

Fax: _____  Email _____

e.  **Domicile, Etc**.  Subscriber, if an individual, is a citizen of _____

_____ and a resident of _____.  Subscriber, if an entity, is organized under the laws of _____ and has its principal place of business in _____.

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122159

FGGSAC0016121

f.    Authorized Persons.  The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below.  Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
|------------|-----------|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile.  If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile instructions.  The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

g.    Redemption Payments.  Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: _____

Bank address: _____

ABA or CHIPS number: _____

Account name: _____

Account number: _____

For further credit: _____

A-6

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122160

FGGSAC0016122

h.      <u>Financial Institution Wiring/Paying Subscription Monies</u>.

Name: _____

Address: _____

Name of account at financial institution being debited for subscription

Payment: _____

Number of such account: _____

i.      <u>Execution</u>.  In witness whereof, Subscriber has executed this Agreement on the date set forth below:

Date: _____, 20___

<u>For individuals</u>

Print name: _____

Signature: _____

<u>For entities</u>

Print name: _____

Print name of authorized signatory: _____

Print title of authorized signatory: _____

Signature: _____

A-7

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122161

FGGSAC0016123

[To be completed by the Fund]

### THIS SUBSCRIPTION APPLICATION IS HEREBY ACCEPTED BY
### FAIRFIELD SENTRY LIMTIED

Date: _____,20__

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

=============================================================

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122162

FGGSAC0016124

**PAYMENT INFORMATION**

[to be placed on letterhead of the financial institution remitting payment]

Date

Via mail and facsimile

Dear Sirs:

Fairfield Sentry Limited (the "Fund")

1.    Name of Remitting Financial Institution:
2.    Address of Remitting Financial Institution:
3.    Name of Customer:
4.    Address of Customer:
5.    We have credited your account at [                                    ], Account Number [number] for [$ ] by order of [Subscriber] on [date].

The above information is given in strictest confidence for your own use only and without any guarantee, responsibility or liability on the part of this institution or it's officials.

Yours faithfully,

Signed: _____

Full Name: _____

Position: _____

A-9

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122163

FGGSAC0016125

## REDEMPTION REQUEST FORM

## INSTRUCTIONS

This form should be saved and may be used by a Shareholder wishing to redeem Shares in the Fund. Redeeming shareholders should complete and return this form, including the information on page 3.

FAIRFIELD SENTRY LIMITED
c/o Citco Fund Services (Europe) B.V.
Telestone 8 –Teleport,
Naritaweg 165
1043 BW Amsterdam
P.O. Box 7241
1007 JE Amsterdam  Telephone: (31)20-572-2114
The Netherlands  Fax: (31-20) 572-2476

_____, 200____

Dear Sirs:

I hereby request redemption, as defined in and subject to all of the terms and conditions of the Confidential Private Placement Memorandum dated June 15, 2002, as amended (the "Memorandum"), of Fairfield Sentry Limited (the "Fund"), of _____ Shares, representing [part/all] of my Shares in the Fund. I understand that redemption will only be effective as of the close of business on the last day of any calendar month, upon at least fifteen (15) business days' prior written notice. Except as otherwise provided in the Offering Memorandum, payment of the redemption proceeds will be made within thirty (30) days after the effective date of redemption.

I hereby represent and warrant that (i) I am the owner of the Shares of the Fund to which this Request relates, with full power and authority to request redemption of such Shares; and (ii) I am not a "U.S. person" (as that term is defined in the Offering Memorandum). Such Shares are not subject to any pledge or otherwise encumbered in any fashion. My signature has been guaranteed by a commercial bank acceptable to the Fund.

**Wire Transfer Instructions (to be completed by redeeming shareholder)**

Bank Name and Address    : _____
ABA or CHIPS No.         : _____
Account Name             : _____
Account No.              : _____

B-1

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122164

FGGSAC0016126

**SIGNATURES MUST BE IDENTICAL TO NAME(S) IN WHICH SHARES ARE REGISTERED**

PRINT:  Name of Registered
        Owner of Shares             Address

**ENTITY SHAREHOLDER (OR
ASSIGNEE)
[PARTNERSHIP, CORPORATION OR
TRUST]**

**INDIVIDUAL
SHAREHOLDER(S)
(OR ASSIGNEE)**

By: _____

[Signature of partner, authorized corporate
officer or trustee]

[Signature(s) of individual(s) or
assignee(s)]

Name and Title

[Signature(s) of individual(s) or
assignee(s)]

By: _____

[Signature of partner, authorized
corporate officer or trustee]

Name and Title

Signature(s) guaranteed by:

B-2

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122165

FGGSAC0016127

**REDEMPTION INFORMATION**
**Share Registration Information:**

Name:          _____
Address:       _____
City:          _____
Country:       _____
Telephone:     _____
Facsimile:     _____

**Name and Address of Bank for transfer of redemptions:**
Name:          _____
Address:       _____
City:          _____
Country:       _____
Telephone:     _____
Facsimile:     _____
Account:       _____

**Post Address (if other than address or registration):**
Name:          _____
Address:       _____
City:          _____
Country:       _____
Telephone:     _____
Facsimile:     _____
Account:       _____

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122166

FGGSAC0016128

**FAIRFIELD SENTRY LTD.**
c/o Citco Fund Services (Europe) B.V
Telestone 8 – Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
**Fax: +31 20 5722 476**

## SHORT FORM SUBSCRIPTION AGREEMENT

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SENTRY LTD. PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sentry Ltd. ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional Shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire Shares of the Fund.

**Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital.   New Subscription Information:**

Subscriber: _____

Contribution Date: _____, 200_

Additional Contribution Amount:    U.S.    $_____

Changes to Subscription Agreement:  [ ] None

[ ] Yes, as follows: (A new complete subscription agreement may be required)
_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of _____, 200_.

**Corporate, Partnership, Trust or Account Subscribers        Individual Subscribers**

Name of Entity (Print) _____        Name (Print) _____

By: _____                          _____
      Signature                                                        Signature

_____                               _____
Name (Print)                                                  Name of Joint Purchaser, If Any (Print)

_____                               _____
Title                                                             Signature

Telephone: _____                          Telephone: _____

Fax: _____                                    Fax: _____

B-4

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122167

FGGSAC0016129

SUBSCRIPTION ACCEPTED AS OF _____, 200_.

FAIRFIELD SENTRY LTD.

By: _____
      Name: _____
      Title: _____

B-5

316364.2

FOIA Confidential Treatment Requested
by Fairfield Greenwich Limited

FGG00122168

FGGSAC0016130