# Exhibit 12

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 11-02540 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO LION GLOBAL INVESTORS LIMITED** |
| LION GLOBAL INVESTORS LIMITED, | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Lion Global Investors Limited ("Lion Global"), states:

## I.    <u>INTRODUCTION</u>

1.      The Trustee seeks to recover a total of at least $50,583,443 in subsequent transfers of BLMIS customer property collectively made to Lion Capital Management ("Lion Capital") in 2005.  In 2008, Lion Capital changed its name to Lion Global.  The BLMIS customer property at issue was transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry"), and subsequently transferred to Lion Capital.

2.      Lion Capital was—and Lion Global is today—a Singapore public limited company operating as an investment manager.

3.      Fairfield Sentry was one of several BLMIS feeder funds ("Feeder Funds")—single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

4.      Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

5.      Lion Capital was created as a result of a merger of OCBC Asset Management Limited and Straits Lion Asset Management ("Straits Lion") in 2005.

6.      Prior to the formation of Lion Capital, FGG had entered into a joint venture with Straits Lion referred to as Fairfield Straits Lion Asset Management with FGG owning 35% and Straits Lion owning 65%.  FGG served as the investment manager for the joint venture, and Straits Lion as the investment adviser.  In 2005, following the creation of Lion Capital, the joint venture was renamed Lion Fairfield Capital Management.

1

7.      The Straits Lion personnel who initiated and cultivated the FGG relationship and had knowledge of Fairfield Sentry operations continued in that same role following the creation of Lion Capital.  Upon information and belief, Lion Capital held shares of Fairfield Sentry in connection with the joint venture.  Hereinafter Straits Lion and Lion Capital will be collectively referred to for ease of reading as "Lion."

8.      Lion conducted due diligence in New York and received and analyzed an abundance of information from FGG in connection with the joint venture.  Lion knew, as the result of its due diligence and its position as the co-owner of a joint venture with FGG, the entire economic purpose of Fairfield Sentry was to deliver money to BLMIS in New York.

9.      Lion purposefully invested in Fairfield Sentry to profit from BLMIS in New York.  But for Lion's choice to deliberately seek to profit from BLMIS's purported trading in U.S. securities in New York, Lion would have received none of the transfers from Fairfield Sentry.

## II.    LION'S RELATIONSHIP WITH FAIRFIELD SENTRY WAS CENTERED IN THE UNITED STATES

10.     Lion's relationship with Fairfield Sentry was centered in the United States.  First, Lion performed due diligence on Fairfield Sentry in New York in connection with the joint venture and its investments.  Second, Lion knew the purpose of investing in Fairfield Sentry was to deliver money to BLMIS in New York.  Third, Lion signed agreements related to the transactions and the joint venture that contained New York choice of law provisions.  Fourth, Lion used New York bank accounts to transfer funds to and from Fairfield Sentry.  Fifth, Fairfield Sentry maintained its principal place of business in New York and was a domestic resident.

2

### A.  Lion Conducted Due Diligence in New York on Fairfield Sentry in Connection with the Joint Venture and Its Investments

11.     Lion began the joint venture—at the time referred to as Fairfield Straits Lion Asset Management—with New York-based FGG in or around September 2003.  The joint venture served as a hedge fund management and distribution platform in Asia for FGG funds, including Fairfield Sentry.  As FGG partner Richard Landsberger explained, FGG saw the joint venture as "a partnership" in which FGG and Lion would "work[] together to meet each other's needs."

12.     Lion employees, as well as employees of the then-newly formed joint venture, frequently traveled to FGG's New York office for due diligence meetings and training sessions in connection with the joint venture and Lion's investments.  FGG trained these employees in New York on topics including manager selection and due diligence, risk management, hedge fund accounting operations, legal and compliance, and hedge fund marketing.  In July 2004, several Lion employees, including Lion's CEO, traveled to New York to visit FGG at its headquarters.  The Lion employees spent a week-and-a-half familiarizing themselves with FGG's processes and procedures.

13.     In May 2005, a Lion employee visited FGG's New York office to work on the joint venture, and met with two FGG New York employees to discuss their respective teams and various FGG funds, including Fairfield Sentry.

14.     Mark McKeefry from FGG's New York headquarters also sent Lion monthly update letters discussing the joint venture.  In a June 2005 monthly update letter, FGG discussed performing work on the joint venture's behalf in New York, bringing joint venture employees to FGG's New York office for additional training, and reviewing Fairfield Sentry risk reports with Lion and joint venture employees.

3

15.     In a July 2005 monthly update letter, FGG detailed conference calls between FGG New York Personnel and joint venture employees that took place on a weekly basis during June. FGG internal documents describe plans to bring Lion and joint venture employees to FGG's New York office.

**B.      Lion Knew the Entire Economic Purpose of Fairfield Sentry Was to Deliver Money to BLMIS in New York**

16.     As a result of its due diligence, its entry into agreements with FGG, and its close relationship with FGG, Lion knew the following facts showing the domestic nature of the transfers:

     a.  In reality the investment adviser for Fairfield Sentry was BLMIS in New York.

     b.  BLMIS in New York was the executing broker for Fairfield Sentry's investments, and BLMIS in New York purportedly operated and executed Madoff's "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry.

     c.  Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

     d.  BLMIS in New York was the custodian of Fairfield Sentry's investments.

17.     Lion knew the entire economic purpose of Fairfield Sentry was to deliver money to BLMIS in New York.  The purpose of Lion's investments was to invest in the U.S. markets, relinquishing all control over those investments to Madoff in New York.

**C.      Lion Agreed New York Law Applied in Connection with the Transactions**

    **1.      Lion Executed A Fairfield Subscription Agreement and Agreed New York Law Applied**

18.     Understanding that virtually all of Fairfield Sentry's assets would be invested domestically by BLMIS in New York, Lion decided to invest in Fairfield Sentry.  In so doing,

Lion agreed to be bound by New York law and submitted to venue in and the jurisdiction of New York courts.

19.     Lion received and reviewed a Fairfield Sentry subscription agreement, and upon information and belief, executed that subscription agreement prior to subscribing funds to Fairfield Sentry.  Lion agreed that the subscription agreement "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." The subscription agreement also explained that, by executing, Lion "agree[d] that any suit, action or proceeding . . . with respect to th[ese] Agreement[s] and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

### 2.     The Joint Venture Entered into a Letter of Understanding with Fairfield Greenwich Limited and Agreed New York Law Applied

20.     Additionally, in July 2005, the joint venture—of which Lion was the majority owner—entered into a letter of understanding with Fairfield Greenwich Limited ("FG Limited"), an FGG administrative entity, to receive fees in exchange for promoting FGG's funds, including Fairfield Sentry.

21.     The letter of understanding stated that the agreement "shall be governed and construed in accordance with the laws of the State of New York," and made clear that all notices under the letter must be sent to FG Limited's Dan Lipton at FGG's New York headquarters.

### D.     Lion Used New York Banks to Transfer Funds

22.     Lion also used New York bank accounts to transfer funds to and from Fairfield Sentry.

23.     Upon information and belief, Lion executed a subscription agreement in connection with its investments in Fairfield Sentry.  The agreement stated that all money from

5

Lion be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. In connection with subscribing funds to Fairfield Sentry, Lion directed funds to this New York HSBC Bank USA account.

24.     Lion also used a correspondent account at The Bank of New York in New York to receive transfers from Fairfield Sentry. Lion used this account repeatedly—at least six times over a two month period—to receive $50,583,443 in redemption payments from Fairfield Sentry.

## III.    FAIRFIELD SENTRY'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

25.     At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a domestic resident.

### A.    The Genesis of the FGG *De Facto* Partnership

26.     In 1988, Walter Noel and Jeffrey Tucker founded the FGG *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were Feeder Funds.

27.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

6

28.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.     Fairfield Sentry

29.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

30.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").  Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations.  The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

31.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

7

### 1. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States

32.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.   In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.   In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.   Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.   In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.   On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

33.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.   In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

34.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.   All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

35.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

36.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

37.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.  Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.   From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

38.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's

services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

39.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

40.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

41.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

11

controlled by BLMIS.

42.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the Feeder Funds and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

43.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

44.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

45.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

46.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its Feeder Funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

47.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

48.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.  The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

49.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
      New York, New York

*/s/* Thomas L. Long

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Damon M. Durbin

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the estate of
Bernard L. Madoff*