**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and
the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and the Chapter 7 Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 12-01205 (CGM) |
| v. | |
| MULTI-STRATEGY FUND LIMITED, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT MULTI-STRATEGY FUND LIMITED'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

## Contents

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    I.      THE PONZI SCHEME ...............................................................................3

    II.     THE BLMIS FEEDER FUNDS ..................................................................3

    III.    DEFENDANT'S INVESTMENTS IN THE BLMIS FEEDER FUNDS...............4

        A.    Defendant and Its Agents............................................................4

        B.    Defendant's BLMIS Feeder Fund Subscriptions and Redemptions ............4

        C.    Defendant Purposefully Invested with BLMIS in New York......................5

        D.    Defendant Met and Communicated with FGG and Tremont Personnel
            in New York Regarding Its BLMIS Feeder Fund Investments ..................6

        E.    Defendant Executed Sentry Subscription Agreements with New York
            Jurisdiction, Forum Selection, and Choice of Law Provisions...................7

        F.    Defendant Used New York Bank Accounts for Its BLMIS Feeder
            Fund Investments ...................................................................7

    IV.    THE FAIRFIELD SETTLEMENT.................................................................8

ARGUMENT ................................................................................................................8

    I.      THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT .........8

        A.    Defendant Purposefully Availed Itself of the Laws and Privileges of
            Conducting Business in New York by Investing in the BLMIS Feeder
            Funds......................................................................................10

            1.    Defendant's Investments with New York-Based BLMIS
                Through the BLMIS Feeder Funds Establish Minimum
                Contacts.................................................................10

                a.    BLI Established this Court's Jurisdiction Over
                    Defendant.....................................................12

                b.    Walden Does Not Save Defendant from this Court's
                    Jurisdiction...................................................14

i

2.     Defendant's Contacts with FGG and Tremont in New York Also Establish the Required Minimum Contacts ..........................16

3.     Defendant's Subscription Agreements Support Specific Jurisdiction ....................................................................................18

4.     Defendant's Purposeful Use of Correspondent Bank Accounts in New York Supports Specific Jurisdiction .................................19

5.     The Trustee's Claim Arises from and Relates to Defendant's New York Transfers .....................................................................23

B.     The Exercise of Personal Jurisdiction Over Defendant Is Reasonable ......25

II.     THE AMENDED COMPLAINT ALLEGES THAT DEFENDANT RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a) ......26

A.     Defendant Misstates the Trustee's Pleading Burden .................................27

B.     Defendant's Tracing Arguments Fail at the Pleading Stage .....................29

C.     Defendant's Claims of Double Recovery Are Premature ..........................33

III.     SECTION 546(e) DOES NOT BAR RECOVERY FROM DEFENDANT .........33

A.     Sentry's Actual Knowledge of Madoff's Fraud Bars Application of Section 546(e) ..............................................................................................34

B.     Defendant Is Precluded from Relitigating the Actual Knowledge Exception Established in Cohmad ............................................................34

C.     Defendant Is Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions ..........................................................36

CONCLUSION .......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ........................................................................27, 28, 31

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ...............................................................................................21, 22, 25

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
    409 B.R. 737 (Bankr. E.D.N.C. 2009) ..................................................................................28

*Anna Sui Corp. v. Forever 21, Inc.*,
    No. 07-cv-3235 (TPG), 2008 WL 4386747 (S.D.N.Y. Sept. 25, 2008) .................................17

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*,
    480 U.S. 102 (1987) ...............................................................................................................15

*Bartlett v. Société Générale de Banque au Liban SAL*,
    No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25,
    2020) .......................................................................................................................................20

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................................9, 18

*Burlington Indus., Inc. v. Salem Int'l Co.*,
    645 F. Supp. 872 (S.D.N.Y. 1986) .......................................................................................16

*Chase Manhattan Bank v. Banque Generale du Commerce*,
    No. 96-cv-5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997) .................................18

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)....................................................................................8, 10, 26

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) ...............................................................................33

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)....................................................................................8

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)............................................................................................................8, 17

*Dery v. United States (In re Bridge)*,
    90 B.R. 839 (E.D. Mich. 1988)..............................................................................................32

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) ........................................................................8

*Druck Corp. v. Macro Fund (U.S.) Ltd.*,
   102 F. App'x 192 (2d Cir. 2004) ..............................................................16

*Ehrlich-Bober & Co. v. Univ. of Houston*,
   49 N.Y.2d 574 (1980) ...............................................................................23

*Eldesouky v. Aziz*,
   No. 11–cv–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ...................................19

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
   343 B.R. 75 (Bankr. S.D.N.Y. 2006) .......................................................39

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011) .....................................................................37

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   397 F. Supp. 3d 323 (S.D.N.Y. 2019) .......................................10, 21, 22

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021) ....................................................9, 15, 19, 23

*Fowler v. Caliber Home Loans, Inc.*,
   277 F. Supp. 3d 1324 (S.D. Fla. 2016) ....................................................30

*Ge Dandong v. Pinnacle Performance Ltd.*,
   966 F. Supp. 2d 374 (S.D.N.Y. 2013) ......................................................20

*Giuliano v. Barch*,
   No. 16-cv-0859 (NSR), 2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ...................................25

*Gowan v. Amaranth Advisors, LLC (In re Dreier LLP)*,
   Adv. Pro. Nos. 10-03493 & 10-05447 (SMB), 2014 WL 47774 (Bankr.
   S.D.N.Y. Jan. 3, 2014) ............................................................................31

*Hau Yin To v. HSBC Holdings PLC*,
   No. 15-cv-3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ...............................24

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ...............................................................................15

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
   601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021) ..........................33

*Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016) ....................................................24

*HSH Nordbank AG N.Y. Branch v. Street*,
No. 11-cv-9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ............................19, 20

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
408 F.3d 689 (11th Cir. 2005) .......................................................................................32

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)......................................................................................................8, 9

*Kelley v. Westford Special Situations Master Fund, L.P.*,
No. 19-cv-1073 (ECT) (KMM), 2020 WL 3077151 (D. Minn. June 10, 2020)..........29, 31, 32

*Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327 (2012) ...............................................................................................20, 22, 23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)...................................................................................... *passim*

*McKee Electric Co. v. Rauland-Borg. Corp*,
20 N.Y.2d 377 (1967) .................................................................................................16, 17

*Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*,
565 B.R. 275 (Bankr. S.D.N.Y. 2017) ..........................................................................18, 21

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016).......................................................................................20, 21

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................................ *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) (Lifland, J.)...................................................... *passim*

*Picard v. Chais (In re BLMIS)*,
440 B.R. 274 (Bankr. S.D.N.Y. 2010)................................................................................23

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
Adv. Pro. Nos. 10-04398 (BRL) & 10-05219 (BRL), 2012 WL 892514
(Bankr. S.D.N.Y. Mar. 14, 2012)................................................................................ *passim*

*Picard v. Citibank, N.A. (In re BLMIS)*,
12 F.4th 171 (2d Cir. 2021) ...............................................................................................3

*Picard v. Cohen (In re BLMIS)*,
Adv. Pro. No. 10-04311 (CGM), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ...................................................................................................................35

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
454 B.R. 317 (Bankr. S.D.N.Y. 2011) ....................................................................32

*Picard v. Estate of Igoin (In re BLMIS)*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015) ....................................................................20

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
627 B.R. 546 (Bankr. S.D.N.Y. 2021) ...............................................................9, 23

*Picard v. Fairfield Inv. Fund (In re BLMIS)*,
Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6,
2021) ......................................................................................................................34

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
773 F.3d 411 (2d Cir. 2014), *cert. denied*, 576 U.S. 1044 (2015) ....................35, 37

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909, (Bankr. S.D.N.Y. Oct.
10, 2014) ................................................................................................................12

*Picard v. Lowrey (In re BLMIS)*,
596 B.R. 451 (S.D.N.Y. 2019), *aff'd sub nom. Picard v. Gettinger (In re
BLMIS)*, 976 F.3d 184 (2d Cir. 2020) ....................................................................35

*Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*,
460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...............................................................9, 26

*Picard v. Mayer (In re BLMIS)*,
Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct.
27, 2021) ................................................................................................................27

*Picard v. Merkin (In re BLMIS)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) .......................................................26, 27, 28

*Picard v. Shapiro*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ....................................................................28

*In re Picard*,
917 F.3d 85 (2d Cir. 2019) ...........................................................................11, 26, 37

*In re Refco Inc. Sec. Litig.*,
No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013) ..............34

*Roxx Allison Ltd. v. Jewelers Inc.*,
385 F. Supp. 3d 377 (S.D.N.Y. 2019) ....................................................................17

*Sass v. Barclays Bank PLC (In re Am. Home Mortg. Holdings, Inc.)*,
501 B.R. 44 (Bankr. D. Del. 2013) ........................................................................30

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ................................................................26, 27, 28

*SIPC v. BLMIS*,
    501 B.R. 26 (S.D.N.Y. 2013) .........................................................................................36

*SIPC v. BLMIS*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..........................................................................35

*SIPC v. BLMIS*,
    No. 12-mc-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........................ *passim*

*Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*,
    548 B.R. 300 (Bankr. C.D. Cal. 2016) ..........................................................................30

*Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*,
    239 F.3d 365, 2000 WL 1741550 (5th Cir. Dec. 11, 2000) ..........................................32

*SPV OSUS v. UBS AG*,
    114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ...................23, 24

*Steinberg v. A Analyst Ltd.*,
    No. 04-60898, 2009 WL 806780 (S.D. Fla. Mar. 26, 2009) .........................................22

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020) ..........................................................................38

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) .......................................................................................................34

*United States v. Henshaw*,
    388 F.3d 738 (10th Cir. 2004) .................................................................................30, 32

*Universitas Educ., LLC v. Nova Grp., Inc.*,
    Nos. 11-1590 (LTS) (HBP) & 11-8726 (LTS) (HBP), 2013 WL 6123104
    (S.D.N.Y. Nov. 20, 2013) ..............................................................................................29

*Walden v. Fiore*,
    571 U.S. 277 (2014) .................................................................................................14, 15

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ..........................................................................................25

## Statutes

11 U.S.C. § 546(e) ..................................................................................................... *passim*

11 U.S.C. § 550(a) ...............................................................................................26, 33, 36

11 U.S.C § 550(d) ..................................................................................................1, 33

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ............................................1

British Virgin Islands Insolvency Act...............................................................................40

**Other Authorities**

CPLR 302(a)(1) ..............................................................................................................24, 25

Federal Rule of Civil Procedure 12(b)(6) ........................................................................30

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"),

respectfully submits this memorandum of law in opposition to the motion to dismiss (ECF No.

102[1]) (the "Motion") of defendant Multi-Strategy Fund Limited ("Defendant").

## PRELIMINARY STATEMENT

"This is called triangulation, my friend… and a little bit of luck."  In a moment of honesty

on December 12, 2008, Mario Therrien, the president of Defendant, captured Defendant's reaction

to the public revelation of Madoff's massive Ponzi scheme—satisfaction and good fortune, but not

a hint of surprise.  Why?  Because Defendant anticipated this moment years earlier.  Therrien

recounted how Defendant had redeemed its BLMIS feeder fund investments in 2005, following a

discussion about "Madoff and the potential ponzi [sic] scheme"—triangulation.  But Defendant

did not just redeem in the amount it had invested.  It also redeemed over $4 million in fictitious

profits—a little bit of luck.  And Defendant gave no pause to consider the obvious implications of

its windfall, that it had received the proceeds of fraud stolen from others.

As part of the Trustee's continuing efforts to recover BLMIS customer property that was

stolen as part of Madoff's Ponzi scheme, this action seeks to recover more than $25 million that

Defendant received in a subsequent transfer of customer property from Fairfield Sentry Limited

("Sentry").[2]

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 12-01205 (CGM) (Bankr. S.D.N.Y.).

[2] Defendant also invested in and redeemed from Kingate Global Fund Limited ("Kingate").  The Trustee is not seeking to recover those subsequent transfers from Kingate under the single satisfaction rule in 11 U.S.C § 550(d).  *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Aug. 6, 2019), ECF No. 417.

Defendant has moved to dismiss the Amended Complaint on three grounds, each of which is meritless. *First*, despite always intending to invest with BLMIS in New York, despite coming into New York to further its business relationships with Sentry and Kingate, and despite relying on New York bank accounts to invest and redeem, Defendant claims this Court lacks personal jurisdiction. But these purposeful contacts with New York establish this Court's jurisdiction. Moreover, Defendant's argument is effectively foreclosed by an earlier decision in this liquidation in *Picard v. Bureau of Labor Insurance*, which contains practically identical facts.

*Second*, Defendant argues that the Trustee has not plausibly alleged that it received BLMIS customer property. But the Trustee has alleged the relevant pathways through which customer property was transferred from BLMIS to Sentry and subsequently to Defendant, and the necessary vital statistics (*i.e.*, the who, when, and how much) of the subsequent transfer Defendant received. Defendant openly admitted that it requested the transfer at issue because it was "so scared" that BLMIS was a "[P]onzi scheme." Nevertheless, Defendant now argues that the transfer it received did not contain any customer property under a fact-based and undisclosed tracing methodology. This is plainly inappropriate on a motion to dismiss.

*Finally*, Defendant argues that the safe harbor in Section 546(e) of the Bankruptcy Code mandates dismissal. But the Trustee has plausibly alleged the avoidability of the initial transfers based on Sentry's actual knowledge of fraud. By arguing that there is no actual knowledge exception and that the safe harbor bars recovery of a subsequent transfer, Defendant disregards the law of the case and ignores the plain language of Section 546(e).

Because Defendant's arguments lack merit, the Trustee respectfully requests that this Court deny Defendant's Motion.

## STATEMENT OF FACTS

### I.    THE PONZI SCHEME

Madoff founded and operated BLMIS out of New York, New York until its collapse in 2008.  (Am. Compl. ¶¶ 26, 28, ECF No. 97.)  BLMIS had three principal business units: (i) a proprietary trading desk; (ii) a broker-dealer operation; and (iii) an investment advisory business (the "IA Business").  (*Id.* ¶ 28.)  For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the S&P 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the market.  (*Id.* ¶¶ 41–44.)  In reality, BLMIS operated a Ponzi scheme through its IA Business.  (*Id.* ¶ 32.)  On December 11, 2008, Madoff's fraud was publicly revealed and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  (*Id.* ¶ 14.)

### II.    THE BLMIS FEEDER FUNDS

Among BLMIS's customers were BLMIS "feeder funds"—large investment funds created for the express purpose of funneling their investors' money into BLMIS.  *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d Cir. 2021).  Defendant knowingly invested in two such funds, Sentry and Kingate (together, the "BLMIS Feeder Funds").  (Am. Compl. ¶ 100.)

Sentry was created, managed, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership headquartered in New York.  (*Id.* ¶¶ 61–62.)  Sentry invested substantially all of its assets with BLMIS.  (*Id.* ¶ 61.)  Sentry was a shell company with no employees of its own, and was instead operated by FGG.  (*Id.* ¶¶ 61–62.)  FGG partners and employees also regularly met with Sentry investors in New York, and communicated with those investors from New York.  (*See id.* ¶¶ 91–93, 96–97.)

Kingate was co-managed by Tremont (Bermuda) Ltd. (with its affiliates, "Tremont") and invested exclusively with BLMIS. (*Id.* ¶¶ 63–64.) Tremont personnel regularly met with Kingate investors in New York, and communicated with investors from New York. (*See id.* ¶¶ 98–99.)

## III. DEFENDANT'S INVESTMENTS IN THE BLMIS FEEDER FUNDS

### A. Defendant and Its Agents

Defendant is a wholly owned subsidiary of Caisse de dépôt et placement du Québec ("Caisse") and is organized under Cayman law. (*Id.* ¶ 58.) CDP Capital Tactical Investments ("CDP Capital"), another wholly owned subsidiary of Caisse, was Defendant's investment manager at all relevant times. (*Id.* ¶ 59.)

Defendant had no employees of its own, so it relied entirely on CDP Capital and its officers, directors, employees, and agents to act as Defendant's agents and carry out its business. This included making investment decisions and directing and controlling Defendant's daily activities, including dealings with the BLMIS Feeder Funds. (*Id.* ¶¶ 65, 67–68.) CDP Capital indicated that it was authorized to act on behalf of Defendant by identifying Defendant as a "CDP entity" to FGG and identifying itself as the "subscriber" in a Kingate subscription agreement. (*Id.* ¶ 69.)

Therrien, president of both CDP Capital and Defendant, gave and received instructions on behalf of Defendant, including about the subscriptions to and redemption from Sentry. (*Id.* ¶¶ 5, 72–77.) Therrien and CDP Capital's Joelle Verdon executed two Sentry subscription agreements on Defendant's behalf, identifying Defendant as the subscriber and Therrien as the "advisor." (*Id.* ¶ 74.) Additionally, CDP Capital's investment committee, which included Therrien, was responsible for overseeing Defendant's investments in the BLMIS Feeder Funds. (*Id.* ¶ 73.)

### B. Defendant's BLMIS Feeder Fund Subscriptions and Redemptions

Defendant began investing with BLMIS through Kingate in 1999 and through Sentry in 2004. (*Id.* ¶ 89.) Defendant asked FGG for approval to increase its investment in Sentry at least

seven times.  (*Id.* ¶ 91.)  FGG eventually approved one such request and Defendant subscribed an additional $5 million into Sentry.  (Therrien Decl., ¶ 10, ECF No. 101.)  Days later, Therrien met with Simon Ruddick of Albourne Partners Limited on February 10, 2005 and "discussed Madoff and the potential ponzi [sic] scheme."  (Am. Compl. ¶¶ 5–6, 91.)  That discussion "so scared" Therrien that, within a week, Defendant redeemed all of its BLMIS Feeder Fund investments.  (*Id.* ¶¶ 5–7.)  In so doing, Defendant not only avoided any loss from the Ponzi scheme, it received a windfall of over $4 million more than it invested in the BLMIS Feeder Funds.  (*Id.* ¶ 8.)  On March 15, 2005, Defendant received a single subsequent transfer of BLMIS customer property from Sentry totaling $25,763,374.  (*Id.* ¶ 2 & Ex. C.)

### C.    Defendant Purposefully Invested with BLMIS in New York

Defendant knew and intended that the funds it invested in the BLMIS Feeder Funds would be transferred to BLMIS to be custodied and purportedly invested in U.S.-listed securities.

Therrien and Verdon executed a Sentry subscription agreement, dated June 23, 2004, to enable Defendant to invest in the fund.  (*Id.* ¶ 74; Therrien Decl., Ex. A.)  Defendant thereby affirmed that it had "received and read" a July 1, 2003 Sentry private placement memorandum (the "PPM") disclosing information about the fund's investments, including that "approximately 95% of the [f]und's assets" were under the custody of New York-based BLMIS.  (Am. Compl. ¶ 90.)

Defendant also subscribed to Kingate three times for the purpose of investing with BLMIS in New York through the purported purchase and sale of securities in the United States.  (*Id.* ¶¶ 88– 89, 92, 94.)  In its Kingate subscription agreements, Defendant affirmed that it had "received, reviewed, and understood" several versions of the Kingate information memorandum, which disclosed that Kingate used a U.S. investment advisor and a New York-based registered broker-dealer: BLMIS.  (*Id.* ¶ 94.)

5

Defendant always knew and intended that its investments would be with New York-based BLMIS. (*Id.* ¶¶ 88–89.) When Defendant subscribed in Sentry, FGG partner Philip Toub remarked that Defendant should be "add[ed] to the long list of Madoff addicts who need a fix." (*Id.* ¶ 91.) Defendant's agents regularly asked FGG about Madoff specifically in correspondence about Defendant's Sentry investments, including for "info that you've got on Madoff," "how Maddoff [sic] made money," and for help "understand[ing] when Maddoff [sic] was invested." (*Id.* ¶ 93.) Defendant fully redeemed from both BLMIS Feeder Funds within days of Therrien discussing "Madoff and the potential ponzi [sic] scheme" with Ruddick, and Therrien referenced "rumors [about] Madoff" with FGG's Toub when Defendant redeemed from Sentry. (*Id.* ¶ 92.)

Defendant also intended that its BLMIS Feeder Fund investments would be in U.S. securities. (*Id.* ¶¶ 100–07.) Defendant received numerous documents from FGG and Tremont disclosing that Madoff's SSC Strategy entailed the purported purchase and sale of a "basket" of U.S. equity securities, S&P 100 Index options, and U.S. Treasury Bills. (*Id.*)

### D. Defendant Met and Communicated with FGG and Tremont Personnel in New York Regarding Its BLMIS Feeder Fund Investments

Defendant maintained regular contact with FGG and Tremont personnel in New York regarding its BLMIS Feeder Fund investments. Therrien "and possibly also one or two of [his] colleagues" (Therrien Decl., ¶ 19) met with Toub and other FGG personnel at FGG's New York headquarters shortly after Defendant began investing in Sentry to discuss the investment. (Am. Compl. ¶ 96.) At this meeting, FGG showed Defendant Sentry tear sheets and reports prepared by an FGG consultant analyzing the performance of the fund and describing the nature of the SSC Strategy. (*Id.*) FGG sought to "avoid [Defendant] feeling the need to see Madoff" about Defendant's BLMIS Feeder Fund investments. (*Id.*) Defendant's agents also met at least once with Tremont personnel in New York about Defendant's Kingate investments. (*Id.* ¶ 99.)

Defendant also directed email and telephonic communications to FGG and Tremont personnel in New York regarding its BLMIS Feeder Fund investments, including sending wiring instructions designating a New York bank account for Defendant's subscriptions in and redemption from Sentry.  (*Id.* ¶¶ 96–97, 99.)

### E.    Defendant Executed Sentry Subscription Agreements with New York Jurisdiction, Forum Selection, and Choice of Law Provisions

By executing subscription agreements to invest in Sentry, Defendant "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding and consent[ed] that service of process as provided by New York law may be made upon [Defendant] in such [p]roceeding . . . ."  (*Id.* ¶ 108.)  Defendant also agreed that its Sentry investments would "be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."  (*Id.* ¶ 109.)

### F.    Defendant Used New York Bank Accounts for Its BLMIS Feeder Fund Investments

Defendant used the New York banking system to subscribe into and redeem from the BLMIS Feeder Funds.  (*Id.* ¶¶ 110–11.)  Defendant agreed to, and did, direct its Sentry investment funds to a bank account with HSBC Bank USA in New York, New York (the "HSBC USA Account").  (*Id.* ¶ 110.)  Defendant sent its subscriptions to Sentry through a New York account at The Bank of New York (the "BNY Account").  (*See* Therrien Decl., Ex. A at 12–13; *id.*, Ex. B at 12–13.)  Defendant also directed FGG and Tremont to pay redemptions from Sentry and Kingate to the BNY Account.  (Am. Compl. ¶¶ 97, 111; Therrien Decl., Ex. A at 11, 13; *id.*, Ex. B at 11, 13; *id.*, Ex. C at 2 & 6.)  And Defendant in fact used the BNY Account to receive the subsequent transfer from Sentry that the Trustee seeks to recover.  (Am. Compl. ¶ 111; Therrien Decl., Ex. E.)

7

## IV.    THE FAIRFIELD SETTLEMENT

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion.  (Am. Compl. ¶ 114.)  In 2011, the Trustee settled with Sentry and others. (*Id.* ¶ 115.)  As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS customer property estate.  (*Id.*)  The Trustee then commenced a number of adversary proceedings against subsequent transferees like Defendant to recover the approximately $3 billion in missing customer property.

## <u>ARGUMENT</u>

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a *prima facie* case that personal jurisdiction exists.  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).  Pleadings concerning personal jurisdiction are to be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation omitted).

The personal jurisdiction analysis is a two-step inquiry that focuses on (1) the defendant's minimum contacts and (2) whether jurisdiction will be reasonable under the circumstances.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  There are two types of personal jurisdiction that satisfy minimum contacts, general jurisdiction and specific jurisdiction.[3]  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001).  "Specific jurisdiction exists when the defendant 'purposefully direct[s] his activities at residents of the forum' and the underlying

---

[3] General jurisdiction is based on the defendant's general business contacts with the forum state and permits a court to exercise jurisdiction where the suit is unrelated to those contacts.  *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014).  Here, the Trustee's case arises out of the contacts Defendant has with the forum and a finding of general jurisdiction is unnecessary.

cause of action 'arises out of or relates to those activities.'" *Picard v. Fairfield Greenwich Grp.*

*(In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

First, specific jurisdiction is appropriate when the defendant's contacts "proximately result

from actions by the defendant *himself* that create a 'substantial connection' with the forum state."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted).  This does not

require a causal relationship between the plaintiff's claims and the defendant's contacts with the

forum.  *See Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1026 (2021).

Indeed, the defendant's activities need not have taken place within the forum at all, "and a single

transaction with the forum will suffice."  *See Picard v. Maxam Absolute Return Fund, L.P. (In re*

*BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (cleaned up).  Moreover, specific jurisdiction

may also be found when a "defendant's allegedly culpable conduct involves at least in part

financial transactions that touch the forum."  *Fairfield Greenwich Grp.*, 627 B.R. at 566.

Second, the court assesses whether the assertion of personal jurisdiction is reasonable,

meaning it comports with "fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at 320.  Where

the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to

present a "compelling case" that jurisdiction would be unreasonable.  *Fairfield Greenwich Grp.*,

627 B.R. at 567 (citing *Burger King*, 471 U.S. at 477).

In determining whether the defendant's forum contacts establish personal jurisdiction, the

court must consider the "quality and nature of the defendant's contacts with the forum state under

a totality of the circumstances test," not each contact in isolation.  *See Licci ex rel. Licci v.*

*Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci II*").  In other words,

"[n]o single event or contact connecting defendant to the forum state need be demonstrated; rather,

the totality of all defendant's contacts with the forum state must indicate that the exercise of

9

jurisdiction would be proper." *Chloé*, 616 F.3d at 164 (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005)).

### A.    Defendant Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York by Investing in the BLMIS Feeder Funds

Defendant's numerous and purposeful contacts with New York establish this Court's jurisdiction. Defendant: (i) invested in the BLMIS Feeder Funds with the knowledge and intention that those funds would be invested, managed, and custodied by BLMIS in New York; (ii) met and communicated with FGG and Tremont personnel in New York regarding its investments with New York-based BLMIS through the BLMIS Feeder Funds; (iii) agreed to New York jurisdiction, forum selection, service of process, and choice of law provisions related to its Sentry investments; and (iv) used the New York banking system to transact with the BLMIS Feeder Funds. Many of these contacts would be sufficient by themselves to support jurisdiction. But the contacts in their totality establish that Defendant purposefully directed its activities into New York. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [of the defendant]'s Agreement-related contacts are considered together, it is clear [the defendant] purposely availed itself of the forum.").

### 1.    Defendant's Investments with New York-Based BLMIS Through the BLMIS Feeder Funds Establish Minimum Contacts

Defendant knew and intended that its investments in the BLMIS Feeder Funds were ultimately investments with New York-based BLMIS and that the funds Defendant invested were purportedly to be used to purchase securities in the United States. Setting aside Defendant's other New York and U.S. contacts that support this Court's assertion of jurisdiction, Defendant's deliberate targeting of New York-based BLMIS and the U.S. securities market—through entities expressly constituted for that purpose—is dispositive.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019). By executing the Sentry subscription agreements and affirming that it "received and read" Sentry's PPM, Defendant knew that "approximately 95%" of Sentry's assets were under the custody of BLMIS in New York. (Am. Compl. ¶ 90.) Similarly, Defendant "received, reviewed, and understood" Kingate's information memoranda, which disclosed the fund's reliance on "an Investment Advisor who is based in the United States" and "a New York . . . broker-dealer." (*Id.* ¶ 94.) Defendant's intent to invest with BLMIS was consistent: From the outset of Defendant's investment in Sentry, FGG considered Defendant another on "the long list of Madoff addicts who need a fix." (*Id.* ¶ 91.) Defendant focused its inquiries to FGG on Madoff, routinely asking for "info that you've got on Madoff," including "how Maddoff [sic] made money." (*Id.* ¶ 93.) And when Therrien informed FGG's Toub that Defendant was redeeming from Sentry, they discussed "the rumors [about] Madoff." (*Id.* ¶ 92.) Therrien was more candid with Ruddick, admitting that Defendant had simultaneously redeemed from Sentry and Kingate because of "Madoff and the potential ponzi [sic] scheme." (*Id.*) Defendant not only knew that BLMIS was the principal target of its investments, it invested with the BLMIS Feeder Funds for precisely that reason.

Defendant also intended that any profits from its BLMIS Feeder Fund investments would be generated by BLMIS's purported investments in U.S. securities. The Sentry PPM and Kingate information memoranda that Defendant reviewed, as well as the documents that FGG showed to Therrien at a meeting in New York and that FGG and Tremont sent at Defendant's request, made clear that Madoff's SSC Strategy purportedly entailed the purchase of U.S. equity securities and U.S. Treasury Bills. (*Id.* ¶¶ 100–07.)

a.    BLI *Established this Court's Jurisdiction Over Defendant*

Based on the intent to invest with BLMIS through Sentry, this Court has already held that

Sentry investors like Defendant are subject to personal jurisdiction in New York.  *See Picard v.*

*Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.)

("*BLI*").

There, as here, the Trustee's suit was "based upon the [subsequent transferee's] investment

of tens of millions of dollars in Fairfield Sentry with the specific goal of having funds invested in

BLMIS in New York, with intent to profit therefrom." *Id.* at 506.  There, as here, the subsequent

transferee executed substantively identical subscription agreements and "received and read"

substantively identical PPMs, establishing the investment's BLMIS-centric purpose.  *Id.* at 507–

08.  And there, as here, the subsequent transferee argued that the foreseeability of its investment

"end[ing] up" in a BLMIS account did not support jurisdiction.  *Id.* at 516–17.  Not only did Judge

Lifland unequivocally reject this argument, he called it "disingenuous," explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an account at
> BLMIS as a result of happenstance or coincidence.  Rather, BLI purposefully
> availed itself of the benefits and protections of New York laws by knowing,
> intending and contemplating that the substantial majority of funds invested in
> Fairfield Sentry would be transferred to BLMIS in New York to be invested in the
> New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. No. 08-99000

(SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation

have already "confirmed that defendants who invested directly or indirectly with BLMIS and

received payments from BLMIS as an initial transferee or subsequent transferee of those initial

transfers were subject to the Court's personal jurisdiction").  As described by Judge Lifland, "BLI

intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money

orchard in the United States and reap the benefits therefrom."  *BLI*, 480 B.R. at 506.

Because Defendant is identically situated to the subsequent transferee in *BLI* with respect to the fundamental purpose of its investment, *BLI* is controlling and resolves Defendant's personal jurisdiction defense without necessitating any further analysis of Defendant's other New York contacts. In fact, the evidence that Defendant purposefully targeted the New York securities market is considerably stronger here because Defendant not only invested in Sentry, but also in Kingate, which was similarly constituted to feed investments directly to BLMIS.

Faced with the obvious weight of *BLI*, Defendant mischaracterizes the Amended Complaint in a half-hearted attempt to distinguish that case. (*See* Motion at 31–32.) Defendant argues that *BLI* does not support a finding of minimum contacts based on Defendant's "knowledge" of Sentry's investment with BLMIS. (*Id.* at 32.) But the Amended Complaint is replete with allegations about Defendant's *intentions* and *purpose*, which are directly analogous to the facts of *BLI*. This includes the allegation that Defendant purposefully availed itself of the benefits and protections of the laws of New York because it knew and intended that its investments in the BLMIS Feeder Funds were ultimately investments with New York-based BLMIS. *Compare, e.g.*, Am. Compl. ¶¶ 88–94, 100–07 (alleging Defendant's intention to invest with BLMIS and in U.S. securities), *with BLI*, 480 B.R. at 517 ("BLI purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market.").

Ultimately, Defendant's argument about *BLI* is incorrect. Judge Lifland was unequivocal that BLI's intentional investment with a BLMIS feeder fund expressly designed to funnel such investments to BLMIS in New York was sufficient to establish personal jurisdiction. *See BLI*, 480 B.R. at 517 ("In a nutshell, BLI invested tens of millions of dollars in Fairfield Sentry with the

specific purpose of having funds invested in BLMIS in New York, and intended to profit from this U.S.-based investment.").  In fact, in addressing BLI's separate argument concerning its New York bank accounts, the Court expressly noted that its decision was not "rooted in the mere existence of these accounts.  Instead, . . . BLI directed its investment towards the forum State, thereby purposefully availing itself of the benefits and protections of New York laws."  *Id.* at 516 n.14. Accordingly, there is no doubt that *BLI* controls.

b.      Walden *Does Not Save Defendant from this Court's Jurisdiction*

Having given short shrift to *BLI*, Defendant attempts to use *Walden v. Fiore* to frame the jurisdictional analysis here through the false lens of "foreseeability."  571 U.S. 277 (2014) (*cited in* Motion at 30–32).  However, the facts and applicable law of *Walden* are significantly different from those here.  *Walden* was an intentional tort case, and therefore the court applied the "effects test" to personal jurisdiction, not the "purposeful availment" test applicable here.  *Id.* at 287–88. The defendant in *Walden*, a Georgia police officer, had no purposeful minimum contacts with the forum state of Nevada:  He had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada," nor was the officer's seizure of funds predicated in any way on the fact that their intended destination was Nevada in particular.  *Id.* at 288–89. Nevertheless, the Ninth Circuit found jurisdiction because the officer had seized money in Georgia from a Nevada resident and therefore the seizure would have some foreseeable effect in Nevada. *Id.* at 289–91.  The Supreme Court disagreed, finding that the defendant had "formed no jurisdictionally relevant contacts with Nevada" and that he could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiff resided in Nevada.  *Id.* In reversing the Ninth Circuit's holding that the officer's knowledge of plaintiff's Nevada connections and the "foreseeable harm" that plaintiff suffered there were dispositive, the Court simply reaffirmed the well-established principle that personal jurisdiction cannot be premised

14

solely on a plaintiff's unilateral contacts with the forum state.  *Id.* at 284 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

This case is nothing like *Walden*.  As a preliminary matter, the Trustee's allegations implicate the Supreme Court's "purposeful availment" framework, a concept that the *Walden* Court did not reference, let alone apply.  Nor is the police officer's lack of any "jurisdictionally relevant contacts with Nevada" (*id.* at 291) remotely analogous to Defendant intentionally directing investments to a New York broker-dealer through a feeder fund formed to funnel investments to that New York broker-dealer.  "The substantial connection . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 112 (1987) (quotation omitted).  That is precisely the sort of action Defendant took when it sent the BLMIS Feeder Funds tens of millions of investment dollars with BLMIS as the ultimate intended recipient.  And Defendant's efforts to downplay its investment's New York destination as some sort of "foreseeable" consequence rather than a deliberate and purposeful targeting of that forum is precisely the same "disingenuous" argument Judge Lifland rejected in *BLI*.  *See* 480 B.R. at 517.

Defendant also misinterprets *Walden* to the extent it argues, in effect, that Defendant's connections to the forum must be viewed in a vacuum as opposed to being based on its relationships with BLMIS and its feeder funds.  (Motion at 30.)  *Walden* recognized that "a defendant's contacts with the Forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."  *Walden*, 571 U.S. at 286; *see also Ford Motor Co.*, 141 S. Ct. at 1031–32 (rejecting defendant's contention that *Walden* "shows that a plaintiff's residence and

place of injury can never support jurisdiction" and explaining that "[t]hose places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit").

Accordingly, this Court should reaffirm *BLI* and hold that Defendant's purposeful targeting of New York and its laws by intentionally investing with BLMIS through Sentry alone establishes personal jurisdiction over Defendant.

> 2.    Defendant's Contacts with FGG and Tremont in New York Also Establish the Required Minimum Contacts

Defendant directed activity into New York and the United States through its contacts with FGG and Tremont. Defendant's agents, including Therrien and "possibly one or two of [his CDP Capital] colleagues" (Therrien Decl., ¶ 19), traveled to New York to meet with FGG partner Philip Toub and other FGG personnel at FGG's New York headquarters. (Am. Compl. ¶ 96.) At that meeting, FGG provided Sentry tear sheets and reports to, in FGG's words, "avoid [Defendant] feeling the need to go see Madoff." (*Id.*) Defendant's agents also traveled to New York to meet with Tremont personnel regarding Defendant's investments with BLMIS through Kingate. (*Id.* ¶ 98.) These visits with FGG and Tremont support jurisdiction. *See Druck Corp. v. Macro Fund (U.S.) Ltd.*, 102 F. App'x 192, 193–94 (2d Cir. 2004) (finding one or two meetings concerning a "fund's investment strategy" to be "substantive and substantial" enough to support jurisdiction even though no investment was immediately forthcoming); *Burlington Indus., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction where defendant attended two meetings in New York to conduct business and reach an agreement).[4]

---

[4] Defendant cites *McKee Electric Co. v. Rauland-Borg. Corp.* for the proposition that a single meeting in New York is inadequate to establish jurisdiction. 20 N.Y.2d 377 (1967) (*cited in* Motion at 37). But jurisdiction was found wanting in *McKee* not for lack of contacts, but because such contacts were unrelated to the underlying cause of action. *See id.* at 382–83. Here, Defendant's meeting with FGG in New York about its investments in Sentry directly relates to the Trustee's claim to recover the subsequent transfer Defendant received from Sentry. *See Druck Corp.*, 102 F. App'x at 194 (distinguishing *McKee* and finding that "the nature and purpose of a solitary business meeting conducted for a single day in New York may supply the sole jurisdictional fact to support jurisdiction") (cleaned up). Moreover, because the putative basis for jurisdiction in *McKee* was the breach of a distribution agreement to provide goods or

Defendant also managed its business relationships with the BLMIS Feeder Funds by directing communications to FGG and Tremont in New York. This included providing wiring instructions to FGG personnel in New York designating the BNY Account for Defendant's Sentry subscriptions and redemption. (Am. Compl. ¶ 97; Therrien Decl., Ex. A at 11–13; *id.*, Ex. B at 11–13; *id.*, Ex. C at 2 & 6.) And Defendant similarly directed communications to New York-based Tremont personnel regarding Defendant's Kingate subscriptions in and redemptions from Kingate. (Am. Compl. ¶ 99.) Defendant's "continuous relationship" and "constant communications" with FGG and Tremont reflect Defendant's transaction of business in New York. *See Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 383 (S.D.N.Y. 2019) (finding personal jurisdiction where "defendant purposefully and voluntarily maintained a years-long relationship with plaintiff, during which time defendant placed many orders for jewelry worth a great sum of money").

These purposeful acts were aimed at New York and the United States as part of Defendant's investments with BLMIS through the BLMIS Feeder Funds, and these contacts of Defendant's agents, including CDP Capital and Therrien, are imputed to Defendant. *See Anna Sui Corp. v. Forever 21, Inc.*, No. 07-cv-3235 (TPG), 2008 WL 4386747, at *2 (S.D.N.Y. Sept. 25, 2008) (agency is established where the agent engaged in purposeful activities in New York relating to the transaction, the agent's actions were for the defendant's benefit and with the defendant's knowledge and consent, and the defendant exercised some control over the agent); *Daimler*, 571 U.S. at 135 n.13 ("[A] corporation can purposefully avail itself of a forum by directing its agents . . . to take action there."). These New York contacts further support jurisdiction.

---

services within New York, the jurisdictional analysis there focused on whether there was a sufficient nexus between the conduct directed at New York and the underlying distribution agreement. *See McKee*, 20 N.Y.2d at 379–80, 382–83. Because the Trustee's claim is not based on an alleged breach of contract, the jurisdictional analysis here is focused on Defendant's conduct directed at New York related to its investments in BLMIS through the BLMIS Feeder Funds. And Defendant's meetings with FGG and Tremont in New York about those investments relate to the Trustee's claims and thus support jurisdiction here. *See infra* at 23–25.

3.   Defendant's Subscription Agreements Support Specific Jurisdiction

Regardless of whether Defendant's execution of Sentry subscription agreements constitutes "consent" to personal jurisdiction in New York (Motion at 24–25), the terms of the subscription agreements, including choice of law and forum selection provisions, further evidence a "strong nexus with New York" that supports jurisdiction. *See BLI*, 480 B.R. at 517 n.15.

When Defendant invested in Sentry, it signed a subscription agreement through which it submitted to venue in New York, the jurisdiction of New York courts, the service of process from New York courts, and the application of New York law. (*See* Am. Compl. ¶¶ 108–09; Therrien Decl., Exs. A & B.)

"[A] choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank v. Banque Generale du Commerce*, No. 96-cv-5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Burger King*, 471 U.S. at 482 (finding jurisdiction where choice of law provision "reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"). For example, in *Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, the court held that even if defendant's agreement to New York forum and choice of law provisions did not constitute consent, the provisions helped establish minimum contacts to support specific jurisdiction. 565 B.R. 275, 288-89 (Bankr. S.D.N.Y. 2017) (finding agreement provisions plus a correspondent bank account in New York reflected a relationship "centered in New York"); *see BLI*, 480 B.R. at 517 n.15.

Moreover, the Sentry subscription agreements plainly "relate to" the Trustee's claim and evidence a strong nexus between this case and New York under the totality of circumstances. Defendant's subscriptions in and redemptions from Sentry are two sides of the same coin.

Defendant could not invest in Sentry without executing a subscription agreement. In turn, Defendant profited from its subscriptions based on BLMIS's purported investments. Because Defendant's subscription agreements were a necessary predicate to the subsequent transfer from Sentry, the subscription agreements are sufficiently related to the Trustee's claims to constitute a relevant purposeful contact with New York. *See Ford Motor Co.*, 141 S. Ct. at 1026 (rejecting a requirement of a "strict causal relationship between the defendant's in-state activity and the litigation"); *see also Licci II*, 732 F.3d at 168–69 (noting that a "causal link" between the defendant's New York business activity and the plaintiff's injury is not required, only "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former").

Defendant's argument that the Trustee is not a party to the Sentry subscription agreements and therefore "is not entitled to invoke their forum selection clause" (Motion at 25) misses the mark. The Trustee does not argue that Defendant is bound to litigate here because of its agreement to do so in the Sentry subscription agreements. Rather, the Trustee argues that Defendant's agreement to New York law, New York jurisdiction, and a New York forum in contracts integral to this case provides a strong jurisdictional contact with New York.

    4.    <u>Defendant's Purposeful Use of Correspondent Bank Accounts in New York Supports Specific Jurisdiction</u>

Defendant's purposeful use of correspondent bank accounts in New York further supports jurisdiction. Courts have often held that a defendant's use of a domestic bank account related to the activity alleged is by itself sufficient to establish jurisdiction.[5] *See, e.g.*, *Eldesouky v. Aziz*, No.

---

[5] Certain cases discussed herein address jurisdiction under New York's long-arm statute. Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g.*, *HSH Nordbank AG N.Y. Branch v. Street*, No. 11-cv-9405 (DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under [CPLR] § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous") (citations omitted).

11–cv–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction based solely on defendant's use of a New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction based solely on defendant's use of a New York bank account to receive the fraudulent conveyances at issue); *Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction based solely on defendant's use of New York bank accounts to facilitate alleged fraud).  In this liquidation, the Court has similarly found jurisdiction where transferee defendants invested from or received the relevant transfers in U.S. bank accounts.  *See Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding jurisdiction over transfers from Tremont funds that were managed in New York and where defendants wired funds to New York, sent redemption requests to New York, and received redemption payments from an account at The Bank of New York in New York); *Picard v. Estate of Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015).

The fact that Defendant used correspondent accounts does not deprive this Court of jurisdiction.  (*See* Motion at 34–37; *see also* Therrien Decl., ¶ 15 n.2.)  In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established," provided that such use was "purposeful."  20 N.Y.3d 327, 338 (2012) ("*Licci I*"); *see also Licci II*, 732 F.3d at 165, 171 (finding jurisdiction over a defendant with "no operations, branches, or employees in the United States" based on its deliberate use of a New York correspondent bank account); *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 70 (S.D.N.Y. 2016) (holding the "deliberate choice" to use New York correspondent bank accounts and the New York banking system as "United States contacts attributable to [defendants]"); *Bartlett v. Société*

*Générale de Banque au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *5 n.2 (E.D.N.Y. Nov. 25, 2020) ("A single transaction is sufficient to satisfy [the transacted business requirement], provided the relevant claims arise from that transaction.") (cleaned up). What matters is that the use was "purposeful" and not coincidental or passive.

Similarly, it does not matter that the HSBC USA Account was Sentry's or whether the BNY Account belonged to Defendant or its bank, because Defendant knew of these accounts and agreed to use them. *See Esso Expl.*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."); *Arcapita*, 549 B.R. at 70 & n.18 ("Because [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant]."). In *BLI*, a subsequent transferee defendant's use of its own and its feeder fund's U.S. correspondent accounts for subscribing into and redeeming from the fund supported purposeful availment. *See* 480 B.R. at 513 & 516 n.14.

That Sentry's subscription agreement required subscribers to use the HSBC USA Account is irrelevant because Defendant voluntarily entered into that agreement. Defendant could have opted not to invest with BLMIS through Sentry. Instead, Defendant voluntarily agreed to use the HSBC USA Account for its subscriptions into, and redemption from, Sentry. Moreover, Defendant affirmatively directed Sentry and Kingate to send redemption payments to Defendant in the BNY Account. (Am. Compl. ¶ 111.) That Defendant made these choices "over others, . . . made its New York connection volitional and not coincidental." *See Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016) (cleaned up). Each subscription and the redemption was thus a volitional act supporting jurisdiction. *See In re Motors Liquidation*, 565 B.R. at 288–89 (finding

defendant's use of a correspondent account to be purposeful where payment in New York was dictated by agreement).[6]

Defendant's reliance on *Steinberg v. A Analyst Ltd.* for the proposition that a bank's maintenance of a correspondent account cannot be imputed to its customer to support specific jurisdiction over that customer, is misplaced. No. 04-60898, 2009 WL 806780 (S.D. Fla. Mar. 26, 2009) (*cited in* Motion at 36.) *Steinberg* held that a foreign entity's designation and use of a New York correspondent bank account to receive a redemption payment that is the subject of the claim is, standing alone, enough to satisfy jurisdiction. 2009 WL 806780, at *6–7. *Steinberg* distinguished its holding from a situation where "the mere wiring of funds through a correspondent bank in New York was insufficient to create jurisdiction," without more. *Id.* at *6. But *Steinberg* pre-dated *Licci I* and *Al Rushaid*, which clarified that the relevant analysis is whether a defendant's course of dealing is purposeful and volitional, rather than passive. *See Al Rushaid*, 28 N.Y.3d at 326–27; *Licci I*, 20 N.Y.3d at 337–38.

Here, Defendant's use of a New York correspondent account was deliberate, as evidenced by the fact that Defendant sent a printed form directing both BLMIS Feeder Funds to send redemption payments through the BNY Account (Am. Compl. ¶¶ 97, 111; *see* Therrien Decl., Ex. A at 12–13; *id.*, Ex. B at 12–13; *id.*, Ex. C at 2, 6), establishing that Defendant's use of New York bank accounts was both purposeful and volitional. The use of a correspondent bank account supports a finding of personal jurisdiction, even when the defendant is not a bank. *See, e.g.*, *Esso Expl.*, 397 F. Supp. 3d at 346 (finding jurisdiction where a non-bank defendant directed others to

---

[6] With rhetorical flourish, Defendant contends that "[a]ll elements of the Trustee's claim and its asserted injury would be exactly the same" if Defendant and Sentry routed the subsequent transfer "through an intermediary bank in Katmandu or Timbuktu." (Motion at 36.) Defendant's counterfactual is irrelevant because, again, Defendant chose to invest in Sentry knowing that Sentry required payment through the HSBC USA Account in New York, and Defendant specifically directed Sentry to send redemption funds to the BNY Account.

send payments to defendant through a U.S. correspondent bank); *Ehrlich-Bober & Co. v. Univ. of Houston*, 49 N.Y.2d 574, 579 (1980) (finding jurisdiction over Texas university that used third-party bank's correspondent account to conduct transactions and that had an employee visit and communicate with plaintiff securities dealer in New York).

     5.    <u>The Trustee's Claim Arises from and Relates to Defendant's New York Transfers</u>

Jurisdiction is proper here because, contrary to Defendant's argument, the Trustee's claim "arise[s] out of or relate[s] to" Defendant's transaction of business in New York.  (Motion at 36–38.)  As the Supreme Court recently held, this prong does not require a causal relationship.  *See Ford Motor Co.*, 141 S. Ct. at 1026–30.  Rather, there need only be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci II*, 732 F.3d at 168–69 (quoting *Licci I*, 20 N.Y.3d at 339); *see also Fairfield Greenwich Grp.*, 627 B.R. at 566 (finding relatedness requirement satisfied when defendant's conduct "involve[d] at least in part financial transactions that touch the forum"); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 279–80 (Bankr. S.D.N.Y. 2010) (finding defendants' transfer-related contacts with the forum "inextricably related" to the Trustee's claims).  Here, the Trustee's claim to recover the subsequent transfer to Defendant arises from and relates to Defendant's deliberate and purposeful contacts with New York concerning investments in the BLMIS Feeder Funds.

Defendant's numerous citations to cases lacking a sufficient relation between the claim and the contacts with New York—all of which were decided before the Supreme Court clarified in *Ford Motor Co.* that causation is not required—do not defeat jurisdiction here.  (*See* Motion at 31 nn.24–25; *id.* at 33–34 & n.27; *id.* at 36–37.)  For example, in *SPV OSUS v. UBS AG*, Madoff investors brought common-law claims against sponsors of BLMIS feeder funds, broadly accusing the sponsors of "act[ing] as accomplices to BLMIS" in the Ponzi scheme.  114 F. Supp. 3d 161,

164 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) (*cited in* Motion at 37). Notably, because

the plaintiffs did not invest in the defendants' funds or have any other affiliation with the

defendants, the court concluded that "[the plaintiffs'] injuries were caused by BLMIS's Ponzi

scheme," not by the defendants. *Id.* at 170. The court dismissed for lack of personal jurisdiction

(and the Second Circuit affirmed), holding that the defendants' "scant contacts" with the forum

were "beside the point . . . because plaintiffs' claims d[id] not 'arise out of or relate to' the

[defendants'] alleged contacts with New York, or any other conduct in which they allegedly

engaged." *Id.* at 170–71 (cleaned up). These facts are distinguishable from the instant case where,

as discussed *supra* at 10–23, the Trustee's claim arises out of and relates to Defendant's contacts

with New York.

  *SPV OSUS* is also distinguishable, like *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333

(S.D.N.Y. 2016) (*cited in* Motion at 33 n.27), and *Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-

3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) (*cited in* Motion at 33–34), because

it involved a dispute between two parties about services owed under a foreign contract. This Court

has already determined that this line of cases is not relevant to the Trustee's actions against

defendants who invested in BLMIS's feeder funds. *See BNP Paribas*, 594 B.R. at 192 ("*Hill* has

no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as

investors in the Tremont Funds which arose from their New York contacts with the Tremont

Funds.").

  Similarly, nearly a dozen other cases cited by Defendant are also distinguishable because

jurisdiction was premised on the existence of a contract to supply goods or services in New York.

(*See* Motion at 31 nn.24–25; *id.* at 33–34 & n.27; *id.* at 36–37.) Jurisdiction in those cases was

premised on the second clause of CPLR 302(a)(1)—"contracts anywhere to supply goods or

services in the state"—and thus the analysis focused on the contract between the parties.  *See, e.g.*, *Giuliano v. Barch*, No. 16-cv-0859 (NSR), 2017 WL 1234042, at *7 (S.D.N.Y. Mar. 31, 2017) (analyzing whether: (i) the contractual relationship is ongoing; (ii) the contract was executed or negotiated in New York or the defendant visited New York to meet with parties to an existing contract; (iii) the contract contains New York choice of law clauses; and (iv) the contract requires payments into New York) (*cited in* Motion at 31 n.24).  This case does not involve claims for breach of contract.  Rather, it involves a claim by a U.S. trustee to recover a fraudulent transfer from a defendant who invested in a feeder fund with the specific goal of having its funds placed with a New York money manager and invested in the U.S. securities markets.  Thus, personal jurisdiction here turns on the first clause of CPLR 302(a)(1)—"transacts any business within the state"—and the jurisdictional analysis focuses on all of Defendant's contacts with New York related to the Trustee's claim.  *See Al Rushaid*, 28 N.Y.3d at 323 (finding the transacting business requirement under CPLR 302(a)(1) is satisfied where a defendant purposefully "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws") (citations omitted).  Among its other purposeful contacts with New York, this includes Defendant's execution of the subscription agreement that was a prerequisite to Defendant's receipt of the fraudulent transfer.  *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the [Subscription] Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the [Subscription] Agreement between BLI and Fairfield Sentry.").

### B.    The Exercise of Personal Jurisdiction Over Defendant Is Reasonable

"The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case."  *Waldman v. Palestine*

*Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citation omitted).  Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477).  Defendant fails to present a compelling reason why jurisdiction would be unreasonable here.  Indeed, the Court has found that "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP Paribas*, 594 B.R. at 188.

This is not that "rare" case.  The burden on Defendant is minimal.  *See Maxam*, 460 B.R. at 119 (finding that New York counsel and the conveniences of modern communication and transportation minimize any potential burden).  The United States has a strong interest in applying U.S. law in the BLMIS liquidation.  *See id.*; *see also In re Picard*, 917 F.3d at 103 (noting the "compelling interest in allowing domestic estates to recover fraudulently transferred property").  And the Trustee has a strong interest in litigating in the United States.  *See Maxam*, 460 B.R. at 119.  Accordingly, this Court's exercise of jurisdiction over Defendant is more than reasonable.

## II.   THE AMENDED COMPLAINT ALLEGES THAT DEFENDANT RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a)

The Amended Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that Defendant received a subsequent transfer of BLMIS customer property.  To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).  No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *See*

*id*. at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398

(BRL) & 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012) ("*Ellerin*")).

Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which

the funds were transferred from BLMIS to [the subsequent transferee]." *Ellerin*, 2012 WL 892514,

at *3; *accord 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R.

730, 747 (Bankr. S.D.N.Y. 2019) (same).  In addition, the Trustee must allege "the 'necessary vital

statistics—the who, when, and how much' of the purported transfers to establish an entity as a

subsequent transferee of the funds." *Merkin*, 515 B.R. at 150 (quoting *Silverman*, 379 B.R. at 32).

The Amended Complaint meets those requirements.  It alleges that Defendant received a

transfer, identified by date and amount, from Sentry, and that Sentry invested substantially all of

its funds with BLMIS.  (Am. Compl. ¶ 61 & Ex. C.)  It therefore alleges that Defendant's

subsequent transfer originated with BLMIS by (i) providing the necessary "vital statistics" of the

transfer received by Defendant and (ii) outlining the relevant pathway through which customer

property was transferred from BLMIS to Sentry and subsequently to Defendant.  Nothing more is

required.  *See, e.g.*, *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL

4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that "claim has not been plead

with enough specificity as to how and what [defendant] received" and holding complaint "contains

sufficient information regarding which transfers the Trustee is seeking to recover").

### A.    Defendant Misstates the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the relevant pleading burden, Defendant

argues for a new one, asserting that the Trustee must tie the subsequent transfer Defendant received

to a specific initial transfer from BLMIS.  (*See* Motion at 16–17.)  In *Merkin*, however, the

Bankruptcy Court refused to dismiss subsequent transfer claims even though the complaint "[did]

not connect each of the subsequent transfers with an initial, voidable transfer emanating from

BLMIS." 515 B.R. at 150; *see also 45 John Lofts*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). And to the extent Defendant is arguing that the Trustee must allege more than the "who, when, and how much of the purported transfer[ ]," and instead must detail what portion of the subsequent transfer comprises customer property, this is also wrong.[7] *See Ellerin*, 2012 WL 892514, at *3 (holding that even at summary judgment, "it is not necessary for the Trustee to specify what portion of the Subsequent Transfers to [defendant] was derived from BLMIS").

Defendant's reliance on *Picard v. Shapiro* for this argument is unavailing because *Shapiro* did not change the Trustee's pleading burden. 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (*cited in* Motion at 17). In *Shapiro*, the Trustee alleged that the initial transferees received approximately $54 million in fraudulent transfers from BLMIS, and "upon information and belief," those defendants subsequently transferred this same amount to other defendants. *Id*. However, the complaint did not detail *any* of the necessary vital statistics of the subsequent transfers: There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers. *Id*. Thus, the Bankruptcy Court granted defendants' motion to dismiss the subsequent transfer claim. *Id*. Here, where the Trustee has alleged the vital statistics of the transfer Defendant received, including the transferor, the transferee, and the date and amount of the transfer, *Shapiro* supports denying the motion to dismiss. *Cf. Angell v. Ber*

---

[7] Defendant seeks dismissal with prejudice, arguing it is "inexcusable" for the Trustee not to tie the subsequent transfer to a particular initial transfer. (Motion at 18.) Defendant claims without basis that the Trustee has "had access to Sentry's records at the time he filed the original Complaint and for nearly a decade since" (*id.*), but this is both an obvious overreach and wrong. The Trustee does not have all of Sentry's books and records, and discovery in the Trustee's actions against the FGG management defendants continues. *See, e.g.*, *Picard v. Fairfield Inv. Fund (In re BLMIS)*, Adv. Pro. No. 09-01236 (CGM), ECF No. 353 (setting August 2023 discovery deadline for expert discovery). Moreover, even if the Trustee had obtained these records, it would not somehow transform his pleading burden. *See Silverman*, 379 B.R. at 30 (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

*Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 750–51 (Bankr. E.D.N.C. 2009) (dismissing

because plaintiff failed to allege even "what entity initiated each transfer") (*cited in* Motion at 17).

### B.    Defendant's Tracing Arguments Fail at the Pleading Stage

Defendant's other fact-based tracing arguments fare no better and are inappropriate for a

motion to dismiss.  Defendant argues that the subsequent transfer it received from Sentry contained

no BLMIS customer property.  In support, it cites the Fairfield Liquidators' allegation that:  "From

time to time, to make Redemption Payments, Sentry . . . made withdrawals from Sentry's BLMIS

accounts (or utilized subscription monies of other investors on hand that were directed for

investment in BLMIS)."[8]  (*See* Motion at 19.)  Seizing on the parenthetical, Defendant asserts its

subsequent transfer was funded entirely with other investors' subscriptions.

Putting aside that there is no basis to impute the Fairfield Liquidators' allegations to the

Trustee, Defendant's argument fails for four additional reasons.  First, the Fairfield Liquidators

only allege that Sentry commingled customer property with subscription funds directed to BLMIS.

But commingling does not defeat the Trustee's ability to trace transfers of customer property.  *See*

*Universitas Educ., LLC v. Nova Grp., Inc.*, Nos. 11-1590 (LTS) (HBP) & 11-8726 (LTS) (HBP),

2013 WL 6123104 (S.D.N.Y. Nov. 20, 2013) ("It is a basic principle of equity that 'the mere

commingling of [other] property with the proceeds of property fraudulently transferred by the

Debtor is not sufficient to defeat tracing.'") (citation omitted); *Kelley v. Westford Special*

*Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT) (KMM), 2020 WL 3077151, at *4 (D. Minn.

---

[8] First Am. Compl. ¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, Adv. Pro. No. 19-01122 (CGM) (Bankr. S.D.N.Y. Nov. 26, 2019), ECF No. 19) (*quoted in* Motion at 19).  In that same paragraph, the Fairfield Liquidators also allege:  "The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business."  *Id.*  Accordingly, the Fairfield Liquidators' allegations cannot establish that Defendant's subsequent transfer contained any "legitimate" funds.

June 10, 2020) ("The law does not place such a difficult burden on trustees.  The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing.").

Second, despite basing its argument on the presumption that Sentry paid redemptions from a commingled pool of customer property and subscription funds, Defendant reaches an unsupported factual conclusion that "all potentially recoverable initial transfers from BLMIS to Sentry had already been exhausted in making redemptions to other investors before Sentry paid [Defendant]."  (Motion at 20.)   But Defendant does not disclose the tracing methodology or methodologies it relies upon to reach this conclusion.[9]  There is a good reason for that:  Because it is for this Court to decide—after fact and expert discovery—the appropriate tracing methodology under the circumstances.  *See Ellerin*, 2012 WL 892514, at *3 n.7 ("Courts have broad discretion to determine which monies of comingled funds derive from fraudulent sources.") (citing *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) ("There are several alternative methods, none of which is optimal for all commingling cases; courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them.")).

Third, Defendant's assertion that Sentry exhausted all BLMIS customer property on hand before satisfying Defendant's redemption request relies on the factual assumption that every subsequent transfer that preceded the one to Defendant was sourced solely by customer property.

---

[9] The declaration of Defendant's counsel, Robert Lack, Esq. includes several "calculations" of various transfers from BLMIS to Sentry, and from Sentry to its investors and to other funds managed by FGG.  (*See* Lack Decl., ¶¶ 9–17, ECF No. 100.)  These calculations add and subtract transfers from over 90 proceedings, amounts that have in some cases changed since the filing of the Trustee's complaints and with no explanation for the methodology behind the calculations.  Defendant's undefined tracing methodology, which it uses to contest the subsequent transfer in this proceeding, serves as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context."  *See Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss); *Sass v. Barclays Bank PLC (In re Am. Home Mortg. Holdings, Inc.)*, 501 B.R. 44, 64 (Bankr. D. Del. 2013) (matter subject to fact and expert evidence "is inappropriate to decide on a motion to dismiss"); *see also Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) (assessment of valuation that "almost certainly will require expert testimony" is inappropriate for a motion to dismiss).

In support, Defendant relies entirely on exhibits the Trustee submitted in this and other adversary proceedings.  (Motion at 19; Lack Decl., Exs. C to E.)  Those exhibits, however, do not establish this fact.  At this stage of the proceedings, the Trustee is not required to plead, much less establish, that an alleged subsequent transfer is comprised solely of customer property.  *See Kelley*, 2020 WL 3077151, at *4 (holding that where debtors' funds are commingled with "cash from new subscribing investors," a trustee is not required to establish that the transfers "originated solely" with the debtor or even to account for "the exact funds at issue" on summary judgment); *45 John Lofts*, 599 B.R. at 746–47 (rejecting defendant's argument "that Plaintiff generically, and without factual support, alleged that every transfer out of" the initial transferee's commingled account was made with debtor property because the plaintiff is not required "to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss") (cleaned up).  Because the Trustee's transfer exhibits do not establish that each alleged transfer was comprised solely of BLMIS customer property, there is nothing to support Defendant's contention that its subsequent transfer did not contain customer property.[10]

Finally, Defendant's tracing arguments are not only wrong, but also premature.  Courts in this District and in this liquidation have denied summary judgment where only an undetermined or small portion of the subsequent transfer was conceivably traceable to the estate.  *See Ellerin*, 2012 WL 892514, at *3 (holding that even at summary judgment, "it is not necessary for the Trustee to specify what portion of the Subsequent Transfers to [the subsequent transferee] was derived from BLMIS"); *see also Gowan v. Amaranth Advisors, LLC (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493 & 10-05447 (SMB), 2014 WL 47774, at *14–16 (Bankr. S.D.N.Y. Jan. 3, 2014)

---

[10] To the extent Defendant is arguing that the subsequent transfer is too far removed in time from the initial transfers, this is just another version of Defendant's tracing argument that should be rejected.

(allowing the trustee to proceed to trial where at most 3.5% of the transfers at issue could be traced to the debtor's Ponzi scheme).  And where, as here, the Trustee "has not been afforded the opportunity to conduct discovery," courts only dismiss such claims "in the rarest of cases."[11] *Ellerin*, 2012 WL 892514, at *2.

This is not a case where the Court should prematurely cut off the Trustee's ability to trace the subsequent transfer at the pleading stage.  The circumstances of the transfers, including the purposes of the transfers and the parties' intent, are relevant to equitable principles applied to tracing.  *See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 239 F.3d 365, 2000 WL 1741550, at *5 (5th Cir. Dec. 11, 2000) (the court's "task here is to look beyond the particular transfers in question to the entire circumstance of the transactions") (cleaned up). Because money is fungible, "[t]he goal of tracing is not to trace anything at all in many cases, but rather to serve as an equitable substitute for the impossibility of specific identification." *Henshaw*, 388 F.3d at 741 (cleaned up).  And "[i]t is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified." *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 709 (11th Cir. 2005) (quoting *Dery v. United States (In re Bridge)*, 90 B.R. 839, 848 (E.D. Mich. 1988)).

Defendant redeemed from both BLMIS Feeder Funds in February 2005 because it was "so scared" Madoff was operating a "potential ponzi [sic] scheme."  (Am. Compl. ¶¶ 6–7.)  It did so believing that it was receiving funds BLMIS transferred to Sentry and Kingate.  And it reaffirmed this belief when Madoff's fraud was revealed publicly and Defendant's fear of a Ponzi scheme

---

[11] "[I]n a case such as this one, where the trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded." *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).  And even after fact and expert discovery, there may still be fact disputes that require a trial. *See Kelley*, 2020 WL 3077151, at *5 (denying summary judgment because of a fact dispute after the trustee introduced an expert report and associated documents from which a jury could infer the defendants received subsequent transfers of property from the Petters Ponzi scheme).

was confirmed. Despite the obvious implication—that Defendant had knowingly received funds

stolen from other investors, including millions in fictitious profits—Defendant celebrated its good

fortune. (*Id.* ¶ 6; Therrien Decl., Ex. G.) Under these circumstances, equity weighs against cutting

the Trustee off at the pleading stage.

### C.    Defendant's Claims of Double Recovery Are Premature

Defendant also argues the Trustee's claim is "not plausible" because the Trustee is seeking

more money from all subsequent transferees of Sentry than the fund withdrew from BLMIS. (*See*

Motion at 18–23.) There is no dispute that the Trustee is limited to "a single satisfaction" under

Section 550(a). *See* 11 U.S.C. § 550(d). However, the Trustee "can recover from any combination

of [transferees]" up to the amount avoided. *Helms v. Metro. Life Ins. Co. (In re O'Malley)*, 601

B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021). And under 11 U.S.C.

§ 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds,

without the necessity for allocation among all the subsequent transferees." *CNB Int'l Inc. v.*

*Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008). Thus, until the

Trustee recovers the full amount of the $3 billion in fraudulent transfers received by Sentry, the

Trustee may simultaneously seek recovery from Defendant in this action and from defendants in

other actions, even in an aggregate amount that exceeds the initial transfers.

## III.    SECTION 546(e) DOES NOT BAR RECOVERY FROM DEFENDANT

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made

outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e)

("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may

not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added).

However, in *Cohmad*, the District Court held that an initial transferee's actual knowledge of

Madoff's fraud precluded application of the Section 546(e) safe harbor in actions to avoid initial

transfers, thereby allowing the Trustee to avoid transfers made prior to the two-year period. *SIPC v. BLMIS*, No. 12-mc-115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

Defendant now argues that Section 546(e) bars the Trustee's claim, even though the Trustee has pleaded the initial transferee's actual knowledge. This argument has already been roundly rejected in other adversary proceedings and is based on a tortured misreading of Section 546(e) and *Cohmad*.

### A.    Sentry's Actual Knowledge of Madoff's Fraud Bars Application of Section 546(e)

Defendant sets forth the requirements of Section 546(e) and how they are purportedly met in this case, specifically discussing whether Sentry or Defendant qualifies as a financial institution,[12] their agreements qualify as securities contracts, or their transfers qualify as settlement payments. (Motion at 6–12.) However, as Defendant concedes, this Court has previously held that the Trustee has sufficiently pleaded Sentry's actual knowledge of Madoff's fraud. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5 (*cited in* Motion at 12). As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry or recovery from Defendant.

### B.    Defendant Is Precluded from Relitigating the Actual Knowledge Exception Established in *Cohmad*

Defendant is precluded from arguing that *Cohmad* is wrong and relitigating whether actual knowledge bars the application of Section 546(e). The District Court issued *Cohmad* following

---

[12] Defendant mischaracterizes the Trustee's relationship with the Fairfield Liquidators as a "substantive legal relationship" in an effort to trigger nonparty issue preclusion as it pertains to Sentry's qualification as a "financial institution" within the meaning of Section 546(e). (*See* Motion at 9 n.11.) But merely sharing an interest in recovering BLMIS customer property hardly constitutes the sort of "substantive legal relationship" required under *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008), to establish nonparty issue preclusion. *See In re Refco Inc. Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *13 (S.D.N.Y. Mar. 25, 2013) (emphasizing "that preclusion of nonparties is an *exceptional* situation, contrary to the basic presumption that every party is entitled to its day in court"). Moreover, given that nonparty preclusion is an affirmative defense, raising it in this Motion is inappropriate. *See Taylor*, 553 U.S. at 907.

consolidated proceedings as to the application of Section 546(e). Defendant participated in those proceedings[13] and concedes that *Cohmad* held that a transferee with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e). (*See* Motion at 12.) The District Court then remanded to this Court, and this Court has since applied the actual knowledge "exception" on several occasions.

Given its participation in the withdrawal of the reference and the District Court's review of this issue, Defendant is bound by *Cohmad* as law of the case. *See SIPC v. BLMIS*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case."); *Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019) (law of the case doctrine foreclosed relitigation of issue where the District Court "considered and rejected the very arguments that defendants now make"), *aff'd sub nom. Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184 (2d Cir. 2020). Defendant also did not seek leave to appeal the *Cohmad* decision.

Nor does the Second Circuit's decision in *Ida Fishman* warrant reconsideration of *Cohmad*'s actual knowledge exception. *See Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*"), *cert. denied*, 576 U.S. 1044 (2015). As this Court has recognized, *Ida Fishman* did not address the actual knowledge exception. *See Picard v. Cohen (In re BLMIS)*, Adv. Pro. No. 10-04311 (CGM), 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016) ("The [*Ida Fishman*] Court did not address the exception to the safe harbor regarding those investors who had actual knowledge that BLMIS was not trading securities.").

---

[13] *See* Mot. to Withdraw the Reference, ECF No. 8 (raising Section 546(e) as a ground for withdrawal).

**C.      Defendant Is Precluded from Arguing that Section 546(e) Applies
Independently to Recovery Actions**

Defendant is also incorrect that the Trustee must allege that a subsequent transferee had

actual knowledge to invoke the actual knowledge exception to Section 546(e). (*See* Motion at 14–

15.) Specifically, Defendant argues that under *Cohmad*, a defendant's subscription agreement

with Sentry may act as the relevant "securities contract" in lieu of BLMIS's account agreement,

and as such, in this Section 550 recovery action, the Court must look solely to that *subsequent*

*transferee's* actual knowledge to determine whether the initial transfer is avoidable.[14] (*See id.* at

14–15.) But *Cohmad* does not stand for that proposition, and Defendant's argument is just a

repackaging of the previously rejected argument that the Section 546(e) safe harbor should

independently apply to actions under Section 550.

By its plain language, Section 546(e) applies to the avoidance of initial transfers, not the

recovery of subsequent transfers under Section 550. *See* 11 U.S.C. § 546(e) ("Notwithstanding

sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer*

. . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see also BNP Paribas*, 594

B.R. at 197 ("The Trustee does not . . . 'avoid' the subsequent transfer; he recovers the value of

the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe

harbor does not refer to the recovery claims under section 550."). This limitation on the safe harbor

to avoidance actions is consistent with the well-established principle that "the concepts of

avoidance and recovery are separate and distinct." *SIPC v. BLMIS,* 501 B.R. 26, 30 (S.D.N.Y.

2013). It is also consistent with the understanding that the Bankruptcy Code's avoidance

---

[14] Defendant's argument on this point rests on what it asserts is "[i]mplicit" in the Trustee's subsequent transfer claim—that BLMIS made the initial transfer to Sentry specifically to fund the subsequent transfer to Defendant. (*See* Motion at 11–12.) Defendant provides no explanation or authority for why this is "implicit" in the Trustee's subsequent transfer claim. However, alleging the "relevant pathways" and "vital statistics" is entirely different than establishing that those initial transfers were made "in connection with" an agreement between Sentry and Defendant.

provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision" intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See In re Picard,* 917 F.3d at 98 (quotation omitted).

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference as to whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section 550.[15] However, in its decision, the court specifically limited the safe harbor to avoidance claims based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9 (applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from [BLMIS].") (emphasis added). And though the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as "financial institutions" or "financial participants," the decision is clear that the focus of the safe harbor is still on the *initial* transfers. *See id.* at *9 ("[T]he question . . . is whether the Trustee has alleged that that *initial transfer* was made in connection with (*i.e.,* related to) a covered securities contract . . .") (emphasis added).[16]

---

[15] *See* Briefing Order*, In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 119.

[16] For this same reason, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, cited by Defendant and which the District Court cites in *Cohmad* solely to support its reading of what constitutes a "securities contract," does not change this outcome. 651 F.3d 329, 339 (2d Cir. 2011) (*cited in* Motion at 14 n.15). The focus is still on the initial transfers, which for purposes of Section 546(e), the Second Circuit has already determined, and it is now not debatable, are the transfers from BLMIS to its feeder funds. *See Ida Fishman*, 773 F.3d at 422-23.

Based on *Cohmad*, the Court has previously held that Section 546(e) applies to avoidance only, not recovery, and that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee adequately pleads the initial transferee's actual knowledge.  *See BNP Paribas*, 594 B.R. at 197; *see also SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 514 (Bankr. S.D.N.Y. 2020) ("[T]he safe harbor defense only applies by its terms to the initial transfer.").

Defendant tries to circumvent the foregoing limitations by arguing that in the Trustee's recovery actions, even for purposes of determining avoidance, the Court must look only to the expectations and knowledge of the subsequent transferee.  (*See* Motion at 15–16.)  But in *BNP Paribas*, the Bankruptcy Court expressly rejected that argument, recognizing that it was a reiteration of the argument rejected in *Cohmad* that Section 546(e) should independently apply to recovery.  594 B.R. at 196–97 (rejecting the argument that the Trustee must plead Defendant's actual knowledge to escape the application of Section 546(e) because trustees "do not 'avoid' the subsequent transfer.").  Based on *BNP Paribas*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee. *Id*. at 197.  Like *Cohmad*, *BNP Paribas* is law of the case and Defendant is bound by it.

Defendant nevertheless seeks to relitigate this point, arguing that to the extent the Sentry subscription agreements are the relevant "securities agreements" in accordance with *Cohmad*, the Court must then look only to the actual knowledge of the subsequent transferee.  (*See* Motion at 14–15.)  But as stated above, the District Court did not conclude this, nor did it suggest that the actual knowledge exception should be applied any differently if the Sentry subscription agreements were to be used for Section 546(e).  Indeed, such an interpretation would effectively eliminate the point of the actual knowledge exception, which is to restrict transferees with actual

knowledge from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining that defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments'"). Adopting Defendant's position means the safe harbor would apply even where the initial transferee feeder fund knew there were no securities transactions in need of protection. It would also allow an initial transferee who had knowledge of the fraud and was unable to satisfy a judgment (like Sentry) to place fraudulently transferred funds with a subsequent transferee out of the reach of a trustee.

Expanding the safe harbor as Defendant proposes would also result in subsequent transferees being afforded more protection as to avoidance than the initial transferee itself, which does not reflect Congress' intent. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75, 82 (Bankr. S.D.N.Y. 2006) ("Upon consideration of the initial transferee's defenses and once the amount of its liability is established, that amount can be sought from any of the transferees, including subsequent transferees, subject to any of their additional defenses."), *rev'd on other grounds*, 388 B.R. 489 (S.D.N.Y. 2008). Conversely, providing subsequent transferees with the same defenses to avoidance as available to the initial transferee does not unfairly prejudice subsequent transferees.

*Cohmad*'s holding that subsequent transferees with actual knowledge are prohibited from using the safe harbor to protect themselves against recovery of transfers they received does not support Defendant's position. On the contrary, it merely ensures that the purpose of the actual knowledge exception is achieved consistently, such that the safe harbor cannot be used by any bad actor, including a subsequent transferee. *See Cohmad*, 2013 WL 1609154, at *7 ("A defendant

cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds

through a nominal third party and still obtain the protections of Section 546(e).").[17]

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendant's Motion in its entirety.

Dated:  April 4, 2022
        New York, New York

                                        /s/ David J. Sheehan
                                        Baker & Hostetler LLP
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        David J. Sheehan
                                        Email: dsheehan@bakerlaw.com
                                        Matthew D. Feil
                                        Email: mfeil@bakerlaw.com
                                        Matthew B. Friedman
                                        Email: mfriedman@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee
                                        for the Substantively Consolidated SIPA
                                        Liquidation of Bernard L. Madoff Investment
                                        Securities LLC and the Chapter 7 Estate of
                                        Bernard L. Madoff*

---

[17] The Bankruptcy Court's *Theodoor GGC Amsterdam* decision in the Fairfield Chapter 15 liquidation proceedings likewise does not support Defendant's position.  (*See* Motion at 7–10 (citing *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-13164 (SMB), 2020 WL 7345988, at *6–7 (Bankr. S.D.N.Y. Dec. 14, 2020)).)  That decision did not involve recovery of subsequent transfers under the Bankruptcy Code.  Rather, the court held that Section 546(e) barred the Fairfield funds' liquidators' claims for unfair preference and undervalue transactions under the British Virgin Islands Insolvency Act, which the court analogized to avoidance provisions in the Bankruptcy Code.  *See Theodoor GGC Amsterdam*, 2020 WL 7345988, at *5 (citation omitted).