## Exhibit 6

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

-and-

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
212-390-9000

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 15 Case |
| **FAIRFIELD SENTRY LIMITED, et al.,** | Case No. 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), FAIRFIELD SIGMA LIMITED (IN LIQUIDATION) and FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof,** | Adv. Pro. No. 19-01122 (SMB) |
|  | **FIRST AMENDED COMPLAINT** |
| Plaintiffs, |  |
| -against- |  |
| **CITCO GLOBAL CUSTODY NV; CITCO GLOBAL CUSTODY (NA) NV; CGC NA; CITCO BANKING CORPORATION N.V.; CITCO BANK NEDERLAND N.V.; CITCO BANK NEDERLAND N.V. DUBLIN BRANCH; and CITCO GROUP LIMITED,** |  |
| Defendants. |  |

1

Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Greig Mitchell (together with the Funds, the "Plaintiffs"), solely in their capacities as the Liquidators of the Funds and the Foreign Representatives of the liquidation proceedings involving the Funds pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.     This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.     The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme. Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS. Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry. Sentry's account statements with BLMIS, which were at all relevant times wholly inaccurate and created by BLMIS to perpetrate Madoff's fraud, as of the

end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry. In reality, and at all times, all monies invested by Sentry in BLMIS, were wrongfully misappropriated and stolen by BLMIS and Madoff and used by them to continue Madoff's Ponzi scheme. As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme. In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby create and perpetuate the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the relevant shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a

2

price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.    From time to time, in order to make the payments to investors for redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds were told by BLMIS were being held, and investments that were being made, by BLMIS for Sentry's account.

6.    As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS. Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was misappropriated and stolen by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS was in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS constituted proceeds of sales of securities or other investments. Instead, such amounts were taken from the monies of more recent investors into the Madoff scheme.

7. In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8. At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon inaccurate and inflated Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme in which Madoff stole and/or misappropriated the monies invested in BLMIS. These payments were crucial in perpetuating the Ponzi scheme and maintaining

the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after April 20, 2004 through November 24, 2008, following the receipt by the Funds of notices of redemption, the Funds made Redemption Payments to accounts held in the Funds' registers in the names of Citco Global Custody NV, Citco Global Custody (NA) NV, and CGC NA (collectively, the "Citco Record Holder Defendants"); Citco Fund Services (BVI); Citco Fund Services (Europe) BVI (collectively, with Citco Fund Services (BVI) and the Citco Record Holder Defendants, the "Citco Record Holders") aggregating USD $1,764,985,992.86.[1]  Upon information and belief, these Redemption Payments were sent and/or directed by the Citco Record Holders to accounts at Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V. (all of which banks were affiliates of each other, the Citco Record Holders and all other Citco entities referred to herein) (collectively, the "Citco Banks").   As set forth herein, in connection with, *inter alia*, the Beneficial Shareholders' (defined below) desire to invest in the Funds through Citco as described herein, (1) each Beneficial Shareholder, (2) one or more of the Citco Record Holders and (3) one of the Citco Banks entered Brokerage and Custody Agreements (the "B&C Agreements").  With respect to the B&C Agreements, at all relevant times (1) the Citco Record Holders acted as, *inter alia*, agents of and nominees for the Citco Banks with

---

[1] Per agreement with certain Citco entities, the Liquidators have, while preserving their rights and positions, substituted Citco Global Custody (NA) NV for Citco Fund Services (BVI) and Citco Fund Services (Europe) BV with resepct to the transfers for which Citco Fund Services (BVI) and Citco Fund Services (Europe) BV are denoted as "Registered Shareholder" in Exhibit A hereto.  Accordingly, while Citco Fund Services (BVI) and Citco Fund Services (Europe) BV remain denoted as "Citco Record Holders," they are not "Citco Record Holder Defendants."

respect to subscriptions and investments in the Funds for the benefit of the Beneficial Shareholders, and (2) both the Citco Record Holders and the Citco Banks (collectively, the "Citco Redemption Recipients) were agents of the Beneficial Shareholders with respect to the B&C Agreements and investments in the Funds for the benefit of the Beneficial Shareholders.

10.     At the time the Redemption Payments were made, such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption based on the inaccurate account statements supplied by BLMIS.  In fact, however, as stated, the Redemption Payments made to the Citco Record Holders far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at the time or any relevant time.  Moreover, these Redemption Payments did not, as the Funds intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by the Funds from BLMIS to make Redemption Payments to the Citco Record Holders were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceeding, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other

creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.     Upon information and belief, the Citco Redemption Recepients have either retained the Redemption Payments made to the Citco Record Holders by the Funds for their own account and benefit (including depositing said monies into and with the Citco Banks) or, alternatively, paid all or some portion of such payments to or for the account of certain customers, persons or entities for whom the Citco Record Holders may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "<u>Beneficial Shareholder</u>" and collectively, the "<u>Beneficial Shareholders</u>").  The Beneficial Shareholders are defendants in two ongoing adversary proceedings in this Court, <u>Fairfield Sentry Limited et al. v. ABN Amro Schweiz AG et al.</u>, Adv. Pro. No. 10-3635 (Bankr. S.D.N.Y.) and <u>Fairfield Sentry Limited et al. v. ABN Amro Schweiz AG et al.</u>, Adv. Pro. No. 10-3636 (Bankr. S.D.N.Y.).

15.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008, and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.     Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have

been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed. Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, the Citco Redemption Recipients will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB). Pursuant to the Amended Standing Order of reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over the Defendants pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because the Defendants purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS.  The Defendants selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry and, upon information and belief, designated United States-based bank accounts to receive the Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.  The Defendants thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  The Defendants should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over the Defendants by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that the Citco Record Holders entered into with the Funds.

10

21.    Upon information and belief, a Subscription Agreement between a Citco
Record Holder and Sentry was entered into on or about January 3, 2003 (the "Initial
Subscription Agreement") pursuant to which the subscribing Citco Record Holder
subscribed for Shares.  Subsequent to entering into the Initial Subscription Agreement,
the Citco Record Holders, upon information and belief, entered into additional
agreements (the "Subsequent Subscription Agreements") with Sentry, Sigma, and
Lambda between January 6, 2003 and November 18, 2008, pursuant to which they
subscribed for additional Shares on the same terms and conditions as those shares
subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription
Agreement and Subsequent Subscription Agreements are collectively referred to herein
as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable
submission by the Citco Record Holders to the jurisdiction of the New York courts with
respect to any proceeding related to said agreement and the Funds and the Citco Record
Holders' consent to service of process by the mailing of such process, as provided
therein.  In particular, the Subscription Agreements provide as follows:

> New York Courts.  Subscriber agrees that any suit, action or proceeding
> ("Proceeding") with respect to this Agreement and the Fund may be
> brought in New York.  Subscriber irrevocably submits to the jurisdiction
> of the New York courts with respect to any Proceeding and consents that
> service of process as provided by New York law may be made upon
> Subscriber in such Proceeding, and may not claim that a Proceeding has
> been brought in an inconvenient forum.  Subscriber consents to the service
> of process out of any New York court in any such Proceeding by the
> mailing of copies thereof, by certified or registered mail, return receipt
> requested, addressed to Subscriber at the address of Subscriber then
> appearing on the Fund's records.  Nothing herein shall affect the Fund's
> right to commence any Proceeding or otherwise to proceed against
> Subscriber in any other jurisdiction or to serve process upon Subscriber in
> any manner permitted by any applicable law in any relevant jurisdiction.

23.     Furthermore, by executing the Subscription Agreements, the Citco Record Holders agreed to all terms and conditions contained therein, including the express provision that any agreement made by the Citco Record Holders in the Subscription Agreements would also apply to any other person for whom the Citco Record Holders was subscribing as trustee, agent, representative, or nominee—*i.e.*, including all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, the Citco Record Holders represented that they had all requisite authority from the Beneficial Shareholders to execute and perform any and all obligations on their behalf, and the Citco Record Holders also agreed to indemnify the Funds for any damages resulting from an assertion by a Beneficial Shareholder that the Citco Record Holders lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.  Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     As alleged in further detail herein, upon information and belief, (i) the Citco Record Holders were wholly owned subsidiaries or, at a minimum affiliates, of the Citco Banks and were all affiliates of the Citco Group; (ii) the Citco Record Holders, including Citco Global Custody, operated principally if not solely as vehicles for the custody of shares purchased for Beneficial Shareholders by the Citco Banks; (iii)

pursuant to the B&C Agreements, the Citco Record Holders were and at all times acted as the nominees of and agents for the Citco Banks with respect to subscriptions of shares and investments in the Funds and custody thereof; (iv) the Citco Record Holders accordingly entered into the relevant Subscription Agreements with the Funds for and on behalf of the Beneficial Shareholders; and, accordingly, (v) the Citco Banks are closely related to the Citco Record Holders.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

27.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

28.    Lambda, a British Virgin Islands company then known as Fairfield Henry Limited, was organized in 1990 under the International Business Company Act of the

British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Lambda's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Lambda is currently in liquidation in proceedings commenced on February 27, 2009, in the BVI Court.

29. The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On July 8, 2019, following notice of resignation of Charlotte Caulfield, the BVI Court entered an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order"), together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in

their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

30.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.  After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.   On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

31.     Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives

15

to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

32.     Citco Global Custody NV was, at all relevant times, a member of Sentry, Sigma, and Lambda and a registered holder of Shares.  Upon information and belief, Citco Global Custody NV is a company organized under the laws of The Netherlands, having its registered address at Naritaweg 165, 1043 BW Amsterdam, The Netherlands. Citco Global Custody NV subscribed for the purchase of Shares by entering into one or more Subscription Agreements with the Funds.  All purchases of Shares by Citco Global Custody NV were subject to the terms of the Subscription Agreements.

33.     Citco Global Custody (NA) NV was, at all relevant times, a member of Sentry, Sigma, and Lambda and a registered holder of Shares.  Upon information and belief, Citco Global Custody (NA) NV is a company, organized under the laws of Curaçao, having its registered address at De Ruyterkade 62, Willemstad, Curaçao.  Citco Global Custody (NA) NV subscribed for the purchase of Shares by entering into one or more Subscription Agreements with the Funds.  All purchases of Shares by Citco Global Custody (NA) NV were subject to the terms of the Subscription Agreements.

34.     CGC NA was, at all relevant times, a member of Sentry, Sigma, and Lambda and a registered holder of Shares.  Upon information and belief, CGC NA is a company, organized under the laws of Curaçao, having its registered address at De

16

Ruyterkade 62, Willemstad, Curaçao. CGC NA subscribed for the purchase of Shares by entering into one or more Subscription Agreements with the Funds. All purchases of Shares by CGC NA were subject to the terms of the Subscription Agreements.

35. Upon information and belief, Citco Bank Nederland N.V. is a company organized under the laws of The Netherlands, having a registered address at Telestone 8, Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands. Citco Bank Nederland N.V. worked in consultation with or directed some or all of the Citco Record Holders to purchase Shares in the Funds on behalf of the Beneficial Shareholders, and, upon information and belief, all such payments for the purchase of or for the redemption of Shares were sent to bank accounts at Citco Bank Nederland N.V.

36. Upon information and belief, Citco Banking Corporation N.V. is a company organized under the laws of Curaçao, having a registered address at De Ruyterkade 62, P.O. Box 707 Willemstad, Curaçao. Citco Banking Corporation N.V. worked in consultation with or directed some or all of the Citco Record Holders to purchase Shares in the Funds on behalf of the Beneficial Shareholders, and, upon information and belief, all such payments for the purchase of or for the redemption of Shares were sent to bank accounts at Citco Banking Corporation N.V.

37. Upon information and belief, Citco Bank Nederland N.V. Dublin Branch is a company organized under the laws of The Netherlands, having a registered address at Custom House Plaza Block 6 International Financial Services Centre Dublin 1, D01X9Y5, Ireland. Citco Bank Nederland N.V. Dublin Branch worked in consultation with or directed some or all of the Citco Record Holders to purchase Shares in the Funds on behalf of the Beneficial Shareholders, and, upon information and belief, all such

17

payments for the purchase of or for the redemption of Shares were sent to bank accounts at Citco Bank Nederland N.V. Dublin Branch.

38.     Upon information and belief, Citco Group Limited is a company organized under the laws of the Cayman Islands, having a registered address at c/o Citco Trustees (Cayman) Limited, P.O. Box 31106, 89 Nexus Way, Camana Bay, Grand Cayman KY1-1205, Cayman Islands.  At all relevant times, all Citco Record Holders and the Citco Banks were wholly-owned subsidiaries of Citco Group Ltd., and all the Citco entities worked under the ultimate direction of the Citco Group's executive committee.

## The Relationship Between the Beneficial Shareholders and the Citco Redemption Recipients

39.     Published materials by Citco companies within Defendant Citco Group Limited ("Citco Group" and collectively, "Citco") make clear that the Citco Banks—utilizing the Citco Record Holders as the record holder of shares in the Funds Register of Shares—performed and took roles in carrying out duties on behalf of the Beneficial Shareholders.   For example, a Citco Fund Services document describing "Fund Administration Operations"[2] explains:

> For institutional clients (primarily banks), the Citco Banks offer a unique custody service to alleviate these institutions from the administrative burden of locating, subscribing in, and keeping track of investments in international funds for their private banking customers.   These services include: locating the fund, placing the subscription/redemption, completing the paperwork, registering the funds in the name of Citco as custodian, addressing corporate actions, providing monthly statements of holdings and most recent [Net Asset Values or] NAVs and sending out documentation and information as required.

---

[2] Citco Fund Services, Fund Administration Operations Using the Ephesus Platform and Related Offshore Investor Relations Services, US Statement on Auditing Standards No. 70 Report on Controls Placed in Operation and Tests of Operating Effectiveness January 1, 2005 to September 30, 2005.

40.    Consistent with such explanations by Citco, upon information and belief, each of the Beneficial Shareholders entered into the "B&C Agreements" with a Citco Bank and one or more of the Citco Record Holders, usually Citco Global Custody. The B&C Agreements made the Citco parties thereto agents of the Beneficial Shareholders in connection therewith.  It was under the B&C Agreements that the Citco Record Holders purchased shares in and made redemptions from the Funds for the benefit of the Beneficial Shareholders.  Under the B&C Agreements, the Beneficial Shareholders were required to maintain bank accounts at the Citco Banks from which and into which "all moneys received from or for the account of" the Beneficial Shareholders were deposited (the "B&C Accounts").  Although, there are some differences in the various B&C Agreements, the provisions summarized herein are, upon information and belief, substantially the same in all the agreements.

41.    Pursuant to the B&C Agreements, the Citco Redemption Recipients had various duties.  For example, the B&C Agreements afforded the Citco Redemption Recipients the power to:

- "register the Securities, other than physically held bearer shares, in the name of the Custodian [the Citco Record Holder] or any sub-custodian";

- "deposit in the [B&C] Account all moneys received from or for the account of the [Beneficial Shareholders]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian [the Citco Record Holder] or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the [Citco] Banks and the Custodian [Citco Record Holder]."

19

42.     Moreover, the Citco Banks were solely responsible for providing brokerage services to the Beneficial Shareholders.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Beneficial Shareholders; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Beneficial Shareholders], or any nominee for the account of the [Beneficial Shareholders]."

43.     Pursuant to the B&C Agreements, the Beneficial Shareholders provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the [Beneficial Shareholders'] behalf," and the B&C Agreements provided that the relevant Citco Bank "may in its absolute discretion refuse to execute any Instructions given by or on behalf of the [Beneficial Shareholders]."

44.     With respect to the subscription or redemption of Shares in the Funds, the Beneficial Shareholders submitted instructions to the Citco Banks and, upon information and belief, the Citco Banks directed the Citco Record Holders to subscribe for or redeem the relevant Shares.

45.     According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Holders, the Beneficial Shareholders were required to "pay to the Bank the fees and expenses" in "U.S. dollars."  Additionally, while the purchased securities were to be transferred to and registered in the name of the

20

Citco Record Holders as the Custodian thereof, if the Beneficial Shareholders were more than five days delinquent in paying in full "all moneys due in connection with such purchase … such Securities will not be transferred to nor held by the Custodian [the Citco Record Holder] on behalf of the [Beneficial Shareholder], but will be freely available to the Bank."

46.    The B&C Agreements provide: "In the performance of their [custodian service] duties, the Bank and/or the Custodian [the Citco Record Holder] may act through agents, subcustodians or any other third party which the Bank and/or Custodian [the Citco Record Holder] may, in their absolute discretion deem necessary.  The Bank and/or Custodian [the Citco Record Holder] are hereby authorized by the [Beneficial Shareholders] to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties."

47.    The B&C Agreements also provide: "The [Beneficial Shareholders] recognize[] that in certain circumstances in order to preserve or safeguard the Securities or other assets of the [Beneficial Shareholders], the Bank and/or Custodian [the Citco Record Holder] may be required to act without first obtaining instructions from the Customer.  In such cases, the Bank and/or Custodian [the Citco Record Holder] may act at their own absolute and unfettered discretion and shall not be liable, in the absence of negligence, willful misfeasance, reckless disregard or fraud, for any loss to the [Beneficial Shareholders] whatsoever."

48.    The B&C Agreements also provide: "The Bank and Custodian [the Citco Record Holder] hereby agree to use their best efforts and judgement and due care [some B&C Agreements modify this language here as follows: "best efforts and judgment and

21

care of a prudent professional custodian"] in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian [the Citco Record Holder], their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder for any loss suffered by the [Beneficial Shareholders] in connection with the subject matter of this Agreement, unless such loss arises from willful misfeasance, fraud, bad faith or negligence in the performance of the Bank's/or Custodian's [the Citco Record Holder's] obligations and duties by reason of the Bank's and/or Custodian's [the Citco Record Holder's] reckless disregard of their obligations and duties hereunder."

49.    Upon information and belief, the B&C Agreements with the Beneficial Shareholders applied to all subscriptions and redemptions of Shares in the Funds by the Citco Record Holders on behalf of the Beneficial Shareholders, and all Redemption Payments were, upon information and belief, sent by the Citco Banks (following their receipt) to the Beneficial Shareholders' B&C Accounts.

**The Relationship Between the Citco Record Holders and the Citco Banks**

50.    Consistent with the Citco Fund Services document described in paragraph 41 herein, and as described above in connection with the provisions of the B&C Agreements, the Citco Banks played a lead role in performing and directing record holding duties on behalf of the Beneficial Shareholders.

51.    Pursuant to the B&C Agreements, the Citco Banks and the Citco Record Holders had various duties. For example, the B&C Agreements afforded the Citco Banks and the Citco Record Holders the power to:

- "register the Securities, other than physically held bearer shares, in the name of the Custodian [the Citco Record Holder] or any sub-custodian";

- "deposit in the [B&C] Account [at the Citco Banks] all moneys received from or for the account of the [Beneficial Shareholders]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian [the Citco Record Holder] or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Banks and the Custodian [the Citco Record Holder]."

52.     Moreover, the Citco Banks were solely responsible for providing brokerage services to the Beneficial Shareholders.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Beneficial Shareholders; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Beneficial Shareholders], or any nominee for the account of the [Beneficial Shareholders]."

53.     Pursuant to the B&C Agreements, the Beneficial Shareholers provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the [Beneficial Shareholders'] behalf," and the B&C Agreements provided that the Citco Banks "may in [their] absolute discretion refuse to execute any Instructions given by or on behalf of the [Beneficial Shareholders]."

23

54.     With respect to the subscription or redemption of Shares in the Funds, the Beneficial Shareholders submitted instructions to the Citco Banks, and, upon information and belief, the Citco Banks directed the Citco Record Holders to subscribe for or redeem the relevant Shares.

55.     According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Holders, the Beneficial Shareholders were required to "pay to the Bank the fees and expenses" in "U.S. dollars."  Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Holders, if the Beneficial Shareholders were more than five days delinquent in paying in full "all moneys due in connection with such purchase . . . such Securities will not be transferred to nor held by the Custodian [the Citco Record Holder] on behalf of the [Beneficial Shareholder], but will be freely available to the Bank."

56.     Upon information and belief, (i) the Citco Record Holders were wholly owned subsidiaries or, at a minimum affiliates, of the Citco Banks and were all affiliates of the Citco Group; (ii) the Citco Record Holders, including Citco Global Custody, operated principally if not solely as vehicles for the custody of shares purchased for Beneficial Shareholders by the Citco Banks; (iii) pursuant to the B&C Agreements, the Citco Record Holders were and at all times acted as the nominees of and agents for the Citco Banks with respect to such share purchases and custody thereof; (iv) the Citco Record Holders accordingly entered into the relevant Subscription Agreements with the Funds for and on behalf of the Beneficial Shareholders; and, accordingly, (v) the Citco Banks are closely related to the Citco Record Holders.

24

### NOTICE PURSUANT TO FED. R. CIV. P. 44.1

57.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

### FACTUAL ALLEGATIONS

**A.     Role of Feeder Funds in Madoff Fraud**

58.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Sentry's account statements with BLMIS, which were at all relevant times wholly inaccurate and created by BLMIS to perpetrate Madoff's fraud, as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

59.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.     Calculation of Net Asset Value and Shareholder Redemption Payments**

60. Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

61. In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

62. In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the

account statements that BLMIS provided to Sentry were entirely and utterly fictitious.

Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with

BLMIS for investment and the purchase of securities to be held by BLMIS for the

account of Sentry were misappropriated, stolen and used by Madoff to pay other BLMIS

investors or were otherwise misappropriated by Madoff for other unauthorized uses.

63.     From time to time, to make Redemption Payments, Sentry (and Sigma and

Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized

subscription monies of other investors on hand that were directed for investment in

BLMIS).   The amounts provided in connection with such withdrawals purportedly

represented the proceeds arising from the profitability of or to continue investment in

BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing

the proceeds of sales of securities or other investment positions were nothing other than

the deposits of other BLMIS investors or previous deposits made by Sentry, never

invested but rather misused and misappropriated as part of Madoff's fraud.   At all

relevant times, payments made from BLMIS to Sentry were made by Madoff to continue

and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from

BLMIS to Sentry were not payments made in the ordinary course of or as part of any

business, nor did they have a legitimate business purpose.  Similarly, the Redemption

Payments were not made for any legitimate purposes or in the ordinary course of any

business.

64.     Given the fraudulent nature of BLMIS and its operation as a massive

Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly

in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant

times and unknown to the Funds, misused, stolen and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.**  **Redemption Payments Made or Transferred to Citco Redemption Recipients**

65.  During the period from and after April 20, 2004 through November 24, 2008, the Citco Redemption Recipients, either directly or indirectly through transfers made by the Funds to the Citco Record Holders, received Redemption Payments totaling USD $1,764,985,992.86 from the Funds in respect of Shares tendered for redemption.

66.  At the Citco Redemption Recipients' directions and instructions, some or all of the Redemption Payments were transferred to Citco Record Holders, through, upon information and belief, designated United States-based bank accounts.

67.  The dates and amounts of each Redemption Payment received by the Citco Record Holders from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by the Citco Record Holders from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.  The dates and amounts of each Redemption Payment received by the Citco Record Holders from Lambda, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit C.

68.  At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction

between the Citco Record Holders and the relevant Fund, the relevant Fund received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by the relevant Fund.

69.      Upon information and belief, the Citco Redemption Recipients, directly or indirectly, received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.  Defendants Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

70.      Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators,  Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision holding that that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco entities acted with a lack of good faith in giving the Certificates.

71.      Over the course of fifteen years, in their capacity as service providers to the Funds, Defendants reviewed information concerning BLMIS not available to the general public and expressed internal alarm about what that information showed with

respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded with issuing the Certificates as if there were no problem.

72.    So grave were the Administrators' internal suspicions that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated unease over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker.  Based upon the proprietary information they reviewed, Defendants expressed fear—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five."  Ultimately, unable to resolve their grave concerns, Defendants, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1.    Defendants Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed

73.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Defendants expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too

consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  According to Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, the broker statements could not be reconciled with the strategy outlined in the offering document.  Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

74.    The Administrators could not verify the existence of the assets because the Funds' custodians and depository, Defendants Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. (individually, the "Fund Custodian," and collectively, the "Fund Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.  Therefore, the custody statements that the Fund Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements.   The Fund Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

75.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Defendant Citco Group, and Meijer, the head of internal audit for the Administrators, raised alarms about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Defendant Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information

from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

76. In addition to warning Bodewes, Meijer also warned Defendant Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Defendants could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns, but dismissed them out of hand. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

77. However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Defendant Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed." Around this time, Meijer had a meeting with his direct supervisor, Tony Stocks ("Stocks"), in which Meijer explained his concerns, expressed his desire to take immediate action, and suggested that Defendants stop the subscriptions until it had assurance of the Funds' assets. Stocks told Meijer that he, not Meijer, was managing the company, and "it's not your business."

78. A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure

32

of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right." The purpose of Meijer's email was not merely to doubt that the BLMIS statements were inaccurate in some respect, but to fundamentally challenge whether the assets even existed.

79.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." Meijer also warned Albert van Nijen ("Van Nijen"), a member of the internal audit group at Citco, in December 2002 that "[e]ven [BLMIS's purported compliance with] the SEC regulation [governing annual account statements] is not a guarantee that everything is OK." However, Defendant Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

80.     In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.   John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.   For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.   Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Defendants were facing "an enormous risk exposure."   Instead, Verhooren instructed Meijer to stop raising the issue and claimed that Defendants would try to meet with Madoff to investigate.

81.     According to Willem Holst ("Holst"), a managing director of Defendant Citco Bank Nederland, N.V., Citco "w[as] totally dependent on Madoff for verification of the existence of the assets" and that BLMIS "was a structure [that was] out of the ordinary for the bank" but BLMIS was nevertheless "an important client, so we had to accommodate them."

82.     Neither Verhooren nor Holst nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.     Defendants Failed to Obtain Evidence of the Existence of the Funds' Assets

83.     Defendants not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—they also knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

84.     The Administrators' audit reports repeatedly designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at

BLMIS. Each year from 2000 through 2006, the Administrators recommended that Defendants either confirm the existence of the Funds' assets held by BLMIS or resign as service providers. On three occasions between May 2000 and December 2002, Defendants attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

85.     In May 2000, Defendants set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Defendants internally acknowledged that the meeting had not provided "a full disclosure of [the] assignment."

86.     In July 2001, Bodewes attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Defendant's proprietary documents because they were concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Defendants' possession, Bodewes shared Meijer's concerns about BLMIS's operations and concluded that losses at BLMIS could be hidden, leaving Defendants ultimately liable to the Funds' shareholders. Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS. Smeets,

Defendant Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Defendant Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

87. By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer"), an executive director at of Defendant Citco Group, stated that Defendants wanted evidence of the existence of the treasury bills that BLMIS held on the Funds' behalf. In December 2002, Defendants once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, Van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as [Fund] Custodian[s]" had again failed. On December 27, 2002, Bodewes reported to Smeets and the rest of the executive committee of Defendant Citco Group that, as long as the position of Sentry with BLMIS was not independently verified, "there will be doubts."

88. After Defendants' third failed attempt, Defendants never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known"

to Defendants' external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

89.     Meanwhile, through the entire period, Defendants continued to issue the Certificates.

### 3.     Defendants Negotiated for Higher Fees as Reimbursement for the "Risks" of Doing Business with Madoff

90.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

91.     By 2002, Defendants knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that their efforts to reconcile Madoff's operations had failed. That year, Defendants' executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Defendants were concerned about their exposure to liabilities well beyond the loans in the case of fraud. Smeets and Defendants' management were aware that the credit line requests were on hold while Defendants tried to "get as much comfort as possible" that BLMIS was not a fraud.

92.     Two years later, in February and March 2004, the Fund Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether. Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen ("Keunen")—who was responsible for the entire division of administration services for Defendants—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . .

[t]hey are scared with the structure . . . ."  It appears that because of this revelation, at least some of Defendant Citco Group management wanted the Fund Custodian to resign: by an email of February 6, 2004, Keunen informed the Administrator that Unternaehrer of Defendant Citco Group had decided that the Fund Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Defendants' concerns regarding AIG's withdrawal from BLMIS.  A few months later, in or about September 2004, Defendants' board of directors made the decision to place the Fund Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."  Defendants knew that their credit relationship with the Funds would expose them to liability because of BLMIS's role as custodian, among other reasons.

93.  By 2006, Defendants considered resigning as service providers.  The Fund Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

94.  Instead, Defendants negotiated a new fee arrangement.  The new arrangement calculated the Fund Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Defendants' fees for the Fund Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Defendants decided "[o]n that basis" to stay on as Fund Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

95.  Simply put, Defendants accepted dramatically higher fees—tied directly to the Net Asset Value certified by Defendants—in exchange for the risks to Defendants of

38

doing business with BLMIS, as well as their continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Defendants' fees increased by 800%.

96.    Internally, Defendants knew that:    (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Fund Custodians did not have custody of the Funds' portfolios.

97.    Defendants failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though they knew that such account statements contained incorrect information.    Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.    The Administrators' personnel did not proceed to ask BLMIS for an explanation of these discrepancies.    Defendants thus turned a blind eye to their knowledge that BLMIS issued account statements with incorrect pricing information.

98.    Defendants acted with a lack of good faith by issuing Certificates in spite of their knowledge that:  (1) BLMIS's transactions were likely impossible because, as Defendants were aware, it appeared that "Madoff always [knew] precisely when to buy and sell"; (2) Madoff was the only broker-dealer Defendants worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Defendants book all trades for the Funds manually, rather than

through automated or electronic means, which directly contradicted Defendants' own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, (4) within their own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Defendants.

99.    This lack of good faith permeated the entire Citco organization and all the Defendants.  Until 2008, the Administrators and the Fund Custodians, all of which are Defendants here, worked hand-in-hand with multiple other "Citco" entities, including, without limitation, Defendant Citco Group, to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Citco Record Holders under the Subscription Agreements.  Under Defendant Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

100.    From the top down, the Defendants saw and appreciated, but consciously disregarded, the risk to the Fund's investors that the Funds' assets with BLMIS did not exist.  The Administrators and all other "Citco" subsidiaries served at the whim of Defendant Citco Group, which through, *inter alia*, the executive committee, controlled and directed the operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds engaged, at all relevant times the Funds were provided services from and on behalf of "Citco" as a whole from at least eleven separate entities, including the Defendants to

this action: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; Citco Global Security Services; Citco Bank Nederland N.V.; Citco Bank Nederland N.V. Dublin Branch; and Citco Banking Corporation N.V.  Indeed, Citco employees themselves often referred to the foregoing collectively as "Citco."

101.   By virtue of the foregoing conduct, Defendants issued the Certificates without good faith.  The Funds were the primary victims of Defendants' conduct and their lack of good faith in issuing the Certificates.

### E.   The Defendants Themselves Knew of, Were Willfully Blind to or Recklessly Disregarded the BLMIS Fraud

102.   Upon information and belief, all of the foregoing information related to BLMIS was conveyed to Defendant Citco Bank Nederland N.V.  At all relevant times, Defendant Citco Bank Nederland N.V. Dublin Branch was a wholly owned subsidiary of Defendant Citco Banking Corporation N.V., and, upon information and belief, Defendant Citco Bank Nederland N.V. worked with Defendants Citco Bank Nederland N.V. Dublin Branch and Citco Banking Corporation N.V. with respect to their work for the Funds. The Citco Banks knew of or consciously disregarded the BLMIS fraud and the bases thereof.  In addition to the foregoing:

- In May 2000, Bodewes and Meijer emailed Renger Boonstra, the general counsel of Defendant Citco Bank Nederland N.V., recognizing that the lack of segregation of duties in BLMIS posed a unique risk because they could not "be sure" that the Funds actually owned the reported holdings.  Boonstra warned that "[w]ith [the] Manhattan [Investment Fund Fraud] in the back of our minds, we as Citco, may very well be in a potential dangerous situation,

41

since we do not seem to have an independent source to verify the information from BLMIS." His proposed solution involved resignation or obtaining segregation of duties.

- Meijer responded to Bodewes and Boonstra observing that BLMIS should have a FED book entry account for treasury bonds and proposed that someone should check whether the transactions for the Funds matched the transactions as they appeared on FED statements or FED confirmations received by BLMIS. He expressed the view that Defendants were selling asset protection that was not covered by sufficient evidence. No evidence suggests that anyone checked the FED statements.

- On August 28, 2000, Meijer emailed Bodewes expressing his concern that the issues with BLMIS were "being put on the back burner and being hushed." On September 13, 2000, Bodewes forwarded the email from Meijer to representatives from Defendant Citco Bank Nederland N.V. and the Administrator. In a separate email to Laurens Luckmann ("Luckmann"), a supervisory director of Defendant Citco Banking Corporation, Bodewes stated that Meijer was "a bit concerned for a second Manhattan case" [a fraud case] and also noted that Holst, a managing director of Defendant Citco Bank Nederland N.V., was not comfortable with the situation.

- On September 18, 2000, Holst replied to Bodewes' September 13 email stating support for Meijer's proposal that PricewaterhouseCoopers, the Funds' auditor, confirm the existence of assets in BLMIS's custody, but indicated that it should be done not once a year but every six months.

42

- In an internal memorandum circulated on July 13, 2001, Bodewes concluded that the two-man audit firm being used by BLMIS did not "match up" to the size of the company. He added that there was a "concrete" risk that losses were being hidden and the custody statements overstated. On July 27, 2001, Luckmann forwarded this memo to all Citco executive directors, including Smeets, requesting that it be discussed at their next meeting. After this meeting, however, new administration and custodian agreements were executed between Defendants and the Funds.

- On or about February 5, 2004, Unternaehrer was advised that AIG had decided to exit their investments with BLMIS citing concerns over the structure. This discovery led Luckmann (by email dated February 6, 2004, and following consultation with Smeets) to give instructions for Citco companies to redeem their own shares in Sentry.

- In emails dated February 6, 2004, Keunen advised the Administrator and Citco Group management that Unternaehrer had decided that Defendant Citco Bank Nederland N.V. would step down as the Fund Custodian.

- On August 25, 2004, Holst emailed Luckmann acknowledging that there had been a problem with the position of BLMIS from the beginning because the Administrator and the Fund Custodian totally depend on BLMIS. That email led Luckmann to email Scott Case (another managing director of Defendant Citco Bank Nederland N.V.), who responded the same day observing that he had no idea why Citco Bank Nederland N.V. continued to fulfill a "shadow" custody function.

43

- In an email dated September 9, 2004, Ronald Irausquin of Citco Bank Nederland N.V. confirmed that all business with Sentry, both on the part of the Administrator and the Fund Custodian, was meant to have been placed under scrutiny by "the Board" and that a decision had been made to close down all credit relationships with Sentry.

- In an email dated September 16, 2004 to the executive committee members, including Smeets, and to Keunen and Luckmann, Unternaehrer stated that he had met with Cornelis Boele of Fairfield Greenwich Limited and that there had also been a conference call with legal counsel and Case of Defendant Citco Bank Nederland N.V., at which agreement had been reached to make changes to the custody agreement, the Private Placement Memorandum and sub-custody agreement in order to make "everybody comfortable with the structure."  When Luckmann queried whether the custody fee could be changed from a fixed fee to a basis points structure, Unternaehrer replied "the main purpose here is to take away possible liabilities while maintaining CFS business."

- In an email dated October 14, 2004 to Keunen and Luckmann, William DeRosa, general manager at Citco Bank Nederland N.V., stated "Regarding Fairfield, a discussion took place wherein the question was posed as to what was going on with it because we thought we were resigning as custodians. [Unternaehrer] met with them and it now appears we are restructuring the relationship.  The concern was that even if we restructured the legal

44

agreement to meet the reality of how this account is processed, we still had some risk."

- On or about November 2, 2004, Boonstra noticed that BLMIS's role as custodian and investment manager contravened clause 2.38 of the Irish Stock Exchange's Listing Requirements and Procedures.

- On an October 6, 2005 email between Holst, DeRosa, Boonstra, and others, Boonstra stated that "we are not really the custodian for Fairfield Sentry, just a sub-custodian."

- A review by Defendant Citco Bank Nederland N.V.'s audit division in December 2007 concluded that it was not able to validate that client instructions were correctly processed by BLMIS.

- As late as 2008, Defendant Citco Bank Nederland N.V. employees, including Boonstra and DeRosa, claimed that the structure between the Funds and BLMIS was a "curious anomaly" and that Defendants felt uncomfortable.

- In December 2009, Boonstra, DeRosa, Case, and others were part of an email exchange, which recapped a discussion with Mark McKeefry regarding the bank's preference to step down as Fund Custodian after a finding that the Fund said it complied with the requirements of the Irish Stock Exchange after misrepresenting that the custodian and investment manager were separate.

103.    As alleged at length herein, all Citco entities, including the Defendants herein, worked collaboratively with respect to their work for the Funds. The free flow of information and coordination of action between the various Defendant Citco entities, including the Citco Banks and the Citco Record Holders and the Citco Group,

demonstrate that all Citco entities worked in collaboration with each other. Additionally, at all relevant times, all Citco Record Holders and the Citco Banks were wholly-owned subsidiaries of the Citco Group, and all the Citco entities worked under the ultimate direction of Smeets, Defendant Citco Group's Chief Executive Officer, and the Citco Group's executive committee. At all relevant times, the Citco Group was aware of or consciously disregarded the potential fraudulent activity, and still directed or consented to the Administrator's and the Fund Custodians' involvement with BLMIS:

- Following the emails and reports from the Administrator regarding the visit to BLMIS, Smeets (Chief Executive Officer of Defendant Citco Group) arranged an executive committee meeting on January 31, 2002 to discuss BLMIS.

- The revised administration agreement between the Funds and the Administrator dated April 10, 2002, was executed with either the agreement or at the direction of Defendant Citco Group because an executive director at the Defendant Citco Group, Unternaehrer, sent an email dated February 6, 2002 to the Administrator stating that the Funds and BLMIS were under investigation.

- A report was forwarded to the Defendant Citco Group's executive committee on December 27, 2002 regarding the Administrator's visit to BLMIS that expressed the Administrator's concerns with BLMIS, but a revised administration agreement was still executed between the Administrator and the Funds on February 20, 2003.

- In early 2002, Defendant Citco Group's executive committee closed some of the Fund's credit facilities to limit its exposure, and then put the credit line

46

requests from the Funds "on hold until . . . the 'investigation' on Fairfield [the Fund]" was complete because the executive committee was concerned that the Fund Custodian and Administrator were exposed to liabilities well beyond the loans in the case of fraud. This issue arose again in 2004 when the Fund Custodian decided to cancel one of its credit facilities with the Fund following the discovery by the Citco Group's executive committee that another investor had pulled its investments from BLMIS. At all times, the executive committee was in charge of the investigation and either permitted or ordered the Citco entities to proceed.

- In relation to the dispute as to whether BLMIS's role as custodian and investment manager contravened the Irish Stock Exchange's Listing Requirements and Procedures, counsel for Defendant Citco Group told the Administrator that it was prepared to tolerate potentially misleading or inaccurate information being provided to the Irish Stock Exchange to continue its relationship with the Funds.

104.    In particular, Smeets, the CEO of Defendant Citco Group, was aware of and consciously disregarded the strong suspicions expressed by employees of the various Citco entities that BLMIS's practices called the existence of the Funds' assets into question. Rather than direct the Citco entities to thoroughly investigate BLMIS and confirm the Funds' assets, Smeets instead participated in the Citco entities' decisions to quietly reduce their exposure to the Funds and BLMIS.

- In May 2000, Meijer warned Smeets that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions

47

of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Defendants could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns, but he dismissed them out of hand.

- Smeets received Bodewes' July 2001 memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.

- On December 27, 2002, after Defendants' third failed attempt to verify the Funds' assets, Bodewes reported to Smeets and the rest of the Citco Group executive committee that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

- In 2002, Smeets was aware that the Funds' credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

- In February and March 2004, Smeets was kept informed and aware of Defendants' concerns regarding AIG's withdrawal from BLMIS. Luckmann consulted Smeets before giving instructions for Citco companies to redeem their own shares in Sentry.

- In 2006, Smeets was aware that Defendants considered resigning as the Funds' service providers. Along with Defendant Citco Group's management, he received an email stating: "We are taking a risk and we only get US$60K per year!"

48

105. Through the above-alleged conduct, the Defendants knew, as early as 2000, that there was no segregation of duties at BLMIS, and that the Defendants did not have an independent source to verify information received from BLMIS. The Defendants identified this risk internally for at least seven consecutive years and flagged it as a known and recognized problem in internal reports.

106. Because of the above-alleged knowledge, employees of some or all of the Defendants developed and expressed concerns about whether the Funds' assets with BLMIS even existed. Further, the Defendants recognized a suspiciously consistent and unique pattern of trading with BLMIS, whereby BLMIS purchased shares and put options and sold call options at the beginning of each month but liquidated all positions towards the end of the month. The Defendants learned that BLMIS did not welcome inquiries regarding its practices and also acknowledged internally that this lack of transparency posed a significant risk to investors. However, upon information and belief, the Defendants did not make any efforts after 2002 to verify the existence of the assets, to establish a line of communication with BLMIS or to investigate BLMIS' trading practices. Further, some or all of the Defendants expressed concerns regarding potential similarities between BLMIS and the Manhattan Investment Fund fraud exposed in 2000.

107. In an effort to limit their own exposure and risk, the Defendants, including the Defendant Citco Banks, considered resigning as the Funds' service providers. However, they ultimately decided to stay on, in exchange for dramatically increased fees.

## F.    Exposure of Madoff's Fraud

108. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws. On that same day, the United States Attorney brought criminal

charges against Madoff, alleging that Madoff ran a multi-billion-dollar Ponzi scheme. See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008). Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

109. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

110. In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC." As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

50

111.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

112.    Madoff is now serving a 150-year sentence in federal prison.

## G.    The Funds' Estates in Liquidation

113.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.   As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

114.    In 2009, the Funds were put into liquidation proceedings in the BVI.

115.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").   The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

116.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").   The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

117.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with

the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").
The Sigma Proceeding is pending in the BVI Court under claim number
BVIHC(COM)2009/139.

118.    As alleged above, the BVI Court issued orders—the BVI Appointment
Orders – appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to
the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects
of the Funds' business, including protecting, realizing, and distributing assets for the
Funds' estates.

119.    The Redemption Payments that were transferred by the Funds to the Citco
Record Holders and received by them and the Citco Banks were erroneous payments and
constituted or formed part of avoidable transactions, and generally represent assets of the
Funds' estates that the Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against the Defendants)*

120.    The Funds (acting by the Foreign Representatives, in their capacities as
Liquidators of the Funds and on behalf of the Funds) repeat and allege again the
allegations contained in paragraphs 1 through 121 above as if set forth herein.

121.    As described above, upon receipt of a redemption request, the Funds made
each of the Redemption Payments based on a miscalculated and inflated Net Asset Value,
which caused those Redemption Payments to be in excess of the Net Asset Value of
redeemed Shares that would have been calculated based upon the true facts existing at
that time or any relevant time.

122.    As alleged above, the Redemption Payments generally represented the
proceeds arising from or to continue investment in what the world now knows was

Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

123.    As described above, the Defendants knew, were willfully blind to, and recklessly disregarded the irregularities at BLMIS at all relevant times during which they received and held the Redemption Payments or any portion thereof.

124.    By reason of their receipt, directly or indirectly, of some or all of the Redemption Payments, the Citco Redemption Recipients have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

125.    Furthermore, the Citco Redemption Recipients were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the monies received by the Citco Redemption Recipients in connection with the Citco Redemption Recipients' redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  The Citco Redemption Recipients knew, were willfully blind to, and recklessly disregarded that the Net Asset Value was inflated at the time the Redemption Payments were made.

126.    It would offend principles of equity and good conscience to permit the Citco Redemption Recipients to retain the Redemption Payments.

127.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by the Citco Redemption Recipients, for the

benefit of the Foreign Representatives and the Funds and other shareholders and creditors of the Funds.

128.     Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

## SECOND CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Citco Record Holder Defendants)

129.     The Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

130.     Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

131.     A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

132.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

133.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if:  "(c) . . . (ii) the company is unable to pay its debts as they fall due."  BVI Insolvency Act §§ 8, 244(3).

134.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

135.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the Liquidators of each Fund.

136.    A "connected person" is:

(1) . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

55

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

137.    Redemption Payments aggregating USD $939,471,244.74 were made by Sentry to the Citco Record Holders during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

138.    Redemption Payments aggregating USD $55,775,336.36 were made by Sigma to the Citco Record Holders during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

139.    Redemption Payments aggregating USD $1,094,880.49 were made by Lambda to the Citco Record Holders during the two-year period prior to the application for appointment of the Liquidators of Lambda in the BVI Liquidation Proceedings (the "Lambda Vulnerability Period").

140.    During the Sentry Vulnerability Period, the Sigma Vulnerability Period and the Lambda Vulnerability Period (the "Funds' Vulnerability Periods") the Funds were insolvent or were rendered insolvent by the making of Redemption Payments.

141.    Each of the Redemptions and/or Redemption Payments made during the Funds' Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

142.    The Citco Record Holders were shareholders (*i.e.*, members) of the Funds during the Vulnerability Periods and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

143.    Each of the Vulnerability Period Payments put the Citco Record Holders in a better position than it would have been in had such Payment not been made.

144.    Because the Citco Record Holders were each a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."    Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, *i.e.* using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS, an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

145.     In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of business" of the Funds.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

146.     Each of the Vulnerability Period Payments was made following receipt by the Funds of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by the Funds of a notice of redemption by the Citco Record Holders, the Citco Record Holders became contingent creditors.  Upon the subsequent redemption of the Citco Record Holders' shares and until such time as the Citco Record Holders' received the Vulnerability Period Payment, the Citco Record Holders were each a "creditor" of the Funds with an admissible claim against the Funds in any subsequent liquidation of the Funds had payment of the Redemption Price not been made, albeit that post-liquidation Citco Record Holders would have been deferred to outside creditors.

147.     By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from the Citco Record Holder Defendants an amount equal to the Vulnerability Period Payments received by the Citco Record Holders from the Funds.

58

## THIRD CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against the Citco Banks)

148. The Foreign Representatives, in their capacities as Foreign Liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121 and 131 through 149 above as if set forth herein.

149. Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

150. Upon information and belief, the Citco Record Holders may have directed some or all of the Redemption Payments received by them to accounts of the Citco Banks.

151. To the extent that any money that the Citco Record Holders received in connection with the Vulnerability Period Payments was transferred to the Citco Banks, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, are entitled to recover from the Citco Banks an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of the Funds, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## FOURTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI*
### *Insolvency Act - Against the Citco Banks and Citco Group)*

152.    The Foreign Representatives, in their capacities as Foreign Liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121 and 131 through 149 above as if set forth herein.

153.    Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Citco Banks and/or the Citco Group.

154.    To the extent the Citco Record Holders acted on behalf the Citco Banks as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Banks under the BVI Insolvency Act and applicable law.

155.    Further, to the extent the Citco Record Holders acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group under the BVI Insolvency Act and applicable law.

## FIFTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the*
### *BVI Insolvency Act - Against the Citco Record Holder Defendants)*

156.    The Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

157.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

158.     During the Funds' Vulnerability Periods, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and the Funds were insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 142 above.  Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

159.     The Funds received no consideration for any of the Vulnerability Period Payments, or in the alternative, the Funds received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration

provided by the Funds to the Citco Record Holders for each of the Vulnerability Period Payments.

160.    The Citco Record Holders were shareholders (*i.e.*, members) of the Funds during the Vulnerability Period and were, accordingly, each a "connected person" as defined in the BVI Insolvency Act.

161.    Because the Citco Record Holders were each a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

162.    As described above, the Citco Record Holders knew, were willfully blind to, and recklessly disregarded the irregularities at BLMIS at all relevant times during which the Citco Redemption Recipients received and held the Redemption Payments or any portion thereof.

163.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from the Citco Record Holder Defendants an amount equal to the Vulnerability Period Payments received by the Citco Record Holders from the Funds.

## SIXTH CLAIM

*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Citco Banks)*

164.    The Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121 and 158 through 165 above as if set forth herein.

165.    Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

166.    Upon information and belief, the Citco Record Holders may have directed some or all of the Redemption Payments received by them to accounts of the Citco Banks.

167.    As described above, the Citco Banks knew, were willfully blind to, and recklessly disregarded the irregularities at BLMIS at all relevant times during which the Citco Redemption Recipients received and held the Redemption Payments or any portion thereof.

168.    To the extent that any money that the Citco Record Holders received in connection with the Vulnerability Period Payments was transferred to the Citco Banks, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, are entitled to recover from the Citco Banks an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as Liquidators of the Funds, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## SEVENTH CLAIM

*(Undervalue Transaction Pursuant to Section 246 of the BVI*
*Insolvency Act - Against the Citco Banks and Citco Group)*

169.    The Foreign Representatives, in their capacities as Foreign Liquidators of

the Funds, repeat and allege again the allegations contained in paragraphs 1 through 121

and 158 through 165 above as if set forth herein.

170.    Upon information and belief, the Citco Record Holders may have

subscribed to all or some portion of the Shares issued to them under the Subscription

Agreements in the capacity of trustee, agent, representative, or nominee for the Citco

Banks and/or the Citco Group.

171.    As described above, the Citco Banks and Citco Group knew, were

willfully blind to, and recklessly disregarded the irregularities at BLMIS at all relevant

times during which the Citco Redemption Recipients received and held the Redemption

Payments or any portion thereof.

172.    To the extent the Citco Record Holders acted on behalf the Citco Banks as

principal, in respect of their liability-creating conduct, the Foreign Representatives are

entitled to recover from the Citco Banks under the BVI Insolvency Act and applicable

law.

173.    Further, to the extent the Citco Record Holders acted on behalf the Citco

Group as principal, in respect of their liability-creating conduct, the Foreign

Representatives are entitled to recover from the Citco Group under the BVI Insolvency

Act and applicable law.

## EIGHTH CLAIM
### *(Unjust Enrichment - Against Citco Record Holder Defendants)*

174.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

175.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to the Citco Record Holders, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

176.    The Citco Record Holders did not provide valuable consideration to the Funds in exchange for each of the Redemption Payments received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

177.    By reason of their receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, the Citco Record Holders have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

178.    It would offend principles of equity and good conscience to permit the Citco Record Holders to retain the Redemption Payments it received from the Funds.

179.    The Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Citco Record Holder Defendants an amount equal to the Redemption Payments received by it from the Funds, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Record Holders less the amount of redemption payments that the Citco Record Holders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## **NINTH CLAIM**
### *(Unjust Enrichment - Against Citco Banks and Citco Group)*

180.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 and 176 through 181 above as if set forth herein.

181.    Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

182.    Upon information and belief, the Citco Record Holders may have paid to or credited some or all of the Redemption Payments received by them from the Funds to accounts at the Citco Banks. These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

183.    The Citco Banks did not provide valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

184.    To the extent that the Citco Banks received any portion of the Redemption Payments paid to the Citco Record Holders in their capacity as trustee, agent, representative, or nominee for the Citco Banks, the Citco Banks have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

185.    It would offend principles of equity and good conscience to permit the Citco Banks to retain the Redemption Payments made by the Funds.

186.    The Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Citco Banks an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Banks less the amount of redemption payments that the Citco Banks would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

187.    Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

## TENTH CLAIM

### *(Money Had and Received - Against Citco Record Holder Defendants)*

188.    The Funds (acting by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

189.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to the Citco Record Holders, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

190.    The Citco Record Holders did not provide valuable consideration to the Funds in exchange for each of the Redemption Payments received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

191.    By reason of their receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, the Citco Record Holders have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

192.    Furthermore, the Citco Record Holders were not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by the Citco Record Holders for their redemption of Shares to be in excess of

the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

193.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

194.    It would offend principles of equity and good conscience to permit the Citco Record Holders to retain the Redemption Payments they received from the Funds.

195.    The Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Citco Record Holder Defendants an amount equal to the Redemption Payments received by it from the Funds, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Record Holders less the amount of redemption payments that the Citco Record Holders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## **ELEVENTH CLAIM**
### *(Money Had and Received - Against Citco Banks and Citco Group)*

196.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 and 190 through 197 above as if set forth herein.

197.    Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to it under the Subscription

Agreements in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

198.     Upon information and belief, the Citco Record Holders may have paid to or credited some or all of the Redemption Payments received by them to accounts at the Citco Banks. These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

199.     The Citco Banks did not provide valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

200.     To the extent that the Citco Banks received any portion of the Redemption Payments paid to the Citco Record Holders in their capacity as trustee, agent, representative, or nominee for the Citco Banks, the Citco Banks have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

201.     Furthermore, the Citco Banks were not entitled to receive the Redemption Payments paid to the Citco Record Holders upon the redemption of Shares issued to them in their capacity as trustee, agent, representative, or nominee for the Citco Banks because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares

that would have been calculated based upon the true facts existing at that time or any relevant time.

202.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

203.    It would offend principles of equity and good conscience to permit the Citco Banks to retain the Redemption Payments made by the Funds.

204.    The Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Citco Banks an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Banks less the amount of redemption payments that the Citco Banks would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

205.    Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

## TWELFTH CLAIM
### (Mistaken Payment - Against Citco Record Holder Defendants)

206.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

207.    As described above, the Funds made each of the Redemption Payments to the Citco Record Holders under the mistaken belief that the amounts paid to the Citco Record Holders represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

208.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to the Citco Record Holders represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

209.    The Redemption Payments, while benefiting the Citco Record Holders, were made to the detriment of the Funds and other shareholders and creditors of the Funds.

210.    Additionally, the Citco Record Holders were not entitled to receive the Redemption Payments because, as was unknown to the Funds, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by the Citco Record Holders for their redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of the Funds, their creditors and the current holders of Shares in the Funds.

211.    The Citco Record Holders did not provide valuable consideration to the Funds in exchange for each of the Redemption Payments received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

212.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

213.    It would thus offend principles of equity and good conscience to permit the Citco Record Holders to retain the Redemption Payments.

214.    The Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Citco Record Holder Defendants a sum in an amount equal to the Redemption Payments received by them from the Funds, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Record Holders less the amount of redemption payments that the Citco Record Holders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRTEENTH CLAIM
### (Mistaken Payment - Against Citco Banks and Citco Group)

215.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 and 208 through 216 above as if set forth herein.

73

216. As described above, the Funds made each of the Redemption Payments to the Citco Record Holders under the mistaken belief that the amounts paid to the Citco Record Holders represented the proceeds arising from the profitability of or to continue investment in BLMIS.

217. However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to the Citco Record Holders represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

218. Upon information and belief, the Citco Record Holders may have paid to or credited some or all of the Redemption Payments received by them to accounts at the Citco Banks. These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

219. Additionally, the Citco Banks were not entitled to receive the Redemption Payments received by the Citco Record Holders upon the redemption of Shares issued to them in their capacity as trustee, agent, representative, or nominee for the Citco Banks because, as was unknown to the Funds, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by the Citco Record Holders for their redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

74

220.    The Citco Banks did not provide valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

221.    The Redemption Payments, while benefiting any Citco Bank receiving any portion thereof, were made to the detriment of the Funds and other shareholders and creditors of the Funds.

222.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

223.    It would thus offend principles of equity and good conscience to permit the Citco Banks to retain the Redemption Payments.

224.    The Foreign Representatives in their capacities as Liquidators of the Funds and on behalf of the Funds are entitled to recover from the Citco Banks an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Citco Banks less the amount of redemption payments that the Citco Banks would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

225.    Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

## FOURTEENTH CLAIM
### *(Breach of Contract - Against the Citco Record Holder Defendants)*

226.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

227.    The Citco Record Holders, upon information and belief, entered into the Initial Subscription Agreement with Sentry on or about January 3, 2003, pursuant to which the Citco Record Holders subscribed for Shares.  The Citco Record Holders' subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Subsequent Subscription Agreements with Sentry, Sigma, and Lambda between January 6, 2003 and November 18, 2008, pursuant to which they subscribed for additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents."

228.    The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per share is to be determined by the directors of the Funds as of the relevant

76

valuation day "by dividing the value of the net assets of [Sentry/Sigma/Lambda] by the number of Shares then in issue [.]"  Articles at 11(1).

229.   The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Funds is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.  Articles at 11(1).  Pursuant to the Fund Documents, each subscriber, including the Citco Record Holders, acknowledge that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value."  See Initial Subscription Agreement ¶ 10.

230.   With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of The Funds.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

231.   With respect to the value of any shares of stock held by The Funds in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided

however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

232.    With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors." Articles at 11(3)(e).

233.    Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine." Articles at 11(3)(f).

234.    The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties." Articles at 11(1).

235.    No Certificate was provided in good faith by or on behalf of the Directors to the Citco Record Holders in respect of any Net Asset Value determination made while the Citco Record Holders were members of the Funds or in respect of any Redemption Payment made to the Citco Record Holders.

236.    Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by the Citco Record Holders and paid to the Citco Record Holders remains subject to adjustment, recalculation and redetermination based on, inter alia, the foregoing identified provisions of the Fund Documents. Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-

payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

237.    Upon information and belief, the Citco Record Holders received the Redemption Payments listed on Exhibit A, Exhibit B, and Exhibit C in respect of Shares submitted for redemption.

238.    Subsequent to December 8, 2008, the Funds have determined that the Net Asset Value calculations upon which Redemption Payments were made to the Citco Record Holders included assets not held by or on behalf of the Funds at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of the Funds existing at the time of such payments.  For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of the Funds.

239.    To the extent that the Citco Record Holders have received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, the Citco Record Holders are contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

240.    Following determination by the Funds that Redemption Payments made to the Citco Record Holders had been calculated on the basis of an overstated Net Asset Value, demand has been made on the Citco Record Holders to return excess and overpaid Redemption Payments to the Funds.

241.   The Citco Record Holders have failed and refused to repay to the Funds the amount that, under the Fund Documents, it is contractually required to repay to the Funds.

242.   The failure of the Citco Record Holders to make the repayment requested constitutes a breach of the Fund Documents for which the Funds are entitled to the award of damages from the Citco Record Holder Defendants.

### FIFTEENTH CLAIM
*(Breach of Contract - Against the Citco Banks and Citco Group)*

243.   The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 and 228 through 244 above as if set forth herein.

244.   Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

245.   The Citco Record Holders may have entered into the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Citco Banks and thereby bound the Citco Banks to the agreements and representations contained therein to the same extent as had the Citco Banks executed the Fund Documents on their own behalf.

246.   Upon information and belief, the Citco Record Holders may have paid to or credited some or all of the Redemption Payments received by it from the Funds to accounts at the Citco Banks.

247.   To the extent that the Citco Banks have received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, the Citco Banks are contractually

obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

248.    Following determination by the Funds that Redemption Payments made to the Citco Record Holders had been calculated on the basis of an overstated Net Asset Value, demand was made on the Citco Banks by demand on the Citco Record Holders for the return of excess and overpaid Redemption Payments.

249.    The Citco Banks have failed and refused to repay to the Funds the amounts that, under the Fund Documents, they are contractually required to repay to the Funds.

250.    The failure of the Citco Banks to make the repayment requested constitutes a breach of the Fund Documents for which the Funds are entitled to the award of damages.

251.    Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

### SIXTEENTH CLAIM
*(Breach of Implied Covenant of Good Faith and*
*Fair Dealing - Against Citco Record Holder Defendants)*

252.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

253.    Following determination by the Funds that Redemption Payments to the Citco Record Holders had been made on the basis of an overstated Net Asset Value,

demand was made to the Citco Record Holders to return excess and overpaid Redemption Payments to The Funds.

254.    The Citco Record Holders have failed and refused to make the requested repayment to the Funds.

255.    By retaining the Redemption Payments to which the Citco Record Holders are not entitled, the Citco Record Holders have deprived the Funds of the benefit of their bargain and has subverted the Fund Documents.

256.    The failure of the Citco Record Holders to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which the Funds are entitled to the award of damages from the Citco Record Holder Defendants.

### SEVENTEENTH CLAIM
*(Breach of Implied Covenant of Good Faith and*
*Fair Dealing - Against Citco Banks and Citco Group)*

257.    The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 and 254 through 258 above as if set forth herein.

258.    Upon information and belief, the Citco Record Holders may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Citco Banks.

259.    Upon information and belief, the Citco Record Holders may have paid to or credited some or all of the Redemption Payments received by it from the Funds to accounts at the Citco Banks.

82

260. Following determination by the Funds that Redemption Payments made to the Citco Record Holders had been calculated on the basis of an overstated Net Asset Value, demand was made on the Citco Banks by demand on the Citco Record Holders for the return of excess and overpaid Redemption Payments.

261. The Citco Banks have failed and refused to make repayment to the Funds.

262. By retaining the Redemption Payments to which they are not entitled, the Citco Banks have deprived the Funds of the benefit of their bargain and have subverted the Fund Documents.

263. The failure of the Citco Banks to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which the Funds are entitled to the award of damages.

264. Further, to the extent the Citco Record Holders or Citco Banks acted on behalf the Citco Group as principal, in respect of their liability-creating conduct, the Foreign Representatives are entitled to recover from the Citco Group.

### EIGHTEENTH CLAIM
*(Declaratory Judgment - Against All Defendants)*

265. The Funds (acting by the Foreign Representatives, in their capacities as Liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 121 above as if set forth herein.

266. An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)     the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)   prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Funds; and

(iv)    Citco issued no Certificates in good faith.

267.    The harm to the Funds is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, the Funds have become insolvent and are presently unable to pay their debts as they fall or will fall due.

268.    Plaintiffs have no adequate remedy at law.

269.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay the Funds that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by the Funds.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief as and against the Defendants:

A.      On the First Claim, imposition of a constructive trust on Redemption Payments;

B.     On the Second, Third and Fourth Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against the Defendants that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against the Defendants in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

C.     On the Fifth, Sixth and Seventh Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against the Defendants that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against the Defendants in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

D.     On the Eighth, Tenth and Twelfth Claims, judgment in favor of Plaintiffs and against the Citco Record Holder Defendants allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by the Citco Record Holders, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by the Citco Record Holders less the amount of redemption payments that the Citco Record Holders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

85

E.     On the Ninth, Eleventh and Thirteenth Claims, judgment in favor of Plaintiffs and against the Citco Banks allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Citco Banks, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Citco Banks less the amount of such portion that the Citco Banks would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

F.     On the Fourteenth and Sixteenth Claims, judgment against the Citco Record Holder Defendants and in favor of the Plaintiffs in an amount to be determined at trial;

G.     On the Fifteenth and Seventeenth Claims, judgment against the Citco Banks and in favor of the Plaintiffs in an amount to be determined at trial;

H.     On the Eighteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by the Funds;

I.     Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.     Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
        November 26, 2019

**BROWN RUDNICK LLP**

By:   /s/ *David J. Molton*
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801
Email: dmolton@brownrudnick.com
Email: mkrzyzowski@brownrudnick.com

-and-

**SELENDY & GAY PLLC**
David Elsberg
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: delsberg@selendygay.com
E-mail: rkrock@selendygay.com

*Attorneys for the Foreign Representatives*