**Exhibit 9**

# 19-cv-3911 (VSB)

## (Administratively Consolidated)
## This document applies to all Administratively Consolidated Appeals

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof,

*Plaintiffs-Appellants,*

v.

CITIBANK NA LONDON,

*Defendant-Appellee.*

*On Appeal from the United States Bankruptcy Court for the Southern District of New York*

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
## FOR SECOND-ROUND APPEAL

SELENDY & GAY PLLC
David Elsberg
Caitlin J. Halligan
Andrew R. Dunlap
Lena Konanova
Ester Murdukhayeva
Ryan Allison
Evan Bianchi
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
delsberg@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
emurdukhayeva@selendygay.com
rallison@selendygay.com
ebianchi@selendygay.com

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs-Appellants Foreign Representatives*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Kenneth M. Krys and Greig Mitchell, in their capacities as liquidators and foreign representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation) (together, the "Funds"), hereby state that none of the Funds has a parent corporation, and there is no publicly held corporation owning ten percent (10%) or more of the shares of any of the Funds.

Date: July 21, 2021

Respectfully submitted,

SELENDY & GAY PLLC
David Elsberg
Caitlin J. Halligan
Andrew R. Dunlap
Lena Konanova
Ester Murdukhayeva
Ryan Allison
Evan Bianchi
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
delsberg@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
emurdukhayeva@selendygay.com
rallison@selendygay.com
ebianchi@selendygay.com

-and-

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................. 1

ISSUES PRESENTED ...................................................................... 8

JURISDICTIONAL STATEMENT .................................................... 9

STANDARD OF REVIEW .............................................................. 10

STATEMENT OF THE CASE ........................................................ 11

    A.    Factual Background .......................................................... 11

        1.    The Funds ................................................................ 11

        2.    Citco's Fraudulent Conduct Permeated
              Redemption Payments to Defendants ........................ 12

    B.    Procedural History ............................................................ 13

    C.    The Decisions Below ........................................................ 16

        1.    *Fairfield I* ................................................................ 16

        2.    *Fairfield II* .............................................................. 17

        3.    Decision on Plaintiffs' Motion for Leave to Amend ..... 19

        4.    *Fairfield III* ............................................................ 20

SUMMARY OF ARGUMENT ........................................................ 21

ARGUMENT .................................................................................. 24

I.    SECTION 546(e) DOES NOT APPLY TO PURELY FOREIGN
    TRANSFERS .......................................................................... 24

    A.    Congress Did Not Intend Section 546(e) to Apply
        Extraterritorially ............................................................... 25

    B.    Congress Did Not Expand Section 546(e) to Reach
        Purely Foreign Claims in Section 561(d) ........................... 27

C.    The Bankruptcy Court Erred in Relying on Legislative History from Unenacted Bills Predating Section 561(d) by Nearly a Decade ............................................................. 34

D.    Applying Section 546(e) to the Purely Foreign Claims at Issue Would Not be "Domestic" ..................................... 37

II.    SECTION 546(e) DOES NOT BAR PLAINTIFFS' BVI AVOIDANCE CLAIMS ...................................................... 38

A.    The Bankruptcy Court's Ruling that Section 546(e) Bars Plaintiffs' BVI Avoidance Claims Conflicts with Section 561(d) by Giving Domestic Trustees Greater Avoidance Powers than Foreign Representatives .................................. 39

B.    The Bankruptcy Court's Ruling Misreads Section 546(e), Which Does Not Apply to Intentionally Fraudulent Transfers Like Those at Issue ............................................. 42

C.    Plaintiffs Squarely Alleged that the Redemption Payments are Intentionally Fraudulent Transfers.............. 45

D.    The Bankruptcy Court's Ruling Conflicts with Congressional Intent by Putting Fraudulently Obtained Foreign Assets Beyond the Reach of U.S. Courts ............... 48

III.    SECTION 246 PERMITS UNDERVALUE TRANSACTION CLAIMS AGAINST ALL DEFENDANTS, NOT JUST THOSE WHO KNEW THE REDEMPTIONS WERE UNDERVALUED .......................................................................... 49

IV.    THE SUBSCRIPTION AGREEMENTS ESTABLISH PERSONAL JURISDICTION OVER NEARLY ALL DEFENDANTS ............................................................................. 53

V.    THE BANKRUPTCY COURT ERRED IN DENYING PLAINTIFFS' MOTION TO AMEND AGAINST KNOWLEDGE DEFENDANTS IN TWELVE CASES ................. 59

CONCLUSION .......................................................................... 62

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.,*
    795 F.3d 351 (2d Cir. 2015).............................................................11

*Bankruptcy Estate of Norske Skogindustrier ASA v. Cyrus Capital*
    *Partners, L.P.* (*In re Norske Skogindustrier ASA*),
    2021 WL 1687903 (Bankr. S.D.N.Y. Apr. 29, 2021) .........................
    ...........................................................................40-41, 43-45, 47, 49

*Beckworth v. Bizier,*
    48 F. Supp. 3d 186 (D. Conn. 2014). ...............................................60

*BOKF, N.A. v. Caesars Entm't Corp.,*
    162 F. Supp. 3d 243 (S.D.N.Y. 2016) ...............................................57

*Cardell Fin.Corp. v. Suchodolski Assocs., Inc.,*
    2012 WL 12932049 (S.D.N.Y. July 17, 2012) ..................................55

*Central Va. Cmty. Coll. v. Katz,*
    546 U.S. 356 (2006) .........................................................................32

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021).................................................................25

*Coregis Ins. Co. v. Am. Health Found. Inc.,*
    241 F.3d 123 (2d Cir. 2011)..............................................................55

*Emps.' Ret. Sys. of Gov't Virgin Islands v. Blanford,*
    794 F.3d 297 (2d Cir. 2015)..............................................................45

*FIH, LLC v. Found. Cap. Partners LLC,*
    920 F.3d 134 (2d Cir. 2019)..............................................................11

*Haarhuis v. Kunnan Enters., Ltd.,*
    177 F.3d 1007 (D.C. Cir. 1999)........................................................32

*Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomms.*
 *(Luxembourg) II SCA*),
  526 B.R. 499 (Bankr. S.D.N.Y. 2015) ...................................... 26, 37

*Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomms.*
 *(Luxembourg) II SCA*),
  535 B.R. 543 (Bankr. S.D.N.Y. 2015) ...................................... 41-42

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011) ............................................. 10

*In re Condor Ins. Ltd.*,
  601 F.3d 319 (5th Cir. 2010) ............................................. 28, 41, 49

*In re Fairfield Sentry Ltd.*,
  2018 WL 3756343 (Aug. 6, 2018) ("*Fairfield I*") ..... 16, 17, 53-55, 57

*In re Fairfield Sentry Ltd.*,
  2020 WL 4813565 (Bankr. S.D.N.Y. Aug. 10, 2020) ..... 19-20, 59, 61

*In re Fairfield Sentry Ltd.*,
  2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)
  ("*Fairfield III*") ....................................... 20-21, 38-39, 41, 43, 46-47

*In re Fairfield Sentry Ltd.*,
  596 B.R. 275 (Bankr. S.D.N.Y. 2018)
  ("*Fairfield II*") ........ 14-15, 17-18, 24-25, 27, 29-31, 34-36, 47, 50, 52

*In re Fairfield Sentry, Ltd.*,
  2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) ........................ 41

*In re Kingscroft Ins. Co.*,
  138 B.R. 121 (Bankr. S.D. Fla. 1992) ............................................. 32

*In re Lyondell Chem. Co.*,
  554 B.R. 635 (S.D.N.Y. 2016) ............................................. 45

*In re Picard*,
  917 F.3d 85 (2d. Cir. 2019) ............................................. 37

*In re Prudential Lines, Inc.,*
    170 B.R. 222 (Bankr. S.D.N.Y. 1994).............................................59

*In re Teleservices Grp., Inc.,*
    444 B.R. 767 (Bankr. W.D. Mich. 2011).......................................44

*In re Zetta Jet USA, Inc.,*
    624 B.R. 461 (Bankr. C.D. Cal. 2020) ...........................................26

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
    153 F.3d 82 (2d Cir. 1998).......................................................10-11

*Jaen v. Sessions,*
    899 F.3d 182 (2d Cir. 2018)..........................................................43

*Jam v. Int'l Fin. Corp.,*
    139 S. Ct. 759 (2019) ...................................................................29

*Kiobel v. Royal Dutch Petroleum,*
    133 S. Ct. 1659 (2013) .................................................................38

*Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.),*
    768 F.3d 239 (2d Cir. 2014)..........................................................29

*Lamborn v. Nat'l Park Bank of N. Y.,*
    212 A.D. 25 (1st Dep't 1925) .......................................................57

*Lazare Kaplan Int'l v. KBC Bank NV,*
    785 Fed. App'x 18 (2d Cir. 2019)..................................................55

*Liu Meng-Lin v. Siemens AG,*
    763 F.3d 175 (2d Cir. 2014)..........................................................31

*Loginovskaya v. Batratchenko,*
    764 F.3d 266 (2d Cir. 2014)....................................................26, 38

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
    797 F.3d 160 (2d Cir. 2015)..........................................................45

*Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.),*
    186 B.R. 807 (S.D.N.Y. 1995).................................................26-27

*Maxwell v. State Farm Mut. Auto. Ins. Co.*,
    461 N.Y.S.2d 541 (3d Dep't 1983) ..................................................58

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) .............................................27, 37, 42-43, 44

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................24, 25, 34

*Murphy v. Long Island Oyster Farms, Inc.*,
    112 A.D.2d 276 (2d Dep't 1985) ..................................................57

*Nestle USA, Inc. v. Doe*,
    141 S. Ct. 1931 (June 17, 2021) ....................................................37

*New York State Nat. Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ........................................................59

*Progressive Ne. Ins. Co. v. State Farm Ins. Cos.*,
    916 N.Y.S.2d 454 (4th Dep't 2011) ...........................................57-58

*Redhawk Holdings Corp. v. Craig Invs., LLC*,
    2016 WL 3636247 (S.D.N.Y. June 24, 2016) ...............................56

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    136 S. Ct. 2090 (2016) ....................................................25, 34, 37

*Sasson v. TLG Acquisition LLC*,
    9 N.Y.S.3d 2 (1st Dep't 2015) .......................................................57

*Saud v. Bank of New York*,
    929 F.2d 916 (2d Cir. 1991) ..........................................................62

*Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V. (In re
    Sherwood Invs. Overseas Ltd.)*,
    2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ....................27

*United States v. Dauray*,
    215 F.3d 257 (2d Cir. 2000) ..........................................................49

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020) ..........................................................27

*United States v. Prado,*
    933 F.3d 121 (2d Cir. 2019) .......................................................32-33

*Waldman v. Vill. of Kiryas Joel,*
    207 F.3d 105 (2d Cir. 2000) ..........................................................60

*Wynns v. Adams,*
    426 B.R. 457 (E.D.N.Y. 2010) ......................................................31

## **Statutes**

11 U.S.C. § 103 ..............................................................................26, 33

11 U.S.C. § 1521 ................................................................................39

11 U.S.C. § 365 ..................................................................................30

11 U.S.C. § 546 ..................................................................................42

11 U.S.C. § 548 ..................................................................................42

11 U.S.C. § 555 ..................................................................................33

11 U.S.C. § 556 ..................................................................................33

11 U.S.C. § 559 ..................................................................................33

11 U.S.C. § 560 ..................................................................................33

11 U.S.C. § 561 .............................................................28, 30, 32, 33, 40

11 U.S.C. § 926 ..................................................................................43

## **Legislative Materials**

H.R. Rep. No. 97-420, at 1,
    *reprinted in* 1982 U.S.C.C.A.N. 583 ...............................................38

Pub. L. No. 101-311, 104 Stat. 267 (1990) ...............................................48

Pub. L. No. 109-390, 120 Stat. 2692 (2006) ..............................................48

Pub. L. No. 109-8, 119 Stat. 23 (2005) .................................................... 48

Pub. L. No. 95-598, 92 Stat. 2549 (1978) ................................................ 48

Pub. L. No. 97-222, 96 Stat. 235 (1982) .................................................. 48

Pub. L. No. 98-353, 98 Stat. 333 (1984) .................................................. 48

## Foreign Authorities

*Ailyan v. Smith*
  [2010] EWHC 24 ...................................................................... 51-52

BVI Insolvency Act § 246 .......................................................................... 50

*Fairfield Sentry Ltd. (in Liquidation) v. Migani*
  [2014] UKPC 9 ("*Migani*") .................................................. 15, 50, 56

*Phillips v Brewin Dolphin Bell Lawrie*
  [2001] BCC 864 ........................................................................ 50-53

*Skandinaviska Enskild Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* ["*Weavering II*"]
  [2019] UKPC 36 ........................................................................ 47-48

## PRELIMINARY STATEMENT

This appeal arises from Plaintiffs-Appellants' efforts to recover billions of dollars from those who profited from Bernard L. Madoff Investment Securities ("<u>BLMIS</u>")'s now-infamous Ponzi scheme. Defendants-Appellants invested in Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation) (together, the "<u>Funds</u>"), which in turn invested nearly all their assets in BLMIS. Defendants-Appellants redeemed their shares in the Funds before BLMIS's fraud was exposed, at false and grossly inflated values, for billions of dollars. Plaintiffs-Appellants Kenneth M. Krys and Greig Mitchell, the duly appointed Liquidators and Foreign Representatives of the Funds, seek to recover these inflated redemption payments so they may equitably distribute them to all the Funds' investors—many of whom, unlike Defendants, lost most or all of their investments.

The Bankruptcy Court (Bernstein, J.) whittled away Plaintiffs' claims at the pleadings stage in seriatim decisions. Plaintiffs brought claims under the common law of the British Virgin Islands ("<u>BVI</u>"), where the Funds are organized; BVI contract claims; and statutory avoidance

claims under the BVI Insolvency Act. In December 2018, the Bankruptcy Court dismissed many of Plaintiffs' BVI common law and contract claims, spawning an appeal (separate from this one) that is briefed and pending before this Court.

Relevant to the present appeal, the Bankruptcy Court then dismissed Plaintiffs' BVI avoidance claims, holding that (1) Section 546(e) of the Bankruptcy Code, a "safe harbor" that shields some securities transfers from avoidance claims, can apply to transfers outside the United States; (2) Section 546(e) bars Plaintiffs' BVI avoidance claims, because only claims brought under Section 548(a)(1)(A) purportedly are exempt from the safe harbor, and by law Plaintiffs cannot bring claims under Section 548(a)(1)(A); and (3) even if the Section 546(e) safe harbor did not apply, Section 246 of the BVI Insolvency Act does not allow Plaintiffs' avoidance claims for "undervalue transactions" against Defendants who did not know or suspect that the transactions were undervalued when they redeemed. The Bankruptcy Court also held that (4) subscription agreements in which most Defendants agreed to jurisdiction in New York for any claim "with respect to this Agreement and the Fund" did not establish personal jurisdiction; and (5) Plaintiffs' prior appeal of the

Bankruptcy Court's dismissal of BVI constructive trust claims in some actions divested the court of jurisdiction to rule on Plaintiffs' proposal to amend those claims based on different facts and legal theories.

The Bankruptcy Court's rulings, made at the motion to dismiss stage and subject to de novo review by this Court, were in error.

First, the Bankruptcy Court erred in holding that Section 546(e) can apply to securities transactions occurring entirely outside of the U.S., like those at issue here. The Supreme Court has held, repeatedly, that U.S. laws apply only domestically unless Congress evinces a clear and unmistakable intent that they also apply extraterritorially; nothing in Section 546(e)'s text or legislative history indicates that Congress intended that statute to apply to transfers outside the United States. Ignoring this well-settled law, the Bankruptcy Court held that a different Code provision, Section 561(d), implicitly extends Section 546(e) to purely foreign transactions. But Section 561(d) explicitly provides that avoidance powers in foreign and domestic proceedings are limited "to the same extent"—just as Section 546(e) does not apply to purely foreign transfers in Chapter 7 and Chapter 11 proceedings, it cannot apply to purely foreign transfers in Chapter 15 proceedings. The Bankruptcy Court's

3

holding ignores basic rules of statutory construction and must be reversed. (This Court's reversal on this point would moot the Bankruptcy Court's ruling on the next point.)

Second, even if Section 546(e) could apply to foreign transfers (it cannot), the Bankruptcy Court erred in holding that it bars Plaintiffs' BVI avoidance claims here. The court held that Section 546(e) exempts from the safe harbor only claims to avoid intentionally fraudulent transfers brought directly under Section 548(a)(1)(A). Because foreign representatives in Chapter 15 proceedings—like Plaintiffs—cannot bring claims under Section 548(a)(1)(A), the court reasoned that the intentionally fraudulent transfer exception to Section 546(e)'s safe harbor is not available to them.

The Bankruptcy Court erred in multiple ways. It violated Section 561(d), which limits avoidance powers "to the same extent" in domestic and foreign proceedings, by letting domestic trustees avoid intentionally fraudulent transfers while prohibiting foreign representatives from doing so. The court also misread Section 546(e)'s exemption from the safe harbor as limited to *claims* brought under that statute—but the exemption applies to intentionally fraudulent *transfers* of any kind regardless

of whether those transfers are challenged through a claim brought under Section 548(a)(1)(A). The court also erred by suggesting that the Funds could not allege intentionally fraudulent transfers based on the Citco Administrator's bad faith.

The court's ruling on the intentionally fraudulent transfer exception is also bad policy: It encourages fraudsters to loot assets by barring foreign liquidators from recovering such assets in U.S. courts. If Section 546(e) can apply to purely foreign transfers (it cannot), this ruling must be reversed.

Third, if this Court reverses the Bankruptcy Court's ruling that Plaintiffs' BVI avoidance claims are barred by the safe harbor (as it should, under either point above), it should then also reverse the Bankruptcy Court's erroneous dismissal of a subset of those claims, brought under Section 246 of the BVI Insolvency Act, for failure to state a claim. Section 246 allows Plaintiffs to avoid "undervalue transactions," including those where the consideration exchanged was significantly less than the money received—like Defendants' exchange of essentially worthless shares for billions of dollars in redemption payments. The Bankruptcy Court held that Section 246 reaches only Defendants who knew or should

have known at the time of redemption that the shares were undervalued, dismissing Plaintiffs' Section 246 claims against Defendants without such knowledge. This was error. The Bankruptcy Court imposed a knowledge requirement found nowhere in the text of Section 246 and misread leading precedent from the United Kingdom House of Lords that courts must look at the "reality" of the transfers at issue, not the parties' perceptions. The undeniable reality here is that Defendants exchanged shares of negligible value for billions of dollars, which Plaintiffs can avoid under Section 246.

Fourth, in a separate ruling, the Bankruptcy Court erred in concluding that subscription agreements failed to establish personal jurisdiction over the hundreds of Defendants bound by them—a ruling that affects all of Plaintiffs' claims against those Defendants. In the subscription agreements' forum selection clause, Defendants expressly consented to personal jurisdiction in New York courts for any claim "with respect to this Agreement and the Fund." There is no dispute that these proceedings are "with respect to" the Fund; they are also "with respect to" the subscription agreements because, without the agreements, Defendants would have had no contractual relationship with the Funds that

authorized the challenged redemptions. The Bankruptcy Court erred in interpreting the phrase "with respect to" to require that the claims in a proceeding actually arise under the agreements. In any event, Defendants' concession that these actions are "with respect to" the Fund is independently dispositive: Under New York law, the term "and" must be read in this context as disjunctive, creating jurisdiction even if the actions relate solely to the Funds.

Finally, this Court should reverse another Bankruptcy Court ruling related to Plaintiffs' pending appeal: that the appeal of the court's prior dismissal of their BVI constructive trust claims in 12 actions purportedly divested the court of jurisdiction over Plaintiffs' request to amend those claims. A notice of appeal divests a lower court of jurisdiction only with respect to issues identical to those on appeal. The proposed amended constructive trust claims here are distinct from the previously dismissed constructive trust claims because they are based on different factual allegations and theories of liability. (If this Court rules in Plaintiffs' favor on the pending appeal, it need not reach this argument.)

This Court should reverse the Bankruptcy Court's flawed rulings and allow Plaintiffs to finally proceed to the merits of their claims.

## ISSUES PRESENTED

1.     U.S. statutes presumptively apply only domestically unless Congress clearly indicates otherwise. Congress did not indicate that Section 546(e) of the Bankruptcy Code applies extraterritorially. Did the Bankruptcy Court err in holding that Section 546(e) can apply to transfers occurring entirely outside the U.S.?

2.     Section 561(d) requires that the avoidance powers of foreign liquidators and domestic trustees be limited "to the same extent." Did the Bankruptcy Court err by holding that domestic trustees can avoid intentionally fraudulent transfers while foreign representatives cannot—thus dismissing Plaintiffs' BVI avoidance claims?

3.     Section 246 of the BVI Insolvency Act allows a liquidator to avoid transactions in which consideration exchanged was significantly less than money received. The applicable foreign law requires courts to look at the "reality" of whether transactions were undervalued. Did the Bankruptcy Court err in holding that Section 246 reaches only transactions that a Defendant knew or suspected were undervalued—thus dismissing Plaintiffs' Section 246 claims in large part?

4.     Hundreds of Defendants consented to jurisdiction in New York courts for claims "with respect to" their subscription agreements and the Funds. Defendants concede Plaintiffs' claims are "with respect to" the Funds; Plaintiffs contend that their claims are also "with respect to" the agreements, as Defendants would have had no shares to redeem absent those agreements. Did the Bankruptcy Court err in holding that the agreements do not establish personal jurisdiction over these Defendants?

5.     A notice of appeal divests a lower court of jurisdiction over only issues identical to those on appeal. After Plaintiffs appealed the Bankruptcy Court's prior dismissal of their BVI constructive trust claims, they proposed amendments to add constructive trust claims based on a new legal theory and different facts. Did the Bankruptcy Court err in holding that Plaintiffs' prior appeal divested it of jurisdiction to consider Plaintiffs' proposed amendments?

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction over the underlying adversary proceedings under 28 U.S.C. § 1334(b). This Court has jurisdiction under 28 U.S.C. § 158(a)(1). The Bankruptcy Court entered final orders

between April 2, 2019 and April 18, 2019, as well as between February 25 and 27, 2021. *See* Exhibit A. Plaintiffs filed timely notices of appeal between May 1, 2019 and May 16, 2019, with respect to the April 2019 orders, after an extension of time to do so was granted by each order. This Court stayed the appeals, in part, in September 2019. Dkt. 8.[1] Plaintiffs filed timely notices of appeal between March 29, 2021 and April 1, 2021, with respect to the February 2021 orders, after an extension of time to do so was granted by each final order. In March 2021, this Court lifted the stay on the 2019 appeals. Dkt. 400. In May 2021, this Court consolidated the previously stayed appeals and the newly noticed appeals. Dkt. 427.

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's legal conclusions de novo. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 234 (2d Cir. 2011). "Determination of a foreign country's law is an issue of law." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92

---

[1] Unless accompanied by a specific case caption and index number, "Dkt." refers to the docket for the consolidated appeals in this Court. *See In re Fairfield Sentry Ltd.*, No. 19-cv-3911 (VSB) (S.D.N.Y.). "Omnibus Bankr. Dkt." refers to the docket for the omnibus consolidated proceeding in Bankruptcy Court. *See In re Fairfield Sentry Ltd.*, No. 10-ap-3496 (CGM) (Bankr. S.D.N.Y.).

(2d Cir. 1998). The Court also reviews de novo the Bankruptcy Court's determinations of the meaning of contractual provisions. *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019).

## STATEMENT OF THE CASE

Plaintiffs' allegations "are presumed true, and are presented in the light most favorable to plaintiffs" on this appeal. *Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.*, 795 F.3d 351, 354 (2d Cir. 2015). Unless otherwise noted, the following facts are drawn from a representative pleading, the Third Amended Complaint in *Fairfield Sentry Ltd. v. Citibank NA London* (*In re Fairfield Sentry Ltd.*), No. 10-ap-03622 (CGM) (Bankr. S.D.N.Y. Jan. 9, 2020) (Dkt. 79) ("Compl.").

### A. Factual Background

#### 1. The Funds

The Funds were investment vehicles for investment in BLMIS, Compl. ¶¶ 33-35, organized under BVI law and their respective Articles of Association. *Id.* ¶¶ 18, 26. Investors like Defendants signed subscription agreements for the purchase of shares in the Funds. Relevant here, the agreements provided that "[a]ny suit, action or proceeding … with respect to this Agreement and the Fund may be brought in New York," and that the subscriber "irrevocably submits to the jurisdiction of the

New York courts with respect to any" such action.[2] *Id.* ¶ 23. The subscription agreements also provided that an investor's relationship with the Funds was governed by those agreements, the Articles, and other fund documents. In turn, the Articles authorized investors to redeem shares at a price based on each Fund's net asset value per share ("NAV"), calculated by the Funds' administrator. *Id.* ¶¶ 4, 35.

Defendants are investors that redeemed shares at fictitious, grossly inflated values before BLMIS's fraud was revealed. *Id.* ¶¶ 35-44.

### 2. Citco's Fraudulent Conduct Permeated Redemption Payments to Defendants

Citco Fund Services (Europe) B.V. and its delegate Citco (Canada) Inc. (together, the "Citco Administrator") served as the Funds' administrator, and, in that capacity, received and reviewed subscription agreements, maintained share registers, calculated the Funds' NAVs, reviewed redemption requests, and issued corresponding certificates to

---

[2] The subscription agreements also bound beneficial owners to their terms. Compl. ¶ 24. Of 424 Defendants that contested personal jurisdiction during the 2016-2017 motion to dismiss briefing, 198 did not contest that they signed a subscription agreement and another 192 are beneficial shareholders of entities that signed subscription agreements. *See* Omnibus Bankr. Dkt. 1336 at 11.

investors. *Id.* ¶ 45. The Funds also engaged Citco Bank Nederland NV
Dublin Branch and Citco Global Custody as custodians. *Id.* ¶ 49.

At all relevant times, the Citco Administrator determined and cer-
tified NAVs in bad faith—based on BLMIS's stated returns, despite
knowing or recklessly disregarding the risk that BLMIS was a fraudulent
scheme. *Id.* ¶¶ 48-74. Executives at other Citco entities raised concerns
about BLMIS as early as 2000 but were told by their upper management
to stop pursuing such inquiries. *Id.* ¶¶ 50-55. Notwithstanding its duties
to the Funds, the Citco Administrator simply stopped trying to verify the
existence of the Funds' assets and, instead of resigning, ended its credit
relationships with the Funds to minimize its own exposure to BLMIS—
while leaving the Funds' investors exposed. *Id.* ¶¶ 57-65. To top it off, the
Citco Administrator negotiated an 800% increase in its custodian fees as
a condition of continuing to do business with the Funds, and further ne-
gotiated that the fees would be calculated as a percentage of the inflated
NAVs that the Citco Administrator itself certified. *Id.* ¶¶ 67-68.

### B. Procedural History

Shortly after BLMIS's fraud was revealed, the Funds entered liqui-
dation proceedings in the BVI and Plaintiffs were appointed as

liquidators responsible for protecting, realizing, and distributing assets for the Funds' estates. *Id.* ¶¶ 89-94. In pursuing assets for an equitable distribution among the Funds' investors, Plaintiffs sought to claw back inflated redemption payments in the BVI and the United States.

From 2010 to 2012, Plaintiffs filed 303 actions, either originally in or removed to the U.S. Bankruptcy Court for the Southern District of New York, to claw back over $6 billion in overpaid redemption payments. Plaintiffs asserted various BVI common law claims. In 188 actions, Plaintiffs also asserted statutory avoidance claims under both Section 245 of the BVI Insolvency Act, which allows a court to set aside an unfairly preferential transfer to a creditor, and Section 246 of the Act, which allows a court to set aside an undervalue transaction. Starting in late 2012, Plaintiffs amended 183 complaints to add BVI contract claims.

Over Plaintiffs' objection, the Bankruptcy Court stayed these actions for over five years pending the resolution of BVI proceedings involving redemption payments not at issue here. *See In re Fairfield Sentry Ltd.*, 596 B.R. 275, 291-92 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*"). In 2011, the BVI court ordered a "preliminary issues" trial on two discrete legal questions—whether various documents issued to investors

14

constituted binding certificates of NAV under the Articles, and whether redeeming investors gave good consideration by surrendering their shares. *Id.* The Bankruptcy Court stayed the U.S. actions pending a final ruling on those points. In 2014, the Judicial Committee of the Privy Council ruled in favor of the BVI defendants in *Fairfield Sentry Ltd. (in Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani*").[3] But *Migani* was limited to the issues presented in the BVI proceedings and did not resolve the U.S. proceedings. The Bankruptcy Court subsequently lifted its stay.

After the U.S. actions resumed, Plaintiffs moved for leave to amend to add allegations of Citco's bad faith and to assert contract claims in complaints they had not yet amended. *See* Omnibus Bankr. Dkt. 923. Defendants moved to dismiss Plaintiffs' claims in their entirety on various grounds, including lack of subject matter jurisdiction and personal jurisdiction, improper service, the purported applicability of Section 546(e), and failure to state a claim. *See* Omnibus Bankr. Dkt. 960.

Over the next four years, the Bankruptcy Court issued a series of rulings that include the subjects of this appeal.

---

[3] A compendium of foreign law authorities is attached as Exhibit B.

## C.    The Decisions Below

### 1.    *Fairfield I*

In August 2018, the Bankruptcy Court issued the first of the rulings at issue here: It found that the parties' subscription agreements, in which hundreds of Defendants consented to jurisdiction in New York courts for claims "with respect to this Agreement and the Fund," did not create personal jurisdiction over those Defendants. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *12 (Aug. 6, 2018) ("*Fairfield I*"). The court acknowledged that parties could consent to personal jurisdiction by contract, *id.* at *8, and that, if the subscription agreements and the Funds' Articles were integrated, then the "venue provisions would govern the redemption claims." *Id.* at *12. But the Bankruptcy Court concluded that the subscription agreements "were irrelevant" to Plaintiffs' claims, because the Privy Council had observed in *Migani* that the two preliminary issues there—neither of which dealt with personal jurisdiction—were governed by the Articles. *Id.*

The Bankruptcy Court declined to address Plaintiffs' additional arguments for personal jurisdiction based on Defendants' contacts with the

United States.[4] *Id.* The court also denied Defendants' motion to dismiss for lack of subject matter jurisdiction. *Id.* at *8.

### 2. *Fairfield II*

In December 2018, the Bankruptcy Court issued two additional rulings at issue here.

First, the Bankruptcy Court ruled that Section 546(e) could apply to transfers occurring entirely outside the United States. *Fairfield II*, 596 B.R. at 306-15. While acknowledging the long-standing presumption against extraterritorial application of U.S. laws, *id.* at 309, the Bankruptcy Court held that "[S]ection 561(d) makes the safe harbor applicable to proceedings brought by foreign representatives in a [C]hapter 15 case seeking to avoid purely foreign transfers under foreign insolvency laws." *Id.* at 310. The court did not decide whether Section 546(e) actually barred Plaintiffs' claims in this case, deferring that question for further briefing. *Id.* at 315.

---

[4] The Bankruptcy Court deferred decision so the parties could propose a process to resolve common issues without reaching individualized personal jurisdiction defenses. *Id*. The parties stipulated to be bound by any decisions on the merits while Defendants reserved their rights to contest personal jurisdiction. *See* Omnibus Bankr. Dkt. 1735.

Second, the Bankruptcy Court held that Plaintiffs' claims under Section 246 of the BVI Insolvency Act to avoid undervalue transactions reach only Defendants who "at the time of a redemption … had reason to believe that the NAVs were inflated, and the Defendant's shares were worthless." *Id.* at 303-05. The court thus found that Plaintiffs stated a claim under Section 246 against only so-called "Knowledge Defendants" who knew or suspected that the NAVs were inflated at the time of redemption—but not Defendants lacking contemporaneous knowledge.[5] *Id.* at 304-05.

In the same decision, the Bankruptcy Court granted Plaintiffs leave to amend their BVI constructive trust claims against the Knowledge Defendants but denied leave to amend their common law and contract claims against other Defendants and dismissed those claims. *Id*. at 316. Plaintiffs' appeal from this ruling is fully briefed and pending before this Court.

---

[5] The Bankruptcy Court rejected Defendants' argument that Plaintiffs failed to state a claim under Section 245 of the BVI Insolvency Act. *Fairfield II*, 596 B.R. at 302-06.

### 3. Decision on Plaintiffs' Motion for Leave to Amend

In April 2019, the Bankruptcy Court entered stipulated orders or settled orders implementing *Fairfield I* and *Fairfield II* in each action. The orders provided for final or partial final judgment with respect to Plaintiffs' BVI common law and contract claims and authorized Plaintiffs to amend their remaining pending complaints to assert BVI avoidance and constructive trust claims in accord with *Fairfield II. See, e.g.*, Omnibus Bankr. Dkt. 1769, 1854.

In January 2020, Plaintiffs moved for leave to further amend their complaints in 29 actions pending in Bankruptcy Court to satisfy *Fairfield II*'s standard for constructive trust claims by supplementing or adding individualized allegations of knowledge or imputation. *See* Omnibus Bankr. Dkt. 2873. In 12 of these actions, the prior constructive trust claims had been dismissed with prejudice in the April 2019 orders.

In August 2020, the Bankruptcy Court denied Plaintiffs leave with respect to these 12 actions—a ruling that Plaintiffs appeal here. *See In re Fairfield Sentry Ltd.*, 2020 WL 4813565, at \*4, 12 (Bankr. S.D.N.Y. Aug. 10, 2020). The Bankruptcy Court held that Plaintiffs' prior appeal of the dismissal of their constructive trust claims in *Fairfield II* divested

the court of jurisdiction over Plaintiffs' request to amend those claims, *id.* at *6, even though the proposed new claims were based on a new legal theory and different facts.

### 4. *Fairfield III*

After ordering additional briefing, *see* Omnibus Bankr. Dkt. 2926, 3028, in December 2020, the Bankruptcy Court issued the final ruling on appeal here, on the issue it had declined to address in *Fairfield I*: The court held that Section 546(e) barred Plaintiffs' BVI avoidance claims.[6] *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *6-9 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"). Specifically, the court held that Plaintiffs' claims did not fall under Section 546(e)'s carve-out for intentionally fraudulent claims, holding that exemption applies only to claims brought under Section 548(a)(1)(A)—which foreign representatives like Plaintiffs cannot bring. *Id.* at *8. In the alternative, the court held that the BVI Insolvency Act does not provide for an intentionally fraudulent transfer claim akin to Section 548(a)(1)(A). *Id.* at *8-9. And the court observed

---

[6] The Bankruptcy Court also held that Section 546(e) does not bar Plaintiffs' live BVI constructive trust claims and permitted alternative service on HSBC Suisse via service on its U.S. counsel. *Fairfield III*, 2020 WL 7345988, at *9-15.

that the Funds "could not have intended to 'hinder, delay or defraud' the Funds' other creditors" "if they were duped" by BLMIS's fraud, and suggested—without holding—that the Funds could not rely on the Citco Administrator's bad faith in establishing an intentionally fraudulent transfer claim. *Id.* at *9 and n.17.

## SUMMARY OF ARGUMENT

The Bankruptcy Court's rulings at issue in this appeal were errors of law that this Court should reverse.

First, the Bankruptcy Court erred in holding that Section 546(e) can apply extraterritorially. U.S. laws apply only domestically, unless Congress clearly indicates otherwise, and there is no indicia of such intent here. *See* Point I.A. Congress did not silently expand Section 546(e) to reach purely foreign transfers in Section 561(d). To the contrary, Section 561(d) explicitly limits avoidance powers "to the same extent" in foreign and domestic proceedings, so Section 546(e) cannot reach purely foreign transfers in either domestic or foreign proceedings. *See* Point I.B. Nor did Congress disguise its supposed extraterritorial intent in two items of "legislative history" for unenacted statutes that predated Section 561(d) by nearly a decade. *See* Point I.C. And Defendants cannot

salvage the Bankruptcy Court's ruling by arguing that applying Section 546(e) here would be domestic: Section 546(e) focuses on the transfers at issue, which here are purely foreign. *See* Point I.D.

Second, the Bankruptcy Court erred in holding that Section 546(e) bars Plaintiffs BVI avoidance claims here, reasoning that the only claims exempt from Section 546(e)'s safe harbor are those brought under Section 548(a)(1)(A), which domestic trustees can invoke but foreign representatives like Plaintiffs cannot. By giving greater avoidance powers to domestic trustees than foreign representatives, the court contradicted Section 561(d)'s command that avoidance powers be limited "to the same extent" in domestic and foreign proceedings. *See* Point II.A. The court also ignored the relevant statutes' focus on avoiding intentionally fraudulent transfers, not specific causes of action. *See* Point II.B. The court further was wrong to suggest that Plaintiffs could not rely on the Citco Administrator's fraudulent intent—accepted as true at the pleadings stage—to invoke Section 548(a)(1)(A)'s intentionally fraudulent transfer exemption. *See* Point I.C. And the court's ruling is bad policy, allowing foreign fraudsters to put ill-gotten assets beyond the reach of U.S. bankruptcy courts. *See* Point II.D.

Third, the Bankruptcy Court erred in holding that Plaintiffs could not state "undervalue transaction" claims under Section 246 of the BVI Insolvency Act against Defendants who did not know or suspect their valuations were inflated when they redeemed. Neither the statute's text nor leading foreign law imposes such a knowledge requirement; to the contrary, foreign authority requires courts to look at the "reality" of the transfers—not the parties' perceptions—and the transfers here were of effectively worthless shares for billions of dollars. *See* Point III.

Fourth, the Bankruptcy Court erred in holding that the subscription agreements' forum selection clause did not create personal jurisdiction over hundreds of Defendants. The clause creates jurisdiction in New York courts for any proceeding "with respect to" the subscription agreements and the Funds, and these actions are "with respect" to both. *See* Point IV.

Finally, the Bankruptcy Court erred in holding that Plaintiffs' prior appeal of the dismissal of their constructive trust claims divested the court of jurisdiction over Plaintiffs' motion for leave to amend such claims in 12 actions. An appeal divests a court of jurisdiction only of claims

"identical" to those on appeal, and the proposed amendments here involved a new legal theory and different facts. *See* Point V.

## ARGUMENT

## I.   SECTION 546(e) DOES NOT APPLY TO PURELY FOREIGN TRANSFERS

The Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States. *See Fairfield II*, 596 B.R. at 306-15. The redemption transfers at issue here were purely foreign. The Citco Administrator (a foreign entity) managed the share register and processed the redemption requests abroad, and the Funds (also foreign entities) transferred redemption payments to Defendants (also chiefly foreign entities). As Defendants concede (Omnibus Bankr. Dkt. 1457 at 19), every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States.

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation marks omitted).

Unless a statute contains a "clear" expression of Congress's "affirmative intention … to give [it] extraterritorial effect, [courts] must presume [the statute] is primarily concerned with domestic conditions." *Id*. A statute can apply extraterritorially only when "Congress has affirmatively and unmistakably instructed that the statute will do so." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2100 (2016). Absent such a statement, a federal statute applies extraterritorially only if the relevant conduct that was "the 'focus' of congressional concern" underlying the statute occurred domestically. *Morrison*, 561 U.S. at 266 (internal quotation marks omitted). Neither basis applies here.

## A. Congress Did Not Intend Section 546(e) to Apply Extraterritorially

"When a statute gives no clear indication of an extraterritorial application, it has none." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2d Cir. 2021) (internal quotation marks omitted). As the Bankruptcy Court implicitly recognized in *Fairfield II*, nothing in the text or legislative history of Section 546(e) indicates that Congress intended the provision to apply to conduct outside the United States. 596 B.R. at 310 & n.49. On the face of the Bankruptcy Code, Section 546(e) applies only to avoidance claims brought under U.S. law in domestic bankruptcy proceedings:

25

Section 546(e) appears in Chapter 5 of the Bankruptcy Code, which applies only in "a case under [C]hapter 7, 11, 12, or 13 of this title," each of which governs a domestic bankruptcy proceeding. 11 U.S.C. § 103. And Section 546(e) limits the avoidance powers of a "trustee," a term of art for a person appointed to represent a debtor's estate in a federal domestic bankruptcy proceeding. *Id.* at § 103(e). Because Section 546(e) "is silent as to extraterritorial reach," it cannot be said to have any. *Loginovskaya v. Batratchenko*, 764 F.3d 266, 271 (2d Cir. 2014).

No prior case held that Section 546(e) applies extraterritorially. The only court that appears to have considered the question "doubt[ed] that Congress intended section 546(e) to apply to … predominantly foreign transfers" even in domestic bankruptcy proceedings. *Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomms. (Luxembourg) II SCA*), 526 B.R. 499, 514 (Bankr. S.D.N.Y. 2015). And bankruptcy courts across the country are reaching consensus that the Bankruptcy Code's avoidance rules generally do not apply to extraterritorial transfers. *See In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020) ("The majority of cases … hold that §§ 547 and 548 do not have extraterritorial application."); *Maxwell Commc'n Corp. v. Societe General PLC* (*In re Maxwell*

26

*Commc'n Corp*.), 186 B.R. 807, 818-21 (S.D.N.Y. 1995) (holding that 11 U.S.C. § 547 does not apply extraterritorially*); Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V.* (*In re Sherwood Invs. Overseas Ltd.*), 2015 WL 4486470, at *18-22 (Bankr. M.D. Fla. July 22, 2015) (holding that § 548 does not apply extraterritorially). If the avoidance rules do not apply extraterritorially, the safe harbor exception to those rules cannot either, as "logically these are two sides of the same coin." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018).

## B. Congress Did Not Expand Section 546(e) to Reach Purely Foreign Claims in Section 561(d)

Eliding the absence of any "clear, affirmative statutory indication of extraterritoriality," *United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020), the Bankruptcy Court instead concluded that Section 546(e) applies extraterritorially by looking to Section 561(d). *See Fairfield II*, 596 B.R. at 310 ("[T]he correct question is whether [S]ection 561(d) makes [Section 546(e)] applicable to proceedings brought by foreign representatives in a [C]hapter 15 case seeking to avoid purely foreign transfer under foreign insolvency laws."). This was error.

The text of Section 561(d) contains no more indication of extraterritorial intent than Section 546(e) does. Section 561(d) is part of

Chapter 15 of the Bankruptcy Code, enacted in 2005 to allow parties to a

foreign bankruptcy proceeding to obtain assistance in U.S. courts as part

of an "inter-jurisdictional collaboration" in cross-border bankruptcies. *In*

*re Condor Ins. Ltd.*, 601 F.3d 319, 321 (5th Cir. 2010). Section 561(d) pro-

vides, in full:

> Any provisions of this title relating to securities
> contracts, commodity contracts, forward contracts,
> repurchase agreements, swap agreements, or mas-
> ter netting agreements *shall apply in a case under*
> *[C]hapter 15*, so that enforcement of contractual
> provisions of such contracts and agreements in ac-
> cordance with their terms will not be stayed or oth-
> erwise limited by operation of any provision of this
> title or by order of a court in any case under this
> title, and *to limit avoidance powers to the same ex-*
> *tent as in a proceeding under [C]hapter 7 or 11 of*
> *this title* (such enforcement not to be limited based
> on the presence or absence of assets of the debtor
> in the United States).

11 U.S.C. § 561(d) (emphasis added). It says nothing about any statute

applying extraterritorially.

By its terms, Section 561(d), at most, makes Section 546(e) applica-

ble in Chapter 15 proceedings "to the same extent" as in Chapter 7 and

Chapter 11 proceedings; in neither proceeding would Section 546(e) or its

sister provisions be deemed to apply to purely foreign transfers. The same

limitations should apply in Chapter 15 cases, as courts commonly read

28

"'same as' provisions," such as the portion of Section 561(d) italicized above, to "mandate ongoing equal treatment of two groups or objects." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019) (collecting cases); *see also Krys v. Farnum Place, LLC* (*In re Fairfield Sentry Ltd.*), 768 F.3d 239, 245-46 (2d Cir. 2014) (characterizing the term "to the same extent" used in a different provision of the Bankruptcy Code as an "express statutory command" mandating equal treatment). The Bankruptcy Court's ruling does not accord "equal treatment" to the limitations on avoidance powers across Chapters 7, 11, and 15. Instead, it would have Section 546(e)'s safe harbor prohibit the avoidance of *both* foreign and domestic transfers in Chapter 15 cases, but bar the avoidance of *only* domestic transfers in Chapter 7 and Chapter 11 cases. The Bankruptcy Court's ruling thus impermissibly expands the substantive reach of Section 546(e) in Chapter 15 proceedings.

The Bankruptcy Court's ruling rests chiefly on an irrelevant parenthetical at the end of Section 561(d). *See Fairfield II*, 596 B.R. at 308 n.47, 310. As the Bankruptcy Court acknowledged, this parenthetical refers to the "enforcement" of certain close-out rights referenced earlier in the

29

same subsection and in Section 561(a)—not to avoidance powers.[7] *Id.* at 310-11. Close-out rights are invoked *before* a transaction is settled. By contrast, avoidance involves clawing back transactions *after* they have settled. Nevertheless, the court relied on Section 561(d), which provides that the "enforcement of contractual provisions of [securities] contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of" Chapter 15, and the Section 561(d) parenthetical, which provides that "such enforcement [is] not to be limited based on the presence or absence of assets of the debtor in the United States." 11 U.S.C. § 561(d).

Even though the enforcement of close-out rights is indisputably not at issue here, the Bankruptcy Court concluded that since contractual close-out rights are to be enforced with respect to assets located abroad,

---

[7] Close-out rights are contractual rights that allow a party "to cause the termination, liquidation or acceleration of or to offset or net termination values, payment amounts or other transfer obligations arising under or in connection with" a securities contract, "because of a condition of the kind specified in section 365(e)(1)." 11 U.S.C. § 561(a); *see* 11 U.S.C. § 365(e)(1) (conditions being: (e)(1)(A) insolvency or financial condition of debtor pre-petition and during the case; (e)(1)(B) commencement of a case under the Bankruptcy Code); and (e)(1)(C) appointment of or taking possession by a trustee during the case, or a custodian before commencement of a case).

it must follow that avoidance powers cannot be exercised with respect to such assets. The court reasoned that it would be "absurd" to "protect" the transaction "at the front end" —when a party seeks to enforce a securities contract that provides for a transfer—if the same transfer could subsequently be "avoid[ed] … at the back end" through an avoidance claim to claw back the transfer after it was made. *Fairfield II*, 596 B.R. at 311.

The Bankruptcy Court was wrong in multiple ways.

First, Section 561(d) does not say that the geographical limits on enforcement rights and avoidance rights in Chapter 15 cases are coextensive. Courts may not apply an indication of extraterritorial application in one part of a statute to another part, but rather must "restrict an indication of extraterritorial application 'to its terms.'" *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 182 (2d Cir. 2014) (quoting *Morrison*, 561 U.S. at 265); *see also Wynns v. Adams*, 426 B.R. 457, 462-63 (E.D.N.Y. 2010) ("[W]hen Congress 'uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'") (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 682, 712 n.9 (2004)). Section 561(d) explicitly treats "enforcement" rights and "avoidance powers" as distinct, and provides that "enforcement" is "not to be

31

limited based on the presence or absence of assets of the debtor in the United States," but does not say the same thing about "avoidance." 11 U.S.C. § 561(d). By expanding Section 561(d) beyond its terms, the Bankruptcy Court erred.

Second, Section 561(d)'s "enforcement" parenthetical has nothing to do with the extraterritorial application of U.S. laws. It was intended to resolve an uncertainty in pre-Chapter 15 case law as to whether bankruptcy courts—whose jurisdiction, "at its core, is in rem," *see, e.g., Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006)—had the power to enjoin litigation in U.S. courts affecting a non-debtor's close-out rights if a debtor had no domestic assets, *see, e.g., Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007, 1010-12 (D.C. Cir. 1999) (holding that a bankruptcy court could enjoin a U.S. lawsuit affecting close-out rights even though the debtor had no U.S. assets but could not issue an order affecting the debtor's property); *In re Kingscroft Ins. Co.*, 138 B.R. 121, 126-27 (Bankr. S.D. Fla. 1992) (same). The parenthetical's intent is underscored by its focus on the "presence or absence of assets" (the language of in rem jurisdiction) rather than on where the conduct at issue occurred (the language typically used to express extraterritorial intent). *See, e.g., United States*

32

*v. Prado*, 933 F.3d 121, 137 (2d Cir. 2019) (statute expressly "specifies that its substantive prohibition applies … 'even though the [prohibited] act is committed outside the territorial jurisdiction of the United States'" (quoting 46 U.S.C. § 70503(b)). The parenthetical does not provide that any statute applies extraterritorially, and the Bankruptcy Court erred in concluding otherwise.

Finally, to the extent that the Bankruptcy Court was concerned that avoidance powers might be used to overcome the "front end" protection on enforcement of close-out rights, it invented a solution to a nonexistent problem: several express and independent provisions of the Bankruptcy Code bar the avoidance of transactions exercising close-out rights in Chapter 15 cases.[8] In any event, the transactions at issue are

---

[8] *See* 11 U.S.C. §555 (exercise of a contractual right "to cause the liquidation, termination, or acceleration of a securities contract … shall not be … stayed, *avoided*, or otherwise limited") (emphasis added); *id.* § 556 (same for commodities or forward contract); 559 (same for a repurchase agreement); *id.* § 560 (same for a swap agreement); *id.* § 561(a) (same for a master netting agreement). Under Section 103(a), these sections—including 307, 362(*o*), 555 through 557, and 559 through 562—explicitly apply in Chapter 15 proceedings. *Id.* § 103(a). Section 561(d) also makes applicable in Chapter 15 cases certain close-out-specific protections embedded in Sections 549(a), 550, and 553(b) concerning prepetition and post-petition transfers that later gain protection upon the maturation and exercise of close-out rights.

33

all settled; the meaning of Section 561(d) with respect to close-out rights is thus irrelevant here.

### C. The Bankruptcy Court Erred in Relying on Legislative History from Unenacted Bills Predating Section 561(d) by Nearly a Decade

The Bankruptcy Court tried to shore up its atextual reading of Section 561(d) with two extra-congressional sources that it said showed Congress's extraterritorial intent for Section 546(e). *Fairfield II*, 596 B.R. at 311. But these sources pertain to *unenacted* statutes and *predate* the passage of Section 561(d) by nine and seven years, respectively. Even if these sources of questionable provenance and limited relevance had some bearing on the meaning of Sections 546(e) and 561(d) (they do not), they come nowhere close to establishing the "affirmative" and "umistake-abl[e]" evidence required to overcome the presumption against extraterritoriality. *RJR Nabisco*, 136 S. Ct. at 2100; *see also Morrison*, 561 U.S. at 265 ("[W]hatever sources of statutory meaning one consults to give 'the most faithful reading' of the text, there is no clear indication of extraterritoriality here.").

The Bankruptcy Court pointed to (1) an unenacted statute proposed by the International Swaps and Derivatives Association, Inc. and the

Public Securities Association in 1996 (the "ISDA/PSA Proposal"), and (2) a 1999 report by the President's Working Group on Financial Markets that analyzed the potential international financial contagion that could have resulted from the collapse of a Cayman Islands fund operated by Long-Term Capital Management in the late 1990s (the "LCTM Report"). *Fairfield II*, 596 B.R. at 311-14. The court thought these sources indicated that, when Congress passed Section 561(d) years later in 2005, as part of a comprehensive statutory scheme to promote comity in cross-border bankruptcies, it intended "to provide broad protection to avoid the spread of financial contagion" and that "ISDA/PSA recognized that … financial contagion … did not stop at the border." *Id*. at 314.

Neither source contains a single statement addressing whether Section 546(e) should apply to foreign transfers in a Chapter 15 proceeding. The Bankruptcy Court concluded that the authors of these documents believed Section 546(e) should be expanded to foreign transfers because the sources reflected generalized concerns about market stability, *id*. at 311, 313—but the sources say no such thing. In fact, the Bankruptcy Court implicitly agreed that these sources are *silent* as to extraterritoriality, noting that "neither [Section 561(d)] nor the legislative history

35

suggests that the safe harbors are limited to U.S. creditors or U.S. mar-
kets." *Id.* at 314. Such silence (i.e., the absence of a "suggest[ion]" in leg-
islative history) cannot overcome the established presumption against
extraterritoriality.

Even if these sources had anything to say about extraterritoriality
(they do not), the Bankruptcy Court erred by relying on them to divine
the meaning of Section 561(d). Legislative history is relevant only if it
sheds light on *Congress*'s contemporaneous intent in enacting the *statute
at issue*—not on the hope that *others* might have had for a *different stat-
ute* proposed nearly a decade earlier. Neither source here was written by
Congress in 2005: The ISDA/PSA Proposal was written by securities in-
dustry lobbying groups in 1996 and the LCTM Report was issued by an
Executive Branch working group in 1999. *Fairfield II*, 596 B.R. at 311.
While Congress relied on recommendations submitted by the same work-
ing group in drafting the legislation that eventually became Sec-
tion 561(d), it gave no indication that it interpreted the LCTM Report to
require the extraterritorial application of Section 546(e).

36

### D.  Applying Section 546(e) to the Purely Foreign Claims at Issue Would Not be "Domestic"

Defendants cannot salvage the Bankruptcy Court's ruling by arguing that, under the second step of the *Morrison* analysis, the application of Section 546(e) would be purely "domestic." Under that second step, a statute will apply to extraterritorial conduct only if "the conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco*, 136 S. Ct. at 2094. "[T]he focus of the [Section 546(e)] inquiry is the transfer that the trustee seeks to avoid"—here, the transfer of funds from the Funds to the Defendant redeemers. *Merit Mgmt.*, 138 S. Ct. at 893; *see also Hosking*, 526 B.R. at 514; *cf. In re Picard*, 917 F.3d 85, 97-99 (2d. Cir. 2019) ("focus" of Code's avoidance recovery provision in Section 550(a) is initial "transfer" to be avoided). A party fails to establish "a permissible domestic application" of a statute when "nearly all of the conduct" relevant to the focus of the underlying statute occurred abroad. *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1935-37 (2021). Because it is undisputed that the transfers at issue here occurred entirely outside the United States—from foreign Funds to foreign Defendant redeemers—Defendants cannot show that Section 546(e) applies here under *Morrison*'s second step.

There is no merit to Defendants' contention before the Bankruptcy Court that Section 546(e) applies any time any party seeks to avoid a transfer in U.S. courts. Omnibus Bankr. Dkt. 1457 at 18. Defendants' limitless interpretation of Section 546(e) is foreclosed by precedent. *See Loginovskaya*, 764 F.3d at 272-73 (2d Cir. 2014) (rejecting argument that "procedural provisions" can be applied extraterritorially without limitation); *see also Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659, 1665 (2013) (applying presumption against extraterritoriality to statute granting federal courts jurisdiction over category of claims). Legislative history, moreover, shows that, in enacting Section 546(e) and its predecessors, Congress was concerned with the transfer to be avoided. *See* H.R. Rep. No. 97-420, at 1, *reprinted in* 1982 U.S.C.C.A.N. 583. Defendants cited no evidence suggesting Congress was instead concerned with where a claim or defense is litigated. Defendants thus cannot show that Section 546(e) should be applied to the transfers at issue here.

## II.  SECTION 546(e) DOES NOT BAR PLAINTIFFS' BVI AVOIDANCE CLAIMS

If this Court concludes that Section 546(e) applies extraterritorially (it should not), it should reverse the Bankruptcy Court's holding that Section 546(e) bars Plaintiffs' BVI avoidance claims here. *Fairfield III*, 2020

WL 7345988 at *6-8.[9] The claims seek to unwind transfers that were intentionally fraudulent and so are exempt from Section 546(e).

### A. The Bankruptcy Court's Ruling that Section 546(e) Bars Plaintiffs' BVI Avoidance Claims Conflicts with Section 561(d) by Giving Domestic Trustees Greater Avoidance Powers than Foreign Representatives

In holding that Section 546(e) bars Plaintiffs' BVI avoidance claims, the Bankruptcy Court improperly imposed greater limitations on avoidance powers in Chapter 15 than in Chapter 7 or Chapter 11 proceedings. Specifically, the court held that the carve-out to Section 546(e) for intentionally fraudulent transfers is limited to claims brought under Section 548(a)(1)(A), and then acknowledged that foreign representatives cannot bring claims under Section 548(a)(1)(A). *Fairfield III*, 2020 WL 7345988, at *8; *see also* 11 U.S.C. § 1521(a)(7). As Bankruptcy Court Judge Martin Glenn recently held in expressly rejecting *Fairfield III*, if this literally impossible standard applied in Chapter 15 proceedings, that

---

[9] If this Court agrees with Plaintiffs on Point I, it need not reach Point II. If the Court agrees with Plaintiffs on either Point I or Point II, then it should reverse the Bankruptcy Court's dismissal of (1) Plaintiffs' BVI avoidance claims under Section 245 of the BVI Insolvency Act; and (2) Plaintiffs' BVI avoidance claims under Section 246 of that Act against Knowledge Defendants. To reverse the Bankruptcy Court's dismissal of Plaintiffs' Section 246 claims against *non*-Knowledge Defendants, the Court must also agree with Plaintiffs on Point III, *infra*.

"would mean that there is effectively no exception to the safe harbor in such cases." *Bankruptcy Estate of Norske Skogindustrier ASA v. Cyrus Capital Partners, L.P.* (*In re Norske Skogindustrier ASA*), 2021 WL 1687903, at *36 (Bankr. S.D.N.Y. Apr. 29, 2021). That is, the Bankruptcy Court *barred* foreign representatives from avoiding intentionally fraudulent transfers.

The Bankruptcy Court's ruling—which provides greater powers to domestic trustees than to foreign representatives—conflicts with the plain text of Section 561(d) that avoidance powers in Chapter 15 proceedings are "limit[ed] … *to the same extent* as in a proceeding under [C]hapter 7 or 11." 11 U.S.C. § 561(d) (emphasis added). As noted *supra* at Point I.B, Section 561(d) indicates that Congress wanted to impose *the same* limitations on avoidance powers in Chapter 15 proceedings as in Chapter 7 and Chapter 11 proceedings. "Reading [S]ection 561(d) to effectively bar any exception to the [S]ection 546(e) safe harbor in a [C]hapter 15 case"—as the Bankruptcy Court did—"would limit avoidance powers *to a broader extent* than in a case under [C]hapter 7 or 11," as Judge Glenn recognized. *In re Norske Skogindustrier ASA*, 2021 WL 1687903, at *35 (emphasis in original).

40

The Bankruptcy Court erred in concluding that its ruling would not create asymmetry between the avoidance powers of foreign representatives and domestic trustees. The court reasoned that Plaintiffs' BVI avoidance claims are "sufficiently analogous to a state law fraudulent transfer claim that is barred" by Section 546(e) in a Chapter 7 or 11 proceeding. *See Fairfield III*, 2020 WL 7345988 at *8. But comparing foreign avoidance claims to state law claims "sets up a strawman that is wholly inapposite." *In re Norske Skogindustrier ASA*, 2021 WL 1687903, at *35. "State law avoidance claims are barred because [S]ection 546(e) preempts state law avoidance claims." *Id.* As the Bankruptcy Court elsewhere acknowledged, preemption does not apply to foreign law claims. *See Fairfield III*, 2020 WL 7345988 at *10; *see also In re Fairfield Sentry, Ltd.*, 2021 WL 771677, at *3 (Bankr. S.D.N.Y. Feb. 23, 2021) ("U.S. preemption law … does not apply to foreign law claims"). The Bankruptcy Court thus had no basis to conclude that Section 561(d) or Section 546(e) bar foreign avoidance claims like those at issue—especially as Chapter 15 creates a forum for such claims to be heard in the U.S. as a matter of comity. *See In re Condor*, 601 F.3d at 324; *Hosking v. TPG Capital Mgmt., L.P.* (*In re*

*Hellas Telecomms. (Luxembourg) II SCA)*, 535 B.R. 543, 568 (Bankr. S.D.N.Y. 2015).

### B. The Bankruptcy Court's Ruling Misreads Section 546(e), Which Does Not Apply to Intentionally Fraudulent Transfers Like Those at Issue

The Bankruptcy Court's ruling may be reversed on the independent ground that it misinterpreted the text of Section 546(e)'s carve-out as limited to causes of action that are both labeled "intentionally fraudulent transfer" and asserted under Section 548(a)(1)(A). In reality, the carve-out applies to all transfers made with actual fraudulent intent.

Section 546(e) is a partial limitation on a bankruptcy trustee's avoidance powers. It provides that a "trustee may not avoid [certain] *transfer[s]*" that meet a set of qualifications, except for transfers "under" Section 548(a)(1)(A). 11 U.S.C. § 546(e) (emphasis added). Section 548(a)(1)(A), in turn, states that "[t]he trustee may avoid *any trans-fer* … , if the debtor voluntarily or involuntarily made such *transfer* … with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted." 11 U.S.C. § 548(a)(1)(A) (emphasis added). Read together, Sections 546(e) and 548(a)(1)(A) provide that a trustee can avoid any transfers made with actual intent to defraud. *See Merit Mgmt.*,

42

138 S. Ct. at 893 (noting that Section 546(e) creates an "exception to the exception" by exempting "actually fraudulent transfer[s]" from Section 546(e)'s ambit).

By reading these statutes as exempting only "intentional fraudulent transfer *claims* [brought] under [Section] 548(a)(1)(A)," *Fairfield III*, 2020 WL 7345988, at *8 (emphasis added), the Bankruptcy Court essentially rewrote them to exempt only specific causes of action. But neither statute uses the term "cause of action," a choice that Congress made intentionally, as it used "cause of action" elsewhere in the Code. *See, e.g.*, 11 U.S.C. § 926(a) ("If the debtor refuses to pursue a cause of action under [S]ection 544, 545, 547, 548, 549(a), or 550, then on request of a creditor, the court may appoint a trustee to pursue such cause of action."); *see also Jaen v. Sessions*, 899 F.3d 182, 189 (2d Cir. 2018) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). As Judge Glenn explained, "[i]f Congress intended to … require that foreign statutes use the same language contained in [S]ection 548(a)(1)(A), it could have said so simply and clearly. It did not." *In re Norske*

*Skogindustrier ASA*, 2021 WL 1687903, at *35. As a matter of basic statutory construction, Section 546(e) exempts intentionally fraudulent transfers, regardless of the cause of action involved.

The Bankruptcy Court's reading was also contrary to the purpose of Section 546(e). "[T]he focus of the [Section 546(e)] inquiry is the *transfer* that the trustee seeks to avoid." *Merit Mgmt.*, 138 S. Ct. at 893 (emphasis added). The intentionally fraudulent transfer exception allows a trustee to recover transfers made to purposefully thwart or hamper a debtor's creditors. By focusing instead on the cause of action, the Bankruptcy Court prevents foreign representatives from clawing back transfers that are patently intentionally fraudulent. *Cf. In re Teleservices Grp., Inc.*, 444 B.R. 767, 808 (Bankr. W.D. Mich. 2011) ("[W]hat otherwise might be subject to avoidance as a preference (and, by analogy, a constructively fraudulent transfer) could also be subject to avoidance as an actually fraudulent transfer if the debtor had the requisite fraudulent intent."). As Judge Glenn put it, "[t]he inquiry whether the foreign statute is sufficiently analogous to [S]ection 548(a)(1)(A) must … be a flexible one, taking into account not only the language of the statute but also the broader context of the foreign legal regime, rather than a rigid

comparison of the language in the foreign statute and our own." *In re Norske Skogindustrier ASA*, 2021 WL 1687903, at *36. "Of equal or greater importance are the allegations in the pleading of the claim that a defendant seeks to dismiss." *Id.* Because the complaints allege that the transfers at issue were made with actual intent to defraud, they are exempt from Section 546(e).

## C. Plaintiffs Squarely Alleged that the Redemption Payments are Intentionally Fraudulent Transfers

Plaintiffs clearly alleged that the redemption payments were transferred with the intent to hinder, delay, or defraud the Funds' creditors because the Citco Administrator had motive (exorbitant fees calculated as a percentage of the inflated NAVs certified by the Citco Administrator itself, Compl. ¶¶ 67-68) and opportunity (authority to determine the NAVs, *id.* ¶¶ 36, 45) to commit or, at minimum, turn a blind eye to, fraud. These allegations easily satisfy the various tests for sufficiently pleading intentionally fraudulent transfers. *See Emps.' Ret. Sys. of Gov't Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015); *see also In re Lyondell Chem. Co.*, 554 B.R. 635, 652 (S.D.N.Y. 2016).

As explained by both Plaintiffs' *and Defendants'* foreign law experts, the Citco Administrator's fraudulent intent is attributable to the Funds, which authorized the transfers. *See* Omnibus Bankr. Dkt. 926 at ¶ 43 ("Knowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal[.]"); Omnibus Bankr. Dkt. 962 at ¶ 91 ("The same principle applies to attribute to the Funds the knowledge and state of mind of Citco, acquired through its officers, since Citco acted as the Funds' agent …."). The court did not dispute that Plaintiffs sufficiently pled the Citco Administrator's fraudulent intent.

The Bankruptcy Court erroneously suggested that Plaintiffs could not rely on the Citco Administrator's imputed intent because Plaintiffs alleged that the Funds believed the redemption payments represented actual BLMIS profits. *See Fairfield III*, 2020 WL 7345988 at *9 ("The Funds were the transferors and if they were duped, they could not have intended to 'hinder, delay or defraud' the Funds' other creditors by redeeming investments at prices they believed to be accurate."). As Defendants' own foreign law expert explained, however, an agent's knowledge is imputed to its principal "even though 'it is clear beyond doubt that the

46

principal was personally unaware of the relevant fact, and that therefore there has not been any communication by the agent.'" Omnibus Bankr. Dkt. 962 at ¶ 90. The Citco Administrator's intent thus is imputed to the Funds as a matter of law, not fact, *see id.*, rendering any allegations of the Funds' mistaken belief entirely beside the point. *See In re Norske Skogindustrier ASA*, 2021 WL 1687903, at *36 (noting that the requisite intent can be alleged "either directly or by imputation"); *see also Skandinaviska Enskild Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* ["*Weavering II*"], [2019] UKPC 36 ¶ 26 ("What matters in this case is that valuations were prepared on a fraudulent basis by the person to whom the directors had given actual authority to carry out the valuations."). The Bankruptcy Court had already correctly previously "concluded that Citco's bad faith is imputed to the [F]unds." *Fairfield II*, 596 B.R. at 306.

The Bankruptcy Court's observation that this imputation would allow the Funds to "rely on their own misconduct to recover the inflated redemption payments" is simply wrong. *Fairfield III*, 2020 WL 7345988, at *9 n.17. Plaintiffs are not acting for the benefit of the Funds; they are acting for the benefit of the Funds' stakeholders, many of whom lost most

47

or all of their investments. By design, a bankruptcy proceeding involves a trustee or representative tasked with preserving the size of the estate—often in cases where the bankruptcy was onset by some misconduct on the part of the debtor. *See Weavering II*, [2019] UKPC, ¶ 111. If the Bankruptcy Court's ruling were upheld, no trustee or foreign representative of an insolvent debtor could ever achieve justice for stakeholders by avoiding the debtor's intentionally fraudulent transfers which—by their very nature—require proof of the debtor's fraudulent intent.

### D. The Bankruptcy Court's Ruling Conflicts with Congressional Intent by Putting Fraudulently Obtained Foreign Assets Beyond the Reach of U.S. Courts

The Bankruptcy Court's ruling clashes with Congress's intent in an additional respect. Congress included a carve-out for intentionally fraudulent transfers in every version of Section 546(e) since the predecessor to that statute was first enacted in 1978. *See* Pub. L. No. 95-598, 92 Stat. 2549 (1978); Pub. L. No. 97-222, 96 Stat. 235 (1982); Pub. L. No. 98-353, 98 Stat. 333, 377 (1984); Pub. L. No. 101-311, 104 Stat. 267 (1990); Pub. L. No. 109-8, 119 Stat. 23 (2005); Pub. L. No. 109-390, 120 Stat. 2692, 2697-98 (2006). It would make no sense for Congress to suddenly (and implicitly) preclude only foreign representatives from being able to avoid

48

intentionally fraudulent transfers unless Congress affirmatively wished to "lend a measure of protection to debtors to hide assets in the United States out of the reach of the foreign jurisdiction." *In re Condor*, 601 F.3d at 327. This result—which would put monies swindled abroad beyond the reach of U.S. courts—is absurd and undermines the purposes of Chapter 15. *See United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results."). Absent reversal, the Bankruptcy Court's "rigid rule" would "risk the U.S. … providing a safe haven for looters and fraudsters of foreign company assets that are transferred to the U.S. and who use banks or brokers to help carry out their schemes." *In re Norske Skogindustrier ASA*, 2021 WL 1687903, at *36 & n.38.

## III. SECTION 246 PERMITS UNDERVALUE TRANSACTION CLAIMS AGAINST ALL DEFENDANTS, NOT JUST THOSE WHO KNEW THE REDEMPTIONS WERE UNDERVALUED

If this Court reverses the Bankruptcy Court's dismissal of the BVI avoidance claims (under either Point I or Point II), it should also reverse the Bankruptcy Court's dismissal of Plaintiffs' claims under Section 246 of the BVI Insolvency Act for failure to state a claim. That reversal would

restore Plaintiffs' BVI avoidance claims in full for resolution on the merits.

Section 246 provides that a company enters an "undervalue transaction" if, among other things, the transaction is "for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company." BVI Insolvency Act § 246(1)(b). The Bankruptcy Court erroneously ruled that Section 246 permits inquiry into the true value of the consideration given only if a Defendant knew or had reason to know that the consideration was worth less than the money received. *Fairfield II*, 596 B.R. at 303-05. The court's ruling rests on a misapplication of a key precedent, *Phillips v Brewin Dolphin Bell Lawrie* [2001] BCC 864.[10]

In *Phillips*, a leading English insolvency case concerning the valuation of consideration in undervalue transaction claims, A.J. Bekhor &

---

[10] House of Lords opinions like *Phillips* "are treated as binding" in the BVI "because, apart from rare exceptions, the judges of the House of Lords/Supreme Court on the one hand and those of the Privy Council, which is the de facto Supreme Court for the BVI, are the same." Omnibus Bankr. Dkt. 1338, ¶ 209; *see also Migani* [2014] UKPC 9, ¶ 17 (the principles of BVI law are, "[i]n every relevant respect … the same as those of English law").

Co. agreed to sublease computer equipment to Private Capital Group Ltd. in exchange for four annual installment payments. *Id.* ¶ 5. A.J. Bekhor defaulted in paying rent to the primary equipment lessors, the primary lessors recovered the equipment, and Private Capital treated the sublease as terminated. *Id.* In valuing the sublease to Private Capital, the court held that the economic reality of the transaction made clear that the sublease would not "survive for the four years necessary to enable all" annual payments to fall due. *Id.* ¶¶ 22-28. It thus was inappropriate to value the sublease as being worth all four years' worth of anticipated payments. *Id.* ¶ 28.

*Phillips* explained: "For the purposes of [the undervalue transaction statute] … , and the valuation of the consideration for which a company has entered into a transaction, *reality should … be given precedence over speculation.*" *Id.* ¶ 26 (emphasis added). Consistent with *Phillips*, other courts applying English law have looked to the facts surrounding a transaction, even if some of those facts were not known at the time of the payment. *See also Ailyan v. Smith*, [2010] EWHC 24 (Ch), ¶ 74 ("The cumulative effect of the factors mentioned … is … such that no one in their right mind with knowledge of them, let alone the hypothetical

purchaser I have postulated, would have been prepared to put money into it. … [T]hose same factors mean … the 'rights' he acquired were of a value in money or money's worth which was negligible, or at least 'substantially less' than the money paid for them.").

The Bankruptcy Court recognized that *Phillips* allows a court to "consider the value of the consideration with the benefit of … hindsight," *Fairfield II*, 596 B.R. at 304, but concluded that *Phillips* was limited to circumstances where "the value of [a transaction] was uncertain at the time it was given, and a post transaction event resolved the uncertainty and rendered [the transaction] worthless." *Id*. "[T]o take advantage of the rule laid down in *Phillips*," the Bankruptcy Court held, Plaintiffs "must plead, at a minimum, that at the time of a redemption, a Defendant had reason to believe that the NAVs were inflated and the Defendant's shares were worthless." *Id*. at 304-05.

The Bankruptcy Court's cramped reading of *Phillips* was stark error. That decision does not impose or imply a knowledge requirement.[11]

---

[11] *Joiner v George* [2003] BCC 298 (cited by the Bankruptcy Court) is immaterial because that case did not pertain to the valuation of consideration in the undervalue transaction context. As *Phillips* noted, valuation

By creating such a requirement out of thin air, the court undermined *Phillips*' clear rule that "reality should … be given precedence over speculation" in valuations under an undervalue transaction statute. *Phillips* [2001] BCC 864, ¶ 26. Applying *Phillips*' straightforward rule here, the redemption payments were undervalue transactions: BLMIS was a massive Ponzi scheme throughout its existence, including at the time of the redemptions. The Funds' shares were virtually worthless *in reality* when Defendants redeemed them, and the redemption payments thus were vastly inflated. *See* Compl. ¶¶ 7, 43, 86. These allegations are more than adequate to state a claim under Section 246.

## IV. THE SUBSCRIPTION AGREEMENTS ESTABLISH PERSONAL JURISDICTION OVER NEARLY ALL DEFENDANTS

The Bankruptcy Court erred in holding that the forum selection clause in the underlying subscription agreements was insufficient to establish personal jurisdiction over Defendants as to all claims.[12] *Fairfield I*, 2018 WL 3756343, at *8-12.

---

approaches "may not be uniform but may depend on the particular context in which the problem arises." *Phillips* [2001] BCC 864, ¶ 26.

[12] Plaintiffs also asserted personal jurisdiction over Defendants based on purposeful contacts, which is evaluated "on a case-by-case basis."

The parties' subscription agreements provide, in relevant part:

> *New York Courts.* Subscriber agrees that any suit, action or proceeding ("Proceeding") *with respect to this Agreement and the Fund* may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

Compl.¶ 23 (emphasis added). While the Bankruptcy Court held that the redeemer actions are "with respect to" the Fund, it held that the clause did not apply because the actions were not *also* "with respect to" the subscription agreements. *Fairfield I*, 2018 WL 3756343, at *10.

The Bankruptcy Court erred in finding that the actions were not "with respect to" the agreements. As the court acknowledged, "the phrase 'with respect to' is broad and synonymous with 'in relation to,' 'in

---

*Fairfield I*, 2018 WL 3756343, at *8 n.18. In the nearly three years since *Fairfield I*, the Bankruptcy Court still has not decided whether Plaintiffs have established bases for personal jurisdiction aside from the forum selection clause; the parties have yet to brief the issue and no briefing schedule has been set. Because this appeal stems from final judgments, and because a ruling for Plaintiffs would streamline the issues to be resolved on remand, it would be appropriate and efficient for this Court to resolve whether the forum selection clause establishes personal jurisdiction over the hundreds of Defendants bound by the subscription agreements.

connection with,' 'associated with', and 'with reference to.'" *Id.* at \*11; *see also Coregis Ins. Co. v. Am. Health Found. Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2011) (noting that the term "with respect to" is "synonymous" with "related to" and means "connected by reason of an established or discoverable relation"); *Lazare Kaplan Int'l v. KBC Bank NV*, 785 Fed. App'x 18, 19 (2d Cir. 2019) (same). The actions here are plainly "related to" the subscription agreements, as Defendants would have had no shares to redeem without the agreements. The agreements were the basis of the contractual relationship between the parties and *expressly incorporated* all other Fund documents, including the Articles that govern the legal issues in dispute here. *See* Omnibus Bankr. Dkt. 1337 at Exh. A, ¶ 1; *see also id.* ¶ 11 (discussing process for redemptions). In such circumstances, a plaintiff need only show that "the lawsuit is about a matter connected or associated with" the agreement. *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL 12932049, at \*45 (S.D.N.Y. July 17, 2012).

The Bankruptcy Court held to the contrary by reading the Privy Council's decision in *Migani* as stating that "the [s]ubscription [a]greement was irrelevant to *actions to recover the inflated redemption payments.*" *Fairfield I*, 2018 WL 3756343, at \*11 (emphasis added). The

Bankruptcy Court erred. *Migani* observed that "*none of the questions raised by the preliminary issues* depends on the terms of the [s]ubscription [a]greement." *Migani* [2014] UKPC 9, ¶ 20 (emphasis added). *Migani* did not hold that the agreements were irrelevant to *all* issues between the parties. Nor could it: The *Migani* court addressed only two specific "preliminary issues"—neither of which dealt with personal jurisdiction in U.S. courts—and nothing else. *Migani*'s simple observation provides no legal basis for the Bankruptcy Court's broad holding that the subscription agreements are "irrelevant" to all issues in these actions.

Moreover, the forum selection clause here does not require that the proceeding "arise from" or "depend on" the subscription agreements—it uses the broader phrase "with respect to." *See, e.g.*, *Redhawk Holdings Corp. v. Craig Invs., LLC*, 2016 WL 3636247, at *5 (S.D.N.Y. June 24, 2016) (distinguishing "narrow forum selection clauses [that] include terms such as 'arise out of,' 'arise from,' or 'arising under,'" from "broad forum selection clauses [that] usually include terms such as 'in connection with,' 'relating to,' '*with respect to*,' 'with reference to,' or 'associated with'" (emphasis added)). The fact that certain legal issues in these actions may be ultimately governed by the terms of the Articles, rather than

the terms of the subscription agreements, does not change the fact that these actions are related to those agreements.

Finally, even if the Bankruptcy Court's narrow interpretation of "with respect to" were correct (and it was not), the decision was still erroneous. The forum selection clause creates personal jurisdiction over actions "with respect to this Agreement and the Fund." The Bankruptcy Court erred by reading "and" as conjunctive: Under New York law, where "[n]othing on the face of [a] document shows that a literal construction of the word 'and' was intended," courts interpret "and" disjunctively. *Murphy v. Long Island Oyster Farms, Inc.*, 112 A.D.2d 276, 277 (2d Dep't 1985); *see also Lamborn v. Nat'l Park Bank of N.Y.*, 212 A.D. 25, 32 (1st Dep't 1925), *aff'd on other grounds* 240 N.Y. 520 (1925). While the Bankruptcy Court cited cases reading "and" to be conjunctive, *Fairfield I*, 2018 WL 3756343, at *10, each performed a contextual analysis of the contract language rather than mechanically applying a blanket rule.[13]

---

[13] *See BOKF, N.A. v. Caesars Entm't Corp.*, 162 F. Supp. 3d 243, 246 n.5 (S.D.N.Y. 2016) (noting that the meaning of "and" turns "on the context and usage in a particular contract"); *Sasson v. TLG Acquisition LLC*, 9 N.Y.S.3d 2, 4 (1st Dep't 2015) (holding that the use of the term "and" in a definition of a plural term was conjunctive); *Progressive Ne. Ins. Co. v.*

Here, the Bankruptcy Court's cramped interpretation of "with re-
spect to" combined with its conjunctive reading of the term "and" would
lead to the absurd result that there could exist disputes "with respect to"
the agreements but not "with respect to" the Funds, which would be liti-
gated outside of New York, whereas disputes "with respect to" both the
agreements and to the Funds would be litigated in New York. This out-
come would be especially odd given that the subscription agreements sep-
arately include a choice-of-law clause providing that the agreements
"shall be governed and enforced in accordance with the laws of New
York." Omnib. Bankr. Dkt. 1337 at Exh. A, ¶ 16. Under the Bankruptcy
Court's reading of the forum selection clause, disputes about enforcement
of the agreements would be subject to substantive New York law, but
would be heard outside New York depending on whether the dispute was
also "with respect to" the Funds, under the Bankruptcy Court's (errone-
ously) heightened standard. At a minimum, the question of whether the

---

*State Farm Ins. Cos.*, 916 N.Y.S.2d 454, 456-57 (4th Dep't 2011) (inter-
preting "and" to be conjunctive because of "[t]he structure of the sen-
tence" in which it is used); *Maxwell v. State Farm Mut. Auto. Ins. Co.*,
461 N.Y.S.2d 541, 543-44 (3d Dep't 1983) (meaning of the term "and" was
"plain and unambiguous" in contractual exclusion).

parties intended for the term "and" to be applied conjunctively or disjunctively is a question of fact that cannot be resolved on a motion to dismiss.

## V. THE BANKRUPTCY COURT ERRED IN DENYING PLAINTIFFS' MOTION TO AMEND AGAINST KNOWLEDGE DEFENDANTS IN TWELVE CASES

This Court should rule in Plaintiffs' favor on their prior appeal of the Bankruptcy Court's dismissal of the BVI common law and contract claims, in which case it need not reach the arguments in this Point V. If this Court does not reinstate those claims, it should reverse the Bankruptcy Court's denial of Plaintiffs' motion for leave to amend their BVI constructive trust claims against Knowledge Defendants in 12 actions where Plaintiffs had appealed the Bankruptcy Court's prior dismissal of those claims. *See In re Fairfield Sentry Ltd.*, 2020 WL 4813565, at *5-7.

An appeal divests the trial court of jurisdiction to "make a decision on a contested issue *identical* to one on appeal," an inquiry that parallels the standards for res judicata. *In re Prudential Lines, Inc.*, 170 B.R. 222, 244 (Bankr. S.D.N.Y. 1994) (emphasis added). "[T]he filing of a notice of appeal only divests the [trial] court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989).

Whether a claim is subject to res judicata (and thus divestiture) turns on "whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations.'" *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000). The key question is not whether the claims bear the same label but whether "the claims asserted … arise out of the same transaction or series of transactions or the same core of operative facts." *Beckworth v. Bizier*, 48 F. Supp. 3d 186, 199 (D. Conn. 2014).

The Bankruptcy Court erred by holding that Plaintiffs' motion for leave to amend is barred by the prior appeal of a claim that is fundamentally *different* from the one Plaintiffs seek to add in the proposed amended complaint. The issue resolved in *Fairfield II* and presented in Plaintiffs' prior appeal was whether Plaintiffs stated a constructive trust claim based on the *Citco Administrator*'s fraudulent or bad faith certification of the NAVs. The relevant issue presented in Plaintiffs' motion for leave to appeal, by contrast, was whether *Defendants* knew or should have known of the BLMIS fraud at the time they redeemed shares. The Bankruptcy Court erred in ruling that, notwithstanding these

differences, the proposed amended constructive trust claims were "iden-
tical" to the previously dismissed constructive trust claims. *See In re
Fairfield Sentry Ltd.*, 2020 WL 4813565, at *6.

While the Bankruptcy Court concluded that the claims were iden-
tical because they are based on the same transfers as the prior claims, it
erred in failing to analyze whether the claims arise from the "same core
of operative facts." *See id.* They do not. The proposed amended construc-
tive trust claims turn on individualized allegations that particular De-
fendants—not the Citco Administrator—knew or should have known of
BLMIS's fraud through transactions with Madoff or with other relevant
entities. *See, e.g.*, Omnibus Bankr. Dkt. 2873-25 at 18-44. The dismissed
constructive trust claims, in contrast, center on allegations of the Citco
Administrator's bad faith in calculating the NAVs—without respect to
Defendants' knowledge of the BLMIS fraud.

The fact that Plaintiffs did not initially plead facts pertaining to the
knowledge of individual Defendants is not evidence of a failure to exercise
diligence. Plaintiffs had no need to plead such allegations until the Bank-
ruptcy Court (wrongly) held in *Fairfield II* that the Citco Administrator's
knowledge was irrelevant to proving a constructive trust claim under BVI

law. Plaintiffs reasonably sought leave to add such allegations after *Fairfield II* was issued. The bases for at least some of Plaintiffs' amended factual allegations, moreover, were not publicly known until pleaded by the BLMIS trustee in other litigations *after* Plaintiffs filed their prior complaints. When the facts underlying a new claim "could not have been discovered with due diligence," res judicata does not apply. *Saud v. Bank of New York*, 929 F.2d 916, 920 (2d Cir. 1991). For the same reason, divestiture does not bar the proposed amended complaints.

## **CONCLUSION**

This Court should (1) reverse the Bankruptcy Court's dismissal of the BVI avoidance claims in full; (2) reverse the Bankruptcy Court's determination that the subscription agreements are insufficient to establish personal jurisdiction; and (3) reverse the Bankruptcy Court's denial of Plaintiffs' motion to amend as to the 12 actions specified in Exhibit C.

Date: July 21, 2021
New York, NY

Respectfully submitted,

SELENDY & GAY PLLC

*/s/ David Elsberg*
David Elsberg
Caitlin J. Halligan
Andrew R. Dunlap
Lena Konanova
Ester Murdukhayeva
Ryan Allison
Evan Bianchi
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
delsberg@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
emurdukhayeva@selendygay.com
rallison@selendygay.com
ebianchi@selendygay.com

-and-

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs-*
*Appellants Foreign*
*Representatives*

63

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) and the Court's Individual Rules & Practices in Civil Cases 5(c) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), this document contains 12,617 words.

This document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Office 365 64-bit and is set in Century Schoolbook, 14-point font.

Dated:  July 21, 2021                    By: */s/ David Elsberg*
       New York, NY                         David Elsberg