NASON YEAGER GERSON HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
Tel: (561) 686-3307
Fax: (561) 686-5442
Gary A. Woodfield

*Attorneys for Frank Avellino, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | ADV. PRO. NO. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>FRANK J. AVELLINO, *et al.*,<br><br>Defendants. | ADV. PRO. NO. 10-05421 (CGM) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

LEGAL STANDARD ................................................................................................ 10

ARGUMENT ........................................................................................................... 11

I.  THE DOCTRINE OF LAW OF THE CASE IS NOT APPLICABLE ................ 11

II.  THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE THAT
THE TRANSFERS TO THE DEFENDANTS DURING THE TWO-YEAR
PERIOD SHOULD BE VOIDED ..................................................................... 12

A.  The Defendants' Relationship with BLMIS was that of a
Traditional Customer/Broker Dealer, Market Maker ............................. 13

B.  The Statements and Confirmations Received from BLMIS Confirmed
Legitimate Transactions ......................................................................... 15

C.  The Trustee has Failed to Prove that BLMIS Made the Transfers
with Actual Fraudulent Intent ................................................................ 16

D.  Dubinsky's Opinions Regarding the Securities Industry, and
his Testimony Consisting of Legal Conclusions, Speculation, State of
Mind Opinions and Narrative Facts About Which He Lacks Personal
Knowledge re Inadmissible and Should Not Be Considered to Support
the Trustee's Prima Facie Case .............................................................. 18

E.  The Trustee Cannot Rely on Inadmissible Evidence to Support His
Prima Facie Case ................................................................................... 23

F.  Even Assuming *Arguendo* the Trustee Has Established His Prima Facie
Case, The Trustee's Calculation of the Defendants' Net Equity Using
the Net Investment Method is Inappropriate and Inapplicable to
Defendants .............................................................................................. 27

III.    11 U.S.C. § 548(c) PRECULDES THE TRUSTEE'S ABILITY TO OBTAIN
SUMMARY JUDGMENT ................................................................................29

A.  Defendants received the transfers in good faith and for value
pursuant to 11 U.S.C. § 548(c) ......................................................................29

B.  Good Faith is Inappropriate for Summary Judgment .....................................35

IV.    AN AWARD OF PREJUDGMENT INTEREST WOULD BE TO
DISREGARD RATHER THAN APPLY EQUITABLE STANDARDS ...................37

V.    CONCLUSION ..................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Adelphia Recovery Tr. v. Bank of Am., N.A.*
  2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011) ............................................... 12

*Andrews v. Metro N. Commuter R.R. Co.*
  882 F.2d 705 (2d Cir. 1989) ................................................................. 23

*Aramony v. United Way of Am.*
  254 F. 3d 403 (2d Cir. 2001) ................................................................ 11

*Bank Brussels Lambert v Credit Lyonnais (Suite) S.A.*
  168 F. Supp. 2d 57 (S.D.N.Y. 2001) ........................................................ 27

*Bank of Communications v. Ocean Dev. Am., Inc.*
  904 F. Supp. 2d 356 (S.D.N.Y. 2012) ...................................................... 36

*Bd. of Trs. of the Aftra Ret. Fund v. JP Morgan Chase Bank, N.A.*
  2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .............................................. 23

*Berk v. St. Vincent's Hospital and Medical Center*
  380 F. Supp. 2d 334 (S.D.N.Y. 2005) ...................................................... 21

*Chambers v. TRM Copy Centers Corp.*
  43 F.3d 29 (2d Cir. 1994) .................................................................... 11

*Dallas Aerospace, Inc. v. CIS Air Corp.*
  352 F. 3d 775 (2d Cir. 2003) ................................................................ 10

*Davis v. Carroll*
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ...................................................... 21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
  504 U.S. 451 (1992) ................................................................. 10, 23, 26

*Est. of Seymour Epstein*,
  Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ........... 12

*Flinn Realty Corp. v. Charter Const. Co.*
  181 A.D. 610 (App. Div. 1918) ............................................................... 31

*Gould Invs., L.P. v. Gen. Ins. Co. of Trieste & Venice*
  737 F. Supp. 812 (S.D.N.Y. 1990) .......................................................... 10

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier*
  2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ..................................................... 10

*Highland Capital Mgmt., L.P. v. Schneider*
  379 F. Supp.2d 461 (S.D.N.Y. 2005) ..................................................... 23

*In re Bernard L. Madoff Inv. Sec. LLC*
  557 B.R. 89 (Bankr. S.D.N.Y. 2016) ..................................................... 1, 31, 33

*In re Bernard L. Madoff Inv. Securities, LLC*
  664 F.3d 229, (2d Cir. 2011) ..................................................... 13

*In re Bernard L. Madoff Investment Securities, LLC v. Citibank, N.A.,*
*and Legacy Capital, Ltd.*
  12 F. 4th 171 (2d Cir. 2021) ..................................................... 17, 30, 31, 35

*In re Blech Sec. Litig.*
  2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ..................................................... 21

*In re Brizinova*
  588 B.R. 311 (Bankr. E.D.N.Y. 2018) ..................................................... 11

*In re Refco, Inc. Sec. Litig.*
  2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ..................................................... 18

*In re Tribune Company Fraudulent Conveyance Litigation*
  2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ..................................................... 18

*In re Pilgrim's Pride Corp.*
  442 B.R. 522 (Bankr. N.D. Tex. 2010) ..................................................... 12

*Major League Baseball Props., Inc. v. Salvino, Inc.*
  542 F.3d 290 (2d Cir. 2008) ..................................................... 23

*Marvel Characters, Inc. v. Kirby*
  726 F.3d 119 (2d Cir. 2013) ..................................................... 25

*Matter of Roberts Real Estate v. New York State Dept. of State, Div. Of Licensing Servs.*
  80 N.Y.2d 116 (1992) ..................................................... 32

*Meridian Horizon Fund, LP v. KPMG (Cayman)*
  487 Fed. Appx 636 (2d Cir. 2012) ..................................................... 34

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
  89 Fed. Appx 287 (2d Cir. 2004) ..................................................... 35

*New Times Secs. Servs.*
   371 F.3d 68 (2d Cir. 2004) ................................................. 28

*Parsons v. Honeywell, Inc.*
   929 F.2d 901 (2d Cir. 1991) ................................................. 26

*Picard v. Jaba Associates, L.P.*
   528 F. Supp. 3d 219 (S.D.N.Y. 2021) ........................................ 12, 24, 40

*Picard v. Lisa Beth Nissenbaum Tr.*
   2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ................................ 12, 24

*Picard v. Miller*
   631 B.R. 1 (Bankr. S.D.N.Y. 2021) ........................................ 12

*Picard v. Sage Realty*
   2021 WL 1987994 (S.D.N.Y. May 18, 2021) ................................ 28

*Picard v. The Gerald and Barbara Keller Fam. Tr.*
   634 B.R. 39 (Bankr. S.D.N.Y. 2021) ........................................ 12

*Robertson v. Seidman & Seidman*
   609 F.2d 583 (2d Cir. 1979) ................................................. 35, 36, 37

*Rodriguez v. Mod. Handling Equip. of N.J., Inc.*
   604 F. Supp.2d 612 (S.D.N.Y. 2009) ........................................ 26

*Rogoz v. City of Hartford*
   796 F.3d 236 (2d Cir. 2015) ................................................. 26

*Schmidt v. McKay*
   555 F.2d 30 (2d Cir. 1977) ................................................. 36

*Scott v. Chipotle Mexican Grill, Inc.*
   315 F.R.D. 33 (S.D.N.Y. 2016) ............................................. 23

*Scott v. City of New York*
   591 F. Supp.2d 554 (S.D.N.Y. 2008) ........................................ 27

*SEC v. U.S. Envtl., Inc.*
   2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ................................ 22

*Sec. Inv. Prot. Corp. v. BLMIS*
   610 B.R. 197 (Bankr. S.D.N.Y. 2019) ...................................... 24, 25

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
   624 B.R. 55 (Bankr. S.D.N.Y. 2020) ........................................ 39, 40

*Sec. Inv'r. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
  563 B.R. 737 (Bankr. S.D.N.Y. 2017)................................................................... 10

*Stern v. Marshall*
  564 U.S. 463 (2011) ............................................................................................ 40

*Unicorn Crowdfunding, Inc. v. New St. Enter, Inc.*
  507 F.Supp.3d 547 (S.D.N.Y. 2020) .................................................................. 26

*United States v. Lombardozzi*
  491 F.3d 61 (2d Cir. 2007) ................................................................................. 24

*Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*
  955 F.2d 831 (2d Cir. 1992) ........................................................................... 37, 38

*Wiener v. AXA Equitable Life Ins. Co.*
  2019 WL 1228074 (S.D.N.Y. Mar. 15, 2019).......................................................... 22

Statutes

11 U.S.C. § 548(c) ................................................................................... 2, 29, 34

11 U.S.C. § 548(a)(1)(A) ................................................................................. 1

11 USC § 548(a) ................................................................................... 12, 30

11 U.S.C. § 550.............................................................................................. 1

15 U.S.C. § 78fff-2(c) ................................................................................ 28

15 U.S.C. § 202(a)(11) .............................................................................. 14

Rules

Fed. R. Bankr. P. 7056 ................................................................................ 10

Fed. R. Bankr. P. Rule 7002 ......................................................................... 1

Fed. R. Civ. P. Rule 56(a) ....................................................................... 1, 10

Fed. R. of Evidence 807............................................................................... 24

FINRA Rule 3260 ........................................................................................ 15

Defendants submit this memorandum of law, pursuant to Fed. R. Civ. P. Rule 56(a), as incorporated in Fed. R. Bankr. P. Rule 7002, and Local Rule 7056-1, in opposition to Plaintiff, Irving H. Picard, as Trustee's ("Trustee") Motion for Partial Summary Judgment (the "Motion").

## PRELIMINARY STATEMENT

The Trustee's Amended Complaint seeks to recover over $900 million from thirty-five defendants, which include Frank Avellino ("Frank"), his wife, Nancy Avellino ("Nancy"), Dianne Bienes, individually and as the Personal Representative of the Estate of Michael Bienes, her husband ("Dianne"), their families, family trusts, a charitable foundation and other entities in which Defendants had an interest.

On July 21, 2016, Judge Bernstein granted, in part, Defendants' motion to dismiss the Amended Complaint, dismissing all claims arising from initial transfers that occurred prior to January 1, 2001. *In re Bernard L. Madoff Inv. Sec. LLC,* 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016), *reconsideration denied,* 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (*"Avellino Decision"*).

By his Motion, the Trustee seeks to recover on Count I of the Amended Complaint transfers made within two years from December 11, 2008, the bankruptcy filing date, against Defendants, Mayfair Ventures, G.P. ($2.5 million), Grosvenor Partners, Ltd. ($2.5 million), Aster Associates ($3.5 million) and St. James Associates ($8.7 million), together with prejudgment interest, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550. Additionally, under Count XII the Trustee seeks judgment against the general partners of these entities, who are identified in Exhibit A attached hereto.

Defendants do not dispute the Trustee's calculations of the transfers it seeks to recover. However, they dispute the Trustee's characterization of such payments as "fictitious profits" that

1

are part of a Ponzi scheme. Defendants did not invest in a Ponzi scheme. Defendants' relationship with Bernard L. Madoff Investment Securities ("BLMIS") was that of a traditional customer/broker-dealer and market maker. The trades of securities reflected on Defendants' monthly statements and contemporaneous confirmations received from BLMIS confirmed the existence of legitimate transactions of real securities. This customer/broker dealer relationship and the validity of the securities transactions are supported by the operative documents, the rules and regulations of the securities industry, the custom and practice in the securities markets and the Defendants' expert.

Furthermore, the Trustee has failed to meet his burden of proving that the transfers to Defendants were made with actual intent to defraud. Moreover, the transfers were made in good faith and for value. Accordingly, the Trustee's Motion to recover funds transferred to the Defendants should be denied.

Assuming *arguendo* the Court concludes the Trustee is entitled to recover the transfers, the Trustee's utilization of the Net Investment Method, which ignores the securities held in the Defendants' accounts, rather than the Last Statement Method to determine the Defendants' net equity is flawed and should not be applied to the Defendants.

## FACTUAL BACKGROUND

The Trustee cites facts which purport to establish that BLMIS' Investment Advisory Business ("IA Business") was a Ponzi scheme. However, Defendants were not customers of the IA Business; their relationship with BLMIS was that of a traditional customer/broker-dealer and market maker. Declaration of Stanley Fortgang dated April 5, 2022, ("Fortgang Decl.") Exhibit A (Expert Report of Stanley I. Fortgang, dated June 5, 2020 ("Fortgang Report")) at 5-7. BLMIS' broker-dealer/market maker business was legitimate, made actual trades and was profitable.

Declaration of Gary A. Woodfield in Opposition to Trustee's Motion for Partial Summary Judgement, dated April 5, 2022 ("Woodfield Decl."), Ex. 1 (Madoff's December 20, 2016 deposition in *SIPC v. BLMIS,* Adv. Pro. No. 08-01789) Tr. 63:12-25; 64:1-10; Woodfield Decl. Ex. 2 (Madoff's April 26, 2017 deposition in *SIPC v. BLMIS,* Adv. Pro. No. 08-01789*)* Tr. 127:5-20; Woodfield Decl. Ex. 3 (Dubinsky's May 8, 2019 testimony in *Picard v Nelson*, Adv. Case Nos. 10-04377 and 10-04658) Tr. 64:10-12; 73:22-25.   Defendants rely on their Objections and Responses to the Trustee's Statement of Material Facts to address the Trustee's facts relating to IA Business as a Ponzi scheme.   See, for example, Defendants' Objections to Plaintiff's Statement of Facts, ¶¶ 29, 34, 39, 56, 58, 71 and 128.

Both the Trustee and his expert, Bruce G. Dubinsky[1] ("Dubinsky") spend an inordinate amount of time setting forth their version of the facts relating to non-party A&B's alleged involvement with BLMIS prior to 1992 and during the 1992 SEC investigation of A&B.  However, these events, remote in time and involving different issues, are not relevant to the facts and issues raised in the Trustee's Motion.   Moreover, the Trustee contrives his erroneous conclusions and inferences on inferences from these facts, rather than upon admissible, relevant evidence. These arguments, therefore, should not be considered as support for the Trustee's Motion.

Assuming, *arguendo*, that the Court determines the pre-1992 events are relevant, the illusions created by the Trustee and Dubinsky that Frank and Michael Bienes ("Michael") participated at all – much less knowingly – in BLMIS's alleged Ponzi scheme are erroneous.  The Trustee has distorted and embellished facts and has merged the identities of Defendants to make

---

[1]   The Trustee provides two reports by his expert, Bruce G. Dubinsky – the Proof of Fraud/Insolvency Expert Report, dated January 16, 2019 (the "Fraud Report"), and the Expert Report of Bruce G. Dubinsky for the Frank Avellino et al. Action, dated June 5, 2020 (the "Avellino Report").  See Dubinsky Declaration, dated February 3, 2022, Attachments A and B, respectively.

it appear as if Defendants who took none of the alleged actions participated in them. For example, the Trustee paints the picture that Frank and Michael "partnered" with Madoff's father-in-law, Alpern, and "joined him," in the inception of the fraud when the evidence cited by the Trustee is that Alpern did not allow Frank or Michael near those accounts.[2]  Trustee's Memorandum of Law in Support of Trustee's Motion for Partial Summary Judgment ("Trustee's Memo") at 8-9; Griffin Decl.,[3] Ex. 21 (Frank deposition) Tr. 25:24-25; 26:1-13; 29:25-30:15. The Trustee also cites to Frank for the conclusion that A&B solicited customers by promoting a risk free investment. Trustee's Memo at 9.  However, the Trustee's conclusion is based upon another person's flyer which Frank was adamant that he had never seen and did not know had been distributed.  Griffin Decl., Ex. 26 (Depo of A & B in *In the Matter of King Arthur,* SEC file No: MNY-1490) Tr. 125:3-135:19.

The Trustee's case relies heavily upon the argument that Frank provided to the SEC "corrected" BLMIS brokerage statements to be consistent with his and Michael's SEC testimony regarding Madoff's investment strategy and the makeup and value of the investments in A&B's accounts with Madoff.  Trustee's Memo at 10-14.  However, there is no evidence that supports the conclusion that either Frank or Michael knew the statements were "corrected" by Madoff or that the statements sent to the SEC were different or "corrected" from the statements A&B maintained and the SEC reviewed at A&B's office.

Frank testified that A&B only retained three years of its customers' BLMIS statements because three years were the open years for taxes.  Griffin Decl., Ex. 21, Tr. 146:13-23.

---

[2] The Trustee also blurs the distinction between Frank and Michael by, for example, referencing "Avellino and Bienes" when he is referring to the entity A&B.  Trustee's Memo at 10-14; Defendants' Opposition to Plaintiff's Statement of Facts at ¶¶ 53, 54 et. seq.

[3] "Griffin Decl." refers to Declaration of Regina Griffin in Support of Trustee's Motion for Partial Summary Judgment dated February 3, 2022.

Additionally, he testified that the brokerage statements could be obtained from BLMIS directly, and Frank wrote to Madoff asking him to send the brokerage statements directly to Price Waterhouse, which had been designated to receive them by the SEC. Woodfield Decl., Ex. 4 (Frank letter to Madoff, dated Dec. 9, 1992). Price Waterhouse confirmed that it received the statements directly from Madoff. Woodfield Decl., Ex. 5 (Affidavit of Frederick Werblow dated Jan. 15, 1993, ¶22). Frank affirmatively confirmed that he was not aware of nor involved in any "corrected" statements to be provided to the SEC. Woodfield Decl., Ex. 13 (Frank's deposition in *P&S v. M. Sullivan, et al.,* Circuit Court, Broward County, Florida, Case No. 12-034123(07) ("*P&S*") Tr. 13:18–16:1-19. Although Dubinsky's report contends that Frank was involved in the "correction" of the statements, and thereafter received them from Madoff and presented them to Price Waterhouse – there is no evidence to support this contention. Dubinsky makes this leap throughout his Avellino Report at 8, 50 and 62.

In fact, the evidence referred to by Dubinsky as support for his theory does not support it. Dubinsky refers to July 15 and August 4, 1992 letters sent by Frank to the SEC as evidence confirming Frank sent the "corrected" brokerage statements to the SEC. Avellino Report at 52. However, both these letters are from Frank's counsel, not Frank, and neither includes copies of the brokerage statements supposedly enclosed, nor do they refer to account numbers. Nor is there testimony that the "corrected" brokerage statements had been returned to Frank. Annette Bongiorno, cited by Dubinsky, testified that she did not remember sending copies of the changes to Frank, and that it was Frank DiPascali and Madoff who directed her to make the changes; she did not work with or speak to anyone from A&B regarding changes to the brokerage statements, and had no knowledge that anyone at BLMIS communicated at all with anyone at A&B about these statements or making changes to them. Griffin Decl., Ex. 27, (Bongiorno deposition) Tr.

140:24-25; 141:1-10; 168:5-22; 185:1-7; 208:8-25; 209:1-19; 210:4-24; 211:12-25; 212:1-17.

Frank DiPascali[4], also cited by Dubinsky, did not testify regarding the alleged return of the "corrected" statements to Frank.

Dubinsky also relies heavily on an envelope which was marked "confidential" and found in BLMIS' records and purported to be from Frank to Madoff. Avellino Report at 50-51. Dubinsky states that brokerage statements and handwritten ledgers were contained in the envelope. However, there is no testimony from any witness confirming what documents were in the envelope; whether the envelope was found sealed or unsealed; whether the documents found in the envelope were there when the envelope was purportedly provided to Madoff, or whether documents were taken out/put in the envelope over the years. Dubinsky cites Frank's deposition testimony for support that Frank sent the envelope to Madoff, Avellino Report at 50, but Frank testified he did not recall sending such envelope, did not know the contents of the envelope, was not asked to send monthly statements and did not return monthly statements to BLMIS.[5] Griffin Decl., Ex. 21, Tr. 93:21-25; 94:1-3; 183:18-25; 184:1-9; 191:10-25; 192:1-21. If brokerage statements were in fact returned by Frank to Madoff, there was no testimony that any person asked Frank to return the brokerage statements so they could be altered, or that Frank had knowledge that the statements were being requested so that they could be altered. In fact, it is just as reasonable to conclude that if Frank sent the statements to Madoff he did so for Madoff to know which ones to add to make an entire package of those requested by the SEC.

Furthermore, Dubinsky concludes that Frank would have known that the statements were not consistent with his testimony of Madoff's investment strategy because he reviewed and

_____

[4] Defendants object to the use of DiPascali's trial testimony. See Point II E, *infra*.
[5] It is hardly surprising that in 2019 when he was deposed that Frank (then 83 years of age) did not recall events of more than twenty-five years ago. Am. Compl., ECF # 86, ¶ 30.

analyzed the statements. However, this is circular reasoning.  If Frank was part of the Ponzi scheme

and had knowledge of it, it would be logical that his testimony would have been consistent with

what was shown on the statements, and there would have been no reason for "corrected"

statements.  Frank, as shown by his testimony, did not have knowledge or an understanding of

investments, hedging, or any other investment strategies used by Madoff or any other broker.

Griffin Decl., Ex. 21, Tr. 117:22-25; 119:20-21; 124:10-22.  Frank reviewed the statements only

to calculate the profits and losses for purposes of filing tax returns. Griffin Decl., Ex. 21, Tr. 31:16-

20; 57:6-12; 90:20-21.[6]   Frank did not review the statements to determine what particular stocks

were purchased; what volume of stocks were purchased; or whether the returns for the investments

were accurate.  Griffin Decl., Ex. 21, Tr. 57:5-12; 90:18-25; 124:20-22.

Finally, Dubinsky relies on the alleged omission of treasuries on the brokerage statements

and the opening of a "new account" reflecting treasuries on statements provided to Price

Waterhouse.  However, it was Frank's understanding that the treasuries were picked up at the end

of a specific period, Griffin Decl., Ex. 21, Tr. 119:22-23; 120:1-4, and, in fact, there were treasuries

noted on brokerage statements. Woodfield Decl., Ex 6 (A&B BLMIS statements). Since Frank did

not have knowledge of the corrected statements, he could not have been aware of an alleged new

account purportedly created by Madoff reflecting treasuries.

---

[6] Dubinsky expands what Frank allegedly should have been looking for on the statements based
on his "experience as a CPA and investment advisor when investing clients".  Avellino Report at
35.  However, this ignores the fact that Frank was not an investment advisor and was not investing
for clients. The same flawed reasoning applies to Dubinsky's statement that Frank should have
understood the importance of his signing confirmation requests.  Avellino Report at 36-37.  Frank,
like all customers of brokerage accounts, was sent each year one month's brokerage statement and
asked to confirm the statement is correct – confirmation of the statement does not confirm the
trades were actually made, at the price and volume indicated on the statement because customers
do not have access to such information.

Although the Trustee often refers to "A&B" and Avellino and Bienes interchangeably, they are different parties with different roles throughout the relevant time period. The Bienes had virtually nothing to do with the operations or management of A&B, Grosvenor, Mayfair Ventures, or any Defendant except for St. James, which was not created until in or about 2004. Griffin Decl., Ex. 21, Tr. 25:24-25; 26:1-25; 32:12-32:16; Woodfield Decl., Ex. 7 (Michael Bienes' Verified Answers and Objections to Plaintiffs' First Set of Interrogatories in *P & S*) ¶ 6 & 7; Woodfield Decl., Ex. 8 (Michael deposition in *P&S*) Tr. 182:3-10; 196:2-6; Woodfield Decl., Ex. 9 (Dianne deposition) Tr. 25:15-25; 34:13-17; 50:11-25, 51:1-18; Declaration of Dianne Bienes in Opposition to Trustee's Motion for Partial Summary Judgment, dated March 30, 2022 ("Bienes Decl.") at ¶ 1. They therefore handled none of the books, funds, or statements, had no knowledge about their contents, and had no functioning role for these entities. Griffin Decl., Ex. 21, Tr. 94:4-20; Woodfield Decl., Ex. 8, Tr. 182:3-10; 196:2-6; Woodfield Decl., Ex. 9, Tr. 50:11-25; 51:1-18. Nor did Michael have more than a few communications a year with Madoff, and Dianne had no communications with anyone from BLMIS except for faxing it requests for funds on behalf of St. James. Woodfield Decl., Ex. 8, Tr. 128:18-25; 129:1-8; 130:2-25; 131:1-25; Woodfield Decl., Ex. 9, Tr. 37:19-25; 38:6-15. Nor did Frank have many such communications. Woodfield Decl., Ex. 10 (Madoff deposition) Tr. 58:1-25; 59:1-12. Nancy, too, had no role in the entities and none of the knowledge attributed to the Defendants. Woodfield Decl., Ex. 11 (Nancy Avellino's deposition in *Daley v. Avellino,* Commonwealth of Massachusetts, Nantucket, C.A. No. 09-10) Tr. 150:22-24; 151:1-12; 19-22; 152:1-5; 9-12; 153:20-24; 154:12-24; 155:1-17.

The only Post-1993 Entity for which the Bienes' received customer statements was St. James; Dianne never saw them, and Michael received them but did not review them and sent them to the

accountant. Woodfield Decl., Ex. 9, Tr. 51: 4-18; 36:23-25; 37: 1-18. Griffin Decl., Ex. 21, Tr. 94:4-20.

Neither Michael nor Dianne had any knowledge whatsoever of any facts relating to the allegations of the return of statements to BLMIS or the creation of new statements. Woodfield Decl., Ex. 8, Tr. 129:9-25; 130:1. Bienes Decl. at ¶ 2. Dianne did not have anything at all to do with the SEC investigation; she did not even know about it until it concluded, and A&B ceased operating. Woodfield Decl., Ex. 9, Tr. 38:16-25; 39:1-12; 40:4-10, 22-25; 41:1-17;23-25; 42:1-8. Michael knew of the SEC investigation and was present for an interview by the SEC, but he categorically denied any knowledge of BLMIS employees assisting A&B in putting together books for the SEC. Woodfield Decl., Ex. 8, Tr. 129:9-25: 130:1.

Contrary to the Trustee's characterization, none of the Defendants were guilty of "willful blindness" or put on inquiry notice. Frank did not ask Madoff about his investment strategy or understand or analyze Madoff's investments or his strategy. Griffin Decl., Ex. 21, Tr. 57:6-12; 124:20-22. Michael did not ask Madoff how he was able to do so well in the market because he would not have understood the explanation and Dianne did not even know what her investments were composed of. Griffin Decl., Ex. 24, (Michael's Frontline interview) at 17[7]; Woodfield Decl., Ex. 9, Tr. 16:10-20; 28:4-5. The only thing that Michael knew was that Madoff was in the "most heavily regulated industry in America." Griffin Decl., Ex. 24, at 14. Madoff confirmed that neither Frank nor Michael knew of any irregularities with BLMIS, nor did they have knowledge that he was committing a fraud. Woodfield Decl., Ex. 12, (Madoff's *P&S* deposition) Tr. 220:18-25; 221:1-10; 21-24; 241:3-8.

_____

[7] As set forth in Part II E, *infra*, the interview is not admissible and should not be considered. However, in the event it is determined that the Trustee can rely on it, then he should not be allowed to pick and choose portions on which to rely.

Not surprisingly based upon the lack of suspicion of countless others throughout the securities industry and their total lack of involvement in the operations of BLMIS, Defendants had no idea at all that Madoff or BLMIS were doing anything remotely wrong. Woodfield Decl. Ex. 8, Tr. 67:18-24; Bienes Decl. at ¶ 3, 4.

## LEGAL STANDARD

Fed. R. Civ. P. 56(a) is applicable to bankruptcy courts pursuant to Fed. R. Bankr. P. 7056. This Rule provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP),* 2014 WL 47774 at *8 (Bankr. S.D.N.Y. Jan. 3, 2014) (internal quotations omitted). "If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations of denials." *Id.* "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *Sec. Inv'r. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 563 B.R. 737, 742 (Bankr. S.D.N.Y. 2017); *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F. 3d 775, 780 (2d Cir. 2003).

It is axiomatic that the evidence of the opponents to a motion for summary judgment "is to be believed" and its version of any disputed issue of fact is presumed correct. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 456 (1992) (affirming the circuit court's reversal of the district court's order granting summary judgment); *Gould Invs., L.P. v. Gen. Ins. Co. of Trieste & Venice,* 737 F. Supp. 812, 815 (S.D.N.Y. 1990) ("The court *must* accept as true

factual statements in the opposing party's affidavits and draw all permissible inferences in that party's favor.") (emphasis added).

If "there is *any* evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party," summary judgment cannot be granted. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis added) (reversing the entry of a summary judgment).

## ARGUMENT

### I.    THE DOCTRINE OF LAW OF THE CASE IS NOT APPLICABLE

The Trustee alleges that this case is similar to others in which courts have granted summary judgment in the Trustee's favor, implying that the law of the case doctrine should control. Trustee's Memo at 1-2. Defendants disagree. Initially, it must be noted that such doctrine is limited to legal, not factual conclusions. *Aramony v. United Way of Am.,* 254 F. 3d 403, 410 (2d Cir. 2001). Moreover, Defendants take issue with the fundamental unfairness of the law of the case doctrine. *In re Brizinova,* 588 B.R. 311, 324 (Bankr. E.D.N.Y. 2018) (and cases cited therein). There exist two fundamental considerations in determining the application of the law of the case doctrine: 1) the identity of the parties and 2) the finality of the prior decisions. *Id.* Applying the doctrine when there is a lack of identity of parties deprives a party "… of the most fundamental component of due process, the opportunity to be heard …". *Id.*

However, this Court need not address this issue because there exists a compelling reason to not apply the law of the case doctrine. Defendants present substantially different evidence than in other actions involving the Trustee – their relationship with BLMIS was that of a customer/broker-dealer, market maker, not as an investment advisor, and the trades reflected on their statements were real, which evidence is supported by a qualified securities expert witness.

See Point II, *infra*; *In re Pilgrim's Pride Corp.,* 442 B.R. 522, 531 (Bankr. N.D. Tex. 2010) (the existence of substantially different evidence is a reason not to adhere to prior rulings). Accordingly, the law of the case doctrine is inapplicable.

## II.   THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE THAT THE TRANSFERS TO THE DEFENDANTS DURING THE TWO-YEAR PERIOD SHOULD BE VOIDED

In order to avoid and recover the transfers to the Defendants during the two-year period, the Trustee must prove: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.,* 2011 WL 1419617 at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd.,* 748 F.3d 110 (2d Cir. 2014). Defendants do not contest the first two elements but do assert the Trustee has failed to establish the third element of actual intent to defraud as applicable to the Defendants. At most the Trustee has established that the BLMIS IA Business was a Ponzi scheme. However, as set forth below, the Trustee has produced no admissible evidence that BLMIS' broker-dealer, market maker business, where the Defendants had their accounts, was a Ponzi scheme, particularly, considering the standards which must be met to obtain such a finding through summary judgment.

The Trustee relies heavily on other cases in which summary judgments were awarded for claims made pursuant to 11 U.S.C. § 548(a), i.e. *Picard v. The Gerald and Barbara Keller Fam. Tr.*, 634 B.R. 39 (Bankr. S.D.N.Y. 2021), *Picard v. Miller*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021), *Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155, *Picard v. JABA Assocs. LP*, 258 F. Supp. 3d 219 (S.D.N.Y. Mar. 24, 2021) and *Picard v. Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021). These cases, however, are distinguishable in critical ways from the current case; in each of those cases, the defendants were indisputably IA customers as they did not contest their status as same, and in each of these

cases, there were no defense experts who rebutted the opinions of Dubinsky. There is, therefore, no reason to follow these cases as the Defendants were not IA customers, *see Section II A*, *infra*, and as Defendants' have proffered the testimony of a securities' expert who directly contradicts Dubinsky. *See Section II D*, *infra*.

### A. The Defendants' Relationship with BLMIS was that of a Traditional Customer/Broker Dealer, Market Maker

The Defendants' relationship with BLMIS was that of a traditional customer/broker-dealer and market maker. As such, the trades of securities reflected on their monthly BLMIS account statements and the confirmations received confirming the securities transactions provided to the Defendants evidenced legitimate transactions of real securities. The validity of the securities transactions is supported by the operative documents, the rules and regulations of the securities industry, the custom and practice in the securities markets and Defendants' expert – the only opinion proffered by a qualified securities expert.

From its inception, and at all relevant times, BLMIS was a registered broker-dealer with the SEC. *In re Bernard L. Madoff Inv. Securities, LLC,* 664 F.3d 229, 233, (2d Cir. 2011) (the "*Net Equity Decision*"). So, too, BLMIS was a market maker, Avellino Report at 46, and during the relevant time, one of the single largest market makers in the United States. Fortgang Decl., Ex. A (Fortgang Report) at 6; Woodfield Decl., Ex. 10, Tr. 21:21-25; 22:3-6. As a market maker, BLMIS could, and did, execute naked shorts, which allowed it to sell and buy securities which it did not own, without borrowing or locating a "borrow". This short to a customer constitutes a valid trade to the customer. Fortgang Decl., Ex. A at 7.

The Defendants' BLMIS account opening documents established a customer/ broker dealer relationship creating a discretionary account which authorized Madoff, the broker, to buy and sell securities without their consent for each trade. See, Griffin Decl., Ex. 4-7 (BLMIS Customer

Agreements for Aster Associates, Grosvenor Partners, Ltd., Mayfair Ventures and St. James Associates); Fortgang Decl., Ex. A at 5-6.  The Customer Agreement executed by the Defendants in connection with opening BLMIS accounts identifies BLMIS as "Broker" and provides:

> 7. **BROKER AS AGENT**
>
> The customer understands that the Broker is acting as the Customer's agent, unless the Broker notifies the Customer, in writing before the settlement date for the transaction, that the Broker is acting for its own account or as agent for some other person.
>
> 8. **CONFIRMATION AND STATEMENTS**
>
> Confirmations of transactions for the Customer's Account(s) shall be binding upon the Customer if the Customer does not object, in writing, within ten days after receipt by Customer.

Griffin Decl., Ex 4 (Customer Agreement, dated June 18, 2004, for Aster Associates).

At no time did the relationship between the Defendants and BLMIS change; nor were Defendants ever customers of the IA Business, which the Trustee, throughout this case and in other adversary proceedings, alleges Madoff operated as a Ponzi scheme.[8]  Amended Complaint, ECF # 86, ¶108; Fortgang Decl., Ex. B, (Rebuttal Report, dated September 4, 2020) at 6.  An Investment Advisory business is materially different from that of a Broker/Dealer, Market Maker.  An Investment Advisor is any person or firm who is engaged in the business of providing advice to others or issuing reports or analyses regarding securities for compensation.  Section 202(a)(11) of the Investment Advisors Act of 1940 ("Advisors Act"), 15 U.S.C. § 202(a)(11).  An Investment Advisor is regulated by the SEC, while a Broker/Dealer is regulated by FINRA.  Fortgang Decl., Ex. A at 5-6 and Ex. B at 5.  Further, the Investment Advisor's customer relationship carries with

---

[8] BLMIS did not register as an Investment Advisor until August 2006, and the Defendants never executed documents indicating that they became customers of the IA Business. Amended Complaint, ECF # 86, ¶111.

it "significantly different requirements than a broker including certain registrations, filing and record keeping in addition to a much higher fiduciary standard of care." Fortgang Decl., Ex. B at 5.  A broker dealer, in contrast, has the duty to place trades for its customers as directed; or when, as with the Defendants, the customer gives the broker absolute trading discretion, it executes trades in a customer's account without first consulting the customer, but followed by a written confirmation of the trade delivered to the customer. FINRA Rule 3260.  Discretionary trading by a broker is not equivalent to providing advice to customers about specific securities.[9]  As opined by Defendants' expert, at no time did the Defendants have an Investment Advisory relationship with BLMIS and all the securities in Defendants' accounts including any naked shorts, were valid and legitimate trades.  Fortgang Decl., Ex. at 7; Ex B at 6.  To rule otherwise would be to upend the entire securities industry as it exists today.

### B.   The Statements and Confirmations Received from BLMIS Confirmed Legitimate Transactions

The importance of the statements and confirmations a broker provides its customers cannot be understated.  Since in discretionary accounts there is no communication between the customer and broker prior to the execution of trades, the statements and confirmations are the only means by which customers became aware of the securities being traded in their accounts.  This is also true for any naked shorts.  Accordingly, controlling law, regulations and industry practice mandate that the transactions reflected on a customer's statements and confirmations evidence real trades of actual securities.  Fortgang Decl., Ex. A at 4.

Fortgang further opines:

> When a customer receives a confirmation of a transaction in his account, it acts as definitive proof that a trade has occurred.

---

[9] The distinction between Investment Advisors and Broker/Dealers with discretionary accounts is identified in detail by Defendants' expert. Fortgang Decl., Ex. B at 6.

> Furthermore, when the transaction occurs via a market maker, not only is it definitive proof that the trade has occurred, but it is also proof that a real security has been passed from seller to buyer whether or not that security can be traced or identified in any custodial accounts or depositories.  As a final step in the consummation of a transaction, it is the sole piece of information proving a trade has occurred.

> As such, receipt of a confirmation coming from a market maker, in the custom and practice of securities markets, gives the recipient all rights of full ownership of the security described in the confirmation whether or not that security can be located in any custodial account or depository. *** All benefit accrues to the rightful owner from the moment the confirmation is generated.

Fortgang Decl., Ex. A at 5.

Whether BLMIS actually owned or held securities or not, or whether it properly recorded the transactions in its books and records reported to regulators is irrelevant as to the customer's actual ownership.  Fortgang Decl., Ex. A at 6.

### C.    The Trustee has Failed to Prove that BLMIS Made the Transfers With Actual Fraudulent Intent

The Trustee attempts to prove actual intent either through the "Ponzi scheme presumption" or through the existence of the badges of fraud.  However, neither can be shown to exist without a plausible contrary conclusion as would be required for the entry of summary judgment.

In order to argue the applicability of the Ponzi scheme presumption, the Trustee relies on Madoff's sworn testimony, DiPascali's testimony, and the Dubinsky Reports to support his argument that BLMIS operated as a Ponzi scheme.  However, the testimony and evidence presented relates only to the IA Business of BLMIS as a Ponzi scheme.  As set forth in Point II A, *supra*, the Defendants were not customers of BLMIS' IA Business.  They were customers of BLMIS' Broker/Dealer, Market Maker business.

Even assuming, *arguendo,* that the IA Business of BLMIS was a Ponzi scheme, the Ponzi scheme presumption should not be applied to the Defendants because their accounts were with BLMIS broker/dealer, market maker, which did conduct legitimate business and produced profits and earnings from the business. *See* Factual Background at 2-3, *supra*.

Furthermore, as opined by Judge Menashi in his concurring opinion in *In re Bernard L. Madoff Investment Securities, LLC v. Citibank, N.A., and Legacy Capital, Ltd.,* 12 F. 4th 171, 201-202 (2d Cir. 2021) *("Legacy Decision")*, the Ponzi scheme presumption should not be applied here to presume that all transfers from BLMIS to the Defendants were made with fraudulent intent, because that improperly treats preferences to creditors as fraudulent transfers.   Instead, the Trustee would have to plead and prove the elements of a fraudulent transfer with respect to each transfer, which has not been done.

The Trustee's reliance on badges of fraud to show actual intent also fails. Although the Trustee refers in his Memo to multiple badges of fraud which have been recognized by the courts, he only claims that the three following badges were established by the evidence adduced: 1) BLMIS' insolvency; 2) its concealment of facts, and 3) lack of consideration for the transfers to Defendants.  Trustee's Memo at 34-35.  However, BLMIS' market maker/proprietary business was not insolvent and, in fact, was profitable.   Woodfield Decl., Ex. 2, Tr. 127:5-1.  It was executing up to 600,000 trades a day at the high and averaging about 300,000 transactions a day. It represented 10% of the United States' volume in transactions, all of which were legitimate trades. Woodfield Decl., Ex. 1, Tr. 56:4-19.   BLMIS traded convertible securities and was considered one of the largest market makers in convertible securities in the country and one of the largest market makers in general in both listed securities and over-the-counter securities.  It had hundreds of other dealer clients.  Woodfield Decl., Ex. 2, Tr. 112:6-12; 187:9-10; and Ex. 1, Tr.

58:16-25. In fact, its solvency is further evidenced by Castor Pollux Securities LLC's purchase of the BLMIS' market maker business out of the bankruptcy proceeding for $25,500,000 on April 28, 2009. *SIPC v. BLMIS*, ADV. No. 08001789-cgm, ECF # 184, at 6.

As for the last badge of fraud relied on by the Trustee, there was consideration for the transfers to the Defendants, because as set forth in Point II B, *supra*, the trades in their accounts were real, and purchased using the monies the Defendants gave to BLMIS. Fortgang Decl., Ex. A at 6; Ex. 5.

Multiple badges of fraud would have to be established by the Trustee to constitute conclusive evidence of an actual intent to defraud. *In re Tribune Company Fraudulent Conveyance Litigation,* 2017 WL 82391 at *13 (S.D.N.Y. Jan. 6, 2017) (presence or absence of one badge of fraud is not conclusive); *In re Refco, Inc. Sec. Litig.,* 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009), *report and recommendation adopted sub nom. In re Refco Sec. Litig.,* 2010 WL 5129072 at *17 (S.D.N.Y. Jan. 12, 2010) ("But the case law does not establish that, for example, asserting two (or three, etc.) badges of fraud are enough to survive a motion to dismiss."). The Trustee has failed to establish sufficient badges of fraud to establish an actual intent.

**D.    Dubinsky's Opinions Regarding the Securities Industry, and his Testimony Consisting of Legal Conclusions, Speculation, State of Mind Opinions and Narrative Facts About Which He Lacks Personal Knowledge are Inadmissible and Should Not Be Considered To Support the Trustee's Prima Facie Case**

The opinions set forth in the Dubinsky reports cover a wide range of topics (some of which lack support and others of which constitute inappropriate conclusions consisting of motive and intent, speculation, and factual narrative). The most egregious of Dubinsky's opinions are those relating to the custom and practice in the securities industry, including:

- Avellino and Bienes' accounts with BLMIS were IA Business accounts. Avellino Report, at 4.

- There is no evidence that trades reflected on the customer statements for the A&B accounts were ever executed. Avellino Report, at 8.

The Defendants' expert debunks these purported expert opinions:

- The Defendants/BLMIS relationship was a "customer/broker relationship". Fortgang Decl., Ex. B, at 5.

- At no point did BLMIS have an IA relationship with Defendants. Fortgang Decl., Ex. B, at 6, 7.

- Acting as a broker-dealer and market maker of securities, BLMIS regularly bought and sold securities on behalf of the Defendants. Fortgang Decl., Ex. B, at 7.

- Acting as a broker-dealer or market maker, BLMIS regularly engaged in short selling, and whether the purchase of the securities occurs, the initial sale is a legal, valid and a "real" transaction involving a real security recognized by all authorities as legitimate and binding. Fortgang Decl., Ex. A, at 6.

- BLMIS, acting as a market maker, regularly sold securities to Defendants that it did not own at the time of the transaction, which are referred to as "naked shorts". Controlling regulations require a broker who executes a naked short transaction to timely deliver the borrowed security to the purchaser. A failure to do so- referred to as a failure to deliver- may constitute a regulatory violation but does not affect the validity of such sale which is "a legitimate transaction and constituted a valid trade involving actual securities." Fortgang Decl., Ex. A, at 7.

Dubinsky's opinions regarding the securities industry have also been repeatedly refuted by Madoff. In his December 20, 2016 deposition, Madoff stated the obvious – Dubinsky had very little experience in the specialized areas of market making, dealer markets and over-the-counter

19

trading. Woodfield Decl., Ex. 1, Tr. 93:1-5.  Such lack of experience resulted in numerous erroneous opinions in his report:

- Dubinsky's failure to recognize the distinction between confirmations in which the dealer acts as principal and a retail confirmation in which the client purchases the securities, resulted in an erroneous opinion that Madoff was violating his agreements with his clients. Woodfield Decl., Ex. 1, Tr. 93:13-96:11.

- Dubinsky's opinion that Madoff was a fraud because the New York Stock Exchange reflected fewer daily bond trades than Madoff's statements reported confirmed his "total lack of understanding," because the NYSE represents only about 1% of the volume, and Dubinsky was treating it as the entire market. Woodfield Decl., Ex. 2, Tr. 114:7-21. Convertible bonds did not trade on the New York Stock Exchange, but rather over-the-counter directly between counterparties. Woodfield Decl., Ex. 2, Tr. 111:17-24.

- Dubinsky's erroneous opinion that Madoff was showing purchase prices of securities cheaper than he could have purchased them in the market reflects his failure to understand how the prices of securities were determined by an average over a period of days that the purchases were made.  Woodfield Decl., Ex. 1, Tr. 109:6-112:4.

- Dubinsky's erroneous opinion that Madoff was showing purchases of securities in excess of the volume of trading for that day reflects his failure to understand how the volume was determined over four days rather than one. Woodfield, Decl., Ex. 2, Tr. 37:1-18.

- Dubinsky's opinion that the short positions reported by Madoff exceeded the amount of short interest in these stocks as reported at the end by the stock exchange is dubious, because if his figures were correct the short interest in Pfizer would be less than 8% of an average day's volume. Woodfield Decl., Ex. 2, Tr. 117:10-25; 118:1-2.

20

- Dubinsky's opinion that there were no trades because he could not find confirmations is erroneous because if bought from another broker or out of inventory, then there would be no customer confirmation. Woodfield Decl., Ex. 1, Tr. 129:4-13.

- Dubinsky's opinion that trades did not occur because they were not recorded in the DTC ignores the purchases of securities over-the-counter, purchases of Treasury securities purchased from other brokerage firms, ex-clearing house broker to broker trades, and convertible bonds traded between dealers. Woodfield Decl., Ex. 2, Tr. 77:1-24; 78:1-25; 112:6-21; and Woodfield Decl., Ex. 10, Tr. 21: 8-20; 22:3-25.

- Dubinsky's failure to understand that consistent annual rates of return and limiting losses can be achieved using hedges, such as puts, calls and options. Woodfield Decl., Ex.2, Tr. 172:4-175:7.

- Dubinsky failed to understand continuous net settlement when a broker's purchases and sales are offset or matched against each other so that at the end of a trading day only those positions that have not been offset internally remain to be settled. Woodfield Decl., Ex. 10, Tr. 20:2-25; 21:1-3; 90:1-5.

In ruling on a summary judgment motion it is appropriate for the court to consider the admissibility of an expert's testimony. *Berk v. St. Vincent's Hospital and Medical Center,* 380 F. Supp. 2d 334, 350 (S.D.N.Y. 2005). However, expert opinions regarding the custom and practice in the securities industry do not rest on traditional scientific methods, so the traditional *Daubert* factors do not apply. Rather, personal knowledge and experience of the expert control. *Davis v. Carroll,* 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). Courts in this district have permitted expert testimony regarding the securities industry based upon the expert's experience in the industry. *In*

21

*re Blech Sec. Litig.,* 2003 WL 1610775 at *21 (S.D.N.Y. Mar. 26, 2003); *SEC v. U.S. Envtl., Inc.,*

2002 WL 31323832 at *3 (S.D.N.Y. Oct. 16, 2002).

Dubinsky's experience and qualifications enabling him to provide expert opinions are set

forth in his Declaration, Attachment C, and his Avellino Report, at 5-7.  Dubinsky defines his

practice as "providing forensic accounting, fraud investigation, and dispute analysis services…".

Dubinsky Decl. ¶ 1.  The only references to any experience in the securities industry are a generic

reference to qualifying as an expert on "investment advisory issues", Dubinsky Decl., ¶ 8, and one

that he was a former Registered Investment Advisor Representative.  Dubinsky Decl., Attachment

C.  Dubinsky's credentials are devoid of any experience or knowledge of a broker dealer or market

maker.

In stark contrast to Dubinsky's inexperience with the securities industry, Fortgang's ability

to provide expert opinions regarding the custom and practice in the securities industry cannot be

seriously questioned.   He spent twenty-five years in sales and trading securities at major

investment institutions, including Goldman Sachs, Morgan Stanley, First Boston and Jefferies,

which included all aspects of the trading businesses and in all asset classes with the capital markets.

Fortgang was involved as a market maker in tens of thousands of transactions.  Fortgang Decl.,

Ex. A at 3; Ex. 1.  Since 2009, Fortgang has provided consulting services and expert opinions for

the financial services industry with a specialty in securities sales and trading.  He has also provided

expert testimony in proceedings throughout the United States.  Fortgang Decl., Ex. A at Ex. 3.

While Dubinsky may be qualified to provide expert opinions regarding forensic

accounting, he should not be permitted to offer expert opinions regarding the securities industry

for which he is not qualified.  *Wiener v. AXA Equitable Life Ins. Co.* 2019 WL 1228074 at *4

(S.D.N.Y. Mar. 15, 2019), *reconsideration denied,* 2020 WL 409785 (S.D.N.Y. 2020). Since the

Trustee has not offered any expert securities testimony to refute Defendants' expert, other than Dubinsky, who is not qualified, Fortgang's opinions should be accepted. In fact, they must be accepted for purposes of refuting a summary judgment motion. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. at 456.

Furthermore, Dubinsky opines about other people's state of mind and motive, draws conclusions based upon pure speculation, and testifies in the form of a factual narrative not based on his own personal knowledge, all of which should be excluded. Expert testimony should be excluded if it is "speculative or conjectural" or is "conclusory." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Speculation about a person's state of mind is improper expert testimony. *Bd. of Trs. of the Aftra Ret. Fund v. JP Morgan Chase Bank, N.A.,* 2011 WL 6288415 at *8 (S.D.N.Y. Dec. 15, 2011). Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony because it describes lay matters which a jury is capable of deciding without the expert's help. *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp.2d 461, 469-70 (S.D.N.Y. 2005) (quoting *Andrews v. Metro N. Commuter R.R. Co.,* 882 F.2d 705, 708 (2d Cir. 1989).) An expert may not testify in the form of a factual narrative based on evidence about which he lacks personal knowledge. *Scott v. Chipotle Mexican Grill, Inc.,* 315 F.R.D. 33, 45 (S.D.N.Y. 2016). All such corresponding testimony identified in Defendants' Objections to Plaintiffs' Statement of the Facts should therefore be disregarded as set forth therein. See, for example, ¶¶ 8, 51, 53, 121, 198, 284, 293 and 324.

**E.    The Trustee Cannot Rely on Inadmissible Evidence to Support His Prima Facie Case**

In addition to relying on Dubinsky, the Trustee relies on the testimony of Frank DiPascali, other BLMIS employees' hearsay testimony and the Frontline interview by Michael to establish his prima facie case. However, all this evidence is inadmissible.

23

The Trustee relies on the plea allocution and trial testimony of Frank DiPascali to support his contention that BLMIS was a Ponzi scheme. Trustee's Memo at 5, 11, 12 and 16. Unlike other witnesses upon which the Trustee relies, DiPascali died prior to Defendants having an opportunity to depose him. Nevertheless, some courts have ruled his prior testimony, although hearsay, admissible under the catchall provision of Fed. R. of Evidence 807, because such testimony has been deemed sufficiently corroborated to be considered trustworthy. *Picard v. Jaba Associates, L.P.,* 528 F. Supp. 3d 219, 232 (S.D.N.Y. 2021); *Picard v. Nissenbaum Trust,* 2021 WL 1141638 at *8 (S.D.N.Y. Mar. 24, 2021).

In *Sec. Inv. Prot. Corp. v. BLMIS,* 610 B.R. 197, 228 (Bankr. S.D.N.Y. 2019), Judge Bernstein determined that DiPascali's testimony as to the allocation of T-Bill purchases to IA customers, while not admissible under Rule 804(b)(1), was admissible under Rule 807. Judge Bernstein identified the five requirements that must be satisfied for such hearsay to be admissible: guarantees of trustworthiness, materiality, relative probative value, the interest of justice and notice. *Id.* As to the element of truthfulness, Judge Bernstein evaluated the seven factors that courts consider and, while finding these factors both supportive and not supportive as to the admissibility of DiPascali's testimony, concluded such testimony was corroborated by Dubinsky's unrefuted testimony and, therefore was admissible. *Id.* at 229.

In this case, however, Dubinsky's testimony has been refuted so admissibility of DiPascali's testimony should be denied. Fortgang Decl. Ex. B, at 4-6.

Moreover, the Trustee's argument is circular to the extent that he is arguing that DiPascali's testimony should be accepted because of Dubinsky and Dubinsky's should be accepted because of DiPascali's. He should not be permitted to bootstrap clear hearsay into admissibility in such a fashion. "Expert testimony may not be used to bolster the credibility of fact witnesses." *United*

*States v. Lombardozzi*, 491 F.3d 61, 77 (2d Cir. 2007); *See also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

DiPascali's testimony that BLMIS' trades were fictitious and that A&B statements were manufactured at Madoff's direction is also directly contradicted by the testimony of Madoff. Madoff pointed out that DiPascali could not have known whether trading was real because "he wasn't involved in the trading; he was just booking." Woodfield Decl., Ex. 12, Tr. 75:6-16. He furthermore categorically refuted DiPascali on many points, including DiPascali's claim that a new set of books was created to provide to the SEC, Woodfield Decl., Ex. 12, Tr. 89:9-20, and that he did not have the funds to return to the A&B customers. Woodfield Decl., Ex. 12, Tr. 44:1-23; 45:1-25; 46:1-15. Like DiPascali, Madoff had been convicted at the time of this testimony, was already serving a life sentence, and had no reason to lie. Upon review of the factors considered by the courts in analyzing trustworthiness, both DiPascali and Madoff would be considered the same in every category: (1) the character of the witness for truthfulness and honesty; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination, and a penalty for perjury; (3) the witness's relationship with both the defendant and the government; (4) the witness's motivation to testify; (5) whether the witness ever recanted the testimony; (6) the existence of corroborating evidence; and (7) the reasons for the witness' unavailability. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. at 229. Yet, the Trustee is asking this Court to accept DiPascali's testimony as gospel and to totally discount Madoff's testimony as a matter of law. DiPascali's testimony is not admissible. Even if admissible, the fact that it is contradicted by that of Madoff precludes the ability to grant summary judgment.

So, too, the threshold element of Rule 807(a)(2) has not even been met as it *only* allows the admission of hearsay if: (1) the statement is supported by sufficient guarantees of trustworthiness after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is *more probative* on the point for which it is offered *than any other evidence* that the proponent can obtain through reasonable efforts. Fed. R. Evidence 807(a)(2). (emphasis added).    To determine if DiPascali's testimony is "more probative" than any other evidence, this Court would have to be presented with the possible other evidence and would be required to weigh the credibility of all possible evidence – an exercise which is strictly prohibited at the summary judgment phase.  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (the court "may not make credibility determinations or weigh the evidence...."). Nor could the Trustee's evidence be weighed against the testimony of Defendants' witnesses.  In fact, if any weighing of the evidence is to be done, the evidence proffered by the opponent to a motion for summary judgment must be believed and its version "presumed correct." *Eastman Kodak*, 504 U.S. at 456.

"Congress 'intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.'" *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (internal citations omitted).  Such circumstances do not exist in this case, considering especially the weighing of evidence which would have to be done in order to determine whose evidence is "more probative" of the material facts.

Furthermore, the Trustee relies on BLMIS' employees' hearsay testimony which is inadmissible.  *See Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.,* 507 F.Supp.3d 547, 571 (S.D.N.Y. 2020) (a party cannot rely on inadmissible hearsay in support of a summary judgment); *Rodriguez v. Mod. Handling Equip. of N.J., Inc.,* 604 F. Supp.2d 612, 622 (S.D.N.Y. 2009) (double

26

hearsay is not admissible unless each level would be subject to a hearsay exception); *Scott v. City of New York,* 591 F. Supp.2d 554, 566 (S.D.N.Y. 2008) (hearsay does not become personal knowledge because a witness internalized statements made by others and decided they must be true). The corresponding testimony identified in Defendants' Objections to Plaintiff's Statement of the Facts should therefore be disregarded as set forth therein. See, for example, ¶¶ 128, 135, 138, 144, 177, 179, 183 and 304.

Finally, the Trustee also relies heavily upon a transcript of an interview which Bienes gave to a television reporter. Griffin Decl., Ex. 24. However, this transcript is an "edited" version of "video excerpts" and is therefore incomplete, untrustworthy, unauthenticated and inadmissible and should not be considered by this Court. *Bank Brussels Lambert v Credit Lyonnais (Suite) S.A.*, 168 F. Supp.2d 57 (S.D.N.Y. 2001). This is particularly true given the fact that, when asked about his interview later, Michael stated, under oath, "some of the things I said … I wasn't clear in my mind . . .whether I was right or wrong or knew what I was talking about …I don't know." Woodfield Decl., Ex. 8, Tr. 172:16-22.

**F.  Even Assuming *Arguendo* the Trustee Has Established His Prima Facie Case, The Trustee's Calculation of the Defendants' Net Equity Using the Net Investment Method is Inappropriate and Inapplicable to Defendants**

Based upon the foregoing, the Trustee's calculation of Defendants' net equity using the "Net Investment Method" is inappropriate and inapplicable to Defendants. It should be rejected.

This Court has cited numerous times and is well versed in the history of the SEC's initial civil complaint, SIPC's intervention and the appointment of the Trustee for the liquidation of BLMIS. So, too, the Court is familiar with the SIPA procedures for liquidating BLMIS, the creation of two funds – the customer property and the general estate of the debtor - entitling the customers of BLMIS to preferential treatment in the distribution of the assets from the BLMIS

estate.  Such customers share ratably in this fund based upon each customer's "net equity" as of

the date of filing, to the exclusion of the general creditors.  15 U.S.C. § 78fff-2(c).

SIPA does not provide how net equity is to be determined; the Trustee has discretion

to determine the method of calculation.  *Net Equity Decision* at 235.  The Trustee calculated the

BLMIS customers' net equity by the Net Investment Method – cash in less cash out – based upon

the alleged unreliability of the BLMIS statements provided to its IA Business customers which

reflected securities transactions the Trustee contends did not take place.  The Second Circuit

upheld this determination but in doing so specifically cautioned:

> … a customer's last account statement will likely be the most appropriate means
> of calculating 'net equity' in more conventional cases.  We would expect that
> resort to the Net Investment Method would be rare because this method wipes out
> all events of a customer's investment history except for cash deposits and
> withdrawals.  The extraordinary facts of this case make the Net Investment Method
> appropriate, whereas in many instances, it would not be.

*Id*. at 238.

As established by Defendant's expert, Defendants did not have IA Business accounts with

BLMIS and the securities identified in the Defendants' statements reflected valid transactions of

real securities.  See, Point II B, *supra*.  Whether BLMIS actually owned or held such securities at

the time or complied with the applicable reporting requirements does not affect the validity of the

securities in the accounts.  Fortgang Decl., Ex A at 4-5.  Accordingly, the Trustee's utilization of

the Net Investment Method to determine the net equity for the Defendants' accounts which

ignores the securities held in the accounts is improper and grossly unfair.  *See, Picard v. Sage*

*Realty,* 2021 WL 1987994 at *3 (S.D.N.Y. May 18, 2021).  It is improper to lump Defendants

together with those in BLMIS' IA Business; two groups of customers should be created – those

in whose accounts trades were made and those in the IA Business in which apparently no trades

took place.  *See, New Times Secs. Servs.,* 371 F.3d 68 (2d Cir. 2004) (investors fraudulently

induced to purchase nonexistent money market funds were treated differently by the trustee than investors fraudulently induced to purchase shares of bona fide mutual bonds, which were never purchased.).

Alternatively, the constant-dollar method proposed by the SEC should be applied to the Defendants. As recognized by the SEC, the Net Investment Method adopted by the Trustee favors the later customers at the expense of earlier customers by treating a dollar invested by both as equal value. In order to achieve a fair and economically accurate allocation among the BLMIS customers who invested and withdrew funds in different historical periods, it is appropriate to convert the dollars invested into "time equivalent" or constant dollars. The Defendants were among the earliest customers of Madoff, investing their money commencing at least by the 1970s, and reinvesting in 1992 after A&B was dissolved, and thus, it is inequitable, in applying the Net Investment Method to them, to treat their dollars invested as having the same value as the dollars invested by other customers of Madoff at much later times. The dollars the Defendants invested should be converted into time equivalent dollars in determining the Net Investment Method so that the Defendants are treated in terms of the real economic value of their investments.

### III.    11 U.S.C. § 548(c) PRECLUDES THE TRUSTEE'S ABILITY TO OBTAIN SUMMARY JUDGMENT

#### A.    Defendants received the transfers in good faith and for value pursuant to 11 U.S.C. § 548(c)

Assuming, *arguendo*, that the Trustee can prove that the transfers to the Defendants were made by BLMIS with actual intent to defraud, the inquiry does not end there because the Defendants received the transfers in good faith and for value, and therefore can retain the transfers pursuant to 11 U.S.C. § 548(c).

The Second Circuit in the *Legacy Decision* recently held that the definition of "good faith" in the context of a SIPA liquidation is inquiry notice, which "signifies *actual* awareness of suspicious facts that would have led a reasonable [transferee], acting diligently, to investigate further and by doing so discover a debtor-transferor's fraud*." Legacy Decision* at 192 (emphasis added).[10] The inquiry notice standard involves a three step approach: (1) what facts the defendant "actually" knew, which is a subjective inquiry; (2) whether the facts the defendant knew would have led a reasonable person in their position to conduct further inquiry into possible fraud; and (3) whether, if the defendant had engaged in diligent inquiry, he would have discovered the fraudulent purpose of the transfer. *Id.* at 191-192. As discussed herein, the Defendants were not on inquiry notice.

The Defendants had no actual knowledge of the Ponzi scheme by BLMIS, the fraud allegedly perpetuated by Madoff or of any "suspicious facts." See Factual Background, *supra*; *see Legacy Decision* at 191 (inquiry notice signifies actual awareness of suspicious facts; constructive notice is irrelevant; and cannot be based on a "theory of fraud by hindsight"). Furthermore, the Trustee cannot rely on any of the badges of fraud to prove knowledge by the Defendants unless they had actual knowledge of same, which they did not.

In the Amended Complaint, the Trustee alleges that Frank and Michael knew of (or were willfully blind to): (1) impossibly consistent annual rates of return; (2) trading impossibilities; (3) impossible options trading volume; (4) impossible transactions priced outside the daily range; (5) backdated trades on original A&B statements and (6) that BLMIS's auditor was not qualified or capable. However, there is no evidence or testimony that Frank or Michael had knowledge of any

---

[10] While preserving its argument that "willful blindness" is the appropriate standard, Defendants employ for purposes of this memorandum only the standard of "inquiry notice" as recently recognized by the Second Circuit.

of these badges of fraud, and in fact, they did not.  Woodfield Decl., Ex. 12, Tr. 220:18-25; 221:1-10; 21-24; 241:3-8; Griffin Decl., Ex. 21, Tr. 57:5-12; 90:18-25; Woodfield Decl., Ex. 13, Tr. 13:18 – 16:19; Bienes Decl. at ¶ 3.[11]

As Judge Bernstein noted, the Defendants did not actually know of trading inconsistencies because they did not compare the prices reported in their trade confirmations with the published daily prices or know if BLMIS' total trading of an option exceeded the total.  *Avellino Decision* at 115; Bienes Decl. at ¶ 3.

Nor did the Defendants have actual knowledge of the badges of insolvency, concealment and lack of consideration identified in the Trustee's Memo.  Woodfield Decl., Ex. 12, Tr. 220:18-25; 221:1-10; 21-24; 241:3-8; Woodfield Decl., Ex. 13, Tr. 76:19-25; 77:1-18; Bienes Decl. at ¶¶ 4, 5.  The Trustee extensively argues about the insolvency and fraud of BLMIS, coupled with allegations that the Defendants "helped" BLMIS and "benefitted" from it, improperly implying that the Defendants therefore must have purposefully done so with knowledge of the fraud, insolvency and other "badges of fraud."  While the transgressions of Madoff and BLMIS were apparently great, no degree of intimation can substitute for proof of the Defendants' knowledge of facts which would have led a reasonable person to investigate further.

The Trustee's lumping the Defendants together to attempt to establish such knowledge further evidences his inability to meet his burden.  For example, consider the Bienes' and St. James.  As the *Legacy Decision* made clear, the Bienes' and St. James' good faith depends solely on what *they* "*actually knew*, and not what [they were] charged with knowing on a theory of constructive notice."  *Legacy Decision* at 191 (citations omitted; emphasis added).  *See, also, Flinn Realty*

_____

[11] In the Frontline interview, Bienes mentioned the size of the auditor but later clarified that statement under oath.  Griffin Decl., Ex. 24, at 46; Woodfield Decl., Ex. 8, Tr.198:12-199:17.

*Corp. v. Charter Const. Co.*, 181 A.D. 610, 612–13 (App. Div. 1918) ("actual intention can only be judged by actual knowledge and not by constructive knowledge."). No artful language employed by the Trustee can impose liability on the Bienes or St. James for knowledge which they did not have based upon "alleged" actions which they did not take, of which they were not aware. St. James would have the same actual knowledge – none - that Michael and Dianne had because they were its partners. *Matter of Roberts Real Estate v. New York State Dept. of State, Div. of Licensing Servs.,* 80 N.Y.2d 116, 121-123 (1992) (a statute requiring "actual knowledge" will not be construed to impose liability on an entity resulting from the conduct of "any affiliated employee" but only through the knowledge of its principals (e.g., brokers, officers or directors).).

Based on the limited knowledge the Defendants had regarding BLMIS and its operations, a reasonable person in their position would not conduct any further inquiry into possible fraud. In fact, from the inception of BLMIS until 2008 when Madoff was exposed as a fraud, many others with access to more knowledge and facts about BLMIS than the Defendants had did not suspect any fraud and did not believe there was a reason to do further investigation into Madoff. The SEC, which conducted an investigation of A&B in 1992, interviewed Madoff and his employees, went to Madoff's place of business, saw his operations, reviewed account statements, reviewed BLMIS' books and records, and did not find fraud or a basis to continue investigating Madoff. Woodfield Decl., Ex. 12, Tr. 45:4-46:17. The A&B monies were returned to the A&B customers and no one at that time had any reason not to believe that the monies returned came from those customers' funds invested with Madoff. Woodfield Decl., Ex. 13, Tr. 76:19-25; 77:1-18. Over the years there were several reports to the SEC from various people of possible fraud by Madoff, which, again, the SEC determined were not sufficient to warrant any further investigation of Madoff**.** Woodfield Decl., Ex. 12, Tr. 220:18-25; 221:1-25; 241:1-8.

Judge Bernstein recognized that:

> …the red flags identified by the Trustee do not support a plausible inference that Avellino or Bienes had actual knowledge that Madoff was not trading securities. The consistency of Madoff's returns was a matter of general knowledge as was his strip mall auditor.

*Avellino Decision* at 115.  For the same reason the badges – even if actually known – would obviously not have caused a reasonable person to investigate further.   To find otherwise would be to find as a matter of law that none of the multitudes of people with the same knowledge acted reasonably.

Madoff was so well respected and known in the industry, no one had any reason to question what he was doing.   He was one of the founders of NASDAQ, became its Chairman and served on its board of directors for nine years. Woodfield Decl., Ex. 1, Tr. 50:10-24.   He served as Chairman on the Board of National Association of Securities Dealers for nine years; and was the founder and Chairman of the National Securities Clearing Corporation and Depository Trust. Woodfield Decl., Ex. 1, Tr. 50:25; 51:1-6. He was a Chairman of the International Securities Clearing Corporation, of the NASD trading committee, of the NASD National Market Design Committee, of the National Business Conduct Committee, of an SEC Large Trader Reporting Committee, of the NASD Small Order Execution Committee, of the NASD Surveillance Committee and of an SEC NASD Payment for Order Flow Committee. Woodfield Decl., Ex. 1, Tr. 51:6-19.  Madoff was a member of the Securities Industry Association board of directors, of the Securities Industry Association Trading Committee, of Securities Industry Association Federal Regulation Committee and of the SEC SIAV/SIA Capital Markets Committee. Woodfield Decl., Ex. 1, Tr. 51:20-25.  He was the Chairman and member of the SEC Intermarket Trading System Committee and head of the SEC NASD arbitration committee. Woodfield Decl., Ex. 1, Tr. 52:1-6.  Madoff also served as the liaison and consultant to the London Stock Exchange, the London

33

Futures Exchange, the Singapore Stock Exchange, the Tokyo Stock Exchange, the Frankfort Stock Exchange, the Paris boards and the Moscow Stock Exchange. Woodfield Decl., Ex. 1, Tr. 52:8-14.

In fact, as noted by the Second Circuit, "…the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals." *Meridian Horizon Fund, LP v. KPMG (Cayman),* 487 Fed. Appx 636, 641 (2d Cir. 2012).

Finally, even if the Defendants had engaged in a diligent inquiry, they would not have discovered the fraudulent nature of the IA Business of BLMIS.  In order to discover the fraud, a person would have had to have had access to BLMIS' books and records; BLMIS customers' investment statements, not just the Defendants' statements; all of the trading information from all regulatory agencies, other brokers, and market makers, and the insight and testimony of Madoff and his employees.  That information would have had to have been gathered for many years to perform the comparisons of what was reported by BLMIS and what was actually being done over the decades.  This is not a theoretical argument – the proof of this is how long it took Dubinksy, with all of his resources, to go through all the information which was made available to him (and would not have been made available to the Defendants) to discover the fraudulent nature of the IA Business of BLMIS.

It is clear the Defendants were not on inquiry notice, and thus, received the transfers from BLMIS in good faith.  Additionally, as set forth in Points II A & B, *supra*, the trades were real so Defendants received the transfers for value.  Accordingly, the Trustee's Motion should be denied because the Defendants can retain the transfers pursuant to 11 U.S.C. § 548(c).

### B.    Good Faith is Inappropriate for Summary Judgment

The requirements for granting summary judgments when good faith is an issue are particularly stringent. Although summary judgment can be entered in limited situations involving good faith, it would not be appropriate in this case. Recognizing, as the Court did in the *Legacy Decision*, the duty of inquiry extends only to matters that are "actually known." The Second Circuit in *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 Fed. Appx 287 (2d Cir. 2004) reversed a summary judgment on the issue of whether certain events would have alerted a party, acting reasonably, to a fraudulent sale of securities despite the sophistication of the investor; "justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases...." *Id*. at 292.

In a case involving several indicia of fraud, including an SEC investigation into a related issue, suspicious activity involving accounting practices and alleged public knowledge of badges of fraud, *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir. 1979) recognized that:

> Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case similar to the type of inferences that must be drawn in determining intent and good faith, [and]…. We have repeatedly stated that summary judgment is particularly inappropriate where, as here, it is sought on the basis of 'the inferences which the parties seek to have drawn (as to) questions of motive, intent, and subjective feelings and reactions.

*Id*. at 591 (reversing a summary judgment on when a plaintiff should have learned of fraud using due diligence despite the trial court's conclusion that what could have been discovered with due diligence was "plausible" because a "contrary conclusion also may be reached."). *Id*.

While the movant for summary judgment in the *Robertson* case, like the Trustee in the instant case, attempted to use the SEC investigation as support for its position that the party was

on inquiry notice of the fraud, the Court correctly noted that that fact could be used to infer the

opposite:

> If the SEC with its commendable expertise and specialized investigative teams
> was unable to discover the complicity of these accountants until shortly before
> its Opinion and Order of September 1, 1976 was released, it cannot be said as a
> matter of law that appellant should have discovered their participation any
> earlier.

*Id.* at 592.

In denying a creditor's motion for summary judgment in a case brought under New York's

fraudulent transfer statutes, *Bank of Communications v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d

356, 361 (S.D.N.Y. 2012), the court recognized that "… the question of whether a person has acted

in good faith is a question of fact dependent on the circumstances of each particular case."

Since an inquiry of whether a party had sufficient knowledge of facts from which he could

reasonably have inferred fraud "necessarily involves a dispute concerning state of mind and

conflicting interpretations of perceived events, summary judgment is ordinarily not a proper

vehicle for the resolution of such a dispute." *Schmidt v. McKay*, 555 F.2d 30, 37–38 (2d Cir. 1977)

(error to enter summary judgment and find that there was no issue of whether a party could have

discovered alleged fraud exercising reasonable diligence within a certain time period).

The Trustee's Memo is replete with innuendo – but no facts – of the Defendants' actual

knowledge of suspicious facts relating to BLMIS's wrongdoing.  The unsupported conclusion that

Frank and Michael actively worked with Madoff to deceive and defraud the SEC is not true, as set

forth herein at 3-10, *supra*.  The only admissible facts that the Trustee has are that the Post 1993

Entities invested funds with BLMIS and benefited from those investments for a time, which is not

proof of any knowledge of wrongdoing.

At best, the Trustee leaps to conclusions and relies only on inferences without supporting evidence regarding the Defendants' knowledge of facts which would have led them to discover BLMIS' fraud. The entry of a summary judgment would require not only a finding that the Defendants had actual knowledge of facts despite the lack of evidence of same but would require the determination – as a matter of law – that there is *no plausible conclusion* other than that any reasonable person with knowledge of those same facts would have investigated further. Such a finding would totally ignore the facts that thousands of other people and the SEC with more information than the Defendants had neither performed investigations nor discovered fraud and that federal judges have found not only that there were alternative plausible inferences which precluded summary judgment but that the inferences to the contrary were more convincing than the one urged by the Trustee. *See, e.g., Robertson v. Seidman*, 609 F.2d at 592. The same improper interpretation would be required to find as a matter of law that if the Defendants had investigated, they would have found proof of the fraud despite the fact that even experts failed to do so.

### IV.  AN AWARD OF PREJUDGMENT INTEREST WOULD BE TO DISREGARD RATHER THAN APPLY EQUITABLE STANDARDS

The Trustee's sole argument for prejudgment interest is that it has been awarded in other cases, without any reference to the facts or equities of this case. Yet, an award of prejudgment interest is not statutory or automatic; the Second Circuit has allowed it "notwithstanding the statute's silence on the subject of interest, when the awards were fair, equitable and necessary to compensate the wronged party fully." *Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,* 955 F.2d 831, 835 (2d Cir. 1992).

The Trustee has not proven that a consideration of the equities of this case result in an award of interest. There is no evidence at all that any of the Defendants had any knowledge of any wrongdoing of Madoff, much less that they did anything wrong themselves. Yet, the Trustee

is seeking in this case not only millions of dollars in distributions made to entities such as Grosvenor and Aster but is seeking from each partner the total distributed to the partnerships regardless of what small fraction thereof was actually distributed to individual partners.   He is seeking, for example, principal alone of 3.5 million against Defendant, Rachel Liersch, a partner of Aster, even though by his own calculations, she and her trusts combined (without evidence of how much she actually received) beneficially received approximately $500,000.00 from Aster after December 8, 2006.  Amended Complaint, ECF # 86, Exhibit D-17, page 27.  To then award an additional $1.8 million at the 4% requested by the Trustee is nothing but punitive – especially when there has been absolutely no attempt to allege that she had any knowledge at all of any allegations or suspicions relating to Madoff. Such a result would totally ignore the obligation to award interest only when it would be equitable to do so.  Dianne, too, is being subjected to possible additional liability of over $4.5 million as a result of her partnership in St. James alone (not even considering interest sought from Grosvenor or Mayfair), despite the lack of any involvement in, or knowledge of, any wrongdoing.

 While a partner's knowledge may be imputed to Aster, such imputed knowledge to the entity does not translate into actual or imputed knowledge to other individual partners, especially when the test is based upon equitable considerations.

Situations in which prejudgment interest is inappropriate include those when the defendant acted innocently and had no reason to know of the wrongfulness of his actions; when there is a good faith dispute between the parties as to the existence of any liability; or when the plaintiff himself is responsible for the delay in recovery.  *Id.* at 834-835.  Since there should be no prejudgment interest when the defendant "had no reason to know of the wrongfulness of *his* actions" and there are no allegations that the Defendants had knowledge of *anyone's* wrongful

conduct, much less their own, interest in this case would defeat the purpose for the discretionary allowance of such interest.

A factor cited in other cases brought by the Trustee which resulted in interest awards is the need to retry issues despite "the law of the case." The Trustee has not raised that as a reason for an award of interest in this case. Furthermore, that principal only relates to law, not facts and is inapplicable in this case because Defendants have introduced expert testimony and facts not relied upon by others. To the extent that arguments are similar to those raised in other cases, then the Trustee should not have had to spend much time on addressing them.

Another justification for an award of interest has been when the defendants caused delays. Again, this issue is not raised by the Trustee as a reason for awarding interest in this case; nor could it be determined via summary judgment because questions of fact exist as to which parties caused any delays. Furthermore, parties should not be penalized for preserving issues for appeal, even if similar issues had been decided adversely in other cases. To rule as such would be putting litigants and their counsel in the untenable position of waiving arguments on appeal or risking an exponential increase in damages.

Nor should issues about what a fair interest rate should be or from what date interest should be calculated be determined as a matter of law on summary judgment, and certainly not on the present record which is void of any evidence of what would be fair.

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 624 B.R. 55 (Bankr. S.D.N.Y. 2020), cited by the Trustee, was not determined on a summary judgment basis but after trial and was based in part upon findings of fact which could not be made in this case, including that the defendants in that case went so "far as to withdraw their customer claims in order to strip this

Court of equitable jurisdiction over these avoidance actions and delay a prior scheduled trial." *Id.* at 65. The equities here weigh against an award of prejudgment interest.[12]

## CONCLUSION

For the foregoing reasons, this Court should enter a report and recommendation[13] denying the Trustee's motion for partial summary judgment in its entirety.

Dated; April 5, 2022

NASON YEAGER GERSON
HARRIS & FUMERO, P.A.

By:    /s/ Gary A. Woodfield___
       Gary A. Woodfield
       gwoodfield@nasonyeager.com
       3001 PGA Boulevard, Suite 305
       Palm Beach Gardens, FL 33410
       Tel: (561) 686-3307
       Fax: (561) 686-5442
       *Attorneys for Frank Avellino, et al.*

---

[12] The Trustee seeks interest from December 11, 2008 – the date of Madoff's arrest. Trustee's Memo at 38. However, the Trustee did not file his initial complaint against the Defendants until December 10, 2010. ECF # 1. If interest were to be awarded, it should not commence before the filing of the initial complaint. *See, Picard v. JABA Assocs. LP,* 528 F. Supp. 3d at 245.

[13] Bankruptcy Court may not enter a final judgment without the parties' consent, which has not been given. *Stern v. Marshall,* 564 U.S. 463, 487 (2011).