# EXHIBIT 12

# Bernard L. Madoff

## Vol. 1

### 10/19/2015

Page 1

```
 1          IN THE CIRCUIT COURT OF THE
            SEVENTEENTH JUDICIAL CIRCUIT
 2      IN AND FOR BROWARD COUNTY, FLORIDA
            CASE NO.: 12-034123(07)
 3          COMPLEX LITIGATION UNIT

 4

 5      -------------------------------------

 6      P&S ASSOCIATES, GENERAL PARTNERSHIP,
        ET AL.,
 7                        Plaintiffs,

 8              -vs-

 9      STEVEN JACOB, ET AL.,

10                        Defendants.

11      -------------------------------------

12

13

14

15              VIDEOTAPED DEPOSITION

16                      OF

17              BERNARD L. MADOFF

18

19              Taken by the Plaintiffs
20              Butner, North Carolina
                   October 19, 2015

21

22

23

24      Reported by: Lisa A. DeGroat, RPR
                     Notary Public
25
```

Page 2

```
 1      APPEARANCES

 2

 3      On behalf of the Plaintiffs:

 4          Leonard K. Samuels, Esq.
            Steven D. Weber, Esq.
 5          Paul Steven Singerman, Esq.
            Berger Singerman, L.L.P.
 6          1450 Brickell Avenue
            Suite 1900
 7          Miami, Florida  33131
            (305) 755-9500
 8          lsamuels@bergersingerman.com

 9              -and-

10          Thomas M. Messana, Esq.
            Messana, P.A.
11          Las Olas City Centre, Suite 1400
            401 East Las Olas Boulevard
12          Fort Lauderdale, Florida  33301
            (954) 712-7400
13          tmessana@messana-law.com

14

15      On behalf of the Defendant Mr. Avellino:

16          Gary A. Woodfield, Esq.
            Haile, Shaw & Pfaffenberger, P.A.
17          660 U.S. Highway One, Third Floor
            North Palm Beach, Florida  33408
18          (561) 627-8100
            gwoodfield@hailieshaw.com
19

20

21      On behalf of the Defendant Mr. Bienes:

22          Jonathan Etra, Esq.
            Broad and Cassel
23          One Biscayne Tower, 21st Floor
            2 South Biscayne Boulevard
24          Miami, Florida  33131
            (305) 373-9447
25          jetra@broadandcassel.com
```

Page 3

```
 1          APPEARANCES (Cont'd)

 2

 3      Also present:

 4          Trae Howerton, Videographer
            Phil Von Kahle
 5

 6

 7

 8

 9

10

11          VIDEOTAPED DEPOSITION OF BERNARD L. MADOFF,

12      taken by the Plaintiffs, at FCI Butner Medium I,

13      Old NC Highway 75, Butner, North Carolina, on the 19th

14      day of October, 2015, at 9:08 a.m., before Lisa A.

15      DeGroat, RPR and Notary Public.

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1          INDEX OF EXAMINATIONS

 2      THE WITNESS:  BERNARD L. MADOFF        EXAMINATION

 3          By Mr. Samuels . . . . . . . . . . . . . . .    8

 4          By Mr. Woodfield . . . . . . . . . . . . . .  244

 5          By Mr. Etra . . . . . . . . . . . . . . . .   247

 6          By Ms. Samuels . . . . . . . . . . . . . .   256

 7          By Mr. Etra . . . . . . . . . . . . . . . .   262

 8

 9

10          INDEX OF EXHIBITS

11      PLAINTIFFS' NO.                              PAGE

12       1  8/7/91 letter, 2 pgs.  . . . . . . . . .    29

13       2  PBS interview with Michael Bienes, 47 pgs.  38

14       3  Portion of DiPascali's testimony, 12 pgs.   50

15       4  3/9/92 letter, 6 pgs. . . . . . . . . . .    72

16       5  Account document for P&S Assoc., 1 pg.   116

17       6  Portion of DiPascali's testimony, 10 pgs.  166

18       7  12/12/08 fax and correspondence, 9 pgs. .  177

19       8  Graphs, 6 pgs. . . . . . . . . . . . . . .  204

20       9  Amended and Restated Partnership Agreement,
            14 pgs. . . . . . . . . . . . . . . . . .   256
21
        10  A&B graph, 1 pg. . . . . . . . . . . . .   258
22

23

24

25
```

**Page 5**

1              THE VIDEOGRAPHER:  Going on the record
2    at 9:06 a.m.  Today's date is October the 19th,
3    2015.  This begins the video deposition of
4    Bernard Madoff.
5         If counsel will please state their
6    appearances for the record, then we can have our
7    court reporter swear in the witness.
8              MR. SAMUELS:  Leonard Samuels,
9    representing the plaintiffs, S&P, P&S and Phil
10   Von Kahle.  With me are Steve Weber and Tom
11   Messana, as well as Mr. Phil Von Kahle.
12              MR. WOODFIELD:  Gary Woodfield, on
13   behalf of Frank Avellino.
14              MR. ETRA:  Jonathan Etra, on behalf of
15   Michael Bienes.
16                   * * * * *
17              PROCEEDINGS
18                   * * * * *
19   Whereupon,
20              BERNARD L. MADOFF,
21    having first been duly sworn, was examined
22              and testified as follows:
23              EXAMINATION
24   BY MR. SAMUELS:
25        Q.   Good morning, Mr. Madoff.

**Page 6**

1         A.   Morning.
2         Q.   My name is Leonard Samuels.  I'm counsel for
3    S&P and P&S.  I'm with Berger Singerman, down in Fort
4    Lauderdale, Florida, where it's a lot warmer than it
5    is here.  And I've already introduced you to the rest
6    of the people here on our side.
7         Have you ever -- please state your name for
8    the record.
9         A.   Bernard Madoff.
10        Q.   Okay.  And have you ever had your deposition
11   taken?
12        A.   Yes, I have.
13        Q.   And when was the last time?
14        A.   Probably about a year ago.
15        Q.   And was that while you were here in --
16        A.   Yes.
17        Q.   -- North Carolina?
18        A.   Uh-huh.
19        Q.   And what was the nature of that?
20        A.   It was a -- a litigation against, I think it
21   was, Banco Santander.
22        Q.   And was the bank purportedly a feeder fund
23   into the Madoff advisory services?
24        A.   They were.  The bank was a feeder fund, but
25   I don't think the -- I think that the attorneys

**Page 7**

1    decided not to proceed on the suit.
2         Q.   Okay.
3         A.   They took the deposition.  I'm sort of --
4    I'm sort of confused as to what happened, but I guess
5    they felt that they -- they weren't going to be able
6    to be successful in the suit, but there were
7    settlements going on all around at the time.  So I
8    gave a deposition, and then they told me that they
9    weren't going to go further.
10        Q.   And have you had your deposition taken in
11   any -- in any other instances since you've been in
12   prison?
13        A.   No.
14        Q.   Okay.  And how about before, when you were
15   out working?
16        A.   I was never involved in any litigation ever
17   until this happened, and I -- I don't believe I ever
18   gave a deposition.  I might have given some SEC
19   deposition based upon my position with two different
20   committees that I served on, but nothing involving
21   litigation with me or the firm.
22        Q.   Okay.  Well, I -- I just want to go over a
23   few of the ground rules here with you today.
24        A.   Oh, okay.
25        Q.   And so I just want to understand your

**Page 8**

1    background and history of having your deposition
2    taken.  So I'm going to ask you a series of questions
3    today.  And you've been put under oath, and you would
4    be expected to answer truthfully.
5         A.   Uh-huh.
6         Q.   Also, we have a court reporter here, who is
7    taking everything down.  So if you could answer
8    verbally, as opposed to nodding your head, that would
9    be --
10        A.   Right.
11        Q.   -- helpful for the court reporter.  Okay?
12   And then let's not try to talk over one another.  A
13   lot of times it can get conversational.  We may have a
14   habit of doing that, but let's try not to do that to
15   you -- again, make it easier for the court reporter.
16   Okay?
17        A.   Uh-huh.
18        Q.   And if I ask you a question, you don't
19   understand it, just let me know.  I'll try to rephrase
20   it for you.  All right?
21        A.   Okay.
22        Q.   Okay.  Do you know anything about this case
23   at all --
24        A.   No.
25        Q.   -- that we're here on today?

Page 9

1          Okay.  So, just by way of background, as I

2    mentioned, I represent S&P and P&S Associates that

3    were based down in Fort Lauderdale, and they had a

4    number of people -- a number -- they were general

5    partnerships, and they had partnerships -- they had

6    partners in the general partnerships, who lost money

7    as P&S and S&P invested in Madoff.

8          So we're here today in an effort -- we have

9    filed a lawsuit against Mr. Avellino and Mr. Bienes

10   and others in an effort to recover funds on behalf of

11   those investors.  Many of whom are elderly.  Some of

12   whom who have already passed away.  Okay?

13       A.    Okay.

14             MR. ETRA:  Objection to the form.

15   BY MR. SAMUELS:

16       Q.    So I just want to let you know that that's

17   the background, in terms of who the people are on our

18   side.

19          Now, I want to talk to you a little bit

20   about the business that you were operating -- that you

21   were operating as part of BLMIS.  I understand that

22   there was a market-making part of the business; is

23   that right?

24       A.    That's correct.

25       Q.    And what did that business do?  What did

Page 10

1    that consist of?

2        A.    Before I get into that, could I ask you --

3        Q.    Sure.

4        A.    Were -- were your clients direct clients of

5    mine or, you know, did they have an account with me

6    under the name of --

7        Q.    Yes.

8        A.    -- S&P or --

9        Q.    S&P and P&S each had a separate account as

10   general partnerships.  Have you heard of them before?

11       A.    No.

12       Q.    Okay.  Have you heard of a gentleman by the

13   name of Michael Sullivan?

14       A.    It sounds familiar.

15       Q.    Okay.

16       A.    It sounds familiar.

17       Q.    Mr. Sullivan was a general manager -- the

18   managing general partner of the two partnerships, and

19   he eventually was replaced as a general manager by

20   Mr. Von Kahle, who was appointed by the court.

21   Mr. Von Kahle is actually called a conservator --

22       A.    Right.

23       Q.    -- by the judge, but he's really in the role

24   of a receiver.

25       A.    Uh-huh.

Page 11

1        Q.    Very similar.  So -- and he's authorized to

2    file a lawsuit against Mr. Bienes --

3        A.    Okay.

4        Q.    -- and Mr. Avellino against others, in an

5    effort to assist our clients in recovering funds.

6          And are you familiar with first-tier

7    claimants versus second-tier claimants or anything

8    like that?

9        A.    Not really.

10       Q.    Okay.  Well -- well, just again, by

11   background, S&P and P&S would be first-tier claimants,

12   who have a claim through SIPC.  And the partner -- the

13   actual partners under that would be considered

14   second-tier people to recover, because they don't have

15   direct accounts.  They didn't have direct accounts

16   with Madoff.  Although, S&P and P&S did.  Okay?

17          So, generally speaking, it's our

18   understanding the first tier -- do you have any

19   understanding about how much money the --

20       A.    Oh.

21       Q.    -- first-tier people are recovering?

22       A.    Well, yeah.  I have -- I have an idea about

23   all of that.  I don't know whether your -- these

24   people -- your clients are considered net losers or

25   net winners.  What --

Page 12

1        Q.    All right.  So what is your understanding,

2    in terms of how all of that is -- is working?

3        A.    Well, a -- a net loser is basically, you

4    know, where they -- they have not recovered their

5    principal.  So the net winners are people that

6    withdrew more money over the lifetime of their account

7    than they deposited.

8        Q.    Right.

9        A.    And, you know, my understanding was -- you

10   know, I've been following the -- the GAO report, and

11   I've read it.  So I'm familiar with all of that, and I

12   know how much has been recovered and -- you know, so I

13   understand all of that.

14       Q.    So S&P and P&S do have claims, and some

15   claims have been paid, but the partners then who are

16   underneath the actual partnership, then they have to

17   deal with each other, in terms of figuring out who the

18   net winners and net losers are --

19       A.    Right.

20       Q.    -- under there.  So there's a whole other

21   layer.  So we've been referring to the actual partners

22   as like a tier-two --

23       A.    Okay.

24       Q.    -- recovery.  And the tier-two folks are not

25   recovering as much money as the tier-one folks.  So

Page 13

1  they're hoping to recover in this lawsuit against
2  Mr. Avellino and Mr. Bienes.  Okay?
3      A.   Uh-huh.
4      Q.   All right.  Actually, before we get into
5  your business, let's just talk a little bit about your
6  background, if we can, just briefly where you went to
7  college and what degree you had.
8      A.   I went to college.  I started at the
9  University of Alabama, and then transferred up to
10  Hofstra College, where I graduated with a — a
11  Bachelor of Arts degree in Political Science, in
12  preparation to go to Brooklyn Law School, which I
13  attended for one year and then dropped out to run my
14  broker-dealer business.
15      Q.   By — by the way, my father went to Hofstra
16  and Brooklyn Law.
17      A.   Did he?
18      Q.   Yes, he did.  Both.
19           Okay.  So you then became a broker-dealer
20  in —
21      A.   1960.
22      Q.   Okay.  And have you heard of an accounting
23  firm called Alpern & Heller?
24      A.   Alpern & Heller.  Right.
25      Q.   Okay.  And did he — tell me who Saul Alpern

Page 14

1  is.
2      A.   He's my father-in-law.
3      Q.   Okay.  And was there a point in time when
4  you were operating your broker-dealer business out of
5  their offices?
6      A.   Yes.
7      Q.   Okay.  And was that in the early '60s?
8      A.   Right.
9      Q.   And was there then a point in time when you
10  moved out of their offices?
11      A.   Yes.
12      Q.   Okay.  And so after you moved out of their
13  offices, I take it, your business expanded greatly?
14      A.   Yes.
15      Q.   Okay.  And so tell me about the different
16  businesses that you ultimately expanded into.  I
17  understand there's a market-making part.
18      A.   Yes.
19      Q.   Okay.
20      A.   That was the main part of my business.
21      Q.   And what did the market-making do?  Can you
22  describe that for me?
23      A.   Market-making was a — a whole — considered
24  to be a wholesale firm that basically dealt primarily
25  with other broker-dealers.  So if a client bought —

Page 15

1  if — as applied to Merrill Lynch, for example, wanted
2  to buy a stock in an over-the-counter company — this
3  is prior to NASDAQ — they would — Merrill Lynch —
4  if he did not have his own market-making operation,
5  which sometimes they did, would go to — you know, to
6  a market-making firm, like myself, and — who had an
7  inventory of securities that we made markets in.
8           And he would buy the stock from us and then
9  charge the client the commission.  And the
10  market-maker made his profit or loss based upon
11  usually the spread or how his inventory did in a
12  particular security.
13      Q.   And that was the biggest part of your
14  operation?
15      A.   That was the biggest part of my operation.
16      Q.   And how many people worked in the
17  market-making end of things?
18      A.   Close to 100 —
19      Q.   Okay.
20      A.   — at the end.  Not in the beginning.  In
21  the beginning it was smaller.
22      Q.   Okay.  And you built the whole thing up?
23      A.   Right.
24      Q.   Okay.  And tell me about — I understand
25  there was a proprietary trading —

Page 16

1      A.   Yes.
2      Q.   — business.
3      A.   That's also substantial.
4      Q.   And tell me about that business.
5      A.   That's a business where — where we have a
6  certain number of traders.  I guess it was about 25,
7  who just traded for the firm's own account.  Meaning
8  we would take positions.
9           It was very similar to what market-makers
10  do, except they're risking the firm's own capital and
11  basically taking — keeping an inventory of — it
12  could be any stock, both listed or NASDAQ security.
13  And that was a very profitable operation for us.
14      Q.   And you built that up from scratch as well?
15      A.   That is correct.  That came in — well,
16  the — we were always proprietary traders.
17  Proprietary traders and market-makers, basically the
18  same type of — of business.  The traders are
19  basically the same skill set.
20           And sometimes a market-maker is also
21  trading — actually, a market-maker is always trading
22  for the firm's account once, because he's — he's
23  either putting — buying stock into his own inventory,
24  in anticipation of selling it out to a client, or he
25  is just, you know, playing the market, so to speak.

Page 17

1    Q.    And then there was an investment advisory

2    portion; correct?

3    A.    That's correct.  Yeah..

4    Q.    And -- and before we get to that, how many

5    people worked in the proprietary trading at its peak?

6    A.    About 25, I would assume.

7    Q.    Okay.  And then we had the investment

8    advisory business; correct?

9    A.    That's correct.

10    Q.    Okay.  And that's the business that caused

11    you to be here today?

12    A.    That caused the problems.  Right.

13    Q.    Caused the problems.  Okay.  And how many

14    people worked in the investment advisory end?

15    A.    Well, there were myself, Frank DiPascali.  I

16    would say there were probably six other people, other

17    than myself.  Plus there were bookkeepers.  So

18    there -- I guess there would be -- there were probably

19    close to 20 people involved in that end of the

20    business.

21    Q.    Okay.  Getting back now to Alpern &

22    Heller --

23    A.    Uh-huh.

24    Q.    -- where you were working, then you

25    eventually moved out of.  Did Alpern & Heller ever

Page 18

1    have an account through the investment advisory

2    business of yours?

3    A.    Yes.

4    Q.    Okay.  And did that firm at any point in

5    time become known as Alpern & Avellino?

6    A.    Yes.

7    Q.    Okay.  And so did Alpern & Avellino also

8    maintain an investment advisory account?

9    A.    Yes.

10    Q.    Okay.  So -- and Avellino would be Frank

11    Avellino; correct?

12    A.    Correct.

13    Q.    And when Alpern & Heller established that

14    account, was that your first account?

15    A.    No.  It was -- I don't think then -- I'm not

16    sure if the name of the account was Alpern & Heller or

17    just -- no.  Maybe it was Alpern & Heller, because

18    there were two partners at the -- when I first started

19    in business, there was Saul Alpern, my father-in-law,

20    and there was another, Sherman Heller.

21    They were the two -- I think Frank Avellino

22    worked for them at that time, and they had other

23    accountants.  They were sort of a small-to-medium-size

24    accounting firm.

25    And Mike Bienes joined them at a later -- at

Page 19

1    a later date.  The -- the accounts that they had

2    was -- I guess it was a -- I'm not sure if the

3    structure was a general -- a limited partnership

4    account or just a -- an informal partnership account.

5    Q.    But --

6    A.    You know, if there was such a thing.

7    Q.    But through the account they invested with

8    you through --

9    A.    Yeah.  They -- they invested primarily for

10    other -- for their clients.

11    Q.    Okay.

12    MR. ETRA:  Objection to the form.

13    THE WITNESS:  Their accounting firm

14    clients.

15    MR. ETRA:  Couldn't get it in.

16    BY MR. SAMUELS:

17    Q.    And let's now talk about Frank Avellino.

18    You mentioned his name.  When did -- when do you first

19    recall meeting Mr. Avellino?

20    A.    Probably when I first moved into my

21    father-in-law's office.  It must have been in the

22    early '60s.

23    Q.    And was he already working there as an

24    accountant --

25    A.    I believe so.

Page 20

1    Q.    -- for your father-in-law?

2    A.    Yes.

3    Q.    Okay.  Let's -- we're -- we're starting to

4    talk on top of each other.  I think we're going to

5    drive the court reporter crazy.  So let's try not to

6    do that.

7    Okay.  And the Alpern -- do you know what a

8    feeder fund is?

9    A.    Yes.

10    Q.    And what is a feeder fund?

11    A.    A feeder fund is basically a hedge fund that

12    assembles clients, individual clients, and then they

13    place their money from the fund with an investment

14    manager, type investment manager.  They, themselves,

15    usually do not make, for the most part, the investment

16    decisions.

17    Q.    Okay.  Do you know if Alpern & Avellino or

18    one of its predecessor companies, Alpern & Heller, was

19    the actual feeder fund for your company?

20    A.    Well, maybe I should explain to you how it

21    first started.  I think it would be easier.

22    Q.    Okay.

23    A.    The -- the concept when it was first formed

24    was that they had a group of accounting clients that

25    were, I would say, fairly successful individuals.  And

Page 21

```
1   rather than me have -- open up individual accounts for
2   the individuals, what they did was my father-in-law
3   formed a partnership, I guess, where they put in a
4   certain amount of money each.
5          I opened up the account as, let's say,
6   Alpern & Heller, was the name of the account, and I
7   bought -- I treated them as one account.  Alpern &
8   Heller was the -- was the account.  They --
9          And what happened was if I bought, for
10  example, 10,000 shares of stock, and -- the
11  transactions were all basically arbitrage transactions
12  involving convertible securities, where you buy a bond
13  or a preferred, and then you short the common stock
14  against it.  And it's considered to be -- it's not --
15  it's class -- it's classified as bona fide arbitrage
16  or riskless arbitrage.
17         The -- then if I bought, for example, 10,000
18  shares of stock based upon, for argument's sake,
19  $100,000, I would confirm that to -- to the -- to
20  Alpern & Heller, to the partnership.  They would then
21  break up based upon the proportionate amount of money
22  that was invested by each one of the individuals.
23         So if they had, for example, ten clients,
24  each putting in $10,000, of that $100,000, and I
25  bought $100,000 worth of stock, I would confirm that I
```

Page 22

```
1   bought $100,000 worth of stock.
2          My father-in-law would then issue a
3   confirmation or some sort of document that's -- that
4   treated each individual client at exactly the same
5   price that I had bought the transaction.
6          And all they did was they charged them an
7   accounting fee, which, I guess, was maybe a percent or
8   so of the transaction.  So the client was filing a tax
9   return as if he had an account with me for each
10  individual stock.
11         That was the way the operation handled --
12  was handled until a later date, when they changed the
13  format.
14  Q.     All right.  Well, let's get into the change
15  in the format a little bit.  And so Frank Avellino,
16  you met.  Did you -- in the '60s and, let's say, the
17  '70s.  Did you have a -- what kind of relationship did
18  you have with Mr. Avellino?
19  A.     The same as I had with my father-in-law.  I
20  mean, basically he -- he was an accountant up there.
21  And most of the time there were -- there was actually
22  not a great deal of conversation involved, because I
23  was handling all of the purchases and sales.
24         And after I sent them a confirmation of what
25  they bought and sold, I never spoke to their clients,
```

Page 23

```
1   you know.  I mean, I might have known some of them
2   over the years, because I -- you know -- you know,
3   I -- I -- I sort of grew up knowing a lot of these
4   people.
5          So -- but, as far as I was concerned, the --
6   the account was -- my client was Alpern & Avellino,
7   that account.  And my father-in-law handled the
8   bookkeeping aspect of it.
9          And that was, to me, sort of -- it was
10  really no different than an investment club.  So if --
11  an investment club was very common certainly in those
12  days.
13         And it was a similar type of thing, where a
14  group of people would get together, pool money into
15  the stock.  They would open an account with Merrill
16  Lynch or someone like myself and do exactly the same
17  thing.
18         And sometimes they would file a partnership
19  return.  You know, sometimes they would actually split
20  up -- more commonly they would split up exactly what
21  my father-in-law did, and that was a relatively simple
22  operation.
23  Q.     And -- and back in the early days, and
24  before it changed, you mentioned it changed, and we'll
25  get to that, but before it changed were the trades
```

Page 24

```
1   actually being executed back then?
2   A.     They were trades all being executed.
3   Q.     Okay.
4   A.     Yes.
5   Q.     All right.  And so you mentioned like you
6   grew up with them.  Did you know Mr. Avellino before
7   he showed up working for --
8   A.     No.
9   Q.     -- your father-in-law?
10  A.     No.
11  Q.     Okay.  So you had a business relationship
12  with him back then, I take it?
13  A.     Well, only as --
14  Q.     Mr. Avellino?
15  A.     The same as --
16  Q.     Right.
17  A.     As Saul Alpern.
18  Q.     And did you have a personal relationship
19  outside of your business relationship --
20  A.     No.
21  Q.     -- with Mr. Avellino?
22  A.     No.  Social?  No.
23  Q.     Okay.  All right.  So you mentioned at one
24  point -- at some point in time that changed.  Did it
25  change after -- strike that.
```

Page 25

1          Let's talk about Mr. Bienes, Mr. Michael
2      Bienes.  When did you first meet him?
3      A.      I first met him when he joined Alpern &
4      Heller.  And I think my first experience with him was
5      he handled an -- an IRS tax audit that I -- that I
6      had.
7      Q.      For you personally?
8      A.      For me personally.  Right.
9      Q.      Okay.  And how did he do?
10     A.      How did he -- what?
11     Q.      How did he do for you?
12     A.      Fine, I guess.  I mean --
13     Q.      Okay.
14     A.      -- I never had any IRS issues.  It was
15     basically just, you know -- you know, travel and
16     entertainment.  The typical tax audit.
17          MR. SAMUELS:  Okay.  Now, I am going to
18     look for a document.
19          (WHEREUPON, MR. SINGERMAN THEN ENTERED
20     THE ROOM.)
21          MR. SAMUELS:  Can you ask him for
22     another chair?
23          (DISCUSSION HELD OFF THE RECORD.)
24     BY MR. SAMUELS:
25     Q.      Okay.  And what sort of interactions did you

Page 26

1      have with Mr. Bienes back in the '60s and '70s?
2          You had a business relationship with him.
3      He was -- handled an audit for you, and he was working
4      with Mr. Avellino; correct?
5      A.      Just -- yeah, just the same as --
6          MR. ETRA:  Objection to the form.
7          Sorry.  I just -- I know Mr. Samuels
8      has asked you this.  It helps to pause.  That way
9      we don't speak over each other, and it gives us a
10     chance to --
11         THE WITNESS:  Okay.
12         MR. ETRA:  An objection is just
13     something we do for the record.
14         THE WITNESS:  Right.
15         MR. ETRA:  And then the deposition can
16     continue.
17         Sorry.  Go ahead.  Objection to form.
18     Go ahead.
19         THE WITNESS:  The relationship with
20     Mike Bienes and Frank Avellino was similar.  It
21     was the same -- same type of interaction.  Frank
22     Avellino was more of a bookkeeper type.
23         You know, had -- had -- had a better
24     sort of handle on -- on the actual transactions.
25     Mike Bienes, I think, was more -- I'm guessing

Page 27

1      was more of an -- or had more interaction with
2      the clients.  I don't know that really for a
3      fact.  I'm just -- he was sort of more outgoing
4      than -- than Frank Avellino.
5      BY MR. SAMUELS:
6      Q.      Now, you mentioned at some point in time
7      the -- the business relationship changed or the way
8      they were doing business with you changed.
9      A.      Yes.
10     Q.      And so explain that change to me.  You've --
11     A.      Well --
12     Q.      -- described earlier how the money was
13     coming in to you.  When did that change, and how did
14     it change?
15     A.      What happened was -- and I guess it was the
16     summer of 1992, I got a frantic phone call from Frank
17     Avellino, saying that he got a -- he was notified by
18     the SEC about a problem that was occurring with the
19     SEC, claiming that somebody had filed a complaint
20     against the -- against Avellino and Bienes, I guess it
21     was, that said that they were operating an illegal
22     partnership that was not registered with the SEC.
23         So I said to him, what are you talking
24     about?  And they explained to me that apparently what
25     happened was they had changed from the system that my

Page 28

1      father-in-law was using, of breaking up all of the
2      transactions and then reporting those to the clients
3      as they occurred for that account.
4          They were issuing interest-bearing notes
5      instead to the clients.  And that was the first time
6      that I became aware of that.  And they also had --
7      there were other partnerships involved, Glantz &
8      Levey, and some other partnerships involved that were
9      clients of theirs.
10         And there was sort of this whole web of
11     situations, and they were all operating the same way
12     with interest-bearing notes.
13     Q.      So Mr. Avellino and Mr. Bienes didn't ask
14     your permission or notify you that they were --
15     A.      No.
16     Q.      -- in fact, issuing notes to people?
17     A.      No.
18     Q.      And is that the first time you learned of
19     that, the summer of 19 --
20     A.      That's correct.
21         MR. SAMUELS:  I just want to show you a
22     document we'll mark as Exhibit 1.  You guys can
23     share that.
24         (PLAINTIFFS' EXHIBIT 1 WAS MARKED FOR
25     IDENTIFICATION.)

Page 29

```
1   BY MR. SAMUELS:
2        Q.   Now, this is a letter from Avellino &
3   Bienes.  And when you're talking about the note
4   situation, would that be a timeframe when it was under
5   Avellino & Bienes --
6        A.   Yes.
7        Q.   -- as opposed to your father-in-law?
8        A.   Well, I think there were -- there were a
9   number of accounts.  There was -- one account was
10  Avellino & Alpern.  There was another account,
11  Avellino & Bienes.
12            There were -- I think it's -- at one point
13  there were like five different accounts, five
14  different partnership accounts.
15       Q.   But at the time it changed to the use of
16  notes were Avellino & Bienes actually running the
17  business that your father-in-law previously had?
18       A.   Yes.  My father-in-law, I think, at that
19  time had already retired and --
20       Q.   Okay.
21       A.   -- moved down to Florida.
22       Q.   Okay.  So I'm showing you a letter from
23  Avellino & Bienes, on August 7th, 1991.  Where
24  Avellino & Bienes talk about accommodating relatives,
25  friends and former clients that we serviced who were
```

Page 30

```
1   then CPAs.
2            Was is it your understanding that Avellino &
3   Bienes were getting investments from or issuing notes
4   to relatives, friends, former clients and the like?
5        A.   Not until '92, when I was informed by the --
6   when they had this SEC issue.
7        Q.   Okay.  And also here in the letter, if you
8   go to the third paragraph, it says, "We do not
9   encourage new accounts, and, therefore, we do not
10  solicit same.  We do, however, like to accommodate
11  those individuals that are recommended as you have
12  been through Virginia Atherton."
13       A.   Uh-huh.
14       Q.   "Summarily, this is a very private group,
15  and no financial statements, prospectuses or brochures
16  have been printed or are available."  Do you see that?
17       A.   Yeah.
18       Q.   Okay.  So did you become aware in the summer
19  of 1992 that Avellino & Bienes had been accepting
20  accounts from people who they considered to be
21  relatives, friends, former clients and the like and
22  that they were running a fairly private operation --
23            MR. ETRA:  Objection to the form.
24       Q.   -- in terms of who they were allowing to
25  invest?
```

Page 31

```
1        A.   Well, as far as I knew, they were the same
2   group of clients.  I mean, they were all clients of
3   the -- of the accounting firm.  That was -- you know,
4   as to whether or not they expanded it or not --
5            I mean, I was aware of the fact that the
6   accounts grew, but most of the people were reinvesting
7   the profits.  They were, you know, not withdrawing all
8   the profits.  They were withdrawing a portion of the
9   profits.
10           Everybody sort of did things differently.
11  So the account certainly grew in time.  I think at the
12  time that I became aware of this issue at the SEC
13  there was like 500 plus million dollars in the
14  account.
15           They had -- when they first started, it was
16  nowhere near that amount of money, but it was started
17  like in, you know, the '60s.  So a lot of years
18  transpired.
19       Q.   And in terms of the 500 million plus in the
20  account that you recall, would that have made Avellino
21  & Bienes and their affiliated groups the largest
22  feeder fund into Madoff?
23       A.   At that time, yes.
24       Q.   And I'm not sure if I asked you this or not,
25  or if I did, I don't recall your answer.  Was your
```

Page 32

```
1   father-in-law's accounting firm the first entity or
2   individual that invested with you, Bernie Madoff, in
3   the advisory investment end?
4        A.   Yes.  Well, let me correct that.  I had some
5   family members that were also his clients as well.
6        Q.   Okay.
7        A.   Same people that, you know, were my first
8   individual clients.  And then the partnership, you
9   know, became -- came after that.
10           So my first retail clients were maybe less
11  than a dozen people that I knew since, you know -- you
12  know, I started dating my wife.  I put in a lawn
13  sprinkler business, you know, for these people and so
14  on, you know.
15           But my first experience with retail -- with
16  these -- this small group of retail clients was in
17  1960 and '62, when I had this -- my first problem,
18  where I bought a new issue, two new -- two or three
19  new issues for, I guess it was, maybe a half dozen of
20  these clients that were my father-in-law's clients.
21           And some of them were also my relatives, you
22  know, through marriage.  They were, you know, uncle --
23  my -- they were Saul Alpern's brother and -- brothers
24  and so on.
25           And I bought, you know, them new issues
```

Page 33

1    that -- that sold around -- over-the-counter stocks at
2    $2 a share.  Right after I bought them, the Cuban
3    missile crisis occurred, the market collapsed, and the
4    underwriters walked away from the market.
5        And the stocks went down to a half a dollar
6    bid, $2 off.  And that was not uncommon in -- at that
7    time.  So all of a sudden I was faced with these
8    clients that were almost like sort of relatives of
9    mine in one way or another, you know, that had lost --
10   would have lost all of their money.
11       I felt guilty about it, and I bought the
12   stock back from them at the same price that they paid
13   for it, at $2 a share, so that they didn't lose any
14   money.
15       And at that time that depleted all of my
16   capital in the firm.  I went with my hat in my hand
17   literally to my father-in-law, in tears, with my wife,
18   and asked him if I could borrow $30,000 to
19   recapitalize the firm, because I had paid these people
20   back out of -- out of the capital of the firm.
21       He gave me bonds to use, $30,000 worth of
22   bonds to use.  And after that incident, I decided I
23   was not going to do any investing for individuals,
24   other than convertible bond arbitrage, where the lines
25   for that didn't have any risk involved.

Page 34

1        That was -- that's what put me into the
2    convertible bond arbitrage business for clients.  I
3    was -- before that happened I was also making a market
4    in -- in convertible securities as well.
5        So that was -- I don't know if I answered
6    your question or not, but that was the beginning of
7    these -- my experience with these clients.
8    Q.   Okay.
9    A.   And then that expanded into -- once I
10   started doing the -- what's known as riskless
11   arbitrage, that interested my father-in-law and his
12   clients even more so.
13   Q.   So after you received some recapitalization
14   from your father-in-law, at that point in time your
15   father-in-law and the accounting firm became your
16   largest and first real client from that moment
17   forward?
18   A.   Yeah, but the -- Avellino & Alpern, the
19   partnership account, came into being after I had
20   already paid my father-in-law back.  That took about a
21   year.
22       I paid him back from my market-making
23   business, which became -- it was -- it was pretty much
24   profitable from day one.  And I was -- we were still
25   doing a small amount of retail business, but, you

Page 35

1    know, just with one or two clients.
2        So they -- the partnership account -- I
3    don't remember exactly when it -- when it started.
4    Whether it was in the '70s or late '60s or not.  I
5    don't -- I don't recall.
6    Q.   So, going back now to the -- when the
7    business changed with Avellino & Bienes that -- and
8    their business changed to the extent that they were
9    then issuing notes --
10   A.   Uh-huh.
11   Q.   -- to investors.  During that point in time
12   did you ever guarantee Avellino & Bienes or their
13   company or anyone over there a specified rate of
14   return?
15   A.   No.  The -- the returns originally -- when I
16   started doing convertible bond arbitrage, the returns
17   were always fairly substantial.  By, "substantial," I
18   mean they were usually anywhere from ten to 20 percent
19   return.
20       That was -- that was the fairly common rate
21   of return in those -- in -- you know, in those days.
22   But there was never any guarantee.  It was -- because
23   when you're doing convertible -- convertible bond
24   arbitrage was basically riskless arbitrage.
25       So when the transactions were set up, there

Page 36

1    really was no loss.  You know, once they were set up,
2    if there was -- there was a risk involved while I was
3    buying and selling the securities into my inventory.
4        So by the time that the stock was turned
5    over to the client they had a -- a two-sided
6    transaction, where they were long in bond and short
7    convertible -- long convertible bond and short stock.
8        That was -- the bonds were convertible into
9    common stock.  So it was known as bona fide riskless
10   arbitrage.
11   Q.   Did you learn in 1992, when you got the
12   phone call from Mr. Avellino, that Mr. -- that
13   Avellino & Bienes were actually guaranteeing
14   certain -- a level of payments through their
15   promissory notes that were in the range of 15, 16
16   percent often?
17   A.   In '92 what I was aware -- became aware of
18   that, that they had issued these notes.  So I knew
19   that they were obviously -- well, I didn't know that
20   they were guaranteeing them.
21       I -- I never actually saw what a note looked
22   like, but I'm assuming it was -- they were issuing
23   a -- a note.  Typically that's -- you know, that's a
24   guarantee to the client.
25   Q.   Right.  Did you ever at any point in time

Page 37

1    tell Avellino or Bienes not to register --

2        A.    No.

3        Q.    -- with the SEC?

4        A.    Well, there was never -- in the --

5    originally there was no reason to register.  They

6    were -- you know, if you -- my recollection was that

7    if you had under 100 clients, you were not required to

8    register as an investment company.

9        And, as far as the way I understood the

10   transactions, the partnerships were handled, it was

11   sort of similar to an investment club.  They -- there

12   was -- there was no --

13       And the compensation that was being taken

14   from the clients was basically an accounting fee, and

15   it was characterized as -- as a bookkeeping fee for

16   breaking up the transactions.  And they were also

17   filing the tax returns for the clients; my

18   father-in-law was and Frank Avellino at that time.

19       Once they issued the notes, which

20   happened -- which I became aware of in '92, that was

21   the problem that they got into with the SEC.

22       Also, at that same time, the SEC told me

23   that they had, you know -- you know, they were well

24   over the 100 clients.  And there would seem to have

25   been some sort of -- when I confronted Frank and Mike

Page 38

1    about that, that was sort of a very, you know,

2    excitable conversation.

3        I said, how many clients do you have,

4    because the SEC is telling me that you had hundreds of

5    clients?  They said, well, there really weren't -- you

6    know, a lot of them were the same clients.

7        They were children, you know, of clients

8    that was really, you know, the same family, and so on

9    and so forth, but it's -- and that, quite frankly, was

10   an open question at the SEC at that time, as to

11   whether or not the SEC was counting them correctly.

12       Now, but they -- I think they were still, no

13   matter how you stretched it, over 100 -- over the 100

14   threshold.  So there was no reason for them to

15   register as a hedge fund or as -- certainly as an

16   investment company as they were originally structured,

17   as I understood it.

18       MR. SAMUELS:  I'm going to show you

19   now -- and let's mark it as Exhibit 2.  This is

20   an interview of Michael Bienes on PBS.

21       (PLAINTIFFS' EXHIBIT 2 WAS MARKED FOR

22   IDENTIFICATION.)

23       MR. WEBER:  Can you guys share that

24   one?

25       MR. ETRA:  Sure.  We'll manage somehow.

Page 39

1        We'll try to manage.

2    BY MR. SAMUELS:

3        Q.    So I'm going to go through this interview a

4    little bit with you and maybe come back to it later on

5    some other topics as well, but if you go to page 17.

6        MR. ETRA:  Objection to the use of the

7    document.

8        Q.    And, by the way, before we get to this, you

9    said that -- you described a conversation you had with

10   Mike Bienes and Frank Avellino about their lack of

11   registration.  Anything else you remember about that

12   conversation that you haven't told us about yet?

13       A.    No.  I think basically I've --

14       Q.    Okay.

15       A.    I've covered the extent of the conversation.

16       Q.    So here is an interview that Michael Bienes

17   gave on Frontline.  I want to turn to page 17 for a

18   moment --

19       A.    Uh-huh.

20       Q.    -- where it talks about whether or not they

21   should have been licensed.  And there's a question

22   towards the bottom that says, "So why didn't you just

23   get yourself licenses?"

24       Answer, "Because you can't just do that,

25   because Bernie didn't want us to."

Page 40

1        "So Bernie was calling the shots here?"

2        "Oh, of course, he is.  Always was.  We were

3    always captive to him.  He owned us."

4        Q.    Do you see that?

5        A.    Uh-huh.

6        Q.    So do you know why -- do you know why

7    Mr. Bienes is stating that you told them not to get

8    licenses?  That's not what you said.

9        A.    There was no reason to get licenses.  I

10   mean, you know, I don't even remember him asking me to

11   get licensed.  There would have been -- there would be

12   no reason to get licensed.

13       I mean, nobody registered with the SEC

14   unless it was necessary.  I mean, so to this day

15   nobody wants to register as an investment advisor.

16   Nobody wants to register as an investment company,

17   because it subjects you to all sorts of -- of

18   regulations.

19       So that's -- that's a battle that as --

20   as -- I was very familiar with, because I served on

21   most of the regulatory bodies, you know, for the SEC

22   and the --

23       THE COURT REPORTER:  "And the" -- what?

24       THE WITNESS:  Regulatory bodies.  So it

25   was not unusual for someone to not want to

Page 41

1    register.  There was nothing that didn't -- that
2    doesn't necessarily mean they thought they were
3    doing anything wrong, but clearly nobody wanted
4    to subject themselves to regulatory bodies if
5    they didn't have to.
6         And as I understood the way the
7    operation was running, they were well under 100
8    clients.  So there would be no reason to register
9    as an investment company.
10        (DISCUSSION HELD OFF THE RECORD.)
11   BY MR. SAMUELS:
12   Q.   Okay.  So I want to go back to the
13   interview.  Just to learn -- understand the status and
14   how things were in 1992 with Avellino and Bienes.
15        So if you look at the lower right-hand
16   corner of the interview.  It says, "Bienes, along with
17   his partner, Frank Avellino, funneled money to
18   Madoff's investment advisory business for decades.  By
19   the time the Securities and Exchange Commission shut
20   them down for being unlicensed in 1992, the men had
21   more than 3,200 clients with 441 million invested with
22   Madoff."
23        You had mentioned earlier that you thought
24   it was 500 plus.  Could it be 441; is that --
25   A.   Yeah.

Page 42

1    Q.   Okay.  And were you aware that they had
2    approximately 3,200 clients --
3    A.   Oh, no.
4    Q.   -- at that point in time?
5    A.   No.
6    Q.   Did you ever become aware back in 1992 they
7    had that many clients?
8    A.   No.
9    Q.   Okay.  And how many clients did you believe
10   they had when the SEC investigation was taking place?
11   A.   Hundreds, you know.
12   Q.   Okay.
13   A.   Again, I think that this 3,200 clients is
14   fairly similar to what happened with -- if you looked
15   at the -- the GAO report -- you're familiar with what
16   the GAO report is; right?
17   Q.   Uh-huh.
18   A.   It mentions something like that I had
19   170,000 clients based upon apparently the banks --
20   like Banco Santander and so on were using their
21   account as a money fund.
22        I mean -- and no one understood how there
23   was 170,000 clients.  I think that that -- so expanded
24   by people, you know, putting in $10,000 or something
25   of that sort.

Page 43

1         So the 3,200 clients, although, certainly it
2    doesn't matter.  It's still more than -- than -- or
3    more than the threshold of 100 clients.  So whether
4    it's 400 clients, 500 clients or 5,000 clients
5    wouldn't make a difference.
6         They still had to register, but they
7    claimed, because their explanation to me when I said,
8    how the hell did you get all of these clients?  They
9    said, well, they're all relatives.
10        They're -- you know, they're grandchildren,
11   so on, somebody -- that's how all these clients
12   expanded.  Because I don't think my father-in-law had
13   3,200 clients in his -- I knew he -- he didn't have
14   that many clients in his -- in his company.
15        And, also, I mean, nobody would want to
16   break up the transactions.  It would have been a
17   monumental job to break up 3,200 clients.  And they
18   said -- later on said, well, that was why we started
19   to issuing notes, because it was too much work for us
20   to, you know, break up all of the transactions as it
21   was originally -- originally organized.
22   Q.   So were you -- at the time, in 1992, the SEC
23   investigation, the 441 million dollars, there were
24   allegations that Avellino & Bienes were not keeping
25   very good records at the time.  Were you aware of

Page 44

1    that?
2    A.   No.
3    Q.   Okay.  In terms of the 441 million dollars
4    that was sent over to your investment advisory
5    business, was -- were actual trades made with that
6    money?
7    A.   At that time, yes.
8    Q.   So these orders were actually executed?
9    A.   Correct.
10   Q.   Okay.  And are you aware that Avellino &
11   Bienes had to pay back money to -- pay all their money
12   back to the investors?
13   A.   I insisted upon it.
14   Q.   Okay.  And did they have the money to do
15   that?
16   A.   Yes.
17   Q.   Okay.  I just want to --
18   A.   I mean, I had the money.
19   Q.   So did you provide them money --
20   A.   Correct.
21   Q.   -- to enable them to pay everybody back?
22   A.   Correct.
23   Q.   Okay.  And --
24        MR. ETRA:  I'm sorry.  I didn't get the
25   answer.  Was it yes?

Page 45

1                THE WITNESS:  Yes.

2          MR. ETRA:  Thank you.

3    BY MR. SAMUELS:

4      Q.    And how did you come up with that money to

5    pay them back?

6      A.    Okay.  There were certain allegations made

7    by the prosecutor and the trustee, which were

8    completely, you know, a false theory.  All right.

9    The -- the transactions -- when the SEC came up --

10         When this thing happened, the SEC and the

11   NASD both showed up in my office immediately to find

12   out, because their immediate concern was that the

13   money wasn't -- that there was a -- a Ponzi scheme,

14   that the money wasn't there.

15         You know, the SEC was like in shock to find

16   out that this -- what -- that this had occurred, and

17   they couldn't understand it, because, as far as they

18   were concerned, I wasn't really doing a -- a general

19   retail business.

20         I was basically a market-making proprietary

21   trading firm and handled, you know, partnership

22   accounts, or, you know, this was really even before

23   the hedge funds were really as common as they are

24   today.

25         So they came up there, and they told me --

Page 46

1    you know, explained what this Avellino & Bienes

2    situation was.  I explained it to them.  And they

3    said, well, is the money here?  I said, look for

4    yourself.

5          And they -- they did a complete audit.  The

6    SEC spent a couple of weeks up in my office.  It was

7    the -- the examination was handled by the chief -- the

8    SEC branch chief at the time.

9          And they verified that the securities, the

10   convertible bonds were -- were in my possession.  They

11   were either in conversion, which would be the typical

12   way that they would be handled or they were down at

13   the banks.

14         You know, so they did a complete audit.

15   They were very satisfied that the money was there.

16   And I told them that I was going to close all of these

17   accounts out.

18         And they said, well, you -- as a matter of

19   fact, the SEC said, you know, Bernie, you don't have

20   to do that.  They can register as an investment

21   company, if they want.

22         And I said, I don't -- I -- I don't care.  I

23   said, I don't want -- I don't want to do business with

24   them at that structure any longer.  I'm -- I'm

25   returning all of the money.

Page 47

1          And, as a matter of fact, they were stunned

2    that I did that and was able to do it as quickly as I

3    did.  And the way I did it was that bonds that were in

4    conversion, when they came out of conversion, I had

5    the money.

6          Plus, the fact I -- I had people take over

7    some of those positions.  You know, there was no

8    reason for me to unwind the transactions prematurely,

9    because they were -- they were sort of -- you know,

10   they were pure arbitrage transactions.

11         So either -- depending upon arbitrage

12   transactions, they -- they could take, you know, two

13   weeks to -- to convert.  You put them into conversion,

14   and depending upon how fast the conversion agent

15   works, it could take two weeks.  It could take -- you

16   know, it could take a month.

17         I wanted -- I wanted to end this thing

18   completely.  So what I did was I -- the stuff that I

19   was able to convert, I converted.  The things that I

20   didn't want to convert, because they were premium

21   hedges, I had other people take over those positions

22   for them, send in money, and then paid it back.

23         The SEC -- or the -- not the SEC.  The

24   trustee was -- came up with this whole theory that my

25   business was a Ponzi scheme from 1962.  That was his

Page 48

1    theory, Picard's theory.  It was one of the more

2    ridiculous theories going.

3          And the reason he came up with this theory

4    was that he couldn't find the contra-side

5    confirmations, where -- you know, broker deals.

6    What -- and we explained to him, we said, are you

7    aware of the fact --

8          And this all took place at the profer

9    meeting that I had at the SEC.

10     Q.    In '92.

11     A.    No, not in '92.

12     Q.    Currently?

13     A.    Currently.

14     Q.    Right.

15     A.    You know, was when he came up with -- that's

16   when Picard first came into this picture.

17     Q.    Right.

18     A.    And he said, well, we're looking at your

19   records.  We see you have customer confirmations, but

20   we don't see any confirmations for other brokerage

21   firms.

22         I said, wait a minute.  I said, I'm telling

23   you that from '92 on, you know, basically I stopped

24   doing the transactions, and I'll get into that in a

25   little bit -- while.

Page 49

1    I said, but prior to that all of the
2    transactions I was buying for Avellino & Bienes and so
3    on, all my other clients were actually securities
4    being bought.
5    I said, of course you're not going to find
6    any confirmations, because there's a six year
7    retention regulation, you know, at the SEC for
8    broker-dealers that nobody keeps confirmations going
9    back for, you know, more than six years.
10    We keep customer confirmations back -- going
11    back further, because they -- they need them for
12    estate purposes and for tax audits and so on. I said,
13    broker-dealers don't keep those transactions.
14    I said, plus, the fact, I said, are you
15    aware of the fact that broker-dealers do not issue
16    confirmations to each other any longer, because
17    they -- the -- the transactions go through what's
18    called continuous net sell in the clearinghouse, and
19    there are no broker-to-broker confirmations issued
20    anymore, you know.
21    They had no idea what I was talking about.
22    And I said to the SEC, who was at this meeting in
23    2008, I said, listen, help me out here. I mean, I
24    had -- there's 20 some odd people sitting in -- around
25    this table, and we obviously have -- have Picard, who

Page 50

1    has no clue as to how brokerage firms operate.
2    And you have the prosecutor, who is asking
3    me these questions, you know, about confirmations.
4    And when I tell him there's a continuous net
5    settlement, he looks at me with his eyes rolling over.
6    He doesn't know what I'm talking about.
7    I said, so, of course, they're not going to
8    find any confirmations, I said. So if you're -- if
9    you're establishing the fact that there was no
10    legitimate trading ever being done from 1962 on, I --
11    I said -- I said, you know, I don't know how -- I
12    don't -- I don't know how to respond to this question.
13    So I -- I looked at my lawyer at that time,
14    Ike Sorkin. He -- he was sort of dumbfounded. I
15    embarrassed the SEC, who was there, had a whole bunch
16    of staff people. And I said to them, somebody say
17    something. Explain this.
18    I mean, the meeting was one of the most
19    bizarre things. It started by them saying, tell me
20    about the history of the firm. That's how the
21    conversation went.
22    And I -- my lawyer said, Bernie, just be
23    honest. Tell them what -- I had already said that I
24    was guilty of this Ponzi scheme. It wasn't like I
25    was -- you know, had no reason to -- to lie to them.

Page 51

1    And they asked me, well, what does a
2    market-maker do? The same question that you asked me.
3    And I explained to them, I said, you know, we bought
4    stock, and we sold stock.
5    And then he said -- and then -- and I went
6    into this whole situation about customers that I had
7    to make whole in 1962, when the market broke. I went
8    into that thing.
9    And they said, well, why would you do that?
10    And I explained to them at the time I did it because
11    they were like relatives of mine, and I felt terribly
12    guilty that they lost money, you know, and, you know,
13    they were putting their trust in me, and I just did
14    it, you know.
15    And they said, well, so why did you start
16    making markets? I said, I went into the market-making
17    business, because in those days that's what people
18    did. They made markets, you know. I bought stock. I
19    sold stock.
20    And they said, and how did you do? I said,
21    well, I did very well. In the '70s I was shorting
22    stock, you know. They said, well, shorting stock.
23    They said, did you ever short stock the clients?
24    I said, of course I short stocked the
25    clients. I said, I was required to short stock. If

Page 52

1    you're a market-maker, you're obligated, you know, to
2    make a two-sided market, and sometimes you short stock
3    to a client, and you hope to buy it back at a better
4    price.
5    So they looked at me. They didn't
6    understand this. Now, I didn't know whether this was
7    an act that they were doing.
8    Q.    Uh-huh.
9    A.    I mean, and -- I literally almost left the
10    meeting. I said, wait a minute. I have four people
11    from the SEC, and you're senior people, you know. And
12    this Angie named -- this Chesnic (SIC), whatever --
13    I mean, these are people that I knew. I
14    mean, I had at this time an unbelievable relationship
15    with all of the regulators. You know, I -- I helped
16    build the whole NASDAQ market.
17    And these guys are acting as if they don't
18    know what I'm talking about, about being shorted.
19    They said, well, how would you -- how could you short
20    stock the clients?
21    I said, listen, I said, I'm not going to sit
22    here in my current frame of mind and explain to you
23    how the stockmarket -- how the markets work. Maybe
24    you should all go back, you know, take some courses.
25    I said, I -- I refuse to believe that this

Page 53

1    is all new to you, you know. So that was the way that
2    conversation went, you know.
3          And then I found out subsequently that
4    Picard's theory, because he couldn't find
5    confirmations, you know, he assumed -- and because I
6    said I shorted stock at times that they assumed
7    that -- that I was never buying stock for any clients.
8          And then I asked them the loaded -- when
9    they came down here with six lawyers and after I was
10   already here, Picard, when I was -- agreed that I
11   would help them get the money back for the clients, I
12   said to them, listen, I said, while you're all here, I
13   said, I'm going to --
14         This was -- Sheehan was here. It wasn't
15   Picard. I said, let me ask you something. I said,
16   are you making the assumption that -- that your --
17   this theory that you have, that this fraud started in
18   the '60s, is all based upon the fact that I -- what I
19   said at the proffer meeting?
20         That I said I shorted stock to clients,
21   which is, by the way, whether you understand it or
22   not, is perfectly legitimate and is required. It's an
23   obligation market-makers have, to short stock, you
24   know, to people when they're making a two-sided
25   market, whether that be a -- a customer or whether it

Page 54

1    be another broker-dealer.
2          I said, your -- because you can't find
3    confirmations, and because I'd -- I'd said that there
4    was -- I was shorting stock, which is perfectly legal,
5    you're now making -- that's how this theory comes that
6    I shorted -- that I never bought stock for customers
7    ever?
8          So they said, yes. And I said, okay. You
9    are aware of the fact that our firm executes 400 to
10   600,000 transactions a day for 500 brokerage firms?
11   This has been well-documented. Everybody knows this.
12   It's been operating for years.
13         We do five to ten percent of the daily
14   transactions that are done in Wall Street, you know.
15   And they said, yeah. You know, we -- we've heard
16   that. I said, it doesn't matter if you've heard it.
17   It's -- it's been well-documented. Everybody knows
18   that.
19         I said, did you ever see any of these
20   confirmations? They said, no. We never -- we -- we
21   couldn't find any confirmations. I said, obviously,
22   because there are no confirmations issued.
23         And, again, you don't understand what
24   you've -- you've never heard of a continuing debt
25   settlement? You've never heard that the clearinghouse

Page 55

1    exists any longer?
2          I said, so now you're -- so I'm going to
3    make the -- the leap that because you can't find any
4    confirmations for these clients, whether it be
5    Avellino or Bienes or Tom Jones, you're now -- because
6    you can't find Merrill Lynch's confirmations that I
7    sent to Merrill Lynch, you're making the assumption
8    that these 400,000 transactions that -- that were
9    bought and settled through the clearinghouse everyday
10   that they didn't exist either?
11         Now, there were six lawyers. They sit here.
12   They were absolutely stunned. They didn't know where
13   to look. I said, because -- so how -- how do you --
14   how do you explain that?
15   Q.   Well --
16   A.   So what I'm saying is that this is a
17   longwinded way of saying to you, your question, as to
18   whether or not the transactions were bought for these
19   clients prior to '92, yes, they were.
20         And the fact that I made a decision to take
21   in additional funds, which Picard claims that, you
22   know, the money that I sent back to Avellino & Bienes'
23   clients, you know, came from -- from new -- from new
24   money that came in, and that those transactions were
25   never actually -- those convertible transactions never

Page 56

1    took place.
2          The fact that the SEC spent two weeks up in
3    my office, examining and verifying with the depository
4    and the banks that the securities were there, you
5    know, and never found me guilty of anything or brought
6    any sort of action against me, that -- that doesn't
7    seem strange to them.
8          I mean, so, yes, the transactions were
9    bought. In '92 is when the problems became -- it
10   really didn't start in '92. It really started, let's
11   say, '94 or '5, but I said that in '92, which was
12   after the Avellino and Bienes fiasco, that's when my
13   problems occurred, because I started shorting stock.
14   It had nothing to do with Avellino and -- and Bienes.
15   Q.   So let's -- let's get into -- and we'll get
16   into 1994 and started shorting stock and the
17   difficulties in --
18   A.   Okay.
19   Q.   -- in -- then, but I want to focus on the
20   1992 timeframe, because you know there are a lot of
21   allegations that the trades were not actually made on
22   the Avellino & Bienes' account.
23   A.   Uh-huh.
24   Q.   You've heard those; right?
25   A.   Yeah.

Page 57

1    Q.   Okay.  And who is Mr. DiPascali, Frank
2  DiPascali?
3    A.   Frank DiPascali was basically my assistant
4  in the investment advisory side of the business.
5    Q.   Okay.
6    A.   He sort of ran the day-to-day operation of
7  the -- of the -- the investment advisory side.
8    Q.   And are you aware that he's provided
9  testimony under oath at all?
10    A.   I'm very much aware of it.
11    Q.   Okay.  Have you had a chance to read his --
12  his testimony?
13    A.   I haven't read it, but I've heard it through
14  various reporters and so on.
15    Q.   All right.  Well, do you -- do you believe
16  Mr. DiPascali to be truthful?
17    A.   No.
18    Q.   You do not.  Okay.  Well, I want to show you
19  what --
20    A.   I mean, not -- not totally truthful, I
21  should say, you know.
22    Q.   Okay.  And why do you question his voracity?
23    A.   Because the comments that he made are not
24  true and are ridiculous.  And I have discussed that
25  with their own -- with the lawyers that were down here

Page 58

1  representing -- not DiPascali, but the other
2  employees.
3        MR. SAMUELS:  Well, let me just show
4    you some things that Mr. DiPascali testified
5    about.  We'll mark that as Exhibit 3, please.
6        (DISCUSSION HELD OFF THE RECORD.)
7        (PLAINTIFFS' EXHIBIT 3 WAS MARKED FOR
8        IDENTIFICATION.)
9  BY MR. SAMUELS:
10    Q.   Now, Mr. DiPascali testified about what
11  happened in 1992 with Avellino & Bienes.
12    A.   Uh-huh.
13    Q.   And so if you look at the first part of your
14  deposition --
15        MR. WOODFIELD:  Excuse me?
16    Q.   I'm sorry.  Mr. DiPascali's statement.  If
17  you'd start on line six on page 4621, and we're going
18  to go to line 21 on 4623.  If you'll take a moment
19  and --
20        MR. WOODFIELD:  I'm sorry.  You said
21    this was a deposition.  Was this his -- his
22    deposition or was this trial testimony?
23        MR. SAMUELS:  It's his trial testimony.
24    All right.  Thank you.
25        MR. WOODFIELD:  Do you understand that?

Page 59

1        THE WITNESS:  Yeah.
2        MR. WOODFIELD:  This is his trial
3    testimony.
4        MR. ETRA:  Are we reading to ourselves?
5        MR. SAMUELS:  We've got -- I'd just
6    like Mr. Madoff to take a look at it.  You're
7    happy to read as well.  Sure.
8        THE WITNESS:  Yeah.  Okay.
9  BY MR. SAMUELS:
10    Q.   Okay.  When you're done.  When you're done.
11    A.   Okay.
12    Q.   All right.  So Mr. DiPascali is testifying
13  now about your learning about the SEC investigation in
14  1992, and it indicates that you were throwing yourself
15  around the office like a lunatic and that you were
16  being crazed.
17        Were you throwing yourself around -- were
18  you -- were you throwing yourself around the office
19  like a lunatic during that period of time; do you
20  remember?
21    A.   I was --
22    Q.   Is that a fair statement?
23    A.   Well, let's put it this way, I was throwing
24  myself around the office at Frank and Mike Bienes.  As
25  I said earlier, I mean, I was very agitated that --

Page 60

1  that they had this SEC issue and that I was going to
2  close all of their accounts, you know, as I said.
3    Q.   And were you concerned at all in 1992 about
4  the SEC coming in and taking a closer look at your
5  operations as a result of the Avellino and Bienes --
6    A.   The SEC --
7    Q.   -- investigation?
8    A.   -- was regularly in my office all of the
9  time.
10    Q.   I'm talking about the advisory -- investment
11  advisory part, not the market-making part.
12    A.   They were -- it was one and the same at that
13  point.  I wasn't an investment advisor.  The
14  investment advisory operation really didn't start
15  until after '92.  In other words, that was when we
16  moved -- it was all -- the investment advisory firm is
17  all part of Bernard -- BLMIS.
18    Q.   Right.
19    A.   All right.  We didn't register as an
20  investment advisor until 2006.  And I can explain to
21  you, you know, after we finish this as to what
22  happened there, but there was the --
23        The convertible bond business that I was
24  doing for Avellino & Bienes was all done at the same
25  area as the market-making and the proprietary side of

Page 61

1   the business and was, quite frankly, not really --
2   Frank --
3           Frank DiPascali did not really play a role
4   in the firm until after we -- you know, we moved that
5   operation, until after 1992.  He had virtually no
6   function at the firm in -- with the clients prior to
7   that time.  It was only after '92 that he really
8   became an issue.
9       Q.   Okay.  Let's now go to -- what was he doing
10  in 1992?  What were his job duties and
11  responsibilities --
12      A.   He --
13      Q.   -- at the time of June of --
14      A.   He --
15      Q.   -- 1992?
16      A.   After I told -- after I made the decision
17  that I was going to take on individual clients from
18  Avellino -- when I returned the money to -- to
19  Avellino & Bienes, I received a lot of phone calls
20  from my father-in-law and people that were hysterical
21  that all of a sudden they were now going to lose the
22  income that they had been living off of and generating
23  for all of these years.
24          And I explained, listen, I'm -- you know,
25  I'm closing these accounts, and so on and so forth.

Page 62

1   I -- I didn't want to have anything to do with Frank
2   and Mike, I was so upset.
3           It was basically Mike that I was really
4   upset with, because I had the feeling that this was
5   all his -- his game plan of -- at least that's the way
6   it was laid out to me.
7           I was prevailed upon by the -- some of the
8   individual clients that were -- that were part of this
9   partnership account, and my father-in-law said, look,
10  why don't you just take these clients back, you know,
11  that, you know, you know a lot of these people.  Open
12  the client -- the accounts directly, rather than --
13  and not have anything to do with this Avellino &
14  Bienes-type structure that they had.
15          As a matter of fact, the SEC and the NASD
16  told me, you know, that there was -- it was fine to do
17  that.  As I said, they -- they had said, listen, you
18  don't have to close these accounts out.  They said,
19  you know, let them register as an investment company
20  and that -- you know, that will be fine.
21          That was the conversation that I -- that I
22  had with the SEC.  And I said, no, no, no, no.  I am
23  furious at this whole thing, because all of a sudden,
24  you know, this is -- you know, for 30 some odd years I
25  had never had a problem with ever violating -- any

Page 63

1   violation at all with the -- with anybody.
2           And now all of a sudden they lied to me
3   about what they were doing.  They had -- I should say,
4   they didn't lie to me.  They never informed me that
5   the structure of their -- of their operation had
6   changed.
7           And as soon as -- when the SEC told me that
8   they were -- you know, they had all of these clients
9   and that they were issuing notes, I realized that that
10  was going to be the problem.  So I insisted upon
11  closing them out, sending them back the money.
12          As a matter of fact, the -- the -- the
13  trustee -- I've forgotten his name already -- from --
14          MR. WOODFIELD:  Lee Richards.
15          THE WITNESS:  Huh?
16          MR. WOODFIELD:  Lee Richards.
17          THE WITNESS:  Yeah.  Lee Richards.
18  They -- they were stunned that -- they thought
19  that this whole thing was going to be this
20  fiasco, you know, and all of a sudden --
21          As a matter of fact, they said -- he --
22  they said to me -- Lee Richards said to me at the
23  time, and, he said, you know, this is
24  unbelievable.  You sent all of the money back.
25  This thing is clean.  It's done.  There was no --

Page 64

1   you know, there was never any problem.
2           So after I returned the money to the
3   clients --
4   BY MR. SAMUELS:
5       Q.   When -- when you -- when you returned the
6   money to the clients, did you get the money from other
7   third parties or related parties --
8       A.   Yeah.
9       Q.   -- like Mr. Picower, for example?
10      A.   Yeah.  As I said, some of them decided to
11  take over, you know, certain positions that were --
12  that were not even in conversion yet, and rather than
13  sell them out and not take advantage of the spread,
14  which is why we -- we set up the trans -- the type of
15  transaction we were doing were two types of
16  transactions.
17          They were buying convertible bonds, shorting
18  the stock and then converting the bonds into stock.
19  Those were where the -- we bought the bonds at a
20  discount.  So all you had to do at that time was
21  convert the bonds into stock, and you -- you'd have
22  the advantage of the arbitrage spread.
23          All right.  But you would have had to go
24  through physically converting the stock.  And, as I
25  said, that could take weeks.  I wanted to get these --

Page 65

1  I just wanted to end the whole business with these
2  people.
3       At that time I wasn't going to take the
4  clients back. I had made a decision. That was it.
5  Sayonara. I don't even want to see you guys any
6  longer. That's how upset I was with this whole
7  situation.
8       There were other types of transactions that
9  we had, which were what's known as premium arbitrage,
10  where you buy the bonds. It's called Chinese
11  arbitrage. Another word for, you buy -- you buy the
12  bonds, you short the stock, but they're selling at a
13  premium.
14       So if you convert -- if you -- you convert
15  it, you'd actually have a loss. So what you're doing
16  is waiting for the spreads to close in, but your loss
17  is limited to the premium.
18       Now, these were built -- these were -- these
19  were trades that I considered to be good trades that
20  we were going to make, you know, nice profits on. So
21  rather than --
22       Q.  Is this what was in the accounts --
23       A.  Yes.
24       Q.  -- of Avellino & Bienes?
25       A.  Exactly. Right.

Page 66

1       Q.  Either the buying, shorting, converting or
2  the premium arbitrage?
3       A.  Correct.
4       Q.  Okay.
5       A.  So rather than unwind all of them and give
6  up what was there as either an exact profit or take a
7  small loss because of the premium on the bond, I
8  called up, you know, certain clients, like Levey and
9  so on, who were big clients of mine at the time, and,
10  said, listen, I've got these trades. If you want to
11  take over, you can have them, you know.
12       And they said, send them in. They --
13  they -- everybody wanted these trades. So they sent
14  in additional money. So it was a combination of
15  actual trades that were done that were in conversion
16  and I was getting the money out of conversion in a
17  matter of days or weeks and other -- others that I
18  would have had to actually go out and liquidate and
19  give up a profit or take a small loss.
20       And, rather than do that, I turned the
21  trades over to -- to -- to Jeff Picower and --
22       Q.  Norman Levey?
23       A.  -- Norman Levey --
24       Q.  And Carl Shapiro?
25       A.  -- and Carl Shapiro, who were doing those

Page 67

1  same types of transactions through me at -- you know,
2  as well. So they were perfectly happy to, you know,
3  take those trades over.
4       And, again, Picard came up with this theory,
5  because you have to understand Picard's -- and
6  Picard's theory of his -- let's say, his reason for
7  wanting to have this fraud go back to as early as
8  possible is to try and recapture as many of my assets
9  as possible.
10       So he -- he -- he kept on wanting to say,
11  listen, his firm was never profitable. The
12  market-making firm was always in -- was always losing
13  money, and -- and this was his theory. To this day he
14  claims that.
15       The fact that he hired Lazard & Company to
16  come in and do a study of whether the firm was
17  profitable or not, you know, that he hired, and Lazard
18  came back and issued a report that said, yes, the firm
19  is -- market-making firm is profitable.
20       I mean, it was almost like a joke to the
21  industry that people would think that this firm never
22  made money. We had offers from Merrill Lynch, from
23  Morgan Stanley and Smith Barney for -- for six billion
24  dollars to buy the market-making operation.
25       I mean, when everybody was buying wholesale

Page 68

1  firms, when Spear Leeds --
2       Q.  Why -- why wouldn't you sell to them?
3       A.  Because I couldn't at that time. The -- at
4  that time -- this was in the 2000s, the firm was
5  operating this -- this fraudulent investment advisory
6  business, all under the same umbrella.
7       So for them to come in and buy the
8  market-making and proprietary trading operation, I
9  would have had to open up my books to them and show
10  them that I had this investment advisory business.
11       So, now, they offered me -- not six billion;
12  I'm sorry. They offered me three billion dollars.
13  And the reason they offered me three billion dollars
14  was Goldman bought Spear Leeds for close to seven
15  billion dollars.
16       Spear Leeds was doing twice the number of
17  transactions that I was doing at the time. So they
18  came, they offered us, said, listen, we'll -- we'll
19  give you three million dollars -- three billion
20  dollars, you know, for the market-making proprietary
21  business.
22       They said, you keep the investment advisory.
23  We don't want your investment advisory or your hedge
24  fund business. We want the market-making business.
25  Because they realized how profitable that was, and --

Page 69

1  and those firms were then on a buying spree to try and
2  buy the -- the market-making business.
3         It was a ridiculous thing at that time in my
4  mind, because I knew the market-making proprietary
5  business had a fairly short history.
6      Q.   In what timeframe was all -- was all this
7  going on?
8      A.   This was 2002.
9      Q.   Okay.
10     A.   And I said to them -- as a matter of fact, I
11  said to -- to Smith Barney, I said, you -- you realize
12  that -- you know, I assume you're going to want to
13  come in and do an audit of my firm.  You're going to
14  want to see the books.
15         They said, yeah, Bernie, but we know how --
16  we know how many trades you do a day.  You're doing
17  them with us, you know.  So we'll -- we'll -- we'll --
18  we'll give you the three billion dollars, and you just
19  do the market-making business -- the advisory
20  business, if you want, or we'll put you -- we'll give
21  our our clients to do that business.
22         The point I'm making is that -- and to this
23  day Picard has never produced any proof at all, you
24  know, to back his theory about whether the firm was
25  profitable or not, because it -- it was totally

Page 70

1  absurd.
2      Q.   Okay.  So the -- the two things essentially
3  you were doing for Avellino & Bienes' clients, who
4  they were giving notes to, was you were buying,
5  shorting and converting, or you were doing the premium
6  arbitrage; correct?
7      A.   Correct.
8      Q.   Okay.  What sort of returns were you making
9  for Avellino & Bienes' clients in the late '80s, early
10  '90s annually?
11     A.   It could be, you know, probably anywhere
12  from 15 to 20 percent.
13     Q.   Okay.  So do you know how it is that
14  Avellino & Bienes were able to give notes to their
15  clients promising 15, 16, 17 percent and still make
16  money?
17     A.   Sure.  If -- if -- as I said, if they were
18  making 15, 17, 18, 20 percent, you know, and they were
19  giving them -- first of all, I'm not sure -- to this
20  day I don't know how -- what the notes were.  I mean,
21  how much were they paying interest.
22         I've heard various figures, but you're
23  saying they were 16 percent?
24     Q.   Sixteen, 17 sometimes.
25     A.   Well --

Page 71

1         MR. ETRA:  Objection.
2         MR. WOODFIELD:  Yeah, that's -- that's
3  his statement to you.
4         MR. SAMUELS:  You can go ahead.
5         MR. WOODFIELD:  It's not fact.
6         THE WITNESS:  You know, as I said,
7  let's put it this way, I -- I would -- I -- as I
8  said, when we first started -- you have to
9  understand that 1980, for example, interest rates
10  were 20 percent.  So you can put your money in --
11  in treasury bonds and make 20 percent.
12  BY MR. SAMUELS:
13     Q.   Right, but we're talking about the late
14  '80s, early '90s.  You know, '88 through '92
15  timeframe.
16     A.   Well, certainly, you know, I was making for
17  them on regular arbitrage probably 16 to 20 percent
18  still.
19     Q.   And how about on the premium arbitrage?
20     A.   It varied.  Be the same.
21     Q.   Okay.
22     A.   I don't understand why they would pay them
23  16 percent, their clients, because that would be, in
24  my mind, sort of too high to pay, because I don't
25  think that they were -- I -- I don't recall, but I

Page 72

1  don't imagine that they were making 20 percent on
2  everything.
3         MR. SAMUELS:  Well, I -- I just want to
4  show you, since there was an objection, and we'll
5  mark this as Exhibit 4.
6         THE WITNESS:  Uh-huh.
7         MR. SAMUELS:  This is --
8         (PLAINTIFFS' EXHIBIT 4 WAS MARKED FOR
9  IDENTIFICATION.)
10  BY MR. SAMUELS:
11     Q.   So if we go to the next-to-last page of this
12  exhibit, Avellino & Bienes, to Ms. Gianna.  We are --
13  and this is in March of 1992, shortly before --
14     A.   Uh-huh.
15     Q.   -- the SEC.  "We are in receipt of your
16  check in the amount of 100,000.  Interest will be
17  calculated at the annual rate of 15 percent compounded
18  quarterly."
19     A.   Uh-huh.
20     Q.   And how is it based upon what you stated
21  they were able to promise in the range of 15 percent
22  and still be -- and still make money?
23     A.   Well, if they were making 17 or 18 percent,
24  they were, you know -- that, you know --
25     Q.   But -- but they didn't know what the return

Page 73

1  was going to be in any given year on the --
2      A.   No.  I mean --
3      Q.   -- buying and shorting --
4      A.   Well --
5      Q.   -- shorting and converting on the arbitrage?
6      A.   Well, you have to understand that when you
7  were doing -- when you -- when you made markets, when
8  you trade -- did convertible bond arbitrage or premium
9  arbitrage, you had a -- you always projected yourself
10 what you were going to make, because if you didn't
11 make a certain amount, then you wouldn't do the trade.
12      In other words, it wasn't like you're buying
13 stock and hoping the stock is going to go up, and you
14 have no idea whether it's going to go up.  If you're
15 doing -- if you're doing, you know, arbitrage trades,
16 you know what the spread is, you know what the --
17 you're locking in the profit as soon as you do the
18 transaction.
19      Q.   Were -- were you keeping Mr. Avellino and
20 Bienes appraised, or your office, precisely what they
21 were getting locked in at and what returns they would
22 be receiving?
23      A.   I didn't apprise them.  They got a
24 confirmation.  They saw.
25      Q.   Okay.  So you sent confirmations on their

Page 74

1  trades?
2      A.   Yeah.  So they saw what they got.  I mean,
3  if -- but if they're issuing a note, when the person
4  sends in the money at 15 percent, they're taking the
5  risk that -- you know, they would be taking the risk.
6      I mean, if I didn't -- if I did a trade, and
7  I didn't make 18 percent or I didn't make 16 percent,
8  and they're guaranteeing them 15 percent, that --
9  they're -- that's their problem.
10     Q.   Okay.  So I want to talk to you now about
11 the record keeping with Avellino & Bienes and with
12 your firm in conjunction with the accounts that they
13 have and whether or not the trades were being made and
14 how they were being made.
15     And so let's start with Mr. DiPascali's
16 trial testimony, starting at 4626.  If you can, take a
17 look at that.  That would be Exhibit --
18         MR. WOODFIELD:  3.
19 BY MR. SAMUELS:
20     Q.   -- 3, I believe.  Yes.  If you can, start at
21 4626 and start with line six.
22     A.   Uh-huh.
23     Q.   So here they're talking -- DiPascali is
24 talking about the promissory notes that you mentioned
25 earlier and having a number of investors that require

Page 75

1  licensing.
2      A.   What -- I'm sorry.
3      Q.   And if -- if you go to page -- let's just go
4  to 4627.
5      A.   Oh.
6      Q.   On line 14 Mr. DiPascali is -- is asked,
7  "Was there any" -- "was any of the trading real in
8  that account?"
9      And he said, "Not to my knowledge," as to
10 the Avellino & Bienes' accounts.
11     A.   In what period is he talking about?
12     Q.   Pre 1992.
13     A.   Okay.  I don't know how -- I don't know how
14 he could say that, because he wasn't really involved
15 in the trading.  He was -- he was just booking.  Frank
16 DiPascali was never trading.
17     So he wouldn't -- he wouldn't -- he would
18 have no -- look, I know this is probably hard for you
19 to understand, but maybe not.
20     When -- when Picard was down here -- not
21 Picard.  Sheehan was down here -- this is the way
22 that -- this is what happened in that meeting.
23     He gives me a piece of paper, a scrap of
24 paper, and on it was a -- written something like 100
25 convertible bonds, equals 10,000 shares of stock at

Page 76

1  so-and-so price.  It was a -- a formula.
2      He asked me what that was.  I looked at it.
3  I could hardly read it, because it was in someone's
4  handwriting.  It turned out to be one of my traders.
5  And he said, what is that?
6      And finally I looked at it, you know,
7  carefully enough, and I said, it's a -- it looks like
8  it's instructions to one of the bookkeepers, a formula
9  of how to transfer, you know, stock from my investment
10 account into a client's account.
11     He said, well, what is that?  And I said,
12 well, I said, when we do an arbitrage trade for a
13 client, I said, we take the -- the bonds out of the
14 firm's trading account or investment account, and we
15 transfer it into a client's account.
16     We buy like -- we could buy 100 bonds or 80
17 bonds, and a client maybe now has enough money for
18 only, let's say, you know, for 20 bonds or 30 bonds.
19 So I issue instructions to the bookkeeping department,
20 you know, how to transfer it.
21     And so he said -- so he says to me, well, so
22 are you -- are you really buying this stock?  I -- I
23 said, I just -- I just finished telling you, you know,
24 we're -- these are instructions to transfer stock out
25 of an -- out of an -- an account that we have, from

Page 77

1   the firm's account into a client's account.
2           He then -- he assumes that this was just --
3   we were just making up this -- this transaction,
4   because I think this -- these instructions were
5   written by David Kugel, who was one of our convertible
6   bond traders, who traded a lot of the convertible
7   bonds.
8           And he -- because he -- he came up with this
9   theory about -- about that. And David Kugel said to
10  him, well, yeah, Bernie would tell me, you know -- you
11  know, issue instructions for Jodi of what bonds to --
12  you know, what bonds to transfer.
13          I said, that's a normal transaction. That's
14  a normal way brokerage firms operate. He -- they --
15  it was lost on them.
16          Okay. So Frank -- what I'm trying to tell
17  you is that Frank DiPascali was not a trader. He was
18  a bookkeeper. He -- he was -- you know, he -- he ran
19  the bookkeeping department.
20          So if I said to him, or anybody said to him,
21  transfer stock out of our investment account to a
22  client's account, he doesn't actually -- he never was
23  involved in the purchasing of it. That would be --
24  the trader would have done that. All right? He's
25  just in --

Page 78

1       Q.    Okay.
2       A.    -- bookkeeping.
3       Q.    All right. So he's in bookkeeping. And now
4   he goes on to testify about what was going on with the
5   books and records at Avellino & Bienes and what your
6   firm was doing to assist them with the SEC
7   investigation, in terms of --
8       A.    Uh-huh.
9       Q.    -- bookkeeping. So let's -- let's continue
10  on with this, where he says, "And what concerns did
11  Madoff discuss relating to the SEC, now looking at
12  Avellino and Bienes?"
13          He says you, "wanted to keep the episode in
14  Avellino and Bienes' office. He did not want the SEC
15  to look any further than the minor violation of
16  failing to register the notes they were issuing. He
17  needed to -- he could not afford for the investigation
18  to dig any deeper, because as you were peeling away
19  the onion that would start with Avellino and Bienes,
20  the fraud would have been disclosed."
21          So do you see where he's saying that on
22  six -- 4627, lines 18 through 24?
23      A.    What line?
24      Q.    Lines 18 through 24. Start with the
25  question, "And what concerns did Madoff discuss

Page 79

1   relating to the SEC, now looking at Avellino and
2   Bienes?"
3       A.    Okay. I'm not sure I understand what he
4   means by that. I mean, the Avellino & Bienes -- and
5   he -- the SEC was looking at the transactions.
6   They -- they -- you know, the Avellino & Bienes'
7   issue, as far as the SEC is concerned, was only the
8   non -- non-registering.
9           That was their violation, was not
10  registering. Whether the trades were actually done or
11  not was never really an issue with the SEC. They had
12  already determined that. That was an easy -- that's
13  easy for them to determine, because -- you know, so it
14  wasn't a matter of keeping -- that was -- as far as
15  the S --
16      Q.    Okay.
17      A.    -- the SEC is concerned, Avellino & Bienes,
18  what their bookkeeping, what they did.
19      Q.    Well -- well, let's see what Mr. DiPascali
20  says about what was going on with the books and
21  records --
22      A.    Uh-huh.
23      Q.    -- at Avellino, what your company was doing
24  to assist them with the SEC investigation. Perhaps,
25  you know, refresh your recollection about --

Page 80

1       A.    Okay.
2       Q.    -- what was happening there.
3           So the question actually on line 25 is,
4   "Now, what steps were taken to deal with the situation
5   internally at Madoff Securities?"
6           And if you can continue reading on through
7   4630, I'll ask you some questions.
8           Okay. So if you look at 4628 -- let's stop
9   there for a moment -- on lines 13, where Mr. DiPascali
10  says, "They were basically trying to do was create an
11  entirely new set of books and records that they can
12  give to Avellino and Bienes, that Avellino and Bienes
13  could then give to the SEC, and hopefully the whole
14  problem would go away."
15          Do you recall folks at Madoff creating or
16  recreating a new set of books and records for Avellino
17  to give -- and Bienes to give to the SEC?
18      A.    What -- I don't understand how -- what --
19  what books and records would I have to create to give
20  to Avellino and Bienes? They already had -- they --
21  as far as I knew, they -- the only records that I gave
22  Avellino and Bienes was the confirmations and the
23  statements that we sent them as we did the trades.
24          I mean, their -- what they -- their -- how
25  they kept their books for their own clients was

Page 81

1  nothing -- I had nothing to do with.
2        In other words, the -- as far as I knew,
3  prior to '92 -- all right.  Prior to this problem with
4  the SEC the only thing that they did or had to do was
5  to break up the transactions that I gave them and
6  report it to the client.
7        Q.    It -- it has been alleged --
8        A.    Uh-huh.
9        Q.    -- by -- by Mr. Picard, and it has been
10  testified to by Mr. DiPascali, and I'll walk you
11  through this, that the accounting document -- that the
12  documents at Avellino & Bienes did not reflect that
13  there were hedged arbitrages in their clients'
14  accounts, that they had told their clients they were
15  doing, who they were giving the notes to, and that a
16  new set of books and records were then created with
17  your -- through your office, so that it would reflect
18  that actually hedged arbitrages were taking place.
19        A.    That's totally ridiculous.  I mean, why
20  would -- why would Avellino and Bienes -- how could
21  they not have these books and records?  How could they
22  be paying the clients the 16 percent?
23        Do you think that they would be paying 16
24  percent, 20 percent or whatever they were paying the
25  client and not getting transactions from us?

Page 82

1        Forget about whether the transactions were
2  real or not.  I mean, they had to -- they had to at
3  least know how much money they were making, you know,
4  so they could cover the note.
5        Q.    There's --
6        A.    I mean, how could they not have had -- why
7  would they -- I mean, it doesn't make any sense, what
8  you're saying.
9        Q.    Well --
10        A.    What he's saying.
11        Q.    Let's -- let's continue on, in terms of
12  4629.
13        A.    And -- and, by the way, how could we
14  possibly have created records?  The SEC came up and
15  did -- started -- did an audit within days -- of --
16  of uncovering this thing for Avellino & Bienes.
17        As soon as they -- this thing started they
18  came up to my office, and they did this.  How could I
19  have possibly now created -- what?  Years of -- of
20  records in -- what?  Two days?
21        Q.    So -- so, Mr. Madoff, I don't know the
22  answer to that or understand that, and so I've got
23  testimony here that I just want to walk through with
24  you.
25        A.    Okay.

Page 83

1        Q.    And see if maybe it would refresh your
2  recollection or if -- or if something happened that
3  you don't recall.  That's all.  Because I've got
4  testimony here.  I've got allegations here.  So I'm
5  just going to ask you some --
6        A.    Right.  Okay.
7        Q.    -- questions about it.  And if your
8  testimony is, it never happened, no, you know, that's
9  fine, but I just want to ask you some questions about
10  it.
11        A.    Uh-huh.
12        Q.    And see maybe this will refresh your
13  recollection actually of some things were done with
14  Avellino and Bienes in 1992 to assist them further in
15  whatever issues they had with the SEC beyond what
16  we've already discussed.
17        So that's really what I'm trying to get at
18  here, and I'm just reading records and things.  That's
19  why I'm here with you today, to try to get some more
20  information.  Okay?
21        A.    Uh-huh.
22        Q.    All right.  So let's continue on here.  So,
23  again, on 4629, he says, "Quite frankly, the accounts
24  had morphed into something completely different than
25  hedged arbitrage for whatever reason.  So Bernie

Page 84

1  couldn't afford for Frank Avellino to be accused of
2  basically a securities fraud by lying to your clients.
3        "So they needed to change the complexion of
4  what was previously issued to Avellino, because if you
5  looked at the Avellino accounts, like when the music
6  stopped on the date that the SEC would get them,
7  they're very problematic to Bernie.
8        "They did not indicate in any way, shape or
9  form that these accounts were hedged in any way, shape
10  or form.  There was a whole configuration of various
11  securities with no rhymes or investment reasons that
12  could be argued to anyone.
13        "And they weren't worth nearly what the
14  liabilities that Avellino and Bienes had to their
15  clients, or if you added up, or the SEC added up, or
16  anyone -- or anyone added up, this is what's out there
17  in terms of IOUs and these Madoff statements are the
18  assets that are backing the liability, it didn't add
19  up.
20        "There wasn't enough cushion there to cover
21  what was out here.  Very problematic for Frank
22  Avellino, but anything that's problematic for Frank
23  Avellino at that point is extremely problematic for
24  Bernie Madoff.
25        "So it was circle the wagons and let's redo

Page 85

1   all of this stuff, so that Frank Avellino can give the
2   SEC a more cohesive investment picture that is worth
3   considerably more money, that is clearly hedged, and
4   that all the new -- and that all of this is now
5   consistent with what he's been telling his clients."
6          Okay.  So I'm just here to ask you about
7   that.  Do you have any recollection of what
8   Mr. DiPascali is talking about and your company having
9   to assist Avellino & Bienes to create books and
10  records to show hedged arbitrages were actually taking
11  place since the books and records of Avellino & Bienes
12  did not indicate that?
13     A.    I'm -- I'm at a loss.
14     Q.    Okay.
15     A.    I'm at a loss, because, you know, it was
16  not -- as I said, it was a very simple process.  In
17  other words, when we bought -- picture that -- the
18  business that I was doing for Frank and -- for
19  Avellino & Bienes was no different than my
20  market-making business or proprietary trading business
21  was -- was.
22          In other words, the securities were very
23  similar.  The trading was very similar, and the
24  processing of buying securities and -- and issuing
25  confirmations, or issuing transactions -- you know,

Page 86

1   originally there were confirmations issued.
2          Okay.  Then once the clearinghouse came in,
3   which was, I guess, in the early '80s, or the
4   continuous net settlement, there was no confirmations
5   issued, but what I'm saying is that you bought and
6   sold stock.
7          You then issued -- you had to settle those
8   transactions, but you, obviously, had to issue a
9   confirmation or a statement to something.  Either you
10  issued them to the clearinghouse, and it was done, you
11  know, computer to computer, or you actually -- if it
12  was a customer, you would actually issue a
13  confirmation and a statement.  And those were issued
14  on a daily basis.
15         All right.  There were -- there was no
16  records that we had to keep.  I mean, I had what
17  was -- I didn't have to keep -- for Avellino & Bienes,
18  all I had to do was issue a confirmation.
19         And I was issuing them usually a block
20  confirmation.  It was a -- you know, we bought
21  80,000 -- 80 bonds and sold 8,000 shares of common
22  stock.  We bought, you know -- or depending upon
23  whatever the amount is.  That was it.  And then we
24  issued them a monthly statement.  And those things
25  went out within days of --

Page 87

1      Q.    So --
2      A.    -- the transaction being done.
3      Q.    So what was --
4      A.    So I don't know what books and records I
5   would have to create for them.
6      Q.    So you're saying that the statements or the
7   confirmations that were being sent by your company to
8   Avellino and Bienes would have reflected the hedged
9   arbitrage --
10     A.    Yeah.
11     Q.    -- transactions?
12     A.    Of course.
13     Q.    Okay.  So --
14     A.    They were the only transactions we were
15  doing for them.
16     Q.    So let's continue on with his statement.
17         MR. ETRA:  Can I have just a moment?
18         MR. SAMUELS:  Sure.
19         MR. ETRA:  I want to get the record of
20  your testimony clean.  I just -- I don't know if
21  I have to keep objecting when you -- and I didn't
22  do it before, because I'm trying to not
23  interrupt.
24         When you read Mr. -- Frank's testimony,
25  DiPascali, because I don't want the jury to hear

Page 88

1   that testimony, but I want you to be able to ask
2   your questions.
3          Do you want to give me a continuing
4   objection to the use of his testimony?
5          MR. SAMUELS:  I don't --
6          MR. ETRA:  Do you want me to just
7   object to the form?
8          MR. SAMUELS:  -- understand your
9   objection, but if you have an objection to my use
10  of reading from Mr. DiPascali's testimony in
11  questioning Mr. Madoff, you can reserve your
12  objection on all of those questions.  Not that I
13  understand the objection, but --
14         MR. ETRA:  Right.  I --
15         MR. SAMUELS:  -- you can make your
16  objection.
17         MR. ETRA:  I have the objection.
18         MR. SAMUELS:  That's fine.
19         MR. ETRA:  Thank you.
20         MR. SAMUELS:  That's fine.  Okay.
21  BY MR. SAMUELS:
22     Q.    So, now, on whether or not these
23  transactions actually took place that Avellino and
24  Bienes -- on the Avellino and Bienes statement, I know
25  you've testified that they did all take place and that

Page 89

1    the Ponzi scheme didn't start until after 1992, but I
2    still want to walk you through what Mr. DiPascali is
3    saying anyway while I have you here.
4            So there's the next question, "Now, stepping
5    back, I want to pick that apart a little bit.  The
6    statement that had already been done, the trading on
7    those was all fake; right?"
8            And the answer is, "Yes."
9            So Mr. DiPascali is saying now that the --
10   the picture that he's painting essentially is that
11   statements were sent to Avellino & Bienes reflecting
12   trades that were never done.
13           The SEC came in, and the fake statements
14   that showed trades that were -- trades that were
15   actually never done had to be redone, and another fake
16   set was set up, so that it can actually reflect the
17   hedged arbitrage strategy.
18           That's the essence of Mr. DiPascali's
19   testimony.  Does any of that ring true to you?
20   A.     No.
21   Q.     Okay.  Now, you mentioned that in 1990 -- in
22   1992, after Mr. -- and, by the way, you can take a
23   break whenever you'd like to.
24           MR. ETRA:  We're close -- we're close
25   to the 11:00 -

Page 90

1            MR. SAMUELS:  We're close to 11:00.
2            MR. WOODFIELD:  You said you have to --
3    do you have to eat something at 11:00?
4            THE WITNESS:  Yeah, soon.  Yes.
5            MR. SAMUELS:  It's five until 11:00.
6    So --
7            MR. ETRA:  You let us know when.
8            MR. SAMUELS:  Okay.  All right.  We can
9    continue on.
10           MR. WOODFIELD:  Turn the heat up here,
11   if you get a chance to.
12           MR. SAMUELS:  So --
13           MR. MESSANA:  Do you have any pull here
14   or --
15           THE WITNESS:  It's getting hot for me.
16   Don't worry.  I'm getting hot.
17           MR. WOODFIELD:  Good.  Give me your
18   coat.
19           MR. SINGERMAN:  You can sell that coat
20   to the court reporter.
21           THE WITNESS:  DiPascali died.
22           MR. SAMUELS:  Yeah.  You know, there's
23   just a few moments left on the tape.  It's a few
24   minutes before 11:00.  It's a good break time,
25   because I'm getting ready to start a whole new

Page 91

1    topic.
2            THE WITNESS:  Okay.
3            MR. SAMUELS:  So why don't we break
4    now?
5            THE WITNESS:  Okay.
6            THE VIDEOGRAPHER:  Going off the
7    record.  The time is 10:57 a.m.
8            (RECESS FROM 10:57 A.M. TO 11:10 A.M.)
9            THE VIDEOGRAPHER:  Going back on the
10   record.  The time is 11:10 a.m.
11           MR. SAMUELS:  Okay.  Let's go back now
12   for a moment to the interview, which is -- should
13   be in front of you, Mr. Bienes' interview with
14   PBS.
15           THE WITNESS:  Oh, uh-huh.
16   BY MR. SAMUELS:
17   Q.     All right.  And, by the way, when were
18   interest rates 20 percent; do you recall?
19   A.     1980.
20   Q.     1980.  Okay.  How long did they stay at 20?
21   A.     For a few years.
22   Q.     Okay.  Then they came down rapidly?
23   A.     Came down, but not significantly until later
24   on.
25   Q.     Okay.  So I want to go back to your finding

Page 92

1    out about the -- about the SEC investigation in the --
2    in 1992.  And if we can, turn to page 23 of this
3    interview.
4            MR. WOODFIELD:  The numbers are up --
5    up there.
6            THE WITNESS:  Okay.
7    BY MR. SAMUELS:
8    Q.     The questioner is asking, "What kind of" --
9    "And you're making what kind of interest on the
10   money?"
11           "I'm glad you asked.  I'm glad you asked.  I
12   said to my partner, Frank, at that time, how lucky are
13   we?  Thank God they closed us down.  You know what we
14   were getting?  Nine and a half, ten maybe, at best.
15           "Bernie said, the golden days are over.  I
16   got into a little snag with the margin accounts.  I
17   was told I was over margin.  I didn't know what the
18   hell he was talking about.
19           "And I have to buy options, and options are
20   very expensive now.  They've all gone up in price,
21   double.  And I won't trade with blah, blah, blah,
22   blah, blah.  I don't know what the hell he's thinking.
23   I said to myself, I'm" --
24           MR. ETRA:  "Talking."
25   BY MR. SAMUELS:

Page 93

```
 1      Q.    -- "what he's talking.  I said to myself,
 2  I'm so glad I'm back with Bernie.  Ten percent, nine
 3  and three-quarters.  It's wonderful.  Who cares?  He
 4  took me back."
 5            And then he mentions your expression was,
 6  "You effin' guys.  You effin' guys.  You're lucky.
 7  You're lucky I take you back.  You effin' guys."
 8            Now, it's -- you had testified earlier that
 9  you were angry at both of them for the SEC issues that
10  arose --
11      A.    Uh-huh.
12      Q.    -- and the way that they were issuing notes,
13  et cetera; correct?
14      A.    Right.
15      Q.    Okay.  And do you recall saying anything to
16  him -- to them, such as, "You effin' guys.  You effin'
17  guys.  You're lucky.  You're lucky I take you back.
18  You effin' guys"?
19      A.    No.
20      Q.    Okay.
21      A.    I mean, I may have said -- not that I
22  don't -- not that I don't curse.  I do, but I -- I
23  mean, I don't remember that -- that conversation.  I
24  don't know what he's talking about, nine and
25  three-quarters.  Where -- where is he -- where does
```

Page 94

```
 1  that come from, nine and three-quarters --
 2      Q.    I --
 3      A.    -- percent?  And I -- that's what they were
 4  making or he was making?  I'm not sure I understand
 5  where -- what he's talking about.
 6      Q.    Okay.  So, despite your being upset at them
 7  for -- for what happened in 1992, you, nevertheless,
 8  agreed to allow them to continue to invest with you
 9  through different entities which they controlled;
10  correct?
11      A.    Right.
12      Q.    And, given the issues that they had and
13  the -- and the way that they conducted their business,
14  why is it you decided to take them back?
15      A.    Why did I take them back?
16      Q.    Yes.
17      A.    Well, because my father-in-law said to me,
18  look, he says, you know -- well, he liked Frank so
19  much.  I mean, it wasn't -- it wasn't because --
20            I don't think my father-in-law ever really
21  was crazy about Mike Bienes, you know.  He -- he
22  just -- he wasn't that type of guy.  Frank was sort
23  of, you know, typical accountant, like my
24  father-in-law was.
25            Mike Bienes was just, you know, really sort
```

Page 95

```
 1  of a blowhard, you know, type of a guy.  And the --
 2  they were the ones that -- they -- they had to call --
 3  they were going to call the clients and tell them --
 4  and tell them that I was willing to open up the
 5  accounts.
 6            I -- because I had -- you know, a lot of
 7  these clients -- some of the clients, as I said, I --
 8  a whole bunch of them, I knew, you know, for years,
 9  but there were lots of other --
10            By now, you know, a lot of years had passed,
11  and there were -- there were children and
12  grandchildren of some of these clients.  So I had
13  no -- I didn't really have any contact with them, nor
14  did I want to have contact with a lot of these people.
15            So Frank had said, look, you know, he
16  said -- he said, I'll call them up and tell them they
17  can open up accounts directly with you.  You know, let
18  them call you, and --
19            And, I said, okay, fine, but I want the
20  clients themselves to call me.  You know, I want to
21  talk to them, because I want to make sure, because at
22  that stage I didn't trust them.
23            I didn't trust what they were going to tell
24  the clients, you know.  So I -- I said, fine.  You --
25  I didn't even have the phone numbers of these clients.
```

Page 96

```
 1  They had all of the records, you know.
 2      Q.    And there was a couple -- there were
 3  thousands of them?
 4      A.    Well, I didn't take a thousand clients.
 5      Q.    Right.
 6      A.    I mean -- so, I said, listen, I said, you
 7  know, I only want -- I forget the amount of money.  I
 8  think I said, each client had to have like $500,000,
 9  you know, or -- you know, I don't want to have --
10            I don't want to have accounts under
11  $500,000, you know.  So -- and a lot of them were like
12  families.  They were like, you know -- you know, Jan
13  Tripp, you know.  They had four kids and whatever it
14  is.
15            So I said, look, you let them open up an
16  account.  I said, I don't want any partnerships, you
17  know.  I don't want any -- I said, the only thing I
18  want is a -- is a family account.
19            They could have a family partnership account
20  or an individual account, but I don't want any more
21  limited partnerships that are, you know, taking in a
22  bunch of small people and paying interest or anything
23  of that sort, and I don't want anybody taking anything
24  off the top or any of these shmatteh type of --
25      Q.    Or general partnerships?
```

Page 97

```
 1      A.   Right.  Arrangements.  I said, but if
 2  there's, you know, let's say, a -- you know, the ABC
 3  family, you know, account, and it's just the children
 4  of the account, you know, the wives -- husbands and
 5  wives and so on, and they're going to pool together
 6  and have $500,000 as a -- you know, like an investment
 7  club account, I'm going to open that -- that account,
 8  I said.
 9          So have them -- you tell them what the deal
10  is.  Have them call me, you know, so I can make sure
11  they understand that, and I'll open up the account.
12  And that's really what Frank's role was basically at
13  that time.
14          He was the one that was going to be -- he at
15  the time was one of the ones that convinced me to --
16  to take in these accounts.  He said, because -- you
17  know, that was -- he was the one that was --
18          He saw this as an -- an opportunity for
19  himself to play a role in the firm, because before
20  that Frank had -- Frank was doing -- he really was --
21  he was also --
22          He was very close to getting fired, because
23  he couldn't make it out as -- he couldn't make -- he
24  wasn't going to make it as a trader.  We had him in
25  the research department.
```

Page 98

```
 1          Frank had a problem -- I'm talking about
 2  Frank --
 3              MR. WOODFIELD:  DiPascali.
 4              MR. ETRA:  DiPascali.
 5              THE WITNESS:  -- DiPascali.  Right.
 6              MR. WOODFIELD:  We've got to keep our
 7  Franks straight.
 8              MR. ETRA:  Yeah.
 9              THE WITNESS:  He had -- he couldn't
10  get -- he kept on trying in different roles.  And
11  I liked him.  He was a nice kid, and he was
12  friendly with Annette and so on.
13          It was like all of our employees, you
14  know, knew each other, and everybody liked Frank
15  DiPascali.  He was a nice kid, but,
16  unfortunately, he had problems where he couldn't
17  get up in time to make the opening.
18          He -- he really wasn't a good trader,
19  but he was just smart.  He was smart.  So he
20  handled our move.  We made him -- he -- he worked
21  for my brother as a -- a research assistant.  We
22  tried him there.
23          He -- he then handled the move when we
24  moved from Wall Street up to the -- to Midtown,
25  New York.  We would put him in charge of, you
```

Page 99

```
 1  know, moving the trading room and doing all of
 2  that sort of stuff.
 3          So when -- and when this fiasco
 4  happened with Avellino & Bienes, at that time he
 5  was -- he was involved with, you know,
 6  handling -- doing -- not -- not really
 7  bookkeeping, but he was involved with just doing
 8  odds and ends, whatever had to be done around the
 9  office.
10          He came to me.  He figured, this is
11  an -- I said, listen, I'm not going to be able
12  to -- I'm not going -- we're going to lose this
13  account.  I'm going to close it, and I'm not
14  going to take in all these other accounts.
15          He said to me, look, why don't you take
16  the individual accounts, you know, which was what
17  my father-in-law wanted me to do also and Frank
18  Avellino wanted me to do.
19          And he said, and I'll be able to --
20  I'll be able to, you know, be in charge of those
21  accounts, you know, make sure the books and
22  records are kept properly and so on.
23          So I said, okay.  Fine.  So the -- what
24  was the question that I --
25  BY MR. SAMUELS:
```

Page 100

```
 1      Q.   I was asking -- the question was actually,
 2  since you were upset at Avellino --
 3      A.   Oh.
 4      Q.   -- and Bienes, why is it that you agreed to
 5  allow them to invest after 1992, when they were shut
 6  down --
 7      A.   Okay.
 8      Q.   -- through entities in which they
 9  controlled?
10      A.   Fine.  So they -- they -- they didn't
11  control it, and they weren't making anything on these
12  other accounts.
13      Q.   On the individual ones?
14      A.   On the individual accounts.  They -- but
15  they had money themselves.  They had made a lot --
16  obviously, they made a lot of money from -- from
17  this --
18      Q.   When you --
19      A.   -- thing.
20      Q.   Let me just stop you for a moment.  Not
21  making anything on the other individual accounts.
22  Were they getting -- to your knowledge, were they
23  getting paid any management fees or any commissions or
24  anything at all --
25      A.   No.
```

Page 101

1      Q.   -- in connection with the individual
2  accounts that they had --
3      A.   No.
4      Q.   -- sent over to Madoff?
5      A.   Something happened between Frank DiPascali
6  and Mike Bienes and, I guess, Frank as well.
7      Q.   Frank Avellino?
8      A.   Yeah.  Where they wanted to make an override
9  on the accounts.  All right?
10      Q.   The individual ones or their own accounts?
11      A.   Their -- their whatchamacallit on -- they
12  wanted it on the -- they wanted it on the original --
13  the individual accounts.
14      Q.   Okay.
15      A.   And I said, listen, you're not making
16  anything on the individual accounts.  I said, that's
17  not -- you're not -- you're not going to be doing
18  anything.  I said, I don't even want you talking to
19  these people, you know.
20           So you're not -- I don't see why -- what --
21  why you have to make anything on these accounts.  So
22  Frank had said to him -- so they -- they came up with
23  this idea --
24      Q.   Frank -- and since there are two Franks --
25      A.   Frank DiPascali.

Page 102

1      Q.   -- if you can, let us know --
2           MR. ETRA:  Thank you.
3           THE WITNESS:  They came up with this
4      idea.  I guess it was Mike --
5  BY MR. SAMUELS:
6      Q.   Bienes?
7      A.   Bienes.  That can they make an extra -- I
8  think it was two percent, you know, on their account.
9  Whereas, everyone was making -- typically the
10  projection was that they were going to make -- like
11  these accounts were going to make 15 percent or 13 or
12  15 percent.
13           And no one ever had a guarantee on any of
14  these accounts.  And if you looked at the trades
15  themselves, they varied.  There wasn't -- you know, it
16  wasn't like everybody made 15 percent all of the time
17  on the accounts.
18           They made -- sometimes it -- sometime they
19  would make 13 percent.  They'd make -- on an
20  individual trade they could make 18 percent.  They
21  could make 16.  Each transaction was different.  It
22  wasn't a partner -- it wasn't --
23      Q.   Could they --
24      A.   -- a hedge fund.
25      Q.   Could they lose money?

Page 103

1      A.   No.  You -- when you're -- if you're doing
2  bona fide arbitrage or even premium arbitrage, you're
3  not going to lose any money significantly.  No.  And
4  that's the whole point.  No one loses money doing
5  convertible bond trading.
6      Q.   Okay.  So getting back now to Mr. Avellino
7  and why you allowed him to invest.  So there's going
8  to be two categories -- let's talk about the two
9  different categories of people.
10           We have the individual people, who were
11  previously investors with Avellino & Bienes, and then
12  we have these other feeder funds that they
13  established, like Grosvenor and Mayfair, we'll get
14  into.
15      A.   Right.
16      Q.   Okay.  So let's just focus now on the
17  individual accounts, which seem to be the ones that
18  you're -- you've been talking about.  And so you
19  wanted them to have $500,000 minimums.  You didn't
20  want little tiny accounts to deal with; right?
21      A.   Right.
22      Q.   You wanted -- you wanted to make sure that
23  you got to spoke -- to speak to them personally?
24           When they opened the account.
25      Q.   When they opened the accounts, you'd have

Page 104

1  some interaction with them to understand something
2  about them and who they were.  You would allow
3  families to invest together --
4      A.   Right.
5      Q.   -- provided they met the $500,000 threshold?
6           And you didn't want any limited partnerships
7  or general partnerships or any of that sort of --
8      A.   Right.
9      Q.   -- stuff that you had previously?
10           That's on the individual side.  Okay.  So as
11  to all of those accounts, did you have discussions
12  with Frank Avellino about any of these particular
13  individuals and what they were like, should I take
14  them, should I not take them, are they good, are they
15  not good --
16      A.   Yeah.
17      Q.   -- things like that?
18      A.   Right.
19      Q.   You did have those discussions with
20  Mr. Avellino?
21      A.   (WITNESS NODS HEAD UP AND DOWN.)
22      Q.   And did you -- before you opened an account
23  that was previously Avellino & Bienes did you speak to
24  Mr. Avellino about any of those -- all of those people
25  or some of them?

Page 105

1    A.    Some of them.  It depends upon -- some of
2    them I knew.  Some of them sounded -- I wanted to make
3    sure.  I didn't knew them that well.  I wanted to make
4    sure that, you know, I was getting the straight story
5    for -- from them.
6    Q.    Okay.  So as to the individuals -- we'll
7    call these the individual accounts.
8    A.    Uh-huh.
9    Q.    Okay.  As to these individual accounts, was
10   there ever any point in time, to your knowledge, that
11   either Mr. Bienes or Mr. Avellino or any entity which
12   they were involved with received any commissions or
13   overrides of any type on those accounts?
14   A.    Not from me.  No.
15   Q.    Okay.  Could it have happened through your
16   company, and you would have not been aware of it;
17   would that be possible?
18   A.    There was -- it could have happened -- yeah,
19   what I started to say was that Frank -- Mike Bienes
20   had -- had decided they were willing to take, you
21   know, greater risk.
22         And so they -- they -- they did more of
23   these premium arbitrage accounts.  Frank said, let --
24   I'll do premium arbitrage for them, which inherently
25   makes more money than the -- than the bona fide.  All

Page 106

1    right.
2    Q.    Is this pre '92 or post '92?
3    A.    Post '92.
4    Q.    Okay.  Got it.
5    A.    Okay.  We had done some of them pre '92
6    for -- for all of the accounts, but once the -- we
7    were taking -- once we started doing the individual
8    accounts they were basically all either bona fide
9    arbitrage, and then we started doing where we weren't
10   actually doing the trades.
11         That was the split-strike trades.  But Frank
12   and Mike wanted to make -- Frank had made -- had
13   suggested to them, look, you can make -- you can --
14   you can make a couple of percent more than -- than the
15   regular bona fide arbitrage accounts made -- could
16   make if you do these premium arbitrage accounts.
17   Q.    For Frank -- which Frank is suggesting this?
18   A.    Frank DiPascali.
19   Q.    Okay.
20   A.    All right?
21   Q.    Uh-huh.
22   A.    They discussed it with -- I guess it was
23   mostly Mike Bienes that I discussed it with.  So --
24   and, as a matter -- as a matter of fact, the accounts,
25   you know, didn't make as much as we -- as we expected

Page 107

1    it to be.
2         And for some reason they had -- I think --
3    I'm trying to piece it together.  They had told the
4    SEC -- they had a shortfall in their -- with the SEC
5    of -- I don't know how much, 30 million dollars,
6    some --
7         There was some discrepancy as to how much
8    they told the SEC that they -- how much they owed
9    the -- told the SEC they had of the clients' money or
10   not, and that was -- you know, so that Frank had --
11        Frank DiPascali was going to try and make
12   greater profits for them in these -- in these premium
13   arbitrage accounts, and that was what they expected to
14   make.  They thought they could make an extra couple of
15   percent, but it wasn't an override on the accounts.
16        They were going to -- they were -- they were
17   projecting that they were going to make -- if we were
18   going to make 15 percent on regular accounts, if that
19   was the projection, they would hopefully make 17
20   percent or 18 percent.
21   Q.    So when you're saying, "they," are you
22   saying --
23   A.    Frank and Mike --
24   Q.    -- Frank and Mike?
25   A.    -- and also Frank DiPascali.  They --

Page 108

1    they -- I never -- once -- post '92, I mean, I had
2    very little conversation with either Frank -- with --
3    almost never with Mike Bienes, because I thought -- I
4    thought Mike Bienes -- as I said before, I thought
5    Mike Bienes had lost his mind.
6    Q.    So -- so when you're -- the extra couple of
7    percent -- I just want to be clear -- is that what
8    Mike Bienes and Frank Avellino were going to make on
9    these individual accounts --
10   A.    No, no.
11   Q.    -- that were coming over?
12        Now we're back talking about their own
13   accounts?
14   A.    No override accounts.  I was very
15   specific --
16   Q.    Okay.
17   A.    -- about that and insistent about that.
18   Q.    All right.  So, now, you touched briefly on
19   the accounts now and bringing the individuals in and
20   how your father-in-law thought that you should open
21   accounts up for these individuals you had longstanding
22   relationships with.
23        Now my question is:  Why if you were upset
24   at Mr. Avellino and Mr. Bienes did you allow them to
25   begin investing in -- in your company through what are

Page 109

1   now known as feeder funds, like Grosvenor, Mayfair
2   Ventures, Aster Associates, St. James, to name a few?
3           MR. ETRA:  Objection.
4           THE WITNESS:  First of all, I -- I'm
5   not even sure that I remember all -- I remember
6   Grosvenor.  I remember Mayfair.  Some of the
7   others -- names aren't even familiar to me.
8   BY MR. SAMUELS:
9       Q.   And so let me just stop you with those.  In
10  terms of Grosvenor and Mayfair, was it your
11  understanding that Frank Avellino or Frank and Nancy
12  Avellino were principals of those entities?
13      A.   Yeah.
14      Q.   Okay.  And let me just throw another name
15  out at you, St. James Associates, does that sound
16  familiar?
17      A.   Never heard of it.
18      Q.   Stra -- Strachan --
19          MR. ETRA:  I'm sorry.  Was that a yes
20  or a no?
21          THE WITNESS:  No.
22  BY MR. SAMUELS:
23      Q.   Strachan Partners?
24      A.   No.
25      Q.   Aster Associates --

Page 110

1       A.   No.
2       Q.   -- Inc.?
3           Okay.  And how about -- do you know a
4   gentleman by the name of Thomas Avellino?
5       A.   Now, was that Frank's son?
6       Q.   Correct.
7       A.   Okay.
8       Q.   And do you know whether he invested with you
9   prior to 1992?
10      A.   I wouldn't have any knowledge.  No.
11      Q.   How about post 1992?
12      A.   Post '92, yes.  He had an account.
13      Q.   And how are you aware of that?  What makes
14  you recall that?
15      A.   Frank -- I'm not sure if I ever met him or
16  not, but Frank told me he -- and he -- I spoke to him
17  on the phone.  He seemed like a nice young fellow.
18      Q.   Okay.  And Nancy Avellino had accounts as
19  well?
20      A.   I don't recall.
21      Q.   Okay.  So, now, getting to these entities in
22  which Frank Avellino and perhaps others were
23  principals, Grosvenor and Mayfair are two you said
24  ring a bell --
25      A.   Uh-huh.

Page 111

1       Q.   -- is that right?
2           So let's just focus on them for a moment.
3   If you were upset at Mr. Avellino and these --
4       A.   Well --
5       Q.   -- weren't individuals, this was -- was it
6   your understanding it was their money or their family
7   money that was going into Grosvenor and Mayfair?
8       A.   Yes.
9       Q.   And so why -- why did you allow to open the
10  door back up --
11      A.   Well --
12      Q.   -- to them after 1992?
13      A.   As I said, I -- I -- I liked Frank.  I'm
14  sorry.
15      Q.   Okay.
16      A.   I liked Frank a lot.  All right.  Mike, I
17  never really liked.  I -- not that I -- not that I --
18  I shouldn't say that I didn't like him.  I thought he
19  was -- he was very different than Frank, and he was,
20  you know, I thought a little bit nuts.
21          As I did his wife.  He was -- my
22  father-in-law really liked Frank a lot, and I -- after
23  this -- after I calmed down, this hysteria that I was
24  really upset with them, I became --
25          I was convinced that this was all Mike's

Page 112

1   doing, not really Frank's.  And Frank was very
2   apologetic to me, and I felt genuinely felt -- he felt
3   bad about this whole situation, and, you know, that,
4   you know, he got sort of talked into it by Mike.
5           So -- and I basically said to him, look, I
6   don't want to have anything to do with Mike really.  I
7   said, you know, keep him away from me, because I think
8   the guy is crazy, I said, at this stage of the game.
9           And I don't -- and, also, I never really
10  spoke to clients a lot.  I mean, not these types of
11  clients, you know.  And I really didn't want to be
12  involved with them.
13          So Frank assured me, look, you won't have
14  any trouble.  These clients are now your clients.  You
15  know, we're not going to have anything to really do
16  with them.  We're not making anything, override, on
17  them.
18          You know, they wanted -- they were basically
19  going to -- they were -- they were going to retire, as
20  far as I knew.  They had made a lot of money from, you
21  know, this -- this interest deal that they had on the
22  override for a lot of years.
23          And my father-in-law said, look, you know,
24  this is really not Frank's fault, and now -- you know,
25  let them open an account.  And I said, okay.  Fine.

Page 113

1    So I -- I did.

2         And then I really didn't have much to do

3    with them. I mean, I -- if I spoke to Frank Avellino

4    two or three times a year, it was a lot. I mean, he

5    spoke to Frank DiPascali all of the time, but I didn't

6    have that much to do with him.

7         But, I mean, as to why I would open the

8    account, look, I made money on these -- these

9    accounts. I mean, it wasn't like -- I wasn't doing

10   this for a philanthropic, you know, exercise.

11        Q.   Okay.

12        A.   So, you know, I had at -- let's say, I had

13   $500,000 -- 500 million dollars worth of accounts

14   originally, and I was making, you know, good money on.

15        You know, I was certainly making on average

16   a couple of percent a year, which was the typical of

17   what you would make on a managed account, and now all

18   of a sudden that was going to, you know, end.

19        So after I got, you know, over my initial,

20   you know -- you know, concern about them, and now I

21   realized, okay. This was fine. The SEC -- you know,

22   I told the SEC what I was doing, that I was opening up

23   these individual accounts. They were all fine with

24   it.

25        I said, okay. I'm not going to have any

Page 114

1    more problem with them, and I'm not going to -- and

2    they're sort of out of the picture.

3         Now they're just going to be an account,

4    like any other account, except, instead of doing only

5    bona fide arbitrage with them, I'll also do the

6    premium arbitrage.

7         You know, they'll -- they'll maybe make, you

8    know, money, and that's fine. And that was -- that

9    was the relationship.

10        Q.   Did you ever become aware at any point in

11   time that Michael Bienes came back in through an

12   entity or through himself as an investor in Madoff, in

13   your company?

14        A.   An investor through what?

15        MR. ETRA:  Objection to the form.

16   BY MR. SAMUELS:

17        Q.   Okay.  Did -- did it -- we talked about

18   Grosvenor and Mayfair being entities that were --

19   became feeder funds that were -- Frank Avellino was a

20   principal of; right?

21        MR. ETRA:  Objection.

22        MR. WOODFIELD:  Objection.

23        Q.   And so my question is:  Were you aware of

24   any company or feeder fund in which Michael Bienes

25   the principal that invested --

Page 115

1    A.   No.

2    Q.   -- with you?

3    A.   I didn't -- I didn't know that any -- I

4    thought that accounts like Grosvenor and Mayfair --

5    and I don't remember what -- I thought those accounts

6    were Mike's and Frank's account. They were all money.

7    That was it. They were -- I wouldn't consider them

8    feeder funds --

9    Q.   Okay.

10   A.   -- because they -- I thought it was their

11   own money.

12   Q.   So you realized that Mike was back in with

13   you post 1993 as well --

14   A.   Yeah.

15   Q.   -- not just Frank?

16   A.   I didn't know --

17   Q.   Okay.

18   A.   One of them was his account. I thought

19   maybe it was Grosvenor, because he moved to England or

20   did something in London.

21   Q.   Okay.

22   A.   So he was living in -- I don't know.

23   Q.   Okay. But you knew he was back in --

24   A.   Right.

25   Q.   -- in some form or fashion. Okay.

Page 116

1    A.   I mean, they was still, you know, friends

2    and partners, the two of them.

3    Q.   In terms of -- are you aware -- in terms of

4    the entities, now, forget about the individuals, but

5    the entities in which they invested in directly, are

6    you aware of them getting paid either commissions or

7    management fees or some payments in excess of what the

8    returns were?

9    A.   No.

10        MR. SAMUELS:  Okay.  What are we up to?

11        THE COURT REPORTER:  Five.

12        MR. SAMUELS:  Mark this as Exhibit 5,

13   please -- actually, I'm going to take that back.

14   I'm sorry.

15        Mark this one. Mark this as Number 5.

16        (PLAINTIFFS' EXHIBIT 5 WAS MARKED FOR

17   IDENTIFICATION.)

18   BY MR. SAMUELS:

19        Q.   Okay. I want to show you what's been marked

20   as Exhibit 5 now, which is an account document for P&S

21   Associates, general partnership, with Bernard Madoff

22   Investment Securities.

23        A.   Uh-huh.

24        Q.   You had testified earlier that you were not

25   interested in having limited partnerships and general

Page 117

1  partnerships invest post 1992. Do you -- have you
2  heard of P&S Associates --
3      A.  No.
4      Q.  -- or S&P Associates?
5      A.  Uh-uh.
6      Q.  Okay.  Do you know if either Mr. Avellino or
7  Mr. Bienes referred a gentleman by the name of Greg
8  Powell or Michael Sullivan to your company to invest
9  with them?
10     A.  Yes.  Wait a minute.  Now, you say Greg
11 Powell and Michael Sullivan?
12     Q.  Yes.
13     A.  Yeah.  The -- that -- now that name is
14 familiar to me.  Yes.
15     Q.  So this was their -- their entity was P --
16 they had entities, P&S and S&P, which I explained to
17 you earlier are my clients.  And Michael Sullivan,
18 Greg Powell passed away in the early '90s, and Michael
19 Sullivan became the sole managing general partner.
20 And now Mr. Von Kahle is the managing general partner,
21 pursuant to court order.
22          So what do you recall about Sullivan and
23 Powell coming to -- to invest in Madoff?
24     A.  They were just, you know, an individual
25 account.  The fact that it was structured as a -- I

Page 118

1  don't know how -- you know, as -- as a partnership --
2  as a general partnership, I had lots of accounts that
3  were structured as general partnerships, but they were
4  not necessarily feeder funds or hedge funds.
5      Q.  Did -- did Mr. Avellino bring -- bring
6  Mr. Sullivan or --
7      A.  Yeah.
8      Q.  -- Mr. Powell to you?
9      A.  Yes.
10     Q.  Okay.  And did he mention to you that
11 Mr. Sullivan was previously an investor with Avellino
12 & Bienes?
13     A.  I think so.
14     Q.  Okay.  And at any point in time prior to
15 today did you become aware that P&S and S&P, in fact,
16 had a number of general partners, who placed money
17 with S&P and P&S that ultimately was invested with
18 you?
19     A.  No.
20     Q.  Okay.  Were you ever aware at any point in
21 time that Mr. Avellino had got investors from the
22 Christ Church in Fort Lauderdale to invest with P&S
23 and S&P?
24          MR. ETRA:  Objection.
25          THE WITNESS:  No.

Page 119

1  BY MR. SAMUELS:
2      Q.  Okay.  Did you ever become aware at any
3  point in time that Mr. Michael Bienes had investors,
4  many of whom through St. John the Baptist Catholic
5  Church, to invest in P&S or S&P?
6          MR. ETRA:  Objection.
7          THE WITNESS:  No.
8      Q.  Okay.  So at any point in time prior to
9  today were you aware that S&P and P&S had a number of
10 general -- a number of partners --
11     A.  Uh-uh.
12     Q.  -- and it wasn't just Michael Sullivan and
13 Greg Powell?
14     A.  No.
15     Q.  Okay.  At any point in time did you become
16 aware of the fact that Michael Bienes and Frank
17 Avellino, in fact, received commissions from P&S and
18 S&P based upon them having located investors into P&S
19 and S&P?
20          MR. ETRA:  Objection.
21          THE WITNESS:  No.
22 BY MR. SAMUELS:
23     Q.  Okay.  Mr. Avellino never mentioned to you
24 that he was making money on S&P and P&S by sending --
25     A.  No.

Page 120

1      Q.  -- folks over there?  Okay.
2      A.  As a matter of fact, as I said prior, I
3  was -- one of the rules that I had with every one of
4  my clients was that there was no -- I didn't want
5  anybody taking any fees off the top of anybody else's
6  account or sharing in the profits of -- of another
7  account.
8      Q.  And so Mr. Avellino and Mr. Bienes told
9  you -- never told you about commissions that they were
10 receiving?
11     A.  No.
12          MR. ETRA:  Objection.
13 BY MR. SAMUELS:
14     Q.  Okay.  And would you have -- what would you
15 have done had you found out that Mr. Avellino and
16 Mr. Bienes were making --
17     A.  Closed the --
18     Q.  -- commissions?
19     A.  -- account.  As a matter of fact, if you --
20 we had a history of -- of closing a number of
21 accounts, not only with -- with -- accounts that were
22 with Frank and Mike, but if we ever -- my --
23          My back office was always to be on the
24 lookout for any account that they thought was a
25 limited partnership account that had more people in

Page 121

1   the account, other than the immediate family.  And we
2   constantly questioned our clients about that.  And if
3   we found that -- that an account did exist, we closed
4   it.
5       Q.   Did you ever let Mr. Avellino or
6   Mr. Bienes -- were they aware of these guidelines --
7       A.   Yes.
8       Q.   -- that you had?
9       A.   Absolutely.
10      Q.   Okay.  And do you know why Mr. Avellino,
11  nevertheless, sent over investors to P&S or S&P?
12      A.   Why -- why he -- what?
13      Q.   Why he sent investors over to P&S and S&P
14  and made commissions on them?
15      A.   No.
16      Q.   Same as to Mr. Bienes, you don't know why?
17      A.   Uh-uh.
18           MR. ETRA:  Objection.
19  BY MR. SAMUELS:
20      Q.   Okay.  Are you aware at all of any
21  involvement in S&P or P&S by a Father Kelly or a
22  Bishop Wills?
23      A.   I had a number of clients that were, you
24  know, church accounts, because I had those -- they
25  would periodically come up to -- to meet me, to talk

Page 122

1   to me.  Kelly sounds familiar.
2       Q.   Okay.
3       A.   For what -- there were -- there were a
4   number of them.
5       Q.   Vincent T. Kelly, does that sound familiar?
6       A.   No.  I just know -- I know the name Kelly,
7   but that's --
8       Q.   Okay.  And do you know whether he invested
9   directly in you or whether he invested in S&P or P&S?
10      A.   I -- as far as I know, he only -- the church
11  itself had, you know, a different -- I don't know what
12  you call them, being Jewish.  I mean, diocese or what.
13  Had individual accounts.
14      Q.   Arch diocese or --
15      A.   Yeah.
16      Q.   -- parishes?
17      A.   (WITNESS NODS HEAD UP AND DOWN.)
18      Q.   Okay.
19           (DISCUSSION HELD OFF THE RECORD.)
20  BY MR. SAMUELS:
21      Q.   Well, let me ask you:  You mentioned that
22  prior to 1992 the trades were actually being made --
23  executed on behalf of Avellino and Bienes' clients;
24  correct?
25      A.   Correct.

Page 123

1       Q.   Okay.  And you mentioned it was sometime
2   after that that the Ponzi scheme started and where
3   trades were not being effectuated?  Yes?
4       A.   Uh-huh.
5       Q.   And when was --
6           MR. WOODFIELD:  Remember, she needs
7   audible answers.
8           THE WITNESS:  Oh, yes.
9   BY MR. SAMUELS:
10      Q.   And -- and when was that, and what caused
11  that to happen?
12      A.   Okay.  You're -- you're going to have to
13  bear with me when I give you this little bit of
14  history, which everyone seems to always want, but --
15      Q.   Well, we wouldn't want to come here and not
16  get that.  So --
17      A.   Right.
18           MR. WOODFIELD:  I'd trade it for heat.
19           THE WITNESS:  The -- I had made -- I
20  had -- I had four prime big clients; Jeffry
21  Picower, Norman Levy, Carl Shapiro and Stanley
22  Chais.  Commonly referred to as the big four in
23  various books that have been written about this
24  thing.
25           These were clients that I had starting

Page 124

1   in the 1960s, you know, and so on.  And I had --
2   I had -- they were -- outside of Picower, who was
3   about, I think, a year or two younger than me,
4   the others were, you know -- you know, were
5   substantially older gentlemen.
6           All of them were -- were considered
7   wealthy.  And I traded for them over the --
8   starting in the '60s and going right on through
9   and made them a great deal of money.
10          They were all -- they were wealthy on
11  their own.  They were certainly all
12  multimillionaires when they opened accounts with
13  me.
14          And I traded primarily arbitrage type
15  of -- of trading for them over the years, and
16  were -- made a huge amount of, you know, money
17  for them doing arbitrage.
18          In 1980 they -- what happened was they
19  were -- they were -- prior to 1980 they were
20  using silver straddles through basically Bear
21  Stearns, E.F. Hutton and -- and Merrill Lynch to
22  convert short-term trading gains into long-term
23  trading gains.
24  BY MR. SAMUELS:
25      Q.   What is a silver straddle?

Page 125

1      A.      Silver straddle -- straddle is where -- it
2   was a tax shelter type of an arrangement, where you
3   bought and sold contracts in silver and other
4   commodities.
5      Q.      Okay.
6      A.      It was a very common tax shelter strategy
7   that was sold by the major firms to clients to convert
8   short-term trading gains into long-term trading gains.
9   I never did any of that.  I wasn't -- I wasn't
10  equipped to handle that.  I never traded in
11  commodities.
12      The -- it was a -- but it was a very popular
13  tax shelter.  You know, similar to like real estate
14  shelters, but this was with commodities.  And these
15  four clients were doing these -- this trading through
16  basically Bear Stearns and E.F. Hutton.
17      The -- the IRS started to be uncomfortable
18  with these types of silver straddles as a way of
19  converting short-term gains into long-term gains, and
20  they started to change the rules on whether you could
21  successfully use those straddles.
22      The -- so these four clients of mine were
23  using these straddles through those firms to convert
24  the short-term gains they were making with me in
25  arbitrage transactions, which were yielding pretty

Page 126

1   much at the time, as I say, around, you know, 15 to 20
2   percent returns.
3      That's -- that's what arbitrage trading
4   basically yielded for everybody.  Not only with me.
5   With basically, you know, throughout Wall Street.
6      So when everybody started to get nervous
7   about using these straddles and being challenged by
8   the IRS, which was challenging -- starting to
9   challenge them in tax court, everybody was frantically
10  looking around for ways of -- of converting short-term
11  gains to long-term gains, because the tax brackets
12  were -- were very high at that time.
13      So these four clients of mine were asking
14  me, you know, is there any other type of trading that
15  they could do, you know, generate long-term gains,
16  rather than -- than short-term gains.
17      Q.      And what timeframe are we at now?
18      A.      This was 1980.
19      Q.      Still 1980.  Okay.
20      A.      They were doing that prior to 1980, but 1980
21  is when the IRS was really starting to come down and
22  challenge these straddles, you know, all over Wall
23  Street.
24      Now, at that same time, in 1980, I was doing
25  business -- I had met some French investors in Paris

Page 127

1   that came to me with this proposition.  Mitterrand,
2   for those of you that know, Mitterrand came into
3   France in 19 -- in -- in 1980 as president, and he was
4   basically a socialist.
5      And to -- to the point where people thought
6   he was -- you know, he was going to turn the country
7   into -- into communism.  What he did was he started to
8   nationalize the -- the banks in France and also, you
9   know, the industries in France.
10      As a matter of fact, he -- he nationalized
11  the Rothschild Bank.  Now, but what he also did at
12  that time, in 1980, is he -- France had currency
13  controls, which meant that French citizens could not
14  own anything but French francs.
15      They couldn't -- they couldn't own other
16  currencies, other than French francs, and they
17  couldn't take French francs -- they couldn't take
18  French francs out of the country.
19      So they -- what -- what now, I'll also
20  say that most foreigners never wanted to keep all of
21  their assets in -- in Europe, in -- in the home
22  country, because they were always worried about, you
23  know, that -- being nationalized or currency -- people
24  and countries taking their money.
25      They all had accounts in Switzerland, in,

Page 128

1   you know, Luxembourg, and they always had their assets
2   out of the country.  That was very common.  But,
3   Mitterrand, when he -- in 1980, when he -- when he did
4   come in, he got everybody in Paris -- and France was
5   sort of hysterical.
6      I had a French client by the name of Albert
7   Igoin, who was a very wealthy French industrialist and
8   a banker and was a client of Goldman Sachs at the
9   time, came to me through a number of Swiss bankers
10  that heard about that I was -- I was --
11      At that time I was one of the largest
12  convertible bond arbiters on Wall Street.  I mean, I
13  had made markets on all of the convertible bonds and
14  was doing a big business in -- in convertible
15  securities by 1980.
16      I flew over to -- to Paris and met with this
17  Albert Igoin, and he basically -- he came to me with a
18  proposition through -- with this bank in Zurich, Swiss
19  bank in Zurich, and said to me he wanted to do a -- a
20  strategy -- an arbitrage strategy that worked the
21  following way.
22      There's a point to this story, by the way.
23  The -- you -- in France you could -- you had the
24  ability to buy dollars, if you were buying the dollars
25  to pay for U.S. securities.

Page 129

```
 1              In other words, you could -- the exception
 2    they made to people that wanted to sell French francs
 3    and purchase dollars was if the purchasing of the
 4    dollars was in order to pay for U.S. securities.
 5              So what -- what wealthy French people did
 6    was they went ahead, and they opened an account, which
 7    had to be done through a French bank.  It couldn't be
 8    done through a U.S. bank.
 9              You would -- they would go out and buy,
10    let's say, the General Motors.  And in order to pay
11    for the General Motors, which settled in dollars, they
12    would sell French francs and change it into U.S.
13    dollars, and then pay for the U.S. securities with
14    dollars.
15              And, in fact, by owning now General Motors,
16    they owned dollars.  All right.  They sold their
17    franc.  So they were out of the franc, which they
18    were -- which was being devalued when Mitterrand came
19    in, and they went into -- they went into dollar-based
20    U.S. securities.
21              So the problem with that is that, the good
22    news was you were out of the French franc, and now you
23    owned dollars.  And if the dollar stayed stable, you
24    were okay.
25              Whereas, the franc was -- was depreciating
```

Page 130

```
 1    rapidly at the time, but, of course, you owned General
 2    Motors.  So you were at risk to the U.S. stockmarket.
 3              All right.  So what firms like Goldman Sachs
 4    and other arbitrage -- arbitrage firms in Wall Street
 5    were doing was you could buy a portfolio of U.S.
 6    stocks, and then you could hedge that some way, so
 7    that that portfolio was sort of neutral, but -- but in
 8    a sense you owned dollars.
 9              So this -- this Frenchman and the banks said
10    to me, look, you are supposed to be the bright young
11    guy on Wall Street that -- that knows how to hedge
12    better than most people.
13              Will you, you know, be willing to take us on
14    as clients, buy portfolios of U.S. securities for us
15    and hedge it some way that you can just make the
16    portfolio sort of neutral?
17              We're not interested in necessarily making
18    money doing the arbitrage.  We just want to be able to
19    hedge the U.S. portfolio of stocks, so that we have --
20    take the market risk out, and we'll -- all we'll -- we
21    want to do is be able to have the dollar assets now in
22    the portfolio.
23              So I said that was no big deal for me to do,
24    you know.  It was relatively easy to -- to hedge a
25    portfolio of U.S. securities.  There were various ways
```

Page 131

```
 1    you can hedge it.
 2              You can do what's known as pass trading,
 3    where you buy General Motors, and you short Ford, and
 4    so on.  You can do all sorts of arbitrage trading,
 5    without even -- you know, and then you can use
 6    options, you know, doing various covered rights and
 7    all sorts of different things.  It was --
 8              So they said to me, okay.  If you can do
 9    that -- and they were doing it at the time through
10    Goldman Sachs and Merrill Lynch and other firms like
11    that, but they came to me, and they said that because
12    of my reputation at that time doing convertible bonds
13    and doing arbitrage, and I was this nice Jewish boy,
14    which they liked, and they said to me, fine.  You
15    know, you do this.  We'll -- we'll open up accounts
16    for you.
17              So I agreed to do this, and so I now had --
18    and I had been doing this for -- I started doing this
19    actually -- this type of trading, you know, really
20    significantly in the late '60s into the '70s.  So by
21    the time they came to me in 19 -- in 1980, I had this
22    substantial reputation at the time.
23              Now, at this same time I had these four U.S.
24    clients, Shapiro, Levy, Picower, you know, wanting to
25    be able to -- to convert short-term gains into
```

Page 132

```
 1    long-term gains.
 2              All right.  Now, the only way to do that was
 3    to be able to buy a portfolio of stocks, you know,
 4    similar to what the French people wanted to do, and to
 5    hedge that portfolio with, you know, doing all sorts
 6    of arbitrage transactions.
 7              The only key -- the key to that was that the
 8    only way you're going to get long-term gains is for
 9    the market to go up.  So I said to them, okay.  Look,
10    you guys are now -- you don't want to use silver
11    straddles anymore.  So that game is over.
12              You can't convert long-term -- short-term
13    gains into long-term gains.  The only strategy that's
14    available that will stand up with the IRS is to buy
15    stocks and hope they go up and hold them for at least
16    one year, you know, and then you're going to get a
17    long-term gain, as opposed to doing the convertible
18    bond arbitrage transactions, which were all --
19       Q.    Short term.
20       A.    -- taxed with short-term gains.  I said, I
21    can't guarantee you that the stockmarket is going to
22    go up.  No one can -- can guarantee you that for a
23    year.  I said --
24              I happened to be bullish at the time in
25    1980, because interest rates were -- what?  What?
```

Page 133

1   Twenty percent?  They had to start, you know, coming
2   lower.
3           But to make 20 percent gains in the
4   stockmarket was not that difficult.  As I say, you
5   could have -- you just could have bought bonds and
6   gotten 20 percent returns.
7           I know it's hard for you to -- to -- to
8   understand that now, in today's environment, but in
9   1980 -- you can check -- that's -- that was what
10  interest rates were.
11          So, I said, if you want to do that, forget
12  about real estate tax shelters, forget about the
13  commodity straddles, because the tax -- the IRS wasn't
14  going to do that.
15          I said, you have to be able to buy a
16  portfolio of stocks and hope that they go up over the
17  next year.  I said -- so they said, well, that's
18  great.  We like that, but we don't want to take the --
19  the market risk.  How can we hedge that?
20          I said, you can hedge.  You can do, you
21  know, hedges, but you -- you have to do certain types
22  of hedges.  You have to -- for it to stand up
23  tax-wise, you have to be able to have some degree of
24  risk, you know, in the portfolio, because that was why
25  the silver straddles were being challenged, because

Page 134

1   they were -- there was always no risk involved in it.
2   It was a sham transaction.
3           So they said, okay.  Fine.  Let's -- these
4   four clients decided, let's go ahead and do that.  So
5   I went about and started to put on these portfolios of
6   stocks for these clients.
7           And, of course, I also had these French
8   clients, who were looking to do a similar type of
9   strategy, but not exactly.  So I had a huge liquidity
10  pool of clients that had these -- that had big
11  portfolios of stocks.  It was like, you know, a dream
12  in heaven for a firm to have contra-side transactions
13  like this.
14          Well, from 1980 through 1987 the market went
15  on a tear, and you had this bull market that kept on
16  going up, and the portfolio of Picower, Levy and
17  Shapiro had an enormous run.
18          Now, in order for everything to work
19  properly when I started to do this in 1980, I said,
20  okay.  Look, I can put you together with these foreign
21  clients, these French clients.  They can be the other
22  sides of these transactions.
23          It was -- you know, I said, however, there
24  has to be an agreement between the parties that they
25  won't -- you will not unwind the transactions

Page 135

1   prematurely, because the -- the key with the Frenchmen
2   were that they -- they had to know that -- that --
3   that their portfolios were going to be -- stay in
4   place, that I wasn't going to force them to liquidate
5   the portfolio prematurely.
6           All right.  Now, the -- my relationship with
7   these other clients was, I said, okay.  Fine.  You
8   want to do that.  I'll put you all together, you know.
9   You know, they'll -- they'll provide the liquidity.
10          They'll sell you -- you sell them the stock
11  that they need on their portfolio.  They'll sell you
12  the stock in their portfolio.  I'll be the
13  clearinghouse for the whole transaction, I said, but
14  everybody has to agree that we're not going to unwind
15  it until all four -- all -- both sides agree to that.
16          Now, that -- that was an arm's length
17  agreement, and everybody was perfectly happy to do
18  this, because my relationship was such, it was like
19  one big family, you know.
20          So from 1980 to 1987 everything went
21  unbelievably well.  Everybody made money.  As a matter
22  of fact, Picard, when they came down here, looked at
23  the returns that Picower and all these guys had made,
24  and he said, you know, there's nine billion dollars
25  worth of profits in Picower's account alone.

Page 136

1           They -- you know, they looked at that, and
2   they said, how is that possible?  And I said -- and
3   I -- so I -- I laid out to them, I said, okay.  I
4   said, you -- it sounds like a huge amount of money,
5   but you're talking about from 1980 to 2008.  That's a
6   lot of years.
7           I said, if you -- if you -- if you look at
8   the returns, you know, they were making, and they were
9   making like -- you know, the market was moving at like
10  18, 20 percent return.
11          You know, you compound that every year,
12  because nobody was -- nobody was unwinding anything.
13  I said, it wasn't as great as what you would think.
14  And there were gains, and there were losses, but the
15  net returns were -- were substantial for everybody.
16          Now, it comes 1987.  The market starts to
17  crash.  Obviously, we had the crash of 1987.  So now
18  all of a sudden Picower and Shapiro basically go into
19  a panic, and they say, listen, we've made -- you've
20  made us all billionaires.
21          This has all been documented that they --
22  this -- this was real money.  Even Picard doesn't
23  doubt for a minute that -- that this money was
24  generated.
25          All right.  They said -- they said, we -- we

Page 137

1  want to sell.  We want to unwind the transaction.  I
2  said, wait a minute.  We all agreed that we can't
3  unwind these transactions.  I can't sell the -- the
4  stock, you know, at this -- you know, now, because the
5  French people don't want to unwind yet.
6        So there was a lot of discussion made, and
7  they were -- Shapiro and Picower were thoroughly
8  convinced that the market was going to go down, and
9  they were going to now lose all their long-term gains.
10        They weren't going to -- they -- they had
11  them hedged.  So they weren't going to come out with a
12  net loss, but if the market went down, they would --
13  they would give back the gains on the long side, but
14  they would make it on the short side, but the short
15  side was taxed at short-term capital gains.
16        So they would have done all right
17  economically, but they would have lost -- lost the
18  advantage of the long-term gain, which was
19  substantial.
20        I said, you can't sell out yet.  They said,
21  well, we want to sell out yet.  I said, listen, you're
22  violating the agreement that we had, you know.  You're
23  going to really screw up my relationship with these
24  French clients, which were very substantial, and
25  you're going to ruin your relationship with me, you

Page 138

1  know.
2        I -- I really don't want you to sell.  Now,
3  I couldn't force them not to sell.  I mean, it was
4  their stock.  If they wanted to sell, they could sell,
5  but they were -- these were people who were like, you
6  know, my relatives.  They were like -- the
7  relationship we had, which has been, you know,
8  reported on all over the place, was a very special
9  relationship.
10        So they said to me, look, okay.  I'll tell
11  you what we'll do.  You take over the short side of
12  the transaction for -- for us.  That way your French
13  clients will be fine.  You don't have to unwind their
14  side of the transaction.
15        You take over the short positions, you know,
16  for us.  And we'll hold you harmless, you know.
17  We'll -- you know, we'll -- you know, we'll be
18  responsible if there's any loss on the short side.
19  Just sell the long side out for us.  Liquidate the
20  long positions.  Let us take our long-term gains, you
21  know, and --
22        You know, I said, wait a minute.  You're
23  going to have all these huge long-term gains, and
24  you're not taking the short side.  So your gains are
25  going to be enormous, you know, but now there's going

Page 139

1  to be -- there's substantial loses on the short side.
2        They said, don't worry.  We'll be
3  responsible for that.  And we actually signed
4  agreements, you know, hold harmless agreements, which
5  actually were drawn up by Pricewaterhouse.
6  Pricewaterhouse was a big client of mine, and they
7  were -- they were the accountants for -- for Shapiro.
8        All right.  So we had these agreements that
9  they would hold me harmless for any loss that occurred
10  on the short side.  They were convinced there wasn't
11  going to be any loses, because they thought the market
12  was finished.  It was going to go down, and the short
13  positions would be gains.  It wouldn't be a problem.
14        So, you know, I agree to do this stupidly.
15  I -- the biggest mistake I made was to agree to this
16  transaction.
17        Now, my choice was I could have litigated
18  with them, but that would have been the end of my
19  relationship with them.  It would have been the end of
20  my relationship with the French clients.  It would
21  have been a total disaster.
22        All right.  So I agreed to take over these
23  positions, and I figured I had these hold harmless
24  agreements with them.  And, you know, the partner from
25  Pricewaterhouse, who was one of the senior partners,

Page 140

1  said to me, don't worry.  You know, they'll -- they'll
2  never lay down on these hold harmless agreements,
3  because you're worth too much money to everybody, you
4  know, for them to screw up the relationship with you.
5        And they -- they have -- you know -- you
6  know, they're billionaires.  You know, you made them.
7  They're -- they're going to stand by this.  So I said,
8  you know what?  I agree with you, but they're --
9  they're older guys.
10        I mean, Shapiro -- you know, I said -- and
11  their families were involved, and they -- the families
12  had, you know, accounts with me.  I said, put me in
13  your will.  So I became the executor of all of their
14  estates, and the families all were aware of -- of this
15  arrangement.
16        And what happened was, of course, the market
17  recovered from this crash in '87.  They had taken
18  their gains.  Everybody -- you know, Picower had nine
19  billion dollars, you know, of gains in there.  Shapiro
20  also had billions of dollars.  Levy had billions of
21  dollars.
22        But the really primary culprit was Picower
23  and Shapiro.  Levy and Chais, you know, were not
24  really the ones pushing, but I had to make the
25  agreement with all four of us, because all four of us

Page 141

1    made the original agreement.  So I had to treat
2    everybody -- everybody the same.
3         The -- it comes actually in 1992, the --
4    when the -- by now the market had -- you know, had
5    recovered from the -- through the '87 crash.  And
6    Picower tells me that, you know, he's lost a lot of
7    money with Goldman Sachs, you know, by being short the
8    market, which, of course, you know, I wasn't aware of
9    the fact that he was doing this, but he had made so
10   much money with me he figured, you know, he started
11   getting screwed up with -- with Goldman.  Goldman
12   started to lose a lot of money for him.
13   Q.    He could have just kept your short positions
14   instead; right?
15   A.    They -- well, the market went up, so the
16   short positions --
17   Q.    Right.
18   A.    -- were -- you know, they were -- they were
19   losing money, you know, on that, and they were
20   responsible for that.
21        To make a long story short, I started to
22   worry that now I was going to -- I was going to be --
23   have a problem with that.  They were not going to
24   honor their -- their gains.
25        They both started to -- to whine.  Primarily

Page 142

1    it was Picower, was the real culprit.  Shapiro, as I
2    said, also, but not to the same extent.
3         At this -- I decided at that time really it
4    was -- in '92, after this thing when I took on these
5    clients, and I said, okay.  Now I'm going to have --
6    you know, I'm going to have retail clients, you know,
7    like I did from Avellino & Bienes.
8         So I started to -- I was -- I had also at
9    that time developed a strategy called the split-strike
10   conversion strategy.  All right.  That's a strategy
11   that you buy a -- I don't know how familiar you are
12   with covered rights, but you -- you buy a -- a stock,
13   and you sell an option against it, and you take --
14        It's an arbitrage strategy, only it's using
15   options.  I had developed what's known as this
16   portfolio, where, instead of buying General Motors and
17   selling a General Motors' call, you bought a portfolio
18   of, you know, 15 stocks, and you sell 15 options
19   against it.
20        And that way you're -- rather -- you're not
21   relying just upon one stock going up, but you're
22   relying on the market going up.  And then I came up
23   with the idea of putting a put wrapper on it, which
24   means you buy a put, which protects it.
25        So it's a covered right with a put wrapper,

Page 143

1    which -- which gives you basically a limited -- a
2    limited risk arbitrage strategy.
3         The -- I was solicited by a lot of foreign
4    clients because of my success with these French
5    people.  I had a lot of foreigners come to me and say,
6    look, why don't you start a hedge fund, and we'll --
7    we'll supply money for you to do this split-strike
8    strategy.
9         I said, I don't want to be in the hedge fund
10   business.  I don't want to start having -- dealing
11   with clients a lot, I said.  So they said, well, fine.
12   We'll -- we'll -- we'll form hedge funds ourselves.
13   We'll deal with it, the clients.
14        You just -- you just handle the hedge fund
15   itself.  You just execute the trades for us.  So I
16   started taking in money from foreign hedge funds, like
17   Fairfield and so on.  And that started really in -- in
18   1995.
19        I took all of these hedge funds in, and
20   what -- in order to keep the hedge funds happy -- and
21   the hedge funds had a reputation of being hot-money
22   clients.
23        In other words, so what they would do is as
24   long as you made money for them they were your
25   clients.  You have one bad year, and the money was

Page 144

1    called in.  They'd want to disappear.
2         So the hedge funds came to me, and they
3    said, look, you know what, if you go ahead and you
4    promise that you will not return the money, you commit
5    to us, that we'll give you the money, you invest in
6    for the hedge fund, but we want to know that, you
7    know, you're going to -- you're going to keep the
8    money working for us, you know, in this strategy.
9         And they were very enamored by this
10   split-strike strategy, which was really -- you know,
11   it was a strategy that, as far as I was concerned,
12   was, you know, a great strategy to use.
13        The -- it started to grow, and I started to
14   do this strategy, but the market went into a funck.
15   And it started -- it got flat.  And all of a sudden I
16   didn't have the volatility that I needed to do the
17   split-strike strategy.
18        And my problem is that I -- I made the
19   decision -- the other major mistake was that I would
20   short the strategy for them, put the money into
21   treasury bills, which were at that time earning two
22   and a half percent return, and short the strategy,
23   which was making 12 percent return for the clients.
24        And I would be losing ten percent, but I
25   thought that was only going to be a short-term, you

Page 145

1   know, play.  That I would, you know, do this maybe for
2   two or three months, the market would turn and so on,
3   but the market just kept on dragging itself.
4           We had the Gulf War, you know.  There was
5   just -- the market just -- you know, in the '90s it
6   just wasn't -- didn't do anything.  We had the -- the
7   bond market collapsed.  You had the -- in '94 Goldman,
8   for example, almost got wiped out.
9           In '94 in the bond market Picower told me
10  he -- that Goldman destroyed him, you know, in that --
11  in that market.  So I was sitting in a situation that
12  I thought the hold harmless agreements weren't going
13  to work out properly.
14          I had taken on this money from these foreign
15  hedge funds, and I was starting to short it for them.
16  And, again, shorting was no big deal.  As a
17  market-maker you shorted all of the time.  That was
18  our business.
19          So to short clients the money, you know, I
20  do that all the time.  I mean, that's every -- not
21  only me.  Every market-maker, every investment banker
22  short stocks their clients.  You know, it's not
23  illegal.  You know, it's -- as a matter of fact, as I
24  said earlier, you're obligated to go short at times.
25          Without boring you with all of the details,

Page 146

1   which I've already done, you know, for you, and
2   probably lost you on all of this, you know, which I
3   can understand, that's what created my whole problem.
4           All right.  Now, to -- to reestablish a
5   certain amount of credibility after -- after all
6   this --
7       Q.   So is that the point in time when you
8   started taking money in and not executing trades?
9       A.   Right.  That's when this whole thing started
10  to -- to -- to blow up.
11          Now, when I -- I realized -- by 1998 I
12  realized that I was dead.  I realized that there was
13  no way I was ever going to recover from any of this,
14  you know.
15          And how I agreed to continue to go through
16  this charade, you know, knowing that in -- starting in
17  '98 that I was -- you know, I continued it for another
18  ten years.
19          I -- after, you know, six years of seeing a
20  psychiatrist -- psychologist in his place, trying to
21  figure out how I was able to keep everything together
22  and not let anybody know what was going on, you know,
23  other than myself.
24          My sons didn't realize it, because they ran
25  a whole different side of the business.  My brother

Page 147

1   did the same.  The -- I realized that I was dead at
2   this stage of the game, which is why when I finally,
3   you know, decided in 2008, when everything was, you
4   know, coming unglued, and I --
5           Everybody wanted their money back, you know,
6   and I was the only liquidity pool in Wall Street as
7   the time, because, unlike all hedge funds that require
8   to give them three months notice and so on, my money
9   was available, as far as the clients were concerned,
10  you know, literally within seven days settlement --
11  you know, settlements for them.
12          So I decided that that was it.  It was over.
13  Now, I realized at the time that Picower had all --
14  had the money that he owed me, because I had partners
15  at Goldman Sachs, which is where he had all of the
16  money that were clients of mine at the time.
17          They were -- you know, they were hedge funds
18  clients of mine, and they had managed accounts with
19  me, like everybody else.  So -- and also --
20      Q.   So he could have made good on the hold
21  harmless?
22      A.   Yeah.  He could have made good on -- he
23  could have made good on -- he didn't owe me nine
24  billion, but what happened was the day that I realized
25  that I was going to -- going to end it, which is when

Page 148

1   I had called Ike Sorkin, my lawyer, and said to him, I
2   got to make an appointment with you.  I got to come
3   and meet with you.
4           He had no idea what I was talking about.  I
5   had decided that I was just going to, you know, throw
6   in the towel.  I called up Jeffry Picower and Stan --
7   and Carl Shapiro and said to them, look, I'm going out
8   of business.  My business is blown up.
9           I said, you guys owe me money, and I want
10  the money back, you know.  Picower was -- you know,
11  said, well, you know, I don't have it all.  I can't --
12  you know, I got killed at Goldman Sachs.
13          I said, Jeffry, you know, I know that you
14  have the money there, you know.  I said, Goldman told
15  me that you got -- you know, you got -- you got --
16  you're worth nine billion dollars.  I said, I want,
17  you know, seven billion back.
18          You know that's what you're -- that's what
19  you're on the hook for, you know, for me, I said.
20  And, as it turns out, I said, I'm never going to be
21  able to make all of my clients whole on the money they
22  think they made, but the principal, you know, I can
23  cover, because the principal -- my -- my --
24          My U.S. clients were only on the hook five
25  million -- five billion dollars.  That was what my

Page 149

```
 1   U.S. clients had.  The hedge funds clients I knew were
 2   covered by the foreign bank guarantees.  The
 3   foreign -- the foreign banks all guaranteed the
 4   principal that -- my clients with structured products.
 5           And I didn't, quite frankly, care that much
 6   about the foreign -- foreign clients.  All I cared
 7   about was the people that had direct accounts with me
 8   that were my U.S. clients.  So that was already --
 9   I -- that was basically five billion dollars, which is
10   what is the GAO report, you know -- you know,
11   verified.
12           I said -- I knew I had money between Picower
13   and Levy and Shapiro.  I was going to get back, you
14   know, nine billion dollars.  So I said to -- to Ike
15   Sorkin at the time, I said, Ike, look, everyone is
16   going to get their principal back.
17           I'm not going to go to trial.  I'm going to,
18   you know, plead guilty, because I am guilty, but the
19   only way that I can come out of this somewhat is to
20   get the money -- put pressure on the clients, get the
21   money back.
22           I said, now, I have enough information on
23   these clients that they're going to give the money
24   back.
25      Q.  You mean Picower and --
```

Page 150

```
 1      A.  Yeah.
 2      Q.  -- Levy?
 3      A.  And he said, no.  Those -- everybody thought
 4   I was being delusional.  I said, trust me.  And I hate
 5   to use that word, that term.  I said, I'm going to be
 6   able to get the money back for clients.  I'm not going
 7   to go to trial.
 8           The government said -- Ike said to me, look,
 9   negotiate with the government, you know.  I said, Ike,
10   what is the point?  I said, I'm guilty.  They're --
11   what are they going to -- what kind of plea am I going
12   to get?  I said, ten years?
13           I said, I'm 70 years old.  I'll be 80 years
14   old.  I said, forget it.  I'm not going to do it.  I
15   said, these -- I said, these guys will never give up
16   the money, you know, unless I threaten them with the
17   information I have on them.
18           They were doing all sorts of shmatteh
19   trades -- it's a Jewish term that we use -- where they
20   were, you know, taking loss trades, and the -- the
21   stuff that they did was unbelievable.
22           And they were doing it through me, you know.
23   That was -- and, you know, they were doing it through,
24   quite frankly, Frank DiPascali, you know, Annette, and
25   so on and so forth.  They weren't sure exactly what
```

Page 151

```
 1   they were doing.  Although, Frank did.  DiPascali.
 2           So I called up Jeffry, and I said, you've
 3   got to give the money back.  And Bill Zabel, who was
 4   his attorney, another goniff, you know, said, Jeffry
 5   can give back two and a half billion dollars.
 6           I said, no, no.  He's not giving back two
 7   and a half billion dollars of seven billion.  Now, he
 8   said, no, no, don't do it.  Finally --
 9      Q.  When is this conversation taking --
10      A.  This is --
11      Q.  -- place?
12      A.  This is while I was out on bail.
13      Q.  Okay.
14      A.  You know, the fact that Jeffry Picower had a
15   heart attack and drowned in his pool, you can
16   congratulate me on that.  He had already had four
17   bypasses before this, you know.
18           But I said to him, Jeffry, if you don't give
19   the money back, Barbara is going to jail, who is his
20   wife.  I said, your -- you know, your other accountant
21   is -- you know, I said, you'd -- you got to give the
22   money back.
23           Forget about what Bill Zabel is telling you.
24   Zabel -- Zabel himself will be lucky to get out,
25   because he was on the board with me with the Picower
```

Page 152

```
 1   Institute.  We were on the board.  Barbara was the
 2   president of the Picower Institute.
 3           There was all sorts of trades going on back
 4   and forth, you know, with them.  I said, they have
 5   to -- he -- you have to give the money back.  Okay.
 6   He has his heart attack, you know.  You know, he dies.
 7           One of the great charades of all time was
 8   the -- was -- was Barbara and Preet Bharara's and
 9   Zabel's press conference that Barbara decided to give
10   back seven billion dollars, because that was what
11   Jeffry would have wanted, you know, to do.
12           Anybody that knew Jeffry Picower almost, you
13   know, died laughing thinking of that.  So she gave the
14   seven billion -- 7.2 billion dollars back.
15           Picower -- Levy's family -- Levy was already
16   dead before this happened.  His family gave back
17   250 -- 150 million dollars.  Levy -- Shapiro gave back
18   650 million; plus, he had sent in 250 million before
19   that.
20           Nine billion dollars came back, which, of
21   course, Picower -- Picard has taken the credit for.
22   He did all of that.  Trust me, he didn't.  I was the
23   one that recovered.
24           Not that it -- not -- not that it matters to
25   me at this stage, other than the fact, this was what I
```

Page 153

1  promised I would do, and that's what I did.  So that's
2  the whole story.
3           Now, you can -- you can have a hard time
4  understanding all of that, but I can tell you that's
5  what the case is.  Now, I have no reason to lie.  I
6  mean, the fact is that I -- what I did was horrible.
7           It was a -- a terrible mistake.  It was not
8  my intention for anybody to lose any of this money,
9  but -- and it was -- the whole thing was a total
10 disaster, but that's -- that's the deal.
11    Q.   Okay.
12    A.   You know --
13    Q.   Well, I appreciate your letting us know how
14 it happened.
15    A.   Doesn't help you any.
16    Q.   Your version of events.  That's -- that's
17 good to know.  I appreciate that.
18           I just want to go back now, if I can, to
19 Mr. Avellino and Mr. Bienes.  When is the last time
20 you spoke to Mr. Avellino?
21    A.   I don't remember.  I mean, not anywhere near
22 when all of this was over.  I mean, his contacts
23 basically with -- with me was -- was primarily done
24 through Frank.  Frank -- he -- he came up --
25           MR. ETRA:  Frank DiPascali?

Page 154

1           THE WITNESS:  -- to the office and --
2  Frank DiPascali, and met with Frank, because
3  Frank was the one that handled the accounts.
4           And Frank had nothing to do, by the
5  way, with Levy, Shapiro.  They never even spoke
6  to him.
7           MR. ETRA:  Frank?
8           THE WITNESS:  Frank DiPascali or
9  Frank -- or Frank Avellino.
10          MR. ETRA:  I --
11          THE WITNESS:  None of the Franks had
12 anything to do with these four clients.  Frank
13 DiPascali's responsibility was strictly for all
14 the other clients, including the hedge funds, but
15 not with the big four clients.  They, for the
16 most part, refused to ever speak to Frank.
17 BY MR. SAMUELS:
18    Q.   Well, when do you recall last speaking to
19 Mr. Avellino?
20    A.   I couldn't tell you.  In the 2000s,
21 certainly, but I don't remember when.
22    Q.   Have you ever spoken to Mr. Avellino's
23 counsel before you met him today?
24    A.   His counsel?
25    Q.   Yes.

Page 155

1     A.   I don't know who his counsel --
2           MR. WOODFIELD:  (INDICATING.)
3           THE WITNESS:  Oh, no.
4  BY MR. SAMUELS:
5     Q.   Okay.  Or anyone purporting to be his
6  lawyers?
7     A.   No.  I thought his lawyers were Ike Sorkin,
8  as a matter of fact.  I --
9     Q.   Well, in the 1992 SEC investigation it's
10 been reported that you referred Ike Sorkin to them; is
11 that correct?
12    A.   Yes.
13    Q.   Okay.  And was Ike -- did Mr. Sorkin work
14 with you or your company during that SEC investigation
15 as well?
16    A.   Did he work with me?  No.  I had no -- he --
17 what he did was -- I had one meeting with Ike Sorkin.
18 He wasn't really my lawyer.  I mean, my relationship
19 with -- was with Ike's senior partner, Howard
20 Squadron.
21           And what happened was when this -- I had no
22 reason to have a lawyer with the SEC, because there
23 was never any -- the SEC had no action with me or
24 interest with me, other than coming up and
25 straightening out the Avellino & Bienes mess and

Page 156

1  verifying it.
2           So what -- what Ike did was -- I know at
3  Howard Squadron's son's bar mitzvah Ike happened to
4  have been a guest there, and he -- Ike went up
5  into Howard Squadron's bedroom and had a conversation
6  with the SEC at the time and --
7           And Ike said to the SEC something to the
8  effect that Bernie is here with me.  And he said that,
9  don't worry.  You know, the money is there, and no one
10 is going to lose any money.  And that was the -- that
11 was the conversation.  The SEC -- I had no reason to
12 have a lawyer.
13           What happened was when Frank Avellino told
14 me that he had this problem, he said, do you know any
15 good lawyers?  I said, the only lawyer that I really
16 know is Howard Squadron, because Howard Squadron, you
17 know, and I were involved in a lot of charities, the
18 American-Jewish Commerce together.
19           And Howard said at that time, even though
20 Ike worked, you know, for Howard, and Howard said,
21 yeah, I have someone, you know, here that can --
22 that's -- you know, can handle that and I would
23 recommend.  And I said, oh, fine.  Gave him the name,
24 and that was it.
25    Q.   Okay.  And when is the last time you spoke

Page 157

1   to Michael Bienes?
2       A.   I went -- I was in my office in London, and
3   I went out with some of my partners to have lunch.
4   And all of a sudden somebody screams across the whole
5   restaurant, Bernie.
6            I turned around, and there's Mike Bienes
7   with his wife sitting in the stands.  I said, what the
8   hell are you doing here?  And he said, I live here.  I
9   said, what?  He said, I live in London.
10           I said, what do you mean, you live in
11  London?  I said, unless -- I thought you were living
12  in Florida.  He said, no.  I -- I live in London.  I
13  said, where do you live?  He said, the Dorchester.  I
14  said, the Dorchester?
15           He said, I live here.  I have a Rolls-Royce
16  here.  I -- I said, okay.  And that was it.  That was
17  the last -- that was the first time I spoke to him,
18  and the last time I spoke to him.
19      Q.   Was in a restaurant?
20      A.   In a restaurant.
21      Q.   Okay.  Reading from Mr. Bienes' testimony,
22  going back to the meeting in 1993, after the SEC
23  investigation, Mr. Bienes indicates --
24           MR. ETRA:  Can you give a page and line
25       number, please?

Page 158

1            MR. SAMUELS:  Yeah.  I'm on page 131,
2        line 19.
3   BY MR. SAMUELS:
4        Q.  "I had a final meeting with Madoff and my
5   wife, Frank Avellino and his wife in Madoff's office.
6   And I do remember that it's in the book.  Some guy
7   wrote a book, and it's in the book that I went to the
8   office.
9            "And I won't forget it, because for the
10  first time in my life I stood up to him, and I said,
11  Bernie, this is your Goddamn fault.  You should
12  have -- you should have found out and told us we must
13  be registered.  If we had been, all would be fine, and
14  now look at what you've led us into here.
15           "Now, I went on a little bit more, and then
16  he was like sitting back, saying, all right.  That's
17  it.  I'm getting a little edgy now.  Cut it.  And he
18  was Madoff; so I cut it.  And when we left, I guess it
19  wasn't on the best of terms."
20           Do you recall that meeting?
21      A.   Very well.
22      Q.   And what is your recollection of that
23  meeting?
24      A.   Nothing like that.
25      Q.   Uh-huh.

Page 159

1        A.   He was --
2        Q.   Well, because that's what he testified to
3   under oath.  So why don't you tell me what you're
4   going to --
5        A.   He --
6        Q.   -- testify about.
7        A.   He showed up at my office with Frank and
8   their two wives.  Both of them wearing Easter bonnets.
9   I never saw anything like this in my life.  I mean,
10  the two of them.  I -- it was a surreal experience.
11           The -- the two of them -- the four of them
12  showed up, and I don't even remember exactly what we
13  were discussing.  I -- you know, what -- Mike Bienes
14  decided to have a conversation with himself for about
15  a half hour in my conference room.
16      Q.   Did you overhear him talking to himself?
17      A.   No.
18      Q.   Okay.
19      A.   I mean, I -- you know, at which point I
20  thought, the man has lost his mind.  I mean, he was
21  having an argument with himself.  You know, walking
22  around the conference room.
23           The three of us, we were -- I guess I was
24  trying to ignore him.  I mean, they apparently -- this
25  was not the first time this had happened.  It was the

Page 160

1   first time it happened to me.
2            So I couldn't -- I didn't know what the hell
3   he was -- I thought he was on a cellphone, you know,
4   but he was talking on -- he was talking to himself.
5   He was having some sort of argument with himself.
6            And finally I said to Frank, what -- what is
7   going on here?  What's wrong with him?  He said, oh,
8   leave him alone.  Don't worry about it, you know.
9   It'll pass.  So, I said, okay.
10           So we -- everybody -- you know, the wives --
11  I don't even know what the wives were doing there,
12  quite frankly, you know.  It was -- I thought it was
13  like some sort of a shopping spree that they were
14  having, because people in my office --
15           I remember the secretaries were like
16  hysterical when these women -- the last time I saw
17  women dressed like that it was in an Easter parade.
18  They had these -- they were all decked out, like they
19  were going to some wedding, but they had these
20  bonnets, literally Easter bonnets on.
21           And I'm not trying to be funny.  I mean, it
22  was really a -- a bizarre situation.  I don't even
23  remember what we discussed, but I -- I couldn't end
24  the meeting quickly enough.
25           I -- it probably, obviously, had to do with

Page 161

1   being just -- them trying to sort of calm me down or
2   make them -- you know, trying to reestablish the
3   relationship that I once had.
4        I mean, Frank was totally normal and always
5   was.  I mean, Frank was the way he always was.  He was
6   very sort of, you know, straight, responsible guy,
7   and -- but Mike had, you know, just literally gone off
8   the deep end.  That was the conversation.
9        Q.   Okay.  Going back to the meeting in London,
10  I want to tell you, Mr. Bienes testified about that in
11  the restaurant.  He did indicate that you happened to
12  see each other in a restaurant, and he --
13            MR. ETRA:  Page and line?
14            MR. SAMUELS:  I'm on page 130.
15  BY MR. SAMUELS:
16       Q.   And he said, "There was some idle" -- "idle
17  chatter going on.  How is Ruth?  Good.  I don't like
18  this restaurant, but I come" -- "but I come."  "And I
19  said," Mr. Bienes, "well, we do too."
20            "Thirty seconds more of idle chatter.  He
21  got up and went back to his table with businessmen in
22  suits, and" --
23       A.   They were partners in London.  My London
24  partners.
25       Q.   Okay.  So Mr. Bienes now says, "And I said

Page 162

1   to my wife, I'll give you ten-to-one he'll never send
2   over a drink."  Being you.
3            And then he says -- then he says --
4        A.   He's right about that.
5        Q.   Then he -- then he says, "I won the bet."
6            "And what made" -- and I asked a question,
7   "What made you think he wouldn't send you over a
8   drink?  What did you know about him, or how did you
9   know him to reach that conclusion?"
10            He says, "The few times over the years I
11  went to his office, he never even offered me a glass
12  of tap water.  That's why."  Is that -- I mean --
13            MR. ETRA:  Is that a question?
14            MR. SAMUELS:  Is that -- yeah.
15  BY MR. SAMUELS:
16       Q.   Is that your recollection, that you wouldn't
17  offer him water?  I mean, you seemed pretty angry
18  about that.
19       A.   I wouldn't offer anybody water.  I mean, I
20  don't --
21       Q.   Or your office, I should say.
22       A.   My office?  I mean, I had, you know, a staff
23  of secretaries that could -- we offered people coffee
24  usually if they want it.  We never offered anybody
25  liquor.  Nobody did that any longer.

Page 163

1        Q.   So -- so what was it about your relationship
2   with Mr. Bienes where you think -- that would cause
3   him to say what I just read to you?
4        A.   Well, you do understand, you're dealing with
5   a nut case.  I mean, the guy is literally, you know,
6   unbalanced, you know.  I always thought he was
7   somewhat, you know, bizarre, and my father-in-law
8   thought he was also.
9            And none of us could figure out what -- how
10  the hell Frank, you know, hooked up with him, because
11  they were so different, you know, but -- I mean, the
12  very fact that this is the kind of things that he --
13  he says gives you an idea -- this is not out of
14  character with him.
15            I mean, he became -- I don't -- I don't even
16  know how he got all of these priests as -- as clients.
17  I mean, he became -- I think he told me -- or Frank
18  told me he became a knight of something or other.  He
19  was --
20       Q.   He -- his deposition testimony indicates
21  that he received a knighthood, and he spoke about
22  that, which is apparently very high --
23       A.   Well, it's not a knighthood that -- like
24  you -- you and I would consider a knighthood.  It's a
25  knighthood of the church, which doesn't --

Page 164

1        Q.   Correct.
2        A.   You know, I don't know what the hell that
3   means, but I think he was -- all it meant was that he
4   was making money for them, because he opened up
5   clients.  He opened up accounts with me.  So he
6   became -- I don't know, you know.
7        Q.   So -- so getting back to Mr. Bienes'
8   testimony, in terms of -- I just want to ask if you're
9   aware of certain of his involvements in the community.
10  And he claims his income came solely from investments
11  with you.
12            And he talks about the Michael and Dianne
13  Bienes Comprehensive Care Center at the Holy Cross
14  Hospital being named after him.  Were you aware of
15  that at all?
16       A.   I became aware that he was involved in the
17  arts in Fort Lauderdale, because somebody once sent me
18  a -- a magazine or something, and there was a picture
19  of him at sort of opening of the ballet or
20  something, opera, or something of that sort.
21       Q.   Okay.  And he also had his name on the wall
22  displayed at the Broward Center for Performing Arts,
23  did you have any knowledge of that at all?
24       A.   No.
25       Q.   Okay.  And that there is the Bienes Center

Page 165

1  for the Arts at St. Thomas High School?

2      A.    (WITNESS SHOOK HEAD FROM SIDE TO SIDE.)

3      Q.    No knowledge of that either?

4      A.    No.

5      Q.    Okay.  And we spoke about receiving a

6  knighthood from the Holy Father that you had heard

7  about as well?

8      A.    (WITNESS NODS HEAD UP AND DOWN.)

9      Q.    Okay.  And do you know if any of the money

10 that Mr. Bienes made over the years was based upon

11 commissions that he received from referring clients to

12 S&P or P&S?

13     A.    As I said, he -- as far as I knew, he was

14 admitted -- any money that he was making with -- he

15 had substantial accounts.  So he was making money on

16 that.  Plus, as I said, he had made money on these

17 Avellino & Bienes accounts for years.

18     Q.    Okay.  Have you -- are you familiar with

19 files that existed at your firm called shtup files?

20     A.    I read something in a book or a paper that

21 Frank said this.  No.  I'm not familiar with -- I

22 think Frank DiPascali claims that he -- Frank -- this

23 is something that Frank said at the --

24     Q.    I'll show you something --

25     A.    -- testimony.

Page 166

1                MR. SAMUELS:  Yeah.  Why don't I show

2  you his testimony on this issue.  Let's mark this

3  as Exhibit --

4                MR. WOODFIELD:  6.

5                MR. SAMUELS:  -- 6.  Thank you.

6                (PLAINTIFFS' EXHIBIT 6 WAS MARKED FOR

7  IDENTIFICATION.)

8                MR. ETRA:  You know what, I'd like my

9  own copy.  I realize you want to give your senior

10 partner a copy, but I'd like my own copy.

11               MR. SAMUELS:  No.  I --

12               MR. ETRA:  I -- it's -- I'd like my own

13 copy.

14               MR. SAMUELS:  I -- I understand.  I get

15 it.

16               MR. SINGERMAN:  Here you go.

17               MR. ETRA:  Thank you.

18               MR. SAMUELS:  Paul will give it to you.

19 I don't always have enough copies.

20               MR. ETRA:  I know.  I know.

21               MR. SAMUELS:  Sorry about that.

22               MR. ETRA:  Just following normal

23 procedure.

24 BY MR. SAMUELS:

25     Q.    Okay.  All right.  Let's go now to page

Page 167

1  4889 -- actually, it's before that.

2                All right.  Actually, let's start before

3  then, on 4885, line 21.  "How did you learn that

4  certain of these accounts had a rate of return that

5  was targeted?"

6                "As it pertained to me in the basket

7  split-strike strategy?"

8                "Yes."

9                And that's what you were just talking about.

10               "I was called into a meeting that was about

11 to break up between Bernie and Frank Avellino."  So

12 now Mr. DiPascali is talking about a meeting between

13 you and Mr. Avellino.

14               Question, "Can we step back.  Frank

15 Avellino, was that the Avellino -- was that the

16 Avellino of Avellino & Bienes?"

17               "Yes."

18               "When did that" -- "when approximately did

19 that occur?"

20               "The winter of '93."

21               "What happened in the meeting?"

22               "Bernie introduced me to Frank Avellino, who

23 I don't think I had met up to that point.  They

24 basically gave me a quick synopsis of what their

25 meeting was about and handed me a document that had

Page 168

1  figures on it that illustrated the meat and potatoes

2  of their meeting."

3                "What was your understanding of the figures

4  that were on there?"

5                Answer, "It was the funds that needed to be

6  put into various client accounts that the split-strike

7  strategy had a method of paying these individuals for

8  bringing in money."

9                "Who were some of the individuals?"

10               Then go through that.

11     A.    Uh-huh.

12     Q.    Now we're going to go to the shtup -- hold

13 on.

14               "These are" -- "these accounts were of

15 individuals that were bringing additional customers to

16 Madoff Securities?"

17               "Yes."

18               "As part of bringing in new customers, what

19 was to be given to them?"

20               "In essence, a commission."  Now we're

21 talking about Frank Avellino.

22               "The commission for bringing in those

23 customers?"

24               Answer, "Correct."

25               "Now I'd like to show you what's in evidence

Page 169

1   as Government 105-C51." We do not have that document.
2   "Looking at the cover page, do you recognize the
3   handwriting?"
4           "It's mine." That's Frank DiPascali.
5           "What does it say?"
6           Answer, "It says, I need to shtup."
7           "What did you mean by shtup?"
8           Answer, "To put funds in clients' accounts."
9           "Can we turn to page three of this document.
10  Do you recognize this document?"
11          "I do."
12          "What is it?"
13              THE COURT REPORTER:  Slow down.
14              MR. SAMUELS:  I'm sorry.
15  BY MR. SAMUELS:
16      Q.  "The typewritten information on this
17  document is what was given to me at the tail end of
18  the Bernie Madoff-Frank Avellino meeting, explaining
19  who and in what quantities we were going to, quote,
20  unquote, shtup these accounts, to put funds in these
21  accounts."
22          "Is that a credit for bringing in the
23  clients you just discussed?"
24          "It is."
25          Do you recall having a meeting with

Page 170

1   Mr. Avellino in 1993 and then handing documents to
2   Mr. DiPascali as he's mentioning here?
3       A.  Not really.
4       Q.  You don't really.
5           Okay.  So it's possible it occurred?  You
6   just don't recall, and that was awhile ago?
7       A.  I don't recall -- I mean, I don't know what
8   he's talking -- I read somewhere else about -- I read
9   part of this -- one of the fellows -- someone is
10  writing a book, who went to all of these hearings, you
11  know, all of these testimony, asked me about the same
12  thing, about this shtup account, you know, that Frank
13  was talking about.
14          As I said, the only -- he had some sort of
15  arrangement, Frank DiPascali, with -- with Frank
16  Avellino, who was -- he was in charge of these
17  accounts.
18          And it was not uncommon for clients -- you
19  know, for them to switch money from -- to transfer
20  moneys from one account to the other account.  Meaning
21  his -- his various accounts that they had.
22          So I don't know if that's what he's talking
23  about, but, as I say, he wasn't getting an override on
24  the -- he wasn't supposed to be getting an override on
25  any of these accounts.  So I don't know what he's

Page 171

1   talking about with this --
2       Q.  Is it possible that --
3       A.  -- with this thing.
4       Q.  -- Mr. DiPascali and Mr. Avellino were,
5   nevertheless, coming to an agreement where
6   Mr. Avellino would be paid commissions or some
7   payments on accounts that he brought in to your firm?
8       A.  He wasn't supposed to -- he wasn't supposed
9   to get any of that.  I mean, if he -- I -- the only
10  thing I can figure is that -- deduce is that this
11  says -- it has something to do with -- with
12  transferring moneys from one account to the other, but
13  clients did that all of the time, you know.
14          It wasn't a matter -- it didn't have to do
15  with overrides.  Someone would, you know, transfer
16  monies from one -- from like a -- from one son's
17  account to another son's account, to the family
18  account.
19          That's -- that's typical transferring of --
20  of assets from one account to the other.  It has
21  nothing to do with -- with doing a trade.  So I'm not
22  familiar with that.
23      Q.  All right.  Let's go now to page 4888, where
24  they're talking about a document, and on line eight.
25  Are you with me?

Page 172

1       A.  Okay.
2       Q.  4888.  Okay.
3       A.  "What did it mean?"
4       Q.  Line eight.  "What did it mean?"
5           "It meant that there was an arrangement in
6   place between Frank and these clients and then
7   subsequently between Bernie and Frank that because
8   A&B," Avellino & Bienes, "had unwound in late '92 and
9   these individuals were due a payment for '93 that had
10  not yet occurred, and here it is in early '94, and
11  they were addressing this payment, they were
12  instructing me that for '93 only these people would
13  get these amounts, and then forward, after '93, they
14  would get a different amount."
15          Question, "On the left side you see a list
16  of four underlined names.  Are those the folks that
17  were going to get shtupped?"
18          "Yes."
19          "Did this process continue to go forward?"
20          "Yes."
21          "Stepping back for a moment, A&B then" --
22  "had been, we talked about it earlier, shut down by
23  the SEC; right?"
24          "That is correct."
25          "You and others were involved" --

**Page 173**

1    THE COURT REPORTER:  Slow down.
2    MR. SAMUELS:  -- "in the process of
3  bringing those A&B clients back to Madoff
4  Securities?"
5    Yes -- "that's correct."
6    "Again, who were the people that were
7  speaking to these A&B clients that were coming
8  back in?
9    "Bernie, myself, Jodi, Annette, members
10  of Bernie" -- "of Annette's staff."
11    Question, "These people were asking you
12  questions about the trading that was going to
13  occur at Madoff Securities?"
14    "Yes."
15    "Did you lie to these folks?"
16    "Yes."
17    Question, "As part of these people
18  coming back, did folks like we see here bring in
19  additional customers to Madoff Securities?"
20    "These were entities" -- "these
21  entities were clients of A&B.  A&B, being closed
22  down by the SEC, and had no vehicle to pay them
23  any longer.  The purpose of this was illustrated
24  to me and explained to me that since Frank can't
25  pay these guys anymore for the money they

**Page 174**

1  originally brought in to A&B, and now those very
2  same clients are going to be transferred, if you
3  will, to Madoff, if you will, and have direct
4  accounts, the only vehicle that Frank and,
5  therefore, now Bernie would have to pay these
6  managers of other people's money would be to
7  shtup their personal accounts with extra P&L."
8    Do you recall that happening at all?
9    THE WITNESS:  As I said, no one got any
10  overrides for any of these accounts.  Nor --
11  look, let me just explain to you, all --
12  everybody wanted to open accounts with me.  I
13  mean, everywhere.
14    Me, raising money or having people open
15  an account, the thought of me having to pay
16  somebody for recommending an account, opening an
17  account, is almost laughable.  Everybody would
18  laugh about that.
19    I mean, I wasn't taking on generally
20  new accounts.  That happened from -- forever.  So
21  that -- why would I ever pay anybody a fee for
22  giving an account that wasn't doing anything on
23  that account?  That was -- that was -- that was
24  not the case.
25    So the only thing I could -- the only

**Page 175**

1  accounts that -- that made money for introducing
2  an account with me was -- was Cohmad, you know.
3  And they -- they got it -- but they were -- those
4  were people that I didn't even know, and they
5  were handling those -- those accounts.
6    They monitored those accounts and --
7  and so on.  And that was -- and they were being
8  paid, and everybody knew that they were being
9  paid.  I mean, that was -- including the SEC.
10    This -- for me to have paid Frank and
11  Mike money, an override, for any of these people
12  to open up an account directly, why would I do
13  that?  It made absolutely no sense.
14    The -- as I said, they opened up --
15  they were going to make more money -- an extra --
16  you know, an extra return on their -- on their
17  own account, because they were doing a strategy
18  that was different than what everybody else was
19  doing.
20    So they made more money in that account
21  sometimes, not even all of the time.  I don't
22  know what he's talking about.  Or whether he had
23  an arrangement with them, I don't know.
24    Look, Frank Avellino -- Frank
25  DiPascali, I found out subsequently, stole two

**Page 176**

1  billion -- two million dollars from the firm,
2  which I never even knew about.
3    I mean, it came -- you know, that -- I
4  found that out as part of when they were doing
5  this, I guess, testimony, that he took money out
6  of the account, two million dollars, you know.
7    So, I mean, you're talking about a guy
8  that, quite frankly, you know, I was shocked at.
9  I never would have imagined that anybody -- I
10  never had anybody in the firm that ever stole any
11  money from me or did anything dishonest, you
12  know, as far as I was concerned, other than
13  Frank.
14    Why he would do that, I don't know.  He
15  was making so much money anyhow.  So whether he
16  had some sort of arrangement with Mike Bienes or
17  Frank Avellino, I don't know.
18  BY MR. SAMUELS:
19    Q.    Okay.
20    A.    And if I seem upset by it, I am.  I mean,
21  not because of this meeting.  It's -- you know, I
22  found out about this, you know, all -- as part of his
23  testimony.
24    MR. SAMUELS:  Let's mark this
25  Exhibit 6.

Page 177

1              THE COURT REPORTER:  7.
2              MR. SAMUELS:  Exhibit 7.
3              (PLAINTIFFS' EXHIBIT 7 WAS MARKED FOR
4        IDENTIFICATION.)
5    BY MR. SAMUELS:
6        Q.    Was DiPascali's compensation affected by the
7    accounts he brought in or supervised?
8        A.    He didn't bring in any accounts.
9        Q.    How about the ones he supervised?
10       A.    No.
11       Q.    So how --
12       A.    No.
13       Q.    So if he was essentially assisting you with
14   books -- bookkeeping --
15       A.    Right.
16       Q.    -- functions, how much was he paid to do
17   that, when you're saying he made so much money?
18       A.    Well, I would say he was making well over a
19   million dollars.
20       Q.    Annually?
21       A.    Yeah.
22       Q.    And is that market in Wall Street during
23   that timeframe?
24       A.    It would have been for someone like -- yeah,
25   for someone like him.  I mean, handling the amount of

Page 178

1    money that he was in charge of.
2              I -- I don't understand.  What -- what is
3    this?
4        Q.    We're going to --
5        A.    Oh.
6        Q.    -- go through this in a second and -- first
7    of all, let's go to the --
8              MR. ETRA:  Is this marked, or are we
9        using the previous number?
10             MR. SAMUELS:  No.  We just marked it as
11       Exhibit 6.
12             THE WITNESS:  7.
13             MR. SAMUELS:  7.  And it was previously
14       marked as Exhibit 27 in Mr. Avellino's
15       deposition.
16   BY MR. SAMUELS:
17       Q.    I'd like to go to page four of this exhibit,
18   if I could.  Do you know -- what would Mr. DiPascali's
19   motivation have been to have a separate deal with
20   Mr. Avellino?
21             MR. ETRA:  Objection.
22             THE WITNESS:  I don't know.
23       Q.    Okay.  So let's take a look at this, because
24   this page, it says -- it's from Frank Avellino.  It
25   says, "Dear, Frank, I" -- "I checked the information

Page 179

1    you sent me.  The only correction I have is the
2    adjustment for the distribution of 1,216,000 for 1993
3    and 1,016,000 for 1994 and thereafter for others.  The
4    net effect on the computation shows a difference of
5    $434,000 in my favor."  And there's an adjusted
6    worksheet here.
7              And do you know why Mr. Avellino was
8    requesting an adjustment for the distributions in the
9    others?
10       A.    No.  I don't know what this is.  As I said,
11   I don't -- I was never involved with the bookkeeping
12   on any of these accounts as to what they transferred
13   or what they did.
14       Q.    So -- so is it possible then that DiPascali
15   and Mr. Avellino had a separate deal that you were
16   unaware of?
17       A.    It certainly is.
18       Q.    Okay.  Where Avellino was making money on --
19   or commissions on the accounts?  Just to complete my
20   question.
21       A.    Look, I had -- you know, clients always
22   wanted to take care of people that worked for me,
23   because they thought they would get some sort of
24   special treatment, but that was never something that
25   was allowed, as far as I was concerned.

Page 180

1              All my people made a lot of money, you
2    know -- you know, without anybody taking care of them,
3    other than buying somebody, you know, a gift.  You
4    know, a secretary a scarf or things like that, but
5    not -- I -- you know, they certainly never would have
6    wanted me to find out.
7        Q.    So -- so we spoke earlier, you told us a
8    story about when the Ponzi scheme started that you
9    have plead guilty for.  What year would you say that
10   was, when there were -- were actually trades were not
11   being affected?
12       A.    It started basically, I would say, in the --
13   probably '94, '95, is when --
14       Q.    Okay.
15       A.    Is when it was common.  There was some
16   shorting that went on as early as '92, but there
17   wasn't that much money involved.  You know, so it was
18   really '94.
19       Q.    And --
20       A.    The -- by '94 there were no trades being
21   done for any of the split-strike accounts.
22       Q.    And did -- was Mr. DiPascali aware of the
23   fact that there were -- trades were not being
24   effectuated?
25       A.    No.  Well, I -- I never knew exactly what --

Page 181

1  you to have understand that most of my -- the -- most
2  of the employees on the 17th floor, which is where all
3  of this took place thought that trades were being done
4  in Europe.
5        I had -- we did a very big European
6  business.  We had -- we had custodian and
7  sub-custodian arrangements with almost every major
8  European bank, you know, banking institution and firm,
9  like Credit Suisse, UBS, Banco Santander and so on and
10  HSBC.
11        So -- and we had a big operation in our
12  London firm, and we cleared trades in London through
13  Barclays Bank and so on.  So that the -- and our books
14  and records, as a matter of fact, reflected that all
15  of our clients --
16        I mean, in the stock record it showed
17  securities held at the clearing banks in Europe.  So
18  it was -- and we had an after-hours trading.  So they
19  weren't sure whether the trades were being done in
20  Europe or not.
21        The only one that would know would be Frank.
22  That Frank was the only --
23      Q.    DiPascali?
24      A.    -- one that would know that the trades
25  weren't being done.  Nobody else would really be sure

Page 182

1  about that.
2      Q.    And did Mr. DiPascali know that new investor
3  money coming in was being used to pay off redemptions?
4      A.    Yes.
5      Q.    And who else on the 17th floor that knew --
6  knew that new investor money coming in was being used
7  to pay off redemptions?
8      A.    Nobody would know that, except Frank.
9  The -- they would have -- they would have no real way
10  of knowing, because the monies were commingled, you
11  know.  So they would not -- they really -- the left
12  hand didn't know what the right hand was doing.
13      Q.    How about Jodi Crupi, did she know?
14      A.    Again, you know, I don't know that she --
15  how she would know that, because when money comes --
16  you know, all -- most of the clients' money was
17  fungible, you know -- you know, at our firm.  So --
18      Q.    Okay.
19      A.    You know, whether or not she would know --
20  the money all flowed through -- through a JPMorgan
21  account, and, you know, as far as Jodi was concerned,
22  it was just a checkbook.
23        The -- the actual clearing of trades for the
24  market-making and -- you know, the market-making
25  proprietary trading went through the -- the cashiering

Page 183

1  department, which was at a different location than --
2  than -- than Frank's operation.  So no one would
3  really know that.
4      Q.    Just -- just getting -- just staying in the
5  invest -- investment advisory --
6      A.    Right.
7      Q.    -- portion, where the Ponzi scheme took
8  place, there were a lot of account statements that
9  were generated that did not reflect trades that
10  actually took place; right?
11      A.    Well, I'm telling you now that -- that --
12  that starting in 1992 there were trades that did not
13  take place.
14      Q.    Right.
15      A.    And by 19 -- by the mid '90s there were no
16  trades taking place in the investment advisory
17  accounts.  They were all, you know, shorting trades.
18      Q.    Right.  So, in terms of the actual
19  documentation, no trades taking place, you know, there
20  had to be books and records created and things like
21  that.  Who else was involved --
22      A.    But they wouldn't --
23      Q.    -- in that?
24      A.    They wouldn't know that, because they -- if
25  the trades were taking -- if the actual buying and

Page 184

1  selling was taking place in Europe, that would --
2  those transactions would clear through the -- through
3  the cage department, and that -- they have no way of
4  knowing that.
5        That's that way in all of Wall Street.  In
6  other words, the trading takes place in one location,
7  and the -- the bookkeeping takes place in another
8  location.
9        And because of the Chinese wall procedures
10  that we're all required to -- to have, there's no
11  access from one department to the other department.
12  You just don't know that.
13      Q.    Okay.
14      A.    In other words, if you're, let's say, Bear
15  Stearns, for example, you have a -- you have an
16  equities desk, a derivative desk.  You have -- you
17  know, and then you have the -- the operations
18  department.
19        If the trades -- you know, if -- if somebody
20  puts a ticket through in the trading department, and
21  on the -- on the equities desk, they hand that to
22  the -- to the -- to the back office.
23        They don't know whether that stock was
24  bought.  They don't know whether it's a long sale or a
25  short sale.  They don't know whether it's an inventory

**Page 185**

```
 1   transaction. They just don't -- they just don't know
 2   that, you know.
 3          It's not -- you know, these are big
 4   operations. I mean, there's -- for example, take our
 5   firm, we were doing on average 400,000 transactions a
 6   day. You know, that -- like we had a trillion dollars
 7   a year used to flow through our firm of actual
 8   trading. I mean, real trading --
 9      Q.   Right.
10      A.   -- in the market-making proprietary trading
11   operation. Now, no one knows whether that is
12   representing -- whether that is -- whether part of
13   that is going to my clients or not. They -- they
14   wouldn't know that, you know.
15          It's not something -- so it's like even --
16   for example, when the S -- when the SEC was looking at
17   this, when somebody said to them, like this -- this
18   character, Harry Markopolos, who was the so-called
19   whistleblower, who is, you know, probably close to
20   Mike Bienes' brain, you know, would say, well, you
21   know --
22          MR. ETRA:  I guess you're going to take
23      that one.
24          THE WITNESS:  There could be -- there
25      could be transactions, you know, that were done.
```

**Page 186**

```
 1   Let me just explain to you, my clients I had that
 2   had accounts -- the same type of accounts as your
 3   clients, Henry Kaufman, who is the chief
 4   economist of Salomon Brothers.
 5          All right. Jim Simons, who runs the
 6   Renaissance Capital Fund, which is -- you know,
 7   he's worth -- I don't know how many -- billions
 8   of dollars now, considered the smartest quant
 9   trader on Wall Street, who was the code breaker.
10          I had four partners of Goldman Sachs.
11   Two ex-chairmen of Merrill Lynch were clients of
12   mine. The chairman of Morgan Stanley was a
13   client. These were all clients of mine.
14          And the heads of derivatives desks of
15   at least four major investment banks of Wall
16   Street were all clients of mine in these
17   split-strike trades.
18          They got confirmations the same day
19   that the trades were done. They got monthly
20   statements, and they all were very familiar with
21   all of these transactions.
22          Every one of these people -- all
23   right -- was very sophisticated. Not one of them
24   ever suspected that any of this trading was
25   unreal or that couldn't be done.
```

**Page 187**

```
 1          All right. So when -- when people went
 2   to the SEC, like this Harry Markopolos, and said
 3   that these trades can't possibly -- Bernie, this
 4   strategy does not work, and they can't be done.
 5          All right. And I'll tell you what the
 6   SEC said to them at the time, they said, listen,
 7   are you trying to tell us that these trades could
 8   not be done, and yet you've got all of these
 9   sophisticated people and hedge funds that are
10   telling -- saying, yeah, these trades -- these
11   trades can be done?
12          The fact that they weren't done doesn't
13   mean that they couldn't be done. Well, they
14   couldn't be done for the amount of 65 billion
15   dollars, which is what -- the amount the clients,
16   you know, thought they had in their accounts.
17          But the -- the clients only had, as far
18   as our records are concerned -- I mean, the only
19   thing that the hedge funds thought we were
20   managing was 16 billion dollars. That was all
21   that our investment advisory firm filed on our
22   ADV form.
23          All right. Now, 16 billion dollars was
24   never really ever -- we never invested 100
25   percent of their money. It was only 50 percent.
```

**Page 188**

```
 1   So that's eight billion dollars. Eight billion
 2   dollars was invested, you know, theoretically
 3   over four or five days.
 4          So let's say that's two billion dollars
 5   a day. For us to invest two billion dollars a
 6   day, when we were trading the sums that we were
 7   trading, and that's what the SEC said to them.
 8          They said, listen, don't tell us that
 9   these trades can't take place. Look -- look at
10   all of the business that this firm did. The fact
11   that we didn't do the trades was because we
12   couldn't have done 65 billion dollars.
13          I'll be the first to admit that, but
14   from the client's standpoint, looking at these
15   trades -- the reason why Picard -- when Picard
16   came down here, I said to him, look, if you are
17   going to -- this is Sheehan.
18          I said, if you're going to now sue all
19   of these hedge funds and all of these banks, and
20   you're going to -- and your -- and your smoking
21   gun is to say that they should have known that
22   these trades couldn't take place, I'm telling
23   you, you will never win any of these cases.
24          So don't waste all of this money on
25   your ridiculous fee of a billion dollars, which
```

Page 189

1    is what he is going to make, bringing a thousand
2    lawsuits for 100 billion dollars, which is what
3    he claimed he was going to do.
4            He sat in this very room and laid this
5    out. And I told these six lawyers, you are
6    wasting your money, because you will never
7    convince a judge or a -- or a jury that these --
8    that these red flags were as obvious as you think
9    they were.
10           For the same reason I'm telling you,
11   that you -- I said, they will produce the
12   smartest minds on Wall Street, all right, and --
13   and say, listen, is this strategy a doable
14   strategy and could Bernie have actually been
15   doing these trades?
16           Based upon the money that everyone
17   thought was working, which was like 16 billion
18   dollars, and I'm telling you, you will never win
19   one of these cases.
20           And that is exactly what happened. He
21   didn't believe me. He went and did this, and he
22   never won any of these cases. Nor did he ever
23   get the money back, other than what I -- what I
24   drew in.
25           So it is -- the -- the point that they

Page 190

1    should have known that -- that these trades
2    couldn't take place is not true, because they
3    could have taken place.
4            You know, not for the large amount they
5    have, but there is no way that -- what I'm
6    telling you is that when you're saying, did Jodi
7    or any of these people know that, they had no way
8    of knowing that these trades --
9            Because my own traders themselves, like
10   David Kugel, which was Picard's so-called smoking
11   gun, that David Kugel told him that -- that he
12   made up these trades. He never said he made up
13   these trades.
14           He -- what he said was he -- he gave a
15   slip of paper to -- to transfer, you know, bonds
16   out of my -- out of my investment account into a
17   client's account.
18           Now, he had no idea what was bought and
19   sold in my investment account or the firm's
20   trading account, because I had five different
21   traders. Each traded the same security for
22   separate trading accounts.
23           That was the way the market-makers
24   operated. So -- and Trader A was not allowed to
25   know what Trader B was buying or selling.

Page 191

1    Everything was done through computers. We had --
2    the -- the SEC rules are for the Chinese wall
3    that you have to have different managers, you
4    know, for each department.
5            So that the market-making department
6    was run by one of my sons. The proprietary
7    trading was run by another one of my sons. The
8    traders were not allowed to see each other's
9    positions.
10           No one could see the firm's P&L, other
11   than one person in the firm and myself, you know.
12   You know, so the traders didn't -- wouldn't know
13   who bought and sold.
14           And we -- it was very common for one
15   trader to be long IBM. Another trader to be
16   short IBM. They -- they all traded
17   independently.
18           So nobody could know any of this stuff.
19   And that's not unique to our firm. That's
20   standard operating procedure on Wall Street.
21           MR. SAMUELS: Okay. We have -- the
22   videographer needs to change his tape.
23           THE WITNESS: Okay.
24           MR. SAMUELS: So we're going to take --
25   let's take five. How is that?

Page 192

1            THE VIDEOGRAPHER: Going off the
2    record. The time is 1:14 p.m.
3            (RECESS FROM 1:14 P.M. TO 1:26 P.M.)
4            THE VIDEOGRAPHER: Going back on the
5    record. The time is 1:26 p.m.
6    BY MR. SAMUELS:
7    Q.     Okay. Mr. Madoff, you had testified that
8    you and one other person got to see the P&L. Who was
9    that one other person?
10   A.     The -- Enrica Pitz.
11   Q.     I'm sorry?
12   A.     Enrica Pitz, P-i-t-z.
13   Q.     And what was Mr. Pitz' position?
14   A.     It's her.
15   Q.     Her.
16   A.     She was -- she was the controller.
17   Q.     For which of the businesses, the entire
18   operation?
19   A.     The entire operation.
20   Q.     Okay. And was she aware that there were
21   trades that were not being effectuated?
22   A.     No.
23   Q.     Okay. So representing S&P and P&S, we've
24   seen a number of statements that have been issued
25   to -- to them from your business. And who is it that

Page 193

1    issued the actual statements?

2        A.    The monthly account statements?

3        Q.    Yeah.  Monthly and quarterly?

4        A.    Well, they were all the same, but the -- it

5    came out of -- I'm trying to think who -- which

6    department was in charge of that.  Was it Jodi or --

7    well, the -- the statements generated -- it probably

8    comes out of -- I guess, Frank would be the one.

9        Q.    Frank DiPascali?

10        A.    Uh-huh.

11        Q.    And did anyone assist him in issuing or

12    generating statements?

13        A.    Well, it's all -- the way the system -- the

14    way our systems work is they put the -- he -- I guess,

15    Frank's department -- I'm not sure who physically does

16    it.  Puts through the -- they have a computer program

17    that runs --

18            He -- Frank feeds it into -- is the one that

19    feeds it into a -- a program.  It generates the

20    actual -- the trades, and the trades generate the

21    tickets, and that generates the statements.

22            It's all like one -- one process.  So

23    whoever loads it in the -- I think Frank is the one

24    that loads in the actual trades, and then everything

25    flows out of that.  And then it goes into the

Page 194

1    mailroom, and the mailroom, you know, mails out the

2    statements.

3        Q.    So -- so when Frank -- Frank is loading an

4    actual -- you're saying actual trades, but those

5    actual trades --

6        A.    He's loading in the tickets.  There's no

7    trades being done.

8        Q.    The tickets.  And how are the tickets being

9    generated on trades that were --

10        A.    It's done --

11        Q.    -- never done?

12        A.    It's done through a computer program.

13        Q.    But who inputs through the computer to

14    generate the tickets on trades that were never done?

15        A.    I believe it would be Frank or Eric Lipkin.

16        Q.    And what was Eric Lipkin's position?

17        A.    He's one of the clerks --

18        Q.    Okay.

19        A.    -- in Frank's department.

20        Q.    Who requests that the tickets be

21    generated --

22        A.    Frank.

23        Q.    -- on trades that were never done?

24        A.    Frank is the one that puts the trades

25    through.

Page 195

1        Q.    And when you say, he's putting the trades

2    through, he's putting trades through that actually did

3    not take place; right?

4        A.    He's putting through the tickets.

5        Q.    The tickets.  So, let's say, for example, on

6    a statement received by S&P, it says, purchase of

7    General Motors -- 100 shares of General Motors.

8        A.    Uh-huh.

9        Q.    And we get a statement that says that.  Who

10    inputs the actual purchase of 100 shares of General

11    Motors that never actually took place?

12        A.    Well, it's -- there's a -- there's --

13    it's -- it's an algorithmic system.  So that, let's

14    assume -- Frank is the one that is the -- what you

15    would call the -- the trigger puller.  He -- he -- I

16    don't know.  I'm going to try and figure out how to

17    explain it to you.

18            I'm not sure that I understand myself

19    technologically how it works, but he -- there's a --

20    we have a -- there's a whole -- when you're doing algo

21    trading, there's a process that is a --

22            There's a program that sets up what do we --

23    what we're looking to buy and sell, securities at --

24    at a certain level, if the -- if the stock is trading

25    at a certain level.

Page 196

1            It's a formula that -- that follows the

2    basket of securities and what the arbitrage will do,

3    how many shares of, let's say, IBM are we going to do,

4    how many shares of Digital Equipment are we going to

5    do and so on and so forth.

6            He decides what -- how many shares he's

7    willing to pay at -- he's willing to buy at this

8    price.

9        Q.    He?

10        A.    He puts a ticket in.  Let's say Frank.

11        Q.    Okay.

12        A.    He's the one that makes the decision of when

13    to go into the market and out of the market.  All

14    right.  I mean, based upon what I would tell him.  I

15    would say -- you know, I'd say, okay.  I like -- I

16    think the market --

17            I don't know how to describe it to you.

18    There's a -- there's a program that tracks a basket of

19    securities.  We have, let's say, 50 securities in

20    there.  So it's -- it's following 50 different

21    securities and -- and the options for those

22    securities, the index option of those securities.

23            And based upon the price of the -- of the

24    stock and the options, it -- it determines that if you

25    could buy the stocks at this price and sell the

Page 197

1    options at this price, you're going to make a certain
2    amount of money.
3        So you -- what you do is you put through --
4    you feed instructions into a system that says, okay,
5    if we buy these -- if we could -- we're successful at
6    buying, you know, 100 million dollars worth of this
7    particular stock and 60 million dollars of this
8    particular stock, you put that into -- into the
9    system.
10        And then from that the system would
11    generate, you know, trades to go down to actually buy
12    them, let's say, in the marketplace. And if you get
13    the executions, it would come through, and then it's a
14    block transaction.
15        Then you -- it looks at how much money are
16    you willing to allocate to the various clients based
17    upon how much money they have available in their
18    account, and the -- the algorithm runs the whole
19    thing.
20        It's like -- it's a very complicated
21    transaction, but it's -- that's the way all firms
22    operate on a derivative desk. They're doing that.
23        Q.    Okay. So I understand that algorithms could
24    be put in place to generate trades on behalf of
25    clients of a broker-dealer. That -- I understand that

Page 198

1    there are certain trading mechanisms and algorithms,
2    but are those same algorithms being inputted by Frank,
3    knowing that these trades are not taking place, this
4    same sort of program?
5        A.    Yeah, of course, he would know.
6        Q.    Okay. All right. And there was, you know,
7    billions of dollars that were being traded or --
8        A.    Right.
9        Q.    -- or purportedly being traded --
10        A.    Uh-huh.
11        Q.    -- through these trades that were never
12    taking place?
13        And, aside from you and Frank, it just seems
14    from the outside, looking in, that there would have to
15    be other people --
16        A.    Everybody --
17        Q.    -- who would be involved in that.
18        A.    Everybody thinks that, because they don't
19    understand how -- how the -- had works. It's -- you
20    know, you'd have to understand how algorithmic trading
21    takes place, and there's no way I'm going to be able
22    to do that.
23        You'd have to -- you'd have to sit on a
24    trading desk and look at that. For example, I have
25    one trader is -- you know, he's a -- quant trader at

Page 199

1    our firm, and he -- he developed a system with -- with
2    some of my programmers that monitors literally 1,000
3    different securities and -- and sends -- and looks at
4    what these securities are trading, all these
5    securities are trading at.
6        And as soon as it -- and it sends constant
7    buy and sell orders, you know, through our system, and
8    it goes out to -- to the marketplace. And if it -- if
9    it can -- if it can be bought, it comes back, and it
10    generates an actual trade.
11        And he could be -- he could do -- you know,
12    he could do, you know, 20,000 transactions literally
13    in a matter of a second. And -- you know, and if
14    he -- if he -- if he actually buys a stock, it then
15    generates an actual trading ticket. It goes through
16    clearing. It's a whole process.
17        I mean, there's no way I'm going to be able
18    to explain that to you here. You'd have to -- you'd
19    have --
20        Q.    I -- I take it at face value that there's a
21    whole process on the back end at your business, and I
22    also take it at -- and understand that trading can be
23    done on algorithms, but my question is: When the
24    trades aren't actually being taken place -- taking
25    place and the tickets are generated and statements are

Page 200

1    generated, you and Frank know about that, but does the
2    person who is actually sending out the statements or
3    participating in the statements --
4        A.    Has no idea --
5        Q.    -- or looking at the tickets or --
6        A.    Has no idea whether the trade is taking
7    place.
8        Q.    Okay. All right. Going back to Exhibit
9    Number 7, the page at the bottom, ending in 1124183.
10    This is --
11            MR. WOODFIELD: The last page.
12            MR. SAMUELS: The last page of the
13        exhibit. Yes. December 15th, 1998.
14            THE WITNESS: What page are you?
15    BY MR. SAMUELS:
16        Q.    The last page --
17            MR. WOODFIELD: The last page.
18        Q.    -- of the exhibit.
19            THE WITNESS: 47?
20            MR. WOODFIELD: No, no, no.
21            MR. SAMUELS: Just go to the last page.
22            MR. ETRA: I think that's the wrong
23        document.
24            MR. SAMUELS: Here we go. The last
25        page of that exhibit.

Page 201

BY MR. SAMUELS:

2      Q.    First of all, before we get to the last

3  page, let's go up a couple of pages to these

4  spreadsheets?

5      A.    Uh-huh.

6      Q.    Do you -- do you recognize any of these

7  spreadsheets?

8      A.    No.

9      Q.    There's some initials here on the

10  spreadsheet.  If you go on the left-hand column, and

11  now we're on the third page from the last, ending

12  in -- document 225.  Do you see the spreadsheet?

13      A.    This one?

14      Q.    No, no.  One --

15      A.    The spreadsheet?

16      Q.    One more before that.

17            MR. WOODFIELD:  It looks like this.

18  BY MR. SAMUELS:

19      Q.    One page before that.  There you go.

20      A.    Yeah.

21      Q.    Okay.  So do you know whose handwriting this

22  is?

23      A.    No.

24      Q.    And there are initials here, E.G., S.M.,

25  J.L. and R.G., do you know who that is?

Page 202

1      A.    Where do you see -- what -- what --

2      Q.    Okay.  We're on this spreadsheet.

3      A.    Yeah.

4      Q.    This page.  And if you go towards the

5  bottom.

6      A.    Oh.

7      Q.    E.G., S.M., J.L. and R.G., do you know who

8  that is?

9      A.    No.

10      Q.    Okay.  Now let's go to the last page.

11      A.    Uh-huh.

12      Q.    Have you ever seen this document or letter

13  purportedly from Frank Avellino?  It says, "Dear,

14  Frank," and I'm guessing that's Frank DiPascali.

15      A.    It says -- I guess so.  Yeah.  It looks like

16  it.

17      Q.    Have you ever seen this?

18      A.    No.

19      Q.    Where he says, "Yes, it's that time of year

20  again.  Just sent a note to touch base about the

21  accounts.  Please make necessary trades in all of the

22  accounts; Grosvenor, Mayfair, Mayfair Ventures pension

23  plan."

24            When he says, "It's that time of year," do

25  you know what he's referring to?

Page 203

1      A.    No.

2      Q.    Is there anything that was supposed to

3  happen to Mr. Avellino's accounts by way of

4  adjustments in December of each year?

5      A.    Uh-uh, no.

6      Q.    Okay.  And -- and the next paragraph -- and

7  then in the next paragraph he says, "I believe that

8  the total base of the three accounts will be enough to

9  even up the balance due."

10            Do you know if he's referring to a balance

11  due to him?

12      A.    I don't know.

13      Q.    Okay.

14      A.    I had nothing to do with this type of thing.

15      Q.    All right.

16      A.    Didn't you ask Frank about any of this stuff

17  or --

18      Q.    We -- we spoke to Mr. Avellino.  Yes.

19      A.    No.  I mean Frank DiPascali.

20      Q.    We --

21      A.    Oh, you never --

22            MR. WOODFIELD:  We can't serve him now.

23            THE WITNESS:  Huh?

24            MR. WOODFIELD:  Tough to serve him now.

25            THE WITNESS:  Well, I know now, but at

Page 204

1  one point.

2            MR. SAMUELS:  Okay.  So Exhibit 8.

3            THE WITNESS:  Huh?

4            MR. SAMUELS:  We're going to mark this

5  as Exhibit 8.  You can put that document down.

6  We're done with that.  This is going to be 8.

7  She can mark it and hand it to you.

8            (PLAINTIFFS' EXHIBIT 8 WAS MARKED FOR

9  IDENTIFICATION.)

10  BY MR. SAMUELS:

11      Q.    First, I want to ask you if you recognize

12  this document?

13      A.    No.

14      Q.    Do you know whether or not these were

15  adjustments being made by Frank DiPascali and Frank

16  Avellino to enable Frank Avellino to receive

17  additional money, as either commissions or management

18  fees for the accounts that he brought in?

19      A.    No.  I have no idea what this is.

20      Q.    Okay.

21      A.    Well, I see names here that I know; O'Hara,

22  Eileen.  I don't know where the --

23      Q.    And what do you know about those --

24      A.    O'Hara is one of our programmers, computer

25  programmers.

Page 205

1    Q.   Okay.

2    A.   Then I see, "Merryl."  I assume -- I don't

3  know whether that's Merrill Lynch or whether it --

4  Myra.

5    Q.   Well, let's go to the -- it -- it also says,

6  if you go down further, "Ellie, Mom, Sarah Cohen,

7  Rita."  Does that -- do those names sound familiar to

8  you?

9    A.   No.  I see, "Jodi, IRA."  I assume that's

10  Jodi Crupi.

11    Q.   Okay.

12    A.   I don't know what these --

13    Q.   And then there's a comment, it says, "Money

14  needed."  Do you see that next to the names?

15    A.   Yeah.

16    Q.   And then after that it says, "Why," and it

17  says, "Shtup."  And --

18         MR. ETRA:  I think it's, "Shupt."

19         MR. SAMUELS:  "Shupt."  And --

20         MR. ETRA:  I think they misspelled the

21    Yiddish term.

22         MR. SAMUELS:  Well, you don't really

23    know.

24  BY MR. SAMUELS:

25    Q.   So, in any -- in any event, do you know --

Page 206

1  does this refresh your recollection as to anything

2  having to do with shtupping or a shtup file back in

3  2004?

4    A.   Well, shtup is -- would be -- the only

5  thing, it would be an adjustment.  I don't know where

6  he comes up with shtup, you know.  A shtup normally

7  means to give somebody, and it's a Jewish term for --

8  you know, to -- to give somebody.

9         Like, you know -- so it -- I would assume

10  this is an adjustment of somehow.  An adjustment of

11  what, I don't know.  I mean, it's -- you know, I don't

12  know whether this -- it's money needed, 21, or whether

13  that's $21, $21,000.  I -- you know, 210,000.  I -- I

14  don't know what these numbers are.

15    Q.   And it's -- you don't recall ever discussing

16  that term with Mr. DiPascali or Mr. Avellino?

17    A.   No.

18    Q.   Okay.  Let's go to the second page of this.

19    A.   Uh-huh.

20    Q.   At the bottom there is an, "Aster, Strattham

21  and St. James."  And under, "Aster," is, "$42,000

22  needed.  Strattham, $26,000 needed."  And we've got,

23  "Ken Jordan, 20,000 needed.  St. James, 42,000

24  needed."  Above that, "Grosvenor, 66,000 needed.

25  Mayfair, 105,000 needed.  Mayfair P" -- "PP, $270,000

Page 207

1  needed."

2    A.   Is this money needed for -- to money to be

3  withdrawn or -- or what?

4    Q.   I'm -- I'm asking --

5    A.   Oh, I don't know.

6    Q.   -- you to -- to see what your understanding

7  is of this, if you have one.

8    A.   I don't know.  I mean, I -- we get --

9  clients send in usually requests of how much money

10  they particularly need.  I don't know what this is,

11  though.  I don't know whether this is $54, $54,000.

12    Q.   Do you know if this is money to Avellino &

13  Bienes from people who were previously with Avellino &

14  Bienes, who they get commissions or payments for?

15    A.   No, because I -- I said that I'm assuming --

16  I don't know why he would make money on someone else's

17  account, if that was -- our policy was not to -- not

18  to do that.

19    Q.   Okay.  I -- I'm looking at some allegations

20  now from your -- from the indictment that was issued

21  against Daniel Bonventre --

22    A.   Uh-huh.

23    Q.   -- Annette Bongiorno, Joann Crupi, Jerome

24  O'Hara and George Perez.  And tell me who O'Hara and

25  Perez were.

Page 208

1    A.   They were -- George was -- they were

2  computer programmers.

3    Q.   Okay.  And in the indictment it states, on

4  paragraph 26, that, "O'Hara and Perez also created a

5  number of other custom computer programs in connection

6  with the SEC audits.  In one such program, for

7  example, the time that all of the investment advisory

8  trades were supposedly executed was changed from the

9  time that corresponded to New York trading hours to a

10  random time that corresponded with London trading

11  hours to be consistent with the foreign scenario."

12         Do you recall that taking place?

13    A.   I'm not sure I understand what he's talking

14  about.

15    Q.   About -- do you recall O'Hara and Perez in

16  any way participating in changing times listed on

17  investment advisory trades that were supposedly

18  executed?

19    A.   The only -- no.  I don't know.  I know

20  that -- the only thing I know about their case

21  was -- and I went over this with their lawyers, with

22  George and O'Hara's lawyer.

23         Frank made a statement that the SEC or

24  Picard, you know, holding his hat on that -- that

25  to -- to incriminate the two of them -- first of all,

Page 209

1  let me space in there.
2        Their -- their job was basically that --
3  they were programmers that, you know, built programs
4  and changed programs for -- for the firm, for the --
5  now, he came up with -- he --
6        He made up this -- created this story that
7  they generated -- for a part of an SEC examination,
8  they generated some records, and that they took those
9  records before they submitted them to the SEC, during
10  the examination that they put them in a
11  refrigerator -- this is the famous story -- so that
12  they were not hot off of the -- off of the -- the --
13  the computers.
14        All right.  Or that they -- and they threw
15  them around to make them seem like they were old.  All
16  right.  Now, I said to the -- to the lawyers, I said,
17  wait a minute.  I said, let me -- let me -- let me
18  give you a little bit of a lesson, I said.
19        I'm not trying to talk down to -- to them,
20  I said, but are you aware of the fact that the routine
21  of an SEC or NASD examination is they come into our
22  firm, you know, twice a year.
23        And they say, okay.  Look, we want to -- we
24  want to examine certain transactions for certain
25  clients at certain times of day.  All right.  Now,

Page 210

1  picture this, again, I'll give you this four or
2  500,000 transactions a day, all right, that -- that
3  our firm operates in our market-making and proprietary
4  trading operation or it would be the same for the
5  investment advisory operation.
6        And what they do is they -- they come in
7  with a schedule, and they say, okay.  We want to see,
8  let's say, Fairfield Centuries transactions on
9  October 19th and 20th, all right, in this particular
10  security.
11        So they want -- and they're doing that to
12  see that -- make sure that the client got the right
13  price at that time related to what the market was,
14  make sure the client was -- was getting what's known
15  as a best execution.
16        Now, they're -- the only way they can do
17  that is they can look through, let's say, the whole
18  days' transactions, 400,000 transactions, and try and
19  pick out that particular security, or they can say, we
20  don't want to see 400,000 trades.
21        We don't have time to do that, you know.
22  And, not only that, we don't have -- we don't produce
23  any longer in Wall Street hard copy.  You don't do
24  that.
25        The SEC said the firms that do a lot of

Page 211

1  business, all they have to do is be able to produce
2  what we want within 48 hours.  And so no longer do
3  firms keep stacks of computer runs, because it costs
4  too much money, it takes up too much space.  So
5  everything has to be retained on a disc for a period
6  of six years, and you have to be able to produce it.
7        Okay.  So the SEC comes in and says to -- to
8  me or to whoever it is that's running the examination,
9  all right.  Let me see this -- this particular
10  client's trades and this particular stock on this
11  particular day, and sort it out from all of your run.
12        So we would go down to Jerry O'Hara and
13  George Perez and say, okay.  We want to produce a run
14  for this particular client, on these particular
15  stocks, on this particular day, at this particular
16  time span.  And he writes a program, and it goes into
17  our system.
18        And then the system generates within, you
19  know, literally minutes hard copy of those particular
20  trades.  And then we bring that -- those documents,
21  those runs, down to the SEC examiner, and he looks at
22  it, and he sees it.
23        Okay.  And it is always warm, because it
24  comes off of the computer run.  So it's hot.
25  Literally that's what it's called.  All right.  So you

Page 212

1  can say to yourself, as Picard and the prosecutor
2  said, well, so you're generating -- you're making up
3  this particular trade.
4        So they -- so Frank said, well, yeah, in
5  order to conceal that we just generated it, we put it
6  in the computer -- into the refrigerator to cool it
7  down.
8        So I said to the lawyers, well, why would we
9  do that?  They -- they expect it to be warm.  They
10  know we're generating it.  They know that this is --
11  they -- they want that.
12        And they also come in and say, we want it in
13  this kind of format, so that we can bring it back to
14  our office on a disc and run it through our own
15  systems to check the price and time priority.
16        They -- they don't want to see a piece of
17  paper.  They want to -- they -- they want to see it in
18  this form.  So Frank -- for some reason, which I have
19  no idea why he -- he -- he made up that statement,
20  because --
21        And I said to the lawyer, look, you know,
22  don't take my word for this.  Go to any firm.  Pick
23  any firm on Wall Street or -- it was, go to any
24  accounting firm and ask them whether it's -- what
25  this -- that this story makes any sense, and they

Page 213

1    would say, of course, it makes sense.

2        Q.    Okay.

3        A.    So the answer is, I have to tell you, I -- I

4    have no idea why he makes up some of these -- these

5    stories or -- or what he does.  I have nothing to do

6    with that.

7        Q.    Did you ever instruct Mr. O'Hara and

8    Mr. Perez to create alternative books and records,

9    including alternative stock record and client account

10   statements?

11       A.    No.  And what happened was there was a

12   meeting -- Frank comes up to me one day, and he said

13   to me, listen, he said -- now, understand that I was

14   aware of the fact that books and records were -- were

15   being generated that were false.

16       Q.    Right.

17       A.    Okay.  I'm not saying that we didn't create

18   false records.  I'm saying that Jerry and George would

19   have no idea that they were creating a false record,

20   because they got --

21            The instructions that Frank gave them, or

22   anybody would give them, to create a record, all

23   right, is a normal procedure, even when they're

24   legitimate trades.

25            As I said, all day long we create records,

Page 214

1    you know, for our -- I have 100 traders that sit up

2    there that constantly go down in the programming

3    department and say, listen, I want to generate this

4    kind of program to be able to -- to look at these

5    particular securities at this particular time, so that

6    they can decide whether they want to trade that

7    particular stock a certain way.

8            And they generate it, and they have to --

9    and the programmers have no idea why they're

10   generating, you know, this information.  They don't

11   know -- that's what they do all day long.

12           I mean, I have 60 programmers that their

13   whole job is to develop programs for 100 traders that

14   are trying to build various quant trading strategies,

15   and so that --

16           One of the reasons that the SEC had a hard

17   time understanding when I said, no one else is

18   involved in this but me -- okay, now, Frank -- I was

19   protecting Frank.  There's -- I'll acknowledge that.

20   All right.  But that was all.

21           But people -- people like Jodi and Annette

22   and anything else like that had no idea whether --

23   that they were doing things necessarily that were

24   wrong, other than what they may have done things on

25   their own account.

Page 215

1            For example, they get -- they get

2    instructions from Norman Levy or Carl Shapiro to -- to

3    sell this particular security or this particular

4    security, you know.  They didn't know that they were

5    doing anything wrong, because they didn't know whether

6    they were taking that security into my investment

7    account or out of my investment account or doing an

8    as-of-trade adjustment or a when-issued trade

9    adjustment.  And it is -- that's common practice on

10   Wall Street.

11           Now, Frank knew what was going on, and I

12   knew what was going on, but nobody -- nobody else knew

13   for sure what was going on.  And that's not unusual,

14   because that's the way the industry works.

15           So when you say it's hard for you to

16   understand how no one else could know that, how do you

17   think that this went undetected for 16 years?

18           When I get examined, you know, twice --

19   twice a year, you know, I get audited, and I had --

20   you know, I had HSBC -- I mean, KPMG came in and --

21   and audited us once a year and, you know, couldn't

22   find out, because it's impossible for them to -- to

23   realize what was going on.

24           Not only at our firm, but all over Wall

25   Street.  The systems -- the way the business operates

Page 216

1    is -- you know, there's no way that they can -- they

2    can follow these things through.

3        Q.    Was -- was there any point in time where any

4    of the accounts from Avellino & Bienes -- this is post

5    1993 -- where they were promised to get predetermined

6    rates of return?

7        A.    No.

8        Q.    Have you ever heard of an entity called

9    27 Cliff, L.L.C.?

10       A.    No.

11       Q.    Let's go back through the interview, which

12   you have in front of you as Exhibit 2.  Okay.  Going

13   to page 25.  Are you with me?

14       A.    Yeah, yup.

15       Q.    Towards the bottom, Mr. Bienes is asked,

16   "Who introduced Sullivan" -- "who introduced Sullivan,

17   Powell and Jacob to Bernie Madoff?"

18           And Mr. Bienes indicates, "My partner must

19   have."

20           So let's just focus on Sullivan and Powell.

21   Forget about Jacob for a second.  For Sullivan and

22   Powell to open up an account with you, they would of

23   have to have been introduced to you by Mr. Avellino;

24   correct?

25       A.    When you say, "introduced" --

Madoff Bernard L Vol. 1 10/19/2015

Page 217

1              MR. WOODFIELD:  Object.
2              THE WITNESS:  Did I meet them
3     personally?
4     BY MR. SAMUELS:
5         Q.   No.  Either they had to call you or get in
6     touch with you?
7         A.   They would usually call me or they would
8     call Frank.
9         Q.   Okay.
10             MR. WOODFIELD:  Frank?
11             THE WITNESS:  Avellino -- I mean --
12             MR. WOODFIELD:  DiPascali?
13             THE WITNESS:  DiPascali.
14    BY MR. SAMUELS:
15        Q.   Now, who -- who would you give your
16    cellphone number to generally as a matter of policy?
17        A.   Anybody.
18        Q.   Anyone?
19        A.   (WITNESS NODS HEAD UP AND DOWN.)
20        Q.   Okay.  Do you recall Mr. Sullivan ever
21    calling you on your cellphone over the years?
22        A.   It's -- it's possible.
23        Q.   Okay.
24        A.   Even though it was -- you know, I never -- I
25    never concealed my -- anybody had access to me, if

Page 218

1     they wanted to.  They usually didn't, I mean, call me,
2     but --
3         Q.   Okay.  He's then asked --
4              MR. WOODFIELD:  Page?
5              MR. SAMUELS:  The same -- on page 25.
6     BY MR. SAMUELS:
7         Q.   "And who introduced all of those clients
8     that used to be going to Avellino & Bienes to Sullivan
9     and his partners?"
10             "I don't know if he had clients who used to
11    go to Avellino & Bienes."
12             "Well, I've talked to people who said
13    they've invested with you."
14             "I never introduced anyone."
15             "You never suggested" --
16             "Never.  Never."
17             -- "that anyone could ever go to Michael
18    Sullivan" --
19             "No, no, no."
20             -- "and that would continue to invest with
21    Madoff through Sullivan?"
22             Are you aware of Mr. Bienes and Mr. Avellino
23    ever instructing people to invest through Michael
24    Sullivan or Michael Powell?
25             MR. ETRA:  Objection.

Page 219

1              MR. WOODFIELD:  Objection.
2              THE WITNESS:  No.
3     BY MR. SAMUELS:
4         Q.   Going back to page 31.
5         A.   Uh-huh.
6         Q.   "And so after '92, you think you" -- "you
7     think you absolved all responsibility?"
8              He answers, "Of course, I did."
9              "But, I mean, there's no part of you that
10    feels some kind of contrition for having participated
11    in steering people towards Bernie Madoff?"
12             "Let me tell you something, figure this one
13    out.  You go with Bernie in '92, and 16 years later
14    the whole thing explodes.  Suppose you were making ten
15    percent a year, and you took the money.  You'd have
16    160 percent, wouldn't you?  Wouldn't you?  What's your
17    problem?  What's your problem?"
18             Answer, "Well, what's your problem?  You
19    lost all your money too."
20             "Yeah, and I don't go around blaming anyone
21    for it.  I did it myself."
22             "But you've got a problem; right?"
23             "Yeah."
24             "You've used home equity?"
25             And let me just go down a little bit, where

Page 220

1     he says, "So what you say to the people" -- "what do
2     you say to the people who are watching this, that got
3     involved in this through you and Frank, and who are
4     angry, feel like they were misled, feel like they've
5     been violated or robbed?"
6              The answer is, "I didn't violate them;
7     Madoff did.  Focus on who was the perpetrator."
8              Do you see that?
9         A.   Uh-huh.  Okay.
10        Q.   So Mr. Bienes apparently is not taking any
11    responsibility for people who were referred to you
12    losing all their money; do you see that?
13        A.   Yes.
14        Q.   Okay.
15             MR. ETRA:  Objection.
16             MR. WOODFIELD:  Objection.
17    BY MR. SAMUELS:
18        Q.   And do you know if Michael Bienes knew at
19    any point in time that there were trades being made on
20    his behalf or on behalf of his -- there were -- there
21    was money being sent to you on his behalf or on behalf
22    of clients for trades that were never effectuated?
23             MR. ETRA:  Objection.
24             THE WITNESS:  I don't think he ever
25    knew the trades weren't being done.  I don't

Page 221

1    think anybody knew that trades weren't being
2    done.
3    BY MR. SAMUELS:
4        Q.    How about Mr. Avellino?
5        A.    Nobody.
6        Q.    And did either Mr. Avellino -- Avellino or
7    Mr. Bienes know that you were operating in such a way
8    that you were taking investor money in and using the
9    new investor money in to pay redemption requests?
10       A.    No.
11       Q.    Did you ever discuss that with Mr. Avellino
12   or Mr. Bienes --
13       A.    No.
14       Q.    -- or any of their lawyers or agents?
15       A.    Uh-uh.  No.  Sorry.
16       Q.    Do you think Mr. Avellino or Mr. Bienes were
17   complicit in any way in their clients losing money
18   through investing in you?
19       A.    No.
20            MR. SINGERMAN:  Tom.
21       Q.    Did Mr. Avellino or Mr. Bienes know of any
22   irregularities at all that were taking place in your
23   company?
24       A.    No.
25       Q.    Did they know of any losses that were taking

Page 222

1    place within your company, including some that you
2    described earlier today?
3        A.    No.  I mean, let me just correct that for a
4    second.  What I'm saying is that nobody knew that the
5    trade, other than Frank and myself, knew for sure --
6    Frank DiPascali and myself knew for sure that there
7    were trades being put through that did not take place.
8            Other than Frank and myself, nobody else
9    knew that.  I am not saying that there were not
10   irregularities that may have taken place in certain
11   clients' accounts that might be considered bookkeeping
12   or tax violations, and I don't know which clients knew
13   that or didn't know that or which employees knew that.
14           You -- you understand there's -- and there's
15   a big difference in my mind between those two issues.
16       Q.    Now, are you aware of any irregularities
17   that took place in any of the Avellino or Bienes --
18       A.    No.  I'm --
19       Q.    -- accounts or any accounts of clients that
20   they sent --
21       A.    No.
22       Q.    -- to Madoff?
23           Now, you indicated that only you and Frank
24   DiPascali knew for sure.  Are there other people who
25   you suspect may have known?

Page 223

1        A.    No.
2        Q.    So what did you mean when you said, knew for
3    sure?
4        A.    There were always people that -- you know,
5    that now claim that they knew that I couldn't have
6    been doing these trades.  Those were mostly
7    professional people, you know, who were not really
8    clients of mine.
9            Whether or not they -- but that doesn't mean
10   that they knew.  I mean, you know, in hindsight they
11   said, well, I knew this was too good to be true, and I
12   knew that you couldn't possibly be doing these trades
13   and, you know, so on and so forth, but that doesn't
14   mean that they -- they knew that, because, as far as
15   I'm concerned, no one knew that.
16       Q.    Now, Mr. Avellino and Mr. Bienes had been
17   with you since the 1960s, 1970s, and they claim to
18   have never had a losing year.
19       A.    A -- a -- never had a losing year?
20       Q.    Yes.
21       A.    That's probably true.
22       Q.    Okay.
23       A.    None of my clients ever had a losing year.
24   That's not unusual on my end.
25       Q.    Even when the market is down 25 percent?

Page 224

1        A.    Even when the market is down 25 percent.
2    And I can give you -- I can tell you eight hedge funds
3    that have had 30 percent returns for the past 25 years
4    and are perfectly legitimate, as far as I and everyone
5    else knows.
6            So I could give you George Soros.  I can
7    give you Stevie Cohen.  I can go on and on and on, you
8    know, and tell you that.
9            You have to understand, my trades were all
10   arbitrage trades, and arbitrage trade, by the very
11   nature of it being a hedged arbitrage trade, does not
12   generate a loss over a long period of time.
13           I will give you another example of a meeting
14   that I had with the chairman of UBS, who came up to my
15   office one day and said to me, listen, Bernie, he
16   said, let me tell you what troubles me, okay, about
17   our account with you.
18           I said, okay.  Tell me -- tell me what it is
19   that troubles you.  He said, I don't understand how on
20   this particular strategy, you know, we never lost any
21   money.
22           So I said, wait a minute.  That's not true.
23   You never -- that's not true, that you never lost any
24   money.  There were transactions that you -- that you
25   could have lost money.

Page 225

1          You never lost money over a period of a
2   quarter, all right, but you lost money, you know, in
3   between that quarter.  So he said, oh, yeah.  Okay.
4   The -- these other people that were sitting around
5   said, yes.
6          I said, now, let me tell you something about
7   the strategy.  I said, this strategy is -- is a hedged
8   strategy.  Regarding the very nature, your loss is
9   limited to maybe a half a percent, you know.  That's
10  the most that you could possibly lose if we close
11  this -- this transaction out based upon the puts and
12  the calls that we have on that make it a hedged
13  strategy.
14         I said, if you look at the volatility of the
15  strategy intraday, during the day, you will see there
16  were times that had we closed out this transaction
17  prematurely, you would have had a loss, I said, but
18  because of the strategy you have a defined loss on
19  there of a half a percent or maybe even one percent on
20  some strategies, because we know that we can wait
21  until the time is right or we feel the time is right
22  and close it out.
23         We have the -- that's the ability of the
24  strategy, but if -- if -- but if you called me up, and
25  said, I need the money tomorrow, I want you to close

Page 226

1   the trade out tomorrow, you will definitely have a
2   loss on that transaction possibly.
3          And we showed it to him in the account, with
4   exactly -- showed him the charts of the price
5   movements in the account, because we have systems that
6   monitor all of that.
7          So, you know, you asked me the question, you
8   know, is it possible for an account of yours to have
9   always made a profit over the course of a year.  I
10  would say, yes.
11         They're never going to make 90 percent, or
12  they're not going to make 80 percent, but, you know,
13  to make a -- my clients averaged out probably 13, 14
14  percent on average for the most part, you know, and
15  some maybe 20 percent.
16         I can show you clients that made much more
17  than that historically.  So that's not going to --
18  that's not going to -- that's not going to prove
19  anything, that -- this strategy was not an unusual
20  strategy.
21         And, mind you, all of their clients,
22  Avellino & Bienes' clients, they're the same as every
23  one of my other clients, you know.  So -- so -- and
24  they are certainly not, in no way, sophisticated
25  enough to know whether this strategy was doable or

Page 227

1   made enough sense.  They're not.  They're not market
2   people.  They're accountants.
3          All right.  But I can tell you that, as I
4   told you before, I can give you the names of some of
5   the most sophisticated and qualified people in Wall
6   Street that would testify that this strategy is a
7   doable strategy under certain parameters, and that, in
8   fact, had accounts with me, and did it.
9          There were no red flags for -- for -- for
10  these clients.  They may have done other stupid things
11  I -- you know, that I'm not aware of -- aware of, but
12  certainly it's possible.
13    Q.     Were there any bookkeeping or tax violations
14  that you knew of at your investment advisory firm?
15    A.     Of certain clients, yes.
16    Q.     And are you aware of any of those as it
17  pertained to any of the Avellino or Bienes'
18  accounts --
19    A.     No.
20    Q.     -- that you're aware of?
21    A.     Uh-uh.
22    Q.     Okay.  And I'm going to name these accounts
23  to you and ask you if you know of any.  First of all,
24  if you know of the account; secondarily, if you know
25  of any bookkeeping or tax irregularities.  Grosvenor?

Page 228

1    A.     No.
2    Q.     Did you have any bookkeeping or tax
3   irregularities?
4    A.     No.
5    Q.     Mayfair Ventures GP, have you heard of that?
6    A.     I've heard of Mayfair.
7    Q.     And are you aware of any bookkeeping --
8    A.     No.
9    Q.     -- or tax irregularities?
10         How about Aster Associates?
11    A.     No.
12    Q.     Have you heard of St. James Associates?
13    A.     I'm not sure --
14    Q.     I think I may have asked you --
15    A.     -- about St. James.
16    Q.     I think I asked you that earlier.
17         How about Strattham Partners, have you heard
18  of that?
19    A.     No.
20    Q.     Ken Jordan Associates?
21    A.     Yes.
22    Q.     And are you aware of any bookkeeping --
23    A.     No.
24    Q.     -- or tax irregularities there?
25         How about Ken Jordan Foundation?

Page 229

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Have you heard of Mayfair pension plan? |
| 3 | A. | No. |
| 4 | Q. | Have you heard of Knightsbridge of South |
| 5 | Florida, Inc? | |
| 6 | A. | No. |
| 7 | Q. | Assent, Inc.? |
| 8 | A. | No. |
| 9 | Q. | And are you aware of Thomas Avellino? |
| 10 | A. | Yes. |
| 11 | Q. | You -- we talked about him earlier. |
| 12 | A. | Uh-huh. |
| 13 | Q. | Are you aware of him having a software |
| 14 | company or -- | |
| 15 | A. | Yes. |
| 16 | Q. | And did his software -- did he or his |
| 17 | software company do any work for you or any -- | |
| 18 | A. | No. |
| 19 | Q. | -- of your firms? |
| 20 | | How do you know he had a software company? |
| 21 | A. | He told me. |
| 22 | Q. | Okay. |
| 23 | A. | Or Frank told me. One of them. |
| 24 | Q. | Okay. And did he or Frank mention to you |
| 25 | that Thomas Avellino was running the software in the |

Page 230

| | | |
|---|---|---|
| 1 | entities in which Frank Avellino was involved? | |
| 2 | A. | No. |
| 3 | Q. | Do you know if Thomas Avellino ever spoke to |
| 4 | the people at Madoff who were doing your software? | |
| 5 | A. | I don't know that. |
| 6 | Q. | Have you heard of 56 Arlington House, |
| 7 | L.L.C.? | |
| 8 | A. | No. |
| 9 | Q. | And the auditor for Madoff -- for your |
| 10 | company, Horowitz? | |
| 11 | A. | Yes. |
| 12 | Q. | What's the full name of that firm? |
| 13 | A. | Friehling & Horowitz. |
| 14 | Q. | Friehling & Horowitz. And you know there |
| 15 | have been questions raised about the size of that -- | |
| 16 | A. | Yes. |
| 17 | Q. | -- company and how they were able to handle |
| 18 | the work. | |
| 19 | | How were they able to handle the work at a |
| 20 | company doing billions of dollars of years in | |
| 21 | business? | |
| 22 | A. | Well, there wasn't much that they had to do, |
| 23 | other than they did what other -- what most accounting | |
| 24 | firms did. They just sampled. They just -- they did | |
| 25 | sampling work. | |

Page 231

| | | |
|---|---|---|
| 1 | Q. | Audits? |
| 2 | A. | Yeah. |
| 3 | Q. | And do you know if they engaged in any |
| 4 | activity to change or alter the books and records -- | |
| 5 | A. | No. |
| 6 | Q. | -- of -- |
| 7 | A. | They did not. |
| 8 | Q. | -- your company? |
| 9 | | Were they aware of the fact that there were |
| 10 | trades that were not actually being effectuated? | |
| 11 | A. | No. |
| 12 | Q. | Were they aware at all of new money coming |
| 13 | in to pay -- to pay requests for money? | |
| 14 | A. | No. As I say, there would be no way -- I |
| 15 | mean, when money flows into the firm, all right, | |
| 16 | from -- from one customer, it is not unusual to pay it | |
| 17 | out -- pay those funds out to another customer. | |
| 18 | | It -- they go into a fungible account. |
| 19 | That's perfectly acceptable. In other words, it's -- | |
| 20 | money comes in -- it goes into a -- into a checking | |
| 21 | account. Money goes out of a checking account, and | |
| 22 | it's -- but it's -- | |
| 23 | | You can characterize it as saying the money |
| 24 | is coming in for one customer to pay another customer. | |
| 25 | You can characterize it as something that's wrong, but | |

Page 232

| | | |
|---|---|---|
| 1 | that happens at every brokerage firm in Wall Street. | |
| 2 | Q. | Were you aware of any other brokerage firm |
| 3 | on Wall Street having a small accounting firm like you | |
| 4 | had? | |
| 5 | A. | I'm sure. |
| 6 | Q. | But you're not aware of any offhand? |
| 7 | A. | I would have to assume. |
| 8 | | MR. SAMUELS: Okay. I want to take a |
| 9 | break right now. Let's take five. Thanks. | |
| 10 | | THE VIDEOGRAPHER: Going off the |
| 11 | record. The time is 2:22 p.m. | |
| 12 | | (RECESS FROM 2:22 P.M. TO 2:29 P.M.) |
| 13 | | THE VIDEOGRAPHER: Going back on the |
| 14 | record. The time is 2:29 p.m. | |
| 15 | BY MR. SAMUELS: | |
| 16 | Q. | Do you know who Joseph Avellino is? |
| 17 | A. | Yes. |
| 18 | Q. | And who is Joseph -- |
| 19 | A. | Oh, excuse me. Joe -- I may be confusing |
| 20 | Joseph and Thomas. | |
| 21 | Q. | Well, we spoke about Thomas earlier. Do you |
| 22 | know who Joseph is? | |
| 23 | A. | I thought -- I only thought he had one son. |
| 24 | Q. | Okay. So you don't know who Joseph is? |
| 25 | A. | I don't know who Thomas is. I know who |

Page 233

1    Joseph is.  I'm sorry.  I thought --
2         Q.    And Joseph would be who?
3         A.    He's Frank's son.
4         Q.    Okay.
5         A.    Who is Thomas?
6         Q.    Well, you spoke -- we spoke earlier of
7    Thomas.
8         A.    Oh, okay.
9         Q.    Who is Frank's --
10        A.    I have to --
11        Q.    Who is Frank's son.
12        A.    Okay.  I thought you were talking about
13   Joseph.
14        Q.    Okay.  We'll just --
15        A.    I'm sorry.
16        Q.    That -- that's okay.  Let's -- hold on a
17   second.  Where is -- just bear with me for a second.
18              Do you know Lorraine Avellino McEvoy?
19        A.    No.
20        Q.    Did you put money in T-bills at the end of
21   each quarter for your account?
22        A.    Yes.
23        Q.    For all your accounts?
24        A.    No.
25        Q.    For which ones?

Page 234

1         A.    Well, I didn't put them in by account.  I
2    just had money in T-bills all the time, not only at
3    the end of a quarter.  I mean, I had as much as six
4    billion dollars in T-bills pretty much all of the
5    time.
6         Q.    Okay.  And how would that be distributed
7    amongst the different accounts?
8         A.    It wasn't distributed amongst any of the
9    accounts.
10        Q.    Was it in your proprietary business?
11        A.    It was in the -- in the investment account.
12        Q.    Your proprietary investment --
13        A.    Right.
14        Q.    -- account?
15              Okay.  Well, were -- were there ever T-bills
16   put --
17        A.    Well, I would say -- wait a minute.  I have
18   to correct that.
19        Q.    Okay.
20        A.    It was in -- it was in -- it was part of
21   like the JPMorgan account, and -- so I don't know how
22   you would classify that.  That would -- that was the
23   account that we used that -- where the money flowed
24   through the -- the investment advisory part of the
25   firm.  And the T-bills were bought through Bear

Page 235

1    Stearns, Merrill Lynch and Morgan -- Morgan Stanley.
2         Q.    Were you -- were the -- was the money given
3    to you by your investment account clients, such as S&P
4    and P&S, were they ever backed by treasury bills?
5         A.    Part of their investment was backed by them.
6         Q.    Did you ever tell Mr. Frank Avellino that
7    the money that he had with you or the money that he --
8    the other investors that he brought to you had was
9    backed by T-bills?
10        A.    When you say, "backed by T-bills," the --
11   the policy -- the strategy basically was designed to
12   that at the end of usually each quarter the accounts
13   were liquidated, and typically the money was flown
14   in -- was -- showed up as an investment in T-bills,
15   but it was not -- if -- it might have shown 50 billion
16   dollars in -- theoretically in T-bills, it might have
17   only been ten billion dollars in T-bills, but the
18   clients would assume that all the -- all the money was
19   put in T-bills.
20        Q.    I'm sorry.  The clients --
21        A.    The clients would assume that -- that the
22   money went -- the money was not in securities.  It was
23   in T-bills.
24        Q.    Okay.
25        A.    Because that's what the account statement

Page 236

1    showed --
2         Q.    Whether that was --
3         A.    -- with each account.
4         Q.    Even though that wasn't true?
5         A.    That's correct.  It was not true.
6         Q.    Okay.  Now, Shana Madoff is your niece; is
7    that right?
8         A.    Shana.  Yes.
9         Q.    Shana.  I'm sorry.
10        A.    That's all right.
11        Q.    Is Shana married to Eric Swanson?
12        A.    Yes.
13        Q.    And Eric Swanson is an attorney for the SEC?
14        A.    Was.  Yes.
15        Q.    Was.
16              And do you know -- was Eric Swanson in
17   charge of the SEC at the time that Shana was dating
18   Eric?
19        A.    Yes.
20        Q.    Okay.  And do you know how long Shana and
21   Eric were dating?
22        A.    No.
23        Q.    Okay.  And did they ever get married or
24   do --
25        A.    Yes.  They got married.

Page 237

1    Q.    They got married.

2          Okay.  And did you have any discussions with

3    Mr. Swanson, encouraging him or the SEC not to

4    investigate your business any further than their --

5    A.    No.

6    Q.    -- regular inquiries?

7    A.    And, to my knowledge, Eric Swanson really

8    had nothing to do with the investigation of the firm.

9    He was an SEC attorney in -- in the division of

10   clients of office of inspections, but I'm not aware of

11   the fact that -- that he was involved in the

12   investigation of the firm.

13   Q.    So let me ask you something, knowing that

14   there were -- you were taking in money and not

15   effectuating trades, if you were to, let's say, during

16   the 2007-2006 timeframe, if you were to come in from

17   the outside and look at your business, how would you

18   be able to find out that that was taking place, if you

19   were coming in from the outside?  What would you look

20   at?  How would you discover that?

21   A.    The -- the big mistake that the SEC made was

22   not verifying that the securities were in custody.

23   That was -- that was a major screw-up.  It was the

24   same -- that was the same problem that the auditor

25   had.  You know, Friehling.  David Friehling.

Page 238

1          It was, in my mind, an inexcusable mistake

2    that they made.  It was -- it was quite easy for them

3    to have done that, and they never did.

4          But I would tell you that that's a problem

5    that they still make.  As a matter of fact, the -- the

6    inspector general, the ex-inspector general of the SEC

7    is presently trying to get me -- he's now teaching at

8    the University of Maryland, and he's recently -- is

9    currently trying to come down to interview me in a

10   course they're doing with fraud detection that he's

11   running for --

12         As a matter of fact, he sent me -- he sent

13   me a book that is this thick (INDICATING) of how to

14   commit a fraud and how did you commit a fraud.  When

15   it came through the Bureau of Prisons, they looked,

16   they said, is this a joke, you know?  And he figured,

17   well, go to the source.

18         So this was just -- look, I'm not bragging

19   about this, you know, because I'm very much ashamed of

20   what I did, and it's inexcusable, but the SEC did not

21   do a terrible job in general.

22         When they came in to do inspections -- don't

23   forget, in 50 years I had an average of two

24   inspections a year, and not one inspection ever turned

25   up any irregularity at all.  Now, for 36 years

Page 239

1    everything was perfectly fine.  For 16 years I was

2    committing fraud, but they did the same thing for 50

3    years.

4          They never checked the depository, with the

5    exception of '92.  The strange thing was that -- well,

6    that's not true.  I'm not sure if they did it prior to

7    '92.  How more often they did it or not, I would not

8    really know.

9          I know in '92, when they came to do the

10   Avellino & Bienes thing, they checked the depository.

11   Now, I was on the board of the depository, you know,

12   and I was the one that -- that formed the clearing

13   corporation at the depository.

14         I was on the original committee that -- that

15   organized that -- that started that whole thing.  So I

16   was very familiar with how the depository worked and

17   so on and so forth.

18         And what the SEC failed to do, and my

19   auditor failed to do, during the years that I was

20   committing the fraud was they never verified the

21   depository.

22         Now, in -- in fairness to the SEC, the

23   depository does not make it easy for regulators to

24   verify.  It's a difficult process, because securities

25   are held in domini name at the depository, and they're

Page 240

1    commingled, you know.

2          They're not like in, you know, every

3    individual client's name.  It's impossible.  And the

4    amount of monies flowing in and out of the depository

5    on a daily basis based upon the volumes of trading is

6    a complicated process.  The SEC did have the ability

7    to do that.

8    Q.    What else could some -- what else would you

9    have known to do if you were coming in from the

10   outside?

11   A.    There was nothing else that they could have

12   done, you know, including checking the trades to see,

13   because, don't forget, this was -- this was a firm

14   that did 400,000 legitimate trades every day.

15         So the SEC's attitude was to say -- say --

16   and this is what they said, the -- you know, Lori

17   Richards, from the -- who lost her job because of me,

18   she was in charge of all compliance inspections.

19         She said to people, look, she said, to think

20   that Bernie Madoff was going to commit a fraud was

21   something that no one could possibly even imagine.

22   And the fact that somebody claiming that he wasn't

23   doing trades, look how many trades he did do.

24         So it's easy in hindsight for everyone to

25   say, well, they should have known this, they should

**Page 241**

1  have known that.  I can tell you -- and, believe me, I
2  do not like Mike Bienes, for obvious reasons.  And,
3  you know, I couldn't care less whether you take all of
4  his money or not, but I'm telling you that there is no
5  way that Mike Bienes or Frank Avellino could possibly
6  have known that I was committing a fraud, for the same
7  reason that people that are much more sophisticated
8  than him, you know, could have detected that.
9          And people who want to make the SEC look bad
10 and this person look bad and so on and so forth, but
11 the reality of it is, I know -- look, for -- I spent
12 20 years on the -- you know -- you know, being on the
13 board of the SIA's capital markets and capital and
14 legal committee.
15         All right.  On all -- I served on all of
16 those boards, and I spent literally every two weeks
17 sitting in a room with 28 lawyers, the general
18 counsels for every Wall Street firm, and I -- I can
19 tell you conversations that went on that would make
20 your hair fall out.
21         I mean -- and it is very, very hard to
22 supervise these, you know, Wall Street firms for
23 fraud.  And every firm knows that they're committing
24 frauds, which is why no one wants to register as an
25 investment advisor, because that makes you subject to

**Page 242**

1  the fraud statutes.  Why do you think firms, you know,
2  resist all of that?
3          Now, the SEC screwed up.  2006, when I --
4  when they -- when they took my testimony and was --
5  was worried about it, they asked me, where are the
6  securities for the clients?  And I said, at the
7  depository trust under 646.  That's my account name.
8          And when I left that meeting, I figured
9  that's it.  They got me.  You know, I lied to them and
10 said they were at the depository, and I figured for
11 sure they're going to call the depository on Monday
12 morning and find out the securities weren't there.
13 They never did.
14         And it wasn't until 2008 that this thing was
15 over.  So that's where -- you asked what would -- what
16 should they have done.  They should have checked.
17 They could have.
18         It wouldn't have been easy, which is why
19 they probably didn't do it, because it's not as simple
20 a matter of -- and that's what they said, the SEC.  I
21 read this in some testimony that somebody had.  They
22 said, why, you know, didn't you call up and verify
23 that?
24         And they said, because we would have called
25 up, and we would have checked, does Madoff -- how many

**Page 243**

1  shares of IBM does Madoff have?  They would have said,
2  you know -- you know, he has, you know, 142,000 shares
3  in his depository account, you know.  But it's not
4  segregated into -- you know, into this many clients'
5  accounts, you know.  They just didn't check it.
6          And it's -- it's -- it's difficult.  Could
7  they have?  Yes.  But, you know, it's like -- did you
8  ever do -- when -- when an auditor comes in to do a
9  box account in a brokerage firm, do you think they
10 count every security?  They -- they sample it.  They
11 do samples.  That's what it is.  And samples don't
12 pick up problems.
13         MR. SAMUELS:  Okay.  Thank you.  I have
14    no further questions --
15         THE WITNESS:  I'm not --
16         MR. SAMUELS:  -- for this witness.
17         THE WITNESS:  I'm not -- I'm not
18    telling you what you want to hear.  I understand
19    that, but I'm being truthful.
20         MR. WOODFIELD:  I have just a few
21    questions.
22         THE WITNESS:  Sure.
23         MR. WHITFIELD:  I'm Gary Whitfield, on
24    behalf of Frank Avellino.
25         Can you hear me?  You can't hear me.

**Page 244**

1              EXAMINATION
2  BY MR. WHITFIELD:
3      Q.    Just a couple of questions.  I wanted to go
4  back to the point in time when the A&B investors
5  transitioned over to -- to you.
6          Now, that was in the hundreds, was it not,
7  or do you have any feel for the number of A&B
8  investors after '92, when they -- they were given
9  their money back, that then became --
10     A.    Opened up new accounts?
11     Q.    -- investors?
12         Yeah.
13     A.    Probably, I would say, more than 100, for
14 sure.  It was probably in the hundreds of accounts.
15     Q.    Now, did -- did either Frank Avellino or
16 Michael Bienes give you a list of these individuals?
17     A.    I don't remember.  I don't remember how
18 that -- whether they actually supplied me with a list
19 or they just had clients, you know, call me up and say
20 that they, you know, had an account at Avellino &
21 Bienes originally, and they wanted to now open up a
22 direct account.
23         And then we would have sent them the
24 necessary papers.  They -- they would have called --
25 they -- they might have spoken to me.  They might have

Page 245

1  spoken to -- to Frank DiPascali or -- or possibly Jodi

2  in my office.

3      Q.   So that was sufficient at that point in time

4  if they called up and said, listen, I was an A&B

5  investor, and I -- I want to continue to invest with

6  you, and I have over a half million dollars, that was

7  sufficient?

8      A.   That -- that was right.  Yes.

9      Q.   Now, you did mention, I believe, before in

10  an answer to a question that you may have spoken about

11  a couple of specific clients or ex-A&B investors with

12  Frank.  Do you -- do you recall any of the specific

13  clients that you may have had a discussion about?

14     A.   No.  I mean, I -- there was -- I didn't

15  speak to all of the clients.  I spoke to certain

16  clients.  It depends upon -- a lot of them I was

17  familiar with or I was familiar with the family, you

18  know, already.

19         Some of that I -- some that I weren't, but a

20  lot -- most of them were people that I was familiar

21  with at -- when we first opened the accounts.  Then

22  the number of accounts grew after that.  And at that

23  stage I wasn't really speaking to them, because we

24  were -- we just too busy.

25     Q.   Now, specifically on this P&S and S&P

Page 246

1  account, do you have any recollection whether Frank

2  Avellino or Michael Bienes mentioned them by specific

3  name to you as being a potential investor?

4      A.   No.  As a matter of fact, as I said, when I

5  saw that on the subpoena, I never -- I didn't even

6  know who they were.  I thought there was a mistake.  I

7  thought it -- it was actually Standard & Poor's, who

8  did have an account with me.

9         So I was sort of confused, and I had no idea

10  that there was any relationship with A&B until you

11  first came down here, you know.

12     Q.   So -- so you have no recollection of Frank

13  Avellino saying anything to you about either S&P or

14  P&S or Michael Sullivan or Greg Powell will be calling

15  you to invest?

16     A.   No.  I know -- I remember the name Michael

17  Sullivan, but I don't know that it was necessarily --

18  at the time they were opening the account it was -- it

19  could have been a year or two after.

20     Q.   So the only thing they really -- that needed

21  then to open an account with you at that time is to

22  call up and say, I was -- I was with A&B.  I'd like to

23  continue to invest with you, and I've got more than

24  half a million dollars?

25     A.   Correct.

Page 247

1          MR. SAMUELS:  Object to the form.

2          MR. WOODFIELD:  Okay.  Nothing further.

3          MR. ETRA:  Hand me this.

4                   EXAMINATION

5  BY MR. ETRA:

6      Q.   Good afternoon again.  How are you?  As you

7  know, I represent Michael Bienes.  I just want to try

8  to focus only on Michael Bienes.

9          I understand you don't like Michael Bienes

10  that much.

11     A.   My sympathies are with you.

12     Q.   Okay.  Okay.  That's a thought you expressed

13  earlier today.

14         I think you testified that you don't think

15  Michael Bienes knew that you were running a Ponzi

16  scheme; correct?

17     A.   That's correct.

18     Q.   And certainly through the time -- through

19  the SEC investigation, '92-'93, you were not running a

20  Ponzi scheme; correct?

21     A.   That's correct.

22     Q.   Okay.  And afterwards you testified about

23  when you started doing that; correct?

24     A.   Right.

25     Q.   And why do you think Michael Bienes wouldn't

Page 248

1  know that, that you were running a Ponzi scheme?

2      A.   I -- I don't think anybody knew it.  There

3  was no reason why they would suspect that I was doing

4  it, because the strategy that I was using was being

5  done legitimately, where I was actually buying and

6  selling securities for a number of years.

7          It was not such a unique strategy, and it

8  was very doable, because of the volumes of the trades

9  that we were handling.  So there would be no reason

10  for -- as I said, for him or anybody that was

11  certainly much more sophisticated than him.

12     Q.   Did you consider Michael Bienes a

13  sophisticate -- sophisticated in the financial Wall

14  Street sense?

15     A.   In no stretch of the imagination.  No.

16     Q.   Okay.  And you'd not had much contact with

17  him; correct?

18     A.   No.

19     Q.   Very little?

20     A.   Right.

21     Q.   Okay.  Certainly after the '92-'93 time

22  period the only contact you had with him was a chance

23  meeting at a London restaurant; correct?

24     A.   Yeah.  I mean, it was possible that he may

25  have shown up in my office every now and then, you

Page 249

1    know.  I don't know, because a lot of times he might
2    have gone up there to see, you know, Frank DiPascali
3    or he may have come up to see me, and -- but I, as a
4    general rule, didn't really meet with clients, and
5    certainly he would have no reason, you know, to come
6    up there and see me.
7        Q.    Do you know -- do you recall whether or not
8    Mr. Bienes ever met with Mr. -- Mr. DiPascali after
9    '92-'93?
10       A.    I don't even know that.  No.
11       Q.    Do you know whether he met with
12   Mr. DiPascali before '92 or '93?
13       A.    I don't know.
14       Q.    Okay.  Do you know what role Mr. Bienes had
15   in the Avellino & Bienes accounting firm when it
16   existed through 1992 or '93?
17       A.    No.
18       Q.    Do you know what his actual role was?
19       A.    No.
20       Q.    I think you said you thought that he was --
21   he was on the client's side.  Wasn't that just
22   speculation on your part?
23       A.    Right.  That's correct.
24       Q.    All right.  You don't -- you did not deal
25   with Mr. Bienes --

Page 250

1        A.    No.
2        Q.    -- in connection with the Avellino-Bienes
3    feeder fund; correct?
4        A.    No.
5        Q.    You're agreeing with me?
6        A.    Yes.
7        Q.    Okay.  And I think you said -- we talked
8    about your -- I think I have the word that you were
9    agitated when you found out in the '92-'93 period, and
10   that's because a few things.  One is you -- now
11   because of what Avellino and Bienes did suddenly
12   there's an SEC investigation; correct?
13       A.    Correct.
14       Q.    The trustee and plaintiffs' counsel thinks
15   that that means that you were worried about your Ponzi
16   scheme being exposed.  Is that correct?
17       A.    There was no Ponzi scheme going on then.
18       Q.    So why were you agitated?
19       A.    I was agitated, because I knew that what
20   they did created a problem with them with the SEC, and
21   the -- they had lied to me.  I saw no reason for them
22   to have done what they did.
23            I thought it was stupid.  I thought they
24   had -- you know, my father-in-law would have been
25   furious at them and would have been furious at me.  He

Page 251

1    would have said to me, how could you let this happen?
2            And, quite frankly, you know, the same way
3    that I, you know, withheld information from the SEC
4    for, you know, a lot of years, they withheld that from
5    me.  Why they withheld it from me, well, I'm -- I'm
6    never really 100 percent sure.
7            You know, first of all, I guess, they would
8    have assumed that I would have realized that they had
9    too many clients, and they would have had to register
10   as an investment company, and --
11           Which they could have done.  Which they
12   should have done.  I mean, had they done that, they
13   wouldn't have had this problem.  Why they didn't do
14   that, I don't know.
15       Q.    Okay.  The lying, you're saying, this is
16   referring to the fact that, instead of taking -- doing
17   what your father-in-law had done, which is essentially
18   spreading out the trades among all the clients, they
19   tried a different system of -- of giving notes;
20   correct?
21       A.    Yeah.  And I'm deducing that they did that,
22   because they had too many clients, and it would have
23   been a lot more work involved in that.
24       Q.    Now, you said they lied to you.  Did they
25   actually tell you that --

Page 252

1        A.    No.
2        Q.    -- anything about what they were doing?
3        A.    I knew --
4            MR. WOODFIELD:  Stop.  One at a time.
5            THE WITNESS:  I'm sorry.  What --
6    what -- when I say, they lied to me, it was that
7    they withheld that information from me.
8    BY MR. EZRA:
9        Q.    So they never told you that they were --
10       A.    They never told me.  Right.
11       Q.    You didn't ask them, because you assumed
12   they were doing it the same way?
13       A.    Right.
14       Q.    Okay.  You never -- okay.
15           I think you said you were especially upset
16   with Mike, because you thought it was -- and I put
17   this in quotes -- his game plan.  I thought you said
18   that earlier when previous counsel --
19       A.    I'm --
20       Q.    -- was -- was --
21       A.    I'm assuming that -- and -- and I have no --
22   there's no way that I could know that this was his
23   idea or not, but it was, I thought, a lamebrain idea.
24   And I do not think that -- that Frank Avellino would
25   have done that --

Page 253

1    Q.    Okay.

2    A.    -- you know.

3    Q.    So -- and we're talking about the idea as

4    being the idea of using the notes versus spreading out

5    the trades among the clients?

6    A.    I mean, even the SEC said, what is wrong

7    with these guys? I mean, Dick Walker, who was the

8    chairman of the -- who was the head of enforcement at

9    that time said that to me. He said, Bernie, what is

10    wrong with these guys?

11    Q.    So basically you thought it was -- because

12    you thought it was a stupid idea, you thought it must

13    have been Michael Bienes' idea, because you didn't

14    think much of Michael Bienes?

15    A.    Correct.

16    Q.    I think at one point you said -- may have

17    said that -- I wasn't clear if you said that Michael

18    Bienes opened up accounts with you, and I'm a little

19    unclear, frankly, some of this testimony.

20        Michael Bienes didn't bring anybody to -- to

21    the Madoff Securities firm to open an account;

22    correct?

23        MR. SAMUELS:  Object to the form of the

24    question.

25        THE WITNESS:  No. I mean, most of the

Page 254

1    contact that I'm aware of with our firm was

2    handled by Frank Avellino. I -- I don't know --

3    as I say, I'm not sure what Michael Bienes' role

4    was with the clients, whether he was the -- the

5    contact guy of the firm.

6        I mean, look, he -- Michael Bienes

7    was -- I'm not suggesting that he wasn't a smart

8    person, you know, and may have been a very good

9    accountant, but he was not, you know, detail

10    oriented in my mind.

11    BY MR. ETRA:

12    Q.    But, just going back to my question, you're

13    not aware of Michael Bienes opening up any accounts

14    with you -- or bringing other accounts to -- to the

15    Madoff firm?

16        MR. SAMUELS:  Object to the form of the

17    question.

18        THE WITNESS:  Well, I -- you know, I --

19    I'm not sure how you would classify the accounts

20    that were -- that were Avellino & Bienes'

21    accounts and then became Madoff accounts.

22    BY MR. ETRA:

23    Q.    Well, we're talking -- I think we're

24    talking -- maybe we're talking about that. So my

25    question is: With respect to the people -- there are

Page 255

1    certain people that were customers at Avellino &

2    Bienes, and then later they became direct customers of

3    Madoff; correct?

4    A.    Right.

5    Q.    Okay. Do you -- do you have any personal

6    knowledge of what role, if any, Mr. Bienes had in

7    causing those people to go from being Avellino &

8    Bienes' clients to Madoff clients?

9    A.    No.

10    Q.    Do you know that Mr. Bienes' -- part of the

11    interview that plaintiffs' counsel didn't show you --

12    I'll just save time and describe it to you --

13    testified -- said and testified in -- in his case that

14    he had actually took out money in about '07-'08 to put

15    more money into your -- into your -- into what we now

16    know is a Ponzi scheme; were you aware of that?

17    A.    That he took money out of where?

18    Q.    He took out a home -- home equity line,

19    just -- just to put more money in with you. Did you

20    know that?

21    A.    No.

22    Q.    Okay. But -- so it's consistent with the

23    knowledge -- with the notion that he had no idea you

24    were running a Ponzi scheme; correct?

25    A.    Right.

Page 256

1        MR. ETRA:  No further questions.

2        MR. SAMUELS:  I just have a few

3    follow-up questions.

4        Let's mark this as Exhibit 9, please.

5        (PLAINTIFFS' EXHIBIT 9 WAS MARKED FOR

6    IDENTIFICATION.)

7        CONTINUED EXAMINATION

8    BY MR. SAMUELS:

9    Q.    Okay. I'm showing you Exhibit 9, which is a

10    document you probably have not seen before. It's the

11    Amended and Restated Partnership Agreement --

12        MR. SAMUELS:  For S&P or P&S?

13        (DISCUSSION HELD OFF THE RECORD.)

14    Q.    -- for S&P Associates.

15        Mr. Whitfield mentioned to you earlier that

16    if a prior investor had over $500,000, and they were

17    previously with Avellino & Bienes, they would be

18    qualified to come over and now open a direct account

19    with your firm, and you had testified earlier about

20    not wanting general partnerships or limited

21    partnerships at -- to open up accounts with you --

22    A.    That would be --

23    Q.    -- correct?

24    A.    That were going to go around soliciting new

25    clients.

Page 257

1      Q.    Okay.  Well -- well, let's look at S&P for a
2    second, and go to page -- this is their partnership
3    agreement.  I just want to ask you, like, for example,
4    in 5.01, where this talks about partners having
5    capital accounts bearing their aggregate total capital
6    contribution of all of the partners on an actual daily
7    basis commencing on the date of each partner's
8    admission into the partnership as follows, 20 percent
9    to the managing general partners and 80 percent to the
10    partners; do you see that?
11      A.    Yes.
12      Q.    Okay.  And so -- and then in 4.05 it talks
13    about individual capital accounts maintained by each
14    partner.  This -- this is not the type of entity then
15    that you wanted to have --
16      A.    That is correct.
17      Q.    -- invest in you; correct?
18      A.    Right.
19      Q.    Okay.  Another thing you mentioned --
20            MR. SAMUELS:  And let's mark this as
21    Exhibit 10.
22            (PLAINTIFFS' EXHIBIT 10 WAS MARKED FOR
23    IDENTIFICATION.)
24    BY MR. SAMUELS:
25      Q.    What's been marked as Exhibit 10 is part of

Page 258

1    the books and records of my client, S&P -- S&P
2    Associates, and at the top, it says, "Management fees
3    to A&B," Avellino & Bienes.
4            And it's got the names of investors, "Alves,
5    Judd" -- "Judd, Hooker Trust, year-to-date management
6    fee," and it's got management fee totals, and then,
7    "4/11/02 meeting, give year-to-date management fee to
8    Frank verbally in January after year end, and he will
9    decide split, hopefully 50/50, and how much to pay and
10    to whom."
11            So you also testified that you were not
12    interested in having accounts opened with you where
13    people were making management fees based upon bringing
14    individual investors in; correct?
15      A.    Yes.
16      Q.    Okay.  So based upon the existence of this
17    partnership agreement and the existence of a document
18    showing Avellino & Bienes getting management fees, had
19    you known this in advance, would you have stopped S&P
20    and P&S from investing in Madoff?
21      A.    Yes.
22      Q.    Okay.  Now, let's talk about Greg Powell and
23    Michael Sullivan.
24      A.    Uh-huh.
25      Q.    Do you remember having a call with them

Page 259

1    prior to them opening accounts with you?
2      A.    No.
3      Q.    Okay.  And had they had contact with you,
4    they would have found you through somebody like
5    Mr. Avellino and Bienes, as opposed to you finding
6    them; correct?
7      A.    Right.
8      Q.    So, in other words, you didn't go through
9    the list of Avellino & Bienes' investors and go out
10    and solicit them and say --
11      A.    No.
12      Q.    -- I'm now taking individual accounts.  Come
13    on board?
14      A.    No.
15      Q.    So it would have been the opposite way
16    around, they would have had to find you?
17      A.    Correct.
18      Q.    And then they would have had to know a way
19    how to contact you and been in touch with you before
20    you authorized an account to open?
21      A.    Correct.
22      Q.    Okay.  So I want to go back to the T-bill
23    question again.
24      A.    Uh-huh.
25      Q.    Did Mr. Avellino ever speak to you in the

Page 260

1    summer of 2008, where you had a conversation
2    indicating that all of the money was in T-bill
3    accounts -- was in T-bills?  I'm sorry.
4      A.    What -- give me that question again, please.
5      Q.    Yeah.
6            Did you ever have a conversation with
7    Mr. Avellino in the summer of 2008 or thereabouts,
8    where it was discussed or told to him that all of the
9    money was in T-bills?
10      A.    It -- it -- that's possible.  I mean,
11    clients, depending upon what the market is doing at
12    the time, if -- for example, if the market had sold
13    off a lot or you, know, whatever it is, it would not
14    be unusual for a client to call up and say, are we
15    fully invested in the market, or are we liquidated in
16    T-bills?  And I would tell them whatever -- you know,
17    they normally would know that by looking at the
18    account statements that they received.
19            But if all of a sudden, you know, the market
20    had a significant down day, sometimes a client would
21    call up.  They really wouldn't speak to me usually.
22    They would call, you know, Frank DiPascali and -- you
23    know, and say, are we still in the market, or are we
24    fully invested?
25            They would -- they would ask the same thing

Page 261

1    if the market was up a lot. They always want to be
2    fully invested, you know. So they would call up and
3    say, are we in, you know.
4        Q.    Okay.
5        A.    And, you know, he normally would -- would be
6    annoyed at them, just the way I would, and say, wait
7    and see what your statement shows. If you get --
8    you'll get the statement, you know.
9            You'll get your confirmations, you know, a
10    day after we do the trade -- two days after we do the
11    trading. You'll know whether you're in the market or
12    not.
13        Q.    So it is possible that you told -- that you
14    and Avellino spoke in the summer of 2008, indicating
15    that all of the money was in T-bills?
16        A.    It's possible. Certainly.
17        Q.    Okay. And if you'd indicated that all of
18    the money in T-bills, that would not have been true at
19    the time?
20        A.    I -- I don't --
21        Q.    You don't know?
22        A.    Well, certainly not all of the money. No.
23    Because in 2008 we didn't have enough money to put all
24    the money into T-bills.
25        Q.    All of the monies in any particular accounts

Page 262

1    or in T-bills?
2        A.    Well, we certainly didn't have -- if there
3    was 60 billion dollars, you know, that was actually
4    being shown on statements, if you added up all of the
5    statements, we certainly didn't have 60 billion
6    dollars invested in anything.
7        Q.    Okay. Do you recall having any discussions
8    with Mr. Avellino at anytime about S&P or P&S?
9        A.    Not that I recall.
10            MR. SAMUELS: Okay. No further
11    questions.
12            MR. ETRA: Oh.
13            MR. WOODFIELD: Go ahead.
14            CONTINUED EXAMINATION
15    BY MR. ETRA:
16        Q.    You've never seen this before about --
17        A.    No.
18        Q.    -- fees; correct?
19        Q.    Okay. And you don't have any knowledge
20    about it; correct?
21        A.    No.
22        Q.    And you -- when -- in better days you gave
23    money to charity; correct?
24        A.    Yes.
25        Q.    You did that for benevolent reasons or for

Page 263

1    your Ponzi scheme?
2        A.    Benevolent reasons.
3        Q.    Okay.
4        A.    Why would I do it for the Ponzi scheme?
5        Q.    That's a good question.
6            In this case the plaintiffs allege that
7    Mr. Bienes gave money to charity shows a Ponzi scheme
8    for -- for purposes of his own --
9            MR. SAMUELS: Objection.
10        Q.    -- alleged Ponzi scheme.
11            MR. SAMUELS: Objection.
12        Q.    That's why I'm raising it.
13            MR. SAMUELS: Object to the form.
14    BY MR. ETRA:
15        Q.    Mr. -- you wouldn't have an objection --
16    Mr. Bienes' testimony is that any money he received,
17    it was for charity purposes, because, you know, from
18    what we've seen, he was very charitable. You wouldn't
19    object to Mr. Bienes giving money to charity; correct?
20        A.    No.
21        Q.    You don't object to Mr. Sullivan giving
22    money to charity; correct?
23        A.    No.
24            MR. ETRA: Thank you.
25            MR. SAMUELS: That's it.

Page 264

1            MR. WOODFIELD: Take that off for you,
2    so you don't walk out and trip over it.
3            MR. SAMUELS: So I noted --
4            THE VIDEOGRAPHER: This concludes --
5            MR. SAMUELS: We will not be --
6            Go ahead.
7            THE VIDEOGRAPHER: This concludes the
8    video deposition of Bernard Madoff. The time
9    going off the record is 3:06 p.m.
10            (DISCUSSION HELD OFF THE RECORD.)
11            MR. SAMUELS: We don't need this on
12    video, but let's stay on the record here for a
13    moment.
14            Under the Florida Rules of Civil
15    Procedure, if this deposition gets typed up,
16    you'll have an opportunity to read it and make
17    any corrections, errors of the court reporter,
18    any other corrections you want to make, or you
19    can waive reading of it, and it is completely up
20    to you.
21            THE WITNESS: I -- you know, how long
22    will it be?
23            MR. SAMUELS: I don't know how many
24    pages it would be or -- I couldn't tell you, but
25    you have the opportunity to read it, or you can

Page 265

```
 1        waive reading.  It's just up to you.
 2               THE WITNESS:  You can send it in.
 3               (SIGNATURE RESERVED.)
 4               (DEPOSITION CONCLUDED AT 3:08 P.M.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 267

```
 1                    SIGNATURE PAGE
 2
 3        I, Bernard L. Madoff, do hereby state under
 4   oath that I have read the above and foregoing
 5   deposition in its entirety and that the same is a
 6   full, true and correct transcript of my testimony,
 7   subject to the attached list of corrections, if any.
 8
 9               _____
10                    Bernard L. Madoff
11
12
13        Sworn to and subscribed before me this _____ day
14   of _____, 2015.
15
16
17               _____
18                    Notary Public
19   My commission expires: _____
20
21
22
23   Mail to:
24   Depositions, Inc.
     709 Highwater Place
25   Fuquay-Varina, NC  27526                    LAD
```

Page 266

```
 1                    ERRATA SHEET
 2   Case name:   P&S Associates vs. Jacob, et al.
 3   Case number: 12-034123(07)
 4   Witness name: Bernard L. Madoff
 5   Date:        October 19, 2015
 6
 7   PAGE   LINE    READS              SHOULD READ
 8   ____/____/_____/_____
 9   ____/____/_____/_____
10   ____/____/_____/_____
11   ____/____/_____/_____
12   ____/____/_____/_____
13   ____/____/_____/_____
14   ____/____/_____/_____
15   ____/____/_____/_____
16   ____/____/_____/_____
17   ____/____/_____/_____
18   ____/____/_____/_____
19   ____/____/_____/_____
20   ____/____/_____/_____
21   ____/____/_____/_____
22   ____/____/_____/_____
23   ____/____/_____/_____
24   ____/____/_____/_____
25   ____/____/_____/_____
```

Page 268

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF NORTH CAROLINA   )
 4   COUNTY OF PERSON          )
 5
 6        I, Lisa A. DeGroat, RPR, the officer before whom
 7   the foregoing deposition was taken, do hereby
 8   certify that the witness whose testimony appears in
 9   the foregoing deposition was duly sworn by me; that
10   the testimony of said witness was taken by me to the
11   best of my ability and thereafter reduced to
12   typewriting under my direction; that I am neither
13   counsel for, related to, nor employed by any of the
14   parties to the action in which this deposition was
15   taken, and further that I am not a relative or
16   employee of any attorney or counsel employed by the
17   parties thereto, nor financially or otherwise
18   interested in the outcome of the action.
19
20
21
22               _____
23                    LISA A. DeGROAT
                      Registered Professional Reporter
24                    Notary Public 19952760001
25
```