**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01209 (CGM) |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | |
| BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO AG, | |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against defendant BSI AG ("BSI"), individually and as successor in interest to Banca del Gottardo AG ("BDG"), alleges the following:

## I.   NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover at least $60,904,246 in subsequent transfers of BLMIS customer property made to BSI, both directly and as the successor in interest to BDG from 2003 through 2008 (the "Transfers"). The Trustee seeks to recover all of the Transfers from BSI, as BDG was acquired by and integrated into BSI in 2008.

3.    At all relevant times, BSI and BDG each were multi-billion-dollar private banks, employing sophisticated and experienced investment management specialists and offering services in, among other areas, alternative investments, including the selection of hedge funds.

4.    BSI, beginning at least as early as 1996, and BDG, beginning at least as early as 2003, each invested in BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma" and, together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global Fund, Ltd. ("Kingate Global"), and Kingate Euro Fund, Ltd. ("Kingate Euro" and, together with Kingate Global, the "Kingate Funds") (collectively, the "BLMIS Feeder Funds"). Each of these BLMIS Feeder Funds invested all or substantially all of its assets

2

with BLMIS's investment advisory business (the "IA Business").  Fairfield Sigma invested all its

assets in Fairfield Sentry, which in turn invested these assets with BLMIS.

5.      The Trustee now seeks to recover subsequent transfers to BSI and BDG from the

Fairfield Funds.[1]

## II.    <u>SUBJECT MATTER JURISDICTION AND VENUE</u>

6.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

7.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

9.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a) and 550, and other applicable law.

---

[1] BSI and BDG also received approximately $24 million in transfers of BLMIS customer property from the Kingate
Funds. The Trustee is not seeking to recover those transfers in light of the settlement in the Kingate case.  *See* Adv.
Pro. No. 09-1161, Dkt. 413, 417.

III.    **BACKGROUND, THE TRUSTEE AND STANDING**

10.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

11.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

12.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

13.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

14.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

4

15.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

16.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

17.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

18.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

19.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

21.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.  BLMIS

22.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

23.    In compliance with SIPA § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

24. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

25. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

26. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

27. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

### B.  THE PONZI SCHEME

28.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

29.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

30.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

8

31.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### C.  MADOFF'S INVESTMENT STRATEGY

32.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split strike conversion strategy ("SSC Strategy").   For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

33.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

34.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

35.    From the early 1990s, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

36.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

37.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P 100 Index call options.

38.    The put options were to limit the downside risk of sizable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

39.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

40.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

41.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

42.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough put and call option notional value to support the Madoff SSC strategy.

43.     Madoff could not have been using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

*BLMIS's Fee Structure*

44.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

45.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

46.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

47.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

*BLMIS Execution*

48.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that it was statistically impossible.

*No Evidence of BLMIS Trading*

49.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

50.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options

*The Collapse of the Ponzi Scheme*

51.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

52.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

53.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.     THE DEFENDANT AND BDG, ITS PREDECESSOR IN INTEREST

54.     BSI is a *société anonyme*, a type of joint stock corporation, with a place of business at Palazzo Botta, Viale Franscini 8, 6901 Lugano, Switzerland.

13

55.     Founded in 1873 as Banca della Svizzera Italiana, BSI is now a wholly owned subsidiary of EFG International AG, a global private banking group headquartered in Zurich, Switzerland. EFG International AG acquired BSI in 2016 from Brazilian bank Grupo BTG Pactual SA, which acquired BSI in 2015 from Assicurazioni Generali SpA ("Generali"), a major Italian insurance and financial services company. During the relevant time period of this action, BSI was a wholly owned subsidiary of Generali.

56.     Prior to its acquisition by BSI, BDG was also a *société anonyme* with a place of business in Lugano, Switzerland and was one of Switzerland's largest private banks.[2] BDG was similarly a leading international private bank, with over a thousand employees, billions of dollars of assets under management, and expertise in alternative investments. BDG was a 100%-owned subsidiary of the Swiss Life Group—Switzerland's largest life insurance company and a leading European provider of pensions and financial security products—and it managed its own capital-protected hedge fund for high-net-worth clients.

57.     In March 2008, BSI acquired BDG. In order to complete the acquisition BSI created a new *société anonyme*, retained the BSI AG name, assumed all of the rights and liabilities of BDG, and integrated BDG's operations with BSI's operations.

58.     The 2008 acquisition of BDG by BSI consolidated the two largest private banks in Italian-speaking Switzerland into the surviving BSI entity.

## VI.    PERSONAL JURISDICTION

59.     BSI (individually and as successor in interest to BDG) is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections

---

[2] PUBLIC0617633-634 at 633 (Securiton.ch Website page re: BSI) (it appears that BSI adopted BDG's headquarters as its own after the acquisition).

of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry.

60.    Through their employees and agents, BSI and BDG each operated in the United States and the State of New York with respect to the transactions relating to the Transfers. For example, at least six BSI employees located in New York communicated with the Fairfield Greenwich Group ("FGG"), which operated the Fairfield Funds, with respect to BSI's investments in the Fairfield Funds.

61.    BSI's asset manager subsidiary Thalia SA ("Thalia")—which was charged with evaluating hedge fund investments for BSI's asset management and private banking businesses—had an advisory office in New York that provided BSI with advice with respect to the BLMIS Funds. FGG referred to New York-based Bob Puccio as influential and an "excellent contact."

62.    Similarly, BDG communicated with New York-based FGG employees regularly and BDG employees met with a number of FGG personnel, including FGG co-founder, Jeffrey Tucker in New York, regarding BDG's investments in the Fairfield Funds.

63.    Like BSI, BDG also used U.S.-based advisers in connection with its investments in the Fairfield Funds. After meeting with BDG on November 24, 2004, FGG Partner Yanko Della Schiava ("Della Schiava") reported that BDG had appointed "Richecourt" as an additional due diligence adviser regarding the Fairfield Funds, and that previously BDG's adviser regarding hedge fund investments had been "Towers in NY." "Richcourt" is an apparent reference to New York-based Richcourt Fund Advisors Inc., and "Towers in NY" is an apparent reference to New York-based Towers Perrin.

15

64.    Moreover, by directing their investments through Fairfield Sentry—a fund primarily managed in New York that invested with BLMIS, also in New York—BSI and BDG knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

65.    BSI and BDG each subjected itself to U.S. law and jurisdiction in connection with its Fairfield Fund investments.  Each time BSI and BDG invested in Fairfield Sentry or Fairfield Sigma, it signed a subscription agreement through which it submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of the New York courts, and the application of New York law.  Specifically, BSI and BDG each (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

66.    In the subscription agreements, BSI and BDG each affirmed that they received and read the relevant Fairfield Fund's information memo or Private Placement Memoranda ("PPM"). Based on these documents, BSI and BDG each knew that BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry. At least one PPM applicable to BSI's and BDG's investments specifically mentioned that BLMIS would serve as sub-custodians for certain assets of Fairfield Sentry and that BLMIS held approximately 95% of the fund's assets.

16

67.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG's New York personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

68.    Based on the information contained in the PPM, BSI and BDG each also knew the following facts indicating that they were transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on Fairfield Sentry's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills") traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was registered with the SEC;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

69.    In addition, BSI and BDG received at least 195 Fairfield Sentry redemption payments into correspondent accounts at HSBC USA in New York.

17

70.    BSI and BDG each directed subscription payments to Fairfield Sentry's designated U.S. bank accounts, from which the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

71.    In addition, BSI and BDG each entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), which compensated BSI and BDG for bringing investments into BLMIS. FG Limited served as an investment management and placement agent for certain FGG-created funds, was registered to do business in New York and listed its principal executive office as that of FGG in New York.  FG Limited's typical fee-sharing agreements with respect to the Fairfield Funds expressly stated that they were governed by New York law. BSI also received fees from FGG pursuant to a verbal agreement made by FGG partners Philip Toub and Lourdes Barreneche, both of whom were based in New York.

72.    Through these FGG fee arrangements, BSI and BDG each received fees in connection with Fairfield Sentry investments from FGG entities at least every quarter from the first quarter of 2003 through the third quarter of 2008.

73.    FG Limited also signed a similar fee-sharing agreement with Genesis Investment Advisors LLC (f/k/a BSI Investment Advisors LLC) ("Genesis").  Genesis was founded as a Delaware corporation registered in New York in May 2000 and in Florida in December 2002, and was spun off from BSI in 2005.

74.    Genesis executive Harvey Glover worked closely with FGG regarding BSI's investments in the Fairfield Funds.  In 2005 Glover left Genesis for FGG, continuing to focus on the FGG/BSI relationship.

75.    Lastly, both BSI's and BDG's primary contacts at FGG were New York-based FGG executives.

76.    BSI and BDG each transacted business within New York, and the Trustee's claims against BSI arise from those business activities.  BSI and BDG each derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

77.    BSI (individually and as successor in interest to BDG) should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to NYCPLR § 302 (McKinney 2001) and Bankruptcy Rule 7004.

## VII.    RECOVERY OF TRANSFERS TO BSI AND BDG

### A.    INITIAL TRANSFERS FROM BLMIS TO FAIRFIELD SENTRY

78.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Investment Fund Limited, et al.*, Adv. Pro. No. 09-01239, seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

79.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

80.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78lll(4).

81.     On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Investment Fund Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

82.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-16.

83.     Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding to the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

84.     Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO BSI AND BDG**

**1.    Transfers to BSI**

85.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BSI (the "Fairfield Sentry-BSI Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-BSI Subsequent Transfers total at least $27,315,638.  A chart setting forth the presently known Fairfield Sentry-BSI Subsequent Transfers by date and amount is attached as Exhibit C.

86.    On March 23, 2012, the Trustee filed this action seeking recovery of subsequent transfers.

87.    The Fairfield Sentry-BSI Subsequent Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

88.    The Fairfield Sentry-BSI Subsequent Transfers represent a redemption of equity interests by BSI as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BSI Subsequent Transfers upon redemption of BSI's interests.

**2.    Transfers to BDG**

89.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BDG (the "Fairfield Sentry-BDG Subsequent Transfers"). Based on the Trustee's investigation to date, the Subsequent Transfers total at least $20,270,860. A chart setting forth the presently known Fairfield Sentry-BDG Subsequent Transfers by date and amount is attached as Exhibit D.

90.     The Fairfield Sentry-BDG Subsequent Transfers are recoverable from BSI, as the successor to BDG, under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

91.     The Fairfield Sentry-BDG Subsequent Transfers represent a redemption of equity interests by BDG as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BDG Subsequent Transfers upon redemption of BDG's interests.

### C.     SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO FAIRFIELD SIGMA AND SUBSEQUENTLY TO BSI AND BDG

#### 1.     Transfers to BSI

92.     Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma.  A chart setting forth the presently known such transfers by date and amount is attached as Exhibit E.

93.     Thereafter, Fairfield Sigma transferred at least $8,695,673 to BSI (the "Sigma-BSI Subsequent Transfers").  A chart setting forth the presently known Sigma-BSI Subsequent Transfers is attached as Exhibit F.

94.     The Sigma-BSI Subsequent Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

95.     The Sigma-BSI Subsequent Transfers represent a redemption of equity interests by BSI as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma was insolvent when it made the Sigma-BSI Subsequent Transfers upon redemption of BSI's interests.

22

### 2.    Transfers to BDG

96.    Fairfield Sigma transferred at least $4,622,074 of the Fairfield Sigma Subsequent Transfers to BDG (the "Sigma-BDG Subsequent Transfers").[3]  A chart setting forth the presently known Sigma-BDG Subsequent Transfers is attached as Exhibit G.

97.    The Sigma-BDG Subsequent Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

98.    The Sigma-BDG Subsequent Transfers represent a redemption of equity interests by BDG as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma was insolvent when it made the Sigma-BDG Subsequent Transfers upon redemption of BDG's interests.

## <u>COUNT ONE</u>

### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

99.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

100.    The Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

101.    BSI and BDG are immediate or mediate transferees of the Transfers.

102.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BSI: (a)

---

[3] The Fairfield Sentry-BSI Subsequent Transfers, the Fairfield Sentry-BDG Subsequent Transfers, the Sigma-BSI Subsequent Transfers and the Sigma-BDG Subsequent Transfers are collectively, and as defined above, the "Transfers".

recovering the Transfers, or the value thereof, from BSI for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

103.    The Trustee's discovery and investigation are ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed herein, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against BSI as follows:

a)    Recovering the Transfers, or the value thereof, from BSI for the benefit of the estate;

b)    If BSI challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a) and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Transfers pursuant to section 550(b) and SIPA § 78fff-2(c)(3);

c)    Awarding the Trustee prejudgment interest from the date on which the Transfers were received by BSI or BDG; and

d)    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: April 8, 2022
     New York, New York

/s/ David J. Sheehan

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Robertson D. Beckerlegge
Email:  rbeckerlegge@bakerlaw.com
Eric R. Fish
Email:  efish@bakerlaw.com
Jonathan A. Forman
Email:  jforman@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Chapter
7 Estate of Bernard L. Madoff*