**Exhibit 7**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02569 (SMB) |
| Plaintiff, | |
| v. | |
| | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BARCLAYS DEFENDANTS** |
| BARCLAYS BANK (SUISSE) S.A., BARCLAYS BANK S.A., and BARCLAYS PRIVATE BANK & TRUST LIMITED, | |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendants Barclays Bank (Suisse) S.A. ("Barclays Suisse"), Barclays Bank S.A. ("Barclays Spain"), and Barclays Private Bank & Trust Limited ("Barclays Jersey") (collectively, the "Barclays Defendants"), states:

## I. INTRODUCTION

1.  Barclays Suisse, Barclays Spain, and Barclays Jersey are private banking entities located in Switzerland, Spain, and Jersey, respectively. The Trustee seeks to recover at least $67,396,667 in subsequent transfers of BLMIS customer property collectively made to the Barclays Defendants.

2.  The Barclays Defendants received BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma"). The Barclays Defendants redeemed shares from Fairfield Sentry and Sigma and received customer property in the following amounts:

|  | Barclays Suisse | Barclays Spain | Barclays Jersey |
|---|---|---|---|
| Fairfield Sentry | $37,973,175 | $4,719,252 | $893,988 |
| Sigma | $7,704,754 | $16,105,498 | $0 |
| **Total** | **$45,677,929** | **$20,824,750** | **$893,988** |

3.  Fairfield Sentry was one of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with New York-based BLMIS. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS.

4.  Fairfield Sigma was a so-called "currency fund" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

1

5. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry and Sigma.

6. The Barclays Defendants purposefully invested in Fairfield Sentry and Sigma to profit from New York-based BLMIS. But for BLMIS's fraudulent activities in New York, the Barclays Defendants would have received none of the transfers from Fairfield Sentry and Sigma.

7. At all relevant times, the Barclays Defendants were subsidiaries of Barclays Bank PLC. Barclays Bank PLC is a multinational banking and financial services company that maintains an office in New York. Each of the Barclays Defendants used bank accounts at Barclays Bank PLC's New York office to receive redemption payments from Fairfield Sentry.

8. Barclays Bank PLC organized its operations into business segments based on the services provided. Employees of Barclays Bank PLC's subsidiaries, including employees of the Barclays Defendants, worked within these business segments. Employees in two business segments in particular—Barclays Wealth and Barclays Capital—were integral in initiating and maintaining the Barclays Defendants' investment relationships with FGG, Madoff, and BLMIS. Barclays Wealth and Barclays Capital had offices around the world, including in the United States, and Barclays Capital employees worked in a Barclays Bank PLC office in New York.

9. The Barclays Defendants relied on Barclays Bank PLC's worldwide network of entities and individuals to conduct due diligence on Fairfield Sentry, Sigma, Madoff, and BLMIS. As a result of this due diligence, the Barclays Defendants knew the following facts evincing the domestic nature of the transfers:

    a. In reality the investment adviser for Fairfield Sentry and Sigma was New York-based BLMIS.

    b. New York-based BLMIS was the executing broker for Fairfield Sentry's and Sigma's investments, and BLMIS purportedly operated and executed Madoff's "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry.

2

    c.    Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills ("Treasurys") traded on U.S. exchanges, and the decisions regarding which U.S. equities to purportedly purchase were made by Madoff in New York.

    d.    New York-based BLMIS was the custodian of Fairfield Sentry's and Sigma's investments.

    e.    BLMIS was a registered broker-dealer with the United States Securities and Exchange Commission ("SEC").

    f.    While BLMIS always functioned as Fairfield Sentry and Sigma's investment adviser, after 2006, BLMIS was a registered investment adviser with the SEC.

    g.    The entire economic purpose of Fairfield Sentry and Sigma was to deliver money to New York-based BLMIS.

10.    The Barclays Defendants knew control over Fairfield Sentry's and Sigma's investments rested entirely with New York-based BLMIS, and invested through the funds precisely to profit from BLMIS's control over a U.S. investment strategy and its implementation.

## II.    THE TRANSFERS AND TRANSACTIONS INVOLVED SIGNIFICANT DOMESTIC COMPONENTS

11.    The transactions at issue involved significant domestic components. The Barclays Defendants used New York bank accounts to receive the transfers at issue and used two Barclays Bank PLC business segments to conduct due diligence on their behalf in New York. Further, Barclays Suisse agreed New York law applied in connection with the transactions and submitted to New York jurisdiction and venue. Barclays Jersey was also a trustee for four family trusts that directly invested with BLMIS and, as a result of this role, knew the SSC Strategy's supposed returns were generated by New York-based BLMIS through U.S.-based investments. Finally, Fairfield Sentry and Sigma maintained their principal place of business in New York and were domestic residents.

3

### A. The Barclays Defendants Routinely Used New York Banks in Connection with their Investments

12. The Barclays Defendants used New York bank accounts to transfer money to and from Fairfield Sentry.

13. The Barclays Defendants voluntarily executed subscription agreements in connection with their investments in Fairfield Sentry. These agreements stated that all money from the Barclays Defendants be directed to New York correspondent bank accounts at either Republic National Bank of New York or HSBC Bank USA (depending on when the subscription agreements were executed) for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. Barclays Suisse, Barclays Spain, and Barclays Jersey directed funds to these Republic National Bank of New York or HSBC Bank USA accounts on at least 81 occasions over the course of 9 years, 11 occasions over the course of 9 years, and 4 occasions over the course of 7 years, respectively.

#### 1. Barclays Suisse

14. During all relevant times, Barclays Suisse maintained a bank account in its own name at Barclays Bank PLC in New York. Barclays Suisse used its New York bank account to receive transfers from Fairfield Sentry. In Fairfield Sentry subscription agreements Barclays Suisse completed, Barclays Suisse directed that all redemptions and payments be sent only to its New York bank account at Barclays Bank PLC.

15. Barclays Suisse used its New York bank account repeatedly—74 times over a 5 year period—to receive $37,973,175 in redemption payments from Fairfield Sentry.

4

### 2. Barclays Spain

16. During all relevant times, Barclays Spain also maintained a bank account in its own name at Barclays Bank PLC in New York. Barclays Spain used its New York bank account to receive transfers from Fairfield Sentry. Fairfield Sentry redemption confirmations indicate that Barclays Spain directed every redemption payment to its New York bank account at Barclays Bank PLC.

17. Barclays Spain utilized its New York bank account repeatedly—10 times over a 5 year period—to receive $4,719,252 in redemption payments from Fairfield Sentry.

### 3. Barclays Jersey

18. Barclays Jersey used a correspondent bank account at Barclays Bank PLC in New York to receive transfers from Fairfield Sentry. Barclays Jersey submitted redemption requests to Fairfield Sentry's administrator that directed redemption payments be sent to this New York Barclays Bank PLC account.

19. Barclays Jersey used this account two times over a five year period to receive $893,988 in redemption payments from Fairfield Sentry.

**B. Barclays Suisse Agreed New York Law Applied in Connection with the Transactions**

20. In addition to using New York bank accounts to subscribe and redeem funds into and from Fairfield Sentry, Barclays Suisse signed a Fairfield Sentry subscription agreement containing New York choice of law, venue, and jurisdiction provisions.

21. Specifically, by signing the subscription agreement, Barclays Suisse "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." The Fairfield Sentry subscription agreement also

5

specified that "[the agreement] shall be governed and enforced in accordance with the laws or New York, without giving effect to its conflict of laws provisions."

### C. The Barclays Defendants Used Barclays Bank PLC Business Segments to Conduct Due Diligence in New York

22.     London-based Barclays Wealth and Barclays Capital employees visited FGG's New York headquarters on multiple occasions to conduct due diligence on behalf of the Barclays Defendants. During these New York visits Barclays Wealth and Barclays Capital employees analyzed Madoff's SSC Strategy and reviewed the operations of BLMIS. Barclays Wealth employees also discussed BLMIS's SEC and National Association of Securities Dealers filings with FGG personnel based in New York ("FGG New York Personnel") during New York visits.

23.     Barclays Wealth and Barclays Capital employees also regularly called and emailed FGG New York Personnel to conduct due diligence on behalf of the Barclays Defendants. For example, Barclays Wealth and Barclays Capital employees questioned FGG New York personnel about BLMIS's operations and New York-based auditor.

24.     Barclays Wealth and Barclays Capital employees reviewed and analyzed due diligence materials sent to them by FGG New York Personnel, including due diligence questionnaires. Virtually all of Fairfield Sentry's assets were invested with New York-based BLMIS; Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasurys traded on U.S. exchanges; and Fairfield Sentry maintained a brokerage account with BLMIS, and the Barclays Defendants knew these facts as a result of their review of the questionnaires.

6

**D. Barclays Jersey was a Trustee for Family Trusts Directly Invested with BLMIS and Filed BLMIS Customer Claims on the Trusts' Behalf**

25. In 2004, Barclays Jersey was appointed as a trustee of four family trusts that held a shared account at New York-based BLMIS. Barclays Jersey monitored this direct BLMIS account on behalf of the four trusts, which gave Barclays Jersey insight into the domestic nature of BLMIS's operation.

26. Barclays Jersey's Paul Lyons monitored this direct account at BLMIS and reviewed account statements detailing the U.S. equities, U.S. options, and U.S. Treasurys purportedly purchased by BLMIS each month. Lyons also reviewed monthly BLMIS trading summaries, which detailed when Madoff purportedly was in and out of the market and highlighted some of the U.S. equities and U.S. Treasurys purportedly purchased each month.

27. Barclays Jersey knew from its review of these account statements and trading summaries that: (1) BLMIS purportedly used funds invested in the SSC Strategy—including Barclays Jersey's own investments in Fairfield Sentry—to purchase U.S. equities, U.S. options, and U.S. Treasurys, and (2) these U.S.-based investments were the source of the SSC Strategy's supposed returns.

28. After Madoff's Ponzi scheme collapsed in 2008, each of these family trusts filed customer claims with the Trustee through Barclays Jersey.

**III. FAIRFIELD SENTRY AND SIGMA'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK**

29. At all relevant times, Fairfield Sentry and Sigma's principal place of business was in New York and they were domestic residents.

7

### A.     The Genesis of the FGG De Facto Partnership

30.     In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

31.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

32.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.     Fairfield Sentry

33.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

8

doing business with other BVI residents except for other entities organized under the International Business Companies Act.

34. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG New York Personnel. Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

        **1.**        **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States**

35. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

36. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

9

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

37.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

38.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

    **2.**    **FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

39.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying

10

the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

40. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

41. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

11

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

42. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

43. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

12

44. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

45. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

46. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

47. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG

13

formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

48. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

49. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

50. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

51. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required

14

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

52. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.     Sigma**

53. FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars. In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma. Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

54. Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

55. Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and

15

hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters. Sigma was operated almost entirely by FGG New York Personnel.

56. As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New York Personnel made the operational decisions regarding Sigma. Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities. Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

57. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares. Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets. Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's

16

PPM's.

58. Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

59. In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—Noel executed a separate contract on Sigma's behalf with the Bank of Montreal for a currency swap which was "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

60. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM's to indicate FG Bermuda was Sigma's Investment Manager. In fact, there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

17

61. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
      New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street
Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Justin J. Joyce

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*