JONES DAY
Thomas E. Lynch
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
telynch@jonesday.com

*Attorneys for QS Finance Ltd.*
*(formerly known as Quilvest Finance Ltd.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
|        Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
|        v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
|        Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
|        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
|        Plaintiff, | Adv. Pro. No. 11-02538 (CGM) |
|        v. | |
| QUILVEST FINANCE LTD., | |
|        Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF ALLEGED FACTS ........................................................................ 3

ARGUMENT ................................................................................................................ 4

I.     The Trustee's Claims to Recover Alleged Subsequent Transfers to QSF
Are Barred by the 11 U.S.C. § 546(e) Safe Harbor ............................................... 4

     A.     The Alleged Initial Transfers Were Made by or to a Covered Entity ........ 7

          1.     The alleged initial transfers were made by a stockbroker ............. 7

          2.     The alleged initial transfers were made to a financial
institution ..................................................................................... 7

     B.     The Alleged Initial Transfers Were Settlement Payments and
Made in Connection with Securities Contracts ........................................ 10

     C.     All of the Trustee's Claims Against QSF Are Covered by the
Section 546(e) Safe Harbor ..................................................................... 15

II.     The Trustee's Complaint Fails to Plead That Alleged Transfers to QSF
Were BLMIS Customer Property ....................................................................... 16

     A.     The Trustee Has Not Plausibly Alleged That Claimed
Subsequent Transfers to QSF Were BLMIS Customer Property ............ 16

     B.     The Trustee's Complaint Seeks to Recover Alleged Transfers from
Sentry to QSF When the Trustee Alleges There Was No Money
Left From BLMIS .................................................................................... 21

III.     The Complaint Does Not Contain a "Short and Plain Statement of the
Claim," Including Any Alleged Avoidability of Initial Transfers ....................... 24

IV.     The Complaint Does Not Allege Facts to Establish Personal Jurisdiction
Over QSF ........................................................................................................... 26

CONCLUSION .......................................................................................................... 33

# TABLE OF AUTHORITIES

**Page**

CASES

*Al Rushaid v. Pictet & Cie,*
    28 N.Y.3d 316 (2016) ...........................................................................................32

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................16, 20

*Best Van Lines, Inc. v. Walker,*
    490 F.3d 239 (2d Cir. 2007)..................................................................................27

*BLMIS v. BNP Paribas S.A.,*
    594 B.R. 167 (Bankr. S.D.N.Y. 2018).............................................................16, 28

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)...............................................................................................28

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
    651 F.3d 329 (2d Cir. 2011)..................................................................................13

*Ctr. For Reprod. Law & Policy v. Bush,*
    304 F.3d 183 (2d Cir. 2002)..................................................................................26

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),*
    323 B.R. 857 (Bankr. S.D.N.Y. 2005)....................................................................8

*Fairfield Sentry Ltd. v. Citco Global Custody NV,*
    No. 19-01122 (Bankr. S.D.N.Y. Nov. 26, 2019) ...................................................19

*Fairfield Sentry Ltd. v. Migani,*
    [2014] UKPC 9, ¶ 10 .......................................................................................11, 32

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),*
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ..............................................32

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),*
    2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)................................7, 8, 9, 10

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
26 N.Y.2d 280 (1970) ..................................................................................................29

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021) ...............................................................................................27

*Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.*,
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ...........................................................23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)...................................................................................................28

*Hill v. HSBC Bank plc*
207 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2016) .........................................................31

*In re Bernard L. Madoff Inv. Sec. LLC*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014)...............................................................20, 22

*In re Bernard L. Madoff Inv. Sec. LLC*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015)......................................................16, 17, 25

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ................................................................................25

*In re Sledziejoinwski*,
2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) ..............................................31

*In re Tribune Co. Fraudulent Conveyance Litig.*,
10 F.4th 147 (2d Cir. 2021) ...................................................................................9, 11

*In re Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019)..................................................................................5, 8, 11

*Int'l Customs Assocs. v. Ford Motor Co.*,
893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ...............29

*Kennedy v. Mondelez Glob. LLC*,
2020 WL 4006197 (E.D.N.Y. July 10, 2020) ..........................................................24

*Kimco Exch. Place Corp. v. Thomas Benz, Inc.*,
34 A.D.3d 433 (2d Dep't 2006) ................................................................................32

*Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*,
2021 WL 5909976 (S.D.N.Y. Dec. 10, 2021) .........................................................33

*Law v. Siegel*,
   571 U.S. 415 (2014)..................................................................................................15

*Leema Enters., Inc. v. Willi*,
   575 F. Supp. 1533 (S.D.N.Y. 1983).........................................................................31

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
   2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017)..........................................................31

*McKee Elec. Co. v. Rauland-Borg Corp.*,
   20 N.Y.2d 377 (1967) ...............................................................................................31

*Merit Mgmt. Grp., LP v. FTI Consulting Inc.*,
   138 S. Ct. 883 (2018)............................................................................................4, 15

*Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*,
   648 F. Supp. 1153 (S.D.N.Y. 1986).........................................................................28

*Mortg. Funding Corp. v. Boyer Lake Pointe, LC*,
   379 F. Supp. 2d 282 (E.D.N.Y. 2005) .....................................................................29

*Nastasi & Assocs. v. Bloomberg, L.P.*,
   2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021)...........................................................8

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)..................................................................................................10

*Palnik v. Westlake Entm't, Inc.*,
   344 Fed. App'x 249 (6th Cir. 2009) .........................................................................27

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)......................................................................................20

*Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
   440 B.R. 274 (Bankr. S.D.N.Y. 2010)......................................................................27

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   12 F.4th 171 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1209 (2022)........................14

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC)*,
   2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ....................................6, 12, 13

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
   773 F.3d 411 (2d Cir. 2014)............................................................................. passim

*Roper Starch Worldwide, Inc. v. Reymer & Assocs.*,
    2 F. Supp. 2d 470 (S.D.N.Y. 1998)......................................................................28

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).................................................................................8

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988)...............................................................................25

*Sapia v. Home Box Off., Inc.*,
    2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018) .......................................................20

*Shaffer v. Heitner*,
    433 U.S. 186 (1977)........................................................................................27

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005)................................................................14

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    476 B.R. 715 (S.D.N.Y. 2012)...........................................................................7

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................11, 12, 13, 25

*SPV Osus Ltd. v. UBS AG*,
    114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ..............31

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..............................................................................27

*Sullivan v. Kodsi*,
    373 F. Supp. 2d 302 (S.D.N.Y. 2005).................................................................16

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)........................................................................................10

*To v. HSBC Holdings PLC*,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) .....................................................30, 31

*U.S. v. Int'l Longshoremen's Ass'n*,
    518 F. Supp. 2d 422 ........................................................................................24

*Verhagen v. Saperstein*,
    1994 WL 330055 (S.D.N.Y. July 11, 1994) .........................................................20

*Walden v. Fiore*,
    571 U.S. 277 (2014) ................................................................................................27

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ............................................................................27, 28

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*,
    2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ...................................................32

STATUTES

11 U.S.C.§ 101(22)(A) .............................................................................................7, 8

11 U.S.C. § 101(53A) ....................................................................................................7

11 U.S.C. § 546(e) ................................................................................................ passim

11 U.S.C.§ 550 ..........................................................................................1, 4, 16, 25

11 U.S.C. § 741 ....................................................................................................11, 14

15 U.S.C. § 78fff-2(c)(3) ......................................................................................16, 19

OTHER AUTHORITIES

CPLR § 302 ..................................................................................................................27

Fed. R. Civ. P. 4 ..........................................................................................................27

Fed. R. Civ. P. 8 .....................................................................................20, 21, 24, 25 26

Fed. R. Civ. P. 12(b) ................................................................................................7, 25

Fed. R. Civ. P. 12(f) ..............................................................................................25, 26

Fed. R. Bankr. P. 7004 ...............................................................................................27

Defendant QS Finance Ltd. ("QSF")[1] respectfully submits this memorandum of law,

together with the accompanying declaration of Thomas E. Lynch ("Lynch Decl.") and the

exhibits attached thereto, in support of its motion to dismiss the Complaint dated

August 18, 2011 (the "Complaint")[2] filed by Plaintiff Irving Picard as Trustee (the "Trustee")

for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS").

## PRELIMINARY STATEMENT

This adversary proceeding is one of scores the Trustee has brought against parties who

allegedly received redemption payments from the Fairfield Sentry Limited Fund ("Sentry").

The Trustee asserts in this and other proceedings that all dollars Sentry transferred to its

investors and others should be considered BLMIS customer property recoverable under

11 U.S.C. § 550(a).  However, the Trustee makes these assertions without regard for whether

any funds transferred plausibly originated from BLMIS.  In this specific proceeding, the Trustee

seeks to unwind thirty-one transfers that QSF allegedly received as redemption payments for

investments in the Sentry feeder fund between May 2003 and March 2007.  The Trustee's claims

against QSF should be dismissed for four independent reasons.

*First*, all of the Trustee's claims against QSF are all barred by Bankruptcy Code

Section 546(e) because the only initial transfers from BLMIS to Sentry to which the Trustee

might point as support for subsequent transfer claims against QSF were made—according to the

Trustee's own allegations—by a stockbroker to a financial institution as settlement payments in

connection with a securities contract.  Section 546(e) precludes the Trustee from avoiding such

---

[1]    Following the initiation of this adversary proceeding, Quilvest Finance Ltd. changed its name to QS Finance Ltd.

[2]    The Trustee's Complaint in this proceeding (ECF 1) (the "Compl.") with Exhibits A through D (ECF 1-1 through ECF 1-4) is attached as Exhibit 1 to the accompanying Declaration of Thomas E. Lynch, dated April 12, 2022 (the "Lynch Decl.").

initial transfers from BLMIS occurring more than two years before the BLMIS bankruptcy.

Because the only potential initial transfers from BLMIS to Sentry that could have preceded

alleged subsequent transfers from Sentry to QSF occurred more than two years before the

BLMIS bankruptcy, Section 546(e) bars the Trustee from recovering any of the alleged

subsequent transfers from Sentry to QSF.

*Second*, the Trustee's complaint fails to connect the allegedly avoidable initial transfers

from BLMIS to Sentry to the claimed subsequent transfers from Sentry to QSF.  Instead, the

Trustee relies on general allegations that, among the approximately $3 billion BLMIS initially

transferred to Sentry, $34,198,293 was subsequently transferred to QSF.  The Trustee's broad

allegations are not only insufficient to state claims for any of the alleged thirty-one transfers

from Sentry to QSF, they are mathematically implausible.  In this and in other proceedings,

the Trustee claims to identify approximately $5 billion in transfers that parties allegedly received

from Sentry even though his pleadings simultaneously state that Sentry received approximately

$3 billion from BLMIS.  Therefore, the Trustee is claiming a right to recover as a "subsequent

transfer" every alleged transfer QSF received from Sentry while simultaneously alleging that

Sentry transferred approximately $2 billion more than it received from BLMIS as potential initial

transfers of BLMIS customer property.  The Trustee's claims that all Sentry transfers were

BLMIS customer property are impossible, and consideration of specific transfers the Trustee

claims a right to recover from QSF illustrate their implausibility.  For example, the Trustee

claims rights to recover transfers from Sentry to QSF that occurred as many as seventeen months

after the closest preceding transfer from BLMIS to Sentry and even though the Trustee's own

allegations show that Sentry would have transferred the entirety of alleged initial transfers long

before transfers to QSF.

*Third*, the Trustee's Complaint fails to provide a "short and plain statement" of the claims against QSF, including any alleged avoidability of initial transfers, because it purports to incorporate by reference another 217-page pleading that was filed in another adversary proceeding and has since been amended and abandoned.

*Fourth,* Trustee's allegations do not make out a *prima facie* case for personal jurisdiction over QSF.[3]

## STATEMENT OF ALLEGED FACTS[4]

The Trustee claims generally that thirty-one transfers from Sentry to QSF that he seeks to recover in this adversary proceeding—transfers totaling $34,198,293—are funds that originated with BLMIS, that BLMIS initially transferred to Sentry, and that Sentry subsequently transferred to QSF.  (Compl. ¶¶ 1-4, 6.)[5]

The Trustee recites in the Complaint background about the December 2008 arrest of Bernard Madoff ("Madoff"), the commencement of civil and criminal proceedings against him, the initiation of this SIPA bankruptcy, and Madoff's criminal conviction.  (Compl. ¶¶ 10-16.)  The Complaint also recites allegations about the history of BLMIS, revelations that Madoff made false claims to clients and regulators, and conclusions that Madoff was operating a Ponzi scheme.  (Compl. ¶¶ 22-31.)

---

[3]    By making this motion, QSF is not waving its right to have an Article III court enter any final judgment in this proceeding.

[4]    This statement of facts is based on the allegations in the Trustee's Complaint.  QSF neither admits nor concedes the facts alleged in the Complaint.

[5]    The Trustee's Complaint, as originally filed, sought to recover thirty-four alleged subsequent transfers from Sentry to QSF totaling $37,800,115.  (Compl. Ex. D.)  In a so-ordered stipulation filed on March 1, 2022, the Trustee dismissed with prejudice four alleged transfers totaling $3,601,820.  (Stipulation and Order, dated Mar. 1, 2022 (Adv. Pro. 11-02538, ECF 105).)

The Trustee recognizes QSF to be an entity registered in the British Virgin Islands, (Compl. ¶ 21), and alleges that it received BLMIS customer property from Sentry, (Compl. ¶¶ 2, 33, 40-42). The Trustee generally contends that, during the six years before Madoff's arrest, BLMIS made transfers to Sentry totaling approximately $3 billion, (Compl. ¶ 35), and that the Trustee has a right to recover funds originating from BLMIS that Sentry subsequently transferred to QSF as redemption payments for QSF's investments in Sentry. (Compl. ¶¶ 1-4, 34-38, 40-41, Exs. B, C, D.)

Among the $3 billion BLMIS allegedly transferred to Sentry, the Trustee generally contends that $34,198,293 was subsequently transferred by Sentry to QSF. (Compl. ¶ 40.) Without identifying connections between alleged initial transfers from BLMIS to Sentry and alleged subsequent transfers from Sentry to QSF, the Trustee includes as part of the Complaint a chart of alleged transfers from Sentry to QSF. (Compl. ¶ 40 and Ex. D.) The Trustee alleges that those transfers from Sentry to QSF are BLMIS customer property that can be recovered under 11 U.S.C. § 550(a). (Compl. ¶¶ 2, 3, 4, 33, 35, 40, 44, 47 and Ex. D.)

**ARGUMENT**

I.     **The Trustee's Claims to Recover Alleged Subsequent Transfers to QSF Are Barred by the 11 U.S.C. § 546(e) Safe Harbor.**

The Trustee's sole basis for claims against QSF is Section 550(a) of the Bankruptcy Code, which provides that, to the extent a transfer from the debtor's estate is avoided under certain Code sections, a trustee may recover property transferred or its value from "the initial transferee" or any subsequent "transferee of the initial transferee." 11 U.S.C. § 550(a)(1), (2).

However, "[t]he Code sets out a number of limits on the exercise of these avoiding powers," including the "securities safe harbor" of Section 546(e). *Merit Mgmt. Grp., LP v. FTI Consulting Inc.*, 138 S. Ct. 883, 899 (2018). Section 546(e) bars a trustee from avoiding

a transfer (other than under Section 548(a)(1)(A), which has only a two-year lookback period)
if that transfer, as is relevant here, (1) was made "by or to (or for the benefit of)" a covered entity
such as a stockbroker, financial institution, or financial participant; and (2) was either a
settlement payment or a transfer in connection with a securities contract. *See* 11 U.S.C. § 546(e).

The Second Circuit has instructed that courts should enforce Section 546(e)'s safe harbor
whenever it applies by its terms, specifically including in actions brought by the Trustee.
Construing Section 546(e) in the context of avoidance actions by the Trustee, the Second Circuit
explained that, "in enacting the Bankruptcy Code, Congress struck careful balances between the
need for an equitable result for the debtor and its creditors, and the need for finality." *Picard v.
Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423
(2d Cir. 2014) ("*Fishman*") (citation omitted).  In particular, "by enacting § 546(e), Congress
provided that, for a very broad range of securities-related transfers, the interest in finality is
sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual
fraudulent transfers under § 548(a)(1)(A)." *Id*.  "Unwinding settled securities transactions . . .
would seriously undermine—a substantial understatement—markets in which certainty, speed,
finality, and stability are necessary to attract capital." *In re Tribune Co. Fraudulent Conveyance
Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) ("*Tribune I*").  "Permitting the clawback of millions, if not
billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder
funds—would likely cause the very 'displacement' that Congress hoped to minimize in enacting
§ 546(e)." *Fishman*, 773 F.3d at 420.

When such a clawback action is brought against a subsequent transferee of a BLMIS
client, the subsequent transferee can assert any defenses that the initial transferee could have
asserted, including Section 546(e).  This includes the situation here, where the alleged initial

transferee, Sentry, settled with the Trustee and agreed to a consent judgment.[6] *See Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC)*, 2021 WL 3477479, at \*3 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) ("*Fairfield Inv. Fund*") ("Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, as is the case here where the transferee settled with the Trustee, the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against the recovery of those funds.").

Because the Trustee seeks to recover from QSF as an alleged subsequent transferee of initial BLMIS transfers to Sentry,[7] the Complaint must be dismissed if BLMIS's transfers to Sentry were protected by Section 546(e).[8] As is shown below, both elements of the Section 546(e) defense are established as a matter of law. And because the Trustee does not allege that BLMIS transferred any funds to Sentry within the two-year lookback period under Section 548(a)(1)(A) before any alleged subsequent transfer to QSF, the Section 546(e) safe harbor bars

---

[6]    On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Sentry and the other Fairfield funds. *See Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), ECF 69-2. This Court approved the Fairfield Settlement Agreement on June 7, 2011, *id*. ECF 92, and it was incorporated into the Consent Judgment entered against Sentry on July 13, 2011 (the "Consent Judgment"), *id*. ECF 109, ¶ 2; *see also* Compl. ¶ 49. A copy of the Fairfield Settlement Agreement is attached as Exhibit 3 to the accompanying Lynch Declaration.

[7]    For reasons set forth in Argument Section II, *infra*, the Trustee's claims against QSF also fail because there is no pleaded connection between alleged initial transfers from BLMIS to Sentry and alleged subsequent transfers from Sentry to QSF. Notwithstanding that independent basis for dismissal of the Complaint, the Trustee's general allegation that initial transfers from BLMIS to Sentry are the basis for its claims against QSF is enough to show that Section 546(e) precludes those claims.

[8]    Although Section 546(e) is an affirmative defense, a court can dismiss based on Section 546(e) if its applicability is established on the face of the complaint or documents incorporated by reference into or integral to the complaint. *See Fairfield Inv. Fund*, 2021 WL 3477479, at \*2; *see also, e.g., Fishman*, 773 F.3d at 414 (affirming dismissal).

all of the Trustee's claims against QSF.  *See Fishman*, 773 F.3d at 415 (affirming dismissal of

claims under Rule 12(b)(6) because they were shielded by the Section 546(e) safe harbor).

### A.    The Alleged Initial Transfers Were Made by or to a Covered Entity.

Here, the alleged initial transfers were made by or to an entity covered by Section 546(e)

both because the alleged initial transfers were made by a stockbroker and because they were

made to a financial institution, though either of those facts alone would be sufficient.[9]

### 1.    The alleged initial transfers were made by a stockbroker.

The Code defines "stockbroker" to include entities that "engage[ ] in the business of

effecting transactions in securities."  11 U.S.C. § 101(53A).  As the District Court found, BLMIS

"qualifies as a stockbroker by virtue of the trading conducted by its market making and

proprietary trading divisions."  *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719

(S.D.N.Y. 2012) (citation omitted), *aff'd sub nom. Fishman*, 773 F.3d at 417 ("It is not disputed

[by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e).")  BLMIS' status

as a "stockbroker" is itself sufficient to satisfy the "covered entity" analysis for purposes of

purposes of § 546(e).

### 2.    The alleged initial transfers were made to a financial institution.

The alleged initial transferee, Sentry, is a "financial institution" for purposes of Section

546(e) and is therefore also a covered entity.  The Code defines "financial institution" to include

both "an entity that is a commercial or savings bank" and the bank's customer "when [the bank]

is acting as agent or custodian for a customer . . . in connection with a securities contract."

11 U.S.C. § 101(22)(A).  In *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield*

---

[9]    QSF reserves for later consideration, if necessary, the question whether the transfer also was
"made by or to (or for the benefit of) a . . . financial participant."  11 U.S.C. § 546(e).

*Sentry Ltd.)*, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"), this Court

held that Sentry and its affiliated funds Fairfield Sigma Limited ("Sigma") and Fairfield Lambda

Limited ("Lambda") were "financial institutions" because they were customers of Citco Bank

Nederland N.V. Dublin Branch ("Citco Bank"), which acted as their agent in connection with the

securities contracts pursuant to which the redemption payments were made.  *Id*. at *7.

Citco Bank is a bank regulated by the Central Bank of the Netherlands and registered

with the Central Bank of Ireland.  *Fairfield III*, 2020 WL 7345988, at *6 & n.11.[10]  In a

document filed with this Court proffering additional allegations pertaining to QSF, ("Proffer"

ECF 73), the Trustee alleged that the founders of Fairfield Greenwich Group, which organized

Sentry, "contracted Citco Global Custody N.V. . . . to nominally serve as the custodian of the

Fairfield Sentry assets" and "opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch." (Proffer ¶ 36.)[11]  Sentry thus was a customer of Citco Bank.  *See Tribune I*, 946 F.3d

at 78-79 (for purposes of Section 101(22)(A), "customer" must be given its "ordinary meaning,"

---

[10]    *See* De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*,
https://www.dnb.nl/en/public-register/information-
detail/?registerCode=WFTDG&relationNumber=B0275 (last visited Apr. 11, 2022) (identifying
Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of
deposits and other repayable funds"); Central Bank of Ireland, *Financial Service Provider
Profile: Citco Bank Nederland NV Dublin Branch*,
http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited
Apr. 11, 2022) (classifying Citco Bank as a "credit institution . . . whose business is to receive
deposits or other repayable funds from the public and to grant credits for its own account").  This
Court can take judicial notice of information from such public registries.  *See Tribune I*, 946 F.3d
at 78; *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr.
S.D.N.Y. 2005).

[11]    This Court may take judicial notice of admissions in documents filed by the Trustee,
particularly where the Trustee does not dispute their accuracy.  *See Rothman v. Gregor*, 220 F.3d
81, 92 (2d Cir. 2000); *Nastasi & Assocs. v. Bloomberg, L.P.*, 2021 WL 3541153, at *4-5
(S.D.N.Y. Aug. 11, 2021).

which includes "someone who buys goods or services" and "a person . . . for whom a bank has

agreed to collect items") (citations omitted); *Fairfield III*, 2020 WL 7345988, at *7.

In this proceeding, the Trustee alleges that the initial transfers from BLMIS to Sentry

were made from BLMIS accounts entitled "Citco Global Custody N.V. FBO Fairfield Sentry

Ltd." (account numbers 1FN012 and 1FN045).  (Compl. Exs. B, C.)  In the Proffer, in addition to

acknowledging Citco Global Custody N.V.'s service as custodian for Sentry and the related

opening of bank accounts by Sentry at Citco Bank, the Trustee alleges that Fairfield Greenwich

Group personnel "had final control of the Fairfield Sentry bank accounts and controlled all of

Fairfield Sentry's relationships with the various Citco entities," (Proffer ¶ 36), and "controlled

and approved all subscriptions into and redemptions from the fund," (*id*. ¶ 38).  Thus, Citco

Bank was Sentry's agent in connection with the redemptions at issue.  To paraphrase the Second

Circuit in *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147 (2d Cir. 2021)

("*Tribune II*"), *cert. denied,* 142 S. Ct. 1128 (2022), "Here, [Sentry] entered into an agreement

with [Citco Bank] whereby [Citco Bank] was hired to be a steward of [Sentry]'s money . . . .

It was clearly acting on behalf of [Sentry], which is enough to satisfy § 546(e)."  *Id*. at 176.

This Court came to the same conclusion in *Fairfield III*:

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco
> Bank establishes the necessary agency.  It is implausible to infer that Citco Bank
> made the redemption payments to specific redeemers in specific amounts absent
> the [Fairfield] Funds' directions to do so.  Moreover, Citco Bank accepted those
> directions by executing the redemption payments.  Based on the foregoing, the
> Funds were customers of Citco Bank who acted as their agents in connection with
> the securities contracts pursuant to which the redemption payments were made,
> and the Funds were, therefore "financial institutions" within the meaning of
> 11 U.S.C. § 546(e).

2020 WL 7345988, at *7. This Court's holding in *Fairfield III* is binding on the Trustee because

he was in privity with the Fairfield Liquidators who were litigating the consolidated Fairfield

redeemer actions partly for the Trustee's benefit.[12]

The Trustee's allegations confirm that, as the Court held in *Fairfield III*, Citgo Bank was

Sentry's agent in connection with the alleged initial transfers at issue, so that Sentry is a

"financial institution" for purposes of Section 546(e).

### B. The Alleged Initial Transfers Were Settlement Payments and Made in Connection with Securities Contracts.

In *Fishman*, the Second Circuit held that Section 546(e) shields transfers from BLMIS

to its account holders from the Trustee's avoidance powers. 773 F.3d at 417. The *Fishman* court

concluded that the documents governing BLMIS customers' accounts constituted securities

contracts, and that the payments BLMIS made to those customers were made "in connection

with" those contracts, and also constituted "settlement payments," *id*. at 418-23, although either

of those findings would have sufficed to invoke the safe harbor. The court rejected the Trustee's

argument that the safe harbor did not apply because Madoff did not actually carry out the

promised securities transactions. *Id*. at 419-20.

---

[12]    Under the Fairfield Settlement Agreement, the Fairfield Liquidators will pay the Trustee 15% of net recoveries from their claims against redeemers from the Fairfield funds until the Trustee has been paid $1.924 billion. (Fairfield Settlement Agreement, (Lynch Decl. Ex. 3), ¶¶ 1, 4, 11.) The Fairfield Settlement Agreement states that "[t]he Trustee and the Liquidators agree and stipulate that a joint interest exists between them with respect to the Sharing Claims." (*Id*. ¶ 14.) This agreed joint interest in any such recovered BLMIS customer property constitutes a "preexisting 'substantive legal relationship,'" focused on a successive or concurrent interest in property, of the kind recognized by the Supreme Court to give rise to nonparty issue preclusion in *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). Because the issue of Sentry's status as a "financial institution" was actually litigated and essential to the final judgments dismissing numerous such actions on ground of the Section 546(e) safe harbor, this Court's finding in *Fairfield III* that Sentry was a "financial institution" in connection with redemption payments from Sentry to its subscribers is binding on the Trustee. *See New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) (stating requirements for issue preclusion).

The same reasoning and result apply to the transfers that the Trustee alleges BLMIS made to Sentry to fund investors' redemption requests. Alleged transfers from BLMIS to Sentry were plainly "in connection with" both the securities contracts Sentry had entered into with BLMIS, *see Fishman* 773 F.3d at 418-23, and the allegedly related securities contract under which Sentry investors made their redemptions, namely Sentry's Articles of Association. *See Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶ 10 (available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf) ("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund").[13]

The definition of "securities contract" includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), and "[t]he term 'redemption,' in the securities context, means 'repurchase,'" *Tribune I*, 946 F.3d at 80. The definition of "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii). Accordingly, "the definition of a securities contract . . . includes . . . redemption requests." *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 2013 WL 1609154, at *8 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). Furthermore, all Section 546(e) requires is that the transfer be "in connection with a securities contract," not in connection with the securities contract between the transferor and initial transferee. *See Fishman*, 773 F.3d at 422 (holding that "Section 546(e) sets a low bar for the

---

[13]    A copy of the Sentry Articles of Association are attached as Exhibit 7 to the accompanying Lynch Declaration. This Court may consider the Articles of Association in connection with this motion because, as the basis for the challenged redemption payments, they are integral to the Complaint. *See Tribune II*, 10 F.4th at 176 ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

required relationship between the securities contract and the transfer sought to be avoided" and

that "a transfer can be connected to, and can be made in relation to, multiple documents or

purposes simultaneously"); *Cohmad*, 2013 WL 1609154, at *9 (explaining that a transfer from a

debtor to an initial transferee may qualify as having been made "in connection with a securities

contract" between the initial transferee and a subsequent transferee, and thus be covered by the

safe harbor on that basis). The conclusion that the alleged initial transfers were made in

connection with a securities contract does not change even if the initial transferee, Sentry,

allegedly knew of Madoff's fraud.[14]

*First*, even if Sentry's alleged knowledge that BLMIS was not actually trading securities

meant that Sentry could have known there was no actual "securities contract" between BLMIS

and Sentry, that would not preclude the straightforward application of Section 546(e) as being

"in connection with" Sentry's agreement with its investors. In *Cohmad*, Judge Rakoff agreed

that securities contracts other than the initial transferee's securities contract with BLMIS could

independently satisfy Section 546(e)'s requirement that the initial transfer be in connection with

a securities contract. *See* 2013 WL 1609154, at *8-9. Judge Rakoff ruled that so long as the

initial transferee withdrew funds from BLMIS to make a payment under a securities contract

between the initial transferee and a subsequent transferee, then the withdrawal from BLMIS

would be a transfer made in connection with a securities contract—namely, the contract between

---

[14]    In *Fairfield Investment Fund Ltd.*, this Court accepted that Sentry's knowledge had been
adequately pleaded in a later version of the *Fairfield* complaint than the one that was
incorporated by reference into the instant Complaint. *See Fairfield Inv. Fund* 2021 WL
3477479, at *4-5 (citing Second Amended Complaint, No. 09-1239, ECF 286). QSF reserves for
a later stage of this action or appeal all arguments that the Trustee has not adequately pleaded
Sentry's actual knowledge of Madoff's fraud either in Second Amended Complaint or the earlier
pleadings in *Fairfield Investment Fund* and/or that Sentry did not in fact have such actual
knowledge.

the initial transferee and the subsequent transferee—and would not be avoidable on a subsequent

transferee claim:

> Take, for example, a hypothetical situation in which the Trustee alleges that a
> withdrawal of funds by an investment fund from its Madoff Securities customer
> account occurred because an investor in that fund sought redemption of its
> investment under the terms of its investment contract.  Assuming that either the
> investment fund or the investor qualifies as a financial institution or financial
> participant, and barring other circumstances that may appear on the facts of a
> given case, that situation appears to fit within the plain terms of Section 546(e):
> an initial transfer that was "made by or to (or for the benefit of) a . . . financial
> institution [or] financial participant . . . in connection with a securities contract."

*Id*. at *9 (footnote omitted).[15]  The logic of Judge Rakoff's hypothetical applies directly here,

where the investment fund was Sentry (which was a financial institution as shown above) and the

alleged investor was QSF.

     *Second*, no facts in the Complaint suggest that QSF had actual knowledge of Madoff's

fraud.[16]  And "actual knowledge," *id*. at *1—not "mere suspicion," *id*. at *3, or inquiry notice—

is what Judge Rakoff repeatedly stated was necessary to defeat the safe harbor.  *See, e.g., id*. at

*4 ("the Trustee must show, at a minimum, that the transferee had actual knowledge that there

were no actual securities transactions being conducted"); *id*. at *1, 3, 6, 7, 10.  Similarly, there is

---

[15]    Judge Rakoff also observed that "[t]o the extent that, for example, an initial transfer from
Madoff [S]ecurities to an investment fund customer and the subsequent transfer from the
investment fund to its redeeming investors may together comprise a 'settlement payment' under
*Enron* [*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011)], that
transfer may fall within the purview of Section 546(e), assuming it meets the statute's other
requirements." *Cohmad*, 2013 WL 1609154, at *9 n.5.

[16]    This case is unlike *Fairfield Investment Fund*, in which this Court found that the allegations
against most of the subsequent transferee defendants in that case were sufficient to allege they
actually knew about Madoff's fraud.  *See* 2021 WL 3477479, at *5-6.  Furthermore, many of the
subsequent transfers in that case were not in connection with securities contracts, but rather
management contracts.  (*See, e.g.*, Lynch Decl. Ex. 2, Fairfield Am. Compl. ¶ 138 (Fairfield
Greenwich Limited received $3,844,000 in management fees and $83,591,000 in performance
fees from Sentry in 2002); Lynch Decl. Ex. 4, Fairfield Second Am. Compl. Ex. 12 (ECF
286-12), at 5 (showing these same amounts as subsequent transfers from Sentry).)

no suggestion that QSF actually knew of any fraud at Sentry.  Because any initial transfer was made in connection with the securities contract between Sentry and QSF and QSF is not alleged to have had actual knowledge of the Madoff fraud, the Court can and should, on those grounds alone, dismiss the Trustee's claims that are subject to the Section 546(e) safe harbor.

*Finally*, Section 546(e) also applies here for a separate and independently sufficient reason.  While this Court and the District Court have previously ruled that Section 546(e) cannot be invoked by a transferee with actual knowledge of Madoff's fraud, and while, for the reasons discussed above, this Court does not need to reject that ruling in order to give QSF the benefit of the safe harbor, nothing in Section 546(e) supports making its applicability turn on the knowledge of the transferee, as opposed to the debtor-transferor.[17]  Section 546(e) provides for only one exception to the safe harbor: namely, for a claim under Section 548(a)(1)(A), which requires the Trustee to allege and prove intentional fraud by the *transferor*.  *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181 (2d Cir. 2021) ("Voidability under § 548(a)(1)(A) focuses on the fraudulent intent of the debtor-transferor."), *cert. denied*, 142 S. Ct. 1209 (2022); *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant").  Nor does transferee knowledge play any role in the definitions of "settlement payment," 11 U.S.C. § 741(8), or "securities contract," *id.* § 741(7).

---

[17]   This is an open question at the Circuit level, and QSF expressly preserves it.  Although the Second Circuit in *Fishman* noted that the defendants there had "every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions," 773 F.3d at 420, it did not state that the result would have been different had that not been the case.

To hold that transferee knowledge defeats the safe harbor is thus inconsistent with Section 546(e)'s language. Where the Code creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional exceptions even when doing so is motivated by a party's alleged wrongdoing. *See Law v. Siegel*, 571 U.S. 415, 424-25 (2014). The courts must, instead, adhere to "the plain meaning of the language" of the statute. *Merit Mgmt. Grp., LP v. FTI Consulting Inc.*, 138 S. Ct. 883, 897 (2018). Considering the Second Circuit's admonitions in *Fishman* that, in enacting Section 546(e) and its single exception for claims under Section 548(a)(1)(A), Congress struck a balance favoring the securities markets' interest in finality over creditors' interests in recovery and that the courts "are obliged to respect the balance Congress struck among these complex competing considerations," 773 F.3d at 423, the safe harbor should apply here according to its plain language.

### C.    All of the Trustee's Claims Against QSF Are Covered by the Section 546(e) Safe Harbor.

All alleged subsequent transfers from Sentry to QSF in the Trustee's Complaint are covered by Section 546(e) and should be dismissed. Twenty-nine of the thirty-one transfers the Trustee claims a right to recover from QSF predate the two-year lookback period of the Section 548(a)(1)(A) exception to the Section 546(e) safe harbor. (Compl., Ex. D.) For the other two alleged transfers—which the Trustee identifies as having occurred in January and March 2007, (Compl., Ex. D)—the Trustee identifies no preceding initial transfer from BLMIS to Sentry within the two year lookback. Accordingly, all thirty-one of the alleged subsequent transfers to QSF are covered by the Section 546(e) safe harbor and should be dismissed.

-15-

## II.    The Trustee's Complaint Fails to Plead That Alleged Transfers to QSF Were BLMIS Customer Property.

### A.    The Trustee Has Not Plausibly Alleged That Claimed Subsequent Transfers to QSF Were BLMIS Customer Property.

The Federal Rules of Civil Procedure do not permit speculative and conclusory pleading. To survive a motion to dismiss, a claim must not merely be possible, but must be "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007).

To sustain claims against QSF, the Trustee must plausibly allege that redemption payments QSF received from Sentry were subsequent transfers of BLMIS customer property that had been fraudulently transferred from BLMIS. *See* 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11"). To state claims under 11 U.S.C. § 550, the Trustee must allege not just that the initial transfers are avoidable, but that the initial transfers (or subsequent transfers of the initial transfers) were transferred to QSF as the subsequent transferee. *In re Bernard L. Madoff Inv. Sec. LLC*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) ("*Shapiro*").[18]  Each alleged subsequent transfer is itself a separate claim, *see BLMIS v. BNP Paribas S.A.*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (citation omitted)), and so the Trustee's Complaint must contain factual assertions from which the Court could conclude that the Trustee has stated a claim for each alleged subsequent transfer. The Trustee has not attempted to make that kind of showing.

---

[18]    Under the New York Debtor and Creditor Law, "as to claims of both actual and constructive fraud, New York law permits money damages to be recovered only against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 309 (S.D.N.Y. 2005) (emphasis, citation, and internal quotation marks omitted).

In the context of claims to set aside subsequent transfers under SIPA, this Court has held that "barebones" allegations—such as the Trustee's allegations here—that customer funds were transferred to the subsequent transferee do not suffice:

> The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds.  At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

*Shapiro*, 542 B.R. at 119.  In *Shapiro*, the Court dismissed as conclusory a subsequent transferee claim, noting that the complaint "does not tie any initial transfer to any subsequent transfer or Subsequent Transferee."  *Id.*

As in *Shapiro*, the Trustee's claims against QSF fail to plead the "necessary vital statistics."  The Trustee's allegations are merely that, during the six years before the Madoff bankruptcy, BLMIS transferred approximately $3 billion to Sentry, and that a portion of those transfers "was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant [QSF]."  (Compl. ¶¶ 35, 41, 44.)  The Trustee does nothing to tie alleged initial transfers to alleged subsequent transfers, and that defect is not cured by the attachment of a 75 page exhibit purporting to list thousands of alleged transactions from Sentry's accounts at BLMIS, (*id.* Ex. C), and a one page exhibit that lists alleged subsequent transfers from Sentry to QSF, (*id.* at Ex. D).  To the contrary, the Trustee declines to identify which, if any, of the transactions between BLMIS and Sentry among 75 pages of transactions constitute initial transfers of BLMIS customer property that were allegedly subsequently transferred to QSF. Essentially, the Trustee is asking the Court to assume that, because BLMIS transferred large amounts of money to Sentry, any funds Sentry transferred to QSF must have originated with BLMIS and can be recovered.

Not only do the Trustee's "barebones allegations" fail to plead the "necessary vital statistics," but they are both facially implausible and mathematically impossible. For instance, the Trustee alleges that BLMIS transferred approximately $3 billion to Sentry. (Compl. ¶ 35.) At the same time, the Trustee purports to identify more than $4 billion of alleged subsequent transfers of customer property in the form of redemption payments made to scores of entities who redeemed from Sentry, including Sigma and Lambda. (*See* Lynch Decl. ¶¶ 10, 12 and Exs. 5, 6.) Additionally, the Trustee seeks to recover, again as alleged subsequent transfers of customer property from Sentry, another more than $1 billion allegedly paid by Sentry to other Fairfield affiliates. (*See* Lynch Decl. ¶ 11 and Ex. 4.) In other words, the Trustee is endeavoring to recover, all as alleged subsequent transfers from Sentry, approximately $2 billion more than the total amount that the Trustee himself alleges that BLMIS transferred to Sentry. The Trustee's theory that all of the redemption payments from Sentry are comprised of BLMIS customer property is not merely implausible, it not possible.

The reason that the amount BLMIS transferred to Sentry is at least $2 billion lower than the amount Sentry distributed is because transfers from BLMIS were not Sentry's sole source of money for redemptions and other payments. The Trustee himself pleads that Sentry also continuously received funds not just from BLMIS, but from investor subscriptions. (*See, e.g.*, Compl. ¶ 6 (alleging that QSF wired funds to Sentry for subscriptions).) Dozens of complaints before this Court contain similar allegations against other defendants. The transaction details the Trustee has provided to this Court in his numerous complaints—alleging that Sentry paid out

more than it received from BLMIS—lead to the inescapable conclusion that Sentry paid

redemptions to its investors with money that could not possibly have originated with BLMIS.[19]

The Trustee's pleadings demonstrate their own implausibility because the Trustee's

allegations show that at least approximately $2 billion in funds that he seeks to "recover" cannot

be customer property under 15 U.S.C. § 78fff-2(c)(3).  There is nothing in SIPA that authorizes

the Trustee to recover funds that were not customer property and never belonged to BLMIS.

The Trustee's failure to allege the "necessary vital statistics" of the transfers he seeks to

put at issue is particularly inexcusable here, where the Trustee possesses all the records relevant

to establishing whether, and to what extent, any alleged transfers to QSF could contain customer

property.  The Trustee sued and settled with the Liquidators of Sentry, who in 2011 stipulated to

the entry of a judgment in favor of the BLMIS Estate (in the amount of approximately $3

billion).[20]  (*See* Fairfield Settlement Agreement (Lynch Decl. Ex. 3), ¶ 1; Compl. ¶ 39.)  Pursuant

to that settlement, the Trustee has had access to Sentry's records for over a decade.  (*See id.* ¶ 14

(Trustee and Fairfield Liquidators "each agree to provide reasonable access to the other's

documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing

Claims.").)  Moreover, the Fairfield Liquidators "agree[d] to provide reasonable cooperation and

assistance" to the Trustee "in connection with the prosecution of the Sharing Claims."  (*Id.* ¶ 14.)

---

[19]  Sentry has admitted that fact in proceedings before this Court.  (*See* First Am. Compl.
¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-01122 (Bankr. S.D.N.Y.
Nov. 26, 2019) (admitting that Sentry, "[f]rom time to time, to make Redemption Payments,
Sentry . . . utilized subscription monies of other investors on hand that were directed for
investment in BLMIS.").)

[20]  This Court approved the Fairfield Settlement Agreement on June 7, 2011, and it was
incorporated into the Consent Judgment entered against Sentry on July 13, 2011.  *See Picard v.
Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. June 7, 2011) ECF 109, ¶ 2.

This case is unlike *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin*"), where this Court granted the Trustee "greater latitude" in pleading where—having "specifie[d] numerous inter-defendant transfers" showing that "defendants commingled their assets, transferring their funds into and out of each other's accounts"—the Trustee faced special "difficulties" because "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." *See Merkin*, 515 B.R. at 150-51. No such latitude is warranted here. The Trustee alleges no inter-defendant transfers and has had for more than a decade access to the data needed to allege whether a claimed subsequent transfer contains customer property and any initial transfer from which an alleged transfer originates. The Trustee has not alleged those facts here because doing so would reveal that the Trustee is pursuing billions of dollars to which, as a matter of simple math, there is no entitlement. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 722 (2d Cir. 2013) (affirming dismissal and finding that "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing claim where plaintiffs failed to plead necessary facts that were "uniquely in [p]laintiffs' possession").

The Complaint's pleading failure not only threatens to impose substantial and unjustified litigation costs on QSF, it fails to provide QSF with fair notice of any legitimate claim against it. This failure deprives QSF of the ability to evaluate any such claim for purposes of defense and settlement, in violation of Rule 8(a). *See Twombly*, 550 U.S. at 555 (Fed. R. Civ. P. 8(a)(2) requires that the plaintiff "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests") (citation omitted); *see also Verhagen v. Saperstein,* 1994 WL 330055, at *2

(S.D.N.Y. July 11, 1994) (Rule 8(a) requires pleader to provide adverse party with fair notice of

the claim "in order to answer and prepare a defense").  This pleading deficiency is not just on

some trivial matter; given the lack of "necessary vital statistics" contained in the pleading here,

QSF cannot determine what the Trustee claims to be customer property, let alone whether such

claims might be colorable.

> **B.    The Trustee's Complaint Seeks to Recover Alleged Transfers from Sentry
> to QSF When the Trustee Alleges There Was No Money Left From BLMIS.**

The implausibility of the Trustee's subsequent transferee claims against QSF is further

demonstrated by the extent to which the Trustee's Complaint repeatedly seeks to recover alleged

transfers from Sentry to QSF during time periods when—according to the Trustee's own

pleadings—amounts Sentry previously transferred as alleged subsequent transfers of BLMIS

customer property exceeded the amounts BLMIS allegedly initially transferred to Sentry.

For example, the Trustee alleges that in the period from December 11, 2002 (*i.e.*, six

years preceding the filing of the petition) through March 31, 2005, BLMIS transferred a total of

$120 million to Sentry in three individual transfers made on May 9, 2003, July 11, 2003, and

July 22, 2003.[21]  The Trustee further alleges that from the time of that first BLMIS transfer on

May 9, 2003, through October 31, 2003, Sentry transferred more than $263 million to redeeming

shareholders (including Sigma and Lambda) and other Fairfield affiliates.  (*See* Lynch Decl. Exs.

¶ 13.)  So when the Trustee alleges that QSF received fifteen redemption payments from Sentry

between November 19, 2003 and January 14, 2005 totaling $10,464,030,[22] those redemption

---

[21]   The Trustee alleges transfers from BLMIS to Sentry in amounts of: $40 million on
May 9, 2003; $55 million on July 11, 2003; and $25 million on July 22, 2003.
(*See* Compl. ¶¶ 10, 19 and Ex. C (pages 19 and 20 of 75, "CHECK WIRE" entries).)

[22]   The Trustee alleges that Sentry transferred to QSF: $578,080 on Nov. 19, 2003; $1,374,582
on Dec. 18, 2004; $4,972,375 on Jan. 21, 2004 (in four payments); $114,013 on Feb. 18, 2004;
$414,182 on Apr. 21, 2004; $213,847 on May 27, 2004; $296,957 on June 17, 2004; $1,260,875

payments are not plausibly BLMIS customer property because amounts the Trustee alleges

Sentry subsequently transferred before October 31, 2003 had already exhausted amounts Sentry

allegedly received from BLMIS.[23]    The fact that alleged payments from Sentry to QSF that the

Trustee claims a right to recover would have occurred between four and seventeen months after

Sentry's last receipt of funds from BLMIS underscores the implausibility of those redemption

payments containing BLMIS customer property.  *Cf. Merkin*, 515 B.R., at 150-51 (inferring a

link where alleged "subsequent transfers took place contemporaneously or shortly after an initial

transfer").

The implausibility of the Trustee's claims is similarly and separately shown by its claims

to recover two other alleged transfers from Sentry to QSF, in January and March 2007, totaling

$17,570,536.[24]  The closest preceding transfer from BLMIS to Sentry that the Trustee alleges

was a $120 million transfer on April 13, 2006,[25] nine and eleven months before the alleged

transfers from Sentry to QSF in January and March 2007.  Between that April 13, 2006 alleged

transfer from BLMIS to Sentry and the alleged January 16, 2007 transfer from Sentry to QSF,

the Trustee elsewhere claims that Sentry transferred more than $340 million to redeeming Sentry

shareholders, including Sigma and Lambda, and other Fairfield affiliates.  (*See* Lynch

Decl. ¶ 14.)  Accounting for the two additional months before the alleged March 16, 2007

---

on July 16, 2004; $293,383 on Nov. 16, 2004; $153,477 on Dec. 13, 2004; and $792,309 on
Jan. 14, 2005 (in two payments).  (Compl. Ex. D.)

[23]    Specifically, the Trustee alleges that: the $40 million BLMIS transferred to Sentry
on May 9, 2003 was subsequently transferred by May 14, 2003; the $55 million BLMIS
transferred to Sentry on July 11, 2003 was subsequently transferred by July 16, 2003; and
the $25 million BLMIS transferred to Sentry on July 22, 2003 was subsequently transferred
by September 17, 2003.  (*See* Lynch Decl. ¶ 13.)

[24]    The Trustee alleges that Sentry transferred to QSF: $1,296,425 on Jan. 16, 2007 and
$16,274,111 on Mar. 16, 2007.  (Compl. Ex. D.)

[25]    *See* Compl. Ex. C page 25 of 75 ("CHECK WIRE" entry).

transfer to QSF, the Trustee alleges subsequent transfers after April 13, 2006 totaling more than $430 million.  (*See* Lynch Decl. ¶ 14.)[26]

The Trustee's claims that alleged transfers from Sentry to QSF in January and March 2007 were subsequent transfers of customer property initially transferred from BLMIS to Sentry are not plausible.  Those transfers were made nine and eleven months after the last prior BLMIS-to-Sentry transfer and from the feeder fund the Trustee alleges transferred hundreds of millions in redemptions and other payments during that period before either of the alleged January and March 2007 transfers to QSF.  It is not plausible that somehow the funds that Sentry received in April 2006 or earlier were used to pay redemptions to QSF in January and March 2007.  *See Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.*, 2020 WL 6323462, at *4–5 (S.D.N.Y. Oct. 28, 2020) (where there is an "obvious alternative explanation . . . that explanation renders [plaintiff]'s competing explanation 'conceivable [but not] plausible'").

Because the Trustee's pleadings show that transfers the Trustee seeks to recover from QSF could not have been subsequent transfers of initial transfers from BLMIS to Sentry, and because the Complaint does nothing to attempt to tie any initial transfer from BLMIS to Sentry with any alleged payment made by Sentry to QSF, the Complaint does not plausibly allege that transfers from Sentry to QSF were subsequently transferred BLMIS customer property.  Even if

---

[26]    The implausibility of the Trustee's contentions is even greater considering that the Trustee also claims that Sentry transferred $910 million to BLMIS between April 13, 2006 and January 16, 2007, plus $175 million more before March 16, 2007.  Specifically, the Trustee identifies the following transfers from Sentry to BLMIS between April 14, 2006 and January 16, 2007: $160 million on August 4, 2006; $150 million on September 6, 2006; $100 million on October 6, 2006; and $500 million on January 4, 2007.  (*See* Compl. Ex. C pages 26, 27, 58, and 59 of 75 ("CHECK WIRE" entries in the "Cash Deposits" column).)  The Trustee identifies another $175 million from Sentry to BLMIS on February 12, 2007.  (*See* Compl. Ex. C page 28 of 75 ("CHECK WIRE" entry in the "Cash Deposits" column).)

the Trustee, who has Sentry's records and cooperation, were entitled to avail himself of liberal

pleading rules designed for plaintiffs without access to such records, such allegations should be

dismissed.  *See Kennedy v. Mondelez Glob. LLC,* 2020 WL 4006197, at *9 (E.D.N.Y. July 10,

2020) ("where the allegations of a complaint are materially inconsistent with the evidence a

plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims

lack the facial plausibility necessary to survive a motion to dismiss.").

III.    **The Complaint Does Not Contain a "Short and Plain Statement of the Claim,"
        Including Any Alleged Avoidability of Initial Transfers.**

         In addition to its other deficiencies, the Trustee's Complaint fails to contain "a short and

plain statement of the claim showing that the pleader is entitled to relief" as Federal Rule of Civil

Procedure 8(a)(2) requires.  Specifically, although the Trustee has had years to amend the

pleading to provide QSF with sufficient notice of the claims it faces, the Trustee still relies on

the incorporation by reference of a separate complaint filed in another proceeding.  (See Compl.

¶ 34 ("The Trustee incorporates by reference the allegations contained in the [Trustee's Fairfield

Amended Complaint] as if fully set forth herein.").  That pleading is 217 pages and 798

paragraphs long (not including exhibits), and it contains scores of allegations against parties

other than Sentry that are unrelated to this proceeding.  (*See* Lynch Decl. Ex. 2.)

         The complaint the Trustee purports to incorporate into his pleading against QSF has also

since been superseded by a further amended complaint.  Thus, the Trustee continues to rely upon

allegations that have since been mooted, in violation of Rule 8(a)(2)'s direction that a plaintiff

provide a "short and plain statement" of facts sufficient to demonstrate the alleged claim for

relief.  *U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 462-63 and 463 n.72 (E.D.N.Y.

2007) (noting that "if all of the allegations in the prior pleadings are deemed to be incorporated

into the [Complaint], then the [Complaint] would become an unintelligible morass of self-

contradictory allegations" and "would in itself be grounds for dismissing the [Complaint pursuant] to Rules 12(b)(6) and 8(a)(2).")

The Trustee's purported incorporation by reference for this proceeding of the superseded pleading from the *Fairfield Sentry Ltd.* case appears to be an attempt to plead the avoidability of initial transfers from BLMIS to Sentry. To state a subsequent transfer claim against QSF, of course, the Trustee must plead and eventually prove, among other things, that the initial transfer was avoided or at least avoidable. 11 U.S.C. § 550(a); *Cohmad*, 2013 WL 1609154, at *7 ("In order to recover a fraudulent or preferential transfer of debtor property from a subsequent transferee, the Trustee mush first show that the initial transfer of that property by the debtor is subject to avoidance under one of the Bankruptcy Code's avoidance provisions." (citation omitted)); *Shapiro*, 542 B.R. at 119. The Trustee's Complaint against QSF, however, does not allege facts to support a conclusion that any initial transfer was avoided or avoidable beyond conclusory references to the *Fairfield Sentry Ltd.* action, which was settled and never litigated. (Compl. ¶¶ 34-39.) Such vague and blanket references to the pleading from another proceeding are not the "short and plain" statement of a claim required by the Federal Rules of Civil Procedure, and they do not give QSF fair notice of the facts the Trustee would claim support its contentions regarding the avoidability of any alleged initial transfers relevant to QSF.

For these reasons, the Trustee's Complaint against QSF should also be dismissed for its failure to comply with Rule 8(a) and paragraph 34 should be stricken pursuant to Rule 12(f). *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, *see* Fed. R. Civ. P. 12(f), or to dismiss the complaint."); *In re Merrill Lynch & Co., Inc. Rsch.*

*Reps. Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003) (striking, under Rule 12(f), references in the

operative complaint to complaints the court deemed irrelevant and contrary to Rule 8(a)).

## IV.    The Complaint Does Not Allege Facts to Establish Personal Jurisdiction Over QSF.

The Trustee's Complaint should also be dismissed for its failure to allege facts sufficient

to support personal jurisdiction over QSF.[27]  As jurisdictional allegations, the Trustee claims:

> Defendant [QSF] is subject to personal jurisdiction in this judicial district because
> it purposely availed itself of the laws and protections of the United States and the
> state of New York by, among other things, knowingly directing funds to be
> invested with New York-based BLMIS through Fairfield Sentry.  Defendant
> [QSF] knowingly received transfers of Customer Property from BLMIS.  The
> Trustee's investigation to date reveals that Defendant [QSF] obtained this
> Customer Property by withdrawing money from Fairfield Sentry, a Fairfield
> Greenwich Group ("FGG") managed Madoff feeder fund.  By directing its
> investment through FGG, Defendant [QSF] knowingly accepted the rights,
> benefits, and privileges of conducting business and/or transactions in the United
> States and New York.  Upon information and belief, Defendant [QSF] entered
> into a subscription agreement with Fairfield Sentry under which it submitted to
> New York jurisdiction, sent a copy of the subscription agreement to FGG's
> New York City office, wired funds to Fairfield Sentry through a bank in New
> York, and regularly communicated by email and telephone with its Fairfield
> Sentry account representatives located in the United States.  Defendant [QSF]
> thus derived significant revenue from New York and maintained minimum
> contacts and/or general business contacts with the United States and New York in
> connection with the claims alleged herein.

(Compl. ¶ 6.)  The Trustee recognizes QSF to be an entity registered in the British Virgin

Islands, (Compl. ¶ 21), and does not claim it maintains a presence in the United States.

A bankruptcy court may exercise personal jurisdiction over a defendant in a proceeding

arising in or related to a case under the Bankruptcy Code only if such exercise would be

---

[27]    The Court has discretion to resolve QSF's other arguments without reaching the
jurisdictional issue based on the existence of other subsequent transferee cases pending before
the Court presenting the same issues without jurisdictional challenges.  *See Ctr. For Reprod.
Law & Policy v. Bush*, 304 F.3d 183, 194 (2d Cir. 2002) (allowing courts to assume jurisdiction
"in those particular circumstances where the outcome on the merits has been foreordained by
another case such that the jurisdictional question could have no effect on the outcome") (internal
quotation omitted).

consistent with due process.[28]  *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC),* 440

B.R. 274, 278 (Bankr. S.D.N.Y. 2010).  Due process requires allegations "(1) that a defendant

has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is

reasonable in the circumstances."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018)

(citation omitted).  Minimum contacts sufficient to support specific jurisdiction focus on "the

relationship among the defendant, the forum, and the litigation," *Shaffer v. Heitner*, 433 U.S.

186, 204 (1977), and a relationship that "must arise out of contacts that the defendant himself

creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

The Trustee does not plead that the Court has general jurisdiction over QSF and bears the

burden of establishing jurisdiction over QSF, *Waldman v. Palestine Liberation Org.*, 835 F.3d

317, 334 (2d Cir. 2016), with facts supporting a finding of specific personal jurisdiction, *Palnik*

*v. Westlake Entm't, Inc.,* 344 Fed. App'x 249, 251–52 (6th Cir. 2009) (citing *Twombly,* 550 U.S.

567), based on contacts directly related to the action, *see Ford Motor Co. v. Montana Eighth Jud.*

*Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) ("The plaintiff 's claims . . . must arise out of or relate to

the defendant's contacts with the forum.").  Moreover, each subsequent transfer is a separate

claim and so the Trustee must establish the Court's jurisdiction over QSF for each individual

---

[28]    As a statutory basis for personal jurisdiction, the Trustee invokes CPLR § 302 and
Bankruptcy Rule 7004.  (Compl. ¶ 7.)  In an action such as this, CPLR § 302(a) provides
personal jurisdiction over an out-of-state defendant only if: (i) the defendant "transacts any
business within the State" of New York and (ii) the plaintiff's claim "arises from" such business
activity.  CPLR § 302(a)(1).  According to the New York Court of Appeals, the two prongs of
CPLR § 302(a)(1) overlap with the first two requirements of the due process test.  *See, e.g., Best
Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-49 (2d Cir. 2007) (examining New York Court of
Appeals cases).  Similarly, Bankruptcy Rule 7004(f) provides for personal jurisdiction in an
adversary proceeding, upon service of process in accordance with Fed. R. Civ. P. 4, if "the
exercise of jurisdiction is consistent with the Constitution and laws of the United States."
Thus, under either CPLR § 302(a)(1) or Bankruptcy Rule 7004(f), the statutory analysis closely
follows the constitutional analysis.

transfer it seeks to recover. *BLMIS v. BNP Paribas S.A.*, 594 B.R. at 190. The alleged contacts the Trustee alleges, however, fail to meet those standards and do not show purposeful availment by QSF or substantial connections to the Trustee's claim to recover alleged redemption payments from Sentry to QSF. The Trustee's jurisdictional allegations are therefore insufficient.

The Trustee alleges that QSF subjected itself to personal jurisdiction by knowingly directing funds to be invested with New York based BLMIS through Fairfield Sentry. (Compl. ¶ 6.) Personal jurisdiction, however, is not measured by third-party contacts, but on contacts "the Defendant himself creates," *Waldman*, 835 F.3d at 335, and anticipated performance in New York by another person does not show purposeful availment. Even when a foreign defendant contracts directly with a forum resident, that alone is insufficient. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[T]he unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.")

Federal and state courts in New York have refused to find specific jurisdiction over a nonresident defendant based on allegations that the defendant contracted even with a New York plaintiff that performed or was expected to perform under the contract in New York.[29] As the

---

[29]    *See, e.g., Roper Starch Worldwide, Inc. v. Reymer & Assocs.*, 2 F. Supp. 2d 470, 474 (S.D.N.Y. 1998) (defendant's "knowledge of, and acquiescence in," New York plaintiff's performance in New York of services under the parties' contract did not suffice to establish personal jurisdiction over nonresident corporation); *Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*, 648 F. Supp. 1153, 1157 (S.D.N.Y. 1986) (fact that New York plaintiff performed its services under the parties' contract entirely in New York did not render California defendant subject to personal jurisdiction).

New York Court of Appeals has explained, "[t]he mere receipt by a nonresident of benefit or profit from a contract performed by others in New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under our longarm statute." *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 285 (1970) (citation omitted). Thus, whether QSF hoped to profit from BLMIS's purported trading activities in New York by investing in Sentry does nothing to establish that QSF purposefully availed itself of the benefits of New York law.[30]

Here, QSF is alleged to be an investor in Sentry, and there is no allegation that QSF was expected to perform obligation in New York or elsewhere in the United States. These are not the type of contacts sufficient to support specific jurisdiction.

The Trustee also asserts that personal jurisdiction exists because QSF is alleged to have knowingly received subsequent transfers of BLMIS customer property by redeeming its interests in Sentry. (Compl. ¶ 6.) Even if the redemption payments QSF received originated with BLMIS in New York, that would not qualify as a purposeful contact by QSF. As a mere investor in Sentry, QSF would not have had authority or reason to send funds to or receive funds from BLMIS. Only Sentry would have done so, and its contacts are not attributable to QSF.[31]

---

[30] *See Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 288 (E.D.N.Y. 2005) ("Even though the Plaintiff may have expended time, energy and resources in New York . . . carrying out [its] obligations under the alleged contract, the Plaintiff's business interactions with New York are not at issue when assessing personal jurisdiction. Rather, the Court must evaluate the Defendants' activities and conduct" in New York."); *Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995) ("contention that the majority of [plaintiff]'s performance under the contract would occur in New York" did not establish jurisdiction, because "appropriate focus . . . is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did") (citations omitted), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

[31] The fact that QSF was an investor or shareholder in Sentry does not change the analysis. The jurisdictional contacts of a corporation generally are not attributed to an investor absent exceptional circumstances not present here. *See, e.g.*, *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 283 (1970) ("The mere fact that respondent is a controlling shareholder in . . . a corporation concededly doing business in New York . . . , will not subject respondent . . . to in personam jurisdiction . . . unless the record would justify our piercing the corporate veil.").

The facts alleged by the Trustee in this case that are even more tenuous than those in *Hau Yin To*, where foreign investors in Madoff feeder funds brought suit in New York against various foreign HSBC affiliates that acted as administrator, custodian, or payee bank for the feeder funds. The plaintiffs argued that personal jurisdiction was established over the defendants in New York because they had "directed and transferred hundreds of millions of dollars to and from BLMIS New York" and "received and facilitated the transfer of Madoff's criminal proceeds out of BLMIS in New York for the benefit of certain Feeder Funds, and vice versa from the Feeder Funds to BLMIS." 2017 WL 816136, at *2. But the District Court held that these allegations failed to establish that the defendants had "purposefully avail[ed] [themselves] of the privilege of conducting activities within [New York]." *Id*. at *5. As the District Court explained, "a foreign defendant's communications with a party in New York or sending of monies into New York are not sufficient to establish personal jurisdiction" if the "communications with and payments to New York were made merely to ensure compliance with contract terms negotiated and executed outside of New York." *Id*. Because the plaintiffs did not allege the defendants' agreements with BLMIS or the funds were negotiated or executed in New York, the fact that "the Foreign Defendants have communicated with and transmitted information and funds to and from BLMIS located in New York, in connection with their fund administration and/or custodial duties under agreements negotiated with BLMIS" were only "incidental consequences of fulfilling a foreign contract" and would not be adequate to establish personal jurisdiction. *Id*. at *6 (citations omitted). On appeal, the Second Circuit affirmed. The same result should hold here, where the allegations are even less substantial than those in the *Hau Yin To* case, which involved transfers "to and from" BLMIS itself, rather than merely transfers to a feeder fund.

The Trustee also alleges that QSF wired funds to Sentry through a bank in New York. (Compl. ¶ 6.)  Allegations of this sort—which are purely mechanical in nature—do not establish requirements for specific jurisdiction where even maintenance of U.S. bank accounts and receipt of funds through such accounts are insufficient to establish personal jurisdiction.  *In re Sledziejoinwski,* 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016); *Leema Enters., Inc. v. Willi,* 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983); *see also Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (fact that contract required payments to New York bank account did not establish specific jurisdiction).  Any use by QSF of New York banks would have been incidental to a foreign investment contract performed abroad and do not create the minimum contacts necessary to exercise specific jurisdiction.  *See To v. HSBC Holdings PLC*, 2017 WL 816136, at *6–7 (S.D.N.Y. Mar. 1, 2017) (contact with U.S. banking system pursuant to foreign feeder fund service contracts does not support jurisdiction); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y. 2016) (same).

The Trustee alleges that QSF communicated with FGG representatives in the United States by telephone and email, (Compl. ¶ 6), but such conduct does not establish jurisdiction. *See, e.g.*, *SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170-71 (S.D.N.Y. 2015) (no personal jurisdiction where defendants had only "sporadic or indirect contacts with the United States"), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 380, 382 (1967) (fact that Illinois corporation's representatives traveled to New York and conferred with plaintiff over contract dispute did not rise to purposeful availment).  Nor does the Trustee identify how his alleged subsequent transfer claims arise out of or relate to these alleged communications into New York.

The Trustee alleges that QSF sent a copy of a subscription agreement to FGG's New York office, (Compl. ¶ 6), but this too does not show purposeful availment. *See Kimco Exch. Place Corp. v. Thomas Benz, Inc.,* 34 A.D.3d 433, 434 (2d Dep't 2006) ("The defendants' acts of faxing the executed contracts to New York . . . do not qualify as purposeful acts constituting the transacting of business."). Nor does the Trustee's claim "arise out of or relate to" QSF allegedly sending a copy of a subscription agreement to New York, which is the relevant test for personal jurisdiction. *See Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, 2020 WL 5503557, at *5 (S.D.N.Y. Sept. 10, 2020) (various contacts with New York insufficient to confer personal jurisdiction under Section 302(a)(1) where none gave rise to plaintiff's cause of action); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 n.4 (2016) (to establish jurisdiction, the cause of action must arise from the very transactions that are relied upon to provide the contact with the forum).

The Trustee also alleges that the QSF subscription agreement with Sentry included a New York choice law clause and a contractual consent to the exercise of personal jurisdiction by the New York courts. Even if that were true, controlling precedent forecloses any argument that such a clause would support personal jurisdiction here. In *Migani*, the Privy Council held that the subscription agreement does not govern redemptions from Sentry; instead, the redemptions are governed by Sentry's Articles of Association and BVI law. *See Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶¶ 10, 17, 20. Following *Migani*, this Court previously held that a suit by the Liquidators of Sentry—a party to the subscription agreement—to recover a redemption payment is not a suit "with respect to [the Subscription] Agreement" and therefore not within the scope of its forum selection clause. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),* 2018 WL 3756343, at *11-12 (Bankr. S.D.N.Y. Aug. 6, 2018). So even if

the trustee's allegations regarding the subscription agreement were true, they would not provide

a consent to suit for claims over redemptions by the Trustee. *See Lavazza Premium Coffees

Corp. v. Prime Line Distributors Inc.*, 2021 WL 5909976, at *7 (S.D.N.Y. Dec. 10, 2021)

(rejecting enforcement of forum selection clause for a non-party plaintiff bringing claims outside

of the clause's scope).

## CONCLUSION

For all of the foregoing reasons, the Trustee's Complaint against QSF should be

dismissed in its entirety.

Dated: April 12, 2022
      New York, New York

By: /s/ Thomas E. Lynch
    Thomas E. Lynch
    JONES DAY
    250 Vesey Street
    New York, New York 10281
    Telephone:  (212) 326-3939
    Facsimile:  (212) 755-7306
    Email:  telynch@jonesday.com

    *Attorneys for QS Finance Ltd.*
    *(formerly known as Quilvest Finance Ltd.)*
