# Exhibit 11

No. _____ _____

---

**NOT FOR USE OR DISTRIBUTION IN THE
UNITED STATES OF AMERICA**

---

**PROSPECTUS**

**Relating to an offering of shares of a
par value of US$0.01 each of**

# GROSVENOR PRIVATE RESERVE FUND LIMITED

## SEPTEMBER ●, 1999

## DRAFT #1

Investment Manager:
Grosvenor Asset Management Limited
Grosvenor House
33 Church Street
Hamilton HM 12
Bermuda

**CONFIDENTIAL PROSPECTUS**

# GROSVENOR PRIVATE RESERVE FUND LIMITED

c/o Maven Fund Administration Limited
Suite 203, 12 Church Street
Hamilton, HM 11
Bermuda

Grosvenor Private Reserve Fund Limited (the "Company") is an open-ended mutual fund company of unlimited duration incorporated on •, 1999 under the laws of Bermuda. The primary investment objective of the Company is to provide investors with long term capital returns in excess of returns obtainable from holding bank deposits, while seeking to control overall levels of risk in all market environments. The Company is offering its shares (the "Shares") initially at $100.00 per Share, and thereafter at a price based on net asset value. The minimum initial investment per investor is US$250,000. Subsequent subscriptions are not subject to a minimum provided that the shareholder holds, at the time of subscription, a number of Shares with an aggregate Net Asset Value of not less than US$250,000.

If you are in any doubt about the contents of this document you should consult your stockbroker, bank manager, lawyer, accountant or other professional adviser. The distribution of this prospectus and the offering of Shares in certain jurisdictions may be restricted and accordingly persons into whose possession this document comes are required by the Company to inform themselves about and to observe such restrictions. This document does not constitute an offer or solicitation to anyone in any jurisdiction in which such offer is not authorised or to any person to whom it is unlawful to make such offer or solicitation.

The Shares are offered on the basis of the information and representations contained in this prospectus. Any information given or representations made by any person may not be relied upon as having been authorised by the Company or its directors unless contained in this prospectus. Under no circumstances shall the delivery of this document or the allotment or issue of Shares create any implication that there has been no change in the affairs of the Company since the date hereof.

No listing or other dealing facility is at present being sought for the Shares of the Company, although the directors may consider seeking a listing in the future.

The Company is a "collective investment scheme" within the meaning of the Bermuda Monetary Authority Act 1969. The Bermuda Monetary Authority (the "BMA") has classified the Company as a Bermuda Standard Scheme pursuant to the Bermuda Monetary Authority (Collective Investment Scheme Classification) Regulations 1998 (the "Regulations"). The permission of the BMA has been obtained for the issue of up to 12,000,000 Shares. Approvals or permissions received from the BMA do not constitute a guarantee by the BMA as to the performance of the scheme or creditworthiness of the Company. Furthermore, in giving such approvals or permissions, the BMA shall not be liable for the performance or default of the scheme or for the correctness of any opinions or statements expressed. In addition, a copy of this document has been delivered to the Registrar of Companies in Bermuda for filing pursuant to the Companies Act 1981 of Bermuda. In accepting this document for filing, the Registrar of Companies in Bermuda accepts no responsibility for the

financial soundness of any proposal or for the correctness of any of the statements made or opinions expressed with regard to them.

The Shares have not been registered under any United States ("US") securities laws and, except in a transaction which does not violate US securities laws, may not be directly or indirectly offered or sold in the US, or any of its territories or possessions or areas subject to its jurisdiction, or to or for the benefit of a US person.

The Company is not a recognised collective investment scheme under any United Kingdom financial services laws and, as such, Shares may not be offered or sold in the United Kingdom by means of this document except to persons authorised to carry on investment business under such laws, persons whose ordinary business involves the acquisition or disposal of investments similar to those of the Company and persons otherwise permitted to receive this document under such laws.

To the best of the knowledge and belief of the directors of the Company (who have taken all reasonable care to ensure that such is the case), this document does not contain any untrue statement, or omit anything which would make any statement untrue.

# GROSVENOR PRIVATE RESERVE FUND LIMITED

## SUMMARY OF TERMS

The following is a summary of certain information set forth more fully elsewhere in this prospectus. This summary should be read in conjunction with such detailed information.

| | |
|---|---|
| THE COMPANY: | The Company is a company incorporated in Bermuda on •, 1999 with limited liability and unlimited duration under the provisions of the Companies Act 1981 of Bermuda. |
| INVESTMENT OBJECTIVE: | The primary investment objective of the Company is to provide investors with long term capital returns in excess of returns obtainable from holding bank deposits, while seeking to control overall levels of risk in all market environments. |
| | The Company will invest principally in a mixture of cash investments, fixed income securities and selected sub-managers. This overall strategy is an important factor in controlling the risk of the total portfolio. |
| INVESTMENT STRATEGY: | Research |
| | The Investment Manager has extensive experience in researching and evaluating specialist investment managers and investment styles. The Investment Manager's research is both quantitative and qualitative. While the quantitative aspects of evaluating historic performance are important, significant emphasis is placed upon the qualitative aspects, including an evaluation of management style. The Investment Manager does not rely upon historic measures to determine a sub-managers risk, but makes an assessment of the potential risk, given the sub-manager's style and implementation of the investment strategy. |
| | Selection of Sub-Managers |
| | The Company seeks to achieve its investment objective by allocating its assets to a number of sub-managers selected by the Investment Manager. The sub-managers selected for the Company may adopt a wide range of investment strategies. Some sub-managers may employ an extensive range of financial instruments to achieve attractive returns and also to control risk in all sectors of the international capital markets. The sub-managers, while staying within their stated investment strategy, may use leverage to enhance returns. |

<u>On-Going Management of the Company</u>

The Investment Manager will monitor the portfolio and all of its investments on an on-going basis. The Investment Manager will actively manage allocations to reflect perceived risks associated with the investment environment or factors specific to each sub-manager.

<u>Use of Leverage and Overlays</u>

The Company may, at the discretion of the Investment Manager, employ leverage and/or overlay strategies to enhance returns or control risk. A typical overlay might involve the purchase of exchange-traded call or put index options or similar instruments.

The purchase of an index call option gives the Investment Manager the right to "buy" an index (for example, the Standard & Poor's 100) at a predetermined strike price. If the underlying index moves above the strike price plus the premium paid to buy the call option, the Company would benefit from the additional return.

The purchase of an index put option gives the Investment Manager the right to "sell" an index (for example, the Standard & Poor's 100) at a predetermined strike price. If the underlying index moves below the strike price plus the premium paid to buy the put option, the Company would benefit from the additional return.

In both cases, should the index not move in the way anticipated by the Investment Manager, the Company's potential loss in relation to the options is limited to the premium paid to purchase those options plus any transaction costs.

OFFERING OF SHARES:    After the initial closing, Shares will be offered for sale on the first Business Day of each month or at such other times as the directors may determine. A Business Day is any day on which banks in Bermuda are open for business (a "Business Day"). Shares will be sold at a purchase price per Share equal to the Net Asset Value per Share as at the close of business on the proceeding Business Day. During the initial offer period when Shares are first offered to the public, Shares will be sold at a purchase price of $100.00 per share. Shares will be offered for sale at $100.00 per Share from 9:00 a.m. (Bermuda time) on the date of this prospectus until

5:00 p.m. (Bermuda time) on •, 1999, or such earlier or later time or date as the directors may determine. In the event that subscriptions for • Shares are not received by the Company within 120 days from the date hereof, all monies received shall be returned without interest. After the initial offering, the Net Asset Value per Share will be available from the Administrator on request.

MINIMUM SUBSCRIPTION:

The minimum initial subscription for Shares is US$250,000. Subsequent subscriptions are not subject to a minimum provided that the shareholder holds, at the time of subscription, a number of Shares with an aggregate Net Asset Value of not less than US$250,000. The directors may accept subscriptions for lesser amounts.

REDEMPTION:

Generally, Shares may be redeemed on the first Business Day of each calendar month with 35 days prior written notice (subject to the directors waiving such notice), or at such other times as the directors may determine. Shares will be redeemed at a price per Share equal to the Net Asset Value per Share as at the close of business on the proceeding Business Day. Ninety per cent (90%) of the payment of the redemption price will normally be made within 21 business days following the redemption date of the Shares. Payment of the balance will normally be made no later than 35 days after the redemption date.

In very exceptional circumstances, such as a significant redemption of Shares or delays due to the auditing requirements of either the Company or the sub-managers, payment of the redemption price may be made up to 90 days after the redemption date.

If a request for partial redemption is less than US$50,000 or would result in the shareholder holding a number of Shares having an aggregate Net Asset Value of less than US$250,000, then the Company has the right to refuse to honour such request for partial redemption. In their sole discretion, and according to the circumstances outlined in the section entitled "Compulsory Redemptions" on page •, the directors may at any time redeem all, but not less than all, the Shares of any shareholder.

SUBSCRIPTION PROCEDURE:

Persons interested in subscribing for Shares should complete the application form attached to this prospectus and return the same to the Administrator at the address listed thereon. Payment for Shares may be made by wire transfer or US$ bank draft. A cheque will also be accepted (see application

v

form for details), provided that cleared funds are received on the Business Day before the issue of the Shares.

| | |
|---|---|
| NET ASSET VALUE: | The Net Asset Value per Share will be determined in accordance with the Company's bye-laws. The net asset value ("Net Asset Value") is equivalent to the assets less the liabilities attributable to the Shares on any valuation date. The Net Asset Value per Share is determined by dividing the Net Asset Value by the number of outstanding Shares. |
| MANAGEMENT FEES: | The Company will pay the Investment Manager a management fee payable in arrears on the last Business Day of each month equal to 0.125% (1.5% on an annualised basis) of the Net Asset Value of each Share on the last Business Day of such month. |
| | The Company will pay fees to the sub-managers. These may include both management fees and/or incentive fees. |
| RISK CONSIDERATIONS: | The specialised investment programme of the Company involves significant risks (see "Risk Considerations"). |
| DIRECTORS: | William Dolan                    (President)<br>Grosvenor House<br>33 Church Street<br>Hamilton HM 12<br>Bermuda |
| | Gordon Howard                 (Vice- President)<br>Grosvenor House<br>33 Church Street<br>Hamilton HM 12<br>Bermuda |
| | Norman J. Holbrow<br>Grosvenor House<br>33 Church Street<br>Hamilton HM 12<br>Bermuda |
| ADMINISTRATOR: | Maven Fund Administration Limited<br>Suite 203<br>12 Church Street<br>Hamilton HM 11<br>Bermuda |

SECRETARY AND
REGISTERED OFFICE:

Maven Fund Administration Limited
Suite 203
12 Church Street
Hamilton HM 11
Bermuda

INVESTMENT MANAGER:

Grosvenor Asset Management Limited
Grosvenor House
33 Church Street
Hamilton  HM 12
Bermuda

AUDITORS:

KPMG Peat Marwick
Vallis Building
58 Par-la-Ville Road
Hamilton HM 11
Bermuda

CUSTODIAN:

Grosvenor Investment Management Limited
Grosvenor House
33 Church Street
Hamilton HM 12
Bermuda

LEGAL COUNSEL:

Mello Hollis Jones & Martin
Barristers and Attorneys
Reid House
31 Church Street
Hamilton HM 12
Bermuda

# GROSVENOR PRIVATE RESERVE FUND LIMITED

## THE COMPANY

Grosvenor Private Reserve Fund Limited (the "Company") is a company incorporated in Bermuda on ●, 1999 with limited liability and unlimited duration under the provisions of the Companies Act 1981 of Bermuda. The Company's registered office is located at "Grosvenor House", 33 Church Street, HM 12, Bermuda.

The Company has an authorised capital of US$120,000 divided into 12,000,000 shares (the "Shares") of US$0.01 par value each. The Company has the object of carrying on the business of a mutual fund. As such, it has the power to issue and redeem its Shares at a price based on Net Asset Value, as determined as set out herein.

In order to provide for the minimum share capital required on incorporation under Bermuda law, the Investment Manager has subscribed for 12,000 Shares, which will be transferred to the initial investors taking up Shares pursuant to this prospectus.

## INVESTMENT OBJECTIVE AND STRATEGY

The primary investment objective of the Company is to provide investors with long term capital returns in excess of returns obtainable from holding bank deposits, while seeking to control overall levels of risk in all market environments. The Company will invest principally in a mixture of cash investments, fixed income securities and selected sub-managers. This overall strategy is an important factor in controlling the risk of the total portfolio.

Research

The Investment Manager has extensive experience in researching and evaluating specialist investment managers and investment styles. The Investment Manager's research is both quantitative and qualitative. While the quantitative aspects of evaluating historic performance are important, significant emphasis is placed upon the qualitative aspects, including an evaluation of management style. The Investment Manager does not rely upon historic measures to determine a sub-managers risk, but makes an assessment of the potential risk, given the sub-manager's style and implementation of the investment strategy.

Selection of Sub-Managers

The Company seeks to achieve its investment objective by allocating its assets to a number of sub-managers selected by the Investment Manager. The sub-managers selected for the Company may adopt a wide range of investment strategies. Some sub-managers may employ an extensive range of financial instruments to achieve attractive returns and also to control risk in all sectors of the international capital markets. The sub-managers, while staying within their stated investment strategy, may use leverage to enhance returns.

1

On-Going Management of the Company

The Investment Manager will monitor the portfolio and all of its investments on an on-going basis. The Investment Manager will actively manage allocations to reflect perceived risks associated with the investment environment or factors specific to each sub-manager.

Use of Leverage and Overlays

The Company may, at the discretion of the Investment Manager, employ leverage and/or overlay strategies to enhance returns or control risk. A typical overlay might involve the purchase of exchange-traded call or put index options or similar instruments.

The purchase of an index call option gives the Investment Manager the right to "buy" an index (for example, the Standard & Poor's 100) at a predetermined strike price. If the underlying index moves above the strike price plus the premium paid to buy the call option, the Company would benefit from the additional return.

The purchase of an index put option gives the Investment Manager the right to "sell" an index (for example, the Standard & Poor's 100) at a predetermined strike price. If the underlying index moves below the strike price plus the premium paid to buy the put option, the Company would benefit from the additional return.

In both cases, should the index not move in the way anticipated by the Investment Manager, the Company's potential loss in relation to the options is limited to the premium paid to purchase those options plus any transaction costs.

## RISK CONSIDERATIONS

Prospective investors should consider the following factors in determining whether an investment in the Company is a suitable investment:

**Management of Risk:**

The Investment Manager approaches the management of risk in a variety of ways. In addition to the standard industry measures of assessing risk, the Investment Manager has developed a number of proprietary risk models. An important aspect of the management of the portfolio is recognition that risk is not static but changes with the general investment environment. Overall asset allocation is likely to change as these perceived risks change. Portfolio risks are further controlled on an ongoing basis through the blending of different investment management styles. Instead of simply relying upon the historic correlations of sub-managers' returns to indices or to each other, the Investment Manager assesses the structural correlation, or true sensitivity, of sub-manager returns to different benchmarks or factors. In this way, the effect of historical "coincidence" is minimised or eliminated. This approach is designed to provide the Company with effective diversification.

2

**Sub-Manager Risk:**

The sub-managers selected by the Company may be managers of unregulated collective investment schemes. Consequently, the Company may invest in other collective investment schemes which may be established in jurisdictions where there is little or no regulation of financial services. The sub-managers selected by the Company may use options, futures or contracts for differences. The markets in which these instruments trade may be volatile.

**Currency Risk:**

The sub-managers may invest in assets and debt securities denominated in currencies other than US dollars. The Company will, however, value the total Company's assets in US dollars. The value of the Company's assets will fluctuate with US dollar exchange rates as well as with price changes of the sub-managers' investments in the various local markets and currencies. The sub-managers may decide to employ hedging instruments to preserve the value of their investments in US dollars, but this may or may not be effective in reducing the Company's overall exposure to currency fluctuations.

The Investment Manager may use currency hedging strategies which may not always achieve the anticipated objectives.

**Leverage Risk:**

The Company may, under certain circumstances, employ overlay strategies to control perceived risks or to enhance returns.

**Operating History:**

The Company will provide prospective investors with details of the operating history of the Company on request.

**Investment and Trading Risks in General:**

All securities investments risk the loss of capital. Investment in the various securities and other instruments of the sub-managers involves significant economic risks. Although the Company's investment program is expected to provide some protection from the risk of loss inherent in the ownership of such investments, there can be no assurance that these strategies will completely protect against this risk or that the Company's investment objectives will be obtained.

**Possible Effect of Redemptions:**

Shareholders may redeem their Shares in accordance with the bye-laws of the Company. Substantial redemptions could require the Company to liquidate investments with sub-managers more rapidly than otherwise desirable in order to raise the necessary cash to fund the redemptions

and to achieve an allocation of funds to the sub-managers to reflect a smaller equity base. This could adversely affect the value of the Shares.

**The foregoing list of risk factors does not purport to be complete or fully explain the risks involved in an investment in the Company.**

## INVESTMENT MANAGER

The Investment Manager is a company incorporated in Bermuda on June 27, 1997 with limited liability under the provisions of the Companies Act 1981 of Bermuda. The Investment Manager's office is located at Grosvenor House, 33 Church Street, Hamilton HM 12, Bermuda. The directors of the Investment Manager are William Dolan, Gordon Howard and Richard Harwood, of whom William Dolan and Gordon Howard are also directors of the Company. Reference is made to the sections entitled "Directors" for a description of William Dolan and Gordon Howard.

**Richard Harwood** has spent 25 years in the manufacturing industry in South Africa, of which 22 years were as a managing director or president of companies in partnership with or under licence from multinational companies. Since leaving South Africa, Mr. Harwood has been involved in providing finance and advice to startup/venture capital operations, as well as working with fund managers in connection with investment portfolios under his management.

The Investment Manager has entered into an investment management agreement with the Company whereby it will provide certain management and investment advisory services to the Company.

Under the investment management agreement, the Company has agreed to indemnify the Investment Manager against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever imposed on the Investment Manager other than those resulting from fraud or dishonesty on the part of the Investment Manager. The investment management agreement continues and remains in force and effect for a period of 3 years from the date of the agreement and thereafter unless and until terminated on not less than 3 months' notice by either party to the other, provided that if one party breaches its obligations under the agreement and fails to make good the breach within 30 days of written notice of the breach, or goes into liquidation, the other party may terminate the agreement forthwith.

## DIRECTORS

The following are the directors of the Company:

**William Dolan** has been managing director of investment management and finance of Grosvenor Investment Management Limited since 1993 and director of Grosvenor Trust Company Limited since 1994. Mr. Dolan was managing director of Bermuda International Securities Limited, the investment banking subsidiary of The Bank of Bermuda Limited, where he worked from 1973 to 1993 and chairman of the Bermuda Stock Exchange for two terms between 1987 and 1993. He

4

serves as a director of various Bermuda incorporated exempt companies, mutual funds and P&I clubs.

**Gordon Howard** has been executive vice president and a director of Grosvenor Trust Company Limited since 1994, and a director of the Investment Manager since 1993. Mr. Howard was educated at Queen University, Canada. Prior to joining the Grosvenor group, he served with The Bank of Bermuda Limited for twenty years where he reached the level of manager, trust and business development. His career with The Bank of Bermuda Limited included service in many areas of international banking. A member of the Institute of Directors, he serves on the board of many international companies.

**Norman Holbrow** has been president and a director of Grosvenor Trust Company Limited since 1994. Mr. Holbrow was a managing director of Bermuda Trust Company Limited and an executive director of Bermuda Trust Company Limited, Bermuda Trust (Far East) Limited and Bermuda Trust Company (Guernsey) Limited. He served on the executive of The Bank of Bermuda Limited, and was with the bank for over twenty-five years.

The remuneration of the directors will be determined by the Company in general meeting. The directors may also be paid, inter alia, for travelling, hotel and other expenses properly incurred by them in attending meetings of the directors or in connection with the business of the Company. Any director who devotes special attention to the business of the Company may be paid such extra remuneration as the directors may determine. This figure is unlikely to exceed $5,000 in any calendar year.

There is no provision in the bye-laws of the Company requiring a director to retire by reason of any age limit and no share qualification for directors.

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager and the sub-managers may act as managers or advisers to other mutual funds or clients. They may also invest for their own accounts. As such, they could compete for the same trades or investments as the Company may otherwise make. When such an occasion arises, the allocation of investment opportunities between the Company and other clients is based on what such persons deem to be equitable. However, in some cases these allocation procedures may adversely affect the price paid or received by the Company or the size of the position obtained or disposed of by the Company.

Directors of the Company may also be directors of the Investment Manager, or directors of companies in which the Company's assets are or may be invested. As such, the directors may have a conflict between their obligation to act in the best interests of the Company and their interest in generating revenues or other benefits for other entities with persons with which they are affiliated.

A director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of director, or may act in a professional capacity to the Company on such terms as the directors may determine. No director shall be disqualified by his

office from contracting with the Company in any capacity, nor shall any such contract or arrangement entered into by the Company in which any director is in any way interested be liable to be avoided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such director holding that office if he shall declare the nature of his interest.

A director, notwithstanding his interest, may be counted in the quorum present at any meeting at which he or any other director is appointed to hold any such office or place of profit under the Company or at which the terms of any such appointment are arranged, and he may vote on any such appointment or arrangement other than his own appointment or the arrangement of terms thereof.

No director has any interest in the Shares of the Company.  William Dolan and Gordon Howard are directors of both of the Company and the Investment Manager. William Dolan, Gordon Howard and Norman Holbrow are directors of both the Company and the Custodian.  There are no existing or proposed service contracts between any of the directors and the Company but the directors may receive remuneration as provided in the bye-laws of the Company.

In the event a conflict of interest arises, the directors will endeavour to ensure that the conflict is resolved fairly.

## **INDEMNITIES**

The bye-laws of the Company provide that no director or officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, unless the same shall happen through his own fraud or dishonesty.

The bye-laws of the Company further provide that each director or officer of the Company shall be indemnified by the Company against, and it shall be the duty of the directors out of the funds of the Company to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the shareholders over all other claims except as respects any such director or officer where any such cost, loss or expense shall happen through his own fraud or dishonesty.

6

## OFFERING OF SHARES

Shares will initially be offered for sale from 9:00 a.m. (Bermuda time) on the date of this prospectus. The initial closing will take place at 5:00 p.m. (Bermuda time) on •, 1999, or such earlier or later time or date as the directors may determine. After the initial closing, Shares will be offered for sale on the first Business Day of each month or at such other times as the directors may determine. A Business Day is any day on which banks in Bermuda are open for business (a "Business Day"). Shares will be sold at a purchase price of US$100.00 per Share during the initial offering and thereafter at a purchase price per Share equal to the Net Asset Value per Share as at the close of business on the proceeding Business Day. On the event that subscriptions for • Shares at the offer price are not received by the Company within 120 days from the date hereof, all monies received shall be returned without interest. After the initial offering, the Net Asset Value per Share will be available from the Administrator on request.

Application should be made by completing and signing the application form at the end of this prospectus and sending the same to the Administrator at the address referred to on that form. Alternatively, applications may be made by telefax to the Administrator at the telefax number shown on the application form providing the details requested on the application form and by promptly mailing the application form duly completed and signed by or on behalf of the applicant to the Administrator. Subscription monies should preferably be sent by wire transfer or US$ bank draft. Cheques will also be accepted (see the application form for details), provided that cleared funds are received on the Business Day before the issue of the Shares. When applying for Shares, applicants should apply for a minimum amount of $250,000.

A contract note will be issued, as of the subscription day, to accepted applicants confirming acceptance and the number of shares allotted. Once applications have been received and accepted by the Company, they will be irrevocable. The Company reserves the right, in its entire discretion, to reject and return any application and remittances. Shares will not be allotted or issued without an accepted application and receipt of cleared subscription monies. The Company will issue fractions of Shares up to 1,000th of a Share.

Applicants should specify on the application form whether they require share certificates to be issued. If specifically requested, share certificates will be dispatched by the Company as soon as practicable after the Shares have been issued. If this specific request is not made Shares will be held in bookstock form.

There are certain restrictions on the eligibility of investors to subscribe for Shares. (See "Compulsory Redemption" for details.) Shares may only be issued in the names of companies, partnerships or individuals. Further, Shares purchased for those under 21 years of age must be registered in the name of the parent or legal guardian.

Applicants subscribing for Shares are advised that the Shares are issued subject to the provisions of the Company's memorandum of association and its bye-laws.

7

The Administrator may take such steps as it considers necessary to comply with international standards for the prevention of money laundering. Applicants may be required to furnish adequate documents as evidence of their identity, their address and information relating to the source of the monies to be invested. Failure to provide such information or documentation in a timely manner could result in a delay in the issue of Shares or a refusal to issue Shares.

### REDEMPTION OF SHARES

Generally, Shares may be redeemed on the first Business Day of each calendar month with 35 days prior written notice (subject to the directors waiving such notice), or at such other times as the directors may determine. Shares will be redeemed at a price per Share equal to the Net Asset Value per Share as at the close of business on the proceeding Business Day. Ninety per cent (90%) of the payment of the redemption price will normally be made within 21 business days following the redemption date of the Shares. Payment of the balance will be made no later than 35 days after the redemption date. In very exceptional circumstances, such as a significant redemption of Shares or delays due to the auditing requirements of either the Company or the sub-managers, payment of the redemption price may be made up to 90 days after the redemption date.

If a request for partial redemption is less than US$50,000 or would result in the shareholder holding a number of Shares having an aggregate Net Asset Value of less than US$250,000, then the Company has the right to refuse to honour such request for partial redemption

Shareholders who hold their Shares in bookstock form should send written instructions to the Administrator. Shareholders holding share certificates must complete the form on the reverse of the share certificate and send the same to the Administrator. Redemption instructions not received 35 days prior to a day set for redemption shall be treated as a request for redemption on the next day available for redemptions. The Investment Manager may elect to purchase Shares offered for redemption at a price equal to the redemption price rather than requiring the Company to redeem them. The Company cannot redeem Shares if to do so would result in less than 1,200,000 Shares being in issue.

### TRANSFER OF SHARES

Shareholders are entitled to transfer their Shares by an instrument in writing in the usual and common form. Unless the Company otherwise determines, a shareholder is not entitled to transfer Shares if as a result of such transfer either he or the person to whom the Shares are to be transferred will hold Shares having a Net Asset Value of less than $250,000. Shareholders are not authorised to transfer Shares to any person who would not be entitled to subscribe for Shares (see "Offering of Shares" and "Compulsory Redemption").

### DETERMINATION OF NET ASSET VALUE

The bye-laws provide that the subscription price and redemption price of each Share will be determined by reference to the Net Asset Value per Share. The bye-laws of the Company provide that the Net Asset Value per Share of the Company will be determined as at the close of business

in Bermuda on the last Business Day of each month and will be calculated by reference to the value of the net assets of the Company.

The Net Asset Value of the Company will be determined in accordance with, inter alia, the following provisions:-

(a) all calculations of the value of investments shall be made by reference to the net asset value of those investments as provided by the sub-managers provided always that the directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation better reflects the value;

(b) if no price quotations are available as above provided, the value of an asset shall be determined from time to time in such manner as the directors shall determine as reflects the fair value; and

(c) any value (whether of a security or cash) otherwise than in US dollars shall be converted into US dollars at the rate (whether official or otherwise) which the directors shall in their absolute discretion deem appropriate to the circumstances having regard, inter alia, to any premium or discount which they consider may be relevant and to costs of exchange.

The bye-laws of the Company provide that any certificate as to the Net Asset Value per Share and/or the subscription price and/or redemption price per Share given in good faith by or on behalf of the directors is binding on all parties.

## COMPULSORY REDEMPTIONS

The directors of the Company, at their sole discretion, have the power to redeem all, but not less than all, of the Shares of any shareholder. In addition to the foregoing, the directors of the Company have the power to impose such restrictions on the issue of Shares as they may think necessary for the purpose of ensuring that no Shares are acquired or held by any person in breach of the law or requirements of any country or governmental authority, or any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any other persons, connected or not, or any other circumstances appearing to the directors to be relevant) which in the opinion of the directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

If it comes to the notice of the directors that any Shares are held by any such non-qualified person, the directors may give notice to such person requiring the redemption or transfer of such Shares in accordance with the provisions of the bye-laws of the Company. If a person becomes aware that he is holding or owning Shares in breach of any such restriction he is required either to deliver to the Company a written request for redemption of the Shares or to transfer the same to a person who is not such a non-qualified person.

9

## INVESTMENT RESTRICTIONS

The directors may exercise the Company's powers to borrow and to charge its assets.

The following restrictions on investments are included in the bye-laws of the Company:-

(a)      the Company shall not invest in a security of any class in any company or body if directors and officers of the Company and the Investment Manager collectively own more than 5 per cent of those securities;

(b)      the Company shall not invest directly in land or buildings (or any options, rights or interests in respect thereof);

(c)      the Company shall not make a loan (except to the extent that an investment might constitute a loan) except with the consent of the Custodian;

(d)      the Company shall not directly invest in securities of a company for the purpose of the Company exercising legal or management control thereof.

The Company does not generally have to sell investments if the above limits are exceeded as a result of changes in the market value of the Company's net assets or as a result of new issues or capital reconstruction.  However, if these limits are exceeded the Company may not add further to such investments.

## THE SHARES

**Shares:**

The capital of the Company is divided into shares of a par value of $0.01 each (the "Shares").  The holders of Shares are:

(a)      entitled to one vote per Share;

(b)      entitled to such dividends as the directors may from time to time declare;

(c)      in the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the reorganization or otherwise or upon distribution of capital, be entitled to all the surplus assets of the Company.

The holders of Shares have the right to vote their Shares on all matters required to be approved by the Company in general meeting, including the election of directors, the appointment of auditors and the approving of audited financial statements.

**Share Certificates:**

Shares will be issued in book stock form, unless share certificates are specifically requested. If specifically requested, share certificates will be in registered form and will be dispatched by the Company as soon as practicable after the Shares have been issued.

Share certificates are only issued in the names of companies, partnerships or individuals. In the case of a shareholder acting in a special capacity (such as a trustee), certificates may, at the request of the a shareholder, record the capacity in which the shareholder is acting. Shares purchased for those under 21 years of age must be registered in the name of the parent or guardian, but may be designated with the minor's initials for the purposes of identification. The Company will take no cognizance of any trust applicable to the Shares represented by such certificates.

**Variation of Class Rights:**

Any rights attached to a class of shares of the Company (of which there are none at present) may be varied (unless otherwise provided by the terms of issue of the shares of that class) with the sanction of a resolution passed by a majority of three-fourths of the holders of such shares at a separate general meeting. The rights attached to any class of shares (unless otherwise expressly provided by the conditions of issue of such shares) are deemed not to be varied by the creation, allotment or issue of shares ranking pari passu therewith.

**Voting Rights:**

At any general meeting, every holder of Shares who is present in person or by proxy, shall have one vote on a show of hands. On a poll, every such holder of Shares present in person or by proxy shall have one vote for every Share held. Shareholders' resolutions of the Company require a simple majority of the votes cast by the shareholders voting at the meeting at which the resolution is proposed in order to be passed, except that a majority of not less than 75% of the shareholders present in person or by proxy and voting is required in order to rescind, alter or amend the bye-laws of the Company. Further, the bye-laws may not be rescinded, altered or amended unless the same shall have been approved at a meeting of the directors.

## SUSPENSION OF DEALINGS

The directors may suspend the determination of the Net Asset Value per Share for the whole or any part of a period:

(a)     during which the calculation of net asset value of any significant portion of the investments of the Company has been suspended;

(b)     when circumstances exist as a result of which in the opinion of the directors it is not reasonably practicable for the Company to dispose of investments comprised in the Company or as a result of which any such disposal would be materially prejudicial to shareholders;

(c)      when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Company cannot reasonably or fairly be ascertained; or

(d)      during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of the Shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of the Shares cannot in the opinion of the directors be effected at normal rates of exchange.

When the determination of the Net Asset Value of the Shares has been suspended, Shares may not be issued or redeemed.

## CUSTODIAN

Grosvenor Investment Management Limited (the "Custodian") has been appointed by the Company as custodian of the investments of the Company, which are held on behalf of the Company either directly by the Custodian or through sub-custodians, nominees, agents or delegates of the Custodian.

The appointment of the Custodian may be terminated by either the Custodian or the Company on not less than three months' notice in writing. The directors of the Company may not remove the Custodian unless and until a successor custodian shall have been appointed in accordance with the bye-laws of the Company.

The Custodian is a company existing under the laws of Bermuda. The directors of the Custodian are William Dolan, Gordon Howard and Norman Holbrow.

## ADMINISTRATOR

Maven Fund Administration Limited (the "Administrator"), located in Hamilton, Bermuda, has been appointed as administrator of the Company pursuant to the terms of an administration agreement dated ●, 1999 (the "Administration Agreement"). The Administrator provides administration, management and accounting services to an international portfolio of individual and institutional clients. The Administrator will calculate the net asset value of the Company, maintain the books of account for the Company, act as registrar and transfer agent and provide secretarial services and a registered office.

The Company has agreed to hold harmless and indemnify the Administrator and its directors, officers, employees, agents and representatives from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever other than those resulting from willful negligence, willful default, fraud or dishonesty on the part of the Administrator or its directors, officers, employees, agents or representatives. The Administrator has agreed to indemnify and hold harmless the Company from

12

and against certain losses of the Company resulting from any act of willful negligence, willful default, fraud or dishonesty on the part of the Administrator or its directors, officers, employees, agents, or representatives.  The Administration Agreement is terminable by either party on three months' notice.  Notwithstanding the foregoing, the Administration Agreement is terminable forthwith by either party in the event of the receivership or liquidation of the other party or a material breach of the agreement by the other party which the other party has failed to make good on 15 days' written notice in the case of a payment obligation or on 30 days' written notice in the case of other obligations.

## EXPENSES

**Management Fees:**

The Company will pay the Investment Manager a management fee payable in arrears on the last Business Day of each month equal to 0.125% (1.5% on an annualized basis) of the  Net Asset Value of the Shares on the last Business Day of such month.

**Sub-Managers Fee:**

The Company will pay fees to the sub-managers, which will not exceed the fees stated within the sub-managers' fund prospectuses where applicable.  These may include both a management fee and/or an incentive fee.  The directors anticipate that most management fees paid to sub-managers by the Company will be between 1% and 2%, plus any applicable performance fee.

**Other Fees and Expenses:**

The Company will pay the Administrator an annual fee of U.S. $25,000 payable monthly in arrears subject to review and adjustment on the agreement of the Company and the Administrator.  In addition, the Administrator is entitled to receive reasonable out of pocket expenses.

The Custodian will not charge a fee for its services, but will be reimbursed for any expenses it may incur.

The Company bears the cost of all brokerage commissions on trading transactions, interest on borrowing and fees in respect thereof, the Bermuda annual company registration fee, the fees and expenses of the auditors of and legal advisers to the Company, the cost of printing and distributing the periodic and annual reports and statements and other operating expenses.

The expenses incurred in connection with the incorporation of the Company  were approximately US$• and will be amortized over five years.

## TAX

The following comments, which are of a general nature, are based on advice received by the directors regarding current law and practice in Bermuda.  Investors should appreciate that the taxation consequences for investors may be otherwise than as stated below.  Investors should consult

their professional advisers on the possible tax consequences of their subscribing for, purchasing, holding, selling or redeeming Shares under the laws of their countries of citizenship, residence, ordinary residence or domicile.

**Bermuda:**

At the date of this prospectus, there is no Bermuda income, corporation, or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax payable by the Company or its shareholders, other than shareholders ordinarily resident in Bermuda. The Company is not subject to stamp duty on the issue, transfer or redemption of its Shares.

The Company has received from the Minister of Finance of Bermuda under the Exempted Undertakings Tax Protection Act 1966 an assurance that, in the event of there being enacted in Bermuda any legislation imposing tax computed on profits or income, or computed on any capital assets, gain or appreciation or any tax in the nature of estate duty or inheritance tax, such tax shall not until March 28, 2016 be applicable to the Company or to any of its operations, or to the Shares, debentures or other obligations of the Company except in so far as such tax applies to persons ordinarily resident in Bermuda and holding such Shares, debentures or other obligations of the Company or any land leased or let to the Company.

As an exempted company, the Company is liable to pay in Bermuda a registration fee based upon its authorised share capital and the premium on its issued Shares at a rate not exceeding $25,000 per annum.

## MATERIAL CONTRACTS

The following contracts (not being contracts in the ordinary course of business) have been entered into by the Company and are, or may be, material:

(a)   the Investment Management Agreement between the Company and the Investment Manager dated as of •, 1999 pursuant to which the Investment Manager has been appointed manager of the Company;

(b)   the Custodian Agreement between the Company and the Custodian dated •, 1999 pursuant to which the Custodian has been appointed custodian of the assets of the Company; and

(c)   the Administration Agreement between the Company and the Administrator dated •, 1999 pursuant to which the Administrator has been appointed administrator (including secretarial and registrar services) of the Company.

## **MISCELLANEOUS**

**Dividends:**

It is the intention of the directors of the Company not to make distribution of net income by way of dividends.

**Bermuda Disclosure:**

The Company has been classified as non-resident for Bermuda Exchange Control purposes by the Bermuda Monetary Authority whose permission for the issue of Shares has been obtained. The issue, redemption and transfer of Shares to, by and between persons regarded as non-resident in Bermuda for exchange control purposes may be effected without specific consent under the Exchange Control Act 1972 of Bermuda and regulations made thereunder. The Company, by virtue of being non-resident of Bermuda for exchange control purposes, is free to acquire, hold and sell any foreign currency and securities without restriction.

The minimum amount which in the opinion of the directors must be raised by the initial offer of Shares in order to provide for the matters referred to in section 28 of the Companies Act 1981 of Bermuda is US$•. Thereafter, such minimum is nil. In the event that the minimum subscription is not received within 120 days of the date hereof no Shares will be allotted or issued and all money received from applicants will be returned without interest.

**Commissions:**

Save as disclosed in this prospectus, no commissions, discounts, brokerages or other special terms have been granted by the Company in connection with the issue or sale of any Shares. No person has, or is entitled to be given, an option to subscribe for any Shares or loan capital of the Company.

**Auditors:**

The Auditors have confirmed their acceptance of the appointment as auditor of the Company and have given and have not withdrawn their written consent to the issue of this prospectus with the references to them in the form and context in which they are included.

**Financial Year End:**

The financial year end of the Company is December 31 in each year.

**Financial Information:**

Audited financial statements and any other financial information will be sent to shareholders within six months of the year-end.

**Annual General Meetings:**

Annual general meetings will usually be held in Bermuda. Notices convening each annual general meeting will be sent to shareholders together with the annual accounts and reports not later than twenty-one days before the date fixed for the meeting.

**Litigation:**

The Company is not engaged in any litigation or arbitration proceedings and is not aware of any litigation or claim pending or threatened by or against it.

**Borrowings:**

As of the date hereof, the Company has no loan capital (including term loans).

**Availability of Documents:**

Copies of the following documents may be inspected and obtained at any time during normal business hours on any Business Day free of charge at the office of the Investment Manager:

      (a)      the Companies Act 1981 (as amended) of Bermuda;

      (b)      the memorandum of association and bye-laws of the Company;

      (c)      the material contracts referred to above;

      (d)      the report of audited accounts prepared by the auditors;

      (e)      the written consent of the auditors referred to above; and

      (f)      any other annual or periodic reports issued by the Company.

**GROSVENOR PRIVATE RESERVE FUND LIMITED**

**A P P L I C A T I O N   F O R M**

**FOR**

**SHARES**

GROSVENOR PRIVATE RESERVE FUND LIMITED (the "Company")
Grosvenor House
33 Church Street
Hamilton HM 12, Bermuda
Attention: William Dolan, President

1.  I/We offer to subscribe for the number of Shares of the Company as may be subscribed by the investment of the amount of US$_____ at a price per Share ("Subscription Price") determined as mentioned below.

2.  I/We confirm that payment of the Subscription Price:

   (a)  has been made by wire transfer to the account details as set out below ☐

   Barclays Bank PLC
   75 Wall Street
   New York, NY
   10265

   | | |
   |---|---|
   | ABA No.: | 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 |
   | For Credit to: | Bermuda Commercial Bank |
   | Fund A/C No.: | 050-03523-1 |
   | Further Credit to: | Grosvenor Private Reserve Fund Limited |
   | Subscription A/C: | • |
   | or Swift Code: | BARCUS 33 |

   (b)  is being made through a US$ Bankers Draft enclosed with this application ☐

   (c)  is being made through a US$ cheque enclosed with this application drawn on account name: ☐

17

3.      Name and address of Financial Institution Remitting Payment for Subscriber's Account:

_____

_____

_____

_____

Payment Date:_____

4.      I/We represent that:

(a)      this application is based solely upon the current prospectus of the Company and subject to the provisions of the memorandum of association and the bye-laws of the Company and that I/we have received and read and am/are familiar with the contents of the said prospectus;

(b)      I am/We are not a national or resident of or a partnership or corporation organised or existing under the laws of the United States or any state, territory or possessions thereof and nor do I/we hold or intend to hold for the benefit of any such person;

(c)      I am/We are not making this application for any person under the age of 21 years; and

5.      I/We request that the Shares be held in Book stock form to be registered in the name(s) and address(es) set out below.

**Standing Proxy:**

Subscriber hereby designates and appoints Grosvenor Asset Management Limited with the powers of substitution, as Subscriber's true and lawful Proxy for the purpose of voting any Shares issued pursuant to this Agreement (or such portion thereof from time to time owned by Subscriber) as said Proxy may determine on any and all matters arising at any annual or fiscal general meeting of the Company upon which such Shares could be voted by Subscriber (or the person in whose name the Shares hereby subscribed are registered at Subscriber's direction) if present in person at the meeting. This proxy may be revoked by Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any general meeting of the Company or by written notice to the Administrator received at the Company's registered office prior to any such meeting.

Shares will normally be held in book stock form.  Share certificates will not be issued unless specifically requested above.  If requested share certificates will be dispatched by the Company as soon as practicable after the Shares have been issued.  Applicants should complete the sections below.  In the case of joint applicants, all must sign.  All communications will be sent to the first registered holder.  In the case of an officer signing on behalf of a company, such officer may be required to provide evidence of his appointment and of his authority to sign.

18

NAME OF APPLICANT_____

ADDRESS_____

_____

_____

TELEPHONE_____

FACSIMILE_____

SIGNATURE_____

DATE_____

Notes

1.      The Subscription Price of Shares issued pursuant to this application (if accepted) will be
        determined as described in the prospectus and bye-laws of the Company.

2.      The minimum subscription amount is US$250,000.  This application need only indicate the
        total amount to be invested.  The Company will calculate the number of Shares (including
        fractional Shares calculated to 3 decimal places) to be issued at the relevant Subscription
        Price.

3.      A confirmation note will be sent upon acceptance of this application.

Applications may be delivered to the Administrator at the address below:

Maven Fund Administration
Suite 203
12 Church Street
Hamilton HM 11
Bermuda
Attention:   Dan Voth
Telephone: (441) 292-4769
Fax:          (441) 292-1416