# Exhibit 5

**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111 Telephone: (212) 589-4200 Facsimile: (212) 589-4201 David J. Sheehan

E-mail: dsheehan@bakerlaw.com

Marc E. Hirschfield

E-mail: mhirschfield@bakerlaw.com

Mark A. Kornfeld

E-mail: mkornfeld@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

                    Plaintiff-Applicant,

           v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                 Defendant.

In re:

BERNARD L. MADOFF,

                 Debtor.

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

                Plaintiff,

          v.

FAIRFIELD SENTRY LIMITED, GREENWICH
SENTRY, L.P., GREENWICH SENTRY PARTNERS,
L.P., FAIRFIELD SIGMA LIMITED, FAIRFIELD
LAMBDA LIMITED, CHESTER GLOBAL
STRATEGY FUND LIMITED, CHESTER GLOBAL
STRATEGY FUND, IRONGATE GLOBAL
STRATEGY FUND LIMITED, FAIRFIELD
GREENWICH FUND (LUXEMBOURG), FAIRFIELD
INVESTMENT FUND LIMITED, FAIRFIELD
INVESTORS (EURO) LIMITED, FAIRFIELD
INVESTORS (SWISS FRANC) LIMITED,
FAIRFIELD INVESTORS (YEN) LIMITED,
FAIRFIELD INVESTMENT TRUST, FIF
ADVANCED, LTD., SENTRY SELECT LIMITED,
STABLE FUND, FAIRFIELD GREENWICH
LIMITED, FAIRFIELD GREENWICH (BERMUDA),
LTD., FAIRFIELD GREENWICH ADVISORS LLC,
FAIRFIELD GREENWICH GP, LLC, FAIRFIELD
GREENWICH PARTNERS, LLC, FAIRFIELD
HEATHCLIFF CAPITAL LLC, FAIRFIELD

Adv. Pro. No. 08-01789 (BRLSMB)

SIPA Liquidation

(Substantively Consolidated)

AMENDED COMPLAINT

Adv. Pro. No. 09-01239 (BRLSMB)

SECOND AMENDED COMPLAINT

JURY TRIAL DEMAND

INTERNATIONAL MANAGERS, INC., ~~FAIRFIELD GREENWICH (UK) LIMITED, GREENWICH BERMUDA LIMITED, CHESTER MANAGEMENT CAYMAN LIMITED,~~ WALTER NOEL, JEFFREY TUCKER, ~~ANDRÉS~~ANDRES PIEDRAHITA~~, MARK MCKEEFRY, DANIEL LIPTON~~, AMIT VIJAYVERGIYA, ~~GORDON MCKENZIE, RICHARD LANDSBERGER,~~ PHILIP TOUB, ~~CHARLES MURPHY, ROBERT BLUM, ANDREW SMITH, HAROLD GREISMAN, GREGORY BOWES,~~ CORINA NOEL PIEDRAHITA, ~~LOURDES BARRENECHE, CORNELIS BOELE, SANTIAGO REYES, JACQUELINE HARARY~~FAIRFIELD GREENWICH CAPITAL PARTNERS and SHARE MANAGEMENT LLC,

        Defendants.

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-//Z ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), by the Trustee's undersigned counsel, for his second amended complaint, states as follows:

I.      NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE .................................................................... 4

III.    BACKGROUND .......................................................................................... 5

IV.     TRUSTEE'S POWERS AND STANDING ................................................ 10

V.      DEFENDANTS ......................................................................................... 12

        A.      The Feeder Funds ........................................................................ 12

        B.      FGG Affiliates ............................................................................ 16

VI.     FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG ................. 79

        A.      Noel and Tucker Meet Madoff and Make Their First Investments
                With BLMIS ................................................................................ 81

        B.      Noel and Tucker Expand FGG's Offerings to U.S. Investors and
                Piedrahita Joins the Partnership ................................................. 81

        C.      FGG's Operations ........................................................................ 83

VII.    THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD ............ 84

        A.      The Defendants' Investment Strategy ......................................... 85

        B.      The Defendants Facilitate the Scheme Through Marketing and
                Sales ............................................................................................ 87

        C.      The Defendants Serve as a Gatekeeper for Madoff to Ensure
                Investors Would Not Find Out the Truth ..................................... 87

        D.      FGG Conspires with Madoff to Hide from the SEC Madoff's True
                Involvement with the Feeder Funds ............................................ 90

        E.      The Defendants Deceive Their Investors by Telling Them They
                Were Performing Extensive and Top of the Line Due Diligence, But They Were Doing No Such
                Thing ........................................................................................... 94

VIII.   THE DEFENDANTS WERE CONSTANTLY FACED WITH
        EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT
        EVIDENCE ............................................................................................... 98

        A.      The Defendants Learn that BLMIS's Auditor is a Single Person in
                a Strip Mall Office ...................................................................... 99

        B.      The Defendants Regularly Received Information That Made It
                Clear Madoff Was Lying About His Alleged Trades and
                Performance .............................................................................. 105

IX.     THE DEFENDANTS WERE WILLING TO IGNORE THE RED
        FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT .............. 130

        A. FGG Does Everything It Can to Mollify Investor Concerns as
                Opposed to Performing Independent Inquiry Into the Possibility of
                Fraud ......................................................................................... 131

        B.      FGG's Consultant Tells the Defendants Madoff May Be a Fraud ........ 133

X.      DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE
        DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF ..... 136

A.    2006:  GS Is Expanded and GSP Is Created ........................................ 136

B.    2007:  Leveraged Note Programs ...................................................... 136

C.    2008:  The Emerald Funds ............................................................... 137

XI.    THE AFTERMATH ................................................................................... 139

XII.    PEOPLE WILL TELL: OH THIS WAS FRAUD, THERE IS NOTHING
WE COULD HAVE DONE ........................................................................ 141

A.    The Barron's and MAR/Hedge Articles Are Published in 2001 ........... 142

B.    Tightening Industry Standards ......................................................... 144

C.    It Was All Over the Street: Madoff Was Suspected of Being a
Fraud ........................................................................................... 146

XIII.    THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE ......... 154

XIV.    THE TRANSFERS ................................................................................... 156

A.    Transfers from BLMIS to the Feeder Funds ....................................... 156

B.    Transfers from the Feeder Funds to the FGG Affiliates,
Management Defendants, and Sales Defendants ................................ 158

COUNT ONE: TURNOVER AND ACCOUNTING - 11 U.S.C. § 542 ..................... 160

COUNT TWO: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ........................................ 161

COUNT THREE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ........................................ 162

COUNT FOUR: PREFERENTIAL TRANSFERS (SUBSEQUENT
TRANSFEREE) - 11 U.S.C. §§ 547(b), 550(a)(2), AND 551 .................. 164

COUNT FIVE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ............................... 166

COUNT SIX: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ............................... 167

COUNT SEVEN: FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) - 11 U.S.C. §§ 548(a)(1)(A), 550(a)(2), AND 551 .......... 168

COUNT EIGHT: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ............................... 170

COUNT NINE: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
- 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ............................... 171

COUNT TEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
- 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(2), AND 551 ............................... 172

COUNT ELEVEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
- NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 .................. 174

COUNT TWELVE: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
- NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 .................. 175

COUNT THIRTEEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - NEW YORK DEBTOR
AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551
...................................................................................................................... 177

COUNT FOURTEEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
— NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 178

COUNT FIFTEEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
— NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 179

COUNT SIXTEEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - NEW YORK DEBTOR
AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551
...................................................................................................................... 180

COUNT SEVENTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) - NEW YORK DEBTOR
AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551
...................................................................................................................... 181

COUNT EIGHTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) - NEW YORK DEBTOR AND
CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ..... 182

COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) - NEW YORK
DEBTOR AND CREDITOR LAW §§
274,  278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551 ......... 183

COUNT TWENTY: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
— NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR
279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ............................................ 185

COUNT TWENTY-ONE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) - NEW YORK DEBTOR
AND CREDITOR LAW §§
275,  278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ......... 186

COUNT TWENTY-TWO: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) - NEW YORK
DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551
...................................................................................................................... 187

COUNT TWENTY-THREE: UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) - NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(1), AND 551 .................................................................................... 188

COUNT TWENTY-FOUR: UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) - NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(1), AND 551 .................................................................................... 190

COUNT TWENTY-FIVE: UNDISCOVERED FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) - NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(2), AND 551 .................................................................................... 191

COUNT TWENTY-SIX: OBJECTION TO THE DEFENDANTS' CUSTOMER
CLAIMS ............................................................................................................... 193

COUNT TWENTY-SEVEN: UNJUST ENRICHMENT ...........................................194

COUNT TWENTY-EIGHT: CONVERSION ....................................................195

COUNT TWENTY-NINE: MONEY HAD AND RECEIVED ...................................196

COUNT THIRTY: AIDING AND ABETTING FRAUD ..........................................197

COUNT THIRTY-ONE: AIDING AND ABETTING BREACH OF

FIDUCIARY DUTY 2081.   Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act §§ 78aaa *et seq.*, by and through his undersigned counsel, for this Amended Complaint, states as follows:

**I.    NATURE OF THE ACTION**

## PRELIMINARY STATEMENT

1.    No investment firm in BLMIS's infamous history was more intertwined with Bernard Madoff than the Fairfield Greenwich Group ("FGG"). FGG and its partners fed more investment capital to Madoff than any other. Madoff needed FGG's international connections and the billions of dollars it collected from investors. But it was a symbiotic relationship. As much as Madoff needed FGG, the FGG partners needed Madoff to develop and maintain their spectacular wealth and support their extravagant lifestyles.

2.    The Defendants named in this Amended Complaint worked in conjunction with BLMIS and Madoff to commit, and exponentially expand, the single largest financial fraud in history. Serving as one of Madoff's largest marketing and investor relations arms, the Defendants were active participants in, and substantially aided, enabled, and helped sustain Madoff's Ponzi scheme. Every dollar the Defendants purportedly "earned," and every dollar they kept to unjustly enrich themselves, was *stolen money*. Every asset the Defendants own that originated from the purported management and performance fees drawn from fictitious returns is in fact *Customer Property,* as defined by statute,[1] and must be returned to the Trustee for equitable distribution to BLMIS customers. FGG partners were deferential to

"Uncle Bernie," as they called him. His steady returns, seemingly impervious to market forces, bolstered FGG even in times of financial crisis.

3.    ~~This is a case in which sophisticated hedge fund investment advisers and promoters engaged in a systematic, purposeful enterprise with Madoff to maintain and profit from a fraud and wrongly enrich themselves. The Defendants had actual and constructive knowledge of Madoff's fraud and cannot deny their knowledge of many "red flags" indicating the likelihood of that fraud. This case goes well beyond "red flags."~~If the FGG partners saw themselves as one big family, Madoff was part of that family. They shared the good times—birthdays, anniversaries, retirements, holidays, yacht trips, and vacations in exotic locales—and the bad, grieving over illnesses and deaths in the family.

~~¹ SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."~~

4.    The ~~Defendants did not properly, independently, and reasonably perform due diligence into the many red flags strongly indicating Madoff was a fraud. The Defendants did exactly the opposite. The Defendants misled regulators, investors, and potential investors and generally looked the other way, focusing only on self-interest and profit. Among many other things, the Defendants:~~partners felt so close to Madoff that they made a video, shown at one partner's retirement party, with open references to Ponzi schemes and the impossible returns Madoff delivered: "Bernie and Sentry... spell a super return that is practically guaranteed... !" Madoff, who attended the party, had the copies of the video confiscated and destroyed—or as one FGG employee put it, Bernie had those videos "taken care of."

a.    ~~failed to perform as independent investment advisers and fiduciaries, serving by their own admission as an extension of BLMIS's marketing and customer relations operation;~~

b.    ~~knowingly and explicitly conspired with Madoff to deceive the Securities Exchange Commission (the "SEC") by misrepresenting the true nature of their respective investment advisory roles and by intentionally misstating Madoff's role;~~

c.    ~~ascribed inconsistent roles to Madoff depending on the circumstances. Sometimes the Defendants claimed Madoff was merely a broker-dealer executing the Defendants' own investment strategy. At other times, the Defendants said Madoff was an investment adviser acting as an agent. And still at other times, the Defendants claimed BLMIS was acting as a principal in performing investment adviser functions;~~

d.      provided false security to their investors through false marketing materials, and shielded Madoff from direct inquiries. The Defendants discouraged customers, potential customers, and others from performing direct due diligence on Madoff, intentionally removed references to him from their offering memoranda and marketing materials, and in all respects served as a "gatekeeper" in order to prevent unwanted inquiries;

e.      performed no real due diligence on Madoff's one-person auditing firm before or even after one of their investors likened BLMIS to another Ponzi scheme. Some of the individual Defendants not only ignored the fact that Madoff's auditing firm lied to them, but perpetrated their own fraud by knowingly misleading investors and potential investors about the auditing firm's size, reputation, and capabilities;

f.      ignored basic, standard industry statistical analyses of Madoff's consistent returns over nearly two decades that should have led them to reasonably conclude the returns were manufactured. The lack of any volatility ever, even in often volatile markets, was an obvious sign of fraud. The Defendants utilized the consistent lack of volatility as a banner to promote the success of their own funds;

g.      regularly received Madoff's trade confirmations reflecting implausible equities trading volumes and percentages, as well as options trading volumes that were impossible, as they greatly exceeded the entire volume of reported options trading on the relevant exchanges. The Defendants never questioned how trading at such massive volumes could not leave a "footprint" in the market or otherwise impact pricing;

h.      represented that the massive options trading that was part of Madoff's purported strategy was made through over-the-counter trades with individual counterparties, even though the trade confirmations the Defendants received from BLMIS reflected exchange-traded options, not over-the-counter trades. The Defendants never knew the identity of a single options trade counterparty, nor did they investigate the counterparties' ability to perform their obligations under the trade agreements;

i.      willingly entered into an investment relationship with Madoff that prevented all of the traditional, independent checks and balances seen in the investment advisory business. Madoff served as investment adviser, prime broker, valuation agent, sub-custodian, as well as executing broker, and all compliance and supervisory functions at BLMIS were performed by Madoff's family. This structure was tailor-made for perpetrating fraud – Madoff could readily misappropriate assets without any independent oversight – but the Defendants never questioned it;

j.      despite representing Madoff's investment strategy as their own for nearly two decades, the Defendants' internal communications indicate they never understood the strategy;

k.      knew for many years that their investors, market experts, due diligence experts, and even their own consultant (hired to review BLMIS transactions) had grave suspicions Madoff and the investment strategy were a sham;

l.      touted and marketed their due diligence process as being the best, as well as the "value added" service that justified fees greater than those of many of their competitors, when, in fact, the Defendants failed to perform even a modicum of reasonable due diligence;

m.    ~~turned a blind eye to Madoff's fraudulent activities for the simple reason that the Defendants' continued prosperity and very existence was directly and exclusively tied to Madoff - if he was exposed as a fraud, their vast empire would collapse; and~~

n.    ~~acted as Madoff's *de facto* partners by failing to act as fiduciaries and by lending their resources, marketing, reputation, protection, and undying allegiance to Madoff. The Defendants, along with many others, knowingly and actively aided Madoff, causing a catastrophic growth of the fraud and deepening of BLMIS's insolvency, the result of which was billions in damages to thousands of customers.~~

~~5.    Through this Amended Complaint the Trustee seeks the return of all Customer Property belonging to the BLMIS estate, in the form of redemptions, fees, compensation, and assets; as well as all damages, including but not limited to compensatory and punitive damages, caused by the Defendants' misconduct; and the disgorgement of all funds and properties by which the Defendants were unjustly enriched at the expense of BLMIS's customers.~~

5.    The relationship existed because the FGG partners were willing accomplices in Madoff's fraud. They needed Madoff to enrich themselves and were willing to lie to protect their relationship. Those deceptions found voice when they spun information to pacify existing FGG investors and to encourage new investment. In many cases, the FGG partners simply omitted material information about Madoff from their representations.

6.    The partners knew their success was a direct result of maintaining the Madoff relationship. As that relationship went, so went their careers and their bank accounts. Over the years, as questions about BLMIS's operations arose, the FGG partners covered for Madoff in deliberate efforts to get investors and regulators off the scent.

7.    One used his background as a former Securities and Exchange Commission attorney as his calling card to add an air of legitimacy to Madoff investment. Another suppressed his observations about BLMIS's inexplicable operations, noting that he saw it as his job to "live better than any of [his] clients."

8.    And the questions about BLMIS's suspicious operations were frequent and numerous. Clients raised them. Potential clients raised them. Most importantly, independent consultants

investigating or working for FGG raised them. These consultants brought signs of fraud at to the FGG partners' attention, but the partners ignored the warnings, protected BLMIS from inquiry, and continued to reap vast wealth from the BLMIS fraud.

9.      It is inescapable that FGG partners knew BLMIS was not trading securities. They knew BLMIS's returns could not be the result of the split strike conversion strategy (the "SSC Strategy"). They knew BLMIS's equities and options trading volumes were impossible. They knew that BLMIS reported impossible, out-of-range trades, which almost always were in Madoff's favor. They knew Madoff's auditor was not certified and lacked the ability to audit BLMIS. They knew BLMIS did not use an independent broker or custodian. They knew Madoff refused to identify any of BLMIS's options counterparties. They knew their clients and potential clients raised numerous due diligence questions they would not and could not satisfactorily answer. They knew Madoff would refuse to provide them with honest answers to due diligence questions because it would confirm the details of his fraud. They knew Madoff lied about whether he traded options over the counter or through the exchange. They knew they lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing. And they knowingly misled the SEC at Madoff's direction.

10.      Every step the FGG partners took was a calculated effort to maintain the viability of the BLMIS Ponzi scheme despite knowing Madoff was not engaged in the trading of securities.

## PARTIES

1 I. FGG was founded in 1983 and is a *de facto* partnership or partnership by estoppel. The FGG partnership is comprised of the named individual Defendants, as well as at least the following individuals: Lourdes Barreneche, Robert Blum, Cornelis Boele, Harold Greisman, Jacqueline Harary, Richard Landsberger, Daniel Lipton, Mark McKeefry, Maria Teresa Pulido Mendoza, Charles Murphy, and Santiago Reyes. FGG's principal place of business was in New York where it maintained an office at 919 Third Avenue, New York, New York 10022.

12.     Fairfield Sentry Limited ("Fairfield Sentry") was incorporated on October 30, 1990 under the International Business Companies Act of the British Virgin Islands, and automatically re-registered on January 1, 2007 as a business company under the BVI Business Companies Act of 2004. Fairfield Sentry commenced operations on December 1, 1990.

Fairfield Sentry is currently in liquidation proceedings commenced on April 21, 2009 in the Commercial Division of the High Court of Justice, British Virgin Islands. At times relevant to the conduct complained of, Fairfield Sentry conducted business in New York.

13.     Defendant Fairfield Greenwich Limited ("FG Limited") is a company organized and existing under the laws of the Cayman Islands. FG Limited is registered as a foreign company authorized to conduct business in New York County and listed New York City as its principal place of business. At times relevant to the conduct complained of, FG Limited maintained an office in New York. From 1997 forward, FG Limited served as the hub of FGG's financial structure. FGG entities channeled the fees they received to FG Limited. FG Limited distributed profits to its owners on a *pro rata* basis. For the FGG-operated funds using FG Limited as the investment manager or placement agent, FGG prepared Information Memoranda or private placement memoranda ("PPMs") identifying FG Limited's address in New York.

14.     Defendant Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda") is a company organized and existing under the laws of Bermuda with its principal place of business at 12 Church Street, Suite 606, Hamilton, Bermuda, HM 11. FG Bermuda was a wholly owned subsidiary of FG Limited until January 1, 2008, at which time ownership was transferred to the other FGG partners based on their FGG partner percentages. At all times relevant to the conduct complained of herein, FG Bermuda conducted business in New York and certain of its employees were based in New York. Except for administrative assistants, all FG Bermuda employees reported directly to FGG personnel in New York. FG Bermuda's files were maintained in New York.

15.    Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited liability company organized under the laws of the State of Delaware and is registered to do business in New York. FG Limited is the sole member and owner of FG Advisors. At times relevant to the conduct complained of herein, FG Advisors' principal place of business was in New York. In December 2001, FGG formed FG Advisors as a wholly owned subsidiary of FG Limited. FG Advisors registered as an investment advisor with the SEC on November 17, 2003 and provided administrative services and back-office support to Fairfield Sentry, Greenwich Sentry, L.P., Greenwich Sentry Partners, L.P., Fairfield Sigma Limited, and Fairfield Lambda Limited. In these roles, FG Advisors received management and performance fees.

16.    Defendant Fairfield International Managers, Inc. is incorporated in Delaware. Fairfield International Managers is an owner of FG Limited. At times relevant to the conduct complained of, Fairfield International Managers conducted business in New York. Fairfield International Managers served as Fairfield Sentry's investment manager from November 1990 to December 31, 1997, when the responsibility was transferred to FG Limited.

17.    Defendant Fairfield Investment Fund Limited ("FIFL") is a British Virgin Islands International Business Company, created on July 27, 2000. Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I. At times relevant to the conduct complained of, FIFL routinely conducted business in New York. FIFL was managed from FGG's New York City office, which was the client and billing contact for FIFL. FGG operated FIFL as a fund of funds. FG Advisors served as FIFL's investment manager. FG Limited served as FIFL's placement agent. FIFL's PPMs directed all FIFL investors or potential FIFL investors to communicate with the fund by corresponding with FG Limited or FG Advisors at FGG's New York City office. Defendants Jeffrey Tucker and Walter Noel served as FIFL's directors and managed FIFL with others such as Mark McKeefry in New York. Noel signed the written agreement on behalf of FIFL under

which FG Advisors and FG Limited provided investment advisory and placement agent services; Tucker signed that same agreement on behalf of FG Limited and FG Advisors.

18.    Defendant Stable Fund L.P. ("Stable Fund") is a Delaware limited partnership with its principal place of business at FGG's New York headquarters. FGG formed Stable Fund in September 2003 as a fund of funds limited to investment by FGG insiders and their families. Stable Fund invested a portion of its assets in Greenwich Sentry. FG Advisors served as Stable Fund's investment manager, for which it received a management fee. Tucker was the fund's managing member.

19.    Defendant Fairfield Greenwich Capital Partners ("FG Capital") is an investment vehicle incorporated as an S corporation under the laws of the State of Delaware. FG Capital maintained a place of business at 919 Third Avenue, New York, New York 10022. FG Capital held varying levels of shares in FG Limited, pursuant to the Second Amended and Restated Shareholder and Voting Agreement for Fairfield Greenwich Limited, effective July 1, 2008. Noel and Tucker, two of the three founding partners of FGG, created FG Capital to receive compensation from FG Limited and FG Advisors. They each owned a 50% share of FG Capital.

20.    Defendant Share Management LLC ("Share Management") is a limited liability corporation incorporated under the laws of the State of Delaware. Share Management's address of record for FGL shareholder notices and K-1 tax information is c/o Loeb, Block & Partners LLP, 505 Park Ave., 9th Floor, New York, NY 10022, with a copy to Corina Noel Piedrahita, Calle Somontes, 9, Puerta de Hierro, 28035 Madrid Spain. Additionally, Share Management's registered agent is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Share Management is a shareholder of FG Limited pursuant to the Second Amended and Restated Shareholder and Voting Agreement, effective July 1, 2008.
Share Management was established by FGG partner Corina Noel Piedrahita to receive her partnership distributions from FGG through FG Limited, thereby hiding the fact that she was the beneficiary of

millions of dollars in distributions resulting from BLMIS's fraud. Since establishing Share Management, Corina Noel Piedrahita operated it as her alter ego, exercising dominion, influence, and control over it and using its funds for her personal use and benefit.

21.    Defendant Walter Noel is an individual who maintains a residence and conducts or conducted business in New York.

22.    Defendant Jeffrey Tucker is an individual who maintains a residence and conducts or conducted business in New York.

23.    Defendant Andrés Piedrahita ("Piedrahita") is an individual who conducts or conducted business in New York.

24.    Defendant Amit Vijayvergiya is a citizen of Canada who conducts or conducted business in New York.

25.    Defendant Philip Toub is an individual who conducts or conducted business in New York.

26.    Defendant Corina Noel Piedrahita is an individual who conducts or conducted business in New York.

**BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

**A. BLMIS**

27.    Madoff founded BLMIS in 1960 as a sole proprietorship. In 2001, Madoff registered BLMIS as a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

28.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership

Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008. On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until December 11, 2008 (the "Filing Date"). SIPC membership is contingent on registration of the broker-dealer with the SEC.

29.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

30.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC in which FGG participated, which forced Madoff to register.

3 I. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

32.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B. The Ponzi Scheme**

33.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

34.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

35.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

36.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

Madoff s Investment Strategy

37.     BLMIS purported to execute two primary investment strategies for IA Business customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of IA Business

customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

38.     All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

39.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

40.     From the early 1990s forward, Madoff began telling IA Business customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.

41.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

42.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of- the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

43.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

44.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

45.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

46.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

47.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy. On over 800 separate occasions, the options volume reported by BLMIS for Fairfield Sentry greatly exceeded the total volume of comparable option contracts traded on the CBOE.

48.     Sophisticated or professional investors including FGG and Defendants knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that

exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

49.     BLMIS charged commissions on purportedly executed trades rather than industrystandard management and performance fees based on AUM or profits. By using a commissionbased structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

50.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year-end.

51.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

52.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

53.    BLMIS's execution, as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor, such as FGG and Defendants, would know it was statistically impossible.

### No Evidence of BLMIS Trading

54.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearinghouse for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

55.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### The Collapse of The Ponzi Scheme

56.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

57.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

58.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## II.    JURISDICTION AND VENUE

6.    ~~The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 (McKinney 2001)), New York Civil Practice Law and Rules (McKinney 2001), and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, unjust enrichment, conversion, money had and received, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, consequential and punitive damages, and objection to the customer claims filed by some of the Defendants. The Trustee seeks, among other things, to set aside all avoidable transfers, collect damages caused by the Defendants, preserve the stolen Customer Property for the benefit of BLMIS customers, and recover *all* stolen Customer Property from the Defendants, in whatever form it may now or in the future exist.~~

7.59.    This is an adversary proceeding ~~brought~~commenced in ~~the~~this Court, in which the main underlying SIPA proceeding, No. 08-01789 ~~(BRL) (the "SIPA Proceeding")~~(SMB), is pending. The ~~Securities Investor Protection Corporation ("SIPC")~~SIPA proceeding was originally brought ~~the SIPA Proceeding~~ in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 ~~(the "District~~and has been referred to this Court ~~Proceeding")~~. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA ~~§§~~§ 78eee(b)(2)(A), and (b)(4).

8.60.    This is a core proceeding ~~pursuant to~~under 28 U.S.C. ~~§§~~§ 157(b)(2)(A), ~~(C), (E), (F),~~ (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

9.61.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

62.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550(a), and other applicable law.

### ~~III.~~    BACKGROUND, THE TRUSTEE AND STANDING

~~10.~~63.  On ~~December 11, 2008 (~~the "Filing Date"~~)~~, Madoff was arrested by federal agents for criminal violations of ~~the criminal~~federal securities laws, including~~, *inter alia,*~~ securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC ~~filed the District Court Proceeding against Madoff, which remains pending. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS Investment Advisory business (the "BLMIS IA Business")~~commenced the District Court proceeding.

~~11.    On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").~~

~~12.~~64.  On December 15, 2008, ~~pursuant to~~under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, ~~*inter alia,*~~among other things, that BLMIS ~~was~~could not ~~able to~~meet its obligations to securities customers as they came due and~~, accordingly,~~ its customers needed the protections afforded by SIPA. ~~On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.~~

~~13.~~65.  Also on December 15, 2008, Judge Stanton granted SIPC~~"~~'s application and entered an order pursuant to SIPA ~~(the "Protective Decree")~~, which, in pertinent part:

a.~~Appointed~~•   appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.~~Appointed~~•   appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA
§ 78eee(b)(3); and

c.~~Removed~~•   removed the case to this ~~Bankruptcy~~ Court pursuant to SIPA § 78eee(b)(4)~~;~~.~~and~~

~~d.        Removed the Receiver for BLMIS.~~

14.    Pursuant to SIPA § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

15.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.66.    By orders dated December 23, 2008 and February 4, 2009, respectively, this

16.    By virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out Customer Property to BLMIS customers, assess claims, and liquidate any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS customers for the billions of dollars they invested through BLMIS. Consequently, the Trustee must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue recovery for BLMIS accountholders.

17.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth a fraction of that amount. Customer accounts had not accrued any real profits because no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, investors had already lost approximately $20 billion in principal.

18.    As Madoff admitted at his Plea Hearing, he never purchased any of the securities, options, or Treasurys for the BLMIS IA Business and the returns he reported to customers were entirely fictitious. Based on the Trustee's investigation to date, there is no record of BLMIS having cleared a single purchase or sale of

securities on any exchange in connection with the SSC Strategy.[2]

19.    For years, prior to his arrest, Madoff repeatedly represented that he conducted his options trading on the over-the-counter ("OTC") market rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the BLMIS IA Business ever entered into any OTC options trades on behalf of BLMIS account holders.

[2]
    Madoff did a *de minimus* amount of securities trading outside of the SSC Strategy—such trading is not at issue in the Trustee's allegations here.

20.    In connection with his efforts to recoup billions of dollars of stolen Customer Property, on May 18, 2009, the Trustee filed the Complaint in this action against the three Fairfield Greenwich Group ("FGG") entities that maintained accounts with BLMIS: Fairfield Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P. ("GS"), and Greenwich Sentry Partners, L.P. ("GSP") (collectively, the "Feeder Funds"). Each of the Feeder Funds maintained one or more customer accounts at BLMIS, were collectively among Madoff's largest sources of investor principal. The Feeder Funds withdrew billions of dollars from the BLMIS accounts. The Trustee initially filed suit against the Feeder Funds in order to recover all avoidable transfers BLMIS made to them.

21.    FGG is a trade name used to refer to a number of affiliated entities, including both domestic and foreign corporations, general partnerships, limited partnerships, trusts, and limited liability companies. Internally, those formal business structures were ignored. According to FGG's own documents, the profits earned by the myriad of FGG entities were distributed to individuals and entities based upon their "partnership" percentages in FGG.

22.    Fairfield Sentry is currently in liquidation. On July 21, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands appointed Kenneth Krys and Christopher Stride as Joint Official Liquidators of Defendant Fairfield Sentry. Defendant Fairfield Sigma Limited ("Sigma") and Defendant

Fairfield Lambda Limited ("Lambda") are two other FGG funds whose sole purpose was to invest all of their respective funds in Fairfield Sentry. Like Fairfield Sentry, both Sigma and Lambda are subject to liquidation proceedings in the British Virgin Islands. Mr. Krys and Mr. Stride were appointed by the Eastern Caribbean Supreme Court as Joint Official Liquidators of Sigma on the same day they were appointed as liquidators of Fairfield Sentry. On April 23, 2009, the Eastern Caribbean Supreme Court appointed Mr. Stride as the Official Liquidator of Lambda.

23.    This Amended Complaint includes new allegations and causes of action against the Feeder Funds, as well as claims against additional Defendants. The Feeder Funds are no longer directly in possession of the majority of the billions of dollars in transfers they received from BLMIS. They have transferred over one billion dollars to other FGG entities as payments for purported management, performance, and administrative fees. Those FGG entities then used hundreds of millions of those dollars to pay percentage distributions to each of FGG's partners. In addition, the Feeder Funds have transferred funds to their investors, which include other FGG entities, which redeemed shares or limited partnership interests in the Feeder Funds.

24.    The newly named Defendants include additional FGG affiliated hedge funds that invested in the Feeder Funds to benefit from their investments with Madoff, and the investment managers and related affiliates that received over a billion dollars of management and performance fees for supposedly monitoring the funds' investments with BLMIS (the "FGG Affiliates"). Three of the FGG Affiliates, Fairfield Greenwich (Bermuda), Ltd. ("FGB"), Fairfield Greenwich Limited ("FGL"), and Greenwich Bermuda Limited ("GBL"), served as general partners to GS and GSP and are liable for all avoidable transfers received by GS and GSP during the periods in which FGB, FGL, and GBL served as general partners.

25.    The Amended Complaint also names as Defendants individual partners and principal wrongdoers within the FGG organization who received hundreds of millions of dollars for orchestrating FGG's extraordinary role in the scheme. These individuals fall into two categories: those in management positions (the "Management

~~Defendants") and those involved in marketing the funds (the "Sales Defendants") (collectively the "FGG~~

~~Individuals"). The Feeder Funds, the FGG Affiliates, the Management Defendants, and the Sales Defendants are~~

~~referred to, collectively, as the "Defendants."~~

~~26.    The Trustee brings this action against the Defendants to, among other things, recover all funds~~

~~received, directly or indirectly, from the BLMIS IA Business.~~

~~27.    BLMIS was insolvent at all times relevant to this proceeding. BLMIS's liabilities were billions of~~

~~dollars greater than its assets. Because BLMIS could not meet its obligations as they came due, BLMIS was~~

~~insolvent at the time it made each of the transfers.~~

~~28.    This Amended Complaint and similar complaints are being filed to recapture stolen monies as well~~

~~as damages caused to customers through wrongful acts, and to require the Defendants to disgorge the illegal~~

~~profits by which they were unjustly enriched at the expense of the customers. All Customer Property recovered by~~

~~the BLMIS estate shall first be distributed pro rata among BLMIS customers in accordance with~~

Court approved the Trustee's bond and found that the Trustee was a disinterested person.
Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

67.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA proceeding.

68.    At a plea hearing on March 12, 2009, in the case captioned *United States* v. *Madoff,* Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted in his allocution statement that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

69.    Madoff stated in his March 12, 2009 allocution:

The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years up and until I was arrested on December 11, 2008. I never invested these funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan Bank account that belonged to them or other clients to pay the requested funds.

70.    In the same allocution, Madoff detailed his SSC Strategy:

Through the split strike conversion strategy, I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their market capitalization. I promised I would select a basket of stocks that would closely mimic the price movements of the Standard & Poors 100 index. I promised I would opportunistically time those purchases and would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities, such as United States Treasury bills. In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting the potential client losses caused by unpredictable changes in stock prices. In fact, I never made those investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

71.    BLMIS investment advisory customers received account statements from BLMIS that purported to reflect securities transactions involving stocks and Government-issued securities related to the SSC Strategy, and investment returns that appeared as though their investments with BLMIS were profitable. Madoff further explained in his allocution:

To further cover up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me.

72.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali,* Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that neither purchases nor sales of securities took place in connection with

BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

73.     At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that security trading was occurring in their investment accounts when in fact, no trades were being made. DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all. . . .
>
> Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client. . . .
>
> I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

74.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel,* Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

75.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

76.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS and/or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

## IV.    TRUSTEE'S POWERS AND STANDING

29.77.  Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5,5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicableapply to this caseproceeding to the extent consistent with SIPA §§ 8pursuant to SIPA § 78fff(b).

30.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

31.    The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.    the Defendants received "Customer Property" as defined in SIPA § 78lll(4);

b.    BLMIS incurred losses as a result of the conduct set forth herein;

c.    BLMIS customers were injured as a result of the conduct detailed herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all

of their losses;

e.      the Trustee will not be able to fully satisfy all claims;

f.      the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

g.      as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.      the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

V.      **DEFENDANTS**

A.      *The Feeder Funds*

32.     **Fairfield Sentry**: Defendant Fairfield Sentry is a hedge fund, currently in liquidation, that is part of the FGG organization, and which maintained accounts at BLMIS. The fund is organized as an international business company under the laws of the British Virgin Islands. Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

33.     Fairfield Sentry opened its first account at BLMIS in November 1990 (Account No. 1FN012) and a second account in October 1992 (Account No. 1FN045). The fund also opened corresponding options accounts (Account Nos. 1FN069 and 1FN070). (A true and accurate copy of exemplar account agreements for Fairfield Sentry is attached hereto as Ex. 1.) All accounts were still open when Madoff was arrested on December 11, 2008.

Prior to Madoff's arrest, Fairfield Sentry deposited almost $4.3 billion and withdrew approximately $3.3 billion from those accounts. (A summary chart of Fairfield Sentry's withdrawals from its BLMIS accounts is attached hereto as Ex. 2.)

---

3    All references to exhibits attached to this Amended Complaint will be indicated as "Ex. ."

34.    Fairfield Sentry is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York and entered into agreements in New York, New York including agreements relating to its BLMIS accounts, which it delivered to BLMIS headquarters in New York, New York.

35.    At all relevant times, Fairfield Sentry was a customer of BLMIS, which operated its principal place of business in New York, New York and maintained Fairfield Sentry's account in New York, New York. At least one of Fairfield Sentry's account agreements contained a choice of law provision indicating the agreement was made in New York and would be construed pursuant to New York law. (*See* Ex. 1.) Fairfield Sentry utilized New York banks when it redeemed funds distributed to it by BLMIS and when it invested additional funds with BLMIS. Specifically, Fairfield Sentry wired funds to BLMIS's account at JPMorgan Chase Account # 000000140081703 (the "703 Account"), in New York, New York, for application to its accounts and for the conducting of trading activities. (Prior to 2008, the 703 Account's complete account number was 140-081703.)

36.    On May 12, 2009, FGG issued a press release stating that FGG professionals actively monitored FGG's investments through Madoff and conducted due diligence both in Bermuda and New York. (A true and accurate copy of the May 12, 2009 press release is attached hereto as Ex. 3.)

37.    In addition, Fairfield Sentry filed customer claims seeking to recover funds it allegedly lost on its investments through BLMIS. By filing its customer claims, Fairfield Sentry submitted to the jurisdiction of this Court.

38. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Fairfield Sentry based on the fund's contacts with the U.S.

39. **GS**: Defendant GS is a hedge fund that is part of the FGG organization and that maintained an account at BLMIS. GS is a limited partnership organized under the laws of the State of Delaware. Its registered agent is Corporation Service Company, 2711 Centreville Road, Suite 400, Wilmington, Delaware 19808.

40. GS opened its account at BLMIS in November 1992 (Account No. 1G0092). This account was still open when Madoff was arrested on December 11, 2008. (A true and accurate copy of exemplar account agreements for GS is attached hereto as Ex. 4.) Prior to Madoff's arrest, GS deposited approximately $420.6 million into this account and withdrew $281.1 million from this account. (A summary chart of GS's withdrawals from its BLMIS account is attached hereto as Ex. 5.)

41. GS is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York and entered into agreements in New York, New York, which it delivered to BLMIS headquarters in New York, New York. At all relevant times, GS was a customer of BLMIS, which operated its principal place of business in New York, New York. GS utilized New York banks when it redeemed funds distributed to it by BLMIS and when it invested additional funds with BLMIS. Specifically, GS wired funds to the 703 Account in New York, New York, for application to its account and for the conducting of trading activities.

42. As previously noted, on May 12, 2009, FGG issued a press release stating FGG professionals actively monitored FGG's investments through BLMIS and conducted due diligence both in Bermuda and New York City. (*See* Ex. 3.)

43. In addition, GS filed a customer claim seeking to recover funds it allegedly lost on its investments

through BLMIS, whereby it submitted to the jurisdiction of this Court.

44.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over GS based on the fund's contacts with the U.S.

45.    **GSP**: Defendant GSP is a hedge fund that is part of the FGG organization, and which maintained an account at BLMIS. GSP is a limited partnership organized under the laws of the State of Delaware. Its registered agent is Corporation Service Company, 2711 Centreville Road, Suite 400, Wilmington, Delaware 19808.

46.    GSP opened its account at BLMIS in May 2006 (Account No. 1G0371). (A true and accurate copy of exemplar account agreements for GSP is attached hereto as Ex. 6.) This account was still open when Madoff was arrested on December 11, 2008. Prior to Madoff's arrest, GSP deposited nearly $9.5 million into this account and withdrew almost $6.0 million from this account. (A summary chart of GSP's withdrawals from its BLMIS account is attached hereto as Ex. 7.)

47.    GSP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, and entered into agreements in New York, New

York, which it delivered to BLMIS headquarters in New York, New York. At all relevant times, GSP was a customer of BLMIS, which operated its principal place of business in New York, New York. GSP utilized New York banks when it redeemed funds distributed to it by BLMIS and when it invested additional funds with BLMIS. Specifically, GSP wired funds to the 703 Account in New York, New York, for application to its account and for the conducting of trading activities.

48.    As previously noted, on May 12, 2009, FGG issued a press release stating FGG professionals

actively monitored FGG's investment through BLMIS and conducted due diligence both in Bermuda and New York. (*See* Ex. 3.)

49.     In addition, GSP filed a customer claim seeking to recover funds it allegedly lost on its investments through BLMIS, whereby it submitted to the jurisdiction of this Court.

50.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over GSP based on the fund's contacts with the U.S.

### B.     *FGG Affiliates*

#### 1. Other FGG Funds

51.     **Sigma**: Defendant Sigma is an FGG fund wholly invested in Fairfield Sentry. The fund was organized on November 20, 1990 under the British Virgin Islands' International Business Companies Act, and began operations in 1997. Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

52.     Sigma accepted investments in Euros, which it converted to U.S. Dollars and invested in Fairfield Sentry. Fairfield Sentry then invested at least 95% of its assets in BLMIS. Through its investment in Fairfield Sentry, Sigma was an indirect investor through BLMIS.

53.     Between 2003 and 2008, Sigma redeemed approximately $752.3 million from Fairfield Sentry. (A true and accurate copy of Sigma's redemption confirmations is attached hereto as Ex. 8.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Sigma's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

54.    Sigma is subject to personal jurisdiction in this judicial district because Sigma filed a customer claim to recover funds it allegedly lost on its investments in Sentry, whereby it submitted to the jurisdiction of this Court.

55.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Sigma based on the fund's contacts with the U.S.

56.    **Lambda**: Defendant Lambda is an FGG fund wholly invested in Fairfield Sentry. The fund was organized on December 7, 1990 under the British Virgin Islands' International Business Companies Act, and began operations in 1999. Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

57.    Lambda accepted investments in Swiss francs, which it converted to U.S. Dollars and invested in Fairfield Sentry. Fairfield Sentry then invested at least 95% of its assets in BLMIS. Through its investment in Fairfield Sentry, Lambda was an indirect investor through BLMIS.

58.    Between 2003 and 2008, Lambda redeemed over $52.9 million from Fairfield Sentry. (A true and accurate copy of Lambda's redemption confirmations are attached hereto as Ex. 9.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Lambda's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

59.    Lambda is subject to personal jurisdiction in this judicial district because Lambda filed a customer claim to recover funds it allegedly lost on its investments in Sentry, whereby it submitted to the jurisdiction of this Court.

60.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Lambda based on the fund's contacts with the U.S.

61.    **Chester Global Strategy Fund Limited ("Chester")**: Defendant Chester is an FGG fund partially invested in Fairfield Sentry. Chester was created as a fund of funds, and placed its investors' money with other hedge funds. The fund is organized as a limited liability company under the laws of the Cayman Islands and began operations on March 1, 2003. Defendant Andrés Piedrahita ("Piedrahita") is one of the fund's directors.

62.    Union Bancaire Privée ("UBP") acted as the fund's investment adviser and custodian. Chester borrowed 30-40% of the net asset value of the fund from UBP for the purpose of making leveraged investments.

63.    Between 2005 and 2007, Chester redeemed over $71.7 million from Fairfield Sentry. Chester liquidated its remaining position in Fairfield Sentry on July 19, 2007 by redeeming over $10.6 million. (A true and accurate copy of Chester's redemption confirmations is attached hereto as Ex. 10.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Chester's redemptions are Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

64.    Chester is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activity in New York, New York, and derived significant revenue from New York, New York. Specifically, Chester was managed out of FGG's New York City office.

65.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with

minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Chester based on the fund's contacts with the U.S.

66.    **Chester Global Strategy Fund, LP ("Chester LP")**: Defendant Chester LP is an FGG fund partially invested in GS. Chester LP was created as a fund of funds, and placed its investors' money with other hedge funds. The fund is organized as a Delaware limited partnership and maintained its principal place of business in New York, New York.

67.    In November 2008, Chester LP redeemed over $853,000 from GS. (A true and accurate copy of Chester LP's redemption confirmation is attached hereto as Ex. 11.) Upon information and belief, in order to pay this redemption, GS withdrew funds from its BLMIS account. As such, Chester LP's redemption is Customer Property subject to turnover to the Trustee and/or an avoidable subsequent transfer from BLMIS recoverable by the Trustee.

68.    Chester LP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activity in New York, New York, and derived significant revenue from New York, New York. Specifically, Chester LP was managed out of FGG's New York City office.

69.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Chester LP based on the fund's contacts with the U.S.

70.    **Irongate Global Strategy Fund Limited ("Irongate")**: Defendant Irongate is an FGG fund partially invested in Fairfield Sentry. Irongate was created as a fund of funds, and placed its investors' money with other hedge funds. It was created as a limited liability company under the laws of the Cayman Islands and began

operations on July 1, 2004. The fund's registered office is c/o Citco Fund Services (Cayman Islands) Limited, Corporate Centre, West Bay Road, P.O. Box 31106SMB, George Town, Cayman Islands. Piedrahita is one of the fund's directors.

71.    In 2007, Irongate redeemed over $36.3 million from Fairfield Sentry. Irongate liquidated its remaining position in Fairfield Sentry on July 19, 2007 by redeeming over $31.3 million. (A true and accurate copy of Irongate's redemption confirmations is attached hereto as Ex. 12.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Irongate's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

72.    Irongate is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, Irongate was managed out of FGG's New York City office.

73.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Irongate based on the fund's contacts with the U.S.

74.    **Fairfield Greenwich Fund (Luxembourg) ("FGF")**: Defendant FGF is an FGG fund partially invested in Fairfield Sentry. The fund was incorporated as a Société d'Investissement à Capital Variable in Luxembourg on October 22, 2002. Its registered office is located at 28 Avenue Monterey, L-2163 Luxembourg. Defendant Walter Noel ("Noel") serves as Chairman of the Board of Directors.

75.    FGF was created as an umbrella fund that would provide investors with a choice of investment in

several sub-funds. As of December 31, 2005, FGF had only one sub-fund, Fairfield Guardian Fund ("Fairfield Guardian"). FGF was invested in Fairfield Sentry both directly and through Fairfield Guardian.

76.    Between 2004 and 2006, FGF redeemed approximately $2.8 million from Fairfield Sentry. (A true and accurate copy of FGF's redemption confirmations is attached hereto as Ex. 13.) In addition, Fairfield Guardian redeemed from Fairfield Sentry throughout 2005. (A true and accurate copy of an internal FGG chart showing Fairfield Guardian's redemptions from Fairfield Sentry is attached hereto as Ex. 14.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, FGF's and Fairfield Guardian's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

77.    FGF is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGF was managed out of FGG's New York City office.

78.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGF based on the fund's contacts with the U.S.

78.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 549, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## THE FAIRFIELD GREENWICH GROUP

### Noel and Tucker Founded and Strategically Expanded FGG

79.    ~~Fairfield Investment Fund Limited ("FIFL")~~: ~~Defendant FIFL is an FGG fund partially invested in Fairfield Sentry and GS. FIFL was created as a fund of funds which invested in other funds. It was created as a British Virgin Islands International Business Company on July 27, 2000, and began operations on July 1, 2004. Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I. Noel and Defendant Jeffrey Tucker ("Tucker") serve on the fund's Board of Directors.~~ In 1988, Tucker joined FGG as a founding partner and together with Noel expanded the business into a multi-billion-dollar enterprise, primarily by creating multiple BLMIS investment vehicles and associated entities. "FGG" came to refer to the multitude of FGG-founded entities, which, along with their principals and owners, held themselves out as and conducted themselves as a partnership. Through entities that Noel, Tucker, and their partners owned and controlled, revenues, in the form of management, performance, and placement fees, in excess of a billion dollars, flowed into FGG's coffers.

80.    ~~Between 2003 and 2008, FIFL redeemed approximately $288.1 million from Fairfield Sentry. FIFL redeemed approximately $9.0 million in October 2008, which constituted a liquidation of FIFL's entire remaining position in Fairfield Sentry. (A true and accurate copy of FIFL's redemption confirmations is attached hereto as Ex. 15.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, FIFL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ Noel and Tucker, who endowed FGG with their considerable investment industry experience, were principals of the many entities comprising FGG, including Fairfield Sentry,

Greenwich Sentry, and Greenwich Sentry Partners, BLMIS feeder funds which were investment funds that pooled their investors' assets for investment with BLMIS. Exhibit 1 lists FGG's accounts at BLMIS.

81.    ~~FIFL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York. Specifically, FIFL was managed out of FGG's New York City office.~~Noel started in the industry as a private banker in Switzerland before working at Citigroup and then heading Chemical Bank's international private banking practice in Switzerland, Nigeria, and Brazil. In 1983, Noel left Chemical Bank to start a consulting firm to advise investors on alternative investments.

82.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIFL based on the fund's contacts with the U.S.~~Tucker was an attorney with the SEC's enforcement division from 1970 to 1978. He later entered private practice where one of his clients was Fred Kolber & Co., a registered broker-dealer with successful practices in arbitrage and hedge trading and equity options market making on the American Stock Exchange and Chicago Board Options Exchange ("CBOE").

83.    **~~Fairfield Investors (Euro) Limited ("FIL-Euro")~~**~~: Defendant FIL-Euro is an FGG fund created as an international business company under the laws of the British Virgin Islands. Its principal business office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I. Defendant Cornelis Boele ("Boele") serves on the fund's Board of Directors.~~In 1987, Tucker joined Fred Kolber & Co. as a general partner, where they launched a domestic hedge fund, the Greenwich Options Fund. Tucker handled the fund's administration and marketing.

84.    ~~FIL-Euro was created to invest in and trade both securities and other financial instruments. The fund allocated its assets principally to the purchase of shares of FIFL. As explained above, FIFL invested assets in Fairfield Sentry and GS.~~That same year, Tucker and Noel became acquainted when Tucker and Kolber sublet office space for the Greenwich Options Fund from Noel.

Impressed with Greenwich Options Fund's performance, Noel wanted in. He told Kolber he could raise investment capital for an offshore counterpart he envisioned. In 1988, Noel, Tucker, and Kolber launched Fairfield International Limited, the first FGG offshore fund.

85.    ~~FIFL, the fund through which FIL-Euro invested in Fairfield Sentry and GS, redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008. (*See* Ex. 15.) Upon information and belief, in order to pay FIFL's redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. FIFL then transferred the funds to FIL-Euro when FIL-Euro redeemed its shares of FIFL. As such, FIL-Euro's redemptions from FIFL constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~It was Fairfield International Limited's and Greenwich Options Fund's combination of money management and distribution services that gave rise to FGG, as the enterprise came to be known.

86.    ~~FIL-Euro is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIL-Euro was managed out of FGG's New York City office.~~By early 1989, Noel and Tucker felt that, combined, the two funds commanded too much capital to continue to employ a purely market-neutral strategy. They set out to find "alternative/non-traditional managers" to manage a portion of the funds' capital.

87.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIL-Euro based on the fund's contacts with the U.S.~~One such manager was Madoff, to whom they were introduced in 1989 by Tucker's father-in-law. Madoff sold them on the SSC Strategy, which they began to "test"

with small investments. This paved the way for Tucker and Noel to launch a series of BLMIS investment vehicles and entities over the next several years.

**Noel and Tucker Establish Fairfield Sentry**

88.    ~~Fairfield Investors (Swiss Franc) Limited ("FIL-Swiss"):~~ ~~Defendant FIL-Swiss is an FGG fund incorporated as an international business company under the laws of the British Virgin Islands on June 6, 1996. Its registered office is located at Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I. Boele serves on the fund's Board of Directors.~~ On October 30, 1990, Noel and Tucker formed Fairfield Sentry, a "single investment fund employing the split-strike conversion strategy" and appointed Noel as a director. Fairfield Sentry was a shell entity with no employees.

89.    ~~FIL-Swiss was created to allocate its assets principally to the purchase of shares of FIFL. As explained above, FIFL invested funds in Fairfield Sentry and GS.~~ In November 1990, Fairfield Sentry opened a BLMIS account with a $4 million deposit. Noel and Tucker offered shares of Fairfield Sentry to non-U.S. taxpayers at a minimum initial investment of $100,000. Under Fairfield Sentry's offering memorandum, the fund's investment manager was required to invest no less than 95% of the fund's assets through BLMIS.

90.    ~~FIFL, the fund through which FIL-Swiss invested in Fairfield Sentry and GS, redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008. (*See* Ex. 15.) Upon information and belief, to pay FIFL's redemptions, Fairfield Sentry withdrew funds from BLMIS. FIFL then transferred the funds to FIL-Swiss when FIL-Swiss redeemed its shares of FIFL. As such, FIL-Swiss's redemptions from FIFL constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ Fairfield Sentry opened a second BLMIS account in 1992. The account opening documents for both accounts listed Fairfield International Managers' Greenwich office as Fairfield Sentry's address.

91.    ~~FIL-Swiss is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIL-Swiss was managed out of FGG's New York City office, and the fund's investment manager, Fairfield Greenwich Advisors LLC *(see infra ^148-157)*, is located in New York, New York.~~ From the beginning, to comport with Madoff's requirement for BLMIS feeder funds, Fairfield Sentry ceded control of not only its investment decisions, but also the custody of its assets, to BLMIS. Noel and Tucker arranged for Citco Global Custody N.V. to be listed as Fairfield Sentry's custodian with the understanding that Citco would hold that position in name only, as custodian duties were contractually delegated to BLMIS.

92.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIL-Swiss based on the fund's contacts with the U.S.~~ Responsibility for Fairfield Sentry's investment decisions was, likewise, delegated to BLMIS. Even so, Fairfield International Managers was listed as Fairfield Sentry's investment adviser, for which it was paid a 20% performance fee. Through this arrangement, FGG received hundreds of millions of dollars in fees.

93.    **Fairfield Investors (Yen) Limited ("FIL-Yen")**: ~~Defendant FIL-Yen is an FGG fund incorporated as an international business company under the laws of the British Virgin Islands on January 1, 2004. Its registered office is located at Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I. Tucker serves on the fund's Board of Directors.~~ As Noel and Tucker raised investment capital for Fairfield Sentry and built the FGG enterprise, they cemented their relationship with Madoff, meeting frequently and socializing, eventually coming to inhabit, with their families, the same social circles.

**Noel and Tucker Expanded the FGG Infrastructure and Formed Investment Vehicles to Increase FGG's Capacity for BLMIS Investment**

94.   ~~FIL-Yen was created to allocate its assets principally to the purchase of shares of FIFL. As explained above, FIFL invested funds in Fairfield Sentry and GS.~~ After forming Fairfield Sentry, Noel and Tucker continued to expand FGG, aggressively marketing new BLMIS investment vehicles. As FGG's fees were based on AUM, the greater the investment with FGG, the greater its fees.

95.   ~~FIFL, the fund through which FIL-Yen invested in Fairfield Sentry and GS, redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008. (*See* Ex. 15.) Upon information and belief, to pay FIFL's redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. FIFL then transferred the funds to FIL-Yen when FIL-Yen redeemed its shares of FIFL. As such, FIL-Yen's redemptions from FIFL constitute Customer Property~~ Fairfield Sentry was a U.S. dollar-denominated fund limited to investment from non-United States taxpayers, narrowing the pool of potential investors. To attract other investors, Noel and Tucker set up fund structures that accepted U.S. taxpayer investors and investors seeking to invest in non-U.S. currencies. ~~subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~

96.   ~~FIL-Yen is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, and purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIL-Yen was managed out of FGG's New York City office, and the fund's investment manager, FGA, is located in New York, New York.~~ To continue FGG's expansion, Noel and Tucker formed Fairfield Sigma as a British Virgin Islands International Business Company. Fairfield Sigma accepted subscriptions in Euros and was wholly invested in Fairfield Sentry.

97.   ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIL-Yen~~

based on the fund's contacts with the U.S. To attract investors using Swiss francs, Noel and Tucker formed Fairfield Lambda, a BVI International Business Company that also invested 100% of its assets in Fairfield Sentry.

98.    **Fairfield Investment Trust ("FIT")**: Defendant FIT is a multi-series unit trust established under the Trusts Law of the Cayman Islands on December 12, 2001. Citco Trustees (Cayman) Limited acts as FIT's trustee, and the trust's registered office is located at Corporate Center, Windward One, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands, B.W.I. To attract U.S. investors, Noel and Tucker formed Greenwich Sentry as a Delaware limited partnership. Greenwich Sentry was marketed in the United States and sold to U.S. taxpayers. BLMIS served as Greenwich Sentry's execution agent and custodian, holding substantially all of Greenwich Sentry's assets.

99.    FIT has established at least two series trusts: Fairfield GCI (USD) Fund and Fairfield GCI (JPY) Fund (the "FIT Funds"). The FIT Funds were created as funds of funds, and placed their investors' money with other hedge funds. One of the hedge funds the FIT Funds invested in was Fairfield Sentry. Noel and Tucker ensured that they, and later, FG Limited and FG Bermuda, received management and performance fees generated by Greenwich Sentry. At various times, FG Limited and FG Bermuda served as the general partner for Greenwich Sentry. As a shareholder in FG Limited and FG Bermuda, Fairfield International Managers received an annual performance fee of 20% of Greenwich Sentry's gains.

100.    Through Fairfield GCI (USD), FIT redeemed over $5.2 million from Fairfield Sentry between 2003 and 2008. (A true and accurate copy of Fairfield GCI (USD)'s redemption confirmations is attached hereto as Ex. 16.) Through Fairfield GCI (JPY), FIT redeemed approximately $5.2 million from Fairfield Sentry between 2003 and 2007. (A true and accurate copy of Fairfield GCI (JPY)'s redemption confirmations is attached hereto as Ex. 17.) Upon information and belief, in order to pay these

redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Fairfield GCI's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. In 2006, FGG moved some Greenwich Sentry investors into another feeder fund, Greenwich Sentry Partners, a Delaware limited partnership. BLMIS served as Greenwich Sentry Partners' investment manager, execution agent, and custodian, and thus held substantially all of Greenwich Sentry Partners' assets. FG Bermuda served as Greenwich Sentry Partners' general partner.

101.    FIT is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIT was managed out of FGG's New York City office. Noel and Tucker served in many capacities for FGG. Noel was a member of the Executive Committee in charge of FGG's day-to-day management, a director of Fairfield Sentry, Fairfield Sigma and FG Bermuda, and, at one time, a general partner of Greenwich Sentry. Tucker also served on the Executive Committee, and was a director of FG Bermuda and FG Limited, and, at one time, a general partner of Greenwich Sentry.

**Andrés Piedrahita Joins FGG**

102.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIT based on the trust's contacts with the U.S. Despite their aggressive expansion of FGG, Noel and Tucker ensured that FGG would retain its culture of insularity. They accomplished this by bringing family members with investment industry connections on board, granting them FGG ownership interests, and enriching them with fees FGG and its constituent entities generated through investment with BLMIS.

103. ~~**FIF Advanced, Ltd. ("FIFA")**: Defendant FIFA is an FGG fund partially invested in Fairfield Sentry. FIFA was created as a fund of funds, and placed its investors' money with other hedge funds. FIFA was incorporated as an international business company under the laws of the British Virgin Islands. Its registered office is located at Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I. Noel sits on the fund's Board of Directors.~~ In 1989, Noel's daughter, defendant and FGG partner Corina Noel Piedrahita, married Piedrahita. Piedrahita was a financial investments marketer with a large international client base developed through his New York-based investment management firm, Littlestone Associates. Piedrahita's stated goal was to "live better than any of his clients."

104. ~~Between 2004 and 2007, FIFA redeemed over $45.2 million from Fairfield~~ In October 1997, Noel, Tucker, and Piedrahita agreed to combine FGG and Littlestone Associates. Thereafter, FGG named Piedrahita its third "founding partner," along with Noel and Tucker.

~~Sentry. Its redemption of $4.6 million in October 2007 constituted a complete liquidation of its shares. (A true and accurate copy of FIFA's redemption confirmations is attached hereto as Ex. 18.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts and then transferred the funds to FIFA. As such, FIFA's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~

105. ~~FIFA is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIFA was managed out of FGG's New York City office, and the fund's investment manager, FGA, is located in New York, New York.~~ To reflect their FGG ownership interests post-merger, Noel, Tucker, and Piedrahita formed defendant FG Limited, an Irish corporation, 66.7% owned by Noel and Tucker through Fairfield International Managers, and 33.3% owned by Piedrahita. FG Limited was later reorganized as a Cayman Islands company. But FG Limited never had

employees in, nor did it ever maintain an office in, Ireland or the Cayman Islands. When FG Limited registered to do business in New York, it listed its principal executive office as FGG's New York headquarters.

106. ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIFA based on the fund's contacts with the U.S~~In 2001, Piedrahita transferred his ownership interest in FG Limited to Safehand Investments, his Cayman Islands corporation. Piedrahita organized Safehand Investments and wholly owns it through a Piedrahita-settled trust, RD Trust. Since organizing Safehand Investments, Piedrahita operated it as his alter ego, exercising dominion, influence, and control over it and using its funds for his personal use and benefit. Safehand Investments received distributions from FG Limited and FG Bermuda at Piedrahita's request, thereby hiding the fact that Piedrahita was the beneficiary of millions of dollars in distributions resulting from BLMIS's fraud. Both Safehand Investments and PF Trustees Limited in its capacity as trustee of RD Trust are defendants in a separate adversary proceeding. Piedrahita always maintained an office in FGG's New York headquarters.

107. **~~Sentry Select Limited ("SSL")~~**: ~~Defendant SSL is an FGG fund partially invested in Fairfield Sentry. It was created as an international business company under the laws of the British Virgin Islands. Its principal business office is c/o Citco B.V.I. Limited, P.O. Box 662, Road Town, Tortola, B.V.I. Noel serves on the fund's Board of Directors.~~Though Piedrahita was one of the founding partners, he also embraced his role as a salesman, and worked to grow FGG. As part of his duties, Piedrahita regularly met with Madoff at BLMIS's headquarters, hosted dinners and client events in New York, attended FGG Executive Committee and Board of Directors meetings in New York, and signed client communications using a New York address block.

108. ~~SSL was created to allocate assets between two other FGG funds, Fairfield Sentry and Arlington International Fund ("AIF"). Eighty percent of the fund's assets were invested in Fairfield Sentry, and the remaining 20% went to AIF.~~ Piedrahita shared with Noel and Tucker the responsibilities of managing and supervising FGG's efforts in Europe and Latin America. Piedrahita also drew on his close personal relationship with Madoff, hosting Madoff on his yacht.

109. ~~SSL redeemed at least $60,000 from Fairfield Sentry in 2004, and may have redeemed additional shares in other years. (A true and accurate copy of SSL's redemption request is attached hereto as Ex. 19.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts and then transferred the funds to SSL. As such, SSL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ Piedrahita and Noel marketed FGG and traveled the world to recruit investment capital for FGG. Tucker was in charge of day-to-day operations and managed FGG's Madoff relationship, reporting back to the partnership.

110. ~~SSL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, SSL was managed out of FGG's New York City office.~~ The three founders ran FGG as a tight-knit family organization. Madoff frequently met with the Defendants in person at the BLMIS offices, for lunch and dinner, and at social functions. Tucker met with Madoff at least 44 times between 1997 and 2008. Noel met with him at least 10 times. Vijayvergiya, FGG's Chief Risk Officer, visited BLMIS's offices at least once or twice each year. Madoff also held in-person meetings with other FGG employees and had additional meetings scheduled in his calendar with the "Fairfield" team. Madoff kept the contact information for Tucker, Noel, and McKeefry, FGG's Chief

Legal Officer and Chief Operating Officer in his personal calendar, alongside that of various other Madoff insiders.

111.   Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over SSL based on the fund's contacts with the U.S.

112.   **Stable Fund LP ("Stable Fund")**: Defendant Stable Fund was an FGG fund partially invested in GS. Stable Fund was created as a fund of funds, and placed its investors' money with other hedge funds. Stable Fund was a Delaware limited partnership with its registered office located at Fairfield Greenwich Partners, LLC, 919 Third Avenue, 11th Floor, New York, New York 10022.

11 I. Emphasizing the importance of Madoff to FGG, on April 29, 2008, Piedrahita wrote all FGG employees stressing, "[o]ur industry is without a shadow of a doubt going through one of the most challenging periods in its history. March was the first time that everything that could go wrong did go wrong AND over every single strategy, the exception being our favourite and steadfast Uncle Bernie, who is always there to give us a helping hand."

**Keeping FGG in the Family**

112.    Four of Noel's daughters married investment industry professionals and FGG capitalized on their husbands' contacts. Corina Noel Piedrahita was the first, marrying Piedrahita, who expanded FGG's sources of investment capital. She and Piedrahita resided in the United States, maintaining multiple residences in New York between 2001 and 2008, as well as residences in Connecticut, Florida, and Spain.

113.   Upon information and belief, the only investors allowed to purchase limited partnership interests in Stable Fund were FGG partners and employees, and their respective spouses. Noel's daughter, Lisina, married Yanko della Schiava in 1991. Della Schiava joined FGG in 1999 and served as a key

sales employee in charge of business development raising investment capital in southern Europe. Della Schiava became an FGG partner in 2008 and was the Managing Director of the Global Business Development section of FGG's client group.

114.    ~~In October 2008, Stable Fund redeemed $4.4 million from GS. (A true and accurate copy of Stable Fund's redemption confirmation is attached hereto as Ex. 20.) Upon information and belief, in order to pay this redemption, GS withdrew funds from its BLMIS accounts and then transferred the funds to Stable Fund. As such, Stable Fund's redemption constitutes Customer Property subject to turnover to the Trustee and/or an avoidable subsequent transfer from BLMIS recoverable by the Trustee.~~Noel's daughter, Alix, married defendant Toub. Since joining FGG in 1997, Toub focused his business development activities on Brazil and the Middle East. He was an FGG partner and served on FGG's Executive Committee.

115.    ~~Stable Fund is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, Stable Fund was managed out of FGG's New York City office, and Stable Fund's general partner, Fairfield Greenwich Partners, LLC ("FGP") *(see infra* ^163-167), is located in New York, New York.~~In 2002, Noel's daughter, Marisa, married Matthew Brown, then a rising star in the investment banking industry. Brown merged his company with FGG in 2005, and worked in the New York office, where he was responsible for marketing, managing third-party platforms, and global business development. He became a partner on January 1, 2008.

**The FGG Partnership**

116.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with~~

~~minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Stable Fund based on the fund's contacts with the U.S.~~

On paper, the FGG entities appeared to be separate and discrete. But FGG operated as a "flat organization"—a single cohesive unit steered by Noel, Tucker, and Piedrahita.

117.    The FGG partners operated in unison to perpetuate the FGG enterprise. The interests of all Defendants were aligned, with each defendant benefiting by increasing the FGG funds' AUM for investment solely with BLMIS.

118.    FGG held itself out and operated as a *de facto* partnership. Through both words and actions, the FGG partners held themselves out as partners in FGG. For example, an FGG brochure describes FGG as consisting of "Partners" and attributes the partners' activities to FGG.

119.    ~~This growth in assets under management resulted in increasing fees to the various FGG investment managers and administration entities. FGG later modified its fee structure to be among the most aggressive in the hedge fund industry.~~ The FGG partners: (i) shared, on a *pro rata* basis, the profits and losses realized by the FGG entities; (ii) made *pro rata* contributions to the capital of FGG entities; (iii) intended to carry on as co-owners of FGG with the common goal of earning a profit; and (iv) participated in the management of entities within the FGG enterprise. FGG's compensation structure was consolidated and its profits passed through FG Bermuda and FG Limited before being distributed to the partners. As a *de facto* partnership, the knowledge of all its members (i.e., the FGG partners and FGG entities) is imputed among each other through the partnership itself, as are the liabilities each FGG partner and entity incurred.

120.    The ~~Defendants established a broad network of investment managers and administrative entities in order to maximize fee revenue derived from BLMIS. Those entities passed monies through two principal entities – FGB and FGL. The FGG entities generated fees from their relationships with BLMIS totaling in excess of one billion dollars.~~ FGG funds' investments with BLMIS were at the center of FGG's business. To manage the funds' investments and their relationship with Madoff, the FGG

**2. FGG Investment Managers and Other Administrative Entities**

117.    By marketing Madoff's strategy, the FGG investment managers and other FGG administrative entities received large sums of money.

118.    According to FGG's records, its assets under management increased as follows:

**Assets Under Management by FGG**

| Year | AUM |
|------|-----|
| 2002 | $5 billion |
| 2003 | $5 billion |
| 2004 | $8 billion |
| 2005 | $9 billion |
| 2006 | $10 billion |
| 2007 | $16 billion |
| 2008 | $14 billion |

partners allocated certain responsibilities to various FGG partners and shared BLMIS-related information with each other for the benefit of the FGG partnership and their common enterprise.

121.    **Fairfield Greenwich (Bermuda) Ltd. ("FGB")**: Along with FGL, Defendant FGB is one of the two principal FGG operating entities. FGB is a company incorporated in Bermuda on June 13, 2003, with its principal place of business at 131 Front Street, First Floor, Hamilton, Bermuda, HM 11. FGB's mailing address is 12 Church Street, Suite 606, Hamilton, Bermuda, HM 11. 121.    At all times relevant hereto and related to the facts alleged herein, the following individuals and entities acted for and as agents of FGG: Noel; Tucker; Piedrahita; Vijayvergiya; McKeefry; Daniel Lipton, FGG's Chief Financial Officer; Gordon McKenzie, FG Bermuda's Controller; Robert Blum, FGG's Chief Operating Officer until 2005; Harold Greisman, FGG's Chief Investment Officer; Corina Noel Piedrahita, FGG's Head of Client Services and Investor Relations; Richard Landsberger; Toub; Andrew Smith; Gregory Bowes; Lourdes Barreneche; Cornelis Boele; Harold Greisman; Jacqueline Harary; Maria Teresa Pulido Mendoza; Charles Murphy; and Santiago Reyes.

122. ~~Prior to 2003, FGL served as the investment manager to Fairfield Sentry, Sigma, and Lambda. In 2003 FGL assigned these management agreements to FGB. A potential investor communicated his belief that the change in management structure was an "attempt by Madoff to avoid SEC scrutiny of his firm and market making activities. This concern seems to be prevalent in Switzerland and has been expressed by a good number of other investor or potential investors in Fairfield Sentry." (A true and accurate copy of the July 2, 2003 email to Tucker and Boele is attached hereto as Ex. 21.)~~At all relevant times, Noel and Tucker acted on behalf of and for the benefit of FIFL as its agents, and their knowledge is imputed to FIFL. Because Noel and Tucker also were directors of FIFL, their knowledge is imputed to FIFL.

123. ~~FGB was, until 2007, a wholly-owned subsidiary of FGL. In 2007, ownership of FGB was transferred from FGL to FGL's shareholders. The shareholders included Fairfield International Managers, Inc. ("FIM") (36.8%) - co-owned by Noel and Tucker, Safehand Investment (27.5%) - owned exclusively by Piedrahita, and many of the other Management Defendants and Sales Defendants. (A true and accurate copy of an excerpt from an FGG chart that contains the proposed shareholder register for FGL is attached hereto as Ex. 22.)~~At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, and Toub acted on behalf of and for the benefit of FG Limited as FG Limited's agents, and their knowledge is imputed to FG Limited. Because Tucker, McKeefry, and Toub also were officers and directors of FG Limited, their knowledge is imputed to FG Limited.

124. ~~FGB has been registered with the SEC as an investment adviser since at least 2003. As a registered investment adviser, FGB filed Form 13Fs with the SEC. FGB's 13Fs were signed by Defendant Mark McKeefry ("McKeefry"), as FGB's general counsel, from FGG's New York offices.~~At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Smith acted on behalf of and for the benefit of FG Bermuda as FG Bermuda's agents. Because Noel,

Tucker, McKeefry, Lipton, Blum, Vijayvergiya, McKenzie, and Smith also were officers and directors of FG Bermuda, their knowledge is imputed to FG Bermuda.

125.    ~~FGB acted as the investment manager to Fairfield Sentry from July 1, 2003 to December 11, 2008. As compensation for these services, FGB received a management fee equal to 1% of the net asset value of the fund, as well as a performance fee equal to 20% of net profits from the fund. Unlike other hedge funds that paid fees on an annual basis, to increase the fees paid to FGB, Fairfield Sentry paid the management fee monthly and the performance fee quarterly.~~ At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Bowes acted on behalf of and for the benefit of FG Advisors as FG Advisors' agents. Because McKeefry, Lipton, Blum, and Bowes also were officers and directors of FG Advisors, their knowledge is imputed to FG Advisors.

126.    ~~According to Fairfield Sentry's financial statements, between 2003 and the first half of 2008, FGB received the following fees from Fairfield Sentry:~~ At all relevant times, Tucker acted on behalf of and for the benefit of Stable Fund as Stable Fund's agent. Because Tucker was managing member of Stable Fund, his knowledge is imputed to Stable Fund.

| ~~Fees Earned by FGB for Serving as Investment Manager to Fairfield Sentry[4]~~ | | | |
|---|---|---|---|
| ~~Year~~ | ~~Management Fees~~ | ~~Performance Fees~~ | ~~Total Fees~~ |
| ~~2003~~ | ~~$5,221,000~~ | ~~$80,515,000~~ | ~~$85,736,000~~ |
| ~~2004~~ | ~~$21,549,000~~ | ~~$81,278,000~~ | ~~$102,827,000~~ |
| ~~2005~~ | ~~$51,127,000~~ | ~~$87,225,000~~ | ~~$138,352,000~~ |
| ~~2006~~ | ~~$50,465,000~~ | ~~$107,779,000~~ | ~~$158,244,000~~ |
| ~~2007~~ | ~~$67,322,000~~ | ~~$116,157,000~~ | ~~$183,479,000~~ |
| ~~2008~~ | ~~$36,134,000~~ | ~~$46,070,000~~ | ~~$82,204,000~~ |
| ~~TOTAL~~ | ~~$231,818,000~~ | ~~$519,024,000~~ | ~~$750,842,000~~ |

127.    ~~Upon information and belief, in order to pay FGB's fees, Fairfield Sentry withdrew funds from BLMIS and then transferred the funds to FGB; as such, the fee payments constitute Customer Property subject to turnover to the Trustee and/or are avoidable subsequent transfers from BLMIS~~

recoverable by the Trustee.At all relevant times, Noel and Tucker acted on behalf of and for the benefit of Fairfield International Managers as Fairfield International Managers' agents. Noel and Tucker were each 50% owners of Fairfield International Managers, which they also controlled, and their knowledge is imputed to Fairfield International Managers.

128.    FGB acted as manager to Irongate, for which it received a 0.8% management fee and 10% performance fee. Irongate's financial statements indicate these fees totaled:At all relevant times, Noel and Tucker acted on behalf of and for the benefit of FG Capital as FG Capital's agents. Noel and Tucker were each 50% owners of FG Capital, which they also controlled, and their knowledge is imputed to FG Capital.

[4]    All fees described herein have been rounded here to the nearest thousand.

**Fees Earned by FGB While Serving as Manager to Irongate**

| Year | Management Fees | Performance Fees | Total Fees |
|------|-----------------|------------------|------------|
| 2005 | $2,387,000 | $2,532,000 | $4,918,000 |
| 2006 | $7,493,000 | $7,986,000 | $15,479,000 |
| 2007 | $14,189,000 | $18,012,000 | $32,201,000 |
| **TOTAL** | **$24,069,000** | **$28,529,000** | **$52,599,000** |

129.    Upon information and belief, in order to pay FGB's fees, Irongate redeemed shares of Fairfield Sentry. In order to pay Irongate's redemptions, Fairfield Sentry withdrew funds from BLMIS and transferred the funds to Irongate, which in turn transferred the funds to FGB to pay its fees. As such, the Irongate redemptions and FGB fee payments constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. At all relevant times, Corina Noel Piedrahita controlled Share Management, and her knowledge is imputed to Share Management.

130.    FGB also served as general partner to GS and GSP. In its role as general partner, FGB was responsible for directing GS's and GSP's investment and trading activities. FGB began serving as general partner to GS on June 13, 2003, and continued to serve in that capacity until 2004. GBL served as GS's general partner between 2004 and 2006. FGB then resumed as general partner in 2006. The performance fees for 2004 and 2006 were split between GBL and FGB based upon when each served as general partner. FGB has served as general partner to GSP since the fund commenced operations on May 1, 2006. At all relevant times, Piedrahita controlled his alter ego, non-party Safehand Investments, and the knowledge and information Safehand Investments acquired through its direct and indirect ownership interest in FG Limited and FG Bermuda is imputed to Piedrahita.

131.    FGB earned management and performance fees from GS and GSP. In 2003, as general partner to GS, FGB earned a performance fee equal to 20% of capital appreciation and a management fee equal to 0.1% of assets under management. The management fee was removed in 2004, and the 0.1% fee was instead passed along to FGA for expense reimbursement. After GSP was created in 2006, FGB returned as GS's general partner and

began charging an increased

management fee equal to 1% of the assets under management, in addition to the 20% performance fee, for both GS and GSP. GS's and GSP's financial statements indicate FGB earned the following fees while serving as general partner to GS and GSP:

| Fees Earned by FGB While Serving as General Partner to GS | | | |
|---|---|---|---|
| Year | Management Fees | Performance Fees | Total Fees |
| 2003 | $59,000 | $2,620,000 | $2,679,000 |
| 2004 | N/A | $2,644,000 | $2,644,000 |
| 2005 | N/A | N/A | N/A |
| 2006 | $282,000 | $2,929,000 | $3,211,000 |
| 2007 | $987,000 | $3,054,000 | $4,041,000 |
| TOTAL | $1,328,000 | $11,247,000 | $12,575,000 |

| Fees Earned by FGB While Serving as General Partner to GSP | | | |
|---|---|---|---|
| Year | Management Fees | Performance Fees | Total Fees |
| 2006 | $16,000 | $93,000 | $109,000 |
| 2007 | $57,000 | $186,000 | $243,000 |
| TOTAL | $73,000 | $278,000 | $351,000 |

13 I. Although FGG, FIFL, Stable Fund, FG Limited, FG Bermuda, FG Advisors, Fairfield International Managers, FG Capital, and Share Management were formed as separate entities, they operated as part of a common enterprise created by and for the benefit of each respective entity within FGG, including its individual partners, to profit from investments with BLMIS. For all of the acts alleged herein, each FGG partner acted with the consent and for the benefit of every other FGG partner. All FGG partners, including the Defendants, had common goals, including to profit together from FGG's investment with BLMIS. FGG and the individual FGG partners have no interests adverse to the interests of any other FGG partner; all of their interests are aligned.

**The Founding Partners Worked Tirelessly to Quell Investors' Fears**

132.    ~~Upon information and belief, FGB received the management fees and performance fees in the form of limited partnership interests. During the years in which FGB served as general partner to GS and GSP, FGB redeemed limited partnership interests worth:~~ In May 2001, two industry publications, MAR/Hedge and Barron's, ran articles questioning the legitimacy of Madoff's returns. Both articles pointed to Fairfield Sentry as the leading BLMIS investment vehicle.

| Redemptions from GS by FGB | |
|---|---|
| Year | Redemptions by FGB |
| 2003 | $2,500,000 |
| 2004 | $4,000,000 |
| 2005 | $0 |
| 2006 | $4,200,000 |
| 2007 | $3,304,000 |
| 2008 | $259,000 |
| TOTAL | $14,263,000 |

133. ~~Upon information and belief, in order to pay FGB's fees and redemptions, GS and GSP withdrew funds from BLMIS and transferred the funds to FGB. As such, FGB's redemptions and fee payments constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. In addition, as the general partner to GS and GSP, FGB is liable for the repayment of GS's and GSP's debts and obligations. During the years in which FGB acted as general partner, GS withdrew more than $124.0 million from BLMIS, and GSP withdrew more than $6.0 million. FGB is directly liable for the repayment of these withdrawals which constitute Customer Property subject to turnover to the Trustee and/or avoidable transfers recoverable by the Trustee.~~ The MAR/Hedge article reported investment industry skepticism about Fairfield Sentry's returns utilizing the SSC Strategy. According to the article, on a risk-adjusted basis, Fairfield Sentry was the "best performing fund" of the 1,100 hedge funds listed on the "Zurich hedge fund database" for the period of July 1989 to February 2001. The article reported that experts questioned the incongruities of the returns Madoff purported to generate: Why could no one duplicate Madoff's returns using the strategy? Why haven't other firms traded against the strategy? Those incongruities contributed to "amazement, fascination, and curiosity" that the fund could, by relying on the SSC Strategy and Madoff's "astonishing ability to time the market" generate returns impervious to market volatility.

134. ~~FGB is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGB was managed out of FGG's New York City office. In addition, FGB filed customer claims, whereby it submitted to the jurisdiction of this Court.~~ The Barron's article highlighted doubt within the industry that the SSC Strategy could have generated Madoff's returns. It noted that "option strategists at major investment banks" "couldn't understand how Madoff churns out such numbers." The article also quoted a "former Madoff investor" who commented,

**Redemptions from GSP by FGB**

| Year | Redemptions by FGB |
|------|-------------------|
| 2006 | $0 |
| 2007 | $248,000 |
| 2008 | $40,000 |
| **TOTAL** | **$288,000** |

"[a]nybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve." Another investor commented, "[e]ven knowledgeable people can't really tell you what he's doing. People who have all the trade confirmations and statements still can't define it very well." Still another investor said, "[w]hat Madoff told us was, 'if you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here.'" The investor added, "[w]hen [Madoff] couldn't explain how they were up or down in a particular month, I pulled the money out."

135.   ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGB based on the entity's contacts with the U.S.~~135.   Tucker was quoted in the Barron's article, commenting that Fairfield Sentry was "a private fund. And so, our inclination has been not to discuss its returns . . . Why Barron's would have any interest in this fund I don't know."

136.   ~~**Fairfield Greenwich Limited ("FGL")**: Defendant FGL was originally incorporated under the laws of Ireland in 1997 and was~~ reorganized as a ~~Cayman Islands limited liability company on January 1, 2002. FGL's mailing address is c/o Charles, Adams, Ritchie & Duckworth, Second Floor, Zephyr House, P.O. Box 709, George Town, Grand Cayman, Cayman Islands, B.W.I. FGL is registered to do business in the State of New York and lists its principal executive office as FGG's offices in New York, New York.~~Shortly after the Barron's article was published, Madoff called Tucker and asked whether FGG was "getting feedback from . . . clients" about the article. Tucker admitted that some FGG

clients had expressed concern. FGG understood that the MAR/Hedge and Barron's articles embodied the concern that had been building within the investment industry that BLMIS's performance was baffling and impossible to duplicate. In June 2001, FGG sent a letter, signed by Tucker, Noel, and Piedrahita, to mollify its clients. The letter characterized the articles as containing "innuendo," which the letter was intended to "clarify."

137. ~~FGL owned 100% of FGA and, until 2007, owned 100% of FGB. FGL was also a 100% owner of Fairfield Heathcliff Capital LLC ("FHC") (*see infra* ^168-172). As owner of these entities, FGL received the benefit of fees these entities earned through their association with the Feeder Funds.~~In the letter, FGG complained that the articles "implied that investors do not completely understand the underlying strategy and that the manager is not transparent in divulging the details of the strategy." FGG claimed an "uncommonly high degree of transparency with respect to the activities of" BLMIS: "[n]o less frequently than monthly we aggregate the confirmations, check them to insure trade execution is within that day's trading range, and compose a performance attribution for the period." The letter failed to respond to the issues related to the impossibilities of BLMIS's performance.

138. ~~FGL served as investment manager and placement agent to a number of FGG funds. Between 1999 and 2003, FGL acted as investment manager to Fairfield Sentry. In this capacity, FGL received a 20% performance fee. In 2002 and 2003, FGL also received a 1% management fee. In total, according to Fairfield Sentry's financial statements, FGL received the following fees:~~**~~Fees Earned by FGL While Serving as Investment Manager to Fairfield Sentry~~**Just a few weeks after the MAR/Hedge and Barron's articles were published, in May 2001, Citco worried that "Madoff is now also doubted upon in the financial world." The root of Citco's fears was that its risk exposure as custodian was approximately "USD3 billion"— at the time, the full amount of Fairfield Sentry's investment supposedly sub-custodied at BLMIS. Citco worried that there "[p]robably . . . are no options to restore this situation from a worse [sic] case scenario."

| ~~Year~~ | ~~Management Fees~~ | ~~Performance Fees~~ | ~~Total Fees~~ |
|---|---|---|---|

| 1999 | N/A | $68,833,000 | $68,833,000 |
| 2000 | N/A | $73,575,000 | $73,575,000 |
| 2001 | N/A | $84,664,000 | $84,664,000 |
| 2002 | $3,844,000 | $83,591,000 | $87,435,000 |
| 2003 | $5,221,000 | $80,515,000 | $85,736,000 |
| **TOTAL** | **$9,065,000** | **$391,178,000** | **$400,243,000** |

139. ~~Based upon information and belief, in order to pay FGL's fees, Fairfield Sentry withdrew funds from its BLMIS account and then transferred the funds to FGL. As such, FGL's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~Concerns continued to mount. Citco believed that "the chance that things are wrong is at least 25%" or "50%" and the consequences were dire. Citco reached out to FGG to arrange a site visit at Madoff's office. Before the site visit, FGG and Citco agreed upon their "mutual objectives" of the visit to "increase[e] Citco's comfort level with respect to the existence of the assets in relation to [its] responsibilities as Custodian."

140. ~~In addition, FGL served as the investment adviser to the FIT Funds, for which it received a 0.1% expense reimbursement, and as the placement agent to FIFL and FIFA, for which it received a 1% placement fee. FIFL's financial statements show FGL earned placement fees totaling:~~It took time to schedule, but on December 17, 2002, the FGG partners tasked Lipton with joining personnel of Citco and PricewaterhouseCoopers ("PwC") (the auditor of Kingate Global Fund, Ltd., Kingate Euro Fund, Ltd., and Fairfield Sentry) for the site visit at BLMIS's offices. Before the site visit, Citco communicated to FGG that it wanted to increase its "comfort level." But at the site visit, the "agreed upon procedures (e.g., walkthrough test)" were "not performed." FGG and Citco were not allowed "to review the back office procedures of Madoff" or "interview other personnel or ... perform some review procedures" themselves. Nor were they provided, as they requested, with "evidence about the existence of the US T bills (e.g.,

stock record reconciliation / clearing confirmation)." Within a few hours of the meeting, Citco's representative declared that the "mission" had "failed."

**Fees Earned by FGL While Serving as Placement Agent to FIFL**

| Year | Placement Fees |
|------|----------------|
| 2005 | $9,070,000 |
| 2006 | $5,409,000 |
| 2007 | $4,985,000 |
| TOTAL | $19,464,000 |

141. Based upon information and belief, in order to pay FGL's fees, FIFL redeemed shares of Fairfield Sentry. In order to pay FIFL's redemptions, Fairfield Sentry withdrew funds from BLMIS and then transferred the funds to FIFL, which in turn transferred the funds to FGL.

As such, FIFL's redemptions and FGL's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. Neither FGG nor Citco were able to verify the existence of Fairfield Sentry's assets. The concern Tucker expressed when the MAR/Hedge and Barron's articles came out, whether "the assets were there," remained a mystery to FGG and Citco after the site visit.

**FGG's Compliance Model and Its Use of Risk Monitoring to Gain Investor Confidence**

142. FGL also served as general partner to GS from 1999 to 2003, for which it earned a 20% performance fee. Financial statements for GS indicate these fees totaled:FGG touted itself as a sophisticated risk monitoring outfit and emphasized its due diligence practices in order to quell investor concerns and justify charging the highest fees of any BLMIS feeder fund. Internal FGG documents set forth the due diligence practices FGG claimed to employ: review of financial statements, on-site review of back-office functions, confirmation that the fund's auditor was "reputable," the independent confirmation of trading, pricing, and the existence of assets, the review of regulatory filings such as SEC

Form ADVs, the presence of inconsistent answers or the refusal to give information, and the independent verification of the proper segregation of back-office duties.

**Fees Earned by FGL While Serving as General Partner to GS**

| Year | Performance Fees |
|------|------------------|
| 1999 | $3,406,000 |
| 2000 | $3,252,000 |
| 2001 | $3,144,000 |
| 2002 | $2,736,000 |
| 2003 | $2,620,000 |
| TOTAL | $15,158,000 |

143.    FGL and FGB each acted as general partner of GS for half of 2003. The fees paid in 2003 were split between FGL and FGB based upon when each served as general partner. In 1990 FGG hired Gil Berman, a former CBOE options trader, as an independent contractor. FGG instructed Berman to analyze the trading activity in the FGG feeder funds' BLMIS accounts, and prepare monthly trading summaries, tasks that Berman used BLMIS account statements and trade confirmations to complete.

144.    FGL received its performance fees in the form of limited partnership interests, of which it redeemed the following amounts: Beginning in the mid-1990s, Berman recognized indicia of fraud and performed analyses that turned up impossibilities on Fairfield Sentry's account statements. Berman reported those issues to the Defendants. FGG suppressed the concerns and misstated the fraud risks to investors.

**Redemptions from GS by FGL**

| Year | Redemptions by FGL |
|------|--------------------|
| 1999 | $1,725,000 |
| 2000 | $1,850,000 |
| 2001 | $12,129,000 |
| 2002 | $895,000 |
| 2003 | $2,500,000 |
| TOTAL | $19,099,000 |

145. ~~Upon information and belief, in order to pay FGL's redemptions, GS withdrew funds from BLMIS and transferred the funds to FGL. As such, FGL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. In addition, as general partner to GS, FGL is directly liable for the repayment of GS's withdrawals from 1999 to 2003, totaling in excess of $58.0 million, which constitute Customer Property subject to turnover to the Trustee and/or avoidable transfers recoverable by the Trustee.~~ As early as 1996, when performing his typical check to confirm that the trading prices BLMIS reported on its trade confirmations fell within the reported daily range, Berman discovered that prices BLMIS reported were above the highest trading prices reported for the day, and informed FGG. FGG did nothing. Nor did FGG act upon Berman's analysis showing that BLMIS reported trades inconsistent with the SSC Strategy.

146. ~~FGL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGL was managed out of FGG's New York City office. In addition, FGL is licensed to do business in the State of New York and maintained its principal executive office in New York, New York.~~ FGG diligently cultivated an image as a sophisticated risk monitor. This was a sales strategy, however, as FGG continued to mislead potential clients to induce them to invest with Madoff, even as it was repeatedly confronted with the impossibilities in Madoff's purported trading. In the early 2000s, FGG worried that the nearly equal number of investment professionals and sales staff it employed would lead potential clients to believe FGG was just a sales organization. It set out to remake its image. As Blum put it, "we are always trying to sell our clients on the fact that we are an investment management organization, with the relevant high ratio toward investment management expertise, not just '[the] large bunch of salesmen,'" they were recognized as.

147. ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGL based on the entity's contacts with the U.S.~~ To enhance the perception of its risk monitoring capabilities, in June 2003 FGG hired Vijayvergiya, a Chartered Financial Analyst and certified Financial Risk Manager, and installed him as the Vice President and Risk Manager of FG Bermuda.

148. ~~**Fairfield Greenwich Advisors LLC ("FGA")**: Defendant FGA is a Delaware limited liability company and a wholly-owned subsidiary of FGL. FGA is also registered as an investment adviser with the SEC. Its offices are located in New York, New York.~~ When asked after Madoff's arrest whether FGG confirmed the settlement of BLMIS's trades with the DTCC, Vijayvergiya responded, "I don't think so. I certainly didn't."

149. ~~FGA provided administrative services and back-office support to GS, GSP, Sigma, and Lambda. According to financial statements issued by those funds, FGA received the following fees:~~ In fact, Vijayvergiya further admitted that FGG did not apply the same standards or tests to BLMIS that it did to other alternative investment managers. At one point, Vijayvergiya committed to his journal the observation that, although he was FGG's Chief Risk Officer, he felt like "a sales 'whore.'"

| ~~Fees Earned by FGA for Providing Administrative Services to GS~~ | |
|---|---|
| ~~Year~~ | ~~Fees~~ |
| ~~2004~~ | ~~$41,000~~ |
| ~~2005~~ | ~~$171,000~~ |
| ~~2006~~ | ~~$137,000~~ |
| ~~2007~~ | ~~$109,000~~ |
| ~~TOTAL~~ | ~~$458,000~~ |

150. ~~Based upon information and belief, in order to pay FGA's fees, GS withdrew funds from its BLMIS account and then transferred the funds from BLMIS to FGA. As such, GS's withdrawals and~~

FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

**Fees Earned by FGA for Providing Administrative Services to GSP**

| Year | Fees |
|------|------|
| 2006 | $4,000 |
| 2007 | $7,000 |
| **TOTAL** | **$11,000** |

By letter dated October 26, 2006, FG Bermuda, on behalf of FGG, informed GSP investors that FGG had initiated a FGG-wide fraud prevention program and encouraged GSP investors to provide their identifying information.

151. Based upon information and belief, in order to pay FGA's fees, GSP withdrew funds from its BLMIS account and then transferred the funds from BLMIS to FGA. As such, FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.  Madoff strongly influenced FG Bermuda's formation. Noel and Tucker initially planned for a U.S.-based FGG entity to serve in that role. Madoff objected because he feared that employing a U.S.-based entity would expose him to greater SEC scrutiny. Noel and Tucker capitulated and formed FG Bermuda to serve as investment adviser. At the same time, FGG created FG Advisors, a Delaware limited liability company, to serve as an administrator to Fairfield Sentry. Both FG Bermuda and FG Advisors were wholly owned subsidiaries of FG Limited.

**Fees Earned by FGA for Providing Administrative Services to Sigma**

| Year | Fees |
|------|------|
| 2003 | € 247,200 |
| 2004 | € 247,000 |
| 2005 | € 459,000 |
| 2006 | € 562,000 |
| 2007 | € 960,000 |
| **TOTAL** | **€ 2,273,000** |

**Fees Earned by FGA for Providing Administrative Services to Lambda**

| Year | Fees |
|------|------|
| 2004 | CHF 59,000 |
| 2005 | CHF 72,000 |
| 2006 | CHF 61,000 |
| 2007 | CHF 61,000 |
| **TOTAL** | **CHF 254,000** |

152.   Upon information and belief, in order to pay FGA's fees, Sigma and Lambda redeemed shares of Fairfield Sentry. Upon information and belief, in order to pay Sigma's and Lambda's redemptions, Fairfield Sentry withdrew funds from BLMIS and transferred the funds to Sigma and Lambda. In turn, Sigma and Lambda transferred the funds to FGA. As such, Sigma's and Lambda's redemptions and FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. 152.   FG Limited assigned the investment advisory agreements for Fairfield Sentry, Fairfield Sigma, Fairfield Lambda, and Greenwich Sentry to FG Bermuda on July 1, 2003, but remained the placement agent for those funds. Each of those roles opened a flow of fees to a different FGG entity. Through their 50% ownership of Fairfield International Managers, Noel and Tucker were indirect shareholders in FG Limited, FG Bermuda, and FG Advisors, and used it as a vehicle to accept their partnership distributions.

153.   FGA provided similar services to SSL, for which it received a fee equal to 0.1% of assets under management. FGG investors rightly suspected FGG of restructuring primarily to help Madoff avoid SEC scrutiny. In June and July 2003, investors questioned FG Limited's motives in assigning the Fairfield Sentry investment management agreement to FG Bermuda. Through meetings involving Tucker, Toub, Blum, and Vijayvergiya, FGG advanced various stories to attempt to defuse investor concerns.

154.   FGA also served as investment manager to a number of FGG funds. These funds included: Chester LP, for which FGA received a management fee equal to 0.8%; Stable Fund, for which FGA received a 1% management fee; FIL-Yen, for which FGA received a 0.1% expense reimbursement; FIL-Swiss, for which FGA received a 0.1% expense reimbursement; and FIFL and FIFA, for which FGA received an expense reimbursement of 0.15% and 0.1%, respectively. Even though FGG had restructured to accommodate Madoff, FGG denied it and falsely claimed that the restructuring was to achieve tax savings. In reality, FGG incurred significant expense to follow Madoff's directions in creating new

foreign entities, opening and staffing an office in Bermuda, and assigning FG Limited's advisory responsibilities to FG Bermuda.

155.    ~~Upon information and belief, some if not all of these fees were paid with funds originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, these fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ For example, in July 2003, Blum wrote Vijayvergiya, Lipton, Landsberger, Toub, and Tucker: "I am portraying this stuff as being tax driven, which resonates easily with a lot of people. I have heard lately that some amateur Madoff watchers/conspiracy theorists out there are making more of this Bermuda thing than that, and without being too obnoxious about it, we should steer the conversation to the tax-driven plane." In this case, he successfully played upon the investor's "Brit[ish] . . . sensitiv[ity]" to tax issues, noting that the investor "readily accepted" that FGG would "have to start doing this stuff" "in accordance with tax guidance." Blum planned to deploy Vijayvergiya at an upcoming meeting with the investor to shore up Blum's "portray[al of] this stuff as being tax driven."

156.    ~~FGA is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGA's principal place of business is located in New York, New York.~~ When a Swiss investor expressed concern that the assignment was an undue attempt "to avoid SEC scrutiny of [Madoff's] firm and market making activities," FGG belittled that concern as part of a trend "in Switzerland . . . expressed by a good number of other investor [sic] or potential investors in Fairfield Sentry." Instead of responding to this valid concern, Tucker steered the conversation back toward the investor's "need and want [for] more capacity to Madoff."

157.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy, a federal court has personal jurisdiction over any defendant~~

with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGA based on the entity's contacts with the U.S. From the beginning of his employment with FGG, Vijayvergiya recorded his unguarded impressions and concerns about FGG's Madoff-related investments on an almost daily basis. One of his first questions, which he posed to Blum was, "what do you see as the main weaknesses and threats to continued success going forward"? Blum responded: "Madoff issues." Vijayvergiya also noted that he asked Blum whether FGG "specifically monitor[ed] adherence to operating guidelines," "to 'gauge manager performance.'" Blum's response: "No."

158.    **Fairfield Greenwich GP, LLC ("FGGP")**: Defendant FGGP is a Delaware limited liability company. Its principal office is located at 575 Madison Avenue, New York, New York 10022. FGGP is a wholly-owned subsidiary of FGL. Vijayvergiya remained undeterred. With FGG's authorization, he undertook the task of recasting FGG in the image of a serious risk monitoring operation, even though FGG's structure and operations were largely unchanged. In August 2003, an investor made a due diligence inquiry to FGG, asking, among other things, that FGG provide "[t]he number of staff in the following categories: number of investment professionals, number of analysts, number of operational staff, others and total number of staff."

159.    FGGP acted as general partner to Chester LP, for which it earned a 10% performance fee in the form of limited partnership interests in Chester LP. Upon information and belief, FGGP redeemed some of the limited partner interests it received as payment from Chester LP. Chester LP was invested in Fairfield Sentry. In order to pay FGGP's redemptions, Chester LP redeemed shares of Fairfield Sentry. Upon information and belief, to pay Chester LP's redemptions Fairfield Sentry withdrew funds from BLMIS and then Chester transferred the funds to FGGP. As such, the redemptions FGGP received from Chester LP constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. In his response, Vijayvergiya was intentionally misleading: "[a]s of June 30, 2003," he wrote, FGG employed 53 people: 26 business development,

sales, and support personnel, and 13 investment professionals and analysts, and 14 operational, legal/compliance, and technology personnel.

160.    ~~Because FGGP served as general partner to Chester LP, it is directly liable for all avoidable transfers from BLMIS to Chester LP.~~ Vijayvergiya's dishonesty impressed Blum. "Good job," he said. "I like the way you got investment professionals up to 13—but how?" He added, "[s]imilarly, I find that splitting the sales group as shown on the org chart into separate sales and client support groups makes the number '26' look less imposing."

161.    ~~FGGP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGGP's principal place of business is located in New York, New York.~~ Vijayvergiya took on many roles on behalf of FGG. While he was initially hired to oversee due diligence, risk modeling, and ongoing risk analysis, FGG expanded his role based on his ability to communicate with "polish and professionalism." He was called upon to prepare investor communiqués, often in response to investors' concerns about Madoff. In his marketing efforts and communications with investors, Vijayvergiya used a U.S. FGG email account— "amit@fggus.com."

162.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGGP based on the entity's contacts with the U.S.~~ Vijayvergiya also communicated on behalf of the FGG partners with Madoff and DiPascali and reported their responses back to the FGG partners. Like the founding partners, Vijayvergiya had privileged access to Madoff. Vijayvergiya spoke to BLMIS personnel hundreds of times during his tenure with FGG, and a number of those conversations were with Madoff himself.

163.    ~~Fairfield Greenwich Partners, LLC ("FGP")~~: ~~Defendant FGP is a Delaware limited liability company organized in 2003. Its principal office is located at 575 Madison Avenue, New York, New York.~~ By July 2006, Vijayvergiya was one of four individuals at FGG permitted to authorize movement of cash into and out of the investment accounts that the FGG feeder funds maintained at BLMIS.

164.    ~~FGP acted as general partner to Stable Fund, for which it received a 10% performance fee in the form of limited partnership interests in Stable Fund. Upon information and belief, FGP redeemed some of the limited partnership interests it received as payment from the Stable Fund. As explained above, Stable Fund was partially invested in GS. Upon information and belief, in order to pay the Stable Fund redemptions, GS withdrew funds from BLMIS and then Stable Fund transferred the funds to FGP. As such, FGP's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ As FGG's Chief Risk Officer, Vijayvergiya headed FGG's Risk Management Division in the New York-based Investment Group, reporting directly to FGG personnel in New York. Ultimately, Vijayvergiya's role at FGG straddled risk monitoring and sales. Though he was responsible for due diligence of BLMIS, and understood the need for clear, well- documented, direct responses to client inquiries, for the benefit of FGG's common enterprise he typically chose obfuscation and vagueness instead. He quickly adopted FGG's policy of trying to prevent prospective investors from contacting Madoff directly.

165.    ~~Because FGP served as general partner to Stable Fund, it is directly liable for all amounts Stable Fund redeemed from GS. Upon information and belief, some if not all of those redemptions were paid by funds withdrawn from GS's accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ From the beginning of Vijayvergiya's tenure, FGG imparted the "prime directive," in Blum's words—to downplay Madoff's role. He sidestepped investors' questions about Madoff and provided

them with oral responses to due diligence questions. For example, in May 2005, as part of an effort to conceal certain information about Fairfield Sentry, Vijayvergiya sought to delete portions of a Fairfield Sentry conference call transcript that discussed Madoff. Likewise, on August 22, 2005, an investor asked FGG to identify the counterparties to a number of over-the-counter ("OTC") option contracts and how FGG managed counterparty risk. Vijayvergiya indicated that FGG would provide only oral, not written, responses.

166.    ~~FGP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGP was managed out of FGG's New York City office and maintained its principal place of business in New York, New York.~~ This was typical of Vijayvergiya's efforts to assist FGG in evading investor inquiries. In May 2006, for example, he made an "urgent" request to make sure that there were no references or links to Madoff on FGG's website. He made this request on the heels of the SEC's investigation of BLMIS as the feeder funds' investment manager, in which he deliberately tried to conceal Madoff's role with the FGG feeder funds.

167.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGP based on the entity's contacts with the U.S.~~ In July 2007, Vijayvergiya similarly tried to conceal from a client BLMIS's role as the funds' broker and custodian. Vijayvergiya responded that it was a "common practice in the US brokerage industry," and that "brokers typically custodize the assets of their clients." His response sidestepped the real issue: that BLMIS's dual role as investment manager and custodian posed significant risk to the safety of the assets. To avoid subjecting his written response to scrutiny, Vijayvergiya instructed that any further discussion with this investor should only be "on a phone call."

168. ~~Fairfield Heathcliff Capital LLC ("FHC")~~: ~~Defendant FHC is a Delaware limited liability company and a broker-dealer registered with the SEC. It is also an affiliate of FGGP.~~ This was part of Vijayvergiya's modus operandi acting for FGG. As he told his colleagues in March 2008, when confronted with a client's concerns about BLMIS's auditor, fee structure, or custodial structure, the concerns "can [be] dispelled most effectively during a conference call." He felt that the answer had to be properly spun, to "highlight our transparency." Tucker agreed that "a call usually disarms the party . . ."

169. ~~FHC served as placement agent to Chester LP and oversaw the marketing of the fund's limited partnership interests. As placement agent, FHC received a fee equal to 5% of the capital contributions it solicited.~~ Vijayvergiya was responsible for communicating "FGG's transparency and risk management capabilities in written pieces," and for writing, updating and reviewing all clientfacing Fairfield Sentry communications. Although there were aspects of BLMIS operations that "remain[ed] unclear" to Vijayvergiya as of late August 2008, he did not let them trouble communications with investors.

**FGG Clients Continuously Raised Doubts About Madoff's Viability**

170. ~~Upon information and belief, some if not all of these fees were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, FHC's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ Because they understood that FGG's profitability hinged on its relationship with BLMIS, Tucker, Noel, and Piedrahita guarded the relationship with Madoff.

171. ~~FHC is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FHC was managed out of FGG's New York City office.~~ FGG wanted at all costs to avoid endangering their relationship with Madoff by exposing him to scrutiny—to

avoid "piss[ing] Bernie off," as Blum wrote in 2003. The source of much of this scrutiny was investors who communicated a steady stream of concerns about BLMIS and Madoff to FGG's sales personnel. The sales personnel constantly relayed the concerns to FGG's partners. Investor concerns about BLMIS—its custody of assets, its lack of transparency, its uncanny market timing—became a drumbeat that resonated throughout FGG for years.

172.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FHC based on the entity's contacts with the U.S~~The dialogue FGG sales personnel maintained with investors forced FGG's partners to constantly reckon with indicia of Madoff's fraud. But rather than permit investor transparency, FGG employees sought to tamp down the investors' concerns and persuade them to invest more.

173.    ~~**Fairfield International Managers, Inc. ("FIM")**: Defendant FIM is a Delaware corporation formed on January 4, 1988. The purpose of FIM is to act as an investment manager and to engage in all phases of the securities business.~~For FGG, this was largely a matter of gaining clients' confidence with sales methods—working within the confines of a Madoff-approved narrative and quelling investors' concerns. Tucker, Noel, and Piedrahita imparted strategy directives to the FGG partners, who interpreted them and handed them down to the members of the sales team, who communicated them to clients.

174.    ~~The original directors of FIM were Noel, Tucker, and Kolber, who later left FIM. As of 2003, Defendants Noel and Tucker each owned 50% of the shares of FIM. FIM owns significant shares in both FGB and FGL.~~FGG personnel sought to walk a narrow line in meetings with investors. In one such meeting with Vijayvergiya and Blum, a potential investor came in with concerns about Madoff and

spent much of the meeting pressing FGG for a response: "guy was totally fixated on the usual Swiss gossip mongering subjects (front running, etc), as well as valid, but overplayed (at least half an hour) custody subject."

175.    ~~FIM received funds from the Feeder Funds' BLMIS accounts through its direct and indirect ownership of FGB and FGL. Upon information and belief, some, if not all, of the monies paid to FIM were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~ To calm the investor, they got the "[r]isk guy" who attended to buy "our risk monitoring story." The discussion, however, remained at a superficial level, as Vijayvergiya did "a really good job," in Blum's estimation, "of explaining the strategy at an idiot's level." By the end of the meeting, Blum felt that FGG had "passed the 'they're good guys' test," but the investor still wanted more information.

176.    ~~FIM is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FIM was managed out of FGG's New York City office.~~ On March 25, 2003, an investor wrote to Piedrahita, Tucker, Blum, and Lipton, suggesting that FGG provide a "monthly commentary" on Madoff. The investor asked FGG to disclose, for investors' benefit, "[]puts, calls, stock portfolio and cash[] of the performance on a monthly and cumulative basis."

177.    ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FIM based on the entity's contacts with the U.S.~~ The email sparked discussion within FGG. Shortly after receiving the email, Lipton forwarded it to Tucker and Blum, commenting that he "get[s] numerous

requests from the sales force" for similar information. The decision whether to disclose such information in writing, as Lipton made clear, was "Jeffrey [Tucker]'s call." Lipton noted that sometimes when asked, he told the sales force that "their clients are welcome to come in and review the statements," a technique FGG frequently employed to put off clients who confronted the sales team with requests for information they were unwilling to release because they knew clients were unlikely to take them up on the offer.

178.    ~~Fairfield Greenwich (UK) Limited ("Fairfield-UK")~~: ~~Defendant Fairfield-UK is an FGG entity incorporated in England and Wales in 1997. Its registered office is located at Fifth Floor, 32 Dover Street, London W1X 3RA, England.~~Blum rejected the idea of a "monthly recap" because even if FGG "haze[d] up details"—in other words, presented trades without "strike prices, etc" it would "still make[ ] [Madoff's] activities transparent to the world . . . and Bernie probably wouldn't like that."

179.    ~~Fairfield-UK served as investment manager to Chester, for which it received fees from Chester Management. Fairfield-UK also served as investment manager to FGF. Depending on the FGF share class Fairfield-UK received a management fee of between 0.55% and 1%, a performance fee of between 0% and 10%, and an expense reimbursement equal to 0.1%.~~In preparation for an October 2003 sales meeting with a Fairfield Sentry investor, Vijayvergiya sought out Tucker's help in crafting responses to concerns the investor had about, among other things, the intrinsic danger of BLMIS occupying the "dual role[s]" of sub-custodian and executing broker. The investor also raised questions about whether BLMIS used "insider information gained through [its] market making business"—in other words, whether BLMIS was engaged in front-running—and other "conflict[s] of interest" arising from BLMIS's market making business and its "managed account and broker/dealer business."

180.    ~~Upon information and belief, some if not all of Fairfield-UK's fees were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~In an October 2003 email, an FGG employee notified Lipton, Blum, Tucker,

and Bowes that Société Generale "won't approve [Fairfield] Sentry from a due diligence standpoint" because of "'collusion' between the manager and the prime broker"—Madoff.

181. ~~Fairfield-UK is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, Fairfield-UK was managed out of FGG's New York City office.~~ On November 4, 2003, an FGG sales consultant sent an email to members of the FGG management and sales teams reporting that he had learned that "due to a very negative opinion on Madoff from their alternative investment group (ex [Royal Bank of Canada] group)," they no longer recommended Fairfield Sentry for investment. The consultant sought advice from Toub, Bowes, and other FGG employees about the next step in FGG's relationship with this client. Toub confirmed the client's skepticism of the scalability of the SSC Strategy, noting that in past meetings the client had expressed "surprise" at "Madoff's ability to make the split strike strategy work so effectively on such a big amount of money."

182. ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Fairfield-UK based on the entity's contacts with the U.S.~~ As AUM increases it becomes more difficult for a fund to find opportunities on a scale that is proportional to the growing size of the fund. Toub and Bowes struggled to formulate a response, ultimately dodging the client's questions by "describ[ing] the situation as best we could" and squelching further discussion that day by "invit[ing the investor] over to our office to further explore his reservations"—one of FGG's tried and true methods of appearing to be attentive to investor concerns without actually addressing them.

183.    **Greenwich Bermuda Limited ("GBL")**: Defendant GBL is a Bermuda corporation. GBL served as the general partner of GS from December 23, 2004 to March 1, 2006. GS's financial statements indicate that, during that time, GBL earned the following performance fees:

In December 2003, HSBC sent its "annual fund review" questionnaire to Fairfield Sentry seeking information on many aspects of Madoff's business. HSBC raised the question of the volume of Madoff's AUM, which HSBC believed to total approximately $17 billion. HSBC sought Fairfield Sentry's take on Madoff's "black box" strategy, which supposedly relied on "gut feel" or "human intervention." They asked how the timing of the strategy was determined—how did Madoff know when to go "in and out of the market"? They asked about the strategy's scalability: "how big can a position be in a basket"? All of these questions should have been answered directly by FGG given its professed access and expertise, yet the Defendants provided evasive answers.

184.    ~~The performance fees for 2004 and 2006 were split between GBL and FGB based upon when each served as general partner.~~On December 2, 2003, an FGG salesperson emailed Noel, Tucker, Piedrahita, and Blum to alert them to inflammatory comments a director of Credit Suisse's private banking division made about FGG. The director said that Credit Suisse "would never do business with FGG." He noted that FGG's failure to play "by the rules" would "soon[er] or later" land FGG "in jail."

185.    ~~GBL received its fees in the form of limited partnership interests in GS. Upon information and belief, GBL redeemed some of its GS limited partnership interests. Upon information and belief, in order to pay GBL's redemptions, GS withdrew funds from its BLMIS account and then transferred the funds to GBL. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~As a registered broker-dealer, BLMIS was required to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. The Defendants knew that in order to evade those reporting requirements, BLMIS purported to liquidate all investment in equities and options at those times, in contravention of the SSC Strategy.

186.    ~~GBL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by~~

**Fees Earned by GBL While Serving as General Partner to GS**

| Year | Performance Fees |
|------|------------------|
| 2004 | $2,644,000 |
| 2005 | $2,451,000 |
| 2006 | $2,929,000 |
| **TOTAL** | **$8,024,000** |

undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, GBL was managed out of FGG's New York City office. On December 11, 2003, an FGG sales executive contacted Vijayvergiya in preparation for an investor meeting. The sales executive correctly anticipated the investor's question—why was Madoff always reportedly in cash at the end of the year? Vijayvergiya told the investor that there were fewer "reliable trade signals" in December to make the strategy profitable, and that BLMIS generally generated enough returns through November that they did not need to take the risk of investing in December. The sales executive responded, "I remember Jeffrey [Tucker] once specifically mentioning about the last days of the year to be in cash so he did not have to fill certain tax forms . . [sic] or something similar." Vijayvergiya acknowledged this was a "third possible reason" for Madoff's behavior, but that he "ha[d] been advised not to emphasize this." He further explained: "I am told that the rule to which Jeffrey [Tucker] is referring requires that if Madoff ends the year invested on December 31, then they are required by law to report their holdings in these same positions for the next four quarters. I am further told Madoff has been reluctant to do this."

187.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over GBL based on the entity's contacts with the U.S.

In March 2005, another client asked Vijayvergiya to prepare a historical month- end exposure summary. The summary showed that BLMIS was invested in Treasury Bills at month-end for 17 of the 26 months analyzed. Seeming to understand the danger in providing this kind of information to clients, Vijayvergiya asked Tucker if they should only provide the summary to the client on an "as requested" basis, rather than monthly.

### FGG KNEW MADOFF'S LIES ABOUT FRIEHLING & HOROWITZ WERE INDICATIVE OF FRAUD AND SOUGHT TO CONCEAL THE TRUTH

188.    BLMIS, with its billions of dollars under management, claimed to use Friehling & Horowitz, an obscure accounting/auditing firm with only two accountants, one of whom was semi-retired and living in Florida. Friehling & Horowitz operated from a strip mall in suburban Rockland County, New York. FGG would come to learn that Friehling & Horowitz was not certified to perform audits.

189. All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program, and those that enroll are listed on the public area of the AICPA website. Although it was an AICPA member, Friehling & Horowitz avoided peer review after 1993 by representing that it did no audit work. Therefore, it was not listed as a certified auditor on the public portion of the AICPA website, a fact known to FGG. Nevertheless, FGG represented to clients that Friehling & Horowitz audited BLMIS, which would not be allowed under the AICPA peer review program, and was contrary to Friehling & Horowitz's claim that it did no audit work.

190.    ~~Upon information and belief, some if not all of these fees were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~Investors continually communicated concerns about Friehling & Horowitz to FGG. In November 2003, following a meeting with members of FGG's sales team, an investor asked about Friehling & Horowitz's qualifications: "Is the auditor that Madoff uses recognized within this industry? Are references available?"

188.    **Chester Management (Cayman) Limited ("Chester Management")**: Defendant Chester Management is an FGG entity incorporated in the Cayman Islands on February 12, 2003 as a limited liability company. Its registered office is located at P.O. Box 309, Ugland House, George Town, Cayman Islands, B.W.I.

189.    Chester Management served as manager to Chester, for which it received a 0.8% management fee and 10% performance fee. According to Chester's financial statements, between 2003 and 2007, these fees totaled:

**Fees Earned by Chester Management While Serving as Manager to Chester**

| Year | Management Fees | Performance Fees | Total Fees |
|------|-----------------|------------------|------------|
| 2003 | $1,322,000 | $1,404,000 | $2,726,000 |
| 2004 | $6,017,000 | $4,788,000 | $10,804,000 |
| 2005 | $8,292,000 | $8,997,000 | $17,289,000 |
| 2006 | $13,442,000 | $14,004,000 | $27,446,000 |
| 2007 | $18,400,000 | $20,330,000 | $38,730,000 |
| **TOTAL** | **$47,472,000** | **$49,523,000** | **$96,995,000** |

191.    Chester Management is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, Chester Management was managed out of FGG's New York City office. 191.    The sales team forwarded the questions to McKeefry, who was unable to answer. He passed them on to Lipton, who after finding that "Friehling & Horowitz do not have a web site, nor is there any information on them at the AICPA," escalated the matter to Tucker. He asked Tucker, "[d]o you know how many clients they have and if they have any references[?]" Although Tucker recalled that "several clients over the years have asked about" Friehling & Horowitz, he said, "I do not know them." He suggested that Lipton look to BLMIS on the question: "call Frank [DiPascali] and ask if they have a brochure or he can give you some info."

192. ~~Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Chester Management based on the entity's contacts with the U.S.~~Lipton and Vijayvergiya tried to call DiPascali, but they were "accidentally transferred" to Madoff himself. The representations Madoff made—that Friehling & Horowitz had "been in business for over 30 years and have audited his firm for over 25 years," and that "[t]hey have 100's of clients and numerous broker-dealers"—did not comport with Lipton's understanding. After the call, Lipton questioned whether this information would satisfy FGG's client—"I don't know if that is good enough. We could try some other methods if that does not suffice." FGG's own research, which showed that Friehling & Horowitz was not listed on the AICPA website, and was therefore barred from conducting audits, belied Madoff's answer. Nevertheless, FGG continued to tell its clients that BLMIS used a reputable, qualified auditor.

### ~~3.    Management Defendants~~

193. ~~**Walter Noel**: Defendant Noel is a founding partner of FGG and sat on its Board of Directors. He also served as a director of Fairfield Sentry, Sigma, and FGB and as a general partner to GS from 1992 to 1998. Noel is also an indirect shareholder in FGB.~~Just six months later, in a February 2004 meeting with a different client, Lipton and Vijayvergiya represented that PwC audited Madoff's returns. After the meeting, however, the FGG partners acknowledged internally that PwC did not audit Madoff.

194. ~~As one of FGG's founding partners, Noel was intimately involved with its operations. Noel made day-to-day management decisions regarding the Feeder Funds and the FGG Affiliates. He was also involved in marketing the Feeder Funds, as well as the preparation and review of sales and marketing materials.~~In March 2004, another client asked the sales team similar questions about Friehling & Horowitz. This time, Vijayvergiya embellished his response, proclaiming Friehling & Horowitz a

"reputable CPA firm," even though its absence from the AICPA website and single-client book of business suggested otherwise.

195.    ~~As further described below, Noel was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.~~ When, in August 2005, the massive Ponzi scheme involving the Bayou Hedge Fund Group was uncovered, FGG investors took note of "similarities" between BLMIS and Bayou. In late August 2005, an investor came to Carla Castillo, a vice president in FGG's Client Services/Investor Relations division, with the observation that, by using Friehling & Horowitz, BLMIS used an obscure, non-independent, possibly conflicted auditor, just as Bayou had.

196.    ~~Noel and his immediate and extended family became exceptionally wealthy due to FGG's *de facto* partnership with Madoff. Noel took for himself and his family hundreds of millions of dollars of Customer Property in the form of fees and profits. This unjust enrichment enabled him, and his family, to live what has been publicly described as a life of grandeur, including a mansion in Greenwich, Connecticut, a tropical retreat in Mustique, and extravagant vacation homes in Palm Beach and Southampton. (A true and accurate copy of the April 2009 Vanity Fair article entitled, "Greenwich Mean Time," is attached hereto as Ex. 23.)~~ The revelation of Bayou as a fraud caused internal concerns at FGG as well.

Tucker received a client bulletin concerning Bayou from a friend at a fellow investment management firm. On August 31, 2005, Tucker forwarded the bulletin to all FGG employees. Within minutes, Andrew Ludwig, another FGG employee, wrote to Tucker, informing him that he was preparing FGG's "own client response piece re: Bayou and our manager selection/D[ue ]D[iligence] process, as discussed yesterday." Although Tucker had just forwarded the bulletin to all FGG employees, he wrote to Ludwig and "question[ed] the importance of sending out such a note to a broad audience." Citing nothing other

than Vijayvergiya's impression that FGG had received only one client inquiry on the issue, McKeefry and Vijayvergiya chimed in that they agreed with shutting down the project.

197. ~~Partners of FGG received three types of compensation. In addition to standard salaries and bonuses, they also received "partnership distributions." Each partner was assigned a specific percentage of the profits earned from all of the FGG entities. When the profits were gathered, they were then distributed to the partners based on their percentage allocation.~~Although he recognized that he would ultimately have to defer to Tucker, Ludwig questioned the decision: "the core client services folks . . . already had a few queries . . . . Happy to let this one go, but I think we are likely to need a general but timely piece of this type sooner rather than later."

198. ~~As a founding partner, Noel received some of the largest distributions. Between 2002 and 2008 alone, Noel received the following partnership distributions: $11.4 million in 2002, $10.6 million in 2003, $21.7 million in 2004, $25.4 million in 2005, $29.7 million in 2006, $28.2 million in 2007, and $12.3 million in 2008, for a total of approximately $114 million between 2002 and 2008. Upon information and belief, Noel received these distributions, as well as additional compensation in the form of salary and bonuses, during each year the Feeder Funds maintained accounts at BLMIS.~~Castillo backed McKeefry and Vijayvergiya, attempting, as they had, to get Ludwig to back away from the project. Castillo told Ludwig that she had received one client inquiry in August, seeking "feedback on the perceived conflict of interest with the two relationships (brokerage and auditing) in Bayou, and any similarities between Bayou and [Fairfield] Sentry related to their use of 'in-house' brokerage." The same client wanted to know "whether Madoff had made any comments regarding the Bayou Fund." Castillo made clear to Ludwig that she would take over from him in dealing with client services on the issue. She then immediately checked in with Vijayvergiya to make sure that he thought her message to Ludwig was "ok"—had it been effective in stopping Ludwig from pursuing the project?

199. ~~Upon information and belief, Noel and his family also received the benefit of redemptions from GS made by the Walter M. Noel Jr. IRA and the Noel Family, LLC. Upon information and belief, the former redeemed $2.5 million in 2006, and the latter redeemed $400,000 in 2008. In addition, as an indirect shareholder in FGL and FGB, Noel received the benefit of many payments to FGL and FGB, which were paid by funds withdrawn from the Feeder Funds' BLMIS accounts.~~Just a few hours after dismissing the importance of Bayou's auditor as a sign of the fraud, Castillo wrote to Vijayvergiya again, with a knowing laugh: "Does this 'perceived conflict of interest with the two relationships (brokerage and auditing)' sound familiar? Hehehe"

200. ~~Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~At the same time, Castillo and Vijayvergiya concocted a plan to quell the investor's fears about Friehling & Horowitz. Castillo turned to Vijayvergiya to come up with a response to the client's questions. In his contemporaneous journal entry, Vijayvergiya noted that the client had asked whether "FGG [had] checked out and approved Frehling [sic] & Horowitz," in light of it not being one of the "big 4" accounting firms and its "similar[ity] to Bayou." In responding to the client, Vijayvergiya purposely answered a different question, telling the investor that Fairfield Sentry (not BLMIS) used an auditor from one of the "big four" accounting firms. The investor immediately recognized Vijayvergiya's dodge: "the question was not about Fairfield Greenwich Group but Bernard L. Madoff Securities LLC."

201. ~~Noel is also personally responsible for repayment to the Trustee of all avoidable transfers received by GS while he was the general partner. During that time, between 1992 and 1998, GS redeemed approximately $37 million from its BLMIS account.~~FGG scheduled a call with the investor but

Vijayvergiya was unavailable to join, forcing Tucker, Lipton, McKenzie, and McKeefry to prepare for the call. Though he had no new information on Friehling & Horowitz, Lipton wrote to the group, repeating the unsubstantiated claims that Friehling & Horowitz was a "small to medium size financial services audit and tax firm, specializing in broker-dealers and other financial services firms . . . They have 100s of clients and are well respected in the local community." This was a lie. Lipton knew Friehling & Horowitz could not perform audit work, as they were not listed on that portion of the AICPA website.

202.    ~~Noel is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Noel filed customer claims, whereby he submitted to the jurisdiction of this Court. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Noel based on his contacts with the U.S~~The day before the call, Tucker had McKenzie continue to look into Friehling & Horowitz. McKenzie reported that he could not "find much information" on Horowitz. There were "a number of Horowitz's [sic] licensed in the state of New York," he said, but he "could not tie back any to the firm." He called DiPascali to obtain more information, but DiPascali was not available.

203.    **~~Jeffrey Tucker~~**: ~~Defendant Tucker is a founding partner of FGG and sits on its Board of Directors. He served as a director of FGB and FGL, and as a principal of FGL. He also served, along with Noel, as general partner of GS from 1992 to 1998. Tucker is an indirect shareholder in FGB.~~Tucker

handled the customer call, and although he had little, if any, concrete information about Friehling & Horowitz, gained the client's confidence.

204.    ~~Tucker was intimately involved with FGG's operations, including the operation of the Feeder Funds. As a director, Tucker was involved in making day-to-day management decisions regarding the Feeder Funds and the FGG Affiliates. He also reviewed and helped prepare sales and marketing materials.~~A few hours after the call with the client, McKenzie obtained a Dun & Bradstreet report showing that Friehling & Horowitz had a single employee—David Friehling—annual receipts of $180,000—far less than an auditor with hundreds of clients would have—and operated out of Mr. Friehling's home.

205.    ~~As further described below, Tucker was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.~~Tucker wrote just a two-word email to McKenzie upon receiving the Dun & Bradstreet report: "thank you." The client was never notified of the updated information.

206.    ~~Tucker and his immediate and extended family became exceptionally wealthy due to FGG's *de facto* partnership with Madoff. Prized racehorses, private jets, and luxurious mansions were just a few of the riches amassed by Tucker from management and partnership fees received for facilitating the fraud.~~The day after the call, DiPascali returned McKenzie's call, "but could not provide any additional information on F & H." McKenzie reported to Tucker that DiPascali had suggested that Tucker and Madoff speak to each other about Friehling & Horowitz.

207.    ~~Tucker received substantial partnership distributions, including $11.4 million in 2002, $10.6 million in 2003, $21.7 million in 2004, $25.4 million in 2005, $29.7 million in 2006, $28.2 million in 2007, and $12.3 million in 2008, for a total of approximately $114 million between 2002 and 2008. Upon information and belief, Tucker received these distributions, as well as additional compensation in~~

the form of salaries and bonuses, during each year FGG maintained accounts with BLMIS beginning from 1990 forward. In mid-September 2005, with the internal FGG conversation about Friehling & Horowitz's role with BLMIS continuing, Andrew Smith, a member of FGG's Executive Committee, reminded Tucker, Vijayvergiya, and others that, having understood the dangers inherent in a fund that was "self-administrated and [that] owned the accounting firm that did their audits," FGG had "passed on an initial meeting" with Bayou. Castillo acknowledged that "you are absolutely right." Another senior member of FGG's investment team, and a head of due diligence, agreed with Smith: "[t]hat is a definite red flag," adding that Bayou's "accounting firm was a very little known firm, which would have raised further questions from us. Furthermore, we always ask if there is any kinship among the service providers and this fact would deter us from the fund."

208.    In addition, as an indirect shareholder in FGL and FGB, Tucker received the benefit of many payments to FGL and FGB which were paid by funds withdrawn from the Feeder Funds' BLMIS accounts. Tucker is also personally responsible for repayment to the Trustee of any avoidable transfers received by GS while he was the general partner. Near the end of 2005, the Defendants held up Bayou as an example of a firm whose fraudulent practices FGG's diligence process would have detected. In a November 2, 2005 Investment Team Presentation, FGG claimed that their diligence process would have led them to question "Bayou's obscure auditing firm."

209.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. From a due diligence perspective, the differences between Friehling & Horowitz and Bayou's auditor were negligible: few employees, minimal revenue, and obscure reputation.

210. ~~Tucker is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Tucker is subject to personal jurisdiction in this judicial district as he is a resident of New York, New York, and Tucker filed a customer claim, whereby he submitted to the jurisdiction of this Court. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Tucker based on his contacts with the U.S.~~Yet, even when called upon to revisit the Friehling & Horowitz issue, FGG took no action. In March 2008, Yanko della Schiava received a client inquiry that raised, among other issues, Madoff's compliance with IFRS "auditing standards." When della Schiava sought guidance on the issue from Vijayvergiya and Toub, Toub viewed the issue not for the fraud risk it was, but only as a matter to be addressed through FGG's "branding efforts," which, in light of the client's concerns, he "[g]uess[ed] we need to work on." He forwarded the email to Tucker, Vijayvergiya, Landsberger, Smith, and others. Smith was perplexed by the client's comment about "auditing standards," but Landsberger quickly explained that the comment meant that the client was concerned about "Madoff's accounts [being] audited by relative of family," the very issue that FGG had recognized in 2005 as a "definite red flag" in the context of the Bayou fraud.

211. **Andrés Piedrahita**: ~~Defendant Piedrahita is a founding partner of FGG, a member of the Board of Directors, and Chairman of its Executive Committee. He has served on FGG's Executive Committee since its inception in 2007. He also served as Director and President of FGB and owned, directly or indirectly, between 10% and 25% of FGB. In 2007 and 2008, Piedrahita was the highest paid partner at FGG.~~Vijayvergiya and Tucker planned a response. Having "heard these concerns numerous times over the years (typically from the Swiss/Italian rumor mill)," Vijayvergiya felt that FGG's

approach should be to "dispel[]" them in a "conference call." Tucker agreed that "a call usually disarms the party making the inquiry," but favored a written response "given the nervousness of our markets."

212. ~~Piedrahita was intimately involved with FGG's operations, including the operations of the Feeder Funds. As a member of the Executive Committee and Chairman of the Board of Directors, Piedrahita was deeply involved in making day-to-day management decisions regarding the FGG entities.~~Vijayvergiya called Madoff a few days later with the client's questions and then reported to Tucker and Noel. On the "Relationship with Accountants Friehling & Horowitz," Vijayvergiya reported that Madoff told him that "F&H is completely independent; there is no family relationship," and that "F&H is a registered member of the American Institute of Certified Public Accountants," which Vijayvergiya knew was irrelevant as Friehling & Horowitz could not perform audits. Landsberger wrote, "great info here." The discussion of the information continued among the FGG partners, but no one commented on the shifts in Madoff's story.

213. ~~As further described below, Piedrahita was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.~~Questions about Friehling & Horowitz continued until just a few hours before Madoff's arrest. On December 10, 2008, an investment advisor asked Lipton and Vijayvergiya questions to be addressed to PwC: "[H]ow do you verify the securities are actually held within each account? . . . How do you know the trade isn't a Ponzi scheme or that another Petters situation does not exist?" The investment adviser was referring to the Ponzi scheme perpetrated by Thomas Petters' investment funds.

### FGG KNEW BLMIS BORE A STRIKING RESEMBLANCE TO BAYOU

214. ~~Piedrahita became exorbitantly rich by serving as a Madoff globetrotting salesman. According to published reports, he lived a whirlwind lifestyle of Gulfstream jets, multi-million dollar yachts, extravagant parties, pheasant hunting with royalty, and spent tens of millions of dollars on homes~~

around the world. (A true and accurate copy of the March 31, 2009 Wall Street Journal article entitled, "The Charming Mr. Piedrahita Finds Himself Caught in the Madoff Storm," is attached hereto as Ex. 24.) Public comments attributed to Piedrahita such as "[my job was] 'to live better than any of my clients,'" *(id.)* manifest his prevailing motivation - do nothing that might upset the Madoff relationship that made his lavish lifestyle possible. His motivation was one of limitless greed, without regard for any interest other than his own. The November 2005 Investment Team Presentation highlighted other Bayou characteristics that FGG claimed would have prevented its investment with Bayou—among them, its "inconsistent answers [and] refusal to give information," its "lax policies and lack of procedures in place," its inability to provide "independent, third party confirmation of assets," and its failure to "segregate[e back office] duties."

215.    Piedrahita received substantial partnership distributions including approximately $9.4 million in 2002, $12.3 million in 2003, $21.3 million in 2004, $25.1 million in 2005, $31.6 million in 2006, $36.0 million in 2007, and $26.4 million in 2008, for a total of approximately $162 million between 2002 and 2008. Upon information and belief, Piedrahita has received these distributions, as well as additional compensation in the form of salaries and bonuses, every year since he joined FGG in 1997. In those ways, which FGG claimed its due diligence would have identified as hallmarks of fraud, BLMIS bore a striking resemblance to Bayou. Not only did Madoff give

FGG inconsistent information about Friehling & Horowitz, he was inconsistent about BLMIS's options trading practices, including whether he contacted options trading partners before executing trades. Although it contravened industry standard, BLMIS provided no electronic access to trading information and mailed trading tickets T+3 (three days after the actual trade). He frequently blocked due diligence and rejected requests for in-person meetings.

216.    As a direct or indirect shareholder of FGL and FGB, Piedrahita received the benefit of many payments to FGL and FGB which were paid by funds withdrawn from the Feeder Funds' BLMIS

account.Like Bayou, BLMIS used an unusual, unremunerative fee structure. Madoff proclaimed to be "perfectly happy" walking away from the billions of dollars he would have received under a conventional arrangement that gave him a management fee of one to two percent of AUM and a performance fee of 20% of profits. BLMIS, however, charged neither, instead charging commissions of $0.04 per equity trade and $1 per option contract trade.

217.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.FGG knew that such atypical fee structures combined with other operational irregularities that existed at BLMIS were inconsistent with industry customs and practices.

218.    Piedrahita is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Piedrahita routinely received payments from FGG's New York City office and regularly attended meetings of FGG's Executive Committee and Board of Directors in New York, New York. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Piedrahita based on his contacts with the U.S.Shortly after the Bayou fraud collapsed in 2005, a Fairfield Sentry investor reached out to FGG asking about "perceived conflict of interest with the two relationships (brokerage and auditing) in Bayou, and any similarities between Bayou and Sentry related to their use of 'in-house' brokerage." Vijayvergiya acknowledged that Bayou did not charge a management fee, which was unusual in the industry.

219. And while FGG tried to explain away the similarities of Bayou's and Madoff's unusual fee structures, it knew, based on its internal monitoring and receipt of BLMIS annual aggregate compensation reports, that it collected more than three times the total fees BLMIS charged from 2004 through 2007.

| Year | Sentry's AUM at Year-End | BLMIS's Commission | BLMIS's Commission as a % of AUM | FGG's Management & Performance Fees | Management & Performance as a % of AUM |
|------|-----|-----|-----|-----|-----|
| 2004 | $5,087,887,422 | $52,426,587 | 1.08% | $102,827,000 | 2.02% |
| 2005 | $4,889,589,926 | $43,534,052 | 0.85% | $138,352,000 | 2.83% |
| 2006 | $5,624,715,292 | $40,203,483 | 0.80% | $158,244,000 | 2.81% |
| 2007 | $7,147,059,409 | $58,079,688 | 0.86% | $183,579,000 | 2.57% |
| **TOTAL** | = | **194,243,810** | = | **583,002,000** | = |

219.    ~~**Mark McKeefry**: Defendant McKeefry joined FGG in 2003. He became a partner in 2005 and served on FGG's Executive Committee since its inception in 2007. He also acted as FGG's Chief Compliance Officer; FGB's Chief Legal Officer ("CLO"), Assistant Secretary, and Director; FGL's Executive Director, Chief Operating Officer, President, and Vice President; FGA's President; and Director of Fairfield-UK. As FGG's CLO, McKeefry was responsible for legal and compliance issues. He was also responsible for maintaining FGG's relationship with Madoff in 2007 and 2008.~~

## FGG MADE FALSE STATEMENTS REGARDING BLMIS'S OVERLAPPING ROLES AS CUSTODIAN, PRIME BROKER, AND INVESTMENT ADVISER

220.    ~~In his role as CLO, as well as in his numerous other roles within the FGG entities, McKeefry was responsible for approving and signing various documents on FGG's behalf. Such documents included: letters to investors; Form 13F filings with the SEC; agreements with BLMIS, including customer agreements and option-trading agreements; Form ADV Applications for Investment Adviser Registration; subscription agreements; confidentiality agreements;~~ The Defendants knew BLMIS functioned as Fairfield Sentry's custodian, investment adviser, and prime broker—a structure atypical in the investment industry. The Defendants identified that an entity playing all three roles would preclude independent, third-party confirmation of assets and trading activity. None of FGG's non-BLMIS funds had a similar structure, nor did Fairfield Sentry's non-BLMIS investments.

distribution agreements; letters of understanding; written resolutions; delegation agreements; selling agreements; and certificates of incumbency.

221.    As further described below, McKeefry was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up. Investors were skeptical as well, and as early as 2002 raised the issue that BLMIS did not use a third-party broker. However, FGG refused to address BLMIS's lack of independence.

222.    McKeefry benefited greatly from FGG's *de facto* partnership with Madoff. McKeefry received approximately $600,000 in partnership distributions in 2005, $1.6 million in 2006, $3.4 million in 2007, and $3.4 million in 2008, for a total of $9.0 million between 2005 and 2008. Upon information and belief, McKeefry also received significant salary and bonuses. In February 2003, one of FGG's clients forwarded a "Notice to Clients" in which EFG Capital International Corporation ("EFG") disclosed risks with Fairfield Sentry. EFG wrote that "the Fund's assets are custodized with its investment adviser, Bernard L. Madoff Investment Securities, rather than with a major international bank . . . as is the case with most investment funds." Obviously, this was precisely the vehicle for Madoffs fraud—he eliminated all checks and balances by arrogating all roles to himself. EFG's observation was correct and an obvious detection of a serious fraud concern.

223.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. On April 28, 2003, an investor raised concerns regarding the "conflict of interest in Madoff acting as both principal in connection with the sale or purchase of securities to the fund and as market-maker in the stocks purchased or sold by the fund."

224.    ~~McKeefry is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, upon information and belief, McKeefry is a resident of New York, New York. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over McKeefry based on his contacts with the U.S.~~On August 27, 2003, one investor voiced similar concerns about "the potential conflict of interest presented by Madoff serving as custodian of the assets in addition to trading on the account." Vijayvergiya explained to Tucker that the sales team dispelled this concern and:

> quite effectively explained that, while we recognize this as potential conflict, we have reviewed internal controls at Madoff extensively over the years and have satisfied ourselves that adequate controls are in place. Further, we have done periodic spot checks of trade tickets and traced them back through Madoff's system to verify their presence on custodial records.

Vijayvergiya and Tucker knew this was not true.

225.    ~~**Daniel Lipton ("Lipton")**: Defendant Lipton joined FGG in 2002. During his employment with FGG, he served as Chief Financial Officer ("CFO") and Assistant Secretary of FGB, and Vice President and CFO of FGA. Lipton has been a partner of FGG since 2005.~~On February 4, 2004, Vijayvergiya devised a list of "[c]ommon concerns regarding Madoff and the split-strike conversion strategy," which listed the following items: "[c]onflict of interest as custodian," "[c]onflict of interest as market maker (Chinese walls)," "[f]ront-running orders," and "[h]ow can Sentry generate such consistent returns?" Despite forming this list of questions indicative of fraud, Defendants never dug deeper.

226.    ~~As CFO, Lipton was principally responsible for overseeing the annual FGG audits. Lipton also assisted in managing FGG's operations, including: authorizing and requesting wire transfers into FGG accounts; communicating with FGG investors regarding audits of FGG's financial statements; and approving and signing numerous documents on FGG's behalf. Such documents included: letters to clients regarding amendments to their agreements with FGG and their statements for various FGG funds; the Feeder Funds' customer, option, and trading authorization agreements with BLMIS; numerous loan requests on behalf of FGG; agreements establishing FGG entities as investment managers and placement agents; requests for wire transfers redeeming money from the Feeder Funds' BLMIS accounts; and letters requesting a confirmation of assets in a number of the Funds.~~ On February 1, 2005, an investment group explained that it had "decided to NOT invest in the Fairfield Sentry fund" due to the "non pure independence between the true manager of the fund and the prime broker/Custodian of the fund." An FGG employee forwarded the investor's email to Tucker, Landsberger, and Vijayvergiya stating, "at least their reason was [] a good one."

227.    ~~As further described below, Lipton was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.~~ Another investor contacted their FGG representative on October 24, 2005 with concerns that BLMIS maintaining custody of Fairfield Sentry's investments was just like Refco, Inc., a financial services company that infamously fell into bankruptcy as a result of its fraud. The next day, the sales representative forwarded these concerns to Vijayvergiya and others.

228.    ~~As a partner, Lipton was compensated handsomely due to FGG's relationship with Madoff. Lipton received partnership distributions of $200,000 in 2005, $757,000 in 2006, $1.8 million in 2007, and $1.1 million in 2008, for a total of approximately $3.8 million between 2005 and 2008. Upon information and belief, Lipton also received significant salary and bonuses.~~ In August 2006, McKeefry

wrote to EFG, scolding the bank for informing its customers of risks associated with Fairfield Sentry. McKeefry wrote that "the Fund's custodian is not BLM but rather Citco Global Custody N.V.," and that "BLM is not an investment adviser to the Fund." This response came as the SEC was determining BLMIS was Fairfield Sentry's actual investment adviser and in the face of the sub-custodian agreement that authorized BLMIS to be in custody of all of Fairfield Sentry's BLMIS assets.

229.    ~~Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee~~In July 2007, a foreign investor expressed significant concern about Madoff acting as both broker and sub-custodian. The investor worried that Madoff may be "tell[ing] lie[s] about the # of stocks, name and so on that [Fairfield] Sentry fund bought." He asked Landsberger and Vijayvergiya whether "CITCO [can] cross check independently the information that . . . BLM provided . . . this is the key question" the investor was considering.

230.    ~~Lipton is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, upon information and belief, Lipton is a resident of New York, New York. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Lipton based on his contacts with the U.S.~~Landsberger called upon Vijayvergiya to script a response. Vijayvergiya's response told the investor what it wanted to hear. Yet for all of the confidence about the "adequa[cy of the] controls" Vijayvergiya's response sought to convey, it was premised upon his dodge on the critical point: "As is common practice in the US brokerage industry," Vijayvergiya wrote,

"brokers typically custodize the assets of their clients." Vijayvergiya's response ignored that the issue was BLMIS's dual role as investment manager and custodian. In any event, further discussion with this investor, Vijayvergiya said, should be "answered on a phone call," rather than in writing, where FGG could assuage any lingering fears.

231.    ~~**Amit Vijayvergiya ("Vijayvergiya")**: Defendant Vijayvergiya joined FGG on June 9, 2003 as FGB's Risk Manager. He quickly became a key player at FGB, and held the title of Vice President and Head of Risk Management in 2005, where he focused primarily on hedge fund manager selection and risk management. On January 1, 2007, Vijayvergiya became a partner and Head of FGG's Risk Management Division in the Investment Group, reporting directly to the Executive Committee.~~FGG partner Smith expressed confusion about several of the client's concerns, noting that the "[o]nly real critique on our fund that can be made is the custody and whether we add value in seed program or not." Landsberger, however, understood all of the concerns. His proposed response was to "figur[e out] how to spin." Vijayvergiya came up with a plan, and like Landsberger, felt that the answer had to be properly spun, to "highlight[] our transparency."

232.    ~~Vijayvergiya was responsible for conducting due diligence, initial risk modeling and ongoing risk analysis on investments, fund operations services, supervising staff, and shareholder communications. He was also charged with assessing the risk of the Feeder Fund investments. (A true and accurate copy of Vijayvergiya's employment offer letter is attached hereto as Ex. 25.)~~On August 23, 2006, Tucker and others received a letter from an investor warning them of the risk posed by BLMIS maintaining custody of Fairfield Sentry's assets due to BLMIS's limited amount of capital—approximately $275 million—compared to the major international banks that provide custody for most investment funds. At the time, FGG had entrusted BLMIS with over four billion dollars.

233.    ~~As further described below, Vijayvergiya was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to~~

~~conduct any proper, independent and reasonable due diligence or follow up.~~In June 2007, another FGG partner forwarded a news report to Piedrahita, Vijayvergiya, and others with a warning that Bear Stearns "is getting criticized for self custody." The FGG partner asked whether the group had "any thoughts on why we are not concerned with regard to Sentry?? We should try to get our response fine tuned." Piedrahita responded that "[w]e have always been concerned. But the reality is that there is absolutely nothing we can do about it      "

234.    ~~FGG's *de facto* partnership with Madoff proved lucrative for Vijayvergiya. After becoming a partner, Vijayvergiya received partnership distributions of $1.8 million in 2007 and $800,000 in 2008. Upon information and belief, Vijayvergiya also received significant salary and bonuses.~~On August 19, 2008, just a few months before the collapse of BLMIS, key FGG partners including Vijayvergiya, Piedrahita, Toub, Tucker, and others corresponded regarding a client's decision to redeem from Fairfield Sentry. The client cited concerns it had with a statement in Fairfield Sentry's PPM that the fund did "not have custody of the assets," which increased the risk "that the personnel of any entity with which [Fairfield Sentry] invests could misappropriate the securities or funds (or both) of the Fund."

235.    ~~Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.~~The Defendants knew that BLMIS was acting as investment adviser, prime broker, and custodian for the feeder funds and that the misappropriation of assets was a real threat. Yet FGG downplayed investor concerns to induce them to ignore this structural defect, and enabled Madoff to commit fraud.

**THE DEFENDANTS STRATEGIZED WITH MADOFF TO MISLEAD THE SEC**

236.    ~~Vijayvergiya is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived~~

significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Vijayvergiya based on his contacts with the U.S. From the outset, BLMIS acted as Fairfield Sentry's investment adviser.

237.    **Gordon McKenzie ("McKenzie")**: Defendant McKenzie was a Director and Controller at FGB, and a member of the Fund Accounting Division in FGG's Operations Group. McKenzie joined FGG in 2003. In spring and summer 2004, the Defendants scrubbed references to BLMIS from FGG materials to avoid disclosure of Madoff's role. As FGG prepared to launch an internal website that would contain information about the investment vehicles they offered, Vijayvergiya agreed with the FGG Finance Group's directive "to remove any mention of our accounts at BLM from the Investment Manager description paragraph." He told the website administrator, "take out all mention of Madoff."

238.    McKenzie was responsible for accounting and back-office operations for Fairfield Sentry, Sigma, Lambda, Chester, and Irongate. He joined FGG as a Finance Associate and was eventually elevated to Controller of FGB. McKenzie was also part of FGG's Finance Group, whose core duties included conducting mini-audits of monthly financial statements and preparing and coordinating audits. He worked closely with PricewaterhouseCoopers ("PwC") when it conducted audits of FGG's funds and reviewed the financial statements PwC prepared. By March 17, 2005, FGG became aware of the SEC's investigation into the trading practices of certain Madoff feeder funds for BLMIS's potential violations of federal securities laws. McKeefry wrote to Tucker and Blum to let them know that Madoff had called him about an SEC sweep examination and that McKeefry, in his role as FGG's Chief Legal Officer and then Chief Operating Officer, had "assured him of our intention to notify him of any regulatory contacts regarding [S]entry or our [registered investment adviser], and to discuss with him in advance."

239.    As further described below, McKenzie was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any

proper, independent and reasonable due diligence or follow up. The SEC collected documents from Madoff in June 2005, but still had outstanding questions. In December 2005, the SEC sought to interview FGG personnel.

240.    McKenzie received significant salary and bonuses during his employment at FGB. For instance, in 2007, he received a $180,000 bonus, in 2008, McKenzie received a salary of over $150,000 and a bonus of over $200,000. He also received over $100,000 in deferred compensation. Upon information and belief, McKenzie received comparable amounts each year since he joined FGG in 2003. High-ranking FGG personnel, including Tucker and Vijayvergiya, met to develop a game-plan for the interview. FGG chose Vijayvergiya and McKeefry to cover the interview for FGG.

241.    Upon information and belief, some if not all of these payments were made with funds originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee. With the confidential SEC interview set for December 21, 2005, FGG arranged a pre-call with Madoff for December 19 to ensure that Vijayvergiya and McKeefry would deliver a Madoff-sanctioned story. Vijayvergiya and McKeefry sent Madoff the SEC's interview request letter, FGG materials that referred to Madoff's role, and FGG's plan for how they would describe the SSC Strategy during the interview.

242.    McKenzie is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over McKenzie based on his contacts with the U.S. On the call, Madoff set the ground rules:

"Obviously, first of all, this conversation never took place, Mark, okay?" Vijayvergiya and McKeefry acceded. Nevertheless, Vijayvergiya made an audio recording of the call.

243.    **Richard Landsberger ("Landsberger")**: Defendant Landsberger joined FGG in 2001, and became an FGG partner in 2002. He was a member of FGG's Executive Committee, Director of Fairfield UK, and Head of Sales of FIFL.

244.    As further described below, Landsberger was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

245.    Landsberger received substantial partner distributions, including $32,000 in 2002, $690,000 in 2003, $1.6 million in 2004, $2.7 million in 2005, $3.9 million in 2006, $5.4 million in 2007, and $4.0 million in 2008, for a total of approximately $18.3 million. Upon information and belief, Landsberger also received significant salary and bonuses.

246.    Upon information and belief, these payments and distributions were paid with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

247.    Landsberger is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Landsberger based on his contacts with the U.S.

248.    **Philip Toub ("Toub")**: Defendant Toub, one of Noel's sons-in-law, joined FGG in 1997 in its New York office. Toub was a partner and member of FGG's Executive Committee. Throughout his employment with FGG, Toub served as a Director of FGL and as a member of FGG's Client Development Group.

249.    Toub's responsibilities included developing new products and marketing FGG's offshore funds. His product development activities focused on markets in Brazil and the Middle East. These activities necessarily required Toub to establish relationships with a number of FGG investors and thereafter respond to customer inquiries related to Madoff.

250.    As further described below, Toub was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

251.    After becoming a partner on January 1, 2001, Toub received the following partnership distributions, totaling over $25 million: $822,000 in 2002, $892,000 in 2003, $1.5 million in 2004, $3.9 million in 2005, $7.5 million in 2006, $8.4 million in 2007, and $3.3 million in 2008. Upon information and belief, Toub also received significant salary and bonuses.

252.    Upon information and belief, some if not all of the payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

253.    Toub is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum

contacts with the U.S. Thus, this Court has personal jurisdiction over Toub based on his contacts with the U.S.

254.    **Charles Murphy ("Murphy")**: Defendant Murphy joined FGG as a partner on April 1, 2007. Based in FGG's New York office, Murphy served on FGG's Executive Committee and focused on strategy and capital markets for FGG.

255.    Murphy was heavily involved in important strategic decisions involving Madoff. Such decisions included the amount of money FGG should invest through BLMIS, which FGG funds should invest through BLMIS, and whether FGG should leverage its investor funds by borrowing cash in order to increase investments through BLMIS. Murphy also was often involved in email correspondence about Madoff, which included discussions about important client redemptions that were requested due to client concerns about Madoff risks.

256.    As further described below, Murphy was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

257.    Murphy received approximately $2.4 million in partnership distributions in 2007 and $2.7 million in 2008, for a total of approximately $5.1 million. Upon information and belief, Murphy also received significant salary and bonuses.

258.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

259.    Murphy is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the

Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Murphy based on his contacts with the U.S.

260.   **Robert Blum ("Blum")**: Defendant Blum served as a Managing Partner at FGG and the Chief Operating Officer of FGB and FGA. He started at FGG in 2000 and made partner on January 1, 2002. Blum resigned from his FGG positions in June of 2005. Because Blum's partnership interest had fully vested at the time of his departure, he will continue to receive distributions through 2010.

261.   While serving as a Managing Partner of FGG, Blum oversaw or assisted in all aspects of FGG's activities. Blum was involved in making day-to-day management decisions related to the Feeder Funds and FGG Affiliates. He also reviewed FGG sales and marketing materials, including webcasts and monthly commentaries.

262.   As further described below, Blum was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

263.   Blum received substantial profit distributions and other compensation, including approximately $605,000 in 2002, $1.5 million in 2003, $2.8 million in 2004, $4.2 million in 2005, $3.7 million in 2006, $4.3 million in 2007, and $3.8 million in 2008, for a total of approximately $21 million. Upon information and belief, Blum also received significant salary and bonuses.

264.   Upon information and belief, some if not all of these payments and distributions were paid with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

265.   Blum is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting

significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Blum filed customer claims, whereby he submitted to the jurisdiction of this Court. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Blum based on his contacts with the U.S.

266.    **Andrew Smith ("Smith")**: Defendant Smith was an Executive Director and partner at FGG in the Fund of Funds Division of the Investment Group. Smith also served as a Portfolio Manager and oversaw all operations for Chester and Irongate. Smith became a partner on January 1, 2006. He left FGG in April 2009 and joined Sciens, the company now managing Chester, Chester LP, and Irongate, as a member of the Sciens Investment Committee and a Portfolio Manager.

267.    As a member of FGG's Executive Committee, Smith worked closely with Piedrahita, McKeefry, Landsberger, Toub, and Murphy to make day-to-day management decisions regarding the Feeder Funds and FGG Affiliates. As the representative from FGG's Investment Group on the Executive Committee, Smith played an integral role in making decisions regarding investor and potential investor requests for information about BLMIS and Madoff.

268.    As further described below, Smith was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

269.    Smith received substantial compensation as a result of his partnership position at FGG, including approximately $1.1 million in partnership distributions in 2006, $3.8 million in 2007, and $785,000 in 2008, totaling approximately $5.6 million. Upon information and belief, Smith also received significant salary and bonuses.

270.    Upon information and belief, some if not all of these payments and distributions were made with

funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

271.    Smith is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Smith based on his contacts with the U.S.

272.    **Harold Greisman ("Greisman")**: Defendant Greisman joined FGG in 1990 in the New York office. He served as FGG's Chief Investment Officer and was a member of the Executive Committee. Beginning on January 1, 2002, Greisman was a partner of FGG.

273.    Greisman was responsible for overseeing the day-to-day investment activities of FGG. This required him to monitor the investment decision-making process, from initial manager search and selection to research and ongoing manager oversight. Greisman utilized Vijayvergiya and Smith, as well as additional FGG employees, to assist him in his duties as Chief Investment Officer. Both Vijayvergiya and Smith reported directly to Greisman.

274.    As further described below, Greisman was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

275.    Greisman received partnership distributions of approximately $600,000 in 2002, $900,000 in 2003, $1.6 million in 2004, $2.3 million in 2005, $3.7 million in 2006, $3.9 million in 2007, and $2.5 million in 2008

for a total of over $15 million. Upon information and belief, Greisman also received significant salary and bonuses.

276.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

277.    Greisman is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, upon information and belief, Greisman is a resident of New York, New York. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Greisman based on his contacts with the U.S.

278.    **Gregory Bowes ("Bowes")**: Defendant Bowes was a partner of FGG and served on FGG's Executive Committee. He joined FGG in 2000 and became partner in 2002. Bowes resigned from his FGG position in 2003. But because his partnership interest had already vested, he continued to receive multi-million dollar partnership distributions.

279.    As further described below, Bowes was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

280.    While he was still at FGG, Bowes received partnership distributions of $605,000 in 2002 and $1.5 million in 2003. After leaving FGG, he received partnership distributions of $2.8 million in 2004, $4.2 million in 2005, $3.8 million in 2006, $4.3 million in 2007, and $3.8 million in 2008. Upon information and belief, Bowes

also received significant salary and bonuses.

281.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

282.    Bowes is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Bowes based on his contacts with the U.S.

283.    **Corina Noel Piedrahita ("Noel Piedrahita")**: Defendant Noel Piedrahita, daughter of Defendant Noel and wife of Defendant Piedrahita, joined FGG as a partner on January 1, 2002. Noel Piedrahita was Head of Client Services and Investor Relations and was part of FGG's Corporate Center before she retired in 2007.

284.    Noel Piedrahita was intimately involved with FGG's enterprise, including the operation of its Feeder Funds. Among other things, she was responsible for approving subscriptions in and redemptions from various FGG funds, and worked closely with Tucker on a variety of issues, including how much money was to be funneled to BLMIS.

285.    As further described below, Noel Piedrahita was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

286.    Independent of her husband's earnings, Noel Piedrahita received approximately $300,000 in 2002,

$325,000 in 2003, $800,000 in 2004, $800,000 in 2005, $1 million in 2006, $900,000 in 2007, and $1.1 million 2008, totaling over $5 million. Upon information and belief, Noel Piedrahita also received significant salary and bonuses.

287.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

288.    Noel Piedrahita is subject to personal jurisdiction in this judicial district as she routinely conducted business in New York, New York, purposely availed herself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Noel Piedrahita based on her contacts with the U.S.

        4.        Sales Defendants

289.    **Lourdes Barreneche ("Barreneche")**: Defendant Barreneche joined FGG in 1997, and became an FGG partner in 2002. She was based in FGG's New York office, and worked in FGG's Business Development Group. She was an international sales specialist who coordinated FGG's sales efforts in Latin America, Spain, Portugal, and Switzerland.

290.    As further described below, Barreneche was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

291.    As a partner of FGG, Barreneche received substantial profit distributions including $1.0 million in

2002, $1.2 million in 2003, $1.9 million in 2004, $2.8 million in 2005, $6.6 million in 2006, $7.8 million in 2007, and $5.6 million in 2008, or approximately $27 million. Upon information and belief, Barreneche also received significant salary and bonuses.

292.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

293.    Barreneche is subject to personal jurisdiction in this judicial district as she routinely conducted business in New York, New York, purposely availed herself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Barreneche based on her contacts with the U.S.

294.    **Cornelis Boele**: Defendant Boele joined FGG in 1997, and became an FGG partner in 2002. Boele oversaw FGG's marketing efforts for offshore funds in Belgium, the Netherlands, Luxembourg, and throughout Europe. He was responsible for structuring and raising assets, and worked for FGG's Business Development Group.

295.    As further described below, Boele was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

296.    Boele received approximately $493,000 in partnership distributions in 2002, $986,000 in 2003, $2.0 million in 2004, $3.7 million in 2005, $5.4 million in 2006, $5.2 million in 2007, and $4.7 million in 2008, for a total of approximately $23.5 million. Upon information and belief, Boele also received significant salary and

bonuses.

297.   Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

298.   Boele is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Boele based on his contacts with the U.S.

299.   **Santiago Reyes ("Reyes")**: Defendant Reyes joined FGG in 1996, and became a partner on January 1, 2002. Reyes was the head of FGG's Miami office where he was responsible for marketing FGG's offshore funds worldwide. Reyes was in charge of business development and held a position on FGG's sales team, where he was responsible for communicating with clients and convincing them and prospective investors to invest in FGG's products, including those funds invested in BLMIS, such as Fairfield Sentry.

300.   Reyes was responsible for communicating with clients and convincing them and prospective investors to invest in FGG's products, including those funds invested in BLMIS, such as Fairfield Sentry. Reyes often asked Vijayvergiya and other FGG employees for advice on how to field client questions or respond to client concerns about Madoff and Fairfield Sentry. In fact, Reyes worked closely with Vijayvergiya, requesting information on Madoff's investment strategy and Fairfield Sentry's performance.

301.   As further described below, Reyes was acutely aware of many facts and red flags, that put him on

actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

302.    Reyes received partnership distributions of approximately $300,000 in 2002, $550,000 in 2003, $1.2 million in 2004, $1.5 million in 2005, $2.3 million in 2006, $2.2 million in 2007, and $2.0 million in 2008, for a total of approximately $10 million. Upon information and belief, Reyes also received significant salary and bonuses.

303.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

304.    Reyes is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of

Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Reyes based on his contacts with the U.S.

305.    **Jacqueline Harary ("Harary")**: Defendant Harary was a partner at FGG who marketed the Feeder Funds worldwide, focusing on Latin America. She joined FGG in 1997 as part of FGG's merger with Littlestone Associates and became partner on January 1, 2002.

306.    Harary's role combined both sales responsibilities and projects related to manager selection and project development. She also coordinated FGG's relationship with investors that were charitable, as well as non-profit organizations. Having been a member of the FGG team for over ten years, Harary was very familiar with

FGG policies, procedures, and politics, especially related to Madoff.

307.    Harary worked very closely with Vijayvergiya, communicating with him on a frequent basis regarding her client inquiries and concerns about Madoff and BLMIS. Vijayvergiya worked with Harary to craft responses to the due diligence inquires she received - responses designed to deflect straightforward questions about the lack of transparency and potential conflicts of interest at BLMIS.

308.    Harary also fielded and responded to investor concerns after Madoff's arrest. Harary had knowledge about how much money was lost and how much damage was done to the Feeder Funds that had invested directly or indirectly in BLMIS.

309.    As further described below, Harary was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

310.    As an FGG partner, Harary received substantial partnership distributions, including approximately $100,000 in 2002, $200,000 in 2003, $700,000 in 2004, $1.1 million in 2005, $1.5 million in 2006, $1.6 million in 2007, and $1.1 in 2008, totaling approximately $6.3 million. Upon information and belief, Harary also received significant salary and bonuses.

311.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS and are recoverable by the Trustee.

312.    Harary is subject to personal jurisdiction in this judicial district as she routinely conducted business in New York, New York, purposely availed herself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Harary filed a customer claim, whereby she submitted to the jurisdiction of this Court. In

addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Harary based on her contacts with the U.S.

## VI.    FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG

313.    Prior to forming FGG, Noel worked in the management consulting and international private banking businesses. He created the international private banking group at Chemical Bank and helped establish a network of offices around the world focused on asset management. In 1983, Noel left Chemical Bank to start his own consulting firm to advise foreign investors regarding U.S.-based alternative investments. Noel acted as a third-party marketer of investment products to wealthy individuals located around the world.

314.    Tucker worked as an attorney for the SEC from 1970 to 1978, after which he entered the private practice of law as a partner at Tucker, Globermand & Feinsand. While in private practice, Tucker represented Fred Kolber ("Kolber") on securities related matters. In 1987, Tucker became a general partner of Fred Kolber & Co., a registered broker-dealer. In his position as general partner, Tucker was responsible for developing and administering the firm's private investment funds. After Tucker became a general partner, Tucker and Kolber launched a domestic hedge fund, the Greenwich Options Fund ("GOF"). Kolber handled the money management and Tucker helped administer and market the fund. During this time, Tucker and Kolber sublet their offices from Noel. Through this landlord-tenant relationship, Noel became acquainted with Tucker and Kolber.

315.    In 1988, Noel, Tucker, and Kolber joined forces to create an offshore counterpart to GOF, the Fairfield Investment Fund, Ltd. Through this association, Noel and Tucker decided to become partners in what became FGG. FGG started providing marketing services for Fred Kolber & Co., and the firms merged.

316.    Eventually, Noel, Tucker, and Kolber decided to outsource the management of some portion of their funds. Tucker and Kolber started the search for a fund manager.

**A.    *Noel and Tucker Meet Madoff and Make Their First Investments With BLMIS***

317.    In 1989, Tucker's father-in-law, Norman Schneider, introduced Madoff to Noel and Tucker. Madoff explained that his returns were more modest than some competitors, such as George Soros and Julian Robertson, but that he provided low volatility. In July of that year, Noel, Tucker, and Kolber pooled $1.5 million and invested it with BLMIS on behalf of an entity called the Fairfield Strategies Ltd. The fund then invested another $1 million with BLMIS in January 1990.

318.    Based on the returns from their initial investments, Noel and Tucker decided to place more money with Madoff and, in 1990, created Fairfield Sentry. Fairfield Sentry made its first deposit of $4 million into its account at BLMIS on November 29, 1990. Noel and Tucker offered shares of Fairfield Sentry to non-U.S. investors at a minimum initial investment of $100,000. Pursuant to the fund's offering memorandum, Fairfield Sentry's investment manager was required to invest no less than 95% of the fund's assets directly through BLMIS, which supposedly would manage the fund's money according to BLMIS's self-proclaimed "split-strike conversion strategy" ("SSC Strategy"), described in detail below.

319.    Over the next eighteen years, as a result of additional investments by Fairfield Sentry and alleged profits produced by BLMIS, Fairfield Sentry's assets grew exponentially. According to Fairfield Sentry's account statements, between November 1990 and December 2008, the fund's assets invested through BLMIS increased from $4 million to approximately $6 billion.

**B.    *Noel and Tucker Expand FGG's Offerings to U.S. Investors and Piedrahita Joins the Partnership***

320.    Shortly after Fairfield Sentry was established, Noel and Tucker formed Aspen/Greenwich Limited Partners ("Aspen/Greenwich"), a Delaware limited partnership, in order to provide a domestic vehicle to funnel U.S. investor monies into BLMIS. Aspen/Greenwich eventually changed its name to GS, gave its first deposit to BLMIS on November 20, 1992, and began operations in January 1993.

321.    In 1997, FGG acquired Littlestone Associates ("Littlestone"), founded by Piedrahita, Noel's son-

in-law. With this acquisition, Piedrahita became a partner in FGG and Littlestone's clients became clients of FGG.

322.   Noel, Tucker, and Piedrahita essentially shared the responsibilities of managing and supervising the business of FGG. Tucker emphasized operations and was considered the founder and engineer of FGG's Madoff investments, and the person responsible for FGG's direct relationship with Madoff. Noel and Piedrahita traveled the world marketing and securing billions of dollars from investors to invest through BLMIS. Noel carried with him short summaries of the SSC Strategy to assist him in touting the Feeder Funds' consistent returns. (A true and accurate copy of an SSC Strategy summary sheet is attached hereto as Ex. 26.)

323.   Seeking to expand the reach of its funds to foreign currency investors, FGG launched Sigma in 1997 and Lambda in 1999. These funds accepted investments in Euros and Swiss francs, respectively, and then invested those funds in Fairfield Sentry, which in turn gave the money to BLMIS.

324.   Based on what FGG determined to be certain legal restrictions limiting the number of U.S. investors in GS, FGG formed a Delaware limited partnership, GSP, in 2006. GSP opened its BLMIS account with a deposit on May 1, 2006.

325.   As late as December 2008, Tucker and Piedrahita were working to gather additional funds to invest through BLMIS. The so-called "Emerald Funds" were supposed to apply a higher volatility, high return strategy, and were to be marketed for BLMIS exclusively by FGG.

### C.    *FGG's Operations*

326.   On paper, FGG appeared to be a group of discrete entities. In reality, FGG operated as one cohesive unit with Noel, Tucker, and Piedrahita at the helm. Along with a core group of other individuals at FGG, Noel, Tucker, and Piedrahita oversaw all of FGG's operations.

327.   The compensation structure at FGG was similarly consolidated. The profits "earned" by all FGG entities passed through FGB and FGL, and then were distributed to the various partners. Compensation documents called "Partner Comp Worksheets 2008," contained details of partnership distributions for each

Defendant that was an FGG partner. (A true and accurate copy of such worksheets is attached hereto as Ex. 27.)

328.    The inter-relations among the FGG entities is clear from the multiple roles played by individuals across the entities. For instance, Tucker was a director of FGB, and general partner of GS and FGL. Tucker also sat on the Management Committee and the Board of Directors of these entities. In addition, he co-owned FIM, the legal entity through which Tucker and Noel owned between 25-50% of FGB. Likewise, Tucker was extensively involved in operations at Fairfield Sentry. He participated in countless discussions within FGG regarding the fund, responded to investors' inquiries relating to the fund, and was for many years Fairfield Sentry's principal contact with Madoff.

329.    The Feeder Funds and FGG Affiliates are similarly interconnected. For example, FGL served as placement agent to Defendants Fairfield Sentry, Sigma, and Lambda; general partner to GS (from January 1, 2002 to June 30, 2003); investment manager to Fairfield Sentry (from December 31, 2001 to June 1, 2003); and investment adviser and placement agent to other FGG funds further discussed below.

330.    Each FGG entity had its own roster of officers drawn from the same group of FGG employees and operations. All of the entities were run by the same group of individuals: Noel, Tucker, and Piedrahita, the FGG "Founding Partners;" McKeefry, FGG's Chief Legal Officer and Chief Operating Officer; Lipton, FGG's Chief Financial Officer; Vijayvergiya, FGG's Head of Risk Management; McKenzie, Controller for FGB; Blum, FGG's Chief Operating Officer until 2005; Greisman, FGG's Chief Investment Officer; Noel Piedrahita, FGG's Head of Client Services and Investor Relations; and the remaining members of the Executive Committee, Landsberger, Toub, Murphy, Smith, and Bowes. With the exception of Defendant McKenzie, all of the Management Defendants were partners of FGG and received partnership distributions. These individuals constitute the Management Defendants.

331.    The Sales Division of FGG was responsible for marketing the Feeder Funds to potential investors and then directing that money to BLMIS. The Sales Division was headed by the following FGG partners: Barreneche, Boele, Reyes, and Harary. These individuals constitute the Sales Defendants.

332.    Each of these individuals was assigned a title at a number of FGG entities, but those were distinctions in name only.

## VII.    THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD

333.    Madoff initially operated by luring in individual investors. His early success came through money deposited from individuals as well as the efforts of various feeder entities such as Avellino & Bienes, a small Fort Lauderdale-based accounting firm that sold to investors notes that were backed by BLMIS's returns.

334.    For BLMIS to survive as a Ponzi scheme it needed massive, regular injections of cash to fuel the scheme. Madoff could have raised money directly from U.S. institutional investors but he knew that such an approach might have subjected BLMIS to strict regulatory scrutiny applicable to banks and pension funds. By contrast, the hedge fund arena, in which the Feeder Funds operated, was largely unregulated. This friendlier regulatory environment led Madoff to turn to "intermediaries" – hedge funds and funds of funds, like the Feeder Funds, which could, and did, deliver large amounts of cash.

335.    The relationship between FGG and Madoff was a *de facto* partnership. FGG and the Defendants procured billions of dollars that Madoff stole over many years, and the alleged returns generated by the Feeder Funds' BLMIS accounts were the engine that drove FGG's success. Simply put, BLMIS needed FGG and other large investors to help it survive and FGG needed BLMIS to make the Defendants their ill-gotten fortunes.

### A.    *The Defendants' Investment Strategy*

336.    Outwardly, Madoff attributed the consistent investment success of the BLMIS IA Business to the SSC Strategy. Madoff promised customers such as Fairfield Sentry that: (a) their funds would be invested in a basket of approximately 35 to 50 common stocks selected from the S&P 100 Index which consists of publicly listed stocks of the 100 largest companies in terms of their market capitalization traded on the New York Stock Exchange ("NYSE") and NASDAQ;

(b) the basket of stocks would closely mimic the price movements of the S&P 100; (c) the investments would be

hedged by option contracts related to the S&P 100 Index, thereby limiting potential losses caused by unpredictable changes in stock prices; (d) he would opportunistically time the entry and exit from the strategy; and (e) when account funds were not invested in the basket of stocks and options described above, they would be invested in money market funds and Treasurys.

337.    Beyond the purchases of equities, the other key component of the SSC Strategy was the hedge of the purchased basket of stocks with S&P 100 Index option contracts. Madoff purported to purchase out-of-the-money S&P 100 put options, and sell out-of-the-money S&P 100 call options, corresponding to the notional amount of the stocks in the basket he claimed he was buying. The put options would theoretically control the downside risk of price changes in the basket of stocks. The call options he purported to sell would likewise limit the potential upside gain in the basket, but were sold so that the premium from their sale could be used to finance the cost of purchasing the put options. Madoff represented that when he believed or sensed it was time to exit the market, he would sell the basket of stocks, close out the options positions, and invest the resulting cash in Treasurys or mutual funds holding Treasurys. BLMIS would purportedly enter and exit the market a few times a year.

338.    FGG embraced the SSC Strategy as its own and went to great lengths to downplay, and, in fact, conceal Madoff's key role in its business. For nearly two decades, the Feeder Funds, with the help and complicity of the Management and Sales Defendants, raised billions of dollars for Madoff's scheme while making hundreds of millions of dollars for themselves in management and performance fees for selling a fraudulent scheme. The Defendants knew, and/or should have known, that all aspects of the strategy were a fabrication.

**B.    *The Defendants Facilitate the Scheme Through Marketing and Sales***

339.    The Defendants repeatedly told investors and potential investors they actively monitored Madoff, his auditor, the execution of the SSC Strategy, and BLMIS's performance. The Defendants claimed to have verified that trading actually occurred and that the assets in BLMIS custody actually existed. Nothing could have been further from the truth.

340.    In exchange for the hundreds of millions of dollars in fees, partnership interests, distributions, and other earnings the Defendants garnered from their *de facto* partnership with Madoff, the Defendants provided extraordinary marketing and customer relations services, as well as important cover and legitimacy to Madoff's operations.

### C.    *The Defendants Serve as a Gatekeeper for Madoff to Ensure Investors Would Not Find Out the Truth*

341.    Madoff could not have survived, much less prospered for as long as he did without the Defendants' substantial assistance. While securing money from new investors for Madoff with one hand, with the other, the Defendants needed to prevent their investors, new and old, from communicating directly with Madoff. The reason for the Defendants' actions was simple: the more people who contacted Madoff directly, the more likely it was one of them might realize that Madoff and FGG were frauds.

342.    The Defendants went to great lengths to keep their investors far away from Madoff. They determined early on that they had to keep their clients away from Madoff because requests to meet and conduct real due diligence on him were bound to "end up in a standoff." (A true and accurate copy of the May 22, 2003 email from Landsberger to Tucker is attached hereto as Ex. 28.) The Defendants told investors they were "monitoring" Madoff so as "to avoid them feeling the need to go see Madoff" themselves. (A true and accurate copy of the July 15, 2004 email from Toub to Vijayvergiya is attached hereto as Ex. 29.)

343.    Defendant Blum advised his colleagues at FGG that just because investors wanted information, did not mean that FGG had to give it to them. Giving out more detail would upset Madoff. (A true and accurate copy of the March 25, 2003 email from Blum to Tucker, Bowes, and Greisman is attached hereto as Ex. 30.) He also directed FGG personnel, "**always keep in mind the prime directive and downplay Madoff's role – never to have his name within 30 words of the word 'manage'. . . . He is extremely sensitive to this and wants to be referred to merely as our broker and custodian.**" (A true and accurate copy of the August 22, 2003 email from Blum to Vijayvergiya and Landsberger is attached hereto as Ex. 31 (emphasis added).)

344.    The Defendants also misled investors by making false excuses when the investors requested meetings with Madoff. By way of example, after explaining that Madoff did not meet with clients, FGG would reassure investors, "if there is a window of opportunity in the future we shall give priority to [you]." (A true and accurate copy of the April 5, 2004 email to Tucker is attached hereto as Ex. 32.) The Defendants gave these types of assurances knowing full well that there would never be any such "window of opportunity."

345.    The Defendants' refusal to allow their clients or prospective investors to contact Madoff was just one of many elements they employed to hide the inner workings of BLMIS from investors. The Defendants always knew and understood that BLMIS exercised discretion in managing their accounts, and was not simply an "executing broker."

346.    In 2002, the Defendants decided that it would be best to just remove all references to BLMIS from their marketing materials. This strategy started with the deletion of all mentions of both Madoff and BLMIS from the investment adviser description on FGG's website and quickly grew into something broader. (A true and accurate copy of the June 24, 2004 email from Vijayvergiya to Lipton and McKeefry is attached hereto as Ex. 33.) The Defendants went on to remove all references to BLMIS from their offering memoranda. They also refused to provide their customers with the Feeder Funds' BLMIS Trading Authorization agreements. (A true and accurate copy of the August 7, 2004 email from Vijayvergiya to Landsberger and McKenzie is attached hereto as Ex. 34.)

347.    "[I]n sensitivity to various issues regarding Bernie" the Defendants made the conscious decision to serve as a gatekeeper, declaring that "**Bernie investors do not need transparency.**" (A true and accurate copy of the January 14, 2003 email from Blum to Tucker, Bowes and Greisman is attached hereto as Ex. 35 (emphasis added).) They held strategy meetings to discuss, among other things, the need to "**haze up the details**" for investors and hold "**heavily scripted**" investor teleconferences. (A true and accurate copy of the March 25, 2003 email from Blum to Lipton and Tucker is attached hereto as Ex. 36 (emphasis added).)

348.    FGG actively and repeatedly "blocked" investors wishing to obtain more information about the

Funds' investments with BLMIS, as well as preventing such investors from accessing key BLMIS employees. Aware of investor concerns that Madoff was "churning the portfolio" (a true and accurate copy of the April 9, 2004 email to Boele, Vijayvergiya, Tucker, Blum, Greisman, Lipton, and Smith is attached hereto as Ex. 37), FGG ignored all such concerns and continued to aggressively market the Feeder Funds which had direct or indirect investments in BLMIS.

349.    When Fairfield Sentry was told by institutional investors that FGG was mysterious, that FGG had little transparency, and that there were numerous concerns about Madoff's family, BLMIS's auditor, the lack of incentive fees for Madoff, and his self-custodying of assets, the Defendants chose not to address or investigate the concerns, instead focusing on "**how to spin**" a response. (A true and accurate copy of the March 15, 2008 email from Landsberger to Smith, Toub, della Schiava, Vijayvergiya, Tucker, and the Executive Committee is attached hereto as Ex. 38 (emphasis added).)

D.    *FGG Conspires with Madoff to Hide from the SEC Madoff's True Involvement with the Feeder Funds*

350.    From inception until 2006, because registration would mean greater regulatory scrutiny, Madoff did not register BLMIS with the SEC as an investment adviser even though BLMIS was required to register. The Defendants went to great lengths to attempt to cover up Madoff's actual role with the FGG funds.

351.    In 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally front-running the market.[5] In connection with its investigation, the SEC contacted FGG. The SEC sought an interview regarding, among other things, the Feeder Funds' actual relationship with BLMIS, transparency as to BLMIS's actual role in the Feeder Funds' operations, as well as who was making investment decisions and implementing the SSC Strategy on behalf of the Feeder Funds.

352.    Throughout 2006, the Defendants helped Madoff try to deceive the SEC. Individual Defendants McKeefry and Vijayvergiya worked directly with Madoff to script false

[5] Front-running occurs when a broker-dealer "runs in front" of customers by executing transactions for itself that are pending and

unexecuted for customers, thereby unlawfully taking for itself market gain that would have accrued to

responses to the SEC to throw the investigators off the trail of the fraud. After being contacted by the SEC,

Vijayvergiya and McKeefry called Madoff to inform him of the upcoming interview. They then forwarded

Madoff some of FGG's marketing materials and a list of potential issues they felt they should discuss before the

interview. Madoff, McKeefry, and Vijayvergiya agreed to defraud the SEC and then had a strategic conference

call to work out the details. Vijayvergiya recorded the call.

353.   The parties first agreed that no one was ever to know they were scripting their responses:

Mr. Madoff: Obviously, first of all, this conversation never took

place, Mark, okay?

Mr. Vijayvergiya:     Yes, of course. Much of Madoff's advice was for FGG to conform not to the truth, but to a story he had designed for feeder funds to mislead SEC investigators and discourage further questioning.

 Mr. Madoff: All right. There are a couple of things that, you 244.   Madoff worked from notes drawn from other SEC interviews concerning BLMIS feeder funds. He coached Vijayvergiya and McKeefry on how to cast BLMIS without raising the SEC's suspicions: "All right. There are a couple of things that, you know, could come— well, I don't know if they'll come up or not but let me just tell you how we—information that we have given out in the past whenever we're asked about our relationship, our relationship with any of these funds is number one . . . we never want to be looked at as the investment manager . . . ."

know, could come [up with the SEC] . . . number
one . . . we never want to be looked at as the investment manager . . . .

Mr. Vijayvergiya:     Right.


245.   Madoff continued, "[S]o in the past if we've ever been asked about what our role is with any of these types of funds, it has always been that we are the executing broker for these transactions and that you use a proprietary trading mode that we—that is ours that basically sets the—that, you know, has

certain parameters built into it which have been approved by you and then that's part of the trading directive you've seen."

246.    Madoff instructed Vijayvergiya and McKeefry on how to address questions about FGG's allocations to BLMIS: "[T]he investment manager is the one that tells us how much to add to the strategy or subtract from the strategy, and that's done basically by a phone call. Okay?" Vijayvergiya agreed. Madoff repeated, "[b]ecause that's the way we've always responded to any of those questions."

247.    And for its part, FGG exhibited a willingness to stray from the truth. For example, McKeefry, seeking to aid Madoff's cause on the issue of allocations, asked Vijayvergiya, "[w]ho makes that phone call on it? Is that [Lipton] calling over to Madoff or you?" Vijayvergiya responded, "I mean[,] I'll actually send the written instructions. It will be a wire request." Initially satisfied with Vijayvergiya's response, McKeefry said, "Okay, good." But Madoff did not want FGG to turn over documents to the SEC, and he recast the answer Vijayvergiya was to give: "The best thing to do is not get involved with what you said, written instructions, if possible because any time you say you have something in writing they ask for it .
. . So, the best thing to do is just say it's a phone call. That's what we said it is, we get contacted by somebody at Fairfield." Madoff coached Vijayvergiya to lie.

248.    And, more generally on the call, he encouraged Vijayvergiya to provide inexact answers so that the SEC would not gain an accurate understanding of FGG's operations and relationship with BLMIS: "you know, also when you speak to these guys, by the way, you're not supposed to, you know . . . you don't have to be exact on this stuff because it's not—you know, no one pays attention to these types of things or who calls or who doesn't or who remembers who calls . . . I mean, the idea is that . . . we're not the one that's operating the fund. That's the issue that they always try and determine as to what the role of the various parties are[,] is the broker controlling the fund[,] is the investment manager controlling the fund."

249.     This pattern repeated itself throughout the prep call. Madoff explained, "probably the most important issue is that Madoff is the one that implements the strategy." He framed Vijayvergiya's response for him: "The time and price of when [Madoff] executes the strategy is his decision, and we [FGG] don't find out about it until after the fact."

250.     Madoff added, "you don't have to actually go out [and] say so there's no front running possibility." Vijayvergiya initially understood Madoff's comment to be a suggestion that FGG steer the SEC investigators away from the topic of front running. Madoff corrected him. Addressing front running directly might arouse the SEC's suspicion: "[Y]ou don't want to plant any seed . . . we [FGG] don't get any information ahead of time [and] that's what . . . they want to know."

Mr. Madoff: So the — you know, the less that you know about 251.     Madoff explained how, by speaking in generalities, FGG could give the appearance of cooperating with the SEC, but not disclose information useful to the SEC's investigation: "[Y]ou know, the less that you know about how we execute, and so on and so forth, the better you are . . . your position is say, listen, Madoff has been in business for 45 years . . . he executes . . . a huge percentage of the industry's orders, he's . . . a well known broker. . . [W]e make the assumption that he's . . . doing everything properly." "[A]nd I'm not— I'm not telling you to conceal anything."

how we execute, and so on and so forth, the better you are . . . if they asked do you know . . . if Madoff has Chinese walls, and you say, yes, look — you know, your position is say, listen, Madoff has been in business for 45 years . . . you know, he's a well known broker. You know, we make the assumption that he's — he's doing everything properly.

customers had their transactions been executed first.

Mr. Madoff: [O]ur role has always been defined as the executing broker for our clients . . . .

Mr. Madoff: The objective of the fund is to achieve capital appreciation . . . but don't say —

consistent monthly returns.

Mr. Vijayvergiya:      Okay. You can delete that, yeah.

(A true and accurate copy of the transcript of the call between McKeefry, Vijayvergiya, and Madoff is attached hereto as Ex. 39.)

354.    Madoff then gave *precise instructions* on how to respond to the SEC's questions in order to mislead the SEC as to the true nature of Feeder Funds' accounts, as to whom the actual investment adviser was, and anything else that might have allowed the SEC to potentially discover that BLMIS and the Defendants were perpetrating a fraud. Madoff specifically told McKeefry and Vijayvergiya to tell the SEC he was merely "the executing broker," and all investment decisions were made by FGG. All participants to the conversation knew this to be false.

355.    The Feeder Funds' account agreements explicitly characterized their BLMIS accounts as discretionary accounts. In June 2001, in a letter to investors, FGG described Fairfield Sentry's account with Madoff as a "discretionary cash account." (A true and accurate copy of the June 2001 letter to Fairfield Sentry's investors is attached hereto as Ex. 40.) Madoff had unfettered discretion as to when to trade, what to trade, with whom to trade, when to leave the market, and when to shift customer investments to Treasurys. The Defendants never knew with whom Madoff was contracting or trading purportedly on their behalf and could not, and did not, understand the SSC Strategy. As late as August 2008, Vijayvergiya acknowledged that BLMIS's operations remained somewhat of a mystery to FGG. (A true and accurate copy of the August 2008 emails from Vijayvergiya to Murphy, Piedrahita, Landsberger, Toub, Tucker, and the Executive Committee is attached hereto as Ex. 41.)

356.    The Defendants knew that the fewer people who knew about the true nature of their partnership with Madoff, especially the SEC, the better it would be for the Defendants' financial interests. The Defendants also knew that if based on FGG's responses, the SEC grasped Madoff's true discretion over FGG's accounts and

inquired further, Madoff could become very angry, which could upset the Feeder Funds' preferred status.

357.    The Defendants were also concerned that if the SEC knew the true nature of the relationship, the SEC would require Madoff to register, expose him to heightened regulation, and remove the secrecy that allowed the fraud to flourish for so many years. For these and other reasons, Defendants Vijayvergiya and McKeefry knowingly agreed to conspire with Madoff to deceive the SEC.

358.    The day after the three spoke, the SEC interviewed Vijayvergiya and McKeefry by telephone, with Vijayvergiya providing nearly all of the responses. At the beginning of the interview, the SEC personnel requested the interview be kept confidential. Vijayvergiya dutifully fed the SEC the false information Madoff required. Two days after the interview, in order to keep their false stories straight – and despite the SEC's express request for confidentiality – someone at FGG transmitted to Madoff detailed notes of the interview. (A true and accurate copy of the notes dated December 21, 2005 found by the Trustee in BLMIS's files is attached hereto as Ex. 42.)

359.    During the first half of 2006 the SEC continued a dialogue with McKeefry, Madoff, and other individuals relevant to their investigation. (A true and accurate copy of the SEC phone log is attached hereto as Ex. 43.) Like the confidential interview, FGG continued to share the information from its SEC calls directly with Madoff.

360.    Ultimately, despite FGG's and Madoff's coordinated efforts in 2006, the SEC required BLMIS to register as an investment adviser. The SEC also determined FGG had to modify its Feeder Funds' marketing materials – which had previously been revised to remove all mention of both Madoff and BLMIS – to make clear that the strategy the Feeder Funds were selling was being managed and executed in all respects by Madoff. The SEC required the Feeder Funds and BLMIS to execute new customer agreements because the existing agreements did not limit Madoff to acting merely as an executing broker, as had been for years, falsely claimed by FGG.

361.    The scheme to defraud the SEC succeeded insofar as, apart from these requirements, the SEC

closed any further investigation of BLMIS. (A true and accurate copy of the SEC Case Closing Recommendation is attached hereto as Ex. 44.)

E.     *The Defendants Deceive Their Investors by Telling Them They Were Performing Extensive and Top of the Line Due Diligence, But They Were Doing No Such Thing*

362.    The Defendants deceived their investors and the investment community, in order to enhance the fraud, enrich themselves, and protect their status as a leading BLMIS feeder fund. The Defendants sold the false assurance that they conducted superior due diligence, far beyond any due diligence performed by their peers. The Defendants justified their extraordinary fees based upon this allegedly superior due diligence. The Defendants conveyed these falsehoods for nearly 20 years throughout FGG's sales, offering, and marketing materials, as well as in direct responses to questions from their investors and prospective investors.

363.    FGG claimed among other things that it had full transparency into its investments, conducted monthly quantitative analyses, and only used counterparties for the OTC options they identified on an approved list. (A true and accurate copy of FGG's October 2002 marketing brochure for Fairfield Sentry is attached hereto as Ex. 45.) All of these claims were false.

364.    The Defendants never knew who any of their OTC options counterparties were. It was also impossible for the Defendants to accurately reconcile trades on a same-day basis because they did not receive paper trade confirmations until three or four days after the alleged trades supposedly had been executed, a delay which permitted back-dating - itself another red flag of possible fraud. Had the Defendants accurately reconciled Madoff's trade confirmations, they also would have discovered any number of anomalies concerning the volumes and prices at which Madoff supposedly purchased stocks and options.

365.    The Defendants' sales pitch about their due diligence process, their knowledge of Madoff and his operations, conflicted with the reality of how little they actually knew. (A true and accurate copy of the December 19, 2003 email from Vijayvergiya is attached hereto as Ex. 46.) The Defendants did not know the exact amount of Madoff's assets under management, and admitted that "**there [was] no check on the amount of money he**

**manages.**" (A true and accurate copy of the September 19, 2003 email from Blum to Tucker is attached hereto as Ex. 47 (emphasis added).)

366.    FGG also emphasized to investors it confirmed the adequacy of FGG's investment managers, staff, as well as the investment manager's technological capabilities. FGG did not know the names of Madoff's alleged traders or how many traders were responsible for executing their SSC Strategy. They also did not perform independent, reasonable due diligence or follow up on the viability or adequacy of BLMIS's technology. Had the Defendants meaningfully investigated the technological capabilities of BLMIS, they would, or should have, been suspicious because there were strong indications of fraud – the BLMIS IA Business computers lacked the ability to send real-time electronic trade confirmations to its customers.

367.    The Defendants never investigated the contradiction between Madoff's marketmaking business, well-known for cutting-edge technology, and the more primitive back-office systems used by the BLMIS IA Business. The BLMIS IA Business could not generate electronic trade tickets, had no website where investors could view their accounts and assets in real-time, and could only deliver paper confirmations by mail days after trades were supposedly executed. These attributes were commonly recognized in the investment advisory industry to be rife with the risk of fraud, yet the Defendants ignored all of them.

368.    Candid internal FGG discussions in 2003 revealed a far different due diligence picture than the "rigorous" processes the Defendants' touted:

> [T]here is an enormous amount that we have to do to meet the higher level of diligence and documentation and fulfillment of the investment process/risk monitoring and portfolio allocation aspects that even the most lazy of institutional and family office investors require to see . . .
>
> This industry is moving to higher levels of perceived quality of process fast, and we are going to have to sprint to keep up. trying [*sic*] to bullshit clients will only result in our bs-ing ourselves . . . .

(A true and accurate copy of the November 24, 2003 email from Blum to Landsberger, Greisman, Tucker, and Piedrahita is attached hereto as Ex. 48 (emphasis added).)

369.    In May of 2005, as part of "sales training," Lipton and Vijayvergiya conducted a mock investor phone interview. Lipton played the role of a potential or existing Fairfield Sentry investor and Vijayvergiya acted as an FGG sales person. Lipton questioned Vijayvergiya as to the due diligence advertised by Fairfield Sentry. In particular, Lipton asked about the due diligence completed by FGG before investing in BLMIS, as well as the ongoing monitoring and diligence of its portfolio manager, Madoff.

370.    In response to certain questions posed by Lipton and other audience members, Vijayvergiya made misstatements about FGG's knowledge of Madoff and his operations, including: (i) "we have a number of options counterparties;" (ii) for options-trading there is a "very well capitalized, well established series of counterparties, which number between 8 to 12"; (iii) FGG is the investment manager; (iv) from time-to-time FGG representatives visit BLMIS, verify that trades are on Depository Trust & Clearing Corporation ("DTCC"), and verify the existence of the Feeder Funds' assets; and (v) Madoff has no discretion except with respect to the price and timing of trade execution, for which he has limited discretion. (A true and accurate copy of the transcript of the training session led by Vijayvergiya is attached hereto as Ex. 49.)

371.    Each one of those statements, disguised as verified due diligence, was false. The Defendants knew *nothing* about Madoff's imaginary options counterparties except for Madoff's claim they were a group of large European financial institutions—a claim which the Defendants never tried to independently verify. The Defendants never reviewed any counterparty's option agreement and there was no list of counterparties. The Defendants never called anyone at any reputable financial institution, *or anyone at all,* to learn more, even though they stated they had done so. The Defendants also knew BLMIS was the investment adviser and that Madoff exercised all investment discretion. The Defendants never asked Madoff for permission to independently confirm their holdings with the DTCC, nor did they conduct any independent and reasonable due diligence, or follow up, to verify the actual existence of their assets.

372.    In response to an audience query wondering how, over the last three years, there were times when FGG made money when to the questioner it seemed like they should not have, Vijayvergiya stated, "***I can***

*honestly say that, hand on heart that . . . we know what is going on*." *(Id.* (emphasis added).) This statement contradicted Vijayvergiya's admission three years later that many things at BLMIS remained a mystery to him. *(See* Ex. 41.)

373.    When speaking to an investor in May 2008, Vijayvergiya and McKenzie admitted they still did not know many basic things about Madoff's operations. They expressed concerns about credit risks due to the options and option counterparty exposure, as well as the fact that "**they ultimately do not really know whether Madoff has the proper systems and controls, segregation of duties, etc.**" (A true and accurate copy of a memorandum summarizing the May 7, 2008 meeting is attached hereto as Ex. 50 (emphasis added).)

## VIII.    THE DEFENDANTS WERE CONSTANTLY FACED WITH EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT EVIDENCE

374.    It did not require an extraordinary due diligence process for the Defendants to discover that Madoff was operating an illegitimate enterprise. Ordinary, independent, and reasonable due diligence by investment professionals would have, and should have, revealed the likelihood of fraud. The Defendants knew of, and were presented with significant red flags from many sources, including, but not limited to: financial and quantifiable information; performance and trade information; market rumors; industry articles; publicly stated investor concerns; market and industry experts who expressed the possibility of fraud; FGG customers who communicated that Madoff was possibly a fraud; FGG's own internal statements and serious doubts; their years of hedge fund experience; and their own common sense.

375.    The totality of the information known and available to the Defendants pointed to the strong likelihood that they were enabling a fraud. At a minimum, the Defendants knew of countless red flags which required proper, independent, and reasonable due diligence and follow up investigation. Not only did the Defendants fail to conduct the required due diligence, they willfully ignored information that was right in front of them, and then lied about it.

376.    The Defendants also knew what other highly reputable institutions were saying directly about

them. One representative of Credit Suisse told Fairfield Sentry that it "**would never do business with FGG as a firm" because FGG was "not going 'by the rules' and soon[er] or later . . . will wind up in jail!!**" (A true and accurate copy of the December 2, 2003 email from della Schiava to Noel, Piedrahita, Tucker, and Blum is attached hereto as Ex. 51 (emphasis added).)

> A.    *The Defendants Learn that BLMIS's Auditor is a Single Person in a Strip Mall Office. Instead of Treating This Red Flag as an Indicator of Fraud, They Lie to Comfort Their Investors and Sell Their Superior Diligence*

377.    Madoff had false audit reports prepared by Friehling & Horowitz ("Friehling"). Those audits were filed with the SEC and copies were given to the Defendants. Friehling was a one-man firm from Rockland County, New York consisting of David Friehling, a Certified Public Accountant. The other two employees were an administrative assistant and a semi-retired accountant living in Florida.

378.    On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, in connection with the services he performed for BLMIS.

379.    By 2005 the Feeder Funds had invested billions of dollars with BLMIS. From 1990 to 2005, the Defendants accepted Friehling as a bona fide auditor without conducting any meaningful, independent due diligence or inquiry.

380.    During 2005, the Defendants were confronted about Friehling when the $400 million Bayou Group hedge fund Ponzi scheme became public. In the early part of the decade, Bayou rode the rise in the stock market following the burst of the dot-com bubble. Bayou also displayed a number of major red flags similar to those exhibited by BLMIS. Both Bayou and BLMIS delivered steady annual returns with almost no volatility. Neither Bayou nor Madoff charged a management fee based on the assets under management. This fee structure was atypical of hedge fund and other alternative investment managers. Finally, both Bayou and BLMIS had obscure, non-independent auditors—Bayou an in-house accountant and BLMIS, Friehling.

381.    When the Bayou fraud came to light in 2005, a Fairfield Sentry investor raised parallels between Madoff and Bayou, questioning FGG about "the risk [of] investing in Sentry" in light of "certain similarities with Bayou." The investor expressly identified the conflict of interest in Madoff acting as the self-clearing broker and receiving commission-based fees, and pointed out that BLMIS employed a small auditor rather than using one of the "big four." (A true and accurate copy of the September 5, 2005 email from Capital Research to Castillo is attached hereto as Ex. 52.)

382.    An investor relations employee for FGG, Carla Castillo ("Castillo"), forwarded information regarding Bayou to Vijayvergiya, joking "**[d]oes this 'perceived conflict of interest with the two relationships (brokerage and auditing)' sound familiar? Hehehe.**" (A true and accurate copy of the September 1, 2005 email from Castillo to Vijayvergiya is attached hereto as Ex. 53 (emphasis added).) At the same time, Castillo was telling the investor there were important differences between Fairfield Sentry and Bayou. *(See* Ex. 52.) With regard to the potential conflict of interest, Castillo responded that FGB, not BLMIS, was Fairfield Sentry's investment manager, FGB maintained an arm's-length relationship with BLMIS, and Bayou used a very small accounting firm, whereas PwC conducted audits of Fairfield Sentry. *(Id.)*

383.    The investor pressed for direct answers to the questions about Madoff and BLMIS's auditor. At that point the investor's questions were escalated within FGG to Tucker, McKeefry, Lipton, and McKenzie. Tucker, despite having served as the Madoff relationship partner for fifteen years, could not answer the investor's question regarding BLMIS's auditor. He asked Lipton and McKenzie to investigate so he could respond to the investor's concerns. (A true and accurate copy of the September 12, 2005 email from Castillo to Lipton is attached hereto as Ex. 54.)

384.    At the time of Tucker's request, Lipton had been FGG's CFO for over three years. Lipton was a nine-year veteran of a Big Four accounting firm, Ernst & Young. Lipton placed a call to Friehling's office. Lipton also contacted the State of New York and learned David

Friehling was licensed in New York and there were no disciplinary actions against him. Based on the short call

with Friehling's office, Lipton subsequently reported to Tucker:

> Frehling [*sic*] & Horowitz, CPAs are a small to medium size financial services audit and tax firm, specializing in broker-dealers and other financial services firms. They are located in Rockland County, NY. They have [hundreds] of clients and are well respected in the local community.

*(Id.)*

385.    Lipton never made any attempt to independently verify this information. While under oath before the Office of the Secretary of the Commonwealth of Massachusetts, Lipton could not remember with whom he spoke when he called the auditor. He claimed all he could remember is that he spoke with someone who "said they were a partner in the firm." (A true and accurate copy of excerpts from the transcript of Lipton's testimony is attached hereto as Ex. 55.)

386.    Following Lipton's call with Friehling, the next day Tucker somehow "addressed all the clients' questions, and gave them the comfort they were seeking." (*See* Ex. 52.)

387.    Later on the same day that Tucker spoke with the investor, McKenzie obtained and distributed internally a Dun & Bradstreet report on Friehling that validated the investor's concerns. The report, reflecting information provided by Friehling, showed Friehling only had one employee and annual receipts of $180,000. Tucker's response upon learning that Lipton had been lied to and that BLMIS's auditor was similar to Bayou's auditor was "thank you." (*See* Ex. 54.)

388.    McKenzie then called Frank DiPascali ("DiPascali") at BLMIS to ask about Friehling. DiPascali was unable, or unwilling, to answer any questions about Friehling, and directed McKenzie to Madoff. Because DiPascali was often the principal source of information regarding the Feeder Funds' accounts and BLMIS's operations, his inability and/or unwillingness to answer simple questions about BLMIS's auditor was a major red flag. McKenzie, knowing Madoff would not speak to him, sent an email to Tucker asking him to bring up the topic the next time Tucker spoke with Madoff. (*See id.*)

389.    The Defendants did nothing to independently confirm if Friehling was equipped or capable of

performing large scale domestic and international auditing services at a time when they were estimating Madoff was managing approximately $10 billion.

390.    Tucker, Lipton, and McKenzie all knew that false information regarding Friehling had been communicated to the investor that had raised the concern. They did not communicate truthfully to investors or prospective investors about Madoff's auditor. They did not disclose what they learned about Madoff's auditor, or that DiPascali had been unwilling or unknowledgeable about Friehling.

391.    Basic due diligence would have further revealed Madoff's auditor was a fraud. Lipton knew or should have known that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program. This program involves having experienced auditors assess a firm's audit quality each year. Friehling, while a member of the AICPA, had not been peer reviewed since 1993. The results of these peer reviews are on public file with the AICPA. Friehling never appeared on the public peer review list because he had notified the AICPA he did not perform audits. His absence on the list was another major red flag.

392.    The Defendants were not satisfied to hide the unknown auditor red flag of fraud from investors and potential investors. The Defendants chose to **market** around the Bayou scandal, stressing to their investors how a Bayou fraud could never happen to FGG's investors due to its impressive due diligence and risk management processes.

393.    Beginning in late 2005 through 2008, FGG generated and distributed marketing materials profiling the Bayou fraud as "Due Diligence: Headlines to Avoid." The Defendants highlighted the falsehood that a Bayou-like fraud could never happen to FGG because, unlike the misguided funds that invested with Bayou, FGG would have "**question[ed] Bayou's obscure auditing firm.**" (A true and accurate copy of the November 2, 2005 FGG Investment Team Presentation is attached hereto as Ex. 56 (emphasis added).)

394.    The Defendants also misled potential investors about Madoff's auditor in direct communications

with them. For example, in 2006, when a consultant performing due diligence for a client considering an investment in Fairfield Sentry questioned Vijayvergiya about BLMIS's auditor, Vijayvergiya lied, stating that Friehling had twenty partners and focused on broker-dealers. (A true and accurate copy of notes taken during the meeting is attached hereto as Ex. 57.) McKenzie participated in this discussion. He remained silent when Vijayvergiya described Friehling. He did not disclose that Friehling was the same firm he had confirmed had only one employee, and not twenty partners.

395.    FGG also reassured its investors by falsely suggesting that Friehling was not the only firm auditing BLMIS. PwC did not conduct a single independent audit of BLMIS.

396.    FGG also represented to investors that PwC (who conducted audits of the Feeder Funds), accompanied by Lipton, performed biannual visits to BLMIS. (A true and accurate copy of the 2007 Fairfield Sentry Due Diligence Questionnaire is attached hereto as Ex. 58.) These representations were also false. PwC briefly visited BLMIS twice over the course of many years, attending information gathering sessions at BLMIS in 2002 and 2004, in connection with its engagements for several Madoff feeder funds. After each visit, PwC summarized its findings and explained in writing that it had not conducted audits of BLMIS. After 2004, PwC did not conduct any visit, inquiry, or investigation of BLMIS in association with any Fairfield Sentry engagement. Lipton only accompanied PwC during its visit of BLMIS on one occasion, in 2002. (*See* Ex. 55.)

397.    The facts about PwC's actual involvement with Madoff did not prevent FGG from falsely representing PwC's role. FGG told investors in an October 2007 Due Diligence Questionnaire for Fairfield Sentry – a document it routinely gave to prospective investors or consultants - that, "[t]he CFO has accompanied PwC's auditors on a bi-annual basis to review BLMIS's internal accounts for the Sentry fund." (*See* Ex. 58.)

398.    In August 2008, in response to a detailed "HSBC Sentry Operational Due Diligence" questionnaire, Lipton confirmed the Defendants' failure to conduct proper, independent, and reasonable due diligence on BLMIS's auditor. Lipton asked Vijayvergiya: "**[d]o we know any of the other client of BLM's auditors? Or how big they are? I remember we called over there a while ago.**" (A true and accurate copy of

the August 20, 2008 email from Lipton to Vijayvergiya is attached hereto as Ex. 59 (emphasis added).)

**B.    *The Defendants Regularly Received Information That Made It Clear Madoff Was Lying About His Alleged Trades and Performance*** 399.    The Defendants had access to vast amounts of information about Madoff that was not available to the public. The account statements and trade confirmations they received from Madoff showed that Madoff was likely a fraud. The Defendants knew, among other things, that Madoff's returns were so consistent they were virtually impossible; Madoff alone traded suspiciously large percentages of the total amount of securities that were reported as trading on the entire NYSE, NASDAQ and CBOE, and, did so without any impact on the prices of those securities; Madoff was supposedly executing billion-dollar options transactions on the Feeder Funds' behalf with anonymous counterparties who never asked for the Feeder Funds' identity or collateral and the Feeder Funds never asked for theirs; Madoff often provided FGG with contradictory and sometimes nonsensical explanations of his market transactions on its behalf; and quantitative information the Defendants trumpeted in their sales, offering, and other marketing materials demonstrated that Madoff's consistent returns were so improbable they appeared impossible.

**1. FGG's Returns Were Too Consistent for Too Many Years**

400.    Both FGG and BLMIS appeared immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises. FGG and BLMIS maintained consistent and seemingly impossible

252.    Madoff painstakingly went through the notes Vijayvergiya and McKeefry drafted for the call with the SEC, editing the remarks Vijayvergiya planned to deliver.

253.    Near the conclusion of the call, McKeefry offered to follow up with the SEC investigators handling the matter. Madoff told him not to: "You don't want them to think that you're concerned about anything." His parting words on the call: "you're best off . . . you just be, you know, casual." McKeefry agreed: "We're trying. We're trying to be cool and to just cooperate and get it over with and get them out of here." They agreed to report to Madoff on

how the call went.

254.    The call between the SEC investigators and Vijayvergiya and McKeefry went forward on December 21, 2005. FGG kept "detailed notes"—it transcribed the call verbatim.

255.    When asked about the "nature of [FGG's] relationship with Madoff," Vijayvergiya minimized BLMIS's role, misleading the SEC to believe that it was FG Bermuda, not BLMIS, that made the investment decisions:

> [FG Bermuda] is the Investment Manager of Fairfield Sentry. We allocate a majority of the fund's assets to the Split Strike Conversion Strategy. We also allocate 5% to seedlings to cultivate growth. The Madoff organization executes the other 95% of trades within the parameters of the Split Strike Conversion Strategy. There are very clear guidelines that govern the execution of this strategy that we have agreed to. The only areas of decision made by BLM are with respect to price and timing of the trades.

256.    Vijayvergiya consciously misstated the scope of the authority FGG had ceded to BLMIS: BLMIS held decision-making authority on every material aspect of the SSC Strategy, not just the price and timing of trades.

257.    The SEC investigators asked Vijayvergiya and McKeefry whether they had "spoken to anyone regarding this investigation." Vijayvergiya disclosed that he had spoken to Tucker, Madoff, Lipton, and others. Despite his and McKeefry's exhaustive prep session with Madoff, Vijayvergiya lied and said that the conversation had been "mostly in regards to reproducing binders."

258.    The SEC investigators asked Vijayvergiya to describe the conversation with Madoff. Vijayvergiya's initial response was simply: "It happened on Monday." When pressed again for more details, Vijayvergiya downplayed the discussion: "We talked about a memo I had made for this call that just summarized the Fund's strategy and objectives." "What was

[Madoff's] reaction? Did he modify or disagree with anything in the memo?" Vijayvergiya elided Madoff's extensive coaching: "No. Nothing material. The whole thing was more of a courtesy call." "Did [Madoff] influence anything?" At this point, McKeefry cut in, and made his own attempt to spin the call: "I was on the call as well. [Vijayvergiya] knows the strategy inside and out as you now know. We were

trying to see what Bernie might know this investigation is about . . . We just are curious as to what the inquiry is really about."

259.    The SEC also interviewed Tucker in January 2006 in connection with its investigation. Tucker explained that he, Noel, and Piedrahita shared responsibility for critical decision-making and repeated many of the same lies that Vijayvergiya told the SEC about Madoff's operation.

260.    In March 2006, FGG registered FG Bermuda as an investment adviser under the Investment Advisers Act of 1940, even though the Sentry PPM stated FG Bermuda had been the investment advisor since 2003.

261.    Regardless of FGG's efforts, later in 2006, the SEC required BLMIS to register as an investment adviser and directed FGG to modify its marketing materials to disclose BLMIS's roles as both investment advisor and executing broker.

262.    The SEC closed its investigation into BLMIS and FGG in November 2007. At that time, the SEC sent a letter to McKeefry, notifying him that it did "not intend to recommend any enforcement action" against FGG. McKeefry forwarded the letter to Lipton, who concluded that "Let's not show [the letter] to PwC" He did not want PwC to know that FGG had also been under investigation, and not just BLMIS.

## THE DEFENDANTS MISLED THIRD PARTIES

### FGG Misled Ratings Agencies in An Effort to Sell Tensyr

263.    In 2006, Natixis S.A., an FGG investor, approached FGG about creating a special purpose vehicle to invest $425 million in BLMIS through Fairfield Sentry. The special purpose vehicle would later be named Tensyr, an anagram of "Sentry."

264.    FGG and Natixis understood that a strong investment rating from the three major rating agencies, Moody's Investor Services, Fitch, and Standard & Poor's, would enhance Tensyr's marketability.

265.    In the meetings with Natixis and FGG, the ratings agencies questioned BLMIS's refusal to identify OTC options counterparties, its unchecked authority over its customers' assets, its customer account structures, its inconsistent representations on its use of margin trading, its conflicted roles as prime broker, investment adviser, and custodian, and its refusal to meet face- to-face with representatives of the ratings agencies on these issues.

266.    FGG stonewalled and when the ratings agencies threatened to deny Tensyr a rating "due to 'non-measurable operational risk at Madoff level,'" Vijayvergiya and McKeefry spearheaded an effort to recommence the process. The responses they provided were rife with inaccurate statements on material issues, like the degree of discretion BLMIS exercised on securities trading, custody of assets, and identity of options counterparties. For example, the responses falsely stated that the only discretion BLMIS had concerned the time and price of the trades.

**FGG Misled Chris Cutler in His Due Diligence Probe**

267.    FGG provided inaccurate information to third-party consultants in the hopes that they would recommend Fairfield Sentry and Greenwich Sentry to clients. One of those consultants, Chris Cutler, saw right through FGG's subterfuge. Cutler compiled due diligence information on Fairfield Sentry and had a phone meeting with FGG including Vijayvergiya, McKenzie, and others.

268.    In late 2006, a year after deflecting concerns about Bayou and receiving the Friehling & Horowitz Dun & Bradstreet report, FGG provided Cutler with inaccurate information about Madoff's and FGG's auditing procedures and BLMIS's auditor that FGG knew would be difficult for Cutler to validate. First, Vijayvergiya claimed that "Madoff has three Ph.D.s and ten traders." Second, Vijayvergiya claimed that PwC, as Fairfield Sentry's auditor, "visited with Madoff, verified assets, verified trade blotter, verified that [BLMIS's] trades are allocated fairly." Third, Vijayvergiya made inaccurate claims about the "size of Friehling & Horowitz as an auditor, their reputation as auditors for smaller broker/dealers, the number of auditors that were there roughly."

**OTHER INDICIA OF FRAUD**

**Impossibly Consistent, Positive Returns**

269.    In preparing and disseminating client-facing communications, FGG was forced to reckon with evidence that neither the returns that BLMIS reported, nor the patterns in which it reported to trade stocks and options were consistent with the SSC Strategy. They could not have taken place as BLMIS claimed.

270.    Because the SSC Strategy purported to invest in S&P 100 Index stocks highly correlated to the Index, the strategy's returns should have been correlated to the S&P 100's performance. The Defendants acknowledged that fact through information provided to their investors in the PPMs. However, as reflected elsewhere in the Defendants' marketing materials, the SSC Strategy's reported returns bore almost no correlation to the S&P 100. Instead, the FGG feeder funds maintained impossibly consistent, positive rates of return during events that otherwise devastated the S&P 100 - the performance of which formed the core tenet of the Defendants' SSC Strategy. In fact, between 1996 and 2008, the Feeder Funds did not experience a single quarter of negative returns.

401.    During the burst of the dotcom "bubble" in 2000, the September 11, 2001 terrorists attacks, and the recession and housing crisis of 2008, the SSC Strategy purported to

produce **positive returns, outperforming the S&P 100 by 20 to 40 percent in each instance where the S&P 100 suffered double-digit losses.**

402. FGG's own marketing materials contain the following rates of returns

| Year | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
|------|------|------|
| 1990 | 2.77% | (5.74%) |
| 1991 | 17.64% | 24.19% |
| 1992 | 13.72% | 2.87% |
| 1993 | 10.75% | 8.28% |
| 1994 | 10.57% | (0.19%) |
| 1995 | 12.04% | 36.69% |
| 1996 | 12.08% | 22.88% |
| 1997 | 13.10% | 27.677% |
| 1998 | 12.52% | 31.33% |
| 1999 | 13.29% | 31.26% |
| 2000 | **10.67%** | (13.42%) |
| 2001 | **9.82%** | (14.88%) |
| 2002 | **8.43%** | (23.88%) |
| 2003 | 7.27% | 23.84% |
| 2004 | 6.44% | 4.45% |
| 2005 | **7.26%** | (0.92%) |
| 2006 | 9.38% | 15.86% |
| 2007 | 7.34% | 3.82% |
| 2008[6] | **4.50%** | (32.30%) |

(A true and accurate copy of Fairfield Sentry's October 2008 marketing tear sheet is attached hereto as Ex. 60.)

403. These consistent rates of return enabled FGG to attract many more investors and dramatically expand investments into BLMIS, including by accepting investments in foreign currencies through Sigma and Lambda into Fairfield Sentry. FGG also directed that the

---

[6]    Through October 2008.

remaining 5% of "discretionary" Sentry funds be indirectly invested back into Fairfield Sentry and other FGG funds with direct or indirect BLMIS accounts.

404. The FGG Affiliates and the Management Defendants failed to conduct proper, independent, and reasonable due diligence or follow up as to how such returns could be achieved legally, or in accordance with their SSC Strategy. The Defendants knowingly and purposefully turned a blind eye to the fact that this strategy, dependent in large part on how stocks in the S&P 100 performed, continued to yield positive returns without any correlation to the S&P 100. The Defendants simply marketed to the world FGG's extraordinary and consistent performance.

### 2. The Defendants' Account Statements Showed the Likelihood of Fraudulent Activity

405. The Defendants repeatedly claimed they verified that all trades were consistent with the SSC Strategy and that all trades were legitimate. The Defendants justified their large management and performance fees based, in part, on their alleged daily monitoring of trade activity.

406. The Defendants knew or should have known of multiple red flags in the trade confirmations and account statements they received. First, Madoff was known as a pioneer of electronic record-keeping in the BLMIS market-making business. For clients of the BLMIS IA Business, Madoff never sent one electronic trade confirmation, and for many years, did not provide electronic account statements. Second, the volumes of securities reported on the Feeder Funds trade confirmations, as well as the month-end account statements, so exceeded reported exchange volumes that they were a strong and recurrent indicia of fraud.

407. The Defendants understood BLMIS did not make separate trades for each of the BLMIS IA Business customer accounts. Madoff purchased large baskets of stocks and options, and proportionately allocated them to each account. For many years, Madoff did not tell the Defendants the amount of assets under his management. The Defendants estimated as early as 2003 that Madoff was managing approximately $10 billion. In August 2003, in response to a due diligence query being performed on Fairfield Sentry by a prospective investor, Vijayvergiya told the investor, who had heard Madoff was managing close to $20 billion, that FGG estimated that Madoff was managing about $8-10 billion. (A true and accurate copy of the August 6, 2003 email from Vijayvergiya is attached hereto as Ex. 61.)

408.    When BLMIS was forced to register as an investment adviser in August 2006, it reported that it had $11.7 billion under management at the end of July 2006. Later filings stated that BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of 2007. At the same time, the Feeder Funds' accounts reported balances of $4.9 billion through July 2006, $5.5 billion at the end of 2006, and $7.2 billion at the end of 2007, or approximately 42% of the assets BLMIS reported it was managing. Because the Defendants knew that Madoff allocated his baskets of stocks and options proportionately, the Defendants reasonably should have calculated or estimated the amounts of stocks and options that BLMIS would have had to purchase or sell for all its IA customer accounts.

409.    The Feeder Funds' account statements regularly indicated that BLMIS's trades in a particular stock for Feeder Funds' accounts alone accounted for a large percentage of that stock's trading volume on the listed markets. This meant that BLMIS's trades for all of its IA customers often approached, or exceeded the entire volume of trades on the listed markets. devastated the S&P 100 Index.

271.    Between Fairfield Sentry's 1990 inception and BLMIS's 2008 collapse, the fund had no negative annual returns. Such returns were impossible under the SSC Strategy.

272.    In a one-on-one conversation on December 19, 2005 between Vijayvergiya and Madoff, he told Vijayvergiya that the best way to make money in a down market was to get out of the market. BLMIS's performance belied Madoff's explanation. Vijayvergiya saw that BLMIS's performance consistently went up during down markets and that BLMIS was purportedly invested in the market during those times.

273.    The Defendants touted their analysis of Fairfield Sentry returns, including their monthly comparison of the fund's returns to the S&P 100's. That analysis showed that there was, in fact, no correlation. The Defendants identified economic "crises" between 1994 and 2007 and compared Fairfield Sentry's returns to the S&P 100's returns during those times. In those times, BLMIS not only purported to have outperformed the market, it claimed that it was typically up when the market plummeted—impossible had BLMIS actually been trading with the SSC Strategy:

| Fairfield Sentry Rate of Return Versus S&P 100 Index: Times of Crisis | | | |
|---|---|---|---|
| Crisis | Time Period | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
| Tech Bubble | Sept. 2000 to Mar. 2001 | 5.89% | (28.05%) |
| World Trade Center Attack | Aug. 2001 to Sept. 2001 | 1.75% | (14.08%) |
| Recession | May 2002 to Sept. 2002 | 5.90% | (22.91%) |
| Second Gulf War | Dec. 2002 to Mar. 2003 | 1.80% | (9.76%) |

274.    When performance questions were raised internally, the Defendants did not attempt to answer or resolve them but instead looked the other way. For example, on April 16, 2004, an FGG partner commented to Vijayvergiya and others that Fairfield Sentry "being up for the week is suspicious. Can [FG] Bermuda look into a spike in vol or other reasons for this as the S&P fell last week?" FG Bermuda never did. Instead, FG Bermuda suppressed this concern

and continued to falsely promote the story to investors that BLMIS was trading securities under the SSC Strategy.

275.    On November 27, 2007, McKenzie, Vijayvergiya, and others acknowledged that it was "extraordinary that [BLMIS returns] could be this good given market indices and performance of nearly all [of FGG's] other funds" and expressed the need to "more fully understand how/why." Despite this, FG Bermuda and Vijayvergiya omitted the concerns from subsequent investor communications and conducted no investigation.

276.    To gauge the feeder funds' portfolio performance, Defendants used the "Sharpe ratio"—a widely used statistical metric that measures the extent to which a trading strategy compensates an investor for risk. Noel explained that his description of the strategy and performance to existing and potential investors included discussion of various performance metrics, including the Sharpe ratio.

277.    Between Fairfield Sentry's inception and BLMIS's collapse, BLMIS's Sharpe ratio was higher than that of its peers over every rolling 10-year period. BLMIS outperformed its peers across other performance metrics, including number of positive months and drawdown. It is highly unlikely for an investment advisor to outperform, and often by a significant amount, every peer group, across multiple performance metrics, across lengthy periods of time. This purported performance was an indicator of fraud and was a red flag that Madoff was not executing the SSC Strategy.

**Impossible Equity Trading Volumes**

278.    The Defendants monitored trading volumes and understood that each time BLMIS purported to trade, it traded between 35 and 50 S&P 100 Index stocks for the feeder funds' accounts. On at least 223 occasions, the stocks BLMIS purported to have purchased for Fairfield Sentry alone exceeded 20% of the trading volume for those stocks on the entire New York Stock Exchange. Extrapolating, as Fairfield did, BLMIS would have accounted for nearly 50% of all market activity in those stocks.

410.    Each time Madoff supposedly entered the market, he purportedly purchased between 35 and 50 S&P 100 stocks for the Feeder Funds' accounts. There were over 150 occasions on which the stocks Madoff purchased for Fairfield Sentry alone accounted for over 20% of the trading volume for those stocks **on the entire NYSE**. BLMIS, as a single investment adviser, was by itself purportedly trading for all of the BLMIS IA Business customers nearly 50% of all market trading in those stocks. There were also 50279.    There were also 64 instances in which Fairfield Sentry'*'*s account was responsible for over 25% of market trading in a particular stock (meaning trading for all of the BLMIS IA Business customers rising to over 60%), and 19 times when Fairfield Sentryi.e., over 60% of trading for all IA Business customers), and 23 instances in which it accounted for over 30% of themarket trading in a particular stock (meaning the BLMIS IA Business customer trading constituting over 75% of market activity). On at least 3 occasions, **BLMIS would have had to engage in more trading than occurred on the entire exchange for a particular stock to execute the purported trades for Fairfield Sentry and the other customers of the BLMIS IA Business**i.e., over 75% of trading for all IA Business customers).

411.    Even using the OTC market, a

280.    A single investment adviser could not ever reasonably be responsible for over half of the reported trading of a particular S&P 100 stock. That Madoff could be responsible for more trading than occurred on an entire trading exchange was seemingly impossible. Sophisticated hedge fund professionals such as the Defendants, seeing such extraordinary percentages in trading patterns by their investment manager – with billions of dollars under his management – were required to undertake proper, independent, and reasonable due diligence or follow up into such indicia of fraud. The Defendants chose not to investigate these trading patterns.

### 3.    Madoff's Extraordinary Trading Volumes Never Affected the Market

412.    The SSC Strategy marketed by FGG involved moving money into the market over the course of one or more days, and then selling off all of those securities over a similar time span. According to the

Defendants, over the course of many years, tens of billions of dollars moved into and then out of the U.S. stock and options markets over the course of just a few days, six-to-eight times a year. The Defendants never independently investigated how these trades could be accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone "on the Street" knowing or even hearing about Madoff's alleged trading activity.

413.    The sale of tens of billions of dollars of stocks in a short period of time would result in a decreased price of those stocks, cutting into the alleged profits from the sales of such stock. The Defendants did not conduct independent or reasonable due diligence into the nonimpact of Madoff's large trading.

414.    When Madoff exited the market, he claimed to have placed his customers' assets in Treasurys or mutual funds invested in Treasurys. The movement of tens of billions of dollars in and out of the market should have materially affected the price of Treasurys. Lipton even remarked how BLMIS had "every angle covered" and was "playing over my head" when he attempted to explain how Madoff "rolled 6-7BN of Tbills on the last day of the year" with "the cost and the market value of investments . . . the exact same" in consecutive years. (A true and accurate copy of April 2008 emails between Lipton and McKenzie is attached hereto as Ex. 62.) The Defendants did not conduct independent or reasonable due diligence into the Treasurys aspect of the SSC Strategy.

### 4.    The Feeder Funds' Account Statements Showed That BLMIS Was Trading More Options Than Were Available on the CBOE

415.    The Defendants could have applied the same calculation they used to determine the universe of BLMIS's equities trading to determine the number of options BLMIS was trading for all of its customers. S&P 100 Index options are traded on the Chicago Board of Exchange ("CBOE") under the symbol OEX100. BLMIS **nearly always** traded more OEX100 options than were traded on the entire CBOE.

416.    From 2001 to 2008, when comparing the volume of OEX100 options that BLMIS was purportedly trading on behalf of the Feeder Funds, with the CBOE volume, BLMIS traded more OEX100 options than the

entire volume of the CBOE **97.6% of the time**. During those eight years, BLMIS traded fewer options than were traded on the options exchange on a given day **only 18 times**.

417.    A comparison between the volume of OEX100 put options BLMIS traded on behalf of the Feeder Funds and the volume of those same put options traded on the entire exchange is striking, as demonstrated on the next page.be responsible for those volumes of trading in a single S&P 100 stock.

### **Indicators of Fraud in Purported Options Trading**

#### *Deviations from the SSC Strategy*

281.    One of the defining features of the SSC Strategy was that it purportedly used put and call options to form "collars" around underlying securities holdings. The theory was that by purchasing put options, BLMIS would hedge the risk of downward swings in the price of underlying stocks, and that by selling call options, it would generate revenue to offset the purchase costs of the puts. BLMIS had its customers—Fairfield Sentry among them—sign on to this strategy with an Option Agreement, representing that BLMIS would "only write (sell) covered calls against long stock positions, and buy stock index puts or puts on the individual stocks that the account owns."

282.    Options trading within the SSC Strategy, therefore, was to follow the representation in the Master Agreement. Failure to follow that representation was an indication that BLMIS was not carrying out the SSC Strategy, putting the investors' assets at significant, unanticipated risk.

283.    FG Bermuda, FG Limited, and the other Defendants tracked options trading activity through the monthly account statements they received from BLMIS. In those documents, FGG observed BLMIS's many apparent deviations from the options trading representation in the SSC Strategy. In October 2003, for example, Gil Berman noted to Tucker and Vijayvergiya the appearance on monthly statements of options trades outside of the SSC Strategy: "Madoff does sometimes purchase long calls in the Fairfield Sentry accounts . . . They appear to have been extra calls and not part of the split-strike

strategy." Vijayvergiya asked for and received the underlying data that confirmed the accuracy of Berman's conclusion, however, FGG took no further action.

284.    Berman continued to report problems with BLMIS's purported options trading to Vijayvergiya. In December 2007, Berman reported to Vijayvergiya that Fairfield Sentry's account statements showed disparate positions in puts and calls in November 2007, which created "additional short exposure not attached to an offsetting stock position." This timing difference resulted in Fairfield Sentry holding a put option position that was not being used in connection with the SSC Strategy (as the equity and call positions had already been unwound). The risk in holding the put option for an extra day is that if the market goes up, the value of the put option will go down. Then, when the option position is sold the next day, the proceeds from the sale will be lower.

285.    Berman grew concerned that his role with FGG did not give him sufficient latitude to communicate the gravity of the problems he had been observing, and that FGG was not adequately responding to those problems. He therefore prefaced his May 2008 monthly report with an email to Vijayvergiya: "[t]hough my consulting assignment is (and has always been) only to summarize the previous month's trading activity without providing editorial commentary, I must mention to you that I find the May options trading activity to be unusual and difficult to explain, and would encourage you to investigate it further." In the report, Berman noted many recent apparent deviations from the SSC Strategy: "several options trades with a one-day timing mismatch . . . a partial early call repurchase on May 13th, a doubling up of long puts on May 19th, and a partial deferred put sale on May 23rd." Berman noted similar deviations in other reports. For example, in his report covering March 2000 trading activity, Berman identified that "[o]n March 8th, the Sentry accounts bought back all of their short OEX March 760 calls at a price of 2 7/8. They resold these calls on March 9th at a price of 6 7/8, reestablishing their original positions with an interim profit of $4,740,000." This was a speculative option transaction, and inconsistent with the SSC Strategy.

286.    Berman spoke with Vijayvergiya about the problems noted in the May 2008 monthly report a few weeks later. They also discussed the fact that no one—not even Madoff— could achieve profitable options trades 100% of the time.

287.    They also discussed the possibility that this was a sign that Madoff was more than simply deviating from the SSC Strategy. One theory they came up with for the supposedly perfect success rate was that Madoff was backdating the trade confirmations.

288.    Berman made a number of recommendations to address fraud risk, including requesting trade confirmations for options trading the day the trade purportedly took place, requesting information on options counterparties to confirm the trades, and conducting an asset audit to verify the assets were there.

289.    Berman was not the only person to raise questions with FGG about BLMIS's deviations from the SSC Strategy. In April 2008, a Swiss investment advisor expressed to Santiago Reyes, an FGG salesman, his doubt that the SSC Strategy could generate the returns Madoff claimed. "I have one question," he wrote:

> How did the manager in such [a] volatile time to [sic] make so much money? I mean, in your strategy buying put was largely more expensive then the sell of the call. So how can he finance the hedge of the portfolio and of course how can he make money (whereas the portfolio can't be hedge buy [sic] the sell of the call)[.] So the alpha generated by the manager is due to good stock picking on the 40 to 50 stocks ch[o]sen? I don't think so! I know that the madoff [sic] strategy is doing great but could it be possible to have more details?

FGG responded by sending only a "preview of Sentry performance estimates as of April 24, 2008," and did not answer any of the Swiss adviser's questions.

*Options Volume*

290.    FGG recognized that the sheer number of options needed, given the volume of AUM, was too large for BLMIS to be trading options as it claimed to be.

291.    FGG knew that BLMIS claimed to be trading baskets of equities correlated to the

S&P 100 proportionally allocated to each account—not separate equity trades for each feeder fund account. To hedge those baskets with put options, as the SSC Strategy called for, BLMIS claimed to be trading S&P 100 Index options ("OEX"), which were traded on the CBOE. The trade confirmations BLMIS provided to FGG included CUSIP numbers, indicative of CBOE- traded options.

292.    The indications on the face of trade confirmations that BLMIS was trading options on the CBOE, however, did not comport with other information about the options markets FGG received. Widespread indications were that there was not enough volume or liquidity in the CBOE to support the SSC Strategy. In November 2003, for example, a member of FGG's sales team commented on a client's concerns that the volume of options needed to hedge FGG's feeder funds' accounts far exceeded market volume, and asked Vijayvergiya and Blum, "[i]s it really as excessive as [the investor] implied[?]" In February 2004, another investor expressed similar doubt that "there [could be] sufficient liquidity in these options to cover the needs of a portfolio the size of which is managed by Madoff in its totality."

293.    If, at that point, FGG harbored the belief that a sufficient number of options could have traded on the CBOE, that belief was dispelled when Vijayvergiya shared with Landsberger a series of extrapolations Vijayvergiya made to estimate the number of options that would have been needed to carry out the SSC Strategy for their accounts.

294.    Based on the AUM in the FGG feeder funds' accounts and the estimated total AUM with BLMIS, Vijayvergiya calculated the percentage of BLMIS AUM the FGG feeder funds made up.

295.    In 2006, for example, Vijayvergiya estimated that Fairfield Sentry accounted for between 35% and 40% of all of BLMIS's AUM. His estimate was confirmed in August 2006, when BLMIS was forced to register as an investment adviser and reported that it had $11.7 billion under management as of July 2006. At that time, Fairfield Sentry's account balances totaled $4.8 billion—41% of BLMIS's AUM. The percentage was approximately the same at year-end in 2006, when Fairfield Sentry accounted for $5.6 billion of the $13.2 billion under management with BLMIS, and at year-end in 2007, when Fairfield Sentry accounted for $7.1 billion of the $17.1 billion under management with BLMIS.

296.    The number of OEX index options needed to carry out the SSC Strategy in the FGG feeder funds' accounts alone exceeded the total number of OEX index options traded on the CBOE. As illustrated on the following charts, the volume of the S&P 100 put and call

options purported to have been purchased on behalf of Fairfield Sentry alone completely dwarfed

the volume of the same S&P 100 put and call options traded on the CBOE on the same days:



**Fairfield Sentry Put Option Volume Relative to Corresponding Market Volume 12/1995 -11/2008**

Includes BLMIS accounts 1FN012, 1FN045, 1FN069 and 1FN070.
Reflects volume of Fairfield Sentry option transactions and corresponding market volume for the relevant option and trade date.



**Fairfield Sentry Call Option Volume Relative to Corresponding Market Volume 12/1995 -11/2008**

Includes BLMIS accounts 1FN012, 1FN045, 1FN069 and 1FN070.
Reflects volume of Fairfield Sentry option transactions and corresponding market volume for the relevant option and trade date.

418.    The volume of OEX100 put options BLMIS traded on behalf of the Feeder Funds (the red line) **completely dwarfs** the volume of OEX100 put options traded on the entire CBOE (the black line). Almost every time BLMIS entered the market to trade put options for the Feeder Funds, it traded more OEX100 put options than all trades on the CBOE **combined**.

419.    Based upon FGG's belief that the Feeder Funds accounted for 42% of BLMIS's trading, BLMIS would have been executing for all of its customers approximately 2.4 times as many trades as he was executing for the Feeder Funds alone. This means that FGG must have believed that, for instance, when BLMIS was trading 140,000 options for the Feeder Funds' accounts in late 2008, BLMIS was trading over 300,000 options for all of his accounts.

420.    The amount by which BLMIS's trading overshadows the trades made by every other person who traded OEX100 put options on the CBOE is unbelievable, as shown below.

421.   The Defendants did not perform independent and reasonable due diligence or follow up concerning the put option trading BLMIS purportedly conducted on their behalf.

422.   As shown below, the volume of OEX100 call options BLMIS traded on behalf of the Feeder Funds, and on behalf of all of BLMIS's customers, versus the volume of those same call options traded on the entire exchange, is equally telling. There was rarely a time when BLMIS traded **fewer** OEX100 call options than were traded on the CBOE.

423.    The Defendants did not perform independent and reasonable due diligence or follow up as to the trading volume for their accounts. Had the Defendants conducted proper due diligence they would have confirmed that their account statements, their strategy, and BLMIS were all a sham.

### 5.    The Defendants Agreed to Enter into Billions of Dollars in Options Contracts With Unidentified Counterparties

424.    In the OTC marketplace, where Madoff claimed to be trading, each transaction requires a private contract between the two parties. In order to allegedly perform the options trades, Madoff had the Feeder Funds execute a Master Agreement for OTC Options. (A true and accurate copy of an excerpt from BLMIS's Master Agreement for OTC Options is attached hereto as Ex. 63.) Under that agreement, Madoff served as the Feeder Funds' agent in executing any options trade. The agreement explicitly states the Feeder Funds could not look to Madoff if the counterparty failed to perform. (*See id.*) Thus, unless the counterparties were reliable, sufficiently capitalized, and liquid, the options could be rendered useless in hedging the Feeder Funds' investments. As a result, under the Master Agreement, if a counterparty failed to perform, **it was the Feeder Funds, and not Madoff, who were exposed**.

425.    The Defendants did not review, comment, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation. Despite bearing the risk of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties' identities. Madoff refused to identify the counterparties claiming he had to prevent his clients from dealing directly with the counterparties, and that the names of parties were proprietary. Madoff would eventually state that the counterparties were large European financial institutions.

426.    Vijayvergiya and Tucker knew Madoff's counterparty explanations were suspicious. In response to a financial institution that told Vijayvergiya "**that his contacts at two of the largest investment firms on Wall Street had no knowledge of the options business (Citi and CSFB),**" Vijayvergiya told Tucker that the investor

"seemed fine with my response re: options counterparties." He noted the investor was "**OK for now** – but I may still pose the casual question to Frank [DiPascali] at some point . . . ." (A true and accurate copy of Vijayvergiya's May 26, 2005 email to Tucker is attached hereto as Ex. 64 (emphasis added).)

427.    After Bear Stearns collapsed in February 2008, inquiries regarding counterparty risk under the SSC Strategy intensified. Investors wanted to know what counterparties were trading options with Madoff, and whether those counterparties were stable and reliable. In the nearly 20 years FGG had been invested with Madoff it had never been provided the name of a single counterparty that bought options from or sold options to BLMIS. The Defendants failed to perform any proper, independent, or reasonable due diligence or follow up to understand and verify any aspect of the options counterparty component of their SSC Strategy.

428.    As the stock market continued to weaken, and FGG was threatened with hundreds of millions of dollars in investor redemptions, Vijayvergiya contacted Madoff in June 2008. During the call, Vijayvergiya asked Madoff about BLMIS's counterparties. Madoff told Vijayvergiya that the options counterparties with whom BLMIS were required to post Treasurys as a performance assurance, and that no one counterparty accounted for more than 10% of the options trades. Madoff reiterated that he did not want FGG providing their investors with too much information regarding BLMIS. (A true and accurate copy of the June 4, 2008 memorandum summarizing the meeting is attached hereto as Ex. 65.)

429.    The Defendants never inquired of Madoff as to why past counterparties needed to be concealed to protect operations or execution of the strategy. The Defendants also never sought to independently confirm, outside of Madoff himself, what exactly were the options "performance assurance," or where, when, or by whom the assurances were posted. The Defendants instead chose to accept Madoff's suspicious explanations.

430.    Noel, Tucker, McKeefry, and Vijayvergiya met with Madoff in October 2008 and asked him to provide additional information about his options counterparties. Madoff told them his options counterparties were

large institutions and that he performed credit checks on each of them. **Even though they were FGG's counterparties and not his**, Madoff again refused to provide the names of any counterparties. The Defendants continued to do nothing to independently verify any of Madoff's statements, taking Madoff solely at his word. The Defendants did not see or review a single document for these contractual relationships on their own accounts.

431.    With the massive purported volume of BLMIS-related options trades, there were only a limited number of institutions that could have satisfied Madoff's and FGG's trading needs. The Defendants regularly communicated with many large European financial institutions – Madoff's alleged counterparties. Despite their regular contacts with institutions which fit Madoff's options counterparts profile, the Defendants never asked any of these institutions if they were trading options with Madoff. In fact, FGG never independently contacted any institutions to determine if they were trading S&P 100 options with Madoff.

297.    Notwithstanding FGG's observation that Madoff could not be trading the options as he said, Vijayvergiya resorted to dishonesty in drafting responses to investor queries. BLMIS, Vijayvergiya said, "utilizes over-the-counter . . . options contracts rather than transacting on any of the U.S. options exchanges. This is because the level of options activity required to notionally protect the stock basket would exceed the amount available on the listed options exchanges." But trading over the counter would also have required BLMIS to enter into private, individually negotiated, arm's length contracts with willing counterparties, a practice FGG knew that BLMIS did not follow, as each trade confirmation contained a CUSIP number matched to exchange trading over the CBOE.

**6.    The Supposed Options Trading Structure Under the SSC Strategy Was Inconsistent With Industry Practice***An Options Trading Structure that Violated Industry Standards*

432.    The purported BLMIS-Feeder Funds options trading was inconsistent with industry practice. Both Madoff and FGG claimed the options counterparties entered into agreements that were identical to the agreements

the Feeder Funds entered into with BLMIS serving as each parties' agent. As a result, any resulting OTC trade would result in a contract between the options counterparty and the Feeder Fund.

433.    FGG and Madoff claimed Madoff traded large blocks of options contracts and then allocated them proportionately to each of the BLMIS IA Business customers, like the Feeder Funds. Under normal industry practice, a block trade and allocation process requires the broker to trade as a principal and not an agent, with all transactions consisting of two trades: one between the one party and broker and then a second trade between broker and the other party. The two-trade process is required for block trade and later allocation transactions because OTC option trades are contracts between the two parties and the identity of the customer being allocated the option agreement is unknown at the time of the trade. In order that the SSC Strategy be consistent with industry practice, BLMIS would have been the principal in the two trades, one with the counterparty and the second with the BLMIS customer.

298.    The Defendants were also aware of other structural issues and inconsistencies in Madoffs purported options trading, including the alleged collateral for the options trading.

434.   Other structural issues which were readily apparent included the alleged collateralization of the options trading. Madoff told the Defendants that he limited each, by design, no counterparty's had exposure to of more than 10% of his overall position, and required that each counterparty was required to post Treasurys Treasury Bills in escrow accounts to serve as collateral to guarantee performance of the put options. When asked what the Defendants later inquired about the collateral the counterparties required of the Feeder Funds in order feeder funds to guarantee the performance of the call option options sold to them, Madoff claimed none was required because his customers held the equities.

435. 299.    Madoff's explanation was facially false for several reasons: (1) the BLMIS held a basket of the 35 to 50 equities did, not perfectly match the entire S&P 100 Index—, the basis of the call option; (2) Madoff was free to sell the equities, which he did on occasion, BLMIS sold equities prior to

the expiration of the call, inconsistent with the SSC Strategy, and leaving the counterparty with no

collateral at all; and (3) Madoff stated that the option counterparty had no lien against its allocated

equities which, if true, meant the counterparties had no collateral protecting their position.

436.    Madoff300.    The Defendants knew that standard industry practice required the principal

counterparties to be directly in contact with one another so each party could assess the other's

creditworthiness. The Defendants also knew that BLMIS's purported options trading structure, leaving

the BLMIS IA Business customer's exposed to counterparty exposed to large credit risk without ever

knowing the identity of the BLMIS IA Business customercounterparty, was highly irregular and

inconsistent with industry practice. FGG never conducted independent or reasonable due diligence about

this aspect of its own SSC Strategy, accepting instead Madoff's implausible explanations without asking

any questions.

### 7.    The Options Trade Confirmations the Defendants Received From BLMIS Did Not Comply With Industry Standards

437.    The Feeder Funds' options trade confirmations contained certain abnormalities. The options trade

under the SSC Strategy was supposed to be a private contract between two parties in the OTC market and the

counterparty should have been expressly identified on the confirmation statement. None of Madoff's options trade

confirmations identified the counterparty.

438.    By contract, options traded on the CBOE have an identifier number known as a "CUSIP"

(Committee on Uniform Security Identification Procedures). The CUSIP allows traders to quickly access

electronic information regarding a particular option by simply inputting the CUSIP number into data terminals.

Because OTC options are private transactions, the options are not assigned any CUSIP number. Madoff's trade

confirmations - reviewed by FGG - included a CUSIP indicating that they were traded on the CBOE.

439.    The master options agreement stated Madoff was acting as the agent of the Feeder Funds when he

entered into options trades, however each confirmation indicated BLMIS was trading as a principal. More importantly, once BLMIS was registered as an investment adviser with the SEC in 2006, SEC regulations prevented BLMIS from trading for a customer account as a principal without written authorization from the customer for each trade. The Feeder Funds never transmitted any authorizations permitting BLMIS to trade as a principal. Nevertheless, every trading confirmation the Feeder Funds received from BLMIS indicated BLMIS acted as a principal, even after he registered as an investment adviser.

440.    The Defendants knew of and ignored these red flags. Simply put, the Defendants did not perform independent or reasonable due diligence into their own trading confirmations.

8.    **Madoff's Inconsistent Stories Were Ignored by the Defendants**

441.    Madoff's explanations about the SSC Strategy often changed according to circumstances, and with whom he was talking. The Defendants knew Madoff made inconsistent statements about the SSC Strategy but did nothing in response.

a.    **Options Trading**

442.    When Madoff first began trading options pursuant to the purported SSC Strategy, he claimed he traded the options contracts on the CBOE. When confronted by customers questioning whether the volume of his options trading activity was too large for the CBOE, Madoff shifted his story and claimed he had moved to OTC trades without telling his customers.

The Defendants never investigated Madoff's statements. Instead, the Defendants falsely repeated whatever Madoff told them about where he was trading options

301.    The timing of BLMIS's options trades was also contrary to industry practice. The feeder funds' account statements demonstrated that many of the options trades BLMIS purportedly made on

their behalf took much longer to settle than was normal in the industry. Industry standard dictated that options trades be settled one business day following the date the trade was made, or T+1. While Madoff claimed to perform options trading in the OTC market, he stated that terms of BLMIS's options trades were identical to exchange-traded options. Thus, the feeder funds' account statements should have shown settlement dates for all of their options trades of T+1.

302.    Between 2000 and 2008, almost a quarter of all of the options purportedly traded by BLMIS for Fairfield Sentry's and Greenwich Sentry's accounts settled more than a day after the trade took place. During this period, Fairfield Sentry's account statements showed 628 delayed settlements, Greenwich Sentry's statements showed 235, and Greenwich Sentry Partners' statements showed 206. Of the option trades anomalies on Greenwich Sentry Partners' account statements, 97% settled on a date other than T+1. The Defendants tracked and monitored Fairfield Sentry's account and saw these dates and knew that BLMIS's options trades were extremely unusual and indicative of fraudulent activity.

303.    The Defendants knew that Madoff was not telling them the truth about options transactions. In March 2008, Vijayvergiya provided the FGG Executive Committee with a "Recap of conversation with Bernie." Among other things, Vijayvergiya stated "on Derivatives Counterparties" that "all OTC options counterparties must provide performance assurance in the form of T-Bills." Landsberger replied, "Not sure I understand the use of t-bills by his option counterparties-can u possibly elaborate? I assume it gives him some risk protection, but if he buys or sells puts/calls, why would counterparty pledge t-bills?" Landsberger knew Madoff's explanation did not add up.

304.    Madoff's story about options counterparties had vacillated for years. For example, in 2005, during the call between Madoff, Vijayvergiya, and McKeefry in preparation for the SEC interview, Vijayvergiya commented that, based on discussions he had had with Madoff in 2003, he knew that Madoff contacted counterparties to ensure that puts were available before he purchased equities. Madoff cut him off. Fearful that the practice Vijayvergiya was referring to would suggest to the SEC front

running, Madoff corrected him—he never would contact counterparties before trading. Although it was inconsistent with their prior discussions with Madoff, Vijayvergiya and McKeefry did not challenge him on this point.

305.    Yet, in later discussions on the same point in June 2008, Madoff would revert to claiming that he contacted OTC options counterparties before implementing the SSC Strategy.

443.    When FGG's investors expressed concern that Madoff could purchase equities but might not find counterparties from whom to purchase the put options to protect the equities purchases from a market drop, Madoff reassured FGG by claiming that he spoke to option counterparties to determine option availability before he purchased any equities. (A true and accurate copy of the Vijayvergiya's July 23, 2008 email to Barreneche is attached hereto as Ex. 66.)306.    A month later, in July 2008, a Fairfield Sentry investor expressed concern about BLMIS's counterparty risk. Vijayvergiya came up with a response, claiming that FGG knew Madoff spoke to option counterparties to determine option availability before he purchased any equities even though Vijayvergiya knew Madoff had denied doing so previously.

444.    By contrast, during the 2006 SEC investigation Madoff expressed concern that the SEC would conclude that the SSC Strategy would promote front-running. During the "scripting" call with Vijayvergiya and McKenzie, Madoff discussed the need not to say anything that might allow the SEC to conclude one party could front-run the trades. When Vijayvergiya asked Madoff whether he spoke to counterparties to assure puts were available before he purchased equities, Madoff replied that he did not contact the options counterparties ahead of time because it would be too easy for them to front-run his trades. (*See* Ex. 39.) As was customary, the Defendants did not perform independent or reasonable due diligence or follow up when Madoff made these contradictory statements.

**b.    Madoff's Auditor**

445.    The Defendants knew that Madoff told changing stories about the relationship between BLMIS and its auditor. When questioned about Friehling, Madoff sometimes told customers, including FGG, that he did not change auditors because there was a family connection to Friehling. Internal FGG communications discussed the fact that BLMIS's auditor was a member of Madoff's family. *(See* Ex. 38.) This lack of independence between the auditor and audit client would be a conflict of interest and itself a huge red flag of fraud. The Defendants did not conduct due diligence as to this conflict of interest. Later when the so-called "family auditor" conflict of interest issue arose, Madoff claimed he had no family ties to Friehling. The Defendants conducted no due diligence into this changing story.

### c.    Number of People at BLMIS Executing the Strategy

446.    At times, FGG repeated Madoff's claims of having dozens of PhD traders and administrative personnel involved in executing the SSC Strategy. However, in 2006, when BLMIS filed its ADV form as independent advisor, BLMIS reported it had only five employees in the BLMIS IA Business. After obtaining the ADV form, the Defendants took no action to reconcile Madoff's prior representations and the information he provided to the SEC. Instead, the Defendants simply repeated what Madoff told them about the traders in the BLMIS IA Business operation.

### 9.    The Defendants' Own Due Diligence Procedures Should Have Uncovered Anomalies in Madoff's Trading

447.    The Defendants told their investors that as part of their due diligence procedures they reconciled trade confirmations immediately. The Defendants knew or should have known of certain trading anomalies through their trade reconciliation efforts.

448.    There were days when the Feeder Funds' trade confirmations indicated Madoff traded stocks at prices that were outside the daily ranges of prices for those stocks. As an example, Fairfield Sentry's account

statements for October 2003 reported purchases of Intel Corporation (INTC) of 1,082,543 shares, 1,097,173 shares, and 67,837 shares. BLMIS's records indicate these stocks were purchased on October 2, 2003 for $27.63 per share. The daily price range for Intel Corporation stock purchased and sold on October 2, 2003 in fact ranged from a low of $28.41 to a high of $28.95.

449.    Fairfield Sentry's and GSP's account statements for December 2006 reported sales of Merck (MRK) of 267,035 shares, 261,266 shares, 15,386 shares, and 786 shares. BLMIS's records and the Feeder Funds' trade confirmations reflect that these stocks were sold on December 22, 2006 for $44.61. The price range for Merck stock in fact bought and sold on December 22, 2006 was between $42.78 and $43.42.

450.    According to the Defendants, they created procedures and employed them every day for the specific purpose of catching such indicators of fraudulent behavior. That in fact never occurred.

**10.    The Quantitative Analysis the Defendants Touted to Their Own Investors Proved Madoff's Returns Were Virtually Impossible.**

451.    Quantitative analysis that is standard in the hedge fund industry revealed that Madoff's positive, consistent returns were, statistically, highly improbable. FGG told its investors that it performed such analysis, but refused to recognize the implications of their findings - BLMIS was a fraud.

452.    FGG's marketing materials emphasized that Vijayvergiya and his risk management team performed exacting quantitative analysis of the Feeder Funds' investments. This analysis included utilizing an industry standard known as the Sharpe ratio to gauge portfolio performance. The Sharpe ratio, developed by William Sharpe, winner of the Nobel Prize in Economic Sciences, measures how well a trading strategy compensates the investor for the risk taken. A higher Sharpe ratio indicates the strategy provides a higher return relative the associated risk. For funds with monthly net asset values ("NAV"), such as the Feeder Funds, the Sharpe ratio is calculated as follows:

(The Fund's Average Monthly Rate of Return) - (That Month's Risk-Free Rate)
Standard Deviation of the Fund's Monthly Returns

453.    BLMIS's Sharpe ratio was remarkable. When compared to the over 800 other hedge funds that reported data to major hedge fund databases, the probability Madoff could maintain such high Sharpe ratios by providing positive returns with very little volatility, was **less than 1%**. When compared to funds that employed comparable strategies to Madoff's SSC Strategy, that probability drops to **less than 0.1%**. In selling his services to FGG, Madoff noted that other star managers might have higher returns, but he produced steady returns without the volatility of those star managers. In fact, for a 13-year period, Fairfield Sentry had a higher Sharpe ratio than Warren Buffett, George Soros, Bruce Kovner, and John Paulson in all but six of 52 quarters between 1995 and 2007. The probability of Fairfield Sentry's Sharpe ratio outperforming these star money managers in almost every quarter for nearly 13 years is approximately **1 in 200,000,000**.

454.    Such an understanding and detailed analysis of the Sharpe ratio was what Defendants touted to be part of their exceptional due diligence procedures. The Feeder Funds' nearly impossible Sharpe ratio was in fact one of the factors that led quantitative analysts, such as Edward Thorp and Harry Markopolos to conclude that Madoff was operating a Ponzi scheme.

455.    Independent analysts viewed the Feeder Funds' Sharpe ratio with a great deal of skepticism because the Feeder Funds' Sharpe ratio **always** remained high. The Feeder Funds' year-over-year Sharpe ratio was driven by the low volatility of the Feeder Funds' performance in often highly volatile markets, and without any meaningful correlation between the two. The Defendants did not perform any reasonable or independent due diligence into the fact that it was nearly impossible for the Feeder Funds to have retained such a consistently high Sharpe ratio.

456.    FGG claimed that Madoff had great market timing based on his "feel" for the flow of the market, premised on short-term market timing. Vijayvergiya responded to critics of Madoff's market timing abilities by

claiming Madoff had unique access to market flow information through his market-making business.

457.    Independent analysts rejected the Defendants' explanations about Madoff's ability to perfectly time the market for over 20 years. Many analysts viewed Madoff's perfect timing based on market flow as indicative of illegal front-running. The Defendants knew that front- running was a "[t]ypical Madoff rumor[]," but they never tried to investigate. (A true and accurate copy of the February 27, 2004 email from Vijayvergiya to FGG's Marco Musciacco is attached hereto as Ex. 67.)

458.    Moreover, despite employing a market timing strategy, Madoff would artificially take his customers' cash out of the market near the end of the quarter for reasons having nothing to do with the SSC Strategy. Madoff claimed to move his customers' funds, like the Feeder Funds, in order to avoid what he understood to be the disclosure requirements of a Form 13F filing under the SEC rules requiring those who exercise discretion over accounts having more than $100 million in exchange-traded or NASDAQ securities to report their holdings.

459.    The Defendants knew Madoff's desire to avoid reporting requirements was the reason for his end-of-quarter positions. The Defendants also knew that Madoff's reason for going to cash would raise concerns among institutional investors. Vijayvergiya and other FGG sales personnel were directed to provide other reasons for the end-of-quarter cash positions.

460.    After Yanko della Schiava, another Noel son-in-law, asked Vijayvergiya why Madoff moved all customer accounts out of the market at the end of the year, Vijayvergiya gave two nonsensical responses based on purported trading strategy. Della Schiava responded, "I remember Jeffrey [Tucker] once specifically mentioning about the last days of the year to be in cash so he [Madoff] did not have to fill certain tax forms . . [Vc] or something similar." Vijayvergiya then responded, "Yes - that is a third possible reason but I have been advised not to emphasize this." Vijayvergiya went on to write, "I am told that the rule to which Jeffrey [Tucker] is

referring requires that if Madoff ends the year invested on December 31, then they are required by law to report their holdings in these same positions for the next four quarters. I am further told that Madoff has been reluctant to do this . . . ." (A true and accurate copy of the December 11, 2003 email from Vijayvergiya to della Schiava is attached hereto as Ex. 68.)

461.    The Defendants performed no independent or reasonable due diligence as to why a strategy based on market timing would pull itself out of the market for reasons having nothing to do with market timing and instead gave cover to Madoff's real reason he was out of the market – avoiding 13F filings that would lead sophisticated investors to conclude he was a fraud.

## IX.    THE DEFENDANTS WERE WILLING TO IGNORE THE RED FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT

462.    The Defendants looked away when faced with red flags about BLMIS. The Feeder Funds' investors, who paid the Defendants to conduct proper, independent, and reasonable due diligence on BLMIS, and the funds' potential investors were far more concerned than the Defendants when they learned of Friehling; BLMIS's unusual fee structure; the fact that BLMIS was the investment manager, self-clearing prime broker, and custodian; and the Defendants' own lack of transparency and limited understanding of their own investment strategy.

463.    For example, in February 2005 one investment group explained that it had "decided to NOT invest in the Fairfield Sentry fund" due to the non pure independence between the true manager of the fund and the prime broker/Custodian of the fund." One of Fairfield–UK's employees told Tucker, Landsberger, and Vijayvergiya, "at least their reason was was [*sic*] a good one." (A true and accurate copy of the February 1, 2005 email to Tucker is attached hereto as Ex. 69.) Instead of investigating the issue further, Piedrahita was still saying over two years later that "there is absolutely nothing we can do about it . . . ." (A true and accurate copy of the June 21, 2007 email from Piedrahita to Landsberger, Vijavergiya, Lipton, and the Executive Committee is

attached hereto as Ex. 70.)

## A. *FGG Does Everything It Can to Mollify Investor Concerns as Opposed to Performing Independent Inquiry Into the Possibility of Fraud*

464.    Throughout the 2000s and increasingly in the 2006-08 period, the Defendants knew that "concerns about lack of transparency" troubled the Feeder Funds' investors and potential investors, causing them to redeem from the Feeder Funds. (A true and accurate copy of the June 10, 2008 email from Vijayvergiya to McKenzie is attached hereto as Ex. 71.) The Defendants tried to stem the tide of redemptions, and tried to convince investors there was nothing about which to be concerned, rather than independently or reasonably investigate or follow up to determine whether Madoff's lack of transparency was an indicia of fraud.

465.    To respond to concerns about Madoff's lack of transparency, the Feeder Funds' sales force was provided with "talking points." Vijayvergiya sent an e-mail to McKenzie and others in which he suggested that Fairfield Sentry personnel ask its customers whether redemptions from the fund were related specifically to the lack of transparency or any other concerns over BLMIS. The Feeder Funds' sales force was to try to convince investors not to redeem their interests in Fairfield Sentry by emphasizing FGG's knowledge, monitoring and insight into Madoff, his operations, the performance, and the SSC Strategy.

466.    In May 2008, the Defendants received basic questions from an institutional client asking the Defendants to confirm how Fairfield Sentry's accounts were segregated at BLMIS. (A true and accurate copy of FGG's May 2008 internal notes in response to investor questions is attached hereto as Ex. 72.) The Defendants could not answer these basic questions because they had never independently confirmed that any trades were being made or that BLMIS was in fact holding their assets. Murphy recommended that, "**we confirm, but not sure we answer directly their questions on how our account is segregated and how this can be confirmed?**" (*See* Ex. 41 (emphasis added).) Murphy also admitted that he did not know whether the Defendants had copies of the audit reports for BLMIS or whether "**we get to talk with the auditors?**" *(Id.* (emphasis added).)

467.    As of May 2008, FGG had invested billions of dollars into Madoff and received over a billion in fees from the Feeder Funds, yet the Defendants still did not know **whether client funds were segregated** or whether anyone knew anything about Madoff's auditor. Vijayvergiya also admitted that "**there are certain aspects of BLM'S operations that remain unclear. . .**" (*Id*. (emphasis added).) In internal email discussions that followed the investor's redemption, Vijayvergiya stated that the client may have heard "certain rumors," which caused it to backpedal on its Fairfield Sentry investments. *(Id.)*

468.    In June 2008, FGG partner and Chief Global Strategist of FGG, David Horn, emailed Vijayvergiya about a prospective client. The email stated that the client "**has always heard about Madoff, but hears things that scare her . . . so neutralize the scare with our transparency . . . this will be a piece of cake . . .**" (A true and accurate copy of the June 2, 2008 email from Horn to Vijayvergiya is attached hereto as Ex. 73 (emphasis added) (alteration in original).) The Defendants' stated objective was to neutralize investor or prospective investor fears. The Defendants did not conduct proper, independent, and reasonable due diligence in connection with the red flags raised by potential investors.

469.    In October 2008, Fairfield Sentry sought an investment from Merrill Lynch ("ML"). ML declined, explaining that BLMIS's unwillingness "to sit down with our due diligence team and open the books and operations" kept ML from investing. The ML representative stated, "I realize the track record speaks for itself, but ML has a process and it involves a lot of due diligence and learning. So I admire you[r] track record but it does not help me do business with your fund." (A true and accurate copy of the October 21, 2008 email from ML to Barreneche is attached hereto as Ex. 74.)

### B.    *FGG's Consultant Tells the Defendants Madoff May Be a Fraud*

470.    FGG's investors, industry experts, other fiduciaries, and money managers were not the only ones flagging indicia that Madoff was a fraud. An FGG consultant, Gil Berman ("Berman"), also told the Defendants

Madoff might be a fraud. On several occasions Berman raised serious concerns regarding BLMIS and Madoff.

471.    When reviewing the trade tickets and account statements, Berman noticed that Madoff was at times taking actions inconsistent with the SSC Strategy he was required to execute. The Feeder Funds' Options Agreement with BLMIS indicated that BLMIS would "only write (sell) covered calls against long stock positions, and buy stock index puts or puts on the individual stocks that the account owns." Berman noticed that Madoff was occasionally purchasing double the notional amount of put options to cover a single basket of stocks, a trade not consistent with the SSC Strategy. Doubling the put option position would actually be detrimental because BLMIS had to pay for put options, and thus was wasting money by purchasing excess puts.

472.    In May of 2008, this over-hedging strategy accounted for approximately $95 million of Sentry's total earnings. (A true and accurate copy of the spreadsheet accompanying Berman's report is attached hereto as Ex. 75.) In a June 13, 2008 email to Vijayvergiya, Berman stated that "there were several unusual transactions" in May 2008 and that "[a]ll of the [options] trades produced excess profits . . . ." (A true and accurate copy of the June 13, 2008 email from Berman to Vijayvergiya is attached hereto as Ex. 76.)

473.    Later that month, in a telephone call with FGG, Berman noted plainly that **even Madoff could not win 100% of the trades**. Berman expressed concern that Madoff might be backdating trade confirmations. He recommended the Defendants require same-day trading tickets, obtain information on the options counterparties, and **verify that BLMIS was actually holding all of the assets purportedly in the Feeder Funds' accounts**. (A true and accurate copy of Berman's notes from the June 25, 2008 call with FGG is attached hereto as Ex. 77.)

474.    However, the Defendants did not take any of Berman's due diligence recommendations—all of which should have been done regularly for years and any one of which would have disclosed the fraud. The Defendants ignored Berman's recommendation.

475.    At another point in time Berman also noticed at least one risky "naked call position," where

BLMIS had sold an S&P 100 call option but did not hold the underlying stock. A naked call position occurs when the seller of the call does not own the shares underlying the call option. In Madoff's SSC Strategy this would occur if he sold a call option for the S&P 100 Index but did not own the basket of stocks correlated to the index. If the index rose, the call would be exercised by the buyer and the Feeder Funds would be exposed to significant losses because they would not have hedged the risk.

476.    Berman brought these activities to Tucker's and Vijayvergiya's attention because they were inconsistent with the SSC Strategy, and, depending on how the market moved, potentially harmful to the Feeder Funds' positions. The real reason the Feeder Funds' statements showed these unusual positions was that during certain down months, it was extremely difficult, even for Madoff, to fabricate trades that could justify his returns. Madoff created fictitious options trades inconsistent with his mandate and trading authority in order to create a consistently positive returns.

477.    This type of options speculation violated the terms of BLMIS's investment agreement with the Feeder Funds, where Madoff agreed to invest all of the Feeder Funds' money pursuant to the SSC Strategy.

478.    Armed with Berman's analysis and recommendations, and even though their own documents showed otherwise, when Noel, Tucker, McKeefry, and Vijayvergiya met with

Madoff in October 2008, they did not question Madoff's responses when he stated the value of the options would never exceed the notional amount of the equities.

479.    The Defendants did not independently or reasonably investigate or follow up on any of these indicia of fraud made known to them by Berman.

**X.    DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF**

480.    For years, the Defendants had overwhelming evidence that Madoff was not a legitimate investment

manager. Instead of performing as fiduciaries and protecting investors from fraud, the Defendants employed a number of ways to raise capital for Madoff, in order to enrich themselves, including, *inter alia,* creating new funds that would then invest a portion of their assets back into Fairfield Sentry; forming GSP to accommodate new investors; working with JPMorgan Chase & Co. ("JPMC"), Natixis, Nomura, BBVA, and many other financial institutions to create leveraged note programs based on Feeder Funds' returns, fully expecting the financial institutions to hedge their exposure by investing directly in Feeder Funds; and finally, when massive redemptions were pushing Madoff to the brink, agreeing to serve as the exclusive marketers for a "new" BLMIS strategy.

**A.    *2006: GS Is Expanded and GSP Is Created***

481.    The Defendants created GS to accommodate U.S. investors that wished to invest their money with BLMIS. By 2006, FGG decided it wanted to further accommodate U.S. investors and on May 1, 2006 created GSP for those investors that did not qualify to invest in GS.

**B.    *2007: Leveraged Note Programs***

482.    More money invested with Madoff translated to more FGG fees and, in 2007, the Defendants expanded aggressively into many types of leveraged products. Madoff's commercial banker, JPMC, for example, structured about $250 million in leveraged notes based on the returns of Fairfield Sentry and Sigma. Others such as Natixis, Nomura, and BBVA did the same.

483.    Purchasers of these notes would be entitled to receive returns based on a multiple of the returns of the underlying Feeder Fund. As an example, in February 2007, JPMC offered a 3x leveraged certificate on Sigma. Individual investors who purchased a note for this product would invest a specific sum (e.g., $100), and would earn returns as if they had actually invested three times that sum (e.g., $300). Each of these products was time restricted. Investors who purchased a note from JPMC in 2007 would not have been able to collect their profits

until the note matured, generally sometime between five and eight years after the initial investment.

484.    The benefit to the Feeder Funds of these note programs was the potential investment from the financial institutions structuring the notes. For instance, if JPMC structured a note on Sigma, and thereby guaranteed returns based on Sigma's performance, JPMC would be expected to hedge that exposure by purchasing shares of Sigma. And that is what happened. The financial institutions invested hundreds of millions of dollars in the Feeder Funds and Sigma, from which the Defendants reaped even greater fees.

C.    *2008: The Emerald Funds*

485.    In late 2008, the Defendants were still working with Madoff to inject additional funds into BLMIS. In November 2008, Madoff contacted the Defendants about setting up new Madoff feeder funds. In a short telephone conversation with Tucker, Madoff stated without much specificity he had a new strategy which would be similar to the SSC Strategy, but would produce higher volatility with higher returns.

486.    Madoff offered this new strategy to the Defendants, who would serve as the exclusive marketer. In order to launch the new strategy, Madoff asked that the Defendants raise $500 million, with $200 million to be raised by the end of 2008. The Defendants agreed.

487.    After nothing more than a brief telephone conversation describing the new strategy and a one-page performance report purporting to show the strategy's simulated *pro forma* performance over the previous year, the Defendants began raising money for the new funds BBHF Emerald and Greenwich Emerald ("the Emerald Funds"). The Defendants tried to raise this capital even though they had not issued a private placement memoranda, offering documents, or other fund documentation, and had not received any details regarding, nor conducted any due diligence on, this new strategy.

488.    On December 10, 2008, Tucker drafted a letter to Madoff outlining the steps FGG was taking to slow withdrawals from BLMIS:

We have taken a number of steps with our other funds in order to put all of our investable capital in Sentry and the new split strike strategy which we call Emerald. While the full results of this strategy will take a few months to take effect, they will include:

- investments in Sentry by existing Fairfield funds (~ $100mm)

- liquidating other Fairfield funds and transferring the assets to Sentry and Emerald (up to ~ $150mm)

- purchases by the firm of Sentry positions from clients rather than having them redeem from Sentry (~ $150mm)

- investments by individual partners of the firm in

Sentry and Emerald (~ $50mm)

We are, as would be expected, aggressively cutting fees for new subscriptions and offering significant fee-sharing incentives to our agents and finders.

(A true and accurate copy of the December 10, 2008 draft letter from Tucker to Madoff is attached hereto as Ex. 78.)

489.    The Defendants and Madoff were partners until the bitter end.

## XI.    THE AFTERMATH

490.    On December 11, 2008, the world's largest Ponzi scheme was uncovered and Madoff was arrested. The Defendants' failure to conduct proper, independent, and reasonable due diligence and follow up on Madoff, and their willful ignorance of information readily available to them for nearly two decades helped facilitate the scheme and allow billions to be lost as a result.

491.    By the time Madoff was arrested, the Management Defendants had only a few million dollars invested with Madoff. Piedrahita had no investments with Madoff, Tucker had approximately $900,000 and Noel had a slight percentage of his wealth, $9 million, invested through Madoff. The Defendants retained every other cent of the fees, partnership distributions, and other monies they unjustly "earned" and had collected over nearly two decades. They have to-date kept millions of dollars of stolen Customer Property.

492.    On December 12, 2008, the day after Madoff's arrest, Tucker faxed withdrawal notices to BLMIS for all of the Feeder Funds' monies. The small fraction of assets left in BLMIS's account was not sufficient to fulfill the redemptions. The result of the FGG Affiliates and Management and Sales Defendants' actions was a precipitous drop in the Net Asset Value ("NAV") of the Feeder Funds. The NAV of the Feeder Funds is defined as the value of their cash, stocks, and options, less any liabilities. When Madoff admitted he had never purchased any stocks or options with the money his customers gave him, the NAV of the Feeder Funds dropped to almost nothing. The Feeder Funds and their investors lost billions. The remaining Defendants, on the other hand, whose fees and profits were based directly on the previous, wrongly calculated NAVs, had already walked away with over a billion dollars.

493.    Shortly after the Madoff scheme collapsed, the Defendants publicly claimed they were innocent and had no reason to suspect anything was amiss at BLMIS. (A true and accurate copy of the December 12, 2008 FGG press release is attached hereto as Ex. 79.) These statements were false.

494.    As alleged support for their claims of innocence, certain Management Defendants proclaimed FGG had created a new feeder fund and funded it with $10 million of personal funds sent to Madoff days before his arrest. However, their statement was not the complete story.

495.    These Management Defendants did not mention the Stable Fund, which was limited to the FGG partners and their spouses. In October 2008, the Stable Fund liquidated and redeemed its remaining $4.4 million in assets out of Fairfield Sentry. On December 8, 2008, the Defendants informed Madoff that it would be forwarding another major redemption. Madoff reacted to this news by suggesting that the Defendants were not a suitable partner for his investment services. When faced with Madoff's threat, through their new Emerald Funds, the Management Defendants put back the $4.4 million they had taken out of BLMIS through the Stable Fund.

496.    After the scheme was revealed, Lipton immediately emailed his personal broker and asked that a

new account be set up in his wife's name, where he transferred all of his municipal bonds and treasury investments. Piedrahita and his wife sold their U.S. residence and moved from country to country after Piedrahita took delivery of a $12 million yacht.

497.    Even after Madoff was arrested, the Defendants continued to lie about the due diligence they purportedly had performed. As late as February 2009, FGG proclaimed that it regularly reviewed DTCC records. (A true and accurate copy of the February 5, 2009 Wall Street Journal article entitled, "Markopolos Testifies Fairfield Knew Little About Madoff," is attached hereto as Ex. 80.) The Defendants' statements were not and could not be true. If any of the Defendants had examined a DTCC record, they would have immediately discovered not a single security had ever been traded on their behalf.

## XII.    "PEOPLE WILL TELL: OH THIS WAS FRAUD, THERE IS NOTHING WE COULD HAVE DONE. BUT THIS , IS SIMPLY NOT TRUE! YOU SHOULD HAVE DONE DUE DILIGENCE!"[7]

498.    There was nothing special about the kind of due diligence that needed to be done to unearth signs that Madoff was possibly a fraud. Many fund managers, due diligence research and consulting firms, consultants, banks, and other industry professionals, with far less access to BLMIS than the Defendants, concluded many years prior to Madoff's arrest that the consistency of his returns was virtually impossible and likely the result of fraud. The FGG Affiliates, Management Defendants, and Sales Defendants knew this too. Because these Defendants were earning millions of dollars year after year based solely on their relationship with Madoff, they knowingly chose to ignore the likelihood of fraud.

[7]    (A true and accurate copy of the December 14, 2008 Salus Alpha Group press release is attached hereto as Ex. 81.)

499.    The claim that no one saw signs that Madoff was a fraud or that the Defendants were not on actual and/or constructive notice of fraud, is false. The Defendants saw the signs and they summarily ignored them.

## A. ~~The Barron's and MAR/Hedge Articles Are Published in 2001~~

~~500. During 2001, two industry analysts published articles that called into question the legitimacy of BLMIS's operations. A May 2001 MAR/Hedge newsletter entitled, "Madoff tops charts; skeptics ask how," reported on Fairfield Sentry's consistent returns stating that experts were bewildered as to how such returns could be achieved so consistently and for so long. The article observed that "others who use or have used the strategy . . . are known to have had nowhere near the same degree of success." (A true and accurate copy of the May 2001 MAR/Hedge article entitled, "Madoff tops charts; skeptics ask how," is attached hereto as Ex. 82.) The MAR/Hedge newsletter is widely read by participants in the fund of funds and hedge fund industry.~~

~~501. Barron's published a similar article on May 7, 2001. The article, entitled "Don't Ask, Don't Tell, Bernie Madoff is so secretive, he even asks investors to keep mum," noted the heavy skepticism on Wall Street surrounding Madoff, as well as the lack of transparency around the BLMIS IA Business as a result of Madoff's unwillingness to answer basic questions about his SSC Strategy. (A true and accurate copy of the May 7, 2001 Barron's article entitled, "Don't Ask, Don't Tell," is attached hereto as Ex. 83.) Noel and Tucker testified in the proceeding brought by the Commonwealth of Massachusetts against certain FGG entities that they read the articles questioning BLMIS's very legitimacy, but were not concerned. Noel testified that the author of the Barron's article had mischaracterized the strategy. He explained, "I mean, anyone who knew what he was doing, like we did, would have said that was not an accurate description, but nothing came of it afterwards." (A true and accurate copy of excerpts from the transcript of Noel's testimony is attached hereto as Ex. 84.) Tucker described the Barron's article as "just irresponsible journalism . . . ." (A true and accurate copy of excerpts from the transcript of Tucker's testimony is attached hereto as Ex. 85.)~~

~~502. Despite having responsibility for billions under management in their Feeder Funds, the Defendants performed no meaningful, independent inquiry or due diligence in response to the dramatic assertions made in these articles. The Defendants did not call the authors to better understand the red flags being raised. The~~

Defendants did not speak to other institutions. The Defendants did nothing to see if there were OTC counterparties. Instead, the Defendants sent a newsletter to the Feeder Funds' investors claiming the articles were wrong. *(See* Ex. 40.)

503.    The Defendants simply went about their business of aggressively touting, marketing, and effectively co-opting Madoff's "fool-proof" strategy as their own. The reason was simple—without Madoff, the Defendants would not continue to reap the hundreds of millions paid to them as Madoff's *de facto* partners. The Defendants consistently did whatever they felt they needed to in order to keep their lucrative relationship with Madoff.

504.    The Defendants marketed the Feeder Funds in the face of investor skepticism. For instance, after reviewing Fairfield Sentry's performance information, one analyst warned a potential Fairfield Sentry investor: "along with many other investment professionals in business, we are skeptical regarding the source and repeatability of [Fairfield Sentry's] returns . . . Therefore, by definition, we have no quantitative or qualitative rationale for believing in the persistence of this strategy." The Defendants became aware of the analyst's assessment when it was forwarded to them. (A true and accurate copy of the May 23, 2005 email to Vijayvergiya is attached hereto as Ex. 86.)

505.    FGG internally joked about red flags suggesting Madoff was a fraud. Years after the Barron's article questioned both Fairfield Sentry's and Madoff's legitimacy, FGG's Yanko della Schiava responded to an investor's inquiries by stating that the investor was "probably a reader of Barrons!" (A true and accurate copy of the September 24, 2003 email from della Schiava is attached hereto as Ex. 87.)

**B.** *Tightening Industry Standards*

506.    During the late 1990s and early 2000s, hedge fund frauds and other financial scandals like Barings, Daiwa, Allied Irish Bank, Lipper, Manhattan Investment Fund, and Bayou, confirmed the recognized need for

initial and ongoing reviews of operational risk factors among investment managers. Reasonable investment professionals knew and market events drove home the fact that a high proportion of hedge fund failures resulted from operational problems.

507.    By 2002, according to a well-known industry report, approximately 50% of all hedge fund failures resulted in full or in part from poor operational controls, and 91% of these failures had one or more of the following problems in common:

- Misappropriation of funds and outright fraud by investment managers who knowingly took money for personal use or to cover trading or other losses;

- Misrepresentation of investments through false account reports, valuations and other misleading information;

- Unauthorized trading by making investments outside of stated portfolio strategies; and

- Infrastructure insufficiency and inadequate technology or personnel that are not able to accommodate or handle the types of investments and supporting activities engaged in by the investment manager.

(A true and accurate copy of the March 2003 article entitled, "Understanding and Mitigating Operational Risk in Hedge Fund Investments," is attached hereto as Ex. 88.)

508.    Additional industry articles, "Valuation issues and operational risk in hedge funds" (a true and accurate copy of the 2004 article is attached hereto as Ex. 89), and "Hedge fund operational risk: meeting the demand for higher transparency and best practice" (a true and accurate copy of the 2006 article is attached hereto as Ex. 90), stressed important due diligence standards and processes. Key operational standards included: (i) robust internal controls and procedures over each stage of the trading cycle; (ii) adequate segregation of duties between those who are responsible for trading and those who are responsible for recording trade activities; and (iii) segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals. Independent checks and balances throughout the trading cycle, the movement of cash, and the custody process

were all seen as critical areas of inquiry for those performing independent and reasonable due diligence on investment managers.

509.    FGG and the Defendants failed to adhere to these due diligence standards, or virtually any other sound industry practices, when it came to the due diligence and follow up it was required to perform on BLMIS. When it came to Madoff, the FGG Individuals simply made up their own, self-serving rules in order to maintain FGG's preferred status and its hundreds of millions of dollars in fees.

### C.    It Was All Over the Street: Madoff Was Suspected of Being a Fraud

510.    The Barron's and Mar/HEDGE articles were based on publicly available information and their authors were not outliers. They were among a large group of industry experts who reviewed public information about the SSC Strategy, saw that it did not make any sense, and then advised their clients to keep their money far away from BLMIS, and far away from funds like the Feeder Funds. For many years – well before Madoff was arrested – many industry professionals spotted the likelihood of fraud.

511.    Edward Thorp, "the grandfather of quantitative analysis," concluded over the course of a single day, as far back as 1991, Madoff's claimed returns were nearly impossible, and he was likely a fraud. All Thorp needed to do was check the number of listed options in the account of one BLMIS customer against the number of the same options traded on the CBOE.

512.    Later, in 2001, in response to the MAR/Hedge and Barron's articles, Thorp wrote to a fund manager friend expressing serious concerns about Madoff, and about his friend's fund being invested in BLMIS:

> Just read the Barron's article. All it does is reinforce my previous suspicions. Do you have access to the "actual" trades done in any one account? If so, can you establish that they could be real? That means checking to see if they are reported on a timely basis, rather than substantially delayed, that they are on listed options, that those options could have traded at

those prices and in the volumes reported on the exchanges where the confirms said the trades occurred, and ditto with the stocks.

What if you scale up your representative account to 7bn$. Could the volume of imputed trading in the options markets, in the "universe" traded, actually have been done?

Hope you don't have a major position, or that you are trading

on "profits".

(A true and accurate copy of the May 11, 2001 email from Thorp is attached hereto as Ex. 91 (emphasis added).)

513.    Thorp laid out simple, independent, and reasonable due diligence queries that the Defendants could have, and should have, undertaken. The Defendants did no such due diligence, asked no such questions, and instead defended Madoff.

514.    As early as 1998, Cambridge Associates recommended that clients stay away from Madoff and Madoff-related feeders due to lack of transparency, a fear of front-running the market, and a general inability to understand how the strategy could produce cash-like, bond-like consistency of returns, in an equity strategy. In 2004, Cambridge was more pointed in its discomfort, stating: "**it 'felt illegal' and that Madoff gave no transparency,**" suggesting that "**[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull over.**" (A true and accurate copy of the redacted public version of the November 11, 2004 Cambridge Associates internal email is attached hereto as Ex. 92 (emphasis added).)

515.    In 2003, a team from Société Génerale's investment bank was sent to New York to perform due diligence on BLMIS. What Société Génerale discovered was that BLMIS's numbers simply "did not add up." Madoff explained to the Société Génerale team how his investment strategy worked, but when the team tested the strategy, they could not match Madoff's returns. Another red flag made the due diligence team anxious – Madoff's brother, Peter, was serving as chief compliance officer of BLMIS. Société Génerale immediately forbade its investment bank from doing business with BLMIS and discouraged its private banking clients from investing with

Madoff. After uncovering obvious red flags during its due diligence visit,

Société Génerale blacklisted Madoff. (A true and accurate copy of the December 17, 2008 New York Times article entitled, "European Banks Tally Losses Linked to Fraud," is attached hereto as Ex. 93.)

516.    Shortly after Madoff's arrest, Robert Rosenkranz of Acorn Partners, a fund of funds, and an investment adviser to high net worth individuals, reflected in email that Acorn had done due diligence on Madoff and concluded "that fraudulent activity was highly likely." (A true and accurate copy of the December 15, 2008 email from Rosenkranz is attached hereto as Ex. 94.)

517.    Acorn succinctly described the indicia of fraud that led it to conclude years prior that Madoff was a fraud.

> We had considered investing in a Madoff managed account, and decided to pass for reasons that give a useful insight into our due diligence process.
>
> First, we ascertained that the description of the strategy (purchase of large cap stocks versus sale of out of the money calls) appeared to be inconsistent with the pattern of returns in the track record, which showed no monthly losses.
>
> Second, we persuaded a Madoff investor to share with us several months of his account statements with Madoff. These revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve. Moreover, the trading volumes reflected in the account (projected to reflect his account's share [of] Madoff's purported assets under management at the time) were vastly in excess of actually reported trading volumes.
>
> Third, we noted that Madoff operated through managed accounts, rather than by setting up a hedge fund of his own. That was suspicious inasmuch as hedge fund fees are typically much higher than the brokerage commissions Madoff was meant to be charging. We suspected the requirement for annual hedge fund audits was the reason he wanted to avoid that approach. We knew that when his clients are audited, their auditors simply look at the account statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.
>
> Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts.

**Taken together, these were not merely warning lights, but a smoking gun.** The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.

(A true and accurate copy of the December 12, 2008 email from Acorn to its investors is attached hereto as Ex. 95 (emphasis added).)

518.    All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known or should have been known by the Defendants. The Defendants did not conduct the type of due diligence performed by Acorn. In fact they conducted no reasonable or independent due diligence at all, even when on both actual and inquiry notice of possible fraud.

519.    Media reports following Madoff's arrest, as well as emails between FGG employees, indicate that in 2004, Mr. Oswald Gruebel, formerly of Credit Suisse and now of UBS, felt uncomfortable with Madoff and Fairfield Sentry after a meeting between FGG personnel and Credit Suisse representatives. (A true and accurate copy of the February 25, 2004 email from Noel to Piedrahita, Tucker, Toub and Landsberger is attached hereto as Ex. 96.) During that meeting, Mr. Gruebel raised serious concerns about Madoff's obscure auditor who had only one client, BLMIS, and the fact that BLMIS was the self-custodian of its investment clients, such as the Feeder Funds. After Madoff refused to provide answers to such basic questions as to how much money he was managing in the SSC Strategy or further, who worked with him to implement the strategy, Gruebel quickly urged customers to withdraw their funds from BLMIS and redeem their shares from feeder funds, like the FGG funds. (A true and accurate copy of the January 7, 2009 Bloomberg article entitled, "Credit Suisse Urged Clients to Dump Madoff Funds," is attached hereto as Ex. 97.)

520.    In 2005, ML continued its long-standing policy of not investing in Fairfield Sentry or any other Madoff feeder fund. ML identified major red flags associated with Fairfield Sentry and stated conclusively that "the prime broker [Madoff] was an affiliate of the company, the custodian wasn't independent," published articles stated the fund's "affiliated broker was subsidizing the fund," and "[t]he fund manager refuses to meet potential clients." (A true and accurate copy of the June 15, 2005 internal ML email is attached hereto as Ex. 98.) A year later, ML once again expressed its discomfort with Madoff and Fairfield Sentry stating, "Madoff is known for keeping the source of his returns a secret. This caused a lot of speculation on Wall Street about the true sources of the admittedly impressive returns." ML also commented internally that "Fairfield is a fund that is unusually opaque to its investors and doesn't accept detailed due diligence which automatically disqualif[ies] it. . . ." (A true and accurate copy of the December 2006 internal ML emails is attached hereto as Ex. 99.) ML emphasized that they were not the only company refusing to get involved with Fairfield Sentry or other Madoff feeder funds. Most of their competitors had taken similar positions. (A true and accurate copy of the February 6, 2008 internal ML email is attached hereto as Ex. 100.)

521.    In 2007, Aksia, LLC, an independent hedge fund research and advisory firm, advised clients against investing with BLMIS, Madoff, or any of his feeder funds. (A true and accurate copy of Aksia's 2007 report is attached hereto as Ex. 101.) Jim Vos, Chief Operating Officer and head of research at Aksia, concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing. (A true and accurate copy of the December 11, 2008 letter from Vos to his clients and friends is attached hereto as Ex. 102.) Aksia also spoke with Mr. Michael Ocrant (the author of the 2001 MAR/Hedge article), who reaffirmed that Madoff was "definitely a Ponzi," is as "bogus as a three dollar bill," and that "[i]t's rather easy to come out looking good when you're a Ponzi." (A true and accurate copy of the August 14, 2007 email from Ocrant to Vos is attached hereto as Ex. 103.)

522.    Aksia made the simple effort as part of its due diligence to do a background check on BLMIS's

auditor, as well as having Friehling's office physically inspected. What was discovered was a simple, closed office in a strip mall with what appeared to be a conference room, secretary space, and two offices. Friehling's office neighbors told Aksia's investigator the office did not have regular hours. (A true and accurate copy of the August 23, 2007 email to Vos is attached hereto as Ex. 104.)

523.    In a post-Madoff arrest letter to clients Aksia summarized why its due diligence led it to not recommend Madoff feeders:

> [T]here were a host of red flags, which taken together made us concerned about the safety of client assets should they invest in these feeders. Consequently, every time we were asked by clients, we waved them away from the Madoff feeder funds.
>
> **As a research firm we are forced to make difficult judgments about the hedge funds we evaluate for clients. This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.** Some of these red flags were as follows:

- It seemed implausible that the S&P100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

- The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz . . . After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

- There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

- Conversations with former employees indicated a high degree of secrecy surrounding the trading

of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

• Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

*(See* Ex. 102 (emphasis added).)

524.   In 2007, David Giampaolo, the chief executive of Pi Capital, a moneymanagement firm based in the United Kingdom, met with Piedrahita and other potential investors in London to discuss an FGG Madoff-related fund. During this meeting, Piedrahita stressed the "longevity and the consistency" of the fund's returns, but was unable to give substantive details regarding the strategy of the fund. When questions arose regarding how the fund generated its performance, Giampaolo recalls "there was no deep scientific or intellectual response" from Piedrahita. (A true and accurate copy of the December 19, 2008 email summarizing the meeting is attached hereto as Ex. 105.)

525.   In 2007, Neil Chelo, a portfolio manager at Benchmark Plus Partners, a hedge fund with its headquarters in Washington State, conducted due diligence on FGG. Chelo and Vijayvergiya had a 45-minute conference call. During this call, Chelo asked Vijayvergiya a list of due diligence questions and concluded that FGG "was **not asking any of [the] questions one would expect of a firm purporting to conduct due diligence.**" (A true and accurate copy of the February 4, 2009 summary of the call is attached hereto as Ex. 106 (emphasis added).) Specifically, Chelo asked multiple risk management questions that Vijayvergiya was unable to answer in a satisfactory manner.

526.   London due diligence firm Albourne Partners ("Albourne") stated publicly that it had long-standing concerns about Madoff's investment strategy and consistent returns, and had been urging clients for a decade to avoid Madoff-related funds. (A true and accurate copy of the December 31, 2008 Bloomberg Businessweek article entitled, "The Madoff Case Could Reel in Former Investors," is attached hereto as Ex. 107.)

Albourne emphasized that the consistency of Madoff's returns was "too good to be true," Madoff refused to meet with investors, and Madoff charged no management or performance fees for his services, resulting in his leaving hundreds of millions of dollars of money on the table each year. (A true and accurate copy of the December 15, 2008 Albourne press release entitled, "Albourne on Madoff," is attached hereto as Ex. 108.) Like others, Albourne flagged as possible fraud the fact that Madoff required that his investors never reveal to anyone that they invested with him. (*See* Ex. 83.)

527.    The above are some of the many illustrations showing that "the street" fully and openly suspected Madoff was a fraud. These Defendants - who represented nearly half of Madoff's billions of dollars of reported assets under management - chose to ignore these well- recognized suspicions.

## XIII.    THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE

528.    For years the Defendants looked away when faced with repeated signs that Madoff's operations and performance could not be legitimate. The reason was simple: greed.

529.    The Defendants had an extraordinary and lucrative financial arrangement with BLMIS. Their sole job was to sell a fund that had returns that were so consistently positive, they were seemingly impossible. In exchange for selling Madoff's strategy, the Defendants received in the aggregate over a billion dollars in fees. The Defendants in their role as fiduciaries had no desire to perform their duties based on known information because if they did, they knew it could and would result in an abrupt end to this lucrative financial relationship.

530.    The Defendants also knew that without Madoff they could not survive. The funds the Defendants tried to create without Madoff's assistance, making their own choices about which investment managers to place money, were all failures.

531.    The Defendants repeatedly lied about why Madoff would personally leave hundreds of millions of dollars in management and performance fees for FGG Affiliates and Individual Defendants. Hedge funds

typically collect management fees of approximately 1% of assets under management and performance fees of 20%.

532.   Unlike virtually everyone in the money-management world, Madoff charged *no fees* for his investment management services. Madoff sometimes explained his decision not charge fees by stating they he was "perfectly happy to just earn commissions." In reality, Madoff was happy to forgo typical performance and management fees, and only earn commissions, as long as his investors remained mum about the source of their inflated returns. And hedge funds like the Defendant Feeder Funds kept procuring billions of dollars to prolong and prop up the Ponzi scheme so they could continue to reap their enormous fees.

533.   A number of professional investors noticed Madoff's failure to charge fees, in addition to the multitude of other red flags, and made the decision to invest their money elsewhere. (A true and accurate copy of excerpts from the August 2009 SEC Office of Inspector General's report on Madoff is attached hereto as Ex. 109.) Madoff's decision to not collect traditional investment manager's fees should have raised red flags with FGG given the sheer amount of money that Madoff was foregoing. Madoff could easily have earned an additional $200 to $400 million plus in annualized management and performance fees. Investment professionals reasonably concluded that a fee structure where the true investment manager voluntarily chose to pass on massive amount of fees was a major red flag of fraud. Defendants knew that the very compensation structure from their relationship with Madoff, which permitted them to be so unjustly enriched, was itself a massive sign of fraud.

534.   The Defendants were not victims. They were enablers. They were facilitators. They deepened the pain of Madoff's customers and their own investors. The effect of their actions was a catastrophic continuation of the Ponzi scheme, the worsening of the BLMIS insolvency, and billions of dollars in additional damages. They cannot be allowed to keep the many hundreds of millions of dollars in stolen Customer Property they received from BLMIS

**Out-of-Range Trades**

307.    In connection with its BLMIS investments, FGG received and reviewed BLMIS account statements that showcased trading anomalies, including out-of-range trades. From February 1998 until November 2008, BLMIS purported to make 358 equity trades outside of the daily price range between the Fairfield Sentry and Greenwich Sentry accounts.

308.    By 2005, FGG's knowledge that BLMIS purported to buy equities below their reported daily low and sell them above their reported daily high was confirmed by analyses conducted by Prime Buchholz & Associates, a prominent investment consultant that managed approximately $20 billion in client assets.

309.    In May 2005, an FGG sales agent forwarded Vijayvergiya the Prime Buchholz analysis they "talked about," attaching a report analyzing BLMIS trades purportedly placed on April 6, 2004. This analysis was based on an April 2004 BLMIS customer statement and compared BLMIS's purported pricing for equities to the daily high, low, and closing prices reported by various sources.

310. Prime Buchholz noted that "in 27 out of 38 trades placed on April 6, 2004, Madoff Securities posted purchases below the reported lowest price available on the exchange that day. In 3 of the noted 27 trades, the difference in price exceeded $1." Knowing this, Prime Buchholz concluded that because BLMIS would "not allow clients to custody their holdings with outside firms," they could not "verify transactions and actual prices received."

311.    According to a 2013 interview with Prime Buchholz's founder and principal consultant, Prime Buchholz "couldn't figure out how [Madoff] made his money." Prime Buchholz explained that "[i]f we can't figure it out, then we can't recommend it to our clients." Prime Buchholz's due diligence included a two-hour meeting in New York with Tucker, and a follow-up meeting with FGG.

312.    But unlike Prime Buchholz, Vijayvergiya simply discounted BLMIS's inexplicable pricing, writing to a co-worker, "feel free to file this under 'completely useless'.. He did so despite having a number of similar, unanswered questions.

313.    Finally, in 2008, and despite Madoff's displeasure with the mounting redemptions, Vijayvergiya also tried to "submit a redemption order to liquidate my entire holdings in Fairfield Sentry Limited." Vijayvergiya did not liquidate any of his other investments but only wanted to sell Fairfield Sentry.

## XIV.   THE TRANSFERS

### A. *Transfers from BLMIS to the Feeder Funds* A. Initial Transfers from BLMIS to the Fairfield Funds

535.   Prior to the Filing Date, the Feeder Funds invested approximately $4.7 billion with BLMIS through over 300 separate transfers via check and wire directly into the 703 Account.

314.    The Bankruptcy Court has entered Consent Judgments in favor of the Trustee on his claims against Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners (together, "Fairfield Funds"). The Bankruptcy Court granted judgments for the Trustee in the amount of $3,054,000,000 as to Fairfield Sentry, $206,038,654 as to Greenwich Sentry, and $5,985,000 as to Greenwich Sentry Partners.

536.315.    During the six years preceding the Filing Date, BLMIS made transfers to the FeederFairfield Funds in the collective amount of approximately $3.2 billion$3,107,023,654 (the "Six Year Initial Transfers"). The Six Year Initial Transfers included transfers of approximately $3.0 billion$2,895,000,000 to Fairfield Sentry (the "Fairfield Six Year Initial Transfers"), $206.0 million to GS, and $6.0 million to GSP206,038,654 to Greenwich Sentry, and $5,985,000 to Greenwich Sentry Partners (collectively, the "Greenwich Six Year Initial Transfers"). (See Exs. 2, 5, 7.) The Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78ZZZ(4) and

are subject to turnover to the Trustee pursuant to SIPA § 78fff-2(c)(3) and section 542 of the Bankruptcy Code. The Six Year Initial Transfers are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA §78fff-2(c)(3), and sections 273-279 of New York Debtor and Creditor Law.537.    The Six Year Initial Transfers include approximately $1.7 billion BLMIS transferred to the Feeder Funds during the two years preceding the Filing Date, (the "Two Year Initial Transfers"). The Two Year Initial Transfers included transfers of approximately $1.6 billion to Fairfield Sentry (the "Fairfield Two Year Initial Transfers"), $81.7 million to GS, and $5.4 million to GSP (collectively, the "Greenwich Two Year Initial Transfers"). *(See* Exs. 2, 5, 7.Exhibits 2-4.)* The TwoSix Year Initial Transfers were and continue to be Customer Propertycustomer property within the meaning of SIPA § 78ZZZ(4) and are subject to turnover to the Trustee pursuant to SIPA §78fff- 2(c)(3) and section 542 of the Bankruptcy Code. The Two///(4). Each of the Six Year Initial Transfers areis avoidable and recoverable under sections 548(a)(1), 550, and 551 of the Bankruptcy Codeunder section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, including 279-a, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).538.    The Fairfield Funds received the Six Year Initial Transfers and Twowith knowledge of fraud at BLMIS.

316. The Six Year Initial Transfers include $1.2 billion1,667,125,000 BLMIS transferred to the FeederFairfield Funds during the 90 daystwo years preceding the Filing Date (the "Preference PeriodTwo Year Initial Transfers"). The Preference PeriodTwo Year Initial Transfers included transfers of approximately $1.1 billion$1,580,000,000 to Fairfield Sentry (theThe "Fairfield Preference PeriodTwo Year Initial Transfers"), $81,700,000 to Greenwich Sentry, and $23.0 million to GS (5,425,000 to Greenwich Sentry Partners (collectively, the "Greenwich Preference Period Transfers"). (See Exs. 2, 5.) The Preference Period Initial Transfers were and are Customer Property subject to turnover to the Trustee pursuant to SIPA §78fff-2(c)(3) and Section 542 of the Bankruptcy Code. The Preference PeriodTwo

Year Initial Transfers"). (See Exhibits 2-4.) Each of the Two Year Initial Transfers areis avoidable and recoverable under sections 547, 550(a)(1), and 551section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff- 2(c)(3). The Fairfield Funds received the Two Year Initial Transfers with knowledge of fraud at BLMIS, or, at a minimum, with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

539.   The Trustee has filed this action against the Feeder Funds to avoid and recover the Initial Transfers and/or seek the turnover of Customer Property to the Trustee.

540.   The Trustee may recover the transfers to GS and GSP from all entities and individuals that served as general partner at the time the transfers were made. GS's and GSP's April, 2006 partnership agreements provide that the general partner "shall have unlimited liability for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year during which they are or were General Partners of the Partnership." (True and accurate copies of GS's and GSP's Partnership Agreements are attached hereto as Exs. 110, 111.) Upon information and belief, prior and preceding limited partnership agreements of GS and GSP contained similar provisions regarding the liability of the general partner.

541.

317. Both GSGreenwich Sentry and GSPGreenwich Sentry Partners were formed as limited partnerships under the laws of the State of Delaware. The entities and individuals that served as general partner are also liable under the Delaware Code provisions governing limited partnerships. Under Delaware law,Under Delaware Code, Title 6, the entities that served as general partners offor the Greenwich Sentry and Greenwich Sentry Partners limited partnerships have the same liability as partners in general partnerships. Del. Code Ann. tit. 6, § 17-403(b). Partners in general partnerships are "liable

and are jointly and severally liable for all obligations of the partnership." Del. Code Ann. tit. 6, § 15-306(a).

542.   Noel and Tucker served as general partners of GS from 1990 to 1998, FGL served as general partner from 1998 to 2003, FGB served as general partner from 2003 to 2004, and then again from 2006 to the present, and GBL served as general partner from 2004 to 2006. FGB has served as GSP's general partner since its inception in 2006.

partnerships, including the liability for the avoidable transfers received by Greenwich Sentry and Greenwich Sentry Partners at the time the entities were serving as general partners. In addition, Greenwich Sentry's and Greenwich Sentry Partners' partnership agreements provided that general partners would have unlimited liability for the repayment and discharge of all debts and obligations of their respective limited partnerships.

318. FG Limited served as general partner for Greenwich Sentry from 1999 to June 2003. FG Bermuda served as general partner for Greenwich Sentry from July 1, 2003 to December 31, 2004 and from January 1, 2006 until November 19, 2010, when Greenwich Sentry filed for protection under Chapter 11 of the Bankruptcy Code. FG Bermuda served as general partner for Greenwich Sentry Partners from its inception in 2006 until November 19, 2010, when Greenwich Sentry Partners filed for protection under Chapter 11 of the Bankruptcy Code.

**B.** *Transfers from the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants* **Subsequent Transfers from the Fairfield Funds to the Defendants**

319. Hundreds of millions of dollars initially transferred from BLMIS to Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners was subsequently transferred, directly or indirectly, to Defendants FIFL, Stable Fund, FG Limited, FG Bermuda, FG Advisors, Fairfield International Managers, FG Capital, Share Management, Noel, Tucker, Piedrahita, Vijayvergiya, Toub, and Corina Noel Piedrahita. (*See* Exhibits 5-23.)

320.    Fairfield Sentry had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following entities and individuals is imputed to Fairfield Sentry: Fairfield International Managers (investment manager from November 1990 to December 31, 1997); FG Limited (investment manager from December 31, 1997 to July 1, 2003; placement agent from July 1, 2003); FG Bermuda (investment manager from July 1, 2003); Noel (founder and director); Tucker (founder).

321.    Greenwich Sentry and Greenwich Sentry Partners had actual knowledge of the fraud at BLMIS or, at a minimum, were willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following entities and individuals is imputed to Greenwich Sentry: Noel (general partner from 1992 to 1998); Tucker (general partner from 1992 to 1998); FG Limited (general partner from 2002 to 2003); FG Bermuda (investment manager from 2003 to 2004 and 2006 to 2008, and special limited partner from 2005 to 2006); and FG Advisors (administrative services). The knowledge of the following entities is imputed to Greenwich Sentry Partners: FG Bermuda (general partner from 2006 to 2008); and FG Advisors (administrative services).

322.    FIFL had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following entities and individuals is imputed to FIFL: FG Advisors (investment manager); FG Limited (placement agent); Noel (director); Tucker (director).

323.    Stable Fund had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of Tucker (managing member) and FG Advisors (investment manager) is imputed to Stable Fund.

324.    FG Limited had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following entities and individuals is imputed to FG Limited: Tucker (director, principal); McKeefry (executive

director, chief operating officer, vice president); Toub (director); Smith (director); and Fairfield International Managers (majority shareholder).

325.    FG Bermuda had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to FG Bermuda: Noel (director); Tucker (director); Piedrahita (director, chief executive officer); McKeefry (chief legal officer, assistant secretary, director); Lipton (chief financial officer, assistant secretary); McKenzie (controller); Blum (chief operating officer); Smith (director, chief investment officer); and Vijayvergiya (chief risk officer, director).

326.    FG Advisors had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to FG Advisors: McKeefry (president); Lipton (vice president, chief financial officer); Blum (chief operating officer); and Bowes (managing partner), as well Tucker and Noel, which FG Advisors' Form ADV identified as control persons of FG Advisors.

327.    Fairfield International Managers had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to Fairfield International Managers: Noel (50% owner); and Tucker (50% owner).

328.    FG Capital had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to FG Capital: Noel (50% owner); and Tucker (50% owner).

329.    Share Management had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of Corina Noel Piedrahita is imputed to Share Management.

330.    Each of the subsequent transfers from the Fairfield Funds was received by the Defendants at a time when they had actual knowledge of the fraud at BLMIS or, at a minimum, were willfully blind to circumstances suggesting a high probability of fraud at BLMIS.[1]

543.    Much of the money transferred from BLMIS to the Feeder Funds was subsequently transferred by the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants. These payments from the Feeder Funds constitute subsequent transfers of the Initial Transfers from BLMIS to the Feeder Funds. Because the FGG Affiliates, Management Defendants, and Sales331.

    Because the Defendants did not take the fundssubsequent transfers in good faith orand without knowledge of the voidability of the initial transfers, all transfers from BLMIS to the FeederFairfield Funds, which the Feeder Fundsthey subsequently transferred, either directly or indirectly, to the FGG Affiliates, Management Defendants, and Sales Defendants (the "Subsequent Transfers"), were and remain Customer Property subject to turnover to the Trustee and/orcustomer property and are avoidable and recoverable by the Trustee under section 550(a) of the Bankruptcy Code.

544.    The portion of the Six Year Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates and FGG Individuals will be referred to as the "Six Year Subsequent Transfers."

545.    The portion of the Two Year Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates, Management Defendants, and Sales Defendants will be referred to as the "Two Year Subsequent Transfers."

546.    The portion of the Preference Period Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates, Management Defendants, and Sales Defendants will be referred to as the "Preference Period Subsequent Transfers."

332.    Based on the Trustee's investigation to date, the recoverable transfers include the immediate or mediate transfers to: FIFL (Exhibit 10); Stable Fund (Exhibit 11), FG Limited (Exhibit 12), FG Bermuda (Exhibit 13), FG Advisors (Exhibit 14), Fairfield International Managers (Exhibit 15), FG Capital (Exhibit 16), Share Management (Exhibit 17), Noel (Exhibit

---

[1] The Trustee reserves all rights to appeal the measure and burden of proof imposed on the Trustee in connection with his avoidance and recovery claims under sections 544(b), 547, 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of the N.Y.D.C.L.

18), Tucker (Exhibit 19), Piedrahita (Exhibit 20), Vijayvergiya (Exhibit 21), Toub (Exhibit 22), and

Corina Noel Piedrahita (Exhibit 23) (collectively, the "Subsequent Transfers").

333.    The chart below summarizes the Subsequent Transfers.

| DEFENDANT | EXHIBIT | SIX YEAR TRANSFERS | TWO YEAR TRANSFERS |
|---|---|---|---|
| FIFL | 10 | $339,733,216 | $84,748,727 |
| Stable Fund | 11 | $14,848,335 | $8,483,335 |
| FG Limited | 12 | $613,046,742 | $293,422,004 |
| FG Bermuda | 13 | $675,462,817 | $295,805,210 |
| FG Advisors | 14 | $165,947,267 | $93,733,319 |
| Fairfield International Managers | 15 | $293,935,681 | $99,898,321 |
| FG Capital | 16 | $2,963,730 | $91,863 |
| Share Management | 17 | $3,321,151 | $2,547,891 |
| Walter Noel | 18 | $12,964,286 | $8,015,421 |
| Jeffrey Tucker | 19 | $2,500,000 | $2,500,000 |
| Andrés Piedrahita | 20 | $163,144,472 | $59,103,511 |
| Amit Vijayvergiya | 21 | $7,083,760 | $6,026,353 |
| Philip Toub | 22 | $32,631,707 | $16,930,200 |
| Corina Noel Piedrahita | 23 | $6,323,496 | $2,787,962 |

**CAUSES OF ACTION**

547.334.    To the extent that any of the following recovery counts may bemaybe inconsistent

with each other, they are to be treated as being pledpleaded in the alternative.

548.335.    The Trustee's's discovery and investigation is on-goingongoing, and the Trustee

reserves the right to: (i) supplement the information on the Initial Transfers, Subsequent Transfersinitial

transfers, the subsequent transfers, and any additional transfers,; and (ii) seek recovery of such additional

transfers.

**COUNT ONE:** ~~TURNOVER AND ACCOUNTING - 11 U.S.C. § 542~~
**RECOVERY OF FIFL SUBSEQUENT TRANSFERS**
**UNDER 11 U.S.C. §§ 105(a) AND 550(a)**

*Against ~~All the Defendants~~FIFL*

~~549.~~336.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~550.    The Initial Transfers and the Subsequent Transfers constitute Customer Property of the estate to be recovered and administered by the Trustee pursuant to sections 541 and 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) and § 78lll(4).~~

~~551.    The Trustee has filed a case on behalf of BLMIS's estate.~~

~~552.    As recipients of the Initial Transfers and the Subsequent Transfers, the Defendants are in possession, custody or control of property the Trustee may use, sell, or lease under section 363 of the Bankruptcy Code, or that BLMIS may exempt under section 522 of the Bankruptcy Code.~~

~~553.    The Defendants are not custodians of the Initial Transfers or the Subsequent Transfers.~~

~~554.    The Initial Transfers and the Subsequent Transfers are not of inconsequential value or benefit to the estate.~~

~~555.~~

337.    FIFL is an immediate or mediate transferee of the Subsequent Transfers totaling $339,733,216 ("FIFL Subsequent Transfers").

338.    Each of the FIFL Subsequent Transfers was received by FIFL when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

339.    As a result of the foregoing, pursuant to ~~section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to the immediate payment and turnover from the Defendants of any and all Initial Transfers and Subsequent Transfers made, directly or indirectly, to the Defendants.~~

~~556.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is also entitled to an accounting of any and all Initial Transfers and Subsequent Transfers made, directly or indirectly, to the Defendants.~~ sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the FIFL Subsequent Transfers, or the value thereof, from FIFL for the benefit of the BLMIS estate; (b) directing FIFL, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FIFL Subsequent Transfers; (c) imposing a constructive trust over the FIFL Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT TWO:** ~~**PREFERENTIAL**~~
**RECOVERY OF STABLE FUND SUBSEQUENT TRANSFERS** ~~**(INITIAL TRANSFEREE)**~~
**UNDER** 11 U.S.C. ~~**547(b), 550**~~ **§§ 105**(a)~~**(1),**~~ **AND** ~~**551**~~**550(a)**

*Against* ~~*the Feeder Funds*~~ *Stable Fund*

~~557.~~340.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~558.    At the time of each of the Preference Period Initial Transfers, the Feeder Funds were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).~~

~~559.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).~~

~~560.    Each of the Preference Period Initial Transfers was to or for the benefit of the Feeder Funds.~~

561.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

562.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

563.    Each of the Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

564.    Each of the Preference Period Initial Transfers enabled Fairfield Sentry, GS, and/or GSP to receive more than each of the Feeder Funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

565.    Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Feeder Funds as initial transferees or the entities for whose benefit such transfers were made pursuant to section 550(a)(1) of the Bankruptcy Code.

341.    Stable Fund is an immediate or mediate transferee of the Subsequent Transfers totaling $14,848,335 ("Stable Fund Subsequent Transfers").

342.    Each of the Stable Fund Subsequent Transfers was received by Stable Fund when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

566.343.    As a result of the foregoing, pursuant to sections 547(b),105(a) and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside, and (c)

recovering the Preference Period Initial recovering the Stable Fund Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) imposing a constructive trust over the Stable Fund Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

### COUNT THREE: PREFERENTIAL RECOVERY OF FG LIMITED SUBSEQUENT TRANSFERS (INITIAL TRANSFEREE) UNDER 11 U.S.C. §§ 547(b), 550 105(a)(1), AND 551 550(a)

*Against FGB FG Limited*

567. 344.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

568.    At the time of each of the Greenwich Preference Period Initial Transfers, GS was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

569.    Each of the Greenwich Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

570.    Each of the Greenwich Preference Period Initial Transfers was to or for the benefit of GS.

571.    Each of the Greenwich Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

572.    Each of the Greenwich Preference Period Initial Transfers was made while BLMIS was insolvent.

573.   ~~Each of the Greenwich Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.~~

574.   ~~Each of the Greenwich Preference Period Initial Transfers enabled GS to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) GS received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.~~

575.   ~~Each of the Greenwich Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from GS as a direct transferee pursuant to section 550(a)(1) of the Bankruptcy Code.~~

576.   ~~FGB served as general partner to GS during the Preference Period. As general partner to GS, FGB is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations GS incurred while FGB was serving as general partner.~~

577.   ~~FGB did not take the Preference Period Initial Transfers for value, in good faith, or without knowledge of the voidability of the Preference Period Initial Transfers.~~

345.   FG Limited is an immediate or mediate transferee of the Subsequent Transfers totaling $613,046,742 ("FG Limited Subsequent Transfers").

346.   Each of the FG Limited Subsequent Transfers was received by FG Limited when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

~~578.~~347.   As a result of the foregoing, pursuant to sections ~~547(b),~~105(a) and 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3)~~, and sections 15-306(a) and 17-403(b) of the Delaware Code~~, the Trustee is entitled to a judgment: (a) ~~avoiding and preserving the Greenwich~~

Preference Period Initial Transfers, (b) directing that the Greenwich Preference Period Initial Transfers be set aside, and (c) recovering the Greenwich Preference Period Initial recovering the FG Limited Subsequent Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS, and to return to injured customers FG Limited for the benefit of the BLMIS estate; (b) directing FG Limited, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) imposing a constructive trust over the FG Limited Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT FOUR: ~~PREFERENTIAL TRANSFERS (~~ RECOVERY OF FG BERMUDA SUBSEGUENT ~~TRANSFEREE)~~ TRANSFERS UNDER 11 U.S.C. §§ ~~547(b), 550~~105(a)~~(2),~~ AND ~~551~~550(a)

*Against ~~the FGG Affiliates, Management Defendants, and Sales Defendants~~FG Bermuda*

~~579.~~348.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

580.    At the time of each of the Preference Period Initial Transfers, Fairfield Sentry and GS were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff 2(c)(3).

581.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff 2(c)(3).

582.    Each of the Preference Period Initial Transfers was to or for the benefit of Fairfield Sentry or GS.

583.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

584.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

585.    Each of the Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

586.    Each of the Preference Period Initial Transfers enabled Fairfield Sentry and/or GS to receive more than each of the funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

587.    Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

588.    The Trustee has filed a lawsuit against Fairfield Sentry and GS to avoid the Preference Period Initial Transfers pursuant to section 547 of the Bankruptcy Code, and to recover the Preference Period Initial Transfers from Fairfield Sentry and GS pursuant to section 550(a)(1) of the Bankruptcy Code.

589.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Preference Period Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

590.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS.

349.    FG Bermuda is an immediate or mediate transferee of the Subsequent Transfers totaling $675,462,817 ("FG Bermuda Subsequent Transfers").

350.    Each of the FG Bermuda Subsequent Transfers was received by FG Bermuda when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

~~591.~~351.    As a result of the foregoing, pursuant to sections ~~547(b),~~105(a) and 550(a)~~(2), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) ~~avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside and (c) recovering the Preference Period~~recovering the FG Bermuda Subsequent Transfers, or the value thereof, from ~~the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers~~FG Bermuda for the benefit of the BLMIS estate; (b) directing FG Bermuda, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Bermuda Subsequent Transfers; (c) imposing a constructive trust over the FG Bermuda Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT FIVE:** ~~**FRAUDULENT**~~

**RECOVERY OF FG ADVISORS SUBSEQUENT** **TRANSFERS** ~~**(INITIAL TRANSFEREE)**~~
**UNDER 11 U.S.C. §§ ~~548~~105(a)~~(1)(A),~~ AND 550(a)~~(1), AND 551~~**

*Against ~~the Feeder Funds~~FG Advisors*

~~592.~~352.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~593.    The Two Year Initial Transfers were made on or within two years before the Filing Date.~~

~~594.    The Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.~~

353.   FG Advisors is an immediate or mediate transferee of the Subsequent Transfers totaling $165,947,267 ("FG Advisors Subsequent Transfers").

595.   Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Fairfield Sentry, GS, and GSP as direct transferees pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3). 354.   Each of the FG Advisors Subsequent Transfers was received by FG Advisors when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

596. 355.   As a result of the foregoing, pursuant to sections 548 105(a)(1)(A), and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial recovering the FG Advisors Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers FG Advisors for the benefit of the BLMIS estate; (b) directing FG Advisors, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Advisors Subsequent Transfers; (c) imposing a constructive trust over the FG Advisors Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT SIX: FRAUDULENT**

**RECOVERY OF FAIRFIELD INTERNATIONAL MANAGERS SUBSEQUENT TRANSFERS (INITIAL TRANSFEREE) UNDER 11 U.S.C. §§ 548 105(a)(1)(A), AND 550(a)(1), AND 551**

*Against FGB Fairfield International Managers, Noel, and Tucker*

597. 356.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

598.    The Greenwich Two Year Initial Transfers were made on or within two years before the Filing Date.

599.    The Greenwich Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

600.    Each of the Greenwich Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from GS and GSP as direct transferees pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

601.    FGB served as general partner to GS and GSP during the two years preceding the Filing Date. As general partner of GS and GSP, FGB is liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB was serving as general partner.

357.    Fairfield International Managers, Noel, and Tucker are immediate or mediate transferees of the Subsequent Transfers totaling $293,935,681 ("Fairfield International Managers Subsequent Transfers").

358.    As owners of Fairfield International Managers, Noel and Tucker each received and controlled 50% of the Fairfield International Managers Subsequent Transfers.

359.    Each of the Fairfield International Managers Subsequent Transfers was received by Fairfield International Managers when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

602. 360.    As a result of the foregoing, pursuant to sections 548 105(a)(1)(A), and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the

Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initialrecovering the Fairfield International Managers Subsequent Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS, and to return to injured customersFairfield International Managers for the benefit of the BLMIS estate; (b) directing Fairfield International Managers, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Fairfield International Managers Subsequent Transfers; (c) imposing a constructive trust over the Fairfield International Managers Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT SEVEN: FRAUDULENT TRANSFERS (**

**RECOVERY OF FG CAPITAL SUBSEQUENT TRANSFEREE) – TRANSFERS UNDER 11 U.S.C. §§ 548105(a)(1)(A), AND 550(a)(2), AND 551**

*Against the FGG Affiliates, Management Defendants, and Sales DefendantsFG Capital, Noel, and Tucker*

603.361.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

604.    The Two Year Initial Transfers were made on or within two years before the Filing Date.

605.    The Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

606.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the FGG Affiliates and FGG Individuals pursuant to section 550(a)(2) and SIPA § 78fff-2(c)(3).

607.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Two Year Initial

Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and to recover the Two Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code.

608.    The FGG Affiliates, Management Defendants, and Sales Defendants were362.    FG Capital, Noel, and Tucker are immediate or mediate transferees of some portion of the Two Year Initialthe Subsequent Transfers pursuant to section 550(a)(2) of the Bankruptcy Codetotaling $2,963,730 ("FG Capital Subsequent Transfers").

363.    As owners of FG Capital, Noel and Tucker each received and controlled 50% of the FG Capital Subsequent Transfers.

364.    Each of the FG Capital Subsequent Transfers was received by FG Capital when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

609.365.    As a result of the foregoing, pursuant to sections 548105(a)(1)(A), and 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two YearFG Capital Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customersFG Capital for the benefit of the BLMIS estate; (b) directing FG Capital, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Capital Subsequent Transfers; (c) imposing a constructive trust over the FG Capital Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT EIGHT: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) –**

**RECOVERY OF SHARE MANAGEMENT SUBSEQUENT TRANSFERS
UNDER 11 U.S.C. §§ 548105(a)(1)(B) , AND 550(a)(1), AND 551**

*Against the Feeder FundsShare Management and Corina Noel Piedrahita*

610.366.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

611.    The Two Year Initial Transfers were made on or within two years before the Filing Date.

612.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

613.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfer in question.

614.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

615.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

616.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

367.    Share Management is an immediate or mediate transferee of the Subsequent Transfers totaling $3,321,151 ("Share Management Subsequent Transfers").

368.    As the alter ego of Share Management, Corina Noel Piedrahita received and controlled the Share Management Subsequent Transfers.

369.    Each of the Share Management Subsequent Transfers was received by Share Management and Corina Noel Piedrahita when they had knowledge of fraud at BLMIS or, at a minimum, were willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

617.370.    As a result of the foregoing, pursuant to sections 548105(a)(1)(B), and 550(a)(1), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial recovering the Share Management Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers Share Management and Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Share Management and Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Share Management Subsequent Transfers; (c) imposing a constructive trust over the Share Management Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT NINE: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) - RECOVERY OF NOEL SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 548105(a)(1)(B), AND 550(a)(1, AND 551

### *Against FGBNoel*

618.371.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

619.    The Greenwich Two Year Initial Transfers were made on or within two years before the Filing Date.

620.    BLMIS received less than a reasonably equivalent value in exchange for each of the Greenwich Two Year Initial Transfers.

621.    At the time of each of the Greenwich Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Greenwich Two Year Initial Transfer in question.

622.    At the time of each of the Greenwich Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

623.    At the time of each of the Greenwich Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

624.    Each of the Greenwich Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from GS and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

625.    FGB served as general partner to GS and GSP during the two years preceding the Filing Date. As general partner of GS and GSP, FGB is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations GS and GSP incurred while FGB was serving as general partner.

372.    Noel is an immediate or mediate transferee of the Subsequent Transfers totaling $12,964,286 ("Noel Subsequent Transfers").

373.    Each of the Noel Subsequent Transfers, including any transfers that Noel received from Fairfield International Managers and FG Capital, was received by Noel when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

626.374.    As a result of the foregoing, pursuant to sections 548105(a)(1)(B), and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initialrecovering the Noel Subsequent Transfers, or the value

thereof, from ~~FGB for the benefit of the estate of BLMIS, and to return to injured customers~~Noel for the benefit of the BLMIS estate; (b) directing Noel, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Noel Subsequent Transfers; (c) imposing a constructive trust over the Noel Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT TEN:** ~~FRAUDULENT TRANSFER (~~
**RECOVERY OF TUCKER** SUBSEQUENT ~~TRANSFEREE)~~ TRANSFERS
UNDER 11 U.S.C. §§ ~~548~~105(a)~~(1)(B)~~, AND 550(a)~~(2), AND 551~~

*Against ~~the FGG Affiliates, Management Defendants, and Sales Defendants~~Tucker*

~~627.~~375.        The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~628.    The Two Year Initial Transfers were made on or within two years before the Filing Date.~~

~~629.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.~~

~~630.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfers in question.~~

~~631.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.~~

~~632.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.~~

~~633.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee~~

pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the FGG Affiliates and FGG Individuals pursuant to section 550(a)(2) and SIPA § 78fff-2(c)(3).

634.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Two Year Initial Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Two Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

376.    Tucker is an immediate or mediate transferee of the Subsequent Transfers totaling $2,500,000 ("Tucker Subsequent Transfers").

635.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Two Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.377.    Each of the Tucker Subsequent Transfers, including any transfers that Tucker received from Fairfield International Managers and FG Capital, was received by Tucker when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

636.378.    As a result of the foregoing, pursuant to sections 548105(a)(1)(B), and 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two YearTucker Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customersTucker for the benefit of the BLMIS estate; (b) directing Tucker, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Tucker Subsequent Transfers; (c) imposing a constructive trust over the Tucker Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs,

prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT ELEVEN:** ~~FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C.~~ RECOVERY OF PIEDRAHITA SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 105(a) AND 550(a)

~~544, 550(a)(1), AND 551~~

*Against* ~~*the Feeder Funds*~~*Piedrahita*

~~637.~~379.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~638.    At all times relevant to the Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).~~

~~639.    The Six Year Initial Transfers were made by BLMIS and transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Initial Transfers to or for the benefit of Fairfield Sentry, GS, and/or GSP in furtherance of a fraudulent investment scheme.~~

~~640.    The Six Year Initial Transfers were received by the Feeder Funds with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.~~

380.    Piedrahita is an immediate or mediate transferee of the Subsequent Transfers totaling $163,144,472 ("Piedrahita Subsequent Transfers").

381.    Each of the Piedrahita Subsequent Transfers was controlled by Piedrahita, and received by him or his alter ego Safehand Investments when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

~~641.~~382.    As a result of the foregoing, pursuant to sections ~~276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),~~105(a) and 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the Delaware Code,~~ the Trustee

is entitled to a judgment: (a) ~~avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six Year Initial~~ <u>recovering the Piedrahita Subsequent</u> Transfers, or the value thereof, from ~~the Feeder Funds for the benefit of the estate of BLMIS, , and to return to injured customers, and (d) recovering attorneys' fees from the Feeder Funds~~<u>Piedrahita for the benefit of the BLMIS estate; (b) directing Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Piedrahita Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.</u>

**COUNT TWELVE:** ~~FRAUDULENT TRANSFER (INITIAL TRANSFEREE) - NEW~~ RECOVERY OF VIJAYVERGIYA SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 105(a) AND 550(a)

~~YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. 544, 550(a)(1), AND 551~~

*Against* ~~*FGB, FGL, and GBL*~~ *Vijayvergiya*

~~642.~~383.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~643.    At all times relevant to the Greenwich Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).~~

~~644.    The Greenwich Six Year Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Greenwich Six Year Initial Transfers to or for the benefit of GS and/or GSP in furtherance of a fraudulent investment scheme.~~

~~645.    The Greenwich Six Year Initial Transfers were received by GS and GSP with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.~~

~~646.    FGB, FGL, and GBL each served as general partner to GS and/or GSP during the six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL, and GBL are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general partner.~~

384.    Vijayvergiya is an immediate or mediate transferee of the Subsequent Transfers totaling $7,083,760 ("Vijayvergiya Subsequent Transfers").

385.    Each of the Vijayvergiya Subsequent Transfers was received by Vijayvergiya when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

647.386.        As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 105(a) and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, (c) recovering the Greenwich Six Year Initialrecovering the Vijayvergiya Subsequent Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from FGB, FGL and GBLVijayvergiya for the benefit of the BLMIS estate; (b) directing Vijayvergiya, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) imposing a constructive trust over the Vijayvergiya Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT THIRTEEN:** ~~FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - NEW YORK DEBTOR AND CREDITOR LAW 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544,~~ **RECOVERY OF TOUB SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 105(a) AND** 550(a)~~(2), AND 551~~

*Against* ~~*the FGG Affiliates, Management Defendants, and Sales Defendants*~~*Toub*

~~648.~~387.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

~~649.    At all times relevant to the Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).~~

~~650.    The Six Year Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Initial Transfers to or for the benefit of Fairfield Sentry, GS, and/or GSP in furtherance of a fraudulent investment scheme.~~

~~651.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 276-9 of the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).~~

388.    Toub is an immediate or mediate transferee of the Subsequent Transfers totaling $32,631,707 ("Toub Subsequent Transfers").

~~652.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.~~389.    Each of the Toub Subsequent Transfers was received by Toub when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

653.390.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),105(a) and 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six YearToub Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the FGG Affiliates, Management Defendants, and Sales DefendantsToub for the benefit of the BLMIS estate; (b) directing Toub, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Toub Subsequent Transfers; (c) imposing a constructive trust over the Toub Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT FOURTEEN:** **FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. 544, 550(a)(1), AND 551RECOVERY OF CORINA NOEL PIEDRAHITA SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 105(a) AND 550(a)**

*Against the Feeder FundsCorina Noel Piedrahita*

654.391.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of thethis Second Amended Complaint as if fully rewritten herein.

655.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

656.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

657.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

392. Corina Noel Piedrahita is an immediate or mediate transferee of the Corina Noel Piedrahita Subsequent Transfers totaling $6,323,496 ("Corina Noel Piedrahita Subsequent Transfers").

393.    Each of the Corina Noel Piedrahita Subsequent Transfers was received by Corina Noel Piedrahita when she had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

658.394.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initialrecovering the Corina Noel Piedrahita Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customersCorina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Corina Noel Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Corina Noel Piedrahita Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**COUNT FIFTEEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW GREENWICH SENTRY GENERAL PARTNER LIABILITY**

**YORK DEBTOR AND CREDITOR LAW – 273 AND 278 AND/OR 279, AND 11 U.S.C. 544, 550(a)(1), AND 551**

*Against the FGB, FGL, and GBLFG Limited*

659.395.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the this Second Amended Complaint as if fully rewritten herein.

660.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

661.    BLMIS did not receive fair consideration for the Greenwich Six Year Initial Transfers.

662.    BLMIS was insolvent at the time it made each of the Greenwich Six Year Initial Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Greenwich Six Year Initial Transfers.

663.    FGB, FGL and GBL each served as general partner to GS and/or GSP during the six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL, and GBL are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general partner.

396.    FG Limited served as the general partner to Greenwich Sentry from 1998 to 2003, during which time certain of the Six Year Initial Transfers were made.

397.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. FG Limited, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while FG Limited was serving as general partner.

664.398.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA§ 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code,applicable Delaware law, FG Limited is jointly and severally liable for all obligations Greenwich Sentry incurred while FG Limited was serving as general

partner, and the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich against FG Limited recovering the Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL their value, that Greenwich Sentry received while FG Limited was serving as general partner, for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT SIXTEEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551**

**GREENWICH SENTRY GENERAL PARTNER LIABILITY**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants FG Bermuda*

665. 399.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the this Second Amended Complaint as if fully rewritten herein.

666.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

667.    BLMIS did not receive fair consideration for

400.    FG Bermuda served as the general partner to Greenwich Sentry from July 2003 to 2004 until November 19, 2010, when Greenwich Sentry filed for protection under Chapter 11 of the Bankruptcy Code, during which time certain of the Six Year Initial Transfers.

668.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

669.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 273, 278, and/or 279 of the New York

Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code.

670.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code. were made.

401.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. FG Bermuda, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while FG Bermuda was serving as general partner.

671.402.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3),applicable Delaware law, FG Bermuda is jointly and severally liable for all obligations Greenwich Sentry incurred while FG Bermuda was serving as general partner, and the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) against FG Bermuda recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales DefendantsInitial Transfers, or their value, that Greenwich Sentry received while FG Bermuda was serving as general partner, for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT SEVENTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) - NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**
*Against the Feeder Funds*

672.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

673.    At all relevant times there was and is at least one or more creditors who held and hold matured or

unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

674.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

675.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

676.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT EIGHTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against FGB, FGL, and GBL*

677.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

678.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

679.    BLMIS did not receive fair consideration for the Greenwich Six Year Initial Transfers.

680.    At the time BLMIS made each of the Greenwich Six Year Initial Transfers, BLMIS was engaged or

was about to engage in a business or transaction for which the property remaining in its hands after each of the Greenwich Six Year Initial Transfers was an unreasonably small capital.

681.    FGB, FGL, and GBL each served as general partner to GS and/or GSP during the six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL, and GBL are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general partner.

682.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) - NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. 544, 550(a)(2), AND 551**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants*

683.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

684.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

685.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

686.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial

Transfers was an unreasonably small capital.

687.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

688.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

689.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT TWENTY: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against the Feeder Funds*

690.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

691.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

692.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

693.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

694.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT TWENTY-ONE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. 544, 550(a)(1), AND 551

### *Against FGB, FGL, and GBL*

695.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

696.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

697.    BLMIS did not receive fair consideration for the Greenwich Six Year Initial Transfers.

698.    At the time BLMIS made each of the Greenwich Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

699.    FGB, FGL, and GBL each served as general partner to GS and/or GSP during the six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL and GBL are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, and GBL

were each serving as general partner.

700.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT TWENTY-TWO: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants*

701.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

702.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

703.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

704.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

705.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

706.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

707.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT TWENTY-THREE: UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against the Feeder Funds*

708.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

709.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

710.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

711.    The Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Initial Transfers to or for the benefit of Fairfield Sentry, GS, and GSP in furtherance of a fraudulent investment scheme.

712.    Fairfield Sentry, GS, and GSP received the Initial Transfer with actual intent to hinder, delay, or

defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

713.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the Feeder Funds.**COUNT TWENTY-FOUR: UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against FGB, FGL, GBL, Noel, and Tucker*

714.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

715.    At all times relevant to the Greenwich Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

716.    At all times relevant to the Greenwich Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

717.    The Greenwich Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Greenwich Initial Transfers to or for the benefit of GS and GSP in furtherance of a fraudulent investment scheme.

718.    GS and GSP received the Greenwich Initial Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

719.    FGB, FGL, GBL, Noel, and Tucker each served as general partner to GS and/or GSP during the six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL, GBL, Noel, and Tucker are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, GBL, Noel, and Tucker were each serving as general partner.

720.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Initial Transfers, (b) directing that the Greenwich Initial Transfers be set aside, (c) recovering the Greenwich Initial Transfers, or the value thereof, from FGB, FGL, GBL, Noel, and Tucker for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from FGB, FGL, GBL, Noel, and Tucker.

**COUNT TWENTY-FIVE: UNDISCOVERED FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) - NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. 544, 550(a)(2), AND 551**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants*

721.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

722.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

723.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

724.    The Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Initial Transfers to or for the benefit of Fairfield Sentry, GS, and GSP in furtherance of a fraudulent investment scheme.

725.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Initial Transfers pursuant to section 544 of the Bankruptcy Code, sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, and Rule 203(g) of the New York Civil Procedure Law and Rules, and to recover the Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code.

726.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

727.    As a result of the foregoing, pursuant to NY CPLR 203(g) and 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the FGG Affiliates, Management Defendants, and Sales Defendants.

## COUNT TWENTY-SIX: OBJECTION TO THE DEFENDANTS' CUSTOMER CLAIMS

### *Against Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary*

728.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

729.    Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary have filed customer claims.

730.    These claims (the "Claims") are not supported by the books and records of BLMIS nor the claim materials submitted by the claimants, and, therefore, should be disallowed pursuant to sections 502(d) of the Bankruptcy Code.

731.    The Claims also should not be allowed as customer claims or as general unsecured claims. Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary are the recipients, as direct, immediate, and/or mediate transferees, of transfers of customers' property that are available and recoverable under sections 502(a), 544(b), 547, 548, and 550 of the Bankruptcy Code, NY Debtor and Creditor Law 270 *et seq.*, NYCPLR 203(g) and 213(8), and applicable sections of SIPA, including § 78fff-2(c)(3), and Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary have not returned the Initial Transfers or the Subsequent Transfers to the Trustee. As a result, pursuant to section 502(d), the Claims must be disallowed unless and until Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary return the Initial Transfers and the Subsequent Transfers to the Trustee.

732.    As a result of the foregoing, the Trustee is entitled to an order disallowing the Claims and/or that Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary are not entitled to customer status.

**COUNT TWENTY-SEVEN: UNJUST ENRICHMENT**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants ("Non-Feeder Fund Defendants")*

733.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

734.    The Non-Feeder Funds Defendants have all been unjustly enriched. They have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and from the Feeder Funds' investors, for which they did not in good faith provide fair value. These Defendants were further unjustly enriched as a result of

aiding, abetting, enabling, and substantially participating in a fraudulent scheme.

735.    The FGG Affiliates earned over a billion dollars in fees. The Management Defendants and Sales Defendants received hundreds of millions of dollars in partnership distributions, salaries, bonuses, and other compensation. None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

736.    As described above, the Non-Feeder Fund Defendants were constantly faced with evidence that BLMIS was a fraud. For example, in 2005 they confirmed Madoff's auditor lied about his capacities and ability to audit the billions of dollars in BLMIS's customer accounts. *(See supra* '''377-398.) They also knew the consistency of Madoff's returns were, statistically, too good to be true. *(See supra* ^400-404, 451–461.) They knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible. (*See supra* ^412-440.) Their own investors and paid consultants, along with numerous industry professionals, raised these concerns over and over again. (*See supra* ^462-479, 498-527.)

737.    Instead of warning their investors and Madoff's other customers, and reporting Madoff to regulators, the Non-Feeder Fund Defendants helped Madoff market BLMIS to their own investors, helped shield him from FGG investors who wanted to meet with him, and protected him by making misrepresentations to the SEC. (*See supra* ^350-361.) Confronted with a plethora of red flags, these Defendants continued to try to raise billions of dollars from investors to enrich themselves. (*See supra* ^480-489.)

738.    Faced with the prospect of losing hundreds of millions of dollars in fees, the NonFeeder Fund Defendants chose to cover up the compelling evidence of Madoff's fraud. As a result, they have been unjustly enriched by over one billion dollars that rightfully belongs to BLMIS customers.

739.    Equity and good conscience require full restitution of the monies received by the Non-Feeder Fund Defendants, directly and indirectly, from BLMIS and any assets derived from that money.

## COUNT TWENTY-EIGHT: CONVERSION

*Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

740.    The Trustee incorporates by reference the allegations in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

741.    The Trustee has the possessory right and interest to all property in the Defendants' possession that went to the Defendants by virtue of the Ponzi scheme. This property reflects money and other interests, which originated from and were co-mingled with other BLMIS customer accounts.

742.    The Trustee's possessory interest in this Customer Property is governed by SIPA. The Trustee has the superior right of possession to all fees, distributions, and other monies that the Defendants possess and that originated from BLMIS. The Defendants' dominion over and interference with the Trustee's interest in the Customer Property is in derogation of the Trustee's right and obligation to return this property on an equitable basis to BLMIS customers.

743.    The Defendants are not authorized, and have never been authorized, to exercise dominion and control over Customer Property. These specifically identified funds have been wrongfully converted by the Defendants.

744.    As a result of the foregoing, the Defendants are liable to the Trustee for having wrongfully converted this Customer Property and are obligated to return all such monies.

## COUNT TWENTY-NINE: MONEY HAD AND RECEIVED

745.    The Trustee incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully rewritten herein.

746.    The Defendants are currently in possession of, or have control over, money that originated from BLMIS. These monies are Customer Property and belong to the customer fund under the Trustee's control. The

Defendants have no lawful or equitable right to these monies, having obtained the monies through fraud, deceit, and/or mistake.

747. In equity and good conscience, the Defendants may not retain possession or control of these monies, which rightfully belong to the customer fund under the Trustee's control. The Defendants are obligated to return all such monies to the Trustee.

## COUNT THIRTY: AIDING AND ABETTING FRAUD

### *Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

748. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

749. By virtue of their individual functions and responsibilities within FGG, their communications with investors, and all of the information of which they had knowledge, each of Defendants Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith knew Madoff was engaged in fraudulent behavior. Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith actively and substantially assisted Madoff in perpetrating the fraud by, among other things, providing marketing; protection from due diligence inquiries; credibility; sales support; and an influx of billions of dollars to keep the Ponzi scheme going. (*See supra* ^333-489.) These individual Defendants each knew of material information that demonstrated Madoff was engaged in fraudulent activities. (*See id.*) Instead of reporting Madoff's fraudulent activities to the SEC or their investors, Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith substantially assisted Madoff in continuing to grow the fraud. Each of these Defendants intentionally and knowingly helped Madoff deceive the SEC for many years, and repeatedly misled investors, prospective investors, and others, all of which directly and substantially aided Madoff in maintaining the fraud. (*See supra* ''333-373.)

750.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith each knew that Madoff's returns were statistically too good to be true. (*See supra* ''400-404, 451-461.) These Defendants also knew that Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible. (*See supra* ''412-440.)

751.    In addition, Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Blum, Toub, and Smith conspired to enter into explicit and implicit agreements with BLMIS to help perpetuate Madoff's fraud. These agreements were corrupt in their purpose to raise billions of dollars in the face of fraudulent activity. Each of these Defendants took intentional and overt actions pursuant to these agreements and participated in the fraud, causing billions of dollars in damages to BLMIS customers.

752.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith explicitly agreed to market BLMIS, and the market the SSC Strategy as their own investment scheme, resulting in billions of dollars of capital to maintain the Ponzi scheme. They each explicitly agreed to protect Madoff from direct inquiries from the Feeder Funds' investors, and to provide the investors with misleading information where necessary. They also each explicitly agreed to help mislead the SEC in order to protect Madoff from having to register as an investment adviser. (*See supra* ''350-361.)

753.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith acted pursuant to these implicit and explicit agreements by traveling the world to market BLMIS and the Feeder Funds and by providing false and misleading responses to customer concerns that Madoff might be a fraud. (*See supra* ^339-349, 362-373.) Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith purposely and knowingly discouraged investors from performing due diligence and helped Madoff by working to remove all references to BLMIS from the Feeder Funds' marketing materials. (*See id.*)

754.    Defendant Noel is a founding partner of FGG and was involved in the day-to-day management

decisions that resulted in FGG falsely marketing the Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ^193-202.)

755.    Noel substantially assisted Madoff by leading and engineering FGG's global marketing efforts to sell Madoff. Noel traveled around with his Feeder Funds summary sheets, convincing investors to give Madoff billions of dollars. Noel knew those summary sheets contained false and misleading information regarding BLMIS and he knowingly misled investors when he parroted the misstatements contained on those sheets. (*See supra* ^193-202, 339-349, 362-373.)

756.    Noel also knew of the inconsistent and contradictory information Madoff provided during FGG's "due diligence" visits. He knew Madoff refused to provide critical information including the identity of the options counterparties. He also knew FGG trained its sales force to provide false answers to investor queries. (*See supra* ^339-349, 362-373.)

757.    All of Noel's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

758.    Defendant Tucker is a founding partner of FGG and was involved in the day-to- day management decisions that resulted in FGG falsely marketing the Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ''203-210.)

759.    Tucker frequently fielded investor questions and provided them with misleading responses. Tucker also knew Madoff's auditor was a sham and never disclosed this information to investors or the SEC, which

substantially aided Madoff in perpetrating the fraud. By intentionally lying to the Feeder Funds' investors, Tucker substantially assisted Madoff in maintaining the fraud. (*See supra* ''350-361.)

760.    Tucker also intentionally and overtly instigated the cover-up of damning information showing BLMIS's auditor lied to FGG's CFO and was not capable of performing proper audits on the billions of dollars under Madoff's management. Tucker specifically directed others to provide false answers to investors when they questioned Madoff's market timing strategy. Tucker also readily assisted Madoff by deflecting criticism, claiming PwC reviewed BLMIS, and by hiding Madoff's options trading structure, which was not in accord with industry practices. (*See supra* ''333-373, 412-440.)

761.    All of Tucker's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

762.    Defendant Piedrahita is a founding partner and Chairman of the Board of Directors of FGG. He was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds; procuring billions of dollars from investors to hand to Madoff; deceiving the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and making misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ^211-218.)

763.    Piedrahita substantially assisted Madoff by directing all of FGG's operations as the Chairman of the Board of Directors and head of the Executive Committee. Piedrahita had knowledge of fraud evidenced by Madoff's trade confirmations, his auditor's lies, and the statistical improbability of the returns reported to the Feeder Funds. Despite his knowledge of fraud, Piedrahita substantially assisted Madoff by selling Madoff to any and all would-be investors. (*See supra* ^211-218.)

764.    Piedrahita also entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors. The information Piedrahita provided helped convince investors to give billions

of dollars to the Feeder Funds, which then sent the money to Madoff. Piedrahita also agreed with Madoff to do everything he could to provide billions of dollars to Madoff, which allowed Madoff to further the Ponzi scheme for his own and the Defendants' benefit. Piedrahita acted pursuant to these agreements in routinely providing false information about Madoff to potential Feeder Funds investors during his global marketing trips. (*See supra* ^333-373.)

765.    All of Piedrahita's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

766.    Defendant McKeefry served as FGG's COO and CLO, is a member of the Executive Committee of FGG, and was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ''219-224.)

767.    As COO, McKeefry was responsible for reviewing and approving FGG's marketing materials. McKeefry approved FGG's marketing materials with knowledge they contained false and misleading information. As CLO, he reviewed the regulatory filings for the Feeder Funds and the FGG Affiliates, as well as the Feeder Funds' agreements with Madoff. With full knowledge of the terms of the agreements with BLMIS, McKeefry agreed to make misrepresentations to the SEC about the nature of the Feeder Funds' relationship with BLMIS in an attempt to stop the SEC from applying additional regulations to BLMIS, and thereby, delaying any discovery of the fraud. (*See supra* ''219-224, 350-361.)

768.    McKeefry entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors. The information McKeefry provided helped convince investors to invest billions of dollars in the Feeder Funds, which was then delivered to Madoff. McKeefry also agreed to conspire with Madoff to provide

false and misleading information to the SEC about the true role BLMIS and Madoff played in managing the Feeder Funds' investments. McKeefry acted pursuant to these agreements when he approved the publication of marketing materials that contained erroneous information; approved fund agreements that contained similarly erroneous information; and misled the SEC. (*See supra* ''219-224, 350-361.)

769.    All of McKeefry's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

770.    Defendant Lipton acted as FGG's CFO and, in that capacity, was involved in upper-level management decisions regarding investor redemptions. Lipton was frequently involved in discussions about how to respond to investor concerns about Madoff, and intentionally devised ways to provide investors false and misleading responses. (*See supra* ^225-230, 339-349, 362-373.)

771.    When faced with the knowledge he had been lied to about the real nature of Madoff's auditing firm, as well as the capabilities of that firm, Lipton did not inform FGG's investors or the SEC that BLMIS's auditor was a sham. By protecting Madoff's fraud from the SEC and FGG's own investors, Lipton substantially assisted Madoff in perpetrating the fraud. (*See supra* ^350-361.)

772.    Lipton also entered into explicit and implicit agreements with Madoff to conspire with him to hide the fact that BLMIS's auditor, Friehling, was a sham. He intentionally acted pursuant to these agreements when he provided false information regarding the auditor to other FGG personnel that Lipton knew would distribute the same false information to the Feeder Funds' investors. Lipton also purposely did not disclose to investors or regulatory authorities that Madoff's auditor had lied to Lipton about the firm's size and reputation. (*See supra* ^377- 398.)

773.    All of Lipton's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

774.    Defendant Vijayvergiya knowingly and intentionally assisted Madoff in perpetrating his fraud by

routinely providing false and misleading information to investors about FGG's knowledge of Madoff's operations and FGG's own due diligence process. Vijayvergiya lied stating Madoff's auditors had twenty partners. He also conspired with Madoff to purposely deceive the SEC in 2006 by knowingly providing false information to the SEC regarding the Feeder Funds' relationship with BLMIS. (*See supra* ''231-236, 333-373, 377-398.)

775.    Vijayvergiya intentionally and overtly provided false answers to investors regarding Madoff's market timing strategy. He also personally trained FGG's sales personnel to provide false statements about the Feeder Funds' relationship with BLMIS including, among other things, telling the sales personnel that FGG had a list of approved options trade counterparties for Madoff's trades, that FGG verified trades at the DTCC, and that PwC reviewed BLMIS. (*See supra* ''333-373.)

776.    All of Vijayvergiya's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

777.    Defendant McKenzie knowingly participated in misleading investors. His intentional acts substantially assisted Madoff in perpetrating the fraud and helped prevent others from uncovering Madoff's fraud. McKenzie knew Madoff's auditor had provided false information to CFO Lipton and then allowed Vijayvergiya to provide false and misleading information about Madoff's auditor. By his actions, McKenzie shielded Madoff from due diligence or investigations by third parties that could have uncovered the fraud. (*See supra* ''237-242, 377-398.)

778.    McKenzie also entered into explicit and implicit agreements with Madoff to hide the fact that Madoff's auditor was a sham. He acted pursuant to these agreements when he did not inform investors or regulatory authorities that he knew that the auditor was a fraud. (*See supra* ^377-398.)

779.    All of McKenzie's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

780.    Defendant Landsberger is a member of the Executive Committee of FGG and was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ^243-247.)

781.    Landsberger addressed investor concerns about possible fraud at BLMIS by working with his colleagues to provide answers that were not only careful not disclose the fraud, but were designed to bury the fraud from inquiry or discovery. Landsberger substantially assisted Madoff by allowing him to avoid additional due diligence investigations that could have led to the discovery of the fraud well before December 2008. (*See supra* ^339-349, 362-373.)

782.    Landsberger also entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors. These agreements served two primary purposes. They allowed Landsberger to help raise billions of dollars for Madoff to replenish the Ponzi scheme and they prevented investors from conducting additional, independent due diligence that might have uncovered the fraud. Landsberger intentionally and overtly acted pursuant to these agreements when he allowed other FGG personnel to provide information to investors which Landsberger knew to be false. (*See supra* ''339-349, 362-373.)

783.    All of Landsberger's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

784.    Defendant Toub is a member of the Executive Committee of FGG and was involved in the day-to-day management decisions that resulted in FGG marketing the Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See*

*supra* ''248-253.)

785.    Toub also substantially assisted Madoff in perpetrating a fraud by falsely addressing investor concerns that BLMIS was involved in fraudulent activities and by working with his colleagues to prevent the fraud from being discovered. Toub substantially assisted Madoff by purposely shielding him from additional due diligence investigations that could have led to the discovery of the fraud well before December, 2008. (*See supra* ''339-349, 362-373.)

786.    Toub entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors. These agreements served two purposes. They allowed Toub to help procure billions of dollars for Madoff to use in the Ponzi scheme and they prevented investors from conducting additional, independent due diligence that might have uncovered the fraud. Toub also acted pursuant to these agreements when he allowed other FGG personnel to provide information to investors which Toub knew to be false. (*See supra* ''339349, 362-373.)

787.    All of Toub's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

788.    Defendant Blum was involved in marketing the funds and responding to investor concerns about Madoff. Blum reviewed FGG's marketing materials and approved the publication of those materials even though he knew they contained false or misleading statements. Blum also substantially assisted Madoff in perpetrating a fraud by working with his colleagues at FGG to limit transparency to Madoff and to avoid delivering to investors accurate information about Madoff. (*See supra* ^260-265, 339-349, 362-373.)

789.    Blum entered into explicit and implicit agreements with Madoff to limit transparency into BLMIS and to limit investors' access to Madoff. He intentionally and overtly acted pursuant to these agreements. All of Blum's activities concerning Madoff substantially assisted in Madoff perpetrating the fraud. (*See supra* ^339-349, 362-373.)

790.    All of Blum's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

791.    Defendant Smith actively responded to investors concerns about Madoff. Like his fellow partners, Smith substantially assisted Madoff in perpetrating a fraud by devising schemes to appease investors' concerns about Madoff being a fraud. Smith intentionally and overtly assisted Madoff in escaping due diligence and investigation that could have uncovered the fraudulent activities. (*See supra* ^266-271, 339-349, 362-373.)

792.    Smith also entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors. These agreements served two primary purposes.

They allowed Smith to help deliver billions of dollars to Madoff to use in the Ponzi scheme and they prevented investors from conducting additional, independent due diligence that might have uncovered the fraud. Smith purposely acted pursuant to these agreements when he misled investors regarding Madoff's lack of transparency by providing false information. (*See supra* ''339-349, 362-373.)

793.    All of Smith's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

## COUNT THIRTY-ONE: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

794.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

795.    BLMIS owed a fiduciary duty to its customers. BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme. Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith knowingly participated in that breach, which resulted in billions of dollars of damage to BLMIS

~~customers.~~

~~796.    BLMIS owed a fiduciary duty to act in the best interests of investors. In this role, BLMIS held a superior position over investors in the Feeder Funds, which required investors to repose trust and confidence with BLMIS. (*See supra* '6.)~~

~~797.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith knew of Madoff's fraudulent activity that was breaching BLMIS's fiduciary duties. They substantially assisted Madoff in breaching his duties by, among other things: traveling the world to market BLMIS and the Feeder Funds; avoiding customer inquiries and providing false answers that all knew would discourage investors from asking additional questions; removing references to BLMIS from their marketing materials; and providing the SEC with answers Madoff gave them, knowing that those answers were not true, but would serve to protect Madoff from further regulatory scrutiny. (*See supra* ^333-489.)~~

~~798.    The intentional and overt actions by Noel, Tucker, Piedrahita, McKeefry, Lipton,~~

## GREENWICH SENTRY PARTNERS GENERAL PARTNER LIABILITY

### *Against FG Bermuda*

403.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

404.    FG Bermuda served as the general partner to Greenwich Sentry Partners from its inception in 2006 to November 19, 2010, when Greenwich Sentry Partners filed for protection under Chapter 11 of the Bankruptcy, during which time certain of the Six Year Initial Transfers were made.

405.    Greenwich Sentry Partners is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. FG Bermuda, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry Partners incurred while FG Bermuda was serving as general partner.

~~Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith to substantially assist Madoff in breaching his fiduciary duties to customers exacerbated BLMIS's monumental insolvency. The intentional and overt actions of Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith to substantially assist Madoff in breaching his fiduciary duties to customers was a proximate cause of loss of billions of dollars of Customer Property.~~ 406.   As a result of the foregoing, pursuant to applicable Delaware law, FG Bermuda is jointly and severally liable for all obligations Greenwich Sentry Partners incurred while FG Bermuda was serving as general partner, and the Trustee is entitled to a judgment against FG Bermuda recovering the Six Year Initial Transfers, or their value, that Greenwich Sentry Partners received while FG Bermuda was serving as general partner, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i~~.~~)        On the First Claim for Relief, pursuant to ~~section 542 of the Bankruptcy Code~~ and SIPA § ~~78fff-2(c)(3), the Trustee is also entitled to an accounting of any and all Initial Transfers and Subsequent Transfers made, directly or indirectly, to the Defendants;~~ sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FIFL: (a) recovering the

FIFL Subsequent Transfers, or the value thereof, from FIFL for the benefit of the BLMIS estate; (b)

directing FIFL, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising

out of, or concerning the FIFL Subsequent Transfers; (c) imposing a constructive trust over the FIFL

Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d)

awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and

appropriate;

(ii.)    On the Second Claim for Relief, pursuant to sections ~~547~~105(~~b~~a)~~, and~~ 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a~~ judgment against Stable Fund: (a) ~~avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside, and (c) recovering the Preference Period Initial~~recovering the Stable Fund Subsequent Transfers, or the value thereof, from ~~the Feeder Funds for the benefit of the estate of BLMIS~~Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) imposing a constructive trust over the Stable Fund Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(iii.)    On the Third Claim for Relief, pursuant to sections ~~547~~105(~~b~~a)~~, and~~ 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a~~ judgment against FG Limited: (a) ~~avoiding and preserving the Greenwich Preference Period Initial Transfers, (b) directing that the Greenwich Preference Period Initial Transfers be set aside, and (c) recovering the Greenwich Preference Period Initial~~recovering the FG Limited Subsequent Transfers, or the value thereof, from ~~FGB~~FG Limited for the benefit of the BLMIS estate ~~of BLMIS~~; (b) directing FG Limited, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) imposing a constructive trust over the FG Limited Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and

(d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(iv~~.~~)    On the Fourth Claim for Relief, pursuant to sections ~~547~~105(b~~a~~)~~,~~ and 550(a)~~(2), and 551~~ of the Bankruptcy Code~~,~~ and SIPA § 78fff-2(c)(3), ~~the Trustee is entitled to a~~ judgment against FG Bermuda: (a) ~~avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside and (c) recovering the Preference Period~~recovering the FG Bermuda Subsequent Transfers, or the value thereof, from ~~the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS~~FG Bermuda for the benefit of the BLMIS estate; (b) directing FG Bermuda, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Bermuda Subsequent Transfers; (c) imposing a constructive trust over the FG Bermuda Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(v~~.~~)    On the Fifth Claim for Relief, pursuant to sections ~~548~~105(a)~~(1)(A), and~~ 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a~~ judgment against FG Advisors: (a) ~~avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial~~recovering the FG Advisors Subsequent Transfers, or the value thereof, from ~~the Feeder Funds for the benefit of the estate of BLMIS~~FG Advisors for the benefit of the BLMIS estate; (b) directing FG Advisors, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Advisors Subsequent Transfers; (c) imposing a constructive trust over the FG Advisors Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(vi~~.~~)    On the Sixth Claim for Relief, pursuant to sections ~~548~~105(a)~~(1)(A), and~~ 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the~~

~~Delaware Code, the Trustee is entitled to a~~ judgment against Fairfield International Managers: (a) ~~avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initial~~ recovering the Fairfield International Managers Subsequent Transfers, or the value thereof, from ~~FGB for the benefit of the estate of BLMIS~~ Fairfield International Managers for the benefit of the BLMIS estate; (b) directing Fairfield International Managers to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Fairfield International Managers Subsequent Transfers; (c) imposing a constructive trust over the Fairfield International Managers Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(vii~~.~~)    On the Seventh Claim for Relief, pursuant to sections ~~548~~105(a)~~(1)(A), and~~ 550(a)~~(2), and 551~~ of the Bankruptcy Code~~,~~ and SIPA § 78fff-2(c)(3), ~~the Trustee is entitled to a~~ judgment against FG Capital: (a) ~~avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c)~~ recovering the ~~Two Year~~FG Capital Subsequent Transfers, or the value thereof, from ~~the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS~~FG Capital for the benefit of the BLMIS estate; (b) directing FG Capital to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Capital Subsequent Transfers; (c) imposing a constructive trust over the FG Capital Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(viii~~.~~ )On the Eighth Claim for Relief, pursuant to sections ~~548~~105(a)~~(1)(B), and~~ 550(a)~~(1), and 551~~ of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), ~~and sections 15-306(a) and 17-403(b) of the~~

Delaware Code, the Trustee is entitled to a judgment against Share Management and Corina Noel Piedrahita: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial recovering the Share Management Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS Share Management and Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Share Management and Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Share Management Subsequent Transfers; (c) imposing a constructive trust over the Share Management Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(ix.) On the Ninth Claim for Relief, pursuant to sections 548 105(a)(1)(B), and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment against Noel: (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initial recovering the Noel Subsequent Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS Noel for the benefit of the BLMIS estate; (b) directing Noel, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Noel Subsequent Transfers; (c) imposing a constructive trust over the Noel Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(x.) On the Tenth Claim for Relief, pursuant to sections 548 105(a)(1)(B), and 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Tucker: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Tucker Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS Tucker for the benefit of the BLMIS estate; (b) directing Tucker, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Tucker Subsequent Transfers; (c) imposing a constructive trust over the Tucker Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xi.) On the Eleventh Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 105(a) and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment against Piedrahita: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six Year Initial recovering the Piedrahita Subsequent Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Feeder Funds Piedrahita for the benefit of the BLMIS estate; (b) directing Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Piedrahita Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xii.) On the Twelfth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 105(a) and 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment against Vijayvergiya: (a) avoiding and preserving the Greenwich

Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, (c) recovering the Greenwich Six Year Initial recovering the Vijayvergiya Subsequent Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from FGB, FGL, and GBL Vijayvergiya for the benefit of the BLMIS estate; (b) directing Vijayvergiya, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) imposing a constructive trust over the Vijayvergiya Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xiii.) On the Thirteenth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 105(a) and 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Toub: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six Year Toub Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the FGG Affiliates and FGG Individuals Toub for the benefit of the BLMIS estate; (b) directing Toub, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Toub Subsequent Transfers; (c) imposing a constructive trust over the Toub Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xiv.) On the Fourteenth Claim for Relief, pursuant to sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 105(a) and 550(a)(1), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is

~~entitled to a~~ judgment against Corina Noel Piedrahita: (a) ~~avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial~~ recovering the Corina Noel Piedrahita Subsequent Transfers, or the value thereof, from ~~the Feeder Funds for the benefit of the estate of BLMIS~~ Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Corina Noel Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Corina Noel Piedrahita Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xv~~.~~)    On the Fifteenth Claim for Relief, pursuant to ~~sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich~~ applicable Delaware law judgment that FG Limited is jointly and severally liable for all obligations Greenwich Sentry incurred while FG Limited was serving as general partner, and recovering the Six Year Initial Transfers, or ~~the value thereof, from FGB, FGL, and GBL~~ their value, that Greenwich Sentry received while FG Limited was serving as general partner, from FG Limited for the benefit of the estate of BLMIS;

(xvi~~.~~)    On the Sixteenth Claim for Relief, pursuant to ~~sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial~~

Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c)applicable Delaware law judgment that FG Bermuda is jointly and severally liable for all obligations Greenwich Sentry incurred while FG Bermuda was serving as general partner, and recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG IndividualsInitial Transfers, or their value, that Greenwich Sentry received while FG Bermuda was serving as general partner, from FG Bermuda for the benefit of the estate of BLMIS;

(xvii. ) On the Seventeenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(1) of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c)applicable Delaware law judgment that FG Bermuda is jointly and severally liable for all obligations of Greenwich Sentry Partners incurred while FG Bermuda was serving as general partner, and recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fundstheir value, that Greenwich Sentry Partners received while FG Bermuda was serving as general partner, from FG Bermuda for the benefit of the estate of BLMIS;

xviii.      On the Eighteenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(1) of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS;

xix.      On the Nineteenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(2) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from

the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xx.        On the Twentieth Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

xxi.        On the Twenty-First Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL and GBL for the benefit of the estate of BLMIS;

xxii.        On the Twenty-Second Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xxiii.        On the Twenty-Third Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17- 403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Feeder Funds;

xxiv.        On the Twenty-Fourth Claim for Relief, pursuant to NY CPLR 203(g), sections

276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Initial Transfers, (b) directing that the Greenwich Initial Transfers be set aside, (c) recovering the Greenwich Initial Transfers, or the value thereof, from FGB, FGL, GBL, Noel, and Tucker for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from FGB, FGL, GBL, Noel, and Tucker;

xxv.      On the Twenty-Fifth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the FGG Affiliates and FGG Individuals;

xxvi.      On the Twenty-Sixth Claim for Relief, a judgment that the SIPA claims filed by Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, and Tucker be disallowed;

(xviii) On all Claims for Relief, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that the Initial Transfers are voidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, §§ 273–279, including 279-a, of the N.Y. Debt. & Cred. Law, and the New York Civil Practice Law and Rules (McKinney 2003), as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), and obtain all appropriate relief.

(xvix) On all Claims for Relief, imputing each of the Defendant's knowledge to each of the other Defendants;

(xx)    On all Claims for Relief, directing the Defendants to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to, arising from, or concerning the Six Year Initial Transfers;

xxvii.(xxi)    On all Claims for Relief, a judgment pursuant to federal common law and NY CPLR N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Subsequent Six Year Initial Transfers were received by the Defendants;

xxviii. (xxii) On all Claims for Relief, establishment of awarding the Trustee attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding;

(xxiii) On all Claims for Relief, establishing a constructive trust over the proceeds of all Six Year Initial Transfers, and Subsequent Transfers and unjust enrichment to the Defendants their proceeds, product and offspring in favor of the Trustee for the benefit of BLMIS's the estate; and

xxix.    On all Claims for Relief, assignment of the Defendants' right to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xxx.    On the Twenty-Seventh, Twenty-Eighth, Twenty-Ninth, Thirtieth, and Thirty-First Claims for Relief, compensatory, exemplary, and punitive damages in excess of $3.6 billion, with the specific amount to be determined at trial;

xxxi.    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xxxii. (xxiv) Granting Plaintiff the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date: New York, New York
        July 20, 2010

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Trustee demands trial by jury in this action of all issues so triable.

s/Marc E. Hirschfield

Of Counsel:Dated: August 28, 2020

BakerBAKER & HostetlerHOSTETLER LLP

Thomas L. Long
Jessie M. Gabriel
Baker & Hostetler LLP
65 East State Street, Suite 2100 Columbus, Ohio 43215
Telephone: (614) 228-1541 Facsimile: (614) 462-2616
Thomas L. Long
E-mail: tlong@bakerlaw.com
Jessie M. Gabriel
E-mail: jgabriel@bakerlaw.comNew York, New York

By: /s/ David J. Sheehan
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan dsheehan@bakerlaw.com

E-mail: dsheehan@bakerlaw.com
Marc E. Hirschfield
E-mail: mhirschfield@bakerlaw.com
Mark A. Kornfeld
E-mail: mkornfeld@bakerlaw.com

*Attorneys for Irving H. Picard,Esq..*
*Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*

Document comparison by Workshare 9.5 on Saturday, March 26, 2022 1:44:38 AM

| Input: | |
|---|---|
| Document 1 ID | file://R:\Document Services\Document Services\Exela - Cenza\Document Services\2022\03_March 2022\25-March-2022\Inbox - WP to Cenza\Draft\Job 206514-Redline\Job 206514-Exhibit 3- First Amended Complaint Picard v.docx |
| Description | Job 206514-Exhibit 3- First Amended Complaint Picard v |
| Document 2 ID | file://R:\Document Services\Document Services\Exela - Cenza\Document Services\2022\03_March 2022\25-March-2022\Inbox - WP to Cenza\Draft\Job 206514-Redline\Job 206514- Exhibit 4 - Second Amended Complaint Picard v.docx |
| Description | Job 206514- Exhibit 4 - Second Amended Complaint Picard v |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 1082 |
| Deletions | 2008 |
| Moved from | 47 |

| Moved to | 47 |
|---|---|
| Style change | 0 |
| Format changed | 0 |
| Total changes | 3184 |