# Exhibit 11

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01021 (SMB) |
| Plaintiff, | |
| v. | |
| GROSVENOR INVESTMENT MANAGEMENT LTD., GROSVENOR PRIVATE RESERVE FUND LIMITED, GROSVENOR BALANCED GROWTH FUND LIMITED, and GROSVENOR AGGRESSIVE GROWTH FUND LIMITED, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO GROSVENOR DEFENDANTS** |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendants Grosvenor Private Reserve Fund Limited ("Grosvenor Private"), Grosvenor Balanced Growth Fund Limited ("Grosvenor Balanced"), Grosvenor Aggressive Growth Fund Limited ("Grosvenor Aggressive") (and together with Grosvenor Private and Grosvenor Balanced, the "Grosvenor Funds"), and Grosvenor Investment Management Ltd. ("Grosvenor Management," and collectively with the Grosvenor Funds, the "Grosvenor Defendants"), states:

1.      The Trustee seeks to recover at least $36,506,571 in subsequent transfers of BLMIS customer property collectively made to the Grosvenor Defendants by Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global," and together with Fairfield Sentry, the "Feeder Funds").  Of the $36,506,571, at least $31,506,389 are subsequent transfers of BLMIS customer property made to the Grosvenor Defendants by Fairfield Sentry, and at least $5,000,182 are subsequent transfers of BLMIS customer property made to Grosvenor Private, Grosvenor Balanced, and Grosvenor Management by Kingate Global.

2.      BLMIS held customer accounts for numerous feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns—including Fairfield Sentry and Kingate Global.

3.      From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.  Similarly, from March 1994 through December 2008, Kingate Global also maintained a direct customer account with BLMIS. As detailed further below, Fairfield Sentry was the largest BLMIS feeder fund, and Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

1

4.      Each of the Grosvenor Defendants was formally incorporated in Bermuda.

5.      At all times relevant, Grosvenor Management was the investment manager of each of the Grosvenor Funds.

6.      The Grosvenor Funds authorized and/or directed Grosvenor Management to conduct due diligence, negotiate transactions, and act on the Grosvenor Funds' behalf for all purposes related to their investments in Fairfield Sentry and Kingate Global.

## I.    THE COMPONENT EVENTS OF THE TRANSFERS WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS

7.      The Grosvenor Defendants invested in the Feeder Funds because their money would ultimately be placed with BLMIS—a New York-based broker dealer where Fairfield Sentry and Kingate Global established trading accounts for the purpose of having Madoff invest their assets in securities purportedly traded on the U.S. stock markets.

8.      The Grosvenor Defendants' investments with BLMIS through Fairfield Sentry and Kingate Global were not accidental or fortuitous—they utilized these feeder funds to profit from BLMIS and Madoff.

9.      The Grosvenor Defendants' transactions with Fairfield Sentry and Kingate Global were centered in the United States and comprised of predominantly domestic elements.

### A.    The Grosvenor Defendants' Relationship with Fairfield Sentry was Centered in the United States

10.     As the Grosvenor Funds' investment manager, Grosvenor Management conducted due diligence on Madoff, BLMIS, and Fairfield Sentry. Grosvenor Management communicated directly with Fairfield Sentry representatives at FGG in New York.

11.     The Grosvenor Defendants requested and received access to FGG's password protected website that provided further detail on Fairfield Sentry's BLMIS account in New York,

2

including information concerning Madoff's purported purchase of U.S. equities as part of his split-strike conversion investment strategy ("SSC Strategy").

12.    On behalf of the Grosvenor Funds, Grosvenor Management also arranged subscriptions in Fairfield Sentry with New York-based Jeffrey Tucker, FGG's founding partner and a U.S. citizen and resident.

### B.    The Grosvenor Defendants Purposefully Invested in Kingate Global in Order to Profit from New York-based BLMIS

13.    The Grosvenor Funds and Grosvenor Management were part of a larger group of sophisticated financial entities that included fund managers, fund administrators, asset managers, and other entities that were generally known to the hedge fund industry as the Grosvenor Group ("Grosvenor Group").

14.    At all times relevant, as part of its standard operating procedure, the Grosvenor Group shared office locations, utilized one another's employees, exchanged information, and discussed specific concerns relating to BLMIS, Madoff, and the Feeder Funds.

15.    Shortly after beginning its relationship with Fairfield Sentry, the Grosvenor Group hired Dan Voth ("Voth") to establish and build a fund administration business unit.  Prior to joining the Grosvenor Group in 1999, Voth was employed by Kingate Global's Bermuda-based administrator, then known as Hemisphere Management Limited ("Hemisphere").

16.    During his time at Hemisphere, Voth acquired significant information concerning New York-based Madoff, BLMIS, and Kingate Global.

17.    As part of his responsibilities at Hemisphere, Voth regularly communicated with New York-based Frank DiPascali, a BLMIS employee who helped run Madoff's fraudulent investment advisory business, about the Kingate Global's investments with BLMIS.

18.     In 1999, Voth left Hemisphere and joined the Grosvenor Group, where he remained employed until 2011.

19.     Prior to Voth joining the Grosvenor Group, the Grosvenor Defendants were invested in Fairfield Sentry. After joining the Grosvenor Group, the Grosvenor Defendants began to invest with Kingate Global. Voth's intimate knowledge of Kingate Global's operations allowed the Grosvenor Defendants to profit from New York-based BLMIS. By late 1999, less than a year after Voth joined the Grosvenor Group, each of the Defendant Grosvenor Funds had invested in Kingate Global.

### C.     The Grosvenor Defendants Knew New York-Based BLMIS Controlled Fairfield Sentry's and Kingate Global's Investments and Madoff Purported to Invest in U.S. Markets

20.     As a result of their due diligence and Voth's employment at Hemisphere, the Grosvenor Defendants knew New York-based BLMIS controlled Fairfield Sentry's and Kingate Global's investments and Madoff purported to invest those assets in U.S. markets.

21.     The Grosvenor Defendants knew New York-based BLMIS had custody of at least 95% of Fairfield Sentry's investments. The Grosvenor Defendants also knew that BLMIS had custody of all of Kingate Global's investments.

22.     Prior to their investments with Fairfield Sentry and Kingate Global, the Grosvenor Defendants also knew the following facts:

- In reality BLMIS was Fairfield Sentry's and Kingate Global's investment adviser. For example, the Grosvenor Defendants reviewed Kingate Global's April 1997 information memorandum identifying that, "the Fund shall primarily invest with an Investment Advisor [BLMIS] who is based in the United States."

- New York-based BLMIS was the executing broker for Fairfield Sentry's and Kingate Global's investments, and BLMIS purportedly operated and executed Madoff's SSC Strategy on behalf of Fairfield Sentry and Kingate Global.

4

- The SSC Strategy purportedly involved the purchase of U.S. equities and U.S. Treasury bills ("Treasurys") traded on U.S. exchanges.

- Madoff controlled the decisions regarding which U.S. securities to purportedly purchase.

- BLMIS was a U.S. registered broker-dealer regulated by the SEC.

- The entire economic purpose of Fairfield Sentry and Kingate Global was to deliver money to and profit from New York-based BLMIS.

23.     Moreover, by virtue of Voth's experience with Hemisphere, interactions with New York-based BLMIS representatives, and knowledge of the SSC Strategy, the Grosvenor Defendants understood that BLMIS purported to execute trades in these U.S. assets collectively for all the BLMIS feeder funds and then allocate the trades to each account pro rata. Because of this understanding, the Grosvenor Defendants knew that whatever trades of U.S. equities and U.S. Treasurys that Madoff purported to make for Kingate Global were also purportedly traded for Fairfield Sentry.

24.     The Grosvenor Defendants were also privy to Voth's review and familiarity with BLMIS trade confirmations each of which listed BLMIS as a member of SIPC regulated by the SEC.

25.     The Grosvenor Defendants knew control over Fairfield Sentry's and Kingate Global's investments rested almost entirely with Madoff and BLMIS in New York, and Madoff purported to invest those investments in U.S. markets.

**D.     The Grosvenor Defendants Repeatedly Utilized New York Banks to Transfer Funds**

26.     The Grosvenor Defendants utilized New York bank accounts to transfer funds to and from Fairfield Sentry and Kingate Global.

27.     The Grosvenor Defendants executed subscription agreements in connection with their investments in Fairfield Sentry.  These agreements stated that all money from the Grosvenor Defendants be directed to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York.  On at least 130 occasions over the course of almost 12 years, in connection with subscribing funds to Fairfield Sentry, the Grosvenor Defendants directed funds to either the Republic National Bank of New York or New York HSBC Bank USA account.

28.     Grosvenor Balanced and Grosvenor Private also used an account at Barclays Bank plc ("Barclays") in New York through which they received transfers from Fairfield Sentry.  Grosvenor Balanced completed several standardized Fairfield Sentry forms entitled "Share Application Form," which directed redemption payments to this Barclays account.  Grosvenor Balanced and Grosvenor Private collectively received $27,315,101 in redemption payments from Fairfield Sentry through this Barclays account in New York.  Upon information and belief, Grosvenor Aggressive also received a $4,191,287 redemption payment from Fairfield Sentry through this Barclays account in New York.

29.     The Grosvenor Defendants executed subscription agreements in connection with their investments in Kingate Global.  These agreements stated that all money from the Grosvenor Defendants be directed to a Citibank N.A. correspondent bank account in New York for ultimate deposit in Kingate Global's bank account.  From Kingate Global's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.  On at least 15 occasions over the

course of more than 3 years, in connection with subscribing funds to Kingate Global, the Grosvenor Defendants directed funds to this Citibank N.A. account in New York.

30.    Pursuant to Grosvenor Balanced's and Grosvenor Private's representations that they received Fairfield Sentry transfers through accounts at Barclays in New York, upon information and belief, Kingate Global redemption proceeds were also received in through this account at Barclays in New York.   Grosvenor Balanced and Grosvenor Private collectively received $5,000,181 in redemption payments from Kingate Global through this Barclays account.

## II.    FAIRFIELD SENTRY MAINTAINED ITS PRINCIPAL PLACE OF BUSINESS IN NEW YORK

31.    At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### A.    The Genesis of the FGG *De Facto* Partnership

32.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called FGG based in New York City.   FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

33.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.   Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda").    Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

34.    FGG also included a number of administrative entities that purportedly provided

7

management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

35.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

36.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

37.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

38.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

39.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

40.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

9

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2.   FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

41.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.   FGG New York Personnel Managed Fairfield Sentry

42.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

10

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

43.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.      Fairfield Sentry's Investors Knew They Were Investing in BLMIS

44.     Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's

services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

45.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

46.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG.  FG Limited was formed under the laws of Ireland.

47.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

12

controlled by BLMIS.

48.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

49.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

50.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

51.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

13

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

52.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

53.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

54.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

55.     The Trustee incorporates by reference the allegations of the Second Amended Complaint filed in *Picard v. Fairfield Investment Fund, Ltd.,* Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## III.    THE KINGATE GLOBAL TRANSFERS ARE DOMESTIC

56.     Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047of customer property to Kingate Global

during the life of the account prior to December 11, 2008.

57.     Kingate Global filed a customer claim in the SIPA liquidation.

**A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation**

58.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

59.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

60.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

61.     Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Global's investments with BLMIS.

62.     Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**B.    The Operative Legal Documents Were New York-Based**

63.     Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

15

64.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

65.     Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### C.     BLMIS Had Full Authority to Make and Execute Investment Decisions

66.     Kingate Global's Trading Authorization Agreements authorized BLMIS to be the Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

67.     As with each of the other BLMIS feeder funds, BLMIS in New York acted as the Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

68.     BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D.     Kingate Global Was Managed From New York

69.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable

contributor in New York to the success of Kingate Global.

70.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

71.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

72.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

73.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

74.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

75.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

76.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

77.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

78.     KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.      Kingate Global Used Banks in New York**

79.     Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

80.     KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

81.     In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

82.     FIM also directed fee payments to be routed through a bank account in New York.

83.     The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Ceretti,* Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF 100.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: June 26, 2015
    New York, New York

*/s/* Thomas L. Long

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Catherine E. Woltering

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Douglas A. Vonderhaar

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*