**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Ferve E. Khan
Eric B. Hiatt

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02922 (CGM) |
| Plaintiff, | |
| v. | |
| BANK JULIUS BAER & CO. LTD., | **AMENDED COMPLAINT** |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll*

("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"),

by and through his undersigned counsel, for his Amended Complaint against defendant Bank

Julius Baer & Co. Ltd. ("BJB"), alleges the following:

## I.     NATURE OF THE PROCEEDING

1.     This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the

massive Ponzi scheme perpetrated by Madoff and others.

2.     The Trustee seeks to recover at least $64,576,233 in subsequent transfers of BLMIS

customer property (the "Transfers") that BJB received by redeeming shares it owned in BLMIS

feeder funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield

Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda" and, together with Fairfield Sentry

and Fairfield Sigma, the "FGG Feeder Funds").

3.     BJB is a Swiss private bank, organized as a limited company, which offers asset

and wealth management, financial planning, and portfolio management services.  At all relevant

times, BJB was a sophisticated entity with significant expertise in hedge fund investments,

including with respect to the FGG Feeder Funds, other BLMIS feeder funds, and BLMIS itself.

4.     BLMIS feeder funds were single-purpose entities that invested all or substantially

all of their assets with BLMIS's investment advisory business (the "IA Business").  The FGG

Feeder Funds were the largest group of BLMIS feeder funds, and were created, operated, and

---

[1] For convenience further references to SIPA will omit title 15 and be cited as SIPA § ____.

controlled by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership. From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS; Fairfield Sigma and Fairfield Lambda were "currency funds," meaning they accepted subscriptions in euros and Swiss francs, respectively, converted the money to U.S. dollars, and then invested 100% of their assets in Fairfield Sentry.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

5.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

6.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

7.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

8.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    PERSONAL JURISDICTION

9.      BJB is subject to the jurisdiction of this Court pursuant to Federal Rule of Bankruptcy Procedure 7004 and the United States Constitution, as well as section 302 of the New

York Civil Practice Law and Rules, because it purposely availed itself of the laws and protections of the United States and the State of New York.

10.    The Trustee's claims against BJB arise from business it transacted within New York. BJB derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

11.    BJB conducted a significant portion of its FGG Feeder Funds business out of its New York branch, through personnel employed by BJB and/or its co-located affiliate, Julius Baer Investment Management LLC ("JBIM"),[2] as agent for BJB. These persons played essential roles in BJB's FGG Feeder Funds transactions, as well as other BLMIS feeder fund transactions.

12.    BJB's and JBIM's New York-based personnel, among other things, (i) were responsible for approving BJB's investments in the FGG Feeder Funds, (ii) met and communicated with New York-based FGG personnel in New York in connection with BJB's FGG Feeder Fund investments, including at least five meetings during the time period 1999 through 2003 with FGG executives Jeffrey Tucker, Philip Toub, Cornelis Boele, Harold Greisman, and/or Robert Blum, and numerous other communications, and (iii) met with Madoff himself at BLMIS's offices in New York on at least three occasions during the time period 1998 through 2003, in connection with all of BJB's BLMIS feeder fund investments.

13.    Accordingly, BJB's and FGG's relationship was primarily established and maintained in New York by New York-based BJB and FGG personnel.

14.    In addition, foreign-based employees of BJB met and corresponded with New York-based FGG personnel regarding BJB's investments in the FGG Feeder Funds.

---

[2] JBIM is now known as Artio Global Management LLC.

15.    BJB invested in the FGG Feeder Funds for the purpose of profiting from BLMIS

in New York, and relinquished control over investment decisions and their implementation to

Madoff in New York.

16.    BJB knowingly directed funds to be invested with, and then redeemed from,

New York-based BLMIS, via the FGG Feeder Funds.  By transacting with New York-based

BLMIS and New York-based FGG, BJB knowingly accepted the rights, benefits, privileges, and

responsibilities of conducting business and transactions in the United States and New York.

17.    BJB voluntarily executed a subscription agreement each time it invested in an FGG

Feeder Fund.  In these agreements, BJB affirmed that it received and read the fund's information

memorandum or private placement memorandum ("PPM").  Based on these documents, BJB knew

the following facts indicating that it was transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and
  Fairfield Sigma and Fairfield Lambda invested 100% of their assets with Fairfield Sentry;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the U.S. Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly
  operated and executed the split-strike conversion strategy (the "SSC Strategy") on the
  fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options,
  and U.S. Treasury securities ("Treasury Bills"), and the decisions regarding which U.S.
  securities to purportedly purchase, and when to make such purchases, were made by
  BLMIS in New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in
  U.S. dollars to New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

18.     The Fairfield Sentry subscription agreements provided that all money for the purchase of Fairfield Sentry shares be directed to a New York correspondent bank account.  As set forth above, BJB knew and intended that these funds would be then invested with BLMIS in New York.  From Fairfield Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York.

19.     BJB directed funds to Fairfield Sentry on at least 251 occasions over the course of at least 12 years.

20.     It was also BJB's practice to use New York bank accounts to receive redemptions (i.e., the Transfers) from Fairfield Sentry.  In subscription agreements, BJB designated a bank account in its own name at JPMorgan Chase Bank in New York as the situs for receiving redemptions, and BJB used this account to receive dozens of Transfers.  BJB also used an HSBC Bank USA correspondent account in New York via Citco Global Custody NV, as its agent, to receive a number of additional Transfers.

21.     In its FGG Feeder Funds subscription agreements, BJB submitted to New York jurisdiction, venue, service of process, and law.  Specifically, BJB (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

22.     BJB also entered into at least one distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), an FGG management entity, which agreement compensated BJB for investments it placed in Fairfield Sentry.  Pursuant to this agreement, BJB

received quarterly fee payments (commonly known as retrocession fees) from FG Limited from at least 2005-2007.

23.     FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York.  FG Limited's fee-sharing agreements with respect to FGG funds typically provided that the agreement is governed by New York law.  For instance, a New York governing-law clause was included in the similar fee agreements that were negotiated by BJB and FGG in connection with FGG funds Chester Global Strategy Fund Limited and Irongate Global Strategy Fund Limited.

## IV.   BACKGROUND, THE TRUSTEE AND STANDING

24.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court Proceeding.

25.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

26.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    c.      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

27.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

28.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

29.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

30.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

31.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

32.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George

Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

33.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

34.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

35.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.     **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

### A.     **BLMIS**

36.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole

proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled

BLMIS first as its sole member and thereafter as its chairman and chief executive.

37.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory Authority

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At

all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership

is contingent on registration of the broker-dealer with the SEC.

38.     For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and the IA Business.

39.     BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

40.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

41.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.    The Ponzi Scheme**

42.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

43.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

44.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm

based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

45.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1.    Madoff's Investment Strategy

46.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

47.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

48.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

49.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

50.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

51.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

52.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

53.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

54.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

55.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the

market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

56.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

57.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

2.    BLMIS's Fee Structure

58.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

3.    BLMIS's Market Timing

59.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out

of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

60.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

61.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4.    BLMIS Execution

62.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5.    No Evidence Of BLMIS Trading

63.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

64.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### 6.    The Collapse Of The Ponzi Scheme

65.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

66.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

67.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    DEFENDANT AND RELEVANT NON-PARTY AFFILIATES

68.    Defendant BJB is a Swiss limited company that provides global private banking and investment services for individual and institutional clients.  BJB is the third largest Swiss bank and maintains its principal office at Bahnhofstrasse 36, 8010 Zurich, Switzerland.  BJB has numerous branches and representative offices throughout the world.

69.    BJB is the principal operating company of Julius Baer Group Ltd. ("Julius Baer Group"), one of the top 30 largest publicly-traded Swiss companies.  Julius Baer Group is headquartered in Zurich, Switzerland.

70.    From 1984 through April 2006, BJB maintained a New York branch at 330 Madison Avenue, New York, NY 10017.

71.    At all relevant times, non-defendant JBIM was a wholly-owned subsidiary of Julius Baer Group and an affiliate of BJB, and was also located at 330 Madison Avenue, New York, NY 10017.  JBIM's personnel were among those responsible for vetting and approving BJB's

investments in third-party funds such as the FGG Feeder Funds.  In this regard, JBIM acted as agent to BJB.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO BJB

### A.    Initial Transfers From BLMIS To Fairfield Sentry

72.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

73.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

74.    The Fairfield Sentry Initial Transfers are set forth in the attached **Exhibits A** and **B**.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

75.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

76.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the

BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

77.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law (the "NYDCL"), particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

78.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    Subsequent Transfers From Fairfield Sentry To BJB**

79.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BJB.  Based on the Trustee's investigation to date, the subsequent transfers to BJB total at least $52,949,944 (the "Fairfield Sentry-BJB Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry-BJB Subsequent Transfers is attached as **Exhibit C**.

80.    On December 8, 2011, the Trustee filed this action against BJB seeking recovery of subsequent transfers from Fairfield Sentry.

81.    The Fairfield Sentry-BJB Subsequent Transfers are recoverable from BJB under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

82.    The Fairfield Sentry-BJB Subsequent Transfers represent redemptions of equity

interests by BJB as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BJB Subsequent Transfers upon redemption of BJB's interests.

**C.    Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To BJB**

83.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by is attached as **Exhibit D**.

84.    Thereafter, Fairfield Sigma transferred at least $11,262,340 to BJB (the "Fairfield Sigma-BJB Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma-BJB Subsequent Transfers is attached as **Exhibit E**.

85.    The Fairfield Sigma-BJB Subsequent Transfers are recoverable from BJB under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

86.    The Fairfield Sigma-BJB Subsequent Transfers represent redemptions of equity interests by BJB as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all of its assets in Fairfield Sentry, and Fairfield Sentry, in turn, invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-BJB Subsequent Transfers upon redemption of BJB's interests.

**D.    Subsequent Transfers From Fairfield Sentry To Fairfield Lambda And Subsequently To BJB**

87.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $51,991,017 of the Fairfield Sentry Initial Transfers

directly to Fairfield Lambda (the "Fairfield Lambda Subsequent Transfers").  A chart setting forth

the presently known Fairfield Lambda Subsequent Transfers by is attached as **Exhibit F**.

88.     Thereafter, Fairfield Lambda transferred at least $363,949 to BJB (the "Fairfield

Lambda-BJB Subsequent Transfers").  A chart setting forth the presently known Fairfield Lambda-

BJB Subsequent Transfers is attached as **Exhibit G**.

89.     The Fairfield Lambda-BJB Subsequent Transfers are recoverable from BJB under

section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-

2(c)(3).

90.     The Fairfield Lambda-BJB Subsequent Transfers represent redemptions of equity

interests by BJB as a shareholder in Fairfield Lambda.  Because Fairfield Lambda invested all of

its assets in Fairfield Sentry, and Fairfield Sentry, in turn, invested all or substantially all of its

assets into the BLMIS Ponzi scheme, Fairfield Lambda was insolvent when it made the Fairfield

Lambda-BJB Subsequent Transfers upon redemption of BJB's interests.

91.     The Fairfield Sentry-BJB Subsequent Transfers, Fairfield Sigma-BJB Subsequent

Transfers, and Fairfield Lambda-BJB Subsequent Transfers together constitute the Transfers, as

defined above.

92.     The Trustee's discovery and investigation is ongoing and the Trustee reserves the

right to: (i) supplement the information on the initial and subsequent transfers discussed above,

and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE

### RECOVERY OF THE TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550

93.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

94.    The Transfers are recoverable from BJB under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

95.    BJB is an immediate or mediate transferee of the Transfers from the FGG Feeder Funds.

96.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BJB: (a) recovering the Transfers, or the value thereof, from BJB for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on the Count in favor of the Trustee and against BJB as follows:

a)    Recovering the Transfers, or the value thereof, from BJB for the benefit of the estate;

b)    If BJB challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

c)    Awarding the Trustee prejudgment interest from the dates on which the Transfers were received by BJB; and

d)      Awarding the Trustee fees and all applicable costs and disbursements, and

such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: April 15, 2022                          /s/ David J. Sheehan
       New York, New York                **Baker & Hostetler LLP**
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Email: dsheehan@bakerlaw.com
                                   Keith R. Murphy
                                   Email: kmurphy@bakerlaw.com
                                   Ferve E. Khan
                                   Email: fkhan@bakerlaw.com
                                   Eric B. Hiatt
                                   Email: ehiatt@bakerlaw.com

                                   *Attorneys for Irving H. Picard, Trustee*
                                   *for the Substantively Consolidated SIPA*
                                   *Liquidation of Bernard L. Madoff Investment*
                                   *Securities LLC and the Chapter 7 Estate of*
                                   *Bernard L. Madoff*

                                   **Windels Marx Lane & Mittendorf, LLP**
                                   156 West 56th Street
                                   New York, New York 10019
                                   Telephone: (212) 237-1000
                                   Facsimile: (212) 262-1215
                                   Kim M. Longo
                                   Email: klongo@windelsmarx.com
                                   Alan D. Lawn
                                   Email: alawn@windelsmarx.com

                                   *Special Counsel for Irving H. Picard, Trustee*
                                   *for the Substantively Consolidated SIPA*
                                   *Liquidation of Bernard L. Madoff Investment*
                                   *Securities LLC and the Chapter 7 Estate of*
                                   *Bernard L. Madoff*