**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 11-02542 (CGM) |
| Plaintiff, | |
| v. | |
| PARSON FINANCE PANAMA S.A., | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT PARSON FINANCE PANAMA S.A.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

<b>Page</b>

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................3

    I.     THE BLMIS PONZI SCHEME.........................................................................3

    II.    FAIRFIELD SENTRY........................................................................................3

    III.   PARSON AND ITS INVESTMENT IN SENTRY .................................................4

        A.     Parson and Its Agents................................................................................4

             1.     Anova .........................................................................................4

             2.     Bamont ......................................................................................5

        B.     Parson Purposefully Invested with BLMIS in New York .........................5

        C.     Parson Met and Communicated with FGG Personnel in New York
             Regarding Its Sentry Investment..............................................................7

        D.     Parson Executed a Sentry Subscription Agreement with New York
             Jurisdiction, Forum Selection, and Choice of Law Provisions..................8

        E.     Parson Designated and Used New York Bank Accounts for Its Sentry
             Investment..............................................................................................8

    IV.   THE FAIRFIELD SETTLEMENT........................................................................9

ARGUMENT .........................................................................................................9

    I.     THIS COURT HAS PERSONAL JURISDICTION OVER PARSON..................9

        A.     Parson Purposefully Availed Itself of the Laws and Privileges of
             Conducting Business in New York by Investing in Sentry .......................11

             1.     Parson's Investment with BLMIS Through Sentry Establishes
                 Minimum Contacts......................................................................12

                 a.    *BLI* Establishes this Court's Jurisdiction Over Parson ......13

                 b.    *Walden* Does Not Save Parson From this Court's
                     Jurisdiction.......................................................................14

             2.     Parson's Contacts with FGG in New York Establish Minimum
                 Contacts......................................................................................16

             3.     Parson's Subscription Agreement Supports Specific
                 Jurisdiction.................................................................................18

i

**TABLE OF CONTENTS CONTINUED**

                                                                                                    **Page**

4.      Parson's Purposeful Use of Correspondent Bank Accounts
        Supports Specific Jurisdiction..........................................................20

5.      The Trustee's Claim Relates to and Arises Out of Parson's
        Transaction of Business in New York ...........................................23

B.      The Exercise of Personal Jurisdiction Over Parson Is Reasonable............25

C.      In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery......25

II.     THE COMPLAINT ALLEGES THAT PARSON RECEIVED BLMIS
        CUSTOMER PROPERTY UNDER SECTION 550(a) ........................................26

A.      Parson Misstates the Trustee's Pleading Burden .......................................27

B.      Parson's Tracing Arguments Fail at the Pleading Stage............................29

C.      Parson's Claims of Double Recovery Are Premature................................33

III.    SECTION 546(e) DOES NOT BAR RECOVERY FROM PARSON.................33

A.      Sentry's Actual Knowledge of Madoff's Fraud Bars Application of
        Section 546(e) ............................................................................34

B.      Parson Is Precluded from Relitigating the Actual Knowledge
        Exception Established in *Cohmad* ............................................................35

C.      Parson Is Precluded from Arguing that Section 546(e) Applies
        Independently to Recovery Actions...........................................................36

CONCLUSION ...........................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) .......................................................................26, 27, 32

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ...........................................................................................................22

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*,
    480 U.S. 102 (1987).............................................................................................................16

*Ayyash v. Bank Al-Madina*,
    No. 04-cv-9201 (GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ...................................26

*Bartlett v. Société Générale de Banque au Liban SAL*,
    No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448
    (E.D.N.Y. Nov. 25, 2020).....................................................................................................21

*In re BLMIS*,
    No. 21-cv-02334 (CM), 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022).....................................35

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)...........................................................................................10, 11, 18, 25

*Burlington Indus., Inc. v. Salem Int'l Co.*,
    645 F. Supp. 872 (S.D.N.Y. 1986) ......................................................................................17

*Chase Manhattan Bank v. Banque Generale du Commerce*,
    No. 96-cv-5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997) .................................18

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010).................................................................................10, 11, 25

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) ...............................................................................33

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)..................................................................................10

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)............................................................................................................10

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
    7 N.Y.3d 65 (2006) .............................................................................................................18

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) .................................................................................. 9

*Druck Corp. v. Macro Fund (U.S.) Ltd.*,
    102 F. App'x 192 (2d Cir. 2004) ....................................................................... 17

*Ehrlich-Bober & Co. v. Univ. of Houston*,
    49 N.Y.2d 574 (1980) ....................................................................................... 22

*Eldesouky v. Aziz*,
    No. 11-cv-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ................ 20

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
    343 B.R. 75 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds*, 388 B.R. 489
    (S.D.N.Y. 2008) ................................................................................................ 39

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011) ............................................................................. 38

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019) ................................................... 12, 21, 22

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
    141 S. Ct. 1017 (2021) ............................................................................ *passim*

*Fowler v. Caliber Home Loans, Inc.*,
    277 F. Supp. 3d 1324 (S.D. Fla. 2016) ............................................................. 30

*Ge Dandong v. Pinnacle Performance Ltd.*,
    966 F. Supp. 2d 374 (S.D.N.Y. 2013) ............................................................... 20

*Gowan v. Amaranth Advisors, LLC (In re Dreier LLP)*,
    Adv. Pro. Nos. 10-03493 (SMB) & 10-05447 (SMB), 2014 WL 47774
    (Bankr. S.D.N.Y. Jan. 3, 2014) ........................................................................ 32

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005) ............................................................................. 11

*Hau Yin To v. HSBC Holdings PLC*,
    No. 15-cv-3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. 2017) .................. 23, 24

*Hecklerco, LLC v. YuuZoo Corp. Ltd.*,
    252 F. Supp. 3d 369 (S.D.N.Y. 2017) ............................................................... 18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ......................................................................................... 15

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
    601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021)...........................33

*Hill v. HSBC Bank plc*,
    207 F. Supp. 3d 333 (S.D.N.Y. 2016); ............................................................................23, 24

*HSH Nordbank AG N.Y. Branch v. Street*,
    No. 11-cv-9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ..................................20

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).......................................................................................................10, 11, 24

*Kelley v. Westford Special Situations Master Fund, L.P.*,
    No. 19-cv-1073 (ECT) (KMM), 2020 WL 3077151 (D. Minn. June 10, 2020)..........29, 31, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02-cv-7618 (KMW) (HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009) ..............25, 26

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ......................................................................................................17, 18

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
    No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25 2013) ...............................34

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ......................................................................................................21, 23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...............................................................................11, 19, 21, 23

*Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In
    re Motors Liquidation Co.)*,
    565 B.R. 275 (Bankr. S.D.N.Y. 2017) .......................................................................18, 19, 22

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018)................................................................................................35

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..............................................................................................................34

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain
    Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)................................................................................................21

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ....................................................................................35

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018) ............................................................................. *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................................. *passim*

*Picard v. Ceretti (In re BLMIS)*,
  Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749
  (Bankr. S.D.N.Y. Aug. 11, 2015) ............................................................................................35

*Picard v. Chais (In re BLMIS)*,
  440 B.R. 274 (Bankr. S.D.N.Y. 2010) ....................................................................................23

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
  Adv. Pro. Nos. 10-04398 (BRL) & 10-05219 (BRL), 2012 WL 892514
  (Bankr. S.D.N.Y. Mar. 14, 2012) ...................................................................................... *passim*

*Picard. v. Citibank, N.A. (In re BLMIS)*,
  12 F.4th 171 (2d Cir. 2021) ......................................................................................................3

*Picard v. Cohen (In re BLMIS)*,
  Adv. Pro. No. 10-04311 (CGM), 2016 WL 1695296
  (Bankr. S.D.N.Y. Apr. 25, 2016) ............................................................................................36

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011) ....................................................................................30

*Picard v. Estate of Igoin (In re BLMIS)*,
  525 B.R. 871 (Bankr. S.D.N.Y. 2015) ..............................................................................20, 22

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
  627 B.R. 546 (Bankr. S.D.N.Y. 2021) ......................................................................10, 11, 23

*Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*,
  Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479
  (Bankr. S.D.N.Y. Aug. 6, 2021) ..................................................................................33, 34, 35

*Picard v. Goldenberg (In re BLMIS)*,
  Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149
  (Bankr. S.D.N.Y. June 20, 2018) ............................................................................................35

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
  773 F.3d 411 (2d Cir. 2014) ..............................................................................................36, 38

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
  Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909
  (Bankr. S.D.N.Y. Oct. 10, 2014) ............................................................................................13

*Picard v. Magnify, Inc. (In re BLMIS)*,
 583 B.R. 829 (Bankr. S.D.N.Y. 2018)........................................................................35

*Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*,
 460 B.R. 106 (Bankr. S.D.N.Y. 2011)......................................................10, 12, 25

*Picard v. Mayer (In re BLMIS)*,
 Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435
 (Bankr. S.D.N.Y. Oct. 27, 2021) ..............................................................................27

*Picard v. Mendelow (In re BLMIS)*,
 560 B.R. 208 (Bankr. S.D.N.Y. 2016)......................................................................35

*Picard v. Merkin (In re BLMIS)*,
 515 B.R. 117 (Bankr. S.D.N.Y. 2014).............................................................. *passim*

*Picard v. Merkin (In re BLMIS)*,
 581 B.R. 370 (Bankr. S.D.N.Y. 2017)..................................................................30, 31

*Picard v. Miller (In re BLMIS)*,
 631 B.R. 1 (Bankr. S.D.N.Y. 2021)...........................................................................35

*Picard v. Shapiro (In re BLMIS)*,
 542 B.R. 100 (Bankr. S.D.N.Y. 2015)............................................................28, 29, 35

*In re Picard*,
 917 F.3d 85 (2d Cir. 2019)...................................................................12, 24, 25, 37

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
 624 F.3d 123 (2d Cir. 2010).......................................................................................10

*Sass v. Barclays Bank PLC (In re Am. Home Mortg. Holdings, Inc.)*,
 501 B.R. 44 (Bankr. D. Del. 2013) ............................................................................30

*Scholastic, Inc. v. Stouffer*,
 No. 99-cv-11480 (AGS), 2000 WL 1154252 (S.D.N.Y. Aug. 14, 2000)...............17

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
 379 B.R. 5 (Bankr. E.D.N.Y. 2007)...........................................................26, 27, 29, 31

*SIPC v. BLMIS*,
 501 B.R. 26 (S.D.N.Y. 2013).....................................................................................37

*SIPC v. BLMIS*,
 No. 12-mc-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............. *passim*

*Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*,
 548 B.R. 300 (Bankr. C.D. Cal. 2016)......................................................................30

*SPV OSUS Ltd. v. UBG AG*,
   882 F.3d 333 (2d Cir. 2018)..................................................................23, 24

*Steinhardt v. Shadow*,
   No. 16-cv-4222 (RJS), 2018 WL 4278335 (S.D.N.Y. Apr. 11, 2018) ....................................17

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
   620 B.R. 505 (Bankr. S.D.N.Y. 2020) ........................................................38

*Taylor v. Sturgell*,
   553 U.S. 880 (2008).................................................................................34

*United States v. Henshaw*,
   388 F.3d 738 (10th Cir. 2004) .....................................................................30

*Universitas Educ., LLC v. Nova Grp., Inc.*,
   Nos. 11-1590 (LTS) (HBP) & 11-8726 (LTS) (HBP), 2013 WL 6123104
   (S.D.N.Y. Nov. 20, 2013) ..........................................................................29

*Walden v. Fiore*,
   571 U.S. 277 (2014)......................................................................14, 15, 16

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)........................................................................25

**Statutes**

11 U.S.C. § 546(e) ....................................................................................... *passim*

11 U.S.C. § 550(a) ........................................................................24, 26, 33, 37

11 U.S.C. § 550(d) ............................................................................................33

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ...............................1

**Rules**

CPLR 302.................................................................................................17, 20

CPLR 302(a)(1) .......................................................................................16, 20

Fed. R. Civ. P. 12(b)(6)................................................................................30

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law and the supporting declaration of Matthew D. Feil ("Feil Decl.") in opposition to the motion to dismiss (ECF No. 93[1]) (the "Motion") filed by defendant Parson Finance Panama S.A. ("Parson").

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts to recover BLMIS customer property that was stolen as part of Madoff's massive Ponzi scheme, this action seeks to recover over $11 million in a subsequent transfer of stolen BLMIS customer property that Parson received from Fairfield Sentry Limited ("Sentry") in April 2005. Through its agents, Anova AG ("Anova") and Bamont Trust Company Limited ("Bamont") and their personnel, Parson maintained a relationship with Sentry's manager, Fairfield Greenwich Group ("FGG"), for more than two years. This relationship with FGG—which began months before Parson's July 2003 subscription in Sentry—included regular in-person meetings in New York, meetings elsewhere, and frequent email and telephonic communications about, for example, Sentry's performance, Madoff's role in Sentry, and BLMIS's investment strategy. Based on the information it obtained, Parson knowingly and purposefully invested with New York-based BLMIS through Sentry, a BLMIS feeder fund—that is, an investment fund created to feed its investors' money to BLMIS in New York.

Parson has moved to dismiss on three grounds, each of which is meritless. *First*, despite always intending to invest with BLMIS in New York, despite coming into New York on numerous

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Parson Finance Panama S.A. (In re BLMIS)*, Adv. Pro. No. 11-02542 (CGM) (Bankr. S.D.N.Y.).

occasions to further its business relationships with FGG and Sentry, and despite relying on New York bank accounts to invest in and redeem from Sentry, Parson claims this Court lacks personal jurisdiction. But these multiple purposeful contacts with New York establish jurisdiction. Moreover, Parson's argument is effectively foreclosed by a prior decision in this SIPA liquidation proceeding, in *Picard v. Bureau of Labor Insurance*, which contains practically identical facts.

*Second*, Parson argues that the Trustee has not plausibly alleged that it received BLMIS customer property. But the Trustee has alleged the relevant pathway through which customer property was transferred from BLMIS to Sentry and subsequently to Parson, and the necessary vital statistics (*i.e.*, the who, when, and how much) of that subsequent transfer. At this stage, nothing more is required. Parson argues that the Trustee must show a dollar-for-dollar accounting at the pleading stage, and that the Trustee's claims are implausible under a fact-based and undisclosed tracing methodology. But Parson's arguments are plainly inappropriate on a motion to dismiss and run contrary to well-established precedent in this SIPA liquidation proceeding.

*Finally*, Parson argues that the safe harbor in Section 546(e) of the Bankruptcy Code mandates dismissal. But the Trustee has plausibly alleged the avoidability of the initial transfers based on Sentry's actual knowledge of fraud. Parson further argues that there is no actual knowledge exception or, in the alternative, that Parson's knowledge as a subsequent transferee should determine the avoidability of the initial transfers from BLMIS. But these arguments controvert both the plain language of the statute and precedent in this SIPA liquidation proceeding establishing that Section 546(e) does not independently bar recovery of avoidable fraudulent transfers from a subsequent transferee.

Because Parson's arguments in favor of dismissal lack merit, the Trustee respectfully requests that this Court deny Parson's Motion.

## STATEMENT OF FACTS

### I.    THE BLMIS PONZI SCHEME

Madoff founded and operated BLMIS from New York until its collapse in 2008.  *See* Complaint ("Compl.") ¶ 21, ECF No. 1.  BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business").  *Id.*  For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the S&P 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the market.  *Id.* ¶¶ 22–23.  In reality, BLMIS operated a Ponzi scheme through its IA Business.  *Id.* ¶¶ 24–26.  On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  *Id.* ¶ 9.

### II.    FAIRFIELD SENTRY

Among BLMIS's customers were BLMIS "feeder funds"—large investment funds created for the express purpose of funneling investors' money into BLMIS.  *See Picard. v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d Cir. 2021).  Parson knowingly invested in one of these feeder funds, Sentry.

Sentry was created, managed, and controlled by FGG, a *de facto* partnership with its principal place of business in New York, New York.  Feil Decl., Exs. 1–5.  Sentry was a U.S. dollar-denominated fund that invested 95% of its assets with BLMIS.  Compl. ¶ 2.  Sentry subscriptions were approved or rejected by a New York-based FGG partner.  Feil Decl., Ex. 6.  FGG's Finance Group, which was responsible for processing subscriptions and redemptions,

performing due diligence, communicating with investors, and providing investor support, was also located in New York.  Feil Decl., Ex. 1.

## III.    PARSON AND ITS INVESTMENT IN SENTRY

### A.    Parson and Its Agents

Parson is a limited company domiciled in Panama.  Compl. ¶ 20.  At all relevant times, Anova and its affiliate Bamont, along with their respective officers, directors, and employees, acted as Parson's agents in initiating and overseeing Parson's investment in Sentry.  Feil Decl., Exs. 7–17, 19–30.  Anova and Bamont and their personnel acted on Parson's behalf and for Parson's benefit in managing Parson's investment in Sentry and making investment decisions for Parson in regard to Sentry and other FGG-managed funds.  *Id.*, Exs. 7–17, 19–30.

### 1.    Anova

Anova and its personnel acted as agents for Parson.  This relationship was reflected in FGG's records, where Parson was recognized as "ANOVA (Parson Finance)."  *Id.*, Exs. 7 & 32. In particular, three key Anova personnel acted on Parson's behalf and for Parson's benefit with regard to Parson's Sentry investment: Daniel Vock, Frank Gulich, and Christian Gresch.

Vock was the head of hedge fund selection for Anova beginning in 1999.  *Id.*, Ex. 8.  Vock regularly communicated with, and made regular visits to, FGG's New York office to discuss Parson's investment in Sentry and other funds.  *Id.*, Exs. 9–12, 19–29.[2]  Gulich was Anova's CEO at all relevant times.  *Id.*, Ex. 10.  And Gresch was Anova's CFO.  *Id.*, Ex. 11.  Vock, Gulich, and Gresch engaged in ongoing email correspondence and attended in-person meetings with FGG in New York (and elsewhere) to discuss Parson's investment in Sentry.  *Id.*, Exs. 9–13, 19–29, 31.

---

[2] In a declaration accompanying the Motion, Parson's declarant avers that an unnamed "representative of Parson Finance" met with Richard Landsberger of FGG in London on June 16, 2003.  Verling Decl., ¶ 8, ECF No. 94.  A June 11, 2003 email shows that this "representative" is Daniel Vock.  *See* Feil Decl., Ex. 9.

       2.    <u>Bamont</u>

Bamont and its personnel also acted as agents for Parson. *See* Verling Decl., ¶ 4 (averring that Parson "has at all times since [2002] been managed by Bamont"). In particular, Parson identified Philip Hjelmer, Bamont's president and general manager, as an authorized signatory in Parson's Sentry subscription agreement. *Id.*, Ex. 1, ¶ 30(f). The subscription agreement directed Sentry to send all written communications concerning Parson's investment to Bamont and all telephone, fax, and email communications to Hjelmer. *Id.*, Ex. 1, ¶¶ 30(c) & 30(d). Hjelmer and Bamont were therefore authorized to, and did, give and receive instructions on behalf of Parson, including making a subscription in, and redemption from, Sentry. *Id.*, Ex. 1, ¶ 30(f); Feil Decl., Exs. 12–15. Hjelmer also traveled to New York to meet with FGG personnel in December 2003, resulting in a subsequent telephone call and Hjelmer, Vock, and Gulich being added to FGG's distribution list for weekly Sentry performance reports. Feil Decl., Exs. 16–17.

Anova and Bamont personnel worked together as Parson's agents to communicate with FGG and facilitate Parson's investment in Sentry. *Id.*, Exs. 8–13. For example, on June 18, 2003, Vock emailed FGG sales representative Ron Thomann to tell him that "we [Anova] just finished our due diligence process and have decided to invest USD 10 mil in the Sentry Fund," and to ask FGG "to contact Philip [Hjelmer] directly" about finalizing the subscription. *Id.*, Ex. 12. Hjelmer was copied on the email. *Id.*, Ex. 12. Later, on July 13, 2003, Hjelmer emailed Thomann, stating, "We intend to subscribe $10 million for Parson Finance by end of July." *Id.*, Ex. 13.

### B.    Parson Purposefully Invested with BLMIS in New York

Parson knew and intended that the funds it invested in Sentry would be transferred to BLMIS to be custodied and purportedly invested in U.S.-listed securities.

Hjelmer and two others signed the Sentry subscription agreement on June 21, 2003 on behalf of Parson, the subscriber in the fund. *See* Verling Decl., Ex. 1, ¶ 30(f). In the agreement,

Parson confirmed that it had "received and read" the February 1, 2003 Sentry private placement memorandum (the "PPM") disclosing information about the fund's investments. *Id.*, Ex. 1, ¶ 7. This information included how Sentry utilized a "nontraditional options trading strategy" called a "split strike conversion" strategy—Madoff's SSC Strategy—which involved the purchase and sale of U.S. securities and options. Feil Decl., Ex. 18, at 7–8; *id.*, Ex. 21. The PPM specifically explained that the SSC Strategy involved the purchase of a "basket" of U.S. equity securities consisting of "approximately 35 to 45 stocks in the S&P 100 [Index]," as well as "the sale of out of the money S&P 100 Index call options" and "the purchase of an equivalent number of out of the money S&P 100 Index put options." *Id.*, Ex. 18 at 8. The PPM also stated that "[t]he Fund may invest some of its assets in short-term U.S. government obligations . . . ." *Id.*, Ex. 18, at 9.

Parson's intent to invest with New York-based BLMIS through Sentry is reflected in the multiple meetings and communications between Parson's agents and FGG. Through Vock's, Gulich's, Gresch's, and Hjelmer's multiple meetings and communications with FGG personnel in New York and elsewhere, discussed further *infra* at 7–8 and 16–18, Parson knew that its Sentry investment would ultimately be an investment with BLMIS. For example, on May 2, 2003, the month before Parson signed the Sentry subscription agreement, FGG sent Vock the Sentry Due Diligence Questionnaire (the "DDQ"). *Id.*, Ex. 19 & 20. The DDQ stated that: "[t]he Manager has established a non-discretionary account for [Sentry] at Bernard L. Madoff Investment Securities, Inc. (sometimes referred to as 'BLM'), a registered broker-dealer in New York, who utilizes a strategy described as 'split strike conversion,' to which it allocates the predominant portion of [Sentry's] assets." *Id.*, Ex. 20, § 12.1. The DDQ confirmed that 95% of the fund's assets would be allocated to Madoff's SSC Strategy, which entailed "the ownership of 40–45 S&P100 stocks most correlated to the index, the sale of out-of-the-money calls on the index and the

6

purchase of out-of-the-money puts on the index . . . ." *Id.*, Ex. 20, §§ 8.8, 11.3.  The DDQ further

identified BLMIS as Sentry's custodian and prime broker, and disclosed that "[t]he services of the

Manager's principals and key employees and Bernard L. Madoff Investment Securities are

essential to the continued operations of the Fund." *Id.*, Ex. 20, §§ 8.5, 8.8, 12.7.  The DDQ also

stated that BLMIS performed all investment management duties for 95% of Sentry's assets,

including making the decisions regarding purported purchases or sales of U.S. securities (and the

timing of those purchases or sales).  *Id.* Ex. 20, §§ 8.8, 12.1.  Finally, the DDQ directed all

correspondence regarding Sentry to FGG's offices at 919 Third Avenue, New York, NY 10022.

*Id.*, Ex. 20, § 5.1.  Parson's agents also reviewed Sentry's trading history "in conjunction with

opening and closing prices of the S+P 100 on the active days of the [SSC] strategy." *Id.*, Ex. 21.

Parson understood that Sentry was specifically constituted to feed investments directly to

BLMIS.  For example, in a May 13, 2003 email following his review of the DDQ, Vock asked

Thomann for "information about Madoff himself," as well as "how much of the business of

[BLMIS] is the Sentry Fund." *Id.*, Ex. 21.  And Parson likewise knew that BLMIS operated

from New York:  The DDQ stated as much, and Vock asked to meet with Madoff or a

representative of BLMIS when he came to New York.  *Id.*, Exs. 21 & 31.

### C.    Parson Met and Communicated with FGG Personnel in New York Regarding Its Sentry Investment

Vock, Gulich, and Hjelmer regularly visited FGG's New York office to discuss Parson's

investment in Sentry.  Feil Decl., Exs. 13, 16–17, 22–27.  For example, approximately 9 months

before Parson's Sentry subscription, Vock and Hjelmer met with FGG partners in New York who

served as "resident experts for Sentry in lieu of [meeting] Madoff." Feil Decl., Ex. 31.  As another

example, on January 4, 2005, FGG's Thomann emailed Vock information about Sentry's

performance and stated that he would be in Zurich the following month and would "welcome the

opportunity to meet you and your colleagues there to review funds." *Id.*, Ex. 28. Vock instead requested that they meet in New York, writing, "I intend to be in the US in March and would suggest that we could meet there." *Id.*, Ex. 28.

Parson purposefully engaged with New York when it invested in Sentry and interacted with FGG, including Anova and Bamont personnel regularly communicating with FGG on Parson's behalf and for Parson's benefit, specifically concerning Parson's "core investment" in Sentry. *Id.*, Exs. 12–13, 29–30, 33–34. Parson knew that FGG purported to manage Sentry from New York, and Parson's agents made routine visits to FGG's New York office. *Id.*, Exs. 13, 22–29.

### D.    Parson Executed a Sentry Subscription Agreement with New York Jurisdiction, Forum Selection, and Choice of Law Provisions

Parson's subscription agreement with Sentry included additional connections to New York. The subscription agreement contained a New York choice of law provision: "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." Verling Decl., Ex. 1, ¶ 16. Under a heading titled "New York Courts," the agreement also contained a New York venue and forum selection clause:

> Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

*Id.*, Ex. 1, ¶ 19. The agreement also instructed investors to send subscription payments to a bank account with HSBC Bank USA in New York (the "HSBC USA Account"). *Id.*, Ex. 1, ¶ 3.

### E.    Parson Designated and Used New York Bank Accounts for Its Sentry Investment

Parson used the New York banking system to subscribe into and redeem from Sentry. First, Parson agreed to, and did, direct its Sentry investment funds to the HSBC USA Account. *See id.*

Second, in its subscription agreement with Sentry, Parson designated a correspondent bank account at "our bank," State Street Bank in Boston, Massachusetts (the "State Street Account"), as the account it would use to fund its subscription into Sentry and the account to which Sentry should make redemption payments. *Id.*, Ex. 1, ¶¶ 30(g) & 30(h); Feil Decl., Ex. 35. And Parson in fact sent its subscription to Sentry through the State Street Account. *See* Verling Decl., Ex. 1, ¶ 30(h); Feil Decl., Ex. 35. Third, when it ultimately redeemed, Parson directed Sentry to pay the redemption to a correspondent bank account at The Bank of New York in New York, New York (the "BNY Account"). Feil Decl., Ex. 14. Parson in fact used the BNY Account to receive the subsequent transfer of $11,089,081 from Sentry on April 14, 2005. *Id.*, Ex. 15.

## IV. THE FAIRFIELD SETTLEMENT

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover fraudulent transfers of stolen customer property in the amount of approximately $3 billion. Compl. ¶ 33. In 2011, the Trustee settled with Sentry and others. *Id.* ¶ 38. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS customer property estate. *Id.* The Trustee then commenced a number of adversary proceedings against subsequent transferees like Parson to recover the approximately $3 billion in missing stolen customer property.

## <u>ARGUMENT</u>

## I. THIS COURT HAS PERSONAL JURISDICTION OVER PARSON

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established solely by allegations." *Id.* at 84–85 (finding "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of

jurisdiction").  A plaintiff also may establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings.  *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).  These pleadings and affidavits are to be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation omitted).

The personal jurisdiction analysis is a two-step inquiry that focuses on (1) the defendant's minimum contacts and (2) whether jurisdiction will be reasonable under the circumstances.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  There are two types of personal jurisdiction that satisfy minimum contacts, general jurisdiction and specific jurisdiction.[3]  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001).  "Specific jurisdiction exists when the defendant 'purposefully direct[s] his activities at residents of the forum' and the underlying cause of action 'arises out of or relates to those activities.'"  *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

First, specific jurisdiction is appropriate when the defendant's contacts "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted).  This does not require a causal relationship between the plaintiff's claims and the defendant's contacts with the forum.  *See Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1026 (2021).  Indeed, the defendant's activities need not have taken place within the forum at all, "and a single transaction with the forum will suffice."  *See Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (cleaned up).  Moreover, specific jurisdiction

---

[3] General jurisdiction is based on a defendant's general business contacts with the forum and permits a court to exercise jurisdiction where the suit is unrelated to those contacts.  *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014).  Here, the Trustee's case arises out of Parson's contacts with the forum and a finding of general jurisdiction is unnecessary.

may also be found when a "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *Fairfield Greenwich Grp.*, 627 B.R. at 566.

Second, the court assesses whether the assertion of personal jurisdiction is reasonable, meaning it comports with "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *Fairfield Greenwich Grp.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 477).

In determining whether the defendant's forum contacts establish jurisdiction, the court must consider the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test," not each contact in isolation. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci II*"). In other words, "[n]o single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *Chloé*, 616 F.3d at 164 (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005)).

### A.    Parson Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York by Investing in Sentry

Parson's numerous and purposeful contacts with New York establish this Court's jurisdiction. Parson: (i) invested in Sentry with the knowledge and intention that its investment would in turn be invested, managed, and custodied by BLMIS in New York; (ii) met and communicated with FGG personnel in New York regarding its investment with New York-based BLMIS through Sentry; (iii) agreed to New York jurisdiction, forum selection, service of process, and choice of law provisions related to its Sentry investment; and (iv) used the New York banking system to transact with Sentry. Many of these contacts would be sufficient by themselves to

11

support jurisdiction. But the contacts in their totality establish that Parson purposefully directed

its activities into New York. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum*

*Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [of defendant]'s Agreement-related

contacts are considered together, it is clear [defendant] purposely availed itself of the forum.").

          1.    <u>Parson's Investment with BLMIS Through Sentry Establishes Minimum</u>
               <u>Contacts</u>

Parson knew and intended that its investment in Sentry was ultimately an investment with

New York-based BLMIS and that the funds Parson invested were purportedly to be used to

purchase securities in the United States. Setting aside Parson's other forum contacts that support

this Court's assertion of jurisdiction, Parson's deliberate targeting of New York-based BLMIS and

the U.S. securities market—through entities expressly constituted for that purpose—is dispositive.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose

to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities,

they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also*

*Maxam*, 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended for funds

invested with Sentry be sent to BLMIS in New York for investment). Indeed, by executing the

subscription agreement, affirming that it received and read Sentry's PPM, and reviewing and

analyzing the DDQ, Parson knew that: (i) Sentry invested at least 95% of its assets with BLMIS;

(ii) BLMIS performed all investment management duties for these assets; (iii) BLMIS was a

registered broker-dealer in New York; (iv) BLMIS was the executing broker for Sentry's

investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

(v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities and U.S. options;

(vi) the decisions regarding which U.S. securities to purportedly purchase, and when to make such

purchases, were made by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's

investments with BLMIS; and (viii) BLMIS was "essential to the continued operation of" Sentry. *See supra* at 6–7; Feil Decl., Exs. 18 & 20.

a.   *BLI* Establishes this Court's Jurisdiction Over Parson

Based on the intent to invest with BLMIS through Sentry, this Court has already held that Sentry investors like Parson are subject to personal jurisdiction in New York. *See Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*").

There, as here, the Trustee's suit was based upon the subsequent transferee's investment of "millions of dollars in Fairfield Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *Id.* at 506. There, as here, the subsequent transferee was provided with the same disclosures, which established the investment's BLMIS-centric purpose. *Id.* at 507–08. And there, as here, the subsequent transferee argued that the foreseeability of its investment ending up in a BLMIS account was insufficient to support personal jurisdiction. *Id.* at 516–17. Not only did Judge Lifland unequivocally reject this argument, he called it "disingenuous," explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an account at BLMIS as a result of happenstance or coincidence. Rather, BLI purposefully availed itself of the benefits and protections of New York laws by knowing, intending, and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation have already "confirmed that defendants who invested directly or indirectly with BLMIS and received payments from BLMIS as an initial transferee or subsequent transferee of those initial transfers were subject to the Court's personal jurisdiction"). As described by Judge Lifland, "BLI

intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money

orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506.

Because Parson is identically situated to the defendant in *BLI* with respect to the

fundamental purpose of its investment, *BLI* is controlling and resolves Parson's jurisdiction

defense without necessitating any further analysis of Parson's multiple other New York contacts.

Faced with the obvious weight of *BLI¸* Parson relegates the case to a footnote and half-

heartedly asserts that it was BLI's *other* "extensive contacts" that were dispositive, including BLI's

use of a New York bank account for subscriptions and redemptions and the choice of forum clause

in the subscription agreement.  Motion at 17 n.6.  Parson's reading of *BLI* is wrong.  Although

there were other contacts between BLI and New York—other contacts that are also present here—

the Court did not rely on these contacts in reaching its holding.  Rather, the Court was unequivocal

throughout its opinion that BLI's intentional investment in a BLMIS feeder fund expressly

designed to funnel those investments to BLMIS in New York was sufficient to establish personal

jurisdiction.  *See BLI*,  480 B.R. at 517 ("In a nutshell, BLI invested tens of millions of dollars in

Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York, and

intended to profit from this U.S.-based investment.").  In fact, in addressing BLI's separate

argument concerning its New York bank accounts, the Court expressly noted that its decision was

not "rooted in the mere existence of these accounts.  Instead, . . . BLI directed its investment

towards the forum State, thereby purposefully availing itself of the benefits and protections of New

York laws." *Id.* at 516 n.14.  Accordingly, there is no doubt *BLI* controls.

       b.      *Walden* Does Not Save Parson From this Court's Jurisdiction

Having given short shrift to *BLI*, Parson cites *Walden v. Fiore* to frame the jurisdictional

analysis through the false lens of "foreseeability."  571 U.S. 277 (2014) (*cited in* Motion at 12–

13).  However, the facts and applicable law of *Walden* are significantly different from those here.

*Walden* was an intentional tort case, and therefore the Court applied the "effects test" to personal jurisdiction, not the "purposeful availment" test applicable here. *Id.* at 287–88. The defendant in *Walden*, a Georgia police officer, had no purposeful minimum contacts with the forum state of Nevada: He had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada," nor was the officer's seizure of funds predicated in any way on the fact that their intended destination was Nevada in particular. *Id.* at 288–89. Nevertheless, the Ninth Circuit found jurisdiction because the officer had seized money in Georgia from a Nevada resident and therefore the seizure would have some foreseeable effect in Nevada. *Id.* at 289–91. The Supreme Court disagreed, finding that the defendant had "formed no jurisdictionally relevant contacts with Nevada" and that he could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiff resided in Nevada. *Id.* In reversing the Ninth Circuit's holding that the officer's knowledge of plaintiff's Nevada connections and the "foreseeable harm" that plaintiff suffered there were dispositive, the Court simply reaffirmed the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *Id.* at 284 (citing *Helicopteros Nacionales de Colombia*, *S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

This case is nothing like *Walden*. As a preliminary matter, the Trustee's allegations implicate the Supreme Court's "purposeful availment" framework, a concept that the *Walden* Court did not reference, let alone apply. Nor is the police officer's lack of any "jurisdictionally relevant contacts with Nevada" (*id.* at 291) remotely analogous to Parson intentionally directing investments to a New York broker-dealer (BLMIS) through a feeder fund (Sentry) formed to funnel investments to that New York broker-dealer. Quoting the Supreme Court, Parson argues, "The substantial connection . . . between the defendant and the forum State necessary for a finding

of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*, 480 U.S. 102, 112 (1987) (emphasis added) (citation omitted) (*quoted in* Motion at 12). That is precisely the sort of action Parson took when it sent Sentry millions of investment dollars with BLMIS as the ultimate intended recipient. And Parson's efforts to downplay its investment's New York destination as some sort of "foreseeable" consequence rather than a deliberate and purposeful targeting of that forum is precisely the same "disingenuous" argument Judge Lifland rejected in *BLI*. *See* 480 B.R. at 517.

Parson also misinterprets *Walden* to the extent it argues, in effect, that Parson's connections to the forum must be viewed in a vacuum as opposed to being based on its relationships with BLMIS and Sentry. *See* Motion at 11–13. *Walden* recognized that "a defendant's contacts with the Forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Walden*, 571 U.S. at 286; *see also Ford Motor Co.*, 141 S. Ct. at 1031–32 (rejecting defendant's contention that *Walden* "shows that a plaintiff's residence and place of injury can never support jurisdiction" and explaining that "[t]hose places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit").

Accordingly, this Court should reaffirm *BLI* and hold that Parson's purposeful targeting of New York and its laws by intentionally investing with BLMIS through Sentry establishes personal jurisdiction over Parson.

2.    Parson's Contacts with FGG in New York Establish Minimum Contacts

Parson directed activity into the forum through its agents' contacts with FGG in New York. Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person *or through an agent* . . . transacts any business within the state" where the cause of action arises from those transactions. *See* CPLR 302(a)(1). The Trustee "need

not establish a formal agency relationship" between Parson and its agents. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). "Under [CPLR] 302, it is sufficient that the alleged agent acted in the state for the benefit of, and with the knowledge and consent of the non-resident principal." *Steinhardt v. Shadow*, No. 16-cv-4222 (RJS), 2018 WL 4278335, at *2 (S.D.N.Y. Apr. 11, 2018) (cleaned up).

Parson's agents, including its self-described "representative of Parson Finance" (Verling Decl., ¶ 8), Daniel Vock, traveled to New York to meet with FGG numerous times before and during Parson's investment in Sentry. *See* Feil Decl., Exs. 8, 13, 16–17, 22–28, 31. In fact, in advance of one New York meeting, Vock declined FGG's offer to meet in Switzerland, and instead requested a meeting in New York. *Id.*, Ex. 28. These visits with FGG in New York support jurisdiction. *See Druck Corp. v. Macro Fund (U.S.) Ltd.*, 102 F. App'x 192, 193–94 (2d Cir. 2004) (finding one or two meetings concerning a "fund's investment strategy" to be "substantive and substantial" enough to support jurisdiction); *see also Burlington Indus., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in New York).

Parson also managed its business relationships with Sentry by directing activities and communications toward New York. This included Anova and Bamont personnel holding regular meetings in person with FGG in New York, as well as frequent email and telephonic communications with New York-based FGG personnel regarding Parson's investment in Sentry. *See* Feil Decl., Exs. 9–13, 19–21, 23, 27–28, 30–31. Parson's extensive communications with FGG reflect Parson's transaction of business in New York. *See Scholastic, Inc. v. Stouffer*, No. 99-cv-11480 (AGS), 2000 WL 1154252, at *6 (S.D.N.Y. Aug. 14, 2000) (finding jurisdiction over defendant who sent letters and made phone calls to plaintiffs in New York and was represented by

an agent at a meeting with plaintiff in New York); *see also Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006) (holding that a defendant "using electronic and telephonic means" to transact business within the state may suffice to confer jurisdiction).

These purposeful acts were aimed at New York and the United States as part of Parson's investments with BLMIS through Sentry, and these contacts of Parson's agents, including Anova and Bamont personnel, are imputed to Parson. *See Kreutter*, 71 N.Y.2d at 467 (to establish jurisdiction over the principal, an agent need only "engage[ ] in purposeful activities in this State" in relation to a transaction for the benefit of and with the knowledge and consent of the principal); *Hecklerco, LLC v. YuuZoo Corp. Ltd.*, 252 F. Supp. 3d 369, 378–79 (S.D.N.Y. 2017) (finding specific jurisdiction over defendants based on their agents' activities in New York to facilitate stock transactions).

### 3.    Parson's Subscription Agreement Supports Specific Jurisdiction

Parson's subscription agreement with Sentry further evidences a "strong nexus with New York" that supports jurisdiction. *See BLI*, 480 B.R. at 517 n.15. When Parson invested in Sentry, it signed a subscription agreement through which it submitted to venue in New York, the jurisdiction of the New York courts, the service of process from New York courts, and the application of New York law. Verling Decl., Ex. 1, ¶¶ 16, 19.

"[A] choice of law provision may constitute a significant contact with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank v. Banque Generale du Commerce*, No. 96-cv-5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Burger King*, 471 U.S. at 482 (finding jurisdiction where choice of law provision "reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"). For example, in *Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors*

*Liquidation Co.)*, the court held that even if the defendant's agreement to New York forum and choice of law provisions did not constitute consent, the provisions helped establish minimum contacts to support specific jurisdiction. 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017) (finding agreement provisions plus a correspondent bank account in New York reflected a relationship "centered in New York"); *see BLI*, 480 B.R. at 517 n.15.

Moreover, Parson's Sentry subscription agreement plainly "relate[s] to" the Trustee's claim and evidences a strong nexus between this case and New York. Parson's subscription in and redemption from Sentry are two sides of the same coin. Parson could not invest in Sentry without a subscription agreement. In turn, Parson profited from its subscription based on BLMIS's purported investments. Because Parson's subscription agreement was a necessary predicate to the subsequent transfer from Sentry, the subscription agreement is sufficiently related to the Trustee's claim to constitute a relevant purposeful contact with New York. *See Ford Motor Co.*, 141 S. Ct. at 1026 (rejecting a requirement of a "strict causal relationship between the defendant's in-state activity and the litigation"); *see also Licci II*, 732 F.3d at 168–69 (noting that a "causal link" between the defendant's New York business activity and the plaintiff's injury is not required, only "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former").

Parson's argument that the Trustee is not a party to the Sentry subscription agreement and therefore "cannot invoke [the] forum selection clause" (Motion at 13) misses the mark. The Trustee does not argue that Parson is bound to litigate here because of its agreement to do so in the Sentry subscription agreement. Rather, the Trustee argues that Parson's agreement to New York law, New York jurisdiction, and a New York forum in a contract integral to this case provides a strong jurisdictional contact with New York.

   4.    Parson's Purposeful Use of Correspondent Bank Accounts Supports
         Specific Jurisdiction

In addition to Parson's other significant contacts with New York, this Court has jurisdiction because Parson purposefully used the New York banking system to subscribe into and redeem from Sentry. Courts have often held that a defendant's use of a domestic bank account related to the activity alleged is by itself sufficient to establish jurisdiction.[4] *See, e.g.*, *Eldesouky v. Aziz*, No. 11-cv-6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction based solely on the defendant's use of a New York account to receive the payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction based solely on the defendant's use of a New York bank account to receive the fraudulent conveyances at issue); *Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction based solely on the defendant's use of New York bank accounts to facilitate alleged fraud). In this SIPA liquidation proceeding, the Court has similarly found jurisdiction where transferee defendants invested from or received the relevant transfers in U.S. bank accounts. *See Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding jurisdiction over defendants for transfers from Tremont funds that were managed in New York and where defendants wired funds to New York and received redemption payments from an account at The Bank of New York in New York); *Picard v. Estate of Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction where defendants repeatedly sent funds to and received redemptions from BLMIS's "New York Bank Account").

---

[4] Certain cases discussed herein address jurisdiction under New York's long-arm statute, CPLR 302. Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g.*, *HSH Nordbank AG N.Y. Branch v. Street*, No. 11-cv-9405 (DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under [CPLR] 302(a)(1) and the Due Process Clause is in most instances essentially coterminous") (citations omitted).

The fact that Parson designated and used correspondent accounts does not diminish the significance of these U.S. accounts. *See* Motion at 15–16; Verling Decl., ¶ 11; *id.*, Exs. 1 & 3. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established," provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012) ("*Licci I*"); *see also Licci II*, 732 F.3d at 165, 171 (finding jurisdiction over a defendant with "no operations, branches, or employees in the United States" based on its deliberate use of a New York correspondent bank account); *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 70 (S.D.N.Y. 2016) (holding the "deliberate choice" to use New York correspondent bank accounts and the New York banking system as "United States contacts attributable to [defendants]"); *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *5 n.2 (E.D.N.Y. Nov. 25, 2020) ("A single transaction is sufficient to satisfy [the transacted business requirement], provided the relevant claims arise from that transaction.") (cleaned up). What matters is that the use was "purposeful" and not coincidental or passive.

Similarly, it does not matter that the HSBC USA Account was Sentry's or whether the State Street Account or BNY Account belonged to Parson or its bank, because Parson knew of these accounts and agreed to use them. *See Esso Expl.*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [the defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."); *Arcapita Bank*, 549 B.R. at 70 & n.18 ("Because [the defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [the defendant]."). In *BLI*, a subsequent transferee defendant's use of its own and its feeder fund's U.S.

correspondent accounts for subscribing into and redeeming from the fund supported purposeful availment. *See* 480 B.R. at 513, 516 n.14.

That Sentry's subscription agreement required subscribers to use the HSBC USA Account is also irrelevant because Parson voluntarily entered into that agreement. Parson could have opted not to invest with BLMIS through Sentry. Instead, Parson voluntarily agreed to use the HSBC USA Account for its subscription into, and redemption from, Sentry. Moreover, Parson affirmatively designated the State Street Account as the account from which Parson's subscription would be paid and directed Sentry to send redemption payments to Parson in the State Street Account, and then in the BNY Account. *See* Verling Decl., Ex. 1, ¶¶ 30(g) & 30(h); *id.*, Ex. 3; Feil Decl., Exs. 14 & 35. That Parson made these choices "over others, . . . made its New York connection volitional and not coincidental." *See Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016) (cleaned up). Both the subscription and the redemption were thus volitional acts supporting jurisdiction. *See Esso Expl.*, 397 F. Supp. 3d at 346 (finding jurisdiction where a non-bank defendant directed others to send payments to defendant through a U.S. correspondent bank); *Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017) (finding the defendant's use of a correspondent account to be purposeful where payment in New York was dictated by agreement); *Ehrlich-Bober & Co. v. Univ. of Houston*, 49 N.Y.2d 574, 579 (1980) (finding jurisdiction over a Texas university that used a third-party bank's correspondent account to conduct transactions and that had an employee visit and communicate with the plaintiff securities dealer in New York).[5]

---

[5] It also makes no difference if a Citco entity chose to use the HSBC USA Account on behalf of Sentry, as various Citco entities acted as Sentry's agents. *See Igoin*, 525 B.R. at 884 ("Whether [defendant] dealt with BLMIS directly or her mother or another acted on her behalf makes no difference because the conduct of her agents is attributed to her for purposes of the jurisdictional analysis.").

5.     The Trustee's Claim Relates to and Arises Out of Parson's Transaction of Business in New York

Jurisdiction is proper here because, contrary to Parson's argument, the Trustee's claim "relates to and arises out of" Parson's transaction of business in New York. *See* Motion at 12. As the Supreme Court recently held, this prong does not require a causal relationship. *See Ford Motor Co.*, 141 S. Ct. at 1026–30. Rather, there need only be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci II*, 732 F.3d at 168–69 (quoting *Licci I*, 20 N.Y.3d at 339); *see also Fairfield Greenwich Grp.*, 627 B.R. at 566 (finding relatedness requirement satisfied when the defendant's conduct "involve[d] at least in part financial transactions that touch the forum"); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 279–80 (Bankr. S.D.N.Y. 2010) (finding defendants' transfer-related contacts with the forum "inextricably related" to the Trustee's claims). Here, the Trustee's claim to recover the subsequent transfer to Parson arises from and relates to Parson's deliberate and purposeful contacts with New York concerning Parson's investment in Sentry.

Parson's reliance on a trio of cases lacking a sufficient relation between the claim and the contacts in New York—each of which was decided before the Supreme Court clarified in *Ford Motor Co.* that causation is not required—and asserting common law claims brought against fund service providers is unavailing. *See* Motion at 14–15 (citing *SPV OSUS Ltd. v. UBG AG*, 882 F.3d 333 (2d Cir. 2018); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016); *Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. 2017)). This Court has already determined that this line of cases is not relevant to the Trustee's actions against defendants like Parson who invested in BLMIS's feeder funds. *See BNP Paribas*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with

the Tremont Funds.").  This is not a dispute between two parties about services owed under a foreign contract, like the breach of fiduciary duty and other claims in *SPV OSUS*, *Hill*, and *Hau Yin To*.  This action is being brought by a U.S. Trustee to recover a fraudulent transfer from an investor who invested in a feeder fund with the specific goal of having its funds placed with a New York money manager and invested in the U.S. securities markets.  *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between BLI and Fairfield Sentry.").

This Court should also reject Parson's claim that the transfer the Trustee seeks to recover "occurred entirely outside of the United States" and was "purely foreign."  *See* Motion at 11–12. Parson bases this claim on arguments made by the Fairfield Liquidators in a different case that turns on whether the Section 546(e) safe harbor applies to claims under British Virgin Islands law by foreign liquidators in a chapter 15 proceeding—an issue plainly not relevant here.  In *this* case, however, the Second Circuit has already found, "[t]hese transfers are domestic activity."  *In re Picard*, 917 F.3d at 100 ("When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States.").

Furthermore, courts have personal jurisdiction over *defendants*, not *transfers*.  *See, e.g.*, *Int'l Shoe Co.*, 326 U.S. at 316.  So courts must assess the defendant's contacts with the forum, not the transfer's.  *BNP Paribas*, 594 B.R. at 189 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.").  And provided that a court finds that a defendant's minimum contacts with the forum support specific jurisdiction, the court may adjudicate any claims,

24

provided they are sufficiently related to those contacts. *See Ford Motor Co.*, 141 S. Ct. at 1026–28. Such is the case here.

### B.        The Exercise of Personal Jurisdiction Over Parson Is Reasonable

"The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citation omitted). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). Parson fails to do so. Indeed, this Court has found that "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP Paribas*, 594 B.R. at 188.

This is not that "rare" case. The burden on Parson is minimal. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). The United States has a strong interest in applying U.S. law in the BLMIS SIPA liquidation proceeding. *See id.*; *see also In re Picard*, 917 F.3d at 103 (noting "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a strong interest in litigating in the United States. *See Maxam*, 460 B.R. at 119. Accordingly, this Court's exercise of jurisdiction over Parson is more than reasonable.

### C.        In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction. *Kiobel v. Royal*

*Dutch Petroleum Co.*, No. 02-cv-7618 (KMW) (HBP), 2009 WL 3817590, at \*4 (S.D.N.Y. Nov. 16, 2009). The Trustee has shown how Parson, *inter alia*, met with FGG in New York on numerous occasions, purposefully invested with BLMIS through Sentry, and relied upon U.S. bank accounts to receive BLMIS customer property. *See supra* at 4–9. At a minimum, these facts establish a "threshold showing" of jurisdiction. *Kiobel,* 2009 WL 3817590, at \*6; *see also Ayyash v. Bank Al-Madina*, No. 04-cv-9201 (GEL), 2006 WL 587342, at \*6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

## II.    THE COMPLAINT ALLEGES THAT PARSON RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a)

The Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that Parson received a subsequent transfer of BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("*Merkin I*") (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)). No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *See id.* at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL) & 10-05219 (BRL), 2012 WL 892514, at \*3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at \*3; *accord 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019) (same). In addition, the Trustee must allege "the 'necessary vital statistics—the who, when, and how much' of the purported transfers

26

to establish an entity as a subsequent transferee of the funds." *Merkin I*, 515 B.R. at 150 (quoting *Silverman*, 379 B.R. at 32).

The Trustee's Complaint meets these requirements. It alleges that Parson received a transfer, identified by date (April 14, 2005) and amount ($11,089,081), from Sentry, and that Sentry invested substantially all of its funds with BLMIS. *See* Compl. ¶¶ 2, 39 & Ex. C.[6] The Complaint therefore plausibly alleges that Parson received a subsequent transfer of customer property by (i) outlining the relevant pathway through which customer property was transferred from BLMIS to Sentry and subsequently to Parson and (ii) providing the necessary vital statistics (*i.e.*, the "who, when, and how much") of the subsequent transfer. Nothing more is required. *See, e.g.*, *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting the argument that the "claim has not been plead with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### A.    Parson Misstates the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the relevant pleading burden, Parson argues for a new one, asserting that the Trustee must tie the subsequent transfer Parson received to a specific initial transfer from BLMIS. *See* Motion at 18–19. In *Merkin I*, however, the Bankruptcy Court refused to dismiss subsequent transfer claims even though the complaint "[did] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150; *see also 45 John Lofts*, 599 B.R. at 747 (finding no "requirement to trace individual

---

[6] Parson claims that it lacks "fair notice of the claims against it" (Motion at 22), despite the specific identification of the subsequent transfer sought by date, amount, transferor, and transferee in the Complaint, and despite Parson's own references in the Motion to the "sole redemption (alleged subsequent transfer) to Parson Finance [that] was processed on April 14, 2005" for $11,089,081. *See* Motion at 24; *see also id.* at 7 ("According to the Complaint, Parson Finance received from Fairfield Sentry a single redemption in the amount of $11,089,081 on April 15, 2004, which the Trustee characterizes as a supposed 'subsequent transfer' of BLMIS 'customer property.'"). Parson is on notice of the Trustee's claim.

dollar amounts from the transferor to the transferees to survive a motion to dismiss").  And to the extent Parson is arguing that the Trustee must allege more than the "who, when, and how much of the purported transfer[ ]," and instead must detail what portion of the subsequent transfer comprises customer property, this is also wrong.  *See Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3 (holding that even at summary judgment, "it is not necessary for the Trustee to specify what portion of the Subsequent Transfers to [defendant] was derived from BLMIS").

To support its argument that the Trustee has failed to allege that the subsequent transfer to Parson was comprised of BLMIS customer property, Parson erroneously relies on *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015) (*cited in* Motion at 17–18).  Parson analogizes this case to *Shapiro* and contends, "[a]s in *Shapiro*, the Trustee's Complaint fails to plead the 'necessary vital statistics.'"  *See* Motion at 17–19.  This is factually and legally incorrect.

In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS and, "upon information and belief," those defendants subsequently transferred a portion of this same amount to other defendants.  542 B.R. at 119.  The Court dismissed the subsequent transfer claim because the complaint did not detail any of the necessary vital statistics of the subsequent transfers.[7]  *Id*.  There were no allegations regarding the specific subsequent transferors, the specific subsequent transferees, or the dates or amounts of the subsequent transfers.  *Id*.  In fact, the complaint in *Shapiro* failed to "plausibly imply that the initial transferees even made subsequent transfers," alleging only that "a portion" was transferred without any evidence of any subsequent transfers.  *Id*.  Consequently, this Court granted the motion to dismiss the subsequent transfer claim.  *Id*.

---

[7] In quoting from the *Shapiro* complaint, the Court noted that the Trustee only alleged: "'Based on the Trustee's investigation to date, the Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS' to the Subsequent Transferee Defendants." *Id*.

28

Unlike in *Shapiro*, the Complaint in this action identifies the specific subsequent transfer from Sentry to Parson by detailing the "necessary vital statistics" for the transfer Parson received and Parson's status as an investor in Sentry. *See Silverman*, 379 B.R. at 32; Compl. ¶ 5. For these important reasons, the facts alleged here are more robust and detailed than in *Shapiro* and provide the details found missing there.

### B.    Parson's Tracing Arguments Fail at the Pleading Stage

Parson's other fact-based tracing arguments fare no better and are inappropriate on a motion to dismiss. First, Parson suggests that the transfer it received from Sentry may have been comprised of subscriptions from other investors. *See* Motion at 19–20. In other words, Parson argues that Sentry commingled customer property with other funds, and this commingling will defeat the Trustee's ability to trace the transfer of stolen customer property from BLMIS. *See id.* But commingling does not defeat the Trustee's ability to trace transfers of customer property. *See Universitas Educ., LLC v. Nova Grp., Inc.*, Nos. 11-1590 (LTS) (HBP) & 11-8726 (LTS) (HBP), 2013 WL 6123104, at *12 (S.D.N.Y. Nov. 20, 2013) ("It is a basic principle of equity that 'the mere commingling of [other] property with the proceeds of property fraudulently transferred by the Debtor is not sufficient to defeat tracing.'"); *Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT) (KMM), 2020 WL 3077151, at *4 (D. Minn. June 10, 2020) ("The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing.") (citing *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *2).

Second, Parson claims that Sentry paid other investors with the customer property it received from BLMIS prior to making the transfer to Parson. *See* Motion at 22–24. However, Parson does not disclose what tracing methodology or methodologies it relies upon to reach this

conclusion.[8]  There is a good reason for that:  Because it is for this Court to decide—after fact and

expert discovery—the appropriate tracing methodology under the circumstances of this case.  *See*

*Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*") ("[T]he

Court's selection of an appropriate methodology is committed to the Court's discretion."); *Charles*

*Ellerin Rev. Tr.*, 2012 WL 892514, at *3 n.7 ("Courts have broad discretion to determine which

monies of comingled funds derive from fraudulent sources.") (citing *United States v. Henshaw*,

388 F.3d 738, 741 (10th Cir. 2004) (finding "courts exercise case-specific judgment to select the

method best suited to achieve a fair and equitable result on the facts before them.")).[9]

The Trustee is a stranger to the transactions between Sentry and Parson and is entitled to

discovery on this issue.  "[I]n a case such as this one, where 'the Trustee's lack of personal

knowledge is compounded with complicated issues and transactions [that] extend over lengthy

periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded."

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011).  This is

one reason why this Court in *Merkin I* denied the defendants' motion to dismiss, finding "[t]he

subsequent transfer claim must ultimately be proved through the books and records of the

---

[8] The declaration of Parson's counsel, Douglas A. Kellner, Esq., includes "calculations" of various transfers from BLMIS to Sentry, and from Sentry to its investors and to other funds managed by FGG.  (*See* Kellner Decl., ¶¶ 9–10, ECF No. 95.)  These calculations add and subtract transfers from over 90 proceedings, amounts that have in some cases changed since the filing of the Trustee's complaints and with no explanation for the methodology behind the calculations.  Parson's undefined tracing methodology, which it uses to contest the subsequent transfer in this proceeding, serves as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context."  *See Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss); *Sass v. Barclays Bank PLC (In re Am. Home Mortg. Holdings, Inc.)*, 501 B.R. 44, 64 (Bankr. D. Del. 2013) (matter subject to fact and expert evidence "is inappropriate to decide on a motion to dismiss"); *see also Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) (assessment of valuation that "almost certainly will require expert testimony" is inappropriate for a motion to dismiss).

[9] This Court has recognized different tracing methodologies offered by the Trustee in this SIPA liquidation proceeding to assist the trier of fact, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality.  Such methodologies "reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer from a commingled fund."  *Merkin II*, 581 B.R. at 386.

defendants." 515 B.R. at 151.  And even after fact discovery, expert opinion may be necessary to determine what portion of the subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts.  *See Merkin II*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5 (denying summary judgment because of a fact dispute after the trustee introduced an expert report and associated documents from which a jury could infer the defendants received subsequent transfers of property from the Petters Ponzi scheme).

Parson attempts to distinguish this Court's decision denying the motion to dismiss in *Merkin I*, arguing that case required defendants' records to address commingling among defendants and, here, "for over a decade, the Trustee has every piece of data he needs to determine" which subsequent transfers contain customer property.  *See* Motion at 21.  This is not persuasive. The commingling among the defendants in *Merkin I* is not substantively different than the commingling at Sentry—each allegedly involved non-debtor property.  And contrary to Parson's unsupported assertion, the Trustee does not have all of Sentry's books and records, and discovery in the Trustee's actions against the FGG management defendants continues.  *See, e.g.*, Stipulated Case Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.(In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec. 6, 2021), ECF No. 353 (setting August 22, 2023 deadline for expert discovery).  Moreover, even if the Trustee had obtained these records, it would not transform his pleading burden.  *See Silverman*, 379 B.R. at 30 (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

Third, Parson asserts that Sentry exhausted all BLMIS customer property on hand when it made a transfer to Abu Dhabi Investment Authority days before satisfying Parson's redemption request.  *See* Motion at 24.  This assertion relies on the factual assumption that the subsequent transfer to Abu Dhabi Investment Authority and other transfers preceding it were sourced solely

by customer property.  In support, Parson relies entirely on exhibits the Trustee submitted in this

and other adversary proceedings.  *See id.*; Kellner Decl., Exs. 1, 5, 6.  Those exhibits, however, do

not establish this fact.  At this stage of the proceedings, the Trustee is not required to plead, much

less establish, that an alleged subsequent transfer is comprised solely of customer property.  *See*

*Kelley*, 2020 WL 3077151, at *4 (holding that where debtors' funds are commingled with "cash

from new subscribing investors," a trustee is not required to establish that the transfers "originated

solely" with the debtor or even to account for "the exact funds at issue" on summary judgment);

*45 John Lofts*, 599 B.R. at 746–47 (rejecting defendant's argument "that Plaintiff generically, and

without factual support, alleged that every transfer out of" the initial transferee's commingled

account was made with debtor property because the plaintiff is not required "to trace individual

dollar amounts from the transferor to the transferees to survive a motion to dismiss") (cleaned up).

Because these transfer exhibits do not establish that each alleged transfer was comprised solely of

BLMIS customer property, there is nothing to support Parson's contention that its subsequent

transfer did not contain any customer property.

Even if the Trustee cannot establish which portion of the subsequent transfer at issue is

customer property, that is not a ground to defeat the Trustee's claim at the summary judgment

stage, let alone at the pleading stage.  Courts in this District and in this SIPA liquidation proceeding

have denied summary judgment where only an undetermined or small portion of the subsequent

transfer was conceivably traceable to the estate.  *See Charles Ellerin Rev. Tr.*, 2012 WL 892514,

at *3 (holding that even at summary judgment, "it is not necessary for the Trustee to specify what

portion of the Subsequent Transfers to [the subsequent transferee] was derived from BLMIS"); *see*

*also Gowan v. Amaranth Advisors, LLC (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493 (SMB) &

10-05447 (SMB), 2014 WL 47774, at *14–16 (Bankr. S.D.N.Y. Jan. 3, 2014) (allowing the trustee

to proceed to trial where at most 3.5% of the transfers at issue could be traced to the debtor's Ponzi scheme). And where, as here, the Trustee "has not been afforded the opportunity to conduct discovery," courts only dismiss such claims "in the rarest of cases." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *2. This is not such a case.

### C.    Parson's Claims of Double Recovery Are Premature

Finally, Parson argues the Trustee's claims are "facially implausible" because the Trustee is seeking more money from all subsequent transferees of Sentry than the fund withdrew from BLMIS. *See* Motion at 19. There is no dispute that the Trustee is limited to "a single satisfaction" under Section 550(a). *See* 11 U.S.C. § 550(d). However, the Trustee "can recover from any combination of [transferees]" up to the amount avoided. *Helms v. Metro. Life Ins. Co. (In re O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021). And under 11 U.S.C. § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds, without the necessity for allocation among all the subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008). Thus, until the Trustee recovers the full amount of the approximately $3 billion in fraudulent transfers received by Sentry, the Trustee may simultaneously seek recovery from Parson in this action and from defendants in other actions, even in an aggregate amount that exceeds initial transfers. *See Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *12 (Bankr. S.D.N.Y. Aug. 6, 2021) (holding defendant's "double recovery" arguments and the Trustee's purported limitations under Section 550(d) are "to be determined at a later stage in the litigation").

### III.    SECTION 546(e) DOES NOT BAR RECOVERY FROM PARSON

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e)

("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added). However, in *Cohmad*, the District Court held that an initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e) safe harbor in actions to avoid initial transfers, thereby allowing the Trustee to avoid transfers made prior to the two-year period. *SIPC v. BLMIS*, No. 12-mc-115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). Nevertheless, Parson now argues that Section 546(e) bars the Trustee's claim, even though the Trustee is seeking to recover a subsequent transfer (and not avoid initial transfers) and the Trustee has pleaded the initial transferee's actual knowledge.  This argument has already been roundly rejected in other adversary proceedings and is based on a tortured misreading of Section 546(e) and *Cohmad*.

A.    **Sentry's Actual Knowledge of Madoff's Fraud Bars Application of Section 546(e)**

Parson sets forth the requirements of Section 546(e) and how they are purportedly met in this case, specifically discussing whether BLMIS was a stockbroker, whether Sentry was a "financial institution,"[10] and whether the transfer Parson received was a "settlement payment." *See* Motion at 26–31.  However, as Parson concedes, this Court has previously held that the Trustee has sufficiently pleaded Sentry's actual knowledge of Madoff's fraud.  *See Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5 (*cited in* Motion at 29 n.15).  As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry or recovery from Parson.

---

[10] Parson's argument that the Trustee is in privity with the Fairfield Liquidators and is therefore bound by any rulings in the Fairfield liquidation is creative—but wrong.  *See* Motion at 27 & n.13.  Parson cites no relevant authority for this argument because none exists.  *New Hampshire v. Maine*, 532 U.S. 742 (2001), does not even involve nonparty preclusion.  And if *Taylor v. Sturgell*, 553 U.S. 880 (2008), "stands for anything, it is for the need to narrow and regularize the use of preclusion against nonparties."  *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *11 (S.D.N.Y. Mar. 25 2013).

B.     **Parson Is Precluded from Relitigating the Actual Knowledge Exception Established in *Cohmad***

Parson is precluded from arguing that *Cohmad* is wrong and relitigating whether actual knowledge bars the application of Section 546(e).  The District Court issued *Cohmad* following consolidated proceedings as to the application of Section 546(e).  As Parson concedes, *Cohmad* held that a party with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e).  *See* Motion at 30–31.  The District Court then remanded to this Court, which has since applied the actual knowledge exception numerous times in this SIPA liquidation proceeding.[11]

Though it did not participate in the District Court proceedings in *Cohmad*, Parson is a subsequent transferee defendant in an adversary proceeding that is part of the same overarching BLMIS SIPA liquidation proceeding as those that did.  As such, Parson is bound by *Cohmad* and that decision is law of the case.  *See Picard v. Goldenberg (In re BLMIS)*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *5 (Bankr. S.D.N.Y. June 20, 2018) ("Although the Defendant did not join in the motions that led to these decisions, the decisions are nevertheless law of the case which applies to rulings across adversary proceedings filed within the same bankruptcy case") (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018)); *see also Picard v. Miller (In re BLMIS)*, 631 B.R. 1, 17 (Bankr. S.D.N.Y. 2021) ("The prior decisions within this SIPA proceeding constitute law of the case."); *In re BLMIS*, No. 21-cv-02334 (CM), 2022 WL 493734, at *12 (S.D.N.Y. Feb. 17, 2022) ("Significantly, in a SIPA liquidation like this one, the different

---

[11] *See, e.g., Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (applying actual knowledge exception); Bench Ruling on Motion to Dismiss, *Picard v. Square One Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 10-04330 (SMB) (Bankr. S.D.N.Y. May 29, 2019), ECF No. 181 (same); *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (same); *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208, 225–26 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 112 (Bankr. S.D.N.Y. 2016) (same); *Shapiro*, 542 B.R. at 112–13 (same); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749, at *13–14 (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *Merkin I*, 515 B.R. at 139–41 (same).

adversary proceedings arising within the same liquidation are 'one case' for purposes of the [law of the case] doctrine.").

Nor does the Second Circuit's decision in *Ida Fishman*—on which Parson relies—warrant reconsideration of *Cohmad*'s actual knowledge exception. *See Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*") (*cited in* Motion at 3, 26, 27, 28, 29, 30 n.17), *cert. denied*, 576 U.S. 1044 (2015). As this Court has recognized, *Ida Fishman* did not address the actual knowledge exception. *See Picard v. Cohen (In re BLMIS)*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016) ("The [*Ida Fishman*] Court did not address the exception to the safe harbor regarding those investors who had actual knowledge that BLMIS was not trading securities.").

### C.    Parson Is Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions

Parson is also incorrect that the Trustee must allege that a subsequent transferee had actual knowledge to invoke the actual knowledge exception to Section 546(e). *See* Motion at 29–31. Specifically, Parson argues that under *Cohmad*, a defendant's subscription agreement with Sentry may act as the relevant "securities contract" in lieu of BLMIS's account agreement and, as such, in this Section 550 recovery action, the Court must look solely to that *subsequent transferee's* actual knowledge to determine whether the initial transfer is avoidable. *See* Motion at 29–31. But *Cohmad* does not stand for that proposition, and Parson's argument is just a repackaging of the previously rejected argument that the Section 546(e) safe harbor should independently apply to actions under Section 550.

By its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550. *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer*

. . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see also BNP Paribas*, 594

B.R. at 197 ("The Trustee does not . . . 'avoid' the subsequent transfer; he recovers the value of

the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe

harbor does not refer to the recovery claims under section 550."). This limitation on the safe harbor

to avoidance actions is consistent with the well-established principle that "the concepts of

avoidance and recovery are separate and distinct." *SIPC v. BLMIS,* 501 B.R. 26, 30 (S.D.N.Y.

2013). It is also consistent with the understanding that the Bankruptcy Code's avoidance

provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility

provision" intended to help execute on that purpose by "tracing the fraudulent transfer to its

ultimate resting place." *See In re Picard*, 917 F.3d at 98 (quotation omitted).

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for

Section 550 recovery actions against subsequent transferees. The District Court withdrew the

reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section

550.[12] However, in its decision, the District Court specifically limited the safe harbor to avoidance

claims based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9

(applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees

can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial transferees and

subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to

the *initial* transfer from [BLMIS].") (emphasis added). And though the court hypothesized, in

*dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund,

and related agreements and transactions, might under certain circumstances constitute relevant

---

[12] *See* Briefing Order, *In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 119 (withdrawing the reference on the issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

"securities contracts," the decision is clear that the focus of the safe harbor is still on the *initial*

transfers.[13]  *See id.* at *9 ("[T]he question . . . is whether the Trustee has alleged that that *initial*

*transfer* was made in connection with (*i.e.,* related to) a covered securities contract . . .") (emphasis

added).[14]

Based on *Cohmad*, the Court has previously held that Section 546(e) applies to avoidance

only, not recovery, and that a subsequent transferee cannot assert the protections of Section 546(e)

where the Trustee adequately pleads the initial transferee's actual knowledge.  *See BNP Paribas*,

594 B.R. at 197; *see also SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620

B.R. 505, 514 (Bankr. S.D.N.Y. 2020) ("[T]he safe harbor defense only applies by its terms to the

initial transfer.").  In *BNP Paribas*, this Court explicitly rejected the argument being made here—

that the "*only* way the Trustee can escape the application of Section 546(e) here is by pleading

with particularity and plausibility that the [subsequent transferee defendants] actually knew of the

Madoff Ponzi scheme."  594 B.R. at 196–97 (emphasis in original).  Based on *BNP Paribas*, a

subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it

protects the initial transferee.  *Id.* at 197.  Like *Cohmad*, *BNP Paribas* is law of the case in this

BLMIS SIPA liquidation proceeding and Parson is bound by it.

Parson nevertheless seeks to relitigate this point, arguing that to the extent that Sentry's

subscription agreement is the relevant "securities agreement" in accordance with *Cohmad*, this

---

[13] For this same reason, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, cited by Parson and which the District Court cites in *Cohmad* solely to support its reading of what constitutes a "securities contract," does not change this outcome.  651 F.3d 329, 339 (2d Cir. 2011) (*cited in* Motion at 30 n.16).  The focus is still on the initial transfers, which for purposes of Section 546(e), the Second Circuit has already determined, and it is now not debatable, are the transfers from BLMIS to its feeder funds.  *See, e.g.*, *Ida Fishman*, 773 F.3d at 422–23.

[14] Parson contends that, by alleging that the subsequent transfer was customer property, the Trustee has conceded that the initial transfers were "in connection with" Sentry's agreement with Parson.  Motion at 3.  But showing that the subsequent transfer can be traced through the "relevant pathways" is irrelevant to the issue of whether the initial transfers were "in connection with" any transaction or contract between Sentry and Parson for purposes of the securities safe harbor.

Court must then look only to the actual knowledge of the subsequent transferee. Motion at 30. But as stated above, the District Court did not conclude this, nor did it suggest that the actual knowledge exception should be applied any differently if the Sentry subscription agreements were to be used for Section 546(e). Indeed, such an interpretation would effectively eliminate the point of the actual knowledge exception, which is to restrict transferees with actual knowledge from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining that defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments'"). Adopting Parson's position means the safe harbor would apply even where the initial transferee feeder fund knew there were no securities transactions in need of protection. It would also allow an initial transferee who had knowledge of the fraud and was unable to satisfy a judgment (like Sentry) to place fraudulently transferred funds with a subsequent transferee out of the reach of a SIPA Trustee.

Expanding the safe harbor as Parson proposes would also result in subsequent transferees being afforded more protection as to avoidance than the initial transferee itself, which does not reflect Congress' intent. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75, 82 (Bankr. S.D.N.Y. 2006) ("Upon consideration of the initial transferee's defenses and once the amount of its liability is established, that amount can be sought from any of the transferees, including subsequent transferees, subject to any of their additional defenses."), *rev'd on other grounds*, 388 B.R. 489 (S.D.N.Y. 2008). Conversely, providing subsequent transferees with the same defenses to avoidance as available to the initial transferee does not unfairly prejudice subsequent transferees.

*Cohmad*'s holding that subsequent transferees with actual knowledge are prohibited from using the safe harbor to protect themselves against recovery of transfers they received does not

support Parson's position.  On the contrary, it merely ensures that the purpose of the actual

knowledge exception is achieved consistently, such that the safe harbor cannot be used by any bad

actor, including a subsequent transferee.  *See Cohmad*, 2013 WL 1609154, at *7 ("A defendant

cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds

through a nominal third party and still obtain the protections of Section 546(e).").

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny Parson's

Motion in its entirety.

Dated: April 19, 2022
       New York, New York

/s/ David J. Sheehan
_____
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Matthew D. Feil
Email: mfeil@bakerlaw.com
Matthew B. Friedman
Email: mfriedman@bakerlaw.com
Matthew K. Cowherd
Email: mcowherd@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Chapter 7 Estate of
Bernard L. Madoff*