# EXHIBIT 20

# FAIRFIELD GREENWICH GROUP

## **Hedge Fund Manager Due Diligence Questionnaire**

### Fairfield Sentry Limited

**Client Contact:**

John Wartman
Fairfield Greenwich Group
919 Third Avenue – 11 Floor
New York, NY  10022
Tel:212.319.6060
E-mail:john@fggus.com

**New York** Office
919 Third  Avenue
11th Floor
New York, NY 10022
Tel: (212) 319-6060
Fax: (212) 319-0450
E-mail: main@fggus.com

**London** Office
32 Dover Street
5th Floor
London W1S 4NE
Tel: 44 207 409 0090
Fax: 44 207 409 3090
Email: main@fgguk.com

**Miami** Office
80 S.W. 8th Street
Suite 2018
Miami, FL 33130
Tel: (305) 373-8123
Fax: (305) 373-8113
E-mail: main@fggus.com

**Rio** Office
Ataulfo de Paiva 482
Suite 603
Leblon 22440-030
Rio de Janeiro, RJ Brazil
Tel: 55 21 2511 5783/5909
Fax: 55 21 2249 9505

**Lugano** Office
Via Maderno 6
6900 Lugano
Switzerland
Tel: 41 91 912 1069
Fax: 41 91 912 1066

Page 1 of 20

FGANW005400899
FG-05548415

# Fairfield Sentry Limited RFP

| MANAGER INFORMATION | |
|---|---|
| **1. CONTACT INFORMATION** | |
| 1.1 Company name: | Fairfield Greenwich Ltd. ("FGL") |
| 1.2 Address: | Charles Adams, Ritchie & Duckworth<br>Second Floor<br>Zepher House, Mary Street<br>George Town, Grand Cayman<br>Cayman Islands<br>British West Indies<br><br>Address for Correspondence:<br>919 Third Avenue, 11th Floor<br>New York, NY 10022 |
| 1.3 Telephone: | (212) 319-6060 |
| 1.4 Name of contact(s): | John Wartman |
| 1.5 Title of contact(s): | |
| 1.6 Telephone of contact() : | NY: (212) 319-6060 |
| 1.7 E-mail of contact(s): | John@fggus.com |
| **2. COMPANY** | |
| 2.1 Please give a brief history of the firm including date founded, products managed and affiliated companies and joint ventures in any area: | In 1983 Walter M. Noel, Jr. established a consulting firm to advise offshore clients in connection with their investments in U.S. based alternative assets.  Mr. Noel had previously completed stints in the management consulting business with Arthur D. Little & Co. and the international private banking business with Citibank and Chemical Bank.  At Chemical, he created the international private banking group in 1977 and helped establish a network of asset management offices throughout the world, until his departure in 1983. Following the establishment of his consulting business, Mr. Noel developed a number of relationships with investment managers, e.g. Martin Zweig, Tweedy, Brown & Co., Morgans, Waterfalls & Vintiadis, who he determined had the capital preservation, low volatility characteristics appropriate for his client base.<br><br>In 1987, Fred Kolber and Jeffrey Tucker, tenants in Mr. Noel's office space, launched the Greenwich Options Fund ("GOF"), a domestic hedge fund.  Mr. Kolber had built a successful business during the prior 25 years managing his own money in a variety of hedge and arbitrage strategies.  GOF marked Mr. Kolber's entry into the money management business as he sought to extend to passive investors the opportunity to participate in his trading activities, then focused on market-making in equity and equity index options using a market neutral posture in most positions.<br><br>Mr. Tucker had previously been engaged in the practice of law for 17 years, and Mr. Kolber was a client of his firm. In 1987 Tucker joined Kolber as a minority partner of the fund management business, providing assistance in the administration and marketing of GOF.<br><br>In 1988 Messrs. Noel, Kolber and Tucker created Fairfield Investment Fund, Ltd. ("FIL"), an offshore counterpart of GOF.  The precipitous growth of assets in the funds and the changes being experienced in the equity options markets, i.e. declining liquidity and the increasing influence of the professionals, necessitated a reduction of assets in GOF and FIL.  Consequently, Noel, Kolber and Tucker sought and received a mandate from their clients to outsource the management of a portion of the funds.  Thereafter, Noel and Tucker embarked upon an effort to identify managers meeting their capital preservation, low volatility approach to investing. Contemporaneous with this effort, the three formed Fairfield Greenwich Group.<br><br>In 1997 the firm was merged with Littlestone Associates of New York City.  Following the merger, Littlestone's principal, Andres Piedrahita, established a London office for the UK subsidiary, and became the third partner in the Fairfield Greenwich Group, in addition to Walter Noel and Jeffrey Tucker.<br><br>Today the firm's personnel are deployed in New York, Greenwich, London, Miami, Madrid, Rio de Janeiro, Lugano, and Holland. The New York office of the firm is responsible for the review and monitoring of the portfolios of the existing managers, for the identification of possible additional managers, and marketing the investment products.  Fairfield |

CONFIDENTIAL

| | |
|---|---|
| | Greenwich manages $5.2 billion for over 800 clients representing over 5,000 investors worldwide. FGG offers single as well as multi-strategy funds. |
| 2.2 Legal entity and domicile: | Fairfield Greenwich Ltd. Is a Cayman Islands Corporation |
| 2.3 Branch offices or other locations, if any: | NY, Greenwich CT, Miami, London, Lugano, Rio de Janeiro, Madrid |
| 2.4 If applicable, please provide the offering memorandum related to the proposed investment vehicle. | Attached. |
| 2.5 Please provide the form ADV Parts I and II (for SEC registered firms). | Not SEC registered. Plan to file in 2003 |
| 2.6 List any affiliations, directorships, memberships and registrations of the company and/or it's principals. | Fairfield Greenwich (UK), and affiliate of FGL, is registered with the FSA in London. Heathcliff Capital Corp., an affiliate of FGL, is registered as a broker dealer in US. FGL is registered with the CFTC as a Commodity Pool Operator. |
| 3. COMPLIANCE | |
| 3.1 Please describe the size and contractual terms of any investment made by the principals in the fund. Also indicate how substantial their commitment is compared to their net wealth. | The Principals have in excess of 50% of their personal assets invested in Fairfield Greenwich products. The firm is 100% employee owned. |
| 3.2 Has the management reduced its personal investment? If so, please specify the date, amount and reason for the reduction. | No, it has increased over time. |
| 3.3 Disclose conditions of subscription/redemptions of team and owners' assets. | The terms for the management team and owners are monthly subscriptions and redemptions, the same terms as subscribers. |
| 3.4 Please describe any current or potential conflict of interest with respect to the fund, investor(s) and professionals involved with the fund and describe the process to handle (potential) conflicts of interests. | The Manager, Bernard L. Madoff Investment Securities and the Non-BLM Investment managers receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund. Such activities could detract from the time that the Manager, Bernard L. Madoff Investment Securities and their respective principals allocate to the affairs of the Fund. The Manager will obtain certain business and financial benefits from the Fund's investments in the Non-BLM Investments which may result in a conflict of interest between the Manager and the Fund in the selection of, and allocation of assets between and among the Non-BLM Investments.<br><br>The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than the account at BLM ("the "Non- |

CONFIDENTIAL

FGANW005400901
FG-05548417

|  | BLM Investments"). It is anticipated that the Non-BLM Investments will be allocated among several managers, with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. The Fund will pay fees with respect to the Non-BLM Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-BLM Investment managers). The Manager and its affiliates may separately benefit from these Non-BLM Investment arrangements.<br><br>In connection with the investment of Fund assets in Non-BLM Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-BLM Investment strategies, which may be made available to other clients of the Manager, (ii) compensation from Non-BLM Investment managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Non-BLM Investment managers. The Manager will share with the Fund, through Performance Fee offset, a portion of the benefits described in clauses (ii) and (iii) of the preceding sentence (the "Shared Cash Flow Amount"). Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.<br><br>Because the Fund was organized by the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.<br><br>The Fund may engage placement agents to market the Fund. If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction, out of the fees the Manager receives from the Fund. You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.<br><br>Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund. The legal counsel to the Fund were retained by the Manager and does not represent the interests of the investors in the Fund. |
|---|---|
| 3.5 Does the firm or advisor have any relationship which may affect its trading flexibility, e.g. associated broker/dealer? | Heathcliff Capital Corp., a broker-dealer affiliated with FGL, acts as a U.S. sub-placement agent in connection with the soliciation and sale of shares of investment funds. None of the Fund's trading activity goes through Heathcliff, nor does Heathcliff receive any commissions or rebates related to the Fund's trading. |
| 3.6 Have the fund, any of the principals of the fund or any of the fund's affiliates been subject to any litigation, other judicial action or to any disciplinary action by a professional body (e.g. AIMR)? If so or if such action is currently in process, please provide (i) a detailed discussion of the case, (ii) the current status of the case, and (iii) a brief comment on the case's merits. | No. |
| 3.7 Provide written copies of your internal investment policies and code of conduct, if available. |  |

CONFIDENTIAL

FGANW005400902
FG-05548418

| | |
|---|---|
| **3.8 What are the firm's employee own account dealing procedures?** | Monthly brokerage statements of the employees and principals of Heathcliff, each of whom is also either an employee or principal of FGG, are copied to the firm for review. |
| **3.9 Do any of the firm's principals have other business involvement? If yes, describe and quantify how much of their professional time is dedicated to each.** | No. |

| **4. MANAGER ORGANISATION** | |
|---|---|
| **4.1 State the number of investment professionals and support staff participating in the management of the fund overall and by area (i.e. portfolio management, research, sales, back office).** | Portfolio Management :    4<br>Research :     5<br>Sales :      15<br>Administration : outsourced to Citco Fund Services (Europe)<br>Risk Management : 4<br>Accounting/Controller:  6<br>Legal : 1 |
| **4.2 What is the (equivalent) number of researchers that are fully dedicated to improving the current strategy?** | The strategy, the tactical implementation of a split strike conversation in S&P 100 stocks, has been developed and refined over 13 years, since 1989. The implementation of this strategy has resulted in a 14.7% compounded annual rate of return with a 3% standard deviation. The trading and stock execution for the portfolio are cutting edge and developed by an industry leader. |
| **4.3 Please provide short background of the principals employed by the fund.** | **_Jeffrey Tucker_**<br><br>Mr. Tucker co-founded the Fairfield Greenwich Group in 1983, and is managing partner of FGG's activities.  He has over 30 years of experience in investment related businesses.  Mr. Tucker began his career as an attorney at what was then the New York Regional Office (the « NYRO ») of the Securities and Exchange Commission from 1970 to 1978.  For much of that time he was an attorney in the Commission's Division of Enforcement.  From 1975 to 1978, he was the Assistant Regional Administrator of the Commission's NYRO, with supervisory responsibility for approximately 50% of the NYRO's enforcement program.  Mr. Tucker entered private practice in 1978 as a partner of the law firm Tucker, Globerman & Feinsand, where he remained until 1987.  During that time, Mr. Tucker specialized in securities and transactional matters, with a principal focus on direct participation offerings, i.e., offerings of limited partnership interests.  Mr. Tucker left the law practice and entered the securities industry in 1987 as a general partner of Fred Kolber & Co. (Limited Partnership), a broker dealer registered with the SEC, a member of the NASD, the Options Clearing Corp., and several securities exchanges.  At FKC, Mr. Tucker was, among other things, responsible for the development and administration of the Options Fund.  FGG began its association with FKC at that time as a marketing agent and the firms subsequently merged activities.  Throughout FGG's development, Mr. Tucker has been responsible for directing the business and operational development of the firm, and has been a Director or General Partner for a variety of its Funds.  In 1989, Mr. Tucker introduced the Madoff Securities relationship to FGG, which became the basis for FGG's Fairfield Sentry Fund.  Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from the Brooklyn Law School.<br><br>**_Walter Noel_**<br><br>Chairman, co-founded FGG in 1983. Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was president of Bagag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice president of the International Private Banking Department of Chemical Bank. Since founding FGG in 1983, Mr. Noel's efforts have been devoted to overseeing the structuring and building of a low volatility fund management business for largely international clients. In recent years, he has concentrated on the client services side of the business and directed the marketing activities. He has been a director or general partner for a variety of FGG funds, and has organized various FGG business opportunities. Mr. Noel graduated from Vanderbilt in 1952, received a Masters of Arts in Economics fron Harvard University in 1953, and graduated from Harvard Law School in 1959. |

CONFIDENTIAL

FGANW005400903
FG-05548419

|  | **_Andres Piedrahita_**<br><br>Founded Littlestone Associated in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-US institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received a Bachelor of Arts degree from Boston University's School of Communications. |
|---|---|
| **4.4 Describe the firm's ownership structure, name of its owners, their percentage ownership, and their role within the firm.** | Fairfield Greenwich Limited ("FGL" or the "Manager"), a corporation organized under the laws of the Cayman Islands, serves as the Fund's investment manager. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund. |
| **4.5 Please enclose an organisation chart and describe the role and composition of any Board.** | The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. |
| **4.6 For every individual year over the previous five years, please list the total number of employees, the number of newly hired employees and the number of employees departed. Of the employees departed, please list their names, date of departure and reason for departure.** | Significant recent hires:<br><br>Richard Landsberger   London Office General Manager<br>Scott Nevin           NY Marketing and Client Services<br>Dan Lipton            CFO<br>Mark McKeefry      General Counsel<br>John Wartman       Risk management, Research Analyst<br><br>Summarize the gains and losses of employees over the past five years in the table.<br><br><table><tr><th></th><th>2002</th><th>2001</th><th>2000</th><th>1999</th><th>1998</th><th>1997</th><th>1996</th></tr><tr><td>**Employees added**</td><td>7</td><td>10</td><td>5</td><td>0</td><td>0</td><td>5</td><td>0</td></tr><tr><td>**Employees lost**</td><td>1</td><td>0</td><td>0</td><td>0</td><td>0</td><td>0</td><td>0</td></tr><tr><td>Total number at year end</td><td>35</td><td>29</td><td>19</td><td>14</td><td>14</td><td>9</td><td>9</td></tr></table><br>Departures:<br>Andrew Gifford , Research Analyst left June 30, 2002 for medical reasons. |
| **4.7 Please discuss your future hiring plans for professionals. Please discuss organisational growth/succession plans.** | The accounting and reporting infrastructure is currently being built out by 4 accountants. The firm is in the process of growth, both in assets under management and by adding managers. Fairfield Greenwich Group is unique in its approach in that it enters into a "strategic relationship" with managers sometimes in a distribution agreement or in a JV. We currently have an incubation capability. We are adding managers and rolling out new product offerings. Fairfield Greenwich is committed to hiring "high quality" personnell to expand the infrastructure as growth dictates.<br>Partnership was expanded in 2001. |
| **4.8 Are outside representatives or consultants used for any activities? If so, please give details.** | Some outside sales representatives/consultants are used.<br>Technology infrastructure development and maintenience is outsourced to the Gold Group.<br>Fund administration is outsourced to Citco fund services (Europe).<br>Quantitative risk calculation, Monte-Carlo VaR, and stress testing, are used via an application service provider, Measurisk LLC.<br>Fairfield Greenwich Limited will seek the best scources for services required to run our business. If the service can be efficiently provided in a cost effective manner by an outside vendor, we are likely to outsource the support service and concentrate resources on our business. |
| **4.9 Please provide two references (with company, title, telephone** | Available upon request. |

CONFIDENTIAL

| | |
|---|---|
| number, email, past and current relationship) for each of the principals involved in the management of the fund. | |
| 4.10 Please provide references (with company, title, telephone number, email, past and current relationship) of your two largest current investors. | Due to client confidentiality, Fairfield Greenwich Limited can not release this information. |

## FUND INFORMATION

### 5. FUND DETAILS

| 5.1 Contact details: | |
|---|---|
| • Name: | Fairfield Sentry Limited |
| • Address and Domicile: | c/o Citco B.V. I. Limited; P.O. Box 662; Road Town, Tortola; British Virgin Islands<br>Correspondence: 919 Third Avenue, 11th Floor;  New York, NY 10022 |
| • Tel: | (212) 319-6060 |
| • E-mail: | main@fggus.com |
| • Fund structure and legal entity: | British Virgin Islands International Business Company |
| 5.2 Date of inception: | November 30, 1990 |

### 6. FEES

| 6.1 Management fee: | 0% Class A, 1% Class B |
|---|---|
| 6.2 Incentive fee: | 20% |
| 6.3 Hurdle rate / High water mark: | No/Yes |
| 6.4 Redemption fee: | none |
| 6.5 Any other fees: | |
| 6.6 What direct or indirect costs, if any, are recharged to the fund? | The Fund's initial organization and offering expenses were approximately $5,000.  Such expenses were paid by the Fund and were amortized among the Fund's shareholders during a period of five years from November 30, 1990, the date the Fund commenced operations.  The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.  In addition, the Fund will reimburse the Manager on a quarterly basis in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value of the Fund as of the last day of each calendar quarter for bearing certain of the internal accounting and operational costs incident to the Fund's activities. |
| 6.7 Please explain to whom the fees are being allocated. | Fairfield Greenwich Limited, the fund manager. |
| 6.8 Do you (have) ever share(d) fees with a third party? | Yes. |
| 6.9 Have any investor been granted rebates? | Yes. |

CONFIDENTIAL

FGANW005400905
FG-05548421

| | |
|---|---|
| **Disclose any soft dollar agreement.** | |

| **7. LIQUIDITY** | |
|---|---|
| **7.1 Subscription frequency (when):** | Monthly. |
| **7.2 Redemption frequency (when):** | Monthly. |
| **7.3 Redemption notice period:** | 15 business days notice. |
| **7.4 Redemption cash proceeds time period:** | Redemptions are processes within 15 business days after monthend. |
| **7.5 Does the fund have any lock-up period or any other liquidity constraints?** | No lock up period. |
| **7.6 Please specify how the liquidity terms above relate to other investors in the fund.** | All shareholders are on the same terms. |

| **8. RELATIONS TO THE FUND** | |
|---|---|
| **8.1 Details administrator:** | |
| •     **Name:** | Citco Fund Services (Europe) B.V. |
| •     **Address:** | Telestone 8 – Teleport |
| • | Naritaweg 165 |
| • | 1043 BW Amsterdam |
| • | P.O. Box 7241   1007  JE Amsterdam |
| • | The Netherlands |
| •     **Name of Contact:** | Bert Lokhorst |
| | (31-20) 572-2100 |
| •     **Telephone of contact:** | blokhorst@citco.com |
| •     **E-mail of contact:** | |
| **8.2 If there has been a change of administrator in the last five years, please specify the reason for this change. What are the procedures for replacing an administrator?** | No |
| **8.3 Details auditor:** | |
| •     **Name:** | PricewaterhouseCoopers |
| •     **Address:** | Martin Meesweg 25 |
| | 3068 AV Rotterdam |
| | The Netherlands Amsterdam |
| •     **Name of Contact:** | Vladan Jankovic |
| | (31 10) 400 8440 |

CONFIDENTIAL

FGANW005400906
FG-05548422

| | |
|---|---|
| • **Telephone of contact:**<br>• **E-mail of contact:** | vladan.jankovic@nl.pwcglobal.com |
| **8.4 If there has been a change of auditor in the last five years, please specify the reason for this change. What are the procedures for replacing an auditor?** | No |
| **8.5 Details custodian:** | 1. Bernard L. Madoff Securities – Equities & Options |
| • **Name:** | 2. Goldman / Morgan / Refco - Seedlings |
| • **Address:** | 3. Citco Bank Nederland, N.V. – Cash |
| | Telestone 8 – teleport<br>Naritaweg 165<br>1043 BW Amsterdam |
| • **Name of Contact:** | The Netherlands<br>Patrick Wagner |
| • **Telephone of contact:** | (31-20) 572-2100 |
| • **E-mail of contact:** | pwagner@citco.com |
| **8.6 If there has been a change of custodian in the last five years, please specify the reason for this change. What are the procedures for replacing an custodian?** | No |
| **8.7 Please list the banks used by the fund:** | Citco Bank Nederland , N.V. |
| **8.8 Please list the prime brokers used by the fund, as well as the duration of your professional relationship:** | 1.  Bernard L. Madoff Investment Securities (95%). Relationship since inception of fund.<br>2.  Goldman / Morgan / Refco investments since October 1, 2002 |
| **8.9 Please list the number of directors, their names and the degree of relationship with manager and service providers.** | **Walter Noel** has over thirty years of experience in the investment business.  From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm.  From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland.  In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank.  Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business.  He co-founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich Limited, in 1983.  Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.<br>**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989.  In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development Fund, which merged with Northern Navigation International Limited ("NNI") in 1991.  Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and |

CONFIDENTIAL

FGANW005400907
FG-05548423

| | managing shipping assets and which is the investment manager of The Navigation Fund Limited.
**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A. Mr. Schmid is a Director of Inter Asset Management Inc. |
|---|---|
| **8.10 Duration of your professional relationship with the directors?** | Over 15 years. |

# DATA OVERVIEW

## 9. FUND ASSETS

| **9.1 Please list the size of assets by investment vehicle:** | Over US $4.0 bil |
|---|---|
| **9.2 Please list the size of the fund's net assets:** | Same as above. |
| **9.3 List the total assets under management, and their respective yearly changes since inception:** | Approximate growth in assets since inception:
1990 - $85 million
1991 - $110 million
1992 - $200 million
1993 - $250 million
1994 - $400 million
1995 - $550 million
1996 - $850 million
1997 - $1.3 billion
1998 - $2.5 billion
1999 - $3.0 billion
2000 - $3.3 billion
2001 - $3.6 billion
2002 - $3.9 billion
The Fairfield Sentry has been closed for direct investment for the past two years and only accepts direct investment up to the amount of redemptions. The fund can be accessed through our multi-strategy funds. |
| **9.4 What percentage of assets is represented by the largest investor (within the fund or seperatly managed)?** | The largest investor represents approximately 3% of total assets. There are no separate accounts. |

## 10. WITHDRAWALS

| **10.1 What were the largest two withdrawals in your fund since** | The two largest redemptions were $65 million in 1999 and $40 million in 2001. The $65 million redemption was due to a pursuit other investment opportunities by the investor and the $40 million redemption was due to a change in regulatory constaints of the investor. |
|---|---|

CONFIDENTIAL

FGANW005400908
FG-05548424

| | |
|---|---|
| inception?<br>• Date:<br>• % of equity:<br>• Reasons: | The $65 million redemption in 1999 was approximately 2.1 % of assets and the $40 million redemption in 2001 was approximately 1.1% of assets. |
| 10.2 Please provide references (with company, title, telephone number and email) for each of the two largest investors which have withdrawn their money. | Due to client confidentiality, Fairfield Greenwich can not answer this question. |
| **11. FUND PERFORMANCE** | |
| 11.1 Has the track record been audited? | Yes |
| 11.2 Please provide actual historical performance since inception (in table format):<br>• Monthly and yearly returns since inception:<br>• Monthly and yearly standard deviation since inception: | From Tear sheet |
| | 14.31% |
| | Annual SD 3% |
| 11.3 Please provide for the complete track record of the fund, in table format, a factor-attribution analysis. So, what was the impact from main market factors (such as value, growth, credit, interest, beta, sector, etc.) and alpha on the total fund performance. | The Fairfield Sentry Fund is traded in a hedge equity style. The fund uses a split strike conversation and on a tactical basis enters the market and executes the strategy. The investment strategy has defined risk and reward parameters. Typically a position will consist of the ownership of 40-45 S&P100 stocks most correlated to the index, the sale of out-of-the-money calls on the index and the purchase of out-of-the-money puts on the index. The sale of the calls is designed to increase the standstill rate of return, while allowing upward movement of the stock portfolio to the strike price of the calls. The puts, funded in large part by the sale of the calls, limit the portfolio's downside. A bullish or bearish bias can be achieved by adjusting the strike prices of the options, overweighting the puts, or underweighting the calls. However, the underlying value of the S&P100 puts is always approximately equal to that of the portfolio of stocks. |
| 11.4 For the complete track record, please show in table format how much of the total alpha has been generated from long-positions and how much from short-postions. | The fund has a unique strategy. It uses no short positions in the underlying equities. Protective put are used but only in the amount to cover the long stock holdings. Short calls are used to finance the purchase of the puts. |

Page 11 of 20

FGANW005400909
FG-05548425

| | |
|---|---|
| **11.5 Please explain any major factors affecting performance and drawdowns (i.e. a manager change, a change in strategy, etc):** | The fund historically has done best in equity market withan upward bias. The worst market environment for the fund is a stagnant market with no volatility.The strategy requires modest market volatility for opportunistic implementation in a tactical sense. The fund may raise cash in lackluster markets with little opportunity. |
| **11.6 List the 5 maximum drawdowns, in percent of equity for each fund, the recovery period, and explain why they have happened:** | The fund has had six drawdowns all less than 55 basis points over its 13 year track record. Recovery is one month for each. During January 2003 extreme market volatility made implementation of the strategy difficult resulting in a drawdown of 27 basis points. |
| **11.7 Over the past 12 months, how many daily drawdowns greater than 2.5% have occurred, and what was the length of recovery?** | None. |
| **11.8 What is the average number of positions held in the portfolio? What is the minimum and maximum?** | Usually a basket of stocks most highly correlated to the S&P 100 containing on average 40 stocks is used in combination with the protective collar. The number of stocks in the strategy can range from a minimum of 30 to a maximum of 50. |
| **11.9 What is your average holding period for:**<br><br>• **All investments**<br>• **Profitable investments**<br>• **Losing investments** | No specific time period. |
| | Depends on the amount of time left in the options(until expiration) and the amount by which the long stocks, short call position is in-the-money. |
| | Loss is stopped out by the protective put. Because of the dynamic nature of options as a hedging vehicle, as the market moves higher the hedged dynamically lifts itself. Traders are not forced prematurely out of losing positions and the protective put allows opportunity for a market reversal of a losing position into a profitable position. |
| **11.10 Average annual commission costs as a percentage of total assets:**<br><br>• **Brokerage to equity ratio**<br>• **Administrator fee to equity ratio**<br>• **Custodian fee to equity ratio**<br>• **Auditors' fee to equity ratio** | Annual commission as a % of Net assets is 1.5% |
| | Brokerage: less than 1 basis point on net assets |
| | Administrative fee: 5 basis points on net asset<br>Custodial fee: less than 1 basis point on net assets |
| | Auditors fee: less than 1 basis point on net assets |

## STRATEGY

| | |
|---|---|
| **12.1 Provide an as much detailed as possible overview of your investment strategy and explain how this results in a competitive** | The Fund seeks to obtain capital appreciation of its assets principally through the utilization of nontraditional options trading strategies. The Manager has established a non-discretionary account for the Fund at Bernard L. Madoff Investment Securities, Inc. (sometimes referred to as "BLM"), a registered broker-dealer in New York, who utilizes a strategy described as "split strike conversion", to which it allocates the predominant portion of the Fund's assets.  This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established.  Set forth below is a description of the "split strike conversion" strategies.<br><br>The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that together will highly correlate |

CONFIDENTIAL

| | |
|---|---|
| advantage. | to the S&P 100 Index, (ii) the sale of out of the money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money S&P 100 Index put options.  A call option is out of the money when its strike price is greater than the current price of the stock; a put option is out of the money when the strike price is lower than the current price of the stock.  The basket typically consists of approximately 40 stocks in the S&P100 . <br><br> The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price.  The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk. <br><br> A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls.  The further away the strike prices are from the price of the S&P 100, the more bullish the strategy.  However, the dollar value underlying the put options always approximates the value of the basket of stocks. <br><br> The options transactions executed for the benefit of the Fund are effected, primarily, in the over-the-counter market, or on a registered options exchange. |
| 12.2 Please list the investment guidelines/restrictions the strategy is using. Detail any instances in which these guidelines have been transgressed. | Guidelines are described above. No violation of guidelines has occurred. |
| 12.3 Which of these guidelines are restrictive with respect to the alpha-generating capacity of the fund? | The strategy, commonly known as a "split strike conversion", has defined risk/reward parameters by virtue of the long puts and the short calls. The portfolio will not take large losses but to pay fro the downside protection, out-of-the-money calls are written that limits the upside to the strike price of the calls. |
| 12.4 Describe the level of competition for your strategy. | The securities industry, including market-making activities and transactions effected in connection therewith, is very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies.  Many such competing persons or entities may be better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund. |
| 12.5 Elaborate on the strategy's current geographical market focus and possible future plans with respect to that. | The strategy  of the Fairfield Sentry fund focuses on the most liquid US stocks, the S&P 100. Although the strategy may be applied to other geographical markets, the platform advantage of operating in the S&P stocks may not be easily replicated in other regional markets. |
| 12.6 List the instrument types you use by percentage. | The portfolio is typically long, 35 –45 stocks of the S&P 100 , those most correlated as a basket. Puts are purchased in an amount to cover the long stock positions. Calls are sold to finance the cost of the puts. |
| 12.7 Describe the fund's internal decision-making processes. To what extent is being relied upon (computer) models and on manager skills? | Dependence Upon Principals and Key Employees of the Manager and Bernard L. Madoff Investment Securities.  The services of the Manager's principals and key employees and Bernard L. Madoff Investment Securities are essential to the continued operations of the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund.  The Manager has allocated the predominant portion of the Fund's assets to a non-discretionary brokerage account at Bernard L. Madoff Investment Securities.  The key employees of the Manager will allocate a small portion of the Fund's assets between and among the Non-BLM Investment managers.  The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-BLM Investments. <br><br> Computers may be used in electronic trading and in stock execution but decision making is not computer driven. |
| 12.8 If the strategy is based on (computer) models, to what extent and when is human | N/A |

CONFIDENTIAL

FGANW005400911
FG-05548427

| | |
|---|---|
| interference permitted? Which procedures and controls are in place to make sure that there is no deviation from these standards? | |
| 12.9 In which markets do you believe your strategy performs best/worst? Please explain why and give examples of time periods. | The strategy performs best in markets with an upward bias and in moderate volatility. The worst market environment for the strategy is in a stagnant market with no volatility. In an extreme downside market, there is little opportunity to successfully implement the strategy. In such cases the manager, may raise cash levels and wait for better market conditions. |
| 12.10 Have the strategy or trading processes changed over time due to capital flows? | No. |
| 12.11 Have you encountered position limit problems? If yes, please explain. | No, the portfolio trades in OTC options with large Money Center Banks and Securities Firms and the stocks are the most liquid S&P 100 stocks. |
| 12.12 What is the maximum capacity of your fund/strategy? | The fund has been closed for direct investment for two years. Direct investment has only been allowed up to the amount of redemptions. The fund is accessable through our multi-strategy products only. |
| 12.13 What is the projected time frame to reach capacity? | The fund is at capacity. |
| 12.14 Describe your cash management policy. | Invest in T-bills or overnight Repos. |

## RISK

### 13. LEVERAGE

| | |
|---|---|
| 13.1 Discuss your leverage exposure policy and its management over different market cycles: | BLM uses no leverage. The option positions are used only in the amount to cover the stock positions. However, non-BLM managers to which the fund may allocated up to 5% of its capital may use leverage. The Non-BLM Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies; however, each manager must ahere to operating guidelines developed with the Fairfield Greenwich Limited investment team that includes leverage limits and a peak to trough drawdown limit of 10%. The non-BLM Managers will all share the Fairfield Greenwich investment philosophy of capital preservation, low leverage, low volatility, full transparency, liquid investments. |
| 13.2 What are your portfolio financing constraints/limits? | N/A |
| 13.3 Discuss sensitivity (cost) to LIBOR levels. | None |
| 13.4 How is the risk of banks increasing margin | The non-BLM managers have low leverage and high liquidity operating guidelines and we do not anticipate a problem with margin levels. |

CONFIDENTIAL

FGANW005400912
FG-05548428

| lines overnight addressed? | |
|---|---|
| **14. DIVERSIFICATION** | |
| **14.1 Discuss the depth of diversification:** | The fund invests in a basket of S&P 100 stocks, usually 30 to 50 holdings. |
| **14.2 How do you calculate the correlation between each investment in the portfolio? How consistent is this correlation in different market environments?** | The correlation that the managers are concerned with is the correlation of the basket to the S&P 100 rather than the correlation of the individual stocks to one another.<br><br>This correlation is tracked daily and can be adjusted through stock trading. |
| **14.3 What are the main sources of marginal risk in your strategy?** | The timing of putting the positions on and the potential slippage in execution adds some marginal risk. Given the sophisticated execution platform employed by BLM , this risk is minimized. |
| **14.4 How has performance been distributed across positions and time?** | The performance has been quite consistant since inception. |
| **15. RISK MANAGEMENT** | |
| **15.1 Discuss position and stop-loss limits and their management.** | The nature of the strategy dictates defined risk/reward parameters. In a split strke conversion strategy, the underlying stock positions are fenced or wrapped by buying an out of the money protective puts and selling an out of the money protective calls. Options are dynamic instruments that will provide increasing coverage as the market moves down and they will lift the coverage allowing upside participation ( up to the strike price of the written calls), when the market goes up. |
| **15.2 How often are these limits applied?  When were their peaks observed?** | Positions may be adjusted as market conditions dictate. Protective put are always in place to limit downside risk. |
| **15.3 How do you adjust your risk capital allocation when there is a significant increase in equity due to trading profits?** | The put protection is always equivalent to the equity value of the underlying stock positions. |
| **15.4 Please describe the operational risk management policy.** | Fairfield Greenwich Limited monitors daily trades and receives copies of trading tickets. An independent consultant verifies prices.Citco our administrator reconciles with the prime broker and produces and independently calculated monthly NAV. Our accounting and control function monitors all cash flows related to the fund. |
| **15.5 To what extent are external factors (such as liquidity) restrictive for exits? How does that impact change in different market situations?** | It is the policy of the fund to offer monthly liquidity. The fund operates in highly liquid securities; therefore, liquidity has not been a problem. |
| **15.6 Have you conducted stress-testing on your strategy? If so, please discuss the results of it.** | Yes, the Fairfield Greenwich Group conducts VaR and Stress testing on the portfolio. Because of the nature of the investment, a split-strike conversion, the position is stopped out on both the upside and the downside in extreme market movements. |
| **16. EXTERNAL CONTROLS** | |

Page 15 of 20

CONFIDENTIAL

FGANW005400913
FG-05548429

| | |
|---|---|
| 16.1 Do you use an external risk monitor? If so, who? | Fairfield Greenwich Group monitors risk internally. We use an ASP(application service provider), Measurisk LLC to perform the calculation on our behalf. |
| 16.2 Are any third parties involved in verifying adherence to risk limits, e.g. the fund's administrator? | FGG has full transparency on a daily basis to the holdings level data in the portfolio. We can verify adherence to the trading style and assure that puts are in place to protect the portfolio's downside.  An independent consultant also verifies positions on a monthly basis. |
| 16.3 Discuss any other not yet discussed risks involved in your strategy, and give a detailed overview of how you plan to manage these risks and the associated business risks. | FGG employs risk monitoring on 2 levels. Sine we have full transparency to securities level data, we can monitor risk from a portfolio reporting level. We also calculate VaR and Stress testing that allows the risk to be aggregated and disaggregated to analyze the sources of risk in the portfolio. Non BLM managers have operating guidelines that provide a peak to trough drawdown limit of 10%. Extensive due dilligence on non-BLM managers due to the strategic partnership, allows us a full understanding of the associated bussness and operating risks.<br><br>Should the Sentry Fund's aggregate position in all Non BLM Funds be in deficit, as at the end of any annual period, against their original investment amount, FGL will temporarily forego receipt of all performance fees that it would otherwise receive on the overall appreciation of the Sentry Fund in subsequent fee periods until such time as the Sentry Fund's initial investment level in these Non BLM Funds is recovered from fees foregone by FGL and/or subsequent aggregate Non BLM Fund investment appreciation. FGL will recapture the previously delayed performance fees to the extent there is subsequent aggregate Non BLM Fund investment appreciation. |

## INVESTOR SERVICE / REPORTING

| | |
|---|---|
| 17.1 Who calculates the NAV? What is the frequency of calculation? Are the calculations being send directly to the investors? | The NAV is calculated monthly by Citco, the funds administrator. FGG handles all the client services on the accounts and distributes NAV's and attribution reports monthly. |
| 17.2 List all reports and correspondence usually sent to clients, and please explain the frequency and the detail the manager reports performance to investors. | FGG produces monthly "tear sheets" that lists the performance, statistics, monthly attribution, and historical track record of the fund to date. Monthly risk reports are available upon request. Citco, our fund administrator, calculated and distributes quarterly NAV reports, yearly audit results, and related manager changes to investors. |
| 17.3 Please provide copies of historical reports. | Attached. |
| 17.4 Are investors informed when minor / major changes are made to the trading, money management, or risk control methods? | Yes. |
| 17.5 What databases, publications, or other available sources does the manager regularly report performance figures to? | Altvest Database, HFR, Hedgefund.net, Tass, International Herald Tribune, Listed on the Irish Stock Exchange, Reuters, Bloomberg. |
| 17.6 What portfolio data can you provide (electronically; excel-format) in terms of: | We use transparency to calculate Monte-Carlo VaR and we apply 2 stress tests to the portfolio each month end. The reports can be set up to slice the portfolio by a number of dimension including instrument type, sector, sub-sector. |
| | Sector , Sub-sector |

CONFIDENTIAL

FGANW005400914
FG-05548430

| | |
|---|---|
| • **Position:** | VaR by Sector, Sub-sector |
| • **Concentration:** | The monthly taer sheets contain manager commentary explaining performance. |
| • **Exposure:** | |
| • **Performance attributes:** | |
| • **Hedge:** | |

## TAX AND LEGAL

| | |
|---|---|
| 18.1 Please provide copies of the proposed contractual documentation, tax and legal opinions and other relevant agreements. | Fairfield Sentry is an offshore fund. We have had no legal actions. Attached please find subscription documents, and the offering memorandum. |
| 18.2 Please confirm that we will receive copies of any existing and future side-letters and that we will have the opportunity to receive the benefit of any clauses in such side-letters (to the extent such clauses apply to our situation). | We will provide. |
| 18.3 Please provide details of the legal structure of the fund, and all affiliated management companies or corporations. | A British Virgin Islands International Business Company. |
| 18.4 Please describe if and to what extent the standard of care of the fund manager has been altered. | N/A |
| 18.5 Please describe if and to what extent the liability of the fund manager has been altered. | N/A |
| 18.6 Please describe if and to what extent the fiduciary duties of the fund manager have been altered. | N/A |
| 18.7 Please describe which authorities (whether governmental or self-regulatory) supervise the activities of the fund manager. | Regulated by the Commodities Futures Trading Commission. |

CONFIDENTIAL

FGANW005400915
FG-05548431

| | |
|---|---|
| **18.8 Is the management of the fund manager supervised by any other body (e.g. a supervisory board)? If so, how is this supervisory body composed and what are its rights and duties?** | N/A |
| **18.9 Please confirm that investor's liability is limited to its investment in the fund or segregated account managed by the fund.** | Yes, the liability is limited to the investment in the fund. |
| **18.10 For US funds: Investors arecareful about submitting itself to US jurisdiction. Are you prepared to accept a jurisdiction clause pointing to the courts in New York (or Delaware)? Are you prepared to waive the right of trial by jury?** | N/A |
| **18.11 Are you prepared to make a representation and warranty that the documentation provided is true and accurate in all material aspects and does not omit any material fact the inclusion of which was necessary to make the statements therein not misleading in the light of the circumstances in which they were made?** | To the best of our knowledge, we will make this representation. |
| **18.12 Please describe the management of tax issues by the fund.** | Fairfield Greenwich Limited relies on the advise of outside counsel with respect to tax matters. |
| **18.13 Please describe how you typically verify and monitor the tax effectiveness of the investments and investment opportunities.** | We monitor the effectiveness through internal and external audits. |

CONFIDENTIAL

FGANW005400916
FG-05548432

| | |
|---|---|
| **18.14 Please specify to what extent the legal structure of the funds provides flexibility to adapting the legal structure of the fund itself and/or the participation of the investor in the fund, to the specific tax and/or legal position of the investor.** | We use broad based corporate provisions. |
| **18.15 Please provide a general description of the tax profile of other (expected) investors to the fund.** | The investors in the fund are 66% high net worth investors and 34% institutional investors (100% offshore) |
| **18.16 Please elaborate on the experience of your organization in assisting the investor in obtaining refunds from withholding taxes or otherwise from the appropriate governmental authority, to which the investor is eligible pursuant to the provisions of the law or any tax treaty, if necessary.** | N/A |

## OTHER

| | |
|---|---|
| **19.1 What proportion of research is generated internally?** | The fund's investment process is not research driven. |
| **19.2 Describe the typical flow of an investment idea from inception to a trading position:** | The basket of stocks representing the S&P 100 is purchased. Out-of-the-money protective puts are purchased and out-of-the-money calls are sold on the S&P 100. The position is adjusted during the month depending upon market conditions. |
| **19.3 Have you published or commissioned any research/academic papers? If so, please provide a copy.** | No. |
| **19.4 What contingency plans do you have in terms of:** | |
| | Not a computer dependent strategy. |
| **• Computer system fault?** | Several investment decision makers. |
| | Prime brokers all have back up systems. |

CONFIDENTIAL

FGANW005400917
FG-05548433

| | |
|---|---|
| • Incapacitated investment decision makers?<br>• Technical failure at Prime Broker's location?<br>• Presence of in-house computer technician?<br>• Back-up systems? | |
| 19.5 What protection does the investor have in the event of fraud, negligence or misappropriation by anyone in your organization? | Typical private action remedies. |
| 19.6 How are trading errors in your fund resolved? | Trading errors are resolved through the standard arbitation process between market makers. |
| 19.7 Who bears the cost for a trade that was submitted in error and, because of a movement in price, involves a loss to the client? Have you experienced any trading error as described in this question over the last 5 years? | The same process applies as in 19.6. Over the past five years there have not been any trading errors. |
| 19.8 Please state any other issues that you consider relevant. | |

Please state the name and title of the officer at your firm who has prepared and reviewed this questionnaire.

**THE UNDERSIGNED REPRESENTS AND WARRANTS THAT THE ANSWERS TO THIS QUESTIONAIRE ARE TRUE AND ACCURATE IN ALL MATERIAL ASPECTS AND DO NOT OMIT ANY MATERIAL FACT THE INCLUSION OF WHICH WAS NECESSARY TO MAKE THE STATEMENTS THEREIN NOT MISLEADING IN THE LIGHT OF THE CIRCUMSTANCES IN WHICH THEY WERE MADE.**

| | |
|---|---|
| **Name:** | John Wartman |
| **Date:** | 4/7/2003 |
| **Position:** | Director of Research |

Page 20 of 20

CONFIDENTIAL