**PORZIO BROMBERG & NEWMAN P.C.**
Brett S. Moore
1675 Broadway
Suite 1810
New York, New York 10019
Telephone: (212) 265-6888
Fax: (212) 957-3983

*Attorneys for Defendants Luxalpha Sicav as*
*represented by its Liquidators Maitre Alain*
*Rukavina and Paul Laplume, Maitre Alain*
*Rukavina and Paul Laplume, in their capacities as*
*liquidators and representatives of Luxalpha Sicav*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | Adv. Pro. No. 10-04285 (CGM)<br><br>**ANSWER TO SECOND AMENDED COMPLAINT** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br> v.<br><br>UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS | |

1

6750934

MANAGEMENT LUXEMBOURG SA (f/k/a
ACCESS INTERNATIONAL ADVISORS
(LUXEMBOURG) SA) as represented by its
Liquidator MAITRE FERNAND ENTRINGER,
ACCESS PARTNERS SA as represented by its
Liquidator MAITRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE
LA VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix under
the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole
beneficiary under the Will of THIERRY MAGON
DE LA VILLEHUCHET (a/k/a RENE THIERRY
DE LA VILLEHUCHET), PIERRE
DELANDMETER, THEODORE DUMBAULD,
LUXALPHA SICAV as represented by its
Liquidators MAITRE ALAIN RUKAVINA and
PAUL LAPLUME, MAITRE ALAIN RUKAVINA
AND PAUL LAPLUME, in their capacities as
liquidators and representatives of LUXALPHA,
GROUPEMENT FINANCIER LTD.,

Defendants.

2

Defendants Luxalpha Sicav as represented by its Liquidators Maitre Alain Rukavina and Paul Laplume, and Maitre Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha Sicav (collectively, "Luxalpha") answers the claims of Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff") (collectively, the "Debtors") as follows.

In answering the allegations set forth in the Second Amended Complaint, Luxalpha does not intend to waive, and does not waive, any and all applicable objections to relevance, admissibility, or prejudicial effect of any of the allegations in the Second Amended Complaint. Except as otherwise expressly admitted below, Luxalpha denies all averments and each allegation set forth in the Second Amended Complaint, including, without limitation, the headings and subheadings in the Second Amended Complaint. Luxalpha expressly reserves the right to amend and/or supplement this Answer.

## NATURE OF THE PROCEEDING[1]

1.      The two BLMIS feeder funds at issue in this action, Defendants Luxalpha SICAV ("Luxalpha"[2]) and Groupement Financier Ltd. ("Groupement Financier") (collectively, the "Feeder Fund Defendants"), trace their origins to the close friendship between Defendant Patrick Littaye and Bernard Madoff dating back to at least 1985.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 1 and therefore denies such allegations.

2.      Littaye ran an investment business that was dependent on its connection to BLMIS to attract investors. That business, which Littaye started in 1994 with the late Thierry Magon de la Villehuchet, was comprised of a series of investment companies—Access International Advisors, Inc., Access International Advisors, LLC, Access International

---

[1] Luxalpha deems the section headings in the Second Amended Complaint not to constitute allegations of the Second Amended Complaint and therefore does not admit or deny any statements contained in any section heading. To the extent any section headings are allegations, Luxalpha admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the Second Amended Complaint.

[2] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Second Amended Complaint.

6750934

Advisors, Ltd., Access Management (Luxembourg), S.A., and Access Partners, S.A.—that operated as a single entity. Together, they comprised an investment firm known as Access International Advisors ("Access," and collectively with Defendants Littaye, Villehuchet, Delandmeter, and Dumbauld, the "Access Defendants"). Luxalpha and Groupement Financier were among the feeder funds Access established to direct investors into BLMIS.

**ANSWER:**    Luxalpha admits that Littaye and Villehuchet founded numerous Access companies, and helped establish Luxalpha, but lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 and therefore denies such allegations.

3.    Luxalpha's creation came about as a direct result of concerns of impropriety at BLMIS—it replaced a prior Access fund, Oreades SICAV, that was closed because of its sponsor's unwillingness to continue to operate a fund that illegally breached EU regulatory requirements.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 3 and therefore denies such allegations.

4.    Shut down in 2004, Oreades was a significant "net winner." Luxalpha was established with no less than $135 million in fictitious profits withdrawn from BLMIS through Oreades. None of the regulatory issues that led to Oreades's closure were corrected by Luxalpha's creation. But there was at least one striking difference between the funds: Luxalpha took even greater care than Oreades did to shield UBS from potential liability.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to whether Oreades was a "net winner", how any purported Oreades fictitious profits were used, the "care" Oreades took to shield UBS from potential liability, or the characterization of "regulatory issues" and therefore denies such allegations and otherwise denies the remaining allegations in Paragraph 4.

5.    Littaye and Access partnered with Defendants UBS AG, UBS (Luxembourg) S.A., UBS Fund Services (Luxembourg) S.A., and UBS Third Party Management Company S.A. ("UBS," or the "UBS Defendants").

**ANSWER:**    Luxalpha admits that Littaye and Access worked with the UBS Defendants in connection with Luxalpha, lacks knowledge sufficient to form a belief as to the characterization of "partnered" and therefore denies such allegation and otherwise denies the remaining allegations in Paragraph 5.

4

6. The next year, certain of the UBS Defendants also began to service Groupement Financier. Together, the UBS Defendants and the Access Defendants operated both Luxalpha and Groupement Financier, regularly sharing information, officers, and directors. As a result of the UBS Defendants' and Access Defendants' activities, Defendants knew BLMIS was operating a fraud.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the UBS Defendants' and the Access Defendants' involvement with Groupement Financier and therefore denies such allegations, admits that the UBS Defendants and the Access Defendants operated and serviced Luxalpha and otherwise denies the remaining allegations in Paragraph 6.

7. The directors, managers, and agents of both Luxalpha and Groupement Financier reviewed the funds' respective account statements and knew from those documents that Madoff could not be executing all the securities transactions reported therein because it was impossible to do so.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the Groupement Financier account statements and therefore denies such allegations, admits that Luxalpha's service providers reviewed Luxalpha's account statements, but otherwise denies the remaining allegations in Paragraph 7.

8. Specifically, Luxalpha and Groupement Financier knew that the volume of options trades Madoff purported to execute on their behalf was impossible, and that Madoff lied about the identity of his purported options counterparties. Luxalpha and Groupement Financier also knew that the returns BLMIS claimed to produce were impossible given its stated trading strategy and that the volume of assets purportedly under management by BLMIS was too large to implement that strategy. And Luxalpha and Groupement Financier knew that BLMIS reported trades as having been made at impossible times and prices.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations relating to Groupement Financier and therefore denies such allegations, and otherwise denies the remaining allegations in Paragraph 8.

9. Aware of these and other indicia of fraud, the Access Defendants shielded Madoff and BLMIS from scrutiny. At the same time, they touted their rigorous due diligence process and a series of antifraud measures that, in reality, never applied to the Feeder Fund Defendants. Luxalpha and Groupement Financier were treated differently from other funds and were allowed to operate as an exception to the Access Defendants' normal policies and procedures regarding the due diligence of funds and their manager.

6750934

**ANSWER:** Luxalpha admits that some of the Access Defendants touted a rigorous due diligence process, lacks knowledge sufficient to form a belief as to the Access Defendants' treatment of other funds relative to Luxalpha and therefore denies such allegations and otherwise denies the remaining allegations in Paragraph 9.

10. The Access Defendants and the UBS Defendants operating the funds also recognized the glaring warning signs at BLMIS, as did outside consultants who bluntly and unequivocally warned the funds' directors and managers of a high risk of fraud at BLMIS. Indeed, UBS's own Private Wealth Management Group reportedly put BLMIS on a "non-approved" list and BLMIS-related funds were not recommended to its clients.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to what the Access Defendants and the UBS Defendants may have recognized as purported "warning signs", or UBS's Private Wealth Management Group's interactions with its clients and therefore denies such allegations, and otherwise denies the remaining allegations in Paragraph 10.

11. Not only were Luxalpha's and Groupement Financier's directors, managers, and agents aware of these and other signs of fraud at BLMIS, Littaye actively impeded any inquiry into these signs of fraud by quashing or deflecting questions and by purposely omitting the names "BLMIS" and "Madoff" from prospectuses and regulatory filings.

**ANSWER:** Paragraph 11 refers to Luxalpha prospectuses and regulatory filings, and Luxalpha respectfully refers to those documents for their respective contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 and therefore denies such allegations.

12. Similarly, the UBS Defendants intentionally misled both U.S. and Luxembourg regulators concerning BLMIS's roles, responsibilities, and options trading partners. UBS concealed Madoff's involvement with Luxalpha from the Luxembourg regulator, the Commission de Surveillance du Secteur Financier (the "CSSF"), knowingly omitting any reference to Madoff or BLMIS when identifying Luxalpha's custodians and managers to the CSSF. UBS knew that Madoff could not pass CSSF scrutiny. The Access Defendants and the UBS Defendants also established and acceded to abnormal practices and procedures for handling Luxalpha's and Groupement Financier's accounts and fictitious trade statements.

**ANSWER:** Luxalpha admits that the UBS Defendants failed to disclose BLMIS and Madoff's roles with Luxalpha to the Luxembourg regulator, the Commission de Surveillance du

6

Secteur Financier (the "CSSF"), and, on information and belief, omitted reference to Madoff or

BLMIS when identifying Luxalpha's custodians and managers to the CSSF, and lacks

knowledge sufficient to form a belief as to truth of the remaining allegations in Paragraph 12

and therefore denies such allegations.

13.    Luxalpha's and Groupement Financier's awareness of BLMIS's impossible
trading activity and performance, their demonstrable awareness of fraud, and their directors'
and managers' deliberate actions to protect Madoff, establish Defendants' knowledge of fraud
at BLMIS, which requires the subordination or disallowance of the Customer Claims and/or the
avoidance of any transfers of Customer Property they received. Defendants' willingness to
actively impede further investigation rose to the level of actual knowledge of fraud at BLMIS
and supports the avoidance and recovery of all fraudulent transfers the Defendants received.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to Groupement

Financier's awareness of BLMIS's alleged "impossible trading activity and performance" or

"deliberate actions to protect Madoff" and therefore denies such allegations. Paragraph 13 also

contains legal conclusions to which no response is required, and Luxalpha otherwise denies the

remaining allegations in Paragraph 13.

14.    Luxalpha and Groupement Financier together withdrew initial transfers from
BLMIS totaling approximately $796 million in the ninety days preceding BLMIS's bankruptcy
filing and roughly $1.12 billion in the preceding six years. This action seeks the avoidance and
recovery of those initial transfers from the Feeder Fund Defendants, recovery of subsequent
transfers that went to the other Defendants, and equitable subordination and disallowance of
related Defendant customer claims.

**ANSWER:**    Luxalpha denies that Luxalpha and Groupement Financier "together

withdrew initial transfers from BLMIS" but admits that Exhibit B to the Second Amended

Complaint sets forth transfers from BLMIS Account No. 1FR108 – UBS (LUXEMBOURG)

SA FBO LUXALPHA SICAV including $535,000,000 with the ninety days preceding BLMIS's

bankruptcy filing and $751,566,000 in the six years preceding BLMIS's bankruptcy filing,

admits that this action seeks the avoidance and recovery of those transfers, including purported

subsequent transfers, and equitable subordination and disallowance of customer claims, and otherwise denies the remaining allegations in Paragraph 14.

15.    The Access Defendants and the UBS Defendants worked together to extend Madoff's fraud to European investors, enriching themselves through the receipt of millions of dollars' worth of fees that—unlike their clients' funds—were not subject to the obvious fraud risk that Defendants knew Madoff posed.

**ANSWER:**    Luxalpha admits that the Access Defendants and the UBS Defendants were paid millions of dollars' worth of fees for services provided to Luxalpha, lacks knowledge sufficient to form a belief as to what those defendants knew about the fraud risk Madoff posed and therefore denies such allegations, and otherwise denies the remaining allegations in Paragraph 15.

16.    Together, the Feeder Fund Defendants channeled over two billion dollars into BLMIS, funds Madoff used to grow and perpetuate his Ponzi scheme. And even more money was fed into Madoff's scheme through other non-defendant feeder funds that were opened or introduced by the Access Defendants, including Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd.

**ANSWER:**    Luxalpha admits that cash deposits of Luxalpha assets in the amount of $1,514,049,766 were made by the UBS Defendants and the Access Defendants into BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV for investment with BLMIS, and lacks knowledge sufficient to form a belief as to cash deposits made into other BLMIS related accounts and therefore denies such allegations, and otherwise denies the remaining allegations in Paragraph 16.

17.    Notwithstanding the massive harm to investors occasioned by the UBS-sponsored Feeder Fund Defendants, UBS Wealth Management congratulated itself after the revelation of Madoff's fraud by publicly flaunting the fact that it had "no material exposure" to BLMIS.

**ANSWER:**    Luxalpha admits that UBS Wealth Management publicized a purported lack of exposure to BLMIS, but otherwise lacks knowledge sufficient to form a belief as to the remaining allegations in Paragraph 17 and therefore denies such allegations.

8

## SUBJECT MATTER JURISDICTION AND VENUE

18.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

**ANSWER:**     Luxalpha admits that this is an adversary proceeding commenced in this

Court in which the main SIPA Proceeding is pending, that the SIPA Proceeding was originally

brought in the United States District Court for the Southern District of New York, and that the

District Court Proceeding has been referred to this Court.   The remaining allegations in

Paragraph 18 state legal conclusions to which no response is required.

19.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (0). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:**     Paragraph 19 states legal conclusions and a statement regarding a legal

position of the Trustee as to which no response is required.  Luxalpha does not consent to entry

of final orders or judgments by the Bankruptcy Court.

20.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**     Paragraph 20 states a legal conclusion to which no response is required.

21.     This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq. (McKinney 2001)), the New York Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.

**ANSWER:**     Paragraph 21 states legal conclusions to which no response is required.

6750934

## PERSONAL JURISDICTION

22.    This Court has personal jurisdiction over each of the Defendants under N.Y. C.P.L.R. 301 and 302, and Federal Rule of Bankruptcy Procedure 7004. Each defendant has maintained minimum contacts with New York in connection with the claims in this adversary proceeding. As further alleged herein, the Defendants have or had offices in New York, are doing or did business in New York, and/or transact or transacted business in New York during the time periods addressed herein. For some, New York is or was their principal place of business. The Feeder Fund Defendants had accounts with BLMIS in New York. The UBS Defendants, the Access Defendants, the Feeder Fund Defendants, and the Feeder Fund Director Defendants (defined below), delivered agreements or caused agreements to be delivered in New York, relating to BLMIS. In addition, certain of the UBS Defendants and Access Defendants communicated regularly with persons in New York regarding the Feeder Fund Defendants and/or BLMIS, and also sent and/or received funds to and/or from BLMIS in New York, utilizing New York banks. In addition, Customer Claims were filed in the SIPA Proceeding, purportedly on behalf of Luxalpha.

**ANSWER:**    The first sentence of Paragraph 22 states legal conclusions to which no response is required.  Luxalpha admits that the UBS Defendants and the Access Defendants opened BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV with BLMIS in New York to invest Luxalpha assets with BLMIS, delivered account opening agreements or caused account opening agreements to be delivered to New York relating to BLMIS Account No. 1FR108, sent and/or received funds relating to Luxalpha assets deposited into BLMIS Account No. 1FR108, communicated with persons in New York regarding Account No. 1FR108, and the UBS Defendants filed Customer Claims relating to BLMIS Account No. 1FR108 on behalf of Luxalpha. Luxalpha lacks knowledge sufficient to form a belief as to alleged "minimum contacts with New York" by each defendant, the offices each defendant has or had in New York, the scope of the business transacted in New York "during the times periods addressed herein" by each defendant, or whether defendants maintain or maintained New York as a principal place of business, and therefore denies such allegations, and otherwise denies the remaining allegations in Paragraph 22.

## BACKGROUND, THE TRUSTEE, AND STANDING

6750934

23.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

**ANSWER:**    On information and belief, Luxalpha admits that Madoff was arrested on December 11, 2008 for criminal violations of federal securities laws, and that the Securities and Exchange Commission commenced the District Court Proceeding.

24.    On December 15, 2008, under SIPA § 78eee(a)(4)(B), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER:**    Luxalpha respectfully refers to the application filed by SIPC referred to in Paragraph 24 for a complete and accurate statement of its contents.

25.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c)    removed this case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER:**    Luxalpha respectfully refers to the order entered by Judge Stanton on December 15, 2008 for a complete and accurate statement of its contents.

26.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER:**    Luxalpha respectfully refers to the orders dated December 23, 2008 and February 4, 2009, respectively, for a complete and accurate statement of their contents. To the extent the allegations in the second sentence of Paragraph 26 state legal conclusions, no response is required.

27.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated Madoff's chapter 7 estate into the SIPA Proceeding.

**ANSWER:**    Luxalpha respectfully refers to the petition dated April 13, 2009, and the order dated June 9, 2009, respectively, for a complete and accurate statement of their contents.

28.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:**    On information and belief, Luxalpha admits that Madoff pleaded guilty of crimes on or about March 12, 2009 and respectfully refers to the transcript of that plea hearing for a complete and accurate statement of its contents.

29.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:**    On information and belief, Luxalpha admits that DiPascali pleaded guilty on or about August 11, 2009 and respectfully refers to the transcript of that plea hearing for a complete and accurate statement of its contents.

30.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:**    On information and belief, Luxalpha admits that Kugel pleaded guilty on or about November 21, 2011 and respectfully refers to the transcript of that plea hearing for a complete and accurate statement of its contents.

6750934

31.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:**    On information and belief, Luxalpha admits that Bonventre, Bongiorno, Crupi, Perez, and O'Hara were convicted of fraud and other crimes on March 24, 2014 and respectfully refers to the trial transcript and judgment for complete and accurate statements of their contents.

32.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:**    Paragraph 32 states legal conclusions and statements regarding legal positions of the Trustee as to which no response is required, and Luxalpha otherwise lacks information sufficient to form a belief as to the remaining allegations in Paragraph 32 and therefore denies such allegations.

33.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER:**    Paragraph 33 states legal conclusions to which no response is required.

34.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:**    Paragraph 34 states legal conclusions and statements regarding legal positions of the Trustee to which no response is required.

6750934

35.     The Trustee has standing to object to customer and creditor claims under SIPA §§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78111(2) and 78fff-2(b). By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78111(2), because such claims are not entitled to a distribution pari passu with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

**ANSWER:**     Paragraph 35 states legal conclusions and statements regarding legal positions of the Trustee as to which no response is required.

## BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

36.     Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 36 and therefore denies such allegations.

37.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore denies such allegations.

38.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue, New York, New York, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

14

**ANSWER:**    On information and belief, Luxalpha admits that BLMIS's principal place of business was 885 Third Avenue, New York, New York, but otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and therefore denies such allegations.

39.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore denies such allegations.

40.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 40 and therefore denies such allegations.

41.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 41 and therefore denies such allegations.

**B.    The Ponzi Scheme**

42.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others who pleaded guilty to, or were found guilty of, assisting Madoff in carrying out the fraud.

15

**ANSWER:**    The first sentence of Paragraph 42 states a legal conclusion to which no response is required.  Luxalpha admits that BLMIS claimed to invest money deposited by customers in securities, respectfully refers to Paragraphs 28 through 31 above, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42 and therefore denies such allegations.

43.    BLMIS proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 43 and therefore denies such allegations.

44.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commission on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:**    On information and belief, Luxalpha admits that BLMIS employed Friehling & Horowitz, CPA, P.C. as its auditor, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 and therefore denies such allegations.

45.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER**    On information and belief, Luxalpha admits that David Friehling pleaded guilty to crimes on or about November 3, 2009 and respectfully refers to the plea hearing transcript and BLMIS's SEC Form X-17A-5 for complete and accurate statements of their contents.

<u>Madoff's Investment Strategy</u>

16

46.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the Split Strike Conversion ("SSC") Strategy. For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 46 and therefore denies such allegations.

47.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

allegations in Paragraph 47 and therefore denies such allegations.

48.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 48 and therefore denies such allegations.

49.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 49 and therefore denies such allegations.

50.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

6750934

**ANSWER:**    On information and belief, Luxalpha admits that BLMIS reported falsified trades on monthly account statements, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50 and therefore denies such allegations.

51.    By 1992, the SSC strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:**    On information and belief, Luxalpha admits that Madoff stated that he managed funds according to a technique referred to as "split-strike conversion" which purportedly involved buying and selling a basket of shares from the S&P 100 and, simultaneously, buying sale and purchase options in order to purportedly cover the risk, and also purportedly included investing assets in U.S. Treasury Bonds, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51 and therefore denies such allegations.

52.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore denies such allegations.

53.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore denies such allegations.

54.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 54 and therefore denies such allegations.

55.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 55 and therefore denies such allegations.

56.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC strategy.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore denies such allegations.

57.    Madoff could not be using the SSC strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC strategy.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore denies such allegations.

<u>No Evidence of BLMIS Trading</u>

58.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 58 and therefore denies such allegations.

6750934

59.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared trades in any exchange-listed options.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 59 and therefore denies such allegations.

The Collapse Of The Ponzi Scheme

60.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:**     On information and belief, Luxalpha admits BLMIS's IA Business

collapsed in December 2008, but lacks knowledge sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 60 and therefore denies such allegations.

61.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through the IA Business as a Ponzi scheme.

**ANSWER:**     Luxalpha respectfully refers to the transcripts of Madoff and DiPascali's

plea hearings for the complete and accurate statement of their contents and otherwise lacks

knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 61 and

therefore denies such allegations.

62.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 62 and therefore denies such allegations.

## THE DEFENDANTS AND THEIR AGENTS

### A.     The UBS Defendants

63.     Defendant UBS AG is a Swiss public company with registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland. UBS AG is the parent company of the global UBS bank, and is present in New

York, with offices at 299 Park Avenue, New York, NY 10171 and 1285 Avenue of the Americas, New York, NY 10019. It also conducts daily business activities in Stamford, Connecticut and other locations in the United States.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 63 concerning UBS AG's daily business activities in Stamford, Connecticut and other locations in the United States, and therefore denies such allegations. On information and belief, Luxalpha admits the remaining allegations in Paragraph 63.

64.    Defendant UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("UBS SA"), a wholly owned subsidiary of UBS AG, is a Societas Europaea, incorporated in Germany and registered with the Register of Commerce of Frankfurt (HRB 107046), with a registered office at Bockenheimer LandstraBe 2-4, 60306 Frankfurt am Main. On or about December 1, 2016, UBS (Luxembourg) S.A. merged with and was absorbed into UBS Europe SE. UBS (Luxembourg) S.A.'s business operations continue to be carried out by UBS Europe SE, Luxembourg Branch, with a place of business at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, and an R.C.S. Luxembourg number of B209123.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 64.

65.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly owned subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a societe anonyme. Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 65.

66.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), a wholly owned subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a societe anonyme. Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 66.

67.    The UBS Defendants presented themselves to the public as a unified global entity operating as "a coherent and effective whole." UBS shared a centralized structure for core enterprise functions including finance, risk, legal, compliance, and shared services such as human resources, information technology, communication and branding, and corporate development. Upon information and belief, this organizational structure is designed to ensure

6750934

UBS AG's centralized control of global business strategy and reporting obligations for UBS group companies. UBS AG subsidiaries market themselves as part of a "worldwide financial network," providing "an international network of experts" that "can propose truly global investment solutions" based on "the experience, know-how and substantial resources provided by the UBS Group as a whole."

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 67 and therefore denies such allegations.

68.    UBS SA and UBSFSL worked closely with several of the Access Defendants—including AIA LLC, AIA Ltd. and AML (f/k/a AIA (Lux))—in the management, supervision and administration of Luxalpha and Groupement Financier.

**ANSWER:**    Luxalpha admits that UBS SA and UBSFSL worked closely with several of

the Access Defendants in the management, supervision and administration of Luxalpha, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68

and therefore denies such allegations.

69.    The UBS Defendants' deep involvement with Madoff and the BLMIS-feeder funds was far-reaching, extended well beyond Luxalpha and Groupement Financier, and involved billions of dollars being funneled into BLMIS. UBS entities also sponsored, managed, administered or served as custodian for several other BLMIS-feeder funds that the Trustee is pursuing or has pursued through separate actions. For example, UBS AG served as sponsor of Luxembourg Investment Fund ("LIF"). UBS SA also served as LIF's custodian, main paying agent and, for a time, as its portfolio manager. UBSTPM ultimately replaced UBS SA as portfolio manager of LIF, and UBSFSL served as administrator of LIF. LIF directed investments of approximately $759 million into BLMIS. UBS SA also served as the custodian for Plaza Investments International Limited, which directed investments of approximately $534 million into BLMIS. And at various times, UBS SA served as portfolio manager and custodian for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited and Thybo Stable Fund Limited, which collectively directed investments of over $200 million into BLMIS.

**ANSWER:**    Luxalpha admits that the UBS Defendants' served in various roles in

connection with the Luxembourg Investment Fund ("LIF"), and similar to Luxalpha, opened an

account with BLMIS into which they deposited LIF assets for investment by BLMIS, and on

information belief, the UBS Defendants also had roles with other investment funds in connection

22

with BLMIS. Luxalpha lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69 and therefore denies such allegations.

70.    All account opening papers and agreements were completed and executed by UBS SA employees, including Managing Director Viviane DeAngelis and Director Serge Karp. UBS SA employees regularly corresponded with Frank DiPascali of BLMIS for purposes of managing Luxalpha's investments and redemptions. All redemptions UBS SA requested for the Luxalpha fund were processed through an account held at UBS AG's Stamford, Connecticut branch.

**ANSWER:**    Luxalpha admits that UBS SA employees, including Managing Director Viviane DeAngelis and Director Serge Karp, completed and executed account opening papers and agreements for BLMIS Account No. 1FR108, and UBS SA employees regularly corresponded with Frank DiPascali of BLMIS regarding investments and redemptions for Luxalpha's assets deposited into BLMIS Account No. 1FR108, and upon information and belief, all redemptions UBS SA requested from BLMIS Account No. 1FR108 were processed through an account at UBS AG's Stamford, Connecticut branch.

71.    Luxalpha Directors Hartmann, Schroeter, Stiehl, Egger, Hondequin, and Kranz were all UBS SA employees.

**ANSWER:** Luxalpha admits the allegations in Paragraph 71.

72.    UBS SA served as Defendant Groupement Financier's prime bank and non-defendant Groupement Financier Levered Ltd.'s ("Groupement Levered") custody bank. Groupement Levered did not have a direct account at BLMIS, but offered leveraged returns based on investments in the underlying Groupement Financier fund that was directly invested with BLMIS. As prime bank for Groupement Financier, UBS SA was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank. UBS SA was also responsible for maintaining a mirror book-keeping of all transactions reported by BLMIS so as to enable UBSFSL, the fund's administrator, to calculate the fund's net asset value ("NAV").

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 72 and therefore denies such allegations.

**B.    The Access Defendants**

73.     Littaye and Villehuchet were sophisticated investment professionals who, before founding Access, had long held senior positions at major financial institutions.

**ANSWER:**   On information and belief, Luxalpha admits the allegations in Paragraph 73.

74.     Before founding Access, Littaye worked in a number of positions in the securities industry. From 1968 until 1971, he was an Assistant Vice-President at Banque Paribas in the Corporate Finance Department. From 1971 until 1977, he was responsible for the Capital Market Products division at Credit Agricole Segespar. From 1977 until 1985, he was Senior Vice President at Banque NSM (ABN Group) responsible for corporate finance for fixed income issues, including "high tech" swaps for bond issues in foreign currencies. From 1985 until 1992, he was Managing Director for brokerage activities at Banque Pallas France. From 1993 through 1994, he was Chief Operating Officer at Credit Lyonnais Securities (USA) responsible for syndication, brokerage activities, back-office/operations and systems.

**ANSWER:**   On information and belief, Luxalpha admits that Littaye worked in a number of positions in the securities industry, but lacks knowledge sufficient to form a belief as to the remaining allegations in Paragraph 74 and therefore denies such allegations.

75.     Similarly, Villehuchet also worked in several positions in the securities business before founding Access. From 1970 until 1983, Villehuchet worked in the Capital Markets division of Banque Paribas in Paris. Villehuchet founded, and from 1983 until 1987, was President of Interfinance, an international brokerage firm. In 1987 he founded Credit Lyonnais Securities (USA) in New York, and from 1987 through 1994, served as its Chairman and CEO.

**ANSWER:**   On information and belief, Luxalpha admits that Villehuchet worked in a number of positions in the securities industry, but lacks knowledge sufficient to form a belief as to the remaining allegations in Paragraph 75 and therefore denies such allegations.

76.     Littaye and Villehuchet co-founded Access in 1994, first establishing Access International Advisers, Inc. ("AIA Inc."). Thereafter, they founded various other Access entities—Defendants AIA LLC, AIA Ltd., AML, and AP (Lux) (all as defined herein)—and arranged for them to act as service providers to the Feeder Fund Defendants.

**ANSWER:**   On information and belief, Luxalpha admits that Littaye and Villehuchet co-founded Access, and that certain Access Defendants acted as service providers for Luxalpha, but lacks knowledge to form a belief as to the remaining allegations in Paragraph 76 and therefore denies such allegations.

6750934

77.     Although formally distinct and separately organized in their various jurisdictions, AIA Inc., AIA LLC, AIA Ltd., AML, and AP (Lux) were, in reality, a single business enterprise or alter egos of each other. At all times relevant herein, Littaye and Villehuchet coordinated, dominated, and controlled that enterprise. Littaye and Villehuchet marketed and used the network of Access entities as a collective whole to service Luxalpha and Groupement Financier, among other BLMIS-feeder funds. Many of the Access entities were shell companies with no employees of their own.

**ANSWER:**   Luxalpha admits that certain Access Defendants acted as service providers for Luxalpha, but lacks knowledge to form a belief as to the remaining allegations in Paragraph 77 and therefore denies such allegations.

78.     Littaye and Villehuchet also co-owned all of the Access Defendants. And Littaye and Villehuchet were also executives and directors of all of the Access Defendants. Villehuchet was Founder, Chairman, and Chief Executive Officer of AIA Inc., and Littaye was Founder and Consultant to AIA Inc. They both acted as AIA LLC's Partner, Chairman, and Chief Executive Officer. They served as AIA Ltd.'s, AML's, and AP (Lux)'s directors. Littaye also served as Director, Chairman, and Managing Director of AIA (Lux). Villehuchet was also AIA Inc.'s President and AIA Inc. was AIA LLC's sole member.

**ANSWER:**   On information and belief, Luxalpha admits that Littaye and Villehuchet were owners, executives and directors of various Access entities, but lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78 and therefore denies such allegations.

79.     Madoff was integral to Access's business. Access's BLMIS-related investments (which, at their peak, exceeded $2 billion), dwarfed its non-Madoff holdings. By February 2008, 79% of Access subscriptions were invested with BLMIS, accounting for 92% of Access's total net revenue.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 79 and therefore denies such allegations.

80.     Littaye visited with Madoff at Madoff's New York office quarterly. During these meetings, Littaye raised questions that Access or its clients had with respect to the BLMIS-related funds. He would then relay Madoff's answers to Access's New York employees.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 80 and therefore denies such allegations.

6750934

81.     Littaye also would meet with Madoff in the south of France when Madoff vacationed there. During these visits in France, Madoff and Littaye would play tennis together, which provided further opportunities for Littaye and Madoff to discuss business and Access's investments with BLMIS.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 81 and therefore denies such allegations.

82.     The Access Defendants had a staff of 20 to 30 employees spread among its New York and European offices responsible for the sales, operation, due diligence and monitoring for its multiple fund offerings. However, any issues, questions or concerns regarding the several Access funds that maintained accounts at BLMIS were addressed by and had to be run through Littaye.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 82 and therefore denies such allegations.

83.     Claudine Magon de la Villehuchet, a/k/a Claudine de la Villehuchet, is named in her capacity as executrix under the November 6, 2000 last will and testament of Thierry Magon de la Villehuchet a/k/a Rene Thierry de la Villehuchet. Ms. Villehuchet is also named individually as the sole beneficiary under Villehuchet's last will and testament. At the time of his death, Villehuchet and Ms. Villehuchet resided in New Rochelle, New York, and both were U.S. citizens.

**ANSWER:**    Luxalpha admits that the Trustee has named Claudine Magon de la

Villehuchet as a defendant in this action in the capacities described in Paragraph 83, but

otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 83 and therefore denies such allegations.

84.     Defendant Pierre Delandmeter, a Belgian citizen, was a member of AML's board. He was both a Director and Legal Advisor of Luxalpha, and an advisor to Littaye, Villehuchet, and the other Access Defendants. Delandmeter was a Legal Advisor to Groupement Financier and Groupement Levered. In addition, Delandmeter was a Director of AML, AP (Lux), and AIA Inc.

**ANSWER:**    Luxalpha admits that Delandmeter was a member of AML's board and a

Director and Legal Advisor of Luxalpha, but lacks knowledge sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 84 and therefore denies such allegations.

26

6750934

85.    Defendant Theodore Dumbauld, a resident of Connecticut, also served the Access Defendants in various roles. Dumbauld was a Partner at AIA LLC beginning in 2002 and then became the Chief Investment Officer of AIA LLC. Dumbauld held both of these positions until his 2006 departure. Dumbauld was also a director of AIA LLC.

**ANSWER:**    On information and belief, Luxalpha admits that Defendant Theodore Dumbauld worked for the Access Defendants in various roles, and otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 85 and therefore denies such allegations.

### AIA LLC

86.    Founded in 2001, Defendant Access International Advisors LLC ("AIA LLC") is a Delaware limited liability company wholly owned by AIA Inc. During the relevant period, its principal place of business was at 509 Madison Avenue, 22nd Floor, New York, New York 10022.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 86 and therefore denies such allegations.

87.    AIA LLC was Luxalpha's portfolio adviser from August 11, 2004 until August 1, 2006. As portfolio adviser, AIA LLC oversaw UBS SA in its role as Luxalpha's portfolio manager. AIA LLC also served as Groupement Financier's sponsor.

**ANSWER:**    Luxalpha admits that AIA LLC entered into a Portfolio Advisory Agreement dated August 11, 2004 with UBS (Luxembourg) S.A., and Luxalpha respectfully refers to that agreement for its contents, admits that the agreement was in place until August 1, 2006, but otherwise lacks knowledge to form a sufficient belief as to the truth of the remaining allegations in Paragraph 87 and therefore denies such allegations.

### AIA Ltd.

88.    Defendant Access International Advisors Ltd. ("AIA Ltd.") is a Bahamas limited company. Its registered address is MMG Bahamas Ltd., P.O. Box CB — 13937, 50 Shirley Street, Nassau, Bahamas.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 88 and therefore denies such allegations.

6750934

89.     AIA Ltd. was nominally Groupement Financier's investment manager until July 2007, though in practice it performed no such services, because they were delegated to BLMIS. At various times, AIA Ltd. was also identified as Groupement Financier's operator and investment adviser. AIA Ltd. also served as Groupement Levered's official investment manager, and as Luxalpha's official consultant and exclusive introducing agent. As investment manager, AIA Ltd. was required to "keep the net assets of the Fund[s] under surveillance and constant review; carry out reviews and controls of the portfolio."

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 89 and therefore denies such allegations.

90.     AIA Ltd. held itself out as Groupement Financier's and Groupement Levered's investment manager, although as its own accountants recognized, it was never licensed to act as an investment manager. AIA Ltd. nevertheless received the vast majority of the fees Access collected from Luxalpha and Groupement Financier.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 90 and therefore denies such allegations.

91.     As of at least 2004, AIA Ltd. was a shell entity that had no physical presence in any jurisdiction. AIA Ltd. is described in Access's internal documents as an offshore "money box" set up for the "prime purpose [of] ... the receipt of fees" on behalf of Access. According to Access, AIA Ltd. was incorporated offshore in the Bahamas to accommodate "Bernie Madoff[, who] want[ed] to only deal with offshore entities related to [the Access] accounts."

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 91 and therefore denies such allegations.

## **AML**

92.     Defendant Access Management Luxembourg S.A. ("AML") (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")) is a Luxembourg limited liability company incorporated as a societe anonyme. Its registered office is at 34a, rue Philippe II, L2340 Luxembourg. AML is in liquidation in Luxembourg. Maitre Fernand Entringer, with offices at 34a, rue Philippe II, L-2340, Luxembourg, is AML's liquidator.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 92.

93.     AML was nominally Luxalpha's portfolio manager from November 17, 2008 through its liquidation, but entered into an Investment Advisory Agreement with AP (Lux). AML ultimately delegated the management of Luxalpha's portfolio to BLMIS. AML also served as Luxalpha's portfolio adviser from February 5, 2004 until August 11, 2004, purporting

28

to advise UBS SA in connection with UBS SA's role as Luxalpha's portfolio manager. Until 2007, AML also served as Groupement Financier's and Groupement Levered's investment adviser.

**ANSWER:**    Luxalpha admits that it entered into a Management Company Services Agreement with Access Management Luxembourg dated November 17, 2008, that Access Management Luxembourg entered into an Investment Advisory Agreement with Access Partners SA dated November 17, 2008, that Access International Advisors (Luxembourg) S.A. entered into a Portfolio Advisory Agreement with UBS (Luxembourg) S.A. dated February 5, 2004, and Luxalpha respectfully refers to those agreements for their contents.  Luxalpha lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 93 and therefore denies such allegations.

94.    A September 2004 questionnaire regarding Luxalpha completed by Access states that AIA (Lux) has "[n]o regular employees" and "no full-time employees," lists Littaye and Delandmeter as the only investment professionals at the firm, and identifies only Littaye and Delandmeter as carrying out the firm's responsibilities. The questionnaire also indicates that AIA (Lux) "outsourced" the functions of trading, research and development, IT/programming, administration, and marketing and business development. Notes from an Access meeting confirm AIA (Lux)'s purpose as an overseas shell entity for the receipt of funds, stating that a "[s]ervice agreement will have to be put in place between the companies of AIA group, to spread the AIA Lux incomes."

**ANSWER:**    Paragraph 94 refers to and partially quotes from a September 2004 questionnaire regarding Luxalpha and notes from an Access meeting, and Luxalpha respectfully refers to that questionnaire and meeting notes for their respective contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 94 and therefore denies such allegations.

### AP (Lux)

95.    Defendant Access Partners S.A. (Luxembourg) ("AP (Lux)") is a Luxembourg limited liability company incorporated as a societe anonyme. Its registered office is at 34a, rue Philippe II, L-2340 Luxembourg. AP (Lux) is in liquidation in Luxembourg. Maitre Fernand Entringer, with offices at 34a, rue Philippe II, L-2340, Luxembourg, is AP (Lux)'s liquidator.

6750934

**ANSWER:** On information and belief, Luxalpha admits the allegations in Paragraph 95.

96. From February 13, 2007 through Madoff's collapse, AP (Lux) was Luxalpha's investment adviser. In that role, it purported to advise UBSTPM, and later AML, in connection with Luxalpha. Beginning in 2007, AP (Lux) was also the nominal adviser of Groupement Financier and Groupement Levered.

**ANSWER:** Luxalpha admits that on February 13, 2007, Access Partners SA entered into an Investment Advisory Agreement with UBS Third Party Management Company S.A., that Access Partners SA entered into an Investment Advisory Agreement with Access Management Luxembourg dated November 17, 2008, and Luxalpha respectfully refers to those agreements for their contents. Luxalpha lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 and therefore denies such allegations.

97. Access used AP (Lux) as a shell entity to protect Luxalpha and BLMIS from U.S. regulatory scrutiny. Littaye acknowledged in an internal meeting that Access had already taken "a small risk for Luxalpha" by helping BLMIS evade the SEC when it had New York-incorporated AIA LLC serve as Luxalpha's investment adviser. Access created AP (Lux) to replace AIA LLC in that role.

**ANSWER:** Paragraph 97 refers to and partially quotes from a document or communication for an internal Access meeting, and Luxalpha respectfully refers to that document or communication for its contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97 and therefore denies such allegations.

C. **The Feeder Fund Defendants**

*Luxalpha*

98. Defendant Luxalpha was founded under Luxembourg law. It was organized as a "UCITS" fund pursuant to the EU directive entitled, "Undertakings for Collective Investments in Transferable Securities," under which open-ended investment schemes were regulated. Luxembourg, like other EU member states, enacted legislation implementing various EU UCITS directives. Luxalpha's registered office was at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, which is the same address as three of the four UBS Defendants.

6750934

**ANSWER:**    Luxalpha admits the allegations in Paragraph 98.

99.    Luxalpha was subject to the regulatory authority of the CSSF. Luxalpha was placed in liquidation by the District Court of Luxembourg on April 2, 2009 and is represented by its court-appointed liquidators, Maitre Alain Rukavina, barrister (avocat a la Cour) and Paul Laplume, company auditor.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 99 except that Mr. Laplume stopped working as a réviseur d'entreprises as of December 31, 2021 and now works as a chartered accountant.

100.    Me. Rukavina and Mr. Laplume are defendants in their capacity as the court-appointed liquidators and representatives of Luxalpha, and as representatives of Luxalpha's investors and creditors, according to the provisions of the District Court of Luxembourg judgment dated April 2, 2009. References to defendant Luxalpha herein include Me. Rukavina and Mr. Laplume.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 100.

### Luxalpha Director Defendants

101.    Defendant Patrick Littaye, a French citizen, was a Director of Luxalpha from June 26, 2006 until it entered liquidation.

**ANSWER:**    On information and belief, Defendant Patrick Littaye was a Luxalpha Director from February 1, 2006 through when Luxalpha entered its court-ordered liquidation.

102.    Defendant Pierre Delandmeter, a Belgian citizen, was a Director of, and the Legal Adviser to, Luxalpha from February 2004 until it entered liquidation.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 102.

103.    Defendants Littaye and Delandmeter are referred to collectively as the "Luxalpha Director Defendants."

**ANSWER:**    Luxalpha admits the allegations in Paragraph 103.

### Groupement Financier

104.    Defendant Groupement Financier is a British Virgin Islands ("BVI") investment fund that invested 100% of its assets directly with BLMIS. Groupement Financier's registered agent is Maples & Calder and its registered office is at Sea Meadow House, P.O. Box 173, Road Town, Tortola VG 1110, BVI.

6750934

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 104 and therefore denies such allegations.

105.    In June 2003, Access created Groupement Levered, which was later known as Groupement II Limited fund. Groupement Levered was a BVI investment fund that invested all of its assets with Groupement Financier. Groupement Financier's BLMIS account remained open until Madoff's arrest in December 2008.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 105 and therefore denies such allegations.

### *Groupement Financier Director Defendants*

106.    Littaye and Villehuchet comprised the board of directors of both Groupement Financier and Groupement Levered.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 106 and therefore denies such allegations.

107.    Delandmeter was a Legal Adviser to Groupement Financier and Groupement Levered.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 107 and therefore denies such allegations.

108.    The Luxalpha Director Defendants and the Groupement Financier Director Defendants are collectively referred to herein as the "Feeder Fund Director Defendants."

**ANSWER:**    Luxalpha admits the allegations in Paragraph 108.

## THE ACCESS PRINCIPALS' CLOSE RELATIONSHIP WITH MADOFF EXPOSED THEM TO MYRIAD INDICIA OF FRAUD AT BLMIS

109.    Littaye and Madoff had a close social and professional relationship, dating back to at least 1985, which allowed Access to occupy integral positions with many BLMIS feeder funds. The relationship benefited both Access and Madoff, introducing Madoff to new sources of investment capital, which he needed to keep his Ponzi scheme alive.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 109 and therefore denies such allegations.

6750934

110.    Littaye helped found Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd., feeder funds that together invested over $200 million with BLMIS. Littaye opened or introduced at least eight other BLMIS managed accounts. Access functioned as the manager and/or portfolio adviser for a number of BLMIS feeder funds.

**ANSWER:**    Luxalpha admits that it entered into a Management Company Services Agreement with Access Management Luxembourg dated November 17, 2008, and admits that certain Access entities entered into portfolio advisory agreements with Luxalpha service providers, and respectfully refers to those agreements for their respective contents, and Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110 and therefore denies such allegations.

111.    Littaye's and Madoff's relationship also allowed Access to obtain fees derived from BLMIS investments, through which Littaye and Villehuchet enriched themselves.

**ANSWER:**    Luxalpha admits that Access Defendants earned fees from their roles with Luxalpha but lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111 and therefore denies such allegations.

112.    Littaye and Access, together with BNP Paribas, operated Oreades, a Madoff feeder fund that predated Groupement Financier and Luxalpha. Oreades's BLMIS accounts were opened in November 1997. As detailed below, Oreades was shut down in March 2004 as a result of BNP Paribas's discomfort with Oreades's relationship with BLMIS. Luxalpha was opened as Oreades's successor.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 112 and therefore denies such allegations.

113.    In July 2003, BNP Paribas told Littaye that it was particularly concerned that BLMIS's role as asset manager had not been properly disclosed. BNP Paribas noted with alarm that because of this failure to disclose, BLMIS "does not exist" in the eyes of the CSSF. BNP Paribas knew that it would bear the risk of any liability associated with Oreades's management and told Littaye of concerns "that the risk [to] BNP Paribas is very extensive." BNP Paribas also observed that, because BLMIS was not a bank, its role as custodian created concern, as did its additional roles of broker-dealer and investment adviser.

**ANSWER:**    Paragraph 113 refers to and partially quotes from documents or communications, and Luxalpha respectfully refers to those documents or communications for

6750934

their respective contents, and otherwise lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 113 and therefore denies such allegations.

114.     Another concern for BNP Paribas was that it could not confirm the existence of a segregated Oreades account at BLMIS. As a result, BNP Paribas could not determine where Oreades's assets were actually being held.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 114 and therefore denies such allegations.

115.     BNP Paribas also advised Access of its concern that BLMIS reports of trading activity and positions for Oreades were delivered only by fax and mail, seven or eight days after the reported trades, inconsistent with industry customs and practices. BNP Paribas and Access knew that this process failed to provide any opportunity to verify trades.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 115 and therefore denies such allegations.

116.     Of all the funds whose investment portfolios Access managed, BLMIS was the lone investment for which Access did not have immediate or next-day transparency, either through website access or next-day batch reports.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 116 and therefore denies such allegations.

117.     Such practices deviated from BNP Paribas's standard operating procedures, which provided for order transmission by fax or electronic communication on the day of the trade, followed by settlement confirmation by the depository bank within one to three days thereafter. This made it very difficult to verify that deals were posted to the correct clients. During internal audits, BNP Paribas's risk and ethics department highlighted this concern. A senior executive at BNP Paribas Securities Services, Lionel Trouvain, noted "it would seem that B. Madoff does not ever want to improve its order transmission methods."

**ANSWER:**   Paragraph 117 refers to and partially quotes from a document or

communication, and Luxalpha respectfully refers to that document or communication for its

contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 117 and therefore denies such allegations.

118.     In August 2003, Trouvain and other BNP Paribas employees met with Access's management to discuss whether it was possible to bring their relationship with BLMIS into

34

6750934

standard compliance with BNP Paribas's internal rules. According to the minutes of that meeting, BNP Paribas deemed BLMIS's hidden role as both custodian and investment adviser for Oreades to be "unconscionable" and understood that it violated BNP Paribas's internal "security rules" and Luxembourg law.

**ANSWER:** Paragraph 118 refers to and partially quotes from meeting minutes, and Luxalpha respectfully refers to those minutes for its contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118 and therefore denies such allegations.

119.    Communicating with BLMIS through Littaye, BNP Paribas asked Madoff for permission to include his name in a disclosure to the CSSF. Madoff refused. Access told BNP Paribas that Madoff's refusal stemmed (at least in part) from the fact that BLMIS was not registered as an investment adviser in the United States and deliberately wanted to avoid regulatory scrutiny.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 119 and therefore denies such allegations.

120.    As an alternative, BNP Paribas requested that its securities services unit or Access be granted real-time access to BLMIS's trade confirmations to allow them to confirm the validity of BLMIS's purported trades. Of course, no such access was granted.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 120 and therefore denies such allegations.

121.    In spring 2004, shortly after BNP Paribas raised its concerns about BLMIS to Access, Oreades was shut down and the Oreades BLMIS accounts were closed.

**ANSWER:** On information and belief, Luxalpha admits that Oreades was shut down in 2004 but lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 121 and therefore denies such allegations.

122.    In January 2008, an Access employee recounted the story behind BNP Paribas's liquidation of Oreades, stating that BNP Paribas did not want to be liable to Oreades's investors and believed it had to exit or "destroy" Oreades.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 122 and therefore denies such allegations.

6750934

## ACCESS AND UBS ESTABLISHED LUXALPHA AND GROUPEMENT FINANCIER DESPITE OVERWHELMING EVIDENCE OF FRAUD AT BLMIS

**A.    Access and UBS Worked Together to Open Luxalpha Even Before Oreades Was Shut Down**

123.    BNP Paribas's decision to extricate itself from Oreades's operations threatened to leave Access without a prime bank, administrator, and nominal custodian to administer the investments it directed into BLMIS. Before Oreades was even closed, Villehuchet and Littaye were working to establish Luxalpha as its successor.

**ANSWER:**    On information and belief, Luxalpha admits that Villehuchet and Littaye

began working with the UBS Defendants on the creation of Luxalpha prior to Oreades ceasing

operations in 2004, and otherwise lacks knowledge sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 123 and therefore denies such allegations.

124.    Luxalpha would allow Villehuchet and Littaye to continue their professional and personal relationship with Madoff and provide a vehicle into which Oreades's assets could be transferred. Access's principals sought and found new partners to replace BNP Paribas— the UBS Defendants—even before Oreades ceased operations in 2004.

**ANSWER:**    On information and belief, Luxalpha admits that Villehuchet and Littaye

began working with the UBS Defendants on the creation of Luxalpha prior to Oreades ceasing

operations in 2004, and otherwise lacks knowledge sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 124 and therefore denies such allegations.

125.    In March 2004, just one week after Oreades was closed, UBS SA opened BLMIS Account 1FR108 and executed the BLMIS account opening documents, including a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, "BLMIS Account Opening Agreements") on behalf of Luxalpha, and as its agent.

**ANSWER:**    Luxalpha admits that in March 2004 UBS SA opened BLMIS Account

1FR108 and executed the BLMIS Account Opening Agreements on behalf of Luxalpha, but

lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in the

allegations in Paragraph 125 and therefore denies such allegations.

6750934

126.    UBS SA formally served as Luxalpha's custodian. UBS SA also entered into a separate agreement with BLMIS that explicitly designated BLMIS as the sub-custodian of Luxalpha's assets, unbeknownst to Luxalpha's investors and the Luxembourg regulators.

**ANSWER:**    Luxalpha admits that UBS SA served as its custodian, and UBS SA entered into a sub-custodian agreement with BLMIS that designated BLMIS as the sub-custodian of Luxalpha's assets, and on information and belief, BLMIS's role as sub-custodian of Luxalpha's assets was unbeknownst to at least some Luxalpha investors and Luxembourg regulators, but lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in the allegations in Paragraph 126 and therefore denies such allegations.

127.    UBS SA held the BLMIS Account in the name of "UBS (Luxembourg) S.A. for the benefit of Luxalpha." Luxalpha's BLMIS Account was still open when Madoff was arrested on December 11, 2008.

**ANSWER:**    Luxalpha admits that Account No. 1FR108 was the account UBS SA opened with BLMIS and into which UBS SA deposited Luxalpha's assets for investment, Account No. 1FR108 was named "UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV", and that account was still open when Madoff was arrested on December 11, 2008.

128.    Luxalpha was initially funded largely by Oreades withdrawals. At least eleven of Oreades's investors withdrew approximately $330 million from Oreades and promptly re-invested those sums in Luxalpha.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 128 and therefore denies such allegations.

129.    Internal Access documents note that certain Access employees were designated to handle the "switch" of Oreades investors over to Luxalpha. Access employees referred to it as simply a "name change."

**ANSWER:**    Paragraph 129 refers to and partially quotes from documents or communications, and Luxalpha respectfully refers to those documents or communications for their respective contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129 and therefore denies such allegations.

37

130.    Access and UBS created Luxalpha to invest with BLMIS despite knowing of the concerns at BNP Paribas and despite many other persistent warnings of fraud at BLMIS.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 130 and therefore denies such allegations.

131.    In the transition from Oreades to Luxalpha, a UBS AG employee expressed deep reservations about Madoff's role as both broker and custodian, which was, standing alone, sufficient reason to decline to step in for BNP Paribas:

> [W]e normally have to give "NO" as the answer in cases like Madoff. In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time! Such a NO is easy to comprehend for both business policy reasons and risk reasons.

And this did not appear to take into account that Madoff held yet a third role—investment adviser—which further heightened the risk of fraud.

**ANSWER:**    Paragraph 131 refers to a partial quote from an email dated March 31, 2003 between UBS employees, and Luxalpha respectfully refers to that email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 131 and therefore denies such allegations.

132.    UBS SA was aware of and dismissed these and other concerns and concluded that even though "[t]he risk [of investing with BLMIS] should not be underestimated . . . [investing with BLMIS] would be advantageous on the income side."

**ANSWER:**    Paragraph 132 refers to a partial quote from an email dated December 17, 2003 between UBS employees, and Luxalpha respectfully refers to that email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 132 and therefore denies such allegations.

133.    The internal message imparted by high-level UBS employees was clear: potential fraud at BLMIS should not stand in the way of UBS profits. Bernd Stiehl, a Luxalpha director and a UBS SA managing director, subordinated the above-referenced negative reports on BLMIS to UBS's desire to capitalize on Madoff. "Business is business," Stiehl wrote. "We cannot permit ourselves to lose 300 million. Accept client."

**ANSWER:**    Paragraph 133 refers to a partial quote from an email dated January 6, 2004 between UBS employees, and Luxalpha respectfully refers to that email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 133 and therefore denies such allegations.

134.    When Luxalpha was founded, UBS stocked Luxalpha's board of directors with senior UBS and Access personnel, and its service providers were UBS and Access entities. The composition of its board and its organizational structure are set forth in the following chart:



**ANSWER:**    Luxalpha admits its board of directors consisted of UBS and Access personnel except that Mr. Delandmeter was an independent lawyer who also was a member of

6750934

AML's board and a Director and Legal Advisor of Luxalpha, and Luxalpha admits that its service providers were UBS and Access entities. Luxalpha also admits that the chart set forth in Paragraph 134 is generally accurate, except that, upon information and belief, Defendant Patrick Littaye began serving as a Luxalpha Director on February 1, 2006.

## B.    Access Created Groupement Financier and Engaged UBS as a Service Provider

135.    Access established Groupement Financier in February 2003, opening BLMIS account 1FR096 in April 2003. Littaye executed Groupement Financier's BLMIS Account Opening Agreements.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 135 and therefore denies such allegations.

136.    In 2005, UBS began to service Groupement Financier and Groupement Levered. UBS SA was Groupement Financier's official prime bank and Groupement Levered's official custodian. UBS SA did not exercise any actual custodial authority over the money invested with Groupement Financier, as this responsibility was contractually delegated to BLMIS. From February 2005, UBSFSL served as Groupement Financier's and Groupement Levered's official administrator and was responsible for accounting functions, keeping the register of shareholders, handling subscriptions and redemptions, communications with investors, and preparations of financial statements for the funds. It also calculated the funds' respective NAV.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 136 and therefore denies such allegations.

137.    In connection with the services they provided to Groupement Financier, UBSFSL and UBS SA artfully avoided any direct legal or contractual links to BLMIS and Madoff In a combined Groupement Financier and Groupement Levered Operating Memorandum dated July 12, 2005, § 3.5 entitled "Not to do," contains this admonition in extra-large, bold font: **"Neither UBS [SA] nor UBSFSL should ever enter into a direct contact with Bernard Madoff!!!"**

**ANSWER:**    Paragraph 137 refers to and partially quotes from a Groupement Levered Operating Memorandum, and Luxalpha respectfully refers to that Operating Memorandum for its contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 137 and therefore denies such allegations.

6750934

138.    Groupement Financier and Groupement Levered were formally managed and supervised by UBS SA and UBSFSL, in conjunction with several of the Access Defendants, including AIA Ltd., AIA (Lux), and AP (Lux). AIA Ltd. was Groupement Financier's and Groupement Levered's investment manager. AIA (Lux), and then AP (Lux), served nominally as Groupement Financier's and Groupement Levered's purported investment advisers, but in reality, this role was allocated to Madoff.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 138 and therefore denies such allegations.

139.    The following chart sets forth the organizational structure of Groupement Financier and Groupement Levered:



**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 139 and therefore denies such allegations.

## C.    Before, During, and After Luxalpha's Creation, UBS AG and Its Affiliates Consistently Rejected BLMIS for Investment by Its Clients

140.    Before UBS created Luxalpha and began servicing Groupement Financier, UBS Wealth Management, a UBS AG business division, considered and rejected BLMIS as a vehicle for direct investment and derivative financial products.

6750934

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 140 and therefore denies such allegations.

141.    Several other UBS entities also analyzed BLMIS and as early as 2002 at least one UBS affiliate noted that [t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible." The UBS analysts assessing the strategy stated "[w]e consider ourselves pretty smart and no one in their firm [BLMIS] has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

**ANSWER:**    Paragraph 141 refers to partial quotes from a UBS Asset Management document entitled "Manager Analysis" dated January 26, 2002, and Luxalpha respectfully refers to that document for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 141 and therefore denies such allegations.

142.    Although several UBS entities rejected BLMIS as an unsuitable investment for UBS clients, UBS recognized that it could nonetheless make money from others' BLMIS investment.

**ANSWER:**    On information and belief, Luxalpha admits that certain UBS entities recognized they could earn fees as service providers to funds whose assets were invested with BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 142 and therefore denies such allegations.

143.    Assessing BLMIS again in 2004—the same year that UBS established Luxalpha—one UBS subsidiary reiterated its prior conclusions that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990." The prior analysis also flagged lack of transparency and impossibly stable returns as reasons for concern, highlighting that since 1990 there had been only a handful of negative months, and that BLMIS's strategy generated incredibly consistent returns each year.

**ANSWER:**    Paragraph 143 refers to partial quotes from an email exchange dated March 5, 2004 between UBS employees that included a write-up done years earlier, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 143 and therefore denies such allegations.

42

144.    In addition to concluding that BLMIS's returns were impossible under the SSC strategy, Madoff's practice of not charging fees, choosing to earn revenue only from commissions, was identified as a red flag under the portion of the analysis entitled "Thoughts and Rationale for NOT Investing,": "The simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter."

**ANSWER:**    Paragraph 144 refers to and partially quotes from an email exchange dated March 5, 2004 between UBS employees, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 144 and therefore denies such allegations.

145.    In a separate email, also dated March 5, 2004, a UBS AG employee echoes the aforementioned concerns about the UBS Defendants doing business with BLMIS, stating:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of cap[a]city . . . .

**ANSWER:**    Paragraph 145 refers to and partially quotes from an email exchange dated March 5, 2004 between UBS employees, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 145 and therefore denies such allegations.

146.    Upon reading the above email, USB Managing Director Viviane DeAngelis responded: "[t]hanks, does not contribute to me having a better feeling. I have inquired about additional insurance."

**ANSWER:**    Paragraph 146 refers to and partially quotes from an email exchange dated March 5, 2004 between UBS employees, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 146 and therefore denies such allegations.

147.    But just a few days after these UBS analysts reaffirmed their prior conclusion that BLMIS's returns were "IMPOSSIBLE," a UBS SA executive confirmed "[w]e have

43

6750934

formed [Luxalpha]." DeAngelis and another UBS employee personally forwarded Luxalpha's account opening documents to BLMIS just a few weeks later.

**ANSWER:** Paragraph 147 refers to and partially quotes from documents or communications, and Luxalpha respectfully refers to those documents or communications for their respective contents, admits that in March 2004 UBS SA employees opened BLMIS Account 1FR108 and forwarded the Account Opening Agreements to BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 147 and therefore denies such allegations.

148.    By 2005, the year after Luxalpha was up and running, a UBS subsidiary, concluded that Madoff was engaging in fraud to generate his returns.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 148 and therefore denies such allegations.

149.    In 2006, armed with knowledge of concerns about BLMIS, DeAngelis and Littaye worked to protect Luxalpha from any inquiry that threatened to disrupt the fund and the fees it generated for UBS and Access. In July 2006, Littaye entered into Access's internal database the following note regarding conversations among himself, DeAngelis and an individual named Lila Seirafi. The internal database was commonly used by individuals at Access to share details of meetings or conversations. Littaye's note reads:

> LS HAD CALLED ME TO ASK IF THEY COULD STRUCTURE A NOTE WITH LEVERAGE ON LUX. FOR ONE OF THEIR CLIENTS. THINKING THEY CAME TO US THROUGH UBS LUXEMB[O]URG, I SENT QUITE A DOC TO HER, THOUGH NON [sic] MENTIONING B[L]MI[S]. V DE ANGELIS STOPPED ME, EXPLAINING THAT THIS COULD CAUSE THE END OF OUR FUND, BECAUSE, IF THE ANALYSTS OF ZURICH FIND OUT B[L]MI[S] IS BEHIND THE STORY, WE WOULD BE KILLED.

**ANSWER:** Paragraph 149 refers to an internal Access database note, and Luxalpha respectfully refers to that document for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 149 and therefore denies such allegations.

6750934

150.    Later, in September of 2006, Littaye entered a note into the internal Access database which reads in part:

> M. Neiman had a bid last July from Ixis concerning a leveraged position in Luxalpha (Leverage 3). One way of [sic] the other, he contacted UBS structured product department — Geneva to get a second bid. This department was very excited.
>
> Now V. d Angelis had told her hierarchy that Luxalpha was a sicav dedicated to a family. She entered in a fundamental risk on her own position, because of this movement, which shows that the sicav is evidently not a dedicated sicav (huge internal compliance risk).

**ANSWER:**    Paragraph 150 refers to an internal Access database note, and Luxalpha respectfully refers to that document for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 150 and therefore denies such allegations.

151.    Subsequently, in June of 2007, Littaye entered the following note into Access's internal database:

> V DE ANGELIS IS RESPONSIBLE OF [sic] THE UBS DEPARTMENT[]ADMINISTRATING THE FUNDS DEDICATED TO A FAMILY OR SOME GROUP. UBS INTERNAL AUDIT ON THESE FUNDS WAS COMPLETED 6 WEEKS AGO. WE FEARED FOR LUXALPHA SURVIVAL DUE TO THE MULTIPLICITY OF SUBSCRIBERS. []IT SEEMS TODAY THAT NO HARM WILL BE DONE. AN A[U]DIT ON THE DEPT ITSELF STARTS IN ONE WEEK. VDA IS HIGHLY CONFIDENT. IT SEEMS WE SHOULD BE TOTALLY COMFORTED AT THE END OF JULY.

**ANSWER:**    Paragraph 151 refers to an internal Access database note, and Luxalpha respectfully refers to that document for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 151 and therefore denies such allegations.

152.    Taken together, these internal notes, which offer only a glimpse of the relationship between Littaye and Viviane DeAngelis, show that Access and UBS SA were concerned that investments into Luxalpha would be stopped because of BLMIS' s involvement.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 152 and therefore denies such allegations.

153.    To approve investments in BLMIS-related products, UBS AG required its analysts to obtain more information on the underlying fund manager, Madoff. One of the due diligence requirements was a "face to face meeting with the manager and a site visit to the HQ of the firm where money is managed." This task was assigned to a UBS AG analyst in London, Mary Kleckner. In preparation for such a meeting, Kleckner asked her team for a list of specific questions or topics that they would like answered. The team responded with concerns about the total assets BLMIS was managing and whether there was a point at which these assets would be large enough to deteriorate the strategy's performance. Additionally, Kleckner's team raised questions about the potential misuse of information between BLMIS's marketing and investment advisory arms. These questions were never answered.

**ANSWER:**    Paragraph 153 refers to documents and/or communications, and Luxalpha respectfully refers to those documents and/or communications for their respective contents.  On information and belief, at various times, Luxalpha admits that certain UBS employees conducted some diligence on Madoff and BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 153 and therefore denies such allegations.

154.    In conducting due diligence on another BLMIS-related investment, Madoff refused to meet with Kleckner. In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting. His simple explanation was that if he meets with one client he would be obligated, perhaps even from a regulatory standpoint now that he is an RIA, to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it.

**ANSWER:**    Paragraph 154 refers to a partial quote from an email exchange dated September 17, 2008 between UBS employees, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 154 and therefore denies such allegations.

6750934

155.    Kleckner also reached out to others for their opinions on Madoff. On October 31, 2007, in response to her question, "What are your feelings on [M]adoff," Kleckner received the following response:

> I think [M]adoff is one of the most controversial funds out there. The historic returns and low vol[atility] make the [M]adoff feeders look very attractive for leveraged structured products and FAs love it. In addition, [M]adoff is very involved with the [NASD] and on a number of committees there. We get asked about sp's on these feeders all the time, but there are a lot of folks who are concerned about the fund. Everything is probably fine, but there are a number of things that are odd or different than the norm. Like no prime broker, all trades done through [M]adoff securities through an ordinary brokerage account. It's also unclear which dealers are executing the [OTC] collars for him? They are pretty big, but no one seems to know who is trading them.

**ANSWER:**    Paragraph 155 refers to and partially quotes from an email exchange dated October 31, 2007, and Luxalpha respectfully refers to those emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 155 and therefore denies such allegations.

## D.    The UBS Defendants Insulated Themselves From Liability Through a Series of Undisclosed Indemnity Agreements With the Access Defendants

156.    Because their analysis had already identified BLMIS as a fraud risk, the UBS Defendants recognized that their connection to Luxalpha exposed them to liability for BLMIS. The UBS Defendants therefore sought to protect themselves through a series of indemnity agreements with the Access Defendants.

**ANSWER:**    Luxalpha admits that certain of the UBS Defendants entered into indemnity agreements with certain of the Access Defendants, respectfully refers to those agreements for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156 and therefore denies such allegations.

157.    Through these indemnity agreements, the UBS Defendants sought to disown the risks associated with Luxalpha's creation and management. From UBS's perspective, such agreements were necessary to avoid the "worst case scenario": BLMIS's failure and UBS SA's resulting liability to Luxalpha investors.

6750934

**ANSWER:** Luxalpha admits that certain of the UBS Defendants entered into indemnity agreements with certain of the Access Defendants, respectfully refers to those agreements for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 157 and therefore denies such allegations.

158.    On or about February 5, 2004, AIA (Lux), entered into a series of indemnity agreements with Luxalpha directors who were also UBS SA employees. The agreements purported to indemnify and hold harmless the directors and UBS SA for any liabilities resulting from their involvement with Luxalpha.

**ANSWER:** Luxalpha admits that AIA (Lux) entered into indemnity agreements with Luxalpha directors who were also employees of UBS SA, respectfully refers to those agreements for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 158 and therefore denies such allegations.

159.    In the indemnity agreement between AIA (Lux) and UBS SA, the parties acknowledged and agreed that AIA (Lux) "requested [UBS SA] to act as a figure head to third parties in the sponsorship and in the managementship [sic] of the Fund." AIA (Lux) also agreed that it would assume UBS SA's liability for "damages resulting from proved irregularities, inadequacies, or omissions in the administration or management" of Luxalpha.

**ANSWER:** Paragraph 159 partially quotes from an indemnity agreement between AIA (Lux) and UBS SA, Luxalpha respectfully refers to that agreement for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 159 and therefore denies such allegations.

160.    UBS SA took other measures to limit its liability in the event of BLMIS's failure. UBS SA demanded that Access provide a "hold harmless" letter from Luxalpha's investors for loss resulting from BLMIS's failure. UBS SA also required Access to obtain and pay for an insurance policy covering Luxalpha's risks.

**ANSWER:** Luxalpha admits that UBS SA requested to be provided with a "hold harmless" letter from Luxalpha's investors, and that Access obtained an insurance policy in connection with Luxalpha, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 160 and therefore denies such allegations.

6750934

161.    Upon AML's appointment as Luxalpha's manager in November 2008, it entered into substantially similar indemnity agreements with UBS SA and the Luxalpha directors. Through these indemnity agreements, the UBS Defendants continued to limit the liability to which Luxalpha exposed them.

**ANSWER:**    Luxalpha admits that certain of the UBS Defendants and Luxalpha directors entered into indemnity agreements with certain of the Access Defendants, respectfully refers to those agreements for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 161 and therefore denies such allegations.

## UBS AND ACCESS KNOWINGLY VIOLATED THEIR OWN POLICIES AND APPLICABLE REGULATIONS TO CONCEAL BLMIS'S ROLE WITH THE FUNDS

**A.    Luxalpha and Access Used UBS as a "Front" and Mere "Window Dressing" to Avoid Regulatory Scrutiny**

162.    A UCITS fund, such as Luxalpha, allows a collective investment scheme once approved and authorized by a single member state, to operate throughout the EU.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 162.

163.    UCITS funds are subject to a strict regulatory framework to protect retail investors, to whom such funds are directed.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 163.

164.    To establish Luxalpha as a Madoff feeder fund, UBS had to give BLMIS "'special' handling," granting exceptions to UBS policies.

**ANSWER:**    Luxalpha admits that the UBS Defendants discussed certain assumptions and a set-up recommendation relating to Luxalpha in an email dated March 31, 2003, respectfully refers to that email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164 and therefore denies such allegations.

165.    Many of the policy exceptions UBS made for BLMIS violated Luxembourg's UCITS regulations. A UBS SA executive acknowledged that this client still "do[es]n't feel right."

6750934

**ANSWER:** Paragraph 165 partially quotes from a communication, and Luxalpha respectfully refers to that agreement for its contents. Luxalpha admits that BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund under Luxembourg's UCITS regulations, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 165 and therefore denies such allegations.

166.    Under applicable Luxembourg law, Luxalpha, as a UCITS fund, had to have a promoter, or sponsor, playing a key role in the creation, launch, and management/administration of the fund. Because of its overall involvement, the promoter would be liable to third parties for damages in the event faults, omissions, or deficiencies were committed in the management or administration of the fund.

**ANSWER:** Luxalpha admits the allegations in Paragraph 166.

167.    A UCITS fund promoter must be a regulated entity with sufficient financial resources. For the CSSF to authorize a UCITS fund, the fund's promoter must meet certain requirements concerning experience and financial soundness, determined in part by the adequacy of its capital base.

**ANSWER:** Luxalpha admits the allegations in Paragraph 167.

168.    UBS AG and UBS SA served as Luxalpha's co-sponsors and co-promoters. With those roles, UBS AG and UBS SA created the appearance, both with the CSSF and with potential investors, that the fund was backed by a highly capitalized, stable bank.

**ANSWER:** Luxalpha admits that UBS AG and UBS SA served as Luxalpha's co-sponsors and co-promoters, and in those roles, provided Luxalpha with a highly capitalized, stable bank, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 168 and therefore denies such allegations.

169.    UBS's role as a "front" for Luxalpha was widely acknowledged and freely discussed among Access insiders. The minutes of Access's February 2007 Quarterly Executive Meeting state that "Luxalpha UCITS is a strange entity; UBS is window dressing or a front." Philip Wogsberg, AIA LLC's Director of Research and the point person for due diligence efforts, testified about these minutes: "[T]he rules are one thing, but also there is [sic] some winks and nods in regulation in Europe, and I think this was a wink and a nod to Patrick [Littaye] please sanitize this and get it all Luxembourgy-looking ...."

6750934

**ANSWER:**   Paragraph 169 refers to minutes from an Access Quarterly Executive Meeting, and testimony given by Philip Wogsberg, Luxalpha respectfully refers to those minutes and the Wogberg transcript for their respective contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 169 and therefore denies such allegations.

170.    Dumbauld, a former Access partner and AIA LLC's Chief Investment Officer, testified that "Access was using its [i.e., UBS's] balance sheet or its reputation in order to be compliant with the regulations in Luxembourg."

**ANSWER:**   Paragraph 170 refers to testimony given by Defendant Dumbauld, Luxalpha respectfully refers to the Dumbauld transcript for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 170 and therefore denies such allegations.

171.    UBS's role then was to create the appearance of UCITS compliance and to deflect regulatory scrutiny by interposing a large, reputable, international bank between Luxalpha and BLMIS.

**ANSWER:**   Luxalpha admits that it required a bank, such as UBS, to perform certain functions and roles for Luxalpha under relevant UCITS regulations, that the UBS Defendants acted as servicer providers to Luxalpha and were between Luxalpha and BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 171 and therefore denies such allegations.

## B.    Access Knowingly Violated Its Own Policies When Doing Due Diligence on Madoff

172.    Access touted its rigorous due diligence processes, which were designed "to avoid the three main risk[s] linked to the hedge fund industry": (1) " [r]isk of fraud by doing an extensive due diligence"; (2) "[r]isk of drift by the implementation of an on going qualitative, operational and quantitative monitoring"; and (3)"[r]isk of dilution of the performances by controlling the flow of investment."

**ANSWER:** Paragraph 172 refers to Access documents or communications concerning Access due diligence processes, and Luxalpha respectfully refers to those documents or communications for their respective contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 172 and therefore denies such allegations.

173.    The Access marketing materials stated:

**Qualitative Review (on a monthly basis)**

Each month, at least one member of Access' portfolio and risk management department (i.e. Stephane Pinon and/or Phil Wogsberg) visits each fund manager at their offices to review investment strategy, trading activity and market conditions. Access continuously analyzes the investment style employed by the manager and the investments implemented in their underlying portfolio.

Access reviews the methods that the manager employs in identifying different investment opportunities and the trading techniques used to establish desired positions. Access also questions the manager and examines the necessary documents to ensure that they are adhering, at all times, to the stated investment discipline.

All individuals influencing the strategies are evaluated including portfolio managers, traders, research staff and administrative employees. This assessment helps determine whether the company can effectively produce the products and results they have indicated.

Access's monitoring process allows to answer [sic] the following two questions:

1. Does the manager follow the stated investment guidelines for the fund?

2. Are there any warning signs that should trigger an exit by investors?

**ANSWER:** Paragraph 173 refers to Access marketing materials, and Luxalpha respectfully refers to those documents for their respective contents, and lacks knowledge

6750934

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 173 and

therefore denies such allegations.

174.    As part of its stringent background checks, Access also required every potential manager to complete extensive background questionnaires and to submit to handwriting analyses by a graphologist in Paris. But Access made an exception for Madoff.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 174 and therefore denies such allegations.

175.    In his Bankruptcy Rule 2004 examination, Wogsberg testified that he was unaware of any other manager whom Access excused from its background questionnaire requirement. Wogsberg suggested that it was because Madoff was a "special manager" whom Littaye treated differently that Access excused Madoff from this requirement.

**ANSWER:**    Paragraph 175 refers to testimony given by Philip Wogsberg, Luxalpha

respectfully refers to the Wogberg transcript for its contents, and lacks knowledge sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 175 and therefore

denies such allegations.

176.    Access also boasted that its due diligence and monitoring process required that each fund manager permit monthly visits by the Access staff.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 176 and therefore denies such allegations.

177.    But Madoff and BLMIS were not subject to these monthly visits—a fact never made known to the public. The regular Access due diligence team never met with Madoff or anyone else at BLMIS. With the exception of one manager in Paris, whom Access's due diligence team declined to visit monthly because it would have required frequent transatlantic travel, Madoff was the only fund manager whom Access excused from monthly qualitative visits and reviews from the Access team.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 177 and therefore denies such allegations.

178.    Littaye "designated" himself Access's sole Madoff contact, and took great pains to preserve and guard the relationship. No other person at Access had—or was permitted to have—any real contact with BLMIS. With the exception of Villehuchet, who attended some

53

meetings, and a select few investors permitted a rare visit with BLMIS, only Littaye was permitted to deal directly with Madoff.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 178 and therefore denies such allegations.

179.   BLMIS was the only one of Access's fund managers for whom Littaye assumed responsibility for due diligence.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 179 and therefore denies such allegations.

**C.    In Coordination With Access, UBS, Luxalpha and Groupement Financier Intentionally Violated the Law and Misled Regulators By Concealing the Delegation of Their Duties to BLMIS**

180.    As the authorized custodian for a UCITS fund, UBS SA was, by law, responsible for both the safekeeping and the supervision of the fund's assets. UBS SA delegated its core custodial functions to BLMIS. It did so knowing that BLMIS was also Luxalpha's investment manager, and knowing that this structure violated applicable laws and regulations.

**ANSWER:**   Luxalpha admits that as the authorized custodian for a UCITS fund, UBS

SA was, by law, responsible for both the safekeeping and the supervision of Luxalpha's assets,

admits that UBS SA entered into a sub-custodian agreement with BLMIS and delegated its

core custodial functions to BLMIS with respect to Luxalpha's assets, admits that BLMIS was

not an accredited custodian for a UCITS fund under Luxembourg law, admits it was a violation

of Luxembourg law for UBS SA to engage BLMIS as the sub-custodian and manager of

Luxalpha's assets, and lacks knowledge sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 180 and therefore denies such allegations.

181.   Under Luxembourg law, the sub-delegation by UBS of custodial authority to BLMIS was illegal. BLMIS was not an accredited custodian and could never have met Luxembourg's strict requirements for either custodians or investment managers.

**ANSWER:**   Luxalpha admits that BLMIS was not an accredited custodian for a

UCITS fund under Luxembourg law, and it was a violation of Luxembourg law for the UBS

Defendants to engage BLMIS as the sub-custodian of Luxalpha's assets, Paragraph 181 also states legal conclusions as to which no response is required, and Luxalpha otherwise denies any remaining allegations.

182.    The appointment of BLMIS as both custodian and investment manager was not in compliance with the regulations governing UCITS funds at the time Luxalpha was created and throughout its operations. Indeed, this was known by Access even before Luxalpha was created when BNP Paribas, referring to Oreades, noted that its own sub-delegation of custodial and advisory authority to BLMIS "must remain `private' that is, the CSSF . . . must remain unaware of it." This approach led one concerned BNP employee to warn, "if the CSSF asks me . . . I will have to tell the truth."

**ANSWER:**    Paragraph 182 contains legal conclusions as to which no response is required, and also contains a partial and incomplete quote from a document or communication, and Luxalpha respectfully refers to document or communication for its content.  Luxalpha admits that the appointment of BLMIS as both custodian and investment manager for Luxalpha's assets was not in compliance with regulations governing UCITS funds in Luxembourg, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 182 and therefore denies such allegations.

183.    The sub-delegation of custodial authority to BLMIS also violated UBS's internal policies.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 183.

184.    The delegation of these functions was not disclosed either to the CSSF or in Luxalpha's sales prospectus.

**ANSWER:**    Paragraph 184 refers to Luxalpha's sales prospectus, Luxalpha respectfully refers to the referenced sales prospectus for its contents, and on information and belief, admits that the delegation of functions to BLMIS with respect to Luxalpha's assets was not disclosed to the CSSF.

6750934

185.    The purpose of the UCITS regulations was to protect against fraud. Yet UBS, together with Access, built a structure designed to circumvent those UCITS regulations. Their actions stood in contrast to those of BNP Paribas, which abandoned Oreades when it became uncomfortable with the fraud risk.

**ANSWER:**    Luxalpha admits that a purpose of the UCITS regulations is to protect

against fraud, and the UBS Defendants and Access Defendants set up a structure for Luxalpha

that was not in compliance with UCITS regulations, and otherwise lacks knowledge sufficient

to form a belief as to the remaining allegations in Paragraph 185 and therefore denies such

allegations.

186.    UBS SA was Luxalpha's nominal portfolio manager from February 2004 until August 2006, even though throughout this time the management of the fund's assets was delegated to BLMIS.

**ANSWER:**    Luxalpha admits that UBS SA performed the duties of both custodian

and portfolio manager of Luxalpha's assets from February 5, 2004 until August 1, 2006 even

though during that time UBS SA had delegated custody and management of nearly all of

Luxalpha's assets to BLMIS.

187.    As Luxalpha's manager, UBS SA executed an agreement with BLMIS entitled "Trading Authorization Limited to Purchases and Sales of Securities and Options." Under the agreement's terms, UBS and Luxalpha delegated management of the fund's assets to BLMIS, designating BLMIS as their "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities."

**ANSWER:**    Paragraph 187 refers to and partially quotes from a document entitled

"Trading Authorization Limited to Purchases and Sales of Securities and Options" and

Luxalpha respectfully refers to that document for its contents, and otherwise denies the

remaining allegations in Paragraph 187.

188.    UBS SA entered into a Sub-Custodian Agreement with BLMIS, which delegated UBS SA's custodial duties to BLMIS "with the function of safekeeping holder and settlement and corporate agent of United States securities, cash, derivatives instruments and other assets" and noted that the "US assets of the Fund" would be invested with BLMIS. The Sub-Custodian Agreement was not disclosed to the CSSF or in any prospectus.

6750934

**ANSWER:** Paragraph 188 refers to and partially quotes from an agreement entitled "Sub-Custodian Agreement" and refers to Luxalpha's prospectuses, Luxalpha respectfully refers to those documents for their respective contents, and on information and belief, admits that the Sub-Custodian Agreement was not disclosed to the CSSF.

189. The Sub-Custodian Agreement put in place could not have met the CSSF's approval because BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund.

**ANSWER:** Paragraph 189 refers to an agreement entitled "Sub-Custodian Agreement" and Luxalpha respectfully refers to that document for its contents, and admits that BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund.

190. The lack of an independent custodian at BLMIS made it impossible to independently verify the existence of assets at BLMIS. Dumbauld confirmed that within Access "[i]t was observed that there was no independent custodian, but any concerns or red flags that raised was always answered by the fact that Madoff was an SEC registered broker-dealer and therefore the SEC was in there doing their monitoring and that was perceived to be sufficient."

**ANSWER:** Luxalpha admits that the lack of an independent custodian at BLMIS made it impossible to independently verify the existence of assets at BLMIS and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 190 and therefore denies such allegations.

191. Luxalpha's prospectuses dated February 2004, August 2004, August 2006, March 2007, and November 2008 each misleadingly state that UBS SA had assumed Luxalpha's custodial rights and duties, failing to disclose the delegation of custodial responsibilities to BLMIS. Each of those prospectuses touted UBS SA's banking experience.

**ANSWER:** Paragraph 191 refers to Luxalpha prospectuses dated February 2004, August 2004, August 2006, March 2007 and November 2008, and Luxalpha respectfully refers to those documents for their contents, and otherwise denies the remaining allegations in Paragraph 191.

192.    Even after the undisclosed delegation of myriad functions to BLMIS, UBS SA represented to the CSSF and potential investors that it actively managed Luxalpha's assets and monitored and adjusted the fund's investments "under the supervision and responsibility of the fund's Board of Directors."

**ANSWER:**    Paragraph 192 partially quotes from a document, and Luxalpha respectfully refers to that document for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 192 and therefore denies such allegations.

193.    Documents submitted to the CSSF on UBS SA's behalf also misrepresented UBS SA's custodial function. In a report dated January 15, 2008 entitled "Controls' Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," to meet CSSF requirements, UBS SA purported to set forth complete lists of the funds for which it served as custodian and the sub-custodians that it used worldwide. Although Luxalpha was included in the list of funds in the report, neither Madoff nor BLMIS was identified as a sub-custodian and are nowhere to be found in the report. The report falsely lists Brown Brothers Harriman as the only sub-custodian that UBS SA used in the United States.

**ANSWER:**    Paragraph 193 refers to a report dated January 15, 2008 entitled "Controls' Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," and Luxalpha respectfully refers to that document for its contents and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 193 and therefore denies such allegations.

194.    If the Sub-Custodian Agreement had been disclosed to the CSSF, it would not have been approved, because neither Madoff nor BLMIS complied with Luxembourg law governing fund custodians. BLMIS received no specific compensation for serving as de facto manager and sub-custodian.

**ANSWER:**    Paragraph 194 refers to an agreement entitled "Sub-Custodian Agreement" and Luxalpha respectfully refers to that document for its contents, and admits that neither Madoff nor BLMIS met the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund, and on information and belief, admits that BLMIS did not receive compensation for serving as asset manager or sub-custodian, and otherwise lacks

58

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph

194 and therefore denies such allegations.

195.    In an August 14, 2009 interview given to Les Echos, a French financial publication, the General Director of the CSSF confirmed that Luxalpha and UBS SA never disclosed—either to the CSSF or in sales prospectuses—that they had ultimately delegated custody of the fund's assets to BLMIS, and that the non-disclosure violated UCITS law.

**ANSWER:**    Paragraph 195 refers to an interview given by the CSSF General Director

on August 14, 2009 to Les Echos, a French financial publication, and Luxalpha respectfully

refers to the transcript of that interview and/or the published article concerning that interview

for their contents and otherwise lacks knowledge sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 195 and therefore denies such allegations.

196.    The 2009 Annual Report of the CSSF further confirms that the documents submitted to it on behalf of Luxalpha, upon which the CSSF based its decision to approve Luxalpha as a UCITS fund:

> did not contain any reference either to the identity of B[L]MIS or to the multiple responsibilities carried on *de facto* by one entity. Between the launch of [Luxalpha] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor of the role played in practice by B[L]MIS at different levels of this structure.

**ANSWER:**    Paragraph 196 refers to a 2009 Annual Report of the CSSF and Luxalpha

respectfully refers to that document for its contents, and lacks knowledge sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 196 and therefore denies such

allegations.

197.    UBS knew that their failure to disclose Madoff and BLMIS in the sales prospectus was illegal under Luxembourg law. UBS AG admitted as much, with one employee stating, "[a]s far as I understand it, the bottom line seems to be that what the fund does is not in line with what the prospectus says (???)." Knowing that Luxalpha was neither structured nor managed as represented in its prospectuses, many UBS employees complained that the irregularities and non-disclosures put UBS at risk. UBS SA silenced the dissenting voices.

**ANSWER:** Paragraph 197 contains a partial quote from a communication, and Luxalpha respectfully refers to that communication for its contents. Luxalpha admits that under Luxembourg law the UBS Defendants were required to disclose the roles of Madoff and BLMIS in Luxalpha's prospectuses, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 197 and therefore denies such allegations.

198. Following the delegation of custodial and management functions to BLMIS, UBS SA remained in regular contact with BLMIS. In addition to receiving account statements and trade confirmations from BLMIS, UBS SA communicated regularly with BLMIS via mail, fax, and telephone to request withdrawals from Luxalpha's account and to address a variety of issues, including erroneous trade tickets, tax issues, and missing account statements.

**ANSWER:** Luxalpha admits that following the delegation of custody and management of Luxalpha's assets to BLMIS, upon information and belief, UBS SA remained in contact with BLMIS, received account statements, trade confirmations, requested withdrawals and addressed a variety of issues, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 198 and therefore denies such allegations.

199. Luxalpha's account statements and trade confirmations were sent from BLMIS to UBS SA, who then shared its contents with UBSFSL. BLMIS also sent Luxalpha's account statements and trade confirmations to Access's New York and London offices.

**ANSWER:** Luxalpha admits that BLMIS sent Luxalpha's account statements and trade confirmations to UBS SA, who then shared them with UBSFLS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 199 and therefore denies such allegations.

200. UBSFSL was Luxalpha's administrator. In this role, UBSFSL was responsible for calculating Luxalpha's NAV, which is the total market value of each share of the fund, by independently verifying the execution of trades and prices at which those trades took place. In so doing, UBSFL calculated NAV based solely on data provided by BLMIS, with no independent verification.

**ANSWER:** Luxalpha admits the allegations in Paragraph 200.

6750934

201.    Without any independent verification, UBSFSL was creating meaningless accounting records that just repeated the trade confirmations and account statements that it received from BLMIS. UBSFSL thereby facilitated the concealment of BLMIS's true involvement and perpetuated the fraud.

**ANSWER:**    Luxalpha admits that UBSFL calculated Luxalpha's NAV based solely on data provided by BLMIS, with no independent verification, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 201 and therefore denies such allegations.

202.    With regard to the calculation of Luxalpha's NAV, the Operating Memorandum specifically notes that: "[d]ue to the considerable delay in the dispatching of the trade confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL issues the NAV with a delay of up to 10 business days."

**ANSWER:**    Paragraph 202 contains a partial quote from an Operating Memorandum and Luxalpha respectfully refers to that document for its contents.

203.    The Operating Memorandum also provides that BLMIS, as sub-custodian, will "promptly report by fax as of each trade date the transactions entered into the Account." These daily faxes were supposed to be sent to UBS SA. Upon information and belief, this procedure was not followed. Instead, BLMIS only reported trades in a delayed, hard copy-only manner.

**ANSWER:**    Paragraph 203 contains a partial quote from an Operating Memorandum and Luxalpha respectfully refers to that document for its contents.  Upon information and belief, BLMIS only reported trades in hard copy, and Luxalpha lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 203 and therefore denies such allegations.

204.    The net effect of the operating procedures put in place for Luxalpha was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of Luxalpha, to earn fees for serving in roles that actually provided no real oversight or protection for Luxalpha's assets, and which provided BLMIS with the freedom to manipulate reports as needed to perpetuate the Ponzi scheme.

**ANSWER:**    Luxalpha admits that UBS SA and UBSFSL are two sophisticated financial institutions, were service providers to Luxalpha, earned fees for their respective roles

6750934

with Luxalpha, failed to exercise appropriate oversight and protection of Luxalpha's assets,

and lacks knowledge sufficient to form a belief as to truth of the remaining allegations in

Paragraph 204 and therefore denies such allegations.

205.    UBSTPM replaced UBS SA as Luxalpha's nominal portfolio manager from
August 2006 to November 2008. UBSTPM represented to the CSSF that it managed,
administered, and monitored the fund's investment policies and restrictions.

**ANSWER:**    Luxalpha admits that UBSTPM replaced UBS SA as Luxalpha's portfolio

manager from August 2006 to November 2008, and lacks knowledge sufficient to form a belief

as to truth of the remaining allegations in Paragraph 205 and therefore denies such allegations.

206.    When UBSTPM became Luxalpha's management company, UBS continued to
conceal the delegation of the fund's management to BLMIS. Luxalpha's August 2006
prospectus states that UBSTPM:

> is responsible for the management, the administration and the
> distribution of the Fund's assets but is allowed to delegate, under its
> supervision and control, all or part of these duties to third parties. In
> case of changes or appointment of additional third parties, the
> prospectus will be updated accordingly.

**ANSWER:**    Paragraph 206 contains a partial quote from Luxalpha's August 2006

prospectus and Luxalpha respectfully refers to that document for its contents, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph

206 and therefore denies such allegations.

207.    No such "updated" prospectus disclosing Luxalpha's delegation of management
to BLMIS was ever provided. Nor did UBSTPM ever attempt to exercise any "supervision" or
"control" over BLMIS.

**ANSWER:**    Luxalpha denies that it delegated management to BLMIS, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph

207 and therefore denies such allegations.

208.    Such a complete abdication of UBS SA's asset management responsibilities
came as a surprise to the then-Head of Portfolio Management at UBS SA, Christian Schoen,
who stated in a March 22, 2004 email to another UBS SA employee:

I am wondering how this is supposed to work and how one can argue that we are officially the portfolio manager but do not have a cent posted on our books. To date I had assumed that Madoff certainly makes the trades and executes them, but that the assets lie with us and that in the end we settle the trades with Madoff. This way I would have been in a position to exercise a certain oversight function.

**ANSWER:**    Paragraph 208 contains a partial quote from an internal UBS email dated March 22, 2004 and Luxalpha respectfully refers to that email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 208 and therefore denies such allegations.

209.    As with Luxalpha, BLMIS had custody of Groupement Financier's assets and served as its exclusive trader, and all transactions involving the assets of Groupement Financier were permitted to be executed and settled solely by BLMIS. The NAV for Groupement Financier was calculated by UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS SA. There was no third-party verification of the information provided by BLMIS. The UBS Defendants' Operating Memorandum for Groupement Financier also accepted the "considerable delay" with which BLMIS dispatched trade confirmations and provided for the "issu[ance of] the NAV with a delay of up to 9 business days." Groupement Financier's account statements and trade confirmations were sent from BLMIS to Access's New York and London offices. The Access Defendants shared Groupement Financier's account statements and trade confirmations with UBS SA and UBSFSL.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 209 and therefore denies such allegations.

**D.    Access Knowingly Made Misrepresentations About Groupement Financier in Violation of Applicable Regulations**

210.    Access prepared marketing materials that included a chart detailing which French anti-fraud regulations Groupement Financier satisfied.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 210 and therefore denies such allegations.

211.    In the chart, Access represented that Groupement Financier satisfied the French regulation requiring "custody of the assets . . . be held by one or more companies which are separate from the management company[.]" Access made this representation despite internal discussions regarding the falsity of the representation. An Access executive noted that "the

63

same entity is both the custodian of the assets . . . and the management company," and that "the prospectus does not identify Bernard L. Madoff or Bernard L. Madoff Securities LLC [as] either."

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 211 and therefore denies such allegations.

212.   Access also represented that the fund's "assets in bank accounts are controlled by the directors of the fund," but Groupement Financier's directors, Littaye and Villehuchet, had delegated complete custody and control of the fund's assets to BLMIS.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 212 and therefore denies such allegations.

213.   Another anti-fraud measure within the French regulations required a fund's manager to be registered with, and under the regulatory supervision of, a governmental financial regulatory agency. When an Access executive suggested satisfying this regulation by using AIA LLC, a New York entity registered with the SEC, Littaye immediately rejected the idea because it was "too risky (cf B[ernard] M[adoff])."

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 213 and therefore denies such allegations.

## E.   Luxalpha Served as the Blueprint for Future BLMIS Feeder Funds, Furthering the Fraud

214.   Luxalpha's ability to establish itself as a BLMIS feeder fund, by successfully circumventing the regulatory standards set forth by the CSSF, created a roadmap for the formation of other BLMIS feeder funds seeking that same advantage.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 214 and therefore denies such allegations.

215.   By December 2004, UBS was in discussions with another entity regarding the formation of a new BLMIS feeder fund, which it described as "a fund sub-fund along the lines of the Luxalpha SICAV' model." On August 18, 2005, LIF was formed, with the UBS Defendants serving as LIF's official sponsor, administrator, and custodian.

**ANSWER:**   Paragraph 215 contains a partial quote from an email or document and

Luxalpha respectfully refers to that email or document for its contents, admits that LIF was

formed on August 18, 2005 with the UBS Defendants serving as LIF's official sponsor,

6750934

administrator and custodian and lacks knowledge sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 215 and therefore denies such allegations.

216.    The UBS Defendants handled LIF "similar to the Luxalpha SICAV with regards to registrar activities, subscription forms, etc." and acknowledged internally that LIF had the "same strategy as for [sic] Luxalpha Sicav." UBS SA even went as far as to take the risk management section from Luxalpha's Long Form Report and use the same description for LIF. LIF was simply a reproduction of Luxalpha.

**ANSWER:**    Paragraph 216 contains partial quotes from an email or document and

Luxalpha respectfully refers to that email or document for its contents, denies that LIF was

simply a reproduction of Luxalpha, and lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 216 and therefore denies such allegations.

217.    LIF's non-UBS service providers followed the UBS Defendants' lead and leveraged the knowledge they obtained in creating a BLMIS feeder fund to launch still more BLMIS feeder funds. From LIF, and by association Luxalpha, two new BLMIS feeder funds were formed: Landmark Investment Fund (sometimes called LIF Ireland) and Defender Limited Fund. Defender, which referred to LIF as its "sister fund," was created to accept new investors at a time when LIF had been temporarily closed to new investment.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 217 and therefore denies such allegations.

218.    These funds, like LIF, funneled additional funds into BLMIS, furthering the fraud and deepening BLMIS's insolvency, and like Luxalpha, created a false appearance of regulatory compliance.

**ANSWER:**    On information and belief, Luxalpha admits that the assets of LIF and

other funds were delegated to BLMIS, and lacks knowledge sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 218 and therefore denies such allegations.

## THE DEFENDANTS WERE AWARE OF OBJECTIVE MARKET IMPOSSIBILITIES FOR WHICH THERE WAS NO PLAUSIBLE EXPLANATION OTHER THAN FRAUD

219.    Once Luxalpha and Groupement Financier were operational, the Defendants quickly became aware of numerous trading impossibilities at both funds. These were objective impossibilities—quantitative evidence that Luxalpha's and Groupement Financier's customer statements and trade confirmations reported non-existent securities transactions. These impossibilities were seen and understood by various Access-related professionals, including

Defendant Dumbauld, and Chris Cutler, a third-party consultant hired by Access to examine signs of fraud. When Cutler presented the evidence of fraud he had observed, the very people who had hired him suppressed his findings, even as those findings were corroborated by internal Access analysts.

**ANSWER:**    On information and belief, Luxalpha admits that the Access Defendants hired Chris Cutler to conduct due diligence on BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 219 and therefore denies such allegations.

A.    **Diligence Professionals Working for Access Identified Impossible Volumes of Options Trades and Other Serious Problems at BLMIS**

220.    Madoff's SSC strategy required the purchase and sale of vast numbers of S&P 100 Index options—volumes so large they raised serious concerns at Access.

**ANSWER:**    Luxalpha admits that the alleged SSC strategy purportedly involved the purchase and sale  of options, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 220 and therefore denies such allegations.

221.    In 2006, spurred by these concerns, Villehuchet asked Theodore Dumbauld, a Partner at AIA LLC and its Chief Investment Officer, to look at the options purportedly being traded by BLMIS. Dumbauld proceeded to take the trade confirmations received from BLMIS and compared them to the information reflected in the OCC database. Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in the OCC database.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 221 and therefore denies such allegations.

222.    Dumbauld then inquired of his industry sources whether there was an explanation for reported options trades not appearing in the OCC database. Dumbauld's sources confirmed that if options were, in fact, exchange- traded, they would appear in the OCC database. BLMIS claimed that the options trades were being traded on the market: BLMIS trade confirmations contained the unique ticker symbols and CUSIP numbers (i.e., "Committee on Uniform Securities Identification Procedures" number) associated solely with exchange-traded options.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 222 and therefore denies such allegations.

6750934

223.    Dumbauld reported his findings to Villehuchet, yet Villehuchet steadfastly refused to accept that conclusion and demanded that Dumbauld get a second opinion.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 223 and therefore denies such allegations.

224.    Access then hired Cutler, a consultant doing business as Manager Analysis Services LLC, to provide a second opinion. Cutler specialized in performing due diligence services on hedge funds and had previously done work for Access relating to non-Madoff funds.

**ANSWER:**    On information and belief, Luxalpha admits that Access hired Cutler to perform due diligence on BLMIS, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 224 and therefore denies such allegations.

225.    It took Cutler the equivalent of just four days' work to determine that there were serious problems with BLMIS. Cutler reviewed generally available information on BLMIS's business, its auditor, audit reports, available trade tickets, and descriptions of the SSC strategy. Access, however, forbade him from speaking to Madoff or anyone at BLMIS.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 225 and therefore denies such allegations.

226.    Cutler easily confirmed Dumbauld's concerns about reported options trades. Indeed, these were not marginal impossibilities. More often than not, BLMIS's reported options trades exceeded the volume of such options trades on the CBOE. This occurred hundreds of times.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 226 and therefore denies such allegations.

227.    Faced with this information, Access's procedures should have required further inquiry and demanded an explanation from Madoff. But rather than thoroughly and independently verifying the legitimacy of BLMIS's and Madoff's options trading, the Access Defendants, including Littaye and Delandmeter—who sat on Luxalpha's Board of Directors with UBS executives—purposely concealed the problem.

**ANSWER:**    Luxalpha admits that Littaye and Delandmenter sat on Luxalpha's Board of Directors with UBS executives, and otherwise lacks knowledge sufficient to form a belief

6750934

as to the truth of the remaining allegations in Paragraph 227 and therefore denies such

allegations.

228.    Upon discovering the significant disparity between what BLMIS was reporting and actual market activity, the Access Defendants declined to press Madoff for an explanation or to exit the relationship with BLMIS. Instead, the Access Defendants quashed any discussion of the issue and hid behind a disclaimer stating that Access does not validate the accuracy of the monthly portfolio movements reported by BLMIS. Access's long-time director of research, Wogsberg, never knew whether Cutler ever finished the due diligence he was asked to undertake.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 228 and therefore denies such allegations.

229.    The options discrepancy was stark. As shown below in charts 1(a) and 1(b), the volume of S&P 100 put options BLMIS purported to trade on behalf of Luxalpha and Groupement Financier (red bars) dwarfs the total volume of the respective S&P 100 put options traded on the CBOE (black bars).

### Chart 1(a)



**Chart 1(b)**



**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 229 and therefore denies such allegations.

230.    Charts 2(a) and 2(b) below depict the volume and S&P 100 call options BLMIS purportedly traded on behalf of Luxalpha and Groupement Financier (blue bars) as compared to the entire CBOE exchange volume (black bars) for the respective options contracts.

6750934

**Chart 2(a)**



**Chart 2(b)**



**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 230 and therefore denies such allegations.

6750934

231.    There were 473 instances over the lifetime of Luxalpha and Groupement Financier where BLMIS's purported trading for Luxalpha and Groupement Financier exceeded the total CBOE volume. In 362 of these instances, the volume traded was at least twice the CBOE; in 151 instances, the volume traded was at least ten times the volume traded on the CBOE.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 231 and therefore denies such allegations.

232.    The statements and trade confirmations revealed that in 52% of the instances when Madoff purported to trade options for Luxalpha, or Groupement Financier, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day. This is, of course, impossible. Even one instance of such a trade should have been a major red flag. But there was not one instance, there were many—hundreds of incidents where purported purchases or sales of options with the same strike price and expiration date for Luxalpha and Groupement Financier exceeded the entire volume of such options traded on the CBOE.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 232 and therefore denies such allegations.

233.    Access knew that BLMIS was purportedly trading the same options for hundreds of other accounts, underscoring the implausibility of Madoff's claims about options trading.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 233 and therefore denies such allegations.

234.    The problems Cutler discovered were not limited to options volumes. He also identified, among other things: (i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper confirmation—the only way in which trades were reported to Access.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 234 and therefore denies such allegations.

**B.    Cutler Recognized That the SSC Strategy Simply Could Not Work as Madoff Claimed, a Fact That Access Already Knew**

235.    In conducting his review of BLMIS, Cutler saw significant problems that went far beyond options trades. Looking at BLMIS as a whole, Cutler came to the same conclusion that UBS had several years earlier and testified that he believed that the strategy itself didn't make sense. In his 2006 analysis, Cutler observed, "EITHER extremely sloppy errors OR serious omissions in tickets. That's the best case ... arithmetic errors in the founder's [Madoff's] strategy description (found at another source), which is so basic that it suggests that the founder doesn't really understand the costs of the option strategy."

**ANSWER:**    Paragraph 235 contains a partial quote from an email dated April 20, 2006 and Luxalpha respectfully refers to that email for its contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 235 and therefore denies such allegations.

236.    The SSC strategy purported to be a "collared" investment strategy that was supposed to track the S&P 100 while also tempering returns in volatile markets. But the virtual elimination of volatility would have been impossible under the SSC strategy. Properly implemented, the SSC strategy should have yielded results for Luxalpha and Groupement Financier that were closely correlated to the S&P 100, but with less dramatic downswings and upswings.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 236 and therefore denies such allegations.

237.    The S&P 100 index options ("OEX Options") collars attached to BLMIS's stock purchases should, in theory, have ensured that when the S&P 100 dropped, it would not drop as much for BLMIS investors. Collapses in stock price would be hedged by put contracts funded by the sale of call options. The effect of that strategy, however, would also limit gains when the S&P 100 went up.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 237 and therefore denies such allegations.

238.    Had BLMIS been deploying the SSC strategy, it would have been impossible for Luxalpha or Groupement Financier to post gains on their BLMIS investments when the S&P 100 was significantly down. This is because downswings were only hedged by put options. Exercising those options would not have turned losses into gains, it would simply have put a floor on losses.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 238 and therefore denies such allegations.

239.    Similarly, outperforming the S&P 100 during a major upswing should also have been impossible, as call options sold by BLMIS would have been exercised during a significant market upswing, putting a ceiling on gains.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 239 and therefore denies such allegations.

6750934

240.    Luxalpha's and Groupement Financier's respective account statements consistently show gains when the market was down. When the market was up, Luxalpha and Groupement Financier appeared to outperform the market. This is objectively impossible under the SSC strategy and reflects the same "IMPOSSIBLE" returns UBS previously identified.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 240 and therefore denies such allegations.

241.    The following chart, which reflects the performance of a theoretical $100 investment, shows the complete and impossible lack of correlation between BLMIS and the S&P 100 index:



**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 241 and therefore denies such allegations.

242.    That Access was aware of these impossibly consistent returns is not in debate, as shown in the performance chart below that Access shared with investors:

ACCESS INTERNATIONAL ADVISORS LLC





**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 242 and therefore denies such allegations.

243.    BLMIS's returns purported to be immune to any market instability, enjoying consistently positive rates of return at all times, even during catastrophic market downturns such as the "dot com" bubble bursting of 2000, the 2000-2002 bear market, and the disastrous and unforeseeable market impact of September 11, 2001. The following table demonstrates the consistency of the Luxalpha and Groupement Financier returns and their lack of correlation to the S&P 100:

| Year | Luxalpha Account Rate of Return | Groupement Financier Account | S&P 100 Rate of |
|------|--------------------------------|------------------------------|-----------------|
| 2004 | 8.1% (partial year) | 9.4% | 4.5% |
| 2005 | 10.5% | 10.4% | (0.9%) |
| 2006 | 13.1% | 13.3% | 15.9% |
| 2007 | 11.0% | 10.7% | 3.8% |
| 2008 | 9.4% | 9.3% | (36.9%) |

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 243 and therefore denies such allegations.

244.    During its 68-month operational life, Groupement Financier's BLMIS account had a negative rate of return in only one month. In the same period, the S&P 100 had a negative rate of return in 26 months. Likewise, Luxalpha's BLMIS account had only one month of negative performance during its 57-month operational life, whereas in the same period, the S&P 100 had a negative rate of return in 25 months.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 244 and therefore denies such allegations.

245.    Even before Cutler's analysis, an internal Access review of Oreades's returns conducted in 1999 identified and acknowledged the irregularity of BLMIS having "no negative months and very stable positive performance." The same impossible returns were repeated with Luxalpha and Groupement Financier.

**ANSWER:**    Paragraph 245 refers to an internal Access review, and Luxalpha

respectfully refers to that review for its contents, and otherwise lacks knowledge sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 245 and therefore denies

such allegations.

246.    Over the lifetime of Luxalpha's and Groupement Financier's accounts, BLMIS account statements and trade confirmations show that almost always, the trades beat the market— an impossibility. Approximately 83% of (reported) stock purchases occurred below the volume-weighted average price. Approximately 74% of (reported) stock sales occurred above the volume-weighted average price. Access and UBS possessed clear evidence that the frequency with which BLMIS purported to trade at the optimal price point was statistically impossible.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 246 and therefore denies such allegations.

247.    Prior to Cutler's analysis, there was skepticism that Madoff could legitimately achieve the consistent returns he reported through implementation of the SSC strategy. Access inquired whether Madoff was illicitly using his market-making operation for insight as to when the market would move.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 247 and therefore denies such allegations.

248.    Littaye suppressed Access's concerns regarding Madoff's suspected market-timing edge. Littaye reported that BLMIS had three models—short-, middle-, and long-term models of the market—that Madoff used in making decisions of when to enter and exit the market. Access's research staff, including Wogsberg, was never provided with any detail concerning these purported models, yet Access accepted them as an explanation of Madoff's market-timing ability. The notion of short-, middle-, and long-term market models made no sense, especially because Madoff purported to move customer funds out of the market at quarter-end and into the market at the beginning of each quarter, regardless of the market's prevailing performance—an act that was itself at odds with the SSC strategy.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 248 and therefore denies such allegations.

## C.    Cutler and Others Understood That BLMIS's Volume of Assets Under Management Was Too Large to Properly Implement the SSC Strategy

249.    Even beyond the impossible options trades, Cutler concluded that "the size of his [Madoff's] trades were so large that I did not see a way he could actually implement the trades without moving the market against him." Madoff's assets under management were simply too large to properly execute the SSC strategy—the strategy was not scalable.

**ANSWER:**    Paragraph 249 refers to a communication relating to Cutler's due

diligence investigation, and Luxalpha respectfully refers to the communication for its contents,

and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 249 and therefore denies such allegations.

250.    In connection with financial markets, "scalability" refers to an investment strategy's ability to handle higher trading volumes or growing assets under management. As assets under management increase, it becomes more difficult for a manager to find opportunities of a scale proportional to a fund's growing size.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the allegations

in Paragraph 250 and therefore denies such allegations.

251.    The SSC strategy, which purported to capitalize on market inefficiencies, was limited because there were fewer opportunities in S&P 100 Index companies because they were so efficiently traded. The purported strategy was further restricted by the limited volumes of stock in the S&P 100 Index companies and in the S&P 100 Index options relative to BLMIS's purported assets under management.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 251 and therefore denies such allegations.

252.     The SSC strategy was not scalable for the amount of BLMIS's purported assets under management. As early as October 2002, a memo Access prepared and shared with UBS states: "assets in [BLMIS's trading] accounts are estimated to exceed $10 billion in the aggregate." Thus, even before the creation of Luxalpha and Groupement Financier, Access and UBS SA knew that BLMIS purportedly held more than $10 billion of assets under management. To execute the SSC strategy with at least $10 billion of assets under management, BLMIS would need $10 billion of notional value in call options.

**ANSWER:**     Paragraph 252 refers to a memo dated October 2002 prepared by Access, and Luxalpha respectfully refers to the memo for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 252 and therefore denies such allegations.

253.     In December 2004, an Access client, a Swiss bank, demanded an explanation for how BLMIS could be trading at more than triple the daily volume for the entire publicly traded index. No satisfactory explanation was ever provided.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 253 and therefore denies such allegations.

254.     In February and May 2006, the same Access client continued to express concerns and seek explanations concerning the volume of Madoff's purported options trading.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 254 and therefore denies such allegations.

255.     In 2006, BLMIS began publicly disclosing its assets under management in Form ADVs filed with the SEC, reporting that it had approximately $11.7 billion as of July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007. Access and UBS SA reviewed BLMIS's filings.

**ANSWER:**     Paragraph 255 refers to BLMIS public filings with the SEC, and Luxalpha respectfully refers to those filings for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 255 and therefore denies such allegations.

6750934

256.     Between 2000 and 2008, there was no time when there were enough options on the listed market to implement Madoff's purported SSC strategy.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 256 and therefore denies such allegations.

**D.     Cutler and Access Could Not Identify Any of Madoff's Counterparties, Marking a Significant Risk to Luxalpha and Groupement Financier**

257.     Despite Cutler's efforts to understand how, and with whom, Madoff entered into options contracts, Cutler could not explain it, stating, "I just can't find the other side of the trade."

**ANSWER:**     Paragraph 257 contains a partial quote from an email dated April 20, 2006

between Cutler and Defendant Dumbauld, and Luxalpha respectfully refers to the email for its

contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 257 and therefore denies such allegations.

258.     Madoff initially purported to trade options contracts on the CBOE. But when customers questioned whether there was adequate volume on the CBOE, Madoff changed his story and claimed to be trading options contracts over-the-counter. This created a new problem for Madoff, as options trades executed via the CBOE are guaranteed by that exchange. Over-the-counter trades, however, require willing counterparties, whose performance is not guaranteed. Cutler correctly recognized that the inability to identify counterparties created a major risk for Luxalpha and Groupement Financier.

**ANSWER:**     Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 258 and therefore denies such allegations.

259.     BLMIS thus purported to enter into vast numbers of private options contracts as Luxalpha's and Groupement Financier's agent. Had the counterparties to those contracts defaulted or otherwise failed to perform, Luxalpha and Groupement Financier would have been exposed to substantial losses.

**ANSWER:**     Luxalpha admits that some account statements for BLMIS Account No.

1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV include a listing of options

contracts, and lacks knowledge sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 259 and therefore denies such allegations.

260.    It was not just Cutler who understood the problem with BLMIS's counterparties. In August, September, and October of 2006, representatives of one of Access's clients, a Swiss private bank, requested disclosure of the counterparties due to credit risk concerns raised by their auditors.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 260 and therefore denies such allegations.

261.    The inquiry from the Swiss private bank prompted Madoff to call Littaye at Access. Littaye's notes of that call indicate that Madoff stated he would not identify the counterparties for the options trades unless there was a default, and that there was no risk because the options were part of "portfolio assurance programs." Littaye's notes further indicate that he had never heard of a "portfolio assurance program" and had no idea what such a program was.

**ANSWER:**    Paragraph 261 contains a partial quote from notes dated October 4, 2006, and Luxalpha respectfully refers to those notes for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 261 and therefore denies such allegations.

262.    Littaye then conveyed Madoff's response to the Swiss private bank. In internal notes and emails, the bank observed that Littaye "did not understand the reply from [Madoff] and was unable to elaborate on it." At least one of the explanations Littaye conveyed was deemed "not very credible." Faced with this troubling response from Madoff, Villehuchet called an employee of the Swiss bank and asked that the bank not send any more inquiries directly to Madoff.

**ANSWER:**    Paragraph 262 contains partial quotes from notes and emails, and Luxalpha respectfully refers to those notes and emails for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 262 and therefore denies such allegations.

263.    Madoff refused to identify the counterparties, claiming he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were "proprietary." The Defendants never reviewed any form of draft or final counterparty agreement or OTC transaction confirmation. Indeed, the Defendants never knew the identities of these options counterparties because they did not exist.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 263 and therefore denies such allegations.

264.    U.S. regulators were also eager to identify Madoff's counterparties. On June 16, 2006, the SEC's Enforcement Staff sent a draft document request to UBS's offices in the U.S. in an attempt to verify whether any of UBS's European affiliates had served as one of Madoff's purported OTC option counterparties. Instead of providing the SEC with a direct answer, UBS's U.S. offices claimed to be unable to access the relevant data from Europe and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from Europe. However, UBS knew in 2006 that no UBS entity had ever acted as a counterparty to an options trade with BLMIS's IA business.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 264 and therefore denies such allegations.

265.    In 2004 and 2005, Luxalpha also falsely reported in Risk Approach Memos prepared for Luxalpha's auditors that BLMIS's option counterparties were approved by UBS AG as Luxalpha's promoter. No such counterparties were ever identified to, or approved by, UBS AG. Of course, no such counterparties ever existed.

**ANSWER:**    Paragraph 265 refers to Risk Approach Memorandums for Luxalpha, and

Luxalpha respectfully refers to those memorandums for their contents, and lacks knowledge

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 265 and

therefore denies such allegations.

## E.    Cutler Concluded in 2006 That Access Should Exit All of Its Investments With BLMIS—But His Conclusions Were Suppressed

266.    Upon completing his review, Cutler's ultimate conclusion was unequivocal: in an April 20, 2006, email to Dumbauld, Cutler said, "Ted, if this [BLMIS] were a new investment prospect, not only would it simply fail to meet due dili standards: **you would likely shove it out the door.**" (Emphasis added.)

**ANSWER:**    Paragraph 266 contains a partial quote from an email dated April 20, 2006

between Cutler and Defendant Dumbauld, and Luxalpha respectfully refers to the email for its

contents, denies that the email was sent after Cutler had completed his due diligence, and otherwise

denies the remaining allegations in Paragraph 266.

267.    Cutler further concluded that BLMIS certainly did not meet his standards and recommended that Access exit all of its investments with BLMIS. Despite the obvious significance of his conclusions, Cutler was not asked to produce a formal report or to put his findings in writing, despite having done so in the past when advising Access with regard to other investments.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 267 and therefore denies such allegations.

268.    Cutler conveyed his conclusions in an oral report given to Access's inner circle. In late April or early May 2006, Cutler attended a lunch meeting at the University Club in New York. Present at the meeting were Littaye, Villehuchet, Dumbauld, and Chantal Lanchon, a long-time, trusted adviser to Littaye and Villehuchet who worked for Access from time to time. Cutler conveyed his conclusion at this meeting that Access should exit BLMIS and concentrate on building other aspects of its business.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 268 and therefore denies such allegations.

269.    As Cutler was conveying his conclusion, he was interrupted by Littaye, who said that he questioned Cutler's "business judgment" given that Access's BLMIS business was "going well," while the other parts of its business were not going well.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 269 and therefore denies such allegations.

270.    On May 9, 2006, Cutler sent an email to Dumbauld concerning the University Club lunch which stated in relevant part:

> Ted, I did my best to inject doubt in a courteous yet effective manner. I would actually like to follow up with Patrick via phone.

 On May 10, 2006, Dumbauld replied:

> I believe you handle[d] the lunch perfectly. As you could tell, Patrick is highly sensitive and defensive of the situation. We have not had a chance to discuss post lunch; I will give you some feedback when I have it. I will also let you know about a call with Patrick.

**ANSWER:**    Paragraph 270 contains partial quotes from emails dated May 9, 2006 and

May 10, 2006 between Cutler and Defendant Dumbauld, and Luxalpha respectfully refers to

those emails for their respective contents, and lacks knowledge sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 270 and therefore denies such allegations.

271.    There was never any follow-up conversation; Cutler was never given any feedback on the fraudulent options volume that he so easily identified.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 271 and therefore denies such allegations.

272.    Cutler's findings were not shared with anyone else at Access, including its research and marketing staff. In his Rule 2004 examination, Cutler testified that it was "understood" that his conclusion would not be shared beyond those who attended the University Club lunch meeting.

**ANSWER:**    Paragraph 272 refers to a Rule 2004 examination of Cutler, and Luxalpha respectfully refers to the Cutler 2004 examination transcript for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 272 and therefore denies such allegations.

273.    On May 12, 2006, the Access Products Committee held a meeting that was attended by, among others, Littaye, Villehuchet, Dumbauld, and Lanchon. The minutes from that meeting state:

> As a result [sic] the conversations we had recently with various sources, it was decided we need to add additional disclosures to the monthly report describing monthly portfolio movements. **The disclosure needs to make clear that AIA is dependent on the information provided to us by BMI and that we do not validate the accuracy of that information.** (Emphasis added.)

**ANSWER:**    Paragraph 273 contains a partial quote from minutes from a May 12, 2006 Access meeting, and Luxalpha respectfully refers to the meeting minutes for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 273 and therefore denies such allegations.

## EVEN BEYOND CUTLER'S ANALYSIS, BLMIS'S STRUCTURE AND OPERATIONS PROVIDED AMPLE EVIDENCE OF FRAUD

### A.    Madoff's Unusual Fee Structure

274.    The customary investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of profits earned by the investment. Fees normally run higher for investment advisers with a history of success. BLMIS did not charge investors any traditional management or performance fees. Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $0.04 per equity share traded. Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table. As UBS O'Connor

noted, the "simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter," and was reason enough to stay away from BLMIS investment.

**ANSWER:** Paragraph 274 refers to a partial quote from an email exchange dated March 5, 2004 between UBS employees that included a write-up done years earlier, and Luxalpha respectfully refers to those emails for their contents, admits that BLMIS did not charge traditional management or performance fees, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 274 and therefore denies such allegations.

275.    Other industry professionals also realized that BLMIS's highly unusual fee structure was a serious warning sign.

**ANSWER:** Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 275 and therefore denies such allegations.

**B.    Madoff's Insistence on Secrecy**

276.    Madoff insisted that his name not appear in any official offering document relating to the Feeder Fund Defendants. Access acquiesced to that request even when the absence of Madoff's name from such documents would violate applicable laws.

**ANSWER:** Paragraph 276 refers to offering documents for Luxalpha, and  Luxalpha respectfully refers to those documents for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 276 and therefore denies such allegations.

277.    Madoff's name was not allowed to appear as the custodian, primary broker, or manager for any fund. The Feeder Fund Defendants' offering documents reflected only that an Access entity was the fund manager.

**ANSWER:** Paragraph 277 refers to offering documents for Luxalpha, and  Luxalpha respectfully refers to those documents for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 277 and therefore denies such allegations.

278.    In 2000 Access instructed that "[Madoff] should not appear in any official document." In a 2004 document, Littaye wrote, "[w]e underline the confidentiality of the product, and insist on the fact that [Madoff's] name must never be published."

**ANSWER:**    Paragraph 278 refers to partial quotes from documents, and  Luxalpha respectfully refers to those documents for their contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 278 and therefore denies such allegations.

279.    During a May 10, 2006 lunch, Madoff asked Littaye if his name was mentioned in Luxalpha's prospectus. In his notes on the meeting, Littaye wrote that he assured Madoff that "BY NO MEANS" did Madoff's name appear in the prospectus.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 279 and therefore denies such allegations.

280.    UBS also complied with Madoff's demand for secrecy. In addition to omitting Madoff's name from Luxalpha's offering documents and the Control Report on custodian bank functions submitted to the CSSF, UBS SA also took steps to remove all references to Madoff from UBS audit reports prepared by Ernst & Young. Ernst & Young agreed to remove Madoff's name from its reports after "very long discussions . . . concerning the subject" with a UBS SA executive. That same executive later cautioned another UBS SA executive that "[o]ne has to be careful about everything" when it comes to ensuring Madoff's name remains undisclosed. UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

**ANSWER:**    Paragraph 280 refers to Luxalpha's offering documents, a Control Report on custodian bank functions submitted to the CSSF, and partial quotes from communications or documents, and Luxalpha respectfully refers to those communications and documents for their respective contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 280 and therefore denies such allegations.

281.    UBS created the facade that Luxalpha's custodial and managerial duties were divided between two Luxembourg companies, UBS SA and UBSTPM, when in fact, from the first day of Luxalpha's operation, both roles rested solely with BLMIS in New York.

**ANSWER:**    Luxalpha admits that the UBS Defendants delegated custodial and portfolio managerial duties for most of Luxalpha's assets to BLMIS at the commencement of Luxalpha's

operations, denies that UBS SA and UBSTPM did not have custodial and managerial duties for

Luxalpha, and lacks knowledge sufficient to form a belief as to the truth of the remaining

allegations set forth in Paragraph 281 and therefore denies such allegations.

**C.    Madoff's Auditor Was Neither Qualified nor Capable of Auditing a Global Investment Management Company With Billions of Dollars Under Management**

282.    BLMIS's auditor was Friehling & Horowitz, a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:**    Luxalpha admits BLMIS's auditor was Friehling & Horowitz, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in

Paragraph 282 and therefore denies such allegations.

283.    Access knew that BLMIS was using a small, unknown auditing firm for the reports it filed with the SEC and provided to investors. Wogsberg expressed concern after preliminary research on Friehling & Horowitz, stating:

> I was quite worried, and so I said, Patrick, look at what we have here.
> It appears that he may have some conflicts and he certainly is tiny and
> it's always better to have a large audit firm do this sort of thing. And
> Patrick's response was if this audit firm is good enough for the SEC,
> it's good enough for Access. Don't go further.

Littaye quashed any further inquiry.

**ANSWER:**    Paragraph 283 refers to communications involving Access employees,

and Luxalpha respectfully refers to those communications for their respective contents, and

lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth

in Paragraph 283 and therefore denies such allegations.

284.    Access was aware that Friehling & Horowitz was incapable of providing auditing services to a global investment adviser of BLMIS's purported size, with billions of dollars under management.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations set forth in Paragraph 284 and therefore denies such allegations.

6750934

285.    As sophisticated market participants, Access, along with UBS, also had to know that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program. This program involves having experienced auditors assess a firm's audit quality periodically. The results of these peer reviews are on public file with the AICPA. Friehling & Horowitz never appeared on the public peer review list because Friehling and Horowitz had notified the AICPA that it did not perform audits.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 285 and therefore denies such allegations.

## LUXALPHA'S AND GROUPEMENT FINANCIER'S TRADE STATEMENTS ALSO CONTAINED OTHER INDICIA OF FRAUD

### A.    BLMIS Purported to Trade Equities Outside the Daily Reported Price Range

286.    BLMIS trade confirmations showed the prices for every purported purchase and sale of stocks and options. The Luxalpha and Groupement Financier BLMIS trade confirmations showed many trades executed outside the daily price range. Over the lifetime of these accounts, there were no fewer than 74 instances where BLMIS purported to execute an equity trade at a price that fell outside the publicly reported daily price range. These 74 impossibly priced transactions represented more than 4.7 million shares of stock. Even one such instance should have been sufficient to reveal the existence of a fraud.

**ANSWER:**    Paragraph 286 refers to trade confirmations, and Luxalpha respectfully refers to those trade confirmations for their respective contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 286 and therefore denies such allegations.

287.    Both Access and UBS, who each received and reviewed copies of BLMIS's trade confirmations for Luxalpha and Groupement, were aware of these impossibilities. For example, a UBS employee in 2006 requested confirmation of "the price of the maturity of the option SP100 P595 0506 which has been settled to 8.99 which is not the range from BB for that day."

**ANSWER:**    Paragraph 287 refers to a partial quote from a communications involving UBS employees, and Luxalpha respectfully refers to that communication for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 287 and therefore denies such allegations.

288.    Luxalpha's account statements and trade confirmations report the sale of 127,275 shares of Merck on December 22, 2006. Groupement Financier's account statements and trade

confirmations also report the sale of 20,953 shares of Merck on December 22, 2006. The account statements reflect that these shares were sold for $44.61. This was impossible given that the actual price range for Merck on December 22, 2006 ranged from $42.78 to $43.42.

**ANSWER:**   Paragraph 288 refers to account statements and trade confirmations, and

Luxalpha respectfully refers to those trade confirmations for their respective contents, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in

Paragraph 288 and therefore denies such allegations.

## B.    Luxalpha and Groupement Financier Regularly Had Negative Cash Balances With BLMIS

289.    On at least 28 occasions, for a total of 73 days, Luxalpha's cash balance with BLMIS had a negative value. When Luxalpha's cash balance was negative, its average value was negative $7,342,851.

**ANSWER:**   Paragraph 289 refers to the cash balance for BLMIS Account No. 1FR108

– UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to

the documents evidencing that account's cash balances for their respective contents, and lacks

knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in

Paragraph 289 and therefore denies such allegations.

290.    On at least 43 occasions, for a total of 122 days, Groupement Financier's cash balance with BLMIS had a negative value. When the Groupement Financier cash balance was negative, its average value was negative $4,495,183.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 290 and therefore denies such allegations.

291.    In one such instance, on March 3, 2006, Littaye sent a fax to BLMIS requesting a $16,000,000 withdrawal from Groupement Financier's account. The request from Littaye asked that securities be redeemed to fund the withdrawal. On March 8, 2006, BLMIS issued a $16,000,000 wire to Groupement Financier's account at the Bank of Bermuda.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 291 and therefore denies such allegations.

292.    The account statements sent to and reviewed by Access and UBS show that, as of the time of Littaye's request, the cash balance at the beginning of the month in Groupement Financier's BLMIS account was $0.88, no securities were redeemed before the withdrawal, and that after the withdrawal the account cash balance was negative $15,435,156.36 and was not returned to a positive balance until March 16, 2006, when equities and call options were purportedly sold.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 292 and therefore denies such allegations.

293.    UBSFSL, as the administrator to not only Luxalpha and Groupement Financier, but also LIF, tracked the funds' cash balance, and noted that, from time to time, the funds had a negative cash balance. For example, in July 2006, UBSFSL recognized that LIF had been in an "overdraft position" for several weeks and attempted to obtain an explanation for that "leverage situation."

**ANSWER:**    Luxalpha admits that UBSFL was the administrator for Luxalpha and LIF,

but otherwise lacks knowledge sufficient to form a belief as to the remaining allegations in

Paragraph 293 and therefore denies such allegations.

294.    In another example, on July 1, 2004, UBS SA employees sent a fax to BLMIS requesting a $4,000,000 withdrawal from Luxalpha's account. On July 6, 2004, BLMIS issued a $4,000,000 wire to Luxalpha's account at UBS AG. The account statements sent to and reviewed by Access and UBS showed that, as of the time of the request, the cash balance in Luxalpha's BLMIS account was $0.47. After the withdrawal, the account cash balance was negative $3,952,257.79. The account was not returned to a positive balance until July 12, 2004, when Treasury Bills were purportedly sold.

**ANSWER:**    Paragraph 294 refers to the cash balance for BLMIS Account No. 1FR108

– UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, a fax request for a withdrawal from

that account, a wire and account statements, and Luxalpha respectfully refers to the referenced

documents for their respective contents, and lacks knowledge sufficient to form a belief as to

the truth of the remaining allegations set forth in Paragraph 294 and therefore denies such

allegations.

295.    Luxalpha and Groupement Financier did not have margin accounts with BLMIS and BLMIS never charged Luxalpha or Groupement Financier any interest for its margin trades, effectively providing millions of dollars of interest-free loans. No legitimate institution would have advanced the funds millions of dollars at zero percent interest.

**ANSWER:**    Luxalpha admits that it did not have a margin account with BLMIS, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 295 and therefore denies such allegations.

## C.    The Dividend Activity Shown on Luxalpha's and Groupement Financier's Statements Was Impossible

296.    At various times when not in the market, BLMIS customer funds were purportedly invested in a money market fund that also paid dividends. Typically, money market funds declare dividends daily and pay them monthly. If an entity transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid once per month.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 296 and therefore denies such allegations.

297.    Luxalpha and Groupement Financier's customer statements and trade confirmations reflected numerous anomalies relating to dividends. Ninety-nine percent of the money market dividends purportedly received were noted as being received on dates different than the disclosed dividend payment date. In addition, in more than sixty percent of months in which money market dividends were paid, the statements noted multiple payments in the same month—even though the money market funds at issue paid dividends only once a month.

**ANSWER:**    Paragraph 297 refers to BLMIS customer statements and trade confirmations, and Luxalpha respectfully refers to those customer statements and trade confirmations for their respective contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 297 and therefore denies such allegations.

## D.    BLMIS Reported Trades for Luxalpha and Groupement Financier That Were Inconsistent With the SSC Strategy

298.    Madoff's options trades on behalf of Luxalpha and Groupement Financier often showed significant gains from speculative options trades that were inconsistent with the SSC strategy. Some of these reported transactions involved short-term options trading that resulted in substantial gains for Luxalpha and Groupement Financier. For example, in 2008, Luxalpha and Groupement Financier each participated in two of these trades, which generated gains of approximately $17.5 million and $4.7 million, respectively. These gains were purportedly achieved through speculation in the options market, leaving the underlying basket of securities exposed to potentially significant losses, and contradicting the inherently conservative premise of

the SSC strategy. Between 2003 and 2008, Luxalpha and Groupement Financier together benefited in excess of $30 million from such trades.

**ANSWER:**    Paragraph 298 refers to trades made for BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to the trade confirmations for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 298 and therefore denies such allegations.

299.    Also inconsistent with the SSC strategy were multiple instances in which Madoff purported to sell a specific stock or stocks from a basket before the rest of the basket was liquidated. Not only was the premature sale of stock inconsistent with the SSC strategy, but the liquidation of these positions should have caused Madoff to adjust the options collar for the basket, which he almost always failed to do. When purported hedges were not adjusted based on changes in the value of the equity position, the BLMIS accounts were left exposed to market risk, and this additional risk was not an element of the SSC strategy. For example, Luxalpha's account statements indicate that in April 2007, BLMIS purported to purchase a basket of S&P 100 Index stocks that included shares of 3M Company and CVS Caremark Corp. The shares of 3M Company and CVS Caremark Corp. were sold in May 2007 whereas the other equities contained in the basket were not sold until June 2007. In light of the early sale of the 3M and CVS shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk. No such adjustment was reflected in the customer statements or trade confirmations.

**ANSWER:**    Paragraph 299 refers to account statements for BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to the account statements for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 299 and therefore denies such allegations.

300.    Both of these trading activities contradicted the SSC strategy and were known to Access and UBS, who regularly reviewed Madoff's account statements and trade confirmations.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 300 and therefore denies such allegations.

**E.    Madoff's Practice of Providing Only Hard Copy Trade Confirmations Defied Industry Practice and Facilitated Fraud**

301.    Access knew that the trade confirmations received from BLMIS were only in a hard copy, paper format and were delayed because they were sent via regular mail, sometimes several days after the purported trade.

**ANSWER:**   On information and belief, Luxalpha admits that BLMIS sent trade confirmations for BLMIS accounts in hard copy, paper format, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 301 and therefore denies such allegations.

302.    Access also knew that it was "abnormal" in the mid-2000s not to have more prompt, electronic access to such information.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 302 and therefore denies such allegations.

303.    As a result of BLMIS's delays in providing trade information, AML provided UBS SA with backdated monthly investment recommendations for Luxalpha.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 303 and therefore denies such allegations.

304.    In addition to the oddity of "paper only" trade confirmations, Cutler also highlighted the fact that the confirmations did not have time stamps on them, which he believed was a standard practice of all broker/dealers.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 304 and therefore denies such allegations.

## F.    BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies in Purported Options Transactions

305.    According to industry standards, the settlement date for exchange-listed options is the business day following the trade date, referred to as "T+1." Trade confirmations produced by BLMIS and sent to UBS and Access regularly showed options transactions that settled more than one day after execution. All of the options trade confirms showed CBOE-traded OEX Options, which would have been subject to the T+1 settlement date.

**ANSWER:**   Luxalpha lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 305 and therefore denies such allegations.

6750934

306.    Approximately 51% of Luxalpha's, and 48% of Groupement Financier's, purported options transactions settled at least three business days after execution and therefore did not comply with standard market practices.

**ANSWER:**    Paragraph 306 refers to options transactions on account statements for BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to the account statements for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 306 and therefore denies such allegations.

**G.    BLMIS Avoided Reporting Requirements by Consistently Claiming to Be Out of the Market at Quarter-End and Year-End Even Though Such Behavior Was Inconsistent With the SSC Strategy**

307.    Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year. To evade these reporting requirements, Madoff purported to liquidate all investments at those times, and invest the proceeds in Treasury Bills.

**ANSWER:**    On information and belief, Luxalpha admits that Madoff purported to liquidate investments at times for BLMIS accounts, and purported to invest in Treasury Bills as reported on BLMIS account statements, and Luxalpha respectfully refers to the account statements for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 307 and therefore denies those allegations.

308.    Luxalpha's and Groupement Financier's account statements showed no equity positions at quarter- and year-end.

**ANSWER:**    Paragraph 308 refers to account statements for BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to the account statements for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 308 and therefore denies such allegations.

309.    Madoff's practice of exiting the market according to the calendar, rather than market or economic indicators, was a badge of fraud. Defendants knew that Madoff touted "market timing" as a cornerstone of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter- and year-end contravened that strategy because it meant that Madoff was locked into whatever market conditions existed at those times, regardless of whether they were favorable. Such trading circumstances were inconsistent with the SSC strategy.

**ANSWER:**    Paragraph 309 asserts legal conclusions to which no response is required, and Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 309 and therefore denies such allegations.

**H.    Post-Fraud Inquiries From Access Investors Reveal the Diligence Access Should Have Done Was Understood and Expected**

310.    Post-fraud inquiries reveal that Access investors understood and expected Access to take the necessary steps to protect their investments, i.e., to ensure the segregation of funds; to comply with UCITS regulations, to be aware of and disclose the existence of sub-accounts or sub-agreements, and to conduct vigorous due diligence. For example, on December 11, 2008 Prince Michel of Yugoslavia, an Access salesperson, forwarded questions from Luca Vaiani asking: "The assets of [L]uxalpha are segregated and their [sic] should be no risk. True? Are you liquidating the positions to be in cash?" Luxalpha's customers believed Luxalpha to be UCITS compliant and that their assets were projected under that regulatory structure.

**ANSWER:**    Paragraph 310 refers to and partially quotes from communications, and Luxalpha respectfully refers to those communications for their contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 310 and therefore denies such allegations.

311.    A subsequent email from Mr. Vaiani to Prince Michel of Yugoslavia states: "I would like to understand if Luxalpha American Selection is in some way (and if yes how much) involved in the Madoff fraud; if affected in any way I would like to understand what is the legal structure of the relation between the Sicav [i.e., Luxalpha] and Madoff."

**ANSWER:**    Paragraph 311 refers to and partially quotes from an email, and Luxalpha respectfully refers to the email for its contents, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 311 and therefore denies such allegations.

312.    Another customer inquiry asked, "Was Access aware of the creation of sub-accounts by Ubs in favour of a company related to Madoff . . . How long ago did the business relations start between Madoff and Access; Can we have a copy of the CSSF circular that outlines the obligations of custodian banks towards the investors? Was Access aware of who[]audited Madoff Investment Securities?"

**ANSWER:**    Paragraph 312 refers to and partially quotes from an email, and Luxalpha

respectfully refers to the email for its contents, and otherwise lacks knowledge sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 312 and therefore denies

such allegations.

313.    Yet another customer asked, "can you confirm that all assets of Luxalpha Sicav—American Selection have been duly kept segregated from any other asset or accounts? . . . [C]an you confirm the integrity of all such assets, irrespective of their current evaluation?"

**ANSWER:**    Paragraph 313 refers to and partially quotes from an email, and Luxalpha

respectfully refers to the email for its contents, and otherwise lacks knowledge sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 313 and therefore denies

such allegations.

314.    Perhaps most damning is the December 16, 2008 email from Manfredo Radicati of Trendtrust SA, which states:

> Dear Michel,
>
> Like all frauds, the collapse of Madoff is a disgrace. What is astonishing is that no one, especially firms such as AIA that pride themselves on the thoroughness of their due diligence didn't see any warning sign. This is all the more disturbing since a number of "red flags" should have been seen ... even more so since you had full transparency on the portfolios. Looking at the situation at hand, AIA, together with UBS, in their role as sponsor, investment manager and custodian of Luxalpha, should answer a number of questions as to why nothing was detected earlier. The most pressing task however, is to explain to investors how the holdings in the portfolio proved to be virtual or nonexistent. Can one speak of negligence or complicity on the part of UBS in this matter?

Of course, all of the Defendants did indeed see the warning signs they should have seen, but they were too driven by greed to act.

**ANSWER:**    Paragraph 314 refers to and partially quotes from an email, and Luxalpha respectfully refers to the email for its contents, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 314 and therefore denies such allegations.

## IMPUTATION OF KNOWLEDGE FROM UBS AND ACCESS TO LUXALPHA AND GROUPEMENT FINANCIER

315.    The Access Defendants and UBS Defendants were intertwined with respect to BLMIS feeder funds and worked closely together for purposes of creating and growing Luxalpha's and Groupement Financier's investments in BLMIS.

**ANSWER:**    Luxalpha admits that the Access Defendants and the UBS Defendants worked together with respect to Luxalpha, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 315 and therefore denies such allegations.

316.    At all times, the Access Defendants and UBS Defendants dominated and controlled Luxalpha and Groupement Financier. Neither Luxalpha nor Groupement Financier ever had any employees or office space. Rather, the Access Defendants and UBS Defendants operated the funds as a single enterprise, of which they were the constituent parts.

**ANSWER:**    Luxalpha admits that the Access Defendants and UBS Defendants controlled Luxalpha, and Luxalpha did not have any employees.  The remaining allegations in Paragraph 316 state legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

317.    Littaye and Villehuchet co-founded and co-owned Access. Littaye and Villehuchet were executives and directors of Access. Access operated under the direction and control of Littaye and Villehuchet at all times.

**ANSWER:**    On information and belief, Luxalpha admits the allegations in Paragraph 317.

318.    The Access Defendants and the UBS Defendants created Luxalpha. The UBS Defendants served as Luxalpha's official sponsor, custodian, administrator, and manager, while the Access Defendants served in official advisory and managerial roles. Both the Access

95

Defendants and the UBS Defendants received Luxalpha's BLMIS account statements and trade confirmations.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 318.

319.    Luxalpha's board of directors was at all times composed of UBS SA and Access principals, including Littaye and Delandmeter. As directors of Luxalpha, Littaye's and Delandmeter's conduct and/or direct knowledge of fraud at BLMIS is imputed to the fund.

**ANSWER:**    Luxalpha admits its board of directors consisted primarily of UBS and

Access personnel, including Mr. Littaye, and admits that Mr. Delandmeter was an independent

lawyer who also was a member of AML's board and a Director and Legal Advisor of Luxalpha,

but otherwise denies the allegations in Paragraph 319.

320.    Likewise, the Access Defendants created Groupement Financier. UBS SA served as the official prime bank and UBSFSL served as the administrator of Groupement Financier, while the Access Defendants served in official management and advisory roles. Both the Access Defendants and UBS Defendants received Groupement Financier's BLMIS account statements and trade confirmations.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 320 and therefore denies such allegations.

321.    The board of directors of Groupement Financier was at all times composed of Access founders Littaye and Villehuchet. Littaye and Villehuchet carried out actions as directors and officers of Groupement Financier, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to Groupement Financier.

**ANSWER:**    Luxalpha lacks knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 321 and therefore denies such allegations.

322.    Further, Littaye and Villehuchet carried out actions as directors and officers of the Access Defendants, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to the Access Defendants.

**ANSWER:**    On information and belief, Luxalpha admits Littaye and Villehuchet were

directors and officers of the Access Defendants.  The remaining allegations in Paragraph 322 state

legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form

a belief as to the truth of such allegations and therefore denies the allegations.

6750934

323.    The Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.

**ANSWER:**    Luxalpha admits that the Access Defendants and the UBS Defendants

were Luxalpha's service providers, and denies that their conduct and/or knowledge should be

imputed to Luxalpha.   The remaining allegations in Paragraph 323 state legal conclusions to

which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the

truth of such allegations and therefore denies the allegations.

## THE TRANSFERS

### The Initial Transfers

324.    Before the Filing Date, Luxalpha maintained BLMIS account no. 1FR108 and Groupement Financier maintained BLMIS account no. 1FR096 (collectively, the "Accounts"), as set forth on Exhibit A. Each Feeder Fund Defendant executed, or caused to be executed, BLMIS Account Opening Agreements (as defined herein) for its account, and delivered, or caused those documents to be delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

**ANSWER:**    Luxalpha admits that before the Filing Date, the UBS Defendants and

the Access Defendants opened BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA

FBO LUXALPHA SICAV with BLMIS in New York to invest Luxalpha assets with BLMIS,

and the UBS Defendants executed, delivered or caused to be delivered to BLMIS in New York

Account Opening Agreements for BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA

FBO LUXALPHA SICAV, and otherwise lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 324 and therefore denies such allegations.

325.    The BLMIS Account Opening Agreements were to be performed in New York through securities trading activities that would take place there. The Accounts were held in New York and the Feeder Fund Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase in New York, Account No. xxxxxxxxxxx1703 (the "703 Account"), for application to the Accounts and the purported conducting of trading activities.

6750934

**ANSWER:**    Paragraph 325 refers to BLMIS Account Opening Agreements, and Luxalpha respectfully refers to those agreements for their contents. Luxalpha admits that BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV was held in New York, and that the UBS Defendants and/or Access Defendants sent or caused Luxalpha funds to be sent to the 703 Account for application to BLMIS Account No. 1FR108 and for investment by BLMIS. The remaining allegations in Paragraph 325 state legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

326.    The Feeder Fund Defendants collectively invested approximately $2 billion with BLMIS through more than 150 separate transfers via check and wire directly into the 703 Account.

**ANSWER:**    Paragraph 326 refers to investments made into BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV, and Luxalpha respectfully refers to the account statements for BLMIS Account No. 1FR108 for their contents, including the amount of Luxalpha's assets deposited with BLMIS, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 326 and therefore denies such allegations.

327.    During the six years preceding the Filing Date, BLMIS made transfers to or for the benefit of the Feeder Fund Defendants in the collective amount of at least $1.12 billion (the "Six Year Transfers"). The Six Year Transfers include transfers of approximately $766 million to Defendant Luxalpha and $352 million to Defendant Groupement Financier. The Six Year Transfers are avoidable and recoverable under §§ 544(b), 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA §78fff- 2(c)(3), and §§ 273-279 of New York Debtor and Creditor Law.

**ANSWER:**    The last sentence in Paragraph 327 states legal conclusions to which no response is required. Luxalpha denies that $766 million was transferred to Luxalpha during the six years preceding the Filing Date, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 327 and therefore denies those allegations.

6750934

328.    Of the Six Year Transfers, BLMIS transferred to or for the benefit of the Feeder Fund Defendants approximately $1.01 billion during the two years preceding the Filing Date, (the "Two Year Transfers"). The Two Year Transfers included transfers of approximately $735 million to Luxalpha and approximately $275 million to Groupement Financier. Each of the Two Year Transfers is avoidable under § 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3). Each of the Two Year Transfers is recoverable under § 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The last two sentences in Paragraph 328 state legal conclusions to which no response is required.  Luxalpha admits that approximately $735 million was withdrawn from BLMIS Account No. 1FR108 – UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV during the two years preceding the Filing Date, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 328 and therefore denies those allegations.

329.    The Six Year Transfers and the Two Year Transfers, are referred to herein as "Initial Transfers." Numerous indicia of fraud concerning BLMIS gave the Feeder Fund Defendants knowledge of BLMIS' fraud. These indicia of fraud, and the Feeder Fund Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent. Give the Feeder Fund Defendants' knowledge of these indicia of fraud, the Feeder Fund Defendants were neither innocent nor good faith investors.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 329 asserted against Luxalpha, and otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 329 and therefore denies those allegations.

330.    The Feeder Fund Defendants had information that put them on actual and/or inquiry notice of fraud at BLMIS, or that BLMIS was insolvent and/or that the transfers were being made with a fraudulent purpose, and strategically chose to ignore that information in order to continue to enrich themselves through their relationship with Madoff and BLMIS.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 330 asserted against Luxalpha, and otherwise lacks knowledge sufficient to form a belief as to the remaining allegations in Paragraph 330 and therefore denies those allegations.

331.    Charts setting forth the Initial Transfers are included as Exhibits B and C. The Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78111(4).

**ANSWER:**    Paragraph 331 states legal conclusions to which no response is required, or refers to Charts that Luxalpha respectfully refers to for their contents.

**The Subsequent Transfers**

332.    Based on the Trustee's investigation to date, the Feeder Fund Defendants subsequently transferred some of the Initial Transfers to the Access Defendants and UBS Defendants (the "Subsequent Transferee Defendants") as payment for their alleged service of the Feeder Fund Defendants. In addition, some of the initial transfers to Groupement Financier were subsequently transferred to Groupement Levered. Groupement Levered then subsequently transferred the initial transfers to Access. All of these payments constitute subsequent transfers of Initial Transfers. All avoidable transfers from BLMIS to the Feeder Fund Defendants, which they subsequently transferred, either directly or indirectly, to the Subsequent Transferee Defendants (the "Subsequent Transfers"), are recoverable from the Subsequent Transferee Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA and N.Y. Debt. & Cred. Law §§ 273-279.

**ANSWER:**    Luxalpha admits that the Access Defendants and UBS Defendants received payments for their services provided to Luxalpha.  The remaining allegations in Paragraph 332 state legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

333.    Based on the Trustee's investigation to date, the UBS Defendants received Subsequent Transfers, including but not limited to:

a.    UBS SA received at least $32.8 million in fees from Luxalpha for serving as the official custodian and official manager of Luxalpha from February 2004 to August 2006, and an additional $6.6 million in fees from Luxalpha for serving as the official custodian of Luxalpha from August 2006 to December 2008. UBS SA also received at least $1 million in fees from Groupement Financier for serving as the official prime bank of Groupement Financier from 2005 to December 2008, and at least $500,000 in fees from Groupement Levered for serving as the official custodian of Groupement Levered from 2005 to December 2008.

b.    UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the official administrator of Luxalpha from February 2004 to December 2008. UBSFSL also received at least $497,000 from Groupement Financier for serving as the official administrator of Groupement and Groupement Levered from 2005 to December 2008.

6750934

    c.    UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the official manager of Luxalpha from August 2006 to November 2008.

**ANSWER:** Paragraph 333 states legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

334.    Based on the Trustee's investigation to date, AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) received at least $100.6 million in Subsequent Transfers, including but not limited to:

    a.    AIA Ltd. received at least $25.4 million in fees from UBS SA pursuant to a February 5, 2004 "Consulting and Exclusive Introducing Agreement," which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. also received at least $28.5 million in fees from UBSTPM under an August 1, 2006 "Client Introducer Agreement," which consisted of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. further received at least $15 million in fees from Groupement Financier for serving as the official manager of Groupement Financier from 2003 to December 2008. AIA Ltd. received at least $400,000 in fees for serving as the official manager of Groupement Levered from 2003 to December 2008.

    b.    AIA LLC received at least $189,000 in fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from August 2004 to August 2006, which consisted of fees received by UBS SA for serving as Luxalpha's official manager. These fees were pursuant to a contract entered into between UBS SA and AIA LLC which contains a New York choice of law provision.

    c.    AP (Lux) received at least $17.8 million in fees from UBSTPM for serving as the investment adviser to Luxalpha from 2007 to December 2008, consisting of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AP (Lux) also received at least $8.4 million in fees from Groupement Financier for serving as the official investment adviser to Groupement Financier from 2007 to December 2008. AP (Lux) received an additional $2.5 million in fees from Groupement Levered for serving as the official investment adviser to Groupement Levered from 2007 to December 2008.

6750934

    d.    AML (f/k/a AIA (Lux)) received at least $2.4 million in fees from Groupement Financier for serving as the investment adviser to Groupement Financier from 2003 to 2007, and received at least $50,000 for serving as the investment adviser to Groupement Levered from 2003 to 2007. In addition, AML (f/k/a AIA (Lux)) received fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from February 2004 to August 2004, which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager, in an amount to be proven at trial.

**ANSWER:**    Paragraph 334 states legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

335.    Based on the Trustee's investigation to date, Littaye, Villehuchet, and Ms. Villehuchet received millions of dollars of Subsequent Transfers, in an amount to be proven at trial. At all relevant times, each of AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was either completely or nearly completely owned by Littaye and Villehuchet. At various times, Littaye and Villehuchet each also served as a director of AIA Ltd., AP (Lux), and AML (f/k/a AIA (Lux)). A significant amount of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was subsequently transferred to Littaye and Villehuchet, either directly or indirectly, in the form of distributions, payments, or other transfers of value. Among other transfers, Villehuchet received $6.5 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2008, and, upon information and belief, his co-owner Littaye received at least the same amount of compensation paid from other Access-controlled bank accounts. The transfers Villehuchet received are recoverable from Ms. Villehuchet, as the executrix and sole beneficiary of Villehuchet's will.

**ANSWER:**    Paragraph 335 states legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

336.    Based on the Trustee's investigation to date, Delandmeter received approximately $350,000 in Subsequent Transfers from Luxalpha, in connection with Delandmeter's purported provision of legal services to Luxalpha. Delandmeter also received Subsequent Transfers from Groupement Financier in connection with Delandmeter's purported provision of legal services to Groupement Financier, in an amount to be proven at trial. Upon information and belief, a portion of the Luxalpha, Groupement Financier, and Groupement Levered-related Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Delandmeter, directly or indirectly, in compensation for Luxalpha, Groupement

6750934

Financier and Groupement Levered-related services Delandmeter provided to Access, in an amount to be proven at trial.

**ANSWER:**    Paragraph 336 states legal conclusions to which no response is required, or

Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and

therefore denies the allegations.

337.    Based on the Trustee's investigation to date, a portion of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Dumbauld, in an amount to be proven at trial. At minimum, Dumbauld received $1.25 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2007. Dumbauld received these transfers as distributions, payments, or other transfers of value in connection with his role as Access partner and Chief Investment Officer.

**ANSWER:**    Paragraph 337 states legal conclusions to which no response is required, or

Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and

therefore denies the allegations.

338.    To the extent that any of the avoidance and recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

**ANSWER:**    Paragraph 338 states legal conclusions to which no response is required.

339.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:**    Paragraph 339 states legal conclusions to which no response is required.

340.    The following chart summarizes the Initial Transfers and the Subsequent Transfers:

**[This Space Intentionally Left Blank]**

6750934



**ANSWER:**   Paragraph 340 states legal conclusions to which no response is required, or Luxalpha lacks knowledge sufficient to form a belief as to the truth of such allegations and therefore denies the allegations.

## CUSTOMER CLAIMS

341.   On or about March 2, 2009, a customer claim was filed with the Trustee and designated as Claim No. 004419. On March 3, 2009, a customer claim was filed with the Trustee and designated as Claim No. 005725. Claim Nos. 004419 and 005725 were signed by Ralf Schroeter and Alan Hondequin and each claim was in the amount of $1,537,099,731. Messrs. Schroeter and Hondequin were UBS employees as well as Luxalpha directors. In addition, on or about March 2, 2009, UBS SA filed with the Trustee an additional customer claim on behalf of Luxalpha, designated as Claim No. 005025, also in the amount of $1,537,099,731. These customer claims are collectively referred to herein as the "Customer Claims." The Trustee objected to the Customer Claims.

6750934

**ANSWER:**    Luxalpha admits the allegations in Paragraph 341.

342.    Luxalpha has taken the position that a factual dispute exists with regard to whether Luxalpha itself maintained an account at BLMIS or filed the Customer Claims.

**ANSWER:**    Luxalpha admits that UBS SA opened Account 1FR108 and deposited Luxalpha's assets into that account with BLMIS, and that the UBS Defendants filed customer claims on Luxalpha's behalf, and otherwise denies the allegations in Paragraph 342.

343.    Specifically, Luxalpha has asserted that Account 1FR108 was maintained and legally owned by UBS SA.

**ANSWER:**    Luxalpha admits that UBS SA opened Account 1FR108 and deposited Luxalpha's assets into that account with BLMIS.  The remaining allegations in Paragraph 343 state legal conclusions to which no response is required, or Luxalpha otherwise denies such allegations.

344.    Luxalpha has also disavowed the Customer Claims by asserting that UBS SA, and not Luxalpha, filed the Customer Claims and that UBS SA did so only for purposes of protecting its own interests, not in Luxalpha's interest, and limiting UBS's potential liability to Luxalpha in Luxembourg.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 344.

345.    There continues to be an ongoing litigation between Luxalpha and UBS in Luxembourg.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 345.

346.    Luxalpha has further asserted that neither its BLMIS account nor the Customer Claims can be attributed to Luxalpha for purposes of determining whether Luxalpha had contact with or otherwise availed itself of the privileges of conducting activities within this jurisdiction.

**ANSWER:**    Luxalpha admits that it has asserted that the filing of the Customer Claims by the UBS Defendants on behalf of Luxalpha was not an affirmative submission to the Court's jurisdiction by Luxalpha itself, nor was the UBS Defendants opening of Account 1FR108. Paragraph 346 also states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 346.

347.    Although Luxalpha has acknowledged that UBS SA was an agent of Luxalpha, it has asserted that there is a question as to whether UBS SA, as such agent, was acting within the scope of its authority when it filed the Customer Claims.

**ANSWER:**    Paragraph 347 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 347.

## COUNT ONE
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

*Against Luxalpha*

348.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**    Luxalpha incorporates by reference its responses to the allegations

contained in each of the previous paragraphs of the Second Amended Complaint as if fully

rewritten herein.

349.    Luxalpha engaged in inequitable conduct, including the conduct described in this Complaint.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 349.

350.    Based on Luxalpha's inequitable conduct, BLMIS's customers were misled as to the true financial condition of BLMIS and were induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 350.

351.    Luxalpha's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on Luxalpha.

**ANSWER:**    Luxalpha denies the allegations in Paragraph 351.

352.    Luxalpha inflicted harm to the estate far in excess of the fraudulent transfers that it received. Luxalpha's investment into the Ponzi scheme included no less than $135 million in fictitious profits its management redeemed from Oreades and immediately reinvested on behalf of the same investors. Furthermore, Luxalpha harmed the estate by directing $1.5 billion into the Ponzi scheme during a time it knew or was willfully blind to the fraud at BLMIS, which significantly contributed to the Ponzi scheme's expansion.

6750934

**ANSWER:**    Luxalpha denies the allegations in Paragraph 352.

353.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha directly or indirectly against the estate—and only to the extent such claims are allowed—are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

**ANSWER:**    Paragraph 353 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 353.

354.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

**ANSWER:**    Paragraph 354 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 354.

355.    To the extent that Luxalpha has denied ownership of the Customer Claims, or alternatively has made a judicial admission that the Customer Claims do not belong to Luxalpha, this provides another basis for subordination of those claims.

**ANSWER:**    Paragraph 355 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 355.

## COUNT TWO
## FRAUDULENT TRANSFERS
## 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551

*Against the Feeder Fund Defendants*

356.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**    Luxalpha incorporates by reference its responses to the allegations

contained in each of the previous paragraphs of the Second Amended Complaint as if fully

rewritten herein.

357.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

**ANSWER:**    Luxalpha admits the allegations in Paragraph 357.

358.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:**    Paragraph 358 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 358.

359.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

**ANSWER:**    Paragraph 359 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 359.

360.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:**    Paragraph 360 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 360.

361.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers or the value thereof, for the benefit of the estate of BLMIS; (d) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (g) awarding any other relief the Court deems just and appropriate.

**ANSWER:**    Paragraph 361 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 361.

<u>**COUNT THREE**</u>
<u>**FRAUDULENT TRANSFERS**</u>
<u>**11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551**</u>

*Against the Feeder Fund Defendants*

362.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

6750934

**ANSWER:** Luxalpha incorporates by reference its responses to the allegations contained in each of the previous paragraph of the Second Amended Complaint as if fully rewritten herein.

363. Each of the Two Year Transfers was made on or within two years before the Filing Date.

**ANSWER:** Luxalpha admits the allegations in Paragraph 363.

364. Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:** Paragraph 364 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 364.

365. BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

**ANSWER:** Paragraph 365 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 365.

366. At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of each of the Two Year Transfers.

**ANSWER:** Paragraph 366 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 366 and therefore denies such allegations.

367. At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

**ANSWER:** Paragraph 367 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 367 and therefore denies such allegations.

368. At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

6750934

**ANSWER:**   Paragraph 368 states legal conclusions to which no response is required, or

Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in

Paragraph 368 and therefore denies such allegations.

369.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:**   Paragraph 369 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 369.

370.     As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**ANSWER:**   Paragraph 370 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 370.

## <u>COUNT FOUR</u>
## <u>FRAUDULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW</u>
### <u>§§ 276, 276-a, 278, and 279, 11 U.S.C. H 105(a), 502(d), 544, and 551</u>

*Against the Feeder Fund Defendants*

371.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**   Luxalpha incorporates by reference its responses to the allegations

contained in each of the previous paragraph of the Second Amended Complaint as if fully rewritten

herein.

372.     At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

6750934

**ANSWER:**    Paragraph 372 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 372 and therefore denies such allegations.

373.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under NYDCL§ 270.

**ANSWER:**    Paragraph 373 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 373.

374.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

**ANSWER:**    Paragraph 374 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 374.

375.    Each of the Six Year Transfers was received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Six Year Transfers.

**ANSWER:**    Paragraph 375 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 375.

376.    As a result of the foregoing, and pursuant to NYDCL §§ 276, 276-a, 278, and 279, sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**ANSWER:**    Paragraph 376 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 376.

## COUNT FIVE
## FRAUDULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273, 278, and 279, 11 U.S.C. H 105(a), 502(d), 544, and 551

6750934

*Against the Feeder Fund Defendants*

377.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**    Luxalpha incorporates by reference its responses to the allegations contained in each of the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

378.    At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

**ANSWER:**    Paragraph 378 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 378 and therefore denies such allegations.

379.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under NYDCL § 270.

**ANSWER:**    Paragraph 379 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 379.

380.    BLMIS did not receive fair consideration for the Six Year Transfers.

**ANSWER:**    Paragraph 380 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 380.

381.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

**ANSWER:**    Paragraph 381 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 381 and therefore denies such allegations.

382.    As a result of the foregoing, and pursuant to NYDCL §§ 273, 278, and/or 279, sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six

112

Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**ANSWER:** Paragraph 382 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 382.

## COUNT SIX
## FRAUDULENT TRANSFER-- NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278, and 279, 11 U.S.C. H 105(a), 544, 550(a), and 551

*Against the Feeder Fund Defendants*

383.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:** Luxalpha incorporates by reference its responses to the allegations

contained in each of the previous paragraphs of the Second Amended Complaint as if fully

rewritten herein.

384.   At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

**ANSWER:** Paragraph 384 states legal conclusions to which no response is required, or

Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in

Paragraph 384 and therefore denies such allegations.

385.   Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under NYDCL § 270.

**ANSWER:** Paragraph 385 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 385.

386.   BLMIS did not receive fair consideration for the Six Year Transfers.

6750934

**ANSWER:**   Paragraph 386 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 386.

387.   At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

**ANSWER:**   Paragraph 387 states legal conclusions to which no response is required, or Luxalpha otherwise lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 387 and therefore denies such allegations.

388.   As a result of the foregoing, and pursuant to NYDCL §§ 275, 278, and/or 279, sections 105(a), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants to the extent allowable by law, to disgorge all profits relating to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**ANSWER:**   Paragraph 388 states legal conclusions to which no response is required, or Luxalpha otherwise denies the allegations in Paragraph 388.

<u>**COUNT SEVEN**</u>
<u>**RECOVERY OF SUBSEQUENT TRANSFERS**</u>
<u>**11 U.S.C. §§ 105(a) and 550(a)**</u>

*Against the Subsequent Transferee Defendants*

389.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**   Luxalpha incorporates by reference its responses to the allegations contained in each of the previous paragraph of the Second Amended Complaint as if fully rewritten herein.

390.   The Subsequent Transfers are recoverable from the Subsequent Transferee Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

114

6750934

**ANSWER:**    Paragraph 390 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 390.

391.    Each of the Subsequent Transferee Defendants is an immediate or mediate transferee of the Initial Transfers.

**ANSWER:**    Paragraph 391 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 391.

392.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:**    Paragraph 392 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 392.

## COUNT EIGHT
## OBJECTION TO AND DISALLOWANCE OF CLAIMS

*Against Luxalpha*

393.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**    Luxalpha incorporates by reference its responses to the allegations in each

of the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

394.    Luxalpha is the recipient of initial transfers of BLMIS's property which are avoidable and recoverable under SIPA section 78fff-2(c)(3), Bankruptcy Code sections 544(b), 547, 548(a) and 550(a) of the Bankruptcy Code, and N.Y. Debt. & Cred. Law sections 273, 274, 275 and 276, and it has not returned the initial transfers to the Trustee. As a result, pursuant to Bankruptcy Code section 502(d), the Customer Claim must be disallowed unless and until Luxalpha returns the Transfers to the Trustee.

**ANSWER:**    Paragraph 394 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 394.

395.    Luxalpha was not an innocent investor at the time it invested with BLMIS and provided no consideration to the estate.

6750934

**ANSWER:**    Paragraph 395 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 395.

396.    The Customer Claim seeks credit for at least $135 million in fictious profits withdrawn from Oreades that was deposited into Luxalpha as purported principal. The Trustee objects to that portion of the Customer Claim. As a result, the Customer Claim must also be disallowed to the extent of the $135 million fictious profits deposit.

**ANSWER:**    Paragraph 396 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 396.

397.    Luxalpha knew or was willfully blind to numerous and serious indications of fraudulent activity at BLMIS, as described in this Second Amended Complaint. This enabled Madoff to perpetuate the fraud at BLMIS.

**ANSWER:**    Paragraph 397 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 397.

398.    As a result of Luxalpha's conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code and section 78fff-2 of SIPA, the Trustee objects to any and all claims of Luxalpha against the BLMIS estate, which should be disallowed, and not entitled to receive a distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

**ANSWER:**    Paragraph 398 states legal conclusions or positions to which no response is

required, or Luxalpha otherwise denies the allegations in Paragraph 398.

399.    To the extent that Luxalpha has denied ownership of the Customer Claims, or alternatively has made a judicial admission that the Customer Claims does not belong to Luxalpha, this provides another basis for disallowing those claims.

**ANSWER:**    Paragraph 399 states legal conclusions to which no response is required, or

Luxalpha otherwise denies the allegations in Paragraph 399.

## RESPONSE FOR REQUEST FOR RELIEF

Luxalpha denies that the Trustee is entitled to his requested judgment or any other relief

against Luxalpha.

6750934

## **AFFIRMATIVE AND OTHER DEFENSES**

Luxalpha asserts the following affirmative and other defenses without conceding in any way that it bears the burden of proof as to such matters or that such matters are not elements that the Trustee must establish in order to make out a prima facie case against Luxalpha. Luxalpha reserves the right to assert any other defenses as discovery in this litigation proceeds and counterclaims not asserted herein of which Luxalpha may become aware through discovery or other investigation as may be appropriate at a later time.

### First Affirmative Defense

Each Count of the Second Amended Complaint asserted against Luxalpha fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

With respect to allegations of fraud, the Second Amended Complaint fails to comply with the requirements of Federal Rule of Civil Procedure 9(b), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7009.

### Third Affirmative Defense

The alleged Initial Transfers may not be avoided or recovered because the Trustee's claims against Luxalpha are barred by 11 U.S.C. § 548(c).

### Fourth Affirmative Defense

The alleged Initial Transfers may not be avoided, in whole or in part, because they were margin payments or settlement payments made by or to, or for the benefit of, a financial institution or financial participant in connection with a securities contract or forward contract within the meaning of 11 U.S.C. §546(e).

6750934

### Fifth Affirmative Defense

The alleged Initial Transfers may not be avoided, in whole or in part, because they were transfers by or to, or for the benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, commodity contract or forward contract within the meaning of 11 U.S.C. § 546(e).

### Sixth Affirmative Defense

The Trustee's claims against Luxalpha are barred, in whole or in part, by laches.

### Seventh Affirmative Defense

The Trustee's claims against Luxalpha are barred, in whole or in part, by the doctrines of waiver, estoppel, and unclean hands.

### Eighth Affirmative Defense

The Initial Transfers satisfied one or more antecedent debts for which the Trustee is not entitled to avoid and recover.

### Nineth Affirmative Defense

The Trustee's claims are barred because the Trustee has failed to sufficiently allege that the knowledge or intent on the part of any other defendant named in this proceeding can be imputed to Luxalpha.

### Tenth Affirmative Defense

The Initial Transfers were taken without actual fraudulent intent and for fair consideration, as provided by section 278(2) of the New York Debtor and Creditor Law.

118

6750934

### Eleventh Affirmative Defense

The Initial Transfers were taken for fair consideration and without knowledge of the fraud, as provided by section 278(1) of the New York Debtor and Creditor Law.

### Twelfth Affirmative Defense

The claims against Luxalpha are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

### Thirteenth Affirmative Defense

The Trustee's equitable subordination claim should be dismissed because the Trustee has failed to sufficiently allege and will be unable to prove that Luxalpha harmed any BLMIS customers.

### Fourteenth Affirmative Defense

The Trustee's equitable subordination claim should be dismissed because the Trustee has failed to sufficiently allege and will be unable to prove gross and egregious conduct on the part of Luxalpha.

### Fifteenth Affirmative Defense

The Trustee's claims for claim disallowance should be dismissed because the Trustee has not alleged a legally sufficient claim, as required by section 502(d) of the Bankruptcy Code.

### Sixteenth Affirmative Defense

Luxalpha and its investors are victims of fraud and any claims against Luxalpha should be dismissed as unconscionable and in violation of public policy.

6750934

### Seventeenth Affirmative Defense

The Trustee's claims against Luxalpha are barred by judicial estoppel.

### Eighteenth Affirmative Defense

The Trustee's claims are barred, in whole or in part, to the extent that the conditions set forth in 15 U.S.C. § 78fff-2(c)(3) have not been met because the Trustee will recover enough property to satisfy customer claims.

### Nineteenth Affirmative Defense

The Court lacks personal jurisdiction over Luxalpha.

### Twentieth Affirmative Defense

The Trustee's claims are barred under applicable foreign law, including Luxembourg law.

### Twenty-First Affirmative Defense

The Trustee's claims are barred because the Trustee has failed to allege that Luxalpha had actual knowledge of Madoff's fraud or was willfully blind of the fraud.

### Twenty-Second Affirmative Defense

The Trustee's claims against Luxalpha are barred, in whole or in part, because Luxalpha is entitled to setoff based on earnings the Trustee has made from holding and investing Luxalpha's assets since the commencement of the SIPA Proceeding.

### Twenty-Third Affirmative Defense

Avoidance and recovery of the Initial Transfers against Luxalpha would be inequitable as compared to the Trustee's treatment of transfers received by similarly situated investors and creditors.

6750934

<u>Twenty-Fourth Affirmative Defense</u>

The Trustee is not entitled to any award of prejudgment interest against Luxalpha under the facts and equities of this case.

<u>Twenty-Fifth Affirmative Defense</u>

Luxalpha adopts and incorporates by reference any and all other defenses asserted or to be asserted by any other defendant or party-in-interest to the extent that those defenses are applicable to Luxalpha.

## **<u>JURY TRIAL DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Luxalpha hereby demands a jury trial on all claims and issues so triable.

## **<u>FINAL ORDER</u>**

In accordance with the Order entered by Judge Rakoff in the United States District Court for the Southern District of New York on January 4, 2013 (Civil Action No. 12-115(JSR), Dkt. No. 427), this Court lacks jurisdiction to enter a final order in this adversary proceeding.

**[This Space Intentionally Left Blank]**

6750934

WHEREFORE, Defendant Luxalpha hereby respectfully request that the Court dismiss the Second Amended Complaint with prejudice, award Luxalpha its fees and costs, including attorneys' fees, incurred in connection with this action, allow the Customer Claims to the fullest extent permitted by law, and grant such other and further relief as the Court deems just and proper.

Dated:  April 22, 2022
New York, New York

Respectfully submitted,

**PORZIO BROMBERG & NEWMAN P.C.**

/s/ Brett S. Moore
Brett S. Moore
1675 Broadway
Suite 1810
New York, New York 10019
(212) 265-6888 (telephone)
(212) 957-3983 (fax)
bsmoore@pbnlaw.com

*Attorneys for Defendants Luxalpha Sicav as represented by its Liquidators Maitre Alain Rukavina and Paul Laplume, Maitre Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha Sicav*

122

6750934