Scott M. Berman
Jeffrey C. Fourmaux
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York 10036
Telephone: (212) 833-1100
E-mail:     sberman@fklaw.com
            jfourmaux@fklaw.com

*Attorneys for Defendant Pierre Delandmeter*

| | |
|---|---|
| <u>Hearing Date</u>: | **Sept. 14, 2022** |
| <u>Opposition Date</u>: | **June 17, 2022** |
| <u>Reply Date</u>: | **July 29, 2022** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,

    v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Defendant.

Adv. Pro. No. 08-01789 (CGM)

SIPA LIQUIDATION

(Substantively Consolidated)

In re:

BERNARD L. MADOFF,

        Debtor.

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

        Plaintiff,

    v.

UBS AG, UBS EUROPE SE (f/k/a UBS
(LUXEMBOURG) SA), UBS FUND SERVICES
(LUXEMBOURG) SA, UBS THIRD PARTY
MANAGEMENT COMPANY SA, ACCESS
INTERNATIONAL ADVISORS LLC, ACCESS
INTERNATIONAL ADVISORS LTD., ACCESS
MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS
INTERNATIONAL ADVISORS (LUXEMBOURG)
SA) as represented by its Liquidator MAITRE

Adv. Pro. No. 10-04285 (CGM)

FERNAND ENTRINGER, ACCESS PARTNERS SA as
represented by its Liquidator MAITRE FERNAND
ENTRINGER, PATRICK LITTAYE, CLAUDINE
MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE
DE LA VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole beneficiary
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), PIERRE DELANDMETER,
THEODORE DUMBAULD, LUXALPHA SICAV as
represented by its Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE ALAIN
RUKAVINA AND PAUL LAPLUME, in their
capacities as liquidators and representatives of
LUXALPHA, , GROUPEMENT FINANCIER LTD.,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PIERRE
DELANDMETER'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

     A.     Pierre Delandmeter ................................................................................................3

     B.     The SAC's Allegations Concerning Delandmeter's
            Roles as Director or Legal Advisor of Other Defendants .......................................3

     C.     The SAC's Group Allegation Concerning an Alleged Red Flag ...........................5

     D.     The SAC's Allegation Concerning
            Subsequent Transfers to Delandmeter ...................................................................7

ARGUMENT ............................................................................................................................8

I.     THE TRUSTEE IMPERMIISBLY RELIES ON CONCLUSORY
      ALLEGATIONS AND GROUP PLEADING IN A FAILED ATTEMPT
      TO PLEAD JURISDICTION OVER DELANDMETER. .................................................8

II.    THE TRUSTEE FAILS TO ESTABLISH THAT DELANDMETER HAD
      MINIMUM CONTACTS WITH NEW YORK OR THE UNITED STATES .................12

     A.     The Trustee's Allegations Fail to Establish General Jurisdiction..........................14

     B.     The Trustee's Allegations Fail to Establish Specific Jurisdiction. ........................14

           1.     Allegations Naming Delandmeter Specifically ........................................ 15

           2.     Allegations Naming "Access Defendants" ............................................... 17

           3.     Allegations Naming "Feeder Fund Director Defendants" ........................ 19

           4.     Allegations Naming All Defendants ......................................................... 20

           5.     Allegations in the Trustee's 2012 Brief in Opposition to
               Delandmeter's Prior Motion to Dismiss for Lack of Personal
               Jurisdiction ............................................................................................... 20

                  a.     Delandmeter's actions as a board member or legal
                       advisor  are insufficient to subject him to personal
                       jurisdiction. ...................................................................................21

b.     Delandmeter's infrequent trips to the United States are insufficient to subject him to personal jurisdiction.......................25

6.     Luxalpha Was Not Delandmeter's Agent and Its Contacts Cannot Be Imputed to Him. ....................................................... 28

a.     Luxalpha did not act for the benefit of Delandmeter, precluding the finding of an agency relationship..........................28

b.     Delandmeter did not exercise the requisite control over Luxalpha necessary to establish an agency relationship...............29

III.    THE TRUSTEE HAS FAILED TO PLAUSIBLY ALLEGE THAT DELANDMETER RECEIVED BLMIS CUSTOMER PROPERTY. ..............................31

IV.    SECTION 546(E) BARS THE TRUSTEE'S CLAIM AGAINST DELANDMETER TO THE EXTENT THAT IT IS BASED ON INITIAL TRANSFERS MORE THAN TWO YEARS BEFORE THE PETITION DATE.........................................................................................................35

A.    Section 546(e) Bars the Trustee From Avoiding Initial Transfers From BLMIS to Luxalpha or Groupement Financier Made More Than Two Years Before the Petition Date. ...........................................................36

B.    The Trustee Has Not Plausibly Alleged that Delandmeter Had "Actual Knowledge" of Madoff's Fraud...........................................................37

CONCLUSION.....................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
    409 B.R. 737 (Bankr. E.D.N.C. 2009) ...................................................................34

*Asahi Metal Indus. Co. v. Superior Ct. of Cal*,
    480 U.S. 102 (1987) .......................................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................31, 33

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) ..............................................................................8

*Barron Partners, LP v. Lab123, Inc.*,
    2008 WL 2902187 (S.D.N.Y. July 25, 2008) ..........................................................30

*Beatie & Osborn LLP v. Patriot Scientific Corp.*,
    431 F.Supp.2d 367 (S.D.N.Y. 2006) ...................................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................31, 33, 35

*Berdeaux v. OneCoin Ltd.*,
    --- F. Supp. 3d ---, 2021 WL 4267693 (S.D.N.Y. 2021) ...............................9, 11, 12

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................................13

*Calder v. Jones*,
    465 U.S. 783 (1984) ........................................................................................9

*Charas v. Sand Tech. Sys. Int'l, Inc.*,
    1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) .......................................................16, 21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ..........................................................................8, 22

*Chen v. Guo Liang Lu*,
    144 A.D.3d 735 (1st Dep't 2019) ......................................................................13

*City of Long Beach v. Total Gas & Power N. Am. Inc.*,
    465 F. Supp. 3d 416 (S.D.N.Y. 2020) ..................................................................9

iii

**Page(s)**

*Daimler AG v. Bauman,*
571 U.S. 117 (2014)...........................................................................................13, 14

*Dep't of Econ. Dev. v. Arthur Anderson & Co.,*
747 F. Supp. 922 (S.D.N.Y.1990)..................................................................23

*Duravest, Inc. v. Viscardi, A.G.,*
581 F. Supp. 2d 628 (S.D.N.Y. 2008)...........................................................23

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.,*
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ........................................... 34-35

*Gates v. Pinnacle Commc'ns Corp.,*
623 F. Supp. 38 (S.D.N.Y.1985)....................................................................27

*Gowan v. Amaranth LLC (In re Dreier LLP),*
452 B.R. 451 (Bankr. S.D.N.Y. 2011) ............................................................33

*Hanson v. Denckla,*
357 U.S. 235 (1958)........................................................................................13

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408 (1984)........................................................................................13

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.,*
2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ..............................................12

*In re AstraZeneca Sec. Litig.,*
559 F. Supp. 2d 453 (S.D.N.Y. 2008)......................................................15, 16

*In re SSA Bonds Antitrust Litig.,*
420 F. Supp. 3d 219 (S.D.N.Y. 2019)............................................................12

*In re Teligent, Inc.,*
2004 WL 724945 (Bankr. S.D.N.Y. Mar. 20, 2004) ..................................14

*Int'l Shoe Co. v. Wash.,*
326 U.S. 310 (1945)........................................................................................31

*Ivy Mar Co. v. C.R. Seasons Ltd.,*
1997 WL 37082 (E.D.N.Y. Jan. 24, 1997) ...................................................29

*J. McIntyre Machinery, Ltd. v. Nicastro,*
564 U.S. 873 (2011)........................................................................................31

*Jazini v. Nissan Motor Co., Ltd.,*
148 F.3d 181 (2d Cir. 1998)........................................................................8, 9

**Page(s)**

*Karabu Corp. v. Gitner*,
    16 F. Supp. 2d 319 (S.D.N.Y. 1998) (Sotomayor, J.).................................28, 29, 30

*Kimco Exch. Place Corp. v. Thomas Benz, Inc.*,
    34 A.D.3d 433 (2d Dep't 2006) ..............................................................18

*King Cnty. Wash. v. IKB Deutsche Industriebank AG*,
    769 F. Supp. 2d 309 (S.D.N.Y. 2011)...................................................28, 31

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ..........................................................................28

*Landau v. New Horizon Partners, Inc.*,
    2003 WL 22097989 (S.D.N.Y. Sept. 8, 2003).........................................17

*Law v. Siegel*,
    571 U.S. 415 (2014).............................................................................36

*M. Shanken Commc'ns, Inc. v. Varian Events, LLC*,
    2010 WL 4159476 (S.D.N.Y. Oct. 7, 2010) .............................................8

*Magdalena v. Lins*,
    123 A.D.3d 600 (1st Dep't 2014) ...........................................................13

*McKee Elec. Co. v. Rauland-Borg Corp.*,
    20 N.Y.2d 377 (1967) ..........................................................................27

*Melnick v. Adelson-Melnick*,
    346 F. Supp. 2d 499 (S.D.N.Y. 2004)......................................................8

*Metzeler v. Bouchard Transp. Co. (In re Metzeler)*,
    66 B.R. 977 (Bankr. S.D.N.Y. 1986) .......................................................8

*Nelson A. Taylor Co. v. Tech. Dynamics Grp. Inc.*,
    1997 WL 176325 (N.D.N.Y. Apr. 7, 1997)..............................................29

*Nuevo Mundo Holdings v. Price Waterhouse-Coopers LLP*,
    2004 WL 2848524 (S.D.N.Y. Dec. 9, 2004) .............................................8

*Palazzo ex rel. Delmage v. Corio*,
    232 F.3d 38 (2d Cir. 2000).....................................................................13

*Papasan v. Allain*,
    478 U.S. 265 (1986).............................................................................31

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
    2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) ...........37, 38, 39

**Page(s)**

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................34, 37, 38

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ......................................................................33, 34

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) .............................................................................31

*Rush v. Savchuk*,
444 U.S. 320 (1980) .................................................................................................9, 10

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
2006 WL 2034663 (S.D.N.Y. July 19, 2006) ................................................................23

*Siegel v. Holson Co.*,
768 F. Supp. 444 (S.D.N.Y. 1991) ..................................................................................27

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) .....................................2, 36, 37, 38

*SPV Osus Ltd. v. UBS AG*,
114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ...........................27

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018) ............................................................................................13

*Tamam v. Fransabank SAL*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010) ..........................................................................8, 9

*Tera Grp. v. Citigroup, Inc.*,
2018 WL 4732426 (S.D.N.Y. 2018) ...............................................................................12

**Statutes**

11 U.S.C. § 546(e) ............................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ................................................................................35, 36, 37

11 U.S.C. § 550(a) ...........................................................................................24, 25, 35, 39

11 U.S.C. § 550(a)(2) ......................................................................................1, 35, 37

15 U.S.C. § 78fff-2(c)(3) .................................................................................................32

CPLR § 301 .......................................................................................................................12

**Page(s)**

CPLR § 302 .................................................................................................................12

CPLR § 302(a) ...........................................................................................................13

CPLR § 302(a)(1) ..................................................................................................13, 27

**Rules**

Fed. R. Bankr. P. 7004 ...............................................................................................12

Fed. R. Bankr. P. 7004(f) ......................................................................................12, 13

Fed. R. Bankr. P. 7012(b) ............................................................................................1

Fed. R.. Civ. P. 9(b) ...................................................................................................37

Fed. R.. Civ. P. 12(b)(2) ...........................................................................................1, 8

Fed. R.. Civ. P. 12(b)(6) .........................................................................................1, 31

Defendant Pierre Delandmeter ("Delandmeter") respectfully submits this memorandum of law, together with his Declaration dated April 22, 2022 and filed herewith ("Delandmeter Decl."), in support of his motion, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012(b), to dismiss the Second Amended Complaint, dated February 28, 2022 (ECF No. 274) ("SAC"), filed by Irving H. Picard as trustee (the "Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS").

## PRELIMINARY STATEMENT

The SAC asserts a single cause of action (Count Seven) against Delandmeter under Section 550(a)(2) to recover amounts subsequently transferred to Delandmeter that allegedly originated from initial transfers from BLMIS to the feeder fund defendants Luxalpha SICAV ("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier"). The claim should be dismissed in whole, or alternatively in part, for three independently sufficient reasons.

**First**, the Trustee's allegations regarding Delandmeter's contacts with the United States are insufficient to establish personal jurisdiction over him. Delandmeter is a dual citizen of Belgium and Luxembourg residing in Luxembourg, and the Trustee does not allege that Delandmeter had the requisite minimum contacts with New York or the United States for this Court to exercise jurisdiction over him under the CPLR's or the Bankruptcy Code's general or specific jurisdictional standards. Instead, the Trustee relies on legal conclusions masquerading as facts, non-fact specific averments, and group pleading, all of which are insufficient to establish personal jurisdiction. Because the Trustee filed the SAC after these exact same defects in his jurisdictional pleading were raised in Delandmeter's prior motion to dismiss the Amended Complaint, and because the SAC fails to remedy those defects, it should be dismissed as to Delandmeter without leave to further replead.

**Second**, in the alternative, the Trustee has failed to plausibly allege Delandmeter received any BLMIS customer property.  Delandmeter is a Luxembourg lawyer.  He provided legal services at the request of Luxalpha and various Access entities over the years and was compensated for his work with fee payments in Luxembourg.  The Trustee seeks to recover legal fees Delandmeter received from other defendants, without identifying what payments he seeks and without tying any of them to any initial transfer from BLMIS.  While the Trustee is not required at the pleading stage to support his theory with a "dollar-for-dollar accounting," he is required to allege the "vital statistics"—the who, when, and how much—but he utterly fails to do so.  The Trustee also speculates that all money paid to Delandmeter by any of the feeder funds or Access entities ultimately came from BLMIS.  But Luxalpha and Groupement Financier maintained reserves for payment of administrative expenses, including legal fees, which were funded with shareholder subscriptions, not transfers from BLMIS.  Because the SAC fails to plausibly allege that any payment Delandmeter received for legal services originated from BLMIS, the Trustee's subsequent transfer claim against Delandmeter should be dismissed.

**Third**, as shown in the UBS Defendants' April 22, 2022 brief in support of their motion to dismiss at Point III, which Delandmeter joins in and incorporates by reference herein, the safe harbor of Section 546(e) bars the Trustee from avoiding any initial transfers made more than two years before the December 11, 2008 petition date (*i.e.*, before December 11, 2006).  Moreover, the SAC fails to plead facts establishing Delandmeter's "actual knowledge" of Madoff's fraud, as would be required under Judge Rakoff's *Cohmad* decision to bar Delandmeter from invoking Section 546(e)'s safe harbor.  Accordingly, in the alternative, the SAC's claim against Delandmeter should, at a minimum, be dismissed to the extent that it seeks recovery of subsequent transfers based on initial transfers that occurred before December 11, 2006.

# STATEMENT OF FACTS

The facts about BLMIS, Madoff, and his Ponzi scheme are well known to the Court and will not be repeated here.  This Statement of Facts focuses on the pertinent jurisdictional facts about defendant Delandmeter and the allegations concerning him in the SAC.

## A.    Pierre Delandmeter

Delandmeter is a Belgian citizen (SAC ¶ 84), residing in Luxembourg with dual Luxembourgish citizenship (Delandmeter Decl. ¶ 2).  He is licensed to practice as an attorney in Luxembourg, and provides legal advice to clients in Luxembourg, with a focus on Luxembourg investment funds and regulated entities.  (*Id.* ¶ 3.)  Delandmeter has never maintained a residence in New York or the United States.  (*Id.* ¶ 2.)  Delandmeter never had an account with BLMIS and did not send funds to, or receive funds from, BLMIS in New York.  (*Id.* ¶ 4.)  Delandmeter did not deliver agreements, or cause agreements related to BLMIS to be delivered, in New York or the United States.  (*Id.* ¶ 5.)  Delandmeter does not maintain, and has never maintained, a bank account or securities account in New York or the United States.  (*Id.* ¶¶ 6-7.)  Delandmeter has never owned or leased any real property in New York or the United States.  (*Id.* ¶ 8.)

## B.    The SAC's Allegations Concerning Delandmeter's Roles as Director or Legal Advisor of Other Defendants

The SAC contains few allegations specifically naming Delandmeter, and those that do are largely limited to alleging that he served as a director of or legal advisor to mostly foreign entities and individuals, without ever alleging *what* he did in those roles, *when* he did it, or (most importantly for the issue of personal jurisdiction) *where* he did it.  Thus, according to the SAC:

- Delandmeter was a director of, and legal advisor to, defendant Luxalpha from February 2004 until Luxalpha entered liquidation in April 2009.  (SAC ¶¶ 84, 99,

102, 319.)  Luxalpha was an open-ended investment fund organized under

Luxembourg law.  (*Id*. ¶ 98.)

- Delandmeter was allegedly a legal advisor to defendant Groupement Financier

  and non-party Groupement Levered.  (SAC ¶¶ 84, 107.)[1]  Groupement Financier

  and Groupement Levered were investment funds organized under British Virgin

  Islands law.  (*Id*. ¶¶ 104-05.)

- Delandmeter was a director of Luxembourg-based defendants AML and AP

  (Lux), and a non-party, AIA Inc.  (SAC ¶ 84.)[2]

- Delandmeter was allegedly an "advisor" to defendant Patrick Littaye (a French

  citizen), the late defendant Thierry Magon de la Villehuchet (allegedly a U.S.

  citizen at the time of his death), and unspecified "other Access Defendants."

  (SAC ¶¶ 83, 84, 101.)

The SAC does not allege what, if any, any actions Delandmeter took in those

roles, how or whether any work he did in those roles was conducted in the United States, or how

the claim against him for claw back of unspecified legal fees arose out any of those unspecified

---

[1]    Contrary to the Trustee's allegation, Delandmeter was not named as legal advisor to Groupement Financier or Groupement Levered, as they were BVI companies, he is not a BVI lawyer, and he was not involved in their formation.  (Delandmeter Decl. ¶ 11.)  Nonetheless, the allegation is taken as true herein solely for the sake of argument on this motion.

[2]    "AML" is defined in the SAC as Access Management Luxembourg S.A., a Luxembourg *société anonyme* (corporation) that served as Luxalpha's portfolio manager from November 17, 2008 until Luxalpha's liquidation (in April 2009) (SAC ¶¶ 92-93, 99), as Luxalpha's portfolio adviser from February 5, 2004 until August 11, 2004 (*id*. ¶ 93), and as Groupement Financier's and Groupement Levered's investment adviser until 2007 (*id*. ¶ 93).

      "AP (Lux)" is defined in the SAC as Access Partners S.A. (Luxembourg), a Luxembourg *société anonyme* that served as Luxalpha's investment advisor from February 13, 2007 through Madoff's collapse (in December 2008) (SAC ¶¶ 95-96), and allegedly as "advisor" of Groupement Financier and Groupement Levered beginning in 2007 (*id*. ¶ 96).

      "AIA Inc." is defined in the SAC as Access International Advisers, Inc., the parent company for certain other Access entities.  (SAC ¶ 76.)

contacts.  This omission is particularly glaring because the Trustee's allegations fail to

distinguish Delandmeter's role as "director" of the Luxembourg companies from typical U.S.

corporate directorships.  Under Luxembourg law, a legal advisor such as Delandmeter often sits

on the board of directors, but he is legally precluded from engaging in the day to day business of

the enterprise.  (*See* Delandmeter Decl. ¶¶ 17-19 & Ex. A, *Commission de Surveillance du*

*Secteur Financier* ("CSSF"), Ch. VII, § 2.6 (providing that "a lawyer cannot be involved in the

daily management of a financial professional.  Thus, a lawyer who sits on a board of directors of

a financial professional will by no means be able to interfere in the daily management which *in*

*fine* shall be delegated to other persons formally authorized by the CSSF as the persons in charge

of the daily management.").)

       C.      <u>**The SAC's Group Allegation Concerning an Alleged Red Flag**</u>

      Besides the allegations that Delandmeter served as a director of and/or legal

advisor to various defendants, the SAC contains only two other allegations naming Delandmeter,

which are addressed here and in the next subsection, respectively.

      The Trustee includes a single allegation insinuating in conclusory terms that

Delandmeter was aware of an alleged "red flag" around BLMIS's purported options trading

(SAC ¶ 227), but it is contradicted by more specific allegations elsewhere in the pleading.  The

Trustee alleges that, in 2006, defendant and New York resident Thierry Villehuchet asked

defendant and Connecticut resident Theodore Dumbauld "to look at options purportedly being

traded by BLMIS."  (*Id.* ¶ 83, 85, 221.)  Dumbauld allegedly tried but was unable to reconcile

trade confirmations received from BLMIS with information in a certain database, which the

Trustee identifies only as "the OCC database" and whose scope and content the Trustee does not

allege.  (*Id.*)  Mr. Villihuchet allegedly asked Dumbauld to get a second opinion, and "Access"

(the Trustee's defined term comprising all Access entities collectively, but excluding any

individuals) hired a consultant named Chris Cutler.  (*Id.* ¶¶ 223-24.)  Cutler allegedly "confirmed

Dumbauld's concerns about reported options trades."  (*Id.* ¶ 226.)  The SAC alleges that Cutler's

opinions were communicated to "Access's inner circle"—consisting of Mr. Villhechet,

Dumbauld, defendant Patrick Littaye, and an individual named Chantal Lanchon—through an

"oral report" at a "lunch meeting at the University Club in New York" in "late April or early

May 2006," and "were not shared with anyone else at Access."  (*Id.* ¶¶ 266-72.)

Despite not naming Delandmeter as one of the four individuals exclusively privy

to Cutler's opinions, the Trustee then implies, without actually averring, that Delandmeter was

aware of Cutler's opinions by alleging that "the Access Defendants, including Littaye *and*

*Delandmeter*—who sat on Luxalpha's Board of Directors with UBS executives—purposely

concealed the problem" (SAC ¶ 227, emphasis added), by "hid[ing] behind a disclaimer stating

that Access does not validate the accuracy of the monthly portfolio movements reported by

BLMIS" (*id.* ¶ 228).  Paragraph 228 does not say in what document this "disclaimer" appears, to

whom it was circulated, who was responsible for preparing the document, or whether the

disclaimer was already present before the alleged Dumbauld or Cutler analyses.

Later paragraphs, however, make clear that the referenced report and disclosure

had nothing to do with Delandmeter.  The SAC alleges that Littaye cut short Cutler's oral report

at the "inner circle's" lunch meeting (SAC ¶ 269); that there was no follow-up conversation and

Cutler was never given further feedback on his options volume opinion (*id.* ¶¶ 270-71); that

"Cutler's findings were not shared with anyone else at Access" (*id.* ¶ 272); and that Cutler

testified in deposition that it was "understood" that his findings "would not be shared beyond

those who attended the University Club lunch meeting" (*id.*), which did not include

Delandmeter.  Allegedly, a few days after the New York lunch meeting, on May 12, 2006 the

"Access Products Committee" held a meeting, including the "inner circle" of Littaye, Mr.

Villehuchet, Dumbauld, and Lanchon, at which it was discussed that a disclosure should be

added to a monthly report on monthly portfolio movements stating "that AIA is dependent on

information provided to us by BMI and that we do not validate the accuracy of that

information." (*Id*. ¶ 273.)  The SAC does <u>not</u> allege:  what "the Access Products Committee"

was, that Delandmeter was a member of it, that he attended the meeting, or that he had anything

to do with preparing any monthly portfolio reports.

Thus, the single, conclusory line in Paragraph 227 about Delandmeter being one

of "the Access Defendants" who "purposefully concealed the problem" allegedly raised by

Cutler (SAC ¶ 227), is contradicted by the specific allegations of the SAC that exclude

Delandmeter from the "inner circle" of individuals who received Cutler's opinion and allegedly

adjusted the wording of certain reports in response (*id*. ¶¶ 268, 273).

**D.    The SAC's Allegation Concerning
<u>Subsequent Transfers to Delandmeter</u>**

The SAC's final allegation naming Delandmeter, avers, without providing any

specifics, that Delandmeter received subsequent transfers of BLMIS customer property.  The

Trustee alleges only that:

(1)    Delandmeter received approximately $350,000 from Luxalpha in payment for
legal services (without alleging when);

(2)    Delandmeter received payment for legal services from Groupement Financier
(without alleging when or how much); and

(3)    "Upon information and belief," AIA Ltd., AIA LLC, AP (Lux), and AML
"directly or indirectly" paid Delandmeter for legal services (without alleging who
paid, when, or how much), and those unidentified payments came out of monies
that those entities directly or indirectly received at unspecified times and in
unspecified amounts from Luxalpha, Groupement Financier, and Groupement
Levered.  (SAC ¶ 336.)

Paragraph 336 describes these largely unidentified fee payments as "Subsequent Transfers" without attempting to connect any of them with any of the initial transfers alleged and identified in SAC Exs. B-C, or to otherwise show that even one penny originated from BLMIS.

## ARGUMENT

## I.

## THE TRUSTEE IMPERMIISBLY RELIES ON CONCLUSORY ALLEGATIONS AND GROUP PLEADING IN A FAILED ATTEMPT TO PLEAD JURISDICTION OVER DELANDMETER.

On a Rule 12(b)(2) motion to dismiss, the plaintiff bears the burden of making a prima facie showing of jurisdiction over the defendant by pleading, in good faith, legally sufficient allegations of jurisdiction. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990); *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998). A prima facie showing requires more than "some evidence" that jurisdiction over the defendant is proper; a plaintiff must instead plead "facts which, if true, are sufficient in themselves to establish jurisdiction." *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010).

In order to satisfy its prima facie pleading burden, the plaintiff cannot rely on "[c]onclusory non-fact-specific jurisdictional allegations," nor is the Court required to accept as true a "legal conclusion couched as a factual allegation." *Jazini*, 148 F.3d at 185. Instead, the plaintiff must plead *specific* facts showing jurisdiction. *See M. Shanken Commc'ns, Inc. v. Varian Events, LLC*, 2010 WL 4159476, at *3 (S.D.N.Y. Oct. 7, 2010); *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 502 (S.D.N.Y. 2004); *Nuevo Mundo Holdings v. Price Waterhouse-Coopers LLP*, 2004 WL 2848524, at *5 (S.D.N.Y. Dec. 9, 2004).

Each fraudulent transfer is a separate claim, *cf. Metzeler v. Bouchard Transp. Co. (In re Metzeler)*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986), and the Trustee "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of Am.*

*Corp.*, 883 F.3d 68, 83 (2d Cir. 2018); *accord City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 416, 432 (S.D.N.Y. 2020). Additionally, in cases with multiple defendants, the plaintiff must plead personal jurisdiction individually, for each defendant. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed *individually*." (emphasis added)); *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (holding that the "requirements of *International Shoe* [] must be met *as to each defendant*" (emphasis added)). Accordingly, a complaint will be dismissed for failure to sufficiently allege personal jurisdiction if it relies on group pleading, by attributing jurisdictional contacts to a group of defendants without identifying which individual defendants had the alleged contact. *See Berdeaux v. OneCoin Ltd.*, --- F. Supp. 3d ---, 2021 WL 4267693, *7 (S.D.N.Y. 2021).

Here, the Trustee fails to set out, as required, "facts which, if true, are sufficient in themselves to establish jurisdiction," *Tamam*, 677 F. Supp. 2d at 725, and instead relies on unsupported legal conclusions. For example, in SAC paragraph 22—the only paragraph to make specific jurisdictional averments—the Trustee makes the conclusory allegation that "[e]ach defendant has maintained minimum contacts with New York in connection with the claims alleged in this adversary proceeding." (SAC ¶ 22.) This allegation lacks specific facts and serves merely as the type of "legal conclusion couched as a factual allegation" that courts have long held are insufficient to establish jurisdiction. *Jazini*, 148 F.3d at 185. Indeed, nowhere in the SAC does the Trustee plead any specific fact demonstrating that Delandmeter had any contact with the United States, let alone the type of contact necessary to establish jurisdiction. Nor does the Trustee establish that his claim against Delandmeter arose out of or relates to whatever contacts he claims Delandmeter had with New York or the United States.

Moreover, the SAC fails to specifically identify which defendant allegedly

engaged in wrongful conduct or purportedly had the requisite contact with the United States.

The Trustee instead lumps the 17 Defendants together in various configurations for the purposes

of his allegations.  Delandmeter is variously grouped with "Access Defendants"—defined as a

sprawling collective of five Bahamian, Luxembourg, and U.S. entities, a "d/b/a" name, and four

Belgian, French, and U.S. individuals (*see* SAC ¶¶ 2, 6, 9, 10, 12, 15, 16, 22, 68, 82, 138, 156,

209, 227-28, 315-16, 318, 320, 322-23, 332)—and with "Luxalpha Director Defendants" (*see id.*

¶¶ 101-103) and "Feeder Fund Director Defendants" (*see id.* ¶¶ 22, 108), as well as combinations

of those groups and other named defendants.  For example, Delandmeter is lumped together with

all 17 Defendants in an allegation that "the Defendants have or had offices in New York, are

doing or did business in New York, and/or transact or transacted business in New York."  (*Id.*

¶ 22.)  This failure to plead jurisdictional facts specific to Delandmeter individually is

insufficient as a matter of law.  *See Rush*, 444 U.S. at 332 (it is "plainly unconstitutional" to

aggregate defendants' forum contacts together, as the "requirements of *International Shoe* []

must be met as to each defendant").

In addition, throughout the SAC, the Trustee alleges that one particular Access

Defendant (or Feeder Fund Director Defendant or Defendant) took some action, and then on that

basis elsewhere alleges that "the Access Defendants" (or "the Feeder Fund Defendants" or "the

Defendants") took the action, creating the misimpression that each and every person in those

defined groups took such action.  For example, from specific allegations that two particular

Defendants, UBS AG and AIA LLC, had New York offices (*see* SAC ¶¶ 63, 86), the Trustee

elsewhere alleges that all Defendants had minimum contacts with New York because "the

Defendants" had New York offices (*id.* ¶ 22).  Thus, while the latter allegation gives the

impression that every one of the 17 Defendants in this action had a New York office, the Trustee

alleges facts showing only that two of them did.[3]  That pleading technique of presenting the

action of one defendant or some defendants as the action of all defendants is improper,

misleading, and insufficient to establish personal jurisdiction over Delandmeter.

Courts in this District have held that instances of group pleading far less

egregious than those in the SAC are insufficient to establish personal jurisdiction.  For example,

in *Berdeaux*, the plaintiff sought to establish personal jurisdiction against four individual

defendants he accused of aiding and abetting a Ponzi scheme.  The complaint grouped the four

individuals together and referred to them collectively as "the Scott Group Defendants."  --- F.

Supp. 3d at ---, 2021 WL 4267693, *7.  Judge Caproni held that such group pleading was

insufficient to establish personal jurisdiction over any of those defendants, and rejected as

"plainly impermissible" the same pleading techniques used here:

> Plaintiffs' complaint is riddled with instances of improper group
> pleading, in which they refer to actions taken by 'the Scott Group
> Defendants,' without distinguishing in the least among the four
> Defendants whom Plaintiffs[] have lashed together in their
> complaint.  Similarly, Plaintiffs often attempt to extend an
> allegation levied against one particular Defendant to the remaining
> Defendants in the group, seemingly without any basis for doing so,
> absent speculative and conclusory allegations.  This tactic is
> plainly impermissible to satisfy Plaintiffs' burden to establish a
> prima facie case of personal jurisdiction against each Defendant as
> to each claim asserted.  Accordingly, the Court is unable to
> exercise personal jurisdiction over a particular defendant based on
> allegations that fail to distinguish among the Scott Group
> Defendants, leaving the Court no basis to discern who did what.

---

[3]      Relatedly, the Trustee alleges that "some" Defendants had their principal place of business in
New York (SAC ¶ 22), but the SAC alleges facts showing only that one of the Defendants (namely, AIA
LLC, not Delandmeter) had its principal place of business in New York (*id.* ¶ 86).

*Id*. (citations omitted.)[4]  The Trustee here uses the same "plainly impermissible" group pleading by alleging that all defendants in a defined group took some action when the Trustee had a basis for making the allegation against only one or some of them.  Indeed, the group pleading here is even more egregious than in *Berdeaux*.  There, the complaint was impermissibly vague for failing to distinguish among four individual defendants.  Here, the Trustee's defendant group "Access Defendants" includes ten entities and individuals, and his allegations about "the Defendants" fail to distinguish among 17 entities and individuals.

Because the Trustee relies on averments that are not fact specific and on group pleading, the SAC fails to establish jurisdiction over Delandmeter.

## II.

## THE TRUSTEE FAILS TO ESTABLISH THAT DELANDMETER HAD MINIMUM CONTACTS WITH NEW YORK OR THE UNITED STATES.

The Trustee seeks to assert both general and specific jurisdiction over Delandmeter pursuant to CPLR § 301 (general jurisdiction) and CPLR § 302 (specific jurisdiction) as well as Bankruptcy Rule 7004.  (SAC ¶ 22.).  Bankruptcy Rule 7004(f) allows

---

[4]    *Berdeaux* is only one of many cases applying the same teachings.  *See, e.g.*, *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd*., 2021 WL 918556, at *15 (S.D.N.Y. Mar. 10, 2021) (allegations that "Defendants" sent emails to New York were insufficient to establish specific jurisdiction over any of three individual defendants because "[i]n relying on group pleading, in which it conflates multiple parties and fails to provide specific allegations, Plaintiff neglects its burden of establishing personal jurisdiction over each defendant"); *In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) (because "[a]llegations in the form of a group pleading are insufficient, even for affiliated corporate entities," complaint that attributed jurisdictional contacts to "Credit Suisse" was insufficient where that term was defined to comprise four different defendants); *Tera Grp. v. Citigroup, Inc.,* 2018 WL 4732426, at *2, 3 (S.D.N.Y. 2018) ("This group pleading—conflating UBS AG and UBS Securities LLC as 'UBS'—fails to establish jurisdiction over 'each defendant.' …. Tera resorts to group pleading of the rankest kind, pointing to all of the defendants as a group of 'Dealer Defendants' – a unit that comprises a dozen multinational financial institutions.  Seeking to impute those activities to the RBS Foreign Defendants is plainly insufficient, because '[e]ach defendant's contacts with the forum … must be assessed individually.'" (citations omitted)).

the Court to exercise personal jurisdiction over a person only where there is a showing that "the

exercise of jurisdiction is consistent with the Constitution and laws of the United States."[5]

To establish <u>general jurisdiction</u> over a defendant who is an individual (such as

Delandmeter) consistent with the Constitution, the plaintiff ordinarily must show that the

defendant individual is domiciled in the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 137

(2014); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018); *Magdalena v. Lins*, 123

A.D.3d 600, 601 (1st Dep't 2014). Domicile is "the place where a person has his true fixed

home and principal establishment, and to which, whenever he is absent, he has the intention of

returning." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000); *accord Chen v.

Guo Liang Lu*, 144 A.D.3d 735, 737 (1st Dep't 2019) ("Domicile means living in a locality with

intent to make it a fixed and permanent home." (cleaned up)).

The exercise of <u>specific jurisdiction</u> is consistent with the Constitution only where

both of two conditions are met: <u>first</u>, the defendant must have "purposefully availed [him]self of

the privilege of conducting activities within the forum State, thus invoking the benefits and

protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), <u>and</u>, <u>second</u>, the

plaintiff's claim must "arise out of or relate to the foreign [defendant's] activities in the forum

State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Specific

---

[5]    As relevant here (where plaintiff does not allege a tortious act or ownership of New York real
property by Delandmeter or that he contracted to provide goods or services in the state), CPLR
§ 302(a) provides personal jurisdiction over an out-of-state defendant only if (i) the defendant "transacts
any business within the state" of New York and (ii) the plaintiff's claim "arises from" such business
activity. CPLR § 302(a)(1). As interpreted by the New York Court of Appeals, the two prongs of CPLR
§ 302(a)(1) are largely coextensive with the purposeful availment and "arises out of or relates to"
requirements of the due process test described above. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239,
246-49 (2d Cir. 2007) (examining New York Court of Appeals cases). Thus, under either CPLR
§ 302(a)(1) or Bankruptcy Rule 7004(f), the statutory analysis largely collapses into the constitutional
analysis set forth in the text above, albeit with one difference: Under the CPLR, defendant must have the
required minimum contacts with New York, whereas under the Bankruptcy Rule, the required contacts
are those with the United States as a whole.

jurisdiction can thus only apply where the claim against a particular defendant arises out of or relates to that defendant's purposeful activity in the forum. *See In re Teligent, Inc.*, 2004 WL 724945, at *6 (Bankr. S.D.N.Y. Mar. 20, 2004).

Here, the only paragraph in the SAC that addresses personal jurisdiction is Paragraph 22, and it fails to establish either general or specific jurisdiction over Delandmeter. Its allegations never once mention Delandmeter by name, and they are contradicted by other allegations in the complaint identifying Delandmeter as a Belgian citizen, on the board of Luxembourg corporations. (SAC ¶¶ 84, 102.) Moreover, the allegations are generalized and purport to characterize all Defendants' contacts, but the Trustee's specific allegations exclude Delandmeter from the contacts generally alleged in Paragraph 22.

### A.    The Trustee's Allegations Fail to Establish General Jurisdiction.

Delandmeter is not subject to general jurisdiction in New York or the United States because he is not domiciled in New York or the United States, *see Daimler*, 571 U.S. at 137, and the Trustee does not allege otherwise. The SAC admits that Delandmeter is a Belgian citizen (SAC ¶¶ 84, 102), and Delandmeter has affirmed that he has resided in Luxembourg at all relevant times, and that he has never had a residence in New York or the United States (Delandmeter Decl. ¶¶ 2, 8). Because the Trustee has done nothing to allege that Delandmeter is the "exceptional case" post-*Daimler* where a defendant's "affiliations with the State" (as distinguished from his "in-forum contacts") are "so continuous and systematic" that he should be deemed "essentially at home" in the United States despite being domiciled in Europe, *Daimler*, 571 U.S. at 139 & n.19, Delandmeter is not subject to general jurisdiction here.

### B.    The Trustee's Allegations Fail to Establish Specific Jurisdiction.

The Trustee's attempts to establish specific jurisdiction in Paragraph 22 are likewise unavailing. Allegations that unspecified Defendants "delivered agreements or caused

agreements to be delivered in New York relating to BLMIS," and "communicated regularly with

persons in New York . . . and also sent and/or received funds to and/or from BLMIS in New

York, utilizing New York banks" fail due to lack of factual specificity and impermissible group

pleading. These allegations also fail to establish that the claim against Delandmeter arose out of

or relates to any contact by Delandmeter through which he purposefully availed himself of the

privilege of doing business in the forum.

Although the allegations in Paragraph 22 are the only ones explicitly directed to

personal jurisdiction, an examination of the allegations in the remainder of the SAC, as well as

those made in the Trustee's opposition to prior motions to dismiss his first Amended Complaint,

reveal no support for exercising specific jurisdiction over Delandmeter.

## 1.    Allegations Naming Delandmeter Specifically

The Trustee only mentions Delandmeter a handful of times in the 97-page SAC,

mostly to identify alleged roles as director or legal adviser to various defendant and non-party

entities, most of which were Luxembourg companies. (*See* SAC ¶¶ 84, 102, 107, 319, which are

described in detail in Facts § B above.) None of those allegations is a legally sufficient basis

upon which to exercise personal jurisdiction.

To begin with, even assuming for the purposes of argument that each of the

mostly foreign entities or individuals for whom he allegedly served as a director or provided

legal services is subject to personal jurisdiction in the United States—and Delandmeter does not

concede that they are—those other parties' jurisdictional contacts cannot, as a matter of law, be

imputed to Delandmeter based on his role as board member or legal advisor. *See In re*

*AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) ("A person's status as a

board member is not alone sufficient to establish jurisdiction."). Instead, the Court must look at

the specific actions the board member took to establish whether jurisdiction over him, in his

individual capacity, is appropriate. *See Charas v. Sand Tech. Sys. Int'l, Inc.,* 1992 WL 296406,

at *4-5 (S.D.N.Y. Oct. 7, 1992) ("Jurisdiction over the representatives of a corporation may not

be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual

officers and directors must be based on their individual contacts with the forum state.");

*AstraZeneca*, 559 F. Supp. 2d at 467 (personal jurisdiction over U.K. directors not sufficiently

pled where complaint contained no non-conclusory allegations that they conducted any business

in United States specifically related to drug at issue in plaintiff's fraud claims).

        The Trustee, however, fails to allege any facts describing any action Delandmeter

took as a board member or legal advisor, and thus provides no basis for determining that

Delandmeter purposefully availed himself of the privilege of doing business in New York or the

United States.  The mere allegation that Delandmeter, a Belgian and Luxembourgish citizen

residing in Luxembourg, sat on the boards of, or provided legal advice to, various foreign entities

cannot, without more, establish personal jurisdiction in New York or the United States.

        The complaint also contains one sentence naming Delandmeter as being among

the group comprising "the Access Defendants," who allegedly purposefully concealed a red flag

raised by a consultant's analysis of Madoff's option trades instead of investigating further.  (SAC

¶ 227.)  Even if this allegation were true (which the complaint's more specific allegations show it

is not, *see* Facts § C above), Delandmeter's alleged concealment or inaction in Luxembourg does

not amount to purposefully availing himself of the protection and benefit of U.S. law.

        Finally, the Trustee makes the conclusory allegation that the foreign entities

Luxalpha, Groupement Financier, and possibly some of the Access entities, paid him unspecified

amounts at unspecified times for the legal services he provided in Luxembourg, and that the

money for those unspecified payments ultimately came, directly or indirectly, from BLMIS.

(SAC ¶ 336.)   The Trustee does not allege that any payment was made to Delandmeter in or

from New York.   The law is clear that a foreign defendant's receipt of money outside of the

United States does not constitute "transacting business" in the United States simply because the

money originated there.   *See Landau v. New Horizon Partners, Inc.*, 2003 WL 22097989, at *6

(S.D.N.Y. Sept. 8, 2003) (declining to exercise personal jurisdiction over Swedish defendant

where plaintiff alleged that money was transferred from New York to defendant in Sweden

because "[t]he source of funds that the plaintiff used does not indicate that [defendant] ever

transacted business in New York").   Delandmeter thus did not purposefully avail himself of the

privilege of doing business in New York by receiving payment for legal services in Luxembourg.

### 2.   Allegations Naming "Access Defendants"

Delandmeter is included as one of the "Access Defendants"—defined as AIA

Inc., AIA LLC, AIA Ltd., AML, AP (Lux), a purported enterprise doing business as "Access

International Advisors," Patrick Littaye, Thierry Villehuchet, Ted Dumbauld, and

Delandmeter—presumably due to his status at unspecified times as a board member of AML, AP

(Lux), and AIA Inc.   (SAC ¶¶ 2, 84.)   None of the group allegations against "the Access

Defendants" suffices to establish personal jurisdiction over Delandmeter.

Paragraph 22 alleges that "The UBS Defendants, *the Access Defendants*, the

Feeder Fund Defendants, and the Feeder Fund Director Defendants (defined below), delivered

agreements or caused agreements to be delivered in New York, relating to BLMIS."   (SAC ¶ 22,

emphasis added.)   Collectively, these defined defendant groups comprise all defendants in the

action except Mr. Villehuchet's widow Claudine and the two liquidator defendants.   But the only

specific allegations included to support the expansive general allegation in SAC ¶ 22 identify

only two specific defendants, and Delandmeter is not one of them.   The SAC alleges that "Each

Feeder Fund Defendant [defined as Luxalpha and Groupement Financier] executed, or caused to

be executed, BLMIS Account Opening Agreements (as defined herein) for its account and

delivered, or caused those documents to be delivered to BLMIS at BLMIS's headquarters at 885

Third Avenue, New York, New York." (SAC ¶ 324.) Thus, only two other Defendants, and not

Delandmeter, are implicated by the specific allegations later in the complaint.[6]

       Paragraph 22 also alleges that "certain of the UBS Defendants and Access

Defendants [1] communicated regularly with persons in New York regarding the Feeder Fund

Defendants and/or BLMIS, and [2] also sent and/or received funds to and/or from BLMIS in

New York, utilizing New York banks." (SAC ¶ 22.) But the SAC identifies only one UBS

Defendant (namely, UBS Luxembourg S.A.) and only three Access Defendants (namely, Littaye,

Mr. Villehuchet, and Dumbauld) as having corresponded or met with persons in New York (*see*

SAC ¶¶ 70, 80, 178, 268, 279, 291, 294). The SAC identifies one specific UBS Defendant

(namely, UBS Fund Services Luxembourg S.A.) as handling subscriptions or redemptions for

one of the feeder funds (Groupement Financier) (*see* SAC ¶ 136), but does not identify any

specific "Access Defendant"—and in particular does not identify Delandmeter—as sending or

receiving funds to or from BLMIS in New York. Thus, none of the SAC's allegations directed

to personal jurisdiction actually pertains to Delandmeter or otherwise identifies any alleged

contact by Delandmeter with New York, nor do they show that the Trustee's claim against

Delandmeter arises out of or relates to any contact by Delandmeter with the forum.

       The Trustee alleges in summary terms that "the Access Defendants" "shielded

Madoff and BLMIS from scrutiny," recognized "warning signs at BLMIS," and "acceded to

---

[6]    Even as those two defendants, sending to New York a copy of an agreement executed outside the state does not constitute purposeful availment of New York law. *See Kimco Exch. Place Corp. v. Thomas Benz, Inc.,* 34 A.D.3d 433, 434 (2d Dep't 2006) ("The defendants' acts of faxing the executed contracts to New York . . . do not qualify as purposeful acts constituting the transacting of business.").

abnormal practices" at BLMIS.  (SAC ¶¶ 9, 10, 12.)  Even if these allegations were true,

knowledge of possible unlawful acts does not indicate that a foreign defendant purposely

directed any action towards the United States.  Possession of knowledge is a passive act.  In any

event, as shown in detail above, when the SAC seeks to substantiate these summary allegations

with specifics, it names only a few particular defendants comprising what the Trustee calls

"Access's inner circle," and Delandmeter is not included.  *See* Facts § C above.

    The SAC asserts that "[t]he Access Defendants and the UBS Defendants worked

together to extend Madoff's fraud to European investors."  (SAC ¶ 15.)  That claim facially

alleges only contacts with Europe.  Likewise, allegations that "the Access Defendants" worked

closely with "the UBS Defendants," principally those in Luxembourg, "for purposes of creating

and growing Luxalpha's and Groupement Financier's investments in BLMIS" (*id.* ¶¶ 315, 316,

318, 320), assert only that European entities engaged in business dealings with other European

entities, in Europe, to solicit European investors.  The United States does not enter the equation,

and, most importantly, Delandmeter's role in that activity, if any, is never alleged.  Similarly,

allegations that unspecified "Access Defendants" received Luxalpha's and Groupement

Financier's BLMIS account statements, and that they served in "advisory and managerial roles"

with the two funds (*id.* ¶¶ 318, 320), organized in Luxembourg and the British Virgin Islands,

respectively, do nothing to show Delandmeter purposefully availed himself of the privilege of

doing business in the United States, thereby invoking the benefit of U.S. laws.

### 3.  Allegations Naming "Feeder Fund Director Defendants"

    Delandmeter is also grouped together with other director defendants as a

"Luxalpha Director Defendant" and a "Feeder Fund Director Defendant."  (SAC ¶¶ 103, 108.)

The sole allegation in the SAC concerning any of the Director Defendants is the previously

discussed group allegation that "The UBS Defendants, the Access Defendants, the Feeder Fund

Defendants, and the Feeder Fund Director Defendants …, delivered agreements or caused

agreements to be delivered in New York, relating to BLMIS."  (*Id*. ¶ 22.)  But, as shown above,

the SAC's specific fact allegations identify two defendants (Luxalpha and Groupement

Financier) as the defendants who delivered the agreements (*id*. ¶ 324), not Delandmeter.

### 4.    Allegations Naming All Defendants

SAC ¶ 22 alleges that "Defendants" have or had offices in New York and that

"some" of them have or had its principal place of business in New York."  Again, later

paragraphs identify only Defendants UBS AG and AIA LLC as having offices in New York, and

only AIA LLC as having its principal place of business in New York (*see id*. ¶¶ 63, 86), not

Delandmeter.  The SAC's introductory paragraphs also assert in conclusory terms that

"Defendants" concealed purported red flags of Madoff's fraud (SAC ¶¶ 6-13), but again, as

shown above (Facts § C), the specific allegations of the complaint concerning those matters

name only a handful of defendants, not including Delandmeter.  None of these allegations

suffices to establish or contribute to a prima face case for specific jurisdiction over Delandmeter.

### 5.    Allegations in the Trustee's 2012 Brief in Opposition to Delandmeter's Prior Motion to Dismiss for Lack of Personal Jurisdiction

In 2012, Delandmeter and other defendants moved to dismiss the Trustee's first

Amended Complaint for lack of personal jurisdiction, but their motions were never decided

despite being fully briefed because of other developments in the case.  The Trustee opposed the

motions in a 113-page brief (ECF No. 127) ("Tr. 2012 Opp."), accompanied by 173 exhibits

taken from the vast Rule 2004 discovery he obtained, including from Access and UBS entities.

(ECF Nos. 128-1 to 128-8) ("Pergament Decl. Ex. _").  The Trustee's 2012 Opposition Brief

asserted numerous allegations against Delandmeter that had not been included in his Amended

Complaint and which now have not been incorporated into his Second Amended Complaint

either.  If the Trustee's counsel asserts these allegations again in response to the present motion despite having elected not to include them in his new pleading, it will be to no avail.  As shown below, none of counsel's unsworn assertions or the cited exhibits individually or collectively raise the Trustee's showing to a prima facie case of specific jurisdiction over Delandmeter.

> **a.      Delandmeter's actions as a board member or legal advisor
> are insufficient to subject him to personal jurisdiction.**

The Trustee's 2012 Opposition Brief tried to establish the requisite "individual contacts with the forum," *Charas,* 1992 WL 296406, at *4, by describing some actions Delandmeter took in his capacity as director or legal advisor to Luxalpha and other foreign companies.  The Trustee pointed to:  (i) Delandmeter's role in incorporating the Luxembourg company Luxalpha (Tr. 2012 Opp. at 57, 74); (ii) Delandmeter's appointment to the Advisory Committee of the Luxembourg company UBS Third Party Management Company S.A. (*id*. at 78); (iii) Delandmeter's signing of board resolutions and agreements as a director (*id*. at 77-78); and (iv) Delandmeter's actions on behalf of Luxalpha after Madoff's arrest (*id.* at 78-79).  The Trustee does not allege any of these actions occurred in the United States, nor do they evidence Delandmeter purposefully availing <u>himself</u> of the privilege of conducting activities here.

Delandmeter's legal work on Luxalpha's formation did not constitute "purposeful availment" of U.S. law and was not "purposefully directed" at the United States.  His services were rendered in Luxembourg.  And they addressed Luxembourg legal and regulatory matters surrounding Luxalpha's incorporation under Luxembourg law and its registration with the Luxembourg financial regulator, CSSF.  (Delandmeter Decl. ¶ 28.)

Delandmeter's appointment to the Advisory Committee of UBS Third Party Management Company S.A. provides no support for jurisdiction.  The Trustee cites a September 22, 2006 agreement between one Luxembourg company, UBS Third Party Management, and

another Luxembourg company, UBS (Luxembourg) S.A., executed in Luxembourg and

governed by Luxembourg law, which contemplated the formation of an Advisory Committee

that could make recommendations to UBS Third Party Management with respect to the

management of Luxalpha, and named Delandmeter as one of five initial members of the

committee. (Pergament Decl. Ex. 54 at LuxAlpha00697, 00699, 00703, 00704.) The Trustee

does not allege that the committee ever met or took any action.[7] Thus, while the Trustee has

identified a contract defining a role, he has not alleged that Delandmeter actually did anything in

that role and has not identified any contacts with the United States resulting from that role.

        The fact that Delandmeter signed various board resolutions and agreements in his

capacity as a director of foreign companies,[8] is insufficient as a matter of law. Allegations that a

---

[7]        In fact, the committee never met or did anything. (*See* Delandmeter Decl. ¶¶ 49-51.)

[8]        The Trustee cited Luxalpha board resolutions signed by Delandmeter along with four or five
other directors *(see* Tr. 2012 Opp. at 7-8, 76-78), namely, Pergament Decl. Ex. 8 (authorizing the opening
of a BLMIS account in the name of Luxalpha c/o UBS (Luxembourg) S.A.), Ex. 12 (approving two
sentences describing investment policy to be include in prospectus), Ex. 13 (approving various defendant
UBS and Access Luxembourg entities for management, administrative, and custodial roles with the fund),
Ex. 14 (approving agenda of matters to be proposed at the annual general shareholders meeting), Ex. 15
(same), Ex. 71 (same), Ex. 16 (accepting request by fund's auditor to approve methodology for
calculating UBS (Luxembourg) S.A.'s portfolio management fee), Exs. 73-81 (noting that risk
management has been performed without observation of significant irregularities in a given quarter,
according to reports provided to the board by the investment manager and investment adviser).

        The Trustee also cited two agreements co-signed by Delandmeter as a Luxalpha director, each
with Luxembourg companies on both sides, governed by Luxembourg law, and executed in Luxembourg:
a February 2004 Portfolio Management Agreement between Luxalpha and UBS Third Party Management
Company S.A. (Pergament Decl. Ex. 23), and a September 2006 Management Company Services
Agreement between Luxalpha and Access Management Luxembourg S.A. (*id*. Ex. 52).

        Last, the Trustee cited two documents for a separate Cayman Islands fund that is not at issue in
this action, called Benouville Finances Ltd.: September 2008 BLMIS account opening agreements co-
signed by Littaye and Delandmeter as directors of Benouville; and a customer claim in the BLMIS
liquidation signed by Delandmeter for Benouville (Pergament Decl. Exs. 170-71). Because each claim is
considered separately for purposes of measuring jurisdictional contacts, *see Charles Schwab*, 883 F.3d at
83, and the Second Amended Complaint does not allege any fraudulent transfer claim related to
Benouville, no claim in this adversary proceeding "arises out of or relates to" anything done by or on
behalf of Benouville. Thus, the fact that Delandmeter signed those documents adds nothing to showing a
prima facie case for exercising specific jurisdiction over Delandmeter here.

foreign defendant signed documents abroad in his corporate capacity cannot support a finding of personal jurisdiction over that defendant. *See Sedona Corp. v. Ladenburg Thalmann & Co.*, 2006 WL 2034663, at *9 (S.D.N.Y. July 19, 2006) (no personal jurisdiction over foreign defendants because they could not "reasonably anticipate being haled into court" in New York based on allegations that each signed documents in their corporate capacity while in a foreign country); *Dep't of Econ. Dev. v. Arthur Anderson & Co.*, 747 F. Supp. 922, 928–29 (S.D.N.Y.1990) (corporate director was not subject to jurisdiction under § 302(a)(1) where he ratified a contract to be performed in New York during board meeting in Northern Ireland and countersigned a letter addressed to New York); *Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628, 635 (S.D.N.Y. 2008) (no jurisdiction over German resident based on his signing and sending letter, in his capacity as chairman of the board, to corporation's shareholders residing in New York). Nothing in the documents on which the Trustee relies suggests that Delandmeter signed them anywhere except in Luxembourg or in any capacity other than as a director of a foreign company, nor did he. (*See* Pergament Decl. Exs. 8, 71, 73-81; Delandmeter Decl. ¶¶ 32-34.) Delandmeter's signature as director on these documents thus fails to demonstrate that he purposefully availed himself of the benefits and protections of New York or U.S. law.[9]

The Trustee also contended that jurisdiction is appropriate because, after Madoff's arrest, Delandmeter "notified the key Luxalpha players of the suspension of Luxalpha and the necessity to notify the Luxembourg financial regulator" (Tr. 2012 Opp. at 78, citing

---

[9] Only one of the cited Luxalpha documents relates to New York or the United States in any way: the Luxalpha board resolution authorizing the opening of a BLMIS account in the name of Luxalpha c/o UBS (Luxembourg) S.A. (Pergament Decl. Ex. 8.) But the purpose and effect of that resolution was the opening of a BLMIS account by or on behalf of the corporation Luxalpha, not the opening of a BLMIS account by the individual Delandmeter. In view of that fact, the Trustee argued in his 2012 Opposition Brief that Luxalpha's corporate contacts should be imputed to Delandmeter personally on the theory that Luxalpha took such acts as Delandmeter's agent. But as shown below, the Trustee has not alleged facts necessary to support a finding of agency. *See* Point II.B.6 below.

Pergament Decl. Ex. 82), and "participated in three days of post-collapse board meetings" (*id.*, citing Pergament Decl. Exs. 83-85). Those exhibits evidence the actions of a Luxembourg attorney advising his Luxembourg-based client, in Luxembourg, on Luxembourg regulatory and legal matters. (Delandmeter Decl. ¶¶ 40-42.) Though Madoff's arrest and the collapse of BLMIS occurred in New York, it was the effect those events had on Luxembourg-based entities under Luxembourg law that Delandmeter addressed. (*Id.* ¶ 42). To claim that these actions were somehow directed at the United States—as opposed to being a reaction to events that took place in the United States—or that he was trying to avail himself of the benefits of U.S. law—as opposed to securing his client the protection of Luxembourg law—makes no sense.[10]

In addition, even if any of those purported contacts had qualified as purposeful availment (and they do not for the reasons discussed above), none of them meets the second prong of the test for specific jurisdiction: The Trustee's single Section 550(a) claim to recover fees paid to Delandmeter as alleged subsequent transfers, does not "arise out of or relate to" any of Delandmeter's foregoing actions in Luxembourg as a director of or legal adviser to foreign companies. No action taken by Delandmeter as a *director* of Luxalpha, AML, AP (Lux), or AIA Inc. supports specific jurisdiction, because he did not receive any director's fees from any of those entities (*see* Delandmeter Decl. ¶¶ 20, 24, 27, 35) and therefore no claim to recover fees from Delandmeter could arise out of or relate to his actions as a director of those companies.

---

[10]    Relatedly, in his 2012 Opposition Brief, the Trustee suggested, based on the minutes of a Luxalpha Board of Directors meeting held after Madoff's arrest, that Delandmeter may have been paid €5 million for legal work in connection with Luxalpha's response to BLMIS's collapse. (Tr. 2012 Opp. at 78-79, citing Pergament Decl. Ex. 85 at 3.) That did not happen. The Trustee misread the Board minutes, as the Board was not approving a €5 million payment request by Delandmeter, but rather was acknowledging that Delandmeter had waived such request. (Pergament Decl. Ex. 85 at 3.) Although Delandmeter had initially requested the money to establish a legal defense fund at his firm for Luxalpha, UBS (Luxembourg) S.A. decided to hire a different firm, and Delandmeter subsequently withdrew his request. (Delandmeter Decl. ¶¶ 47-48 & Exs. D, E.) He was never paid €5 million by Luxalpha.

Moreover, the Section 550(a) claim cannot possibly "arise out of or relate to" Delandmeter's work as a Luxalpha director <u>after</u> Madoff's arrest on December 11, 2008, since at that time Madoff's Ponzi scheme had already collapsed and the last fraudulent transfer from BLMIS to Luxalpha or Groupement Financier alleged in the SAC had been completely nearly a month earlier, on November 19, 2008.  (*See* SAC Ex. B at 12.)

While Delandmeter did receive fees for his work as *legal advisor*, under Luxalpha's fee payment structure, Delandmeter's legal fees were paid from a reserve for administrative costs retained by Luxalpha's custodian UBS (Luxembourg) S.A., which was funded by investors' subscriptions, and segregated from the funds that were to be invested.  The funds in this reserve were not invested in, and were not funded with transfers from, BLMIS.  (*See* Delandmeter Decl. ¶¶ 43-44; Pergament Decl. Ex. 28 at 20.)  As such, the legal fees paid to Delandmeter were not derived from funds from BLMIS, nor can they be claimed to be a subsequent transfer of the same.  Consequently, the fees Delandmeter received—and the Trustee's claw back claim seeking them—do not, in any way, arise out of or relate to any purported contact created by Delandmeter's actions as a director or legal advisor in Luxembourg.

> **b.      Delandmeter's infrequent trips to the United States
> are insufficient to subject him to personal jurisdiction.**

In his 2012 brief, the Trustee also claimed that Delandmeter "purposefully availed himself of the privilege of transacting business in New York and undertook numerous actions in the state."  (Tr. 2012 Opp. at 74.)  Specifically, the Trustee's brief (1) asserted that "Delandmeter came to New York at least once or twice a year between 2004 and 2008 to make presentations about Access's funds at Access's Quarterly Strategic Meetings" (*id.* at 76); (2) insinuated that, at these meetings, Delandmeter and Access executives "promote[d] their Madoff-related funds" to clients (*id.*); and (3) contended that "Delandmeter's participation in meetings in New York to

conduct Access's and Luxalpha's business was not 'isolated' but rather was continuous and essential to the success of Access and Luxalpha" and "this proceeding arises directly out of Delandmeter's contacts with the forum" (*id.* at 75). The Trustee counsel's assertions about the meetings are contradicted by the exhibits he relies on and are incorrect.

Delandmeter visited the United States a total of five times between 2004 and 2008. (Delandmeter Decl. ¶ 52.) During some of these visits, Delandmeter attended portions of quarterly meetings held by AIA Inc. in his capacity as legal advisor to present on Access's European presence and questions of European law. (*See id.* ¶¶ 52-56.) In the few he attended, he did not discuss Madoff or anyone's investments with Madoff. (*Id.* ¶ 56.)

None of the Trustee's exhibits are to the contrary. In fact, both the deposition testimony of Access employee Philip Wogsberg (Pergament Decl. Ex. 89 at 41:23–43:12) and the Access quarterly meeting agendas (*id.* Ex. 100 at 5; Ex. 101 at 5; Ex. 102 at 3–4) that the Trustee cited (*see* Tr. 2012 Opp. at 76), demonstrate the infrequency of Delandmeter's visits and their lack of connection to the Trustee's claim against Delandmeter. Mr. Wogsberg testified that Delandmeter's attendance at Access quarterly meetings "wasn't on a regular schedule," and said "[Delandmeter] would come maybe once a year, maybe twice a year" "during the last four years or so," before revising that to say "in the last couple of years." (Pergament Decl. Ex. 89 at 42:2-5; 42:13-14; 42:19-21.) Wogsberg did <u>not</u> testify that Delamenter promoted Madoff investments to Access clients; the only person Wogsberg identified as saying anything at the meetings about Madoff was Patrick Littaye. (*Id.* Ex. 89 at 43:6-7.) Similarly, the meeting agendas demonstrate that Delandmeter attended only a short portion (under two hours) of a few of the quarterly meetings, and they identify his presentation topics as two Luxembourg funds not at issue in this action (Omega and Argent), Access's administrative structure, and Access's organization in

Europe.  (*See* Pergament Decl. Exs. 100-02; Delandmeter Decl. ¶¶ 53-55.)  Far from being

"continuous," "essential" to Access and Luxalpha's relationship with BLMIS, and directly

giving rise to this proceeding, the Trustee's exhibits indicate that Delandmeter's attendance was

sporadic, brief, and unrelated to Madoff and the fraudulent transfer claims here.

        The Trustee also noted that during one of Delandmeter's few visits to New York,

Delandmeter met with Madoff, but did not claim any business was transacted at the meeting and

did not allege it had any connection to the subsequent transferee claim against Delandmeter.  (Tr.

2012 Opp. at 76.)  As Delandmeter affirms in his Declaration, in his capacity as legal advisor to

Luxalpha, Delandmeter accompanied Littaye to a short meeting with Madoff in February 2004.

Delandmeter spoke briefly with Madoff about European law.  They did not conduct negotiations

or enter into any agreement.  And Delandmeter was not compensated for his attendance.

(Delandmeter Decl. ¶¶ 57-58.)  Such brief meetings where no contract was formed and no

transaction was concluded are insufficient to show purposeful availment.[11]

        In addition to failing to establish the "purposeful availment" prong of the test for

minimum contacts, Delandmeter's few New York meetings also fail to meet the second prong of

the test, because the Trustee's claw back claim against Delandmeter does not "arise out of or

relate to" any of his few New York meetings.  None of the meetings had anything to do with

Madoff's fraud, any investment in BLMIS or the Feeder Funds, or any redemption from BLMIS

---

[11]    *See, e.g.*, *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 380, 381-82 (1967) (travel to
New York and one-day meeting there with contract counter-party after contract had already been formed
did not rise to level of transacting any business within the state); *SPV Osus Ltd. v. UBS AG*, 114 F. Supp.
3d 161, 170-71 (S.D.N.Y. 2015) (no personal jurisdiction where defendants had only "sporadic or indirect
contacts with the United States"), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *Siegel v. Holson Co*., 768 F. Supp.
444, 446 (S.D.N.Y. 1991) ("infrequent visits to the state of New York for business and pleasure do not
indicate that [defendant] purposefully availed himself of the benefits and protections of the state's laws
for the activities involved in this suit"); *Gates v. Pinnacle Commc'ns Corp*., 623 F. Supp. 38, 42
(S.D.N.Y.1985) ("A single meeting in New York meets the requirements of NYCPLR § 302(a)(1) only
where that meeting is the beginning and end of negotiations.").

or the Feeder Funds. Accordingly, the New York meetings provide no basis for exercising

specific jurisdiction over Delandmeter.

### 6. Luxalpha Was Not Delandmeter's Agent and Its Contacts Cannot Be Imputed to Him.

No doubt in recognition of the insufficiency of Delandmeter's contacts with the

United States, the Trustee asserted in his 2012 Opposition Brief that Luxalpha's contacts should

be imputed to Delandmeter for purposes of asserting specific jurisdiction over him because,

supposedly, Delandmeter "used Luxalpha as his agent in New York." (Tr. 2012 Opp. at 18, 19,

79 n.41.) As the Trustee acknowledged (*see id*. at 18), under well-established law, for a court to

find that a corporation acted as the agent of a corporate director or officer, there must be a

showing that the corporation engaged in purposeful activities in the state, in relation to the

transaction at issue "for the benefit of and with the knowledge and consent of the defendant and

that [the defendant] exercised some control over [the corporation] in the matter." *Karabu Corp.*

*v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (Sotomayor, J.) (quoting *Kreutter v.*

*McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Even assuming *arguendo* that the Trustee could make the threshold showing of

personal jurisdiction over Luxalpha—which he cannot—Luxalpha cannot be treated as

Delandmeter's agent because the Trustee has not alleged facts sufficient to show either the

"benefit" or "control" prong of the test for agency jurisdiction, both of which are required.

### a. Luxalpha did not act for the benefit of Delandmeter, precluding the finding of an agency relationship.

The Trustee has not alleged facts showing Luxalpha transacted business in New

York for the benefit of Delandmeter. Courts routinely hold allegations of agency are insufficient

where, as here, the alleged principal did not stand to personally benefit from the corporation's

conduct in the forum. *See, e.g.*, *King Cnty. Wash. v. IKB Deutsche Industriebank AG*, 769 F.

Supp. 2d 309, 320 (S.D.N.Y. 2011) (no agency as any benefit was "attenuated and generalized");

*Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F.Supp.2d 367, 390 (S.D.N.Y. 2006); *Ivy*

*Mar Co. v. C.R. Seasons Ltd.*, 1997 WL 37082, at *6 (E.D.N.Y. Jan. 24, 1997).

The Trustee has not alleged that Delandmeter obtained a personal benefit from

any corporate action of Luxalpha.  The Trustee's only contention on the issue—speculation that

Delandmeter was "undoubtedly well compensated for his role as Luxalpha's director and legal

advisor" (Tr. 2012 Opp. at 79 n.41)—is not pled in the SAC and is incorrect.  Delandmeter

received no fees for serving as a Luxalpha director, and the fees he did receive were for the legal

services he performed and did not depend on Luxalpha's performance or profitability, or the

amount of its subscriptions or redemptions.  (Delandmeter Decl. ¶¶ 20, 35, 46.).  Delandmeter

was not paid for actions, if any, Luxalpha took in the United States.  (*Id.* ¶ 46.)

Moreover, "[c]ases finding the benefit prong . . . to be satisfied typically have

involved claims against the controlling shareholders of closely held corporations."  *Karabu*

*Corp.*, 16 F. Supp. 2d at 326 n.6; *see, e.g., Nelson A. Taylor Co. v. Tech. Dynamics Grp. Inc.*,

1997 WL 176325, at *5 (N.D.N.Y. Apr. 7, 1997) (finding personal jurisdiction over two

defendants who owned 61.5% of corporation's stock).  Delandmeter is not alleged to have been a

controlling shareholder, and he had no control over the day-to-day operations of Luxalpha.

(Delandmeter Decl. ¶¶ 18-19, 29-31.)  The Trustee thus has not established "personal benefit."

> **b.    Delandmeter did not exercise the requisite control over
> Luxalpha necessary to establish an agency relationship.**

The Trustee also has failed to meet the "some control" prong required for a

showing of agency.  "To make a prima facie showing of 'control,' a plaintiff's allegations must

sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a

'primary actor' in the specific matter in question; control cannot be shown based merely upon a

defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." *Karabu Corp.*, 16 F. Supp. 2d at 324. Where courts have found agency, the plaintiff's allegations made it "readily apparent" that the out-of-state officer was "a driving force" behind the corporation's actions in the forum. *Id.* at 325 (collecting cases).

Here, the Trustee has pled no specific facts showing Delandmeter to be the "primary actor" or "a driving force" behind anything that Luxalpha did.[12] Instead, the Trustee's allegations are precisely the type found insufficient in *Karabu Corp.* He asserts that Delandmeter was a "primary actor" because he was a director and "was involved in nearly every major decision regarding Luxalpha," inasmuch as he, along with Luxalpha's other four directors, "routinely executed board resolutions." (Tr. 2012 Opp. 77, 79 n.41.) Such actions reveal <u>participation</u>, not the requisite <u>control</u> or position as "primary actor." Indeed, the Trustee does not, and cannot, point to such control, instead casting Delandmeter as being "involved." Such allegations are insufficient. *See Barron Partners, LP v. Lab123, Inc.*, 2008 WL 2902187 at *10 (S.D.N.Y. July 25, 2008) ("Where the plaintiff has made only broadly worded or vague allegations about a defendant's participation in the action allegedly taken in New York, courts have routinely granted motions to dismiss for lack of personal jurisdiction." (collecting cases)).

Luxalpha did not act for the benefit of Delandmeter, nor was Delandmeter a primary actor exercising the requisite control over Luxalpha. As such, the Trustee has failed to

---

[12]     Taking the SAC's allegations as true for argument's sake, they make it readily apparent that, if anyone was a "driving force" behind Luxalpha's creation as a vehicle for investment with BLMIS, it was Littaye, Villehuchet, Access, and UBS. *See* SAC ¶ 1 ("Luxalpha … and Groupement Financier … trace their origins to the close friendship between Defendant Patrick Littaye and Bernard Madoff dating back to at least 1985."); ¶ 2 ("Littaye ran an investment business that was dependent on its connection to BLMIS to attract investors. … Luxalpha … [was] among the feeder funds Access established to direct investors into BLMIS."); ¶ 123 ("Before Oreades was even closed, Villehuchet and Littaye were working to establish Luxalpha as its successor."); ¶ 124 ("Luxalpha would allow Villehuchet and Littaye to continue their professional and personal relationship with Madoff and provide a vehicle into which Oreades's assets could be transferred."); ¶ 130 ("Access and UBS created Luxalpha to invest with BLMIS ….").

show that Luxalpha acted as agent for Delandmeter in taking any action in New York, and thus, Luxalpha's jurisdictional contacts, if any, should not be imputed to Delandmeter.[13]

### III.

### THE TRUSTEE HAS FAILED TO PLAUSIBLY ALLEGE THAT DELANDMETER RECEIVED BLMIS CUSTOMER PROPERTY.

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a claim must not merely be possible, but must be plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007). The complaint's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A plausible claim pleads facts "that allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the Court must accept well-pleaded factual allegations as true, it need not accept assertions that are unsupported by factual allegations. *Iqbal*, 556 U.S. at 678–79. Nor must the Court accept a "legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely," *Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

---

[13]     Even if Delandmeter had sufficient minimum contacts with the United States (which he did not), exercise of jurisdiction over him would be unreasonable as it would run afoul of the traditional notions of "fair play and substantial justice." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). Delandmeter would be greatly burdened having to defend himself thousands of miles from home, where he has no presence. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal*, 480 U.S. 102, 114 (1987); *King Cnty. Wash.*, 769 F. Supp. 2d at 321 (even if plaintiff's allegations sufficed, personal jurisdiction over foreign individual defendants would be unreasonable based on the burden of travel, expense, and time that litigating in New York would impose).

In order to state a claim against Delandmeter under SIPA, the Trustee must

plausibly allege that Delandmeter received subsequent transfers of BLMIS customer property

initially fraudulently transferred from BLMIS to Luxalpha and Groupement Financier. *See* 15

U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which,

except for such transfer, would have been customer property if and to the extent that such

transfer is voidable or void under the provisions of title 11").

The SAC fails to do this. As to Delandmeter, all the SAC alleges is that

(1) Delandmeter received $350,000 in legal fees from Luxalpha (without alleging when);

(2) Delandmeter received legal fees from Groupement Financier (without alleging when or how

much); and (3) "upon information and belief," Delandmeter received legal fees from Access

entities (without saying who paid him, when, or how much), and they (whoever they are) paid

him out of some unspecified amounts of money that they received, directly or indirectly, at some

unspecified times from Luxalpha or Groupement Financier, who in turn received the money from

BLMIS in unspecified amounts at unspecified times. (SAC ¶ 336.) Besides failing to allege the

"who, when, and how much" necessary to even identify what alleged subsequent transfers he is

attempting to recover, the Trustee makes no effort to tie any alleged subsequent transfer to any

initial transfer from BLMIS to Luxalpha or Groupement Financier.

Thus, although the SAC's exhibits contain 26 pages of small type listing hundreds

of transactions recorded in Luxalpha's and Groupement Financier's accounts at BLMIS (SAC

Exs. B & C), it fails to identify the subsequent transfers it seeks to recover from Delandmeter,

and fails to identify which, if any, of the transactions in Exhibits B and C constituted initial

transfers of BLMIS customer property that were allegedly subsequently transferred to

Delandmeter. Essentially, the Trustee is asking the Court to speculate that because BLMIS

transferred a large amount of money to Luxalpha and Groupement Financier over a long period

of time, if Luxalpha or Groupement Financier paid any legal fees to Delandmeter at any time,

then all of that money must have come from BLMIS in the six-year period.  He also asks the

Court to further speculate that if any Access entities paid legal fees to Delandmeter at any time,

then all of that money must have ultimately come from Luxalpha and Groupement Financier,

which in turn must have obtained it from BLMIS in the six-year period.

As the Supreme Court has made clear, the Federal Rules of Civil Procedure do

not permit such speculative and conclusory pleading.  To survive a motion to dismiss, a claim

must not merely be possible, but must be plausible.  *See Iqbal*, 556 U.S. at 678-79; *Twombly*,

550 U.S. at 555-57. As this Court stated in *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec.*

*LLC)*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015), barebones allegations that customer funds were

transferred to the subsequent transferee do not suffice to make the claim plausible:

> The Trustee must allege facts that support the inference that the
> funds at issue originated with . . . BLMIS, and contain the
> "necessary vital statistics"—the "who, when, and how much" of
> the transfers to establish that an entity was a subsequent transferee
> of the funds.  At the pleading stage, the Trustee is not required to
> provide a "dollar-for-dollar accounting" of the exact funds at issue.
> However, barebones allegations that the funds at issue were
> transferred to the Subsequent Transferees, without more detail, are
> insufficient.

*Id*. at 119; *see also Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 464 (Bankr.

S.D.N.Y. 2011) (same).  In *Shapiro*, the Court dismissed a conclusory subsequent transferee

claim, noting that the complaint "does not tie any initial transfer to any subsequent transfer or

Subsequent Transferee."  542 B.R. at 119.  The same is true for the instant SAC, which does not

even allege the "who, when, how much" needed to identify the alleged subsequent transfers to

Delandmeter, much less "tie any initial transfer [from BLMIS to Luxalpha or Groupement

Financier] to any subsequent transfer or [Delandmeter]."  *Compare* SAC ¶¶ 327, 336, 389-92,

*with* Second Am. Compl. ¶¶ 108, 110, 160-66 in *Picard v. Shapiro*, No. 10-5383, ECF 33

(Bankr. S.D.N.Y. July 8, 2014); *see also Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*, 409

B.R. 737, 750-51 (Bankr. E.D.N.C. 2009).[14]

       Moreover, the SAC's theory that, if Delandmeter was paid legal fees by

Luxalpha, Groupement Financier, or any Access entity at any time, those legal fee payments

must have consisted of BLMIS customer property is not plausible.  Luxalpha and Groupement

Financier maintained reserves for payment of administrative costs, such as legal fees, which

were funded by investor subscriptions.  (*See* Pergament Decl. Ex. 28 at 20 & Ex. 18 at 28;

Delandmeter Decl. ¶¶ 44-45.)  Moreover, as the Trustee alleges, Luxalpha's and Groupement

Financier's incoming subscription monies (approximately $2 billion) far exceeded the amounts

they received from BLMIS (approximately $1.1 billion), and were more than sufficient to cover

the $126 million in fees allegedly paid by the two funds to the other defendants.  (*See* SAC

¶¶ 326-27, 334-37.)  Accordingly, the Trustee's conclusory allegations that all monies sent by

Luxalpha or Groupement Financier came from BLMIS is implausible in light of the Trustee's

own allegations of cash flows into and out of Luxalpha and Groupement Financier, and cannot

be credited on a motion to dismiss.  Put another way, because "[t]here is an 'obvious alternative

explanation'" for the source of any legal fee payments to Delandmeter, "that explanation renders

[plaintiff's] competing explanation 'conceivable [but not] plausible.'"  *Garfinkle v. Conf. on*

---

[14]     The Trustee's failure to tie the alleged subsequent transfers to any particular initial transfer from
BLMIS cannot be excused on the ground that the Trustee lacks access to information.  Prior to filing the
SAC, the Trustee obtained voluminous Rule 2004 discovery from Access and UBS that should have
enabled him to adequately allege recovery of subsequent transfers, if such claims actually existed.  Thus,
this case is unlike *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, where this Court allowed the
Trustee "greater latitude" in pleading the required tie because the subsequent transfer claims there had to
"be proved through the books and records of the defendants."  515 B.R. 117, 151 (Bankr. S.D.N.Y. 2014).

*Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (quoting *Twombly*, 550 U.S. at 567, 570).

Because the SAC fails to allege the "vital statistics" of the subsequent transfers the Trustee seeks to recover from Delandmeter and does nothing to tie any alleged initial transfer to any legal fee payment (if any) made by Luxalpha, Groupement Financier, or any Access entity to Delandmeter, the SAC does not plausibly allege that Delandmeter received BLMIS customer property, and the Section 550(a) claim against him must be dismissed.

## IV.

### SECTION 546(E) BARS THE TRUSTEE'S CLAIM AGAINST DELANDMETER TO THE EXTENT THAT IT IS BASED ON INITIAL TRANSFERS MORE THAN TWO YEARS BEFORE THE PETITION DATE.

Section 546(e) bars the trustee from avoiding a transfer by, to, or for the benefit of a stockbroker or financial institution that was a settlement payment or that was a transfer made in connection with a securities contract, except for claims for intentional fraudulent conveyance under Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e). Claims under Section 548(a)(1)(A) are limited to transfers within the two-year period before the filing date. Thus, if Section 546(e) applies, then even if a claim were adequately pled under Section 548(a)(1)(A), the Trustee cannot avoid initial transfers occurring more than two years before the filing date, and therefore cannot recover property so transferred from a subsequent transferee under Section 550(a)(2).

Here, if the entire claim against Delandmeter is not dismissed on the grounds discussed in Points I – III above, then in the alternative, the Trustee's Section 550(a)(2) claim against Delandmeter should be dismissed to the extent that it seeks to recover from Delandmeter as a subsequent transferee, any initial transfer from BLMIS to Luxalpha or Groupement Financier made more than two years before the filing date (*i.e.*, before December 11, 2006), because (A) Section 546(e) applies to the initial transfers alleged in the SAC, and (B) the Trustee

has failed to plausibly allege that Delandmeter had "actual knowledge" that BLMIS was not

trading securities so as to bar Delandmeter from invoking Section 546(e) under the holding of

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 2013 WL 1609154, at *1

(S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*").[15]

      **A.**      **Section 546(e) Bars the Trustee From Avoiding Initial Transfers From BLMIS to Luxalpha or Groupement Financier Made More Than Two Years Before the Petition Date.**

      Delandmeter adopts and incorporates by reference herein Point III of the UBS

Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended

Complaint.  As shown therein: Section 546(e) applies to the initial transfers alleged in the SAC

because each involved both covered persons and covered transactions.  The initial transfers

involved persons covered by Section 546(e) both because they were made "by" a "stockbroker"

(BLMIS) and because they were made "to" "financial institutions" (Luxalpha and Groupement

Financier).  The initial transfers were covered transactions both because they were "settlement

payments" and because they were "transfers made … in connection with a securities contract."

Accordingly, the Trustee cannot avoid any of the initial transfers alleged in this adversary

proceeding that are outside the two-year limitations period for Section's 546(e)'s exception for

claims under Section 548(a)(1)(A)—*i.e.*, the Trustee cannot avoid any of the Initial Transfers

made before December 11, 2006.[16]

---

[15]      Although Delandmeter shows below that the Trustee has not plausibly alleged his "actual knowledge" of Madoff's fraud, Delandmeter's knowledge is in fact irrelevant, because there is no exception in the text of Section 546(e) based on a transferee's knowledge and *Cohmad* was wrongly decided.  When a statute creates an exemption or safe harbor, and specifies exceptions (as does Section 546(e)), courts are not free to create additional exceptions on policy or equitable grounds.  *See Law v. Siegel*, 571 U.S. 415, 424-25 (2014).  Delandmeter, however, understands that the Bankruptcy Court is bound to follow *Cohmad* until it is reconsidered by the District Court or overturned by a higher court. Delandmeter is here noting his objection to *Cohmad*'s ruling to preserve the issue for appeal.

[16]      To preserve the issue for appeal, Delandmeter joins in and adopts the argument in Point IV of the UBS Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended

B.      **The Trustee Has Not Plausibly Alleged that Delandmeter
        Had "Actual Knowledge" of Madoff's Fraud.**

The Trustee may argue that Section 546(e) does not apply because he has alleged

that "Defendants" had actual knowledge of Madoff's fraud.  Section 546(e), however, contains

no transferee "knowledge" exception and, even if it did, the SAC fails to plead individualized

factual allegations demonstrating that Delandmeter had "actual knowledge" that BLMIS was not

trading securities.  *See Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*, 2021 WL 3477479, at

*6, 15 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) (dismissing subsequent transferee claim

against Corine Noel Piedrahita where "Trustee failed to plead individualized factual allegations

that [she] had independent actual knowledge of the BLMIS fraud," even though Trustee was held

to have adequately pled the initial transferee Fairfield Funds' actual knowledge).

"Actual knowledge" requires more than "constructive knowledge" or even

"willful blindness."  *Merkin*, 515 B.R. at 139.  "'[A]ctual knowledge' implies a high level of

certainty and absence of any substantial doubt regarding the existence of a fact."  *Id*.  In *Cohmad*,

Judge Rakoff held that "actual knowledge" of Madoff's fraud was adequately pled where the

defendant was a partnership that included Madoff himself, shared office space and a computer

network with BLMIS, was privy to a database maintained by BLMIS that monitored the actual

cash value of each BLMIS account without regard to fictitious profits, and directed Madoff to

back date trades to create fictitious gains and losses.  2013 WL 1609154, at *5-6.  And in

---

Complaint that Section 546(e) also bars the Trustee from avoiding Initial Transfers made within two years
before the petition date, on the grounds that the Trustee has not sufficiently alleged a claim under Section
548(a)(1)(A) because the Trustee relies on the so-called "Ponzi scheme presumption" and that
presumption is not good law.  Based on that argument, the Trustee is also barred from recovering any
Two-Year Initial Transfers from Delandmeter as a subsequent transferee under Section 550(a)(2).
Relatedly, Delandmeter also joins in and adopts the argument in Point IV.C of the Access Defendants'
and Groupement's Memorandum of Law in Support of their Motion to Dismiss that the Trustee has not
adequately pled a Section 548(a)(1)(A) claim because he has not alleged intent to defraud with
particularity as required by Rule 9(b).

*Fairfield Investment Fund*, this Court held "actual knowledge" was adequately pled against

certain individual defendants, who were not only personally aware of the "red flags" alleged here

and in most of the Trustee's complaints, but who also affirmatively lied in response to questions

by the SEC and investors about Madoff's practices.  2021 WL 3477479, at *5-6.  In contrast,

allegations that an individual was warned Madoff could be a Ponzi scheme, half-joked about

BLMIS appearing to be a Ponzi scheme, indicated to others that there was some probability in

his mind that Madoff could be a fraud, and was aware that the options markets lacked the volume

necessary to sustain BLMIS's options trading, have been held to rise only to the level of willful

blindness, and not to the level of actual knowledge.  *Merkin*, 515 B.R. 140-41.

Here, the Trustee has made no individualized allegations of fact against

Delandmeter of the kind held sufficient to plausibly allege actual knowledge in *Fairfield

Investment Fund* or *Cohmad* (or even of the kind held to reach only the insufficient level of

willful blindness in *Merkin*).  The SAC only alleges in summary, group pleadings that

"*Luxalpha's* and Groupement Financier's awareness of BLMIS's impossible trading activity and

performance, …, and their *directors'* … deliberate actions to protect Madoff, establish

*Defendants'* knowledge of fraud at BLMIS" and that "*Defendants'* willingness to actively

impede further investigation rose to the level of actual knowledge of fraud at BLMIS."  (SAC

¶ 13, emphasis added.)  But as shown in detail above (Facts § C), when the SAC attempts to

substantiate those summary group allegations with specific facts regarding an "investigation" of

BLMIS's trading activity and performance by Dumbauld and Cutler, or regarding actions to

conceal or "actively impede further investigation," the specific allegations (besides being

insufficient to show actual knowledge) name only four particular defendants that the Trustee

identifies as comprising "Access's inner circle."  (SAC ¶¶ 266-73.)  Delandmeter is not named as

one of the four, and the Trustee alleges that the investigation and its conclusion "were not shared

with anyone else at Access" and that it was understood by the investigator (Cutler) that they

would not be shared beyond those who attended a certain lunch meeting in New York, namely,

the "inner circle" four.  (*Id.* ¶¶ 268, 272.)  Thus, as was the case with Corine Noel Piedrahita in

*Fairfield Investment Fund*, the Trustee has failed to plead individualized allegations of fact

demonstrating Delandmeter's actual knowledge of Madoff's fraud.

The Trustee has thus failed to allege facts that would preclude Delandmeter from

invoking the safe harbor of Section 546(e).  Accordingly, the Trustee's Section 550(a)

subsequent transferee claim against Delandmeter should, in the alternative, be dismissed to the

extent that it seeks recovery of any initial transfer made before December 11, 2006.

## **CONCLUSION**

For the foregoing reasons, Pierre Delandmeter respectfully requests that the

Second Amended Complaint be dismissed as to him with prejudice.

Dated:  New York, New York
          April 22, 2022

FRIEDMAN KAPLAN SEILER
& ADELMAN LLP


By:    /s/ Scott M. Berman
        Scott M. Berman
        Jeffrey C. Fourmaux
7 Times Square
New York, New York  10036
Telephone:  (212) 833-1100
E-mail:        sberman@fklaw.com
                  jfourmaux@fklaw.com

*Attorneys for Defendant Pierre Delandmeter*