Scott M. Berman
Jeffrey C. Fourmaux
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York  10036
Telephone: (212) 833-1100
E-mail:    sberman@fklaw.com
           jfourmaux@fklaw.com

*Attorneys for Defendant Pierre Delandmeter*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| | (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-04285 (CGM) |
| v. | |
| UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAITRE FERNAND ENTRINGER, ACCESS PARTNERS SA as | |

3658272.1

represented by its Liquidator MAITRE FERNAND
ENTRINGER, PATRICK LITTAYE, CLAUDINE
MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE
DE LA VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole beneficiary
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), PIERRE DELANDMETER,
THEODORE DUMBAULD, LUXALPHA SICAV as
represented by its Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE ALAIN
RUKAVINA AND PAUL LAPLUME, in their
capacities as liquidators and representatives of
LUXALPHA, , GROUPEMENT FINANCIER LTD.,

               Defendants.

## DECLARATION OF PIERRE DELANDMETER

I, PIERRE DELANDMETER, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am submitting this declaration in support of my Motion to Dismiss the

Second Amended Complaint ("SAC") filed in this adversary proceeding by Irving H. Picard,

Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC, substantively

consolidated with the Estate of Bernard L. Madoff (the "Trustee"). The facts and matters to

which I declare are derived from my personal knowledge and are true to the best of my belief.

**Background**

2.      I am a citizen of Belgium and, since 2019, also a citizen of Luxembourg. I

have resided in Luxembourg since 1987. I have never maintained a residence in New York or

any State in the United States.

3.      I am an attorney licensed to practice law in Luxembourg with a Masters of

Law from Louvain-La-Neuve in Belgium. I am not licensed to practice law in the United States

nor have I ever practiced law in the United States.  At the times relevant to this lawsuit, I was the

managing member of the Delandmeter Law firm, located in Luxembourg, which provides legal

advice and assistance to clients in Luxembourg and focuses on registering Luxembourg

investment funds and regulated providers.  My firm provides advice only as to European law,

with a primary focus on Luxembourg law.  I have never counseled clients in regard to the laws of

the United States.

4.      I have never had an account with BLMIS, and as such, I did not send

funds to, or receive any funds from, BLMIS in New York.

5.      I did not deliver agreements or cause agreements relating to BLMIS to be

delivered in New York, or any other State in the United States.

6.      I do not maintain a bank account at any bank in New York, or any state in

the United States, and I have never maintained a bank account at any bank in New York, or any

State in the United States.

7.      I do not maintain a securities account in New York, or any State in the

United States, and I have never maintained a securities account in New York, or any State in the

United States.

8.      I have never owned or leased any real property in New York, or any State

in the United States.

**The Present Allegations**

9.      In the SAC, I am described as a "Director" and "Legal Advisor" to

Luxalpa SICAV ("Luxalpha")[1] from February 2004 through its liquidation.  (SAC ¶¶ 84, 102.)  I

---

[1] Luxalpa is represented in this action by its liquidators Maitre Alain Rukavina and Paul
Laplume.

was also named as a "Director" of defendants Access Management Luxembourg SA ("AML")[2]

(as well as its predecessor entity Access International Advisors (Luxembourg) SA ("AIA

(Lux)")), and Access Partners SA ("AP (Lux)").[3]  (SAC ¶ 84.)  And I was formally identified as

a director of Access International Advisors, Inc. ("AIA Inc.").  (SAC ¶ 84.)

10.     The SAC alleges that I was an "advisor" to defendants Patrick Littaye and

Thierry Magon de la Villehuchet, and "the other Access Defendants."  (SAC ¶ 84.)  It is unclear

to me what the Trustee means by "advisor" or what individuals or entities he is referring to when

he refers to "the other Access Defendants," so I will state that facts as I know them.  I provided

legal advice and performed legal and/or regulatory services from time to time, in Luxembourg, at

the request of defendants AML (as well as its predecessor entity AIA (Lux)), AP (Lux), Access

International Advisors Ltd. ("AIA Ltd."), and Access International Advisors LLC ("AIA LLC"),

as described more fully below.  Messrs. Littaye and Villehuchet were principals of those entities,

but I did not provide legal advice to either them in their personal capacities.

11.     The SAC also alleges that I was a "Legal Advisor" to defendant

Groupement Financier Ltd. ("Groupement Financier") and a related fund Groupement Financier

Levered Ltd. ("Groupement Levered").  (SAC ¶¶ 84, 107.)  That allegation is incorrect.

Groupement Financier and Groupement Levered never appointed me to the position of "Legal

Advisor."  Groupement Financier and Groupement Levered were funds organized under British

Virgin Islands law.  I am not a British Virgin Islands lawyer and was not involved in the

formation of those funds.  And for those reasons, I would not have been competent to serve in

the role of Legal Advisor to those funds.

---

[2] AML is represented in this action by its liquidator Maitre Fernand Entringer.

[3] AP (Lux) is represented in this action by its liquidator Maitre Fernand Entringer.

12.     I never charged Groupement Financier or Groupement Levered, or received from them, any legal fees.  My only work related to Groupement Financier and Groupement Levered was that, from time to time, Access entities retained me to work, in Luxembourg, on Luxembourg-law governed service agreements for the Groupement funds or other matters relating to the funds that required advice on Luxembourg law.  I invoiced my work on those matters to Access entities.

**My Role as a "Director" of Luxembourg Business Entities**

13.     I have served on the board of approximately 50 entities in Luxembourg. My role as a director of the various entities is derived from my role as legal advisor.  It is extremely common for a Luxembourg entity to have an attorney sit on its board of directors.  As such, I am invited to sit on a board of a particular entity because I have previously provided legal services to the same.  Under Luxembourg law, as described below, however, a legal advisor who sits on a board does not and cannot engage in day-to-day business matters.

14.     The SAC describes me as a board member of AML, which served as "Luxalpha's portfolio manager from November 17, 2008 through its liquidation."  (SAC ¶¶ 84, 93.)  The Trustee further alleges that I was both "a Director and Legal Advisor of Luxalpha" and a "Director of AML, AP (Lux), and AIA Inc."  (*Id.* ¶ 84.)

15.     My role with each of these entities, however, needs to be more fully and accurately described.

*AML and AIA Lux*

16.     AML and its predecessor AIA (Lux) are both "*société anonyme*" (public limited companies) formed under the laws of Luxembourg.  (SAC ¶¶ 92.)  AML is alleged to have been Luxalpha's portfolio manager from November 17, 2008 until Luxalpha's liquidation (in April 2009) (*id.* ¶¶ 92-93, 99), Luxalpha's portfolio adviser from February 5, 2004 until

August 11, 2004 (*id*. ¶ 93), and Groupement Financier's and Groupement Levered's investment adviser until 2007 (*id*. ¶ 93).

17.      While my role for AML and AIA (Lux) was that of "Director," under Luxembourg law, the role of "Director" for such entities is very limited.

18.      As a "Director" of these entities my role was to deal with the "corporate formalities" of the various entities, specifically in relation to Luxembourg law.  I did not participate in the management of the companies, nor take part in their business decisions.  Such activities are carried out instead by board members, or non-board members who are authorized to so act by the regulator, who are designated as "Managing Directors."  I was never appointed in such capacity.

19.      Indeed, pursuant the regulations of the *Commission de Surveillance du Secteur Financier* ("CSSF"), attorneys sitting on the board of a financial institution are forbidden from interfering in the daily management of the entity.  (*See* Ex. A, CSSF 2009 Annual Report, Ch. VII, § 2.6 ("[A] lawyer who sits in the board of directors of a financial professional will by no means be able to interfere in the daily management which *in fine* shall be delegated to other persons formally authorised by the CSSF as the persons in charge of the daily management.")).[4]

20.      Because of the limited scope of a non-managing director's responsibilities under Luxembourg regulations and because there were no physical board meetings in the ordinary course of business, I never received fees or compensation for serving as a Director of AML or any other Access entity or Luxalpha.  Nor did I charge legal fees to anyone for my work

---

[4] Because the CSSF 2009 Annual Report is extremely voluminous, only excerpts are attached hereto.  A complete copy is available on the CSSF's website at https://www.cssf.lu/wp-content/uploads/files/Publications/Rapports_annuels/ Rapport_2009/RA2009_eng.pdf.  Alternatively, upon request, I will promptly provide a complete hard copy of the 2009 Annual Report to the Court or any other party.

as a Director of any Access entity or Luxalpha.  Immediately following BLMIS's collapse,

Luxalpha's promotor called in-person board meetings to address the consequences of the

collapse for Luxalpha, and I charged no legal fees for those meetings either.

*AP (Lux)*

21.    AP (Lux) is a *societe anonyme* incorporated and organized under the laws

of Luxembourg, with a registered office there.  (SAC ¶ 95.)  AP (Lux) is alleged to have been

Luxalpha's investment advisor from February 13, 2007 through December 2008 (*id.* ¶¶ 95-96),

and an "advisor" of Groupement Financier and Groupement Levered beginning in 2007 (*id*.

¶ 96).

22.    In February 2007, I was appointed as one of four directors of AP (Lux).

(*See* Pergament Decl. Ex. 96 (D.E. 128).)

23.    As with AML/AIA (Lux), my role as director was to deal with the

corporate formalities of the various entities, specifically in relation to Luxembourg law, as I was

forbidden by CSSF regulation from involvement in the daily management of the entity.

24.    I was never paid any fees in relation to my role as director of AP (Lux).

*AIA Inc.*

25.    It appears that, in 2003, I was appointed, along with four other individuals,

to serve on the board of AIA Inc.  However, I never attended any AIA Inc. board meeting.  To

the best of my recollection, I signed one resolution in my capacity as director of AIA Inc., and

that resolution had nothing to do with BLMIS.  (*See* Ex. B (March 21, 2006 AIA, Inc.

resolution).)

26.    To the best of my recollection, I took no other action in my capacity as

director of AIA Inc.

27.    I never received any fees for my role as director of AIA Inc.

*Luxalpha*

28.    At the request of Luxalpha's sponsor UBS, I and UBS (Luxembourg) S.A. served as the formal incorporators for Luxalpha (*see* Pergament Decl. Ex. 7 (D.E. 128)), which was organized as a *société d'investissement à capital variable* (open-ended investment company) under Luxembourg law.  I did not personally propose the creation of Luxalpha or its investment policy.  My legal services in connection with Luxalpha's formation were rendered in Luxembourg.  I addressed Luxembourg legal and regulatory matters surrounding Luxalpha's incorporation under Luxembourg law and its registration with the Luxembourg financial regulator, CSSF.

29.    Following Luxalpha's formation, I acted as one of five or six "Directors" for the period from 2004 to April 2, 2009.  My role as a Luxalpha Director was similar to my role with AML/AIA (Lux) and AP (Lux) in that I dealt with the "corporate formalities" of the various entities, specifically in relation to Luxembourg law.

30.    Under Luxembourg law and the Articles of Incorporation for Luxalpha, certain board members may be designated as "Managing Directors," who participate in the management of Luxalpha and make business decisions.  (*See* Ex. C, Luxalpha Articles of Incorporation, at Article 16.)  I was not designated as a "Managing Director" of Luxalpha, and indeed, I did not, and by regulation could not, participate in the management of Luxalpha nor take part in its business decisions.

31.    The Articles of Incorporation for Luxalpha also provide that special general power may formally be given to one director, enabling that director to bind the entity.  (*See id.*)  I never received such power while serving as Director of Luxalpha.

32.    The Articles of Incorporation for Luxalpha governed the procedure through which the Board of Directors could act.  (*See id.* at Article 13.)  Such action could be

8

taken either through circular resolutions (*i.e.*, a resolution circulated to board members for signature) in writing or through resolutions passed at physical board meetings. (*See id.*) Circular resolutions in writing must be signed by all directors in order to be effective. (*See id.*) Resolutions passed at a physical board meeting require the signature of the Chairman of the Board. (*See id.*)

33. In my capacity as director, I signed certain corporate board resolutions. (*See, e.g.*, Pergament Decl. Exs. 8 at 2-4; 9 at 7-9, 18-21; 10; 12; 144 (D.E. 128).) All of these resolutions were signed in Luxembourg. These resolutions were universally requested by Luxalpha's promoter, UBS, in its duties of head of Luxalpha in charge of controlling and making all decisions relating to the business of Luxalpha. When a resolution is advanced by the promoter, it is presented to the board in final form approved by the promoter for board approval and execution, which is generally a formality. I did not provide any business advice or contribute to the business discussions or decisions leading to the business resolutions, including the initial business resolution authorizing the opening of an account with BLMIS in the name of Luxalpha c/o UBS (Luxembourg) S.A. My only contribution, if any, on particular business resolutions was to provide legal advice on the form or language of the resolution. At times, and based on the content of the resolution requested by promoter, I provided legal advice in my capacity as legal advisor to Luxalpha on administrative and regulatory issues. I signed any and all written resolutions in my capacity as director and in Luxembourg.

34. Also in my capacity as director, I signed various agreements, governed by Luxembourg law, retaining certain Luxembourg affiliates of UBS to serve in various roles with Luxalpha. (*See, e.g.*, Pergament Decl. Exs. 23 & 52 (D.E. 128).) These agreements were signed in Luxembourg. I signed these agreements at the request of Luxalpha's promoter to fulfill Luxembourg corporate law's formal requirement that agreements must be signed by two

directors, and on these occasions, I was one of the only directors available in Luxembourg to sign at the time.

35.    I never received fees or compensation for serving as a Director of Luxalpha.

**My Role as a Legal Advisor to Luxembourg Entities**

36.    While the SAC does not give any details regarding my role as "legal advisor" to Luxalpha, or any of the other defendant entities, it is important to emphasize that my duties involved providing advice and services exclusively as to European (and primarily Luxembourg) law and regulatory issues.  I provided legal advice, in Luxembourg, at the request of Luxalpha, AP (Lux), AML (as well as its predecessor entity, AIA (Lux)), and AIA Ltd., and on one small matter involving AIA LLC and Luxalpha.[5]

37.    For example, my law firm assisted with the Luxembourg regulatory aspects of the creation and licensing of Luxalpha, AML, and AP (Lux).

38.    In furtherance of the CSSF authorization process, my firm submitted a regulatory application on behalf of these entities to the CSSF.  The CSSF is the Luxembourg financial supervisory authority in charge of authorizing, licensing, and supervising financial entities in Luxembourg.

39.    All these actions taken by my firm or me took place in Luxembourg and were for the purpose of creating Luxembourg corporations in compliance with Luxembourg law.

40.    Additionally, in response to my previous Motion to Dismiss the Amended Complaint, the Trustee alleged that I had a "prominent role directing Luxalpha's response to

---

[5] At the request of one of the Access entities (whose exact identity I cannot recall at this time), I reviewed, in Luxembourg, an investment advisory agreement between AIA LLC and Luxalpha from the perspective of Luxembourg law.

Madoff's arrest and the collapse of BLMIS." (Tr. 2012 Opp. at 78 (D.E. 127).)  Specifically, the

Trustee contended that jurisdiction is appropriate over me because I "notified the key Luxalpha

players of the suspension of Luxalpha and the necessity to notify the Luxembourg financial

regulator," (*id.*, citing Pergament Decl. Ex. 82), and "participated in three days of post-collapse

board meetings" (*id.*, citing Pergament Decl. Exs. 83-85).)

      41.    My role with regard to BLMIS's collapse was not "prominent."  As legal

advisor, my role was to inform my client Luxalpha to notify the regulatory authorities about the

suspension of Luxalpha.  Specifically, UBS requested my firm as legal advisor that, in

accordance with Luxembourg law, we prepare draft regulatory documents with respect to

suspension of Luxalpha activities.  We did so and presented to the promoter and the board of

directors draft regulatory documents.  I did not notify the regulatory authorities regarding the

suspension of Luxalpha.  I did not participate in the actual decision to suspend Luxalpha.

Indeed, the decision to suspend Luxalpha was not discretionary, as Luxalpha's Articles of

Incorporation and Prospectus required suspension under certain conditions and, at the time

Luxalpha was suspended, these conditions had been met.

      42.    Moreover, my actions following the collapse of BLMIS were unrelated to

the United States.  I was acting in my capacity as a Luxembourg lawyer, advising my

Luxembourg based clients on regulatory and various other issues of Luxembourg law.  Though

Madoff's arrest and the collapse of BLMIS occurred in the United States, it was the effect those

issues had on Luxembourg based entities, and in relation to Luxembourg law, with which I was

concerned.

**Receipt of Fees for Legal Services**

      43.    From 2004 through 2008, I received a total of approximately €275,000 in

fees from Luxalpha.

44.     To the best of my knowledge, the fees that I received from Luxalpha were paid from a segregated, reserve fund designed for administrative expenses and maintained by Luxalpha's custodian UBS (Luxembourg) S.A.  (*See* Pergament Decl. Ex. 28 at p. 20 of 27 (D.E. 128).)  This reserve fund was supported by funds that came directly from investors.  These funds were never invested in BLMIS or any other financial product, nor did proceeds or transfers from BLMIS enter into the reserve.

45.     The Trustee alleges "upon information and belief" that to the extent I received legal fees from AIA Ltd., AIA LLC, AP (Lux), or AML, those payments ultimately came from funds that BLMIS transferred to Luxalpha and Groupement Financier, which then directly or indirectly transferred those funds to the Access entities.  (*See* ¶ SAC 336.)  That does not follow and is entirely speculative.  Access entities promoted and serviced many funds that were entirely unrelated to BLMIS, and those other funds accounted for a substantial part of the Access entities' business.  For example, the Trustee himself alleges facts indicating that, in February 2008, 21% of Access subscriptions were invested outside of BLMIS.  (*See* SAC ¶ 79.)  Moreover, even with respect to fees paid by Luxalpha or Groupement Financier to Access entities, those fees consisted, in whole or in part, of fixed administrative fees that were payable out of Luxalpha's or Groupement Financier's administrative expense reserves (*see* Pergament Decl. Ex. 28 at p. 20 of 27 (providing for Luxalpha administrative reserve); *id*. Ex. 18 at p. 28 of 34 (providing for Groupement administrative reserve) (D.E. 128)), which in turn were funded by investor subscriptions rather than redemptions from BLMIS.

46.     My legal fees did not depend on Luxalpha's performance or profitability, or the amount of its subscriptions or redemptions.  I was not paid for actions, if any, that Luxalpa took in the United States.  All legal fees I received were paid to me in Luxembourg.

47.     After the exposure of the Madoff fraud, Luxalpha initially planned to transfer €5 million to my firm, Delandmeter Law Firm, in order to ensure that Luxalpha would be able to effectively seek recovery of the Luxalpha investments into BLMIS and defend itself against any potential claims that arose in connection with Madoff's Ponzi scheme.  I submitted a request for the €5 million on December 12, 2008.  (*See* Ex. D (French language letter requesting €5 million).)

48.     After this preliminary decision was made, UBS (Luxembourg) S.A. decided to take a different approach and to hire different law firms to represent them in connection with various issues arising out of the Madoff Ponzi scheme.  Consequently, on December 19, I withdrew my request for the €5 million.  (*See* Ex. E (French language letter withdrawing request for €5 million).)  This withdrawal is acknowledged in the minutes of the Luxalpha Board of Directors Meeting held on December 19, 2008.  (*See* Pergament Decl. Ex. 85 at 3 (D.E. 128).)  Both the initial request and subsequent withdrawal were also reported to the CSSF, which oversees and acts as the auditor of the liquidation of Luxembourg entities, and must approve transfers such as this proposed €5 million transfer.  The funds were never transferred.

**My Role on Advisory Committee to UBSTPMC**

49.     In the Trustee's Opposition to my previous Motion to Dismiss the Amended Complaint, I am described as "involved in 'determining the investment policy of [Luxalpha],' the 'purchase and sale of investments in accordance with [Luxalpha's] investment policy,' and 'any matters in relation to which the Prospectus provides for the Management Company, or its delegates, to take a decision.'" (Tr. 2012 Opp. at 78 (D.E. 127) (citing Pergament Decl. Ex. 54 at LuxAlpha 00699).)

50.    While I was officially a member of the Advisory Committee, the Advisory Committee never met or did anything.

51.    Moreover, the only duty of the Advisory Committee was to make recommendations to Luxalpha's manager UBSTPMC, not obligatory directives.  (*See* Pergament Decl. Ex. 54 (D.E. 128) at LuxAlpha 00697 (Advisory Committee to "provide the Management Company with recommendations regarding the management of the Fund."); 00699 ("The Advisory Committee will be responsible for making Recommendations to the Management Company in relation to any matters regarding the Fund.").)

**Trips to New York and Contact with Madoff**

52.    Between 2004 and 2008, I visited the United States only five times.[6]  The purpose of these visits was to meet with various U.S.-based clients.  During some of these visits, I was invited to attend some quarterly meetings held by Access International Advisors Inc. in my capacity as legal advisor to answer questions about Luxembourg law.  (*See* Pergament Decl. Exs. 100-02 (D.E. 128).)  These quarterly meetings generally lasted several days, with meetings scheduled from approximately 9:00 a.m. to 5:00 p.m.  (*See id.* Exs. 100 at 1; 101 at 1; 102 at 1.)

53.    For the quarterly meeting that occurred from February 6, 2007 through February 9, 2007, I attended certain sessions on February 8 and 9.  (*See* Pergament Decl. Ex. 100 (D.E. 128).)  On February 8, I gave a presentation entitled "OMEGA & ARGENT UCIT 3 Product presentation," during which I addressed issues of Luxembourg law for Omega and Argent, two sub-funds of the Luxembourg Elite Performance Fund.  (*See id.* Ex. 100 at 5.)  I did not participate in the "BMI Product Review" presentation given later in the day by other

---

[6] I have not visited the United States after 2008.

individuals.  (*See id.* Ex. 100 at 5.)  I also attended a February 9 "Administration" meeting

concerning the Luxembourg Elite Performance Fund.  (*See id.* Ex. 100 at 7.)

54.     For the quarterly meeting that occurred February 12, 2008 through

February 15, 2008, I attended a portion of the sessions that occurred on February 13, 14, and 15.

(*See* Pergament Decl. Ex. 101 (D.E. 128).)  On February 13, I attended two presentations given

by other individuals, entitled "AIA Liability Insurance policy presentation" and "EP Funds –

Platform fees feasibility and implementation process."  (*See id.* Ex. 101 at 4.)  On February 14, I,

along with three others, gave a 20-minute presentation on "AIA administrative structures and

related products," but did not present the "BMI Product review" that occurred earlier in the day.

(*See id.* Ex. 101 at 5.)  I also attended a meeting to discuss administrative aspects of the funds –

*i.e.*, structure of the funds.  Clients did not attend administrative meetings.  (*See id.* Ex. 101 at 6.)

On February 15, I attended another administrative meeting and conference call.  (*See id.* Ex. 101

at 7.)

55.     For the quarterly meeting that took place from October 27, 2008 through

October 30, 2008, I attended a portion of the October 28th and 30th sessions.  (*See* Pergament

Decl. Ex. 102 (D.E. 128).)  On October 28, I gave a presentation on the "Organization in

Europe," but did not participate in, or even attend, the presentation on October 27 on the "BMI

Product Review."  (*See id.* Ex. 102 at 1, 4.)  On October 30, I participated in an administrative

meeting and conference call.  (*See id.* Ex. 102 at 5.)

56.     During the foregoing meetings, I discussed Access' European presence

and answered questions regarding European law.  I was never asked to, nor did I, discuss BLMIS

or anyone's investments with BLMIS.

57.     I met Bernard Madoff only once.  In my capacity as legal advisor to

Luxalpha, I accompanied Patrick Littaye to meet Madoff at BLMIS' offices in February 2004.

The meeting was very short.  During the meeting, I spoke briefly with Madoff about European law and nothing else.  We did not conduct negotiations, nor did we enter into any agreements.

58.     I was not paid for my brief meeting with Madoff.

[Remainder of page intentionally left blank]

\*       \*       \*       \*       \*

I declare, under penalty of perjury under the laws of the United States of America and the laws of Luxembourg that the foregoing is true and correct.

Executed in Luxembourg on the 22nd day of April, 2022.

_____
Pierre Delandmeter

# EXHIBIT A



# COMMISSION
# DE SURVEILLANCE
# DU SECTEUR
# FINANCIER

ANNUAL
REPORT
2009



- presentation of the general context and activities of the companies concerned;

- courtesy visits.

## 2.4. Specific controls

Article 54(2) of the law of 5 April 1993 on the financial sector entitles the CSSF to request external auditors to carry out a specific audit at a financial professional, covering one or several specific aspects of the business or operation of the entity concerned. The ensuing costs are to be borne by the professional concerned. The CSSF has not made formally use of this right in 2009.

## 2.5. Supervision on a consolidated basis

The supervision of investment firms on a consolidated basis is governed by the law of 5 April 1993 on the financial sector and in particular by Chapter 3a of Part III. The relevant articles define the conditions governing the supervision of investment firms on a consolidated basis and its scope. The form, extent, content and means of supervision on a consolidated basis are also laid down therein.

The CSSF carries out supervision on a consolidated basis for investment firms falling under the scope of application of the above-mentioned law. In practice, an in-depth study of the financial groups to which most investment firms belong is necessary in order to determine whether, at what level and in what form consolidation should apply. For the investment firms concerned, Circular CSSF 00/22 on the supervision of investment firms on a consolidated basis carried out by the CSSF specifies the practical aspects of the rules as regards supervision on a consolidated basis.

The following eleven PFS were subject to supervision by the CSSF on a consolidated basis as at 31 December 2009:

- Brianfid-Lux S.A.

- CapitalatWork Foyer Group S.A.

- Crédit Agricole Luxembourg Conseil S.A., in abbreviated form "CAL Conseil"

- Farad Investment Advisor S.A.

- FIL (Luxembourg) S.A.

- Fuchs & Associés Finance S.A.

- Fund Channel S.A.

- Hottinger & Cie

- HSH Investment Management S.A.

- Petercam (Luxembourg) S.A.

- Valbay International S.A.

## 2.6. Representation of lawyers within the boards of directors

The CSSF confirmed its previous decision that a lawyer cannot be involved in the daily management of a financial professional. Thus, a lawyer who sits in the board of directors of a financial professional will by no means be able to interfere in the daily management which *in fine* shall be delegated to other persons formally authorised by the CSSF as the persons in charge of the daily management.

# EXHIBIT B

UNANIMOUS CONSENT

OF THE

BOARD OF DIRECTORS

OF ACCESS INTERNATIONAL ADVISORS, INC.

The undersigned, being all of the members of the Board of Directors **ACCESS INTERNATION ADVISORS, INC.** (the "Corporation"), a New York corporation, do hereby consent in writing, pursuant to Section 708(b) of the New York Business Corporation Law (the "BCL"), to the adoption of the following resolutions:

WHEREAS, the Corporation previously issued stock certificate number CS-2 in the amount of 900 Common Stock shares to EarthStreet Limited on June 13, 2003 ("Certificate CS-2"); and

WHEREAS, EarthStreet Limited desires to assign and transfer all of its interests in the Common Stock shares in the Corporation represented by Certificate CS-2 to Dalestrong Limited pursuant to the terms of the Share Transfer attached hereto as Exhibit A.

NOW, THEREFORE, BE IT:

RESOLVED, to hereby ratify the cancellation of Certificate CS-2 as of April 7, 2004 and EarthStreet Limited shall cease to have any rights in such shares as of the date hereof; and be it further

RESOLVED, that the issuance by the Corporation of stock certificate number CS-4 in the amount of 900 Common Stock shares in the Corporation to Dalestrong Limited in the form attached hereto as Exhibit B is hereby ratified; and be it further

RESOLVED, that the directors and officers of the Corporation be, and each of them hereby singly is, authorized, empowered and directed to heretofore or hereafter done, in the name and on behalf of the Corporation, any and all such further acts and things and to execute, deliver, certify or file any and all such other documents or instruments as may be necessary or advisable in order fully to carry out the purposes and intentions of the foregoing resolution, the taking of such actions and the execution, delivery, certification or filing of such further documents or instruments to be conclusive evidence of such approval.

84109409_1

**IN WITNESS WHEREOF,** the undersigned have caused this Unanimous Written Consent to be executed this 21 day of March 2006.

_____
R. Thierry Magon de La Villehuchet

_____
Patrick Littaye

_____
Corinne Bouygues

_____
Chantal Lanchon

_____
Pierre Delandmeter

84109409_1

# EXHIBIT C



**«LUXALPHA SICAV»**

Société d'Investissement à Capital Variable

L-1150 Luxembourg

291, route d'Arlon



| **CONSTITUTION**<br>Du 5 FEVRIER 2004 | **No 208/04** |
| --- | --- |

In the year two thousand and four, on the fifth of February.
Before Us, Maître Henri HELLINCKX, notary residing in Mersch, Grand Duchy of Luxembourg.

There appeared:

1) **UBS (Luxembourg) S.A.**, with its registered office at 36-38 Grand-Rue, L-1661 Luxembourg,
duly represented by Miss Frédérique Lefèvre, juriste, residing professionally in Luxembourg, by virtue of a proxy given in Luxembourg, on February 4, 2004.

2) Me Pierre Delandmeter, attorney-at-law, residing professionally in 8-10 avenue Marie-Thérèse, L-2132 Luxembourg.
duly represented by Miss Frédérique Lefèvre, prenamed,
by virtue of a proxy given in Luxembourg, on February 4, 2004.

The proxies given, signed ne varietur shall remain annexed to the document to be filed with the registration authorities.

Such appearing parties, in the capacity in which they act, have requested the notary to state as follows the Articles of Incorporation of a société anonyme, which they form between themselves:

### Title I NAME - REGISTERED OFFICE - DURATION - PURPOSE

#### Article 1. - Name

There exists among the subscribers and all those who may become owners of shares hereafter issued, a public limited company ("société anonyme") qualifying as an investment company with variable share capital ("société d'investissement à capital variable") under the name of "LUXALPHA SICAV" (herein after the "Company").

1

In the event of a vacancy in the office of director, the remaining directors may temporarily fill such vacancy; the shareholders shall take a final decision regarding such nomination at their next general meeting.

### Article 13: Board meetings



The Board shall choose from among its members a chairman, and may choose from among its members one or more vice-chairmen. It may also choose a secretary, who need not be a director, who shall write and keep the minutes of the meetings of the Board and of the shareholders. The Board shall meet upon call by the chairman or any two directors, at the place indicated in the notice of meeting.

The chairman shall preside at the meetings of the directors and of the shareholders. In his absence, the shareholders or the board members shall decide by a majority vote that another director, or in case of a shareholders' meeting, that any other person shall be in the chair of such meetings.

The Board may appoint any officers, including a general manager and any assistant general managers as well as any other officers that the Company deems necessary for the operation and management of the Company. Such appointments may be cancelled at any time by the Board. The officers need not be directors or shareholders of the Company. Unless otherwise stipulated by these articles of incorporation, the officers shall have the rights and duties conferred upon them by the Board.

Written notice of any meeting of the Board shall be given to all directors at least twenty-four hours prior to the date set for such meeting, except in circumstances of emergency, in which case the nature of such circumstances shall be set forth in the notice of meeting. This notice may be waived by consent in writing, by telegram, telex, telefax or any other similar means of communication. Separate notice shall not be required for meetings held at times and places fixed in a resolution adopted by the Board.

Any director may act at any meeting by appointing in writing, by telegram, telex or telefax or any other similar means of communication another director as his proxy. A director may represent several of his colleagues.

Any director may participate in a meeting of the Board by conference call or similar means of communications equipment whereby all persons participating in the meeting can hear each other, and participating in a meeting by such means shall constitute presence in person at such meeting.

The directors may only act at duly convened meetings of the Board. The directors may not bind the Company by their individual signatures, except if specifically authorised thereto by resolution of the Board.

The Board can deliberate or act validly only if at least the majority of the directors, or any other number of directors that the board may determine, are present or represented.

Resolutions of the Board will be recorded in minutes signed by the chairman of the meeting. Copies of extracts of such minutes to be produced in judicial proceedings or elsewhere will be validly signed by the chairman of the meeting or any two directors.

Resolutions are taken by a majority vote of the directors present or represented.

Resolutions in writing approved and signed by all directors shall have the same effect as resolutions voted at the directors' meetings; each director shall approve such resolution in writing, by telegram, telex, telefax or any other similar means of communication. Such approval shall be confirmed in writing and all documents shall form the record that proves that such decision has been taken.

13

### Article 14. Powers of the Board

The Board is vested with the broadest powers to perform all acts of disposition and administration within the Company's purpose, in compliance with the investment policy as determined in Article 17 hereof.

All powers not expressly reserved by law or by the present Articles of Incorporation to the general meeting of shareholders are in the competence of the board.

In accordance with article 72.2 of the Luxembourg law of August 10, 1915, the Board of Directors is authorised to decide the payment of interim dividends.

### Article 15. Corporate Signature

Vis-à-vis third parties, the Company is validly bound by the joint signatures of any two directors or by the joint or single signature of any person(s) to whom authority has been delegated by the Board.

### Article 16. Delegation of power

The Board of the Company may delegate its powers to conduct the daily management and affairs of the Company (including the right to act as authorised signatory for the Company) and its powers to carry out acts in furtherance of the corporate policy and purpose to one or several physical persons or corporate entities, which need not to be members of the board and who shall have the powers determined by the Board and who may, if the Board so authorises, sub-delegate their powers.

### Article 17. Investment Policies and Restrictions

The Board, based upon the principle of risk diversification, has the power to determine the investment policies and strategies of the Company and the course of conduct of the management and business affairs of the Company, within the restrictions as shall be set forth by the Board in compliance with the law of December 20, 2002 or be laid down in the laws and regulations of those countries where the shares are offered for sale to the public, or shall be adopted from time to time by resolutions of the Board and as shall be described in any prospectus referring to the offer of the shares.

In the determination and implementation of the investment policy the Board of Directors may cause the assets of the Company to be invested in:

(i) transferable securities and money market instruments admitted to official listing on a stock exchange in an Eligible State. (For this purpose an «Eligible State» shall mean any member State of the Organisation for the Economic Cooperation and Development («OECD») and any other country of Europe, North, Central & South America, Asia, Africa and the Pacific Basin); and/or

(ii) transferable securities and money market instruments dealt in on another regulated market in an Eligible State which operates regularly and is recognised and open to the public (a «Regulated Market»); and/or

(iii) recently issued transferable securities and money market instruments, provided that the terms of issue include an undertaking that application will be made for admission to official listing on a stock exchange or Regulated Market in an Eligible State provided that the choice of the stock exchange or the market has been provided for in the constitutional documents of the undertaking for collective investment in transferable securities («UCITS») and such admission is secured within a year of issue; and/or

14

# EXHIBIT D

PIERRE DELANDMETER
AVOCAT À LA COUR

Luxembourg, le 12 décembre 2008

LUXALPHA SICAV
33A, avenue J.F. Kennedy
L - 1855 LUXEMBOURG

### DEMANDE D'ACOMPTE

**Sur frais juridiques dans le cadre de la défense des intérêts de la SICAV dans le contexte du défaut de la contrepartie Bernard Madoff**

| | |
|---|---|
| **TOTAL H.T. ACOMPTE** | **5 000. 000- €** |
| **T.V.A. à 15,00%** | **750. 000- €** |
| **TOTAL T.T.C.** | **5 750. 000- €** |

*Cette facture est payable dès réception sur le compte suivant :*

Compte : DELANDMETER
Banque : ING Luxembourg SA
Compte : IBAN LU43 0142 2340 7730 0000
Swift : CELLLULL
Réf :LUX ALPHA SICAV
*Les frais bancaires sont à la charge du client.*

---

8-10, avenue Marie Thérèse
L - 2132 LUXEMBOURG
TVA 1959 0326 030
NO IBLC LU 1597 1347

B.P. 1727
PHONE :    (352) 46 77 11 1
FAX :      (352) 46 77 11 250
E.MAIL :   delandlo@pt.lu

# EXHIBIT E

PIERRE DELANDMETER
Avocat à la Cour

Luxembourg, le 19 décembre 2008

**LUXALPHA SICAV**
33A, avenue J.F. Kennedy
1855 LUXEMBOURG

A l'attention du Conseil d'Administration

Messieurs,

Je vous prie de considérer comme nulle et non avenue ma demande d'acompte faite en date du 12 décembre 2008.

Meilleures salutations,

Pierre Delandmeter

8-10, Avenue Marie-Thérèse          B.P. 1727 – L-1017 LUXEMBOURG
L - 2132 LUXEMBOURG                 PHONE : (352) 46 77 11-1
TVA 1959 0326 030                   FAX :    (352) 46 77 11-250