DATED September 1, 2005

Between

GROUPEMENT FINANCIER LIMITED

and

UBS (LUXEMBOURG) S.A.

PRIME BANK AGREEMENT

PRIME BANK AGREEMENT THIS AGREEMENT is made on the September 1st, 2005

BETWEEN

(1) GROUPEMENT FINANCIER LIMITED, a company incorporated in the British Virgin Islands the registered office of which is at Kingston Chambers, P.O. Box 173, Road Town, Tortola, British Virgin Islands, (the "Company").

AND

(2) UBS (LUXEMBOURG) S.A., a company incorporated in the Grand-Duchy of Luxembourg the registered office of which is at 36-38, Grand-Rue, L-1660 Luxembourg (the "Prime Banker").

IT IS AGREED AS FOLLOWS:

1. Definitions and interpretation

In this Agreement, unless the context otherwise requires, the following words and expressions shall bear the following meaning:-

| | |
|---|---|
| "Account" | a separate account established in the books and records of the Prime Banker for the Company and includes all files and Documents of Title in respect of such Account; |
| "Authorised Person" | means each officer identified in Schedule I and any other person appointed from time to time as an authorised person in a replacement Schedule I; |
| "Business Day" | means a day on which banks and securities houses are open for business in Luxembourg and such other places as the Directors may from time to time determine. |
| "Cash" | includes all cash and cash equivalents in any currency received by the Prime Banker and held in the Account; |
| "Documents of Title" | means the certificates, warrants, receipts, acknowledgements, scrip and other written evidence of title to, or interest in, any of the assets delivered to the Prime Banker for holding in the Account; |
| "Instruction Procedures" | the procedures as set out in Schedule II to this Agreement and as amended by agreement in writing between the Prime Banker and the Company from time to time governing the manner in which and the persons from whom Proper Instructions may be given to the Prime Banker hereunder; |
| "Investment Manager" | means Access International Advisors Ltd., for the time being acting as investment manager to the Company; |

| | |
|---|---|
| "Proper Instructions" | any written instructions from the Company to the Prime Banker in accordance with the Instruction Procedures and signed or purported to be signed by an Authorised Person appointed by the Company in respect of any of the matters referred to in this Agreement or in relation to the Account; |

## 2. Appointment of Prime Banker

Subject to the terms of this Agreement the Company hereby appoints the Prime Banker as prime banker of the Cash transferred to the Account and the Prime Banker accepts responsibility for the safe custody of such assets whilst they are held in or through the Account.

## 3. Duties of Prime Banker

3.1. During the continuance of its appointment as Prime Banker and subject to the terms of this Agreement, the Prime Banker:-

(i) shall hold in the Account or procure to be held to its order through the Account Cash delivered to it for the account of the Company and all documents of title to or evidencing ownership of that Cash;

(ii) shall collect and receive for the account of the Company all income and other payments on or with respect to the Cash held in the Account;

(iii) shall on receipt of Proper Instructions hold, pay out or deal with un-invested Cash of the Company in from or through the Account on behalf of the Company in accordance with the provisions of this Agreement or in such manner as may be stipulated in writing by the Company;

(iv) shall keep or cause to be kept at its premises such books, records and statements as may be necessary to give a complete record of all Cash and documents as referred to in 3.1 (a) above held in the Account and transactions carried out by it on behalf of the Company through the Account and shall permit the Company or the Company's auditors to inspect such books, records and statements. In addition, the Prime Banker will perform a mirror booking of the Securities held with the Prime Broker in order to compute the NAV.

(v) shall on receipt of any notice or documentation relating to the Cash forthwith forward the same to the Investment Manager or deal with the same in accordance with the directions given by the Investment Manager from time to time;

(vi) may act by its proper officer or officers;

3.2. Forthwith after each purchase, sale or deposit being made for the Account the Company or the Investment Manager shall cause the Prime Banker to be instructed by Proper Instructions in relation to the receipt or delivery of the documents of title to or evidencing ownership of the instruments in question. Such Proper Instructions as aforesaid shall be given without delay and in the event of a delay the Prime Banker shall not be liable for any consequence arising solely there from.

3

JSD

3.3. In the execution of its duties set forth above, the Prime Banker shall have no discretion nor responsibility as to the selection of Securities of the Company nor will it have any responsibility for ensuring that the Securities comply with any investment guidelines which may have been adopted by the Company.

### 4. Fees of Prime Banker

4.1 In consideration for the provision of services hereunder, the Prime Banker shall be entitled to receive fees, calculated from the effective date hereof at the rates specified in the Schedule III hereto (or such rates as may from time to time be adjusted pursuant to the terms hereof).

4.2 In addition to the fees specified in Clause 4.1 the Prime Banker shall be entitled to be reimbursed for fees, charges, taxes, duties and imposts whatsoever levied on or in respect of the Company or its business as may be properly incurred, as well as all reasonable out of pocket expenses including, all other charges or fees expressly authorised by this Agreement.

### 5. Records, Ownership and Statements

5.1 The ownership of the Account and the Cash held in the Account shall be clearly recorded in the Prime Banker's books and records as belonging to the Company and not for the Prime Banker's own interest.

5.2 The Prime Banker shall keep accurate and detailed accounts of all acquisitions, receipts, disbursements and other transactions for the Company. All books and records of the Prime Banker relating to the Account shall be open to inspection and audit at all reasonable times during normal business hours by the Company or its duly authorised agent. The Prime Banker will supply to the Company statements in respect of the Account at such times and in such form as may be agreed.

5.3. Unless an objection is made in writing by the Company to any matter contained in any such statement within 90 days of the date it was received by the Company, the statement rendered by the Prime Banker in respect of the Account shall (in the absence of fraud) be treated as conclusive evidence of the matters contained therein, and the Company shall not thereafter be entitled to make any claim against the Prime Banker or to take any other action in respect thereof.

### 6. Co-custodians

6.1 The services of the Prime Banker hereunder are not to be deemed exclusive and the Company shall be free to appoint co-custodians on such terms as the Company may think fit and the Prime Banker shall not be deemed to be affected with notice of or to be under any duty of care to the Company in relation to such co-custodian or have any liability or responsibility to the Company other than in respect of Cash delivered to it to be held in the Account.

6.2 The Company shall appoint a prime broker (the "Prime Broker") on such terms as the Company thinks fit and the Company may hold assets in the account (the "Prime Brokerage Account") opened with the Prime Broker. The Investment Manager will be responsible for the delivery of any securities into the Prime Brokerage Account and for conducting trading activities in relation to the securities within the Prime Brokerage Account. The Prime Banker will have no responsibility in relation to the Prime Brokerage Account. In particular but without in any way limiting the foregoing, the Prime Banker shall not be deemed to be affected with notice of, or to be under any duty of care to the Company in relation to, any Prime Broker appointed by the Company.

## 7. Standard of Care

7.1. The Prime Banker will exercise reasonable care and due diligence in performing its duties under this Agreement. The Prime Banker shall be liable to the Company for any loss resulting from its own negligence, willful default or fraud but shall not be subject to any stricter standard of care or more extensive liability. So long as reasonable care and due diligence have been exercised, the Prime Banker, shall not be liable for any loss occasioned by acting upon Proper Instructions or other notices or other documents which were reasonably believed to be genuine or for acts or omissions required or demanded by any governmental, taxing, regulatory or other competent authority in any country in which all or part of the assets of the Company transferred to the Account is held or which has jurisdiction over the Prime Banker, or for loss resulting from acts of war or terrorism, storm, tempest, insurrection, revolution, or acts of God. So long as the Prime Banker has exercised reasonable care and due diligence, the Prime Banker shall not be responsible for the authenticity or validity of title to any Securities held in the Account.

7.2. The provisions of this clause shall survive the termination of this Agreement.

## 8. Indemnity and Liability

8.1. The Prime Banker (which in this Clause shall include all directors, officers and employees of the Prime Banker) shall not be liable for any loss or damage suffered by the Company or any Shareholders arising directly or indirectly out of any error of judgment or oversight or mistake of law on the part of the Prime Banker, made or committed in good faith in the performance of its duties hereunder, PROVIDED THAT the Prime Banker shall remain liable for any loss arising from its own actual negligence, dishonesty, fraud, willful default or willful breach of duty in the performance of this Agreement, and be responsible for any loss or damage which the Company may sustain or suffer as the result of or in the course of the discharge of its duties hereunder and the Company shall indemnify and hold harmless the Prime Banker against all claims and demands (including costs and expenses arising there from or incidental thereto) which may be made against the Prime Banker in respect of any loss or damage sustained or suffered by any third party, otherwise than by reason of the actual negligence, dishonesty, fraud, willful default or willful breach of duty in the performance of this Agreement of the Prime Banker as aforesaid.

5



8.2. The Prime Banker shall be entitled to obtain legal advice from its lawyers for the time being and/or opinion of counsel on any matter relating to the performance of this Agreement and if the Company shall give its prior approval to the obtaining of any such advice or opinion the Company shall pay or procure payment of the expenses thereof. Any action or omission taken or suffered by the Prime Banker in good faith in reliance on or in accordance with such advice or opinion shall be full protection and justification to it with respect to the action or omission so taken or suffered.

8.3. Notwithstanding the other provisions of this Agreement, the Prime Banker shall not be obliged to act upon Proper Instructions or to deliver to the Company any Cash until the Prime Banker is satisfied in its reasonable discretion that all the amounts due and owing by the Company to the Prime Banker in connection with this Agreement have been fully discharged. If the Prime Banker declines to act upon Proper Instructions in accordance with this clause, it shall notify the Company of the same, and if reasonably practicable shall do so before any transaction which is the subject of the Proper Instructions is due to settle.

8.4. The Prime Banker shall not be required to take any legal action in connection with the performance of its duties hereunder or on behalf of the Company unless fully indemnified to its reasonable satisfaction for all costs and liabilities that may be incurred or suffered by the Prime Banker and if the Company requires the Prime Banker to take any action of whatsoever nature which in the reasonable opinion of the Prime Banker might make the Prime Banker liable for the payment of money or liable in any other way the Prime Banker shall be and be kept indemnified in any reasonable amount and form satisfactory to the Prime Banker before taking such action.

9. Disclosures

Both parties to this Agreement will at all times respect and protect the confidentiality of information acquired in consequence of it except that disclosures of information may be made to comply with the requirements of law or of any regulatory or taxing authority.

10. Amendment, Modifications, etc.

This Agreement may be amended by written notification by one party to the other of changes which are necessary to enable the notifying party to comply with regulatory requirements to which it is subject from time to time and which do not materially alter the other party's rights or obligations hereunder. Save as hereinbefore provided, this Agreement may be amended, modified or waived only by written agreement signed by the parties hereto.

6



## 11. Termination

This Agreement may be terminated by the Company or the Prime Banker by ninety (90) days' notice to the other provided that any such notice given by the Company shall specify the names of the persons to whom the Cash in the Account shall be paid. If notice of termination is given by the Prime Banker, the Company shall, within ninety (90) days' following the giving of such notice, deliver to the Prime Banker a written notice specifying the names of the persons to whom the Cash shall be paid. In either case, the Prime Banker shall deliver such Cash to the persons so specified, after deducting therefrom any amounts owed to the Prime Banker. If within ninety (90) days' following the giving of a notice of termination by the Prime Banker the Prime Banker does not receive from the Company a written notice specifying the names of the persons to whom the Cash shall be paid, the Prime Banker shall continue to hold such Cash until a written notice as aforesaid is delivered to the Company, but without being subject to the obligations imposed on the Prime Banker hereunder.

## 12. Notices

Except as otherwise provided in this Agreement, all requests, demands or other communications between the parties or notices in connection herewith:

(a) shall be in writing, delivered by hand or sent by facsimile addressed:-

(i) if to the Company, to its address set forth on the signature page hereof; and
(ii) if to the Prime Banker, to, Mr. Daniel Deprez Department **Key Clients Desk Western Europe** Facsimile No. + 352 45 12 12 747; or
(iii) in either case to such other address as shall have been furnished by the receiving party pursuant to the provisions hereof; and

(b) shall be deemed effective when received, or in the case of a facsimile, when sent to the proper number and acknowledged by a proper answerback.

(c) (c) The Prime Banker shall not suffer any loss, damage, claims or liability for facsimile errors or any failure or errors in transmission

## 14 Compliance

The Company agrees and undertakes to the Prime Banker that it will comply (or ensure compliance by any agent or delegate) with all anti-money laundering legislation applicable to the Company or the Account and accordingly that it accepts full responsibility for the verification or identification of all investors in the Company or the Account for the purposes of complying with such legislation.

## 15. Successors and Assigns

This Agreement shall not be assignable by either party, but shall bind the successors in interest of the Company and the Prime Banker.

7

### 16. Governing law and jurisdiction

16.1 This Agreement shall be governed by and construed in accordance with the laws of the Grand-Duchy of Luxembourg.

16.2 The courts of the Grand-Duchy of Luxembourg shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement.

### 17. Headings

The headings of the clauses hereof are included for convenience of reference only and do not form a part of this Agreement.

### 18. Counterparts

This Agreement may be executed in any number of counterparts. All counterparts taken together will be deemed to constitute one document.

### 19. Effective Date

The effective Date of this Agreement shall be **September 1, 2005.**

**IN WITNESS WHEREOF** the parties hereto have executed this Prime Bank Agreement the day and year first hereinbefore written.

Signed for and on behalf of **GROUPEMENT FINANCIER LIMITED.**
by _PATRICK LITTAYE_    and _THIERRY MAGON DE LA VILLEHUCHET_

Signed for and on behalf of **UBS (Luxembourg) S.A.**
by _____ and _____

8

## SCHEDULE I

**AUTHORISED PERSONS** Schedule attaching to and forming an integral part of the Agreement between **GROUPEMENT FINANCIER LIMITED** and **UBS (Luxembourg) S.A.** dated September 1st, 2005

NAME    SPECIMEN SIGNATURE

Patrick LITTAYE

Thierry MAGON DE LA VILLEHUCHET

Approval can be provided by any authorized signatory signing individually

Signed for and on behalf of **GROUPEMENT FINANCIER LIMITED.**
by _Patrick LITTAYE_ and _Thierry Magon de la Ville Huchet_

Signed for and on behalf of **UBS (Luxembourg) S.A.**
by _____ and _____

9

## SCHEDULE II
### INSTRUCTION PROCEDURES

Schedule attaching to and forming an integral part of the Agreement between **GROUPEMENT FINANCIER LIMITED** and **UBS (Luxembourg) S.A.** dated **September 1, 2005.** All Proper Instructions shall be sent by facsimile to the Prime Banker at its address set out in clause 14 hereof and shall be sent for the attention of Mr. Daniel Deprez, Key Clients desk Western Europe for any such name as may be advised by the Prime Banker.

All Proper Instructions shall be by facsimile and given by such person or persons as the Company shall have authorised from time to time to give the particular class of Proper Instructions in question and whose name and (if applicable) signature and office facsimile number shall have been provided to the Prime Banker.

The Prime Banker shall be entitled to act on Proper Instructions received from any person who has been authorised by the Company in accordance with paragraph 2. above notwithstanding revocation of such authority, unless and until notice of the revocation is given by the Company and received by the Prime Banker.

Signed for and on behalf of **GROUPEMENT FINANCIER LIMITED.**
by _PATRICK LITTAYE_ and _THIERRY MAGON DE LA VILLEHUCHET_.

Signed for and on behalf of **UBS (Luxembourg) S.A.**
by _____ and _____

10

## SCHEDULE III FEES

Schedule attaching to and forming an integral part of the Agreement between **GROUPEMENT FINANCIER LIMITED** and **UBS (Luxembourg) S.A.** dated **September 1, 2005**

The Prime Banker is entitled to a commission of 0.15% / p.a., calculated on the Fund's average total net assets, less the average net assets owned by GROUPEMENT FINANCIER LEVERED, and payable monthly in arrears in accordance with the terms of the Fund's current Information Memorandum.

Signed for and on behalf of **GROUPEMENT FINANCIER LIMITED.**
by _PATRICK LITTAYE_ and _THIERRY MAGON DE LA VILLEHUCHET_

Signed for and on behalf of **UBS (Luxembourg) S.A.**
by _____ and _____