11425



# MEMORIAL
**Journal Officiel
du Grand-Duché de
Luxembourg**

# MEMORIAL
**Amtsblatt
des Großherzogtums
Luxemburg**

## RECUEIL DES SOCIETES ET ASSOCIATIONS

Le présent recueil contient les publications prévues par la loi modifiée du 10 août 1915 concernant les sociétés commerciales
et par loi modifiée du 21 avril 1928 sur les associations et les fondations sans but lucratif.

**C — N° 239**                                                                 **28 février 2004**

## SOMMAIRE

Accurate S.A., Frisange....................... 11452
Aderland Holding S.A., Luxembourg............ 11467
Aigle Equity Investments S.A.H., Luxembourg.... 11451
Albacore Lux S.A., Luxembourg ............... 11469
BCP Luxembourg Holdings, S.à r.l., Luxemburg .. 11455
Beartree Investments S.A.H., Luxembourg ...... 11470
Bycsa S.A., Luxembourg...................... 11454
C.L.F. S.A., Frisange ........................ 11452
Cap de l'Ecole Française Holding S.A., Luxem-
bourg.................................... 11470
Cemato, S.à r.l., Luxembourg................. 11453
Colas et Lang, S.à r.l., Luxembourg............. 11454
Compagnie Financière Luxembourgeoise d'Inves-
tissement et Participation «Cofilux» S.A.H., Lu-
xembourg................................. 11471
Compagnie Privée Commerciale Internationale
S.A., Luxembourg ......................... 11463
Compradore S.A.H., Luxembourg.............. 11465
Distribution Automobile Européenne, S.à r.l., Ho-
wald..................................... 11452
Elsa S.A.H., Luxembourg .................... 11469
Euromoneta, GmbH, Luxembourg ............. 11453
Fan S.A., Luxembourg....................... 11454
Foralim S.A., Luxembourg ................... 11462
Fuchs Invest, Sicav, Luxembourg .............. 11472
G.M.P. Group S.A., Luxembourg .............. 11463
Global Invest Umbrella Fund, Sicav, Luxembourg .. 11463
Global Investors, Sicav, Luxembourg............ 11462
Hager G.m.b.H. Internationale Transporte, Gre-
venmacher ............................... 11453
Intel Holding S.A., Luxembourg............... 11468
Inter Ikea Capital S.A.H., Alzingen ............ 11453
Inter Ikea Finance S.A. Holding, Luxembourg .... 11453
Inter Ikea Holding S.A., Luxembourg .......... 11453
Inter Ikea Investment, S.à r.l., Luxembourg ...... 11426
Intfideco S.A., Luxembourg .................. 11465

Kanlipe Holding S.A.H., Luxembourg .......... 11450
Kodifonti Luxembourg S.A.H., Luxembourg..... 11462
Korea Confectionery (Luxembourg), S.à r.l., Lu-
xembourg ................................ 11452
Lion 51 S.A.H., Luxembourg.................. 11471
Luxalpha Sicav, Luxembourg ................. 11426
Luxdrinks S.A., Luxembourg.................. 11451
Luxdrinks S.A., Luxembourg.................. 11451
MainFirst, Sicav, Luxembourg................. 11465
Maitland & Co, S.à r.l., Luxembourg ........... 11455
Maitland Management Services S.A., Luxembourg 11455
Matival S.A.H., Luxembourg.................. 11460
Matival S.A.H., Luxembourg.................. 11461
Morga S.A.H., Luxembourg................... 11451
Music World Europe S.A., Luxembourg ........ 11468
Navigator S.A., Luxembourg.................. 11468
Omnium de Participations S.A., Luxembourg ... 11456
Optimol, S.à r.l., Luxembourg ................ 11459
Oriflame Cosmetics S.A., Luxembourg ......... 11466
Parmeria S.A.H., Luxembourg ................ 11471
Plastichem S.A., Luxembourg................. 11464
Pletor Holding S.A., Strassen ................ 11464
Reyl (Lux) Global Funds, Sicav, Luxembourg .... 11471
Rock International S.A., Luxembourg .......... 11469
Schumann - Lavedrine Asset Management I, Sicav,
Luxembourg.............................. 11469
SEPINVEST S.A., Société Européenne de Partici-
pations et Investissement, Luxembourg ....... 11452
SOMALUX - Société de Matériel Luxembour-
geoise S.A.H., Luxembourg ................. 11472
Sopalux Holding S.A., Luxembourg ............ 11468
T.S.B., S.à r.l., Luxembourg.................. 11451
Taxalo S.A.H., Luxembourg .................. 11463
Unifida Holding S.A., Luxembourg............. 11467
Vista S.A.H., Luxembourg.................... 11470
Zatto Group S.A.H., Luxembourg ............. 11454

11426

**INTER IKEA INVESTMENT, S.à r.l., Société à responsabilité limitée.**
Siège social: L-1371 Luxembourg, 223, Val Sainte Croix.
R. C. Luxembourg B 69.198.

—

Le bilan au 31 décembre 2002, enregistré à Luxembourg, le 27 janvier 2004, réf. LSO-AM06306, a été déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.
Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Signature.

(009655.3//10) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

**LUXALPHA SICAV, Société d'Investissement à Capital Variable.**
Registered office: L-1150 Luxembourg, 291, route d'Arlon.
R. C. Luxembourg B 98.874.

—

STATUTES

In the year two thousand and four, on the fifth of February.
Before Us, Maître Henri Hellinckx, notary residing in Mersch, Grand Duchy of Luxembourg.

There appeared:
1) UBS (LUXEMBOURG) S.A., with its registered office at 36-38 Grand-Rue, L-1661 Luxembourg,
duly represented by Miss Frédérique Lefèvre, juriste, residing professionally in Luxembourg,
by virtue of a proxy given in Luxembourg, on February 4, 2004.
2) Me Pierre Delandmeter, attorney-at-law, residing professionally in 8-10 avenue Marie-Thérèse, L-2132 Luxembourg.
duly represented by Miss Frédérique Lefèvre, prenamed,
by virtue of a proxy given in Luxembourg, on February 4, 2004.
The proxies given, signed ne varietur shall remain annexed to the document to be filed with the registration authorities.

Such appearing parties, in the capacity in which they act, have requested the notary to state as follows the Articles of Incorporation of a société anonyme, which they form between themselves:

### Title I Name - Registered office - Duration - Purpose

#### Art. 1. - Name ·

There exists among the subscribers and all those who may become owners of shares hereafter issued, a public limited company («société anonyme») qualifying as an investment company with variable share capital («société d'investissement à capital variable») under the name of LUXALPHA SICAV (herein after the «Company»).

#### Art. 2. - Registered Office ·

The registered office of the Company is established in Luxembourg, Grand Duchy of Luxembourg. Branches, subsidiaries or other offices may be established either in the Grand Duchy of Luxembourg or abroad (but in no event in the United States of America, its territories or possessions) by decision of the Board of Directors (herein after the «Board»).

In the event that the Board determines that extraordinary political, economic or social developments have occurred or are imminent which would interfere with the normal activities of the Company at its registered office or with the ease of communication between such office and persons abroad, the registered office may be temporarily transferred abroad until the complete cessation of these abnormal circumstances; such provisional measures shall have no effect on the nationality of the Company which, notwithstanding such temporary transfer, will remain a Luxembourg corporation.

#### Art. 3. - Duration

The Company is established for an unlimited period of time. The Company may at any time be dissolved by a resolution of the shareholders, adopted in the manner required for amendment of these Articles of Incorporation by law.

#### Art. 4. Purpose

The exclusive purpose of the Company is to invest the funds available to it in transferable securities of all types and other assets permitted by law, within the limits of the investment policies and restrictions determined by the Board pursuant to Article 17 hereof with the purpose of spreading investment risks and affording its shareholders the result of the management of its assets.

The Company may take any measures and carry out any transaction which it may deem useful for the fulfilment and development of its purpose to the largest extent permitted under the law of December 20, 2002 regarding undertakings for collective investment or any legislative replacements or amendments thereof.

### Title II Share Capital - Shares - Net asset value

#### Art. 5. Share Capital

The capital of the Company shall at any time be equal to the total net assets of all Subfunds of the Company as defined in Article 10 hereof and shall be represented by fully paid up shares of no par value, divided into several categories, as the Board may decide to issue within the relevant Subfund.

The Board may decide, in accordance with Article 7, if and from which date shares of different categories shall be offered for sale, those shares to be issued on terms and conditions as shall be decided by the Board. A portfolio of assets

11427

shall be established for each Subfund of shares or for two or more categories of shares in the manner as described in article 10 hereof.

Such shares may, as the Board shall determine, be of different classes corresponding to separate portfolios of assets (each a «Subfund»), (which may as the Board may determine, be denominated in different currencies) and the proceeds of the issue of shares of each Subfund be invested pursuant to Article 4 hereof for the exclusive benefit of the relevant Subfund in transferable securities or other assets permitted by law as the Board may from time to time determine in respect of each Subfund.

With regard to creditors the Fund is a single legal entity the assets of a particular Subfund are only applicable to the debts, engagements and obligations of that Subfund. In respect of the relationship between the shareholders, each subfund is treated as a separate entity.

The minimum capital shall be the equivalent in USD of one million two hundred fifty thousand euro (EUR 1,250,000.-) and has to be reached within six months after the date on which the Company has been authorised as a collective investment undertaking under Luxembourg law. The initial capital is forty thousand USD (USD 40,000.-) divided into forty (40) fully paid up shares of no par value.

The Company has the power to acquire for its own account its shares at any time.

**Art. 6. - Form of Shares**

The Board shall determine whether the Company shall issue shares in bearer and/or in registered form.

Share certificates (herein after «the certificates») of the relevant category of any Subfund will be issued; if bearer certificates are to be issued, such certificates will be issued with coupons attached, in such denominations as the Board shall prescribe.

Certificates shall be signed by two directors. Such signatures shall be either manual, or printed, or in facsimile. However, one of such signatures may be made by a person duly authorised thereto by the Board, in which case, it shall be manual.

The Company may issue temporary certificates in such form as the Board may determine.

All issued registered shares of the Company shall be registered in the register of shareholders (herein after the «Register») which shall be kept by the Company or by one or more persons designated thereto by the Company, and such register shall contain the name of each owner of registered shares, his residence or elected domicile as indicated to the Company and the number of registered shares held by him and the amount paid up on each such share.

If bearer shares are issued, registered shares may be converted into bearer shares and bearer shares may be converted into registered shares at the request of the holder of such shares. A conversion of registered shares into bearer shares will be effected by cancellation of the registered share certificate, if any, and issuance of one or more bearer share certificates in lieu thereof, and an entry shall be made in the register of shareholders to evidence such cancellation. A conversion of bearer shares into registered shares will be effected by cancellation of the bearer certificate, and, if requested, by issuance of a registered share certificate in lieu thereof, and an entry shall be made in the register of shareholders to evidence such issuance. At the option of the Board, the costs of any such conversion may be charged to the shareholder requesting it.

Before shares are issued in bearer form and before registered shares shall be converted into bearer form, the Company may require assurances satisfactory to the Board that such issuance or conversion shall not result in such shares being held by a non authorised person as defined in Article 9 hereof.

In case of bearer shares, the Company may consider the bearer as the owner of the shares; in case of registered shares, the inscription of the shareholder's name in the register of shares evidences his right of ownership on such registered shares. The Company shall decide whether a certificate for such inscription shall be delivered to the shareholder or whether the shareholder shall receive a written confirmation of his shareholding.

If bearer shares are issued, transfer of bearer shares shall be effected by delivery of the relevant certificates. Transfer of registered shares shall be effected (i) if certificates have been issued, upon delivering the certificate or certificates representing such shares to the Company along with other instruments of transfer satisfactory to the Company, and (ii), if no share certificates have been issued, by a written declaration of transfer to be inscribed in the register of shareholders, dated and signed by the transferor and transferee, or by persons holding suitable powers of attorney to act therefore. Any transfer of registered shares shall be entered into the register of shareholders.

Shareholders entitled to receive registered shares shall provide the Company with an address to which all notices and announcements may be sent. Such address will also be entered into the register of shareholders.

In the event that a shareholder does not provide an address, the Company may permit a notice to this effect to be entered into the register of shareholders and the shareholder's address will be deemed to be at the registered office of the Company, or at such other address as may be so entered into by the Company from time to time, until another address shall be provided to the Company by such shareholder. A shareholder may, at any time, change his address as entered into the register of shareholders by means of a written notification to the Company at its registered office, or at such other address as may be set by the Company from time to time.

If any shareholder can prove to the satisfaction of the Company that his share certificate has been mislaid or destroyed, then, at his request, a duplicate certificate may be issued under such conditions and guarantees (including but not restricted to a bond issued by an insurance company), as the Company may determine. At the issuance of the new share certificate, on which it shall be recorded that it is a duplicate, the original certificate in replacement of which the new one has been issued shall become void.

Mutilated certificates may be cancelled by the Company and replaced by new certificates.

The Company may, at its election, charge to the shareholder the costs of a replacement certificate and all reasonable expenses incurred by the Company in connection with the issue and registration thereof or in connection with the voiding of the original certificate.

11428

The Company recognises only one single owner per share. If one or more shares are jointly owned or if the ownership of such share(s) is disputed, all persons claiming a right to such share(s) have to appoint one single attorney to represent such share(s) towards the Company. The failure to appoint such attorney implies a suspension of all rights attached to such share(s).

The Company may decide to issue fractional shares. Such fractional shares shall not be entitled to vote but shall be entitled to participate in the net assets of the Company on a pro rata basis. In the case of bearer shares, only certificates evidencing full shares will be issued.

### Art. 7. - Issue and conversion of Shares

Issue of shares

The Board is authorised without limitation to issue at any time additional shares of no par value fully paid up, in any category within any Subfund, without reserving the existing shareholders a preferential right to subscribe for the shares to be issued.

When shares are issued by the Company, the net asset value per share is calculated in accordance with Article 10 hereof. The issue price of shares to be issued is based on the net asset value per share of the relevant category of shares in the relevant Subfund, as determined in compliance with article 10 hereof plus any additional premium or cost as determined by the Board and as disclosed in the current prospectus. Any taxes, commissions and other fees incurred in the respective countries in which Company shares are sold will also be charged.

Shares will only be allotted upon acceptance of the subscription and receipt of payment of the issue price. The issue price is payable within 15 Luxembourg business days after the relevant Calculation Day. The subscriber will without undue delay, upon acceptance of the subscription and receipt of the issue price, receive title to the shares purchased by him.

Applications received by the paying agents and the sales agencies during normal business hours on a given Calculation Day in Luxembourg shall be settled at the issue price calculated on the following Calculation Day in Luxembourg. Applications can be submitted for payment in the reference currency which forms part of the name of the relevant Subfund or in another currency as may be determined from time to time by the Board.

Applications for the issue and conversion of shares received by the paying agents and sales agencies after the deadline mentioned above will be settled at the issue price calculated on the next following Calculation Day.

The Fund at its discretion may accept subscriptions in kind, in whole or in part. However in this case the investments in kind must be in accordance with the respective Subfund's investment policy and restrictions. In addition these investments will be audited by the Fund's appointed auditor.

The Board may delegate to any duly authorised director, manager, officer or to any other duly authorised agent the power to accept subscriptions, to receive payment of the price of the new shares to be issued and to deliver them.

The Company may, in the course of its sales activities and at its discretion, cease issuing shares, refuse purchase applications and suspend or limit in compliance with article 11 hereof, the sale for specific periods or permanently, to individuals or corporate bodies in particular countries or areas. The Company may also at any time compulsorily redeem shares from shareholders who are excluded from the acquisition or ownership of Company shares.

Conversion of shares

Any shareholder may request conversion of the whole or part of his shares corresponding to a certain Subfund into shares of another Subfund, provided that the issue of shares by this Subfund has not been suspended and provided that the Board may impose such restrictions as to, inter alia, the possibility or the frequency of conversion, and may make conversion subject to payment of such charge, as it shall determine and disclose in the current prospectus. Shares are converted according to a conversion formula as determined from time to time by the Board of Directors and disclosed in the current sales prospectus.

Shareholders may not convert shares of one category into shares of another category of the relevant Subfund or of another Subfund, unless otherwise determined by the Board of Directors and duly disclosed in the current prospectus.

The Board may resolve the conversion of one or several categories of shares of one Subfund into shares of another category of the same Subfund, in the case that the Board estimates that it is no longer economically reasonable to operate this or these categories of shares.

During the month following the publication of such a decision, as described in Article 23 hereafter, shareholders of the categories concerned are authorised to redeem all or part of their shares at their net asset value - free of charge - in accordance with the guidelines outlined in article 8.

Shares not presented for redemption will be exchanged on the basis of the net asset value of the corresponding category of shares calculated for the day on which this decision will take effect.

The same procedures apply to the submission of conversion applications as apply to the issue and redemption of shares. This conversion will be effected at the rounded net asset value increased by charges and transaction taxes, if any. However, the sales agency may charge an administrative fee which may be fixed by the Company.

### Art. 8. - Redemption of Shares

Any shareholder may request the redemption of all or part of his shares by the Company, under the terms and procedures set forth by the Board in the sales documents for the shares and within the limits provided by law and these Articles.

Payment of the redemption price will be executed in the reference currency of the relevant Subfund or in another currency as may be determined from time to time by the Board, within a period of time determined by the Board which will not exceed 15 business days after the relevant Calculation Day.

11429

The redemption price is based on the net asset value per share less a redemption commission if the Board so decides, whose amount is specified in the sales prospectus for the shares. Moreover, any taxes, commissions and other fees incurred in the respective countries in which Company shares are sold will be charged.

If as a result of any request for redemption, the number or the aggregate net asset value of the shares held by any shareholder would fall below such number or such value as determined by the Board, then the Company may decide that this request be treated as a request for redemption for the full balance of such shareholder's holding of shares.

Further, if on any Calculation Day redemption and conversion requests pursuant to this article exceed a certain level determined by the Board in relation to the number of shares in issue in any Subfund, the Board may decide that part or all of such requests for redemption or conversion will be deferred for a period and in a manner that the Board considers to be in the best interests of the relevant Subfund. On the next Calculation Day following that period, these redemption and conversion requests will be met in priority to later requests.

A redemption request shall be irrevocable, except in case of and during any period of suspension of redemption. Any such request must be filled by the shareholder in written form (which, for these purposes includes a request given by cable, telegram, telex or telecopier, or any other similar way of communication subsequently confirmed in writing) at the registered office of the Company or, if the Company so decides, with any other person or entity appointed by it as its agent for redemption of shares, together with the delivery of the certificate or certificates for such shares in proper form and accompanied by proper evidence of transfer or assignment.

The Board may impose such restrictions as it deems appropriate on the redemption of shares; the Board may, in particular, decide that shares are not redeemable during such period or in such circumstances as may be determined from time to time and provided for in the sales documents for the shares.

In the event of an excessively large volume of redemption applications, the Company may decide to delay execution of the redemption applications until the corresponding assets of the Company are sold without unnecessary delay. On payment of the redemption price, the corresponding Company share ceases to be valid.

All redeemed shares shall be cancelled.

The Fund, at its discretion, may, at the request of the investor accept redemptions in kind. In addition these redemptions (1) must not have negative effect for the remaining investors and (2) will be audited by the Fund's appointed auditor.

### Art. 9. - Restrictions on Ownership of Shares

The Company may restrict or prevent the ownership of shares in the Company by any person, firm or corporate body, namely any person in breach of any law or requirement of any country or governmental authority and any person which is not qualified to hold such shares by virtue of such law or requirement or if in the opinion of the Company such holding may be detrimental to the Company, if it may result in a breach of any law or regulation, whether Luxembourg or foreign, or if as a result thereof the Company may become subject to laws (including without limitation tax laws) other than those of the Grand Duchy of Luxembourg.

Specifically but without limitation, the Company may restrict the ownership of shares in the Company by any non authorised persons, as defined in this Article, and for such purposes the Company may:

A.- decline to issue any shares and decline to register any transfer of a share, where it appears to it that such registry or transfer would or might result in legal or beneficial ownership of such shares by a non authorised person or a person holding more than a certain percentage of capital determined by the Board («non authorised person»); and

B.- at any time require any person whose name is entered in, or any person seeking to register the transfer of shares on the register of shareholders, to furnish it with any information, eventually supported by affidavit, which it may consider necessary for the purpose of determining whether or not beneficial ownership of such shareholder's shares rests in an authorised person, or whether such registry will result in beneficial ownership of such shares by a non authorised person; and

C.- decline to accept the vote of any non authorised person at any meeting of shareholders of the Company; and

D.- where it appears to the Company that any non authorised person either alone or in conjunction with any other person is a beneficial owner of shares, direct such shareholder to sell his shares and to provide to the Company evidence of the sale within thirty (30) days of the notice. If such shareholder fails to comply with the direction, the Company may compulsorily redeem or cause to be redeemed from any such shareholder all shares held in the following manner:

(1) The Company shall serve a second notice (the «purchase notice») upon the shareholder holding such shares or appearing in the register of shareholders as the owner of the shares to be purchased, specifying the shares to be purchased as aforesaid, the manner in which the purchase price will be calculated and the name of the purchaser.

Any such notice may be served upon such shareholder by posting the same in a registered envelope addressed to such shareholder at his last address known to or appearing in the books of the Company. The said shareholder shall thereupon forthwith be obliged to deliver to the Company the share certificate or certificates representing the shares specified in the purchase notice.

Immediately after the close of business on the date specified in the purchase notice, such shareholder shall cease to be the owner of the shares specified in such notice and, in the case of registered shares, his name shall be removed from the register of shareholders, and in the case of bearer shares, the certificate or certificates representing such shares shall be cancelled.

(2) The price at which each such share is to be purchased (the «purchase price») shall be an amount based on the net asset value per share as at the Calculation Day specified by the Board for the redemption of shares in the Company next preceding the date of the purchase notice or next succeeding the surrender of the share certificate or certificates representing the shares specified in such notice, whichever is lower, all as determined in accordance with Article 8 hereof, less any service charge provided therein.

11430

(3) Payment of the purchase price will be made available to the former owner of such shares normally in the currency fixed by the Board for the payment of the redemption price of the shares of the Company and will be deposited for payment to such owner by the Company with a bank in Luxembourg or elsewhere (as specified in the purchase notice) upon final determination of the purchase price following surrender of the share certificate or certificates specified in such notice and unmatured distribution coupons attached thereto. Upon service of the purchase notice as aforesaid such former owner shall have no further interest in such shares or any of them, nor any claim against the Company or its assets in respect thereof, except the right to receive the purchase price (without interest) from such bank following effective surrender of the share certificate or certificates as aforesaid. Any funds receivable by a shareholder under this paragraph, but not collected within a period of five years from the date specified in the purchase notice, may not there-after be claimed and shall revert to the relevant Subfund. The Board shall have power from time to time to take all steps necessary to perfect such reversion and to authorise such action on behalf of the Company.

(4) The exercise by the Company of the powers conferred by this Article shall not be questioned or invalidated in any case, on the ground that there was insufficient evidence of ownership of shares by any person or that the true own-ership of any shares was otherwise than appeared to the Company at the date of any purchase notice, provided in such case the said powers were exercised by the Company in good faith.

### Art. 10.- Calculation of Net Asset Value per Share

The net asset value of one Subfund share results from dividing the total net assets of the Subfund by the number of its shares in circulation. The net assets of each Subfund are equal to the difference between the asset values of the Sub-fund and its liabilities. The net asset value per share is calculated in the reference currency of the relevant Subfunds and may be expressed in such other currencies as the Board may decide.

Referring to Subfunds for which different categories of shares have been issued, the net asset value per share is cal-culated for each category of shares. To this effect, the net asset value of the Subfund attributable to the relevant category is divided by the total outstanding shares of that category.

The total net assets of the Company are expressed in USD and correspond to the difference between the total assets of the Company and its total liabilities. For the purpose of this calculation, the net assets of each Subfund, if they are not denominated in USD, are converted into USD and added together.

I. The assets of the Subfunds shall include:

1) all cash in hand, receivable or on deposit, including any interest accrued thereon;

2) all bills and notes payable on demand and any account due (including the proceeds of securities sold but not yet collected);

3) all securities, shares, bonds, time notes, debentures, debenture stocks, subscription rights, warrants, options, and other securities, money market instruments and similar assets owned or contracted for by the Company;

4) all interest accrued on any interest-bearing assets owned by the relevant Subfund except to the extent that the same is included or reflected in the principal amount of such asset;

5) the preliminary expenses of the relevant Subfund, including the cost of issuing and distributing shares of the Com-pany, insofar as the same have not been written off;

6) all other assets of any kind and nature including expenses paid in advance.

The value of such assets shall be determined as follows:

(a) The value of securities which are listed on an official stock exchange or traded on any other regulated market will be valued at the last available price on the principal market on which such security is traded, as furnished by a pricing service approved by the Board of Directors.

(b) Based on the net acquisition price and by keeping the calculated investment return constant, the value of money market paper and of other debt securities with a residual maturity of less than one year is successively adjusted to the redemption price thereof. In the event of material changes in market conditions, the valuation basis is adjusted on the new market yields;

(c) debt securities with a residual maturity of more than one year and other securities are valued at the closing price, if they are listed on an official stock exchange. If the same security is quoted on several stock exchanges, the closing price on the stock exchange that represents the major market for this security will apply;

(d) Debt securities with a residual maturity of more than one year and other securities are valued at the last available price on this market, if they are not listed on an official stock exchange, but traded on another regulated market, which is recognised, open to the public and operating regularly;

(e) If these prices are not in line with the market, the respective securities, as well as the other legally admissible assets, will be valued at their market value which the Company, acting in good faith, shall estimate on the basis of the price likely to be obtained;

(f) Time deposits with an original maturity exceeding 30 days can be valued at their respective rate of return, provided the corresponding agreement between the credit institution holding the time deposits and the Company stipulates that these time deposits may be called at any time and that, if called for repayment, their cash value corresponds to this rate of return;

(g) Any cash in hand or on deposit, notes payable on demand, bills and accounts receivable, prepaid expenses, cash dividends, interests declared or accrued as aforesaid and not yet received shall be valued at their full nominal value, un-less in any case the same is unlikely to be paid or received in full, in which case the Board of Directors may value these assets with a discount he may consider appropriate to reflect the true value thereof;

(h) The value of swaps is calculated by the counterpart to the swap transactions, according to a method based on market value, recognised by the Board and verified by the Company's auditor.

11431

The value of all assets and liabilities not expressed in the reference currency of the Subfund will be converted into the reference currency of the Subfund at the middle rate between spot bid and spot ask rates, as quoted in Luxembourg, or if unavailable as quoted on a representative market for the relevant currency on the relevant Calculation Day.

The Board, in its discretion, may permit some other method of valuation to be used, if it considers that such valuation better reflects the fair value of any asset of the Company.

In the case of extensive redemption applications, the Company may establish the value of the shares of the relevant Subfund on the basis of the prices at which the necessary sales of assets of the Company are effected. In such an event, the same basis for calculation shall be applied for subscription and redemption applications submitted at the same time.

All valuation regulations and determinations shall be interpreted and made in accordance with generally accepted accounting principles.

If since the time of determination of the net asset value there has been a material change in the quotations in the markets on which a substantial portion of the investments of the Company attributable to the relevant Subfund are dealt in or quoted, the Company may, in order to safeguard the interests of the shareholders and the Company, cancel the first valuation and carry out a second valuation.

In the absence of bad faith, negligence or manifest error, every decision in calculating the net asset value taken by the Board or by any bank, company or other organisation which the Board may appoint for the purpose of calculating the net asset value (the «delegate of the board»), shall be final and binding on the Company and present, past or future shareholders.

II. The liabilities of the Subfunds shall include:

1) all loans, bills and accounts payable;

2) all accrued interest on loans of the Subfunds (including accrued fees for commitment for such loans);

3) all accrued or payable expenses (including administrative expenses, advisory and management fees, including incentive fees, custodian fees, and corporate agents' fees);

4) all known liabilities, present and future, including all matured contractual obligations for payments of money, including the amount of any unpaid distributions declared by the Subfund;

5) an appropriate provision for future taxes based on capital and income to the Calculation Day, as determined from time to time by the Company, and other reserves (if any) authorised and approved by the Board, as well as such amount (if any) as the Board may consider to be an appropriate allowance in respect of any contingent liabilities of the Company;

6) all other liabilities of each Subfund of whatsoever kind and nature reflected in accordance with generally accepted accounting principles. In determining the amount of such liabilities each Subfund shall take into account all expenses payable by the Company/Subfund which shall comprise formation expenses, fees payable to its investment managers or investment advisors, including performance related fees, fees and expenses payable to its accountants, custodian and its correspondents, domiciliary, administrative, registrar and transfer agents, any paying agent, any distributors and permanent representatives in places of registration, as well as any other agent employed by the Company respectively the Subfunds, the remuneration of the directors and their reasonable out-of-pocket expenses, insurance coverage and reasonable travelling costs in connection with board meetings, fees and expenses for legal and auditing services, any fees and expenses involved in registering and maintaining the registration of the Company with any Governmental agencies or stock exchanges in the Grand Duchy of Luxembourg and in any other country, reporting and publishing expenses, including the cost of preparing, translating, printing, advertising and distributing prospectuses, explanatory memoranda, periodical reports or registration statement, the cost of printing certificates, and the costs of any reports to shareholders, the cost of convening and holding shareholders' and Board' meetings, all taxes, duties, governmental and similar charges, and all other operating expenses, including the cost of buying and selling assets, the cost of publishing the issue and redemption prices, interest, bank charges and brokerage, postage, telephone and telex. The Subfund may accrue administrative and other expenses of a regular or recurring nature based on an estimated amount rateably for yearly or other periods.

III.- The assets shall be allocated as follows:

The Board of directors shall establish a Subfund in respect of each category of shares and may establish a Subfund in respect of two or more categories of shares in the following manner:

a) If two or more categories of shares relate to one Subfund, the assets attributable to such categories shall be commonly invested pursuant to the specific investment policy of the Subfund concerned. Within a Subfund, categories of shares may be defined from time to time by the Board so as to correspond to (i) a specific distribution policy, such as entitling to distributions («distribution shares») or not entitling to distributions («capitalisation shares») and/or (ii) a specific sales and redemption charge structure and/or (iii) a specific management or advisory fee structure;

b) The proceeds to be received from the issue of shares of a category shall be applied in the books of the Company to the Subfund corresponding to that category of shares, provided that if several categories of shares are outstanding in such Subfund, the relevant amount shall increase the proportion of the net assets of such Subfund attributable to the category of shares to be issued;

c) The assets and liabilities and income and expenditure applied to a Subfund shall be attributable to the category or categories of shares corresponding to such Subfund;

d) Where any asset is derived from another asset, such derivative asset shall be applied in the books of the Company to the same Subfund as the assets from which it was derived and on each revaluation of an asset, the increase or diminution in value shall be applied to the relevant Subfund;

e) Where the company incurs a liability which relates to any asset of a particular Subfund or to any action taken in connection with an asset of a particular Subfund, such liability shall be allocated to the relevant Subfund;

f) In the case where any asset or liability of the Company cannot be considered as being attributable to a particular Subfund, such asset or liability shall be allocated to all the Subfunds pro rata to the net asset values of the relevant cat-

11432

egories of shares or in such other manner as determined by the Board acting in good faith, provided that all liabilities, whatever Subfund they are attributable to, shall, unless otherwise agreed upon with the creditors, be binding upon the Company as a whole;

g) Upon the payment of distributions to the holders of any category of shares, the net asset value of such category of shares shall be reduced by the amount of such distributions.

IV. For the purpose of the Net Asset Value computation

1) Shares of the Company to be redeemed under Article 8 hereof shall be treated as existing and taken into account until immediately after the time specified by the Board on the relevant Calculation Day, and from such time and until paid by the Company the price therefore shall be deemed to be a liability of the Company;

2) shares to be issued by the Company shall be treated as being in issue as from the time specified by the Board on the Calculation Day on which such valuation is made, and from such time and until received by the Company the price therefore shall be deemed to be a debt due to the Company;

3) all investments, cash balances and other assets expressed in currencies other than the currency in which the net asset value for the relevant Subfund is calculated shall be valued after taking into account the market rate or rates of exchange in force at the date and time for determination of the net asset value of shares and

4) where on any Calculation Day the Company has contracted to:

- purchase any asset, the value of the consideration to be paid for such asset shall be shown as a liability of the Company and the value of the asset to be acquired shall be shown as an asset of the Company;

- sell any asset, the value of the consideration to be received for such asset shall be shown as an asset of the Company and the asset to be delivered shall not be included in the assets of the Company;

provided however, that if the exact value or nature of such consideration or such asset is not known on such Calculation Day, then its value shall be estimated by the Board.

**Art. 11. - Frequency and Temporary Suspension of Calculation of Net Asset Value per Share of Issue and Redemption of Shares**

The net asset value per share and the price for the issue and redemption of the shares shall be calculated from time to time by the Company or any agent appointed thereto by the Company, at least twice monthly at a frequency determined by the Board, such date or time of calculation being referred to herein as the «Calculation Day».

The Board may impose restrictions on the frequency at which shares shall be issued; the Board may, in particular, decide that shares shall only be issued during one or more offering periods or at some periodicity as provided for in the sales documents of the shares.

The Company may suspend the determination of the net asset value per share and the issue, conversion and redemption of shares in any Subfund from its shareholders during:

a) any period when any of the principal stock exchanges or other markets on which any substantial portion of the investments of the Company is quoted or dealt in, or when the foreign exchange markets corresponding to the currencies in which the net asset value or a considerable portion of the Company's assets are denominated, is closed otherwise than for ordinary holidays, or during which dealings therein are restricted or suspended, provided that the closing of such exchange or such restriction or suspension affects the valuation of the investments of the Company quoted thereon; or

b) the existence of any state of affairs which constitutes an emergency as a result of which disposals or valuation of assets owned by the Company would be impracticable or such disposal or valuation would be detrimental to the interests of shareholders; or

c) any breakdown in the means of communication or computation normally employed in determining the price or value of any of the investments of the Company or the current price or values on any stock exchange in respect of the assets of the Company; or

d) when for any other reason the prices of any investments owned by the Company cannot promptly or accurately be ascertained; or

e) any period when the Company is unable to repatriate funds for the purpose of making payments on the redemption of the shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemption of shares cannot in the opinion of the Board be effected at normal rates of exchange;

f) upon the publication of a notice convening a general meeting of shareholders for the purpose of resolving the winding-up of the Company.

Any such suspension shall be published, if appropriate, by the Company and may be notified to shareholders having made an application for subscription, conversion or redemption of shares for which the calculation of the net asset value has been suspended.

### Title III Administration and Supervision

**Art. 12. Directors**

The Company shall be managed by a Board composed of not less than three members, who need not be shareholders of the Company. They shall be elected for a term not exceeding six years. The directors shall be elected by the shareholders at a general meeting of shareholders; the latter shall further determine the number of directors, their remuneration and the term of their office.

Directors shall be elected by the majority of the votes of the shares present or represented.

Any director may be removed with or without cause or be replaced at any time by resolution adopted by the general meeting.

In the event of a vacancy in the office of director, the remaining directors may temporarily fill such vacancy; the shareholders shall take a final decision regarding such nomination at their next general meeting.

11433

### Art. 13. Board meetings

The Board shall choose from among its members a chairman, and may choose from among its members one or more vice-chairmen. It may also choose a secretary, who need not be a director, who shall write and keep the minutes of the meetings of the Board and of the shareholders. The Board shall meet upon call by the chairman or any two directors, at the place indicated in the notice of meeting.

The chairman shall preside at the meetings of the directors and of the shareholders. In his absence, the shareholders or the board members shall decide by a majority vote that another director, or in case of a shareholders' meeting, that any other person shall be in the chair of such meetings.

The Board may appoint any officers, including a general manager and any assistant general managers as well as any other officers that the Company deems necessary for the operation and management of the Company. Such appointments may be cancelled at any time by the Board. The officers need not be directors or shareholders of the Company. Unless otherwise stipulated by these articles of incorporation, the officers shall have the rights and duties conferred upon them by the Board.

Written notice of any meeting of the Board shall be given to all directors at least twenty-four hours prior to the date set for such meeting, except in circumstances of emergency, in which case the nature of such circumstances shall be set forth in the notice of meeting. This notice may be waived by consent in writing, by telegram, telex, telefax or any other similar means of communication. Separate notice shall not be required for meetings held at times and places fixed in a resolution adopted by the Board.

Any director may act at any meeting by appointing in writing, by telegram, telex or telefax or any other similar means of communication another director as his proxy. A director may represent several of his colleagues.

Any director may participate in a meeting of the Board by conference call or similar means of communications equipment whereby all persons participating in the meeting can hear each other, and participating in a meeting by such means shall constitute presence in person at such meeting.

The directors may only act at duly convened meetings of the Board. The directors may not bind the Company by their individual signatures, except if specifically authorised thereto by resolution of the Board.

The Board can deliberate or act validly only if at least the majority of the directors, or any other number of directors that the board may determine, are present or represented.

Resolutions of the Board will be recorded in minutes signed by the chairman of the meeting. Copies of extracts of such minutes to be produced in judicial proceedings or elsewhere will be validly signed by the chairman of the meeting or any two directors.

Resolutions are taken by a majority vote of the directors present or represented.

Resolutions in writing approved and signed by all directors shall have the same effect as resolutions voted at the directors' meetings; each director shall approve such resolution in writing, by telegram, telex, telefax or any other similar means of communication. Such approval shall be confirmed in writing and all documents shall form the record that proves that such decision has been taken.

### Art. 14. Powers of the Board

The Board is vested with the broadest powers to perform all acts of disposition and administration within the Company's purpose, in compliance with the investment policy as determined in Article 17 hereof.

All powers not expressly reserved by law or by the present Articles of Incorporation to the general meeting of shareholders are in the competence of the board.

In accordance with article 72.2 of the Luxembourg law of August 10, 1915, the Board of Directors is authorised to decide the payment of interim dividends.

### Art. 15. Corporate Signature

Vis-à-vis third parties, the Company is validly bound by the joint signatures of any two directors or by the joint or single signature of any person(s) to whom authority has been delegated by the Board.

### Art. 16. Delegation of power

The Board of the Company may delegate its powers to conduct the daily management and affairs of the Company (including the right to act as authorised signatory for the Company) and its powers to carry out acts in furtherance of the corporate policy and purpose to one or several physical persons or corporate entities, which need not to be members of the board and who shall have the powers determined by the Board and who may, if the Board so authorises, sub-delegate their powers.

### Art. 17. Investment Policies and Restrictions

The Board, based upon the principle of risk diversification, has the power to determine the investment policies and strategies of the Company and the course of conduct of the management and business affairs of the Company, within the restrictions as shall be set forth by the Board in compliance with the law of December 20, 2002 or be laid down in the laws and regulations of those countries where the shares are offered for sale to the public, or shall be adopted from time to time by resolutions of the Board and as shall be described in any prospectus referring to the offer of the shares.

In the determination and implementation of the investment policy the Board of Directors may cause the assets of the Company to be invested in:

(i) transferable securities and money market instruments admitted to official listing on a stock exchange in an Eligible State. (For this purpose an «Eligible State» shall mean any member State of the Organisation for the Economic Cooperation and Development («OECD») and any other country of Europe, North, Central & South America, Asia, Africa and the Pacific Basin); and/or

(ii) transferable securities and money market instruments dealt in on another regulated market in an Eligible State which operates regularly and is recognised and open to the public (a «Regulated Market»); and/or

11434

(iii) recently issued transferable securities and money market instruments, provided that the terms of issue include an undertaking that application will be made for admission to official listing on a stock exchange or Regulated Market in an Eligible State provided that the choice of the stock exchange or the market has been provided for in the constitutional documents of the undertaking for collective investment in transferable securities («UCITS») and such admission is se-cured within a year of issue; and/or

(iv) units of UCITS authorised according to Directive 85/611/EEC as amended and/or other undertakings for collec-tive investment («UCIs») within the meaning of Article 1, paragraph (2) first and second indents of Directive 85/611/EEC as amended, should they be situated in a Member State of the European Union or not, provided that:

- such other UCIs are authorised under laws which provide that they are subject to supervision considered by the Commission de Surveillance du Secteur Financier («CSSF») to be equivalent to that laid down in Community law, and that cooperation between authorities is sufficiently ensured;

- the level of protection for unit-holders in the other UCIs is equivalent to that provided for unit-holders in a UCITS, and in particular that the rules on asset segregation, borrowing, lending, uncovered sales of transferable securities and money market instruments are equivalent to the requirements of Directive 85/611/EEC as amended;

- the business of the other UCIs is reported in half-yearly and annual reports to enable an assessment to be made of the assets and liabilities, income and operations over the reporting period.

No more than ten (10) per cent of the UCITS' or the other UCIs' assets, whose acquisition is contemplated, can, according to their constitutional documents, be invested in aggregate in units of other UCITS or other UCIs; and/or

(v) deposits with credit institutions which are repayable on demand or have the right to be withdrawn, and maturing in no more than twelve (12) months, provided that the credit institution has its registered seat in a Member State of the European Union (a «Member State») or, if the registered seat of the credit institution is situated in a non-Member State, provided that it is subject to prudential rules considered by the CSSF as equivalent to those laid down in Com-munity law; and/or

(vi) money market instruments other than those dealt in on a Regulated Market, which are liquid and whose value can be determined with precision at any time, if the issue or issuer of such instruments is itself regulated for the purpose of protecting investors and savings, and provided that they are:

- issued or guaranteed by a central, regional or local authority or central bank of a Member State, the European Cen-tral Bank, the European Union or the European Investment Bank, a non-Member State or, in the case of a Federal State, by one of the members making up the federation, or by a public international body to which one or more Member States belong, or

- issued by a company any securities of which are dealt in on Regulated Markets referred to in items (i), (ii) or (iii) above, or

- issued or guaranteed by an establishment subject to prudential supervision, in accordance with criteria defined by Community law, or by an establishment which is subject to and complies with prudential rules considered by the CSSF to be at least as stringent as those laid down by Community law, or

- issued by other bodies belonging to the categories approved by the CSSF provided that investments in such instru-ments are subject to investor protection equivalent to that laid down in the first, the second or the third indents and provided that the issuer is a company whose capital and reserves amount to at least ten million euros (EUR 10,000,000.-) and which presents and publishes its annual accounts in accordance with the fourth directive 78/660/EEC, is an entity which, within a group of companies which includes one or several listed companies, is dedicated to the financing of the group or is an entity which is dedicated to the financing of securitisation vehicles which benefit from a banking liquidity line; and/or

(vii) financial derivative instruments, including equivalent cash-settled instruments in accordance with articles 41 (1) g) and 42 (2) of the law of December 20, 2002.

Provided that the Company may also invest in transferable securities and money market instruments other than those referred to above; provided further that the total of such investment shall not exceed ten (10) percent of the net assets attributable to sub-Fund.

The Company may invest up to a maximum of thirty-five (35) per cent of the net assets of any or of all the Sub-Funds in transferable securities or money market instruments issued or guaranteed by a Member State, its local authorities, by another Eligible State or by public international bodies of which one or more Member States are members.

The Company may further invest up to hundred (100) per cent of the net assets of any Sub-Fund, in accordance with the principle of risk spreading, in transferable securities and money market instruments issued or guaranteed by a Mem-ber State, by its local authorities or by a member State of the OECD or by public international bodies of which one or more Member States are members, provided the relevant Sub-Fund holds securities from at least six different issues and securities from one issue do not account for more than thirty (30) per cent of the total net assets of such Sub-Fund.

In case of investment in the units of other UCITS and/or other UCIs that are managed, directly or by delegation, by the Investment Manager of the Company (the «Investment Manager») or by any other Company which is linked to the Investment Manager by common management or control or by a substantial direct or indirect holding (a «Linked Com-pany»), neither the Investment Manager nor the Linked Company may charge subscription or redemption fees on ac-count of the Company's investment in the units of such UCITS and/or UCI.

### Art. 18. Conflict of Interest

No contract or other transaction between the Company and any other company or firm shall be affected or invali-dated by the fact that any one or more of the directors or officers of the Company is interested in, or is a director, associate, officer or employee of such other company or firm. Any director or officer of the Company who serves as a director, officer or employee of any company or firm with which the Company shall contract or otherwise engage in

11435

business shall not, by reason of such affiliation with such other company or firm, be prevented from considering and voting or acting upon any matters with respect to such contract or other business.

In the event that any director or officer of the Company may have in any transaction of the Company an interest different to the interests of the Company, such director or officer shall make known to the Board such conflict of interest and shall not consider or vote on any such transaction, and such transaction and such director's or officer's interest therein shall be reported to the next succeeding general meeting of shareholders.

The term «conflict of interests», as used in the preceding sentence, shall not include any relationship with or without interest in any matter, position or transaction involving the sponsor, the Portfolio Managers, the Investment Advisors, the Custodian, the distributors as well as any other person, company or entity as may from time to time be determined by the Board on its discretion.

### Art. 19. Indemnification of Directors

The Company may indemnify any director or officer, and his heirs, executors and administrators, against expenses reasonably incurred by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being or having been a director or officer of the Company or, at its request, of any other company of which the Company is a shareholder or a creditor and from which he is not entitled to be indemnified, except in relation to matters as to which he shall be finally adjudged in such action, suit or proceeding to be liable for gross negligence or misconduct; in the event of a settlement, indemnification shall be provided only in connection with such matters covered by the settlement as to which the Company is advised by counsel that the person to be indemnified did not commit such a breach of duty. The foregoing right of indemnification shall not exclude other rights to which he may be entitled.

### Art. 20. Auditors

The accounting data related in the Annual Report of the Company shall be examined by an auditor («réviseur d'entreprises agréé») appointed by the general meeting of shareholders and remunerated by the Company.

The Auditor shall fulfil all duties prescribed by the law of December 20, 2002 regarding undertakings for collective investment.

### Title IV General meetings - Accounting year - Distributions

### Art. 21. Representation

The general meeting of shareholders shall represent the entire body of shareholders of the Company. Its resolutions shall be binding upon all the shareholders of the Company. It shall have the broadest powers to order, carry out or ratify acts relating to the operations of the Company.

### Art. 22. General Meetings

The general meeting of shareholders shall meet upon call by the Board.

It may also be called upon the request of shareholders representing at least one fifth of the share capital.

The annual general meeting shall be held in accordance with Luxembourg law at Luxembourg-City at a place specified in the notice of meeting, on the 15th day of May at 11.30 hours a.m.

If such day is not a business day in Luxembourg, the annual general meeting shall be held on the next following business day.

Other meetings of shareholders may be held at such places and times as may be specified in the respective notices of meeting.

Shareholders shall meet upon call by the Board pursuant to a notice setting forth the agenda sent at least eight days prior to the meeting to each registered shareholder at the shareholder's address in the register of shareholders. The giving of such notice to registered shareholders need not be justified to the meeting. The agenda shall be prepared by the Board except in the instance where the meeting is called on the written demand of the shareholders in which instance the Board may prepare a supplementary agenda.

If bearer shares are issued, the notice of meeting shall, in addition, be published as provided for by law in the «Mémorial, Recueil des Sociétés et Associations», in one or more Luxembourg newspapers, and in such other newspapers as the Board may decide.

If all shares are in registered form and if no publications are made, notices to shareholders may be mailed by registered mail only.

If all shareholders are present or represented and consider themselves as being duly convened and informed of the agenda, the general meeting may take place without notice of meeting.

The Board may determine all other conditions that must be fulfilled by shareholders in order to attend any meeting of shareholders.

The business transacted at any meeting of the shareholders shall be limited to the matters contained in the agenda (which shall include all matters required by law) and business incidental to such matters.

Each share in whatever Subfund and category, regardless of the Net Asset Value per share of such category within such Subfund is entitled to one vote, in compliance with Luxembourg law and these Articles of Incorporation. Only full shares are entitled to vote. A shareholder may act at any meeting of shareholders by giving a written proxy to another person, who need not be a shareholder and who may be a director of the Company.

Resolutions concerning the interests of shareholders of the Company shall be taken in a general meeting and resolutions concerning the particular rights of the shareholders of one specific Subfund shall, in addition, be taken by this Subfund's general meeting.

Unless otherwise provided by law or herein, resolutions of the general meeting are passed by a simple majority vote of the shareholders present or represented.

As long as the share capital is divided into different Subfunds, the rights attached to the shares of any Subfund (unless otherwise provided by the terms of issue of the shares of the Subfund) may, whether or not the Company is being

11436·

wound up, be varied with the sanction of a resolution passed at a separate general meeting of the holders of the shares of that Subfund by a majority of two-thirds of the votes cast at such separate general meeting. To every such separate general meeting the provisions of these Articles relating to general meeting shall mutatis mutandis apply, but so that the minimum necessary quorum at every such separate general meeting shall be holders of the shares of the relevant Subfund present in person or by proxy holding not less than one-half of the issued shares of that Subfund (or, if at any adjourned Subfund meeting the number of holders or quorum as defined above is not present, any one person present holding shares of that Subfund or his proxy shall be quorum).

### Art. 23. Liquidation and Merging of Subfunds

The Board may resolve the liquidation of one or several Subfunds in the case that the respective Subfund's net assets fall below the equivalent of ten million euros (10,000.000.- EUR) being the minimum level for such Subfund to be operated in an economically efficient manner, or in case of changes in the political or economic environment.

Upon proposal by the Board, the general meeting of the shareholders of a Subfund can reduce the capital of the Company by cancellation of all the shares issued by this Subfund and refund to the shareholders the net asset value of their shares. The net asset value is calculated for the day on which the decision shall take effect, taking into account the actual price realised on liquidating the Subfund's assets and any costs arising from this liquidation.

, The shareholders will be informed of the general meeting's decision or the Board's decision to withdraw shares of a specific Subfund, as the case may be, via a corresponding bulletin published in the «Mémorial» and the «Luxemburger Wort» in Luxembourg. The countervalue of the net asset value of shares liquidated which have not been presented by shareholders for redemption shall be deposited with the Custodian for a period of six months; after such period, the liquidation proceeds not distributed will be deposited with the Caisse des Consignations in Luxembourg until expiry of the legal prescription period.

Under the same circumstances as provided in the first paragraph of this Article, the Board may decide the cancellation of shares of a specified Subfund or Subfunds and the allocation of shares/units to be issued by another Subfund or another UCI (Undertaking for collective Investment) organised under Part I of the Luxembourg law relating to undertakings for collective investment enacted on December 20, 2002. Notwithstanding the powers conferred to the Board in this paragraph, the decision of a merger as described herein may also be taken by a general meeting of the shareholders of the Subfund concerned. The shareholders will be informed of the decision to merge in the same way as previously described for the withdrawal of shares.

During the month following the publication of such a decision, shareholders are authorised to redeem all or part of their shares at their net asset value - free of charge - in accordance with the guidelines outlined in article 8. Shares not presented for redemption will be exchanged on the basis of the net asset value of the corresponding Subfund shares calculated for the day on which this decision will take effect. In the case where the units to be allocated are units of a collective investment fund, the decision is binding only for the shareholders who voted in favour of the allocation. At the general meeting referred to in the preceding paragraphs, there is no minimum quorum required and decisions can be taken with a simple majority of shares present or represented.

### Art. 24. Accounting year

The accounting year of the Company shall commence on the first of January of each year and shall terminate on the last day of December of the same year.

### Art. 25. Distributions

The general meeting of shareholders of each Subfund shall, within the limits provided by law, determine how the results of the Company shall be disposed of, and may from time to time declare, or authorise the Board to declare distributions, provided, however, that the minimum capital of the Company does not fall below the prescribed minimum capital.

The Board may decide to pay interim dividends in compliance with the conditions set forth by law.

The payment of any distributions shall be made to the address indicated on the register of shareholders in case of registered shares and upon presentation of the dividend coupon to the agent or agents therefore designated by the Company in case of bearer shares.

Distributions may be paid in such currency and at such time and place that the Board shall determine from time to time.

The Board may decide to distribute stock dividends in lieu of cash dividends upon such terms and conditions as may be set forth by the Board.

No interest shall be paid on a dividend declared by the Company and kept by it at the disposal of its beneficiary.

Payment of dividends to holders of bearer shares, and notice of declaration of such dividends, will be made to such shareholders in the manner determined by the Board from time to time in accordance with Luxembourg Law.

A dividend declared but not paid on a share cannot be claimed by the holder of such share after a period of five years from the notice given thereof, unless the Board has waived or extended such period in respect of all shares, and shall otherwise revert after expiry of the period to the relevant category within the relevant Subfund of the Company. The Board shall have power from time to time to take all steps necessary and to authorise such action on behalf of the Company to perfect such reversion. No interest will be paid on dividends declared, pending their collection.

### Title V Final provisions

### Art. 26. Custodian

To the extent required by law, the Company shall enter into a custody agreement with a banking or saving institution as defined by the law of 5 April 1993 on the financial sector (herein referred to as the «Custodian»).

The Custodian shall fulfil the duties and responsibilities as provided for by the law of December 20, 2002 regarding undertakings for collective investment.

11437

If the Custodian desires to retire, the Board shall use its best endeavours to find a successor Custodian within two months of the effectiveness of such retirement. The directors may terminate the appointment of the Custodian but shall not remove the Custodian unless and until a successor custodian shall have been appointed to act in the place thereof.

### Art. 27. Dissolution

The Company may at any time be dissolved by a resolution of the general meeting subject to the quorum and majority requirements referred to in Article 28 hereof.

Whenever the share capital falls below two thirds of the minimum capital indicated in Article 5 hereof, the question of the dissolution of the Company shall be referred to the general meeting by the Board. The general meeting, for which no quorum shall be required, shall decide by simple majority of the votes of the shares represented át the meeting.

The question of the dissolution of the Company shall further be referred to the general meeting whenever the share capital falls below one fourth of the minimum capital set by Article 5 hereof; in such an event, the general meeting shall be held without any quorum requirements and the dissolution may be decided by the votes of the shareholders holding one fourth of the shares represented at the meeting.

The meeting must be convened so that it is held within a period of forty days from ascertainment that the net assets of the Company have fallen below two thirds or one fourth of the legal minimum, as the case may be.

### Art. 28. Amendments to the Articles of Incorporation

These Articles of Incorporation may be amended by a general meeting of shareholders subject to the quorum and majority requirements provided by the law of 10 August 1915 on commercial companies, as amended.

### Art. 29. Statement

Words importing a masculine gender also include the feminine gender and words importing persons or shareholders also include corporations, partnerships, associations and any other organised group of persons whether incorporated or not.

The term «business day» referred to in this document, shall mean the usual bank business days (i.e. each day on which banks are opened during normal business hours) in Luxembourg with the exception of some non-regulatory holidays.

### Art. 30. Applicable Law

All matters not governed by these Articles of Incorporation shall be determined in accordance with the law of 10 August 1915 on commercial companies and the law of December 20, 2002 regarding undertakings for collective investment as such laws have been or may be amended from time to time.

#### Transitory Dispositions

1) The first accounting year will begin on the date of the formation of the Company and will end on December thirty one two thousand and four.

2) The first annual general meeting will be held in two thousand and five.

#### Subscription and Payment

The share capital of the Company is subscribed as follows:

1) UBS (LUXEMBOURG) S.A., above named, subscribes for thirty nine (39) shares, resulting in a total payment of thirty-nine thousand USD (39,000.- USD).

2) Mr Pierre Delandmeter, above named, subscribes for one (1) share, resulting in a total payment of one thousand USD (1,000.- USD).

Evidence of the above payments, totalling forty thousand USD (USD 40,000.-) was given to the undersigned notary.

#### Declaration

The undersigned notary declares that the conditions enumerated in article 26 of the law of August 10, 1915 on commercial companies are fulfilled.

#### Expenses

The expenses which shall be borne by the Company as a result of its creation are estimated at approximately seven thousand euros (7.000.- EUR).

#### General Meeting of Shareholders

The above named persons representing the entire subscribed capital and considering themselves as validly convened, have immediately proceeded to hold a general meeting of shareholders which resolved as follows:

I. The following are elected as directors for a term to expire at the close of the annual general meeting of shareholders which shall deliberate on the annual accounts as at December 31, 2004:

* Roger Hartmann, Managing Director, UBS (LUXEMBOURG) S.A.

* Bernd Stiehl, Executive Director, UBS (LUXEMBOURG) S.A.

* Alain Hondequin, Executive Director, UBS (LUXEMBOURG) S.A.

* Hermann Kranz, Executive Director, UBS (LUXEMBOURG) S.A.

* Pierre Delandmeter, Attorney at law, Luxembourg

II. The following is elected as independent auditor for an unlimited period of time: ERNST & YOUNG, 7, Parc d'Activité Syrdall, L-5365 Munsbach.

III. The address of the Company is set at Luxembourg, 291, route d'Arlon.

IV. In compliance with Article 60 of the Law of August 10, 1915 on commercial companies, as amended, the general meeting authorises the Board to delegate the day-to-day management of the Company as well as the representation of the Company in connection therewith to one or several of its members.

11438

The undersigned notary who understands and speaks English, states herewith that on request of the above appearing persons, the present deed is worded in English followed by a French translation; on the request of the same appearing persons and in case of divergence between the English and the French text, the English version will be prevailing.

Whereof the present notarial deed was drawn up in Luxembourg, on the day named at the beginning of this document.

The document having been read to the appearing persons, all of whom are known to the notary by their surnames, Christian names, civil status and residences, the said persons appearing signed together with us, the notary, the present original deed.

### Suit la traduction française du texte qui précède:

L'an deux mille quatre, le cinq février.

Par-devant Maître Henri Hellinckx, notaire de résidence à Mersch, Grand-Duché de Luxembourg.

Ont comparu:

1) UBS (LUXEMBOURG) S.A., ayant son siège social au 36-38 Grand-Rue, L-1661 Luxembourg,

ici représentée par Mademoiselle Frédérique Lefèvre, juriste, résidant professionellement à Luxembourg,

en vertu d'une procuration donnée à Luxembourg, 4 février 2004.

2) Monsieur Pierre Delandmeter, Avocat à la Cour, résidant professionellement à Luxembourg

ici représenté par Mademoiselle Frédérique Lefèvre, prénommée,

en vertu d'une procuration donnée à Luxembourg, le 4 février 2004.

Les prédites procurations, signées ne varietur par les personnes comparantes et le notaire instrumentant, resteront annexées au présent acte avec lequel elles seront soumises aux formalités de l'enregistrement.

Les parties comparantes, ès qualités en vertu desquelles elles agissent, ont demandé au notaire d'arrêter les statuts d'une société anonyme qu'elles forment entre elles:

### Titre Ier Dénomination - Siège social - Durée - Objet

#### Art. 1er. - Dénomination

Il existe entre les souscripteurs et tous ceux qui deviendront propriétaires par la suite des actions ci-après créées, une société anonyme sous la forme d'une société d'investissement à capital variable sous la dénomination de LUX-ALPHA SICAV (la Société).

#### Art. 2. - Siège Social

Le siège social de la Société est établi à Luxembourg, Grand-Duché de Luxembourg. La Société peut établir, par simple décision du conseil d'administration (ci-après «le conseil»), des filiales, des succursales ou des bureaux, tant dans le Grand-Duché de Luxembourg qu'à l'étranger (à l'exception des Etats-Unis d'Amérique, de ses territoires ou possessions).

Au cas où le conseil d'administration estimerait que des événements extraordinaires d'ordre politique, économique ou social, de nature à compromettre l'activité normale de la Société à son siège social ou la communication avec ce siège ou de ce siège avec l'étranger, se présentent ou paraissent imminents, il pourra transférer provisoirement le siège social à l'étranger jusqu'à cessation complète de ces circonstances anormales; cette mesure provisoire n'aura toutefois aucun effet sur la nationalité de la Société, laquelle, nonobstant ce transfert provisoire, restera luxembourgeoise.

#### Art. 3. - Durée

La Société est constituée pour une durée illimitée. L'assemblée générale peut en tout temps dissoudre la Société en observant les règles de quorum et de majorité prescrites par la loi pour la modification des présents statuts.

#### Art. 4. - Objet

L'objet exclusif de la Société est d'investir les fonds dont elle dispose en valeurs mobilières de toute nature et en autres valeurs autorisées par la loi dans le cadre de la politique et des restrictions d'investissement déterminées par le conseil d'administration conformément à l'article 17 ci-après, avec l'objectif de répartir les risques d'investissement et de faire bénéficier ses actionnaires des résultats de la gestion de ses actifs.

La Société peut prendre toutes mesures et faire toutes opérations qu'elle jugera utiles à l'accomplissement et au développement de son objet, au sens le plus large autorisé par la loi du 20 décembre 2002 relative aux organismes de placement collectif ainsi que toute substitution ou modification de cette loi.

### Titre II Capital social - Actions - Valeur nette d'inventaire

#### Art. 5. Capital Social

Le capital de la Société sera représenté par des actions entièrement libérées, sans mention de valeur, pouvant être émises dans les Sous-fonds respectifs et suite à une décision du conseil d'administration en différentes catégories, et sera à tout moment égal à la somme des actifs nets des Sous-fonds, établis conformément à l'article 10 ci-dessous.

Le conseil d'administration peut décider conformément à l'article 7 ci-après, si et pour quelle date des actions d'autres catégories sont offertes à la vente. Ces actions sont émises à des termes et conditions fixés par le conseil d'administration. Pour chaque Sous-Fonds d'actions ou pour deux ou plusieurs catégories d'actions doit être établi un portefeuille d'avoirs d'une façon telle que décrite dans l'article 10 ci-après.

Celui-ci peut décider que ces actions soient de classes différentes, chacune en rapport avec la constitution d'un patrimoine déterminé (le «Sous-fonds»), (qui, par résolution du conseil d'administration peuvent être libellées en différentes devises). Les fonds collectés lors de l'émission de ces actions pour chaque Sous-fonds sont à investir conformément à l'article 4 ci-dessus au profit exclusif du Sous-fonds concerné en valeurs mobilières ou tous autres avoirs autorisés par la loi que le conseil d'administration déterminera de temps en temps pour chaque Sous-fonds.

11439

En ce qui concerne les créanciers de la Société, la Société doit être considérée comme une seule unité juridique. Les actifs d'un compartiment déterminé ne répondent que des dettes, engagements et obligations qui concernent ce compartiment. Dans les relations entre porteurs de parts, chaque compartiment est considéré séparément.

Le capital minimum sera celui prévu par la loi, soit actuellement l'équivalent en USD de un million deux cent cinquante mille euros (1.250.000,- EUR). Le capital minimum de la Société doit être atteint dans un délai de six mois à partir de la date à laquelle la Société a été agréée en tant qu'organisme de placement collectif selon la loi luxembourgeoise. Le capital initial est de quarante mille USD (USD 40.000,-) divisé en quarante (40) actions entièrement libérées, sans mention de valeur. La Société peut en tout temps acquérir pour son compte ses propres actions.

### Art. 6. - Forme des Actions

Le conseil d'administration déterminera si la Société émettra des actions au porteur et/ou nominatives; des certificats d'actions («les Certificatsn) des différentes catégories de chaque Sous-fonds sont émis. Si des Certificats au porteur sont émis, ils le seront avec les coupons attachés et dans des dénominations choisies par le conseil d'administration.

Les Certificats d'actions seront signés par deux administrateurs. Les deux signatures pourront être soit manuscrites, soit imprimées, soit apposées au moyen d'une griffe. Toutefois une des signatures pourra être apposée par une personne déléguée à cet effet par le conseil d'administration; dans ce cas, elle devra être manuscrite. La Société pourra émettre des Certificats temporaires dans des formes qui seront déterminées par le conseil d'administration.

Toutes les actions nominatives émises de la Société seront inscrites au Registre des actionnaires (le «Registre») qui sera tenu par la Société ou par une ou plusieurs personnes désignées à cet effet par la Société; l'inscription doit indiquer le nom de chaque propriétaire d'actions nominatives, sa résidence ou son domicile élu, tel qu'il a été communiqué à la Société, le nombre d'actions nominatives qu'il détient et le montant payé sur chacune de ces actions.

En cas d'émission d'actions au porteur, les actions nominatives pourront être converties en actions au porteur et les actions au porteur pourront être converties en actions nominatives sur demande du propriétaire des actions concernées. La conversion d'actions nominatives en actions au porteur sera effectuée par annulation des Certificats d'actions nominatives, si de tels Certificats ont été émis, et par émission d'un ou de plusieurs Certificats d'actions au porteur en leur lieu et place, et une mention devra être faite au Registre des actions nominatives constatant cette annulation. La conversion d'actions au porteur en actions nominatives sera effectuée par annulation des Certificats d'actions au porteur, et, s'il y a lieu, par émission de Certificats d'actions nominatives en leur lieu et place, et une mention sera faite au Registre des actions nominatives constatant cette émission. Le coût de la conversion pourra être mis à la charge de l'actionnaire par décision du conseil d'administration.

Avant que des actions au porteur ne soient émises et avant la conversion d'actions nominatives en actions au porteur, la Société pourra exiger des garanties satisfaisantes pour les administrateurs que cette émission ou conversion n'entraînera pas la possession de ces actions par une personne non-autorisée tel que ce terme est défini à l'article 9 ci-après.

Pour les actions émises au porteur, la Société considère le détenteur des actions comme propriétaire. La propriété de l'action nominative s'établit par une inscription au Registre des actions nominatives. La Société décidera si un Certificat constatant cette inscription sera délivré à l'actionnaire ou si celui-ci recevra une confirmation écrite de sa qualité d'actionnaire.

En cas d'émission d'actions au porteur, le transfert d'actions au porteur se fera par la délivrance du Certificat d'actions correspondant. Le transfert d'actions nominatives se fera (i) si des Certificats d'actions ont été émis, par la remise à la Société du ou des Certificats d'actions nominatives et de tous autres documents de transfert exigés par la Société, ou bien (ii) s'il n'a pas été émis de Certificats, par une déclaration de transfert écrite, portée au Registre des actions nominatives, datée et signée par le cédant et le cessionnaire, ou par le mandataire valablement constitué à cet effet. Tout transfert d'actions nominatives sera inscrit au Registre des actions nominatives.

Tout actionnaire habilité à recevoir des actions nominatives devra fournir à la Société une adresse à laquelle toutes les communications et toutes les informations pourront être envoyées. Cette adresse sera inscrite à son tour au Registre des actions nominatives.

Au cas où un actionnaire en nom ne fournit pas d'adresse à la Société, mention en sera faite au Registre des actions nominatives, et l'adresse de l'actionnaire sera censée être au siège social de la Société ou à telle autre adresse fixée par celle-ci, jusqu'à ce qu'une autre adresse soit communiquée à la Société par l'actionnaire. Celui-ci pourra à tout moment faire changer l'adresse portée au Registre des actions nominatives par une déclaration écrite, envoyée à la Société à son siège social ou à telle autre adresse fixée par celle-ci.

Lorsqu'un actionnaire peut justifier à la Société que son Certificat d'actions a été égaré ou détruit, un duplicata peut être émis à sa demande, aux conditions et garanties que la Société déterminera, notamment sous forme d'une assurance, sans préjudice de toute autre forme de garantie que la Société pourra exiger. Dès l'émission du nouveau Certificat, sur lequel il sera mentionné qu'il s'agit d'un duplicata, le Certificat original n'aura plus de valeur.

Les Certificats endommagés peuvent être annulés par la Société et remplacés par des Certificats nouveaux.

La Société peut à son gré mettre en compte à l'actionnaire le coût du duplicata ou du nouveau Certificat, ainsi que toutes les dépenses raisonnables encourues par la Société en relation avec l'émission du Certificat de remplacement et son inscription au Registre des actions nominatives ou avec la destruction de l'ancien Certificat.

La Société ne reconnaît qu'un seul propriétaire par action. Si la propriété de l'action est indivise, démembrée ou litigieuse, les personnes invoquant un droit sur l'action devront désigner un mandataire unique pour représenter l'action à l'égard de la Société. La Société aura le droit de suspendre l'exercice de tous les droits attachés à l'action jusqu'à ce que cette personne ait été désignée.

La Société peut décider d'émettre des fractions d'actions. Une fraction d'action ne confère pas le droit de vote mais donnera droit à une fraction correspondante des actifs nets de la Société. Dans le cas d'actions au porteur, uniquement des Certificats représentant des actions entières seront émis.

11440

### Art. 7. Emission et Conversion des Actions

Emission des Actions

Le conseil d'administration est autorisé à émettre à tout moment et sans limitation pour toutes les catégories des Sous-fonds des actions nouvelles entièrement libérées sans mention de valeur, sans réserver aux actionnaires anciens un droit préférentiel de souscription des actions à émettre.

Lorsque la Société offre des actions en souscription, le prix par action offerte sera égal à la valeur nette d'inventaire par action, déterminée conformément à l'article 10 ci-dessous. Le prix d'émission des actions est calculé sur base de la valeur nette d'inventaire de la catégorie d'actions concernée du Sous-fonds respectif tel que déterminée conformément aux conditions et modalités dans l'article 10 ci-dessous et publiées dans les documents de vente. Ce prix sera majoré des frais et commissions déterminés par le conseil d'administration. Tous les impôts, taxes ou autres charges prélevés éventuellement dans les pays de distributions sont imputés en sus.

Dès réception de la souscription et du payement du prix d'émission, les actions sont attribuées. Le prix d'émission est payable endéans les 15 jours ouvrables à partir du Jour de Calcul applicable. L'investisseur est investi des droits attachés aux actions immédiatement après la réception de la souscription et du payement.

Pour toutes les demandes d'émission reçues par les agents payeurs et agents de distribution pendant les heures de bureau usuelles d'un jour de Calcul luxembourgeois, le prix d'émission calculé le jour de Calcul suivant à Luxembourg s'applique. Les demandes peuvent être soumises dans la devise de référence figurant dans la dénomination du Sous-fonds concerné ou dans d'autres devises telles que déterminées par le conseil d'administration de temps en temps.

Toutes les demandes d'émission et de conversion reçues par les agents payeurs et agents de distribution après la limite définie ci-dessus sont traitées le Jour de Calcul suivant.

La Société peut à sa discrétion accepter des souscriptions en nature à condition que les apports en nature soient en accord avec la politique d'investissement et les restrictions d'investissements du compartiment concerné. De plus, ces apports doivent être audités par le réviseur d'entreprises nommé par la Société.

Le conseil d'administration peut déléguer à tout administrateur, directeur, fondé de pouvoir ou autre mandataire dûment autorisé à cette fin, la charge d'accepter les souscriptions, de recevoir en paiement le prix des actions nouvelles à émettre et de les délivrer.

La Société peut dans le cadre de son activité d'émission, et à sa discrétion, suspendre l'émission d'actions ou refuser à son gré des ordres d'achat, ainsi que suspendre ou limiter temporairement ou définitivement, conformément à l'article 11 ci-après, la vente des actions à des personnes physiques ou morales dans des pays ou régions bien déterminés. La Société peut également à tout moment racheter des actions détenues par des personnes qui seraient exclues de l'achat ou de la détention d'actions.

Conversion d'actions

L'actionnaire peut convertir un certain nombre ou la totalité de ses actions d'un certain Sous-fonds dans un autre Sous-fonds pour autant que l'émission d'actions du Sous-fonds concerné ne soit pas suspendue et sous-entendu que le conseil d'administration puisse imposer des restrictions comme la possibilité ou la fréquence de conversion et soumettre la conversion au payement d'une commission de conversion. Ces spécifications doivent être décrites et publiées dans le prospectus de vente. La conversion est effectuée conformément à une formule déterminée de temps à autre par le conseil d'administration et décrite dans le prospectus en vigueur.

Les actionnaires ne peuvent pas convertir des actions d'une catégorie d'un Sous-fonds dans une autre catégorie du même Sous-fonds ou d'un autre Sous-fonds, à moins qu'il en ait été décidé autrement par le conseil d'administration et que le fait est révélé dans le prospectus d'émission des actions.

Le Conseil d'Administration pourra décider la conversion d'une ou de plusieurs catégories d'actions d'un Sous-fonds en actions d'une autre catégorie du même Sous-fonds, si le Conseil d'Administration estime que pour des raisons économiques il n'est plus raisonnable d'avoir cette ou ces catégories d'actions.

Pendant un mois à dater de la publication de cette décision, tel que décrit à l'article 23 ci-après, les actionnaires des catégories concernées sont autorisés à demander le rachat de tout ou partie de leurs actions à leur valeur nette d'inventaire, sans frais, conformément à la procédure décrite dans l'article 8.

Les actions non présentées pour le rachat seront échangées sur base de la valeur nette d'inventaire de la catégorie d'actions correspondante calculée au jour où la décision entre en vigueur.

La remise de demandes de conversion sera soumise aux mêmes modalités que l'émission et le rachat d'actions. La conversion s'opère sur la base de la valeur nette d'inventaire augmentée des charges et frais de transactions éventuels. Toutefois, l'agent de distribution peut prélever un émolument administratif fixé par la Société.

### Art. 8. - Rachat des Actions

Tout actionnaire a le droit de demander à la Société qu'elle lui rachète tout ou partie des actions qu'il détient, selon les modalités fixées par le conseil d'administration dans les documents de vente des actions et dans les limites imposées par la loi et par les présents Statuts.

Le prix de rachat par action sera payable dans la devise de référence du Sous-fonds concerné ou dans d'autres devises qui peuvent être fixées par le conseil d'administration de temps en temps et pendant une période déterminée par le conseil d'administration qui n'excédera pas 5 jours ouvrables à partir du Jour de Calcul applicable.

Le prix de rachat sera égal à la valeur nette d'inventaire par action, déduction faite de toutes charges et commissions (s'il y a lieu) au taux indiqué dans les documents de vente des actions de la Société. De même tous les taxes, impôts ou autres charges prélevés éventuellement dans les pays de distribution respectifs sont débités.

Au cas où une demande de rachat d'actions aurait pour effet de réduire le nombre ou la valeur nette d'inventaire totale des actions qu'un actionnaire détient en-dessous de tel nombre ou de telle valeur déterminé(e) par le conseil d'administration, la Société pourra obliger cet actionnaire au rachat de toutes ses actions.

11441

En outre, si pour un Jour de Calcul déterminé, les demandes de rachat et de conversion faites conformément à cet Article dépassent un certain seuil déterminé par le conseil d'administration par rapport au nombre d'actions en circulation dans les Sous-fonds, le conseil d'administration peut décider que le rachat ou la conversion de tout ou partie de ces actions sera reporté pendant une période et aux conditions déterminées par le conseil d'administration, eu égard à l'intérêt du Sous-fonds concerné. Ces demandes de rachat et de conversion seront traitées, lors du Jour de Calcul suivant cette période, prioritairement aux demandes introduites postérieurement au Jour de Calcul concerné.

Les demandes de rachat sont irrévocables excepté pendant les périodes de suspension du rachat.

Une telle demande doit être faite par écrit (ce qui se fait par câble, télégramme, télex, télécopieur ou tout autre moyen de communication similaire à confirmer par lettre) au siège social de la Société ou auprès de toute autre personne ou unité nommée par la Société en qualité d'agent chargé du rachat des actions, ensemble avec le ou les certificats en bonne et due forme et accompagné d'une preuve de transfert ou d'attribution.

Le conseil d'administration pourra imposer telles restrictions qu'il estimera nécessaires quant au rachat d'actions; le conseil d'administration pourra, en particulier, décider que les actions ne seront pas rachetables pendant telle période ou lors de telles circonstances déterminées par le conseil d'administration en temps qu'il appartiendra et prévues dans les documents de vente des actions de la Société.

En cas de demandes de rachat importantes, la Société peut décider de retarder l'exécution des rachats jusqu'à ce que des actifs de la Société correspondants aient été vendus sans retard. Lors du paiement des demandes de rachats, les actions de la société correspondantes cessent d'être valables.

Toutes les actions rachetées seront annulées.

La Société peut à sa discrétion, à la demande de l'investisseur, accepter des remboursements en nature. De plus, ce remboursement (1) ne doit pas avoir d'effet négatif pour les investisseurs restants et (2) doit être audité par le réviseur d'entreprises nommé par la Société.

### Art. 9. - Restrictions à la Propriété des Actions

La Société pourra restreindre ou empêcher la possession de ses actions par toute personne, firme ou société, notamment une personne violant une loi d'un pays ou d'une autorité gouvernementale et toute personne non autorisée à détenir des actions en raison d'une violation d'une loi ou exigence ou si, de l'avis de la Société, une telle possession peut être préjudiciable pour la Société, si elle peut entraîner une violation légale ou réglementaire, luxembourgeoise ou étrangère, ou s'il en résultait que la Société serait soumise à une loi (incluant mais non limitée à la loi fiscale) autre que luxembourgeoise.

La Société pourra notamment, mais sans limitation, restreindre la propriété de ses actions par des personnes non-autorisées telles que définies dans cet Article, et à cet effet:

A. - la Société pourra refuser l'émission d'actions et l'inscription du transfert d'actions lorsqu'il apparaît que cette émission ou ce transfert aurait ou pourrait avoir pour conséquence d'attribuer la propriété d'actions à une personne non-autorisée ou à une personne détenant plus qu'un certain pourcentage d'actions, déterminé par le conseil d'administration («personne non-autorisée»); et

B. - la Société pourra, à tout moment, demander à toute personne figurant au Registre des actions nominatives, ou à toute autre personne qui demande à s'y faire inscrire, de lui fournir tous renseignements, qu'elle estime nécessaires, éventuellement appuyés d'une déclaration sous serment, en vue de déterminer si ces actions appartiennent ou vont appartenir économiquement à une personne non-autorisée; et

C. - la Société pourra refuser d'accepter, lors de toute assemblée générale d'actionnaires de la Société, le vote de toute personne non-autorisée; et

D. - s'il apparaît à la Société qu'une personne non-autorisée, seule ou ensemble avec d'autres personnes, est le bénéficiaire économique d'actions de la Société, celle-ci pourra l'enjoindre à vendre ses actions et à prouver cette vente à la Société dans les trente (30) jours de cette injonction. Si l'actionnaire en question manque à son obligation, la Société pourra procéder ou faire procéder au rachat forcé de l'ensemble des actions détenues par cet actionnaire, en respectant la procédure suivante:

(1) La Société enverra une seconde injonction (appelée ci-après «avis de rachat») à l'actionnaire possédant les titres ou apparaissant au Registre des actions nominatives comme étant le propriétaire des actions à racheter; l'avis de rachat spécifiera les titres à racheter, la manière suivant laquelle le prix de rachat sera déterminé et le nom de l'acheteur.

L'avis de rachat sera envoyé à l'actionnaire par lettre recommandée adressée à sa dernière adresse connue ou à celle inscrite au Registre des actions nominatives. L'actionnaire en question sera obligé de remettre à la Société sans délai le ou les Certificats représentant les actions spécifiées dans l'avis de rachat.

Immédiatement après la fermeture des bureaux au jour spécifié dans l'avis de rachat, l'actionnaire en question cessera d'être propriétaire des actions spécifiées dans l'avis de rachat; s'il s'agit d'actions nominatives, son nom sera rayé du Registre des actions nominatives; s'il s'agit d'actions au porteur, le ou les Certificats représentatifs de ces actions seront annulés.

(2) Le prix auquel chaque action spécifiée dans l'avis de rachat sera rachetée (appelé ci-après «prix de rachat») sera basé sur la valeur nette d'inventaire par action au Jour de Calcul déterminé par le conseil d'administration pour le rachat d'actions de la Société et qui précédera immédiatement la date de l'avis de rachat ou suivra immédiatement la remise du ou des Certificats représentant les actions spécifiées dans cet avis, en prenant le prix le moins élevé, le tout ainsi que prévu à l'article 8 ci-dessus, déduction faite des commissions qui y sont également prévues.

(3) Le paiement du prix de rachat à l'ancien propriétaire sera effectué en la monnaie déterminée par le conseil d'administration pour le paiement du prix de rachat des actions de la Société; le prix sera déposé pour le paiement à l'ancien propriétaire par la Société, auprès d'une banque au Luxembourg ou à l'étranger (telle que spécifiée dans l'avis de rachat), après détermination finale du prix de rachat suite à la remise du ou des Certificats indiqués dans l'avis de rachat ensemble avec les coupons non échus. Dès signification de l'avis de rachat, l'ancien propriétaire des actions mentionnées dans

11442

l'avis de rachat ne pourra plus faire valoir de droit sur ces actions ni exercer aucune action contre la Société et ses avoirs, sauf le droit de l'actionnaire apparaissant comme étant le propriétaire des actions de recevoir le prix déposé (sans intérêts) à la banque après remise effective du ou des Certificats. Au cas où le prix de rachat n'aurait pas été réclamé dans les cinq ans de la date spécifiée dans l'avis de rachat, ce prix ne pourra plus être réclamé et reviendra au Sous-fonds concerné. Le conseil d'administration aura tous pouvoirs pour prendre périodiquement les mesures nécessaires et autoriser toute action au nom de la Société en vue d'opérer ce retour.

(4) L'exercice par la Société des pouvoirs conférés au présent Article ne pourra en aucun cas être mis en question ou invalidé pour le motif qu'il n'y aurait pas de preuve suffisante de la propriété des actions dans le chef d'une personne ou que la propriété réelle des actions était autre que celle admise par la Société à la date de l'avis de rachat, sous réserve que la Société ait, dans ce cas, exercé ses pouvoirs de bonne foi.

### Art. 10.- Calcul de la Valeur Nette d'Inventaire des Actions

La valeur nette d'inventaire par action d'un sous-fond est déterminée en divisant l'actif net du sous-fonds, constitué par la valeur de ses avoirs moins ses engagements, par le nombre d'actions en circulation à ce moment. La valeur nette d'inventaire des actions est exprimée dans la devise de référence du Sous-fonds concerné et peut être exprimée en toute autre monnaie fixée par le Conseil d'Administration.

Pour les Sous-fonds ayant des catégories différentes, la valeur nette d'inventaire des actions est calculée pour chaque catégorie. Dans ce cas, la valeur nette d'inventaire des actions se calcule en divisant la fortune nette de la catégorie concernée du Sous-fonds par le nombre des actions en circulation de cette catégorie du Sous-fonds.

La valeur nette totale de la Société est exprimée en USD et résulte de la différence entre l'ensemble de ses valeurs patrimoniales et de l'ensemble de ses engagements. Pour ce calcul, la valeur nette de chaque Sous-fonds, si celle-ci n'est pas exprimée en USD, est convertie en USD et toutes les fortunes sont ensuite additionnées.

I. Les avoirs des sous-fonds comprendront:

1) toutes les espèces en caisse, à recevoir ou en dépôt, y compris les intérêts échus ou courus;

2) tous les effets et billets payables à vue et les comptes exigibles (y compris les résultats de la vente de titres dont le prix n'a pas encore été encaissé);

3) tous les titres, parts, actions, obligations, droits de souscription, warrants, options et autres valeurs mobilières, instruments financiers et autres avoirs qui sont la propriété de la Société;

4) tous les intérêts échus ou courus sur les avoirs qui sont la propriété du Sous-fonds concerné, sauf si ces intérêts sont compris ou reflétés dans le prix de ces avoirs;

5) les dépenses préliminaires du Sous-fonds concerné, y compris les frais d'émission et de distribution des actions de la Société, pour autant que celles-ci n'ont pas été amorties;

6) tous les autres avoirs détenus par la Société, de quelque nature qu'ils soient, y compris les dépenses payées d'avance.

La valeur de ces avoirs sera déterminée de la manière suivante:

a. La valeur des titres listés sur un marché officiel ou échangés sur tout autre marché régulé sera évaluée sur la base du dernier prix disponible sur le marché principale où le titre est échangé, ce prix sera fourni par un service pricing agréé par le conseil d'administration;

b. Sur la base du prix net d'acquisition et en calculant le rendement de manière constante, la valeur des instruments du marché monétaire et de tous les titres de créance ayant une maturité résiduelle inférieure à un an est constamment ajustée au prix de rachat de ces instruments. En cas de changement matériel des conditions de marché, la base d'évaluation est ajustée aux nouveaux taux du marché;

c. les titres de créance ayant une maturité résiduelle supérieure à un an et les autres valeurs mobilières sont évalués au dernier cours connu, lorsqu'ils sont cotées à une Bourse officielle. Si une valeur est cotée à plusieurs Bourses, le dernier cours connu sur le marché principal de cette valeur est déterminant;

d. les titres de créance ayant une maturité résiduelle supérieure à un an et les autres valeurs mobilières sont évalués au dernier cours connu sur ce marché, lorsqu'ils ne sont pas cotés à une Bourse officielle, mais font l'objet de transactions suivies sur un autre marché réglementé, reconnu, ouvert au public et en fonctionnement régulier sont évalués au dernier cours connu sur ce marché;

e. si les cours connus ne sont pas conformes à la situation du marché, les valeurs impliquées sont évaluées, tout comme les autres valeurs patrimoniales admises par la loi, à la valeur vénale que la société détermine de bonne foi en fonction de la valeur vénale qu'elle pense pouvoir vraisemblablement obtenir;

f. les dépôts à terme dont la maturité originelle excède 30 jours peuvent être évalués selon leur taux de rendement, à condition que le contrat conclu entre l'établissement de crédit détenant ces dépôts à terme et la Société précise que ces dépôts à terme peuvent être résiliés à tout moment, et qu'en cas de remboursement, leur valeur en liquide corresponde à ce rendement;

g. la valeur des espèces en caisse ou en dépôt, des effets et billets payables à vue et des comptes à recevoir, des dépenses payées d'avance et des dividendes et intérêts annoncés ou venus à échéance, mais non encore encaissés, consistera dans la valeur nominale de ces avoirs. Toutefois, s'il s'avère improbable que cette valeur puisse être touchée en entier, le conseil d'administration pourra évaluer ces actifs en retranchant tel montant qu'il estimera adéquat en vue de refléter la valeur réelle de ces actifs;

h. la valeur des swaps est donnée par la contrepartie à l'opération de swap, conformément à une méthode basée sur la valeur du marché, reconnue par le conseil d'administration et contrôlée par l'auditeur de la Société.

La valeur de tous les avoirs et engagements non exprimés dans la devise de référence du Sous-fonds sera convertie dans la devise de référence du Sous-fonds avec le cours moyen entre le cours d'offre et de demande coté au Luxembourg ou en cas de non-disponibilité avec les derniers cours de change disponibles d'un marché représentatif pour la devise concernée pour le Jour de Calcul.

11443

Le conseil d'administration, à son entière discrétion, pourra permettre l'utilisation de toute autre méthode d'évaluation s'il considère que cette évaluation reflète mieux la valeur probable de réalisation d'un avoir détenu par la Société.

En cas de fortes demandes de rachat de parts, la société peut évaluer la valeur de la part du Sous-fonds concerné sur la base des cours auxquels les titres nécessaires à ces opérations peuvent être vendus. Dans ce cas, la même base de calcul sera appliquée pour les demandes de souscription et de rachat de parts reçues simultanément.

Toutes ces Règles d'Evaluation et de détermination de la valeur nette d'inventaire seront interprétées conformément et seront conformes aux principes de comptabilité généralement acceptés.

Si depuis la détermination de la valeur nette d'inventaire les cours de marchés, dans lesquels la Société et par conséquence le Sous-fonds respectif investit des montants importants, ont changé d'une façon notable, la Société peut, sous le motif de sauvegarder les intérêts des actionnaires et de la Société, annuler la première évaluation et en émettre une deuxième.

En l'absence de mauvaise foi, de négligence ou d'erreur manifeste, toute décision prise lors du calcul de la valeur nette d'inventaire par le conseil d'administration ou par une banque, société ou autre organisation que le conseil d'administration peut désigner aux fins de calculer la valeur nette d'inventaire («le délégué du conseil d'administration») sera définitive et liera la Société ainsi que les actionnaires présents, anciens ou futurs.

II. Les engagements des sous-fonds comprendront:

1) tous les emprunts et factures et comptes exigibles;

2) tous intérêts courus sur des emprunts des Sous-fonds (y compris les commissions courues pour l'engagement à des emprunts);

3) tous frais courus ou à payer (y compris les frais d'administration, les commissions de conseil et de gestion, commissions de performance, commissions du dépositaire et commissions des agents de la Société);

4) toutes les obligations connues, échues ou non, y compris toutes les obligations contractuelles venues à échéance, qui ont pour objet des paiements en espèces, y compris le montant des dividendes annoncés par le Sous-fonds mais non encore payés;

5) une provision appropriée pour impôts futurs sur le capital et sur le revenu encourus au Jour de Calcul concerné, fixée périodiquement par la Société et, le cas échéant, toutes autres réserves autorisées et approuvées par le conseil d'administration ainsi qu'un montant (s'il y a lieu) que le conseil d'administration pourra considérer comme constituant une provision suffisante pour faire face à toute responsabilité éventuelle de la Société;

6) tous autres engagements de chaque Sous-fonds de quelque nature que ce soit, renseignés conformément aux règles comptables généralement admises. Pour l'évaluation du montant de ces engagements, chaque Sous-fonds prendra en considération toutes les dépenses à supporter par la Société / le Sous-fonds qui comprendront, sans limitation, les frais de constitution, les commissions payables aux gestionnaires ou conseils en investissements, y compris les commissions liées à la performance, les frais et commissions payables aux comptables, au dépositaire et à ses correspondants, aux agents domiciliataire, administratif, enregistreur et de transfert, à tous agents payeurs, aux distributeurs et aux représentants permanents des lieux où la Société, respectivement le Sous-fonds est soumis à l'enregistrement, ainsi qu'à tout autre employé de la Société, la rémunération des administrateurs ainsi que les dépenses raisonnablement encourues par ceux-ci, les frais d'assurance et les frais raisonnables de voyages relatifs aux conseils d'administration, les frais encourus en rapport avec l'assistance juridique et la révision des comptes annuels de la Société, les frais des déclarations d'enregistrement auprès des autorités gouvernementales et des bourses de valeurs dans le Grand-Duché de Luxembourg ou à l'étranger, les frais de publicité incluant les frais de préparation, de traduction, d'impression et de distribution des prospectus, rapports périodiques et déclarations d'enregistrement, les frais d'impression des Certificats, les frais des rapports pour les actionnaires, les frais de convocation et de tenue des conseils d'administration et assemblées générales d'actionnaires, tous les impôts et droits prélevés par les autorités gouvernementales et toutes les taxes similaires, toute autre dépense d'exploitation, y compris les frais d'achat et de vente des avoirs, les frais de publication des prix d'émission et de rachat des actions, les intérêts, les frais financiers, bancaires ou de courtage, les frais de poste, téléphone et télex. Le Sous-fonds pourra tenir compte des dépenses administratives et autres, qui ont un caractère régulier ou périodique, par une estimation pour l'année ou pour toute autre période.

III. L'Allocation des avoirs se fait comme suit:

Le conseil d'administration crée un Sous-fonds pour chaque catégorie d'actions et crée un Sous-fonds pour deux ou plusieurs catégories de la façon suivante:

a) Si deux ou plusieurs catégories appartiennent au même Sous-fonds, les avoirs attribuables à ces catégories sont investis ensembles suivant une politique d'investissement spécifique pour le Sous-fonds concerné. Pour ce Sous-fonds les catégories d'actions sont à définir de temps en temps par le conseil d'administration de façon qu'ils correspondent à (i) une politique de distribution, en faisant une différence entre distribution («les actions de distribution») et non-distribution («les actions de capitalisation») et/ou (ii) une structure spécifique de charges de vente et de rachat et/ou (iii) une structure spécifique de charge de gestion et de conseil;

b) Les produits de vente de l'émission des actions d'une catégorie sont à comptabiliser en faveur du Sous-fonds auquel la catégorie d'action concernée appartient, pourvu que si différentes catégories appartiennent à un Sous-fonds, le montant concerné est attribué aux avoirs du Sous-fonds appartenant à la catégorie concernée lors de l'émission d'actions de cette catégorie;

c) Les avoirs et les engagements et les revenus et les dépenses d'un Sous-fonds sont à attribuer à la catégorie ou aux catégories d'actions de ce Sous-fonds;

d) Si des avoirs sont dérivés d'autres avoirs, les avoirs dérivés sont à comptabiliser en faveur du même Sous-fonds que les avoirs de base et lors de chaque réévaluation des avoirs, les augmentations et diminutions de valeur sont à attribuer au Sous-fonds concerné;

11444

e) Pour tout engagement de la Société qui est relié aux avoirs d'un Sous-fonds spécifique et pour toute action prise en relation avec les avoirs d'un Sous-fonds spécifique, les engagements résultant sont à attribuer au Sous-fonds concerné.

f) Si des avoirs ou engagements de la Société ne sont pas attribuables à un Sous-fonds spécifique, ces avoirs ou engagements sont à attribuer à tous les Sous-fonds au prorata de la valeur d'inventaire nette des catégories d'actions concernées ou d'une façon déterminée par le conseil d'administration de bonne foi, pourvu que tous les engagements, à quelque Sous-fonds qu'ils soient attribuables, sont des obligations de la Société en tant qu'une unité;

g) Lors de la distribution de paiements aux actionnaires d'une catégorie, la valeur nette d'inventaire de cette catégorie d'actions est à réduire du montant de la distribution.

IV. Pour les besoins de cet Article:

1) les actions en voie de rachat par la Société conformément à l'article 8 ci-dessus seront considérées comme actions émises et existantes jusqu'immédiatement après l'heure, fixée par le conseil d'administration, du Jour de Calcul au cours duquel une telle évaluation est faite, et seront, à partir de ce moment et jusqu'à ce que le prix en soit payé, considérées comme engagement de la Société;

2) les actions à émettre par la Société seront traitées comme étant créées à partir de l'heure, fixée par le conseil d'administration, du Jour de Calcul au cours duquel une telle évaluation est faite, et seront, à partir de ce moment, traitées comme une créance de la Société jusqu'à ce que le prix en soit payé;

3) tous investissements, soldes en espèces ou autres avoirs du Sous-fonds, exprimés autrement que dans la devise dans laquelle la valeur nette d'inventaire par action du Sous-fonds est calculée, seront évalués en tenant compte des taux de change du marché, en vigueur à la date et à l'heure de la détermination de la valeur nette d'inventaire des actions; et

4) à chaque Jour de Calcul où la Société aura conclu un contrat dans le but:

- d'acquérir un élément d'actif, le montant à payer pour cet élément d'actif sera considéré comme un engagement de la Société, tandis que la valeur de cet élément d'actif sera considérée comme un avoir de la Société;

- de vendre tout élément d'actif, le montant à recevoir pour cet élément d'actif sera considéré comme un avoir de la Société et cet élément d'actif à livrer ne sera plus repris dans les avoirs de la Société;

sous réserve cependant, que si la valeur ou la nature exactes de cette contrepartie ou de cet élément d'actif ne sont pas connues au Jour de Calcul, leur valeur sera estimée par le conseil d'administration.

### Art. 11. - Fréquence et Suspension Temporaire du Calcul de la Valeur Nette d'Inventaire par Action, des Emissions et Rachats d'Actions

La valeur nette d'inventaire par action ainsi que le prix d'émission et de rachat des actions seront déterminés périodiquement par la Société ou par son mandataire désigné à cet effet, au moins deux fois par mois à la fréquence que le conseil d'administration décidera, tel jour ou moment de calcul étant défini dans les présents Statuts comme «Jour de Calcul».

Le conseil d'administration peut imposer des restrictions concernant la fréquence d'émission des actions; le conseil d'administration peut en particulier décider d'émettre les actions pendant une ou plusieurs périodes d'offre ou avec une autre périodicité définie dans les documents de vente des actions de la Société.

La Société peut suspendre le calcul de la valeur nette d'inventaire par action ainsi que l'émission, la conversion et le rachat de ses actions de chaque Sous-fonds lors de la survenance de l'une des circonstances suivantes:

a) pendant toute période pendant laquelle l'une des principales bourses de valeurs ou autres marchés sur lesquels une partie substantielle des investissements de la Société est cotée, ou si le marché de devises dans lesquelles la valeur nette d'inventaire ou une partie considérable du capital de la Société est investie, est fermé pour une autre raison que pour le congé normal ou pendant laquelle les opérations y sont restreintes ou suspendues, pourvu que cette fermeture, restriction ou suspension affecte l'évaluation des investissements de la Société qui y sont cotés; ou

b) lorsqu'il existe une situation d'urgence par suite de laquelle la Société ne peut pas disposer de ses avoirs ou ne peut les évaluer ou une telle disposition ou évaluation est nuisible aux intérêts des actionnaires;

c) lorsque les moyens de communication ou de calcul qui sont nécessaires pour déterminer le prix ou la valeur des investissements de la Société ou les cours en bourse relatifs aux avoirs de la Société sont hors de service;

d) si pour toute autre raison les prix ou valeurs des investissements de la Société ne peuvent être rapidement et exactement déterminés;

e) lors de toute période pendant laquelle la Société est incapable de rapatrier des fonds dans le but d'opérer des paiements pour le rachat d'actions ou pendant laquelle les transferts de fonds concernés dans la réalisation ou l'acquisition d'investissements ou de paiements dus pour le rachat d'actions ne peuvent, de l'avis du conseil d'administration, être effectués à des taux de change normaux;

f) suite à la publication d'une convocation à une assemblée générale des actionnaires afin de décider de la mise en liquidation de la Société.

Pareille suspension sera publiée par la Société, si cela est approprié, et pourra être notifiée aux actionnaires ayant fait une demande de souscription, de conversion ou de rachat d'actions pour lesquelles le calcul de la valeur nette d'inventaire a été suspendu.

### Titre III Administration et Surveillance

### Art. 12. - Administrateurs

La Société sera administrée par un conseil d'administration composé de trois membres au moins, actionnaires ou non. La durée du mandat d'administrateur est de six ans au maximum.

Les administrateurs sont nommés par l'assemblée générale des actionnaires qui fixe leur nombre, leurs émoluments et la durée de leur mandat.

Les administrateurs seront élus à la majorité des votes des actions présentes ou représentées.

11445

Tout administrateur pourra être révoqué avec ou sans motif ou être remplacé à tout moment par décision de l'assemblée générale des actionnaires.

En cas de vacance d'un poste d'administrateur, les administrateurs restants ont le droit d'y pourvoir provisoirement; dans ce cas l'assemblée générale procédera à l'élection définitive lors de sa prochaine réunion.

### Art. 13. - Réunions du Conseil d'Administration

Le conseil d'administration choisira parmi ses membres un président et pourra élire en son sein un ou plusieurs vice-présidents. Il pourra également désigner un secrétaire qui n'a pas besoin d'être administrateur et qui dressera les procès-verbaux des réunions du conseil d'administration ainsi que des assemblées générales des actionnaires. Le conseil d'administration se réunira sur la convocation du président ou de deux administrateurs au lieu indiqué dans l'avis de convocation.

Le président présidera les réunions du conseil d'administration et les assemblées générales des actionnaires. En son absence, l'assemblée générale ou le conseil d'administration désignera à la majorité un autre administrateur et, lorsqu'il s'agit d'une assemblée générale, toute autre personne pour assumer la présidence de ces assemblées et réunions.

Le conseil d'administration, s'il y a lieu, nommera des directeurs ou autres fondés de pouvoir dont un directeur général, des directeurs généraux-adjoints et tous autres directeurs et fondés de pouvoir dont les fonctions seront jugées nécessaires pour mener à bien les affaires de la Société. Pareilles nominations peuvent être révoquées à tout moment par le conseil d'administration. Les directeurs et fondés de pouvoir n'ont pas besoin d'être administrateurs ou actionnaires de la Société. Pour autant que les présents Statuts n'en décident pas autrement, les directeurs et fondés de pouvoir auront les pouvoirs et charges qui leur sont attribués par le conseil d'administration.

Avis écrit de toute réunion du conseil d'administration sera donné à tous les administrateurs au moins vingt-quatre heures avant la date prévue pour la réunion sauf s'il y a urgence, auquel cas la nature et les motifs de cette urgence seront mentionnés dans l'avis de convocation. Il pourra être passé outre à cette convocation à la suite de l'assentiment de chaque administrateur par écrit ou par câble, télégramme, télex, télécopieur ou tout autre moyen de communication similaire. Une convocation spéciale ne sera pas requise pour une réunion du conseil d'administration se tenant à une heure et un endroit déterminés dans une résolution préalablement adoptée par le conseil d'administration.

Tout administrateur pourra se faire représenter à une réunion du conseil d'administration en désignant par écrit ou par câble, télégramme, télex, télécopieur ou tout autre moyen de communication similaire un autre administrateur comme son mandataire. Un administrateur peut représenter plusieurs de ses collègues.

Tout administrateur peut participer à une réunion du conseil d'administration par conférence téléphonique ou d'autres moyens de communication similaires où toutes les personnes prenant part à cette réunion peuvent s'entendre les unes les autres. La participation à une réunion par ces moyens équivaut à une présence en personne à une telle réunion.

Les administrateurs ne pourront agir que dans le cadre de réunions du conseil d'administration régulièrement convoquées. Les administrateurs ne pourront engager la Société par leur signature individuelle, à moins d'y être autorisés par une résolution du conseil d'administration.

Le conseil d'administration ne pourra délibérer et agir valablement que si au moins la majorité des administrateurs ou tout autre nombre que le conseil d'administration pourra déterminer, sont présents ou représentés.

Les décisions du conseil d'administration seront consignées dans des procès-verbaux signés par le président de la réunion. Les copies des extraits de ces procès-verbaux devant être produites en justice ou ailleurs seront signées valablement par le président de la réunion ou par deux administrateurs.

Les décisions sont prises à la majorité des votes des administrateurs présents ou représentés.

Le conseil d'administration pourra, à l'unanimité, prendre des résolutions par voie circulaire en exprimant son approbation au moyen d'un ou de plusieurs écrits ou par câble, télégramme, télex, télécopieur ou tout autre moyen de communication similaire, à confirmer par écrit, le tout ensemble constituant le procès-verbal faisant preuve de la décision intervenue.

### Art. 14. - Pouvoirs du Conseil d'Administration

Le conseil d'administration jouit des pouvoirs les plus étendus pour orienter et gérer les affaires sociales et pour effectuer les actes de disposition et d'administration qui rentrent dans l'objet social, sous réserve de l'observation de la politique d'investissement telle que prévue à l'article 17 ci-dessous.

Tous pouvoirs non expressément réservés à l'assemblée générale par la loi ou les présents Statuts sont de la compétence du conseil d'administration.

Conformément à l'article 72.2 de la loi luxembourgeoise du 10 août 1915, le conseil d'administration est autorisé à décider le payement de dividendes intérimaires.

### Art. 15. - Engagement de la Société vis-à-vis des tiers

Vis-à-vis des tiers la Société sera valablement engagée par la signature conjointe de deux administrateurs ou par la seule signature ou la signature conjointe de toute (s) personne (s) à laquelle (auxquelles) pareil pouvoir de signature aura été délégué par le conseil d'administration.

### Art. 16. - Délégation de Pouvoirs

Le conseil d'administration de la Société peut déléguer les pouvoirs relatifs à la gestion journalière des investissements de la Société (y compris le droit de signature) ainsi que la représentation de la Société en ce qui concerne cette gestion à une ou plusieurs personnes physiques ou morales qui ne doivent pas nécessairement être administrateurs de la Société, qui auront les pouvoirs déterminés par le conseil d'administration et qui pourront, si le conseil d'administration les y autorise, sous-déléguer leurs pouvoirs.

11446

### Art. 17. - Politiques et Restrictions d'Investissement

Le conseil d'administration, appliquant le principe de la répartition des risques, a le pouvoir de déterminer les politiques et stratégies d'investissement de la Société ainsi que les lignes de conduite à suivre dans l'administration et la conduite des affaires de la Société, sous réserve des restrictions d'investissement prévues par le conseil d'administration en accord avec la loi du 20 décembre 2002 ou les lois et règlements des pays dans lesquels les actions de la Société sont offertes à la vente au public, ou aux résolutions prises de temps à autre par le conseil d'administration et définies dans les prospectus de vente des actions.

Pour la détermination et la mise en oeuvre de la politique d'investissement, le conseil d'administration pourra décider d'investir les actifs de la société de la manière suivante:

(i) en valeurs mobilières et instruments du marché monétaire admis à la cote officielle d'un marché d'un Etat Eligible. (Dans cet objectif, «Etat Eligible» signifie à tout Etat-membre de l'Organisation pour la Coopération et le Développement Economiques («OCDE») ainsi que tout pays d'Europe, d'Amérique du Nord, d'Amérique Centrale ou d'Amérique du Sud, d'Asie, Afrique ou du Bassin Pacifique); et/ou

(ii) en valeurs mobilières et instruments du marché monétaire négociés sur un autre marché réglementé d' un Etat Eligible, en fonctionnement régulier, reconnu et ouvert au public («Marché Réglementé»); et/ou

(iii) valeurs mobilières et instruments du marché monétaire nouvellement émis, sous réserve que:

a. les conditions d'émission comportent l'engagement que la demande d'admission à la cote officielle d'une bourse de valeurs ou à un autre Marché Réglementé, soit introduite, et pour autant que le choix de la bourse ou du marché ait été prévu par les documents constitutifs de l'OPCVM;

b. l'admission soit obtenue au plus tard avant la fin de la période d'un an depuis l'émission;

(iv) parts d'OPCVM agréés conformément à la directive 85/611/CEE telle qu'amendée et/ou d'autres OPC au sens de l'article 1er, paragraphe (2), premier et deuxième tirets, de la directive 85/611/CEE telle qu'amendée, qu'ils se situent ou non dans un Etat membre de l'Union Européenne, à condition que:

a. ces autres OPC soient agréés conformément à une législation prévoyant que ces organismes sont soumis à une surveillance que la Commission de Surveillance du secteur financier (la «CSSF») considère comme équivalente à celle prévue par la législation communautaire et que la coopération entre les autorités soit suffisamment garantie;

b. le niveau de la protection garantie aux détenteurs de parts de ces autres OPC soit équivalent à celui prévu pour les détenteurs de parts d'un OPCVM et, en particulier, que les règles relatives à la division des actifs, aux emprunts, aux prêts, aux ventes à découvert de valeurs mobilières et d'instruments du marché monétaire soient équivalentes aux exigences de la directive 85/611/CEE telle qu'amendée;

c. les activités de ces autres OPC fassent l'objet de rapports semestriels et annuels permettant une évaluation de l'actif et du passif, des bénéfices et des opérations de la période considérée;

d. la proportion d'actifs des OPCVM ou de ces autres OPC dont l'acquisition est envisagée, qui, conformément à leurs documents constitutifs, peut être investie globalement dans des parts d'autres OPCVM ou d'autres OPC ne dépasse pas 10%;

(v) dépôts auprès d'un établissement de crédit remboursables sur demande ou pouvant être retirés et ayant une échéance inférieure ou égale à douze mois, à condition que l'établissement de crédit ait son siège statutaire dans un Etat membre de l'Union Européenne («Etat Membre») ou, si le siège statutaire de l'établissement de crédit est situé dans un pays tiers, soit soumis à des règles prudentielles considérées par la CSSF comme équivalentes à celles prévues par la législation communautaire;

(vi) instruments du marché monétaire autres que ceux négociés sur un Marché Réglementé, liquides et dont la valeur peut être évaluée à tout moment, pour autant que l'émission ou l'émetteur de ces instruments soient soumis eux-mêmes à une réglementation visant à protéger les investisseurs et l'épargne et que ces instruments soient:

a. émis ou garantis par une administration centrale, régionale ou locale, par une banque centrale d'un Etat Membre, par la Banque Centrale Européenne, par l'Union Européenne ou par la Banque Européenne d'Investissement, par un Etat Tiers (Etat non membre de l'Union Européenne) ou, dans le cas d'un Etat fédéral, par un des membres composant la fédération, ou par un organisme public international dont font partie un ou plusieurs Etats membres, ou

b. émis par une entreprise dont des titres sont négociés sur les marchés réglementés visés aux points a), b) ou c) ci-dessus, ou

c. émis ou garantis par un établissement soumis à une surveillance prudentielle selon les critères définis par le droit communautaire, ou par un établissement qui est soumis et qui se conforme à des règles prudentielles considérées par la CSSF comme au moins aussi strictes que celles prévues par la législation communautaire, ou

d. émis par d'autres entités appartenant aux catégories approuvées par la CSSF pour autant que les investissements dans ces instruments soient soumis à des règles de protection des investisseurs qui soient équivalentes à celles prévues aux premier, deuxième ou troisième tirets, et que l'émetteur soit une société dont le capital et les réserves s'élèvent au moins à dix millions d'euros (10.000.000 euros) et qui présente et publie ses comptes annuels conformément à la quatrième directive 78/660/CEE, soit une entité qui, au sein d'un groupe de sociétés incluant une ou plusieurs sociétés cotées, se consacre au financement du groupe ou soit une entité qui se consacre au financement de véhicules de titrisation bénéficiant d'une ligne de financement bancaire.

(vii) instruments financiers dérivés, y compris les instruments assimilables donnant lieu à un règlement en espèces, en application des articles 41 (1) g) et 42 (2) de la Loi du 20 Decembre, à condition que:

a. que la Société investisse également en valeur mobilières et instruments des marchés monétaires autres que ceux précités

b. que le total desdits investissements n'excède pas 10% des actifs nets attribuable à un sous-fonds;

· 11447

La Société pourra investir jusqu'à 35% de ses actifs nets de chacun ou de tous les Sous-fonds ou des Sous-fonds en valeur mobilières et instruments des marchés monétaires émis ou garantis par un Etat-Membre, ses autorités locales, par un Etat Eligible ou par un organisme international dont un ou plusieurs membres sont Etat-Membres.

La Société pourra investir jusqu'à 100% de ses actifs nets de tout Sous-fonds, en accord avec le principe de répartition des risques en valeur mobilières et instruments des marchés monétaires émis ou garantis par un Etat-membre de l'OCDE ou par un organisme international public dont un ou plusieurs membres sont Etat-Membres à condition que le Sous-fonds en questions détienne des titres issues de six émissions différents et dont aucune des détentions précitées n'excède 30% des actifs nets totaux de ce Sous-fonds.

Dans l'hypothèse d'investissement dans des parts d'autres OPCVM ou autres OPC gérés directement ou de façon déléguée par l' Investment Manager de la Société (l' «Investment Manager»)ou par toute autre société liée à l'Investment Manager par gestion commune, par contrôle ou par des détentions substantielles directes ou indirectes (la «Société Liée»), ni l' Investment Manager ni la Société Liée ne pourront facturer les commissions de souscription ou de rachat de ce même OPC et/ou OPCVM.

### Art. 18. - Conflit d'Intérêt

Aucun contrat ni aucune transaction que la Société pourra conclure avec d'autres sociétés ou firmes ne pourront être affectés ou invalidés par le fait qu'un ou plusieurs administrateurs, directeurs ou fondés de pouvoir de la Société auraient un intérêt quelconque dans telle autre société ou firme ou par le fait qu'ils seraient administrateurs, associés, directeurs, fondés de pouvoir ou employés de cette autre société. L'administrateur, directeur ou fondé de pouvoir de la Société qui est administrateur, directeur, fondé de pouvoir ou employé d'une société ou firme avec laquelle la Société passe des contrats ou avec laquelle elle est autrement en relations d'affaires ne sera pas, par là même, privé du droit de délibérer, de voter et d'agir en ce qui concerne des matières en relation avec pareils contrats ou pareilles affaires.

Au cas où un administrateur, directeur ou fondé de pouvoir aurait dans quelque affaire de la Société un conflit d'intérêt avec celle-ci, cet administrateur, directeur ou fondé de pouvoir devra informer le conseil d'administration de ce conflit d'intérêt et il ne délibérera pas et ne prendra pas part au vote concernant cette affaire. Rapport en devra être fait à la prochaine assemblée générale des actionnaires.

Le terme «conflit d'intérêt» tel qu'il est utilisé à l'alinéa précédent ne s'appliquera pas aux relations ou aux intérêts qui pourront exister de quelque manière, en quelque qualité, ou à quelque titre que ce soit, en rapport avec le promoteur, les gestionnaires en investissement, les conseillers en Investissements, le Dépositaire, les distributeurs ainsi que toute autre personne, société ou entité juridique que le conseil d'administration pourra déterminer à son entière discrétion.

### Art. 19. - Indemnisation des Administrateurs

La Société pourra indemniser tout administrateur, directeur ou fondé de pouvoir, ses héritiers, exécuteurs testamentaires et autres ayants-droit, des dépenses raisonnablement occasionnées par tous actions ou procès auxquels il aura été partie en sa qualité d'administrateur, de directeur ou fondé de pouvoir de la Société ou pour avoir été, à la demande de la Société, administrateur, directeur ou fondé de pouvoir de toute autre société, dont la Société est actionnaire ou créditrice et par laquelle il ne serait pas indemnisé, sauf au cas où dans pareils actions ou procès il sera finalement condamné pour négligence grave ou mauvaise gestion. En cas d'arrangement extrajudiciaire, une telle indemnité ne sera accordée que si la Société est informée par son avocat-conseil que l'administrateur, directeur ou fondé de pouvoir en question n'a pas commis de manquement à ses devoirs. Le droit à indemnisation n'exclura pas d'autres droits dans le chef de l'administrateur, directeur ou fondé de pouvoir.

### Art. 20. - Surveillance de la Société

Les données comptables contenues dans le rapport annuel établi par la Société seront contrôlées par un réviseur d'entreprises agréé qui est nommé par l'assemblée générale des actionnaires et rémunéré par la Société.

Le réviseur d'entreprises agréé accomplira tous les devoirs prescrits par la loi 20 décembre 2002 relative aux organismes de placement collectif.

### Titre IV Assemblées générales - Année sociale - Distributions

### Art. 21. - Représentation

L'assemblée générale des actionnaires représente l'universalité des actionnaires de la Société. Ses résolutions s'imposent à tous les actionnaires. Elle a les pouvoirs les plus larges pour ordonner, faire ou ratifier tous les actes relatifs aux opérations de la Société.

### Art. 22. - Assemblées Générales des Actionnaires

L'assemblée générale des actionnaires est convoquée par le conseil d'administration.

Elle peut l'être également sur demande d'actionnaires représentant un cinquième au moins du capital social.

L'assemblée générale annuelle se réunit, conformément à la loi luxembourgeoise, dans la Ville de Luxembourg, à l'endroit indiqué dans l'avis de convocation, le 15ème jour de mai à 11.30 heures.

Si ce jour n'est pas un jour ouvrable à Luxembourg, l'assemblée générale se réunit le premier jour ouvrable suivant.

D'autres assemblées générales d'actionnaires peuvent se tenir aux lieux et dates spécifiés dans l'avis de convocation.

Les actionnaires se réuniront sur convocation du conseil d'administration à la suite d'un avis énonçant l'ordre du jour envoyé au moins huit jours avant l'assemblée à tout propriétaire d'actions nominatives à son adresse portée au Registre des actionnaires; cependant, la justification de la notification de ces avis aux actionnaires nominatifs n'a pas besoin d'être apportée à l'assemblée. L'ordre du jour est préparé par le conseil d'administration, excepté dans les cas où l'assemblée est convoquée sur la demande écrite des actionnaires, ainsi qu'il est prévu par la loi, auquel cas le conseil d'administration pourra préparer un ordre du jour supplémentaire.

11448

Si des actions au porteur ont été émises, les convocations seront en outre publiées, conformément à la loi, au Mémorial, Recueil des Sociétés et Associations, dans un ou plusieurs journaux luxembourgeois et dans tels autres journaux que le conseil d'administration déterminera.

Si toutes les actions sont sous forme nominative et si des publications ne sont pas faites, les convocations pourront être adressées aux actionnaires uniquement par lettre recommandée.

Chaque fois que tous les actionnaires sont présents ou représentés et qu'ils déclarent se considérer comme dûment convoqués et avoir eu connaissance préalable de l'ordre du jour soumis à leur délibération, l'assemblée générale peut avoir lieu sans convocation.

Le conseil d'administration peut déterminer toutes autres conditions à remplir par les actionnaires pour pouvoir prendre part aux assemblées générales.

Les affaires traitées lors d'une assemblée des actionnaires seront limitées aux points contenus dans l'ordre du jour (qui contiendra toutes les matières requises par la loi) et aux affaires connexes à ces points.

Chaque action de quelque Sous-fonds ou catégorie que ce soit, indépendant de la valeur nette d'inventaire de l'action d'une telle catégorie d'un tel Sous-fonds donne droit à une voix, conformément à la loi luxembourgeoise et aux présents Statuts. Cependant seules les actions entières donnent droit à une voix. Un actionnaire peut se faire représenter à toute assemblée des actionnaires par un mandataire qui n'a pas besoin d'être actionnaire et peut être administrateur, en lui conférant un pouvoir écrit.

Les résolutions concernant les intérêts des actionnaires de la Société sont à prendre dans l'assemblée générale de la Société alors que les résolutions concernant les intérêts particuliers des actionnaires d'un Sous-fonds doivent en outre être prises par les assemblées générales de celui-ci.

Dans la mesure où il n'en est pas autrement disposé par la loi ou par les présents Statuts, les décisions de l'assemblée générale sont prises à la majorité simple des votes des actionnaires présents ou représentés.

Aussi longtemps que le capital de la Société est divisé dans différents Sous-fonds, les droits reliés aux actions de chaque Sous-fonds (à moins qu'il n'en soit fixé autrement lors de l'émission des actions d'un Sous-fonds) peuvent, nonobstant le fait que la Société est en liquidation ou non, changer avec une résolution prise lors d'une assemblée générale du Sous-fonds concerné, tenue pour ce fait, avec une majorité de deux tiers des votes présents lors de cette assemblée générale spécifique. Les articles concernant les assemblées générales sont, mutatis mutandis, applicables pour une telle assemblée générale qui sera tenue de façon que le quorum minimal nécessaire pour une telle assemblée générale extraordinaire soit constitué par des actionnaires du Sous-fonds respectif, présents ou représentés par procuration, tenant au moins la moitié des actions émises pour le Sous-fonds concerné (si lors d'une assemblée générale ajournée d'un Sous-fonds, le quorum ou le nombre des actionnaires, comme décrit ci-dessus, n'est pas présent ou représenté, un seul actionnaire ou son représentant peut agir en tant que quorum).

### Art. 23. - Dissolution et regroupement de Sous-fonds

Le conseil d'administration peut décider la dissolution d'un ou de plusieurs Sous-fonds si la fortune globale nette d'un Sous-fonds tombe au-dessous de l'équivalent de dix millions d'euros (10.000.000,- EUR) étant le niveau minimal nécessaire à une opération économiquement efficace pour un Sous-fonds ou une catégorie ou si l'environnement économique ou politique change.

Sur demande du conseil d'administration, l'assemblée générale peut réduire le capital social en annulant des actions émises du Sous-fonds concernée et en remboursant aux actionnaires la valeur nette d'inventaire de leurs actions. La valeur nette d'inventaire du Sous-fonds est calculée au jour de l'entrée en vigueur de la décision, compte tenu du prix obtenu à la réalisation des actifs et de tous les frais effectifs en rapport avec cette annulation.

Les actionnaires sont informés de la décision d'annuler les actions d'un Sous-fonds de l'assemblée générale par sa publication dans le Mémorial et dans le «Luxemburger Wort» à Luxembourg. La contre-valeur de la valeur nette d'inventaire totale des actions annulées n'ayant pas été présentées au rachat par leurs porteurs est déposée pendant une période de six mois auprès du dépositaire; après ces six mois, les avoirs sont déposés à la Caisse des Consignations à Luxembourg jusqu'à l'expiration du délai de prescription légal.

Dans les mêmes circonstances que décrites dans le premier paragraphe de cet article, le conseil d'administration peut annuler des actions émises d'un Sous-fonds spécifique ou de plusieurs Sous-fonds et attribuer des actions à émettre d'un autre Sous-fonds ou un autre OPC (Organisme de placement collectif) conformément à la partie I de la loi luxembourgeoise du 20 décembre 2002 relative aux organismes de placement collectif. Pourtant cette décision de regroupement peut aussi être prise par l'assemblée générale des actionnaires du Sous-fonds concerné. Les actionnaires sont informés de la décision de regroupement de la même façon que décrite pour l'annulation d'actions.

Les actionnaires sont autorisés pendant un mois à dater de la publication de la décision à demander le rachat d'une partie ou de la totalité des actions à la valeur nette d'inventaire de l'action conformément à la procédure décrite dans l'article 8 et à exiger un rachat sans frais. Les actions n'ayant pas été présentées au rachat sont échangées sur la base de la valeur de l'action du Sous-fonds calculée au jour où la décision entre en vigueur. Au cas où les actions attribuées sont des actions de fonds communs de placement, la décision n'engage et n'est valable que pour les actionnaires qui ont voté en faveur de cette allocation. Lors d'une assemblée générale concernant les paragraphes précédents, aucune règle de quorum n'est imposée et les décisions peuvent être prises à la majorité simple des voix présentes ou représentées.

### Art. 24. - Année Sociale

L'année sociale de la Société commence le premier janvier de chaque année et se termine le dernier jour de décembre de la même année.

11449

### Art. 25. - Distributions

Dans les limites légales, l'assemblée générale des actionnaires de chaque Sous-fonds déterminera l'affectation des résultats de la Société et pourra périodiquement déclarer ou autoriser le conseil d'administration à déclarer des distributions. La répartition ne doit pas diminuer la fortune nette de la société au-dessous du capital minimal prévu par la loi.

Le conseil d'administration peut décider de payer des dividendes intérimaires, en respectant les conditions prévues par la loi.

Le paiement de toutes distributions se fera pour les actions nominatives à l'adresse portée au Registre des actions nominatives et pour les actions au porteur sur présentation du coupon de dividende remis à l'agent ou aux agents désignés par la Société à cet effet.

Les distributions pourront être payées en toute monnaie choisie par le conseil d'administration et en temps et lieu qu'il appréciera.

Le conseil d'administration pourra décider de distribuer des dividendes d'actions au lieu de dividendes en espèces en respectant les modalités et conditions déterminées par le conseil.

Aucun intérêt ne sera payé sur le dividende déclaré par la Société et conservé par elle à la disposition de son bénéficiaire.

Le payement de dividendes aux détenteurs d'actions au porteur ainsi que la proclamation d'un tel dividende se fait selon les modalités déterminées de temps en temps par le conseil d'administration en accord avec la législation luxembourgeoise.

Un dividende déclaré et non-payé ne peut pas être réclamé par l'actionnaire après une période de cinq années à compter de cette déclaration, à moins que le conseil d'administration n'ait éliminé ou prolongé cette période. Sinon, après cette période le dividende est retourné à la catégorie concernée du Sous-fonds concerné de la Société. Le conseil d'administration a le droit de temps en temps de prendre toutes les mesures nécessaires et d'autoriser toute action au nom de la Société pour conclure à bien la réversion des fonds. Il n'y pas de payement d'intérêts sur les dividendes déclarés, mais pas encore distribués.

### Titre V Dispositions finales

### Art. 26. - Dépositaire

Dans la mesure requise par la loi, la Société conclura un contrat de dépôt avec un établissement bancaire ou d'épargne au sens de la loi du 5 avril 1993 relative au secteur financier (le «Dépositaire»).

Le Dépositaire aura les pouvoirs et charges tels que prévus par la loi du 20 décembre 2002 relative aux organismes de placement collectif.

Si le Dépositaire désire se retirer, le conseil d'administration s'efforcera de trouver un remplaçant dans les deux mois de la date de prise d'effet de cette décision. Le conseil d'administration peut dénoncer le contrat de dépôt mais ne pourra révoquer le Dépositaire que si un remplaçant a été trouvé.

### Art. 27. - Dissolution de la Société

La Société peut être dissoute à tout moment par décision de l'assemblée générale statuant aux conditions de quorum et de majorité prévues à l'article 28 ci-dessous.

La question de la dissolution de la Société doit de même être soumise par le conseil d'administration à l'assemblée générale lorsque le capital social est devenu inférieur aux deux tiers du capital minimum tel que prévu à l'article 5 des présents Statuts. L'assemblée délibère sans condition de présence et décide à la majorité simple des votes des actions présentes ou représentées à l'assemblée.

La question de la dissolution de la Société doit en outre être soumise par le conseil d'administration à l'assemblée générale lorsque le capital social est devenu inférieur au quart du capital minimum fixé à l'article 5 des présents Statuts; dans ce cas, l'assemblée délibère sans condition de présence et la dissolution peut être prononcée par les votes des actionnaires possédant un quart des actions représentées à l'assemblée.

La convocation doit se faire de façon à ce que l'assemblée soit tenue dans le délai de quarante jours à partir de la constatation que l'actif net de la Société est devenu inférieur aux deux tiers respectivement au quart du capital minimum.

### Art. 28. - Modifications des Statuts

Les présents Statuts pourront être modifiés par une assemblée générale des actionnaires statuant aux conditions de quorum et de majorité requises par la loi du 10 août 1915 concernant les sociétés commerciales, telle que modifiée.

### Art. 29. - Déclaration

Les mots, bien qu'écrits au masculin, englobent également le genre féminin, les mots «personnes» ou «actionnaires» englobent également les sociétés, associations et tout autre groupe de personnes constitué ou non sous forme de société ou d'association.

Le terme «jour ouvrable» utilisé dans ce document est défini comme tout jour bancaire ouvrable (càd chaque jour pendant lequel les banques sont ouvertes pendant les heures d'ouvertures normales) à Luxembourg, à l'exception de certains jours fériés non-légaux.

### Art. 30. - Loi Applicable

Pour tous les points non spécifiés dans les présents Statuts, les parties se réfèrent et se soumettent aux dispositions de la loi du 10 août 1915 concernant les sociétés commerciales ainsi qu'à la loi du 20 décembre 2002 relative aux organismes de placement collectif, telles que ces lois ont été ou seront modifiées par la suite.

*Dispositions transitoires*

1) La première année sociale commence le jour de la constitution et se terminera le 31 décembre 2004.

2) La première assemblée générale annuelle se tiendra en deux mille cinq.

11450

*Souscription et Paiement*

Les souscripteurs ont souscrit les actions comme suit:

1) UBS (LUXEMBOURG) S.A., préqualifiée, souscrit trente neuf actions, résultant en un paiement total de trente-neuf mille USD (USD 39.000,-)

2) M. Pierre Delandmeter, préqualifié, souscrit une (1) action, résultant en un paiement total de mille USD (USD 1.000,-)

La preuve du total de ces paiements, c'est-à-dire quarante mille USD (USD 40.000,-) a été donnée au notaire instrumentant qui le reconnaît.

*Déclaration*

Le notaire soussigné déclare que les conditions énumérées par l'article 26.1 de la loi du 10 août 1915 sur les sociétés commerciales sont remplies.

*Frais*

Le montant, au moins approximatif, des frais, dépenses, rémunérations, ou charges, sous quelque forme que ce soit, qui incombent à la Société ou qui sont mis à sa charge à raison de sa constitution sont évalués approximativement à sept mille euros (7.000,- EUR).

*Assemblée Générale Extraordinaire des Actionnaires*

Les comparants préqualifiés, représentant la totalité du capital souscrit et se considérant comme dûment convoqués, se sont ensuite constitués en assemblée générale extraordinaire et ont pris à l'unanimité les résolutions suivantes:

I. Sont nommés administrateurs pour un terme qui prendra fin à l'issue de l'assemblée générale annuelle des actionnaires appelée à délibérer sur les comptes arrêtés au 31 décembre 2004:

* Roger Hartmann, Managing Director, UBS (LUXEMBOURG) S.A.

* Bernd Stiehl, Executive Director, UBS (LUXEMBOURG) S.A.

* Alain Hondequin, Executive Director, UBS (LUXEMBOURG) S.A.

* Hermann Kranz, Executive Director, UBS (LUXEMBOURG) S.A.

* Pierre Delandmeter, Avocat à la Cour, Luxembourg

II. Est nommée réviseur d'entreprises agréé pour une durée illimitée: ERNST & YOUNG, 7, Parc d'Activité Syrdall, L-5365 Munsbach.

III. L'adresse de la Société est fixée à Luxembourg, 291 route d'Arlon.

IV. Conformément à l'article 60 de la loi modifiée du 10 août 1915 concernant les sociétés commerciales, l'assemblée générale autorise le conseil d'administration à déléguer la gestion journalière de la Société ainsi que la représentation de la Société en ce qui concerne cette gestion à un ou plusieurs de ses membres.

Le notaire soussigné qui comprend et parle la langue anglaise déclare que sur la demande des comparants, le présent acte de société est rédigé en langue anglaise, suivi d'une version française, à la requête des mêmes personnes et en cas de divergences entre le texte anglais et français, la version anglaise fera foi.

Dont acte, fait et passé à Luxembourg, date qu'en tête des présentes.

Et après lecture faite aux comparants, tous connus du notaire par leurs nom, prénom usuel, état et demeure, les comparants ont tous signé avec Nous, notaire, la présente minute.

Signé: F. Lefèvre, H. Hellinckx

Enregistré à Mersch, le 6 février 2004, vol. 426, fol. 78, case 9. – Reçu 1.250 euros.

*Le Receveur* (signé): A. Muller.

Pour copie conforme, délivrée aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Mersch, le 9 février 2004.                                                                                 H. Hellinckx.

(014048.3/242/1575) Déposé au registre de commerce et des sociétés de Luxembourg, le 10 février 2004.

---

**KANLIPE HOLDING S.A.H., Société Anonyme Holding.**

Siège social: L-2086 Luxembourg, 23, avenue Monterey.

R. C. Luxembourg B 33.102.

—

*Extrait des résolutions prises lors de l'assemblée générale statutaire du 16 avril 2003*

La cooptation de Madame Antonella Graziano, employée privée, demeurant professionnellement au 23, avenue Monterey, L-2086 Luxembourg en tant qu'administrateur en remplacement de Madame Francesca Barcaglioni, démissionnaire, est ratifiée. Son mandat viendra à échéance lors de l'assemble générale statutaire de 2005.

La cooptation de la société LOUV, S.à r.l., Société à responsabilité limitée, L-2086 Luxembourg en tant qu'administrateur en remplacement de la société FINIM LIMITED, démissionnaire est ratifiée. Son mandat viendra à échéance lors de l'assemblée générale statutaire de 2005.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Fait à Luxembourg, le 16 avril 2004.

Certifié sincère et conforme

KANLIPE HOLDING S.A.H.

Signatures

*Administrateurs*

Enregistré à Luxembourg, le 27 janvier 2004, réf. LSO-AM06344. – Reçu 14 euros.

*Le Receveur* (signé): D. Hartmann.

(009630.3/795/21) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

11451

### MORGA S.A., Société Anonyme Holding.
Siège social: L-2450 Luxembourg, 15, boulevard Roosevelt.
R. C. Luxembourg B 21.787.
—

Le bilan au 31 décembre 2002, enregistré à Luxembourg, le 27 janvier 2004, réf. LSO-AM06317, a été déposé au re-
gistre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Signature.

(009663.3//10) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

### AIGLE EQUITY INVESTMENTS S.A., Société Anonyme Holding.
Siège social: L-2450 Luxembourg, 15, boulevard Roosevelt.
R. C. Luxembourg B 82.759.
—

Le bilan au 31 décembre 2002, enregistré à Luxembourg, le 27 janvier 2004, réf. LSO-AM06321, a été déposé au re-
gistre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Signature.

(009666.3//10) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

### T.S.B., S.à r.l., Société à responsabilité limitée.
Siège social: L-1247 Luxembourg, 14-16, rue de la Boucherie.
R. C. Luxembourg B 86.418.
—

*Extrait du procès-verbal de la réunion du 22 janvier 2004 des Associés*

1) Les associés ont décidé d'accepter la démission de Monsieur Luc Reis de sa fonction de gérant administratif et
technique de la société et lui ont accordé la décharge pleine et entière pour l'exécution de son mandat jusqu'à ce jour.

2) Est nommée nouvelle gérante administrative Claude Barthelemy, née le 18 juillet 1961 et demeurant à L-7249 Be-
reldange.

La signature de Claude Barthelemy sera requise pour toutes les opérations de gestion journalière.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Le 22 janvier 2004.

Pour extrait conforme
T.S.B., S.à r.l.
Signature / C. Barthelemy

Enregistré à Luxembourg, le 2 février 2004, réf. LSO-AN00163. – Reçu 89 euros.

*Le Receveur* (signé): D. Hartmann.

(010860.3/000/19) Déposé au registre de commerce et des sociétés de Luxembourg, le 2 février 2004.

### LUXDRINKS S.A., Société Anonyme.
Siège social: L-1150 Luxembourg.
R. C. Luxembourg B 22.396.
—

Le bilan au 31 décembre 2001, enregistré à Luxembourg, le 26 janvier 2004, réf. LSO-AM06012, a été déposé au re-
gistre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Luxembourg, le 21 janvier 2004.                                                          Signature.

(009711.3//10) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

### LUXDRINKS S.A., Société Anonyme.
Siège social: L-1150 Luxembourg.
R. C. Luxembourg B 22.396.
—

Le bilan au 31 décembre 2002, enregistré à Luxembourg, le 26 janvier 2004, réf. LSO-AM06013, a été déposé au re-
gistre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Luxembourg, le 21 janvier 2004.                                                          Signature.

(009714.3//10) Déposé au registre de commerce et des sociétés de Luxembourg, le 29 janvier 2004.