08-01789-cgm    Doc 21435-5    Filed 04/25/22    Entered 04/25/22 18:36:37    Exhibit 5
Pg 1 of 7

# INVESTMENT ADVISORY AGREEMENT

THIS AGREEMENT is made as of February 13, 2007
Between

**UBS Third Party Management Company S.A.**
291, route d'Arlon B.P. 91,
L-2010 Luxembourg
(hereinafter called "the Management Company")

and

Access Partners SA
49, boulevard Prince Henri
L-1724 Luxembourg
(hereinafter called "the Investment Adviser)

WHEREAS :

(A) The Management Company has been authorised by the Commission de Surveillance du Secteur Financier ("CSSF") as a management company under Chapter 13 of the 2002 Law and ") and is in charge of the management of the assets of Luxalpha Sicav hereinafter referred to as "the Fund".

(B) The Fund is an Undertaking for Collective Investment in Securities organised as a "société d'investissement à capital variable" (SICAV) under Part I of the Luxembourg Law of December 20, 2002 on Undertakings for Collective Investment as amended from time to time (the "Law"), with the exclusive purpose of investment in securities and other permitted assets as more fully described in the Fund's prospectus (the "Prospectus") and articles of incorporation (the "Articles of Incorporation") as such documents may be amended from time to time;

(C) Pursuant to the Management Company Services Agreement and in particular to its paragraph 11.7, the Management Company is entitled to appoint, one or more investment adviser(s) who shall supply the Management Company with recommendations, advice and other services, on all matters relating to the investment policy of the Fund;

(D) The Management Company has selected the Investment Adviser to serve as its investment adviser and the Investment Adviser is ready and willing to serve as such, subject to and in accordance with the provisions hereinafter set forth.

NOW IT IS HEREBY AGREED:

### Article I: Defined Terms

Terms defined in the present agreement and not otherwise defined herein shall have the same meanings as provided in the Prospectus and Articles of Incorporation.

### Article II: Appointment of the Investment Adviser

The Management Company hereby appoints, on the terms and subject to the provisions of this Agreement, the Investment Adviser as investment adviser, and the Investment Adviser accepts such appointment and agrees to provide advisory services with respect to the assets of the sub-funds and to assume the obligations set forth herein.

### Article III: Duties

During its appointment, the Investment Adviser shall assist and perform services to the Management Company and the Fund in relation with the investment of the cash and assets of the Fund.

The Investment Adviser shall:

1. give recommendations to the Management Company and the Fund for the manner in which the cash raised by the Fund might be invested;
2. give recommendations to the Management Company for the manner in which any cash required for the redemption of shares or other purposes of the Fund should be realised;
3. advise the Fund and the Management Company concerning all actions which it appears to the Investment Adviser the Fund should consider to carry into effect the purchase and sale programmes;
4. assist the Fund in obtaining necessary information to determine the net asset value of the sub-funds;
5. recommend when any suspension of the net asset value of any sub-fund of the Fund should be declared pursuant to the Articles of Incorporation and when any such suspension should be terminated;
6. advise whether and in what manner all rights conferred by the investments of the Fund shall be exercised;
7. provide regularly to the Fund and the Management Company information and documentation, together with a detailed analysis thereof relating to the markets contemplated by the investment policy of the sub-funds;
8. prepare material for insertion in the annual and other reports of the Fund;
9. recommend to the Management Company the brokers and dealers through which the Fund trade.
10. prepare the relevant risk management reporting. The Investment Advisor will provide the Daily Managers of the Management Company with information relating to the quantitative limits that apply in the risk management of the Fund as well as to the methods chosen for this purpose and the recent evolution of the main instrument categories risks and yields.

The Investment Adviser and the Management Company undertake to keep each other informed of the relevant developments affecting the investments of the Fund.

2

The Management Company shall without any delay inform the Investment Adviser of any amendments to the sub-fund's policy.

### ARTICLE IV: Investment Restrictions

In carrying out its duties, the Management Company shall regard to:

1. the investment policy and objectives determined by the Fund;
2. any restrictions for the time being contained in the Articles of Incorporation and the Prospectus with regard to investment and borrowing;
3. the entitlement of the shareholders of the Fund to require redemption of the shares;
4. the terms of any exchange control consent and any other present or future governmental consents;
5. any directions from the Board of Directors;
6. any other matter to which a prudent investment to a manager should reasonably pay regard in the proper discharge of its duties.

The Investment Adviser shall not have any power to enter into any transaction on behalf of or in any way to bind the Fund.

### ARTICLE V: Instructions

In carrying out its duties, the Investment Adviser shall comply with all proper instructions of the Management Company in connection therewith.

Whenever used in this Agreement, the term "proper instructions" shall be deemed to mean any written instruction, computer transmission, telex or facsimile transmission signed by any Director of the Management Company or purporting to be signed by a Director or (unless the Investment Adviser is notified by the Directors otherwise) by one or more authorised officer(s) or designated agents of any other person or persons designated in writing for this purpose by the Management Company. The authorised signature is valid as long as the Investment Adviser has not received a contrary statement.

The Management Company shall deposit with the Investment Adviser, in its capacity as investment adviser under the present Agreement the signature(s) of its statutory representative(s) or authorised signatories. The Investment Adviser may solely rely on such specimen, irrespective of any entries in commercial registries or other official publications. A certified copy of a resolution of the Management Company's Board of Directors may be received by the Investment Adviser as conclusive evidence of the authority of any person to give proper instruction.

The Investment Adviser shall not be liable for accepting, and shall be fully protected in relying upon any instructions believed by it to be genuine and to have been properly executed by or on behalf of the Management Company.

### ARTICLE VI: Remuneration

For the rendering of its services according to the present Agreement, the Management Company shall pay to the Investment Adviser a remuneration corresponding to the portfolio management fee described in the Management Company Services Agreement and consisting of a fixed fee and a performance fee.

This remuneration may be revised at any time between the parties hereto.

The Investment Adviser shall render the services referred to in the present Agreement at its own expenses including, without limitation, wages of employees necessary for such services, cable, telex, mail and telecopier charges and other advisory and operating expenses, as well as any fees payable to its correspondents, associates or any other persons from which it receives services.

### ARTICLE VII: Liability

The Investment Adviser shall not be liable for any loss or damage suffered by the Management Company arising directly or indirectly out of any error of judgment or oversight or mistake of the law on the part of the Investment Adviser made or committed in good faith in the performance of its duties and the Investment Adviser shall not in the absence of gross negligence or wilful misconduct or bad faith responsible for any loss or damage which the Management Company and/or the Fund may sustain or suffer as the result of or in the course of the discharge of its duties. The Management Company shall indemnify and hold harmless the Investment Adviser against all claims and demands (including costs and expenses arising as a result) which may be made against the Investment Adviser in respect of any loss or damage sustained or suffered or alleged to have been sustained or suffered by any third party otherwise than by reason of the gross negligence or wilful misconduct or bad faith of the Investment Adviser.

The Investment Adviser shall send to the Management Company as soon as possible all notices of claims summons or writs which may receive arising from the performance of its duties and no liability of any sort shall be admitted and no undertakings given nor shall any offer promise or payment be made or legal expenses incurred by the Investment Adviser in relation to any claim summons or writs without the written consent of the Management Company who shall be entitled if it is so desires to take over and conduct the defence of any action or to prosecute any claim for indemnity or damages or otherwise against any third party.

### ARTICLE VIII: Conflict of Interest

The Directors of the Investment Adviser and any affiliate thereof, its members and staff may engage in various activities other than the Fund's and/or the Investment Adviser's business, including providing consulting and other services (including, without limitation, serving as Director) to a variety of partnerships, corporations and other entities, not excluding those in which the Fund invests. However, the Investment Adviser and its members will devote the time and effort necessary and appropriate to the business of the Fund and/or Management Company.

The Directors of the Investment Adviser and any affiliates thereof, its members and staff may also invest and trade for their own accounts. Because the Directors of the Investment Adviser and any affiliate thereof, its members and staff can have other accounts managed by them, the interests of the Fund and other accounts, in the selection, negotiation and administration of investments, may conflict.

The Investment Adviser and its members will attempt to resolve all such conflicts in a manner that it deemed equitable to all parties under the circumstances.

### ARTICLE IX: Termination

This Agreement is entered into for an indefinite duration. It shall become effective on the date as of which it is made. Either party may terminate this Agreement upon written notice thereof delivered or dispatched by registered mail by the one to the other not less than 3 months prior to the date upon which such termination becomes effective. Cost of termination will be the ones conform to common practice in Luxembourg.

However, the Investment Adviser or the Management Company may terminate this Agreement forthwith and at any time upon written notice thereof delivered or dispatched by registered mail by the one to the other provided that there is a breach of any material clause

contained in this Agreement or gross negligence which shall not have been remedied within 30 days of written notice thereof having been given by either party to the party in breach shall entitle the party giving such notice to terminate the Agreement with immediate effect.

This Agreement shall be terminated forthwith upon any party being declared bankrupt or becoming subject to a similar procedure of compulsory liquidation or administration.

### ARTICLE X: Duty of secrecy

Notwithstanding any more constringent obligations of the Management Company under Luxembourg banking secrecy rules, neither of the parties hereto shall unless compelled or authorised to do so by law or by any court of competent jurisdiction or by the other party, disclose to any person information relating to the other party or to the affairs of such party. Each party shall use its best endeavours to prevent any disclosure as aforesaid, before or after the termination of this Agreement.

### ARTICLE XI: Assignement

This Agreement shall not be assigned by any party save with the prior written consent of all other parties.

### ARTICLE XII: Notices

Any notice given thereunder shall be given by sending the same by registered mail, or by telegram, cable, telex or facsimile confirmed in each case by a signed copy sent forthwith by registered mail or by delivering the same by hand; such notice shall be addressed, dispatched or delivered (as the case may be) to the following addresses:

Notices to the Investment Adviser:    **Access Partners SA**
49, boulevard Prince Henri
L-1724 Luxembourg

Notice to the Management Company:    **UBS Third Party Management Company S.A.**
291, route d'Arlon
L-1150 Luxembourg
Phone: 44 10 10 1
Fax: 44 10 10 62 79

The above mentioned addresses may be changed by simple notice of such change from each party.

Any notice sent by post, by telegram, cable, telex, facsimile or by hand as provided in this clause shall be deemed to have been given upon receipt. Failure to receive any confirmation of any notice duly given by post, telegram, cable, telex or facsimile shall not invalidate such notice.

### ARTICLE XIII: Waiver, etc.

Should one or several clauses of this agreement be or become invalid, ineffective or void, the remaining clauses would not be affected and should be interpreted or completed in a way as to maintain the economic aim as exactly as possible in a legally allowable way. This is also relevant for gaps that would need to be completed.

No provision of this Agreement may be changed, waived, discharged or discontinued, except by any instrument in writing signed by or on behalf of all parties hereto.

### ARTICLE XIV: Governing law

This Agreement shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg.

## ARTICLE XV: Jurisdiction

In relation to any legal action or proceedings arising out of or in connection with this Agreement, the parties hereto submit to the exclusive jurisdiction of the District Court of Luxembourg, ("Tribunal d'Arrondissement") Grand Duchy of Luxembourg.

---

IN WITNESS whereof the parties hereto have caused this Agreement to be executed as of the day and year first above written, in two counterparts, one such counterpart to be retained by each party.

Luxembourg, February 13, 2007                            Luxembourg, February 13, 2007

*[signature]*                                            *[signatures: Bernard Ameray]*

Access Partners SA                                       UBS Third Party Management Company S.A.

APPENDIX TO
*The INVESTMENT ADVISORY AGREEMENT*

*Signed on February 13, 2007*
*Between* UBS Third Party Management Company S.A. *(hereinafter referred to as the "Management Company")*
*And*
ACCESS PARTNERS S.A. *(hereinafter referred to as the "Investment Adviser")*

**WHEREAS**

- According to the According to the Investment Advisory Agreement, Section VI "the Management Company shall pay to the Investment Adviser a remuneration corresponding to the portfolio management fee described in the Management Company Services Agreement and consisting of a fixed fee and a performance fee".

- According to the prospectus and as provided in the Portfolio Management Agreement:
    - The management fee for the Subfund is 0.80 % p.a. of the Trading Assets calculated in USD, accrued on each Valuation Day and payable quarterly in arrears on the average Trading Assets over the quarter.
    - The Subfund shall pay quarterly in arrears a performance fee of 16% of the quarterly performance of the Trading Assets over a hurdle rate of 5% per annum; performance means the positive difference between (i) Trading Assets on the last business day of the quarter and (ii) the Trading Assets on the last business day of the previous quarter increased by a hurdle rate of one quarter of 5% per annum (the "Performance Index").
    Trading Assets means Assets traded by the Portfolio Manager corresponding to the Assets of the Subfund after deduction of liquid assets necessary to pay redemption proceeds, (if any), ordinary expenses and fees, adjusted if appropriate on a pro rata temporis basis for subscription and redemption made during the quarterly period.
    The performance fee is calculated on a quarterly high water mark basis, incorporating the Performance Index, which means that, if there are net losses during a calculation period, such losses are carried forward in the following calculation period(s), and must be recovered before a further performance fee may be paid, taking into account the trading gains and losses attributable to subscribed and redeemed shares occurred in previous calculated periods.

**NOW IT IS HEREBY AGREED AS FOLLOWS**

In consideration for the services performed by the Investment Adviser, the Management Company agrees to pay the Investment Adviser quarterly fees equal to 50% of the whole 0,60% Trading Assets management fee and 50% of the whole 16% of the performance fee calculated according to the above on all of the aggregate investments in the Subfund.

This appendix forms an integral part of the above-mentioned agreement and will be effective as of March 1st, 2007.

Luxembourg, February 13, 2007            Luxembourg, February 13, 2007

Access Partners SA                                 UBS Third Party Management Company S.A.