# EXHIBIT 12



[2014] UKPC 9
Privy Council Appeal No 0061 of 2012
and Nos 0058, 0059, 0060 and 0061 of 2013

# JUDGMENT

**Fairfield Sentry Limited (in Liquidation) (Appellant) v Migani and others (Respondents)**

**Lombard, Odier & Cie and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)**

**Credit Suisse London Nominees Limited and another (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)**

**Quilvest Finance Limited and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)**

**UBS AG New York and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)**

**From the Court of Appeal of the British Virgin Islands**

**before**

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**

**JUDGMENT DELIVERED BY**

**Lord Sumption**

**ON**

**16 April 2014**

**Heard on 18 and 19 March 2014**

*Lombard, Odier & Cie and others*
David Lord QC
Robert Christie

(Instructed by Blake Lapthorn)

*Fairfield Sentry Ltd (in Liquidation)*
Jonathan Crow QC
Andrew Westwood
Stephen Midwinter
(Instructed by Macfarlanes LLP)

*Credit Suisse London Nominees Ltd and another*
Laurence Rabinowitz QC
Arabella di Iorio
Maximilian Schlote
(Instructed by Herbert Smith Freehills LLP)

*UBS AG New York and others*
Lord Falconer QC
Paul Webster QC
(Instructed by Gibson Dunn & Crutcher LLP)

*Quilvest Finance Ltd and others*
Mark Hapgood QC
Phillip Kite
Alan Roxburgh
(Instructed by Latham & Watkins)

**LORD SUMPTION:**

*Introduction*

1.      Bernard L. Madoff and his company Bernard L. Madoff Investment Securities LLC ('BLMIS') ostensibly operated as fund managers, principally from New York. Over a period of at least seventeen years he operated what seems likely to be the largest Ponzi scheme in history, accepting sums variously estimated between US$17 billion and US$50 billion for investment. It appears that from at least the early 1990s there had been no trades and no investments. Returns to investors were fictitious and the corresponding documentation fabricated. As with any Ponzi scheme, net withdrawals from funds under management were paid from new money placed with BLMIS for investment. In December 2008 Madoff was arrested, and in March 2009 he pleaded guilty in a New York court to a number of counts of fraud. He was later sentenced to 150 years imprisonment.

2.      Fairfield Sentry Ltd is a company incorporated in the British Virgin Islands as a mutual fund. I shall, like most of the formal documentation, call it "the Fund". From 1997 to 2008, it was the largest of a number of feeder funds which placed money with BLMIS for investment. Over that period, about 95% of its assets, amounting to some US$7.2 billion was placed with BLMIS. Investors participated indirectly in these placements by subscribing for shares in the Fund at a price dependent on the Fund's net asset value per share ('NAV'), and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's Articles of Association. The net addition to or reduction of its funds arising from subscriptions or withdrawals over any month was reflected in corresponding additions or reductions of funds placed with BLMIS. The shares were also transferrable, subject to certain restrictions in the Articles, but we were told that there was no secondary market in them. On 18 December 2008, shortly after Madoff's frauds came to light, the Directors of the Fund suspended the determination of the Fund's NAV per share, thus effectively terminating the redemption of shares. On 21 July 2009, the High Court of the British Virgin Islands ordered the Fund to be wound up.

3.      It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails. Members of the Fund who redeemed their shares before 18 December 2008 recovered the NAV which the Directors determined to be attributable to their shares on the basis of fictitious reports from BLMIS. The loss will in principle be borne entirely by those who were still Members of the Fund at that date.

4.   These proceedings are brought by the Fund at the instance of its liquidators against a number of financial institutions who were Members of the Fund but redeemed some or all of their shares before December 2008. Their purpose is to recover from the Defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets. Any recoveries made on this basis can then be distributed rateably between all Members, irrespective of when or whether they redeemed.

5.   Similar proceedings have been brought by the Fund in other jurisdictions against other Members and former Members to recover redemption payments. They include more than 300 actions in the United States, in which the Fund is claiming more than US$6 billion. The United States actions have been stayed pending the outcome of these proceedings.

6.   On 20 April 2011, Bannister J in the Commercial Division of the High Court of the British Virgin Islands ordered four preliminary issues to be tried. The first three issues have together been called the "Article 11" question. These issues were all concerned with the question whether certain transaction documents issued to Members of the Fund recording the NAV per share or the redemption price upon redemption were binding on the Fund under Article 11 of its Articles, which deals with the effect of certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they were binding the present claims must fail. The fourth issue was whether the Defendants have a defence on the ground that by their surrendering their shares they gave good consideration for the money that they received on redemption. This has been called the "Good Consideration" question. The two questions were argued separately below and before us. But for reasons which will be explained, they are closely related and have to be considered together.

7.   Bannister J decided the Article 11 question in favour of the Fund. He held that the documents relied upon by the Defendants as binding were not "certificates" for the purpose of Article 11. But he held in favour of the Defendants on the Good Consideration question, and on that basis summarily dismissed the action. He was affirmed on both points by the Eastern Caribbean Court of Appeal.

*The contractual documentation*

8.   Subscribers for shares in the Fund complete a Subscription Agreement, by which they subscribe for shares to be offered by the Fund at the NAV per share as the opening of business on the effective date of purchase "pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively 'the Fund Documents')": see clause 1.

9.   Of these three documents, the "Memorandum" means the Private Placement Memorandum by which the Fund offers a stated number of shares. Its main function is to convey information about how the Fund is managed and how its assets are invested, and to define certain expressions used in the Subscription Agreement. It describes the investment strategy of the Fund, and explains that it is implemented by BLMIS. A section headed "Transfers, Redemptions and Termination" describes the procedure for redemption.

10.  The Subscription Agreement binds the subscriber to his subscription and to the terms of the Fund Documents, but is otherwise concerned entirely with acknowledgements, representations and warranties as to his understanding of the investment and of associated procedures and risks, mostly for regulatory purposes. For present purposes, what matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares. These terms are to be found in the Articles of Association of the Fund. The relevant provisions are Articles 9, 10 and 11 and the associated definitions in Article 1. These operate by reference to the "Valuation Day" and the "Dealing Day". A Valuation Day is the last business day of any month (or such other date as the Directors may determine); and with respect to redemptions a Dealing Day is a Valuation Day.

11.  Article 9 deals with the issue and allotment of shares. Article 9(1) provides for shares to be issued to those applying for them on the Dealing Day following the application. Article 9(1)(b) provides:

> "The issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value."

Article 9(2) provides that the Subscription Price per share is to be the

> "Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands, on the Valuation Day immediately preceding the Dealing Day on which such issue is made."

12.  Article 10 deals with redemptions. It is in some respects the mirror image of Article 9. Article 10(1) provides that

> "Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member ('the Applicant') specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name, PROVIDED THAT:
>
> (a) subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time."

Article 10(1)(b) provides (so far as relevant) that

> "the redemption or purchase of Shares pursuant to this article shall be effected at the Redemption Price determined in accordance with paragraph (2) of this article."

Article 10(1)(c) provides for the Redemption Price to be paid "as soon as practicable after the Dealing Day", being normally 30 days after the Dealing Day, subject to extension in certain special cases. Article 10(2) deals with the Redemption Price. It provides:

> "(2) The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency."

13. Article 11 deals with the determination of the NAV per share for the purpose of both subscriptions and redemptions. Article 11(1) provides:

> "[a] The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph

(4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

[b] The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

[c] Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

The sub-paragraph numbers [a], [b] and [c] have been added for ease of reference. Article 11(2) identifies the assets and liabilities to be included in the calculation of the NAV. In effect they are all the assets and liabilities of the Fund. Article 11(3) contains detailed supplementary provisions governing certain aspects of the valuation.

*Redemption procedure*

14. Since 1999, the Fund's administrator has been Citco Fund Services (Europe) BV, a leading professional administrator of mutual funds based in the Netherlands. The Private Placement Memorandum records that under an administration agreement dated 20 February 2003, the Fund has appointed Citco as the administrator of the Fund under the overall direction of the Directors. Citco is described as having responsibility for day-to-day administrative services including "calculation of Net Asset Value" and "communications with shareholders".

15. This summary description is borne out by the terms of the agreement of 20 February 2003. Clause 2.1 of the agreement provides for the Administrator (Citco) to provide "the Services", which are defined in Schedule 2 as including the "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents", and "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund." Clause 3.4 provides that "the Administrator shall on behalf of the Fund redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents", on receipt of the

Member's written request to redeem and the provision of sufficient moneys to satisfy the Redemption Price.

16.   The management of a mutual fund is bound to involve the communication to Members of a substantial volume of routine documentation, including transactional documentation generated upon redemption. It is common ground that in the Fund's case, this included the following documents:

i)   Citco calculated an estimated NAV weekly and a final NAV on each Valuation Day, i.e. on the last business day of each month. All of these figures were posted by Citco on a password-protected website which it maintained and which was accessible to Members.

ii)   The final NAV per share for the last business day of each month was communicated in about the middle of the following month by the Fairfield Group client desk at Citco by e-mail to all Members. The operative part of the representative e-mail before us reads:

> "Please be advised that the final net asset value per share of Fairfield Sentry Limited, Class A, is USD 957.8430 as at December 2003.
>
> Should you have any questions or require further information, please do not hesitate to contact us."

iii)   Upon each redemption, the redeeming Member received from Citco in about the middle of the month following the relevant Valuation Day a contract note recording the transaction. The operative part began:

> "In accordance with your instructions, we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED."

There followed the relevant Valuation Day, the number of shares redeemed, the Redemption price per share and the total net redemption proceeds.

iv)   Each Member received from Citco in about the middle of each month a monthly statement of his account. This recorded, among other things, the

opening and closing NAV per share for the previous calendar month, and a summary of activity (if any) over the previous calendar month recording subscriptions and redemptions in the month and the NAV per share corresponding to each one.

Each of these documents is said by the Defendants to be a "certificate" for the purpose of Article 11(1) [c] of the Fund's Articles.

*Restitution*

17.     The availability of a claim for restitution arising out of a transaction governed by the Articles of the Fund is governed by the same law which governs the Articles themselves, namely the law of the British Virgin Islands. In every relevant respect, the principles of the law of the British Virgin Islands governing the construction of the Articles and any associated common law right to restitution are the same as those of English law.

18.     The basic principle is not in dispute. The payee of money "cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him": *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). Or, as Professor Burrows has put it in his *Restatement of the English Law of Unjust Enrichment* (2012) at §3(6), "in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation." Therefore, to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J. Simms Son & Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess.

19.     It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the Directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable.

*What was the Fund obliged to pay upon redemption*

20.     Mr Crow QC, who appeared for the Fund, invited us to stop at the general principle, and not to answer this question. He submitted that the effect of the contractual

provisions governing redemption was not covered by the preliminary issues and ought to be referred back to the High Court. He also suggested that at a further hearing in the High Court, New York law, which is the proper law of the Subscription Agreement, might be relevant. The Board unhesitatingly rejects these submissions. Neither the Article 11 question nor the Good Consideration question, as formulated in the preliminary issues, can be resolved without deciding what is the effect of the Articles. Both courts below proceeded on that basis. The effect of the Articles is therefore properly before the Board. The Board notes that neither the Fund nor the Defendants have pleaded New York law. Nor can the Board discern any basis on which New York law could be relevant, since none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands.

21. The starting point is the scheme of the Articles. Articles 9 and 10 determine the status of investors as Members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the Subscription Price under Article 9 and the Redemption Price under Article 10 depend on the NAV per share determined under Article 11. Article 9(1)(a) provides that the issue of shares "shall be made on the Dealing Day". Article 9(1)(b) provides for the Subscription Price to be determined in accordance with Article 9(2), which means that it is to be the NAV per share "determined in accordance with Article 11". Article 9(1)(c) provides for the Subscription Price to be payable at a time fixed by the Directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of Article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares "shall be made on the Dealing Day". Article 10(1)(b) provides that the redemption is to be effected at the Redemption Price determined in accordance with Article 10(2), which means the "Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)" on the Dealing Day. Under Article 10(1)(c), that price must be paid as soon as practicable after the Dealing Day, being normally thirty days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly Valuation Day is ascertained, subscriptions and redemptions effected at the corresponding Subscription and Redemption Price will affect the determination of NAV per share on the following monthly Valuation Day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of Article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the Dealing Day and known to the parties shortly thereafter. It is unworkable on any other basis.

22. The Fund's case is that when Article 10(2) defines the Redemption Price as the NAV per share "determined in accordance with Article 11", it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with Articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be

Page 8

true of Article 9(1)(c), which fixes the Subscription Price by reference to the same provisions of Article 11. The Directors' determination of the NAV per share as at the Valuation Day, under Article 11, was not definitive according to this analysis unless a certificate was issued pursuant to Article 11(1)[c], and that would happen only if the Directors chose to issue one.

23. In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the Directors at the time and substitute a different one based on information acquired long afterwards about the existence or value of the assets. This would not only expose Members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other Members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the Subscription Price long after the shares had been allotted. Indeed, it is difficult to see how the Directors could perform their duty under Article 9(1)(b) not to allot or issue a share at less than the Subscription Price if the latter might depend on information coming to light after the allotment had been made.

24. If, as the Articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3). That means either (i) that the Directors' determination at the time must be treated as conclusive whether or not there is a certificate under Article 11(1)[c]; or else (ii) that Article 11(1)[c] must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors. The Board considers, for the reasons given below, that in a case where a provision for certification such as Article 11(1)[c] has been included as part of the mechanics of subscription and redemption, the correct approach is the second one.

*Certification*

25. The Board has been referred to a number of authorities dealing with certification clauses, none of them analogous to Article 11(1)[c]. Their effect, broadly summarised, is that the word "certificate" has no standard meaning and that the question what

Page 9

constitutes a certificate is dependent on the commercial or legal context in which the certification clause appears.

26. The Board was invited by the Fund to read the opening words ("Any certificate") as if they said "A certificate, if any". This, it was argued, showed that there would not necessarily be one in every case. For that reason, and because there is nothing in the language of the Articles which obliged the Fund to issue a certificate, it was submitted that the issue of a certificate was wholly in the discretion of the Directors or their delegates and that it could be withheld for any rational and honest reason. A variant of this argument appears to have been accepted by the Court of Appeal. The Board, however, is unable to accept it. In the first place, it places more weight on the word "Any" than it will bear. It seems more likely that the word was used because the rest of the clause refers to a number of different things that may be certified, namely the NAV per share, the Subscription Price and the Redemption Price. Secondly, the problem about the suggestion that certification is a discretionary matter for the Directors, is that it is impossible to discern what purpose such a discretion could rationally be thought to serve. The sole object of certification is to produce finality, and the scheme of the Articles, as the Board has summarised it above, shows that finality is equally important for all determinations of the NAV per share and all Subscription and Redemption Prices. There is no rational ground for regarding finality as desirable in some cases but not in others, according to the discretionary decision of the Directors or their delegates. Such a discretion, if it existed, could only operate capriciously, and is therefore most unlikely to have been intended by the draftsman.

27. As a matter of language, a "certificate" ordinarily means (i) a statement in writing, (ii) issued by an authoritative source, which (iii) is communicated by whatever method to a recipient or class of recipients intended to rely on it, and (iv) conveys information, (v) in a form or context which shows that it is intended to be definitive. There is no reason to think that a document must satisfy any further formal requirements, unless its purpose or legal context plainly requires them. There is nothing in the context of these Articles which does.

28. The relevant categories of document generated in the ordinary course of the Fund's relations with Members are listed at paragraph 16. In the Board's opinion the monthly e-mail, the contract notes and the monthly statement of account are all "certificates". They communicate information in documentary form to Members. It follows that the critical questions in the present case are whether transaction documents in the three categories are (i) issued by an authoritative source and (ii) in a form or context which shows that they are intended to be definitive.

29. The authoritative character of their source can be shortly dealt with. Documents in all three categories were issued by Citco under the authority of the Directors, conferred by the Administration Agreement. The calculation of the monthly NAV per

share was among the functions of Citco included in Schedule 2, Part 1 of the Agreement. Its publication was a function of Citco under Schedule 2, Part 2(e). The communication to Members seeking to redeem their shares of the monthly NAV per share and the Redemption Price is necessarily implicit in clause 3.4 of the Agreement, which delegates to Citco the duty of redeeming shares in accordance with the "provisions and procedures" set out in the Fund Documents. These authorities are general, and not specific to any particular transaction or category of transactions. If the issue of a "certificate" were an exceptional or discretionary step, something more specific by way of authority might have been required. But for the reasons which the Board has already given, the certification procedure under Article 11(1)[c] is neither exceptional nor discretionary.

30. Turning to the question whether they were intended to be definitive, the context in which they are issued plainly demonstrates that they were. As the Board has already observed, the nature of a redemption transaction and the procedures set out in Article 10 make it essential that the Redemption Price should be definitively ascertained at the time of the transaction and as at the Valuation Day. In that context, any unqualified documentary statement of the Redemption Price or the NAV per share on which it is based must be intended to be definitive. The Articles could not otherwise operate as they are intended to.

31. This conclusion is borne out by the language of the documents. The emails formally "advising" the monthly NAV per share to Members describe it in terms as the "final" figure. The contract notes formally "confirm" the redemption and record its terms. The monthly Members' statement constitutes a formal record of each transaction during the month and the NAV per share at which it went through. All of this information was plainly intended to be relied upon by Members as a definitive record of the transaction and the values on which it was based.

32. The Board prefers to express no opinion on the question whether the statements posted on the Citco website are also "certificates". A statement on a website may well have all the characteristics of a "certificate", but that may depend on a variety of considerations on which the Board has little or no evidence, including the permanence of any statement posted on it and what Members are told about the kind of information which they will find there.

*Conclusion*

The Board will humbly advise Her Majesty that the appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed, save as to information posted on the Citco website, and that the appeal against their decision on Issue 4 should be dismissed. The parties are invited to agree an appropriate form of declaration on all four issues.