**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff-Applicant,

       v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

            Defendant.

SIPA Liquidation

No. 08-01789 (CGM)

(Substantively Consolidated)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re

BERNARD L. MADOFF,

            Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

            Plaintiff,

       v.

CITIBANK, N.A., CITICORP NORTH
AMERICA, INC., AND CITIGROUP GLOBAL
MARKETS LIMITED,

            Defendants.

Adv. Pro. No. 10-05345 (CGM)

**ORAL ARGUMENT**
**REQUESTED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE CITI DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................i

PRELIMINARY STATEMENT .......................................................................................1

BACKGROUND................................................................................................................3

    A.    The Trustee Seeks To Recover From Citibank Approximately $343 Million
Received By It From Prime Fund As Payment On A Loan. .....................................3

    B.    The Trustee Seeks To Recover From CGML $100 Million Received By It
From Fairfield Sentry In Connection With A CGML Swap. ...................................5

LEGAL STANDARD ........................................................................................................7

ARGUMENT .....................................................................................................................8

    I.    BLMIS's Initial Transfers to Prime Fund and Fairfield Sentry Are Not
Avoidable As Intentionally Fraudulent Conveyances. ..........................................9

        A. The Amended Complaint Fails to Raise A Strong Inference Of Actual
Fraudulent Intent With Respect To Each Initial Transfer. ....................................10

        B. The Existence Of A Ponzi Scheme Does Not Establish Actual Intent To
Defraud With Respect To Every Single Transfer Made During the Scheme's
Course.........................................................................................................13

    II.    The Trustee's Principal Claim Against Citibank—for $301 Million In
A Loan Repayment—Should Be Dismissed Because The Money Did Not
Deplete the BLMIS Estate.....................................................................................17

    III.    At Minimum, the Court Should Dismiss $60 Million Of The Trustee's
Claim Against CGML, and About $43 Million Of The Trustee's Claim
Against Citibank, As Untraceable to BLMIS. .......................................................19

        A. CGML Could Not Have Received $60 Million of BLMIS Money
From Fairfield Sentry. .........................................................................................20

        B. Prime Fund's Monthly Payments To Citibank, Totaling $43 Million,
Do Not Correspond With Any Of BLMIS's Initial Transfers To Prime Fund. ......22

        C. The Claims Should Be Dismissed With Prejudice. ..............................................23

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 546 ........................................................................................................... 14

11 U.S.C. § 547(b)(4)(A) ........................................................................................... 14

11 U.S.C. § 548 ..................................................................................................... 16, 17

11 U.S.C. § 548(a)(1) ................................................................................................. 14

15 U.S.C. § 78fff-2(c)(3) ......................................................................................... 8, 19

Fed. R. Bankr. § 548(a)(1)(A) ............................................................................. passim

Fed. R. Bankr. § 550(a) ....................................................................................... passim

Fed. R. Bankr. § 2004 ............................................................................................ 4, 23

Fed. R. Civ. P. § 9(b) ............................................................................................. 9, 13

Fed. R. Civ. P. § 12(b)(6) ............................................................................................. 7

**Cases**

*Achtman v. Kirby, McInerney & Squire, LLP,*
464 F.3d 328 (2d Cir. 2006) ......................................................................................... 3

*Ades-Berg Inv. v. Breeden (In re The Bennett Funding Grp., Inc.),*
439 F.3d 155 (2d Cir. 2006) ....................................................................................... 16

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) .................................................................................................. 7

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.),*
256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd* 264 B.R. 303 (S.D.N.Y. 2001) ................... 15

*Bear, Stearns Sec. Corp. v. Gredd,*
275 B.R. 190 (S.D.N.Y. 2002) ............................................................................... 17, 18

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................................... 7

*Boston Trading Grp. Inc. v. Burnazos*,
835 F.2d 1504 (1st Cir. 1987) ..................................................................... 16

*Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*,
318 B.R. 276 (Bankr. S.D.N.Y. 2004) .......................................................... 17

*Daly v. Deptula (In re Carrozzella & Richardson)*,
286 B.R. 480 (D. Ct. 2002) .......................................................................... 15

*Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
2006 WL 687153 (Bankr. S.D.N.Y Mar. 6, 2006) ......................................... 17

*Fairfield Sentry Ltd. (In Liquidation) v. Citibank NA London*,
No. 19-CV-03911, 2021 WL 1027535 (S.D.N.Y. March 17, 2021) ............... 5

*Fairfield Sentry Ltd. (In re Fairfield) v. Citigroup Glob. Mkts. Ltd.*,
No. 11-2770 (Bankr. S.D.N.Y.)...................................................................... 5

*Finn v. Alliance Bank*,
860 N.W.2d 638 (Minn. 2015) ...................................................................... 15

*Geltzer v. Barish (In re Geltzer)*,
502 B.R. 760 (S.D.N.Y. 2013) ...................................................................... 11

*In re Caremerica, Inc.*,
409 B.R. 737 (Bankr. E.D.N.C. 2009) ........................................................... 19

*In re Harris*,
464 F.3d 263 (2d Cir. 2006) .......................................................................... 16

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983) ................................................................... 10, 11

*In re M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. Inc.*,
394 B.R. 721 (Bankr. S.D.N.Y. 2008) .......................................................... 12

*Intercontinental Metals Corp. v. Erlanger & Co., Inc.*,
902 F.2d 1565, 1990 WL 64805 (4th Cir. May 1, 1990) ................................ 18

*Ivey v. First-Citizens Bank & Tr. Co. (In re Whitley)*,
2014 WL 6910837 (Bankr. M.D.N.C. Dec. 8, 2014), *aff'd*, 539 B.R. 77 (M.D.N.C. 2015),
*aff'd*, 848 F.3d 205 (4th Cir. 2017), *cert denied*, 138 S. Ct. 314 (2017) ........... 17

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd* 2002 WL 32500567 (W.D.N.Y. June 21,
2002) .................................................................................................................    15

*New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*,
2008 WL 2115225 (S.D.N.Y. May 16, 2008) ...................................................    10

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013) .............................................................    18

*Picard v. ABN AMRO Bank N.V.*,
No. 10-5354 (Bankr. S.D.N.Y. June 10, 2019), Dkt. No. 180-1 ......................    23

*Picard v. Citibank, N.A.*,
12 F.4th 171 (2d Cir. 2021) ...................................................... 11, 12, 13, 14

*Picard v. Fairfield Inv. Fund Ltd.*,
Adv. Proc. No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011)................................    5, 24

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
603 B.R. 682 (Bankr. S.D.N.Y. 2019) .............................................................    16

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) .............................................................    20, 23

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) .............................................................    19

*Picard v. Tremont Grp. Hldgs., Inc.*,
No. 10-5310 (Bankr. S.D.N.Y. Dec. 7, 2010) .................................................    3

*Pioneer Liquidating Corp. v. San Diego Tr. & Savings Bank (In re Consol. Pioneer
Mortg. Entities)*, 211 B.R. 704 (S.D. Cal. 1997), *aff'd in part, rev'd on other grounds*,
166 F.3d 342, 1999 WL 23156 (9th Cir. Jan. 13, 1999) .................................    17

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
501 B.R. 26 (S.D.N.Y. 2013) ..........................................................................    12

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
590 B.R. 200 (S.D.N.Y. 2018) ........................................................................    23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv'r Sec. LLC*,
505 B.R. 135 (S.D.N.Y. 2013) ........................................................................    passim

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp)*,
403 F.3d 43 (2d Cir. 2005) ............................................................................ passim

*SungChang Interfashion Co. v. Stone Mountain Accessories, Inc. Ltd.*,
2013 WL 5366373 (S.D.N.Y. Sept. 25, 2013) ................................................. 10

*Van Iderstine v. Nat'l Disc. Co.*,
227 U.S. 575 (1913) ....................................................................................... 14

*Verestar, Inc. v. Am. Towers Corp. (In re Verestar, Inc.)*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ......................................................... 9, 11, 12

**Other Authorities**

*Amy J. Sepinwall, Righting Others' Wrongs: A Critical Look at Clawbacks in the
Madoff-Type Ponzi Schemes and Other Frauds*, 78 BROOK. L. REV. 1, 23-24 (2012) ....... 13

Defendants Citicorp North America, Inc. ("Citicorp"), Citibank, N.A. (together with Citicorp, "Citibank") and Citigroup Global Markets Limited ("CGML") (collectively, the "Citi Defendants") submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint filed in this proceeding by Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"). *See* Am. Compl., *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-05345 (Bankr. S.D.N.Y. Feb. 11, 2022), Dkt. No. 214 ("Amended Complaint" or "Am. Compl.").

## PRELIMINARY STATEMENT

The Trustee purports to be recovering money that the debtor, BLMIS, paid to two of its customers, Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") and Fairfield Sentry Limited ("Fairfield Sentry"), and that was allegedly subsequently transferred in part to the Citi Defendants. Instead, he reaches far beyond his statutory authority, trying to lay claim under Bankruptcy Code Section 550(a) to any and all money that the Citi Defendants received from Prime Fund and Fairfield Sentry, regardless of whether it actually came from BLMIS in the first place. The Amended Complaint is so vague and conclusory that it must be dismissed.

As to Citibank, the Trustee demands $343,084,590 in a loan repayment that Citibank received from Prime Fund, an investment fund that was a customer of BLMIS. Am. Compl. ¶ 3. As to CGML, the Trustee demands $100 million in payments that CGML received from Fairfield Sentry when it redeemed Fairfield Sentry shares held as a hedge on a swap that CGML entered with a counterparty seeking synthetic exposure to Fairfield Sentry. Am. Compl. ¶ 4; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv'r Sec. LLC*, 505 B.R. 135, 141 (S.D.N.Y. 2013) ("*The Swap Safe Harbor Decision*"). The Trustee fails to adequately plead entitlement to either demand.

*First*, the claim against CGML has a fundamental flaw—namely, the failure of the Trustee to plead facts supporting the avoidability under Bankruptcy Code Section 548(a)(1)(A) of any of BLMIS's initial transfers. The Trustee's principal theory of avoidability is based on the fact that BLMIS operated a Ponzi scheme and thus, he seemingly assumes any and all of BLMIS's transfers must have been made with actual fraudulent intent. This presumption is inconsistent with the avoidance statute governing actual fraudulent transfers, Section 548(a)(1)(A), which requires intent to be specific to the transfers sought to be avoided. Even more, it is not based in reality; simply because a debtor conducts its business fraudulently does not necessarily make every single payment by that debtor fraudulent. Because Section 548(a)(1)(A) is the only avoidance statute available for the CGML claim, the claim must be dismissed.

*Second*, the Trustee cannot avoid the BLMIS-to-Prime Fund transfer allegedly underlying $301 million in Prime Fund-to-Citibank transfers because the transfers did not deplete any assets of the BLMIS estate. Because Prime Fund's withdrawals from BLMIS were quickly replaced with new funds by another lender, the Trustee is not entitled to $301 million of its claim against Citibank.

*Third*, despite having conducted extensive investigations of the workings of BLMIS, Fairfield Sentry, and Prime Fund, the Trustee alleges in conclusory fashion that the monies received by the Citi Defendants are actually traceable to BLMIS. Indeed, as to $60 million received by CGML from Fairfield Sentry on April 14, 2008, and $43 million in interest received by Citibank from Prime Fund, there is nothing in the pleadings supporting the tracing of these amounts to BLMIS. In fact, based on the information before the Court, *see* Am. Compl., Exs. B-C, E-F, their traceability is rendered implausible by the timing and amounts of the initial

2

transfers, which do not correspond with the alleged subsequent transfers to Citibank and CGML.

This pleading failure requires at least partial dismissal of the claims against the Citi Defendants.

## BACKGROUND[1]

### A.    The Trustee Seeks To Recover From Citibank Approximately $343 Million Received By It From Prime Fund As Payment On A Loan.

Prime Fund is an investment fund that was a customer of BLMIS before its collapse.

Am. Compl. ¶ 53. On June 15, 2005, Prime Fund entered into a loan agreement with Citibank,

and it allegedly used at least some of the loan monies to invest in BLMIS. Am. Compl. ¶ 3; *see*

*also* Tremont Complaint ¶ 91, *Picard v. Tremont Grp. Hldgs., Inc.*, No. 10-5310 (Bankr.

S.D.N.Y. Dec. 7, 2010) ("*Tremont Action*"), Dkt. No 1. On March 26, 2008, Prime Fund repaid

Citibank the loan principal of $300 million, and over the three-year life of the loan, Prime Fund

made an additional 35 payments to Citibank, totaling over $43 million in monthly interest and

fee payments due on the loan. *See* Am. Compl., Ex. F; *see also* Trustee's Mem. of Law in Supp.

of Mot. for Leave to File an Am. Compl., Adv. Proc. No. 10-5345 (Bankr. S.D.N.Y. Dec. 14,

2018), Dkt. No. 149 p. 34 ("$42,061,207 of additional transfers . . . were paid to Defendants as

fees and interest payments pursuant to the credit facility."). When Prime Fund decided to repay

the Citibank loan principal, it allegedly withdrew money from BLMIS and replaced it with

money from another bank. In other words, it simply changed lenders. *See* Tremont Complaint

¶ 198, *Picard v. Tremont Grp. Hldgs., Inc.*, No. 10-5310 (Bankr. S.D.N.Y. Dec. 7, 2010)

("*Tremont Action*"), Dkt. No 1. Thus, there was no depletion of the BLMIS estate by virtue of

---

[1] The facts set forth in this section are drawn from the allegations contained in the Amended Complaint, which the Citi Defendants accept as true for purposes of this motion only. The Citi Defendants also refer to the contents of documents filed in other legal proceedings before this Court, which the Court may judicially notice. *See Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 338 (2d Cir. 2006).

one lender coming in for another and replacing the money Prime Fund initially borrowed from Citibank to invest in BLMIS.

Prime Fund also made various withdrawals from its BLMIS account wholly unrelated to Citibank or the loan, as the Trustee is aware. Indeed, following the revelation of BLMIS's Ponzi scheme, the Trustee brought an action against Prime Fund, its manager, Tremont Partners, Inc. ("Tremont"), and other Tremont affiliates, seeking $2.1 billion of initial transfers of BLMIS property to the Tremont entities. Am. Compl. ¶ 88; *see also* Tremont Complaint, *Tremont Action*, No. 10-5310 (Bankr. S.D.N.Y. Dec. 7, 2010), Dkt. No. 1. The largest portion of the claim—$1.01 billion—was for alleged transfers of property from BLMIS to Prime Fund. Am. Compl. ¶ 174; *see also* Tremont Compl. ¶ 265. In July 2011, the Trustee settled the action, recovering an aggregate total of $1.025 billion from Prime Fund, Tremont, and their affiliates. Tremont Settlement Agreement, *Tremont Action*, No. 10-5310 (Bankr. S.D.N.Y. July 28, 2011), Dkt. No. 17.

Despite his substantial recovery, the Trustee now alleges that a portion of BLMIS's $1.01 billion in initial transfers from BLMIS to Prime Fund—approximately $343,084,590—was used by Prime Fund to repay the Citibank loan and make the monthly interest payments. Am. Compl. ¶¶ 2-3. The Trustee has broad access to information from Prime Fund,[2] but the Amended Complaint fails to link (or trace) any alleged Prime Fund-to-Citibank payment to a BLMIS-to-Prime Fund transfer. Instead, the Trustee supposes that Prime Fund received money from BLMIS, and that "a portion" of the received money was ultimately transferred to Citibank. Am. Compl. ¶¶ 53, 188, 189. But there is no factual allegation to support this supposition. Even

---

[2] In settling its claims against Prime Fund, the Trustee conducted "a comprehensive investigation" of Prime Fund, including investigatory interviews, Bankruptcy Rule 2004 examinations, and a full review of BLMIS-related transaction histories, account statements, correspondence, and other records from Tremont and Prime Fund. *See* Tremont Settlement Agreement, Ex. A ¶ DD.

within the two exhibits attached to the Amended Complaint, one listing BLMIS's initial transfers to Prime Fund, and the other listing Prime Fund's payments to Citibank, the transfer dates and amounts do not plausibly line up between the BLMIS-to-Prime Fund transfers and the Prime Fund-to-Citibank monthly payments. *See* Am. Compl. Exs. E, F. The Trustee provides no further alleged detail on the flow of BLMIS's property or why he assumes that Prime Fund's payments to Citibank were drawn specifically from money that BLMIS transferred to Prime Fund.

**B.    The Trustee Seeks To Recover From CGML $100 Million Received By It From Fairfield Sentry In Connection With A CGML Swap.**

Fairfield Sentry is an investment fund that was a customer of BLMIS before its collapse. Am. Compl. ¶ 55. The Trustee's claim against CGML concerns funds that CGML allegedly received in connection with an April 2005 swap agreement that it entered into with a hedge fund, Auriga International Ltd. ("Auriga") that sought exposure to Fairfield Sentry. *See The Swap Safe Harbor Decision*, 505 B.R. at 141. As a hedge on the swap, CGML bought shares in Fairfield Sentry, and whenever Auriga requested a reduction in exposure to Fairfield Sentry shares, CGML would reduce its hedge in Fairfield Sentry shares in a corresponding amount, including by $60 million on April 14, 2008, and $40 million on November 19, 2008. *Id.*

As a customer of BLMIS, Fairfield Sentry made a number of withdrawals from its BLMIS account. On May 18, 2009, the Trustee sued Fairfield Sentry and its affiliates to avoid and recover, among other things, approximately $3 billion in alleged customer property transferred from BLMIS to Fairfield Sentry.[3] *See* Fairfield Sentry Amended Complaint, *Picard*

---

[3] Following the Trustee's lawsuit, Fairfield Sentry entered its own liquidation proceedings. *See* Fairfield Sentry Settlement Agreement, *Trustee-Fairfield Action*, Adv. Proc. No. 10-5310 (Bankr. S.D.N.Y. 09-1239), Dkt. No. 69-2. In or around April 2010, the Fairfield Liquidators filed actions in New York against hundreds of defendants, seeking to obtain BLMIS customer property that the Fairfield funds

*v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. July 20, 2010) ("Trustee-Fairfield

Action"), Dkt No. 23 ¶¶ 20, 536. On May 9, 2011, the Trustee and the liquidators of Fairfield

Sentry (the "Fairfield Liquidators") entered into a settlement agreement whereby the Trustee

obtained a $3.054 million judgment against Fairfield Sentry.[4] Fairfield Settlement Agreement at

3, *Trustee-Fairfield Action*, Adv. Proc. No. 10-5310 (Bankr. S.D.N.Y. 09-1239), Dkt. No. 69-2.

In his Amended Complaint, the Trustee alleges that a portion of the $3 billion in initial

transfers to Fairfield Sentry—$100 million worth—was subsequently transferred to CGML.[5]

Am. Compl. ¶¶ 4, 189-90. The $100 million consists of Fairfield Sentry's $60 million payment

to CGML on April 14, 2008, and its $40 million payment on November 19, 2008. Am. Compl.,

Ex. C. Despite the Trustee's access to Fairfield Sentry's documents, the Amended Complaint

fails to link any alleged Fairfield Sentry-to-CGML payment with a BLMIS-to-Fairfield Sentry

transfer. Instead, the Trustee relies on the generality that Fairfield Sentry received billions of

dollars from BLMIS to presume that $100 million worth of the received money somehow was

surely transferred to CGML. Am. Compl. ¶¶ 163, 169. As with the alleged Prime Fund

---

allegedly subsequently transferred to them. Fairfield Settlement Agreement, Ex. G ¶ 14, *Trustee-Fairfield Action*, Case No. 10-5310 (Bankr. S.D.N.Y. 09-1239), Dkt. No. 69-2. Among these actions was one proceeding in which the Fairfield Liquidators sued CGML to recover the same $100 million that the Trustee seeks in this case. *See Fairfield Sentry Ltd. (In re Fairfield) v. Citigroup Glob. Mkts. Ltd.*, No. 11-2770 (Bankr. S.D.N.Y.) ("Fairfield-CGML Action"). After a series of decisions by this Court (now on appeal to the District Court), the Fairfield Liquidators' only live claim against CGML is a B.V.I. law claim for constructive trust. *See generally Fairfield Sentry Ltd. (In Liquidation) v. Citibank NA London*, No. 19-CV-03911, 2021 WL 1027535 (S.D.N.Y. March 17, 2021) (lead case in the administratively consolidated appeals). The case is currently in active discovery.

[4] The settlement requires the Trustee and Fairfield Liquidators to cooperate in each other's actions and share any recoveries. Fairfield Settlement Agreement, Ex. A ¶¶ 12, 14, Trustee-Fairfield Action, Case No. 10-5310 (Bankr. S.D.N.Y. 09-1239), Dkt. No. 69-2. As a result, the Trustee has for over a decade had the benefit of Fairfield Sentry's cooperation and full access to their "documents, data, and other information relating to, or beneficial to the pursuit of," this action. Fairfield Settlement Agreement, Ex. A ¶ 14, Trustee-Fairfield Action, Case No. 10-5310 (Bankr. S.D.N.Y. 09-1239), Dkt. No. 69-2.

[5] The Trustee originally claimed that $130 million had been transferred to CGML, but the District Court has since dismissed $30 million of the claim. *See The Swap Safe Harbor Decision*, 505 B.R. at 150-51.

transfers, the Trustee pleads no facts to support his assumption that Fairfield's payments to CGML were drawn from money Fairfield received from BLMIS. The two exhibits attached to the Amended Complaint, listing BLMIS's initial transfers to Fairfield, and Fairfield's payments to CGML, do not support a plausible claim that the latter are traceable to the former. *See* Am. Compl., Exs. B, C.

The District Court (Rakoff, J.) has already found that transfers underlying the Trustee's claims against CGML are covered by the swap safe harbor in Section 546(g). *See The Swap Safe Harbor Decision*, 505 B.R. at 150. In its December 26, 2013 decision, the District Court held that the redemption payments could only be recovered to the extent they were avoidable fraudulent transfers under the meaning of Section 548(a)(1)(A). *Id. The Swap Safe Harbor Decision* thus counsels that, as a practical matter, if the Trustee cannot establish that these transfers were intentionally fraudulent, his claims against CGML should be dismissed. *Id.*

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Procedure 12(b)(6) unless it "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face,'" and provides "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.")). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at 556. A complaint must make a "'showing,' rather than a blanket

assertion, of entitlement to relief" supported by sufficient "factual allegation[s]." *Twombly*, 550 U.S. at 556 n.3.

## ARGUMENT

The Court should dismiss the Amended Complaint because it fails to plead the essential elements of a Section 550(a) recovery claim. Section 550(a) of the Bankruptcy Code provides that when a debtor's transfer of property is avoidable under one of the enumerated sections of the Bankruptcy Code, a trustee may recover "the property transferred" or its value from the person to whom it was transferred or from a person who subsequently received it. 11 U.S.C. § 550(a); *see also* 15 U.S.C. § 78fff-2(c)(3). But the Trustee nowhere pleads facts to establish that the money he now seeks from the Citi Defendants is the property that BLMIS initially transferred to Prime Fund and Fairfield Sentry, or that BLMIS's initial transfers of property are avoidable in the first place.

*First*, the Trustee fails to plead facts supporting a plausible claim that BLMIS's initial transfers to Fairfield Sentry or Prime Fund are avoidable as fraudulent transfers under the avoidance provision in Section 548(a)(1)(A). For one, the statute requires transfer-specific facts related to the transferor's intent. Rather than providing any facts about BLMIS's specific transfers, the Trustee merely lists them, *see* Am. Compl., Exs. B, E, and asks the Court to assume that they were all made with fraudulent intent. This is insufficient to state to establish avoidance under Section 548(a)(1)(A). For another, the Trustee cannot rely on the general existence of a Ponzi scheme to establish actual fraudulent intent as to each specific transfer. Such a presumption is overbroad and inconsistent with the text and purpose of Section 548(a)(1)(A). Because this is the only avoidance provision that could possibly apply to the BLMIS-to-Fairfield

8

transfers underlying the Trustee's case against CGML, the claim against CGML must be dismissed in full.

*Second*, the Trustee cannot avoid $301 million of alleged transfers from Prime Fund to Citibank because the transfers did not deplete the BLMIS estate. Specifically, the BLMIS-to-Prime Fund transfer allegedly underlying Prime Fund's $301 million Prime Fund-to-Citibank transfer cannot be avoided as it did not deplete any assets of the BLMIS estate because another lender replaced the financing. Accordingly, the Trustee's claim for $301 million in transfers to Citibank should be dismissed.

*Third*, the Trustee has failed to plead that the Citi Defendants received "the property transferred" by BLMIS. In particular, $60 million of the Trustee's claim against CGML, and $43 million of the Trustee's claim against Citibank, are not supported by factual allegations that they are traceable to BLMIS. At minimum, this Court should dismiss the Trustee's claims for those amounts.

## I.    BLMIS's Initial Transfers to Prime Fund and Fairfield Sentry Are Not Avoidable As Intentionally Fraudulent Conveyances.

The Amended Complaint fails to include facts demonstrating that BLMIS's initial transfers are avoidable as intentionally fraudulent conveyances. A trustee may only recover property under Section 550(a) "to the extent that a transfer is avoided under" the Bankruptcy Code. 11 U.S.C. § 550(a). As relevant here, Section 548(a)(1)(A) makes avoidable transfers made by the debtor "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A); *see* Am. Compl. ¶¶ 21, 168, 176. The statute requires a showing of actual intent to defraud (per the text of the statute) or, at minimum, circumstances that give rise to an inference of fraud (known as "badges of fraud"). *See Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp)*, 403 F.3d 43, 56 (2d Cir. 2005). Allegations of fraudulent intent must go

9

to the "specific transfers challenged." *Verestar, Inc. v. Am. Towers Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006); *see also Sharp*, 403 F.3d at 56-57. As with all allegations of intentional fraud, the circumstances constituting the fraud must be stated "with specificity." *See Sharp* at 56; *see also* Fed. R. Civ. P. 9(b).

The Trustee tries to bypass these pleading requirements, alleging no facts relating to the specific initial transfers he claims are avoidable. Instead, the Trustee apparently expects the Court to presume that because BLMIS operated a Ponzi scheme, *any* and *every* transfer it made was made with fraudulent intent. This presumption, known as the "Ponzi scheme presumption," is unwarranted, and, accordingly, BLMIS's initial transfers to Prime Fund and Fairfield Sentry are not avoidable under Section 548(a)(1)(A). Because Section 548(a)(1)(A) is the only avoidance statute available for the Trustee's claims against CGML—the District Court has already ruled out avoidance under any other provision, *see The Swap Safe Harbor Decision*, 505 B.R. at 150—this Court should dismiss the Trustee's claims against CGML in full.

## A. The Amended Complaint Fails to Raise A Strong Inference Of Actual Fraudulent Intent With Respect To Each Initial Transfer.

Absent direct evidence of actual intent to defraud, a trustee may rely on certain "badges of fraud . . . *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp*, 403 F.3d at 56 (internal quotations and citations omitted); *see also In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Courts have inferred intent to defraud from (1) the family, friendship, or close associate relationship between the parties; (2) the retention of possession, benefit, or use of the property in question; (3) the lack or inadequacy of consideration; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial

10

difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Id.* at 1582-83; *see also Sharp*, 403 F.3d at 56. The "flip side of these badges of fraud is that their absence" suggests no intent to defraud. *New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, 2008 WL 2115225, at *4 (S.D.N.Y. May 16, 2008) (internal citation omitted); *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc. Ltd.*, 2013 WL 5366373, at *8 (S.D.N.Y. Sept. 25, 2013).

The Amended Complaint spends significant page space describing BLMIS's Ponzi scheme. *See* Am. Compl. ¶¶ 56-87. But not once do the allegations discuss any of the specific initial transfers at issue. *See Sharp*, 403 F.3d at 56; *see also Verestar*, 343 B.R. at 468. They do not suggest that any particular transfer was made without adequate consideration, or that BLMIS somehow retained control of the transfers, or that the transfers were done in a secret or suspicious manner. Instead, the Trustee merely includes two lists of BLMIS transfers and expects the Court to assume that all of them were made with intent to defraud. This is insufficient to support avoidance under Section 548(a)(1)(A).

A closer assessment of the "badges of fraud" confirms the inadequacies of the Trustee's pleadings. First, neither Fairfield Sentry nor Prime Fund were closely held by, controlled by, or related to BLMIS, and there are no allegations that BLMIS retained possession or benefit of the money it transferred to them. *See Kaiser*, 722 F.2d at 1583 (describing a debtor's transfer of property to his spouse while insolvent or to a corporation he wholly owns as a "classic badge of fraud"). These badges of fraud are plainly not present.

Second, the Amended Complaint contains no allegation that any of the particular initial transfers from BLMIS to Fairfield Sentry or Prime Fund lacked consideration. It is established principal that "the satisfaction of a preexisting debt qualifies as fair consideration for a transfer

of property." *Sharp*, 403 F.3d at 54 (quoting *Pashaian v. Eccelston Props. Ltd.*, 88 F.3d 77, 85

(2d Cir. 1996)). Moreover, in these proceedings, the Second Circuit has already recognized that

a customer's investments in BLMIS—that is, money "deposited by [a] customer into his or her

BLMIS account [i.e. the investment principal]"—are valid contractual antecedent debts. *See*

*Picard v. Citibank, N.A.*, 12 F.4th 171, 203 (2d Cir. 2021) ("*Citibank, N.A.*") (Menashi, J.,

concurring) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233, 242 (2d Cir.

2011)). Transfers in which BLMIS was simply returning Fairfield Sentry's or Prime Fund's

initial investments thus were made with consideration and do not qualify for avoidance. *See*

*Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (S.D.N.Y. 2013) ("[A] trustee is not

permitted to sue innocent investors in a Ponzi scheme under fraudulent transfer law for the return

of their principal."). The Trustee claims broadly that BLMIS, as part of the Ponzi scheme, paid

out fictitious profits to customers. Am. Compl. ¶ 19. But he makes no effort to explain when or

in which initial transfers such fictitious payments were made. Instead, on its face, the Amended

Complaint only alleges that Fairfield Sentry and Prime Fund received transfers from BLMIS.

Whether these initial transfers were mere preferential transfers of principal or transfers of

fictitious profits (and therefore fraudulent) is completely unclear.

   Third, BLMIS's alleged insolvency is also not suggestive of actual intent to defraud with

respect to its initial transfers to Fairfield Sentry and Prime Fund. Even when a debtor is

insolvent, its decision to repay certain creditors does not necessarily make those payments

intentionally fraudulent. *See In re M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.*

*Inc.*, 394 B.R. 721, 732 (Bankr. S.D.N.Y. 2008); *see also Sharp*, 403 F.3d at 54 (noting that it is

not fraudulent for a debtor who is insolvent to make "a conveyance which satisfies an antecedent

debt" (internal quotations and citations omitted)); *Citibank, N.A.*, 12 F.4th at 200-01 (Menashi,

12

J., concurring) ("Normally, when a creditor receives a payment from a debtor—even if the creditor knows that the debtor is insolvent and the payment will prevent other creditors from being repaid—that payment is considered a preference, not a fraudulent transfer.").

Finally, the Amended Complaint contains no allegations that BLMIS's initial transfers were with the intent to "shortchang[e] creditors by squirreling away assets out of [its] creditors' reach."[6] *Citibank, N.A.*, 12 F.4th at 204 (Menashi, J., concurring); *see also Verestar*, 343 B.R. at 468 (finding that "conclusory allegations that do not evidence fraudulent intent with respect to the specific transfers challenged do not suffice" to state a claim, even if "combined with . . . an alleged overall 'pattern of inappropriate transfers'"). The purpose of fraudulent transfer law is not to recapture every transfer made by a debtor, but "to prevent the debtor from secreting away his assets, typically for his own benefit, such that they are beyond the reach of his creditors." *See Amy J. Sepinwall, Righting Others' Wrongs: A Critical Look at Clawbacks in the Madoff-Type Ponzi Schemes and Other Fraud*s, 78 Brook. L. Rev. 1, 23-24 (2012). Having failed to provide any detail with respect to the specific transfers he seeks to avoid, the Trustee cannot claim their avoidance under Section 548(a)(1)(A).

**B. The Existence Of A Ponzi Scheme Does Not Establish Actual Intent to Defraud With Respect To Every Single Transfer Made During the Scheme's Course.**

The Trustee will likely argue that he need not plead badges of fraud because BLMIS operated a Ponzi scheme, and thus any and all of its transfers were fraudulent. This presumption—known as the Ponzi scheme presumption—is overbroad, inconsistent with the text

---

[6] Importantly, the Trustee has not actually avoided any of the initial transfers at issue. *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 32-33 (S.D.N.Y. 2013) (noting that the Trustee's settlement agreement with Fairfield Sentry "does not constitute a formal avoidance of the initial transfer," but that the Trustee may bring claims against subsequent transferees if the initial transfers are, in theory, "avoidable").

and purpose of Section 548(a)(1)(A) and Federal Rule of Procedure 9(b), and wholly invalid with respect to these allegations.

The Ponzi scheme presumption assumes the requisite actual fraudulent intent from the general existence of a Ponzi scheme. *Citibank, N.A*, 12 F.4th at 181 (explaining and applying, but not affirming, the presumption). But the plain text of Section 548(a)(1)(A) only allows a trustee to avoid a transfer if the debtor "made *such transfer* . . . with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A) (emphasis added). The statute, accordingly, requires a trustee to show the intent underlying the *specific* transfers he seeks to avoid. He cannot rely on the general nature of the debtor's enterprise—like the presumption does—to prove intent for *all* transfers.

Without transfer-specific facts concerning the debtor's intent, the Ponzi scheme presumption "improperly treats preferences as fraudulent transfers," empowering a trustee to avoid, as fraudulent transfers, any and all payments made by a Ponzi scheme operator—even those made by the debtor to a creditor "to satisfy an antecedent debt." *See Citibank, N.A.*, 12 F.4th at 201 (Menashi, J., concurring). This conclusion—that a debtor's repayment of a debt it owed to a creditor amounts to a fraudulent transfer—is absurd. *See id.* at 202, 203 (suggesting that the presumption leads to "counterintuitive" and "questionable" results); *see also See Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582 (1913) ("It is therefore not in itself unlawful to prefer, nor fraudulent for one, though insolvent, to borrow in order to use the money in making a preference."). Such repayment "is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another." *Sharp*, 403 F.3d at 54 (alteration and citation omitted). The Bankruptcy Code treats fraudulent and preferential transfers differently, assigning them different sections in the statute, different look-back periods, and different safe harbors. *Compare* 11

U.S.C. § 547(b)(4)(A) (90-day look-back period for preferences) *with* 11 U.S.C. § 548(a)(1)

(two-year look-back period for fraudulent transfers); *see also* 11 U.S.C. § 546 (limiting

avoidance powers for preferential transfers but not for intentionally fraudulent transfers). The

Ponzi scheme presumption wholly ignores these differences, improperly extending a trustee's

avoiding powers beyond their statutory limits.

Numerous courts have dismissed avoidability claims based on the Ponzi scheme

presumption, finding that it is extra-statutory and overly broad, and that it improperly sweeps in

a variety of valid and unavoidable transfers. *See Finn v. Alliance Bank*, 860 N.W.2d 638, 647

(Minn. 2015) ("[T]here is no statutory justification for relieving the [trustee] of its burden of

proving—or for preventing the transferee from attempting to disprove—fraudulent intent."); *see*

*also Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr.

W.D.N.Y. 2001) (loan repayment cannot be presumed fraudulent), *aff'd* 2002 WL 32500567

(W.D.N.Y. June 21, 2002); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480,

488-89 (D. Ct. 2002) ("[T]he proper focus of a fraudulent transfer inquiry is on the transfer itself,

not the overall business practices of the Debtor."); *Balaber-Strauss v. Sixty-Five Brokers (In re*

*Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680-81 (Bankr. S.D.N.Y. 2000) ("Not every

transaction which has the effect of 'exacerbating the harm to creditors by increasing the amount

of claims while diminishing the debtor's estate' is a fraudulent conveyance. Section 548 is not a

catch-all provision."), *aff'd* 264 B.R. 303, 308 (S.D.N.Y. 2001).

Moreover, at least one Second Circuit judge has affirmatively questioned the

presumption's validity in this very case, noting that the Second Circuit has never explicitly

accepted the presumption, applying it only "when its application was uncontested." *See*

*Citibank, N.A.*, 12 F.4th at 202 n.7 (Menashi, J., concurring). And while some lower courts have

held that actual fraudulent intent can be presumed for every transfer made during a Ponzi

scheme, other courts have recognized that "[s]imply because a debtor conducts its business

fraudulently does not make every single payment by the debtor subject to avoidance." *Daly*, 286

B.R. at 489 (citation omitted). Though the concern underlying the presumption is that Ponzi

scheme operators attract new customers by paying out artificial profits,[7] a debtor's simple return

of an investor's money does not attract new investors, nor further the Ponzi scheme, nor suggest

anything about the debtor's intent as to the specific transaction. It simply extinguishes a valid

debt. *See Boston Trading Grp. Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) ("The

basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to

satisfy *some* of his creditors; it normally does not try to choose among them."). Here, the

Amended Complaint fails to provide any facts regarding BLMIS's initial transfers, expecting the

Court to presume that each and every one must have been made with fraudulent intent. Because

Fairfield Sentry and Prime Fund invested money in BLMIS, transfers in which BLMIS was

simply returning Fairfield Sentry's and Prime Fund's initial investments cannot be per se

fraudulent.

Because the Trustee provides no detail with respect to the specific transfers he seeks to

avoid, and nothing to establish fraudulent intent as to them, he cannot claim their avoidance

under Section 548(a)(1)(A). Because this is the only avoidance statute available for the initial

transfers to Fairfield Sentry (*i.e.*, the initial transfers underlying the claims against CGML), the

claims against CGML must be dismissed in full.

---

[7] *See Ades-Berg Inv. v. Breeden (In re The Bennett Funding Grp., Inc.)*, 439 F.3d 155, 157 n.2 (2d Cir. 2006). This premise may not hold at all, especially in the later stages of a long-running scheme like Madoff's, which began in the late 1980s or early 1990s. *See Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019).

## II.    The Trustee's Principal Claim Against Citibank—for $301 Million In A Loan Repayment—Should Be Dismissed Because The Money Did Not Deplete the BLMIS Estate.

The Trustee cannot avoid the $475 million BLMIS-to-Prime Fund transfer allegedly underlying Prime Fund's $301 million Prime Fund-to-Citibank transfer because it did not deplete any assets of the BLMIS estate—another lender replaced the financing.

The Bankruptcy Code's avoidance provisions, including Section 548, "protect a debtor's estate from depletion to the prejudice of the unsecured creditor." *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006) (Sotomayor, J.) (citing *In re French*, 440 F.3d 145, 150 (4th Cir. 2006)); *see also Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*, 318 B.R. 276, 282-83 (Bankr. S.D.N.Y. 2004) ("[C]reditors must actually be harmed in order to avoid a fraudulent transfer under [11 U.S.C. § 548].") (alteration in original) (citing *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002)). Accordingly, courts readily dismiss fraudulent transfer claims where, as here, the transfers at issue did not actually deplete the estate. *See, e.g.*, *Bear, Stearns*, 275 B.R at 195 (dismissing claims at motion to dismiss stage where transfers did not deplete estate because "[a] transfer of property, even if made with fraudulent intent, that does not leave any creditor in a worse position than he would have been had the transfer never occurred, obviously does not offend the policy behind § 548(a)(1)(A)"); *Pioneer Liquidating Corp. v. San Diego Tr. & Savings Bank (In re Consol. Pioneer Mortg. Entities)*, 211 B.R. 704, 717 (S.D. Cal. 1997) (dismissing fraudulent transfer claims where the transfers at issue did not deplete the debtor's estate), *aff'd in part, rev'd on other grounds*; 166 F.3d 342 (Table), 1999 WL 23156 (9th Cir. Jan. 13, 1999); *Ivey v. First-Citizens Bank & Tr. Co. (In re Whitley)*, 2014 WL 6910837, at *1 (Bankr. M.D.N.C. Dec. 8, 2014) (finding as a matter of law that "the transfers to the Bank in this case . . . were not fraudulent transfers because . . . they did not diminish the Debtor's estate nor place the funds involved in the transfers beyond the reach of creditors"),

*aff'd*, 539 B.R. 77 (M.D.N.C. 2015), *aff'd*, 848 F.3d 205 (4th Cir. 2017), *cert denied*, 138 S. Ct. 314 (2017).

Because Prime Fund's $475 million withdrawal from its BLMIS account on March 25, 2008 did not deplete any assets of the BLMIS estate, it was "not [a] fraudulent transfer[]." *See Whitley*, 2014 WL 6910837, at *1; *Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 2006 WL 687153 at *14 (Bankr. S.D.N.Y Mar. 6, 2006) ("[T]he relevant inquiry is whether the transfer had a net effect on the assets or liabilities of [the debtor].") (internal quotation marks and citation omitted). The $475 million withdrawal was part of an "integrated series of transactions," *see The Swap Safe Harbor Decision*, 505 B.R. at 147, which should be evaluated as a circular transfer that did not deplete the estate, *see Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 379 (Bankr. S.D.N.Y. 2013) (analyzing transactions as single integrated transaction "compatible with fraudulent conveyance principles as both emphasize substance over form"). Tremont, vis-à-vis Prime Fund, withdrew $475 million from Prime Fund's BLMIS account on March 25, 2008 to pay back a loan it received from Citibank, but it replaced the Citibank loan with funds from another bank, *see* Tremont Complaint ¶ 198, *Tremont Action*, No. 10-5310, Dkt. No. 1; ABN AMRO Compl. ¶ 57, *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. June 18, 2012), Dkt. No. 42.

Here, the transfers did "not harm a single [customer]." *Bear, Stearns*, 275 B.R. at 198. Accordingly, the "circular transfer" is not avoidable. *Intercontinental Metals Corp. v. Erlanger & Co., Inc.*, 902 F.2d 1565 (Table), 1990 WL 64805, at *1-2 (4th Cir. May 1, 1990) (upholding decision of the bankruptcy court and affirmance by the district court that "circular transfer" from a now-bankrupt company was not avoidable where the transfer had "no net deleterious effect on

18

the bankruptcy estate"). Because the $475 million transfer to Prime Fund is not avoidable, the

Trustee cannot recover the alleged subsequent transfer of $301 million from Prime Fund to

Citibank. *See* 11 U.S.C. § 550(a) (Trustee may recover "to the extent a transfer is avoided.").

### III.    At Minimum, the Court Should Dismiss $60 Million Of The Trustee's Claim Against CGML, and About $43 Million of the Trustee's Claim Against Citibank, As Untraceable to BLMIS.

The Amended Complaint fails to include facts demonstrating that the property that the

Citi Defendants received came from money that Prime Fund and Fairfield Sentry received from

BLMIS. Section 550(a) permits a trustee to recover only "the property transferred," or its value,

from the person to whom it was transferred or a person who subsequently received it. 11 U.S.C.

§ 550(a); *see also* 15 U.S.C. § 78fff-2(c)(3). Accordingly, a trustee "must allege facts that

support the inference that the funds at issue originated with the [debtor]." *Picard v. Shapiro (In

re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015). While a

trustee may not be "required to provide a 'dollar-for-dollar accounting' of the exact funds at

issue," a failure to "tie any initial transfer to any subsequent transfer or Subsequent Transferee"

is fatal to a subsequent transfer claim. *Id*. at 119 (citations and alterations omitted) (dismissing

subsequent transfer claim for failure to state a claim); *see also In re Caremerica, Inc.*, 409 B.R.

737, 750-51 (Bankr. E.D.N.C. 2009) (same). "[B]arebones allegations that the funds at issue

were transferred to the [s]ubsequent [t]ransferees, without more detail, are insufficient."

*Shapiro*, 542 B.R. at 119.

As pleaded, a total of $102,061,207 of the Trustee's claims against the Citi Defendants—

$60 million as to CGML and $42,061,207 as to Citibank—is completely untraceable to BLMIS.

The Amended Complaint provides no facts as to which initial transfers purportedly made their

way to the Citi Defendants. Instead, it speculatively pleads that "a portion" of BLMIS's initial

transfers were subsequently transferred to the Citi Defendants. Am. Compl. ¶ 169 ("Prior to the

Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to CGML. Based on the Trustee's investigation to date, the subsequent transfers to CGML total at least $130 million, of which the Trustee seeks to recover $100 million (the "Fairfield Sentry Subsequent Transfers"); *see also id.* ¶ 178 ("Prior to the Filing Date, Prime Fund subsequently transferred a portion of the Prime Fund Initial Transfers to Defendants Citibank and Citicorp. Based on the Trustee's investigation to date, the subsequent transfers from Prime Fund to Citibank and Citicorp total $343,084,590 (the "Prime Fund Subsequent Transfers")). This is explicitly conclusory and insufficient to state a claim.

### A.    CGML Could Not Have Received $60 Million of BLMIS Money From Fairfield Sentry.

The Trustee alleges that on April 14, 2008, Fairfield Sentry transferred $60 million of BLMIS property to CGML. Am. Compl., Ex. C. Based on the Trustee's filings, this claim is implausible.[8]

First, there is no BLMIS-to-Fairfield Sentry transfer that closely corresponds in time with Fairfield Sentry's April 14, 2008, payment to CGML. Looking at BLMIS's initial transfers to Fairfield Sentry, *see* Ex. B, and Fairfield Sentry's payments to CGML, *see* Ex. C, the closest preceding transfer from BLMIS to Fairfield Sentry was made on January 11, 2008—a whole three months before the payment to CGML. *See* Am. Compl., Ex. B ("CHECK WIRE" cash withdrawal of $70 million on January 11, 2008). There is no allegation that Fairfield Sentry kept the money it received from BLMIS in order to pay CGML three months later. *Cf. Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 150-51 (Bankr. S.D.N.Y. 2014)

---

[8] CGML preserves the argument that Fairfield Sentry's $40 million payment to CGML on November 19, 2008 also cannot be traced to an initial transfer from BLMIS to Fairfield Sentry. The Trustee fails to plead a basis for tracing this amount to BLMIS, and the Citi Defendants expect to prove its untraceability upon completion of fact discovery.

(finding time elapsed between alleged initial and subsequent transfers to be plainly relevant to the plausibility of a subsequent transfer claim).

Second, the Trustee's own records attached to the Amended Complaint belie any suggestion that Fairfield Sentry saved the money it received from BLMIS to pay CGML. *See Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (holding that on a motion to dismiss, the court may consider all documents attached to the complaint); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (court may take judicial notice "of documents filed in other courts . . . to establish the fact of such litigation and related filings"). Per the Trustee's own filings against other alleged subsequent transferees, in the three months between BLMIS's initial transfer to Fairfield Sentry (January 11, 2008) and Fairfield Sentry's payment to CGML (April 14, 2008), Fairfield Sentry paid out over $141 million of alleged BLMIS property to other alleged subsequent transferees, but it only received $70 million. *See* Boccuzzi Decl. ¶¶ 7-9. It is implausible to conclude that Fairfield Sentry's subsequent transfers of BLMIS property somehow exceeded its receipt of BLMIS property.[9]

The Trustee's failure to plead the traceability of the transfers to CGML is confirmed by the Trustee's litigation with respect to Fairfield Sentry transfers generally. According to the Trustee, BLMIS transferred approximately $2.9 billion to Fairfield Sentry. Am. Compl. ¶ 167.

---

[9] A further review of the transactions in the months preceding Fairfield Sentry's April 2008 payment to CGML also fails to support a conclusion that Fairfield Sentry's payments to CGML were the property transferred from BLMIS. According to the Trustee, in the seven months preceding Fairfield Sentry's April 14, 2008 payment to CGML—between September 6, 2007 and April 14, 2008—Fairfield Sentry's alleged subsequent transfers of BLMIS property somehow outpaced its receipt of BLMIS property by $253 million. Boccuzzi Decl. ¶ 9. Specifically, as the Trustee's exhibits show, BLMIS transferred a total of $230 million to Fairfield Sentry in that time period: $65 million on September 6, 2007, $95 million on October 5, 2007, and $70 million on January 11, 2008. *See* Am. Compl., Ex. B; Boccuzzi Decl. ¶ 7. In other actions, the Trustee alleges that Fairfield Sentry paid out approximately $483 million during that same period: about $117 million between September 6, 2007 and October 5, 2007, $225 million between October 5, 2007 and January 10, 2008, and $141 million between January 12, 2008 and April 4, 2008. *See* Boccuzzi Decl. ¶¶ 8-9. In short, the Trustee's math does not add up to support his claim.

But based on the Trustee's own public filings, Fairfield Sentry produced *over $5 billion* in subsequent transfers. *See* Boccuzzi Decl. ¶¶ 3-5. Rather than address these inconsistencies, the Trustee ignores them, seeking to obtain money for the estate from CGML, regardless of whether it actually originated at BLMIS as is required under Section 550.

On its face, the claim that Fairfield Sentry paid CGML using $60 million that it received from BLMIS is completely implausible. Accordingly, the Trustee's claim for recovery of this payment must be dismissed.

**B.    Prime Fund's Monthly Payments To Citibank, Totaling $43 Million, Do Not Correspond with Any of BLMIS's Initial Transfers To Prime Fund.**

The Trustee claims that between June 15, 2005, and March 4, 2008, Prime Fund transferred a total of $42,061,207 in monthly payments to Citibank. *See* Ex. F; *see also* Trustee's Mem. of Law in Support of Mot. for Leave to File an Am. Compl., Adv. Proc. No. 10-5345 (Bankr. S.D.N.Y. Dec. 14, 2018), Dkt. No. 149 ("$42,061,207 of additional transfers . . . were paid to Defendants as fees and interest payments pursuant to the credit facility."). Like the Trustee's allegations related to the Fairfield Sentry and CGML transfers, this claim is implausible.[10]

The BLMIS-to-Prime Fund transfers do not line up with any of Prime Fund's monthly payments to Citibank. For example, between June 16, 2005 and December 2, 2005, Prime Fund made seven payments to Citibank, totaling nearly $4.4 million. Am. Compl., Ex. F. BLMIS made no transfers to Prime Fund during that time. Am. Compl., Ex. E. The next year, in 2006, Prime Fund continued to make monthly payments to Citibank, only interspersed by a few sporadic withdrawals from BLMIS—never once aligning with the timing of Prime Fund's

---

[10] Citibank preserves the argument that Prime Fund's March 26, 2008, payments to Citibank, totaling $301,023,383, also cannot be traced to an initial transfer from BLMIS to Prime. The Trustee fails to plead a basis for tracing this amount to BLMIS, and fact discovery may show its untraceability.

regular monthly payments to Citibank. Am. Compl., Exs. E, F. In 2007, Prime Fund continued

making monthly payments to Citibank, totaling approximately $18 million. Am. Compl. Ex. F.

Yet that same year, BLMIS made zero transfers to Prime Fund. Am. Compl., Ex. E. The

Trustee's allegations in other cases render his claims against the Citibank Defendants even more

implausible. In *Picard v. ABN AMRO Bank N.V.*, for example, the Trustee openly alleges that

BLMIS transferred over $22 million to another Tremont entity in 2007. *See Picard v. ABN*

*AMRO Bank N.V.*, No. 10-5354 (Bankr. S.D.N.Y. June 10, 2019), Dkt. No. 180-1, Ex. G (listing

alleged subsequent transfers from Prime Fund). The idea, unsupported by additional factual

detail, that Prime Fund was setting aside any money it received from BLMIS to pay Citibank, is

implausible. Accordingly, the Trustee's claim for recovery of the monthly payments, totaling

$42,061,207, should be dismissed.

### C.    The Claims Should Be Dismissed With Prejudice.

The lack of factual detail in the Amended Complaint is inexcusable given the Trustee's

access, for over a decade, to discovery from Prime Fund, Fairfield Sentry, and others. *Cf.*

*Merkin*, 515 B.R. at 151 (permitting trustee "greater latitude" in his pleadings when he lacks

sufficient access to defendants' books and records). Before settling his case against Prime Fund

in July 2011, the Trustee conducted a "comprehensive investigation," which included

investigatory interviews, Bankruptcy Rule 2004 examinations, and a full review of BLMIS-

related transaction histories, account statements, correspondence, and other records from Prime

Fund, Tremont, and their affiliates. *See* Tremont Settlement Agreement, *Tremont Action*, No.

10-5310 (Bankr. S.D.N.Y. July 28, 2011), Dkt. No. 17, Ex. A ¶ DD; *see also Sec. Inv'r Prot.*

*Corp. v. Bernard L. Madoff Inv'r Sec. LLC*, 590 B.R. 200, 209 (S.D.N.Y. 2018) ("To the

contrary, the Trustee, with the assistance of his counsel and other professionals, "extensively

investigated [BLMIS'] financial affairs both within the United States and abroad.") (citing

*Trustee's Fourth Interim Report for the Period Ending September 30, 2010*, dated Oct. 29, 2010, at ¶ 59 (Dkt. No. 3083)).

The Trustee's access to documents from Fairfield Sentry is even more extensive. As part of their settlement agreement, the Trustee and the Fairfield Liquidators "agree[d] to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of," actions against subsequent transferees, including the Citi Defendants. *See* Fairfield Settlement Agreement ¶ 14, *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Proc. No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), Dkt. No. 69-2. With access to substantial discovery, the Trustee is well-positioned to map out the flow of funds from BLMIS to all subsequent transferees. He simply fails to do so with respect to the Citi Defendants—especially with regard to the $60 million transfer to CGML and the $42,061,207 in transfers to Citibank. Accordingly, the Trustee's claims should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Citi Defendants respectfully request that the Court:

(1) dismiss CGML from the action, and in the alternative, dismiss the claim against CGML as it

pertains to the $60 million alleged subsequent transfer; and (2) dismiss the action against

Citibank, and in the alternative, dismiss the claim against Citibank as it pertains to the aggregate

$42,061,207 in alleged subsequent transfers.

Dated: April 22, 2022
      New York, New York

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP

                    By: /s/ _____
                        Carmine D. Boccuzzi, Jr.
                        (cboccuzzi@cgsh.com)
                        E. Pascale Bibi
                        (pbibi@cgsh.com)
                        Brandi M. Lupo
                        (blupo@cgsh.com)
                        One Liberty Plaza
                        New York, New York  10006
                        T: 212-225-2000
                        F: 212-225-3999

                        *Attorneys for Citibank, N.A., Citicorp North America,*
                        *Inc., and Citigroup Global Markets Limited*