## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC,

Defendant.

---

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

Plaintiff,

v.

UBS AG, et al.,

Defendants.

Adv. Pro. No. 10-04285 (CMG)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THEODORE DUMBAULD'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL ALLEGATIONS RELEVANT TO DEFENDANT TED DUMBAULD ................. 2

*The Ponzi Scheme* ............................................................................................................ 2

*The Initial and Subsequent Transfers* ............................................................................. 3

*This Adversarial Proceeding* .......................................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.      LEGAL STANDARD ................................................................................................ 5

II.     THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF
        FOR RECOVERY OF SUBSEQUENT TRANSFERS AGAINST DEFENDANT TED
        DUMBAULD ............................................................................................................ 6

        A.      The Alleged Voidable Initial Transfers to the Feeder Funds ................................ 6

                1.      The Trustee's Conclusory Allegations Should Be Ignored ........................ 8

                2.      Access, BNP and Oreades ......................................................................... 9

                3.      Allegations Concerning UBS ................................................................... 13

                4.      Access' Alleged Deviation From Diligence Practices .............................. 17

                5.      The Allegations Regarding the Chris Cutler Investigation ...................... 18

                6.      The List of "Indicia of Fraud" Is Insufficient to Plead Actual
                        Knowledge ........................................................................................... 22

        B.      The SAC Fails To Plead a Subsequent Transfer Claim Against Defendant
                Ted Dumbauld .................................................................................................. 24

                1.      The SAC Fails to Plead Facts Supporting the Conclusory Allegation That
                        Defendant Ted Dumbauld is a Subsequent Transferee ........................... 24

                2.      Defendant Ted Dumbauld Should Be Dismissed From Count VII Because
                        He Received Funds From Access As Employee Compensation ............. 28

CONCLUSION ................................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
   219 F.3d 519 (6th Cir. 2000) .................................................................................. 8

*Andrews v. Metro N. Commuter R. Co.*,
   882 F.2d 705 (2d Cir. 1989) .................................................................................. 11

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) .................................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 5, 27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 5, 28

*DeLollis v. Friedberg, Smith & Co.*,
   600 Fed.Appx. 792 (2d Cir.2015) ....................................................................... 22

*Dusek v. JPMorgan Chase & Co.*,
   132 F. Supp. 3d 1330 (M.D. Fla. 2015) .............................................................. 15

*Eddystone Rail Co.*,
   2021 WL 4443371 ............................................................................................... 28

*Faber v. Metro. Life Ins., Co.*,
   648 F.3d 98 (2d Cir. 2011) .................................................................................... 5

*ICD Cap., LLC v. CodeSmart Holdings, Inc.*,
   No. 14 CIV. 8355 (JFK), 2020 WL 3961617 (S.D.N.Y. July 13, 2020) ............. 27

*In re 45 John Lofts, LLC*,
   599 B.R. 730 (Bankr. S.D.N.Y. 2019) .................................................................. 8

*In re Agape Litig.*,
   773 F. Supp. 2d 298 (E.D.N.Y. 2011) .............................................................. 8, 20

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................................................. 15

*In re Bernard L. Madoff Inv. Sec. LLC,*
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ........................................................ 24, 25, 26

*In re Bernard L. Madoff Inv. Sec. LLC,*
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................. passim

*In re Bernard L. Madoff Inv. Sec. LLC,*
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) ................................................................... passim

*In re Bernard L. Madoff Inv. Sec. LLC,*
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...................................................................... 14, 22

*In re Bernard L. Madoff Inv. Sec. LLC,*
    773 F.3d 411 (2d Cir. 2014) ..................................................................................... 6, 7

*In re Dreier LLP,*
    452 B.R. 451 (Bankr. S.D.N.Y. 2011) ........................................................................ 25

*In re Geltzer,*
    502 B.R. 760 (Bankr. S.D.N.Y. 2013) ................................................................... 28, 29

*In re M. Fabrikant & Sons, Inc.,*
    480 B.R. 480 (S.D.N.Y. 2012) ..................................................................................... 13

*In re Madoff,*
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) .......................................................................... 6

*In re Tremont Sec. L., State L., & Ins. Litig.,* 08 CIV. 11117,
    2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ........................................................ 16, 21

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006) ..................................................................................... 14, 20

*Lynch v. City of New York,*
    952 F.3d 67 (2d Cir. 2020) ............................................................................................ 27

*Mazzaro de Abreu v. Bank of America Corp.,*
    525 F.Supp.2d 381 (S.D.N.Y.2007) ....................................................................... 7, 9, 15

*Meridian Horizon Fund, LP v. KPMG,*
    487 F. App'x 636 (2d Cir. 2012) ................................................................................... 10

*MLSMK Inv. Co. v. JP Morgan Chase & Co.,*
    737 F. Supp. 2d 137 (S.D.N.Y. 2010) ........................................................................... 20

*Nathel v. Siegal,*
    592 F. Supp. 2d 452 (S.D.N.Y.2008) ............................................................................ 12

*Picard v. Madoff*,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011) ...................................................................... 25

*R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania v. Meridian Capital Partners, Inc.*,
    634 Fed. App'x 4, 2015 WL 8731547 (2d Cir. Dec. 15, 2015) ................................. 23

*Renner v. Chase Manhattan Bank*,
    No. 98 CIV. 926 (CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000) ..................... 12

*Ryan v. Hunton & Williams*,
    No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000)........................... 8, 10, 14

*Schmidt v. Fleet Bank*,
    No. 96 CIV. 5030 (AGS), 1998 WL 47827 (S.D.N.Y. Feb. 4, 1998)................................ 15, 21

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ................................................................. 10, 15

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)............................................................ 7

*Sec Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ............................................... 29

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12 MC 115, 2013 WL 8337090 (S.D.N.Y. Feb. 13, 2013)................................. 7

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. AP, 08-01789 (SMB), 2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ............. 17, 20

*S.E.C. v. Cohmad Sec. Corp.*,
    No. 09 CIV 5680 (LLS), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ...................... 17

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)................................................................................... 21

*Smith v. Loc. 819 I.B.T. Pension Plan*,
    291 F.3d 236 (2d Cir. 2002)................................................................................... 24

*Stephenson v. Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010)................................................................... 14

*United States v. Wolfe*,
    71 F.3d 611 (6th Cir. 1995)................................................................................... 15

## PRELIMINARY STATEMENT

More than 15 years ago, defendant Ted Dumbauld left his employment at defendant Access International Advisors LLC ("AIA LLC") in New York.  More than 11 years ago, in November 2010, the Trustee included Mr. Dumbauld as a defendant in a wide-ranging complaint against two Madoff "feeder funds" based in Luxembourg, service providers to those feeder funds (including AIA LLC), and individuals associated with the service providers.  In relevant part, the Trustee claims that Mr. Dumbauld must have received "subsequent transfers" of voidable transfers made to the feeder funds because Mr. Dumbauld received compensation for his work at AIA LLC during the period from 2004 to 2007.

The Second Amended Complaint ("SAC") does not allege that Mr. Dumbauld personally performed any work for any Madoff entity or the Luxembourg feeder funds.  The Second Amended Complaint does not allege that Mr. Dumbauld's work for AIA LLC involved raising capital for the feeder funds.  The Second Amended Complaint does not allege that AIA LLC had no revenues during Mr. Dumbauld's employment other than funds received directly or indirectly from the feeder funds.  Nor does the Second Amended Complaint allege that AIA LLC would have been unable to pay Mr. Dumbauld his employment compensation in the absence of funds received directly or indirectly from the feeder funds.

In sum, the Second Amended Complaint contains no well-pleaded factual allegations to support the legal conclusion that Mr. Dumbauld received "subsequent transfers" of voidable transfers made to the feeder funds.  Instead, the Second Amended Complaint simply assumes that Mr. Dumbauld received "subsequent transfers" merely because he received employment compensation from AIA LLC while employed there.  Therefore, the sole claim in the Second Amended Complaint brought against Mr. Dumbauld should be dismissed.

1

## FACTUAL ALLEGATIONS RELEVANT
## TO DEFENDANT TED DUMBAULD[1]

### *The Ponzi Scheme*

From 1960 to 2008, Bernard Madoff served as the chairman and chief executive of BLMIS. SAC ¶ 36. BLMIS operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business. *Id.* ¶ 38. In December 2008, BLMIS maintained over 4,900 active customer accounts with approximately $68 billion in assets under management. *Id.* ¶ 41. BLMIS represented to customers that the funds in their accounts were invested in securities based upon a Split Strike Conversion ("SSC") trading strategy. *Id.* ¶¶ 46, 49. This trading strategy consisted of purchasing equities or derivatives that correlated to the equities comprising the S&P 100 index and hedging risks by buying put options and selling call options. *Id.* ¶¶ 51–53.

In reality, BLMIS did not make any trades based upon the SSC trading strategy and was operating a Ponzi scheme. SAC ¶¶ 42, 46, 49, 55, 58, 59. All of BLMIS' customer funds were commingled into a single bank account at JPMorgan Chase Bank and were not used to trade securities. *Id.* ¶ 47. Instead, the commingled funds were used to make payments to other customers and to benefit Madoff and his family. *Id.* BLMIS sent customers monthly account statements that reported falsified trades. *Id.* ¶¶ 50, 57. In 2008, the Ponzi scheme collapsed when BLMIS customers' requests for redemption overwhelmed the flow of new investments. *Id.* ¶ 40. On December 11, 2008, Madoff was arrested by federal agents for criminal violations of federal securities laws. *Id.* ¶ 23. Madoff thereafter admitted that BLMIS purchased none of the

---

[1]    The fact section of this memorandum, solely in connection with defendant's motion to dismiss, assumes the truth of well-pleaded factual allegations set forth in the SAC.

securities listed on customers' fraudulent statements and that it had operated a Ponzi scheme. *Id.*

¶ 61.

### *The Initial and Subsequent Transfers*

In 1994, Patrick Littaye and Thierry Magon de la Villehuchet founded a series of

investment companies that collectively formed the investment firm known as Access

International Advisors.[2]  SAC ¶ 2.  According to the SAC, LuxAlpha SICAV ("Luxalpha") and

Groupement Financier Ltd. ("Groupement") were "established" by "Access" and then invested

exclusively in BLMIS (together "Feeder Funds").  *Id.*  Together, the Feeder Funds invested over

two billion dollars into BLMIS.  *Id.* ¶¶ 16, 134, 139, 326.  Before the Ponzi scheme collapsed,

the Feeder Funds made the following withdrawals from BLMIS: (a) from December 11, 2002 to

December 11, 2008, BLMIS transferred a total of $1.12 billion to the Feeder Funds ("Six Year

Transfers"); and (b) of the Six Year Transfers, BLMIS transferred $ 1.01 billion from December

11, 2006 to December 11, 2008 ("Two Year Transfers").  *Id.* ¶¶ 327, 382.

The Access entities operated, managed, and supervised the Feeder Funds in various ways.

SAC at ¶¶ 86–97.  For instance, between August 11, 2004 to August 1, 2006, AIA LLC served as

Luxalpha's portfolio advisor.  *Id.* ¶ 87.  AIA LLC also served as Groupement's sponsor.  *Id.*

From at least 2002 to 2006, Ted Dumbauld was employed at AIA LLC, where he was

first a Partner and then the Chief Investment Officer.  SAC ¶ 85.  Mr. Dumbauld also served as a

Director of AIA LLC.  According to the SAC, AIA LLC (Mr. Dumbauld's employer) "received

at least $189,000 in fees from UBS SA in connection with [AIA's] role as official portfolio

---

[2]       These entities include Access International Advisors, Inc. ("AIA Inc."); Access
International Advisors, LLC ("AIA LLC"); Access International Advisors, Ltd. ("AIA Ltd.");
Access Management Luxembourg S.A. ("AML"); and Access Partners S.A. ("AP (Lux)").  The
SAC repeatedly lumps together these different entities by defining them collectively as "Access"
or "Access Defendants" and then stating allegations concerning "Access".

advisor to Luxalpha from August 2004 to August 2006, . . . ." *Id.* ¶ 334(b).  The SAC does <u>not</u>

allege that Mr. Dumbauld personally provided any services to Luxalpha or UBS SA as an AIA

LLC employee, or that Mr. Dumbauld personally received any portion of the $189,000 in fees

received from UBS SA by AIA LLC.  The SAC also does not allege that AIA LLC, Mr.

Dumbauld's employer, received any payments from the Feeder Funds or UBS SA during the two

year period that preceded the commencement of the SIPA Proceeding.

Instead, the SAC alleges that four "Access" entities "received at least $100.6 million in

Subsequent Transfers," including the $189,000 received by AIA LLC, Mr. Dumbauld's

employer.  SAC ¶ 334.  The SAC also alleges that a portion of the subsequent transfers that

Access received were transferred to its employees and directors.  *Id.* ¶¶ 335–337.  According to

the SAC, Mr. Dumbauld received at least "$1.25 million in compensation paid from bank

accounts controlled by Access's New York office from 2004 through 2007" in connection with

his role as AIA, LLC's Partner and Chief Investment Officer.  *Id.* ¶ 337.  The SAC admits that

Mr. Dumbauld received his compensation in exchange for services performed by Mr. Dumbauld

as Partner and Chief Investment Officer of AIA LLC.  *Id.*  The SAC does not allege that the fees

received by the four "Access" entities from UBS and the Feeder Funds were the only funds

available to AIA LLC to pay the compensation owed to Mr. Dumbauld for his services as an

employee, none of which were allegedly performed for the Feeder Funds, directly or indirectly.

### *This Adversarial Proceeding*

The Trustee initiated this adversarial proceeding in November 2010, in relevant part, to

avoid and recover BLMIS' initial transfers to the Feeder Funds and to recover the subsequent

transfers to the other Defendants.

On February 28, 2022, the Trustee filed his Second Amended Complaint.  *See* Dkt. No.

274.  In Counts II and III, the Trustee asserts claims for actual fraud and constructive fraud under

the Bankruptcy Code.  In Counts IV through VI, the Trustee asserts claims for actual fraud and

constructive fraud under the New York Debtor Creditor Law.  In Count VII, the Trustee seeks to

recover subsequent transfers under the Bankruptcy Code and the New York Debtor Creditor

Law.

## ARGUMENT

## I.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), a complaint must allege sufficient facts to "state a claim to relief that is

plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "above the speculative

level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  This standard "requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555.  Although the Court must accept as true all factual allegations

and draw all reasonable inferences in Plaintiff's favor, it is not "bound to accept conclusory

allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins.,

Co.,* 648 F.3d 98, 104 (2d Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  There must be "more than a sheer

possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly,* 550 U.S. at 555–556).

5

II.     THE SECOND AMENDED COMPLAINT FAILS TO STATE
        A CLAIM FOR RELIEF FOR RECOVERY OF SUBSEQUENT
        TRANSFERS AGAINST DEFENDANT TED DUMBAULD

The Trustee's sole claim for relief against Mr. Dumbauld in the Second Amended

Complaint alleges that Mr. Dumbauld received "subsequent transfers" that are recoverable under

11 U.S.C. § 550(a) and 11 U.S.C. § 78fff-2(c)(3).  SAC ¶¶ 390–392.  To state a claim for relief

against Mr. Dumbauld as a subsequent transferee, the Trustee must plead sufficient facts to

demonstrate both: (a) the existence of avoidable initial transfers to the Feeder Funds; and (b) the

receipt by Mr. Dumbauld of some portion of those same avoidable initial transfers.

The Second Amended Complaint fails to state a claim against Mr. Dumbauld for two

reasons: (i) the SAC fails to plead that the initial transfers to the Feeder Funds are voidable under

Counts III, IV, V and VI of the Second Amended Complaint; and (ii) the SAC fails to plead

facts, rather than legal conclusions, that Mr. Dumbauld received any subsequent transfers of any

alleged voidable transfer made to the Feeder Funds.

A.      The Alleged Voidable Initial Transfers to the Feeder Funds

The Trustee's ability to maintain his avoidance claims against the Feeder Funds is limited

by 11 U.S.C. § 546(e).

> In light of the safe harbor granted under 11 U.S.C. § 546(e), the
> Trustee may only avoid and recover intentional fraudulent transfers
> under § 548(a)(1)(A) made within two years of the filing date,
> unless the transferee had actual knowledge of Madoff's Ponzi
> scheme, or more generally, "actual knowledge that there were no
> actual securities transactions being conducted."

In re Madoff, 542 B.R. 100, 111 (Bankr. S.D.N.Y. 2015) (internal citations omitted); In re

Bernard L. Madoff Inv. Sec. LLC, 773 F.3d 411, 414 (2d Cir. 2014) (holding that § 546(e)'s safe

harbor applies to claims to avoid and recover initial payments BLMIS made to its customers).

Accordingly, if the Trustee fails to sufficiently plead that the Feeder Funds had "actual

knowledge," then the constructive fraud claims under § 548(a)(1)(B) and all New York state law claims are barred by § 546(e) and must be dismissed. *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 414–415.

The safe harbor also limits the Trustee's ability to recover against subsequent transferees. "[W]here Section 546(e) applies to the Trustee's claims, the Trustee may only proceed against a subsequent transferee insofar as he seeks to recover those subsequent transfers under Section 550(a) as to which he could have avoided the initial transfer under Section 548(a)(1)(A)." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 JSR, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013). Moreover, "even if the initial (or mediate) transferee fails to raise a Section 546(e) defense against the Trustee's avoidance of certain transfers . . . . the subsequent transferee is nonetheless entitled to raise a Section 546(e) defense against recovery of those funds." *Id.*; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 8337090, at *1 (S.D.N.Y. Feb. 13, 2013).

To plead "actual knowledge" against the Feeder Funds, the Trustee must advance specific, particular allegations showing that the Feeder Funds had "direct and clear knowledge," that "implies a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) ("*Merkin*"). Allegations of inquiry notice or "constructive knowledge" are insufficient. *Id.*; *Mazzaro de Abreu v. Bank of America Corp.*, 525 F.Supp.2d 381, 390 (S.D.N.Y.2007) (allegations of "constructive knowledge of a fraudulent scheme" are "insufficient to support an allegation that [the defendant] had actual knowledge of an underlying fraud."). Moreover, the factual allegations must "allege that the defendant had actual knowledge of the wrongful conduct committed, not simply that the defendant should have known of the

conduct." *In re Agape Litig.*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011) ("*Agape*") (quoting

*Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010)); *Aetna Cas. &*

*Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) ("evidence establishing

negligence, i.e., that a bank 'should have known,' will not suffice."). Similarly, allegations

implying that a defendant merely "suspected fraudulent activity" do not "raise an inference of

actual knowledge." *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *9

(E.D.N.Y. Sept. 20, 2000).

Luxalpha and Groupement are not "natural person[s]" and "can act solely through the

instrumentality of their officers or other duly authorized agents." *In re 45 John Lofts, LLC*, 599

B.R. 730 (Bankr. S.D.N.Y. 2019) (internal quotation marks and citation omitted). In an effort to

plead "actual knowledge" against the Feeder Funds, the Trustee attempts to impute the

knowledge of their alleged agents—*i.e.*, their officers and directors, the Access entities, and the

UBS entities—to the funds. However, none of the Trustee's allegations are sufficient to plead

the high "level of certainty or absence of substantial doubt associated with actual knowledge."

*Merkin*, 515 B.R. at 140.

### 1.    The Trustee's Conclusory Allegations Should Be Ignored

Throughout the Second Amended Complaint, the Trustee attempts to plead "actual

knowledge" with conclusory allegations. For instance, in multiple paragraphs, the Trustee

asserts without sufficient factual support that Defendants knew BLMIS was operating a fraud.

*See, e.g.*, SAC at ¶¶ 6, 13, 319, 321-323. It is well-established that "[a]llegations that are

conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Consequently, these and similar conclusory

assertions do not plausibly allege "actual knowledge" and should be disregarded by the Court.

*See Agape*, 773 F. Supp. 2d at 311 ("The Plaintiffs cannot plausibly allege actual knowledge

through conclusory statements."); *Mazzaro de Abreu*, 525 F. Supp. 2d at 390 ("the claim is

conclusory, and as such, it is insufficient to indicate BOA's knowledge of Bank of Europe's

fraudulent activities.").

        2.     Access, BNP and Oreades

     First, the Trustee alleges that Access established Luxalpha one week after Oreades, a

BLMIS feeder fund that predated Groupement and Luxalpha, had shut down. SAC ¶¶ 112–130.

Oreades shut down in March 2004 after its custodian BNP Paribas ("BNP") had expressed its

concerns with BLMIS. *Id.* ¶ 112. The Trustee claims that in July 2003, BNP expressed its

concerns to Littaye and Access including: (1) "BLMIS's role as asset manager had not been

properly disclosed"; (2) BLMIS was serving as Oreades' custodian while it was also a broker-

dealer and investment manager; (3) BNP "could not confirm the existence of a segregated

Oreades account at BLMIS" and (4) "BLMIS['] reports of trading activity and positions for

Oreades were delivered only by fax and mail, seven or eight days after the reported trades,

inconsistent with industry customs and practices." *Id.* ¶¶ 113–115. The Trustee claims that

despite their awareness of these concerns, Villechuet and Littaye established Luxalpha to replace

Oreades and found a new partner, UBS SA, to serve as its custodian. *Id.* ¶¶ 123, 126. He alleges

that "Access and UBS created Luxalpha to invest with BLMIS despite knowing of the concerns

at BNP Paribas and despite many other persistent warnings of fraud at BLMIS." *Id.* ¶ 130.

     These allegations do not plausibly suggest that any of the Defendants subjectively knew

BLMIS was operating a Ponzi scheme. Indeed, in the Trustee's action against BNP, this Court

rejected the Trustee's attempt to plead "actual knowledge" against BNP with similar allegations

regarding BNP's concerns with BLMIS. There, the Court explained:

> The Trustee alleges that the way certain Defendants serviced and
> ultimately closed Oreades supports an inference that they knew that
> there was a high probability of fraud at BLMIS. Some of the

> Defendants' practices with respect to Oreades were undoubtedly questionable. *They include representing that BNP Securities Services was Oreades' custodian and receiving fees while delegating those duties to BLMIS,* (¶¶ 97-100)*, allowing BLMIS to act as Oreades' custodian and investment adviser in violation of BNP Bank's "strict separation" rule,* (¶ 106)*, and Luxembourg law, and failing to disclose that BLMIS served as Oreades' investment advisor.* (¶¶ 108-111.) Although these allegations raise questions about the propriety of certain of Defendants' actions in servicing Oreades, and imply that they were willing to overlook legal and regulatory violations to make more money, they do not support the inference that those Defendants believed there was a high probability that BLMIS was not actually trading securities on behalf of Oreades and its investors.

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 199 (Bankr. S.D.N.Y. 2018) ("*BNP Paribas*") (emphases added). The Court explained that these allegations only allowed for the "plausible inference" that BNP "shut down the Oreades fund because of the risks associated with" BLMIS' structure and other concerns, but not because BNP had actually believed BLMIS was engaged in fraud. *Id.*; *see also Ryan*, 2000 WL 1375265, at *9 ("Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud."). In light of *BNP Paribas*, the allegations here fail to support the inference that BNP had "actual knowledge" of the Ponzi scheme.

It is also implausible that Defendants acquired "actual knowledge" by becoming aware of BNP's concerns. The Trustee alleges that Access was informed that BLMIS's role as asset manager had not been properly disclosed, and that BLMIS was improperly serving as Oreades' investment advisor and custodian. SAC ¶ 113. At best, these allegations suggest that Access, like all other servicing agents who did business with Madoff, acquiesced to Madoff's structure preference. *See, e.g.*, *Meridian Horizon Fund, LP v. KPMG*, 487 F. App'x 636, 641 (2d Cir. 2012) (noting that Madoff's business model where he served as custodian, investment manager, and administrator was well known by "investors in and auditors of other Madoff feeder funds,

and the SEC, none of whom discovered the Madoff scheme."); *In re Bernard L. Madoff Inv. Sec.
LLC*, 548 B.R. 13, 22 (Bankr. S.D.N.Y. 2016), *vacated and remanded on other grounds*, 12
F.4th 171 (2d Cir. 2021) ("*Legacy*") (holding that "actual knowledge" was insufficiently pled
despite allegations that the defendants were aware that "Madoff held positions at BLMIS that
would normally be occupied by three separate entities: he was the investment advisor, custodian,
and the broker-dealer.").

The Trustee also alleges that Access was aware of BNP's concerns about BLMIS'
delayed paper reporting, which did not allow for verification.  SAC ¶¶ 115–117.  Again, these
allegations merely imply that Access acquiesced to BLMIS' outdated reporting method.  *See
Legacy*, 548 B.R. at 22 (holding that "actual knowledge" was insufficiently pled despite
allegations that the defendants were aware that they were only receiving "printed account
statements and paper trading confirmations.").  Indeed, the Trustee previously alleged that
Access was "willing to look past BLMIS's delayed, paper trade confirmations reporting because
Madoff purportedly justified his atypical reporting method by contending that it was the only
way to protect his trading strategy."  Dkt. No. 251-4 ("FAC") ¶ 239.[3]

The Trustee further alleges that Access was informed that BNP "could not confirm the
existence of a segregated Oreades account."  SAC ¶ 114.  However, based on the allegations in
the Trustee's action against Oreades, shortly after BNP's discussion with Access, BNP received
confirmation that Oreades' accounts at BLMIS had been segregated.[4]  In that proceeding, the
Trustee alleged that on August 7, 2003, Lionel Trouvain, a senior executive at BNP, asked

---

[3]    It is well-established that a court may examine a plaintiff's prior allegations at the motion
to dismiss stage. *See Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)
("The amendment of a pleading does not make it any the less [of] an admission of the party.").

[4]    *See Picard v. Oreades SICAV*, Adv. Pro. No. 10-05120 (Bankr. S.D.N.Y. Dec. 2, 2010),
Dkt. No. 1 ("Oreades Complaint").

Madoff to provide "independent verification" as to "[Oreades's] assets and its two underlying accounts" with BLMIS. Oreades Complaint ¶ 57. On August 12, 2003, Frank DiPascali at BLMIS confirmed that "all security positions held since June 1, 2002 have been segregated for the exclusive benefit of BNP Paribas Securities Services." *Id.* ¶ 58. On August 21, 2003, Friehling & Horowitz, the auditor for BLMIS responded by confirming that Oreades' assets "were held in *segregated accounts* for the exclusive benefit of BNP Paribas Securities Services." *Id.* ¶ 59 (emphasis added). Accordingly, the allegations from the Oreades Complaint imply that any concerns BNP or Access may have had about the existence of segregated accounts were resolved.

At best, these allegations imply that Access was aware that BLMIS presented risks of fraud. However, pleadings suggesting awareness of signs of fraud are insufficient to allege "actual knowledge." *See, e.g.*, *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y.2008) ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud."); *Renner v. Chase Manhattan Bank*, No. 98 CIV. 926 (CSH), 2000 WL 781081, at *12 (S.D.N.Y. June 16, 2000) ("[a]lthough they rejected the transactions on the basis that they were potential vehicles for fraud, there is no factual basis for the assertion that Chase officials actually knew that the fraud was, in fact, occurring.").

Finally, the fact that Access established Luxalpha after BNP had expressed its concerns undercuts the inference that Access had known about the fraud. It is not plausible that Access would have established Luxalpha to continue to invest in BLMIS if it had actual knowledge that BLMIS was operating a Ponzi scheme. *See, e.g.*, *Legacy*, 548 B.R. at 32 ("it is not plausible that the average financial professional owing fiduciary duties to its own clients and investors would

knowingly invest their money in a Ponzi scheme that is doomed to collapse."); *In re M. Fabrikant & Sons, Inc.*, 480 B.R. 480, 489 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013) ("Put simply, drawing all inferences in favor of Appellant, it is difficult to see what benefit the Banks could hope to obtain by lending ever-larger amounts of money to failing companies.").[5]

### 3.    Allegations Concerning UBS

The SAC includes numerous allegations concerning the alleged knowledge of the UBS Defendants and how that knowledge may be imputed to the Feeder Funds.  The Trustee claims that before the UBS Defendants began servicing the Feeder Funds, other UBS entities had "considered and rejected BLMIS as a vehicle for direct investment and derivative financial products."  SAC ¶ 140.  The SAC also asserts that UBS SA delegated its "core custodial functions" and management responsibilities to BLMIS, which allowed BLMIS to serve as Luxalpha's custodian and investment manager.  *Id*. ¶¶ 180, 181, 186, 187.  According to the SAC, the UBS Defendants failed to disclose this delegation to potential investors or CSSF, despite knowing that the delegation was illegal under Luxembourg law and non-compliant with the regulations governing UCITS funds.  *Id.* ¶¶ 180–182.  The SAC further alleges that UBS SA

---

[5]    *But see Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (CGM), 2021 WL 3477479, at *8 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield*") ("The idea that a financial institution would never knowingly risk its own investments in a Ponzi scheme is belied by the fact that this case is before the Court.").  In *Fairfield*, the Court found that the Trustee's pleadings adequately alleged "actual knowledge" against several of the defendants.  The Trustee pled that these defendants had "lied to the SEC to assist Madoff in covering up his fraud," "joked in an email to colleagues about how Madoff was running a Ponzi scheme similar to that of Bayou's," "[a]ttempted to liquidate his personal investment in [the feeder fund] as Madoff's scheme was unraveling in 2008," and "intentionally [misled] clients about the safety of [the feeder fund]."  *Id.* at *4-*7.  The Trustee has not advanced these or similar allegations against Mr. Dumbauld.

agreed to serve as Luxalpha's "UCITS fund promoter" so as to "create the appearance of UCITS compliance and to deflect regulatory scrutiny." *Id.* ¶ 171.

   None of these allegations are sufficient to plead "actual knowledge." The pleadings regarding the other UBS' entities rejection of BLMIS do not plausibly suggest that any entity at UBS *actually knew* about Madoff's fraud. Certain UBS entities allegedly did not view BLMIS as a suitable investment choice due to concerns about BLMIS' impossibly stable returns, the feasibility of the SSC method, the fund's lack of transparency, and Madoff's idiosyncratic fee structure. SAC ¶¶ 140–155. However, this Court has explained that allegations of awareness of these and other "red flags" are insufficient to plead "actual knowledge." *See, e.g.*, *Legacy*, 548 B.R. at 33 ("The 'red flag' theory of *scienter* has been rejected in the Madoff-related federal securities law litigation because it amounts to pleading fraud by hindsight."); *In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89, 115 (Bankr. S.D.N.Y. 2016) ("*Avellino*") ("The Amended Complaint identifies several red flags including, impossibly consistent annual returns, trading impossibilities, impossible options trading volumes, transactions outside the daily price range, back-dated trades, and the use of an incapable, strip mall auditor. . . .the red flags identified by the Trustee do not support a plausible inference that Avellino or Bienes had actual knowledge that Madoff was not trading securities."); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (explaining that while "red flags" may have "put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge of Schick's outright theft of client funds.").

   The SAC alleges that notwithstanding the rejection of BLMIS by other UBS entities, the UBS Defendants provided services to BLMIS feeder funds and took measures to shield themselves from the risks of doing so, like entering into indemnity agreements with the Access

entities.  SAC ¶¶ 142, 160–61.  While these allegations may imply that the UBS Defendants were willing to overlook certain risks, they fail to imply that the UBS Defendants had "actual knowledge" of the fraud.  *See Ryan*, 2000 WL 1375265, at \*9 ("allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud.").  Indeed, the Trustee alleges that the UBS entities "presented themselves to the public as a unified global entity" and as operating as a "coherent and effective whole." *Id.* at ¶ 67.  Accordingly, it not reasonable or plausible that the UBS would have knowingly jeopardized the reputation of the entire global financial organization in exchange for limited service fees.  *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 621 (S.D.N.Y. 2010) (noting the implausibility of auditor ignoring Madoff fraud, as "it is economically irrational to risk your professional reputation" and "legal liability" in exchange for fees); *Schmidt v. Fleet Bank*, No. 96 CIV. 5030 (AGS), 1998 WL 47827, at \*6 (S.D.N.Y. Feb. 4, 1998) ("Ponzi schemes are doomed to collapse, *United States v. Wolfe*, 71 F.3d 611, 619 (6th Cir. 1995), and while an individual may be able to escape with the proceeds of a Ponzi scheme, a bank cannot. Thus, participation in the scheme would not appear to be in the banks' economic interest."); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 407 (S.D.N.Y. 2010) ("it is indeed troubling to suppose that a well-established industry leader would deliberately shut its eyes to the possibility of fraud"); *Dusek v. JPMorgan Chase & Co.*, 132 F. Supp. 3d 1330, 1351 (M.D. Fla. 2015), *aff'd*, 832 F.3d 1243 (11th Cir. 2016) ("there are no plausible allegations as to why defendants would knowingly involve themselves in Madoff's inevitably doomed Ponzi scheme in order to earn routine banking fees.").

The Trustee's allegations regarding UBS SA's acquiescence to Madoff's preferred structure, and its alleged willingness to hide the delegation of its custodial and managerial

responsibilities, are similarly insufficient. As previously explained, BLMIS' structure preference

was well-known. All servicing agent who did business with Madoff accepted the BLMIS

structure. While these allegations imply that the UBS Defendants were willing to "overlook

legal and regulatory violations to make more money, they do not support the inference that those

Defendants believed there was a high probability that BLMIS was not actually trading securities

on behalf of [Luxalpha] and its investors." *BNP Paribas*, 594 B.R. at 199; *Mazzaro de

Abreu*, 525 F.Supp.2d at 390 (finding that suspicious behavior "at most would indicate only

constructive knowledge of a fraudulent scheme, and are insufficient to support an allegation that

[a bank] had actual knowledge of an underlying fraud."). Similarly, the UBS Defendants'

alleged willingness to serve as Luxalpha's "UCITS fund promoter" further implies their

willingness to accommodate Madoff's structure preference but also fails to support the inference

that they believed Madoff was engaged in fraud.

Finally, it is implausible that the UBS Defendant actually knew BLMIS was operating a

Ponzi scheme in light of their efforts to investigate BLMIS. In a prior version of the complaint,

the Trustee referred repeatedly to the "extensive due diligence" that the UBS Defendants

performed on Madoff and BLMIS. FAC ¶¶ 106, 107, 112–114. It is irrational that the UBS

Defendants would have engaged in these diligence efforts if they had already known about the

Ponzi scheme. *See In re Tremont Sec. L., State L., & Ins. Litig.*, No. 08 CIV. 11117, 2013 WL

5179064, at *5 (S.D.N.Y. Sept. 16, 2013), *aff'd sub nom. Elendow Fund, LLC v. Rye Inv. Mgmt.*,

588 F. App'x 27 (2d Cir. 2014) ("if Tremont had known, or even strongly suspected, that Madoff

was perpetrating a fraud, it would have been peculiar for Tremont to continue discussing ways of

gaining greater transparency into Madoff's operations and to continue sending Madoff due-

diligence questionnaires.").

4.    Access' Alleged Deviation From Diligence Practices

The Trustee further alleges that Access knowingly exempted Madoff from the "rigorous due diligence processes" that it applied to all fund managers. SAC ¶¶ 172–179. These processes included "stringent background checks" and monthly meetings with the fund managers. *Id.* ¶¶ 173–177. The Trustee further alleges that Littaye was the only person at Luxalpha who was permitted to have "any real contact with BLMIS." *Id.* ¶ 178.

These allegations falls short of pleading "actual knowledge" that should be imputed to the Feeder Funds. In *Merkin*, the Trustee alleged that Merkin, an officer of funds that invested in BLMIS, exempted BLMIS from due diligence that investigated fund managers for indicators of fraud. 515 B.R. at 131. There, the Trustee alleged that Merkin exempted BLMIS from the investigation "because he knew each of [the] indicators of fraud applied to BLMIS." *Id.* Despite these allegations, the Court concluded that the Trustee had failed to "plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme." *Id.* at 141.

Here, the Trustee's pleadings are even less capable of implying "actual knowledge" than those in *Merkin*. Unlike the allegations in *Merkin*, the Trustee has not pled that Access deviated from its due diligence protocols *because* it believed Madoff may have been engaged in fraud. Instead, the allegations imply that Access exempted BLMIS from its diligence policies in order to acquiesce to Madoff's idiosyncratic preferences, including his well-known preference for secrecy. SAC ¶¶ 178, 179, 276–281. This Court previously explained that accommodating Madoff's preference for secrecy fails to imply "actual knowledge." *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789 (SMB), 2020 WL 1584491, at *13 (Bankr. S.D.N.Y. Mar. 31, 2020) ("Madoff's penchant for secrecy was legendary and in any event, does not support a conclusion that Madoff's secrecy made the Defendant aware that he was a fraud."); *S.E.C. v. Cohmad Sec. Corp.*, No. 09 CIV. 5680 (LLS), 2010 WL 363844, at *4 (S.D.N.Y. Feb.

2, 2010) ("That Madoff's secrecy warned defendants of fraud amounts to an argument of 'fraud

by hindsight,' which the Second Circuit 'has rejected as a basis for a securities fraud

complaint.'" (internal citation omitted)).   Moreover, in later sections of the SAC, the Trustee

alleges that Access *did* perform diligence on BLMIS, including by asking Mr. Dumbauld and an

outside consultant to investigate Madoff's options trading.  *See id.* ¶¶ 221–225.  Again, it is not

plausible that Access would have performed diligence if had known Madoff was actually

engaged in fraud.

      5.     <u>The Allegations Regarding the Chris Cutler Investigation</u>

The Trustee alleges that Access became concerned in 2006 with the high trading volume

the SSC strategy required.  SAC ¶¶ 220–221.  Consequently, Villehuchet asked Mr. Dumbauld

to look into BLMIS' options trading.  *Id.*  Mr. Dumbauld compared the BLMIS trade

confirmations with information reflected in the OCC database and "confirmed that the trades

being reported by BLMIS did not show up anywhere in the OCC database."  *Id.* ¶ 221.  Mr.

Dumbauld reported his findings to Villehuchet, who requested a second opinion.  *Id.* ¶ 223.

Access hired Chris Cutler ("Cutler"), an outside consultant, who discovered "serious problems

with BLMIS" after reviewing "generally available information on BLMIS's business, its auditor,

audit reports, available trade tickets, and descriptions of the SSC strategy."  *Id.* ¶ 225.

Specifically, Cutler identified the following issues: (1) "More often than not, BLMIS's

reported options trades exceeded the volume of such options trades on the CBOE"; (2) the

complete lack of correlation between BLMIS' returns and the S&P 100 index, which was an

"impossibility" under the SSC strategy; (3) "The SSC strategy was not scalable for the amount of

BLMIS's purported assets under management"; (4) he could not identify the  counterparties to

Madoff's purported over-the-counter options trades.  SAC ¶¶ 226–265.  Based on these findings,

Cutler "recommended that Access exit all of its investments with BLMIS."  *Id.* ¶ 267.  However,

there are no allegations that Cutler had concluded or believed BLMIS was operating a Ponzi scheme or that he shared such a conclusion or belief with anyone at Access.

During a lunch meeting, Cutler conveyed his alleged conclusions to Littaye, Villehuchet, Mr. Dumbauld, and Chantal Lachon, "a long-time, trusted adviser to Littaye and Villehuchet who worked for Access from time to time." SAC ¶ 268. According to the SAC, Littaye interrupted Cutler and questioned his "'business judgment' given that Access's BLMIS business was 'going well,' while the other parts of its business were not going well." *Id.* ¶ 269. In a prior version of the complaint, the Trustee alleged that "Chantal Lachon then declared her view that Cutler's conclusions could not be correct because she claimed BLMIS was audited on a regular basis by the SEC and FINRA, and that there could not possibly be a problem." FAC ¶ 221. The Trustee alleges that Mr. Dumbauld expressed that his concerns with BLMIS were "answered by the fact that Madoff was an SEC registered broker-dealer and therefore the SEC was in there doing their monitoring and that was perceived to be sufficient." SAC ¶ 190.

These allegations regarding the Cutler investigation do not imply that the attendees had "actual knowledge" Madoff was not trading securities and that such actual knowledge should be imputed to the Feeder Funds. In *Legacy*, the Trustee attempted to plead "actual knowledge" against a feeder fund defendant by alleging that one of its officers had access to a report called the "Renaissance Report." *Legacy*, 548 B.R. at 18–19. This report was published by a hedge fund that had studied BLMIS' SSC strategy by using BLMIS account statements and publicly available information. The report found various issues with BLMIS, including: "BLMIS' option trades were impossible," "a high percentage of its equity trades fell outside the daily price range," "Madoff's SSC strategy could not be simulated without putting BLMIS in the market on days the account statements showed it was out of the market," and "Madoff supposedly traded

billions of dollars but inexplicably left no footprint [on the market]." *Id.* at 29–30.  However, the "Renaissance Report did not conclude that Madoff's operation was a Ponzi scheme or that BLMIS was not actually making the trades it was reporting." *Id.*

The Court held that the Trustee's allegations regarding the contents of the Renaissance Report, and the subsequent discussions among those who had access to it, were insufficient to allege that the officer had "actual knowledge" BLMIS was not conducting trades. *Id.* at 30–31. The Court explained that the allegations confirmed that those who had reviewed the report were "highly suspicious of Madoff's option trades." *Id.*  However, the "allegations of the Amended Complaint do not plead a plausible claim that they actually knew that Madoff was not trading securities." *Id.*  The Court found that it was implausible that those who had reviewed the report actually believed Madoff was operating a Ponzi scheme because following their review, they did not immediately withdraw all assets from BLMIS.  The Court explained, "[w]hile greed may cloud judgment, it is not plausible that the average financial professional owing fiduciary duties to its own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed to collapse." *Id.* at 32.

Here, the Trustee's allegations do not plausibly suggest that any of the Access Defendants, including Mr. Dumbauld, actually believed BLMIS was operating a Ponzi scheme. Like the report in *Legacy*, Cutler's analysis presented certain "red flags," but it did not suggest or conclude that Madoff was operating a Ponzi scheme.  Absent such suggestion or conclusion, it is implausible that that the analysis caused the attendees to *know* that Madoff was operating a Ponzi scheme. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 144 (S.D.N.Y. 2010) ("While it may be true that Defendants could have connected the dots to determine that Madoff was committing [a] fraud, Plaintiff offers no facts to support the claim that they actually

reached such a conclusion."); *Lerner*, 459 F.3d at 294 (noting that while it is plausible that "red flags" placed "the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge of Schick's outright theft of client funds."); *Agape*, 773 F. Supp. 2d at 318–19 ("While the Plaintiffs have gathered allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud, these allegations fail to rise to [the] level of specificity that . . . raise a strong inference of actual knowledge.").

Moreover, Access did not advise the Feeder Funds to withdraw their investments from BLMIS after the Cutler meeting, implying that the attendees were not convinced BLMIS was engaged in fraud. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789 (SMB), 2020 WL 1584491, at *11 (Bankr. S.D.N.Y. Mar. 31, 2020) (explaining that it is implausible that the defendant would "entrust[] $679,109,384.00 of its own capital . . . . with BLMIS feeder funds it strongly suspected had invested with an entity that was not actually trading securities."); *Schmidt v. Fleet Bank*, No. 96 CIV. 5030 (AGS), 1998 WL 47827, at *6 (S.D.N.Y. Feb. 4, 1998) (noting that "Ponzi schemes are doomed to collapse."); *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1130 (2d Cir. 1994) ("[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").

The Trustee's allegations regarding statements made by the attendees further imply that they did not actually believe Madoff was running a Ponzi scheme. The Trustee alleges that Littaye reacted to Cutler's analysis by questioning his "business judgment," suggesting that he was unconvinced BLMIS was engaged in wrongdoing. SAC ¶ 269. The Trustee also alleged that Lachon and Mr. Dumbauld were satisfied that BLMIS was regularly audited by the SEC and FINRA, implying they believed BLMIS could not have been engaged in fraud. FAC ¶ 221; SAC

¶ 190. *See Tremont*, 2013 WL 5179064, at *6 (finding that "actual knowledge" was insufficiently pled where the defendant allegedly knew that "numerous controls [were] put around Madoff" including "numerous audits by administrators, accountants, exchanges and governmental entities.").

Finally, the fact that Mr. Dumbauld and Access hired Cutler to perform an investigation into BLMIS' options trading implies that they were unaware of Madoff's scheme. Indeed, it would be "peculiar" for Access to commission Cutler "to conduct the type of due diligence alleged in the [Second] Amended Complaint if it already knew" that BLMIS was a fraud. *Legacy*, 548 B.R. at 33; *Tremont*, 2013 WL 5179064, at *5.

      6.    <u>The List of "Indicia of Fraud" Is Insufficient to Plead Actual Knowledge</u>

Finally, the Trustee identifies several "indicia of fraud" that he claims Defendants were aware of including: (1) BLMIS' unusual fee structure, (2) Madoff's insistence on secrecy, (3) BLMIS' auditor was small and unknown; (4) trade confirmations showed many trades executed outside the daily price range; (5) the Feeder Funds regularly had negative cash balances with BLMIS; (6) the dividend activity shown on Luxalpha and Groupement's statement was impossible; (7) the trades were inconsistent with the SSC strategy; (8) Madoff only provided hard copy trade confirmations; (9) BLMIS' trade confirmations frequently contained settlement anomalies; (10) BLMIS avoided reporting requirements; (10) BLMIS avoided reporting requirements; (11) the volume of options trades Madoff purported to execute was impossible; (12) impossible returns; and (13) unidentifiable options counterparties. *See* SAC at ¶¶ 8; ¶¶ 274–309.

This Court has repeatedly held that allegations of these "indicia of fraud" or "red flags" are insufficient to plead "actual knowledge" because doing so "amounts to pleading fraud by hindsight." *Legacy*, 548 B.R. at 33–34; *Avellino*, 557 B.R. at 115–16 (Bankr. S.D.N.Y. 2016)

("the red flags identified by the Trustee do not support a plausible inference that Avellino or

Bienes had actual knowledge that Madoff was not trading securities").  "Alleging actual

knowledge based on the existence of red flags amounts to pleading that the defendant. . . knew *or*

*should have known* that BLMIS was not engaged in the actual trading of securities." *Legacy*,

548 B.R. at 34 (emphasis added).  Accordingly, there is broad consensus among courts in this

Circuit that "red flags" pleadings should be rejected.  *See DeLollis v. Friedberg, Smith & Co.*,

600 Fed.Appx. 792, 796 (2d Cir.2015) ("Numerous actions brought against auditors and

investment advisors by victims of Madoff's fraud have been dismissed despite the presence of

'red flags,' which in hindsight arguably should have called attention to Madoff's illegal

conduct."); *R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania v. Meridian Capital*

*Partners, Inc.*, 634 Fed. App'x 4, 7, 2015 WL 8731547, at *2 (2d Cir. Dec. 15, 2015) ("Grand

Lodge essentially makes a 'red flag' argument—that Appellees were aware or had the duty to

become aware of red flags in the Rye Funds' operations and that Appellees were reckless in

ignoring the red flags. This court, along with many district courts in this circuit, has rejected

similar claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi

scheme.").  In light of the ample authority holding that "red flags" allegations are insufficient,

the Court should similarly reject the Trustee's "red flags" pleadings here.

      In sum, because the Trustee has failed to allege "actual knowledge" as to the Feeder

Funds or Mr. Dumbauld, none of the transfers that are the subject of Counts III through VI of the

SAC constitute voidable initial transfers that can provide a basis for a "subsequent transfer" to

Mr. Dumbauld.

**B.    The SAC Fails To Plead a Subsequent Transfer Claim Against Defendant Ted Dumbauld**

The Court should dismiss the entire subsequent transfer claim, Count VII, against Mr. Dumbauld because the Trustee has failed to sufficiently allege that Mr. Dumbauld is a subsequent transferee.  First, while the Trustee alleges that Mr. Dumbauld received compensation from Access, the SAC does not identify the particular funds that are the alleged subsequent transfers or trace Mr. Dumbauld's compensation to any initial voidable transfers.  Second, the claim should be dismissed because an employee who receives salary compensation from a company that received allegedly fraudulent transfers is not, without more, a subsequent transferee.

1.    The SAC Fails to Plead Facts Supporting the Conclusory Allegation That Defendant Ted Dumbauld is a Subsequent Transferee

To allege a subsequent transfer claim, the Trustee must plead facts to demonstrate that: (1) "the initial transfer is avoidable" and (2) "the defendant is a subsequent transferee of that initial transfer."  *Merkin*, 515 B.R. at 149.  To sufficiently plead the "subsequent transferee" prong, "the complaint must allege facts that support the inference that the funds at issue originated with the debtor."  *Id*. (internal quotation marks and citation omitted).  While the Trustee does not need to plead "dollar-for-dollar accounting" of the "exact funds at issue," the complaint must "contain the 'necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds."  *Id.* (internal quotation marks omitted).  At the very least, the Trustee "must plead a statement of facts that adequately apprises the [defendants] of the [subsequent transfers] he seeks to recover."  *In re Bernard L. Madoff Inv. Sec. LLC* ("Cohmad"), 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011) (internal citation omitted).

The SAC fails to plead facts to support the inference that Mr. Dumbauld is a subsequent

transferee. Indeed, the complaint contains only three sentences regarding the funds Mr.

Dumbauld purportedly received from Access:

> Based on the Trustee's investigation to date, a portion of the
> Subsequent Transfers received by received by AIA Ltd., AIA LLC,
> AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently
> transferred to Dumbauld, in an amount to be proven at trial. At
> minimum, Dumbauld received $1.25 million in compensation paid
> from bank accounts controlled by Access's New York office from
> 2004 through 2007. Dumbauld received these transfers as
> distributions, payments, or other transfers of value in connection
> with his role as Access partner and Chief Investment Officer.

SAC ¶ 337.

In evaluating pleadings on a motion to dismiss, the Court cannot consider conclusory

allegations. *See Smith v. Loc. 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)

("conclusory allegations or legal conclusions masquerading as factual conclusions will not

suffice to prevent a motion to dismiss.") (internal alterations and quotation marks omitted).

Accordingly, the Court should disregard the first sentence of this paragraph, which asserts in

barebone fashion that "a portion of the Subsequent Transfers" that Access received were

"subsequently transferred to Dumbauld." SAC ¶ 337. Courts have rejected similar allegations as

too conclusory to sufficiently plead a subsequent transfer claim. *See, e.g.*, *In re Dreier LLP*, 452

B.R. 451, 465 (Bankr. S.D.N.Y. 2011) ("The Trustee here makes the assertion that she is seeking

to 'recover some of the funds that flowed from DLLP to Partners that subsequently fed into

Amaranth LLC' without substantiating this allegation." (internal alternation omitted)).

The Trustee also pleads that "Dumbauld received $1.25 million in compensation paid

from bank accounts controlled by Access's New York office from 2004 through 2007." SAC ¶

337. However, this allegation is also insufficient. As an initial matter, the Trustee fails to

identify the precise transfers that he seeks to recover from Mr. Dumbauld.  The Trustee fails to

provide the "vital statistics" for the transfers he believes are subsequent transfers including:

*which* Access entities made the transfers, *why* they took place, *when* they were made, and *how*

*much* was transferred.  *Cf. Cohmad*, 454 B.R. at 341 (holding that the subsequent transfer claim

was sufficiently pled where the complaint and exhibits apprised the subsequent transferees of

"which transactions are claimed to be fraudulent and why, when they took place, how they were

executed and by whom." (internal citation omitted)).  On this basis alone, the Trustee fails to

plead a subsequent transfer claim against Mr. Dumbauld.  *See Picard v. Madoff*, 458 B.R. 87,

120 (Bankr. S.D.N.Y. 2011) (dismissing subsequent transfer claim when the complaint failed to

"provid[e] any sort of estimate of the amount of the purported Subsequent Transfer, or when or

how such Transfer occurred.").

 *Second*, even if the Trustee had sufficiently identified the subsequent transfers,

the Trustee has failed to plead non-conclusory facts tracing any portion of Mr. Dumbauld's

compensation to the initial allegedly voidable transfers.  *Cohmad* and *Merkin* make clear that to

sufficiently plead a subsequent transfer claim, the Trustee must provide details connecting the

subsequent transfers to the initial transfers.  In *Cohmad*, a company employed broker

representatives who referred investors to BLMIS.  BLMIS calculated the value of the accounts

referred by these representatives in order to determine their commission.  The Trustee alleged

that every month BLMIS made an initial transfer to the company based on the commission

payment schedule, which "was essentially a composite of the Subsequent Transfers of

Commissions that BLMIS agreed to pay each Cohmad Representative."  *Cohmad*, 454 B.R. at

340.  Upon receiving the initial transfer, the company distributed the commission to each

representative.  Based on these allegations, the Court held that the Trustee had sufficiently

demonstrated that the subsequent transfers originated from the initial transfers.  The Court noted

that "the amounts of Commissions specified by BLMIS on the Payment Schedules correspond to

the amounts paid by BLMIS to Cohmad and, subsequently, to the Cohmad Representatives."  *Id*.

at 341.

In *Merkin*, the Court found that the Trustee sufficiently pled tracing by alleging facts

demonstrating that the subsequent transfers occurred contemporaneously with, or shortly after,

the initial transfers.  In that case, the Trustee attached an exhibit to the complaint that identified

initial transfers from BLMIS (Exhibit B) and another exhibit that identified the subsequent

transfers (Exhibit C).  When comparing the two exhibits, the court was able to infer a connection

between subsequent transfers and initial transfers based the timing of the transactions.  The court

explained "several subsequent transfers took place contemporaneously or shortly after an initial

transfer identified in Exhibit B, implying linkage."  *Merkin*, 515 B.R. at 150.  The court noted

that "[g]iven the short amount of time between the first and second transfers, it is reasonable to

infer in considering a motion to dismiss that some portion of the first transfer formed part of the

second transfer."  *Id.* at 151.

Unlike the pleadings in *Cohmad* and *Merkin*, the Second Amended Complaint contains

virtually no details tracing Mr. Dumbauld's compensation to the initial transfers.  The Trustee

cannot satisfy this tracing requirement merely by alleging that Mr. Dumbauld received

compensation from bank accounts controlled by Access.  The SAC does <u>not</u> allege that all funds

held by Access originated from the Feeder Funds.  In a prior version of the complaint, the

Trustee alleged that in 2005, "61% of Access's total net revenue" were from its services for

BLMIS.  *See* FAC ¶ 88.  Thus, the pleadings allege that a significant portion of the funds held by

Access *cannot* be traced to the Feeder Funds.

Asides from referencing these bank accounts, the Trustee has alleged no other facts

connecting Mr. Dumbauld's compensation to the initial transfers.  While the Trustee has

identified certain transfers AIA LLC received indirectly from the Feeder Funds, SAC ¶ 334(b),

the SAC contains no allegations connecting Mr. Dumbauld's compensation to these alleged

subsequent transfers to AIA LLC.  The SAC does not allege that Mr. Dumbauld received his

compensation contemporaneously or shortly after these transfers were made.  Accordingly, the

pleadings fail to demonstrate that Mr. Dumbauld's compensation originated from the initial

transfers.  *See, e.g., Lynch*, 952 F.3d at 74 ("But where the well-pleaded facts do not permit the

court to infer more than *the mere possibility of misconduct*, the complaint has alleged—but it has

not 'shown' – 'that the pleader is entitled to relief.'") (quoting *Iqbal*, 556 U.S. at 679); *ICD Cap.,

LLC v. CodeSmart Holdings, Inc.*, No. 14 CIV. 8355 (JFK), 2020 WL 3961617, at *7 (S.D.N.Y.

July 13, 2020) ("To present a plausible claim, the pleading must contain something more than a

statement of facts that merely creates a suspicion of a legally cognizable right of action.")

(quoting *Twombly*, 550 U.S. at 555);  *Eddystone Rail Co., LLC v. Bank of Am., N.A.*, No. 19

CIV. 9584 (GBD), 2021 WL 4443371, at *5 (S.D.N.Y. Sept. 28, 2021) (rejecting the argument

that "the pleading standard for alleging a subsequent conveyance is 'necessarily lenient' on a

motion to dismiss such that a plaintiff simply needs to 'show the relevant pathway' of the

conveyance and 'merely imply that at least some of the subsequent conveyance originated with

the' initial fraudulent conveyance.") (alteration omitted).

    2.    <u>Defendant Ted Dumbauld Should Be Dismissed From Count VII
Because He Received Funds From Access As Employee Compensation</u>

The Court should also dismiss Mr. Dumbauld from this action because the funds he

received from Access are compensation for his employment with AIA LLC.  The Trustee alleges

that Mr. Dumbauld received funds from Access as "distributions, payments, or other transfers of

value in connection with his role as Access partner and Chief Investment Officer." SAC ¶ 337.

Courts have explained that an employee who receives salary from a subsequent transferee is not,

without more, a further subsequent transferee.

In *Geltzer*, a defendant to the action was the CEO of a company that had received $1.17

million in fraudulent transfers from the debtor. *See In re Geltzer*, 502 B.R. 760, 773 (Bankr.

S.D.N.Y. 2013). The trustee sought to avoid the funds that the debtor transferred to the

company, and to recover the portion of these transfers that were paid to the CEO. The court

granted the CEO's motion to dismiss, holding that "an officer or employee who is the recipient

of a salary from a company that received an allegedly fraudulent transfer is not, without more,

the subsequent transferee of the conveyance." *Id.* 502 B.R. at 773. The court explained:

> Even if the Trustee could prove that the $1.17 million in transfers
> were fraudulent, the Trustee has not adequately pleaded that he can
> recover the amount from Barish as a subsequent transferee. The
> Trustee merely alleges that Barish received some or all of the
> transfer, explaining in his papers that Barish admitted to receiving
> some of the funds as his salary. The Trustee, however, provides no
> support for the proposition that a corporate officer that receives a
> salary from fraudulently conveyed funds is a subsequent transferee
> under § 550(a)(2). In fact, the only applicable authority is to the
> contrary. As the District Court held in *Roselink Investors, L.L.C. v.
> Shenkman*, 386 F.Supp.2d 209, 227 (S.D.N.Y.2004), "receipt of a
> salary from the transferee corporation as an officer of the
> corporation is not sufficient to render the officer a transferee or
> beneficiary of the transfer." *See also TLC Merch. Bankers, Inc. v.
> Brauser*, 01 CIV.3044 GEL, 2003 WL 1090280, at *7 (S.D.N.Y.
> Mar. 11, 2003) (same).
>
> These holdings are particularly relevant because there is no
> allegation that Barish had any knowledge of Starr's fraud. There is
> also no allegation that Martini Park failed to receive value from
> Barish in exchange for his salary as its CEO, chairman and manager.

*Id.* at 772–773.

Like the pleadings in *Geltzer*, the Trustee's allegations make clear that Mr. Dumbauld

received payments from Access as compensation.  SAC ¶ 337.  As previously explained, the

Trustee has failed to allege that Mr. Dumbauld possessed "actual knowledge" of BLMIS' fraud.

There are also no allegations to suggest that AIA LLC failed to receive value in exchange for Mr.

Dumbauld's compensation.  Because *Geltzer* is squarely on point, the Court should apply its

holding and dismiss Mr. Dumbauld from this action.[6]

## CONCLUSION

For the foregoing reasons, Mr. Dumbauld respectfully requests that the Court dismiss the

Second Amended Complaint against Mr. Dumbauld with prejudice.


Dated:  April 22, 2022
         New York, New York


                              SHER TREMONTE LLP

                              By: /s/ Robert Knuts
                              Robert Knuts
                              Cathy Liu
                              90 Broad Street, 23rd Floor
                              New York, New York 10004
                              Tel: 212.202.2638
                              Email: rknuts@shertremonte.com


                              *Attorneys for Defendant Theodore Dumbauld*

---

[6]    The court in *Geltzer* made clear that it was not applying the 11 U.S.C. § 550(b)(1) fair
value defense to subsequent transfer claims, which is generally asserted at the motion for
summary judgment stage.  *See Geltzer*, 502 B.R. at 773 ("Admittedly, fair value is a defense to
be pleaded by the defendant, 11 U.S.C. § 550(b)(1), but it is not necessary to reach this issue.").