**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. _____ (CGM) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| BNP PARIBAS - DUBLIN BRANCH. | |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa– *lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Complaint against defendant BNP Paribas - Dublin Branch ("BNP Dublin" or "Defendant"), alleges the following:

## I.    NATURE OF THE ACTION

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property stolen as part of the massive Ponzi scheme perpetrated by Madoff and others before Madoff's arrest on December 11, 2008.

2. In 2010, the Trustee commenced an adversary proceeding against Legacy Capital, Ltd. ("Legacy Capital") and other defendants which resulted in the November 12, 2019 entry of a Final Judgment avoiding $79,125,781 in fictitious profits transferred from BLMIS to, or for the benefit of Legacy Capital ("Final Judgment"). *Picard v. Legacy Capital Ltd. (In re BLMIS)*, Adv. Pro. No. 10-05286 (CGM) (Bankr. S.D.N.Y.) (the "Legacy Adversary Proceeding"), ECF No. 231.

3. In this Complaint, the Trustee seeks to recover from BNP Dublin initial transfers made from BLMIS to BNP Dublin from Legacy Capital's BLMIS account. These transfers were avoided in the Final Judgment as fictitious profits transferred from BLMIS to or for the benefit of Legacy Capital.

4. Between September 2007 and June 2008, after BNP Dublin's related entity BNP Paribas Securities Corp. took over signatory authority for Legacy Capital's BLMIS account, BNP Dublin withdrew from Legacy Capital's BLMIS account $87 million of customer property. Of that amount, BNP Dublin received approximately $49,505,850 in fictitious profits from the Ponzi scheme.

2

5. This action is brought to recover from BNP Dublin the transfers avoided in the Final Judgment, so that this customer property can be equitably distributed among the holders of allowed claims in this SIPA proceeding.

## II. SUBJECT MATTER JURISDICTION AND VENUE

6. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.,* No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

7. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

8. Venue in this judicial district is proper under 28 U.S.C. § 1409.

9. This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), and 550, and other applicable law.

## III. THE DEFENDANTS, RELEVANT NON-PARTIES, AND PERSONAL JURISDICTION

10. BNP Paribas S.A. is an entity organized under the laws of France, and registered to do business in Ireland, with its principal place of business located at 5 George's Dock, IFSC, Dublin I, D01 X8N7, Ireland and an office at 787 Seventh Avenue, New York, New York 10019. BNP Dublin is an Irish registered branch of BNP Paribas S.A. with offices at Termini, 3

3

Arkle Road, Sandyford, Dublin 18, D18 T6T7, Ireland and 5 George's Dock, IFSC, Dublin I, D01 X8N7, Ireland. During the acts complained of herein, BNP Dublin conducted business in New York and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules §§ 301 and 302 (McKinney 2001) and Bankruptcy Rule 7004. BNP Dublin knowingly received transfers of BLMIS customer property, for the benefit of Legacy Capital, from Legacy Capital's New York-based BLMIS account. BNP Dublin utilized BNP Paribas S.A.'s New York branch location to receive funds out of BLMIS, and also used a collateral agent in New York to communicate directly with BLMIS concerning each of the transfers from BLMIS to BNP Dublin.

11. Non-party Legacy Capital is a British Virgin Islands Corporation, with its principal place of business in care of Hamilton Trust & Management Company Limited, Level 1, Palm Grove House, Wickham's Cay 1, Road Town, Tortola VG1110, British Virgin Islands. At all times relevant to this Complaint, Legacy Capital was a single purpose vehicle; it invested solely with BLMIS through Account No. 1FR071 (the "Legacy Capital Account"). A chart setting forth the name and account number for the Legacy Capital Account is attached hereto as Exhibit A. Legacy Capital is owned by BNP Dublin.

12. Non-party BNP Paribas Securities Corp. is a Delaware Corporation, with its principal place of business located at 787 Seventh Avenue, New York, New York, 10019. Pursuant to a credit agreement between BNP Dublin and Legacy Capital, BNP Paribas Securities Corp. in New York was designated as the collateral agent for BNP Dublin. At all times relevant to this Complaint, BNP Paribas Securities Corp. acted as BNP Dublin's agent in New York, and directly handled all communications with BLMIS in New York concerning all transfers of BLMIS customer property.

4

13. Non-party BNP Paribas S.A. New York Branch is an operational and legal extension of BNP Paribas S.A. and BNP Dublin, with offices at 787 Seventh Avenue, New York, New York, 10019. At all times relevant to this Complaint, BNP Paribas S.A.'s branch in New York, *i.e.* BNP Paribas S.A. New York Branch, acted as the receiving bank for all transfers of BLMIS customer property to Defendant.

### IV.   BACKGROUND, THE TRUSTEE AND STANDING

14. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

15. On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

16. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

   a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

   b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

   c. removed the case to this Court pursuant to SIPA § 78eee(b)(4).

17.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

18.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

19.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

20.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS investment advisory business ("IA Business") customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

21.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

22. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

23. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

24. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

25. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

26.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

27.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

28.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

29.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

30. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

31. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B.  THE PONZI SCHEME

32. In the Legacy Adversary Proceeding, the Court found that BLMIS operated as a Ponzi scheme.

33. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

34. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was

9

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

35. To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

36. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### C. MADOFF'S INVESTMENT STRATEGY

37. In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

38. All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

39. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

40. From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

41. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

42. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

43. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

44. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

11

outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

45. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

46. If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

47. Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

48. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

*BLMIS's Fee Structure*

49.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

50.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

51.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

52.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

*BLMIS Execution*

53.     BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor would know it was statistically impossible.

*No Evidence of BLMIS Trading*

54.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

55.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

56.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

57.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

58.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

VI.   **THE LEGACY ADVERSARY PROCEEDING AND THE TRANSFERS**

**The Legacy Adversary Proceeding**

59.   On December 6, 2010, the Trustee commenced the Legacy Adversary Proceeding against Legacy Capital, Isaac Jimmy Mayer, Rafael Mayer, Khronos LLC ("Khronos"), Khronos Capital Research LLC, HCH Management Co. Ltd., Montpellier Resources Ltd., BNP Paribas Securities Corp., Inversiones Coque S.A., Aurora Resources Ltd., and Olympus Assets LDC. *See* Legacy Adversary Proceeding, Adv. Pro. No. 10-05286 (CGM), ECF No. 1.

60.   By stipulation dated July 1, 2015, the Trustee amended the caption in the Legacy Adversary Proceeding and agreed to amend his complaint to discontinue the action against all the previously named defendants, except for Legacy Capital and Khronos. *See id.*, ECF No. 111.

61.   On July 2, 2015, the Trustee filed an amended complaint seeking to avoid and recover initial transfers of customer property from BLMIS to Legacy Capital in the amount of approximately $213,180,068 (the "Amended Complaint"). *See id.*, ECF No. 112.

62.   On April 12, 2016, the Court dismissed Khronos from the Legacy Adversary Proceeding and dismissed all claims against Legacy Capital, except those seeking to avoid and recover $86,505,850 in fictitious profits transferred to or for the benefit of Legacy Capital within two years of the Filing Date. *See id.*, ECF No. 137.

63.   On November 12, 2019, the Court entered a Stipulation and Order for Entry of Final Judgment ("Stipulated Order") that provided, among other things: (i) the Parties' consent to the Bankruptcy Court's entry of a final order and judgment in connection with the Trustee's avoidance claim; and (ii) entry of a Final Judgment against Legacy Capital in the amount of $79,125,781 (the "Legacy Transfers"). *See id.*, ECF No. 230. The Stipulated Order provided that "the Legacy Transfers are avoidable and avoided under § 548(a)(1)(A) and recoverable from Legacy Capital under § 550(a) of the Bankruptcy Code." *Id*.

64. The Trustee was advised through post-judgment discovery that Legacy Capital was impecunious and lacked funds to satisfy the Final Judgment to which it had consented. Additionally, Legacy Capital represented to the Trustee that as of December 2008, it was owned by BNP Dublin.

**The Transfers to BNP Dublin**

65. On July 26, 2004, Legacy Capital entered into a credit agreement with BNP Dublin and other BNP entities for a $100 million line of credit secured by the Legacy Capital Account (the "Credit Agreement"). The Credit Agreement provided that BNP Paribas Securities Corp. would be the collateral agent for BNP Dublin, and BNP Paribas Arbitrage SNC would be the calculation agent for BNP Dublin. After this date, BNP Paribas Securities Corp. took over signatory authority for Legacy Capital's BLMIS account and BNP Dublin started to receive direct transfers from BLMIS.

66. During the two years preceding the Filing Date, BLMIS made transfers totaling approximately $174,000,000 to Legacy Capital and BNP Dublin. This included $87,000,000 transferred directly to Legacy Capital and $87,000,000 transferred to BNP Dublin (the "Two-Year Initial Transfers"). The Two-Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4). A chart setting forth the Two-Year Initial Transfers is attached as Exhibit B.

67. On the date of each Two-Year Initial Transfer, various BNP Paribas entities, through a New York collateral agent, BNP Paribas Securities Corp., directed BLMIS to make identical transfers to Legacy Capital and BNP Dublin. BNP Dublin's affiliate in New York, BNP Paribas S.A. New York Branch, acted as the receiving bank for BNP Dublin's transfers out of BLMIS. The Two-Year Initial Transfers to Defendant went to BNP Dublin's account at BNP

16

Paribas S.A. New York Branch in New York.  Specifically, BNP Dublin received the Two-Year Initial Transfers as follows: (i) $50,000,000 on September 4, 2007, which, based on records currently available to the Trustee, included up to approximately $12,505,850 of fictitious profits; (ii) $27,000,000 on October 4, 2007, which entirely consisted of fictitious profits; and (iii) $10,000,000 on June 6, 2008, which entirely consisted of fictitious profits.  Legacy Capital received the same amounts on the same dates.  A chart setting forth these transfers is attached hereto as Exhibit C.

68.    Of the $87,000,000 BNP Dublin received, approximately $49,505,850 ("BNP Transfers") comprised fictitious profits.

69.    The BNP Transfers are recoverable from BNP Dublin pursuant to section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

## COUNT ONE
## RECOVERY OF FRAUDULENT TRANSFERS
## 11 U.S.C. § 550 AND SIPA § 78fff-2(c)(3)

70.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

71.    BNP Dublin received the BNP Transfers, totaling approximately $49,505,850 in fictitious profits.

72.    Each of the BNP Transfers is recoverable from BNP Dublin under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

73.    Each of the BNP Transfers was made directly to BNP Dublin.

74.    BNP Dublin is an initial transferee of the BNP Transfers.

75.    As a result of the foregoing, pursuant to 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Dublin: (a) recovering the BNP

17

Transfers, or the value thereof, from BNP Dublin for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against BNP Dublin as follows:

(a) Recovering the BNP Transfers, or the value thereof, from BNP Dublin for the benefit of the estate;

(b) Awarding the Trustee prejudgment interest from the date on which the BNP Transfers were received by BNP Dublin; and

(c) Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: April 27, 2022
New York, New York

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Jason S. Oliver
Tatiana Markel
Carrie A. Longstaff
Peter B. Shapiro

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*