**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Marshall R. King
Matthew K. Kelsey
Gabriel Herrmann

*Attorneys for the UBS Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>               Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>               Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>               Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>               Plaintiff,<br><br>    v.<br><br>UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its | Adv. Proc. No. 10-04285 (CGM) |

Liquidator MAÎTRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE
LA VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole
beneficiary under the Will of THIERRY MAGON
DE LA VILLEHUCHET (a/k/a RENE THIERRY
DE LA VILLEHUCHET), PIERRE
DELANDMETER, THEODORE DUMBAULD,
LUXALPHA SICAV as represented by its
Liquidators MAÎTRE ALAIN RUKAVINA and
PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA
AND PAUL LAPLUME, in their capacities as
liquidators and representatives of LUXALPHA,
GROUPEMENT FINANCIER LTD.,

                              Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF THE UBS DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 2

ARGUMENT .......................................................................................................... 5

I.      APPLICABLE LEGAL STANDARDS ..................................................... 5

II.     THE COURT LACKS PERSONAL JURISDICTION OVER THE UBS
        DEFENDANTS ........................................................................................ 7

        A.      The Trustee's Conclusory Allegations and Improper Group
                Pleading Cannot Support Jurisdiction......................................... 8

        B.      The UBS Defendants Are Not Subject to General Jurisdiction in
                this Court.................................................................................... 10

        C.      The UBS Defendants Are Not Subject to Specific Jurisdiction in
                this Court.................................................................................... 11

                1.      The Trustee Identifies No Jurisdictionally Significant
                        Contacts Between UBS AG and the United States ..................... 13

                2.      The Trustee Identifies No Jurisdictionally Significant
                        Contacts Between UBSTPM and the United States ................... 14

                3.      The Trustee Identifies No Jurisdictionally Significant
                        Contacts Between UBSFSL and the United States..................... 16

III.    THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF THE
        ALLEGED INITIAL TRANSFERS MADE MORE THAN TWO YEARS
        BEFORE THE FILING DATE.......................................................................... 17

        A.      The Alleged Initial Transfers Were Made by or to a Covered Entity...... 18

                1.      The Alleged Initial Transfers Were Made by a Stockbroker....... 19

                2.      The Alleged Initial Transfers Were Made to a Financial
                        Institution ................................................................................. 19

        B.      The Alleged Initial Transfers Were Settlement Payments Made in
                Connection with a Securities Contract.................................................... 22

                1.      The Alleged Initial Transfers Were Settlement Payments
                        Made in Connection with BLMIS Securities Contracts .............. 22

i

|   |   | 2. | The Alleged Initial Transfers Were Made in Connection with Other Securities Contracts | 23 |
|---|---|---|---|---|
|   | C. |   | Any Transfers Pre-Dating the Two-Year Pre-Filing Period are Time-Barred | 24 |
|   | D. |   | Section 546(e) Does Not Contain a "Knowledge" Exception | 25 |
| IV. |   |   | THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF THE REMAINING ALLEGED INITIAL TRANSFERS | 28 |
|   | A. |   | The Trustee Has Failed to Allege Actual Fraudulent Intent as Required by Section 548(a)(1)(A) and Rule 9(b) | 28 |
|   | B. |   | The Trustee Should Not Be Permitted to Rely on the Ponzi Scheme Presumption to Avoid His Pleading Burden | 30 |
| V. |   |   | THE SAC ESTABLISHES UBS'S GOOD-FAITH DEFENSE | 31 |
|   | A. |   | Value | 32 |
|   | B. |   | Good Faith | 32 |
|   | C. |   | Without Knowledge of Voidability | 35 |
| VI. |   |   | THE SAC DOES NOT PLAUSIBLY ALLEGE THAT UBS RECEIVED BLMIS CUSTOMER PROPERTY | 36 |
| CONCLUSION |   |   |   | 40 |

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
    457 F. Supp. 3d 401 (S.D.N.Y. 2020)........................................................................6

*Am. Girl, LLC v. Zembrka*,
    2021 WL 1699928 (S.D.N.Y. Apr. 28, 2021)..........................................................12

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
    409 B.R. 737 (Bankr. E.D.N.C. 2009)....................................................................39

*Asahi Metal Indus. Co. v. Super. Ct.*,
    480 U.S. 102 (1987)................................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................7, 38

*Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*,
    270 F. App'x 52 (2d Cir. 2008) ..............................................................................19

*Bah v. Apple Inc.*,
    2021 WL 4894677 (S.D.N.Y. July 26, 2021) ........................................................12

*Balaber-Strauss v. Lawrence*,
    264 B.R. 303 (S.D.N.Y. 2001)................................................................................32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................7, 38

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)....................................................................................30

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*,
    803 F.3d 835 (7th Cir. 2015) ..................................................................................35

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018).................................................................................12, 13

*In re CIL Ltd.*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ...................................................................6, 11

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).......................................................................................6, 10, 11

iii

*DiStefano v. Carozzi N. Am., Inc.*,
   286 F.3d 81 (2d Cir. 2001).................................................................................5

*Fagan v. Republic of Austria*,
   2011 WL 1197677 (S.D.N.Y. Mar. 25, 2011) ...............................................9

*Finn v. Alliance Bank*,
   860 N.W.2d 638 (Minn. 2015)........................................................................31

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)..........................................................................12, 13, 14

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)........................................................................................11

*Greatship (India) Ltd. v. Marine Logistics Sols. (Marsol) LLC*,
   2012 WL 204102 (S.D.N.Y. Jan. 24, 2012) ..................................................8

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*,
   408 B.R. 318 (Bankr. N.D. Cal. 2009) ........................................................32

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)........................................................................5, 6

*Guo Jin v. EBI, Inc.*,
   2008 WL 896192 (E.D.N.Y. Mar. 31, 2008).................................................8

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984)........................................................................................6

*Hydro-Dyne, Inc. v. Ecodyne Corp.*,
   812 F.2d 1407, 1987 WL 36573 (6th Cir. 1987) ........................................26

*Int. Shoe Co. v. Washington*,
   326 U.S. 310 (1945)........................................................................................5

*Jazini v. Nissan Motor Co., Ltd.*,
   148 F.3d 181 (2d Cir. 1998).........................................................................8

*Kennedy v. Mondelez Glob. LLC*,
   2020 WL 4006197 (E.D.N.Y. July 10, 2020)...............................................40

*King Cnty. v. IKB Deutsche Industriebank AG*,
   769 F. Supp. 2d 309 (S.D.N.Y. 2011)........................................................5, 9

*Langenberg v. Sofair*,
   2006 WL 2628348 (S.D.N.Y. Sept. 11, 2006)..............................................6

iv

*Law v. Siegel*,
    571 U.S. 415 (2014).............................................................................28

*In re Lehman Bros. Holdings Inc.*,
    535 B.R. 608 (Bankr. S.D.N.Y. 2015) .................................................6

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...............................................................14

*Lustig v. Weisz & Assocs. (In re Unified Com. Cap., Inc.)*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001) ..............................................31

*M. Shanken Commc'ns, Inc. v. Variant Events, LLC*,
    2010 WL 4159476 (S.D.N.Y. Oct. 7, 2010) ........................................8

*McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*,
    323 F. Supp. 3d 488 (S.D.N.Y. 2018).................................................17

*Melnick v. Adelson–Melnick*,
    346 F. Supp. 2d 499 (S.D.N.Y. 2004)...................................................5

*Merit Mgmt. Grp. v. FTI Consulting*,
    138 S. Ct. 883 (2018).................................................................17, 28

*In re Merkin*,
    817 F. Supp. 2d 346 (S.D.N.Y. 2011).................................................26

*Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*,
    267 F.3d 1190 (11th Cir. 2001) .........................................................27

*Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*,
    2011 WL 381612 (E.D.N.Y. Feb. 2, 2011)........................................8, 9

*Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...........................................29, 30

*Papasan v. Allain*,
    478 U.S. 265 (1986)...........................................................................7

*Picard v. BNP Paribas S.A. (In re Madoff)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018).............................12, 13, 27, 38

*Picard v. Bureau of Lab. Ins. (In re Madoff)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012)...........................................15, 16

*Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*,
    12 F.4th 171 (2d Cir. 2021) ...........................................30, 31, 33, 36

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ...................................17, 18, 29

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014)..........................................................2, 18, 19, 22, 23, 24

*Picard v. Maxam Absolute Return Fund, L.P.*,
460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...............................................................15, 16

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014)......................................................................39

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015)................................................................38, 40

*Rajala v. Spencer Fane LLP (In re Generation Res. Holding Co.)*,
964 F.3d 958 (10th Cir. 2020) .................................................................................36

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001).......................................................................7

*Rush v. Savchuk*,
444 U.S. 320 (1980)..................................................................................................6, 9

*Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
516 B.R. 18 (S.D.N.Y. 2014)....................................................................................36

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005).................................................................................29, 31

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...................................................................28

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................19, 24, 25, 26

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
476 B.R. 715 (S.D.N.Y. 2012)..................................................................................19

*SPV OSUS Ltd. v. UBS AG*,
114 F. Supp. 3d 161 (S.D.N.Y. 2015)...................................................5, 6, 10, 11

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)......................................................................................11

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010).......................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)................................................................................6

*In re Trib. Co. Fraudulent Conv. Litig.*,
  10 F.4th 147 (2d Cir. 2021) ...............................................................................22

*In re Trib. Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019)..............................................................18, 21, 24, 28

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984)..............................................................................10

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)..............................................................................11

*Wilder v. News Corp.*,
  2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014) ..................................................10

## STATUTES

11 U.S.C. § 101(22)(A).............................................................................................20

11 U.S.C. § 101(53A)...............................................................................................19

11 U.S.C. § 546(e) ..............................................................................................18, 19

11 U.S.C. § 548(a)(1)(A)..........................................................................................30

11 U.S.C. § 548(d)(2)(A)..........................................................................................32

11 U.S.C. § 550(a)....................................................................................................17

11 U.S.C. § 550(a)(2)................................................................................................11

11 U.S.C. § 550(b)....................................................................................................32

11 U.S.C. § 741(7)....................................................................................................28

11 U.S.C. § 741(7)(A)..........................................................................................22, 24

11 U.S.C. § 741(8)....................................................................................................28

15 U.S.C. § 78*fff*-2(c)(3).........................................................................................36

15 U.S.C. § 78*lll*(4)............................................................................................5, 37

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021)...............................................32

vii

Defendants UBS AG, UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("***UBS Lux***" or
"***UBS SA***"), UBS Fund Services (Luxembourg) S.A. ("***UBSFSL***"), and UBS Third Party
Management Company S.A. ("***UBSTPM***") (collectively, "***UBS***" or the "***UBS Defendants***")
respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules
of Civil Procedure 12(b)(2) and 12(b)(6) (made applicable by Fed. R. Bankr. P. 7012), to dismiss
Count Seven of the Second Amended Complaint (No. 10-4285, ECF No. 274) (the "***Second
Amended Complaint***" or "***SAC***")[1] filed on February 28, 2022 by Plaintiff Irving H. Picard, Trustee
for the Liquidation of Bernard L. Madoff Investment Securities LLC ("***BLMIS***") and the chapter
7 Estate of Bernard L. Madoff (the "***Trustee***").  In support of their motion, the UBS Defendants
respectfully represent as follows:

## PRELIMINARY STATEMENT

The subsequent-transfer claims asserted against the UBS Defendants in the Second
Amended Complaint fail for at least four independent reasons.

*First*, insofar as the Trustee purports to assert claims against UBS AG, UBSFSL, and
UBSTPM, he improperly sues foreign-domiciled entities that are not "at home" in the United
States and that lack any suit-related U.S. contacts, making the assertion of personal jurisdiction
over them constitutionally impermissible.  Indeed, as the SAC confirms, these UBS Defendants—
at most—merely rendered services overseas to foreign investment funds that had assets with
BLMIS.  Thus, the claims against UBS AG, UBSFSL, and UBSTPM should be dismissed for lack
of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

*Second*, even setting aside that jurisdictional infirmity, the Trustee fails to state an
actionable claim for relief as against any of the UBS Defendants because recovery of the transfers

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the SAC.

he seeks to recoup is barred by the safe harbor of Bankruptcy Code section 546(e).  Permitting the

Trustee to proceed with this litigation would undermine the protection of the securities markets

that Congress intended and "cause the very displacement that Congress hoped to minimize in

enacting § 546(e)."  *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec.

LLC)*, 773 F.3d 411, 420 (2d Cir. 2014).  The alleged transfers were "settlement payments" and

made in connection with "securities contract[s]," and are therefore subject to 546(e) in all respects.

Although section 546(e) does not shield transfers that were actually fraudulent under section

548(a)(1)(A), the Trustee does not adequately allege actual fraud under Rule 9(b), and the so-

called "Ponzi scheme presumption" does not rectify this failure, as it has no textual support in the

Bankruptcy Code or Bankruptcy Rules.

*Third*, the Trustee's claims must be dismissed in any event because the SAC establishes

UBS's good-faith defense as a matter of law—i.e., that a diligent inquiry would not have

discovered the fraudulent purpose of BLMIS's alleged initial transfers.  Indeed, the Trustee simply

wishes away the fact that BLMIS duped thousands of sophisticated customers and operated under

the regulatory eye of the SEC, which, even after investigating BLMIS, was unable to unearth

Madoff's Ponzi scheme.

*Fourth*, even if avoidance of the relevant initial transfers to the Fund Defendants (defined

below) could be had, the Trustee's claims against the UBS Defendants fail because the SAC does

not plausibly allege that the payments UBS allegedly received from the Fund Defendants were

"subsequent transfers" of BLMIS customer property.

## FACTUAL BACKGROUND

In the SAC, the Trustee alleges that Luxalpha SICAV ("**Luxalpha**") and Groupement

Financier Ltd. ("**Groupement**" and, together with Luxalpha, the "**Fund Defendants**") "were

among the feeder funds . . . established to direct investors into BLMIS," SAC ¶ 2, and that BLMIS

made fraudulent "Initial Transfers" to the Fund Defendants, which then subsequently transferred "some" of the Initial Transfers to the "Subsequent Transferee Defendants," including the UBS Defendants, as payment for alleged service of the Fund Defendants, *id.* ¶¶ 324–32.

The SAC alleges that the Fund Defendants and the UBS Defendants are all foreign entities. Luxalpha and Groupement are investment funds with registered offices in Luxembourg and the British Virgin Islands, respectively, *id.* ¶¶ 98, 104; UBS AG is a Swiss public company with registered and principal offices in Switzerland (along with offices in New York), *id.* ¶ 63; and UBSTPM and UBSFSL are both *sociétés anonymes* organized under the laws of Luxembourg with principal places of business in Luxembourg, *id.* ¶¶ 65–66.  The Trustee alleges that UBS AG served as a "sponsor" and "promoter" of Luxalpha, *id.* ¶ 168; UBSTPM served as the "official manager" of Luxalpha, *id.* ¶ 333(a); and UBSFSL served as the "official administrator" of both Fund Defendants, *id.* ¶ 333(b).  As "payment" for these "alleged service[s]," the Trustee claims, "some of the initial transfers [from BLMIS] to . . . the Fund Defendants" were "subsequently transferred . . . to the UBS Defendants."  *Id.* ¶ 332.

The SAC insinuates that the UBS Defendants should have known of BLMIS's fraud. Notably, however, it fails to allege that they *actually* knew of the fraud, and it tellingly omits relevant factual matters that are in the public record and that the Trustee has alleged in other pleadings—including that BLMIS had duped thousands of sophisticated customers and was under the regulatory ambit of the SEC, which investigated BLMIS extensively and found no wrongdoing (let alone a multi-billion dollar Ponzi scheme).  *See Picard v. Fairfield Sentry Ltd.*, No. 09-01239, ECF No. 23, *Amended Complaint* ¶¶ 4(n), 351, 361 (Bankr. S.D.N.Y. Jul. 20, 2010) (alleging that Madoff's scheme caused "billions in damages to thousands of customers," that "[i]n 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally

front-running the market," and that Madoff's "scheme to defraud the SEC succeeded" and "the SEC closed any further investigation of BLMIS").

The Trustee alleges that the Fund Defendants collectively invested approximately $2 billion with BLMIS, SAC ¶ 326; that BLMIS made transfers to or for the benefit of the Fund Defendants totaling at least $1.1 billion during the six years preceding the Filing Date ($752 million to Luxalpha and $352 million to Groupement Financier), *id.* ¶ 327; and that approximately $1.01 billion of those initial transfers ($735 million to Luxalpha and $275 million to Groupement Financier) were made during the two years preceding the Filing Date, *id.* ¶ 328.

As to the alleged "Subsequent Transfers," the Trustee alleges that the "Fund Defendants subsequently transferred some of the Initial Transfers to the . . . UBS Defendants . . . as payment for their alleged service of the . . . Fund Defendants." *Id.* ¶ 332. The SAC describes the Subsequent Transfers as follows:

a.  UBS SA received at least $32.8 million in fees from Luxalpha for serving as the official custodian and official manager of Luxalpha from February 2004 to August 2006, and an additional $6.6 million in fees from Luxalpha for serving as the official custodian of Luxalpha from August 2006 to December 2008. UBS SA also received at least $1 million in fees from Groupement Financier for serving as the official prime bank of Groupement Financier from 2005 to December 2008, and at least $500,000 in fees from Groupement Levered for serving as the official custodian of Groupement Levered from 2005 to December 2008.

b.  UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the official administrator of Luxalpha from February 2004 to December 2008. UBSFSL also received at least $497,000 from Groupement Financier for serving as the official administrator of Groupement and Groupement Levered from 2005 to December 2008.

c.  UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the official manager of Luxalpha from August 2006 to November 2008.

*Id.* ¶ 333(a)–(c). The SAC does not allege that UBS AG received any of these transfers.

The Trustee alleges that "the *Initial Transfers* were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4)," *id.* ¶ 331 (emphasis added), but does not allege that

4

the *Subsequent Transfers* to the UBS Defendants were of customer property. While the Trustee has attached to the SAC voluminous tables setting forth the alleged Initial Transfers, he fails to identify the dates or amounts of any particular Subsequent Transfer, or to specify which, if any, of the Initial Transfers allegedly were subsequently transferred (in whole or in part) to UBS.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction" over "each defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *King Cnty. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 313 (S.D.N.Y. 2011). "Although ambiguities in the pleadings should be resolved in the plaintiff's favor, 'conclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a prima facie showing of jurisdiction.'" *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) (quoting *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010)). Moreover, "resolving all doubts in the plaintiff's favor is not the same as blindly crediting all allegations regardless of their factual support." *Melnick v. Adelson–Melnick*, 346 F. Supp. 2d 499, 502 n.17 (S.D.N.Y. 2004).

"Since *International Shoe Co. v. Washington*, the touchstone due process principle has been that, before a court may exercise jurisdiction over a person or an organization . . . that person or entity must have sufficient 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (quoting *Int. Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In a bankruptcy proceeding, the relevant forum is the United States. *See In re CIL Ltd.*, 582 B.R. 46, 70 (Bankr. S.D.N.Y. 2018). Thus, an adversary proceeding must be

5

dismissed if the plaintiff cannot demonstrate that the defendant has sufficient contacts with the United States to establish personal jurisdiction. *See In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 623 (Bankr. S.D.N.Y. 2015) (noting that "a court cannot enforce a[] . . . judgment against a foreign defendant unless the foreign defendant has the requisite minimum contacts with the United States"). The contacts of each defendant must be assessed individually, without "aggregating" the contacts of other defendants. *See Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980); *see also Langenberg v. Sofair*, 2006 WL 2628348, at *6 (S.D.N.Y. Sept. 11, 2006) (noting that the "jurisdictional requirements" of due process "must be met as to *each defendant* over whom a court exercises jurisdiction").

"In assessing whether a defendant has the requisite 'minimum contacts' with the forum, courts distinguish between 'general' and 'specific' personal jurisdiction." *SPV OSUS Ltd.*, 114 F. Supp. 3d at 167 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)). General jurisdiction "permits a court to hear 'any and all claims' against an entity" that is "'essentially at home'" in the forum. *Gucci Am.*, 768 F.3d at 134-35 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Specific jurisdiction, by contrast, permits the court to exercise jurisdiction "only over issues that 'arise out of or relate to the entity's contacts with the forum.'" *Id.* (alterations omitted) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). In either case, "[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 407 (S.D.N.Y. 2020).

The Court must dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Moreover, the allegations "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plausible claim pleads facts "that allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

While the Court must accept well-pled factual allegations as true, it need not accept assertions that are unsupported by factual allegations. *Iqbal*, 556 U.S. at 678–79. Nor must the Court accept "legal conclusion couched as a factual allegation[,]" *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely," *Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

## II.     THE COURT LACKS PERSONAL JURISDICTION OVER THE UBS DEFENDANTS

As a threshold matter, the Trustee fails to make out a prima facie case of personal jurisdiction over Defendants UBS AG, UBSFSL, and UBSTPM.[2] The SAC is rife with fatal defects, including conclusory, non-particularized jurisdictional allegations, improper group pleading of the UBS Defendants' supposed jurisdictional contacts, and an improper attempt to aggregate those contacts and impute them from one UBS entity to another. When the SAC is stripped of its conclusory rhetoric, improper group pleading, and other manifest flaws, an analysis of the relevant *facts* alleged by the Trustee demonstrates that his case for personal jurisdiction cannot withstand constitutional scrutiny as applied to any of the UBS Defendants. Accordingly, the SAC should be dismissed as against the UBS Defendants for lack of personal jurisdiction.

---

[2]   Pursuant to stipulation so-ordered by the Court on June 18, 2013, UBS Lux agreed not to contest personal jurisdiction in this action. *See* ECF No. 154. As such, insofar as the term "UBS Defendants" is employed in this section, it refers only to UBS AG, UBSTPM, and UBSFSL.

A.    **_The Trustee's Conclusory Allegations and Improper_**
      **_Group Pleading Cannot Support Jurisdiction_**

It is well-settled that mere "conclusory allegations are not enough to establish personal

jurisdiction." *M. Shanken Commc'ns, Inc. v. Variant Events, LLC*, 2010 WL 4159476, at *3

(S.D.N.Y. Oct. 7, 2010) (cleaned up); *see, e.g.*, *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181,

185 (2d Cir. 1998) (finding that "conclusory non-fact-specific jurisdictional allegations" were

insufficient to satisfy requirements of personal jurisdiction over a defendant); *Greatship (India)*

*Ltd. v. Marine Logistics Sols. (Marsol) LLC*, 2012 WL 204102, at *2 (S.D.N.Y. Jan. 24, 2012);

*Guo Jin v. EBI, Inc.*, 2008 WL 896192, at *2 (E.D.N.Y. Mar. 31, 2008); *see also, e.g., Nationwide*

*Mut. Ins. Co. v. Morning Sun Bus Co.*, 2011 WL 381612, at *4 (E.D.N.Y. Feb. 2, 2011) ("[T]he

burden was on [plaintiff] to plead facts that, if true, would provide the Court with personal

jurisdiction."). Yet despite that settled standard, the SAC is replete with such allegations as to the

UBS Defendants and the other named defendants—but it contains no *specific* factual allegations

that, if true, would support the exercise of jurisdiction over any of the individual UBS Defendants.

For example, the Trustee vaguely alleges—without further elaboration or particularization—that

"the Defendants" (a) "have or had offices in New York"; (b) "are doing or did business in New

York", and (c) "transact or transacted business in New York." SAC ¶ 22.

Courts in this and other circuits routinely dismiss claims for lack of personal jurisdiction

where the plaintiff relies only on conclusory allegations, as the Trustee does here. In *Morning*

*Sun*, for example, the court found jurisdiction lacking where the plaintiff "vaguely allege[d] that

[defendant] has employees and property in New York, and engages in business in New York, but

otherwise fail[ed] to include any detail." 2011 WL 381612, at *5. The plaintiff there could not

rely on mere "formulaic recitation of the long-arm statute" to assert jurisdiction, *id.* at *3—nor can

the Trustee rely on such allegations to support his case for personal jurisdiction here. The Trustee

cannot "simply stat[e] the standard" for establishing personal jurisdiction and then expect the court "to find, without any corroborating facts, that [defendant] by definition has the required contacts with [the forum]." *Id.* at *3; *see, e.g.*, *Fagan v. Republic of Austria*, 2011 WL 1197677, at *14 (S.D.N.Y. Mar. 25, 2011) (conclusory allegations that defendants had "offices and/or agents through which [they] advertise[d] and/or conduct[ed] business" and that they "market[ed] and promot[ed]" products and services in the forum did not support jurisdiction). The Trustee's conclusory jurisdictional allegations must be disregarded.

The SAC is also fatally flawed in another respect: many of the SAC's allegations address the "UBS Defendants" in the aggregate, in an apparent attempt to paint the purported contacts of all the UBS Defendants with a single jurisdictional brush. *E.g.*, SAC ¶ 22 ("certain of the *UBS Defendants* . . . communicated regularly with persons in New York regarding the Feeder Fund Defendants and/or BLMIS" (emphasis added)); *see id.* ¶¶ 6, 10, 12, 15, 67. Time and again, courts in this Circuit have held that such non-particularized jurisdictional allegations against a group of defendants are insufficient to establish jurisdiction. *See, e.g.*, *Rush*, 444 U.S. at 331–32 (rejecting "attempt[] to attribute [one defendant]'s contacts to [another defendant] by considering the 'defending parties' together and aggregating their forum contacts," because "[t]he requirements of *International Shoe*" must be "met as to each defendant over whom a . . . court exercises jurisdiction"); *King Cnty.*, 769 F. Supp. 2d at 315 ("*[E]ach* individual defendant must be shown to have personally engaged in relevant and intentional transactions in [the forum] to warrant the exercise of personal jurisdiction." (emphasis added)).

Finally, the Trustee alleges that the UBS Defendants have "present[ed] themselves to the public as a unified global entity," that they share a "centralized structure for core enterprise functions," and that "this organizational structure is designed to ensure UBS AG's centralized

control of global business strategy [over] UBS group companies." SAC ¶ 67. Insofar as the
Trustee intends to assert that the jurisdictional contacts of parent company UBS AG may be
imputed to subsidiaries UBSFSL and UBSTPM, that argument should be summarily rejected. The
jurisdictional acts of a parent may be imputed to a foreign subsidiary only where, as relevant here,
"the parent's control is so complete that the subsidiary is a 'mere department' of the parent,"
*Wilder v. News Corp.*, 2014 WL 1315960, at *4 (S.D.N.Y. Mar. 31, 2014) (citation omitted), and
"only if the parent company is subject to general jurisdiction in the forum," *SPV OSUS Ltd.*, 114
F. Supp. 3d at 169 (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d
117, 120 (2d Cir. 1984)). However, for the reasons described *infra*, UBS AG is not subject to
general jurisdiction in New York. The Trustee's allegations regarding UBS's "unified" corporate
structure are thus irrelevant and his attempt to subject all of the UBS Defendants to a single
(baseless) jurisdictional analysis must be rejected.

**B.**     ***The UBS Defendants Are Not Subject***
***to General Jurisdiction in this Court***

Stripped of conclusory allegations and improper group pleading, the facts alleged in the
SAC fail to make out a case for asserting general jurisdiction over any of the UBS Defendants.
The Supreme Court made clear in *Daimler*, that a corporation typically is "at home"—and thus
subject to general jurisdiction—only in its place of incorporation and its principal place of
business. 571 U.S. at 138. Only in an "exceptional case" can a corporation's operations in another
forum be "so substantial and of such a nature as to render the corporation at home in that State." *Id.*

Consistent with *Daimler*'s clear dictates, the Second Circuit and a host of other courts in
this Circuit have uniformly held that "the UBS defendants simply lack sufficient contacts with the
United States to allow the exercise of general jurisdiction." *SPV Osus Ltd. v. UBS AG*, 882 F.3d
333, 344 (2d Cir. 2018). The UBS Defendants are all foreign entities, each with principal offices

and places of incorporation abroad.  *See supra* at 3 (citing SAC ¶¶ 63, 65–66); *see also SPV Osus Ltd.*, 882 F.3d at 343.  And, while the Trustee alleges that UBS AG has "offices" in New York and conducts "daily business activities" in Connecticut, SAC ¶ 63, such alleged contacts, "at most, . . . amount to 'a substantial, continuous, and systematic course of business,' which the Supreme Court expressly held to be insufficient in *Daimler*," *SPV OSUS Ltd.*, 114 F. Supp. 3d at 168 (citation omitted); *see also In re CIL Ltd.*, 582 B.R. at 81 (holding that subsequent transferee's contacts, which included "maintain[ing] bank accounts and conduct[ing] business in the United States," were insufficient to "render it essentially at home" in the United States (citation omitted)).  The Trustee "points to nothing that would render this an exceptional case" in which a foreign corporation is "essentially at home" in the United States.  As such, "*Daimler* bars the court's exercise [of] general jurisdiction over the UBS defendants." *SPV Osus Ltd.*, 882 F. 3d at 343.

### C.    *The UBS Defendants Are Not Subject to Specific Jurisdiction in this Court*

The Trustee likewise fails to plead any valid basis for asserting specific jurisdiction over any of the UBS Defendants.  "The exercise of specific jurisdiction depends on in-state activity that '*gave rise to the episode-in-suit*.'"  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)).  Here, the Trustee's claims are based on 11 U.S.C. § 550(a)(2), which authorizes the recovery of avoidable transfers from subsequent transferees.  "Therefore, the jurisdictional analysis focuses on the Defendants' U.S. contacts related to the receipt of the . . . subsequent transfers at issue." *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018).  "Each transfer is a separate claim, and the Trustee '*must* establish the court's jurisdiction with respect to *each* claim asserted.'"  *Id.* (emphases added) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018)).

11

To establish specific jurisdiction with respect to each subsequent transfer claim, the Trustee must demonstrate that the subsequent transfer "arise[s] out of or relate[s] to" each UBS Defendant's respective contacts with the United States. *Bah v. Apple Inc.*, 2021 WL 4894677, at *2 (S.D.N.Y. July 26, 2021) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021)). As the Supreme Court recently reaffirmed in *Ford Motor*, "the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." 141 S. Ct. at 1026. Specifically, the Trustee must show that, with respect to each subsequent transfer, the UBS Defendants "engage[d] in business 'purposefully directed toward'" the United States. *Am. Girl, LLC v. Zembrka*, 2021 WL 1699928, at *6 (S.D.N.Y. Apr. 28, 2021) (quoting *Ford*, 141 S. Ct. at 1025 ("Plaintiff must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State.")); *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 112 (1987) ("The 'substantial connection' between the defendant and forum State necessary for a finding of minimum contacts must come about by *an action of the Defendant purposefully directed toward the forum State.*" (citation omitted)).

That is a burden the Trustee cannot meet. Indeed, the Trustee's case for specific jurisdiction is doomed from the start because the SAC fails even to identify the alleged subsequent transfers which he seeks to recover. It is well-established that "a plaintiff must establish the court's jurisdiction with respect to *each* claim asserted," *Charles Schwab*, 883 F.3d at 83 (emphasis added), and as applied here, this means that the Trustee must establish jurisdiction "with respect to *each* . . . of the [] subsequent transfers at issue," each of which must be treated "as separate and distinct" claim. *BNP Paribas*, 594 B.R. at 190 (citation omitted) (emphasis added). Here, however, the SAC lumps all of the alleged subsequent transfers together, broadly alleging that "the Feeder Defendants subsequently transferred *some* of the Initial Transfers to the Access Defendants

12

and UBS Defendants . . . as payment for their alleged service of the Feeder Fund Defendants," with no delineation whatsoever among each individual transfer. SAC ¶ 332 (emphasis added). The Trustee cannot possibly meet his burden of establishing jurisdiction "with respect to *each* of the claims asserted," *Charles Schwab*, 883 F.3d at 83 (emphasis added), when he has failed to identify what those claims are in the first place.

### 1.    The Trustee Identifies No Jurisdictionally Significant Contacts Between UBS AG and the United States

The SAC reflects only the most tenuous relationship between UBS AG—a foreign bank vaguely alleged to have provided services to foreign investment funds, carried out entirely abroad—and the United States, and what scant few U.S.-based contacts are asserted reflect no connection at all to any subsequent transfer, much less that such transfer "arises out of or relates to" those contacts. *Ford*, 141 S. Ct. at 1025. Specifically, the Trustee alleges that UBS AG was a "sponsor" and "promoter" of Luxalpha. SAC ¶ 168. However, the Trustee fails to explain these terms and, more importantly, alleges no *conduct* relating to those roles that occurred in the United States; in fact, the Trustee asserts that the purpose of UBS AG's role as sponsor/promoter was to help secure approval from a *Luxembourg* regulator so that Luxalpha could "operate throughout *the EU*." *Id.* ¶ 162 (emphasis added). The Trustee also alleges that UBS AG attempted to conduct due diligence of BLMIS and engaged in various internal communications surrounding this effort. *Id.* ¶ 153. But he further alleges that this due diligence work "was assigned to a UBS AG analyst *in London*" as well as that analyst's "team," *id.* (emphasis added), and does not allege that any of this activity occurred in the United States, that the team's communications were directed toward the United States, or that the alleged diligence related in any way to the transfers supposedly at issue here.

13

The one U.S.-based contact that the Trustee *does* allege with respect to UBS AG is that "all redemptions UBS SA requested for the Luxalpha fund were processed through an account held at UBS AG's Stamford, Connecticut branch." *Id.* ¶ 70. But the Trustee alleges nothing more than "mere maintenance" of the account, which is not sufficient "to support the constitutional exercise of personal jurisdiction." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). Transactions undertaken by UBS SA, the accountholder, on behalf of Luxalpha cannot be imputed as jurisdictional contacts to the bank maintaining that account, which does not "avail itself" of the benefits of its accountholder's in-state transactions. Nor does the Trustee allege that any of the proceeds of such transfers were paid to UBS AG.

Finally, and perhaps most critically, the SAC does not allege that UBS AG received even a *single* subsequent transfer at all. *See* SAC ¶ 333 (alleging subsequent transfers received by other UBS Defendants, but not UBS AG); *see also infra* Section VI. Surely, a subsequent-transfer claim must "arise out of or relate to" the receipt by the defendant of a subsequent transfer—and, here, the Trustee does not allege that UBS AG received any subsequent transfers, let alone that it received such transfers as a result of activity directed at the United States.

## 2.     The Trustee Identifies No Jurisdictionally Significant Contacts Between UBSTPM and the United States

The Trustee likewise fails to connect UBSTPM's conduct to the United States or explain how any subsequent transfer allegedly received by UBSTPM "arises out of or relates to" such conduct. The Trustee alleges only that UBSTPM—a Luxembourg entity—was Luxalpha's "nominal portfolio manager," but that it did not actually perform any management functions. SAC ¶¶ 69, 206–07. In other words, the Trustee alleges that UBSTPM did not engage in any actual conduct that relates to the claims against it. *A fortiori*, there are no allegations that UBSTPM engaged in any jurisdictionally relevant contacts with the United States.

14

Moreover, while UBSTPM (unlike UBS AG) is alleged to have received subsequent transfers, it is not alleged to have received any funds in the United States—and, indeed, is not alleged to have even maintained any bank or brokerage accounts in the United States—meaning that it could not possibly have received subsequent transfers in the United States.  Furthermore, UBSTPM is not itself a fund that "transferr[ed] assets to and from the United States" in order to invest with BLMIS.  *See Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 118 (Bankr. S.D.N.Y. 2011).  To the contrary, the SAC alleges that the UBS Defendants rejected BLMIS as an investment vehicle for their clients.  *See* SAC ¶ 140.  Thus, this is not a case like *Maxam Absolute Return Fund*, in which the subsequent transferee's indirect investments into BLMIS and withdrawals of its own assets from BLMIS—effected through another fund that held a BLMIS account—were the very U.S. contacts out of which the Trustee's subsequent-transfer claim arose. 460 B.R. at 118.  Nor is this a case like *Picard v. Bureau of Lab. Ins. (In re Madoff)*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012), where the subsequent transferee had not only received subsequent transfers but itself "invested tens of millions of dollars" in a BLMIS feeder fund "with the specific purpose of having funds invested in BLMIS in New York."  *Id.* at 517.  In concluding that the transferee's conduct supported the exercise of jurisdiction, the court reasoned that the transferee had "purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in [the feeder fund] would be transferred to BLMIS in New York to be invested in the New York securities market." *Id.*  UBSTPM made no such investments in a feeder fund, much less to the tune of "tens of millions of dollars."  *Id.*  Put simply, UBSTPM's activities (if any) are far too attenuated from the United States and from the subsequent transfers themselves to support the exercise of specific jurisdiction over it.

15

### 3.    The Trustee Identifies No Jurisdictionally Significant Contacts Between UBSFSL and the United States

The Trustee's jurisdictional allegations against UBSFSL similarly falter.  The Trustee alleges that UBSFSL, in its capacity as administrator for Luxalpha and Groupement, was "responsible for accounting functions," including calculating the funds' net asset value, handling subscription and redemption requests (for Groupement), keeping the shareholder registers, communicating with investors, and preparing the funds' financial statements.  SAC ¶¶ 72, 136, 200.  None of these tasks is alleged to have been performed in or directed to the United States.

The Trustee also alleges that UBSFSL received subsequent transfers of fees for the services it allegedly performed for the Fund Defendants.  *Id.* ¶ 333.  But as with UBSTPM's alleged subsequent transfers, *see supra* at 14–16, the subsequent transfers to UBSFSL were effectuated exclusively between foreign entities and are not alleged to have touched the United States in any way.  As also was the case with UBSTPM, *see id.*, the Trustee does not allege that UBSFSL received any funds in the United States, nor that UBSFSL is itself a fund that "transferr[ed] assets to and from the United States" in order to invest with BLMIS.  *Cf. Maxam Absolute Return Fund*, 460 B.R. at 118; *Bureau of Lab. Ins.*, 480 B.R. at 517.  UBSFSL's contacts with the United States are far too tenuous—indeed, non-existent—to support specific jurisdiction over it.

\*   \*   \*

The Trustee falls far short of his burden to allege that the UBS Defendants had contacts with the United States that gave rise or relate to the subsequent transfers they allegedly received. To subject the UBS Defendants to jurisdiction under these circumstances would be to hale them into court based on "random, fortuitous, or attenuated contacts," *Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*, 2021 WL 3477479, at *13 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, J.)—the very danger that the "stringent" requirements of specific jurisdiction are designed to guard against,

*McGraw-Hill Glob. Educ. Holdings v. Khan*, 323 F. Supp. 3d 488, 495 (S.D.N.Y. 2018) (citation

omitted).  The SAC should be dismissed against the UBS Defendants for lack of jurisdiction.

III.    **THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF
THE ALLEGED INITIAL TRANSFERS MADE MORE
THAN TWO YEARS BEFORE THE FILING DATE**

The Trustee's sole claim against the UBS Defendants is to recover subsequent transfers

pursuant to 11 U.S.C. §§ 105(a) and 550(a).  But the Trustee may recover subsequently transferred

property, or its value, only to the extent that the initial transfer of such property by the debtor is

avoided under the Bankruptcy Code's avoidance provisions.  11 U.S.C. § 550(a).  "The Code sets

out a number of limits on the exercise of these avoiding powers," including the securities safe

harbor of Section 546(e).  *Merit Mgmt. Grp. v. FTI Consulting*, 138 S. Ct. 883, 889 (2018).  That

safe harbor bars the Trustee's claims here.

Section 546(e) bars a trustee from avoiding a transfer (other than under section

548(a)(1)(A), which has only a two-year lookback period) if the transfer, *inter alia*, (1) was made

by or to a covered entity such as a stockbroker, financial institution, or financial participant; and

(2) was either a settlement payment or a transfer in connection with a securities contract:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer that is a . . . settlement payment, as defined in
> section 101 or 741 of this title, made by or to (or for the benefit of) a . . .
> stockbroker, financial institution, [or] financial participant, . . . or that is a transfer
> made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or]
> financial participant, . . . in connection with a securities contract, as defined in
> section 741(7), . . . that is made before the commencement of the case, except under
> section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

"[I]n enacting the Bankruptcy Code, Congress struck careful balances between the need

for an equitable result for the debtor and its creditors, and the need for finality."  *Picard v. Ida

Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir.

2014).  "[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A)."  *Id.*  "Unwinding settled securities transactions . . . would seriously undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract capital."  *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) ("***Tribune I***").  "Permitting the clawback of millions, if not billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder funds—would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)."  *Fishman*, 773 F.3d at 420.

In an action to recover a subsequent transfer, the subsequent transferee may assert any defenses to avoidability of the initial transfer the initial transferee could have asserted, including section 546(e).  *See Fairfield*, 2021 WL 3477479, at *3.  Although section 546(e) is an affirmative defense, a court can dismiss a complaint based on section 546(e) if its applicability is established on the face of the complaint or documents that are incorporated by reference into, or integral to, the complaint.  *See id.* at *2.

A.    ***The Alleged Initial Transfers Were Made by or to a Covered Entity***

The alleged initial transfers at issue here were made by or to an entity covered by section 546(e), both because those transfers were made *by* a "stockbroker" and because they were made *to* a "financial institution."  Either of those facts alone is sufficient to compel dismissal.[3]

---

[3]  UBS reserves for later consideration, if necessary, the questions of (1) whether the transfers were made "for the benefit of" a financial institution because any alleged transfers to the Fund Defendants were ultimately made to satisfy redemptions made by the funds' investors, which were financial institutions, *see SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("***Cohmad***"); and (2) whether the transfers were "made by or to (or for the benefit of) a . . . financial participant," 11 U.S.C. § 546(e).

### 1.    The Alleged Initial Transfers Were Made by a Stockbroker

The Bankruptcy Code defines "stockbroker" to include entities that "engage[ ] in the

business of effecting transactions in securities."  11 U.S.C. § 101(53A).  The District Court in

*Fishman* has already concluded that BLMIS was a stockbroker:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC,
> clearly engaged in securities transactions. . . .  [E]ven assuming the truth of the
> allegation that Madoff Securities' investment advisory division never traded
> securities on behalf of clients, ***Madoff Securities nonetheless qualifies as a
> stockbroker by virtue of the trading conducted by its market making and
> proprietary trading divisions***.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (emphasis added),

*aff'd*, 773 F.3d 411.  On appeal, the Second Circuit affirmed the District Court's holding: "It is not

disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)."  773 F.3d

at 417.  These findings are binding on the Trustee in this proceeding under the doctrine of collateral

estoppel.  *See Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x 52, 54

(2d Cir. 2008) ("[I]f a litigant has had an opportunity to fully and fairly litigate an issue and lost,

then third parties unrelated to the original action can bar the litigant from relitigating that same

issue in a subsequent suit.").

Because BLMIS is a "stockbroker," transfers made by BLMIS, including the Initial

Transfers to Luxalpha and Groupement alleged in the SAC, were made by a covered entity under

section 546(e).  The Court can end its "covered entity" analysis here because the fact that the

alleged Initial Transfers were made by a stockbroker satisfies that requirement.  However, there

are additional and independently sufficient routes to the same conclusion.

### 2.    The Alleged Initial Transfers Were
### Made to a Financial Institution

Section 101(22) of the Bankruptcy Code defines "financial institution" to include not only

"an entity that is a commercial or savings bank," but also the customer of such a bank "when [the

bank] is acting as agent or custodian for a customer . . . in connection with a securities contract."
11 U.S.C. § 101(22)(A).  As alleged by the Trustee, Luxalpha and Groupement Financier are
"financial institutions" because they were customers of UBS, which acted as their agent in
connection with the securities contracts with BLMIS.

The SAC alleges that UBS is a commercial or savings bank, that UBS SA acted as
Luxalpha's agent, and that "the UBS Defendants" acted as Luxalpha's and Groupement
Financier's agents.  *First*, the SAC alleges that UBS (including specifically UBS SA) is a
commercial or savings bank.  *See* SAC ¶ 72 ("UBS SA served as Defendant Groupement
Financier's prime bank"); *id.* ¶ 168 (referring to UBS AG and UBS SA as "a highly capitalized,
stable bank"); *id.* ¶ 171 (referring to "UBS" as "a large, reputable, international bank").

*Second*, the SAC alleges that UBS acted as the Fund Defendants' agent.  The Second
Circuit has applied the common-law definition of "agency" for purposes of 101(22)(A) and 546(e):

> Agency is the fiduciary relationship that arises when one person (a "principal")
> manifests assent to another person (an "agent") that the agent shall act on the
> principal's behalf and subject to the principal's control, and the agent manifests
> assent or otherwise consents so to act. . . . Establishment of an agency relationship
> requires facts sufficient to show (1) the principal's manifestation of intent to grant
> authority to the agent, and (2) agreement by the agent. In addition, the principal
> must maintain control over key aspects of the undertaking.

946 F.3d at 79 (cleaned up).

As to Luxalpha, the SAC alleges that "UBS SA . . . executed the BLMIS account opening
documents . . . on behalf of Luxalpha, ***and as its agent***," SAC ¶ 125 (emphasis added), and that
"UBS SA formally served as Luxalpha's custodian," *id.* ¶ 126.  As to Groupement Financier, the
SAC alleges that "[t]he . . . ***UBS Defendants were*** Luxalpha's and ***Groupement Financier's***
***agents*** . . . ," *id.* ¶ 323 (emphasis added), that "UBS SA was Groupement Financier's official prime
bank," *id.* ¶ 136, that "UBSFSL served as Groupement Financier's . . . official administrator and
was responsible for accounting functions, keeping the register of shareholders, handling

20

subscriptions and redemptions, communications with investors, and preparations of financial statements for the funds," *id.*, and that "Groupement Financier . . . [was] formally managed and supervised by UBS SA and UBSFSL," *id.* ¶ 138.

*Third*, the SAC alleges that the agency relationship between UBS and the Fund Defendants was in connection with a securities contract. As to Luxalpha, the SAC alleges that "UBS SA . . . executed the BLMIS account opening documents, including a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities (collectively, 'BLMIS Account Opening Agreements') on behalf of Luxalpha, and as its agent." SAC ¶ 125. Further, the SAC alleges that Groupement Financier entered into the same "BLMIS Account Opening Agreements," *id.* ¶ 135, and "[e]ngaged UBS as a [s]ervice [p]rovider," *id.* at 31. As discussed in Section III(B)(1) *infra*, the BLMIS Account Opening Agreements were "securities contracts" for purposes of section 546(e).

Thus, because the SAC alleges that UBS was acting as agent for its customers Luxalpha and Groupement Financier in connection with securities contracts, transfers made by BLMIS to Luxalpha and Groupement Financier were made to a "financial institution"—a covered entity under section 546(e). This is an independent basis to meet the "covered entity" requirement under 546(e). *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir. 2021) ("***Tribune II***") ("Tribune entered into an agreement with CTC whereby CTC was hired to be a steward of Tribune's money . . . . It was clearly acting on behalf of Tribune, which is enough to satisfy § 546(e)."), *cert. denied*, 2022 WL 516021 (U.S. Feb. 22, 2022).

**B.    *The Alleged Initial Transfers Were Settlement Payments
Made in Connection with a Securities Contract***

**1.    The Alleged Initial Transfers Were Settlement Payments
Made in Connection with BLMIS Securities Contracts**

Section 546(e) applies to transfers from BLMIS to its account holders and shields them
from avoidance, both because the documents governing BLMIS customers' accounts constituted
securities contracts, and because the payments BLMIS made to those customers were made "in
connection with" those contracts and also constituted "settlement payments." *Fishman*, 773 F.3d
at 417, 418–23.  Either of those reasons would suffice to invoke the safe harbor.

A "securities contract" includes "a contract for the purchase, sale, or loan of a security,"
11 U.S.C. § 741(7)(A)(i), as well as "any other agreement or transaction that is similar to an
agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii); *see also
Fishman*, 773 F.3d at 417 (section 741(7) "defines 'securities contract' with extraordinary
breadth").  The SAC defines "BLMIS Account Opening Agreements" to include "a Customer
Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of
Securities and Options," all of which qualify as "securities contracts."  *See* SAC ¶ 125.

In *Fishman*, the Second Circuit held that section 546(e) shielded transfers between BLMIS
and its account holders from the Trustee's avoidance powers. 773 F.3d at 417.  The Second Circuit
concluded that the documents governing BLMIS customers' accounts—the same documents
described in the SAC—constituted securities contracts, and that the payments BLMIS made to
those customers were made "in connection with" those contracts, and also constituted "settlement
payments," *id*. at 418–23, though either of those findings would have sufficed to invoke the safe
harbor.  The Court rejected the Trustee's argument that the safe harbor did not apply because
Madoff allegedly did not actually carry out the promised securities transactions.  *Id*. at 419–20

("Section 546(e) only requires that a covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities transaction.").

**2.    The Alleged Initial Transfers Were Made in
Connection with Other Securities Contracts**

Even if the BLMIS Account Opening Agreements did not constitute "securities contracts" for purposes of section 546(e)—which they clearly do—the alleged initial transfers are still shielded from avoidance under 546(e) because they were made in connection with the Fund Defendants' securities contracts with their own investors, including investment fund subscription agreements and redemption requests tendered pursuant thereto.

Section 546(e) applies to all transfers made "in connection with a securities contract," not just to a transfer in connection with a securities contract that is entered into between the initial transferor and transferee. If the Fund Defendants withdrew funds from BLMIS to make payments pursuant to redemption requests or the terms of subscription agreements between them and their respective investors, then the withdrawals from BLMIS also would be a transfer made in connection with the securities contracts between the Fund Defendants and their investors, and therefore would not be avoidable. As Judge Rakoff stated:

> Take, for example, a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract. Assuming that either the investment fund or the investor qualifies as a financial institution or financial participant, and barring other circumstances that may appear on the facts of a given case, that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

*Cohmad*, 2013 WL 1609154, at *9 (footnote omitted); *see Fishman*, 773 F.3d at 422 ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided.").

23

The Fund Defendants entered into "securities contracts" with their investors pursuant to which the transfers were made to the Fund Defendants, then to the investors, and the Fund Defendants' relationships with their investors—including in respect of redemption payments—were governed by subscription agreements and associated redemption requests. *See* SAC ¶ 2 (alleging that "Luxalpha and Groupement Financier were among the feeder funds . . . established to direct investors into BLMIS"). The definition of "securities contract" includes "a contract for the purchase, sale, or loan of a security" or "any other agreement or transaction that is similar" to such an agreement. 11 U.S.C. § 741(7)(A)(i)(vii); *see also* Section III(B) *supra* (discussing breadth of "securities contract" definition). "The term 'redemption,' in the securities context, means 'repurchase.'" *Tribune I*, 946 F.3d at 80. And as Judge Rakoff expressly noted in *Cohmad*, "the definition of a securities contract . . . includes . . . investment fund subscription agreements and redemption requests." *Cohmad*, 2013 WL 1609154, at *8. Thus, the Fund Defendants' agreements with their investors were "securities contracts," and any transfers from BLMIS to the Fund Defendants were made "in connection with" those securities contracts.

### C.    *Any Transfers Pre-Dating the Two-Year Pre-Filing Period are Time-Barred*

Exhibits B and C to the SAC set forth the alleged Initial Transfers, separated into the "Two Year Transfers" and the "Six Year Transfers." Under section 548(a)(1)(A), a trustee may avoid only transfers made within two years before the Filing Date. Any transfer made before that date is protected by section 546(e) and may not be avoided as a matter of law.[4]

Thus, section 546(e) bars avoidance and recovery of "at least $32.8 million in fees from Luxalpha" allegedly received by UBS SA for serving as the official custodian and official manager

---

[4] As discussed in Section IV *infra*, the section 546(e) safe harbor shields even those Initial Transfers made within two years of the Filing Date because the SAC fails to allege actual fraudulent intent as required by section 548(a)(1)(A) and Rule 9(b).

of Luxalpha from February 2004 to August 2006.  SAC ¶ 333(a).  Moreover, there clearly are other

fees allegedly paid to the UBS Defendants that pre-date the two-year period before the Filing Date,

even though the SAC fails to identify the specific dates on which transfers were allegedly made.

*See* SAC ¶ 333 (alleging various fees paid beginning, respectively, in "August 2006," "2005," and

"February 2004").  And, as discussed below, even if any of the alleged subsequent transfers to

UBS were of funds initially transferred to the Fund Defendants within two years of the Filing Date,

such transfers are not recoverable by the Trustee because they were not "customer property."

### D.    *Section 546(e) Does Not Contain a "Knowledge" Exception*

The Trustee may argue that section 546(e)'s safe harbor does not apply because the Fund

Defendants and/or UBS knew there was no actual "settlement payment" or "securities contract"

for any of Madoff's fictitious trading.  *See Cohmad*, 2013 WL 1609154, at *3.  This argument fails

because section 546(e) contains no such "knowledge" exception and, even if it did, the SAC fails

to allege that the Fund Defendants and/or UBS had *actual* knowledge of Madoff's scheme.

*First*, as noted above, even if there was no actual securities contract between BLMIS and

the Fund Defendants, there still were securities contracts between the Fund Defendants and their

investors, and there is no allegation that those securities contracts were not real.  Thus, even if the

Fund Defendants, as initial transferees, knew that BLMIS was not trading securities, if they

withdrew funds from BLMIS to make payments under securities contracts with their investors,

then—as Judge Rakoff ruled in *Cohmad*—the withdrawal from BLMIS would be a transfer made

in connection with the securities contract between the initial transferee (the Fund Defendants) and

a subsequent transferee (the investors) and would not be avoidable.  2013 WL 1609154, at *7.

*Second*, while the Trustee alleges that the Fund Defendants and UBS *should have known*

of BLMIS's fraud, he fails to allege that the Defendants *actually* knew of the fraud.  *See*

SAC ¶¶ 123–213.  For example, the SAC alleges that "UBS established Luxalpha and Groupement

Financier despite overwhelming evidence of fraud at BLMIS," *id.* at 28, and "despite knowing of

. . . concerns . . . and despite many other persistent warnings of fraud at BLMIS," *id.* ¶ 130—

allegations that merely point to risks involved with investing in BLMIS, not to *actual knowledge*

that BLMIS was conducting a multi-billion dollar Ponzi scheme.  Similarly, the Trustee alleges

that because certain UBS entities previously decided not to invest with BLMIS, this must be

indicative of actual knowledge of BLMIS's fraud.  *Id.* ¶¶ 140–47.  Of course, the mere fact that

UBS itself had different investment risk tolerances relative to those of the Fund Defendants says

nothing about whether the UBS Defendants *knew* that BLMIS was running a multi-billion dollar

Ponzi scheme.  *See, e.g.*, *In re Merkin*, 817 F. Supp. 2d 346, 357 (S.D.N.Y. 2011) (holding that

"allegations of Madoff-related red flags do not adequately plead scienter"), *vacated in part on*

*other grounds*, 2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015).

Moreover, while the Trustee attempts to ascribe ill intent to UBS obtaining indemnification

in connection with services performed for Luxalpha, *id.* ¶¶ 156–61, such a practice is prudent and

generally the market standard, *see, e.g.*, *Hydro-Dyne, Inc. v. Ecodyne Corp.*, 812 F.2d 1407 (table),

1987 WL 36573, at *12 (6th Cir. 1987) (Boggs, J., dissenting) (describing indemnity agreements

as "commonplace for numerous commercial transactions" because "[t]hey seek to assign

anticipatable risks of loss to one or both parties, for commercial convenience in allocating

transaction costs"); *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1194 n.4 (11th

Cir. 2001) ("broad language is commonly found in indemnification provision").  And while the

Trustee alleges that UBS violated its own internal policies, *id.* ¶¶ 162–79, and applicable

Luxembourg and French law, *id.* ¶¶ 180–213, in its dealings with BLMIS, even accepting such

baseless allegations as true for purposes of this motion, a violation of internal policy or applicable

law does not equate to knowledge of the BLMIS scheme.  *See BNP Paribas*, 594 B.R. at 199

("[a]lthough these allegations . . . imply that [defendants] were willing to overlook legal and regulatory violations to make more money, they do not support the inference that those Defendants believed there was a high probability that BLMIS was not actually trading securities").

The Trustee alleges that UBS "complied with Madoff's demand for secrecy" by omitting Madoff's name from certain documents and reports. *Id.* ¶¶ 280–81. However, according to the Trustee's own allegations, this practice was done at Madoff's insistence: "Madoff insisted that his name not appear in any official offering document," and "Madoff's name was not allowed to appear as the custodian, primary broker, or manager for any fund." *Id.* ¶¶ 276–77. The Trustee also implies that Madoff's refusal to meet with UBS analysts, and other unanswered questions, somehow show that UBS must have known about the fraud, *id.* ¶¶ 153–54, but the SAC explains that Madoff justified his refusal to meet by explaining that "if he meets with one client he would be obligated, perhaps even from a regulatory standpoint . . . , to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it," *id.* ¶ 154. These allegations barely qualify as suspicious, much less that any UBS Defendant had actual knowledge of the Madoff fraud.

Further, the Trustee alleges that Defendants were aware of certain market impossibilities with BLMIS's purported trades, and that a number of "unusual" practices and "other indicia of fraud" should have revealed the fraud to the Defendants. *Id.* ¶¶ 219–314. Again, alleging that there were purported "red flags" that supposedly should have alerted Defendants to BLMIS's fraud falls far short of alleging that Defendants had *actual knowledge* of Madoff's scheme such that they knew there were no bona fide "securities contracts" for purposes of 546(e).

*Third*, nothing in section 546(e) turns on the knowledge of the transferee. The only exception to section 546(e) is a claim under section 548(a)(1)(A), which involves actual fraudulent

intent by the *transferor*. *See Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant") (citations omitted). Nor does knowledge play any role in the definitions of "settlement payment" or "securities contract." 11 U.S.C. § 741(7), (8). Where the Bankruptcy Code creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional exceptions, even when doing so is motivated by a party's alleged wrongdoing. *See Law v. Siegel*, 571 U.S. 415, 424–25 (2014). Courts must adhere to the statute's "plain meaning." *Merit*, 138 S. Ct. at 897. Permitting transferee knowledge to defeat the safe harbor would be inconsistent with the language and purpose of section 546(e), which reflects a balancing of interests by Congress to avoid "undermin[ing] . . . markets" by "[u]nwinding settled securities transactions." *Tribune I*, 946 F.3d at 90.

IV.     **THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF THE REMAINING ALLEGED INITIAL TRANSFERS**

While section 546(e) bars the Trustee from avoiding all transfers other than actual fraudulent transfers under section 548(a)(1)(A) made within the two-year lookback period, the Trustee has failed to allege actual fraudulent intent, and the so-called "Ponzi scheme presumption" does not cure the pleading deficiencies.

A.     ***The Trustee Has Failed to Allege Actual Fraudulent Intent as Required by Section 548(a)(1)(A) and Rule 9(b)***

The sole statutory exception to the section 546(e) safe harbor is for transfers avoidable under section 548(a)(1)(A), which has a two-year lookback period. "[W]here § 546(e) applies to the Trustee's claims, the Trustee may only proceed insofar as he seeks to recover those subsequent transfers under § 550(a) as to which he could have avoided the initial transfer under § 548(a)(1)(A)." *Fairfield*, 2021 WL 3477479, at *4. The Trustee, however, has failed to plead

28

the avoidability of any initial transfers under section 548(a)(1)(A), and cannot salvage any part of

his claims from the section 546(e) bar.

Section 548(a)(1)(A) requires the Trustee to plead that BLMIS "made" each "transfer"

challenged under that provision "with actual intent to hinder, delay, or defraud any entity to which

the debtor was or became" indebted "on or after the date that such transfer was made."  Because

"'actual intent to hinder, delay or defraud' constitutes fraud, it must be pled with specificity, as

required by Fed. R. Civ. P. 9(b)."  *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp*

*Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted); *see also Off. Comm. of Unsecured*

*Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 459–60 (Bankr.

S.D.N.Y. 2006).  Under Rule 9(b), "conclusory allegations that do not evidence fraudulent intent

with respect to the specific transfers challenged do not suffice," even if "combined with . . .

allegations [about] an alleged overall pattern of inappropriate transfers."  *Id.* at 468 (internal

quotation marks omitted).

The SAC lacks any allegations which, if proved, would establish that in making any of the

alleged Two Year Transfers, BLMIS acted with the requisite intent to "hinder, delay or defraud"

creditors, as opposed to merely honoring its contractual commitments to the Fund Defendants.[5]

The Trustee has pled nothing about BLMIS's intent in making *any* (much less *each*) of the

"specific transfers challenged" here, *id.*, and therefore fails to plead avoidability based on actual

intent to defraud at all, let alone with the particularity Rule 9(b) requires.

---

[5]   For example, because transfers intended to return capital to the Fund Defendants or to satisfy an antecedent debt
to them would not have been made with the "actual intent to hinder, delay or defraud" creditors, 11 U.S.C.
§ 548(a)(1)(A), merely alleging that BLMIS paid money to the Fund Defendants is insufficient to establish an
actually fraudulent transfer.  Such a pleading deficiency is even more egregious here, where the SAC establishes
that the Fund Defendants were "net losers" in BLMIS's scheme.  *See* SAC ¶¶ 326–27 (alleging that Fund
Defendants invested approximately $2 billion but received only $1.1 billion); *cf. In re Bernard L. Madoff Inv.
Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011) (adopting Trustee's Net Investment Method, pursuant to which net
losers are afforded priority over net winners).

**B.**    ***The Trustee Should Not Be Permitted to Rely on the
Ponzi Scheme Presumption to Avoid His Pleading Burden***

Rather than actually pleading facts establishing the fraudulent intent behind each initial transfer, as required by section 548(a)(1)(A), the Trustee apparently relies upon the presumption "that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt." *Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 201 (2d Cir. 2021) (Menashi, J., concurring) ("***Citibank***"); *see* SAC ¶ 42. Although the unchallenged application of the Ponzi scheme presumption has been accepted by this Court and the District Court in actions commenced by the Trustee, Judge Menashi's recent concurring opinion in *Citibank* makes clear that the issue is not settled at the Circuit level,[6] and explains that there are several cogent reasons why the Ponzi scheme presumption represents a "questionable" application of fraudulent transfer statutes. *Id*. at 202.

*First*, section 548(a)(1)(A) does not even mention Ponzi schemes, much less authorize courts to relax the Trustee's pleading burden in such cases.

*Second*, fraudulent transfer cases warrant an "asset-by-asset and transfer-by-transfer" inquiry—one that requires proof of "the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer"—because the statutory focus is "on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (construing Minnesota UFTA provision that is virtually identical to section 548(a)(1)(A)); *see also Citibank*, 12 F.4th at 201 (Menashi, J., concurring).

---

[6]    Although the Second Circuit has on occasion applied the presumption "when its application was uncontested," *Citibank*, 12 F.4th at 202 n.7 (Menashi, J., concurring), it has not sanctioned use of the presumption in any case where the issue was litigated.  Nor has the Supreme Court recognized the presumption.

*Third*, the Ponzi scheme presumption "improperly treats preferences as fraudulent transfers," thereby "obscur[ing] the essential distinction between fraudulent transfers and preferences." *Citibank*, 12 F.4th at 201–02; *accord Lustig v. Weisz & Assocs. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001). While "fraudulent transfer law prevents preinsolvency transfers to non-creditors or colluding creditors," "preference provisions, by contrast, . . . serve the policy of equality of distribution among creditors," yet the presumption "uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors." *Citibank*, 12 F.4th at 201–02 (cleaned up); *see Unified*, 260 B.R. at 350 ("fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress").

*Fourth*, the Ponzi scheme presumption conflicts with Rule 9(b), which requires particularity in pleading how each transfer was made with actual intent to defraud. *See*, *e.g.*, *Sharp*, 403 F.3d at 56. If such exceptions are to be created, Congress—not the courts—should create them. *See Unified*, 260 B.R. at 350, *cited in Citibank*, 12 F.4th at 202 (Menashi, J., concurring).

Without the Ponzi scheme presumption, the SAC alleges nothing whatsoever about BLMIS's intent in making specific "Two Year Transfers"—and certainly not that they were made with the requisite actual fraudulent intent. Accordingly, as demonstrated by application of Judge Menashi's analysis in *Citibank* to the facts alleged here, the Trustee patently has not adequately pled fraudulent intent, and his section 548(a)(1)(A) claims should be dismissed.

## V.    THE SAC ESTABLISHES UBS'S GOOD-FAITH DEFENSE

The Trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b). The SAC

establishes UBS's good faith defense because a diligent inquiry would not have discovered the

fraudulent purpose of BLMIS's alleged transfers.

A.    *Value*

For purposes of the good faith defense, "value" is merely consideration and need not be

reasonably equivalent:

> The "value" required to be paid by the secondary transferee is merely consideration
> sufficient to support a simple contract, analogous to the "value" required under state
> law to achieve the status of a bona fide purchaser for value. There is no requirement
> that the value given by the transferee be a reasonable or fair equivalent. The term
> "value" in this subsection is different from and does not mean value to the debtor.

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021) (footnotes omitted).

Payment received for services is equivalent to "satisfaction or securing of a present or

antecedent debt." 11 U.S.C. § 548(d)(2)(A); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307–08

(S.D.N.Y. 2001) (mortgage brokerage provided "reasonably equivalent value" by originating

mortgages and soliciting additional investors, even for alleged Ponzi scheme); *see also Greenspan*

*v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318,

341 (Bankr. N.D. Cal. 2009) ("A transfer is for value if one is the quid pro quo of the other.").

Thus, because the UBS Defendants provided services to the Fund Defendants, and the Trustee

does not allege that such services lacked value, any Subsequent Transfers received by the UBS

Defendants were in exchange for value.

B.    *Good Faith*

The Second Circuit in *Citibank* recently set forth a three-step inquiry for establishing a

good-faith defense. 12 F.4th at 191–92. A court must examine (1) "what facts the defendant knew;

this is a subjective inquiry and not a theory of constructive notice," (2) "whether these facts put

the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether

the facts the transferee knew would have led a reasonable person in the transferee's position to

32

conduct further inquiry into a debtor-transferor's possible fraud," and (3) "whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer." *Id.* (cleaned up). Thus, under *Citibank*, even if the transferee (1) knew actual facts that (2) would put it on inquiry notice of the fraudulent purpose underlying the transaction or transfer, the transferee still takes the transfer in good faith if (3) a diligent inquiry would not have discovered the fraudulent purpose of the transfer. As the face of the SAC establishes, such is the case here because a diligent inquiry would not have enabled UBS to discover the fraudulent purpose of BLMIS's transfers.

The Trustee alleges various purported "red flags" that he claims should have alerted investors to the fraudulent purposes of BLMIS's transfers to the Fund Defendants. For instance, the Trustee alleges that consultants and market analysts at various times raised questions about BLMIS's trading and reporting practices. *See, e.g.*, SAC ¶¶ 141, 153, 219. But these allegations amount to, at most, a lack of transparency at BLMIS, potential self-dealing, improper trading activities, and deviations from utilizing the SSC trading strategy. None of the inquiries resulting from such questions led to discovery of the BLMIS fraud. Meanwhile, thousands of market participants with varying degrees of sophistication conducted their own diligence and invested with BLMIS, either directly or through funds, all while BLMIS was subject to stringent SEC regulatory oversight and was even investigated by the SEC on a number of occasions—yet never charged with any impropriety. *See supra* at 3–4.

Moreover, even if UBS actually knew some of these purported facts (as opposed to having merely constructive knowledge, the standard rejected in *Citibank*), and even if those facts would have put UBS on inquiry notice, the SAC establishes that even upon a diligent inquiry, investors could not have discovered the fraudulent purpose of the transfers. As an initial matter, Madoff successfully deployed practices that prevented even the most sophisticated investigators from

33

uncovering his scheme.  For example, in the SEC Complaint filed against Madoff, No. 08-civ-
10791, ECF No. 1 (S.D.N.Y. Dec. 11, 2008), the SEC alleged that "Madoff ran his investment
adviser business from a separate floor in the New York offices of BMIS," *id.* ¶ 16, "kept the
financial statements for the firm under lock and key, and was 'cryptic' about the firm's investment
advisory business when discussing the business with other employees of BMIS," *id.* ¶ 17.  These
allegations are consistent with those in the SAC and demonstrate that even a diligent inquiry would
not have led to discovery of BLMIS's fraud.

Indeed, even a comprehensive SEC investigation failed to uncover BLMIS's fraud and
merely led the SEC to impose additional compliance measures.  In pleadings filed in related
adversary proceedings, the Trustee has alleged that "[t]he SEC collected documents from Madoff
in June 2005," *Picard v. Fairfield Sentry Limited*, No. 09-01239, ECF No. 286, *Second Amended
Complaint* ¶ 239 (Bankr. S.D.N.Y. Aug. 28, 2020), and "[i]n 2006, the SEC began an investigation
into allegations that BLMIS may have been a Ponzi scheme or illegally front-running the market,"
*id.*, ECF No. 23, *Amended Complaint* ¶ 351 (Bankr. S.D.N.Y. Jul. 20, 2010), but that ultimately,
Madoff's "scheme to defraud the SEC succeeded" and "the SEC closed any further investigation
of BLMIS," *id.* ¶ 361; *see* SAC ¶ 39 ("BLMIS did not register as an investment adviser with the
SEC until 2006, following an investigation by the SEC, which forced Madoff to register.").  The
SEC's failure to uncover the scheme—even with its powerful investigative tools, expansive
subpoena powers, and substantial resources—establishes that any further diligent inquiry by the
UBS Defendants would not have discovered the fraud.

Moreover, the Trustee alleges that the Defendants actually *did* conduct diligent inquiries,
yet their investigations did not uncover BLMIS's multi-billion dollar Ponzi scheme.  The Trustee
alleges that Access first investigated the BLMIS options trading activity, merely leading to

unanswered questions regarding BLMIS's fidelity to the SSC trading strategy, and not unearthing any fraud. *Id.* ¶¶ 221–23. Next, Access allegedly hired Chris Cutler, a third-party consultant, to review BLMIS's activities. *Id.* ¶ 224. Rather than discovering a fraudulent scheme, Cutler ultimately determined that BLMIS was making either "extremely sloppy errors" or "serious omissions in tickets," *id.* ¶ 235, a far cry from discovering the expansive and multi-decade Ponzi scheme actually perpetrated by Madoff.

Accordingly, because the Trustee's own allegations establish that a diligent inquiry would not have enabled the UBS Defendants to discover the fraudulent purpose of the BLMIS transfers, the SAC establishes the UBS Defendants' good faith defense.

## C.    *Without Knowledge of Voidability*

In applying this element of the good faith defense, the Court must test a subsequent transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer. *Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*, 803 F.3d 835 (7th Cir. 2015). Courts construe "without knowledge of the voidability of the transfer" the same as good faith, so a transferee who is found to be in good faith is also found to be without knowledge of voidability. As Judge Rakoff noted, "[i]n light of the legislative history, the most plausible reading is that this third requirement is merely one specific type of subjective knowledge required." *Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014), *disapproved of on other grounds sub nom. Citibank*, 12 F.4th 171 (2d Cir. 2021). Thus, this element of the good faith defense is also met.

## VI.    THE SAC DOES NOT PLAUSIBLY ALLEGE THAT UBS RECEIVED BLMIS CUSTOMER PROPERTY

Finally, even if the Initial Transfers to the Fund Defendants were subject to avoidance, the Subsequent Transfers to UBS are not recoverable because the SAC does not plausibly allege that the Subsequent Transfers were transfers of BLMIS customer property.

Under section 550(a)(2), a trustee may recover from a subsequent transferee only the property that was transferred in the initial transfer or its value. A trustee may not recover proceeds of the transferred property. *Rajala v. Spencer Fane LLP (In re Generation Res. Holding Co.)*, 964 F.3d 958, 965 (10th Cir. 2020). To state a claim against UBS, the Trustee must plausibly allege that the alleged Subsequent Transfers to UBS were subsequent transfers *of BLMIS customer property* fraudulently transferred from BLMIS to the Fund Defendants. *See* 15 U.S.C. § 78*fff*-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11"). The SAC fails to do this.

Regarding the alleged "Initial Transfers," the SAC alleges that the Fund Defendants collectively invested approximately $2 billion with BLMIS; that during the six years preceding the Filing Date, BLMIS made transfers to or for the benefit of the Fund Defendants in the collective amount of at least $1.1 billion ($752 million to Luxalpha and $352 million to Groupement Financier); and that approximately $1.01 billion of those initial transfers ($735 million to Luxalpha and $275 million to Groupement Financier) were made during the two years preceding the Filing Date. SAC ¶¶ 326–28. Tables detailing the alleged Initial Transfers (including the dates and amounts) are attached to the SAC as Exhibits B and C.

As to the alleged "Subsequent Transfers," the SAC is far skimpier, alleging that the Fund Defendants "subsequently transferred some of the Initial Transfers to the . . . UBS Defendants" as

"payment for their alleged service[s]." *Id.* ¶ 332. Without linking them to any particular Initial

Transfer, the SAC generically describes the Subsequent Transfers as follows:

> a. UBS SA received at least $32.8 million in fees from Luxalpha for serving as
> the official custodian and official manager of Luxalpha from February 2004 to
> August 2006, and an additional $6.6 million in fees from Luxalpha for serving
> as the official custodian of Luxalpha from August 2006 to December 2008.
> UBS SA also received at least $1 million in fees from Groupement Financier
> for serving as the official prime bank of Groupement Financier from 2005 to
> December 2008, and at least $500,000 in fees from Groupement Levered for
> serving as the official custodian of Groupement Levered from 2005 to
> December 2008.
>
> b. UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the
> official administrator of Luxalpha from February 2004 to December 2008.
> UBSFSL also received at least $497,000 from Groupement Financier for
> serving as the official administrator of Groupement and Groupement Levered
> from 2005 to December 2008.
>
> c. UBSTPM received at least $53.3 million in fees from Luxalpha for serving as
> the official manager of Luxalpha from August 2006 to November 2008.

*Id.* ¶ 333(a)–(c).[7]

First, as a threshold matter, the SAC does not allege that UBS AG received *any* transfers.

Thus, the Trustee's claims against UBS AG should be dismissed.

Moreover, while the SAC alleges that "the Initial Transfers were and continue to be

customer property within the meaning of 15 U.S.C. § 78*lll*(4)," the SAC does not allege that the

*Subsequent Transfers* were of customer property. SAC ¶ 331. And unlike the Initial Transfers,

the Subsequent Transfers are not broken down by date or amount, and are instead described only

vaguely in lump sums spanning multiple years with no delineation. *See id.* ¶ 333. Similarly,

although the Exhibits to the SAC contain pages and pages of tables in small type listing alleged

transactions recorded in the Fund Defendants' respective accounts at BLMIS, SAC Exs. B & C,

---

[7] While the SAC alleges that UBS defendants received "at least" the amounts listed in paragraph 333, the Court
should grant the motion to dismiss to the extent the SAC purports to be based on unspecified transfers in excess
of the listed amounts.

they fail to identify which, if any, of these transactions constituted initial transfers of BLMIS

customer property that were allegedly subsequently transferred to UBS. Accordingly, the Trustee

is effectively asking the Court to infer that because BLMIS transferred a large amount of money

to the Fund Defendants over a long period of time, to the extent the Fund Defendants transferred

money during that time to UBS, all of that money must have come from BLMIS.

As the Supreme Court has made clear, the Federal Rules of Civil Procedure do not permit

such speculative and conclusory pleading. To survive a motion to dismiss, a claim must not merely

be possible, but must be plausible. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555–57,

570. As this Court stated in *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R.

100 (Bankr. S.D.N.Y. 2015), barebones allegations that customer funds were transferred to the

subsequent transferee do not suffice to make the claim plausible:

> The Trustee must allege facts that support the inference that the funds at issue
> originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who,
> when, and how much" of the transfers to establish that an entity was a subsequent
> transferee of the funds. At the pleading stage, the Trustee is not required to provide
> a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones
> allegations that the funds at issue were transferred to the Subsequent Transferees,
> without more detail, are insufficient.

*Id*. at 119; *see also BNP Paribas*, 594 B.R. at 195 (same). Thus, in *Shapiro*, the Court dismissed

a conclusory subsequent transferee claim, noting that the complaint "does not tie any initial transfer

to any subsequent transfer or Subsequent Transferee." *Id*. The same is true for the SAC here,

which fails to tie the Subsequent Transfers to any particular initial transfers from BLMIS to the

Fund Defendants. *Compare* Second Am. Compl. ¶¶ 108, 110, 162-66 in *Picard v. Shapiro*, No.

10-5383, ECF No. 33 (Bankr. S.D.N.Y. July 8, 2014) *with* SAC ¶ 333; *see also Angell v. Ber Care,

Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 750-51 (Bankr. E.D.N.C. 2009).

The Trustee's failure to tie the alleged UBS transfers to any particular transfer from BLMIS

to the Fund Defendants cannot be excused on the ground that the Trustee lacks access to

38

information.  Prior to filing this adversary proceeding, the Trustee obtained voluminous Rule 2004

discovery from Access and UBS that should have enabled him to adequately allege recovery of

subsequent transfers, if such claims actually existed.  Indeed, the Trustee purports to know the

total amounts paid to UBS, the nature of the payments (*e.g.*, as custodian, prime bank,

administrator, or manager), and the broad time frames of such payments—yet he failed (apparently

deliberately) to allege specific dates or amounts for any Subsequent Transfer.[8]

Moreover, any claim that Subsequent Transfers from the Fund Defendants to UBS

consisted of BLMIS customer property (which was not even alleged in the SAC) is not plausible

given the facts that the Trustee actually does allege.  For example, the SAC alleges that UBS

received "at least $32.8 million" in supposedly recoverable Subsequent Transfers for its services

as custodian for Luxalpha "from February 2004 to August 2006."  SAC ¶ 333(a).  However,

Exhibit B of the SAC shows that prior to August 2006, only $16.2 million was transferred to

Luxalpha by BLMIS.  SAC Ex. B at 1–6.  Thus, even if the entirety of the $16.2 million transferred

from BLMIS during this period were avoidable and recoverable as a transfer of customer property,

it is established from the face of the SAC that at least $16.6 million of the fees described in ¶ 333

are *not* customer property subject to recovery.

Additionally, although the SAC fails to "allege facts that support the inference that the

funds at issue originated with . . . BLMIS, and contain the 'necessary vital statistics'—the 'who,

when, and how much'" of the Subsequent Transfers, *Shapiro*, 542 B.R. at 1119—it is clear from

the limited information provided that a portion of the alleged Subsequent Transfers pre-dated *all*

of the Initial Transfers alleged in the SAC.  For example, according to the SAC, the first alleged

---

[8]    Thus, this case is unlike *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117 (Bankr. S.D.N.Y.
2014), where this Court allowed the Trustee "greater latitude" in pleading the required tie because the subsequent
transfer claims there had to "be proved through the books and records of the defendants."  *Id*. at 151 (internal
quotation marks omitted).

Initial Transfer from BLMIS to Luxalpha was made on April 1, 2004. SAC Ex. B at 1. However, in addition to the allegations described above that UBS received at least $32.8 million in transfers "from February 2004 to August 2006," the SAC also alleges that UBS received "at least $2.5 million" from Luxalpha "from February 2004 to December 2008." SAC ¶ 333(b). Of course, any alleged "Subsequent Transfers" made from Luxalpha prior to April 1, 2004 are not recoverable because they could not be BLMIS customer property.

Because the face of the SAC demonstrates that a substantial portion of the transfers the Trustee seeks to avoid could not have been Subsequent Transfers by the Fund Defendants, and the SAC does nothing to attempt to tie any Initial Transfer to any payment made by the Fund Defendants to UBS, the SAC should be dismissed because it does not plausibly plead that UBS received customer property that was transferred from BLMIS to the Fund Defendants in avoidable transfers. *See Kennedy v. Mondelez Glob. LLC*, 2020 WL 4006197, at *9 (E.D.N.Y. July 10, 2020) ("where the allegations of a complaint are materially inconsistent with the evidence a plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss") (citation omitted).

## CONCLUSION

For all of the foregoing reasons, the UBS Defendants respectfully request that this Court grant the motion to dismiss the Second Amended Complaint with prejudice and provide such other relief as is necessary and just.

Dated: April 22, 2022
      New York, New York

Respectfully Submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*
Marshall R. King
Matthew K. Kelsey
Gabriel Herrmann

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
mking@gibsondunn.com
mkelsey@gibsondunn.com
gherrmann@gibsondunn.com

*Attorneys for the UBS Defendants*