# EXHIBIT 4

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
E-mail: dsheehan@bakerlaw.com
Marc E. Hirschfield
E-mail: mhirschfield@bakerlaw.com
Mark A. Kornfeld
E-mail: mkornfeld@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | **AMENDED COMPLAINT** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> FAIRFIELD SENTRY LIMITED, | Adv. Pro. No. 09-01239 (BRL) |

GREENWICH SENTRY, L.P.,
GREENWICH SENTRY PARTNERS, L.P.,
FAIRFIELD SIGMA LIMITED, FAIRFIELD
LAMBDA LIMITED, CHESTER GLOBAL
STRATEGY FUND LIMITED, CHESTER
GLOBAL STRATEGY FUND, IRONGATE
GLOBAL STRATEGY FUND LIMITED,
FAIRFIELD GREENWICH FUND
(LUXEMBOURG), FAIRFIELD
INVESTMENT FUND LIMITED,
FAIRFIELD INVESTORS (EURO)
LIMITED, FAIRFIELD INVESTORS
(SWISS FRANC) LIMITED, FAIRFIELD
INVESTORS (YEN) LIMITED, FAIRFIELD
INVESTMENT TRUST, FIF ADVANCED,
LTD., SENTRY SELECT LIMITED,
STABLE FUND, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA), LTD.,
FAIRFIELD GREENWICH ADVISORS
LLC, FAIRFIELD GREENWICH GP, LLC,
FAIRFIELD GREENWICH PARTNERS,
LLC, FAIRFIELD HEATHCLIFF CAPITAL
LLC, FAIRFIELD INTERNATIONAL
MANAGERS, INC., FAIRFIELD
GREENWICH (UK) LIMITED,
GREENWICH BERMUDA LIMITED,
CHESTER MANAGEMENT CAYMAN
LIMITED, WALTER NOEL, JEFFREY
TUCKER, ANDRÉS PIEDRAHITA, MARK
MCKEEFRY, DANIEL LIPTON, AMIT
VIJAYVERGIYA, GORDON MCKENZIE,
RICHARD LANDSBERGER, PHILIP
TOUB, CHARLES MURPHY, ROBERT
BLUM, ANDREW SMITH, HAROLD
GREISMAN, GREGORY BOWES,
CORINA NOEL PIEDRAHITA, LOURDES
BARRENECHE, CORNELIS BOELE,
SANTIAGO REYES, JACQUELINE
HARARY

Defendants.

I.      NATURE OF THE ACTION ............................................................... 1

II.     JURISDICTION AND VENUE .......................................................... 4

III.    BACKGROUND ................................................................................. 5

IV.     TRUSTEE'S POWERS AND STANDING ...................................... 10

V.      DEFENDANTS ................................................................................ 12

        A.      The Feeder Funds .............................................................. 12

        B.      FGG Affiliates ................................................................... 16

VI.     FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG ......... 79

        A.      Noel and Tucker Meet Madoff and Make Their First Investments
                With BLMIS ...................................................................... 81

        B.      Noel and Tucker Expand FGG's Offerings to U.S. Investors and
                Piedrahita Joins the Partnership ......................................... 81

        C.      FGG's Operations .............................................................. 83

VII.    THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD .... 84

        A.      The Defendants' Investment Strategy .................................. 85

        B.      The Defendants Facilitate the Scheme Through Marketing and
                Sales .................................................................................. 87

        C.      The Defendants Serve as a Gatekeeper for Madoff to Ensure
                Investors Would Not Find Out the Truth ............................. 87

        D.      FGG Conspires with Madoff to Hide from the SEC Madoff's True
                Involvement with the Feeder Funds ..................................... 90

        E.      The Defendants Deceive Their Investors by Telling Them They
                Were Performing Extensive and Top of the Line Due Diligence,
                But They Were Doing No Such Thing ................................. 94

VIII.   THE DEFENDANTS WERE CONSTANTLY FACED WITH
        EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT
        EVIDENCE ..................................................................................... 98

        A.      The Defendants Learn that BLMIS's Auditor is a Single Person in
                a Strip Mall Office ............................................................. 99

        B.      The Defendants Regularly Received Information That Made It
                Clear Madoff Was Lying About His Alleged Trades and
                Performance .................................................................... 105

IX.     THE DEFENDANTS WERE WILLING TO IGNORE THE RED
        FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT .............. 130

        A.      FGG Does Everything It Can to Mollify Investor Concerns as
                Opposed to Performing Independent Inquiry Into the Possibility of
                Fraud ............................................................................... 131

    B.     FGG's Consultant Tells the Defendants Madoff May Be a Fraud ........ 133

X.    DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF ....... 136

    A.     2006:  GS Is Expanded and GSP Is Created .......................................... 136

    B.     2007:  Leveraged Note Programs .......................................................... 136

    C.     2008:  The Emerald Funds ................................................................... 137

XI.    THE AFTERMATH ................................................................................. 139

XII.    PEOPLE WILL TELL:  OH THIS WAS FRAUD, THERE IS NOTHING WE COULD HAVE DONE ....................................................................... 141

    A.     The Barron's and MAR/Hedge Articles Are Published in 2001 .......... 142

    B.     Tightening Industry Standards ............................................................. 144

    C.     It Was All Over the Street:  Madoff Was Suspected of Being a Fraud ................................................................................................... 146

XIII.    THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE ....... 154

XIV.    THE TRANSFERS ................................................................................. 156

    A.     Transfers from BLMIS to the Feeder Funds.......................................... 156

    B.     Transfers from the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants ................................... 158

COUNT ONE:  TURNOVER AND ACCOUNTING – 11 U.S.C. § 542 ..................... 160

COUNT TWO:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ...................................... 161

COUNT THREE:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ................................. 162

COUNT FOUR:  PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(2), AND 551 ......................... 164

COUNT FIVE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................... 166

COUNT SIX:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................... 167

COUNT SEVEN:  FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(2), AND 551 ............... 168

COUNT EIGHT:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ............................ 170

COUNT NINE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ............................ 171

COUNT TEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
– 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(2), AND 551............................................ 172

COUNT ELEVEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 174

COUNT TWELVE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 175

COUNT THIRTEEN: FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551................................................................................................................ 177

COUNT FOURTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 178

COUNT FIFTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 179

COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) –NEW YORK DEBTOR AND CREDITOR LAW §§
273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551................................................................................................................ 180

COUNT SEVENTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 .......... 181

COUNT EIGHTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 .......... 182

COUNT NINETEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551 .......... 183

COUNT TWENTY:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR
279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ....................................... 185

COUNT TWENTY-ONE:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 .......... 186

COUNT TWENTY-TWO:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551.................... 187

COUNT TWENTY-THREE:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ...................................................................................... 188

COUNT TWENTY-FOUR:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ...................................................................................... 190

COUNT TWENTY-FIVE:  UNDISCOVERED FRAUDULENT TRANSFERS
(SUBSEQUENT TRANSFEREE) – NEW YORK CIVIL PROCEDURE
LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(2), AND 551 .............................................................................. 191

COUNT TWENTY-SIX:  OBJECTION TO THE DEFENDANTS' CUSTOMER
CLAIMS .......................................................................................................... 193

COUNT TWENTY-SEVEN:  UNJUST ENRICHMENT ........................................... 194

COUNT TWENTY-EIGHT:  CONVERSION ............................................................ 195

COUNT TWENTY-NINE:  MONEY HAD AND RECEIVED ................................. 196

COUNT THIRTY:  AIDING AND ABETTING FRAUD ............................................ 197

COUNT THIRTY-ONE:  AIDING AND ABETTING BREACH OF
FIDUCIARY DUTY ........................................................................................ 208

1.       Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act §§ 78aaa *et seq.*, by and through his undersigned counsel, for this Amended Complaint, states as follows:

## I.      NATURE OF THE ACTION

2.       The Defendants named in this Amended Complaint worked in conjunction with BLMIS and Madoff to commit, and exponentially expand, the single largest financial fraud in history.  Serving as one of Madoff's largest marketing and investor relations arms, the Defendants were active participants in, and substantially aided, enabled, and helped sustain Madoff's Ponzi scheme.  Every dollar the Defendants purportedly "earned," and every dollar they kept to unjustly enrich themselves, was *stolen money*.  Every asset the Defendants own that originated from the purported management and performance fees drawn from fictitious returns is in fact *Customer Property*, as defined by statute,[1] and must be returned to the Trustee for equitable distribution to BLMIS customers.

3.       This is a case in which sophisticated hedge fund investment advisers and promoters engaged in a systematic, purposeful enterprise with Madoff to maintain and profit from a fraud and wrongly enrich themselves.  The Defendants had actual and constructive knowledge of Madoff's fraud and cannot deny their knowledge of many "red flags" indicating the likelihood of that fraud.  This case goes well beyond "red flags."

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

1

4.      The Defendants did not properly, independently, and reasonably perform due diligence into the many red flags strongly indicating Madoff was a fraud.  The Defendants did exactly the opposite.  The Defendants misled regulators, investors, and potential investors and generally looked the other way, focusing only on self-interest and profit.  Among many other things, the Defendants:

a.      failed to perform as independent investment advisers and fiduciaries, serving by their own admission as an extension of BLMIS's marketing and customer relations operation;

b.      knowingly and explicitly conspired with Madoff to deceive the Securities Exchange Commission (the "SEC") by misrepresenting the true nature of their respective investment advisory roles and by intentionally misstating Madoff's role;

c.      ascribed inconsistent roles to Madoff depending on the circumstances. Sometimes the Defendants claimed Madoff was merely a broker-dealer executing the Defendants' own investment strategy.  At other times, the Defendants said Madoff was an investment adviser acting as an agent. And still at other times, the Defendants claimed BLMIS was acting as a principal in performing investment adviser functions;

d.      provided false security to their investors through false marketing materials, and shielded Madoff from direct inquiries.  The Defendants discouraged customers, potential customers, and others from performing direct due diligence on Madoff, intentionally removed references to him from their offering memoranda and marketing materials, and in all respects served as a "gatekeeper" in order to prevent unwanted inquiries;

e.      performed no real due diligence on Madoff's one-person auditing firm before or even after one of their investors likened BLMIS to another Ponzi scheme.  Some of the individual Defendants not only ignored the fact that Madoff's auditing firm lied to them, but perpetrated their own fraud by knowingly misleading investors and potential investors about the auditing firm's size, reputation, and capabilities;

f.      ignored basic, standard industry statistical analyses of Madoff's consistent returns over nearly two decades that should have led them to reasonably conclude the returns were manufactured.  The lack of any volatility ever, even in often volatile markets, was an obvious sign of fraud.  The Defendants utilized the consistent lack of volatility as a banner to promote the success of their own funds;

g.      regularly received Madoff's trade confirmations reflecting implausible equities trading volumes and percentages, as well as options trading volumes that were impossible, as they greatly exceeded the entire volume of reported options trading on the relevant exchanges. The Defendants never questioned how trading at such massive volumes could not leave a "footprint" in the market or otherwise impact pricing;

h.      represented that the massive options trading that was part of Madoff's purported strategy was made through over-the-counter trades with individual counterparties, even though the trade confirmations the Defendants received from BLMIS reflected exchange traded options, not over-the-counter trades. The Defendants never knew the identity of a single options trade counterparty, nor did they investigate the counterparties' ability to perform their obligations under the trade agreements;

i.      willingly entered into an investment relationship with Madoff that prevented all of the traditional, independent checks and balances seen in the investment advisory business. Madoff served as investment adviser, prime broker, valuation agent, sub-custodian, as well as executing broker, and all compliance and supervisory functions at BLMIS were performed by Madoff's family. This structure was tailor-made for perpetrating fraud – Madoff could readily misappropriate assets without any independent oversight – but the Defendants never questioned it;

j.      despite representing Madoff's investment strategy as their own for nearly two decades, the Defendants' internal communications indicate they never understood the strategy;

k.      knew for many years that their investors, market experts, due diligence experts, and even their own consultant (hired to review BLMIS transactions) had grave suspicions Madoff and the investment strategy were a sham;

l.      touted and marketed their due diligence process as being the best, as well as the "value added" service that justified fees greater than those of many of their competitors, when, in fact, the Defendants failed to perform even a modicum of reasonable due diligence;

m.      turned a blind eye to Madoff's fraudulent activities for the simple reason that the Defendants' continued prosperity and very existence was directly and exclusively tied to Madoff – if he was exposed as a fraud, their vast empire would collapse; and

n.      acted as Madoff's *de facto* partners by failing to act as fiduciaries and by lending their resources, marketing, reputation, protection, and undying allegiance to Madoff. The Defendants, along with many others,

knowingly and actively aided Madoff, causing a catastrophic growth of the fraud and deepening of BLMIS's insolvency, the result of which was billions in damages to thousands of customers.

5.     Through this Amended Complaint the Trustee seeks the return of all Customer Property belonging to the BLMIS estate, in the form of redemptions, fees, compensation, and assets; as well as all damages, including but not limited to compensatory and punitive damages, caused by the Defendants' misconduct; and the disgorgement of all funds and properties by which the Defendants were unjustly enriched at the expense of BLMIS's customers.

## II.     JURISDICTION AND VENUE

6.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 (McKinney 2001)), New York Civil Practice Law and Rules (McKinney 2001), and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, unjust enrichment, conversion, money had and received, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, consequential and punitive damages, and objection to the customer claims filed by some of the Defendants.  The Trustee seeks, among other things, to set aside all avoidable transfers, collect damages caused by the Defendants, preserve the stolen Customer Property for the benefit of BLMIS customers, and recover *all* stolen Customer Property from the Defendants, in whatever form it may now or in the future exist.

7.     This is an adversary proceeding brought in the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.  The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities Exchange*

*Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).

8.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (F), (H), and (O).

9.      Venue in this district is proper under 28 U.S.C. § 1409.

## III.    BACKGROUND

10.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC filed the District Court Proceeding against Madoff, which remains pending. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS Investment Advisory business (the "BLMIS IA Business").

11.     On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

12.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

13.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a.    Appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.    Appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

c.    Removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

d.    Removed the Receiver for BLMIS.

14.    Pursuant to SIPA § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

15.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16.    By virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out Customer Property to BLMIS customers, assess claims, and liquidate any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS customers for the billions of dollars they invested through BLMIS.  Consequently, the Trustee

must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code
to pursue recovery for BLMIS accountholders.

17.     Based upon the Trustee's ongoing investigation, it now appears there were more
than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008,
BLMIS generated account statements for its approximately 4,900 open customer accounts.
When added together, these statements purportedly showed that BLMIS customers had
approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth
a fraction of that amount.  Customer accounts had not accrued any real profits because no
investments were ever made.  By the time the Ponzi scheme came to light on December 11,
2008, investors had already lost approximately $20 billion in principal.

18.     As Madoff admitted at his Plea Hearing, he never purchased any of the securities,
options, or Treasurys for the BLMIS IA Business and the returns he reported to customers were
entirely fictitious.  Based on the Trustee's investigation to date, there is no record of BLMIS
having cleared a single purchase or sale of securities on any exchange in connection with the
SSC Strategy.[2]

19.     For years, prior to his arrest, Madoff repeatedly represented that he conducted his
options trading on the over-the-counter ("OTC") market rather than through any listed exchange.
Based on the Trustee's investigation to date, there is no evidence that the BLMIS IA Business
ever entered into any OTC options trades on behalf of BLMIS account holders.

---

[2]     Madoff did a *de minimus* amount of securities trading outside of the SSC Strategy – such trading is not at
issue in the Trustee's allegations here.

20.     In connection with his efforts to recoup billions of dollars of stolen Customer
Property, on May 18, 2009, the Trustee filed the Complaint in this action against the three
Fairfield Greenwich Group ("FGG") entities that maintained accounts with BLMIS:  Fairfield
Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P. ("GS"), and Greenwich Sentry
Partners, L.P. ("GSP") (collectively, the "Feeder Funds").  Each of the Feeder Funds maintained
one or more customer accounts at BLMIS, were collectively among Madoff's largest sources of
investor principal.  The Feeder Funds withdrew billions of dollars from the BLMIS accounts.
The Trustee initially filed suit against the Feeder Funds in order to recover all avoidable transfers
BLMIS made to them.

21.     FGG is a trade name used to refer to a number of affiliated entities, including both
domestic and foreign corporations, general partnerships, limited partnerships, trusts, and limited
liability companies.  Internally, those formal business structures were ignored.  According to
FGG's own documents, the profits earned by the myriad of FGG entities were distributed to
individuals and entities based upon their "partnership" percentages in FGG.

22.     Fairfield Sentry is currently in liquidation.  On July 21, 2009, the Eastern
Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands appointed
Kenneth Krys and Christopher Stride as Joint Official Liquidators of Defendant Fairfield Sentry.
Defendant Fairfield Sigma Limited ("Sigma") and Defendant Fairfield Lambda Limited
("Lambda") are two other FGG funds whose sole purpose was to invest all of their respective
funds in Fairfield Sentry.  Like Fairfield Sentry, both Sigma and Lambda are subject to
liquidation proceedings in the British Virgin Islands.  Mr. Krys and Mr. Stride were appointed by
the Eastern Caribbean Supreme Court as Joint Official Liquidators of Sigma on the same day

8

they were appointed as liquidators of Fairfield Sentry.  On April 23, 2009, the Eastern Caribbean Supreme Court appointed Mr. Stride as the Official Liquidator of Lambda.

23.     This Amended Complaint includes new allegations and causes of action against the Feeder Funds, as well as claims against additional Defendants.  The Feeder Funds are no longer directly in possession of the majority of the billions of dollars in transfers they received from BLMIS.  They have transferred over one billion dollars to other FGG entities as payments for purported management, performance, and administrative fees.  Those FGG entities then used hundreds of millions of those dollars to pay percentage distributions to each of FGG's partners.  In addition, the Feeder Funds have transferred funds to their investors, which include other FGG entities, which redeemed shares or limited partnership interests in the Feeder Funds.

24.     The newly named Defendants include additional FGG affiliated hedge funds that invested in the Feeder Funds to benefit from their investments with Madoff, and the investment managers and related affiliates that received over a billion dollars of management and performance fees for supposedly monitoring the funds' investments with BLMIS (the "FGG Affiliates").  Three of the FGG Affiliates, Fairfield Greenwich (Bermuda), Ltd. ("FGB"), Fairfield Greenwich Limited ("FGL"), and Greenwich Bermuda Limited ("GBL"), served as general partners to GS and GSP and are liable for all avoidable transfers received by GS and GSP during the periods in which FGB, FGL, and GBL served as general partners.

25.     The Amended Complaint also names as Defendants individual partners and principal wrongdoers within the FGG organization who received hundreds of millions of dollars for orchestrating FGG's extraordinary role in the scheme.  These individuals fall into two categories:  those in management positions (the "Management Defendants") and those involved

in marketing the funds (the "Sales Defendants") (collectively the "FGG Individuals"). The

Feeder Funds, the FGG Affiliates, the Management Defendants, and the Sales Defendants are

referred to, collectively, as the "Defendants."

26.    The Trustee brings this action against the Defendants to, among other things,

recover all funds received, directly or indirectly, from the BLMIS IA Business.

27.    BLMIS was insolvent at all times relevant to this proceeding. BLMIS's liabilities

were billions of dollars greater than its assets. Because BLMIS could not meet its obligations as

they came due, BLMIS was insolvent at the time it made each of the transfers.

28.    This Amended Complaint and similar complaints are being filed to recapture

stolen monies as well as damages caused to customers through wrongful acts, and to require the

Defendants to disgorge the illegal profits by which they were unjustly enriched at the expense of

the customers. All Customer Property recovered by the BLMIS estate shall first be distributed

pro rata among BLMIS customers in accordance with SIPA § 78fff-2(c)(1).

## IV.    TRUSTEE'S POWERS AND STANDING

29.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code. Chapters 1, 3, 5, and subchapters I and II of

chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA

§§ 8fff(b).

30.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers

granted by SIPA.

31.    The Trustee is a real party in interest and has standing to bring these claims

pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1),

because, among other reasons:

a.    the Defendants received "Customer Property" as defined in SIPA

§ 78*lll*(4);

b.    BLMIS incurred losses as a result of the conduct set forth herein;

c.    BLMIS customers were injured as a result of the conduct detailed herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all

customers for all of their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of Customer Property, can sue on behalf of the

customer-bailors;

g.    as of this date, the Trustee has received multiple, express assignments of

certain claims of the applicable accountholders, which they could have asserted.  As assignee,

the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and

palpable loss for which the Trustee is entitled to reimbursement in the form of monetary

damages;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon

the Trustee enforcement of its rights of subrogation with respect to payments it has made and is

making to customers of BLMIS from SIPC funds; and

    i.  the Trustee has the power and authority to avoid and recover transfers

pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-

2(c)(3).

## V.   DEFENDANTS

### A.   *The Feeder Funds*

32. **Fairfield Sentry**:  Defendant Fairfield Sentry is a hedge fund, currently in

liquidation, that is part of the FGG organization, and which maintained accounts at BLMIS.  The

fund is organized as an international business company under the laws of the British Virgin

Islands.  Its registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams

Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

33. Fairfield Sentry opened its first account at BLMIS in November 1990 (Account

No. 1FN012) and a second account in October 1992 (Account No. 1FN045).  The fund also

opened corresponding options accounts (Account Nos. 1FN069 and 1FN070).  (A true and

accurate copy of exemplar account agreements for Fairfield Sentry is attached hereto as Ex. 1.) [3]

All accounts were still open when Madoff was arrested on December 11, 2008.  Prior to

Madoff's arrest, Fairfield Sentry deposited almost $4.3 billion and withdrew approximately $3.3

billion from those accounts.  (A summary chart of Fairfield Sentry's withdrawals from its

BLMIS accounts is attached hereto as Ex. 2.)

---

[3]  All references to exhibits attached to this Amended Complaint will be indicated as "Ex. ___."

34.     Fairfield Sentry is subject to personal jurisdiction in this judicial district as it
routinely conducted business in New York, New York and entered into agreements in New York,
New York including agreements relating to its BLMIS accounts, which it delivered to BLMIS
headquarters in New York, New York.

35.     At all relevant times, Fairfield Sentry was a customer of BLMIS, which operated
its principal place of business in New York, New York and maintained Fairfield Sentry's
account in New York, New York.  At least one of Fairfield Sentry's account agreements
contained a choice of law provision indicating the agreement was made in New York and would
be construed pursuant to New York law.  (*See* Ex. 1.)  Fairfield Sentry utilized New York banks
when it redeemed funds distributed to it by BLMIS and when it invested additional funds with
BLMIS.  Specifically, Fairfield Sentry wired funds to BLMIS's account at JPMorgan Chase
Account # 000000140081703 (the "703 Account"), in New York, New York, for application to
its accounts and for the conducting of trading activities.  (Prior to 2008, the 703 Account's
complete account number was 140-081703.)

36.     On May 12, 2009,  FGG issued a press release stating that FGG professionals
actively monitored FGG's investments through Madoff and conducted due diligence both in
Bermuda and New York.  (A true and accurate copy of the May 12, 2009 press release is
attached hereto as Ex. 3.)

37.     In addition, Fairfield Sentry filed customer claims seeking to recover funds it
allegedly lost on its investments through BLMIS.  By filing its customer claims, Fairfield Sentry
submitted to the jurisdiction of this Court.

38.     Finally, where a federal statute provides for nationwide service of process, as does
Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal
jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has
personal jurisdiction over Fairfield Sentry based on the fund's contacts with the U.S.

39.     **GS**:  Defendant GS is a hedge fund that is part of the FGG organization and that
maintained an account at BLMIS.  GS is a limited partnership organized under the laws of the
State of Delaware.  Its registered agent is Corporation Service Company, 2711 Centreville Road,
Suite 400, Wilmington, Delaware 19808.

40.     GS opened its account at BLMIS in November 1992 (Account No. 1G0092).
This account was still open when Madoff was arrested on December 11, 2008.  (A true and
accurate copy of exemplar account agreements for GS is attached hereto as Ex. 4.)  Prior to
Madoff's arrest, GS deposited approximately $420.6 million into this account and withdrew
$281.1 million from this account.  (A summary chart of GS's withdrawals from its BLMIS
account is attached hereto as Ex. 5.)

41.     GS is subject to personal jurisdiction in this judicial district as it routinely
conducted business in New York, New York and entered into agreements in New York, New
York, which it delivered to BLMIS headquarters in New York, New York.  At all relevant times,
GS was a customer of BLMIS, which operated its principal place of business in New York, New
York.  GS utilized New York banks when it redeemed funds distributed to it by BLMIS and
when it invested additional funds with BLMIS.  Specifically, GS wired funds to the 703 Account
in New York, New York, for application to its account and for the conducting of trading
activities.

42.     As previously noted, on May 12, 2009, FGG issued a press release stating FGG professionals actively monitored FGG's investments through BLMIS and conducted due diligence both in Bermuda and New York City.  (*See* Ex. 3.)

43.     In addition, GS filed a customer claim seeking to recover funds it allegedly lost on its investments through BLMIS, whereby it submitted to the jurisdiction of this Court.

44.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over GS based on the fund's contacts with the U.S.

45.     **GSP**:  Defendant GSP is a hedge fund that is part of the FGG organization, and which maintained an account at BLMIS.  GSP is a limited partnership organized under the laws of the State of Delaware.  Its registered agent is Corporation Service Company, 2711 Centreville Road, Suite 400, Wilmington, Delaware 19808.

46.     GSP opened its account at BLMIS in May 2006 (Account No. 1G0371).  (A true and accurate copy of exemplar account agreements for GSP is attached hereto as Ex. 6.)  This account was still open when Madoff was arrested on December 11, 2008.  Prior to Madoff's arrest, GSP deposited nearly $9.5 million into this account and withdrew almost $6.0 million from this account.  (A summary chart of GSP's withdrawals from its BLMIS account is attached hereto as Ex. 7.)

47.     GSP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, and entered into agreements in New York, New

York, which it delivered to BLMIS headquarters in New York, New York. At all relevant times, GSP was a customer of BLMIS, which operated its principal place of business in New York, New York. GSP utilized New York banks when it redeemed funds distributed to it by BLMIS and when it invested additional funds with BLMIS. Specifically, GSP wired funds to the 703 Account in New York, New York, for application to its account and for the conducting of trading activities.

48. As previously noted, on May 12, 2009, FGG issued a press release stating FGG professionals actively monitored FGG's investment through BLMIS and conducted due diligence both in Bermuda and New York. (*See* Ex. 3.)

49. In addition, GSP filed a customer claim seeking to recover funds it allegedly lost on its investments through BLMIS, whereby it submitted to the jurisdiction of this Court.

50. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over GSP based on the fund's contacts with the U.S.

### B. *FGG Affiliates*

#### 1. Other FGG Funds

51. **Sigma**: Defendant Sigma is an FGG fund wholly invested in Fairfield Sentry. The fund was organized on November 20, 1990 under the British Virgin Islands' International Business Companies Act, and began operations in 1997. Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

52.     Sigma accepted investments in Euros, which it converted to U.S. Dollars and invested in Fairfield Sentry.  Fairfield Sentry then invested at least 95% of its assets in BLMIS.  Through its investment in Fairfield Sentry, Sigma was an indirect investor through BLMIS.

53.     Between 2003 and 2008, Sigma redeemed approximately $752.3 million from Fairfield Sentry.  (A true and accurate copy of Sigma's redemption confirmations is attached hereto as Ex. 8.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  As such, Sigma's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

54.     Sigma is subject to personal jurisdiction in this judicial district because Sigma filed a customer claim to recover funds it allegedly lost on its investments in Sentry, whereby it submitted to the jurisdiction of this Court.

55.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Sigma based on the fund's contacts with the U.S.

56.     **Lambda**:  Defendant Lambda is an FGG fund wholly invested in Fairfield Sentry.  The fund was organized on December 7, 1990 under the British Virgin Islands' International Business Companies Act, and began operations in 1999.  Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.

57.     Lambda accepted investments in Swiss francs, which it converted to U.S. Dollars and invested in Fairfield Sentry.  Fairfield Sentry then invested at least 95% of its assets in BLMIS.  Through its investment in Fairfield Sentry, Lambda was an indirect investor through BLMIS.

58.     Between 2003 and 2008, Lambda redeemed over $52.9 million from Fairfield Sentry.  (A true and accurate copy of Lambda's redemption confirmations are attached hereto as Ex. 9.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  As such, Lambda's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

59.     Lambda is subject to personal jurisdiction in this judicial district because Lambda filed a customer claim to recover funds it allegedly lost on its investments in Sentry, whereby it submitted to the jurisdiction of this Court.

60.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Lambda based on the fund's contacts with the U.S.

61.     **Chester Global Strategy Fund Limited ("Chester")**:  Defendant Chester is an FGG fund partially invested in Fairfield Sentry.  Chester was created as a fund of funds, and placed its investors' money with other hedge funds.  The fund is organized as a limited liability company under the laws of the Cayman Islands and began operations on March 1, 2003.  Defendant Andrés Piedrahita ("Piedrahita") is one of the fund's directors.

18

62. Union Bancaire Privée ("UBP") acted as the fund's investment adviser and custodian. Chester borrowed 30–40% of the net asset value of the fund from UBP for the purpose of making leveraged investments.

63. Between 2005 and 2007, Chester redeemed over $71.7 million from Fairfield Sentry. Chester liquidated its remaining position in Fairfield Sentry on July 19, 2007 by redeeming over $10.6 million. (A true and accurate copy of Chester's redemption confirmations is attached hereto as Ex. 10.) Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts. As such, Chester's redemptions are Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

64. Chester is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activity in New York, New York, and derived significant revenue from New York, New York. Specifically, Chester was managed out of FGG's New York City office.

65. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Chester based on the fund's contacts with the U.S.

66. **Chester Global Strategy Fund, LP ("Chester LP")**: Defendant Chester LP is an FGG fund partially invested in GS. Chester LP was created as a fund of funds, and placed its

investors' money with other hedge funds.  The fund is organized as a Delaware limited

partnership and maintained its principal place of business in New York, New York.

67.     In November 2008, Chester LP redeemed over $853,000 from GS.  (A true and

accurate copy of Chester LP's redemption confirmation is attached hereto as Ex. 11.)  Upon

information and belief, in order to pay this redemption, GS withdrew funds from its BLMIS

account.  As such, Chester LP's redemption is Customer Property subject to turnover to the

Trustee and/or an avoidable subsequent transfer from BLMIS recoverable by the Trustee.

68.     Chester LP is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by undertaking significant commercial activity in New York, New York, and derived

significant revenue from New York, New York.  Specifically, Chester LP was managed out of

FGG's New York City office.

69.     Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has

personal jurisdiction over Chester LP based on the fund's contacts with the U.S.

70.     **Irongate Global Strategy Fund Limited ("Irongate")**:  Defendant Irongate is

an FGG fund partially invested in Fairfield Sentry.  Irongate was created as a fund of funds, and

placed its investors' money with other hedge funds.  It was created as a limited liability company

under the laws of the Cayman Islands and began operations on July 1, 2004.  The fund's

registered office is c/o Citco Fund Services (Cayman Islands) Limited, Corporate Centre, West

Bay Road, P.O. Box 31106SMB, George Town, Cayman Islands.  Piedrahita is one of the fund's directors.

71.     In 2007, Irongate redeemed over $36.3 million from Fairfield Sentry.  Irongate liquidated its remaining position in Fairfield Sentry on July 19, 2007 by redeeming over $31.3 million.  (A true and accurate copy of Irongate's redemption confirmations is attached hereto as Ex. 12.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  As such, Irongate's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

72.     Irongate is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, Irongate was managed out of FGG's New York City office.

73.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Irongate based on the fund's contacts with the U.S.

74.     **Fairfield Greenwich Fund (Luxembourg) ("FGF")**:  Defendant FGF is an FGG fund partially invested in Fairfield Sentry.  The fund was incorporated as a Société d'Investissement à Capital Variable in Luxembourg on October 22, 2002.  Its registered office is

located at 28 Avenue Monterey, L-2163 Luxembourg.  Defendant Walter Noel ("Noel") serves

as Chairman of the Board of Directors.

75.    FGF was created as an umbrella fund that would provide investors with a choice

of investment in several sub-funds.  As of December 31, 2005, FGF had only one sub-fund,

Fairfield Guardian Fund ("Fairfield Guardian").  FGF was invested in Fairfield Sentry both

directly and through Fairfield Guardian.

76.    Between 2004 and 2006, FGF redeemed approximately $2.8 million from

Fairfield Sentry.  (A true and accurate copy of FGF's redemption confirmations is attached

hereto as Ex. 13.)  In addition, Fairfield Guardian redeemed from Fairfield Sentry throughout

2005.  (A true and accurate copy of an internal FGG chart showing Fairfield Guardian's

redemptions from Fairfield Sentry is attached hereto as Ex. 14.)  Upon information and belief, in

order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  As

such, FGF's and Fairfield Guardian's redemptions constitute Customer Property subject to

turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the

Trustee.

77.    FGF is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by undertaking significant commercial activities in New York, New York, and

derived significant revenue from New York, New York.  Specifically, FGF was managed out of

FGG's New York City office.

78.    Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGF based on the fund's contacts with the U.S.

79.   **Fairfield Investment Fund Limited ("FIFL")**:  Defendant FIFL is an FGG fund partially invested in Fairfield Sentry and GS.  FIFL was created as a fund of funds which invested in other funds.  It was created as a British Virgin Islands International Business Company on July 27, 2000, and began operations on July 1, 2004.  Its registered office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.  Noel and Defendant Jeffrey Tucker ("Tucker") serve on the fund's Board of Directors.

80.   Between 2003 and 2008, FIFL redeemed approximately $288.1 million from Fairfield Sentry.  FIFL redeemed approximately $9.0 million in October 2008, which constituted a liquidation of FIFL's entire remaining position in Fairfield Sentry.  (A true and accurate copy of FIFL's redemption confirmations is attached hereto as Ex. 15.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  As such, FIFL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

81.   FIFL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York.  Specifically, FIFL was managed out of FGG's New York City office.

82.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FIFL based on the fund's contacts with the U.S.

83.     **Fairfield Investors (Euro) Limited ("FIL-Euro")**:  Defendant FIL-Euro is an FGG fund created as an international business company under the laws of the British Virgin Islands.  Its principal business office is c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I.  Defendant Cornelis Boele ("Boele") serves on the fund's Board of Directors.

84.     FIL-Euro was created to invest in and trade both securities and other financial instruments.  The fund allocated its assets principally to the purchase of shares of FIFL.  As explained above, FIFL invested assets in Fairfield Sentry and GS.

85.     FIFL, the fund through which FIL-Euro invested in Fairfield Sentry and GS, redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008.  (*See* Ex. 15.)  Upon information and belief, in order to pay FIFL's redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts.  FIFL then transferred the funds to FIL-Euro when FIL-Euro redeemed its shares of FIFL.  As such, FIL-Euro's redemptions from FIFL constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

86.     FIL-Euro is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived

24

significant revenue from New York, New York.  Specifically, FIL-Euro was managed out of FGG's New York City office.

87.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FIL-Euro based on the fund's contacts with the U.S.

88.     **Fairfield Investors (Swiss Franc) Limited ("FIL-Swiss")**:  Defendant FIL-Swiss is an FGG fund incorporated as an international business company under the laws of the British Virgin Islands on June 6, 1996.  Its registered office is located at Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I. Boele serves on the fund's Board of Directors.

89.     FIL-Swiss was created to allocate its assets principally to the purchase of shares of FIFL.  As explained above,  FIFL invested funds in Fairfield Sentry and GS.

90.     FIFL, the fund through which FIL-Swiss invested in Fairfield Sentry and GS, redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008.  (*See* Ex. 15.)  Upon information and belief, to pay FIFL's redemptions, Fairfield Sentry withdrew funds from BLMIS.  FIFL then transferred the funds to FIL-Swiss when FIL-Swiss redeemed its shares of FIFL.  As such, FIL-Swiss's redemptions from FIFL constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

91.     FIL-Swiss is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by conducting significant commercial activities in New York, New York, and derived

significant revenue from New York, New York.  Specifically, FIL-Swiss was managed out of

FGG's New York City office, and the fund's investment manager, Fairfield Greenwich Advisors

LLC (*see infra* ¶¶148-157), is located in New York, New York.

92.     Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has

personal jurisdiction over FIL-Swiss based on the fund's contacts with the U.S.

93.     **Fairfield Investors (Yen) Limited ("FIL-Yen")**:  Defendant FIL-Yen is an FGG

fund incorporated as an international business company under the laws of the British Virgin

Islands on January 1, 2004.  Its registered office is located at Codan Trust Company (B.V.I.)

Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay 1, Road Town, Tortola, B.V.I.  Tucker

serves on the fund's Board of Directors.

94.     FIL-Yen was created to allocate its assets principally to the purchase of shares of

FIFL.  As explained above, FIFL invested funds in Fairfield Sentry and GS.

95.     FIFL, the fund through which FIL-Yen invested in Fairfield Sentry and GS,

redeemed approximately $288.1 million from Fairfield Sentry between 2003 and 2008.  (*See* Ex.

15.)  Upon information and belief, to pay FIFL's redemptions, Fairfield Sentry withdrew funds

from its BLMIS accounts.  FIFL then transferred the funds to FIL-Yen when FIL-Yen redeemed

its shares of FIFL.  As such, FIL-Yen's redemptions from FIFL constitute Customer Property

subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

96.     FIL-Yen is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, and purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FIL-Yen was managed out of FGG's New York City office, and the fund's investment manager, FGA, is located in New York, New York.

97.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FIL-Yen based on the fund's contacts with the U.S.

98.     **Fairfield Investment Trust ("FIT")**:  Defendant FIT is a multi-series unit trust established under the Trusts Law of the Cayman Islands on December 12, 2001.  Citco Trustees (Cayman) Limited acts as FIT's trustee, and the trust's registered office is located at Corporate Center, Windward One, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands, B.W.I.

99.     FIT has established at least two series trusts:  Fairfield GCI (USD) Fund and Fairfield GCI (JPY) Fund (the "FIT Funds").  The FIT Funds were created as funds of funds, and placed their investors' money with other hedge funds.  One of the hedge funds the FIT Funds invested in was Fairfield Sentry.

100.    Through Fairfield GCI (USD), FIT redeemed over $5.2 million from Fairfield

Sentry between 2003 and 2008.  (A true and accurate copy of Fairfield GCI (USD)'s redemption

confirmations is attached hereto as Ex. 16.)  Through Fairfield GCI (JPY), FIT redeemed

approximately $5.2 million from Fairfield Sentry between 2003 and 2007.  (A true and accurate

copy of Fairfield GCI (JPY)'s redemption confirmations is attached hereto as Ex. 17.)  Upon

information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from

its BLMIS accounts.  As such, Fairfield GCI's redemptions constitute Customer Property subject

to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the

Trustee.

101.    FIT is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by conducting significant commercial activities in New York, New York, and derived

significant revenue from New York, New York.  Specifically, FIT was managed out of FGG's

New York City office.

102.    Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has

personal jurisdiction over FIT based on the trust's contacts with the U.S.

103.    **FIF Advanced, Ltd. ("FIFA")**:  Defendant FIFA is an FGG fund partially

invested in Fairfield Sentry.  FIFA was created as a fund of funds, and placed its investors'

money with other hedge funds.  FIFA was incorporated as an international business company

under the laws of the British Virgin Islands.  Its registered office is located at Romasco Place,

Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, B.V.I.  Noel sits on the fund's Board of Directors.

104.    Between 2004 and 2007, FIFA redeemed over $45.2 million from Fairfield Sentry.  Its redemption of $4.6 million in October 2007 constituted a complete liquidation of its shares.  (A true and accurate copy of FIFA's redemption confirmations is attached hereto as Ex. 18.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts and then transferred the funds to FIFA.  As such, FIFA's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

105.    FIFA is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FIFA was managed out of FGG's New York City office, and the fund's investment manager, FGA, is located in New York, New York.

106.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FIFA based on the fund's contacts with the U.S.

107.    **Sentry Select Limited ("SSL")**:  Defendant SSL is an FGG fund partially invested in Fairfield Sentry.  It was created as an international business company under the laws of the British Virgin Islands.  Its principal business office is c/o Citco B.V.I. Limited, P.O. Box

662, Road Town, Tortola, B.V.I.  Noel serves on the fund's Board of Directors.

108.     SSL was created to allocate assets between two other FGG funds, Fairfield Sentry and Arlington International Fund ("AIF").  Eighty percent of the fund's assets were invested in Fairfield Sentry, and the remaining 20% went to AIF.

109.     SSL redeemed at least $60,000 from Fairfield Sentry in 2004, and may have redeemed additional shares in other years.  (A true and accurate copy of SSL's redemption request is attached hereto as Ex. 19.)  Upon information and belief, in order to pay these redemptions, Fairfield Sentry withdrew funds from its BLMIS accounts and then transferred the funds to SSL.  As such, SSL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

110.     SSL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, SSL was managed out of FGG's New York City office.

111.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over SSL based on the fund's contacts with the U.S.

112.     **Stable Fund LP ("Stable Fund")**:  Defendant Stable Fund was an FGG fund partially invested in GS.  Stable Fund was created as a fund of funds, and placed its investors'

money with other hedge funds.  Stable Fund was a Delaware limited partnership with its

registered office located at Fairfield Greenwich Partners, LLC, 919 Third Avenue, 11th Floor,

New York, New York 10022.

113.    Upon information and belief, the only investors allowed to purchase limited

partnership interests in Stable Fund were FGG partners and employees, and their respective

spouses.

114.    In October 2008, Stable Fund redeemed $4.4 million from GS.  (A true and

accurate copy of Stable Fund's redemption confirmation is attached hereto as Ex. 20.)  Upon

information and belief, in order to pay this redemption, GS withdrew funds from its BLMIS

accounts and then transferred the funds to Stable Fund.  As such, Stable Fund's redemption

constitutes Customer Property subject to turnover to the Trustee and/or an avoidable subsequent

transfer from BLMIS recoverable by the Trustee.

115.    Stable Fund is subject to personal jurisdiction in this judicial district as it

routinely conducted business in New York, New York, purposely availed itself of the laws of the

State of New York by conducting significant commercial activities in New York, New York, and

derived significant revenue from New York, New York.  Specifically, Stable Fund was managed

out of FGG's New York City office, and Stable Fund's general partner, Fairfield Greenwich

Partners, LLC ("FGP") (*see infra* ¶¶163-167), is located in New York, New York.

116.    Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has

personal jurisdiction over Stable Fund based on the fund's contacts with the U.S.

## 2.    FGG Investment Managers and Other Administrative Entities

117.    By marketing Madoff's strategy, the FGG investment managers and other FGG administrative entities received large sums of money.

118.    According to FGG's records, its assets under management increased as follows:

### Assets Under Management by FGG

| Year | AUM |
|------|-----|
| 2002 | $5 billion |
| 2003 | $5 billion |
| 2004 | $8 billion |
| 2005 | $9 billion |
| 2006 | $10 billion |
| 2007 | $16 billion |
| 2008 | $14 billion |

119.    This growth in assets under management resulted in increasing fees to the various FGG investment managers and administration entities.  FGG later modified its fee structure to be among the most aggressive in the hedge fund industry.

120.    The Defendants established a broad network of investment managers and administrative entities in order to maximize fee revenue derived from BLMIS.  Those entities passed monies through two principal entities – FGB and FGL.  The FGG entities generated fees from their relationships with BLMIS totaling in excess of one billion dollars.

121.    **Fairfield Greenwich (Bermuda) Ltd. ("FGB")**:  Along with FGL, Defendant FGB is one of the two principal FGG operating entities.  FGB is a company incorporated in Bermuda on June 13, 2003, with its principal place of business at 131 Front Street, First Floor,

Hamilton, Bermuda, HM 11.  FGB's mailing address is 12 Church Street, Suite 606, Hamilton, Bermuda, HM 11.

122.     Prior to 2003, FGL served as the investment manager to Fairfield Sentry, Sigma, and Lambda.  In 2003 FGL assigned these management agreements to FGB.  A potential investor communicated his belief that the change in management structure was an "attempt by Madoff to avoid SEC scrutiny of his firm and market making activities.  This concern seems to be prevalent in Switzerland and has been expressed by a good number of other investor or potential investors in Fairfield Sentry."  (A true and accurate copy of the July 2, 2003 email to Tucker and Boele is attached hereto as Ex. 21.)

123.     FGB was, until 2007, a wholly-owned subsidiary of FGL.  In 2007, ownership of FGB was transferred from FGL to FGL's shareholders.  The shareholders included Fairfield International Managers, Inc. ("FIM") (36.8%) − co-owned by Noel and Tucker, Safehand Investment (27.5%) – owned exclusively by Piedrahita, and many of the other Management Defendants and Sales Defendants.  (A true and accurate copy of an excerpt from an FGG chart that contains the proposed shareholder register for FGL is attached hereto as Ex. 22.)

124.     FGB has been registered with the SEC as an investment adviser since at least 2003.  As a registered investment adviser, FGB filed Form 13Fs with the SEC.  FGB's 13Fs were signed by Defendant Mark McKeefry ("McKeefry"), as FGB's general counsel, from FGG's New York offices.

125.     FGB acted as the investment manager to Fairfield Sentry from July 1, 2003 to December 11, 2008.  As compensation for these services, FGB received a management fee equal to 1% of the net asset value of the fund, as well as a performance fee equal to 20% of net profits

from the fund. Unlike other hedge funds that paid fees on an annual basis, to increase the fees paid to FGB, Fairfield Sentry paid the management fee monthly and the performance fee quarterly.

126.    According to Fairfield Sentry's financial statements, between 2003 and the first half of 2008, FGB received the following fees from Fairfield Sentry:

**Fees Earned by FGB for Serving as Investment Manager to Fairfield Sentry[4]**

| Year | Management Fees | Performance Fees | Total Fees |
|------|-----------------|------------------|------------|
| 2003 | $5,221,000 | $80,515,000 | $85,736,000 |
| 2004 | $21,549,000 | $81,278,000 | $102,827,000 |
| 2005 | $51,127,000 | $87,225,000 | $138,352,000 |
| 2006 | $50,465,000 | $107,779,000 | $158,244,000 |
| 2007 | $67,322,000 | $116,157,000 | $183,479,000 |
| 2008 | $36,134,000 | $46,070,000 | $82,204,000 |
| **TOTAL** | **$231,818,000** | **$519,024,000** | **$750,842,000** |

127.    Upon information and belief, in order to pay FGB's fees, Fairfield Sentry withdrew funds from BLMIS and then transferred the funds to FGB; as such, the fee payments constitute Customer Property subject to turnover to the Trustee and/or are avoidable subsequent transfers from BLMIS recoverable by the Trustee.

128.    FGB acted as manager to Irongate, for which it received a 0.8% management fee and 10% performance fee.  Irongate's financial statements indicate these fees totaled:

---

[4]       All fees described herein have been rounded here to the nearest thousand.

**Fees Earned by FGB While Serving as Manager to Irongate**

| Year | Management Fees | Performance Fees | Total Fees |
|---|---|---|---|
| 2005 | $2,387,000 | $2,532,000 | $4,918,000 |
| 2006 | $7,493,000 | $7,986,000 | $15,479,000 |
| 2007 | $14,189,000 | $18,012,000 | $32,201,000 |
| **TOTAL** | **$24,069,000** | **$28,529,000** | **$52,599,000** |

129.    Upon information and belief, in order to pay FGB's fees, Irongate redeemed

shares of Fairfield Sentry.  In order to pay Irongate's redemptions, Fairfield Sentry withdrew

funds from BLMIS and transferred the funds to Irongate, which in turn transferred the funds to

FGB to pay its fees.  As such, the Irongate redemptions and FGB fee payments constitute

Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from

BLMIS recoverable by the Trustee.

130.    FGB also served as general partner to GS and GSP.  In its role as general partner,

FGB was responsible for directing GS's and GSP's investment and trading activities.  FGB

began serving as general partner to GS on June 13, 2003, and continued to serve in that capacity

until 2004.  GBL served as GS's general partner between 2004 and 2006.  FGB then resumed as

general partner in 2006.  The performance fees for 2004 and 2006 were split between GBL and

FGB based upon when each served as general partner.  FGB has served as general partner to

GSP since the fund commenced operations on May 1, 2006.

131.    FGB earned management and performance fees from GS and GSP.  In 2003, as

general partner to GS, FGB earned a performance fee equal to 20% of capital appreciation and a

management fee equal to 0.1% of assets under management.  The management fee was removed

in 2004, and the 0.1% fee was instead passed along to FGA for expense reimbursement.  After

GSP was created in 2006, FGB returned as GS's general partner and began charging an increased

35

management fee equal to 1% of the assets under management, in addition to the 20% performance fee, for both GS and GSP. GS's and GSP's financial statements indicate FGB earned the following fees while serving as general partner to GS and GSP:

### Fees Earned by FGB While Serving as General Partner to GS

| Year | Management Fees | Performance Fees | Total Fees |
|---|---|---|---|
| 2003 | $59,000 | $2,620,000 | $2,679,000 |
| 2004 | N/A | $2,644,000 | $2,644,000 |
| 2005 | N/A | N/A | N/A |
| 2006 | $282,000 | $2,929,000 | $3,211,000 |
| 2007 | $987,000 | $3,054,000 | $4,041,000 |
| **TOTAL** | **$1,328,000** | **$11,247,000** | **$12,575,000** |

### Fees Earned by FGB While Serving as General Partner to GSP

| Year | Management Fees | Performance Fees | Total Fees |
|---|---|---|---|
| 2006 | $16,000 | $93,000 | $109,000 |
| 2007 | $57,000 | $186,000 | $243,000 |
| **TOTAL** | **$73,000** | **$278,000** | **$351,000** |

132. Upon information and belief, FGB received the management fees and performance fees in the form of limited partnership interests. During the years in which FGB served as general partner to GS and GSP, FGB redeemed limited partnership interests worth:

### Redemptions from GS by FGB

| Year | Redemptions by FGB |
|---|---|
| 2003 | $2,500,000 |
| 2004 | $4,000,000 |
| 2005 | $0 |
| 2006 | $4,200,000 |
| 2007 | $3,304,000 |
| 2008 | $259,000 |
| **TOTAL** | **$14,263,000** |

**Redemptions from GSP by FGB**

| Year | Redemptions by FGB |
|------|-------------------|
| 2006 | $0 |
| 2007 | $248,000 |
| 2008 | $40,000 |
| **TOTAL** | **$288,000** |

133.     Upon information and belief, in order to pay FGB's fees and redemptions, GS and

GSP withdrew funds from BLMIS and transferred the funds to FGB.  As such, FGB's

redemptions and fee payments constitute Customer Property subject to turnover to the Trustee

and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.  In addition, as

the general partner to GS and GSP, FGB is liable for the repayment of GS's and GSP's debts and

obligations.  During the years in which FGB acted as general partner, GS withdrew more than

$124.0 million from BLMIS, and GSP withdrew more than $6.0 million.  FGB is directly liable

for the repayment of these withdrawals which constitute Customer Property subject to turnover

to the Trustee and/or avoidable transfers recoverable by the Trustee.

134.     FGB is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by conducting significant commercial activities in New York, New York, and derived

significant revenue from New York, New York.  Specifically, FGB was managed out of FGG's

New York City office.  In addition, FGB filed customer claims, whereby it submitted to the

jurisdiction of this Court.

135.     Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGB based on the entity's contacts with the U.S.

136. **Fairfield Greenwich Limited ("FGL")**: Defendant FGL was originally incorporated under the laws of Ireland in 1997 and was reorganized as a Cayman Islands limited liability company on January 1, 2002. FGL's mailing address is c/o Charles, Adams, Ritchie & Duckworth, Second Floor, Zephyr House, P.O. Box 709, George Town, Grand Cayman, Cayman Islands, B.W.I. FGL is registered to do business in the State of New York and lists its principal executive office as FGG's offices in New York, New York.

137. FGL owned 100% of FGA and, until 2007, owned 100% of FGB. FGL was also a 100% owner of Fairfield Heathcliff Capital LLC ("FHC") (*see infra* ¶¶168-172). As owner of these entities, FGL received the benefit of fees these entities earned through their association with the Feeder Funds.

138. FGL served as investment manager and placement agent to a number of FGG funds. Between 1999 and 2003, FGL acted as investment manager to Fairfield Sentry. In this capacity, FGL received a 20% performance fee. In 2002 and 2003, FGL also received a 1% management fee. In total, according to Fairfield Sentry's financial statements, FGL received the following fees:

**Fees Earned by FGL While Serving as Investment Manager to Fairfield Sentry**

| Year | Management Fees | Performance Fees | Total Fees |
|---|---|---|---|
| 1999 | N/A | $68,833,000 | $68,833,000 |
| 2000 | N/A | $73,575,000 | $73,575,000 |
| 2001 | N/A | $84,664,000 | $84,664,000 |
| 2002 | $3,844,000 | $83,591,000 | $87,435,000 |
| 2003 | $5,221,000 | $80,515,000 | $85,736,000 |
| **TOTAL** | **$9,065,000** | **$391,178,000** | **$400,243,000** |

139.    Based upon information and belief, in order to pay FGL's fees, Fairfield Sentry withdrew funds from its BLMIS account and then transferred the funds to FGL.  As such, FGL's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

140.    In addition, FGL served as the investment adviser to the FIT Funds, for which it received a 0.1% expense reimbursement, and as the placement agent to FIFL and FIFA, for which it received a 1% placement fee.  FIFL's financial statements show FGL earned placement fees totaling:

**Fees Earned by FGL While Serving as Placement Agent to FIFL**

| Year | Placement Fees |
|---|---|
| 2005 | $9,070,000 |
| 2006 | $5,409,000 |
| 2007 | $4,985,000 |
| **TOTAL** | **$19,464,000** |

141.    Based upon information and belief, in order to pay FGL's fees, FIFL redeemed shares of Fairfield Sentry.  In order to pay FIFL's redemptions, Fairfield Sentry withdrew funds from BLMIS and then transferred the funds to FIFL, which in turn transferred the funds to FGL.

As such, FIFL's redemptions and FGL's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

142.    FGL also served as general partner to GS from 1999 to 2003, for which it earned a 20% performance fee.  Financial statements for GS indicate these fees totaled:

**Fees Earned by FGL While Serving as General Partner to GS**

| Year | Performance Fees |
|------|------------------|
| 1999 | $3,406,000 |
| 2000 | $3,252,000 |
| 2001 | $3,144,000 |
| 2002 | $2,736,000 |
| 2003 | $2,620,000 |
| **TOTAL** | **$15,158,000** |

143.    FGL and FGB each acted as general partner of GS for half of 2003.  The fees paid in 2003 were split between FGL and FGB based upon when each served as general partner.

144.    FGL received its performance fees in the form of limited partnership interests, of which it redeemed the following amounts:

**Redemptions from GS by FGL**

| Year | Redemptions by FGL |
|------|--------------------|
| 1999 | $1,725,000 |
| 2000 | $1,850,000 |
| 2001 | $12,129,000 |
| 2002 | $895,000 |
| 2003 | $2,500,000 |
| **TOTAL** | **$19,099,000** |

145.    Upon information and belief, in order to pay FGL's redemptions, GS withdrew funds from BLMIS and transferred the funds to FGL.  As such, FGL's redemptions constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from

BLMIS recoverable by the Trustee.  In addition, as general partner to GS, FGL is directly liable for the repayment of GS's withdrawals from 1999 to 2003, totaling in excess of $58.0 million, which constitute Customer Property subject to turnover to the Trustee and/or avoidable transfers recoverable by the Trustee.

146.    FGL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FGL was managed out of FGG's New York City office.  In addition, FGL is licensed to do business in the State of New York and maintained its principal executive office in New York, New York.

147.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FGL based on the entity's contacts with the U.S.

148.    **Fairfield Greenwich Advisors LLC ("FGA")**:  Defendant FGA is a Delaware limited liability company and a wholly-owned subsidiary of FGL.  FGA is also registered as an investment adviser with the SEC.  Its offices are located in New York, New York.

149.    FGA provided administrative services and back-office support to GS, GSP, Sigma, and Lambda.  According to financial statements issued by those funds, FGA received the following fees:

41

**Fees Earned by FGA for Providing Administrative Services to GS**

| Year | Fees |
|------|------|
| 2004 | $41,000 |
| 2005 | $171,000 |
| 2006 | $137,000 |
| 2007 | $109,000 |
| **TOTAL** | **$458,000** |

150.     Based upon information and belief, in order to pay FGA's fees, GS withdrew funds from its BLMIS account and then transferred the funds from BLMIS to FGA.  As such, GS's withdrawals and FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

**Fees Earned by FGA for Providing Administrative Services to GSP**

| Year | Fees |
|------|------|
| 2006 | $4,000 |
| 2007 | $7,000 |
| **TOTAL** | **$11,000** |

151.     Based upon information and belief, in order to pay FGA's fees, GSP withdrew funds from its BLMIS account and then transferred the funds from BLMIS to FGA.  As such, FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

**Fees Earned by FGA for Providing Administrative Services to Sigma**

| Year | Fees |
|------|------|
| 2003 | € 247,200 |
| 2004 | € 247,000 |
| 2005 | € 459,000 |
| 2006 | € 562,000 |
| 2007 | € 960,000 |
| **TOTAL** | **€ 2,273,000** |

42

**Fees Earned by FGA for Providing Administrative Services to Lambda**

| Year | Fees |
|------|------|
| 2004 | CHF 59,000 |
| 2005 | CHF 72,000 |
| 2006 | CHF 61,000 |
| 2007 | CHF 61,000 |
| **TOTAL** | **CHF 254,000** |

152.    Upon information and belief, in order to pay FGA's fees, Sigma and Lambda redeemed shares of Fairfield Sentry.  Upon information and belief, in order to pay Sigma's and Lambda's redemptions, Fairfield Sentry withdrew funds from BLMIS and transferred the funds to Sigma and Lambda.  In turn, Sigma and Lambda transferred the funds to FGA.  As such, Sigma's and Lambda's redemptions and FGA's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

153.    FGA provided similar services to SSL, for which it received a fee equal to 0.1% of assets under management.

154.    FGA also served as investment manager to a number of FGG funds.  These funds included:  Chester LP, for which FGA received a management fee equal to 0.8%; Stable Fund, for which FGA received a 1% management fee; FIL-Yen, for which FGA received a 0.1% expense reimbursement; FIL-Swiss, for which FGA received a 0.1% expense reimbursement; and FIFL and FIFA, for which FGA received an expense reimbursement of 0.15% and 0.1%, respectively.

155.    Upon information and belief, some if not all of these fees were paid with funds originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, these fees constitute

Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from

BLMIS recoverable by the Trustee.

156.    FGA is subject to personal jurisdiction in this judicial district as it routinely

conducted business in New York, New York, purposely availed itself of the laws of the State of

New York by undertaking significant commercial activities in New York, New York, and

derived significant revenue from New York, New York.  Specifically, FGA's principal place of

business is located in New York, New York.

157.    Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy, a federal court has personal jurisdiction over any

defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over

FGA based on the entity's contacts with the U.S.

158.    **Fairfield Greenwich GP, LLC ("FGGP")**:  Defendant FGGP is a Delaware

limited liability company.  Its principal office is located at 575 Madison Avenue, New York,

New York 10022.  FGGP is a wholly-owned subsidiary of FGL.

159.    FGGP acted as general partner to Chester LP, for which it earned a 10%

performance fee in the form of limited partnership interests in Chester LP.  Upon information

and belief, FGGP redeemed some of the limited partner interests it received as payment from

Chester LP.  Chester LP was invested in Fairfield Sentry.  In order to pay FGGP's redemptions,

Chester LP redeemed shares of Fairfield Sentry.  Upon information and belief, to pay Chester

LP's redemptions Fairfield Sentry withdrew funds from BLMIS and then Chester transferred the

funds to FGGP.  As such, the redemptions FGGP received from Chester LP constitute Customer

Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS

recoverable by the Trustee.

160.    Because FGGP served as general partner to Chester LP, it is directly liable for all avoidable transfers from BLMIS to Chester LP.

161.    FGGP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York. Specifically, FGGP's principal place of business is located in New York, New York.

162.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over FGGP based on the entity's contacts with the U.S.

163.    **Fairfield Greenwich Partners, LLC ("FGP")**: Defendant FGP is a Delaware limited liability company organized in 2003. Its principal office is located at 575 Madison Avenue, New York, New York.

164.    FGP acted as general partner to Stable Fund, for which it received a 10% performance fee in the form of limited partnership interests in Stable Fund. Upon information and belief, FGP redeemed some of the limited partnership interests it received as payment from the Stable Fund. As explained above, Stable Fund was partially invested in GS. Upon information and belief, in order to pay the Stable Fund redemptions, GS withdrew funds from BLMIS and then Stable Fund transferred the funds to FGP. As such, FGP's redemptions

constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

165.    Because FGP served as general partner to Stable Fund, it is directly liable for all amounts Stable Fund redeemed from GS.  Upon information and belief, some if not all of those redemptions were paid by funds withdrawn from GS's accounts at BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

166.    FGP is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FGP was managed out of FGG's New York City office and maintained its principal place of business in New York, New York.

167.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FGP based on the entity's contacts with the U.S.

168.    **Fairfield Heathcliff Capital LLC ("FHC")**:  Defendant FHC is a Delaware limited liability company and a broker-dealer registered with the SEC.  It is also an affiliate of FGGP.

169.     FHC served as placement agent to Chester LP and oversaw the marketing of the fund's limited partnership interests.  As placement agent, FHC received a fee equal to 5% of the capital contributions it solicited.

170.     Upon information and belief, some if not all of these fees were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, FHC's fees constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

171.     FHC is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FHC was managed out of FGG's New York City office.

172.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FHC based on the entity's contacts with the U.S.

173.     **Fairfield International Managers, Inc. ("FIM")**:  Defendant FIM is a Delaware corporation formed on January 4, 1988.  The purpose of FIM is to act as an investment manager and to engage in all phases of the securities business.

174.    The original directors of FIM were Noel, Tucker, and Kolber, who later left FIM. As of 2003, Defendants Noel and Tucker each owned 50% of the shares of FIM.  FIM owns significant shares in both FGB and FGL.

175.    FIM received funds from the Feeder Funds' BLMIS accounts through its direct and indirect ownership of FGB and FGL.  Upon information and belief, some, if not all, of the monies paid to FIM were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

176.    FIM is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, FIM was managed out of FGG's New York City office.

177.    Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over FIM based on the entity's contacts with the U.S.

178.    **Fairfield Greenwich (UK) Limited ("Fairfield-UK")**:  Defendant Fairfield-UK is an FGG entity incorporated in England and Wales in 1997.  Its registered office is located at Fifth Floor, 32 Dover Street, London W1X 3RA, England.

179.   Fairfield-UK served as investment manager to Chester, for which it received fees from Chester Management.  Fairfield-UK also served as investment manager to FGF. Depending on the FGF share class Fairfield-UK received a management fee of between 0.55% and 1%, a performance fee of between 0% and 10%, and an expense reimbursement equal to 0.1%.

180.   Upon information and belief, some if not all of Fairfield-UK's fees were paid with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

181.   Fairfield-UK is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, Fairfield-UK was managed out of FGG's New York City office.

182.   Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Fairfield-UK based on the entity's contacts with the U.S.

183.   **Greenwich Bermuda Limited ("GBL")**:  Defendant GBL is a Bermuda corporation.  GBL served as the general partner of GS from December 23, 2004 to March 1, 2006.  GS's financial statements indicate that, during that time, GBL earned the following performance fees:

49

**Fees Earned by GBL While Serving as General Partner to GS**

| Year | Performance Fees |
|------|------------------|
| 2004 | $2,644,000 |
| 2005 | $2,451,000 |
| 2006 | $2,929,000 |
| **TOTAL** | **$8,024,000** |

184.     The performance fees for 2004 and 2006 were split between GBL and FGB based upon when each served as general partner.

185.     GBL received its fees in the form of limited partnership interests in GS.  Upon information and belief, GBL redeemed some of its GS limited partnership interests.  Upon information and belief, in order to pay GBL's redemptions, GS withdrew funds from its BLMIS account and then transferred the funds to GBL.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

186.     GBL is subject to personal jurisdiction in this judicial district as it routinely conducted business in New York, New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York, and derived significant revenue from New York, New York.  Specifically, GBL was managed out of FGG's New York City office.

187.     Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over GBL based on the entity's contacts with the U.S.

188.    **Chester Management (Cayman) Limited ("Chester Management")**:

Defendant Chester Management is an FGG entity incorporated in the Cayman Islands on

February 12, 2003 as a limited liability company.  Its registered office is located at P.O. Box 309,

Ugland House, George Town, Cayman Islands, B.W.I.

189.    Chester Management served as manager to Chester, for which it received a 0.8%

management fee and 10% performance fee.   According to Chester's financial statements,

between 2003 and 2007, these fees totaled:

**Fees Earned by Chester Management While Serving as Manager to Chester**

| Year | Management Fees | Performance Fees | Total Fees |
|------|-----------------|------------------|------------|
| 2003 | $1,322,000 | $1,404,000 | $2,726,000 |
| 2004 | $6,017,000 | $4,788,000 | $10,804,000 |
| 2005 | $8,292,000 | $8,997,000 | $17,289,000 |
| 2006 | $13,442,000 | $14,004,000 | $27,446,000 |
| 2007 | $18,400,000 | $20,330,000 | $38,730,000 |
| **TOTAL** | **$47,472,000** | **$49,523,000** | **$96,995,000** |

190.    Upon information and belief, some if not all of these fees were paid with funds

that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, they

constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent

transfers from BLMIS recoverable by the Trustee.

191.    Chester Management is subject to personal jurisdiction in this judicial district as it

routinely conducted business in New York, New York, purposely availed itself of the laws of the

State of New York by undertaking significant commercial activities in New York, New York,

and derived significant revenue from New York, New York.  Specifically, Chester Management

was managed out of FGG's New York City office.

192.    Finally, where a federal statute provides for nationwide service of process, as does

Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal

jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has

personal jurisdiction over Chester Management based on the entity's contacts with the U.S.

### 3.    Management Defendants

193.    **Walter Noel**:  Defendant Noel is a founding partner of FGG and sat on its Board

of Directors.  He also served as a director of Fairfield Sentry, Sigma, and FGB and as a general

partner to GS from 1992 to 1998.  Noel is also an indirect shareholder in FGB.

194.    As one of FGG's founding partners, Noel was intimately involved with its

operations.  Noel made day-to-day management decisions regarding the Feeder Funds and the

FGG Affiliates.  He was also involved in marketing the Feeder Funds, as well as the preparation

and review of sales and marketing materials.

195.    As further described below, Noel was acutely aware of many facts and red flags,

that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to

conduct any proper, independent and reasonable due diligence or follow up.

196.    Noel and his immediate and extended family became exceptionally wealthy due

to FGG's *de facto* partnership with Madoff.  Noel took for himself and his family hundreds of

millions of dollars of Customer Property in the form of fees and profits.  This unjust enrichment

enabled him, and his family, to live what has been publicly described as a life of grandeur,

including a mansion in Greenwich, Connecticut, a tropical retreat in Mustique, and extravagant

vacation homes in Palm Beach and Southampton.  (A true and accurate copy of the April 2009

Vanity Fair article entitled, "Greenwich Mean Time," is attached hereto as Ex. 23.)

197.    Partners of FGG received three types of compensation.  In addition to standard salaries and bonuses, they also received "partnership distributions."  Each partner was assigned a specific percentage of the profits earned from all of the FGG entities.  When the profits were gathered, they were then distributed to the partners based on their percentage allocation.

198.    As a founding partner, Noel received some of the largest distributions.  Between 2002 and 2008 alone, Noel received the following partnership distributions:  $11.4 million in 2002, $10.6 million in 2003, $21.7 million in 2004, $25.4 million in 2005, $29.7 million in 2006, $28.2 million in 2007, and $12.3 million in 2008, for a total of approximately $114 million between 2002 and 2008.  Upon information and belief, Noel received these distributions, as well as additional compensation in the form of salary and bonuses, during each year the Feeder Funds maintained accounts at BLMIS.

199.    Upon information and belief, Noel and his family also received the benefit of redemptions from GS made by the Walter M. Noel Jr. IRA and the Noel Family, LLC.  Upon information and belief, the former redeemed $2.5 million in 2006, and the latter redeemed $400,000 in 2008.  In addition, as an indirect shareholder in FGL and FGB, Noel received the benefit of many payments to FGL and FGB, which were paid by funds withdrawn from the Feeder Funds' BLMIS accounts.

200.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

201. Noel is also personally responsible for repayment to the Trustee of all avoidable transfers received by GS while he was the general partner. During that time, between 1992 and 1998, GS redeemed approximately $37 million from its BLMIS account.

202. Noel is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, Noel filed customer claims, whereby he submitted to the jurisdiction of this Court. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Noel based on his contacts with the U.S.

203. **Jeffrey Tucker**: Defendant Tucker is a founding partner of FGG and sits on its Board of Directors. He served as a director of FGB and FGL, and as a principal of FGL. He also served, along with Noel, as general partner of GS from 1992 to 1998. Tucker is an indirect shareholder in FGB.

204. Tucker was intimately involved with FGG's operations, including the operation of the Feeder Funds. As a director, Tucker was involved in making day-to-day management decisions regarding the Feeder Funds and the FGG Affiliates. He also reviewed and helped prepare sales and marketing materials.

205.    As further described below, Tucker was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

206.    Tucker and his immediate and extended family became exceptionally wealthy due to FGG's *de facto* partnership with Madoff.  Prized racehorses, private jets, and luxurious mansions were just a few of the riches amassed by Tucker from management and partnership fees received for facilitating the fraud.

207.    Tucker received substantial partnership distributions, including $11.4 million in 2002, $10.6 million in 2003, $21.7 million in 2004, $25.4 million in 2005, $29.7 million in 2006, $28.2 million in 2007, and $12.3 million in 2008, for a total of approximately $114 million between 2002 and 2008.  Upon information and belief, Tucker received these distributions, as well as additional compensation in the form of salaries and bonuses, during each year FGG maintained accounts with BLMIS beginning from 1990 forward.

208.    In addition, as an indirect shareholder in FGL and FGB, Tucker received the benefit of many payments to FGL and FGB which were paid by funds withdrawn from the Feeder Funds' BLMIS accounts.  Tucker is also personally responsible for repayment to the Trustee of any avoidable transfers received by GS while he was the general partner.

209.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' accounts at BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

210.    Tucker is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, Tucker is subject to personal jurisdiction in this judicial district as he is a resident of New York, New York, and Tucker filed a customer claim, whereby he submitted to the jurisdiction of this Court.  Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Tucker based on his contacts with the U.S.

211.    **Andrés Piedrahita**:  Defendant Piedrahita is a founding partner of FGG, a member of the Board of Directors, and Chairman of its Executive Committee.  He has served on FGG's Executive Committee since its inception in 2007.   He also served as Director and President of FGB and owned, directly or indirectly, between 10% and 25% of FGB.  In 2007 and 2008, Piedrahita was the highest paid partner at FGG.

212.    Piedrahita was intimately involved with FGG's operations, including the operations of the Feeder Funds.  As a member of the Executive Committee and Chairman of the Board of Directors, Piedrahita was deeply involved in making day-to-day management decisions regarding the FGG entities.

213.    As further described below, Piedrahita was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

56

214.    Piedrahita became exorbitantly rich by serving as a Madoff globetrotting salesman.  According to published reports, he lived a whirlwind lifestyle of Gulfstream jets, multi-million dollar yachts, extravagant parties, pheasant hunting with royalty, and spent tens of millions of dollars on homes around the world.  (A true and accurate copy of the March 31, 2009 Wall Street Journal article entitled, "The Charming Mr. Piedrahita Finds Himself Caught in the Madoff Storm," is attached hereto as Ex. 24.)  Public comments attributed to Piedrahita such as "[my job was] 'to live better than any of my clients,'" (*id.*) manifest his prevailing motivation – do nothing that might upset the Madoff relationship that made his lavish lifestyle possible.  His motivation was one of limitless greed, without regard for any interest other than his own.

215.    Piedrahita received substantial partnership distributions including approximately $9.4 million in 2002, $12.3 million in 2003, $21.3 million in 2004, $25.1 million in 2005, $31.6 million in 2006, $36.0 million in 2007, and $26.4 million in 2008, for a total of approximately $162 million between 2002 and 2008.  Upon information and belief, Piedrahita has received these distributions, as well as additional compensation in the form of salaries and bonuses, every year since he joined FGG in 1997.

216.    As a direct or indirect shareholder of FGL and FGB, Piedrahita received the benefit of many payments to FGL and FGB which were paid by funds withdrawn from the Feeder Funds' BLMIS account.

217.    Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

218.    Piedrahita is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, Piedrahita routinely received payments from FGG's New York City office and regularly attended meetings of FGG's Executive Committee and Board of Directors in New York, New York.  Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Piedrahita based on his contacts with the U.S.

219.    **Mark McKeefry**:  Defendant McKeefry joined FGG in 2003.  He became a partner in 2005 and served on FGG's Executive Committee since its inception in 2007.  He also acted as FGG's Chief Compliance Officer; FGB's Chief Legal Officer ("CLO"), Assistant Secretary, and Director; FGL's Executive Director, Chief Operating Officer, President, and Vice President; FGA's President; and Director of Fairfield-UK.  As FGG's CLO, McKeefry was responsible for legal and compliance issues.  He was also responsible for maintaining FGG's relationship with Madoff in 2007 and 2008.

220.    In his role as CLO, as well as in his numerous other roles within the FGG entities, McKeefry was responsible for approving and signing various documents on FGG's behalf.  Such documents included:  letters to investors;  Form 13F filings with the SEC; agreements with BLMIS, including customer agreements and option-trading agreements; Form ADV Applications for Investment Adviser Registration; subscription agreements; confidentiality agreements;

distribution agreements; letters of understanding; written resolutions; delegation agreements; selling agreements; and certificates of incumbency.

221.     As further described below, McKeefry was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

222.     McKeefry benefited greatly from FGG's *de facto* partnership with Madoff. McKeefry received approximately $600,000 in partnership distributions in 2005, $1.6 million in 2006, $3.4 million in 2007, and $3.4 million in 2008, for a total of $9.0 million between 2005 and 2008.  Upon information and belief, McKeefry also received significant salary and bonuses.

223.     Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds originally withdrawn from the Feeder Funds' BLMIS accounts.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

224.     McKeefry is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, upon information and belief, McKeefry is a resident of New York, New York.  Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over McKeefry based on his contacts with the U.S.

225.    **Daniel Lipton ("Lipton")**:  Defendant Lipton joined FGG in 2002.  During his employment with FGG, he served as Chief Financial Officer ("CFO") and Assistant Secretary of FGB, and Vice President and CFO of FGA.  Lipton has been a partner of FGG since 2005.

226.    As CFO, Lipton was principally responsible for overseeing the annual FGG audits.  Lipton also assisted in managing FGG's operations, including:  authorizing and requesting wire transfers into FGG accounts; communicating with FGG investors regarding audits of FGG's financial statements; and approving and signing numerous documents on FGG's behalf.  Such documents included:  letters to clients regarding amendments to their agreements with FGG and their statements for various FGG funds; the Feeder Funds' customer, option, and trading authorization agreements with BLMIS; numerous loan requests on behalf of FGG; agreements establishing FGG entities as investment managers and placement agents; requests for wire transfers redeeming money from the Feeder Funds' BLMIS accounts; and letters requesting a confirmation of assets in a number of the Funds.

227.    As further described below, Lipton was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

228.    As a partner, Lipton was compensated handsomely due to FGG's relationship with Madoff.  Lipton received partnership distributions of $200,000 in 2005, $757,000 in 2006, $1.8 million in 2007, and $1.1 million in 2008, for a total of approximately $3.8 million between 2005 and 2008.  Upon information and belief, Lipton also received significant salary and bonuses.

229.   Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

230.   Lipton is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, upon information and belief, Lipton is a resident of New York, New York.  Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Lipton based on his contacts with the U.S.

231.   **Amit Vijayvergiya ("Vijayvergiya")**:  Defendant Vijayvergiya joined FGG on June 9, 2003 as FGB's Risk Manager.  He quickly became a key player at FGB, and held the title of Vice President and Head of Risk Management in 2005, where he focused primarily on hedge fund manager selection and risk management.  On January 1, 2007, Vijayvergiya became a partner and Head of FGG's Risk Management Division in the Investment Group, reporting directly to the Executive Committee.

232.   Vijayvergiya was responsible for conducting due diligence, initial risk modeling and ongoing risk analysis on investments, fund operations services, supervising staff, and shareholder communications.  He was also charged with assessing the risk of the Feeder Fund

investments. (A true and accurate copy of Vijayvergiya's employment offer letter is attached hereto as Ex. 25.)

233. As further described below, Vijayvergiya was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

234. FGG's *de facto* partnership with Madoff proved lucrative for Vijayvergiya. After becoming a partner, Vijayvergiya received partnership distributions of $1.8 million in 2007 and $800,000 in 2008. Upon information and belief, Vijayvergiya also received significant salary and bonuses.

235. Upon information and belief, some if not all of the above-referenced payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

236. Vijayvergiya is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Vijayvergiya based on his contacts with the U.S.

237.   **Gordon McKenzie ("McKenzie")**:  Defendant McKenzie was a Director and Controller at FGB, and a member of the Fund Accounting Division in FGG's Operations Group. McKenzie joined FGG in 2003.

238.   McKenzie was responsible for accounting and back-office operations for Fairfield Sentry, Sigma, Lambda, Chester, and Irongate.  He joined FGG as a Finance Associate and was eventually elevated to Controller of FGB.  McKenzie was also part of FGG's Finance Group, whose core duties included conducting mini-audits of monthly financial statements and preparing and coordinating audits.  He worked closely with PricewaterhouseCoopers ("PwC") when it conducted audits of FGG's funds and reviewed the financial statements PwC prepared.

239.   As further described below, McKenzie was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

240.   McKenzie received significant salary and bonuses during his employment at FGB.  For instance, in 2007, he received a $180,000 bonus, in 2008, McKenzie received a salary of over $150,000 and a bonus of over $200,000.  He also received over $100,000 in deferred compensation.  Upon information and belief, McKenzie received comparable amounts each year since he joined FGG in 2003.

241.   Upon information and belief, some if not all of these payments were made with funds originally withdrawn from the Feeder Funds' BLMIS accounts.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

242.    McKenzie is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over McKenzie based on his contacts with the U.S.

243.    **Richard Landsberger ("Landsberger")**:  Defendant Landsberger joined FGG in 2001, and became an FGG partner in 2002.  He was a member of FGG's Executive Committee, Director of Fairfield-UK, and Head of Sales of FIFL.

244.    As further described below, Landsberger was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

245.    Landsberger received substantial partner distributions, including $32,000 in 2002, $690,000 in 2003, $1.6 million in 2004, $2.7 million in 2005, $3.9 million in 2006, $5.4 million in 2007, and $4.0 million in 2008, for a total of approximately $18.3 million.  Upon information and belief, Landsberger also received significant salary and bonuses.

246.    Upon information and belief, these payments and distributions were paid with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts.  As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

247.    Landsberger is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Landsberger based on his contacts with the U.S.

248.    **Philip Toub ("Toub")**:  Defendant Toub, one of Noel's sons-in-law, joined FGG in 1997 in its New York office.  Toub was a partner and member of FGG's Executive Committee.  Throughout his employment with FGG, Toub served as a Director of FGL and as a member of FGG's Client Development Group.

249.    Toub's responsibilities included developing new products and marketing FGG's offshore funds.  His product development activities focused on markets in Brazil and the Middle East.  These activities necessarily required Toub to establish relationships with a number of FGG investors and thereafter respond to customer inquiries related to Madoff.

250.    As further described below, Toub was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

251.    After becoming a partner on January 1, 2001, Toub received the following partnership distributions, totaling over $25 million:  $822,000 in 2002, $892,000 in 2003, $1.5

million in 2004, $3.9 million in 2005, $7.5 million in 2006, $8.4 million in 2007, and $3.3 million in 2008.  Upon information and belief, Toub also received significant salary and bonuses.

252.    Upon information and belief, some if not all of the payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

253.    Toub is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Toub based on his contacts with the U.S.

254.    **Charles Murphy ("Murphy")**:  Defendant Murphy joined FGG as a partner on April 1, 2007.  Based in FGG's New York office, Murphy served on FGG's Executive Committee and focused on strategy and capital markets for FGG.

255.    Murphy was heavily involved in important strategic decisions involving Madoff. Such decisions included the amount of money FGG should invest through BLMIS, which FGG funds should invest through BLMIS, and whether FGG should leverage its investor funds by borrowing cash in order to increase investments through BLMIS.  Murphy also was often

involved in email correspondence about Madoff, which included discussions about important client redemptions that were requested due to client concerns about Madoff risks.

256.    As further described below, Murphy was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

257.    Murphy received approximately $2.4 million in partnership distributions in 2007 and $2.7 million in 2008, for a total of approximately $5.1 million.  Upon information and belief, Murphy also received significant salary and bonuses.

258.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

259.    Murphy is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Murphy based on his contacts with the U.S.

260. **Robert Blum ("Blum")**: Defendant Blum served as a Managing Partner at FGG and the Chief Operating Officer of FGB and FGA. He started at FGG in 2000 and made partner on January 1, 2002. Blum resigned from his FGG positions in June of 2005. Because Blum's partnership interest had fully vested at the time of his departure, he will continue to receive distributions through 2010.

261. While serving as a Managing Partner of FGG, Blum oversaw or assisted in all aspects of FGG's activities. Blum was involved in making day-to-day management decisions related to the Feeder Funds and FGG Affiliates. He also reviewed FGG sales and marketing materials, including webcasts and monthly commentaries.

262. As further described below, Blum was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

263. Blum received substantial profit distributions and other compensation, including approximately $605,000 in 2002, $1.5 million in 2003, $2.8 million in 2004, $4.2 million in 2005, $3.7 million in 2006, $4.3 million in 2007, and $3.8 million in 2008, for a total of approximately $21 million. Upon information and belief, Blum also received significant salary and bonuses.

264. Upon information and belief, some if not all of these payments and distributions were paid with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

265.    Blum is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, Blum filed customer claims, whereby he submitted to the jurisdiction of this Court.  Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Blum based on his contacts with the U.S.

266.    **Andrew Smith ("Smith")**:  Defendant Smith was an Executive Director and partner at FGG in the Fund of Funds Division of the Investment Group.  Smith also served as a Portfolio Manager and oversaw all operations for Chester and Irongate.  Smith became a partner on January 1, 2006.  He left FGG in April 2009 and joined Sciens, the company now managing Chester, Chester LP, and Irongate, as a member of the Sciens Investment Committee and a Portfolio Manager.

267.    As a member of FGG's Executive Committee, Smith worked closely with Piedrahita, McKeefry, Landsberger, Toub, and Murphy to make day-to-day management decisions regarding the Feeder Funds and FGG Affiliates.  As the representative from FGG's Investment Group on the Executive Committee, Smith played an integral role in making decisions regarding investor and potential investor requests for information about BLMIS and Madoff.

268.    As further described below, Smith was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

269.    Smith received substantial compensation as a result of his partnership position at FGG, including approximately $1.1 million in partnership distributions in 2006, $3.8 million in 2007, and $785,000 in 2008, totaling approximately $5.6 million.  Upon information and belief, Smith also received significant salary and bonuses.

270.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

271.    Smith is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Smith based on his contacts with the U.S.

272.    **Harold Greisman ("Greisman")**:  Defendant Greisman joined FGG in 1990 in the New York office.  He served as FGG's Chief Investment Officer and was a member of the Executive Committee.  Beginning on January 1, 2002, Greisman was a partner of FGG.

273.    Greisman was responsible for overseeing the day-to-day investment activities of FGG. This required him to monitor the investment decision-making process, from initial manager search and selection to research and ongoing manager oversight. Greisman utilized Vijayvergiya and Smith, as well as additional FGG employees, to assist him in his duties as Chief Investment Officer. Both Vijayvergiya and Smith reported directly to Greisman.

274.    As further described below, Greisman was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

275.    Greisman received partnership distributions of approximately $600,000 in 2002, $900,000 in 2003, $ 1.6 million in 2004, $2.3 million in 2005, $3.7 million in 2006, $3.9 million in 2007, and $2.5 million in 2008 for a total of over $15 million. Upon information and belief, Greisman also received significant salary and bonuses.

276.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

277.    Greisman is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, upon information and belief, Greisman is a resident of New York, New York. Finally, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy

Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Greisman based on his contacts with the U.S.

278. **Gregory Bowes ("Bowes")**: Defendant Bowes was a partner of FGG and served on FGG's Executive Committee. He joined FGG in 2000 and became partner in 2002. Bowes resigned from his FGG position in 2003. But because his partnership interest had already vested, he continued to receive multi-million dollar partnership distributions.

279. As further described below, Bowes was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

280. While he was still at FGG, Bowes received partnership distributions of $605,000 in 2002 and $1.5 million in 2003. After leaving FGG, he received partnership distributions of $2.8 million in 2004, $4.2 million in 2005, $3.8 million in 2006, $4.3 million in 2007, and $3.8 million in 2008. Upon information and belief, Bowes also received significant salary and bonuses.

281. Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

282. Bowes is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State

of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Bowes based on his contacts with the U.S.

283. **Corina Noel Piedrahita ("Noel Piedrahita")**: Defendant Noel Piedrahita, daughter of Defendant Noel and wife of Defendant Piedrahita, joined FGG as a partner on January 1, 2002. Noel Piedrahita was Head of Client Services and Investor Relations and was part of FGG's Corporate Center before she retired in 2007.

284. Noel Piedrahita was intimately involved with FGG's enterprise, including the operation of its Feeder Funds. Among other things, she was responsible for approving subscriptions in and redemptions from various FGG funds, and worked closely with Tucker on a variety of issues, including how much money was to be funneled to BLMIS.

285. As further described below, Noel Piedrahita was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

286. Independent of her husband's earnings, Noel Piedrahita received approximately $300,000 in 2002, $325,000 in 2003, $800,000 in 2004, $800,000 in 2005, $1 million in 2006, $900,000 in 2007, and $1.1 million 2008, totaling over $5 million. Upon information and belief, Noel Piedrahita also received significant salary and bonuses.

287.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

288.    Noel Piedrahita is subject to personal jurisdiction in this judicial district as she routinely conducted business in New York, New York, purposely availed herself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Noel Piedrahita based on her contacts with the U.S.

### 4.    Sales Defendants

289.    **Lourdes Barreneche ("Barreneche")**:  Defendant Barreneche joined FGG in 1997, and became an FGG partner in 2002.  She was based in FGG's New York office, and worked in FGG's Business Development Group.  She was an international sales specialist who coordinated FGG's sales efforts in Latin America, Spain, Portugal, and Switzerland.

290.    As further described below, Barreneche was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

291.    As a partner of FGG, Barreneche received substantial profit distributions including $1.0 million in 2002, $1.2 million in 2003, $1.9 million in 2004, $2.8 million in 2005,

$6.6 million in 2006, $7.8 million in 2007, and $5.6 million in 2008, or approximately $27 million.  Upon information and belief, Barreneche also received significant salary and bonuses.

292.    Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

293.    Barreneche is subject to personal jurisdiction in this judicial district as she routinely conducted business in New York, New York, purposely availed herself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York.  In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of Bankruptcy, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Barreneche based on her contacts with the U.S.

294.    **Cornelis Boele**:  Defendant Boele joined FGG in 1997, and became an FGG partner in 2002.  Boele oversaw FGG's marketing efforts for offshore funds in Belgium, the Netherlands, Luxembourg, and throughout Europe.  He was responsible for structuring and raising assets, and worked for FGG's Business Development Group.

295.    As further described below, Boele was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

75

296.    Boele received approximately $493,000 in partnership distributions in 2002,
$986,000 in 2003, $2.0 million in 2004, $3.7 million in 2005, $5.4 million in 2006, $5.2 million
in 2007, and $4.7 million in 2008, for a total of approximately $23.5 million.  Upon information
and belief, Boele also received significant salary and bonuses.

297.    Upon information and belief, some if not all of these payments and distributions
were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts.
As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable
subsequent transfers from BLMIS recoverable by the Trustee.

298.    Boele is subject to personal jurisdiction in this judicial district as he routinely
conducted business in New York, New York, purposely availed himself of the laws of the State
of New York by conducting significant commercial activities in New York, New York, and
derived significant income from New York, New York.  In addition, where a federal statute
provides for nationwide service of process, as does Rule 7004 of the Federal Rules of
Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with
minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Boele based on
his contacts with the U.S.

299.    **Santiago Reyes ("Reyes")**:  Defendant Reyes joined FGG in 1996, and became a
partner on January 1, 2002.  Reyes was the head of FGG's Miami office where he was
responsible for marketing FGG's offshore funds worldwide.  Reyes was in charge of business
development and held a position on FGG's sales team, where he was responsible for
communicating with clients and convincing them and prospective investors to invest in FGG's
products, including those funds invested in BLMIS, such as Fairfield Sentry.

300. Reyes was responsible for communicating with clients and convincing them and prospective investors to invest in FGG's products, including those funds invested in BLMIS, such as Fairfield Sentry. Reyes often asked Vijayvergiya and other FGG employees for advice on how to field client questions or respond to client concerns about Madoff and Fairfield Sentry. In fact, Reyes worked closely with Vijayvergiya, requesting information on Madoff's investment strategy and Fairfield Sentry's performance.

301. As further described below, Reyes was acutely aware of many facts and red flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet failed to conduct any proper, independent and reasonable due diligence or follow up.

302. Reyes received partnership distributions of approximately $300,000 in 2002, $550,000 in 2003, $1.2 million in 2004, $1.5 million in 2005, $2.3 million in 2006, $2.2 million in 2007, and $2.0 million in 2008, for a total of approximately $10 million. Upon information and belief, Reyes also received significant salary and bonuses.

303. Upon information and belief, some if not all of these payments and distributions were made with funds that were originally withdrawn from the Feeder Funds' BLMIS accounts. As such, they constitute Customer Property subject to turnover to the Trustee and/or avoidable subsequent transfers from BLMIS recoverable by the Trustee.

304. Reyes is subject to personal jurisdiction in this judicial district as he routinely conducted business in New York, New York, purposely availed himself of the laws of the State of New York by conducting significant commercial activities in New York, New York, and derived significant income from New York, New York. In addition, where a federal statute provides for nationwide service of process, as does Rule 7004 of the Federal Rules of

77

Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with minimum contacts with the U.S. Thus, this Court has personal jurisdiction over Reyes based on his contacts with the U.S.

305. **Jacqueline Harary ("Harary")**: Defendant Harary was a partner at FGG who marketed the Feeder Funds worldwide, focusing on Latin America. She joined FGG in 1997 as part of FGG's merger with Littlestone Associates and became partner on January 1, 2002.

306. Harary's role combined both sales responsibilities and projects related to manager selection and project development. She also coordinated FGG's relationship with investors that were charitable, as well as non-profit organizations. Having been a member of the FGG team for over ten years, Harary was very familiar with FGG policies, procedures, and politics, especially related to Madoff.

307. Harary worked very closely with Vijayvergiya, communicating with him on a frequent basis regarding her client inquiries and concerns about Madoff and BLMIS. Vijayvergiya worked with Harary to craft responses to the due diligence inquires she received - responses designed to deflect straightforward questions about the lack of transparency and potential conflicts of interest at BLMIS.

308. Harary also fielded and responded to investor concerns after Madoff's arrest. Harary had knowledge about how much money was lost and how much damage was done to the Feeder Funds that had invested directly or indirectly in BLMIS.

309.    As further described below, Harary was acutely aware of many facts and red

flags, that put him on actual and/or inquiry notice that BLMIS was engaging in fraud, and yet

failed to conduct any proper, independent and reasonable due diligence or follow up.

310.    As an FGG partner, Harary received substantial partnership distributions,

including approximately $100,000 in 2002, $200,000 in 2003, $700,000 in 2004, $1.1 million in

2005, $1.5 million in 2006, $1.6 million in 2007, and $1.1 in 2008, totaling approximately $6.3

million.  Upon information and belief, Harary also received significant salary and bonuses.

311.    Upon information and belief, some if not all of these payments and distributions

were made with funds that were originally withdrawn from the Feeder Funds' accounts at

BLMIS.  As such, they constitute Customer Property subject to turnover to the Trustee and/or

avoidable subsequent transfers from BLMIS and are recoverable by the Trustee.

312.    Harary is subject to personal jurisdiction in this judicial district as she routinely

conducted business in New York, New York, purposely availed herself of the laws of the State of

New York by conducting significant commercial activities in New York, New York, and derived

significant income from New York, New York.  In addition, Harary filed a customer claim,

whereby she submitted to the jurisdiction of this Court.  In addition, where a federal statute

provides for nationwide service of process, as does Rule 7004 of the Federal Rules of

Bankruptcy Procedure, a federal court has personal jurisdiction over any defendant with

minimum contacts with the U.S.  Thus, this Court has personal jurisdiction over Harary based on

her contacts with the U.S.

**VI.    FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG**

313.    Prior to forming FGG, Noel worked in the management consulting and

international private banking businesses. He created the international private banking group at Chemical Bank and helped establish a network of offices around the world focused on asset management. In 1983, Noel left Chemical Bank to start his own consulting firm to advise foreign investors regarding U.S.-based alternative investments. Noel acted as a third-party marketer of investment products to wealthy individuals located around the world.

314.    Tucker worked as an attorney for the SEC from 1970 to 1978, after which he entered the private practice of law as a partner at Tucker, Globermand & Feinsand. While in private practice, Tucker represented Fred Kolber ("Kolber") on securities related matters. In 1987, Tucker became a general partner of Fred Kolber & Co., a registered broker-dealer. In his position as general partner, Tucker was responsible for developing and administering the firm's private investment funds. After Tucker became a general partner, Tucker and Kolber launched a domestic hedge fund, the Greenwich Options Fund ("GOF"). Kolber handled the money management and Tucker helped administer and market the fund. During this time, Tucker and Kolber sublet their offices from Noel. Through this landlord-tenant relationship, Noel became acquainted with Tucker and Kolber.

315.    In 1988, Noel, Tucker, and Kolber joined forces to create an offshore counterpart to GOF, the Fairfield Investment Fund, Ltd. Through this association, Noel and Tucker decided to become partners in what became FGG. FGG started providing marketing services for Fred Kolber & Co., and the firms merged.

316.    Eventually, Noel, Tucker, and Kolber decided to outsource the management of some portion of their funds. Tucker and Kolber started the search for a fund manager.

### A. Noel and Tucker Meet Madoff and Make Their First Investments With BLMIS

317.    In 1989, Tucker's father-in-law, Norman Schneider, introduced Madoff to Noel and Tucker. Madoff explained that his returns were more modest than some competitors, such as George Soros and Julian Robertson, but that he provided low volatility. In July of that year, Noel, Tucker, and Kolber pooled $1.5 million and invested it with BLMIS on behalf of an entity called the Fairfield Strategies Ltd. The fund then invested another $1 million with BLMIS in January 1990.

318.    Based on the returns from their initial investments, Noel and Tucker decided to place more money with Madoff and, in 1990, created Fairfield Sentry. Fairfield Sentry made its first deposit of $4 million into its account at BLMIS on November 29, 1990. Noel and Tucker offered shares of Fairfield Sentry to non-U.S. investors at a minimum initial investment of $100,000. Pursuant to the fund's offering memorandum, Fairfield Sentry's investment manager was required to invest no less than 95% of the fund's assets directly through BLMIS, which supposedly would manage the fund's money according to BLMIS's self-proclaimed "split-strike conversion strategy" ("SSC Strategy"), described in detail below.

319.    Over the next eighteen years, as a result of additional investments by Fairfield Sentry and alleged profits produced by BLMIS, Fairfield Sentry's assets grew exponentially. According to Fairfield Sentry's account statements, between November 1990 and December 2008, the fund's assets invested through BLMIS increased from $4 million to approximately $6 billion.

### B. Noel and Tucker Expand FGG's Offerings to U.S. Investors and Piedrahita Joins the Partnership

81

320.     Shortly after Fairfield Sentry was established, Noel and Tucker formed Aspen/Greenwich Limited Partners ("Aspen/Greenwich"), a Delaware limited partnership, in order to provide a domestic vehicle to funnel U.S. investor monies into BLMIS. Aspen/Greenwich eventually changed its name to GS, gave its first deposit to BLMIS on November 20, 1992, and began operations in January 1993.

321.     In 1997, FGG acquired Littlestone Associates ("Littlestone"), founded by Piedrahita, Noel's son-in-law.  With this acquisition, Piedrahita became a partner in FGG and Littlestone's clients became clients of FGG.

322.     Noel, Tucker, and Piedrahita essentially shared the responsibilities of managing and supervising the business of FGG.  Tucker emphasized operations and was considered the founder and engineer of FGG's Madoff investments, and the person responsible for FGG's direct relationship with Madoff.  Noel and Piedrahita traveled the world marketing and securing billions of dollars from investors to invest through BLMIS.  Noel carried with him short summaries of the SSC Strategy to assist him in touting the Feeder Funds' consistent returns.  (A true and accurate copy of an SSC Strategy summary sheet is attached hereto as Ex. 26.)

323.     Seeking to expand the reach of its funds to foreign currency investors, FGG launched Sigma in 1997 and Lambda in 1999.  These funds accepted investments in Euros and Swiss francs, respectively, and then invested those funds in Fairfield Sentry, which in turn gave the money to BLMIS.

324.     Based on what FGG determined to be certain legal restrictions limiting the number of U.S. investors in GS, FGG formed a Delaware limited partnership, GSP, in 2006. GSP opened its BLMIS account with a deposit on May 1, 2006.

325.     As late as December 2008, Tucker and Piedrahita were working to gather
additional funds to invest through BLMIS.  The so-called "Emerald Funds" were supposed to
apply a higher volatility, high return strategy, and were to be marketed for BLMIS exclusively
by FGG.

### C.     FGG's Operations

326.     On paper, FGG appeared to be a group of discrete entities.  In reality, FGG
operated as one cohesive unit with Noel, Tucker, and Piedrahita at the helm.  Along with a core
group of other individuals at FGG, Noel, Tucker, and Piedrahita oversaw all of FGG's
operations.

327.     The compensation structure at FGG was similarly consolidated.  The profits
"earned" by all FGG entities passed through FGB and FGL, and then were distributed to the
various partners.  Compensation documents called "Partner Comp Worksheets 2008," contained
details of partnership distributions for each Defendant that was an FGG partner.  (A true and
accurate copy of such worksheets is attached hereto as Ex. 27.)

328.     The inter-relations among the FGG entities is clear from the multiple roles played
by individuals across the entities.  For instance, Tucker was a director of FGB, and general
partner of GS and FGL.  Tucker also sat on the Management Committee and the Board of
Directors of these entities.  In addition, he co-owned FIM, the legal entity through which Tucker
and Noel owned between 25-50% of FGB.  Likewise, Tucker was extensively involved in
operations at Fairfield Sentry.  He participated in countless discussions within FGG regarding the
fund, responded to investors' inquiries relating to the fund, and was for many years Fairfield
Sentry's principal contact with Madoff.

329.    The Feeder Funds and FGG Affiliates are similarly interconnected.  For example,

FGL served as placement agent to Defendants Fairfield Sentry, Sigma, and Lambda; general

partner to GS (from January 1, 2002 to June 30, 2003); investment manager to Fairfield Sentry

(from December 31, 2001 to June 1, 2003); and investment adviser and placement agent to other

FGG funds further discussed below.

330.    Each FGG entity had its own roster of officers drawn from the same group of

FGG employees and operations.  All of the entities were run by the same group of individuals:

Noel, Tucker, and Piedrahita, the FGG "Founding Partners;" McKeefry, FGG's Chief Legal

Officer and Chief Operating Officer; Lipton, FGG's Chief Financial Officer; Vijayvergiya,

FGG's Head of Risk Management; McKenzie, Controller for FGB; Blum, FGG's Chief

Operating Officer until 2005; Greisman, FGG's Chief Investment Officer; Noel Piedrahita,

FGG's Head of Client Services and Investor Relations; and the remaining members of the

Executive Committee, Landsberger, Toub, Murphy, Smith, and Bowes.  With the exception of

Defendant McKenzie, all of the Management Defendants were partners of FGG and received

partnership distributions.  These individuals constitute the Management Defendants.

331.    The Sales Division of FGG was responsible for marketing the Feeder Funds to

potential investors and then directing that money to BLMIS.  The Sales Division was headed by

the following FGG partners:  Barreneche, Boele, Reyes, and Harary.  These individuals

constitute the Sales Defendants.

332.    Each of these individuals was assigned a title at a number of FGG entities, but

those were distinctions in name only.

## VII.    THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD

333.    Madoff initially operated by luring in individual investors.  His early success came through money deposited from individuals as well as the efforts of various feeder entities such as Avellino & Bienes, a small Fort Lauderdale-based accounting firm that sold to investors notes that were backed by BLMIS's returns.

334.    For BLMIS to survive as a Ponzi scheme it needed massive, regular injections of cash to fuel the scheme.  Madoff could have raised money directly from U.S. institutional investors but he knew that such an approach might have subjected BLMIS to strict regulatory scrutiny applicable to banks and pension funds.   By contrast, the hedge fund arena, in which the Feeder Funds operated, was largely unregulated.  This friendlier regulatory environment led Madoff to turn to "intermediaries" – hedge funds and funds of funds, like the Feeder Funds, which could, and did, deliver large amounts of cash.

335.    The relationship between FGG and Madoff was a *de facto* partnership.  FGG and the Defendants procured billions of dollars that Madoff stole over many years, and the alleged returns generated by the Feeder Funds' BLMIS accounts were the engine that drove FGG's success.  Simply put, BLMIS needed FGG and other large investors to help it survive and FGG needed BLMIS to make the Defendants their ill-gotten fortunes.

### A.    *The Defendants' Investment Strategy*

336.    Outwardly, Madoff attributed the consistent investment success of the BLMIS IA Business to the SSC Strategy.  Madoff promised customers such as Fairfield Sentry that: (a) their funds would be invested in a basket of approximately 35 to 50 common stocks selected from the S&P 100 Index which consists of publicly listed stocks of the 100 largest companies in terms of their market capitalization traded on the New York Stock Exchange ("NYSE") and NASDAQ;

(b) the basket of stocks would closely mimic the price movements of the S&P 100; (c) the investments would be hedged by option contracts related to the S&P 100 Index, thereby limiting potential losses caused by unpredictable changes in stock prices; (d) he would opportunistically time the entry and exit from the strategy; and (e) when account funds were not invested in the basket of stocks and options described above, they would be invested in money market funds and Treasurys.

337.     Beyond the purchases of equities, the other key component of the SSC Strategy was the hedge of the purchased basket of stocks with S&P 100 Index option contracts. Madoff purported to purchase out-of-the-money S&P 100 put options, and sell out-of-the-money S&P 100 call options, corresponding to the notional amount of the stocks in the basket he claimed he was buying. The put options would theoretically control the downside risk of price changes in the basket of stocks. The call options he purported to sell would likewise limit the potential upside gain in the basket, but were sold so that the premium from their sale could be used to finance the cost of purchasing the put options. Madoff represented that when he believed or sensed it was time to exit the market, he would sell the basket of stocks, close out the options positions, and invest the resulting cash in Treasurys or mutual funds holding Treasurys. BLMIS would purportedly enter and exit the market a few times a year.

338.     FGG embraced the SSC Strategy as its own and went to great lengths to downplay, and, in fact, conceal Madoff's key role in its business. For nearly two decades, the Feeder Funds, with the help and complicity of the Management and Sales Defendants, raised billions of dollars for Madoff's scheme while making hundreds of millions of dollars for themselves in management and performance fees for selling a fraudulent scheme. The Defendants knew, and/or should have known, that all aspects of the strategy were a fabrication.

## B.    *The Defendants Facilitate the Scheme Through Marketing and Sales*

339.    The Defendants repeatedly told investors and potential investors they actively monitored Madoff, his auditor, the execution of the SSC Strategy, and BLMIS's performance. The Defendants claimed to have verified that trading actually occurred and that the assets in BLMIS custody actually existed.  Nothing could have been further from the truth.

340.    In exchange for the hundreds of millions of dollars in fees, partnership interests, distributions, and other earnings the Defendants garnered from their *de facto* partnership with Madoff, the Defendants provided extraordinary marketing and customer relations services, as well as important cover and legitimacy to Madoff's operations.

## C.    *The Defendants Serve as a Gatekeeper for Madoff to Ensure Investors Would Not Find Out the Truth*

341.    Madoff could not have survived, much less prospered for as long as he did without the Defendants' substantial assistance.  While securing money from new investors for Madoff with one hand, with the other, the Defendants needed to prevent their investors, new and old, from communicating directly with Madoff.  The reason for the Defendants' actions was simple:  the more people who contacted Madoff directly, the more likely it was one of them might realize that Madoff and FGG were frauds.

342.    The Defendants went to great lengths to keep their investors far away from Madoff.  They determined early on that they had to keep their clients away from Madoff because requests to meet and conduct real due diligence on him were bound to "end up in a standoff."  (A true and accurate copy of the May 22, 2003 email from Landsberger to Tucker is attached hereto as Ex. 28.)  The Defendants told investors they were "monitoring" Madoff so as "to avoid them

feeling the need to go see Madoff" themselves.  (A true and accurate copy of the July 15, 2004

email from Toub to Vijayvergiya is attached hereto as Ex. 29.)

343.    Defendant Blum advised his colleagues at FGG that just because investors wanted

information, did not mean that FGG had to give it to them.  Giving out more detail would upset

Madoff.  (A true and accurate copy of the March 25, 2003 email from Blum to Tucker, Bowes,

and Greisman is attached hereto as Ex. 30.)  He also directed FGG personnel, "**<u>always keep in</u>**

**<u>mind the prime directive and downplay Madoff's role – never to have his name within 30</u>**

**<u>words of the word 'manage'.</u> . . .  He is extremely sensitive to this and wants to be referred**

**to merely as our broker and custodian.**"  (A true and accurate copy of the August 22, 2003

email from Blum to Vijayvergiya and Landsberger is attached hereto as Ex. 31 (emphasis

added).)

344.    The Defendants also misled investors by making false excuses when the investors

requested meetings with Madoff.  By way of example, after explaining that Madoff did not meet

with clients, FGG would reassure investors, "if there is a window of opportunity in the future we

shall give priority to [you]."  (A true and accurate copy of the April 5, 2004 email to Tucker is

attached hereto as Ex. 32.)  The Defendants gave these types of assurances knowing full well that

there would never be any such "window of opportunity."

345.    The Defendants' refusal to allow their clients or prospective investors to contact

Madoff was just one of many elements they employed to hide the inner workings of BLMIS

from investors.  The Defendants always knew and understood that BLMIS exercised discretion

in managing their accounts, and was not simply an "executing broker."

88

346.    In 2002, the Defendants decided that it would be best to just remove all references to BLMIS from their marketing materials.  This strategy started with the deletion of all mentions of both Madoff and BLMIS from the investment adviser description on FGG's website and quickly grew into something broader.  (A true and accurate copy of the June 24, 2004 email from Vijayvergiya to Lipton and McKeefry is attached hereto as Ex. 33.)  The Defendants went on to remove all references to BLMIS from their offering memoranda.  They also refused to provide their customers with the Feeder Funds' BLMIS Trading Authorization agreements.  (A true and accurate copy of the August 7, 2004 email from Vijayvergiya to Landsberger and McKenzie is attached hereto as Ex. 34.)

347.    "[I]n sensitivity to various issues regarding Bernie" the Defendants made the conscious decision to serve as a gatekeeper, declaring that "**Bernie investors do not need transparency.**"  (A true and accurate copy of the January 14, 2003 email from Blum to Tucker, Bowes and Greisman is attached hereto as Ex. 35 (emphasis added).)  They held strategy meetings to discuss, among other things, the need to "**haze up the details**" for investors and hold "**heavily scripted**" investor teleconferences.  (A true and accurate copy of the March 25, 2003 email from Blum to Lipton and Tucker is attached hereto as Ex. 36 (emphasis added).)

348.    FGG actively and repeatedly "blocked" investors wishing to obtain more information about the Funds' investments with BLMIS, as well as preventing such investors from accessing key BLMIS employees.  Aware of investor concerns that Madoff was "churning the portfolio" (a true and accurate copy of the April 9, 2004 email to Boele, Vijayvergiya, Tucker, Blum, Greisman, Lipton, and Smith is attached hereto as Ex. 37), FGG ignored all such concerns and continued to aggressively market the Feeder Funds which had direct or indirect investments in BLMIS.

89

349.    When Fairfield Sentry was told by institutional investors that FGG was mysterious, that FGG had little transparency, and that there were numerous concerns about Madoff's family, BLMIS's auditor, the lack of incentive fees for Madoff, and his self-custodying of assets, the Defendants chose not to address or investigate the concerns, instead focusing on "**how to spin**" a response.  (A true and accurate copy of the March 15, 2008 email from Landsberger to Smith, Toub, della Schiava, Vijayvergiya, Tucker, and the Executive Committee is attached hereto as Ex. 38 (emphasis added).)

### D.    *FGG Conspires with Madoff to Hide from the SEC Madoff's True Involvement with the Feeder Funds*

350.    From inception until 2006, because registration would mean greater regulatory scrutiny, Madoff did not register BLMIS with the SEC as an investment adviser even though BLMIS was required to register.  The Defendants went to great lengths to attempt to cover up Madoff's actual role with the FGG funds.

351.    In 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally front-running the market.[5]  In connection with its investigation, the SEC contacted FGG.  The SEC sought an interview regarding, among other things, the Feeder Funds' actual relationship with BLMIS, transparency as to BLMIS's actual role in the Feeder Funds' operations, as well as who was making investment decisions and implementing the SSC Strategy on behalf of the Feeder Funds.

352.    Throughout 2006, the Defendants helped Madoff try to deceive the SEC. Individual Defendants McKeefry and Vijayvergiya worked directly with Madoff to script false

---

[5] Front-running occurs when a broker-dealer "runs in front" of customers by executing transactions for itself that are pending and unexecuted for customers, thereby unlawfully taking for itself market gain that would have accrued to

responses to the SEC to throw the investigators off the trail of the fraud.  After being contacted

by the SEC, Vijayvergiya and McKeefry called Madoff to inform him of the upcoming

interview.  They then forwarded Madoff some of FGG's marketing materials and a list of

potential issues they felt they should discuss before the interview.  Madoff, McKeefry, and

Vijayvergiya agreed to defraud the SEC and then had a strategic conference call to work out the

details.  Vijayvergiya recorded the call.

  353. The parties first agreed that no one was ever to know they were scripting their

responses:

> Mr. Madoff: Obviously, first of all, this conversation never took place, Mark, okay?
>
> Mr. Vijayvergiya: Yes, of course.
>
> Mr. Madoff: All right.  There are a couple of things that, you know, could come [up with the SEC] . . . number one . . . we never want to be looked at as the investment manager . . . .
>
> Mr. Vijayvergiya: Right.
>
>     ***************************
>
> Mr. Madoff: So the -- you know, the less that you know about how we execute, and so on and so forth, the better you are . . . if they asked do you know . . . if Madoff has Chinese walls, and you say, yes, look -- you know, your position is say, listen, Madoff has been in business for 45 years . . . you know, he's a well known broker.  You know, we make the assumption that he's -- he's doing everything properly.
>
>     ***************************

---

customers had their transactions been executed first.

Mr. Madoff:    [O]ur role has always been defined as the executing broker for our clients . . . .

                     ***************************

Mr. Madoff:    The objective of the fund is to achieve capital appreciation . . . but don't say -- consistent monthly returns.

Mr. Vijayvergiya:    Okay.  You can delete that, yeah.

(A true and accurate copy of the transcript of the call between McKeefry, Vijayvergiya, and Madoff is attached hereto as Ex. 39.)

354.    Madoff then gave *precise instructions* on how to respond to the SEC's questions in order to mislead the SEC as to the true nature of Feeder Funds' accounts, as to whom the actual investment adviser was, and anything else that might have allowed the SEC to potentially discover that BLMIS and the Defendants were perpetrating a fraud.  Madoff specifically told McKeefry and Vijayvergiya to tell the SEC he was merely "the executing broker," and all investment decisions were made by FGG.  All participants to the conversation knew this to be false.

355.    The Feeder Funds' account agreements explicitly characterized their BLMIS accounts as discretionary accounts.  In June 2001, in a letter to investors, FGG described Fairfield Sentry's account with Madoff as a "discretionary cash account."  (A true and accurate copy of the June 2001 letter to Fairfield Sentry's investors is attached hereto as Ex. 40.)  Madoff had unfettered discretion as to when to trade, what to trade, with whom to trade, when to leave the market, and when to shift customer investments to Treasurys.  The Defendants never knew with whom Madoff was contracting or trading purportedly on their behalf and could not, and did

92

not, understand the SSC Strategy. As late as August 2008, Vijayvergiya acknowledged that BLMIS's operations remained somewhat of a mystery to FGG. (A true and accurate copy of the August 2008 emails from Vijayvergiya to Murphy, Piedrahita, Landsberger, Toub, Tucker, and the Executive Committee is attached hereto as Ex. 41.)

356.    The Defendants knew that the fewer people who knew about the true nature of their partnership with Madoff, especially the SEC, the better it would be for the Defendants' financial interests. The Defendants also knew that if based on FGG's responses, the SEC grasped Madoff's true discretion over FGG's accounts and inquired further, Madoff could become very angry, which could upset the Feeder Funds' preferred status.

357.    The Defendants were also concerned that if the SEC knew the true nature of the relationship, the SEC would require Madoff to register, expose him to heightened regulation, and remove the secrecy that allowed the fraud to flourish for so many years. For these and other reasons, Defendants Vijayvergiya and McKeefry knowingly agreed to conspire with Madoff to deceive the SEC.

358.    The day after the three spoke, the SEC interviewed Vijayvergiya and McKeefry by telephone, with Vijayvergiya providing nearly all of the responses. At the beginning of the interview, the SEC personnel requested the interview be kept confidential. Vijayvergiya dutifully fed the SEC the false information Madoff required. Two days after the interview, in order to keep their false stories straight – and despite the SEC's express request for confidentiality – someone at FGG transmitted to Madoff detailed notes of the interview. (A true and accurate copy of the notes dated December 21, 2005 found by the Trustee in BLMIS's files is attached hereto as Ex. 42.)

359.    During the first half of 2006 the SEC continued a dialogue with McKeefry, Madoff, and other individuals relevant to their investigation.  (A true and accurate copy of the SEC phone log is attached hereto as Ex. 43.)  Like the confidential interview, FGG continued to share the information from its SEC calls directly with Madoff.

360.    Ultimately, despite FGG's and Madoff's coordinated efforts in 2006, the SEC required BLMIS to register as an investment adviser.  The SEC also determined FGG had to modify its Feeder Funds' marketing materials – which had previously been revised to remove all mention of both Madoff and BLMIS – to make clear that the strategy the Feeder Funds were selling was being managed and executed in all respects by Madoff.  The SEC required the Feeder Funds and BLMIS to execute new customer agreements because the existing agreements did not limit Madoff to acting merely as an executing broker, as had been for years, falsely claimed by FGG.

361.    The scheme to defraud the SEC succeeded insofar as, apart from these requirements, the SEC closed any further investigation of BLMIS.  (A true and accurate copy of the SEC Case Closing Recommendation is attached hereto as Ex. 44.)

**E.**    ***The Defendants Deceive Their Investors by Telling Them They Were Performing Extensive and Top of the Line Due Diligence, But They Were Doing No Such Thing***

362.    The Defendants deceived their investors and the investment community, in order to enhance the fraud, enrich themselves, and protect their status as a leading BLMIS feeder fund. The Defendants sold the false assurance that they conducted superior due diligence, far beyond any due diligence performed by their peers.  The Defendants justified their extraordinary fees based upon this allegedly superior due diligence.  The Defendants conveyed these falsehoods for

nearly 20 years throughout FGG's sales, offering, and marketing materials, as well as in direct responses to questions from their investors and prospective investors.

363.    FGG claimed among other things that it had full transparency into its investments, conducted monthly quantitative analyses, and only used counterparties for the OTC options they identified on an approved list.  (A true and accurate copy of FGG's October 2002 marketing brochure for Fairfield Sentry is attached hereto as Ex. 45.)  All of these claims were false.

364.    The Defendants never knew who any of their OTC options counterparties were.  It was also impossible for the Defendants to accurately reconcile trades on a same-day basis because they did not receive paper trade confirmations until three or four days after the alleged trades supposedly had been executed, a delay which permitted back-dating – itself another red flag of possible fraud.  Had the Defendants accurately reconciled Madoff's trade confirmations, they also would have discovered any number of anomalies concerning the volumes and prices at which Madoff supposedly purchased stocks and options.

365.    The Defendants' sales pitch about their due diligence process, their knowledge of Madoff and his operations, conflicted with the reality of how little they actually knew.  (A true and accurate copy of the December 19, 2003 email from Vijayvergiya is attached hereto as Ex. 46.)  The Defendants did not know the exact amount of Madoff's assets under management, and admitted that "**there [was] no check on the amount of money he manages.**"  (A true and accurate copy of the September 19, 2003 email from Blum to Tucker is attached hereto as Ex. 47 (emphasis added).)

366.    FGG also emphasized to investors it confirmed the adequacy of FGG's investment managers, staff, as well as the investment manager's technological capabilities.  FGG

did not know the names of Madoff's alleged traders or how many traders were responsible for executing their SSC Strategy.  They also did not perform independent, reasonable due diligence or follow up on the viability or adequacy of BLMIS's technology.  Had the Defendants meaningfully investigated the technological capabilities of BLMIS, they would, or should have, been suspicious because there were strong indications of fraud – the BLMIS IA Business computers lacked the ability to send real-time electronic trade confirmations to its customers.

367.    The Defendants never investigated the contradiction between Madoff's market-making business, well-known for cutting-edge technology, and the more primitive back-office systems used by the BLMIS IA Business.  The BLMIS IA Business could not generate electronic trade tickets, had no website where investors could view their accounts and assets in real-time, and could only deliver paper confirmations by mail days after trades were supposedly executed. These attributes were commonly recognized in the investment advisory industry to be rife with the risk of fraud, yet the Defendants ignored all of them.

368.    Candid internal FGG discussions in 2003 revealed a far different due diligence picture than the "rigorous" processes the Defendants' touted:

> **[T]here is an enormous amount that we have to do to meet the higher level of diligence and documentation and fulfillment of the investment process/risk monitoring and portfolio allocation aspects that even the most lazy of institutional and family office investors require to see . . .**
>
> **This industry is moving to higher levels of perceived quality of process fast, and we are going to have to sprint to keep up. trying [*sic*] to bullshit clients will only result in our bs-ing ourselves . . . .**

(A true and accurate copy of the November 24, 2003 email from Blum to Landsberger,

Greisman, Tucker, and Piedrahita is attached hereto as Ex. 48 (emphasis added).)

369.    In May of 2005, as part of "sales training," Lipton and Vijayvergiya conducted a

mock investor phone interview.  Lipton played the role of a potential or existing Fairfield Sentry

investor and Vijayvergiya acted as an FGG sales person.  Lipton questioned Vijayvergiya as to

the due diligence advertised by Fairfield Sentry.  In particular, Lipton asked about the due

diligence completed by FGG before investing in BLMIS, as well as the ongoing monitoring and

diligence of its portfolio manager, Madoff.

370.    In response to certain questions posed by Lipton and other audience members,

Vijayvergiya made misstatements about FGG's knowledge of Madoff and his operations,

including:  (i) "we have a number of options counterparties;" (ii) for options-trading there is a

"very well capitalized, well established series of counterparties, which number between 8 to 12";

(iii) FGG is the investment manager; (iv) from time-to-time FGG representatives visit BLMIS,

verify that trades are on Depository Trust & Clearing Corporation ("DTCC"), and verify the

existence of the Feeder Funds' assets; and (v) Madoff has no discretion except with respect to the

price and timing of trade execution, for which he has limited discretion.  (A true and accurate

copy of the transcript of the training session led by Vijayvergiya is attached hereto as Ex. 49.)

371.    Each one of those statements, disguised as verified due diligence, was false.  The

Defendants knew *nothing* about Madoff's imaginary options counterparties except for Madoff's

claim they were a group of large European financial institutions – a claim which the Defendants

never tried to independently verify.  The Defendants never reviewed any counterparty's option

agreement and there was no list of counterparties.  The Defendants never called anyone at any

reputable financial institution, *or anyone at all,* to learn more, even though they stated they had done so.  The Defendants also knew BLMIS was the investment adviser and that Madoff exercised all investment discretion.  The Defendants never asked Madoff for permission to independently confirm their holdings with the DTCC, nor did they conduct any independent and reasonable due diligence, or follow up, to verify the actual existence of their assets.

372.     In response to an audience query wondering how, over the last three years, there were times when FGG made money when to the questioner it seemed like they should not have, Vijayvergiya stated, "***I can honestly say that, hand on heart that . . . we know what is going on***."  (*Id.* (emphasis added).)  This statement contradicted Vijayvergiya's admission three years later that many things at BLMIS remained a mystery to him.  (*See* Ex. 41.)

373.     When speaking to an investor in May 2008, Vijayvergiya and McKenzie admitted they still did not know many basic things about Madoff's operations.  They expressed concerns about credit risks due to the options and option counterparty exposure, as well as the fact that "**they ultimately do not really know whether Madoff has the proper systems and controls, segregation of duties, etc.**"  (A true and accurate copy of a memorandum summarizing the May 7, 2008 meeting is attached hereto as Ex. 50 (emphasis added).)

## VIII.  THE DEFENDANTS WERE CONSTANTLY FACED WITH EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT EVIDENCE

374.     It did not require an extraordinary due diligence process for the Defendants to discover that Madoff was operating an illegitimate enterprise.  Ordinary, independent, and reasonable due diligence by investment professionals would have, and should have, revealed the likelihood of fraud.  The Defendants knew of, and were presented with significant red flags from many sources, including, but not limited to: financial and quantifiable information; performance

and trade information; market rumors; industry articles; publicly stated investor concerns; market and industry experts who expressed the possibility of fraud; FGG customers who communicated that Madoff was possibly a fraud; FGG's own internal statements and serious doubts; their years of hedge fund experience; and their own common sense.

375.    The totality of the information known and available to the Defendants pointed to the strong likelihood that they were enabling a fraud.  At a minimum, the Defendants knew of countless red flags which required proper, independent, and reasonable due diligence and follow up investigation.  Not only did the Defendants fail to conduct the required due diligence, they willfully ignored information that was right in front of them, and then lied about it.

376.    The Defendants also knew what other highly reputable institutions were saying directly about <u>them</u>.  One representative of Credit Suisse told Fairfield Sentry that it "**would never do business with FGG as a firm" because FGG was "not going 'by the rules' and soon[er] or later . . . will wind up in jail!!**"  (A true and accurate copy of the December 2, 2003 email from della Schiava to Noel, Piedrahita, Tucker, and Blum is attached hereto as Ex. 51 (emphasis added).)

> **A.    *The Defendants Learn that BLMIS's Auditor is a Single Person in a Strip Mall Office.  Instead of Treating This Red Flag as an Indicator of Fraud, They Lie to Comfort Their Investors and Sell Their Superior Diligence***

377.    Madoff had false audit reports prepared by Friehling & Horowitz ("Friehling"). Those audits were filed with the SEC and copies were given to the Defendants.  Friehling was a one-man firm from Rockland County, New York consisting of David Friehling, a Certified Public Accountant.  The other two employees were an administrative assistant and a semi-retired accountant living in Florida.

378.    On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, in connection with the services he performed for BLMIS.

379.    By 2005 the Feeder Funds had invested billions of dollars with BLMIS.  From 1990 to 2005, the Defendants accepted Friehling as a bona fide auditor without conducting any meaningful, independent due diligence or inquiry.

380.    During 2005, the Defendants were confronted about Friehling when the $400 million Bayou Group hedge fund Ponzi scheme became public.  In the early part of the decade, Bayou rode the rise in the stock market following the burst of the dot-com bubble.  Bayou also displayed a number of major red flags similar to those exhibited by BLMIS.  Both Bayou and BLMIS delivered steady annual returns with almost no volatility.  Neither Bayou nor Madoff charged a management fee based on the assets under management.  This fee structure was atypical of hedge fund and other alternative investment managers.  Finally, both Bayou and BLMIS had obscure, non-independent auditors – Bayou an in-house accountant and BLMIS, Friehling.

381.    When the Bayou fraud came to light in 2005, a Fairfield Sentry investor raised parallels between Madoff and Bayou, questioning FGG about "the risk [of] investing in Sentry" in light of "certain similarities with Bayou."  The investor expressly identified the conflict of interest in Madoff acting as the self-clearing broker and receiving commission-based fees, and pointed out that BLMIS employed a small auditor rather than using one of the "big four."  (A

true and accurate copy of the September 5, 2005 email from Capital Research to Castillo is attached hereto as Ex. 52.)

382.    An investor relations employee for FGG, Carla Castillo ("Castillo"), forwarded information regarding Bayou to Vijayvergiya, joking "**[d]oes this 'perceived conflict of interest with the two relationships (brokerage and auditing)' sound familiar?  Hehehe.**"  (A true and accurate copy of the September 1, 2005 email from Castillo to Vijayvergiya is attached hereto as Ex. 53 (emphasis added).)  At the same time, Castillo was telling the investor there were important differences between Fairfield Sentry and Bayou.  (*See* Ex. 52.)  With regard to the potential conflict of interest, Castillo responded that FGB, not BLMIS, was Fairfield Sentry's investment manager, FGB maintained an arm's-length relationship with BLMIS, and Bayou used a very small accounting firm, whereas PwC conducted audits of Fairfield Sentry.  (*Id.*)

383.    The investor pressed for direct answers to the questions about Madoff and BLMIS's auditor.  At that point the investor's questions were escalated within FGG to Tucker, McKeefry, Lipton, and McKenzie.  Tucker, despite having served as the Madoff relationship partner for fifteen years, could not answer the investor's question regarding BLMIS's auditor. He asked Lipton and McKenzie to investigate so he could respond to the investor's concerns.  (A true and accurate copy of the September 12, 2005 email from Castillo to Lipton is attached hereto as Ex. 54.)

384.    At the time of Tucker's request, Lipton had been FGG's CFO for over three years. Lipton was a nine-year veteran of a Big Four accounting firm, Ernst & Young.  Lipton placed a call to Friehling's office.  Lipton also contacted the State of New York and learned David

101

Friehling was licensed in New York and there were no disciplinary actions against him.  Based

on the short call with Friehling's office, Lipton subsequently reported to Tucker:

> Frehling [*sic*] & Horowitz, CPAs are a small to medium size
> financial services audit and tax firm, specializing in broker-dealers
> and other financial services firms.  They are located in Rockland
> County, NY.  They have [hundreds] of clients and are well
> respected in the local community.

(*Id.*)

385.    Lipton never made any attempt to independently verify this information.  While

under oath before the Office of the Secretary of the Commonwealth of Massachusetts, Lipton

could not remember with whom he spoke when he called the auditor.  He claimed all he could

remember is that he spoke with someone who "said they were a partner in the firm."  (A true and

accurate copy of excerpts from the transcript of Lipton's testimony is attached hereto as Ex. 55.)

386.    Following Lipton's call with Friehling, the next day Tucker somehow "addressed

all the clients' questions, and gave them the comfort they were seeking."  (*See* Ex. 52.)

387.    Later on the same day that Tucker spoke with the investor, McKenzie obtained

and distributed internally a Dun & Bradstreet report on Friehling that validated the investor's

concerns.  The report, reflecting information provided by Friehling, showed Friehling only had

one employee and annual receipts of $180,000.  Tucker's response upon learning that Lipton had

been lied to and that BLMIS's auditor was similar to Bayou's auditor was  "thank you."  (*See* Ex.

54.)

388.    McKenzie then called Frank DiPascali ("DiPascali") at BLMIS to ask about

Friehling.  DiPascali was unable, or unwilling, to answer any questions about Friehling, and

directed McKenzie to Madoff.  Because DiPascali was often the principal source of information

regarding the Feeder Funds' accounts and BLMIS's operations, his inability and/or

unwillingness to answer simple questions about BLMIS's auditor was a major red flag.

McKenzie, knowing Madoff would not speak to him, sent an email to Tucker asking him to bring

up the topic the next time Tucker spoke with Madoff.  (*See id.*)

389.    The Defendants did <u>nothing</u> to independently confirm if Friehling was equipped

or capable of performing large scale domestic and international auditing services at a time when

they were estimating Madoff was managing approximately $10 billion.

390.    Tucker, Lipton, and McKenzie all knew that false information regarding Friehling

had been communicated to the investor that had raised the concern.  They did not communicate

truthfully to investors or prospective investors about Madoff's auditor.  They did not disclose

what they learned about Madoff's auditor, or that DiPascali had been unwilling or

unknowledgeable about Friehling.

391.    Basic due diligence would have further revealed Madoff's auditor was a fraud.

Lipton knew or should have known that all accounting firms that perform audit work must enroll

in the American Institute of Certified Public Accountants' ("AICPA") peer review program.

This program involves having experienced auditors assess a firm's audit quality each year.

Friehling, while a member of the AICPA, had not been peer reviewed since 1993.  The results of

these peer reviews are on public file with the AICPA.  Friehling never appeared on the public

peer review list because he had notified the AICPA he did not perform audits.  His absence on

the list was another major red flag.

392.    The Defendants were not satisfied to hide the unknown auditor red flag of fraud

from investors and potential investors.  The Defendants chose to **market** around the Bayou

scandal, stressing to their investors how a Bayou fraud could never happen to FGG's investors due to its impressive due diligence and risk management processes.

393.    Beginning in late 2005 through 2008, FGG generated and distributed marketing materials profiling the Bayou fraud as "Due Diligence:  Headlines to Avoid."  The Defendants highlighted the falsehood that a Bayou-like fraud could never happen to FGG because, unlike the misguided funds that invested with Bayou, FGG would have "**question[ed] Bayou's obscure auditing firm.**"  (A true and accurate copy of the November 2, 2005 FGG Investment Team Presentation is attached hereto as Ex. 56 (emphasis added).)

394.    The Defendants also misled potential investors about Madoff's auditor in direct communications with them.  For example, in 2006, when a consultant performing due diligence for a client considering an investment in Fairfield Sentry questioned Vijayvergiya about BLMIS's auditor, Vijayvergiya lied, stating that Friehling had twenty partners and focused on broker-dealers.  (A true and accurate copy of notes taken during the meeting is attached hereto as Ex. 57.)  McKenzie participated in this discussion.  He remained silent when Vijayvergiya described Friehling.  He did not disclose that Friehling was the same firm he had confirmed had only one employee, and not twenty partners.

395.    FGG also reassured its investors by falsely suggesting that Friehling was not the only firm auditing BLMIS.  PwC did not conduct a single independent audit of BLMIS.

396.    FGG also represented to investors that PwC (who conducted audits of the Feeder Funds), accompanied by Lipton, performed biannual visits to BLMIS.  (A true and accurate copy of the 2007 Fairfield Sentry Due Diligence Questionnaire is attached hereto as Ex. 58.)  These representations were also false.  PwC briefly visited BLMIS twice over the course of many

years, attending information gathering sessions at BLMIS in 2002 and 2004, in connection with

its engagements for several Madoff feeder funds.  After each visit, PwC summarized its findings

and explained in writing that it had not conducted audits of BLMIS.  After 2004, PwC did not

conduct any visit, inquiry, or investigation of BLMIS in association with any Fairfield Sentry

engagement.  Lipton only accompanied PwC during its visit of BLMIS on one occasion, in 2002.

(*See* Ex. 55.)

397.    The facts about PwC's actual involvement with Madoff did not prevent FGG from

falsely representing PwC's role.  FGG told investors in an October 2007 Due Diligence

Questionnaire for Fairfield Sentry – a document it routinely gave to prospective investors or

consultants – that, "[t]he CFO has accompanied PwC's auditors on a bi-annual basis to review

BLMIS's internal accounts for the Sentry fund."  (*See* Ex. 58.)

398.    In August 2008, in response to a detailed "HSBC Sentry Operational Due

Diligence" questionnaire, Lipton confirmed the Defendants' failure to conduct proper,

independent, and reasonable due diligence on BLMIS's auditor.  Lipton asked Vijayvergiya:

"**[d]o we know any of the other client of BLM's auditors? Or how big they are?  I

remember we called over there a while ago.**"  (A true and accurate copy of the August 20,

2008 email from Lipton to Vijayvergiya is attached hereto as Ex. 59 (emphasis added).)

   **B.    *The Defendants Regularly Received Information That Made It Clear
            Madoff Was Lying About His Alleged Trades and Performance***

399.     The Defendants had access to vast amounts of information about Madoff that was not available to the public.  The account statements and trade confirmations they received from Madoff showed that Madoff was likely a fraud.  The Defendants knew, among other things, that Madoff's returns were so consistent they were virtually impossible; Madoff alone traded suspiciously large percentages of the total amount of securities that were reported as trading on the entire NYSE, NASDAQ and CBOE, and, did so without any impact on the prices of those securities; Madoff was supposedly executing billion-dollar options transactions on the Feeder Funds' behalf with anonymous counterparties who never asked for the Feeder Funds' identity or collateral and the Feeder Funds never asked for theirs; Madoff often provided FGG with contradictory and sometimes nonsensical explanations of his market transactions on its behalf; and quantitative information the Defendants trumpeted in their sales, offering, and other marketing materials demonstrated that Madoff's consistent returns were so improbable they appeared impossible.

### 1.     FGG's Returns Were Too Consistent for Too Many Years

400.     Both FGG and BLMIS appeared immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.  FGG and BLMIS maintained consistent and seemingly impossible positive rates of return during events that otherwise devastated the S&P 100 – the performance of which formed the core tenet of the Defendants' SSC Strategy.  In fact, between 1996 and 2008, the Feeder Funds did not experience a single quarter of negative returns.

401.     During the burst of the dotcom "bubble" in 2000, the September 11, 2001 terrorists attacks, and the recession and housing crisis of 2008, the SSC Strategy purported to

produce **positive returns, outperforming the S&P 100 by 20 to 40 percent in each instance
where the S&P 100 suffered double-digit losses.**

402.    FGG's own marketing materials contain the following rates of returns:

| Year | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
|---|---|---|
| 1990 | 2.77% | (5.74%) |
| 1991 | 17.64% | 24.19% |
| 1992 | 13.72% | 2.87% |
| 1993 | 10.75% | 8.28% |
| 1994 | 10.57% | (0.19%) |
| 1995 | 12.04% | 36.69% |
| 1996 | 12.08% | 22.88% |
| 1997 | 13.10% | 27.677% |
| 1998 | 12.52% | 31.33% |
| 1999 | 13.29% | 31.26% |
| 2000 | **10.67%** | (13.42%) |
| 2001 | **9.82%** | (14.88%) |
| 2002 | **8.43%** | (23.88%) |
| 2003 | 7.27% | 23.84% |
| 2004 | 6.44% | 4.45% |
| 2005 | **7.26%** | (0.92%) |
| 2006 | 9.38% | 15.86% |
| 2007 | 7.34% | 3.82% |
| 2008[6] | **4.50%** | (32.30%) |

(A true and accurate copy of Fairfield Sentry's October 2008 marketing tear sheet is attached
hereto as Ex. 60.)

403.    These consistent rates of return enabled FGG to attract many more investors and
dramatically expand investments into BLMIS, including by accepting investments in foreign
currencies through Sigma and Lambda into Fairfield Sentry.  FGG also directed that the

---

[6]     Through October 2008.

remaining 5% of "discretionary" Sentry funds be indirectly invested back into Fairfield Sentry

and other FGG funds with direct or indirect BLMIS accounts.

404.    The FGG Affiliates and the Management Defendants failed to conduct proper,

independent, and reasonable due diligence or follow up as to how such returns could be achieved

legally, or in accordance with their SSC Strategy.  The Defendants knowingly and purposefully

turned a blind eye to the fact that this strategy, dependent in large part on how stocks in the S&P

100 performed, continued to yield positive returns without any correlation to the S&P 100.  The

Defendants simply marketed to the world FGG's extraordinary and consistent performance.

### 2.    The Defendants' Account Statements Showed the Likelihood of Fraudulent Activity

405.    The Defendants repeatedly claimed they verified that all trades were consistent

with the SSC Strategy and that all trades were legitimate.  The Defendants justified their large

management and performance fees based, in part, on their alleged daily monitoring of trade

activity.

406.    The Defendants knew or should have known of multiple red flags in the trade

confirmations and account statements they received.  First, Madoff was known as a pioneer of

electronic record-keeping in the BLMIS market-making business.  For clients of the BLMIS IA

Business, Madoff never sent one electronic trade confirmation, and for many years, did not

provide electronic account statements.  Second, the volumes of securities reported on the Feeder

Funds trade confirmations, as well as the month-end account statements, so exceeded reported

exchange volumes that they were a strong and recurrent indicia of fraud.

407.     The Defendants understood BLMIS did not make separate trades for each of the

BLMIS IA Business customer accounts.  Madoff purchased large baskets of stocks and options,

and proportionately allocated them to each account.  For many years, Madoff did not tell the

Defendants the amount of assets under his management.  The Defendants estimated as early as

2003 that Madoff was managing approximately $10 billion.  In August 2003, in response to a

due diligence query being performed on Fairfield Sentry by a prospective investor, Vijayvergiya

told the investor, who had heard Madoff was managing close to $20 billion, that FGG estimated

that Madoff was managing about $8-10 billion.  (A true and accurate copy of the August 6, 2003

email from Vijayvergiya is attached hereto as Ex. 61.)

408.     When BLMIS was forced to register as an investment adviser in August 2006, it

reported that it had $11.7 billion under management at the end of July 2006.  Later filings stated

that BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of 2007.

At the same time, the Feeder Funds' accounts reported balances of $4.9 billion through July

2006, $5.5 billion at the end of 2006, and $7.2 billion at the end of 2007, or approximately 42%

of the assets BLMIS reported it was managing.  Because the Defendants knew that Madoff

allocated his baskets of stocks and options proportionately, the Defendants reasonably should

have calculated or estimated the amounts of stocks and options that BLMIS would have had to

purchase or sell for all its IA customer accounts.

409.     The Feeder Funds' account statements regularly indicated that BLMIS's trades in

a particular stock for Feeder Funds' accounts alone accounted for a large percentage of that

stock's trading volume on the listed markets.  This meant that BLMIS's trades for all of its IA

customers often approached, or exceeded the entire volume of trades on the listed markets.

410.    Each time Madoff supposedly entered the market, he purportedly purchased between 35 and 50 S&P 100 stocks for the Feeder Funds' accounts.  There were over 150 occasions on which the stocks Madoff purchased for Fairfield Sentry alone accounted for over 20% of the trading volume for those stocks **on the entire NYSE**.  BLMIS, as a single investment adviser, was by itself purportedly trading for all of the BLMIS IA Business customers nearly 50% of all market trading in those stocks.  There were also 50 instances in which Fairfield Sentry's account was responsible for over 25% of market trading in a particular stock (meaning trading for all of the BLMIS IA Business customers rising to over 60%), and 19 times when Fairfield Sentry accounted for over 30% of the trading in a particular stock (meaning the BLMIS IA Business customer trading constituting over 75% of market activity).  On at least 3 occasions, **BLMIS would have had to engage in more trading than occurred on the entire exchange for a particular stock to execute the purported trades for Fairfield Sentry and the other customers of the BLMIS IA Business**.

411.    Even using the OTC market, a single investment adviser could not ever reasonably be responsible for over half of the reported trading of a particular S&P 100 stock.  That Madoff could be responsible for more trading than occurred on an entire trading exchange was seemingly impossible.  Sophisticated hedge fund professionals such as the Defendants, seeing such extraordinary percentages in trading patterns by their investment manager – with billions of dollars under his management – were required to undertake proper, independent, and reasonable due diligence or follow up into such indicia of fraud.  The Defendants chose not to investigate these trading patterns.

### 3. Madoff's Extraordinary Trading Volumes Never Affected the Market

412.    The SSC Strategy marketed by FGG involved moving money into the market over the course of one or more days, and then selling off all of those securities over a similar time span.  According to the Defendants, over the course of many years, tens of billions of dollars moved into and then out of the U.S. stock and options markets over the course of just a few days, six-to-eight times a year.  The Defendants never independently investigated how these trades could be accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone "on the Street" knowing or even hearing about Madoff's alleged trading activity.

413.    The sale of tens of billions of dollars of stocks in a short period of time would result in a decreased price of those stocks, cutting into the alleged profits from the sales of such stock.  The Defendants did not conduct independent or reasonable due diligence into the non-impact of Madoff's large trading.

414.    When Madoff exited the market, he claimed to have placed his customers' assets in Treasurys or mutual funds invested in Treasurys.  The movement of tens of billions of dollars in and out of the market should have materially affected the price of Treasurys.  Lipton even remarked how BLMIS had "every angle covered" and was "playing over my head" when he attempted to explain how Madoff "rolled 6-7BN of Tbills on the last day of the year" with "the cost and the market value of investments . . . the exact same" in consecutive years.  (A true and accurate copy of April 2008 emails between Lipton and McKenzie is attached hereto as Ex. 62.)  The Defendants did not conduct independent or reasonable due diligence into the Treasurys aspect of the SSC Strategy.

### 4. The Feeder Funds' Account Statements Showed That BLMIS Was Trading More Options Than Were Available on the CBOE

415.    The Defendants could have applied the same calculation they used to determine the universe of BLMIS's equities trading to determine the number of options BLMIS was trading for all of its customers.  S&P 100 Index options are traded on the Chicago Board of Exchange ("CBOE") under the symbol OEX100.  BLMIS **nearly always** traded more OEX100 options than were traded on the entire CBOE.

416.    From 2001 to 2008, when comparing the volume of OEX100 options that BLMIS was purportedly trading on behalf of the Feeder Funds, with the CBOE volume, BLMIS traded more OEX100 options than the entire volume of the CBOE **97.6% of the time**.  During those eight years, BLMIS traded fewer options than were traded on the options exchange on a given day **only 18 times**.

417.    A comparison between the volume of OEX100 put options BLMIS traded on behalf of the Feeder Funds and the volume of those same put options traded on the entire exchange is striking, as demonstrated on the next page.



Fairfield Greenwich Group - Historic Option Activity compared to CBOE 2001-2008 (Puts Only)

Red line indicates Fairfield Greenwich Group Option Volume
Black line indicates CBOE Option Volume

418.    The volume of OEX100 put options BLMIS traded on behalf of the Feeder Funds

(the red line) **completely dwarfs** the volume of OEX100 put options traded on the entire CBOE

(the black line).  Almost every time BLMIS entered the market to trade put options for the

Feeder Funds, it traded more OEX100 put options than all trades on the CBOE **combined**.

419.    Based upon FGG's belief that the Feeder Funds accounted for 42% of BLMIS's

trading, BLMIS would have been executing for all of its customers approximately 2.4 times as

many trades as he was executing for the Feeder Funds alone.  This means that FGG must have

believed that, for instance, when BLMIS was trading 140,000 options for the Feeder Funds'

accounts in late 2008, BLMIS was trading over 300,000 options for all of his accounts.

420.    The amount by which BLMIS's trading overshadows the trades made by every

other person who traded OEX100 put options on the CBOE is unbelievable, as shown below.



Estimated Option Activity for all BLMIS Accounts compared to CBOE 2001-2008 (Puts Only)

Red line indicates Estimated BLMIS Option Volume (based on a 2.4x multiplier of Fairfield Greenwich Group Option Volume)
Black line indicates CBOE Option Volume

421.    The Defendants did not perform independent and reasonable due diligence or follow up concerning the put option trading BLMIS purportedly conducted on their behalf.

422.    As shown below, the volume of OEX100 call options BLMIS traded on behalf of the Feeder Funds, and on behalf of all of BLMIS's customers, versus the volume of those same call options traded on the entire exchange, is equally telling.  There was rarely a time when BLMIS traded **fewer** OEX100 call options than were traded on the CBOE.



Fairfield Greenwich Group - Historic Option Activity compared to CBOE 2001-2008 (Calls Only)

Blue line indicates Fairfield Greenwich Group Option Volume
Black line indicates CBOE Option Volume



Estimated Option Activity for all BLMIS Accounts compared to CBOE 2001-2008 (Calls Only)

Blue line indicates Estimated BLMIS Option Volume (based on a 2.4x multiplier of Fairfield Greenwich Group Option Volume)
Black line indicates CBOE Option Volume

423.    The Defendants did not perform independent and reasonable due diligence or follow up as to the trading volume for their accounts.  Had the Defendants conducted proper due diligence they would have confirmed that their account statements, their strategy, and BLMIS were all a sham.

### 5.    The Defendants Agreed to Enter into Billions of Dollars in Options Contracts With Unidentified Counterparties

424.    In the OTC marketplace, where Madoff claimed to be trading, each transaction requires a private contract between the two parties.  In order to allegedly perform the options trades, Madoff had the Feeder Funds execute a Master Agreement for OTC Options.  (A true and accurate copy of an excerpt from BLMIS's Master Agreement for OTC Options is attached hereto as Ex. 63.)  Under that agreement, Madoff served as the Feeder Funds' agent in executing any options trade.  The agreement explicitly states the Feeder Funds could not look to Madoff if the counterparty failed to perform.  (*See id.*)  Thus, unless the counterparties were reliable, sufficiently capitalized, and liquid, the options could be rendered useless in hedging the Feeder Funds' investments.  As a result, under the Master Agreement, if a counterparty failed to perform, **it was the Feeder Funds, and not Madoff, who were exposed**.

425.    The Defendants did not review, comment, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation.  Despite bearing the risk of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties' identities.  Madoff refused to identify the counterparties claiming he had to prevent his clients from dealing directly with the counterparties, and that the names of parties were proprietary.  Madoff would eventually state that the counterparties were large European financial institutions.

426.    Vijayvergiya and Tucker knew Madoff's counterparty explanations were

suspicious.  In response to a financial institution that told Vijayvergiya "**that his contacts at two**

**of the largest investment firms on Wall Street had no knowledge of the options business**

**(Citi and CSFB)**," Vijayvergiya told Tucker that the investor "seemed fine with my response re:

options counterparties."  He noted the investor was "**OK for now** - but I may still pose the casual

question to Frank [DiPascali] at some point . . . ."  (A true and accurate copy of Vijayvergiya's

May 26, 2005 email to Tucker is attached hereto as Ex. 64 (emphasis added).)

427.    After Bear Stearns collapsed in February 2008, inquiries regarding counterparty

risk under the SSC Strategy intensified.  Investors wanted to know what counterparties were

trading options with Madoff, and whether those counterparties were stable and reliable.  In the

nearly 20 years FGG had been invested with Madoff it had never been provided the name of a

single counterparty that bought options from or sold options to BLMIS.  The Defendants failed

to perform any proper, independent, or reasonable due diligence or follow up to understand and

verify any aspect of the options counterparty component of their SSC Strategy.

428.    As the stock market continued to weaken, and FGG was threatened with hundreds

of millions of dollars in investor redemptions, Vijayvergiya contacted Madoff in June 2008.

During the call, Vijayvergiya asked Madoff about BLMIS's counterparties.  Madoff told

Vijayvergiya that the options counterparties with whom BLMIS were required to post Treasurys

as a performance assurance, and that no one counterparty accounted for more than 10% of the

options trades.  Madoff reiterated that he did not want FGG providing their investors with too

much information regarding BLMIS.  (A true and accurate copy of the June 4, 2008

memorandum summarizing the meeting is attached hereto as Ex. 65.)

429.    The Defendants never inquired of Madoff as to why <u>past</u> counterparties needed to be concealed to protect operations or execution of the strategy. The Defendants also never sought to independently confirm, outside of Madoff himself, what exactly were the options "performance assurance," or where, when, or by whom the assurances were posted. The Defendants instead chose to accept Madoff's suspicious explanations.

430.    Noel, Tucker, McKeefry, and Vijayvergiya met with Madoff in October 2008 and asked him to provide additional information about his options counterparties. Madoff told them his options counterparties were large institutions and that he performed credit checks on each of them. **<u>Even though they were FGG's counterparties and not his</u>**, Madoff again refused to provide the names of any counterparties. The Defendants continued to do nothing to independently verify any of Madoff's statements, taking Madoff solely at his word. The Defendants did not see or review a single document for these contractual relationships on their own accounts.

431.    With the massive purported volume of BLMIS-related options trades, there were only a limited number of institutions that could have satisfied Madoff's and FGG's trading needs. The Defendants regularly communicated with many large European financial institutions – Madoff's alleged counterparties. Despite their regular contacts with institutions which fit Madoff's options counterparts profile, the Defendants never asked any of these institutions if they were trading options with Madoff. In fact, FGG never independently contacted any institutions to determine if they were trading S&P 100 options with Madoff.

**6.      The Supposed Options Trading Structure Under the SSC Strategy Was Inconsistent With Industry Practice**

432.    The purported BLMIS-Feeder Funds options trading was inconsistent with industry practice.  Both Madoff and FGG claimed the options counterparties entered into agreements that were identical to the agreements the Feeder Funds entered into with BLMIS serving as each parties' agent.  As a result, any resulting OTC trade would result in a contract between the options counterparty and the Feeder Fund.

433.    FGG and Madoff claimed Madoff traded large blocks of options contracts and then allocated them proportionately to each of the BLMIS IA Business customers, like the Feeder Funds.  Under normal industry practice, a block trade and allocation process requires the broker to trade as a principal and not an agent, with all transactions consisting of two trades:  one between the one party and broker and then a second trade between broker and the other party.  The two-trade process is required for block trade and later allocation transactions because OTC option trades are contracts between the two parties and the identity of the customer being allocated the option agreement is unknown at the time of the trade.  In order that the SSC Strategy be consistent with industry practice, BLMIS would have been the principal in the two trades, one with the counterparty and the second with the BLMIS customer.

434.    Other structural issues which were readily apparent included the alleged collateralization of the options trading.  Madoff told the Defendants that he limited each counterparty's exposure to 10% of his overall position, and required each counterparty to post Treasurys in escrow accounts to serve as collateral to guarantee performance of the put options.  When asked what collateral the counterparties required of the Feeder Funds in order to guarantee the performance of the call option sold to them, Madoff claimed none was required because his customers held the equities.

435.    Madoff's explanation was facially false for several reasons:  (1) the basket of the 35 to 50 equities did not perfectly match the entire S&P 100 Index – the basis of the call option; (2) Madoff was free to sell the equities, which he did on occasion, prior to the expiration of the call, leaving the counterparty with no collateral at all; and (3) Madoff stated that the option counterparty had no lien against its allocated equities which, if true, meant the counterparties had no collateral protecting their position.

436.    Madoff's purported options trading structure, leaving the BLMIS IA Business customer's counterparty exposed to large credit risk without ever knowing the identity of the BLMIS IA Business customer, was irregular and inconsistent with industry practice.  FGG never conducted independent or reasonable due diligence about this aspect of its own SSC Strategy, accepting instead Madoff's implausible explanations without asking any questions.

### 7.    The Options Trade Confirmations the Defendants Received From BLMIS Did Not Comply With Industry Standards

437.    The Feeder Funds' options trade confirmations contained certain abnormalities. The options trade under the SSC Strategy was supposed to be a private contract between two parties in the OTC market and the counterparty should have been expressly identified on the confirmation statement.  None of Madoff's options trade confirmations identified the counterparty.

438.    By contract, options traded on the CBOE have an identifier number known as a "CUSIP" (Committee on Uniform Security Identification Procedures).  The CUSIP allows traders to quickly access electronic information regarding a particular option by simply inputting the CUSIP number into data terminals.  Because OTC options are private transactions, the

options are not assigned any CUSIP number. Madoff's trade confirmations – reviewed by FGG – included a CUSIP indicating that they were traded on the CBOE.

439.   The master options agreement stated Madoff was acting as the agent of the Feeder Funds when he entered into options trades, however each confirmation indicated BLMIS was trading as a principal. More importantly, once BLMIS was registered as an investment adviser with the SEC in 2006, SEC regulations prevented BLMIS from trading for a customer account as a principal without written authorization from the customer for each trade. The Feeder Funds never transmitted any authorizations permitting BLMIS to trade as a principal. Nevertheless, every trading confirmation the Feeder Funds received from BLMIS indicated BLMIS acted as a principal, even after he registered as an investment adviser.

440.   The Defendants knew of and ignored these red flags. Simply put, the Defendants did not perform independent or reasonable due diligence into their own trading confirmations.

### 8.    Madoff's Inconsistent Stories Were Ignored by the Defendants

441.   Madoff's explanations about the SSC Strategy often changed according to circumstances, and with whom he was talking. The Defendants knew Madoff made inconsistent statements about the SSC Strategy but did nothing in response.

### a.    Options Trading

442.   When Madoff first began trading options pursuant to the purported SSC Strategy, he claimed he traded the options contracts on the CBOE. When confronted by customers questioning whether the volume of his options trading activity was too large for the CBOE, Madoff shifted his story and claimed he had moved to OTC trades without telling his customers.

The Defendants never investigated Madoff's statements.  Instead, the Defendants falsely repeated whatever Madoff told them about where he was trading options.

443.    When FGG's investors expressed concern that Madoff could purchase equities but might not find counterparties from whom to purchase the put options to protect the equities purchases from a market drop, Madoff reassured FGG by claiming that he spoke to option counterparties to determine option availability before he purchased any equities.  (A true and accurate copy of the Vijayvergiya's July 23, 2008 email to Barreneche is attached hereto as Ex. 66.)

444.    By contrast, during the 2006 SEC investigation Madoff expressed concern that the SEC would conclude that the SSC Strategy would promote front-running.  During the "scripting" call with Vijayvergiya and McKenzie, Madoff discussed the need not to say anything that might allow the SEC to conclude one party could front-run the trades.  When Vijayvergiya asked Madoff whether he spoke to counterparties to assure puts were available before he purchased equities, Madoff replied that he did not contact the options counterparties ahead of time because it would be too easy for them to front-run his trades.  (*See* Ex. 39.)  As was customary, the Defendants did not perform independent or reasonable due diligence or follow up when Madoff made these contradictory statements.

### b.    Madoff's Auditor

445.    The Defendants knew that Madoff told changing stories about the relationship between BLMIS and its auditor.  When questioned about Friehling, Madoff sometimes told customers, including FGG, that he did not change auditors because there was a family connection to Friehling.  Internal FGG communications discussed the fact that BLMIS's auditor

was a member of Madoff's family.  (*See* Ex. 38.)  This lack of independence between the auditor

and audit client would be a conflict of interest and itself a huge red flag of fraud.  The

Defendants did not conduct due diligence as to this conflict of interest.  Later when the so-called

"family auditor" conflict of interest issue arose, Madoff claimed he had no family ties to

Friehling.  The Defendants conducted no due diligence into this changing story.

### c.      Number of People at BLMIS Executing the Strategy

446.     At times, FGG repeated Madoff's claims of having dozens of PhD traders and

administrative personnel involved in executing the SSC Strategy.  However, in 2006, when

BLMIS filed its ADV form as independent advisor, BLMIS reported it had only five employees

in the BLMIS IA Business.  After obtaining the ADV form, the Defendants took no action to

reconcile Madoff's prior representations and the information he provided to the SEC.  Instead,

the Defendants simply repeated what Madoff told them about the traders in  the BLMIS IA

Business operation.

### 9.      The Defendants' Own Due Diligence Procedures Should Have Uncovered Anomalies in Madoff's Trading

447.     The Defendants told their investors that as part of their due diligence procedures

they reconciled trade confirmations immediately.  The Defendants knew or should have known

of certain trading anomalies through their trade reconciliation efforts.

448.     There were days when the Feeder Funds' trade confirmations indicated Madoff

traded stocks at prices that were outside the daily ranges of prices for those stocks.  As an

example, Fairfield Sentry's account statements for October 2003 reported purchases of Intel

Corporation (INTC) of 1,082,543 shares, 1,097,173 shares, and 67,837 shares.  BLMIS's records

indicate these stocks were purchased on October 2, 2003 for $27.63 per share.  The daily price

range for Intel Corporation stock purchased and sold on October 2, 2003 in fact ranged from a

low of $28.41 to a high of $28.95.

449.     Fairfield Sentry's and GSP's account statements for December 2006 reported

sales of Merck (MRK) of 267,035 shares, 261,266 shares, 15,386 shares, and 786 shares.

BLMIS's records and the Feeder Funds' trade confirmations reflect that these stocks were sold

on December 22, 2006 for $44.61.  The price range for Merck stock in fact bought and sold on

December 22, 2006 was between $42.78 and $43.42.

450.     According to the Defendants, they created procedures and employed them every

day for the specific purpose of catching such indicators of fraudulent behavior.  That in fact

never occurred.

> **10.      The Quantitative Analysis the Defendants Touted to Their
> Own Investors Proved Madoff's Returns Were Virtually
> Impossible.**

451.     Quantitative analysis that is standard in the hedge fund industry revealed that

Madoff's positive, consistent returns were, statistically, highly improbable.  FGG told its

investors that it performed such analysis, but refused to recognize the implications of their

findings – BLMIS was a fraud.

452.     FGG's marketing materials emphasized that Vijayvergiya and his risk

management team performed exacting quantitative analysis of the Feeder Funds' investments.

This analysis included utilizing an industry standard known as the Sharpe ratio to gauge portfolio

performance.  The Sharpe ratio, developed by William Sharpe, winner of the Nobel Prize in

Economic Sciences, measures how well a trading strategy compensates the investor for the risk

taken. A higher Sharpe ratio indicates the strategy provides a higher return relative the

associated risk. For funds with monthly net asset values ("NAV"), such as the Feeder Funds, the

Sharpe ratio is calculated as follows:

$$\frac{\text{(The Fund's Average Monthly Rate of Return)} - \text{(That Month's Risk-Free Rate)}}{\text{Standard Deviation of the Fund's Monthly Returns}}$$

453.   BLMIS's Sharpe ratio was remarkable. When compared to the over 800 other

hedge funds that reported data to major hedge fund databases, the probability Madoff could

maintain such high Sharpe ratios by providing positive returns with very little volatility, was **less

than 1%**. When compared to funds that employed comparable strategies to Madoff's SSC

Strategy, that probability drops to **less than 0.1%**. In selling his services to FGG, Madoff noted

that other star managers might have higher returns, but he produced steady returns without the

volatility of those star managers. In fact, for a 13-year period, Fairfield Sentry had a higher

Sharpe ratio than Warren Buffett, George Soros, Bruce Kovner, and John Paulson in all but six

of 52 quarters between 1995 and 2007. The probability of Fairfield Sentry's Sharpe ratio

outperforming these star money managers in almost every quarter for nearly 13 years is

approximately **1 in 200,000,000**.

454.   Such an understanding and detailed analysis of the Sharpe ratio was what

Defendants touted to be part of their exceptional due diligence procedures. The Feeder Funds'

nearly impossible Sharpe ratio was in fact one of the factors that led quantitative analysts, such

as Edward Thorp and Harry Markopolos to conclude that Madoff was operating a Ponzi scheme.

455.   Independent analysts viewed the Feeder Funds' Sharpe ratio with a great deal of

skepticism because the Feeder Funds' Sharpe ratio **always** remained high. The Feeder Funds'

year-over-year Sharpe ratio was driven by the low volatility of the Feeder Funds' performance in

often highly volatile markets, and without any meaningful correlation between the two.  The

Defendants did not perform any reasonable or independent due diligence into the fact that it was

nearly impossible for the Feeder Funds to have retained such a consistently high Sharpe ratio.

456.    FGG claimed that Madoff had great market timing based on his "feel" for the

flow of the market, premised on short-term market timing.  Vijayvergiya responded to critics of

Madoff's market timing abilities by claiming Madoff had unique access to market flow

information through his market-making business.

457.    Independent analysts rejected the Defendants' explanations about Madoff's ability

to perfectly time the market for over 20 years.  Many analysts viewed Madoff's perfect timing

based on market flow as indicative of illegal front-running.  The Defendants knew that front-

running was a "[t]ypical Madoff rumor[]," but they never tried to investigate.  (A true and

accurate copy of the February 27, 2004 email from Vijayvergiya to FGG's Marco Musciacco is

attached hereto as Ex. 67.)

458.    Moreover, despite employing a market timing strategy, Madoff would artificially

take his customers' cash out of the market near the end of the quarter for reasons having nothing

to do with the SSC Strategy.  Madoff claimed to move his customers' funds, like the Feeder

Funds, in order to avoid what he understood to be the disclosure requirements of a Form 13F

filing under the SEC rules requiring those who exercise discretion over accounts having more

than $100 million in exchange-traded or NASDAQ securities to report their holdings.

459.    The Defendants knew Madoff's desire to avoid reporting requirements was the

reason for his end-of-quarter positions.  The Defendants also knew that Madoff's reason for

going to cash would raise concerns among institutional investors.  Vijayvergiya and other FGG

sales personnel were directed to provide other reasons for the end-of-quarter cash positions.

460.    After Yanko della Schiava, another Noel son-in-law, asked Vijayvergiya why

Madoff moved all customer accounts out of the market at the end of the year, Vijayvergiya gave

two nonsensical responses based on purported trading strategy.  Della Schiava responded, "I

remember Jeffrey [Tucker] once specifically mentioning about the last days of the year to be in

cash so he [Madoff] did not have to fill certain tax forms . . [*sic*] or something similar."

Vijayvergiya then responded, "Yes – that is a third possible reason but I have been advised not to

emphasize this."  Vijayvergiya went on to write, "I am told that the rule to which Jeffrey

[Tucker] is referring requires that if Madoff ends the year invested on December 31, then they

are required by law to report their holdings in these same positions for the next four quarters.  I

am further told that Madoff has been reluctant to do this . . . ."  (A true and accurate copy of the

December 11, 2003 email from Vijayvergiya to della Schiava is attached hereto as Ex. 68.)

461.    The Defendants performed no independent or reasonable due diligence as to why

a strategy based on market timing would pull itself out of the market for reasons having nothing

to do with market timing and instead gave cover to Madoff's real reason he was out of the

market – avoiding 13F filings that would lead sophisticated investors to conclude he was a fraud.

## IX.    THE DEFENDANTS WERE WILLING TO IGNORE THE RED FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT

462.    The Defendants looked away when faced with red flags about BLMIS.  The

Feeder Funds' investors, who paid the Defendants to conduct proper, independent, and

reasonable due diligence on BLMIS, and the funds' potential investors were far more concerned

than the Defendants when they learned of Friehling; BLMIS's unusual fee structure; the fact that

BLMIS was the investment manager, self-clearing prime broker, and custodian; and the

Defendants' own lack of transparency and limited understanding of their own investment

strategy.

463.    For example, in February 2005 one investment group explained that it had

"decided to NOT invest in the Fairfield Sentry fund" due to the non pure independence between

the true manager of the fund and the prime broker/Custodian of the fund."  One of Fairfield-

UK's employees told Tucker, Landsberger, and Vijayvergiya, "at least their reason was was [*sic*]

a good one." (A true and accurate copy of the February 1, 2005 email to Tucker is attached

hereto as Ex. 69.)  Instead of investigating the issue further, Piedrahita was still saying over two

years later that "there is absolutely nothing we can do about it . . . ."  (A true and accurate copy

of the June 21, 2007 email from Piedrahita to Landsberger, Vijavergiya, Lipton, and the

Executive Committee is attached hereto as Ex. 70.)

> **A.**    ***FGG Does Everything It Can to Mollify Investor Concerns as
> Opposed to Performing Independent Inquiry Into the Possibility of
> Fraud***

464.    Throughout the 2000s and increasingly in the 2006–08 period, the Defendants

knew that "concerns about lack of transparency" troubled the Feeder Funds' investors and

potential investors, causing them to redeem from the Feeder Funds.  (A true and accurate copy of

the June 10, 2008 email from Vijayvergiya to McKenzie is attached hereto as Ex. 71.)  The

Defendants tried to stem the tide of redemptions, and tried to convince investors there was

nothing about which to be concerned, rather than independently or reasonably investigate or

follow up to determine whether Madoff's lack of transparency was an indicia of fraud.

465.    To respond to concerns about Madoff's lack of transparency, the Feeder Funds' sales force was provided with "talking points." Vijayvergiya sent an e-mail to McKenzie and others in which he suggested that Fairfield Sentry personnel ask its customers whether redemptions from the fund were related specifically to the lack of transparency or any other concerns over BLMIS. The Feeder Funds' sales force was to try to convince investors not to redeem their interests in Fairfield Sentry by emphasizing FGG's knowledge, monitoring and insight into Madoff, his operations, the performance, and the SSC Strategy.

466.    In May 2008, the Defendants received basic questions from an institutional client asking the Defendants to confirm how Fairfield Sentry's accounts were segregated at BLMIS. (A true and accurate copy of FGG's May 2008 internal notes in response to investor questions is attached hereto as Ex. 72.) The Defendants could not answer these basic questions because they had never independently confirmed that any trades were being made or that BLMIS was in fact holding their assets. Murphy recommended that, "**we confirm, but not sure we answer directly their questions on how our account is segregated and how this can be confirmed?**" (*See* Ex. 41 (emphasis added).) Murphy also admitted that he did not know whether the Defendants had copies of the audit reports for BLMIS or whether "**we get to talk with the auditors?**" (*Id.* (emphasis added).)

467.    As of May 2008, FGG had invested billions of dollars into Madoff and received over a billion in fees from the Feeder Funds, yet the Defendants still did not know **whether client funds were segregated** or whether anyone knew anything about Madoff's auditor. Vijayvergiya also admitted that "**there are certain aspects of BLM'S operations that remain unclear. . . .**" (*Id.* (emphasis added).) In internal email discussions that followed the investor's

redemption, Vijayvergiya stated that the client may have heard "certain rumors," which caused it
to backpedal on its Fairfield Sentry investments.  (*Id.*)

468.    In June 2008, FGG partner and Chief Global Strategist of FGG, David Horn,
emailed Vijayvergiya about a prospective client.  The email stated that the client "**has always
heard about Madoff, but hears things that scare her . . . so neutralize the scare with our
transparency . . . this will be a piece of cake . . . .**"  (A true and accurate copy of the June 2,
2008 email from Horn to Vijayvergiya is attached hereto as Ex. 73 (emphasis added) (alteration
in original).)  The Defendants' stated objective was to neutralize investor or prospective investor
fears.  The Defendants did not conduct proper, independent, and reasonable due diligence in
connection with the red flags raised by potential investors.

469.    In October 2008, Fairfield Sentry sought an investment from Merrill Lynch
("ML").  ML declined, explaining that BLMIS's unwillingness "to sit down with our due
diligence team and open the books and operations" kept ML from investing.  The ML
representative stated, "I realize the track record speaks for itself, but ML has a process and it
involves a lot of due diligence and learning.  So I admire you[r] track record but it does not help
me do business with your fund."  (A true and accurate copy of the October 21, 2008 email from
ML to Barreneche is attached hereto as Ex. 74.)

### B.    *FGG's Consultant Tells the Defendants Madoff May Be a Fraud*

470.    FGG's investors, industry experts, other fiduciaries, and money managers were
not the only ones flagging indicia that Madoff was a fraud.  An FGG consultant, Gil Berman
("Berman"), also told the Defendants Madoff might be a fraud.  On several occasions Berman
raised serious concerns regarding BLMIS and Madoff.

471.     When reviewing the trade tickets and account statements, Berman noticed that
Madoff was at times taking actions inconsistent with the SSC Strategy he was required to
execute.  The Feeder Funds' Options Agreement with BLMIS indicated that BLMIS would "only
write (sell) covered calls against long stock positions, and buy stock index puts or puts on the
individual stocks that the account owns."  Berman noticed that Madoff was occasionally
purchasing double the notional amount of put options to cover a single basket of stocks, a trade
not consistent with the SSC Strategy.  Doubling the put option position would actually be
detrimental because BLMIS had to pay for put options, and thus was wasting money by
purchasing excess puts.

472.     In May of 2008, this over-hedging strategy accounted for approximately $95
million of Sentry's total earnings.  (A true and accurate copy of the spreadsheet accompanying
Berman's report is attached hereto as Ex. 75.)  In a June 13, 2008 email to Vijayvergiya, Berman
stated that "there were several unusual transactions" in May 2008 and that "[a]ll of the [options]
trades produced excess profits . . . ."  (A true and accurate copy of the June 13, 2008 email from
Berman to Vijayvergiya is attached hereto as Ex. 76.)

473.     Later that month, in a telephone call with FGG, Berman noted plainly that **even
Madoff could not win 100% of the trades**.  Berman expressed concern that Madoff might be
backdating trade confirmations.  He recommended the Defendants require same-day trading
tickets, obtain information on the options counterparties, and **verify that BLMIS was actually
holding all of the assets purportedly in the Feeder Funds' accounts**.  (A true and accurate
copy of Berman's notes from the June 25, 2008 call with FGG is attached hereto as Ex. 77.)

474. However, the Defendants did not take any of Berman's due diligence recommendations – all of which should have been done regularly for years and any one of which would have disclosed the fraud. The Defendants ignored Berman's recommendation.

475. At another point in time Berman also noticed at least one risky "naked call position," where BLMIS had sold an S&P 100 call option but did not hold the underlying stock. A naked call position occurs when the seller of the call does not own the shares underlying the call option. In Madoff's SSC Strategy this would occur if he sold a call option for the S&P 100 Index but did not own the basket of stocks correlated to the index. If the index rose, the call would be exercised by the buyer and the Feeder Funds would be exposed to significant losses because they would not have hedged the risk.

476. Berman brought these activities to Tucker's and Vijayvergiya's attention because they were inconsistent with the SSC Strategy, and, depending on how the market moved, potentially harmful to the Feeder Funds' positions. The real reason the Feeder Funds' statements showed these unusual positions was that during certain down months, it was extremely difficult, even for Madoff, to fabricate trades that could justify his returns. Madoff created fictitious options trades inconsistent with his mandate and trading authority in order to create a consistently positive returns.

477. This type of options speculation violated the terms of BLMIS's investment agreement with the Feeder Funds, where Madoff agreed to invest all of the Feeder Funds' money pursuant to the SSC Strategy.

478. Armed with Berman's analysis and recommendations, and even though their own documents showed otherwise, when Noel, Tucker, McKeefry, and Vijayvergiya met with

Madoff in October 2008, they did not question Madoff's responses when he stated the value of the options would never exceed the notional amount of the equities.

479.    The Defendants did not independently or reasonably investigate or follow up on any of these indicia of fraud made known to them by Berman.

## X.    DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF

480.    For years, the Defendants had overwhelming evidence that Madoff was not a legitimate investment manager.  Instead of performing as fiduciaries and protecting investors from fraud, the Defendants employed a number of ways to raise capital for Madoff, in order to enrich themselves, including, *inter alia*, creating new funds that would then invest a portion of their assets back into Fairfield Sentry; forming GSP to accommodate new investors; working with JPMorgan Chase & Co. ("JPMC"), Natixis, Nomura, BBVA, and many other financial institutions to create leveraged note programs based on Feeder Funds' returns, fully expecting the financial institutions to hedge their exposure by investing directly in Feeder Funds; and finally, when massive redemptions were pushing Madoff to the brink, agreeing to serve as the exclusive marketers for a "new" BLMIS strategy.

### A.    *2006:  GS Is Expanded and GSP Is Created*

481.    The Defendants created GS to accommodate U.S. investors that wished to invest their money with BLMIS.  By 2006, FGG decided it wanted to further accommodate U.S. investors and on May 1, 2006 created GSP for those investors that did not qualify to invest in GS.

### B.    *2007:  Leveraged Note Programs*

482.    More money invested with Madoff translated to more FGG fees and, in 2007, the
Defendants expanded aggressively into many types of leveraged products.  Madoff's commercial
banker, JPMC, for example, structured about $250 million in leveraged notes based on the
returns of Fairfield Sentry and Sigma.  Others such as Natixis, Nomura, and BBVA did the same.

483.    Purchasers of these notes would be entitled to receive returns based on a multiple
of the returns of the underlying Feeder Fund.  As an example, in February 2007, JPMC offered a
3x leveraged certificate on Sigma.  Individual investors who purchased a note for this product
would invest a specific sum (e.g., $100), and would earn returns as if they had actually invested
three times that sum (e.g., $300).  Each of these products was time restricted.  Investors who
purchased a note from JPMC in 2007 would not have been able to collect their profits until the
note matured, generally sometime between five and eight years after the initial investment.

484.    The benefit to the Feeder Funds of these note programs was the potential
investment from the financial institutions structuring the notes.  For instance, if JPMC structured
a note on Sigma, and thereby guaranteed returns based on Sigma's performance, JPMC would be
expected to hedge that exposure by purchasing shares of Sigma.  And that is what happened.
The financial institutions invested hundreds of millions of dollars in the Feeder Funds and
Sigma, from which the Defendants reaped even greater fees.

C.    *2008: The Emerald Funds*

485.    In late 2008, the Defendants were still working with Madoff to inject additional
funds into BLMIS.  In November 2008, Madoff contacted the Defendants about setting up new
Madoff feeder funds.  In a short telephone conversation with Tucker, Madoff stated without

much specificity he had a new strategy which would be similar to the SSC Strategy, but would produce higher volatility with higher returns.

486.    Madoff offered this new strategy to the Defendants, who would serve as the exclusive marketer.  In order to launch the new strategy, Madoff asked that the Defendants raise $500 million, with $200 million to be raised by the end of 2008.  The Defendants agreed.

487.    After nothing more than a brief telephone conversation describing the new strategy and a one-page performance report purporting to show the strategy's simulated *pro forma* performance over the previous year, the Defendants began raising money for the new funds BBHF Emerald and Greenwich Emerald ("the Emerald Funds").  The Defendants tried to raise this capital even though they had not issued a private placement memoranda, offering documents, or other fund documentation, and had not received any details regarding, nor conducted any due diligence on, this new strategy.

488.    On December 10, 2008, Tucker drafted a letter to Madoff outlining the steps FGG was taking to slow withdrawals from BLMIS:

> We have taken a number of steps with our other funds in order to put all of our investable capital in Sentry and the new split strike strategy which we call Emerald.  While the full results of this strategy will take a few months to take effect, they will include:
>
> •    investments in Sentry by existing Fairfield funds (~$100mm)
>
> •    liquidating other Fairfield funds and transferring the assets to Sentry and Emerald (up to ~$150mm)
>
> •    purchases by the firm of Sentry positions from clients rather than having them redeem from Sentry (~$150mm)
>
> •    investments by individual partners of the firm in

Sentry and Emerald (~$50mm)

We are, as would be expected, aggressively cutting fees for new subscriptions and offering significant fee-sharing incentives to our agents and finders.

(A true and accurate copy of the December 10, 2008 draft letter from Tucker to Madoff is attached hereto as Ex. 78.)

489.    The Defendants and Madoff were partners until the bitter end.

## XI.    **THE AFTERMATH**

490.    On December 11, 2008, the world's largest Ponzi scheme was uncovered and Madoff was arrested. The Defendants' failure to conduct proper, independent, and reasonable due diligence and follow up on Madoff, and their willful ignorance of information readily available to them for nearly two decades helped facilitate the scheme and allow billions to be lost as a result.

491.    By the time Madoff was arrested, the Management Defendants had only a few million dollars invested with Madoff. Piedrahita had no investments with Madoff, Tucker had approximately $900,000 and Noel had a slight percentage of his wealth, $9 million, invested through Madoff. The Defendants retained every other cent of the fees, partnership distributions, and other monies they unjustly "earned" and had collected over nearly two decades. They have to-date kept millions of dollars of stolen Customer Property.

492.    On December 12, 2008, the day after Madoff's arrest, Tucker faxed withdrawal notices to BLMIS for all of the Feeder Funds' monies. The small fraction of assets left in BLMIS's account was not sufficient to fulfill the redemptions. The result of the FGG Affiliates and Management and Sales Defendants' actions was a precipitous drop in the Net Asset Value

("NAV") of the Feeder Funds.  The NAV of the Feeder Funds is defined as the value of their

cash, stocks, and options, less any liabilities.  When Madoff admitted he had never purchased

any stocks or options with the money his customers gave him, the NAV of the Feeder Funds

dropped to almost nothing.  The Feeder Funds and their investors lost billions.  The remaining

Defendants, on the other hand, whose fees and profits were based directly on the previous,

wrongly calculated NAVs, had already walked away with over a billion dollars.

493.    Shortly after the Madoff scheme collapsed, the Defendants publicly claimed they

were innocent and had no reason to suspect anything was amiss at BLMIS.  (A true and accurate

copy of the December 12, 2008 FGG press release is attached hereto as Ex. 79.)  These

statements were false.

494.    As alleged support for their claims of innocence, certain Management Defendants

proclaimed FGG had created a new feeder fund and funded it with $10 million of personal funds

sent to Madoff days before his arrest.  However, their statement was not the complete story.

495.    These Management Defendants did not mention the Stable Fund, which was

limited to the FGG partners and their spouses.  In October 2008, the Stable Fund liquidated and

redeemed its remaining $4.4 million in assets out of Fairfield Sentry.  On December 8, 2008, the

Defendants informed Madoff that it would be forwarding another major redemption.  Madoff

reacted to this news by suggesting that the Defendants were not a suitable partner for his

investment services.  When faced with Madoff's threat, through their new Emerald Funds, the

Management Defendants put back the $4.4 million they had taken out of BLMIS through the

Stable Fund.

496.    After the scheme was revealed, Lipton immediately emailed his personal broker and asked that a new account be set up in his wife's name, where he transferred all of his municipal bonds and treasury investments.  Piedrahita and his wife sold their U.S. residence and moved from country to country after Piedrahita took delivery of a $12 million yacht.

497.    Even after Madoff was arrested, the Defendants continued to lie about the due diligence they purportedly had performed.  As late as February 2009, FGG proclaimed that it regularly reviewed DTCC records.  (A true and accurate copy of the February 5, 2009 Wall Street Journal article entitled, "Markopolos Testifies Fairfield Knew Little About Madoff," is attached hereto as Ex. 80.)  The Defendants' statements were not and could not be true.  If any of the Defendants had examined a DTCC record, they would have immediately discovered not a single security had ever been traded on their behalf.

## XII.    **"PEOPLE WILL TELL:  OH THIS WAS FRAUD, THERE IS NOTHING WE COULD HAVE DONE.  BUT THIS IS SIMPLY NOT TRUE!  YOU SHOULD HAVE DONE DUE DILIGENCE!"**[7]

498.    There was nothing special about the kind of due diligence that needed to be done to unearth signs that Madoff was possibly a fraud.  Many fund managers, due diligence research and consulting firms, consultants, banks, and other industry professionals, with far less access to BLMIS than the Defendants, concluded many years prior to Madoff's arrest that the consistency of his returns was virtually impossible and likely the result of fraud.  The FGG Affiliates, Management Defendants, and Sales Defendants knew this too.  Because these Defendants were earning millions of dollars year after year based solely on their relationship with Madoff, they knowingly chose to ignore the likelihood of fraud.

---

[7]    (A true and accurate copy of the December 14, 2008 Salus Alpha Group press release is attached hereto as Ex. 81.)

499.    The claim that no one saw signs that Madoff was a fraud or that the Defendants were not on actual and/or constructive notice of fraud, is false. The Defendants saw the signs and they summarily ignored them.

## A.    *The Barron's and MAR/Hedge Articles Are Published in 2001*

500.    During 2001, two industry analysts published articles that called into question the legitimacy of BLMIS's operations. A May 2001 MAR/Hedge newsletter entitled, "Madoff tops charts; skeptics ask how," reported on Fairfield Sentry's consistent returns stating that experts were bewildered as to how such returns could be achieved so consistently and for so long. The article observed that "others who use or have used the strategy . . . are known to have had nowhere near the same degree of success." (A true and accurate copy of the May 2001 MAR/Hedge article entitled, "Madoff tops charts; skeptics ask how," is attached hereto as Ex. 82.) The MAR/Hedge newsletter is widely read by participants in the fund of funds and hedge fund industry.

501.    Barron's published a similar article on May 7, 2001. The article, entitled "Don't Ask, Don't Tell, Bernie Madoff is so secretive, he even asks investors to keep mum," noted the heavy skepticism on Wall Street surrounding Madoff, as well as the lack of transparency around the BLMIS IA Business as a result of Madoff's unwillingness to answer basic questions about his SSC Strategy. (A true and accurate copy of the May 7, 2001 Barron's article entitled, "Don't Ask, Don't Tell," is attached hereto as Ex. 83.) Noel and Tucker testified in the proceeding brought by the Commonwealth of Massachusetts against certain FGG entities that they read the articles questioning BLMIS's very legitimacy, but were not concerned. Noel testified that the author of the Barron's article had mischaracterized the strategy. He explained, "I mean, anyone who knew what he was doing, like we did, would have said that was not an accurate description,

142

but nothing came of it afterwards." (A true and accurate copy of excerpts from the transcript of Noel's testimony is attached hereto as Ex. 84.) Tucker described the Barron's article as "just irresponsible journalism . . . ." (A true and accurate copy of excerpts from the transcript of Tucker's testimony is attached hereto as Ex. 85.)

502.    Despite having responsibility for billions under management in their Feeder Funds, the Defendants performed no meaningful, independent inquiry or due diligence in response to the dramatic assertions made in these articles. The Defendants did not call the authors to better understand the red flags being raised. The Defendants did not speak to other institutions. The Defendants did nothing to see if there were OTC counterparties. Instead, the Defendants sent a newsletter to the Feeder Funds' investors claiming the articles were wrong. (*See* Ex. 40.)

503.    The Defendants simply went about their business of aggressively touting, marketing, and effectively co-opting Madoff's "fool-proof" strategy as their own. The reason was simple – without Madoff, the Defendants would not continue to reap the hundreds of millions paid to them as Madoff's *de facto* partners. The Defendants consistently did whatever they felt they needed to in order to keep their lucrative relationship with Madoff.

504.    The Defendants marketed the Feeder Funds in the face of investor skepticism. For instance, after reviewing Fairfield Sentry's performance information, one analyst warned a potential Fairfield Sentry investor: "along with many other investment professionals in business, we are skeptical regarding the source and repeatability of [Fairfield Sentry's] returns . . . Therefore, by definition, we have no quantitative or qualitative rationale for believing in the persistence of this strategy." The Defendants became aware of the analyst's assessment when it

was forwarded to them. (A true and accurate copy of the May 23, 2005 email to Vijayvergiya is attached hereto as Ex. 86.)

505. FGG internally joked about red flags suggesting Madoff was a fraud. Years after the Barron's article questioned both Fairfield Sentry's and Madoff's legitimacy, FGG's Yanko della Schiava responded to an investor's inquiries by stating that the investor was "probably a reader of Barrons!" (A true and accurate copy of the September 24, 2003 email from della Schiava is attached hereto as Ex. 87.)

### B. *Tightening Industry Standards*

506. During the late 1990s and early 2000s, hedge fund frauds and other financial scandals like Barings, Daiwa, Allied Irish Bank, Lipper, Manhattan Investment Fund, and Bayou, confirmed the recognized need for initial and ongoing reviews of operational risk factors among investment managers. Reasonable investment professionals knew and market events drove home the fact that a high proportion of hedge fund failures resulted from operational problems.

507. By 2002, according to a well-known industry report, approximately 50% of all hedge fund failures resulted in full or in part from poor operational controls, and 91% of these failures had one or more of the following problems in common:

- Misappropriation of funds and outright fraud by investment managers who knowingly took money for personal use or to cover trading or other losses;

- Misrepresentation of investments through false account reports, valuations and other misleading information;

- Unauthorized trading by making investments outside of stated portfolio strategies; and

- Infrastructure insufficiency and inadequate technology or personnel that are not able to accommodate or handle the types of investments and supporting activities engaged in by the investment manager.

(A true and accurate copy of the March 2003 article entitled, "Understanding and Mitigating Operational Risk in Hedge Fund Investments," is attached hereto as Ex. 88.)

508.    Additional industry articles, "Valuation issues and operational risk in hedge funds" (a true and accurate copy of the 2004 article is attached hereto as Ex. 89), and "Hedge fund operational risk:  meeting the demand for higher transparency and best practice" (a true and accurate copy of the 2006 article is attached hereto as Ex. 90), stressed important due diligence standards and processes.  Key operational standards included:  (i) robust internal controls and procedures over each stage of the trading cycle; (ii) adequate segregation of duties between those who are responsible for trading and those who are responsible for recording trade activities; and (iii) segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals.  Independent checks and balances throughout the trading cycle, the movement of cash, and the custody process were all seen as critical areas of inquiry for those performing independent and reasonable due diligence on investment managers.

509.    FGG and the Defendants failed to adhere to these due diligence standards, or virtually any other sound industry practices, when it came to the due diligence and follow up it was required to perform on BLMIS.  When it came to Madoff, the FGG Individuals simply made up their own, self-serving rules in order to maintain FGG's preferred status and its hundreds of millions of dollars in fees.

### C.    *It Was All Over the Street:  Madoff Was Suspected of Being a Fraud*

510.    The Barron's and Mar/HEDGE articles were based on publicly available information and their authors were not outliers.  They were among a large group of industry experts who reviewed public information about the SSC Strategy, saw that it did not make any sense, and then advised their clients to keep their money far away from BLMIS, and far away from funds like the Feeder Funds.  For many years – well before Madoff was arrested – many industry professionals spotted the likelihood of fraud.

511.    Edward Thorp, "the grandfather of quantitative analysis," concluded over the course of a single day, as far back as 1991, Madoff's claimed returns were nearly impossible, and he was likely a fraud.  All Thorp needed to do was check the number of listed options in the account of one BLMIS customer against the number of the same options traded on the CBOE.

512.    Later, in 2001, in response to the MAR/Hedge and Barron's articles, Thorp wrote to a fund manager friend expressing serious concerns about Madoff, and about his friend's fund being invested in BLMIS:

> **Just read the Barron's article.  All it does is reinforce my previous suspicions.  Do you have access to the "actual" trades done in any one account?  If so, can you establish that they could be real?  That means checking to see if they are reported on a timely basis, rather than substantially delayed, that they are on listed options, that those options could have traded at those prices and in the volumes reported on the exchanges where the confirms said the trades occurred, and ditto with the stocks.**

> **What if you scale up your representative account to 7bn$.  Could the volume of imputed trading in the options markets, in the "universe" traded, actually have been done?**

> **Hope you don't have a major position, or that you are trading**

on "profits".

(A true and accurate copy of the May 11, 2001 email from Thorp is attached hereto as Ex. 91
(emphasis added).)

513.    Thorp laid out simple, independent, and reasonable due diligence queries that the
Defendants could have, and should have, undertaken.  The Defendants did no such due diligence,
asked no such questions, and instead defended Madoff.

514.    As early as 1998, Cambridge Associates recommended that clients stay away
from Madoff and Madoff-related feeders due to lack of transparency, a fear of front-running the
market, and a general inability to understand how the strategy could produce cash-like, bond-like
consistency of returns, in an equity strategy.  In 2004, Cambridge was more pointed in its
discomfort, stating: "**it 'felt illegal' and that Madoff gave no transparency**," suggesting that
"**[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull
over**."  (A true and accurate copy of the redacted public version of the November 11, 2004
Cambridge Associates internal email is attached hereto as Ex. 92 (emphasis added).)

515.    In 2003, a team from Société Génerale's investment bank was sent to New York
to perform due diligence on BLMIS.  What Société Génerale discovered was that BLMIS's
numbers simply "did not add up."  Madoff explained to the Société Génerale team how his
investment strategy worked, but when the team tested the strategy, they could not match
Madoff's returns.  Another red flag made the due diligence team anxious - Madoff's brother,
Peter, was serving as chief compliance officer of BLMIS.  Société Génerale immediately forbade
its investment bank from doing business with BLMIS and discouraged its private banking clients
from investing with Madoff.  After uncovering obvious red flags during its due diligence visit,

Société Génerale blacklisted Madoff.  (A true and accurate copy of the December 17, 2008 New

York Times article entitled, "European Banks Tally Losses Linked to Fraud," is attached hereto

as Ex. 93.)

516.    Shortly after Madoff's arrest, Robert Rosenkranz of Acorn Partners, a fund of

funds, and an investment adviser to high net worth individuals, reflected in email that Acorn had

done due diligence on Madoff and concluded "that fraudulent activity was highly likely."  (A

true and accurate copy of the December 15, 2008 email from Rosenkranz is attached hereto as

Ex. 94.)

517.    Acorn succinctly described the indicia of fraud that led it to conclude years prior

that Madoff was a fraud.

> We had considered investing in a Madoff managed account, and
> decided to pass for reasons that give a useful insight into our due
> diligence process.
>
> First, we ascertained that the description of the strategy (purchase
> of large cap stocks versus sale of out of the money calls) appeared
> to be inconsistent with the pattern of returns in the track record,
> which showed no monthly losses.
>
> Second, we persuaded a Madoff investor to share with us several
> months of his account statements with Madoff.  These revealed a
> pattern of purchases at or close to daily lows and sales at or close
> to daily highs, which is virtually impossible to achieve.  Moreover,
> the trading volumes reflected in the account (projected to reflect
> his account's share [of] Madoff's purported assets under
> management at the time) were vastly in excess of actually reported
> trading volumes.
>
> Third, we noted that Madoff operated through managed accounts,
> rather than by setting up a hedge fund of his own.  That was
> suspicious inasmuch as hedge fund fees are typically much higher
> than the brokerage commissions Madoff was meant to be charging.
> We suspected the requirement for annual hedge fund audits was
> the reason he wanted to avoid that approach.  We knew that when
> his clients are audited, their auditors simply look at the account

statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.

Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts.

**Taken together, these were not merely warning lights, but a smoking gun.** The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.

(A true and accurate copy of the December 12, 2008 email from Acorn to its investors is attached hereto as Ex. 95 (emphasis added).)

518.    All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known or should have been known by the Defendants. The Defendants did not conduct the type of due diligence performed by Acorn. In fact they conducted no reasonable or independent due diligence at all, even when on both actual and inquiry notice of possible fraud.

519.    Media reports following Madoff's arrest, as well as emails between FGG employees, indicate that in 2004, Mr. Oswald Gruebel, formerly of Credit Suisse and now of UBS, felt uncomfortable with Madoff and Fairfield Sentry after a meeting between FGG personnel and Credit Suisse representatives. (A true and accurate copy of the February 25, 2004 email from Noel to Piedrahita, Tucker, Toub and Landsberger is attached hereto as Ex. 96.)

During that meeting, Mr. Gruebel raised serious concerns about Madoff's obscure auditor who had only one client, BLMIS, and the fact that BLMIS was the self-custodian of its investment clients, such as the Feeder Funds. After Madoff refused to provide answers to such basic questions as to how much money he was managing in the SSC Strategy or further, who worked with him to implement the strategy, Gruebel quickly urged customers to withdraw their funds from BLMIS and redeem their shares from feeder funds, like the FGG funds. (A true and accurate copy of the January 7, 2009 Bloomberg article entitled, "Credit Suisse Urged Clients to Dump Madoff Funds," is attached hereto as Ex. 97.)

520.    In 2005, ML continued its long-standing policy of not investing in Fairfield Sentry or any other Madoff feeder fund. ML identified major red flags associated with Fairfield Sentry and stated conclusively that "the prime broker [Madoff] was an affiliate of the company, the custodian wasn't independent," published articles stated the fund's "affiliated broker was subsidizing the fund," and "[t]he fund manager refuses to meet potential clients." (A true and accurate copy of the June 15, 2005 internal ML email is attached hereto as Ex. 98.) A year later, ML once again expressed its discomfort with Madoff and Fairfield Sentry stating, "Madoff is known for keeping the source of his returns a secret. This caused a lot of speculation on Wall Street about the true sources of the admittedly impressive returns." ML also commented internally that "Fairfield is a fund that is unusually opaque to its investors and doesn't accept detailed due diligence which automatically disqualif[ies] it. . . ." (A true and accurate copy of the December 2006 internal ML emails is attached hereto as Ex. 99.) ML emphasized that they were not the only company refusing to get involved with Fairfield Sentry or other Madoff feeder funds. Most of their competitors had taken similar positions. (A true and accurate copy of the February 6, 2008 internal ML email is attached hereto as Ex. 100.)

521.    In 2007, Aksia, LLC, an independent hedge fund research and advisory firm,

advised clients against investing with BLMIS, Madoff, or any of his feeder funds.  (A true and

accurate copy of Aksia's 2007 report is attached hereto as Ex. 101.)  Jim Vos, Chief Operating

Officer and head of research at Aksia, concluded that the stock holdings reported in the quarterly

statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS

claimed to be managing.  (A true and accurate copy of the December 11, 2008 letter from Vos to

his clients and friends is attached hereto as Ex. 102.)  Aksia also spoke with Mr. Michael Ocrant

(the author of the 2001 MAR/Hedge article), who reaffirmed that Madoff was "definitely a

Ponzi," is as "bogus as a three dollar bill," and that "[i]t's rather easy to come out looking good

when you're a Ponzi."  (A true and accurate copy of the August 14, 2007 email from Ocrant to

Vos is attached hereto as Ex. 103.)

522.    Aksia made the simple effort as part of its due diligence to do a background check

on BLMIS's auditor, as well as having Friehling's office physically inspected.  What was

discovered was a simple, closed office in a strip mall with what appeared to be a conference

room, secretary space, and two offices.  Friehling's office neighbors told Aksia's investigator the

office did not have regular hours.  (A true and accurate copy of the August 23, 2007 email to Vos

is attached hereto as Ex. 104.)

523.    In a post-Madoff arrest letter to clients Aksia summarized why its due diligence

led it to not recommend Madoff feeders:

> [T]here were a host of red flags, which taken together made us concerned about
> the safety of client assets should they invest in these feeders.  Consequently, every
> time we were asked by clients, we waved them away from the Madoff feeder
> funds.
>
> . . .

**As a research firm we are forced to make difficult judgments about the hedge funds we evaluate for clients. This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.** Some of these red flags were as follows:

. . .

- It seemed implausible that the S&P100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

- The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz . . . After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

- There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

- Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

- Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

(*See* Ex. 102 (emphasis added).)

152

524.     In 2007, David Giampaolo, the chief executive of Pi Capital, a money-management firm based in the United Kingdom, met with Piedrahita and other potential investors in London to discuss an FGG Madoff-related fund.  During this meeting, Piedrahita stressed the "longevity and the consistency" of the fund's returns, but was unable to give substantive details regarding the strategy of the fund.  When questions arose regarding how the fund generated its performance, Giampaolo recalls "there was no deep scientific or intellectual response" from Piedrahita.  (A true and accurate copy of the December 19, 2008 email summarizing the meeting is attached hereto as Ex. 105.)

525.     In 2007, Neil Chelo, a portfolio manager at Benchmark Plus Partners,  a hedge fund with its headquarters in Washington State, conducted due diligence on FGG.  Chelo and Vijayvergiya had a 45-minute conference call.  During this call, Chelo asked Vijayvergiya a list of due diligence questions and concluded that FGG "was **not asking any of [the] questions one would expect of a firm purporting to conduct due diligence.**"  (A true and accurate copy of the February 4, 2009 summary of the call is attached hereto as Ex. 106 (emphasis added).)  Specifically, Chelo asked multiple risk management questions that Vijayvergiya was unable to answer in a satisfactory manner.

526.     London due diligence firm Albourne Partners ("Albourne") stated publicly that it had long-standing concerns about Madoff's investment strategy and consistent returns, and had been urging clients for a decade to avoid Madoff-related funds.  (A true and accurate copy of the December 31, 2008 Bloomberg Businessweek article entitled, "The Madoff Case Could Reel in Former Investors," is attached hereto as Ex. 107.)  Albourne emphasized that the consistency of Madoff's returns was "too good to be true," Madoff refused to meet with investors, and Madoff charged no management or performance fees for his services, resulting in his leaving hundreds of

millions of dollars of money on the table each year.  (A true and accurate copy of the December 15, 2008 Albourne press release entitled, "Albourne on Madoff," is attached hereto as Ex. 108.) Like others, Albourne flagged as possible fraud the fact that Madoff required that his investors never reveal to anyone that they invested with him.  (*See* Ex. 83.)

527.     The above are some of the many illustrations showing that "the street" fully and openly suspected Madoff was a fraud.  These Defendants – who represented nearly half of Madoff's billions of dollars of reported assets under management – chose to ignore these well-recognized suspicions.

## XIII.   THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE

528.     For years the Defendants looked away when faced with repeated signs that Madoff's operations and performance could not be legitimate.  The reason was simple: greed.

529.     The Defendants had an extraordinary and lucrative financial arrangement with BLMIS.  Their sole job was to sell a fund that had returns that were so consistently positive, they were seemingly impossible.  In exchange for selling Madoff's strategy, the Defendants received in the aggregate over a billion dollars in fees.  The Defendants in their role as fiduciaries had no desire to perform their duties based on known information because if they did, they knew it could and would result in an abrupt end to this lucrative financial relationship.

530.     The Defendants also knew that without Madoff they could not survive.  The funds the Defendants tried to create without Madoff's assistance, making their own choices about which investment managers to place money, were all failures.

531.    The Defendants repeatedly lied about why Madoff would personally leave hundreds of millions of dollars in management and performance fees for FGG Affiliates and Individual Defendants.  Hedge funds typically collect management fees of approximately 1% of assets under management and performance fees of 20%.

532.    Unlike virtually everyone in the money-management world, Madoff charged *no fees* for his investment management services.  Madoff sometimes explained his decision not charge fees by stating they he was "perfectly happy to just earn commissions."  In reality, Madoff was happy to forgo typical performance and management fees, and only earn commissions, as long as his investors remained mum about the source of their inflated returns. And hedge funds like the Defendant Feeder Funds kept procuring billions of dollars to prolong and prop up the Ponzi scheme so they could continue to reap their enormous fees.

533.    A number of professional investors noticed Madoff's failure to charge fees, in addition to the multitude of other red flags, and made the decision to invest their money elsewhere.  (A true and accurate copy of excerpts from the August 2009 SEC Office of Inspector General's report on Madoff is attached hereto as Ex. 109.)  Madoff's decision to not collect traditional investment manager's fees should have raised red flags with FGG given the sheer amount of money that Madoff was foregoing.  Madoff could easily have earned an additional $200 to $400 million plus in annualized management and performance fees.  Investment professionals reasonably concluded that a fee structure where the true investment manager voluntarily chose to pass on massive amount of fees was a major red flag of fraud.  Defendants knew that the very compensation structure from their relationship with Madoff, which permitted them to be so unjustly enriched, was itself a massive sign of fraud.

534.    The Defendants were <u>not</u> victims.  They were enablers.  They were facilitators. They deepened the pain of Madoff's customers and their own investors.  The effect of their actions was a catastrophic continuation of the Ponzi scheme, the worsening of the BLMIS insolvency, and billions of dollars in additional damages.  They cannot be allowed to keep the many hundreds of millions of dollars in stolen Customer Property they received from BLMIS.

## XIV.   THE TRANSFERS

### A.    *Transfers from BLMIS to the Feeder Funds*

535.    Prior to the Filing Date, the Feeder Funds invested approximately $4.7 billion with BLMIS through over 300 separate transfers via check and wire directly into the 703 Account.

536.    During the six years preceding the Filing Date, BLMIS made transfers to the Feeder Funds in the collective amount of approximately $3.2 billion (the "Six Year Initial Transfers").  The Six Year Initial Transfers included transfers of approximately $3.0 billion to Fairfield Sentry (the "Fairfield Six Year Initial Transfers"), $206.0 million to GS, and $6.0 million to GSP (collectively, the "Greenwich Six Year Initial Transfers").  (*See* Exs. 2, 5, 7.) The Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are subject to turnover to the Trustee pursuant to SIPA § 78fff-2(c)(3) and section 542 of the Bankruptcy Code.  The Six Year Initial Transfers are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA §78fff-2(c)(3), and sections 273-279 of New York Debtor and Creditor Law.

537.     The Six Year Initial Transfers include approximately $1.7 billion BLMIS transferred to the Feeder Funds during the two years preceding the Filing Date, (the "Two Year Initial Transfers").  The Two Year Initial Transfers included transfers of approximately $1.6 billion to Fairfield Sentry (the "Fairfield Two Year Initial Transfers"), $81.7 million to GS, and $5.4 million to GSP (collectively, the "Greenwich Two Year Initial Transfers").  (*See* Exs. 2, 5, 7.)  The Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA §78*lll*(4) and are subject to turnover to the Trustee pursuant to SIPA §78fff-2(c)(3) and section 542 of the Bankruptcy Code.  The Two Year Initial Transfers are avoidable and recoverable under sections 548(a)(1), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA §78fff-2(c)(3).

538.     The Six Year Initial Transfers and Two Year Initial Transfers include $1.2 billion BLMIS transferred to the Feeder Funds during the 90 days preceding the Filing Date (the "Preference Period Initial Transfers").  The Preference Period Initial Transfers included transfers of approximately $1.1 billion to Fairfield Sentry (the "Fairfield Preference Period Transfers") and $23.0 million to GS (the "Greenwich Preference Period Transfers").  (*See* Exs. 2, 5.)  The Preference Period Initial Transfers were and are Customer Property subject to turnover to the Trustee pursuant to SIPA §78fff-2(c)(3) and Section 542 of the Bankruptcy Code.  The Preference Period Initial Transfers are avoidable and recoverable under sections 547, 550(a)(1), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

539.     The Trustee has filed this action against the Feeder Funds to avoid and recover the Initial Transfers and/or seek the turnover of Customer Property to the Trustee.

540.    The Trustee may recover the transfers to GS and GSP from all entities and individuals that served as general partner at the time the transfers were made.  GS's and GSP's April, 2006 partnership agreements provide that the general partner "shall have unlimited liability for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year during which they are or were General Partners of the Partnership." (True and accurate copies of GS's and GSP's Partnership Agreements are attached hereto as Exs. 110, 111.)  Upon information and belief, prior and preceding limited partnership agreements of GS and GSP contained similar provisions regarding the liability of the general partner.

541.    Both GS and GSP were formed as limited partnerships under the laws of the State of Delaware.  The entities and individuals that served as general partner are also liable under the Delaware Code provisions governing limited partnerships.  Under Delaware law, general partners of limited partnerships have the same liability as partners in general partnerships.  Del. Code Ann. tit. 6, § 17-403(b).  Partners in general partnerships are "liable jointly and severally for all obligations of the partnership." Del. Code Ann. tit. 6, § 15-306(a).

542.    Noel and Tucker served as general partners of GS from 1990 to 1998, FGL served as general partner from 1998 to 2003, FGB served as general partner from 2003 to 2004, and then again from 2006 to the present, and GBL served as general partner from 2004 to 2006. FGB has served as GSP's general partner since its inception in 2006.

### B.    *Transfers from the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants*

543.    Much of the money transferred from BLMIS to the Feeder Funds was subsequently transferred by the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants.  These payments from the Feeder Funds constitute subsequent transfers of

the Initial Transfers from BLMIS to the Feeder Funds. Because the FGG Affiliates, Management Defendants, and Sales Defendants did not take the funds in good faith or without knowledge of the voidability of the initial transfers, all transfers from BLMIS to the Feeder Funds, which the Feeder Funds subsequently transferred, either directly or indirectly, to the FGG Affiliates, Management Defendants, and Sales Defendants (the "Subsequent Transfers"), were and remain Customer Property subject to turnover to the Trustee and/or are avoidable and recoverable by the Trustee.

544.     The portion of the Six Year Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates and FGG Individuals will be referred to as the "Six Year Subsequent Transfers."

545.     The portion of the Two Year Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates, Management Defendants, and Sales Defendants will be referred to as the "Two Year Subsequent Transfers."

546.     The portion of the Preference Period Initial Transfers that the Feeder Funds subsequently transferred to the FGG Affiliates, Management Defendants, and Sales Defendants will be referred to as the "Preference Period Subsequent Transfers."

547.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

548.     The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on the Initial Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE:  TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

### *Against All the Defendants*

549.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

550.    The Initial Transfers and the Subsequent Transfers constitute Customer Property of the estate to be recovered and administered by the Trustee pursuant to sections 541 and 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) and § 78lll(4).

551.    The Trustee has filed a case on behalf of BLMIS's estate.

552.    As recipients of the Initial Transfers and the Subsequent Transfers, the Defendants are in possession, custody or control of property the Trustee may use, sell, or lease under section 363 of the Bankruptcy Code, or that BLMIS may exempt under section 522 of the Bankruptcy Code.

553.    The Defendants are not custodians of the Initial Transfers or the Subsequent Transfers.

554.    The Initial Transfers and the Subsequent Transfers are not of inconsequential value or benefit to the estate.

555.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to the immediate payment and turnover from the Defendants of any and all Initial Transfers and Subsequent Transfers made, directly or indirectly, to the Defendants.

556.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is also entitled to an accounting of any and all Initial Transfers and Subsequent Transfers made, directly or indirectly, to the Defendants.

## COUNT TWO:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551

### *Against the Feeder Funds*

557.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

558.    At the time of each of the Preference Period Initial Transfers, the Feeder Funds were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

559.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

560.    Each of the Preference Period Initial Transfers was to or for the benefit of the Feeder Funds.

561.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

562.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

563.     Each of the Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

564.     Each of the Preference Period Initial Transfers enabled Fairfield Sentry, GS, and/or GSP to receive more than each of the Feeder Funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

565.     Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Feeder Funds as initial transferees or the entities for whose benefit such transfers were made pursuant to section 550(a)(1) of the Bankruptcy Code.

566.     As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside, and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS.

## COUNT THREE:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551

### *Against FGB*

567.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

568.    At the time of each of the Greenwich Preference Period Initial Transfers, GS was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

569.    Each of the Greenwich Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

570.    Each of the Greenwich Preference Period Initial Transfers was to or for the benefit of GS.

571.    Each of the Greenwich Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

572.    Each of the Greenwich Preference Period Initial Transfers was made while BLMIS was insolvent.

573.    Each of the Greenwich Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

574.    Each of the Greenwich Preference Period Initial Transfers enabled GS to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) GS received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

575.    Each of the Greenwich Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code

and recoverable from GS as a direct transferee pursuant to section 550(a)(1) of the Bankruptcy Code.

576.    FGB served as general partner to GS during the Preference Period.  As general partner to GS, FGB is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations GS incurred while FGB was serving as general partner.

577.    FGB did not take the Preference Period Initial Transfers for value, in good faith, or without knowledge of the voidability of the Preference Period Initial Transfers.

578.    As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Preference Period Initial Transfers, (b) directing that the Greenwich Preference Period Initial Transfers be set aside, and (c) recovering the Greenwich Preference Period Initial Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT FOUR:  PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(2), AND 551

### Against the FGG Affiliates, Management Defendants, and Sales Defendants

579.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

580.    At the time of each of the Preference Period Initial Transfers, Fairfield Sentry and GS were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

581.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

582.    Each of the Preference Period Initial Transfers was to or for the benefit of Fairfield Sentry or GS.

583.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

584.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

585.    Each of the Preference Period Initial Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

586.    Each of the Preference Period Initial Transfers enabled Fairfield Sentry and/or GS to receive more than each of the funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

587.    Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

588.    The Trustee has filed a lawsuit against Fairfield Sentry and GS to avoid the Preference Period Initial Transfers pursuant to section 547 of the Bankruptcy Code, and to

recover the Preference Period Initial Transfers from Fairfield Sentry and GS pursuant to section 550(a)(1) of the Bankruptcy Code.

589.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Preference Period Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

590.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS.

591.    As a result of the foregoing, pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside and (c) recovering the Preference Period Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT FIVE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551

### *Against the Feeder Funds*

592.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

593.    The Two Year Initial Transfers were made on or within two years before the Filing Date.

594.     The Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

595.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Fairfield Sentry, GS, and GSP as direct transferees pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

596.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT SIX:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551

### *Against FGB*

597.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

598.     The Greenwich Two Year Initial Transfers were made on or within two years before the Filing Date.

599.     The Greenwich Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

600. Each of the Greenwich Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from GS and GSP as direct transferees pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

601. FGB served as general partner to GS and GSP during the two years preceding the Filing Date. As general partner of GS and GSP, FGB is liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB was serving as general partner.

602. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initial Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT SEVEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(2), AND 551

### *Against the FGG Affiliates, Management Defendants, and Sales Defendants*

603. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

604. The Two Year Initial Transfers were made on or within two years before the Filing Date.

605. The Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

606. Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the FGG Affiliates and FGG Individuals pursuant to section 550(a)(2) and SIPA § 78fff-2(c)(3).

607. The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Two Year Initial Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and to recover the Two Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code.

608. The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Two Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

609. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT EIGHT: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551

### *Against the Feeder Funds*

610. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

611. The Two Year Initial Transfers were made on or within two years before the Filing Date.

612. BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

613. At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfer in question.

614. At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

615. At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

616. Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

617.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551

of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of

the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two

Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c)

recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Funds for the

benefit of the estate of BLMIS, and to return to injured customers.

## COUNT NINE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551

### *Against FGB*

618.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

619.     The Greenwich Two Year Initial Transfers were made on or within two years

before the Filing Date.

620.     BLMIS received less than a reasonably equivalent value in exchange for each of

the Greenwich Two Year Initial Transfers.

621.     At the time of each of the Greenwich Two Year Initial Transfers, BLMIS was

insolvent, or became insolvent as a result of the Greenwich Two Year Initial Transfer in

question.

622.     At the time of each of the Greenwich Two Year Initial Transfers, BLMIS was

engaged in a business or a transaction, or was about to engage in a business or a transaction, for

which any property remaining with BLMIS was an unreasonably small capital.

623.    At the time of each of the Greenwich Two Year Initial Transfers, BLMIS

intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to

pay as such debts matured.

624.    Each of the Greenwich Two Year Initial Transfers constitutes a fraudulent

transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and

recoverable from GS and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA §

78fff-2(c)(3).

625.    FGB served as general partner to GS and GSP during the two years preceding the

Filing Date.  As general partner of GS and GSP, FGB is liable, pursuant to sections 15-306(a)

and 17-403(b) of Title 6 of the Delaware Code, for all obligations GS and GSP incurred while

FGB was serving as general partner.

626.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551

of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of Title 6 of

the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the

Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial

Transfers be set aside, and (c) recovering the Greenwich Two Year Initial Transfers, or the value

thereof, from FGB for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT TEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(2), AND 551

### *Against the FGG Affiliates, Management Defendants, and Sales Defendants*

627.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

628.    The Two Year Initial Transfers were made on or within two years before the Filing Date.

629.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

630.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfers in question.

631.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

632.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

633.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the FGG Affiliates and FGG Individuals pursuant to section 550(a)(2) and SIPA § 78fff-2(c)(3).

634.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Two Year Initial Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Two Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

635.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Two Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

636.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT ELEVEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

### *Against the Feeder Funds*

637.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

638.    At all times relevant to the Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

639.    The Six Year Initial Transfers were made by BLMIS and transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Initial Transfers to or for the benefit of Fairfield Sentry, GS, and/or GSP in furtherance of a fraudulent investment scheme.

640.    The Six Year Initial Transfers were received by the Feeder Funds with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

641.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, , and to return to injured customers, and (d) recovering attorneys' fees from the Feeder Funds.

## COUNT TWELVE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

### *Against FGB, FGL, and GBL*

642.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

643.    At all times relevant to the Greenwich Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

644.    The Greenwich Six Year Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS

made the Greenwich Six Year Initial Transfers to or for the benefit of GS and/or GSP in

furtherance of a fraudulent investment scheme.

645.    The Greenwich Six Year Initial Transfers were received by GS and GSP with the

actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers

and/or future creditors of BLMIS.

646.    FGB, FGL, and GBL each served as general partner to GS and/or GSP during the

six years preceding the Filing Date.  As general partner of GS and GSP, FGB, FGL, and GBL are

each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all

obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general

partner.

647.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of

the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy

Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the

Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year Initial

Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, (c) recovering

the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the

benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys'

fees from FGB, FGL and GBL.

**COUNT THIRTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) –
NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11
U.S.C. §§ 544, 550(a)(2), AND 551**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants*

648.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

649.     At all times relevant to the Six Year Initial Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not

allowable only under section 502(e).

650.     The Six Year Initial Transfers were made by BLMIS and the transferees with the

actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year

Initial Transfers to or for the benefit of Fairfield Sentry, GS, and/or GSP in furtherance of a

fraudulent investment scheme.

651.     The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the

Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 276-9 of

the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from

Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA §

78fff-2(c)(3).

652.     The FGG Affiliates, Management Defendants, and Sales Defendants were

immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to

section 550(a)(2) of the Bankruptcy Code.

653.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the FGG Affiliates, Management Defendants, and Sales Defendants.

## COUNT FOURTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

### Against the Feeder Funds

654.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

655.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

656.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

657.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

658.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA

§ 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is

entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing

that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers,

or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return

to injured customers.

## COUNT FIFTEEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

### *Against the FGB, FGL, and GBL*

659.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

660.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

661.    BLMIS did not receive fair consideration for the Greenwich Six Year Initial

Transfers.

662.    BLMIS was insolvent at the time it made each of the Greenwich Six Year Initial

Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Greenwich Six

Year Initial Transfers.

663.    FGB, FGL and GBL each served as general partner to GS and/or GSP during the

six years preceding the Filing Date. As general partner of GS and GSP, FGB, FGL, and GBL are

each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all

obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general partner.

664.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551

### Against the FGG Affiliates, Management Defendants, and Sales Defendants

665.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

666.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

667.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

668.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

669. The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code.

670. The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

671. As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT SEVENTEEN:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

***Against the Feeder Funds***

672. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

673. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

674. BLMIS did not receive fair consideration for the Six Year Initial Transfers.

675. At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

676. As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT EIGHTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

### *Against FGB, FGL, and GBL*

677. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

678. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

679.     BLMIS did not receive fair consideration for the Greenwich Six Year Initial Transfers.

680.     At the time BLMIS made each of the Greenwich Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Greenwich Six Year Initial Transfers was an unreasonably small capital.

681.     FGB, FGL, and GBL each served as general partner to GS and/or GSP during the six years preceding the Filing Date.  As general partner of GS and GSP, FGB, FGL, and GBL are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general partner.

682.     As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers.

**COUNT NINETEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551**

*Against the FGG Affiliates, Management Defendants, and Sales Defendants*

683.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

684.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

685.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

686.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

687.    The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year Initial Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

688.    The FGG Affiliates, Management Defendants, and Sales Defendants were immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

689.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c)

recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates,

Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to

return to injured customers.

**COUNT TWENTY: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against the Feeder Funds*

690.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

691.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

692.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

693.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had

incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay

them as the debts matured.

694.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New

York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code,

SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is

entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing

that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers,

or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return

to injured customers.

### COUNT TWENTY-ONE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

#### *Against FGB, FGL, and GBL*

695.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

696.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

697.    BLMIS did not receive fair consideration for the Greenwich Six Year Initial

Transfers.

698.    At the time BLMIS made each of the Greenwich Six Year Initial Transfers,

BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its

ability to pay them as the debts matured.

699.    FGB, FGL, and GBL each served as general partner to GS and/or GSP during the

six years preceding the Filing Date.  As general partner of GS and GSP, FGB, FGL and GBL are

each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all

obligations GS and GSP incurred while FGB, FGL, and GBL were each serving as general

partner.

700.     As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT TWENTY-TWO:  FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551

### Against the FGG Affiliates, Management Defendants, and Sales Defendants

701.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

702.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

703.     BLMIS did not receive fair consideration for the Six Year Initial Transfers.

704.     At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

705.     The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 275, 278,

and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year Initial

Transfers from Fairfield Sentry, GS, and GSP pursuant to section 550(a)(1) of the Bankruptcy

Code and SIPA § 78fff-2(c)(3).

706.    The FGG Affiliates, Management Defendants, and Sales Defendants were

immediate or mediate transferees of some portion of the Six Year Initial Transfers pursuant to

section 550(a)(2) of the Bankruptcy Code.

707.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the New

York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six

Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c)

recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates,

Management Defendants, and Sales Defendants for the benefit of the estate of BLMIS, and to

return to injured customers.

**COUNT TWENTY-THREE:  UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against the Feeder Funds*

708.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

709.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

710.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

711.    The Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of Fairfield Sentry, GS, and GSP in furtherance of a fraudulent investment scheme.

712.    Fairfield Sentry, GS, and GSP received the Initial Transfer with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

713.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the Feeder Funds.

**COUNT TWENTY-FOUR: UNDISCOVERED FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against FGB, FGL, GBL, Noel, and Tucker*

714.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

715.   At all times relevant to the Greenwich Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

716.   At all times relevant to the Greenwich Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

717.   The Greenwich Initial Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Greenwich Initial Transfers to or for the benefit of GS and GSP in furtherance of a fraudulent investment scheme.

718.   GS and GSP received the Greenwich Initial Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

719.   FGB, FGL, GBL, Noel, and Tucker each served as general partner to GS and/or GSP during the six years preceding the Filing Date.  As general partner of GS and GSP, FGB,

FGL, GBL, Noel, and Tucker are each liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations GS and GSP incurred while FGB, FGL, GBL, Noel, and Tucker were each serving as general partner.

720.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Initial Transfers, (b) directing that the Greenwich Initial Transfers be set aside, (c) recovering the Greenwich Initial Transfers, or the value thereof, from FGB, FGL, GBL, Noel, and Tucker for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from FGB, FGL, GBL, Noel, and Tucker.

## COUNT TWENTY-FIVE:  UNDISCOVERED FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551

### *Against the FGG Affiliates, Management Defendants, and Sales Defendants*

721.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

722.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

723.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

724.     The Initial Transfers were made by BLMIS and the transferees with the actual

intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to

or for the benefit of Fairfield Sentry, GS, and GSP in furtherance of a fraudulent investment

scheme.

725.     The Trustee has filed a lawsuit against Fairfield Sentry, GS, and GSP to avoid the

Initial Transfers pursuant to section 544 of the Bankruptcy Code, sections 275, 278, and/or 279

of the New York Debtor and Creditor Law, and Rule 203(g) of the New York Civil Procedure

Law and Rules, and to recover the Initial Transfers from Fairfield Sentry, GS, and GSP pursuant

to section 550(a)(1) of the Bankruptcy Code.

726.     The FGG Affiliates, Management Defendants, and Sales Defendants were

immediate or mediate transferees of some portion of the Initial Transfers pursuant to section

550(a)(2) of the Bankruptcy Code.

727.     As a result of the foregoing, pursuant to NY CPLR 203(g) and 213(8), sections

276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),

550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment:  (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial

Transfers be set aside, (c) recovering the Subsequent Transfers, or the value thereof, from the

FGG Affiliates, Management Defendants, and Sales Defendants for the benefit of the estate of

BLMIS, and to return to injured customers, and (d) recovering attorneys' fees from the FGG

Affiliates, Management Defendants, and Sales Defendants.

**COUNT TWENTY-SIX:  OBJECTION TO THE DEFENDANTS' CUSTOMER CLAIMS**

*Against Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary*

728.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

729.    Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary have filed customer claims.

730.    These claims (the "Claims") are not supported by the books and records of BLMIS nor the claim materials submitted by the claimants, and, therefore, should be disallowed pursuant to sections 502(d) of the Bankruptcy Code.

731.    The Claims also should not be allowed as customer claims or as general unsecured claims.  Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary are the recipients, as direct, immediate, and/or mediate transferees, of transfers of customers' property that are available and recoverable under sections 502(a), 544(b), 547, 548, and 550 of the Bankruptcy Code, NY Debtor and Creditor Law 270 *et seq*., NYCPLR 203(g) and 213(8), and applicable sections of SIPA, including § 78fff-2(c)(3), and Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary have not returned the Initial Transfers or the Subsequent Transfers to the Trustee.  As a result, pursuant to section 502(d), the Claims must be disallowed unless and until Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary return the Initial Transfers and the Subsequent Transfers to the Trustee.

732.    As a result of the foregoing, the Trustee is entitled to an order disallowing the Claims and/or that Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, Tucker, Blum, and Harary are not entitled to customer status.

## COUNT TWENTY-SEVEN:  UNJUST ENRICHMENT

### *Against the FGG Affiliates, Management Defendants, and Sales Defendants ("Non-Feeder Fund Defendants")*

733.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

734.    The Non-Feeder Funds Defendants have all been unjustly enriched.  They have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and from the Feeder Funds' investors, for which they did not in good faith provide fair value.  These Defendants were further unjustly enriched as a result of aiding, abetting, enabling, and substantially participating in a fraudulent scheme.

735.    The FGG Affiliates earned over a billion dollars in fees.  The Management Defendants and Sales Defendants received hundreds of millions of dollars in partnership distributions, salaries, bonuses, and other compensation.  None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

736.    As described above, the Non-Feeder Fund Defendants were constantly faced with evidence that BLMIS was a fraud.  For example, in 2005 they confirmed Madoff's auditor lied about his capacities and ability to audit the billions of dollars in BLMIS's customer accounts. (*See supra* ¶¶377-398.)  They also knew the consistency of Madoff's returns were, statistically,

too good to be true. (*See supra* ¶¶400-404, 451-461.) They knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible. (*See supra* ¶¶412-440.) Their own investors and paid consultants, along with numerous industry professionals, raised these concerns over and over again. (*See supra* ¶¶462-479, 498-527.)

737.    Instead of warning their investors and Madoff's other customers, and reporting Madoff to regulators, the Non-Feeder Fund Defendants helped Madoff market BLMIS to their own investors, helped shield him from FGG investors who wanted to meet with him, and protected him by making misrepresentations to the SEC. (*See supra* ¶¶350-361.) Confronted with a plethora of red flags, these Defendants continued to try to raise billions of dollars from investors to enrich themselves. (*See supra* ¶¶480-489.)

738.    Faced with the prospect of losing hundreds of millions of dollars in fees, the Non-Feeder Fund Defendants chose to cover up the compelling evidence of Madoff's fraud. As a result, they have been unjustly enriched by over one billion dollars that rightfully belongs to BLMIS customers.

739.    Equity and good conscience require full restitution of the monies received by the Non-Feeder Fund Defendants, directly and indirectly, from BLMIS and any assets derived from that money.

## COUNT TWENTY-EIGHT:  CONVERSION

### *Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

740.     The Trustee incorporates by reference the allegations in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

741.     The Trustee has the possessory right and interest to all property in the Defendants' possession that went to the Defendants by virtue of the Ponzi scheme.  This property reflects money and other interests, which originated from and were co-mingled with other BLMIS customer accounts.

742.     The Trustee's possessory interest in this Customer Property is governed by SIPA.  The Trustee has the superior right of possession to all fees, distributions, and other monies that the Defendants possess and that originated from BLMIS.  The Defendants' dominion over and interference with the Trustee's interest in the Customer Property is in derogation of the Trustee's right and obligation to return this property on an equitable basis to BLMIS customers.

743.     The Defendants are not authorized, and have never been authorized, to exercise dominion and control over Customer Property.  These specifically identified funds have been wrongfully converted by the Defendants.

744.     As a result of the foregoing, the Defendants are liable to the Trustee for having wrongfully converted this Customer Property and are obligated to return all such monies.

**COUNT TWENTY-NINE:  MONEY HAD AND RECEIVED**

745.     The Trustee incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully rewritten herein.

746.     The Defendants are currently in possession of, or have control over, money that originated from BLMIS.  These monies are Customer Property and belong to the customer fund

under the Trustee's control.  The Defendants have no lawful or equitable right to these monies,

having obtained the monies through fraud, deceit, and/or mistake.

747.    In equity and good conscience, the Defendants may not retain possession or

control of these monies, which rightfully belong to the customer fund under the Trustee's

control.  The Defendants are obligated to return all such monies to the Trustee.

## COUNT THIRTY:  AIDING AND ABETTING FRAUD

### *Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

748.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

749.    By virtue of their individual functions and responsibilities within FGG, their

communications with investors, and all of the information of which they had knowledge, each of

Defendants Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger,

Toub, Blum, and Smith knew Madoff was engaged in fraudulent behavior.  Noel, Tucker,

Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith

actively and substantially assisted Madoff in perpetrating the fraud by, among other things,

providing marketing; protection from due diligence inquiries; credibility; sales support; and an

influx of billions of dollars to keep the Ponzi scheme going.  (*See supra* ¶¶333-489.)  These

individual Defendants each knew of material information that demonstrated Madoff was engaged

in fraudulent activities.  (*See id.*)  Instead of reporting Madoff's fraudulent activities to the SEC

or their investors, Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie,

Landsberger, Toub, Blum, and Smith substantially assisted Madoff in continuing to grow the

fraud.  Each of these Defendants intentionally and knowingly helped Madoff deceive the SEC

for many years, and repeatedly misled investors, prospective investors, and others, all of which directly and substantially aided Madoff in maintaining the fraud.  (*See supra* ¶¶333-373.)

750.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith each knew that Madoff's returns were statistically too good to be true.  (*See supra* ¶¶400-404, 451-461.)  These Defendants also knew that Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible.  (*See supra* ¶¶412-440.)

751.    In addition, Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Blum, Toub, and Smith conspired to enter into explicit and implicit agreements with BLMIS to help perpetuate Madoff's fraud.  These agreements were corrupt in their purpose to raise billions of dollars in the face of fraudulent activity.  Each of these Defendants took intentional and overt actions pursuant to these agreements and participated in the fraud, causing billions of dollars in damages to BLMIS customers.

752.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith explicitly agreed to market BLMIS, and the market the SSC Strategy as their own investment scheme, resulting in billions of dollars of capital to maintain the Ponzi scheme.  They each explicitly agreed to protect Madoff from direct inquiries from the Feeder Funds' investors, and to provide the investors with misleading information where necessary.  They also each explicitly agreed to help mislead the SEC in order to protect Madoff from having to register as an investment adviser.  (*See supra* ¶¶350-361.)

753.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith acted pursuant to these implicit and explicit agreements by

traveling the world to market BLMIS and the Feeder Funds and by providing false and

misleading responses to customer concerns that Madoff might be a fraud. (*See supra* ¶¶339-349,

362-373.) Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger,

Toub, Blum, and Smith purposely and knowingly discouraged investors from performing due

diligence and helped Madoff by working to remove all references to BLMIS from the Feeder

Funds' marketing materials. (*See id.*)

754.    Defendant Noel is a founding partner of FGG and was involved in the day-to-day

management decisions that resulted in FGG falsely marketing the Feeder Funds. He procured

billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by

providing them with information about BLMIS that was untrue; and made misrepresentations to

the SEC about how BLMIS and the Feeder Funds operated. (*See supra* ¶¶193-202.)

755.    Noel substantially assisted Madoff by leading and engineering FGG's global

marketing efforts to sell Madoff. Noel traveled around with his Feeder Funds summary sheets,

convincing investors to give Madoff billions of dollars. Noel knew those summary sheets

contained false and misleading information regarding BLMIS and he knowingly misled investors

when he parroted the misstatements contained on those sheets. (*See supra* ¶¶193-202, 339-349,

362-373.)

756.    Noel also knew of the inconsistent and contradictory information Madoff

provided during FGG's "due diligence" visits. He knew Madoff refused to provide critical

information including the identity of the options counterparties. He also knew FGG trained its

sales force to provide false answers to investor queries. (*See supra* ¶¶339-349, 362-373.)

757.    All of Noel's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

758.    Defendant Tucker is a founding partner of FGG and was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds.  He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated.  (*See supra* ¶¶203-210.)

759.    Tucker frequently fielded investor questions and provided them with misleading responses.  Tucker also knew Madoff's auditor was a sham and never disclosed this information to investors or the SEC, which substantially aided Madoff in perpetrating the fraud.  By intentionally lying to the Feeder Funds' investors, Tucker substantially assisted Madoff in maintaining the fraud.  (*See supra* ¶¶350-361.)

760.    Tucker also intentionally and overtly instigated the cover-up of damning information showing BLMIS's auditor lied to FGG's CFO and was not capable of performing proper audits on the billions of dollars under Madoff's management.  Tucker specifically directed others to provide false answers to investors when they questioned Madoff's market timing strategy.  Tucker also readily assisted Madoff by deflecting criticism, claiming PwC reviewed BLMIS, and by hiding Madoff's options trading structure, which was not in accord with industry practices.  (*See supra* ¶¶333-373, 412-440.)

761.    All of Tucker's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

762.     Defendant Piedrahita is a founding partner and Chairman of the Board of Directors of FGG.  He was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds; procuring billions of dollars from investors to hand to Madoff; deceiving the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and making misrepresentations to the SEC about how BLMIS and the Feeder Funds operated.  (*See supra* ¶¶211-218.)

763.     Piedrahita substantially assisted Madoff by directing all of FGG's operations as the Chairman of the Board of Directors and head of the Executive Committee.  Piedrahita had knowledge of fraud evidenced by Madoff's trade confirmations, his auditor's lies, and the statistical improbability of the returns reported to the Feeder Funds.  Despite his knowledge of fraud, Piedrahita substantially assisted Madoff by selling Madoff to any and all would-be investors.  (*See supra* ¶¶211-218.)

764.     Piedrahita also entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors.  The information Piedrahita provided helped convince investors to give billions of dollars to the Feeder Funds, which then sent the money to Madoff.  Piedrahita also agreed with Madoff to do everything he could to provide billions of dollars to Madoff, which allowed Madoff to further the Ponzi scheme for his own and the Defendants' benefit.  Piedrahita acted pursuant to these agreements in routinely providing false information about Madoff to potential Feeder Funds investors during his global marketing trips.  (*See supra* ¶¶333-373.)

765.     All of Piedrahita's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

766.    Defendant McKeefry served as FGG's COO and CLO, is a member of the Executive Committee of FGG, and was involved in the day-to-day management decisions that resulted in FGG falsely marketing the Feeder Funds.  He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated.  (*See supra* ¶¶219-224.)

767.    As COO, McKeefry was responsible for reviewing and approving FGG's marketing materials.  McKeefry approved FGG's marketing materials with knowledge they contained false and misleading information.  As CLO, he reviewed the regulatory filings for the Feeder Funds and the FGG Affiliates, as well as the Feeder Funds' agreements with Madoff. With full knowledge of the terms of the agreements with BLMIS, McKeefry agreed to make misrepresentations to the SEC about the nature of the Feeder Funds' relationship with BLMIS in an attempt to stop the SEC from applying additional regulations to BLMIS, and thereby, delaying any discovery of the fraud.  (*See supra* ¶¶219-224, 350-361.)

768.    McKeefry entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors.  The information McKeefry provided helped convince investors to invest billions of dollars in the Feeder Funds, which was then delivered to Madoff.  McKeefry also agreed to conspire with Madoff to provide false and misleading information to the SEC about the true role BLMIS and Madoff played in managing the Feeder Funds' investments.  McKeefry acted pursuant to these agreements when he approved the publication of marketing materials that contained erroneous information; approved fund agreements that contained similarly erroneous information; and misled the SEC.  (*See supra* ¶¶219-224, 350-361.)

769.    All of McKeefry's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

770.    Defendant Lipton acted as FGG's CFO and, in that capacity, was involved in upper-level management decisions regarding investor redemptions.  Lipton was frequently involved in discussions about how to respond to investor concerns about Madoff, and intentionally devised ways to provide investors false and misleading responses.  (*See supra* ¶¶225-230, 339-349, 362-373.)

771.    When faced with the knowledge he had been lied to about the real nature of Madoff's auditing firm, as well as the capabilities of that firm, Lipton did not inform FGG's investors or the SEC that BLMIS's auditor was a sham.  By protecting Madoff's fraud from the SEC and FGG's own investors, Lipton substantially assisted Madoff in perpetrating the fraud.  (*See supra* ¶¶350-361.)

772.    Lipton also entered into explicit and implicit agreements with Madoff to conspire with him to hide the fact that BLMIS's auditor, Friehling, was a sham.  He intentionally acted pursuant to these agreements when he provided false information regarding the auditor to other FGG personnel that Lipton knew would distribute the same false information to the Feeder Funds' investors.  Lipton also purposely did not disclose to investors or regulatory authorities that Madoff's auditor had lied to Lipton about the firm's size and reputation.  (*See supra* ¶¶377-398.)

773.    All of Lipton's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

774.     Defendant Vijayvergiya knowingly and intentionally assisted Madoff in perpetrating his fraud by routinely providing false and misleading information to investors about FGG's knowledge of Madoff's operations and FGG's own due diligence process.  Vijayvergiya lied stating Madoff's auditors had twenty partners.  He also conspired with Madoff to purposely deceive the SEC in 2006 by knowingly providing false information to the SEC regarding the Feeder Funds' relationship with BLMIS.  (*See supra* ¶¶231-236, 333-373, 377-398.)

775.     Vijayvergiya intentionally and overtly provided false answers to investors regarding Madoff's market timing strategy.  He also personally trained FGG's sales personnel to provide false statements about the Feeder Funds' relationship with BLMIS including, among other things, telling the sales personnel that FGG had a list of approved options trade counterparties for Madoff's trades, that FGG verified trades at the DTCC, and that PwC reviewed BLMIS.  (*See supra* ¶¶333-373.)

776.     All of Vijayvergiya's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

777.     Defendant McKenzie knowingly participated in misleading investors.  His intentional acts substantially assisted Madoff in perpetrating the fraud and helped prevent others from uncovering Madoff's fraud.  McKenzie knew Madoff's auditor had provided false information to CFO Lipton and then allowed Vijayvergiya to provide false and misleading information about Madoff's auditor.  By his actions, McKenzie shielded Madoff from due diligence or investigations by third parties that could have uncovered the fraud.  (*See supra* ¶¶237-242, 377-398.)

778.     McKenzie also entered into explicit and implicit agreements with Madoff to hide

the fact that Madoff's auditor was a sham. He acted pursuant to these agreements when he did

not inform investors or regulatory authorities that he knew that the auditor was a fraud. (*See*

*supra* ¶¶377-398.)

779. All of McKenzie's intentional and overt actions concerning Madoff and BLMIS

substantially assisted Madoff in perpetrating a fraud.

780. Defendant Landsberger is a member of the Executive Committee of FGG and was

involved in the day-to-day management decisions that resulted in FGG falsely marketing the

Feeder Funds. He procured billions of dollars from investors to hand to Madoff; deceived the

Feeder Funds' investors by providing them with information about BLMIS that was untrue; and

made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated. (*See*

*supra* ¶¶243-247.)

781. Landsberger addressed investor concerns about possible fraud at BLMIS by

working with his colleagues to provide answers that were not only careful not disclose the fraud,

but were designed to bury the fraud from inquiry or discovery. Landsberger substantially

assisted Madoff by allowing him to avoid additional due diligence investigations that could have

led to the discovery of the fraud well before December 2008. (*See supra* ¶¶339-349, 362-373.)

782. Landsberger also entered into explicit and implicit agreements with Madoff to

provide false and misleading information to investors. These agreements served two primary

purposes. They allowed Landsberger to help raise billions of dollars for Madoff to replenish the

Ponzi scheme and they prevented investors from conducting additional, independent due

diligence that might have uncovered the fraud. Landsberger intentionally and overtly acted

pursuant to these agreements when he allowed other FGG personnel to provide information to investors which Landsberger knew to be false. (*See supra* ¶¶339-349, 362-373.)

783.    All of Landsberger's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

784.    Defendant Toub is a member of the Executive Committee of FGG and was involved in the day-to-day management decisions that resulted in FGG marketing the Feeder Funds.  He procured billions of dollars from investors to hand to Madoff; deceived the Feeder Funds' investors by providing them with information about BLMIS that was untrue; and made misrepresentations to the SEC about how BLMIS and the Feeder Funds operated.  (*See supra* ¶¶248-253.)

785.    Toub also substantially assisted Madoff in perpetrating a fraud by falsely addressing investor concerns that BLMIS was involved in fraudulent activities and by working with his colleagues to prevent the fraud from being discovered.  Toub substantially assisted Madoff by purposely shielding him from additional due diligence investigations that could have led to the discovery of the fraud well before December, 2008.  (*See supra* ¶¶339-349, 362-373.)

786.    Toub entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors.  These agreements served two purposes.  They allowed Toub to help procure billions of dollars for Madoff to use in the Ponzi scheme and they prevented investors from conducting additional, independent due diligence that might have uncovered the fraud.  Toub also acted pursuant to these agreements when he allowed other FGG personnel to provide information to investors which Toub knew to be false. (*See supra* ¶¶339-349, 362-373.)

787.    All of Toub's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

788.    Defendant Blum was involved in marketing the funds and responding to investor concerns about Madoff.  Blum reviewed FGG's marketing materials and approved the publication of those materials even though he knew they contained false or misleading statements.  Blum also substantially assisted Madoff in perpetrating a fraud by working with his colleagues at FGG to limit transparency to Madoff and to avoid delivering to investors accurate information about Madoff.  (*See supra* ¶¶260-265, 339-349, 362-373.)

789.    Blum entered into explicit and implicit agreements with Madoff to limit transparency into BLMIS and to limit investors' access to Madoff.  He intentionally and overtly acted pursuant to these agreements.  All of Blum's activities concerning Madoff substantially assisted in Madoff perpetrating the fraud.  (*See supra* ¶¶339-349, 362-373.)

790.    All of Blum's intentional and overt actions concerning Madoff and BLMIS substantially assisted Madoff in perpetrating a fraud.

791.    Defendant Smith actively responded to investors concerns about Madoff.  Like his fellow partners, Smith substantially assisted Madoff in perpetrating a fraud by devising schemes to appease investors' concerns about Madoff being a fraud.  Smith intentionally and overtly assisted Madoff in escaping due diligence and investigation that could have uncovered the fraudulent activities.  (*See supra* ¶¶266-271, 339-349, 362-373.)

792.    Smith also entered into explicit and implicit agreements with Madoff to provide false and misleading information to investors.  These agreements served two primary purposes.

They allowed Smith to help deliver billions of dollars to Madoff to use in the Ponzi scheme and

they prevented investors from conducting additional, independent due diligence that might have

uncovered the fraud.  Smith purposely acted pursuant to these agreements when he misled

investors regarding Madoff's lack of transparency by providing false information.  (*See supra*

¶¶339-349, 362-373.)

793.    All of Smith's intentional and overt actions concerning Madoff and BLMIS

substantially assisted Madoff in perpetrating a fraud.

## COUNT THIRTY-ONE:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *Against Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith*

794.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

795.    BLMIS owed a fiduciary duty to its customers.  BLMIS breached that fiduciary

duty by perpetrating a massive Ponzi scheme.  Noel, Tucker, Piedrahita, McKeefry, Lipton,

Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith knowingly participated in that

breach, which resulted in billions of dollars of damage to BLMIS customers.

796.    BLMIS owed a fiduciary duty to act in the best interests of investors.  In this role,

BLMIS held a superior position over investors in the Feeder Funds, which required investors to

repose trust and confidence with BLMIS.  (*See supra* ¶6.)

797.    Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya, McKenzie,

Landsberger, Toub, Blum, and Smith knew of Madoff's fraudulent activity that was breaching

BLMIS's fiduciary duties.  They substantially assisted Madoff in breaching his duties by, among

other things:  traveling the world to market BLMIS and the Feeder Funds; avoiding customer

inquiries and providing false answers that all knew would discourage investors from asking

additional questions; removing references to BLMIS from their marketing materials; and

providing the SEC with answers Madoff gave them, knowing that those answers were not true,

but would serve to protect Madoff from further regulatory scrutiny.  (*See supra* ¶¶333-489.)

798.    The intentional and overt actions by Noel, Tucker, Piedrahita, McKeefry, Lipton,

Vijayvergiya, McKenzie, Landsberger, Toub, Blum, and Smith to substantially assist Madoff in

breaching his fiduciary duties to customers exacerbated BLMIS's monumental insolvency.  The

intentional and overt actions of Noel, Tucker, Piedrahita, McKeefry, Lipton, Vijayvergiya,

McKenzie, Landsberger, Toub, Blum, and Smith to substantially assist Madoff in breaching his

fiduciary duties to customers was a proximate cause of loss of billions of dollars of Customer

Property.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against the Defendants as follows:

i.        On the First Claim for Relief, pursuant to section 542 of the Bankruptcy Code and

SIPA § 78fff-2(c)(3), the Trustee is also entitled to an accounting of any and all Initial Transfers

and Subsequent Transfers made, directly or indirectly, to the Defendants;

ii.        On the Second Claim for Relief, pursuant to sections 547(b), 550(a)(1), and 551

of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the

Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference

Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside, and

(c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder

Funds for the benefit of the estate of BLMIS;

iii.     On the Third Claim for Relief, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Preference Period Initial Transfers, (b) directing that the Greenwich Preference Period Initial Transfers be set aside, and (c) recovering the Greenwich Preference Period Initial Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS;

iv.     On the Fourth Claim for Relief, pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers, (b) directing that the Preference Period Initial Transfers be set aside and (c) recovering the Preference Period Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

v.     On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

vi.     On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set

aside, and (c) recovering the Greenwich Two Year Initial Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS;

vii.  On the Seventh Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

viii.  On the Eighth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside, and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

ix.  On the Ninth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Two Year Initial Transfers, (b) directing that the Greenwich Two Year Initial Transfers be set aside, and (c) recovering the Greenwich Two Year Initial Transfers, or the value thereof, from FGB for the benefit of the estate of BLMIS;

x.  On the Tenth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial

Transfers be set aside, and (c) recovering the Two Year Subsequent Transfers, or the value

thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xi.    On the Eleventh Claim for Relief, pursuant to sections 276, 276-a, 278, and/or

279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the

Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware

Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial

Transfers, (b) directing that the Six Year Initial Transfers be set aside, (c) recovering the Six

Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of

BLMIS, and (d) recovering attorneys' fees from the Feeder Funds;

xii.    On the Twelfth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279

of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the

Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware

Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year

Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, (c)

recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and

GBL for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from FGB, FGL,

and GBL;

xiii.    On the Thirteenth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or

279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding

and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be

set aside, (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG

Affiliates and FGG Individuals for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the FGG Affiliates and FGG Individuals;

xiv.        On the Fourteenth Claim for Relief, pursuant to sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

xv.        On the Fifteenth Claim for Relief, pursuant to sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS;

xvi.        On the Sixteenth Claim for Relief, pursuant to sections 273, 278, and 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xvii.        On the Seventeenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(1) of the Bankruptcy Code,

SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

xviii.     On the Eighteenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(1) of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL, and GBL for the benefit of the estate of BLMIS;

xix.     On the Nineteenth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b) and 550(a)(2) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xx.     On the Twentieth Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS;

xxi.        On the Twenty-First Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Greenwich Six Year Initial Transfers, (b) directing that the Greenwich Six Year Initial Transfers be set aside, and (c) recovering the Greenwich Six Year Initial Transfers, or the value thereof, from FGB, FGL and GBL for the benefit of the estate of BLMIS;

xxii.        On the Twenty-Second Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers, (b) directing that the Six Year Initial Transfers be set aside, and (c) recovering the Six Year Subsequent Transfers, or the value thereof, from the FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS;

xxiii.        On the Twenty-Third Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Feeder Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Feeder Funds;

xxiv.        On the Twenty-Fourth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and sections 15-306(a) and 17-

403(b) of the Delaware Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving

the Greenwich Initial Transfers, (b) directing that the Greenwich Initial Transfers be set aside, (c)

recovering the Greenwich Initial Transfers, or the value thereof, from FGB, FGL, GBL, Noel,

and Tucker for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from FGB,

FGL, GBL, Noel, and Tucker;

xxv.         On the Twenty-Fifth Claim for Relief, pursuant to NY CPLR 203(g), sections

276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),

550(a)(2), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment:  (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial

Transfers be set aside, (c) recovering the Subsequent Transfers, or the value thereof, from the

FGG Affiliates and FGG Individuals for the benefit of the estate of BLMIS, and (d) recovering

attorneys' fees from the FGG Affiliates and FGG Individuals;

xxvi.        On the Twenty-Sixth Claim for Relief, a judgment that the SIPA claims filed by

Fairfield Sentry, GS, GSP, Sigma, Lambda, FGB, Noel, and Tucker be disallowed;

xxvii.       On all Claims for Relief, a judgment pursuant to common law and NY CPLR

5001 and 5004, awarding the Trustee prejudgment interest from the date on which the

Subsequent Transfers were received by the Defendants;

xxviii.      On all Claims for Relief, establishment of a constructive trust over the proceeds of

the Initial Transfers, Subsequent Transfers and unjust enrichment to the Defendants in favor of

the Trustee for the benefit of BLMIS's estate;

xxix.        On all Claims for Relief, assignment of the Defendants' right to seek refunds from

the government for federal, state, and local taxes paid on Fictitious Profits during the course of

the scheme;

xxx.        On the Twenty-Seventh, Twenty-Eighth, Twenty-Ninth, Thirtieth, and Thirty-

First Claims for Relief, compensatory, exemplary, and punitive damages in excess of $3.6

billion, with the specific amount to be determined at trial;

xxxi.        Awarding the Trustee all applicable interest, costs, and disbursements of this

action; and

xxxii.        Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.

Date:   New York, New York
        July 20, 2010

                                                  _s/Marc E. Hirschfield_____
                                                  Baker & Hostetler LLP
                                                  45 Rockefeller Plaza
Of Counsel:                                       New York, New York 10111
                                                  Telephone: (212) 589-4200
Thomas L. Long                                    Facsimile: (212) 589-4201
Jessie M. Gabriel                                 David J. Sheehan
Baker & Hostetler LLP                             E-mail: dsheehan@bakerlaw.com
65 East State Street, Suite 2100                  Marc E. Hirschfield
Columbus, Ohio  43215                             E-mail: mhirschfield@bakerlaw.com
Telephone: (614) 228-1541                         Mark A. Kornfeld
Facsimile: (614) 462-2616                         E-mail: mkornfeld@bakerlaw.com
Thomas L. Long
E-mail: tlong@bakerlaw.com                        *Attorneys for Irving H. Picard, Esq., Trustee*
Jessie M. Gabriel                                 *for the Substantively Consolidated SIPA*
E-mail: jgabriel@bakerlaw.com                     *Liquidation of Bernard L. Madoff Investment*
                                                  *Securities LLC and Bernard L. Madoff*

In re: Bernard L. Madoff Investment Securities LLC and
Bernard L. Madoff, Debtors

Irving H. Picard, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

v.

Fairfield Sentry Limited, et al.

Adv. Pro. No. 09-1239 (BRL)

## Exhibits 1-111 to the Amended Complaint as listed on the attached index are available for review upon written or telephonic request to:

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Attn: Nikki Landrio
Tel: (212) 589-4221
Email: nlandrio@bakerlaw.com

| Exhibit Number | Exhibit Description |
|---|---|
| 1 | Exemplar BLMIS account agreements for Fairfield Sentry Limited |
| 2 | Summary chart of Fairfield Sentry Limited's withdrawals from its BLMIS accounts |
| 3 | FGG press release dated May 12, 2009 |
| 4 | Exemplar BLMIS account agreements for Greenwich Sentry, L.P. |
| 5 | Summary chart of Greenwich Sentry, L.P.'s withdrawals from its BLMIS account |
| 6 | Exemplar BLMIS account agreements for Greenwich Sentry Partners, L.P. |
| 7 | Summary chart of Greenwich Sentry Partners, L.P.'s withdrawals from its BLMIS account |
| 8 | Fairfield Sigma Limited's redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 9 | Fairfield Lambda Limited's redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 10 | Chester Global Strategy Fund Limited's redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 11 | Chester Global Strategy Fund, L.P.'s redemption confirmation for a withdrawal from Greenwich Sentry, L.P. |
| 12 | Irongate Global Strategy Fund Limited's redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 13 | Fairfield Greenwich Fund (Luxembourg)'s redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 14 | Internal FGG chart showing Fairfield Guardian Fund's redemptions from Fairfield Sentry Limited |
| 15 | Fairfield Investment Fund Limited's redemption confirmations for withdrawals from Fairfield Sentry Limited |
| 16 | Fairfield Investment Trust's redemption confirmations, made through Fairfield GCI (USD) Fund, for withdrawals from Fairfield Sentry Limited |
| 17 | Fairfield Investment Trust's redemption confirmations, made through Fairfield GCI (JPY) Fund, for withdrawals made from Fairfield Sentry Limited |
| 18 | FIF Advanced, Ltd.'s redemption confirmations for withdrawals made from Fairfield Sentry Limited |
| 19 | Sentry Select Limited's redemption confirmation for a withdrawal from Fairfield Sentry Limited |
| 20 | Stable Fund's redemption confirmation for the October 2008 withdrawal made from Fairfield Sentry Limited |
| 21 | July 2, 2003 email from FGG's Thomann to Tucker and Boele |
| 22 | Excerpt from an FGG chart that contains the proposed shareholder register for Fairfield Greenwich Limited |
| 23 | April 2009 Vanity Fair article entitled, "Greenwich Mean Time" |
| 24 | March 31, 2009 Wall Street Journal article entitled, "The Charming Mr. Piedrahita Finds Himself Caught in the Madoff Storm" |
| 25 | FGG employment offer letter to Vijayvergiya |
| 26 | FGG's split-strike conversion strategy summary |

| Exhibit Number | Exhibit Description |
|---|---|
| 27 | Worksheets detailing FGG partner compensation for 2008 |
| 28 | May 22, 2003 email from Landsberger to Tucker |
| 29 | July 15, 2004 email from Toub to Vijayvergiya |
| 30 | March 25, 2003 email from Blum to Tucker, Bowes, Greisman, and FGG's Ludwig |
| 31 | August 22, 2003 email from Blum to Vijayvergiya and Landsberger |
| 32 | April 5, 2004 email from FGG's Chaudhuri to Tucker |
| 33 | June 24, 2004 email from Vijayvergiya to Lipton, McKeefry, and FGG's Ludwig |
| 34 | August 7, 2004 email from Vijayvergiya to Landsberger and McKenzie |
| 35 | January 14, 2003 email from Blum to Tucker, Bowes, Greisman, and FGG's Nevin |
| 36 | March 25, 2003 email from Blum to Lipton and Tucker |
| 37 | April 9, 2004 email from FGG's Boncompagni to Boele, Vijayvergiya, Tucker, Blum, Greisman, Lipton, Smith, and others at FGG |
| 38 | March 15, 2008 email from Landsberger to Smith, Toub, della Schiava, Vijayvergiya, Tucker, and the Executive Committee |
| 39 | Transcript of the telephone call between McKeefry, Vijayvergiya, and Madoff |
| 40 | June 2001 letter to Fairfield Sentry Limited's investors |
| 41 | August 2008 emails between Vijayvergiya, Murphy, Piedrahita, Landsberger, Toub, Tucker, and the Executive Committee |
| 42 | Notes of the SEC's telephone interview of Vijayvergiya and McKeefry |
| 43 | SEC phone log exhibit from the SEC Office of Inspector General's Report on Madoff |
| 44 | SEC Case Closing Recommendation for BLMIS |
| 45 | October 2002 marketing brochure for Fairfield Sentry Limited |
| 46 | December 19, 2003 email from Vijayvergiya to FGG's Musciacco |
| 47 | September 19, 2003 email from Blum to Tucker |
| 48 | November 24, 2003 email from Blum to Landsberger, Greisman, Tucker, and Piedrahita |
| 49 | May 2005 transcript of mock investor phone interview between Lipton and Vijayvergiya during a sales team training session |
| 50 | May 7, 2008 memorandum summarizing an investor meeting with FGG |
| 51 | December 2, 2003 email from FGG's della Schiava to Noel, Piedrahita, Tucker, and Blum |
| 52 | September 5, 2005 email from Capital Research's Jan Buren to FGG's Carla Castillo |
| 53 | September 1, 2005 email from FGG's Castillo to Vijayvergiya |
| 54 | September 12, 2005 email from FGG's Castillo to Lipton |
| 55 | Excerpts from the transcript of Lipton's testimony before the Office of the Secretary of the Commonwealth of Massachusetts |
| 56 | November 2, 2005 FGG Investment Team Presentation |
| 57 | Notes taken during a 2006 due diligence meeting on Fairfield Sentry Limited |
| 58 | Fairfield Sentry Limited Due Diligence Questionnaire |
| 59 | August 20, 2008 email from Lipton to Vijayvergiya |
| 60 | Fairfield Sentry Limited's October 2008 marketing tear sheet |
| 61 | August 6, 2003 email from Vijayvergiya to CBG Investment Advisors Inc.'s Martin |
| 62 | April 15, 2008 email from Lipton to McKenzie |

| Exhibit Number | Exhibit Description |
|---|---|
| 63 | BLMIS's Master Agreement for OTC Options |
| 64 | May 26, 2005 email from Vijayvergiya to Tucker |
| 65 | June 4, 2008 memorandum summarizing Vijayvergiya's telephone conference with Madoff |
| 66 | July 23, 2008 email from Vijayvergiya to Barreneche |
| 67 | February 27, 2004 email from Vijayvergiya to FGG's Musciacco |
| 68 | December 11, 2003 email from Vijayvergiya to della Schiava |
| 69 | February 1, 2005 email from FGG's Perry to Tucker |
| 70 | June 21, 2007 email from Piedrahita to Landsberger, Vijavergiya, Lipton, and the Executive Committee |
| 71 | June 10, 2008 email from Vijayvergiya to McKenzie and FGG's Attavar |
| 72 | May 2008 internal FGG notes in response to investor questions |
| 73 | June 2, 2008 email from FGG's Horn to Vijayvergiya |
| 74 | October 21, 2008 email from Merrill Lynch's Craane to Barreneche |
| 75 | Spreadsheet accompanying a May 2008 report from Berman |
| 76 | June 13, 2008 email from Berman to Vijayvergiya |
| 77 | Berman's notes from a June 25, 2008 telephone call with FGG |
| 78 | December 10, 2008 draft letter from Tucker to Madoff |
| 79 | December 12, 2008 FGG press release |
| 80 | February 5, 2009 Wall Street Journal article entitled, "Markopolos Testifies Fairfield Knew Little About Madoff" |
| 81 | December 14, 2008 Salus Alpha Group press release |
| 82 | May 2001 MAR/Hedge article entitled, "Madoff tops charts; skeptics ask how" |
| 83 | May 7, 2001 Barron's article entitled, "Don't Ask, Don't Tell" |
| 84 | Excerpts from the transcript of Noel's testimony before the Office of the Secretary of the Commonwealth of Massachusetts |
| 85 | Excerpts from the transcript of Tucker's testimony before the Office of the Secretary of the Commonwealth of Massachusetts |
| 86 | May 23, 2005 email from FGG's Ross to Vijayvergiya |
| 87 | September 24, 2003 email from della Schiava to FGG's Barco |
| 88 | March 2003 article entitled, "Understanding and Mitigating Operational Risk in Hedge Fund Investments" |
| 89 | 2004 article entitled, "Valuation issues and operational risk in hedge funds" |
| 90 | 2006 article entitled, "Hedge fund operational risk: meeting the demand for higher transparency and best practice" |
| 91 | May 11, 2001 email from Thorp to Dillon |
| 92 | November 11, 2004 redacted email from Cambridge Associates LLC's Sherman to Cambridge Associates LLC's Kleeblatt and Woolston |
| 93 | December 17, 2008 New York Times article entitled, "European Banks Tally Losses Linked to Fraud" |
| 94 | December 15, 2008 email from Acorn Partners LP's Rosenkranz to Zuckerman and Probert |
| 95 | December 12, 2008 email from Acorn Partners LP to its investors |

| Exhibit Number | Exhibit Description |
|---|---|
| 96 | February 25, 2004 email from Noel to Piedrahita, Tucker, Toub, Landsberger, and Caledon Partners' Horne |
| 97 | January 7, 2009 Bloomberg article entitled, "Credit Suisse Urged Clients to Dump Madoff Funds" |
| 98 | June 15, 2005 email from Merrill Lynch's El Hicheri to Dutruit |
| 99 | December 2006 email from Merrill Lynch's El Hicheri to Fuehrer |
| 100 | February 6, 2008 email from Merrill Lynch's Personne to Homes and Alberici |
| 101 | 2007 report by Aksia |
| 102 | December 11, 2008 letter from Aksia's Vos to his clients and friends |
| 103 | August 14, 2007 email from Institutional Investor Inc.'s Ocrant to Vos |
| 104 | August 23, 2007 email from Aksia's Gray to Vos |
| 105 | December 19, 2008 email from Sitrick and Company's Kabrin to FGG's Ludwig |
| 106 | February 5, 2009 email from Sitrick and Company's Kabrin to Thorne |
| 107 | December 31, 2008 Bloomberg Businessweek article entitled, "The Madoff Case Could Reel in Former Investors" |
| 108 | December 15, 2008 Albourne press release entitled, "Albourne on Madoff" |
| 109 | August 2009 SEC Office of Inspector General's report on Madoff |
| 110 | April 2004 Limited Partnership Agreement for Greenwich Sentry, L.P. |
| 111 | April 2004 Limited Partnership Agreement for Greenwich Sentry Partners, L.P. |