**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>        Plaintiff,<br><br>  v.<br><br>BANCO ITAÚ EUROPA LUXEMBOURG S.A., and BANCO ITAÚ EUROPA INTERNATIONAL,<br><br>        Defendants. | Adv. Pro. No. 12-01019 (CGM)<br><br><br>**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................3

I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS...........................3

II.   THE FAIRFIELD FUNDS ....................................................................3

III.  DEFENDANTS AND THEIR INVESTMENTS IN THE BLMIS FEEDER
      FUNDS ................................................................................6

      A.    Itaú Private Bank....................................................................6

      B.    Defendants Purposefully Invested with BLMIS in New York ................7

ARGUMENT ........................................................................................8

I.    THIS COURT HAS PERSONAL JURISDICTION OVER BANCO ITAÚ ....................8

      A.    Banco Itaú Purposefully Availed Itself of the Laws and Privileges of
            Conducting Business in the United States .........................................9

            1.    Banco Itaú Purposefully Invested in BLMIS.............................10

            2.    Banco Itaú's Contacts with FGG in New York Establish Minimum
                  Contacts.........................................................................15

            3.    Banco Itaú's Purposeful Use of a New York Correspondent Bank
                  Account Supports Jurisdiction ..............................................18

      B.    The Exercise of Personal Jurisdiction Over Banco Itaú Is Reasonable ................22

      C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery.................23

II.   THE TRUSTEE'S COMPLAINT PLEADS THAT DEFENDANTS RECEIVED
      BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)....................................23

      A.    Defendants Misstate the Trustee's Pleading Burden ...............................25

      B.    Defendants' Tracing Arguments Fail on a Motion to Dismiss ............................25

      C.    Defendants' Claims of Double Recovery Are Premature....................................28

III.  SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANTS .................29

      A.    The Fairfield Funds Had Actual Knowledge of Madoff's Fraud ..........................30

B.    Defendants Are Bound By The Actual Knowledge Exception Established in *Cohmad* .......................................................................................................... 30

C.    Defendants Are Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions ...................................................................... 31

D.    The Trustee Has Adequately Alleged Fraudulent Intent Under the Bankruptcy Code ............................................................................................... 34

IV.    THE 550(B) AFFIRMATIVE DEFENSE IS INAPPROPRIATE TO RESOLVE AT THE MOTION TO DISMISS STAGE ...................................................................... 36

CONCLUSION ............................................................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
599 B.R. 730 (Bankr. S.D.N.Y. 2019)................................................................24, 25

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
98 F.3d 25 (2d Cir. 1996)..............................................................................................9

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016)............................................................................................19, 20

*Armstrong v. Collins*,
No. 01-cv-2437, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010)...............................35

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California*,
480 U.S. 102 (1987)....................................................................................................14

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25,
2020) ...........................................................................................................................20

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
397 B.R. 1 (S.D.N.Y. 2007)........................................................................................35

*In Re: Bernard L. Madoff Investment Securities LLC*,
No. 20-cv-02586 (CM), 2022 WL 130458 (S.D.N.Y. May 2, 2022) ......................36

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)............................................................................................8, 9, 16

*Burlington Indust., Inc. v. Salem Int'l Co.*,
645 F. Supp. 872 (S.D.N.Y. 1986) .............................................................................15

*Chase Manhattan Bank v. Banque Generale Du Commerce*,
No. 96 CIV 5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997)...............16

*Chloé v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010).................................................................................8, 22

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
393 B.R. 306 (Bankr. W.D.N.Y. 2008) .....................................................................29

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)......................................................................................................8

*Dandong v. Pinnacle Performance Ltd.*,
    966 F. Supp. 2d 374 (S.D.N.Y. 2013)...................................................................19

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)...............................................................................8

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...........................................................35, 37

*Eldesouky v. Aziz*,
    No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ...............18

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
    343 B.R. 75 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds*, 388 B.R. 489
    (S.D.N.Y. 2008) ..........................................................................................34

*Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019)..........................................................10, 21

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ..........................................16

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
    141 S. Ct. 1017 (2021)...............................................................................17, 21

*Fowler v. Caliber Home Loans, Inc.*,
    277 F. Supp. 3d 1324 (S.D. Fla. 2016) .............................................................26

*Giuliano v. Barch*,
    No. 16 CV 0859 (NSR), 2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ................15

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
    Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
    S.D.N.Y. Jan. 3, 2014) .................................................................................28

*Gucci Am., Inc. v. Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015).................................................................20

*Hecklerco, LLC v. YuuZoo Corp. Ltd.*,
    252 F. Supp. 3d 369 (S.D.N.Y. 2017)...............................................................18

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
    601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021)..........28

*Hill v. HSBC Bank plc*,
    207 F. Supp. 3d 333 (S.D.N.Y. 2016)...............................................................22

*Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomm. (Lux.) II SCA )*,
  547 B.R. 80 (Bankr. S.D.N.Y. 2016) ........................................................................................9

*HSH Nordbank AG N.Y. Branch v. Street*,
  No. 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ......................9, 19, 21

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ....................................................................................................... 8, 9

*Johnson v. Holder*,
  564 F.3d 95 (2d Cir. 2009) ................................................................................................35

*Kelley v. Safe Harbor Managed Account 101, Ltd.*,
  31 F.4th 1058 (8th Cir. 2022) ......................................................................................31, 34

*Kelley v. Westford Special Situations Master Fund, L.P.*,
  No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) .......................................26, 27

*Kelly–Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) ................................................................................................36

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16,
  2009) ...............................................................................................................................23

*Kreutter v. McFadden Oil Corp.*,
  71 N.Y.2d 460 (1988) ....................................................................................................17, 18

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
  No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013) ...............................30

*Licci v. Lebanese Can. Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ................................................................................................19

*Licci v. Lebanese Canadian Bank, SAL*,
  20 N.Y.3d 327 (2012) ....................................................................................................19, 20

*In re Madoff Sec.*,
  501 B.R. 30 (S.D.N.Y. 2013) ..............................................................................................32

*Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A.
  (In re Motors Liquidation Co.)*,
  565 B.R. 275 (Bankr. S.D.N.Y. 2017) ..............................................................................17, 21

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ..........................................................................................................30

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*,
    549 B.R. 56 (Bankr. S.D.N.Y. 2016) ...............................................................19, 21

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) .....................................................................31

*Picard v. Banco Itaú Europa Luxembourg S.A.*,
    Adv. Pro. No. 12-01019 (CGM) (Bankr. S.D.N.Y.)...................................... *passim*

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018)......................................................... *passim*

*Picard v. Bureau of Labor Insurance (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) (Lifland, J.)...................................... *passim*

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) .................................................................................................................31

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
    Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514 (Bankr.
    S.D.N.Y. Mar. 14, 2012)............................................................................24, 26, 27

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d. Cir. 2021) ......................................................................3, 34, 35

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311, 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ...................31

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011)....................................................................27

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
    525 B.R. 871 (Bankr. S.D.N.Y. 2015).......................................................19, 21, 34

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021)..............................................................8, 9, 21

*Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*,
    Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6,
    2021) ..........................................................................................................29, 30, 37

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014)....................................................................................31

*Picard v. JABA Assocs. LP (In re BLMIS)*,
    2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) .......................................................36

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
  Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10,
  2014) ...................................................................................................................................12

*Picard v. Magnify, Inc. (In re BLMIS)*,
  583 B.R. 829 (Bankr. S.D.N.Y. 2018) ............................................................................31

*Picard v. Maxam Absolute Return Fund, L.P.*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011) ........................................................................9, 10, 23

*Picard v. Mayer (In re BLMIS)*,
  Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct.
  27, 2021) .............................................................................................................................24

*Picard v. Mendelow (In re BLMIS)*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016) .............................................................................31

*Picard v. Merkin (In re BLMIS)*,
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) .............................................................................37

*Picard v. Merkin (In re BLMIS)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
  581 B.R. 370 (Bankr. S.D.N.Y. 2017) .............................................................................27

*Picard v. Nelson (In re BLMIS)*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) .............................................................................36

*Picard v. Sage Realty*,
  No. 20-CV-10109, 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) (JFK) ...............................35

*Picard v. Shapiro (In re BLMIS)*,
  542 B.R. 100 (Bankr. S.D.N.Y. 2015) ..........................................................................25, 31

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019)...........................................................................................10, 23, 32

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010)...............................................................................................8

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
  245 F. Supp. 2d 543 (S.D.N.Y. 2003)...............................................................................15

*Scholastic, Inc. v. Stouffer*,
  No. 99-cv-11480 (AGS), 2000 WL 1154252 (S.D.N.Y. Aug. 14, 2000)...............................18

*Sharp International Corp. v. State Street Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005)................................................................35

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007)............................................24, 25

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015)..........................................31

*SIPC v. BLMIS (In re Madoff Securities)*,
    No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)........................29, 32, 33

*Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*,
    548 B.R. 300 (Bankr. C.D. Cal. 2016)..........................................26

*Steinhardt v. Shadow*,
    No. 16-cv-4222 (RJS), 2018 WL 4278335 (S.D.N.Y. Apr. 11, 2018) ....................17

*Strauss v. Credit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..............................................20

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020).........................................33

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004).............................................................16

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)......................................................................30

*To v. HSBC Holdings plc*,
    No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017)..........................21, 22

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)........................................................35

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
    39 F. Supp. 3d 461 (S.D.N.Y. 2014)..........................................36

*In re Viropharma, Inc.*,
    No. CIV.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .........................26

*Walden v. Fiore*,
    571 U.S. 277 (2014)..............................................................13, 14

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016).........................................................22

**Statutes**

11 U.S.C. § 546(e) ...................................................................................................29, 31

11 U.S.C. § 548(a)(1)(A) ...............................................................................................29

11 U.S.C. § 550(a) ....................................................................................................23, 31

15 U.S.C. §§ 78aaa–*lll* ..................................................................................................1

28 U.S.C. § 1334............................................................................................................9

**Rules**

CPLR § 302(a)(1) ..............................................................................................14, 15, 17

Fed. R. Civ. P. 9(b) ......................................................................................................35

Fed. R. Civ. P. 12(b)(2)..................................................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 26

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law and declaration of Maximillian S. Shifrin ("Shifrin Decl.") in opposition to Banco Itaú Europa Luxembourg ("Banco Itaú") and Banco Itaú Europa International's ("Itaú International," and collectively, "Defendants") motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

This action seeks to recover almost $75 million in subsequent transfers of stolen BLMIS customer property that Defendants received from Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma," and together with Sentry, the "Fairfield Funds"). For nearly ten years, Defendants invested in BLMIS through BLMIS feeder funds—investment funds created for the express purpose of feeding their investors' money to BLMIS in New York. Defendants now move to dismiss the Trustee's Complaint, arguing that (i) this Court does not have jurisdiction over Banco Itaú, (ii) Defendants did not receive any transfers of customer property, (iii) the safe harbor under Section 546(e) bars *any* recovery, including recovery of transfers made within two years of BLMIS's collapse, and (iv) Defendants' affirmative defenses warrant dismissal of the Trustee's complaint as a matter of law. All of Defendants' arguments fail.

There is no question that this Court has personal jurisdiction over Banco Itaú. Banco Itaú purposefully invested in the Fairfield Funds knowing that BLMIS in New York was the *de facto* investment manager, broker dealer, and custodian of the Fairfield Funds' investments, and that the Fairfield Funds fed substantially all of their funds into BLMIS. Investing in BLMIS was the entire point. These facts, plus the additional contacts discussed herein, establish jurisdiction.

The Trustee plausibly alleges that Defendants received customer property under Section 550(a) by outlining the relevant pathways through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to Defendants.  The Trustee further alleges the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer Defendants received.  At this stage of the litigation, nothing more is required.  Defendants' arguments that the Trustee must show a dollar-for-dollar accounting at the pleading stage are plainly inappropriate on a motion to dismiss and run contrary to well established case law in this SIPA liquidation proceeding.

The Trustee also plausibly alleges the avoidability of the initial transfers from BLMIS based on the Fairfield Funds' actual knowledge of fraud, and thus the safe harbor under Section 546(e) is inapplicable and does not bar recovery from Defendants.  Defendants' position that their knowledge as a subsequent transferee should determine the avoidability of the initial transfers from BLMIS conflicts with the plain language of the statute and precedent in this liquidation, all of which establish that Section 546(e) does not independently protect against the recovery of avoidable fraudulent transfers from a subsequent transferee.

Finally, the Section 550(b) affirmative defense available to subsequent transferees is a fact-intensive inquiry that is premature and plainly inappropriate for dispositive resolution on a motion to dismiss.  Because the Trustee has not had any opportunity to take discovery into this critical question of fact, the Court should reject Defendants' arguments to the contrary.

## STATEMENT OF FACTS

### I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008.  *See* Compl. ¶ 25, ECF No. 1.[1]  BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business").  *Id.*  For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was out of the market.  *Id.* ¶¶ 26–27.  In reality, BLMIS operated a Ponzi scheme through its IA Business.  *Id.* ¶ 28.  On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  *Id.* ¶ 12.

The damage Madoff caused was facilitated by BLMIS "feeder funds"—large investment funds created to funnel monies into BLMIS.  *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021).  Defendants knowingly invested in multiple such funds, including the Fairfield Funds and Kingate Global Fund, Ltd. ("Kingate Global").  Compl. ¶¶ 37–44.

### II.    THE FAIRFIELD FUNDS

The Fairfield Funds were controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership with its principal place of business in New York.  Shifrin Decl., Exs. 1–5.  Sentry was a U.S. dollar-denominated fund that invested 95% of its assets with BLMIS.  Compl. ¶ 2.  Sigma

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Banco Itaú Europa Luxembourg S.A.*, Adv. Pro. No. 12-01019 (CGM) (Bankr. S.D.N.Y.).

accepted subscriptions in Euros, converted the Euros into U.S. dollars, and wholly invested its funds in Sentry. *Id.*; *see also* Shifrin Decl., Ex. 6.

Until 2003, FGG represented that the Fairfield Funds were managed from New York through Fairfield Greenwich Limited. Shifrin Decl., Ex. 7. In 2003, FGG designated a Bermuda entity known as Fairfield Greenwich Bermuda Limited ("FG Bermuda") as manager. *Id.*, Ex. 8. FGG nevertheless continued to conduct key operations from its New York office. *Id.*, Exs. 3–5. For example, Sentry subscriptions were approved or rejected by a New York-based FGG partner. *Id.*, Ex. 9. FGG's Finance Group, which was responsible for processing subscriptions and redemptions, performing due diligence, communicating with investors, and providing investor support, was also located in New York. *Id.*, Ex. 1.

Investors in the Fairfield Funds were required to execute subscription agreements, in which investors acknowledged their sophistication and that they had "such knowledge and experience in financial and business matters that [they were] capable of evaluating the risks of this investment." *Id.*, Exs. 10–12, ¶ 5.c. The subscription agreements also incorporated the Fairfield Funds' Private Placement Memoranda ("PPMs"), and by signing, investors warranted that they "received and read a copy of the [PPMs]." *Id.* ¶ 7.

The PPMs explicitly disclosed BLMIS's multiple roles as the *de facto* investment manager, broker dealer, and custodian for the Fairfield Funds. Specifically, the PPMs disclosed:

> The Manager has allocated the predominant portion of the Fund's assets to a managed account at Bernard L. Madoff Investment Securities. As a result, the Fund is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

*Id.*, Ex. 13 at p. 12. The PPMs also disclosed how "[t]he services of BLM[IS] and its personnel

are essential to the continued operation of [Sentry], and its profitability, if any." *Id.*, Ex. 14 at

p. 10.

As to BLMIS's roles as broker dealer and custodian, the PPMs further disclosed:

> As a result of the Investment Manager's selection of Bernard L.
> Madoff Investment Securities, LLC ("BLM[IS]") as execution agent
> of the split strike conversion strategy, substantially all of the Fund's
> assets will be held in segregated accounts at BLM[IS], a U.S.
> registered broker-dealer and qualified custodian. Accordingly,
> BLM[IS] will be a sub-custodian of the Fund.

*Id.* at p. 16. The PPMs therefore specifically informed investors that BLMIS—not the Fairfield

Funds or their service providers—would have custody of Sentry's assets in New York and would

execute the funds' purported investment strategy involving the purchase and sale of U.S. securities.

The subscription agreements included additional connections to New York. The

agreements contained a New York choice of law provision: "This Agreement shall be governed

and enforced in accordance with the laws of New York, without giving effect to its conflict of laws

provisions." *Id.*, Exs. 10–12, ¶ 16. Under a heading titled *New York Courts*, the agreements also

contained a New York venue and forum selection clause:

> Subscriber agrees that any suit, action or proceeding ("Proceeding")
> with respect to this Agreement and the Fund may be brought in New
> York. Subscriber irrevocably submits to the jurisdiction of the New
> York courts with respect to any Proceeding and consents that service
> of process as provided by New York law may be made upon
> Subscriber in such Proceeding, may not claim that a Proceeding has
> been brought in an inconvenient forum.

*Id.* ¶ 19. The agreements also instructed investors to send subscription payments to a bank account

with HSBC Bank USA in New York (the "HSBC USA Account"). *Id.*

Following BLMIS's collapse, the Trustee filed an adversary proceeding against the

Fairfield Funds and related defendants to avoid and recover fraudulent transfers of customer

5

property in the amount of approximately $3 billion.  Compl. ¶ 45.  In 2011, the Trustee settled

with the Fairfield Funds.  *Id.* ¶ 50.  As part of the settlement, Sentry consented to a judgment in

the amount of $3.054 billion but repaid only $70 million to the BLMIS customer property estate.

*Id.*  The Trustee then commenced a number of adversary proceedings against defendants, like

Defendants here, to recover the approximately $3 billion in stolen customer property.

## III.    DEFENDANTS AND THEIR INVESTMENTS IN THE BLMIS FEEDER FUNDS

Defendants are sophisticated private banks owned by the multinational financial

conglomerate Itaú Unibanco Holding S.A. ("Itaú Unibanco").  Defendant Banco Itaú is a

Luxembourg *société anonyme*.  Compl. ¶ 3.  Itaú International is an Edge Act corporation chartered

by the Federal Reserve.  *Id.*

### A.    Itaú Private Bank

At all relevant times, Banco Itaú affiliate, non-party Itaú Private Bank, acted as Banco

Itaú's agent in initiating and overseeing Banco Itaú's investment in Sentry.  Shifrin Decl. Exs. 15-

18, 25.  Itaú Private Bank oversaw private banking across Itaú Unibanco's subsidiaries, and its

personnel acted on Banco Itaú's behalf and for its benefit by managing Banco Itaú's investment in

Sentry and making investment decisions for Banco Itaú.  *Id.*  In particular, Antonio Carlos da R.

Conceição, a member of Itaú Private Bank's wealth management services, communicated with

FGG regarding Banco Itaú's investments in Sentry.  Conceição conducted investment research on

Sentry and confirmed Banco Itaú's subscriptions in the fund.  *Id.*, Ex. 16-17.  When there were

questions or "operational error[s]" at Banco Itaú, Conceição communicated directly with FGG

regarding subscription payments.  *Id.*, Ex. 18, 25.  For example, on behalf of Banco Itaú, Mr.

Conceição asked FGG "how the 'split [] strike conversion' strategy generate[d] returns that [were]

not correlated with the S&P" and whether "someone within Madoff's family [sic] is the auditor of

the master fund," *i.e.*, BLMIS.  *Id.*, Ex. 16.

Itaú Private Bank manager, Philippe Fremau, also communicated with Albourne Partners ("Albourne"), an investment advisor, regarding BLMIS and the BLMIS feeder funds. *Id.*, Ex. 19. In February 2008, Mr. Fremau emailed Albourne about the "Madoff issue," including concerns that the "qualitative history [is] *too good to be true*, family [sic] members holding key positions, independent auditor unkown [sic]." *Id.* (emphasis added). Albourne responded that it had "material concerns about the fund," and offered to meet with Mr. Fremau and Katie Grossman, a hedge fund analyst at Itaú International, in New York or Connecticut to discuss. *Id.* On March 5, 2008, Mr. Fremau and Ms. Grossman traveled to New York and later met with Albourne at its Rowayton, Connecticut office. *Id.*

### B.    Defendants Purposefully Invested with BLMIS in New York

Banco Itaú began investing in BLMIS feeder funds, including the Fairfield Funds, in the late 1990s. *Id.*, Ex. 20. Prior to BLMIS's collapse, Defendants received approximately $75 million in transfers from the Fairfield Funds and Kingate Global. Compl., Exs. C, F–I. Banco Itaú executed at least three subscription agreements with Sentry, in which it acknowledged that it received and read the PPMs and thus understood the BLMIS-centric nature of the investment. Shifrin Decl., Exs. 6-8; 10–14. Banco Itaú also sent dozens of subscription payments from its designated correspondent account at UBS AG Stamford's branch in New York, New York (the "UBS Account") to Sentry's HSBC USA Account. *See, e.g.*, *id.*, Exs. 21-22. In subscription agreements and redemption requests with the Fairfield Funds, Banco Itaú identified and designated the same UBS Account to receive redemptions from the Fairfield Funds. *Id.*, Exs. 11–12, ¶ 30.g. Banco Itaú used the UBS Account to receive redemptions from the Fairfield Funds on at least 25 occasions. *See, e.g.*, *id.*, Exs. 23-24.

Finally, Banco Itaú employees traveled to New York to meet with FGG concerning its investments in Sentry. For example, in or around July 2005, Lywal Salles, chief executive officer

and board member of Banco Itaú, and Gustavo Castro met with FGG partners, including Jeffrey

Tucker, Walter Noel, and Philip Toub in New York, to discuss Banco Itaú's $50 million investment

in Sentry—"their largest fund counterparty." *Id.*, Ex. 20.

## ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER BANCO ITAÚ

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show

a *prima facie* case that personal jurisdiction exists, which "may be established solely by

allegations."[2] *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A

*prima facie* case of jurisdiction can be supported by affidavits and supporting materials containing

facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138

(2d Cir. 2010). Courts construe pleadings and affidavits in the light most favorable to the plaintiff,

resolving all doubts in the plaintiff's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616

F.3d 158, 163 (2d Cir. 2010).

Specific jurisdiction exists where the defendant purposely directs its activities into the

forum and the underlying cause of action arises out of or relates to those activities.[3] *See Picard v.*

*Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

To make this determination, the court first assesses whether the defendant has purposefully availed

itself of the privilege of conducting activities with the forum by establishing "minimum contacts."

*See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 475–76 (1985). The defendant's activities need not have taken place

---

[2] Only Banco Itaú moves to dismiss for lack of personal jurisdiction. *See* D. Mem. at 21 ("Itaú International does not contest that the Court has personal jurisdiction over it at this time.")

[3] General jurisdiction is based on the defendant's general business contacts with the forum and permits a court to exercise jurisdiction where the claims are unrelated to those contacts. *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014). Here, the Trustee's claims arise out of Banco Itaú's specific contacts with the forum and a finding of general jurisdiction is unnecessary.

within the forum, "and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011).  Moreover, minimum contacts may be found when a "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566.  The court then conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320.  Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's contacts establish personal jurisdiction, the court must look at "the totality of the circumstances" rather than analyze each contact in isolation. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).  In bankruptcy cases arising under 28 U.S.C. § 1334, "[b]ecause the sovereign exercising jurisdiction is the United States, not a particular state, minimum contacts with the United States is sufficient to satisfy the Fifth Amendment due process requirement, whether the claims asserted arise under federal, state or foreign law." *See, e.g., Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecom. (Lux.) II SCA )*, 547 B.R. 80, 96-97 (Bankr. S.D.N.Y. 2016).[4]

### A.    Banco Itaú Purposefully Availed Itself of the Laws and Privileges of Conducting Business in the United States

Banco Itaú's numerous contacts with the United States establish this Court's jurisdiction. Banco Itaú (1) purposefully targeted New York-based BLMIS to purchase U.S. securities through

---

[4] Certain cases discussed herein address jurisdiction under New York's long-arm statute.  Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g., HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405(DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous" (citations omitted)).

the Fairfield Funds and other BLMIS feeder funds; (2) agreed to New York jurisdiction and New

York law in its Sentry subscription agreements; (3) used Itaú Private Bank as its agent to

communicate and meet with FGG in New York about its investments in the Fairfield Funds; (4)

used Itaú Private Bank as its agent to meet with Albourne in Connecticut to discuss its investments

with the Fairfield Funds; and (5) used New York banks to transact with the Fairfield Funds.  Many

of these contacts independently establish jurisdiction.  In their totality, these contacts plainly

establish that Banco Itaú purposefully directed its activities to the United States.  *See Esso*

*Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344

(S.D.N.Y. 2019) ("When all [defendant]'s Agreement-related contacts are considered together, it

is clear [the defendant] purposely availed itself of the forum.").

### 1.    Banco Itaú Purposefully Invested in BLMIS

Banco Itaú's intentional investment with BLMIS in New York through known BLMIS

feeder funds establishes personal jurisdiction over Banco Itaú.  Regardless of its other contacts

that support jurisdiction, Banco Itaú's deliberate targeting of BLMIS and the New York securities

market—through entities expressly constituted for that purpose—is dispositive.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose

to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities,

they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also*

*Maxam*, 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended that funds

invested with BLMIS feeder fund would be sent to BLMIS in New York for investment).  Indeed,

by executing the subscription agreements and affirming that it received and read Sentry's PPM,

Banco Itaú knew that: (i) Sentry invested at least 95% of its assets with BLMIS, and Sigma

invested substantially all of its assets in Sentry; (ii) BLMIS performed all investment management

duties for these assets; (iii) BLMIS was registered with the U.S. Securities and Exchange

Commission; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. treasury bills; (vi) the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS; and (viii) BLMIS was "essential to the continued operation of" Sentry. *See supra* pp. 4–6. Investing with BLMIS was the whole point of Banco Itaú's investment.

Against all this, Banco Itaú tries to understate its intentional investment with BLMIS and insists on a formalistic jurisdictional analysis that focuses entirely on the mere presence of a "third party" (*i.e.,* the Fairfield Funds) while ignoring the nature of the investment itself. *See, e.g.,* D. Mem. at 24 ("the law is clear that *anticipated* performance in New York by a third party does not show purposeful availment"); 25 ("The fact that a third party *might* take action in New York is the type of "unilateral activity" that cannot establish that the defendant had the required contact with the forum.) (emphasis added). None of it works. The facts are unequivocal that Banco Itaú deliberately targeted the U.S. securities market, and the law is unequivocal that this sort of purposeful availment establishes personal jurisdiction.

### a. *BLI* Establishes this Court's Jurisdiction Over Banco Itaú

In *Picard v. Bureau of Labor Insurance (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*"), this Court concluded that investing in BLMIS through BLMIS feeder funds alone establishes personal jurisdiction. The facts of that case are indistinguishable from the facts here. There, as here, the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of dollars in Fairfield Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *BLI*, 480 B.R. at 506. There, as here, the defendant was provided with identical PPMs and

11

executed identical subscription agreements establishing the investment's BLMIS-centric purpose. *Id.* at 507–08.  And there, as here, the subsequent transferee argued that the foreseeability of its investment ending up in a BLMIS account was insufficient to support personal jurisdiction.  *Id.* at n.14.  Not only did the Court reject this argument, Judge Lifland called it "disingenuous," explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an account at BLMIS as a result of happenstance or coincidence. Rather, BLI purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation have already "confirmed that defendants who invested directly or indirectly with BLMIS and received payments from BLMIS as an initial transferee or subsequent transferee of those initial transfers were subject to the Court's personal jurisdiction").  As framed by this Court, "BLI intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom."  *BLI*, 480 B.R. at 506.

Because Banco Itaú is identically situated to the defendant in *BLI* with respect to the fundamental purpose of its investment, *BLI* is controlling and resolves Banco Itaú's personal jurisdiction defense without the need for inquiry into its additional New York contacts.  In fact, the evidence that Banco Itaú purposefully targeted the New York securities market is stronger here because Banco Itaú also invested in Kingate Global—a fund similarly constituted to feed foreign investments directly to BLMIS in New York.

### b.    *Walden* Does Not Save Banco Itaú from this Court's Jurisdiction

Banco Itaú relies heavily on *Walden v. Fiore*, 571 U.S. 277 (2014) and seems to suggest that, after *Walden*, *BLI* is no longer good law. But *Walden* and *BLI* are completely different cases and easily coexist in their own jurisprudential contexts. *Walden* involved a Nevada plaintiff who sued a Georgia police officer in Nevada after the police officer seized the plaintiff's funds in a Georgia airport. *Id.* at 288. The police officer had no purposeful minimum contacts with the forum state of Nevada: he had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 289. Nor was the officer's seizure of funds predicated in any way on the fact that their intended destination was Nevada. *Id.*

Applying the "effects" test applicable in intentional tort cases (which that case was and this case is not), the Court of Appeals concluded that the Georgia officer's seizure of funds in Georgia would have some foreseeable effect in Nevada, and that jurisdiction was therefore proper. *Id.* at 290–91. The Supreme Court disagreed, finding that the defendant had "formed no jurisdictionally relevant contacts with Nevada" and that he could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiff resided in Nevada. *Id.* at 289–91. In reversing the Court of Appeals' holding that the officer's knowledge of plaintiff's Nevada connections and the "foreseeable harm" that plaintiff suffered there were dispositive, the Court simply reaffirmed the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *Id.* at 284 & 289.

This case is nothing like *Walden*. The Trustee's allegations implicate the Supreme Court's "purposeful availment" framework (not the "effects" test), a concept that the Court in *Walden* did not reference, let alone apply. Nor is the police officer's lack of "any jurisdictionally relevant contacts with Nevada" remotely analogous to Banco Itaú intentionally directing investments to a New York investment manager, broker dealer, and custodian through feeder funds formed for this

express purpose.  *Id.* at 289–91.  As the Supreme Court held in *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, "[t]he 'substantial connection' . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*."  480 U.S. 102, 112 (1987).  This is exactly what Banco Itaú did when it knowingly sent millions of dollars to the Fairfield Funds with BLMIS as the ultimate intended recipient.

### c.    Banco Itaú's Alternative Arguments Are Unpersuasive

Banco Itaú's efforts to downplay its investment's New York destination as an "anticipated" consequence that "might" have happened—rather than a deliberate and purposeful targeting of the forum that was 100% guaranteed to happen—is the same "disingenuous" argument this Court rejected in *BLI*.  At no point in its Motion does Banco Itaú address the purposefulness of its investments with BLMIS or meaningfully address Judge Lifland's analysis in *BLI*.  Instead, Banco Itaú mischaracterizes its investments to minimize the underlying connections with New York.

Banco Itaú's related argument that a third party's "unilateral activities" in a forum state is insufficient to confer personal jurisdiction over a defendant is similarly flawed and misleading. Motion at 25-27.  The Fairfield Funds' funneling of Banco Itaú's investment to BLMIS in New York was not some unilateral act that Defendants could not control or account for; it was the precise reason Banco Itaú subscribed with the Fairfield Funds.  Banco Itaú purposefully invested in BLMIS *through* the Fairfield Funds, a fact that distinguishes it from the defendants in the inapposite string of cases Banco Itaú cites.  *See* Motion at 25-26, n. 18, 20.  In other words, Banco Itaú's contacts with New York were "intertwined with [its] transactions or interactions with the plaintiff or other parties," *Walden*, 571 U.S. at 286, and thus support jurisdiction.[5]

---

[5] Banco Itaú principally relies on cases that apply New York's long-arm statute—CPLR § 302(a)(1)—which provides two independent bases for establishing personal jurisdiction.  Under that provision, a defendant must either "transact[]

## 2. Banco Itaú's Contacts with FGG in New York Establish Minimum Contacts

By investing with the Fairfield Funds, Banco Itaú knowingly transacted business with FGG in New York. When Banco Itaú first invested in the Fairfield Funds, FGG represented that Fairfield Greenwich Limited, a New York entity, managed the Fairfield Funds, and FGG conducted key operations from its New York office throughout the investment. *See supra* pp. 3-5. Under similar facts, this Court in *BNP* found jurisdiction over investor defendants based on the U.S. contacts inherent in doing business with the Tremont funds. *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) ("*BNP*") (finding *prima facie* showing of jurisdiction "over any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds"). Banco Itaú employees also traveled to New York to meet with FGG in 2005, which further supports personal jurisdiction over Banco Itaú. Shifrin Decl., Exs. 20; *see SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for meeting); *see also Burlington Indust., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in New York).

---

any business within the state *or* contract[] anywhere to supply goods or services in the state" CPLR § 302(a)(1) (emphasis added). Banco Itaú focuses on the latter, contract-based provision—which does not apply here—and, in so doing, appears to argue for a new, far more onerous standard than the purposeful availment inquiry governing jurisdictional analyses under either federal or New York law. *Compare* Motion at 20 ("The pertinent question is, instead, whether and to what extent the *defendant* performed or was obligated to perform in New York under the contract.") *with Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL 1234042, at *9 (S.D.N.Y. Mar. 31, 2017) ("Purposeful activities are volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). Ultimately, Banco Itaú's cases confirm that the focus of the jurisdictional analysis should be on the defendant, not the plaintiff. *See* Motion at 26, n. 20. That is precisely the inquiry the Trustee is advocating for here.

a.    **The Subscription Agreements Evidence a Strong Nexus With New York**

Banco Itaú's subscription agreements with Sentry further evidence a "strong nexus with New York" that supports jurisdiction.  *See BLI*, 480 B.R. at 517, n.15.  When Banco Itaú invested in Sentry, it signed subscription agreements through which it submitted to venue in New York, the jurisdiction of the New York courts, and the application of New York law.  *See supra* at 7.  Banco Itaú's argument that the "Subscription Agreements could not provide a consent to suit for claims over redemptions by the Trustee" misses the mark.  Motion at 23.  The Trustee is not arguing this Court has jurisdiction based on Banco Itaú's consent, which was the specific issue analyzed by the Court in *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018).  Rather, Banco Itaú's New York-submissions in the subscription agreements show that Banco Itaú purposefully directed its activities toward New York and provide another strong jurisdictional contact with New York.

"[A] choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws."  *Chase Manhattan Bank v. Banque Generale Du Commerce*, No. 96 CIV 5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Burger King*, 471 U.S. at 482 ("Although such a [choice of law] provision standing alone would be insufficient to confer jurisdiction . . . it reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law.").  For example, in *BLI*, the Court, without addressing the issue of whether defendants consented to jurisdiction, found that the clauses in the subscription agreements "further evidenc[e]

the strong nexus with New York." 480 B.R. at 517, n.15. Similarly, in *Motors Liquidation Co.*

*Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, the court

held that, even if defendant's agreement to New York forum and choice of law provisions did not

constitute consent, the provisions helped establish minimum contacts to support specific

jurisdiction. 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017).

Moreover, the Fairfield Funds' subscription agreements plainly "relate to" the Trustee's

claims and evidence a strong nexus between this case and New York. *See Ford Motor Co. v. Mont.*

*Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (finding that plaintiffs' claims related to

defendant's in-state activity and rejecting "strict causal relationship between the defendant's in-

state activity and the litigation"). Banco Itaú's subscriptions in and redemptions from Sentry are

two sides of the same coin, and Banco Itaú could not invest in and profit from Sentry without a

subscription agreement. Because Banco Itaú's subscription agreements were necessary predicates

to its receipt of customer property through Sentry, the subscription agreements are sufficiently

related to the Trustee's claims to recover that customer property from Banco Itaú.

**b.      Banco Itaú Managed Its Relationship with FGG Through Itaú
          Private Bank**

Banco Itaú also directed activity into the forum through its agents' contacts with FGG.

New York courts "may exercise personal jurisdiction over any non-domiciliary . . . who in person

*or through an agent* . . . transacts any business within the state" where the cause of action arises

from those transactions. *See* CPLR 302(a)(1). The Trustee "need not establish a formal agency

relationship" between Banco Itaú and its agents. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d

460, 467 (1988). Rather, "it is sufficient that the alleged agent acted in the state for the benefit of,

and with the knowledge and consent of the non-resident principal." *Steinhardt v. Shadow*, No. 16-

cv-4222 (RJS), 2018 WL 4278335, at *2 (S.D.N.Y. Apr. 11, 2018) (cleaned up).

Banco Itaú managed its business relationships with Sentry through Itaú Private Bank. This included Itaú Private Bank personnel's frequent email and telephonic communications with New York-based FGG personnel regarding Banco Itaú investment in Sentry. *See supra* at 6-7. In March 2006, Mr. Conceição asked FGG whether it would accept a $200,000 subscription after "there was an operational error in Itaú Europa Luxembourg and they did not manage to send the money." Shifrin Decl., Exs. 15-18. In October 2007, Mr. Conceição of Itaú Private Bank contacted FGG partner Philip Toub regarding questions about Madoff's purported compensation. *Id*, Ex. 18. The next month, Mr. Conceição sent FGG additional questions from the "risk team." *Id.* Itaú Private Bank employees also met with Albourne in Connecticut in 2008 to discuss the "Madoff issue."

Banco Itaú's extensive communications with FGG reflect its transaction of business in New York and the United States. *See Scholastic, Inc. v. Stouffer*, No. 99-cv-11480 (AGS), 2000 WL 1154252, at *6 (S.D.N.Y. Aug. 14, 2000) (letters and phone calls to plaintiffs in New York and meeting by agent with plaintiff in New York established jurisdiction); *Kreutter*, 71 N.Y.2d at 467 (agent need only "engage[ ] in purposeful activities in this State" in relation to a transaction for the benefit of and with the knowledge and consent of the principal); *Hecklerco, LLC v. YuuZoo Corp. Ltd.*, 252 F. Supp. 3d 369, 378–79 (S.D.N.Y. 2017) (finding specific jurisdiction over defendants based on their agents' activities in New York to facilitate stock transactions).

### 3.    Banco Itaú's Purposeful Use of a New York Correspondent Bank Account Supports Jurisdiction

This Court has jurisdiction because Banco Itaú purposefully used the U.S. banking system to subscribe into and redeem from Sentry. Courts have often held that a defendant's use of a domestic bank account is sufficient to establish personal jurisdiction. *See, e.g.*, *Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding

jurisdiction based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction based solely on defendants' use of a New York account to receive fraudulent conveyances at issue); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction based solely on defendant's use of New York accounts to facilitate alleged fraud). In this liquidation, this Court has also found jurisdiction where initial and subsequent transferee defendants received transfers from U.S. bank accounts. *See BNP*, 594 B.R. at 191 (finding jurisdiction over subsequent transferee defendants that sent subscriptions to, and received redemptions from, feeder funds' New York bank account); *Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction over initial transferee defendants who received transfers from BLMIS's New York bank account).

Courts reach the same conclusion where the account at issue is a correspondent bank account. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established" provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012); *see also Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 165, 171 (2d Cir. 2013) (finding jurisdiction over defendant with "no operations, branches, or employees in the United States" based on repeated use of New York's banking system); *Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 67–69 (Bankr. S.D.N.Y. 2016) (finding jurisdiction based on designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322–29 (2016) (same). What matters is that the use was "purposeful," and not coincidental or passive. *See Licci*, 20 N.Y.3d at 338–39 (finding jurisdiction where use of

19

correspondent account was not "coincidental," and distinguishing case where defendant passively received funds due entirely to another party's actions).

> a.    **Banco Itaú's Repeated Use of the UBS Account and the HSBC USA Account Support Jurisdiction**

In its subscription agreements and redemption documents, Banco Itaú designated its UBS Account through which it sent and received payments from Sentry.  *See* Shifrin Decl., Exs. 11–12; *see also Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *5 n.2 (E.D.N.Y. Nov. 25, 2020) ("A single transaction is sufficient to satisfy this [jurisdictional] requirement, provided the relevant claims arise from that transaction."). Without any discovery from Banco Itaú, the Trustee has already identified at least 25 transfers from the Fairfield Funds that were sent to and deposited in Banco Itaú's UBS Account, consistent with Banco Itaú's subscription agreements.  *See, e.g.,* Shifrin Decl., Exs. 23 - 24; *see also Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (finding jurisdiction even though defendant executed only five of 280 relevant transfers through a U.S. bank account).

In addition, Banco Itaú sent and received dozens of payments to and from Sentry's HSBC USA Account in accordance with Sentry's subscription agreements.  *See, e.g.*, Shifrin Decl., Exs. 21 - 22.  Banco Itaú received at least 156 transfers from the Fairfield Funds in the Six-Year Period, all of which went through the HSBC USA Account.  Where, as here, there has been repeated use of a correspondent account, purposeful availment may be inferred from the sheer volume of transactions.  *See Licci,* 20 N.Y.3d at 340 (routing several million dollars through correspondent account dozens of times indicates desirability and lack of coincidence); *Al Rushaid*, 68 N.E.3d at 5–6 (finding transfer to correspondent accounts at least 12 times for $4 million sufficient for personal jurisdiction); *Gucci Am., Inc. v. Li*, 135 F. Supp. 3d 87, 94–96 (S.D.N.Y. 2015) (nearly a dozen correspondent account transfers sufficient to support personal jurisdiction).

That the HSBC USA Account was Sentry's account does not change the analysis because Banco Itaú agreed to use it. *See Esso*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."). That Sentry's subscription agreement required subscribers use the HSBC USA Account is irrelevant, because Banco Itaú voluntarily entered into that agreement to use Sentry's HSBC USA Account for its subscriptions into, and redemptions from, the fund. Each transaction was thus a volitional act that supports jurisdiction.[6] *See In re Motors Liquidation Co.*, 565 B.R. at 288–89 (finding defendant's use of a correspondent account to be purposeful even where payment in New York was dictated by agreement).

Banco Itaú's purposeful use of the UBS and HSBC USA Accounts supports jurisdiction because the Trustee's claims "arise out of or relate to" Banco Itaú's use of the accounts. As the Supreme Court recently held, this prong does not require a causal relationship. *See Ford Motor*, 141 S. Ct. at 1026–30. Rather, this prong may be satisfied if the defendant's conduct involves "financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also Arcapita*, 549 B.R. at 68–71 (requiring only that claim is not completely "unmoored" from transaction). Because the Trustee's causes of action in this proceeding relate to the very transfers that came through the accounts, Banco Itaú's use of these accounts supports jurisdiction. *See, e.g.*, *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction where "claims against [defendants] arise directly out of the transfer of funds into [defendant's] New York accounts").

Banco Itaú primarily relies on *To v. HSBC Holdings plc*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), a case involving common law claims brought against fund

---

[6] It makes no difference if a Citco entity chose to use the U.S. correspondent account on behalf of Sentry, as various Citco entities acted as FGG's agents. *See Igoin*, 525 B.R. at 884 ("Whether [defendant] dealt with BLMIS directly or her mother or another acted on her behalf makes no difference because the conduct of her agents is attributed to her for purposes of the jurisdictional analysis.").

service providers.  *See* Motion at 28, n. 22 (citing, *e.g.*, *Hill v. HSBC Bank plc*, 207 F. Supp. 3d

333, 339-40 (S.D.N.Y. 2016).  But this Court has already determined that *To* and other similar

cases are not relevant to the Trustee's actions against defendants like Banco Itaú, who invested in

BLMIS feeder funds.  *See BNP*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal

jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which

arose from their New York contacts with the Tremont Funds.").  This is not a dispute between two

parties about services owed under a foreign contract, like the breach of fiduciary duty and other

claims in *Hill* and *To*.  This action is brought by a SIPA Trustee to recover fraudulent transfers

from an investor whose transfers of funds to and from U.S. correspondent accounts evidence an

intent to direct activity towards the U.S. securities markets.  *See BLI*, 480 B.R. at 513 ("This

movement of money to and from BLMIS in the United States, as contemplated by the Agreements,

was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of

the Agreement between BLI and Fairfield Sentry.").

## B.    The Exercise of Personal Jurisdiction Over Banco Itaú Is Reasonable

Banco Itaú fails to present a compelling reason why jurisdiction would be unreasonable.

"The reasonableness inquiry requires the court to determine whether the assertion of personal

jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the

circumstances of the particular case."  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331

(2d Cir. 2016).  Where a plaintiff has made a threshold showing of minimum contacts, a defendant

must present "a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."  *Chloé*, 616 F.3d at 165.  Indeed, this Court has found "it would be a

'rare' case where the defendant's minimum contacts with the forum support the exercise of

personal jurisdiction but it is unreasonable to force the defendant to defend the action in that

forum."  *BNP*, 594 B.R. at 188.

This is not that "rare" case. The burden on Banco Itaú is minimal. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). The United States has a strong interest in applying U.S. law in this SIPA liquidation proceeding. *See id.*; *see also In re Picard*, 917 F.3d at 103 (noting "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a strong interest in litigating in the United States. *See Maxam*, 460 B.R. at 119. Accordingly, this Court's exercise of jurisdiction over Banco Itaú is more than reasonable.

### C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction. *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009). The Trustee has shown how Banco Itaú, *inter alia*, purposefully invested with BLMIS through Madoff's feeder funds, relied upon U.S. bank accounts to receive BLMIS customer property, and communicated with FGG in New York through Itaú Private Bank. At a minimum, these facts establish a "threshold showing" of jurisdiction. *Kiobel*, 2009 WL 3817590, at *6.

### II.    THE TRUSTEE'S COMPLAINT PLEADS THAT DEFENDANTS RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)

The Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that Defendants received subsequent transfers of BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–150 (Bankr. S.D.N.Y. 2014) ("*Merkin I*"). No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id.* at 150

(quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)).  Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]."  *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019).  In addition, the Trustee must allege "'the necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds."  *Merkin I*, 515 B.R. at 150 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).

The Trustee's Complaint meets these requirements.  The Complaint alleges that Defendants received transfers, identified by date and amount, from Sentry, and that Sentry invested substantially all of its funds with BLMIS.  Compl. ¶¶ 51-53, Exs. F - G.  The Complaint likewise alleges that Defendants received transfers, identified by date and amount, from Sigma, and that Sigma invested all of its funds with Sentry.  *Id*. ¶¶ 54-58, Exs. H - I.  Thus, the Complaint plausibly alleges that Defendants received subsequent transfers of customer property by (a) outlining the relevant pathway through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to Defendants and (b) providing the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer.  Nothing more is required.  *See, e.g.*, *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that claim was not pled "with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### A.    Defendants Misstate the Trustee's Pleading Burden

Defendants essentially argue for an alternative pleading standard, asserting that the Trustee must tie each subsequent transfer Defendants received to a specific initial transfer from BLMIS. Motion at 16.  But the Court already rejected this argument in *Merkin I*, where the Court refused to dismiss subsequent transfer claims even though the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss").  The Court likewise rejected the argument that the Trustee must detail which and what portion of each subsequent transfer comprises customer property.  *See Merkin I*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also In re Allou Distribs., Inc.*, 379 B.R. at 30 (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

Defendants' reliance on *Picard v. Shapiro* is unavailing because *Shapiro* did not change the pleading burden for recovery under Section 550(a).  In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and that "upon information and belief" these defendants subsequently transferred this same amount to other defendants.  *See Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 104, 109, 119 (Bankr. S.D.N.Y. 2015).  The complaint did not detail *any* of the necessary vital statistics of the subsequent transfers.  *Id.* at 119.  Here, where the Trustee has alleged the vital statistics of each transfer Defendants received, *Shapiro* supports denying the motion to dismiss.

### B.    Defendants' Tracing Arguments Fail on a Motion to Dismiss

Defendants' tracing arguments fare no better and are inappropriate on a motion to dismiss. As an initial matter, the word "tracing" is conspicuously absent from Defendants' Motion.  Perhaps

Defendants will claim they are only relying on the notice pleading requirements under *Iqbal* and *Twombly* and are not requiring that the Trustee trace the exact transfers of customer property from BLMIS through the Fairfield Funds to Defendants.  This would be disingenuous.  Of course, Defendants are arguing for a tracing analysis at the pleading stage; they just refuse to acknowledge this because such an argument is clearly inappropriate on a motion to dismiss for each of the reasons set forth below.

First, Defendants claim the transfers it received from the Fairfield Funds comprise subscriptions from other investors.  Motion at 17-18.  In other words, Defendants argue that Sentry commingled customer property with other funds, and this commingling defeats the Trustee's ability to trace the transfer of customer property from BLMIS.  *Id*.  Again, Defendants are wrong.  "The law does not place such a difficult burden on trustees.  The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing."  *Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151, at *4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3) (citation omitted).

Second, Defendants claim that Sentry paid other investors with the customer property it received from BLMIS prior to making any transfers to Defendants.  Motion at 19-20.[7]  But

---

[7] The declaration of Defendants' counsel (Resetarits Decl.) includes two "calculations" of various transfers from BLMIS to Sentry and Sentry to its investors.  *See* Resetarits Decl. ¶¶ 6–7, ECF No. 119.  Defendants attempt to add transfers from Sentry to subsequent transferee defendants between May 9, 2003 through December 31, 2003, which implicates multiple proceedings and amounts that have in some cases changed since the filing of the Trustee's complaints.  Defendants claim this "calculation" shows that the May 17, 2004 transfer from Sentry to Banco Itaú "*could not possibly have been BLMIS customer property*."  Motion at 20.  But Defendants' undefined tracing methodology, which they use to contest the transfers in this proceeding, serves as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context."  *Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss); *see also Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) (assessment of valuation that "almost certainly will require expert testimony" is inappropriate for a motion to dismiss); *In re Viropharma, Inc.*, No. CIV.A. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) ("The [party's] submission of an expert report at [the motion to dismiss] stage is entirely improper.").  And to the extent the Court finds it relevant, Defendants conveniently ignore many of the alleged transfers in the Trustee's Complaint where the initial and subsequent transfers are close in time.

Defendants do not disclose what tracing methodology or methodologies they rely on to reach this conclusion—precisely because the appropriate methodology is for this Court to decide after fact and expert discovery. *See Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*") ("[T]he Court's selection of an appropriate methodology is committed to the Court's discretion."); *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3, n.7 ("Courts have broad discretion to determine which monies of commingled funds derive from fraudulent sources.").[8]

The Trustee is a stranger to the transactions between Sentry and Defendants and is entitled to discovery on this issue. "[I]n a case such as this one, where 'the Trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded." *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011). This is one reason why this Court in *Merkin I* denied defendants' motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." 515 B.R. at 151. And even after fact discovery, expert opinion is necessary to determine what portion of the subsequent transfers stemmed from the initial transfer where the subsequent transfers originated from commingled accounts. *Merkin II*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5 (denying summary judgment as jury could infer that defendants received subsequent transfers of customer property from expert report and associated documents).

For the same reasons, this Court should reject Defendants' argument that the Trustee's claims should be dismissed because he has "all the records relevant to establishing whether, and

---

[8] This Court has recognized different tracing methodologies offered by the Trustee in this liquidation to assist the trier of fact, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality. These "methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer form a commingled fund." *Merkin II*, 581 B.R. at 386.

to what extent, any alleged transfers to the [Defendants] included any customer property." Motion at 18. The Trustee does not have "all" of the Fairfield Funds' books and records, and discovery in the Trustee's actions against the FGG defendants continues. *See, e.g.*, Stipulated Case Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.*, Ad. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec. 6, 2021), ECF No. 353 (setting fact/expert discovery deadlines of November 22, 2022 and August 22, 2023).

Third, Defendants' argument that they could not have received any customer property because of the amount of time that elapsed between Sentry's receipt of certain initial transfers from BLMIS and Sentry's subsequent transfers to Defendants is a variation of their broader tracing argument and is inappropriate on a motion to dismiss. That it may prove more difficult for the Trustee to trace all the subsequent transfers is no ground for dismissal at the pleading stage. *See Merkin I*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss"); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees'] speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting [their cross-motion for summary judgment].").

### C.    Defendants' Claims of Double Recovery Are Premature

Defendants' position that the Trustee's claims are "facially implausible" because the Trustee is seeking more money from all of Sentry's subsequent transferees than the fund withdrew from BLMIS is a non-argument at the pleading stage. Motion at 16-17. There is no dispute that the Trustee is limited to "a single satisfaction" under Section 550(a), but the Trustee "can recover from any combination of [transferees]" up to the amount avoided. *Helms v. Metro. Life Ins. Co. (In re O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021). And under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of

those funds, without the necessity for allocation among all [the] subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008). Until the Trustee recovers the full amount of the approximately $3 billion in fraudulent transfers received by Sentry, the Trustee may simultaneously seek recovery from defendants in different actions. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (holding defendant's "double recovery" arguments and the Trustee's purported limitations under Section 550(d) are "to be determined at a later stage in the litigation").

## III.    SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANTS

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added). However, in *SIPC v. BLMIS (In re Madoff Securities)*, No. 12-MC-115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), the District Court held that an initial transferee's actual knowledge of Madoff's fraud precludes application of the safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year period.

Defendants' argument that Section 546(e) bars all of the Trustee's claims to avoid or recover transfers made by BLMIS (including those made within the two-year period)—even though the Trustee has pled the Fairfield Funds' actual knowledge—has already been rejected in other adversary proceedings and is based on a tortured misreading of Section 546(e) and *Cohmad*.

### A.    The Fairfield Funds Had Actual Knowledge of Madoff's Fraud

Defendants principally assert that the requirements of Section 546(e) are supposedly met in this case with respect to the initial transfers from BLMIS.  None of that matters.[9]  As Defendants recognize, this Court has previously held that the Trustee has pled Sentry's actual knowledge of fraud and that such initial transfers are avoidable.  *See* Motion at 11; *Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5.  Although Defendants apparently disagree with this Court's opinion in *Fairfield Investment Fund*, Motion at 11, they do not argue that the Trustee has not plausibly alleged the Fairfield Funds' actual knowledge of Madoff's fraud.  As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from Defendants regardless of whether Sentry and Defendants satisfy its requirements.[10]

### B.    Defendants Are Bound By The Actual Knowledge Exception Established in *Cohmad*

Defendants are precluded from arguing that *Cohmad* is wrong and relitigating whether actual knowledge bars the application of Section 546(e).  The District Court issued *Cohmad* following consolidated proceedings on the application of Section 546(e).  As Defendants concede, *Cohmad* held that a transferee with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e).  Motion at 11.  The District Court then remanded to this Court, and this Court has since applied the actual knowledge "exception" on numerous occasions.[11]  Because

---

[9] The Trustee does not concede that any agreements or transfers between Sentry and Defendants fall within the safe harbor under Section 546(e).  For the purposes of the safe harbor, these agreements and transfers are simply not relevant, because whether the initial transfer from BLMIS to Sentry is avoidable turns on Sentry's actual knowledge of fraud at BLMIS.

[10] Though not necessary to the Court's analysis, Defendants' argument that the Trustee is in privity with the Fairfield liquidators and therefore bound by any rulings in the Fairfield liquidation is incorrect.  *See* Motion at 9.  Defendants cite no relevant authority for this argument because none exists.  *New Hampshire v. Maine*, 532 U.S. 742 (2001), does not even involve non-party preclusion.  And if *Taylor v. Sturgell*, 553 U.S. 880 (2008), "stands for anything, it is for the need to narrow and regularize the use of preclusion against nonparties."  *Krys v. Sugrue* (*In re Refco Inc. Sec. Litig.*), No. 07-MD-1902 (JSR), 2013 WL 12191844, at *11 (S.D.N.Y. Mar. 25, 2013).

[11] *See, e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (applying actual knowledge exception); Bench Ruling on Mot. to Dismiss, *Picard v. Square One Fund Ltd.*, Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2019), ECF

Defendants participated in the District Court proceedings, they are bound by *Cohmad*. *See* Mot. to Withdraw the Reference, ECF No. 15 (raising Section 546(e) as grounds for withdrawal); *SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case.").

Nor does the Second Circuit's decision in *Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014) warrant reconsideration of *Cohmad's* actual knowledge exception. Motion at 11. As this Court has recognized, the Second Circuit's decision in *Ida Fishman* did not address the actual knowledge holding from *Cohmad*. *See Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016).

### C.    Defendants Are Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550. *See* 11 U.S.C. § 546(e) ("the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title." (emphasis added)); *see also BNP*, 594 B.R. at 197 ("The Trustee does not … 'avoid' the subsequent transfer; he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550."). The Eighth Circuit made this point clear in a recent decision involving a trustee's attempt to recover a subsequent transfer from a feeder fund in the Petters Ponzi scheme. *See Kelley v. Safe Harbor Managed Account 101, Ltd.*, 31 F.4th 1058, 1064 (8th Cir. 2022) ("Though [the trustee] is seeking to claw

---

No. 181 (same); *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (same); *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 112 (Bankr. S.D.N.Y. 2016) (same); *Shapiro*, 542 B.R. at 100 (same); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *Merkin I*, 515 B.R. at 117 (same).

back the subsequent transfers made by [the feeder fund] to [subsequent transferee] through this adversary proceeding, the focus of the § 546(e) analysis is the initial transfers made by [the initial transferor/debtor] to [initial transferee/feeder fund].").    The safe harbor's limitation to avoidance is consistent with the well-established principle that "the concepts of avoidance and recovery are separate and distinct."    *In re Madoff Sec.*, 501 B.R. at 30.    It is also consistent with the understanding that the Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place."    *See In re Picard*, 917 F.3d at 98. The Court should reject Defendants' attempt to muddle the law by conflating avoidance and recovery under Section 550.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees.    The District Court specifically limited the safe harbor to avoidance claims based on the plain language of Section 546(e).    *See Cohmad*, 2013 WL 1609154, at \*4, 9 (applying the "plain terms" of Section 546(e)); *id.* at \*7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); *id.* at \*10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from Madoff Securities." (emphasis added)).    And although the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as "financial institutions" or "financial participants," the decision is clear that the focus of the safe harbor is still on the *initial* transfers.[12]    *See id.* at \*9.

---

[12] The point of the *Cohmad* hypothetical was to address the subsequent transfer defendants' argument that if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities

This Court also held in *BNP* that Section 546(e) applies only to avoidance, not recovery, and that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee has adequately pled the initial transferee's actual knowledge. *See BNP*, 594 B.R. at 197; *see also SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 514 (Bankr. S.D.N.Y. 2020) ("[T]he safe harbor defense only applies by its terms to the initial transfer."). In *BNP*, the Court rejected the argument that the "*only* way the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the [subsequent transferee defendants] actually knew of the Madoff Ponzi scheme." *BNP*, 594 B.R. 196–97 (emphasis added).

Based on *BNP*, a subsequent transferee is protected by Section 546(e) to the same extent as the initial transferee: only when the initial transferee did not have actual knowledge of Madoff's fraud. *Id*. at 197. Defendants' interpretation would eliminate the point of the actual knowledge exception—which is to restrict transferees with actual knowledge from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining that defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments'"). It would mean that the safe harbor would apply even where the initial transferee *knew* there were no securities transactions to protect. And it would also allow an initial transferee—who had knowledge of the fraud and was unable to satisfy a judgment (like Sentry)—to place fraudulently transferred moneys with a subsequent transferee and out of the reach of a trustee. *See Cohmad*, 2013 WL 1609154, at *1, 7 ("A defendant cannot

agreements under Section 546(e). *Cohmad* at *8. That argument became moot as both the Second Circuit and the District Court determined that the BLMIS customer agreement was a "securities agreement" and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore subject to Section 546(e).

be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e).").

Expanding the safe harbor as Defendants propose would also result in subsequent transferees being afforded more protection as to avoidance than the initial transferee, which does not reflect Congress' intent. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75, 83 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds*, 388 B.R. 489 (S.D.N.Y. 2008) ("Upon consideration of the initial transferee's defenses and once the amount of its liability is established, that amount can be sought from any of the transferees, including subsequent transferees, subject to any of their additional defenses."). As the Eighth Circuit pointed out in *Kelley* while citing *BNP*, under Section 546(e), "a subsequent transferee is protected indirectly to the extent that the initial transfer is not avoidable because of the safe harbor." 31 F.4th at 1064, n. 5 (cleaned up; emphasis added). Conversely, providing subsequent transferees with the same defenses to avoidance as available to the initial transferee does not unfairly bias subsequent transferees.

### D.     The Trustee Has Adequately Alleged Fraudulent Intent Under the Bankruptcy Code

Defendants' argument that the Section 546(e) safe harbor somehow precludes the Trustee's avoidance and recovery of the two-year transfers under Section 548(a)(1)(A) because of the Trustee's reliance on the Ponzi scheme presumption to establish fraudulent intent is at odds with the law of this liquidation.[13]   Under that presumption, "the existence of a Ponzi scheme demonstrates actual intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."

---

[13] As a preliminary matter, Defendants are incorrect that the adequacy of the Trustee's fraudulent intent allegations even raise a Section 546(e) safe harbor issue.  Rather, if the Trustee fails to plead "actual intent to hinder, delay or defraud," then he has failed to satisfy a core element of his Section 548(a)(1)(A) claim.  The 546(e) safe harbor has nothing to do with it.

*Citibank*, 12 F.4th at 181 (citing *Picard v. Estate (Succession) of Igoin (In re BLMIS)*, 525 B.R. 871, 892 n.21 (Bankr. S.D.N.Y. 2015)).   Multiple courts have repeatedly concluded that the Trustee has satisfied the fraudulent intent element of Section 548(a)(1)(A) by virtue of the Ponzi scheme presumption.[14]   And the Complaint alleges numerous facts supporting that BLMIS was a Ponzi scheme, including that the money received from investors was used to pay off other investors—the *sine qua non* of a Ponzi scheme.   Compl. ¶¶ 25 - 35.

Defendants nevertheless urge this Court to disregard this settled principle, relying on a singular statement by a Circuit Court Judge in a concurring opinion to the Second Circuit's *Citibank* decision.   *See Citibank*, 12 F.4th at 202 (Menashi, J., concurring).   But as the District Court recently recognized, "[n]otwithstanding Judge Menashi's concerns, 'the Ponzi scheme presumption remains law of this Circuit.'"   *See Sage Realty*, 2022 WL 1125643, at *28 (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007).   *Dicta* in a concurring opinion has no precedential effect, and it certainly does not constitute an intervening change of controlling law or provide any other "cogent" or "compelling" reasons to depart from the law.   *See Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) ("We may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'") (citing *United States v. Quintieri*, 306 F.3d 1217, 1231 (2d Cir. 2002)).

---

[14] *See, e.g., Picard v. Sage Realty*, No. 20-CV-10109, 2022 WL 1125643, at *27–28 (S.D.N.Y. Apr. 15, 2022) (JFK) (concluding Trustee has established actual intent to defraud pursuant to Ponzi scheme presumption).   The Ponzi scheme presumption has also been embraced in this jurisdiction outside the BLMIS context.   *See, e.g., Armstrong v. Collins*, No. 01-cv-2437, 2010 WL 1141158, at *20 (S.D.N.Y. Mar. 24, 2010) ("In considering claims of actual fraud, 'courts have widely found that Ponzi scheme operators necessarily act with actual intent to defraud creditors due to the very nature of their schemes.'").

Citing *Sharp International Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005), Defendants also argue that the Ponzi scheme presumption contravenes the specificity requirements of Fed. R. Civ. P. 9(b). But multiple courts have explained that *Sharp* did not call into question the continued validity of the Ponzi scheme presumption. *See, e.g., Dreier*, 452 B.R. at 425 (rejecting argument that *Sharp* eliminated the Ponzi scheme presumption because "*Sharp* did not involve a Ponzi scheme and the Second Circuit did not discuss or refer to the Ponzi scheme presumption or Ponzi schemes in general").

In any event, numerous courts have found that BLMIS's actual intent to defraud has been established independent of the presumption, based on the same "badges of fraud" alleged in the Complaint—including the concealment of facts by BLMIS, BLMIS's insolvency, and the lack of consideration provided for BLMIS's fictitious transfers to customers (Compl. ¶¶ 25 - 35). *See Picard v. JABA Assocs. LP (In re BLMIS)*, 2021 WL 1112342, at *14-15 (S.D.N.Y. Mar. 24, 2021) (citing *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 223-224 (Bankr. S.D.N.Y. 2019) ("[T]he existence of the badges of fraud supply a separate basis to conclude that the Two-Year Transfers were made with the actual intent to defraud.")).

## IV.    THE 550(B) AFFIRMATIVE DEFENSE IS INAPPROPRIATE TO RESOLVE AT THE MOTION TO DISMISS STAGE

This Court should reject Defendants' attempt to raise the "good faith" affirmative defense on a motion to dismiss. Affirmative defenses are fact-driven and require a presentation of evidence—a reality the District Court just recently reaffirmed by rejecting an identical argument raised by defendants in another adversary proceeding. *See In Re: Bernard L. Madoff Investment Securities LLC*, Case. No. No. 20-cv-02586 (CM), 2022 WL 130458, *3 (S.D.N.Y. May 2, 2022) ("The Trustee rightfully points out that such a fact-based determination can only be made based on the entirety of the factual record after discovery (which has not occurred here), not from isolated

documents cherry-picked by Appellees and factual inferences Appellees improperly seek to have drawn in their favor."); *see also United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 475 (S.D.N.Y. 2014) ("Affirmative defenses 'often require[ ] consideration of facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'") (quoting *Kelly–Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)).  That sort of factual analysis is not appropriate at this stage, particularly with respect to a good faith defense.  *See, e.g.*, *Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010) ("[W]hether the Moving Defendants acted in good faith . . .  is a disputed issue that this Court can properly determine only upon consideration of all of the relevant evidence obtained through the discovery process."); *In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011) ("Determining the Defendants' good faith is an indisputably factual inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage.").

To get around the fact that the good faith pleading burden is no longer on the Trustee, Defendants make an unsupportable argument that its good faith under the inquiry notice standard has been established as a matter of law on the face of the Trustee's Complaint.  But as recognized in *Merkin*, such an argument applies only as a "limited exception to the general rule" that good faith cannot be established on a motion to dismiss.  440 B.R. at 256.  To prevail under this limited exception, Defendants must show there is an "insuperable bar to securing relief" set forth on the face of the Complaint.  *Drier*, 452 B.R. at 426.  Defendants' argument that diligent inquiry by Defendants would have been futile is pure conjecture that is easily disputed and fails this standard.  And Defendants' similar arguments as to value, another factually driven prong of the Section 550 affirmative defense, is also inappropriate for a final determination on a motion to dismiss barring highly unusual circumstances, which Defendants do not show exist here.  *See e.g. Fairfield Inv.*

*Fund*, 2021 WL 3477479, at *9 (stating that "[w]hether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial" and finding in that case that value was not shown on the face of the complaint); *id.* ("[a]s to whether the Defendants 'gave value' in the form of surrendering shares in the Fairfield Funds, such a determination cannot be made as a matter of law or fact at this stage.").

## **CONCLUSION**

The Trustee respectfully requests that the Court deny Defendants' Motion.

Dated:  May 13, 2022
      New York, New York

*/s/ Maximillian S. Shifrin*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Torello H. Calvani
Email: tcalvani@bakerlaw.com
Joanna F. Wasick
Email: jwasick@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com
Tara E. Turner
Email: tturner@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*