# EXHIBIT 8

*Confidential Private Placement Memorandum*

### FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Class A Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator**
*Citco Fund Services (Europe) B.V.*

CLASS A SHARES OF THE FUND MAY BE OFFERED TO PERSONS WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES AND TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF PENSION AND PROFIT SHARING TRUSTS, CHARITIES AND OTHER TAX-EXEMPT ENTITIES.

THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

*The date of this Confidential Private Placement Memorandum is as of July 1, 2003.*

**Fairfield Greenwich (Bermuda) Ltd.**

i

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560333

SECSEV2137283

SECSEV2137283

**COMMODITY POOL OPERATOR NO-ACTION RELIEF**

**PURSUANT TO NO-ACTION RELIEF ISSUED BY THE COMMODITY FUTURES TRADING COMMISSION, FAIRFIELD GREENWICH (BERMUDA) LTD. ("FGBL") IS NOT REQUIRED TO REGISTER, AND IS NOT REGISTERED WITH THE COMMISSION AS A CPO.  AMONG OTHER THINGS, THE NO-ACTION RELIEF REQUIRES THIS CPO TO FILE A CLAIM OF NO-ACTION RELIEF WITH THE NATIONAL FUTURES ASSOCIATION AND THE COMMISSSION.  IT ALSO REQUIRES THAT AT ALL TIMES EITHER:   (A) THE AGGREGATE INITIAL MARGIN AND PREMIUMS REQUIRED TO ESTABLISH COMMODITY INTEREST POSITIONS DOES NOT EXCEED TWO PERCENT OF THE LIQUIDATION VALUE OF THE POOL'S PORTFOLIO; OR (B) THE AGGREGATE NOTIONAL VALUE OF THIS POOL'S COMMODITY INTEREST POSITIONS DOES NOT EXCEED FIFTY PERCENT OF THE LIQUIDATION VALUE OF THE POOL'S PORTFOLIO.  YOU SHOULD ALSO KNOW THAT THIS REGISTRATION NO-ACTION RELIEF IS TEMPORARY.   IN THE EVENT THE COMMISSION ADOPTS A REGISTRATION EXEMPTION RULE THAT DIFFERS FROM THE NO-ACTION RELIEF, FGBL MUST COMPLY WITH THAT RULE TO BE EXEMPT FROM CPO REGISTRATION.  IF FGBL DETERMINES NOT TO COMPLY WITH THIS RULE, IT MUST EITHER REGISTER WITH THE COMMISSION OR CEASE HAVING THE POOL TRADE COMMODITY INTERESTS.  A REASONABLE OPPORTUNITY TO TRADE FOR LIQUIDATION ONLY WILL BE PROVIDED.**

ii

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE001560334
SECSEV2137284

SECSEV2137283

## CERTAIN GENERAL INFORMATION

The Class A Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sentry Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent of the Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

iii

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560335
SECSEV2137285

SECSEV2137283

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct, or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment.

This is a private offering made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

iv

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560336
SECSEV2137286

## TABLE OF CONTENTS

Page

CERTAIN GENERAL INFORMATION...................................................................................................iii

FUND DIRECTORY ........................................................................................................................... vi

SUMMARY………………………………………………………………………………………….1

THE FUND ........................................................................................................................................... 4

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS .......................................................4

INVESTMENT POLICIES .................................................................................................................... 8

OFFERING OF THE SHARES............................................................................................................. 10

FEES, COMPENSATION AND EXPENSES......................................................................................... 13

ESCROW BANK AND CUSTODIAN................................................................................................... 14

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ............................................................. 15

RISK FACTORS ................................................................................................................................. 16

POTENTIAL CONFLICTS OF INTEREST............................................................................................20

PRIOR TRADING RESULTS .............................................................................................................. 21

DESCRIPTION OF SHARES .............................................................................................................. 21

DIVIDEND POLICY........................................................................................................................... 21

TRANSFERS, REDEMPTIONS AND TERMINATION.......................................................................... 21

ANTI-MONEY LAUNDERING REGULATIONS................................................................................. 21

ANTI-MONEY LAUNDERING POLICIES ......................................................................................... 21

TAX CONSIDERATIONS AND EXCHANGE CONTROL .................................................................. 21

LEGAL MATTERS............................................................................................................................. 21

MISCELLANEOUS ............................................................................................................................ 21

COUNTRY-SPECIFIC NOTICES........................................................................................................ 21

APPENDIX A     FINANCIAL STATEMENTS

APPENDIX B     SUBSCRIPTION DOCUMENTS

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED     FGGE001560337
SECSEV2137287

SECSEV2137283

## FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Citco B.V.I. Limited<br>P.O. Box 662<br>Road Town, Tortola<br>British Virgin Islands<br>Telephone: (284) 494-2217<br>Facsimile: (284) 494-3917 |
| INVESTMENT MANAGER | Fairfield Greenwich (Bermuda) Ltd.<br>14 Par La Ville Road<br>3rd Floor<br>Hamilton, Bermuda<br>Telephone: 441-292-5401<br>Facsimile: 441-292-5413 |
| ADMINISTRATOR; REGISTRAR<br>AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>P.O. Box 7241  1007 JE Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2100<br>Facsimile: (31-20) 572-2610 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>488 Madison Avenue, 16th Floor<br>New York, New York 10022<br>USA |
| BRITISH VIRGIN ISLANDS COUNSEL | Conyers Dill & Pearman<br>Romasco Place, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>Amsterdam<br>The Netherlands |
| PAYMENT BANK | Citco Bank Nederland, N.V.<br>Telestone 8 – Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2200<br>Telecopier: (31-20) 572-2625 |

vi

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE001560338
SECSEV2137288

SECSEV2137283

CUSTODIAN

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Telecopier: (31-20) 572-2625

vii

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560339
SECSEV2137289

SECSEV2137283

*For the Exclusive Use of:*_____ *Copy No:*_____

## SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.*

### THE OFFERING

| | |
|---|---|
| **Issuer** | Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. |
| **Securities Offered** | Class A Shares (the "Shares") were sold on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been sold at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance. The Net Asset Value per Share on May 31, 2003 was $909.96, with total net assets of approximately $4.1 billion (subject to audit). The Fund also issues Class B Shares, which utilize the same investment strategy as the Class A Shares, but have a different fee structure. |
| **Offerees** | Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Persons") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax Exempt Investors"). See "OFFERING OF THE SHARES". |
| **Minimum Subscription** | The minimum initial subscription per investor is U.S. $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000. |
| **Maximum Capitalization** | The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 6,000,000. As of May 31, 2003, the Fund had 4,507,856 shares outstanding. |
| **Subscription Procedures** | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560340
                                                                            SECSEV2137290

SECSEV2137283

| | |
|---|---|
| **Solicitation of Subscriptions** | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents or other intermediaries. Such unaffiliated placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| **Business Objective** | The Fund will seek to achieve capital appreciation of its assets through the purchase and sale of securities principally by utilizing an options trading strategy described as "split strike conversion". See "INVESTMENT POLICIES". |
| **Investment Manager** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). FGBL expects to make application with the Bermuda Monetary Authority to become licensed as an investment provider and has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission.. |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is a Director of the Manager. |
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as escrow agent, administrator, registrar and transfer agent for the Fund. The Fund's escrow account is maintained at Citco Bank Nederland, N.V. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

2

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE001560341
SECSEV2137291

SECSEV2137283

SALE AND REDEMPTION OF SHARES

| | |
|---|---|
| **Redemption at the Option of a Shareholder** | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day (being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month.  There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares. |
| **Compulsory Redemption** | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time.   This right will only be exercised as to Shares where the continued holding of which would result in regulatory, pecuniary, legal, taxation, or material administrative disadvantage for the Fund or the shareholders as a whole. |
| **Sales** | Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1.   Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |
| **Exchange Listing** | The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a public trading market will develop for the Fund's shares and none has developed to date.   Shareholder redemption rights are not affected by this listing. |

COMPENSATION AND EXPENSES

| | |
|---|---|
| **Expenses** | The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.   In addition, the Fund will reimburse Fairfield Greenwich Advisors LLC, an affiliate of the Manager on a quarterly basis in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value of the Fund as of the last day of each calendar quarter (10 basis points per annum), for providing certain of administrative services and back-office support to the Fund. |

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE001560342

| | |
|---|---|
| **Performance Fee** | The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of any New High Net Profits (as defined under "FEES, COMPENSATION AND EXPENSES - Performance Fee") allocable to the Shares, subject to reduction in connection with certain offsets with respect to each Share. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such Shares were outstanding. The Performance Fee will only be paid on "new appreciation" in the Fund's Net Asset Value allocable to the Shares. |
| | In certain circumstances, the Performance Fee may be reduced for particular calendar quarters and the amount of the reduction repaid in subsequent calendar quarters (see "FEES, COMPENSATION AND EXPENSES – Performance Fee"). |
| | The Manager and the Fund may enter into an agreement pursuant to which the Manager may elect to defer payment of all or a portion of its Performance Fees. |

## THE FUND

### Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares as of the last business day of any month, or purchase additional shares as of the first business day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

### The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over thirty years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management

4

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560343

consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. He founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983. Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A. Mr. Schmid is a Director of Inter Asset Management Inc.

### The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda ("FGBL" or the "Manager"), which was incorporated on June 13, 2003. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its escrow agent, custodian, administrator, registrar and transfer agent. The Manager has an office at 14 Par La Ville Road, 3rd Floor, Hamilton, Bermuda; telephone number: 441-292-5401 ; fax: 441-292-5413. The Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which previously served as the investment manager of the Fund.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has approximately \$5.5 billion employed in alternative asset management funds. Throughout its history, the firm has internally managed alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE001560344
SECSEV2137294

SECSEV2137283

and subject to the supervision of FSA, and another FGG-affiliated entity is registered as a broker-dealer in the United States.

The Manager expects to make application with the Bermuda Monetary Authority to become licensed as a financial provider and has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission with respect to its operation of the Fund.

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is not liable for any error of judgment or for any loss incurred by the Fund, except a loss resulting from willful malfeasance, bad faith or gross negligence in the performance of its duties under such agreement. The Investment Management Agreement further provides that the Manager, its directors, officers, employees, agents and counsel will be indemnified and held harmless by the Fund against any and all claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such indemnified party, except to the extent an act or omission constitutes willful misconduct or reckless disregard of the duties of such indemnified party. The Investment Management Agreement may be terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.** His background is summarized above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGG's European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over twenty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Robert Blum** oversees or assists in all aspects of FGG's activities, and focuses on product creation as well as operational and related matters. Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena. He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General

6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560345
SECSEV2137295

SECSEV2137283

Counsel.  At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas.  Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989).  Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law School.

**Gregory Bowes** focuses on all aspects of new business development including manager selection.  He has eighteen years of experience in capital markets.  Before joining FGG in 2000, Mr. Bowes advised large pools of private capital at Morgan Stanley (1999-2000).  He previously managed the proprietary trading and broker-dealer operations for Greenwich NatWest in Europe (1997-1999).  Before that, he was responsible for Greenwich International (1993-1997), a fixed income arbitrage business and the European-based broker-dealer operation for Greenwich Capital Markets.  The combined businesses managed in excess of $10 billion in positions, long and short, across all G10 interest rate and derivative markets.  Previously, he worked in institutional sales and proprietary trading for Greenwich Capital (1987-1993).  Mr. Bowes began his career at Bankers Trust (1983-1987) in a variety of institutional capital markets positions.  He received his Bachelor of Arts degree from Bowdoin College.

**Harold Greisman** is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight.  Mr. Greisman has over fifteen years of experience in the investment business.  Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank.  Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982).  Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

FGL and certain of its principals have beneficial interests in the Fund.

The backgrounds of the Directors and key officers of the Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Manager.  His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Ian Pilgrim** is a Director of the Manager and is Managing Director of Citco Fund Services (Bermuda) Limited ("Citco Bermuda"), which performs administrative services for Manager.  He also serves as Citco Bermuda's General Counsel.  Prior to joining Citco Bermuda in January 2001, Mr. Pilgrim practiced from the beginning of 1997 until the end of 2000 as a Barrister & Attorney with M.L.H. Quin & Co. in Bermuda, specializing in the structuring and establishment of hedge funds and other collective investment vehicles. From 1994 to 1996, Mr. Pilgrim practiced as a solicitor with Allen & Overy in Hong Kong, where he was involved primarily in banking and project finance, and, prior to that, from 1991 to 1994, with Deacons in Hong Kong. Before moving to Hong Kong, Mr. Pilgrim practiced as a solicitor with the City of London law firm, Taylor Joynson Garrett.  Mr. Pilgrim was admitted to practice as a solicitor in England and Wales in 1989 and in Hong Kong in 1992. He was admitted to the Bar in Bermuda in 1998. He is a member of the Law Societies of England and Wales and Hong Kong and of the Bar of Bermuda.

**Amit Vijayvergiya** is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund.  He has been employed by the Manager since 2003.  Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research.  Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers.  From 1998 to

7

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560346
SECSEV2137296

SECSEV2137283

2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index , (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 45 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

### Other Investments

The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560347
                                                                             SECSEV2137297



                                                                             SECSEV2137283

that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters for certain Non-SSC Investment Losses. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES –Performance Fee".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

## Investment Restrictions

The Fund will observe the following investment restrictions:

a) no more than 10 percent of the Net Asset Value of the Fund will be invested in the equity or debt securities of any one issuer (other than any government or governmental agency);

b) the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c) no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty, in each case calculated at the time of investment;

d) no more than 10 percent of the Net Asset Value of the Fund may be invested in securities whose prices are not quoted;

e) no more than 10 percent of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

f) the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5 percent of such securities;

g) the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

h) the Fund will adhere to the general principle of diversification in respect of all of its assets;

9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560348
SECSEV2137298

SECSEV2137283

i)   the Fund will not invest directly in real property;

j)   the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) except with the consent of the custodian of the Fund's assets; and

k)   no more that 10 percent of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

## OFFERING OF THE SHARES

The Fund is offering up to 6,000,000 Shares. The initial offering price was U.S. $200 per Share on November 30, 1990. The Shares are currently offered at a price equal to the Net Asset Value per Share (as hereinafter defined) as of the opening of business on the date of issuance. As of May 31, 2003, the Net Asset Value per Share was $909.96 (subject to audit), with 4,507,550,856 Shares outstanding. The Fund also offers its Class B Shares, which utilize the same investment strategy as the Shares, but which have a different fee structure incident thereto.

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Investors") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax-Exempt Investors').

The minimum initial purchase by each subscriber is U.S. $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's escrow agent, Citco Fund Services (Europe) B.V. There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and other intermediaries, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar month prior to the third to the last business day of the month will be accepted, subject to the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 28 shall be accepted as of February 1. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a trading market in the Fund's

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560349
                                                                             SECSEV2137299


                                                                             SECSEV2137283

Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

## Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund, to the extent allocable to the relevant class of shares.

Notwithstanding the foregoing:

       (i)     in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

       (ii)    the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V., which will promptly notify the Irish Stock Exchange of the results of each such Net Asset Value calculation.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

       (a)    during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

       (b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

       (c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

       (d)    during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

11

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE001560350

SECSEV2137300

SECSEV2137283

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

### Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000 and is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Confidential Private Placement Memorandum, and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport, Naritaweg 165, 1043BW Amsterdam, P.O. Box 7241 1007 JE Amsterdam, The Netherlands; fax number (31-20) 572-2610. Subscription funds should be wire transferred to the Fund's escrow account at:

12

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED         FGGE001560351
                                                                            SECSEV2137301

SECSEV2137283

HSBC Bank USA
New York, NY
United States of America
SWIFT: Redacted US33
Fed Wire: 021 001 088

Account Name:          Citco Bank Nederland N.V., Dublin Branch
Account Number:       Redacted 6487
Swift:                Redacted IE2D

For Further Credit To:
Account Name:          Fairfield Sentry Limited – Class A
Account No.:             **Redacted**     0501
By Order of:           (Name of Subscriber)

In the event a subscriber cannot wire transfer funds, a check payable to "Fairfield Sentry Limited-Class A-Escrow Account" in U.S. dollars-denominated funds for the full purchase price of the Shares should be mailed to the Fund with the Subscription Agreement.

### FEES, COMPENSATION AND EXPENSES

#### Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities, all insurance expenses, all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund. The Fund pays an annual expense reimbursement to Fairfield Greenwich Advisors LLC, an affiliate of the Manager, on a quarterly basis, in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value on the last day of each calendar quarter (ten basis points per annum) of the Fund for providing certain administrative services and back-office support to the Fund.

#### Performance Fee

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the amount of any New High Net Profits allocable to the Shares. Shares which are purchased or redeemed during a calendar quarter shall have their Net Asset Value decreased by the payment of the Performance Fee only for the portion of the quarter during which such Shares were outstanding. New High Net Profits are defined as the excess, if any, of, respectively, (A) the Net Asset Value as of the last day of a calendar quarter (before the deduction of the current Performance Fee, if any, paid or payable) over (B) the difference between (i) the sum of (a) the highest Net Asset Value of the Shares as of the last day of any preceding calendar quarter during which such Share was outstanding, or the date of the initial closing of this offering (or if such Share was issued thereafter, as of the date of such issuance, whichever date the Net Asset Value was higher), and (b) the amount of any subscription proceeds for Shares issued as of, or subsequent to, the date thereof, and (ii) the amount of dividends, distributions and redemptions payable as of, or subsequent to, the date thereof, and losses, if any, associated with redeemed shares. IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE SHARES. No Share will be subject to the payment of a Performance Fee until all Shares have recouped their respective loss carryovers, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share. The Manager will reduce any Performance Fees otherwise payable to it by

13

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE001560352
SECSEV2137302

SECSEV2137283

offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of the Fund's interests in Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable by the Non-SSC Investment vehicles) (such excess being the "Non-SSC Investment Loss") the Manager will reduce its Performance Fee payable at subsequent quarter-end by an amount equal to the Non-SSC Investment Loss. The portion of the Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event that the Non-SSC Investment Loss is, in part or in whole, subsequently recouped by Non-SSC Investment vehicles, the Fund will pay the Manager such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to Performance Fees otherwise payable for any quarter.

Pursuant to its agreement with the Fund, the Manager may elect to defer payment of all or a portion of its Performance Fee.

### Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The Directors not affiliated with the Manager, of which there are at the present time two, will each be paid a fee of $25,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## ESCROW BANK AND CUSTODIAN

The Fund's escrow account is maintained at Citco Bank Nederland N.V. ("Citco Bank"). Citco Global Custody ("Citco Custody") has agreed to act as custodian of the Fund's assets. Bernard L. Madoff Investment Securities ("BLM" and, together with other qualified entities with which sub-custodial arrangements may be made, the "Sub-Custodians", and each, singularly, a Sub-Custodian") serve as sub-custodians for certain assets of the Fund. The underlying assets of the Non-SSC Investments managers are held pursuant to custodial arrangements with Goldman, Sachs & Co., Refco, LLC and other qualified entities.

Citco Custody has been appointed custodian to the Fund pursuant to a custodian agreement dated September 20, 1994 between and among the Fund, Citco Bank and Citco Custody (the "Custody Agreement"). Citco Custody currently has U.S.$36 billion under custody. Currently BLM has approximately 95% of the Fund's assets under custody. Citco Custody will be responsible for all of the assets of the Fund, other than the assets deposited with the Sub-Custodians. All assets under custody will be held by Citco Custody and/or a Sub-Custodian, as the case may be, in a separate client account and will be separately designated in the books and records of Citco Custody and the Sub-Custodians. Assets deposited as margin need not be segregated and may become available to the creditors of brokers.

Sub-custodians may be appointed by Citco Custody provided that Citco Custody shall exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. Citco Custody will also maintain an appropriate level of supervision over the sub-custodians and will make appropriate inquiries periodically to confirm

14

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560353
SECSEV2137303

SECSEV2137283

that the obligations of the sub-custodians continue to be competently discharged.  Any sub-custodian appointed will be paid at normal commercial rates.

Citco Custody shall not be liable in the event of loss of any assets held by a sub-custodian, provided that such sub-custodian exercised reasonable care and acted without gross negligence or willful misconduct.

The Custody Agreement provides that Citco Bank shall receive an annual fee of $35,000, plus actual sub-custodian charges and out-of-pocket expenses, together with a fee in the amount of $25 per transaction. The Custody Agreement may be terminated by any of the parties thereto on thirty days' prior written notice.  Pursuant to the Waiver and Indemnity Agreement between and among the Fund, Citco Bank and Citco Custody, dated April 20, 1995, the Fund has agreed to indemnify Citco Custody and Citco Bank against losses and liabilities arising out of the actions of certain sub-custodians of the Fund's assets which do not involve willful misconduct or gross negligence of Citco Bank or Citco Custody or a claim against a sub-custodian where either Citco Bank or Citco Custody do not carry out their responsibilities to the Fund with respect to such claim as set forth under the Custody Agreement.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) B.V. ("Citco") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors.  As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as:  accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required.  In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a rate of 5 basis points per annum.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations.  Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, dated February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim")which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement.  Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement.  The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

15

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE001560354
SECSEV2137304

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to the Fund's allocation of assets to SSC and Non-SSC Investments.

      1.    **Trading Risks.** Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices, as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options. A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed by or on behalf of the Fund cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

      2.    **Trading Strategies May Not be Successful.** There can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability. In that regard, certain of the managers receiving Non-SSC Investment allocations may not have investment records compiled while managing assets on their own. Profitable trading is often dependent on anticipating trends or trading patterns. In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades. There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur. Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability. Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

      3.    **Dependence Upon Principals and Key Employees of the Manager**. The services of the Manager's principals and key employees are essential to the continued operations of the Fund. If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Manager will allocate a small portion of the Fund's assets between and among the Non-SSC Investment managers. The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

16

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

4.    **Conflicts of Interest**.  The Manager and the Non-SSC Investment managers receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund.  Such activities could detract from the time that the Manager and its principals allocate to the affairs of the Fund.  The Manager will obtain certain business and financial benefits from the Fund's investments in the Non-SSC Investments which may result in a conflict of interest between the Manager and the Fund in the selection of, and allocation of assets between and among, the Non-SSC Investments.    See "POTENTIAL CONFLICTS OF INTEREST".

5.    **Custodian/Clearing Firm Loss or Insolvency**.  If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Fund was to become insolvent, the Fund could have some or all of these positions closed out without its consent.  In addition, all of the Fund's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions.    Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place.  Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Fund.

6.    **Competition**.  The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive.  Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies.  Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

7.    **Regulated Industries**.  The securities and commodities industries are highly regulated.  The Fund will not be directly subject to regulation by the SEC, national securities exchanges, the CFTC or the Federal Reserve Board.  However, the SEC and CFTC regularly review the practices and procedures of the securities and commodities industries, and the market place in general, and from time to time revises rules and regulations pertaining thereto.  The exchanges engage in similar reviews and at times revise their rules.  There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

8.    **Over-the-Counter Options Transactions.**  Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution.  Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

9.    **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

17

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560356
SECSEV2137306

SECSEV2137283

10.    **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.    **Combination Transactions**.  At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.    **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends.  Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.    **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

14.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.    **Incentive Compensation**.  The Non-SSC Investment managers will generally be compensated through incentive arrangements.  Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC

18

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE001560357
SECSEV2137307

SECSEV2137283

Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative. In most cases, however, the Fund anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual. Further, to the extent that the Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC Investment vehicles, the Net Asset Value of all Shares of the Fund then outstanding will be reduced, including Shares purchased after the reduction of the Performance Fee.

16.    **Risks of Leverage**.    The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies. A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses. Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

17.    **Possibility of Misappropriation of Assets**.    When the Fund invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.    **Sole Proprietor Non-SSC Investment Managers**.    Some of the Non-SSC Investment vehicles to which the Fund may allocate capital may consist of investment operations with only one principal. In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19.    **Experience of Non-SSC Investment Managers**.    While certain of the Non-SSC Investment Managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments. In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.    **Emerging Managers**.    As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues. For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel. Competing investment

19

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560358

managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

      21.    **Lack of Liquidity**.  Certain of the Fund's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of the Fund to withdraw capital from such investment. While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that the Fund will not sustain additional losses while such lock-up period remains in effect.

      22.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars. The Net Asset Value per Share is determined in U.S. dollars. Non-dollar investors are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency. In addition, a hedge may be established in anticipation of new subscribers. In the event such subscriptions are not made, the hedge position will be unwound and the transactions will be borne by the existing shareholders.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities. Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs. See also "RISK FACTORS".

In connection with the investment of Fund assets in Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Emerging Managers. The Manager will share with the Fund annually, through Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or n affiliate thereof in the businesses of Emerging Managers and (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount"). Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because the Fund was organized by affiliates of the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund. If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction out of the fees the Manager receives from the Fund. You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

20

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE001560359
SECSEV2137309

SECSEV2137283

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders. When allocating investment opportunities, the Manager will ensure that all such investments are allocated in a fair and equitable manner.

## PRIOR TRADING RESULTS

The Fund's securities trading activities are directed by the Manager. Set forth below are the prior trading results of the Fund since its inception, during which the Fund was managed by an affiliate of the Manager. The trading results of the other entities for which FGBL or its affiliates have directed trading, or with which they have otherwise been affiliated, may be obtained upon request.

### The Fund

The Fund allocates the predominant portion of its assets to a strategy described as "split strike conversion". (See "INVESTMENT POLICIES.") The Fund issued its shares at $200 per share as on November 30, 1990. As of May 31, 2003, Net Asset Value per Share was $916.36 (subject to audit). Prior performance is shown below on a monthly basis through May 31, 2003.

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| **1990** | | | | | | | |
| December | 4,363,400 | 8,157,216 | 0 | 123,779 | 12,644,395 | 2.84% | 61,478 |
| **1991** | | | | | | | |
| January | 12,644,395 | 0 | 0 | 388,941 | 13,033,336 | 3.08% | 61,478 |
| February | 13,033,336 | 0 | 0 | 190,582 | 13,223,918 | 1.46% | 61,478 |
| March | 13,223,918 | 605,364 | 315,447 | 77,222 | 13,591,057 | 0.58% | 62,818 |
| April | 13,591,057 | 1,799,968 | 0 | 189,610 | 15,580,635 | 1.40% | 71,023 |
| May | 15,580,635 | 0 | 0 | 293,006 | 15,873,641 | 1.88% | 71,023 |
| June | 15,873,641 | 4,848,334 | 0 | 58,587 | 20,780,562 | 0.37% | 92,636 |
| July | 20,780,562 | 0 | 0 | 423,819 | 21,204,381 | 2.04% | 92,636 |
| August | 21,204,381 | 0 | 0 | 226,959 | 21,431,340 | 1.07% | 92,636 |
| September | 21,431,340 | 5,533,746 | 793,533 | 170,115 | 26,341,668 | 0.79% | 112,964 |
| October | 26,341,668 | 0 | 0 | 742,835 | 27,084,503 | 2.82% | 112,964 |
| November | 27,084,503 | 0 | 0 | 21,668 | 27,106,171 | 0.08% | 112,964 |
| December | 27,106,171 | 5,514,647 | 21,703 | 441,219 | 33,040,334 | 1.63% | 135,489 |
| | | | **RATE OF RETURN: 18.57%** | | | | |
| **1992** | | | | | | | |
| January | 33,040,334 | 0 | 0 | 161,245 | 33,201,579 | 0.49% | 135,489 |
| February | 33,201,579 | 0 | 0 | 925,390 | 34,126,969 | 2.79% | 135,489 |
| March | 34,126,969 | 6,245,218 | 1,891,095 | 343,980 | 38,825,072 | 1.01% | 152,603 |
| April | 38,825,072 | 0 | 0 | 1,110,950 | 39,936,022 | 2.86% | 152,603 |
| May | 39,936,022 | 0 | 0 | -76,302 | 39,859,720 | -0.19% | 152,603 |
| June | 39,859,720 | 9,184,966 | 52,912 | 512,808 | 49,504,582 | 1.29% | 187,121 |
| July | 49,504,582 | 0 | 0 | -1,721 | 49,502,861 | 0.00% | 187,121 |
| August | 49,502,861 | 0 | 0 | 456,575 | 49,959,436 | 0.92% | 187,121 |
| September | 49,959,436 | 20,978,110 | 26,806 | 199,047 | 71,109,787 | 0.40% | 265,279 |
| October | 71,109,787 | 0 | 0 | 995,069 | 72,104,856 | 1.40% | 265,279 |
| November | 72,104,856 | 0 | 0 | 1,026,781 | 73,131,637 | 1.42% | 265,279 |
| December | 73,131,637 | 4,636,235 | 0 | 1,043,369 | 78,811,241 | 1.43% | 281,860 |

21

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560360
SECSEV2137310

SECSEV2137283

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| **RATE OF RETURN: 14.66%** | | | | | | | |
| **1993** | | | | | | | |
| January | 78,811,241 | 0 | 0 | -3,185 | 78,808,056 | 0.00% | 281,860 |
| February | 78,808,056 | 0 | 0 | 1,522,044 | 80,330,100 | 1.93% | 281,860 |
| March | 80,330,100 | 8,400,171 | 174,175 | 1,491,518 | 90,047,614 | 1.86% | 310,197 |
| April | 90,047,614 | 0 | 0 | 49,104 | 90,096,718 | 0.05% | 310,197 |
| May | 90,096,718 | 0 | 0 | 1,550,985 | 91,647,703 | 1.72% | 310,197 |
| June | 91,647,703 | 21,630,468 | 894 | 789,049 | 114,066,326 | 0.86% | 382,781 |
| July | 114,066,326 | 0 | 0 | 98,107 | 114,164,433 | 0.09% | 382,781 |
| August | 114,164,433 | 0 | 0 | 2,028,739 | 116,193,172 | 1.78% | 382,781 |
| September | 116,193,172 | 20,148,879 | 30,460 | 403,068 | 136,714,659 | 0.35% | 448,829 |
| October | 136,714,659 | 0 | 0 | 2,422,330 | 139,136,989 | 1.77% | 448,829 |
| November | 139,136,989 | 0 | 0 | 359,063 | 139,496,052 | 0.26% | 448,829 |
| December | 139,496,052 | 20,144,941 | 5,522,656 | 632,176 | 154,750,513 | 0.45% | 495,664 |
| **RATE OF RETURN: 11.66%** | | | | | | | |
| **1994** | | | | | | | |
| January | 154,750,513 | 2,499,475 | 0 | 3,373,291 | 160,623,279 | 2.18% | 503,499 |
| February | 160,623,279 | 3,744,520 | 300,070 | -575,550 | 163,492,179 | -0.36% | 514,335 |
| March | 163,492,179 | 11,896,109 | 1,747,663 | 2,478,735 | 176,119,360 | 1.52% | 545,785 |
| April | 176,119,360 | 0 | 0 | 3,198,300 | 179,317,660 | 1.82% | 545,785 |
| May | 179,317,660 | 6,489,179 | 0 | 945,192 | 186,752,031 | 0.53% | 565,536 |
| June | 186,752,031 | 19,912,627 | 10,049,903 | 513,368 | 197,128,123 | 0.27% | 595,215 |
| July | 197,128,123 | 2,644,775 | 3,306,812 | 3,510,400 | 199,976,486 | 1.78% | 593,251 |
| August | 199,976,486 | 3,502,115 | 0 | 838,982 | 204,317,583 | 0.42% | 603,597 |
| September | 204,317,583 | 11,949,985 | 8,944,492 | 1,678,318 | 209,001,394 | 0.82% | 612,412 |
| October | 209,001,394 | 3,009,728 | 165,160 | 3,936,829 | 215,782,791 | 1.88% | 620,593 |
| November | 215,782,791 | 4,272,314 | 1,342,682 | -1,194,329 | 217,518,094 | -0.55% | 629,065 |
| December | 217,518,094 | 8,349,741 | 13,253,982 | 1,437,665 | 214,051,518 | 0.66% | 614,975 |
| **RATE OF RETURN: 11.49%** | | | | | | | |
| **1995** | | | | | | | |
| January | 214,051,518 | 6,531,360 | 0 | 1,965,645 | 222,548,523 | 0.92% | 633,569 |
| February | 222,548,523 | 4,036,226 | 5,746,065 | 1,690,996 | 222,529,680 | 0.76% | 628,738 |
| March | 222,529,680 | 5,847,319 | 2,605,471 | 1,875,588 | 227,647,116 | 0.84% | 637,821 |
| April | 227,647,116 | 3,703,035 | 541,500 | 3,841,022 | 234,649,673 | 1.69% | 646,532 |
| May | 234,649,673 | 2,689,810 | 19,566 | 4,033,842 | 241,353,759 | 1.72% | 653,765 |
| June | 241,353,759 | 3,704,370 | 6,314,199 | 1,213,061 | 239,956,991 | 0.50% | 646,731 |
| July | 239,956,991 | 2,150,152 | 2,805,737 | 2,598,436 | 241,899,842 | 1.08% | 644,983 |
| August | 241,899,842 | 7,987,906 | 1,397,472 | -381,765 | 248,108,511 | -0.16% | 662,583 |
| September | 248,108,511 | 1,282,270 | 9,927,218 | 4,226,087 | 243,689,650 | 1.70% | 639,883 |
| October | 243,689,650 | 6,278,096 | 5,869,513 | 3,891,193 | 247,989,426 | 1.60% | 640,939 |
| November | 247,989,426 | 11,786,986 | 6,303,763 | 1,259,638 | 254,732,287 | 0.51% | 655,039 |
| December | 254,732,287 | 3,504,248 | 7,797,963 | 2,803,763 | 253,242,335 | 1.10% | 644,118 |
| **RATE OF RETURN: 12.96%** | | | | | | | |
| **1996** | | | | | | | |
| January | 253,242,335 | 5,112,706 | 8,125,743 | 3,770,800 | 254,000,098 | 1.49% | 636,552 |
| February | 254,000,098 | 4,326,423 | 2,796,660 | 1,852,111 | 257,381,973 | 0.73% | 640,358 |
| March | 257,381,973 | 7,631,216 | 5,905,689 | 3,159,206 | 262,266,706 | 1.23% | 644,599 |

22

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560361

SECSEV2137311

SECSEV2137283

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| April | 262,266,706 | 8,582,153 | 1,596,537 | 1,679,848 | 270,932,170 | 0.64% | 661,660 |
| May | 270,932,170 | 14,474,663 | 1,167,224 | 3,811,955 | 288,051,564 | 1.41% | 693,708 |
| June | 288,051,564 | 42,775,784 | 4,014,666 | 623,922 | 327,436,607 | 0.22% | 786,854 |
| July | 327,436,607 | 8,106,296 | 5,108,487 | 6,288,688 | 336,723,104 | 1.92% | 793,922 |
| August | 336,723,104 | 36,219,104 | 2,654,122 | 919,606 | 371,207,692 | 0.27% | 872,846 |
| September | 371,207,692 | 62,038,406 | 3,235,919 | 4,531,387 | 434,541,566 | 1.22% | 1,009,444 |
| October | 434,541,566 | 12,036,849 | 709,111 | 4,782,259 | 450,651,563 | 1.10% | 1,035,472 |
| November | 450,651,563 | 30,780,959 | 6,293,629 | 7,097,233 | 482,236,126 | 1.57% | 1,090,865 |
| December | 482,236,126 | 29,746,295 | 11,515,954 | 2,297,036 | 502,763,503 | 0.48% | 1,131,908 |
| **RATE OF RETURN: 12.97%** | | | | | | | |
| **1997** | | | | | | | |
| January | 502,763,503 | 43,243,168 | 9,536,924 | 12,300,790 | 548,770,537 | 2.45% | 1,205,981 |
| February | 548,770,537 | 39,643,333 | 1,057,113 | 4,014,291 | 591,371,048 | 0.73% | 1,290,157 |
| March | 591,371,048 | 64,512,292 | 6,494,470 | 5,097,281 | 654,486,151 | 0.86% | 1,415,649 |
| April | 654,486,151 | 42,440,532 | 4,216,998 | 7,629,767 | 700,339,452 | 1.17% | 1,497,373 |
| May | 700,339,452 | 31,659,013 | 787,664 | 4,421,919 | 735,632,720 | 0.63% | 1,562,964 |
| June | 735,632,720 | 69,112,559 | 6,804,423 | 9,893,080 | 807,833,936 | 1.34% | 1,693,613 |
| July | 807,833,936 | 52,481,196 | 8,178,631 | 6,041,458 | 858,177,959 | 0.75% | 1,785,804 |
| August | 858,177,959 | 36,666,097 | 21,752,715 | 2,965,872 | 876,057,213 | 0.35% | 1,816,730 |
| September | 876,057,213 | 27,840,464 | 9,288,074 | 20,947,631 | 915,557,234 | 2.39% | 1,854,305 |
| October | 915,557,234 | 29,687,157 | 4,818,657 | 5,081,365 | 945,507,099 | 0.56% | 1,904,394 |
| November | 945,507,099 | 24,605,224 | 9,721,179 | 14,717,179 | 975,108,323 | 1.56% | 1,933,913 |
| December | 975,108,323 | 30,971,574 | 24,902,843 | 4,122,122 | 985,299,175 | 0.42% | 1,945,897 |
| **RATE OF RETURN: 14.00%** | | | | | | | |
| **1998** | | | | | | | |
| January | 985,299,175 | 64,128,161 | 4,125,194 | 8,991,182 | 1,054,293,324 | 0.91% | 2,063,329 |
| February | 1,054,293,324 | 54,230,671 | 11,143,328 | 13,636,704 | 1,111,017,371 | 1.29% | 2,146,992 |
| March | 1,111,017,371 | 95,721,424 | 26,362,202 | 19,466,433 | 1,199,843,026 | 1.75% | 2,278,277 |
| April | 1,199,843,026 | 106,333,505 | 13,744,299 | 5,071,899 | 1,297,504,131 | 0.42% | 2,453,347 |
| May | 1,297,504,131 | 79,146,772 | 10,310,446 | 22,781,809 | 1,389,122,266 | 1.76% | 2,581,258 |
| June | 1,389,122,266 | 116,150,874 | 5,809,650 | 17,825,450 | 1,517,288,940 | 1.28% | 2,783,083 |
| July | 1,517,288,940 | 118,183,377 | 13,707,714 | 12,612,398 | 1,634,377,001 | 0.85% | 2,973,907 |
| August | 1,634,377,001 | 46,389,989 | 36,074,223 | 4,555,854 | 1,649,248,621 | 0.28% | 2,992,510 |
| September | 1,649,248,621 | 40,386,702 | 98,307,437 | 17,204,958 | 1,608,532,844 | 1.04% | 2,888,457 |
| October | 1,608,532,844 | 41,783,296 | 103,128,044 | 31,021,732 | 1,578,209,828 | 1.93% | 2,780,384 |
| November | 1,578,209,828 | 70,996,507 | 17,958,632 | 13,314,829 | 1,644,562,531 | 0.85% | 2,873,218 |
| December | 1,644,562,531 | 104,933,982 | 22,984,058 | 5,415,708 | 1,731,928,163 | 0.33% | 3,013,350 |
| **RATE OF RETURN: 13.42%** | | | | | | | |
| **1999** | | | | | | | |
| January | 1,731,928,163 | 45,092,968 | 18,524,174 | 35,594,045 | 1,794,091,002 | 2.06% | 3,061,038 |
| February | 1,794,091,002 | 111,903,663 | 20,600,407 | 3,148,148 | 1,888,542,407 | 0.18% | 3,126,576 |
| March | 1,888,542,407 | 91,072,350 | 128,559,324 | 43,277,106 | 1,894,332,539 | 2.29% | 3,154,158 |
| April | 1,894,332,539 | 111,884,699 | 4,451,465 | 6,774,495 | 2,008,540,268 | 0.36% | 3,332,402 |
| May | 2,008,540,268 | 58,868,950 | 18,051,157 | 30,391,176 | 2,079,749,237 | 1.51% | 3,399,115 |
| June | 2,079,749,237 | 62,267,285 | 19,845,772 | 36,687,904 | 2,158,858,654 | 1.76% | 3,466,605 |
| July | 2,158,858,654 | 59,033,936 | 19,938,726 | 9,189,869 | 2,207,143,733 | 0.43% | 3,529,768 |
| August | 2,207,143,733 | 45,330,076 | 9,376,222 | 20,742,718 | 2,263,840,305 | 0.94% | 3,589,145 |
| September | 2,263,840,305 | 42,067,369 | 41,179,552 | 16,517,273 | 2,281,245,395 | 0.73% | 3,587,770 |

23

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560362
SECSEV2137312

SECSEV2137283

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| October | 2,281,245,395 | 77,425,625 | 17,954,855 | 25,426,891 | 2,366,143,055 | 1.11% | 3,680,638 |
| November | 2,366,143,055 | 57,783,705 | 31,873,529 | 38,078,419 | 2,430,131,650 | 1.61% | 3,720,304 |
| December | 2,430,131,650 | 47,002,695 | 21,613,195 | 9,506,086 | 2,465,027,236 | 0.39% | 3,759,022 |
| | | | **RATE OF RETURN: 14.19%** | | | | |
| **2000** | | | | | | | |
| January | 2,465,027,236 | 64,235,939 | 27,573,080 | 54,317,122 | 2,556,007,217 | 2.20% | 3,813,277 |
| February | 2,556,007,217 | 91,327,878 | 113,405,417 | 5,086,674 | 2,539,016,352 | 0.20% | 3,780,849 |
| March | 2,539,016,352 | 108,078,165 | 127,090,606 | 46,758,544 | 2,566,762,455 | 1.84% | 3,753,050 |
| April | 2,566,762,455 | 61,042,682 | 56,082,334 | 8,679,314 | 2,580,402,117 | 0.34% | 3,760,278 |
| May | 2,579,848,257 | 110,459,522 | 52,948,330 | 35,235,908 | 2,672,595,357 | 1.37% | 3,841,931 |
| June | 2,672,595,357 | 101,530,419 | 66,558,421 | 21,295,802 | 2,728,863,156 | 0.80% | 3,892,028 |
| July | 2,729,207,613 | 81,613,273 | 34,447,095 | 17,611,761 | 2,793,985,552 | 0.65% | 3,959,359 |
| August | 2,793,985,552 | 73,391,209 | 30,460,213 | 36,993,561 | 2,879,910,109 | 1.32% | 4,027,863 |
| September | 2,879,910,109 | 104,779,206 | 35,286,623 | 7,288,186 | 2,956,690,877 | 0.25% | 4,124,810 |
| October | 2,956,690,877 | 90,181,025 | 45,966,847 | 27,324,857 | 3,028,229,913 | 0.92% | 4,185,928 |
| November | 3,028,229,913 | 85,384,090 | 71,253,618 | 20,728,720 | 3,063,089,104 | 0.68% | 4,205,328 |
| December | 3,063,089,104 | 67,674,660 | 42,216,458 | 13,044,480 | 3,101,591,786 | 0.43% | 4,240,131 |
| | | | **RATE OF RETURN: 11.55%** | | | | |
| **2001** | | | | | | | |
| January | 3,101,591,786 | 62,278,433 | 27,649,620 | 68,561,629 | 3,204,782,228 | 2.21% | 4,286,448 |
| February | 3,204,782,228 | 52,531,167 | 33,018,838 | 4,568,911 | 3,228,863,468 | 0.14% | 4,312,508 |
| March | 3,228,863,468 | 79,380,350 | 104,005,191 | 6,575,710 | 3,240,814,337 | 1.13% | 4,279,988 |
| April | 3,240,814,337 | 76,560,499 | 34,333,422 | 42,918,485 | 3,325,959,900 | 1.32% | 4,335,026 |
| May | 3,325,959,900 | 95,021,952 | 45,442,877 | 10,765,692 | 3,386,304,666 | 0.32% | 4,339,439 |
| June | 3,386,304,666 | 9,379,518 | 120,636,949 | 7,919,722 | 3,365,966,958 | 0.23% | 4,362,812 |
| July | 3,365,966,958 | 88,048,536 | 46,396,925 | 14,912,075 | 3,422,530,644 | 0.44% | 4,416,561 |
| August | 3,422,530,644 | 16,431,369 | 38,447,533 | 34,398,818 | 3,434,913,298 | 1.01% | 4,388,433 |
| September | 3,434,913,298 | 11,206,536 | 27,034,199 | 25,001,765 | 3,444,087,399 | 0.73% | 4,368,358 |
| October | 3,444,087,399 | 41,274,678 | 40,829,146 | 44,190,756 | 3,488,723,687 | 1.28% | 4,368,916 |
| November | 3,488,723,687 | 27,125,482 | 27,125,543 | 42,195,913 | 3,530,919,539 | 1.21% | 4,368,916 |
| December | 3,530,919,539 | 47,352,122 | 30,412,928 | 6,646,084 | 3,554,504,763 | 0.19% | 4,389,875 |
| | | | **RATE OF RETURN: 10.69%** | | | | |
| **2002** | | | | | | | |
| January | 3,554,504,763 | 50,956,862 | 27,476,760 | 1,128,253 | 3,579,113,117 | 0.03% | 4,418,874 |
| February | 3,579,113,117 | 20,411,839 | 22,326,660 | 21,371,287 | 3,598,569,582 | 0.60% | 4,416,510 |
| March | 3,598,569,582 | 37,040,351 | 14,197,008 | 16,499,072 | 3,637,911,997 | 0.46% | 4,444,545 |
| April | 3,637,911,997 | 45,842,039 | 28,057,623 | 42,370,556 | 3,698,066,968 | 1.16% | 4,466,273 |
| May | 3,698,066,968 | 18,283,875 | 76,412,970 | 77,039,592 | 3,716,977,465 | 2.12% | 4,396,071 |
| June | 3,716,977,465 | 32,951,087 | 28,637,145 | 9,665,470 | 3,730,956,877 | 0.26% | 4,401,173 |
| July | 3,730,956,877 | 83,125,986 | 39,604,398 | 126,728,363 | 3,901,206,828 | 3.36% | 4,452,513 |
| August | 3,901,206,828 | 46,046,044 | 64,614,418 | -2,165,035 | 3,880,473,419 | -0.06% | 4,431,320 |
| September | 3,880,473,419 | 104,397,742 | 74,031,004 | 4,902,961 | 3,915,743,118 | 0.13% | 4,465,998 |
| October | 3,915,743,118 | 146,271,626 | 52,713,221 | 29,222,211 | 4,038,523,735 | 0.73% | 4,572,703 |
| November | 4,038,523,735 | 42,572,701 | 50,159,834 | 6,538,396 | 4,037,474,997 | 0.16% | 4,564,112 |
| December | 4,037,474,997 | 33,066,358 | 30,751,706 | 2,536,239 | 4,042,325,888 | 0.06% | 4,566,729 |
| | | | **RATE OF RETURN: 9.32%** | | | | |

24

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE001560363
SECSEV2137313

SECSEV2137283

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Outstanding |
|---|---|---|---|---|---|---|---|
| **2003** | | | | | | | |
| January | 4,042,325,888 | 71,987,001 | 31,851,602 | -11,080,942 | 4,071,380,346 | -0.27% | 4,612,071 |
| February | 4,071,380,346 | 34,780,792 | 15,575,154 | 1,513,057 | 4,092,099,042 | 0.04% | 4,633,827 |
| March | 4,092,099,042 | 29,036,976 | 46,448,391 | 97,675,974 | 4,172,363,600 | 1.97% | 4,614,111 |
| April | 4,172,363,600 | 70,917,092 | 103,023,261 | 6,774,620 | 4,146,948,369 | 0.10% | 4,578,456 |
| May | 4,146,948,369 | 16,396,566 | 80,304,016 | 47,509,937 | 4,130,550,856 | 0.95% | 4,507,554 |

RATE OF RETURN 2.80% (5 Months)

**NOTES TO TABLE**

1) Beginning Net Asset Value represents the sum of cash, cash equivalents and equity balances in trading accounts accounted for at fair market value. Beginning Net Asset Value is the same as the previous reporting period's Ending Equity.

2) Additions are the sum of capital contributions as of the last day of the reporting period.

3) Withdrawals are the sum of partial or total withdrawals of capital as of the last day of the reporting period.

4) Net Profit/Loss is the sum of the profits and losses realized from trading activities during the reporting period net of the quarterly performance fee (20% of new high net profits) and other expenses for the reporting period, which has been allocated monthly for purposes of this chart.

5) Ending Equity is the sum of Beginning Net Asset Value plus additions, minus withdrawals, and Net Profit/(Loss) for the reporting period. Ending Equity is the Beginning Net Asset Value for the following reporting period.

6) Rate of Return is calculated by dividing Net Profit/(Loss) for the reporting period by the Beginning Net Asset Value for that reporting period. The cumulative Rate of Return figures which appear at the end of each year are calculated by applying on a compound basis each of the monthly or quarterly rates of return for such year to the Beginning Net Asset Value at the beginning of such year, not by adding or averaging the rates of return.

**DESCRIPTION OF SHARES**

The Fund is authorized to issue up to 10,000,000 shares in two classes (6,000,000 Class A Shares and 4,000,000 Class B Shares) with a par value of U.S. $.01 each. The Fund has an authorized share capital of U.S. $100,000. The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

**DIVIDEND POLICY**

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any. Any distributions made will be in accordance with the policies of the Irish Stock Exchange, which provide that a dividend payment may only be made out of the Fund's accumulated net income plus the net of accumulated realized and unrealized capital gains and accumulated net realized and unrealized capital losses.

25

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560364
SECSEV2137314

SECSEV2137283

## TRANSFERS, REDEMPTIONS AND TERMINATION

### Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH CALENDAR MONTH ON FIFTEEN (15) CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund will constitute grounds for compulsory redemption of the Shares concerned. Such consent may only be withheld if the transfer would result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.

THE DISPOSITION OF SHARES TO U.S. PERSONS (INCLUDING U.S.TAX-EXEMPT INVESTORS AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

### Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

### Compulsory Redemption

The Fund reserves the right to make compulsory redemption where the holding of such Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

### Redemptions - General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then, in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing

26

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560365
SECSEV2137315

positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in full within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES- Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

## Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or Administrator's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the account and the source of the payment.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

27

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560366
SECSEV2137316

SECSEV2137283

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations. Such countries are the 15 EU countries, being Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, together with Australia, Canada, Channel Islands, Hong Kong, Iceland, Isle of Man, Japan, New Zealand, Norway, Singapore, Switzerland and the United States and Turkey.

Prospective investors who DO NOT make the subscription payment from an account held in their own name at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

28

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560367
SECSEV2137317

SECSEV2137283

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI and the Bank of England. Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the BVI, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not persons resident in the BVI are also exempt from the provisions of the Income Tax Act of the BVI. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

29

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560368
SECSEV2137318

SECSEV2137283

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund. The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

### Non-U.S. Investors

In addition, with respect to Shares held by Non-U.S. Persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund.

### U.S. Tax-Exempt Investors

As noted above, Shares may be sold to a limited number of U.S. Tax-Exempt Investors which are pension and profit sharing trusts or other tax exempt organizations. The Fund is a "passive foreign investment company" ("PFIC") as defined in Code Section 1297. Under present law, assuming a U.S. Tax-Exempt Investor does not borrow money or otherwise utilize leverage in connection with its acquisition of Shares, any dividends from the Fund or gain on the sale or redemption of Shares should not constitute "unrelated debt-financed income" as defined in Code Section 512 to the U.S. Tax-Exempt Investor and should not be subject to United States federal income tax under the PFIC provision of the Code.

### ERISA Matters

The Fund will not accept any contributions from investors that are "benefit plan investors" as defined in U.S. Department of Labor Regulation 2510.3-2101, pension plans or similar pension or retirement trusts (all such entities are herein referred to as "Plans") if after such contribution the Shares in the Fund held by the Plan would be 25% or more of the total outstanding shares of any class of shares in the Fund. If the shares in the class held by the Plans were to exceed this 25% limit, then the Fund's assets would be considered "plan assets" under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which could result in adverse consequences to the Manager and the fiduciaries of the Plans.

30

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560369
SECSEV2137319

SECSEV2137283

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022. Matters with respect to the laws of the British Virgin Islands have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses and the Irish Stock Exchange, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive an unaudited interim report with respect to the Fund's financial performance within four months from the end of June of each year.

1) **General**

   a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

   b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

   c) Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

   d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of the Manager.

   e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

   f) None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

   g) As of the date of this Confidential Private Placement Memorandum, the Shares have commenced operations, but no dividends have been declared.

31

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560370
SECSEV2137320

SECSEV2137283

h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

2) **Litigation and Arbitration**

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

3) **Memorandum and Articles of Association**

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI. As such, the Fund may carry on business as an investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency or deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay, all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

4) **Directors**

a) The number of Directors shall not be less than one (1) or more than twenty (20).

b) The remuneration of Directors shall be fixed from time to time by the Board.    Currently the Director who is affiliated with the Manager does not receive compensation as a Director. The two Directors not affiliated with the Manager are each paid $25,000 per annum.

c) None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of the Manager.

d) There is no retirement age for Directors.

e) The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

32

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560371
SECSEV2137321

SECSEV2137283

f) The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g) The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h) No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

**5) Borrowing Powers**

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

**Documents Available for Inspection**

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands and the offices of the Sponsoring Broker during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund;

c) the British Virgin Islands Mutual Funds Act, 1996;

33

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560372
SECSEV2137322

SECSEV2137283

d)  when available, the latest financial statements of the Fund;

e)  audited accounts as of the close of the last immediately fiscal year;

f)  Auditors letter of consent; and

g)  a list of all past and present directorships and partnerships held by each Director over the past five years.

## COUNTRY-SPECIFIC NOTICES

Australia.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

Bahamas.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

Belgium.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

Brazil.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

British Columbia and Ontario, Canada.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages

34

that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser. The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

British Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands. No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

France. "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse. Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France. Les investisseurs doivent agir pour leur propre compte. Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant." This Memorandum has not been submitted to the Commission des Operations de Bourse in France. Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account. The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

35

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560374
SECSEV2137324

SECSEV2137283

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany.  Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy.  The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part.  The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

36

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560375
                                                                              SECSEV2137325


                                                                              SECSEV2137283

Japan.    Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person. Furthermore, disclosure under the SEL has not been made. The Shares will not be registered under the SEL.  The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey.    The Memorandum relates to a private placement and does not constitute an offer to the public in Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought for the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person.  The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.    The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.    Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.    The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.    The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands. In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560376
                                                                          SECSEV2137326


                                                                              SECSEV2137283

Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand. The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway. The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman. The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund. Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted. Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama. The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia. The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore. The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa. The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain. This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland. This Memorandum has been prepared for private information purposes of interested investors only. It may not be used for and shall not be deemed a public offering of Shares. No application has been made under Swiss law to publicly market the Fund in or out of Switzerland. The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly. Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland. This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

38

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE001560377
SECSEV2137327

SECSEV2137283

United Kingdom.   The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act"). The promotion of the Fund and the distribution of this Prospectus in the United Kingdom is accordingly restricted by law.

The content of this Prospectus has not been approved by an authorized person and such approval is, save where this Prospectus is directed at or issued to the types of person referred to above, required by Section 21 of the Act. Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability. Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay.   The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

39

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560378
SECSEV2137328

SECSEV2137283

**APPENDIX A**

**FINANCIAL STATEMENTS**

**FAIRFIELD SENTRY LIMITED**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE001560379
SECSEV2137329

SECSEV2137283

**APPENDIX B**

**SUBSCRIPTION DOCUMENTS**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560380
SECSEV2137330

## FAIRFIELD SENTRY LIMITED SUBSCRIPTION DOCUMENTS

**Instructions**

A. **All subscribers**. Provide all information requested in the Subscription Agreement and execute in the appropriate place on the signature page.

B. **Items to be delivered by All Subscribers**.

    (i)  Completed and signed Subscription Agreement.

    (ii)  U.S. dollar denominated funds in the amount of the full purchase price for Shares. Wire transfer funds for the full amount of the subscription to the Fund's escrow account at:

|  |  |
|---|---|
| | HSBC Bank USA |
| | New York, NY |
| | United States of America |
| | SWIFT: Redacted US33 |
| | Fed Wire:  021 001 088 |
| Account Name: | Citco Bank Nederland N.V., Dublin Branch |
| Account Number: | Redacted 6487 |
| Swift: | Redacted IE2D |

For Further Credit To:
| | |
|---|---|
| Account Name: | Fairfield Sentry Limited – Class A |
| Account No.: | **Redacted**   0501 |
| By Order of: | (Name of Subscriber) |

    (iii) Subscription documents should be delivered or sent by courier to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 –Teleport, Naritaweg 165, 1043 BW Amsterdam, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands; fax no.: (31-20) 572-2610.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

Name of Subscriber: _____

Amount of Subscription: $_____

## SUBSCRIPTION AGREEMENT

## (NON-UNITED STATES OF AMERICA SUBSCRIBERS ONLY)

## FAIRFIELD SENTRY LIMITED

## CLASS A SHARES - ONLY

Fairfield Sentry Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile: (31-20) 572-2610

Dear Sirs:

1.    Subscription.  The undersigned ("Subscriber") hereby subscribes for voting, participating Class A Shares, each with a par value U.S. $0.01 per share (the "Shares") of Fairfield Sentry Limited (the "Fund"), an international business company organized under the laws of the Territory of the British Virgin Islands ("BVI").  The Shares will be offered at the net asset value ("Net Asset Value") per Share as of the opening of business on the effective date of purchase.  The Shares have identical rights and privileges in all respects (including the right to one vote per Share).  All capitalized terms used in this Subscription Agreement (the "Agreement") that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum dated July 1, 2003 (as amended from time to time, the "Memorandum").  Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above.  Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents").  All references herein to "dollars" or "$" are to U.S. dollars.

2.    Acceptance or Rejection.  If the Fund accepts this subscription, Subscriber shall become a shareholder of the Fund and be bound by the Fund Documents.  The minimum initial subscription is $100,000.  The Board of Directors, in consultation with Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), may reject a subscription for any reason or no reason.  Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.  If rejected, the Fund shall promptly return the subscription funds, with any interest actually earned thereon, and this Agreement shall be void.

3.    Payment of Subscription Funds.  Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Agreement to the Fund.  In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560382

"Administrator"), the sample bank letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf of the subscriber.

|  | HSBC Bank USA |
|---|---|
|  | New York, NY |
|  | United States of America |
|  | SWIFT: Redacted DUS33 |
|  | Fed Wire:  021 001 088 |
| Account Name: | Citco Bank Nederland N.V., Dublin Branch |
| Account Number: | Redacted 6487 |
| Swift: | CITCIE2D |

| For Further Credit To: |  |
|---|---|
| Account Name: | Fairfield Sentry Limited – Class A |
| Account No.: | Redacted        0501 |
| By Order of: | (Name of Subscriber) |

4.      Delivery of Subscription Agreement.   Subscriber should fax and mail an executed, completed copy of this Agreement to the Administrator at the above facsimile number and address, with a copy to the Manager at Fairfield Greenwich (Bermuda) Ltd., Par La Ville Place, 14 Par La Ville Road, 3rd Floor, Hamilton, Bermuda.

5.      Status Representations.

a.      SEC Regulation S.   Subscriber is not a "U.S. Person" under Regulation S of the U.S. Securities and Exchange Commission (adopted under the U.S. Securities Act of 1933, as amended (the "1933 Act")) because (a) if an individual, Subscriber is not a resident of the United States of America or its territories or possessions (the "U.S.") or "resident alien" as defined under the U.S. income tax laws, and (b) if an entity, Subscriber is not any of the following: (i) a partnership or corporation organized or incorporated under U.S. law; (ii) an estate of which any executor or administrator is a U.S. Person; (iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors as defined in Rule 501 under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

Subscriber acknowledges that, except with the consent of the Fund, the Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of the Fund, the Subscriber will not resell, reoffer or transfer any Shares or any interest therein to any person, including a U.S. Person or any non-U.S. Person subject to the above restrictions.  Subscriber acknowledges that reoffers, resales or any transfer of the Shares is subject to the limitations imposed by the Fund's Articles of Association and may be made only in compliance with applicable securities laws and only with the prior written consent of the Board of Directors which may, in its sole discretion, decline to issue any Shares to, or register Shares in the name of, any person, and the Subscriber will not transfer any of its Shares except on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are eligible to purchase Shares in

2

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED            FGGE001560383
SECSEV2137333

the Fund as described above and in the Memorandum. Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

      b.    CFTC Regulation 4.7. Subscriber is not a "U.S. Person" under Regulation 4.7 of the U.S. Commodity Futures Trading Commission (adopted under the U.S. Commodity and Exchange Act of 1974, as amended) ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons", as defined in Rule 4.7; (iii) an estate or trust the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

      c.    Professional Investor Status. Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI and the Irish Stock Exchange, because Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000 or, (in the case of an institution) $5,000,000, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund, and Subscriber warrants that he has such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of the risks and can bear the loss of the entire investment in the Fund.

      d.    Employee Benefit Plans. Investment in the Fund by "Employee Benefit Plans", as defined under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may be limited to less than 25% of the total capital of the Fund (excluding investments by the Investor). To help determine whether investment by Subscriber is included in the 25% limitation, Subscriber has initialed here (_____) if it is an Employee Benefit Plan (such as a retirement account, corporate pension or profit sharing plan, or governmental retirement plan). If the Subscriber at any time becomes an Employee Benefit Plan, the Subscriber shall forthwith inform this to the Fund.

If the Subscriber is an insurance company investing the assets of its general account in the Fund, less than 25% of the Subscriber's general account constitutes assets of an Employee Benefit Plan (as determined under Section 401(c) of ERISA). If the Subscriber is such an entity and at any time 25% or more of its general account constitute assets of an Employee Benefit Plan, the Subscriber shall forthwith disclose to the Fund the amount of Employee Benefit Plan assets held in its general account. By signing this Subscription Agreement, the Subscriber expressly acknowledges that the Fund may require that the Subscriber redeem its Shares and withdraw from the Fund if 25% or more of the Subscriber's general account constitutes assets of an Employee Benefit Plan.

      6.    Related Professionals.
          (Subscriptions cannot be accepted if this section is not completed)

Please indicate the name of the person at the Fairfield Greenwich Group with whom this subscription is associated.
Name: _____

Please indicate the name, if applicable, of the person and/or entity who acts as an advisor with respect to this subscription.

Name of Advisor:
_____

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560384
SECSEV2137334


SECSEV2137283

Name of Advisor's firm or organization:

_____

Not Applicable: _____

      7.     Receipt of Fund Documents and Other Documents. Subscriber has received and read a copy of the Memorandum. Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely upon the Fund Documents and independent investigations made by Subscriber and has not relied on any representation inconsistent with the information in the Fund Documents. Subscriber is not relying on the Fund, the Fund's Board of Directors, administrator, the Investment Manager, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

      8.     Subscriber Sophistication and Financial Condition. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements within the Subscriber's own country (countries) regarding a purchase of the Shares. Subscriber is not relying on the Fund or the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of Shares and has determined that the Shares are a suitable investment for the Subscriber. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity.

Subscriber understands that (a) the Fund's operating history is not a prediction of its future success; (b) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (c) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

4

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE001560385
SECSEV2137335

9.      Redemptions.  Subscriber is aware of the limited provisions for redemptions and has read the section in the Memorandum entitled "Transfers, Redemptions and Termination."  Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time.  Subscriber understands that the Fund will generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 business days prior to the Redemption Date.

10.      Valuations.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

11.      Beneficial Owner.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) the Investment Manager, on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from the Investment Manager to the particular placement agent for the introduction, out of the fees the Investment Manager receives from the Fund.

12.      Investment Intent.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

13.      Subsequent Subscriptions.  If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares.

14.      Registration of Shares; Certificates.  The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee.  Shares will be issued in registered, book-entry form.

15.      Binding Nature of Agreement.  This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns.  The Agreement shall survive the acceptance of the subscription.  If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

16.      Governing Law.  This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions.

17.      Legal Representation.  Subscriber understands that the Law Offices of Andrew E. Goldstein acts as U.S. counsel to the Fund, and as counsel to the Investment Manager and its affiliates. Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, the Law Offices of Andrew E. Goldstein will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

18.      Authority.  Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber.  The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal

5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560386
SECSEV2137336

SECSEV2137283

competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

19.    New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of theNew York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

20.    Office of Foreign Assets Control. (A)    Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B)    Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, Subscriber reasonably believes that no such beneficial

---

[1]    The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2]    Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3]    Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4]    Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation; (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor  trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity. If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners. If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560387

owners are Prohibited Persons, (c) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and (d) it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

(C)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(D)     Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E)     If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

21.     Anti-Money Laundering.  Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal conduct or activity. Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money laundering, the Administrator may require a detailed verification of Subscriber's identity. Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary. These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations. For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth. In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors. The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber. In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided. Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption or Subscriber's rejection if such information as has been required by the parties referred to has not been provided by Subscriber.

22.     Confidentiality.  The Fund may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

7

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560388
SECSEV2137338

SECSEV2137283

23.    Indemnification.  Subscriber agrees to indemnify and hold harmless the Fund and any of its service providers, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to (a) any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription or (b) any action for securities law violations instituted by Subscriber which is finally resolved by judgment against Subscriber.

Subscriber acknowledges that each director and officer of the Fund is entitled to be indemnified out of the assets of the Fund against all costs, losses or expenses arising from mistakes of judgement or any action or inaction that the person reasonably believed to be within the scope of the authority granted to him, provided that such actions or inactions did not constitute gross negligence, willful misconduct or breach of fiduciary duty.

24.    Enforceability.  If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

25.    Currencies.  If Subscriber subscribes in a currency other than U.S. Dollars, Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

26.    Appointment of Revocable Proxy.  Subscriber hereby designates and appoints the Administrator, with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by shareholders present in person at that meeting.  This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of Shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a shareholder) received before the meeting.

27.    If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund, the Investment Manager and the Administrator and their respective directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an

8

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560389
SECSEV2137339

SECSEV2137283

agent of the Fund; and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules, and an "accredited investor" under Regulation D promulgated under the 1933 Act and a "qualified purchaser" under the Investment Company Act of 1940 and is eligible to receive "hot issues" because it is not a restricted person as contemplated under the rules of the National Association of Securities Dealers, Inc. Subscriber also agrees to indemnify the Fund, the Investment Manager and their respective officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

28.   Country-Specific Disclosures. Subscriber has reviewed the country-specific disclosures in the Memorandum.

29.   Additional Information. The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares, and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold Shares or to enable the Fund to determine its compliance with applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of the information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

30.   Subscriber Information and Execution.

a.   Amount of Subscription. U.S. \$_____.

b.   Registration of Shares. The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

_____

_____

c.   Written Communications. All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

d.   Telephone, Fax and Email. Telephone: _____

Fax: _____   Email: _____

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED     FGGE001560390
SECSEV2137340

SECSEV2137283

e.   <u>Domicile, Etc.</u>   Subscriber, if an individual, is a citizen of _____

_____ and a resident of _____.  Subscriber, if an entity, is

organized under the laws of _____ and has its principal place of business in

_____.

f.   <u>Authorized Persons</u>.  The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below.  Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile.  If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising as to any of them as a result of any of them acting upon facsimile instructions.  The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

g.   <u>Redemption Payments</u>.  Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: _____

Bank address: _____

ABA or CHIPS number: _____

Account name: _____

Account number: _____

For further credit: _____

10

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE001560391
SECSEV2137341

SECSEV2137283

    h.    <u>Financial Institution Wiring/Paying Subscription Monies</u>.

Name: _____

Address: _____

Name of account at financial institution being debited for subscription payment: _____

Number of such account: _____

    i.    <u>Execution</u>. In witness whereof, Subscriber has executed this Agreement on the date set forth below:

Date: _____, 200_

<u>For individuals</u>

Print name: _____

Signature: _____

<u>For entities</u>

Print name: _____

Print name of authorized signatory: _____

Print title of authorized signatory: _____

Signature: _____

11

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

## SCHEDULE A

PLEASE GIVE THIS LETTER TO YOUR FINANCIAL INSTITUTION AND HAVE THEM RETURN IT TO THE ADMINISTRATOR AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE WIRED.

## SAMPLE LETTER

[to be placed on letterhead of the financial institution remitting payment]

Date

**Via mail and facsimile:** (31-20) 572-2610
Fairfield Sentry Limited
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Dear Sirs

**RE:    FAIRFIELD SENTRY LIMITED (the "Fund") – CLASS A**

1.    Name of Remitting Financial Institution:
2.    Address of Remitting Financial Institution:
3.    Name of Customer:
4.    Address of Customer:
5.    We have credited your account at [Bank], Account Number [number] for [amount] by order of [subscriber] on [date].

The above information is given in strictest confidence for your own use only and without any guarantee, responsibility or liability on the part of this institution or its officials.

Yours faithfully,

Signed:                 _____

Full Name:              _____

Position:               _____

**For additional information, please contact the Administrator at Citico Fund Services (Europe) B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands, Telephone: (31-20) 572-2100, Facsimile:  (31-20) 572-2610.**

A-1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560393
SECSEV2137343

SECSEV2137283

## REDEMPTION REQUEST FORM
### INSTRUCTIONS

### CLASS A SHARES - ONLY

This form should be saved and may be used by a shareholder wishing to redeem Class A Shares in the Fund. Redeeming shareholders should complete and return this form, including the information on page RR-3.

> FAIRFIELD SENTRY LIMITED
> c/o Citco Fund Services (Europe) B.V.
> Telestone 8 – Teleport
> Naritaweg 165
> 1043 BW Amsterdam
> The Netherlands
> Telephone: (31-20) 572-2100
> Fax: (31-20) 572-2610
> **Dated (month, day, year):** _____, _____, _____

Dear Sirs:

I hereby request redemption, as defined in and subject to all of the terms and conditions of the Confidential Private Placement Memorandum, as it may be amended from time to time (the "Memorandum"), of Fairfield Sentry Limited (the "Fund"), of _____ Class A Shares, (the "Shares") representing [part/all] of my Shares in the Fund. I understand that redemption will only be effective as of the close of business on the last day of any calendar month, upon at least fifteen (15) calendar days' prior written notice. Except as otherwise provided in the Memorandum, payment of the redemption proceeds will be made within thirty (30) days after the effective date of redemption.

I hereby represent and warrant that (i) I am the true, lawful and beneficial owner of the Shares of the Fund to which this Request relates, with full power and authority to request redemption of such Shares; and (ii) I am not a "U.S. Person" (as that term is defined in the Memorandum). These Shares are not subject to any pledge or otherwise encumbered in any fashion. My signature has been guaranteed by a commercial bank acceptable to the Fund.

**Wire Transfer Instructions (to be completed by redeeming shareholder):**

_____

Bank Name

_____

Bank Address

_____

ABA Number

_____

Account Name

_____

Account Number

RR-1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560394
SECSEV2137344

**SIGNATURES MUST BE IDENTICAL TO NAME(S) IN WHICH SHARES ARE REGISTERED**

**ENTITY SHAREHOLDER** (OR ASSIGNEE)

**INDIVIDUAL SHAREHOLDER(S)** PARTNERSHIP, CORPORATION (OR ASSIGNEE) OR TRUST

_____
Name of Registered Owner of Shares

_____
Name of Subscriber

_____
Address

_____
Address

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signatures guaranteed by:

RR-2

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE001560395
SECSEV2137345

SECSEV2137283

## REDEMPTION INFORMATION

**SHARE REGISTRATION**

**MAILING (POST) INFORMATION**
(if other than address of registration)

_____

Name

_____

Name

_____

Address

_____

Address

_____

Country of Residence

_____

Country of Residence

_____

Telephone

_____

Telephone

_____

Telephone (Evenings)

_____

Telephone (Evenings)

_____

Fax

_____

Fax

**BANK FOR TRANSFER OF REDEMPTION**

_____

Name

_____

Address

_____

Country of Residence

_____

Telephone

_____

Telephone (Evenings)

_____

Fax

RR-3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE001560396
SECSEV2137346

SECSEV2137283

=================================================================

[To be completed by the Fund]

THIS SUBSCRIPTION APPLICATION IS HEREBY ACCEPTED BY FAIRFIELD SENTRY LIMITED

Date: _____, 200_

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

=================================================================

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560397
SECSEV2137347

# Short Form Subscription Agreement

## For Existing Shareholders

**CLASS A SHARES - ONLY**

**FAIRFIELD SENTRY LIMITED**

c/o Citco Fund Services (Europe) B.V
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile: (31-20) 572-2610

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

## SHORT FORM SUBSCRIPTION AGREEMENT – CLASS A SHARES - ONLY

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SENTRY LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sentry Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional Shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire Shares of the Fund.

**Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital.   New Subscription Information:**

Subscriber: _____

Contribution Date: _____, 200_

Additional Contribution Amount: U.S. $_____ Class A Shares

Changes to Subscription Agreement:   [ ] None
                                      [ ] Yes, as follows:
_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of _____, 200_.

**Corporate, Partnership, Trust or Account Subscribers**          **Individual Subscribers**

_____                    _____
Name of Entity (Print)                                 Name (Print)

By: _____                    _____
     Signature                                          Signature

_____                    _____
     Name (Print)                                       Name of Joint Purchaser, If Any (Print)

_____                    _____
     Title                                              Signature

Telephone: _____                    Telephone: _____

Fax: _____                   Fax: _____


SUBSCRIPTION ACCEPTED AS OF _____, 200_.


RR-3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE001560399
SECSEV2137349

SECSEV2137283

FAIRFIELD SENTRY LIMITED

By: _____

     Name: _____

     Title: _____

RR-4

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE001560400
SECSEV2137350