UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02572 (CGM) |
| Plaintiff, | |
| v. | |
| KOREA EXCHANGE BANK, et al., | |
| Defendant | |

## KOREA EXCHANGE BANK'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION TO DISMISS

CIRILLO LAW OFFICE
Richard A. Cirillo
246 East 33rd Street – 1 FR
New York, NY 10016-4802
T: 917-541-6778
E: rcirillo@cirillo-law.com

*Attorney for Defendant*
*Korea Exchange Bank*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................iii

NATURE OF THIS CASE .................................................................................1

ARGUMENT.....................................................................................................2

I.    THE COMPLAINT DOES NOT ALLEGE FACTS SHOWING A PRIMA FACIE
      CASE OF PERSONAL JURISDICTION OVER KEB ...................................2

      A.  Requirements for Exercising Personal Jurisdiction over a Foreign Defendant.............3

      B.  The Plaintiff's Jurisdictional Allegations ……………………………………….......4

            1.  The Plaintiff Does Not Allege a Factual Basis for the Allegation that KEB K
                "Knew" about Fairfield's Relationship with BMIS………………………….…..5

            2.  The Forum Selection Provision in Fairfield Subscription Agreements Did Not
                Commit Fairfield or KEB to NY Courts and Does Not Support Personal
                Jurisdiction over KEB …………………………………………………………6

            3.  KEB's Use of a NY Correspondent Bank to Forward US Dollar Transfers
                Between Non-US Banks Is Not "Purposeful Availment" in this Commercial
                Context ………………………………………………………………………....8

            4.  The Claims that KEB Filed for the Trusts for Unredeemed Shares Do Not
                Confer Jurisdiction Over KEB in this Adversary Proceeding…………………….13

      C.  Exercise of Jurisdiction over KEB Would Not Comport With Due Process ……...…17

II.   STANDARD FOR DISMISSAL OF CLAIMS UNDER RULE 12(b)(6) ……...……...18

III.  SECTION § 546(e)'s "SAFE-HARBOR" BARS THE CLAIM AGAINST KEB ……...19

      A.  The BLMIS Initial Transfers Were Made More than Two Years before the
          Filing Date and so the Exception for Transfers Avoidable under § 548(A)(1)
          Does Not Apply …………………………………………………………………20

      B.  All the Initial Transfers by BLMIS Were Made by a "Stockbroker"……………20

      C.  All the BLMIS Initial Transfers Were "Made by or to (or for the benefit of)"
          a "Financial Institution"……………………………………….………………...21

i

D.    All the Initial Transfers by BLMIS Were "Settlement Payments" and Were
Made "in Connection with Securities Contracts"…………………………..…22

IV.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE KEB RECEIVED
ANY BLMIS CUSTOMER PROPERTY……………………………...........................23

V.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE  AVOIDABILITY
OF THE BLMIS INITIAL TRANSFERS……………………………………………..…27

CONCLUSION.........................................................................................................................30

## TABLE OF CASES, STATUTES, RULES AND AUTHORITIES

**Cases**

Page(s)

*Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (N.Y. 2016)..........................................11-12

*American Casein Co. v. Geiger (In re Geiger)*,
446 B.R. 670 (E.D. Pa. 2010) ....................................................................................28 n.17

*Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391, 384 N.Y.S.2d
124 (1976)...............................................................................................................................11

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
409 B.R. 737 (Bankr. E.D.N.C. 2009) ...........................................................................24-25

*Asahi Metal Indus. Co. v. Sup. Ct. of Calif.*, 480 U.S. 102 (1987)..............................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................5, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................5, 18

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007).....................................................................................2, 3 n.3

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)......................................................................................................3, 18

*Daimler AG v. Bauman*,
517 U.S. 117 (2014) ......................................................................................................3 n.2

*Davis v. Bifani*,
2007 U.S. Dist. LEXIS 30880 (D. Colo. 2007).......................................................28 n.17

*DiStefano v. Carozzi N. Am. Inv.*,
286 F.3d 81 (2d Cir. 2001)...............................................................................................2

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005) .........................................................................21 n.13

*Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9 ...............................................................7, 22

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*").....................21, 21 n.12

iii

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ...........................................................................25

*Germain v. National Bank*,
988 F.2d 1323 (2d Cir. 1993)………………………………………….………….…...16

*Granfinanciera, S.A. . Nordberg*,
492 U. S. 33 (1989)……………………………………………………….………….…...14

*Hanson v. Denckla*,
357 U.S. 235 (1958)...............................................................................................................3, 6

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)...............................................................................................................3, 8

*Hill v. HSBC Bank plc*,
207 F. Supp. 3d 333 (S.D.N.Y. 2016)……………………………………...…….……8

*In re BLMIS* ,
740 F.3d 81 (2d Cir. 2014)……………………………………………………….……..17

*In re CBI Holding Co. (Bankruptcy Services, Inc. v. Ernst & Young)*,
529 F.3d 432 (2d Cir.  2008)……………………………………………………….16, 17

*In re Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019) ("*Tribune I*")...........................................................21 n.12, 22 n.14

*In re Tribune Co. Fraudulent Conveyance Litig.*,
10 F.4th 147 (2d Cir. 2021), *cert. denied sub nom.*
*Kirschner v. FitzSimons*, 2022 WL 161692 (U.S. Feb. 22, 2022)………………....…22 n.14

*Jesner v. Arab Bank, PLC*,
138 S. Ct. 1386, 1394-95, 200 L. Ed. 2d 612 (2018)…………………………...…………… 9, 10

*Katchen v. Landy*,
382 U.S. 323 (1966)……………………………………………………………….……..14

*Langenkamp v. Culp*,
498 U.S. 42 (1990)…………………………………………………………….………….14

*Licci ex rel. Licci v. Lebanese Canadian Bank SAL*,
673 F.3d 50, 60 (2d Cir. 2012) ("*Licci I*")……………………………… ……………10-11

*Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327, 338 (N.Y. 2012) ("*Licci II*")………………………………………., 11, 12-13

iv

*Licci v. Lebanese Canadian Bank SAL,*
732 F.3d 161 (2d Cir. 2013) ("Licci IV")..............................................2-3

*Lowden v. William M. Mercer, Inc.,*
903 F. Supp. 212 (D. Mass. 1995)......................................................28

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
84 F.3d 560 (2d Cir. 1996)................................................................17

*NCUA Bd. v. Morgan Stanley & Co.,*
2014 U.S. Dist. LEXIS 58751 (S.D.N.Y. Apr. 28, 2014)......................................28

*New Hampshire v. Maine,*
532 U.S. 742 (2001)....................................................................21 n.12

*Papasan v. Allain,*
478 U.S. 265 (1986).........................................................................18

*Phillips v. Prairie Eye Center,* 530 F.3d 22, 27, 28 (1st Cir. 2008).........................3-4, 6

*Picard v. Bam L.P. (In re Bernard L .Madoff Inv. Sec. LLC),*
612 B.R, 257 (SDNY 2020)...............................................................15-16

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC),*
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021 ("Fairfield Inv. Fund")..........19, 23 n.16

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),*
773 F.3d 411 (2d Cir. 2014) ("Fishman") ..............................................19

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC),*
542 B.R. 100 (Bankr. S.D.N.Y. 2015)....................................................24

*Sawtelle v. Farrell,*
70 F.3d 1381 (1st Cir. 1995)..............................................................4

*SIPC v. BLMIS,*
597 B.R. 466, 472 (Bankr. S.D.N.Y. 2010)...............................................15

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
476 B.R. 715 (S.D.N.Y. 2012), aff'd sub nom. Picard v. Ida Fishman Revocable Trust (In re
Bernard L. Madoff Inv. Sec. LLC), 773 F.3d 411 (2d Cir. 2014) ....................................20, 23

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("Cohmad")......................22, 22 n.13, 23 n.16

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178, 183 (2d Cir. 2008)…………………………………… ………………….…18

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)……………………………………………………………….8

*Thomas v. Ashcroft*,
470 F.3d 491, 495 (2d Cir. 2006)………………………………………………………..2

*U.S. v. International Longshoremen's Ass'n*,
518 F. Supp. 2d 422 (E.D.N.Y. 2007)…………………………………….…………29

*Walden v. Fiore*,
571 U.S. 277 (2014)……………………………………………………………………18

*Waldman v. Palestine Liberation Org.*,
835 F.2d 317 (2d Cir. 2016)…………………………………………………………….3

*Wolfe v. Charter Forest Behavioral Health Sys., Inc.*,
185 F.R.D. 225, 229 (W.D. La. 1999)……………………………………………….29

*Whitaker Securities, LLC v. Rosenfeld (In re Rosenfeld)*,
543 B.R. 60 (Bankr. S.D.N.Y. 2015)…………………………………………….…29

*Wolfe v. Charter Forest Behavioral Health Sys., Inc.*,
185 F.R.D. 225 (W.D. La. 1999)……………………………………………………29

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286, 297 (1980)…………………………………………………………….17

**Statutes**

11 U.S.C. § 101(22)(A)……………………………………………………………….21

11 U.S.C. § 101(53A)………………………………………………………………….20

11 U.S.C. § 546(e) …………………………………………………………………18-20

11 U.S.C. § 548(a)(1)(A) …………………………………………………………….20

11 U.S.C. § 550(a) …………………………………………………………………2, 26

11 U.S.C. § 551………………………………………………………………………..2

15 U.S.C. § 78fff-2(c)(3) ……………………………………………………………..2

15 U.S.C. § 78lll(4)………………………………………………………..……23

**Rules**

Fed. R. Bankr. P. 7004 ...........................................................................3 n.3

Fed. R. Bankr. P. 7004(f)........................................................................2, 3 n.3

Fed. R. Bankr. P. 7008 …………………………………………….…………..27

Fed. R. Bankr. P. 7010………………………………………………..………..27

Fed. R. Bankr. P. 7012(b)……………………………………………………….1

Fed. R. Civ. P. 1……………………………………………………………….28

Fed. R. Civ. P. 8......................................................................................27, 28

Fed. R. Civ. P. 10....................................................................................27, 28

Fed. R. Civ. P. 12(b)(2) ..........................................................................1, 2, 18

Fed. R. Civ. P. 12(b)(6)...........................................................................1, 2, 18

NY Civ. Prac. Law & Rules § 302…........................................2, 3 n.3, 4 n.4, 10, 11, 13, 17

**Authorities**

2 Moore's Federal Practice–Civil § 10.04[1] (2021)……………………………………28

2 Moore's Federal Practice–Civil § 10.04[3] (2021)……………………………………28

**Articles**

A. Hayes, "Can CIPS, China's potential SWIFT competitor, help Russia?",
https://www.investopedia.com/terms/clearing-house-interbank-payments-system-chips.asp,
Feb. 24, 2021 (last visited May 16, 2022)………………………………………………..9

W. Kenton, "What is Fedwire?", https://www.investopedia.com/terms/f/fedwire.asp,
April 21, 2021 (last visited May 15, 2022)……………………………………………9

Defendant Korea Exchange Bank ("KEB") respectfully submits this memorandum in support of its motion under Federal Rules of Civil Procedure 12 (b)(2) and 12(b)(6), made applicable by Bankruptcy Rule 7012(b), to dismiss the first amended complaint, 12 cv 01194 (CGM), ECF Dkt. (the "ECF Dkt.") # 30, filed on June 6, 2012 (the "complaint" or "Compl."). The complaint is an exhibit to the Notice of Motion.

## NATURE OF THIS CASE

The plaintiff is the trustee for the bankruptcy estates of BLMIS and Bernie Madoff. Compl. p.1. Defendant KEB is a Korean bank located in Korea. Compl. ¶ 21. The complaint names a second defendant, Korea Investment Trust Management Company ("KITMC"), a company unaffiliated with KEB that is described as "an investment and asset management company" with offices separate from KEB's. *Id.* ¶ 22. The complaint identifies KEB as a "trustee for" two Korean funds, Korea Global All Asset Trust I-1 N Tams Rainbow Trust III; neither of those trusts is a defendant.[1]

The complaint makes allegations against "Defendants," a word it defines to mean both KEB and non-defendant KITMC. The complaint does not allege that the defendants have joint liability, are affiliated, or acted as agent for the other. *Id.* ¶¶ 5-7, 34, 44-46. On the face of many allegations, however, only one entity could have taken the alleged actions. The defined term makes it impossible to know what acts the complaint asserts were done by KEB rather than by non-defendant KITMC.

The plaintiff seeks to recover alleged subsequent transfers of BLMIS "Customer Property" "by Fairfield Sentry Ltd. ("Fairfield"), a British Virgin Islands company, to "Defendants." *Id.* ¶ 2 & Ex. C. All but one transfer is alleged to have occurred between November 2004 and October 2006 and all alleged transfers total $33.6 million. That is a small portion of about $3 billion of BLMIS Customer Property BLMIS transferred to Fairfield during the six years before the "Filing Date," defined as December 11,

---

[1] On December 22, 2021, the plaintiff and counsel for KITMC dismissed the complaint against KITMC without consulting KEB. ECF Dkt. # 130 (filed Dec. 22, 2021).

2008. *Id.* ¶¶ 10, 35-39, 47, and Exs. A & B). *Id.* The complaint does to explain the source of any

payments by Fairfield to "Defendants" except to conjecture that "a portion of them" "derived" from

BLMIS Customer Property. *Id.* ¶¶ 2, 34, 41. The $3 billion allegedly transferred by BLMIS to Fairfield

was only 60% of $5 billion the plaintiff alleges Fairfield transferred to the hundreds of its shareholders that

are subsequent transferee defendants in other actions in which the lists of subsequent transfers is identical

in form and description to Exhibit C to the KEB complaint.

The complaint seeks relief under Bankruptcy Code, 11 U.S.C., §§ 550(a) and 551 and Securities

Investor Protection Act, 15 U.S.C., § 78fff-2(c)(3). *Id.* ¶ 47.

KEB moves to dismiss the complaints on two principal grounds: the complaint (1) fails to allege

facts making out a prima facie basis for this court to exercise its personal jurisdiction over KEB; and (2)

fails to state the elements of a claim upon which relief can be given. Fed. R. Civ. P. 12(b)(2), (6).

## ARGUMENT

## I.  THE COMPLAINT DOES NOT ALLEGE FACTS SHOWING
## A PRIMA FACIE CASE OF PERSONAL JURISDICTION OVER KEB

### A.  Requirements for Exercising Personal Jurisdiction over a Foreign Defendant

The plaintiff cites New York Civil Practice Law & Rules ("CPLR") § 302 and Bankruptcy Rule

7004(f) as the source of jurisdiction over KEB, a Korean bank.  Compl. ¶ 7. The law governing personal

jurisdiction law are well known to this court. To summarize, a plaintiff must make factual allegations

establishing prima facie that the court has jurisdiction or else the action is dismissible. *Thomas v. Ashcroft*,

470 F.3d 491, 495 (2d Cir. 2006); *DiStefano v. Carozzi N. Am. Inv.*, 286 F.3d 81, 84 (2d Cir. 2001).  A

court must "first look[] to the law of the forum state to determine whether personal jurisdiction will lie.

*See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir.2007) [and, if so,] whether the exercise of

personal jurisdiction over a foreign defendant comports with due process protections established under the

United States Constitution. *Id.*" *Licci v. Lebanese Canadian Bank SAL*, 732 F.3d 161, 168 (2d Cir. 2013)

("Licci IV").

When a plaintiff relies on specific rather than general jurisdiction as here,[2] the Supreme Court precedents impose three constitutional tests, all of which must be competently alleged: that (i) the defendant must have "purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); (ii) the plaintiff's claim must "arise out of or relate to the foreign corporation's activities in the forum State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); and (iii) the court's exercise of jurisdiction must be reasonable under the circumstances to satisfy due process, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985); *Waldman v. Palestine Liberation Org.*, 835 F.2d 317, 327-28 (2d Cir. 2016).[3]

The New York Court of Appeals has held that *Hanson v. Denckla's* "purposeful availment" element "necessarily requires examination of the particular facts of each case," and that it calls for an "objective inquiry [that] always requires a court to closely examine the defendant's contacts for their quality." *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (N.Y. 2012) (Licci II) (citing *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501 (2007)). The US Supreme Court selected "purposeful availment" rather than another phrase to describe the test; purposeful availment means more than "minimal" contact with the forum and instead requires the "minimum" contacts necessary to satisfy the constitutional standards. "Purposeful availment" requires a conscious decision to "invok[e] the benefits and protections of [the forum state's] laws." *Hanson*, 357 U.S. at 253. Purposeful availment is characterized by "voluntariness and foreseeability." *Phillips v. Prairie Eye Center*, 530 F.3d 22, 27, 28 (1st Cir. 2008). "A purpose of the foreseeability requirement is that 'personal jurisdiction over

---

[2] General jurisdiction cannot be asserted over KEB because it is clear that Korea, not NY is KEB's "home," as the complaint concedes (¶ 21) and alleges no contrary facts. *Daimler AG v. Bauman*, 517 U.S. 117, 136-37 (2014).

[3] The plaintiff alleges personal jurisdiction under the "long-arm" provisions of CPLR §302(a) and Bankruptcy Rule 7004. Those provisions encompass the Supreme Court's requirements for exercising personal jurisdiction. *Best Van Lines, Inc. v. Walker*, 490 F.3d at 246-49 ) (examining New York Court of Appeals decisions). Bankruptcy Rule 7004(f) allows the exercise of personal jurisdiction if it "is consistent with the Constitution of the United States."

nonresidents ... is a quid for a quo that consists of the state's extending protection or other services to the nonresident.' *Sawtelle [v. Farrell*, 70 F.3d 1381, 1392 (1st Cir. 1995)] (quoting *Cote v. Wadel*, 796 F.2d 981, 984 (7th Cir. 1986)) (alteration omitted) (internal quotation marks omitted)." [4] In this case, the question is whether the complaint alleges truly "purposeful" conduct by KEB seeking or receiving any "protection or other services" provided by New York. For the following reasons, it does not make those allegations.

## B. The Plaintiff's Jurisdictional Allegations

The plaintiff's jurisdictional allegations are contained in paragraphs 5 and 6 of the complaint. Some portions of those paragraphs are purely legal conclusions, which the court disregards in assessing whether the complaint adequately alleges jurisdiction. Compl. ¶ 5, ll. 7-9, 13-15. The remaining allegations assert that "Defendants"

- "knew" they were investing in NY-based BLMIS when they bought shares of BVI-based Fairfield and "knew" that redemption payments for Fairfield shares really were BLMIS Customer Property. *Id.*, lines 3-5.

- entered into a subscription agreement with Fairfield that contained a non-exclusive forum provision allowing the parties to sue each other in NY or anywhere else where jurisdiction could be obtained, and sent a copy of that contract to a NY office of a company associated with Fairfield. *Id.*, lines 9-11.

- used a NY bank account "through" which to send and receive US dollars transmitted between non-US entities. *Id.*, lines 11-12.

- filed customer claims for non-redeemed Fairfield shares in the BLMIS/Madoff bankruptcy proceeding, which were promptly rejected because KEB was an "indirect purchaser." *Id.* ¶ 6.

Neither alone nor in combination do these alleged actions permit exercise of personal jurisdiction over KEB, even if it were assumed for purposes of this motion that acts attributed to "Defendants" mean acts

---

[4] *Sawtelle* applied New Hampshire's long-arm statute which, like CPLR 302, permitted "the exercise of personal jurisdiction over a defendant that "transacts any business within [the] state" or "commits a tortious act within [the] state." *Sawtelle*, 70 F.3d at 1387-88.

taken by KEB rather than KITMC.  We discuss each of these allegations in turn.[5]

### 1. The Plaintiff Does Not Allege a Factual Basis for the Allegation that KEB "Knew" about Fairfield's Relationship with BMIS

The allegation reads, "Defendants "knowingly direct[ed] funds to be invested with New York based BLMIS through Fairfield Sentry" and "knowingly received transfers of Customer property from BLMIS." Id. ¶ 5. The underlying claim is that KEB bought shares of a BVI company but really wanted to invest the money in a different, NY company. That is unsupported by anything to show that this fact was known to KEB at the times of purchases and sales (redemptions) of Fairfield shares and therefore an insufficient conclusory and speculative allegation. It is at least equally plausible, if not facially far more plausible, that a purchaser of Fairfield shares had no idea at the relevant times that Fairfield was reinvesting funds in BLMIS or any other company.  It is possible the Defendants, including KEB, "knew" and intended that but the allegation does not push what may be possible across the line to what is "plausible," as the Supreme Court requires. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing and quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 558 (2007), for the statement that a complaint's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Without facts, an inference cannot be drawn from this allegation or from anything else in the complaint that Korean KEB dealt with or intended to deal with anyone other than Fairfield. Equally, an inference cannot be drawn that KEB knew that redemptions payments from Fairfield came from assets of anyone other than Fairfield.[6]  And, as discussed in Part IV below, the redemption payments are equally

---

[5] On June 26, 2015, the plaintiff filed "proffered" allegations against some defendants, including KEB and KIMTC (again grouped under the term "Defendants"). The court did not allow the complaint to be amended to include any of the "proffered" statements and they are not part of the complaint this court is called on to evaluate. The proffered allegations may not be considered in this dismissal motion because they are not alleged in the complaint.

[6]  The plaintiff may believe that knowledge may have come from Fairfield Private Placement Memoranda ("PPMs") describing its activities but the complaint does not allege that it did and does not identify a PPM from which KEB derived knowledge, assuming it was actually received and read and thereby conferred knowledge.  PPMs that have been submitted in various lawsuits show that earlier ones provided no relevant information about BLMIS or Madoff while later ones provided more. Therefore, the allegation of KEB's knowledge is conjecture.

likely to have come from Fairfield's own assets and not from BLMIS, again leaving the allegation as mere conjecture and failing to move possible to plausible. The plaintiff's non-factually allegations show only the plaintiff's assumptions and hopeful thinking, which are insufficient.[7]

The complaint asserts that KEB entered into subscription agreements with KEB to buy shares. Compl. ¶ 5. The plaintiff may argue that a provision of the subscription agreements stating that KEB received and read Fairfield Private Placement Memoranda ("PPMs") told it that an investment in Fairfield was actually an indirect investment in BLMIS. However, the complaint does not identify any PPM that KEB received or read, which is a key issue because Fairfield's PPMs were different and some disclosed little or no information about BLMIS while others' disclosures mentioned BLMIS but concealed its true role. The point on this motion is that the plaintiff does not provide anything beyond the supposition that KEB had certain knowledge and intend but does not allege any fact, even that KEB received any PPM, to support that conclusory allegation.

Separately, even if a foreign purchaser knows that the issuer of the shares is in NY, the purchase, without more, does not constitute "conducting activities within [NY]" or "invoking the benefits and protections of [NY's] laws." *Hanson*, 357 U.S. at 253. The same is true when a foreign shareholder sells (redeems) the shares abroad. In neither case are the shareholder's "activities" "conduct[ed]" in NY and the transaction calls on no "benefits or protections" NY. Therefore, the "quid" of becoming subject to NY jurisdiction lacks the reciprocal "pro quo" of "the state's extending protection or other services to the nonresident." *Phillips*, 530 F.3d at 28.

With no other allegation to illuminate the plaintiff's assumption that KEB had knowledge, these allegations do not support jurisdiction.

## 2. The Forum Selection Provision in Fairfield Subscription Agreements Did Not Commit

---

[7] The complaint alleges that Fairfield was a "Fairfield Greenwich Group" company. Compl. ¶ 5, ll. 6-7. It says Defendants "directed its investment [in Fairfield] through FGG" and "withdr[ew] money from Fairfield." Id. The allegation says nothing about how or why directing an investment "through" FGG with offices around the world or withdrawing money from a BVI company via share sales/redemptions has any connection with the NY jurisdictional analysis. These statements are mere surplusage.

**Fairfield or KEB to NY Courts and Does Not Support Personal Jurisdiction over KEB**

The complaint states that KEB entered into a subscription agreement with Fairfield that "subjected it to New York jurisdiction." Compl. ¶ 5, l. 10. The plaintiff seems to be referring to language in subscription agreements KEB provided to the plaintiff, which reads:

> New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and [Fairfield] may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that s Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on [Fairfield's] records. Nothing herein shall affect [Fairfield's] right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.[8]

Three things are notable about the provision. First, it does not bind Fairfield to NY court jurisdiction; it only binds KEB. Thus it is Fairfield, not KEB, that is availing itself of NY courts. Second, the provision does not make NY courts an exclusive jurisdiction but expressly permits Fairfield and, by not limiting KEB, permits KEB to sue the other anywhere in the world it could obtain jurisdiction. That included at a bare minimum BVI and Korea. In fact, Fairfield forewent the opportunity to sue redeeming shareholders with identical subscription agreements in NY and instead sued many of them in the BVI courts. *Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶ 10, https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf (last visited May. 15, 2022). Third, the provision has been construed by this court to be limited to disputes over Fairfield share purchases but excluding redemptions of Fairfield shares. As to claims arising as to purchases, there is no submission to jurisdiction at all. Because the jurisdictional legal standard requires the plaintiff's claim to "arise out of or relate to the foreign corporation's activities in the forum State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984), the

---

[8] Exhibit A to Declaration of Richard A. Cirillo dated May 16, 2022 ("Cirillo Decl."), Subscription Agreement attachment at p.6, ¶ 19.

subscription agreement's forum clause does not apply to the plaintiff's redemption claims at all.

Therefore, KEB did not in any sense "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

As to the related assertion that KEB (or KITMC) "sent a copy of the subscription agreement to FGG's New York City office" (Compl. ¶ 5, ll. 10-11), the law is clear that an isolated sending of a single document from a foreign country to NY, even if true, would not satisfy the personal jurisdiction analysis. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) ("handful of communications … insufficient to allow the exercise of specific personal jurisdiction over the [Foreign] Defendants"); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2016) (allegations that foreign defendants "communicated with and transmitted information and funds to and from BLMIS located in New York" insufficient to "project" the foreign defendants into New York) (internal quotations omitted).

### 3. KEB's Use of a NY Correspondent Bank to Forward US Dollar Transfers Between Non-US Banks Is Not "Purposeful Availment" in this Commercial Context

The plaintiff argues that, by transferring US dollars "through" accounts at a NY correspondent or intermediary bank constitutes "purposeful availment" of "rights, benefits, and privileges of conducting business and/or transactions in the United States and New York." Compl. ¶ 5, ll. 11-12.  The basis for this conclusory assertion is that, under the Subscription Agreement, "KEB wired funds to Fairfield Sentry through a bank in New York, and received funds through its own bank account in New York." Id. ll. 9-12. The plaintiff knows from the Subscription Agreement incorporated into the complaint that KEB account was a correspondent account and that the source and destination of the dollars was KEB's account in Korea.  Cirillo Decl. Exs. A and B at ¶30(g), p. 11.

It is true that, in some tort contexts, courts have found repeated use of correspondent banks to confer jurisdiction.  However, those decisions are distinguishable from the commercial context of this case as is shown by closely reading the decisions and understanding correspondent bank transfers in commercial matters.

There is no question that rapid international dollar money transfers are crucial to international commerce and cannot be made effectively except by banks with access to CHIPS (Clearing House Interbank Payments System), the Fedwire, or SWIFT (Society for Worldwide Interbank Financial Telecommunications) by which dollar transfers are made. *See* A. Hayes, "Can CIPS, China's potential SWIFT competitor, help Russia?," https://www.investopedia.com/terms/clearing-house-interbank-payments-system-chips.asp, Feb. 24, 2021 (last visited May 16, 2022); W. Kenton, "What is Fedwire?," https://www.investopedia.com/terms/f/fedwire.asp, April 21, 2021 (last visited May 15, 2022). Only members of those systems may use them. *Id.* Processing international dollar transfers through a correspondent bank do not need or and do not receive deliberation. In a case involving foreign terrorism, Justice Kennedy said in the Court's plurality opinion *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1394-95, 200 L. Ed. 2d 612 (2018):

> Foreign banks often use dollar-clearing transactions to facilitate currency exchanges or to make payments in dollars from one foreign bank account to another. Arab Bank and certain amici point out that CHIPS transactions are enormous both in volume and in dollar amounts. The transactions occur predominantly in the United States but are used by major banks both in the United States and abroad. The CHIPS system is used for dollar-denominated transactions and for transactions where the dollar is used as an intermediate currency to facilitate a currency exchange. Brief for Institute of International Bankers as Amicus Curiae 12–13, and n. 8. In New York each day, on average, about 440,000 of these transfers occur, in dollar amounts totaling about $1.5 trillion. Id., at 14. The "clearance activity is an entirely mechanical function; it occurs without human intervention in the proverbial 'blink of an eye.' " *Ibid.* There seems to be no dispute that the speed and volume of these transactions are such that individual supervision is simply not a systemic reality. As noted below, substantial regulations govern these transactions, both in the United States and in Jordan.

Thus, use of correspondent banks to effect international payments is not "purposeful" activity under the "purposeful availment" definition but instead a common and unavoidable means to effect a transient and vanishingly brief way to pass dollars between non-US bank accounts. The contact with the US is not "qualitatively" "meaningful" whether it occurs once or more than once in commercial transactions. The contrast with other types of cases shows this.

9

Federal courts apply New York law in assessing personal jurisdiction. *Licci ex rel. Licci v. Lebanese Canadian Bank SAL*, 673 F.3d 50, 60 (2d Cir. 2012) ("*Licci I*") ("We therefore look to New York law in determining whether personal jurisdiction is available in New York"). In *Licci*, the Second Circuit asked the NY Court of Appeals to answer certified questions about the proper interpretation of CPLR § 302(a)(1). It summarized the nature of the *Licci* action in which the long-arm jurisdictional question arose before the federal courts this way:

> The plaintiffs contend that LCB's role in conducting those wire transfers on Shahid's behalf was actionable. They allege that LCB had "actual knowledge" that Hizballah was a violent terrorist organization, as reflected on official U.S. government lists, and that Shahid was "part of Hizbollah's financial arm." *Id.* ¶¶ 130, 135. Moreover, the plaintiffs allege that the bank, as a matter of "official LCB policy," "continuously supports and supported Hizbollah and its anti-Israel program, goals and activities." *Id.* ¶ 126. In particular, the plaintiffs allege that LCB carried out the wire transfers "in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel." *Id.* ¶ 129.

*Licci I*, 673 F.3d at 56-57. Thus, the foreign originating bank, LCB, was knowingly sending money to the US bank account of Shahid specifically to carry out a program of illegal, violent terrorism in which LCB was allegedly aware and complicit. The money passed through the account of a NY bank, namely, American Express Bank in New York. The court described the correspondent bank's role, similar to Justice Kennedy's description in *Jesner*, this way:

> "Correspondent accounts are accounts in domestic banks held in the name of [ ] foreign financial institutions. Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*,234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996). " 'Without correspondent banking ... it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries.' " *United States v. Davidson*, 175 Fed.Appx. 399, 401 n. 2 (2d Cir.2006) (summary order) (quoting Role of U.S. Correspondent Banking in International Money Laundering: Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Gov't Affairs, 107th Cong. 1–2 (2001) (opening remarks of Senator Susan M. Collins)).

*Licci I*, 673 F.3d at 56 n.3.

In answering the Second Circuit's certified questions, the NY Court of Appeals confirmed its holding in a prior decision that "'standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [CPLR 302(a)(1) ].'" *Licci II*, 20 N.Y.3d at 336 (quoting *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391, 396, 384 N.Y.S.2d 124 (1976). The NY Court of Appeals then quoted the Second Circuit's *Licci I* opinion and confirmed its distillation of what *Amigo Foods* held:

> "*Amigo Foods* [was] best read as standing for the proposition that the first prong of the long-arm jurisdiction test under [CPLR 302(a)(1) ] ... may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, if the defendant's use of that account was purposeful" ([673 F.3d] at 66).

> This is an accurate summing up of New York law. The jurisdictional inquiry under CPLR 302(a)(1) necessarily requires examination of the particular facts in each case. And although determining what facts constitute "purposeful availment" is an objective inquiry, it always requires a court to closely examine the defendant's contacts for their quality (*see Fischbarg v. Doucet*, 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501, 880 N.E.2d 22 [2007]). Thus, in *Amigo Foods* we focused on the nature and extent of Aroostook's involvement in the deposit of funds intended to pay Parent in the correspondent account that Aroostook maintained at Irving in New York. As discovery revealed, Aroostook's purported use of the account in this transaction, the sole potential basis for personal jurisdiction, was essentially adventitious—i.e., it was not even Aroostook's doing.

*Licci II*, 20 N.Y.3d at 338. Thus, the NY Court of Appeals held that a correspondent account suffices to establish NY jurisdiction only upon close examination of the "defendants contacts for their quality." The court articulated the same rule in its subsequent decision in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (N.Y. 2016), where, again, the remitting bank was complicit with its customer in an alleged bribery and money laundering scheme:

> Defendants played a central role in the employees' scheme by knowingly laundering and concealing the bribes and kickbacks for approximately four years. According to the amended complaint, "the corrupted employees needed the help of a willing banker [at the originating bank], a role fulfilled by Defendants Pictet and Chambaz [employees of the remitting bank]." Specifically, Chambaz set up an offshore "bogus" company to receive the bribes—TSJ Engineering Consulting Co. Ltd. (TSJ) in the British Virgin Islands. He opened and actively managed Geneva-based Pictet bank accounts for TSJ and the

11

individual employees. The bank orchestrated the laundering of funds from the vendors who wired bribes in favor of "Pictet and Co. Bankers Geneva" to Pictet's New York correspondent bank account. From there, the funds were credited by Pictet to TSJ's Geneva-based account, and the money was later divided up and transferred to the employees' individual accounts.

*Id.* at 320. A qualitative aspect of the originating bank's use of the correspondent bank was its advertising of the availability of correspondent bank relationships in the US, which is not alleged in this case:

> "The amended complaint asserts that Pictet maintained a relationship with New York banks and marketed 'business relations in New York' on its website. Specifically, the Citibank, New York account was used to wire the bribes to a Pictet account in Geneva, after which point, the money was divided up and distributed amongst the 'corrupted employees' by deposit to their individual Pictet accounts. Chambaz knew the large sums of money being wired were proceeds of an illegal scheme but never questioned them, and continued to aid and abet the fraud. In opposition to the motion to dismiss, plaintiffs submitted copies documenting 12 wire transfers to Citibank in favor of TSJ, from 2006–2008, which reveal the movement of millions of dollars from the vendors to the employees. Similar transactions were documented from several other of Pictet's New York correspondent accounts."

*Id.* at 327. Another qualitative aspect present in *Al Rushaid* and *Licci* was that the originating bank over which personal jurisdiction was sought used the correspondent bank deliberately to carry out a scheme of criminal conduct, namely, bribery in *Al Rushaid* and terrorism financing and money laundering in *Licci.* This aspect of the facts was underscored in Licci II in the court's discussion of the "relatedness" portion of the jurisdiction analysis, which is not met in this case:

> Accepting the complaint's allegations as true, LCB's use of its AmEx correspondent account to transfer money for Shahid provided money for Hizballah to carry out terrorist violence, including the 2006 rocket attacks. Application of the second prong of the jurisdictional inquiry varies according to the nature and elements of the particular causes of action pleaded; here, LCB's alleged breach of various statutory duties. As personal jurisdiction is fundamentally about a court's control over the person of the defendant, the inquiry logically focuses on the defendant's conduct. Again, the complaint alleges that LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars. Taken as true, LCB arguably thereby violated duties owed to plaintiffs under the various statutes asserted as a basis for subject matter jurisdiction. Furthermore, the alleged breaches occurred when LCB used the New York account. Again, whether or not plaintiffs can prove these allegations at trial, including showing

12

links between Shahid and Hizballah, and whether or not these allegations state a claim
under the various statutes, the pleadings establish the "articulable nexus" or "substantial
relationship" necessary for purposes of personal jurisdiction.

*Licci II*, 20 N.Y.3d at 340.

The qualitative aspects of KEB's actions alleged in the complaint were not part of an illegal
scheme and were not aimed at harming any US persons. The complaint's allegations are that KEB, as
trustee of two Korean trusts, remitted and received money for individual Fairfield share purchases and
redemptions by one or the other trust. These transfers were not interconnected to carry out terrorism
financing, bribery and money laundering, or other unlawful activity but only to execute lawful commercial
transactions. KEB is not alleged to have advertised or marketed its correspondent banking relationships.
Therefore, the lesson of *Amigo Foods* is that jurisdiction cannot be laid under CPLR § 302 on individual
use of a correspondent bank and the lesson of *Licci* and *Al Rushaid* is that repeated use of a correspondent
bank to carry out an illegal scheme in which the originating bank is a participant may provide a predicate
for jurisdiction. Therefore, the plaintiff's allegations concerning KEB's use of correspondent accounts
does not suffice to establish a prima facie case of personal jurisdiction.

### 4. The Claims that KEB Filed for the Trusts for Unredeemed Shares Do Not Confer Jurisdiction Over KEB in this Adversary Proceeding

The plaintiff alleges that KEB is subject to New York jurisdiction because KEB filed customer
claims in the BLMIS/Madoff bankruptcy. Compl. ¶ 6; see Exs. A & B to Cirillo Decl. [9] Those claims were
filed on July 1, 2009, by "Korea Exchange Bank as Plaintiff of Korea Global All Asset Trust I-1" and
"Korea Exchange Bank, on behalf of Tams Rainbow Trust." They were denominated "Indirect Investor

---

[9] The claims filed in July 2009 said that under "Reason for Claim Filing" that Fairfield "had accounts with BLMIS understood [and] that [BMLIS] was also sub-custodian for [Fairfield] and implemented [Fairfield's] investment strategy [and] that most of [Fairfield's] assets may have been held in custody by [BLMIS]." Cirillo Decl. Exs. A & B at 6th page." We note that the complaint does not allege, and the claims filings do not show, any basis to consider that KEB's knowledge in mid-2009 after more than six months of intense media description about what had happened with BLMIS, Madoff, Fairfield, and other wrongdoers and victims, say anything about what KEB knew and did not know at the times in 2004-06 and April 2018 when it allegedly made the redemptions listed in Ex. C to the complaint. KEB's use of the claims forms as matter incorporated into the complaint (at ¶ 6) does not admit or concede any matter alleged in the complaint except that it filed those claims in the bankruptcy proceeding.

Customer Claims" because KEB and the trusts had no account with BLMIS, unlike direct customers. In

early December 2009, the plaintiff sent KEB a "Notice of Determination" rejecting each claim saying:

> you did not have an account [with BLMIS]. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined in 15 U.S.C. §78lll(2). Accordingly, your claim for securities and/or a credit balance is DENIED."

Cirillo Decl. Ex. C. This adversary proceeding was not commenced until September 2011, twenty-two

months after the claims were denied. Therefore, by the time this action was filed and thereafter, there was

no adjudication process for KEB's claims.

It is often said, overly broadly, that filing a claim in bankruptcy subjects the filer to the bankruptcy

court's jurisdiction, overstating the Supreme Court's holding in *Langenkamp v. Culp*, 498 U.S. 42, 45

(1990).  Referring to its decision a year earlier in *Granfinanciera, S.A. . Nordberg*, 492 U. S. 33 (1989),

this is what *Langenkamp* says:

> In *Granfinanciera*, we recognized that, by filing a claim against a bankruptcy estate, the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. 492 U.S. at 492 U. S. 58-59, and n. 14 (citing *Katchen [v. Landy]*, 382 U.S. 323, 336 (1966)] If the creditor is met, in turn, with a preference action from the plaintiff, that action becomes part of the claims-allowance process which is triable only in equity. *Ibid*. <u>In other words, the creditor's claim and the ensuing preference action by the plaintiff become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction</u>. Granfinanciera, supra, 492 U.S. at 492 U. S. 57-58. As such, there is no Seventh Amendment right to a jury trial. If a party does not submit a claim against the bankruptcy estate, however, the plaintiff can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances, the preference defendant is entitled to a jury trial. 492 U.S. at 492 U. S. 58-59.

*Langenkamp*, 498 U. S. at 44-45 (emphasis added). The *Katchen* decision cited by the Court similarly said

that, "although petitioner might be entitled to a jury trial on the issue of preference if he presented no claim

in the bankruptcy proceeding and awaited a federal plenary action by the plaintiff, *Schoenthal v. Irving*

*Trust Co.*, 287 U.S. 92 , when the same issue arises as part of the process of allowance and disallowance of

claims, it is triable in equity." *Katchen*, 382 U.S. at 336 n.12.

14

In another Madoff adversary proceeding brought by the plaintiff, the claim in bankruptcy filed by

the defendants coexisted with the adversary proceeding during nine years of litigation. *Picard v. Bam L.P.*

*(In re Bernard L .Madoff Inv. Sec. LLC*), 612 B.R. 257 (SDNY 2020). This court had held that the

adversary action would be a non-jury trial. *SIPC v. BLMIS*, 597 B.R. 466, 472 (Bankr. S.D.N.Y. 2010). On

the eve of trial, the defendants moved to withdraw their bankruptcy claim to avoid a non-jury trial of the

adversary proceeding.  *Picard v. BAM*, 612 B.R. at 261. The district court upheld this court's decision and

provided a detailed explanation of the legal analysis:

> Second, the claims at issue are equitable in nature given Defendants' filing of a proof of
> claim. As the Supreme Court has made clear, the filing of a proof of claim "triggers the process
> of 'allowance and disallowance of claims,' thereby subjecting [a creditor] to the bankruptcy
> court's equitable power." *Langenkamp* , 498 U.S. at 44, 111 S.Ct. 330 (1990)
> (citing *Granfinanciera* , 492 U.S. at 58–59 n.14, 109 S.Ct. 2782 ); *see also In re CBI Holding
> Co.* , 529 F.3d at 466 (stating that "a creditor who files such a claim subjects itself to the
> bankruptcy court's equitable jurisdiction in proceedings affecting that claim."); *In re Residential
> Capital, LLC* , 698 F. App'x 16, 17 (2d Cir. 2017) (summary order) ("When Boyd filed a proof
> of claim with the bankruptcy court in 2011, he invoked the special rules of bankruptcy
> concerning objections to the claim." (internal quotation marks omitted)); *In re Millenium
> Seacarriers, Inc.*, 419 F.3d 83, 98 (2d Cir. 2005) (collecting cases and holding that "parties ...
> who submit proofs of claim and thereafter actively litigate in the bankruptcy court without
> contesting personal jurisdiction can transform a non-core proceeding into a core one"). "As [the
> Second Circuit] recognized in *Germain v. National Bank* , 988 F.2d 1323 (2d Cir. 1993), filing a
> proof of claim is a necessary but not sufficient condition to forfeiting a creditor's right to a jury
> trial" regarding objections to the claim. *In re CBI Holding Co.*, 529 F.3d [432, 466 (2d Cir.
> 2008)]. "Rather, a creditor loses its jury trial right only with respect to claims whose resolution
> affects the allowance or disallowance of the creditor's proof of claim or is otherwise so integral
> to restructuring the debtor-creditor relationship." *Id.* ; *accord Stern* [*v. Marshall*], 564 U.S. 462,
> 499, 131 S.Ct. 2594 [2011] (stating in the Article III context that "Congress may not bypass
> Article III simply because a proceeding may have some bearing on a bankruptcy case; the
> question is whether the action at issue stems from the bankruptcy itself or would necessarily be
> resolved in the claims allowance process."). However, " '[b]ecause 11 U.S.C. § 502(d) provides
> that the claims of pre-petition fraudulent transfers may be disallowed,' an adversary proceeding
> that invokes '11 U.S.C. § 548 is part of the claims allowance process ... and does not carry a jury
> trial right.' *Picard for Liquidation of BLMIS* , 2018 WL 2383141, at *4 (quoting *Glinka v.
> Abraham & Rose Co.* , No. 2:93-CV-291, 1994 WL 905714, at *11 (D. Vt. June 6, 1994) ); *see
> also Katchen v. Landy*, 382 U.S. 323, 329, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) ("This power to
> allow or to disallow claims includes full power to inquire into the validity of any alleged debt or
> obligation of the bankrupt upon which a demand or a claim against the estate is based. This is

essential to the performance of the duties imposed upon it." (internal quotation marks omitted)); *In re CBI Holding Co.*, 529 F.3d at 467–68 (emphasizing that "[a]n action that bears directly on the allowance of a claim is integrally related to the equitable reordering of debtor-creditor and creditor-creditor relations. <u>If an equitable reordering cannot be accomplished without resolution of what would otherwise be a legal dispute, then that dispute becomes an essential element of the broader equitable controversy</u>." (quoting *Germain*, 988 F.2d at 1329)). Indeed, the Second Circuit has held that <u>where "defendants filed a proof of claim against the [bankruptcy] estate" and, "[i]n order to rule on that claim, the Bankruptcy Court was required to first resolve [a] fraudulent transfer issue," the Bankruptcy Court could adjudicate both</u>. *In re BLMIS*, 740 F.3d 81, 95 (2d Cir. 2014) ; *see also In re: FKF 3, LLC* , No. 13-CV-3601 (KMK), 2016 WL 4540842, at \*11 (S.D.N.Y. Aug. 30, 2016) ("Because § 502(d) requires that any creditor claim must be disallowed if the entity ... is the transferee of a transfer avoidable under, inter alia, §[ ] 548 (and recoverable under § 550 ), unless the entity has turned over the property, the causes of action ... brought pursuant to §§[ ] 548[ ] and 550 ... would 'necessarily be resolved in the claims allowance process,' *Stern*, 564 U.S. at 499, 131 S.Ct. 2594, and thus the Bankruptcy Court can constitutionally enter final judgment on those claims."). Thus, in considering the second *Orion* factor, I conclude that the Plaintiff's claims are equitable in nature.

*Picard v. Bam,* 612 B.R. at 264-65 (emphasis added).

The significance of the jury/non-jury issue to the personal jurisdiction issue lies in the fact that the availability of a jury trial turns on the same analysis of whether filing a bankruptcy claim constitutes a submission to the court's power. The submission is not absolute and is not necessarily continuing. The Second Circuit explained: "a creditor loses its jury trial right only with respect to claims whose resolution affects the allowance or disallowance of the creditor's proof of claim or is otherwise so integral to restructuring the debtor-creditor relationship. [*Germain v. National Bank*, 988 F.2d 1323, 1327 (2d Cir. 1993).] That [the creditor] waived its right to a jury trial [in the adversary proceeding] with regard to the CBI claims by filing its Proof of Claim follows directly from this decision. *In re CBI Holding Co. (* Bankruptcy Services, Inc. v. Ernst & Young), 529 F.3d 432, 466-67 (2d Cir. 2008), quoted in *Picard v. BAM, supra.* This distills the Supreme Court's teaching in *Granfinanciera, Langenkamp,* and *Katchen,* the Second Circuit's lessons in *CBI Holdings, Millennium Seacarriers, Germain v. National Bank* and the district court decisions cited in *Picard v. BAM.*

The application of these principles to this case lies in the fact that the claims KEB filed in the bankruptcy court (a) were rejected prior to the commencement of and do not coexist with this adversary proceeding; and (b) are not related to this subsequent adversary proceeding to recover payments for redeemed Fairfield shares because the bankruptcy claims were to recover the value of the non-redeemed Fairfield shares, which is a separate claim under this court's analysis. Therefore, this "Court [is not] required to first resolve [a] fraudulent transfer issue," before and in order to resolve a creditor claim in bankruptcy. *In re BLMIS*, 740 F.3d 81, 95 (2d Cir. 2014). And resolution of this adversary proceeding does not "affect the allowance or disallowance of the creditor's proof of claim or is otherwise so integral to restructuring the debtor-creditor relationship." *CBI Holdings*, 529 F.3d at 466. Therefore, the basis for using the filing of a proof of claim in bankruptcy as a basis to assert personal jurisdiction over the claimant is lacking and the allegation of KEB's filing of the claims does not make or advance a prima facie case of personal jurisdiction over KEB.

## C. EXERCISE OF JURISDICTION OVER KEB WOULD NOT COMPORT WITH DUE PROCESS

It would not be reasonable and, therefore, would violate due process for this court to exercise personal jurisdiction over KEB "under the circumstances of th[is] particular case." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Even if there were a sufficient basis to find CPLR § 302 satisfied, due process raises a bar to "haling" KEB into a court in NY. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). It is true that courts have set out various practical factors of burden and hardship to the parties and interests of jurisdictions that may not be met here, but those factors are non-exclusive. Making KEB defend plaintiff's claims in this forum inherently unreasonable.

The complaint does not allege that KEB a Korean company performing routine transactions in Korea actually foresaw or expected any of the minimal actions alleged here could lead to being forced into

NY court and be deprived of its own country's courts, procedures, laws, and customs. *See Walden v.*

*Fiore*, 571 U.S. 277, 286 (2014) ("Due Process requires that a defendant be haled into court in a forum

State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated'

contacts he makes by interacting with other persons affiliated with the State."). Nothing occurred that a

Korean defendant could consider its "purposeful" taking advantage of NY "benefits and privileges" in

such a minimal way would result in having to defend claims against it in NY. *See Asahi Metal Indus. Co.*

*v. Sup. Ct. of Calif.*, 480 U.S. 102, 109 (1987). quoting *Burger King,* 471 U.S. at 475. For this reason, the

exercise of jurisdiction over KEB in this case would fall below the constitutional standard.

## II.  STANDARD FOR DISMISSAL OF CLAIMS UNDER RULE 12(b)(6)

The following parts of this memorandum are based, not on Fed. R. Civ. Proc. 12(b)(2) as the prior

sections but on Fed. R. Civ. Proc. 12(b)(6) and seek dismissal of the plaintiff's claims for failure to state

all the elements of a claim for relief.  This court already knows the rule that a claim should be dismissed if

well-pleaded, factual allegations in a complaint, "however true, could not raise a claim of entitlement to

relief." *Twombly*, 550 U.S. at 558. The allegations "must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 570). A plausible claim pleads facts "that allow … the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court may not

credit in the analysis conclusory statements, assertions not supported by factual allegations, *id.* at 678–79,

or "legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"Although we construe the pleadings liberally, 'bald assertions and conclusions of law will not suffice.'"

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)).

## III.  SECTION § 546(e)'s "SAFE-HARBOR"
## BARS THE CLAIM AGAINST KEB

The complaint should be dismissed because KEB is protected by the "safe harbor" provided by 11

U.S.C. § 546(e). Based on its balancing of important interests, Congress barred avoidance and recovery of

certain transfers made "in connection with" securities transactions. *Id*. A court should dismiss a claim if

the applicability of § 546(e) is established on the face of the complaint, documents incorporated into, or

documents integral to the complaint. *See Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff*

*Inv. Sec. LLC)*, 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) ("*Fairfield Inv.*

*Fund*"). That is the case with the claims against KEB.

Under § 546(e), the plaintiff may not avoid a "settlement payment" made "by or to (or for the

benefit of) a … stock broker [or] financial institution, … or that is a transfer made by or to (or for the

benefit of) a … stock broker [or] financial institution …, in connection with a securities contract … made

before the commencement of the case, except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

The reason is that, "by enacting § 546(e), Congress provided that, for a very broad range of securities-

related transfers, the interest in finality is sufficiently important that they cannot be avoided by a

bankruptcy plaintiff at all, except as actual fraudulent transfers under § 548(a)(1)(A)." *Picard v. Ida*

*Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014)

("*Fishman*") (citation omitted). "Permitting the clawback of millions, if not billions, of dollars from

BLMIS clients—many of whom are institutional investors and feeder funds—would likely cause the very

'displacement' that Congress hoped to minimize in enacting § 546(e)." *Id*. at 420. As a subsequent

transferee, KEB is entitled to raise § 546(e) as a bar to recovery. *Fairfield Inv. Fund*, 2021 WL 3477479,

at *3 ("Where the initial transferee fails to raise a § 546(e) defense against the Plaintiff's avoidance of

certain transfers, as is the case here …, the subsequent transferee is nonetheless entitled to raise a § 546(e)

defense against recovery of those funds."). Each statutory element of § 546(e) is met as to all or all but one

of the BLMIS-to-Fairfield initial transfers ("the "BLMIS Initial Transfers") that allegedly funded

Fairfield-to-KEB redemption payments.

**A. The BLMIS Initial Transfers Were Made More than
Two Years before the Filing Date and so the Exception for
Transfers Avoidable under § 548(A)(1) Does Not Apply**

The complaint alleges that all but one the alleged Fairfield-to-KEB subsequent transfers were between November 2004 and October 2006, more than two years before the "Filing Date" defined in the complaint. Compl. ¶ 41 & Ex. C. Therefore any BLMIS Initial Transfer to Fairfield that could have funded those redemption payments to KEB also had to occur beyond the two-year look-back of § 548(a)(1)(A) and, accordingly, the subsequent transfer allegedly derived from those initial transfers is eligible for § 546(e) safe harbor protection.[10] Accordingly, the exception in § 546(e) for claims avoidable under § 548(a)(1)(A) does not bar KEB's entitlement to claim the safe harbor's protection.

### B. All the Initial Transfers by BLMIS Were Made by a "Stockbroker"

The complaint (¶ 23) acknowledges that BLMIS was a "stockbroker." A "stock broker" is a person or entity who "engaged in the business of effecting transactions in securities" "for the account of others" "with respect to which there is a customer." 11 U.S.C. § 101(53A). That BLMIS was a stockbroker is not subject to dispute:

> Overall, Madoff Securities, which was registered as a stockbroker the SEC, clearly engaged in securities transactions....[E]ven assuming the truth of the allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (citation omitted), *aff'd sub nom. Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d Cir. 2014). On the appeal, the Second Circuit noted that the SIPC Plaintiff does "not dispute[] that BLMIS was a 'stockbroker' for the purposes of § 546(e)." Fishman, 773 F.3d at 417.

### C. All the BLMIS Initial Transfers Were "Made by or to (or for the benefit of)" a "Financial Institution"

The complaint alleges that BLMIS made the Initial Transfers to Fairfield in order for Fairfield to

---

[10] It is not clear if the alleged Fairfield-to-KEB subsequent transfer shown in Compl. Ex. C as made in April 2008, was funded by a BLMIS Initial Transfer that occurred more or less than two years before the bankruptcy filing. This uncertainty is due to the complaint not making any factual allegations to connect any alleged BLMIS Initial Transfer to any alleged KEB-to-Fairfield subsequent transfer. Therefore this transfer may also qualify for the safe harbor.

make redemption payments to KEB for Fairfield shares. Compl. ¶¶ 2, 34, Exs. B & C. It did so by

transferring the money to Fairfield's bank, Citco Bank Nederland N.V., Dublin Branch, through a NY

correspondent bank, from which Fairfield transferred money to KEB. *Id.* Exs. B & C. Citco Netherland is

a financial institution[11] and an agent of Fairfield. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re*

*Fairfield Sentry Ltd.)*, 2020 WL 7345988 at *6, *7 n.11 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"),

a decision binding on the plaintiff in this action.[12] Therefore, Fairfield is a "financial institution" under 11

U.S.C. § 101(22)(A) as a customer of a commercial bank that acted "as agent or custodian for a

customer...in connection with a securities contract." Accordingly, stockbroker BLMIS made the Initial

Transfers to financial institution Citco Nederland. Further, the Initial Transfers are alleged to have been

made "to" or "for the benefit of" "Defendants," which includes KEB, which also is a "financial

institution" as defined by § 101(22)(A). Compl. ¶¶ 2, 3, 21, 34, and 41.

### D. All the Initial Transfers by BLMIS Were "Settlement Payments" and Were Made "in Connection with Securities Contracts"

---

[11] 11 U.S.C. defines the term "financial institution" to include "an entity that is a commercial...bank [or] trust company...and, when any such… entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741)."

As to Citco, see De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl /en/public-register/information-detail/?registerCode=WFTDG&relationNumber=B0275 (last visited Mar. 5, 2022) (Citco Bank Nederland N.V. "[c]arryi[es] on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx?firmReference Number= C27278 (last visited Mar. 5, 2022) Citco Bank is a "credit institution...whose business is to receive deposits or other repayable funds from the public and to grant credits...."). This court can take judicial notice of information in such public registries. *See In Re Tribune Company Fraudulent Conveyance Litig.*, 946 F.3d 66, 78 (2d Cir. 2016, *amended* 2019) *(Tribune I); Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).

[12] This court held in *Fairfield III*, 2020 WL 7345988, at *7, that Citco Bank was the Fairfield's funds' agent and the Fairfield funds were its customers, consistently with the Second Circuit's definition of agency in *Tribune I*, 946 F.3d at 78-79, and the definition of a financial institution under 11 U.S.C. § 101(22)(A)):

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco Bank establishes the necessary agency. It is implausible to infer that Citco Bank made the redemption payments to specific redeemers in specific amounts absent the [Fairfield] Funds' directions to do so. Moreover, Citco Bank accepted those directions by executing the redemption payments. Based on the foregoing, the Funds were customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made, and the Funds were, therefore "financial institutions" within the meaning of 11 U.S.C. § 546(e).

The decision is binding on the plaintiff because it is in privity with the plaintiffs in *Fairfield III* under a sharing and common interest litigation agreement approved by this court and integral to the action in the complaint. *See New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) (stating requirements for issue preclusion).

The only remaining element for KEB to be entitled to the protection of the § 546(e) safe harbor is that the Initial Transfers were either (1) "settlement payment[s]," or (2) "transfer[s]" that were made by or to (or for the benefit of) a…stockbroker[or] financial institution…in connection with a securities contract." Only one or the other is necessary, but both are met in this case. As already shown, the Initial Transfers were made by BLMIS, a stockbroker," to Citco Bank Nederland, a "financial institution," and were made "for the benefit of KEB," also a "financial institution." They were payments to settle securities transactions (i) between BLMIS and Fairfield and (ii) between Fairfield and KEB under and "in connection with" securities contracts as defined in the Bankruptcy Code[13] between each pair of entities.

The securities contract between BLMIS and Fairfield was the agreement that Fairfield would invest money in BLMIS, which would invest that money in securities options and other securities instruments and return invested money to Fairfield upon its withdrawal requests. Compl. ¶¶ 2-3, 24-25. The securities contract between Fairfield and KEB was the agreement that KEB would purchase Fairfield shares, which are plainly "securities," that Fairfield's Bermudan Investment Manager would manage the money, and that Fairfield would pay KEB the share value to settle its redemptions as set out in the Subscription Agreements between KEB and Fairfield and Fairfield's Articles of Association. The Articles govern KEB's redemption of Fairfield shares. *Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶ 10, https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf (last visited May. 15, 2022) ("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares...are to be found in the Articles of Association of the Fund").[14] Those are "securities contracts" within the statutory definition and the BLMIS Initial Transfers were both (i) "settlement payments" to Fairfield and (ii) "transfers" to Fairfield and by Fairfield to KEB "in connection with" them. *Fishman*, 773 F.3d at 418-24 ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided;" "a transfer can be connected to, and can be made in relation to, multiple documents or purposes simultaneously"); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154 at *9 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").[15]  Therefore, the final element of § 546(e) is met.

---

[13] 11 U.S.C. § 741(7)(A)(i), (vii) defines "securities contract" to include "a contract for the purchase, sale, or loan of a security," and "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph," In the securities context, the "[t]he term 'redemption,' means 'repurchase,'" *Tribune I*, 946 F.3d at 80, and "the definition of a securities contract...includes...redemption requests." *Cohmad*, 2013 WL 1609154, at *8.

[14] The ~~Fairfield Articles of Association~~ are before this court on this motion because, as the basis for the challenged redemption, they are integral to the complaint. *See In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147 (2d Cir. 2021), cert. denied sub nom. *Kirschner v. FitzSimons*, 2022 WL 161692 (U.S. Feb. 22, 2022) ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

[15] The Second Circuit rejected the argument that BLMIS Initial Transfers could not be settlements of securities transactions or made in connection with securities contracts because BLMIS did not carry out promised securities trades. *Fishman*, 773 Fed.3d at 419-20.

Because KEB satisfies all the safe harbor requirements to protect it against the avoidance of the Initial Transfers and recovery of the redemption payments to KEB that they allegedly funded and the plaintiff seeks to recover, the claim against KEB should be dismissed.[16]

## IV. THE COMPLAINT DOES NOT ADEQUATELY ALLEGE KEB RECEIVED ANY BLMIS CUSTOMER PROPERTY

The plaintiff must support each element of his claim with "well-pleaded allegations," which requires him to state facts and not legal conclusions or rest his complaint on a possibility that the defendant has liability. See Part II above. The plaintiff's claim in this case is that KEB is liable to return "customer property," which the Securities Investor Protection Act defines as "cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78lll(4).

The complaint must allege factually that the $33.6 million of redemptions allegedly paid to KEB were at one time cash or securities held by BLMIS. The complaint does not make that allegation. Instead, the only thing it says on this issue is that "[a] portion of the [BLMIS] Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendants." Compl. ¶ 41. Nothing is cited for this allegation except Exhibit C to the complaint, which is only a list of alleged payments by Fairfield to KEB. Exhibit B shows what are alleged payments by BLMIS to Fairfield. However, nothing is a factual allegation that any Exhibit C payments came from any Exhibit B transfers.

Is this speculation "possible"? Yes, but only because many things are possible. But alleging what is possible does not meet the pleading standard, and nothing else in the complaint pushes "possible" over the

---

[16] Section 546(e) does not state or imply that a defendant subsequent transferee must not have had knowledge of fraud. As Congress did not include that requirement, canons of statutory interpretation preclude parties and courts from engrafting one. That is why Judge Rakoff erred in saying that "if the Plaintiff sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Cohmad*, 2013 WL 1609154, at *7 (quoted in *Fairfield Inv. Fund*, 2021 WL 3477479, at *4). However, even it Judge Rakoff's comment were correct, it would not affect this case because there is no allegation that KEB had actual knowledge of BLMIS' fraud.

line into "plausible," which is the bar the Supreme Court set to "state a claim upon which relief can be

granted." The bare and unsupported allegation that "a portion" of the $33.6 million of redemptions allegedly

paid to KEB were derived from transfers from BLMIS to Fairfield could not illustrate more perfectly what an

impermissible conclusion and speculation looks like. The plaintiff must state what portion and how he

reaches that conclusion.

This court explained to the plaintiff in, that bare allegations like those here that customer funds

were transferred to the subsequent transferee do not suffice:

> The Plaintiff must allege facts that support the inference that the funds at issue
> originated with ... BLMIS, and contain the "necessary vital statistics"—the "who, when,
> and how much" of the transfers to establish that an entity was a subsequent transferee of
> the funds. At the pleading stage, the Plaintiff is not required to provide a "dollar-for-
> dollar accounting" of the exact funds at issue. However, barebones allegations that the
> funds at issue were transferred to the Subsequent Transferees, without more detail, are
> insufficient.

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y.

2015).

The plaintiff may argue that Exhibit B is really quite detailed and does provide "who,

when, and how much." But what it lacks is any information to meet the critical *Shapiro*

element to allege "facts" "to establish that an entity was a subsequent transferee of the funds."

KEB cannot learn that from the body of the complaint or Exhibits B and C. That is why, in

*Shapiro*, the court dismissed the plaintiff's subsequent transferee claim: because the complaint

"does not tie any initial transfer to any subsequent transfer or Subsequent Transferee." *Id.*

A bankruptcy court reviewing a complaint and facts very similar to those here, dismissed the

plaintiff's adversary proceeding claims because the allegations failed to make a plausible factual showing

that the transfers the plaintiff sought were "customer property." If anything, the allegations in that case,

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737 (Bankr. E.D.N.C. 2009), were more robust

than the allegations provided by the plaintiff here:

24

> Upon review of the Amended Complaint and Exhibit B, the court finds insufficient facts
> to support the trustee's contention that the funds flowing through BER Care, Inc.
> originated with the debtors. The assertion that "the debtors transferred its (sic) funds into
> bank accounts operated by the debtors' principals" is merely a conclusory statement that
> lacks factual support. Similarly, the trustee provides little factual basis for his assertion
> that "one or more of the debtors, or, in the alternative, the consolidated debtor ... made
> certain transfers to such defendant in at least the amount listed beside such defendant's
> name...." Exhibit B provides a list of the transferees, amounts, and dates of each transfer,
> but fails to indicate what entity initiated each transfer.

*Id.* at 750-51.

The plaintiff might contend that he needs discovery to determine if, when, and how much of the alleged KEB subsequent transfers originated with BLMIS. This argument deflects the fact that any answers would not come from KEB and the plaintiff has had access to the BLMIS and Fairfield (and other) records for more than a decade. If the plaintiff does not have the facts by now, where would he look and what would he expect to find to cure his pleading deficiency?

Showing that a subsequent transfer came from customer property is a key requirement, if not the key requirement, for the plaintiff to prove his claim. The plaintiff alone bears the burden to plead and prove it. If the plaintiff were to say he will "call an expert" to prove this most fundamental factual element, the argument would fail. The expert will need the same facts that are missing from the complaint and without facts, the expert's opinion on which "portion of" what subsequent transfers is, and which portion is not  customer property would be inadmissible speculation.

In this case, there are "obvious competing explanations" for the source of the alleged Fairfield-to-KEB subsequent transfers that rely on known facts and are at least as if not more plausible to explain the source of $33.6 million of Fairfield to KEB than that they came from BLMIS. An "obvious alternative explanation" is one that makes a plaintiff's allegation "conceivable but not plausible" and therefore dismissible. *Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020).  One such alternative is that, as is now well known, Fairfield continued to

receive substantial new investment money from existing and new investors during the 2004-2006 (and 2008) period of KEB's redemptions. Even if Fairfield was supposed to deposit new money with BLMIS and obtain money redemptions money from BLMIS, it is "obviously plausible" Fairfield netted the funds and paid redemptions with new investments, depositing only the difference with BLMIS. If so, the Fairfield redeeming shareholders would not have received BLMIS "customer property." Secondly, Fairfield was on paper a wealthy company with robust financial statements audited by a Big Four accounting firm. Fairfield could have obtained and used borrowed money to pay redemptions. Or Fairfield could have received and used intercompany transfers from affiliates engaged in non-BLMIS activities. These common financing steps may have been better, quicker, and easier to respond to shareholder redemptions than processing a cash withdrawal from BLMIS. These alternate explanations are far from implausible and the plaintiff's speculation that "a portion of" the payments to KEB were from BLMIS customer property is therefore inadequate.

The obligation of a plaintiff to make factually specific allegations caselaw is intended to enable a court to assess and manage the case and to allow the defendant to prepare its defenses. Hiding the ball may benefit a plaintiff but it prejudices the court and defendant. Having had more than a decade to perfect the complaint against KEB, the plaintiff should stand or fall on his pleading. It is not enough to hope something might turn up in the future to explain the inadequate speculation that "a portion" of the redemptions came from BLMIS. Litigation is costly and KEB is entitled to dismissal absent factually plausible allegations.

## V. THE COMPLAINT DOES NOT ADEQUATELY ALLEGE AVOIDABILITY OF THE BLMIS INITIAL TRANSFERS

To recover redemption payments from KEB, the plaintiff must adequately allege and prove that the Initial Transfers were either avoided or are avoidable under 11 U.S.C. § 550(a). The absence of factual avoided/avoidability allegations is fatal and is another basis for dismissal. But this complaint itself says nothing about that except the two conclusory words "are avoidable" in paragraphs 36-38, conceding that

26

they have not been avoided. But those words convey only a legal conclusion and must be disregarded in evaluating the complaint. See Part II above. Because the complaint alleges nothing to meet the necessary avoidability element, it should be dismissed.

The plaintiff may argue that he has satisfactorily alleged avoidability element by incorporating by reference in complaint paragraph 35 all "allegations contained in the Fairfield Amended Complaint as if fully set forth herein," referring to *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), which the plaintiff settlement with some defendants in 2011. Compl. ¶ 40. KEB was not a party to either the adversary proceeding or settlement. If that is the plaintiff's effort to allege avoidability, it fails because such a gross incorporation by reference is barred by Federal Rules of Civil Procedure 8 and 10.

The KEB complaint is 13 pages long, contains 47 paragraphs of allegations, and asserts one claim against KEB. It attaches three exhibits. The "incorporated" Fairfield Amended Complaint is more than 223 pages long, contains 798 paragraphs of allegations, and asserts 31 claims against 45 defendants. It incorporates 111 exhibits (which are not filed with the complaint in the court's electronic filing system. Adv. Pro. No. 09-01239 Dkt. # 23 (filed July 20,2010). The Fairfield Amended Complaint does not )mention KEB. It is contrary to the Federal Rules to ask KEB to sift through that prolix mammoth document trying to determine what allegations the plaintiff considers pertinent to the avoidability of Initial Transfers that allegedly funded KEB redemptions. It is unfair to try to conceal meaning in a welter of words, parties, and exhibits.

The Federal Rules prohibit this attempted incorporation by reference for two reasons. First, Rule 8(a)(2) & (d)(1) made applicable by Bankruptcy Rule 7008 says the plaintiff must make "a short and plain statement of [his] claim…." and must make that short and plain statement by using allegations that "are simple, concise, and direct.". A serious argument cannot be made that adding the Fairfield Amended Complaint to the KEB complaint meets either of those standards. Fed. R. Civ. Pro. 10(c), made applicable by Bankruptcy Rule 7010 also bars this attempted incorporation. The Rule says that "[a] statement in a

pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."
(Emphasis added.) Here, the plaintiff has not adopted "a statement in a pleading" but has tried to insert the
entirety of an extraordinarily long and complicated complaint against other parties and claims. The Rule
insists that an incorporation "must specifically identify which portions of the prior pleading are adopted."
*Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 216 (D. Mass. 1995); *accord NCUA Bd. v. Morgan
Stanley & Co.*, 2014 U.S. Dist. LEXIS 58751 (S.D.N.Y. Apr. 28, 2014) (citing Charles Alan Wright &
Arthur R. Miller, et al., 5A Fed. Prac. & Proc. Civ. § 1326 (3d ed. 2013)); 2 Moore's Federal Practice–
Civil § 10.04[3] (2021).[17]  The plaintiff has not done so.  Surely, he could have specified what specific
allegations on which he means to rely and, if not amend his complaint to include them, at least identify
them. That is what the rules require.

Federal Rules 8 and 10 are not technicalities. They preserve the court's and parties' ability to
manage cases, for which the complaint is the blueprint for subsequent developments, including answers,
counterclaims, motions, discovery, and trial. The rules make it possible for defendants to identify, prepare,
and present defenses. Improper incorporation, as here, add to the court's and KEB's time, effort, and cost,
ignoring the goal of Fed. R. Civ. Proc. 1, "to secure the just, speedy, and inexpensive determination of
every action and proceeding."

The length and breadth of the incorporated complaint conceal what parts, if any, are pertinent and
require responsive pleading or motions. Any allegations relevant to avoidability are buried deep within it,
not presented in plain sight. Moore's Federal Practice distills the requirements of the Federal Rules: "The
[incorporated] reference must be clear and specific and must specifically identify the statements
incorporated." 2 Moore's Federal Practice–Civil § 10.04[1] (2021) (citing *Toberman v. Copas*, 800 F.

---

[17] The court can (and should) decide that the incorporation by reference violates both Rules 8(a) and 10(c), or it can choose
either. The courts struck pleading under Rule 8(a) rather than 10(c) for the improper incorporation of allegations in  wholly
separate actions. *Davis v. Bifani*, 2007 U.S. Dist. LEXIS 30800 (D. Colo. 2007); *Am. Casein Co. v. Geiger (In re Geiger)*, 446
B.R. 670 (Bankr. E.D. Pa. 2010). However, the *Geiger* court's reasoning was based on the misapprehension that different
adversary proceedings in a single bankruptcy case are the same proceeding when legally they constitute different proceedings.

Supp. 1239, 1243 (M.D. Pa. 1992)). Paragraph 35 is the antithesis of the requirement.

A relevant precedent is the civil RICO action *U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007). The plaintiff attempted to incorporate into its complaint the entirety of lengthy pleadings and exhibits. The court dismissed the complaint under Rules 8 and 10 for improper incorporation. The court held that wholesale incorporation of prior pleadings was "a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a 'short and plain statement of the claim,'" and made the complaint "incoherent" and "unintelligible." *Id.* at 462, n.72, 463 (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (Rule 8(a)'s purpose is to give the adverse party fair notice of the claim asserted)). As to Rule 10, the court found that the plaintiff's "failure to specifically identify which portions of the hundreds of pages of exhibits it intends to incorporate by reference into the Amended Complaint makes it impossible for the court or the defendants to ascertain the nature and extent of the incorporation, and the purported incorporation is therefore invalid." *Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d  at 462. The court pointed out the practical consequence that allowing the incorporation would require the defendants to respond not only the 85-page complaint but also to every paragraph in 400 pages of exhibits. Id. at 464. The comparable burdens are even greater with the plaintiff's attempt to incorporate the Fairfield Amended Complaint into the KEB complaint.

The court should reject the incorporation for failure to provide "a degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the incorporation." *Wolfe v. Charter Forest Behavioral Health Sys., Inc.*, 185 F.R.D. 225, 229 (W.D. La. 1999); cf. *Whitaker Securities, LLC v. Rosenfeld (In re Rosenfeld)*, 543 B.R. 60 (Bankr. S.D.N.Y. 2015) (permitting incorporation where there was no danger of prejudice because the parties to the incorporating and incorporated pleadings were the same and agreed that the incorporated pleading should be considered on the motion before the court). In this case, the prejudice to KEB and the court is apparent, and the attempted incorporation should be rejected.

Without any permissible allegations on the necessary element of the avoidability of initial BLMIS-to-Fairfield transfers that supposedly funded subsequent Fairfield-to-KEB transfers, the complaint should be dismissed for failure to state a claim for relief.

## CONCLUSION

For the foregoing reasons, KEB respectfully requests dismissal of the complaint in its entirety. Because the plaintiff has had ample opportunity to present a sufficient complaint, the dismissal should be with prejudice and without leave to further amend.[18]

Dated: New York, NY
May 16, 2022

**Respectfully submitted,**

/s/  Richard A. Cirillo

Richard A. Cirillo
CIRILLO LAW OFFICE
246 East 33rd Street – 1 FR
New York, NY 10016-4802
T:  917-541-6778
E:  rcirillo@cirillo-law.com
*Attorney for Defendant*
*Korea Exchange Bank*

---

[18] KEB does not consent to the Bankruptcy Court's entry of a final order or final judgment.

30