**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01565 (CGM) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A. (f/k/a AMERICAN EXPRESS FINANCIAL SERVICES (LUXEMBOURG) S.A. and f/k/a AMERICAN EXPRESS BANK (LUXEMBOURG) S.A.), as represented by its Liquidator HANSPETER KRÄMER, HANSPETER KRÄMER, in his capacities as liquidator and representative of STANDARD | |

CHARTERED FINANCIAL SERVICES
(LUXEMBOURG) S.A.,

STANDARD CHARTERED BANK
INTERNATIONAL (AMERICAS) LTD.,
f/k/a AMERICAN EXPRESS BANK
INTERNATIONAL, and STANDARD
CHARTERED HOLDINGS INC. (as
successor in interest to STANDARD
CHARTERED INTERNATIONAL (USA)
LTD., f/k/a AMERICAN EXPRESS BANK
LTD.),

                    Defendants.

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa-

lll("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"),

by and through his undersigned counsel, for his Amended Complaint against defendants Standard

Chartered Financial Services (Luxembourg) S.A. (formerly known as American Express Financial

Services (Luxembourg) S.A. and before that, known as American Express Bank (Luxembourg)

S.A.) (defined together as "AEB Lux"); Standard Chartered Bank International (Americas) Ltd.

(formerly known as American Express Bank International) (defined together as "AEB Miami");

and Standard Chartered Holdings Inc. ("SCHI") (as successor to Standard Chartered International

(USA) Ltd. ("SCIUSA"), which was formerly known as American Express Bank Ltd. (defined

together with SCIUSA as "AEB New York," and collectively with SCHI, AEB Lux and AEB

Miami, as "Defendants")), alleges the following:

## I.     NATURE OF THE ACTION

1.     This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78lll (4), stolen as part of Madoff's massive

Ponzi scheme. Specifically, the Trustee seeks to recover at least $289,232,434 of BLMIS customer

property transferred to Defendants: $274,029,164 by Fairfield Sentry Limited ("Fairfield Sentry"), and $15,203,270 from Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds").

2.      Fairfield Sentry was a U.S. Dollar-based fund that had customer accounts with BLMIS's investment advisory business ("IA Business"). Fairfield Sentry invested in excess of 95% of its assets in its BLMIS customer accounts. Fairfield Sigma was a Euro-denominated currency fund that invested all its assets in Fairfield Sentry. The Fairfield Funds are British Virgin Islands ("BVI") companies, currently in liquidation. They were created, marketed, managed, and operated by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership in New York.

3.      AEB Lux purchased and redeemed shares in the Fairfield Funds on behalf of itself and the other Defendants. Defendants acted collectively as part of a single enterprise and were agents and alter egos of each other for purposes of their investments in, and redemptions from, the Fairfield Funds.

4.      AEB Lux also purchased shares in Kingate Global Fund Ltd. ("Kingate Global"), another fund that invested 100% of its assets in BLMIS customer accounts, on behalf of itself and the other Defendants. The Fairfield Funds and Kingate Global are collectively referred to as the "BLMIS Feeder Funds."

5.      The Trustee commenced an adversary proceeding against Kingate Global, among other defendants, captioned *Picard v. Ceretti, et al*, Adv. Pro. No. 09-01161 (SMB).  On August 6, 2019, the Court approved a settlement between the Trustee and the Kingate Funds' Joint Liquidators and other entities and individuals, resulting in the Trustee recovering all the initial transfers.  As a result of that settlement, the Trustee does not seek recovery of any of those subsequent transfers in this action.

3

6.      Defendants recognized various abnormalities associated with BLMIS as two American Express Bank ("AEB") executives went so far as to that Fairfield Sentry would "explode" because it was a "scam" and "not possible to achieve such high returns with such low volatility." Nevertheless, Defendants continued to invest in BLMIS through Fairfield Sentry and reap the profits. For Defendants, the promise of fees from BLMIS exceeded the obvious risk of fraud.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

7.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

8.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

9.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

10.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.   BACKGROUND, THE TRUSTEE, AND STANDING

11.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission
("SEC") commenced the District Court Proceeding.

12.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to
combining its action with an application by the Securities Investor Protection Corporation
("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court
alleging, among other things, that BLMIS could not meet its obligations to securities customers as
they came due and its customers needed the protections afforded by SIPA.

13.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered
an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant
to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court
approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly,
the Trustee is duly qualified to serve and act on behalf of the estate.

15.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,
and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the
SIPA Proceeding.

16.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,
Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against
him by the United States Attorney for the Southern District of New York.  At the plea hearing,
Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

5

17.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

18.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

19.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

20.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

21.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code

apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

## IV. BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

22.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a

broker dealer with the United States Securities and Exchange Commission.  In 2001, Madoff

changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability

company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter

as its chairman and chief executive.

23.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory Authority

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At

all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

in January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership

is contingent on registration of the broker-dealer with the SEC.

24.     For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

25.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

26.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

27.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.    The Ponzi Scheme**

28.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

29.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

30.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

31.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

<u>Madoff's Investment Strategy</u>

32.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

33.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

34.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

35.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

36.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

37.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

38.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

39.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

40.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

41.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

42.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

43.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times

significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

44.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

45.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every year end and at every quarter end starting in 2003.

46.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

47.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

48.     BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### No Evidence of BLMIS Trading

49.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

50.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### The Collapse of the Ponzi Scheme

51.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

52.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

53.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    DEFENDANTS AND PERSONAL JURISDICTION

54.     Each Defendant is a wholly owned subsidiary of Standard Chartered Bank.

55.     During all times relevant to this Amended Complaint, AEB New York was an Agreement Corporation under the Federal Reserve Act.  Agreement Corporations are corporations chartered by a state to engage in international banking that enter into agreements with the Federal Reserve Board of Governors to limit themselves to certain permitted activities.

56.     AEB New York was originally incorporated under the laws of Connecticut but changed into an Agreement Corporation when Standard Chartered PLC acquired AEB New York in February 2008. It later changed its name from American Express Bank Ltd. to Standard Chartered International (USA) Ltd.  AEB New York's principal place of business has been located in New York City since its establishment in 1919.  As of October 31, 2017, AEB New York changed its corporate status to a Delaware limited liability company.  AEB New York was liquidated in 2021, and its successor in interest is SCHI.  AEB New York maintained an office located at 1095 Avenue of the Americas, New York, New York 10036.  SCHI's current registered office is located at 1209 Orange Street, Wilmington, Delaware 19801.

57.     AEB Miami is an Edge Act corporation organized under the laws of the United States of America.  Edge Act corporations are organizations chartered by the Federal Reserve to engage in international banking and financial operations. After being acquired by Standard Chartered PLC, AEB Miami changed its name from American Express Bank International to Standard Chartered Bank International (Americas) Limited.

58.    Standard Chartered Bank International (Americas) Limited is in liquidation and its assets and liabilities will be transferred to SCHI.

59.    AEB Miami maintained offices in Miami and New York City throughout its involvement with the BLMIS Feeder Funds. Its current principal place of business is located at 1111 Brickell Avenue, Miami, Florida 33131.

60.    AEB Lux was incorporated and organized under the laws of the Grand Duchy of Luxembourg as a *société anonyme*, a type of public limited company common in civil law countries.  AEB Lux's registered office is located at 26 boulevard Royal, L-2449 Luxembourg. AEB Lux changed its name from American Express Bank (Luxembourg) S.A. to American Express Financial Services (Luxembourg) S.A. in 2005, then to Standard Chartered Financial Services (Luxembourg) S.A., after being acquired by Standard Chartered PLC. AEB Lux is currently in liquidation under the laws of the Grand Duchy of Luxembourg and is represented by its liquidator, Mr. Hanspeter Krämer, located at 30 rue Schrobilgen, L-2526 Luxembourg. Hanspeter Krämer is a defendant in his capacity as the court-appointed liquidator and representative of AEB Lux, and as representative of AEB Lux's investors and creditors. Allegations and references to Defendant AEB Lux herein include Mr. Krämer.

61.    Prior to being acquired by Standard Chartered PLC, AEB New York managed AEB Miami and AEB Lux, which operated together as a single enterprise.  AEB Miami marketed the Fairfield Funds and coordinated the client relationships with its U.S. affiliates, AEB New York, and AEB Lux.  As part of this single enterprise AEB Lux entered into the subscription agreements with the Fairfield Funds and distribution agreements with FG Limited.

62.    AEB Lux is subject to personal jurisdiction in this district because it purposely availed itself of the laws and protections of the United States of America and the State of New York by, among other things:

(a)    Acting under the direction of AEB New York as the investor in Fairfield Sentry;

(b)    Purposefully and knowingly directing funds to be invested with New York-based BLMIS through the Fairfield Funds, which each had operations or principal places of business in New York;

(c)    Investing on behalf of AEB and the other Defendants pursuant to subscription agreements with the Fairfield Funds and distribution agreements with FG Limited governed by New York law, and through which AEB Lux agreed to be subject to the jurisdiction of New York courts;

(d)    Knowingly sending Fairfield Sentry subscription payments in U.S. dollars to New York bank accounts for ultimate deposit in BLMIS's New York bank account;

(e)    Designating and using New York bank accounts, including a correspondent account with the Bank of New York, to receive subsequent transfers on behalf of AEB and the other Defendants from BLMIS in the form of redemptions of Fairfield Sentry shares, as well as rebates and fees from FG Limited in New York, all in U.S. dollars on numerous occasions; and

(f)    Investing in Fairfield Funds with regular communications and contact with FGG employees in New York.

63.    Accordingly, AEB Lux knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States of America and the State of New York.

64.    AEB Lux acknowledged in the Fairfield Sentry subscription agreements that it received and reviewed a copy of Fairfield Sentry's private placement memorandum ("PPM"), which disclosed:

(a)    Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

(b)    BLMIS performed all investment management duties for these assets;

(c)     BLMIS was registered with the SEC;

(d)     BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

(e)     BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

(f)     BLMIS was the custodian of Fairfield Sentry's investments with BLMIS;

(g)     BLMIS was "essential to the continued operation of" Fairfield Sentry;

(h)     Fairfield Sentry's initial investment manager was Fairfield Greenwich Limited, an FGG company whose principal place of business was FGG's office in New York; and

(i)     Fairfield Sentry retained U.S. counsel in New York.

65.     AEB Lux entered into subscription agreements with Fairfield Sigma that were nearly identical to the Fairfield Sentry subscription agreements.  In particular, pursuant to the Fairfield Sigma subscription agreements, AEB Lux agreed the transaction would be governed by New York law, submitted to the jurisdiction of the courts of the State of New York, and acknowledged that it received and reviewed a copy of Fairfield Sigma's PPM.

66.     AEB New York received Fairfield Sigma's PPM, which described how, among other things: (a) Fairfield Sigma invested exclusively in Fairfield Sentry, receiving investments in Euros and converting them to U.S. Dollars to invest in Fairfield Sentry, with a small currency hedge; and (b) FG Limited in New York was Fairfield Sigma's initial investment manager.

67.     AEB New York directed AEB Lux's purchase of the Fairfield Funds shares and with AEB Miami negotiated and entered into distribution agreements with Fairfield Greenwich Limited in New York pursuant to which AEB received a percentage of management fees paid to FGG entities by the Fairfield Funds.  These agreements were governed by the laws of the State of New York and were addressed to AEB's New York office.

17

68.     Consistent with the distribution agreements, AEB Miami was identified as AEB Lux's agent on performance and management fee reports prepared by Fairfield Sentry's administrator, which detailed the fees AEB Miami received for AEB's purchases of Fairfield Funds shares.

69.     On February 29, 2008, Standard Chartered PLC acquired each Defendant, assumed their liabilities, and continued their business operations with respect to the BLMIS Feeder Funds (the "Acquisition").  Following the Acquisition, Defendants' corporate structure was reorganized such that AEB Miami and AEB Lux were no longer subsidiaries of AEB New York.  Defendants are all now wholly owned subsidiaries of Standard Chartered Bank.

70.     Each Defendant, highlighted in the figure below, should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure and the United States Constitution.

**Trustee's Figure 1: AEB Organization Before and After the 2008 Acquisition by Standard Chartered PLC**



## VI.    DEFENDANTS COLLECTIVELY ACTED AS ONE BUSINESS

71.    Each Defendant was part of the American Express Company's international banking business, which was headquartered in New York and comprised of offices worldwide that all used the marketing name "American Express Bank" ("AEB").

72.    Both before and after the Acquisition and the change in their corporate names, Defendants continued their same operations and held themselves out to the public as AEB by using the "American Express Bank" and "American Express Private Bank" marketing names.

### A.    Key AEB Groups, Committees, and Executives

73.    Certain AEB New York groups and committees managed and oversaw AEB's promotion of the BLMIS Feeder Funds. Although these groups and committees were centered in New York, they also included executives from other AEB offices, including AEB Miami. This reporting structure and the key employees responsible for the investments in the BLMIS Feeder Funds remained in place after the Acquisition. As described more fully below, Defendants deviated from their standard policies, procedures, and controls that would have confirmed Madoff was a fraud even after two of their executives issued separate warnings that BLMIS's returns were "not possible" and that Fairfield Sentry was a "scam" and would "explode."

#### 1.    The Global Investment Group

74.    AEB's Global Investment Group was responsible for AEB's diligence of hedge funds into which AEB invested its clients' funds, including the BLMIS Feeder Funds.

75.    AEB New York's Executive Director, Robert Friedman, was the head of the Global Investment Group, which also included several other executives from AEB New York and AEB's Geneva office.

### 2.    The Client Investment Committee

76.    AEB New York's Client Investment Committee was responsible for approving and reviewing investment products that AEB promoted to its clients.

77.    Many Client Investment Committee members were AEB New York employees, including Friedman.   Other AEB executives from its offices in New York, Miami, Geneva, London, France, India, Hong Kong, and Singapore, including Rodolfo Pages, the head of sales at AEB Miami, also attended the Client Investment Committee's quarterly meetings.

78.    In October 2003, the Client Investment Committee reviewed and approved Fairfield Sentry on the recommendation of the Global Investment Group, namely Friedman and Joseph Hardiman.

### 3.    The Product Approval Committee

79.    AEB New York's Product Approval Committee vetted and approved new investment products that AEB created and promoted.   In January 2003, based on the recommendation of Friedman and Samuel Perruchoud with the Global Investment Group, the Product Approval Committee approved the Concentrated Elite Managers Fund of Funds Portfolio ("Concentrated Elite Fund"), a fund of funds that allocated 25% of its assets to purchase Fairfield Sentry shares.

### 4.    The Risk Management Committee

80.    AEB New York's Risk Management Committee oversaw every AEB investment product.  Both the Global Investment Group and Client Investment Committee separately reported to the Risk Management Committee about AEB's investment products.  The Risk Management Committee thus oversaw the Global Investment Group's and Client Investment Committee's responsibilities for the BLMIS Feeder Funds.

### 5.    Key AEB Executives

81.    Robert Friedman was the Executive Director of AEB New York, the head of the Global Investment Group, and a member of the Client Investment Committee and the Product Approval Committee.  He was responsible for "integrat[ing] [AEB's] global investment product offerings" and "organiz[ing] [its] investment staff around the world into a cohesive team." Friedman was identified as the "Utility Head" in the Global Investment Group's memorandum to the Client Investment Committee recommending Fairfield Sentry.  He was the "gatekeeper" and decision-maker for all AEB investment products both before and after the Acquisition.

82.    Samuel Perruchoud was the Chief Investment Officer of Funds of Hedge Funds for AEB in Geneva.  Perruchoud was the Global Investment Group member primarily responsible for conducting due diligence on Fairfield Sentry and, along with Friedman, recommended Fairfield Sentry.

83.    Arnaud Heymann was a Senior Director and Global Co-Head of Hedge Fund investments for AEB in Geneva. Heymann participated in three of four Client Investment Committee meetings in 2008.

84.    Joseph Hardiman was a Senior Director of Hedge Fund Products from 1999 to 2007, at which point he became the Chief Operating Officer ("COO") and Managing Director of AEB New York.

**Figure 2: Reporting Lines for Key AEB Groups, Committees, and Executives Who Shared Information on BLMIS-Related Investments**



B.      **Defendants Acted Collectively to Invest Their Clients' Money in the BLMIS Feeder Funds**

85.     In 2003 AEB New York initiated AEB's purchase of Fairfield Sentry shares. AEB initially purchased the Fairfield Sentry shares for its own use in creating the Concentrated Elite Fund. Later AEB expanded the purchase of Fairfield Sentry for clients. Eventually, AEB further expanded its role with BLMIS Feeder Funds by agreeing to distribute structured notes linked to the performance of the BLMIS Feeder Funds.

86.     AEB New York directed AEB Lux to sign the subscription agreements and hold the shares in the BLMIS Feeder Funds for AEB because investments in those funds were foreclosed to U.S. taxpayers. AEB Miami then sold the BLMIS Feeder Funds shares to AEB clients. AEB Lux thereafter received the subsequent transfers on behalf of AEB and the other

Defendants.  As part of the single enterprise, Defendants acted as agents and alter egos of each other in connection with their investments in the BLMIS Feeder Funds.

## VII.    DEFENDANTS RECOGNIZED ABNORMALITIES IN BLMIS TRADING THAT RAISED CONCERNS

87.    Prior to AEB investing with the BLMIS Feeder Funds, Perruchoud reported the anomalies and risks associated with BLMIS to the Global Investment Group, pointing to Madoff's secrecy and the inability to independently verify his trades.  Following investment, and after reviewing Fairfield Sentry's November 2004 trade confirmations and account statements Perruchoud warned his colleagues that Fairfield Sentry would "explode" because it was "not possible to achieve such high returns with such low volatility."  Later, after his own review of Fairfield Sentry, Heymann reached the same conclusion as Peruchoud and told Friedman the Fairfield Funds were "a scam" that could "explode" at any time.

### A.    Initial Review of Fairfield Sentry

#### 1.    Defendants Approved BLMIS Feeder Funds to Their Clients Despite Concerns

88.    In December 2002, Perruchoud visited FGG's New York office to review the performance and operations of Fairfield Sentry and, effectively, BLMIS.  Perruchoud reported that Madoff purportedly traded in "15% of the volume of listed stocks in the US" but did not allow financial institutions to meet with him.

89.    Perruchoud also noted the lack of any independent verification that Madoff actually had the assets and traded them as he reported, in direct contrast with the two other non-Madoff FGG funds in the Concentrated Elite Fund that each had independent prime brokers.

90.    The Global Investment Group recommended the creation of the Concentrated Elite Fund, a fund of funds with 25% of its assets used to purchase Fairfield Sentry shares, that would be sold to AEB's clients with AEB earning fees for managing and selling the fund.  Perruchoud

indicated that the inclusion of Fairfield Sentry in AEB's fund of funds portfolio would attract

substantial sales. He also recognized that investing in single-manager hedge funds—like BLMIS—

"entails significant 'manager risk'" relating to the "integrity of the underlying managers

themselves."

91.    At that time, Perruchoud admitted time that, despite AEB's concerns, AEB did not

follow the Defendants' standard review process because they did "not have access to Madoff for

due diligence purposes."

92.    Nevertheless, Perruchoud and Friedman continued to profit from the fees buoyed

by BLMIS's impossible returns.   While spearheading BLMIS-related investments in 2003,

Perruchoud was promoted to "head the alternative group for Amex globally."

93.    At the January 2003 meeting attended by Friedman and Hardiman, the Product

Approval Committee specifically recognized that the Concentrated Elite Fund involved "Manager

Risk."   The meeting minutes noted that AEB's pre-investment review process "cannot guarantee

against an individual manager blowing up."

94.    In September 2003, the Global Investment Group prepared a memorandum to the

Client Investment Committee, recommending that AEB market Fairfield Sentry directly to its

clients.   Hardiman and Friedman headed this effort.   The Global Investment Group identified

Fairfield Sentry as a "particularly attractive product" with high returns, low volatility, and over

96% positive months during a 13-year period.   All the while, no one at AEB could explain how

Madoff was achieving BLMIS's high returns with such low volatility.

B.    **Ongoing Analysis of BLMIS and the BLMIS Feeder Funds Further Revealed Abnormalities in BLMIS's Trading**

95.    The Global Investment Group and Client Investment Committee continued their perfunctory review of Fairfield Sentry, Fairfield Sigma, and Kingate Global throughout AEB's investment in the BLMIS Feeder Funds.

1.    **Defendants Reviewed BLMIS Trade Confirmations and Thereafter Expressed Concern that BLMIS Would "Explode"**

96.    Hardiman, on behalf of Friedman, asked FGG in April 2004 to arrange a meeting between AEB and Madoff. However, because Madoff refused to meet with FGG clients, FGG offered to let AEB visit FGG's office to review FGG's records.

97.    In December 2004, Perruchoud took FGG up on its offer and conducted a review of Fairfield Sentry's November 2004 portfolio and trade confirmations in FGG's New York office.

98.    Shortly after his December 2004 meeting Perruchoud told his colleague Sebastian Gonzalez that Fairfield Sentry would "explode" because it was "not possible to achieve such high returns with such low volatility."

2.    **Defendants Continued Their BLMIS-Related Activities After Being Acquired by Standard Chartered Bank in Spite of Their Concerns Regarding Trading Abnormalities**

99.    Prior to acquiring AEB in February 2008, Standard Chartered PLC had conducted its own review of certain BLMIS-related investment products but did not invest in any of them.

100.    After the acquisition, Standard Chartered insisted that FGG arrange a meeting between AEB and Madoff to comply with its own internal review requirements. AEB was Fairfield Sentry's largest shareholder, with holdings over $500 million, and yet AEB had never met with Madoff. Within a week of this request, FGG scheduled a meeting for AEB with Madoff for later that month.

101.    On April 15, 2008, Friedman and two other members of the Global Investment Group met with Madoff and two FGG partners at BLMIS's office in New York.  Previously FGG told Perruchoud that the volume of SSC accounts was affecting returns.  Although BLMIS's Form ADV as of December 2007 reported that it had $17.1 billion in assets under management, Madoff told AEB during their meeting that he managed between $20 and $50 billion, and in contrast to what FGG had said, Madoff claimed the outsized amount of assets under management was not causing diminished returns.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

102.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

103.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109]. The Trustee's litigation against the entities and certain individuals responsible for the management and operation of the Fairfield Funds is ongoing.

104.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

105.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

106.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.

107.    Of the Judgment Amount, approximately $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

108.    Of the Fairfield Sentry Six Year Transfers, at least $1,667,125,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    Subsequent Transfers from Fairfield Sentry to Defendants**

109.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to Defendants. Based on the Trustee's investigation to date, the subsequent transfers to AEB Lux, which received those transfers collectively for all the Defendants, total $274,029,164 ("Subsequent Transfers"). A chart setting forth the presently known Subsequent Transfers is attached as Exhibit C.

110.    On April 26, 2012, the Trustee filed this action seeking recovery of the Subsequent Transfers.

111.    The Subsequent Transfers are recoverable from Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

112.    The Subsequent Transfers represent a redemption of equity interests by AEB Lux on behalf of Defendants as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Subsequent Transfers to Defendants upon redemption of their interests.

C.    **Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to Defendants**

113.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Six Year Transfers directly to Fairfield Sigma ("Fairfield Sentry-Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-Fairfield Sigma Subsequent Transfers by date and amount is attached as Exhibit D.

114.    Thereafter, Fairfield Sigma transferred at least $15,203,270 to AEB Lux, which received those transfers on behalf of the other Defendants (the "Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

115.    The Fairfield Sigma Subsequent Transfers are recoverable from Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

116.    The Fairfield Sigma Subsequent Transfers represent a redemption of equity interests by AEB Lux on behalf of Defendants as a shareholder in Fairfield Sigma.  Because

Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma Subsequent Transfers to AEB Lux upon redemption of Defendants' interests.

117.    The Subsequent Transfers and Fairfield Sigma Subsequent Transfers are collectively referred to herein as the Fairfield Subsequent Transfers.

118.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

119.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

120.    Each of the Fairfield Subsequent Transfers is recoverable from Defendants under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

121.    Each of the Fairfield Subsequent Transfers was made to AEB Lux as part of AEB, which was operated collectively by the Defendants.  AEB Lux received those Fairfield Subsequent Transfers on behalf of AEB and the other Defendants.

122.    Defendants are immediate or mediate transferees of the Fairfield Subsequent Transfers from Fairfield Sentry.

123.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants:  (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendants as follows:

(i)    Recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate;

(ii)    If Defendants challenges the avoidability of the Fairfield Sentry Initial Transfers to Defendants, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

(iii)    Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by Defendants; and

(iv)    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: May 17, 2022
      New York, New York

/s/ *David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Michelle R. Usitalo
Email: musitalo@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*

*for the substantively consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*