**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02541 (CGM) |
| Plaintiff, | |
| v. | |
| FIRST GULF BANK, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT FIRST GULF BANK'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 2

I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS........................... 2

II.     SENTRY ........................................................................................ 3

III.    FGB'S INVESTMENTS AND ITS TIES TO NEW YORK............................. 4

    A.      FGB Was a Sophisticated Investor ........................................ 4

    B.      FGB Used Its Investment in Sentry to Gain Access to New York-Based BLMIS. 5

    C.      FGB Had Numerous Contacts in New York.......................... 8

ARGUMENT .............................................................................................. 9

I.      THE COURT HAS PERSONAL JURISDICTION OVER FGB....................... 9

    A.      FGB's Contacts With New York Support Jurisdiction........................ 11

        1.      FGB Purposefully Availed Itself of the Laws and Privileges of New York 12

            a.      *BLI* Establishes this Court's Jurisdiction Over FGB .................... 13

            b.      *Walden* Does Not Change the Jurisdictional Analysis ................. 14

        2.      FGB's Repeated Meetings and Communications with Sentry in New York Further Establish Personal Jurisdiction .........................................16

        3.      FGB's Purposeful Use of New York Bank Accounts Establishes Specific Personal Jurisdiction...........................................................18

            a.      FGB's Use of Its Bank of New York Account and the HSBC USA Account Supports Jurisdiction ...................................... 20

            b.      The Trustee's Claims Relate to FGB's Use of Its Bank of New York Account and the HSBC USA Account in New York .......... 21

    B.      Exercise of Personal Jurisdiction Over FGB Is Reasonable ................................ 24

    C.      In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery................. 25

II.     SECTION 546(E) DOES NOT PREVENT THE TRUSTEE FROM AVOIDING THE TRANSFERS TO FGB.................................................................. 26

    A.      The Section 546(e) Exception Does Not Extend to the Knowledge of the Subsequent Transferee.......................................................... 26

    B.      BLMIS Ran the IA Business as a Ponzi Scheme and the Trustee Is Entitled to Rely on the Ponzi Scheme Presumption............................................. 27

III.    THE TRUSTEE HAS SATISFIED HIS PLEADING BURDEN .................................... 29

A.      The Trustee's Complaint Sufficiently Pleads the Avoidability of the Sentry Initial
        Transfers ........................................................................................................... 29

B.      The Trustee's Complaint Properly Pleads That FGB Received Recoverable
        Customer Property Under Section 550(A) ........................................................... 31

        1.      FGB Misstates the Trustee's Pleading Burden ............................................ 33

        2.      FGB's Claims of Double Recovery Are Premature ................................... 37

IV.    THE 550(B) GOOD FAITH AND VALUE DEFENSES ARE AFFIRMATIVE
       DEFENSES THAT ARE INAPPROPRIATE AT THE MOTION TO DISMISS STAGE
       ........................................................................................................................... 38

CONCLUSION ................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*In re 45 John Lofts, LLC*,
  599 B.R. 730 (Bankr. S.D.N.Y. 2019). ............................................................................. 34

*In re Allou Distribs., Inc.*,
  379 B.R. 5 (Bankr. E.D.N.Y. 2007) .................................................................................. 34

*Am. Casein Co. v. Geiger (In re Geiger)*,
  446 B.R. 670 (Bankr. E.D. Pa. 2010) ............................................................................... 30

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.*,
  480 U.S. 102 (1987) .......................................................................................................... 26

*In re AWTR Liquidation Inc.*,
  548 B.R. 300 (Bankr. C.D. Cal. 2016) ............................................................................. 38

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou Grp. LLC)*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 439 B.R. 284
  (S.D.N.Y. 2010) ........................................................................................................... 29, 30

*In re Bernard L. Madoff Inv. Sec. LLC*,
  No. 1:21-CV-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ....................... 28, 29

*In Re: Bernard L. Madoff Inv. Sec. LLC* ("*Fortis*"),
  No. 20-CV-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ........................ 38, 39

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ....................................................................................................... 9, 16

*Burlington Indust., Inc. v. Salem Int'l Co.*,
  645 F. Supp. 872 (S.D.N.Y. 1986) .................................................................................... 17

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) ...................................................................................... 9, 11, 25

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
  393 B.R. 306 (Bankr. W.D.N.Y. 2008) ............................................................................ 38

*Dandong v. Pinnacle Performance Ltd.*,
  966 F. Supp. 2d 374 (S.D.N.Y. 2013) ............................................................................... 19

*DeMasi v. Benefico*,
  567 F. Supp. 2d 449 (S.D.N.Y. 2008) ............................................................................... 31

*In re Dewey & LeBoeuf LLP*,
  522 B.R. 464 (Bankr. S.D.N.Y. 2014) .............................................................................. 18

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ........................................................................................... 9

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ................................................................... 37, 39

*Druck Corp. v. Macro Fund (U.S.) Ltd.*,
    102 F. App'x 192 (2d Cir. 2004) ................................................................................ 17

*Eldesouky v. Aziz*,
    No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ........................... 19

*ESI, Inc. v. Coastal Corp.*,
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) ............................................................................ 12

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F.Supp.3d 323 (S.D.N.Y. 2019) ........................................................................... 21

*Ferrari v. Cnty of Suffolk*,
    790 F. Supp. 2d 34 (E.D.N.Y. 2011) .......................................................................... 31

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) .................................................................... 10, 22, 23, 24

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
    No. 11-3673(RJS), 2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) ...................................... 18

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier)*,
    No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) .......................... 37

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005) ...................................................................................... 11

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981) ...................................................................................... 18

*Hau Yin To v. HSBC Holdings plc*, No. 15CV3590-LTS-SN ........................................ 23

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
    601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021) ...................... 38

*Hill v. HSBC Bank*
    207 F. Supp. 3d 333 (S.D.N.Y. 2016) .................................................................. 23, 24

*Homeschool Buyers Club, Inc. v. Brave Writer, LLC, No. 19-CV-6046 (VSB)*,
    2020 WL 1166053 (S.D.N.Y. Mar. 11, 2020) ............................................................. 16

*HSH Nordbank AG N.Y. Branch v. Street*,
    No. 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ...................... 19, 22

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ........................................................................................ 9, 10, 22

iv

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ............................................................................................... 10, 14, 16

*Kelley v. Westford Special Situations Master Fund, L.P.*,
    No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) .................................... 35, 36

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 Civ. 7618(KMW)(HBP), 2009 WL 3817590 (Nov. 16, 2009)............................... 26

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
    No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013)........................... 24

*Licci v. Lebanese Canadian Bank, SAL*,
    984 N.E.2d 893 (N.Y. 2012) ............................................................................................ 21

*McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*,
    439 B.R. 78 (Bankr. S.D.N.Y. 2010) ................................................................................ 36

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) .............................................................................................. 10

*In re Motors Liquidation Co.*,
    565 B.R. 275 (Bankr. S.D.N.Y. 2017) .............................................................................. 21

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018) ........................................................................................... 31

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................................................ 24

*Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016) ........................................................................................... 22

*Picard v. BNP Paribas S.A. (In re Madoff)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ....................................................................... *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) (Lifland, J.)..................................................... *passim*

*Picard v. Chais (In re BLMIS)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) ........................................................................ 21, 22

*Picard v. Charles Ellerin Rev.Tr. (In re BLMIS)*,
    No. 08-01789 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)........................ 33, 35

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    12 F.4th 171 (2d Cir. 2021)....................................................................................... *passim*

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................... 27, 28, 36

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ............................................................................... 20

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
   627 B.R. 546 (Bankr. S.D.N.Y. 2021) ............................................................. 2, 9, 10, 22

*Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*
   Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021)............... *passim*

*Picard v. JABA Assocs. LP (In re Bernard L. Madoff)*,
   528 F. Supp. 3d 219 (S.D.N.Y. 2021) ............................................................................... 29

*Picard v. JPMorgan Chase & Co.*,
   No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10, 2014)..................................... 14

*Picard v. Lowrey (In re BLMIS)*,
   596 B.R. 451 (S.D.N.Y. 2019) ............................................................................... 31

*Picard v. Maxam Absolute Return Fund, L.P.*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ............................................................... 10, 12, 26

*Picard v. Mayer (In re BLMIS)*,
   Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021)..................... 33

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)* ("*Merkin I*"),
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ............................................................................... 39

*Picard v. Merkin (In re BLMIS)* ("*Merkin II*"),
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................................... *passim*

*Picard v. Merkin (In re Bernard L. Madoff)* ("*Merkin III*"),
   581 B.R. 370 (Bankr. S.D.N.Y. 2017) ....................................................................... 32, 36

*Picard v. Nelson (In re BLMIS)*,
   610 B.R. 197 (Bankr. S.D.N.Y. 2019) ....................................................................... 28, 29

*Picard v. Sage Realty*,
   No. 20 Civ. 10057 (JFK), 2021 WL 5926059 (S.D.N.Y. Dec. 15, 2021) ........................................... 38

*Picard v. Sage Realty*,
   No. 20 CIV. 10057 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) ........................................... 29

*Picard v. Shapiro,*
   *542 B.R. 100 (Bankr. S.D.N.Y. 2015)* ....................................................................... 34, 35

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
   917 F.3d 85 (2d Cir. 2019) ............................................................................... 12, 24, 26, 28

*Quilvest Fin. Ltd. v. Fairfield Sentry Ltd.*,
   Nos. HCVAP 2011/041–052 ............................................................................... 40

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ........................................................................................ 32

*Rubinbaum LLP v. Related Corp. Partners V, L.P.*,
   154 F. Supp. 2d 481 (S.D.N.Y. 2001) ...................................................................... 18

*S. New Eng. Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010) ........................................................................................ 9

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
   245 F. Supp. 2d 543 (S.D.N.Y. 2003) ...................................................................... 17

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*,
   501 B.R. 26 (S.D.N.Y. 2013) .................................................................................... 31

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   No. AP 08-01789 (SMB), 2018 WL 3078149 (Bankr. S.D.N.Y. June 20, 2018) ............... 28

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ...................................................................................... 24

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) .................................................................................................... 24

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
   39 F. Supp. 3d 461 (S.D.N.Y. 2014) ........................................................................ 38

*Walden v. Fiore*,
   571 U.S. 277 (2014) ........................................................................................ 14, 15, 16

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) ...................................................................................... 25

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*,
   No. 19-CV-3444 (VSB), 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ........................... 19

**Statutes**

11 U.S.C. 548(a)(1)(A) .................................................................................................... 26

11 U.S.C. § 546(e) ........................................................................................ 1, 24, 26, 27

11 U.S.C. § 548(a)(1)(A) ................................................................................ 26, 28, 29, 30

11 U.S.C. § 550 ................................................................................................... *passim*

11 U.S.C. § 550(d) ........................................................................................................ 38

15 U.S.C. § 78*lll*(4) ........................................................................................................ 1

**Rules**

Fed. R. Civ. P. 8(a)(2)...................................................................................................................... 30

Fed. R. Civ. P. 10(c)........................................................................................................................ 30

Fed. R. of Civ. P. 37(e)................................................................................................................... 37

N.Y. C.P.L.R. § 302(a)(1)............................................................................................................... 19

**Other Authorities**

MERRIAM-WEBSTER (11th ed. 2020)....................................................................................................... 7

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"),

submits this memorandum of law and declaration of Dean D. Hunt ("Decl."), in opposition to

Defendant First Gulf Bank's ("FGB")[1] Motion to Dismiss the Complaint ("Motion").

## PRELIMINARY STATEMENT

The Trustee filed this lawsuit against FGB, a United Arab Emirates based bank, on August

18, 2011. FGB knowingly invested in BLMIS through Fairfield Sentry ("Sentry"), a single purpose

feeder fund wholly dependent on BLMIS. The Trustee seeks to recover from FGB two "Two-Year

Period"[2] subsequent transfers of stolen Customer Property[3] totaling $11,532,393 under 11 U.S.C.

§ 550. Compl. ¶ 44. By the very nature of FGB's investments and withdrawals, the financial gain

that it sought could only be obtained through purposeful contact with New York.

All of FGB's arguments for dismissal fail. First, this Court has personal jurisdiction over

FGB. FGB's contacts with the forum related to its BLMIS investments are precisely the type of

minimum contacts courts have found establish this Court's specific personal jurisdiction.

Second, 11 U.S.C. § 546(e) does not bar the Trustee from avoiding the initial transfers from

BLMIS to Sentry. The safe harbor provision of Section 546(e) does not protect FGB from liability

because the Trustee only seeks to recover transfers made during the Two-Year Period and has

sufficiently pled the avoidability of the initial transfers to Sentry. Also, contrary to FGB's

assertions, at the pleading stage, the Trustee's Complaint is not required to specify a tracing

---

[1] FGB is now known as First Abu Dhabi Bank, but has chosen to use its former name, FGB. Motion at 1 n.1.

[2] The "Two-Year Period" is the two years prior to the December 11, 2008 Filing Date.

[3] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

1

methodology to detail what portion of the subsequent transfers to FGB comprise Customer Property.

Third, the Trustee correctly incorporates by reference his Complaint against the Fairfield Greenwich Group of defendants in his Complaint against FGB.[4] An incorporation to plead the avoidability of the initial transfers from BLMIS to Sentry is proper under the Federal Rules of Civil Procedure.

Fourth, and finally, FGB is not entitled to dismissal based on the "good faith" and "value" Section 550 affirmative defenses. By their very nature, these defenses are fact driven and require expert analysis and presentation of evidence and thus, are not appropriate for a motion to dismiss.

As detailed below, FGB's challenges to the Trustee's Complaint are insufficient and the Motion must be denied.

## STATEMENT OF FACTS

### I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Complaint ("Compl.") ¶ 22. BLMIS was a registered broker-dealer in New York. *Id.* BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.* For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 23–

---

[4] Amended Complaint, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL) (July 20, 2010), ECF No. 23 ("Fairfield Amended Complaint"), now superseded by the Second Amended Complaint. Second Amended Complaint, *Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*, Adv. Pro. No. 09-01239 (SMB) (Aug. 28, 2020), ECF No. 286.

24. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶ 25. On December

11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of

federal securities laws, including securities fraud, investment adviser fraud, and mail and wire

fraud. *Id.* ¶ 10.

The sweeping financial damage Madoff caused was made possible by BLMIS "feeder

funds"—large investment funds created for the express purpose of funneling investors' money into

BLMIS. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 179

(2d Cir. 2021). FGB knowingly invested in one such feeder fund, Sentry. Compl. ¶¶ 2, 6.

## II.    SENTRY

Sentry was controlled by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership

managed and operated in New York. *See Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L.*

*Madoff)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6,

2021); *see also* Compl. ¶ 6. Sentry was a single purpose investment fund—that purpose was to

funnel money to BLMIS. Sentry represented it was managed from New York through Fairfield

Greenwich Limited.  Decl., Ex. 1.  At all times, FGG conducted key operations from its New York

office.  *Id.*, Ex. 15, 28. Sentry was a U.S. dollar-denominated fund that invested 95% of the assets

of investors like FGB with BLMIS. *See* Compl. ¶¶ 2, 6.

As detailed below, Sentry required investors, like FGB, to execute a Subscription

Agreement ("Subscription Agreement"), in which the investors acknowledged their sophistication.

The Subscription Agreement incorporated Sentry's Information Memorandum ("IM")[5] into that

contract and, by signing, investors warranted that they "received and read . . . the terms of the

Private Placement Memorandum." The IM clearly detailed that Sentry had given New York-based

---

[5] Later versions of the IM were subsequently titled the "Private Placement Memorandum."

BLMIS total control over FGB's investment to utilize BLMIS's options trading SSC Strategy to buy and sell U.S. securities, options, and treasuries traded on New York exchanges.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover approximately $3 billion of fraudulent transfers of Customer Property. Compl. ¶ 34. In 2011, the Trustee settled with Sentry and others. *Id.* ¶ 39. As part of the settlement, Sentry consented to a $3.054 billion judgment but paid only $70 million to the BLMIS estate *Id.* The Trustee then commenced a number of adversary proceedings against defendants like FGB to recover the approximately $3 billion in stolen Customer Property.

## III.    FGB'S INVESTMENTS AND ITS TIES TO NEW YORK

### A.    FGB Was a Sophisticated Investor

Investing in Sentry was limited to professional investors, such as FGB, "who ha[d] the ability to speculate in high risk securities." *See* Decl. Ex. 1. When FGB received subsequent transfers of BLMIS Customer Property in 2008, it was one of the largest equity-based banks in the United Arab Emirates. Compl. ¶ 3. FGB was a highly sophisticated full-service bank that claimed to capitalize on its deep understanding of the markets and purported to attach great weight to its ability to manage risk. *Id.* The head decision makers of FGB were all educated in the United States, knowledgeable, and experienced:

- **Mansour bin Zayed bin Sultan Al Nahyan** ("Sheikh Mansour") served as the Chairman of FGB until 2006. Sheikh Mansour studied English at Santa Barbara Community College, is the deputy prime minister of the United Arab Emirates, minister of presidential affairs, and member of the royal family of Abu Dhabi. Sheikh Mansour also maintained a personal account with Sentry.
- **Abdul Hamid Mohammed Saheed** was the Managing Director of FGB as of March 2006 and sat on FGB's Board of Directors. Mr. Saheed is currently Governor of Central Bank of United Arab Emirates. Mr. Saheed, educated at University of Arizona, also maintained a personal account with Sentry.
- **Zafar Habib Khan** worked as FGB Chief Investment Officer from 2001 to 2009. Mr. Khan received his MBA in finance from American University. He worked for Falcon Private Bank, another subsequent transferee sued by the Trustee, from 2009 to 2014 and is currently CEO of Falcon Private Wealth

Management. Mr. Khan met and corresponded with Sentry representatives in New York.

- **Sara Al-Binali** was the Head of Strategic Planning at FGB beginning in 2004, and currently holds the same position at First Abu Dhabi Bank, which merged with FGB in 2016. After graduating from Northwestern University with a B.A. in Economics in 1998, Ms. Al-Binali began her career at the Abu Dhabi Investment Authority before moving to FGB. Ms. Al-Binali met and corresponded with Sentry representatives in New York.

- **Shahid Rasool** served as Head of Investments at FGB from 2005 to 2009. Mr. Rasool received his MBA from The University of Chicago, Booth School of Business and joined FGB as Chief Dealer & Senior Manager of Alternative Investments, Group from 1996 to 2000. Mr. Rasool met and corresponded with Sentry representatives in New York.

**B.    FGB Used Its Investment in Sentry to Gain Access to New York-Based BLMIS**

FGB began investing in May 2001. Decl. Ex. 2. Over a seven-year period, Sentry facilitated FGB's $9,178,327 investment in BLMIS. FGB received two subsequent transfers of BLMIS Customer Property from Sentry of $2,626,363 on June 17, 2008 and $8,906,030 on October 15, 2008 totaling the $11,532,393 the Trustee seeks in this recovery action. Compl. ¶ 40, Ex. D; *see* Decl. Exs. 3, 4. In its Motion, FGB contends it was a victim of BLMIS and that the Trustee seeks to impose even greater losses. Mot. at 1. Not true. The Trustee's investigation shows FGB did not lose money from the Ponzi scheme, it received a windfall of $2,354,066 more than it invested.

FGB's financial transactions that form the basis of the Complaint were rooted in New York. When FGB first invested in BLMIS, it executed a Subscription Agreement with Sentry. Under the Subscription Agreement, as detailed in the IM, FGB gave money to Sentry to pass on to New York-based BLMIS to invest in U.S. securities and treasuries. Decl. Ex. 1. Each time FGB authorized Sentry to invest its money in BLMIS, it executed a Short Form Subscription Agreement confirming it had executed and was bound by the Subscription Agreement. *See* Decl. Ex. 5.

The Subscription Agreement incorporated Sentry's IM into the contract between FGB and Sentry. Each time FGB invested money in Sentry, it warranted, through a Short Form Subscription

5

Agreement, that FGB had "received and read" the IM and reaffirmed "each and every representation and covenant made by [FGB] in the original Subscription Agreement." *See id.* FGB's redemption documents further confirm that its redemptions were "defined in and subject to all of the terms and conditions of the [IM]." Decl. Exs. 6, 7. The IM identified that Sentry's attorney was located in New York. Decl. Ex. 1.

Under the IM in effect when FGB first subscribed to Sentry on May 31, 2001, there was no doubt about the investment's inextricable ties to New York. FGB knowingly took advantage of those ties to make money by investing in BLMIS. The IM described Sentry's total reliance on BLMIS. *See id.* In fact, FGB authorized investing in a fund whose objective was only achieved by allocating the assets invested by FGB to BLMIS, in New York:

> **BUSINESS OBJECTIVE OF THE COMPANY**
>
> The Company will seek to achieve capital appreciation of its assets by allocating its assets to an account at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, which employs an options trading strategy described as "split strike conversion".

*See id.* The IM affirmed the fund's dependance on BLMIS, stating:

> 4. **Dependence Upon Principals and Bernard L. Madoff Investment Securities.** The services of Messrs. Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the continued operations of the Manager. If any of their services were no longer available, their absence would have an adverse impact upon an investment in the Company. The manager has delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the Company is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

*See id.* Through the IM, FGB approved that **all** investment management duties were delegated to BLMIS, and, as a result, Sentry had **no control** over BLMIS's decisions. *See id.* Further, BLMIS was given unrestricted control over FGB's investment and "no arm's length relationship exists between [Sentry] and BLMIS" when executing transactions for the account. *See id.* Sentry's

complete reliance on BLMIS was endorsed by FGB and the IM clearly established BLMIS's authority and control over FGB's investment.

Using the access it gained to BLMIS, FGB sought "to obtain capital appreciation of its assets through the utilization of nontraditional options trading strategies." *See id.* The IM disclosed that Sentry achieved this through a discretionary account at BLMIS utilizing BLMIS's SSC Strategy. *See id.* Further, the IM made clear that all investment decisions in the New York-based BLMIS account were "effected by persons associated with BLM[IS]." *See id.* In fact, "[m]ost of the stocks for which [BLMIS] acts as a market maker are also listed on the New York Stock Exchange." *See id.* It was clear that decisions about FGB's investment were being made and executed by persons in New York trading on FGB's behalf through the New York Stock Exchange.

Regarding BLMIS's role as principal, the PMM disclosed:

**TRANSACTION EXECUTIONS**

BLM acts as a principal in connection with its sale of securities to the Company and the purchase of securities from the Company. BLM acts as a market-maker in the stocks purchased and sold by the Company. These market making activities enable BLM to trade with the Company as principal.

*See id.* FGB knew and agreed that BLMIS, a New York-based broker dealer, had controlling authority[6] over its investment, including its subscriptions and redemptions.

FGB also consented to Sentry's abdication of control of FGB's investments to BLMIS. FGB knew, and agreed, that the money it sent to Sentry would be held by New York-based BLMIS, as sub-custodian. Specifically, the IM disclosed:

---

[6] Merriam-Webster's dictionary defines "principal" as "a person who has controlling authority." *Principal*, MERRIAM-WEBSTER (11th ed. 2020).

**ESCROW BANK AND CUSTODIAN**

The Company's escrow account is maintained at Citco Bank Nederland N.V. Citco Global Custody N.V. ("Citco Custody") has agreed to act as the custodian of the Company's assets. Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of the Company's assets.

*See id.* The IM elaborated on additional connections to New York. It provided that both Sentry's attorney and Investment Manager were resident in New York. *See id.* The IM also instructed FGB to send subscription payments to a bank account with HSBC Bank USA located at 452 Fifth Avenue, New York, New York (the "HSBC USA Account"). *See id.*

### C.    FGB Had Numerous Contacts in New York

FGB knew Sentry and BLMIS were located in New York and FGB purposefully directed its activities toward New York—indeed, FGB employees travelled to New York to meet with FGG managers and executives on multiple occasions to consult with them about and gain the benefits of FGB's investments—investments that FGB redeemed, and the Trustee now seeks to recover. *See id.* Exs. 3, 4. To accomplish these goals, FGB regularly had meetings in New York with FGG, *see id.* Exs. 8–14, and sent direct correspondence to New York related to its subscriptions and redemptions. *See id.* Exs. 16–23.[7]

In addition, FGB used the New York banking system to subscribe into and redeem from Sentry. FGB sent its subscription payments to Sentry's HSBC USA Account. *See id.* Ex. 1. In its redemption documents with Sentry, FGB instructed all redemption proceeds be wired to an account held in FGB's name at Bank of New York in New York. *See id.* Exs. 6, 7. Specifically,

---

[7] FGB also sent correspondence both directly through its executives and through its agent, Peter Desjardins ("Desjardins"). Desjardins worked with Sentry on behalf of FGB, including communicating with FGG in New York to give and receive instructions related to FGB's subscriptions and plan meetings between FGG senior executives and FGB's decisionmakers, all at the direction and control of FGB. *See id.* Exs. 10–11, 24–26.

FGB used Bank of New York account number xxxxxxx165 to receive the Two-Year subsequent

transfers totaling $11,532,393 from Sentry. *See id.* Exs. 3, 4.

## ARGUMENT

### I.    THE COURT HAS PERSONAL JURISDICTION OVER FGB

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show

a *prima facie* case that personal jurisdiction exists, which "may be established solely by

allegations." *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013). A

plaintiff also may establish a *prima facie* case of jurisdiction through affidavits and supporting

materials that contain averments of facts outside the pleadings. *See S. New Eng. Tel. Co. v. Glob.

NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits are construed in the

light most favorable to the plaintiff, resolving all doubts in plaintiff's favor. *See Chloé v. Queen

Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). Specific jurisdiction exists where the

defendant purposefully directs its activities into the forum and the underlying cause of action arises

out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry

Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

The specific jurisdiction analysis is a two-step inquiry. First, did the defendant purposefully

establish "minimum contacts" in the forum, such that the defendant purposefully availed itself of

the privilege of conducting activities with the forum? *See Int'l Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945). Due Process requires "fair warning" that an activity will be subject to jurisdiction,

which is satisfied if the defendant has "purposefully directed" its activities to the forum. *Burger

King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The focus here is on the relationship among

the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775

(1984) (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). The claims "must arise out of or relate

to the defendant's contacts" with the forum, however specific jurisdiction does not require "proof

that the plaintiff's claim came about *because of* the defendant's in-state conduct." *Ford Motor Co.*

*v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025–26 (2021) (emphasis added) (citation

omitted).

Further, the defendant's activities do not have to take place in the forum, "and a single

transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R.

106, 117 (Bankr. S.D.N.Y. 2011). Moreover, minimum contacts exist when a "defendant's

allegedly culpable conduct involves, at least in part, financial transactions that touch the forum."

*In re Fairfield Sentry Ltd.*, 627 B.R. at 566. FGB's activities satisfy the first criterion.

Second, the court conducts a "reasonableness" inquiry to determine that its exercise of

jurisdiction will not offend traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326

U.S. at 320. To determine whether jurisdiction is reasonable, courts consider the following:

> (1) the burden on the defendant; (2) the interests of the forum State; (3) the
> plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in
> obtaining the most efficient resolution of controversies; and (5) the shared interest
> of the several States in furthering fundamental substantive social policies.

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987) (quoting

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). Where the plaintiff has

alleged purposeful availment, as the Trustee does here, the burden shifts to the defendant to present

a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R.

at 567 (citing *Burger King*, 471 U.S. at 472–73). Because FGB does not meet that burden, the

second criterion is satisfied.

In determining if a defendant's contacts establish personal jurisdiction, this Court must

look at "the totality of the circumstances" rather than analyze each contact in isolation. *Chloé*, 616

F.3d at 164; *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005)

("[T]he totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.").

FGB's attempt to avoid personal jurisdiction rests on flawed assertions that: (i) FGB's investments in New York were nothing more than "unilateral activity" of a third party, (ii) the Trustee has not alleged the subsequent transfers were received by bank accounts in New York, (iii) the Trustee has failed to allege connections to New York, and (iv) the Trustee has not alleged that FGB had any contacts with the U.S. related to the Trustee's claims. FGB is wrong on all counts. Not only does FGB ignore the jurisdictional allegations made in the Trustee's Original Complaint, Compl. ¶ 6, it also wholly overlooks the detailed allegations that have been on the record since 2015 in the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to FGB ("Proffered Allegations"). Proffered Allegations ECF No. 54 ¶¶ 14–17; *see* Decl. Ex. 27. FGB's repeated contacts with New York are further detailed below.

### A. FGB's Contacts With New York Support Jurisdiction

FGB's choice to invest with a New York broker and custodian that had unfettered control over FGB's investment and FGB's repeated contacts with New York related to those investments gave it fair warning that its investment activity might subject it to the jurisdiction of this Court.

FGB purposely targeted New York for its investment and had numerous contacts with New York that establish this Court's jurisdiction. These contacts were not random, fortuitous or attenuated. FGB: (i) created a substantial relationship with New York when it deliberately invested in and redeemed from Sentry, knowing Sentry had given BLMIS unfettered control over FGB's investment; (ii) purposefully availed itself of New York through its continuous communications and contacts and multiple meetings with Sentry in New York related to its investment in BLMIS and the redemptions the Trustee seeks to recover; and (iii) used two New York bank accounts to execute all of its subscriptions and redemptions, including a bank account held in FGB's name in

New York to obtain the redemptions the Trustee seeks to recover. Many of FGB's contacts are sufficient to independently support jurisdiction. In totality, FGB's contacts plainly establish FGB purposefully availed itself of New York specifically to take advantage of a business opportunity completely controlled by BLMIS. *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 59 (S.D.N.Y. 1999) (finding the aggregate of defendant's forum contacts was "qualitatively significant").

### 1. FGB Purposefully Availed Itself of the Laws and Privileges of New York

FGB's intentional investment with (i) New York-based BLMIS through (ii) a known New York-based BLMIS feeder fund seeking to profit from (iii) trading in U.S. domestic securities and treasuries (iv) traded on New York-based stock exchanges alone establishes this Court's personal jurisdiction over FGB. Regardless of FGB's other New York contacts that support this Court's assertion of personal jurisdiction, FGB's deliberate targeting of BLMIS and the New York securities market—through an entity expressly constituted for that purpose—is dispositive.[8]

FGB knew it was investing in New York. Compl. ¶ 6. As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 105 (2d Cir. 2019) ("*ET Decision*"); *see also Maxam Absolute*, 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended funds invested with BLMIS feeder fund would be sent to New York for investment by BLMIS in New York). By executing the Sentry Subscription Agreement, as reaffirmed by the Short Form Subscription Agreements, FGB acknowledged that it received and read Sentry's IM. FGB agreed that:

    (i)      all investment management duties were delegated to BLMIS;
    (ii)     BLMIS had controlling authority over FGB's investment;

---

[8] The Trustee is not imputing Sentry's acts to FGB. The Trustee asserts that FGB took affirmative steps of its own to gain benefits available to it only in New York.

(iii)    BLMIS was a registered broker-dealer in New York and was the executing broker for Sentry's investments;

(iv)    BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. treasury bills;

(v)    most of the stocks that BLMIS acted as a market maker for were listed on the New York Stock Exchange;

(vi)    New York-based BLMIS was the sub-custodian of Sentry's investments;

(vii)    the decisions regarding which U.S. Securities to purportedly purchase, and when to make such purchases, were delegated to BLMIS in New York; and

(viii)    BLMIS was "essential to the continued operations of" Sentry.

FGB undoubtedly did more than "just benefit" from BLMIS's purported trading activities in New York. Mot. at 26. Instead, FGB purposefully availed itself of the benefits and protections of New York. FGB purposely sought out Sentry because of Sentry's deep and extensive ties to BLMIS in New York. FGB was aware of, acknowledged, and agreed that BLMIS's activities in New York were essential to Sentry and without the New York investments in BLMIS, FGB's investment would not have existed. *See* Decl. Ex. 1.

### a.    *BLI* Establishes this Court's Jurisdiction Over FGB

Based on Sentry's investment structure, this Court has already concluded that investors like FGB are subject to personal jurisdiction in *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*"). There, as here, the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of dollars in Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *Id.* at 506. There, as here, the subsequent transferee was provided with IMs and executed Subscription Agreements establishing the investment's BLMIS-centric purpose. *Id.* at 507–08.

Despite the obvious parallels between the cases, FGB ignores *BLI's* clear holding and incorrectly attempts to recast *BLI,* stating that its authority does not support a finding of minimum contacts based on FGB's knowledge of Sentry's investment in New York-based BLMIS. Mot. at

13

26. FGB is wrong. *BLI* holds that, "BLI purposefully availed itself of the benefits and protections of New York laws by *knowing, intending and contemplating* that the substantial majority of funds invested in Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." *BLI*, 480 B.R. at 517 (emphasis added); *see also Picard v. JPMorgan Chase & Co.*, No. 08-99000 (SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (courts in this liquidation proceeding have already "confirmed that defendants who invested directly or indirectly with BLMIS and received payments from BLMIS as an initial transferee or subsequent transferee of those initial transfers were subject to the Court's personal jurisdiction.").

As framed by this Court, "BLI intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506. Because FGB is identically situated to the defendant in *BLI* with respect to the fundamental purpose of the investment, *BLI* is controlling and resolves FGB's personal jurisdiction challenge even without inquiry into its additional New York contacts.

An intentional investment using a BLMIS feeder fund expressly designed to funnel those investments to BLMIS in New York establishes personal jurisdiction. *See id.* at 517 ("In a nutshell, BLI invested tens of millions of dollars in Sentry *with the specific purpose* of having funds invested in BLMIS in New York and intended to profit from this U.S.-based investment.") (emphasis added). In fact, in addressing BLI's separate argument concerning its New York bank accounts, the Court expressly noted that its decision was not "rooted in the mere existence of these accounts. Instead . . . BLI directed its investment towards the forum State, thereby purposefully availing itself of the benefits and protections of New York laws." *Id.* at 516 n.14.

### b. *Walden* Does Not Change the Jurisdictional Analysis

For obvious reasons, FGB glosses over *BLI* and asks this Court to misconstrue *Walden v. Fiore*, 571 U.S. 277 (2014). *Walden* does not overrule *BLI*, change the standard in *Keeton*, or

preclude finding jurisdiction here. Rather, as discussed below, *Walden* validates *BLI* and this Court's jurisdiction over FGB.

Holding that a Georgia police officer could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the <u>plaintiffs</u> lived in Nevada, *Walden* simply reaffirms the well-established principle that personal jurisdiction cannot be premised solely on a <u>plaintiff's</u> unilateral contacts with the forum state. *See id.* at 284 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). Although it was foreseeable that the unlawful seizure would harm the plaintiffs in their home state of Nevada, the defendant's conduct neither occurred in nor was directed toward Nevada. *Id.* at 288–91. Rather, the harm occurred in Nevada solely because of <u>plaintiffs'</u> unilateral decision to be in Nevada when they used the seized funds. *Id.* at 290. The Supreme Court held that finding jurisdiction under those circumstances would inappropriately permit "a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id*. at 289.

The opposite is true here. Jurisdiction is premised on <u>Defendant</u> FGB's intent to invest funds with BLMIS in New York and redemption of those investments. *Id.* at 290 ("The proper question is . . . whether the defendant's conduct connects him to the forum in a meaningful way."). Finding jurisdiction here is consistent with *Walden* because <u>Defendant FGB's</u> contacts with the forum state are "intertwined with his transactions or interactions with the plaintiff or other parties." *See id.* at 286.

FGB argues it is insufficient for the Trustee to only allege FGB "knew of" the strong forum connections. Mot. at 25. However, FGB had more than mere knowledge of Sentry's ties to BLMIS and New York—it was *because of* Sentry's ties to BLMIS and New York that FGB invested. FGB's intent to invest in the New York stock market with BLMIS was New York specific. *See*

15

*Homeschool Buyers Club, Inc. v. Brave Writer, LLC, No. 19-CV-6046 (VSB*), 2020 WL 1166053,

at *5 (S.D.N.Y. Mar. 11, 2020). That Sentry invested FGB's subscription funds with BLMIS in

New York was not merely foreseeable to FGB, it was FGB's objective. Compl. ¶ 6, *see* Decl. Ex.

1. Sentry was a BLMIS feeder fund. Its express purpose was to funnel funds to New York so

BLMIS could invest them in the U.S. securities market. Compl. ¶ 2; *see* Decl. Ex. 1; *see also See*

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 179 (2d Cir. 2021).

FGB, a sophisticated full-service bank that claimed to have a "deep understanding of the markets"

and purported to attach great weight to its ability to manage risk, made a conscious and informed

decision to invest in Sentry precisely to reap the rewards of investing with BLMIS in New York.

Compl. ¶ 2 and 3. This conduct created a substantial connection with New York. *Walden*, 571 U.S.

at 284. Such a purposeful act directed at the State of New York supports finding jurisdiction and

comports with traditional notions of fair play and substantial justice. *See Burger King*, 471 U.S. at

471–74 (due process concerns are satisfied when an out of state defendant purposely directs his

activities at residents of the forum state and purposely benefits from those activities).

### 2. FGB's Repeated Meetings and Communications with Sentry in New York Further Establish Personal Jurisdiction

While physical presence is not a prerequisite to find jurisdiction, "physical entry into the

State—either by the defendant in person or through an agent, goods, mail, or some other means—

is certainly a relevant contact." *Walden*, 571 U.S. at 285 (citing *Keeton*, 465 U.S. at 773–74). FGB

satisfies the *Walden* and *Keeton* criteria. Not only did FGB intentionally invest in and redeem

millions of dollars from New York, it also repeatedly travelled to New York to evaluate its

investment in Sentry. Throughout the course of its seven-year investment in BLMIS through

Sentry, FGB also stayed in communication with New York-based FGG employees and executives

by sending emails to and calling New York regarding its investment in Sentry.

FGB decisionmakers regularly met with New York-based Sentry senior executives and partners in New York in connection with FGB's Sentry investments. *See* Decl. Exs. 8–14; ECF No. 54 ¶ 14–17. FGB met with Sentry at the highest levels, including meeting with FGG's U.S.-based partners Walter Noel, Jeffrey Tucker, Philip Toub, and Andrew Smith, Decl. Ex. 15, to:

(i)     discuss Sentry investment approaches and performance, *see id.* Exs. 9, 13, 14;
(ii)    stay in touch with FGG managers, *see id.* Exs. 8, 11;
(iii)   expand FGB's investment in Sentry, *see id*. Ex. 12; and
(iv)    "hear more about the investment approaches, methodology, and risk controls." *See id.* Ex. 10.

Even without an investment, traveling to the forum in connection with claims asserted supports finding personal jurisdiction. *See Druck Corp. v. Macro Fund (U.S.) Ltd.*, 102 F. App'x 192, 193–94 (2d Cir. 2004) (finding one or two meetings concerning a "fund's investment strategy" to be "substantive and substantial" enough to support jurisdiction even though no investment was immediately forthcoming); *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for meeting to develop business relationship); *Burlington Indust., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in New York). FGB's meetings in New York exceed the thresholds set by *Druck*, *SAS*, and *Burlington.*

FGB decisionmakers also communicated regularly with New York-based FGG senior executives and partners in New York about FGB's investments. *See* Decl. Exs. 14, 16–22. FGB's express goal in its business correspondence with New York was to (i) further increase FGB's investments, *see id.* Ex. 16; (ii) plan meetings with FGG in New York, *see id.* Ex. 17; and (iii) obtain information regarding Sentry updates and strategies, which ultimately lead to FGB

redeeming Customer Property from Sentry. *See id.* Exs. 17–22. Additionally, FGB had telephone conferences with FGG regarding its New York-based investment in Sentry. *See id.* Ex. 23.

Correspondence with investors in the forum is a contributing factor for finding personal jurisdiction. *Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11-3673(RJS), 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012) (communications including emails, phone calls, and video conferences with company in New York subjected defendant to personal jurisdiction); *Rubinbaum LLP v. Related Corp. Partners V, L.P.*, 154 F. Supp. 2d 481, 493 (S.D.N.Y. 2001) (telephone calls with and correspondence sent to investors in New York contributed to a showing of personal jurisdiction); *In re Dewey & LeBoeuf LLP*, 522 B.R. 464, 475 (Bankr. S.D.N.Y. 2014) (personal jurisdiction appropriate where defendant corresponded with partners in New York office of law firm).[9]

FGB traveled to and corresponded with FGG personnel in New York extensively and purposefully to further its investments and realize profits from those investments. These contacts directly relate to the transfers the Trustee seeks to recover because they were done by FGB to increase its investments and to obtain information that resulted in its redemptions. *See* Decl. Exs. 16–22 FGB's direct contacts with New York further establish personal jurisdiction over FGB.

### 3. FGB's Purposeful Use of New York Bank Accounts Establishes Specific Personal Jurisdiction

This Court has jurisdiction because FGB purposefully used the New York banking system to subscribe in and redeem from Sentry. Compl. ¶ 6. In its redemption documents with Sentry,

---

[9] The acts of FGB's agent, Desjardins, further support jurisdiction because, at FGB's direction and control, he facilitated FGB's subscriptions into Sentry, *see id.* Exs. 24–28 and organized meetings between FGB and FGG managers in New York. *See id.* Exs. 8, 10, 11. As this Court has held, "[a]n agent's knowledge and acts are imputed to the corporation and partnerships . . ." *Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*, 2021 WL 3477479, at *4; *see also Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981) (agency is established for jurisdictional purposes where the agent acted for the benefit of the principal, with the knowledge and consent of the principal, and under the control of the principal).

FGB designated a Bank of New York account in New York held in its name, number xxxxxxx165, through which it received Customer Property from Sentry. *See* Decl. Exs. 6, 7. In addition, FGB utilized Sentry's New York correspondent bank account at HSBC Bank USA to make its subscriptions. *See id.* Ex. 1.

Even absent other contacts, FGB's use of a domestic New York bank account to receive the two transfers the Trustee seeks to recover is sufficient to establish personal jurisdiction, under either the due process analysis or the New York long-arm statute, N.Y. C.P.L.R. § 302(a)(1).[10] *See, e.g., Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York bank account to receive payment at issue); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction in New York-based solely on defendant's use of New York bank accounts to facilitate alleged fraud).

In this SIPA liquidation proceeding, this Court has also found jurisdiction where initial and subsequent transferee defendants received transfers from New York bank accounts. *See Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding jurisdiction over subsequent transferee defendants that sent subscriptions to, and received redemptions from, feeder funds' New York bank account); *Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction over initial transferee defendants who received transfers from BLMIS's New York bank account).

---

[10] Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g., HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405(DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous.") (citations omitted). FGB sets forth the standard of jurisdiction under § 302(a)(1) as "(1) FGB must have transacted business within the state; and (2) the claims asserted must arise from that business activity," Mot. at 22, but conveniently leaves out that "transacts business" is defined as "some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, No. 19-CV-3444 (VSB), 2020 WL 5503557, at *4 (S.D.N.Y. Sept. 10, 2020) (citations omitted).

### a.  FGB's Use of Its Bank of New York Account and the HSBC USA Account Supports Jurisdiction

FGB conceded that jurisdiction is proper if the Trustee can show FGB used New York bank accounts when it told this Court that without an allegation the transfers were sent to or through New York accounts, jurisdiction is defeated. Mot. at 23.  Yet, FGB does not disclose to the Court that in its redemption documents, FGB actually chose a Bank of New York account in New York to receive stolen Customer Property from Sentry. *See* Decl. Ex. 1. Specifically, FGB told Sentry to send the two redemption payments totaling $11,532,393 of the stolen Customer Property the Trustee seeks to recover to its account with Bank of New York—and that is what Sentry did. *See id.* Exs. 3, 4. Courts in this SIPA liquidation proceeding have found that the use of a New York bank is a factor establishing minimum contacts with the forum. *See, e.g.*, *BNP Paribas*, 594 B.R. at 191 (finding that the receipt of redemption payments from New York bank helped establish minimum contacts); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 279 (Bankr. S.D.N.Y. 2010) (finding that the defendant's maintenance of a bank account in California supported jurisdiction over the defendant).

FGB's use of Sentry's HSBC USA New York correspondent bank account to send funds to and receive funds from Sentry—which FGB also fails to disclose—further establishes FGB's nexus with New York. *See* Decl. Exs. 6, 7; *see also Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 899–900 (N.Y. 2012) (leading case, holding that a defendant's purposeful "use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established" suffices to show defendant transacted business in New York).

The fact that Sentry held the HSBC USA Account does not change the analysis because FGB agreed to use it. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F.Supp.3d 323, 346 (S.D.N.Y. 2019) ("[T]he point is not whether [defendant] owns the accounts,

it is that they made purposeful use of them for reasons related to the underlying dispute."). FGB voluntarily entered into a Subscription Agreement which required subscribers to use the HSBC USA Account. *See* Decl. Ex. 1. FGB chose to invest in BLMIS through Sentry. Each transaction was a volitional act that supports jurisdiction. *See In re Motors Liquidation Co.*, 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017) (finding defendant's use of a correspondent account to be purposeful even where payment in New York was dictated by agreement).

FGB's choice to use two bank accounts located in New York—an account held in its own name and Sentry's correspondent account—to execute each of the transfers the Trustee seeks to recover demonstrate FGB's repeated, systematic, and purposeful use of New York bank accounts and establishes the requisite contacts with New York.

> **b.    The Trustee's Claims Relate to FGB's Use of Its Bank of New York Account and the HSBC USA Account in New York**

FGB's purposeful use of the Bank of New York and HSBC USA accounts in New York supports jurisdiction because the Trustee's claims "arise out of or relate to" FGB's use of the accounts. As the Supreme Court recently held, this prong does not require a causal relationship. *See Ford Motor*, 141 S. Ct. at 1026. Rather, it may be satisfied if defendant's conduct involves "financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016) (requiring only that claim is not "completely unmoored" from transaction). Because the Trustee's cause of action relates to the transfers that came through these New York bank accounts, FGB could reasonably anticipate the transfers would be adjudicated in the New York. *See, e.g., HSH Nordbank*, 2012 WL 2921875, at *4 (finding "claims against [defendants] arise directly out of the transfer of funds into [defendant's] New York accounts");

*Chais*, 440 B.R. at 279 (finding that defendant's contacts with the forum and the Trustee's claims are "inextricably related").

FGB argues the Trustee must allege that "each individual transfer [he] seeks to recover" was received in New York for this Court to have jurisdiction. Mot. at 22 (citing *BNP*, 594 B.R. at 190). But FGB misconstrues the requirements for personal jurisdiction and this Court's decision in *BNP*. Courts have personal jurisdiction over *defendants*, not transfers. *See, e.g., Int'l Shoe*, 326 U.S. at 316. Likewise, this Court must assess the Defendant's contacts with the forum, not the transfers. *BNP*, 594 B.R. at 189 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.").[11] Regardless, the factual allegations set out in this Opposition support jurisdiction for each transfer as each of the two subsequent transfers the Trustee seeks to collect were made into FGB's Bank of New York account.

FGB's reliance on a trio of cases asserting common law claims brought against fund service providers does not defeat jurisdiction. *See* Mot. at 26–280 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018); *Hau Yin To v. HSBC Holdings plc*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) *aff'd*, 700 F. App'x 66 (2d Cir. 2017); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016). This Court has already determined that this line of cases is not relevant to the Trustee's recovery actions in this SIPA liquidation proceeding against defendants like FGB who invested in BLMIS's feeder funds. *See BNP*, 594 B.R. at 192 ("*Hill* has

---

[11] This is exactly what this Court did in BNP and what it should do here. The Court did not look at each transfer to determine jurisdiction; the Court assessed each defendant, focused on the overall relationship with the initial transferees, and determined it had jurisdiction. *BNP*, 594 B.R. at 191 (finding jurisdiction for "any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds" where "[t]he Tremont Funds were managed from offices in New York, and in their capacity as investors, the Defendants sent subscription agreements to New York, wired funds in U.S. dollars to New York, sent redemption requests to New York and received redemption payments from a Bank of New York account in New York.") (citations omitted).

no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). This is not a dispute between two parties about services owed under a foreign contract, like the breach of fiduciary duty and other claims in *SPV*,[12] *Hau Yin To*, and *Hill*. This action is brought by the SIPA Trustee in this SIPA liquidation proceeding to recover fraudulent transfers from an investor whose transfers of funds to and from New York accounts evidence an intent to direct activity towards the U.S. securities markets. *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between BLI and Fairfield Sentry.").

This Court should also reject FGB's claim that the transfers the Trustee seeks to recover "occurred entirely outside of the United States" and were "purely foreign," *see* Mot. at 23–24, because it is not true. FGB bases this claim on arguments made by the Sentry Liquidators in a different case that turns on whether the Section 546(e) safe harbor applies to claims brought under B.V.I. law by foreign liquidators in a chapter 15 proceeding—an issue plainly not relevant here.[13] In this case, by contrast, the Second Circuit has already found, "[t]hese transfers are domestic activity." *ET Decision*, 917 F.3d at 100 ("When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United

---

[12] FGB's reliance on *SPV*, which found no specific jurisdiction because plaintiff's injury was not caused by defendants' contacts, is at odds with the Supreme Court's decision in *Ford Motor*, which held that causation is not a prerequisite for jurisdiction. 141 S. Ct. at 1026–30.

[13] FGB's argument that the Trustee is in privity with the Sentry liquidators and is therefore bound by any rulings in the Sentry liquidation is wrong. *See* Motion at 10, n.6. FGB cites no relevant authority for this argument because none exists. *New Hampshire v. Maine*, 532 U.S. 742 (2001) does not even involve nonparty preclusion. And if *Taylor v. Sturgell*, 553 U.S. 880 (2008) "stands for anything, it is for the need to narrow and regularize the use of preclusion against nonparties." *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *11 (S.D.N.Y. Mar. 25, 2013).

States."). The argument is further distinguished by FGB's use of New York bank accounts, plainly establishing the transfers occurred domestically.

In summary, FGB's purposeful use of the Bank of New York and HSBC USA accounts in New York establish this Court's jurisdiction. Further, FGB purposefully availed itself of the benefits and protections of New York when it chose to invest in Sentry with the objective of investing with New York-based BLMIS in U.S. markets. FGB's contacts with New York are further bolstered by its regular meetings with FGG personnel in New York and the communications FGB sent to the forum. FGB purposely availed itself of the forum and jurisdiction over FGB is proper.

### B.      Exercise of Personal Jurisdiction Over FGB Is Reasonable

FGB cannot present a compelling reason why jurisdiction would be unreasonable. FGB's only argument that personal jurisdiction over FGB is unreasonable is that the Trustee has not alleged that FGB had any contacts with the forum whatsoever, *see* Mot. at 31, a statement that ignores allegations made by the Trustee in the Complaint, *see* Compl. ¶ 6, and previously briefed in the Trustee's Proffered Allegations. ECF No. 54. As detailed above, FGB's contacts with New York were extensive and related to the very transfers the Trustee seeks to recover; therefore, exercise of personal jurisdiction over FGB is reasonable.

The reasonableness inquiry requires a determination of "whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citations omitted). If a plaintiff makes a threshold showing of minimum contacts, a defendant must show "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. This Court found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the

exercise of personal jurisdiction, but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188 (citation omitted). This is not a "rare" case.

When evaluating the reasonableness factors set out in *Asahi* and *World-Wide Volkswagen*, enumerated above in Section I, the factors clearly weigh in the Trustee's favor. The burden on FGB, a bank with multiple connections to New York, is minimal. *See Maxam Absolute*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). Moreover, travel to New York by FGB does not impose an inconvenience. In fact, the Trustee's investigation has revealed that Sheikh Mansour, Chairman of FGB during the time of FGB's Sentry subscriptions, currently co-owns with the Yankees a New York-based Major League Soccer team, the New York City Football Club, and has considered building a stadium for the Club in Brooklyn. The U.S. has a strong interest in applying U.S. law in the BLMIS liquidation. *See Asahi Metal.,* at 113; *see also ET Decision*, 917 F.3d at 103 (noting "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a strong interest in litigating in the U.S. *See Maxam Absolute*, 460 B.R. at 119; *see also BLI*, 480 B.R. at 517 (having purposely funneled millions of dollars to BLMIS in New York, the defendant "cannot claim a violation of its due process rights from having to appear in a New York court to defend itself in a suit arising from activities with a clear New York nexus"). Accordingly, this Court's exercise of jurisdiction over FGB is more than reasonable.

### C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

The facts above establish a *prima facie* showing of personal jurisdiction. If this Court requires a further showing of jurisdiction, the Trustee requests jurisdictional discovery. "Such discovery may be authorized where a plaintiff has made 'a threshold showing' that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618(KMW)(HBP), 2009 WL 3817590, at *4 (Nov. 16, 2009).

## II.    SECTION 546(E) DOES NOT PREVENT THE TRUSTEE FROM AVOIDING THE TRANSFERS TO FGB

The Trustee may avoid transfers made during the Two-Year Period, because BLMIS made the transfers with actual intent to hinder, delay, or defraud. *See* 11 U.S.C. § 548(a)(1)(A). Section 546(e) provides an affirmative defense to the avoidance of certain transfers made outside the Two-Year Period. *See* 11 U.S.C. § 546(e). That affirmative defense does not apply to the Two-Year Transfers sought here. In the first paragraph of its Motion, FGB admits BLMIS defrauded it when it says "FGB is a victim of the fraud perpetrated by BLMIS and Bernard Madoff." Mot. at 1. Despite its judicial admission, and the fact that the subsequent transfers sought here occurred in 2008, FGB inexplicably devotes more than eight pages of its Motion setting forth the requirements of Section 546(e) and how they are supposedly met in this case. Mot. at 4–12. FGB's argument, copied verbatim from Banco Itaú's Motion to Dismiss filed in Adversary Proceeding 12-01019,[14] fails.

### A.    The Section 546(e) Exception Does Not Extend to the Knowledge of the Subsequent Transferee

The transfers to FGB were all within the Two-Year Period. The Trustee <u>only seeks to recover two transfers to FGB, both made during the Two-Year Period on June 17, 2008 and October 15, 2008</u>. Compl. ¶ 40, Ex. D.[15] Nevertheless, FGB repeats Bank Itaú's argument that this Court should require the Trustee to allege the subsequent transferee had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Mot. at 13–14. Specifically, FGB asks

---

[14] FGB's Motion mistakenly leaves in references to Bank Itaú when it copied the Bank's argument. Motion at 3 n.3 ("By making this motion, the **Itaú Defendants** are not waiving, and expressly reserve, their rights…") (emphasis added).

[15] This Court has previously held, the Trustee has sufficiently pleaded that the initial transferee Sentry had actual knowledge of Madoff's fraud and that such initial transfers are avoidable. *See Fairfield Inv. Fund Ltd.*, 2021 WL 3477479, at *4–5. As such, Section 546(e) does not bar recovery of those transfers from FGB, regardless of whether Sentry or FGB qualifies as a financial institution, their Agreements qualify as securities contracts, or their transfers qualify as settlement payments.

this Court to misconstrue the plain language of Section 546(e) and the clear holding in *Cohmad*[16]

to extend the exception to the knowledge of any transferee as opposed to the debtor-transferee.

This argument is a repackaging of the previously rejected argument that the Section 546(e) safe

harbor should independently apply to actions under Section 550. This is wrong. By its plain

language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of

subsequent transfers under Section 550. *BNP Paribas*, 594 B.R. at 197,[17] and nothing in *Cohmad*

indicates that an initial transferees' actual knowledge, when it exists, should be disregarded.

*Cohmad* and *BNP* are the law of the case and FGB is bound by those decisions.

### B. BLMIS Ran the IA Business as a Ponzi Scheme and the Trustee Is Entitled to Rely on the Ponzi Scheme Presumption

FGB argues that the Trustee has not adequately pled intentional fraud. However, as alleged

in the Complaint, (i) both subsequent transfers the Trustee seeks to recover were made in the Two-

Year Period (ii) the Trustee's claim is based upon the BLMIS Ponzi scheme, and (iii) the transfers

were made in furtherance of the Ponzi scheme. The particulars of this fraudulent scheme have been

pled in detail. Compl. ¶¶ 22–32, 40, Ex. D. The Trustee can recover the Two-Year Transfers under

the Ponzi scheme presumption, which is based on the recognition that "transfers made in the course

of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud

creditors." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. AP 08-01789 (SMB),

2018 WL 3078149, at *4 (Bankr. S.D.N.Y. June 20, 2018) (citation omitted). The intent to hinder,

delay or defraud creditors is presumed where the Trustee shows "(1) the transferor operated a

Ponzi scheme; and (2) the transfers made to the transferee by the debtor were 'in furtherance' of

---

[16]  *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (holding that the Section 546(e) safe harbor will not apply to a transfer if the initial transferee has actual knowledge of Madoff's fraud).

[17]  It is also consistent with the understanding that the Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See ET Decision*, 917 F.3d at 98.

the Ponzi scheme." *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 233 (Bankr. S.D.N.Y. 2019).

Most recently, Judge McMahon has confirmed this Court's prior rulings that the Trustee has established BLMIS made transfers with actual intent to hinder, delay or defraud its creditors under Section 548(a)(1)(A). *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 1:21-CV-02334-CM, 2022 WL 493734, at *11 (S.D.N.Y. Feb. 17, 2022) ("*Epstein*"); *see, e.g., Nelson*, 610 B.R. at 233 (citations omitted). This Court has also ruled the Trustee has established BLMIS was engaged in a Ponzi scheme. *See, e.g., Nelson*, 610 B.R. at 233 (concluding that Madoff and Frank DiPascali allocuted to facts establishing that BLMIS was a Ponzi scheme and holding that BLMIS was a Ponzi scheme at least no later than the early 1990s).

This case is no different from any of this Court's prior considerations—BLMIS was a Ponzi scheme, and as a result of the Ponzi scheme presumption, the initial transfers were made with actual intent to defraud. FGB's request that this Court void the well-established Ponzi scheme presumption based on dicta in Judge Menashi's concurring opinion in *Citibank*, Mot. at 15–17, is surprising and misguided. District Judge Keenan's recent ruling in *Sage* confirms the presumption's applicability here. *Picard v. Sage Realty*, No. 20 CIV. 10057 (JFK), 2022 WL 1125643, at *28 (S.D.N.Y. Apr. 15, 2022) ("Notwithstanding Judge Menashi's concerns, 'the Ponzi scheme presumption remains the law of this Circuit'"). As this and other Courts have repeatedly held, the Ponzi scheme presumption applies. *Id.* at *28 n.10 ("[T]he Ponzi scheme presumption has been adopted by federal courts of appeals throughout the county.").[18]

---

[18] Of course, this Court does not need to apply the Ponzi scheme presumption here since, contrary to FGB's assertion, the Trustee has plead the necessary elements of actual intent to defraud. This Court and District Courts have found that BLMIS made transfers with actual intent to defraud, which is sufficient to meet the Trustee's burden under section 548(a)(1)(A) based on evidence of "badges of fraud" enumerated in the *Nelson* opinion. *See Nelson*, 610 B.R. at 235; *see also Picard v. JABA Assocs. LP (In re Bernard L. Madoff)*, 528 F. Supp. 3d 219, 240 (S.D.N.Y. 2021). The Trustee and FGB have plead the numerous badges of fraud. BLMIS showed its customers it had invested approximately $65 billion, while its assets were only a fraction of the amount purportedly invested. Compl. ¶ 31. Customer accounts had not accrued any real profits because no investments were ever made. *Id.* BLMIS was insolvent. *Id.* ¶ 32; and FGB admits that it was defrauded by BLMIS. Mot. at 1. Accordingly, there is a separate basis to conclude that the initial

The transfers made by BLMIS to Sentry were "in furtherance" of a fraudulent scheme. *Epstein,* 2022 WL 493734, at *18; *see also Nelson*, 610 B.R. at 233. In a Ponzi scheme, the failure to honor an investor's withdrawal request "would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou Grp. LLC*), 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010). Thus, "every redemption payment *in and of itself* constituted an intentional misrepresentation of fact" and are "an integral and essential part" of the fraud. *Id.* (emphasis in original).

As alleged by the Trustee, Sentry received transfers from BLMIS which Sentry subsequently transferred to FGB. Compl. ¶¶ 33–42. The transfers to Sentry, like the payments made to customers in any Ponzi scheme, were an integral and essential part of BLMIS's fraudulent scheme. Thus, BLMIS made each of the avoidable transfers to Sentry with the actual intent to hinder, delay, or defraud some or all BLMIS's then existing and/or future creditors within the meaning of section 548(a)(1)(A).

## III.    THE TRUSTEE HAS SATISFIED HIS PLEADING BURDEN

### A.    The Trustee's Complaint Sufficiently Pleads the Avoidability of the Sentry Initial Transfers

FGB argues that the Trustee's incorporation of the then-operative Fairfield complaint violates Rule 8(a)(2)'s requirement to include a "short and plain statement" showing the Trustee is entitled to relief. Fed. R. Civ. P. 8(a)(2); Mot. at 31. The Trustee pleads the avoidability of the initial transfers. Compl. ¶ 4. The Trustee may incorporate the Fairfield complaint under Rule 10(c) to further plead the avoidability of the initial transfers from BLMIS. Fed. R. Civ. P. 10(c); *see Am.*

---

transfers were made with the actual intent to defraud based on (i) concealment of facts and false pretenses by the transferor; (ii) BLMIS's insolvency; and (iii) the lack of consideration for the fictitious transfers. *See Nelson*, 610 B.R. at 235 (finding actual intent to defraud based on these badges of fraud).

*Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010) (allowing incorporation by reference under Rule 10(c) of pleadings in different adversary proceeding within the same liquidation).

FGB claims it is left to guess which allegations of the incorporated pleading it must respond to. Mot. at 32. But the Trustee clearly advises FGB that the Fairfield complaint is incorporated to demonstrate the transfers are avoidable. Compl. ¶ 34. FGB's argument conflicts with the district court's prior opinion on whether, under Section 550(a), the Trustee must avoid an initial transfer or plead its avoidability in a subsequent transfer action. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*, 501 B.R. 26, 36 (S.D.N.Y. 2013). Holding that Section 550(a) only "requires that the Trustee show that the transfer he seeks to recover is avoidable in each recovery action," *id.* at 29, the district court found sufficient the Trustee's incorporation by reference of the then-operative Sentry complaint:

> [The] Trustee's complaint against Standard Chartered Financial Services incorporates by reference the complaints against Kingate and Fairfield, including the allegations concerning the avoidability of the initial transfers, and further alleges the avoidability of these transfers outright. *See* Standard Chartered Compl. ¶¶ 43–46, 50–53. Thus, the avoidability of the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes of section 550(a).

*Id.* at 36. This decision is the law of the case. *See Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019); *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (holding that "law of the case doctrine," in which "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages," also "applies to different adversary proceedings filed within the same main bankruptcy case") (citations omitted)).

Moreover, FGB's argument is irrelevant, because this Court may take judicial notice of the Fairfield Amended Complaint[19] and its prior decision holding that the complaint sufficiently

---

[19] *See* footnote 4 *supra*.

alleges the avoidability of the initial transfers from BLMIS. *See Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *2 (Bankr. S.D.N.Y. Aug. 6, 2021). On a motion to dismiss, "a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*" *Ferrari v. Cnty of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011). "Included among such matters are decisions in prior lawsuits." *DeMasi v. Benefico*, 567 F. Supp. 2d 449, 453 (S.D.N.Y. 2008). Finally, it does not matter that the noticed complaint was filed after this Complaint against FGB. *See Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (noticing later filed complaint in related proceeding).

The Trustee has pleaded the avoidability of the initial transfers in compliance with the Federal Rules, and this Court may take judicial notice of its opinion in *Fairfield Investment Fund*. If this Court holds otherwise, the Trustee requests the opportunity to replead.

### B.    The Trustee's Complaint Properly Pleads That FGB Received Recoverable Customer Property Under Section 550(A)

Tracing is an equitable process used by courts where funds have been commingled with other property in such a manner that they have lost their identity. Using facts developed in discovery and aided by expert testimony, this Court will eventually determine which of the available equitable tracing methodologies best achieves a fair and equitable result for the parties before it.[20] Using what it characterizes as "simple arithmetic," Mot. at 20, FGB is really asking this Court to adopt the FIFO methodology at the pleadings stage and to rely on its counsel's ability to employ that methodology. Of course, this is wrong. Telling this Court that it must adopt

---

[20] The Bankruptcy Court has recognized several different tracing methodologies offered by the Trustee in this liquidation, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality. These "methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer from a commingled fund." *Picard v. Merkin (In re Bernard L. Madoff)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin III*").

counsel's chosen methodology (and trust his math) at the pleadings stage is like diagnosing car troubles without opening the hood and then telling a mechanic she can only use a screwdriver to fix the car. FGB effectively usurps this Court's authority and completely ignores the financial complexities of this case and the several equitable tracing methodologies that can be considered to achieve an equitable result.

The Trustee's Complaint states a claim for recovery under Section 550(a) by plausibly alleging that FGB received subsequent transfers of BLMIS Customer Property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("*Merkin II*"). No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id.* at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, No. 08-01789 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3. In addition, to recover under Section 550(a), the Trustee must allege "'the necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds." *Merkin II*, 515 B.R. at 150 (citation omitted).[21]

The Trustee's Complaint meets these requirements. The Complaint alleges Sentry invested substantially all of its funds with BLMIS, and FGB received transfers, identified by date and amount, from Sentry. Compl. ¶¶ 2, 40, Decl. Ex. 1. Thus, the Complaint plausibly alleges FGB received subsequent transfers of Customer Property by (a) outlining the relevant pathway through

---

[21] *See* footnote 15 *supra*.

which Customer Property was transferred from BLMIS to Sentry, and subsequently to FGB and (b) providing the necessary vital statistics (i.e., the "who, when, and how much") for each subsequent transfer. Here, the Complaint does so by outlining these vital statistics in paragraphs 38, 40–41 and Exhibits B, C and D. The Trustee alleges with particularity that FGB received the two subsequent transfers on June 17, 2008 and October 15, 2008, well within the Two-Year Period. Nothing more is required. *See, e.g., Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that subsequent transfer claim was not pled "with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### 1. FGB Misstates the Trustee's Pleading Burden

Because the Trustee meets the relevant pleading burden, FGB attempts to create a new one, asserting the Court must adopt FIFO as the only available equitable tracing methodology and trust its counsel's assertion that each subsequent transfer FGB received must be tied to a specific initial transfer from BLMIS. Mot. at 19. That is not how equitable tracing works, and this Court already rejected this argument in *Merkin II*, when it refused to dismiss subsequent transfer claims where the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019) (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). Likewise, the Court already rejected the argument that the Trustee must detail which and what portion of each subsequent transfer comprises Customer Property. *See Merkin II*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also In re Allou*

*Distribs., Inc.*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

FGB relies on an incorrect reading of *Picard v. Shapiro. Shapiro* did not change the pleading burden for recovery under Section 550(a). In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and that "upon information and belief" these defendants subsequently transferred this same amount to other defendants. *See* 542 B.R. 100, 104, 119 (Bankr. S.D.N.Y. 2015). However, that complaint did not detail any of the necessary vital statistics of the subsequent transfers. *Id.* at 119. There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers, and consequently this Court granted defendants' motion to dismiss the subsequent transfer claim. *Id.* Here, the Trustee has alleged the vital statistics of FGB's receipt of two subsequent transfers of BLMIS Customer Property from Sentry of $2,626,363 on June 17, 2008 and $8,906,030 on October 15, 2008 totaling $11,532,393, Compl. ¶ 40, Ex. D. *Shapiro* supports denying FGB's Motion.

FGB's counsel's improper and premature mathematical exercise demonstrates this case involves a fact intensive analysis that is not only improper on a motion to dismiss, but also is clearly not "simple arithmetic." Mot. at 20. Tellingly, FGB picks which facts it wants to rely on and tells this Court how those facts should be interpreted when it claims the transfers it received from Sentry comprise subscriptions from other investors. Mot. at 19–20. In other words, FGB argues that Sentry commingled Customer Property with other funds, and this commingling will defeat the Trustee's ability to trace the transfer of Customer Property from BLMIS. *Id.* Again, FGB is wrong. "The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing." *Kelley v. Westford*

34

*Special Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151, at *4 (D.

Minn. June 10, 2020) (citing *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3) (citation omitted).

Because money is fungible, "[t]he goal of tracing is not to trace anything at all in many

cases, but rather [to] serve[] as an equitable substitute for the impossibility of specific

identification." *Charles Ellerin Revocable Tr.*, 2012 WL 892514, at *2 (quoting *United States v.

Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004)). "Courts have broad discretion to determine which

monies of comingled funds derive from fraudulent sources." *Id.* at *3 n.7 (citing *Henshaw*, 388

F.3d at 741) ("There are several alternative methods, none of which is optimal for all commingling

cases; courts exercise case-specific judgment to select the method best suited to achieve a fair and

equitable result on the facts before them."); *see, e.g., McHale v. Boulder Cap. LLC (In re 1031

Tax Grp., LLC)*, 439 B.R. 78, 81 (Bankr. S.D.N.Y. 2010) (concluding that a pro rata allocation of

commingled fraudulent transfers was appropriate). FGB's own argument makes it clear that the

analysis and opinions of accounting and financial experts will be required to allow this Court to

determine the tracing methodology and amount of the Trustee's recovery, Mot. at 20, especially

since Sentry's express purpose was to pool funds and funnel them to BLMIS in New York for

investment in the U.S. securities market. Compl. ¶ 2.

The Trustee is a stranger to the transactions between Sentry and FGB and is entitled to

discovery on this issue. "[I]n a case such as this one, where 'the Trustee's lack of personal

knowledge is compounded with complicated issues and transactions [that] extend over lengthy

periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded."

*Cohmad*, 454 B.R. at 329. This is one reason why this Court in *Merkin II* denied defendants'

motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved through the

books and records of the defendants." 515 B.R. at 151. And even after fact discovery, expert

opinion is necessary to determine what portion of the subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts. *Merkin III*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5 (denying summary judgment because trustee introduced expert report and associated documents from which a jury could infer defendants received subsequent transfers of Customer Property).

FGB's argument that "the Trustee has had every piece of information he needs to determine whether an alleged subsequent transfer contains customer property" is not true. Mot. at 21. Despite the "reasonable cooperation" owed to the Trustee by the Liquidators regarding the actions assigned to the Trustee by the Liquidators, the Trustee does not have all of the books and records nor the testimony of FGG's former investment advisors, managers, directors, and partners and other third-parties interpreting those records, and discovery in the actions assigned to the Trustee by the Liquidators against the FGG defendants continues. *See, e.g.*, Stipulated Case Mgmt. Order*, Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*, Adv. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec. 6, 2021), ECF No. 353 (setting November 22, 2022 deadline for fact discovery and August 22, 2023 deadline for expert discovery). And of course, discovery in this Adversary Proceeding has not even begun. Moreover, if FGB has complied with Federal Rule of Civil Procedure 37(e), it will have its own records on these same transactions. Fed. R. Civ. P. 37(e).

Tracing the subsequent transfers requires discovery and expert analysis, which demonstrates the inescapable conclusion that dismissal at the pleading stage is premature. *See Merkin II*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because the tracing may prove formidable due to comingling of assets); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, No. 08-15051 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees']

speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting

[their cross-motion for summary judgment].”). Indeed, using the records the Trustee has now, he

has alleged the date and amount of the two transfers he seeks to collect.

### 2.    FGB's Claims of Double Recovery Are Premature

Finally, FGB argues that the improper and premature mathematical exercise embarked on

by its counsel proves the Trustee's claims are "facially implausible" because the Trustee is seeking

more money from all of Sentry's subsequent transferees than the fund withdrew from BLMIS.

Mot. at 19. FGB's inappropriate testimony by its counsel concludes that Sentry must have paid

redemptions to its investors with money that could not have originated with BLMIS while ignoring

that Sentry had 95% of its investments in Madoff.[22] *Id.* at 20; Compl. ¶ 2.

The Trustee is limited to "a single satisfaction." 11 U.S.C. § 550(d). However, the Trustee

"can recover from any combination of [transferees]" up to the amount avoided. *Helms v. Metro.*

*Life Ins. Co. (In re O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332

(N.D. Ill. 2021). And under § 550(a), "a trustee may recover [an avoided] transfer from a

subsequent transferee of those funds, without the necessity for allocation among all [the]

subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333

(Bankr. W.D.N.Y. 2008). Thus, until the Trustee recovers the full amount of the approximately $3

billion in avoidable fraudulent transfers received by, but left unpaid by, Sentry, the Trustee may

simultaneously seek recovery from FGB and from defendants in other actions, even in an aggregate

---

[22] This argument is based on improper testimony by FGB's counsel—similar attempts have been rejected in this litigation. *See Picard v. Sage Realty*, No. 20 Civ. 10057 (JFK), 2021 WL 5926059, at *3 (S.D.N.Y. Dec. 15, 2021) (finding the analysis and conclusions contained in the proffered exhibits were improper expert testimony) (citing *United States v. Cut*, 720 F.3d 453, 457 (2d Cir. 2013)). Regardless, assessment of the recovery will require **expert** testimony, which is improper at the motion to dismiss stage. *In re AWTR Liquidation Inc.*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) ("[A] 'fair' valuation of assets and liabilities almost certainly will require expert testimony, which is inappropriate to require on a motion to dismiss.").

amount that exceeds initial transfers. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (holding defendant's "double recovery" arguments and the Trustee's purported limitations under Section 550(d) are "to be determined at a later stage in the litigation").

## IV.   THE 550(B) GOOD FAITH AND VALUE DEFENSES ARE AFFIRMATIVE DEFENSES THAT ARE INAPPROPRIATE AT THE MOTION TO DISMISS STAGE

FGB's attempt to raise a "good faith" affirmative defense on a motion to dismiss is ill-timed and contrary to the Southern District's recent confirmation in another recovery adversary proceeding in this SIPA liquidation proceeding that the good faith defense requires a post-discovery, fact-intensive inquiry. *In Re: Bernard L. Madoff Inv. Sec. LLC*, No. 20-CV-02586 (CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) ("*Fortis*"). By their very nature, affirmative defenses require a factual analysis, and presentation of evidence, and are not appropriate at this stage of litigation. *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 475 (S.D.N.Y. 2014) (finding affirmative defenses require "consideration of facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'").

Even if this Court were to consider FGB's fact-intensive affirmative defense, the Trustee must be given the opportunity to pursue discovery of those facts. *Fortis*, 2022 WL 1304589, at *3 (finding that such a fact-based defense must be based on the entirety of the factual record after discovery); *See Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010) ("*Merkin I*") ("[W]hether the Moving Defendants acted in good faith when they allegedly accepted hundreds of millions of dollars in transfers of BLMIS funds is a disputed issue that this Court can properly determine only upon consideration of all of the relevant evidence obtained through the discovery process.").

To circumvent the Second Circuit's holding that the good faith pleading burden is no longer on the Trustee, *Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 199 (2d Cir. 2021), FGB

makes an unsupportable argument that good faith under the inquiry notice standard has been established as a matter of law on the face of the Trustee's *Fairfield* complaint. However, such an argument applies only as a "limited exception to the general rule" that good faith cannot be established on a motion to dismiss. *Merkin I*, 440 B.R. at 256. To prevail under this limited exception, FGB must show there is an "insuperable bar to securing relief' set forth on the face of the complaint. *In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011). Further, FGB cannot "cherry pick" the documents and factual inferences it wishes this Court to draw from in its favor. *Fortis*, 2022 WL 1304589, at *3.

FGB comes nowhere near meeting the *Citibank* standard cited in its Motion, especially when it acknowledges that what facts FGB actually knew is a subjective inquiry. Mot. at 34. Only FGB knows what it knew. As demonstrated in Section III(A) above, FGB is a sophisticated party capable of performing its own investigations and diligence on its BLMIS investments—facts which can only be developed during discovery.

FGB makes a similar argument as to the factually intensive "value" affirmative defense available to subsequent transferees under Section 550. Like the "good faith" defense, this is inappropriate for a final determination on a motion to dismiss barring highly unusual circumstances, which FGB does not show exist here. *See e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *9 (stating that "[w]hether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial" and finding in that case that value was not shown on the face of the complaint). And in any event, if the facts establish there was not good faith, FGB cannot rely on the value defense. Of course, the Sentry complaint standing alone does not satisfy either affirmative defense, and indeed this Court has previously concluded, "[a]s to

whether the Defendants 'gave value' in the form of surrendering shares in the Sentry Funds, such

a determination cannot be made as a matter of law or fact at this stage." *Id.*

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests the Court deny FGB's Motion.

Dated: May 17, 2022

Of Counsel:                                    **Baker & Hostetler LLP**

**BAKER & HOSTETLER LLP**          /s/ David J. Sheehan
811 Main Street, Suite 1100              45 Rockefeller Plaza
Houston, Texas 77002-5018              New York, New York 10111
Telephone: 713.751.1600                  Telephone: 212.589.4200
Facsimile: 713.751.1717                   Facsimile:  212.589.4201
Dean D. Hunt                                   David J. Sheehan
Email: dhunt@bakerlaw.com            Email: dsheehan@bakerlaw.com
Farrell A. Hochmuth                         Torello Calvani
Email: fhochmuth@bakerlaw.com     Email: tcalvani@bakerlaw.com

*Attorney for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*