# EXHIBIT B

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>   v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>          Plaintiff,<br><br>   v.<br><br>FAIRFIELD INVESTMENT FUND LIMITED, STABLE FUND, FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH (BERMUDA), LTD., FAIRFIELD GREENWICH ADVISORS LLC, FAIRFIELD INTERNATIONAL MANAGERS, INC., WALTER NOEL, JEFFREY TUCKER, ANDRES PIEDRAHITA, AMIT VIJAYVERGIYA, PHILIP TOUB, CORINA NOEL PIEDRAHITA, FAIRFIELD GREENWICH CAPITAL PARTNERS and SHARE MANAGEMENT LLC,<br><br>          Defendants. | Adv. Pro. No. 09-01239 (SMB)<br><br>**<u>SECOND AMENDED COMPLAINT</u>**<br><br><br>**JURY TRIAL DEMAND** |

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), by the Trustee's undersigned counsel, for his second amended complaint, states as follows:

## PRELIMINARY STATEMENT

1.      No investment firm in BLMIS's infamous history was more intertwined with Bernard Madoff than the Fairfield Greenwich Group ("FGG"). FGG and its partners fed more investment capital to Madoff than any other. Madoff needed FGG's international connections and the billions of dollars it collected from investors. But it was a symbiotic relationship. As much as Madoff needed FGG, the FGG partners needed Madoff to develop and maintain their spectacular wealth and support their extravagant lifestyles.

2.      The FGG partners were deferential to "Uncle Bernie," as they called him. His steady returns, seemingly impervious to market forces, bolstered FGG even in times of financial crisis.

3.      If the FGG partners saw themselves as one big family, Madoff was part of that family. They shared the good times—birthdays, anniversaries, retirements, holidays, yacht trips, and vacations in exotic locales—and the bad, grieving over illnesses and deaths in the family.

4.      The partners felt so close to Madoff that they made a video, shown at one partner's retirement party, with open references to Ponzi schemes and the impossible returns Madoff delivered: "Bernie and Sentry…spell a super return that is practically guaranteed…!" Madoff, who attended the party, had the copies of the video confiscated and destroyed—or as one FGG employee put it, Bernie had those videos "taken care of."

1

5.      The relationship existed because the FGG partners were willing accomplices in Madoff's fraud.  They needed Madoff to enrich themselves and were willing to lie to protect their relationship.  Those deceptions found voice when they spun information to pacify existing FGG investors and to encourage new investment.  In many cases, the FGG partners simply omitted material information about Madoff from their representations.

6.      The partners knew their success was a direct result of maintaining the Madoff relationship.  As that relationship went, so went their careers and their bank accounts.  Over the years, as questions about BLMIS's operations arose, the FGG partners covered for Madoff in deliberate efforts to get investors and regulators off the scent.

7.      One used his background as a former Securities and Exchange Commission attorney as his calling card to add an air of legitimacy to Madoff investment.  Another suppressed his observations about BLMIS's inexplicable operations, noting that he saw it as his job to "live better than any of [his] clients."

8.      And the questions about BLMIS's suspicious operations were frequent and numerous.  Clients raised them.  Potential clients raised them.  Most importantly, independent consultants investigating or working for FGG raised them.  These consultants brought signs of fraud at BLMIS to the FGG partners' attention, but the partners ignored the warnings, protected BLMIS from inquiry, and continued to reap vast wealth from the BLMIS fraud.

9.      It is inescapable that FGG partners knew BLMIS was not trading securities.  They knew BLMIS's returns could not be the result of the split strike conversion strategy (the "SSC Strategy").  They knew BLMIS's equities and options trading volumes were impossible.  They knew that BLMIS reported impossible, out-of-range trades, which almost always were in Madoff's favor.  They knew Madoff's auditor was not certified and lacked the ability to audit

BLMIS. They knew BLMIS did not use an independent broker or custodian. They knew Madoff refused to identify any of BLMIS's options counterparties. They knew their clients and potential clients raised numerous due diligence questions they would not and could not satisfactorily answer. They knew Madoff would refuse to provide them with honest answers to due diligence questions because it would confirm the details of his fraud. They knew Madoff lied about whether he traded options over the counter or through the exchange. They knew they lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing. And they knowingly misled the SEC at Madoff's direction.

10.    Every step the FGG partners took was a calculated effort to maintain the viability of the BLMIS Ponzi scheme despite knowing Madoff was not engaged in the trading of securities.

## **PARTIES**

11.    FGG was founded in 1983 and is a *de facto* partnership or partnership by estoppel. The FGG partnership is comprised of the named individual Defendants, as well as at least the following individuals: Lourdes Barreneche, Robert Blum, Cornelis Boele, Harold Greisman, Jacqueline Harary, Richard Landsberger, Daniel Lipton, Mark McKeefry, Maria Teresa Pulido Mendoza, Charles Murphy, and Santiago Reyes. FGG's principal place of business was in New York where it maintained an office at 919 Third Avenue, New York, New York 10022.

12.    Fairfield Sentry Limited ("Fairfield Sentry") was incorporated on October 30, 1990 under the International Business Companies Act of the British Virgin Islands, and automatically re-registered on January 1, 2007 as a business company under the BVI Business Companies Act of 2004. Fairfield Sentry commenced operations on December 1, 1990.

Fairfield Sentry is currently in liquidation proceedings commenced on April 21, 2009 in the

Commercial Division of the High Court of Justice, British Virgin Islands.  At times relevant to

the conduct complained of, Fairfield Sentry conducted business in New York.

13.    Defendant Fairfield Greenwich Limited ("FG Limited") is a company organized

and existing under the laws of the Cayman Islands.  FG Limited is registered as a foreign

company authorized to conduct business in New York County and listed New York City as its

principal place of business.  At times relevant to the conduct complained of, FG Limited

maintained an office in New York.  From 1997 forward, FG Limited served as the hub of FGG's

financial structure.  FGG entities channeled the fees they received to FG Limited.  FG Limited

distributed profits to its owners on a *pro rata* basis.  For the FGG-operated funds using FG

Limited as the investment manager or placement agent, FGG prepared Information Memoranda

or private placement memoranda ("PPMs") identifying FG Limited's address in New York.

14.    Defendant Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda") is a company

organized and existing under the laws of Bermuda with its principal place of business at 12

Church Street, Suite 606, Hamilton, Bermuda, HM 11.  FG Bermuda was a wholly owned

subsidiary of FG Limited until January 1, 2008, at which time ownership was transferred to the

other FGG partners based on their FGG partner percentages.  At all times relevant to the conduct

complained of herein, FG Bermuda conducted business in New York and certain of its

employees were based in New York.  Except for administrative assistants, all FG Bermuda

employees reported directly to FGG personnel in New York.  FG Bermuda's files were

maintained in New York.

15.    Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited

liability company organized under the laws of the State of Delaware and is registered to do

business in New York.  FG Limited is the sole member and owner of FG Advisors.  At times

relevant to the conduct complained of herein, FG Advisors' principal place of business was in

New York.  In December 2001, FGG formed FG Advisors as a wholly owned subsidiary of FG

Limited.  FG Advisors registered as an investment advisor with the SEC on November 17, 2003

and provided administrative services and back-office support to Fairfield Sentry, Greenwich

Sentry, L.P., Greenwich Sentry Partners, L.P., Fairfield Sigma Limited, and Fairfield Lambda

Limited.  In these roles, FG Advisors received management and performance fees.

16.     Defendant Fairfield International Managers, Inc. is incorporated in Delaware.

Fairfield International Managers is an owner of FG Limited.  At times relevant to the conduct

complained of, Fairfield International Managers conducted business in New York.  Fairfield

International Managers served as Fairfield Sentry's investment manager from November 1990 to

December 31, 1997, when the responsibility was transferred to FG Limited.

17.     Defendant Fairfield Investment Fund Limited ("FIFL") is a British Virgin Islands

International Business Company, created on July 27, 2000.  Its registered office is c/o Codan

Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town,

Tortola, B.V.I.  At times relevant to the conduct complained of, FIFL routinely conducted

business in New York.  FIFL was managed from FGG's New York City office, which was the

client and billing contact for FIFL.  FGG operated FIFL as a fund of funds.  FG Advisors served

as FIFL's investment manager.  FG Limited served as FIFL's placement agent.  FIFL's PPMs

directed all FIFL investors or potential FIFL investors to communicate with the fund by

corresponding with FG Limited or FG Advisors at FGG's New York City office.  Defendants

Jeffrey Tucker and Walter Noel served as FIFL's directors and managed FIFL with others such

as Mark McKeefry in New York.  Noel signed the written agreement on behalf of FIFL under

which FG Advisors and FG Limited provided investment advisory and placement agent services; Tucker signed that same agreement on behalf of FG Limited and FG Advisors.

18.     Defendant Stable Fund L.P. ("Stable Fund") is a Delaware limited partnership with its principal place of business at FGG's New York headquarters. FGG formed Stable Fund in September 2003 as a fund of funds limited to investment by FGG insiders and their families. Stable Fund invested a portion of its assets in Greenwich Sentry. FG Advisors served as Stable Fund's investment manager, for which it received a management fee. Tucker was the fund's managing member.

19.     Defendant Fairfield Greenwich Capital Partners ("FG Capital") is an investment vehicle incorporated as an S corporation under the laws of the State of Delaware. FG Capital maintained a place of business at 919 Third Avenue, New York, New York 10022. FG Capital held varying levels of shares in FG Limited, pursuant to the Second Amended and Restated Shareholder and Voting Agreement for Fairfield Greenwich Limited, effective July 1, 2008. Noel and Tucker, two of the three founding partners of FGG, created FG Capital to receive compensation from FG Limited and FG Advisors. They each owned a 50% share of FG Capital.

20.     Defendant Share Management LLC ("Share Management") is a limited liability corporation incorporated under the laws of the State of Delaware. Share Management's address of record for FGL shareholder notices and K-1 tax information is c/o Loeb, Block & Partners LLP, 505 Park Ave., 9th Floor, New York, NY 10022, with a copy to Corina Noel Piedrahita, Calle Somontes, 9, Puerta de Hierro, 28035 Madrid Spain. Additionally, Share Management's registered agent is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Share Management is a shareholder of FG Limited pursuant to the Second Amended and Restated Shareholder and Voting Agreement, effective July 1, 2008.

Share Management was established by FGG partner Corina Noel Piedrahita to receive her partnership distributions from FGG through FG Limited, thereby hiding the fact that she was the beneficiary of millions of dollars in distributions resulting from BLMIS's fraud. Since establishing Share Management, Corina Noel Piedrahita operated it as her alter ego, exercising dominion, influence, and control over it and using its funds for her personal use and benefit.

21. Defendant Walter Noel is an individual who maintains a residence and conducts or conducted business in New York.

22. Defendant Jeffrey Tucker is an individual who maintains a residence and conducts or conducted business in New York.

23. Defendant Andrés Piedrahita ("Piedrahita") is an individual who conducts or conducted business in New York.

24. Defendant Amit Vijayvergiya is a citizen of Canada who conducts or conducted business in New York.

25. Defendant Philip Toub is an individual who conducts or conducted business in New York.

26. Defendant Corina Noel Piedrahita is an individual who conducts or conducted business in New York.

### BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

**A.    BLMIS**

27. Madoff founded BLMIS in 1960 as a sole proprietorship. In 2001, Madoff registered BLMIS as a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

28. In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public

7

records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from

January 19, 1960 through December 31, 2008.  At all times, BLMIS was assigned CRD

No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration

with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.

On December 30, 1970, BLMIS became a member of SIPC and continued its membership

without any change in status until December 11, 2008 (the "Filing Date").  SIPC membership is

contingent on registration of the broker-dealer with the SEC.

29.     For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and an investment advisory business (the "IA

Business").

30.     BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC in which

FGG participated, which forced Madoff to register.

31.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

32.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January

8

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B. The Ponzi Scheme

33. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

34. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

35. To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

36.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

<u>Madoff's Investment Strategy</u>

37.     BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

38.     All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

39.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

40.     From the early 1990s forward, Madoff began telling IA Business customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.

41.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

42.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

43.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

44.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

45.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

46.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

47.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.  On over 800 separate occasions, the options volume reported by BLMIS for Fairfield Sentry greatly exceeded the total volume of comparable option contracts traded on the CBOE.

48.     Sophisticated or professional investors including FGG and Defendants knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

49.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-

12

based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

<u>BLMIS's Market Timing</u>

50.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.  BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year-end.

51.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

52.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

<u>BLMIS Execution</u>

53.    BLMIS's execution, as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor, such as FGG and Defendants, would know it was statistically impossible.

13

<u>No Evidence of BLMIS Trading</u>

54.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearinghouse for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

55.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

<u>The Collapse of The Ponzi Scheme</u>

56.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

57.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

58.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**JURISDICTION AND VENUE**

59.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB), is pending.  The SIPA proceeding was originally brought in the United States District Court for the Southern District of New York as

14

*Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

60.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

61.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

62.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550(a), and other applicable law.

## BACKGROUND, THE TRUSTEE AND STANDING

63.    On the Filing Date, Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court proceeding.

64.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

65.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

- appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);
- appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

15

- removed the case to this Court pursuant to SIPA § 78eee(b)(4).

66.     By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

67.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA proceeding.

68.     At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff,* Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted in his allocution statement that he "operated a Ponzi scheme

through the investment advisory side of [BLMIS]."

69.     Madoff stated in his March 12, 2009 allocution:

> The essence of my scheme was that I represented to clients and
> prospective clients who wished to open investment advisory and
> individual trading accounts with me that I would invest their
> money in shares of common stock, options, and other securities of
> large well-known corporations, and upon request, would return to
> them their profits and principal.  Those representations were false
> for many years up and until I was arrested on December 11, 2008.
> I never invested these funds in the securities, as I had promised.
> Instead, those funds were deposited in a bank account at Chase
> Manhattan Bank.  When clients wished to receive the profits they
> believed they had earned with me or to redeem their principal, I
> used the money in the Chase Manhattan Bank account that
> belonged to them or other clients to pay the requested funds.

70.     In the same allocution, Madoff detailed his SSC Strategy:

> Through the split strike conversion strategy, I promised to clients
> and prospective clients that client funds would be invested in a
> basket of common stocks within the Standard & Poors 100 index, a
> collection of the 100 largest publicly-traded companies in terms of

their market capitalization. I promised I would select a basket of
stocks that would closely mimic the price movements of the
Standard & Poors 100 index. I promised I would opportunistically
time those purchases and would be out of the market
intermittently, investing client funds during these periods in United
States Government-issued securities, such as United States
Treasury bills. In addition, I promised that as part of the split
strike conversion strategy, I would hedge the investments I made
in the basket of common stocks by using client funds to buy and
sell option contracts related to those stocks, thereby limiting the
potential client losses caused by unpredictable changes in stock
prices. In fact, I never made those investments I promised clients,
who believed they were invested with me in the split strike
conversion strategy.

71.    BLMIS investment advisory customers received account statements from BLMIS

that purported to reflect securities transactions involving stocks and Government-issued

securities related to the SSC Strategy, and investment returns that appeared as though their

investments with BLMIS were profitable. Madoff further explained in his allocution:

> To further cover up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations
> and client account statements that reflected the bogus transactions and
> positions to be created and sent to clients purportedly involved in the split
> strike conversion strategy, as well as other individual clients I defrauded
> who believed they had invested in securities through me.

72.    At a plea hearing on August 11, 2009, in the case captioned *United States v.

DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

guilty to a ten-count criminal information charging him with participating in and conspiring to

perpetuate the Ponzi scheme. DiPascali admitted that neither purchases nor sales of securities

took place in connection with BLMIS customer accounts and that the Ponzi scheme had been

ongoing at BLMIS since at least the 1980s.

73.    At the plea hearing, DiPascali testified that he had been instructed to falsely

represent to clients that security trading was occurring in their investment accounts when in fact,

no trades were being made. DiPascali explained:

17

From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all. . . .

Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used these prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client. . . .

I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

74.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

75.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

76.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover payouts of fictitious profits and/or other transfers made by BLMIS and/or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

77. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

78. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 549, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## THE FAIRFIELD GREENWICH GROUP

### Noel and Tucker Founded and Strategically Expanded FGG

79. In 1988, Tucker joined FGG as a founding partner and together with Noel expanded the business into a multi-billion-dollar enterprise, primarily by creating multiple BLMIS investment vehicles and associated entities. "FGG" came to refer to the multitude of FGG-founded entities, which, along with their principals and owners, held themselves out as and conducted themselves as a partnership. Through entities that Noel, Tucker, and their partners owned and controlled, revenues, in the form of management, performance, and placement fees, in excess of a billion dollars, flowed into FGG's coffers.

80. Noel and Tucker, who endowed FGG with their considerable investment industry experience, were principals of the many entities comprising FGG, including Fairfield Sentry,

19

Greenwich Sentry, and Greenwich Sentry Partners, BLMIS feeder funds which were investment funds that pooled their investors' assets for investment with BLMIS. Exhibit 1 lists FGG's accounts at BLMIS.

81. Noel started in the industry as a private banker in Switzerland before working at Citigroup and then heading Chemical Bank's international private banking practice in Switzerland, Nigeria, and Brazil. In 1983, Noel left Chemical Bank to start a consulting firm to advise investors on alternative investments.

82. Tucker was an attorney with the SEC's enforcement division from 1970 to 1978. He later entered private practice where one of his clients was Fred Kolber & Co., a registered broker-dealer with successful practices in arbitrage and hedge trading and equity options market making on the American Stock Exchange and Chicago Board Options Exchange ("CBOE").

83. In 1987, Tucker joined Fred Kolber & Co. as a general partner, where they launched a domestic hedge fund, the Greenwich Options Fund. Tucker handled the fund's administration and marketing.

84. That same year, Tucker and Noel became acquainted when Tucker and Kolber sublet office space for the Greenwich Options Fund from Noel. Impressed with Greenwich Options Fund's performance, Noel wanted in. He told Kolber he could raise investment capital for an offshore counterpart he envisioned. In 1988, Noel, Tucker, and Kolber launched Fairfield International Limited, the first FGG offshore fund.

85. It was Fairfield International Limited's and Greenwich Options Fund's combination of money management and distribution services that gave rise to FGG, as the enterprise came to be known.

20

86.    By early 1989, Noel and Tucker felt that, combined, the two funds commanded too much capital to continue to employ a purely market-neutral strategy. They set out to find "alternative/non-traditional managers" to manage a portion of the funds' capital.

87.    One such manager was Madoff, to whom they were introduced in 1989 by Tucker's father-in-law. Madoff sold them on the SSC Strategy, which they began to "test" with small investments. This paved the way for Tucker and Noel to launch a series of BLMIS investment vehicles and entities over the next several years.

### Noel and Tucker Establish Fairfield Sentry

88.    On October 30, 1990, Noel and Tucker formed Fairfield Sentry, a "single investment fund employing the split-strike conversion strategy" and appointed Noel as a director. Fairfield Sentry was a shell entity with no employees.

89.    In November 1990, Fairfield Sentry opened a BLMIS account with a $4 million deposit. Noel and Tucker offered shares of Fairfield Sentry to non-U.S. taxpayers at a minimum initial investment of $100,000. Under Fairfield Sentry's offering memorandum, the fund's investment manager was required to invest no less than 95% of the fund's assets through BLMIS.

90.    Fairfield Sentry opened a second BLMIS account in 1992. The account opening documents for both accounts listed Fairfield International Managers' Greenwich office as Fairfield Sentry's address.

91.    From the beginning, to comport with Madoff's requirement for BLMIS feeder funds, Fairfield Sentry ceded control of not only its investment decisions, but also the custody of its assets, to BLMIS. Noel and Tucker arranged for Citco Global Custody N.V. to be listed as

Fairfield Sentry's custodian with the understanding that Citco would hold that position in name only, as custodial duties were contractually delegated to BLMIS.

92.     Responsibility for Fairfield Sentry's investment decisions was, likewise, delegated to BLMIS.  Even so, Fairfield International Managers was listed as Fairfield Sentry's investment adviser, for which it was paid a 20% performance fee.  Through this arrangement, FGG received hundreds of millions of dollars in fees.

93.     As Noel and Tucker raised investment capital for Fairfield Sentry and built the FGG enterprise, they cemented their relationship with Madoff, meeting frequently and socializing, eventually coming to inhabit, with their families, the same social circles.

### Noel and Tucker Expanded the FGG Infrastructure and Formed Investment Vehicles to Increase FGG's Capacity for BLMIS Investment

94.     After forming Fairfield Sentry, Noel and Tucker continued to expand FGG, aggressively marketing new BLMIS investment vehicles.  As FGG's fees were based on AUM, the greater the investment with FGG, the greater its fees.

95.     Fairfield Sentry was a U.S. dollar-denominated fund limited to investment from non-United States taxpayers, narrowing the pool of potential investors.  To attract other investors, Noel and Tucker set up fund structures that accepted U.S. taxpayer investors and investors seeking to invest in non-U.S. currencies.

96.     To continue FGG's expansion, Noel and Tucker formed Fairfield Sigma as a British Virgin Islands International Business Company.  Fairfield Sigma accepted subscriptions in Euros and was wholly invested in Fairfield Sentry.

97.     To attract investors using Swiss francs, Noel and Tucker formed Fairfield Lambda, a BVI International Business Company that also invested 100% of its assets in Fairfield Sentry.

22

98.     To attract U.S. investors, Noel and Tucker formed Greenwich Sentry as a Delaware limited partnership. Greenwich Sentry was marketed in the United States and sold to U.S. taxpayers. BLMIS served as Greenwich Sentry's execution agent and custodian, holding substantially all of Greenwich Sentry's assets.

99.     Noel and Tucker ensured that they, and later, FG Limited and FG Bermuda, received management and performance fees generated by Greenwich Sentry. At various times, FG Limited and FG Bermuda served as the general partner for Greenwich Sentry. As a shareholder in FG Limited and FG Bermuda, Fairfield International Managers received an annual performance fee of 20% of Greenwich Sentry's gains.

100.    In 2006, FGG moved some Greenwich Sentry investors into another feeder fund, Greenwich Sentry Partners, a Delaware limited partnership. BLMIS served as Greenwich Sentry Partners' investment manager, execution agent, and custodian, and thus held substantially all of Greenwich Sentry Partners' assets. FG Bermuda served as Greenwich Sentry Partners' general partner.

101.    Noel and Tucker served in many capacities for FGG. Noel was a member of the Executive Committee in charge of FGG's day-to-day management, a director of Fairfield Sentry, Fairfield Sigma and FG Bermuda, and, at one time, a general partner of Greenwich Sentry. Tucker also served on the Executive Committee, and was a director of FG Bermuda and FG Limited, and, at one time, a general partner of Greenwich Sentry.

**Andrés Piedrahita Joins FGG**

102.    Despite their aggressive expansion of FGG, Noel and Tucker ensured that FGG would retain its culture of insularity. They accomplished this by bringing family members with investment industry connections on board, granting them FGG ownership interests, and

enriching them with fees FGG and its constituent entities generated through investment with BLMIS.

103.    In 1989, Noel's daughter, defendant and FGG partner Corina Noel Piedrahita, married Piedrahita. Piedrahita was a financial investments marketer with a large international client base developed through his New York-based investment management firm, Littlestone Associates. Piedrahita's stated goal was to "live better than any of his clients."

104.    In October 1997, Noel, Tucker, and Piedrahita agreed to combine FGG and Littlestone Associates. Thereafter, FGG named Piedrahita its third "founding partner," along with Noel and Tucker.

105.    To reflect their FGG ownership interests post-merger, Noel, Tucker, and Piedrahita formed defendant FG Limited, an Irish corporation, 66.7% owned by Noel and Tucker through Fairfield International Managers, and 33.3% owned by Piedrahita. FG Limited was later reorganized as a Cayman Islands company. But FG Limited never had employees in, nor did it ever maintain an office in, Ireland or the Cayman Islands. When FG Limited registered to do business in New York, it listed its principal executive office as FGG's New York headquarters.

106.    In 2001, Piedrahita transferred his ownership interest in FG Limited to Safehand Investments, his Cayman Islands corporation. Piedrahita organized Safehand Investments and wholly owns it through a Piedrahita-settled trust, RD Trust. Since organizing Safehand Investments, Piedrahita operated it as his alter ego, exercising dominion, influence, and control over it and using its funds for his personal use and benefit. Safehand Investments received distributions from FG Limited and FG Bermuda at Piedrahita's request, thereby hiding the fact that Piedrahita was the beneficiary of millions of dollars in distributions resulting from BLMIS's fraud. Both Safehand Investments and PF Trustees Limited in its capacity as trustee of RD Trust

24

are defendants in a separate adversary proceeding. Piedrahita always maintained an office in FGG's New York headquarters.

107.    Though Piedrahita was one of the founding partners, he also embraced his role as a salesman, and worked to grow FGG. As part of his duties, Piedrahita regularly met with Madoff at BLMIS's headquarters, hosted dinners and client events in New York, attended FGG Executive Committee and Board of Directors meetings in New York, and signed client communications using a New York address block.

108.    Piedrahita shared with Noel and Tucker the responsibilities of managing and supervising FGG's efforts in Europe and Latin America. Piedrahita also drew on his close personal relationship with Madoff, hosting Madoff on his yacht.

109.    Piedrahita and Noel marketed FGG and traveled the world to recruit investment capital for FGG. Tucker was in charge of day-to-day operations and managed FGG's Madoff relationship, reporting back to the partnership.

110.    The three founders ran FGG as a tight-knit family organization. Madoff frequently met with the Defendants in person at the BLMIS offices, for lunch and dinner, and at social functions. Tucker met with Madoff at least 44 times between 1997 and 2008. Noel met with him at least 10 times. Vijayvergiya, FGG's Chief Risk Officer, visited BLMIS's offices at least once or twice each year. Madoff also held in-person meetings with other FGG employees and had additional meetings scheduled in his calendar with the "Fairfield" team. Madoff kept the contact information for Tucker, Noel, and McKeefry, FGG's Chief Legal Officer and Chief Operating Officer in his personal calendar, alongside that of various other Madoff insiders.

111.    Emphasizing the importance of Madoff to FGG, on April 29, 2008, Piedrahita wrote all FGG employees stressing, "[o]ur industry is without a shadow of a doubt going through

25

one of the most challenging periods in its history.  March was the first time that everything that

could go wrong did go wrong AND over every single strategy, the exception being our favourite

and steadfast Uncle Bernie, who is always there to give us a helping hand."

## Keeping FGG in the Family

112.   Four of Noel's daughters married investment industry professionals and FGG

capitalized on their husbands' contacts.  Corina Noel Piedrahita was the first, marrying

Piedrahita, who expanded FGG's sources of investment capital.  She and Piedrahita resided in

the United States, maintaining multiple residences in New York between 2001 and 2008, as well

as residences in Connecticut, Florida, and Spain.

113.   Noel's daughter, Lisina, married Yanko della Schiava in 1991.  Della Schiava

joined FGG in 1999 and served as a key sales employee in charge of business development

raising investment capital in southern Europe.  Della Schiava became an FGG partner in 2008

and was the Managing Director of the Global Business Development section of FGG's client

group.

114.   Noel's daughter, Alix, married defendant Toub.  Since joining FGG in 1997,

Toub focused his business development activities on Brazil and the Middle East.  He was an

FGG partner and served on FGG's Executive Committee.

115.   In 2002, Noel's daughter, Marisa, married Matthew Brown, then a rising star in

the investment banking industry.  Brown merged his company with FGG in 2005, and worked in

the New York office, where he was responsible for marketing, managing third-party platforms,

and global business development.  He became a partner on January 1, 2008.

## The FGG Partnership

116.   On paper, the FGG entities appeared to be separate and discrete.  But FGG

operated as a "flat organization"—a single cohesive unit steered by Noel, Tucker, and Piedrahita.

26

117.   The FGG partners operated in unison to perpetuate the FGG enterprise.  The interests of all Defendants were aligned, with each defendant benefiting by increasing the FGG funds' AUM for investment solely with BLMIS.

118.   FGG held itself out and operated as a *de facto* partnership.  Through both words and actions, the FGG partners held themselves out as partners in FGG.  For example, an FGG brochure describes FGG as consisting of "Partners" and attributes the partners' activities to FGG.

119.   The FGG partners: (i) shared, on a *pro rata* basis, the profits and losses realized by the FGG entities; (ii) made *pro rata* contributions to the capital of FGG entities; (iii) intended to carry on as co-owners of FGG with the common goal of earning a profit; and (iv) participated in the management of entities within the FGG enterprise.  FGG's compensation structure was consolidated and its profits passed through FG Bermuda and FG Limited before being distributed to the partners.  As a *de facto* partnership, the knowledge of all its members (i.e., the FGG partners and FGG entities) is imputed among each other through the partnership itself, as are the liabilities each FGG partner and entity incurred.

120.   The FGG funds' investments with BLMIS were at the center of FGG's business. To manage the funds' investments and their relationship with Madoff, the FGG partners allocated certain responsibilities to various FGG partners and shared BLMIS-related information with each other for the benefit of the FGG partnership and their common enterprise.

121.   At all times relevant hereto and related to the facts alleged herein, the following individuals and entities acted for and as agents of FGG:  Noel; Tucker; Piedrahita; Vijayvergiya; McKeefry; Daniel Lipton, FGG's Chief Financial Officer; Gordon McKenzie, FG Bermuda's Controller; Robert Blum, FGG's Chief Operating Officer until 2005; Harold Greisman, FGG's Chief Investment Officer; Corina Noel Piedrahita, FGG's Head of Client Services and Investor

Relations; Richard Landsberger; Toub; Andrew Smith; Gregory Bowes; Lourdes Barreneche; Cornelis Boele; Harold Greisman; Jacqueline Harary; Maria Teresa Pulido Mendoza; Charles Murphy; and Santiago Reyes.

122.    At all relevant times, Noel and Tucker acted on behalf of and for the benefit of FIFL as its agents, and their knowledge is imputed to FIFL.  Because Noel and Tucker also were directors of FIFL, their knowledge is imputed to FIFL.

123.    At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, and Toub acted on behalf of and for the benefit of FG Limited as FG Limited's agents, and their knowledge is imputed to FG Limited.  Because Tucker, McKeefry, and Toub also were officers and directors of FG Limited, their knowledge is imputed to FG Limited.

124.    At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Smith acted on behalf of and for the benefit of FG Bermuda as FG Bermuda's agents.  Because Noel, Tucker, McKeefry, Lipton, Blum, Vijayvergiya, McKenzie, and Smith also were officers and directors of FG Bermuda, their knowledge is imputed to FG Bermuda.

125.    At all relevant times, Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Bowes acted on behalf of and for the benefit of FG Advisors as FG Advisors' agents.  Because McKeefry, Lipton, Blum, and Bowes also were officers and directors of FG Advisors, their knowledge is imputed to FG Advisors.

126.    At all relevant times, Tucker acted on behalf of and for the benefit of Stable Fund as Stable Fund's agent.  Because Tucker was managing member of Stable Fund, his knowledge is imputed to Stable Fund.

127.    At all relevant times, Noel and Tucker acted on behalf of and for the benefit of Fairfield International Managers as Fairfield International Managers' agents.  Noel and Tucker were each 50% owners of Fairfield International Managers, which they also controlled, and their knowledge is imputed to Fairfield International Managers.

128.    At all relevant times, Noel and Tucker acted on behalf of and for the benefit of FG Capital as FG Capital's agents.  Noel and Tucker were each 50% owners of FG Capital, which they also controlled, and their knowledge is imputed to FG Capital.

129.    At all relevant times, Corina Noel Piedrahita controlled Share Management, and her knowledge is imputed to Share Management.

130.    At all relevant times, Piedrahita controlled his alter ego, non-party Safehand Investments, and the knowledge and information Safehand Investments acquired through its direct and indirect ownership interest in FG Limited and FG Bermuda is imputed to Piedrahita.

131.    Although FGG, FIFL, Stable Fund, FG Limited, FG Bermuda, FG Advisors, Fairfield International Managers, FG Capital, and Share Management were formed as separate entities, they operated as part of a common enterprise created by and for the benefit of each respective entity within FGG, including its individual partners, to profit from investments with BLMIS.  For all of the acts alleged herein, each FGG partner acted with the consent and for the benefit of every other FGG partner.  All FGG partners, including the Defendants, had common goals, including to profit together from FGG's investment with BLMIS.  FGG and the individual FGG partners have no interests adverse to the interests of any other FGG partner; all of their interests are aligned.

### The Founding Partners Worked Tirelessly to Quell Investors' Fears

132.    In May 2001, two industry publications, MAR/Hedge and Barron's, ran articles questioning the legitimacy of Madoff's returns.  Both articles pointed to Fairfield Sentry as the leading BLMIS investment vehicle.

133.    The MAR/Hedge article reported investment industry skepticism about Fairfield Sentry's returns utilizing the SSC Strategy.  According to the article, on a risk-adjusted basis, Fairfield Sentry was the "best performing fund" of the 1,100 hedge funds listed on the "Zurich hedge fund database" for the period of July 1989 to February 2001.  The article reported that experts questioned the incongruities of the returns Madoff purported to generate:  Why could no one duplicate Madoff's returns using the strategy?  Why haven't other firms traded against the strategy?  Those incongruities contributed to "amazement, fascination, and curiosity" that the fund could, by relying on the SSC Strategy and Madoff's "astonishing ability to time the market" generate returns impervious to market volatility.

134.    The Barron's article highlighted doubt within the industry that the SSC Strategy could have generated Madoff's returns.  It noted that "option strategists at major investment banks" "couldn't understand how Madoff churns out such numbers."  The article also quoted a "former Madoff investor" who commented, "[a]nybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."  Another investor commented, "[e]ven knowledgeable people can't really tell you what he's doing.  People who have all the trade confirmations and statements still can't define it very well."  Still another investor said, "[w]hat Madoff told us was, 'if you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here.'"  The investor added, "[w]hen [Madoff] couldn't explain how they were up or down in a particular month, I pulled the money out."

135.    Tucker was quoted in the Barron's article, commenting that Fairfield Sentry was "a private fund.  And so, our inclination has been not to discuss its returns . . . Why Barron's would have any interest in this fund I don't know."

136.    Shortly after the Barron's article was published, Madoff called Tucker and asked whether FGG was "getting feedback from . . . clients" about the article.  Tucker admitted that some FGG clients had expressed concern.  FGG understood that the MAR/Hedge and Barron's articles embodied the concern that had been building within the investment industry that BLMIS's performance was baffling and impossible to duplicate.  In June 2001, FGG sent a letter, signed by Tucker, Noel, and Piedrahita, to mollify its clients.  The letter characterized the articles as containing "innuendo," which the letter was intended to "clarify."

137.    In the letter, FGG complained that the articles "implied that investors do not completely understand the underlying strategy and that the manager is not transparent in divulging the details of the strategy."  FGG claimed an "uncommonly high degree of transparency with respect to the activities of" BLMIS: "[n]o less frequently than monthly we aggregate the confirmations, check them to insure trade execution is within that day's trading range, and compose a performance attribution for the period."  The letter failed to respond to the issues related to the impossibilities of BLMIS's performance.

138.    Just a few weeks after the MAR/Hedge and Barron's articles were published, in May 2001, Citco worried that "Madoff is now also doubted upon in the financial world."  The root of Citco's fears was that its risk exposure as custodian was approximately "USD3 billion"—at the time, the full amount of Fairfield Sentry's investment supposedly sub-custodied at BLMIS.  Citco worried that there "[p]robably . . . are no options to restore this situation from a worse [sic] case scenario."

31

139.    Concerns continued to mount.  Citco believed that "the chance that things are wrong is at least 25%" or "50%" and the consequences were dire.  Citco reached out to FGG to arrange a site visit at Madoff's office.  Before the site visit, FGG and Citco agreed upon their "mutual objectives" of the visit to "increase[e] Citco's comfort level with respect to the existence of the assets in relation to [its] responsibilities as Custodian."

140.    It took time to schedule, but on December 17, 2002, the FGG partners tasked Lipton with joining personnel of Citco and PricewaterhouseCoopers ("PwC") (the auditor of Kingate Global Fund, Ltd., Kingate Euro Fund, Ltd., and Fairfield Sentry) for the site visit at BLMIS's offices.  Before the site visit, Citco communicated to FGG that it wanted to increase its "comfort level."  But at the site visit, the "agreed upon procedures (e.g., walkthrough test)" were "not performed."  FGG and Citco were not allowed "to review the back office procedures of Madoff" or "interview other personnel or … perform some review procedures" themselves.  Nor were they provided, as they requested, with "evidence about the existence of the US T bills (e.g., stock record reconciliation / clearing confirmation)."  Within a few hours of the meeting, Citco's representative declared that the "mission" had "failed."

141.    Neither FGG nor Citco were able to verify the existence of Fairfield Sentry's assets.  The concern Tucker expressed when the MAR/Hedge and Barron's articles came out, whether "the assets were there," remained a mystery to FGG and Citco after the site visit.

**FGG's Compliance Model and Its Use of Risk Monitoring to Gain Investor Confidence**

142.    FGG touted itself as a sophisticated risk monitoring outfit and emphasized its due diligence practices in order to quell investor concerns and justify charging the highest fees of any BLMIS feeder fund.  Internal FGG documents set forth the due diligence practices FGG claimed to employ: review of financial statements, on-site review of back-office functions, confirmation that the fund's auditor was "reputable," the independent confirmation of trading, pricing, and the

existence of assets, the review of regulatory filings such as SEC Form ADVs, the presence of

inconsistent answers or the refusal to give information, and the independent verification of the

proper segregation of back-office duties.

143.    In 1990 FGG hired Gil Berman, a former CBOE options trader, as an independent

contractor.  FGG instructed Berman to analyze the trading activity in the FGG feeder funds'

BLMIS accounts, and prepare monthly trading summaries, tasks that Berman used BLMIS

account statements and trade confirmations to complete.

144.    Beginning in the mid-1990s, Berman recognized indicia of fraud and performed

analyses that turned up impossibilities on Fairfield Sentry's account statements.  Berman

reported those issues to the Defendants.  FGG suppressed the concerns and misstated the fraud

risks to investors.

145.    As early as 1996, when performing his typical check to confirm that the trading

prices BLMIS reported on its trade confirmations fell within the reported daily range, Berman

discovered that prices BLMIS reported were above the highest trading prices reported for the

day, and informed FGG.  FGG did nothing.  Nor did FGG act upon Berman's analysis showing

that BLMIS reported trades inconsistent with the SSC Strategy.

146.    FGG diligently cultivated an image as a sophisticated risk monitor.  This was a

sales strategy, however, as FGG continued to mislead potential clients to induce them to invest

with Madoff, even as it was repeatedly confronted with the impossibilities in Madoff's purported

trading.  In the early 2000s, FGG worried that the nearly equal number of investment

professionals and sales staff it employed would lead potential clients to believe FGG was just a

sales organization.  It set out to remake its image.  As Blum put it, "we are always trying to sell

our clients on the fact that we are an investment management organization, with the relevant high

ratio toward investment management expertise, not just '[the] large bunch of salesmen,'" they were recognized as.

147.    To enhance the perception of its risk monitoring capabilities, in June 2003 FGG hired Vijayvergiya, a Chartered Financial Analyst and certified Financial Risk Manager, and installed him as the Vice President and Risk Manager of FG Bermuda.

148.    When asked after Madoff's arrest whether FGG confirmed the settlement of BLMIS's trades with the DTCC, Vijayvergiya responded, "I don't think so.  I certainly didn't."

149.    In fact, Vijayvergiya further admitted that FGG did not apply the same standards or tests to BLMIS that it did to other alternative investment managers.  At one point, Vijayvergiya committed to his journal the observation that, although he was FGG's Chief Risk Officer, he felt like "a sales 'whore.'"

150.    FGG founded FG Bermuda earlier in 2003 to serve as an offshore investment adviser to the FGG feeder funds to aid FGG's push into investing with BLMIS through fund-of-funds structures.  FGG named Noel and Tucker as two of the three original FG Bermuda directors.  New York-based FG Limited held 100% of the FG Bermuda shares.  Any FG Bermuda transaction more than $10,000 had to be approved by, and include the signature of, FGG's New York-based executives.  Except for administrative assistants, all FG Bermuda employees reported directly to FGG personnel in New York.  FG Bermuda's files were maintained in New York.

151.    Madoff strongly influenced FG Bermuda's formation.  Noel and Tucker initially planned for a U.S.-based FGG entity to serve in that role.  Madoff objected because he feared that employing a U.S.-based entity would expose him to greater SEC scrutiny.  Noel and Tucker capitulated and formed FG Bermuda to serve as investment adviser.  At the same time, FGG

34

created FG Advisors, a Delaware limited liability company, to serve as an administrator to

Fairfield Sentry.  Both FG Bermuda and FG Advisors were wholly owned subsidiaries of FG

Limited.

152.   FG Limited assigned the investment advisory agreements for Fairfield Sentry,

Fairfield Sigma, Fairfield Lambda, and Greenwich Sentry to FG Bermuda on July 1, 2003, but

remained the placement agent for those funds.  Each of those roles opened a flow of fees to a

different FGG entity.  Through their 50% ownership of Fairfield International Managers, Noel

and Tucker were indirect shareholders in FG Limited, FG Bermuda, and FG Advisors, and used

it as a vehicle to accept their partnership distributions.

153.   FGG investors rightly suspected FGG of restructuring primarily to help Madoff

avoid SEC scrutiny.  In June and July 2003, investors questioned FG Limited's motives in

assigning the Fairfield Sentry investment management agreement to FG Bermuda.  Through

meetings involving Tucker, Toub, Blum, and Vijayvergiya, FGG advanced various stories to

attempt to defuse investor concerns.

154.   Even though FGG had restructured to accommodate Madoff, FGG denied it and

falsely claimed that the restructuring was to achieve tax savings.  In reality, FGG incurred

significant expense to follow Madoff's directions in creating new foreign entities, opening and

staffing an office in Bermuda, and assigning FG Limited's advisory responsibilities to FG

Bermuda.

155.   For example, in July 2003, Blum wrote Vijayvergiya, Lipton, Landsberger, Toub,

and Tucker: "I am portraying this stuff as being tax driven, which resonates easily with a lot of

people.  I have heard lately that some amateur Madoff watchers/conspiracy theorists out there are

making more of this Bermuda thing than that, and without being too obnoxious about it, we

should steer the conversation to the tax-driven plane."  In this case, he successfully played upon the investor's "Brit[ish] . . . sensitiv[ity]" to tax issues, noting that the investor "readily accepted" that FGG would "have to start doing this stuff" "in accordance with tax guidance." Blum planned to deploy Vijayvergiya at an upcoming meeting with the investor to shore up Blum's "portray[al of] this stuff as being tax driven."

156.    When a Swiss investor expressed concern that the assignment was an undue attempt "to avoid SEC scrutiny of [Madoff's] firm and market making activities," FGG belittled that concern as part of a trend "in Switzerland . . . expressed by a good number of other investor [sic] or potential investors in Fairfield Sentry."  Instead of responding to this valid concern, Tucker steered the conversation back toward the investor's "need and want [for] more capacity to Madoff."

157.    From the beginning of his employment with FGG, Vijayvergiya recorded his unguarded impressions and concerns about FGG's Madoff-related investments on an almost daily basis.  One of his first questions, which he posed to Blum was, "what do you see as the main weaknesses and threats to continued success going forward"?  Blum responded: "Madoff issues."  Vijayvergiya also noted that he asked Blum whether FGG "specifically monitor[ed] adherence to operating guidelines," "to 'gauge manager performance.'"  Blum's response: "No."

158.    Vijayvergiya remained undeterred.  With FGG's authorization, he undertook the task of recasting FGG in the image of a serious risk monitoring operation, even though FGG's structure and operations were largely unchanged.  In August 2003, an investor made a due diligence inquiry to FGG, asking, among other things, that FGG provide "[t]he number of staff in the following categories: number of investment professionals, number of analysts, number of operational staff, others and total number of staff."

36

159.    In his response, Vijayvergiya was intentionally misleading:  "[a]s of June 30, 2003," he wrote, FGG employed 53 people: 26 business development, sales, and support personnel, and 13 investment professionals and analysts, and 14 operational, legal/compliance, and technology personnel.

160.    Vijayvergiya's dishonesty impressed Blum.  "Good job," he said.  "I like the way you got investment professionals up to 13—but how?"  He added, "[s]imilarly, I find that splitting the sales group as shown on the org chart into separate sales and client support groups makes the number '26' look less imposing."

161.    Vijayvergiya took on many roles on behalf of FGG.  While he was initially hired to oversee due diligence, risk modeling, and ongoing risk analysis, FGG expanded his role based on his ability to communicate with "polish and professionalism."  He was called upon to prepare investor communiqués, often in response to investors' concerns about Madoff.  In his marketing efforts and communications with investors, Vijayvergiya used a U.S. FGG email account— "amit@fggus.com."

162.    Vijayvergiya also communicated on behalf of the FGG partners with Madoff and DiPascali and reported their responses back to the FGG partners.  Like the founding partners, Vijayvergiya had privileged access to Madoff.  Vijayvergiya spoke to BLMIS personnel hundreds of times during his tenure with FGG, and a number of those conversations were with Madoff himself.

163.    By July 2006, Vijayvergiya was one of four individuals at FGG permitted to authorize movement of cash into and out of the investment accounts that the FGG feeder funds maintained at BLMIS.

164.   As FGG's Chief Risk Officer, Vijayvergiya headed FGG's Risk Management

Division in the New York-based Investment Group, reporting directly to FGG personnel in New

York.  Ultimately, Vijayvergiya's role at FGG straddled risk monitoring and sales.  Though he

was responsible for due diligence of BLMIS, and understood the need for clear, well-

documented, direct responses to client inquiries, for the benefit of FGG's common enterprise he

typically chose obfuscation and vagueness instead.  He quickly adopted FGG's policy of trying

to prevent prospective investors from contacting Madoff directly.

165.   From the beginning of Vijayvergiya's tenure, FGG imparted the "prime

directive," in Blum's words—to downplay Madoff's role.  He sidestepped investors' questions

about Madoff and provided them with oral responses to due diligence questions.  For example, in

May 2005, as part of an effort to conceal certain information about Fairfield Sentry, Vijayvergiya

sought to delete portions of a Fairfield Sentry conference call transcript that discussed Madoff.

Likewise, on August 22, 2005, an investor asked FGG to identify the counterparties to a number

of over-the-counter ("OTC") option contracts and how FGG managed counterparty risk.

Vijayvergiya indicated that FGG would provide only oral, not written, responses.

166.   This was typical of Vijayvergiya's efforts to assist FGG in evading investor

inquiries.  In May 2006, for example, he made an "urgent" request to make sure that there were

no references or links to Madoff on FGG's website.  He made this request on the heels of the

SEC's investigation of BLMIS as the feeder funds' investment manager, in which he deliberately

tried to conceal Madoff's role with the FGG feeder funds.

167.   In July 2007, Vijayvergiya similarly tried to conceal from a client BLMIS's role

as the funds' broker and custodian.  Vijayvergiya responded that it was a "common practice in

the US brokerage industry," and that "brokers typically custodize the assets of their clients."  His

38

response sidestepped the real issue: that BLMIS's dual role as investment manager and custodian posed significant risk to the safety of the assets. To avoid subjecting his written response to scrutiny, Vijayvergiya instructed that any further discussion with this investor should only be "on a phone call."

168.   This was part of Vijayvergiya's modus operandi acting for FGG. As he told his colleagues in March 2008, when confronted with a client's concerns about BLMIS's auditor, fee structure, or custodial structure, the concerns "can [be] dispelled most effectively during a conference call." He felt that the answer had to be properly spun, to "highlight our transparency." Tucker agreed that "a call usually disarms the party . . ."

169.   Vijayvergiya was responsible for communicating "FGG's transparency and risk management capabilities in written pieces," and for writing, updating and reviewing all client-facing Fairfield Sentry communications. Although there were aspects of BLMIS operations that "remain[ed] unclear" to Vijayvergiya as of late August 2008, he did not let them trouble communications with investors.

**FGG Clients Continuously Raised Doubts About Madoff's Viability**

170.   Because they understood that FGG's profitability hinged on its relationship with BLMIS, Tucker, Noel, and Piedrahita guarded the relationship with Madoff.

171.   FGG wanted at all costs to avoid endangering their relationship with Madoff by exposing him to scrutiny—to avoid "piss[ing] Bernie off," as Blum wrote in 2003. The source of much of this scrutiny was investors who communicated a steady stream of concerns about BLMIS and Madoff to FGG's sales personnel. The sales personnel constantly relayed the concerns to FGG's partners. Investor concerns about BLMIS—its custody of assets, its lack of transparency, its uncanny market timing—became a drumbeat that resonated throughout FGG for years.

39

172.    The dialogue FGG sales personnel maintained with investors forced FGG's partners to constantly reckon with indicia of Madoff's fraud.  But rather than permit investor transparency, FGG employees sought to tamp down the investors' concerns and persuade them to invest more.

173.    For FGG, this was largely a matter of gaining clients' confidence with sales methods—working within the confines of a Madoff-approved narrative and quelling investors' concerns.  Tucker, Noel, and Piedrahita imparted strategy directives to the FGG partners, who interpreted them and handed them down to the members of the sales team, who communicated them to clients.

174.    FGG personnel sought to walk a narrow line in meetings with investors.  In one such meeting with Vijayvergiya and Blum, a potential investor came in with concerns about Madoff and spent much of the meeting pressing FGG for a response: "guy was totally fixated on the usual Swiss gossip mongering subjects (front running, etc), as well as valid, but overplayed (at least half an hour) custody subject."

175.    To calm the investor, they got the "[r]isk guy" who attended to buy "our risk monitoring story."  The discussion, however, remained at a superficial level, as Vijayvergiya did "a really good job," in Blum's estimation, "of explaining the strategy at an idiot's level."  By the end of the meeting, Blum felt that FGG had "passed the 'they're good guys' test," but the investor still wanted more information.

176.    On March 25, 2003, an investor wrote to Piedrahita, Tucker, Blum, and Lipton, suggesting that FGG provide a "monthly commentary" on Madoff.  The investor asked FGG to disclose, for investors' benefit, "[]puts, calls, stock portfolio and cash[] of the performance on a monthly and cumulative basis."

40

177.    The email sparked discussion within FGG.  Shortly after receiving the email,
Lipton forwarded it to Tucker and Blum, commenting that he "get[s] numerous requests from the
sales force" for similar information.  The decision whether to disclose such information in
writing, as Lipton made clear, was "Jeffrey [Tucker]'s call."  Lipton noted that sometimes when
asked, he told the sales force that "their clients are welcome to come in and review the
statements," a technique FGG frequently employed to put off clients who confronted the sales
team with requests for information they were unwilling to release because they knew clients
were unlikely to take them up on the offer.

178.    Blum rejected the idea of a "monthly recap" because even if FGG "haze[d] up
details"—in other words, presented trades without "strike prices, etc" it would "still make[ ]
[Madoff's] activities transparent to the world . . . and Bernie probably wouldn't like that."

179.    In preparation for an October 2003 sales meeting with a Fairfield Sentry investor,
Vijayvergiya sought out Tucker's help in crafting responses to concerns the investor had about,
among other things, the intrinsic danger of BLMIS occupying the "dual role[s]" of sub-custodian
and executing broker.  The investor also raised questions about whether BLMIS used "insider
information gained through [its] market making business"—in other words, whether BLMIS was
engaged in front-running—and other "conflict[s] of interest" arising from BLMIS's market
making business and its "managed account and broker/dealer business."

180.    In an October 2003 email, an FGG employee notified Lipton, Blum, Tucker, and
Bowes that Societé Generale "won't approve [Fairfield] Sentry from a due diligence standpoint"
because of "'collusion' between the manager and the prime broker"—Madoff.

181.    On November 4, 2003, an FGG sales consultant sent an email to members of the
FGG management and sales teams reporting that he had learned that "due to a very negative

41

opinion on Madoff from their alternative investment group (ex [Royal Bank of Canada] group),"
they no longer recommended Fairfield Sentry for investment. The consultant sought advice from
Toub, Bowes, and other FGG employees about the next step in FGG's relationship with this
client. Toub confirmed the client's skepticism of the scalability of the SSC Strategy, noting that
in past meetings the client had expressed "surprise" at "Madoff's ability to make the split strike
strategy work so effectively on such a big amount of money."

182.    As AUM increases it becomes more difficult for a fund to find opportunities on a
scale that is proportional to the growing size of the fund. Toub and Bowes struggled to
formulate a response, ultimately dodging the client's questions by "describ[ing] the situation as
best we could" and squelching further discussion that day by "invit[ing the investor] over to our
office to further explore his reservations"—one of FGG's tried and true methods of appearing to
be attentive to investor concerns without actually addressing them.

183.    In December 2003, HSBC sent its "annual fund review" questionnaire to Fairfield
Sentry seeking information on many aspects of Madoff's business. HSBC raised the question of
the volume of Madoff's AUM, which HSBC believed to total approximately $17 billion. HSBC
sought Fairfield Sentry's take on Madoff's "black box" strategy, which supposedly relied on "gut
feel" or "human intervention." They asked how the timing of the strategy was determined—how
did Madoff know when to go "in and out of the market"? They asked about the strategy's
scalability: "how big can a position be in a basket"? All of these questions should have been
answered directly by FGG given its professed access and expertise, yet the Defendants provided
evasive answers.

184.    On December 2, 2003, an FGG salesperson emailed Noel, Tucker, Piedrahita, and
Blum to alert them to inflammatory comments a director of Credit Suisse's private banking

division made about FGG.  The director said that Credit Suisse "would never do business with FGG."  He noted that FGG's failure to play "by the rules" would "soon[er] or later" land FGG "in jail."

185.    As a registered broker-dealer, BLMIS was required to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. The Defendants knew that in order to evade those reporting requirements, BLMIS purported to liquidate all investment in equities and options at those times, in contravention of the SSC Strategy.

186.    On December 11, 2003, an FGG sales executive contacted Vijayvergiya in preparation for an investor meeting.  The sales executive correctly anticipated the investor's question—why was Madoff always reportedly in cash at the end of the year?  Vijayvergiya told the investor that there were fewer "reliable trade signals" in December to make the strategy profitable, and that BLMIS generally generated enough returns through November that they did not need to take the risk of investing in December.  The sales executive responded, "I remember Jeffrey [Tucker] once specifically mentioning about the last days of the year to be in cash so he did not have to fill certain tax forms . . [sic] or something similar."  Vijayvergiya acknowledged this was a "third possible reason" for Madoff's behavior, but that he "ha[d] been advised not to emphasize this."  He further explained: "I am told that the rule to which Jeffrey [Tucker] is referring requires that if Madoff ends the year invested on December 31, then they are required by law to report their holdings in these same positions for the next four quarters.  I am further told Madoff has been reluctant to do this."

187.    In March 2005, another client asked Vijayvergiya to prepare a historical month-end exposure summary.  The summary showed that BLMIS was invested in Treasury Bills at

month-end for 17 of the 26 months analyzed. Seeming to understand the danger in providing this kind of information to clients, Vijayvergiya asked Tucker if they should only provide the summary to the client on an "as requested" basis, rather than monthly.

### FGG KNEW MADOFF'S LIES ABOUT FRIEHLING & HOROWITZ WERE INDICATIVE OF FRAUD AND SOUGHT TO CONCEAL THE TRUTH

188.    BLMIS, with its billions of dollars under management, claimed to use Friehling & Horowitz, an obscure accounting/auditing firm with only two accountants, one of whom was semi-retired and living in Florida. Friehling & Horowitz operated from a strip mall in suburban Rockland County, New York. FGG would come to learn that Friehling & Horowitz was not certified to perform audits.

189.    All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program, and those that enroll are listed on the public area of the AICPA website. Although it was an AICPA member, Friehling & Horowitz avoided peer review after 1993 by representing that it did no audit work. Therefore, it was not listed as a certified auditor on the public portion of the AICPA website, a fact known to FGG. Nevertheless, FGG represented to clients that Friehling & Horowitz audited BLMIS, which would not be allowed under the AICPA peer review program, and was contrary to Friehling & Horowitz's claim that it did no audit work.

190.    Investors continually communicated concerns about Friehling & Horowitz to FGG. In November 2003, following a meeting with members of FGG's sales team, an investor asked about Friehling & Horowitz's qualifications: "Is the auditor that Madoff uses recognized within this industry? Are references available?"

191.    The sales team forwarded the questions to McKeefry, who was unable to answer. He passed them on to Lipton, who after finding that "Friehling & Horowitz do not have a web

site, nor is there any information on them at the AICPA," escalated the matter to Tucker. He asked Tucker, "[d]o you know how many clients they have and if they have any references[?]" Although Tucker recalled that "several clients over the years have asked about" Friehling & Horowitz, he said, "I do not know them." He suggested that Lipton look to BLMIS on the question: "call Frank [DiPascali] and ask if they have a brochure or he can give you some info."

192. Lipton and Vijayvergiya tried to call DiPascali, but they were "accidentally transferred" to Madoff himself. The representations Madoff made—that Friehling & Horowitz had "been in business for over 30 years and have audited his firm for over 25 years," and that "[t]hey have 100's of clients and numerous broker-dealers"—did not comport with Lipton's understanding. After the call, Lipton questioned whether this information would satisfy FGG's client—"I don't know if that is good enough. We could try some other methods if that does not suffice." FGG's own research, which showed that Friehling & Horowitz was not listed on the AICPA website, and was therefore barred from conducting audits, belied Madoff's answer. Nevertheless, FGG continued to tell its clients that BLMIS used a reputable, qualified auditor.

193. Just six months later, in a February 2004 meeting with a different client, Lipton and Vijayvergiya represented that PwC audited Madoff's returns. After the meeting, however, the FGG partners acknowledged internally that PwC did not audit Madoff.

194. In March 2004, another client asked the sales team similar questions about Friehling & Horowitz. This time, Vijayvergiya embellished his response, proclaiming Friehling & Horowitz a "reputable CPA firm," even though its absence from the AICPA website and single-client book of business suggested otherwise.

195. When, in August 2005, the massive Ponzi scheme involving the Bayou Hedge Fund Group was uncovered, FGG investors took note of "similarities" between BLMIS and

45

Bayou.  In late August 2005, an investor came to Carla Castillo, a vice president in FGG's Client

Services/Investor Relations division, with the observation that, by using Friehling & Horowitz,

BLMIS used an obscure, non-independent, possibly conflicted auditor, just as Bayou had.

196.    The revelation of Bayou as a fraud caused internal concerns at FGG as well.

Tucker received a client bulletin concerning Bayou from a friend at a fellow investment

management firm.  On August 31, 2005, Tucker forwarded the bulletin to all FGG employees.

Within minutes, Andrew Ludwig, another FGG employee, wrote to Tucker, informing him that

he was preparing FGG's "own client response piece re: Bayou and our manager selection/D[ue

]D[iligence] process, as discussed yesterday."  Although Tucker had just forwarded the bulletin

to all FGG employees, he wrote to Ludwig and "question[ed] the importance of sending out such

a note to a broad audience."  Citing nothing other than Vijayvergiya's impression that FGG had

received only one client inquiry on the issue, McKeefry and Vijayvergiya chimed in that they

agreed with shutting down the project.

197.    Although he recognized that he would ultimately have to defer to Tucker, Ludwig

questioned the decision: "the core client services folks . . . already had a few queries . . . . Happy

to let this one go, but I think we are likely to need a general but timely piece of this type sooner

rather than later."

198.    Castillo backed McKeefry and Vijayvergiya, attempting, as they had, to get

Ludwig to back away from the project.  Castillo told Ludwig that she had received one client

inquiry in August, seeking "feedback on the perceived conflict of interest with the two

relationships (brokerage and auditing) in Bayou, and any similarities between Bayou and

[Fairfield] Sentry related to their use of 'in-house' brokerage."  The same client wanted to know

"whether Madoff had made any comments regarding the Bayou Fund."  Castillo made clear to

46

Ludwig that she would take over from him in dealing with client services on the issue. She then immediately checked in with Vijayvergiya to make sure that he thought her message to Ludwig was "ok"—had it been effective in stopping Ludwig from pursuing the project?

199.    Just a few hours after dismissing the importance of Bayou's auditor as a sign of the fraud, Castillo wrote to Vijayvergiya again, with a knowing laugh: "Does this 'perceived conflict of interest with the two relationships (brokerage and auditing)' sound familiar? Hehehe."

200.    At the same time, Castillo and Vijayvergiya concocted a plan to quell the investor's fears about Friehling & Horowitz. Castillo turned to Vijayvergiya to come up with a response to the client's questions. In his contemporaneous journal entry, Vijayvergiya noted that the client had asked whether "FGG [had] checked out and approved Frehling [sic] & Horowitz," in light of it not being one of the "big 4" accounting firms and its "similar[ity] to Bayou." In responding to the client, Vijayvergiya purposely answered a different question, telling the investor that Fairfield Sentry (not BLMIS) used an auditor from one of the "big four" accounting firms. The investor immediately recognized Vijayvergiya's dodge: "the question was not about Fairfield Greenwich Group but Bernard L. Madoff Securities LLC."

201.    FGG scheduled a call with the investor but Vijayvergiya was unavailable to join, forcing Tucker, Lipton, McKenzie, and McKeefry to prepare for the call. Though he had no new information on Friehling & Horowitz, Lipton wrote to the group, repeating the unsubstantiated claims that Friehling & Horowitz was a "small to medium size financial services audit and tax firm, specializing in broker-dealers and other financial services firms . . . They have 100s of clients and are well respected in the local community." This was a lie. Lipton knew Friehling & Horowitz could not perform audit work, as they were not listed on that portion of the AICPA website.

47

202.    The day before the call, Tucker had McKenzie continue to look into Friehling & Horowitz.  McKenzie reported that he could not "find much information" on Horowitz.  There were "a number of Horowitz's [sic] licensed in the state of New York," he said, but he "could not tie back any to the firm."  He called DiPascali to obtain more information, but DiPascali was not available.

203.    Tucker handled the customer call, and although he had little, if any, concrete information about Friehling & Horowitz, gained the client's confidence.

204.    A few hours after the call with the client, McKenzie obtained a Dun & Bradstreet report showing that Friehling & Horowitz had a single employee—David Friehling—annual receipts of $180,000—far less than an auditor with hundreds of clients would have—and operated out of Mr. Friehling's home.

205.    Tucker wrote just a two-word email to McKenzie upon receiving the Dun & Bradstreet report: "thank you."  The client was never notified of the updated information.

206.    The day after the call, DiPascali returned McKenzie's call, "but could not provide any additional information on F & H."  McKenzie reported to Tucker that DiPascali had suggested that Tucker and Madoff speak to each other about Friehling & Horowitz.

207.    In mid-September 2005, with the internal FGG conversation about Friehling & Horowitz's role with BLMIS continuing, Andrew Smith, a member of FGG's Executive Committee, reminded Tucker, Vijayvergiya, and others that, having understood the dangers inherent in a fund that was "self-administered and [that] owned the accounting firm that did their audits," FGG had "passed on an initial meeting" with Bayou.  Castillo acknowledged that "you are absolutely right."  Another senior member of FGG's investment team, and a head of due diligence, agreed with Smith: "[t]hat is a definite red flag," adding that Bayou's "accounting

48

firm was a very little known firm, which would have raised further questions from us.
Furthermore, we always ask if there is any kinship among the service providers and this fact
would deter us from the fund."

208.     Near the end of 2005, the Defendants held up Bayou as an example of a firm
whose fraudulent practices FGG's diligence process would have detected.  In a November 2,
2005 Investment Team Presentation, FGG claimed that their diligence process would have led
them to question "Bayou's obscure auditing firm."

209.     From a due diligence perspective, the differences between Friehling & Horowitz
and Bayou's auditor were negligible: few employees, minimal revenue, and obscure reputation.

210.     Yet, even when called upon to revisit the Friehling & Horowitz issue, FGG took
no action.  In March 2008, Yanko della Schiava received a client inquiry that raised, among
other issues, Madoff's compliance with IFRS "auditing standards."  When della Schiava sought
guidance on the issue from Vijayvergiya and Toub, Toub viewed the issue not for the fraud risk
it was, but only as a matter to be addressed through FGG's "branding efforts," which, in light of
the client's concerns, he "[g]uess[ed] we need to work on."  He forwarded the email to Tucker,
Vijayvergiya, Landsberger, Smith, and others.  Smith was perplexed by the client's comment
about "auditing standards," but Landsberger quickly explained that the comment meant that the
client was concerned about "Madoff's accounts [being] audited by relative of family," the very
issue that FGG had recognized in 2005 as a "definite red flag" in the context of the Bayou fraud.

211.     Vijayvergiya and Tucker planned a response.  Having "heard these concerns
numerous times over the years (typically from the Swiss/Italian rumor mill)," Vijayvergiya felt
that FGG's approach should be to "dispel[]" them in a "conference call."  Tucker agreed that "a

call usually disarms the party making the inquiry," but favored a written response "given the nervousness of our markets."

212.    Vijayvergiya called Madoff a few days later with the client's questions and then reported to Tucker and Noel.  On the "Relationship with Accountants Friehling & Horowitz," Vijayvergiya reported that Madoff told him that "F&H is completely independent; there is no family relationship," and that "F&H is a registered member of the American Institute of Certified Public Accountants," which Vijayvergiya knew was irrelevant as Friehling & Horowitz could not perform audits.  Landsberger wrote, "great info here."  The discussion of the information continued among the FGG partners, but no one commented on the shifts in Madoff's story.

213.    Questions about Friehling & Horowitz continued until just a few hours before Madoff's arrest.  On December 10, 2008, an investment advisor asked Lipton and Vijayvergiya questions to be addressed to PwC:  "[H]ow do you verify the securities are actually held within each account? . . .  How do you know the trade isn't a Ponzi scheme or that another Petters situation does not exist?"  The investment adviser was referring to the Ponzi scheme perpetrated by Thomas Petters' investment funds.

**FGG KNEW BLMIS BORE A STRIKING RESEMBLANCE TO BAYOU**

214.    The November 2005 Investment Team Presentation highlighted other Bayou characteristics that FGG claimed would have prevented its investment with Bayou—among them, its "inconsistent answers [and] refusal to give information," its "lax policies and lack of procedures in place," its inability to provide "independent, third party confirmation of assets," and its failure to "segregate[e back office] duties."

215.    In those ways, which FGG claimed its due diligence would have identified as hallmarks of fraud, BLMIS bore a striking resemblance to Bayou.  Not only did Madoff give

FGG inconsistent information about Friehling & Horowitz, he was inconsistent about BLMIS's options trading practices, including whether he contacted options trading partners before executing trades. Although it contravened industry standard, BLMIS provided no electronic access to trading information and mailed trading tickets T+3 (three days after the actual trade). He frequently blocked due diligence and rejected requests for in-person meetings.

216. Like Bayou, BLMIS used an unusual, unremunerative fee structure. Madoff proclaimed to be "perfectly happy" walking away from the billions of dollars he would have received under a conventional arrangement that gave him a management fee of one to two percent of AUM and a performance fee of 20% of profits. BLMIS, however, charged neither, instead charging commissions of $0.04 per equity trade and $1 per option contract trade.

217. FGG knew that such atypical fee structures combined with other operational irregularities that existed at BLMIS were inconsistent with industry customs and practices.

218. Shortly after the Bayou fraud collapsed in 2005, a Fairfield Sentry investor reached out to FGG asking about "perceived conflict of interest with the two relationships (brokerage and auditing) in Bayou, and any similarities between Bayou and Sentry related to their use of 'in-house' brokerage." Vijayvergiya acknowledged that Bayou did not charge a management fee, which was unusual in the industry.

219.    And while FGG tried to explain away the similarities of Bayou's and Madoff's unusual fee structures, it knew, based on its internal monitoring and receipt of BLMIS annual aggregate compensation reports, that it collected more than three times the total fees BLMIS charged from 2004 through 2007.

| Year | Sentry's AUM at Year-End | BLMIS's Commission | BLMIS's Commission as a % of AUM | FGG's Management & Performance Fees | Management & Performance as a % of AUM |
|---|---|---|---|---|---|
| 2004 | $5,087,887,422 | $52,426,587 | 1.08% | $102,827,000 | 2.02% |
| 2005 | $4,889,589,926 | $43,534,052 | 0.85% | $138,352,000 | 2.83% |
| 2006 | $5,624,715,292 | $40,203,483 | 0.80% | $158,244,000 | 2.81% |
| 2007 | $7,147,059,409 | $58,079,688 | 0.86% | $183,579,000 | 2.57% |
| TOTAL | - | 194,243,810 | - | 583,002,000 | - |

## FGG MADE FALSE STATEMENTS REGARDING BLMIS'S OVERLAPPING ROLES AS CUSTODIAN, PRIME BROKER, AND INVESTMENT ADVISER

220.    The Defendants knew BLMIS functioned as Fairfield Sentry's custodian, investment adviser, and prime broker—a structure atypical in the investment industry. The Defendants identified that an entity playing all three roles would preclude independent, third-party confirmation of assets and trading activity. None of FGG's non-BLMIS funds had a similar structure, nor did Fairfield Sentry's non-BLMIS investments.

221.    Investors were skeptical as well, and as early as 2002 raised the issue that BLMIS did not use a third-party broker. However, FGG refused to address BLMIS's lack of independence.

222.    In February 2003, one of FGG's clients forwarded a "Notice to Clients" in which EFG Capital International Corporation ("EFG") disclosed risks with Fairfield Sentry. EFG wrote that "the Fund's assets are custodized with its investment adviser, Bernard L. Madoff Investment Securities, rather than with a major international bank . . . as is the case with most investment funds." Obviously, this was precisely the vehicle for Madoff's fraud—he eliminated

52

all checks and balances by arrogating all roles to himself. EFG's observation was correct and an obvious detection of a serious fraud concern.

223.   On April 28, 2003, an investor raised concerns regarding the "conflict of interest in Madoff acting as both principal in connection with the sale or purchase of securities to the fund and as market-maker in the stocks purchased or sold by the fund."

224.   On August 27, 2003, one investor voiced similar concerns about "the potential conflict of interest presented by Madoff serving as custodian of the assets in addition to trading on the account." Vijayvergiya explained to Tucker that the sales team dispelled this concern and:

> quite effectively explained that, while we recognize this as potential conflict, we have reviewed internal controls at Madoff extensively over the years and have satisfied ourselves that adequate controls are in place. Further, we have done periodic spot checks of trade tickets and traced them back through Madoff's system to verify their presence on custodial records.

Vijayvergiya and Tucker knew this was not true.

225.   On February 4, 2004, Vijayvergiya devised a list of "[c]ommon concerns regarding Madoff and the split-strike conversion strategy," which listed the following items: "[c]onflict of interest as custodian," "[c]onflict of interest as market maker (Chinese walls)," "[f]ront-running orders," and "[h]ow can Sentry generate such consistent returns?" Despite forming this list of questions indicative of fraud, Defendants never dug deeper.

226.   On February 1, 2005, an investment group explained that it had "decided to NOT invest in the Fairfield Sentry fund" due to the "non pure independence between the true manager of the fund and the prime broker/Custodian of the fund." An FGG employee forwarded the investor's email to Tucker, Landsberger, and Vijayvergiya stating, "at least their reason was [] a good one."

227.    Another investor contacted their FGG representative on October 24, 2005 with concerns that BLMIS maintaining custody of Fairfield Sentry's investments was just like Refco, Inc., a financial services company that infamously fell into bankruptcy as a result of its fraud. The next day, the sales representative forwarded these concerns to Vijayvergiya and others.

228.    In August 2006, McKeefry wrote to EFG, scolding the bank for informing its customers of risks associated with Fairfield Sentry.  McKeefry wrote that "the Fund's custodian is not BLM but rather Citco Global Custody N.V.," and that "BLM is not an investment adviser to the Fund."  This response came as the SEC was determining BLMIS was Fairfield Sentry's actual investment adviser and in the face of the sub-custodian agreement that authorized BLMIS to be in custody of all of Fairfield Sentry's BLMIS assets.

229.    In July 2007, a foreign investor expressed significant concern about Madoff acting as both broker and sub-custodian.  The investor worried that Madoff may be "tell[ing] lie[s] about the # of stocks, name and so on that [Fairfield] Sentry fund bought."  He asked Landsberger and Vijayvergiya whether "CITCO [can] cross check independently the information that . . . BLM provided . . . this is the key question" the investor was considering.

230.    Landsberger called upon Vijayvergiya to script a response.  Vijayvergiya's response told the investor what it wanted to hear.  Yet for all of the confidence about the "adequa[cy of the] controls" Vijayvergiya's response sought to convey, it was premised upon his dodge on the critical point: "As is common practice in the US brokerage industry," Vijayvergiya wrote, "brokers typically custodize the assets of their clients."  Vijayvergiya's response ignored that the issue was BLMIS's dual role as investment manager and custodian.  In any event, further discussion with this investor, Vijayvergiya said, should be "answered on a phone call," rather than in writing, where FGG could assuage any lingering fears.

54

231.    FGG partner Smith expressed confusion about several of the client's concerns, noting that the "[o]nly real critique on our fund that can be made is the custody and whether we add value in seed program or not."  Landsberger, however, understood all of the concerns.  His proposed response was to "figur[e out] how to spin."  Vijayvergiya came up with a plan, and like Landsberger, felt that the answer had to be properly spun, to "highlight[] our transparency."

232.    On August 23, 2006, Tucker and others received a letter from an investor warning them of the risk posed by BLMIS maintaining custody of Fairfield Sentry's assets due to BLMIS's limited amount of capital—approximately $275 million—compared to the major international banks that provide custody for most investment funds.  At the time, FGG had entrusted BLMIS with over four billion dollars.

233.    In June 2007, another FGG partner forwarded a news report to Piedrahita, Vijayvergiya, and others with a warning that Bear Stearns "is getting criticized for self custody."  The FGG partner asked whether the group had "any thoughts on why we are not concerned with regard to Sentry?? We should try to get our response fine tuned."  Piedrahita responded that "[w]e have always been concerned.  But the reality is that there is absolutely nothing we can do about it….."

234.    On August 19, 2008, just a few months before the collapse of BLMIS, key FGG partners including Vijayvergiya, Piedrahita, Toub, Tucker, and others corresponded regarding a client's decision to redeem from Fairfield Sentry.  The client cited concerns it had with a statement in Fairfield Sentry's PPM that the fund did "not have custody of the assets," which increased the risk "that the personnel of any entity with which [Fairfield Sentry] invests could misappropriate the securities or funds (or both) of the Fund."

235. The Defendants knew that BLMIS was acting as investment adviser, prime broker, and custodian for the feeder funds and that the misappropriation of assets was a real threat. Yet FGG downplayed investor concerns to induce them to ignore this structural defect, and enabled Madoff to commit fraud.

## THE DEFENDANTS STRATEGIZED WITH MADOFF TO MISLEAD THE SEC

236. From the outset, BLMIS acted as Fairfield Sentry's investment adviser.

237. In spring and summer 2004, the Defendants scrubbed references to BLMIS from FGG materials to avoid disclosure of Madoff's role. As FGG prepared to launch an internal website that would contain information about the investment vehicles they offered, Vijayvergiya agreed with the FGG Finance Group's directive "to remove any mention of our accounts at BLM from the Investment Manager description paragraph." He told the website administrator, "take out all mention of Madoff."

238. By March 17, 2005, FGG became aware of the SEC's investigation into the trading practices of certain Madoff feeder funds for BLMIS's potential violations of federal securities laws. McKeefry wrote to Tucker and Blum to let them know that Madoff had called him about an SEC sweep examination and that McKeefry, in his role as FGG's Chief Legal Officer and then Chief Operating Officer, had "assured him of our intention to notify him of any regulatory contacts regarding [S]entry or our [registered investment adviser], and to discuss with him in advance."

239. The SEC collected documents from Madoff in June 2005, but still had outstanding questions. In December 2005, the SEC sought to interview FGG personnel.

240. High-ranking FGG personnel, including Tucker and Vijayvergiya, met to develop a game-plan for the interview. FGG chose Vijayvergiya and McKeefry to cover the interview for FGG.

56

241.    With the confidential SEC interview set for December 21, 2005, FGG arranged a

pre-call with Madoff for December 19 to ensure that Vijayvergiya and McKeefry would deliver a

Madoff-sanctioned story.  Vijayvergiya and McKeefry sent Madoff the SEC's interview request

letter, FGG materials that referred to Madoff's role, and FGG's plan for how they would

describe the SSC Strategy during the interview.

242.    On the call, Madoff set the ground rules: "Obviously, first of all, this conversation

never took place, Mark, okay?"  Vijayvergiya and McKeefry acceded.  Nevertheless,

Vijayvergiya made an audio recording of the call.

243.    Much of Madoff's advice was for FGG to conform not to the truth, but to a story

he had designed for feeder funds to mislead SEC investigators and discourage further

questioning.

244.    Madoff worked from notes drawn from other SEC interviews concerning BLMIS

feeder funds.  He coached Vijayvergiya and McKeefry on how to cast BLMIS without raising

the SEC's suspicions: "All right.  There are a couple of things that, you know, could come—

well, I don't know if they'll come up or not but let me just tell you how we—information that we

have given out in the past whenever we're asked about our relationship, our relationship with any

of these funds is number one . . . we never want to be looked at as the investment manager . . . ."

245.    Madoff continued, "[S]o in the past if we've ever been asked about what our role

is with any of these types of funds, it has always been that we are the executing broker for these

transactions and that you use a proprietary trading mode that we—that is ours that basically sets

the—that, you know, has certain parameters built into it which have been approved by you and

then that's part of the trading directive you've seen."

246.    Madoff instructed Vijayvergiya and McKeefry on how to address questions about FGG's allocations to BLMIS: "[T]he investment manager is the one that tells us how much to add to the strategy or subtract from the strategy, and that's done basically by a phone call. Okay?" Vijayvergiya agreed.  Madoff repeated, "[b]ecause that's the way we've always responded to any of those questions."

247.    And for its part, FGG exhibited a willingness to stray from the truth.  For example, McKeefry, seeking to aid Madoff's cause on the issue of allocations, asked Vijayvergiya, "[w]ho makes that phone call on it? Is that [Lipton] calling over to Madoff or you?" Vijayvergiya responded, "I mean[,] I'll actually send the written instructions.  It will be a wire request."  Initially satisfied with Vijayvergiya's response, McKeefry said, "Okay, good." But Madoff did not want FGG to turn over documents to the SEC, and he recast the answer Vijayvergiya was to give: "The best thing to do is not get involved with what you said, written instructions, if possible because any time you say you have something in writing they ask for it . . . So, the best thing to do is just say it's a phone call.  That's what we said it is, we get contacted by somebody at Fairfield."  Madoff coached Vijayvergiya to lie.

248.    And, more generally on the call, he encouraged Vijayvergiya to provide inexact answers so that the SEC would not gain an accurate understanding of FGG's operations and relationship with BLMIS: "you know, also when you speak to these guys, by the way, you're not supposed to, you know . . . you don't have to be exact on this stuff because it's not—you know, no one pays attention to these types of things or who calls or who doesn't or who remembers who calls . . . I mean, the idea is that . . . we're not the one that's operating the fund.  That's the issue that they always try and determine as to what the role of the various parties are[,] is the broker controlling the fund[,] is the investment manager controlling the fund."

58

249.    This pattern repeated itself throughout the prep call.  Madoff explained, "probably the most important issue is that Madoff is the one that implements the strategy."  He framed Vijayvergiya's response for him: "The time and price of when [Madoff] executes the strategy is his decision, and we [FGG] don't find out about it until after the fact."

250.    Madoff added, "you don't have to actually go out [and] say so there's no front running possibility."  Vijayvergiya initially understood Madoff's comment to be a suggestion that FGG steer the SEC investigators away from the topic of front running.  Madoff corrected him.  Addressing front running directly might arouse the SEC's suspicion: "[Y]ou don't want to plant any seed . . . we [FGG] don't get any information ahead of time [and] that's what . . . they want to know."

251.    Madoff explained how, by speaking in generalities, FGG could give the appearance of cooperating with the SEC, but not disclose information useful to the SEC's investigation: "[Y]ou know, the less that you know about how we execute, and so on and so forth, the better you are . . . your position is say, listen, Madoff has been in business for 45 years . . . he executes . . . a huge percentage of the industry's orders, he's . . . a well known broker. . . [W]e make the assumption that he's . . . doing everything properly."  "[A]nd I'm not—I'm not telling you to conceal anything."

252.    Madoff painstakingly went through the notes Vijayvergiya and McKeefry drafted for the call with the SEC, editing the remarks Vijayvergiya planned to deliver.

253.    Near the conclusion of the call, McKeefry offered to follow up with the SEC investigators handling the matter.  Madoff told him not to:  "You don't want them to think that you're concerned about anything."  His parting words on the call: "you're best off . . . you just be, you know, casual."  McKeefry agreed: "We're trying.  We're trying to be cool and to just

59

cooperate and get it over with and get them out of here." They agreed to report to Madoff on how the call went.

254.    The call between the SEC investigators and Vijayvergiya and McKeefry went forward on December 21, 2005. FGG kept "detailed notes"—it transcribed the call verbatim.

255.    When asked about the "nature of [FGG's] relationship with Madoff," Vijayvergiya minimized BLMIS's role, misleading the SEC to believe that it was FG Bermuda, not BLMIS, that made the investment decisions:

> [FG Bermuda] is the Investment Manager of Fairfield Sentry. We allocate a majority of the fund's assets to the Split Strike Conversion Strategy. We also allocate 5% to seedlings to cultivate growth. The Madoff organization executes the other 95% of trades within the parameters of the Split Strike Conversion Strategy. There are very clear guidelines that govern the execution of this strategy that we have agreed to. The only areas of decision made by BLM are with respect to price and timing of the trades.

256.    Vijayvergiya consciously misstated the scope of the authority FGG had ceded to BLMIS: BLMIS held decision-making authority on every material aspect of the SSC Strategy, not just the price and timing of trades.

257.    The SEC investigators asked Vijayvergiya and McKeefry whether they had "spoken to anyone regarding this investigation." Vijayvergiya disclosed that he had spoken to Tucker, Madoff, Lipton, and others. Despite his and McKeefry's exhaustive prep session with Madoff, Vijayvergiya lied and said that the conversation had been "mostly in regards to reproducing binders."

258.    The SEC investigators asked Vijayvergiya to describe the conversation with Madoff. Vijayvergiya's initial response was simply: "It happened on Monday." When pressed again for more details, Vijayvergiya downplayed the discussion: "We talked about a memo I had made for this call that just summarized the Fund's strategy and objectives." "What was

[Madoff's] reaction?  Did he modify or disagree with anything in the memo?" Vijayvergiya elided Madoff's extensive coaching: "No.  Nothing material.  The whole thing was more of a courtesy call."  "Did [Madoff] influence anything?"  At this point, McKeefry cut in, and made his own attempt to spin the call:  "I was on the call as well.  [Vijayvergiya] knows the strategy inside and out as you now know.  We were trying to see what Bernie might know this investigation is about . . .  We just are curious as to what the inquiry is really about."

259.    The SEC also interviewed Tucker in January 2006 in connection with its investigation.  Tucker explained that he, Noel, and Piedrahita shared responsibility for critical decision-making and repeated many of the same lies that Vijayvergiya told the SEC about Madoff's operation.

260.    In March 2006, FGG registered FG Bermuda as an investment adviser under the Investment Advisers Act of 1940, even though the Sentry PPM stated FG Bermuda had been the investment advisor since 2003.

261.    Regardless of FGG's efforts, later in 2006, the SEC required BLMIS to register as an investment adviser and directed FGG to modify its marketing materials to disclose BLMIS's roles as both investment advisor and executing broker.

262.    The SEC closed its investigation into BLMIS and FGG in November 2007.  At that time, the SEC sent a letter to McKeefry, notifying him that it did "not intend to recommend any enforcement action" against FGG.  McKeefry forwarded the letter to Lipton, who concluded that "Let's not show [the letter] to PwC."  He did not want PwC to know that FGG had also been under investigation, and not just BLMIS.

## THE DEFENDANTS MISLED THIRD PARTIES

### FGG Misled Ratings Agencies in An Effort to Sell Tensyr

61

263. In 2006, Natixis S.A., an FGG investor, approached FGG about creating a special purpose vehicle to invest $425 million in BLMIS through Fairfield Sentry. The special purpose vehicle would later be named Tensyr, an anagram of "Sentry."

264. FGG and Natixis understood that a strong investment rating from the three major rating agencies, Moody's Investor Services, Fitch, and Standard & Poor's, would enhance Tensyr's marketability.

265. In the meetings with Natixis and FGG, the ratings agencies questioned BLMIS's refusal to identify OTC options counterparties, its unchecked authority over its customers' assets, its customer account structures, its inconsistent representations on its use of margin trading, its conflicted roles as prime broker, investment adviser, and custodian, and its refusal to meet face-to-face with representatives of the ratings agencies on these issues.

266. FGG stonewalled and when the ratings agencies threatened to deny Tensyr a rating "due to 'non-measurable operational risk at Madoff level,'" Vijayvergiya and McKeefry spearheaded an effort to recommence the process. The responses they provided were rife with inaccurate statements on material issues, like the degree of discretion BLMIS exercised on securities trading, custody of assets, and identity of options counterparties. For example, the responses falsely stated that the only discretion BLMIS had concerned the time and price of the trades.

**FGG Misled Chris Cutler in His Due Diligence Probe**

267. FGG provided inaccurate information to third-party consultants in the hopes that they would recommend Fairfield Sentry and Greenwich Sentry to clients. One of those consultants, Chris Cutler, saw right through FGG's subterfuge. Cutler compiled due diligence information on Fairfield Sentry and had a phone meeting with FGG including Vijayvergiya, McKenzie, and others.

268.    In late 2006, a year after deflecting concerns about Bayou and receiving the

Friehling & Horowitz Dun & Bradstreet report, FGG provided Cutler with inaccurate

information about Madoff's and FGG's auditing procedures and BLMIS's auditor that FGG

knew would be difficult for Cutler to validate.  First, Vijayvergiya claimed that "Madoff has

three Ph.D.s and ten traders."  Second, Vijayvergiya claimed that PwC, as Fairfield Sentry's

auditor, "visited with Madoff, verified assets, verified trade blotter, verified that [BLMIS's]

trades are allocated fairly.  Third, Vijayvergiya made inaccurate claims about the "size of

Friehling & Horowitz as an auditor, their reputation as auditors for smaller broker/dealers, the

number of auditors that were there roughly."

## OTHER INDICIA OF FRAUD

### Impossibly Consistent, Positive Returns

269.    In preparing and disseminating client-facing communications, FGG was forced to

reckon with evidence that neither the returns that BLMIS reported, nor the patterns in which it

reported to trade stocks and options were consistent with the SSC Strategy.  They could not have

taken place as BLMIS claimed.

270.    Because the SSC Strategy purported to invest in S&P 100 Index stocks highly

correlated to the Index, the strategy's returns should have been correlated to the S&P 100's

performance.  The Defendants acknowledged that fact through information provided to their

investors in the PPMs.  However, as reflected elsewhere in the Defendants' marketing materials,

the SSC Strategy's reported returns bore almost no correlation to the S&P 100.  Instead, the FGG

feeder funds maintained impossibly consistent, positive rates of return during events that

devastated the S&P 100 Index.

271.    Between Fairfield Sentry's 1990 inception and BLMIS's 2008 collapse, the fund

had no negative annual returns.  Such returns were impossible under the SSC Strategy.

63

272.    In a one-on-one conversation on December 19, 2005 between Vijayvergiya and

Madoff, he told Vijayvergiya that the best way to make money in a down market was to get out

of the market.  BLMIS's performance belied Madoff's explanation.  Vijayvergiya saw that

BLMIS's performance consistently went up during down markets and that BLMIS was

purportedly invested in the market during those times.

273.    The Defendants touted their analysis of Fairfield Sentry returns, including their

monthly comparison of the fund's returns to the S&P 100's.  That analysis showed that there

was, in fact, no correlation.  The Defendants identified economic "crises" between 1994 and

2007 and compared Fairfield Sentry's returns to the S&P 100's returns during those times.  In

those times, BLMIS not only purported to have outperformed the market, it claimed that it was

typically up when the market plummeted—impossible had BLMIS actually been trading with the

SSC Strategy:

| Fairfield Sentry Rate of Return Versus S&P 100 Index: Times of Crisis | | | |
|---|---|---|---|
| Crisis | Time Period | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
| Tech Bubble | Sept. 2000 to Mar. 2001 | 5.89% | (28.05%) |
| World Trade Center Attack | Aug. 2001 to Sept. 2001 | 1.75% | (14.08%) |
| Recession | May 2002 to Sept. 2002 | 5.90% | (22.91%) |
| Second Gulf War | Dec. 2002 to Mar. 2003 | 1.80% | (9.76%) |

274.    When performance questions were raised internally, the Defendants did not

attempt to answer or resolve them but instead looked the other way.  For example, on April 16,

2004, an FGG partner commented to Vijayvergiya and others that Fairfield Sentry "being up for

the week is suspicious.  Can [FG] Bermuda look into a spike in vol or other reasons for this as

the S&P fell last week?"  FG Bermuda never did.  Instead, FG Bermuda suppressed this concern

64

and continued to falsely promote the story to investors that BLMIS was trading securities under

the SSC Strategy.

275.    On November 27, 2007, McKenzie, Vijayvergiya, and others acknowledged that it

was "extraordinary that [BLMIS returns] could be this good given market indices and

performance of nearly all [of FGG's] other funds" and expressed the need to "more fully

understand how/why."  Despite this, FG Bermuda and Vijayvergiya omitted the concerns from

subsequent investor communications and conducted no investigation.

276.    To gauge the feeder funds' portfolio performance, Defendants used the "Sharpe

ratio"—a widely used statistical metric that measures the extent to which a trading strategy

compensates an investor for risk.  Noel explained that his description of the strategy and

performance to existing and potential investors included discussion of various performance

metrics, including the Sharpe ratio.

277.    Between Fairfield Sentry's inception and BLMIS's collapse, BLMIS's Sharpe

ratio was higher than that of its peers over every rolling 10-year period.  BLMIS outperformed

its peers across other performance metrics, including number of positive months and drawdown.

It is highly unlikely for an investment advisor to outperform, and often by a significant amount,

every peer group, across multiple performance metrics, across lengthy periods of time.  This

purported performance was an indicator of fraud and was a red flag that Madoff was not

executing the SSC Strategy.

**Impossible Equity Trading Volumes**

278.    The Defendants monitored trading volumes and understood that each time BLMIS

purported to trade, it traded between 35 and 50 S&P 100 Index stocks for the feeder funds'

accounts.  On at least 223 occasions, the stocks BLMIS purported to have purchased for Fairfield

Sentry alone exceeded 20% of the trading volume for those stocks on the entire New York Stock Exchange. Extrapolating, as Fairfield did, BLMIS would have accounted for nearly 50% of all market activity in those stocks.

279.    There were also 64 instances in which Fairfield Sentry's account was responsible for over 25% of market trading in a particular stock (i.e., over 60% of trading for all IA Business customers), and 23 instances in which it accounted for over 30% of market trading in a particular stock (i.e., over 75% of trading for all IA Business customers).

280.    A single investment adviser could not be responsible for those volumes of trading in a single S&P 100 stock.

### Indicators of Fraud in Purported Options Trading

#### *Deviations from the SSC Strategy*

281.    One of the defining features of the SSC Strategy was that it purportedly used put and call options to form "collars" around underlying securities holdings. The theory was that by purchasing put options, BLMIS would hedge the risk of downward swings in the price of underlying stocks, and that by selling call options, it would generate revenue to offset the purchase costs of the puts. BLMIS had its customers—Fairfield Sentry among them—sign on to this strategy with an Option Agreement, representing that BLMIS would "only write (sell) covered calls against long stock positions, and buy stock index puts or puts on the individual stocks that the account owns."

282.    Options trading within the SSC Strategy, therefore, was to follow the representation in the Master Agreement. Failure to follow that representation was an indication that BLMIS was not carrying out the SSC Strategy, putting the investors' assets at significant, unanticipated risk.

283.    FG Bermuda, FG Limited, and the other Defendants tracked options trading activity through the monthly account statements they received from BLMIS.  In those documents, FGG observed BLMIS's many apparent deviations from the options trading representation in the SSC Strategy.  In October 2003, for example, Gil Berman noted to Tucker and Vijayvergiya the appearance on monthly statements of options trades outside of the SSC Strategy: "Madoff does sometimes purchase long calls in the Fairfield Sentry accounts . . . They appear to have been extra calls and not part of the split-strike strategy."  Vijayvergiya asked for and received the underlying data that confirmed the accuracy of Berman's conclusion, however, FGG took no further action.

284.    Berman continued to report problems with BLMIS's purported options trading to Vijayvergiya.  In December 2007, Berman reported to Vijayvergiya that Fairfield Sentry's account statements showed disparate positions in puts and calls in November 2007, which created "additional short exposure not attached to an offsetting stock position."  This timing difference resulted in Fairfield Sentry holding a put option position that was not being used in connection with the SSC Strategy (as the equity and call positions had already been unwound).  The risk in holding the put option for an extra day is that if the market goes up, the value of the put option will go down.  Then, when the option position is sold the next day, the proceeds from the sale will be lower.

285.    Berman grew concerned that his role with FGG did not give him sufficient latitude to communicate the gravity of the problems he had been observing, and that FGG was not adequately responding to those problems.  He therefore prefaced his May 2008 monthly report with an email to Vijayvergiya: "[t]hough my consulting assignment is (and has always been) only to summarize the previous month's trading activity without providing editorial

commentary, I must mention to you that I find the May options trading activity to be unusual and difficult to explain, and would encourage you to investigate it further."  In the report, Berman noted many recent apparent deviations from the SSC Strategy:  "several options trades with a one-day timing mismatch . . . a partial early call repurchase on May 13th, a doubling up of long puts on May 19th, and a partial deferred put sale on May 23rd."  Berman noted similar deviations in other reports.  For example, in his report covering March 2000 trading activity, Berman identified that "[o]n March 8th, the Sentry accounts bought back all of their short OEX March 760 calls at a price of 2 7/8.  They resold these calls on March 9th at a price of 6 7/8, reestablishing their original positions with an interim profit of $4,740,000."  This was a speculative option transaction, and inconsistent with the SSC Strategy.

286.    Berman spoke with Vijayvergiya about the problems noted in the May 2008 monthly report a few weeks later.  They also discussed the fact that no one—not even Madoff—could achieve profitable options trades 100% of the time.

287.    They also discussed the possibility that this was a sign that Madoff was more than simply deviating from the SSC Strategy.  One theory they came up with for the supposedly perfect success rate was that Madoff was backdating the trade confirmations.

288.    Berman made a number of recommendations to address fraud risk, including requesting trade confirmations for options trading the day the trade purportedly took place, requesting information on options counterparties to confirm the trades, and conducting an asset audit to verify the assets were there.

289.    Berman was not the only person to raise questions with FGG about BLMIS's deviations from the SSC Strategy.  In April 2008, a Swiss investment advisor expressed to

Santiago Reyes, an FGG salesman, his doubt that the SSC Strategy could generate the returns

Madoff claimed. "I have one question," he wrote:

> How did the manager in such [a] volatile time to [sic] make so
> much money? I mean, in your strategy buying put was largely
> more expensive then the sell of the call. So how can he finance the
> hedge of the portfolio and of course how can he make money
> (whereas the portfolio can't be hedge buy [sic] the sell of the
> call)[.] So the alpha generated by the manager is due to good stock
> picking on the 40 to 50 stocks ch[o]sen? I don't think so! I know
> that the madoff [sic] strategy is doing great but could it be possible
> to have more details?

FGG responded by sending only a "preview of Sentry performance estimates as of April 24,

2008," and did not answer any of the Swiss adviser's questions.

*Options Volume*

290.    FGG recognized that the sheer number of options needed, given the volume of

AUM, was too large for BLMIS to be trading options as it claimed to be.

291.    FGG knew that BLMIS claimed to be trading baskets of equities correlated to the

S&P 100 proportionally allocated to each account—not separate equity trades for each feeder

fund account. To hedge those baskets with put options, as the SSC Strategy called for, BLMIS

claimed to be trading S&P 100 Index options ("OEX"), which were traded on the CBOE. The

trade confirmations BLMIS provided to FGG included CUSIP numbers, indicative of CBOE-

traded options.

292.    The indications on the face of trade confirmations that BLMIS was trading

options on the CBOE, however, did not comport with other information about the options

markets FGG received. Widespread indications were that there was not enough volume or

liquidity in the CBOE to support the SSC Strategy. In November 2003, for example, a member

of FGG's sales team commented on a client's concerns that the volume of options needed to

69

hedge FGG's feeder funds' accounts far exceeded market volume, and asked Vijayvergiya and Blum, "[i]s it really as excessive as [the investor] implied[?]"  In February 2004, another investor expressed similar doubt that "there [could be] sufficient liquidity in these options to cover the needs of a portfolio the size of which is managed by Madoff in its totality."

293.    If, at that point, FGG harbored the belief that a sufficient number of options could have traded on the CBOE, that belief was dispelled when Vijayvergiya shared with Landsberger a series of extrapolations Vijayvergiya made to estimate the number of options that would have been needed to carry out the SSC Strategy for their accounts.

294.    Based on the AUM in the FGG feeder funds' accounts and the estimated total AUM with BLMIS, Vijayvergiya calculated the percentage of BLMIS AUM the FGG feeder funds made up.

295.    In 2006, for example, Vijayvergiya estimated that Fairfield Sentry accounted for between 35% and 40% of all of BLMIS's AUM.  His estimate was confirmed in August 2006, when BLMIS was forced to register as an investment adviser and reported that it had $11.7 billion under management as of July 2006.  At that time, Fairfield Sentry's account balances totaled $4.8 billion—41% of BLMIS's AUM.  The percentage was approximately the same at year-end in 2006, when Fairfield Sentry accounted for $5.6 billion of the $13.2 billion under management with BLMIS, and at year-end in 2007, when Fairfield Sentry accounted for $7.1 billion of the $17.1 billion under management with BLMIS.

296.    The number of OEX index options needed to carry out the SSC Strategy in the FGG feeder funds' accounts alone exceeded the total number of OEX index options traded on the CBOE.  As illustrated on the following charts, the volume of the S&P 100 put and call

70

options purported to have been purchased on behalf of Fairfield Sentry alone completely dwarfed

the volume of the same S&P 100 put and call options traded on the CBOE on the same days:



Fairfield Sentry Put Option Volume Relative to Corresponding
Market Volume 12/1995 - 11/2008

Includes BLMIS accounts 1FN012, 1FN045, 1FN069 and 1FN070.
Reflects volume of Fairfield Sentry option transactions and corresponding market volume for the relevant option and trade date.



**Fairfield Sentry Call Option Volume Relative to Corresponding Market Volume 12/1995 - 11/2008**

Includes BLMIS accounts 1FN012, 1FN045, 1FN069 and 1FN070.
Reflects volume of Fairfield Sentry option transactions and corresponding market volume for the relevant option and trade date.

297.    Notwithstanding FGG's observation that Madoff could not be trading the options as he said, Vijayvergiya resorted to dishonesty in drafting responses to investor queries.  BLMIS, Vijayvergiya said, "utilizes over-the-counter . . . options contracts rather than transacting on any of the U.S. options exchanges.  This is because the level of options activity required to notionally protect the stock basket would exceed the amount available on the listed options exchanges."  But trading over the counter would also have required BLMIS to enter into private, individually negotiated, arm's length contracts with willing counterparties, a practice FGG knew that BLMIS did not follow, as each trade confirmation contained a CUSIP number matched to exchange trading over the CBOE.

### *An Options Trading Structure that Violated Industry Standards*

298.    The Defendants were also aware of other structural issues and inconsistencies in Madoff's purported options trading, including the alleged collateral for the options trading.

72

Madoff told the Defendants that, by design, no counterparty had exposure of more than 10% of his overall position and that each counterparty was required to post Treasury Bills in escrow accounts as collateral to guarantee performance of the put options. When the Defendants later inquired about the collateral the counterparties required of the feeder funds to guarantee the performance of the call options sold to them, Madoff claimed none was required because his customers held the equities.

299. Madoff's explanation was facially false for several reasons: (1) BLMIS held a basket of 35 to 50 equities, not the entire S&P 100 Index, the basis of the call option; (2) on occasion, BLMIS sold equities prior to the expiration of the call, inconsistent with the SSC Strategy, and leaving the counterparty with no collateral at all; and (3) Madoff stated that the option counterparty had no lien against its allocated equities which, if true, meant the counterparties had no collateral protecting their position.

300. The Defendants knew that standard industry practice required the principal counterparties to be directly in contact with one another so each party could assess the other's creditworthiness. The Defendants also knew that BLMIS's purported options trading structure, leaving the IA Business customer exposed to counterparty risk without ever knowing the identity of the counterparty, was highly irregular and inconsistent with industry practice.

301. The timing of BLMIS's options trades was also contrary to industry practice. The feeder funds' account statements demonstrated that many of the options trades BLMIS purportedly made on their behalf took much longer to settle than was normal in the industry. Industry standard dictated that options trades be settled one business day following the date the trade was made, or T+1. While Madoff claimed to perform options trading in the OTC market, he stated that terms of BLMIS's options trades were identical to exchange-traded options. Thus,

the feeder funds' account statements should have shown settlement dates for all of their options trades of T+1.

302.    Between 2000 and 2008, almost a quarter of all of the options purportedly traded by BLMIS for Fairfield Sentry's and Greenwich Sentry's accounts settled more than a day after the trade took place.  During this period, Fairfield Sentry's account statements showed 628 delayed settlements, Greenwich Sentry's statements showed 235, and Greenwich Sentry Partners' statements showed 206.  Of the option trades anomalies on Greenwich Sentry Partners' account statements, 97% settled on a date other than T+1.  The Defendants tracked and monitored Fairfield Sentry's account and saw these dates and knew that BLMIS's options trades were extremely unusual and indicative of fraudulent activity.

303.    The Defendants knew that Madoff was not telling them the truth about options transactions.  In March 2008, Vijayvergiya provided the FGG Executive Committee with a "Recap of conversation with Bernie."  Among other things, Vijayvergiya stated "on Derivatives Counterparties" that "all OTC options counterparties must provide performance assurance in the form of T-Bills."  Landsberger replied, "Not sure I understand the use of t-bills by his option counterparties-can u possibly elaborate?  I assume it gives him some risk protection, but if he buys or sells puts/calls, why would counterparty pledge t-bills?" Landsberger knew Madoff's explanation did not add up.

304.    Madoff's story about options counterparties had vacillated for years.  For example, in 2005, during the call between Madoff, Vijayvergiya, and McKeefry in preparation for the SEC interview, Vijayvergiya commented that, based on discussions he had had with Madoff in 2003, he knew that Madoff contacted counterparties to ensure that puts were available before he purchased equities.  Madoff cut him off.  Fearful that the practice Vijayvergiya was

74

referring to would suggest to the SEC front running, Madoff corrected him—he never would contact counterparties before trading. Although it was inconsistent with their prior discussions with Madoff, Vijayvergiya and McKeefry did not challenge him on this point.

305.   Yet, in later discussions on the same point in June 2008, Madoff would revert to claiming that he contacted OTC options counterparties before implementing the SSC Strategy.

306.   A month later, in July 2008, a Fairfield Sentry investor expressed concern about BLMIS's counterparty risk. Vijayvergiya came up with a response, claiming that FGG knew Madoff spoke to option counterparties to determine option availability before he purchased any equities even though Vijayvergiya knew Madoff had denied doing so previously.

### Out-of-Range Trades

307.   In connection with its BLMIS investments, FGG received and reviewed BLMIS account statements that showcased trading anomalies, including out-of-range trades. From February 1998 until November 2008, BLMIS purported to make 358 equity trades outside of the daily price range between the Fairfield Sentry and Greenwich Sentry accounts.

308.   By 2005, FGG's knowledge that BLMIS purported to buy equities below their reported daily low and sell them above their reported daily high was confirmed by analyses conducted by Prime Buchholz & Associates, a prominent investment consultant that managed approximately $20 billion in client assets.

309.   In May 2005, an FGG sales agent forwarded Vijayvergiya the Prime Buchholz analysis they "talked about," attaching a report analyzing BLMIS trades purportedly placed on April 6, 2004. This analysis was based on an April 2004 BLMIS customer statement and compared BLMIS's purported pricing for equities to the daily high, low, and closing prices reported by various sources.

310.    Prime Buchholz noted that "in 27 out of 38 trades placed on April 6, 2004, Madoff Securities posted purchases below the reported lowest price available on the exchange that day.  In 3 of the noted 27 trades, the difference in price exceeded $1."  Knowing this, Prime Buchholz concluded that because BLMIS would "not allow clients to custody their holdings with outside firms," they could not "verify transactions and actual prices received."

311.    According to a 2013 interview with Prime Buchholz's founder and principal consultant, Prime Buchholz "couldn't figure out how [Madoff] made his money."  Prime Buchholz explained that "[i]f we can't figure it out, then we can't recommend it to our clients."  Prime Buchholz's due diligence included a two-hour meeting in New York with Tucker, and a follow-up meeting with FGG.

312.    But unlike Prime Buchholz, Vijayvergiya simply discounted BLMIS's inexplicable pricing, writing to a co-worker, "feel free to file this under 'completely useless'…"  He did so despite having a number of similar, unanswered questions.

313.    Finally, in 2008, and despite Madoff's displeasure with the mounting redemptions, Vijayvergiya also tried to "submit a redemption order to liquidate my entire holdings in Fairfield Sentry Limited."  Vijayvergiya did not liquidate any of his other investments but only wanted to sell Fairfield Sentry.

## THE TRANSFERS

### A.    Initial Transfers from BLMIS to the Fairfield Funds

314.    The Bankruptcy Court has entered Consent Judgments in favor of the Trustee on his claims against Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners (together, "Fairfield Funds").  The Bankruptcy Court granted judgments for the Trustee in the amount of

$3,054,000,000 as to Fairfield Sentry, $206,038,654 as to Greenwich Sentry, and $5,985,000 as to Greenwich Sentry Partners.

315.    During the six years preceding the Filing Date, BLMIS made transfers to the Fairfield Funds in the collective amount of $3,107,023,654 (the "Six Year Initial Transfers"). The Six Year Initial Transfers included transfers of $2,895,000,000 to Fairfield Sentry (the "Fairfield Six Year Initial Transfers"), $206,038,654 to Greenwich Sentry, and $5,985,000 to Greenwich Sentry Partners (collectively, the "Greenwich Six Year Initial Transfers"). (*See* Exhibits 2-4.)  The Six Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).  Each of the Six Year Initial Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, including 279-a, and applicable provisions of SIPA, particularly § 78fff-2(c)(3). The Fairfield Funds received the Six Year Initial Transfers with knowledge of fraud at BLMIS.

316.    The Six Year Initial Transfers include $1,667,125,000 BLMIS transferred to the Fairfield Funds during the two years preceding the Filing Date (the "Two Year Initial Transfers").  The Two Year Initial Transfers included transfers of $1,580,000,000 to Fairfield Sentry (The "Fairfield Two Year Initial Transfers"), $81,700,000 to Greenwich Sentry, and $5,425,000 to Greenwich Sentry Partners (collectively, the "Greenwich Two Year Initial Transfers").  (*See* Exhibits 2-4.)  Each of the Two Year Initial Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).  The Fairfield Funds received the Two Year Initial Transfers with knowledge of fraud at BLMIS, or, at a minimum, with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

317.    Both Greenwich Sentry and Greenwich Sentry Partners were formed as limited partnerships under the laws of the State of Delaware.  Under Delaware Code, Title 6, the entities that served as general partners for the Greenwich Sentry and Greenwich Sentry Partners limited partnerships have the same liability as partners in general partnerships and are jointly and severally liable for all obligations of the partnerships, including the liability for the avoidable transfers received by Greenwich Sentry and Greenwich Sentry Partners at the time the entities were serving as general partners.  In addition, Greenwich Sentry's and Greenwich Sentry Partners' partnership agreements provided that general partners would have unlimited liability for the repayment and discharge of all debts and obligations of their respective limited partnerships.

318.    FG Limited served as general partner for Greenwich Sentry from 1999 to June 2003.  FG Bermuda served as general partner for Greenwich Sentry from July 1, 2003 to December 31, 2004 and from January 1, 2006 until November 19, 2010, when Greenwich Sentry filed for protection under Chapter 11 of the Bankruptcy Code.  FG Bermuda served as general partner for Greenwich Sentry Partners from its inception in 2006 until November 19, 2010, when Greenwich Sentry Partners filed for protection under Chapter 11 of the Bankruptcy Code.

**B.      Subsequent Transfers from the Fairfield Funds to the Defendants**

319.    Hundreds of millions of dollars initially transferred from BLMIS to Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners was subsequently transferred, directly or indirectly, to Defendants FIFL, Stable Fund, FG Limited, FG Bermuda, FG Advisors, Fairfield International Managers, FG Capital, Share Management, Noel, Tucker, Piedrahita, Vijayvergiya, Toub, and Corina Noel Piedrahita.  (*See* Exhibits 5-23.)

78

320.    Fairfield Sentry had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.  The knowledge of the following entities and individuals is imputed to Fairfield Sentry:  Fairfield International Managers (investment manager from November 1990 to December 31, 1997); FG Limited (investment manager from December 31, 1997 to July 1, 2003; placement agent from July 1, 2003); FG Bermuda (investment manager from July 1, 2003); Noel (founder and director); Tucker (founder).

321.    Greenwich Sentry and Greenwich Sentry Partners had actual knowledge of the fraud at BLMIS or, at a minimum, were willfully blind to circumstances suggesting a high probability of fraud at BLMIS.  The knowledge of the following entities and individuals is imputed to Greenwich Sentry:  Noel (general partner from 1992 to 1998); Tucker (general partner from 1992 to 1998); FG Limited (general partner from 2002 to 2003); FG Bermuda (investment manager from 2003 to 2004 and 2006 to 2008, and special limited partner from 2005 to 2006); and FG Advisors (administrative services).  The knowledge of the following entities is imputed to Greenwich Sentry Partners:  FG Bermuda (general partner from 2006 to 2008); and FG Advisors (administrative services).

322.    FIFL had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.  The knowledge of the following entities and individuals is imputed to FIFL:  FG Advisors (investment manager); FG Limited (placement agent); Noel (director); Tucker (director).

323.    Stable Fund had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.  The

knowledge of Tucker (managing member) and FG Advisors (investment manager) is imputed to Stable Fund.

324.  FG Limited had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following entities and individuals is imputed to FG Limited: Tucker (director, principal); McKeefry (executive director, chief operating officer, vice president); Toub (director); Smith (director); and Fairfield International Managers (majority shareholder).

325.  FG Bermuda had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to FG Bermuda: Noel (director); Tucker (director); Piedrahita (director, chief executive officer); McKeefry (chief legal officer, assistant secretary, director); Lipton (chief financial officer, assistant secretary); McKenzie (controller); Blum (chief operating officer); Smith (director, chief investment officer); and Vijayvergiya (chief risk officer, director).

326.  FG Advisors had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. The knowledge of the following individuals is imputed to FG Advisors: McKeefry (president); Lipton (vice president, chief financial officer); Blum (chief operating officer); and Bowes (managing partner), as well Tucker and Noel, which FG Advisors' Form ADV identified as control persons of FG Advisors.

327.  Fairfield International Managers had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at

BLMIS.  The knowledge of the following individuals is imputed to Fairfield International

Managers: Noel (50% owner); and Tucker (50% owner).

328.    FG Capital had actual knowledge of the fraud at BLMIS or, at a minimum, was

willfully blind to circumstances suggesting a high probability of fraud at BLMIS.  The

knowledge of the following individuals is imputed to FG Capital: Noel (50% owner); and Tucker

(50% owner).

329.    Share Management had actual knowledge of the fraud at BLMIS or, at a

minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

The knowledge of Corina Noel Piedrahita is imputed to Share Management.

330.    Each of the subsequent transfers from the Fairfield Funds was received by the

Defendants at a time when they had actual knowledge of the fraud at BLMIS or, at a minimum,

were willfully blind to circumstances suggesting a high probability of fraud at BLMIS.[1]

331.    Because the Defendants did not take the subsequent transfers in good faith and

without knowledge of the voidability of the initial transfers, all transfers from BLMIS to the

Fairfield Funds, which they subsequently transferred, either directly or indirectly, to the

Defendants, were and remain customer property and are recoverable by the Trustee under section

550(a) of the Bankruptcy Code.

332.    Based on the Trustee's investigation to date, the recoverable transfers include the

immediate or mediate transfers to:  FIFL (Exhibit 10); Stable Fund (Exhibit 11), FG Limited

(Exhibit 12), FG Bermuda (Exhibit 13), FG Advisors (Exhibit 14), Fairfield International

Managers (Exhibit 15), FG Capital (Exhibit 16), Share Management (Exhibit 17), Noel (Exhibit

---

[1] The Trustee reserves all rights to appeal the measure and burden of proof imposed on the Trustee in connection
with his avoidance and recovery claims under sections 544(b), 547, 548, 550, and 551 of the Bankruptcy Code, and
applicable provisions of the N.Y.D.C.L.

18), Tucker (Exhibit 19), Piedrahita (Exhibit 20), Vijayvergiya (Exhibit 21), Toub (Exhibit 22),

and Corina Noel Piedrahita (Exhibit 23) (collectively, the "Subsequent Transfers").

333.    The chart below summarizes the Subsequent Transfers.

| DEFENDANT | EXHIBIT | SIX YEAR TRANSFERS | TWO YEAR TRANSFERS |
|---|---|---|---|
| FIFL | 10 | $339,733,216 | $84,748,727 |
| Stable Fund | 11 | $14,848,335 | $8,483,335 |
| FG Limited | 12 | $613,046,742 | $293,422,004 |
| FG Bermuda | 13 | $675,462,817 | $295,805,210 |
| FG Advisors | 14 | $165,947,267 | $93,733,319 |
| Fairfield International Managers | 15 | $293,935,681 | $99,898,321 |
| FG Capital | 16 | $2,963,730 | $91,863 |
| Share Management | 17 | $3,321,151 | $2,547,891 |
| Walter Noel | 18 | $12,964,286 | $8,015,421 |
| Jeffrey Tucker | 19 | $2,500,000 | $2,500,000 |
| Andrés Piedrahita | 20 | $163,144,472 | $59,103,511 |
| Amit Vijayvergiya | 21 | $7,083,760 | $6,026,353 |
| Philip Toub | 22 | $32,631,707 | $16,930,200 |
| Corina Noel Piedrahita | 23 | $6,323,496 | $2,787,962 |

## CAUSES OF ACTION

334.    To the extent that any of the following recovery counts maybe inconsistent with

each other, they are to be treated as being pleaded in the alternative.

335.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the

right to: (i) supplement the information on the initial transfers, the subsequent transfers, and any

additional transfers; and (ii) seek recovery of such transfers.

## COUNT ONE:
## RECOVERY OF FIFL SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against FIFL*

336.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

337.     FIFL is an immediate or mediate transferee of the Subsequent Transfers totaling $339,733,216 ("FIFL Subsequent Transfers").

338.     Each of the FIFL Subsequent Transfers was received by FIFL when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

339.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the FIFL Subsequent Transfers, or the value thereof, from FIFL for the benefit of the BLMIS estate; (b) directing FIFL, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FIFL Subsequent Transfers; (c) imposing a constructive trust over the FIFL Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT TWO:
## RECOVERY OF STABLE FUND SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Stable Fund*

340.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

341.    Stable Fund is an immediate or mediate transferee of the Subsequent Transfers totaling $14,848,335 ("Stable Fund Subsequent Transfers").

342.    Each of the Stable Fund Subsequent Transfers was received by Stable Fund when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

343.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Stable Fund Subsequent Transfers, or the value thereof, from Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) imposing a constructive trust over the Stable Fund Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT THREE:
## RECOVERY OF FG LIMITED SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

### *Against FG Limited*

344.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

345.    FG Limited is an immediate or mediate transferee of the Subsequent Transfers totaling $613,046,742 ("FG Limited Subsequent Transfers").

346.     Each of the FG Limited Subsequent Transfers was received by FG Limited when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

347.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the FG Limited Subsequent Transfers, or the value thereof, from FG Limited for the benefit of the BLMIS estate; (b) directing FG Limited, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) imposing a constructive trust over the FG Limited Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT FOUR:
## RECOVERY OF FG BERMUDA SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

### *Against FG Bermuda*

348.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

349.     FG Bermuda is an immediate or mediate transferee of the Subsequent Transfers totaling $675,462,817 ("FG Bermuda Subsequent Transfers").

350.     Each of the FG Bermuda Subsequent Transfers was received by FG Bermuda when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

351.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the FG Bermuda Subsequent Transfers, or the value thereof, from FG Bermuda for the benefit of

the BLMIS estate; (b) directing FG Bermuda, to the extent allowable by law, to disgorge to the

Trustee all profits related to, arising out of, or concerning the FG Bermuda Subsequent

Transfers; (c) imposing a constructive trust over the FG Bermuda Subsequent Transfers, or their

proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs,

prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems

just and appropriate.

**COUNT FIVE:**
**RECOVERY OF FG ADVISORS SUBSEQUENT TRANSFERS**
**UNDER 11 U.S.C. §§ 105(a) AND 550(a)**

*Against FG Advisors*

352.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

353.    FG Advisors is an immediate or mediate transferee of the Subsequent Transfers

totaling $165,947,267 ("FG Advisors Subsequent Transfers").

354.    Each of the FG Advisors Subsequent Transfers was received by FG Advisors

when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS.

355.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the FG Advisors Subsequent Transfers, or the value thereof, from FG Advisors for the benefit of

the BLMIS estate; (b) directing FG Advisors, to the extent allowable by law, to disgorge to the

Trustee all profits related to, arising out of, or concerning the FG Advisors Subsequent Transfers; (c) imposing a constructive trust over the FG Advisors Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT SIX:
### RECOVERY OF FAIRFIELD INTERNATIONAL MANAGERS SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Fairfield International Managers, Noel, and Tucker*

356.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

357.    Fairfield International Managers, Noel, and Tucker are immediate or mediate transferees of the Subsequent Transfers totaling $293,935,681 ("Fairfield International Managers Subsequent Transfers").

358.    As owners of Fairfield International Managers, Noel and Tucker each received and controlled 50% of the Fairfield International Managers Subsequent Transfers.

359.    Each of the Fairfield International Managers Subsequent Transfers was received by Fairfield International Managers when it had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

360.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Fairfield International Managers Subsequent Transfers, or the value thereof, from Fairfield International Managers for the benefit of the BLMIS estate; (b) directing Fairfield International Managers, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising

out of, or concerning the Fairfield International Managers Subsequent Transfers; (c) imposing a

constructive trust over the Fairfield International Managers Subsequent Transfers, or their

proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs,

prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems

just and appropriate.

**COUNT SEVEN:**
**RECOVERY OF FG CAPITAL SUBSEQUENT TRANSFERS**
**UNDER 11 U.S.C. §§ 105(a) AND 550(a)**

*Against FG Capital, Noel, and Tucker*

361.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

362.    FG Capital, Noel, and Tucker are immediate or mediate transferees of the

Subsequent Transfers totaling $2,963,730 ("FG Capital Subsequent Transfers").

363.    As owners of FG Capital, Noel and Tucker each received and controlled 50% of

the FG Capital Subsequent Transfers.

364.    Each of the FG Capital Subsequent Transfers was received by FG Capital when it

had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS.

365.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the FG Capital Subsequent Transfers, or the value thereof, from FG Capital for the benefit of the

BLMIS estate; (b) directing FG Capital, to the extent allowable by law, to disgorge to the Trustee

all profits related to, arising out of, or concerning the FG Capital Subsequent Transfers; (c)

imposing a constructive trust over the FG Capital Subsequent Transfers, or their proceeds,

88

products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs,

prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems

just and appropriate.

## COUNT EIGHT:
## RECOVERY OF SHARE MANAGEMENT SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Share Management and Corina Noel Piedrahita*

366.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

367.    Share Management is an immediate or mediate transferee of the Subsequent

Transfers totaling $3,321,151 ("Share Management Subsequent Transfers").

368.    As the alter ego of Share Management, Corina Noel Piedrahita received and

controlled the Share Management Subsequent Transfers.

369.    Each of the Share Management Subsequent Transfers was received by Share

Management and Corina Noel Piedrahita when they had knowledge of fraud at BLMIS or, at a

minimum, were willfully blind to circumstances suggesting a high probability of fraud at

BLMIS.

370.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the Share Management Subsequent Transfers, or the value thereof, from Share Management and

Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Share Management and

Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits

related to, arising out of, or concerning the Share Management Subsequent Transfers; (c)

imposing a constructive trust over the Share Management Subsequent Transfers, or their

89

proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT NINE:
## RECOVERY OF NOEL SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Noel*

371.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

372.    Noel is an immediate or mediate transferee of the Subsequent Transfers totaling $12,964,286 ("Noel Subsequent Transfers").

373.    Each of the Noel Subsequent Transfers, including any transfers that Noel received from Fairfield International Managers and FG Capital, was received by Noel when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

374.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Noel Subsequent Transfers, or the value thereof, from Noel for the benefit of the BLMIS estate; (b) directing Noel, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Noel Subsequent Transfers; (c) imposing a constructive trust over the Noel Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT TEN:
## RECOVERY OF TUCKER SUBSEQUENT TRANSFERS
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Tucker*

375.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

376.     Tucker is an immediate or mediate transferee of the Subsequent Transfers totaling

$2,500,000 ("Tucker Subsequent Transfers").

377.     Each of the Tucker Subsequent Transfers, including any transfers that Tucker

received from Fairfield International Managers and FG Capital, was received by Tucker when he

had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS.

378.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the Tucker Subsequent Transfers, or the value thereof, from Tucker for the benefit of the BLMIS

estate; (b) directing Tucker, to the extent allowable by law, to disgorge to the Trustee all profits

related to, arising out of, or concerning the Tucker Subsequent Transfers; (c) imposing a

constructive trust over the Tucker Subsequent Transfers, or their proceeds, products or offspring,

in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any

other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT ELEVEN:
## RECOVERY OF PIEDRAHITA SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

### *Against Piedrahita*

379.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

380.     Piedrahita is an immediate or mediate transferee of the Subsequent Transfers totaling $163,144,472 ("Piedrahita Subsequent Transfers").

381.     Each of the Piedrahita Subsequent Transfers was controlled by Piedrahita, and received by him or his alter ego Safehand Investments when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

382.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Piedrahita Subsequent Transfers, or the value thereof, from Piedrahita for the benefit of the BLMIS estate; (b) directing Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Piedrahita Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT TWELVE:
## RECOVERY OF VIJAYVERGIYA SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Vijayvergiya*

383.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

384.   Vijayvergiya is an immediate or mediate transferee of the Subsequent Transfers totaling $7,083,760 ("Vijayvergiya Subsequent Transfers").

385.   Each of the Vijayvergiya Subsequent Transfers was received by Vijayvergiya when he had knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

386.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Vijayvergiya Subsequent Transfers, or the value thereof, from Vijayvergiya  for the benefit of the BLMIS estate; (b) directing Vijayvergiya, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) imposing a constructive trust over the Vijayvergiya Subsequent Transfers, or their proceeds, products or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT THIRTEEN:
## RECOVERY OF TOUB SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Toub*

387.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

388.    Toub is an immediate or mediate transferee of the Subsequent Transfers totaling

$32,631,707 ("Toub Subsequent Transfers").

389.    Each of the Toub Subsequent Transfers was received by Toub when he had

knowledge of fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting

a high probability of fraud at BLMIS.

390.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the Toub Subsequent Transfers, or the value thereof, from Toub for the benefit of the BLMIS

estate; (b) directing Toub, to the extent allowable by law, to disgorge to the Trustee all profits

related to, arising out of, or concerning the Toub Subsequent Transfers; (c) imposing a

constructive trust over the Toub Subsequent Transfers, or their proceeds, products or offspring,

in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any

other relief, including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT FOURTEEN:
## RECOVERY OF CORINA NOEL PIEDRAHITA SUBSEQUENT TRANSFERS
## UNDER 11 U.S.C. §§ 105(a) AND 550(a)

*Against Corina Noel Piedrahita*

391.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

94

392.     Corina Noel Piedrahita is an immediate or mediate transferee of the Corina Noel

Piedrahita Subsequent Transfers totaling $6,323,496 ("Corina Noel Piedrahita Subsequent

Transfers").

393.     Each of the Corina Noel Piedrahita Subsequent Transfers was received by Corina

Noel Piedrahita when she had knowledge of fraud at BLMIS or, at a minimum, was willfully

blind to circumstances suggesting a high probability of fraud at BLMIS.

394.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering

the Corina Noel Piedrahita Subsequent Transfers, or the value thereof, from Corina Noel

Piedrahita for the benefit of the BLMIS estate; (b) directing Corina Noel Piedrahita, to the extent

allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the

Corina Noel Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Corina

Noel Piedrahita Subsequent Transfers, or their proceeds, products or offspring, in favor of the

Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief,

including attorneys' fees and costs, the Court deems just and appropriate.

## COUNT FIFTEEN:
## GREENWICH SENTRY GENERAL PARTNER LIABILITY

*Against FG Limited*

395.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

396.     FG Limited served as the general partner to Greenwich Sentry from 1998 to 2003,

during which time certain of the Six Year Initial Transfers were made.

397.     Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any

judgment on the claims asserted herein.  FG Limited, as the general partner, is liable to satisfy

any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while

FG Limited was serving as general partner.

398.    As a result of the foregoing, pursuant to applicable Delaware law, FG Limited is

jointly and severally liable for all obligations Greenwich Sentry incurred while FG Limited was

serving as general partner, and the Trustee is entitled to a judgment against FG Limited

recovering the Six Year Initial Transfers, or their value, that Greenwich Sentry received while

FG Limited was serving as general partner, for the benefit of the estate of BLMIS.

**COUNT SIXTEEN:**
**GREENWICH SENTRY GENERAL PARTNER LIABILITY**

*Against FG Bermuda*

399.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

400.    FG Bermuda served as the general partner to Greenwich Sentry from July 2003 to

2004 until November 19, 2010, when Greenwich Sentry filed for protection under Chapter 11 of

the Bankruptcy Code, during which time certain of the Six Year Initial Transfers were made.

401.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any

judgment on the claims asserted herein.  FG Bermuda, as the general partner, is liable to satisfy

any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while

FG Bermuda was serving as general partner.

402.    As a result of the foregoing, pursuant to applicable Delaware law, FG Bermuda is

jointly and severally liable for all obligations Greenwich Sentry incurred while FG Bermuda was

serving as general partner, and the Trustee is entitled to a judgment against FG Bermuda

recovering the Six Year Initial Transfers, or their value, that Greenwich Sentry received while

FG Bermuda was serving as general partner, for the benefit of the estate of BLMIS.

96

## COUNT SEVENTEEN:
## GREENWICH SENTRY PARTNERS GENERAL PARTNER LIABILITY

### *Against FG Bermuda*

403.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

404.     FG Bermuda served as the general partner to Greenwich Sentry Partners from its

inception in 2006 to November 19, 2010, when Greenwich Sentry Partners filed for protection

under Chapter 11 of the Bankruptcy, during which time certain of the Six Year Initial Transfers

were made.

405.     Greenwich Sentry Partners is insolvent, and its assets are insufficient to satisfy

any judgment on the claims asserted herein.  FG Bermuda, as the general partner, is liable to

satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry Partners

incurred while FG Bermuda was serving as general partner.

406.     As a result of the foregoing, pursuant to applicable Delaware law, FG Bermuda is

jointly and severally liable for all obligations Greenwich Sentry Partners incurred while FG

Bermuda was serving as general partner, and the Trustee is entitled to a judgment against FG

Bermuda recovering the Six Year Initial Transfers, or their value, that Greenwich Sentry Partners

received while FG Bermuda was serving as general partner, for the benefit of the estate of

BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the

Trustee and against the Defendants as follows:

(i)     On the First Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FIFL: (a) recovering the

FIFL Subsequent Transfers, or the value thereof, from FIFL for the benefit of the BLMIS

97

estate; (b) directing FIFL, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FIFL Subsequent Transfers; (c) imposing a constructive trust over the FIFL Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(ii)    On the Second Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Stable Fund: (a) recovering the Stable Fund Subsequent Transfers, or the value thereof, from Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) imposing a constructive trust over the Stable Fund Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(iii)   On the Third Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FG Limited: (a) recovering the FG Limited Subsequent Transfers, or the value thereof, from FG Limited for the benefit of the BLMIS estate; (b) directing FG Limited, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) imposing a constructive trust over the FG Limited Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

98

(iv)     On the Fourth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FG Bermuda: (a)

recovering the FG Bermuda Subsequent Transfers, or the value thereof, from FG

Bermuda for the benefit of the BLMIS estate; (b) directing FG Bermuda, to the extent

allowable by law, to disgorge to the Trustee all profits related to, arising out of, or

concerning the FG Bermuda Subsequent Transfers; (c) imposing a constructive trust over

the FG Bermuda Subsequent Transfers, or their proceeds, products, or offspring in favor

of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other

relief, the Court deems just and appropriate;

(v)     On the Fifth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FG Advisors: (a)

recovering the FG Advisors Subsequent Transfers, or the value thereof, from FG

Advisors for the benefit of the BLMIS estate; (b) directing FG Advisors, to the extent

allowable by law, to disgorge to the Trustee all profits related to, arising out of, or

concerning the FG Advisors Subsequent Transfers; (c) imposing a constructive trust over

the FG Advisors Subsequent Transfers, or their proceeds, products, or offspring in favor

of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other

relief, the Court deems just and appropriate;

(vi)     On the Sixth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Fairfield International

Managers: (a) recovering the Fairfield International Managers Subsequent Transfers, or

the value thereof, from Fairfield International Managers for the benefit of the BLMIS

estate; (b) directing Fairfield International Managers to the extent allowable by law, to

disgorge to the Trustee all profits related to, arising out of, or concerning the Fairfield International Managers Subsequent Transfers; (c) imposing a constructive trust over the Fairfield International Managers Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(vii)    On the Seventh Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against FG Capital: (a) recovering the FG Capital Subsequent Transfers, or the value thereof, from FG Capital for the benefit of the BLMIS estate; (b) directing FG Capital to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the FG Capital Subsequent Transfers; (c) imposing a constructive trust over the FG Capital Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(viii)    On the Eighth Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Share Management and Corina Noel Piedrahita: (a) recovering the Share Management Subsequent Transfers, or the value thereof, from Share Management and Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Share Management and Corina Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Share Management Subsequent Transfers; (c) imposing a constructive trust over the Share Management Subsequent Transfers, or their proceeds, products, or

100

offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment

interest and any other relief, the Court deems just and appropriate;

(ix)    On the Ninth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Noel: (a) recovering the

Noel Subsequent Transfers, or the value thereof, from Noel for the benefit of the BLMIS

estate; (b) directing Noel, to the extent allowable by law, to disgorge to the Trustee all

profits related to, arising out of, or concerning the Noel Subsequent Transfers; (c)

imposing a constructive trust over the Noel Subsequent Transfers, or their proceeds,

products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs,

prejudgment interest and any other relief, the Court deems just and appropriate;

(x)    On the Tenth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Tucker: (a) recovering the

Tucker Subsequent Transfers, or the value thereof, from Tucker for the benefit of the

BLMIS estate; (b) directing Tucker, to the extent allowable by law, to disgorge to the

Trustee all profits related to, arising out of, or concerning the Tucker Subsequent

Transfers; (c) imposing a constructive trust over the Tucker Subsequent Transfers, or

their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys'

fees, costs, prejudgment interest and any other relief, the Court deems just and

appropriate;

(xi)    On the Eleventh Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Piedrahita: (a) recovering

the Piedrahita Subsequent Transfers, or the value thereof, from Piedrahita for the benefit

of the BLMIS estate; (b) directing Piedrahita, to the extent allowable by law, to disgorge

to the Trustee all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers; (c) imposing a constructive trust over the Piedrahita Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xii)    On the Twelfth Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Vijayvergiya: (a) recovering the Vijayvergiya Subsequent Transfers, or the value thereof, from Vijayvergiya for the benefit of the BLMIS estate; (b) directing Vijayvergiya, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) imposing a constructive trust over the Vijayvergiya Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xiii)    On the Thirteenth Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Toub: (a) recovering the Toub Subsequent Transfers, or the value thereof, from Toub for the benefit of the BLMIS estate; (b) directing Toub, to the extent allowable by law, to disgorge to the Trustee all profits related to, arising out of, or concerning the Toub Subsequent Transfers; (c) imposing a constructive trust over the Toub Subsequent Transfers, or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and appropriate;

(xiv)    On the Fourteenth Claim for Relief, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), judgment against Corina Noel Piedrahita:

(a) recovering the Corina Noel Piedrahita Subsequent Transfers, or the value thereof,

from Corina Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Corina

Noel Piedrahita, to the extent allowable by law, to disgorge to the Trustee all profits

related to, arising out of, or concerning the Corina Noel Piedrahita Subsequent Transfers;

(c) imposing a constructive trust over the Corina Noel Piedrahita Subsequent Transfers,

or their proceeds, products, or offspring in favor of the Trustee; and (d) awarding

attorneys' fees, costs, prejudgment interest and any other relief, the Court deems just and

appropriate;

(xv)    On the Fifteenth Claim for Relief, pursuant to applicable Delaware law judgment

that FG Limited is jointly and severally liable for all obligations Greenwich Sentry

incurred while FG Limited was serving as general partner, and recovering the Six Year

Initial Transfers, or their value, that Greenwich Sentry received while FG Limited was

serving as general partner, from FG Limited for the benefit of the estate of BLMIS;

(xvi)    On the Sixteenth Claim for Relief, pursuant to applicable Delaware law judgment

that FG Bermuda is jointly and severally liable for all obligations Greenwich Sentry

incurred while FG Bermuda was serving as general partner, and recovering the Six Year

Initial Transfers, or their value, that Greenwich Sentry received while FG Bermuda was

serving as general partner, from FG Bermuda for the benefit of the estate of BLMIS;

(xvii)    On the Seventeenth Claim for Relief, pursuant to applicable Delaware law

judgment that FG Bermuda is jointly and severally liable for all obligations of Greenwich

Sentry Partners incurred while FG Bermuda was serving as general partner, and

recovering the Six Year Initial Transfers, or their value, that Greenwich Sentry Partners received while FG Bermuda was serving as general partner, from FG Bermuda for the benefit of the estate of BLMIS;

(xviii)  On all Claims for Relief, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that the Initial Transfers are voidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, §§ 273-279, including 279-a, of the N.Y. Debt. & Cred. Law, and the New York Civil Practice Law and Rules (McKinney 2003), as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), and obtain all appropriate relief.

(xvix)  On all Claims for Relief, imputing each of the Defendant's knowledge to each of the other Defendants;

(xx)      On all Claims for Relief, directing the Defendants to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to, arising from, or concerning the Six Year Initial Transfers;

(xxi)     On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Six Year Initial Transfers were received by the Defendants;

(xxii)   On all Claims for Relief, awarding the Trustee attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding;

(xxiii)  On all Claims for Relief, establishing a constructive trust over all Six Year Initial Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate; and

(xxiv)  Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Trustee demands trial by jury in this action of all issues so triable.

Dated:    August 28, 2020
New York, New York

**BAKER & HOSTETLER LLP**

By: _/s/ David J. Sheehan_
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
dsheehan@bakerlaw.com

_Attorneys for Irving H. Picard,_
_Trustee for the Substantively Consolidated_
_SIPA Liquidation of Bernard L. Madoff_
_Investment Securities LLC and the Estate of_
_Bernard L. Madoff_