**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Chapter 7 Estate of Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10- 04492 (CGM) |
| STUART LEVENTHAL 2001 IRREVOCABLE TRUST and STUART LEVENTHAL, individually and in his capacity as trustee of the Stuart Leventhal 2001 Irrevocable Trust, | |
| Defendants. | |

## TRUSTEE'S STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7

estate of Bernard L. Madoff ("Madoff"), in support of his motion for summary judgment in the

above-referenced proceeding against defendants Stuart Leventhal 2001 Irrevocable Trust (the

"Leventhal Trust") and Stuart Leventhal, in his capacity as trustee of the Leventhal Trust

(collectively, the "Defendants"), respectfully submits this statement of material facts for which

there is no genuine issue to be tried under Local Rule 7056-1.

## I.    Background and the Trustee

1.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for criminal violations of federal securities laws, including securities fraud, investment adviser
fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission
("SEC") commenced an action in the United States District Court for the Southern District of
New York.  Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No.
1.

2.    On December 11, 2008, the United States Government initiated a criminal action
against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities
fraud, investment advisor fraud, and mail and wire fraud.  Compl., *United States v. Madoff*, No.
08-mj-02735 (S.D.N.Y. 2008), ECF No. 1.

3.    On December 15, 2008, under 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to
combining its action with an application by the Securities Investor Protection Corporation
("SIPC").  Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec.
15, 2008), ECF No. 5.  Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application
in the district court alleging, among other things, that BLMIS could not meet its obligations to
securities customers as they came due and its customers needed the protections afforded by the
Securities Investor Protection Act ("SIPA").  *Id.* at 2–3.

4.      Also, on December 15, 2008, the district court granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

    i.   appointed the Trustee for the liquidation of the business of BLMIS pursuant to
15 U.S.C. § 78eee(b)(3);

    ii.  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15
U.S.C. § 78eee(b)(3); and

    iii. removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4).

Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("SIPC

Liquidation Order").

5.      By orders dated December 23, 2008 and February 4, 2009, respectively, the

bankruptcy court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789

(SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF

No. 69.

6.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, the bankruptcy court substantively consolidated the chapter 7 estate of

Madoff into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No.

09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1; Consent Order, *Sec. Inv'r Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y.

June 9, 2009), ECF No. 252.

## II.     BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

### A.     BLMIS's Business

7.      In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.

He was assigned registrant number 8-8132. Through that registration, the broker-dealer became

a member of SIPC when SIPA was enacted in 1970. SIPC Liquidation Order; Declaration of

Nicholas J. Cremona, dated May 25, 2022 ("Cremona Decl."), Ex. 1 (1959 SEC Form BD for

Bernard L. Madoff dated Dec. 31, 1959 (PUBLIC0003607)).

8.      Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole

proprietorship. Declaration of Bruce G. Dubinsky, dated May 23, 2022 ("Dubinsky Decl."),

Attach. A (Expert Report of Bruce G. Dubinsky, dated August 20, 2013 ("Dubinsky Report")) ¶

35. During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff

Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC. *Id.* ¶

37.

9.      Effective as of January 1, 2001, BLMIS was registered as a New York single

member limited liability company. On January 12, 2001, BLMIS amended its SEC Form BD to

reflect its change in corporate form from a sole proprietorship to a single member limited

liability company and all the assets and liabilities of the sole proprietorship were transferred to

the limited liability company. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

10.     In response to the direction in the SEC Amended Form BD to "[b]riefly describe

details of the *succession* including any assets or liabilities not assumed by the *successor*

[BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO
> SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES,
> RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT
> RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD) at Question 5 (emphasis in original). No

assets or liabilities of the sole proprietorship were listed as "not assumed by the successor." *Id.*

11.     Madoff further certified that no "accounts, funds, or securities of customers of the

*applicant* are held or maintained by such other *person*, firm, or organization." *Id.* at Question

8(c) (emphasis in original).

12.     Also effective January 1, 2001, BLMIS's Amended and Restated Operating

Agreement transferred all assets—including bank accounts—held by the sole proprietorship to

the LLC:

> 3. **Purpose.**  The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 5 (Amended and Restated Operating Agreement).

13.     BLMIS's change from a sole proprietorship to an LLC was reflected on BLMIS

documents, including customer statements sent to Defendant and customer agreements, which

included "LLC" in the top left corner starting in 2001.  *See* Dubinsky Decl., Attach. A (Dubinsky

Report) Figure 7 (Dec. 30, 2000 BLMIS Customer Statement); Cremona Decl., Ex. 15 (Feb. 29,

2008 BLMIS Customer Statement).

14.     BLMIS informed various financial institutions of the change in corporate form.

Cremona Decl., Ex. 6 (Letters to Financial Institutions).

15.     In 2006, BLMIS registered as an investment advisor with the SEC claiming to

have only 23 accounts and $11.7 billion in assets under management.  Cremona Decl., Ex. 4

(2006 Form ADV); *see also* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 38.  Madoff used

the same SEC registrant number (8-8132) and signed the Form ADV on behalf of "Bernard L.

Madoff Investment Securities LLC."  Cremona Decl., Ex. 4 (2006 Form ADV).

16.     BLMIS operated three business units: (i) a proprietary trading business; (ii) a

market-making business; and (iii) an investment advisory business (the "IA Business").

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 35.

17.     The proprietary trading business traded for its own account to make money for

BLMIS.  *Id.* ¶¶ 35, 45.

18.     The market-making business made markets in certain stocks, bonds, warrants and

rights.  *Id.*

19.     The proprietary trading and market-making businesses were referred to within

BLMIS as "House 5."  *Id.* ¶ 35.

20.     The IA Business was designed to purportedly trade stocks to buy equities and to

buy options on behalf of its customer accounts.  *Id.* ¶¶ 40–43.

21.     The proprietary trading business, the market-making business, and the IA

Business were units of BLMIS operated by Madoff.  *Id.* ¶¶ 35, 47.

**B.     BLMIS Was Not Trading Securities**

22.     Bruce Dubinsky, a forensic accountant with more than 30 years of experience in

financial fraud investigations, was retained by the Trustee as an expert witness in this matter.

Mr. Dubinsky conducted numerous analyses from which he concluded that BLMIS did not

conduct any trading on behalf of its IA Business customers.  *Id.* at Section VI.A.

23.     At various times, BLMIS reported to its IA Business customers that the money

they deposited with BLMIS was invested in investment strategies called the "convertible

arbitrage" strategy or the "split-strike conversion" strategy.   BLMIS did not execute either

strategy on behalf of its IA Business customers.  *Id.* ¶¶ 18–25; *see also* ¶¶ 40–43.

24.     Mr. Dubinsky analyzed BLMIS's execution of the convertible arbitrage strategy

and determined that trading never occurred dating back to at least the 1970s.  *Id.* at Section VI.A.

(1)(a).

25.     By 1992, the IA Business changed its primary purported investment strategy to

the split-strike conversion strategy.  *Id.* at Section VI.A.(1)(b), specifically ¶ 127.

26.     The split-strike conversion strategy, as purportedly executed by BLMIS, involved

(a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put

options and selling call options to hedge against price changes in the underlying basket of stocks,

and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of the market."  The

strategy was purportedly set up by BLMIS so that the purchase of put options and the sale of call

options would create a collar around the stock to reduce the volatility of BLMIS's portfolio.  *Id.*

¶¶ 128–30.  BLMIS did not conduct this strategy on behalf of its customers.  *Id.* at Section

VI.A.(1)(b).

27.     Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on

behalf of its IA Business customers based on (a) the impossible reported volume of equity trades;

(b) the impossible equity and options trades reported outside the daily price range; (c) the low

volatility in its reported daily trading performance compared to the actual market behavior and

the performance achieved by BLMIS in the proprietary trading business unit as measured by the

volume weighted average prices for its sales and purchases; (d) the consistently positive rates of

returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust

Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and

(f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business

options trades.  *Id.* at Section VI.A.(1)(c)(i)-(vi), A.(1)(e)(i)-( v).

###     i.      Volume of Equity Trades

28.     Mr. Dubinsky analyzed equity trades that the IA Business reportedly made in the

split-strike conversion strategy between January 2000 and November 2008.  His analysis

compared the daily volumes for certain stocks reported as purchased or sold by the IA Business

on the aggregated customer statements with the actual market volumes sold as reported by

Bloomberg. *Id.* ¶¶ 131–32.

29.    Mr. Dubinsky found many instances where the volume that BLMIS claimed to

have purchased or sold on behalf of all IA Business customers exceeded the volume of equities

traded for the entire market. *Id.*

30.    For example, on July 14, 2000, the aggregated IA Business customer statements

reported purchases of 2,822,680 shares of AIG (as reflected in the column titled "IA Business

Purported Value"), but the total market volume that traded that day for all of AIG shares in the

market was only 1,692,800 (as reflected in the column titled "Actual Market Value").  Similarly,

the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total

market volume that traded all day for GE shares in the market was only 7,604,800.  *Id.* ¶ 131, Ex.

11 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Volume Analysis,

Analyzed Time Period"); *see also id.* ¶ 132, Ex. 12 to Dubinsky Report ("Split-Strike

Conversion IA Business Options Volume Analysis, Analyzed Time Period").

31.    Mr. Dubinsky concluded that BLMIS's trading in excess of market volumes

demonstrated that the IA Business did not trade on behalf of its customers. *Id.* at Section

VI.A.(1)(c), ¶¶ 131–32, Exs. 11–12 to Dubinsky Report.

### ii.    Equity and Options Trades Priced Outside Daily Price Range

32.    For the analyzed period of 2000-2008, Mr. Dubinsky determined that there were

99,972 equity transactions executed outside the daily market traded price range.  The purported

prices for these transactions exceeded the daily high price by as much as $8.96 and were below

the daily low by as much as $105.04.  There was no evidence in the BLMIS books and records

that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing

that the trades were actually executed.  Mr. Dubinsky opined that equity trades that were

reported as having been executed outside the daily price range of the entire U.S. equities market

could not have occurred.  *Id.* ¶¶ 133–35, Ex. 13 to Dubinsky Report ("Split-Strike Conversion IA

Business Equity Price Analysis, Analyzed Time Period").

33.    Mr. Dubinsky performed the same analysis on options trades for the same time

period and identified 34,501 options transactions traded outside of the daily price range.  He

found that the options traded above the daily high price by as much as $15.25 higher and by as

much as $6.05 below the daily low price.  Mr. Dubinsky opined, as with the equity trades, that

the reported options trades purportedly executed outside the daily price range could not have

occurred.  *Id.* ¶¶ 136–39, Ex. 14 to Dubinsky Report ("Split-Strike Conversion IA Business

Options Price Analysis, Analyzed Time Period").

### iii.    Volume Weighted Average Price Analysis

34.    The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Mr.

Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily

purchases and sales reported by the IA Business and the proprietary trading business.  *Id.* ¶¶

140–44.

35.    VWAP is a trading benchmark that gives the average price a security has traded

throughout the day, based on both volume and price.  The VWAP is a widely used industry

benchmark that allows a firm to see how well its traders are doing compared to the rest of the

market.  *Id.* ¶¶ 140–41.

36.    Based on Mr. Dubinsky's analysis, he determined that the IA Business

purportedly executed 83% of the daily buy transactions by share volume *below* the VWAP, and

72% of the daily sell transactions by share volume *above* the VWAP.   In other words, BLMIS

had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market.  *Id.* ¶¶ 142–43.

37.     Mr. Dubinsky further compared the IA Business's purchase and sale of the same stock actually traded by the proprietary trading business on the same days.  The proprietary trading business matched average VWAP of traders.  The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades.  *Id.* ¶¶ 143–44.

38.     Mr. Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers.  *Id.* ¶¶ 142–44.

### iv.     Annual Rates of Return

39.     To further test whether the IA Business engaged in trading, Mr. Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008.  *Id.* ¶ 150.

40.     Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index.  In other words, if the market goes down, the returns should have gone down and vice versa.  *Id.* ¶ 149.

41.     Mr. Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices.  The IA Business rates of return stayed within a small range, generally between 10-12% for most years

and going up to 20% for the year of 1999. *Id.* ¶¶ 150, 152. The returns for the major market indices ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely from a high of 31% to a low of -37%, and the Dow Jones from a high of 25% to a low of -34%). *Id.* ¶ 150–51, Figure 15 ("IA Business Weighted Average Annual Rate of Return vs. Annual Rate of Return on Major Indices").

42.    While the returns available in the major indices went up and down, representing the volatility in the market, the IA Business returns stayed steady for the twelve-year period examined, never having a negative year or month (even throughout 2008). *Id.* ¶ 152.

43.    Mr. Dubinsky concluded that the lack of volatility in the IA Business demonstrated that the IA Business was not engaged in trading. *Id.* ¶ 153.

> **v.    Securities Listed on the IA Business Customer Statements Did Not Reconcile with DTC Records**

44.    Mr. Dubinsky compared the trades purportedly executed for the customer accounts in the IA Business with the records maintained by the DTC, an organization in the United States that clears and settles equity transactions in the U.S. market. *Id.* at Section VI.A.(1)(e).

45.    When equity trades are recorded at the DTC it creates the official record of where that stock is held. The ownership of the stock can be confirmed with the DTC. *Id.* ¶¶ 156–57.

46.    BLMIS had a single account with the DTC, the "646 account." All equity trades made by BLMIS should have been reflected in the DTC records pertaining to its account. *Id.* ¶ 161.

47.    Mr. Dubinsky's analysis confirmed that the securities that were cleared through BLMIS's DTC account, the 646 account, were traded by the proprietary trading business. No IA Business trades were cleared through BLMIS's DTC account. *Id.* ¶¶ 161–64.

48.     The proprietary trading business shares reflected in the DTC records matched the

BLMIS records evidencing those trades.  *Id.* ¶¶ 161, 163, 165.

49.     Mr. Dubinsky concluded that the proprietary trading business actually executed

those trades in the marketplace, as confirmed by the DTC records.  For the IA Business,

however, Mr. Dubinsky could not account for the stock purportedly traded for the customers in

the IA Business in any DTC records.  *Id.* ¶¶ 161, 164.

50.     Based on his analysis, Mr. Dubinsky concluded that the IA Business did not

execute the equity trades reflected on the customer statements.  *Id.*

51.     Because there were no records from the DTC showing that BLMIS owned the

securities listed on the IA Business customer statements, BLMIS created fake DTC records for

the IA Business.  Mr. Dubinsky discovered dozens of fake DTC screen inquiries to document

purported trading activity of the IA Business.  *Id.* ¶¶ 175–184.

52.     BLMIS installed software on the IA Business computer system that recreated fake

DTC reports that were meant to look like official reports.  *Id.* ¶¶ 182–83.

53.     Mr. Dubinsky explained that there would be no reason, if one were doing

legitimate trading and had owned the stocks, to go into a computer system and write code that

used form-printing software to print out a report that mimicked what the DTC puts out, because

there would instead be a real DTC report.  *Id.* ¶ 184.  Mr. Dubinsky made this determination by

examining the metadata of the fake DTC screens, the code embedded in the document to record

characteristics of the document, including when it was created.  *Id.* ¶¶ 175–181.

54.     Based on Mr. Dubinsky's analysis of the DTC records, Mr. Dubinsky concluded

that BLMIS was not trading equities for its IA Business customers.  *Id.* ¶ 184.

### vi.     Reported Options Trades Could Not be Reconciled to OCC Records

55.     The options purportedly executed for the customer accounts in the IA Business

could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market. *Id.* ¶¶ 158–60, 185–89.

56.     Mr. Dubinsky explained that BLMIS had a single account with the OCC, and the IA Business purportedly traded S&P Index options ("OEX"), which are "proprietary options" traded exclusively on the Chicago Board of Option Exchange ("CBOE"). These proprietary options can only be traded on the CBOE, but there would be a record of them both from the CBOE and the OCC. *Id.* ¶¶ 138, 185.

57.     Mr. Dubinsky reviewed the OCC records for the BLMIS account from October 31, 2002 through October 31, 2008. *Id.* ¶ 185. Based on his review of those records, Mr. Dubinsky was able to reconcile and confirm the options that were traded by the proprietary trading business but could not account for the options purportedly traded for the customers in the IA Business. *Id.* ¶¶ 185–87. Mr. Dubinsky found that the options purportedly traded on behalf of the IA Business customers, as recorded in the IA Business trading records, were not shown on OCC records and were not cleared through the OCC. *Id.* ¶ 188.

58.     For example, on October 31, 2005, records for the proprietary trading business and the OCC indicate that 20 options described as "S&P 100 INDEX November 590 Call" were purchased and held by BLMIS. The aggregate number of "S&P 100 INDEX NOVEMBER 590 CALL" options reported on IA Business customer statements for the same date totaled 658,342. *Id.* ¶ 189.

59.     Based on his analyses, Mr. Dubinsky concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers. *Id.* ¶ 188.

**C.    The IA Business Did Not Purchase Treasuries for IA Business Customer Accounts**

60.     In addition to purchasing stocks and options collars, BLMIS claimed it would

intermittently invest IA Business customer funds in T-Bills as part of the split-strike conversion

strategy. *Id.* ¶ 43.

61.    Mr. Dubinsky found no evidence of such purchases having been made on behalf

of IA Business customers.  While BLMIS purchased T-Bills with customer funds, these

purchases did not match the allocation of T-Bill transactions that appeared on customer

statements. *Id.* ¶ 171.

62.    For the period of 2002 through 2007, Mr. Dubinsky reviewed the BLMIS books

and records to identify the unique T-Bills held by the proprietary trading business on December

31 of each of those years.  He then compared those holdings to (i) those T-Bill positions held at

BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries,

and (ii) the T-Bills purportedly held by the IA Business for its customers. *Id.* ¶¶ 172–74.

63.    Mr. Dubinsky prepared a summary chart of his review of these voluminous

records, which accurately represents his comparison of the T-Bill positions in the proprietary

trading business and the positions purportedly purchased by the IA Business for its customers:

**Table 5**
**Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business**

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

*Id.* ¶ 174, Table 5.

64.    The amount of T-Bills held by the proprietary trading business was negligible

compared to those purportedly held on behalf of customers of the IA Business.  For example, by

the end of 2007, the $80 million in treasury positions held by the proprietary trading business (as

recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in treasury

positions purportedly held by the IA Business.  *Id.*

      65.     Frank DiPascali, a former BLMIS employee, now deceased, gave certain

testimony at the multi-day criminal trial held in *United States v. Bonventre*, 10-CR-228 (LTS)

(S.D.N.Y.) ("DiPascali Testimony"), ECF Nos. 858, 862, 884 (attached as Exhibit 8 to Cremona

Decl.)  In his criminal trial testimony, DiPascali confirmed that the T-Bills purchased with the IA

Business money were for BLMIS's cash management and were not purchased for any customer

account:

> **Q.** From time to time did you get real treasury bills?
> **A.** Yes.
> **Q.** And what were those real treasury bills for?
> **A.** To invest the excess cash in the IA checking account.
> **Q.** And when you say to invest the excess cash in the IA checking
> account, for what reason did you get a treasury bill to do that?
> **A.** So as to provide safety and an enhanced yield to what the
> checking account interest rate was.
> **Q.** So it would be fair to say it would be a way of getting interest
> on the checking account?
> **A.** More or less, yes.

Cremona Decl., Ex. 8 (DiPascali Testimony) at 4931:12–23 (Dec. 5, 2013); *see also id.*

at 4921:7–12, 4930:6–4931:5, 4934:3–25; *id.* at 5345:1–5346:3 (Dec. 10, 2013).

      66.     DiPascali differentiated between the T-Bills actually purchased for cash

management purposes and those fabricated for customers of the IA Business:

> **Q.** And when you bought those real treasury bills to earn interest on
> the Madoff checking account, what did you have to do?
> **A.** I had to call my broker.
> **Q.** And after you called your broker, was there a process to going
> out and buying the treasury bill?

**A.** Yeah, I would tell the broker how much dollars I wanted to commit to treasury bills and typically which one I wanted to buy, and he would take down that information and call me back and typically give me a report that I bought X amount of treasury bills at this price.

**Q.** And then that would – you would actually get a real treasury bill?

**A.** Yeah.

**Q.** Now, for on the IA side, when you had to provide – when you would provide the fake information, what would you do there?

**A.** I'd look at a pricing service of historical prices of treasury bills, ascertain the price on the date that I needed and write a ticket and put it into the AS/400.

· 	***

· 	**Q.** Now, what was your understanding of what Ms. Bongiorno would do with the treasury information that you gave to her?

**A.** She would put through a buy ticket that was approximately equal to the cash credit balance reflected in the account she was working on, and it would produce a confirmation and an entry on the customer statement that he was now – owned treasuries.

**Q.** And as with the other trading that was on those accounts, was any of it real?

**A.** No.

*Id.* at 4931:24–4934:13 (Dec. 5, 2013).

67.    DiPascali further testified that the T-Bill purchases in the eight brokerage accounts (held at Bank of New York, Bear Stearns, Fidelity, Lehman, and Morgan Stanley) were made at the direction of Mr. Madoff to earn interest on the cash held in JP Morgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account") (further discussed below in ¶ 69):

**Q.** Did Mr. Madoff propose a solution for how to deal with this?

**A.** He either already had an account or two open or was about to open a new account or a series of them, I don't recall. He was basically giving that responsibility to me. He wanted treasury notes, treasury bills only. As the CDs would get unwound or, I don't remember, they might have unwound them immediately, I'm not sure, but in short order I managed a group of Bernard L. Madoff brokerage accounts that were held at other brokerage firms for the purpose of purchasing short-term U.S. government securities.

**Q.** These short-term U.S. securities were real, right?

**A.** Yes.

16

**Q.** This was just a way of getting interest on the real cash that was in the 703 account?
**A.** Yes.
**Q.** What were some of the firms that you now had responsibility for that had these brokerage accounts?
**A.** Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.
**Q.** We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?
**A.** I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.
**Q.** This was different than just looking at historical prices and writing something up for the fake trades, right?
**A.** Yes.

*Id.* at 4961:15–4962:22 (Dec. 5, 2013).

68.    DiPascali explained the nuts and bolts of his process that resulted in T-Bill

transactions showing up on the IA Business customer statements, and further confirmed that they

were all fake:

**Q.** Now can we go to the second page of this document. What is this that we are looking at?
**A.** It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise. It was going to do a lot of the calculation for me and allow the process to progress swiftly instead of from month to month to month and client to client to client calculate all sorts of stuff, and then have to then create another side to that. This spreadsheet, which is an Excel-based spreadsheet, is identifying certain treasury bills across the top column. The top row is the CUSIP of treasury bills and options. The second row are the symbols of options and then a string of treasury bills. Going on the far left column are a string of account numbers. Those are the accounts that Bernie told us he wanted to use to be the counterparties of the customer option positions. What this is doing is it's allowing me to randomly assign, once I know the total of my customer option positions, a quantity to each of those counterparties. Then, once I've randomly defined what each counterparty's position is, this is calculating what its margin or collateral requirement would be. Once I established that, this spreadsheet allows me to randomly pick a group of treasuries that

were going to represent that collateral, and then the whole total
number would circle back to what I needed. It's fairly complicated,
but it did all the grind work necessary to accomplish what Bernie
wanted.

**Q.** Were any of the treasury bills that are reflected on this real?

**A.** No.

*Id.* at 5344:24–5346:3 (Dec. 10, 2013).

69.     DiPascali also confirmed that the proprietary trading business did not have an

inventory of T-Bills "that was equivalent to the amount that was on the statements" for IA

Business customers.  *Id.* at 6950:25–6951:9 (Jan. 13, 2014).

**D.      The IA Business Had No Other Sources of Funds**

70.     During at least the ten-year period before its collapse on December 11, 2008,

BLMIS primarily used three bank accounts for the IA Business: the 703 Account; JPMorgan

account #xxxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan

Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶ 279 n.243; Declaration of Lisa M. Collura, dated May 23, 2022

("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated February

22, 2016 ("Collura Leventhal Report")) ¶ 17.

71.     IA Business customers' cash deposits were deposited (and commingled) into the

703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279; Collura Decl., Attach. A

(Collura Leventhal Report) ¶¶ 20–24.

72.     IA Business customer withdrawals were made through the JPMorgan Accounts

and the BT Account, which was a checking account entirely funded by the 703 Account during

the period for which bank records are available.  Collura Decl., Attach. A (Collura Leventhal

Report) ¶¶ 25–30.

73.     The JPMorgan Accounts were linked commercial business accounts.  The 509

Account was a controlled disbursement account that was entirely funded by the 703 Account.  *Id.*
¶ 25.  An analysis of the 703 Account showed that the money in that account consisted almost
entirely of customer deposits.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279; Collura
Decl., Attach. A (Collura Leventhal Report) ¶ 24.

74.    Ninety-seven percent of all cash additions into the 703 Account came directly
from IA Business customers.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279 n.243, Figure
37; Collura Decl., Attach. A (Collura Leventhal Report) ¶ 24.

75.    The other three percent of inflows into the 703 Account came from income earned
on (1) short-term investment activity made directly from the 703 Account (including overnight
sweeps, overnight deposits, commercial paper, Certificates of Deposit and T-Bills); and (2)
investments of BLMIS customer funds made through bank and brokerage accounts held in the
name of BLMIS or Madoff.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279 n.242–
43, Figure 37 & n.244.

76.    Because the short-term investments, including overnight sweeps, were made
directly out of the 703 Account, the source of the money for those investments was customer
funds.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279; Collura Decl., Attach. A (Collura
Leventhal Report) ¶ 24.

77.    There were no inflows into the 703 Account from sales of securities for customer
accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 279; Collura Decl., Attach. A
(Collura Leventhal Report) ¶ 24.

78.    There were no outflows from the 703 Account to purchase securities for customer
accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 289; Collura Decl., Attach. A
(Collura Leventhal Report) ¶ 24.

79.     Apart from two short-term loans BLMIS received from JPMorgan totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the proprietary trading and market-making businesses sufficient to pay the IA Business customer withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 280–83.

80.     The IA Business also did not receive payments of any cash dividends.  According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.* ¶¶ 190–98.

81.     Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account.  *Id.* ¶¶ 196–97.

82.     There is no record of any dividends being received by the IA business.  *Id.* ¶¶ 191, 197.

83.     The IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account.  *Id.* ¶¶ 269–76.

84.     These transactions rendered BLMIS insolvent.  By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.  *Id.* at Section VII., ¶¶ 358–59, Table 13.

85.     In December 2008, BLMIS's capital had dwindled to the point where customer

redemptions or withdrawal requests grossly exceeded the amounts it had on hand.  The customer

property on hand at BLMIS as of December 11, 2008 was not sufficient to pay the claims of its

customers.  *Id.* ¶¶ 39, 366–67.

> ### i.    The Transfers Were Made by Bernard L. Madoff Investment Securities LLC

86.    BLMIS operated as a sole proprietorship prior to 2001.  In January 2001, the sole

proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-

8132.  *See* Cremona Decl., Ex. 3 (2001 SEC Amended Form BD); Ex. 5 (Amended and Restated

Operating Agreement).

87.    The bank statements for the JPMorgan Accounts listed the account holder as

"Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to

"Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura Leventhal Report)

Ex. 3.

88.    For the time period for which bank records were available (December 1998

through December 2008), the JPMorgan Accounts were used for customer deposits and

withdrawals—the business of the IA Business.  *Id.* ¶¶ 20–27; Dubinsky Decl., Attach. A

(Dubinsky Report) ¶ 279 n.243, Figure 37.

89.    For the time period for which bank records were available, the face of the bank

statements for the JPMorgan Accounts showed they were designated as "Commercial Checking"

accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS

employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at

885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff

personally.  Cremona Decl., Ex. 7 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky

Decl., Attach. A (Dubinsky Report) Exs. 23–24.

90.     At all times after January 1, 2001, the JPMorgan Accounts were owned by

BLMIS.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

### E.     The Plea Allocutions

91.     The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David

Kugel, Irwin Lipkin, and Eric Lipkin, attached as Exhibits 9–14 to the Cremona Decl., further

establish that BLMIS did not conduct legitimate operations from its IA Business.

**Bernard L. Madoff**

92.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,

No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by

the United States Attorney for the Southern District of New York.  Plea Allocution of Bernard L.

Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff

Allocution"), ECF No. 57 (attached as Exhibit 9 to Cremona Decl.).

93.     At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the

investment advisory side of [BLMIS]."  Cremona Decl., Ex. 9 (Madoff Allocution) at 23:14–23;

31:25–32:1.

94.     Madoff further testified at the plea hearing that he never invested his clients' funds

in securities, that he used funds on hand in the JP Morgan account to pay customer redemptions,

and that he created false trading confirmations and client account statements to cover up the fact

that he had not executed trades on behalf of BLMIS investment advisory clients.  Madoff stated:

> The essence of my scheme was that I represented to clients and prospective clients
> who wished to open investment advisory and individual trading accounts with me
> that I would invest their money in shares of common stock, options, and other
> securities of large well-known corporations, and upon request, would return to them
> their profits and principal.  Those representations were false for many years.  Up
> until I was arrested on December 11, 2008, I never invested these funds in the
> securities, as I had promised.  Instead, those funds were deposited in a bank account
> at Chase Manhattan Bank.  When clients wished to receive the profits they believed
> they had earned with me or to redeem their principal, I used the money in the Chase

Manhattan bank account that belonged to them or other clients to pay the requested
funds. The victims of my scheme included individuals, charitable organizations,
trusts, pension funds, and hedge funds.

*Id.* at 24:9–24.

95.    Beginning in the early 1990s, Madoff represented to IA Business customers that he

was using a split strike conversion strategy based on blue-chip securities. *Id.* at 25:18–24.

96.    Madoff further detailed his strategy as follows:

Through the split strike conversion strategy I promised to clients and prospective
clients that client funds would be invested in a basket of common stocks within the
Standard & Poors 100 index, a collection of the 100 largest publicly-traded
companies in terms of their market capitalization. I promised that I would select a
basket of stocks that would closely mimic the price movements of the Standard &
Poors 100 index. I promised that I would opportunistically time those purchases
and would be out of the market intermittently, investing client funds during these
periods in United States Government-issued securities, such as United States
Treasury bills. In addition, I promised that as part of the split strike conversion
strategy, I would hedge the investments I made in the basket of common stocks by
using client funds to buy and sell option contracts related to those stocks, thereby
limiting the potential client losses caused by unpredictable changes in stock prices.
In fact, I never made those investments I promised clients, who believed they were
invested with me in the split strike conversion strategy.

*Id.* at 25:25–26:18.

97.    BLMIS investment advisory customers received account statements from BLMIS

that purported to reflect securities transactions and investment returns that appeared as though their

investments with BLMIS were profitable. Madoff explained:

To further cover up the fact that I had not executed trades on behalf of my
investment advisory clients, I knowingly caused false trading confirmations and
client account statements that reflected the bogus transactions and positions to be
created and sent to clients purportedly involved in the split strike conversion
strategy, as well as other individual clients I defrauded who believed they had
invested in securities through me.

*Id.* at 27:9–16.

98.    Madoff stated that the proprietary trading and market-making businesses were

engaged in legitimate trading. *Id.* at 25:6–11.

23

99.    Madoff also stated that funds from his investment advisory business were transferred to the proprietary trading and market-making businesses, via his affiliated London entity. *Id.* at 29:12–22.

**Frank DiPascali**

100.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal action charging him with participating in and conspiring to perpetuate the Ponzi scheme. Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 12 (attached as Exhibit 10 to Cremona Decl.). Mr. DiPascali confirmed Madoff's explanation of the split-strike conversion strategy and that BLMIS never engaged in the strategy or executed the purported trades reported on customer statements. DiPascali stated:

> By the early 1990s Bernie Madoff had stable clients whose accounts he managed as an investment adviser. He attracted a lot of these clients by telling them that the firm would apply a hedged investment strategy to their money. The clients were told that the strategy involved purchasing what we call basket of blue chip common stocks. Hedging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times. . . . From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of [sic] sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

Cremona Decl., Ex. 10 (DiPascali Allocution) at 45:21–46:15.

101.    At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that security trading was occurring in their investment accounts when in fact, no trades were being made. DiPascali explained:

24

From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

*Id.* at 46:21–25.

***Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

*Id.* at 47:5–22.

***… I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

*Id.* at 52:2–5.

**David Kugel**

102.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 188 (attached as Exhibit 11 to Cremona Decl.).

103.    As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers ever occurred, and in fact the evidence reveals that those transactions did not and could not have

occurred.  Cremona Decl., Ex. 11 (Kugel Allocution) at 32:4–12 ("Specifically, beginning the

early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades.

I provided historical trade information . . . to create fake trades that, when included on the account

statements and trade confirmations of Investment Advisory clients, gave the appearance of

profitable trading when in fact no trading had actually occurred.").

**Irwin Lipkin**

104.    At a plea hearing on November 8, 2012, in the case captioned *United States v.*

*Irwin Lipkin*, No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to

a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS,

and making false statements in relation to documents required by ERISA.  Plea Allocation of

Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the

"Irwin Lipkin Allocution"), ECF No. 288 (attached as Exhibit 12 to Cremona Decl.).  Mr. Lipkin

admitted that BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and

annual audited reports.  Cremona Decl., Ex. 12 (Irwin Lipkin Allocution) at 30:23–31:3, 31:10–

18, 31:24–32:5.

**Eric S. Lipkin**

105.    At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S.*

*Lipkin*, No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-

count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy,

and making false statements to facilitate a theft concerning ERISA.  Plea Allocution of Eric S.

Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric

Lipkin Allocution"), ECF No. 148 (attached as Exhibit 13 to Cremona Decl.).

106.    Mr. Eric Lipkin admitted that BLMIS created fake reports that replicated those of

the DTC, which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market. The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead them. Cremona Decl., Ex. 13 (Eric Lipkin Allocution) at 32:4–10, 33:22–34:8.

**Enrica Cotellessa-Pitz**

107.    At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC. Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 1512 (attached as Exhibit 14 to Cremona Decl.).

108.    Ms. Cotellessa-Pitz admitted that IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate their revenue and hide their losses. Cremona Decl., Ex. 14 (Cotellessa-Pitz Allocution) at 31:12–32:12.

**III.    The Leventhal Account BLMIS Transactions**

109.    The Leventhal Trust is a trust that was formed under the laws of the state of New York. *See* Compl. ¶ 7, ECF No. 1.[1]

110.    Defendant Leventhal Trust was a customer of the IA Business and held BLMIS Account No. 1CM940 in the name, "Stuart Leventhal 2001 Irrevocable Trust" (the "Leventhal

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Stuart Leventhal 2001 Irrevocable Trust*, Adv. Pro. No. 10-04492 (CGM) (Bankr. S.D.N.Y.).

Account").  Compl. ¶ 7; *see also* Ex. B to Compl..

111.    Defendant Stuart Leventhal is a resident of New York, New York, and is a trustee and beneficiary of the Leventhal Trust.  Answer ¶ 8, ECF No. 8

112.    Defendants do not dispute the withdrawals as reflected on Exhibit B to the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 18 (Defendants' Responses to Plaintiff's Interrogatories Nos. 4 & 6; Defendant Stuart Leventhal 2001 Irrevocable Trust's Response to Plaintiff's Requests for Admission No. 4).

A.    **Analysis of the Leventhal Account**

113.    Lisa Collura was retained by the Trustee to reconcile the cash transactions reflected on the statements of the BLMIS customer accounts with available records and trace the flow of those funds.  Collura Decl., Attach. A (Collura Leventhal Report) ¶¶ 7–8.

114.    For both the reconciliation and tracing analyses, Collura reviewed available third-party bank records.  These bank records include hundreds of thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks, and deposit slips.  Collura Decl., Attach A (Collura Leventhal Report) ¶¶ 11–13.

115.    The reconciliation of the customer statements and bank records was conducted to determine whether the cash transactions on the BLMIS customer statements were accurately reflected as cash transactions—cash deposits or cash withdrawals.  *Id.* ¶ 16.

116.    Collura confirmed that the deposit and withdrawal transactions identified on the BLMIS customer statements corresponded to transactions on the available third-party bank records in the same amount, on or around the same date, and to or for the benefit of the same customer.  *Id.* ¶ 17–30.

117.    Collura reviewed over 225,000 transactions on the customer statements, and over 150,000 transactions on the bank records.  She kept track of these transactions by assigning a

unique identifier to each of the cash transactions on the customer statements and a different

unique identifying number to all of the transactions in the bank records. *Id.* ¶¶ 23, 26, 29, 31.

118.    Of the over 225,000 transactions reflected on BLMIS customer statements from

December 1998 to December 2008, Collura was able to reconcile 99.01% of these cash

transactions to BLMIS bank records. *Id.* ¶¶ 15, 31.

119.    For Collura's reconciliation analysis with respect to Defendants, she analyzed the

cash transactions in the Leventhal Account from March 2005 to December 2008.  During this

time period, the customer statements for the Leventhal Account reflected 22 cash deposit and

withdrawal transactions.  All 22 cash transactions reflected on the customer statements for the

Leventhal Account occurred in the ten-year period, December 1998 to December 2008, for

which there were available BLMIS bank records. *Id.* ¶¶ 15, 32–33, Exs. 7, 10.

120.    Collura reconciled 22 cash transactions reflected on the customer statements for

the Leventhal Account to available BLMIS bank records, documentation contained in BLMIS

customer files, and/or documents produced to the Trustee related to the Leventhal Account. *Id.*

¶¶ 11–14, 33–38, Ex. 8.

121.    Based on her review of documents contained in the customer file maintained at

BLMIS for the Leventhal Account, Collura did not find any instance of Defendants

communicating to BLMIS any disagreement with respect to the accuracy of any cash transaction

reflected on the customer statements for the Leventhal Account. *Id.* ¶¶ 15, 34–37, 40.

122.    For Collura's tracing analysis with respect to Defendants, she analyzed the 13

cash withdrawals from the Leventhal Account during the two years prior to December 11, 2008

(the "Two-Year Period"), totaling $1,290,000. *Id.* ¶¶ 41–45, Exs. 9–10.

123.    Based on available bank records from BLMIS, Collura traced 100% of the total

amount of the 13 cash withdrawals of $1,290,000 reflected on the customer statements for the

Leventhal Account during the Two-Year Period to bank accounts held by Defendants.  *Id.* ¶ 45,

Exs. 9–10.

124.    Matthew Greenblatt oversaw the task of reconstructing BLMIS's books and

records and calculating the principal balance for each BLMIS account (the "Principal Balance

Calculation").  Greenblatt's Principal Balance Calculation applied the Net Investment Method

(the Trustee's cash in/cash out net equity methodology), which takes into account all of the

customer deposits as additions to principal and all of the customer withdrawals or inter-account

transfers as reductions to principal.  Declaration of Matthew B. Greenblatt, dated May 23, 2022

("Greenblatt Decl."), Attach. A (Expert Report of Matthew G. Greenblatt, CPA/CFF, CFE dated

November 15, 2012 ("Greenblatt Report")) ¶¶ 4–5; *see also Sec. Inv'r Prot. Corp. v. Bernard L.*

*Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

125.    Greenblatt prepared a chronological listing of cash and principal transactions

reflected in the BLMIS customer statements.  Greenblatt relied on the customer statements

because they are the most comprehensive and complete accounting of the debtor's books and

records with respect to transaction-by-transaction line item detail of the cash and principal

transactions and because the customer statements were sent to customers, giving customers the

opportunity to object to the statements.  Greenblatt Decl., Attach. A (Greenblatt Report) ¶¶ 10–

12, 40–43.

126.    The first monthly customer statement which reported dollar amounts for any

securities allegedly held at month end was March of 1981.  Therefore, the full period for which

the Principal Balance Calculation could be performed covers the period April 1, 1981 through

December 11, 2008.  *Id.* ¶ 5 n.1.

127.    Greenblatt's Principal Balance Calculation for Defendants covered the period from the Leventhal Account opening through December 11, 2008.  Greenblatt Decl., Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated February 22, 2016) ("Greenblatt Leventhal Report")) ¶¶ 4, 7–25.

128.    Mr. Greenblatt determined that on May 2, 2005, the Leventhal Account was opened with an inter-account transfer from BLMIS Account 1CM113 in the amount of $2,691,646.  However, because there was another inter-account transfer from BLMIS Account 1CM113 into BLMIS Account 1CM941 in the same amount of $2,691,646, the Leventhal Account and BLMIS Account 1CM941 were each credited with $525,000 of principal.  The remaining balance of the reported inter-account transfers constituted fictitious profits.  *Id.* ¶¶ 21–23, Exs. 4B, 4C.

129.    In sum, the one inter-account transfer provided the Leventhal Account with a total of $525,000 of principal.  *Id.* ¶ 23, Ex. 3.

130.    Between May 2, 2005 and December 11, 2008, the Leventhal Account reflected a total of 22 cash withdrawals totaling $3,140,000.  *Id.* ¶ 24.

131.    The Principal Balance Calculation for the Leventhal Account demonstrated that between May 2, 2005 and December 11, 2008, $3,140,000was withdrawn from BLMIS, which consisted of $525,000 of principal and an additional $2,615,000 of funds withdrawn in excess of principal, representing fictitious profits withdrawn over the life of the Leventhal Account.  *Id.* ¶ 25, Ex. 4C.

132.    Within the Two-Year Period prior to December 11, 2008, $1,290,000 of fictitious profits was withdrawn from the Leventhal Account.  *Id.*

133.    It is therefore undisputed that, during the Two-Year Period, Defendants withdrew $1,290,000 in excess of principal deposited in the Leventhal Account.  *Id.*

Dated: May 25, 2022
      New York, New York

*/s/ Nicholas J. Cremona*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Nicholas J. Cremona
ncremona@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*