Michael S. Feldberg
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
*mfeldberg@reichmanjorgensen.com*
750 Third Avenue, Suite 2400
New York, NY 10017
Tel.: (212) 381-1965

*Attorney for Defendant NatWest Markets, N.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Hearing Date: November 16, 2022**
**Response Date: July 22, 2022**
**Reply Date: August 22, 2022**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | **ORAL ARGUMENT**<br>**REQUESTED** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>          Plaintiff,<br><br>v.<br><br>ABN AMRO BANK N.V. (presently known as NATWEST MARKETS N.V.),<br><br>          Defendant. | Adv. Pro. No. 10-05354 (CGM)<br>Adv. Pro. No. 11-02760 (CGM) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**NATWEST MARKETS N.V.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

I.     The XL Funds Transfer Cash to NatWest as Collateral for Two Swap
Transactions ................................................................................................................ 4

II.    NatWest Hedges Its Exposure to the XL Fund Swap Transactions by
Investing in Two Rye Feeder Funds, Rye Broad Market and Rye Portfolio
Limited ....................................................................................................................... 5

III.   NatWest Makes Redemptions from Rye Portfolio Limited and Rye Broad
Market ........................................................................................................................ 5

IV.   The Harley Transaction ............................................................................................. 6

ARGUMENT ......................................................................................................................... 6

I.     All Claims for Recovery Should Be Dismissed Because the Trustee Has
Failed to Plausibly Tie the Money Received by NatWest to "Initial
Transfers" out of BLMIS ............................................................................................ 6

    A.    The Trustee Has Failed to Allege that the XL Fund Collateral
Payments Were "Subsequent Transfers" Tied to Particular "Initial
Transfers" out of BLMIS .................................................................................. 7

    B.    The Trustee Has Failed to Allege that NatWest's Redemptions from
Feeder Funds Were "Subsequent Transfers" Tied to Particular
"Initial Transfers" out of BLMIS ..................................................................... 11

II.    All Claims to "Recover" Collateral Payments Received by NatWest Should
Be Dismissed Because, According to the Logic of the Complaint, NatWest
Has Already "Returned" That Money to BLMIS ......................................................... 13

III.   All Claims Predicated on Avoidance of Initial Transfers Pursuant to Section
544 Should Be Dismissed Because They Are Barred by the Section 546
Safe Harbors ............................................................................................................. 14

    A.    The Section 546 Safe Harbors Protect All of the Alleged "Initial
Transfers" from Avoidance Pursuant to Section 544 .............................. 14

         1.    The Section 546(e) Safe Harbor Protects All Alleged "Initial
Transfers" ............................................................................................. 15

         2.    The Section 546(g) Safe Harbor Protects All "Initial
Transfers" Which Allegedly Related to Subsequent
Redemptions by NatWest ...................................................................... 20

    B.    The Effect of the Section 546 Safe Harbors on the Trustee's
Recovery Claims ............................................................................................. 22

1.      All Claims for Recovery of "Initial Transfers" That Occurred
        More Than Two Years Prior to the Petition Must Be
        Dismissed ...................................................................................... 22

2.      Claims for "Recovery" of Alleged "Subsequent Transfers"
        That Were Not Preceded by Any "Initial Transfers"
        Occurring Within the Two-Year Look-Back Period Must Be
        Dismissed ...................................................................................... 23

IV.     All Recovery Claims Predicated on Avoidance of "Initial Transfers"
        Pursuant to Section 548(a)(1)(A) Should Be Dismissed Because the Trustee
        Has Failed to Plead the Necessary Fraudulent Intent ............................................ 25

V.      The Complaint Establishes the Good Faith Defense as a Matter of Law ............. 30

VI.     Conclusion ......................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arizona v. California*,
460 U.S. 605 (1983)............................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................11

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd*, 264 B.R. 303 (S.D.N.Y. 2001) ........................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................11

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ...............................................................................18

*Daly v. Deptula (In re Carrozella & Richardson)*,
286 B.R. 480 (D. Conn. 2002)..............................................................................26

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005)...................................................................18

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)................................................................................16

*In re Fairfield Sentry Ltd.*,
No. 10-13164, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020), app.
pending (S.D.N.Y. No. 1:19-cv-03911-VSB)..................................................17, 18

*Geltzer v. Barish (In re Geltzer)*,
502 B.R. 760 (S.D.N.Y. 2013).............................................................................28

*Leshin v. Welt (In re Warmus)*,
276 B.R. 688 (S.D. Fla. 2002) .............................................................................14

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd*, No. 01-MBK-6004L, 6005L,
2002 WL 32500567 (W.D.N.Y. June 21, 2002)..............................................26, 28

*In re M. Fabrikant & Sons, Inc.*,
394 B.R. 721 (Bankr. S.D.N.Y. 2008) .............................................................13, 14

*In re Madoff Sec.*,
No. 12-MC-115 (S.D.N.Y. May 16, 2012), ECF No. 119....................................15

*Meridian Horizon Fund, LP v. KPMB (Cayman),*
    487 F. App'x 636 (2d Cir. 2012) ......................................................30

*Merrill v. Abbott (In re Independent Clearing House Co.),*
    77 B.R. 843 (D. Utah 1987) (en banc) ...........................................26, 27

*Official Committee of Unsecured Creditors of Verestar, Inc. v. American Tower
    Corp.* (*In re Verestar, Inc.),*
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ................................................25

*Picard v. ABN AMRO Bank (Ireland) Ltd. (In re BLMIS),*
    505 B.R. 135 (S.D.N.Y. 2013) ....................................................... *passim*

*Picard v. BNP Paribas,*
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ................................................13

*Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC),*
    12 F.4th 171 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 1209 (2022) .......................26, 27, 28, 29

*Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Secs. LLC),*
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ................................................26

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC),*
    No. 08-01789, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .................................14, 18

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC),*
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) .........................................7, 8, 11

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    654 F.3d 229 (2d Cir. 2011) .............................................................12

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
    403 F.3d 43 (2d Cir. 2005) ...........................................................24, 28

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
    476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv.
    Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ................................................17

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
    No. 12 MC 115 JSR, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........................... *passim*

*Stoebner v. Opportunity Fin., LLC,*
    909 F.3d 219 (8th Cir. 2018) ............................................................27

*Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.),*
    168 B.R. 408 (Bankr. D. Ariz. 1994) ..................................................14

*VFB L.L.C. v. Money's Trust (In re VF Brands, Inc.)*,
    282 B.R. 134 (Bankr. D. Del. 2002) ...................................................................................14

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992)...........................................................................................26

**State Cases**

*Finn v. Alliance Bank*,
    860 N.W.2d 638 (Minn. 2015)..........................................................................................27

**Federal Statutes**

11 U.S.C. § 544.......................................................................................................3, 13, 21, 22

11 U.S.C. § 546(e) .......................................................................................................... *passim*

11 U.S.C. § 546(g)......................................................................................3, 13, 14, 18, 19

11 U.S.C. § 101(22A)........................................................................................................17

11 U.S.C. § 101(53)(C).......................................................................................................20

11 U.S.C. § 547...................................................................................................................28

11 U.S.C. §§ 548.....................................................................................................4, 21, 29

11 U.S.C. § 550.......................................................................................................5, 6, 13, 15, 29

**Rules**

Fed. R. Bankr. P. 7009.........................................................................................................25

Fed. R. Civ. P. 9(b) ................................................................................................24, 25, 28

Defendant NatWest Markets N.V. (formerly known as ABN AMRO Bank N.V.)

("NatWest")[1] respectfully submits this memorandum of law in support of its motion pursuant to

Federal Rule of Civil Procedure 12(b)(6) to dismiss the Consolidated Second Amended

Complaint ("Complaint"), No. 10-05354, Dkt. 220, filed by plaintiff Irving H. Picard, Trustee

("Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and

the Estate of Bernard L. Madoff ("Madoff").

## PRELIMINARY STATEMENT

Two hedge funds known as Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio

Limited") and Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and collectively

with XL Portfolio Limited, the "XL Funds") aimed to provide returns to their investors by

investing fund assets in swap transactions with NatWest and other financial institution

counterparties.[2] In each of two transactions, the XL Fund in question posted cash "collateral"

with NatWest and, in exchange, NatWest agreed to provide three times the returns that would

have been generated if that amount were invested in a specified "feeder fund" that invested with

BLMIS. Thus, from the perspective of the XL Funds, the swaps were essentially leveraged,

synthetic investments in BLMIS.

The bulk of what the Trustee seeks to "recover" from NatWest in this proceeding consists

of approximately $180 million of the "collateral" payments that the XL Funds invested with

NatWest in connection with these swaps, specifically, $84.6 million posted by XL Portfolio

---

[1]    After the events at issue in this litigation, ABN AMRO Bank N.V., a financial institution organized under laws of the Netherlands, was renamed The Royal Bank of Scotland N.V. and was later renamed again as NatWest Markets N.V. To avoid confusion with defendants in other Madoff adversary proceedings with similar names, "Defendant" or "NatWest" has been used throughout.

[2]    For purposes of this motion, the well-pleaded allegations in the Complaint are assumed to be true.

1

Limited and $95.8 million posted by XL Broad Market. The Trustee's theory is that, in making

these payments to NatWest, the XL Funds were not doing what they appeared to be doing—

investing the capital placed with them by their investors—but rather passing to NatWest money

that was really the property of BLMIS. How could the money invested by the XL Funds be the

property of BLMIS? The Trustee's answer is to juxtapose three allegations about a multitude of

seemingly unrelated money transfers that occurred in the six years prior to Madoff's collapse: (a)

the XL Funds invested in the swaps with NatWest by posting cash collateral; (b) the XL Funds

received wires from four Madoff feeder funds (the "Rye Feeder Funds"); and (c) the Rye Feeder

Funds made redemptions from BLMIS. The Trustee then labels the collateral payments made by

the XL Funds to NatWest in (a) as "subsequent transfers" and the redemptions paid by BLMIS to

the Rye Feeder Funds in (c) as "initial transfers," and conveniently concludes that the former

consisted of BLMIS customer property that he can now "recover" from NatWest. This

speculative theorizing does not substitute for the kind of plausible, non-conclusory allegations of

fact tying (a), (b) and (c) together that would be required to sustain the Trustee's claim.

One irony of the Trustee's theory is that, according to its own logic, NatWest took the

$180 million in XL Fund collateral payments and . . . returned it to BLMIS! Upon receiving the

collateral payments from the XL Funds, NatWest hedged its exposure under the swaps by

investing three times the amount of the collateral with two of the Rye Feeder Funds (Rye

Portfolio Limited and Rye Broad Market). According to the Trustee's theory, any money sent or

received by the Rye Feeder Funds—including NatWest's investments in them—should be

deemed sent or received by BLMIS. Thus, the Trustee's claims for "recovery" of the XL Fund

collateral payments should be dismissed because, per the Complaint's own allegations, NatWest

previously "returned" all that money—indeed, three times that amount of money—to BLMIS.

2

In addition to the $180 million in XL Fund collateral payments, the Trustee seeks to "recover" approximately $128 million that NatWest received when it unwound some of its hedges on the XL Fund swaps (and its hedge on a similar transaction with another Madoff feeder fund known as Harley International (Cayman) Ltd. ("Harley")) by redeeming from the relevant feeder fund. Once again, in lieu of well pled facts, the Trustee juxtaposes allegations about a large number of seemingly unrelated money transfers: (a) NatWest unwound $128 million of its hedges ($25 million in 2007, the rest in 2008) by making redemptions from the three feeder funds (Rye Portfolio Limited, Rye Broad Market, and Harley); and (b) those three feeder funds made $1.931 billion in redemptions from BLMIS over the course of the six years that preceded Madoff's collapse. The Trustee then labels the specific redemption amounts paid by the feeder funds to NatWest (a) as "subsequent transfers," and all of the many redemptions paid by BLMIS to the feeder funds (b) as "initial transfers," and conveniently concludes that the so-called "subsequent transfers" consisted of BLMIS customer property that he can now "recover" from NatWest. However, the Complaint lacks any non-conclusory allegations of fact tying (a) to (b), including any attempt to specify which of $1.931 billion in "initial transfers" that BLMIS allegedly made to the feeder funds over the course of six years ($609 million to Rye Portfolio Limited, $252 million to Rye Broad Market, and $1.073 billion to Harley) he now proposes to take back by recovering $128 million from NatWest in his claims.

Additionally, with respect to all of the Trustee's claims (both those concerning the $180 million in XL Fund collateral payments and those concerning the $128 million in feeder fund redemptions), the Trustee's Complaint fails to the extent it seeks to claw back transfers from BLMIS that the Trustee proposes can be avoided as constructive fraudulent conveyances pursuant to Section 544 of the Code. As the district court previously held, all of the alleged

"initial transfers" in this case from BLMIS to the Rye Feeder Funds and Harley are protected from avoidance pursuant to Section 544 by the safe harbors contained in Sections 546(e) and 546(g) of the Code. As a result, because Section 544 is the only way to avoid transfers out of BLMIS that occurred more than two years before the Filing Date, all claims for recovery of such transfers must be dismissed. One consequence is that avoidance and recovery of BLMIS payments that occurred within two years of the Filing Date can only be had, if at all, via Section 548(a)(1) intentional fraudulent conveyance avoidance. Moreover, another consequence is that certain of the Trustee's recovery claims predicated on Section 548(a)(1)—claims to recover alleged "subsequent transfers" that were not preceded by any initial transfers within the two-year look-back period of Section 548—must be dismissed.

The Complaint should also be dismissed because the Trustee has failed adequately to allege—indeed appears to have abdicated his responsibility to allege—the elements necessary to avoid any of the two-year "initial transfers" alleged in the Complaint pursuant to Section 548(a)(1) of the Code. In particular, the Complaint does not deign to allege that BLMIS had the requisite intent necessary to state a claim for intentional fraudulent conveyance.

Finally, the Complaint should be dismissed because on its face it establishes the good faith defense.

## BACKGROUND

### I.    The XL Funds Transfer Cash to NatWest as Collateral for Two Swap Transactions

The XL Funds—XL Portfolio Limited and XL Broad Market—aimed to provide returns to their investors by investing fund assets in swap transactions with NatWest and other financial institution counterparties. *See* Compl. ¶ 3. In each of two swap transactions with NatWest, the relevant XL Fund posted cash "collateral" with NatWest and, in exchange, NatWest agreed to

provide three times the returns that would have been generated if that amount were invested in a specified Rye Feeder Fund that invested with BLMIS. *Id.* ¶ 6.

In aggregate, the XL Funds posted $313 million in cash collateral with NatWest. Specifically, XL Portfolio Limited posted $217 million in cash collateral between September 2006 and July 2007. *See id.* ¶ 202 and Ex. P. And XL Broad Market posted $95.8 million in cash collateral to NatWest between November 2007 and August 2008. *See id.* ¶ 207 and Ex. O. Of the $313 million total of collateral payments, the Trustee labels $180 million ($84.6 million from XL Portfolio Limited and $95.8 million from XL Broad Market) as "subsequent transfers" of BLMIS property and seeks to "recover" them pursuant to Section 550 of the Code.

## II.    NatWest Hedges Its Exposure to the XL Fund Swap Transactions by Investing in Two Rye Feeder Funds, Rye Broad Market and Rye Portfolio Limited

By virtue of the XL Fund swap transactions, NatWest was exposed to the XL Funds in the sense that if the two Rye Feeder Funds referenced in the swaps went up in value, NatWest would be obliged to pay the XL Funds three times the returns that would have been earned by hypothetical investments of the XL Fund collateral payments in the referenced funds. The two Rye Feeder Funds referenced in the swaps were Rye Portfolio Limited and Rye Broad Market; accordingly, NatWest hedged its exposure by investing three times the amount of the collateral payments in those two funds. Specifically, because the XL Funds posted $313 million of cash collateral with NatWest in connection with swaps referencing Rye Portfolio Limited and Rye Broad Market, NatWest invested more than $900 million in those two funds.

## III.    NatWest Makes Redemptions from Rye Portfolio Limited and Rye Broad Market

Under the XL Fund swap agreements, the XL Funds were permitted to adjust the size of their synthetic investments by reducing the amount of collateral they posted with NatWest. When this occurred, NatWest would redeem a portion of its investments in the referenced fund

5

and return collateral to the XL Funds. As alleged in the Complaint, of its more than $900 million

in hedge investments, NatWest redeemed (a) $104.5 million from Rye Portfolio Limited in

connection with the XL Portfolio Limited swap, *id.* ¶ 203, and (b) $1.4 million from Rye Broad

Market in connection with the XL Broad Market swap. *Id*. ¶ 208.

## IV.    The Harley Transaction

The Trustee also seeks to recover $21.8 million in redemptions that NatWest made from

Harley, another Madoff feeder fund. *Id.* ¶ 12. In a transaction similar to the XL Fund swap

transactions, NatWest "sold to a counterparty the future performance over three years of a 3.7

times levered exposure to Harley, less the costs of financing such an investment in Harley and

less a profit margin." *Id.* Having hedged its exposure by investing in Harley, NatWest in

December 2008 redeemed $21.8 million from Harley, which the Trustee alleges constitutes

subsequent transfers of BLMIS customer property. *Id.*

**ARGUMENT**

## I.    All Claims for Recovery Should Be Dismissed Because the Trustee Has Failed to Plausibly Tie the Money Received by NatWest to "Initial Transfers" out of BLMIS

The Complaint fails because the Trustee has not plausibly tied any of the money that

NatWest received to the alleged "initial transfers" out of BLMIS. In short, the Complaint fails to

plausibly allege that NatWest was a "subsequent transferee" of BLMIS property.

All of the Trustee's claims are for "recovery" of avoided transfers pursuant to 11 U.S.C.

§ 550. That section gives the Trustee the power to "recover" any avoided transfer from either

"the initial transferee of such transfer," "the entity for whose benefit such transfer was made," or

"any immediate or mediate transferee of such initial transferee" (a so-called "subsequent

transferee"). *Id.* § 550(a)(1)-(2). In this proceeding, the Trustee does not allege that NatWest was

an "initial transferee" from BLMIS or an "entity for whose benefit [any] such transfer was

6

made." Rather, the Trustee's theory is that NatWest was a "subsequent transferee" which

received BLMIS property from a variety of hedge funds that were "initial transferee[s]." *Id*.

In order to state a claim for recovery from an alleged "subsequent transferee," the Trustee

"must allege facts that support the inference that the funds at issue originated with BLMIS, and

contain the necessary vital statistics—the who, when, and how much of the transfers to establish

that an entity was a subsequent transferee of the funds." *Picard v. Shapiro (In re Bernard L.*

*Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (quotations omitted).

Although, "the Trustee is not required to provide a dollar-for-dollar accounting . . . barebones

allegations that the funds at issue were transferred to the Subsequent Transferees, without more

detail, are insufficient." *Id.* (quotation omitted). A complaint must "tie [an] initial transfer to any

subsequent transfer or Subsequent Transferee." *Id.* (rejecting as insufficient allegation that "the

Initial Transferee Defendants subsequently transferred a portion of the [money] received from

BLMIS to the Subsequent Transferee Defendants" (internal quotation omitted)).

### A.    The Trustee Has Failed to Allege that the XL Fund Collateral Payments Were "Subsequent Transfers" Tied to Particular "Initial Transfers" out of BLMIS

The Trustee fails to plausibly tie the $84.6 million in XL Portfolio collateral payments or

the $95.8 million in XL Broad Market collateral payments back to any particular "initial

transfer" out of BLMIS. Thus, the collateral payments are not adequately alleged to be

"subsequent transfers," and the Trustee's bid to "recover" them as alleged BLMIS property must

be dismissed. In support of his claim to "recover" the XL Fund collateral payments, the Trustee

has an elaborate, two-step theory, neither step of which is supported by well-pleaded facts.

In the first step of the Trustee's theory, he speculates that the XL Funds might have

funded the $180 million, not with capital they had received from their investors, but with money

that they received from the four Rye Feeder Funds. The $84.6 million in XL Portfolio Limited

collateral payments supposedly came from two of the Rye Feeder Funds: Rye Portfolio Limited

(from which XL Portfolio received $74 million) and Rye Insurance LDC (from which XL

Portfolio Limited received $10.3 million). *See* Compl. ¶¶ 200-02. The $95.8 million in XL Broad

Market collateral payments supposedly came from the two other Rye Feeder Funds, Rye Broad

Market and Rye Prime Fund, that together transferred approximately $341 million to XL Broad

Market over six years (the Complaint does not say which of these $341 million in transfers were

supposedly used to fund the $95.8 million in XL Broad Market collateral payments, or what

portion of that amount came from Rye Broad Market versus Rye Prime Fund). *See id.* ¶¶ 205-07.

The Complaint does not allege the existence or non-existence of any fact that would

plausibly support the conclusion that the XL Funds funded their collateral payments to NatWest

with money received from the Rye Feeder Funds, or otherwise tie the collateral payments back to

the Rye Feeder Funds. To the contrary, the sparse allegations that are in the Complaint—and the

absence of other allegations one would expect to see if the Trustee's theory had any basis in

fact—strongly contradict the Trustee's theory. The Complaint alleges that the source of the XL

Funds' investment capital was investors whom the XL Funds solicited with private placement

memoranda that described the XL Funds' swap transaction investments. *See id.* ¶ 40[3]; ¶ 41

(alleging that the XL Funds each issued a "Confidential Private Placement Memorandum" to

"potential investors that described its 'Counterparties,' including Defendant, as highly rated

financial institutions"). However, the Complaint omits to allege the amount of capital that the XL

---

[3]    Notably, the Trustee does not allege that the "feeder funds" made or were directed to make redemptions from BLMIS in order to transfer money to the XL Funds. Moreover, the Trustee's allegation that the "feeder funds" invested "nearly all" of their money "directly or indirectly with BLMIS," *id.* ¶ 39, is equally consistent with an individual investing money with a feeder fund for the sole purpose of investing in an XL Fund for the purpose of a swap transaction with NatWest. Such an investment would not be BLMIS "customer property." *Id.*

8

Funds (a) received from such investors just prior to making the collateral payments to NatWest, and (b) had on hand at that time. The Complaint does not allege that the Rye Feeder Funds were among the investors in the XL Funds (let alone the primary or sole investors), nor that they instructed the XL Funds to use their money to make collateral payments to NatWest (or had any ability or reason to do so). The Complaint merely alleges that, over six years, the XL Funds received a number of transfers from the Rye Feeder Funds. But the Complaint does not explain why this may have occurred or why it should lead to the conclusion that an unspecified set of $180 million of those transfers were used by the XL Funds to make collateral payments to NatWest. For example, the Complaint does not allege that the XL Funds had investments in the Rye Feeder Funds, or that they redeemed any such investments in order to re-invest the money in the swaps, as opposed to returning it to fund investors. There is a complete absence of the information—about relationships, capital, inflow and outflow of money—that one would need to reasonably conclude that the XL Funds sourced their collateral payments from the Rye Feeder Funds.

The Trustee's failure to allege that the collateral payments were "subsequent transfers" of money received from the Rye Feeder Funds is particularly acute with respect to his allegations concerning the XL Portfolio collateral payments, as to which the Trustee himself appears to have concerns. The Trustee has carefully omitted even a conclusory allegation that the $84.6 million the he seeks to recover as the "XL Portfolio Limited Subsequent Transfers" ever passed from the XL Funds to NatWest; rather, in the second sentence of Paragraph 202 of the Complaint, he noticeably defines the "XL Portfolio Limited Subsequent Transfers" that the Trustee seeks to recover, not as the $84.6 million that NatWest received from the XL Funds, but as the $84.6 million that *the XL Funds received from the Rye Feeder Funds*. *See id.* ¶ 202. In fact, the Trustee

more or less admits, in a footnote, that he has no basis to make the conclusion that he does about the source of the XL Portfolio collateral payments. *Id.* ¶ 202 n.1 ("Upon complete discovery and review of comprehensive bank records of XL Portfolio Limited, which are not currently available to the Trustee, additional transfers of customer property to XL Portfolio Limited, and/or from XL Portfolio Limited to Defendant, may be identified.").

And the Trustee's own allegations demonstrate that $32,330,373 of the XL Portfolio transfers that the Trustee seeks could not possibly have been customer property. The last of the transfers from XL Portfolio Limited to NatWest on which the Trustee relies was on July 2, 2007. *See id.*, Ex. P. But 11 of the transfers from feeder funds to XL Portfolio Limited on which the Trustee relies to claim that NatWest received customer property came *after* that date. *See id.*, Exs. K, N. These transfers could not possibly have been passed on to NatWest, since XL Portfolio Limited made no transfers to NatWest after they were received. *Compare id.*, Ex. P with *id.*, Exs. K, N.[4]

The pleading failures described above only concern the first step in the Trustee's attempt to link the XL Fund collateral payments back to "initial transfers" out of BLMIS. Even if there was reason to think that the XL Funds used money received from the Rye Feeder Funds to make the collateral payments, the Trustee still must plausibly tie the money received from the Rye Feeder Funds back to "initial transfers" out of BLMIS. Thus, in the second step of the Trustee's

---

[4]    Second, the Trustee seeks to recover $95,833,333 transferred by XL Broad Market as part of a swap transaction in 2007. *Id.* ¶ 207. Again, since XL Broad Market did not itself invest with BLMIS, the Trustee relies on the fact that XL Broad Market received transfers in excess of $95 million to claim that all of the $95 million was customer property. *Id.* (While this series of transactions does not present the same impossibility problem as the XL Portfolio Transactions, it is still the case that many of the transactions that the Trustee relies on for the amount of customer property received post-date the last transfer from XL Broad Market to NatWest. *Compare id.*, Exs. D, G *with id.*, Ex, O.)

theory, he speculates that the Rye Feeder Funds funded their $180 million in transfers to the XL

Funds (which the XL Funds supposedly used to fund some of their collateral payments) with

money that they had received from BLMIS, in the transfers which the Trustee labels as "initial

transfers."

However, in aggregate, in multiple transfers over six years, the Rye Feeder Funds

received approximately $1.9 billion of these so-called "initial transfers" from BLMIS. *See id.* ¶¶

187-98. The Complaint does not allege anything that ties the $180 million in collateral

payments—which supposedly can be traced from the Rye Feeder Funds to the XL Funds and

finally to NatWest as collateral payments (the alleged "subsequent transfers")—back to any

specific Rye Feeder Fund redemption from BLMIS (the alleged "initial transfers"). NatWest and

the Court are left to guess which of the $1.9 billion in "initial transfers" from BLMIS to the Rye

Feeder Funds, made over the course of six years, the Trustee is really seeking to "recover" by

clawing back the collateral payments received by NatWest.

### B. The Trustee Has Failed to Allege that NatWest's Redemptions from Feeder Funds Were "Subsequent Transfers" Tied to Particular "Initial Transfers" out of BLMIS

The Trustee also fails to plausibly tie NatWest's redemptions of its hedge investments in

Rye Portfolio Limited ($104.5 million), Rye Broad Market ($1.4 million), and Harley ($21.8

million) back to any particular "initial transfer" out of BLMIS. Thus, the redemption payments,

like the XL Fund collateral payments, are not adequately alleged to be "subsequent transfers,"

and the Trustee's bid to "recover" them as alleged BLMIS property must be dismissed.

In support of his claims to claw back these $128 million in redemptions, the Trustee

theorizes that Rye Portfolio Limited, Rye Broad Market, and Harley funded their redemption

payments to NatWest with money that they received from BLMIS, in transfers that the Trustee

labels as "initial transfers." However, in aggregate, in multiple transfers over six years:

- Rye Portfolio Limited received approximately $609 million in these so-called "initial transfers" (Compl. ¶ 193);

- Rye Broad Market received approximately $252 million in these so-called "initial transfers" (*Id.* ¶ 187); and

- Harley received approximately $1.073 billion in these so-called "initial transfers" (*Id.* ¶ 214).

The Complaint fails to tie the $128 million in NatWest feeder fund redemptions (the alleged "subsequent transfers") back to any one of these redemptions from BLMIS (the alleged "initial transfers"), and the Court and NatWest are left to guess which of the $1.934 billion in "initial transfers" from BLMIS, made over the course of six years, the Trustee is really seeking to "recover" by clawing back the redemption payments received by NatWest, leaving open the possibility that the Trustee is seeking to recover transfers he has already recovered, is in the process of recovering in other proceedings, or is seeking to recover twice in this proceeding.

Moreover, the Complaint is devoid of non-conclusory factual allegations that would lead to the conclusion that any of these three feeder funds in fact funded NatWest's redemptions with their own redemptions from BLMIS. The Trustee has appended several tables purporting to show transfers of money from BLMIS to these funds, and from the funds to NatWest, but does not allege, with the detail required to be plausible, that any transfers from the three funds to NatWest actually were customer property, as *Shapiro* requires. And the mere assertion that they were is conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007).

\*\*\*

The Trustee's failure to adequately plead with respect to the transfers at issue in this case is twofold. First, he has failed to plausibly tie what he calls "subsequent transfers" back to any of what he calls the "initial transfers." Second, he has alleged an extraordinary number of "initial

12

transfers," but does not identify which of those "initial transfers" he is seeking to recover in this proceeding. Each failure requires dismissal of the entire Complaint.

## II.    All Claims to "Recover" Collateral Payments Received by NatWest Should Be Dismissed Because, According to the Logic of the Complaint, NatWest Has Already "Returned" That Money to BLMIS

The Complaint fails as to the collateral payments because, assuming the allegations of the complaint are true, NatWest immediately *returned* all of the collateral payments to BLMIS. As explained in the previous section, the Complaint fails to sufficiently allege that the XL Fund collateral payments were BLMIS customer property. But even accepting the Trustee's speculation, the Complaint also alleges that this money was passed back to BLMIS, netting out the transfer.[5]

The Trustee seeks $84.6 million in XL Portfolio collateral payments and $95.8 million in XL Broad Market collateral payments. *See* Compl. ¶¶ 202, 207. But the Trustee also alleges that, in both swap transactions, NatWest proceeded to invest three times the amount of collateral it received from the XL Funds in Rye Feeder Funds, which in turn it invested in BLMIS. *Id.* ¶¶ 7, 39. That means, that NatWest transferred back the money it supposedly received indirectly from BLMIS—the collateral payments have already been "recovered" from NatWest.

Rather than recognizing this, the Trustee is attempting to double dip and "recover" money from NatWest that it simultaneously alleges that NatWest already returned to BLMIS. This of course is contrary to common sense, equity, and the goals of SIPA. It is also in tension with the Trustee's own "Net Investment Method," which calculates a customer's net equity by summing the amount of money deposited by a customer and subtracting the amount withdrawn by the customer. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229,

---

[5]    In fact, since NatWest is alleged in both instances to have invested three times the collateral in a feeder fund, NatWest's net transfer was to rather than from BLMIS.

233 (2d Cir. 2011). Here the Trustee turns his approach on its head and wants to look only at transfers allegedly from BLMIS and not consider whether the money was then transferred back to BLMIS.

### III.    All Claims Predicated on Avoidance of Initial Transfers Pursuant to Section 544 Should Be Dismissed Because They Are Barred by the Section 546 Safe Harbors

To state a claim for recovery of a transfer pursuant to Section 550, the Trustee must adequately allege, among other things, that the transfer is avoidable. *See* 11 U.S.C. § 550(a) (providing that a trustee may recover a transfer "to the extent that a transfer is avoided"). To meet this element of his claim, the Trustee's primary theory is that all of the alleged initial transfers from BLMIS to the Feeder Funds are avoidable pursuant to Section 544 of the Code, which provides for the avoidance of transfers that are constructive fraudulent conveyances under federal or state law. However, the Section 544 theory fails. The Trustee cannot avoid any of the initial transfers pursuant to Section 544 because the Section 546 safe harbors—which expressly protect against Section 544 avoidance—are applicable as a matter of law (*see* Part III.A below). This has significant consequences for the Trustee's recovery claims (*see* Part III.B).

### A.   The Section 546 Safe Harbors Protect All of the Alleged "Initial Transfers" from Avoidance Pursuant to Section 544

The two Section 546 safe harbors that bar avoidance of the alleged initial transfers in this proceeding are Section 546(e) and Section 546(g). The Trustee may not avoid the subsequent transfers to NatWest because NatWest falls within the statutory safe harbors. A "subsequent transferee," who gave value "is protected indirectly to the extent that the initial transfer is not avoidable because of the safe harbor." *Picard v. BNP Paribas*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018); *see also Picard v. ABN AMRO Bank (Ireland) Ltd. (In re BLMIS)*, 505 B.R.

14

135, 143-44 (S.D.N.Y. 2013) (explaining that when a subsequent transferee raises section 546(g)

as a defense, the question is whether the initial transfer is protected by section 546(g)).[6]

### 1.    The Section 546(e) Safe Harbor Protects All Alleged "Initial Transfers"

Section 546(e) provides that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

---

[6]    That the Trustee has avoided the initial transfers does not suffice to show avoidability of the subsequent transfers, because the settlement with the Tremont Defendants and the default judgment with Harley do not determine the safe harbor's applicability. *See, e.g.*, *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 746 (citing *Leshin v. Welt (In re Warmus),* 276 B.R. 688, 694-95 (S.D. Fla. 2002) ("subsequent transferee not collaterally estopped from contesting avoidability following settlement between trustee and initial transferee"); *Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.),* 168 B.R. 408, 416 (Bankr. D. Ariz. 1994) (trustee who obtained a default judgment against the initial transferee was required to prove every element of preference or fraudulent transfer against the subsequent transferee); *VFB L.L.C. v. Money's Trust (In re VF Brands, Inc.),* 282 B.R. 134, 139 (Bankr. D. Del. 2002) (denying motion for stay pending appeal on the ground, *inter alia,* that the movant, a subsequent transferee, would not be collaterally estopped from contesting any issue decided in the action between the trustee and the initial transferee)). The Tremont Defendants and Harley could have claimed the safe harbor, and therefore NatWest may now claim its protection. *See Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC*), No. 08-01789, 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield II*") (Morris, C.J.) ("Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, as is the case here . . . , the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against recovery of those funds."); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 JSR, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*") (same, citing *Fabrikant*, 394 B.R. at 744 ("[D]ue process require that transferees who claim an interest in . . . property . . . have a full and fair opportunity to contest claims of fraudulent transfer.")); *see also ABN AMRO*, 505 B.R. at 143 (S.D.N.Y. 2013) ("Even though the [initial transferees] did not raise section 546(g) as a defense, the instant defendants are nonetheless entitled to do so in the context of the Trustee's recovery action against them as subsequent transferees.").

11 U.S.C.A. § 546(e).

The district court has already held that the Section 546(e) safe harbor protects all of the initial transfers alleged in the Complaint from avoidance. *Cohmad*, the Section 546(e) decision, resulted from the District Court's withdrawal of the reference in many adversary proceedings (including this one) to address "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550." Section 546(e) Briefing Order, *In re Madoff Sec.*, No. 12-MC-115 (S.D.N.Y. May 16, 2012), ECF No. 119 ("Briefing Order"). The *Cohmad* decision was binding on a number of adversary proceedings, including this one, *see* Briefing Order, Ex. A, lines 9, 29 (ECF No. 119, at 13, 17), and held that "*the Bankruptcy Court must adjudicate those claims in the first instance consistent with this Opinion*." *Cohmad*, 2013 WL 1609154, at *10 (emphasis added). As the *Cohmad* Court itself later explained its own decision, it "found that, in the majority of cases, section 546(e) requires the dismissal of the Trustee's avoidance claims." *ABN AMRO*, 505 B.R. at 142.

Section 546(e) applies to transfers made by or to or for the benefit of a covered entity and in connection with a securities contract or settlement payment. Section 546(e) is "broad" and requires only that a transfer be made "in connection with" a securities contract, meaning that the transfer must be "related to" that securities contract. *Cohmad*, 2013 WL 1609154, at *9. *Cohmad* held that "the definition of a securities contract . . . includes . . . redemption requests . . . and total return swaps" (the two types of transfers at issue here). *Id*. *8. Also, the term "for the benefit" is interpreted broadly—for a transfer to be "for the benefit of" a covered entity, there must be "some intent-to-benefit on the part of either the initial transferee or the debtor: that is, either of the parties to the initial transfer must have contemplated that defendants would benefit from the transfer." *ABN AMRO*, 505 B.R. at 149.

16

The initial transfers alleged to underly the transfers to NatWest were in connection with securities contracts between BLMIS and the Tremont and Harley funds but were also in connection with securities contracts between NatWest and Tremont and Harley. The safe harbor applies to transfers "in connection with a securities contract," not just to transfers in connection with *the* securities contract between the initial transferor and transferee. *See, e.g.*, *Cohmad*, 2013 WL 1609154, at *9 ("Nowhere in the language of Section 546(e) is such a relationship explicitly required," but "[r]ather, a broader reading of the securities contracts covered by the Section 546(e) safe harbor is implied.").

> Take, for example, a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract. Assuming that either the investment fund or the investor qualifies as a financial institution or financial participant, and barring other circumstances that may appear on the facts of a given case, that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

*Id.*

Much as *Cohmad* held the definition of "securities contract" per the safe harbor was expansive, it also held a settlement payment covers any "transfer of cash or securities made to complete a securities transaction" (i.e., all the transfers alleged here). *Id.* at 9 n.5 (citing *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)). Further, "a transfer can be part of a chain of payments that together constitute a settlement payment." *Id.* at *9. "To the extent that, for example, an initial transfer from Madoff [S]ecurities to an investment fund customer and the subsequent transfer from the investment fund to its redeeming investors

may together comprise a 'settlement payment' under *Enron*, *see id.* at 339, that transfer may fall

within the purview of Section 546(e) . . . ." *Id.* at \*9 n.5. (citing *Enron*, 651 F.3d at 339).[7]

As the Second Circuit has already held in a prior adversary proceeding in this SIPA case,

BLMIS is a stockbroker. *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y.

2012) (footnote and citation omitted), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773

F.3d 411 (2d Cir. 2014) ("*Fishman*") ("It is not disputed [by the Trustee] that BLMIS was a

'stockbroker' for the purposes of § 546(e)."). *Fishman*, 773 F.3d at 417. Further, Section

101(22A) defines "financial participant" as an entity that at the relevant time "has one or more

agreements or transactions . . . of a total gross dollar value of not less than $1,000,000,000 in

notional or actual principal amount outstanding (aggregated across counterparties) . . . or has

gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties)

in one or more such agreements or transactions with the debtor or any other entity." 11 U.S.C.

§ 101(22A). This Court has already held that NatWest satisfies this definition of financial

participant. *ABN AMRO*, 505 B.R. at 148 ("As for ABN/RBS, the Rye XL Portfolio swap

involved $141 million in collateral, while the Rye XL LP swap involved $87.5 million in

collateral, directly implying notional values far in excess of the Bankruptcy Code's $100 million

requirement.").

The Complaint itself alleges that NatWest is a "financial institution," and that fact is not

in dispute. *See, e.g.*, Compl. ¶¶ 31, 41.[8] Judicially noticeable public registry information

---

[7]   Although NatWest disputes the allegations, which are implausible as discussed above, the Trustee's allegations would mean that Tremont and Harley Initial Transfers were caused by NatWest's redemption requests. *See Cohmad*, 2013 WL 1609154, at \*9 (and were therefore in connection with those securities contracts and were settlement payments).

[8]   In addition, the Trustee has also established that Harley and the Tremont Funds meet the definition of financial participants (large market participants with substantial exposure to other participants through securities contracts or other qualified financial contracts). *See, e.g.*, Compl.

confirms NatWest's status as a bank during the relevant period.[9] *See also Cohmad*, 2013 WL

1609154, at *8 ("[A] bank" "is a financial institution." (citing *Contemporary Indus. Corp. v.*

*Frost*, 564 F.3d 981, 987 (8th Cir. 2009))). The Complaint also alleges that the Harley Initial

Transfers are all "for the benefit of" NatWest. Compl. ¶ 217. (Though the Complaint does not

use the same words, it makes the same allegations of the Tremont Initial Transfers. *Id.* ¶¶ 203,

208.) Thus, the initial transfers were for the benefit of a financial institution or financial

participant.

Satisfying the requirements to qualify for Section 546(e), the initial transfers alleged to

have been passed to NatWest were made by a stockbroker (BLMIS) and to and for the benefit of

a financial institution and/or financial participant (to Tremont/Harley and for the benefit of

NatWest), although any one of those participants alone would be sufficient; and were made in

connection with both multiple securities contracts and settlement payments, although any one

securities contract or settlement payment would be sufficient. Section 546(e)'s purpose is

therefore "achieved by protecting" NatWest's "reasonable expectations" and dismissing the

Trustee's claims. *Cohmad*, 2013 WL 1609154, at *4.

---

¶¶ 109 (Tremont had outstanding transactions with total gross value of $2.1 billion), 212 (Harley had outstanding transactions with total gross value of $1,072,800,000); *see also* 11 U.S.C § 101(22A); H.R. Rep. No. 106-711, pt. 2, at 55 (2000). Because Tremont and Harley also contracted banks to hold their funds and act as their agent in making their redemption payments, Compl. ¶¶ 45, 69, 71, 72, Tremont and Harley also qualify as financial institutions. *See, e.g., In re Fairfield Sentry Ltd.*, No. 10-13164, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield I*"), app. pending (S.D.N.Y. No. 1:19-cv-03911-VSB). Therefore, the initial transfers are also to financial institutions or financial participants.

[9]      *See* DE NEDERLANDSCHE BANK, *NatWest Markets N.V.: Information Detail*, https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTDG&relationNumber=B0148 (last accessed May 1, 2022) (identifying NatWest as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"). Judicial notice can be taken of such records. *See Tribune I*, 946 F.3d at 77, 80; *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005); *Fairfield II*, 2020 WL 7345988, at *6.

### 2.    The Section 546(g) Safe Harbor Protects All "Initial Transfers" Which Allegedly Related to Subsequent Redemptions by NatWest

One set of initial transfers from BLMIS to the Feeder Funds—the ones that were allegedly used by Rye Portfolio Limited, Rye Broad Market, and Harley to fund $104.5 million, $1.4 million and $21,799,920, respectively, in redemption requests made by NatWest—are protected from avoidance not only by Section 546(e), but also by Section 546(g). Compl. ¶¶ 9, 11, 12.

Section 546(g) provides that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C.A. § 546(g).

Again, the applicability of the Section 546(g) safe harbor to these transfers has already been decided by the district court. Section 546(g) operates in almost the same fashion as Section 546(e), except that instead of shielding transfers made in connection with securities contracts, it shields transfers made in connection with swap agreements and by or to or for the benefit of swap participants or financial participants.

Discussing the Tremont transactions, *ABN AMRO* held that NatWest's redemption requests were made in connection with reductions in collateral in the underlying swap agreements. 505 B.R. at 147-50 ("Through this causal chain, it is clear that the initial transfers of the redemption payments were related to, and therefore made in connection with, the underlying swap agreements."). Much as 546(e) protects chains of transfers, 546(g) also explicitly permits "collapsing transactions" to protect "multi-layered transactions." *Id.* at 148.

Reiterating the reasoning from *Cohmad*, *ABN AMRO* again held that "in connection with" is a broad standard that "simply means that the transfer must be related to such an agreement."

*Id.* at 145. And as discussed above, "for the benefit of" is similarly expansive. *Id.* at 149.

"Furthermore, the fact that the initial transferees [the Rye Funds, Rye Insurance LDC, and Rye

Prime Fund] and the synthetic funds [the XL Funds] were owned and operated by Tremont

Partners suggests a coordinated scheme to leverage their investments." *Id.* at 147-48.

"Since the funds' withdrawals were directly caused by the defendants' request for

redemptions," *ABN AMRO* held that "these initial transfers were 'for the benefit' of defendants

as redeeming investors," i.e., swap participants, financial participants, and financial institutions,

"who benefited by maintaining their perfect hedge on the swap transactions." *Id.* at 149-50.[10] As

already discussed above, the initial transfers were made by a stockbroker and to and for the

benefit of financial participants. That Tremont, Harley, and NatWest are all swap participants

provides additional (and unnecessary) cumulative grounds for protection.

The term "swap participant" means an entity that, at any time before the filing of the

petition, has an outstanding swap agreement with the debtor. 11 U.S.C. § 101(53C). The

Complaint states that the relationships between Tremont and NatWest and between Harley and

NatWest began because Tremont and Harley required leverage, which NatWest agreed to

provide in exchange for collateral as part of the "total return swap" transactions that form the

basis of the relationships. Compl. ¶¶ 6, 12. Thus, all transfers to the funds that entered the swaps

with NatWest, to the extent the Trustee alleges (however implausibly) they were subsequent

transfers to NatWest were transfers to or for the benefit of swap participants, both to the Tremont

Feeder Funds and Harley and for the benefit of NatWest. Initial transfers to funds that made

---

[10]     Although, as discussed in the previous section regarding 546(e), NatWest disputes the
Trustee's allegations, and argues they are implausible (*see* Section I, *supra*), the Trustee's
allegations themselves suggest the transfers were in connection with redemption requests made to
reduce collateral in connection with the swap agreements. *Id.* at 146, 149-50.

subsequent transfers to funds that entered the swaps with NatWest—i.e., initial transfers to Rye

Funds, Rye Prime Fund, and Rye Insurance LDC, all of which thereafter made transfers to XL

Funds—are also, to the extent the Trustee alleges (implausibly) they underly subsequent transfers

to NatWest, transfers for the benefit of swap participants (both NatWest and the XL Funds).

*ABN AMRO* has thus already held that the Trustee may not recover $127,663,920 of the

monies he seeks because he alleges those funds were redemption payments. 505 B.R. at 150

(holding "section 546(g)'s safe harbor protects the redemption payments . . . from recovery");

Compl. ¶¶ 9, 11, 12. As explained below, because none of the redemption payments are subject

to avoidance under 548(a)(1)(A), either because they do not fall within the two-year lookback

period, or even if they do, the Trustee has failed to plead the requisite intent, the safe harbor

protects them all.

**B.    The Effect of the Section 546 Safe Harbors on the Trustee's Recovery Claims**

Because the Section 546 safe harbors preclude the Trustee from avoiding any initial

transfers pursuant to Section 544, there are two significant consequences for the Trustee's

recovery claims. And those consequences accrue to the recovery claims even to the extent the

Trustee seeks to avoid the initial transfers as intentional fraudulent conveyances pursuant to

Section 548(a)(1), which is not subject to the safe harbors.

**1.    All Claims for Recovery of "Initial Transfers" That Occurred More
Than Two Years Prior to the Petition Must Be Dismissed**

The first consequence of the applicability of the safe harbors is that all of the Trustee's

recovery claims based on initial transfers which occurred more than two years prior to the Filing

Date must be dismissed. Because the safe harbors preclude the Trustee from avoiding initial

transfers pursuant to Section 544, the Trustee may only avoid transfers pursuant to Section 548.

However, unlike Section 544—which allows avoidance of transfers that occurred more than two

years prior to the petition—Section 548 only allows avoidance of transfers within a two-year

look-back period. Thus, the Trustee can only argue for avoidance of transfers within that two-

year look-back period, and as discussed below even those are not avoidable because the Trustee

has failed to establish the applicability of Section 548. Regardless, all claims for recovery based

on initial transfers which occurred more than two years prior to the petition must be dismissed.

> **2.     Claims for "Recovery" of Alleged "Subsequent Transfers" That Were Not Preceded by Any "Initial Transfers" Occurring Within the Two-Year Look-Back Period Must Be Dismissed**

The second consequence of the applicability of the safe harbors is that certain of the

Trustee's claims—those to recover alleged subsequent transfers that were not preceded by any

initial transfers within the two-year look-back period of Section 548—also must be dismissed.

As explained below, these particular claims for recovery must be dismissed because the transfers

to NatWest upon which they are based were not preceded in time by any actionable initial

transfer (rather, they were preceded only by older initial transfers that are protected by the safe

harbors).

> a.     NatWest's Redemption of $25 Million from Rye Portfolio Limited on September 4, 2007

According to the Complaint, on September 4, 2007, NatWest received a $25 million

redemption payment from Rye Portfolio Limited (the "September 4, 2007 Rye Portfolio

Redemption Payment"). *See* Compl., Ex. J. The Trustee's claim for recovery of the September 4,

2007 Rye Portfolio Redemption Payment should be dismissed because it was not preceded in

time by any actionable initial transfer to Rye Portfolio Limited.

Two sets of alleged initial transfers to Rye Portfolio Limited are at issue. First, the

Trustee alleges that Rye Portfolio Limited received $259 million in a number of initial transfers

that occurred more than two years before the Filing Date. *See* Compl. ¶¶ 193-94. However, these

older transfers—which given their vintage could only have been avoided pursuant to Section 544—are protected by the safe harbors and therefore not avoidable. Therefore, they cannot serve as the basis for the Trustee's claim to recover the September 4, 2007 Redemption Payment.

Second, the Trustee alleges that Rye Portfolio Limited received three payments totaling $350 million from BLMIS *within* the two years preceding the Filing Date. *See* Compl. ¶ 194 (citing Compl., Ex. I). These transfers are recent enough that they could be avoided pursuant to Section 548 irrespective of the Section 546 safe harbors. However, they also cannot serve as the basis for the Trustee's claim to recover the September 4, 2007 Rye Portfolio Redemption Payment. This is because BLMIS transferred the $350 million to Rye Portfolio Limited in 2008, well *after* NatWest received the September 4, 2007 Rye Portfolio Redemption Payment. Obviously, NatWest could not have been the subsequent recipient in September 2007 of initial transfers that Rye Portfolio Limited did not receive until 2008.

> b.   NatWest's Receipt of Collateral Payments from XL Portfolio Limited

For XL Portfolio Limited, $125 million of the transfers to NatWest are alleged to have been made outside of the two-year look-back period. *Id.*, Ex. P. The other $92 million of transfers is only supported by $20 million of transfers that the Trustee alleges predated the subsequent transfers (both from Rye Portfolio Limited to XL Portfolio Limited on January 2, 2007). *Id.*, Ex. K. The remainder of the initial transfers occurred after the subsequent transfers. And no transfers from BLMIS to Rye Portfolio Limited were made during the two-year look-back period and prior to the date of the alleged $20 million in subsequent transfers. *Id.*, Ex. I. Thus, none of the XL Portfolio Limited alleged subsequent transfers to NatWest come within the two-year look-back, and regardless of Section 548(a)(1)(A) the safe harbors apply to bar all

alleged XL Portfolio Limited subsequent transfers.[11] Likewise, because the only BLMIS transfer

to Rye Insurance LDC within the two-year look-back period was made after the last subsequent

transfer from Rye Insurance LDC to XL Portfolio Limited, none of the transfers from XL

Portfolio Limited come within the two-year applicability of Section 548(a)(1)(A) (because none

originate from initial transfers within the two-year period). *Id.*, Exs. M, N.

## IV.  All Recovery Claims Predicated on Avoidance of "Initial Transfers" Pursuant to Section 548(a)(1)(A) Should Be Dismissed Because the Trustee Has Failed to Plead the Necessary Fraudulent Intent

The Trustee has failed to plead the necessary intent to qualify for Section 548(a)(1)(A).

Section 548(a)(1)(A) requires the Trustee to plead that BLMIS "made" each "transfer"

challenged "with actual intent to hinder, delay, or defraud any entity to which the debtor was or

became, on or after the date that such transfer was made."[12] Because "'actual intent to hinder,

delay or defraud' constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P.

9(b)." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56

(2d Cir. 2005) (citation omitted); *see also Official Comm. of Unsecured Creditors of Verestar,*

---

[11]     For XL Broad Market, the Complaint alleges $95,833,333 in transfers to NatWest, an amount originating from some combination of $48,387,616 in Rye Broad Market transfers to XL Broad Market and $292,472,765 in Rye Prime Fund transfers to XL Broad Market. *Id.* ¶¶ 205-07. One million of the Rye Broad Market transfers to XL Broad Market was made outside the two-year period. In addition, of the remaining $47,387,616 Rye Broad Market is alleged to have transferred to XL Broad Market, only a single $20,000,000 initial transfer within the two-year period is alleged in support of $45,687,616 in subsequent transfers (those subsequent transfers made between July 3, 2007 and September 2, 2008). *Id.*, Exs. B, D. Thus, the Trustee has only alleged $21,700,000 in subsequent transfers from Rye Broad Market within the two-year period. In addition, a single transfer of $20,000,000 from BLMIS to Rye Prime Fund is alleged to support $25,513,076 of subsequent transfers from Rye Prime Fund to XL Broad Market (those made between July 3, 2007 and March 3, 2008); and a single transfer from BLMIS to Rye Prime Fund of $475,000,000 is alleged to support the remaining $266,959,689 of transfers from Rye Prime Fund to XL Broad Market (those subsequent transfers made between March 26, 2008 and November 24, 2008). *Id.*, Exs. F, G.
[12]     Although the relevant intent is the intent of the debtor, the Trustee has also not pled Tremont or Harley acted with the requisite intent.

25

*Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 459-60 (Bankr. S.D.N.Y. 2006)

("*Verestar*") (applicable to adversary proceedings by Fed. R. Bankr. P. 7009). Under Rule 9(b),

"conclusory allegations that do not evidence fraudulent intent with respect to the specific

transfers challenged do not suffice," even if "combined with its alter ego allegations" about an

"alleged overall pattern of inappropriate transfers." *Verestar*, 343 B.R. at 468 (internal quotation

marks omitted).

The Complaint is devoid of any allegations that, if proved, would establish that in making

any of the alleged "Rye Broad Market Two Year Transfers," "Rye Prime Fund Two Year

Transfers," "Rye Portfolio Limited Two Year Transfers," "Rye Insurance LDC Two Year

Transfers," or "Harley Two Year Initial Transfers," BLMIS acted with the requisite intent to

"hinder, delay or defraud" creditors, as opposed to merely honoring its contractual commitments

to Tremont and Harley.[13] For example, transfers made to return capital to Tremont or Harley or

to satisfy an antecedent debt were not made to "hinder, delay, or defraud" creditors. Mere

allegations that BLMIS made transfers does not suffice to show fraudulent intent. The Trustee

has, in fact, pleaded nothing at all about BLMIS's intent in making any (much less each) of the

"specific transfers challenged" here. He has therefore failed to plead avoidability based on actual

intent to defraud at all, let alone with the particularity Rule 9(b) requires.

Rather than plead the intent required by Section 548(a)(1)(A), the Trustee apparently

relies on the "Ponzi scheme presumption"—a judicially created shortcut that would excuse him

from actually pleading and proving fraudulent intent, instead "presum[ing] that transfers from a

---

[13]    NatWest does not admit that any of what the Complaint alleges are "Rye Broad Market Two Year Transfers," "Rye Prime Fund Two Year Transfers," "Rye Portfolio Limited Two Year Transfers," "Rye Insurance LDC Two Year Transfers," or "Harley Two Year Initial Transfers" fall within the two-year period, but accepts that these are the only transfers the Trustee alleges have been made within the two-year period.

debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an

antecedent debt." *Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 201

(2d Cir. 2021) ("*Citibank*") (Menashi, J., concurring), *cert. denied*, 142 S. Ct. 1209 (2022). This

"presumption," however, lacks any foundation in Section 548(a)(1)(A). That provision does not

even mention Ponzi schemes, much less authorize courts to relax the Trustee's pleading burden,

merely by incanting the phrase "Ponzi scheme." No decision of the United States Supreme Court

has recognized the "Ponzi scheme presumption." The "presumption" was devised by judges in

out-of-Circuit cases, such as *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R.

843 (D. Utah 1987) ("*Independent Clearing*") (en banc). And, although the Second Circuit has

on occasion applied it "when its application was uncontested," it has not sanctioned use of the

"presumption" in any case where the issue was litigated nor "held directly that the presumption

is well-founded." *Citibank*, 12 F.4th at 202 n.7 (Menashi, J., concurring).[14]

---

[14]     Although the Trustee may argue that the "Ponzi scheme presumption" is the law of the
case because it has been applied in other adversary proceedings within the BLMIS liquidation,
*see, e.g., Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Secs. LLC)*, 445 B.R. 206, 220
(Bankr. S.D.N.Y. 2011) ("*Chais*"), the "law of the case" doctrine does not create an absolute bar
to reconsideration of the issue—particularly now that a Second Circuit judge has, for the first
time, trenchantly questioned the viability of the "presumption." *See Virgin Atl. Airways, Ltd. v.
Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The law of the case doctrine is
admittedly discretionary and does not limit a court's power to reconsider its own decisions prior
to final judgment."); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("[L]aw of the
case is an amorphous concept" which "does not limit the tribunal's power.").
    Further, some courts within the Circuit have recognized that "[s]imply because a debtor
conducts its business fraudulently does not make every single payment by the debtor subject to
avoidance." *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 489 (D. Conn. 2002)
(internal quotation marks and citation omitted); *see also Lustig v. Weisz & Assocs., Inc. (In re
Unified Com. Capital, Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("*Unified*"), *aff'd*, No.
01-MBK-6004L, 6005L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002); *Balaber-Strauss v. Sixty-
Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680-81 (Bankr. S.D.N.Y. 2000)
("Not every transaction which has the effect of 'exacerbating the harm to creditors by increasing
the amount of claims while diminishing the debtor's estate' is a fraudulent conveyance. Section
548 is not a catch-all provision."), *aff'd*, 264 B.R. 303, 308 (S.D.N.Y. 2001).

In his thoughtful concurring opinion in *Citibank,* Judge Menashi explained that the "Ponzi scheme presumption" represents a "questionable" application of fraudulent transfer statutes. *Id*. at 202. This is so for several cogent reasons.

*First*, Section 548(a)(1)(A) is focused "on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (construing Minnesota UFTA), *cited with approval in Citibank*, 12 F.4th at 201 Section 548(a)(1)(A) requires a showing that the debtor, in making the *particular transfers* claimed to be avoidable, acted with the requisite intent; this necessitates an "asset-by-asset and transfer-by-transfer" inquiry, which "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Id.*; *see also Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018) (following *Finn*).

*Second*, the "Ponzi scheme presumption" is based on the hypothesis that *whenever* a Ponzi scheme operator "makes payments to present investors," it does so for the purpose of "attract[ing] new investors." *Independent Clearing*, 77 B.R. at 860. But even if the operator makes *some* payments for that purpose, it does not follow that *all* of its payments are so intended—especially in the later stages of a long-running scheme like Madoff's, which began in the 1970s, Compl. ¶ 26, more than 26 years before the first "Rye Broad Market Two Year Transfer," "Rye Prime Fund Two Year Transfer," "Rye Portfolio Limited Two Year Transfer," "Rye Insurance LDC Two Year Transfer," or "Harley Two Year Initial Transfer." The Trustee should be held to his burden of pleading that each transfer was made with actual fraudulent intent, not relieved of that obligation by applying an overbroad and counterintuitive "presumption."

*Third*, the "Ponzi scheme presumption," as Judge Menashi explained, has been rejected by courts "on the ground that it improperly treats preferences as fraudulent transfers," *Citibank*, 12 F.4th at 201, thereby "obscur[ing] the essential distinction between fraudulent transfers and preferences," *id*. at 202. Although the law of preferences, *see, e.g.,* 11 U.S.C. § 547, is intended to promote an equal distribution among creditors, the "Ponzi scheme presumption" deploys fraudulent transfer law to do so, which is at odds with its purpose. *See Citibank,* 12 F.4th at 201; *Unified*, 260 B.R. at 350.

*Finally*, the "Ponzi scheme presumption" conflicts with Rule 9(b), which requires particularity in pleading how each transfer was made with actual intent to defraud. *See, e.g., Sharp*, 403 F.3d at 56. "Presuming" away the critical element of Section 548(a)(1)(A) essentially creates a "Ponzi scheme exception" to both the Code and Rule 9(b). If such exceptions are to be created, Congress—and not the courts—should create them. *See Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi, J., concurring)).

The Complaint alleges nothing whatsoever about BLMIS's intent in making the specific "Rye Broad Market Two Year Transfers," "Rye Prime Fund Two Year Transfers," "Rye Portfolio Limited Two Year Transfers," "Rye Insurance LDC Two Year Transfers," or "Harley Two Year Initial Transfers," still less that they were made with the requisite fraudulent intent. In addition, the Trustee does not plead at all, much less with particularity, that those specific transfers were made without consideration. Nor could he: transfers by which BLMIS simply returned Tremont and Harley's previous investments were made with consideration and do not qualify for avoidance. *See Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (S.D.N.Y. 2013) ("[A] trustee is not permitted to sue innocent investors in a Ponzi scheme under fraudulent

29

transfer law for the return of their principal . . . .").[15] Section 546's safe harbors therefore apply

to those transfers. Section 548(a)(1)(A) has no effect on the safe harbor. Claims based on those

transfers alleged to have been made within the two-year period, as well as those based on alleged

initial transfers made outside of the two-year period, should be dismissed.

## V.    The Complaint Establishes the Good Faith Defense as a Matter of Law

"Under the Bankruptcy Code, a transferee may retain transfers it took 'for value' and 'in

good faith.'" *Citibank*, 12 F.4th at 178 (citing 11 U.S.C. §§ 548(c), 550(b)). "[G]ood faith" is

judged by an "inquiry notice" standard, "signif[ying] actual awareness of suspicious facts that

would have led a reasonable [transferee], acting diligently, to investigate further and by doing so

discover' a debtor-transferor's fraud." *Id.* at 191 (quotation omitted). Courts first examine what a

defendant knew, second determine whether knowing those facts a reasonable person would have

conducted further inquiry, and third whether inquiry would have led to discovery of the

fraudulent purpose of the transfer. *Id.* at 191-92.

While good faith is an affirmative defense, and the Trustee need not plead the lack of

good faith, *id.* at 200, in this case, the Trustee's own Complaint establishes the defense.[16] The

Complaint contains no specific allegations that NatWest knew any suspicious facts that would

have put it on inquiry notice, much less that would have led it to discover the BLMIS fraud

through further inquiry. Instead, the Complaint contains general allegations concerning "red

---

[15]    *See also Citibank*, 12 F.4th at 203 (Menashi, J., concurring) (noting that BLMIS customers'
deposits of principal into their accounts create valid contractual antecedent debts).

[16]    The Complaint clearly establishes that all of the transfers at issue were "for value"
because they were either received as part of swap transactions in exchange for a promise to pay
leveraged returns, Compl. ¶¶ 6-11, 202, 207, or were equity redemptions, *id.* ¶¶ 12, 203, 208,
217. *See* Dkt. 200 at 20-21.

flags" about BLMIS. *Id.* ¶¶ 77-108.[17] But this fraud-by-hindsight theory has been repeatedly

rejected by the Second Circuit. *See, e.g.*, Dkt. 200 at 25-26. "[T]he more compelling inference as

to why Madoff's fraud went undetected for two decades was his proficiency in covering up his

scheme and deceiving the SEC and other financial professionals." *Meridian Horizon Fund, LP v.*

*KPMB (Cayman)*, 487 F. App'x 636, 641 (2d Cir. 2012) (quotation omitted). These "red flags"

were "common knowledge." Dkt. 200 at 26. If they were common knowledge and Madoff's

fraud was undetected, it cannot be the case that a reasonable person knowing those facts would

have conducted further inquiry and that further inquiry would have led to discovery of Madoff's

fraud.

To make matters worse for the Trustee, he also alleges that NatWest "negotiated special

rights that would be triggered if BLMIS were no longer the 'Account Manager' or able to carry

out the SSC Strategy," Compl. ¶ 60, as well as priority redemption rights, *id.* ¶¶ 61-62. As this

Court has explained, "[t]he fact that the Defendant was insisting on fraud protections or special

redemption rights implies its belief that the reference funds' investments with BLMIS had

value." Dkt. 200 at 31. And as this Court has also explained, the Trustee's own allegations

establish that NatWest entrusted a huge amount of its *own capital*, "which dwarfed the amount of

any fees it earned." *Id.* at 28. The idea that NatWest did so knowing that BLMIS was a fraud is a

"preposterous theory." *Id.*

Notably, this Court's prior conclusions are not premised on a generic idea that a

sophisticated entity would never invest in a Ponzi scheme. Rather, the Court concluded, based on

the facts alleged by the Trustee, that it was wholly implausible that NatWest knew BLMIS was a

---

[17]     The Complaint also contains allegations concerning what *Tremont* knew, *id.* ¶¶ 109-81,
and specifically alleges that Tremont took measures to keep its clients ignorant of facts about
BLMIS, *id.* ¶¶ 142-51. These allegations, of course, say nothing about what NatWest knew.

Ponzi scheme or was willfully blind to that fact. The same facts reinforce the conclusion that the

Trustee's own allegations establish that a reasonable transferee knowing what NatWest knew,

would not have conducted a further inquiry that would have led to discovery of the BLMIS

fraud.

## VI.    Conclusion

Because the Trustee has failed to establish that any of the transfers at issue constitute

customer property, making allegations that are not only implausible but often impossible, the

Court should dismiss the Complaint. The claims seeking to claw back collateral payments should

also be dismissed, because the Trustee himself alleges that these payments were already

returned. Moreover, the Section 546 safe harbors bar the Trustee's claims and the Trustee has

failed to allege the necessary fraudulent intent to recover pursuant to Section 548(a)(1)(A).

Finally, because the Trustee's allegations establish that NatWest took for value and in good faith,

the Trustee may not avoid any transfers to NatWest. For the foregoing reasons, because the

Trustee has failed to satisfy the pleading standard, his claims should proceed no further.


Dated: May 23, 2022                              Respectfully submitted,

                                                 */s/ Michael S. Feldberg*

                                                 Michael S. Feldberg
                                                 REICHMAN JORGENSEN LEHMAN &
                                                 FELDBERG LLP
                                                 750 Third Avenue, Suite 2400
                                                 New York, New York 10017
                                                 Tel: (212) 381-1965
                                                 mfeldberg@reichmanjorgensen.com


                                                 *Attorneys for Defendant NatWest N.V.*

32