# Exhibit 8

# 12-2557-bk(L)

**12-2497-bk(CON), 12-2500-bk(CON), 12-2557-bk(CON), 12-2616-bk(CON), 12-3422-bk(CON), 12-3440-bk(CON), 12-3582-bk(CON), 12-3585-bk(CON)**

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

In Re: Bernard L. Madoff Investment Securities LLC,

*Debtor.*

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

*Plaintiff-Appellant,*

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR PLAINTIFF-APPELLANT IRVING H. PICARD,
AS TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED
SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT
SECURITIES LLC AND BERNARD L. MADOFF**

DAVID J. SHEEHAN, ESQ.
OREN J. WARSHAVSKY, ESQ.
TRACY L. COLE, ESQ.
SEANNA R. BROWN, ESQ.
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Plaintiff-Appellant
Irving H. Picard, As Trustee for
the Substantively Consolidated
SIPA Liquidation of Bernard L.
Madoff Investment Securities LLC
and Bernard L. Madoff*

(*Counsel continued on inside cover*)

SECURITIES INVESTOR PROTECTION CORPORATION,
Statutory Intervenor pursuant to Securities Investor Protection Act,
15 U.S.C. § 78eee(d),

*Intervenor-Appellant,*

—against—

IDA FISHMAN REVOCABLE TRUST, PAUL S. SHURMAN, in his capacity as co-trustee of the Ida Fishman Revocable Trust, WILLIAM SHURMAN, in his capacity as co-trustee of the Ida Fishman Revocable Trust and as Executor of the estate of Ida Fishman,

*Defendants-Appellees.*

———————————————

HOWARD L. SIMON, ESQ.
WINDELS MARX LANE
  & MITTENDORF LLP
156 West 56th Street
New York, New York 10019
(212) 237-1000

*Conflicts Counsel for Trustee*

MATTHEW B. LUNN, ESQ.
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rockefeller Center
1270 Avenue of the Americas,
  Suite 2210
New York, New York 10020
(212) 332-8840

*Conflicts Counsel for Trustee*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.....................................................................1

INTRODUCTION .................................................................................................2

STATEMENT OF THE ISSUES.........................................................................5

STATEMENT OF THE CASE.............................................................................6

     A.    The Securities Investor Protection Act. ...................................7

     B.    BLMIS and Its Customers. ........................................................9

          1.    The Account Opening Documents. .................................9

          2.    No Trades Took Place. ...................................................11

          3.    Madoff's Ponzi Scheme Created Winners and
                 Losers..................................................................................13

     C.    The "Net Investment" Method Governs the BLMIS
          Liquidation. .................................................................................14

     D.    The Proceedings Below. ...........................................................16

          1.    *Picard v. Katz* and the Subsequent Motions to
                 Withdraw. ........................................................................16

          2.    The District Court's Decision........................................18

          3.    This Appeal......................................................................20

SUMMARY OF THE ARGUMENT ..................................................................21

STANDARD OF REVIEW ................................................................................25

ARGUMENT .......................................................................................................25

     I.    Section 546(e) Does Not Apply Where There Are No Securities
        Transactions..............................................................................................25

        A.    Section 546(e) Does Not Shield Any Relevant Transfers
            Because BLMIS Did Not Conduct Securities
            Transactions. .............................................................................26

        B.    The Transfers Were Not Settlement Payments Because
            No Securities Transactions Were Ever Initiated,
            Executed, Completed, or Settled................................................29

        C.    The Transfers Were Not in Connection With a Securities
            Contract Because No Securities Transactions Occurred. ........35

# TABLE OF CONTENTS
## (continued)

II.    The Account Opening Documents Are Not Securities
       Contracts. ........................................................................... 37

       A.    The Plain Language of the Statute Requires a Contract
             for the Purchase or Sale of Securities. .................................. 37

       B.    The Account Opening Documents Established the
             Customer Relationship But Did Not Exchange Cash for
             Securities. ................................................................. 40

       C.    The Account Opening Documents Are Not Master
             Agreements. ............................................................... 42

       D.    The Account Opening Documents Are Not Security
             Agreements. ............................................................... 46

       E.    Deeming Account Opening Documents as Securities
             Contracts Conflicts With SIPA. ......................................... 48

III.   The District Court Ignored SIPA and This Court's *Net Equity
       Decision*. .......................................................................... 51

IV.    Even if Section 546(e) Applied, its Application Would Require
       Determinations of Fact. .......................................................... 56

V.     Invoking Section 546(e) Does Not Mandate Withdrawal of the
       Reference to the Bankruptcy Court. ............................................ 58

CONCLUSION ................................................................................ 63

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adler Coleman Clearing Corp.*,
   195 B.R. 266 (Bankr. S.D.N.Y. 1996) ................................................................. 61

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   351 F. Supp. 2d 79 (S.D.N.Y. 2004) .................................................................. 56

*In re Appleseed's Intermediate Holdings, LLC*,
   470 B.R. 289 (D. Del. 2012) ............................................................................. 56

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25
   (2012) ............................................................................................................ *passim*

*Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*,
   590 F.3d 252 (3d Cir. 2009) ............................................................................. 30

*Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp.
   of Am.)*,
   460 B.R. 360 (Bankr. S.D.N.Y. 2011) ............................................................... 43

*Castro v. Marine Midland Bank*,
   695 F. Supp. 1548 (S.D.N.Y. 1988) ..................................................... 22, 23, 41

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ............................................................................. 25

*City of New York v. Exxon Corp.*,
   932 F.2d 1020 (2d Cir. 1991) ........................................................................... 59

*Clark-Fitzpatrick v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (1987) ...................................................................................... 39

*Contemporary Indus. Corp. v. Frost*,
   564 F.3d 981 (8th Cir. 2009) ............................................................................ 30

*Enron Corp. v. JP Morgan Sec., Inc.*,
   No. M-47 (GBD), 2008 WL 281972 (S.D.N.Y. Jan. 25, 2008) ......................... 62

*Enron Creditors Recovery Corp. v. Alfa S.A.B. de C.V. (In re Enron
   Creditors Recovery Corp.)*,
   651 F.3d 329 (2d Cir. 2011) ......................................................................... *passim*

# TABLE OF AUTHORITIES
## (continued)

*Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*,
450 B.R. 414 (Bankr. S.D.N.Y. 2011)....................................................27, 35, 61

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
343 B.R. 63 (S.D.N.Y. 2006) ...............................................................................60

*Grede v. FCStone*,
485 B.R. 854 (N.D. Ill. 2013) ..............................................................................35

*GSGSB, Inc. v. N.Y. Yankees*,
862 F. Supp. 1160 (S.D.N.Y. 1994) .....................................................................57

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*,
83 B.R. 880 (D.N.J. 1988) ....................................................................................50

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*,
185 B.R. 680 (S.D.N.Y. 1995) .............................................................................60

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
263 B.R. 406 (S.D.N.Y. 2001) .............................................................................62

*Johnson v. Neilson (In re Slatkin)*,
525 F.3d 805 (9th Cir. 2008) ................................................................................62

*Jonas v. Resolution Trust Corp. (In re Comark)*,
971 F.2d 322 (9th Cir. 1992) ................................................................................30

*Julien J. Studly, Inc. v. N.Y. News, Inc.*,
70 N.Y.2d 628 (1987) ...........................................................................................39

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
913 F.2d 846 (10th Cir. 1990) .................................................................27, 30, 33

*Kaiser Steel Corp. v. Pearl Brewery Co. (In re Kaiser Steel)*,
952 F.2d 1230 (10th Cir. 1991) .....................................................................32, 43

*Keene Corp. v. Williams Bailey & Wesner L.L.P. (In re Keene Corp.)*,
182 B.R. 379 (S.D.N.Y. 1995) .............................................................................60

*Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*,
321 B.R. 527 (B.A.P. 9th Cir. 2005) ....................................................................62

# TABLE OF AUTHORITIES
## (continued)

*Lashua v. LaDuke*,
  707 N.Y.S.2d 542 (3d Dept. 2000) .......................................................47

*Lehman Bros. Inc. v. JPMorgan Chase Bank (In re Lehman Bros. Holdings)*,
  469 B.R. 415 (Bankr. S.D.N.Y. 2012) ..................................................46

*Lowenschuss v. Resorts Int'l, Inc. ( In re Resorts Int'l, Inc.)*,
  181 F.3d 505 (3d Cir. 1999) ................................................................30

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 2:10-cv-0302 (MRP), 2011 WL 4389689 (C.D. Cal. May 5, 2011) ..........48

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999) ....................................................62

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*,
  936 F.2d 640 (2d Cir. 1991) ................................................................41

*In re New Times Sec. Servs., Inc.*,
  371 F.3d 68, 74, 88 (2d Cir. 2004) .......................................................28

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v.
  Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
  453 B.R. 201(Bankr. S.D.N.Y. 2011) ...................................................61

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v.
  Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
  480 B.R. 468 (S.D.N.Y. 2012) ............................................................39

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011) ...................................................*passim*

*Picard v. Katz*,
  No. 11-cv-3605 (JSR), 2011 WL 7267859 (S.D.N.Y. July 5, 2011) ................17

*Picard v. Katz*,
  No. 11-cv-3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5, 2012) .................34

*Picard v. Madoff*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011)................................................16, 38, 61, 62

# TABLE OF AUTHORITIES
## (continued)

*Picard v. Merkin*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010)..............................................16, 38, 51, 62

*Picard v. Merkin*,
No. 11-mc-0012 (KMW), 2011 WL 3897970
(S.D.N.Y. Aug. 31, 2011) .................................................................16, 38, 56, 62

*Price v. Crestar Sec. Corp.*,
44 F. Supp. 2d 351 (D.D.C. 1999) .......................................................................41

*QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*,
571 F.3d 545 (6th Cir. 2009) ...............................................................................30

*Richardson Greenshields Sec. v. Lau*,
819 F. Supp. 1246 (S.D.N.Y. 1993) .....................................................................41

*Royal Bank & Trust Co. v. Pereira (In re Lady Madonna Indus.)*,
99 B.R. 536 (S.D.N.Y. 1989) ...............................................................................47

*Sec. Investor Prot. Corp. v. Barbour*,
421 U.S. 412 (1975)................................................................................................7

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010)..............................................11, 12, 13, 29

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
No. 12-mc-00115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ..........45

*Sec. Investor Prot. Corp. v. Charisma Sec. Corp.*,
506 F.2d 1191 (2d Cir. 1974) ..............................................................................48

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*,
922 F.2d 984 (2d Cir. 1990) ..........................................................................59, 60

*Stotler & Co. v. Commodity Futures Trading Comm'n*,
855 F.2d 1288 (7th Cir. 1988) ................................................................22, 23, 40

*Union Bank v. Wolas*,
502 U.S. 151 (1991)..............................................................................................49

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988) ...........................................................................................26

*United States v. Chen*,
    127 F.3d 286 (2d Cir. 1997) .............................................................................36

*United States v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    63 B.R. 600 (S.D.N.Y. 1986) ...........................................................................59

*In re Vicars Ins. Agency, Inc.*,
    96 F.3d 949 (7th Cir. 1996) ..............................................................................25

*Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*,
    466 B.R. 188 (S.D.N.Y. 2011) .........................................................................63

*Wider v. Wootton*,
    907 F.2d 570 (5th Cir. 1990) ............................................................................62

**STATUTES**

11 U.S.C. § 101 ...........................................................................................3, 26

11 U.S.C. § 101(37) .........................................................................................47

11 U.S.C. § 101(49) .........................................................................................32

11 U.S.C. § 101(50) .........................................................................................47

11 U.S.C. § 101(51) .........................................................................................47

11 U.S.C. § 544 ................................................................................................20

11 U.S.C. § 546(e) ......................................................................................*passim*

11 U.S.C. § 547 ................................................................................................20

11 U.S.C. § 548(a)(1)(A) .................................................................................27

11 U.S.C. § 548(a)(1)(B) .................................................................................20

11 U.S.C. § 741(7)(A)(i) ..................................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

11 U.S.C. § 741(7)(A)(x) ........................................................................22, 42

11 U.S.C. § 741(7)(A)(xi) ........................................................................*passim*

11 U.S.C. § 741(8) ........................................................................30

15 U.S.C. § 78aaa ........................................................................1

15 U.S.C. § 78eee(b)(2)(A) ........................................................................1

15 U.S.C. § 78eee(b)(4) ........................................................................1, 60

15 U.S.C. § 78fff-1 ........................................................................23

15 U.S.C. § 78fff-1(a) ........................................................................49

15 U.S.C. § 78fff-2(c)(1) ........................................................................52

15 U.S.C. § 78fff-2(c)(3) ........................................................................7, 23, 49, 52

15 U.S.C. § 78fff(a)(1)(B) ........................................................................52

15 U.S.C. § 78fff(b) ........................................................................8, 48, 60, 61

15 U.S.C. § 78*lll*(4) ........................................................................7

15 U.S.C. § 78*lll*(4)(D) ........................................................................7

28 U.S.C. § 157(d) ........................................................................*passim*

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1334(b) ........................................................................1

## RULES

17 C.F.R. § 240.17a-4 ........................................................................40, 41

Fed. R. App. P. 3(b)(2) ........................................................................1

Fed. R. Civ. P. 12(b)(6) ........................................................................25

Fed. R. Civ. P. 54(b) ........................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

FINRA Rule 4512 (2011) ...................................................................40, 41

NASD Rule 2510(b) (2005)........................................................................41

NYSE Rule 408 (2008)...............................................................................41

**LEGISLATIVE HISTORY**

*Bankr. of Commodity and Sec. Brokers: Hearings Before the Subcomm. on
Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 97th
Cong. 287 (1981) ..................................................................................51

*Bankr. Treatment of Swap Agreements and Forward Contracts: Hearing on
H.R. 2057 Before the Subcomm. on Econ. and Commercial Law of the H.
Comm. on the Judiciary*, 101st Cong. 14 (1990)................................44

H.R. Rep. 97-420 (1982)............................................................................27

H.R. Rep. No. 101-285 (1990)....................................................................44

H.R. Rep. No. 106-123 (1999)....................................................................48

**OTHER AUTHORITIES**

*Nat'l Sec. Clearing Corp: Order Granting Registration and Statement of
Reasons*, Exchange Act Release No. 13,163 n.56, 42 Fed. Reg. 3920
(Jan. 13, 1977).......................................................................................31

*In re The Full Registration as Clearing Agencies of:, Depository Trust Co.,
Stock Clearing Corp., Midwest Sec. Trust Co., Options Clearing Corp.,
Midwest Clearing, Sec. & Exchange Comm'n*, Exchange Act Release No.
20,221 n.33, 28 SEC Docket 1175-2 (Sept. 23, 1983) .......................31

Int'l Swap Dealers Ass'n, *User's Guide to the 1992 ISDA Master
Agreements* 1-8 (1993 ed.).....................................................................43

Paul C. Harding, *Mastering the ISDA Master Agreements (1992 and 2002)*
19-27 (2d ed. 2004)...............................................................................43

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Southern District of New York

had subject matter jurisdiction under 28 U.S.C. § 1334(b) and 15 U.S.C.

§§ 78eee(b)(2)(A) and 78eee(b)(4) over the avoidance actions that are the subject

of this appeal brought by Irving H. Picard, as trustee ("Trustee") for the estate of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] substantively

consolidated with the estate of Bernard L. Madoff ("Madoff").  The United States

District Court for the Southern District of New York withdrew the reference to the

bankruptcy court under 28 U.S.C. § 157(d) in these avoidance actions.

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from

final partial judgments that the district court entered under Fed. R. Civ. P. 54(b).

The district court certified its dismissals as final judgments on May 23, 2012 and

July 27, 2012.  (SPA-164-65; SPA-187-88.)  On June 21, 2012 and August 13,

2012, the Trustee timely filed notices of appeal.  (A-3834-4212; A-4536-4914; A-

5447-5673; A-5883-6109.)  This Court consolidated the appeals under Fed. R.

App. P. 3(b)(2).

---

[1] References to SIPA sections hereinafter shall replace "15 U.S.C." with "SIPA."

## **INTRODUCTION**

This appeal presents issues arising from the massive Ponzi scheme run through BLMIS, requiring the Court again to consider the legal import of Madoff's failure to engage in any securities trading for his Investment Advisory ("IA") customers.

This Court previously analyzed SIPA—the customer protection statute for BLMIS's customers—and recognized that not only were the trades fictional but also that they were impossible to execute in the marketplace: the "fictional customer statements were generated based on after-the-fact stock 'trades' using already-published trading data to pick advantageous historical prices."   *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 232 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) ("*Net Equity Decision*").  Accordingly, in determining customer claims under SIPA, customer expectations based on fictitious account statements could not be protected, as those statements were fabricated "to conceal the fact that [BLMIS] *engaged in no trading activity whatsoever*" and "did not reflect any actual trading or holdings of securities by [BLMIS] on behalf of the customer."  *Id.* at 231-32 (emphasis added).

2

The district court below held that section 546(e),[2] which creates a safe

harbor for certain transfers related to securities transactions, shields transfers from

BLMIS because many customers *believed* Madoff was engaged in securities

transactions. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Madoff Sec.)*, 476 B.R. 715, 722 (S.D.N.Y. 2012) ("*Greiff*"); (SPA-43).[3] The

district court applied section 546(e)—a statute intended to protect securities

transactions in securities markets—to protect instead what it viewed as the

legitimate expectations of a certain subset of customers. (SPA-43.) In doing so,

the district court's order disregarded section 546(e)'s plain language and purpose,

and ran afoul of this Court's holding in *Enron Creditors Recovery Corp. v. Alfa*

*S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329 (2d Cir.

2011).

The district court also interpreted section 546(e) in a way that violates SIPA,

both on its face and as applied by this Court in the *Net Equity Decision*. In its

effort to protect the expectations of a subgroup of customers, the district court gave

legal effect to what this Court recognized as a fiction, treating Madoff's

---

[2] Unless otherwise specified, all section references are to the Bankruptcy Code of
1978, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

[3] For convenience, references to *Greiff* will cite to the Special Appendix and will
omit citations to the Bankruptcy Reporter.

nonexistent market as real and awarding appellees money this Court already held

they have no right to expect.  It did so by broadly ruling that practically every

transfer between a broker and its customers is subject to the safe harbor. If allowed

to stand, this ruling would undercut the avoidance powers granted by SIPA—

including its express power to avoid preferences—and interfere with its remedial

scheme.  The decision below was in error and should be reversed.

## STATEMENT OF THE ISSUES

I.      Whether section 546(e) applies to transfers unrelated to any securities transactions;

II.     Whether cash withdrawals from BLMIS constitute "settlement payments" or transfers "in connection with a securities contract" under sections 546(e), 741(7), and 741(8) where no securities transactions were initiated, executed, completed, or settled;

III.    Whether documents that open a customer brokerage account are "securities contracts" under sections 546(e) and 741(7)(A)(i),(x), or (xi);

IV.     Whether application of section 546(e) to virtually all transfers between a broker and its customer contravenes SIPA;

V.      Whether the expectations of some customers can override the equitable treatment of all BLMIS customers under SIPA as applied by this Court's *Net Equity Decision*; and

VI.     Whether invoking the section 546(e) defense to an avoidance claim mandates withdrawal of the reference to the bankruptcy court under 28 U.S.C. § 157(d).

## STATEMENT OF THE CASE

A  Ponzi scheme shifts funds among investors, paying fictional "profits" to early investors from the money of later investors.  When the scheme collapses, "net winners" are those who withdrew more than they invested.  "Net losers" are those who withdrew less than they invested and whose losses funded the net winners' gains.  Compensating net losers requires recovering fictitious profits withdrawn by net winners.

Although Madoff claimed to execute an investment strategy for his customers, he did no such thing, neither buying nor selling securities for them. Instead, BLMIS was a Ponzi scheme and its collapse created two customer classes: net winners and net losers.  Their opposing interests are the subject of this appeal.

To fulfill his statutory duties, the Trustee brought over one thousand avoidance actions to recover preferences and other transfers to customers for equitable distribution according to the net equity formula approved by this Court and contemplated by SIPA.  Certain customers here argue that such recoveries by the Trustee ought to be barred by section 546(e), a "safe harbor" against unwinding securities transactions, and that they are therefore entitled to keep the funds they withdrew from BLMIS.  The district court below agreed, holding that the safe harbor applied, even where no securities transactions existed, so long as the customers believed they did.  Because the district court's decision precludes the

6

avoidance and recovery of billions of dollars for Madoff's victims and is wrong as

a matter of law, the Trustee appeals that decision.

### A.    The Securities Investor Protection Act.

Following a spate of broker-dealer liquidations, Congress enacted SIPA in

1970 to restore confidence in the securities markets.  *See Sec. Investor Prot. Corp.*

*v. Barbour*, 421 U.S. 412 (1975).  It did so by establishing a comprehensive

remedial scheme to protect investors against a broker's insolvency.  *See id.* at 415,

421.  To do this, SIPA creates a fund of "customer property," separate from the

general estate, for priority distribution to the debtor's customers.  *See Net Equity*

*Decision*, 654 F.3d at 233.  Each customer shares ratably in this fund of assets to

the extent of their net equity.  *See id.*

To fully satisfy customers from the fund of customer property, SIPA

empowers a trustee to recover "customer property" wrongfully transferred or

unlawfully converted by the brokerage firm.  SIPA §§ 78*lll*(4), 78fff-2(c)(3)

(2000).  SIPA defines "customer property" broadly to include any "property of the

debtor which, upon compliance with applicable laws, rules, and regulations, would

have been set aside or held for the benefit of customers . . . ."  *Id.* § 78*lll*(4)(D).  By

litigating or settling with recipients of customer property and distributing that

property *pro rata* among customers, SIPA facilitates the avoidance and recovery of

customer property and "achieve[s] a fair allocation of the available resources among the customers . . . ." *Net Equity Decision*, 654 F.3d at 240.

At issue in this appeal is whether the Trustee's duty to achieve a fair allocation of customer property among this Ponzi scheme's victims is limited by section 546(e). In general, a SIPA liquidation proceeding is conducted in accordance with the provisions of the Bankruptcy Code, but where these two statutory schemes are not consistent, SIPA governs. SIPA § 78fff(b). Section 546(e) provides a "safe harbor" for transfers by a stockbroker that are "settlement payments" or made "in connection with a securities contract." 11 U.S.C. § 546(e). Here, the district court interpreted section 546(e) to reach cash transfers in connection with a Ponzi scheme that did not involve securities trades, and to immunize virtually all transfers between any stockbroker and its customers. This interpretation not only impermissibly benefits some BLMIS customers over others but places section 546(e) at odds with SIPA by interfering with a SIPA trustee's ability to recover customer property.

## B.    BLMIS and Its Customers.

Madoff operated the largest Ponzi scheme in history through BLMIS's IA

unit.  (A-598 ¶ 13; A-602 ¶ 22.)[4]  While purporting to execute a "split strike

conversion strategy" for his customers, he merely deposited customer money in a

single account, which he used to pay customer withdrawals.  (A-603 ¶ 25.)

BLMIS conducted no trades in its IA unit.  (A-602 ¶ 22.)  Appellees were

customers of BLMIS's IA unit and received transfers of fictitious profits,

preferential transfers within the ninety days preceding bankruptcy, or both.

### 1.    The Account Opening Documents.

To open an account with BLMIS, customers generally executed one or more

of three standard "Account Opening Documents:" (1) a "Customer Agreement,"

(2) an "Option Agreement," and (3) a "Trading Authorization."  (A-605 ¶ 34.)

None of these documents effected any particular securities transaction.

The Customer Agreement is a three-page document and contains general

provisions governing the customer relationship with BLMIS.  (A-1257-59.)  It

specifies choice of law, mandates arbitration for disputes, and explains that all

transactions "shall be subject" to normal market rules and customs, as well as

---

[4] Unless otherwise specified, the Trustee cites to allegations and/or exhibits in
*Picard v. Greiff*, Adv. Pro. No. 10-04357 (Bankr. S.D.N.Y.), Civil Action No. 11-
cv-03775 (S.D.N.Y.).  All such general allegations and exhibits are virtually
identical across complaints against all appellees.

applicable federal law.  (A-1257 ¶ 1; A-1258 ¶¶ 10, 12; A-1259 ¶ 13.)  So far as securities trading is concerned, it states only that the "customer understands that the Broker is acting as the Customer's agent" in any transaction (A-1258 ¶ 7), that confirmations and statements "shall be binding" unless the customer objects within ten days (*id.* ¶ 8), and that the customer "is entitled, upon appropriate demand, to receive physical delivery of fully paid securities in the Customer's Account" (A-1257 ¶ 5).  Nothing in the Customer Agreement effects or requires the purchase, sale, or loan of a security.

The Option Agreement is a two-page document consisting primarily of disclosures regarding option trading—for example, that "option trading may be highly speculative in nature."  (A-1261 ¶ 1.)  Only three provisions have any substance.  The first states that normal market rules and customs apply to any transactions and that the customer will abide by applicable rules and laws.  (*Id.* ¶ 2.)  The second provides that, if the customer does not satisfy certain obligations, BLMIS could take "any and all steps . . . necessary" to protect itself, including buying and selling for the customer account.  (*Id.* ¶ 3.)  And the third provides that BLMIS could provide preferential treatment when executing large orders in certain securities.  (A-1262 ¶ 7.)  Again, nothing in the Option Agreement effects or requires the purchase, sale, or loan of a security.

The Trading Authorization is a one-page document that designates Madoff as the customer's "agent and attorney in fact to buy, sell and trade in stocks, bonds and any other securities . . . ." (A-1264.) It authorizes BLMIS's counterparty, in executing transactions, "to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account . . . ." (*Id.*) Yet again, although this document authorized Madoff to undertake future actions to "buy, sell, and trade" securities, nothing in it effects or requires the purchase, sale, or loan of a security.

## 2.   No Trades Took Place.

Despite being authorized to do so, it is undisputed that Madoff did not buy, sell, or trade securities on behalf of his customers. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 129-30 (Bankr. S.D.N.Y. 2010) ("*Bankr. Net Equity Decision*"); (A-602 ¶ 22; SPA-35). Customer funds "were never exposed to the uncertainties or fluctuations of the securities market." *Net Equity Decision*, 654 F.3d at 232. Madoff's "split-strike conversion strategy" consisted of pretending to time the market to "purchase" a basket of stocks on the S&P 100 Index, and then pretending to hedge those purchases with related S&P 100 options contracts. *Bankr. Net Equity Decision*, 424 B.R. at 129-30. When he pretended to "sell" those positions, he pretended to always make money. His strategy was never actually executed.

11

Instead, BLMIS commingled customer money into a single checking account, fabricated customer statements and other documentation purporting to show account activity, and sent cash to customers when they requested withdrawals. *Id.* at 129. When requesting withdrawals, appellees did not seek to liquidate particular securities to fund that withdrawal. *Net Equity Decision*, 654 F.3d at 238.

To create the fraudulent customer statements, BLMIS monitored published trading data to select stocks that bought and sold at the exact prices necessary to achieve annual returns between 10 and 17 percent. *Bankr. Net Equity Decision*, 424 B.R. at 130. With the benefit of perfect hindsight—something no broker could legitimately offer its customers—BLMIS always reported positive annual returns on paper, showing "an astonishing pattern of continuously profitable trades." *Net Equity Decision*, 654 F.3d at 232. But no broker executed trades with BLMIS for its customers, no counterparties to the fictitious trades existed, and no securities were ever purchased or sold.

In fact, BLMIS made many mistakes consistent only with fabricated transactions and possible only in Madoff's fictional market. For instance, some BLMIS customer statements showed the purchase and sale of "Fidelity Spartan U.S. Treasury Money Market Fund" long after Fidelity ceased offering a fund with that name. *Bankr. Net Equity Decision*, 424 B.R. at 130. Similarly, various

12

"trades" reported by BLMIS were impossible: trades outside of the daily price range for a particular security; trades on weekends and holidays when the market was closed; backdated and retroactively changed trades; and, in many instances, trades in a particular security that greatly exceeded the entire market volume for that security.  (A-1210 ¶ 101; A-1211 ¶ 106.)  "At bottom, the BLMIS customer statements were bogus and reflected Madoff's fantasy world of trading activity, replete with fraud and devoid of any connection to market prices, volumes, or other realities."  *Bankr. Net Equity Decision*, 424 B.R. at 130.

### 3.    Madoff's Ponzi Scheme Created Winners and Losers.

As with any Ponzi scheme, Madoff's created winners and losers among his customers.  When Madoff's fraud came to an end, nearly $20 billion in customer property was gone.  (A-1196 ¶ 24.)   Billions of dollars went to customers who, through luck of timing or otherwise, made withdrawals prior to BLMIS's collapse, recovering both their own investments and some portion of the fictitious profits recorded on their account statements.  (A-603 ¶ 27.)  Because this is a zero-sum game, recovery of those fictitious profits and other avoidable transfers is necessary to compensate net losers.

At stake are billions of dollars in preferences and fictitious profits avoidable under the Bankruptcy Code, SIPA, and applicable New York law.  For example, the Apfelbaum appellees received more than $150 million in transfers of fictitious

profits within six years of the bankruptcy.  (A-2911-12 ¶ 39.)  The fictitious profits

received by these appellees consisted of the principal lost by other BLMIS

customers.  Other appellees did not receive fictitious profits but received

preferential transfers, in some cases, for millions of dollars.  (A-3250 ¶ 33.)  Under

the Bankruptcy Code and SIPA, the Trustee is entitled to recover these preference

payments to distribute *pro rata* among all BLMIS customers—including appellees

who are net losers.  And some appellees received both.  For example, River Road

Associates LLC received $6 million of fictitious profits in the six-year period and a

$44 million preference payment in the 90 days preceding bankruptcy.  (A-3594 ¶

3.)

### C.    The "Net Investment" Method Governs the BLMIS Liquidation.

Since the inception of this SIPA liquidation, the Trustee determined over

16,000 customer claims and commenced over one thousand avoidance actions to

bring money into the BLMIS estate for the benefit of Madoff's victims.  In both

determining customer claims and calculating avoidance amounts, the Trustee

employed the "Net Investment Method," which offsets the amount of money each

customer deposited with the money withdrawn from BLMIS.  Under this method,

except for insiders or those acting without good faith, customers who withdrew

less money than they invested have allowable customer claims in the amount of

their net losses.  Conversely, customers who withdrew more money than they

14

invested do not have allowable customer claims and are subject to avoidance actions to recover the fictitious profits they received in excess of their principal investment. Appellees here are either net winners who seek to retain the fictitious profits they received or customers who received preferential transfers within the ninety days preceding the liquidation.

In 2011, this Court upheld the use of the Net Investment Method for determining customer claims here, finding it to be equitable and consistent with SIPA. *Net Equity Decision*, 654 F.3d at 242. On those same grounds, it rejected net winners' argument that their claims against the estate should be based on account statements issued by BLMIS:

> Here, the profits recorded over time on the customer statements were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers. These facts provide powerful reasons for the Trustee's rejection of the Last Statement Method for calculating "net equity." In addition, if the Trustee had permitted the objecting claimants to recover based on their final account statements, this would have affected the limited amount available for distribution from the customer property fund. The inequitable consequence of such a scheme would be that those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed.

*Id.* at 238 (quotation marks, citations, and footnote omitted). Notably, this Court contrasted the circumstances of this case with "more conventional cases," such as where "securities were actually purchased . . . but then converted by the debtor" or

15

where "customers authorize or direct purchases of specific stocks," where the Last

Statement Method may be appropriate. *Id.* But here, where "Madoff constructed

account statements retrospectively, designating stocks based on advantageous

historical price information and arbitrarily distributing profits among his

customers," use of that method would "have been legal error." *Id.* at 241.

**D.    The Proceedings Below.**

**1.    *Picard v. Katz* and the Subsequent Motions to Withdraw.**

Prior to *Picard v. Katz*, the courts that considered whether section 546(e)

limited the Trustee's avoidance powers decided the question in the negative. *See,*

*e.g.*, *Picard v. Merkin*, 440 B.R. 243, 266-67 (Bankr. S.D.N.Y. 2010) ("*Merkin I*")

(section 546(e) affirmative defense could not succeed at pleading stage); *Picard v.*

*Madoff*, 458 B.R. 87, 115-17 (Bankr. S.D.N.Y. 2011) ("*Madoff Family*"). *Cf.*

*Picard v. Merkin*, No. 11-mc-0012 (KMW), 2011 WL 3897970, at \*12 (S.D.N.Y.

Aug. 31, 2011) ("*Merkin II*") (denying interlocutory appeal in absence of

"substantial grounds for difference of opinion as to the correctness of the standards

relied on by the Bankruptcy Court in its refusal—at the pleading stage—to dismiss

on the grounds of [defendants'] Section 546(e) affirmative defense"). Despite

these rulings, the district court found that application of section 546(e) to BLMIS

customer withdrawals presented complex issues, mandating withdrawal of the case

from the bankruptcy court for consideration. *Picard v. Katz*, No. 11-cv-3605 (JSR), 2011 WL 7267859, at *1 (S.D.N.Y. July 5, 2011).

Thereafter, the district court granted a motion to dismiss, holding that the "literal language" of section 546(e) precluded many of the Trustee's avoidance claims. *Picard v. Katz*, 462 B.R. 447, 452-53 (S.D.N.Y. 2011). This was so, it held, despite the absence of actual securities transactions. *Id.* The district court's rationale was that "the kind of contract[s BLMIS] had with its customers" were contracts for the purchase, sale, or loan of a security as defined by section 741(7), and therefore any payment by BLMIS to its customers was either a "settlement payment" or a "'transfer' made 'in connection with a securities contract.'" *Id.* at 451-52. The *Katz* matter was subsequently settled.

After the reference was withdrawn in *Katz*, hundreds of motions to withdraw the reference were filed, and hundreds more followed after the *Katz* decision granting the motion to dismiss. In total, over 875 motions to withdraw were filed on behalf of thousands of parties, including appellees. On November 28, 2011, the district court issued an order governing over eighty cases holding that the application of section 546(e) requires significant interpretation of "securities laws" and therefore required withdrawal of the reference (the "Withdrawal Order"). (SPA-5-19.)

17

## 2.    The District Court's Decision.

Consistent with *Katz*, the district court in *Greiff* precluded the Trustee from

avoiding both preferences and transfers of fictitious profits withdrawn more than

two years prior to BLMIS's collapse under section 546(e).  (SPA-36-46.)

Underlying the decision was the district court's view that section 546(e) was

"designed to protect the legitimate expectations of customers" and should be

interpreted in light of that purpose.  (SPA-43.)  After determining that BLMIS was

a stockbroker (SPA-38), the district court held that payments to appellees were

transfers "in connection with a securities contract," and therefore subject to section

546(e), because the Account Opening Documents "clearly qualify as securities

contracts."  (SPA-39.)  This was so, the court explained, because the Customer

Agreement "makes numerous references to securities transactions;" the Option

Agreement provided that BLMIS would carry accounts for transactions in option

contracts; and the Trading Authorization authorized Madoff to execute securities

transactions.  (*Id*.)  Thus, the Account Opening Documents gave appellees "the

expectation that [BLMIS] would perform under the account agreements by

purchasing specific securities."  (SPA-40.)

In the alternative, the district court also held that payments to appellees were

"settlement payments" and therefore subject to section 546(e).  (SPA-42.)  While

finding that this presented "a closer question," the district court was again swayed

by customer expectations—in particular, appellees' expectation that "withdrawals from their [BLMIS] accounts completed securities transactions." (SPA-40-41.) It made no difference, the court concluded, that no securities had been traded and that there was absolutely nothing to "settle," because the statute was "designed to protect the legitimate expectations of customers . . . even when the stockbroker is engaged in fraud." (SPA-43.)

Fourth, the district court held that eliminating most of the Trustee's avoidance powers did not conflict with SIPA because SIPA "expressly incorporates the limitations Title 11 places on trustee's powers." (SPA-44 n.7.) The portions of this Court's *Net Equity Decision* that cautioned against treating fictitious profits as real were simply irrelevant, the court explained, because that decision "does not even mention § 546(e)." (*Id.*)

Finally, the district court found that this Court's ruling in *Enron* mandated application of section 546(e). Explaining that before *Enron* some courts recognized an "illegal conduct" exception to section 546(e), the district court held that this exception does not survive *Enron*, and reasoned that because BLMIS engaged in illegal conduct, section 546(e) must apply here. (SPA-42.) But the Trustee does not argue that illegal conduct, standing alone, creates an exception to section 546(e). Instead, the Trustee argues that BLMIS's failure to trade securities

means that section 546(e) does not apply.  As such, the district court's ruling on "illegal conduct" is not presented by this appeal.

On May 15, 2012, the district court issued a supplemental order clarifying that *Greiff* also applies to dismiss preference claims under section 547.  (SPA-63.)

### 3.    This Appeal.

To streamline this Court's review, the Trustee agreed to limited consolidation of the actions decided in *Greiff* with all other pending actions raising the section 546(e) issue (the "Withdrawn Actions"), excepting those where the defendant was alleged to be acting without good faith (the "Consent Order"). (SPA-65-72.)  The Consent Order deemed *Greiff* applicable to all Withdrawn Actions and dismissed those claims under sections 544, 547, and 548(a)(1)(B) and New York Debtor & Creditor Law.  (SPA-65-71.)  The district court certified its dismissals as final judgments on May 23, 2012 and July 27, 2012.  (SPA-164-65; SPA-187-88.)  The Trustee timely appealed.

# SUMMARY OF THE ARGUMENT

None of the transfers between BLMIS and its customers were connected to securities trading.  Section 546(e)'s "safe harbor" for securities transactions is therefore inapplicable on its face.  But the district court found that application of section 546(e) is not affected by the existence—or nonexistence—of securities transactions.  Rather, it found that because BLMIS successfully convinced customers of its fraud, section 546(e) must apply as a matter of law.  (SPA-42-43.)

Though the district court leaned heavily on *Enron* as requiring a "broad and literal interpretation of" section 546(e) (SPA-42), *Enron* does not apply here.  In *Enron*, there was no dispute about the existence of a securities transaction.  The issue was whether that security transaction—the redemption of commercial paper—constituted a "settlement payment."  *Enron*, 651 F.3d at 330.  Focusing on the mechanics of the transaction rather than the motivations behind it, this Court determined that section 546(e) applied in *Enron*.  *Enron* thus supports the notion that the key inquiry is the substance—and existence—of a securities transaction, rather than expectations surrounding it.  Until the decision below, no court applied section 546(e) to anything other than actual securities transactions.

The plain language of section 546(e) requires settlement payments or transfers in connection with statutorily defined securities contracts.  11 U.S.C. § 546(e).  Neither such payment nor transfer exists here.  For a transfer to be a

"settlement payment," it must complete a securities transaction. *Enron*, 651 F.3d at 336. Regardless of what appellees may have subjectively believed, the transfers were simply cash withdrawals from a commingled checking account. (A-604 ¶ 29.) For the same reason, the transfers were not "in connection with" a securities contract because the transfers had nothing to do with any securities transactions or the terms of any relevant agreement.

Nor are the Account Opening Documents "securities contracts" as defined by the Bankruptcy Code. Instead, these types of documents are routinely used to initiate the broker-customer relationship. *See, e.g.*, *Stotler & Co. v. Commodity Futures Trading Comm'n*, 855 F.2d 1288, 1290 (7th Cir. 1988); *Castro v. Marine Midland Bank*, 695 F. Supp. 1548, 1550 (S.D.N.Y. 1988). They are not "securities contracts" because they did not purport to effect the purchase, sale, or loan of securities. 11 U.S.C. § 741(7)(A)(i). They are not "master agreements" because they do not incorporate or contain specific contracts between counterparties, *id.* § 741(7)(A)(x), and they are not "security agreements" because they do not provide customers with a lien against, or security interest in, property of BLMIS itself. *Id.* § 741(7)(A)(xi). In any event, section 546(e) expressly requires an underlying securities contract, and none exists here. 11 U.S.C. § 546(e). This precludes application of section 546(e).

22

Moreover, treating the Account Opening Documents as securities contracts for purposes of section 546(e) renders that section inconsistent with SIPA. Every broker requires customers to execute agreements similar to the Account Opening Documents to open brokerage accounts. *See, e.g.*, *Stotler*, 855 F.2d at 1290; *Castro*, 695 F. Supp. at 1550. And every SIPA proceeding involves a failed broker. SIPA creates a legal fiction to meet its goals: when the fund of customer property is insufficient to satisfy customers' net equity claims, a trustee may avoid transfers of customer property that were made to customers. SIPA § 78fff-2(c)(3). A SIPA trustee uses this legal fiction to avoid preferences and transfers to customers. If, as the district court held, Account Opening Documents were sufficient to establish section 546(e)'s safe harbor for every transfer to that account, a SIPA trustee would never be able to recover preferences—despite the explicit grant of this power by SIPA. *See id.* § 78fff-1. And absent the rare cases (such as this one) where a trustee could plead actual fraud, recovery of constructively fraudulent transfers and transfers avoidable under applicable state laws would be precluded, thus wiping out the purpose of the legal fiction and rendering ineffective the customer payment scheme established by SIPA.

Despite its purported adherence to the plain language of section 546(e), the district court instead based its conclusions on its view that section 546(e) was designed to protect customers' legitimate expectations. (SPA-43.) This was error.

Section 546(e) protects securities transactions: its purpose, consistent with its plain

language, is to protect securities markets from the unwinding of securities

transactions.  Honoring the expectations of customers who received fictitious

profits would not further the statutory goal of section 546(e); it would only deprive

other customers of their ability to recover their principal investment.  This

approach ignores the realities of Madoff's fraud, allowing Madoff's whim to

dictate the winners and losers.  *Net Equity Decision*, 654 F.3d at 240-42.

SIPA is the statute that protects customers.  As this Court recognized, the

goal of this SIPA proceeding is the fairest allocation of resources among all

customers.  By stretching section 546(e) beyond its purpose to reach a result

benefitting only certain customers, the district court displaced the actual purpose of

the customer protection statute, SIPA.  The district court's decision allows net

winners to rely on their expectations, but precludes net losers from recovering their

principal because it is in the hands of other customers.  If allowed to stand, the

district court's decision would preclude any SIPA trustee from exercising the vast

majority of his avoidance powers to accomplish SIPA's purpose of protecting

customers of failed brokerages.

Finally, the district court erred when it withdrew the reference to determine

whether section 546(e) applies here.  The district court ruled that section 546(e)

mandates withdrawal.  But a section 546(e) defense involves straightforward

application of the Bankruptcy Code.  No significant interpretation of non-

bankruptcy federal law is required, nor is there any potential conflict between

the Bankruptcy Code and other non-bankruptcy federal law.

## STANDARD OF REVIEW

All issues in this appeal are reviewed *de novo*, including dismissals of

complaints under Fed. R. Civ. P. 12(b)(6), *see Chambers v. Time Warner, Inc.*, 282

F.3d 147, 152 (2d Cir. 2002), and grants of motions to withdraw the reference to a

bankruptcy court under 28 U.S.C. § 157(d).  *See In re Vicars Ins. Agency, Inc.*, 96

F.3d 949, 951 (7th Cir. 1996).

## ARGUMENT

### I.      Section 546(e) Does Not Apply Where There Are No Securities Transactions.

Section 546(e) is an exception to the rule that a trustee can avoid and recover

property transferred by a debtor.  In enacting section 546(e), Congress sought to

prevent havoc to the securities market which could result from the unwinding of

securities transactions years after their completion.

Section 546(e) was not enacted to provide a safe harbor for a fictional

market.  Nor was section 546(e) enacted to provide a safe harbor for what someone

subjectively thinks is a securities transaction but in reality is not.  Simply put, if

there are no securities transactions to unwind, then section 546(e) is inapplicable

on its face.  That is clearly the case here and should end the analysis.  Until the

district court did so here, no court applied section 546(e) to fictional, nonexistent transactions.

Turning to the constituent parts of the statute invoked by the district court—(1) a "settlement payment," and, (2) a transfer made "in connection with" a "securities contract"—the lack of any securities transactions precludes both as a matter of law. A "settlement payment" occurs only upon the completion of a securities transaction. There were no securities transactions, and thus no "settlement payments" to implicate section 546(e)'s safe harbor. And regardless of whether any securities contracts existed here—and as explained in Point II below, they do not—the transfers made by BLMIS were cash payments that were not made "in connection" with any securities transaction, or with the terms of any contract effecting such transactions. Accordingly, section 546(e) does not apply.

### A. Section 546(e) Does Not Shield Any Relevant Transfers Because BLMIS Did Not Conduct Securities Transactions.

Statutory construction must begin with the statute as a whole. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). And when considered as a whole, section 546(e) is clear: it creates a safe harbor for securities transactions. Section 546(e)'s "safe harbor" provides, in pertinent part:

> [T]he trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . stockbroker, . . . or that is a transfer made by or to (or

26

for the benefit of) a . . . stockbroker . . . in connection with a securities contract, as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

Intending to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries," *Enron*, 651 F.3d at 334 (quoting *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990)), Congress enacted section 546(e) to protect the financial markets from the destabilizing effects caused by reversing routine securities transactions.  H.R. Rep. 97-420, at 2 (1982); *see also Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 420 (Bankr. S.D.N.Y. 2011).  As this Court explained, if "a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Enron*, 651 F.3d at 334.  Section 546(e) limits this risk by preventing the unwinding of securities transactions.

Accordingly, while some courts have applied section 546(e) to transfers made in connection with privately-traded securities—and, in rare cases, securities that were traded illegally—there is no basis for extending section 546(e)'s safe harbor to protect transfers where no securities were traded.  And no court had ever done so until the district court did so here.

The Trustee's complaints allege that BLMIS never engaged in securities transactions for appellees. (A-602 ¶ 22; A-603 ¶ 24.) And this Court already found that "[e]ven though a customer's monthly account statement listed securities transactions purportedly executed during the reporting period and purported individual holdings in various Standard & Poor's 100 Index stocks . . . , the statement did not reflect any actual trading or holdings of securities by Madoff on behalf of the customer." *Net Equity Decision*, 654 F.3d at 231-32. Even the district court below acknowledged that "[i]n reality, the investment advisory unit of [BLMIS] never, or almost never, made the trades or held the securities described in the statements it sent to investment advisory clients." (SPA-35.) All of which begs the question as to how a safe harbor for securities transactions could apply when all agree that there are no securities transactions.

The district court answered by treating section 546(e) as a customer protection statute, finding that it applies because appellees expected that BLMIS engaged in securities transactions. (SPA-38 (customers, "having every reason to believe that [BLMIS] was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded the customers of stockbrokers, including the protection offered by § 546(e)").) But, as demonstrated by this Court's cases interpreting SIPA, the customer protection statute, customer expectations do not provide a basis for ignoring reality. In *In re*

28

*New Times Sec. Servs., Inc.*, this Court explained that where there are fictional

securities or a fictional market, SIPA does not protect what a customer reasonably

expected—those expectations do not transform fiction into reality.  371 F.3d 68,

74, 88 (2d Cir. 2004).  And in the *Net Equity Decision*, this Court explained that

while BLMIS's customers may have expected BLMIS to engage in securities

transactions, those expectations cannot trump the reality that there were none.  *Net

Equity Decision*, 654 F.3d at 241.

By its plain terms, section 546(e) is not a customer protection statute but

rather one that prevents market disruption from unwinding actual trades.  BLMIS's

customers were never exposed to the market—and the market was never exposed

to the trades that BLMIS purported to make.  *See Bankr. Net Equity Decision*, 424

B.R. at 131 n.21 (no customer trades were recorded at DTCC).  Because BLMIS

did not enter the market or engage in any securities trading for its customers,

regardless of customer expectations, there are no transfers that implicate section

546(e).

> **B.    The Transfers Were Not Settlement Payments Because No
> Securities Transactions Were Ever Initiated, Executed,
> Completed, or Settled.**

Section 546(e) limits a trustee's power to avoid "settlement payments."  A

settlement payment is defined as "a preliminary settlement payment, a partial

settlement payment, an interim settlement payment, a settlement payment on

account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). In *Enron*, this Court explained that these words should be given the meaning they bear "in the context of the securities industry." *Enron*, 651 F.3d at 337; *see also Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258 (3d Cir. 2009) (meaning "is best understood by examining how the term is used by those who work in the public securities market").

Like every other Circuit to consider the question, this Court previously held that a "settlement refers to the completion of a securities transaction." *Enron*, 651 F.3d at 336 (quotation marks and citation omitted); *see also Lowenschuss v. Resorts Int'l, Inc. ( In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999) ("transfer of cash or securities made to complete a securities transaction"); *Plassein*, 590 F.3d at 258 (same); *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009) (citing *Kaiser*, 913 F.2d at 849) ("'settlement' refers to 'the completion of a securities transaction'")); *Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322, 325 (9th Cir. 1992) (same).

The "completion of a securities transaction" requires an exchange of cash and securities, *Enron*, 651 F.3d at 336, such that "securities and corresponding funds are delivered and credited to the appropriate accounts." *Id.* at 337 (citing

Group of Thirty, *Clearance and Settlement Systems in the World's Securities Markets* 86 (1989)); *see also In re The Full Registration as Clearing Agencies of: Depository Trust Co., Stock Clearing Corp., Midwest Sec. Trust Co., Options Clearing Corp., Midwest Clearing, Sec. & Exchange Comm'n*, Exchange Act Release No. 20,221 n.33, 28 SEC Docket 1175-2 (Sept. 23, 1983) (defining "settlement" as "delivery and receipt of funds and securities"); *Nat'l Sec. Clearing Corp.: Order Granting Registration and Statement of Reasons*, Exchange Act Release No. 13,163 n.56, 42 Fed. Reg. 3920 (Jan. 13, 1977) (same).

The district court found that under *Enron*, the definition of a "settlement payment" is "extremely broad" and does not require a purchase or sale; therefore, it followed that BLMIS's transfers were "settlement payments," even though there were no securities transactions. (SPA-41-42.)  The district court's opinion ignored *Enron's* holding that a settlement payment requires an exchange of cash for securities—meaning that actual securities must exist and be the subject of the transaction. *Enron*, 651 F.3d at 337.  *Enron* does not stand for the proposition that that there can be a "settlement payment" in the absence of any underlying securities transaction.  This Court held just the opposite: settlement refers to the completion of a securities transaction.  *Id.*

In *Enron*, the "payments at issue were made to redeem commercial paper, which the Bankruptcy Code defines as a security," and were therefore "settlement

31

payments." *Id*. at 339 (citing 11 U.S.C. § 101(49)(A)(i)).  The commercial paper

in that case was, in fact, real.  By contrast, it is undisputed that Madoff did not

transact securities for his customers.  Thus, the trades in this case were not, in fact,

real.  *See Net Equity Decision*, 654 F.3d at 231-32.  Instead, BLMIS transferred

cash from customers into a checking account and then, to satisfy requests for

withdrawals, transferred cash from that checking account to other customers.  Cash

is not a security.  *See* 11 U.S.C. § 101(49)(B)(i).  With no securities transactions,

BLMIS's IA unit had nothing to settle, and therefore made no settlement

payments.  To hold otherwise would run afoul of *Enron*'s already "extremely

broad" definition of "settlement payment."  *Enron*, 651 F.3d at 334 (quotations and

citations omitted).

Indeed, the fundamental problem with holding such transfers to be

"settlement payments" is that it expands the concept of "settlement" beyond

reason.  The "settlement" that a "settlement payment" pays for occurs when all

parties' obligations regarding a transaction end, such that they face no further risk

in that transaction.  *See Kaiser Steel Corp. v. Pearl Brewery Co. (In re Kaiser

Steel)*, 952 F.2d 1230, 1238 (10th Cir. 1991).  It is only at that point, when the cash

is with one party, and the securities with the other, that the transaction is "settled."

The costs of unwinding settled securities transactions, long after their completion,

would ripple through the market because cash and securities have already changed

32

hands.  Certain firms might fail to make good on subsequent transactions, made in

reliance on transactions already marked as settled.  The effects would quickly

spiral out of control.  That is precisely why Congress enacted section 546(e).  *See*

*Kaiser*, 913 F.2d at 849 (discussing legislative history).

But here, where there are no securities transactions, no firm ever assumed

the risk of any fictitious transactions.  Because there were no settlements, no ripple

effect through the securities markets is possible.  Permitting avoidance of BLMIS's

payments to its customers thus does not implicate the purposes of section 546(e)

because it does not upend settled transactions among market participants—there

were no other market participants.  This Ponzi scheme involved nothing more than

transfers of cash, which are no more within the safe harbor's ambit than the routine

"non-tradeable" bank loans recognized in *Enron* as beyond the statute's reach.

*Enron*, 651 F.3d at 337.

The district court's holding to the contrary was in error.  First, its holding

that beliefs or expectations of BLMIS's customers transform the transfers from

Madoff into "settlement payments" finds no basis in the statutory text.  Second, the

district court's failure to identify *any* securities transaction conflicts with this

Court's previous definition of "settlement payment."  The district court

acknowledged that "when clients withdrew money from their accounts with

[BLMIS], they did not actually receive returns on successful investments, but

33

instead only the very money that they and others had deposited with [BLMIS] for the purpose of purchasing securities." (SPA-35.) That fact alone should have dictated the opposite result.

By relying on the subjective impressions of parties, the district court's holding would do far worse than "make application of the safe harbor in every case depend on a factual determination regarding the commonness of a given transaction," which this Court previously rejected as completely unworkable. *Enron*, 651 F.3d at 336. Application of the district court's holding would require a full evidentiary hearing into investors' subjective beliefs and the reasonableness of those beliefs. *See, e.g.*, *Picard v. Katz*, No. 11-cv-3605 (JSR), 2012 WL 691551, at *2 (S.D.N.Y. Mar. 5, 2012) (defendants' good faith was a fact determination for trial). This holding is not limited to customers—in other cases, a court would be required to consider the subjective understandings of all market participants that are party to a transaction. Thus, the district court's reading of the statutory text "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium." *Enron*, 651 F.3d at 336.

Finally, at least one court has held that characterizing payments to customers as completing securities transactions when the customers were not party to the transactions would erroneously "extend[] §546(e) *beyond* the securities transaction

34

to subsequent, indirectly related cash transactions to customers." *Grede v. FCStone*, 485 B.R. 854, 887 (N.D. Ill. 2013) (customer agreement not a securities contract and cash payments to investment advisory customers not settlement payments under section 546(e)).

### C. The Transfers Were Not in Connection With a Securities Contract Because No Securities Transactions Occurred.

Section 546(e)'s purpose is also demonstrated by its protection of transfers made "in connection with" specifically enumerated agreements defined in section 741(7) as "securities contracts." The "common thread of these transactions is that they involve financial intermediaries . . . that often hedge their risk on these transactions through other market transactions, repledge securities collateral received under these transactions, or both." *MacMenamin's Grill*, 450 B.R. at 420 (quoting H.R. Rep. No. 109-648, at 5 (2006)). Thus, like the "settlement payments" prong, the "in connection with a securities contract" prong of section 546(e) protects certain securities transactions—in this case, transactions made pursuant to each of the various kinds of securities agreements described in the statute.

As further detailed below, there were no securities contracts here. But even if there were, there were certainly no transfers in connection with a securities contract. Contrary to the district court's reasoning, all transfers are not immunized from avoidance once the parties enter into a contract relating to the subject matter

of securities. Instead, transfers must be made "in connection with" specific types

of agreements enumerated in section 741(7) that are defined as "securities

contracts."

No withdrawals by BLMIS customers could be "in connection with a

securities contract" in the absence of securities transactions. The only agreements

BLMIS entered were those with appellees, in which they granted Madoff

permission to transact securities on their behalf. Although Madoff falsely

represented that he had engaged in securities transactions, he never did. BLMIS's

scheme was possible only because Madoff concocted fictional trades after-the-fact

and with no market exposure. Thus, regardless of customer expectations, the

transfers between BLMIS and appellees had nothing to do with the securities

trading activity authorized by the BLMIS Account Opening Documents.

However "broad and literal" one's interpretation of section 546(e), its words

must be given meaning. Thus, a transfer made "in connection" with a statutorily

defined agreement must have some connection with the agreement. *See, e.g.*,

*United States v. Chen*, 127 F.3d 286, 291 (2d Cir. 1997) (sentencing provision

regarding possession of a weapon "in connection with the offense," "surely means

something more than *during* the offense"). There is no such connection here.

To the extent that the Account Opening Documents—agreements permitting

Madoff to engage in securities trading—could constitute "securities contracts," the

ostensible securities trading here was imaginary and thus any financial

consequences from completing or unwinding any transactions impossible.  None of

the transfers Madoff made to customers were made "in connection with" a

"contract for the purchase, sale or loan of a security" (or with master or security

agreement providing for such contracts or transactions) because Madoff never

intended to, and never did, purchase, sell, or loan any securities.  Instead, he

arbitrarily distributed money among his customers.  Far from being "in connection

with" any actual securities contracts, the transfers from BLMIS to its customers

were payments of stolen money to perpetuate a fraud.

## II.    The Account Opening Documents Are Not Securities Contracts.

### A.    The Plain Language of the Statute Requires a Contract for the Purchase or Sale of Securities.

In *Katz*, the district court determined that "a contract for the purchase, sale,

or loan of a security" under section 741(7) is "the kind of contract [BLMIS] had

with its customers."  *Katz*, 462 B.R. at 451-52.  Accordingly, the Court held that

"any payment by [BLMIS] to its customer that somehow does not qualify as a

'settlement payment' qualifies as a 'transfer' made 'in connection with a securities

contract.'"  *Id.* at 452.

At the time the district court made this ruling, it did not have any contracts

before it.  *Id.*  When it actually reviewed the Account Opening Documents in

*Greiff*, the district court declined to explicitly find that they constituted contracts

for the "purchase, sale or loan of a security."  (SPA-40.)  For good reason: as every

court to examine them has recognized, the Account Opening Documents do not

identify, much less purport to effect the purchase, sale, or loan of any particular

security.  *See Merkin I*, 440 B.R. at 267 (none of the Account Opening Documents

"is a contract that, by its terms, effects the 'purchase, sale or loan of a security'

between the parties or contemplates any securities transaction"); *Merkin II*, 2011

WL 3897970, at *12; *Madoff Family*, 458 B.R. at 117.

Contrary to the district court's holding in *Katz*, the Account Opening

Documents are not contracts for the purchase, sale, or loan of a security. They do

not identify any security, issuer, quantity, price, or other terms necessary to

describe a security transaction.  The execution of the Account Opening Documents

did not and could not, without more, result in a securities transaction, and no court

could enforce them to complete any transaction.

The district court nonetheless held that the Account Opening Documents

"clearly qualify as securities contracts" because the Customer Agreement "makes

numerous references to securities transactions"; the Option Agreement mentioned

that BLMIS would "carry accounts for transactions in opinion contracts"; and the

Trading Authorization authorized Madoff to undertake securities transactions.

(SPA-39.)  Thus, the Account Opening Documents collectively gave appellees "the

expectation that [BLMIS] would perform under the account agreements by

38

purchasing specific securities."  (SPA-40; SPA-198-99 (goal of section 546(e) "is

best achieved by protecting the reasonable expectations of investors who believed

they were signing a securities contract").)

Section 546(e) does not create a safe harbor for contracts that in some way

relate to securities, nor does it contain any other language encompassing a

customer's understanding or expectations of a contract.  Indeed, the district court's

dependence on the quasi-contractual concepts of customers' reasonable

expectations and reliance tacitly acknowledges that no express contract for the

purchase, loan, or sale of a security existed.  *See, e.g.*, *Julien J. Studly, Inc. v. N.Y.*

*News, Inc.*, 70 N.Y.2d 628, 629 (1987) (contract may not be implied in fact if there

is an express contract that governs the same subject matter); *Clark-Fitzpatrick v.*

*Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) (quasi-contract applies only

absent an express agreement and "is not really a contract at all, but rather a legal

obligation imposed in order to prevent a party's unjust enrichment.").

"'[L]ooking to the statute's plain language,' as *Enron* instructs . . . it follows

that the definition of 'securities contract' is limited to contracts 'for the purchase,

sale, or loan of a security.'"  *Official Comm. of Unsecured Creditors of Quebecor*

*World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,

480 B.R. 468, 479 (S.D.N.Y. 2012).  Just as this Court held in the *Net Equity*

*Decision* that fraudulent statements could not create "securities positions to be

liquidated" for determining net equity, customer expectations cannot transform the Account Opening Documents into "contracts for the purchase, sale, or loan of a security" that would trigger section 546(e).

### B. The Account Opening Documents Established the Customer Relationship But Did Not Exchange Cash for Securities.

In treating the Account Opening Documents as "securities contracts," the district court ignored what those documents are. The Account Opening Documents provided BLMIS and its customers with basic information establishing the purported broker-customer relationship: they enabled customers to open accounts with BLMIS; set forth the terms governing the account and the type of trading BLMIS could conduct; designated BLMIS as the customer's agent to effect securities transactions; and satisfied certain regulatory requirements to maintain information relating to brokerage accounts. *See* 17 C.F.R. §§ 240.17a-4(c), (b)(6) (2012) (broker dealers must preserve records relating to "the opening and maintenance of the account" and "all powers of attorney and other evidence of the granting of any discretionary authority"); FINRA Rule 4512 (2011) (requiring member to maintain signature of persons authorized to exercise discretion in accounts).

Courts consistently recognize that these are merely the routine documents necessary to open an investment account. *See, e.g.*, *Stotler*, 855 F.2d at 1290 (customer received "trading authorization and customer agreement forms

40

necessary to open an account"); *Castro*, 695 F. Supp. at 1550 (client opened

account and signed trading authorization giving broker authority to trade in

account). First, the Customer Agreement simply sets forth the terms that governs

the operation of the account. *See, e.g.*, *Modern Settings, Inc. v. Prudential-Bache

Sec., Inc.*, 936 F.2d 640, 642 (2d Cir. 1991) (customer agreement contains various

provisions governing operation of brokerage account).

Second, the Trading Authorization established an agency relationship

BLMIS and its customers. Such authorizations generally provide for an express

power of attorney, so that the authorized party may enter into securities

transactions on behalf of the authorizing party. *See, e.g.*, *Richardson Greenshields

Sec*. *v. Lau*, 819 F. Supp. 1246, 1257 (S.D.N.Y. 1993) (when accounts were

opened, trading authorization and power of attorney signed); *Price v. Crestar Sec.

Corp.*, 44 F. Supp. 2d 351, 352 (D.D.C. 1999) (same). Various securities

regulations require customers to execute such authorizations before a broker can

exercise discretionary power on their behalf. *See* 17 C.F.R. § 240.17a-4; FINRA

Rule 4512; NYSE Rule 408 (2008); NASD Rule 2510(b) (2005).

Finally, the Option Agreement was no different. It contained disclosures

regarding option trading and provided that customers would abide by applicable

rules and laws, that BLMIS could take appropriate action if the customer did not

41

satisfy a call for money or security, and that BLMIS could provide preferential

treatment when executing certain large orders.  (A-1261-62, ¶¶ 2,3,7.)

The Account Opening Documents are no more contracts for the purchase

and sale of a security than a real estate brokerage agreement is a contract for the

purchase or sale of a house.  The fact that a buyer or seller gives a real estate

broker authority to act as an agent does not transform the real estate brokerage

agreement into a real estate purchase or sale contract that actually conveys

property.  By characterizing standard forms establishing the broker-customer

relationship as "securities contracts," the district court brought every transfer from

BLMIS to its customers into the safe harbor.  (SPA-39-40.)  But section 546(e)

does not purport to apply to every transfer between a stockbroker and its

customers.  If Congress had intended this result, it would have said so.

### C.    The Account Opening Documents Are Not Master Agreements.

The statute defines a master agreement as one "that provides for an

agreement or transaction referred to in [the preceding nine clauses] together with

all supplements to any such master agreement . . . *except* that such master

agreement shall be considered to be a securities contract under this subparagraph

*only with respect to each agreement or transaction* under such master agreement

that is referred to in [those clauses]."  11 U.S.C. § 741(7)(A)(x) (emphasis added).

Because BLMIS never executed any securities transactions under the Account

42

Opening Documents, there are no underlying securities agreements or transactions "with respect to" which they could be securities contracts. This should end the inquiry.

In any event, the Account Opening Documents are not "master agreements." Because the term "master agreement" is not defined in the Bankruptcy Code, one must look to the context within which it is given. *Kaiser,* 952 F.2d at 1237. The term "master agreement" is a term of art in the securities industry. A master agreement is a contract establishing the mutual undertakings between two counterparties that anticipate executing future securities transactions with each other, including one or more swap, forward, option or other derivative transactions. *See generally* Paul C. Harding, *Mastering the ISDA Master Agreements (1992 and 2002)* 19-27 (2d ed. 2004) ("Harding"); Int'l Swap Dealers Ass'n, *User's Guide to the 1992 ISDA Master Agreements* 1-8 (1993 ed.) ("*User's Guide*"); *see also Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.),* 460 B.R. 360, 374 (Bankr. S.D.N.Y. 2011). Such "master agreements" require both counterparties to execute supplements or confirmations that describe the specific terms of any trade between them and incorporate the general terms of the master agreement. *See* Harding 22-23; *User's Guide* 37-39.

An important aspect of the master agreement is that it, together with all supplements, is considered one securities contract that is to be enforced, applied, or

rejected in its entirety.  For example, a trustee may not "cherry pick" among the individual transactions, *i.e.*, reject a supplement that is not beneficial for the debtor, while accepting another.  This is the very reason that the term "master agreement" was originally added to the Bankruptcy Code.  *See* H.R. Rep. No. 101-285, at 9 (1990).  All of the various rights and obligations between the parties to a master agreement and its supplements are thus to be netted out to prevent an inequitable result.  *See Bankr. Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 Before the Subcomm. on Econ. and Commercial Law of the H. Comm. on the Judiciary*, 101st Cong. 14 (1990).

The Account Opening Documents are like master agreements in that they generally contemplate the possibility of future transactions and future agreements.  But the similarities end there.  These future agreements and transactions contemplated by the Account Opening Documents are between BLMIS and innumerable, unnamed counterparties.  A discretionary agreement between a customer and its broker to establish an account is a wholly separate and independent contract from any agreements to buy and sell securities that may be executed between that broker and numerous counterparties in the marketplace.  And each agreement between the broker and the counterparty (who does not have a relationship with or even know the broker's customer) is its own separate and independent contract.  From the standpoint of both law and market practice, the

buy and sell contracts between a broker and its counterparties create rights and
duties distinct from the contractual arrangements embodied in the Account
Opening Documents, and those separate contracts are not, and cannot be, merged
together and enforced by courts as an integrated unitary master agreement.

That the district court erred in holding that the Account Opening Documents
are master agreements is evident from the progression of the three opinions it has
issued on this subject.  In *Katz*, the district court held that the Account Opening
Documents were securities contracts because they were contracts for the purchase
or sale of a security.  *Katz*, 462 B.R. at 451-52.  In *Greiff*, the district court held
that "each [Account Opening Document] qualifies as a [sic] 'a master agreement
that provides for' the purchase and sale of securities."  (SPA-40.)  In its subsequent
decision on section 546(e)'s application to bad faith investors (the "*Actual
Knowledge Opinion*"), the district court reconsidered, and found that instead of
each one itself qualifying as a master agreement, the Account Opening Documents
"were made pursuant to 'a master agreement that provides for' the purchase or sale
of securities."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re
Madoff Sec.)*, No. 12-mc-00115 (JSR), 2013 WL 1609154, at *2 (S.D.N.Y. Apr.

15, 2013); (SPA-195-96).[5]  The district court itself cannot articulate how or why the Account Opening Documents are master agreements.

### D.      The Account Opening Documents Are Not Security Agreements.

The district court also held that the Account Opening Documents were "security agreements," defined in section 741(7) as a "securities contract" to which section 546(e) applies.  11 U.S.C. § 741(7)(A)(xi) ("any security agreement or arrangement or other credit enhancement related to any agreement or transaction in this subparagraph").  Like the definition of "master agreement," the term security agreement does not expand the definition of securities contract: "a security agreement is a 'securities contract' to the extent that it secures debts 'related to' another 'securities contract.'"  *Lehman Bros. Inc. v. JPMorgan Chase Bank (In re Lehman Bros. Holdings)*, 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012) (citing 11 U.S.C. § 741(7)(A)(xi)).

In *Lehman Brothers*, the court found the existence of a "security agreement" under section 741, and thus a securities contract for purposes of section 546(e), because "the August Guaranty and the August Security Agreement . . . expressly contemplated obligations owing . . . from L[ehman] to JPMC under the Clearance Agreement," which was "itself, a 'securities contract.'"  *Id.* at 438-39.  Here, only

---

[5] For convenience, further references to the *Actual Knowledge Opinion* will cite only to the Special Appendix.

if the district court identified independent underlying securities transactions or

contracts to which the purported security agreement related—which it did not—

could a "security agreement" constitute a securities contract under section 546(e).

The Account Opening Documents are not security agreements. "Security

agreement" is defined as an "agreement that creates or provides for a security

interest." 11 U.S.C. § 101(50). A "security interest" is a "lien created by an

agreement." *Id.* § 101(51). "The term 'lien' means charge against or interest in

property to secure payment of a debt or performance of an obligation." *Id.*

§ 101(37). A "security agreement" gives one party an interest in another's

property to secure payment of a debt. *See, e.g.*, *Royal Bank & Trust Co. v. Pereira*

*(In re Lady Madonna Indus.)*, 99 B.R. 536, 539 (S.D.N.Y. 1989) (security

agreement is only enforceable against a debtor or third parties if the collateral is in

possession of the secured party or the security agreement contains a description of

the collateral); *Lashua v. LaDuke*, 707 N.Y.S.2d 542, 544 (3d Dept. 2000) (same).

Contrary to the district court's suggestion, the Account Opening Documents

did not grant customers a lien on BLMIS's property to secure its debt to them. Nor

are the Account Opening Documents related to any other terms within section

741(7)(A)(xi), *i.e.*, security arrangements or other credit enhancements. "An

example of a security arrangement is a right of set off, and examples of other credit

enhancements are letters of credit, guarantees, reimbursement obligations and other

47

similar agreements." H.R. Rep. No. 106-123, at 179 (1999); *see also Maine State*

*Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-0302 (MRP), 2011 WL 4389689,

at *5 n.14 (C.D. Cal. May 5, 2011). Because the Account Opening Documents do

not grant customers liens, do not provide a right of set off, and are not letters of

credit or guarantees, the district court erred in finding that the Account Opening

Documents are security agreements under section 741(7)(A)(xi).

## E. Deeming Account Opening Documents as Securities Contracts Conflicts With SIPA.

The district court held that section 546(e) applies when customers fill out

forms necessary to open brokerage accounts and grant their broker trading

authority. This interpretation of section 546(e) impermissibly conflicts with SIPA

and wreaks havoc on its remedial scheme.

SIPA incorporates chapter 5 of the Bankruptcy Code only to the extent

consistent with SIPA. SIPA § 78fff(b). A provision of the Bankruptcy Code is

inconsistent with SIPA "if it conflicts with an explicit provision of [SIPA] or if its

application would substantially impede the fair and effective operation of SIPA

without providing significant countervailing benefits." *Sec. Investor Prot. Corp.*

*v. Charisma Sec. Corp.*, 506 F.2d 1191, 1195 (2d Cir. 1974). Here, the district

court's interpretation of section 546(e) does both. By eliminating a SIPA trustee's

power to avoid preferential and constructively fraudulent transfers, as well as

fraudulent transfers avoidable under state law, it conflicts with the explicit

48

provision that permits a Trustee to recover preferences and impedes SIPA's very purpose by negating its remedial powers without any countervailing benefits.

A SIPA trustee has the "same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11." SIPA § 78fff-1(a). The purpose of the preference provision is to discourage creditors from racing to the courthouse to enforce their rights at the expense of other creditors, and to facilitate the bankruptcy policy of equal distribution among creditors by recovering those payments for a *pro rata* distribution. *Enron*, 651 F.3d at 346 (citing *Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991)).

SIPA creates a legal fiction, which allows a trustee to recover more than just the property of the debtor under certain circumstances. Where insufficient funds exist to satisfy customer net equity claims, SIPA section 78fff-2(c)(3) allows a trustee to avoid and recover transfers of customer property made by the debtor-broker, including those made to customers, by treating transferred customer property as property of the debtor and by treating customers as creditors. The purpose of this legal fiction is to allow transfers to customers of money from their own accounts maintained with the broker to fit within the Bankruptcy Code's avoidance provisions, which otherwise require the debtor to have an interest in the property and preferential payments to be made to a creditor. *See Hill v. Spencer*

*Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 894

(D.N.J. 1988).

Virtually all brokerage customers—and therefore all customers in SIPA

liquidations—execute documents similar to the Account Opening Documents

when they first deposit funds into their accounts.  Therefore, the district court's

reasoning will lead to the absurd result that once a customer opens and funds an

account, practically every transfer of funds by the broker to the customer will be

shielded from avoidance under section 546(e) regardless of whether any securities

transactions are executed for that customer.  Except for those situations where

there is an actual fraud like Madoff's here, which allow for pleading actually

fraudulent transfers under the Bankruptcy Code, there would be no means for

recovery.  There would be virtually no SIPA liquidation in which a trustee could

recover preferences, constructively fraudulent transfers, or transfers recoverable

under applicable state law.  There is no basis in SIPA or the Bankruptcy Code to

conclude that Congress intended to abrogate a SIPA trustee's avoidance powers the

instant the customer signs a brokerage agreement.

To the contrary, the statutory predecessor to section 546(e) shielded

"deposits" from avoidance.  In testimony before Congress in 1981, SIPC explained

that the word "deposit" was "too ambiguous a word and might well be used to

defeat a trustee's attempt to recover a preferential transfer that should be

50

recovered. . . .  Preventing such recovery would not add to the stability of the

securities markets. There should be no ambiguities that would hamper a trustee in

making a recovery." *Bankr. of Commodity and Sec. Brokers: Hearings Before the*

*Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*,

97th Cong. 287 (1981) (statement of Theodore H. Focht, General Counsel, SIPC).

When Congress enacted section 546(e), it excluded "deposits" from the transfers

shielded from avoidance.

     The bankruptcy court correctly recognized that applying section 546(e)'s

safe harbor to the Account Opening Documents "would eliminate most avoidance

powers granted to a trustee under SIPA, negating its remedial purpose," *Merkin I*,

440 B.R. at 268, thus creating an impermissible conflict with SIPA.

## III.    The District Court Ignored SIPA and This Court's *Net Equity Decision*.

     Deeming it irrelevant that the securities transactions here were not only

fictional but impossible, the district court erroneously injected customer

expectations into the analysis of section 546(e).  The district court held that

appellees "have every right to avail themselves of all the protections afforded the

customers of stockbrokers, including the protection offered by § 546(e)."  (SPA-

38.)  The district court's stated rationale was simply that "[n]othing in the express

language of § 546(e) suggests that it is not designed to protect the legitimate

expectations of customers . . . ."  (SPA-43.)  Yet in giving a statute with "nothing"

51

to say about customer protection primacy over SIPA, the statute that Congress

intended to protect brokerage customers, the district court's order violated this

Court's *Net Equity Decision*.

SIPA's purpose is to protect customers from the insolvency of their brokers.

To that end, it establishes a priority distribution scheme, with customers at the top,

and empowers a trustee to recover "customer property" and distribute that property

in accordance with that priority scheme.  SIPA §§ 78fff-2(c)(1), (3), 78fff(a)(1)(B).

By contrast, section 546(e) says nothing about customers.  The word

"customer" is completely absent from its text and the relevant definitions it

incorporates.  Section 546(e) does not distinguish between brokerage customers

and other transferees.  Nor does it refer to the "legitimate expectations" of

brokerage customers or anyone else, for that matter.  Instead, Congress enacted

section 546(e) to protect securities markets and transactions within those markets.

So far as BLMIS customers' "legitimate expectations" are concerned, SIPA

governs.  *Net Equity Decision*, 654 F.3d at 236 (SIPA "protects [brokerage

customers'] 'legitimate expectations' as investors in the securities market").  This

Court's *Net Equity Decision* made clear that customers had no legitimate

expectation that they were entitled to fictitious profits.  If customer expectations

were elevated above reality, this Court found that the "inequitable consequence of

such a scheme would be that those who had already withdrawn cash deriving from

imaginary profits in excess of their initial investment would derive additional

benefit at the expense of those customers who had not withdrawn funds before the

fraud was exposed." *Id.* at 238.  By contrast, the Court held that the Trustee's Net

Investment Method "effectuates [SIPA's] purposes": "to protect investors, and to

protect the securities market as a whole." *Net Equity Decision*, 654 F.3d at 235.

Nonetheless, the district court upheld the expectations of certain

customers—the avoidance defendants—dismissing this Court's *Net Equity*

*Decision* as irrelevant in a single footnote sentence, on the basis that "the decision

. . . does not even mention § 546(e)." (SPA-44 n.7.)  But that decision does

mention, interpret, and apply SIPA.  By endorsing the same customer expectations

that this Court has already rejected for purposes of reconciling net equity, the

decision below has the "absurd effect of treating fictitious and arbitrarily assigned

paper profits as real and . . . give[s] legal effect to Madoff's machinations." *Net*

*Equity Decision*, 654 F.3d at 235.  Despite the teaching of this Court, the district

court essentially ratified the "whim of the defrauder." *Id.* at 241.

The district court's focus on customer expectations in this case further

conflicts with the *Net Equity Decision* because it gives one class of customers—

those who withdrew fictitious profits—the benefit of the impossible transactions

that other customers were previously denied.  But all customers (except those that

acted in bad faith)—net winners and losers alike—relied on the same fraudulent

statements and Account Opening Documents, to their great detriment.  The district
court's ruling confers the benefit of that reliance only on those customers subject to
avoidance actions.

The district court's disregard of the principles underlying the *Net Equity
Decision* becomes clear in its selective framing of the question before it: "the issue
[presented by this Ponzi scheme is] how to apportion *the monies already paid* to
innocent investors."  (SPA-33 (emphasis added).)  This Court has stated, however,
that the appropriate question is how to "achieve a fair allocation of the available
resources among the customers"—all customers, not merely those subject to
avoidance.  *Net Equity Decision*, 654 F.3d at 240.

This reflects the zero-sum nature of distributions in this SIPA proceeding
that is at the heart of this Court's *Net Equity Decision*.  The amount of resources
available to allocate among customers is directly decreased by a corresponding
reduction in the amount of customer property that the Trustee can recover in
avoidance actions.  Because Madoff ran a Ponzi scheme, all customer property that
the Trustee seeks to recover for customers who lost principal is in the possession of
appellees and bad faith investors.  BLMIS paid out billions of dollars in
preferences in its final days, which the Trustee is expressly entitled to recover
under SIPA.  And because this Ponzi scheme lasted for decades, much of the
customer property was transferred prior to the two years before BLMIS's collapse.

The Trustee's state law avoidance actions therefore are a significant source of recovery of principal to be given back to net losers. The district court's decision incorrectly deprives these BLMIS customers of those funds.

If section 546(e) applies here, appellees will derive an additional benefit at the expense of net loser customers because appellees will keep the fictitious profits they received as well as their principal; net losers will never catch up. Rather than effectuating a *pro rata* distribution of customer property, this places "some claims unfairly ahead of others." *Id.* at 242 n.10 (citations omitted). And if net losers are precluded from receiving their *pro rata* share of customer property held by net winners because section 546(e) is stretched beyond its plain language to reward appellees' "expectations," net losers unfairly lose the protections of SIPA and the Bankruptcy Code and disproportionately shoulder the burden of BLMIS's Ponzi scheme. Distributions would be arbitrarily unequal, greatly reduced and would violate SIPA's remedial scheme and this Court's *Net Equity Decision*.

**IV.    Even if Section 546(e) Applied, its Application Would Require
        Determinations of Fact.**

As a matter of law, there were no "settlement payments" or transfers in
connection with "securities contracts" in this Ponzi scheme.  But even if the safe
harbor applied, the district court erred in holding that it encompassed all transfers
to thousands of customers over a multi-decade period as a matter of law.

Even where securities trading actually occurs, the determination that each
transfer was a settlement payment or made in connection with a securities contract
must be based on factual issues that cannot be resolved in a motion to dismiss.  *See
Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79,
108 (S.D.N.Y. 2004) (denying motion to dismiss bankruptcy claims on the basis of
section 546(e) because "[r]esolution of these issues must . . . await the taking of
evidence to clarify . . . whether the transfers constitute 'settlement payments'
within the meaning of § 546(e) . . . ."); *Merkin II*, 2011 WL 3897970, at *12.  And
even where securities transactions take place, not every transfer that arguably
relates to those transactions constitutes a settlement payment.  *See In re
Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 302 (D. Del. 2012) (not all
transfers relating to leveraged buyout constituted "settlement payments;" each
transfer must be independently to determine whether it completes a securities
transaction).

56

Additionally, the district court's conclusion that the Account Opening

Documents constituted "securities contracts" creates its own questions of fact.  The

district court based its conclusion on the customers' reasonable reliance on

Madoff's representations and the resulting "legitimate expectations" that he traded

securities on their behalf.  (SPA-43.)  The reasonableness and legitimacy of

customer expectations are classic questions of fact that can be determined only at

trial.  *See, e.g.*, *GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1170 (S.D.N.Y.

1994).  Just as *Enron* rejected an interpretation that "would make application of the

safe harbor in every case depend on a factual determination regarding the

commonness of a given transaction," *Enron*, 651 F.3d at 336, it serves neither

reason nor the statute to base application of the safe harbor on the subjective

beliefs of customers and the legitimacy of their expectations.

The unwieldiness of injecting customer expectations into the statute became

apparent in the district court's *Actual Knowledge Opinion*, in which it announced

an "actual knowledge exception" to the section 546(e) exception.  (SPA-197-98.)

Having ruled that customers were entitled to the benefit of the safe harbor based on

their legitimate expectations, the next question was how to treat investors whom

the Trustee alleges were on notice of the fraud and did not have such "legitimate

expectations."

Citing to itself for the proposition that the "plain" language of section 546(e) protects "reasonable expectations of legitimate participants" in the securities markets, the district court held that "the burden is on the Trustee to prove . . . at a minimum, that the transferee had actual knowledge that there were no actual securities transactions being conducted."  (SPA-200.)  It is not enough, the district court explained, to show that a transferee lacked "good faith" in receiving a transfer because the concept of "good faith" nowhere appears in section 546(e). (SPA-199-200.)

But of course the concepts of "legitimate participants" and "reasonable expectations" do not appear in section 546(e) either—the district court created an entire statutory construct out of whole cloth.  By inserting subjective expectations into section 546(e), the district court rewrote both the Bankruptcy Code and SIPA in order to reach a result it preferred to the one Congress chose.

## V.  Invoking Section 546(e) Does Not Mandate Withdrawal of the Reference to the Bankruptcy Court.

Following adverse rulings on this issue from the bankruptcy court, appellees and other defendants moved to withdraw the reference.  The district court granted the motions, finding that section 546(e) required substantial and material interpretation of federal law other than title 11, even though section 546(e) is a provision of title 11 and no other federal laws were identified.  (SPA-5-19.)  None of the district court's rulings withdrawing the reference identified a single federal

statute that requires consideration to determine the meaning of section 546(e).  Nor did the district court cite any securities laws, SIPA provisions, or any other federal laws requiring such considerations.  Other than the district court below, no court has withdrawn the reference based on section 546(e) alone.  By granting these motions after the bankruptcy court issued dispositive rulings on section 546(e), the district court converted section 157(d) into an "escape hatch" out of the bankruptcy court, endorsed blatant forum shopping, and permitted parties to collaterally attack the bankruptcy court's prior decisions.

Withdrawal of the reference is mandatory only if a proceeding requires "substantial and material" consideration of non-bankruptcy federal statutory law. *See Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990).  "Substantial and material consideration" requires "significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991).  Indeed, the "substantial and material consideration" standard excludes from mandatory withdrawal those cases that involve only the routine application of non-title 11 federal statutes to a particular set of facts.  *See United States v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

Section 157(d) is "construed narrowly," *Ionosphere*, 922 F.2d at 995, and should not be used a "broad escape hatch through which most bankruptcy matters [could] be removed to a district court." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 66 (S.D.N.Y. 2006) (quotation and citation omitted). For the bankruptcy court to proceed efficiently and within the bounds of its jurisdiction, the reference to the bankruptcy court should be withdrawn only in limited circumstances, as provided in section 157(d) of title 28. A narrow reading of the mandatory withdrawal provisions is necessary so as not to "eviscerate much of the work of the bankruptcy courts . . . ." *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 683 (S.D.N.Y. 1995). This stringent standard can be "more easily satisfied when complicated issues of first impression are implicated under non-bankruptcy federal laws." *Keene Corp. v. Williams Bailey & Wesner L.L.P. (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995); *see also Houbigant*, 185 B.R. at 684. Complexity alone, however, does not require withdrawal of the reference. Bankruptcy courts ably decide complicated issues every day.

SIPA does not provide a basis for mandatory withdrawal. SIPA is derived directly from section 60e of the Chandler Act and explicitly incorporates the Bankruptcy Code. SIPA § 78fff(b). Also, SIPA liquidations are automatically removed to the bankruptcy court. *Id.* § 78eee(b)(4). This means that Congress

intended the bankruptcy court to oversee SIPA liquidations and to consider the

interplay between the Bankruptcy Code and SIPA.  "[A] SIPA liquidation is

essentially a bankruptcy liquidation tailored to achieve the special purposes of

SIPA."  *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 269 (Bankr. S.D.N.Y.

1996) (citing SIPA § 78fff(b)).  Therefore, application or interpretation of any

SIPA provision is not a basis for mandatory withdrawal.

Only if both bankruptcy law and other federal non-bankruptcy law must be

resolved is mandatory withdrawal appropriate.  The district court found that "other

securities laws" must be interpreted (SPA-28), but failed to identify a specific

securities law requiring "substantial or material" interpretation, pointing only to

section 546(e).  Resolution of a defense provided by the Bankruptcy Code to an

avoidance action authorized by the Bankruptcy Code only requires consideration

of Bankruptcy Code provisions.  Specifically, the section 546(e) defense requires

determining whether the Account Opening Documents are "securities contracts" or

the transfers to appellees constitute "settlement payments," as defined in sections

546(e) and 741(7)-(8) of the Bankruptcy Code.  Factual determinations regarding

section 546(e) are routinely decided by bankruptcy courts.  *See, e.g.*, *Madoff*

*Family*, 458 B.R. at 115-17; *Official Comm. of Unsecured Creditors of Quebecor*

*World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,

453 B.R. 201(Bankr. S.D.N.Y. 2011); *MacMenamin's Grill*, 450 B.R. at 414.

Nor are defenses to avoidance actions issues of first impression involving
non-bankruptcy federal laws.  In fact, before the district court withdrew the
reference, several courts had ruled on the section 546(e) defense to the Trustee's
avoidance actions in this liquidation.  *Merkin I*, 440 B.R. at 267; *Merkin II*, 2011
WL 3897970, at *12; *Madoff Family*, 458 B.R. at 116-17.  Similarly, other courts
have determined the section 546(e) defense does not apply to Ponzi-scheme
avoidance actions.  *See Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 816-19
(9th Cir. 2008); *Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990); *Kipperman
v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 539-41 (B.A.P.
9th Cir. 2005); *see also Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
263 B.R. 406, 480-83 (S.D.N.Y. 2001); *Mishkin v. Ensminger (In re Adler,
Coleman Clearing Corp.)*, 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999).  Thus,
application of section 546(e) does not raise issues of first impression involving
non-bankruptcy federal law.

The district court below is the only court to ever mandatorily withdraw the
reference at the pleading stage on the basis of section 546(e).  Other courts have
denied such motions as premature.  *See Enron Corp. v. JP Morgan Sec., Inc.*, No.
M-47 (GBD), 2008 WL 281972, at *6 (S.D.N.Y. Jan. 25, 2008) ("Mere
speculation that the bankruptcy court may have to determine, at some future time, a
securities law issue is an insufficient basis for withdrawing the reference.");

*Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*, 466 B.R. 188, 203 (S.D.N.Y. 2011). While a district court may permissively withdraw bankruptcy cases, the district court erred in holding that withdrawal was mandatory at the pleading stage when the only issues presented involved the application of the Bankruptcy Code and SIPA. If the mere presence of SIPA resulted in mandatory withdrawal, SIPA would turn into an "escape hatch" from bankruptcy court, contrary to SIPA and this Court's precedent. To avoid this pernicious result, this Court should similarly continue to construe section 157(d) narrowly and hold that section 546(e) is not a basis for mandatory withdrawal at the pleading stage.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court reverse and vacate (i) *Greiff* and all related orders, and (ii) the Withdrawal Order and all subsequent orders withdrawing the reference of these cases; and remand these cases to the bankruptcy court for further proceedings.

Date:  New York, New York                  Respectfully submitted,
       May 15, 2013

                                           /s/ David J. Sheehan
                                           David J. Sheehan
                                           Oren J. Warshavsky
                                           Tracy L. Cole
                                           Seanna R. Brown
                                           BAKER & HOSTETLER LLP
                                           45 Rockefeller Plaza
                                           New York, New York 10111
                                           Telephone:  (212) 589-4200
                                           Facsimile:  (212) 589-4201

                                           *Attorneys for Irving H. Picard, Trustee for
                                           the Substantively Consolidated SIPA
                                           Liquidation of Bernard L. Madoff
                                           Investment Securities LLC and the Estate
                                           of Bernard L. Madoff*

                                           /s/ Howard L. Simon
                                           Howard L. Simon
                                           WINDELS MARX LANE &
                                           MITTENDORF, LLP
                                           156 West 56th Street
                                           New York, New York 10019
                                           Telephone: (212) 237-1000
                                           Facsimile: (212) 262-1215

                                           *Conflicts Counsel to Irving H. Picard,
                                           Trustee for the Substantively
                                           Consolidated SIPA Liquidation of
                                           Bernard L. Madoff Investment
                                           Securities LLC and Bernard L. Madoff*

/s/ Matthew B. Lunn
Matthew B. Lunn
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855

*Conflicts Counsel to Irving H. Picard,
Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L.
Madoff*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 13,919 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Office

Word in 14-point Times New Roman font.

Date:  New York, New York                    Respectfully Submitted,
      May 15, 2013

                                         /s/ David J. Sheehan
                                         David J. Sheehan
                                         BAKER & HOSTETLER LLP
                                         45 Rockefeller Plaza
                                         New York, New York 10111
                                         Telephone:  (212) 589-4200
                                         Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the*
*Estate of Bernard L. Madoff*

# CERTIFICATE OF SERVICE & CM/ECF FILING
## 12-2557-bk(L)

      I hereby certify that I caused the foregoing Brief to be served on All Counsel via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25:

      I further certify that one of the participants in the case is not a registered CM/ECF user. We have mailed a CD-ROM and foregoing document by U.S. First Class Mail for delivery to the following non-CM/ECF participant:

Mr. Stanley Plesent
24 Maple Avenue
Larchmont, New York 10538

      I further certify that the foregoing document will be served electronically on the non-CM/ECF participants listed below at the following email address bdon@daibes.com:

Fred A. Daibes Madoff Securities
Trust c/o Fred A. Daibes
1000 Portside Drive
Edgewater, NJ 07020

Fred A. Daibes LLC
c/o Fred A. Daibes Enterprises
1000 Portside Drive
Edgewater, NJ 07020

Fred A. Daibes Madoff Securities
Trust c/o Fred A. Daibes
99 Gorge Road, Apt. 2010
Edgewater, NJ 07020

Fred A. Daibes
99 Gorge Road, Apt. 2010
Edgewater, NJ 07020

1096-1100 River Road Associates, LLC
c/o Fred A. Daibes Enterprises
1000 Portside Drive
Edgewater, NJ 07020

I certify that an electronic copy was uploaded to the Court's electronic filing system. Six hard copies of the foregoing Joint Appendix were sent to the Clerk's Office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8500

on this 15th day of May 2013.

/s/ Nadia R. Oswald-Hamid
Nadia Oswald-Hamid