**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215
Howard L. Simon

*Special Counsel for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | **AMENDED COMPLAINT** |
| Plaintiff, | Adv. Pro. No. 12-01278 (CGM) |
| v. | |
| ZEPHYROS LIMITED, | |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa-*lll*,[1] substantively consolidated with the chapter 7 estate of Bernard L. Madoff

("Madoff" and together with BLMIS, the "Debtors"), by and through his undersigned counsel,

for his Amended Complaint against defendant Zephyros Limited ("Defendant"), alleges the

following:

## I.    NATURE OF THE PROCEEDING

1.     This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS "customer property," as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of

the massive Ponzi scheme perpetrated by Madoff and others.

2.     The Trustee seeks to recover at least $95,358,159 in subsequent transfers of

BLMIS customer property (the "Transfers") made to Defendant.  Defendant obtained the

Transfers by redeeming interests it held in BLMIS feeder fund Rye Select Broad Market

Portfolio Limited (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye Portfolio

Limited").  BLMIS feeder funds were entities that invested all or substantially all of their assets

with BLMIS's investment advisory business (the "IA Business").

3.     Defendant also invested in, and in certain cases received transfers out of, other

BLMIS feeder funds; such transfers are not being sought in this Amended Complaint.

4.     Defendant is a proprietary hedge fund of, and is 100% indirectly owned and

managed by, non-party Credit Suisse Group AG ("CS Group").  CS Group's affiliated

companies, including Defendant, invested hundreds of millions of dollars with at least ten

BLMIS feeder funds.  This recovery action is one of several commenced by the Trustee for

---

[1] For convenience further references to SIPA will omit title 15 and be cited as SIPA §____.

transfers received in connection with those investments.[2]  At all relevant times, Defendant was

part of the global Credit Suisse enterprise, a highly sophisticated financial organization

consisting of CS Group and its subsidiaries, all of which operated under the master brand name

"Credit Suisse" (with the enterprise collectively referred to herein as "Credit Suisse").

## II.  BACKGROUND, THE TRUSTEE AND STANDING

5.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

(the "SEC") commenced the District Court Proceeding.

6.      On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

7.      Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)      appointed the Trustee for the liquidation of the business of BLMIS
         pursuant to SIPA § 78eee(b)(3); and

(b)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

---

[2] Other recovery actions commenced by the Trustee against Credit Suisse entities invested with BLMIS feeder funds
include *Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925)*; Picard v. Solon Capital, Ltd.* (Adv. Pro. No. 12-
01025) (since dismissed); *Picard v. Mistral (SPC)* (Adv. Pro. No. 12-01273); *Picard v. Credit Suisse AG (as successor
in interest to Clariden Leu AG and Bank Leu AG)* (Adv. Pro. No. 12-01676); and *Picard v. Trincastar Corporation*
(Adv. Pro. No. 11-02731).

8.      By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

9.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

10.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

11.     On July 16, 2009, this Court entered an order granting the Trustee's motion to retain Windels Marx Lane & Mittendorf, LLP as special counsel on behalf of the consolidated estate, nunc pro tunc as of June 9, 2009.

12.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

13.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

14.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

15.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

16.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

17.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

### III.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

#### A.    BLMIS

18.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from  a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

19.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

20.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

21.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

22.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

23.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

24.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

25.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

26.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted

BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements

and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person

accounting firm based out of a strip mall in Rockland County, New York.  Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was

a semi-retired accountant living in Florida.

27.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.    Madoff's Investment Strategy

28.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the

"SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's

close friends and their families, Madoff also purportedly purchased securities that were held for a

certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no

legitimate business operations using any of these strategies.

29.    All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

30.    The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets.  Investors were told they would gain profits from a change in the expectations

for the stock or convertible security over time.  In the 1970s this strategy represented a

significant portion of the total BLMIS accounts, but by the early 1990s the strategy was

purportedly used in only a small percentage of BLMIS accounts.

31.     From the early 1990s forward, Madoff began telling BLMIS customers that he

employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any

securities for its BLMIS customers.

32.     BLMIS reported falsified trades using backdated trade data on monthly account

statements sent to BLMIS customers that typically reflected impossibly consistent gains on the

customers' principal investments.

33.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or

basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-

the-money S&P 100 Index put options; and, (iii) the sale of out-of-the-money S&P 100 Index

call options.

34.     The put options were to limit the downside risk of sizeable price changes in the

basket.  The exercise of put options could not turn losses into gains, but rather could only put a

floor on losses.  By definition, the exercise of a put option should have entailed a loss for

BLMIS.

35.     The sale of call options would partially offset the costs associated with acquiring

puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would

make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

outperform the market, because in a rising market, calls would have been expected to be

exercised by the counterparty.

36.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

37.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold, had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

38.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

39.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

2.      BLMIS's Fee Structure

40.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-

10

based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars
in fees.

### 3. BLMIS's Market Timing

41.    Madoff also lied to customers when he told them that he carefully timed securities

purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by

intermittently entering and exiting the market.  During the times when Madoff purported to be

out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities

("Treasury Bills") or mutual funds invested in Treasury Bills.

42.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5

of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that

showed, among other things, financial information on customer activity, cash on hand, and assets

and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were

undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck

with the then-prevailing market conditions.  It would be impossible to automatically sell all

positions at fixed times, independent of market conditions, and win almost every time.

43.    BLMIS's practice of exiting the market at fixed times, regardless of market

conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does

not depend on exiting the market in a particular month.

### 4. BLMIS Execution

44.    BLMIS's execution showed a consistent ability to buy low and sell high, an

ability so uncanny that any sophisticated or professional investor would know it was statistically

impossible.

5.    <u>No Evidence of BLMIS Trading</u>

45.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

46.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

6.    <u>The Collapse of the Ponzi Scheme</u>

47.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

48.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

49.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## IV.    **DEFENDANT**

50.    Defendant is a corporate entity organized under the laws of the Cayman Islands and has its registered address at MaplesFS Limited, P.O. Box 1093, Queensgate House, 113 South Church Street, Cayman Islands.  Defendant shared its registered address with other

entities, including another proprietary hedge fund owned and operated by Credit Suisse, Mistral (SPC) ("Mistral").

51.    Defendant was formed by Credit Suisse in August 2003 as a proprietary investment vehicle.  As of at least 2013 and upon information and belief, at all relevant times, Defendant was 100% directly owned by Credit Suisse International and indirectly owned 100% by CS Group.  At all relevant times, Defendant was a hedge fund of funds managed by New York-based Credit Suisse Index Co., Inc. (*f/k/a* Credit Suisse First Boston Index Co., Inc.) (the "CS Manager"), a Delaware corporation.  The CS Manager's officers were shared with other Credit Suisse subsidiaries, based in Credit Suisse's New York offices at 11 Madison Avenue.

52.    Defendant had no employees of its own and its only operations were its investments, which consisted of BLMIS feeder funds and other hedge funds tracked by a prominent hedge fund index known as the Credit Suisse/Tremont Hedge Fund Index (*f/k/a* CSFB/Tremont Hedge Fund Index) (the "CS/Tremont Index").

53.    The CS/Tremont Index was, as announced in a 1999 Credit Suisse press release, a joint venture between Credit Suisse and Tremont Group Holdings, Inc. (f/k/a Tremont Capital Management, Inc. f/k/a Tremont Advisers, Inc., "Tremont Group" and together with affiliates, including Tremont Partners, Inc. "Tremont Partners," collectively "Tremont") formed and thereafter owned by Credit Suisse Tremont Index LLC (the "CS/Tremont Partnership"), a Delaware limited liability company.  The CS Manager and New York-based Tremont Group jointly operated the CS/Tremont Index, including jointly selecting the funds for inclusion and reviewing, analyzing and reporting on the funds' performance.

54.    Defendant's purpose was to provide investors with a vehicle to invest in hedge funds tracked by the CS/Tremont Index.  Credit Suisse created funds such as Defendant, Mistral

and Solon Capital, Ltd. ("Solon")—all operated by the CS Manager from New York—

specifically to invest in funds that were tracked by the CS/Tremont Index. The chart below

details the relationships between Defendant, CS Group, the CS Manager, and the CS/Tremont

Partnership:



## V.    SUBJECT MATTER JURISDICTION AND VENUE

55.     This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is

pending. The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff

Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court. This Court has jurisdiction over this adversary proceeding under

28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

56.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

57.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

58.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## VI.    PERSONAL JURISDICTION

59.     Defendant is subject to the jurisdiction of this Court pursuant to Bankruptcy Rule 7004 and the United States Constitution, as well as section 302 of the New York Civil Practice Law and Rules, because Defendant purposely availed itself of the laws and protections of the United States and the State of New York.

60.     The Trustee's claims against Defendant arise from business it transacted within New York.  Defendant derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

61.     All of Defendant's operations took place in New York.  Although organized and registered under the laws of the Cayman Islands, Defendant had no meaningful business operations in the Cayman Islands or elsewhere.  As an exempt company under the Cayman Islands Companies Law, Defendant was prohibited from soliciting investors in the Cayman Islands.

62.     At all relevant times, Defendant was managed by the New York-based CS Manager.  Defendant's only business activities were its investments, which the CS Manager managed using personnel located at Credit Suisse's New York headquarters.

63.    The CS/Tremont Partnership marketed the CS/Tremont Index and its underlying fund products–which included Defendant, Mistral and Solon–from Credit Suisse's New York headquarters.

64.    KPMG annually audited Defendant in New York based on financial information provided by Credit Suisse personnel operating Defendant in New York.

65.    Defendant knowingly directed funds to be invested with New York-based BLMIS and knowingly received subsequent transfers of customer property from BLMIS.

66.    Defendant knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS via Rye Portfolio Limited.  New York-based Tremont Group, a Delaware corporation, created, owned, managed and operated the Rye Select family of BLMIS feeder funds[3] out of Rye, New York, including Rye Portfolio Limited.  Tremont's employees in New York spoke openly with their investors about their funds being invested with BLMIS and regularly referred to the Rye Select Funds as "our Madoff fund" or as a Madoff "feeder."  An email to Tremont from a New York-based Credit Suisse representative who was operating Defendant referred to Rye Portfolio Limited as "the Bernie Maddof [sic] fund."

67.    Defendant also directed funds to be invested with BLMIS via Kingate Global Fund Limited ("Kingate Global"), a BLMIS feeder fund co-managed by Tremont, and via Fairfield Sentry Limited ("Fairfield Sentry"), a BLMIS feeder fund owned, managed, and operated by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.  In an email to FGG, a New York-based Credit Suisse employee operating Defendant indicated his

---

[3] Rye Select Broad Market Fund LP (*f/k/a* American Masters Broad Market Fund, L.P.), Rye Select Broad Market Prime Fund LP (*f/k/a* American Masters Broad Market Prime Fund, L.P.), and Rye Portfolio Limited (collectively, the "Rye Select Funds").

team's view that Rye Portfolio Limited, Kingate Global and Fairfield Sentry were "essentially the same fund" but with "different managers."

68.     By directing its investments to BLMIS through Rye Portfolio Limited, Kingate Global and Fairfield Sentry, Defendant knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

69.     Tremont Group, Tremont's holding company, was Defendant's primary contact for Rye Portfolio Limited.  The New York-based Credit Suisse personnel operating Defendant and co-operating the CS/Tremont Index regularly communicated with and received information from New York-based Tremont executives in connection with Defendant's Rye Portfolio Limited investments.

70.     The Credit Suisse personnel operating Defendant regularly transacted and corresponded with Tremont personnel, and monitored and reviewed documents related to BLMIS and Rye Portfolio Limited, on Defendant's behalf from Credit Suisse's New York headquarters.

71.     Credit Suisse executives and employees, including those operating Defendant, also met with representatives of BLMIS feeder funds in New York periodically from as early as 2000 through 2008, which included visits to Tremont's New York offices as well as a meeting with Madoff himself at BLMIS's office.  As members of groups, committees, and/or business lines within Credit Suisse that oversaw and had responsibility for the organization's BLMIS feeder fund investments, including for Defendant, these Credit Suisse personnel acted on behalf of CS Group, its subsidiaries and affiliates—including Defendant.

72.     Defendant signed a subscription agreement each time it invested in Rye Portfolio Limited, in which it affirmed having received and read the fund's prospectus.  The prospectus

provided that the fund's assets would be invested with a manager using the SSC Strategy.  Rye

Portfolio Limited investors were also informed by the Rye Select Funds' due diligence

questionnaires ("DDQs") that the Rye Select Funds traded in the "U.S. equity market" and

related equity index options, and that cash would be held in "U.S. short term treasury bills."  The

Rye Select Funds' PPMs and prospectuses confirmed that custody of the securities held on

behalf of the Rye Select Funds would be held in "a brokerage account with an NASD registered

broker dealer" (i.e. BLMIS).  Rye Portfolio Limited investors, including Defendant, knew that a

redemption from this account should have resulted in the investment manager liquidating U.S.

securities.

73.    Defendant designated and used a U.S. administrator and custodian, SEI

Investments Company, a financial services company headquartered in Pennsylvania ("SEI"), to

facilitate its investments in Rye Portfolio Limited, including for signing and sending subscription

and redemption requests.

74.    The Transfers themselves also occurred in the United States and New York.

75.    Defendant received at least 22 redemptions from Rye Portfolio Limited, which

comprise the totality of the transfers sought herein.  Defendant designated and used a bank

account of its administrator/custodian SEI at Wachovia National Bank in the U.S. (and one other

SEI account located at the same U.S. bank; together, the "U.S. Accounts") to receive the

majority, and upon information belief, all, of the redemption payments from Rye Portfolio

Limited.

76.    Defendant also designated and used the U.S. Accounts to make subscription

payments to Rye Portfolio Limited.

77.    Prior to fall of 2006, Rye Portfolio Limited used a U.S. correspondent bank account at Citibank, N.A. in New York (the "Rye Portfolio Citibank Account") to receive subscription payments from its investors, including Defendant.  From mid- to late-2006 onward, Rye Portfolio Limited used a U.S. bank account at Bank of New York in New York (the "Rye Portfolio BNY Account") to receive subscription payments from its investors, including Defendant.  The moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank in New York.

78.    Rye Portfolio Limited also used the Rye Portfolio BNY Account and, upon information and belief, the Rye Portfolio Citibank Account, to send redemptions to its investors, including Defendant.

## VII.    TREMONT KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD

79.    On December 7, 2010, the Trustee commenced an adversary proceeding against, among others, Tremont Group, Tremont Partners, and several Tremont funds invested wholly or in part with BLMIS (including Rye Portfolio Limited and, collectively, the "Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property under SIPA (the "Tremont Complaint").[4]  The Trustee incorporates by reference the factual allegations in the Tremont Complaint, as supplemented below.

80.    Tremont created, managed, and operated a number of feeder funds that invested directly and indirectly with BLMIS, including Rye Portfolio Limited.

81.    In a September 22, 2011 order, this Court approved a settlement between the Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its affiliates, and a former Tremont chief executive (collectively, the "Tremont Settling Defendants") that obligated

---

[4] *Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010).  *See* the Tremont Complaint at ¶ 2 for the full names of the defendants.

the Tremont Settling Defendants collectively to pay the Trustee $1.025 billion for the benefit of

the customer property estate (the "Tremont Settlement").  The Tremont Settlement also provides

that the transfers made to the Tremont Feeder Funds were "deemed avoided."

**A.      Tremont's Senior Executives Had a Close Relationship with Madoff**

82.      Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or

around 1991.  Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO,

helping to select money managers, including Madoff.  Robert Schulman joined Tremont in 1994

and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

83.      Manzke and Schulman met and had regular calls with both Madoff and his top

lieutenant Frank DiPascali.  Schulman had a special relationship with Madoff, which Tremont

described as its "competitive edge."  In fact, Tremont touted Schulman's unusually close

relationship with Madoff, stating that his "long-standing relationships with the principals of our

existing managers [BLMIS listed first among them] is clearly an edge over any firm

contemplating a similar business as our ability to negotiate preferential terms is related directly

to the strength and longevity of the relationships."  Emphasizing Schulman's special relationship

with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's

unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities

throughout the year. . . ."  At least once, Madoff even sought Schulman's advice on hiring

decisions at BLMIS.  In June 2006, Tremont Vice President Chris Cichella explained to a

potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year

relationship."

84.      Investors took notice of the relationship between Schulman and Madoff.  For

example, a prospective investor had a call with Tremont in May 2007 where he referenced the

"friendly relationship between Bob and Bernie."  He also noted that, "[f]or Tremont, it goes back

to the relationship . . . . Bob has been there many times and has worked w/ Bernie is [sic]

business since the 1980s."

### B.    Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business

85.    Tremont received warnings of BLMIS's fraudulent IA Business from clients as

early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I

know you are sick of answering this but man is it hot out there with the Bernie fraud rumors."

The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used

such a "small" firm as its auditor.

86.    Less than a month later, Tremont became aware of the *Barron's* and *MARHedge*

articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering

BLMIS feeder funds to its clients.  On May 7, 2001, Tremont Group's Chief Operating Officer

(and later President) Barry Colvin emailed a number of Tremont employees alerting them to the

articles and instructing them to direct third party questions to Tremont's management.

87.    On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a

discussion Mitchell had with an investor about "associating Madoff with broker-dealer

wrongdoing of late."  The following month, Mitchell, Schulman, and the investor visited Madoff.

The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation

as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to

meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at every

year end; (iv) the absence of a third party custodian; and (v) BLMIS's "exceptionally stable"

returns "with only 7 negative months since 1990."

88.    Mitchell retained these notes and years later forwarded them to Tremont vice

president and manager responsible for product line management and oversight, Darren Johnston,

cautioning: "Don't attach this – but it's an interesting set of notes from a meeting years

back . . . ."

89.      In March 2004, the investor who emailed Schulman in 2001 about the "Bernie

fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments,

explaining:

> My motivation for doing this is not due to some new buzz out there
> for as you know that is a constant din but rather that I can no
> longer ignore my core instincts as an investor in which I have the
> [sic] battle the fact that I really don't know what is going on, what
> a [sic] do know is I am in an investment program that no one else
> in history has been able to make work, return series is flat out too
> good given how efficient the underlying securities are priced and
> he doesn't charge a fee all compounded by it seems every stone I
> turn over is another multi billion $ [M]adoff feeder. I . . . found
> that my inability to rationalize & be intellectually honest on why I
> was invested bothered me more than it has in the past . . . .

90.      When Madoff's scheme collapsed, that investor circulated an email among certain

of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!!!! THE WORLD IS

NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail

over this . . . ."  (Emphasis in original.)

91.      In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum

that investment advisory firm RogersCasey (where Tremont personnel, including Manzke,

previously worked) was "concerned about Tremont's relationship with Madoff" and would thus

recommend that its client not invest with Tremont.  Cichella said RogersCasey would not

reconsider its position because BLMIS "was prone to a blow-up that would destabilize

Tremont . . . ."  Analyzing Tremont for a prospective institutional investor in 2005, the investor's

representative James Purnell raised concerns to Tremont's head of Product Management and

Investment Advisory board member Stuart Pologe about what he dubbed "the Madoff black box"

including, among other things, whether BLMIS's assets were segregated and being verified by a

third party, how Madoff is paid, and whether any written Tremont materials exist mentioning

Madoff (the response was that there were none and there never would be).  After Madoff's arrest

and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they

were "finally vindicated on Madoff.  If it looks too good to be true . . . ."

92.    In March 2007, representatives from Tremont's potential client, Agile Group

("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and

portfolio manager Brian Marsh as part of its due diligence.  Agile's notes from the meeting (the

"Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding

operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades.

This included queries about its auditors, the lack of information on options trading, identity of

counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use

of paper trade tickets and account statements, the inability to verify BLMIS's assets, and

BLMIS's going in and out of the market in large transactions with no overall effect on the

market for the securities it purportedly traded.

93.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA

Business was a fraud and perhaps even a Ponzi scheme.  Agile pointed out in the meeting how

the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people"

operating the IA Business were involved.  During the discussion, it was deduced that, "[e]ither

Madoff owns what he owns or they are fictitious.  But if it is a Ponzi scheme, every dollar profit

has been realized."

94.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions

concerning BLMIS.  Addressing Agile's request, Johnston instructed internally: "We should give

answers by phone rather than email . . . ."  After speaking with Johnston and Tremont's vice

president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

95.     In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 *Barron's* article.

96.     Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws.  As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third party controls and how he executes his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

97.     Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place."  A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure."  That same month, Cichella once again pulled out the May 2001 *Barron's* article, this time forwarding it to Mitchell, stating, "Enjoy!"

## C.     Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

98.     Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious

trades and that the fraud warnings it received were well founded.  Tremont created reports and

marketing materials of its own highlighting the impossible trading and performance.  For

example, Tremont knew from the monthly analytic summaries its senior management prepared

based on these BLMIS documents that the positions and prices BLMIS reported differed from

prices Bloomberg reported.  Tremont's auditor, KPMG, similarly found and reported to Tremont

more than 20 such differences in 2006 alone.

99.    Tremont also estimated in its reports the amount BLMIS had in AUM and

calculated whether or not there was sufficient volume in each instrument for Madoff to be able to

execute such trades.  Given that Tremont knew BLMIS had "well in excess of $20 billion" in

AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont

knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to

complete.

### D.    Tremont Exempted BLMIS From Its High Due Diligence Standards

100.    The majority of Tremont's business involved placing its clients' assets with third-

party managers.  For managers other than Madoff, Tremont implemented due diligence

procedures, investigated the quality of the management personnel, assessed key risk factors

associated with the investment, and continuously monitored the investment and the managers.

101.    As a sophisticated manager with industry-leading due diligence standards,

Tremont positioned itself at the forefront of initiatives to improve monitoring of investment

managers in light of frauds that preceded Madoff.  Tremont claimed that its comprehensive

operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent

activity.

102.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS

from its due diligence standards.  In fact, Tremont's executives deliberately prevented

transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.  To ensure

that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff,

Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya

don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's

auditors.

103.    According to the SEC—which investigated Tremont after Madoff's arrest—

Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's

procedures as applied to other managers.  The SEC concluded that because "Schulman

conducted the due diligence, he would be able to control what areas and information [were]

reviewed or not reviewed."

104.    Tremont also did not conduct due diligence on Friehling & Horowitz.  Rather, as

the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations

with Madoff's auditors."  In 2007, Tremont even admitted to Agile that someone from Tremont

"anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they

exist."

105.    In an unusually candid response to one strategic consulting firm, Pologe admitted

that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred

to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business."  Pologe

noted: "We make a lot of money off this, though."

### E.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

106.    Tremont's due diligence standards considered independent oversight of its outside

managers to be critical.  Tremont, however, knowingly made BLMIS an exception to its

requirement of third-party oversight of its money managers.

107.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

108.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties.  Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

109.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification.  This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?"  This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy."  Mitchell took the conversation off-line, replying, "What is your telephone number?"

110.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form.  . . . it would be great if you could convince them" that the assets existed.

111.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS

feeder funds. Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Evidencing that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

### F. Tremont Consistently Shielded Madoff From Third Party Due Diligence

112. Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.)

113. In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [sp] agreement," before sending vague, one word answers to the questions.

114. On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]." In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

115.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

116.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional.  We should discourage this . . . ."  Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and we told [the investor] that we have never had an on site meeting with a client and BM."

117.    Tremont even restricted which of its employees could contact BLMIS.  In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF.  ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!"  (Emphasis in original.)

118.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers.  Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y.  In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff."  In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

119.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

120.    Tremont also lied to investors when presented with concerns about BLMIS's auditors.  As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers."  Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

G.    **Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading**

121.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked.  In fact, Schulman bragged internally that he taught Madoff how to trade options.  Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

1.    Divergent Answers on Over-the-Counter/Listed Trading Questions

122.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

123.    Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties—a basic requirement for all OTC options trades.

124.    Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

125.    For example, a November 2006 DDQ for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange."  In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC."  On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

126.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning.  Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

        2.    <u>Failure to Conduct Any Diligence on Purported Options Counterparties and Covering Up the Truth with Fabrications</u>

127.    Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

128.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds.  This meant that the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

129.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk.  A JPMorgan Chase ("JPM") representative even pointed out to

Johnston that the trading counterparties should all have been known to Tremont if Madoff supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and not in BLMIS's name. But Tremont never spoke with a single counterparty for Madoff's purported options trading, because there were none.

130.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed depending on who was asking. In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not disclosed [any counterparty names] to us." Kelly nevertheless later told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it."

131.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

132.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM—who had just inquired on the identity of the counterparties—as one of them.

133.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

134.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

135.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the time—led to industry and investor panic.  Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

136.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events.  They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds.  For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

137.    Tremont worked to avoid discussions with investors regarding the Lehman collapse.  To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

138.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that … [w]e do not discuss our counterparty arrangements as we are contractually bound not to."  In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

139.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties

presented no risk.  If Tremont's senior management believed its BLMIS options were real,

however, the Lehman collapse would have been more than a non-event.

### H.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

140.    Tremont's profitability and, as it turned out, its very existence, depended on

BLMIS.  Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly

consistent, positive returns, which enhanced their investment track records and ability to attract

business partners and clients.  This led to the Tremont Feeder Funds' AUM increasing rapidly.

For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM

increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

141.    Tremont's revenues grew along with its AUM; during this period, Tremont

received at least $255 million in fees from its BLMIS-facing products.

142.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly

dependent" on Madoff, which accounted for "all of the profits of the firm."  Cichella said Rye

Prime Fund's "only reason for being is as a $2b feeder into Madoff."  Pologe said BLMIS was

Tremont's "crack addiction business."

143.    Tremont's parent company concluded that "the economics of Tremont's business

[was] Madoff."  Tremont did nothing more to earn its fees through its Tremont Feeder Funds

than provide access to BLMIS.  Pologe acknowledged Tremont "just sell[s] access [to BLMIS]

for 2% management fee . . . .  We make a lot of money off this."  As Schulman told Mitchell, for

some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for

them to access Madoff."

144.    Fees were a powerful reason for funds like Tremont to close their eyes and hide

what they knew about BLMIS's fraud.  As noted by Albourne in late 2008, "[w]e have been

advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

## I.  Tremont Co-Managed Kingate Global

145.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship with the Kingate-related feeder funds and management.[5]

146.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, "Kingate").

147.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

148.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud.  Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke.  Specifically, in or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global.  Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global.  Manzke and Hammond were listed as "principal decision-makers" in May 2005.

---

[5] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global and concerning the role of Kingate Management Limited are incorporated by reference.  *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM) (Bankr. S.D.N.Y.) (ECF No. 100).

149.     As part of this deal, Kingate Management and Tremont Bermuda also split Kingate Global's management fees, which provided Tremont with a significant revenue. Between 1998 and 2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

150.     Tremont Bermuda and Kingate Management were co-agents to Kingate Global through their conduct and the operation of the various agreements entered into between the parties.  As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont.[6]

## VIII.   RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANT

### A.     Initial Transfers from BLMIS to Rye Portfolio Limited

151.     As discussed above, the Trustee commenced a separate adversary proceeding against Rye Portfolio Limited and other funds directly or indirectly invested with BLMIS that were managed by Tremont, seeking to avoid and recover initial transfers of customer property from BLMIS in the amount of $2,140,297,364.

152.     Also as discussed above, by the Order dated September 22, 2011, this Court approved the Tremont Settlement, under which the Trustee received a settlement payment of $1,025,000,000.  The Tremont Settlement specifically states that transfers to subsequent transfer defendants were not recovered with the partial payment by the Tremont Settling Defendants.

153.     From the inception of Rye Portfolio Limited's account with BLMIS to the Filing Date, BLMIS made transfers to Rye Portfolio Limited of approximately $620,000,000 (the "Initial Transfers").  Of the Initial Transfers, $609,000,000 was transferred to Rye Portfolio Limited, Account Number 1FR080, during the six years preceding the Filing Date (the "Six Year

---

[6] *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015).

Transfers"). The Six Year Transfers are avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

154.    Of the Six Year Transfers, $350,000,000 was transferred to Rye Portfolio Limited during the two years preceding the Filing Date (the "Two Year Transfers"). The Two Year Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

155.    As alleged above in paragraphs 79-150, Rye Portfolio Limited received each of the Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Portfolio Limited to inquire further into the BLMIS fraud. *See also* Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-1364 (CGM), ECF No. 399, ¶¶ 425–467 (Bankr. S.D.N.Y. filed June 26, 2015) (detailing Tremont's relationship with BLMIS).

156.    Charts setting forth the Initial Transfers are included as Exhibits A and B. The Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**B.    Subsequent Transfers from Rye Portfolio Limited to Defendant**

157.    Prior to the Filing Date, Rye Portfolio Limited subsequently transferred a portion of the Initial Transfers to Defendant (the Transfers, as defined above). Based on the Trustee's investigation to date, the Transfers to Defendant total at least $95,385,159. A chart setting forth the presently known Transfers is attached as Exhibit C.

158.    On April 5, 2012, the Trustee filed this action seeking recovery of the Transfers.

159.    The Transfers are recoverable from Defendant under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

160.    The Transfers represent a redemption of equity interests by Defendant as a

shareholder in Rye Portfolio Limited.  Because Rye Portfolio Limited invested all or

substantially all of its assets into the BLMIS Ponzi scheme, Rye Portfolio Limited was insolvent

when it made the Transfers to Defendant upon redemption of its interests.

161.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the

right to:  (i) supplement the information on the initial and subsequent transfers discussed above,

and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**COUNT ONE**
**RECOVERY OF THE SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550(a)**

162.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

163.    The Transfers are recoverable from Defendant under 11 U.S.C. § 550(a) and

SIPA § 78fff-2(c)(3).

164.    Defendant is the immediate or mediate transferee of the Transfers.

165.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the

Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b)

awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on

Count One in favor of the Trustee and against Defendant as follows:

a)    Recovering the Transfers, or the value thereof, from Defendant for the benefit of

the estate;

b)      If Defendant challenges the avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

c)      Awarding the Trustee prejudgment interest from the date on which the Transfers were received by Defendant; and

d)      Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York
      June 9, 2022

<div style="margin-left:40%">

**WINDELS MARX LANE & MITTENDORF, LLP**

<u>/s/ Howard L. Simon</u>
Howard L. Simon (hsimon@windelsmarx.com)
Kim M. Longo (klongo@windelsmarx.com)
Alex Jonatowski (ajonatowski@windelsmarx.com)
156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
Facsimile: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

</div>