# EXHIBIT I

# Offering Memorandum

*25 April 2007*



Primeo Select Fund
Primeo Executive Fund

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

## Primeo Fund

**(the "Fund")**
(incorporated as an exempted company
with limited liability in the Cayman Islands)

## Offering Memorandum

## 25 April 2007

relating to Participating Shares in the following sub-funds of
the Fund

**Primeo Select Fund**

**Primeo Executive Fund**

**The fund is not subject to the Laws of Luxembourg
and is not subject to supervision in Luxembourg**

This Offering Memorandum is distributed on a confidential basis
in connection with a private offering of Participating Shares,
none of which will be issued to any person other than a person
to whom a copy of this Offering Memorandum is sent and who
is an eligible investor. No person receiving a copy of this Offering
Memorandum in any territory may treat it as constituting
an offer to him, unless in the relevant territory such an offer
could lawfully be made to him without compliance with any
registration or other legal requirements.

The contents of this Offering Memorandum are not to be
construed as a recommendation or advice to any prospective
investor in relation to the subscription, purchase, holding or
disposition of Participating Shares. **Prospective investors should
consult their professional advisers accordingly.**

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10482

PIMSAA0082582

This Offering Memorandum has been prepared for the benefit of investors interested in investing in Participating Shares ("**Participating Shares**") of the Primeo Fund (the "**Fund**") offered hereby and any reproduction or distribution of this Offering Memorandum in whole or in part, or the divulgence of any of its contents (other than to professional advisers of the prospective investors receiving this Offering Memorandum), without the prior written consent of the Adviser (as defined below), is prohibited.

The Directors of the Fund (with the exception of the non-executive Directors), whose names appear under the section headed "Directors and Other Parties", accept responsibility for the information contained in this Offering Memorandum. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this Offering Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information.

The Participating Shares are suitable for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in investing in the Fund.

---

No action has been taken to permit the distribution of this Offering Memorandum in any jurisdiction where action would be required for such purpose. Accordingly, no person receiving a copy of this Offering Memorandum and/or an application form in any territory may treat it as constituting an invitation to him to purchase or subscribe for participating shares nor should he in any event use such an application form unless in the relevant territory such an invitation could lawfully be used without compliance with any registration or other legal requirement.

No offer or invitation to subscribe for participating shares may be made to the public in the Cayman Islands.

The participating shares of the fund are exempt from registration under the U.S. Securities Act of 1933 (the "*Securities Act*"). The participating shares may not, as part of the distribution of the participating shares, be offered or sold directly or indirectly in the United States (including the states and the District of Columbia and its territory and possessions) or to "U.S. Persons" (which means a citizen or resident of the United States, a corporation, partnership or other entity created or organized in or under the laws of the United States or any political subdivision thereof or an estate or trust, the income of which is subject to united states federal income taxation regardless of its source; provided, however, that the term "U.S. Person" shall not involve a branch or agency of a United States bank or insurance company that is operating outside of the United States for valid business and not solely for the purpose of investing in securities not registed under the Securities Act).

Any information given or representation made by any dealer, salesman or other person and (in either case) not contained herein should be regarded as un-authorised and, accordingly, should not be relied upon.

Neither the delivery of this Offering Memorandum nor the Offer, issue or sale of participating shares shall, under any circumstances, constitute a representation that the information contained in this Offering Memorandum is correct at any time subsequent to the date of this Offering Memorandum.

Prospective subscribers are not to construe the contents of this Offering Memorandum or any communication relating to this offering as investment, legal or tax advice. Potential subscribers for participating shares should inform themselves as to (a) the possible tax consequences, (b) the legal requirements and (c) any foreign exchange restrictions or exchange control requirements which they might encounter under the laws of the countries of their citizenship, residence, incorporation or domicile and which might be relevant to the subscription, holding, or disposal of participating shares.

The participating shares are neither guaranteed by, nor constitute obligations of Pioneer Global Asset Management S.P.A., The adviser, or their respective subsidiaries or affiliates, which make no representation as to, and specifically disclaim any responsibility for, the financial position and future prospects of the Fund.

As at the date of this offering memorandum, the fund has no mortgages, charges, debentures, loan capital (whether outstanding or created but unissued), or any other borrowings or indebtedness in the nature of borrowing, including bank overdrafts and liabilities under acceptances or acceptance credits, obligations under finance leases, hire purchase commitments or guarantees or other material commitments or contingent liabilities.

It is not the present intention of the board of directors of the fund to advertise or market the participating shares in Ireland and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland. The Fund has not established a place of business in Ireland.

The Fund is not subject to the Laws of Luxembourg and is not subject to supervision in Luxembourg.

**For United Kingdom Investors**
This Offering Memorandum has not been delivered for registration to The Registrar of Companies in England and Wales. The Participating Shares may not be offered or sold in the United Kingdom except in accordance with all applicable provisions of the Financial Services Act 1986 and all applicable orders, rules and regulations thereto. Purchases of any of the Participating Shares in the United Kingdom may only be made on the terms set forth in this paragraph.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10483
PIMSAA0082583

# Table of Contents

**Definitions** .................................................................................................................. 5

**Summary of Offering Memorandum** ........................................................................ 6

**The Fund** ...................................................................................................................... 8
Objects of the Fund........................................................................................................ 8
Borrowing of Cash ........................................................................................................ 8

**Investment Objective and Policies**............................................................................ 8
Primeo Select Fund (the "Select Fund")....................................................................... 8
Investment Objective .................................................................................................... 8
Investment Approach .................................................................................................... 8
Primeo Select Euro Fund .............................................................................................. 8
Primeo Executive Fund (the "Executive Fund")........................................................... 9
Investment Objective .................................................................................................... 9
Investment Approach .................................................................................................... 9
Limitations on Investments .......................................................................................... 9

**Risk Factors and Special Considerations**................................................................. 9
Managed Accounts ...................................................................................................... 10
Currency....................................................................................................................... 10
Performance.................................................................................................................. 10
Valuation of Fund's Assets .......................................................................................... 10

**Advisory Fees Payable by The Fund** ....................................................................... 10
Limited Liquidity......................................................................................................... 10
Cross Series Liability................................................................................................... 10
Potential Conflicts of Interest ..................................................................................... 10

**Typical Investor's Profile** ........................................................................................ 10

**Management and Administration of The Fund**....................................................... 10
Investment Adviser...................................................................................................... 10
Investment Advisory Agreement ................................................................................ 11
Directors and Officers.................................................................................................. 11
Administrator and Custodian ...................................................................................... 12
Administrator ............................................................................................................... 12

**Administration Agreement** ..................................................................................... 12

**Custodian** ................................................................................................................. 13

**Custodian Agreement** ............................................................................................. 13

**The Offering** ............................................................................................................ 13
Initial Offer.................................................................................................................. 13
Subscription................................................................................................................. 14
Payment for Shares ..................................................................................................... 14
Solicitation Arrangements ........................................................................................... 15
Switches ....................................................................................................................... 15
Additional Offerings.................................................................................................... 15

**Eligible Subscribers**................................................................................................. 15

**Use of Proceeds** ....................................................................................................... 15

Offering Memorandum **3**

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

**Expenses** ............................................................................................................... 15

**Net Asset Value** ...................................................................................................... 15

**Shares** ................................................................................................................. 16
Share Capital ........................................................................................................... 16
Share Rights ............................................................................................................. 16

**Transfer of Shares** .................................................................................................. 17

**Redemption of Shares** .............................................................................................. 17

**Compulsory Redemptions** .......................................................................................... 18

**Dividend Policy** ....................................................................................................... 18

**Reports** ................................................................................................................ 18

**Taxation** ............................................................................................................... 18
Cayman Islands ......................................................................................................... 19

**Mutual Funds Law** ................................................................................................... 19

**Anti-Money Laundering Regulations** ............................................................................. 19

**Directors and Other Parties** ....................................................................................... 21

**4** Offering Memorandum

# Definitions

For the purposes of this Offering Memorandum, the following expressions have the following meanings:

**"Administrator"**
means Bank of Bermuda (Cayman) Limited or such other person, firm or corporation appointed, and from time to time acting, as administrator of the Fund.

**"Administration Agreement"**
means the agreement by which the Fund has appointed the Administrator to provide administrative services to the Fund.

**"Adviser"**
means Pioneer Alternative Investment Management Limited.

**"Articles"**
means the articles of association of the Fund, as the same may be amended, restated or supplemented and in effect from time to time.

**"Business Day"**
means any day other than a Saturday, Sunday or other day on which banks in New York City, Luxembourg, or Grand Cayman are authorized or required by law or governmental action to close.

**"Cayman Islands"**
means the British Overseas Territory of the Cayman Islands.

**"Custodian"**
means HSBC Securities Services (Luxembourg) S.A. or such other person, firm or corporation appointed and from time to time acting as custodian of the Fund's assets.

**"Custodian Agreement"**
means the agreement by which the Fund has appointed the Custodian to provide custodian services to the Fund.

**"Directors"**
means the directors for the time being of the Fund.

**"EUR" and "Euro"**
mean the lawful currency of the member states of the European union that maintain the single currency in accordance with Council Regulation (EC) No 974/98 of 3 May 1998 on the introduction of the euro.

**"EUR-class"**
means a Participating Share or Participating Shares with a par value of EUR1.00 per share.

**"Founder Share"**
means a voting non participating share in the capital of the Fund of US$1.00 par value designated as a Founder Share and having the rights provided for under the Articles.

**"Fund"**
means the Primeo Fund, being an open-ended investment fund designed for non-U.S. investors desiring to invest a portion of their assets in a fund emphasizing preservation of capital through diversification of investments. See "The Fund".

**"Manager"**
means entities supervised by the Advisor, with which the Fund's assets may be allocated or invested from time to time.

**"Member"**
has the same meaning as in the Companies Law (2004 Revision).

**"Memorandum"**
means the memorandum of association of the Fund, as the same may be amended, restated or supplemented and in effect from time to time.

**"Offering Memorandum"**
means this offering memorandum.

**"Offering Price"**
the net asset value ("NAV") per Participating Share calculated as of the Valuation Date.

**"Primeo Executive Fund Shares"**
means those Participating Shares which have been designated by the Directors as Primeo Executive Fund Shares.

**"Primeo Select Fund Shares"**
means those Participating Shares which have been designated by the Directors as Primeo Select Fund Shares.

**"Participating Share"**
means a non-voting participating redeemable share in the capital of the Fund designated as a Participating Share and having the rights provided for under the Articles.

**"Restricted Jurisdiction"**
means the United States.

**"S&P"**
means Standard and Poor's, a division of The McGraw-Hill Companies, Inc.

**"Shareholder"**
means a person who is registered on the register of members of the Fund as the holder of a Participating Share.

**"Sub-Manager"**
means such entities as are appointed by a Manager and with whom a Manager allocates or invests the Fund's assets.

**"Sub-Registrar"**
means HSBC Securities Services (Luxembourg) S.A. or such other person, firm or corporation appointed and from time to time acting as the sub-registrar of the Fund.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10486
PIMSAA0082586

# Summary of Offering Memorandum

*The following is a summary only and is qualified in its entirety by the more detailed information appearing elsewhere in this Offering Memorandum, in the Articles of the Fund and other agreements referred to herein.*

**"Subscription Agreement"**
means the form of subscription agreement annexed to this Offering Memorandum.

**"United States"**
means the United States of America.

**"US$-class"**
means a Participating Share or Participating Shares with a par value of US$1.00 per share.

**"US$" and "USD"**
means the currency of the United States.

**"Valuation Date"**
means the last Business Day of each month, upon which the Net Asset Value per Participating Share is calculated.

**The Fund:**
The Primeo Fund is an open-ended investment fund designed for non-U.S. investors desiring to invest a portion of their assets in a fund emphasizing preservation of capital through diversification of investments. See "The Fund".

**The Participating Shares:**
The shares offered hereby are non-voting participating redeemable Participating Shares in the capital of the Fund designated as participating shares and having the rights provided for under the Articles.

**Investment Objective and Policies:**
The Primeo Fund currently consists of the following sub-funds: Primeo Select Fund and Primeo Executive Fund.

**Primeo Select Fund (the "Select Fund")**
The Select Fund aims to achieve the goal of long term capital growth. For Select Fund Shareholders, the Fund intends to achieve the objective of a long-term capital growth by investing primarily with underlying Managers. See "Investment Objective and Policies".

**Primeo Executive Fund (the "Executive Fund")**
The Executive Fund aims to achieve the goal of long term capital growth. For Executive Fund Shareholders, the Fund intends to achieve the objective of a long-term capital growth by investing primarily with underlying Managers.

**Offering:**
Primeo Select Fund and Primeo Executive Fund each have two classes of Participating Shares, one class denominated in United States Dollars and the other class in Euro.

The Participating Shares may not be offered, sold or delivered in the United States or to U.S. persons. The Fund reserves the right to issue additional shares and additional classes of shares. See "The Offering".

**Investment Adviser and Managers:**
Pioneer Alternative Investment Management Limited in Dublin (the "**Adviser**"), a company incorporated and licensed to provide investment management and advisory services under the laws of the Republic of Ireland, shall act as the investment adviser to the Fund in order to achieve the Fund's investment objectives pursuant to an advisory agreement dated 25 April 2007. Prior to 25 April 2007, the investment advisory function was undertaken by BA Worldwide Fund Management, Ltd. pursuant to an advisory agreement dated as of 13 December 1993, which was terminated by the parties thereto on 25 April 2007.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10487

PIMSAA0082587

The Adviser is responsible for advising the Fund on the selection and monitoring of the Managers and investment partnerships and the companies, among which assets will be allocated, and those other administrative matters as agreed upon with the Fund. The Adviser will serve as the Adviser for the Primeo Select Fund and Primeo Executive Fund shares with the right to elect a Manager or Managers to assist in advising with respect to investments relating to such Participating Shares.

The selection of Managers shall be dependent upon several criteria, including experience and performance. Such selection is designed to diversify risk and to reduce volatility, thereby enhancing what the Adviser considers to be potential long-term returns. See "Investment Objective and Policies – Investment Approach".

Substantially all of the Fund's assets are managed by one Manager, i.e., a Cayman Islands domiciled company, who appoints on a continuous basis, a sub-manager/sub-managers (each, a "**Sub-Manager**"), managing collective investment schemes and/or discretionary portfolio management accounts ("**Accounts**") with different backgrounds in terms of strategies, markets and financial instruments. The Manager employs an investment strategy that is consistent with that of the Fund.

**Sub-Registrar:**
HSBC Securities Services (Luxembourg) S.A.

**Subscription:**
The Fund commenced operations on January 1, 1994. The minimum purchase of Participating Shares in each of Primeo Select Fund and Primeo Executive Fund is US$50,000 for the US$-class and, for the EUR-class, the greater of 50,000 EUR or the Euro equivalent of US$50,000. The minimum subsequent purchase of Participating Shares in each of Primeo Select Fund and Primeo Executive Fund is US$1,000 for the US$-class and EUR1,000 for the EUR-class. Participating Shares may be purchased by completing a subscription agreement and delivering it, along with payment for the purchase of Participating Shares, to the Sub-Registrar by the close of business on the twenty-fourth day of each month. In the event that the twenty-fourth day of any month is not a Business Day, the subscription agreement along with the payment must then be received by the Sub-Registrar by the close of business on the immediately preceding Business Day. Proposed investors will not have any right to rescind a purchase after the Sub-Registrar has received a completed subscription agreement. See "The Offering – Payment for Participating Shares".

**Administrator and Custodian:**
Administrative services and registration shall be provided by Bank of Bermuda (Cayman) Limited as Administrator and HSBC Securities Services (Luxembourg) S.A. as Custodian. See "Administrator and Custodian".

**Fees:**
With respect to the Primeo Select Fund Shares the Fund will pay management and advisory fees monthly equal to 1/12th of 2% (annual rate of 2%) of the month-end net asset value of the Fund. The Fund shall also pay an annual performance fee. The first 10% of annual appreciation in net asset value shall not be subject to the performance fee. The Adviser shall be entitled to 20% of that amount of annual appreciation in net asset value of each class of shares, which exceeds 10%. For switches between Primeo Select Fund US$-class and EUR-class, a fee of 1%, calculated from the gross redemption amount, will be charged. See "Management of the Fund  Investment Advisory Agreement".

With respect to Primeo Executive Fund Shares the Fund will pay management and advisory fees monthly equal to 1/12th of 1.50% (annual rate of 1.50%) of the month-end net asset value of the Fund. The Fund shall also pay an annual performance fee of 5% of the annual appreciation in net asset value. For switches between US$-class and EUR-class a fee of 1%, calculated from the gross redemption amount, will be charged. See "Management of the Fund – Investment Advisory Agreement".

The Fund requires, except for special circumstances, a fee of 3% of the subscription price per share. See "The Offering – Solicitation Arrangements".

**Expenses:**
The Fund is responsible for its own organizational and offering expenses and annual operating expenses, including but not limited to advisory fees, administrative fees, custody fees, auditing expenses, legal expenses, corporate licensing fees, and any stock exchange listing fees. See "Expenses".

**Distribution:**
The Fund may appoint distribution agents from time to time. The fees and expenses of any distribution agents appointed by the Fund will be paid by the Adviser out of the fees received by the Adviser pursuant to the Advisory Agreement, not from the assets of the Fund.

**Dividends:**
The Fund does not intend to declare a dividend to Shareholders. See "Dividend Policy".

**Redemption:**
Shareholders will have the right to redeem their Participating Shares at least once each month, on the last Business Day of each month upon prior notice, no later than the twenty-fourth day of the month in which redemption occurs. In case of partial redemption of Primeo Select Fund and/or Primeo Executive Fund a minimum investment of US$50,000 for US$-class and a minimum of the Euro equivalent of US$50,000 for EUR-class has to remain. See "Redemption of Shares".

**Reports:**
The Fund's financial year will end on 31 December of each year. Audited statements of the Fund will be sent to Shareholders within 120 days after the end of each financial year (or as soon thereafter as possible).

**Risk Factors:**
Investment in the Fund involves significant risks. Investors' attention is drawn to the risks outlined in the section headed "Risk Factors".

Offering Memorandum **7**

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

## The Fund

Primeo Fund (the "**Fund**") is an exempted company incorporated with limited liability in the Cayman Islands on 18 November 1993 and empowered under the Memorandum and Articles and the laws of the Cayman Islands to issue and redeem its own Participating Shares and to carry on investment activities. The Fund is structured as an open-ended investment fund and the Directors have power from time to time to establish and maintain a separate portfolio or sub-fund for each class of Participating Share. The Directors had resolved to establish three sub-funds: the Primeo Global Fund; the Primeo Select Fund; and the Primeo Executive Fund.

Although the Primeo Global Fund was established, no assets have been held by the Primeo Global Fund and no Participating Shares were issued with respect to this sub-fund. Accordingly, the Directors resolved to terminate this sub-fund in April 2007.

The Fund is managed by its board of Directors and the Directors will review the activities of the Administrator, the Adviser and the Custodian and decide upon matters of general policy. Subject to the overall supervision of the Directors, the Administrator shall conduct and supervise the administration of the Fund, including responsibility for the calculation of the Fund's net asset value. The Fund will be advised as to its investment activities by the Adviser.

The registered office of the Fund is at the offices of Bank of Bermuda (Cayman) Limited, P.O. Box 513, 2nd Floor, Strathvale House, North Church Street, Grand Cayman KY1-11006, Cayman Islands.

### Objects of the Fund

The objects of the Fund, as stated in section 3 of the Fund's Memorandum, are unrestricted and the Fund shall have full power and authority to carry out any object not prohibited by law.

### Borrowing of Cash

The Fund will not pursue borrowing as an investment policy, but is authorized to borrow in order to purchase securities or debt instruments or to fund redemption requests. There are no restrictions on the Fund's borrowing capacity other than limitations imposed by any lender and any applicable credit regulations except as provided herein. The Fund may enter into arrangements for borrowing or overdraft facilities only with the Custodian or any affiliated company for a net amount of no more than 10% of the Net Asset Value. Such facilities are subject to the terms and conditions as specified by the Custodian or its affiliates from time to time. In addition, the Fund may not pledge or otherwise encumber any securities or claims belonging to the Fund, other than in connection with the borrowing of cash.

## Investment Objective and Policies

### Primeo Select Fund (the "Select Fund")

**Investment Objective**

The Select Fund aims to achieve the goal of long term capital growth. For Select Fund shareholders, the Fund intends to achieve the objective of a long-term capital growth by investing primarily with underlying Managers.

**Investment Approach**

Although the Adviser has the discretion to select different Managers, at present, substantially all of the Select Fund's assets are managed by one Manager, who utilizes a "split-strike conversion strategy" approach with respect to investment and management of its assets. The Manager, in consultation with its investment advisers, will select, on a continuous basis, one Sub-Manager.

The Adviser will consider, in supervising the selection of the Manager, its experience and market performance, trading strategy and techniques, areas of expertise and judgment.

The Sub-Manager invests primarily in the United States and utilizes a non-traditional strategy that is a variation of the traditional "option conversion" strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares). The strategy utilized by the Sub-Manager is called "split-strike conversion" and entails:

(a)   purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;

(b)   selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and

(c)   purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

The Adviser will continually monitor, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to appropriate changes in, or reallocation of assets. The Manager is responsible for all the investment decisions, including asset allocations. Such monitoring will be direct, by the Adviser, or indirect, through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market. The Select Fund may from time to time allocate all or any portion of its assets to cash or cash equivalents.

### Primeo Select Euro Fund

The Directors established a separate sub-fund called Primeo Select Euro Fund in May 2001. Following a re-organization of the Fund in November 2005, investors in the Primeo Select Euro

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10489
PIMSAA0082589

Fund redeemed their shares in exchange for the issue of shares in the Primeo Select Fund, EUR-class.

**Primeo Executive Fund (the "Executive Fund")**
**Investment Objective**
The Executive Fund aims to achieve the goal of long term capital growth. For Executive Fund shareholders, the Fund intends to achieve the objective of a long-term capital growth by investing primarily with underlying Managers.

**Investment Approach**
Although the Adviser has the discretion to select different Managers, at present, substantially all of the Executive Fund's assets are managed by three Managers, who utilize a "split-strike conversion strategy" approach with respect to investment and management of its assets. The Managers, in consultation with its investment advisers, may select, on a continuous basis, one Sub-Manager.

The Adviser will consider, in supervising the selection of the Managers, their experience and market performance, trading strategy and techniques, areas of expertise and judgment.

The Sub-Manager invests primarily in the United States and utilizes a non-traditional strategy that is a variation of the traditional "option conversion" strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares). The strategy utilized by the Sub-Manager is called "split-strike conversion" and entails:

(a)    purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;

(b)    selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and

(c)    purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

In structuring the portfolio for the Executive Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

The Adviser will continually monitor, directly or indirectly, the performance of the Managers in which such assets are invested and advise the Fund's Directors as to appropriate changes in, or reallocation of assets among, existing or new Managers. The Manager is responsible for all the investment decisions, including asset allocations. Such monitoring will be direct, by the Adviser, or indirect, through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market. The Executive Fund may from time to time allocate all or any portion of its assets to cash or cash equivalents.

**Limitations on Investments**
The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer except that a Manager may on a temporary basis invest more than 30% of the Select Fund assets in United States government securities (or securities issued by a national government). In the event that the Adviser discovers that more than 30% of the assets of the Select Fund are invested in the securities of a single issuer (other than temporary investments in United States government securities or other securities issued by a national government), the Adviser will promptly use its best efforts to reduce such investment to less than 30%. Moreover the Adviser will monitor the underlying portfolio of Managers to seek to ensure that the Fund will not permit more than 30% of the assets of the Select Fund to be subject to the counterparty risk of a single counterparty, other than the United States government. In the event that such threshold is exceeded, the Adviser will promptly use its best efforts to reduce such counterparty risk to less than 30%. In addition, the Fund will not take legal or management control of underlying investments made by an investment company or Manager. Any realization of any single investment amounting to 50% or more of the Fund's portfolio will be conditioned on the prior approval of the Shareholders of the Fund. The Fund will adhere to the general principal of diversification in its use of derivative instruments.

There can be no assurance, however, that the Fund's investment objectives can be achieved and results may vary substantially over time.

The Fund will not make investments involving the direct sale by the Fund of securities of an issuer, which securities are not assets of the Fund.

**It must be emphasised, that the fund will be subject to normal market risks and no assurance can be given that the investment objectives of the fund will be achieved.**

## Risk Factors and Special Considerations
Investors should be aware that the value of Participating Shares may fall as well as rise.

Investment in the Fund involves significant risks. Whilst it is the intention of the Adviser to implement strategies which are designed to minimise potential losses, there can be no assurance that these strategies will be successful. It is possible that an investor may lose a substantial proportion or all of its investment in the Fund. As a result, each investor should carefully consider whether it can afford to bear the risks of investing in the Fund. The following discussion of risk factors does not purport to be a complete explanation of the risks involved in investing in the Fund.

The risks of investing in the Fund include, but are not necessarily limited to, the following:

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

## Managed Accounts

The Fund may allocate certain money to investment managers running managed accounts. In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every security transaction only. Any loss arising as a result of an investment in a managed account will be borne by the Shareholders.

## Currency

The Fund's Participating Shares are denominated in United States Dollars and Euro and trading of the Participating Shares will be made in United States Dollars with exception of the Participating Shares of Primeo Select Fund EUR-class and Primeo Executive Fund EUR-class which are both denominated in Euro. For those prospective investors whose functional currency is other than the United States Dollar or Euro, consideration should be given to the potential losses that arise from currency fluctuations between the United States Dollar or Euro and their own functional currency. Further, to the extent securities or other financial instruments are denominated in non-U.S. or non-Euro currencies, the Fund's investment performance is subject to changes in currency exchange rates.

## Performance

The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers. However, there can be no assurance that the Fund will achieve its investment objective. See "Investment Objective and Policies". Managers may utilize investment techniques such as margin financing, short sales, options and forwards and future contracts, which practices can, in certain circumstances, maximize the adverse impact to which the Fund may be subject.

## Valuation of Fund's Assets

The board of Directors, or its delegate, will value the assets and liabilities of the Fund in accordance with the Articles. When the board of Directors, or its delegate, determines that the market price does not fairly represent the value of an asset, or when the value of any asset for which liquidation or third party market valuations are not available, the board of Directors will value such investment as it, in its sole discretion, reasonably determines. In addition, the board of Directors, as well as the Adviser and the Administrator, may rely solely on the valuations provided by the Managers with whom the Fund has invested. (See "Net Asset Value".)

## Advisory Fees Payable by The Fund

The Adviser will receive an asset based management fee and will receive, except with respect to the Primeo Select Fund, a 20% incentive fee if the annual appreciation in the sub-fund exceeds 10% of its Net Asset Value of either class of the sub-fund as determined by the Administrator. (See "Management of the Fund – Investment Advisory Agreement"). For the Primeo Executive Fund, the Adviser will receive 5% of the annual appreciation of such class. The Managers of investment companies with whom the Fund invests may also receive management and incentive fees relating to their performance with the particular investment company, which they manage, regardless of whether the Fund as a whole is profitable. The payment of incentive fees may cause the Adviser or a Manager to make investments that are riskier or more speculative than would be the case in the absence of incentive based compensation. (See "Management of the Fund – Investment Advisory Agreement").

## Limited Liquidity

Investors may generally redeem their Participating Shares only monthly and payment of redemption proceeds may be limited or suspended. (See "Redemption of Shares").

## Cross Series Liability

The Fund has the power to issue Participating Shares in classes or series. The Articles provide for the manner in which the liabilities are to be attributed across the various classes or series (liabilities are to be attributed to the specific class or series in respect of which the liability was incurred). However, the Fund is a single legal entity. Shareholders in the Fund may be compelled to bear the liabilities incurred in respect of other classes or series of Participating Shares if there are insufficient assets in that other class or series to satisfy those liabilities including Participating Shares that are attributable to other sub-funds.

## Potential Conflicts of Interest

A majority of the Directors of the Fund are employees and Directors of the Adviser, and will be entitled to vote on matters pertaining to the Adviser provided that any conflict of interest has been declared or disclosed by the relevant Director(s) prior to the vote on any such matter.

One of the Directors of the Fund is an employee of the Administrator and of the Custodian of the Fund. Again, that Director will be entitled to vote on matters pertaining to the Administrator and the Custodian, provided that any conflict of interest has been declared or disclosed prior to the vote on any such matter.

In accordance with the Articles, a general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

The Fund has not been engaged in any litigation or arbitration proceedings since incorporation and the Fund is unaware of any litigation or claim pending or threatened against it.

## Typical Investor's Profile

The Fund targets high net worth individuals as well as institutional clients who have already obtained sufficient experience in the complex issues of the wide area of hedge fund-strategies and are aware of all high risks involved. The Investors are strongly advised to contact their personal investment consultant, tax consultant or any other professional consultant of their choice, in order to fully understand all risks involved.

## Management and Administration of The Fund

### Investment Adviser

The investment adviser of the Fund is Pioneer Alternative Investment Management Limited in Dublin (the "**Adviser**"). The Adviser is a private company limited by shares incorporated in Ireland on 27 January 1999 and is a wholly-owned subsidiary of Pioneer Global Asset Management S.p.A., which is itself a subsidiary of Unicredito Italiano S.p.A. The Advisor is authorized to provide investment management and advisory services in

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10491

PIMSAA0082591

Ireland by the Financial Regulator under section 10 of the Investment Intermediaries Act 1995.

The Adviser has a total of approximately USD6.5 Billion in discretionary funds under management.

Prior to 25 April 2007, BA Worldwide Fund Management, Ltd. acted as the adviser of the Fund pursuant to an investment advisory agreement dated as of 15 December 1993. This agreement was terminated on 25 April 2007 and a new advisory agreement (the "**Advisory Agreement**") dated 25 April 2007 was entered into between the Fund and the Adviser.

**Investment Advisory Agreement**

Pursuant to the Advisory Agreement, the Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's board of Directors.

Under the Advisory Agreement, the Adviser has complete discretion on behalf of and as agent for the Fund to buy, sell, retain, exchange or otherwise deal in investments and other assets of the Fund; to make deposits, subscribe to issues and offers for sale of, and accept placing of any investments, underwritings and sub-underwritings of any investments or securities; and to effect transactions on any markets or off-exchange, take all day to day decisions and otherwise act as appropriate in relation to the management of the assets of the Fund.

The Advisory Agreement may be terminated by either party on not less than three months' notice in writing, or immediately upon notice in writing given by either party upon the occurrence of certain events.

The Advisory Agreement provides that the Adviser shall not, in the absence of gross negligence or wilful default on its part or on the part of its servants or agents, be liable for any loss or damage which the Fund may sustain or suffer as a result or in the course of the discharge by the Adviser of its duties thereunder.

The Advisory Agreement also contains provisions for the indemnification of the Adviser by the Fund against losses other than in relation to losses resulting from the gross negligence or wilful default of the Adviser.

**Directors and Officers**

The Fund is managed by its board of Directors who shall be responsible for the management and administration of the Fund.

According to the Articles, the Directors have the capacity to determine the remuneration payable to any Director and may, by resolution, approve additional remuneration to any Director for any services other than his ordinary routine work as a Director. Directors are, under the Articles, also entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Fund, or otherwise in connection with the business of the Fund.

The Articles of the Fund provide that a Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon. In addition, a general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

The Directors of the Fund are listed below:-

MR. ALBERTO LA ROCCA is Managing Director of Pioneer Alternative Investment Management (Bermuda) Limited (since December 2002), a director of Pioneer Global Asset Management Limited, S.p.A. (since November 2003) and has been Chief Executive Officer of Pioneer Alternative Investment Management Limited since 1998. He joined Credito Italiano S.p.A. in 1991 and from 1991 to 1995 he was Assistant Portfolio Manager of the Bond Portfolio of Credito Italiano S.p.A. From 1995 to 1997 he was Head of the Bond Portfolio. From 1997 to 1998 he was Head of Global Proprietary Trading in the Finance Department of Credito Italiano S.p.A. Mr. La Rocca holds a Laurea Diploma in Management and Finance from Bocconi University, Milan (1991) and a Certified Accountants Professional Qualification from University of Lecce (1993).

MR. DECLAN MURRAY has been the Chief Operating Officer of Pioneer Alternative Investment Management Limited since 1999. Between 1995 and 1999 he worked for ING Barings Limited as manager, Emerging Market Debt, Emerging Market High Yield Projects and Structured Assets Product Control and advanced to the role of Product controller for Equity Broking and Trading in 1999. Mr. Murray held the position of Investment Services Accountant at Eagle Star Life Assurance Company of Ireland between 1991 and 1995. He was employed by Ernst & Young from 1987 to 1991 and completed an accountancy designation at the Institute of Chartered Accountants in Ireland in 1991.

MS. URSULA RADEL-LESZCZYNSKI is President of BA Worldwide Fund Management, an offshore subsidiary of Bank Austria Creditanstalt, since February 2000. She joined Bank Austria Creditanstalt's Asset Management group in 1995, specializing in Hedge Funds/Offshore Industry. Prior to this, Ms. Radel-Leszczynski worked as a deputy General Manager of a private Austrian international business company. She studied at Jagellonian University in Krakow, Vienna State University, Clayton University and Harvard University. Ms. Radel-Leszczynski holds B.A., M.A. and Ph.D. degrees.

MR. MICHAEL WHEATON is a Senior Vice President with Maples Finance Limited, a company with offices in the British Virgin Islands, the Cayman Islands, Dublin, Hong Kong, Jersey, and Luxembourg that offers a comprehensive range of services to finance vehicles and investment funds. Mr. Wheaton joined Maples Finance Limited in 2006 and works on a wide range of

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10492
PIMSAA0082592

products including multi-manager funds, hedge funds, private equity funds and unit trust structures. From 2000 to 2006 Mr. Wheaton worked with Dart Management Limited where he was Vice President of Treasury. Previously from 1993 to 2000 he worked at Bank of Butterfield International (Cayman) Limited in the Retail and Treasury Departments progressing to the position of Corporate Dealer. He graduated from Kings College London with a BSc Hons.

MR. WHEATON is employed by Maples Finance Limited ("**MFL**"), a licensed trust company and mutual fund administrator headquartered in the Cayman Islands. MFL is wholly owned and controlled by Maples and Calder, the Cayman Islands legal counsel to the Company. MFL has entered into an Agreement for the Provision of Directors with the Fund which sets out the terms on which it will provide the services of Michael Wheaton. MFL is entitled to remuneration from the Fund at its customary rates and for reimbursement of its out-of-pocket expenses, including all traveling, hotel and other expenses properly incurred by Michael Wheaton in attending meetings of the Directors or any shareholders meeting held in connection with the business of the Fund.

The Directors may exercise all the powers of the Fund to borrow money and to mortgage or charge the Fund's undertaking and property, or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Fund or of any third party.

All of the Directors of the Fund, other than Mr. Wheaton, are executive directors.

As a non-executive Director, Mr. Wheaton is not required to devote his full time and attention to the business of the Fund. He may be engaged in any other business and/or be concerned or interested in or act as a director or officer of any other company or entity. Neither MFL nor Mr. Wheaton are responsible for (i) the commercial structuring of the Fund or its investment strategy, (ii) the purchase or sale of any investment on behalf of the Fund (which is the responsibility solely of the Manager), (iii) the valuation of the assets of the Fund, or (iv) any loss or damage caused by the acts or omissions of the Advisor, the Manager, the Administrator or the Custodian or any of their delegates or sub-delegates unless any such loss or damage is actually occasioned by the actual fraud or wilful default of Mr. Wheaton.

The Articles provide that every Director and officer of the Company shall be indemnified out of the assets of the Company against any liability incurred as a result of any act or failure to act in carrying out his or her functions other than such liability (if any) that may be incurred by reason of the actual fraud or wilful default of such Director or officer. The Articles also provide that no such Director or officer shall be liable to the Company for any loss or damage in carrying out his or her functions unless that liability arises through the actual fraud or wilful default of such Director or officer.

The address at which the directors may be reached is c/o Bank of Bermuda (Cayman) Limited, P.O. Box 513, 2nd Floor, Strathvale

House, North Church Street, Grand Cayman KY1-11006, Cayman Islands.

### Administrator and Custodian

The Fund has engaged Bank of Bermuda (Cayman) Limited, P.O. Box 513, 2nd Floor, Strathvale House, North Church Street, Grand Cayman KY1-11006, Cayman Islands, to act as the administrator (the "**Administrator**") and HSBC Securities Services (Luxembourg) S.A., 40 avenue Monterey, P.O. Box 413, L-2014 Luxembourg, to act as the custodian of the Fund (the "**Custodian**").

### Administrator

The Administrator is a wholly owned subsidiary of Bank of Bermuda Limited. Founded in 1889, The Bank of Bermuda Limited is a licensed bank incorporated in Bermuda under the Bank of Bermuda Act 1890. The Bank of Bermuda Limited is engaged in a wide range of international banking and trust services through its main office in Bermuda and its subsidiaries worldwide. On 18 February 2004, The Bank of Bermuda Limited became an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England. As at 31 December 2005, HSBC Holdings plc had consolidated gross assets of approximately US$1,502 billion.

The Fund is not registered under Luxembourg law and is not subject in Luxembourg to the permanent supervision of a control authority.

The Administrator shall not, in the absence of fraud, negligence or wilful default, be liable to the Fund or to any shareholder of the Fund for any act or omission in the course of or in connection with the discharge by the Administrator of its duties. The Fund has agreed to indemnify the Administrator or any persons appointed by it from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (other than those resulting from the fraud, negligence or wilful default on the part of the Administrator) which may be imposed on, incurred by or asserted against the Administrator in performing its obligations or duties hereunder.

The Administrator will have no decision-making discretion relating to the Fund's investment decisions. The Administrator is a service provider to the Fund and is not responsible for the preparation of this document or the activities of the Fund and therefore accepts no responsibility for the accuracy of any information contained in this document, other than the information contained in this section.

### Administration Agreement

Pursuant to an administration agreement dated 19 December 1996 between the Administrator and the Fund (the "**Administration Agreement**"), the Administrator is responsible, under the general supervision of the Adviser, for all matters pertaining to the day-to-day administration of the Fund. The Administrator is responsible for:

(a)  maintaining corporate and financial books and records of the Fund;

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10493

PIMSAA0082593

(b)  providing the Fund with periodic reports regarding the Fund's account and preparing annual financial statements for the Fund;

(c)  computing Net Asset Value on a monthly basis;

(d)  providing registrar and transfer agent services;

(e)  attending to certain non-discretionary details in connection with the sale, purchase, transfer and other dealings with the securities, debt instruments and other property of the Fund held by it; and

(f)  performing certain accounting and clerical services necessary in connection with the administration of the Fund.

The Administrator is entitled to delegate certain of its duties under the Administration Agreement to an affiliate. The Administrator shall serve as corporate secretary.

The Administration Agreement may be terminated by either party upon sixty (60) days' prior notice. The Administration Agreement provides that the Administrator shall not be liable to the Fund or its shareholders for any acts or omissions in the performance of its services, other than as a result of its wilful default or negligence.

## Custodian

The Custodian is an ultimately wholly owned subsidiary of HSBC Holdings plc, a public company incorporated in England. The HSBC Group has major commercial and investment banking business in the Asia Pacific region, Europe, the Americas, the Middle East and Africa. The HSBC Group has over 9,500 offices in 76 countries/territories world –wide. As at 31 December 2005, HSBC Holdings plc had consolidated gross assets of approximately US$1,502 billion.

The Custodian will be responsible for all assets of the Fund other than assets deposited as margin with brokers. Such assets will be held by the Custodian in a separate client account and will be separately designated in the books of the Custodian as belonging to the Fund. Assets other than cash, which are so segregated will be unavailable to the creditors of the Custodian in the event of its bankruptcy or insolvency. Assets deposited as margin need not be segregated and may become available to the creditors of brokers.

The Custodian shall not, in the absence of fraud, negligence or wilful default, be liable to the Fund or to any shareholder of the Fund for any act or omission in the course of or in connection with the discharge by the Custodian of its duties. The Fund has agreed to indemnify the Custodian or any persons appointed by it from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (other than those resulting from the fraud, negligence or wilful default on the part of the Custodian) which may be imposed on, incurred by or asserted against the Custodian in performing its obligations or duties hereunder.

The Custodian will have no decision-making discretion relating to the Fund's investments. The Custodian is a service provider to the Fund and is not responsible for the preparation of this document or the activities of the Fund and therefore accepts no responsibility for the accuracy of any information contained in this document.

The Custodian may appoint sub-custodians, agents or delegates ("**Correspondents**") to hold the assets of the Fund. The Custodian will retain responsibility for the acts and omissions of the majority of its Correspondents, but will not be liable for any loss directly or indirectly arising as a result of the acts or omissions of its Correspondents in certain emerging markets provided that the Custodian uses reasonable skill, care and diligence in the selection of a suitable Correspondent. In addition, the Custodian shall not be liable for any losses arising as a result of the liquidation, bankruptcy or insolvency of its Correspondents in any market. The Custodian will be responsible to the Fund for the duration of any sub-custody agreement and for satisfying itself as to the ongoing suitability of the Correspondent to provide custodial services to the Fund. The Custodian will also maintain an appropriate level of supervision over the Correspondents and will make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged. The fees of any Correspondent appointed by the Custodian shall be paid by the Fund.

## Custodian Agreement

Pursuant to a custodian agreement dated 19 December 1996 the Custodian has agreed to act in such capacity in accordance with the Articles and the terms of such agreement (the "**Custodian Agreement**"). Inasmuch as the Adviser selects Managers to invest the Fund's assets, the Custodian's primary function will be to hold the indicia of ownership in such Managers. The assets of the Fund will be held by the Custodian in a segregated account in the name of the Fund and unavailable to third party creditors of the Custodian in the event of its insolvency, except that the Fund may allocate certain money to investment managers running managed accounts. In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every security transaction only. Any loss arising as a result of an investment in a managed account will be borne by the Shareholders.

The Custodian Agreement may be terminated by either party upon sixty (60) days' prior notice. The Custodian Agreement provides that the Custodian shall not be liable to the Fund or its shareholders for any acts or omissions in the performance of its services, other than as a result of its wilful default or negligence.

## The Offering
### Initial Offer

Each of the Primeo Select Fund and the Primeo Executive Fund has two classes of Participating Shares, one class denominated in United States Dollars and the other class denominated in Euro.

Primeo Select Fund Shares denominated in United States Dollars were initially issued on 1 March 1996, at US$10 each. Primeo Select Fund Shares denominated in Euro will, for the initial issue, be issued at a price equal to the last applicable NAV of the Participating Shares in the Primeo Select Euro Fund (see "Investment Objective and Policies – Primeo Select Euro Fund").

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.
PIM-017-10494
PIMSAA0082594

Primeo Executive Fund Shares were initially issued on 1 November 2003, at US$100 each for the US$-class and at EUR100 each for the EUR-class.

**Subscription**

Participating Shares in the Fund, either the Primeo Select Fund Shares or the Primeo Executive Fund Shares, will be offered for sale on the first Business Day of each month or at such other times as the board of Directors, in its sole discretion, may allow (a "**Subscription Date**").

The offering price per Participating Share (the "**Offering Price**") will be the Net Asset Value ("**NAV**") per Participating Share calculated as of the last Business Day of each month (the "**Valuation Date**"). Within 15 days of the Subscription Date, the Sub-Registrar will register in the name of the purchaser on the books of the Fund the Participating Shares (including fractional Participating Shares) issuable to the purchaser, based upon the Net Asset Value as of the Valuation Date.

The minimum initial subscription for Participating Shares of Primeo Select Fund is US$50,000 for the US$-class and the greater of 50,000 Euro or the Euro equivalent of US$50,000 for the EUR-class. The minimum subsequent purchase for Participating Shares of Primeo Select Fund is US$1,000 for the US$-class and EUR1,000 for the EUR-class.

The minimum purchase for Participating Shares of Primeo Executive Fund is US$50,000 for the US$-class and the greater of 50,000 Euro or the Euro equivalent of US$50,000 for the EUR-class. The minimum subsequent purchase of Primeo Executive Fund is US$1,000 for the US$-class and EUR1,000 for the EUR-class.

A person seeking to purchase Participating Shares (a "**Subscriber**") acceptable to the board of Directors or its delegate, will be sold that number of Participating Shares, which its subscription will purchase at the Offering Price. Subscribers will have no right to rescind a purchase after receipt by the Sub-Registrar of a completed form of Subscription Agreement and payment of the Offering Price. Participating Shares will be issued in registered book-entry form.

**Payment for Shares**

Participating Shares may be purchased by filling in and signing the form of Subscription Agreement, which accompanies this Offering Memorandum and telefaxing the completed and signed Subscription Agreement to the Sub-Registrar.

Subscription Agreements along with payments must be received by the Sub-Registrar by the close of business on the twenty-fourth (24th) day of each month, subject to the right of the board of Directors of the Fund to waive this "prior receipt" requirement (which discretion can only be exercised prior to the Valuation Date). In the event that the 24th day of any month is not a Business Day, the Subscription Agreement along with the payment must then be received by the Sub-Registrar by the close of business on the immediately preceding Business Day

Subscriptions will be accepted when the executed Subscription Agreement and payment of the Subscription Proceeds are

received by the Sub-Registrar as set forth above, and not rejected by the board of Directors of the Fund five days after the Subscription Date.

The funds received for the purchase of shares will be deposited into a segregated account of the Fund until the Subscription is accepted or rejected.

**A payment for the purchase of participating shares must be (a) in United States dollars for Primeo Select Fund USs-Class Shares and for Primeo Executive Fund USs-class shares and (b) in euro for Primeo Select Fund Eur-Class Shares and Primeo Executive Fund Eur-Class Shares by swift or wire transfer of immediately available funds and must be payable to the sub-registrar, reference "*Primeo Fund*" details of which must be confirmed on and must accompany an executed subscription form which is received by facsimile or physical delivery.**

The Fund, in its sole discretion, may accept subscriptions in other currencies, which would be converted as promptly as practicable to United States Dollars or Euro at the prevailing market rate as determined by the Sub-Registrar in its sole discretion. Such United States Dollar or Euro amount after conversion would then be used to purchase that number of shares, which such amount will purchase.

All questions concerning the timeliness, validity, form and eligibility of any Subscription Agreement will be determined by the Sub-Registrar, whose determinations will be final and binding. The Fund in its sole discretion may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as it may determine, or reject the purported purchase of Participating Shares. Subscriptions will not be deemed to have been received or accepted until all irregularities have been waived or cured within such time as the Sub-Registrar determines in its sole discretion. The Fund will not be under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Agreement or incur any liability for failure to give such notification. The Fund has the right to reject any subscription in its sole discretion.

Measures aimed towards the prevention of money laundering, within the jurisdiction of the Sub-Registrar, may require a detailed verification of the applicant's identity. Depending on the circumstances of each application, a detailed verification may not be required where (i) the applicant makes the payment from an account held in the applicant's name at a recognized financial institution or (ii) the application is made through a recognized intermediary. These exceptions will only apply if the financial institution or intermediary referred to are within a country recognized by Luxembourg as having equivalent anti-money laundering regulations.

By way of example an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth. In the case of corporate applicants this may require production of a certified copy of the certificate of incorporation (and any changes of name), memorandum and articles of association (or equivalent), the

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10495

PIMSAA0082595

names, occupations, dates of birth, and residential and business addresses of all directors.

The Sub-Registrar reserves the right to request such information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes the Administrator or the Fund may refuse to accept the application and all subscription monies.

### Solicitation Arrangements

There is, except for special circumstances, a fee of three percent (3%) of the Net Asset Value per Participating Share to be paid for each subscription. Such commission is payable by the investor as an amount in addition to the price of the Participating Shares being subscribed for by such investor.

### Switches

For switches between (a) Primeo Select Fund US$-class and Primeo Select Fund EUR-class and (b) Primeo Executive Fund US$-class and Primeo Executive Fund EUR-class, there is a fee of one percent (1%), which is calculated on the basis of the gross redemption amount in the currency of the redeeming fund.

### Additional Offerings

The Fund may offer additional shares pursuant to future issuances and in different classes of shares pursuant to the Articles. To the extent the Fund offers additional shares in different classes pursuant to a subsequent offering memorandum, the assets of the Fund, as a whole, would be available to third party creditors to satisfy the liabilities of any particular class.

## Eligible Subscribers

Each Subscriber must represent, warrant and agree that none of the Participating Shares (nor any interest therein) are being acquired or will at any time be held, directly or indirectly, for the account or benefit of any United States citizen or resident or any other "Restricted Person" (as used in this Offering Memorandum).

The term "**Restricted Person**" as used in the Subscription Agreement and this Offering Memorandum means:

(a)    a citizen or a resident (including persons who have acquired residence solely by reason of taxation) of a Restricted Jurisdiction;

(b)    any corporation, partnership, trust or other legal entity organized or created under the laws of any such Restricted Jurisdiction; or

(c)    any organization or entity controlled, directly or indirectly by a person or persons described in (a) or (b) or of which such person or persons described in (a) or (b) are known to be the owners, directly or indirectly, of a majority of the beneficial interest therein.

## Use of Proceeds

Proceeds received by the Fund from the sale of Participating Shares for investment, after payment of offering and organizational expenses, will be used by the Fund for investment in accordance with its investment objectives and for operating expenses of the Fund.

## Expenses

The organizational expenses of the Primeo Select Fund and Primeo Executive Fund are being expensed on a current basis.

The Fund is responsible for all normal operating expenses, including payment of the fees of the Adviser, the Administrator and the Custodian, operating expenses, including legal and accounting fees and expenses, corporate licensing, and any stock exchange listing fees, and offering expenses. The expenses reflect the specialized nature of the Fund, the extent of the advisory effect involved with multi-managers and the costs of communications and other costs associated with investing in securities and other instruments on a global level. The fees and expenses of any Distributors appointed by the Fund will be paid by the Adviser out of the fees received by the Adviser pursuant to the Advisory Agreement, and will not be met out of the assets of the Fund.

## Net Asset Value

Net asset value for each class of Participating Shares is determined by the Administrator as of the last Business Day of each month by subtracting from the value of the gross assets of such class of Participating Shares the gross liabilities. Net asset value per Participating Share is determined by dividing the net asset value of the class of Participating Shares by the total number of outstanding Participating Shares of such class, rounding, if necessary to the nearest one-hundredth and adjusting, as necessary, to take account of any hedging costs (as applicable, "**Net Asset Value**"). Such determination shall be made available within 10 Business Days of the end of the preceding month. Net Asset Value calculations shall be delivered to Shareholders monthly.

To the extent feasible, expenses, fees and other liabilities will be accrued in accordance with generally accepted accounting principles as applied in the United States of America. In valuing each sub-fund's assets, all listed equity securities from which market quotations are readily available are, regardless of purchase price, valued at the last sales price on the date of determination. Listed securities with no such sales price and unlisted equity securities are valued at the mean between the current bid and asked prices, if any, of two reputable brokers, if available. Short-term investments having a maturity of 60 days or less are valued at cost plus accrued interest. Other securities as to which market quotations are readily available are valued at their market values. All other securities and assets are taken at fair value as determined in good faith by the Adviser although the actual calculation may be done by the Administrator. With respect to investments by the Fund in investment companies where a current net asset value calculation is not available, the Administrator shall determine, as of the date of calculation, the most recent estimated net asset value provided by such investment companies and utilize such estimated calculation in determining Net Asset Value. The board of Directors, the Adviser and the Administrator may rely on the valuations, including estimated net asset value calculations, provided by the Managers of investment companies with whom the Fund has invested assets. In instances where price cannot be determined in accordance with the above procedures, or in instances in which the Adviser determines it is impractical or inappropriate to determine price in accordance with the above procedures, the price

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10496
PIMSAA0082596

is at fair value as determined in good faith in a manner as the board of Directors may prescribe. In no event shall the board of Directors or the Adviser incur any individual liability or responsibility for any determination made or other action taken or omitted by them in the absence of fraud or wilful default.

With respect to any class of Participating Shares in a sub-fund denominated in Euro, any investments that are denominated in United States Dollars will be hedged. Although the costs of the hedging program may vary from time to time depending on market conditions, it is currently estimated that the hedging costs will be approximately 3% of the underlying NAV.

In calculating the Net Asset Value and Net Asset Value per Participating Share, the Administrator may rely upon such automatic pricing services as it shall determine or, if so instructed by the Fund, the Manager or Adviser it may use information provided by particular pricing services, brokers, market makers or other intermediaries. In such circumstances, the Administrator shall not, in the absence of fraud, negligence or wilful default on the part of the Administrator, be liable for any loss suffered by the Fund or any Shareholder by reason of any error in the calculation of the Net Asset Value and Net Asset Value per Participating Share resulting from any inaccuracy in the information provided by any such pricing service, broker, market maker or other intermediary.

The Administrator will provide the Net Asset Value per Participating Share for any listed class of Participating Shares to the respective stock exchange upon its calculation. The Fund will also notify the respective stock exchange of any suspension in the determination of the Net Asset Value per Participating Share for any listed class of Participating Shares.

## Shares
### Share Capital
The share capital of the Fund is the aggregate of (i) US$80,000,000 divided into 100 Founder Shares of a nominal or par value of US$1.00 each and 79,999,900 Participating Shares of a nominal or par value of US$1.00 each and (ii) EUR20,000,000 divided into 20,000,000 Participating Shares of a nominal or par value of EUR1.00 each, 20,000,000 of which are designated as Primeo Select Fund EUR-class shares.

Of the 79,999,900 authorised Participating Shares of a par value of US$1.00 each, 40,000,000 have been designated as Primeo Select Fund Shares and 10,000,000 are designated as Primeo Executive Fund Shares. The remaining US$ denominated Participating Shares are reserved for additional series. All of the EUR denominated Participating Shares are designated as Primeo Select Fund EUR-class shares.

The Directors reserve the right to create additional series of shares. None of the share capital is under option or is agreed to be put under option.

All of the 100 Founder Shares of par value US$1.00 are held by Pioneer Alternative Investment Management Limited, a wholly-owned subsidiary of Pioneer Global Asset Management S.p.A..

### Share Rights
Founder Shares carry one vote each and they are only held by Pioneer Alternative Investment Management Limited. Other than as set out below, no other shares issued by the Fund have a right to vote. Founder Shares do not have a right to dividends. In a winding up of the Fund, Founder Shares rank only for a return of the nominal amount paid up thereon.

Participating Shares, i.e. Primeo Select Fund Shares or Primeo Executive Fund Shares, are sold at the relevant Net Asset Value per Participating Share. There is provision in the Articles for Shareholders owning Participating Shares to vote at a meeting of Shareholders on matters relating to alteration or variation of rights attaching to the Participating Shares. Participating Shares carry no right to vote at general meetings of the Fund.

In a winding up, each Participating Share has a right to share in the surplus assets of the Fund after the return of the paid up capital on the Participating Shares and Founder Shares.

The Fund may declare dividends on the Participating Shares, but does not anticipate paying any dividends at this time. See "– Dividends".

Participating Shares are liable to be redeemed at the option of the Fund at any time and from time to time at the relevant Net Asset Value minus the relevant charges.

The Fund may from time to time:

(a)  by majority vote of those Shareholders entitled to vote thereon (being the holder of the Founder Shares) present in person or, where allowed, by proxy and voting in favour of a particular motion, increase the capital of the Fund; and

(b)  by vote of not less than two-thirds of those Shareholders entitled to vote thereon pursuant to the Articles present in person or, where allowed, by proxy at a general meeting of which notice is specified of intent to propose the resolution to reduce capital as a special resolution under relevant law has been given, reduce the capital of the Fund.

A formal reduction of capital requires the approval of the Grand Court of the Cayman Islands.

In the event that the Fund proposes to amend any agreement that would adversely affect the rights of any Shareholder, such as any increase in advisory fees, the Fund shall provide the Shareholder with 75 days' prior written notice of such proposed changes thereby permitting a Shareholder to make a request for redemption of Participating Shares prior to such proposed change.

The rights of existing Shareholders may only be varied with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of that class and the issued Participating Shares of any other class which may be affected by such variation, or with the sanction of a resolution passed with a two-thirds majority at a separate class meeting of the holders of issued Participating Shares of each affected class.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10497
PIMSAA0082597

The unissued Participating Shares of the Fund shall be at the disposal of the board of Directors who may issue them at their discretion in accordance with the Memorandum and the Articles. Without prejudice to the rights previously conferred on the holders of existing Participating Shares, Participating Shares in the Fund may be issued with such preferred, deferred or other special rights or such restrictions as the board of Directors may from time to time determine.

No capital of the Fund is under option or agreed conditionally or unconditionally to be put under option.

The Founder Shares and the Participating Shares carry no preemptive rights.

## Transfer of Shares

The Articles provide that Participating Shares may be sold without the prior written consent of the board of Directors of the Fund. The Participating Shares are freely transferable. Should any joint Shareholder die, the remaining Shareholder(s) should be treated as solely and fully entitled to such Participating Shares. There is no independent market for the purchase or sale of Participating Shares, and none is expected to develop. Subscribers must represent that they are purchasing the Participating Shares for investment. A Shareholder may not transfer Participating Shares if as a result either the transferor or the transferee would hold less than the minimum holding permitted by the Fund. Transferees who are not existing Shareholders in the Fund will be required to complete an application form. The Participating Shares may be transferred to or held only for the benefit of non-U.S. persons.

Each Subscriber is urged to consult with its own financial adviser to determine the suitability of an investment in the Participating Shares and is required to represent that after evaluation, his, her or its investment in the Fund is suitable and appropriate.

## Redemption of Shares

Participating Shares may be redeemed, in whole or in part, on the last Business Day of each month or at such other times, and upon such terms of payment, as may be approved by the board of Directors, in its sole discretion on behalf of the Fund (each such date being referred to as a "**Redemption Date**"). To effect a redemption, a request for redemption of Participating Shares, obtainable from the Administrator, must be received by the Sub-Registrar by the 24th day of the month of any designated Redemption Date, subject to the discretion of the board of Directors of the Fund to waive this "prior receipt" requirement (which discretion can only be exercised prior to the date on which the Net Asset Value per Participating Share on the Redemption Date is calculated), and all other conditions to the validity of the redemption request must have been fulfilled or waived prior to such Redemption Date.

In case of partial redemption a minimum investment of US$50,000 for the US$-class and a minimum of the Euro equivalent of US$50,000 for the EUR-class has to remain.

The board of Directors may suspend NAV calculation and Participating Share redemptions:

(i)   during any period when any stock or commodity exchange on which any of the Fund's investments are quoted is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(ii)  during the existence of any state of affairs as a result of which, in the opinion of the board of Directors, disposal of investments by the Fund would not be reasonably practicable or might prejudice the non-redeeming shareholders of the Fund;

(iii) during any breakdown in the means of communication normally employed in determining the price or value of any of the Fund's investments, or of current prices in any stock or commodity market as aforesaid; or

(iv)  during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the opinion of the board of Directors, be effected at normal rates of exchange.

The board of Directors may further limit redemptions as it, in its sole discretion, deems necessary to prevent the Fund from being deemed to be a personal holding company, foreign personal holding fund or controlled corporation under United States tax laws.

To the extent that a request for redemption of Participating Shares is not withdrawn, the redemption shall be effected as of the first Redemption Date following the recommencement of redemptions. In addition, the Fund shall not be bound to redeem as of any Redemption Date more than 25% of the number of Participating Shares outstanding in the event that the board of Directors determines, in consultation with the Adviser, that such limitation is necessary to protect the Fund's investments. If the Fund receives redemption requests as of any Redemption Date for an amount exceeding such percentage, it may reduce pro rata the number of Participating Shares to be redeemed in response to such request and shall carry forward to the next and each succeeding Redemption Date the balance of the request until such request has been complied with and that such balance shall have priority over any later requests. Consistent with sound business judgment, the Directors will take reasonable steps to limit the duration of any suspension.

The price per Participating Share at which Participating Shares will be redeemed (the "**Redemption Price**") will be the Net Asset Value per Participating Share of such Participating Shares on the Redemption Date (adjusted to reflect any applicable accruals).

The Directors have resolved that, due to the liquidity of the underlying assets, payment of 100% of the redemption value of the proceeds for Primeo Select Fund Shares will normally be made within 30 days following the Redemption Date and payment of 100% of the redemption value of the proceeds for Primeo Executive Fund Shares will normally be made within 60 days following the Redemption Date.

Any portion of the Redemption Price may be withheld until such time as the board of Directors, in consultation with the Advisor, believes a fair and adequate valuation can be made for all of the assets of the Fund or until such time as redemption proceeds

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10498
PIMSAA0082598

are received from investment companies in which the Fund has invested. Redemptions are also subject to any reserves established in the discretion of the Administrator for any estimated expenses or contingent liabilities.

A redeeming Shareholder will, in accordance with the Articles, have no Shareholder rights with respect to the Participating Shares to be redeemed after the close of business on the date as of which the Redemption Price was calculated, except the right to receive the Redemption Price therefor.

The Fund does not currently intend to charge an investor upon redemption of shares. At the discretion of the board of Directors, a charge of not more than 1% may be made upon redemption of shares in accordance with the Articles to cover costs associated with such redemption.

## Compulsory Redemptions

The Fund reserves the right, upon not less than 10 days' prior written notice, to require any Shareholder to redeem all or any portion of its Participating Shares if the Fund determines or has reason to believe that:

(a)   it is in the interests of the Fund to do so;

(b)   ownership of such Participating Shares of such Shareholder will cause the Fund to be in violation of, or require registration of any Participating Shares in the Fund under, or subject the Fund, the Adviser or the Administrator to additional regulation under, the securities or commodities laws of the United States or any other relevant jurisdiction or the rules of any self-regulatory organization applicable to the Fund;

(c)   continued ownership of such Participating Shares by such Shareholder may be harmful or injurious to the business or reputation of the Fund, the Adviser or the Administrator, or may subject the Fund or any of the Shareholders to an undue risk or adverse tax or other fiscal consequences, including without limitation, adverse consequences under the United States Employee Retirement Income Security Act of 1974, as amended;

(d)   any of the representations and warranties made by such Shareholder in connection with the acquisition of his Participating Shares was not true when made or has ceased to be true in any material respect;

(e)   such redemption (whether by redemption, exchange, conversion or roll up of Participating Shares) is necessary for the Fund to comply with any law, public rule, regulatory requirement or other regulation applicable to it;

(f)   such redemption is necessary to give effect to an exchange, conversion or roll up policy disclosed in this Offering Memorandum or otherwise adopted by the Directors pursuant to which Participating Shares of one class or series (the "**Old Shares**") may, at the option of the Fund, be exchanged for Participating Shares of another class or series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription on behalf of the

relevant Shareholders of the redemption proceeds in paying up the New Shares; or

(g)   to redeem shares of any class or series in order to terminate a class or series of Participating Shares if the Adviser advises the Fund to terminate that class or series of Participating Shares.

Additionally, the Fund has the right to require a redemption of Participating Shares if it determines that a portion of the assets of the Fund cannot be effectively invested. Under such circumstances, the Fund will have the irrevocable power to act in the name of all Shareholders to redeem their Participating Shares pro-rata across all Shareholders of the relevant sub-fund.

In the event of any compulsory redemption, the Redemption Price will be the Net Asset Value per Participating Share as at the close of business on such Redemption Date, less any adjustments as set forth above. (See "Redemption of Shares" and "Net Asset Value"). Such Shareholder will have no Shareholder rights with respect to the Participating Shares to be redeemed after the close of business on the date as of which the Redemption Price was calculated, except the right to receive the Redemption Price therefor, together with any interest as provided under "Redemption of Shares".

## Dividend Policy

The board of Directors does not anticipate paying dividends in the foreseeable future. In the event any dividend payment remains unclaimed after a period of five years from the date of declaration, such amount shall be forfeited and shall revert to the Fund. Dividends shall only be payable to the holders of Participating Shares out of the funds of the Fund lawfully available therefor, including the share premium account

## Reports

The Fund's fiscal year will end on 31 December of each year (the "**Fiscal Year**"). An annual report and audited statements of the Fund will be sent to investors and for any listed class of Participating Shares to the relevant stock exchange within 120 days of the end of each Fiscal Year or as soon thereafter as possible in any event, within 6 months of the end of the Fiscal Year. A report to Shareholders will be delivered quarterly, setting forth the performance of the relevant Sub-Fund during the previous quarter. An unaudited half-yearly interim report will be sent to Shareholders within 60 days of the period to which it relates.

## Taxation

Investors should consult their professional advisers on the potential tax consequences of subscribing for, purchasing, holding or redeeming Participating Shares under the laws of their country of citizenship, domicile or residence.

As is the case with any investment, there can be no guarantee that the tax position or proposed tax position prevailing at the time an investment in the Fund is made will endure indefinitely. The following is based on the law and practice currently in force in the Cayman Islands and accordingly, is subject to changes therein.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10499

PIMSAA0082599

**Cayman Islands**

The Fund is incorporated in the Cayman Islands. Under the system of taxation presently in force in the Cayman Islands no taxes will be chargeable on any income, profits or capital gains of the Fund or on any dividends or redemption proceeds payable by the Fund. The Cayman Islands are not party to any double taxation treaties.

The Fund obtained on 21 December 1993 an undertaking from the Governor in Cabinet in the Cayman Islands that for a period of twenty years from the date of such undertaking when issued no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**Each prospective shareholder should consult with and depend upon its personal tax adviser with respect to the tax consequences of an investment in the fund. Tax consequences may vary depending upon the particular status of a prospective shareholder. The tax and other matters described herein do not constitute, and should not be considered as, legal or tax advice to prospective shareholders.**

The Fund expects that Shareholders in the Fund will, for tax purposes, be residents of many tax jurisdictions, therefore no attempt has been made in this Offering Memorandum to summarize tax consequences for investors. Prospective investors should review with their own tax advisor the possible tax consequences of purchasing, holding, transferring or redeeming shares in the Fund.

## Mutual Funds Law

The Fund falls within the definition of a "mutual fund" under the Mutual Funds Law (2003 Revision) (the "**Law**") of the Cayman Islands and, accordingly, will be regulated under the Law. The Fund is not required to be licensed under the Law as the minimum initial investment per investor is not less than the equivalent of US$50,000 and shall instead be registered under the Law. However, the fact that the Fund is regulated under the Law does not imply that the Cayman Islands Monetary Authority (the "**Monetary Authority**") has passed upon or approved this Offering Memorandum and the offering of the Participating Shares. The Fund is required to provide the Monetary Authority with a summary of the terms of the offering of Participating Shares and the details of its various agents. The Fund is also required to give a copy of this Offering Memorandum and its audited financial statements to the Monetary Authority.

As a regulated mutual fund, the Fund will be subject to the supervision of the Monetary Authority who may at any time instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. In addition, the Monetary Authority may ask the Directors to give the Monetary Authority

such information or such explanation in respect of the Fund as the Monetary Authority may reasonably require to enable the Monetary Authority to carry out its duties under the Law.

The Directors must, on request, give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of a record to which it is given access. Failure to comply with these requests by the Monetary Authority may result in substantial fines being imposed on the Directors and may result in the Monetary Authority applying to the court to have the Fund wound up.

The Monetary Authority is prohibited by the Law from disclosing any information relating to the affairs of a mutual fund other than disclosure required for the effective regulation of a mutual fund or when required to by law or by the court or when permitted by law in cooperation with a foreign regulatory authority.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meets its obligations as they fall due or is carrying on or is attempting to carry on business or winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Monetary Authority include, amongst other things, the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

## Anti-money Laundering Regulations

In order to comply with regulations aimed at the prevention of money laundering, the Fund will require all prospective investors to provide evidence to verify their identity and source of funds (unless in any particular case the Directors or the Administrator are satisfied that an exemption applies under the Money Laundering Regulations (2003 Revision) of the Cayman Islands (the "**Regulations**")). Depending on the circumstances of each application, a detailed verification of identity might not be required where:

(a)    the applicant makes the payment for his investment from an account held in the applicant's name at a recognised financial institution; or

(b)    the applicant is regulated by a recognised regulatory authority and is based or incorporated in, or formed under the law of, a recognised jurisdiction; or

(c)    the application is made through an intermediary which is regulated by a recognised regulatory authority and is based in or incorporated in, or formed under the law of a recognised jurisdiction.

For the purposes of these exceptions, recognition of a financial institution, regulatory authority or jurisdiction will be determined in accordance with the Regulations by reference to those jurisdictions recognised by Luxembourg as having sufficient anti-money laundering regulations.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10500

PIMSAA0082600

The Fund also reserves the right to request such information as is necessary to verify the source of the payment. The Fund may refuse to accept the application and the subscription monies if an applicant for Participating Shares delays in producing or fails to produce any information required for the purposes of verification of identity or source of funds, and in that event the Fund shall return the subscription monies (without interest and at the expense of the applicant) by telegraphic transfer to the account from which the monies were originally sent.

If any person resident in the Cayman Islands knows or suspects that another person is engaged in money laundering and the information for that knowledge or suspicion came to his attention in the course of his trade, profession, business or employment he is required to report such belief or suspicion to the relevant authorities pursuant to the Proceeds of Criminal Conduct Law (2001 Revision) of the Cayman Islands, and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by any enactment or otherwise.

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10501

PIMSAA0082601

# Directors and Other Parties

**Directors of the Fund**
MR. ALBERTO LA ROCCA
MR. DECLAN MURRAY
MS. URSULA RADEL-LESZCZYNSKI
MR. MICHAEL WHEATON

**Adviser**
**Pioneer Alternative Investment Management Limited**
Sixth Floor, 1 George's Quay Plaza
George's Quay
Dublin 2
Ireland

**Administrator & Registrar**
**Bank of Bermuda (Cayman) Limited**
P.O. Box 513
2nd Floor, Strathvale House
North Church Street
Grand Cayman KY1-11006
**Cayman Islands**

**Custodian, Sub-Registrar & Secretary**
HSBC Securities Services (Luxembourg) S.A.

40 avenue Monterey
L-2163 Luxembourg

**Auditors**
Ernst & Young
Public Accountants P.O. Box 510
George Town
Grand Cayman
Cayman Islands

**Registered Office**
c/o Bank of Bermuda (Cayman) Limited
P.O. Box 513
2nd Floor, Strathvale House
North Church Street
Grand Cayman KY1-11006
Cayman Islands

**Legal Advisers**
(As to matters of Austrian law)

Rechsanwälte GesmbH Hausmaninger und Kletter
Franz Josefs-Kay 3
A-1010 Vienna
Austria

(As to matters of Cayman Islands law)
Maples and Calder
PO Box 309GT
Ugland House
South Church Street
George Town
Grand Cayman
Cayman Islands

FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10502
PIMSAA0082602



FOIA Confidential Treatment Requested by Pioneer Investment Management, Inc.

PIM-017-10503

PIMSAA0082603