**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05348 (CGM) |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| NOMURA INTERNATIONAL PLC, | |
| Defendant. | |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§

78aaa–*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, for his Second Amended Complaint against

Nomura International plc ("Nomura"), alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive

Ponzi scheme perpetrated by Bernard L. Madoff and others.

2.    With this Second Amended Complaint, the Trustee seeks to recover approximately

$34,074,372 in subsequent transfers of BLMIS customer property that Nomura received from

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma") (together, the

"Fairfield Funds").

3.    With the specific purpose of having funds invested with BLMIS in New York and

profiting from those investments, Nomura invested with multiple BLMIS feeder funds, including

the Fairfield Funds and Harley International (Cayman) Ltd. ("Harley").  Sentry, Sigma, and Harley

were among the various investment vehicles that invested all or substantially all of their assets

with BLMIS.

4.    Sigma did not invest directly with BLMIS, but invested all of its assets in Sentry,

serving solely as a vehicle for converting its shareholders' Euro-denominated investments into

U.S. Dollars and purchasing Sentry shares.

5.    Nomura received at least $20,013,186 in subsequent transfers of BLMIS customer

property from Sentry.

6.     Nomura received at least $14,061,186 in subsequent transfers of BLMIS customer property from Sigma.

7.     In a separate adversary proceeding, the Trustee also seeks to recover $24,449,920 in subsequent transfers of BLMIS customer property that Nomura received from Harley.  *See Picard v. Nomura International plc*, Adv. Pro. No. 11-02759 (Bankr. S.D.N.Y. 2011).

## II.     SUBJECT MATTER JURISDICTION AND VENUE

8.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

9.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

10.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

11.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.     BACKGROUND, THE TRUSTEE, AND STANDING

12.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

13.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

14.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

15.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

16.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

17.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea

hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

18.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

19.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

20.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

21.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.

Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

22.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

23.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    THE DEFENDANT AND NON-PARTIES

24.     Defendant Nomura is incorporated under the laws of the United Kingdom.  During the relevant period, Nomura's principal place of business was Nomura House, 1 St. Martin's-le-Grand, London EC1A 4NP, United Kingdom.

25.     Non-party Fairfield Greenwich Group ("FGG") is a *de facto* partnership based in New York City that created, managed, and controlled Sentry and Sigma.

26.     Non-party Sentry was a BLMIS feeder fund incorporated in the British Virgin Islands ("BVI") that invested substantially all of its assets with BLMIS in New York.  At all relevant times, Sentry was managed and controlled by FGG from its New York headquarters.

27.     Non-party Sigma was a BLMIS feeder fund incorporated in the BVI that invested all of its assets in Sentry and, therefore, substantially all of its assets with BLMIS in New York.  At all relevant times, Sigma was managed and controlled by FGG from its New York headquarters.

28.     Non-party Harley was a Cayman-registered BLMIS feeder fund that invested all of its assets with BLMIS in New York.  Harley had no employees or offices of its own.  Harley acted primarily through New York-based Fix Asset Management Services, Inc.

## V.     PERSONAL JURISDICTION

29.     Nomura is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York, and knowingly accepted the rights, benefits, and privileges of conducting business in the United States and New York.

30.     Nomura has been registered with the SEC as an institutional investment manager since at least 1998 and has filed required quarterly Form 13Fs since at least 1999.

31.     Nomura invested in the Fairfield Funds with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

32.     Nomura knew that the Fairfield Funds invested substantially all of their assets with BLMIS in New York.

33.     To invest in the Fairfield Funds, Nomura executed subscription agreements through which it affirmed having received and read the Fairfield Funds' private placement memoranda (individually "PPM," and together "PPMs") and agreed to be bound by the terms set forth in the PPMs.

34.     The PPMs informed Nomura that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Sentry's BLMIS investment advisory accounts.

35.     The PPMs informed Nomura that any returns on its investments in the Fairfield Funds would be earned in New York by BLMIS's purported execution of the split strike conversion strategy ("SSC Strategy"), which involved the purchase and sale of United States securities, options, and Treasury Bills.

36.    Sigma's PPM informed Nomura that substantially all of Sigma's assets would be invested in Sentry and ultimately sent to BLMIS for investment in the SSC Strategy.

37.    The Fairfield Funds' PPMs were specific about the critical roles BLMIS performed in New York on behalf of the Fairfield Funds.  The August 14, 2006 Sentry PPM, the operative document when Nomura began investing in Sentry in September 2006, expressly informed Nomura that:

    (a)    "[t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC"; and

    (b)    "BLM[IS] is authorized to determine the price and timing of stock and options transactions in [Sentry's] account"; and

    (c)    "substantially all of the Fund's assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM[IS] will be a sub-custodian of [Sentry]."

38.    Sigma's PPM contained identical representations.

39.    Moreover, Nomura knew from the PPMs and other materials it received from FGG that the Fairfield Funds' performance depended on BLMIS and its personnel in New York. Specifically, the PPMs disclosed that:

    (a)    "The services of BLM[IS] and its personnel are essential to the continued operation of [the Fairfield Funds], and its profitability, if any;" and

    (b)    "their absence would have an adverse impact upon an investment in [the Fairfield Funds]."

40.    To attract investors, Nomura prepared marketing materials promoting its access to BLMIS.  Those marketing materials highlighted that the Fairfield Funds sent substantially all of their assets to BLMIS in New York to be invested using the SSC Strategy, which Nomura touted as generating "remarkably consistent" returns through the purchase and sale of S&P 100 Index equities, options, and United States Treasury Bills.

41.     Through its execution of the Fairfield Funds' subscription agreements, Nomura voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.

42.     The Sentry subscription agreement Nomura executed provided that it "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."

43.     The Sigma subscription agreement Nomura executed contained an identical choice of law provision.

44.     The Sentry and Sigma subscription agreements required Nomura to "irrevocably submit to the jurisdiction of New York courts" and agree "that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York."

45.     Nomura maintained a New York bank account in its own name at Bank of America (the "New York Account").

46.     At Nomura's instruction, Sentry sent redemption payments to the New York Account.  Those redemption payments comprise the subsequent transfers of customer property the Trustee seeks to recover with this Second Amended Complaint.

47.     Nomura sent its Sentry subscription payments to a New York correspondent account, from which the funds were ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

48.     Nomura knew that the Fairfield Funds were operated and controlled by FGG in New York.

49.     Nomura personnel directed email and telephone communications regarding Nomura's investments with BLMIS through the Fairfield Funds to FGG personnel located in FGG's New York office.

50.     Nomura personnel traveled to New York and met with FGG personnel in FGG's New York office regarding Nomura's investments with BLMIS through the Fairfield Funds.

51.     In connection with its ongoing management of investments in the Fairfield Funds, Nomura agreed to the terms of a non-disclosure agreement with FGG in August 2007 to receive non-public information about Sentry. The non-disclosure agreement also contained New York choice of law and jurisdiction provisions. Specifically, the agreement provided that:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its conflict of law principles. Each party hereby irrevocably and unconditionally consents to submit to the jurisdiction of the courts of the State of New York for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby . . . .

52.     Nomura's investments with Madoff were not limited to its investments in the Fairfield Funds. Among other BLMIS feeder funds, Nomura invested in Harley with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

53.     Because Nomura was aware that all of its investments through various BLMIS feeder funds, including the Fairfield Funds and Harley, were placed with BLMIS in New York, Nomura calculated its exposure to Madoff's SSC Strategy based on its aggregate investments in those funds.

54.     Nomura informed third parties that its ability to make additional BLMIS feeder fund investments depended on its overall exposure to Madoff through a number of BLMIS feeder funds.

55.     Nomura knew that Harley, like the Fairfield Funds, invested substantially all of its assets with BLMIS in New York.

56.     As a precondition to investing in Harley, Nomura was required to execute a subscription agreement with Harley.  By executing subscription agreements, Harley investors affirmed having read, understood, and accepted the terms set forth in the Harley Confidential Explanatory Memorandum (the "Harley PPM").  As set forth in the Harley PPM, Harley investors also received copies of Harley's annual audited financial statements (collectively, the "Audited Financial Statements").

57.     Based on information contained in the Harley PPM and the Audited Financial Statements for the years 2003 through 2007, Nomura understood that any returns on its investments in Harley would be and were earned in New York by BLMIS's purported execution of the SSC Strategy, which involved the purchase and sale of United States securities, options, and Treasury Bills.

58.     The 2007 Harley Audited Financial Statement reflected that on December 31, 2007, all of Harley's over $3 billion of assets invested with BLMIS were purportedly invested in United States Treasury Bills.

59.     The 2007 Harley Audited Financial Statement also disclosed that BLMIS in New York acted as the "Custodian" for substantially all of Harley's assets.  Specifically, the statement disclosed that:

(a)     "The company holds cash with . . . Bernard L. Madoff Investment Securities LLC;" and

(b)     "Bernard L. Madoff Investment Securities LLC hold assets worth US$3,329,127,954."

60.     As with Sentry, at Nomura's instruction, Harley sent redemption payments to the New York Account, including the subsequent transfers of BLMIS customer property the Trustee

seeks to recover from Nomura in *Picard v. Nomura International plc*, Adv. Pro. No. 11-02759 (Bankr. S.D.N.Y. 2011).

61.    Nomura thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  Nomura should therefore expect to be, and is, subject to the jurisdiction of the Bankruptcy Court pursuant to Bankruptcy Rule 7004 and the U.S. Constitution, as well as N.Y. C.P.L.R. § 302.

## VI.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.  BLMIS

62.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

63.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

64.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

65.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

66.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

67.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B. The Ponzi Scheme**

68.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

69.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

70.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

71.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### Madoff's Investment Strategy

72.     All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to

trade securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

73.    From the early 1990s forward, Madoff began telling BLMIS customers that he

employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any

securities for its BLMIS customers.

74.    BLMIS reported falsified trades using backdated trade data on monthly account

statements sent to BLMIS customers that typically reflected impossibly consistent gains on the

customers' principal investments.

75.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or

basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-

the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call

options.

76.    The put options were to limit the downside risk of sizeable price changes in the

basket.  The exercise of put options could not turn losses into gains, but rather could only put a

floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

77.    The sale of call options would partially offset the costs associated with acquiring

puts but would have the detrimental effect of putting a ceiling on gains.  The call options would

make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

outperform the market, because in a rising market, calls would have been expected to be exercised

by the counterparty.

78.    The simultaneous purchase of puts and sale of calls to hedge a securities position

is commonly referred to as a "collar."  The collar provides downside protection while limiting the

upside.

79.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

80.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

81.    Sophisticated or professional investors including Nomura knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

BLMIS's Fee Structure

82.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

BLMIS's Market Timing

83.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

84.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

85.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

BLMIS Execution

86.     BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor, such as Nomura, would know it was statistically impossible.

No Evidence of BLMIS Trading

87.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

88.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

The Collapse of The Ponzi Scheme

89.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

90.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

91.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO NOMURA**

**A. Initial Transfers from BLMIS to Sentry**

92.    The Trustee commenced a separate adversary proceeding against Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Sentry in the approximate amount of $3,000,000,000 (the "Sentry Initial Transfers").

93.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the

Trustee and against Sentry in the amount of $3,054,000,000 ("Sentry Judgment Amount") [ECF No. 109].

94.    The Sentry Initial Transfers are set forth in the attached Exhibits A and B.  The Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

95.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding (the "Sentry Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Sentry Initial Transfers in satisfaction of the Sentry Judgment Amount and entry of a declaratory judgment that the Sentry Initial Transfers comprising the Sentry Judgment Amount are avoided.

96.    As set forth in the Sentry Second Amended Complaint, Sentry received each of the Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or at a minimum, while aware of suspicious facts that would have led Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Sentry Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

97.    Of the Sentry Judgment Amount, $2,895,000,000 was transferred to Sentry during the six years preceding the Filing Date (the "Sentry Six Year Initial Transfers").  Each of the Sentry Six Year Initial Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law ("NYDCL"), particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

98.    Of the Sentry Six Year Initial Transfers, approximately $1,600,000,000 was transferred to Sentry during the two years preceding the Filing Date (the "Sentry Two Year Initial

Transfers"). Each of the Sentry Two Year Initial Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### B. Subsequent Transfers from Sentry to Nomura

99.    Prior to the Filing Date, Sentry transferred a portion of the Sentry Initial Transfers to Nomura. Based on the Trustee's investigation to date, the subsequent transfers from Sentry to Nomura total $20,013,186 (the "Sentry Subsequent Transfers"). A chart setting forth the presently known Sentry Subsequent Transfers is attached as Exhibit C.

100.    The Trustee commenced this proceeding on December 8, 2010.

101.    The Sentry Subsequent Transfers are recoverable from Nomura under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

102.    The Sentry Subsequent Transfers represent a redemption of equity interest by Nomura as a shareholder in Sentry. Because Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Sentry was insolvent when it made the Sentry Subsequent Transfers to Nomura upon redemption of its interests.

103.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial transfers, the subsequent transfers, and any additional transfers; and (ii) seek recovery of such transfers.

### C. Subsequent Transfers from Sentry to Sigma and Then to Nomura

104.    Prior to the Filing Date, Sentry transferred at least $772,690,257 of the Sentry Initial Transfers to Sigma. A chart setting forth the presently known subsequent transfers that Sigma received from Sentry is attached as Exhibit D.

105.    Thereafter, Sigma transferred to Nomura at least $14,061,186 of customer property that Sigma received from Sentry (the "Sigma Subsequent Transfers").  A chart setting forth the presently known Sigma Subsequent Transfers is attached as Exhibit E.

106.    The Sigma Subsequent Transfers are recoverable from Nomura under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

107.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial transfers, the subsequent transfers, and any additional transfers; and (ii) seek recovery of such transfers.

## <u>COUNT ONE:</u>
## RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a)

### *(Sentry Subsequent Transfers)*

108.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

109.    The Sentry Subsequent Transfers are recoverable from Nomura under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

110.    Nomura is an immediate or mediate transferee of the Sentry Subsequent Transfers totaling $20,013,186.

111.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Nomura: (a) recovering the Sentry Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**COUNT TWO:**

**RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a)**

*(Sigma Subsequent Transfers)*

112.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

113.   The Sigma Subsequent Transfers are recoverable from Nomura under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

114.   Nomura is an immediate or mediate transferee of the Sigma Subsequent Transfers totaling $14,061,186.

115.   As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Nomura: (a) recovering the Sigma Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Counts One and Two in favor of the Trustee and against Nomura as follows:

(a)   Recovering the Sentry Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate;

(b)   If Nomura challenges the avoidability of the Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(a) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to Section 550 and 15 U.S.C. § 78fff-2(c)(3);

(c)   Awarding the Trustee prejudgment interest from the date on which the Sentry Subsequent Transfers were received by Nomura;

(d)      Recovering the Sigma Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate;

(e)      Awarding the Trustee prejudgment interest from the date on which the Sigma Subsequent Transfers were received by Nomura; and

(f)      Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: June 13, 2022
       New York, New York

/s/ David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Matthew D. Feil
Email: mfeil@bakerlaw.com
Frank M. Oliva
Email: foliva@bakerlaw.com
David Choi
Email: dchoi@bakerlaw.com
Andrew M. Serrao
Email: aserrao@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 estate of Bernard L. Madoff*