**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>    Plaintiff,<br><br> v.<br><br>NOMURA INTERNATIONAL PLC,<br><br>    Defendant. | Adv. Pro. No. 11-02759 (CGM)<br><br><br><br>**<u>AMENDED COMPLAINT</u>** |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against Nomura International plc ("Nomura"), alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover approximately $24,449,920 in subsequent transfers of BLMIS customer property that Nomura received from Harley International (Cayman) Ltd. ("Harley").

3.    With the specific purpose of having funds invested with BLMIS in New York and profiting from those investments, Nomura invested with multiple BLMIS feeder funds, including Harley, Fairfield Sentry Limited ("Sentry"), and Fairfield Sigma Limited ("Sigma," together with Sentry, the "Fairfield Funds").  Harley, Sentry, and Sigma were among the various investment vehicles that invested all or substantially all of their assets with BLMIS.

4.    In a separate adversary proceeding, the Trustee seeks to recover $34,074,372 in subsequent transfers of BLMIS customer property that Nomura received from Sentry and Sigma. *See Picard v. Nomura International plc*, Adv. Pro. No. 10-05348 (Bankr. S.D.N.Y. 2010).

## II.    SUBJECT MATTER JURISDICTION AND VENUE

5.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

6.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

7.  Venue in this judicial district is proper under 28 U.S.C. § 1409.

8.  This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.  BACKGROUND, THE TRUSTEE, AND STANDING

9.  On the December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

10. On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

11. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

2

  (a)  appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

  (b)  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

  (c)  removed the case to this Court pursuant to SIPA § 78eee(b)(4).

12. By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

13. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

14. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

15. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

16. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded

3

guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

17. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

18. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

20. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV. THE DEFENDANT AND NON-PARTIES

21. Defendant Nomura is incorporated under the laws of the United Kingdom. During the relevant period, Nomura's principal place of business was Nomura House, 1 St. Martin's-le-Grand, London EC1A 4NP, United Kingdom.

22. Non-party Harley was a Cayman-registered BLMIS feeder fund that invested all of its assets with BLMIS in New York. Harley had no employees or offices of its own. Harley acted primarily through New York-based Fix Asset Management Services, Inc. ("FAM").

23. Non-party FAM was an institutional fund of funds manager incorporated under New York law with a principal place of business in New York. FAM was owned and controlled by Charles Fix, a New York resident who owned and controlled all of the voting shares for Harley.

24. Non-party Fairfield Greenwich Group ("FGG") is a *de facto* partnership based in New York City that created, managed, and controlled Sentry and Sigma.

25. Non-party Sentry was a BLMIS feeder fund incorporated in the British Virgin Islands ("BVI") that invested substantially all of its assets with BLMIS in New York. At all relevant times, Sentry was managed and controlled by FGG from its New York headquarters.

26. Non-party Sigma was a BLMIS feeder fund incorporated in the BVI that invested all of its assets in Sentry and, therefore, substantially all of its assets with BLMIS in New York. At all relevant times, Sigma was managed and controlled by FGG from its New York headquarters.

## V. PERSONAL JURISDICTION

27. Nomura is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York, and knowingly accepted the rights, benefits, and privileges of conducting business in the United States and New York.

5

28. Nomura has been registered with the SEC as an institutional investment manager since at least 1998 and has filed required quarterly Form 13Fs since at least 1999.

29. Nomura invested in Harley with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

30. Nomura knew that Harley invested all of its assets with BLMIS in New York.

31. As a precondition to investing in Harley, Nomura was required to execute a subscription agreement with Harley. By executing subscription agreements, Harley investors affirmed having read, understood, and accepted the terms set forth in the Harley Confidential Explanatory Memorandum (the "Harley PPM"). As set forth in the Harley PPM, Harley investors also received copies of Harley's annual audited financial statements (collectively, the "Audited Financial Statements").

32. Based on information contained in the Harley PPM and the Audited Financial Statements for the years 2003 through 2007, Nomura understood that any returns on its investments in Harley were to be earned in New York by BLMIS's purported execution of the split strike conversion strategy (the "SSC Strategy"), which involved the purchase and sale of United States securities, options, and Treasury Bills.

33. For example, the 2007 Harley Audited Financial Statement reflected that on December 31, 2007, all of Harley's over $3 billion of assets invested with BLMIS were purportedly invested in United States Treasury Bills.

34. The 2007 Harley Audited Financial Statement also disclosed that BLMIS in New York acted as the "Custodian" for substantially all of Harley's assets. Specifically, the statement disclosed that:

    (a) "The company holds cash with . . . Bernard L. Madoff Investment Securities LLC;" and

6

  (b) "Bernard L. Madoff Investment Securities LLC hold assets worth US$3,329,127,954."

35. As set forth in the Harley PPM, Harley Shareholders agreed that investments in Harley would be governed by Harley's articles of association (the "Harley Articles of Association"). The Harley Articles of Association, in turn, provided that all disputes between Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association.

36. Nomura's investments with Madoff were not limited to its investments in Harley. Among other BLMIS feeder funds, Nomura invested in the Fairfield Funds with the specific purpose of having funds invested with BLMIS and profiting therefrom.

37. Because Nomura was aware that all of its investments through various BLMIS feeder funds, including Harley and the Fairfield Funds, were placed with BLMIS in New York, Nomura calculated its exposure to Madoff's SSC Strategy based on its aggregate investments in those funds.

38. Nomura informed third parties that its ability to make additional BLMIS feeder fund investments depended on its overall exposure to Madoff through a number of BLMIS feeder funds.

39. Nomura knew that the Fairfield Funds, like Harley, invested substantially all of their assets with BLMIS in New York.

40. To invest in the Fairfield Funds, Nomura executed subscription agreements through which it affirmed having received and read the Fairfield Funds' private placement memoranda (the "Fairfield Funds PPMs") and agreed to be bound by the terms set forth in the PPMs.

7

41. The Fairfield Funds PPMs informed Nomura that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Sentry's BLMIS investment advisory accounts.

42. Like the Harley PPM, the Fairfield Funds PPMs informed Nomura that any returns on its investments in the Fairfield Funds would be and were earned in New York by BLMIS's purported execution of the SSC Strategy, which involved the purchase and sale of United States securities, options, and Treasury Bills.

43. Nomura maintained a New York bank account in its own name at Bank of America (the "New York Account").

44. As it did with Sentry, Nomura instructed Harley to send redemption payments to the New York Account. Like Sentry, Harley complied with this instruction and sent Nomura's redemption payments to the New York Account. Those redemption payments comprise the subsequent transfers of customer property the Trustee seeks to recover with this Amended Complaint.

45. As with Sentry, to invest in Harley, investors sent subscription payments to a New York correspondent bank account. From 2005 through December 2008, Harley investors sent subscription payments to a New York bank account at the Northern Trust Banking Corporation in the name of Fortis Prime Fund Solutions (IOM), Harley's administrator, banker, and nominal custodian. Before 2005, Harley investors sent subscription payments to a New York bank account at JPMorgan Chase.

46. In connection with its investments in the Fairfield Funds, Nomura purposely directed activities at the United States and New York, including visiting and directing communications to FGG in New York and creating marketing materials promoting Nomura's

8

access to BLMIS in New York through the Fairfield Funds. On information and belief, Nomura engaged in similar activities with respect to its investments in Harley.

47. Nomura knew that the Fairfield Funds were operated and controlled by FGG in New York. Likewise, Nomura knew that Harley was operated and controlled by FAM in New York.

48. Nomura directed email and telephone communications regarding Nomura's investments with BLMIS through the Fairfield Funds to FGG personnel located in FGG's New York office. Likewise, on information and belief, Nomura directed email and telephone communications regarding Nomura's investments with BLMIS through Harley to FAM personnel located in New York.

49. Nomura personnel visited FGG's New York office to meet with FGG personnel regarding Nomura's investments with BLMIS through the Fairfield Funds.

50. Likewise, on information and belief, Nomura personnel visited FAM's New York office to meet with FAM personnel regarding Nomura's investments with BLMIS through Harley.

51. To attract investors, Nomura prepared marketing materials promoting its access to BLMIS. Those marketing materials highlighted that the Fairfield Funds sent substantially all of their assets to BLMIS in New York to be invested using the SSC Strategy, which Nomura touted as generating "remarkably consistent" returns through the purchase and sale of S&P 100 Index equities, options, and United States Treasury Bills. On information and belief, Nomura also promoted its access to BLMIS through Harley.

52. Nomura thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Nomura should therefore expect to be, and is, subject to the jurisdiction

9

of the Bankruptcy Court pursuant to Bankruptcy Rule 7004 and the United States Constitution, as well as N.Y. C.P.L.R. § 302.

## VI. BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

53. Madoff founded BLMIS in 1960 as a sole proprietorship and registered as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

54. In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

55. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

56. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

10

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

57. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

58. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B. The Ponzi Scheme

59. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

60. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was

11

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

61. To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

62. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### Madoff's Investment Strategy

63. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

64. From the early 1990s forward, Madoff began telling IA Business customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

65. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

66. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

67. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

68. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

69. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

70. If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are

no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

71.   Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

72.   Sophisticated or professional investors including Nomura knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

73.   BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

74.   Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

14

75. As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

76. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

77. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor, such as Nomura, would know it was statistically impossible.

### No Evidence of BLMIS Trading

78. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

79. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

15

Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### The Collapse of The Ponzi Scheme

80. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

81. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

82. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

### VII. RECOVERY OF SUBSEQUENT TRANSFERS TO NOMURA

#### A. Initial Transfers from BLMIS to Harley

83. The Trustee commenced a separate adversary proceeding against Harley in this Court under the caption, *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL) (the "Harley Complaint"), seeking to avoid and recover initial transfers of customer property from BLMIS to Harley in the approximate amount of $1,074,592,422 (the "Harley Initial Transfers"). The Trustee incorporates by reference the allegations contained in the Harley Complaint as if fully set forth herein.

84. By order dated November 10, 2010, this Court entered a default judgment against Harley in the amount of $1,072,820,000 (the "Harley Judgment Amount") [ECF No. 15].

85. The Harley Initial Transfers are set forth in the attached Exhibits A and B. The Harley Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

16

86. Of the Harley Judgment Amount, $1,072,800,000 was transferred to Harley during the six years preceding the Filing Date (the "Harley Six Year Initial Transfers").

87. Each of the Harley Six Year Initial Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

88. Of the Harley Six Year Initial Transfers, $1,066,800,000 was transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year Initial Transfers").

89. Each of the Harley Two Year Initial Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

90. Of the Harley Judgment Amount, $1,066,800,000 was awarded in a default summary judgment against Harley. [ECF No. 15].

91. The Trustee has not recovered any monies as a result of the November 10, 2010 default judgment against Harley.

### B. Subsequent Transfers from Harley to Nomura

92. Prior to the Filing Date, Harley transferred a portion of the Harley Initial Transfers to Nomura. Based on the Trustee's investigation to date, the subsequent transfers to Nomura total at least $24,449,920 (the "Harley Subsequent Transfers"). A chart setting forth the presently known Harley Subsequent Transfers is attached as Exhibit C.

93. The Trustee commenced this proceeding on October 6, 2011.

94. The Harley Subsequent Transfers are recoverable from Nomura under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

95. The Harley Subsequent Transfers represent a redemption of equity interest by Nomura as a shareholder in Harley. Because Harley invested all or substantially all of its assets

17

into the BLMIS Ponzi scheme, Harley was insolvent when it made the Subsequent Transfers to Nomura upon redemption of its interests.

96. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial transfers, the subsequent transfers, and any additional transfers; and (ii) seek recovery of such transfers.

## COUNT ONE:
## RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a)

97. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

98. The Harley Subsequent Transfers are recoverable from Nomura under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

99. Nomura is an immediate or mediate transferee of the Harley Subsequent Transfers totaling at least $24,449,920.

100. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Nomura: (a) recovering the Harley Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Nomura as follows:

(a) Recovering the Harley Subsequent Transfers, or the value thereof, from Nomura for the benefit of the estate.

(b) If Nomura challenges the avoidability of the Harley Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(a) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551

18

of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to Section 550 and 15 U.S.C. § 78fff-2(c)(3);

(c)     Awarding the Trustee prejudgment interest from the date on which the Harley Subsequent Transfers were received by Nomura; and

(d)     Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: June 13, 2022
      New York, New York

*/s/ David J. Sheehan*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Matthew D. Feil
Email: mfeil@bakerlaw.com
Frank M. Oliva
Email: foliva@bakerlaw.com
David Choi
Email: dchoi@bakerlaw.com
Andrew M. Serrao
Email: aserrao@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 estate of Bernard L. Madoff*

19