**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02538 (CGM) |
| Plaintiff, | |
| v. | |
| QUILVEST FINANCE LTD., | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**QUILVEST FINANCE LTD.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS .........................................................................3

I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS...........................................3

II.     QS FINANCE LTD AND ITS INVESTMENTS IN SENTRY .........................................4

ARGUMENT ....................................................................................6

I.      THIS COURT HAS PERSONAL JURISDICTION OVER QSF .......................................6

        A.      QSF's Contacts With New York Demonstrate that it Purposefully Availed
                Itself of the Laws and Privileges of Conducting Business in New York................8

                1.      QSF's Intentional Investment in BLMIS through Sentry Constitutes
                        Minimum Contacts.................................................................8

                2.      QSF's Purposeful use of New York Bank Accounts Establishes
                        Minimum Contacts................................................................11

                3.      QSF's Contacts with FGG in New York also Establishes Minimum
                        Contacts.........................................................................15

                4.      QSF's Contacts with the Forum are Sufficiently Related to the
                        Trustee's Claims ...............................................................18

        B.      Exercise of Personal Jurisdiction Over QSF is Reasonable...................................19

        C.      In the Alternative, the Trustee is Entitled to Jurisdictional Discovery .................20

II. SECTION 546(E) DOES NOT BAR RECOVERY FROM QSF...........................................20

        A.      Sentry had Actual Knowledge of Madoff's Fraud................................................21

        B.      QSF is Precluded from Relitigating the Actual Knowledge Exception
                Established in *Cohmad* ...........................................................................22

        C.      QSF is Precluded from Arguing that Section 546(e) Applies Independently to
                Recovery Actions................................................................................24

III.    THE TRUSTEE'S COMPLAINT PLEADS THAT QSF RECEIVED BLMIS
        CUSTOMER PROPERTY UNDER SECTION 550(A) ..................................................28

        A.      QSF Misstates the Trustee's Pleading Burden ....................................................29

i

B.      QSF's Tracing Arguments Fail on a Motion to Dismiss .........................................30

C.      QSF's Claims of Double Recovery Are Premature ................................................33

IV.      THE TRUSTEE'S COMPLAINT SUFFICIENTLY PLEADS THE
AVOIDABILITY OF THE FAIRFIELD SENTRY INITIAL TRANSFERS ..................34

CONCLUSION ...................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ..................................................................28, 29, 31

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp*.,
    98 F.3d 25 (2d Cir. 1996) .......................................................................................................7

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ..........................................................................................................13

*Am. Casein Co. v. Geiger (In re Geiger)*,
    446 B.R. 670 (Bankr. E.D. Pa. 2010) ...................................................................................34

*Ayyash v. Bank Al-Madina*,
    No. 04 Civ. 9201(GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ...................................20

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985) ....................................................................................................6, 7, 17

*Chase Manhattan Bank v. Banque Generale Du Commerce*,
    No. 96 CIV 5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997) ...............................17

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ..............................................................................................6, 19

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) .................................................................................33

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ....................................................................................6

*Dandong v. Pinnacle Performance Ltd.*,
    966 F. Supp. 2d 374 (S.D.N.Y. 2013) ...................................................................................12

*DeMasi v. Benefico*,
    567 F. Supp. 2d 449 (S.D.N.Y. 2008) ...................................................................................35

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ......................................................................................................5

*Druck Corp. v. Macro Fund (U.S.) Ltd.*,
    102 F. App'x 192 (2d Cir. 2004) ....................................................................................15, 16

*Eldesouky v. Aziz*,
　No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ...............................12

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
　651 F.3d 329 (2d Cir. 2011).............................................................................................26

*ESI, Inc. v. Coastal Corp.*,
　61 F. Supp. 2d 35 (S.D.N.Y. 1999) .....................................................................................7

*Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
　397 F. Supp. 3d 323 (S.D.N.Y. 2019)............................................................................8, 13

*Fairfield Sentry Ltd. v. Migani*,
　[2014] UKPC 9 ...................................................................................................................18

*Ferrari v. Cnty. of Suffolk*,
　790 F. Supp. 2d 34 (E.D.N.Y. 2011) .................................................................................35

*Foman v. Davis*,
　371 U.S. 178 (1962)...........................................................................................................36

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
　141 S. Ct. 1017 (2021)..................................................................................................16, 18

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
　No. 11-3673(RJS), 2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) .........................................15

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
　Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
　S.D.N.Y. Jan. 3, 2014) .......................................................................................................32

*Gucci Am., Inc. v. Li*,
　135 F. Supp. 3d 87 (S.D.N.Y. 2015)..................................................................................13

*Hau Yin To v. HSBC Holdings PLC*,
　2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ........................................................................14

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
　601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021)...........................33

*Hill v. HSBC Bank*
　*plc*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016)...........................................................................14

*HSH Nordbank AG N.Y. Branch v. Street*,
　*No.* 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012)............................12, 19

*Int'l Shoe Co. v. Washington*,
　326 U.S. 310 (1945)......................................................................................................6, 7, 8

*Kelley v. Safe Harbor Managed Acct. 101, Ltd.*,
No. 20-3330, 2022 WL 1177748 (8th Cir. Apr. 21, 2022)................................................24, 27

*Kelley v. Westford Special Fund, L.P.*,
No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ................................30, 31, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16,
2009) .....................................................................................................................................20

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013)..............................22

*Leema Enters., Inc. v. Willi*,
575 F. Supp. 1533 (S.D.N.Y. 1983).......................................................................................14

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017).........................................................................14

*Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327 (2012) ...........................................................................................12, 13, 19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)..................................................................................................18

*McGee v. Int'l Life Ins. Co.*,
335 U.S. 220 (1957)................................................................................................................6

*McKee Electric Co. v. Rauland-Borg. Corp.*
20 N.Y.2d 377 (1967) ...........................................................................................................16

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996)......................................................................................................7

*Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*
*(In re Motors Liquidation Co.),*
565 B.R. 275 (Bankr. S.D.N.Y. 2017) ..................................................................................17

*New Hampshire v. Maine*,
532 U.S. 742 (2001)..............................................................................................................22

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic*
*Bank*,
549 B.R. 56 (Bankr. S.D.N.Y. 2016).....................................................................................13

*In re Picard, Trustee for Liquidation of Bernard L. Madoff Inv. Sec. LLC,* 917
F.3d 85 (2d Cir. 2019).................................................................................................9, 20, 25

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)....................................................................23

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 191 (Bankr. S.D.N.Y. 2018)........................................................... *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012)........................................................... *passim*

*Picard v. Ceretti, et al.*,
    No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)........................23

*Picard v. Charles Ellerin Revocable Tr. (In re BLMIS)*,
    Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514, (Bankr.
    S.D.N.Y. Mar. 14, 2012)..............................................................................28, 30, 31

*Picard. v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d. Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
    142 S. Ct. 1209 (2022).........................................................................................4

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311, 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016)....................23

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011)........................................................... *passim*

*Picard v. Estate of Stanley Chais*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011)..................................................................19

*Picard v. Fairfield Greenwich Grp. (In re Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021)..................................................................6, 7

*Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014)...........................................................................23, 26

*Picard v. JPMorgan Chase & Co.*,
    No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10, 2014)........................10

*Picard v. Lowrey (In re BLMIS)*,
    596 B.R. 451 (S.D.N.Y. 2019), *aff'd sub nom. Picard v. Gettinger (In re*
    *BLMIS)*, 976 F.3d 184 (2d Cir. Cir. 2020)........................................................23, 35

*Picard v. Magnify, Inc.*,
    583 B.R. 829 (Bankr. S.D.N.Y. 2018)..................................................................23

*Picard v. Maxam Absolute Return Fund*,
    L.P., 460 B.R. 106 (Bankr. S.D.N.Y. 2011) ..................................................7, 9, 20

*Picard v. Mayer (In re BLMIS)*,
    2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021) ............................................................28

*Picard v. Mendelow et al.*,
    560 B.R. 208 (Bankr. S.D.N.Y. Sept. 28, 2016).....................................................................23

*Picard v. Merkin*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................ *passim*

*Picard v. Merkin (In re BLMIS)*,
    581 B.R. 370 (Bankr. S.D.N.Y. 2017) ............................................................................31, 32

*Picard v. Multi-Strategy Fund Ltd.*,
    Adv. Pro. No. 12-01205 (CGM), ECF No. 122 (Main Case ECF No. 21729)
    (Bankr. S.D.N.Y. June 13, 2022)......................................................................................3

*Picard v. Shapiro*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015)....................................................................23, 29, 30

*Picard v. Square One Fund Ltd.*,
    Bench Ruling on Motion to Dismiss, Adv. Pro. No. 10-04330 (Bankr.
    S.D.N.Y. May 29, 2018)..................................................................................................23

*Porat v. Lincoln Towers Cmty. Ass'n*,
    464 F.3d 274 (2d Cir. 2006)............................................................................................36

*Porina v. Marward Shipping Co.*,
    521 F.3d 122 (2d Cir. 2008)..............................................................................................6

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..............................................................................................36

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010)..............................................................................................6

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
    245 F. Supp. 2d 543 (S.D.N.Y. 2003)..............................................................................16

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*,
    501 B.R. 26 (S.D.N.Y. 2013)...................................................................................25, 27, 34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ................. *passim*

*Sentry Ltd. v. Theodoor GGC Amsterdam (In re Sentry Ltd.)*,
    2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)............................................................24

*Sentry Ltd. v. Theodoor GGC Amsterdam (In re Sentry Ltd.)*,
    596 B.R. 275 (Bankr. S.D.N.Y. Dec. 6, 2018) ......................................................24

*Sentry Ltd. v. Theodore GGC Amsterdam (In re Sentry Ltd.)*,
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ...............................................18

*Sherman v. A.J. Pegno Constr. Corp.*,
    528 F. Supp. 2d 320 (S.D.N.Y. 2007).....................................................................35

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007)..........................................................28, 29, 30

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015).....................................................................23

*In re Sledziejowski*, No. 13-22050 (RDD), 2016 WL 6155929 (Bankr. S.D.N.Y.
    Oct. 21, 2016) .........................................................................................................14

*SPV Osus Ltd. v. UBS AG*,
    114 F. Supp. 3d 161 (S.D.N.Y. 2015)......................................................................16

*Stipulated Case Mgmt. Order, Picard v. Fairfield Inv. Fund Ltd.*,
    (Bankr. S.D.N.Y. Dec. 6, 2021)....................................................................2, 3, 33

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020).....................................................................26

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)........................................................................................17

*Taylor v. Sturgell*,
    533 U.S. 880 (2008)..................................................................................................22

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
    916 F.3d 143 (2d Cir. 2019).........................................................................................7

*United States v. Henshaw*,
    388 F.3d 738 (10th Cir. 2004) ...................................................................................31

*United States v. Int'l Longshoremen's Ass'n*,
    518 F. Supp. 2d 483 (E.D.N.Y. 2007) .....................................................................36

*Walden v. Fiore*,
    571 U.S. 277 (2014)..................................................................................................11

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016).......................................................................................19

**Statutes**

11 U.S.C. § 546(e) ................................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ....................................................................................20, 21, 24

11 U.S.C. § 548(a)(1)(B) ..........................................................................................21, 24

11 U.S.C. § 548(b) ....................................................................................................21, 24

11 U.S.C. § 550 .........................................................................................................24, 25

11 U.S.C. § 550(a) ................................................................................................... *passim*

11 U.S.C. § 550(a)(2) ....................................................................................................28

11 U.S.C. § 550(d) ....................................................................................................33, 34

**Rules**

Fed. R. Civ. P. 8 .........................................................................................................3, 35

Fed. R. Civ. P. 8(a)(2) ....................................................................................................34

Fed. R. Civ. P. 10(c) .......................................................................................................34

Fed. R. Civ. P. 12(b)(2) ....................................................................................................1

Fed. R. Civ. P. 12(b)(6) ...............................................................................................1, 36

N.Y. C.P.L.R. § 302(a)(1) ..........................................................................................12,18

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"),

respectfully submits this memorandum of law and supporting declaration of Robertson D.

Beckerlegge ("Beckerlegge Decl."), in opposition to defendant QS Finance Ltd.'s ("QSF")[1]

motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and

12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover

BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, this action by the

Trustee within the SIPA BLMIS liquidation proceeding seeks to recover $34,198,295[2] in

subsequent transfers of stolen BLMIS customer property that QSF received from Fairfield Sentry

Limited ("Sentry"). For years, QSF purposefully invested in BLMIS through Sentry, the largest of

the BLMIS feeder funds. Nonetheless, QSF moves to dismiss the Trustee's Complaint, arguing

that: (i) this Court does not have jurisdiction; (ii) the safe harbor under Section 546(e) bars

recovery; (iii) QSF did not receive any transfers of customer property; and (iv) the Trustee failed

to state a claim because the Complaint incorporates the Trustee's initial transfer complaint against

Sentry[3] by reference. For the reasons set forth herein, QSF's arguments fail.

First, there is no question that this Court has personal jurisdiction over QSF. QSF's contacts

with the forum are precisely the type of minimum contacts courts have found establish and support

---

[1] Following the initiation of this adversary proceeding, Quilvest Finance Ltd. changed its name to QS Finance Ltd.

[2] The amount sought in the Complaint was $37,800,115. Pursuant to a March 1, 2022 Stipulation [ECF No. 105], the Trustee agreed not to pursue transfers totaling $3,601,820.

[3] Amended Complaint, *Picard v. Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL) (July 20, 2010), ECF No. 23 ("Fairfield Amended Complaint").

a finding of specific personal jurisdiction. QSF purposefully invested in Sentry, knowing and intending that BLMIS in New York would be the *de facto* investment manager, broker dealer, and custodian of Sentry (and QSF's) investments. QSF knew Sentry fed substantially all its funds into BLMIS and that BLMIS was essential to its investments. Investing in BLMIS was the entire point. QSF purposefully used U.S. bank accounts to subscribe into and redeem out of Sentry, which standing alone, provides sufficient basis for jurisdiction. Also, QSF does not contest that it entered into subscription agreements with Sentry, with New York jurisdiction, venue, and choice of law provisions. These contacts support the exercise of jurisdiction in this case and should be considered under the totality of the circumstances.

Second, the Trustee has plausibly alleged the avoidability of the initial transfers based on Sentry's actual knowledge of fraud by incorporating the Fairfield Amended Complaint.[4] Therefore under controlling law, the Section 546(e) safe harbor is inapplicable and does not bar recovery from QSF. QSF argues that QSF's knowledge as a subsequent transferee (and not the Fairfield Funds' knowledge as initial transferees) should determine the avoidability of the initial transfers from BLMIS. This argument conflicts with the plain language of the statute and precedent in this SIPA liquidation proceeding establishing that Section 546(e) does not bar recovery from a subsequent transferee.

Third, the Trustee has plausibly alleged that QSF received customer property under Section 550(a) by outlining the relevant pathways through which customer property was transferred from BLMIS to Sentry and subsequently to QSF. The Trustee has also alleged the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer QSF received. At the

---

[4] After the Trustee filed his Complaint against Defendant, the Trustee filed a Second Amended Complaint (the "Fairfield SAC") in the initial transfer action. *See* Fairfield Second Amended Complaint, *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

pleading stage, nothing more is required. QSF nevertheless argues that the Trustee must show a dollar-for-dollar accounting and tie every subsequent transfer to specific initial transfers at the pleading stage. QSF's arguments misstate the law and are plainly inappropriate on a motion to dismiss.

Fourth, the Trustee's Complaint provides a "short and plain statement" showing the Trustee is entitled to relief. QSF alleges the Trustee has violated Rule 8 of the Federal Rules of Civil Procedure by incorporating by reference the Fairfield Amended Complaint. This argument conflicts with precedent from the District Court, and regardless, this Court may take judicial notice of the operative Fairfield SAC and its opinion in *Picard v. Fairfield Inv. Fund Ltd (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) (holding that Trustee had plausibly alleged the avoidability of the initial transfers to the Fairfield Funds) ("*Fairfield Inv. Fund*").

Finally, QSF's arguments in its Motion are very similar to those made by Multi-Strategy Fund Ltd. in its motion to dismiss. In a Memorandum Decision issued today, this Court rejected those arguments and denied Multi Strategy Fund's motion to dismiss in its entirety. *See Picard v. Multi-Strategy Fund Ltd.*, Adv. Pro. No. 12-01205 (CGM), ECF No. 122 (Main Case ECF No. 21729) (Bankr. S.D.N.Y. June 13, 2022). For the reasons articulated in the Court's Memorandum Decision and for the reasons the Trustee argues herein, the Trustee respectfully requests that the Court deny QSF's Motion.

## **STATEMENT OF FACTS**

### I.    **THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS**

Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Complaint ("Compl.") ¶ 30. BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA

Business"). *Id.* ¶ 22. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved: (a) investing in a basket of common stocks from the Standard & Poor's 100 Index; (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks; and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 23-24. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶ 27. On December 11, 2008, Madoff's fraud was publicly revealed and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 10.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created to funnel investors' funds into BLMIS. *See Picard. v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021), cert. denied sub nom. *Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) ("*Citibank*"). QSF knowingly invested in Sentry, a BLMIS feeder fund. Compl. ¶ 2, 6.

## II.    QS FINANCE LTD AND ITS INVESTMENTS IN SENTRY

QSF (formerly known as Quilvest Finance Ltd.) is a subsidiary of Quilvest S.A., a leading global independent wealth and private equity manager. Compl. ¶ 3. QSF invested substantial sums with Sentry, which in turn invested nearly all of its funds with BLMIS. *Id.* at ¶ 6.

Sentry was controlled by the Fairfield Greenwich Group ("FGG" or "Fairfield"), a *de facto* partnership with its principal place of business in New York. *See Fairfield Inv. Fund,* 2021 WL 3477479, at *9. Sentry was a U.S. dollar-denominated fund that invested 95% of its assets with BLMIS. *Picard v. Sentry Limited, et al.*, No. 08-01789 (CGM), Adv. Proc. No. 09-01239, ECF No. 23 (the "Fairfield Am. Compl.") ¶¶ 52, 318.

As an investor in Sentry, QSF executed subscription agreements. Beckerlegge Decl. Ex. 1. The subscription agreements incorporated the Sentry Information Memoranda (later known as

4

Private Placement Memoranda) ("PPMs"), and by signing, investors like QSF, warranted that they "received and read a copy of the [PPMs]." *Id.* Ex. 1. QSF does not contest that it executed subscription agreements voluntarily submitting to New York choice of law, venue in New York, and the jurisdiction of New York courts.

The PPMs explicitly disclosed BLMIS's multiple roles as the *de facto* investment manager, broker dealer, and custodian for the Fairfield Funds. Beckerlegge Decl. Ex. 2. Additionally, the PPMs also disclosed how "[t]he services of BLM[IS] are essential to the continued operations of [ Sentry]." *Id*. Specifically investors learned from the PPMs that BLMIS—not the Fairfield Funds or their service providers—would have custody of Sentry's assets in the United States and would execute the funds' purported investment strategy.

Like all Sentry investors, QSF agreed to send—and did send—its subscription payments to FGG's HSBC bank account in New York ("HSBC NY Account"). Beckerlegge Decl., *Id*., Ex. 2. That money was then deposited by Sentry into BLMIS's account at JPMorgan Chase Bank in New York. Fairfield Am. Compl. ¶ 35. In addition, QSF designated redemptions from Sentry be deposited into a JP Morgan Chase Bank in New York and later designated a UBS account in New York, in its affiliate's name. Beckerlegge Decl., Exs. 3, 4.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. Compl. ¶ 34; *see also* Fairfield SAC. In 2011, the Trustee settled with Sentry. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS estate. *Id.* The Trustee then commenced a number of adversary proceedings against defendants like QSF to recover the approximately $3 billion in stolen customer property.

5

## <u>ARGUMENT</u>

### I.    THIS COURT HAS PERSONAL JURISDICTION OVER QSF

This Court has personal jurisdiction over QSF because: (i) QSF had minimum contacts

with the forum such that it purposefully availed itself of the benefits and privileges of investing in

New York; and (ii) the exercise of jurisdiction over QSF is reasonable.

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make

a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ,

S.A.*,722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established

solely by allegations." *Id*. at 84–85. A plaintiff may also establish a *prima facie* case of jurisdiction

through affidavits and supporting materials that contain averments of facts outside the pleadings.

*See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings

and affidavits are to be construed in the light most favorable to the plaintiff, resolving all doubts

in plaintiff's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.

2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).

Depending on the nature of a defendant's contacts with the forum, a court may exercise

general or specific jurisdiction. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473

(S.D.N.Y. 2001). Relevant here, specific jurisdiction exists where the defendant purposely directs

its activities into the forum and the underlying cause of action arises out of or relates to those

activities. *See Picard v. Fairfield Greenwich Grp. (In re Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr.

S.D.N.Y. 2021) (citing *Cromer*, 137 F. Supp. 2d at 473).

The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether the

defendant purposefully established "minimum contacts" in the forum, such that the defendant

purposefully availed itself of the privilege of conducting activities with the forum. *See Int'l Shoe

Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King v. Rudzewicz*, 471 U.S. 462, 475–76

(1985). "The defendant's activity need not have taken place within the forum, [citation omitted] and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund*, L.P., 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (citing *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)). Moreover, minimum contacts may be found when a "'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Sentry Ltd.*, 627 B.R. at 566 (quoting *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019)).

Second, the Court conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. To determine whether jurisdiction is reasonable, courts consider the following factors:

> (1) the burden that the exercise of Jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citations omitted). Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's forum contacts establish personal jurisdiction, the Court must look at "the totality of the circumstances" rather than analyze each contact in isolation. *See, e.g., Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 59 (S.D.N.Y. 1999) ("First, the Affiliates improperly analyze each contact as if it were the defendant's sole contact (i.e., 'standing alone, is insufficient'),

whereas we are directed by the Second Circuit to look at 'the totality of the circumstances.'")
(citation omitted).

Contrary to QSF's claims, the trustee need not establish this Court's jurisdiction over QSF
for each individual transfer it seeks to recover. Courts have personal jurisdiction over *defendants*,
not *transfers*.[5] *See, e.g., Int'l Shoe*, 326 U.S. at 316. In this case, the Court should assess each
defendant and focus on the overall relationship with the initial transferees to determine jurisdiction.

### A.    QSF's Contacts With New York Demonstrate that it Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York

QSF had numerous contacts with New York that establish this Court's jurisdiction. QSF:
(1) deliberately targeted the New York securities market by investing in Sentry, whose assets were
managed and custodied by BLMIS in New York; (2) used New York banks to transact business
with Sentry; and (3) purposefully availed itself of New York through its other investment-related
activity and that of its affiliates. Many of these contacts independently establish jurisdiction. In
their totality, these contacts plainly establish that QSF purposefully directed its activities towards
New York. *See Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F.
Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [defendant]'s Agreement-related contacts are
considered together, it is clear [the defendant] purposely availed itself of the forum.").

### 1.    QSF's Intentional Investment in BLMIS through Sentry Constitutes Minimum Contacts

QSF's intentional investment with BLMIS in New York through a known BLMIS feeder
fund, Sentry, establishes personal jurisdiction over QSF. QSF invested in Sentry with the specific

---

[5] QSF argues each subsequent transfer is a separate claim and so the Trustee must establish the Court's jurisdiction over QSF for each individual transfer it seeks to recover. QSF misconstrues the requirements for personal jurisdiction and this court's decision in *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 191 (Bankr. S.D.N.Y. 2018). The Court in *BNP* did not look at each transfer to determine jurisdiction. The Court assessed each defendant, focused on the overall relationship with the initial transferees, and determined it had jurisdiction.

purpose of having funds invested with BLMIS and profiting therefrom. Compl. ¶ 6. QSF knew the funds they invested were purportedly to be used to purchase securities in the United States. As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard, Trustee for Liquidation of Bernard L. Madoff Inv. Sec. LLC,* 917 F.3d 85, 98 (2d Cir. 2019) (*"ET Decision"*); *see also Maxam,* 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended that funds invested with BLMIS feeder fund would be sent to BLMIS in New York for investment).

By initially executing a subscription agreement and affirming that it received and read Sentry's PPM, QSF knew that: (i) Sentry invested its assets with BLMIS; (ii) BLMIS performed all investment management duties for these assets; (iii) BLMIS was registered with the U.S. Securities and Exchange Commission; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. treasury bills; (vi) the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS; and (viii) BLMIS was "essential to the continued operation of" Sentry. *See* Beckerlegge Decl., Ex. 2. Although QSF seeks to paint the picture of a "mere" investor with no authority or reason to send funds to or receive funds from BLMIS, the fact that QSF's investments would ultimately lie with BLMIS was not a mystery; it was the entire point of investing with Sentry, a fact that was plainly apparent in Sentry's PPMs.

This Court has already concluded that investors like QSF, who intentionally invested in BLMIS through Sentry, are subject to personal jurisdiction in *Picard v. Bureau of Labor Ins. (In*

9

*re BLMIS)*, 480 B.R. 501, 516-518 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*").[6] There, as here,

the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of

dollars in Sentry with the specific goal of having funds invested in BLMIS in New York, with

intent to profit therefrom." *BLI*, 480 B.R. at 506. There, as here, the subsequent transferee was

provided with PPMs and executed subscription agreements establishing the investment's BLMIS-

centric purpose. *Id.* At 507-08. And there, as here, the subsequent transferee argued that the

foreseeability of its investment "ending up" in a BLMIS account was insufficient to support

personal jurisdiction. *Id.* at 517. Not only did the Court reject this argument, Judge Lifland called

it "disingenuous," explaining that:

> BLI's investments in Sentry did not merely "end up" in an account
> at BLMIS as a result of happenstance or coincidence. Rather, BLI
> purposefully availed itself of the benefits and protections of New
> York laws by knowing, intending and contemplating that the
> substantial majority of funds invested in Sentry would be transferred
> to BLMIS in New York to be invested in the New York securities
> market.

*Id.* at 517; see also *Picard v. JPMorgan Chase & Co.*, No. 08-99000 (SMB), 2014 WL 5106909,

at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation proceeding have already

"confirmed that defendants who invested directly or indirectly with BLMIS and received payments

from BLMIS as initial transferees or as subsequent transferees of those initial transfers were

subject to the Court's personal jurisdiction"). As framed by this Court, "BLI intentionally tossed

a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United

States and reap the benefits therefrom." *BLI*, 480 B.R. at 506.

Because QSF is similarly situated to the defendant in *BLI* with respect to the fundamental

purpose of the investment, *BLI* is controlling and resolves QSF's personal jurisdiction defense

---

[6] Despite *BLI* being directly on point, Defendant fails to address it.

without the need for inquiry into its additional New York contacts. This Court should reaffirm *BLI* and hold that QSF's purposeful targeting of New York and its laws by intentionally investing with BLMIS through Sentry establishes personal jurisdiction over QSF.

In attempting to downplay the importance of its contacts with Sentry, QSF relies on a misreading of *Walden v. Fiore*, 571 U.S. 277 (2014). Mot. at 28. *Walden*, however, has no application here. In a case addressing the foreseeability of an injury arising within a forum state based on tortious conduct outside that state, the Court in *Walden* found that a Georgia police officer could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiffs resided in Nevada. *Walden*, 571 U.S. at 288-91. *Walden* simply reaffirms the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *See id*. at 284.

By contrast, here, the Trustee is not alleging foreseeability as to the situs of an injury. Rather, as in *BLI*, the Trustee is alleging that QSF purposefully availed itself of the benefits and laws pertaining to investing in the United States. Here, where QSF has signed agreements expressly indicating its intent to direct custody and control over all of their funds to a specific U.S. broker-dealer in order to knowingly profit from the U.S. securities markets—QSF has purposefully availed itself of the laws and protections of the United States.

## 2.    QSF's Purposeful use of New York Bank Accounts Establishes Minimum Contacts

QSF's purposeful use of bank accounts in New York to both subscribe into and redeem out of Sentry supports jurisdiction. QSF used its affiliate, Quilvest Switzerland's, account at JPMorgan Chase Bank in New York to receive transfers from Sentry. In the Sentry subscription agreements QSF executed, QSF directed that all redemptions and payments be sent to this New York account. In 2007, QSF changed its account to its affiliate's UBS Bank account in New York. Contrary to

QSF's contentions, these uses of the New York bank accounts were purposeful and support the exercise of personal jurisdiction.

Under either the due process analysis or the New York long-arm statute, courts have frequently ruled that the use of New York bank accounts to effectuate transfers of funds is sufficient to establish personal jurisdiction. N.Y. C.P.L.R. § 302(a)(1);[7] *see e.g., Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (foreign defendant subject to jurisdiction under New York long-arm statute based solely on its use of a New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (same); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (same).

This Court similarly found jurisdiction where initial and subsequent transferee defendants received the transfers at issue out of, and made the underlying BLMIS or BLMIS feeder fund investments into, U.S. bank accounts. *See BNP*, 594 B.R. at 167, 191 (finding jurisdiction over the subsequent transferee defendants that sent subscription agreements to New York, wired funds in U.S. dollars to New York, sent redemption requests to New York and received redemption payments from a Bank of New York account in New York."). Additionally, in accordance with Sentry's subscription agreement and PPM, QSF repeatedly sent payments to, and received payments from Sentry's HSBC NY account. QSF agreed to send subscription payments from its affiliate's New York account to Sentry's HSBC NY account in multiple subscription agreements.

Even if the accounts are correspondent bank accounts, the New York Court of Appeals has held that a defendant's purposeful use of a correspondent bank account in New York supports a

---

[7] Certain cases discussed herein address jurisdiction under New York's long-arm statute. Due to the very close overlap between the requirements of the New York long-arm statute and those of due process, courts engaging in a due process analysis frequently cite long-arm cases as a matter of course. See, e.g., *HSH Nordbank AG N.Y. Branch v. Street, No. 11 Civ. 9405(DLC)*, 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting that "the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous").

finding of jurisdiction "even if no other contacts between the defendant and New York can be established" *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (2012). New York Courts have consistently followed this holding. *See Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 67–69 (Bankr. S.D.N.Y. 2016) (designation and use of New York correspondent accounts to receive the transfers at issue); *Al Rushaid v. Pictet & Cie, 28 N.Y.3d 316, 322–29* (2016) (use of New York correspondent accounts to effectuate transfers on behalf of the defendant's bank's clients). Such use must be "purposeful," and not coincidental or passive. *See Licci*, 20 N.Y.3d at 338–39 (finding jurisdiction where use of correspondent account was not "coincidental," and distinguishing case where defendant passively received funds due entirely to another party's actions).

Where, like here, there has been repeated use of a correspondent account (over 30 times), purposeful availment may be inferred from the sheer volume of transactions. *See Licci,* 20 N.Y.3d at 340 (routing several million dollars through correspondent account dozens of times indicates desirability and lack of coincidence); *Al Rushaid*, 68 N.E.3d at 5–6 (finding transfer to correspondent accounts at least 12 times for $4 million sufficient for personal jurisdiction); *Gucci Am., Inc. v. Li*, 135 F. Supp. 3d 87, 94–96 (S.D.N.Y. 2015) (transfers nearly a dozen times through correspondent account sufficient to support personal jurisdiction). Additionally, it makes no difference that the HSBC NY account was Sentry's account because QSF opted to use it. *See Esso*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute.").

The Trustee's action is therefore a far cry from cases cited by QSF. QSF argues that maintenance of U.S. bank accounts and receipt of funds through such accounts are insufficient to establish personal jurisdiction, *see* Mot. at 31. However, QSF's use of its New York bank accounts

went beyond "mere maintenance" as QSF was a knowing participant in the underlying transactions, directing the movement of its own funds through this account. Moreover, the cases QSF cites are distinguishable. *In re Sledziejowski*, 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016) (finding transfer of funds by third party from United States to Poland in connection with a loan agreement was not a contact relevant to specific jurisdiction analysis because the transfer was not made by defendant); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (finding that correspondent bank accounts were "unrelated to the fraud alleged"); *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (finding planned payments in connection with a contract to book a venue insufficient to establish specific jurisdiction).

QSF also argues that because its use of New York banks was "incidental to foreign investment contracts performed abroad" they do not create the necessary minimum contacts. Mot. at 31. QSF's reliance on *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136, at *6–7 (S.D.N.Y. Mar. 1, 2017), and *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 340 (S.D.N.Y. 2016), where use of a correspondent account was deemed an "incidental consequence[] of fulfilling a foreign contract," is similarly misplaced. In *BNP*, this Court already determined that this line of cases is not relevant to the Trustee's subsequent transfer actions. *See BNP*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). This is not a dispute between two parties stemming from services owed under a foreign contract, like the breach of fiduciary duty and other claims in *To* and *Hill*. Rather, this action is brought by a SIPA trustee in a SIPA liquidation proceeding against investors whose transfers of funds to and from U.S. correspondent accounts fulfilled the very purpose of their feeder fund agreements and

themselves evidence the defendants' intent to direct activity towards the U.S. securities markets. *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the 'raison d'etre' of the Agreement between BLI and Sentry.").

QSF's repeated, systematic, and purposeful use of New York bank accounts to direct funds to BLMIS through Sentry is sufficient to establish minimum contacts with New York.

### 3.    QSF's Contacts with FGG in New York also Establishes Minimum Contacts

By investing in Sentry, QSF knowingly transacted business with New York entity FGG. When QSF first invested in Sentry, FGG represented that Fairfield Greenwich Limited, a New York entity, managed the Fairfield Funds. Beckerlegge Decl. Ex. 2. After FGG formed FG Bermuda in 2003, FGG designated FG Bermuda as Sentry's manager. However, FGG continued to conduct key operations of Sentry from its New York office. *See supra* pp. 4-5. In *BNP*, this Court found jurisdiction based on a similar investment with a BLMIS feeder fund. *BNP*, 594 B.R. at 191 (finding a *prima facie* showing of jurisdiction "over any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds").

QSF not only enjoyed the benefits of investing in Sentry but also split management or performance fees with FGG based on Sentry investments.  Beckerlegge Decl. Ex. 7. Personnel from QSF's affiliate in Switzerland, Quilvest Switzerland, traveled to FGG's New York headquarters to meet with FGG's founding partner, Jeffrey Tucker, on QSF's behalf. Beckerlegge Decl. Ex. 5. QSF's affiliate's personnel frequently communicated with FGG employees in New York. Beckerlegge Decl. Ex. 6. All these contacts support jurisdiction. *See Druck Corp. v. Macro Fund (U.S.) Ltd.*, 102 F. App'x 192, 193–94 (2d Cir. 2004) (finding one or two meetings concerning a "fund's investment strategy" to be "substantive and substantial" enough to support

jurisdiction even though no investment was immediately forthcoming); *see Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11-3673(RJS), 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012) (communications including emails, phone calls, and video conferences with company in New York subjected defendant to personal jurisdiction); *see also SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for meeting to develop business relationship).[8]

The subscription agreements that governed QSF's investments in Sentry over the years further evidence a "strong nexus with New York" that supports jurisdiction. *See BLI*, 480 B.R. at 517, n.15 (finding choice of law clauses in subscription agreements "further evidenc[e] the strong nexus with New York."). From at least January 1, 2002, all Sentry subscription agreements contained New York choice of law, jurisdiction, and forum provisions. QSF subscribed to Sentry both before and after this time and QSF does not contest that it entered into subscription agreements with these provisions.[9]

_____

[8] QSF cites *McKee Electric Co. v. Rauland-Borg. Corp.* for the proposition that a meeting in New York is inadequate to establish jurisdiction. 20 N.Y.2d 377 (1967). Mot. at 31. But in *Mckee* the court did not find jurisdiction, not for lack of contacts, but because such contacts were unrelated to the underlying cause of action. *See id.* at 382–83. Here, Quilvest Switzerland's meeting with FGG in New York about QSF's investments in Sentry directly relates to the Trustee's claim to recover the subsequent transfer Defendant received from Sentry. See *Druck Corp.*, 102 F. App'x at 194 (distinguishing *McKee* and finding that "the nature and purpose of a solitary business meeting conducted for a single day in New York may supply the sole jurisdictional fact to support jurisdiction") (cleaned up). Moreover, because the putative basis for jurisdiction in *McKee* was the breach of a distribution agreement to provide goods or services within New York, the jurisdictional analysis there focused on whether there was a sufficient nexus between the conduct directed at New York and the underlying distribution agreement. *See McKee*, 20 N.Y.2d at 379–80, 382–83. Because the Trustee's claim is not based on an alleged breach of contract, the jurisdictional analysis here is focused on Defendant's conduct directed at New York related to its investments in BLMIS through the BLMIS Feeder Fund, Sentry. QSF also cites to *SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170-71 (S.D.N.Y. 2015), the holding of which found no jurisdiction because defendants' contacts did not cause the injury, is called into question following the Supreme Court's decision in *Ford Motor*, which held that causation is not a prerequisite for jurisdiction. 141 S. Ct. 1017, 1026–30 (2021).

[9] Despite the fact that QSF invested after 2002, the Trustee does not have copies of executed subscription agreements after 2002, which is why this allegation is made upon information and belief. Compl. ¶ 6. Nevertheless, QSF does not dispute this allegation and argues only that the forum selection clause does not provide for jurisdiction. *See* Mot. at 32. To the extent QSF denies that it signed subscription agreements after 2002 with such language and the Court determines this is a key issue for jurisdiction, the Trustee requests jurisdictional discovery. This also demonstrates

16

QSF argues such clauses do not support personal jurisdiction because the Trustee is not a party to the subscription agreement and the claims do not arise under the subscription agreements. Mot. at 32. QSF's argument misses the mark. The Trustee is not arguing jurisdiction based on QSF's consent through the subscription agreements. Nor is the Trustee seeking to enforce the subscription agreements. Rather, QSF's agreement to New York law, New York venue, and New York jurisdiction shows that QSF purposefully directed its activities towards New York and is a strong jurisdictional contact with New York.

Courts have consistently found that such provisions constitute jurisdictional contacts with the forum state. "[A] choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank v. Banque Generale Du Commerce*, No. 96 CIV 5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law."); *Burger King*, 471 U.S. at 482 ("Although such a [choice of law] provision standing alone would be insufficient to confer jurisdiction . . . it reinforce[s] [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."); *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.), 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017)* (finding agreement provisions under New York law plus correspondent banking in New York evidenced a relationship "centered in New York").

---

that the Trustee does *not* have all relevant documents due to its settlement with Fairfield Sentry, contrary to QSF's assertion. *See* Mot. at 19.

QSF cites to *Sentry Ltd. v. Migani [2014] UKPC 9* and *Sentry Ltd. v. Theodore GGC Amsterdam (In re Sentry Ltd.)*, Ch. 15 Case No. 10-13164, Adv No. 10- 03496, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) to support its arguments, noting that pursuant to those decisions, the forum selection and other clauses of the agreements do not constitute consent to jurisdiction. Again, the Trustee does not argue that QSF is subject to jurisdiction in New York based on consent. Rather, the Trustee argues that QSF's agreement to New York law, New York jurisdiction, and New York venue in the Sentry subscription agreements are relevant and provide a strong jurisdictional contact with New York. Additionally, the decisions in *Migani* and *Amsterdam* are relevant only "to the extent that personal jurisdiction is based *solely* on the forum selection clause in the Subscription agreements." *Theodore GGC Amsterdam*, 2018 WL 3756343, at *1 (emphasis added). The Court in *Amsterdam* made clear that its decision "does not resolve the Foreign Defendants' jurisdictional objections" and "[u]pon further analysis, [the Court] may indisputably have personal jurisdiction over at least one defendant in every adversary proceeding." *Id*. at *12. Also, the agreements, and any others QSF likely would have subsequently signed, are but one jurisdictional contact the Trustee offers to establish personal jurisdiction over QSF. *See* Compl. ¶¶ 6-7.

### 4.    QSF's Contacts with the Forum are Sufficiently Related to the Trustee's Claims

The subscription agreements, bank accounts, communications with, and travel to New York, plainly "relate to" the Trustee's claims. Without executing subscription agreements, QSF could not have invested in Sentry. The subscription agreements were necessary for QSF to receive customer property through Sentry and are therefore sufficiently related to the Trustee's claims to recover the customer property from QSF. Also, the very transfers which came through these U.S. bank accounts are central to the Trustee's claims. *See Ford Motor*, 141 S. Ct. at 1026-30 (rejecting

18

a "strict causal relationship between the defendant's in-state activity and the litigation"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013) (noting that the New York Court of Appeals "made clear that the 'arising from' prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury," but rather, "it requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" (quoting *Licci*, 20 N.Y.3d at 339)).

QSF should reasonably anticipate that disputes concerning such transfers would be adjudicated in the United States. *See, e.g., HSH Nordbank*, 2012 WL 2921875, at *4 ("claims against [defendants] arise directly out of the transfer of funds into [defendant's] New York accounts"); *Picard v. Estate of Stanley Chais*, 445 B.R. 206, 279 (Bankr. S.D.N.Y. 2011) (finding that defendants' contacts with the forum and the Trustee's claims are "inextricably related"). The Trustee has demonstrated that QSF's contacts with New York are sufficiently related to the Trustee's claims.

### B.    Exercise of Personal Jurisdiction Over QSF is Reasonable

QSF fails to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citations omitted). Where a plaintiff has made a threshold showing of minimum contacts, a defendant opposing the exercise of personal jurisdiction must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. Indeed, this Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal

19

jurisdiction, but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188 (citation omitted).

This is not that "rare" case. The burden on QSF is minimal. *See Maxam Absolute Return Fund, L.P.*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). The United States has a strong interest in applying U.S. law in this SIPA liquidation proceeding. *See id.*; *see also ET Decision*, 917 F.3d at 103 (noting the "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a strong interest in litigating in the United States. *See Maxam Absolute Return Fund, L.P.*, 460 B.R. at 119. Accordingly, this Court's exercise of jurisdiction over QSF is more than reasonable.

### C.     In the Alternative, the Trustee is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not yet made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. "Such discovery may be authorized where a plaintiff has made 'a threshold showing' that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009). QSF purposefully invested with BLMIS through Sentry and relied upon U.S. bank accounts to receive BLMIS customer property. *See supra* pp. 11-15. At a minimum, these facts establish a "threshold showing" of jurisdiction. *Kiobel*, 2009 WL 3817590, at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting jurisdictional discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

## II. SECTION 546(E) DOES NOT BAR RECOVERY FROM QSF

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e)

("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may

not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added)).

However, in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12-MC-115, 2013 WL

1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"), the District Court held that an

initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e)

safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year

period referenced in Section 548(a)(1)(A).

QSF's argument that Section 546(e) bars recovery against it notwithstanding Sentry's

actual knowledge, Mot. at 5-6, misreads *Cohmad* and ignores this Court's application of that

decision in another subsequent transfer recovery action. *See BNP*, 594 B.R. at 167, 197. QSF's

arguments therefore must be rejected.

## A.    Sentry had Actual Knowledge of Madoff's Fraud

QSF sets forth at length the requirements of Section 546(e) and how they are presumably

met in this case in multiple ways with respect to the initial transfers from BLMIS to Sentry.

Specifically, QSF discusses whether Sentry qualifies as a financial institution, whether Sentry's

agreements qualify as securities contracts, and whether Sentry's transfers to QSF qualify as

settlement payments. Mot. at 7-15. However, none of this matters.[10]  As QSF concedes, this Court

has previously found that the Trustee has sufficiently pled that the initial transferee, Sentry, had

---

[10] The Trustee does not concede that any agreements or transfers between Sentry and QSF activate the safe harbor
under Section 546(e). Sentry's subscription agreements with and transfers to QSF are simply not relevant, because
whether the initial transfers from BLMIS to Sentry are avoidable turns on Sentry's actual knowledge of fraud at
BLMIS, not QSF's knowledge as a subsequent transferee. Among other things, the Trustee does not concede—by
alleging that the subsequent transfers were customer property—that the initial transfers were "in connection with" the
subscription agreements with QSF. As discussed elsewhere herein, the Trustee believes he will prevail on showing
that the subsequent transfers are customer property. However, showing that the subsequent transfers can be traced
through the "relevant pathways" to the initial transfers is entirely irrelevant to the issue of whether the initial transfers
were "in connection with" any transaction or contract between the initial transferee Feeder Funds and the Defendant
for purposes of application of the securities safe harbor.

actual knowledge of fraud and that such initial transfers are avoidable. *See* Mot. 12 & n.14; *Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5. As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from QSF regardless of whether Sentry and QSF qualify as financial institutions, their agreements qualify as securities contracts, or their transfers qualify as settlement payments. The Trustee therefore focuses his response on Defendant's erroneous arguments regarding the actual knowledge exception and its application here.

In the midst of their lengthy argument, QSF seeks to characterize the Trustee's relationship with the Fairfield Liquidators as a "substantial legal relationship" in an effort to trigger nonparty issue preclusion as it relates to Sentry's qualifications as a "financial institution" within the meaning of Section 546(e). Mot. at 10, n.12. QSF is wrong. Merely sharing an interest in recovering customer property does not equate to the sort of "substantial relationship" required under *Taylor v. Sturgell*, 533 U.S. 880, 894 (2008), to establish nonparty issue preclusion. *See Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *13 (S.D.N.Y. Mar. 25, 2013) (emphasizing "preclusion of nonparties is an exceptional situation, contrary to the basic presumption that every party is entitled to its day in court"). Additionally, QSF cites to *New Hampshire v. Maine*, 532 U.S. 742 (2001), a case that does not even involve nonparty preclusion. Furthermore, given that nonparty preclusion is an affirmative defense, raising it in this Motion is inappropriate. *See Taylor*, 553 U.S. at 907.

**B.**     **QSF is Precluded from Relitigating the Actual Knowledge Exception Established in *Cohmad***

QSF is precluded from arguing that *Cohmad* is wrong and from relitigating whether actual knowledge bars the application of Section 546(e). *Cohmad* was issued in connection with consolidated proceedings before the District Court as to the application of Section 546(e), that

decision held that a party with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e). *Cohmad*, 2013 WL 1609154, at *7. The District Court then remanded the relevant cases back to this Court, and this Court has since applied the actual knowledge "exception" on several occasions.[11]

Given QSF's participation in the withdrawal of the reference and the District Court proceedings,[12] QSF is bound by *Cohmad* as law of the case. *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case."); *Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019), *aff'd sub nom. Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184 (2d Cir. Cir. 2020). QSF also did not seek leave to appeal the *Cohmad* decision.

The Second Circuit's decision in *Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, heavily relied upon by QSF, does not warrant reconsideration of *Cohmad's* actual knowledge exception. 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*"). As this Court has recognized, *Ida Fishman* did not address the actual knowledge exception. *See Picard v. Cohen*, Adv. Pro. No. 10-04311, 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016).

---

[11] *See e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Fairfield Inv. Fund Ltd.)*, No. 08-01789 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021); *Picard v. Square One Fund Ltd.*, Bench Ruling on Motion to Dismiss, Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2018); *Picard v. Magnify, Inc.*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018); *Picard v. Mendelow et al.*, 560 B.R. 208 (Bankr. S.D.N.Y. Sept. 28, 2016); *Picard v. Avellino*, 557 B.R. 89, 112 (Bankr. S.D.N.Y. 2016); *Picard v. Shapiro*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015); *Picard v. Ceretti, et al.*, No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015); *Picard v. Merkin*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014).

[12] *See* ECF No. 8, Memorandum of Law in Support of QSF Finance Ltd.'s Motion to Withdraw Reference at 7 (raising Section 546(e) as grounds for withdrawal).

### C.    QSF is Precluded from Arguing that Section 546(e) Applies Independently to Recovery Actions

QSF is also wrong that the Trustee must allege that the subsequent transferee itself had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Specifically, QSF argues that under *Cohmad*, a defendant's subscription agreement with Sentry may act as the relevant "securities contract" in lieu of BLMIS's account agreement, and as such, in these Section 550 recovery actions, the court must look solely to that *subsequent transferee's* actual knowledge to determine whether the initial transfer is avoidable.  Mot. at 11-12. But *Cohmad* does not stand for this proposition and QSF's argument is just a repackaging of the previously rejected argument that the Section 546(e) safe harbor should independently apply to recovery actions under Section 550.[13]

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550.  *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see BNP*, 594 B.R. at 191 ("The Trustee does not . . . 'avoid' the subsequent transfer; he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550."); *Kelley v. Safe Harbor Managed Acct. 101, Ltd.*, No. 20-3330, 2022 WL 1177748, *3, n.5 (8th Cir. Apr. 21, 2022) ("*SHMA*") (citing *BNP*).

---

[13] This Court's decision in *Fairfield III*, the Fairfield Chapter 15 liquidation proceedings, does not support QSF's position that its agreement with Sentry requires the Trustee to plead QSF's actual knowledge in order to avoid the initial transfer from BLMIS. *See* Motion at 7-8 (citing *Sentry Ltd. v. Theodoor GGC Amsterdam (In re Sentry Ltd.)*, Adv. Pro. No. 10-13164 (SMB), 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"). That decision did not involve recovery of subsequent transfers under the Bankruptcy Code. Rather, the Court held that Section 546(e) barred the Fairfield liquidators' claims for unfair preference and undervalue transactions under the B.V.I. Insolvency Act, which the Court analogized to avoidance provisions in the Bankruptcy Code. *See Amsterdam*, 2020 WL 7345988, at *5 (citing *Sentry Ltd. v. Theodoor GGC Amsterdam (In re Sentry Ltd.)*, 596 B.R. 275, 302, 314 (Bankr. S.D.N.Y. Dec. 6, 2018)). The *Fairfield III* decision is currently on appeal in District Court. *See In re Sentry Ltd.*, No. 19-CV-03911 (VSB) (consolidated) (S.D.N.Y.).

24

This limitation on the safe harbor to avoidance is consistent with the well-established principle that "the concepts of avoidance and recovery are separate and distinct." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*, 501 B.R. at 26, 30 (S.D.N.Y. 2013) (citation omitted). It is also consistent with the understanding that the Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See ET Decision,* 917 F.3d at 85, 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section 550.[14] However, in its decision, the District Court specifically limited the safe harbor to avoidance claims based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9 (applying the "plain terms" of Section 546(e)); at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to avoidance); and at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the initial transfer from Madoff Securities") (emphasis added). Although the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as

---

[14] *See* Section 546(e) Briefing Order, *In re Madoff Sec.*, No. 12-MC-115 (S.D.N.Y. May 16, 2012), ECF No. 119 (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

"financial institutions" or "financial participants," the decision was clear that the focus of the safe harbor is still on the *initial* transfers. *See id*. at *9.[15]

*Contrary* to QSF's argument, the District Court did not, in its hypothetical, discuss actual knowledge or indicate that in such circumstances, the initial transferee's actual knowledge should be disregarded. For this same reason, *Enron Creditors Recovery Corp. v. Alfa*, *S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011), cited by QSF and which the District Court cites in *Cohmad* merely to support its reading of what constitutes a "securities contract," does not change this outcome. *See* Mot. at 13, n.15. The focus remains on the *initial* transfers, which for purposes of Section 546(e) in this case are the transfers from BLMIS to its feeder funds. *See Ida Fishman*, 773 F.3d at 422–23.

Based on *Cohmad*, this Court held in *BNP* that Section 546(e) applies only to avoidance and not recovery, and most notably that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee has adequately pled the initial transferee's actual knowledge. *See BNP*, 594 B.R. at 197; *see also SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 514 (Bankr. S.D.N.Y. 2020). As such, in *BNP*, this Court explicitly rejected the argument being made here—that the "only way the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the [subsequent transferee defendants] actually knew of the Madoff Ponzi scheme." *See BNP*, 594 B.R. 196–97 (quoting defendant's brief). As explained in *BNP*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee, only when the initial

---

[15] The original point of the *Cohmad* hypothetical was to address the subsequent transfer defendants' argument that, if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities agreements under Section 546(e). *Cohmad*, 2013 WL 1609154, at *8. That argument became moot as both the Second Circuit and the District Court determined that the BLMIS customer agreement was a "securities agreement" and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore subject to Section 546(e).

transferee did not have actual knowledge of Madoff's fraud. *Id*. at 197. *BNP* holding with respect to Section 546(e) is law of the case and QSF is bound by both decisions.

QSF's misinterpretation of *Cohmad* would effectively eliminate the point of the actual knowledge exception—which is to restrict all bad actors with actual knowledge from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining that defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments'"). Adopting QSF's position would mean the application of the safe harbor even where the initial transferee *knew* there were no securities transactions to protect. It would moreover allow an initial transferee like Sentry, who had knowledge of the fraud and was unable to satisfy a judgment, to place fraudulently transferred funds with a subsequent transferee and out of the reach of a Trustee. *See id.,* at *1, 7 ("A defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e).").

QSF's interpretation of *Cohmad* would provide a subsequent transferee with more rights than an initial transferee, which is inconsistent with congressional intent on section 546(e). *See In re Madoff Sec.*, 501 B.R. at 29 ("Section 550(a) requires that the Trustee show that the transfer he seeks to recover is avoidable in each recovery action, and the subsequent transferee in possession of that transfer may raise any defenses to avoidance available to the initial transferee, as well as any defenses to recovery it may have."). As the Eighth Circuit pointed out in *SHMA* while citing *BNP*, under Section 546(e), "a subsequent transferee is protected *indirectly* to the extent that the initial transfer is not avoidable because of the safe harbor." 2022 WL 1177748, at *3 n.5 (cleaned up; emphasis added). Conversely, providing subsequent transferees with the same defenses to avoidance as available to initial transferees does not unfairly bias subsequent transferees.

27

### III.    THE TRUSTEE'S COMPLAINT PLEADS THAT QSF RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)

The Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that QSF received subsequent transfers of stolen BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("*Merkin I*"). No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id*. at 150 (quoting *Picard v. Charles Ellerin Revocable Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Revocable Tr.*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019). In addition, the Trustee must allege "'the necessary vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds." *Merkin I*, 515 B.R. at 150 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).

The Trustee's Complaint meets these requirements. The Complaint alleges that QSF received transfers, identified by date and amount, from Sentry, and that Sentry invested substantially all of its funds with BLMIS. Compl. ¶¶ 2, 40, Exs. C-D. Thus, the Complaint plausibly alleges that QSF received subsequent transfers of customer property by (a) outlining the relevant pathways through which customer property was transferred from BLMIS to Sentry and subsequently to QSF and (b) providing the necessary vital statistics (i.e., the "who, when, and how much") for each subsequent transfer. Nothing more is required. *See, e.g., Picard v. Mayer (In re*

*BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting the argument that the subsequent transfer claim was not pled "with enough specificity as to how and what [defendant] received" and holding Complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### A.    QSF Misstates the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the relevant pleading burden, QSF argues for a new one, asserting that the Trustee must tie each subsequent transfer QSF received to a specific initial transfer from BLMIS. Mot. at 16. In *Merkin I*, however, the Court already rejected this argument, denying the defendants' motion to dismiss subsequent transfer claims even though the Complaint "[did] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the Transferees to survive a motion to dismiss"). Also, the Court already rejected the argument that the Trustee must detail which and what portion of each subsequent transfer comprises customer property. *See Merkin I*, 515 B.R. at 152–53 (refusing to dismiss Complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also In re Allou Distribs., Inc.*, 379 B.R. at 30 (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

To support its arguments, QSF erroneously relies on *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015). *See* Mot. at 17. QSF's reliance on *Shapiro* is legally and factually wrong. *Shapiro* did not change the pleading burden for recovery under Section 550(a). In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and "upon information and belief" the defendants subsequently transferred a portion of this same amount to other defendants. 542

29

B.R. at 119. However, the Court found that the Trustee's Complaint did not detail any of the necessary vital statistics of the subsequent transfers.[16] *Id*. at 119. There were no allegations regarding the specific initial transferees, the specific subsequent transferees, or the dates or amounts of the subsequent transfers. Consequently, this Court granted defendants' motion to dismiss the subsequent transfer claim. *Id*. This case is nothing like *Shapiro*. Unlike *Shapiro*, in this case the Trustee has alleged the vital statistics of each transfer QSF received. *See In re Allou Distribs.*, Inc., 379 B.R. at 32. Moreover, the Trustee's Complaint alleges additional facts that shed light into QSF's investments in Sentry including communications with Sentry, wire transfers regarding its investments and redemptions, and the investment relationship between the parties. *See* Compl. ¶ 6. *Shapiro* supports denying the motion to dismiss.

### B.    QSF's Tracing Arguments Fail on a Motion to Dismiss

QSF's other fact-based tracing arguments fare no better and are inappropriate on a motion to dismiss. First, QSF argues the transfers it received from Sentry are comprised of subscriptions from other investors. Mot. at 18-19. In other words, QSF argues that Sentry commingled customer property with other funds, and this commingling defeats the Trustee's ability to trace the transfer of customer property from BLMIS. *Id*. Again, QSF is wrong. "The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from a debtor does not defeat tracing." *Kelley v. Westford Special Fund, L.P.,* No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151, at *4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Revocable Tr.,* 2012 WL 892514, at *3) (citation omitted).

---

[16] In quoting from the *Shapiro* Complaint, the Court noted that the Trustee only alleged: "'Based on the Trustee's investigation to date, the Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS' to the Subsequent Transferee Defendants." 542 B.R. at 119.

Second, QSF argues that Sentry paid other investors with the customer property it received from BLMIS prior to making any transfers to QSF. Mot. at 21-22. However, QSF does not disclose what tracing methodology or methodologies it relies upon to reach this conclusion. And why not? Because it is for this Court to decide—after fact and expert discovery—the appropriate tracing methodology under the circumstances of this case.[17] See *Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*") ("[T]he Court's selection of an appropriate methodology is committed to the Court's discretion."); *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3, n.7 ("Courts have broad discretion to determine which monies of comingled funds derive from fraudulent sources.") (citing *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (finding "courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them"))). Additionally, at this stage of the proceedings, the Trustee is not required to plead, much less establish, that an alleged subsequent transfer consisted entirely of customer property. *See Kelley*, 2020 WL 3077151, at *4 (holding where debtors' funds are commingled with "cash from new subscribing investors," a trustee is not required to establish that transfers "originated solely" with the debtor or even to account for "the exact funds at issue" on summary judgment); *In re 45 John Lofts, LLC*, 599 B.R. at 746–47 (rejecting argument "that Plaintiff generically, and without factual support, alleged that every transfer out of" the initial transferee's commingled account was made with debtor property because the plaintiff is not required "to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss") (internal quotation marks omitted)).

---

[17] In this liquidation, this Court has recognized different tracing methodologies offered by the Trustee to assist the trier of fact, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality. These "methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer form a commingled fund." *Merkin II*, 581 B.R. at 386.

Third, QSF argues that it could not have received any customer property because of the amount of time that elapsed between Sentry's receipt of certain initial transfers from BLMIS and Sentry's subsequent transfers to QSF. Mot. at 22. This is a variation of QSF's tracing argument that Sentry transferred BLMIS's customer property to other investors. Again, this argument is inappropriate on a motion to dismiss. And even if it may prove more difficult for the Trustee to trace all of the subsequent transfers sought here, this is not grounds for dismissal at the pleading stage. *See Merkin I*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because the tracing may prove difficult); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees'] speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting [their cross-motion for summary judgment].").

Finally, without discovery, QSF's tracing arguments are entirely premature. The Trustee is a stranger to the transactions between Sentry and QSF and is entitled to discovery on this issue. "[I]n a case such as this one, where 'the Trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded." *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (citation omitted). This is one reason why this Court in *Merkin I* denied defendants' motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." 515 B.R. at 151. And even after fact discovery, expert opinion is necessary to determine what portion of the subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts. *Merkin II*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5

(denying summary judgment because the Trustee introduced expert report and associated documents from which a jury could infer that defendants received subsequent transfers of customer property).

QSF's attempts to distinguish this Court's decision denying the motion to dismiss in *Merkin I* are not persuasive. Mot. at 20. QSF argues that, unlike in *Merkin I*, the Trustee has had "for more than a decade access to the data needed to allege" which subsequent transfers contain customer property. *Id*. But, the commingling at issue in *Merkin I* is not substantively different than the purported commingling at Sentry, as each involved arguments related to non-debtor property. Also, contrary to QSF's belief, the Trustee does not have all of Sentry's books and records, and discovery in the Trustee's actions against the FGG defendants continues. *See, e.g., Stipulated Case Mgmt. Order, Picard v. Fairfield Inv. Fund Ltd.*, Ad. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec. 6, 2021), ECF No. 353 (setting November 22, 2022 deadline for fact discovery and August 22, 2023 deadline for expert discovery). There is no doubt QSF has records it can provide on these same transactions.

### C.    QSF's Claims of Double Recovery Are Premature

QSF argues the Trustee's claims are "facially implausible and mathemateically impossible" because the Trustee is seeking more money from all of Sentry's subsequent transferees than the fund withdrew from BLMIS. Mot. at 18. There is no dispute that the Trustee is limited to "a single satisfaction" under Section 550(a). 11 U.S.C. § 550(d). However, the Trustee "can recover from any combination of [transferees]" up to the amount avoided. *Helms v. Metro. Life Ins. Co. (In re O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), aff'd, 633 B.R. 332 (N.D. Ill. 2021). And under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds, without the necessity for allocation among all subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008).

Thus, until the Trustee recovers the full amount of the approximately $3 billion in fraudulent

transfers received by Sentry, the Trustee may simultaneously seek recovery from QSF in this

action and from defendants in other actions, even in an aggregate amount that exceeds initial

transfers. Moreover, the Court has already held that this type of argument is inappropriate on a

motion to dismiss. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (holding defendant's

"double recovery" arguments and the Trustee's purported limitations under Section 550(d) are "to

be determined at a later stage in the litigation").

## IV.   THE TRUSTEE'S COMPLAINT SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE FAIRFIELD SENTRY INITIAL TRANSFERS

QSF argues the Trustee's incorporation of the Fairfield Amended Complaint violates Rule

8(a)(2)'s requirement to include a "short and plain statement" showing the Trustee is entitled to

relief. Mot. at 24-25. QSF is wrong. The Trustee may incorporate the Fairfield Amended

Complaint under Rule 10(c) to demonstrate the avoidability of the initial transfers from BLMIS.

*See Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010) (allowing

incorporation by reference under Rule 10(c) of pleadings in different adversary proceeding within

the same liquidation).

QSF's argument conflicts with the District Court's prior opinion in this liquidation on

whether under Section 550(a) the Trustee must avoid an initial transfer or plead its avoidability in

a subsequent transfer action. *In re Madoff Sec.*, 501 B.R. at 26. The District Court held that Section

550(a) only "requires that the Trustee show that the transfer he seeks to recover is avoidable in

each recovery action," *id*. at 29, and found sufficient the Trustee's incorporation by reference of

the then-operative Fairfield Amended Complaint:

> [T]he Trustee's Complaint against Standard Chartered Financial
> Services incorporates by reference the Complaints against Kingate
> and Fairfield, including the allegations concerning the avoidability
> of the initial transfers, and further alleges the avoidability of these

> transfers outright. See Standard Chartered Compl. 1143–46, 50–53.
> Thus, the avoidability of the transfers from Madoff Securities to
> Kingate and Fairfield is sufficiently pleaded for purposes of section
> 550(a).

*Id*. at 36. QSF withdrew on the Section 550(a) issue. *See* Mot. to Withdraw the Reference, ECF

No. 6. And this decision—allowing for incorporation by reference—is law of the case. *See Picard*

*v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019).

QSF is wrong that the Trustee's allegations do not provide fair notice. Mot. at 25. Reference

to the Fairfield Amended Complaint provides notice of avoidability of initial transfers in a manner

that avoids repetition and over-complication. QSF is able to respond to the Complaint, which is

simple, concise, and direct in accordance with the plain statement requirement of Rule 8. Courts

have noted that "[t]he ability to incorporate matters from other pleadings is especially useful in

multiparty litigation when the presence of common questions often results in the pleadings of the

parties on the same side of the litigation being virtually identical, which makes employing simple

incorporations by reference highly desirable." *Sherman v. A.J. Pegno Constr. Corp.*, 528 F. Supp.

2d 320, 323 n.5 (S.D.N.Y. 2007) (citing Wright & Miller § 1326); Wright & Miller § 1326 n.1

("Adoption by reference avoids overly long or complicated pleadings.").

QSF's argument is much ado about nothing because this Court may take judicial notice of

the operative Fairfield SAC itself as well as its holding that the Trustee sufficiently alleges the

avoidability of the initial transfers from BLMIS. *See Fairfield Inv. Fund*, 2021 WL 3477479. On

a motion to dismiss, "a court may take judicial notice of prior decisions, pleadings, orders, and

other related documents in the record of prior litigation that relate to the case at bar." *Ferrari v.*

*Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011). *DeMasi v. Benefico*, 567 F. Supp.

2d 449, 453 (S.D.N.Y. 2008). Finally, the fact that the noticed Fairfield SAC was filed after this

Complaint against QSF is of no moment. *See Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (noticing later filed complaint in related proceeding).

The Trustee has complied with the Federal Rules in pleading the avoidability of the initial transfers, and regardless, this Court may take judicial notice of its opinion in *Fairfield Investment Fund*. If this Court holds otherwise, the Trustee respectfully requests the opportunity to replead. The cases QSF relies upon make clear that leave to replead extends to complaints that were dismissed for improperly incorporating other pleadings or motions by reference. *See e.g.*, *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 483 (E.D.N.Y. 2007) (granting leave to replead). The Supreme Court has noted, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In addition, the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a Complaint under Rule 12(b)(6)." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006). Thus, the Trustee should be afforded the opportunity to replead.

## CONCLUSION

The Trustee respectfully requests that the Court deny QSF's Motion.

Dated: June 13, 2022
    New York, New York

/s/ Robertson D. Beckerlegge
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com

Michelle R. Usitalo
Email: musitalo@bakerlaw.com
Robyn M. Feldstein
Email: rfeldstein@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Chapter 7 Estate of
Bernard L. Madoff*