**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE HEBREW UNIVERSITY OF JERUSALEM, YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., BEN-GURION UNIVERSITY OF THE NEGEV, B.G. NEGEV TECHNOLOGIES AND APPLICATIONS LTD., THE WEIZMANN INSTITUTE OF SCIENCE, and BAR ILAN UNIVERSITY,<br><br>　　　　　Defendants. | Adv. Pro. No. 21-01190 (CGM) |

## TRUSTEE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL HISTORY ..................................................................................................... 4

I.      BACKGROUND ......................................................................................................... 4

II.     THE ISRAELI ACTION, THE DENIAL OF THE ISRAELI ANTI-SUIT
        INJUNCTION, AND THE TRUSTEE'S SUBSEQUENT TRANSFEREE
        COMPLAINT ............................................................................................................. 7

STATEMENT OF FACTS ...................................................................................................... 8

I.      THE BLMIS PONZI SCHEME ................................................................................... 8

II.     YHA OWNED THE MAGNIFY AND YHA BLMIS ACCOUNTS ................................ 9

III.    YHA'S MEMBERS AND GREEN TRANSFERRED FUNDS FROM BLMIS
        TO DEFENDANTS ................................................................................................... 11

IV.     DEFENDANTS' AGENTS PARTICIPATED IN YHA TO OBTAIN MONEY
        FOR THE DEFENDANTS ........................................................................................ 13

                1.      Hebrew University and Yissum ................................................. 13

                2.      Bar Ilan ..................................................................................... 15

                3.      Weizmann .................................................................................. 16

                4.      BGU and B.G. Negev ................................................................. 18

                5.      Green and Defendants BGU, Hebrew University, and Weizmann ........... 19

ARGUMENT ...................................................................................................................... 21

I.      STANDARD OF REVIEW ON A FED. R. CIV. P. 12(B)(2) MOTION TO
        DISMISS AND FRAMEWORK FOR PERSONAL JURISDICTION ......................... 21

II.     THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS ................. 24

        A.      Defendants Purposefully Availed Themselves of Laws and Privileges of
                New York Through their Management of and Receipt of Transfers from
                YHA. ........................................................................................................... 26

                1.      Defendants Benefitted from, Consented to, and Controlled their
                        Officers' and Professors' YHA Conduct. ................................. 27

2.      Defendants' Professors and Officers Who Simultaneously Served as YHA's Members were Defendants' Agents for Personal Jurisdiction Purposes. ................................................................30

a.      Hebrew University ......................................................30

b.      Bar Ilan.......................................................................32

c.      BGU ............................................................................34

d.      Weizmann ...................................................................37

e.      Green's Conduct is Imputed to Defendants Hebrew University, BGU and Weizmann for Jurisdictional Purposes. ...................................................................39

f.      The Defendants Ratified the YHA Members' Actions.................40

3.      The Trustee's Claim Arises from and Relates to YHA's New York-Originated Transfers to Defendants. .................................42

4.      The Trustee Sufficiently Alleges that B.G. Negev and Yissum are Alter Egos of BGU and Hebrew University. ...............................44

5.      The Declaration of Amir Licht Is Neither Relevant Nor Correct. ............48

B.      The Exercise of Jurisdiction Over Defendants is Reasonable. ..............................50

C.      In the Alternative, the Trustee is Entitled to Jurisdictional Discovery. .................53

III.    THE TRUSTEE STATES A CLAIM FOR RECOVERY OF SUBSEQUENT TRANSFERS ................................................................................57

A.      The Trustee May Recover from Subsequent Transferees Under Section 550(a) by Alleging that the Initial Transfers Are Avoidable.................................58

B.      Under Law of the Case, A Prior Judgment of Avoidance Is Not An Element of a Section 550 Claim. ........................................................61

C.      The Second Circuit Did Not Overrule the Decisions in this Case, Nor Do Citations to Inapposite Decisions Assist Defendants' Interpretation. ...................62

D.      SIPA Authorizes the Trustee to Recover "Void or Voidable" Transfers Under the Bankruptcy Code...................................................................64

CONCLUSION .......................................................................................65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996) ........................................................................24

*Anderson v. Bajaj (In re Med. Mgmt. Grp., LLC)*,
    534 B.R. 646 (Bankr. D.S.C. 2015) ...........................................................59

*Aramony v. United Way of Am.*,
    254 F.3d 403 (2d Cir. 2001) ......................................................................61

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
    480 U.S. 102 (1987) ..................................................................................50

*In re AVI, Inc.*,
    389 B.R. 721 (B.A.P. 9th Cir. 2008) ......................................................59, 60

*In re Bernard L. Madoff Inv. Sec. LLC*,
    No. 1:21-cv-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ...................62

*Bidonthecity.com LLC v. Halverston Holdings Ltd.*,
    No. 12 Civ. 9258 (ALC) (MHD), 2014 WL 1331046 (S.D.N.Y. Mar. 31,
    2014) ......................................................................................................27

*Breeden v. Kirkpatrick & Lockhart LLP (In re The Bennett Funding Grp., Inc.)*,
    336 F.3d 94 (2d Cir. 2003) ........................................................................40

*Brown v. Phillips (In re Phillips)*,
    379 B.R. 765 (Bankr. N.D. Ill 2007) ...........................................................59

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................... *passim*

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) .............................................................22, 24, 50

*Chou v. Univ. of Chi.*,
    254 F.3d 1347 (Fed. Cir. 2001) ..................................................................28

*Citizens United v. Schneiderman*,
    882 F.3d 374 (2d Cir. 2018) ......................................................................47

*In re Cnty. of Orange*,
    183 B.R. 594 (Bankr. C.D. Cal. 1995)........................................................................60

*Crafts Plus+, Inc. v. Foothill Capital Corp. (In re Crafts Plus+, Inc.)*,
    220 B.R. 331 (Bankr. W.D. Tex. 1998).......................................................................59

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001).........................................................................22

*Cromer Fin. Ltd. v. Berger*,
    No. 00 CIV. 2284 (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002).......................27

*In re Crysen/Montenay Energy Co.*,
    226 F.3d 160 (2d Cir. 2000), *cert, denied*, 532 U.S. 920, 121 S. Ct. 1356, 149
    L.Ed.2d 286 (2001)......................................................................................................62

*CutCo Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986).......................................................................................26

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)....................................................................................................22

*Daventree Ltd. v. Republic of Azerbaijan*,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004).........................................................................54

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)....................................................................................21, 55

*E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*,
    2:17-cv-01034, 2017 WL 4162309 (E.D.N.Y. Sept. 19, 2017)..................................48

*Ehrenfold v. Mahfaouz*,
    489 F.3d 542 (2d Cir. 2007).......................................................................................54

*In re Eur. Gov't Bonds Antitrust Litig.*,
    No. 19 CIV. 2601 (VM), 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ...............22, 42

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..........................................................................................22, 42, 43

*Geltzer v. Salzman (In re ContinuityX, Inc.)*,
    582 B.R. 124 (Bankr. S.D.N.Y. 2018)...................................................................59, 61

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y 2009).....................................................................26, 39

*Glob. Tech. Indus. Grp., Inc. v. Go Fun Group Holdings, Ltd.*,
    17 Civ. 3727 (AJP), 2017 WL 5036665 (S.D.N.Y. Nov. 2, 2017)...........................50

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
425 F.3d 158 (2d Cir. 2005)................................................................24

*Harrah's Atl. City. Operating Co. v. Lamonica (In re JVJ Pharmacy, Inc.)*,
630 B.R. 388 (S.D.N.Y. 2021)................................................................63

*Haua v. Prodigy Network, LLC*,
20 Civ. 2318 (PGG) (KNF), 2021 WL 4478737 (S.D.N.Y. Sept. 29, 2021)..........................40

*Hebrew Univ. of Jerusalem v. Gen. Motors LLC*,
No. CV-10-3790-AB (JCX), 2015 WL 9653154 (C.D. Cal. Jan. 12, 2015) ..........................50

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984).........................................................................29

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
408 F.3d 689 (11th Cir. 2005) .............................................................59

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945).......................................................22, 23, 43

*In re Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Inv. Sec.
LLC*,
917 F.3d 85 (2d Cir. 2019)............................................................... *passim*

*Jazini v. Nissan Motor Co., Ltd.*,
148 F.3d 181 (2d Cir. 1998)................................................................44

*In re Jones Storage & Moving, Inc.*,
2005 WL 2590385 (Bankr. D. Kan. Apr. 14, 2005) ............................................63

*Kendall v. Sorani (In re Richmond Produce Co.)*,
195 B.R. 455 (N.D. Cal. 1996) ............................................................60

*Kiobel v. Royal Dutch Petroleum Co.*,
No. 02 Civ. 7618(KMW)(HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009)..................54

*Lakah v. UBS AG*,
996 F.Supp.2d 250,260 (S.D.N.Y. 2014) ................................................45

*Lear v. Royal Caribbean Cruises Ltd.*,
20-cv-4660-GHW, 2021 WL 1299489 (S.D.N.Y. Apr. 7, 2021) ............................56

*Lensky v. Yollari*,
20-cv-4978-GHW, 2021 WL 4311319 (S.D.N.Y. Sept. 20, 2021) ........................54

*Leonard v. Optimal Payments, Ltd. (In re Nat'l Audit Defense Network Inc.)*,
332 B.R. 896 (Bankr. D. Nev. 2005) ....................................................59

*In re Lloyd Sec., Inc.*,
   75 F.3d 853 (3d Cir. 1996)....................................................................................64

*In re M. Fabrikant & Sons, Inc.*,
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) ............................................63

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.3d 204 (2d Cir. 2003)....................................................................................54

*Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*,
   731 F. Supp. 587 (S.D.N.Y. 1990) ..........................................................................54

*Mayes v. Leipziger*,
   674 F.2d 178 (2d Cir. 1982)....................................................................................28

*Meisel v. Grunberg*,
   651 F. Supp. 2d 98 (S.D.N.Y. 2009)........................................................................26

*Merit Management Group, LP v. FTI Consulting, Inc.*,
   138 S. Ct. 883 (2018)..............................................................................................62

*Meserole v. Sony Corp. of Am., Inc.*,
   No. 08-Cv-8987 (RPP), 2009 WL 1403933 (S.D.N.Y. May 19, 2009) ...................49

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996)........................................................................23, 24, 53

*Milestone Shipping, S.A. v. Estech Trading LLC*,
   764 F. Supp. 2d 632 (S.D.N.Y. 2011)......................................................................47

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*,
   319 F. Supp. 2d 352 (S.D.N.Y. 2004)................................................................28, 41

*Network Enters., Inc. v. APBA Offshore Prods., Inc.*,
   No. 01-11765(CSH), 2003 WL 124521 (S.D.N.Y. Jan. 15, 2003)....................46, 47

*Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.*
   *(In re Sunbeam Corp.)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002)......................................................................46

*Official Comm. Of Unsecured Creditors, v. Foss (In re Felt Mfg. Co.)*,
   371 B.R. 589 (Bankr. D.N.H. 2007) ........................................................................59

*Picard v. Banque Syz & Co., S.A., (In re Bernard L. Madoff Inv. Sec. LLC)*,
   Adv. No. 10-05279 (BRL), Case No. 11-02149 (CGM) (Bankr. S.D.N.Y. June
   14, 2022) ........................................................................................................ *passim*

*Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ............................................................ *passim*

*Picard v. Bureau of Labor Ins. (In re Sec. Inv. Prot. Corp.)*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................ *passim*

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   12 F.4th 171 (2d Cir. 2021) ............................................................... 62, 63

*Picard v. the Estate (Succession) of Doris Igoin (In re Bernard L. Madoff Inv. Sec. LLC)*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ................................................... 5, 23

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
   627 B.R. 546 (Bankr. S.D.N.Y. 2021) .................................................. *passim*

*Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*,
   No. 08-01789 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ................ 51, 58

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*,
   976 F.3d 184 (2d Cir. 2020)................................................................... 64, 65

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   548 B.R. 13 (Bankr. S.D.N.Y. 2016)............................................................ 57

*Picard v. Magnify (In re Bernard L. Madoff Inv. Sec. LLC)*,
   Adv. No. 10-05279 (BRL), 2012 WL 2254995 (Bankr. S.D.N.Y. June 15, 2012) ............ 54, 55

*Picard v. Magnify, Inc., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   583 B.R. 829 (Bankr. S.D.N.Y. 2018) .................................................. 5, 20

*Picard v. Maxam Absolute Return Fund, L.P.*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011)................................................... 23, 50

*Picard v. Mayer (In re Bernard L. Madoff)*,
   Adv. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021) ............ 21

*Picard v. Multi-Strategy Fund Limited (In re Bernard L. Madoff Inv. Sec. LLC)*,
   Adv. No. 10-05279 (BRL), Case No. 12-01205 (CGM), (Bankr. S.D.N.Y. June 13, 2022)................................................................... *passim*

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
   185 F. Supp. 2d 335 (S.D.N.Y. 2002)....................................................... 55

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms*,
   466 F.3d 88 (2006)............................................................................. 52

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010)................................................................................21

*Santa Fe Sci. & Tech., Inc. v. Drexel Univ.*,
    CIV. No. 02-0689 .............................................................................................28

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995).............................................................................53

*Schencker A.G. v. Société Air France*,
    14 Civ. 4711 (BMC)(PK), 2016 WL 1465353 (E.D.N.Y. Apr. 14, 2016) ............52

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    48 F. Supp. 3d 675 (S.D.N.Y. 2014)..................................................................26

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec.*,
    513 B.R. 222 (S.D.N.Y. 2014)..................................................................5, 6, 8, 52

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    501 B.R. 26 (S.D.N.Y. 2013)................................................................... *passim*

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 08-01789 (SMB), 563 B.R. 737 (Bankr. S.D.N.Y. 2017)................................58

*Shepherd v. Annucci*,
    921 F.3d 89 (2d Cir. 2019)................................................................................54

*SHLD, LLC v. Hall*,
    15 civ. 6225 (LLS), 2016 WL 659109, at *4 (S.D.N.Y. Feb. 17, 2016) ................23

*Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*),
    379 B.R. 5 (Bankr. E.D.N.Y. 2007)....................................................................57

*SPV Osus Ltd. v. UBS AG*,
    114 F. Supp. 3d 161 (S.D.N.Y. 2013)..............................................................42, 43

*Star Energy Corp. v. RSM Top-Audit*,
    No. 08 CIV. 00329 (DC), 2008 WL 5110919 (S.D.N.Y. Nov. 26, 2008)..............26

*Vista Food Exchange, Inc. v. Champion Foodservice, Inc.*,
    124 F. Supp. 3d 301 (S.D.N.Y. 2015).................................................................56

*Wafios Machinery Corp. v. Nucoil Indus. Co.*,
    No. 03 Civ. 9865(RWS), 2004 WL 1627168 (S.D.N.Y. July 21, 2004) ................55

*Walden v. Fiore*,
    571 U.S. 277 (2014)...........................................................................28, 29, 40

*Weinman v. Simons (In re Slack-Horner Foundries Co.)*,
971 F.2d 577 (10th Cir. 1992) ............................................................59

*Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*,
543 B.R. 127 (Bankr. S.D.N.Y. Jan. 4, 2016) .............................44, 45

*Wiwa v. Royal Dutch Petroleum Co.*,
226 F.3d 88 (2d Cir. 2000) ..................................................................28

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*,
933 F.2d 131 (2d Cir. 1991) ................................................................45

*Zornoza* v. *TerraForm Global, Inc.*,
419 F. Supp. 3d 715 (S.D.N.Y. 2019) (Mot. ) .....................................28

**Statutes**

11 U.S.C. § 502 ...........................................................................................60

11 U.S.C. § 544 .............................................................................................6

11 U.S.C. § 548 .............................................................................................6

11 U.S.C. § 548(c) .......................................................................................65

11 U.S.C. § 550 .................................................................................. *passim*

11 U.S.C. § 550(a) ............................................................................. *passim*

11 U.S.C. § 550(f) .......................................................................................61

11 U.S.C. § 551 .............................................................................................7

15 U.S.C. § 78fff(a)(4) ................................................................................64

15 U.S.C. § 78fff(b) .....................................................................................64

15 U.S.C. § 78fff-1(a) ............................................................................64, 65

15 U.S.C. § 78fff-2(a)(3) .............................................................................64

15 U.S.C. § 78fff-2(c)(1)(A)–(D) ...............................................................65

15 U.S.C. § 78fff-2(c)(3) ...................................................................6, 64, 65

15 U.S.C. § 78fff (2) ..............................................................................64, 65

15 U.S.C. § 78*lll*(4).....................................................................................64

Israeli Unjust Enrichment Law, 5739-1979 § 1 .............................................................6

N.Y. C.P.L.R. § 203(g) ...............................................................................................6

N.Y. C.P.L.R. § 213(8) ...............................................................................................6

N.Y. Debt. & Cred. Law §§ 273-79..............................................................................7

**Rules**

Fed. R. Bankr. P. 2002 ................................................................................................6

Fed. R. Bankr. P. 9019................................................................................................6

Fed. R. Civ. P. 12(b)(2) ..................................................................................21, 52, 54

**Other Authorities**

Restatement (Third) of Agency § 1.01 .......................................................................28

Restatement (Third) of Agency § 4.06 .......................................................................41

Ved P. Nanda, David K. Pansius, & Bryan Neihart, *Litig. of Int'l Disputes in U.S.
Courts* § 7A:13 (2d ed., 2005) ................................................................................48

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this memorandum of law and supporting declaration of Fernando A. Bohorquez, Jr. ("Bohorquez Decl."), attaching exhibits, in opposition to the motion ("Motion" or "Mot.") brought by Defendants The Hebrew University of Jerusalem ("Hebrew University"), Yissum Research Development Company of the Hebrew University of Jerusalem Ltd. ("Yissum"), Ben-Gurion University of the Negev ("BGU"), B.G. Negev Technologies and Applications Ltd. ("B.G. Negev"), The Weizmann Institute of Science ("Weizmann"), and Bar Ilan University ("Bar Ilan") to dismiss the Trustee's complaint ("Complaint").

## PRELIMINARY STATEMENT

Defendants feign shock at being haled into a U.S. court for the recovery of stolen customer money they received from the Yeshaya Horowitz Association ("YHA"), an association their officers and professors helped create, manage, and operate for Defendants' benefit. YHA was the BLMIS accountholder and transferor of the transfers at issue here, from whom Defendants received "donations" of almost $50 million in BLMIS stolen customer money between 2002 and 2008 alone. Defendants do not deny or contest the conduct of their officers and professors. Rather, Defendants' primary claim is that they—the most sophisticated academic and research institutions in Israel, which received tens of millions of dollars through YHA—cannot be subject to the jurisdiction of this Court because they did not formally authorize or appoint their representatives to YHA. Defendants are wrong. The unrebutted facts alleged in the Trustee's Complaint amply establish this Court's jurisdiction over them based on the conduct of their agents. Defendants' remaining arguments, which misstate the applicable personal jurisdiction standard for "causation,"

and misunderstand the "avoidability" requirement of Section 550, are unavailing. Defendants' motion should be denied.

The transfers to Defendants in this case implicate a siphoning off and laundering of tens of millions of dollars in customer money over two decades, through three BLMIS accounts owned and controlled by YHA. YHA was a publicly registered Israeli association and BLMIS accountholder founded in 1988 by three key individuals: a longstanding close associate of Madoff's named Albert Igoin; Hebrew University's then-asset manager and head fundraiser, Itzhak Amir; and Israeli attorney Yair Green, who, while controlling the funding of YHA, also served on the Boards of Governors of Hebrew University, BGU, and Weizmann. Amir opened a BLMIS account in YHA's name in 1988 (the "YHA Account") and by 1990, YHA would acquire two BLMIS accounts (the "Magnify Accounts") in the name of Magnify, Inc., a shell company created by Igoin that he transferred to YHA in 1989.

Between 1989 and 2008, YHA was operated by Green and YHA's members, including Amir; a subsequent President of and professor at Hebrew University; the President of and professors at Weizmann; and professors at BGU and Bar Ilan. YHA's purpose was to distribute money to Defendants and other Israeli entities from the YHA Account, which YHA disclosed to regulators and the public as the source of 99.6% of its assets. Nearly all of the money in the YHA Account was first fictitiously generated in the Magnify Accounts out of thin air. More than $120 million appeared in the Magnify Accounts, which inexplicably purported to grow to almost $1 billion before the fraud ended. Green requested BLMIS transfer funds from the Magnify Accounts into the YHA Account, and YHA requested BLMIS transfer funds from the YHA Account to YHA's bank account in Israel.

Defendants portray YHA as a kind of honorific scientific grant society that some of their employees elected to join in their personal time; individuals who "at most" served as "members of a committee that reviewed grant applications." Mot. at 14. This is untrue and belied by Defendants' own actions. YHA is an association; as such, it is comprised of and can only act through its members. YHA's members, consisting largely of Defendants' officers and professors, were responsible for YHA's operations: they reviewed and approved YHA's financials, served on its audit committee, participated in general meetings, and voted for and served on YHA's managing board. And when YHA's members made grant determinations and approved grants, there is no evidence within YHA's records that any of Defendants' officers or professors recused themselves from discussions relating to their own institution, as one would expect if they were acting in their personal capacity. To the contrary, Defendants' officers and professors proposed, advocated for, and approved grants for their own and other projects at their institutions, including awarding grants to pay their own institutional salaries. In other words, they were the Defendants' agents through whom Defendants purposefully availed themselves of BLMIS customer property.

While the precise contours of the relationships between Defendants and their various agents remain issues for discovery, for personal jurisdiction purposes it is sufficient that Defendants' agents acted with Defendants' consent, under their control, and for their benefit. Defendants were actively involved in all phases of the requests for and receipt of YHA's donations. Specifically, beyond the YHA members themselves, Defendants' other employees participated in preparing donation requests to YHA, Defendants' legal departments negotiated and signed grant agreements with YHA, and Defendants' relevant academic or scientific departments received the YHA grants. Defendants also ratified the conduct of their agents by accepting, retaining, and using the grants, and publicly recognized the contributions of YHA, including by appointing YHA's

3

"trustee" and legal counsel, Yair Green, to their Boards of Governors. Because YHA acted through Defendants' agents, the actions of those agents are imputed to Defendants for jurisdictional purposes.

For similar reasons, Defendants' contention that the Trustee failed to allege a causal link for personal jurisdiction purposes between the acts of the Defendants' agents and the subsequent BLMIS transfers they received from YHA falls flat. The Trustee's subsequent transfer claims against Defendants arise from and/or relate to Defendants' professors and officers' conduct in directing tens of millions of dollars from YHA's BLMIS account in New York, which is all the case law requires. Defendants' attempt to argue inferences in their favor must be rejected at this motion to dismiss stage; the Trustee has amply established the Defendants' purposeful availment and the reasonableness of the Court's exercising its jurisdiction over them in this forum.

Finally, Defendants' interpretation of Section 550 has been rejected by both the District Court and this Court in decisions that constitute the law of this case, as well as by the overwhelming majority of other courts to address this issue. The Trustee is not required to litigate to judgment the avoidance of the initial transfers to state a subsequent transfer claim against these Defendants; he must only plead that the initial transfers are avoidable and that Defendants are subsequent transferees of those transfers, which he has.

The Trustee respectfully requests that the Court deny Defendants' Motion in its entirety.

## **PROCEDURAL HISTORY**

## I.    **BACKGROUND**

The Trustee brought a series of actions related to the Magnify and YHA Accounts in the U.S. and Israel seeking to recover customer property.

<u>U.S. Initial Transfer Actions</u>: Following BLMIS' collapse, the Trustee investigated BLMIS accounts related to Albert Igoin and brought two avoidance actions: one against the Igoin family

4

(the "Apfelbaum Action"),[1] and the other against accountholders and transferees related to Magnify and YHA (the "Magnify/YHA Action").[2] The Magnify/YHA Action sought to avoid and recover approximately $150 million in transfers of fictitious profits the Trustee alleged were received with a lack of good faith by Magnify, YHA, Green, Strand International Investments Ltd. (an entity created by Green), Magnify Director Kurt Brunner, YHA employee Osnat Dodelson, and other initial transferees. The Trustee settled with certain initial transferee defendants, and, after engaging in jurisdictional discovery, dismissed his claims against Brunner and Dodelson.

The Trustee subsequently amended his Magnify/YHA Complaint to allege actual knowledge of the fraud by Magnify, YHA, Green, and Strand.[3] The defendants brought a motion to dismiss the Magnify SAC, which the bankruptcy court denied in 2018. *See Picard v. Magnify, Inc., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 583 B.R. 829 (Bankr. S.D.N.Y. 2018) ("Magnify/YHA Decision"). Among other things, the bankruptcy court held the facts alleged by the Trustee were sufficient to show Green's actual knowledge of the BLMIS fraud; that Green was the alter ego of Magnify; imputation of Green's knowledge to Magnify and YHA; and that YHA owned Magnify and controlled the Magnify Accounts in New York. *Id.* at 843-50.

Extraterritoriality Decision and the Israeli Actions: In 2014, the District Court withdrew the reference across the BLMIS SIPA liquidation proceeding to determine whether actions brought by the Trustee in the U.S. to avoid and recover "foreign transfers" would be an improper extraterritorial application of the Bankruptcy Code. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.*

---

[1] Complaint, *Picard v. Est. (Succession) of Doris Igoin (In re Bernard L. Madoff)*, Adv. Pro. No. 10-04336 (BRL) (Nov. 30, 2010), ECF No. 1 ("Apfelbaum Complaint"). After personal jurisdiction discovery and the bankruptcy court's denial of defendants' motion to dismiss, the Trustee settled the Apfelbaum Action.
[2] Complaint, *Picard v. Magnify, Inc., et al. (In re Bernard L. Madoff)*, Adv. Pro. No. 10-05279 (BRL) (Dec. 6, 2010), ECF No. 1 ("Magnify Complaint"), superseded by the Second Amended Complaint. Second Amended Complaint, *Picard v. Magnify, Inc., et al. (In re Bernard L. Madoff)*, Adv. Pro. No. 10-05279 (SMB) (Sept. 29, 2017), ECF No. 143 ("Magnify SAC").
[3] *See* Magnify SAC.

*Sec.,* 513 B.R. 222, 232 (S.D.N.Y. 2014) (the "District Court ET Decision"). The court determined

the Trustee could not allege subject matter jurisdiction over foreign transfers, which the court

defined as transfers received abroad by a foreign transferee and transferor. *Id.* at 231-32. Because

YHA withdrawals from BLMIS were regularly deposited into YHA's own Israeli bank account

before being transferred to Defendants and others,[4] the District Court ET Decision potentially

barred the Trustee from bringing an action in the U.S. to recover subsequent transfers.

Accordingly, the Trustee determined to bring suit in Israel based on his rights there. In

December 2015, before the expiration of Israel's seven-year statute of limitations, the Trustee filed

an unjust enrichment claim (the "Israeli Action") against multiple entities (the "Israeli

Defendants") that received transfers from YHA, including the six Defendants here.[5] The claims in

the Israeli Action, which arise under Section 1 of the Israeli Unjust Enrichment Law, 5739-1979,[6]

require different proofs and provide for damages distinct from an avoidance and recovery action.[7]

Settlement of the Magnify/YHA Action: On or about September 28, 2020, the Trustee

reached a settlement in the Magnify/YHA Action, including with Green, in which Magnify, YHA,

and other defendants consented to judgments for the full amount of the transfers.[8] The judgments

provided that the transfers are avoided pursuant to, *inter alia*, 11 U.S.C. §§ 544, 548 and SIPA §

78fff-2(c)(3) and applicable state law including §§ 203(g) and 213(8) of the New York Civil

---

[4] Complaint, *Picard v. The Hebrew University of Jerusalem, et al.*, Adv. Pro. No. 21-01190 (CGM) (Sept. 27, 2021), ECF No. 1, at ¶ 19. ("Compl.")

[5] *See* Bohorquez Decl., Ex. 1 (Statement of Claim, CivC (DC TA) 18909-12-15 Picard v. The Hebrew University of Jerusalem, et al. (Dec. 9, 2015) (Isr.)). The Trustee also filed an action in Israel against defendants who received direct transfers from BLMIS (the "Israeli Direct Action"), which since settled.

[6] *Id.* ¶¶ 206-13, unjust enrichment § 1 and the elements explained; ¶¶ 208-210, the defendants continue to hold the funds without justification; ¶¶ 211-13, voidability of gift agreements.

[7] *See* Bohorquez Decl., Ex. 2 (Israeli Unjust Enrichment Law 5739-1979, United Nation's World Intellectual Property Organization Website).

[8] Order Pursuant to Section 105(A) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement, *Picard v. Magnify, Inc., et al. (In re Bernard L. Madoff)*, Adv. Pro. No. 10-05279 (SMB) (Sept. 28, 2020), ECF Nos. 193, 197-202. At or around the same time, the Trustee settled the Israeli Direct Action. The consent judgment in the Israeli Direct Action was filed and granted on October 26, 2020.

Practice Law & Rules and §§ 273 through 279 of the New York Debtor and Creditor Law, and

thus recoverable by the Trustee under §§ 550 and 551 of the Bankruptcy Code. *See id.*, ECF Nos.

198-202. YHA, which has consistently represented it had no assets, did not contribute financially

to the settlement. *See* ECF No. at 193 at Ex. A. The Trustee has not recovered the full amount of

the avoided initial transfers.

## II.    THE ISRAELI ACTION, THE DENIAL OF THE ISRAELI ANTI-SUIT INJUNCTION, AND THE TRUSTEE'S SUBSEQUENT TRANSFEREE COMPLAINT

In the Israeli Action, the Israeli Defendants filed responses to the Trustee's claim that they

were unjustly enriched by receipt of BLMIS customer property. Although they have not disputed

receipt of the transfers from YHA alleged in the Trustee's claim, they deny that they were unjustly

enriched by those transfers, and among other things, do not concede that the transfers are

comprised of BLMIS customer money—*i.e.*, they do not concede the Ponzi scheme.[9]

Through discovery in the Israeli Action, the Trustee provided the Israeli Defendants access

to BLMIS' books and records through an electronic data room, as well as millions of pages of

electronic copies of documents relating to proof of the fraud. In contrast, the Israeli Defendants

have collectively produced to the Trustee several thousand documents over the course of the six-

year litigation. The Trustee completed the filing of his direct evidence in August 2021.[10] The Israeli

Court has yet to set a date for the Israeli Defendants to provide their direct evidence and, as such,

there is no trial date set.

---

[9] *See, e.g.,* Bohorquez Decl., Ex. 3 (Statement of Defense on behalf of [Hebrew University and Yissum], CivC (DC TA) 18909-12-15 Picard v. The Hebrew University of Jerusalem, et al., ¶ 21 (May 31, 2016) (Isr.)); Ex. 4 (Statement of Defense on behalf of [BGU and B.G. Negev], CivC (DC TA) 18909-12-15 Picard v. The Hebrew University of Jerusalem, et al., ¶ 56 (May 31, 2016) (Isr.)).

[10] In October 2020, the Trustee filed the first part of his direct evidence, including five expert opinions regarding the tracing of the funds from BLMIS through YHA to Defendants. *See* Bohorquez Decl., Ex. 5 (Filing Certificates, 18909-12-15 Picard v. The Hebrew University of Jerusalem, et al. (Isr.)). In August 2021, he filed the second part, an additional expert opinion along with three evidentiary affidavits. *Id.*

During the pendency of the Israeli Action, in February 2019, the Second Circuit reversed the District Court ET Decision,[11] meaning that subject matter jurisdiction in the U.S. was restored over the subsequent transfers received by the Israeli Defendants. In May 2019, the Trustee notified Hebrew University, BGU, Weizmann, and Bar Ilan that he intended to file a separate subsequent transfer action in the U.S. These Israeli Defendants responded by moving in Israel for an anti-suit injunction in October 2019. The motion was denied by the Israeli District Court, and the decision was affirmed on appeal by the Supreme Court of Israel.[12] Among other things, the Supreme Court rejected the Israeli Defendants' argument that the U.S. action should be enjoined because the forum was selected by the Trustee "for reasons of procedural convenience or to make it easier for him to recover the funds…." *Id.* at p.13, ¶ 23. The Court stated: "the convenience entailed by filing the U.S. Lawsuit does not derogate from the [Trustee's] right to file such a lawsuit before the competent U.S. court . . . ." *Id.*

The Trustee timely filed this subsequent transferee recovery action in September 2021.

## **STATEMENT OF FACTS**

### I.    **THE BLMIS PONZI SCHEME**

As detailed in the Complaint, Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Compl. ¶¶ 98-122. In reality, BLMIS operated a Ponzi scheme through the investment advisory portion of his business at all relevant times. *Id.* at ¶¶ 108-112. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of the federal securities laws. *Id.* ¶ 86-97.

---

[11] *In re Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019).
[12] *See* Bohorquez Decl., Ex. 6 (Anti-Suit Injunction Decision, Supreme Court of Israel, CivA 2459/20 Hebrew University of Jerusalem v. Picard (Nevo database, June 25, 2020) (Isr.)).

## II.    YHA OWNED THE MAGNIFY AND YHA BLMIS ACCOUNTS

Albert Igoin was a Madoff associate since the late 1970s. Magnify SAC ¶ 48. Over the course of the BLMIS Ponzi scheme, accounts related to Igoin, including his family accounts, withdrew hundreds of millions of dollars in fictitious profit. *See* Magnify SAC ¶ 4 and Apfelbaum Complaint ¶ 39. In 1983, Igoin directed the creation of a Panamanian shell company called Magnify, Inc., and directed a BLMIS customer account be opened for Magnify with a deposit of about $3.1 million (the "Magnify I Account"). *Id.* ¶¶ 2, 4.

YHA is a non-profit association registered with the Israeli Registrar (the "Registrar") that was founded in 1988 for the purpose of distributing funds from BLMIS to Hebrew University and other Israeli institutions. Compl. ¶¶ 13, 123, 124. Igoin was encouraged to found YHA by Itzhak Amir, then Head Asset Manager of Defendant Hebrew University, and Israeli attorney Yair Green. Compl. ¶ 14. YHA's founding members included Igoin, Amir, Amnon Pazi (President of Hebrew University), Henri Atlan (Professor at Hadassah University Hospital, affiliated with Hebrew University) and Igoin's niece, Ayala Nahir. *Id.* ¶¶ 2, 13, 127. Green was YHA's legal counsel and its self-proclaimed "living spirit." *Id.* ¶ 11. Green incorporated YHA and filed its registration papers with the Registrar in May 1988. Compl. ¶ 125.

Hebrew University's Amir opened an account for YHA at BLMIS (the "YHA Account"), which was funded by a March 1989 transfer from the Magnify I Account of approximately $2.8 million in principal and $183,339 in fictitious profits. Compl. ¶ 126. Minutes from a YHA meeting held that month indicated the founding members, including Amir and Atlan, "expect[ed] that the $3,000,000 invested with the New York broker [BLMIS] will reach $4,000,000 by the end of the 1989"—an expectation of a 33% return over a period of nine months. Compl. ¶ 128.

In December 1989, Magnify executed an unconditional Assignment of Transfer of its shares to YHA, and its bearer shares were delivered to Green in connection with the transfer. *Id.*

¶¶ 14, 16, 129, 134. From that point forward, YHA had full legal control, and Green had effective control, over the disposition of the funds in the Magnify Accounts. *Id.* ¶ 14.

Following the transfer of Magnify to YHA, a second BLMIS account was opened for Magnify (the "Magnify II Account") without any initial deposit. Instead, BLMIS created fictitious backdated trades purporting to "sell" shares in May 1990 that had been "bought" in October 1986, resulting in an immediate "profit" of about $100 million appearing on the Magnify II Account's September 1990 customer ledger. *Id.* ¶¶ 12, 130. Virtually no other funds were ever deposited into either Magnify Account. *Id.* Over a period of almost twenty years, Madoff purported to generate hundreds of millions of dollars in blatantly fictitious profits in the Magnify Accounts. *Id.* ¶ 10. Contrary to his practice with all other investors, by at least 1995 Madoff did not bother even pretending to trade securities in the Magnify Accounts or to provide monthly customer statements containing fictitious transaction-level detail. *Id.* ¶ 17. Instead, Madoff personally met with Green in New York to finalize semi-annual "Portfolio Evaluations," perfunctory snapshots of Magnify's purported holdings in the Magnify Accounts and their value as of the document's date. *Id.* These documents contained no underlying historical information or transactional details for any security purportedly bought or sold in the Magnify Accounts. *Id.* After Igoin's death in 1995, YHA increased the size and scope of its redemptions from BLMIS, jumping from up to approximately $2 million annually through 1997 to between $4 million and $15 million annually between 1998 and 2008. Compl. ¶¶ 135-37.

Nearly all of the funds distributed by YHA came from the fictitious profits generated in the Magnify Accounts. After Madoff generated "profits" in the Magnify Accounts, Green directed that a portion of those funds be internally transferred within BLMIS on paper from the Magnify Accounts to the YHA Account. *Id.* ¶¶ 131-32. YHA, usually through Nahir, Atlan, or, during his

lifetime, Amir, then directed withdrawals from the YHA Account at BLMIS in New York to YHA's Israeli bank account, from where the funds were distributed to Defendants in the form of grants. *Id.* ¶¶ 3, 11-12, 40, 132-133, 181.

### III.    YHA'S MEMBERS AND GREEN TRANSFERRED FUNDS FROM BLMIS TO DEFENDANTS

YHA was an association consisting solely of its members. These members along with Green operated and managed YHA, including the Magnify and YHA Accounts at BLMIS. Compl. ¶ 15. As described more fully below, YHA held general meetings of its members at which YHA's members considered and voted on grant requests, approved YHA's annual financial reports, elected members to the audit committee, managing board, and other positions, addressed staff salary and employment issues, made any revisions to the bylaws of YHA, and performed the other functions of a general assembly.[13] In addition to Green, most of YHA's members simultaneously served as agents for both YHA and Defendants, including Amir, Atlan, Hanoch Gutfreund (Hebrew University), Bracha Rager (BGU), Ilan Chet (Hebrew University), Amnon Caspi (Bar Ilan), Irun Cohen (BGU and Weizmann), and Shimon Ullman (Weizmann). Compl. ¶ 15. While serving as YHA's members, Defendants' officers, professors, researchers, and other employees requested millions of dollars in grants from YHA (including on behalf of Defendants) and approved (as members of YHA) the same grants for the benefit of their own institutions, including for their own personal research projects. *Id.* ¶ 21. As YHA members, Defendants' professors and officers attended general meetings at which they, among other things, reviewed, discussed, and approved YHA's financial statements acknowledging its funds were sourced with a U.S. broker and the purported balance of the YHA Account without disclosing the existence of or balance in

---

[13] *See* Bohorquez Decl., Ex. 7 (YHA Articles of Association (PUBLIC0593780.0004)). In response to the declarations submitted in support of Defendants' Motion, this Opposition refers to certain documents underlying the allegations in the Complaint, attached as exhibits to the Bohorquez Decla.

the Magnify Accounts. *Id.* ¶¶ 42, 54-55, 63, 78-79, 206-10, 281. Because the Magnify Accounts'

funds were excluded from YHA's financial reports for each of the years 1999 – 2003, YHA's

financial statements showed that YHA was insolvent because its pledged amounts exceeded its

reported assets for each year by between $1.8 and $10.2 million. *Id.* ¶ 153.

Although YHA was funded entirely by the Magnify Accounts, YHA's members and Green

effectively concealed Magnify and the Magnify Accounts from regulators and the public. Compl.

¶ 138. Only the holdings in the YHA Account were disclosed. Since at least 1996, registered non-

profit associations in Israel have been required to disclose their sources of funding to the Registrar.

*Id.* ¶ 139. The disclosure that YHA was funded by Magnify, a foreign entity that it owned or

controlled, would have invited the Registrar to request documentation of Magnify's ownership,

assets, balance sheet, and income. *Id.* ¶ 147. The minutes of general meetings of the membership,

which are submitted to the Registrar and publicly maintained, reflect no discussion at any meeting

of basic questions regarding YHA's financial position, its sources of funding or its ability to meet

its commitments. *Id.* ¶ 156. In response to demands by the Registrar as to the source of YHA's

funding, Green, Atlan, and Gutfreund represented repeatedly over a period of years that YHA was

funded by a donor who wished to remain anonymous. *Id.* ¶ 145. Only in 2004, nine years after

Igoin's death, did Green report to the Registrar for the first time that "the donor" had died, at which

point Green claimed that he was the trustee for the donor. *Id.* ¶ 148. YHA's October 2008 revised

bylaws filed with the Registrar stated that the "Income of the Association" would be "[t]hrough

special donations that will be transferred via Mr. Albert Igoin" and that Igoin, who by then had

been dead for thirteen years, would remain on the Board of Directors. *Id.* ¶ 150.

## IV.    DEFENDANTS' AGENTS PARTICIPATED IN YHA TO OBTAIN MONEY FOR THE DEFENDANTS

The members of YHA included officers and employees of the Defendants, including professors, Presidents, and members of their Boards of Governors. While operating YHA, these individuals requested grants from YHA and participated in YHA's decisions to grant millions of dollars to their respective institutions. These grants were documented with contracts that were negotiated by the Defendants' legal departments, and were used by Defendants' employees and staff, often over a period of years, to fund major projects.

### 1.    Hebrew University and Yissum

Hebrew University is one of the largest higher education and research institutions in the State of Israel. *Id.* ¶ 31. It participates in global fundraising efforts, including through an international "Society of Friends" network covering more than 25 countries. One such effort, the American Friends of the Hebrew University, is incorporated and headquartered in New York. *Id.* ¶ 36.

Hebrew University's President and Head Asset Manager were two of the founders of YHA, and Hebrew University was one of only two institutions that received funding from YHA prior to Igoin's death. Compl. ¶ 173. Prominent officers of Hebrew University have participated in YHA's Management Committee for most of its existence. Amir, who was responsible for fundraising for the university, instructed Madoff to open the YHA account at BLMIS in 1989, *id.* ¶¶ 40, 126, and the YHA Account's monthly statements were delivered to him by BLMIS until shortly before his death in 1997. *Id.* ¶ 42. While working at Hebrew University, Amir received a salary from YHA. *Id.* ¶ 172. He hosted YHA meetings at his home, led YHA meetings, and signed meeting minutes. *Id.* ¶ 174. His home address in Jerusalem served as YHA's official address. *Id.* Throughout his tenure with YHA, Amir solicited millions of dollars from YHA for Hebrew University's benefit.

*Id*. ¶ 175. After Amir's death, YHA donated $100,000 to establish a permanent scholarship fund for Hebrew University doctoral students because "without [Amir's] vision, [YHA] would not have been founded." *Id.* ¶ 176.

Hebrew University's then-President, Amnon Pazi, was another co-founder of YHA, as was Henri Atlan, Professor at Hadassah University Hospital affiliated with Hebrew University's School of Medicine. *Id.* ¶¶ 37, 38, 180.

Hanoch Gutfreund is currently the Director of Hebrew University's Einstein Center and served as President of Hebrew University from 1992 – 1997. *Id*. ¶¶ 38, 185. Gutfreund frequently traveled to the U.S. to raise funds for Hebrew University, and on at least one occasion met with Madoff at BLMIS' office. *Id*. ¶ 43. Gutfreund joined YHA by at least 1995, was given signatory authority for YHA's bank accounts in Israel in 2000, and was appointed to YHA's Management Board in 2001, on which he served through at least 2008. *Id.* ¶¶ 38, 185-87. YHA's records indicate Gutfreund attended nearly every YHA meeting between 1995 – 2008 and served as its Chairman at several meetings in Atlan's absence beginning in 1998. *Id*. ¶ 186. Beginning in 1997, Gutfreund drafted, solicited, and presented to YHA grant proposals on behalf of Hebrew University, and participated in YHA meetings awarding grants to Hebrew University. *Id*. ¶¶ 188-89. As Gutfreund admits in his declaration, he visited BLMIS in New York and was aware that YHA's funds were invested there. Gutfreund Decl. ¶ 13. He also directly corresponded with the Registrar in response to its inquiries, assisting YHA to effectively conceal the existence of Magnify. Compl. ¶ 144.

Ilan Chet served as Hebrew University's Vice President for Research and Development Authority from 1991 – 2001 and returned to Hebrew University in 2006 as a professor. *Id.* ¶ 203. While serving in this role, he actively solicited grants from YHA. *Id.* ¶ 203. In or around March 2007, Chet joined YHA as a member and participated in meetings at which YHA's members

reviewed, discussed, and approved YHA's annual financial statements. *Id*. ¶ 206. He also participated in approving grants for Hebrew University, where he remained a professor. *Id*. ¶ 207.

Withdrawals from the YHA Account throughout the twenty-year relationship with BLMIS were submitted to BLMIS under the signatures of Amir, Atlan, Green, and/or Nahir. *Id*. ¶ 40. As signatories, on several occasions, Amir and/or Atlan requested that BLMIS transfer funds from the YHA Account to YHA's Israeli bank account to fund grants to Hebrew University and others. *Id*. ¶ 41.

Yissum is a wholly-owned commercial subsidiary of Hebrew University. *Id*. ¶ 32. Hebrew University relies on Yissum to monetize the inventions and intellectual property generated by its researchers and collaborators. *Id*. Hebrew University and Yissum share certain directors, officers, business operations, and office space. *Id*. ¶ 33. Hebrew University used its control over Yissum to effectuate Yissum's receipt of funds from YHA. *Id*. ¶ 35.

2.    Bar Ilan

Bar Ilan is one of Israel's largest academic and research institutions. *Id*. ¶ 51. Bar Ilan participates in global fundraising efforts through a network of international associations of "friends" located in various countries, including the U.S., where it operates through the American Friends of Bar-Ilan University, with headquarters in New York. *Id*.

Amnon Caspi has been a professor and researcher at Bar Ilan throughout the relevant period. *Id*. ¶ 53. He has held several leadership positions there, including Deputy Head of the School of Business Administration and Economics, Head of the EMBA program at the School of Business Administration, Academic Head of Safed College, and Director of the Institute for Labor Relations. *Id*. ¶¶ 15, 53. Caspi is still part of Bar Ilan's faculty.[14] Caspi joined YHA as a member

---

[14] Bohorquez Decl., Ex. 8 (Caspi Faculty Information, Bar Ilan School of Business Administration Website).

in 1995, participating in, among other duties, deliberating and voting on the distribution of grants. Compl. ¶ 54.

Simultaneously, Caspi solicited grants on behalf of Bar Ilan as Director and principal investigator of Bar Ilan's "Cranet" research laboratory in the field of human resources and labor relations. *Id.* ¶ 287. The Cranet research laboratory that Caspi operated on behalf of Bar Ilan was established by YHA and was funded by YHA grants that were solicited by Caspi on behalf of Bar Ilan and approved by YHA members, including Caspi. *Id.* Among other things, Caspi's salary at Bar Ilan was supplemented by an "addition" of $1,000 from YHA through one of YHA's grants to Bar Ilan. *Id.* ¶ 289.

In 2000, Caspi was elected to YHA's Audit Committee. *Id.* ¶ 292. His responsibilities included confirming the propriety of the activities of YHA and its officers. *Id.* Caspi represented that he "examined the [financial] conduct of [YHA] and found it to be in order," *id.* ¶ 292, despite the conflicts, regulatory deficiencies, and period of reported insolvency described above. The same year Caspi joined YHA's Audit Committee, Caspi asked that YHA increase its contribution to his Cranet project at Bar Ilan, for which he was the director and principal investigator, and an additional $540,000 was accordingly approved. *Id.* ¶ 290. During Caspi's tenure, Bar Ilan received at least $660,000 for Caspi's own research. *Id.* ¶ 291. As discussed below, documents surrounding the grants show that Bar Ilan participated with Caspi in seeking funding from YHA on its behalf. *Id.*

      3.    Weizmann

Weizmann is an Israeli advanced higher education and research institution. *Id.* ¶ 59. Weizmann participates in global fundraising efforts through a network of international "committees" located in various countries including the U.S., where it operates through the New York-based American Committee for the Weizmann Institute of Science. *Id.*

Irun Cohen was a professor at Weizmann. *Id.* ¶ 61. He also held several senior and leadership positions there, including Senior Scientist of the Department of Cell Biology, the Mauerberger Professor of Immunology, and Director of the Robert Koch-Minerva Center for Research in Autoimmune Diseases. *Id.* ¶¶ 61, 253. As a professor and program director at Weizmann, Cohen solicited grants for Weizmann and actively participated in YHA meetings where grants to Weizmann were discussed and approved. *Id.* ¶ 61.

In 1996, Cohen became a member of YHA. *Id.* ¶¶ 62, 254. In 1997, he served a key role in creating the Center for the Study of Emerging Diseases ("CSED"), which was another name under which YHA provided grants to the Defendants. *Id.* ¶ 254. Cohen served as Director of the CSED, which allowed him particular influence over the disbursement of YHA's funds through that channel. *Id.* ¶ 256. Through the CSED, Cohen approved distributions for his own research projects at Weizmann and for the projects and studies of other YHA members and other Weizmann researchers. *Id.* YHA documents show correspondence from Cohen to YHA regarding CSED grant requests, and correspondence from Cohen, on CSED letterhead on behalf of YHA, "informing" himself that the grant requests he had made for research to be conducted at Weizmann were approved. *Id.* ¶ 257. Cohen was appointed to YHA's Audit Committee from 2001, and his responsibilities included confirming the propriety of the activities of YHA and its officers. *Id.* ¶ 260. Like Caspi at Bar Ilan, Cohen represented that he "examined the financial conduct of [YHA] and found it to be in order" notwithstanding YHA's purported insolvency and its regulatory and governance failures. *Id.* ¶ 260.

In March 2004, Shimon Ullman, another Weizmann professor, became a member of YHA. *Id.* ¶ 65. At Weizmann, Ullman was both a professor and the head of the Applied Mathematics and Computer Science Department. *Id.* Ullman actively solicited grants from YHA on behalf of

Weizmann even while, like other YHA members, his duties included deliberating and voting on those and other grants. *Id*. ¶¶ 65, 267-68. Ullman also, like other members of YHA, shared responsibility for reviewing and approving YHA's annual financial statements. *Id*.

Additionally, Chet, who also served as an agent of Hebrew University as discussed above, served as President of Weizmann from 2001 – 2006. *Id.* ¶ 204.

4.    BGU and B.G. Negev

BGU is an Israeli higher education and research institution and conducts its commercial endeavors through its wholly-owned and controlled subsidiary B.G. Negev. Because BGU is a not-for-profit entity, it relies on B.G. Negev to serve as its commercial arm to monetize inventions and intellectual property of BGU's researchers. *Id.* ¶ 70. BGU participates in global fundraising efforts through a network of "Associates" or "Friends" located in various countries, including the U.S., where it operates through American Associates of Ben-Gurion University of Negev, with headquarters in New York. *Id.* ¶ 74.

Bracha Rager was a Professor in the Department of Microbiology and Immunology at BGU, having joined in or around January 1976. *Id.* ¶ 219. As a BGU professor, Rager conducted research and applied for grant funding on behalf of BGU, including for herself. *Id.* ¶¶ 76, 219. In 1997, Rager also joined YHA's CSED. *Id.* ¶¶ 77, 221. She guided CSED's activities, including providing funding to her employer, BGU. *Id.* ¶¶ 221-22. In September 2005, Rager formally became a YHA member. *Id.* ¶¶ 78, 223. In that capacity, Rager participated in YHA's grant-making decisions beyond the CSED, and approved YHA's annual financial statements for the years ending in 2005, 2006, and 2007. *Id.* ¶ 223. As discussed further below, both before and after joining YHA as a member, Rager signed grant agreements through which BGU received grants from YHA. YHA funded several BGU projects, including projects in which Rager participated.

In 2006, Rager spearheaded the creation of another YHA "research center" called the Israel Vaccine Research Initiative ("IVRI"), under which YHA could expand its grants. *Id.* ¶ 224. The IVRI, which followed the same model as CSED, was in the process of becoming an additional avenue under which YHA would distribute grants to Defendants. *Id.* With Rager serving as its lead director, IVRI was publicly held out as BGU's affiliate. *Id.* ¶ 225. In a letter dated January 2006, written on BGU letterhead and addressed to YHA, Rager reported that there was "a need for long-term financial support" for the IVRI, and expressed her "backing for the application for support" from YHA. *Id.* On April 3, 2008, Rager participated in a YHA meeting and approved increasing the IVRI's budget by $1.8 million in research funds to be allotted to BGU. *Id.*[15] Rager participated in the approval process for YHA's grants under the names of CSED and IVRI. *Id.* ¶ 248.

Cohen, in addition to his roles at Weizmann, served as the Associate Dean of BGU's Medical School from 1973 to 1974, *id.* ¶ 79, and served as the Director of the National Center for Biotechnology at BGU from 2004-2006. *Id.* ¶¶ 79, 231. As an administrator at BGU, Cohen actively solicited funds or grants on behalf of and for the benefit of the university. *Id.* ¶ 79. As a member of YHA and its Audit Committee, Cohen's responsibilities included deliberating and voting on the distribution of grants, and reviewing and approving YHA's financial statements. *Id.* ¶¶ 79, 232. As a member of YHA's Audit Committee, Cohen represented that he had "examined the financial conduct of [YHA] and found it to be in order," despite its reported insolvency and the regulatory and governance failures discussed above. *Id.* ¶ 233.

### 5.    Green and Defendants BGU, Hebrew University, and Weizmann

Green served on the Boards of Governors for Hebrew University, BGU, and Weizmann. He was the legal counsel for YHA and described himself, alternatively, as "trustee" and as YHA's

---

[15] Due to BLMIS' collapse, YHA did not actually transfer that research grant to BGU. Compl. ¶ 225.

"living spirit." Compl. ¶¶ 11, 148. He was a chief architect of the Magnify scheme, managing the Magnify Accounts and directing inter-account transfers of approximately $120 million in fictitious profits from the Magnify Accounts into the YHA Account. *Id.* ¶¶ 11, 197. Green participated in YHA's founding and had effective control over the funds in the Magnify Accounts. *Id.* ¶ 14. At least by 1995, Green was formally responsible for Magnify and for supervising the movement of funds between the Magnify Accounts and the YHA Account. *Id.* ¶ 16. Green was the individual who met with Madoff semi-annually in New York to finalize Magnify's semi-annual "Portfolio Evaluations," which contained no underlying historical information or transactional details for any security purportedly bought or sold in the Magnify Accounts, such as trade dates, settlement dates, trade prices or even transfers made to the YHA Account. *Id.* ¶ 17. Instead, they offered perfunctory snapshots of Magnify's purported holdings in the Magnify Accounts and their value as of the document's date. *Id.* Based on Green's conduct and the demonstrable fraud in the Magnify Accounts, the bankruptcy court concluded that the Magnify/YHA Complaint sufficiently alleged Green's actual knowledge of the BLMIS fraud and the imputation of that knowledge to YHA. Magnify/YHA Decision at 844. Green also participated in concealing the existence of Magnify and the Magnify Accounts from the Registrar. Compl. ¶¶ 123, 138.

Green was appointed to the Board of Governors of Hebrew University in 2001, which has the authority to, among other things, ratify Hebrew University's financial and budgetary reports and to receive reports on the financial and other aspects of Hebrew University. Compl. ¶ 44. The following year, in 2002, Green was appointed to BGU's Board of Governors, which is "the supreme authority of BGU" and "oversees its affairs, management and assets" including approving BGU's financial reports, ratifying its annual budget and financial policy, and raising funds for BGU. *Id.* ¶ 81. While serving on BGU's Board of Governors, Green served on the Investments

and Executive Committees, which were responsible for making decisions concerning BGU's finances and fundraising efforts. *Id.* ¶ 82. Green served on BGU's Executive Committee from at least 2002 – 2012 and its Investments Committee from 2003 – 2012. *Id.* ¶ 241. Green was elected Chairman of BGU's Board of Directors in 2010. *Id.* ¶ 241. In 2007, Green was also appointed to Weizmann's Board of Governors, the body that is responsible for controlling the business of Weizmann. *Id.* ¶ 66.

While serving on the Boards of Governors for Hebrew University, BGU, and Weizmann, Green served as YHA's counsel, drafting and signing grant contracts on behalf of YHA. *Id.* ¶ 200. He also held himself out as having authority to issue grants and signed agreements as "trustee" of the donor. *Id.* ¶ 148. At all relevant times, Green played a crucial role in funneling millions of dollars of grants from YHA to the Defendants, while actively participating in Madoff's fraud. *Id.* ¶¶ 197, 200-01, 243, 274. Each Defendant retained the benefit of the funds it received from YHA through the efforts of Green and its other agents. *Id.* ¶¶ 201, 250, 277.

## **ARGUMENT**

### I.    **STANDARD OF REVIEW ON A FED. R. CIV. P. 12(B)(2) MOTION TO DISMISS AND FRAMEWORK FOR PERSONAL JURISDICTION**

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), a plaintiff need show only a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). At this preliminary stage, a *prima facie* showing of jurisdiction may either be established "solely by allegations," *id.* at 84-85, or through affidavits and supporting materials that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Picard v. Mayer (In re Bernard L. Madoff)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *3 (Bankr. S.D.N.Y. Oct. 27, 2021). These pleadings and affidavits are to be construed "in the light

most favorable to the plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (citation omitted); *see also Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021) ((same)).

Depending on a defendant's contacts with the forum, a court may exercise general[16] or specific jurisdiction. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001). Specific jurisdiction exists where the defendant purposely directs its activities into the forum and the underlying cause of action "arises out of or relates to" those activities. *See Fairfield Sentry Ltd.*, 627 B.R. at 566. As the Supreme Court recently explained in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021), although "[t]here must be an affiliation between the forum and the underlying controversy," there is no causation-only requirement for the "'connection' between a plaintiff's suit and a defendants' activities." *Id.*; *see also Picard v. Multi-Strategy Fund Limited (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. No. 10-05279, Case No. 12-01205 (CGM), at 8-9 (Bankr. S.D.N.Y. June 13, 2022); *Picard v. Banque Syz & Co., S.A., (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. No. 10-05279, Case No. 11-02149 (CGM), at 7-8 (Bankr. S.D.N.Y. June 14, 2022).

The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether the defendant established "minimum contacts" in the forum, such that the defendant purposely availed itself of the privilege of conducting activities with the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). This "means that the defendant's contacts with the forum state must be of their 'own choice' and not 'random, isolated, or fortuitous'." *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 CIV. 2601

---

[16] General jurisdiction is based on the defendant's general business contacts with the forum and permits a court to exercise jurisdiction where the claims are unrelated to those contacts. *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014). Because the Complaint amply alleges specific jurisdiction, there is no need to reach the issue of general jurisdiction at this time.

(VM), 2022 WL 768680, *8 (S.D.N.Y. Mar. 14, 2022) (quoting *Burger King*, 471 U.S. at 475).

The defendant's activities need not have taken place within the forum, "and a single transaction

with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117

(Bankr. S.D.N.Y. 2011). Minimum contacts may be found when a "defendant's allegedly culpable

conduct involves at least in part financial transactions that touch the forum." *Fairfield Sentry Ltd.*,

627 B.R. at 566. And as detailed below, a "defendant can be subjected to personal jurisdiction by

its own actions or those of its agents." *SHLD, LLC v. Hall*, 15 civ. 6225 (LLS), 2016 WL 659109,

at *4 (S.D.N.Y. Feb. 17, 2016); *see also Picard v. the Estate (Succession) of Doris Igoin (In re

Bernard L. Madoff Inv. Sec. LLC)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) ("Whether

[defendant] dealt with BLMIS directly or … another acted on her behalf makes no difference

because the conduct of her agents is attributed to her for purposes of the jurisdictional analysis.").

Second, the court conducts a "reasonableness inquiry to determine that its exercise of

jurisdiction will not offend traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326

U.S. at 320. To determine whether jurisdiction is reasonable, courts consider:

> (1) the burden that the exercise of jurisdiction will impose on the
> defendant; (2) the interests of the forum state in adjudicating the
> case; (3) the plaintiff's interest in obtaining convenient and effective
> relief; (4) the interstate judicial system's interest in obtaining the
> most effective resolution of the controversy; and (5) the shared
> interest of the states in furthering social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). Where the plaintiff

has alleged purposeful availment, however, the burden shifts to the defendant to present a

"compelling case" that jurisdiction would be unreasonable. *Fairfield Sentry Ltd.*, 627 B.R. at 567

(citing *Burger King*, 471 U.S. at 472-73). As the inquiry is grounded in "traditional notions of fair

play and substantial justice . . . in assessing whether it may exercise jurisdiction over a particular

defendant, a court must weigh the relative strengths and weaknesses of each requirement–that is,

depending upon the strength of the defendants' contacts with the forum state, the reasonableness inquiry may have a greater or lesser effect on the outcome of the due process inquiry." *Metro. Life Ins. Co.,* 84 F.3d at 568 (citing *Burger King,* 471 U.S. at 477 (the "reasonableness" considerations "may sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.")); *see also Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*, 594 B.R. 167, 187-88 (Bankr. S.D.N.Y. 2018) (same).

Finally, in assessing whether a defendant's contacts establish personal jurisdiction, the court must look at the "totality of the circumstances" rather than analyze each contact in isolation. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also Chloé*, 616 F.3d at 164; *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's contacts* with the forum state must indicate the exercise of jurisdiction would be proper.").

## II.   THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

Defendants are subject to this Court's jurisdiction as recipients of transfers from the U.S. account of an entity they themselves helped create, manage, and operate. *See Picard v. Bureau of Labor Ins. (In re Sec. Inv. Prot. Corp.)*, 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012) ("*BLI*") ("BLI cannot claim a violation of its due process rights from having to appear in a New York court to defend itself in a suit arising from activities with a clear New York nexus."). Simply put, YHA was founded by and run for the benefit of the Defendants to the tune of tens of millions of dollars in BLMIS customer money.

The fact that YHA essentially operated to launder stolen customer money from BLMIS to the Defendants should alone be a sufficient basis for this Court to exercise jurisdiction. Defendants' own professors and officers were members of YHA and helped found and manage it

for the purpose of directing stolen customer money from BLMIS in New York to their respective institutions. As YHA members, Defendants' professors and officers were responsible for YHA's operations and grant process, including presenting on and making grant requests, and deliberating and voting on those requests. And the majority of those grant monies, which originated at BLMIS, went to the Defendants, including for their agents' own projects, research and/or salaries at their respective institutions.

Defendants' only counter to these factual allegations is to state they did not formally authorize or appoint these individuals as their representatives to YHA. But in applying agency principles to establish personal jurisdiction, the Second Circuit looks to facts and not formality. And the facts pled by the Trustee establish that Defendants' professors and officers took action at YHA for Defendants' benefit, and each of the Defendants participated in and sanctioned their professors' and officers' operation of YHA by securing YHA funding.

Defendants' remaining arguments fare no better. Defendants contend that the Trustee failed to allege a causal link for personal jurisdiction purposes between the acts of the Defendants' agents and the subsequent BLMIS transfers they received from YHA. But the "causation" that Defendants urge is not required by the law: the Trustee need only allege, as he has, that Defendants' professors' and officers' conduct directing transfers from BLMIS to the Defendants "arises from and/or relates to" the Trustee's subsequent transfer claims against them. Finally, Defendants submit a declaration from Professor Amir Licht on the formalities of Israeli agency law. This declaration is neither relevant nor correct for the reasons set forth below and in the supporting declaration submitted on behalf of the Trustee by Judge (Ret.) Varda Alshech ("Alshech Decl.") and discussed below.

A.      **Defendants Purposefully Availed Themselves of Laws and Privileges of New York Through their Management of and Receipt of Transfers from YHA.**

Defendants attempt to portray YHA as an unrelated third party whose conduct cannot be attributed to them. But YHA could function only through its individual members—including the many individuals who simultaneously represented both YHA and the Defendants, and who operated YHA for Defendants' benefit. Even so, Defendants claim that these professors and officers were not acting as Defendants' agents. They argue the Trustee "does not allege *facts* showing that any professor was appointed to Yeshaya by any defendant or acted in any capacity other than his or her personal or private capacity." Mot. at 16. To the contrary, the Complaint is replete with facts, not disputed by the Defendants, describing conduct through which Defendants secured millions of dollars. There is no need for the Trustee to assert facts showing any individual's "appointment" to Yeshaya by any defendant under the applicable legal standards.

In determining agency for jurisdictional purposes, courts in this Circuit are "focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986); *see also Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 685 (S.D.N.Y. 2014) ("In order to make a prima facie showing of jurisdiction under an agency theory, the plaintiff does not need to establish a 'formal agency relationship'."). The test for agency in this context is straightforward: "To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318-19 (S.D.N.Y 2009) (cleaned up).[17] Here, the facts alleged in the

---

[17] Generally, "[t]here is no discernable difference between federal common law principles of agency and New York agency law." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110, n.5 (S.D.N.Y. 2009); *see also Star Energy Corp. v. RSM Top-Audit*, No. 08 CIV. 00329 (DC), 2008 WL 5110919, at *2, n.1 (S.D.N.Y. Nov. 26, 2008) (noting that there is no

Complaint establish each element of benefit, consent, and control. Moreover, the Trustee has amply alleged facts establishing that the Defendants, in approving, memorializing, and accepting the benefit of YHA's grants, ratified their agents' activities, constituting an independent basis for imputation.

        1.        **Defendants Benefitted from, Consented to, and Controlled their Officers' and Professors' YHA Conduct.**

Agency for jurisdictional purposes requires that an agent take action in the forum for the benefit of the defendant. *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12 Civ. 9258 (ALC) (MHD), 2014 WL 1331046, at *4 (S.D.N.Y. Mar. 31, 2014). Here, Defendants' officers and professors, as members of YHA, directed tens of millions of dollars from YHA's BLMIS account in New York to the Defendants, for the Defendants' indisputable benefit.

Defendants' argument appears to be that because they did not "appoint" these individuals, they were not Defendants' "representatives." *See, e.g.*, Rager Decl. ¶ 5; Ullman Decl. ¶ 2. Tellingly, Defendants remain silent regarding the Trustee's allegations that they consented to and controlled the actions taken on their behalf. As detailed in the Complaint and the additional documents referenced herein, the Defendants not only accepted the benefit of this conduct, but participated in it at an institutional level. In addition to those Defendants' officers and professors who served as YHA members, other employees of Defendants prepared grant requests and proposals to YHA; reviewed, executed, and operated under YHA grant agreements; and even attended YHA general meetings where, among other things, YHA's financials were discussed.

This is ample evidence of consent and control, as recognized even in cases relied on by Defendants. *See, e.g., Bidonthecity.com*, 2014 WL 1331046, at *4 (allegations that parent company

---

substantive difference between New York agency law and the federal common law of agency). Thus, this Court may rely on one or both sources of agency law. *See, e.g., Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002).

issued press release announcing its acquisition of interest in joint venture sufficient to establish

parent's consent and control over subsidiary's negotiations in forum relating to joint venture). The

element of control is "to ensure that a party will not be subjected to a suit in a jurisdiction against

its will, by virtue of the actions of a purported 'agent' to which that party did not consent and as

to which it had no choice." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319

F. Supp. 2d 352, 361 (S.D.N.Y. 2004). The Second Circuit applies this control requirement

"flexibly" (*Mayes v. Leipziger,* 674 F.2d 178, 181 (2d Cir. 1982)), where the minimal level

required does not need to be formal or direct, *see Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d

88, 95 (2d Cir. 2000), but encompasses situations where the principal may exercise influence over

an agent's actions, such as the imposition of incentive structures that "reward the agent for

achieving results," thereby affecting the agent's actions. Restatement (Third) of Agency § 1.01,

cmt f. Where, as here, the principal actively participated in the conduct at issue in order to obtain

the benefit, its control of its agent is clear.

Similarly, Defendants' own cases confirm that whether an individual functions as an

entity's agent for these purposes depends on the conduct alleged rather than on the individual's

job title. *See, e.g.*, *Zornoza* v. *TerraForm Global, Inc.*, 419 F. Supp. 3d 715, 734 (S.D.N.Y. 2019)

(performing a functional agency analysis of the director's conduct); *Santa Fe Sci. & Tech., Inc. v.

Drexel Univ.*, CIV. No. 02-0689 JC/LFG, 2002 WL 35649493, at *6 (D.N.W. Dec. 4, 2002)

(professors may be agents of university depending on evidence).[18]

Defendants' reliance on *Walden v. Fiore*, 571 U.S. 277 (2014), is therefore perplexing.

Mot. at 14. In *Walden*, there was no argument or suggestion that the defendant had purposefully

---

[18] Defendants' suggestion that a university professor can never be an agent of their university, Mot. at 17, n.13, is belied also by the other case on which they rely, *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1361-62 (Fed. Cir. 2001) (finding fact issue regarding scope of professor's agency for purposes of respondeat superior liability for fraudulent nondisclosure).

availed himself of the relevant forum. Instead, a Georgia police officer working at an Atlanta airport searched and seized money from two Nevada residents traveling to Las Vegas. *Id*. at 288-89. The officer "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada," nor was the officer's seizure of funds predicated in any way on the fact that the plaintiffs' intended destination was Nevada. *Id*. at 289. In rejecting Nevada's jurisdiction over the Georgia police officer, the Supreme Court reaffirmed the well-established principle that personal jurisdiction cannot be premised solely on a *plaintiff's unilateral contacts* with the forum state. *Id*. at 284, 289 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)). Moreover, relying on *Walden*, this Court recently rejected a similar argument that personal jurisdiction cannot be based on a third-party's forum contacts to determine whether a Defendant purposefully availed itself of this Court's jurisdiction. *Multi-Strategy*, at 8.

Here, YHA's conduct was not "unilateral," and Defendants are alleged to have purposefully availed themselves of U.S. law by their own conduct. Defendants participated in the formation and operation of an entity whose purpose was to funnel BLMIS money from the U.S. to Defendants and other Israeli entities, and purposefully solicited and received tens of millions of dollars originating from the Magnify and YHA Accounts in New York. Defendants' receipt of BLMIS subsequent transfers could hardly be further from "happenstance or coincidence." *See BLI*, 480 B.R. at 506 (finding personal jurisdiction "based upon [subsequent transferee's] investment of tens of millions of dollars in Fairfield Sentry with the specific goal of having funds invested in BLMIS in New York with the intent to profit therefrom.").

Aside from their participation in YHA's formation and operations, Defendants knew YHA was funded exclusively from the U.S. Indeed, the vast majority of YHA's grants in Israel were made in U.S. dollars, and one of the few facts publicly disclosed about YHA's mysterious finances

was that its assets were with a U.S. broker.[19] Compl. ¶¶ 42, 52, 55, 60, 63, 75, 78. Like the defendant investors in *BLI*, by intentionally directing withdrawals from a New York investment manager, broker dealer, and custodian through YHA's account at BLMIS formed for this express purpose, Defendants purposefully availed themselves of the laws of the U.S. 480 B.R. at 289–91.

Defendants' attempts to distance themselves from YHA are contradicted by the allegations in the Complaint and by the factual evidence underlying those allegations, including additional detail proffered below in response to Defendants' declarations. For example, any suggestion by Hebrew University that it was unaware of BLMIS and YHA's connection to the U.S. is belied not only by the fact that its agents were signatories for and controllers of YHA's BLMIS Account, Compl. ¶¶ 37-38, 40-42, but also that it received a transfer of $250,000 directly from YHA's BLMIS account.[20]

2.    Defendants' Professors and Officers Who Simultaneously Served as
YHA's Members were Defendants' Agents for Personal Jurisdiction
Purposes.

a.    Hebrew University

Hebrew University's ties to this forum are unequivocal. As discussed above, Hebrew University's professors and officers helped found YHA, including opening the YHA account with BLMIS from which Hebrew University received more than $36 million in subsequent transfers of stolen customer money. *See supra*, p. 9. Hebrew University's officers directed the activity in the BLMIS YHA Account, were signatories to YHA's bank account, and throughout YHA's existence, a current or former President of Hebrew University was a member of YHA. Despite Gutfreund's denial that he or others acted as its "agents," *See* Gutfreund Decl. ¶ 10, 11, the

---

[19] *See* Bohorquez Decl., Ex. 9 (YHA Financial Statements as of Dec. 31, 2004 (PUBLIC0593780.C0001 at .0173 and .0178)).

[20] *See* Bohorquez Decl., Ex. 10 (Letter from Amir and Nahir to Madoff directing a wire transfer to Hebrew University (Nov. 20, 1995)); Ex. 11 (Wire instruction from BLMIS to Bankers Trust Company requesting a credit to Hebrew University's bank account (Dec. 5, 1995)).

participation of Hebrew University's professors and officers in YHA was not an independent and unrelated pursuit, but was for the direct benefit of the university and done with its full knowledge and consent.

First, Hebrew University's professors and officers—including Amir, Atlan,[21] Gutfreund, Chet, and Green—participated in countless YHA meetings wherein they deliberated on, voted on, and effectuated grant requests directly benefitting the university. Compl. ¶¶ 182, 186, 200, 207, 306. While Gutfreund denies authority to approve or direct funding "on [his] own," Gutfreund acknowledges participating in grant determinations. Gutfreund Decl. ¶ 14.[22] In fact, Gutfreund personally solicited and secured millions of dollars in YHA grants for the benefit of Hebrew University including, but not limited to:

- <u>July 18, 1997 YHA meeting</u>: Gutfreund presented a grant request on behalf of Hebrew University wherein he secured $3.6 million in funding[23] in the same year he was President of the university. Also present at the meeting were Atlan and Green. *Id.*
- <u>August 2, 1998 YHA meeting</u>: Gutfreund presented a request on behalf of Hebrew University wherein he secured $1.15 million in funding. Also present at the meeting were Atlan and Green, as well as employees at Yissum.[24]
- <u>April 17, 2000 YHA meeting</u>: Gutfreund engaged in a joint presentation with Green on behalf of Hebrew University wherein they secured $3.5 million in funding.[25] Atlan signed the meeting minutes for this meeting. *Id.* at .0004.

These monies were not for Gutfreund himself, nor his personal pursuits, but rather, for research, programming, and scholarships for the benefit of Hebrew University.

---

[21] Hebrew University's counsel avers that "in his capacity at Hadassah," Atlan was not an agent of Hebrew University. Yakirevich Decl. ¶ 14. Yakirevich acknowledges, however, that Hadassah personnel are eligible for academic appointments at Hebrew University. *Id.* While Yakirevich avers that such appointments would not render the appointee an "employee[]" of Hebrew University or result in a salary from Hebrew University, they do not deny that such an appointment may render an individual an agent of Hebrew University. *Id.* The evidence suggests that Atlan, who has frequently been identified as a Professor of Hebrew University, is or has held an academic appointment at Hebrew University during the relevant time. *See, e.g.*, Bohorquez Decl., Ex. 12 (Update from the Hebrew University in Jerusalem Website identifying Atlan as among the professors who represented the University (April 2002) (PUBLIC0693307 at 3308 under the section titled "Conferences")). Notably, Atlan did not submit a declaration on Defendants' behalf.

[22] Notably, Professors Atlan and Chet did not furnish a declaration with Defendants' Motion.

[23] Bohorquez Decl., Ex. 13 (YHA General Assembly Meeting Minutes (July 18, 1997)).

[24] *Id.*, Ex. 14 (YHA General Assembly Meeting Minutes (Aug. 2, 1998)).

[25] *Id.*, Ex. 15 (YHA General Assembly Meeting Minutes (Apr. 17, 2000) (MPSYGE 01093.C0001 at .0002)).

Second, while Hebrew University argues that "[t]he university did not appoint members or officers of [YHA]," Yakirevich Decl. ¶ 17, the university nevertheless was aware of, participated in, and consented to the activities of its professors and officers who served on YHA, as evidenced by (among other things) the university's participation in the drafting of grant agreements and participation in funded projects. As alleged in the Complaint, Green "drafted the contracts for the donations to Hebrew University," Compl. ¶ 45, which, in turn, were executed by high level executives of the university in order to receive the funds YHA granted to it. Pepi Yakirevich, Hebrew University's General Counsel and who submitted a declaration in support of Defendants' Motion, was a signatory to various of these contracts.[26] Moreover, prior to joining the membership of YHA, Chet, in his capacity as Deputy President for Research, signed various of these contracts on behalf of Hebrew University, including for the above grant of $3.6 million secured by Gutfreund.[27] Defendants' argument that these various individuals acted solely in their "private" capacity is contradicted by the facts.

b.    Bar Ilan

As detailed above, Bar Ilan's Professor Caspi was a member of YHA from 1995 – 2008, during which period YHA transferred more than $10 million to Bar Ilan. In 2000, Caspi joined the Audit Committee. Compl. ¶ 286. He was among those responsible for approving YHA's financials and participated in countless YHA meetings wherein the Association deliberated on, voted on, and effectuated grant requests directly benefitting the university. *Id.* ¶¶ 52, 54.[28]

Bar Ilan describes Caspi as an "Adjunct Associate Professor" and employee of Bar Ilan. Frenkel Decl. ¶ 3(a). Caspi has been affiliated with Bar Ilan for decades, and has served as Head,

---

[26] *See, e.g.,* Bohorquez Decl., Ex. 16 (Agreement between YHA and Hebrew University (Apr. 22, 1999)).

[27] *Id.*, Ex. 17 (Agreement between YHA and Hebrew University, Weizmann, and Hadassah Medical Association (Nov. 19, 1997)).

[28] Notably, Caspi did not submit a declaration in support of Defendants' Motion.

Deputy Head and Director of various of its programs and schools. At Bar Ilan's request, YHA established and funded the Cranet research laboratory[29] which, as Bar Ilan admits, was led by Caspi and operated under Bar Ilan's School of Business Administration. Frenkel Decl. ¶ 3(a). YHA's grant agreements specified Caspi was to continue to lead the project.[30] Caspi presented on grant requests benefitting Bar Ilan, totaling hundreds of thousands of dollars, across various YHA meetings, including:

- <u>February 4, 1999 YHA meeting</u>: Caspi presented a request on behalf of Bar Ilan wherein he secured $280,000 in funding.[31]
- <u>April 17, 2000 YHA meeting</u>: Caspi presented a request to increase the donation for the Cranet research laboratory on behalf of Bar Ilan wherein he secured $540,000 in funding. *Id.*, Ex. 15.

Beyond YHA's funding for the Bar Ilan laboratory led by Caspi, Caspi's compensation from Bar Ilan was directly tied to his work at YHA on Bar Ilan's behalf: a portion of the salary Caspi received from the university was paid by YHA in the amount of $1,000 per month, along with a stipend of $2,000 for travel abroad related to the Cranet research laboratory.[32] These grants, and the others allocated to Bar Ilan, were tracked by the university's Deputy Director General of Finance, who periodically sent financial reports to YHA typed on Bar Ilan letterhead.[33]

Having knowingly accepted the benefit of Caspi's conduct at YHA on its behalf, Bar Ilan cannot disclaim liability for it, regardless of whether the university formally appointed him to YHA in the first instance. *See* Frenkel Decl. ¶¶ 3-4. For example, YHA meeting minutes dated September 25 and 28, 2001 reflect that Green, Gutfreund, and Caspi planned to meet with the President of Bar Ilan, Moshe Kaveh, to determine the university's commitment to a biological

---

[29] Bohorquez Decl., Ex. 18 (Agreement between YHA and Bar Ilan (Apr. 1999)).

[30] *See, e.g.,* Bohorquez Decl., Ex. 19, ¶ 5 (Supplement to Agreement between YHA and Bar Ilan (Mar. 25, 2001)).

[31] Bohorquez Decl., Ex. 20 (YHA General Assembly Meeting Minutes (Feb. 4, 1999)).

[32] *See id.*, Ex. 21 (Letter from Nahir to Moshe Solomon at Bar Ilan regarding Caspi's salary (Jan. 7, 2004)).

[33] *See generally id.*, Ex. 22 (Financial Reports from the Deputy Director-General Finance at Bar Ilan addressed to Nahir).

research center at the end of YHA's financial support to the university regarding this center.[34]

Kaveh was a signatory to various contracts between YHA and Bar Ilan concerning the allocation

of grant monies, including a 2005 contract between YHA and Bar Ilan governing a $3 million

grant to establish a center at the university is signed by YHA and Kaveh.[35] Kaveh was President

of Bar Ilan from 1996 – 2013.[36]

Nor may Bar Ilan argue that it lacked control over Caspi's YHA work. Bar Ilan admits that

Caspi was an employee, Frenkel Decl. ¶ 3(a), and a portion of Caspi's salary at Bar Ilan was paid

by YHA. *See* Bohorquez Decl., Ex. 21. Moreover, the Trustee is in possession of at least fifteen

contracts between YHA and Bar Ilan, wherein Dror Frenkel, legal advisor to Bar Ilan and a

declarant in support of Defendants' Motion, signed contracts relating to YHA's donations to the

university.[37] Frenkel also worked with Green to edit the language of these agreements before they

were finalized.[38] Having participated in its agent's activity, Bar Ilan had ample opportunity to

exercise control over it, up to and including rejecting the funds if Bar Ilan had any concerns or

objections about their origin.

c.    BGU

As detailed above, BGU's professors and executives—including Rager, Cohen, and

Green—participated in countless YHA meetings wherein they deliberated on, voted on, and

effectuated grant requests directly benefitting the university, amounting to over $18 million in

subsequent transfers. Compl. ¶¶ 217, 223, 232, 245.

---

[34] *See* Bohorquez Decl., Ex. 23 (YHA General Assembly Meeting Minutes (Sept. 25 and 28, 2001)).
[35] *Id.*, Ex. 24 (Agreement between YHA and Bar Ilan (Aug. 21, 2005)).
[36] *Id.*, Ex. 25 (Bar Ilan website listing former University Presidents).
[37] *See, e.g., id.*, Ex. 26 (Agreement between YHA and Bar Ilan (Jan. 1, 2002)).
[38] *Id.*, Ex. 27 (Letter from Green to Kaveh mentioning Frenkel's comments to an agreement (Dec. 3, 2002)).

First, while BGU attempts to diminish Green's role as a member of the university's Executive and Investments Committees, it admits that as a member of the Investments Committee, Green was responsible for "overseeing [BGU's] investment of its assets." Mund Decl. ¶ 6. In 2004, and in accordance with this role, Green recommended BGU open an account with HSBC, and upon this suggestion, the university placed several millions of dollars with HSBC.[39] That same year, BGU directed HSBC to invest $1 million of this money into Fairfield Sentry Limited ("Fairfield Sentry"), BLMIS' largest feeder fund.[40] In 2009, BGU filed a customer claim with the Trustee concerning the monies it invested in Fairfield Sentry. Although the strength of BGU's ties to the forum are clear from its Green-fueled investment activities, BGU's collaboration with YHA to obtain millions of dollars in customer monies only further cements these ties. Further, the Trustee has been advised that at least one Defendant has filed a claim with the separate but related BLMIS-victim fund established by the United States Attorneys' Office.[41]

Second, Rager's relationship with YHA began approximately eight years before she became a member of YHA, when Cohen appointed Rager to the CSED—a center formed and funded entirely by YHA. Rager Decl. ¶¶ 3-5. Through the CSED, Rager used her position to obtain funds from YHA for her research at BGU for the benefit of the university. For example in 2003 YHA, through the CSED, granted $90,000 to BGU for a research project spearheaded by Rager.[42] The grant was memorialized on CSED letterhead, which prominently features the names of Cohen, Rager, and Atlan. Id. When Rager was made a member of YHA in 2005, Rager Decl. ¶ 5, she continued to leverage her position within YHA to obtain further grant monies for BGU. For

---

[39] See Bohorquez Decl., Exs. 28 and 29 (BGU's Account Opening Documents at HSBC).

[40] See id., Ex. 30 (Letter from HSBC to BGU regarding transactions that occurred in 2004 (May 5, 2009)).

[41] The Trustee is working to obtain the identity of this Defendant who is simultaneously seeking to benefit from the laws and benefits of the United States through the recovery of BLMIS funds on the one hand, while denying jurisdiction over it concerning the Trustee's efforts to recover stolen BLMIS customer funds on the other hand.

[42] See Bohorquez Decl., Ex. 31 (Letter from Cohen, as Director of CSED, to Green noting the distribution of funds to ten scientists, including Rager (Aug. 4, 2003)).

example, at Rager's first YHA meeting, her BGU colleagues presented on and received approval

for a request to fund an E-Beam Lithography Device in the amount of $2.5 million.[43] The grant

request was made by, among others, Moti Herskovitz, BGU's Dean of Research and Development

and approved by YHA. *Id.*

Moreover, while Rager alleges that the IVRI – a vehicle created by Rager for YHA to

further funnel BLMIS customer monies – "had no activity, and no funds were transferred to it,"

this was a function of the timing of BLMIS' collapse. The center was created for BGU's direct

benefit and was approved by YHA for millions of dollars in grants. Rager Decl. ¶ 7. For example:

- <u>July 3, 2008 YHA meeting</u>: YHA approved a $2.5 million request by BGU concerning the Center for Infectious Diseases and Translational Vaccine Research wherein YHA directed that the monies for the grant be "given to [the] IVRI and intended for [BGU]." Present at this meeting were Rager and Cohen.[44]

BGU asserts: "*Except regarding their teaching and research roles* at the University,

professors of [BGU] do not have the power and authority to act on behalf of the University." Mund

Decl. ¶ 7 (emphasis added). But the conduct alleged in the Complaint is patently related to Rager's

"teaching and research role" at BGU: indeed, she was the researcher for a number of BGU's

projects funded by YHA. Regardless, the scope of Rager's formal authority to bind BGU is

irrelevant, since she acted on BGU's behalf with their consent and control. The planned YHA-

funded IVRI initiative, with Rager as lead director, was publicly held out as BGU's affiliate, and

Rager corresponded on BGU's behalf (and on its letterhead) with YHA. Compl. ¶¶ 224-25.

Multiple contracts between YHA and BGU were signed by Rager as researcher, including those

grants governing funding allocated to Rager's research at BGU, and while she was a member of

the CSED.[45] These contracts were also executed by other agents of BGU, including high ranking

---

[43] *See* Bohorquez Decl., Ex. 32 (YHA General Assembly Meeting Minutes (Jan. 2, 2006)).

[44] *See* Bohorquez Decl., Ex. 33 (YHA General Assembly Meeting Minutes (July 3, 2008)).

[45] *See e.g.*, Bohorquez Decl., Ex. 34 (Contract Addition to an Agreement between YHA and BGU (Nov. 5, 2000)).

officers such as Moti Herskowitz, who as noted above was BGU's Dean of Research and Development.[46] Indeed, Herskowitz was present at YHA meetings, including in February 2005, when YHA's financial reports stating that YHA's monies were managed by a broker in the U.S. were discussed and approved by YHA's membership.[47] Like other Defendants, BGU participated in and controlled its agents' activity, up to and including rejecting the funds if it so chose.

Finally, Cohen, who served as BGU's Director of the National Center for Biotechnology, attempts to downplay his position within the university by referring to himself as a "consultant." Cohen Decl. ¶ 13. Notably, Cohen provides no documentation relating to his role at the institution. Regardless, Cohen founded and led YHA's CSED, *id.* ¶ 7, participated in meetings at which YHA allotted millions of dollars to BGU, *see, e.g.*, Bohorquez Decl., Ex. 32, and directed additional grants through the CSED to BGU.[48] Whether or not his YHA membership predated his role at BGU, his role in funneling these monies to BGU during his affiliation with the university is evident. Between October 2004 and June 2006, while Cohen was employed by BGU, Cohen Decl. ¶ 13, BGU received over $4 million in stolen customer monies and B.G. Negev received nearly $200,000. *See* Compl., Exs. C and D.

        d.     Weizmann

As detailed above, Weizmann's professors and executives—including Ullman, Cohen, and Green—participated in countless YHA meetings wherein they deliberated on, voted on, and effectuated grant requests directly benefitting the institute, amounting to over $10 million in subsequent transfers. Compl. ¶¶ 223, 232, 245, 251, 260, 267-268.

---

[46] *Id.*, Ex. 35 (Addendum to an Agreement between YHA and BGU (Oct. 23, 2005)).

[47] *Id.*, Ex. 36 (YHA General Assembly Meeting Minutes (Feb. 10, 2005)); Ex. 9 (YHA Financial Statements as of Dec. 31, 2004 (PUBLIC0593780.C0001 at .0173 and .0178)).

[48] *See, e.g.*, Bohorquez Decl., Ex. 37 (Letter from Cohen, as Director of CSED, to Dr. Yaffa Mizrachi at BGU renewing a research grant (June 25, 2001)).

The majority of Cohen's tenure on YHA overlapped with his role as Director of the Robert Koch-Minerva Center for Research in Autoimmune Diseases at Weizmann. Cohen Decl. ¶ 2. Cohen submits that while he "participated in evaluating projects for funding by [YHA]," he "did not have authority [him]self to direct funding of projects." *Id.* ¶ 6. Regardless of whether he had sole authority, Cohen's participation as YHA member and Director of CSED helped fund his research for the benefit of Weizmann. Cohen acknowledges that he submitted grant applications for the research that he conducted. Cohen Decl. ¶ 10. And in addition to presenting on Weizmann's behalf for grant money, Cohen participated in its award. For example, on July 4, 2000, Cohen, in his capacity as CSED Director, wrote and signed a letter on CSED letterhead *to himself* at Weizmann *informing himself* of a grant for his research at Weizmann totaling $270,000.[49] Included on the letter were Green and Dr. Boaz Avron, the Chairman of Weizmann's Research & Development. *Id.* Cohen appeared on both sides of a transaction again on June 25, 2001, where he wrote a letter *to himself* on CSED letterhead providing that the CSED was allocating a $90,000 grant concerning Cohen's research for the benefit of Weizmann.[50] Green and Dr. Avron were again copied on the letter. *Id.* Even if Cohen refrained from "evaluating the application[s]" in such instances (an assertion for which there is no documentary evidence), his admitted solicitation of funds and participation in its provision to the university, with the knowledge and consent of Weizmann, constitutes conduct as its agent.

Ullman, the Samy and Ruth Cohn Professor of Computer Science at Weizmann, minimizes his position at YHA by stating that YHA's decisions to fund projects were "made by [its] membership as a whole" and not by his sole authority. Ullman Decl. ¶ 2. The impact of Ullman's

---

[49] *Id.*, Ex. 38 (Letter from Cohen, as Director of CSED, to himself in his capacity as a project lead at Weizmann (July 4, 2000)).
[50] *Id.*, Ex. 39 (Letter from Cohen, as Director of CSED, to himself in his capacity as a researcher at Weizmann (June 25, 2001)).

membership in YHA, however, is apparent: in 2004, the first year Ullman was a member of YHA, Weizmann received approximately $450,000 in stolen customer monies from BLMIS. *See* Compl., Ex. E. These monies continued to increase into the millions of dollars per year up until BLMIS collapsed in 2008. *Id.*

> e.    Green's Conduct is Imputed to Defendants Hebrew University, BGU and Weizmann for Jurisdictional Purposes.

Defendants argue that Green was not an agent of Hebrew University, BGU, or Weizmann even though he served on their respective Boards of Governors. BGU, attempting to minimize Green's participation on its Board's Investment and Executive Committees, simply asserts that its governing board consists of "hundreds of members" and that individual board members ("or members of other governing bodies that Green is alleged to have joined") do not have authority to act on the university's behalf. Mot. at 13; Mund Decl. ¶ 5. Hebrew University and Weizmann similarly state that their governing boards have "hundreds of members . . . and usually [meet] once a year" and agree that "[n]o individual member of the Board of Governors has any power because he or she is a member of the Board." Yakirevich Decl. ¶¶ 7-8; *see also* Naveh Decl. ¶¶ 6-7. But the Trustee does not allege that Green happened to be one of "hundreds" of university board members while he controlled the funding for YHA. The Trustee alleges that Green was appointed to the governing boards of these Defendant universities precisely because he worked with Defendants to transfer YHA's money to them for their benefit. Like Defendants' other agents, imputing Green's conduct and knowledge to them for jurisdictional purposes does not require formal agency authorization or that Green "participated in [YHA] at any university's behest." Mot at 12. It is sufficient that he participated in YHA for Defendants' benefit with their knowledge, their consent, and some level of control. *See, e.g., GEM Advisors,* 667 F. Supp. at 318-19. Green's

appointment to their Boards of Governors was both reward and incentive for Green to transfer tens of millions of dollars to these Defendants.

f.    The Defendants Ratified the YHA Members' Actions.

Defendants also ratified their professors' and officers' actions made on their behalf by accepting the benefit of the BLMIS transfers. "Ratification is a form of retroactive activity that occurs when the principal, having knowledge of the material facts, accepts the benefits of the agent's action already made on his behalf." *Haua v. Prodigy Network, LLC*, 20 Civ. 2318 (PGG) (KNF), 2021 WL 4478737, at *5 (S.D.N.Y. Sept. 29, 2021) (citation omitted).

As discussed above, Defendants actively participated in YHA through their agents, including YHA members and non-member agents who participated in presenting, negotiating, preparing and signing grant requests, proposals, agreements, progress reports and the like. In addition to establishing that Defendants controlled their agents, these same facts establish that Defendants ratified their agents' conduct by accepting, retaining and spending the funds: they "condon[ed] [their professors and executives] acts and accept[ed] the benefits of them." *Breeden v. Kirkpatrick & Lockhart LLP (In re The Bennett Funding Grp., Inc.)*, 336 F.3d 94, 100 (2d Cir. 2003). Defendants' arguments against ratification accordingly fail.

*Walden* does not salvage Defendants' arguments, as it has nothing to do with whether Defendants' professors and officers acted as their agents or whether Defendants ratified their conduct. Similarly, Defendants' tautological claim that ratification is inapplicable in this case because the Trustee has not established an underlying agency or apparent agency relationship between the Defendants and its professors and executives, Mot. at 28, fails for all the reasons discussed above. *See supra*, p. 26-40.

Finally, Defendants' argument that ratification does not apply because Defendants were not aware of the material facts fails. Mot. at 28. Defendants' knowledge that their agents were

40

participating in YHA and were acting on their behalf while Defendants themselves negotiated agreements for and accepted the benefit of those actions is sufficient knowledge for jurisdictional purposes. *See Nat'l Union Fire Ins. Co.*, 319 F. Supp. 2d, at 361-62 (holding that defendants could have avoided the amenability to suit in New York by asking about the insurance coverage defendants' agents coordinated, and if they had objected to the insurance coverage, could have sought to obtain coverage elsewhere). And failure to inquire into the source of these funds is not a defense to ratification. *See* Restatement (Third) of Agency § 4.06 cmt d (2006) (ratification can be implied where the principal is shown to have knowledge of the material facts "that would have led a reasonable person to investigate further, but the principal ratified without further investigation.")

Regardless, the only "material facts" about which Defendants claim ignorance are their professors' and officers' particular roles at YHA, and their involvement in conduct that had a U.S. connection. Mot. at 28. But Defendants' awareness of the specific position within YHA held by their professors and officers is not "material" to the conduct at issue here. Defendants were aware that, regardless of their role at YHA, their agents solicited and obtained YHA funds on their behalf. *See supra*, p. 13-19. As to the U.S. connection, even assuming Defendants are correct that this would constitute a material fact as to ratification, YHA—through its members and Green—controlled the YHA Accounts at BLMIS. Moreover, most of the money Defendants received from YHA was in U.S. dollars, YHA publicly disclosed that its assets were held with a U.S. broker, and all Defendants sent other representatives *in addition to* the YHA members, to attend YHA meetings. At a minimum, Defendants ratified their agents' purposeful availment of U.S. laws by accepting, memorializing, enjoying, and retaining the fruits of their efforts.

   3.   The Trustee's Claim Arises from and Relates to YHA's New York-
        Originated Transfers to Defendants.

Jurisdiction is proper in this case because the Trustee's claim to recover subsequent

transfers from the Defendants clearly "arise[s] out of or relates to" Defendants' transaction of

business in New York through their agents' conduct. Relying on *SPV Osus Ltd. v. UBS AG*, 114

F. Supp. 3d 161 (S.D.N.Y. 2013), Defendants contend that the Trustee must demonstrate that

YHA's BLMIS withdrawals were "proximately caused" by the professors' conduct; specifically,

the Trustee must "allege that [YHA] would have withdrawn less from BLMIS, or that any

withdrawals from BLMIS would not have occurred, had [YHA] made different grant decisions"

and/or that a specific agent of the Defendant unilaterally "had the power to cause [YHA] to approve

a grant" to that Defendant. Mot. at 14. Going even further, Defendants rely on *BNP Paribas* to

argue the Trustee's burden is to establish this "causation" on a "transfer-by-transfer basis." *Id.* at

16. Again, Defendants are wrong.

First, the Trustee is not required to allege causation. As to the second prong of the personal

jurisdiction analysis, "the suit must arise out of *or relate* to the defendants' contacts with the

forum." *Multi-Strategy* at 8 (quoting *Ford Motor* 141 S. Ct. at 1027) (emphasis in original) The

Court "need only find 'an affiliation between the forum and the underlying controversy.'" *Id.* at 9.

*Banque Syz.* at 7-8.

Defendants' reliance on the 2013 decision in *SPV Osus Ltd.* to argue a "proximate cause"

requirement is therefore misplaced as well, given *Ford Motor*'s recent black-letter holding that

causation is not a prerequisite for jurisdiction. Defendants' admonition to the Court to simply

ignore *Ford Motor*, apparently because the case concerned defective products, is nonsensical. *Ford*

*Motor* provided guidance and clarity on a broadly applicable legal standard and is not limited in

application solely to the facts before it. *See, e.g., In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL

768680, at *9 ("In *Ford*, the Supreme Court rejected the argument that the conduct underlying a plaintiff's claim must be caused by the defendant's contacts with the forum state for the court to exercise personal jurisdiction over that defendant.").[51]

Here, the Trustee's subsequent transfer claim is not merely "related" to Defendants' jurisdictional contacts through YHA and its agents but also "arises out" of those contacts. YHA is run by individuals, who in this case were also Defendants' professors and officers. The YHA grants received by Defendants were requested by Defendants' professors and officers, approved by them as YHA members, and then funded by subsequent transfers of stolen customer money originating from BLMIS. *See, e.g.,* Compl. ¶¶ 21, 41, 56, 68; *see also Multi-Strategy* at 9 (finding that Trustee's "subsequent transferee claim against Defendants for monies it received from Fairfield Sentry … is directly related to [their] investment with Fairfield and BLMIS."); *see also Banque Syz* at 8 (same).

Second, Defendants' reliance on *BNP Paribas* to argue that the Trustee must establish personal jurisdiction on a "transfer-by-transfer basis" is also wrong. *See* Mot. at 15-16. Courts have personal jurisdiction over *defendants*, not *transfers*. *See, e.g., Int'l Shoe*, 325 U.S. at 316. Likewise, the "inquiry whether a forum State may assert personal jurisdiction over a nonresident

---

[51] *SPV Osus* is also distinguishable on the facts. That action was brought by Madoff investors against sponsors of BLMIS feeder funds broadly accusing the defendants of "acting as accomplices to BLMIS" in the Ponzi scheme. 114 F. Supp. 3d at 164. Notably, because the plaintiffs in that case did not invest in the defendants' funds or have any affiliation with the defendants, the court concluded that "[the plaintiff's] injuries were caused by BLMIS' Ponzi scheme," not by the defendants. *Id.* at 170. Moreover, *SPV Osus* involves a dispute between parties about services owed under a foreign contract, which this Court has already determined is not relevant to the Trustee's actions against defendants who received subsequent transfers from BLMIS. *Cf.*, *BNP Paribas*, 594 B.R. at 192 (explaining that cases concerning foreign contract disputes related to BLMIS "have no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). That is not the case here. This is an action brought by a U.S. Trustee to recover fraudulent transfers from a group of Israeli institutions who received tens of millions in BLMIS transfers from an entity whose "ultimate objective" and "*raison d'etre*" was to move money from BLMIS in the U.S. to the Defendants in Israel. *See BLI*, 480 B.R. at 513.

defendant focuses on the relationship between the defendant, the forum and the litigation." *BNP Paribas*, 594 B.R. at 189.

This is exactly what this Court did in *BNP Paribas*. The Court did not look at each transfer to determine jurisdiction, nor adopt a strictly causational standard as Defendants suggest; rather, the *BNP Paribas* Court assessed each defendant, focused on the overall relationship with the initial transferees, and determined it had jurisdiction. *BNP Paribas*, 594 B.R. at 191.

### 4. The Trustee Sufficiently Alleges that B.G. Negev and Yissum are Alter Egos of BGU and Hebrew University.

Contrary to Defendants' contentions, Mot. at 26, the Complaint adequately alleges that Yissum and B.G. Negev are alter egos of Hebrew University and BGU, respectively.[52] As a threshold matter, Defendants invoke Israeli law but fail to identify any conflict between U.S. and Israeli law on this issue; they instead assert the outcome would be the same. Mot. at 27. And because personal jurisdiction here is based on federal law, the alter ego analysis should similarly be based on federal law.[53] Courts in this Circuit consider the following factors in applying this standard:

> (1) the absence of [corporate formalities], (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the

---

[52] The Defendants incorrectly characterize the Trustee's allegations as invoking the mere department theory of jurisdiction. Mot. at 26. Importantly, the Trustee relies on an alter ego theory to establish personal jurisdiction over Yissum through its symbiotic relationship with Hebrew University and B.G. Negev through its dependency on BGU. *Compare Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (explaining that the mere department theory involves a claim where "the foreign corporation is present in New York state because of the activities of its subsidiary") *with Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. Jan. 4, 2016) (explaining that "a plaintiff demonstrates that an entity is the alter ego of another entity for jurisdictional purposes when one entity 'exerts greater than normal control' over the other").

[53] *See Lyondell*, 543 B.R. at 140. Defendants rely on *Lyondell*, Mot. at 27, for the opposite proposition: that the law of the forum of incorporation (here, Israel) should govern. The discussion in *Lyondell* notes the unsettled state of the law on whether a choice of law analysis is necessary and what law should apply. The court in *Lyondell* did not undertake a choice of law analysis because, similar to the case here, the parties did not request one.

> dominated corporation at arms length, (8) whether the corporations
> are treated as independent profit centers, (9) the payment or
> guarantee of debts of the dominated corporation by other
> corporations in the group, and (10) whether the corporation in
> question had property that was used by other of the corporations as
> if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).[54]

Here, the Trustee alleges, among other things, that: Yissum and B.G. Negev were funded entirely by their parent entities; the parents treated the subsidiaries' revenues as their own; overlap in ownership, officers, directors, personnel and office space; the parents' complete ownership and control over the subsidiaries and their business decisions, including regarding YHA; and the subsidiaries existed only to carry out their parents' businesses. *See* Compl. ¶¶ 33-35, 71-73. These allegations are sufficient to allege that Yissum and B.G. Negev were alter egos of their parents' and "carrying on the controlling corporation[s'] business instead of their own." *Lyondell*, 643 B.R. at 141 (citation omitted).

The basis for these allegations includes Defendants' own contemporaneous records with respect to the transfers. Contrary to Defendants' position that Yissum is merely "associated" with Hebrew University, Mot. at 26, grant contracts between Hebrew University and YHA, including at least one signed by Hebrew University's general counsel Pepi Yakirevich, refer to Yissum as "wholly owned and controlled by" Hebrew University. *See* Bohorquez Decl., Ex. 16. Agreements governing YHA's grants to Yissum were executed by Hebrew University on Yissum's behalf. They stated that Yissum applied to or approached YHA for the grant at issue "through the University" and referred to Yissum and Hebrew University interchangeably throughout. *See e.g., id.* at .0001. As one agreement put it, "[YHA] is prepared to continue to support *Yissum* by

---

[54] *Passalacqua* interpreted New York law; courts have observed that the "Second Circuit's common law standard is taken directly from New York law." *Lakah v. UBS AG*, 996 F.Supp.2d 250, 260 (S.D.N.Y. 2014).

providing an additional multi-year grant to the *University…*" *Id.* at .0001 (emphasis added). Similarly, in a grant contract between YHA and B.G. Negev "on its behalf and on behalf of [BGU]," B.G. Negev is referred to as a "subsidiary" that is "wholly owned and controlled by [BGU]."[55] Agreements governing grants for B.G. Negev were executed by B.G. Negev on behalf of BGU and B.G. Negev, the funds were paid to BGU to be "earmarked for…research within the [B.G. Negev] funds," and communications were to be between YHA and BGU "by means of [B.G. Negev]." *Id*. at .0002 and .0003.

The declarations from Hebrew University and BGU counsel each include the same single paragraph offering parallel reasons their respective subsidiaries are not "the same entity" or "treated as the same entity" by the parents. Mund Decl. ¶ 8, Yakirevich Decl. ¶ 9.[56] These self-serving statements do not disprove or render implausible the Complaint's allegations and offer only a sliver of the information necessary for an alter ego analysis.

Notably, Defendants chose not to submit additional documents that go directly to the alter ego question of fact, such as financial information, correspondence between the entities concerning YHA, or corporate filings. In any event, the determination and extent of a corporation's domination is a question of fact that is not ordinarily addressed before discovery. *See, e.g.*, *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002); *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01-11765(CSH), 2003 WL 124521, at * 2-3 (S.D.N.Y. Jan. 15, 2003). Veil piercing determinations are similarly questions of fact, inappropriate for resolution on a motion to dismiss or even summary

---

[55] *Id*., Ex. 40 (Agreement between YHA and B.G. Negev (Sept. 25, 2001) (18909-12-15_BGUNegev-0000826.C0001 at .0001)).

[56] The declarations are nearly identical, except that Hebrew University omits from its version that it respects Yissum's "status as a separate entity," that Yissum's board "has its own meetings," and that Yissum "has its own employees and … bank accounts. Compare Mund Decl. ¶ 8 and Yakirevich Decl. ¶ 9. Hebrew University's omissions of course beg the very question before this Court.

judgement. *See, e.g.*, *Milestone Shipping, S.A. v. Estech Trading LLC*, 764 F. Supp. 2d 632, 636 (S.D.N.Y. 2011) ("without a fuller record aided by proper discovery," defendant could not "extinguish all questions of fact nor defeat [plaintiff's] claim against it as a matter of law," and thus claims were sufficiently pleaded).

Defendants protest the Trustee's use of "information and belief" to state certain allegations. But the sole case on which they rely, *Citizens United v. Schneiderman*, actually undermines their claim. That case states in whole relevant part:

> A litigant cannot merely plop "upon information and belief" in front of a conclusory allegation and thereby render it non-conclusory. *Those magic words will only make otherwise unsupported claims plausible when "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible*."

882 F.3d 374, 384-85 (2d Cir. 2018) (emphasis added). An "information and belief" pleading is particularly appropriate where, as here, the Trustee has set forth factual allegations of the relationship between Hebrew University and Yissum, and BGU and B.G. Negev, and the issue is a fact question that is peculiarly within the control of these Defendants. *See Network Enters., Inc.*, 2003 WL 124521, at *3. Regardless, the Trustee's belief is based on "factual information that makes the inference of culpability" sufficient to withstand Defendants' motion to dismiss. *Citizens United*, 882 F.3d at 385.

Finally, Defendants' Licht Declaration, defined below, opines that Israeli law will not pierce the corporate veil unless the corporate form is "abused in a purposeful way to harm creditors." Licht Decl. ¶ 80. As discussed above, the analysis here should be based on U.S. federal law relevant to personal jurisdiction, and not Israeli law relating to substantive liability in Israel. Regardless, as demonstrated by the Alshech Declaration, a court applying Israeli law would likely pierce the corporate veil. Alshech Decl. ¶¶ 93-98.

5.    The Declaration of Amir Licht Is Neither Relevant Nor Correct.

Defendants provide a 49-page declaration by Professor Amir Licht opining on Israeli corporations and agency law (the "Licht Declaration"), which the Court should ignore for several reasons. First, Defendants identify no conflict between New York and Israeli law, which is the threshold requirement for engaging in a choice of law analysis. A New York court will engage in a choice of law analysis only "where an actual conflict exists between the laws of relevant jurisdictions." *Fairfield Sentry Ltd.*, 627 B.R. at 559; Ved P. Nanda, David K. Pansius, & Bryan Neihart, *Litig. of Int'l Disputes in U.S. Courts* § 7A:13 (2d ed., 2005) ("Courts will generally require proof of an actual conflict of laws before engaging in a choice of law analysis."). An "actual conflict" exists when "the law of each jurisdiction provides different *substantive* rules, and the differences are relevant and have a significant possible effect on the outcome of the trial, although they need not lead to different outcomes." *Fairfield Sentry Ltd.*, 627 B.R. at 559 (emphasis added). "If the party advocating a choice of law analysis fails to demonstrate an actual conflict between New York and another [jurisdiction's] laws, no choice of law analysis need be undertaken." *E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 2:17-cv-01034 (ADS)(AYS), 2017 WL 4162309, at *4 (E.D.N.Y. Sept. 19, 2017) (citations omitted). *See also* Nanda, Pansius & Neihart, *supra* ("[A] party seeking to employ foreign law must provide proof of foreign law, and argue how it differs from domestic law.").

Defendants not only fail to point out a conflict but rather candidly admit that Israeli and New York agency law are the same. *See, e.g.,* Mot. at 13, 17, 20, 27. This alone should end the Court's consideration of the Licht Declaration and Israeli law. *See Fairfield Sentry Ltd.*, 627 B.R. at 559 (foregoing a choice of law analysis upon a determination that there was no actual conflict between the laws of the two jurisdictions presented by the parties); *E. Materials Corp.*, 2017 WL 4162309, at *4 (same).

48

Second, courts often decline to undertake a choice of law analysis at the motion to dismiss stage because of the fact-intensive nature of the analysis. *See, e.g.*, *Meserole v. Sony Corp. of Am., Inc.*, No. 08-Cv-8987 (RPP), 2009 WL 1403933, at *5, n.6 (S.D.N.Y. May 19, 2009) (noting that engaging in a detailed choice of law analysis would be premature at the 12(b)(6) motion to dismiss stage). Here, Defendants are requesting the Court go well beyond the personal jurisdictional analysis, which requires consideration of federal common law to determine the procedural issue of agency sufficient for personal jurisdiction. *See supra,* p. 27.

Finally, even if the Court were to consider Israeli law, the Licht Declaration does not advance Defendants' motion. As demonstrated by the supporting declaration submitted by Judge (Ret.) Varda Alshech (the "Alshech Declaration"), the Licht Declaration focuses on an overly narrow and incomplete interpretation of agency law, relying primarily on criminal law cases regarding the imputation of a criminal mental state. The Licht Declaration does not address the relevant agency, corporate and tort law standards that would apply to impose corporate liability for the acts of agents or impute agents' knowledge to their principals under Israeli law, much less apply those standards to the facts here. *See* Alshech Decl. ¶¶ 6, 8-9, 20, 46, 56-60, 61-64. Indeed, Licht does not purport to have considered all of the Defendants' own declarations in rendering his opinion. *See* Licht Decl. ¶ 8, Ex. B. With respect to the relevant question of whether the conduct and knowledge of the individuals here would be imputed to these specific Defendants, Judge Alshech in her Declaration comes to the opposite conclusion based on her review of relevant law and application of that law to the pleadings and declarations presented before this Court. *See* Alshech Decl. at ¶¶ 26-37, 48, 49-55, 99. Simply put, the Licht Declaration is unreliable, at best, and insufficient to offer support to Defendants' motion.

**B.      The Exercise of Jurisdiction Over Defendants is Reasonable.**

Defendants also fail to present any reason, much less a compelling one, why jurisdiction would be unreasonable. Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). This Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction, but it is unreasonable to force the defendant to defend the action in that forum." *BNP Paribas*, 594 B.R. at 188. This is not that "rare" case.

First, the burden on Defendants is minimal. Despite the physical distance between New York and Israel the Defendants are "represented by highly competent U.S. counsel." *Banque Syz* at 9. Additionally, based on the realities of "modern communication and transportation," courts in this adversary proceeding have routinely found distance alone as posing "no serious burden." *See BLI*, 480 B.R. at 517; *Maxam*, 460 B.R. at 119 (same).[57] Similarly, under the analogous forum non-conveniens analysis, courts in the Southern District of New York have held that to the extent evidence and witnesses are located abroad, modern technological advancements have decreased the burden of litigating in a foreign forum and such concerns have naturally become of less consequence. *See Glob. Tech. Indus. Grp., Inc. v. Go Fun Group Holdings, Ltd.*, 17 Civ. 3727 (AJP), 2017 WL 5036665, at *8 (S.D.N.Y. Nov. 2, 2017). Indeed, Hebrew University has itself filed suit in the U.S. numerous times. *See, e.g., Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, No. CV-10-3790-AB (JCX), 2015 WL 9653154, at *1 (C.D. Cal. Jan. 12, 2015).

---

[57] Defendants' reliance on *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987), is misplaced. *Asahi* was long before email, video-conferencing and other forms of modern communications substantially mitigated the burdens of litigating in a foreign jurisdiction. Moreover, the burden on the defendant in *Asahi* was particularly acute because it was being haled into California court as the result of an accident involving the defendant's components and the plaintiff was not even a California resident. *Id.* at 114.

Second, this "forum has a substantial interest in applying the subsequent transfer provisions of the Bankruptcy Code which are incorporated through SIPA." *Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff)*, No. 08-01789 (CGM), 2021 WL 3477479, at *14 (Bankr. S.D.N.Y. Aug. 6, 2021) (citations omitted); *see also In re Picard*, 917 F.3d at 103 (noting "compelling interest in allowing domestic estates to recover fraudulently transferred property"). And "[c]ourts in the Southern District of New York have routinely held that the forum and the Trustee have a strong interest in litigating BLMIS adversary proceedings in the United States." *Fairfield Sentry Ltd.*, 627 B.R. at 568 (collecting cases). In sum, as this Court recently stated, the "forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court." *Multi-Strategy*, at 10 (collecting cases); *Banque Syz* at 9 (same).

Any implicit comity argument based on the Trustee's action in Israel would not warrant dismissal of this action. Contrary to Defendant's position, the Trustee's—and this Court's—interest in adjudicating this BLMIS recovery action in this forum does not "evaporate" because of the Israeli Action. Mot. at 29-30. The Trustee has the right to bring actions wherever he has claims.[58] Moreover, the Israeli Action is fundamentally different from the action here. Here, the Trustee's claims, brought in his capacity as a SIPA Trustee in a SIPA liquidation proceeding, arise under SIPA and the U.S. Bankruptcy Code. The Trustee need only plead that the initial transfers are avoidable and that the Defendants are subsequent transferees of those initial transfers. Further, the Trustee's recovery is not subject to an equitable set-off. In the Israeli Action, by contrast, the Trustee has brought claims as a successor-in-interest to BLMIS under Israeli Unjust Enrichment Law, alleging that Defendants were enriched by receiving money that consisted of fictitious profit from the BLMIS Ponzi scheme. Unlike in the U.S Action, even if the Trustee obtains a judgment

---

[58] Bohorquez Decl., Ex. 41 (Expert Opinion of the Hon. Judge (Ret.) Randall J. Newsome submitted on behalf of the Trustee in the Israeli Action (Dec. 15, 2016) (PUBLIC0693237 at 245-247)).

in his favor, the amount of his recovery remains subject to the Israeli court's weighing of the equities. The U.S. and Israeli actions are based on entirely different causes of action, asserted in different capacities, each with different remedies and damages. Neither is Israel the most efficient forum, Mot. at 30, to resolve his subsequent transferee claims against the Defendants.

Further, as discussed above, the Trustee timely filed the Israeli Action because of the state of U.S. law under the District Court ET Decision. After that decision was reversed, the Trustee filed this action. Given the Trustee's statutory duty to achieve maximum recovery for the victims of the BLMIS fraud, and as part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, it is entirely appropriate for the Trustee to pursue his different claims in separate forums.[59] And judicial efficiency is served by advancing the claim here, where the Trustee's claim is limited to issues of avoidability and proof of Defendants' receipt of subsequently transferred customer funds and do not extend to issues of equity and unjust enrichment.

Moreover, despite the length of time the Israeli Action has been pending, "that litigation is not about to conclude and [the Trustee] cannot estimate with any reasonable certainty how long it will take before a judgment is issued." *Schencker A.G. v. Société Air France*, 14 Civ. 4711 (BMC)(PK), 2016 WL 1465353 at *3 (E.D.N.Y. Apr. 14, 2016). Defendants' claim the Trustee has taken "broad discovery in Israel." Mot. at 30. In fact, consistent with Israeli discovery, which is narrower than in the U.S., Defendants have only produced limited documents. No date has been set for trial, the next pretrial hearing, or even for Defendants' evidence to be filed. Given the six-

---

[59] Notably, Defendants' sole authority to the contrary is inapposite. *Burke v. Bimbo Bakeries USA, Inc.*, 5:19-CV-902 (MAD/ATB), 2019 WL 6068038 (S.D.N.Y. Nov. 15, 2019), is a "first-filed" case applicable to duplicative federal court suits. That is not the case here where there are two concurrent domestic and foreign litigations. Rather, the relevant analysis would be an international comity abstention argument under Rule 12(b)(2) subject matter jurisdiction motion to dismiss. *See Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms*, 466 F.3d 88 (2d Cir. 2006). But Defendants did not make that motion here, likely because they could not meet the "exceptional circumstances" test to warrant surrender of the Court's "unflagging obligation" to exercise subject matter jurisdiction. *Id.* at 92.

year pace of the Israeli litigation, if the Trustee is forced to wait longer, there is a strong chance that the availability of evidence, facts and key witnesses will be diminished. And even if the Israeli Action were to go to judgment any time soon—which it likely will not—a judgment of "unjust enrichment" does not itself resolve whether the funds must be returned.

In addition to the Trustee's and this Court's interest in litigating here, this Court's familiarity with the BLMIS SIPA liquidation proceeding renders the U.S. action efficient. The fact that the Defendants have challenged the Ponzi scheme in Israel illustrates this point. This issue has already been litigated and decided in the U.S., like many common issues that have either been a part of the BLMIS litigation in this SIPA liquidation proceeding in the past thirteen years or are likely to arise in the myriad subsequent transferee cases currently before this Court.

Finally, Defendants' claim that bringing the instant action somehow offends Israeli's sovereign interests is belied by the fact that the Israeli courts already have opined that it does not. Mot. at 30. As discussed above, the Israeli Supreme Court affirmed the denial of the Israeli Defendants' motion for an anti-suit injunction, effectively precluding the Defendants' efforts to halt the Trustee's pursuit of the Defendants here in the U.S. If anything, the circumstances here offer a "strong showing of reasonableness" that strengthens, rather than weakens, the case for jurisdiction here. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1394 (1st Cir. 1995); *Metro. Life Ins. Co.*, 84 F.3d at 568 (citing *Burger King*, 471 U.S. at 477)).

### C.    In the Alternative, the Trustee is Entitled to Jurisdictional Discovery.

If the Court finds that the Trustee has not yet made a *prima facie* showing of personal jurisdiction as to any particular Defendant, the Trustee respectfully requests jurisdictional discovery. "It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to

53

develop a full factual record." *Lensky v. Yollari*, 20-cv-4978-GHW, 2021 WL 4311319, at *8 (S.D.N.Y. Sept. 20, 2021) (collecting cases). On a Rule 12(b)(2) motion to dismiss, courts within the Second Circuit have considerable procedural leeway and discretion to, *inter alia*, authorize discovery "and to devise the procedures to ferret out the facts pertinent to jurisdiction" or conduct an evidentiary hearing on the merits of the motion. *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618(KMW)(HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009); *see also Shepherd v. Annucci*, 921 F.3d 89, 95 (2d Cir. 2019).

Indeed, courts within the Second Circuit routinely grant discovery where a plaintiff has "made a sufficient start, and shown their position not to be frivolous." *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990) (citation omitted); *see also Picard v. Magnify (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. No. 10-05279 (BRL), 2012 WL 2254995, at *7-9 (Bankr. S.D.N.Y. June 15, 2012). This is because a plaintiff — especially one that may come as an outsider to the case — "should be provided with 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction' through jurisdictional discovery." *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) (citation omitted). In fact, the Second Circuit has gone so far as to state that it would be "legal error" for a court to "forbid[] jurisdictional discovery any time a plaintiff does not make a prima facie showing of jurisdiction." *Ehrenfold v. Mahfaouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (reversing denial of jurisdictional discovery as premature "prior to allowing discovery on plaintiff's insufficiently developed allegations regarding the relationship between [the foreign parent] and its subsidiary").

The Trustee's allegations at a minimum make a sufficient start toward establishing personal jurisdiction over each Defendant. At the very least, each Defendant participated in YHA through

54

officers and/or professors who served as YHA members and participated in meetings, deliberating on, voting on, and effectuating grant requests to benefit their respective universities. *See supra,* p. 13-21. There is no Defendant as to whom the Trustee has not alleged at least a question of fact as to jurisdiction. *See Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 185 F. Supp. 2d 335, 339 (S.D.N.Y. 2002) (holding that jurisdictional discovery is appropriate on issues of fact concerning ratification when determining subject matter and personal jurisdiction) (collecting cases). And agency is a classic question of fact that goes to the merits as well as jurisdiction and is seldom resolved at the motion to dismiss stage. *See Dorchester*, 722 F.3d at 87 (holding that if the jurisdictional issue overlaps with the merits, "then the [District] Court must leave the jurisdictional issue for the trial;" however, the "[District] Court may also deem it appropriate to make a preliminary finding on jurisdictional facts, subject to revision later in the proceedings or at trial").

Moreover, although the facts relevant to jurisdictional analysis are almost exclusively in Defendants' control, Defendants' slew of declarations in opposition to jurisdiction raise more questions than they answer concerning the agency relationship between the YHA members and Defendants. *See, e.g.*, *Magnify*, 2012 WL 2254995, at *8-9 (granting jurisdictional discovery where defendant's affidavit raised "questions that must be resolved in order to determine whether personal jurisdiction exists"); *Wafios Machinery Corp. v. Nucoil Indus. Co.*, No. 03 Civ. 9865(RWS), 2004 WL 1627168, at *5 (S.D.N.Y. July 21, 2004) (same).

Of note, Defendants did not submit declarations from YHA members Henri Atlan, Ilan Chet, and Amnon Caspi. And with respect to the YHA members that did submit declarations, they uniformly sidestep the question of to what extent their involvement with YHA was within the scope of their employment with the Defendants. Similarly, the declarations from Defendants' legal

officers dodge the scope of the YHA members' relationship with the institutions and Defendants' knowledge of their activities with YHA, particularly as to Defendants' receipt of funding from YHA.[60] It would be inequitable to allow the Defendants to evade jurisdiction without allowing the Trustee to test the declarations through discovery and depositions.

Likewise, Defendants' declarations fail to address whether Green acted as an agent of Hebrew University, Weizmann, and BGU; they simply recite that board members "as such" are not generally authorized to act on behalf of the entities. Hebrew University, Weizmann, and BGU's failure to meaningfully address Green's role is especially noteworthy considering that: Green was involved with the creation of YHA; YHA was created to provide funding to the Defendants; and as a member of these Defendants' boards of governors, Green had knowledge of the institutions' finances. Defendants' governing documents, affixed to their declarations, do not address Green's unique and simultaneous roles with YHA and Defendants. It is Green's conduct that creates an agency relationship for jurisdictional purposes.

Discovery would address the issues for the relevant period omitted from Defendants' declarations such as: (1) the scope of the YHA members' relationship with Defendants; (2) Defendants' knowledge of the YHA members' activities within YHA; (3) any communications between Defendants and the YHA members concerning fundraising and funding received from YHA; and (4) funding Defendants received from YHA. In short, this case is far from one where jurisdictional discovery would amount to a "fishing expedition" or a plaintiff did not point to any particular facts that would aid in the exercise of jurisdiction.[61]

---

[60] Notably, accompanying the declarations are, *inter alia*, copies of the Defendants' governing documents, but no copies of the YHA members' employment contracts or any documents that would shine a light on the scope of the YHA members' relationship with the Defendants.

[61] *See* Mot. at 18, citing *Lear v. Royal Caribbean Cruises Ltd.*, 20-cv-4660-GHW, 2021 WL 1299489, at *12 (S.D.N.Y. Apr. 7, 2021) (rejecting jurisdictional discovery where the plaintiff's request was based "on nothing more than the bare assertion that 'nearly all of the information necessary to establish jurisdiction is squarely in the hands of Defendants'"); *Vista Food Exchange, Inc. v. Champion Foodservice, Inc.*, 124 F. Supp. 3d 301, 315 (S.D.N.Y. 2015)

## III.    THE TRUSTEE STATES A CLAIM FOR RECOVERY OF SUBSEQUENT TRANSFERS

To plead a subsequent transfer recovery claim under section 550(a) of the Bankruptcy Code, the Trustee must "plead that the initial transfer is avoidable and that the defendant is a subsequent transferee of that initial transfer." *BNP Paribas,* 594 B.R. at 195 (quoting *Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016)); *see Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 31, 35-36 (S.D.N.Y. 2013) ("Consolidated 550 Ruling"). Regarding the second prong, the Trustee must allege facts that support the inference "that the funds at issue originated with the debtor" and contain the "necessary vital statistics—the who, when, and how much—" of the purported transfers. *BNP Paribas,* 594 B.R. at 195 (quoting *Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007)).

Defendants do not challenge that the Trustee has pleaded both (1) that the initial transfers are avoidable, and (2) that they are subsequent transferees of those transfers. Those concessions should end the Court's inquiry. Defendants argue, however, that the Complaint fails to state a recovery claim because the Trustee first must have obtained a fully litigated judgment on the merits avoiding the initial transfers. Mot. at 32–36. Moreover, Defendants argue that if subsequent transferees are not parties to that avoidance action, they cannot be bound by such judgment, and the transfers will not be recoverable against them. Thus, under Defendants' argument, a trustee's only "solution" is to bring an avoidance action against all initial and subsequent transferees within two years of the commencement of the bankruptcy case (even, presumably, if the trustee does not yet know who the subsequent transferees are) and obtain a judgment of avoidance.

---

(denying jurisdictional discovery based on a theory already rejected by the court and the plaintiff's failure to demonstrate a need for it).

Not surprisingly, the Defendants' interpretation has been rejected by the overwhelming weight of authority and, dispositively, the law of this case. Their interpretation is further contradicted by the separate avoidance and recovery schemes of the Bankruptcy Code, as well as the provisions of SIPA.[62]

### A.    The Trustee May Recover from Subsequent Transferees Under Section 550(a) by Alleging that the Initial Transfers Are Avoidable.

The Defendants invoke the "plain text" of section 550 to argue that the clause "to the extent a transfer is avoided" prevents the Trustee from recovering transfers from them without first obtaining a final, adjudicated judgment of avoidance. Mot. at 31–36. But other subsequent transferee defendants, including in this SIPA proceeding, have made this argument (or similar variations) and failed.

Within the BLMIS liquidation, the District Court and this Court have adopted the majority view that a trustee need not obtain a judgment avoiding an initial transfer prior to pursuing and recovering from a subsequent transferee. *See* Consolidated 550 Ruling, 501 B.R. at 37 (holding that language of section 550 addressing recovery "to the extent a transfer is avoided" requires only that the trustee show that a transfer is avoidable and does not require an actual judgment of avoidance); *Multi-Strategy*, at 13 (concluding that the Trustee need only allege avoidability in order to pursue subsequent transferee); *Banque Syz* at 12-13 (same); *Fairfield Inv. Fund Ltd.*, 2021 WL 3477479, at *3 (stating that recovery of a fraudulent or preferential transfer of property from a subsequent transferee requires the Trustee to show that the initial transfer of that property by the debtor is *subject to avoidance* under one of the Bankruptcy Code's avoidance provisions); *Sec.*

---

[62] The Defendants compound these errors by urging the Court to decide that a consent judgment cannot form the basis for avoidance of initial transfers. Mot. at 36-40. To be clear, the Trustee is not seeking to apply the YHA consent judgment offensively against the Defendants. Consistent with due process, the Defendants may challenge whether the initial transfers to YHA are subject to avoidance at later stages of this litigation. *See BLI*, 480 B.R. at 522 (collecting cases).

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB), 563 B.R. 737, 753 (Bankr. S.D.N.Y. 2017) (rejecting argument that subsequent transfer claims must be dismissed because Trustee did not avoid and recover initial transfers from initial transferee before doing so); *BLI*, 480 B.R. at 522 (construing section 550 to require only avoidability in order to pursue subsequent transferee).

These decisions are consistent with nearly every court to have considered the issue. *See, e.g., In re AVI, Inc.*, 389 B.R. 721, 735-36 (B.A.P. 9th Cir. 2008) (finding that settlement where initial transfer was not "actually avoided" did not preclude recovery from subsequent transferees under section 550(a)); *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 706 (11th Cir. 2005) ("[O]nce the plaintiff proves that an avoidable transfer exists he can then skip over the initial transferee and recover from those next in line"); *Geltzer v. Salzman, (In re ContinuityX, Inc.)*, 582 B.R. 124, 136 (Bankr. S.D.N.Y. 2018) (allowing trustee to pursue recovery from subsequent transferee where it would have been impractical, if not impossible, to obtain a judgment of avoidance against initial transferee).[63]

Defendants' recycled statutory interpretation arguments urging a strict "plain text" reading have been rejected in this SIPA proceeding and other bankruptcy cases based on the same or similar rationales. Courts recognize that the clause "to the extent a transfer is avoided" in section 550(a) is ambiguous, and that it must be interpreted flexibly and in light of the framework of the Bankruptcy Code's avoidance and recovery provisions. *See* Consolidated 550 Ruling, 501 B.R. at 31-32; *BLI*, 480 B.R. at 521-22 (rejecting strict construction and reviewing in context of statutory

---

[63] Numerous courts have held likewise. *See, e.g., Anderson v. Bajaj (In re Med. Mgmt. Grp., LLC)*, 534 B.R. 646, 653 (Bankr. D.S.C. 2015); *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 786 (Bankr. N.D. Ill 2007); *Official Comm. Of Unsecured Creditors, v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 638-39 (Bankr. D.N.H. 2007); *Leonard v. Optimal Payments, Ltd. (In re Nat'l Audit Defense Network Inc.)*, 332 B.R. 896, 915 (Bankr. D. Nev. 2005); *Crafts Plus+, Inc. v. Foothill Capital Corp., (In re Crafts Plus+, Inc.)*, 220 B.R. 331, 334-38 (Bankr. W.D. Tex. 1998); *but see Weinman v. Simons (In re Slack-Horner Foundries Co.)*, 971 F.2d 577, 580 (10th Cir. 1992).

framework as a whole to avoid absurd results); *AVI*, 389 B.R. at 733-35 (same). As a result, the

"extent a transfer is avoided" clause in section 550 has been interpreted to establish a limitation on

the amount of recovery, not a "temporal limitation requiring prior avoidance." Consolidated 550

Ruling, 501 B.R. at 31-32 (citing cases and legislative history). In other words, the statute

recognizes that transfers may be partially avoidable, and only the avoidable portion of the transfer

may ultimately be recovered.[64] *See id.* at 31-32, 34*; AVI, 389 B.R. at 733; Kendall v. Sorani (In re*

*Richmond Produce Co.)*, 195 B.R. 455, 463 (N.D. Cal. 1996).

Moreover, Defendants' impractical interpretation of section 550(a) is contrary to Congress'

intent, conflates avoidance and recovery, and has been described as nonsensical. *See, e.g.*, *AVI*,

389 B.R. at 735 ("[W]e conclude that Congress intended avoidance as one remedy and recovery

as another. Thus, we hold that a trustee is not required to avoid the initial transfer from the initial

transferee before seeking recovery from subsequent transferees under section 550(a)(2)"). Rigidly

interpreting section 550(a) also would adversely impact settlements with initial transferees. To

require a formal judgment of avoidance would leave "little incentive to partially settle avoidance

actions, thereby running up the costs of litigation and causing further delay. Congress could not

have contemplated this outcome in enacting section 550." *Id.*; *see BLI*, 480 B.R. at 521-22 ("To

avoid such an impractical result [from forcing the Trustee to choose between burdensome litigation

with an insolvent initial transferee on the one hand and forfeiting the right to recover from

subsequent transferees on the other], the Court construes Section 550 flexibly to require only

---

[64] Footnote 22 of Defendants' Motion references section 349(b)(1)(B) as another basis for reading "avoided" in section 550 as a present state. This is just a variation on the argument raised and rejected by the District Court with respect to the different forms of "avoid" and section 502 of the Bankruptcy Code. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. at 32-33. Moreover, the automatic remedial nature of section 349(b)(1)(B) addresses a different issue by eliminating the burden on a transferee to reverse an already-avoided transfer based on the dismissal of a debtor's case. *See In re Cnty. of Orange*, 183 B.R. 594, 609 (Bankr. C.D. Cal. 1995) (citing to the legislative history and stating that objective of the section is to "restore all property rights to the position they occupied at the commencement of the case.").

*avoidability* to pursue recovery from BLI.") (emphasis added); *ContinuityX,* 582 B.R. at 133-36

(discussing and agreeing with avoidability rationale to preclude nonsensical results).

A corollary argument of the Defendants is that because a "prior judgment of avoidance" is

an element of a section 550 claim, a trustee therefore must include an avoidance claim within every

subsequent transfer action, thereby making such actions subject to the time limitations of section

546(a) for avoiding initial transfers. *See* Mot. at 40. That argument too conflates the concepts of

avoidance and recovery and has been rejected by the same courts. A trustee need only timely bring

an avoidance action to avoid initial transfers within the two-year period set forth in section 546(a),

which the Trustee in fact did. *See* Consolidated 550 Ruling, 501 B.R. at 34-36 (rejecting argument

that subsequent transferee action must be dismissed if Trustee failed either to obtain a judgment

against the relevant subsequent transferee avoiding the initial transfer, or to assert within 546(a)

time period an avoidance claim against the subsequent transferee to avoid the initial transfer); *BLI,*

480 B.R. at 520 (holding that trustee may recover from subsequent transferee under section 550

because he timely filed a complaint against initial transferee alleging the initial transfers are

"avoidable"). And a recovery action against a subsequent transferee need only be commenced

within one year of settlement or avoidance of the initial transfers. *See* 11 U.S.C. 550(f); *BLI*, 480

B.R. at 522; *ContinuityX*, 582 B.R. at 136. The Trustee did so here.

### B.    Under Law of the Case, A Prior Judgment of Avoidance Is Not An Element of a Section 550 Claim.

Despite protests to the contrary, the Consolidated 550 Ruling, *Multi-Strategy*, *Banque Syz,*

*BLI* and *Fairfield* are law of the case, and Defendants are bound by them. The "law of the case"

doctrine provides that when prior decisions in an ongoing case "either expressly resolved an issue

or necessarily resolved it by implication," that "'rule of law . . . should continue to govern in

subsequent stages of the same case.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir.

2001) (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 165 n.5 (2d Cir. 2000), *cert,*

*denied*, 532 U.S. 920, 121 S. Ct. 1356, 149 L.Ed.2d 286 (2001)).

In a SIPA liquidation proceeding, the doctrine applies across different adversary

proceedings arising from the same SIPA liquidation proceeding. *In re Bernard L. Madoff Inv. Sec.*

*LLC*, No. 1:21-cv-02334-CM, 2022 WL 493734, at *12 (S.D.N.Y. Feb. 17, 2022) (collecting

cases). As discussed above, because this Court and the District Court previously have decided as

a matter of law that a prior judgment of avoidance is not an element of a section 550 recovery

claim, the Court should reject the Defendants' invitation to revisit prior decisions under the law of

the BLMIS SIPA liquidation proceeding.

### C.    The Second Circuit Did Not Overrule the Decisions in this Case, Nor Do Citations to Inapposite Decisions Assist Defendants' Interpretation.

None of the decisions the Defendants cite—including decisions by the Second Circuit—

address, much less support, the argument that a prior judgment of avoidance is a prerequisite to a

recovery claim. Neither *Merit Management Group, LP v. FTI Consulting, Inc.,* 138 S. Ct. 883

(2018), nor *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC),* 12 F.4th 171 (2d

Cir. 2021), concern the interpretation of section 550(a); rather, the language in those decisions

relied on by Defendants consists of recitation of the language of the statute in deciding issues not

relevant to the Defendants' motion. In *Merit*, the Supreme Court considered the proper scope of

the section 546(e) safe harbor to the avoidance of initial transfers. 138 S. Ct. at 892. In parsing the

statutory language of the safe harbor, the Supreme Court mentions section 550(a) in passing and

only to explain the structure of the Bankruptcy Code's avoidance and recovery provisions. *Id.* at

889. That fleeting reference provides no insight concerning the specific issue before this Court.

Like in *Merit*, the Second Circuit in *Citibank* only refers to section 550(a) to generally

explain the concepts of avoidance and recovery under the Bankruptcy Code, and on the unrelated

issues of whether section 550(b) is an affirmative defense and the appropriate pleading standard

for this defense. 12 F.4th at 181, 197. Defendants' argument appears to be that by referencing the

avoidance and recovery concepts in its decision, the Second Circuit also intended to gratuitously

reverse Judge Rakoff's separate opinion in the Consolidated 550 Ruling, in which he withdrew

and resolved the specific issue of whether to recover a subsequent transfer the Trustee must litigate

the "avoidance" of an initial transfer or need merely allege it is avoidable. Defendants provide no

support either for this implausible suggestion, or their interpretive argument.

The other authorities cited by the Defendants are similarly unavailing. *See* Mot. at 32–36.

For example, in *Geron v. Craig (In re Direct Access Partners, LLC)*, the court held that the trustee

was not able to avoid the initial transfer due to the applicable state statute of limitations and thus

was unable to use Section 550 to recover against subsequent transferees. 602 B.R. 495, 518 (Bankr.

S.D.N.Y. 2019*); see also In re Picard*, 917 F.3d 85 (2d Cir. 2019) (holding that presumption

against extraterritoriality and international comity do not prevent the Trustee from recovering

transfers under section 550(a)(2)); *Harrah's Atl. City. Operating Co. v. Lamonica (In re JVJ*

*Pharmacy, Inc.),* 630 B.R. 388 (S.D.N.Y. 2021) (vacating summary judgment on constructive

fraudulent transfer claim under section 548(a)(1) and remanding to determine defendant's potential

status as an initial or subsequent transferee).[65] Finally, contrary to the Defendants' suggestion,

none of the cases cited by the Defendants require a trustee to avoid initial transfers as against a

---

[65] The Defendants in fact cite decisions that undermine their argument. *See* Mot. at 32 (citing *In re M. Fabrikant &*
*Sons, Inc.*, 394 B.R. 721 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) (declining to adopt the majority or minority view on
whether section 550(a) requires a prior judgment of avoidance and stating that a trustee can always settle with an
initial transferee so long as he demonstrates that the initial transfer is subject to avoidance in an action against the
subsequent transferee)) and Mot. at 39 (citing *In re Jones Storage & Moving, Inc.*, 2005 WL 2590385, at *5-*7 (Bankr.
D. Kan. Apr. 14, 2005) (observing that to recover under section 550, trustee must establish that transfer was *avoidable*,
but dismissed recovery action where trustee failed to file a timely action to avoid initial transfers and was precluded
from using a consent judgment obtained through that untimely action to establish avoidability as against a different
party)). With respect to *Fabrikant,* Judge Bernstein's own subsequent decision in *BNP Paribas,* 594 B.R. at 195,
makes clear that the Trustee need only plead that the initial transfer is "avoidable."

subsequent transferee within the statutory period set forth in section 546(a) for commencing an action to avoid initial transfers.

        **D.**      **SIPA Authorizes the Trustee to Recover "Void or Voidable" Transfers Under the Bankruptcy Code.**

Defendants are incorrect on their interpretation of the Bankruptcy Code. Even if they were not incorrect, their interpretation would still be barred. To the extent consistent with SIPA, a SIPA liquidation proceeding must be conducted "in accordance with" and "as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." SIPA § 78fff(b). SIPA incorporates applicable sections of the Bankruptcy Code only to the extent they are consistent with SIPA. *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 199 (2d Cir. 2020).

SIPA contemplates the satisfaction of customer claims, liquidation of the debtor's business, and satisfaction of claims filed by general creditors. *See* SIPA §§ 78fff(a)(4), 78fff-2(a)(3). To accomplish these goals, SIPA provides a SIPA trustee with the same powers as a chapter 7 bankruptcy trustee, *see, e.g.*, *In re Lloyd Sec., Inc.*, 75 F.3d 853, 858 (3d Cir. 1996), and additional powers that enable him to perform the special functions of a SIPA liquidation proceeding. *See* SIPA § 78fff-1(a) (a SIPA trustee is "vested with the same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under title 11."). These powers include the power to avoid and recover transfers of "customer property." *See* SIPA §§ 78fff-1(a), 78fff-2(c)(3); *Gettinger*, 976 F.3d at 199 ("A trustee therefore can invoke the fraudulent transfer provisions in the Bankruptcy Code to recover customer property."). Customer property includes property that was received, acquired, or held by the broker-dealer for the accounts of customers and that has been unlawfully converted. SIPA § 78*lll*(4). For purposes of avoidance and recovery, customer property is deemed to be property of the debtor. *See* SIPA § 78fff-2(c)(3).

Defendants' misinterpretation of the Code would create a conflict with SIPA, in which case

SIPA would govern, and SIPA's language mandates an avoidability standard. SIPA permits the

Trustee to recover transfers of customer property where (1) "customer property is not sufficient to

pay in full" all customer claims as set forth in SIPA § 78fff- 2(c)(1)(A)–(D), and (2) to the extent

that the transfers are "*voidable* or *void* under the provisions of title 11." SIPA § 78fff-2(c)(3)

(emphasis added). SIPA § 78fff-2(c)(3) expressly authorizes the Trustee to recover "*voidable*"

transfers of customer property. That provision of SIPA controls even if it were deemed inconsistent

with the Bankruptcy Code. *See, e.g.*, *Gettinger*, 976 F.3d at 199 (precluding defendants from

invoking a defense under Section 548(c) of the Bankruptcy Code because it conflicts with SIPA).

However, when viewed properly, SIPA merely restates the requirements for recovery under

Section 550.

**CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendants' Motion.

Dated: June 15, 2022                           Respectfully submitted,
     New York, New York

                                      /s/ *Tracy L. Cole*
                                      Baker & Hostetler LLP
                                      45 Rockefeller Plaza
  New York, New York
  Tel.: (212) 589-4200
  Fax: (212) 589-4201
  David J. Sheehan
  Email: dsheehan@bakerlaw.com
  Tracy L. Cole
  Email: tcole@bakerlaw.com
  Fernando A. Bohorquez, Jr.
  Email: fbohorquez@bakerlaw.com
  Keith R. Murphy
  Email: kmurphy@bakerlaw.com
  Ganesh Krishna
  Email: gkrishna@bakerlaw.com

Michelle N. Tanney
Email: mtanney@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and Chapter 7
Estate of Bernard L. Madoff*