**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-04285 (CGM) |
| Plaintiff, | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT** |
| UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, PATRICK LITTAYE, CLAUDINE MAGON DE LA | |

VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) in her capacity as Executrix under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) individually as the sole beneficiary under the Will of THIERRY MAGON DE LA VILLEHUCHET) (a/k/a RENE THIERRY DE LA VILLEHUCHET), PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICAV as represented by its Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA AND PAUL LAPLUME, in their capacities as liquidators and representatives of LUXALPHA, and GROUPEMENT FINANCIER LTD.,

Defendants.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................6

I.      THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS............6

    A.      AIA LTD., AML, AND AP (LUX) ARE SUBJECT TO THIS COURT'S
        JURISDICTION AS MERE DEPARTMENTS OR AGENTS OF AIA
        LLC AND AIA INC. ........................................................................................9

        1.      The Trustee's Allegations Concerning AIA Ltd., AML, and AP
            (Lux) Show That They Are Mere Departments, and/or Agents of
            Access New York ....................................................................................11

        2.      Access Operated as a Single Business Enterprise From AIA LLC's
            and AIA Inc.'s New York Office................................................................12

        3.      Access Disregarded Corporate Formalities .............................................14

    B.      THE TRUSTEE PLEADS SUFFICIENT MINIMUM CONTACTS FOR
        SPECIFIC JURISDICTION OVER EACH DEFENDANT.................................17

        1.      Littaye's Contacts With BLMIS and Access New York Establish
            Minimum Contacts...................................................................................18

        2.      AIA Ltd., AML, and AP (Lux) Are Each Subject to Specific
            Jurisdiction Because They Directed Investment Into BLMIS in
            New York ................................................................................................22

             a.      AIA Ltd. .....................................................................................22

            b.      AML...........................................................................................23

            c.      AP (Lux) ....................................................................................24

        3.      Delandmeter Is Subject to Jurisdiction Because He Undertook
            Numerous Actions Directed at New York ..................................................24

             a.      Delandmeter Directed His Actions at New York in
                 Furtherance of Luxalpha's BLMIS-Related Business ..................25

            b.      Delandmeter Directed His Actions at New York in
                 Furtherance of Access's BLMIS-Related Business.......................29

i

c.    Luxembourg Law on Legal Advisors Has No Bearing on This Court's Jurisdiction Over Delandmeter ...............................30

d.    Delandmeter Filed Suit Against the Trustee in Luxembourg Which Subjects Him to This Court's Jurisdiction ........................31

4.    UBS AG's, UBSFSL's, and UBSTPM's Operations and Roles as Service Providers to Multiple BLMIS Feeder Funds, Including Luxalpha and Groupement, Subject Them to this Court's Jurisdiction ...............................................................................32

a.    UBS AG .........................................................................33

b.    UBSFSL .........................................................................34

c.    UBSTPM .........................................................................36

C.    THE TRUSTEE'S CLAIMS AGAINST THE PJ DEFENDANTS ARISE OUT OF THEIR CONTACTS WITH NEW YORK AND THE TRUSTEE DOES NOT NEED TO SHOW PROXIMATE CAUSE ...................38

D.    THE PJ DEFENDANTS WAIVED THE DEFENSE OF PERSONAL JURISDICTION BY PARTICIPATING IN THIS PROCEEDING AND RELATED PROCEEDINGS..............................................................................40

E.    THE TRUSTEE'S ALLEGATIONS ARE NOT CONCLUSORY ......................43

F.    THE EXERCISE OF PERSONAL JURISDICTION IS REASONABLE...........44

G.    AT MINIMUM THE TRUSTEE IS ENTITLED TO JURISDICTIONAL DISCOVERY...............................................................................................46

II.    THE TRUSTEE'S CLAIM AGAINST THE DEFENDANTS UNDER SECTION 550 SHOULD NOT BE DISMISSED ..............................................................48

A.    LEGAL STANDARD...............................................................................48

B.    SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY FROM THE DEFENDANTS...........................................................49

1.    The Majority of the Defendants' Arguments Concerning 546(e) Are Irrelevant or Beyond the Pleadings......................................49

2.    The SAC Plausibly Pleads That the Fund Defendants Had Actual Knowledge That No Securities Were Being Traded.................................52

C.    THE TRUSTEE HAS ADEQUATELY ALLEGED ACTUAL FRAUDULENT INTENT UNDER SECTION 548(A)(1)(A) .............................56

ii

D.    THE TRUSTEE HAS PLAUSIBLY PLEADED THAT HE CAN
RECOVER THE SUBSEQUENT TRANSFERS FROM THE
DEFENDANTS ........................................................................................60

1.    The SAC Pleads That the Defendants Received BLMIS Customer
Property Under Section 550(a) of the Bankruptcy Code ..........................61

2.    The Defendants Misstate the Trustee's Pleading Burden .........................61

3.    Further Details of the Subsequent Transfers Must Come From the
Defendants' Books and Records .................................................................64

4.    The Trustee Need Not Tie Each Subsequent Transfer to an Initial
Transfer ......................................................................................................65

5.    The Trustee Must Sufficiently Plead Some of the Transfers .....................66

6.    The Defendants' Tracing Arguments Fail on a Motion to Dismiss...........67

7.    The Trustee May Recover Subsequent Transfers Paid Out as
Compensation Where the Subsequent Transferee Was Not Acting
in Good Faith or the Transfer Was Not for Value .....................................69

E.    THE SAC DOES NOT ESTABLISH THE DEFENDANTS'
AFFIRMATIVE DEFENSES UNDER SECTION 550(b) ..................................70

1.    The SAC Does Not Establish Section 550(b)'s Good Faith
Requirement ...............................................................................................71

2.    The SAC Does Not Establish Section 550(b)'s Value Requirement .........74

3.    The SAC Does Not Establish Section 550(b)'s Lack of Knowledge
Requirement ...............................................................................................74

III.    THE TRUSTEE HAS NOT IMPROPERLY "GROUP PLEADED" ...............................75

CONCLUSION .................................................................................................................77

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) .......................................................................53, 61, 65

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996) ................................................................................................8

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 346 (S.D.N.Y. 2005) ............................................................................20

*Amsellem v. Host Marriot Corp.*,
    280 A.D.2d 357 (N.Y. App. Div. 2001) .........................................................................46

*Anderson News L.L.C. v. Am. Media Inc.*,
    680 F.3d 162 (2d Cir. 2012) ...........................................................................................48

*Andros Compania Maritima, S.A. v. Intertanker Ltd.*,
    718 F. Supp. 1215 (S.D.N.Y. 1989) ...............................................................................41

*Armstrong v. Collins*,
    No. 01-cv-2437, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ....................................57

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................................48

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ............................................................................25

*Ayyash v. Bank Al-Madina*,
    No. 04 Civ. 9201 (GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ...........................46

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    No. 87-CV-191, 1989 WL 87418 (N.D.N.Y. July 31, 1989) .........................................11

*In re Bayou Grp., LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) .......................................................................................57

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
    397 B.R. 1 (S.D.N.Y. 2007) ...............................................................................58, 59, 60

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................48, 60, 61

*In re Bernard L. Madoff Inv. Sec. LLC*,
  12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
  142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022) ............................................................56, 58, 70, 71

*In re Bernard L. Madoff Inv. Sec. LLC*,
  976 F.3d 184 (2d Cir. 2020), *cert. denied sub nom. Gettinger v. Picard*, 141 S.
  Ct. 2603, 209 L. Ed. 2d 736 (2021) ................................................................................57

*In re Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Estate of Seymour Eptstein*),
  No. 1:21-CV-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) .....................53, 57, 58

*In re Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Ida Fishman Recoverable
  Trust*),
  773 F.3d 411 (2d Cir. 2014).........................................................................................49, 50

*In re Bernard L. Madoff Investment Securities LLC*,
  20-cv-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ...........................................70

*Bickerton v. Bozel S.A.* (*In re Bozel S.A.*),
  434 B.R. 86 (Bankr. S.D.N.Y. 2010) ..................................................................................25

*In re BLMIS, LLC*,
  445 B.R. 206 (Bankr. S.D.N.Y. 2011)..................................................................................64

*Bryant Park Capital, Inc. v. Jelco Ventures*,
  No. 05 Civ. 8702 (GEL), 2005 WL 3466013 (S.D.N.Y. Dec. 16, 2005) ...............................42

*Bulova Watch Co. v. Hattori & Co.*,
  508 F. Supp. 1322 (E.D.N.Y. 1981) .............................................................................12, 14

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985).............................................................................................8, 38, 45

*Burlington Indus., Inc. v. Salem Int'l Co.*,
  645 F. Supp. 872 (S.D.N.Y. 1986) ...............................................................................20, 25

*Cargo Partner AG v. Albatrans, Inc.*,
  352 F.3d 41 (2d Cir. 2003)...............................................................................................48

*Charas v. Sand Tech. Sys. Int'l, Inc.*,
  No. 90-civ-5638(JFK), 1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ....................................25

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010)...........................................................................................7, 45

*Cohen v. UBS Fin. Servs., Inc.*,
  No. 12-CV-02147, 2014 WL 240324 (S.D.N.Y. Jan. 22, 2014) ...........................................59

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)...........................................................................7, 33, 35

*In re Deak & Co., Inc.*,
   63 B.R. 422 (Bankr. S.D.N.Y. 1986) .....................................................................................41

*Dep't of Econ. Dev. v. Arthur Andersen & Co.*,
   747 F. Supp. 922 (S.D.N.Y. 1990) ........................................................................................27

*In re Direct Access Partners, LLC*,
   602 B.R. 495 (S.D.N.Y. 2019)...............................................................................................70

*DiVittorio v. Equidyn Extractive Indus., Inc.*,
   822 F.2d 1242 (2d Cir. 1987)................................................................................................75

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013).....................................................................................................7

*Dorfman v. Marriott Int'l Hotels, Inc.*,
   No. 99 CIV 10496 (CSH), 2002 WL 14363 (S.D.N.Y. Jan. 3, 2002) .........................12, 17, 37

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...............................................................................58, 59

*Drenis v. Haligiannis*,
   452 F. Supp. 2d 418 (S.D.N.Y. 2006)...................................................................................58

*Duravest, Inc. v. Viscardi, A.G.*,
   581 F. Supp. 2d 628 (S.D.N.Y. 2008)...................................................................................27

*In re Enron Corp.*,
   No. 01-16034 AJG, 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ...........................61

*Erick Van Egeraat Associated Architects B.V. v. NBBJ LLC*,
   No. 08 CIV. 7873 (JSR), 2009 WL 1209020 (S.D.N.Y. Apr. 29, 2009)....................14, 16, 17

*ESI, Inc. v. Coastal Corp.*,
   61 F. Supp. 2d 35 (S.D.N.Y. 1999) ........................................................................................8

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   397 F. Supp. 3d 323 (S.D.N.Y. 2019).......................................................................18, 19, 34

*In re Fairfield Sentry Ltd.*,
   10-13164 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020),
   *reconsideration denied*, 10-13164 (SMB), 2021 WL 771677 (Bankr. S.D.N.Y.
   Feb. 23, 2021) ....................................................................................................................49

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
   26 N.Y.2d 280 (1970) ............................................................21

*Finn v. All. Bank*,
   860 N.W.2d 638 (Minn. 2015)................................................59

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S.Ct. 1017 (2021)............................................................39

*Fox v. Picard (In re BLMIS)*,
   No. 10 Civ. 4652 (JGK), 2012 WL 99089 (S.D.N.Y. Mar. 26, 2012) ...................31

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   No. 16 CIV. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)........................75, 76

*Gates v. Pinnacle Commc'ns Corp.*,
   623 F. Supp. 38 (S.D.N.Y. 1985) ............................................30

*Gelfand v. Tanner Motor Tours, Ltd.*,
   385 F.2d 116 (2d Cir. 1967)....................................................12

*In re Geltzer*,
   502 B.R. 760 (Bankr. S.D.N.Y. 2013)......................................69

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)................................................................39

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
   Adv. Pro. No. 10-03493 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3,
   2014) .....................................................................................69

*Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*,
   957 F.2d 1575 (11th Cir. 1992) ..............................................59

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
   310 B.R. 500 (Bankr. S.D.N.Y. 2002)....................................58

*Hamilton v. Atlas Turner, Inc.*,
   197 F.3d 58 (2d. Cir. 1999)....................................................41

*Herbst Gaming, Inc. v. Insurcorp. (In re Zante, Inc.)*,
   No. 10-cv-00231 (RCJ) (RAM), 2010 WL 5477768 (D. Nev. Dec. 29, 2010) ......................41

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)..................................................................8

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011)......................................48

*Johnson v. Holder*,
  564 F.3d 95 (2d Cir. 2009).............................................................................59

*JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.*,
  No. 08 Civ. 2154 (VM), 2011 WL 1796298 (S.D.N.Y. Apr. 22, 2011)................................41

*Kelley v. Westford Special Situations Master Fund, L.P.*,
  No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ............................................66

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
  712 F. Supp. 2d 104 (S.D.N.Y. 2010).................................................................11

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16,
  2009) ......................................................................................................46

*Kucher v. Domino's Pizza, Inc.*,
  No. 16-CV-02492 (AJN), 2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017)................................47

*LaMonica v. North of England Protecting and Indem. Assoc. Ltd. (In re Probulk
  Inc.)*,
  407 B.R. 56 (S.D.N.Y. 2009)..........................................................................31

*Landau v. New Horizon Partners, Inc*,
  No. 02 CIV 6802 (JGK), 2003 WL 22097989 (S.D.N.Y. Sept. 8, 2003)..............................40

*In re Levant Line, S.A.*,
  166 B.R. 221 (Bankr. S.D.N.Y. 1994) ...............................................................11

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
  260 B.R. 343 (Bankr. W.D.N.Y. 2001) .............................................................59

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020)............................................................................48

*Mayatextil, S.A. v. Liztex U.S.A., Inc.*,
  No. 92 Civ. 4528 (SS), 1995 WL 131774 (S.D.N.Y. Mar. 23, 1995) .............................11

*McGee v. Int'l Life Ins. Co.*,
  335 U.S. 220 (1957)....................................................................................8

*McKee Elec. Co. v. Rauland-Borg Corp.*,
  20 N.Y.2d 377 (1967) ................................................................................30

*Metro. Life. Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)............................................................................8

*Miller v. Calotychos*,
303 F. Supp. 2d 420 (S.D.N.Y. 2004) ...................................................................25

*In re Motors Liquidation Co.*,
590 B.R. 39 (S.D.N.Y. 2018) ...............................................................................53

*Motown Record Co., L.P. v. iMesh.com, Inc.*,
No. 03 Civ. 7339 (PKC), 2004 WL 503720 (S.D.N.Y. Mar. 12, 2004) ...........17, 43

*In re Nat'l Audit Def. Network*,
332 B.R. 896 (Bankr. D. Nev. 2005) .....................................................................16

*Ontel Products, Inc. v. Project Strategies, Co.*,
899 F. Supp. 1144 (S.D.N.Y. 1995) ......................................................................21

*Palmieri v. Estefan*,
793 F. Supp. 1182 (S.D.N.Y. 1992) ...........................................................11, 12, 37

*Pandeosingh v. Am. Med. Response, Inc.*,
No. 09-CV-5143 (FB) (RER), 2014 WL 12827988 (E.D.N.Y. Apr. 30, 2014) .....................11

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 449 (S.D.N.Y.) ............................................................................20

*Picard v. Avellino*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016) .....................................................................52

*Picard v. Banque Syz (In re BLMIS)*
Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bank. S.D.N.Y. June 14,
2022) .................................................................................................... *passim*

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ..............................................................45, 74

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) .....................................................................7

*Picard v. Ceretti, et al.*,
No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .........52

*Picard v. Chais (In re BLMIS)*,
440 B.R. 274 (Bankr. S.D.N.Y. 2010) ..............................................................36, 39

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
No. 10-04398 (BRL), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012) .....................61, 68

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
418 B.R. 75 (Bankr. S.D.N.Y. 2009) ..............................................................39, 41

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................49, 61, 64

*Picard v. Estate (Succession) of Igoin (In re BLMIS)*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ...................................................................................57

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
   627 B.R. 546 (Bankr. S.D.N.Y. 2021) ..........................................................................7, 8, 39

*Picard v. Fairfield Pagma Assocs., LP*,
   Adv. Pro. No. 10-05169, 2022 WL 1110560 (Bankr. S.D.N.Y. Apr. 13, 2022) ...................57

*Picard v. Gerald & Barbara Keller Fam. Trust*,
   634 B.R. 39 (Bankr. S.D.N.Y. 2021) ...................................................................................57

*Picard v. Goldenberg*,
   Adv. Pro. No. 10-04946, 2018 WL 3078149 (Bankr. S.D.N.Y. June 20, 2018) ...................52

*Picard v. JABA Assocs. LP*,
   528 F. Supp. 3d 219 (S.D.N.Y. 2021) .............................................................................57, 60

*Picard v. Ken-Wen Fam. Ltd. P'ship*,
   Adv. Pro. No. 10-04468 (CGM), 638 B.R. 41 (Bankr. S.D.N.Y. 2022) ................................57

*Picard v. Legacy*,
   548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...................................................................................49

*Picard v. Lisa Beth Nissenbaum Trust*,
   No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ......................................57, 60

*Picard v. Magnify, Inc.*,
   583 B.R. 829 (Bankr. S.D.N.Y. 2018) ...................................................................................52

*Picard v. Maxam Absolute Return Fund, L.P.*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ........................................................................ *passim*

*Picard v. Mayer*,
   No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021) .......60, 63, 64, 75

*Picard v. Mendelow et al.*,
   560 B.R. 208 (Bankr. S.D.N.Y. Sept. 28, 2016)....................................................................52

*Picard v. Merkin*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ......................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
   581 B.R. 370 (Bankr. S.D.N.Y. 2017) .............................................................................66, 68

x

*Picard v. Miller*,
    631 B.R. 1 (Bankr. S.D.N.Y. 2021) .......................................................................53

*Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*)
    Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June
    13, 2022) ............................................................................................... *passim*

*Picard v. Nelson*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) .............................................................57, 60

*Picard v. Sage Realty*,
    No. 20-CV-10109 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) .........................57, 58

*Picard v. Shapiro*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) .............................................................52, 63

*Picard v. Square One Fund Ltd.*,
    Bench Ruling on Motion to Dismiss, Adv. Pro. No. 10-04330 (Bankr.
    S.D.N.Y. May 29, 2018) ...................................................................................52

*In re Picard*,
    917 F.3d (2d Cir. 2019).....................................................................................45

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)................................................................................48

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010).................................................................................7

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
    245 F. Supp. 2d 543 (S.D.N.Y. 2003)............................................................20, 25

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Fairfield Inv.
    Fund Ltd.*),
    No. 08-01789 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .............52, 53, 74

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..........................50, 51, 52, 53

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
    No. 03-CIV-2120 (LTS) (THK), 2006 WL 2034663 (S.D.N.Y. July 19, 2006) ....................27

*Sharp International Corp. v. State Street Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005)..................................................................................59

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994).................................................................................43

*Siegel v. Holson Co.*,
    768 F. Supp. 444 (S.D.N.Y. 1991) ......................................................30

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...........................................61, 62, 66

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006) ...............................................................38

*SPV Osus Ltd. v. AIA LLC*,
    No. 15-cv-619 (JSR), 2016 WL 3039192 (S.D.N.Y. May 26, 2016) ....................10, 11, 13, 18

*SPV Osus Ltd. v. UBS AG*,
    114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ...........................30

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) .........................................................7, 39, 40

*Tese-Milner v. De Beers Centenary A.G.*,
    613 F. Supp. 2d 404 (S.D.N.Y. 2009) ...................................................47

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
    916 F.3d 143 (2d Cir. 2019) .............................................................8, 39

*United States v. Henshaw*,
    388 F.3d 738 (10th Cir. 2004) ...........................................................68

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ............................................................59

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
    751 F.2d 117 (2d Cir. 1984) ..............................................................11

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ..............................................................44

*Winston & Strawn v. Dong Won Sec. Co.*,
    No. 02 Civ. 0193 (RWS), 2002 WL 31444625 (S.D.N.Y. Nov. 1, 2002) ...........................46

*Wiwa v. Royal Dutch Petrol. Co.*,
    226 F.3d 88 (2d Cir. 2000) ...............................................................12

## Statutes

11 U.S.C. § 362(a) ...........................................................................31

11 U.S.C. § 546(e) ..................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ...............................................................50, 56, 58, 59

11 U.S.C. § 550.................................................................................................5, 60, 69, 70

**Rules**

CPLR 301.................................................................................................................43

CPLR 302.......................................................................................................21, 38, 43

Fed. R. Bankr. P. 2004.........................................................................................47, 65

Fed. R. Bankr. P. 7004................................................................................................43

Fed. R. Civ. P. 8(a) ..............................................................................................48, 61

Fed. R. Civ. P. 9(b) ......................................................................................48, 49, 56, 60

Fed. R. Civ. P. 12 ...........................................................................6, 40, 41, 42, 43, 48

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
    1391 (3d ed. 2010) .............................................................................................42

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Access PJ Defendants | **Access Personal Jurisdiction Defendants**: AIA Ltd., AML, AP (Lux), and Littaye. |
| Access | **Access**: AIA LLC, AIA Ltd., AML, AP (Lux), Littaye, Villehuchet, Dumbauld, Delandmeter, and non-party AIA Inc. |
| AIA Inc. | **Access International Advisers, Inc.**: (New York) Former parent company of AIA LLC; dissolved entity. |
| AIA LLC | **Access International Advisors LLC**: (New York) Luxalpha's portfolio adviser; Groupement Financier's sponsor. |
| AIA Ltd. | **Access International Advisors Ltd.**: (Bahamas) Groupement's investment manager, operator, and investment adviser; Groupement Levered's official investment manager; Luxalpha's official consultant and exclusive introducing agent. |
| AML | **Access Management Luxembourg S.A. (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")**: (Luxembourg) Luxalpha's portfolio manager and portfolio adviser; Groupement's and Groupement Levered's investment adviser. |
| AP (Lux) | **Access Partners S.A. (Luxembourg)**: (Luxembourg) Luxalpha's investment adviser; Groupement's and Groupement Levered's adviser. |
| Delandmeter | **Pierre Delandmeter**: Director of AML, AP (Lux), and AIA, Inc., and Luxalpha; legal advisor to Luxalpha, Groupement, and Groupement Levered; advisor to Littaye, Villehuchet, and AIA Inc., AIA LLC, AIA Ltd., AML, and AP (Lux). |
| Dumbauld | **Theodore Dumbauld**: Chief Investment Officer, Partner, and Director of AIA LLC. |
| Fund Defendants | **Fund Defendants**: BLMIS Feeder Funds Luxalpha SICAV and Groupement Financier Ltd. |
| Groupement | **Groupement Financier Ltd.**: (BVI) BLMIS feeder fund. |
| Groupement Levered | **Groupement Financier Levered Ltd.**: (BVI) Investment fund that provided leveraged returns based on Groupement's returns. |
| Littaye | **Patrick Littaye**: Co-founder, co-owner, director, and executive of AIA Inc., AIA LLC, AIA Ltd., AML, and AP (Lux). |
| Luxalpha | **Luxalpha SICAV**: (Luxembourg) BLMIS feeder fund. |
| PJ Defendants | **Personal Jurisdiction Defendants**: Defendants Littaye, Delandmeter, UBS AG, UBSFSL, UBSTPM, AIA Ltd., AML, and AP (Lux), which moved to dismiss the Trustee's claims for lack of personal jurisdiction. |

| UBS | **UBS**: UBS AG, UBS SA, UBSFL, and UBSTPM. |
| UBS AG | **UBS AG**: (Switzerland) Parent company of the global UBS bank; Luxalpha's sponsor and promoter. |
| UBSFSL | **UBS Fund Services (Luxembourg) S.A.**: (Luxembourg) Wholly owned subsidiary of UBS AG; Luxalpha's and Groupement's administrator. |
| UBS PJ Defendants | **UBS Personal Jurisdiction Defendants**: UBS AG, UBSFSL, and UBSTPM, which moved to dismiss the Trustee's claims for lack of personal jurisdiction. |
| UBS SA | **UBS Europe SE (f/k/a UBS (Luxembourg) S.A.)**: (Germany) Wholly owned subsidiary of UBS AG; Luxalpha's portfolio manager; Groupement's prime bank; Groupement Levered's custody bank. |
| UBSTPM | **UBS Third Party Management Company S.A.**: (Luxembourg) Wholly owned subsidiary of UBS AG; Luxalpha's management company. |
| Villehuchet | **Thierry Magon de la Villehuchet**: Co-founder, co-owner, director, and executive of AIA Inc., AIA LLC, AIA Ltd., AML, and AP (Lux). |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa–*lll* ("SIPA") and the substantively consolidated chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, respectfully submits this

memorandum of law in opposition to the multiple motions to dismiss (the "Motions") the

Trustee's Second Amended Complaint brought by Defendants UBS AG, UBS Europe SE (f/k/a

UBS (Luxembourg) S.A.) ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL"),

UBS Third Party Management Company S.A. ("UBSTPM"); Access International Advisors LLC

("AIA LLC"), Access International Advisors Ltd. ("AIA Ltd."), Access Management

Luxembourg SA f/k/a Access International Advisors (Luxembourg) S.A. ("AML"), Access

Partners SA ("AP (Lux)"), Patrick Littaye, Claudine Magon de la Villehuchet, Groupement

Financier Ltd. ("Groupement"), Pierre Delandmeter, and Theodore Dumbauld.

## PRELIMINARY STATEMENT

The Second Amended Complaint details allegations from which this Court can plausibly

infer that the Defendants[1] acted together to direct investments to BLMIS in New York, and that

despite knowing of BLMIS's impossible trading activity and performance, they took deliberate

actions to protect Madoff. The force that drove these actions, Patrick Littaye and Thierry Magon

de la Villehuchet ("Villehuchet"), had a long and fruitful relationship with Madoff and BLMIS.

(Trustee's Second Amended Complaint, ECF No. 274 ("SAC") ¶ 109.) Littaye and Villehuchet's

company, Access, created numerous funds for investment with Madoff, including Luxalpha and

---

[1] The Trustee refers to the Defendants throughout this memorandum of law inclusive of Luxalpha SICAV ("Luxalpha") but notes that Luxalpha did not join in moving to dismiss. Through, use of the term, the Trustee is not intending to attribute any of the arguments made in the Motions to Luxalpha.

Groupement. (SAC ¶¶ 110, 112, 123.) Aligned with UBS[2] and in total control of Access,[3] Littaye

and Villehuchet channeled over two billion dollars into BLMIS through Luxalpha and

Groupement. (SAC ¶ 16.) As a result, the Defendants received millions of dollars in fees. But

unlike their clients' investment capital, which, as soon as it was transferred to BLMIS, was

vulnerable to the obvious fraud risk, their fees were not vulnerable to fraud. (SAC ¶¶ 15, 111.)

So long as the feeder funds had assets under management, the Defendants earned fees. These

facts, which the SAC details, meet the requisite actual knowledge standard that permits the

Trustee to avoid the initial transfers Luxalpha and Groupement received before December 10,

2006 and to recover that stolen Customer Property from the Defendants. The same facts

demonstrate that Luxalpha, Groupement, and the Defendants were on inquiry notice of Madoff's

fraud and are therefore liable for the value of stolen Customer Property transferred to them.

Access and UBS joined forces after another Access-founded BLMIS feeder fund,

Oreades, was forced to shutter. BNP Paribas ("BNP"), which administered Oreades, told Access

that Oreades's failure to disclose Madoff's identity was "unconscionable" and violated

Luxembourg law. (SAC ¶¶ 112-18.) The Luxembourg law at issue, which implemented the EU

Undertakings for Collective Investments in Transferable Securities ("UCITS") provisions,

requires structural checks and balances to prevent fraud. Prominent among those anti-fraud

measures is the requirement that an independent custodian safeguard and segregate fund assets,

thus allowing confirmation that the assets exist and that the trades the broker claims to have

made have, in fact, been made. (SAC ¶¶ 180-85.) BNP told Access that under Luxembourg law,

that it was required to disclose Madoff's involvement to the Commission de Surveillance du

---

[2] The term "UBS" refers to Defendants UBS AG, UBS SA, UBSFL, and UBSTPM, collectively.

[3] The term "Access" refers to Defendants AIA LLC, AIA Ltd., AML, AP (Lux), non-defendant AIA, Inc., Littaye, Villehuchet, Dumbauld, and Delandmeter, collectively.

Secteur Financier ("CSSF"), Luxembourg's financial regulator. (SAC ¶ 119.) Access blocked

this disclosure because, as Littaye and Villehuchet explained, Madoff sought to evade regulatory

scrutiny. (SAC ¶ 119.) As such, Access chose to shut Oreades rather than comply with the law.

(SAC ¶ 121.)

      Knowing that Oreades's structure could not be used for a UCITS fund, Littaye and

Villehuchet, in setting up Luxalpha, nonetheless duplicated the structure they knew was illegal

from the outset. (SAC ¶¶ 123-25, 130.) Access found UBS—which, after initially refusing to do

so, agreed to ignore its own internal policies and Luxembourg law—to act as a "front" and

"window dressing" to mislead the CSSF. (SAC ¶¶ 131, 169.) UBS simply could not pass up the

opportunity to make money. "Business is business" a UBS SA managing director and Luxalpha

director wrote. "We cannot permit ourselves to lose 300 million. Accept client." (SAC ¶ 133.)

Littaye and Access also used Access's New York affiliate (AIA LLC) to serve as "investment

adviser" to help Madoff avoid SEC scrutiny, thus helping to mislead a second regulator.

      Soon after Luxalpha was up and running, the Defendants expanded their relationship and

increased their ability to earn fees when Access established Groupement, and Access and UBS

became its service providers. (SAC ¶ 139.) Throughout their relationship, the Defendants

recognized the clear evidence of fraud at BLMIS, noting that Madoff's returns were

"IMPOSSIBLE," that his fee structure was a "non-starter," and that "IF THE ANALYSTS OF

[UBS] ZURICH FIND OUT B[L]MI[S] IS BEHIND THE STORY, WE WOULD BE

KILLED." (SAC ¶¶ 140-55.)

      Access deliberately allowed Luxalpha and Groupement, with all of their assets invested

with BLMIS, to operate outside of Access's normal policies and procedures for its due diligence

on funds and fund managers. (SAC ¶¶ 9, 172-79, 188, 232.) When an Access employee began

3

questioning BLMIS's use of a small, unknown firm as BLMIS's auditor, Littaye instructed him: "Don't go further." (SAC ¶ 283.) UBS silenced employees who complained of irregularities and non-disclosures and avoided providing information to the SEC concerning Madoff. (SAC ¶¶ 197, 263-65.) In so doing, the Defendants were able to earn fees while providing no real oversight or protection of Luxalpha's and Groupement's assets, facilitating the concealment of BLMIS's true involvement and perpetuating the fraud. (SAC ¶¶ 198-213.)

When the Defendants did take a closer look at BLMIS trading activity they found fraud and impossibilities. In 2006, Access's Chief Investment Officer, Theodore Dumbauld, analyzed Luxalpha's BLMIS account statements and determined that Madoff was reporting impossible options trades. (SAC ¶¶ 221-23.) Access hired an outside consultant, Christopher Cutler, who confirmed these and more impossibilities and recommended an immediate exit. (SAC ¶¶ 224-26, 234-35, 249, 257, 266.) Littaye and Dumbauld disregarded the analysis and ended Cutler's inquiry. (SAC ¶¶ 227-28, 268-73.) Later in 2006, a Luxalpha investor contacted Madoff directly to ask for the identity of BLMIS's options counterparties. (SAC ¶ 260.) Madoff called Littaye to shut the investor's inquiry down, providing Littaye with a nonsensical explaination concerning the counterparties that Littaye himself did not understand, but he passed it on to the investor anyway. (SAC ¶¶ 261-62.) Later that day, recognizing that Littaye's problematic response could lead to further questions, Villehuchet contacted the same investor and directed him never to contact Madoff again. (SAC ¶¶ 261-62.) All the while, Littaye and Villehuchet worked to ensure Madoff was not subject to Access's anti-fraud due diligence, which it publicly touted and conducted on all of its other existing and potential investments. (SAC ¶¶ 9, 172-79.)

The SAC shows the pattern of activity this enterprise engaged in to evade regulatory scrutiny. While each Defendant in this case possessed the requisite state of mind to allow the

4

Trustee to avoid and recover the transfers of Customer Property, all of the Defendants should also be viewed as part of Luxalpha's and Groupement's network. Littaye and Villehuchet engineered the network, founding the Access entities and enlisting the UBS entities. Littaye and Villehuchet drove the network to obtain and share information and to lend each other support to protect the Madoff relationship and to profit from BLMIS investment. And Littaye and Villehuchet ensured that evidence of Madoff's fraud would be suppressed.

The Defendants offer their own interpretation of the allegations in the SAC, but even if a plausible inference could be drawn from the Defendants' version, their demand that the Court choose between plausible theories is an invitation for legal error. Any plausible explanation put forth by the Trustee requires the Court to draw an inference in his favor. There is no balancing of competing narratives at the pleading stage.

Faced with the SAC's allegations, the Defendants proffer legal theories that ignore the law of the case and the proper application of the Bankruptcy Code and SIPA. The Defendants twist the Trustee's pleading burden under section 550 of the Bankruptcy Code, both as to their good faith and as to the details of the subsequent transfers. As this Court has noted, the Trustee is a stranger to these transactions and the Defendants are in the best position to provide the information based on their own books and records. It is for this reason that good faith is an affirmative defense that defendants bear the burden of proving. And the details of subsequent transfers from BLMIS will have to be fleshed out in discovery. The Defendants have been adequately apprised of the claims made against them. By offering an alternative explanation of the actions they took and the money flows they received, the Defendants merely raise questions of fact.

Likewise, the Defendants' claims that the subsequent transfers they received are protected by the safe harbor provided by section 546(e) of the Bankruptcy Code are patently incorrect. The Trustee has adequately met the burden of pleading the initial transferees' actual knowledge. Nothing more is required at this stage.

Finally, the Defendants cannot escape liability by claiming to be outside this Court's jurisdiction. The SAC details the entities and individuals that worked as an enterprise to create Luxalpha and Groupement, both of which were created and operated for the sole purpose of investing with BLMIS in New York. Whether by acting as a mere department of Access's New York entities, as agents of one another or of Luxalpha and Groupement (the "Fund Defendants"), or by their own contacts with New York, the Defendants acted to direct investments with BLMIS, facilitate redemptions from BLMIS, and earn fees. Each Defendant's specific actions subject them to this Court's jurisdiction. When the totality of these circumstances are considered, there can be no question that haling the Defendants into this Court would be reasonable.

The Defendants' Motions should be denied.

## **ARGUMENT**

## I.    **THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS**

The Court has personal jurisdiction over the Defendants because: (i) they had minimum contacts with the forum such that they purposefully availed themselves of the benefits and privileges of investing in New York, and (ii) the exercise of jurisdiction over the Defendants is reasonable.

"To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee must make a prima facie showing that jurisdiction exists." *See Picard v. Banque Syz (In re BLMIS)* Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *2 (Bank. S.D.N.Y. June 14, 2022) (internal quotation marks

omitted) (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018)); *see also*

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). "At this

preliminary stage, 'the plaintiff's prima facie showing may be established solely by allegations.'"

*Banque Syz*, 2022 WL 2135019, at *2 (quoting *Dorchester Fin.*, 722 F.3d at 84–85). A plaintiff

also may establish a *prima facie* case of jurisdiction through affidavits and supporting materials

that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs

Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). The pleadings and affidavits are to be construed "in the

light most favorable to plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of

Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

    "In order to be subjected to personal jurisdiction in the United States, due process

requires that a defendant have sufficient minimum contacts with the forum in which defendant is

sued such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*) Adv. Pro. No. 12-01205

(CGM), 2022 WL 2137073, at *2 (Bankr. S.D.N.Y. June 13, 2022) (internal quotation marks

omitted) (quoting *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr.

S.D.N.Y. 2012)). A court may exercise general or specific personal jurisdiction based on the

nature of the defendant's contacts with the forum. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp.

2d 452, 473 (S.D.N.Y. 2001). Specific jurisdiction exists where the defendant purposely directs

its activities into the forum and the underlying cause of action arises out of or relates to those

activities. *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566

(Bankr. S.D.N.Y. 2021) (citing *Cromer*, 137 F. Supp. 2d at 473).

    The specific jurisdiction analysis is a two-step inquiry. *First*, the court assesses whether

the defendant established "minimum contacts" in the forum, such that the defendant purposely

availed itself of the privilege of conducting activities within the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). Even a "single transaction" within the forum can constitute purposeful availment. *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (citing *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)). Moreover, minimum contacts may be found when a "'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (quoting *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019)).

*Second*, the court determines if the exercise of personal jurisdiction is "reasonable" such that doing so will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. To determine whether jurisdiction is reasonable, courts consider the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life. Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citations omitted). Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's forum contacts establish personal jurisdiction, the Court must look at the "totality of the circumstances," not each contact in isolation. *See, e.g., Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 59 (S.D.N.Y. 1999) ("[W]e are directed by the Second

8

Circuit to look at the 'totality of the circumstances'" in a personal jurisdiction analysis) (internal

citation omitted). In this case, the totality of the circumstances demonstrates that the Defendants

moving to dismiss on the basis of jurisdiction[4] ("PJ Defendants") purposely availed themselves

of the protections and privileges of conducting business in New York and that the exercise of

personal jurisdiction over the PJ Defendants is reasonable. *Banque Syz*, 2022 WL 2135019, at *4

(holding that defendant's contacts with New York were not random, isolated, or fortuitous where

defendant intentionally directed investment activity to BLMIS in New York and solicited clients

to invest in Madoff Feeder Funds).

   A.    **AIA LTD., AML, AND AP (LUX) ARE SUBJECT TO THIS COURT'S
          JURISDICTION AS MERE DEPARTMENTS OR AGENTS OF AIA LLC
          AND AIA INC.**

          Access was a tangled assemblage of commonly owned, similarly named entities whose

day-to-day operations and activities were often difficult to ascribe to any one Access entity. As

set forth herein and in the SAC, one Access entity often acted on behalf of another Access entity,

and Access employees performed work for Access entities without regard to which entity

formally employed them. (SAC ¶¶ 77-78.) Access and its employees also commonly used

collective names like "Access" or "AIA Group," heightening the confusion. This absence of

formalities stemmed from the Access entities' common ownership—Littaye and Villehuchet

(and sometimes through other entities they owned)—and the manner in which Littaye and

Villehuchet dominated and controlled Access. (SAC ¶¶ 77-78.) Although it tried to maintain the

pretense of a formal corporate structure that included foreign entities, it is undeniable that Access

---

[4] The term "PJ Defendants" refers to those defendants that have moved to dismiss the Trustee's claims for
lack of personal jurisdiction and includes UBS AG, UBSFSL, UBSTPM, AIA Ltd., AML, AP (Lux),
Littaye, and Delandmeter. The term "Access PJ Defendnts" will refer to AIA Ltd., AML, AP (Lux), and
Littaye, and the term "UBS PJ Defendants" will refer to UBS AG, UBSFSL, and UBSTPM.

was present in New York through its two New York-based entities, AIA LLC and AIA Inc.

(together, "Access New York"), and that most of the foreign entities' work was performed in

New York, rather than overseas.

To be clear, the Trustee refers to Access by names it used for itself and its constituent

entities. The purpose is not to blur the lines with "group pleading." In *SPV Osus Ltd. v. AIA LLC*,

the United States District Court for the Southern District of New York confronted this issue, and

recognized that Access itself sometimes referred to AIA LLC and AIA Inc. together as its "New

York office." No. 15-cv-619 (JSR), 2016 WL 3039192, at *4 n.6 (S.D.N.Y. May 26, 2016). AIA

LLC and AIA Inc. were also, themselves, interconnected. AIA LLC was a wholly owned

subsidiary of AIA Inc. until July 2010, when AIA Inc. dissolved. AIA LLC does not dispute

personal jurisdiction in New York, nor could AIA Inc. if it still existed. And as the SAC alleges,

AIA Ltd., AML, and AP (Lux) were mere departments or agents of Access's "New York office."

The *SPV Osus* court considered allegations as to AIA, AML, and AP (Lux) that were

substantively the same as the Trustee's. There, Access conceded the key fact that AIA LLC was

subject to general jurisdiction in New York. *Id.* at *4. And with AIA LLC's presence in New

York established, the court found that the plaintiff had "met its burden of making a prima facie

showing of jurisdiction over [AIA Ltd., AML, and AP (Lux)] by adequately pleading that [they]

. . . are 'mere departments' of New York-based AIA LLC"—that is, they were "affiliated,

commonly owned, and financially interdependent shell entities that were effectively operated by

a New York-based affiliate that held itself out as the functional headquarters of the Access

Defendants' operations." *Id.* at *3, *5. The result here should be no different—AIA LLC is

present in New York, as was AIA Inc. before its dissolution, and the Trustee has adequately

alleged that AIA Ltd., AML, and AP (Lux) are mere departments thereof.

10

1.    **The Trustee's Allegations Concerning AIA Ltd., AML, and AP (Lux) Show That They Are Mere Departments, and/or Agents of Access New York**

The analysis the District Court performed in *SPV Osus* should be followed here. Where a foreign party is not present in the district, the jurisdictional presence of a related party may be imputed to it in two circumstances: (1) where one entity is the "mere department" of the other entity; or (2) where one of the entities acts as the agent of the other entity. *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 712 F. Supp. 2d 104, 110 (S.D.N.Y. 2010).[5]

If a court has general jurisdiction over an entity, its foreign subsidiaries and affiliates that are "mere departments" are subject to the court's jurisdiction as well. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). "A corporation is deemed a mere department of another corporation if the latter's control is so pervasive that the corporate separateness is more a formality than a reality." *In re Levant Line, S.A.*, 166 B.R. 221, 231 (Bankr. S.D.N.Y. 1994) (citation omitted). When analyzing whether one entity is a "mere department" of another, courts typically analyze the following four factors: (1) the financial interdependence of the entities; (2) interference in personnel selection and assignment; (3) the extent to which corporate formalities are observed; and (4) the degree of control over marketing and operational policies. *Volkswagenwerk*, 751 F.2d at 120–22. Common ownership is "essential to the assertion of jurisdiction" on a mere-department theory. *Id.* at 120.

---

[5] The distinction between the agency and mere department tests "is not always great." *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, No. 92 Civ. 4528 (SS), 1995 WL 131774, at *4 (S.D.N.Y. Mar. 23, 1995); *see also Pandeosingh v. Am. Med. Response, Inc.*, No. 09-CV-5143 (FB) (RER), 2014 WL 12827988, at *3 (E.D.N.Y. Apr. 30, 2014) ("[A]s other district courts have explained, the case law is muddled, with agency, alter ego, mere department, and similar theories often 'melded together for purposes of the personal jurisdiction inquiry.'") (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, No. 87-CV-191, 1989 WL 87418, at *6 (N.D.N.Y. July 31, 1989)). "Ultimately, the important issue in evaluating jurisdiction is that of fairness." *Palmieri v. Estefan*, 793 F. Supp. 1182, 1193–94 (S.D.N.Y. 1992).

"To establish that a corporation doing business in New York is an agent of a related

foreign corporation, the plaintiff must show that the former does all the business which [the

foreign corporation] could do were it here by its own officials." *Dorfman v. Marriott Int'l Hotels,

Inc.*, No. 99 CIV 10496 (CSH), 2002 WL 14363, at *3 (S.D.N.Y. Jan. 3, 2002) (citation and

internal quotation marks omitted) (alteration in original); *see also Palmieri*, 793 F. Supp. at

1190. The Second Circuit has stated that the New York entity must "render[] services on behalf

of the foreign corporation that go beyond mere solicitation and are sufficiently important to the

foreign entity that the corporation itself would perform equivalent services if no agent were

available." *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95 (2d Cir. 2000); *see also Gelfand v.

Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967). An agency relationship also exists

between entities if they are "engaged in a single business enterprise that relies on the joint

efforts" of each of the entities, and those efforts are "coordinated and controlled" by the parent

entity. *Dorfman*, 2002 WL 14363, at *11. Moreover, "[t]he interrelatedness of the corporations is

the factor on which the courts have focused, rather than on the 'control' of one by the other."

*Palmieri*, 793 F. Supp. at 1193. Ultimately, for the agency test, courts "look to realities rather

than to formal relationships." *Bulova Watch Co. v. Hattori & Co.*, 508 F. Supp. 1322, 1334

(E.D.N.Y. 1981).

### 2.    Access Operated as a Single Business Enterprise From AIA LLC's and AIA Inc.'s New York Office

As the SAC alleges, Littaye and Villehuchet, the co-founders, co-owners, executives, and

directors of the Access entities, were the overseers of the "Access empire." (SAC ¶¶ 2, 76–78.)

They co-founded New York-based AIA Inc. in 1994. (SAC ¶ 76.) And, over time, they founded

AIA LLC in New York and the other Access entities abroad with the intention of enabling

Access's BLMIS feeder funds to evade regulatory scrutiny, thereby mollifying Madoff. (SAC ¶¶

76, 91, 97.) Thus the threshold inquiry of common ownership required for finding that these entities are "mere departments" of Access New York is satisfied, as AP (Lux), AML, and AIA Ltd. were commonly owned by Access New York's owners, Littaye and Villehuchet. (SAC ¶ 335.)

From Access New York, Littaye and Villehuchet directed the Access entities' coordinated activity. (SAC ¶ 77); *see SPV Osus*, 2016 WL 3039192, at *5. For example, an Access fee sharing schedule on AIA Ltd. letterhead refers to "A.I.A.," "Access," and the "A.I.A. Group" throughout, including in the section setting forth the fees received in connection with Groupement and Luxalpha. (Declaration of Robertson D. Beckerlegge, dated June 17, 2022 ("Beckerlegge Decl.") Ex. 1.)

An Access presentation refers to Access as a single company "[b]ased in New York City, with additional European offices in Paris, London and Luxembourg." (SAC ¶ 82; Beckerlegge Decl. Ex. 2 at 3.) In reality, despite representations about those "offices," all of the due diligence, monitoring, and risk assessment duties purportedly performed for BLMIS feeder funds was actually performed by Access in New York. (SAC ¶ 82; Beckerlegge Decl. Ex. 3 at 30:3–31:25, 39:16–21, 47:4–49:8, 57:9–58:16, 74:20–76:10, 81:21–82:6; Ex. 4 at 22:23–23:10.)

For example, AIA Ltd. was officially designated as Groupement's investment manager but AIA Ltd. was not licensed anywhere in the world to act as an investment manager. (SAC ¶¶ 88–91.) Rather, Access personnel in New York performed this work. New York personnel prepared reports on their visits to BLMIS offices in New York, on Luxalpha's and Groupement's performance, and on BLMIS's purported market activity. (*See, e.g.*, Beckerlegge Decl. Ex. 5-7.) The reports themselves acknowledge that they were "[p]repared by [New York-based] Access International Advisors, Inc. for Access International Advisors Limited." (Beckerlegge Decl. Ex.

13

5 at 2; Ex. 6 at 2, 10-13; Ex. 7 at 2, 14–19.) *See Erick Van Egeraat Associated Architects B.V. v.*

*NBBJ LLC*, No. 08 CIV. 7873 (JSR), 2009 WL 1209020, at *2–4 (S.D.N.Y. Apr. 29, 2009)

(finding personal jurisdiction based on the presence and activities of an affiliated entity where

the New York entity "renders services on behalf of the foreign corporation that . . . are

sufficiently important to the foreign entity that the corporation itself would perform equivalent

services if no agent were available.") (internal quotation marks omitted)); *see also Bulova*, 508

F. Supp. at 1334.

Access's strategy was determined in New York. As the name "Quarterly Strategic

Meetings" suggests, Access met periodically to set strategy. The meetings were held in New

York and nearly all Access personnel, including Littaye, Delandmeter, and Villehuchet, attended.

(Beckerlegge Decl. Ex. 3 at 41:23–43:12; Exs. 8-10.) Discussions at the meetings naturally

centered on Access's BLMIS business, including the structure and management of the entities

associated with Access's BLMIS feeder funds, and how Access would use those entities to

discharge the duties they owed to the BLMIS feeder funds. (*Id.*) The meetings also included

special "executive sessions," in which Littaye, Delandmeter, Villehuchet, and other Access

managers discussed operational policies, budgets, salaries, and hiring decisions. (Beckerlegge

Decl. Ex. 3 at 110:20–111:13; Ex. 8 at 7; Ex. 9 at 7; Ex. 10 at 6.)

### 3.    Access Disregarded Corporate Formalities

Although they were formed as legally separate entities, the Access entities disregarded

corporate formalities. (SAC ¶ 77.) Littaye and Villehuchet used all of the Access entities,

including AIA Ltd., AML, and AP (Lux), as part of a collective whole to service Luxalpha and

Groupement, among other BLMIS feeder funds, (SAC ¶ 77), and to direct transfers into and out

of New York. (SAC ¶¶ 79, 109.) Littaye and Villehuchet dominated and controlled AIA Ltd.,

AML, and AP (Lux) in their roles as service providers to Luxalpha and Groupement. (SAC ¶ 77.)

Access went by many names—the Access Group, the Access International Advisor Group, Access International Advisors, or simply Access. Access's website address, www.AIAGroup.com, was similarly styled to reflect Access collectively. (Beckerlegge Decl. Ex. 11 at 1.) Access marketing materials obscured the distribution of employees across locations and noted that its staff of 20 to 30 employees was spread among its New York and European offices. (SAC ¶ 82.) These materials identified employees not by the entity or office they were affiliated with, but by their department or function—investor relations, risk and portfolio management, and administration, among others. (SAC ¶ 82; Beckerlegge Decl. Ex. 11 at 8.) Many Access employees performed work for several Access entities at the same time. Sitting in New York, but sometimes performing work for other Access entities, Dumbauld exemplified Access's approach. Dumbauld acknowledged that he "theoretically worked for multiple Access entities," but was paid by New York-based AIA LLC, and "had contracts . . . with maybe three different entities," including "a London-based entity and then maybe a Paris or French-based entity." (Beckerlegge Decl. Ex. 4 at 29:6-17.) Several Access employees had more than one Access email address, and the addresses were not tied to the offices where they sat. For example, John Baker, an "Operational Officer," who worked for AIA Europe in London, had at least three email addresses: "jbaker@aiallc.us" (Beckerlegge Decl. Ex. 12), "jbaker@accessmanlux.com" (Beckerlegge Decl. Ex. 13), and "jbaker@aiagroup.com." (Beckerlegge Decl. Ex. 14).

To the extent AIA Ltd., AML, or AP (Lux) had any corporate duties or responsibilities at all, they were performed by Access's personnel in its New York office. This was often necessitated by the fact that AIA Ltd, AML, and AP (Lux) were shell companies with no regular

15

employees of their own. (SAC ¶¶ 91, 94, 97.) Accordingly, the jurisdictional contacts of Access

New York should be imputed to AIA Ltd., AML, or AP (Lux). *See Van Egeraat*, 2009 WL

1209020, at *2–4; *see also In re Nat'l Audit Def. Network*, 332 B.R. 896, 905–06 (Bankr. D.

Nev. 2005) ("[A foreign party] may not avoid jurisdiction in the United States by conveniently

interposing a subsidiary between its acts and the debtor.").

AIA Ltd. was a shell entity in the Bahamas, established for two main purposes: (1) to

satisfy Madoff's desire "to only deal with offshore entities related to [the Access] accounts;" and

(2) to act as Access's "money box," its "prime purpose" the "receipt of fees" on behalf of

Access. (SAC ¶ 91.) Access leased a letter box in the Bahamas, but everything received there—

mail, fax, emails, and documents—were to be forwarded by the landlord's agent to an Access

entity in another location. Because there were no Access employees there, the landlord's agent's

staff was to answer the telephone. (Declaration of Patrick Litttaye, dated Apr. 22, 2022, ECF No.

291 ("Littaye Decl.") Ex. 39.)

Likewise, AML was a shell company set up to receive the fees Access earned, including

from Luxalpha and Groupement. (SAC ¶ 94.) All of AML's functions—trading, research and

development, IT/Programming, administration, marketing and business development—were

"outsourced" to the other Access entities. (SAC ¶ 94.) The "risk management" work that AML

purported to do was actually performed by Access personnel in New York. (Beckerlegge Decl.

Exs. 11 at 8; 14, 15, 16.)

AP (Lux) was yet another Access shell entity.  Its primary purpose was to replace AIA

LLC in its aim to protect Luxalpha and BLMIS from regulatory scrutiny. (SAC ¶ 97.)

Indeed, as the Trustee alleges, lines separating the Access entities were largely absent. A

lack of clarity about which Access entity was carrying out an action was commonplace. This

atmosphere, which pervaded Access as a whole, demonstrates the appropriateness of finding that the foreign Access entities were mere departments of Access New York.

The SAC's allegations show that AP (Lux), AML, and AIA Ltd. are subject to this Court's jurisdiction because of their agency and mere department relationships with Access's New York office. Although nothing more than shell entities, with no independent operations, AP (Lux), AML, and AIA Ltd. earned fees as a result of being dominated and controlled by, and financially dependent on, Access New York, which Littaye and Villehuchet operated as a single business enterprise managed out of New York. *See Van Egeraat,* 2009 WL 1209020, at *2–4; *Dorfman*, 2002 WL 14363, at *11; *Motown Record Co., L.P. v. iMesh.com, Inc.*, No. 03 Civ. 7339 (PKC), 2004 WL 503720, at *5 (S.D.N.Y. Mar. 12, 2004) (finding that where "entities do not treat themselves as separate," and there was a "pervasive" "blur" between them, the last three elements of the mere department test "meld together").

## B.    THE TRUSTEE PLEADS SUFFICIENT MINIMUM CONTACTS FOR SPECIFIC JURISDICTION OVER EACH DEFENDANT

In addition to exercising general jurisdiction over AIA Ltd., AML, and AP (Lux) as mere departments and agents of AIA LLC and AIA Inc., this Court may exercise specific jurisdiction over each of the PJ Defendants because of their direct and systematic contacts with New York. These parties played vital roles that made it possible for Luxalpha and Groupement to invest in BLMIS in New York. Each collected fees or other compensation, a fact the PJ Defendants do not dispute. (SAC ¶¶ 204, 334-35; Mem. of Law in Support of Access Defs.' Motion to Dismiss, ECF No. 292, ("Access Mot."), at 15-16, 21, 29; Mem. of Law in Support of UBS Defs.' Motion to Dismiss, ECF No. 286, ("UBS Mot."), at 40; Mem. of Law in Support of Delandmeter's Motion to Dismiss, ECF No. 280, ("Delandmeter Mot."), at 25.) Their roles in the management and administration of the BLMIS feeder funds demonstrate that these entities directed

17

investments into New York and are thus subject to this Court's jurisdiction in a lawsuit directly

bearing upon that activity. *See Banque Syz*, 2022 WL 2135019, at *4 (finding sufficient

minimum contacts based on investment activity intentionally directed to New York); *Multi-*

*Strategy Fund Ltd.*, 2022 WL 2137073, at *4-5 (same); *see also Maxam*, 460 B.R. at 117

(exercising specific jurisdiction over foreign defendant who "direct[ed] investments to the

United States").

### 1.    Littaye's Contacts With BLMIS and Access New York Establish Minimum Contacts

Littaye had numerous, substantive contacts with New York that establish this Court's

jurisdiction. Littaye: (1) regularly traveled to New York for Access business; (2) communicated

with both Access personnel and Madoff in New York; and (3) coordinated, dominated, and

controlled Access, serving as a director and executive for all of the Access entities. (SAC ¶¶ 77–

78, 80, 82, 178, 261, 268, 279, 317.) In isolation these contacts would be sufficient to support

jurisdiction; in their totality, they undeniably establish that Littaye purposefully directed his

activities to New York. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,

397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("[C]onsidered together," defendant's contacts clearly

demonstrate that it "purposely availed itself of the forum.").

Though the Access PJ Defendants point to cases in which a foreign defendant's contacts

did not support personal jurisdiction, no case is more factually analogous than *SPV Osus* in

which the Southern District of New York found that the plaintiff had made a prima facie

showing of personal jurisdiction over Littaye. 2016 WL 3039191, at *5,The *SPV Osus* court

found that allegations concerning Littaye's quarterly meetings with Madoff in New York and his

efforts to shut down discussions of BLMIS's irregularities in a 2006 meeting in New York were

"more than sufficient to make out a prima facie case that [the] claims against Littaye 'arise out of

or relate to Littaye's contacts with the forum.'" *Id.* (citation omitted). The Trustee alleges the

same facts, (SAC ¶¶ 80, 268), as well as numerous others that support specific jurisdiction over

Littaye. (*See, e.g.*, SAC ¶¶ 77–78, 82, 178, 261, 279, 317.)

      In addition to his quarterly visits to Madoff's New York office, and in keeping with his

efforts to ensure that he was the sole point of communication between Access and Madoff,

Littaye sometimes accompanied foreign Access clients to New York to meet with Madoff. (*See*

SAC ¶¶ 82, 178–79; Beckerlegge Decl. Ex. 3 at 41:18–22.) The Access PJ Defendants argue

that, in these meetings, Littaye discussed neither the subsequent transfers he received nor

Access's redemptions generally, (Access Mot. at 12), but his discussions need not have been so

narrowly focused to support jurisdiction. The gravamen of the Trustee's claims is that the PJ

Defendants purposefully and systematically directed investment activity into BLMIS and played

roles essential to Luxalpha's and Groupement's ability to function and invest in New York. Each

PJ Defendant collected fees for its (or his) services. The fees originated from money transferred

to and from BLMIS. Any of the PJ Defendants' activities in furtherance of Luxalpha and

Groupement, including Littaye's meetings and communications with Madoff, relate directly to

the Trustee's claims and are relevant contacts for specific jurisdiction. Without Littaye's

quarterly meetings at BLMIS in New York, Access could not have maintained the close

relationship with BLMIS that enabled it to service and market its Madoff feeder funds.

      Littaye also visited New York on other Access/Madoff business. He relayed information

about BLMIS to Access's New York employees and otherwise communicated with them about

Access's Madoff feeder funds. (SAC ¶ 80.) He attended the Quarterly Strategic Meetings in New

York, described above. (*See supra* I(A)(2).) The Access PJ Defendants claim that these meetings

focused not on BLMIS, but on general Access business. (Access Mot. at 12.) The SAC alleges

otherwise—Access's business was so dependent upon Madoff that its strategic meetings necessarily dealt with Madoff. In any event, these contentions, which ask the Court to adopt the Defendants' alternative account, are inappropriate on a motion to dismiss and should be rejected.

The Access PJ Defendants admit that Littaye visited the U.S. three or four times a year. (Access Mot. at 12.) This admission by itself, supports jurisdiction over Littaye. *See SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for meeting to develop business relationship); *see also Burlington Indus., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in New York).

Contrary to the Access PJ Defendants' contention, the Trustee does not argue that Littaye's status as an Access director or officer, by itself, subjects him to personal jurisdiction. Rather, it is Littaye's conduct and the fact that he was aware of, and concealed, clear indicia of BLMIS's fraud that subjects him, as an Access director or officer, to personal jurisdiction. The Trustee has alleged both the specific acts Littaye committed in this jurisdiction and those that he knew would have an impact in this jurisdiction, all of which facilitated the fraudulent transfers at issue in this case—which Littaye knew emanated from New York. Directors have been held subject to personal jurisdiction where they have taken actions that gave rise to fraud claims. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 401 (S.D.N.Y. 2005) ("If [the outside director] were sufficiently responsible for the contents and dissemination of the [fraudulent] Registration Statements, then this fact would support the exercise of this Court's jurisdiction."). Knowledge or reckless disregard of fraud may also form a basis for exercising jurisdiction over a director. *See, e.g.*, *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 456 (S.D.N.Y.) (finding that

allegations of a foreign director's knowledge of fraud, combined with her involvement in a variety of corporate activities, satisfied the minimum contacts test).

Nor does the Trustee argue that Littaye's status as a co-founder and co-owner of Access, by itself, subjects him to personal jurisdiction in New York. Rather, it is Littaye's conduct, as alleged in the SAC—that he availed himself of the privilege of doing business in New York for the purpose of feeding investment into Madoff's New York-based fraud—that subjects him to jurisdiction. (*See, e.g.*, SAC ¶¶ 77–78, 80, 82, 178, 261, 268, 279, 317.) Littaye's reliance on *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 283 (1970) (Access Mot. at 12-13), makes little sense. *Ferrante* examined, in the context of a contractual dispute, whether the language of CPLR 302 "covers the case of a nonresident who never comes to our State, but whose actions in his home State affect the performance of work by others in New York." *Ferrante*, 26 N.Y.2d at 283-84. This is not the fact pattern here. The Trustee's primary basis for asserting that this Court has personal jurisdiction over Littaye is that he was in New York conducting business related to Access and BLMIS.  The Trustee unequivocally alleges that Littaye, with actual knowledge or at least willful blindness, actively took steps to halt an inquiry into BLMIS that would have (or already had) revealed Madoff's fraud. Littaye's reliance on *Ferrante* does not meaningfully refute those allegations. Nor does *Ontel Products, Inc. v. Project Strategies, Co.*, 899 F. Supp. 1144, 1148 (S.D.N.Y. 1995) lend support to the Access PJ Defendants' contention. In *Ontel*, the Southern District of New York dismissed for lack of personal jurisdiction because the plaintiff had failed to provide any support for the "naked statement" that a corporate founder abused the corporate form and that the corporate veil should be pierced. *Id.* Here, by contrast, the Trustee's case for jurisdiction over Littaye is based upon

extensive allegations concerning Littaye's presence in New York. (SAC ¶¶ 77–78, 80, 82, 178-79, 261, 268, 279, 317.)

>        **2.      AIA Ltd., AML, and AP (Lux) Are Each Subject to Specific
>                  Jurisdiction Because They Directed Investment Into BLMIS in New
>                  York**

If the Court does not find that AIA Ltd., AML, and AP (Lux) are subject to general

jurisdiction in New York as mere departments or agents of AIA LLC and AIA, Inc., they are

each nevertheless subject to specific jurisdiction in New York. Each entity facilitated transfers of

investment capital into and out of BLMIS and received fees in return. These activities, which are

at the core of the Trustee's claims, demonstrate their extensive contacts with the forum and

satisfy the requirements for specific jurisdiction.

>                  **a.      AIA Ltd.**

AIA Ltd. held itself out as Groupement's and Groupement Financier Levered Ltd.'s

("Groupement Levered")[6] investment manager. (SAC ¶¶ 89-90.) In that role, AIA Ltd. was

required to "keep the net assets of the Fund[s] under surveillance and constant review [and] carry

out reviews and controls of the portfolio." (SAC ¶ 89.) AIA Ltd. also served as Luxalpha's

official consultant and exclusive introducing agent for potential investors in Luxalpha. (SAC ¶

89.) AIA Ltd. communicated directly with BLMIS. For example, it sent a fax requesting that

copies of the trade and bi-monthly statements be sent to various recipients, including Littaye at a

New York mailing address. (Beckerlegge Decl. Ex. 17 at AMF00077600.) AIA Ltd. knew that

any funds being invested into Luxalpha were being directed to New York for investment with

BLMIS, and that any returns or redemptions related to that investment would similarly emanate

---

[6] Groupement Levered did not have a direct account at BLMIS, but offered leveraged returns based on investments
in the underlying Groupement Financier fund that was directly invested with BLMIS. (SAC ¶ 72.)

from New York. Moreover, AIA Ltd. knew that its revenues were dependent on the economic

activity undertaken by BLMIS—AIA Ltd. received a portion of the management and

performance fees that UBSTPM received from Luxalpha and received annual management and

performance fees based upon Groupement's NAV. (SAC ¶ 334(a); Beckerlegge Decl. Ex. 18.)

### b.    AML

AML was nominally Luxalpha's portfolio manager from November 17, 2008 through its

liquidation. (SAC ¶ 93.) It was to "distribute, market and promote the Fund," to "solicit and

transmit subscription orders," to "receive and transmit redemption and conversion orders," to

"receive from investors payment . . . for their subscription," and . . . "where applicable allocate to

Investors, . . . the Shares to be issued to them." (Beckerlegge Decl. Ex. 19 at 8.) As is the case

with AIA Ltd., AML knew at all times that any subscription, redemption, and/or conversion

orders would result in funds being transmitted to or from BLMIS in New York. As a result,

AML received from Luxalpha quarterly fees based on the fund's performance and on the fund's

purported trading of assets. (*Id.* at 22.)

AML also served as Luxalpha's portfolio adviser from February 5, 2004 until August 11,

2004. (SAC ¶ 93.) In that role, it advised UBS SA in connection with UBS SA's official role as

portfolio manager of Luxalpha. (SAC ¶ 93.) AML was also tasked with ensuring compliance

with the "investment restrictions" applicable to Luxalpha and "surveillance and constant review"

of Luxalpha's assets. (Beckerlegge Decl. Ex. 20 at 3-4.) AML received fees in connection with

this role. (SAC ¶ 334(d).) As Luxalpha's portfolio advisor, AML knew that all purported trading

activity was undertaken by BLMIS and Madoff in New York.

Until 2007, AML also served as Groupement and Groupement Levered's investment

adviser. (SAC ¶ 93.) AML was tasked with advising Groupement on matters relating to its

portfolio, its investment objectives, and to liaise with Groupement's principal banker and

administration agent. (Beckerlegge Decl. Ex. 21 at 2-3.) As was the case with Luxalpha, AML

was aware that all of Groupement's trading activities were directed to BLMIS and Madoff in

New York. In connection with this role, AML received advisory and performance fees from AIA

Ltd. tied to Groupement's NAV. (*Id.* at App'x 1-2.)

### c.      AP (Lux)

From February 13, 2007 through Madoff's collapse, AP (Lux) was Luxalpha's

investment adviser. (SAC ¶ 96.) In that role, AP (Lux) was responsible for advising Luxapha's

portfolio managers, UBSTPM and AML, with regard to investment recommendations. (SAC ¶

96.) AP (Lux) was entitled to receive a portion of the management and performance fee from

Luxalpha's portfolio manager.

Beginning in 2007, AP (Lux) was also the nominal adviser of Groupement Financier and

Groupement Levered, (SAC ¶ 96), for which it received part of the fees received by

Groupement's investment manager. (SAC ¶ 334(c).)

As was the case with AIA Ltd and AML, in light of its responsibilities for Luxalpha and

Groupement, AP (Lux) knew at all times that its actions related to Luxalapha's and

Groupement's trading activity, including that subscriptions and redemptions were directed to

BLMIS in New York.

### 3.      Delandmeter Is Subject to Jurisdiction Because He Undertook Numerous Actions Directed at New York

From Luxalpha's beginning, Delandmeter was an integral part of Access's enterprise,

serving in many high-level roles for Luxalpha and Access. He was one of Luxalpha's

incorporators in 2004. Once Luxalpha was up and running, Delandmeter was the fund's legal

advisor and a member of its board. He served as a director of AIA Inc., AML, and AP (Lux). In

these roles, Delandmeter traveled to New York regularly, sometimes as a presenter on the Access

feeder funds at Access's Quarterly Strategic Meetings and, at least once, as Littaye's companion

at an in-person meeting with Madoff at BLMIS's offices.

There is no support for Delandmeter's assertion that his status as a director insulates him

from jurisdiction here. *See Bickerton v. Bozel S.A.* (*In re Bozel S.A.*), 434 B.R. 86 at 99-100

(Bankr. S.D.N.Y. 2010) (finding specific jurisdiction over a corporate officer where the

"Adversary Proceeding arises out of [the officer's] duties as a corporate officer and his

corresponding contacts with the United States"). Delandmeter's participation as a director and

board member of Luxalpha are more significant and continuous than the directors in *Charas*,

where the director was alleged only to have participated by phone in one board meeting in the

U.S., and in *AstraZeneca*, where the complaint alleged only the defendants' general supervisory

duties. *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008); *Charas v. Sand

Tech. Sys. Int'l, Inc.*, No. 90-civ-5638(JFK), 1992 WL 296406, at *4-5 (S.D.N.Y. Oct. 7, 1992).

Nor is there any merit to Delandmeter's argument that his contacts were too random or

infrequent to support jurisdiction. *See, e.g.*, *Miller v. Calotychos*, 303 F. Supp. 2d 420, 425–27

(S.D.N.Y. 2004) (finding jurisdiction where defendants participated in two business meetings

with plaintiff in New York); *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543,

549–50 (S.D.N.Y. 2003) (finding jurisdiction over defendant who traveled to New York for a

single meeting to develop business relationship); *Burlington Indus., Inc. v. Salem Int'l Co.*, 645

F. Supp. 872, 874 (S.D.N.Y. 1986) (finding jurisdiction over defendant based on two meetings in

New York).

### a.    Delandmeter Directed His Actions at New York in Furtherance of Luxalpha's BLMIS-Related Business

Delandmeter was both a director of, and the legal advisor to, Luxalpha from 2004 until it

entered liquidation. (SAC ¶¶ 84, 102.) In these roles, Delandmeter was integrally involved in

25

nearly every major decision regarding Luxalpha from the fund's inception through BLMIS's collapse.

In early 2004, as Access was creating Luxalpha, Delandmeter executed the fund's formational documents. Through these documents, Luxalpha and Access ceded authority to Madoff, enabling him to carry out his fraud through Luxalpha. Delandmeter and UBS SA created Luxalpha's articles of incorporation. (Beckerlegge Decl. Ex. 22 at LUXSAA0000139.) Delandmeter executed a resolution authorizing Luxalpha's relationship with Madoff in New York. (Beckerlegge Decl. Ex. 23 at 2-4.) Delandmeter executed resolutions that approved and amended sales prospectuses that concealed Madoff's role as actual custodian and asset manager. (Beckerlegge Decl. Exs. 23 at 2; 24; 25.)

Delandmeter argues that the only document he executed connecting him to New York is the Luxalpha board resolution authorizing the opening of a BLMIS account in the name of Luxalpha c/o UBS (Luxembourg) S.A. (Delandmeter Mot. at 23 n.9.) He claims that "the purpose and effect of that resolution was the opening of a BLMIS account by or on behalf of the corporation Luxalpha, not the opening of a BLMIS account by the individual Delandmeter." (*Id.*) But this misses the purpose of the resolution, which explicitly vested Delandmeter with the power to apply to the CSSF to have Luxalpha officially listed as a UCITS fund, open for public investment. (Beckerlegge Decl. Ex. 23.)

Delandmeter also routinely executed board resolutions that protected and preserved the Luxalpha-BLMIS relationship. For example, Delandmeter signed a June 20, 2006 report confirming that Luxalpha was "in conformity with the determined investment policy" and "the investment restrictions as mentioned in the prospectus." (Beckerlegge Decl. Ex. 26.) On numerous occasions, Delandmeter also executed quarterly board resolutions stating that

Luxalpha's Board "noted that the monitoring of the management of the various risks to which the SICAV is exposed has been performed and has not signaled significant irregularities over the period." (Beckerlegge Decl. Ex. 27.) Delandmeter also executed agreements on behalf of Luxalpha with UBS and Access entities that authorized Luxalpha to pay the management and administrative fees to these entities.[7] It is these fees that the Trustee seeks to recover through this lawsuit. And he approved Luxalpha's financial statements, even though he knew that these documents omitted Madoff's role as custodian and asset manager. (*See* Beckerlegge Decl. Exs. 28; 29.)

Delandmeter argues that "[a]llegations that a foreign defendant signed documents abroad in his corporate capacity cannot support a finding of personal jurisdiction over that defendant." (Delandmeter Mot. at 22-23.) The cases Delandmeter relies upon are inapposite. They do not address directors like Delandmeter, whose presence in New York was continuous and purposeful. *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-CIV-2120 (LTS) (THK), 2006 WL 2034663, at *9 (S.D.N.Y. July 19, 2006), *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 747 F. Supp. 922, 928-29 (S.D.N.Y. 1990), and *Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628, 635 (S.D.N.Y. 2008) all address defendants who had either minimal, incidental contacts with New York, or no business contacts at all. By contrast, the Trustee has alleged Delandmeter's numerous actions to operate Luxalpha, a fund that invested entirely with BLMIS in New York.

---

[7] For example, he signed the February 2004 Portfolio Management Agreement between Luxalpha and UBS SA, the September 2006 Management Company Services Agreement between Luxalpha and UBSTPM, and the November 2008 Management Company Services Agreement between Luxalpha and AML, pursuant to which UBS SA, UBSTPM, and then AML were entitled to receive fees as Luxalpha's official portfolio management companies. (Beckerlegge Decl. Exs. 30 at 6; 31 at LuxAlpha 00424; 19 at 21.)

As the SAC alleges, Delandmeter's participation in Luxalpha, including as an advisor directing UBS's activities with respect to Luxalpha, was meaningful and intentional. Faced with restrictions on UBS SA's ability to act as manager to Luxalpha, UBS SA put UBSTPM in that role while it dictated UBSTPM's actions behind the scenes. UBSTPM was not simply free to act, however. An Advisory Committee was formed to make "recommendations" and an agreement created whereby UBSTPM was *required* to "act upon and implement all Recommendations" as long as those recommendations did not violate the law or mandates of Luxalpha's governing documents. (Beckerlegge Decl. Ex. 32, at LUXSAA0000699.) Along with Littaye, Delandmeter served on the Advisory Committee. The committee's purview included Luxalpha's investment policy, lending ability, shareholder reporting, fund registration, offering document changes, and any decision that the prospectus allowed Luxalpha's manager to make.

Moreover, Delandmeter directed Luxalpha's response to the news of Madoff's arrest and BLMIS's collapse. A few days after Madoff's arrest, Delandmeter notified the key Luxalpha players that the CSSF, the Luxembourg financial regulator, would have to be notified that the fund was suspended. (Beckerlegge Decl. Ex. 33.) Delandmeter participated in three days of post-collapse board meetings with Littaye, Villehuchet, and Dumbauld, addressing how the CSSF was to be notified, how redemptions were to be treated, and what legal action and liability Luxalpha could be facing. (Beckerlegge Decl. Exs. 34-36.) Delandmeter claims that his involvement at this stage was addressed to the impact of Madoff's collapse on Luxembourg-based entities under Luxembourg law. (Delandmeter Mot. at 24.) But the reality is that Delandmeter was doing damage control for a fund for which he bore responsibility. Delandmeter was involved in the fund's strategy both before and after BLMIS's collapse. (Beckerlegge Decl. Ex. 34 (minutes

revealing that the Board of Directors came up with action items in response to Madoff's arrest

after Delandmeter sent a draft of the notice to the shareholders).)

### b.    Delandmeter Directed His Actions at New York in Furtherance of Access's BLMIS-Related Business

The Trustee also alleges that Delandmeter undertook numerous actions in New York

purposefully directed at maintaining and enhancing Access's relationship with BLMIS.[8]

Delandmeter was a director of New York-based AIA Inc. (SAC ¶ 84.) Delandmeter served as a

director for several other Access entities, including AML and AP (Lux), and as Access's

Luxembourg counsel. (SAC ¶ 84; Beckerlegge Decl. Ex. 3 at 41:20–22; Ex. 37 at 7-8.) AML

identified only Littaye and Delandmeter as the individuals carrying out the firm's

responsibilities. (SAC ¶ 94.) He was also the Legal Advisor to Groupement and Groupement

Levered. (SAC ¶¶ 84, 107.)[9]

Delandmeter concedes that in these roles he visited the United States five times between

2004 and 2008. (Delandmeter Decl. ¶¶ 53-55, 57.) During those visits, the Trustee alleges,

Delandmeter attended and made presentations at Access's Quarterly Strategic Meetings.

(Beckerlegge Decl. Ex. 3 at 41:23–43:12; Ex. 8 at 5; Ex. 9 at 5; Ex. 10 at 3–4.) Delandmeter

acknowledges that he attended the meetings, but argues that his role at the meetings was not

related to Madoff or Access's BLMIS investments. (Delandmeter Decl. ¶¶ 52-56.) The fact that

Delandmeter accompanied Littaye to a meeting with Madoff in New York calls into question his

---

[8] Delandmeter had contacts with New York through not only Luxalpha and Groupement, but another Access BLMIS feeder fund, Benouville Finances Ltd., for which he and Littaye served as directors, and for which Delandmeter executed contracts.  Delandmeter prepared and submitted Benouville's customer claim in the BLMIS liquidation, which constitutes another contact with the forum.

[9] Contrary to his assertion, Delandmeter was the legal advisor to Groupement Financier and Groupement Levered, (Delandmeter Mot. at 4 n.1), as reflected in the 2005 Operating Memorandum explicitly naming Delandmeter as legal advisor. (Beckerlegge Decl. Ex. 38 at 31.**)**

characterization of the visits and underscores the factual nature of the issue. (Delandmeter ¶ 57;

Beckerlegge Decl. Ex. 3 at 41:20–22.) Delandmeter seeks to align himself with the defendants in

*McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 380, 381-82 (1967), *SPV Osus Ltd. v.

UBS AG*, 114 F. Supp. 3d 161, 171 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *Siegel v.

Holson Co.*, 768 F. Supp. 444, 446 (S.D.N.Y. 1991), and *Gates v. Pinnacle Commc'ns Corp.*,

623 F. Supp. 38, 41-42 (S.D.N.Y. 1985), but in those cases, there were "scant contacts" between

the defendant and New York—a single, brief meeting, or a trip unrelated to the claims at issue in

the case—or an "utter lack of nexus" between the contacts and the claims. The cases are nothing

like Delandmeter's alleged annual or semi-annual trips to New York for strategic meetings

focused on BLMIS.

> c.      **Luxembourg Law on Legal Advisors Has No Bearing on This
> Court's Jurisdiction Over Delandmeter**

Notwithstanding Delandmeter's multiple contacts with the forum, he argues that he is not

subject to this Court's jurisdiction because Luxembourg law restricts legal advisors from

performing day-to-day operations. (Delandmeter Mot. at 5.) Entertaining this interpretation of

Luxembourg law would be inappropriate on a motion to dismiss—the law can be interpreted to

allow a legal advisor to ensure that all parties act in compliance with applicable policies and

regulations in their day-to-day management duties, an interpretation just as plausible as

Delandmeter's. Regardless, the Trustee alleges that Delandmeter did engage in the day-to-day

business of Luxalpha, as well as the day-to-day business of the Access entities on whose boards

he served, whether or not Luxembourg law allowed him to do so. Delandmeter's consistent

participation in Quarterly Strategic Meetings in New York and his meeting with Madoff in New

York were not isolated, casual encounters. As a Luxalpha and AIA Inc. director, Delandmeter

had a vested interest in Luxalpha's and Access's success. Delandmeter's contacts, essential to

Access's and Luxalpha's business relationship with BLMIS, demonstrate his purposeful direction of investment activity to New York and subject Delandmeter to the Court's jurisdiction.

### d. Delandmeter Filed Suit Against the Trustee in Luxembourg Which Subjects Him to This Court's Jurisdiction

In December 2009, Luxalpha's liquidators filed an action in Luxembourg against, *inter alia*, AML, Delandmeter, Littaye, the UBS Defendants, and UBS AG (the "Luxembourg Action") for damage caused to Luxalpha as a result of the fraud perpetrated by Madoff and enabled and/or facilitated by each of the named defendants. (Beckerlegge Decl. Ex. 39.) On or about May 12, 2010, AML, Delandmeter, and Littaye filed a third party writ, (the "Luxalpha Third-Party Writ"), naming the Trustee, on behalf of the BLMIS estate, as a third-party defendant through an impleader in the Luxembourg Action. (Beckerlegge Decl. Ex. 40.) This action subjects Delandmeter to this Court's jurisdiction. Bankruptcy courts have exercised jurisdiction over foreign defendants solely on the basis that an action they have taken abroad has "a substantial, direct and foreseeable effect on the administration of [the bankruptcy] estate that 11 U.S.C. § 362(a) was designed to prevent." *LaMonica v. North of England Protecting and Indem. Assoc. Ltd., (In re Probulk Inc.)*, 407 B.R. 56, 63–64 (S.D.N.Y. 2009). The filing of a foreign action against a debtor or a debtor's property that is subject to a United States bankruptcy proceeding subjects that plaintiff to this Court's jurisdiction because it affects "the very ability of the bankruptcy court to govern such a liquidation and to fairly distribute same and is tampering with the exclusive jurisdiction over all such property afforded by 28 U.S.C. § 1334(e)." *Id.* at 64 (citations omitted); *see also Fox v. Picard (In re BLMIS)*, No. 10 Civ. 4652 (JGK), 2012 WL 99089, at *7 (S.D.N.Y. Mar. 26, 2012) (acknowledging the importance of "prevent[ing] dissipation of the debtor's assets before orderly distribution to creditors can be effected")

(internal citation omitted). The Luxalpha Third-Party Writ unquestionably could affect the administration of the BLMIS estate.

      **4.**      **UBS AG's, UBSFSL's, and UBSTPM's Operations and Roles as Service Providers to Multiple BLMIS Feeder Funds, Including Luxalpha and Groupement, Subject Them to this Court's Jurisdiction**

UBS was Luxalpha's and Groupement's agent. Each service a UBS entity provided to Luxalpha and Groupement was directed to, in support of, and because of, Luxalpha's and Groupement's investment with BLMIS in New York. As Luxalpha and Groupement had no purpose other than to invest with BLMIS, the acts UBS undertook in service of those funds could have no purpose other than to further BLMIS investment. UBS provided the scaffolding for Luxalpha's and Groupement's investment with BLMIS, and without UBS neither Luxalpha nor Groupement could stand. UBS entities acted as: (1) custodian; (2) administrator; (3) promoter; (4) sponsor; (5) portfolio manager; (6) custody bank; and (7) prime bank for Luxalpha, Groupement, and for other BLMIS feeder funds, including Luxembourg Investment Fund-U.S. Equities Plus ("LIF-USEP"), another massive BLMIS feeder fund named as a defendant in a separate proceeding. (SAC ¶¶ 69, 72, 93, 126, 136, 168, 186, 200, 205, 208, 214-15, 265, 293, 314, 318, 320.)

UBS SA does not dispute this Court's jurisdiction over it, nor can it. (UBS Mot. at 7 n.2.) It signed the BLMIS account opening documents for Luxalpha. (SAC ¶¶ 70, 125.) It served as custodian of the assets Luxalpha transferred into and out of BLMIS, maintained the books and records for those transfers, and held those funds in its accounts. (SAC ¶¶ 126-27.) It entered into an agreement directly with BLMIS, designating BLMIS the sub-custodian of Luxalpha's assets. (SAC ¶ 127.) It regularly corresponded with BLMIS to manage Luxalpha's investment within BLMIS, and six of Luxalpha's directors were UBS SA employees. (SAC ¶¶ 70, 71.) After the

Ponzi scheme collapsed, UBS SA prepared and submitted a customer claim for Luxalpha in this SIPA liquidation proceeding. (SAC ¶¶ 341-47.)

But UBS SA did not act alone in its service to Luxalpha's investment with BLMIS. UBS operated as a "coherent and effective whole" to provide their customers, like Luxalpha and Groupement, with "the experience, know-how and substantial resources provided by the UBS Group as whole." (SAC ¶ 67.) At times, UBS SA merely used UBSTPM as a front, while continuing to control the decision-making. (SAC ¶¶ 205-08.) But while direction as to Luxalpha and Groupement may have come from UBS SA, all of the UBS defendants—UBS AG, UBSFSL, UBSTPM, and UBS SA—shared a common purpose: to work with Access to direct investments to BLMIS, handle subscriptions and redemptions, and most importantly, earn fees. UBS coordinated their efforts accordingly. (SAC ¶¶ 67-72, 137-38, 204, 281, 320.)

For these reasons, the Trustee's allegations plausibly show that the UBS PJ Defendants' contacts with New York are sufficient to establish minimum contacts for specific jurisdiction, and neither UBS AG, UBSFSL, nor UBSTPM have any greater argument to escape jurisdiction than does UBS SA. *See Maxam*, 460 B.R. at 117 (finding jurisdiction as a result of defendants' "directing investments to the United States"); *Cromer*, 137 F. Supp. 2d at 476–77 (finding that a foreign fund administrator was subject to jurisdiction given "the quality and nature of [its] relationship with the United States, arising out of [its] work for the [f]und").

### a.    UBS AG

UBS AG was integral to Luxalpha's operations. UBS AG received every Luxalpha redemption from BLMIS through its Stamford, Connecticut branch, fulfilling the critical role of facilitating and receiving transfers between Luxalpha and BLMIS. (SAC ¶ 70.) UBS AG's actions with respect to BLMIS were deliberate efforts to facilitate further investment. For example, a UBS AG analyst reached out to BLMIS to request a face-to-face meeting—one of

33

UBS's due diligence requirements—with BLMIS in New York. Although BLMIS ultimately

declined the request, claiming the need to avoid burdening Madoff with meetings, UBS AG

made the request to expand its BLMIS relationship. (SAC ¶¶ 154-55.)

UBS AG also served as Luxalpha's (and LIF-USEP's) sponsor and promoter, projecting

to investors and the CSSF that it supported and custodied Luxalpha's investments with BLMIS.

(*See* SAC ¶¶ 136, 293; Declaration of Pierre-Antoine Boulat, dated April 25, 2012, ECF No.

111, ("Boulat Decl.") ¶¶ 9, 12.) UBS AG's association with Luxalpha gave it the imprimatur of

one of the world's largest, most sophisticated banks. (SAC ¶ 168.) These contacts, along with

UBS AG's overall coordination with UBS in facilitating investments with BLMIS, taken in their

totality, establish that UBS AG purposefully directed activities to New York. *See Esso Expl. &*

*Prod. Nigeria Ltd.*, 397 F. Supp. 3d at 344 ("[C]onsidered together," defendant's contacts clearly

demonstrate that it "purposely availed itself of the forum.").

### b.    UBSFSL

UBSFSL served as both Luxalpha's and Groupement's administrator (*see* SAC ¶ 136;

Boulat Decl. ¶¶ 9, 12) and played a critical role in the funds' operation, management, and

servicing. As a result, UBSFSL knew that any funds invested in Luxalpha and Groupement were

sent to New York for investment with BLMIS and that any returns or redemptions related to that

investment emanated from New York. Moreover, UBSFSL knew that its revenues were

dependent on the economic activity undertaken by BLMIS.

UBSFSL performed a host of fundamental tasks for Luxalpha. Luxalpha had no offices of

its own but shared offices with UBSFSL, UBSTPM, and UBS S.A. UBSFSL lent Luxalpha its

address. (SAC ¶¶ 64, 65, 66, 98.) UBSFSL performed Luxalpha's "day-to-day" tasks, like

calculating the fund's net asset value (based on trade and account information BLMIS provided),

receiving the fund's documents and correspondence, setting up its annual general meeting, and

34

filing documents with the Luxembourg financial regulator. (SAC ¶¶ 199, 200; Beckerlegge Decl. Ex. 41 at 7-8, 15-16, 22-23.) These kinds of activities subject a foreign fund administrator to jurisdiction. *Cromer*, 137 F. Supp. 2d at 476-77 (holding that because the administrator "received from the United States all of the information from which it prepared the statements it disseminated as Fund administrators," it was subject to jurisdiction).

UBSFSL also processed subscriptions and redemptions for Luxalpha and Groupement investors. (SAC ¶ 136.) It received Luxalpha and Groupement subscription requests from investors, and then coordinated with UBS SA so that UBS SA could receive investor money and transfer it into BLMIS in New York. (Beckerlegge Decl. Ex. 38 at 8, 13-14; Ex. 41 at 11-12; Ex. 42 at 1; Ex. 43.) It handled redemption requests similarly. (Beckerlegge Decl. Ex. 41 at 11-12; 38 at 10.) UBSFSL was also responsible for keeping Luxalpha's and Groupement's accounting, which included preparing the annual accounts, reports, and financial statements, and coordinating with the funds' auditor. (Beckerlegge Decl. Ex. 41 at 3-4; Ex. 44 at LuxAlpha00644-45; Ex. 45 at LuxAlpha00471-75; Ex. 46 at 1-2.)

UBSFSL worked alongside Access—nominally, Access New York, AIA Ltd., and AML—as part of a network of service providers responsible for Luxalpha's and Groupement's management, supervision, and administration. (SAC ¶ 68.) UBSFSL employees attended administrative meetings with Access to discuss Luxalpha and Groupement (SAC ¶ 68; *see, e.g.*, Beckerlegge Decl. Ex. 47 at 15) and participated in calls and email exchanges with Access employees in New York to discuss Luxalpha and Groupement. (SAC ¶ 68; *see, e.g.*, Beckerlegge Decl. Exs. 42-43, 48.)

After August 2006, UBSFSL served as Luxalpha's and Groupement's Registrar and Transfer Agent, responsible for issuing, redeeming, and transferring investors' shares in the

funds. (SAC ¶ 216; Beckerlegge Decl. Ex. 44 at LUXSAA00645-47; Ex. 45 at 2-4; Ex. 46 at 2-3.) UBSFSL also monitored the investment restrictions that Luxalpha purportedly placed on the types of securities that Madoff could trade. (*See* Beckerlegge Decl. Ex. 41 at 17-22, 25 (describing investment restrictions).)

While UBSFSL claims that none of UBSFSL's "tasks is alleged to have been performed in or directed to the United States" (UBS Mot. at 16), BLMIS records demonstrate fax communications and telephone discussions between BLMIS and UBSFSL employees (Beckerlegge Decl. Ex. 17 at AMF00077591 (facsimile communication between UBSFSL and BLMIS); *see also* Beckerlegge Decl. Ex. 49 (BLMIS's phone records suggesting at least 4 calls between UBSFSL and BLMIS)). Moreover, Luxalpha's operating memorandum reflects that UBSFSL was responsible for contacting Frank DiPascali at BLMIS if Luxalpha did not have sufficient cash on hand to satisfy outstanding redemption requests. (Beckerlegge Decl. Ex. 41 at 12, 17.)

The Trustee alleges that UBSFSL earned at least $2.5 million in fees with respect to Luxalpha from February 2004 to December 2008 (*see* SAC ¶ 333(b); Beckerlegge Decl. Ex. 50 at 9; Ex. 45 at 16) and fees of at least $497,000 from Groupement. (*See* SAC ¶ 333(b); Beckerlegge Decl. Ex. 46 at 8.) These fees, which the Trustee now seeks to recover, were based on Luxalpha's and Groupement's assets under management with BLMIS and were paid to UBSFSL as a result of UBSFL's facilitation of investment activity to New York.

### c.    UBSTPM

UBSTPM is subject to jurisdiction because it deliberately facilitated investment activity with BLMIS in New York and earned substantial fees in connection with those investments. *See Maxam*, 460 B.R. at 117-18; *Picard v. Chais* (*In re BLMIS*), 440 B.R. 274, 279 (Bankr. S.D.N.Y. 2010). UBSTPM served as Luxalpha's management company from August 2006 to November

36

2008, taking over as portfolio manager from UBS SA. (SAC ¶ 205; Declaration of Aloyse

Hemmen, dated Apr. 26, 2012, ECF No. 114 ¶ 9.)

UBSTPM was responsible for managing and administering the fund, as well as

monitoring investment policies and restrictions, and was officially responsible for Luxalpha's

investment management decisions. (Beckerlegge Decl. Ex. 25 at 7, 17; Ex. 31 at

LUXSAA0000410.) In reality, to safeguard enormous potential profits from BLMIS-related

work, UBSTPM simply adopted and did not disturb the decision to invest Luxalpha entirely with

BLMIS.[10] UBSTPM received at least $53.3 million in fees from Luxalpha for serving as

Luxalpha's official manager from August 2006 until November 2008. (SAC ¶ 333(c).) These

were management and performance fees tied to Luxalpha's performance. (Beckerlegge Decl. Ex.

25 at 6; Ex. 31 at LUXSAA0000415.)

To the extent that UBS SA retained control over UBSTPM with respect to the

management of Luxalpha's portfolio after August 2006, UBS SA's numerous connections with

New York should be imputed to UBSTPM for purposes of jurisdiction. *Dorfman*, 2002 WL

14363, at *3, 6 (finding jurisdiction based on agency where the corporation present in New York

"does all the business which [the foreign corporation] could do were it here by its own

officials"); *see also Palmieri*, 793 F. Supp. at 1194. As noted above, UBSTPM's role as

Luxalpha's manager was dictated by the Advisory Committee UBS SA formed, which consisted

entirely of UBS SA directors and Access principals. (Beckerlegge Decl. Ex. 32 at

LUXSAA0000697-98.) That committee's purpose was to advise UBSTPM "with

recommendations . . . in relation to the management and investment policy and strategy of the

---

[10] Asset management decisions for Luxalpha had been delegated to BLMIS in 2004 pursuant to the Trading
Authorization Limited to Purchases and Sales of Securities and Options. (Beckerlegge Decl. Ex. 51 at
ACCSAB0030235.)

Fund"—the very responsibilities that had supposedly been shifted from UBS SA to UBSTPM.

(*Id.* at LUXSAA0000698–99.) The committee's "recommendations" were more than just advice.

They were directives that UBSTPM was to "act upon and implement." (*Id.* at

LUXSAA0000699.) UBSTPM and UBS SA also executed an "Agreement of Understanding and

Indemnification," whereby UBS SA agreed to indemnify UBSTPM with respect to Luxalpha,

and UBSTPM agreed, upon request, to delegate its marketing functions to UBS SA.

(Beckerlegge Decl. Ex. 52 at 2.) The Advisory Committee's work, on behalf of UBSTPM,

constitutes additional contacts between UBSTPM and the forum, as alleged throughout the SAC.

Littaye and Delandmeter likewise had extensive contacts with the forum directly relating to the

Fund Defendants. Pursuant to its contract with UBS SA, UBSTPM also agreed to delegate its

administrative functions to UBSFSL. (*Id.*)

### C. THE TRUSTEE'S CLAIMS AGAINST THE PJ DEFENDANTS ARISE OUT OF THEIR CONTACTS WITH NEW YORK AND THE TRUSTEE DOES NOT NEED TO SHOW PROXIMATE CAUSE

Specific jurisdiction exists over each of the PJ Defendants because the SAC seeks to

recover BLMIS funds subsequently transferred to the PJ Defendants as fees from the Fund

Defendants, among other claims, and therefore unquestionably "arises out of or relates to" the PJ

Defendants' contacts with New York. *See Burger King*, 471 U.S. at 472 (stating that nonresident

defendant is subject to jurisdiction "if the defendant has 'purposefully directed' his activities at

residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or

relate to' those activities") (internal citations omitted); *see also Sole Resort, S.A. de C.V. v.

Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (requiring "some articulable nexus

between the business transacted and the cause of action sued upon" for jurisdiction under CPLR

§ 302(a)(1)).

The Trustee need only show that the PJ Defendants' contacts relate to the underlying claim; he does not need to show that they are the "but for" cause or proximate cause of the Trustee's claim. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). A lawsuit can be properly issued against a defendant where the underlying claims "relate to" the defendant's contacts with the forum even if those contacts did not give rise to the claim. *Id.* The Trustee's claims "only need be affiliated with the alleged in-state conduct." *Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *5 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The PJ Defendants' systematic and continued contacts with New York are such that proximate causation is not required.

"The 'arises out of or relates to those activities' prong may be satisfied when 'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (quoting *U.S. Bank*, 916 F.3d at 151). The Trustee's allegations unquestionably satisfy this prong. The Trustee has pleaded that the PJ Defendants received transfers of BLMIS money in the form of fees or profits through the Fund Defendants. These transfers were received in connection with the services they provided for directing investment activity to BLMIS in New York through the Fund Defendants. *Chais*, 440 B.R. at 278 ("[F]oreign defendants who profited by their maintenance of BLMIS accounts and receipt of transfers subjected themselves to personal jurisdiction of this Court with regard to the Trustee's claims arising from such transfers.") (citing *Picard v. Cohmad Sec. Corp.*, (*In re BLMIS*), 418 B.R. 75 (Bankr. S.D.N.Y. 2009) ("*Cohmad I*")).[11]

---

[11] The PJ Defendants' reliance on *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018) on the "arises out of or relates to" prong is misplaced. In *SPV Osus*, the plaintiffs, who were claiming that UBS aided and abetted Madoff's fraud, failed to allege that Osus relied on UBS's contacts with, or its creation and service of, the relevant feeder funds in that case, Luxalpha and Groupement. Osus had been investing with BLMIS since 1997, at least six years

The PJ Defendants knew that any funds being invested into Luxalpha and Groupement were being directed to New York for investment with BLMIS. They were aware that any returns or redemptions related to those investments similarly emanated from New York.[12] They received fees that were directly related to the economic activity being undertaken by BLMIS in New York, and received management and performance fees from Luxalpha and Groupement. (SAC ¶¶ 15, 90, 91, 149, 204, 333-34.)

### D. THE PJ DEFENDANTS WAIVED THE DEFENSE OF PERSONAL JURISDICTION BY PARTICIPATING IN THIS PROCEEDING AND RELATED PROCEEDINGS

The Access PJ Defendants and Delandmeter waived their objection to personal jurisdiction in this adversary proceeding. After moving to withdraw the reference to the District Court in July 2011 (Notice of Joinder, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. July 8, 2011), ECF No. 6), moving dispositively before the District Court in August 2011 (Notice of Joinder, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. Aug. 1, 2011), ECF No. 20), and opposing the Trustee's appeal in the Second Circuit in April 2012 (*Picard v. UBS AG (In re Bernard L. Madoff Inv. Sec.)*, No. 11-5051 (2d Cir. April 5, 2012), ECF No. 100), the Access PJ Defendants and Delandmeter now invoke Rule 12(b)(2) to contest this Court's ability to adjudicate this dispute based on lack of personal jurisdiction. It is improper for the Access PJ Defendants and Delandmeter to avail themselves of affirmative relief before the District Court

---

before it decided to invest with Luxalpha and Groupement. *Id.* at 345. Therefore, there could have been no reliance on UBS's involvement. Here, by contrast, the SAC includes clear allegations demonstrating that the claims to recover the subsequent transfers arise out of the PJ Defendants' activities to direct investments to BLMIS in New York.

[12] Citing *Landau v. New Horizon Partners, Inc*, No. 02 CIV 6802 (JGK), 2003 WL 22097989, at *6 (S.D.N.Y. Sept. 8, 2003), Delandmeter argues he did not receive payment in or from New York. (Delandmeter Mot. at 16-17.) But in *Landau*, the source of the funds at issue was not business transacted in New York. 2003 WL 22097989, at *6. Here, the Trustee alleges that Delandmeter purposefully contracted for and earned substantial fees for directing investment activity to BLMIS in New York through Luxalpha and Groupement. (SAC ¶¶ 227, 319, 336.)

and the Second Circuit, and then later argue that this Court lacks jurisdiction over them. *See Andros Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989) ("It is a fundamental tenet of jurisdictional law that a party may waive a challenge to the Court's *in personam* jurisdiction, . . . and appearing and seeking affirmative relief from the Court is the paradigm of such a waiver.").

In *Cohmad I*, this Court found that the defendants "effectively consented to personal jurisdiction by purposefully availing themselves of the protections afforded by United States bankruptcy law." *Cohmad I*, 418 B.R. at 81 (citing *In re Deak & Co., Inc.*, 63 B.R. 422, 431 (Bankr. S.D.N.Y. 1986)); *see also Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d. Cir. 1999) (defendant forfeited challenge to personal jurisdiction where he "joined with other defendants" in seeking transfer of case to another district court); *Deak*, 63 B.R. at 431–32 (defendant waived personal jurisdiction "when he filed his notice of appearance"); *Herbst Gaming, Inc. v. Insurcorp. (In re Zante, Inc.)*, No. 10-cv-00231 (RCJ) (RAM), 2010 WL 5477768, at *7 (D. Nev. Dec. 29, 2010) (noting that Defendants submitted to jurisdiction by filing a motion to withdraw the reference and motion for summary judgment, "which act constituted a general appearance").

Rule 12(h)(1) of the Federal Rules of Civil Procedure provides that a party waives the defense of lack of personal jurisdiction when it fails to raise that defense in either its first Rule 12 motion or in its responsive pleading. Fed. R. Civ. P. 12(h)(1)(B). "The message conveyed by . . . [R]ule 12(h)(1) seems quite clear. It advises a litigant to exercise great diligence in challenging personal jurisdiction . . . If that party wishes to raise [the defense of lack of personal jurisdiction], that must be done at the time the first significant defensive move[] is made— whether it be by way of a Rule 12 motion or a responsive pleading." *JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.*, No. 08 Civ. 2154 (VM), 2011 WL 1796298, at

*2 (S.D.N.Y. Apr. 22, 2011) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1391 (3d ed. 2010)).

While the District Court on July 12, 2011 ordered the Access PJ Defendants and Delandmeter to brief the threshold issues of standing and SLUSA preemption, Endorsed Letter, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. July 12, 2011), ECF No. 10, this was not an invitation to play fast and loose with the Federal Rules. The Access PJ Defendants and Delandmeter had the opportunity to bring to the District Court's attention their anticipated defense of lack of personal jurisdiction in their letters to the Court regarding their forthcoming motions to dismiss—but did not. *See, e.g.*, Endorsed Letter, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. July 12, 2011), ECF No. 10. Instead, they simply asserted that they intended to "preserve" the defense in their August 1, 2011 moving papers in support of their motion to dismiss for lack of standing and SLUSA preemption. *See* Notice of Joinder at 4, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. Aug. 1, 2011), ECF No. 20. The District Court's briefing order did not exempt them from complying with Rule 12(h)(1).

The Access PJ Defendants' and Delandmeter's attempt to "preserve" the defense of lack of personal jurisdiction by simply announcing their intent to contest the Court's jurisdiction at a later point in time is inadequate. *See* Notice of Joinder at 4, *Picard v. UBS AG*, No. 11-cv-04212 (S.D.N.Y. Aug. 1, 2011), ECF No. 20. This approach is procedurally improper and has been rejected in the Southern District of New York. *See, e.g.*, *Bryant Park Capital, Inc. v. Jelco Ventures*, No. 05 Civ. 8702 (GEL), 2005 WL 3466013, at *1 (S.D.N.Y. Dec. 16, 2005) ("[D]efendants are mistaken in contending that they 'do not waive' *any* of the listed objections [by "assert[ing], in passing, that . . . they 'do not waive' any future objection" to personal

42

jurisdiction]; the failure to properly raise a Rule 12(b)(2) motion for lack of personal jurisdiction at this juncture is preclusive.").

It is the Trustee's position that Littaye also waived his objections to personal jurisdiction by failing to raise the issue in the 2012 Motions to Dismiss. While the Access PJ Defendants noted in their brief that Littaye contests the jurisdiction of the United States, Littaye has not made this assertion before the Court until now. (Access Mot. at 1.)

Likewise, UBS AG also waived its ability to contest personal jurisdiction. In 2012, UBS filed a Motion to Dismiss the Amended Complaint alleging lack of personal jurisdiction over UBSFSL, UBS SA, and UBSTPM, as well as other Director Defendants, but not over UBS AG. (ECF No. 108.) *Gilmore v. Shearson American Exp. Inc.*, 811 F.2d 108, 112 (2d Cir. 1987) (overruled on other grounds) (failure to raise lack of personal jurisdiction under Rule 12 in response to the original complaint "may not be resurrected merely because a plaintiff has amended the complaint."); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("the defenses and objections that are irrevocably waived by answering an original complaint are those that involve[] the core issue of a party's willingness to submit a dispute to judicial resolution, such as objections to lack of personal jurisdiction . . . .") (internal quotations and citation omitted).

### E.    THE TRUSTEE'S ALLEGATIONS ARE NOT CONCLUSORY

The allegations in the SAC are fact-specific jurisdictional allegations that satisfy the Trustee's *prima facie* burden to adequately plead jurisdiction over the PJ Defendants. The Trustee's allegations are neither generalized nor unsupported as the PJ Defendants claim. The PJ Defendants claim that because paragraph 22 of the SAC lacks sufficient detail, the Trustee has not pleaded personal jurisdiction over them. Paragraph 22 sets forth the legal bases—N.Y. CPLR. 301 and 302 and Federal Rule of Bankruptcy Procedure 7004—of personal jurisdiction in

this case and summarizes, in broad terms, the SAC's jurisdictional allegations. The PJ

Defendants' argument (Access Mot. at 4; UBS Mot. at 8; Delandmeter Mot. at 9.) insinuates that

the detailed factual allegations throughout the SAC setting forth the defendants' activities

directed at BLMIS investment in New York are nullified by the inclusion of summary language

in paragraph 22. This is nonsense.

The SAC details meetings the PJ Defendants attended in New York, particularly with

Madoff at BLMIS's New York office, their regular communications with Access New York

employees about Luxalpha's and Groupement's BLMIS investments, Access's operations as a

single purpose enterprise acting out of New York, UBS AG's presence in New York, the PJ

Defendants' execution of agreements with BLMIS, Luxalpha's and Groupement's receipt of

transfers of BLMIS funds through New York banks, the sharing of information with Access's

New York office about Luxalpha's and Groupement's BLMIS investments, Access's and UBS's

review of information received from BLMIS in NY, UBS SA's New York contacts, Luxalpha's

New York contacts, and LIF-USEP's New York contacts. (SAC ¶¶ 63, 69, 70, 77, 80, 82, 91, 94,

97, 135, 153, 154, 198, 199, 200, 209.)

The Trustee has pleaded personal jurisdiction with the specificity required and the PJ

Defendants argument to the contrary is disingenuous.

## F.    THE EXERCISE OF PERSONAL JURISDICTION IS REASONABLE

The PJ Defendants fail to present a compelling reason why jurisdiction would be

unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion

of personal jurisdiction . . . comports with 'traditional notions of fair play and substantial justice'

under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d

317, 331 (2d Cir. 2016) (citations omitted). The relevant facts for the Court to consider include

"the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's

44

interest in obtaining convenient and effective relief, the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and the shared interest of the several

States in furthering fundamental substantive social policies." *Multi-Strategy Fund Ltd.*, 2022 WL

2137073, at *5. Where a plaintiff has made a threshold showing of minimum contacts, a

defendant must present a "compelling case that the presence of some other considerations would

render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at

477). This Court has found that "it would be a 'rare' case where the defendant's minimum

contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to

force the defendant to defend the action in that forum." *Picard v. BNP Paribas S.A. (In re

BLMIS)*, 594 B.R. 167, 188 (Bankr. S.D.N.Y. 2018).

      This is not that "rare" case. The burden on the PJ Defendants is minimal. *See Maxam*,

460 B.R. at 119 (finding New York counsel and conveniences of modern communication and

transportation minimize any such burden). The PJ Defendants have also been litigating in this

Court for the past ten years. *See Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *5. The United

States also has a strong interest in applying U.S. law in this SIPA liquidation proceeding. *See id.*;

*see also In re Picard*, 917 F.3d at 85, 103 (2d Cir. 2019) (noting a "compelling interest in

allowing domestic estates to recover fraudulently transferred property"). And the Trustee has a

strong interest in litigating in the United States. *See Maxam*, 460 B.R. at 119–20 (finding that the

"the most efficient resolution of the controversy would be in the United States, where the

inextricably-related BLMIS litigation is ongoing. . . .") Accordingly, this Court's exercise of

jurisdiction over the PJ Defendants is more than reasonable.

### G.    AT MINIMUM THE TRUSTEE IS ENTITLED TO JURISDICTIONAL DISCOVERY

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests that he be entitled to jurisdictional discovery. A party may be entitled to jurisdictional discovery when a "plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009) (internal citation marks and quotation omitted). The Trustee has made at least this threshold showing for each of the PJ Defendants. The Trustee has alleged that the Access entities, *inter alia*, functioned as a single business enterprise with management, marketing, and operational decisions being coordinated through the AIA LLC or AIA Inc. New York office and with the Access entities being at all times coordinated, dominated, and controlled by Littaye and Villehuchet. The Trustee has alleged that the UBS PJ Defendants worked as a coherent and effective whole and that they did so in their service of Luxalpha and Groupement to direct investments to BLMIS in New York. At a minimum, these facts establish a "threshold showing" of jurisdiction sufficient for discovery. *Id.* at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

Where jurisdictional theories are fact intensive, such as those alleged here, jurisdictional discovery is warranted. *See Winston & Strawn v. Dong Won Sec. Co.*, No. 02 Civ. 0193 (RWS), 2002 WL 31444625, at *5 (S.D.N.Y. Nov. 1, 2002) (ordering jurisdictional discovery to "gauge the extent of [the parent's] control over [the subsidiary] and whether such control would provide a basis for jurisdiction . . . ."); *see also Amsellem v. Host Marriot Corp.*, 280 A.D.2d 357, 359 (N.Y. App. Div. 2001) (finding jurisdictional discovery appropriate "especially since the

corporate relationships are complex and the relevant facts are exclusively within the control of the party seeking dismissal" (internal citation omitted)); *Kucher v. Domino's Pizza, Inc.*, No. 16-CV-02492 (AJN), 2017 WL 2987214, at *11-13 (S.D.N.Y. Feb. 13, 2017) (holding that plaintiffs alleged subsidiaries were "mere department[s]" of the parent entity subject to general jurisdiction in New York were sufficent to warrant jurisdictional discovery); *Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 417 (S.D.N.Y. 2009) (noting that jurisdictional discovery, rather than dismissal, is particularly appropriate if questions remain "regarding the relationship between a parent and its subsidiary given the fact-specific nature of the inquiry into whether a subsidiary's contacts should be imputed to the parent").

The Trustee acknowledges that he has received some documents from UBS SA, UBS AG, AIA LLC, and AIA Inc. through the Rule 2004 process. (UBS Mot. at 29; Access Mot. at 1, 30.) But the production from UBS is incomplete and there has been no discovery from the other PJ Defendants. Targeted jurisdictional discovery would elucidate the facts concerning the PJ Defendants' relationship with the other defendants, including the Fund Defendants. Although the Trustee submits that he had made the required showing here, jurisdictional discovery, including narrowly focused document requests and interrogatories, would allow the Trustee to confirm whether the Access PJ Defendants: (1) were ultimately owned at all relevant times by Littaye and Villehuchet; (2) were financially dependent on AIA LLC's and AIA Inc.'s New York office; (3) had no employees or actual physical office space; and (4) relied on employees in AIA LLC's and AIA Inc.'s New York office to perform duties to Luxalpha and Groupement. It would also confirm the UBS PJ Defendants' operations and their procedures in servicing the Fund Defendants. Importantly, jurisdictional discovery would also enable the Trustee to learn the details of the transfers of BLMIS Customer Property that the PJ Defendants received from

47

Luxalpha and Groupement (either directly or indirectly), out of which the Trustee's subsequent

transfer causes of action arise, and which form the basis for jurisdiction over them.

## II.    THE TRUSTEE'S CLAIM AGAINST THE DEFENDANTS UNDER SECTION 550 SHOULD NOT BE DISMISSED

### A.    LEGAL STANDARD

When considering motions to dismiss under Federal Rule of Civil Procedure 12(b)(6),

"the Court must liberally construe all claims, accept all factual allegations in the complaint as

true, and draw all reasonable inferences" in the plaintiff's favor. *In re J.P. Jeanneret Assocs.,*

*Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352

F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)). To survive a

motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the pleading stage, the allegations

need only meet the "plausibility" standard, such that they "'nudge[] [the] claims' . . . 'across the

line from conceivable to plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). The

court's task is "not to assess the weight of the evidence" or identify the most plausible inference.

*Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020); *Anderson News L.L.C. v. Am. Media*

*Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).

Rule 9(b), which governs claims to avoid intentional fraudulent transfers, requires

complaints to state "with particularity the circumstances constituting fraud" but permits

"[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"

and requires less particularity where the opposing parties are insiders or affiliates or otherwise

control the relevant facts. Fed. R. Civ. P. 9(b); *Picard v. Legacy*, 548 B.R. 13, 35-36 (Bankr.

S.D.N.Y. 2016). "Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee,

applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee

is an outsider to the transaction who must plead fraud from second-hand knowledge." *Multi-*

*Strategy Fund Ltd.*, 2022 WL 2137073, at *7. "Even greater latitude should be afforded," when,

in a case such as this one, "the Trustee's lack of personal knowledge is compounded with

complicated issues and transactions that extend over lengthy periods of time." *Id.* at 14 (citing

*Picard v. Cohmad Sec. Corp., (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011)

("*Cohmad II*")).

## B. SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY FROM THE DEFENDANTS

### 1. The Majority of the Defendants' Arguments Concerning 546(e) Are Irrelevant or Beyond the Pleadings

The Defendants[13] invoke the section 546(e) safe harbor to shield from avoidance all

transfers beyond the two-year period. "[T]he safe harbor applies where two requirements are

met: (1) there is a qualifying transaction (i.e., there is a 'settlement payment' or a 'transfer

payment . . . made in connection with a securities contract) and (2) there is a qualifying

participant . . .'" i.e., a stockbroker. *In re Fairfield Sentry Ltd*., 10-13164 (SMB), 2020 WL

7345988, at *5 (Bankr. S.D.N.Y. Dec. 14, 2020), *reconsideration denied*, 10-13164 (SMB),

2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (citations omitted). In *Ida Fishman*, the

Second Circuit found that BLMIS is a stockbroker, an issue that has not been in dispute, and that

BLMIS's payments to its customers were qualifying transactions because they had been made

---

[13] Access and Delandmeter have adopted UBS's arguments concerning section 546(e). Any of the Trustee's arguments in this section in response to UBS's brief equally apply to the other Defendants.

"in connection with" securities contracts—the BLMIS Account Opening Documents—and constituted "settlement payments." *In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Recoverable Trust)*, 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*").

In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12-MC-115, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad III*"), the District Court held that the Trustee may defeat a transferee's invocation of the section 546(e) safe harbor—thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year period referenced in section 548(a)(1)(A)—provided the Trustee pleads that the defendant knew it was not entering into a securities contract with BLMIS.

UBS sets forth at length the requirements of section 546(e) and argues that they are met in this case in multiple, alternative, ways. Most of UBS's discussion on this point—i.e., whether BLMIS is a stockbroker, whether the transfers are to a financial institution,[14] or whether the transfers are settlement payments or made in connection with a securities contract—is irrelevant; the Second Circuit settled the issue of whether section 546(e) applies to limit the avoidance of transfers between BLMIS and its customers long ago. *See Ida Fishman*, 773 F.3d at 417.

Next, UBS argues that BLMIS could have made the initial transfers in connection with the Fund Defendants' "securities contracts with their own investors, including investment fund subscription agreements and redemption requests tendered pursuant thereto." (UBS Mot. at 23.) It seems UBS makes this argument to hedge against the Court's potential finding that the Trustee has pleaded that the Fund Defendants knew that the account opening documents were not securities contracts. (*Id.* at 25.) According to UBS, if the investor subscription agreements

---

[14] Given that the prong is satisfied it is unclear why UBS then contends that the transfers here were made to a "financial institution" or reserves alternative argument, that the transfers were made to (or for the benefit of) a financial participant.

qualify as securities contracts, then the Trustee will not be able to demonstrate that they were

fictitious and thus the initial transferees could never be accused of knowing they were not real.

To support its argument, UBS seizes on *dicta* in *Cohmad III* wherein the court

hypothesized that a subsequent transferee's subscription agreements with the initial transferee

feeder fund, and related agreements and transactions, might under certain circumstances

constitute relevant securities contracts. 2013 WL 1609154, at *9.[15] First, that issue was not

decided in *Cohmad III* and the Trustee does not concede whether such contracts could indeed

form securities contracts for purposes of section 546(e). More importantly, to apply that scenario

to the facts herein, it is incumbent on UBS to demonstrate where in the SAC the Trustee pleads

that the initial transfers were made in connection with investor subscription agreements or

redemption requests. UBS points only to one allegation: "Luxalpha and Groupement Financier

were among the feeder funds . . . established to direct investors into BLMIS." (UBS Mot. at 24

(citing SAC ¶ 2).) Obviously, this allegation does not establish that BLMIS made the initial

transfers, let alone each of them, to the Fund Defendants in connection with investor subscription

agreements or investor redemptions. In fact, the SAC makes no mention of the contracts that

governed the relationship between the Fund Defendants and their investors.[16] The only

conclusion that can be drawn from the SAC is that the BLMIS redemptions were made at the

---

[15] The original point of the *Cohmad III* hypothetical was to address the subsequent transferee defendants' argument
that, if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant
securities agreements under Section 546(e). 2013 WL 1609154, at *8. That argument became moot as both the
Second Circuit and the District Court determined that each BLMIS customer agreement was a "securities
agreement" and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities
were traded and therefore the Trustee's avoidance claims were subject to Section 546(e).

[16] UBS reserves "for later consideration," the argument that the initial transfers were made "for the benefit of" a
financial institution because they "were ultimately made to satisfy redemptions made by the funds' investors, which
were financial institutions." (UBS Mot. at 18 n.3 (citing *Cohmad III*).) It is unclear what UBS means by "later
consideration." Regardless, this argument would fail if made here because nowhere in the SAC does it allege that
the initial transfers were made to satisfy investor redemptions.

behest of the initial transferee Fund Defendants. (*See, e.g.*, SAC ¶ 70 ("UBS SA employees

regularly corresponded with Frank DiPascali of BLMIS for purposes of managing Luxalpha's

investments and redemptions. All redemptions UBS SA requested for the Luxalpha fund were

processed through an account held at UBS AG's Stamford, Connecticut branch."); SAC ¶ 136

(UBSFL "was responsible for . . . handling subscriptions and redemptions . . . for the funds.").)

As such, UBS's argument fails.

### 2.    The SAC Plausibly Pleads That the Fund Defendants Had Actual Knowledge That No Securities Were Being Traded

UBS makes two additional arguments. It claims that the Trustee has not pleaded the

defendants' actual knowledge to defeat section 546(e). It also contends that section 546(e) does

not turn on a transferee's knowledge, and that *Cohmad III* was therefore wrongly decided.[17] With

respect to the latter, UBS is precluded from arguing that *Cohmad III* is wrong and relitigating

whether a transferee's actual knowledge bars the application of section 546(e). *Cohmad III* was

issued in connection with consolidated proceedings before the District Court as to the application

of section 546(e), and that decision held that a party with actual knowledge of Madoff's fraud

cannot claim section 546(e)'s protections. The District Court then remanded the relevant cases

back to this Court, and this Court has since applied the actual knowledge "exception" on several

occasions.[18] UBS is bound by *Cohmad III* and that decision is law of the case. *See Picard v.*

---

[17] Though UBS does not say so explicitly, that is the implication of its argument. Access states outright its belief that *Cohmad III* was wrongly decided. (Access Mot. at 31 n.12.)

[18] *See e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Fairfield Inv. Fund Ltd.)*, No. 08-01789 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021) (applying actual knowledge exception); *Picard v. Square One Fund Ltd.*, Bench Ruling on Motion to Dismiss, Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2018) (same); *Picard v. Magnify, Inc.*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (same); *Picard v. Mendelow et al.*, 560 B.R. 208 (Bankr. S.D.N.Y. Sept. 28, 2016) (same); *Picard v. Avellino*, 557 B.R. 89, 112 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Shapiro*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015) (same); *Picard v. Ceretti, et al.*, No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *Picard v. Merkin*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) (same).

*Goldenberg*, Adv. Pro. No. 10-04946, 2018 WL 3078149, at *5 (Bankr. S.D.N.Y. June 20, 2018)

("Although the Defendant did not join in the motions that led to these decisions, the decisions are

nevertheless law of the case which applies to rulings across adversary proceedings filed within

the same bankruptcy case") (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y.

2018)); *Picard v. Miller*, 631 B.R. 1, 17 (Bankr. S.D.N.Y. 2021) ("The prior decisions within

this SIPA proceeding constitute law of the case."); *In re Bernard L. Madoff Inv. Sec. LLC*

(*Picard v. Estate of Seymour Eptstein*), No. 1:21-CV-02334-CM, 2022 WL 493734, at *12

(S.D.N.Y. Feb. 17, 2022) ("Significantly, in a SIPA liquidation like this one, the different

adversary proceedings arising within the same liquidation are 'one case' for purposes of the [law

of the case] doctrine.").

    Bound by *Cohmad III*, the only argument that remains is whether the Trustee has pleaded

that the Fund Defendants had actual knowledge that Madoff was not trading securities. The Fund

Defendants "are not natural persons and can act only through 'the instrumentality of their

officers or other duly authorized agents.'" *Fairfield*, 2021 WL 3477479, at *4 (citing *45 John

Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 743 (Bankr.

S.D.N.Y. 2019)). Neither Luxalpha nor Groupement ever had any employees or office space, and

both acted solely though their agents—UBS and Access. (SAC ¶¶ 315-23.) Therefore the Fund

Defendants' agents' knowledge and acts are imputed to the Fund Defendants. *Fairfield,* 2021

WL 3477479, at *4.

    Because the SAC sufficiently pleads the Fund Defendants' actual knowledge, the Trustee

is entitled to avoid all transfers BLMIS made within the six-year period. Despite the Defendants'

contention to the contrary, the Trustee has demonstrated that Luxalpha and Groupement knew

that Madoff was not trading securities. Access had special access to Madoff as a result of

Littaye's close relationship with him. (SAC ¶¶ 109-11.) Access continually expanded that relationship, despite knowing that the BLMIS fund structure violated Luxembourg law. For example, though Access was forced to close Oreades because of BNP's inability to confirm Madoff's trades and BLMIS's illegal role as both custodian and investment advisor, Access opened Luxalpha while winding down Oreades so as not to squander a day of potential profit from the extensive fees they drew from Madoff investment. Luxalpha was then structured to circumvent Luxembourg anti-fraud protections. (SAC ¶¶ 123-25, 214.) Once Luxalpha was up and running, Access deliberately acted to assist Madoff in evading regulatory scrutiny. (SAC ¶ 97.) Access found UBS—which, after initially declining, agreed to ignore its own internal policies and Luxembourg law—to act as a "front" and "window dressing" to mislead the Luxembourg regulator. (SAC ¶¶ 131, 169.) Littaye and Access even used AIA LLC to serve as "investment adviser" to help Madoff avoid SEC scrutiny, thus helping to mislead a second regulator. In 2003, the Defendants further expanded their BLMIS relationship when they created Groupement. (SAC ¶ 135.)

Throughout their relationship, the Defendants recognized Madoff as a fraud risk, noting that Madoff's returns were "IMPOSSIBLE," that his fee structure was a "non-starter," and that "IF THE ANALYSTS OF [UBS] ZURICH FIND OUT B[L]MI[S] IS BEHIND THE STORY, WE WOULD BE KILLED." (SAC ¶¶ 140-55.) Despite knowing that BLMIS's involvement with the Fund Defendants was illegal, UBS and Littaye sought to quash the concerns of those around them instructing employees to not "go further." (SAC ¶¶ 197, 263-65, 283.) UBS and Access silenced employees who complained of irregularities and non-disclosures and avoided providing information to the SEC concerning Madoff. (SAC ¶ 197.)

But some did "go further," and when they looked closely they found clear evidence of fraud. In 2006, Dumbauld analyzed Luxalpha's BLMIS account statements and determined that Madoff was reporting impossible securities transactions. (SAC ¶¶ 221-23.) In fact, there were 473 instances where BLMIS's purported trading for Luxalpha and Groupement exceeded the total CBOE volume; in 151 of those instances, the volume traded was at least *ten times* the total volume traded on the CBOE. (SAC ¶ 231.) Refusing to accept Dumbauld's conclusion, Access's founder and principal Villehuchet, demanded that Dumbauld get a second opinion. Access hired an outside consultant, Christopher Cutler, who, after merely four days of analysis confirmed these and more impossibilities and recommended an immediate exit. (SAC ¶¶ 224-26, 234-35, 249, 257, 266.)

Cutler identified serious problems with the feasibility of Madoff's strategy, including the lack of any independent verification of trades or assets and the opportunity for fraud created by the delayed, paper-confirmation-only reporting of trades. Cutler conveyed to Access his belief that BLMIS's strategy did not make sense and that the size of BLMIS's purported trades was so large that there was no apparent way the trades could actually have been implemented without moving the market against BLMIS. According to Cutler, if any BLMIS fund were a new investment product, not only would it fail to meet due diligence standards, but that Access would "likely shove it out the door." (SAC ¶ 266.) Access disregarded the analysis and ended Cutler's inquiry. (SAC ¶¶ 227-28, 268-73.) Later in 2006, a Luxalpha investor contacted Madoff directly to ask for the identity of options counterparties. (SAC ¶ 260.) Madoff called Littaye to shut the investor's inquiry down, providing Littaye with a nonsensical explanation concerning the counterparties that Littaye himself did not understand. (SAC ¶ 261.) Yet Littaye still passed Madoff's explanation along to the investor. (SAC ¶ 262.) Later that day, recognizing that

55

Littaye's problematic response could lead to further questions, Villehuchet contacted the same

investor and directed him never to contact Madoff again. (*Id.*) While continually suppressing all

evidence of fraud at BLMIS, Littaye and Villehuchet worked to ensure Madoff was not subject

to Access's anti-fraud due diligence, which it publicly touted and conducted on all of its other

existing and potential investments.

These allegations are but some of the hundreds in the complaint that detail the red flags

identified as part of the review of Madoff's trading activity (SAC ¶ 296-97), including 74 of out

range trades, (SAC ¶ 286), impossible dividend activity, settlement date anomalies, incorrect

trade statements, and concerns over paper account statements (SAC ¶ 301-04). Taken together

these allegations plausibly plead that the Fund Defendants had actual knowledge that no

securities were being traded.

## C.    THE TRUSTEE HAS ADEQUATELY ALLEGED ACTUAL FRAUDULENT INTENT UNDER SECTION 548(A)(1)(A)[19]

UBS next argues that the Two-Year Transfers are also not avoidable or recoverable,

because the Trustee has failed to adequately allege BLMIS's "actual intent to hinder, delay or

defraud" creditors under section 548(a)(1)(A) of the Bankruptcy Code. UBS contends that the

SAC lacks particularized allegations of BLMIS's actual fraudulent intent as required by Rule

9(b), and that the Trustee instead improperly relies on the "Ponzi scheme presumption." (UBS

Mot. at 28-31.) Under this presumption, "the existence of a Ponzi scheme demonstrates actual

intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have

been made for no purpose other than to hinder, delay or defraud creditors." *In re Bernard L.*

---

[19] Access and Delandmeter have adopted UBS's arguments concerning the Trustee's pleading of actual fraudulent intent under section 548(a)(1)(A). Any of the Trustee's arguments in this section in response to UBS's brief equally apply to the other Defendants.

*Madoff Inv. Sec. LLC*, 12 F.4th 171, 181 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v.

Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022) ("*Citibank*") (citing *Picard v. Estate

(Succession) of Igoin (In re BLMIS)*, 525 B.R. 871, 892 n.21 (Bankr. S.D.N.Y. 2015)). UBS's

argument as to the Ponzi scheme presumption falls flat. Actual intent has already been repeatedly

determined to exist in the Trustee's cases by virtue of the Ponzi scheme presumption.[20] And the

SAC alleges numerous facts supporting that BLMIS was a Ponzi scheme, including that the

money received from investors was used to pay off other investors—the *sine qua non* of a Ponzi

scheme. (SAC ¶¶ 28-31, 42-61.)

Moreover, federal courts in this jurisdiction have embraced the Ponzi scheme

presumption. *See, e.g.*, *In re Bayou Grp., LLC*, 439 B.R. 284, 307 (S.D.N.Y. 2010) (holding

the Ponzi scheme presumption was "fully applicable" to establish actual fraudulent intent);

*Armstrong v. Collins*, No. 01-cv-2437, 2010 WL 1141158, at *20 (S.D.N.Y. Mar. 24, 2010) ("In

considering claims of actual fraud, 'courts have widely found that Ponzi scheme operators

necessarily act with actual intent to defraud creditors due to the very nature of their schemes.'")

---

[20] *See, e.g.*, *Picard v. Sage Realty*, No. 20-CV-10109 (JFK), 2022 WL 1125643, at *27-28 (S.D.N.Y. Apr. 15, 2022)
(concluding Trustee has established actual intent to defraud pursuant to Ponzi scheme presumption); *Picard v.
Fairfield Pagma Assocs., LP*, Adv. Pro. No. 10-05169, 2022 WL 1110560, at *3 (Bankr. S.D.N.Y. Apr. 13, 2022)
(finding actual "intent to defraud is established as BLMIS operated a Ponzi scheme" at summary judgment stage);
*Estate of Seymour Epstein*, 2022 WL 493734, at *17-18 (S.D.N.Y. Feb. 17, 2022) (holding that the "Trustee is
entitled to the benefit of the Ponzi scheme presumption, and so can prove fraudulent intent as a matter of law");
*Picard v. Lisa Beth Nissenbaum Trust*, No. 20 cv. 3140 (JGK), 2021 WL 1141638, at *11 (S.D.N.Y. Mar. 24, 2021)
("There is no genuine dispute of material fact that BLMIS operated a Ponzi scheme. The breadth and notoriety of
the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts
of this case, particularly in light of Madoff's criminal admission.") (citations and quotation marks omitted); *Picard
v. JABA Assocs. LP*, 528 F. Supp. 3d 219, 237 (S.D.N.Y. 2021); *Picard v. Ken-Wen Fam. Ltd. P'ship*, Adv. Pro. No.
10-04468 (CGM), 638 B.R. 41, 49 (Bankr. S.D.N.Y. 2022) ("Intent to defraud is established as Madoff operated a
Ponzi scheme."); *Picard v. Gerald & Barbara Keller Fam. Trust*, 634 B.R. 39, 47 (Bankr. S.D.N.Y. 2021) (same);
*Picard v. Nelson*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019) ("[T]he Trustee has established that the Two-Year
Transfers were made with actual intent to defraud under the Ponzi scheme presumption."); *see also In re Bernard L.
Madoff Inv. Sec. LLC*, 976 F.3d 184 (2d Cir. 2020), *cert. denied sub nom. Gettinger v. Picard*, 141 S. Ct. 2603, 209
L. Ed. 2d 736 (2021) (in which the Second Circuit noted that the case "arises out of the infamous Ponzi scheme
perpetrated by Bernard L. Madoff" (footnote omitted)).

(citation omitted); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R.

1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit[.]");

*Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2006) (complaint adequately

alleged actual intent under New York state law equivalent of section 548(a)(1)(A) where

complaint alleged defendants perpetrated a Ponzi scheme); *In re Dreier LLP*, 452 B.R. 391, 425

(Bankr. S.D.N.Y. 2011) (noting that courts in this jurisdiction and elsewhere have "uniformly

recognized" the Ponzi scheme presumption); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan

Inv. Fund Ltd.)*, 310 B.R. 500, 506-07 (Bankr. S.D.N.Y. 2002) (citing cases holding that debtor

operating a Ponzi scheme is presumed to have made transfers with fraudulent intent). Although

Defendants ask this Court to disregard all of the above decisions, this Court has already stated

that it "will follow all courts who have opined on the issue and allow the Trustee to rely on the

Ponzi scheme presumption." Memorandum Decision Granting Summary Judgment in Favor of

the Trustee, *Picard v. Jacob M. Dick Rev Living Trust DTD 4/6/01*, Adv. Pro. No. 10-04570

(CGM) (Bankr. S.D.N.Y. June 6, 2022), ECF No. 141, at 11 (citing *Estate of Seymour Epstein*,

2022 WL 493734, at *17).

UBS concedes, as it must, that the Ponzi scheme presumption has been applied by this

Court and the District Court in the Trustee's actions and does not attempt to rebut that law of the

case applies. (UBS Mot. at 30.) Nevertheless, UBS urges this Court to disregard this settled

principle in light of a single statement by a Circuit Judge in a concurring opinion to the Second

Circuit's *Citibank* decision, in which that Judge questioned the Ponzi scheme presumption as it

applied to the facts in that case. *See Citibank*, 12 F.4th at 202 (Menashi, J., concurring).

However, the District Court recently recognized that, "[n]otwithstanding Judge Menashi's

concerns, 'the Ponzi scheme presumption remains the law of this Circuit.'" *See Sage Realty*,

2022 WL 1125643, at *28 (citing *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11). Moreover,

*dicta* in a concurring opinion has no precedential effect, and it certainly does not constitute an

intervening change of controlling law or provide any other "cogent" or "compelling" reason to

depart from the law. *See Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) ("We may

depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening

change in law, availability of new evidence, or 'the need to correct a clear error or prevent

manifest injustice.'") (citing *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002));

*Cohen v. UBS Fin. Servs., Inc.*, No. 12-CV-02147, 2014 WL 240324, at *4 (S.D.N.Y. Jan. 22,

2014) (preceding decision was not considered "intervening change in controlling law" when

relevant finding was "mere dicta"); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt

Miller,* 957 F.2d 1575, 1578 (11th Cir. 1992) (recognizing that dicta was "neither the law of the

case nor binding precedent").

      UBS attempts to cast doubt on the presumption's validity by citing a handful of

inapplicable cases. *Finn v. All. Bank*, 860 N.W.2d 638, 646-47 (Minn. 2015) concludes that the

presumption did not apply purely as a matter of Minnesota state law. *Lustig v. Weisz & Assocs.,

Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350-54 (Bankr. W.D.N.Y. 2001) addresses

avoidance of a fraudulent conveyance under a *constructive fraud* theory in connection with a

Ponzi scheme, without even mentioning the presumption as it applies to an *actual fraud* theory.

Neither case rejects the presumption as it applies to section 548(a)(1)(A). UBS also cites to

*Sharp International Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005) in

support of its argument, but multiple courts have explained why *Sharp* does not do away with the

Ponzi scheme presumption. *See, e.g., Dreier*, 452 B.R. at 425 (rejecting argument that *Sharp*

eliminated the Ponzi scheme presumption because "*Sharp* did not involve a Ponzi scheme and

the Second Circuit did not discuss or refer to the Ponzi scheme presumption or Ponzi schemes in

general"); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11 ("*Sharp* does not dispose of the Ponzi

scheme presumption. At most, it simply means that courts must be sure that the transfers sought

to be avoided are related to the scheme.").

Finally, even if this Court were to entertain UBS's arguments as to the Ponzi scheme

presumption, the Trustee has in any event satisfied Rule 9(b). Numerous courts have found that

BLMIS's actual intent to defraud has been established independent of the presumption, based on

the same "badges of fraud" as alleged in the SAC, such as, among others, BLMIS's concealment

of facts, BLMIS's insolvency, and the lack of consideration provided for BLMIS's fictitious

transfers to customers. (SAC ¶¶ 28-31, 42-61.) *See JABA Assocs. LP*, 528 F. Supp. 3d at 241

("[T]he existence of the badges of fraud supply a separate basis to conclude that the Two-Year

Transfers were made with the actual intent to defraud.") (quoting *Nelson*, 610 B.R. at 235); *Lisa

Beth Nissenbaum Trust*, 2021 WL 1141638, at *15 (same). In light of these and the other

allegations detailing Madoff's fraud, it is also particularly difficult to take seriously UBS's

suggestion that based on the complaint, the initial transfers could have been made by BLMIS to

"merely honor[] its contractual commitments to the Fund Defendants." (UBS Mot. at 29.)

### D.   THE TRUSTEE HAS PLAUSIBLY PLEADED THAT HE CAN RECOVER THE SUBSEQUENT TRANSFERS FROM THE DEFENDANTS

The SAC states a claim for recovery under Section 550(a)(2) by plausibly alleging that

the Defendants received subsequent transfers of BLMIS stolen Customer Property. A complaint

must show that a claim is plausible but does not require that it be probable and must show

enough facts "to raise a reasonable expectation that discovery will reveal evidence" of the claim.

*Picard v. Mayer*, No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27,

2021) (citing *Twombly*, 550 U.S. at 556). And "a well-pl[ed] complaint may proceed even if it

strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at \*5 (citing *Twombly*, 550 U.S. at 556).

### 1.    The SAC Pleads That the Defendants Received BLMIS Customer Property Under Section 550(a) of the Bankruptcy Code

To successfully plead a subsequent transfer claim, the Trustee must allege sufficient facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149-50 (Bankr. S.D.N.Y. 2014) ("*Merkin I*") (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). No tracing analysis is necessary—the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id*. at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, No. 10-04398 (BRL), 2012 WL 892514, at \*3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at \*3; *see also In re 45 John Lofts, LLC*, 599 B.R. at 747.

### 2.    The Defendants Misstate the Trustee's Pleading Burden

Rule 8(a) governs the Trustee's pleading burden and thus a short and plain statement that the pleader is entitled to relief is all that is required. *See Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at \*6; *Merkin I*, 515 B.R. at 149; Fed. R. Civ. P. 8(a). This standard of pleading is meant to ensure that the defendant has proper notice of the claim, while recognizing the limitations a plaintiff may have in setting out each detail of the claim before discovery. *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400369, at \*4 (Bankr. S.D.N.Y. May 11, 2006). In a subsequent transfer claim, this means only that a defendant must be adequately apprised of the subsequent transfers that the Trustee seeks to recover. *Cohmad II*, 454 B.R. at 340.

The SAC satisfies the Trustee's pleading burden. The allegations detail an enterprise of entities, individuals, and their agents participating in Luxalpha's and Groupement's investment with BLMIS and the subsequent transfer of Customer Property for their benefit. (SAC ¶¶ 13, 33.) The Defendants are: (i) service providers that received fees based on Luxalpha's and Groupement's assets under management; and (ii) principals that received payments for facilitating the BLMIS relationship. Though UBS and Access deride the allegations as "vague," "skimpy," and "generic" (UBS Mot. at 36-37, Access Mot. at 29), the allegations in the SAC describe the structure and relationships on which the subsequent transfers are based, and provide additional detail on the subsequent transfers themselves, including the identities of the transferors and transferees, and the date ranges and amounts of the transfers, i.e., the transfers' "vital statistics." *Merkin I*, 515 B.R. at 150 (quoting *In re Allou Distribs., Inc.*, 379 B.R. at 32).

For example, and as UBS repeats in its Motion (UBS Mot. at 37), the Trustee alleges that UBS SA received $32.8 million in subsequent transfers from Luxalpha between February 2004 and August 2006—the amounts, identities of the transferor and transferee and the date ranges. (SAC ¶ 333(a).) The Trustee alleges the same details with respect to UBSTPM, which the SAC alleges received $53.3 million in subsequent transfers from Luxalpha between August 2006 and November 2008, and then transferred $17.8 million of that $53.3 million to AP (Lux). (SAC ¶¶ 333(c) & 334(c).)

Relying on *Picard v. Merkin*, Dumbauld claims that the Trustee failed to identity the subsequent transfers made to him. In *Merkin*, the complaint did not allege the vital statistics of the transfers. But the Trustee's claim against Dumbauld is not like the claims in *Merkin*. The Trustee alleges that, "at minimum, Dumbauld received $1.25 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2007," a fact that

Dumbauld concedes. (SAC ¶ 337; Dumbauld Mot. 28-29.) The Trustee's allegations concerning transfers to Littaye, Villehuchet, and Delandmeter, likewise include estimates of the amounts, date ranges, and the bases and origins of subsequent transfers they received. (SAC ¶¶ 336-37.) The transfers are mapped out in a chart illustrating the flow of the $1.1 billion at issue in this case from BLMIS to initial transferees Luxalpha and Groupement, and then to the Defendants. (SAC ¶ 340.)

The Defendants also erroneously seek to align the SAC with the complaint in *Picard v. Shapiro*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015), where the subsequent transfer allegations were deemed insufficient. (Access Mot. at 27.) In *Shapiro*, the Court found that the Trustee's claims, which consisted of "barebones" allegations that "the Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS" to subsequent transferees, did not satisfy the pleading burden. *Id*. The court found that the allegations did not "plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent transfers rather than simply keep the initial transfers for themselves." *Id*.

The *Shapiro* complaint is a far cry from the SAC, which outlines the pathways Customer Property traveled, from BLMIS to Luxalpha and Groupement and then to the Defendants. It alleges the dates ranges, amounts, and bases for those transfers. There can be no question that the allegations here apprise the Defendants of the transfers that the Trustee seeks to recover. Nothing more is required at this stage. *See, e.g.*, *Mayer*, 2021 WL 4994435, at *5 (rejecting argument that subsequent transfer claim was not pleaded "with enough specificity as to how and what [defendant] received" and holding that the complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").

### 3. Further Details of the Subsequent Transfers Must Come From the Defendants' Books and Records

The Defendants seek to diminish the Trustee's allegations by arguing that each and every detail of the subsequent transfers has not been pleaded. Not only is this not required but also, it is not possible at this point in the proceeding. The Trustee is a stranger to the transactions between Luxalpha, Groupement, and the subsequent transferees and is entitled to discovery on this issue. "[I]n a case such as this one, where 'the Trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the Trustee's handicap increases,' and 'even greater latitude' should be afforded." *Cohmad II*, 454 B.R. at 329. In *Mayer*, this Court recently recognized the Trustee's difficult position in similar circumstances:

> [T]he Trustee is an outsider to these transactions and will need discovery to identify the specific subsequent transfers by date, amount and the manner in which they were effected. The Moving Defendants are a group of interrelated individuals and entities . . . . Whether they additionally received Subsequent Transfers of BLMIS funds from one another is a question to which they, and they alone, have the requisite information to respond. *In re BLMIS, LLC*, 445 B.R. 206, 236 (Bankr. S.D.N.Y. 2011). The Complaint contains sufficient information regarding which transfers the Trustee is seeking to recover . . . The allegations contain plausible grounds to infer that [the Defendant] received the Subsequent Transfers as part of a scheme and that discovery may reveal additional information on this scheme.

2021 WL 4994435, at *5.

The Court in *Merkin I* denied defendants' motion to dismiss for a similar reason, finding "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." 515 B.R. at 151. UBS claims that this case is unlike *Merkin I* because the "Trustee purports to know the total amounts paid to UBS, the nature of the payments (e.g., as custodian, prime bank, administrator, or manager) and the broad time frames of such payments—yet he failed (apparently deliberately) to allege specific dates or amounts for any Subsequent Transfer." (UBS Mot. 39.) This argument proves the Trustee's point. The Trustee has pleaded enough

64

details of the transfers to put the Defendants on notice. In fact, Delandmeter concedes that he

received at least €275,000 in fees from Luxalpha from 2004 through 2008. (Delandmeter Mot. at

24-25; Delandmeter Decl. ¶ 43.) The Trustee should be entitled to move beyond the pleading

stage to obtain discovery and move forward with his claims. Although Delandmeter claims he

received no further transfers, a review of Delandmeter's books and records is necessary to

provide certainty.

As noted above, the Trustee did receive some documents pursuant Rule 2004 subpoenas.

(*See supra* Sec. I(G).) These productions included invoices, service agreements, and audited

financial reports. And it is true that from these documents the Trustee was able to formulate the

allegations concerning the subsequent transfers at issue in this case. But the productions were

incomplete—they were too narrow in scope and timeframe—and did not supply the granular

detail of every transfer. The information within the exclusive possession, custody, and control of

the Defendants will provide the exact circumstances of the transfers the Defendants received.

### 4.    The Trustee Need Not Tie Each Subsequent Transfer to an Initial Transfer

Despite the dearth of information available to the Trustee concerning the details of

transfers, the Defendants seek to raise the pleading bar even higher, arguing that the Trustee

must tie each subsequent transfer to a specific initial transfer from BLMIS. (Access Mot. at 28-

29; UBS Mot. 38; Dumbauld Mot. at 26; Delandmeter Mot. at 33.) But the Court rejected this

argument in *Merkin I*. There the Court refused to dismiss subsequent transfer claims even though

the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer

emanating from BLMIS." *Merkin I*, 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R.

at 747 (finding no requirement "to trace individual dollar amounts from the transferor to the

transferees to survive a motion to dismiss"). The Court also rejected the argument that the

65

Trustee must detail the portion of each subsequent transfer made up of Customer Property. *See Merkin I*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also In re Allou Distribs., Inc.*, 379 B.R. at 30 (finding that "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either."). The Trustee has alleged that Luxalpha's and Groupement's only business was investing with BLMIS and, as a result, they received hundreds of millions of dollars in initial transfers of Customer Property from BLMIS. (SAC ¶¶ 26-27.) The Trustee has also alleged that the Defendants received payment of fees from Luxalpha and Groupement. (SAC ¶¶ 333-37.) Thus, the Trustee has plausibly alleged that the subsequent transfers originated with BLMIS. Nothing more is required.

The Defendants do not deny that they received the payments, but rather focus on the accounting methods used. This analysis may be more appropriate for expert opinion which may be necessary to determine, for example, the portion of subsequent transfers that stemmed from the initial transfer or if the subsequent transfer originated from a commingled account. *Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*"); *see also Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073, 2020 WL 3077151, at *1 (D. Minn. June 10, 2020) (denying summary judgment because trustee introduced expert report and associated documents from which a jury could infer that defendants received subsequent transfers of customer property).

### 5.    The Trustee Must Sufficiently Plead Some of the Transfers

The Trustee is not required to plead <u>all</u> subsequent transfers, but, rather, it is enough that some of them are sufficiently pleaded. *See Merkin I,* 515 B.R. at 151 ("The Court's conclusion that the TAC sufficiently pleads at least some subsequent transfers is also informed by the difficulties the Trustee faces in a case such as this."). UBS argues that UBS AG should be

dismissed outright. But this ignores the Trustee's allegations that: (1) UBS AG sits atop a global

UBS network "designed to ensure UBS AG's centralized control of global business strategy and

reporting obligations for UBS group companies" (SAC ¶ 67); (2) "All redemptions UBS SA

requested for the Luxalpha fund were processed through an account held at UBS AG's Stamford,

Connecticut branch" (SAC ¶ 70); (3) "UBS AG and UBS SA served as Luxalpha's co-sponsors

and co-promoters" (SAC ¶ 168); (4) "On July 6, 2004, BLMIS issued a $4,000,000 wire to

Luxalpha's account at UBS AG." (SAC ¶ 294); (5) "Based on the Trustee's investigation to date,

the Feeder Fund Defendants subsequently transferred some of the Initial Transfers to the [UBS

Defendants, including UBS AG] as payment for their alleged service of the Feeder Fund

Defendants (SAC ¶ 332); and (6) UBS AG is noted on the transfer flow chart as having received

$4.2 million (SAC ¶ 340). Thus an acceptable and plausible inference is that UBS AG received

Customer Property from Luxalpha. The same reasoning applies to all of the subsequent

transferees. The Trustee's circumstances may not allow him to plead each and every subsequent

transfer received by the Defendants, but it is sufficient on a motion to dismiss that he alleges

some of the subsequent transfers. Thus, the Defendants' argument that every detail of each

subsequent transfer has not been pleaded must fail. (Access Mot. at 28; UBS Mot. at 39;

Delandmeter Mot. at 32; Dumbauld Mot. at 25.)

### 6.    The Defendants' Tracing Arguments Fail on a Motion to Dismiss

The Defendants' other fact-based tracing arguments fare no better and are inappropriate

on a motion to dismiss. These arguments reveal that the Defendants have been sufficiently

apprised of the transfers the Trustee seeks to recover.

First, the Trustee's allegations that the Defendants received transfers originating from

BLMIS cannot be dismissed at the pleading stage simply based on the Defendants' conclusory

rejoinder that they did not. For example, Access asserts that "infrequent and irregular

withdrawals" by Luxalpha and Groupement "could not have been the source of the alleged

routine and regular payments made [sic] the Access Defendants to support their management and

administrative fees." (Access Mot. 29.) This is obviously a question of fact. In their declarations,

Littaye and Delandmeter state that Delandmeter and Access received fees and payments that

were part of a "holdback" account. (Littaye Decl. ¶¶ 55-57; Delandmeter Decl. ¶¶ 44-45.) This,

again, is a question of fact. *See Mayer*, 2021 WL 4994435, at *4 (Whether the defendants

"actually received the [Subsequent Transfers] is an issue to be determined by this Court after

discovery.").

        In addition to claiming that transfers originated from a "holdback" account, the

Defendants argue that they could not have received any Customer Property because of the timing

of the initial transfers and the subsequent transfers. (Delandmeter Mot. at 25, 34; Access Mot. at

2, 16, 28 n.10, 29; UBS Mot. at 38-40; Dumbauld Mot. at 28.) Tracing arguments are

inappropriate on a motion to dismiss. The appropriate tracing methodology under the

circumstances is for the Court to decide after fact and expert discovery. As this Court has noted,

the calculation of Customer Property and the determination of what funds were used to make

payments to the Defendants "are issues of fact better resolved at a later stage of litigation."

*Banque Syz*, 2022 WL 2135019, at *12*; see also Merkin II*, 581 B.R. at 386 ("Court's selection

of an appropriate methodology is committed to the Court's discretion.") (citation omitted);

*Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3 n.7 ("Courts have broad discretion to determine

which monies of commingled funds derive from fraudulent sources.") (citing *United States v.*

*Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004)). It would be "premature," as the *Merkin I* court

found, "to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to

dismiss" merely because the tracing may prove difficult. *See Merkin I*, 515 B.R. at 152 (citing

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. No. 10-03493 (SMB), 2014

WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees'] speculation

that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting [their cross-

motion for summary judgment].")).

> ### 7.    The Trustee May Recover Subsequent Transfers Paid Out as Compensation Where the Subsequent Transferee Was Not Acting in Good Faith or the Transfer Was Not for Value

Dumbauld argues that the Trustee may not recover the subsequent transfers from him

because these transfers were received as compensation for his employment with AIA LLC.

(Dumbauld Mot. at 28.) First, the Trustee has not been able to confirm through discovery that the

only transfers that Dumbauld received can be classified as compensation. Second, the case on

which Dumbauld relies for support, *In re Geltzer*, 502 B.R. 760 (Bankr. S.D.N.Y. 2013), only

serves to contrast Dumbauld's position with the defendant's position in *Geltzer*. As Dumbauld

acknowledges, it is only when a plaintiff has alleged that a defendant has received a subsequent

transfer "*without more*" that compensation cannot be recovered. *Id.* at 773 (emphasis added). The

"more" to which the court in *Geltzer* refers is an allegation that could imply that the defendant

did not receive the funds in good faith or for value. *Id.* The Trustee's complaint alleges "more"—

to both Dumbauld as an individual (SAC ¶¶ 190, 219, 221–23, 266, 273) and to Dumbauld as

part of the Access enterprise that controlled and operated Luxalpha and Groupement. (*See, e.g.*,

SAC ¶¶ 170, 190, 221-23.) Thus, contrary to Dumbauld's claim, the Trustee has satisfied his

pleading burden to recover the subsequent transfers from initial transfers made within the two-

year and six-year periods. Whether the Trustee may ultimately recover the transfers Dumbauld

received cannot be determined on a motion to dismiss where Dumbauld's good faith is in

question, not only in the context of section 550(b)(1), but also in the context of whether

Dumbauld's compensation can be found to have been for value. *See, e.g.*, *In re Direct Access*

*Partners, LLC*, 602 B.R. 495, 546–47 (S.D.N.Y. 2019) (salaries may be recovered as initial

transfers if the Trustee can prove transfers were for less than a reasonably equivalent value or the

transferee lacked good faith). For this reason, the Trustee's claims against Dumbauld should not

be dismissed.

### E.    THE SAC DOES NOT ESTABLISH THE DEFENDANTS' AFFIRMATIVE DEFENSES UNDER SECTION 550(b)

The section 550(b) affirmative defense is the defendants' "burden to plead in an answer

and prove with evidence; it cannot be established in a complaint." *Banque Syz*, 2022 WL

2135019, at *10. Despite its burden, UBS nonetheless tries to convince the Court that the SAC

establishes that UBS took its transfers for value, in good faith, and without knowledge of the

voidability of the transfer. (UBS Br. at 31 (citing 11 U.S.C. § 550(b).) UBS's attempts fail on

each element.

UBS's argument that the SAC establishes its good faith defense is untenable in light of

the District Court's recent opinion in *In re Bernard L. Madoff Inv. Sec. LLC*, 20-cv-02586 (CM),

2022 WL 1304589, at *3-4 (S.D.N.Y. May 2, 2022) ("*ABN AMRO*"), which flatly rejected a

nearly identical good faith argument that two ABN AMRO affiliates made in another case

brought by the Trustee. Following the Second Circuit's decision in *Citibank*, the District Court in

*ABN AMRO* noted that good faith is an affirmative defense that defendants bear the burden of

proving. *Id*. at *2-3.

UBS's argument is both procedurally and substantively wrong. Not only has UBS failed

to meet its burden on its Motion, but the allegations of the SAC, when properly viewed in the

light most favorable to the Trustee, and the additional facts—many from outside the SAC—

implicated by UBS's argument, actually show UBS's cynical and calculated approach to its

Madoff business. Its Motion should be denied.

      1.      **The SAC Does Not Establish Section 550(b)'s Good Faith Requirement**

UBS acknowledges that, under *Citibank*, to determine good faith the Court must examine (1) what facts the defendant knew, (2) whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud, and (3) whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer. (UBS Mot. at 32-33). "The Second Circuit made clear in its decision in [*Picard v.*] *Citibank*[, *N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021), *cert. denied* No. 21-1059 (Feb. 28, 2022)] that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently situated transferees.'" *Banque Syz*, 2022 WL 2135019, at *11 (citing *In re BLMIS, LLC*, Dec. & Order, 20-cv-02586 (CM) (May 2, 2022)) (internal quotation marks omitted). Because "such a fact-based determination can only be made based on the entirety of the factual record after discovery" UBS fails to demonstrate that its good faith is evident on the face of the complaint. *Id.*

For its showing as to the first two elements of the good faith requirement, UBS merely cherry-picks a few "red flags" alleged in the SAC while completely ignoring many others. (UBS Mot. at 33 (addressing only SAC ¶¶ 141, 153, 219).) UBS then improperly characterizes these few selected facts and draws inferences in its own favor by asserting that "these allegations amount to, at most, a lack of transparency at BLMIS, potential self-dealing, improper trading activities, and deviations from utilizing the SSC trading strategy." (*Id.*) UBS makes no effort to address the hundreds of other facts alleged in the SAC and makes no showing whatsoever that

the facts alleged in the SAC, when taken together and viewed in the light most favorable to the

Trustee, could not serve to put UBS on inquiry notice.

Effectively punting on the first two elements of its required showing, UBS posits that

even if it knew facts that would have put it on inquiry notice, the SAC somehow establishes that

a diligent inquiry could not have discovered the fraudulent purpose of the transfers. To reach this

conclusion, UBS first turns to facts drawn from *outside* the SAC. UBS relies on the SEC's

complaint against Madoff and the Trustee's pleadings in other matters to argue that the SEC's

own "comprehensive" investigation shows that the third element of the good faith defense is met.

(UBS Mot. at 33-34). However, even if the Court were to indulge UBS's invitation to look

beyond the SAC for purposes of this motion to dismiss (which it should not), UBS's argument at

best presents issues of fact that are contradicted by the Office of the Inspector General's Report

on the failures of the SEC to properly investigate BLMIS. (United States Securities and

Exchange Commission, Office of Investigations, *Investigation of Failure of the SEC To Uncover

Bernard Madoff's Ponzi Scheme -Public Version-* Aug. 31, 2009) ("OIG Report"), Aug. 31,

2009, https://www.sec.gov/files/oig-509%2C0.pdf.)

Among other conclusions, the OIG Report found that "the SEC received more than ample

information in the form of detailed and substantive complaints over the years to warrant a

thorough and comprehensive examination and/or investigation of Bernard Madoff and BMIS for

operating a Ponzi scheme, and that despite three examinations and two investigations being

conducted **a thorough and competent investigation or examination was never performed**."

OIG Report at 20-21 (emphasis added). The OIG Report further notes that "at no time did the

SEC ever verify Madoff's trading through an independent third-party, and in fact, **never actually

conducted a Ponzi scheme examination or investigation of Madoff**." *Id.* at 23 (emphasis

added). The OIG Report also notes that multiple entities and individuals within the securities

industry who did in fact perform diligent inquiries came to the conclusion that BLMIS's returns

were impossible and/or that BLMIS was a Ponzi scheme. *Id.* at 21-22.

UBS's misplaced reliance on the SEC's investigation of BLMIS to establish "good faith"

is all the more galling in light of the SAC's allegations concerning UBS's deliberate efforts to

thwart SEC oversight of BLMIS. As alleged in the SAC, UBS's offices in the U.S. failed to

cooperate with the SEC's inquiries into BLMIS's purported options trading counterparties. (SAC

¶ 264.) It is also difficult to see how UBS can claim that the Trustee's allegations that UBS

intentionally misled the CSSF to circumvent the CSSF's fraud protections can be viewed, in any

light, as consistent with "good faith." Not surprisingly, UBS omits any discussion of these facts

in connection with its good faith defense.

UBS contends that the SAC alleges that the Defendants "actually *did* conduct diligent

inquiries" that failed to uncover the scheme. (UBS Mot. at 34-35). By arguing that UBS's good

faith can be demonstrated by Access's actions—and the actions of Access's consultant Chris

Cutler—UBS proves the Trustee's enterprise theory, i.e., that UBS and Access were working

together to further a profit-making enterprise reliant on income derived from New York-based

BLMIS. And of course UBS ignores the fact that both Access and UBS in bad faith ignored and

buried the very real evidence of fraud that Cutler uncovered. In any event, UBS's argument

misconstrues the SAC's allegations about Cutler and his findings. UBS acknowledges that Cutler

found "extremely sloppy errors" and "serious omissions in tickets," but ignores Cutler's ultimate

recommendation to exit all BLMIS investments and Access's choice to disregard and suppress

Cutler's advice. (*Id.* at 35; SAC ¶¶ 266-73).

In light of the foregoing issues of fact, the SAC does not establish UBS's good faith.

### 2.    The SAC Does Not Establish Section 550(b)'s Value Requirement

UBS fares no better with the remaining two requirements for its good faith defense. UBS

states that "value" is merely consideration and need not be reasonably equivalent, and then

concludes that because UBS provided services to the Fund Defendants, and because the Trustee

does not allege that the services lacked value, any of the subsequent transfers received by UBS

were in exchange for value. (UBS Mot. at 32.)

However, the Trustee does not bear the burden of establishing that UBS did not provide

value. Value is the transferee's burden to plead and prove. *BNP*, 594 B.R. at 196. UBS's

assertion that the Trustee did not allege that the services lacked value is therefore unavailing.

UBS's total failure to delineate which UBS entity provided services of value in exchange for

which transfer only highlights the factual nature of the question of whether UBS provided value.

*Banque SYZ*, 2022 WL 2135019, at *11 ("Whether the Defendant gave value is a question of fact

to be resolved either at the summary judgment stage or at trial.") (citing *Fairfield*, 2021 WL

3477479, at *9). Moreover, many of the Trustee's allegations, when taken together and viewed

in the light most favorable to the Trustee, call into doubt the value of many of the services UBS

purportedly provided. The SAC alleges that UBS misled regulators, entirely delegated vital

management and custodial responsibilities to BLMIS, and was merely a "front" or "window

dressing" in certain capacities. (*See, e.g.*, SAC ¶¶ 12, 126, 169.)

### 3.    The SAC Does Not Establish Section 550(b)'s Lack of Knowledge Requirement

UBS's argument on the third requirement for its good faith defense, the lack of

knowledge of the voidability of the initial transfer, is almost nonexistent and wholly conclusory.

Despite acknowledging that the proper analysis would require a determination of UBS's

subjective knowledge, UBS offers no explanation for how the SAC could establish or resolve

such issues of fact, nor does it cite any paragraph or allegation that supports the lack of

knowledge requirement.

To the extent UBS argues that the lack of knowledge requirement is coextensive with the

good faith requirement, its argument fails the same reasons detailed above as to why the SAC in

no way establishes UBS's good faith. *Banque Syz*, 2022 WL 2135019, at *11 ("Having

determined that 'good faith' cannot be found on the face of a complaint, the Court must deny the

Defendant's motion on this element"). In light of UBS's inability to meet its burden on any of

the three required elements for its good faith defense at this pleading stage, its Motion must be

denied on this basis as well.

## III.    THE TRUSTEE HAS NOT IMPROPERLY "GROUP PLEADED"

The Defendants accuse the Trustee of improperly aggregating facts pleaded against them.

(*See, e.g.*, UBS Mot. at 7; Access Mot. at 6.) *First*, group pleading is not improper, especially in

this instance. As this Court has found, "group pleading is permissible where, like here, the

Complaint 'informs each defendant of the nature of his or her alleged participation in the fraud.'"

*Mayer*, 2021 WL 4994435, at *10 (citation omitted). The reasoning for this is pertinent here:

> [W]here . . . much of the factual information needed to fill out
> plaintiff's complaint lies peculiarly within the opposing parties'
> knowledge, the general rule disfavoring allegations founded upon
> belief ought not to be rigidly enforced. An example is the
> shareholder derivative action, in which the complaining
> stockholders know little of the ways in which the corporation's
> internal affairs are conducted.

*Id.* (quoting *DiVittorio v. Equidyn Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987)).

*Second*, group pleading is also permissible when the conduct of one entity is attributable

to another. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263

75

(AKH), 2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017). The Trustee alleges that the Access

entities—AIA, Inc., AIA LLC, AIA Ltd., and AP (Lux)—were "formally distinct and separately

organized in their various jurisdictions" but "in reality, [were] a single business enterprise or

alter egos of each other," that Littaye and Villehuchet "coordinated, dominated, and controlled."

(SAC ¶ 77.) Similarly, the Trustee alleges that UBS—UBS AG, UBSFSL, UBSTPM, and UBS

SA—were part of the unified UBS global entity that operated as "a coherent and effective

whole," and that "shared a centralized structure." (SAC ¶ 67.)

There should be no confusion about the constituent parts of the collectives—each

collective term was defined in the SAC and carefully used thereafter. It is not a case where it is

"impossible to know" as to which defendant an allegation was directed. *FrontPoint Asian Event*

*Driven Fund*, 2017 WL 3600425, at *6. The SAC details the activities of Luxalpha and

Groupement from before conception until Madoff's arrest, the Funds' sole purpose as an

investment vehicle to invest with BLMIS in New York, and the actions each of the Defendants

undertook to ensure that Luxalpha's and Groupement's investments continued despite

recognition and confirmation of the warning signs along the way. (SAC ¶¶ 10, 172, 313, 330.) At

times it is difficult to separate out those actions, but that is due to the reality of the enterprise that

Access created, and UBS collectively serviced—not a pleading problem.

## CONCLUSION

For all the foregoing reasons, the Court should deny the Defendants' Motions.

Dated:    June 17, 2022                    /s/ Oren J. Warshavsky
          New York, New York              **BAKER & HOSTETLER LLP**
                                          45 Rockefeller Plaza
                                          New York, New York 10111
                                          Telephone: (212) 589-4200
                                          Facsimile: (212) 589-4200
                                          David J. Sheehan
                                          dsheehan@bakerlaw.com
                                          Oren J. Warshavsky
                                          owarshavsky@bakerlaw.com
                                          Geoffrey A. North
                                          gnorth@bakerlaw.com
                                          Michelle R. Usitalo
                                          musitalo@bakerlaw.com

                                          *Attorneys for Irving H. Picard,*
                                          *Trustee for the Substantively Consolidated*
                                          *SIPA Liquidation of Bernard L. Madoff*
                                          *Investment Securities LLC and the Chapter 7*
                                          *Estate of Bernard L. Madoff*

**OF COUNSEL:**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4200

Gonzalo Zeballos
gzeballos@bakerlaw.com
Benjamin Pergament
bpergament@bakerlaw.com
Robertson Beckerlegge
rbeckerlegge@bakerlaw.com
Tatiana Markel
tmarkel@bakerlaw.com