UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01194 (CGM) |
| Plaintiff, | |
| v. | |
| KOOKMIN BANK, | |
| Defendant | |

## KOOKMIN BANK'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS

CIRILLO LAW OFFICE
Richard A. Cirillo
246 East 33rd Street – 1 FR
New York, NY 10016-4802
T: 917-541-6778
E: rcirillo@cirillo-law.com

*Attorney for Defendant Kookmin Bank*

# TABLE OF CONTENTS

Page

TABLE OF CASES, STATUTES, AND RULES..........................................................................ii

PRELIMINARY STATEMENT …………….........................................................................1

ARGUMENT .............................................................................................................................2

I.      THE ALLEGATIONS THAT KB KNEW FAIRFIELD ASSETS WERE MANAGED
        BY BLMIS AND MADOFF IN NEW YORK CANNOT SUPPORT "PURPOSEFUL
        AVAILMENT" BY KB ...……...…………………………………………………….2

II.     KB's USE OF CORRESPONDENT ACCOUNTS FOR ROUTINE, DOLLAR
        TRANSFERS IN LAWFUL COMMERCIAL TRANSACTIONS IS NOT
        A BASIS FOR PERSONAL JURISDICTION ...…………………………………....5

III.    SUBSCRIPTION AGREEMENTS BETWEEN KB AND FAIRFIELD ARE NOT
        A BASIS FOR JURISDICTION OVER KB IN THIS CASE ..…………………………11

IV.     SECTION546(e) BARS THE PLAINTIFF'S CLAIMS BECAUSE AN INNOCENT
        SUBSEQUENT TRANSFEREE IS ENTITLED TO SAFE-HARBOR PROTECTION
        EVEN IF THE INITIAL TRANSFEREE IS NOT ……………………………………...14

CONCLUSION .......................................................................................................................20

i

## TABLE OF CASES, STATUTES, AND RULES

**Cases**

*Page(s)*

*Al Rushaid v. Pictet & Cie,*
28 N.Y.3d 316 (2016) ………………………………………………………… 6-9, 11

*Amigo Foods Corp. v. Marine Midland Bank–N.Y.,*
39 N.Y.2d 391 (1976) …………………………………………………………5, 7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...........................................................................................19, 20

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
171 F.3d 779 (2d Cir. 1999) …………………………………………………6-7

*Bartlett v. Société Générale de Banque Au Liban SAL,*
No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448
(E.D.N.Y. Nov. 25, 2020) ……………………………………………...…..………11

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................................19, 20

*Dandong v. Pinnacle Performance Ltd.,*
966 F. Supp. 2d 374 (S.D.N.Y. 2013) …………………………………………...10

*DiStefano v. Carozzi N. Am. Inv.,*
286 F.3d 81 (2d Cir. 2001)………………………………………………….......2

*Eldesouky v. Aziz,*
No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) …..………………11

*Flaherty v. Filardi,*
No. 03 Civ. 2167, 2007 U.S. Dist. LEXIS 4595 (S.D.N.Y. 2007) …………………..4 n.5

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.,*
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020)........................................................20

*Hanson v. Denckla,*
357 U.S. 235 (1958)........................................................................................5, 6

*Hill v. HSBC Bank plc,*
207 F. Supp. 3d 333 (S.D.N.Y. 2016)……………………………………………….4, 9

*HSH Nordbank AG N.Y. Branch v. Street,*
No. 11 Civ. 9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ……………………..10

*In re UBS AG Sec. Litig.*,
No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. 2012),
*aff'd sub nom. City of Pontiac Policemen's &Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) …………………………………………………………………..14

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) …………………………………………5, 6

*In re Picard*, 917 F.3d 85 (2d Cir. 2019) …………………………………………………..11-12

*Jesner v. Arab Bank, PLC*,
138 S. Ct. 1386 (2018) .............………………………………………………………5 n.6

*Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327 (2012) *("Licci II")* …………………………………………………..6-9, 11

*Paraco Gas Corporation v. Ion Bank*,
20 CV 4971 (VB) (S.D.N.Y. July 6, 2021) …………………………………………………7

*Paterno v. Laser Spine Inst.*,
24 N.Y.3d 370 (2014) ……………………………………………………………………7

*Picard v. Avellino (In re Bernard L. Madoff*
*Inv. Sec. LLC)* 557 B.R. 89 (Bankr. S.D.N.Y. 2016) …………………………….17 n.10

*Picard v. Bureau of Labor Insurance* (In re BLMIS),
480 B.R. 501 (Bankr. S.D.N.Y. 2012) *("BLI")* …………………………………4, 13 n.8, 18

*Picard v. BNP Paribas S.A. (In re Madoff)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) *("BNP")* …………………………………4, 9, 11, 16

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,
No. 08–99000, 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) …………….....17 n.10

*Picard v. Est.(Succession) of Doris Igoin (In re BLMIS)*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015) …………………………………………………..11

*Picard v. Est. of Mendelow*,
560 B.R. 208 (Bankr. S.D.N.Y. 2016) ……………………………………...……………17 n.10

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff*
*Inv. Sec. LLC*), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021
*("Fairfield Inv. Fund")* ……………………………………………....…..13 n.9, 17, 17 n.10

*Picard v. Magnify Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*,
583 B.R. 829 (Bankr. S.D.N.Y. 2018) …………………………………………………..17 n.10

iii

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ....................................................17 n.10, 18-19

*Picard v. Multi-Strategy Fund Limited*,
12 cv 01205 (CGM), ECF Dkt. # 122 ("*Multi-Strategy*") ........................ 1, 11 n.9, 17 n.11

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015)...........................................................17 n.10, 19

*Picard v. Banque Syz & Co. SA*,
11 cv 02149 (CGM), ECF Dkt.# 167 ("*Syz*") ....................................1, 11 n.9, 17 n.11

*Picard v. Square One Fund Ltd. (In re Madoff)*,
No. 10-04330 (Bankr. S.D.N.Y. May 29, 2019) .............................................17 n.10

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad II*")............................13 n.9, 14-17

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*,
620 B.R. 505 (Bankr. S.D.N.Y. 2020) ......................................................................16

*Wyler v. US*,
725 F.2d 156 (2d Cir. 1983) ....................................................................................4 n.5

## Statutes

11 U.S.C. § 546(e) ..................................................................................... 1, 13-17, 20

## Rules

Fed. R. Bankr. P. 7012..................................................................................................1

Fed. R. Civ. P. 8(a)......................................................................................................1

Fed. R. Civ. P. 10(c).....................................................................................................1

Fed. R. Civ. P. 12(b)(2) ...........................................................................................1, 2

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 19

NY Civ. Prac. Law & Rules § 302(a)(2).......................................................................7

iv

Defendant Kookmin Bank ("KB") respectfully submits this reply memorandum in support of its motion to dismiss the complaint ("Compl.") under Federal Rules of Civil Procedure ("FRCP") 12 (b)(2) and 12(b)(6) and Bankruptcy Rule 7012(b).[1]

## PRELIMINARY STATEMENT

This is one of the many "subsequent transfer" actions the plaintiff brought against many defendants. KB fully reviewed the court's June 13 and 14 decisions in the *Multi-Strategy* and *Syz* actions,[2] which were handed down after KB brought and the plaintiff responded to KB's motion. KB asks the court to give full consideration to the arguments in KB's opening memorandum concerning the plaintiff's failure to allege a *prima facie* basis for the exercise of personal jurisdiction; whether KB received BLMIS customer property; and KB's entitlement to the safe harbor provided by §546(e) discussed in KB Opening Mem. Points I, II, and IV. KB withdraws its argument that the complaint should be dismissed under FRCP 8(a) and 10(c) and will work with the plaintiff to find a pragmatic solution to handling the incorporated complaint.

Full consideration of these points is warranted because (1) KB's jurisdictional motion presents individualized facts and allegations that differ radically from what was alleged and considered in *Multi-Strategy* and *Syz*; (2) KB's position about receipt of customer property is based on a different argument than *Multi-Strategy* and *Syz*,[3] and, (3) respectfully, the court did not apply controlling precedent as to the safe harbor issue.

---

[1] The plaintiff's March 22, 2012, complaint is at 12 cv 01194 (CGM), ECF Dkt. (the "ECF Dkt.") # 1; its opening memorandum ("KB Opening Mem.") is at ECF Dkt # 82; the Declaration of Hoon-Mi Park, Manager of KB's Custody Department ("Park Decl."), is at Dkt. # No. 83; the plaintiff's opposition memorandum ("Opp. Mem.") is at ECF Dkt. # 87; and the opposition declaration of Eric R. Fish, Esq. ("Fish Decl.") is at ECF Dkt. # 88. As in the KB In this memorandum as in the KB Opening memorandum, "Fairfield" means "Fairfield Sentry Limited;" "BLMIS means "Bernard L. Madoff Investment Securities LLC;" and "Madoff" means "Bernard L. Madoff."

[2] *Picard v. Multi-Strategy Fund Limited*, 12 cv 01205 (CGM), ECF Dkt. # 122 ("*Multi-Strategy*"); *Picard v. Banque Syz & Co. SA*, 11 cv 02149 (CGM), ECF Dkt.# 167 ("*Syz*")

[3] KB takes no position on the allegations, declarations, arguments, or decision as to personal jurisdiction or receipt of customer property in *Multi-Strategy* or *Syz*.

1

## I. THE ALLEGATIONS THAT KB KNEW FAIRFIELD ASSETS WERE MANAGED BY BLMIS AND MADOFF IN NEW YORK CANNOT SUPPORT "PURPOSEFUL AVAILMENT" BY KB

As is proper on a Rule 12(b)(2) motion, KB submitted the Park Decl. and Exhibits, which show that the plaintiff's allegations that KB knew Fairfield's assets were managed by BLMIS and Madoff in NY have no support and are actually contrary to fact. Declarant Park is an authorized KB officer and demonstrates in detail that, and why, the plaintiff's footless assertions and legal conclusions asserting KB's knowledge cannot be credited.[4] Therefore, the allegations do not state a *prima facie* jurisdictional case. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) ("The allegations in the complaint must be taken as true <u>to the extent they are uncontroverted by the defendant's affidavits</u>." (emphasis added)).

The unimpeached Park Decl. attests that KB did not know what the plaintiff alleges. That is because KB (i) did not invest in Fairfield; (ii) did not advise any customer as to purchases or redemptions; (iii) served solely as a trustee executing specific orders as directed by third-party asset managers for unidentified beneficiaries; (iv) had no legal or business reason to learn about Fairfield's business, actions, or associations; (v) did not communicate with BLMIS or Madoff; (vi) did nothing in the US or NY concerning Fairfield purchases or redemptions; and (vii) could not have learned from the Fairfield Private Placement Memorandum ("PPM") that BLMIS and Madoff managed Fairfield's assets in NY. Park Decl. ¶¶ 2-14. In the face of these facts, the plaintiff's allegations do not support a *prima facie* jurisdictional case.

---

[4] The plaintiff claims incorrectly the Park Decl. is "incomplete and unreliable," Opp. Mem. at 9-10. The only reason he gives is that it attaches one Subscription Agreement saying there were "several substantively identical ones." Park Decl. ¶ 10 & Ex. 2. The plaintiff submits two KB Subscription Agreements, Fish Decl. Exs. 1 & 2, which in fact are "substantively identical" to Park Ex. 2, but the plaintiff argues that one identifies a different bank than the others, Pl. Opp. Mem at 10. Even if so, it is immaterial because KB's and the plaintiff's arguments are directed to the jurisdictional effect correspondent banks and all the accounts in all three agreements are correspondent accounts. Thus, the plaintiff's comment does not impeach even that small item and he does not try to controvert the balance.

The plaintiff asserts that PPMs allegedly received by KB would have informed it of BLMIS and Madoff's role investing Fairfield's assets. Opp. Mem. at 12-14. He does not specify which of Fairfield's sequential PPMs he basis his argument on, but they were different and disclosures in later ones, particularly after the SEC required Madoff to register as an Investment Advisor in 2006, not in the earlier ones when KB were purchases in early 2004 such as the one located in KB's files dated October 2004. Park Decl. ¶ 7 & Ex.1. The plaintiff does not argue that others KB may have received provided any more or different information than Park Ex. 1.

The Park demonstrates in detail at ¶¶ 8-9 that a person who read the PPM could learn absolutely no information stating or allowing a reasonable inference that BLMIS or Madoff managed Fairfield's assets or that Fairfield was a passthrough to them. See also KB Opening Mem. at 17-20. As the Park Decl. shows, the sole reference to BLMIS in the PPM says that BLMIS served as one of several "sub-custodians" under contract with Citco, the "custodian," and at the time was "sub-custodian" for mostly all Fairfield's assets. *Id.* ¶ 8.

But the PPM nowhere says or give any basis to infer that BLMIS or Madoff managed Fairfield's money or investment strategy. *Id.* ¶ 9. "Custodian" and "sub-custodian" do not mean asset or investment strategy managers in or out of the investment industry. The PPM avers eleven times that Fairfield's Investment Manager was a Bermuda company with offices in Bermuda, not BLMIS or Madoff in NY. *Id.* Ex. 1 at cover (2x), pp. ii, iii, iv, 2 (2x), 5, 6, and attached form subscription agreement at pp.1 & 2. Nothing says BLMIS or Madoff invested Fairfield's money or carried out Fairfield's Split Strike Conversion investment strategy described in the PPM or even hints at it. The plaintiff has provided no rebuttal. See Opp. Mem. at 13-14.[5]

---

[5] The Fish Decl. submitted by plaintiff, ECF Dkt. # 88, does not address these issues or provide anything relevant to this motion. It attaches six exhibits. Exs. 1 and 2, are the two Subscription Agreements substantively identical to Park Decl. 2. See note 4 above. Exs. 3-6 are random sample documents showing KB purchased and redeemed Fairfield shares in the manner required by the subscription agreements. This also is not contested on this motion. And, even if they were relevant, they are not admissible under the Federal Rules of Evidence because the declarant

On the law, the plaintiff's is wrong in saying that *Picard v. Bureau of Labor Insurance*
(In re BLMIS), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012) ("*BLI*"), is "controlling" precedent.
Opp. Mem. at 11-12, In fact it does not even apply to KB because, in the very passage the
plaintiff quotes, BLI rested personal jurisdiction on defendant BLI's "invest[ing] in" Fairfield
and "knowing, intending and contemplating that the substantial majority of funds invested in
Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York
securities market." *Id.* at 11-12. That is just the opposite of the facts pertaining to KB.

The plaintiff cannot rely here on *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R.
167 (Bankr. S.D.N.Y. 2018) ("*BNP*"). Opp. Mem. at 21. *BNP* does not apply because the
"purposeful availment" by that defendant was acting with regard to Fairfield purchases and
redemption through it personnel located within NY. BNP, 594 B.R. at 190, 192. And *Hill v.*
*HSBC Bank plc*, 207 F. Supp. 3d 333, 339 (S.D.N.Y. 2016) ("*Hill*"), also does not support the
plaintiff because it rejected jurisdiction even though, unlike KB, the defendants "communicated
with and transmitted information and funds to and from BLMIS located in New York in
connection with their fund administration and/or custodial duties under agreements negotiated
with BLMIS." In *BNP*, the District Court said, without criticism of the decision, that *Hill* was
"distinguishable, not even citing *BLI* in its jurisdictional analysis.

In light of the sworn facts discrediting the plaintiff's conclusory, unsupported statements
and legal assertions, the plaintiff has not made a *prima facie* showing that personal jurisdiction
over KB can be based on knowing investment in BLMIS in New York.

---

does not show testimonial capacity or authenticate the exhibits. He only says they are "true and correct copies." That
means they were photocopied correctly but does not say if the copied documents were complete, originals or other
copy, the origin of the prior copy, where and by whom it was obtained, or if the initial document was altered along
the chain leading to this copy. *Wyler v. US*, 725 F.2d 156, 160 (2d Cir. 1983); *Flaherty v. Filardi*, No. 03 Civ. 2167,
2007 U.S. Dist. LEXIS 4595, at *12 (S.D.N.Y. 2007).

## II. KB's USE OF CORRESPONDENT ACCOUNTS FOR ROUTINE, DOLLAR TRANSFERS IN LAWFUL COMMERCIAL TRANSACTIONS IS NOT A BASIS FOR PERSONAL JURISDICTION

KB does not contest on this motion that, as the plaintiff alleges, it agreed to "wire[] funds to Fairfield Sentry <u>through</u> a bank in New York." Compl. ¶ 7 (emphasis added). KB did not, and is not alleged to have, chosen dollars as the transaction currency. And, as the Compl. says, the money wired was "through" NY correspondent accounts, not "to" or "from" NY destination accounts. The reason is that, as the Subscription Agreements show, the money was sent between a destination account in Dublin, Ireland maintained by Fairfield, a BVI company with a Dublin account at Netherlands Citco Bank and KB's destination account in Korea. Park Decl. Ex. 2 ¶¶ 30(g), (h); Fish Decl. Exs.1 & 2, ¶¶ 30(g), (h). The plaintiff does not allege that any funds originated from or terminated in a NY account. See Compl. ¶¶ 6 & 7.

To reach Ireland from Korea, dollars necessarily, but only for an instant, passed "through" NY correspondent banks.[6] The plaintiff argues that merely "because [KB] purposefully used the New York banking system to subscribe into and redeem from Fairfield Sentry," the court has jurisdiction. Opp. Mem. at 17. In fact, that argument is not supported by and is contrary to NY law as the Court of Appeals has laid it out if the use of correspondent accounts is not for illegal purposes in which the originating bank is complicit.

The basic legal question is what "purposeful availment" means. The phrase arose, and the answer begins, with the Supreme Court's test in *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), which was based on *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). The answer ends with the NY Court of Appeals' explanation of how correspondent banking is treated under NY law in

---

[6] In *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) (plurality opinion), Justice Kennedy described the instantaneous nature of transactions though the "CHIPS" system that transmit dollars between banks, saying, "The 'clearance activity is an entirely mechanical function; it occurs without human intervention in the proverbial 'blink of an eye.'" *Id.* at 1394-95 (citations omitted).

its trilogy of decisions, *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391

(1976), *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) (*Licci II*), and *Al Rushaid*

*v. Pictet & Cie*, 28 N.Y.3d 316 (2016). Although underpinnings of decisions are sometimes

overlooked, these three decisions are the definitive statement of the NY common law today and

can be changed only by the NY Court of Appeals or the US Supreme Court.

> Chief Justice Warren's full statement of the "purposeful availment" phrase in Hanson is,

> The unilateral activity of those who claim some relationship with a nonresident
> defendant cannot satisfy the requirement of contact with the forum State. The
> application of that rule will vary with the quality and nature of the defendant's
> activity, but it is essential in each case that there be some act by which the
> defendant purposefully avails itself of the privilege of conducting activities within
> the forum State, thus invoking the benefits and protections of its laws.
> *International Shoe Co*. v. *Washington*, 326 U.S. 310, 319.

*Hanson*, 357 U.S. at 253. The reliance on *Int'l Shoe* signals the Court's contrasting the "quality

and nature" of the substantial activity justifying personal jurisdiction in *Int'l Shoe* with the lack

of such activity in *Hanson,* where the Court reversed the Florida Supreme Court and found no

jurisdiction. In *Int'l Shoe*, Chief Justice Stone explained the foundation for *Hanson* in the part of

the decision Chief Justice Warren cited:

> It is evident that the criteria by which we mark the boundary line between those
> activities which justify the subjection of a corporation to suit, and those which do
> not, cannot be simply mechanical or quantitative. The test is not merely, as has
> sometimes been suggested, whether the activity, which the corporation has seen
> fit to procure through its agents in another state, is a little more or a little less. *St.*
> *Louis S.W.R. Co*. v. *Alexander, supra*, 228; *International Harvester Co.*
> v. *Kentucky, supra*, 587. Whether due process is satisfied must depend rather
> upon the quality and nature of the activity in relation to the fair and orderly
> administration of the laws which it was the purpose of the due process clause to
> insure.

> Thus, *Hanson* and *Int'l Shoe* require an individualized, in-depth, qualitative examination

of all activities pertinent to jurisdiction in the context of the claim in the lawsuit. The Second

Circuit naturally demands the same. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*

6

171 F.3d 779, 787 (2d Cir. 1999) ("To determine whether a party has 'transacted business' in

New York, courts must look at the totality of circumstances concerning the party's interactions

with, and activities within, the state."); *Paraco Gas Corporation v. Ion Bank*, 20 CV 4971 (VB),

at \*8 (S.D.N.Y. July 6, 2021) ("When analyzing whether a defendant has met the purposeful

availment standard, courts look 'not [at] the quantity but the quality of the contacts,' *quoting*

*Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 378 (2014).)

    In *Amigo Foods*, the NY Court of Appeals held definitively that, "standing by itself, a

correspondent bank relationship, without any other indicia or evidence to explain its essence,

may not form the basis for long-arm jurisdiction under" CPLR 302(a)(1). 39 N.Y.2d at 396

(emphasis added). Because there were no other jurisdictionally relevant activities, the analysis

ended there. However, the Second Circuit was unsure how to apply *Amigo Foods* to the different

facts in *Licci* and asked the NY Court of Appeals to elaborate on NY law by answering two

certified questions. *Licci II*, 20 N.Y.3d at 334.

    In doing so, the NY Court of Appeals set out the *Licci* facts in great detail. The plaintiffs

were seeking to show NY jurisdiction over foreign banks that originated dollar transfers through

correspondent banks in New York knowingly used fund and facilitate terrorism by a designated

terrorist group the Middle East. *Id.* at 330-31. The plaintiff made factual allegations that the

originating banks not only knew that the transfers were intended for these illegal purposes but

that they were themselves knowing participants in the underlying illegal activity. *Id.* at 330-32.

Thus, the correspondent accounts were not used for a routine, innocent, commercial transactions

but were necessary for and integral to the illegal activity. On that basis, the NY Court of Appeals

held the use of the correspondent accounts sufficed for personal jurisdiction. *Id.* at 338-39.

    The relevant facts in *Al Rushaid* were very similar to *Licci II* except that the illegal

scheme was international bribery and money laundering. *Al Rushaid*, 28 N.Y.3d at 320-22.

Again, the originating bank was a direct, knowing participant in the illegal activity. *Id.* at 327.

The NY Court of appeals reached the same decision as in *Licci II* that use of correspondent

accounts by a knowing originating bank participating in illegality was "purposeful availment:"

> Repeated, deliberate use [of a correspondent account] that is approved by the
> foreign bank on behalf and for the benefit of a customer—as in *Licci* —
> demonstrates volitional activity constituting transaction of business. In other
> words, the quantity and quality of a foreign bank's contacts with the
> correspondent bank must demonstrate more than banking by happenstance.

*Id.* at 327 (emphasis added).

The contrast with the present case is of critical importance. KB¸ a non-US bank, used NY

correspondent accounts, not to facilitate an illegal scheme in which it was a knowing participant,

but to make legitimate dollar transfers between two non-US companies' non-US destination

accounts. KB was unaware of BLMIS or Madoff, of any connection Fairfield had to them, or that

they were engaged in illegality. Park Decl. ¶¶ 2-12. But those factors are at the heart of the facts

and holdings of *Licci II* and *Al Rushaid*. The *Al Rushaid* court added: "The facts here illustrate

the point because the complaint alleges that defendants orchestrated the money laundering and

that the New York account was integral to the scheme." 28 N.Y.3d at 328. It continued:

> [The originating bank] Pictet was therefore actively engaged in a cycle of banking
> transactions wherein [bribery] money went from the vendors to New York to
> Geneva, and then from Geneva to the employees. The use of the account was not
> "adventitious" because the account was used routinely to hold deposits which
> Pictet then credited to [BVI-incorporated bribe recipient] TSJ's account in
> Geneva. Thus, the correspondent account was crucial to a course of repeated
> banking activity.

*Id.* at 328-29 (emphasis added). And, finally:

> [The originating bank] Pictet, it is alleged, had a shared purpose with the corrupt
> ARPD employees—to further the kickback scheme—in the same manner the
> Lebanese bank in *Licci* was alleged to have shared Hizballah's terrorist goals. Use
> of a correspondent bank account in New York was a deliberate step by clients in

both cases to move funds central to these shared goals. In neither case was the use
of a New York correspondent account merely "coincidental."

*Id.* at 338 (emphasis added). This bears no resemblance to alleged or actual facts relating to KB.

A common law holding rests on and may not be divorced from its facts. The rule of law
decision controls subsequent decisions and a court that departs from controlling law needs to
explain the basis why it is doing so. Decisions subsequent to *Licci II* and *Al Rushaid* have not
explained that they intended to depart from those decisions or show that jurisdiction through
correspondent accounts does not require the originator's knowing participation in illegality. The
distillation of NY law is lies in the statement in *Al Rushaid*, "The facts here illustrate the point
because the complaint alleges that defendants orchestrated the money laundering and that the
New York account was integral to the scheme." *Al Rushaid*, 28 N.Y.3d at 328 (emphasis added).

Therefore, KB submits that, in order for correspondent account to be used a basis for
personal jurisdiction under NY law, three elements are necessary: (1) an illegal scheme in which
(2) the originating bank was a knowing participant, to which (3) the use of the correspondent
bank is "integral" to the illegal scheme. None of these elements is alleged or present as to KB
and it is respectfully submitted that NY law does not permit asserting personal jurisdiction over
KB based on its innocent use of correspondent accounts for lawful transfers between non-US
persons' non-US accounts.

This is what the District Court held in *Hill*, at least implicitly, when it held that personal
jurisdiction could not be exercised even though the defendants had "communicated with and
transmitted information and funds to and from BLMIS located in New York." 207 F. Supp. 3d at
339 (emphasis added). As mentioned before, Judge Rakoff cited *Hill* without criticism, only
distinguishing it from the *BNP* facts. See p. 4 above.

The plaintiff cites several cases as support for his view that "courts have often held that a defendant's use of a domestic bank account is sufficient to establish personal jurisdiction," Opp. Mem. at 17, but those decisions do not deal with the facts here and, in fact, they support KB's position. In *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012), cited in Opp. Mem. at 17, the defendants fraudulently transferred their assets to NY bank accounts of relatives and controlled companies to defeat prospective execution of judgments for defaulted guarantees. The transfer recipients argued that the court lacked personal jurisdiction. The court said, "District courts in this Circuit have upheld personal jurisdiction based upon a defendant's use of a correspondent bank account in New York where the use of that account was held to lay at the very root of the plaintiff's action.'" *Id*. at *13 (emphasis supplied)." It continued, long-arm jurisdiction "is satisfied where, as here, the plaintiff's cause of action arises directly from the use of New York accounts," *Id*. *14, quoting *Licci* (citation omitted). In *HSH* Nordbank, the NY bank account was not merely integral to the fraud, it actually was the fraud. The plaintiff's cause of action against KB, however, does not arise directly from use of correspondent accounts but from whether money transfers, however made, are avoidable and recoverable.

Similarly, the plaintiff's citation to *Dandong v. Pinnacle Performance Ltd*., 966 F. Supp. 2d 374, 382 (S.D.N.Y. 2013), Opp. Mem. at 17, supports KB, not the plaintiff. There, the plaintiff "alleg[ed] claims for fraud, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and aiding and abetting fraud" involving money the defendant had raised from investors and deposited in NY bank accounts to carry out the fraud. *Id*. at 378. Citing *Licci II,* the court made it clear that the foreign defendant's contacts with NY were not limited to use of a correspondent account (as plaintiff incorrectly asserts) but instead that

10

Plaintiffs allege that for each series of Notes that Pinnacle issued, it (1) established bank accounts in New York with MS Capital to deposit investors' funds; (2) submitted IRS tax documentation related to those accounts to other Defendants in New York to file on its behalf; and (3) used the funds in those accounts to purchase the Underlying Assets that Defendants created (namely, the MS ACES CDOs).

*Id.* at 382.

The plaintiff also gets no support from *BNP*, Opp. Mem. at 17, where the court enumerated the defendants' extensive NY activities separate from their use of correspondent accounts to find jurisdiction. *BNP*, 594 B.R. at 190. Also, in *Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015), Opp. Mem. at 17, the court found jurisdiction because the defendant had established <u>direct accounts with BLMIS</u> in NY from which she directed withdrawals; KB had no direct accounts with BLMIS and directed no withdrawals from BLMIS.[7] And in *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 at *5 n.2 (E.D.N.Y. Nov. 25, 2020), Opp. Mem. at 18, the facts were just as in *Licci II* and *Al Rushaid* and showed that the originating banks knowingly and deliberately used the correspondent banks to further their terrorism funding and money laundering schemes, and "participate[] in Hezbollah's trade-based money laundering operations." Again, the use of the correspondent accounts was integral to the illegal schemes.

The decision in *Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014), Opp. Mem. at 17, does not help the plaintiff because it was a post-default inquest. The defendants did not contest jurisdiction and the court heard only the

---

[7] The *Igoin* decision refers to "cases illustrating a split within New York courts on the issue of whether the maintenance of a correspondent bank account is sufficient to confer jurisdiction under New York's long arm statute," 525 B.R. at 885-85, but it does not evaluate NY cases or, most importantly, *Amigo Foods, Licci II*, and *Al Rushaid*, which remain the controlling NY law. *See Malaeb v. BankMed S.A.L.*, 2021 N.Y. Slip Op. 31619, 11 (Sup. Ct., NY Cty, Comm. Div., May 13, 2021) ""[S]tanding by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction (*Amigo Foods Corp. v Marine Midland Bank-N.Y.*, 39 NY2d 391, 396 [1976])."

11

plaintiff's *pro forma* presentation on jurisdiction. It also appears that the parties in *Eldesouky* did

not use correspondent accounts. See id. at *2 - *6.

Finally, the plaintiff is incorrect in asserting that the Second Circuit's extraterritoriality

decision *In re Picard*, 917 F.3d 85, 99 (2d Cir. 2019), found transfers from Fairfield to

subsequent transferees like KB to have been "domestic." Opp. Mem. at 17. The court did not

address subsequent transfers but instead said, "we must decide whether Madoff Securities'

transfers [to direct customers, three feeder funds] took place in the United States such that

regulating them involves a domestic application of that statute," and held that "a domestic

debtor's allegedly fraudulent, hindersome, or delay-causing transfer of property from the United

States is domestic activity for the purposes of §§ 548(a)(1)(A) and 550(a)." *Id.*

For these reasons, "purposeful availment" conferring jurisdiction over KB may not be

based on it use of correspondent accounts.

### III. SUBSCRIPTION AGREEMENTS BETWEEN KB AND FAIRFIELD ARE NOT A BASIS FOR JURISDICTION OVER KB IN THIS CASE

The non-exclusive forum and choice-of-law paragraphs of the Subscription Agreements

cannot support personal jurisdiction in this case despite plaintiff's contention. Opp. Mem. at 14-

16. "Purposeful availment" means intentionally taking the benefits and privileges of conducting

business in the forum jurisdiction. Neither of these provisions meets this test.

- First, KB did not agree to submit itself to NY jurisdiction for claims except any (i) brought by Fairfield and (ii) arising from its purchases of Fairfield shares. It did not submit to jurisdiction for any other purpose or for any other person or entity, including the plaintiff here or the bankruptcy claim for redemptions.

- Second, KB did not "avail itself" of the privileges and benefits of NY. Rather, it was Fairfield that did. Fairfield received the right to force Fairfield to defend in NY. The provision is for Fairfield's not KB's benefit, and KB cannot force Fairfield, a BVI company, to litigate in NY. The provision also does not prevent Fairfield from picking another jurisdiction to sue KB or restrict KB from suing Fairfield in a jurisdiction outside NY, subject to Fairfield's possible right to force the case into a

NY court. It also does not restrict KB in any way over where to sue Fairfield over claims arising from redemptions, which the agreement does not cover.

Therefore, giving meaning to the definition of "purposeful," it is patently clear that KB did not "purposefully avail" itself of NY's benefits, privileges, or courts through the forum clause.[8]

Finally, the NY governing law clause is not conceptually or legally an "availment" of a NY "privilege or a benefit." NY law does not "belong to" NY. NY cannot prevent anyone from designating its law as the rule by which parties, arbitrators, or courts interpret and enforce an agreement. Designating NY law or citing NY cases is not conducting business in or a projecting an agreeing party into NY. Therefore, language in cases mentioning governing law clauses as having jurisdictional effect is necessarily either *dicta* or analytically incorrect.

## IV. SECTION546(e) BARS THE PLAINTIFF'S CLAIMS BECAUSE AN INNOCENT SUBSEQUENT TRANSFEREE IS ENTITLED TO SAFE-HARBOR PROTECTION EVEN IF THE INITIAL TRANSFEREE IS NOT.[9]

---

[8] The plaintiff cites a lone sentence in a footnote in *BLI*, 480 B.R. at 517 n.15, saying "Further evidencing the strong nexus with New York, the Agreement contains a New York choice of law clause and a New York forum selection clause." The comments is not holding, dicta, or otherwise supported and carries no weight. But the fact is the *BLI* court did not base its jurisdiction decision on this observation but instead on facts not present in the case against KB, namely, the BLI defendant's "knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market," and its "hir[ing] Union Securities to conduct diligence on Fairfield Sentry and its investment strategies." *BLI*, 480 B.R. at 517. The "strong nexus" comment like the holding in *BLI* does not apply to KB. See also note 10 below.

[9] KB recognizes that the court held in *Multi-Strategy* and *Syz* that § 546(e) does not apply to subsequent transfers and transferees and said that it did not reach a different result in *Picard v. Fairfield Inv. Fund Ltd. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. 09-01239, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield Inv. Fund*"). *Multi-Fund*, 12 cv 01205, ECF Dkt. # 122, at 19-21; *Syz*, 11-02149, ECF Dkt. 167, at 20-22. Defendant respectfully urges that the court's *Multi-Strategy* and *Syz* decisions misread the District Court's controlling precedent in *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) and that properly applied that controlling precedent in its *Fairfield Inv. Fund* decision, which follows *Cohmad II*'s reasoning and quotes a key *Cohmad II* holding, saying, "if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Id.*at *4 (emphasis added; *quoting Cohmad II*). The court examined whether the plaintiff sufficiently alleged facts establishing actual knowledge as to each defendant, *id.* at *5-*7, and concluded that the plaintiff had done so for all except the one defendant who was only a subsequent transferee. *Id.* at *4–6, *15. As to that defendant, the court found the plaintiff had "failed to plead individualized factual allegations demonstrating that [she] had independent actual knowledge of the BLMIS fraud" and dismissed all claims against her. *Id.* at *6. KB respectfully requests the court to consider KB's argument and dismiss the claims against it under the safe harbor.

KB's Opening Mem. (at 3-7) shows that KB satisfies all the statutory criteria for entitlement to the § 546(e) safe harbor protection for all the subsequent transfers the plaintiff seeks to recover from it. The plaintiff did not contest that KB meets the statutory criteria, Opp. Mem. at 23 et seq. and those facts are established. *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *11 (S.D.N.Y. 2012), *aff'd sub nom. City of Pontiac Policemen's &Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). The plaintiff's response to KB's explanation why it is entitled to dismissal under the safe harbor misreads the District Court's controlling decision, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad II*"). That decision rejects the plaintiff's position and compels dismissal of the claims against KB.

The plaintiff contends that § 546(e) does not protect a subsequent transferee if the plaintiff alleges actual knowledge of fraud by both the initial transferor and the initial transferee, even if he does not and cannot allege that the subsequent transferee had such actual knowledge. Opp. Mem. at 24-28. *Cohmad II* does not say that and actually leads to the opposite conclusion, namely that innocent subsequent transferees like KB are entitled to the safe harbor even if the initial transferor and transferee had actual knowledge. *Cohmad II* decision is a holding and not *dicta* because the court directed it to be applied to many adversary proceedings besides the one before it, 2013 WL 1609154, at *10, contrary to plaintiff's suggestion. Opp. Mem at 26.

*Cohmad II* holds that the relevant "actual knowledge" that would defeat application of § 546(e) is the knowledge of the party from which the plaintiff seeks to recover, here KB:

> (1) Where the Trustee has sought to avoid transfers to an initial transferee, the avoidance of which would otherwise be barred by Section 546(e) ..., the initial transferee will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" *if* the Trustee has alleged that the initial transferee had actual knowledge of Madoff Securities' fraud; and

14

(2) Where the Trustee has sought to recover transfers made to a <u>subsequent transferee</u>, the avoidance of which would otherwise be barred by Section 546(e) as to the initial transferee, the <u>subsequent transferee</u> will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" *if* the Trustee has alleged that the <u>subsequent transferee</u> had actual knowledge of Madoff Securities' fraud.

*Cohmad II*, 2013 WL 1609154, at *1 (emphasis added, except "*if*").

The second of these two paragraph is directed to a subsequent transferee with actual knowledge of Madoff's fraud, not to a subsequent transferee without that knowledge. In fact, in his implementing Order, the court included the quoted language and underlined the word "subsequent" at the end, showing that the decision was directed to the subsequent transferee's state of actual knowledge, not the initial transferee's. Order, *Cohmad*, No. 12-MC-00115 (S.D.N.Y. Feb. 12, 2013), ECF Dkt. # 439 at 3. The court's explanation of its ruling makes this clear by focusing on the knowledge of a subsequent transferee from whom recovery is sought:

[I]f the allegations adequately allege that a <u>defendant</u> had actual knowledge of Madoff's scheme, <u>such a transferee stands in a different posture from an innocent transferee, even as concerns the application of Section 546(e)</u>.... [T]he purpose of this section is "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." ... In the context of Madoff Securities' fraud, that goal is best achieved by protecting the reasonable expectations of investors who believed they were signing a securities contract; but a transferee who had actual knowledge of the Madoff "Ponzi" scheme did not have any such expectations, but was simply obtaining moneys while he could. Neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors.

\* \* \*

[T]o the extent that an innocent customer transferred funds to a <u>subsequent transferee who had actual knowledge of Madoff Securities' fraud</u>, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor. Again, this follows from the general principles enunciated earlier in this Opinion. A defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e).... In sum, if the Trustee sufficiently

15

> alleges that <u>the transferee from whom he seeks to recover a fraudulent transfer</u>
> knew of Madoff Securities' fraud, <u>that transferee</u> cannot claim the protections of
> Section 546(e)'s safe harbor.

*Id.* at *4, 7 (emphasis added; citations omitted). This explains that subsequent transferees' rights

parallel but do not exceed initial transferees' rights and that subsequent transferees may not rely

on § 546(e) <u>if</u> they themselves have actually knowledge that the funds they received had

been fraudulently transferred, but may do so if they did not have that knowledge. The

plaintiff concedes this stating, "the point of the actual knowledge exception ... is to restrict all <u>bad</u>

<u>actors</u> from hiding behind the safe harbor." Opp. Mem. at 27 (emphasis added). An innocent

subsequent transferee like KB is not a "bad actor."

The reasoning of *Cohmad II* is that an initial transferee with actual knowledge of the

fraud knows there was no *bona fide* settlement payment or securities contract, and the same is true

for a subsequent transferee with that knowledge. *Cohmad II*, 2013 WL 1609154, at *10.

Similarly, a non-innocent subsequent transferee with actual knowledge of the fraud cannot claim

that the initial transfer was in connection with a *bona fide* securities settlement because that

the subsequent transferee actually knows the contrary. *See id.* at *8.  But a subsequent

transferee without actual knowledge has a "reasonable expectation" that it is receiving a

securities settlement payment pursuant to a securities contract. That is the reasonable expectation

Congress intends to protect by § 546(e).  *Id.* at *4.

The plaintiff says, incorrectly, that his contrary position is supported by *BNP* and

*SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505 (Bankr.

S.D.N.Y. 2020), Opp. Br. at 27.  That is not so, and cannot be so, because neither decision

discusses this issue. *BNP*, 594 B.R. at 197; *SunEdison*, 620 B.R. at 514. Also, *BNP* would

conflict impermissibly with *Cohmad II* if it excluded innocent subsequent transferees from the

safe harbor.

16

The plaintiff sets up a straw man by arguing that KB's interpretation would "allow an initial transferee—who had knowledge of the fraud and was unable to satisfy a judgment (like Sentry)—to place fraudulently transferred moneys with a subsequent transferee out of the reach of a trustee." Opp. Br. at 27. That is speculative and is not the scenario here. Fairfield did not initiate transfers to KB to suit Fairfield's desire to avoid recovery; it made redemption payments initiated by KB to suit the Korean trusts' needs and asset managers' orders. The plaintiff's hypothetical argument is not relevant. Accordingly, the statute, its purpose, *Cohmad II* (and *Fairfield Inv. Fund*) entitle KB to dismissal of the claims against it.[10]

## V.    THE PLAINTIFF HAS NOT ALLEGED THAT KB RECEIVED ANY BLMIS CUSTOMER PROPERTY

There is a very simple, non-intricate, explanation why the plaintiff has failed to allege that KB received any BLMIS customer property and that the case must therefore be dismissed.[11] The plaintiff either overlooked or misunderstood KB's argument. Either way, he does not address it in his opposition. KB Opening Mem. at 7-10; Opp. Mem. at 28-30.

---

[10] The plaintiff also claims incorrectly that "this Court has ... applied the actual knowledge 'exception' on numerous occasions," Opp. Br. at 15. But, again, the cases he cites do not support that statement. *Fairfield Inv. Fund*, 2021 WL 3477479, at *1, *7 (dismissing innocent subsequent transferee), discussed in note 9. The other cases deal with allegations of initial transferee's actual knowledge and inn most instances dismiss subsequent transfer claims. Tr. of May 29, 2019 Hr'g, *Picard v. Square One Fund Ltd. (In re Madoff)*, No. 10-04330 (Bankr. S.D.N.Y. May 29, 2019), ECF Dkt. #181, at 41 (complaint's allegations "fail to spell out a claim of actual knowledge" against initial transferee defendant); *Picard v. Magnify Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, 583 B.R. 829 (Bankr. S.D.N.Y. 2018) (no subsequent transfer claims in complaint at No. 10-05279, ECF Dkt. # 143); *Picard v. Est. of Mendelow*, 560 B.R. 208, 226, 229 (Bankr. S.D.N.Y. 2016) (sustaining allegations of initial transferees' actual knowledge but dismissing subsequent transferee claims); *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 116, 125-26 (Bankr. S.D.N.Y. 2016) (not addressing the question specifically due to defendants' concessions and lack of challenges); *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (dismissing subsequent transfer claims); *Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 08–99000, 2015 WL 4734749, at *1, 10 (Bankr. S.D.N.Y. Aug. 11, 2015) (subsequent transfer claims not subject of motion); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 141, 153 (Bankr. S.D.N.Y. 2014) (applying safe harbor to subsequent transfers beyond two-year period because complaint failed to plausibly allege transferees' actual knowledge).

[11] KB is aware that the court rejected what it called "a very intricate factual argument about how billions of dollars might have come from non-BLMIS property." *Multi-Strategy, 12 cv 01205*, ECF Dkt. # 122, at 22; *Syz*, 11 cv 11 cv 02149, ECF Dkt. # 167, at 25-26. KB is not making that argument but instead a very simple one. KB takes no position on the allegations, declarations, arguments, or decision as to customer property in *Multi-Strategy* or *Syz*.

17

An essential element of the plaintiff's claim is that the property he seeks to recover is "customer property." Therefore, he must allege – consistently with the FRCP and pleading caselaw – that the transfers from Fairfield to KB set out in his Exhibit C actually came from the transfers BLMIS made to Fairfield set out in Exhibit B. He does not make a single fact-based allegation to show that is so. From the first paragraph of the complaint, he "assumes away" his obligation and substitutes the implicit view that, by simply calling what KB received "Customer Property" that he has sufficiently alleged that to be so. It is not sufficient and noting in the complaint alleges the connection, only the assumption. Compl. ¶¶ 1, 2, 3, 34, 39, 41.

The problem is this: the plaintiff alleges in his subsequent transferee complaints that (i) BLIMS transferred $3 billion to Fairfield and (ii) Fairfield transferred $5 billion to subsequent transferees and others. KB Opening Mem. at 8. Therefore, it is equally possible that (a) all or some of the $42 million of alleged subsequent transfers to KB came from the BLMIS $3 billion; or (b) none of it did. According to the plaintiff's allegations in his subsequent transfer actions, Fairfield transferred $2 billion to someone without saying who; therefore, because it is just as possible that KB's subsequent transfer redemption payments came from the $2 billion as from the $3 billion and, if from the $2 billion, the plaintiff has no claim against KB.

Consider an illustration: a plaintiff says that A gave $300 to B who gave $500 to 1, 2, 3, 4, and 5. The plaintiff demands 1-5 give back the $300 that A gave to B. Who among 1-5 received A's money and is liable for its return and who got the other $200 and has no liability? The plaintiff must make a fact-based allegation. Saying they all might have gotten some or all of the $300 is not a fact-based allegation but a speculative possibility. Alleging that is an attempt to shift the plaintiff's burden to show who is a proper defendant onto the defendants to show which of them is not. In this case, a claim may not lie against as many as 40% of the named defendants.

The plaintiff concedes that, "[t]o plead a subsequent transfer claim, the Trustee must

18

allege facts that support an inference 'that the funds at issue originated with the debtor,'" Opp.

Mem. at 28, *citing Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y.

2014). That is correct and is just what the plaintiff does not do. He also concedes that he "must

allege "the 'necessary vital statistics—the who, when, and how much' of the purported transfers to

establish an entity as a subsequent transferee of the funds." Opp. Mem. at 29, citing *Merkin*, 515

B.R. at 150. But he has also failed to do this, too: he does not allege "how much … of the

purported transfers … establish [KB] as a subsequent transferee." If it is none, KB is not a

subsequent transferor. The Compl. fails under the plaintiff's articulation of the legal standard.

The law is as simple. On a 12(b)(6) motion, courts disregards footless, unsupported,

ungrounded allegations and conjecture, legal conclusions, and opinions. "Maybe yes/maybe no"

is disregarded. FRCP 8(a)(2) requires a "statement of the claim <u>showing that the pleader is</u>

<u>entitled to relief</u>." If entitlement to relief is not properly alleged because an essential element is

not pled. The complaint must be dismissed. The Supreme Court says the "possibility" the

plaintiff may have a claim against KB is not enough. It said a complaint "must be dismissed" if

the plaintiff "ha[s] not nudged the[]claims across the line from conceivable to plausible." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In its following decision, it added:

> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to
> relief.'"

*Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009), citing and quoting *Bell Atl. Corp.*, 550 U.S. at 557

(brackets omitted); *accord Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC*, 542 B.R.

100, 119 (Bankr. S.D.N.Y. 2015). Here, the complaint alleges only a "sheer possibility" that KB

19

received BLMIS customer property and, since that is possibility is equal to the possibility that it did not, the complaint "stops short" and must be dismissed.

Contrary to the plaintiff's assertion, KB is not asking the plaintiff to "plead damages" or to "trace" money through "commingled accounts" or to make "dollar-for-dollar accountings." Opp. Mem. at 29-30. The pleading omission is more basic and deals with a fundamental element of liability. The plaintiff also argues that "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Id.* at 29. If the pathways he alleged had made the connection, he might have a point, but they do not. Here, the "BLMIS to Fairfield" pathway does not match up with the "Fairfield to KB" pathway and do not allege that KB received any customer property.

Finally, the plaintiff makes two mistaken arguments. First, he disputes KB's "alternative explanations" as implausible and possibly requiring discovery and experts. *Id.* at 31. That misses the point. KB was pointing out an application of Twombly and Iqbal, namely that failing to explain an "obvious possible explanation" alternative" leaves the allegation deficient and the complaint must be dismissed. *Garfinkle v. Conference on Jewish Material Claims against Ger., Inc.*, 19-CV-7007 (JPO), at *8 (S.D.N.Y. Oct. 28, 2020) ("There is an "obvious alternative explanation" for the [defendant's] conduct — that it sought to ensure the proper use of its funds — and that explanation renders [plaintiff's competing explanation "conceivable [but not] plausible." Citing Twombly, 550 U.S. at 567, 570 and Iqbal, 556 U.S. at 681. The "obvious alternative explanation" here is that KB was paid from the $2 billion BLMIS money and the plaintiff does not deal with it. KB offered some places for the plaintiff to look, but it is his job to find and allege the source of the payments to KB. He did not, so his complaint is dismissible.[12]

---

[12] The plaintiff also sets up another straw man by arguing that the "Single Satisfaction Rule Does not Bar the Trustee's Claim." Opp. Mem. at 33-34. Whether true or not, it is irrelevant because KB never raised that concept.

**CONCLUSION**

KB respectfully request that the court dismiss the complaint because it fails to allege a basis for personal jurisdiction, because KB is entitled to the protection of § 546(e)'s safe harbor, and because the plaintiff has not adequately alleged that KB received any BLMIS customer property.[13]

Dated: New York, NY
June 20, 2022

Respectfully submitted,

/s/ Richard A. Cirillo

Richard A. Cirillo
CIRILLO LAW OFFICE
246 East 33rd Street – 1 FR
New York, NY 10016-4802
T: 917-541-6778
E: rcirillo@cirillo-law.com
*Attorney for Defendant Kookmin Bank*

---

[13] KB does not consent to the Bankruptcy Court's entry of a final order or final judgment.

21