**Hearing Date: November 16, 2022**
**Objection Date: August 22, 2022**
**Reply Date: September 21, 2022**

Pamela A. Miller
Amber Covucci
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail: pmiller@omm.com
*Attorneys for Merrill Lynch International*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 10-05346 (CGM) |
| Plaintiff, | |
| v. | |
| MERRILL LYNCH INTERNATIONAL, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MERRILL LYNCH INTERNATIONAL'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .............................................................................. 1

BACKGROUND ................................................................................................. 4

      A.     MLI ..................................................................................................... 4

      B.     The Funds ........................................................................................ 4

      C.     The Absolute Alpha Notes and Warrants ................................. 5

      D.     The Complaint and Related Proceedings .................................. 5

ARGUMENT .................................................................................................... 8

   I.    THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF
       PERSONAL JURISDICTION UNDER RULE 12(B)(2) .................................... 8

      A.     The Court lacks general jurisdiction over MLI ......................... 9

      B.     The Court lacks specific jurisdiction over MLI ....................... 10

      C.     The Exercise of Jurisdiction Over MLI Would Not Comport With
          Due Process .............................................................................. 14

   II.   THE COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN
       STATEMENT OF THE CLAIM" IN VIOLATION OF RULE 8(A)(2) ........... 17

   III.  THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE
       MLI REDEMPTIONS WERE BLMIS PROPERTY ......................................... 20

      A.     The Trustee does not adequately allege that the funds transferred to
          MLI originated with BLMIS. ..................................................... 20

      B.     Based on the Trustee's own allegations, it is implausible that all of
          the MLI Redemptions contain BLMIS customer property. ...................... 21

   IV.  THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE
       FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE
       BARRED UNDER BANKRUPTCY CODE SECTION 546(e) ........................ 23

      A.     The Initial Transfers Were Made By and To Entities Covered by
          Section 546(e). .......................................................................... 24

   V.   THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A)
       CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH
       RELIEF CAN BE GRANTED. ..................................................................... 27

i

**TABLE OF CONTENTS**
**(continued)**

Page

VI.   THE COMPLAINT ESTABLISHES THAT MLI IS ENTITLED TO THE
GOOD FAITH DEFENSE.................................................................................. 29

    A.   MLI Received The Redemptions For Value ........................................... 30

    B.   MLI Received The Redemptions In Good Faith...................................... 31

    C.   The Good Faith Defense is Particularly Warranted For The
Preference Claims. ................................................................................... 39

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amidax Trading Grp. v. S. W.I.F.T. SCRL*,
 671 F.3d 140 (2d Cir.2011)...........................................................................9

*Anwar v. Fairfield Greenwich Ltd.*,
 286 F.R.D. 258 (S.D.N.Y. 2012) ................................................................32

*Anwar v. Fairfield Greenwich Ltd.*,
 728 F. Supp. 2d 372 (S.D.N.Y. 2010)..........................................................34

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*,
 480 U.S. 102 (1987)....................................................................................12

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)....................................................................................19

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)...............................................................................19, 21

*Bos. Trading Grp., Inc. v. Burnazos*,
 835 F.2d 1504 (1st Cir. 1987).....................................................................39

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
 137 S. Ct. 1773 (2017)................................................................................10

*Charles Schwab Corp. v. Bank of Am. Corp.*,
 883 F.3d 68 (2d Cir. 2018)............................................................................9

*Chirag v. MT Marida Marguerite Schiffahrts*,
 604 F. App'x 16 (2d Cir. 2015).....................................................................10

*Cohen v. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*,
 No. 08-01789(SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ........................29

*Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*,
 801 F. Supp. 2d 211 (S.D.N.Y. 2011).........................................................18

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014).................................................................................9, 10

*David v. Bifani*,
 No. 07–cv–00122, 2007 WL 1216518 (D. Colo. Apr. 24, 2007) ........................18

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In Re Enron Creditors
 Recovery Corp.)*,
 651 F.3d 329 (2d Cir. 2011).........................................................................25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fairfield Sentry Limited (In Liquidation) v. Theodoor CGC Amsterdam*,
   No. 10-13164, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018)...................................9, 24

*Fairfield Sentry Ltd. v. Migani*,
   [2014] UKPC 9 ...........................................................................................................24, 29

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
   No. 10-03496, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ....................................24

*Finn v. Alliance Bank*,
   860 N.W.2d 638 (Minn. 2015)..............................................................................................27, 28

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
   2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ..........................................................................21

*In re Bayou Group, LLC*,
   439 B.R. 284 (S.D.N.Y. 2010).................................................................................................29

*In re Bernard L. Madoff Inv. Sec.*,
   LLC, 440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...........................................................................26

*In re Dreier LLP*,
   453 B.R. 499 (Bankr. S.D.N.Y. 2011)......................................................................................36

*In re Geiger*,
   446 B.R. 670 (Bankr. E.D. Pa. 2010) ......................................................................................16

*In re Lyondell Chem. Co.*,
   543 B.R. 127 (Bankr. S.D.N.Y. 2016)......................................................................................10

*In re Morrison*,
   375 B.R. 179 (Bankr. W.D. Pa. 2007) .....................................................................................15

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 659 (2d Cir. 2013)..............................................................................................10, 12

*In re Tribune Co. Fraudulent Conv. Litig.*,
   946 F.3d 66 (2d Cir. 2019)................................................................................................22, 25

*In re Unified Com. Cap., Inc.*,
   260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd sub nom. In re Unified Com.
   Cap.*, No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) ..................27, 28

*Irving Tr. Co. v. Chase Nat'l Bank*,
   65 F.2d 409 (2d Cir. 1933).......................................................................................................39

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jones v. Nat'l Comms. & Surveillance Networks*,
    266 F. App'x 31 (2d Cir. 2008) ...........................................................................15

*Koehler v. Bank of Berm. Ltd.*,
    101 F.3d 863 (2d Cir. 1996)................................................................................9

*LaMonica v. CEVA Group Plc (In re CIL Ltd.)*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-
    11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) ............................... passim

*Lehigh Val. Indus., Inc. v. Birenbaum*,
    527 F.2d 87 (2d Cir. 1975)................................................................................10

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018)......................................................................................22

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996).............................................................................13, 15

*NCUA Bd. v. Morgan Stanley & Co.*,
    No. 13 Civ. 6705, 2014 WL 1673351 (S.D.N.Y. Apr. 28, 2014)...........................18

*Newman v. Fam. Mgmt. Corp.*,
    748 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013).........................33

*Nicholsen v. Feeding Tree Style, Inc.*,
    No. 12 CIV. 6236, 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014)................................9

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
    No. 08-CV-5023, 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010)...........................17

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)...............................................................................22

*Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.
    Sec. LLC)*,
    No. AP 08-01789, 2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020)...............29

*Picard v. Banque SYZ & Co. (In re BLMIS)*,
    No. 11-02149, 2022 WL 2135019 (Bankr. S.D.N.Y. Jun. 14, 2022) .................13, 14, 18, 33

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................................14

*Picard v. BNP Paribas S.A.*,
    594 B.R. 167 (2018)......................................................................................31, 33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC*),
   12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
   142 S. Ct. 1209 (2022) ..................................................................................... passim

*Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*),
   773 F.3d 411 (2d Cir. 2014) ........................................................................... 24, 25

*Picard v. Legacy Capital Ltd.* (*In re BLMIS*),
   548 B.R. 13 (Bankr. S.D.N.Y. 2016) ....................................................................... 33

*Picard v. Multi-Strategy Fund Limited* (*In re BLMIS*),
   No. 12-01205, 2022 WL 2137073 (Bankr. S.D.N.Y. Jun 13, 2022) .......... 13, 14, 18

*Picard v. Shapiro* (*In re Madoff*),
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) ................................................................. 19, 20

*Salahuddin v. Cuomo*,
   861 F.2d 40 (2d Cir. 1988) ....................................................................................... 15

*Saltz v. First Frontier, LP*,
   782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd sub nom. Saltz v. First Frontier,
   L.P.*, 485 F. App'x 461 (2d Cir. 2012) ................................................................... 33

*Sapia v. Home Box Off., Inc.*,
   No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018) ......................... 22

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   No. 08-01789 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .......... 38

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   No. 12 MC 115 JSR, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ................. 23, 25

*Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*),
   403 F.3d 43 (2d Cir. 2005) ................................................................. 26, 28, 38, 39

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
   476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman
   Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d
   Cir. 2014) ................................................................................................................. 23

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F.Supp.3d 521 (S.D.N.Y. 2017) ......................................................................... 9

*Stephenson v. Citco Grp. Ltd.*,
   700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd on other grounds sub nom.
   Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir.
   2012), *as amended* (June 13, 2012) ....................................................................... 34

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Stephenson v. PricewaterhouseCoopers, LLP,*
  482 F.Appx 618 (2d Cir. 2012), *as amended* (June 13, 2012)................................34

*Stephenson v. PricewaterhouseCoopers, LLP,*
  768 F. Supp. 2d 562 (S.D.N.Y. 2011), *aff'd,* 482 F. App'x 618 (2d Cir. 2012),
  as amended (June 13, 2012)................................................................33, 34

*Stoebner v. Opportunity Fin., LLC,*
  909 F.3d 219 (8th Cir. 2018) ............................................................28

*Sunward Elec., Inc. v. McDonald,*
  362 F.3d 17 (2d Cir. 2004)..............................................................9

*U.S. Philips Corp. v. ATI Techs., Inc.,*
  No. 05CIV.8176, 2008 WL 2073928 (S.D.N.Y. May 8, 2008)................................32

*United States v. International Longshoremen's Association,*
  518 F. Supp. 2d 422 (E.D.N.Y. 2007) ....................................................18

*Walden v. Fiore,*
  571 U.S. 277, 284 (2014)................................................................10

*Waldman v. Palestine Liberation Org.,*
  835 F.3d 317 (2d Cir. 2016)..........................................................9, 12

*Youngers v. Virtus Inv. Partners Inc.,*
  No. 15CV8262, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017)................................32

## Statutes

11 U.S.C. § 546(e) ......................................................................22, 26

11 U.S.C. § 548(a)(1)(A) ................................................................26

11 U.S.C. § 550(a) ......................................................................19

11 U.S.C. § 550(a)(2)....................................................................22

11 U.S.C. § 550(b) ......................................................................29

EU GDPR Art. 4(1)........................................................................14

EU GDPR Art. 44 ........................................................................14

EU GDPR Art. 45 ........................................................................14

EU GDPR Art. 46 ........................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

SIPA § 78fff-2(c)(3) ........................................................................................................19

UKDPA, Part 2, Ch. 1 § 2 ...............................................................................................14

UKDPA, Part 2, Ch. 2 § 18 .............................................................................................14

**Other Authorities**

https://www.gov.uk/government/publications/uk-approach-tointernational-data-
transfers/international-data-transfers-building-trust-delivering-growth-
andfiring-up-innovation ............................................................................................14

**Rules**

Fed. R. Civ. P. 8(a)(2) ......................................................................................................15

Fed. R. Civ. P. 9(b) ..........................................................................................................26

**Treatises**

Wright & Miller, 5 Federal Practice and Procedure § 1282 (4th ed. 2021) ...................15

Defendant Merrill Lynch International ("MLI"),[1] by and through its undersigned counsel,

submits this memorandum of law in support of its motion to dismiss the Complaint ("Complaint"

or "Compl.," ECF No. 1-1)[2] filed by Plaintiff Irving H. Picard (the "Trustee"), trustee for the

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantially

consolidated estate of Bernard L. Madoff, under Federal Rules of Civil Procedure (the "Rules")

12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

MLI is a "net loser." MLI never had an account with BLMIS. Instead, MLI bought $31.2

million worth of shares in Fairfield. Fairfield, in turn, entrusted most of its money to BLMIS. MLI

redeemed approximately half of its shares in Fairfield, leaving it with a net loss of more than $15

million.

While the Trustee admits that MLI lost $15 million of its own principal in the Madoff Ponzi

scheme, the Trustee demands that MLI forfeit its entire principal to be redistributed to BLMIS'

customers—converting MLI's roughly 50% loss into a complete loss for the benefit of other

investors. The Trustee's Complaint provides no basis to support that extreme and inequitable

result.

The transfers the Trustee seeks to avoid all took place outside of the United States, between

non-United States entities. The Trustee does not allege that MLI—a United Kingdom

stockbroker—is subject to general jurisdiction in the United States. And the Complaint pleads no

facts about the transfers that would give rise to specific jurisdiction: the Trustee alleges MLI

---

[1] *See* ECF No. 11 (Stipulation and Order), stipulating that Merrill Lynch International replaces Merrill Lynch International & Co. C.V as the named defendant in the Complaint.

[2] Unless otherwise noted, references to "ECF No. __" refer to Adv. Proc. No. 10-05346 (CGM). (Bankr. S.D.N.Y.). Unless otherwise noted, internal citations and quotation marks in case references are omitted. "Jackson-Proes Decl." refers to the Declaration of Richard Jackson-Proes in Support of Defendant Merrill Lynch International's Motion to Dismiss. "Covucci Decl." refers to the Attorney Declaration of Amber Covucci in Support of Defendant Merrill Lynch International's Motion to Dismiss.

invested in, and redeemed shares from, two British Virgin Islands hedge funds. Each specific allegation about MLI in the Complaint acknowledges that its activities took place in London and Paris, not the United States. Exercising personal jurisdiction over MLI, a foreign entity, based on entirely foreign transactions would be unreasonable and contrary to due process requirements. The Complaint should be dismissed for that reason alone.

The Complaint fails for the additional reason that it does not comply with Rule 8(a)'s requirement that a complaint contain a "short and plain state statement of the claim showing that the pleader is entitled to relief." To support its allegations that the initial transfers from BLMIS to Sentry were avoidable—an *essential element* of the subsequent transfer claims against MLI—the Trustee purports to incorporate by reference a 217 page complaint, attaching 111 exhibits, in an entirely separate action to which MLI is not even a party. Compl. ¶ 128 (incorporating *Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 ECF No. 23 (the "Fairfield Amended Complaint")). Rule 8(a) forbids the Trustee from taking such opaque and confusing pleading shortcuts.

The Complaint also fails on another essential element of its claims: it does not allege that the subsequent transfers to MLI contained BLMIS customer property. The Complaint does not connect any of the transfers to MLI to funds originating with BLMIS, asserting merely that "[u]pon information and belief, to pay each of these redemptions, Sentry withdrew and/or utilized funds from its BLMIS accounts and used those funds to directly pay MLI, or to pay Sigma, which, in turn, paid MLI." Compl. ¶ 126. In fact, the Trustee seeks to recover roughly *$2 billion more* from subsequent transferees of Sentry than it alleges BLMIS transferred to Sentry in the first place. The Trustee's allegations are not simply implausible, but mathematically impossible.

Further, under prior judgments of this Court, the District Court, and the Second Circuit, Bankruptcy Code section 546(e)'s safe harbor applies to the Trustee's claims for redemptions made outside of the preference period. BLMIS is a "stockbroker" and Sentry a "financial institution" within the meaning of section 546(e); the transfers were made in connection with both Sentry's accounts with BLMIS and the contract governing MLI's redemptions from Sentry, both of which are "securities contracts"; and BLMIS's redemption payments to its customers constitute "settlement payments." The intentional fraudulent conveyance claims similarly fail, because the Complaint does not plead *any* specific facts showing that the initial transfers were made with "intent to defraud."

Even if the Trustee had made a *prima facie* showing of both jurisdiction and the elements of his fraudulent conveyance and preference claims, which he has not, the Complaint demonstrates an additional reason to dismiss: MLI is entitled to the good faith defense under 11 U.S.C. § 550(b). The Complaint assembles a collection of hindsight observations to argue that MLI should have suspected and investigated one of the largest frauds in history—a fraud that the entire banking industry and even the SEC failed to detect for decades. But the Complaint does not plead that MLI actually knew of the scheme or red flags that should have put it on inquiry notice, nor that it could ever have discovered the scheme even with further diligence. Most powerfully, MLI's investment and loss of its own principal in the Funds belies that notion. What major brokerage house would risk its own capital if it suspected the securities were worthless as the result of a massive Ponzi scheme? Compounding MLI's losses by clawing back its remaining principal would be contrary to both the facts and the law. The Complaint should be dismissed in its entirety.

3

## BACKGROUND

### A.    MLI

MLI is a stockbroker based in London, England. *See* Jackson-Proes Decl. ¶ 1. At all times relevant to this litigation, MLI's place of incorporation and principal place of business have been London, England. *Id.* ¶ 1. MLI does not have any employees or offices in the United States. *Id.* ¶¶ 4–6.

### B.    The Funds

Fairfield Sentry Ltd. ("Sentry") and Fairfield Sigma Ltd. ("Sigma," together with Sentry, the "Funds") are hedge funds based in the British Virgin Islands (BVI). Compl. ¶¶54–55. Sentry maintained one or more customer accounts at BLMIS and was one of BLMIS's sources of investor principal, and Sigma was entirely invested in Sentry. *Id*. Sentry transacted in US Dollars and Sigma transacted in Euros. Compl. ¶¶55, 121. On July 21, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands placed both Funds in liquidation. *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Proc. No. 09-01239, ECF No. 23 (the "Fairfield Amended Complaint" or "Fairfield Am. Compl.") ¶ 22.

The Trustee filed a complaint against, and eventually settled with, the Liquidators of Sentry and Sigma. *See* Covucci Decl. Ex. A (Fairfield Am. Compl.); *Id* Ex. B (*Settlement Agreement, Picard v. Fairfield Sentry Ltd., et. al.*, Adv. Proc. No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), ECF 69-2 (the "Fairfield Settlement Agreement")). In the Fairfield Settlement Agreement the parties stipulated to the entry of a judgment in favor of the BLMIS Estate (in the amount of approximately $3 billion for Sentry and approximately $750 million for Sigma). *See* Fairfield Settlement Agreement ECF 69-2. The Fairfield Settlement Agreement provided for cooperation and information sharing between the joint liquidators for the Funds and the Trustee concerning,

4

*inter alia*, claims against parties that redeemed shares from Sentry and Sigma. *See id*. ¶ 14. Under

that Agreement, the Trustee has had access to the Funds' books and records for well over a decade.

### C.    The Absolute Alpha Notes and Warrants

MLI sold notes and warrants indexed against a basket of funds, labelled the "Absolute

Alpha" index, which included 10% of either Sentry or Sigma. Compl. ¶ 17. In structured note

transactions, investors pay the issuer (here, MLI) and receive a structured note in exchange. By

the note, the issuer promises to pay back the principal, plus or minus a multiple of a the 'index,'

(here, the Absolute Alpha index) less interest and fees, payable at maturity. The investor realizes

a profit if the value of the index increases before maturity. If the index value falls, the issuer pays

out less than the original investment. By issuing these notes and warrants, MLI committed itself

to *paying* purchasers of the Absolute Alpha notes if the index *rose*, and *profiting* if the index *fell*.

In other words, MLI undertook a risk of losing money if the Funds increased in value. In order to

"hedge [this] risk," MLI purchased Sentry and Sigma shares. *Id* ¶¶ 15, 18.

### D.    The Complaint and Related Proceedings

The Trustee filed the Complaint [ECF 1-1] (the "Complaint" or "Compl.") over a decade

ago, on December 8, 2010. The Complaint named Merrill Lynch International & Co. C.V., a

Netherlands Antilles limited partnership, as the defendant. Compl. ¶ 51. On May 26, 2011, the

parties stipulated to replace MLI as the named defendant in the Complaint and change the caption

of this action. *See* ECF No. 11. The stipulation did not alter any other allegations in the Complaint.

*See id*. In the more than ten years since, the Trustee has not amended the Complaint.

The Trustee seeks to recover at least $16 million that MLI allegedly received from Sentry

and Sigma. The Trustee alleged that MLI's redemptions from Sentry are avoidable because some

unknown "portion" of BLMIS's initial transfers to Sentry "must" have been subsequently

transferred to MLI in each of its redemptions. Compl. ¶¶ 26, 133–134. The Trustee has categorized

MLI's redemptions from Sentry based on the timing of each transfer relative to December 11, 2008 (the date the SEC filed a District Court Proceeding against Madoff alleging that Madoff and BLMIS engaged in fraud, also referred to as the "Filing Date"). All of the transfers are dubbed the "MLI Six Year Subsequent Transfers;" the portion within two years of the petition are also called the "MLI Two Year Subsequent Transfers," and the portion within 90 days of the petition are also called the "MLI Preference Period Subsequent Transfers," collectively the "MLI Subsequent Transfers." *Id*. ¶¶ 134–139. A chart setting forth the MLI Subsequent Transfers from Sentry to MLI is below.

| Request Date | Payment Date | Account | Fairfield Fund | Redemption | Subsequent Transfer Period(s) |
|---|---|---|---|---|---|
| 07/31/06 | 08/14/06 | Merrill Lynch International | Sentry | $1,200,000 | MLI Six Year Subsequent Transfer |
| 01/31/08 | 02/15/08 | Merrill Lynch International | Sentry | $2,000,000 | MLI Six Year Subsequent Transfer; MLI Two Year Subsequent Transfers |
| 05/31/08 | 06/17/08 | Merrill Lynch International | Sentry | $3,000,000 | MLI Six Year Subsequent Transfer; MLI Two Year Subsequent Transfers |
| 10/31/08 | 11/19/08 | Merrill Lynch International | Sentry | $3,000,000 | MLI Six Year Subsequent Transfer; MLI Two Year Subsequent Transfers; MLI Preference Period Subsequent Transfers |
| 10/31/08 | 11/19/08 | Merrill Lynch International | Sentry | $5,000,000 | MLI Six Year Subsequent Transfer; MLI Two Year Subsequent Transfers; MLI Preference Period Subsequent Transfers |

Similarly, the Complaint alleges that MLI's redemption of €1.5 million from Sigma on November 21, 2008 is recoverable as "a portion" of a payment from BLMIS, which was transferred to Sentry, and then transferred from Sentry to Sigma. Compl. ¶ 142–150. The Complaint dubs this single transfer the "MLI-Sigma Six Year Subsequent Transfer," "MLI-Sigma Two Year

6

Subsequent Transfer," and "MLI-Sigma Preference Period Subsequent Transfer," collectively "MLI-Sigma Subsequent Transfer." *Id.* ¶ 146–148.

A chart describing the MLI-Sigma Subsequent Transfer is below.

| Request Date | Payment Date | Account | Fairfield Fund | Redemption | Subsequent Transfer Period(s) |
|---|---|---|---|---|---|
| 10/31/08 | 11/21/08 | Merrill Lynch International | Sigma | €1,500,000 | MLI-Sigma Six Year Subsequent Transfer; MLI-Sigma Two year Subsequent Transfer; MLI-Sigma Preference Period Subsequent Transfer |

The Complaint alleges that because "[a] sizeable portion of the money transferred from BLMIS to Sentry was subsequently transferred by Sentry to MLI," the redemption payments from Sentry to MLI are recoverable as subsequent transfers pursuant to section 550 of the Bankruptcy Code. *Id.* ¶¶ 133, 136. Similarly, the Complaint alleges that "[a] sizeable portion" of the money transferred from BLMIS to Sentry was subsequently transferred by Sentry to Sigma, and then by Sigma to MLI. *Id.* ¶ 142. However, despite having had access to Sentry's books and records for more than a decade and ample time to investigate and amend its Complaint, the Trustee does not specifically trace any of the MLI redemptions to BLMIS. Rather, the Trustee attaches an exhibit comprising nearly sixty pages of small type listing thousands of transactions among BLMIS and Sentry. *See* Compl., Ex. A, ECF No. 1-2. The exhibits show that the payments were made from Citco bank accounts designated for the benefit of Sentry, referred to as "Citco Global Custody N V FBO Fairfield Sentry Ltd" (Account Nos. IFN012 and IFN045).

The Complaint similarly contains no specific allegations about the initial transfers from BLMIS to Sentry; rather, the Complaint purports to "incorporate by reference" the allegations contained in the Fairfield Amended Complaint in the Trustee's case against Sentry and various related parties. Compl. ¶ 128; *see also* Fairfield Am. Compl. MLI is not a party to the Fairfield

7

Amended Complaint, and the Trustee does not identify which paragraphs or allegations it intends to incorporate by reference.

The Fairfield Amended Complaint alleges, in broad terms, that BLMIS's operations were characterized by secrecy and a lack of transparency, and that the Fairfield Funds' management "went to great lengths to keep their investors far away from Madoff," (Fairfield Am. Compl. ¶ 342), "misled investors," (*id*. ¶ 344), "remove[d] all references to BLMIS from their marketing materials" in 2002, (*id*. ¶ 346), "actively and repeatedly 'blocked' investors wishing to obtain more information." (*id*. ¶ 348) It continues that the Funds "went to great lengths to attempt to cover up Madoff's actual role with the [Fairfield Greenwich Group] funds" (*id*. ¶ 350) and "sold the false assurance that they conducted superior due diligence" (*id*. ¶ 362). The Fairfield Amended Complaint further alleges that the SEC investigated BLMIS in 2006, but failed to uncover the fraud and "closed any further investigation of BLMIS." *Id*. ¶¶ 351–361.

Notably, by the Trustee's calculations, MLI was itself a victim of Madoff's Ponzi scheme and suffered significant financial losses. The Trustee pleads that MLI invested approximately $28.6M in Sentry and €1.75M in Sigma from 2005 through 2007, and redeemed only $14.2M from Sentry from August 2006 to November 2008 and €1.5M from Sigma in November 2008—a loss of $14.4M and €0.25M in principal. Compl. ¶¶ 121, 124. As of November 11, 2008, MLI's outstanding Sentry shares were valued at approximately $20M. Compl. ¶ 125. Those shares became "essentially worthless" when Madoff's fraud was exposed. Compl. ¶ 125.

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION UNDER RULE 12(B)(2)

This Court has held that MLI did not consent to personal jurisdiction in New York by subscribing to the Funds. *See Fairfield Sentry Limited (In Liquidation) v. Theodoor CGC*

*Amsterdam*, No. 10-13164, 2018 WL 3756343, at *12 (Bankr. S.D.N.Y. Aug. 6, 2018). The Trustee therefore bears the "burden of establishing jurisdiction over the defendant." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 334 (2d Cir. 2016). At the motion to dismiss stage, the Trustee "must make a *prima facie* showing that jurisdiction exists" consistent with due process. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018). "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Id.* Jurisdiction must be established as to each specific claim asserted in the action. *See Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F.Supp.3d 521, 586 (S.D.N.Y. 2017) (citing *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

As a threshold matter, the Complaint fails to plead MLI's principal place of business, place of incorporation, or address. The Trustee stipulated to change the defendant in this Complaint from Merrill Lynch International & Co. C.V. to MLI (*see* ECF No. 11) in 2011, but in the ten years since, the Trustee never amended the Complaint to assert even basic jurisdictional facts about MLI. This "failure to plead jurisdictional facts" means jurisdiction cannot be established on the record before the Court. *LaMonica v. CEVA Group Plc (In re CIL Ltd.)*, 582 B.R. 46, 79–80 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) (trustee did not allege sufficient facts for personal jurisdiction over a London-based defendant, in part because the trustee incorrectly pled the defendant's place of employment).

### A.     The Court lacks general jurisdiction over MLI

Regardless, MLI is not subject to the Court's general jurisdiction. A party is subject to general personal jurisdiction only when it is essentially "at home" in the forum by virtue of its place of incorporation or principal place of business. *See, e.g., Daimler AG v. Bauman*, 571 U.S.

117, 136–37 (2014). It is undisputed that MLI's principal place of business is not in the United

States. *See supra* at 4. Moreover, when assessing jurisdiction "the court need not accept

'[t]hreadbare recitals of the elements of [jurisdiction] which are essentially legal conclusions."

*Nicholsen v. Feeding Tree Style, Inc*., No. 12 CIV. 6236 JPO, 2014 WL 476355, at *1 (S.D.N.Y.

Feb. 6, 2014) (citing *Amidax Trading Grp. v. S. W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011)

(applying plausibility standard to facial attack on subject matter jurisdiction)). The Trustee's

allegations that MLI "routinely conducts business in New York" and "purposely avails itself of

the laws of the State of New York by undertaking significant commercial activities in New York"

are no more than a recitation of the jurisdictional test, which this Court can ignore. Compl. ¶ 23.

### B.    The Court lacks specific jurisdiction over MLI

In the absence of general jurisdiction, the Trustee must plead facts supporting the exercise

of specific jurisdiction. *See Daimler AG*, 571 U.S. at 136–37. To do so, the Trustee must assert

that (1) the claims arise out of MLI's sufficient "minimum contacts" with New York and (2) "the

exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on September

11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). The minimum contacts inquiry focuses on "the

relationship among the defendant, the forum, and the litigation," a relationship that "must arise out

of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S.

277, 284 (2014); *see also Bristol-Myers Squibb v. Super. Ct. of Cal*., 137 S. Ct. 1773, 1781 (2017)

(declining to exercise personal jurisdiction where "[w]hat is missing . . . is a connection between

the forum and *the specific claims at issue*") (emphasis added). "A prima facie case requires non-

conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of

jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19

(2d Cir. 2015). The Trustee has failed to meet this pleading burden.

The Trustee makes blanket allegations that MLI "routinely conducts business in New

10

York" and "purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, New York" and that MLI "derives significant revenue from activities occurring in New York." Compl. ¶ 23. But the Complaint is devoid of any detail regarding the "business" or "commercial activities" allegedly conducted by MLI "in New York." Generalized, boilerplate allegations are insufficient to establish jurisdiction where there "are no allegations of specific facts which would connect [MLI] with any New York activity." *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975); *see also In re Lyondell Chem. Co*., 543 B.R. 127, 137 (Bankr. S.D.N.Y. 2016) ("conclusory allegations are not enough to establish personal jurisdiction.").

Nor does the unsupported claim that MLI "entered into subscription agreements with New York entities" suffice to establish jurisdiction. The Complaint provides no details or specific facts about the unidentified "subscription agreements with New York entities." It cannot be referring to MLI's subscription agreements with the Funds, which are indisputably *not* New York entities. *See* Compl. ¶¶ 54-55 (Sentry and Sigma are BVI hedge funds).

Not only are the Trustee's vague assertions unsupported by any well-pled allegations, but they are belied by the Complaint itself. Each of the Trustee's specific allegations about MLI describes actions taken by employees in London or Paris, with no connection to New York:

- "MLI's London-based fund-linked derivatives solutions group . . . ." Compl. ¶ 60.
- "Another MLI London desk employee . . . ." *Id.* ¶ 61.
- "a Vice President for Latin America Structured Products from a 'Merrill Lynch' entity contacted the MLI London desk . . . An MLI London desk employee answered promptly . . . ." *Id.* ¶ 62.
- "a Paris-based MLI employee contacted his colleagues on the MLI London desk . . . ." *Id.* ¶ 63.
- "In February 2008, MLI was again asked for a quote for a two times (2x) levered note on Sentry. An MLI London desk employee responded . . . ." *Id.* ¶ 64.

11

- "Another MLI employee in London followed up on the request by stating to his London desk colleagues . . . ." *Id.* ¶ 65.

- "MLI's London desk was again contacted . . . . One of the MLI London desk employees responded by e-mail . . . ." *Id.* ¶ 66.

- "MLI's London desk passed along the request for a quote . . . to their equity derivatives counterparts . . . in London." *Id.* ¶ 67.

- "an independent hedge fund investment specialist in London . . . contacted MLI's London desk . . . ." *Id.* ¶ 68.

- "an MLI employee summed up MLI's position with respect to Madoff to two of his London-based colleagues . . . ." *Id.* ¶ 69.

- "yet another MLI London employee . . . ." *Id.* ¶ 70.

- "MLI London desk employees also regularly interacted with other structured products and hedge funds investment personnel at MLI's competitor banks and securities firms in London and the rest of Europe." *Id.* ¶ 71.

- "discussions between MLI traders and sales people and the London and Paris desks of other major financial and trading institutions . . .these London and Paris trading desks communicated specifically about . . . ." *Id.* ¶ 72. "In fact, multiple financial institutions with London derivatives trading desks . . ." *Id.*

- "MLI's London-based traders . . . ." *Id.* ¶ 73.

- "an [sic] MLI London employee . . . ." *Id.* ¶ 113.

Finally, the Complaint's allegations about the Absolute Alpha products do not establish personal jurisdiction. The Complaint alleges MLI sold notes and warrants indexed against the "Absolute Alpha" basket of funds, which included 10% of either Sentry or Sigma. Compl. ¶ 17. The Complaint admits that MLI purchased Sentry and Sigma shares only to "hedge its risk in the Absolute Alpha notes and warrants." *Id* ¶¶ 15, 18. In other words, MLI, a UK entity, invested in the Funds, BVI entities, on its own behalf, to hedge its own risk. Those allegations confirm that MLI's redemptions were wholly foreign transactions.

This Court's recent decisions in *Picard v. Multi-Strategy Fund Limited (In re BLMIS)*, No. 12-01205, 2022 WL 2137073 (Bankr. S.D.N.Y. Jun. 13, 2022) and *Picard v. Banque SYZ & Co. (In re BLMIS)*, No. 11-02149, 2022 WL 2135019 (Bankr. S.D.N.Y. Jun. 14, 2022) do not impact this analysis.

In both cases, the Court relied on *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R.

501 (Bankr. S.D.N.Y. 2012) to find that the Court has personal jurisdiction because the Trustee

alleged the defendants "knowingly directed funds to be invested with New York-based BLMIS

through Madoff Feeder Funds." *Banque SYZ*, 2022 WL 2135019 at *3 (citing Banque SYZ Compl.

¶ 6); *Multi-Strategy*, 2022 WL 2137073 at *3 ("Defendant invested in the BLMIS Feeder Funds

with the specific purpose of having funds invested with BLMIS in New York. Defendant knew

and intended that its investments in the BLMIS Feeder Funds were ultimately investments with

New York-based BLMIS."). And because both had actual knowledge that "approximately 95% of

the Fund's assets were under the custody of New York based BLMIS." *Id*. (citing Multi-Strategy

Compl. ¶ 93); *Banque SYZ*, 2022 WL 2135019 at *3 (noting SYZ Banque's subscription

agreements incorporated the Funds' Private Placement Memorandum, which disclosed the Funds

principally allocated assets to BLMIS). Neither of those allegations are made in the MLI

Complaint and thus there is no similar basis for jurisdiction.

Further, in both cases there were additional contacts with New York to substantiate

jurisdiction. This Court found Multi-Strategy, "through its president and investment manager, was

physically present in New York at Fairfield Greenwich Group's New York office, received

payments and sold shares through its New York based bank account, and used that New York

based bank account to gain access, through its agent Fairfield Sentry, to BLMIS." *Multi-Strategy*,

2022 WL 2137073 at *4. In Banque SYZ's case, it "maintained its own account with BLMIS in

New York and used New York bank to transfer funds into and receive funds from BLMIS, and

filed a customer claim in this SIPA proceeding." *Banque SYZ*, 2022 WL 2135019 at *4. The

Complaint's cursory assertion of jurisdiction includes no such claims about MLI. Accordingly, the

Trustee has failed allege sufficient contacts to establish jurisdiction.

**C.    The Exercise of Jurisdiction Over MLI Would Not Comport With Due Process.**

Even if the Trustee established that MLI had sufficient contacts to enable this Court to exercise personal jurisdiction, which it has not, this Court would still have to find that the exercise of jurisdiction reasonable under the circumstances. *Terrorist Attacks on September 11, 2001*, 714 F.3d at 673; *see also Waldman*, 835 F.3d at 331. When evaluating the reasonableness of personal jurisdiction, courts assess: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering social substantive policies." *LaMonica*, 582 B.R. at 79; *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*, 480 U.S. 102, 113 (1987). Where a defendant's connections with the forum are weak, the bar for showing reasonableness is high. *LaMonica,* 582 B.R. at 79 ("the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction").

The Trustee seeks to rely on the most incidental of contacts to establish jurisdiction. *See supra* Sec I.B. The Trustee must therefore make a *stronger showing* that exercise of jurisdiction would be reasonable. But the relevant factors weigh *against* jurisdiction. *First*, forcing MLI to defend a suit in the United States would impose a substantial burden on MLI. Cross-border discovery would be particularly burdensome as the Complaint is wholly concerned with transfers and activities occurring outside the United States, by entities and actors who are not present in the United States (*supra* at 4–5, Sec. I.A–B). MLI is a U.K. stockbroker, and discovery of documents in the United States would involve cross-border discovery issues that could implicate foreign laws. *See* Bench Ruling Granting in Part and Denying in Part the Foreign Representatives Mot. Seeking

14

Limited Relief, *Fairfield Sentry Ltd., (In Liquidation), et al., v. Theodoor GGC Amsterdam, et al.*, No. Adv. Pro. No. 10-03496, ECF No. 799-2 (July 19, 2012) ("The various respondents have described . . . the strong and undeniable interest of many nations in enforcing their banking secrecy laws. Thus, yielding to the Foreign Representative's Disclosure Request implicates the significant bank customer confidentiality laws of no fewer than 30 countries . . . As such, this Court is hard-pressed to find any compelling United States' interest in mandating discovery here at this juncture of the pending litigation."). In addition to the foreign law concerns, cross-border discovery would impose financial and logistical burdens on MLI as "none of [MLI's] records, files, or witnesses with information about the litigation are located" in the United States. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996).

The *second* and *third* factors—respectively, the United States' interest and the availability of a more appropriate forum elsewhere—are closely related and both weigh against the exercise of jurisdiction here. The dispute concerns a foreign defendant and "transaction[s] that took place almost entirely outside of the United States" *LaMonica*, 582 B.R. at 80. The United States' interest in adjudicating this transaction is thus minimal at best. And effective relief is available to the Trustee where the transactions *did* occur, including in the United Kingdom. Convenience to the Trustee alone cannot tip the balance in favor of an exercise of jurisdiction. *LaMonica*, 582 B.R at 80 ("While there is undoubtedly an interest in the plaintiff obtaining convenient and effective relief, the dismissal . . . based on lack of personal jurisdiction does not mean that the Trustee would not be able to continue this Adversary Proceeding and ultimately obtain effective relief.").

*Finally*, forcing cross-border discovery involving records dating back at least 17 years, which are predominately located on the other side of the Atlantic, would place a heavy burden on MLI and witnesses. *See* Compl. ¶ 112. ("In 2005, MLI began creating . . . the 'Absolute Alpha'

indices"). The United Kingdom Data Protection Act of 2018 (the "UKDPA")[3] prohibits the transfer of "Personal Data"[4] from the United Kingdom to a country outside of the United Kingdom, unless the country to which the data is transferred has been determined by the United Kingdom to provide adequate safeguards for Personal Data. *See* UKDPA, Part 2, Ch. 2 § 18; EU GDPR Arts. 44, 45, 46. The UK has not determined the United States to be a country with these adequate safeguards. *See* https://www.gov.uk/government/publications/uk-approach-tointernational-data-transfers/international-data-transfers-building-trust-delivering-growth-andfiring-up-innovation (the United States is not deemed "adequate" under UKDPA as of August 26, 2021). MLI would thus face significant burdens in evaluating the Personal Data implicated by each request and determining whether and how it can be permissibly transferred to and processed in the United States. As such, efficient resolution of this case is better served by adjudication in a United Kingdom Court, where the majority of the witnesses and records implicated by the complaint lie. *See Metro Life Ins*., 84 F.3d at 574 (In evaluating the efficient resolution of the case, courts "generally consider where witnesses and evidence are likely to be located.") This factor weighs heavily against the exercise of jurisdiction here. *LaMonica*, 582 B.R at 80 (finding jurisdiction unreasonable where litigation involved "mostly foreign defendants over a transaction that took place almost entirely outside of the United States").

---

[3] For the purpose of these submissions, UKDPA refers to the UK Data Protection Act 2018 together with Regulation (EU) 2016/679 (General Data Protection Regulation) ("EU GDPR") as retained and amended post-Brexit (i.e. from 1 January 2021) pursuant to the UK European Union (Withdrawal) Act 2018 and the UK Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019 (SI 2019/419). As the UKDPA generally incorporates by reference the substantive terms of the EU GDPR but not the specific text, citations are to the relevant articles of the EU GDPR, unless modified, supplemented, or specifically addressed by the UKDPA.

[4] "Personal Data" is defined as "any information relating to an identified or identifiable natural person ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person." UKDPA, Part 2, Ch. 1 § 2; EU GDPR Art. 4(1).

These factors compel a finding that jurisdiction would be unreasonable.[5]

## II.    THE COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN STATEMENT OF THE CLAIM" IN VIOLATION OF RULE 8(A)(2)

Even if jurisdiction is established, the Trustee's Complaint fails because it lacks "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2) ("Rule 8"). Rule 8 is intended to avoid "plac[ing] an unjustified burden on the [Court] and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage." Wright & Miller, 5 Federal Practice and Procedure § 1282, at 422 (4th ed. 2021). When a complaint fails to comply with the "short and plain" requirement, the court has the authority to "strike any portions that are redundant or immaterial or to dismiss the complaint." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see also Jones v. Nat'l Comms. & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008) (affirming dismissal of "single-spaced 58-page complaint with 87 additional pages of attachments, alleging over twenty separate causes of action against more than 40 defendants").

While incorporation by reference is permitted, it is "always accompanied by the requirement that it be done with a degree of specificity and clarity which would enable a responding party to easily determine the nature and extent of the incorporation." *In re Morrison*, 375 B.R. 179, 193 (Bankr. W.D. Pa. 2007). And when a Complaint recklessly incorporates pleadings by reference, the court has the authority to dismiss the Complaint for violating Rule 8. *See In re Geiger*, 446 B.R. 670, 679–80 (Bankr. E.D. Pa. 2010) (dismissing the complaint at hand

---

[5] Again, this Court's reasoning in *Multi Strategy* and *Banque SYZ* does not alter this conclusion. In both cases, the Court found jurisdiction reasonable as the defendants submitted to New York Jurisdiction by signing subscription agreements with the Funds. *See Multi-Strategy*, 2022 WL 2137073 at *5; *Banque SYZ*, 2022 WL 2135019 at *5. Here, as discussed *supra* at 11, the Complaint does not allege that MLI entered into subscription agreements with the Funds, nor does the Complaint claim that MLI submitted to New York jurisdiction through any subscription agreement. Further, as MLI's contacts with New York, if they exist at all, are much weaker than both Multi-Strategy and Banque SYZ's, the bar for reasonableness is higher here. *LaMonica*, 582 B.R. at 79. For the reasons stated herein, the Complaint fails to satisfy that high bar.

for improperly incorporating by reference other pleadings). As the bankruptcy court in *In re Geiger* stated, "[The] most serious problem with the Complaint is that it leaves the reader—the Defendant and the Court—to sift through many pages of attached material trying to figure out which fact goes with which allegation […] Putting together the puzzle of matching the bare-bones allegations with the meat of the attached materials is the job of the Plaintiffs, not of the Debtor or the Court. For this reason alone, the Complaint must be dismissed." *Id.* at 679–80.

Rather than provide sufficient details in the Complaint, the Trustee has chosen to incorporate by reference an entirely different complaint filed in another proceeding to which MLI is not a party. *See* Compl. ¶ 128. The Fairfield Amended Complaint contains 798 paragraphs spanning 217 pages, with 111 accompanying exhibits, asserting a panoply of claims including turnover and accounting, preference, subsequent transfer to other defendants, unjust enrichment, conversion, money had and received, aiding and abetting fraud and breach of fiduciary duty, and objections to allowance of claims, all against numerous defendants, *none of which is MLI*. Trustee relies on this morass to plead an essential element of its claim against MLI: the avoidability of the initial transfers from BLMIS to the Funds. *See, e.g.* Compl. ¶ 130–132 ("The Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and sections 273–279 of New York Debtor and Creditor Law.")

In addition, the Fairfield Amended Complaint has since been amended. *See* Covucci Decl. Ex. C, *Picard v. Fairfield Sentry Ltd., et. al.*, Adv. Proc. No. 09-1239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF 286 ("Fairfield Second Amended Complaint"). The Fairfield Second Amended Complaint no longer names the Funds as defendants following the Fairfield Settlement Agreement.

As a result, the Fairfield Amended Complaint, which the Trustee seeks to incorporate, is no longer operative.

This wholesale incorporation violates the Federal Rules of Civil Procedure. While Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," it does not permit a party to adopt wholesale an entirely separate pleading. *See, e.g.*, *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) ("A Rule 10(c) adoption clause that does little more than make wholesale reference to the contents of a prior pleading exemplifies the kind of incorporation that fails to give the requisite guidance to the responding party."). That is all the more true where, as here, a party attempts to incorporate an entire pleading filed in a *separate action*. *See, e.g.*, *Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action."); *NCUA Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705, 2014 WL 1673351, at *9 (S.D.N.Y. Apr. 28, 2014) (striking defense where defendant attempted to "incorporate the affirmative defenses in answers filed by defendants *in other actions* into its answer"); *Davis v. Bifani*, No. 07–cv–00122, 2007 WL 1216518, at *1 (D. Colo. Apr. 24, 2007) (striking attempt "to incorporate by reference wholesale the allegations in a complaint in a completely separate action"); *see also U.S. v. Int'l Longshoremen's Association*, 518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007) (dismissing a civil RICO complaint after concluding that "the Government's proposed method of pleading necessary elements of its RICO claim by incorporating factual allegations contained in several prior lengthy criminal and civil RICO pleadings is . . . a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a 'short and plain statement of the claim.'").

For all these reasons, the Court should reject the Trustee's attempt to incorporate the Fairfield Amended Complaint by reference. Without the incorporated complaint, this Complaint's pleadings are conclusory at best and do not adequately plead the avoidability of the initial transfers from BLMIS to Sentry or the intermediate transfers from Sentry to Sigma—an essential element of the claim to recover the MLI Subsequent Transfers. Accordingly, the Complaint should be dismissed.

## III. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE MLI REDEMPTIONS WERE BLMIS PROPERTY

Even excusing these facial deficiencies, dismissal is appropriate because the Complaint does not state a plausible claim for relief as required by the Supreme Court's holdings in *Iqbal* and *Twombly*. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully").

### A. The Trustee does not adequately allege that the funds transferred to MLI originated with BLMIS.

All of the counts in the Complaint rely on Bankruptcy Code section 550(a) and SIPA § 78fff-2(c)(3) to avoid the redemption payments as subsequent transfers of BLMIS property. The applicability of both those sections turns on whether the subsequent transfer sought to be avoided contained estate property. *See* 11 U.S.C. § 550(a) (permitting recovery of estate property from subsequent transferee); SIPA § 78fff-2(c)(3) ("trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property"). The Trustee must identify which of the funds transferred to MLI originated with BLMIS. In *Picard v. Shapiro (In re Madoff)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) the Court set forth precisely what facts the Trustee must plead to assert a subsequent transferee claim:

The Trustee must allege facts that support the inference that the funds at issue originated

with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

Yet the Trustee never amended the Complaint to include any details of the "who, when, and how much" of the subsequent transfers allegedly made to MLI. Instead, the Trustee simply asserts on "information and belief" that to pay each redemption alleged in the Complaint, "Sentry withdrew and/or utilized funds from its BLMIS accounts and used those funds to directly pay MLI, or to pay Sigma, which, in turn, paid MLI." Compl. ¶ 126; *see also* Compl. ¶¶ 130, 135 ("a portion of the Sentry Initial Transfers, or the value thereof, were subsequently transferred either directly or indirectly to, or for the benefit of, MLI.") Exhibits A and B do not substantiate these allegations: they simply list transfers made from BLMIS to Sentry, without tying those transfers to the payment of any redemption request from MLI.

These "barebones" and conclusory allegations are insufficient to support the claims. *See Shapiro*, 542 B.R. at 119 ("The SAC does not tie any initial transfer to any subsequent transfer or Subsequent Transferee. Moreover, it does not plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent transfers rather than simply keep the initial transfers for themselves.")

**B.    Based on the Trustee's own allegations, it is implausible that all of the MLI Redemptions contain BLMIS customer property.**

The Trustee's allegations are not only unsupported; they are mathematically impossible. The Trustee alleges that BLMIS transferred approximately $3 billion to Sentry in the six years preceding the Petition (Compl. ¶ 130). But the Trustee seeks to "recover" $5 billion total, comprised of two components. *First,* the Trustee seeks an aggregate of approximately $4 billion of alleged subsequent transfers of customer property in the form of redemption payments made to

21

dozens of defendants who redeemed from Sentry, including Sigma itself. *See* Covucci Decl. Ex. C (Exs. 5 and 6 to the Second Amended Complaint, Fairfield Action). *Second*, the Trustee seeks to recover, also as alleged subsequent transfers of customer property from Sentry, another approximately $1 billion in money allegedly paid by Sentry to the Fairfield Greenwich Group defendants in a separate action. *See Id.* (Exs. 8, 10, 12, 13, 14 and 21 to the Second Amended Complaint, Fairfield Action). In other words, the Trustee is attempting to recover $2 billion *more* in subsequent transfers than he alleges BLMIS initially transferred to Sentry. As such, the Trustee's theory that all of the redemption payments are customer property is facially implausible.

The Trustee's own pleadings make clear why Sentry distributed far more to its investors than BLMIS transferred to Sentry: Sentry was not receiving funds just from BLMIS, but also from its own investors as well. *See* Compl. ¶¶ 120–121 (MLI invested approximately $30 million in Sentry and Sigma). To make redemption payments, Sentry sometimes used subscription payments from other investors, rather than withdrawing any funds from BLMIS accounts. *See* Covucci Decl. Ex. D, First Am. Compl., *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF 19, ¶ 63 ("From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry). . . utilized subscription monies of other investors on hand."). This is an "obvious alternative explanation" for the source of the redemption funds, which demonstrates the facial implausibility of the Trustee's theory. *See Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.,* 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020); *Twombly*, 550 U.S. at 547.

This pleading failure cannot be excused for lack of information. Here, the Trustee, rather than MLI, possesses all the records relevant to establishing whether and to what extent Sentry's transfers to MLI and Sigma included any BLMIS customer property. By virtue of the document-

sharing provisions of the Fairfield Settlement, the Trustee had access to Sentry's books and records prior to filing the Complaint and for over a decade since. *See* Covucci Decl. Ex. B (Fairfield Settlement) ¶ 14 (Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims"). Nonetheless, the Trustee fails to allege precisely what transfers to MLI contain customer property, and from which initial transfer that transfer originates. That failure alone is grounds for dismissal. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 723 (2d Cir. 2013) (affirming dismissal and finding that "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*, No. 18 CIV. 1317, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing claim where plaintiffs failed to precisely plead necessary facts that were "uniquely in [p]laintiffs' possession").

## IV.    THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE BARRED UNDER BANKRUPTCY CODE SECTION 546(e)

Several of the Trustee's fraudulent transfer claims (Counts 3, 4, 5, 6, 7, 10, 11, 12, 13, and 14) are barred under section 546(e). The Trustee asserts these claims under Bankruptcy Code section 550(a), which provides that avoided transfers can be recovered from a subsequent "transferee of such initial transferee." 11 U.S.C. § 550(a)(2). But these transfers are protected from clawback under the "securities safe harbor" of Section 546(e). *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018). Under section 546(e), a trustee may not avoid a transfer "made by or to (or for the benefit of)" a qualifying entity, including a "stockbroker, financial institution, financial participant, or securities clearing agency" "in connection with a securities contract," or a "settlement payment," except under section 548(a)(1)(A) (*i.e.*, those based

on federal intentional fraudulent conveyance claims). *See* 11 U.S.C. § 546(e). The safe harbor

protections extend to state law claims, including those brought under New York's Debtor and

Creditor Law. *See In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019)

(Section 546(e) preempts state-law claims that have the same effect as a fraudulent transfer claim

that would otherwise be barred by section 546(e)).

MLI is entitled to raise a section 546(e) defense as a purported subsequent transferee of the

funds transferred to Sentry and Sigma by the Debtor. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff*

*Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013) ("both initial

transferees and subsequent transferees are entitled to raise a defense based on the application of

Section 546(e) to the initial transfer from Madoff Securities.") Section 546(e) applies to

subsequent transfer claims as long as the initial transfer is subject to the safe harbor. *Id*. Dismissal

of the fraudulent transfer and preference claims is warranted here because the initial transfers at

issue were made by a stockbroker in connection with a securities contract.

## A.    The Initial Transfers Were Made By and To Entities Covered by Section 546(e).

As an initial matter, the initial transfers were made by and to "covered entities" because

BLMIS was a stockbroker and Sentry and Sigma were financial institutions.

### 1.    The Alleged Initial Transfers Were Made by a Stockbroker.

The District Court has already found that BLMIS is a stockbroker for purposes of section

546(e). *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd*

*sub nom. Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773

F.3d 411 (2d Cir. 2014) ("even assuming the truth of the allegation that Madoff Securities'

investment advisory division never traded securities on behalf of clients, Madoff Securities

nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and

proprietary trading divisions.").

    **2.**  **The Alleged Initial Transfers Were Made to a Financial Institution.**

  In addition, Judge Bernstein has already held that the Funds are "financial institutions within the meaning of 11 U.S.C. § 546(e)" as "customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made." *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, No. 10-03496, 2020 WL 7345988, at \*7 (Bankr. S.D.N.Y. Dec. 14, 2020). That holding applies with equal force here, because the Trustee alleges that the Initial Transfers were made from BLMIS accounts entitled "Citco Global Custody N V FBO Fairfield Sentry Ltd" (Account Nos. IFN012 and IFN045). *See* Compl. Exs. A, B.

    **3.**  **The Alleged Initial Transfers Were "Transfers In Connection With A Securities Contract."**

  The Second Circuit has also held that account opening documents of BLMIS customers constituted securities contracts for purposes of section 546(e). *Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 418 (2d Cir. 2014). As Sentry "maintained one or more customer accounts at BLMIS," it held securities contracts with BLMIS. Compl. ¶ 54. The Initial Transfers from Sentry's BLMIS accounts were "in connection with" those securities contracts. *See* Compl. ¶ 126. As the Second Circuit has held, "Section 546(e) only requires that a covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities transaction." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 420 (2d Cir. 2014). The Initial Transfers easily satisfy this "low bar." *Id.* at 422.

  Taking the Trustee at its word, the Initial Transfers were also made in connection with the securities contracts between each of Sentry and Sigma and MLI. The Trustee claims that to "pay the MLI redemptions, Sentry withdrew and/or utilized funds from BLMIS." Compl. ¶ 19. The

redemption payments were governed by Sentry and Sigma's Articles of Association. *See Theodoor GGC Amsterdam*, 2018 WL 3756343, at \*11–12 ("the Articles govern redemptions") (citing *Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶ 10 (redemption of shares were found in the Articles)). And the redemption payments were "in connection with" those governing documents. As Judge Rakoff has held, "the definition of a securities contract is in fact much broader [than the Madoff Securities account agreements] and includes, *inter alia*, investment fund subscription agreements *and redemption requests*, margin loans, and total return swaps coupled with a securities sale transaction." *Sec. Inv. Prot. Corp.*, 2013 WL 1609154, at \*8 (emphasis added); *see also id,* at \*9 (noting that a "hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract" would "fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract"); *Tribune Co.*, 946 F.3d at 81 (as "securities contract" includes a contract for the "repurchase" of a security, or any contract "similar to" a securities contract, "we have no trouble concluding . . . [payments] connected to the redemption of shares, were 'in connection with a securities contract.'").

### 4.    The Alleged Initial Transfers Were "Settlement Payments"

As the Second Circuit held in *Fishman*, "[e]ach time a customer requested a withdrawal from BLMIS . . . each transfer in respect of such an order or request constituted a settlement payment." 773 F.3d at 422 (citing *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In Re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011)). That reasoning equally applies here, and provides an additional reason that the initial transfers are protected under section 546(e).

For the reasons stated above, the alleged transfers meet the requirements of section 546(e) and are subject to the safe harbor protections. Accordingly, all fraudulent transfer and preference claims, except those made under section 548(a)(1)(A), should be dismissed under section 546(e).

## V.    THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A) CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Counts Two and Nine of the Complaint rely on section 548(a)(1)(A), the only exception to the safe harbor rule.[6] That provision of the Code allows the Trustee to avoid transfers made "within 2 years before" the bankruptcy petition was filed if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Because "'actual intent to hinder, delay or defraud' constitutes fraud it must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). *See In re Bernard L. Madoff Inv. Sec.*, LLC, 440 B.R. 243, 258 (Bankr. S.D.N.Y. 2010) ("To adequately plead intent, the Trustee must allege "facts that give rise to a strong inference of fraudulent intent.")

Stripped of its impermissible incorporation of a 217 page-long complaint in another action, *see supra* Sec. 2, the Complaint is devoid of *any specific* allegation regarding BLMIS's actual intent to hinder, delay, or defraud. In the absence of such allegations, the Trustee appears to rely on the "Ponzi scheme presumption," a judicially-created shortcut that bypasses pleading requirements and "presume[s] that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt." *Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 12 F.4th 171, 201 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) (Menashi J., concurring).

---

[6] Section 546(e) prevents the Trustee from avoiding certain transfers "except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

The presumption is not settled law. *In re Unified Com. Cap., Inc*., 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001), *aff'd sub nom. In re Unified Com. Cap*., No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015). The Second Circuit has not definitively spoken on the presumption, applying it only where it is uncontested. *Citibank, N.A.* 12 F.4th at 181, n.7 ("parties do not dispute the applicability of the Ponzi scheme presumption here" and "we do not address—whether the Ponzi scheme presumption is well-founded.") Thus, there is no binding precedent compelling its application here.

In *Citibank* Judge Menashi explained that the "Ponzi scheme presumption" represents a "questionable" application of fraudulent transfer statutes. *Id*. at 202 (Menashi, J., concurring). Several cogent reasons support this observation all of which are applicable here and militate against the application of the presumption on these facts.

*First*, the presumption "obscures the essential distinction between fraudulent transfers and preferences. It uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors." *Id*. at 202. On this basis, some courts have rejected the presumption. *Id* at 201; *see also Unified*, 260 B.R. at 350 ("By forcing the square peg facts of a "Ponzi" scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress."). In the case of BLMIS, the presumption would essentially permit—subject to other defenses—the clawback of all property transferred from BLMIS within two years before the bankruptcy filing, effectively expanding the preference period by 21 months.

*Second*, 548(a)(1)(A) focuses on the debtor's mindset at the time of making *particular*

28

transactions "rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn*, 860 N.W.2d at 647 (construing Minnesota UFTA) *cited with approval in Citibank*, 12 F.4th at 201 (Menashi J., concurring). This necessitates an "asset-by-asset and transfer-by-transfer" inquiry, which "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Finn*, 860 N.W.2d at 647; *see also Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018). This criticism is particularly valid here, where the Trustee has not even specified the relevant transfers at issue making it virtually impossible to infer intent at the time of any one of those transfers.

*Third*, the Ponzi scheme presumption abrogates Rule 9(b)'s pleading requirements, which require "actual intent" to hinder, delay, or defraud to be pled "with specificity." *Sharp*, 403 F.3d at 56. A judicially created exception to the Federal Rules would run counter to Congress' intent. *Finn,* 860 N.W.2d at 647 (concluding "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer"); *see also Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi J. concurring)).

## VI.     THE COMPLAINT ESTABLISHES THAT MLI IS ENTITLED TO THE GOOD FAITH DEFENSE.

Under section 550(b), a trustee may not recover from a subsequent transferee who took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). The Trustee's own allegations establish that MLI was a net loser in the Madoff scheme to the tune of $14.4M

29

and €0.25M. *See supra* at 8. MLI took for value, in good faith, and without knowledge of the voidability of the transfer. There is no plausible reason for MLI to invest $28.6M and €1.75M of its own money if it had any reason to believe the Funds would invest its money in a Ponzi scheme. MLI is thus entitled to the good faith defense with respect to all claims.

### A.     MLI Received The Redemptions For Value

To establish "value" the Code simply requires that a redemption is "sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789, 2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021). Here, the complaint clearly shows the redemption payments were in exchange for MLI "[s]urrendering equity interests" which "constitutes value for purposes of section 550(b)." *Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. AP 08-01789, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020); *see also Fairfield Sentry Ltd. v. Migani,* [2014] UKPC. Moreover, as MLI was a "net loser" in its dealings with the Funds, this is a straightforward case where *all* of the redemptions received by MLI were for value. *See In re Bayou Group, LLC*, 439 B.R. 284, 309 (S.D.N.Y. 2010) (investors in Ponzi scheme "gave value in the form of their initial investments"); *Cohen v. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. 08-01789, 2016 WL 1695296, at *10, 14 (Bankr. S.D.N.Y. Apr. 25, 2016) ("transferee does not give value beyond his deposits of principal" and "[i]n all Ponzi scheme fraudulent transfer litigation, a transferee must return transfers in excess of his principal deposits"). Further, as explained *infra* at 38, the Complaint effectively concedes that at the time MLI made the redemptions, it did not know "that the redemption prices were based on fictitious assets." *See Banque SYZ*, 2022 WL 2135019 at *11 (citing *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *6 (Dec. 14, 2020)). Accordingly, it is clear from the face of the Complaint that MLI received the transfers for value.

30

### B.     MLI Received The Redemptions In Good Faith

The Second Circuit has recently concluded that "good faith" in the context of fraudulent transfers under the Bankruptcy Code "embraces an inquiry notice standard." *Citibank*, 12 F.4th at 188. Whether a defendant was on inquiry notice of fraud involves a three-step inquiry:

- *First*, a court must examine what facts the defendant knew, a subjective inquiry;

- *Second*, a court determines whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud;

- *Third*, the Court will ascertain whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer.

*Id.* at 191–92. An objective "reasonable person" standard applies in the second and third steps. *Id.*

### 1.     The facts available to MLI were not sufficient to put MLI on inquiry notice (steps 1 and 2).

From any perspective, the Trustee has not pleaded facts that "a reasonable person in [MLI's] position [would have] conducted further inquiry into [BLMIS's] possible fraud." *Id* at 191–92.

#### (1)     The alleged knowledge of other Merrill Lynch entities is not relevant to the analysis of MLI's inquiry notice.

As a threshold matter, the relevant knowledge for purposes of the good faith defense is the defendant MLI, not (as the Trustee alleges) unspecified "global" "Merrill Lynch entities" or corporate affiliates. *See Citibank*, 12 F.4th at 191 ("a court must examine what facts *the defendant* knew; this is a subjective inquiry and not 'a theory of constructive notice.'"). The Complaint claims that the "warning bell" was sounded about Madoff "within the global 'Merrill Lynch' organization" years before BLMIS's collapse and that "internal cautions about Madoff and his

31

[investment] Strategy repeatedly circulated within the global MLCI organization." Compl. ¶¶ 58, 71. It further alleges that Merrill Lynch & Co., Inc ("MLCI"), MLI's indirect parent, "learned a lot of other information about Madoff and his [Investment Advisory] Business in connection with other due diligence efforts directed towards various Madoff Feeder Funds" and alleges "[f]or some time, MLCI did not permit its own money or its clients' money to be used to invest directly or indirectly through BLMIS" or "make levered investments in Madoff Feeder Funds." *Id.* ¶¶ 83, 57. The Complaint alleges that a former senior executive at Merrill Lynch Investment Management ("MLIM"), another subsidiary of MLCI, "easily spotted numerous red flags indicative of irregular or fictitious lending activities." *Id.* ¶ 59.

But general statements about what other Merrill employees in other offices and on other continents may have known are irrelevant to the good faith inquiry regarding *MLI's* inquiry notice of the alleged fraud.

This Court's opinion in *Picard v. BNP Paribas S.A.*, 594 B.R. 167 (2018) is instructive. There, the Trustee alleged that "various third parties expressed concern to one or more of the Defendants about BLMIS or refused to do business with BLMIS." *Id* at 200. In particular, the Trustee claimed a member of the defendant's asset management group, "upon information and belief . . . shared its knowledge that Madoff was illegitimate, as well as its prohibitions against investing with Madoff" with the defendant, while others shared concerns, including generally known red flags." *Id.* The Court held that warnings by or concerns of third parties, including other entities within the BNP Paribas corporate family, were not relevant to the defendant's knowledge and amounted to no more than "pleading by innuendo." *Id* at 202. Here, unlike *BNP Paribas*, the Trustee does not even allege that other Merrill Lynch entities shared their knowledge or concerns with MLI or that MLI had any knowledge of those alleged concerns. That MLCI is MLI's parent,

or that MLIM shares a corporate parent with MLI, does not change the analysis. The Trustee may

not simply impute alleged knowledge among separate corporate entities. *Youngers v. Virtus Inv.*

*Partners Inc.*, No. 15CV8262, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("a parent-

subsidiary relationship 'is not on its own sufficient to impute the scienter of the subsidiary to the

parent or affiliate.'"); *U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05CIV.8176, 2008 WL 2073928,

at *2 (S.D.N.Y. May 8, 2008) (A parent's knowledge will not be imputed to a subsidiary unless it

is "shown that the parent's employees informed of the [information] were under a duty to report

that information to the subsidiary.").

> **(2)** <u>The facts known to MLI were insufficient to put MLI on inquiry</u>
> <u>notice that BLMIS was a Ponzi scheme.</u>

The Complaint demonstrates that MLI was *not* on inquiry notice that BLMIS was a Ponzi

scheme.

**Generic allegations of "red flags" available to all investors.** The Trustee alleges several

purported "red flags" about BLMIS' operations that were equally available to all investors. Compl.

¶¶ 83–107. But the Trustee does not connect any of these generic allegations about BLMIS to

MLI's actual, subjective knowledge. To survive a motion to dismiss, the Trustee must plausibly

allege that MLI was actually aware of the red flags. *See Anwar v. Fairfield Greenwich Ltd.*, 286

F.R.D. 258, 260 (S.D.N.Y. 2012) (rejecting a proposed amended complaint as insufficient because

it failed to "allege facts plausibly suggesting that defendants were aware of these red flags, or that

if they were aware, they then translated those red flags into a suspicion of fraud."); *see also*

*Citibank*, 12 F.4th at 191 (a court must examine what facts the defendant knew; this is a subjective

inquiry and not 'a theory of constructive notice.'"). This Court has previously held that the "red

flag" allegations recited in the Complaint do not support an inference defendants believed BLMIS

was not actually trading securities. *See BNP Paribas*, 594 B.R. at 199 (pointing to allegations that

33

"returns of BLMIS feeder funds were too consistent," "Defendants received trade confirmations for BLMIS feeder funds with prices above the daily high or below the daily low," "BLMIS timed trades too consistently," "BLMIS option volumes were too high," and "BLMIS made trades that were inconsistent with the SSC Strategy."); *see also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), *aff'd sub nom. Saltz v. First Frontier, L.P.*, 485 F. App'x 461 (2d Cir. 2012) ("An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent.").

In fact, *all* of the alleged red flags about BLMIS' operations have been rejected by courts as insufficient to support inquiry knowledge of a Ponzi scheme. These include:

- BLMIS "produced returns that were simply too good to be true." Compl. ¶ 106. *See.Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 577 (S.D.N.Y. 2011), *aff'd,* 482 F. App'x 618 (2d Cir. 2012), as amended (June 13, 2012) (recognizing that success in securities trading is not a red flag); *Newman v. Fam. Mgmt. Corp.*, 748 F. Supp. 2d 299, 310 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013) (concluding that it was not a red flag because plaintiffs failed to assert that defendants knew that the investment returns could not be replicated).

- BLMIS "reported impossible options trading volumes." Compl. ¶¶ 84–90; *BNP Paribas*, 594 B.R. at 198 (*citing Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 33–34 (Bankr. S.D.N.Y. 2016)) (rejecting "the Trustee's attempt to plead, in hindsight, a defendant's subjective knowledge by showing trading impossibilities in BLMIS account statements.")

- "Madoff's alleged trades could not be legitimately accomplished without any impact on the price of the securities bought and sold, without any market footprint,

and without anyone in the industry knowing or even hearing about Madoff's alleged trading activity." Compl. ¶ 95; *Stephenson*, 768 F. Supp. 2d at 577–78 (such an allegation did not establish an inference that PWC knew market data did not reflect transactions BMIS reported, nor establish PWC would have learned those aspects of the fraudulent funds up on diligent inquiry); *see also Stephenson*, 482 F.Appx 618 (2d Cir. 2012) ("the SAC failed sufficiently to allege that PWC was aware of most of the red flags alleged by Stephenson.")

- BLMIS had an unusual business structure. Compl. ¶¶ 102, 104. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010), *aff'd on other grounds sub nom. Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012), *as amended* (June 13, 2012) ("although [the fact that Madoff was both broker and custodian of the accounts] is something of a red flag, it is far too mild to support an inference of recklessness.").

- BLMIS used paper confirmations. Compl. ¶ 107. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 452 (S.D.N.Y. 2010) (concluding that paper confirmation of supposed trades was not a red flag sufficient to establish a strong inference that defendants had a state of mind approximating actual intent to aid the fraud).

- BLMIS used a strip mall auditor. Compl. ¶ 97. *Stephenson*, 700 F. Supp.2d at 624 (concluding that allegations that the auditor "was small, not well known, and not properly certified" were insufficient because plaintiffs failed to allege that defendants knew of this).

**Specific allegations about MLI's supposed knowledge.** The Complaint's few specific allegations about MLI's actual knowledge are threadbare, and support the inference that MLI was

35

*not* on inquiry notice that BLMIS was a Ponzi scheme. The Trustee alleges that there was "speculation" about Madoff and the Funds. *Id*. ¶¶ 60, 64–65, 72." *Id.* ¶ 60; *see also Id.* ¶¶ 76, 79. But speculation is, by definition, not knowledge. Absurdly, the Trustee alleges that purely because MLI was "operating in Europe," it should have discovered that BLMIS's purported OTC options counterparties did not exist. Compl. ¶ 93. The Trustee alleges without factual support that "Madoff sometimes stated that the [OTC options] counterparties supposedly were 8–12 large European financial institutions." Compl. ¶ 92. According to the Trustee, because "[u]pon information and belief, MLI, operating in Europe, regularly communicated with many large European financial institutions," MLI should have "asked" each of the "institutions that fit Madoff's counterparty profile" "if they were trading options with Madoff." Compl. ¶ 93. MLI had no obligation to scour the continent of Europe for Madoff's counterparties, simply because Madoff had not identified them. *See id.* ¶ 91; *see also Citibank*, 12 F.4th at 192 (inquiry notice only asks whether the defendant performed a "reasonably diligent investigation").

In fact, other allegations in the Complaint underscore the absurdity of the Trustee's allegations and suggest that MLI did not suspect Madoff's fraud. The Complaint's allegations about the economics of the Absolute Alpha notes are inconsistent with suspicion of a Ponzi scheme. The economics of the structured notes were such that if MLI actually suspected that BLMIS was a Ponzi scheme, it would have behaved in a manner directly contrary to what it actually did. By issuing the structured notes, MLI set itself up to *lose* money if the index *rose* and to *make* money if the index *fell*. *See* Compl. ¶¶ 14–15; *supra* at 5. To hedge the risk that the index would rise, MLI purchased shares of the indexed funds, including Sentry and Sigma. *See* Compl. ¶¶ 2, 15, 18. If MLI suspected BLMIS was a Ponzi scheme, the economically rational course of action would be not to purchase shares and simply collect its profits when the shares became

worthless and the value of the Absolute Alpha index fell. *See supra* at 5. *In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) is instructive on this point. Applying the inquiry notice standard, the Court held that it was facially implausible that the defendant bank would have knowingly chose to facilitate the fraudulent scheme just to earn fees, and while it may not have accurately assessed Dreier as a credit risk, this did not amount to inquiry notice such that it could not satisfy the good faith test. *Id.* at 514. As in *Dreier*, it is facially implausible to conclude that MLI suspected BLMIS was a Ponzi scheme, yet would *knowingly* choose to expose its own money to the scheme.

Further, MLI invested more than $30 million USD in Sentry and Sigma, and only redeemed $14 million. Compl. ¶¶ 121, 124. Its investments and redemptions were made over time, between 2005 and 2008, consistent with routine market conduct, not suspicion of a Ponzi scheme. *See* Compl. ¶¶ 121, 124. Indeed MLI's decision to withdraw its Fairfield position in 2008 also followed adverse market conditions and sustained negative outlook in 2008.[7]

### 2. More diligent inquiry by MLI would not have discovered the fraudulent purpose of the transfers (step 3).

Even if MLI was on notice that something was amiss at BLMIS, the Complaint itself demonstrates that further "diligent inquiry" would not have led MLI to "discover[] the fraudulent purpose of the transfer[s]." *Citibank*, 12 F.4th at 192. BLMIS was founded in 1959 and was operating a Ponzi scheme undiscovered "since at least the 1980's." Compl. ¶¶ 32, 41. In December 2008 it had "approximately 4,900 open customer accounts" and customers had "approximately $65 billion invested through BLMIS." *Id.* ¶ 42. Among those customers were "multiple financial institutions with London derivatives trading desks." *Id.* ¶ 72. Yet the fraud went undiscovered for

---

[7] Between December 2007 and October 31, 2008 (the date of MLI's last redemption), the Dow Jones Industrial Average fell 36%. The S&P 100 fell 32%. There were among the largest and steepest stock market declines ever. Financial giant Bear Stearns collapsed in February; by September the casualties included Lehman Brothers, AIG, and Washington Mutual. The credit markets seized up. Things were so bad that even the illusory Sentry returns fell. Compl. ¶ 79.

decades, even by its numerous and sophisticated customers.

Moreover, as the complaint acknowledges, the Fairfield funds and Madoff were extremely resistant to diligence, effectively shielding the fraud from discovery. *Id.* ¶ 61 ("Fairfield is a fund that is unusually opaque to its investors and doesn't accept detailed due diligence"). The Complaint essentially concedes that further inquiry from MLI would not have revealed the Ponzi scheme: it admits that further inquiry by MLI "would have revealed . . . red flags," ***not*** fraud. Compl. ¶ 74; *see also id.* ¶ 90 ("Conducting additional reviews would have revealed "*signs* of *possible* fraudulent trading activity at BLMIS*.*").

The Trustee should not be permitted to incorporate by reference the entire Fairfield Amended Complaint, *see supra* Sec. 2, but in the event the Court does consider that complaint, its allegations only underscore how futile any further inquiry would have been. The Fairfield Amended Complaint alleges BLMIS was highly secretive and Sentry "actively and repeatedly 'blocked' investors wishing to obtain more information." Fairfield Am. Compl. ¶ 348. In fact, the Funds "went to great lengths to keep their investors far away from Madoff," and prevent them from conducting "real due diligence." *Id.* ¶¶ 342, 344. They employed various tactics "to hide the inner workings of BLMIS from investors," including "remov[ing] all references to BLMIS from their marketing materials" and their offering memoranda and refusing to provide customers with BLMIS Trading Authorization agreements. *Id.* ¶¶ 345–46. They held "'heavily scripted' investor teleconferences" and focused on how to "spin" the outward appearance of BLMIS to keep investors in the dark, while insisting they conducted "superior due diligence." *Id.* ¶¶ 347, 362. BLMIS even managed to deceive the SEC, despite its investigative tools, broad resources and its power to subpoena documents and information. Fairfield Am. Compl. ¶¶ 351–361.

The Second Circuit has recognized that the Madoff Ponzi scheme was "a fraud of

38

'unparalleled magnitude.'" *Sec. Inv. Prot. Corp.*, 2021 WL 3477479, at *1. That MLI could have discovered this highly secretive, longstanding, Ponzi scheme while thousands of other market participants and the SEC did not is simply inconceivable.

### C.   The Good Faith Defense is Particularly Warranted For The Preference Claims.

Even if the Court finds that the face of the Complaint does not demonstrate that MLI is entitled to the good faith defense for the fraudulent transfer claims, the preference claims in Counts 1 and 8 should still be dismissed. The Second Circuit limited its *Citibank* holding to fraudulent transfer claims under sections 548 and 550 of the Bankruptcy Code, and in doing so expressly distinguished preference claims from fraudulent transfer claims. *See id* at 191 ("[T]he absence of an inquiry notice standard in the preferential transfers context simply has no bearing on the meaning of good faith here.").

Under Second Circuit precedent, "[a] mere preference between creditors does not constitute bad faith . . . Nor does it matter that the preferred creditor knows that the debtor is insolvent." *In re Sharp Intern. Corp.*, 403 F.3d 43, 54 (2d Cir. 2005). A creditor is not "subject to attack" on grounds of bad faith "by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors" and where no ground exists to "collapse" a transfer into other "bad-faith maneuvers." *Id.* at 54–55. The Court in *Sharp* relied on the First Circuit decision in *Boston Trading Group*, which held that bad faith centers on a defendant's "'state of mind,' his subjective appreciation of the situation" and may be found "where the transferee participates in the original dishonesty." *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987). This is consistent with the Second Circuit's decision in *Irving Tr. Co.*, which declined to avoid preferential transfers where the transferee did not "knowingly aid[] the debtor to defeat equal distribution," and was not "privy to the grantor's purpose." 65 F.2d at 410–411.

Accordingly, the good faith standard only requires a transferee to show that it did not "knowingly aid" the debtor-transferor in defeating equal distribution among creditors. *See Irving Tr. Co. v. Chase Nat'l Bank*, 65 F.2d 409, 410 (2d Cir. 1933).

It is clear from the face of the Complaint that MLI had no actual knowledge of BLMIS's scheme, much less any knowing participation in it. Compl. ¶¶ 74, 90 (indicating that MLI could have discovered red flags if it conducted further inquiry). There is no suggestion that MLI engaged directly with BLMIS at any point, or that it conspired with the feeder funds in an effort to defraud other creditors or obtain preferential transfers to their detriment. As such, the alleged preferential transfers are not subject to attack on grounds of bad faith. *Sharp*, 403 F.3d at 54.

## CONCLUSION

For the reasons discussed above, the Court should dismiss the Complaint.

Dated: June 23, 2022          Respectfully submitted,

New York, New York          O'MELVENY & MYERS LLP

By: */s/ Pamela A. Miller*
Pamela A. Miller
Amber Covucci
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail: pmiller@omm.com

*Attorneys for Merrill Lynch International*