**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Zachary.Rosenbaum@kobrekim.com
Adam.Lavine@kobrekim.com
Donna.Xu@kobrekim.com

*Attorneys for BSI AG*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01209 (CGM) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |
| BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO AG, | |
| Defendant. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND .............................................................................................. 4

   I.   General Background Regarding BLMIS and the Fairfield Funds ...................... 4

   II.   The Adversary Proceeding Against the BSI Defendants ............................... 5

      A.   The Alleged "Subsequent Transfers" to the BSI Defendants ..................... 6

      B.   Jurisdictional Allegations ................................................................. 6

   III.   The Trustee's Complaints Against Other Alleged Subsequent Transferees ........ 7

ARGUMENT ................................................................................................... 8

   I.   The Court Lacks Personal Jurisdiction Over the BSI Defendants ....................... 8

      A.   The Amended Complaint Fails to Allege Sufficient Minimum Contacts with New York and the United States ................................................................................. 8

         1.   Sentry's Investments in BLMIS Do Not Form a Basis for Personal Jurisdiction over the BSI Defendants .................................................................... 10

         2.   The BSI Defendants' Alleged Contacts Related to the Fairfield Funds Are Unrelated to the Basis for Liability .................................................................... 12

         3.   Alleged Agreements with the Fairfield Funds ........................................... 17

         4.   Receipt of Payments Into Correspondent Accounts and Direction of Subscription Payments to Sentry's U.S. Bank Account ....................................... 18

      B.   The Exercise of Personal Jurisdiction Over the BSI Defendants Would Be Unreasonable ................................................................................... 20

      C.   The Multi-Strategy Fund and Banque Syz Opinions Do Not Require the Exercise of Jurisdiction in this Case ................................................................. 22

   II.   The Trustee's Claim Is Barred By 11 U.S.C. § 546(e) ............................... 24

      A.   The Initial Transfers Were Settlement Payments and Made in Connection with a Securities Contract ............................................................................. 25

      B.   The Initial Transfers Were Made By or to a Covered Entity ....................... 28

         1.   The Initial Transfers Were Made By a Stockbroker ................................... 28

         2.   The Initial Transfers Were Made To (Or For the Benefit Of) A Financial Institution 28

      C.   Sentry's Alleged Knowledge of Madoff's Fraud Does Not Defeat the BSI Defendants' Ability to Invoke the 546(e) Safe Harbor ................................................ 30

   III.   The Amended Complaint Fails to Plausibly Allege that the BSI Defendants Received BLMIS Customer Property ................................................................. 32

   IV.   The Trustee's Own Allegations Establish that the BSI Defendants Are Entitled to the Application of the Good Faith Defense ............................................. 36

A.    The BSI Defendants Gave Value in Exchange for the Redemption Payments.............. 36

B.    The BSI Defendants Acted in Good Faith and Could Not Have Discovered Madoff's Fraud Where So Many Others Failed ..................................................................................... 37

C.    The BSI Defendants Lacked Knowledge of Voidability ............................................... 39

CONCLUSION................................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguas Lenders Recovery Grp. v. Suez, S.A.*,
585 F.3d 696 (2d Cir. 2009) ............................................................ 17, 18

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016) ............................................................................ 9

*Al-Ahmed v. Twitter, Inc.*,
553 F. Supp. 3d 118 (S.D.N.Y. 2021) ............................................... 14

*Angell v. BER Care, Inc (In re Caremerica, Inc.)*,
409 B.R. 737 (Bankr. E.D.N.C. 2009) ............................................... 33

*Asahi Metal Indus. Co. v. Superior Court*,
480 U.S. 102 (1987) ...................................................................... 10, 21

*Atherton v. F.D.I.C.*,
519 U.S. 213 (1997) ............................................................................ 37

*Aybar v. Aybar*,
169 A.D.3d 137 (2d Dep't 2019) ....................................................... 14

*Aybar v. Aybar*,
37 N.Y.3d 274 (2021) ........................................................................ 14

*Beacon Enters., Inc. v. Menzies*,
715 F.2d 757 (2d Cir. 1983) .............................................................. 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 36

*Bernard L. Madoff Inv. Sec. LLC*,
476 B.R. 715 (S.D.N.Y. 2012) .......................................................... 28

*Bernard L. Madoff Inv. Sec. LLC*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............................ *passim*

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*,
803 F.3d 835 (7th Cir. 2015) ....... ................................................... 39

*Bristol-Myers Squibb v. Superior Court of Cal., San Francisco Cty.*,
137 S. Ct. 1773 (2017) ......................................................................... 9

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ...................................................................... 10, 11

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ................................................................ 11

iv

*City of Long Beach v. Total Gas & Power N. Am. Inc.*,
465 F. Supp. 3d 416 (S.D.N.Y. 2020) ................................................................ 11

*Comm. of Unsecured Creditors of Arcapita Bank v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016) ............................................................................ 8

*Contant v. Bank of Am. Corp.*,
385 F. Supp. 3d 284 (S.D.N.Y. 2019) ................................................................ 16

*Cooper v. Parsky*,
1997 WL 242534 (S.D.N.Y. Jan. 8, 1997) ........................................................ 11

*Cooper v. Parsky*,
140 F.3d 433 (2d Cir. 1998) .............................................................................. 11

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......................................................................................... 8

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005) .............................................................. 32

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) .............................................................................. 32

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ................................... 18, 27

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ............... 24, 25, 28, 29

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
31 A.D.2d 355 (1969); ...................................................................................... 11

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
26 N.Y.2d 280 (1970) ........................................................................................ 11

*Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.*,
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) .................................................... 36

*Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*,
310 B.R. 500 (Bankr. S.D.N.Y. 2002) .............................................................. 31

*Gucci Am., Inc. v. Bank of China*,
768 F.3d 122 (2d Cir. 2014) .............................................................................. 14

*Hau Yin To v. HSBC Holdings, PLC*,
2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ...................................................... 19

*Hill v. HSBC Bank plc*,
207 F. Supp. 3d 333 (S.D.N.Y. 2016) .......................................................... 19, 20

*In re Amaranth Natural Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................ 9

v

*In re Mexican Gov't Bonds Antitrust Litig.*,
    2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020)..................................................... 12

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 659 (2d Cir. 2013) ......................................................................... 8, 16

*In re Trib. Co. Fraudulent Conv. Litig.*,
    10 F.4th 147 (2d Cir. 2021) ............................................................................ 27

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019) ........................................................................ 25, 29

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
    893 F. Supp. 1252 (S.D.N.Y. 1995) ................................................................ 16

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015)............................................................. 33

*J. McIntyre Mach., Ltd v. Nicastro*,
    564 U.S. 873 (2011) ...................................................................................... 12

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) .................................................................... 15, 16

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018).................................................................................. 20

*Karoon v. Credit Suisse Grp. AG*,
    2016 WL 815278 (S.D.N.Y. Feb. 29, 2016) ............................................ 15, 16

*Khan v. Mahia (In re Khan)*,
    2014 WL 4956676 (Bankr. E.D.N.Y. Sept. 30, 2014) ..................................... 34

*Knight v. Standard Chartered Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2021) ............................................................ 16

*LaMonica v. CEVA Grp., PLC (In re CIL Ltd.)*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018).......................................................... 20, 21

*Law v. Siegel*,
    571 U.S. 415 (2014) ................................................................................ 30, 31

*Leema Enters., Inc. v. Willi*,
    575 F. Supp. 1533 (S.D.N.Y. 1983) ............................................................... 19

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012)............................................................. 26

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
    2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017)................................................... 19

*Manko Window Systems, Inc. v. Prestik*,
    2017 WL 4355580 (D. Kan. Sept. 29, 2017).................................................... 24

*Maranga v. Vira*,
   386 F. Supp. 2d 299 (S.D.N.Y. 2005) ......................................................................... 16

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
   12 N.E.3d 456 (N.Y. 2014) ......................................................................................... 20

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
   138 S. Ct. 883 (2018) .......................................................................................... 24, 31

*Metals Alliance Corp. v. Beshay*,
   1998 WL 811788 (S.D.N.Y. Nov. 19, 1998) ......................................................... 21, 22

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) .................................................................................. 21, 22

*Motorola Credit Corp. v. Uzan*,
   132 F. Supp. 3d 518 (S.D.N.Y. 2015) ....................................................................... 14

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .................................................................................................. 29

*O'Toole v. Myplace Dev. Sp. Z O.O. (In re Sledziejowski)*,
   2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) .................................................. 19

*Picard v. ABN AMRO Bank N.A. (In re BLMIS)*,
   2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ................................................. 36

*Picard v. Banque SYZ & Co., SA (In re BLMIS)*,
   2022 WL 2135019 (Bankr. S.D.N.Y. 2022) ...................................................... 4, 22, 23

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ......................................................................... 8

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................................. 17, 22

*Picard v. Citibank, N.A. (In re BLMIS)*,
   12 F.4th 171 (2d Cir. 2021) ......................................................................................... 3

*Picard v. Fairfield Inv. Fund (In re BLMIS)*
   2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) ……………………............. 24

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
   773 F.3d 411 (2d Cir. 2014) .......................................................................... 25, 27, 28

*Picard v. Merkin (In re BLMIS)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ....................................................................... 32

*Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*,
   2022 WL 2137073 (CGM) ................................................................................. *passim*

*Picard v. Shapiro (In re BLMIS)*
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) ....................................................................... 32

*Porina v. Marward Shipping Co.*,
    2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006) ........................................................ 21

*RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*,
    2021 WL 230194 (S.D.N.Y. Jan. 22, 2021) .......................................................... 16

*Rocky Mountain Chocolate Factory v. Arellano*,
    2017 WL 4697503 (D. Colo. Oct. 19, 2017) ......................................................... 21

*Rosenblatt v. Coutts & Co. AG*,
    2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) …….............................................. 20

*Silverman v. Actrade Capital, Inc. (In re Actrade)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ................................................................. 30

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017) ................................................................. 14

*Strandberg v. State Farm Mutual Auto Ins. Co.*,
    2016 WL 614401 (D. Nev. Feb. 16, 2016) ........................................................... 32

*Tamam v. Fransabank Sal*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ................................................................. 20

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) .............................................................................................. 28

*Tera Group, Inc. v. Citigroup, Inc.*,
    2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018) ....................................................... 8

*Universal Trading & Inv. Co. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. 2012) ..................................................................... 20

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................... 9, 10

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) .............................................................................................. 20

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*,
    2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ....................................................... 9

*Zurich Am. Life Ins. Co. v. Nagel*,
    2021 WL 5225947 (S.D.N.Y. Nov. 10, 2021) ..................................................... 14

**Statutes**

11 U.S.C. § 101(22)(A)........................................................................................... 31

11 U.S.C. § 546(g) ............................................................................................ 28, 29

11 U.S.C. § 546(e) ............................................................................................ *passim*

11 U.S.C. § 548(a)(1)(A) ............................................................................. 24, 25, 30

11 U.S.C. § 550(a) ................................................................................... 24, 34

11 U.S.C. § 550(a)(1), (2) ..................................................................... 24

11 U.S.C. § 550(b) ............................................................................ 36, 37

11 U.S.C. § 741(7) .................................................................................. 27

11 U.S.C. § 741(7)(A)(i) ....................................................................... 27

11 U.S.C. § 741(7)(A)(vii) ................................................................... 27

Section 550 of Title 11 of the United States Code ......................................... 1

**Rules**

Fed. R. Civ. P. 12(b)(2) ............................................................................ 1

Fed. R. Civ. P. 12(b)(6) ....................................................................... 1, 25

Fed. R. Bankr. P. 7004 ............................................................................. 8

N.Y. C.P.L.R. § 302 (McKinney 2001) ............................................... 8, 14

N.Y. C.P.L.R. § 302(a)(1) (McKinney 2001) ...................................... 9, 16

**Other**

H.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982) ........................................ 31

5 Collier on Bankruptcy ¶ 550.03[1] (16th ed. 2021) ............................... 36

Swiss Federal Act on Private International Law Article 174c .................... 21

Message of the Swiss Federal Council, FF 3864 ss ................................. 21

BSI AG ("BSI"), individually and as alleged successor-in-interest to Banca del Gottardo AG ("BDG" and together with BSI, the "BSI Defendants"), by the undersigned, respectfully submits this memorandum of law in support of its motion to dismiss, with prejudice, the Amended Complaint filed by plaintiff Irving H. Picard (the "Trustee"), as trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The BSI Defendants and their customers are victims of the fraud perpetuated by BLMIS and Bernard L. Madoff. Nevertheless, the Trustee seeks to impose even greater losses by clawing back redemptions withdrawn by the BSI Defendants' customers in the six years prior to the BLMIS bankruptcy filing.[1]

Although the Trustee often claims that he brings suits such as this one to ensure equitable treatment amongst similarly situated victims of the Madoff fraud, that simply is not true with respect to the BSI Defendants. Because the BSI Defendants had no direct privity with BLMIS, and because they were investing on behalf of individual customers, *they stand to lose vastly more than other victims of the Madoff fraud.* This is because most Madoff victims are able to access recoveries of at least seventy percent or more, either by participating in recoveries made available by the Trustee and the BLMIS estate, by the Madoff Victim Fund, or by both. The BSI Defendants, however, have been barred from participating in those meaningful recoveries, chiefly because their

---

[1] Specifically, the Trustee alleges that the BSI Defendants received transfers of approximately $60.9 million from Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma" and together with Sentry, the "Fairfield Funds") in the six years prior to BLMIS's bankruptcy, and that such funds are recoverable under Section 550 of Title 11 of the United States Code (the "Bankruptcy Code") because the BSI Defendants were alleged subsequent transferees of alleged fraudulent transfers made by BLMIS.

clients, who were also foreign, made investments through beneficial ownership of equity positions in foreign vehicles—*i.e.*, shares in the Fairfield Funds.[2]

Many of the foreign aspects of the alleged transfers, however, coupled with other pleading deficiencies in the Amended Complaint, demonstrate that the Trustee's claims should not be allowed to proceed. Indeed, the Amended Complaint contains four separate pleading deficiencies, each independently warranting dismissal of either the entire Amended Complaint or, at the very least, the majority of claims asserted therein.

*First*, the Court lacks personal jurisdiction over the BSI Defendants. The Trustee seeks to hail into court two foreign banks that engaged in no alleged transactions in the United States, merely because their clients invested in securities issued by foreign funds who, in turn, invested in the United States. In doing so, the Trustee would have this Court disavow precedent holding that a third party's connections to the forum state (such as Sentry and Sigma's) cannot be used to establish personal jurisdiction over a foreign defendant, such as BSI or BDG. The Trustee's other personal jurisdiction allegations concerning the BSI Defendant's alleged connections to the U.S. do not withstand scrutiny, particularly in light of the factual declarations submitted in connection with this motion.

*Second*, Bankruptcy Code Section 546(e) prevents the Trustee from avoiding the majority of the alleged transfers at issue in this case. Section 546(e) prohibits the Trustee from avoiding a transfer (1) that was either a settlement payment or a transfer in connection with a securities contract, and (2) that was made by or to (or for the benefit of) a covered entity such as a

---

[2] The Fairfield Funds themselves have also refused to provide the BSI Defendants with any recoveries to date. Instead, they are suing them. *See Fairfield Sentry Limited* (*In Liquidation*) *et al v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. Pro. No. 10-03496 (CGM); *Fairfield Sentry Limited* (*In Liquidation*) *et al v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. Pro No. 10-03635 (CGM); *Fairfield Sentry Limited* (*In Liquidation*) *et al v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. No. 10-03636 (CGM).

stockbroker, financial institution, or financial participant.  As is discussed below in detail, the transfers alleged in the Amended Complaint fall within the plain text of Section 546(e)'s safe harbor, thus barring the Trustee from recovering redemptions more than two years before BLMIS's December 11, 2008 bankruptcy filing.  Not applying the safe harbor here as written would undermine the very securities markets Section 546(e) was designed to protect.

*Third*, the Amended Complaint makes no attempt to tie the funds allegedly received by the BSI Defendants to transfers first made from BLMIS to Sentry.  Although the Trustee alleges that specific amounts were transferred on specific dates, what those allegations purport to show is implausible: that investors such as clients of the BSI Defendants (and others) received from Sentry approximately $2 billion *more* of purported BLMIS customer property than BLMIS ever transferred to Sentry.  The Trustee's own allegations also *establish* that, at particular times, Sentry transferred millions more to the BSI Defendants than it had on hand from BLMIS.  As a result, the Trustee's allegations that all of the funds he seeks to claw back are BLMIS customer property are not only implausible, they are impossible.

*Fourth*, the Trustee's Amended Complaint makes clear that the BSI Defendants are entitled to dismissal because they acted in good faith and provided value in exchange for their receipt of redemption payments.  As the Second Circuit recently held in *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021), to lose the protections afforded by the good faith defense, a defendant must have been able to reasonably discover the Madoff fraud, even if that defendant was on inquiry notice of suspicious facts.  Here, the Amended Complaint demonstrates that the BSI Defendants could not realistically have discovered Madoff's fraud from their position as foreign banks whose clients invested in Sentry and Sigma without direct accounts at BLMIS.  Among other things, the Trustee's Complaint outlines an extraordinarily complex and effective

3

fraud that duped thousands of investors, not to mention highly sophisticated regulators with subpoena powers, like the SEC. As a result, it was not objectively reasonable to expect that the BSI Defendants could have discovered that fraud.

For these reasons and as explained further below, the BSI Defendants respectfully request that the Amended Complaint be dismissed with prejudice. [3]

## BACKGROUND

### I.    General Background Regarding BLMIS and the Fairfield Funds

On December 11, 2008 (the "Filing Date"), the U.S. Securities and Exchange Commission commenced proceedings in the District Court for the Southern District of New York against BLMIS. Am. Compl. ¶ 10. *See* Declaration of Paul Kanellopoulos ("Kanellopoulos Decl.") Ex. 1. The District Court appointed the Trustee for the liquidation of BLMIS and removed the action to the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). *Id.* ¶ 11.

On or around May 18, 2009, the Trustee commenced an adversary proceeding in the Bankruptcy Court against Sentry, styled as *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-01239 (the "Fairfield Action"), seeking to avoid and recover approximately $3 billion in transfers of alleged customer property from BLMIS to Sentry (the "Initial Transfers"). *Id.* ¶ 78. Sentry was an investment fund organized under the laws of the British Virgin Islands, which sold shares directly to foreign investors. Second Amended Complaint (the "Second Amended Fairfield Complaint"), Fairfield Action, Dkt. No. 286 ¶ 12 (Kanellopoulos Decl. Ex. 2).

On July 20, 2010, the Trustee amended the complaint in the Fairfield Action to, among other things, seek to recover approximately $752.3 million in subsequent transfers from Sentry to

---

[3] The BSI Defendants acknowledge that the Court has rejected arguments similar to those raised in this motion in related cases. *See Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), Adv. Pro. No. 12-01205, 2022 WL 2137073 (CGM) (Bankr. S.D.N.Y. 2022); *Picard v. Banque SYZ & Co., SA* (*In re BLMIS*), Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. 2022). The BSI Defendants advance these arguments either because the facts are sufficiently distinguishable to warrant a different outcome or to preserve the arguments for appeal.

Sigma and approximately $52.9 million in subsequent transfers from Sentry to Fairfield Lambda Limited ("Lambda").  First Amended Complaint, Fairfield Action, Dkt 23 ¶¶ 53, 58 ("First Amended Fairfield Complaint") (Kanellopoulos Decl. Ex. 3).  As alleged by the Trustee, Sigma and Lambda were British Virgin Islands International Business Companies wholly invested in Sentry.  Second Amended Fairfield Complaint ¶¶ 95, 97.

On May 9, 2011, the Trustee settled with Kenneth Krys and Charlotte Caulfield, the liquidators of the Fairfield Funds (the "Fairfield Liquidators").  *See* Settlement Agreement (the "Fairfield Settlement"), Fairfield Action, Dkt. No. 69-2 (Kanellopoulos Decl. Ex. 4).  On July 13, 2011, this Court entered consent judgments in favor of the Trustee against Sentry for $3.054 billion, Consent Judgment, Fairfield Action, Dkt. No. 109 (Kanellopoulos Decl. Ex. 5, at 5), and Sigma for $752.3 million, Consent Judgment, Fairfield Action, Dkt. No. 110 (Kanellopoulos Decl. Ex. 6, at 5).  In the Fairfield Settlement, the Trustee and the Fairfield Liquidators "each agree[d] to provide reasonable access to the other's documents, data, and other information . . . ."  Fairfield Settlement ¶ 14.

On August 28, 2020, the Trustee filed the Second Amended Fairfield Complaint, which the Trustee incorporates by reference in the Amended Complaint, seeking to recover, as BLMIS customer property, *inter alia*, approximately $1 billion in amounts allegedly paid by Sentry to certain individuals and entities connected to Fairfield Greenwich Group ("FGG").  *See* Exhibits 8, 10, 12, 13, 14, and 21 to the Second Amended Fairfield Complaint, Fairfield Action, Dkt. Nos. 286-8, 286-10, 286-12, 286-13, 286-14, and 286-21 (Kanellopoulos Decl. Ex. 7).

## II.    The Adversary Proceeding Against the BSI Defendants

On March 23, 2012, the Trustee commenced this adversary proceeding against the BSI Defendants by filing the Complaint, which was amended on April 8, 2022.  The Amended Complaint alleges that the BSI Defendants were two separate *société anonyme* located in

Switzerland offering private banking services, until BSI acquired BDG and consolidated the two

banks into the surviving BSI entity.  Am. Compl. ¶¶ 54–58.  According to the Complaint, when

the BSI Defendants redeemed their clients' investments in Sentry and Sigma, they collectively

received from Sentry and Sigma approximately $60.9 million in subsequent transfers of purported

customer property (the "<u>Subsequent Transfers</u>").  *Id.* ¶ 2.

A.  <u>The Alleged "Subsequent Transfers" to the BSI Defendants</u>

The Trustee alleges that, on particular dates in the six-year period preceding the Filing

Date, Sentry transferred in the form of redemption payments: $27,315,638 to BSI (Am. Compl.

¶ 85 & Ex. C) and $20,270,860 to BDG (*Id.* ¶ 89 & Ex. D).  The Trustee further alleges that, during

the same time period, Sigma transferred in the form of redemption payments: $8,695,673 to BSI

(*Id.* ¶ 93 & Ex. F) and $4,622,074 to BDG (*Id.* ¶ 96 & Ex. G). The Trustee does not identify any

details concerning the source of these redemption payments.  He does not tie any specific portion

of the Initial Transfers to the BSI Defendants.   Nor does he indicate what portions of the

Subsequent Transfers to the BSI Defendants were sourced from BLMIS.  The Trustee, instead,

speaks only in broad generalities, alleging generically that Sentry and Sigma transferred to the BSI

Defendants a "portion of" the Initial Transfers from BLMIS to Sentry.  *Id.* ¶¶ 85, 89.

B.  <u>Jurisdictional Allegations</u>

The Trustee alleges four bases for asserting specific jurisdiction over the BSI Defendants,

including that they: (1) "purposely availed [themselves] of the laws and protections of the United

States and the State of New York by, among other things, knowingly directing funds to be invested

with New York-based BLMIS through Fairfield Sentry," *id.* ¶ 59; (2) "communicated with" the

operator of the Fairfield Funds, FGG, about their investments in the Fairfield Funds and received

advice from individuals in New York with respect to the Fairfield Funds, *id.* ¶¶ 60–63, 75;

(3) "subjected [themselves] to U.S. law and jurisdiction in connection with [their] Fairfield Fund

investments" through subscription agreements with the Fairfield Funds and a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), *id.* ¶¶ 65, 71; and (4) "directed subscription payments to Fairfield Sentry's designated U.S. bank accounts, from which the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York" and "received at least 195 Fairfield Sentry redemption payments into correspondent accounts at HSBC USA in New York," *id.* ¶¶ 69–70.

The Amended Complaint contains no allegations asserting that the BSI Defendants sent funds or received funds directly from BLMIS in New York or that the BSI Defendants had the authority to instruct the Fairfield Funds to invest in BLMIS. Further, the Amended Complaint lacks allegations indicating that the BSI Defendants' instructions to redeem shares in the Fairfield Funds were made from, or sent to New York, or that any of the BSI Defendants' communications with the Fairfield Funds concerned the redemptions at issue.

## III. The Trustee's Complaints Against Other Alleged Subsequent Transferees

In addition to the claims against the BSI Defendants, the Trustee has commenced dozens of actions against other alleged subsequent transferees of Sentry, seeking to recover payments that the alleged subsequent transferee defendants received for redeeming their shares in the Fairfield Funds. *See* Twenty-Seventh Interim Report for the Period October 1, 2021 through March 31, 2022 filed in the substantively consolidated SIPA liquidation proceeding captioned *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-01789, Dkt. No. 21473 (Kanellopoulos Decl. Ex. 8). In those actions, the Trustee seeks to recover at least $3.4 billion from defendants who allegedly received redemption payments from Sentry on top of the $1.8 billion of subsequent transfers alleged in the Fairfield Action. (Kanellopoulos Decl. ¶ 14 & Ex. 7; First Amended Fairfield Complaint ¶¶ 53, 58).

**ARGUMENT**

**I.    The Court Lacks Personal Jurisdiction Over the BSI Defendants**

The Trustee does not assert any basis for general personal jurisdiction over the BSI

Defendants.  Because the BSI Defendants are not alleged to be "at home" in the United States, the

Trustee must demonstrate that the Court can appropriately exercise specific jurisdiction over them.

*See Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014).  To do so, the Trustee must establish

that (1) his claims arose out of the BSI Defendants' sufficient "minimum contacts with the relevant

forum," and (2) "the exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist*

*Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks

omitted).[4]  As set forth below, the Amended Complaint does not sufficiently allege either

requirement for specific jurisdiction.

**A.    The Amended Complaint Fails to Allege Sufficient Minimum Contacts with New York and the United States**

As Judge Bernstein held, each redemption payment is a separate claim for jurisdictional

purposes.  *See Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y.

2018) ("Each transfer is a separate claim, and the Trustee must establish the court's jurisdiction

with respect to each claim asserted.").  Accordingly, the Trustee must establish the Court's

jurisdiction over each of the BSI Defendants for each individual redemption.  *See Tera Group, Inc.*

*v. Citigroup*, Inc., No. 17-CV-4302 (RJS), 2018 WL 4732426, at *3 (S.D.N.Y. Sept. 28, 2018)

(holding that jurisdictional allegations must be pled as to each defendant).

The Trustee alleges four broad categories of contacts in New York: (1) the BSI Defendants'

alleged initial investments (or subscriptions) in the Fairfield Funds; (2) contacts related to those

---

[4] The Trustee bases personal jurisdiction on New York's long-arm statute, N.Y. C.P.L.R. § 302, and Federal Rule of Bankruptcy Procedure 7004.  Am. Compl. ¶ 77.  The federal jurisdictional analysis "closely resemble[s]" New York's long-arm statute and due process requirements, so the analyses are largely interchangeable.  *Off. Comm. of Unsecured Creditors of Arcapita Bank v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016).

initial investments in the Fairfield Funds; (3) agreements with the Fairfield Funds; and (4) the

direction of subscription payments to Sentry's U.S. bank account and the receipt of redemptions

into a correspondent account at HSBC.  These allegations all fail to establish personal jurisdiction

for the same basic reason—the alleged basis for liability is not the BSI Defendants' decision to

invest with the Fairfield Funds, which is the focus of the Trustee's personal jurisdiction allegations.

Rather, the Trustee seeks recovery of a subsequent transfer and the alleged basis for liability is

therefore the redemptions made by the BSI Defendants that gave rise to those subsequent transfers.

*See* Am. Compl. ¶¶ 2, 92–103.  Each aspect of the BSI Defendants' conduct with respect to the

relevant redemptions was foreign—Swiss entities sent instructions from Switzerland on behalf of

foreign customers to a custodian located in the Netherlands to redeem shares held in entities

located in the British Virgin Islands.  *See* Declaration of Fernando Poretti, Dkt. No. 82 ("Poretti

Decl.").

Accordingly, there is no connection between the forum and the specific claims at issue—

*i.e.*, claw-back of entirely foreign redemption payments—even when viewing the Trustee's

allegations as a whole.  *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Bristol-Myers Squibb v.

Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) (declining to exercise

personal jurisdiction where "[w]hat is missing . . . is a connection between the forum and the

specific claims at issue").[5]  And for the reasons set out below, each category of personal

jurisdiction allegations also fails individually.

---

[5] *See also In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536–37 (S.D.N.Y. 2008) (finding
that defendant lacked the requisite minimum contacts with the forum where "[t]he only connection between
[Defendant] and the forum is that the company invested in a foreign hedge fund located in the Cayman Islands but
managed by plaintiffs" and "never allegedly directed any activity toward the United States."); *See Zim Integrated
Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, No. 19-CV-3444 (VSB), 2020 WL 5503557, at *5 (S.D.N.Y.
Sept. 10, 2020) (various contacts with New York are insufficient to confer personal jurisdiction under N.Y.C.P.L.R.
§ 302(a)(1) where none gave rise to plaintiff's cause of action); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 n.4
(2016) (to establish jurisdiction, the cause of action must arise from the very transactions that are relied upon to provide
the contact with the forum).

1. *Sentry's Investments in BLMIS Do Not Form a Basis for Personal Jurisdiction over the BSI Defendants*

The Trustee alleges minimum contacts by way of the BSI Defendants' "directing their investments through Fairfield Sentry—a fund primarily managed in New York that invested with BLMIS, also in New York." Am. Compl. ¶ 64; *id.* ¶ 59 ("[The BSI Defendants] . . . knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry.").

However, personal jurisdiction is not measured by third-party contacts, but on contacts "the Defendant himself creates." *Walden*, 571 U.S. at 284. Thus, Sentry's contacts with BLMIS do not establish that the BSI Defendants "accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and the State of New York," Am. Compl. ¶ 64, because mere knowledge that Sentry would invest money it raised in the British Virgin Islands with BLMIS in New York is insufficient as a matter of law to support jurisdiction. As the Supreme Court explained in *Walden*, tying personal jurisdiction to foreseeability "impermissibly allows a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289. The Supreme Court instead has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 284; *see also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987) ("The substantial connection . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the internal forum State*.") (internal quotation marks omitted) (emphasis in original).

Indeed, even when a foreign defendant contracts directly with a forum resident, that alone does not suffice to show purposeful ailment. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone

10

can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 31 A.D.2d 355, 356 (1969), *aff'd*, 26 N.Y.2d 280 (1970) ("The mere receipt by a nonresident of benefit or profit from a contract performed by others in New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under our longarm statute.").

Nor can the Trustee establish personal jurisdiction by way of his allegations regarding the BSI Defendants' ownership of shares in the Fairfield Funds. The corporate form is respected for jurisdictional purposes and, therefore, the fact that a foreign defendant owns shares in a company that purposefully avails itself of the privilege of conducting business in New York does not suffice to establish jurisdiction. The Trustee has not alleged that Sentry was an alter ego or acted as an agent as required to impute Sentry's contacts to the BSI Defendants. *See City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 416, 437–39 (S.D.N.Y. 2020) (alter ego or agent); *Cooper v. Parsky*, No. 95-CV-10543 (JGK), 1997 WL 242534, at *14 (S.D.N.Y. Jan. 8, 1997) (dismissing the claim against shareholder for lack of personal jurisdiction due to lack of alter ego allegations justifying piercing the corporate veil), *aff'd in relevant part, vacated in part on other grounds*, 140 F.3d 433 (2d Cir. 1998); *Ferrante Equip. Co.*, 26 N.Y.2d at 283 ("The mere fact that respondent is a controlling shareholder in . . . a corporation concededly doing business in New York . . . will not subject respondent . . . to in personam jurisdiction . . . unless the record would justify our piercing the corporate veil.").[6]

---

[6] An alter ego finding requires grounds for piercing the corporate veil, which have not and cannot be alleged here. *See Cooper*, 1997 WL 242534, at *14 (merely alleging investment in a New York-based company "does not justify piercing the corporate veil"). An agency finding requires the plaintiff to show that the corporation "acted in New York for the benefit of, with the knowledge and consent of, and under some control by," the defendant shareholder. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018).

Consequently, the Trustee's allegations that the BSI Defendants knew that Sentry would invest with BLMIS fall far short of what is needed to subject the BSI Defendants to personal jurisdiction in this Court.  While some of the money invested in Sentry may have been transferred to BLMIS, and some of the redemption payments may have been funded by transfers from BLMIS, that does not convert the actions of Sentry into actions by the BSI Defendants.  Such allegation is nothing more than a repackaging of the type of "stream of commerce" theory of personal jurisdiction rejected by the Supreme Court.  *See J. McIntyre Mach., Ltd v. Nicastro*, 564 U.S. 873, 882, 886 (2011) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum].");  *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830 (JPO), 2020 WL 7046837, at *3–4 (S.D.N.Y. Nov. 30, 2020) (holding neither an attempt to profit from conduct underlying claim nor foreseeability of a harm in forum were sufficient to establish jurisdiction in absence of a defendant's contact with forum).

2.  *The BSI Defendants' Alleged Contacts Related to the Fairfield Funds Are Unrelated to the Basis for Liability*

The Trustee asserts that the Court may exercise personal jurisdiction over the BSI Defendants due to various alleged contacts between the BSI Defendants and the Fairfield Funds in New York.  To the extent the Trustee alleges specifics, those allegations are either false or do not support personal jurisdiction, even if true.

a.  BDG

The Amended Complaint contains no supportable factual allegations tying BDG—an entity that had no branches, offices, or employees in the United States during the relevant time period— to New York or the United States.  *See* Declaration of Massimo Antonini ("Antonini Decl.") at ¶¶ 5–6.  The only "*fact*" in the Amended Complaint alleging BDG had jurisdictional contacts is

12

that BDG "used U.S.-based advisers in connection with its investments in the Fairfield Funds" based on second-hand statements by FGG representatives that BDG received due diligence advice from Richcourt Fund Advisors Inc. ("Richcourt") and Towers Perrin ("Towers"). Am. Compl. ¶ 63.

A hearsay statement by one third party (FGG) that BDG retained other third-parties (Richcourt and Towers) is not sufficient to establish a jurisdictional contact by BDG. Importantly, BDG could not have appointed these firms as advisors as the internal due diligence team at BDG focused its efforts on a limited set of hedge fund investments—diversified funds of funds—which Sentry and Sigma were not. *See* Declaration of Andrea Russi ¶¶ 4–5. Further, Andrea Russi, a member of the only BDG business group principally responsible for diligence on hedge fund investments, has no recollection of BDG ever appointing these entities to conduct diligence for the Fairfield Funds. *Id.* ¶ 5. All other meetings or communication with the United States alleged by the Amended Complaint concern BSI and do not establish purposeful availment by BDG.

### b. BSI

The Trustee alleges three contacts by BSI with the United States: (1) communications by BSI employees with FGG; (2) receipt of due diligence advice from a subsidiary; and (3) contacts by a former executive at Genesis Investment Advisors LLC (f/k/a BSI Investment Advisors LLC) ("Genesis"). None of these alleged facts support exercising personal jurisdiction over BSI.

First, the Trustee alleges that "six BSI employees located in New York communicated with" FGG. Am. Compl. ¶ 60. But BSI did not have branches, offices, or employees in the United States from March 14, 2003 through November 21, 2008, which is the time period in which the Amended Complaint alleges that BSI received redemptions from the Fairfield Funds. (Antonini Decl. ¶¶ 5–6). Moreover, the Trustee admits that the BSI Defendants are or were incorporated and

headquartered in Switzerland, while making no allegations that either possessed an office or employed individuals in New York during that time period.[7]

In any event, the alleged presence of unidentified BSI employees in New York, who made undescribed communications with FGG at an unnamed time, is insufficient to plead—let alone establish—minimum contacts, especially considering that those contacts were unrelated to the basis for liability alleged by the Trustee (i.e., the redemptions). *See Al-Ahmed v. Twitter*, Inc., 553 F. Supp. 3d 118, 126 (S.D.N.Y. 2021) (finding specific jurisdiction lacking even though defendant had a "large office in New York" because there was "no meaningful connection" between the defendant and the "suit-related conduct"); *Zurich Am. Life Ins. Co. v. Nagel*, No. 20-CV-11091 (JSR), 2021 WL 5225947, at *7 (S.D.N.Y. Nov. 10, 2021) ("Nagel alleges that ZIG's Head of Litigation and Investigations worked in New York and reported directly to ZIG in Switzerland. But Nagel does not connect this to his employment discrimination claims . . . .").

Second, the Trustee alleges that BSI's "asset manager subsidiary Thalia SA ('Thalia') . . . had an advisory office in New York that provided BSI with advice with respect to the BLMIS Funds." Am. Compl. ¶ 61.  The premise of this allegation is that Thalia "was charged with evaluating hedge fund investments for BSI's asset management and private banking businesses." *Id.*  But Thalia was created to offer those services for certain funds of funds in which BSI clients could choose to invest.  (Antonini Decl. ¶ 8).  There is no allegation by the Trustee that any of the

---

[7] As previously stated, there are no allegations of general jurisdiction in the Amended Complaint and the only bases for personal jurisdiction asserted are that "the Trustee's claims against BSI arise from [its] business activities" in New York under N.Y.C.P.L.R. § 302.  Am. Compl. ¶¶ 76–77.  Even construing this stray reference to employees located in New York as an assertion of general jurisdiction, that alone is insufficient.  *See, e.g.*, *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 587 (S.D.N.Y. 2017) (holding that *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) "stands for the proposition that 'mere operation of a branch office in a forum–and satisfaction of any attendant licensing requirements–is not constitutionally sufficient to establish general jurisdiction'") (quoting *Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518, 521 (S.D.N.Y. 2015); *Aybar v. Aybar*, 169 A.D.3d 137, 151 (2d Dep't 2019) ("[F]ollowing the United States Supreme Court's decision in *Daimler*, personal jurisdiction cannot be asserted against a foreign corporation based solely on the corporation's continuous and systematic business activity in New York."), *aff'd on other grounds*, 37 N.Y.3d 274 (2021).

funds of funds managed by Thalia invested in the Fairfield Funds, and BSI is not aware of any

such investments. *Id.* The mere receipt of communications from Thalia concerning BLMIS in the

abstract does not support specific jurisdiction over BSI absent allegations tying those

communications to the investments at issue in this action, which the Amended Complaint lacks.

Finally, the Trustee alleges that Harvey Glover, an executive at Genesis, "worked closely

with FGG regarding BSI's investments in the Fairfield Funds." Am. Compl. ¶ 74. However, the

Amended Complaint contains no allegations tying Genesis to the Subsequent Transfers or

establishing that Genesis' contacts should be attributed to BSI. By the Trustee's own allegations,

Genesis was "spun off from BSI in 2005" such that any contacts by Genesis or Glover cannot

relate to redemptions by BSI after that date. *Id.* ¶ 73. As stated above, the specific jurisdiction

analysis respects principles of corporate separateness and Genesis' contacts are not attributable to

BSI or BDG.

c.  Boilerplate Allegations

Aside from the allegations described above, which are insufficient, the remainder of the

Amended Complaint merely makes generic statements that BSI or BDG "operated in the United

States and the State of New York with respect to the transactions relating to the Transfers,"

Am. Compl. ¶ 60; "communicated with New York-based FGG employees regularly," *id.* ¶ 62;

"met with a number of FGG personnel," *id.*; and that their "primary contacts at FGG were New

York-based FGG executives," *id.* ¶ 75.

These conclusory assertions lack the specificity required to confer jurisdiction, such as who

was involved in the communication, when the communication occurred, and the content of the

alleged communication. *See Karoon v. Credit Suisse Grp. AG*, No. 15-CV-4643 (JPO), 2016 WL

815278, at *2 (S.D.N.Y. Feb. 29, 2016) ("As a general rule, 'conclusory non-fact-specific

jurisdictional allegations' are insufficient to overcome a motion to dismiss for lack of personal

jurisdiction") (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)). Under such circumstances, "courts are 'not to resolve argumentative inferences in the plaintiff's favor or accept as true a legal conclusion couched as a factual allegation.'" *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 770 (S.D.N.Y. 2021) (quoting *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 290 (S.D.N.Y. 2019); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673).

Further, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York.'" *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)); *accord Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1252 at 1261 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (collecting cases); *RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*, No. 19-CV-10247 (NRB), 2021 WL 230194, at *4 (S.D.N.Y. Jan. 22, 2021) (same). Instead, "[o]nly in cases where the telephone call or communication clearly shows that the defendant intends to project itself into ongoing New York commerce, such as where a defendant directly conducts market activity or securities transactions in New York over the telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile transmissions alone." *Metals Alliance Corp. v. Beshay*, No. 97-CV-3401 (SHS), 1998 WL 811788, at *2 (S.D.N.Y. Nov. 19, 1998).

Here, the Amended Complaint lacks allegations showing that the BSI Defendants "projected" themselves into ongoing commerce in New York. Instead, the Trustee merely alleges that the BSI Defendants generally communicated with individuals in New York *about* the Fairfield Funds. Am. Compl. ¶ 60 (alleging communications "with respect to BSI's investments in the

16

Fairfield Funds"), *id.* ¶ 62 (alleging communications "regarding BDG's investments in the Fairfield Funds"). But such allegations do not support personal jurisdiction because they are merely boilerplate assertions of minimum contacts and, in any event, are unrelated to the specific redemptions allegedly containing customer property. General communications about investment in the Fairfield Funds are too attenuated to establish minimum contacts with New York. *See Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y. 2016) (finding allegations that foreign defendants "communicated with and transmitted information and funds to and from BLMIS located in New York" were insufficient to "project" the foreign defendants into New York).

### 3. *Alleged Agreements with the Fairfield Funds*

The Amended Complaint alleges that each of the BSI Defendants subjected themselves to U.S. law and jurisdiction in connection with their clients' Fairfield investments by way of provisions in subscription agreements with Sentry and Sigma and a fee-sharing agreement with FG Limited. Am. Compl. ¶¶ 65, 71. According to the Trustee, these agreements contained provisions expressly stating that they were governed by New York law and consenting to venue in New York. *Id.*[8]

The Trustee cannot assert jurisdiction based on either alleged agreement. Neither he nor BLMIS were parties to, or third-party beneficiaries, of such agreements. *See Aguas Lenders*

---

[8] To the extent the Trustee argues that these agreements establish jurisdiction because they demonstrate that the BSI Defendants knew they were investing in New York-based BLMIS, Am. Compl. ¶¶ 66, 68, such an argument would simply be a repackaging of the arguments addressed *supra* I.A.1. Further, the Trustee is incorrect that the Private Placement Memorandum ("PPM") referenced in the subscription agreements establishes purposeful availment in New York. The PPM confirms that the transactions in this case are foreign: the PPM not only provides that the transactions will take place between "non-U.S. Persons"; that is, neither citizens nor residents of the United States, Declaration of Thomas L. Long, Exhibit 4, *Picard v. Bureau of Labor Insurance*, Adv. Pro. No., 11-2732 (CGM), Dkt. No. 17-4 at 11, 13, and that Fairfield Funds will use Investment Managers located in Bermuda, Placement Agents located in the Grand Cayman, an Administrator and Transfer Agent and Depository located in The Netherlands, Auditors located in the Netherlands, and a Custodian Bank located in Ireland. *Id.* at 2, 3, 7 and Fund Directory. The PPM also expressly confirms that the Fairfield Funds and its representatives are all outside the U.S. for the purpose of, among other things, falling into a "safe harbor" pursuant to which a "non-U.S. corporation [i.e. the Funds] *will not be deemed to be engaged in a U.S. trade or business*." *Id.* at 28 (emphasis added).

*Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701–02 (2d Cir. 2009) (finding that non-signatories to an agreement cannot be bound by agreement's forum selection clause absent rare exceptions not applicable here).  Moreover, in *Fairfield Sentry Ltd. v. Migani*, the UK Privy Council held that the Sentry subscription agreement does not govern redemptions from Sentry, nor does it make New York law applicable to redemptions; instead, the redemptions are governed by Sentry's Articles of Association and BVI law.  [2014] UKPC 9, ¶¶ 10, 17, 20 (Kanellopoulos Decl. Ex. 9).  Following *Migani*, this Court held that a suit by the Liquidators of Sentry, a party to the subscription agreement, to recover a redemption payment is not a suit "with respect to [the] Agreement" and therefore not within the scope of its forum selection clause.  *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2018 WL 3756343, at *11–12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*").  The fee-sharing arrangement fares no better, as it allegedly relates purely to fees received by the BSI Defendants for "bringing investments into BLMIS."  Am. Compl. ¶ 71.  It has no relationship to redemption payments outside the scope of that agreement and it is not the basis on which the claims have been asserted.

Therefore, none of the agreements cited in the Amended Complaint establish that the BSI Defendants purposefully availed themselves of jurisdiction in New York.

> 4.  *Receipt of Payments Into Correspondent Accounts and Direction of Subscription Payments to Sentry's U.S. Bank Account*

The Trustee alleges that the BSI Defendants received redemption payments into "correspondent accounts" in New York, Am. Compl. ¶ 69, and "directed subscription payments to Fairfield Sentry's designated U.S. bank accounts," *id.* ¶ 70.  However, neither BSI nor BDG made subscription payments directly to the Fairfield Funds' bank accounts.  (Poretti Decl. ¶¶ 8–9).  As the Trustee previously admitted, all such payments were transferred to or from accounts with Citco in the Netherlands and only used correspondent accounts in the United States to facilitate U.S.

18

dollar-denominated payments to those accounts. *Id.*; Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality and in Further Support of the Trustee's Motion for Leave to Amend Complaints, Dkt No. 81, at n.88 ("Investors wired funds to Fairfield's account at Citco Bank in Ireland . . . .").

Even assuming the truth of the Trustee's allegations, the "mere maintenance" of a U.S. bank account and the "knowing receipt of funds" through the account does not establish personal jurisdiction. *See, e.g., O'Toole v. Myplace Dev. Sp. Z O.O.* (*In re Sledziejowski*), No. 13-22050 (RDD), 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983). It is also settled law that sending "payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction." *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, No. 17-CV-3793 (PAE), 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (fact that contract required payments to New York bank account did not establish specific jurisdiction).

The incidental use of a correspondent bank account in the United States to facilitate U.S. dollar-denominated payments to settle a foreign securities transaction—here, the investment in and the redemption of shares in a British Virgin Islands company by its Swiss shareholders—does not give rise to personal jurisdiction. *See Hau Yin To v. HSBC Holdings, PLC*, No. 15-CV-3590 (LTS), 2017 WL 816136, at *6. (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (rejecting personal jurisdiction over foreign defendants because their alleged connection to the forum was the transmission of information and funds "to and from BLMIS . . . [as an] incidental consequence[] of fulfilling a foreign contract"); *Hill*, 207 F.Supp. 3d 333, 339–40 (finding that transmission of information and funds to and from BLMIS to be "incidental consequences of

fulfilling a foreign contract . . . insufficient to 'project' the Foreign Defendants into New York"

and not amounting "to 'purposeful availment' of the laws of [the forum]"); *Tamam v. Fransabank*

*Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("[C]ourts in this district have routinely held that

merely maintaining a New York correspondent bank account is insufficient to subject a foreign

bank to personal jurisdiction.") (collecting cases); *Rosenblatt v. Coutts & Co. AG*, 17-CV-3528

(AKH), 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant's act of sending

payment to plaintiff's New York bank account pursuant to an agreement negotiated and executed

outside the United States was not purposeful availment).[9]

B. The Exercise of Personal Jurisdiction Over the BSI Defendants Would Be Unreasonable

The Court's exercise of jurisdiction must be reasonable under the circumstances for it to

be consistent with due process. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297

(1980) ("The Due Process Clause . . . gives a degree of predictability to the legal system that allows

potential defendants to structure their primary conduct with some minimum assurance as to where

that conduct will and will not render them liable to suit.") (citation omitted).    Courts apply a

"sliding scale" in assessing whether jurisdiction is consistent with due process: "the weaker the

plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of

unreasonableness to defeat jurisdiction." *LaMonica v. CEVA Grp., PLC (In re CIL Ltd.)*, 582 B.R.

---

[9] Hundreds of thousands of foreign dollar transactions valued at over $1.5 trillion are cleared in New York each day. *See generally Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018) ("In New York each day, on average, about 440,000 of these transfers [Clearing House Interbank Payments System . . . the system used for most large banking transactions], occur, in dollar amounts totaling about $1.5 trillion.").  Were the incidental use of U.S.-based accounts sufficient to confer personal jurisdiction over foreign entities, New York would become a forum for any foreign commercial dispute, contrary to federal and state policy, merely because global transactions are frequently cleared in U.S. dollars in New York.  *See Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 459–60 (N.Y. 2014) ("Our state's interest in the integrity of its banks . . . is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York."); *see also Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-CV-7877 (PAC), 2012 WL 6186471, at *3 (S.D.N.Y. 2012) ("[C]ourts have long recognized that there are significant policy reasons which caution against the exercise of personal jurisdiction based only on . . . a correspondent bank account.") (internal quotation marks omitted).

46, 79 (Bankr. S.D.N.Y. 2018) (internal quotation marks and citation omitted); *see also Porina v. Marward Shipping Co.*, No. 5-CV-5621 (RPP), 2006 WL 2465819, at *6 (S.D.N.Y. Aug. 24, 2006) ("[I]f a defendant's contacts with the United States are weak, the plaintiff has to make a stronger showing of reasonableness in order to show that jurisdiction over the defendant is proper."). In evaluating the reasonableness of exercising personal jurisdiction, "[a] court must consider the burden on defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi*, 480 U.S. at 113.

The Trustee here seeks to rely on the most incidental of contacts to establish jurisdiction. Even if those contacts are deemed sufficient, the Trustee must make a stronger showing that the exercise of jurisdiction would be reasonable. Each of the factors that the Court must assess in weighing reasonableness weighs against jurisdiction: the burden on BSI and Gottardo in litigating here is high, and the Trustee cannot show that New York is more reasonable than other available fora, namely Switzerland, where the BSI Defendants have (or had) their principal place of business and most of the evidence regarding the claims is located.[10]

The imposition of personal jurisdiction is not warranted in circumstances, like this one, where even assuming defendants' contacts with the forum only "barely satisf[y] the minimum contacts standard," "a majority of the reasonableness factors weigh against the exercise of jurisdiction." *Rocky Mountain Chocolate Factory v. Arellano*, No. 17-CV-582 (WJM), 2017 WL 4697503, at *11 (D. Colo. Oct. 19, 2017) (citation omitted). The same result is warranted in this

---

[10] In addition, the interest of the United States in tracing the flow of funds from BLMIS is not superior to Switzerland's interests. Switzerland's Federal Act on Private International Law ("PILA") requires that all claims for avoidance against entities domiciled in Switzerland be asserted in Swiss proceedings. Avoidance claims can only be recognized and enforced on Swiss based assets if the Defendant does not have his domicile in Switzerland. As such, the Trustee has no authority to act in Switzerland and any judgment he obtains in these proceedings are not recognizable there either. PILA Article 174c; Message of the Swiss Federal Council, FF 3863 ss, p. 3880. Under these circumstances, the Trustee cannot show that it would be more reasonable to litigate his claim against the BSI Defendants in New York than Switzerland, where the BSI Defendants are (or were) located and where Swiss courts can address the issue.

case, since exercising jurisdiction over the BSI Defendants would not "comport[] with 'traditional

notions of fair play and substantial justice,'" *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d

560, 578 (2d Cir. 1996) (citation omitted), and the Complaint should be dismissed with prejudice.

    C.   The Multi-Strategy Fund and Banque Syz Opinions Do Not Require the Exercise of
          Jurisdiction in this Case

The BSI Defendants acknowledge that the Court recently held that personal jurisdiction

existed in recovery actions against other entities who received redemptions from the Fairfield

Funds.  There, the Court found the Trustee "made a *prima facie* showing of personal jurisdiction

with respect to the Fairfield Funds subsequent transfers at issue" through specific facts alleged in

the complaints against those defendants.  *Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *5;

*Banque Syz & Co., SA*, 2022 WL 2135019 at *5.  Here, however, the Amended Complaint against

the BSI Defendants lacks several substantial jurisdictional contacts that the Trustee alleged against

Multi-Strategy Fund and Banque Syz, warranting a different outcome in this case.

In deciding to exercise jurisdiction over those defendants, the Court principally relied on

the fact that Multi-Strategy Fund and Banque Syz knowingly directly money towards New York

with the intent to profit from those investments.  The Court found that Multi-Strategy Fund and

Banque Syz "'intentionally tossed a seed from abroad to take root and grow as a new tree in the

Madoff money orchard in the United States and reap the benefits therefrom.'"  *Multi-Strategy

Fund Ltd.*, 2022 WL 2137073, at *4 (quoting *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480

B.R. 501, 504 (Bankr. S.D.N.Y. 2012)); *Banque Syz & Co., SA*, 2022 WL 2137073, at *4.

However, no such profit motive exists here, as neither BSI nor BDG ever invested their own money

with the Fairfield Funds.  (Antonini Decl. ¶ 9).

Additionally, the complaints against Multi-Strategy Fund and Banque Syz contained

specific allegations concerning the content of the meetings and tied those meetings to the

subscription and redemption of Fairfield Fund shares.  *See Multi-Strategy Fund Ltd.*, 2022 WL 2137073 at *3 ("Defendant, through its president, director and authorized signatory, asked about additional capacity for Fairfield Sentry on at least seven occasions."); *id.* ("Defendant's knowledge and intention that its investments in Fairfield Sentry . . . were investments with BLMIS are reflected in Defendant's total redemption of its investments in both BLMIS Feeder Funds after [Defendant's president] discussed 'Madoff and the potential ponzi [sic] scheme.'"); *id.* at *4 ("[I]n connection with Defendant's Fairfield Sentry investments, persons associated with the Defendant asked for 'info that you've got on Madoff,' including asking 'how Maddoff [sic] made money' and for help 'understand[ing] when Maddoff [sic] was invested.'"); *Banque Syz & Co., SA*, 2022 WL 2135019 at *3 ("Banque Syz solicited its own clients to invest in Madoff Feeder Funds' and enticed those customers to increase their investments by offering them loans to fund the investments.").  In contrast, the Amended Complaint here merely states that the BSI Defendants or third parties connected to the BSI Defendants communicated with Fairfield about unspecified subject matters.

Finally, the monies associated with the subsequent transfers received by Multi-Strategy Fund and Banque Syz had more explicit connections to New York than exist here.  In the Multi-Strategy Fund case, "Defendant sent wiring instructions specifically designating a New York-based bank account to which Defendant directed FGG to wire Defendant's redemption payments from Fairfield Sentry, and from which Defendant was going to fund its subscriptions in Fairfield Sentry." *Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *4.  And "Banque Syz maintained its own account with BLMIS in New York and used New York bank to transfer funds into and receive funds from BLMIS, and filed a customer claim in this SIPA proceeding seeking to recover its own alleged losses on account of its investment with BLMIS." *Banque Syz & Co., SA*,

2022 WL 2135019, at *4. Here, there is no suggestion that BSI or BDG held a financial account

in the United States or sent instructions designating a United States account to receive redemption

payments. Rather, the Amended Complaint merely alleges that the BSI Defendants incidentally

received payments *through* a correspondent account to facilitate a deposit into an overseas account.

The key differences between the Trustee's jurisdictional assertions against Multi-Strategy

Fund and Banque Syz compared with those here thus warrant a different outcome. No jurisdiction

exists in this case.

## II.    The Trustee's Claim Is Barred By 11 U.S.C. § 546(e)

The Trustee's sole cause of action against the BSI Defendants is asserted under Section

550(a), which provides that, to the extent a transfer is avoided, "the trustee may recover, for the

benefit of the estate, the property transferred," or its value, from "the initial transferee" or any

subsequent "transferee of such initial transferee." 11 U.S.C. § 550(a)(1), (2). "The Code sets out

a number of limits on the exercise of [the Trustee's] avoiding powers," including the safe harbor

of Section 546(e). *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018)

("*Merit*"). Section 546(e) bars the Trustee from avoiding (other than under section 548(a)(1)(A)

with a limited reach-back period of two years) a transfer, *inter alia*, (1) that was either a settlement

payment or a transfer in connection with a securities contract; and (2) made by or to (or for the

benefit of) a covered entity such as a stockbroker, financial institution, or financial participant.[11]

"[T]he application of Section 546(e) presents a straightforward question of statutory

interpretation of the type that is appropriately resolved on the pleadings." *Fairfield Sentry Ltd. v.*

*Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2020 WL 7345988

---

[11] The Section 546(e) safe harbor is available as a defense to subsequent transferees. *See Picard v. Fairfield Inv. Fund*
(*In re BLMIS*), No. 08-01789 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) ("Where the initial
transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, . . . the subsequent
transferee is nonetheless entitled to raise a § 546(e) defense against recovery of those funds.").

(Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*") (quotation marks and citation omitted).   The

Second Circuit has instructed courts to enforce Section 546(e)'s safe harbor whenever it applies

by its terms, explaining that "in enacting the Bankruptcy Code, Congress struck careful balances

between the need for an equitable result for the debtor and its creditors, and the need for finality."

*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014) (citation

omitted) ("*Fishman*").   In particular, "by enacting §546(e), Congress provided that, for a very

broad range of securities-related transfers, the interest in finality is sufficiently important that they

cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under

§ 548(a)(1)(A)."   *Id.*   "Unwinding settled securities transactions . . . would seriously

undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract

capital."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90 (2d Cir. 2019).

This case falls within the scope of the Section 546(e) safe harbor, requiring the dismissal

of all claims asserted against the BSI Defendants that are based on any initial transfer made more

than two years before the Filing Date.  *Fishman*, 773 F.3d at 415 (affirming dismissal of relevant

claims under Rule 12(b)(6) because they were shielded by 11 U.S.C. § 546(e)).[12]

A.  The Initial Transfers Were Settlement Payments and Made in Connection with a
    Securities Contract

The Second Circuit has already ruled that initial transfers from BLMIS to its customers

pursuant to account agreements were settlement payments and were made in connection with a

securities contract (*i.e.*, the account agreements between BLMIS and its customers), so as to come

within the protection of section 546(e). *Fishman*, 773 F.3d at 417, 418–23.  In doing so, the Court

---

[12] Although Section 546(e) is an affirmative defense, a court can dismiss based on Section 546(e) if its applicability
is established on the face of the complaint or documents incorporated by reference into or integral to the complaint.
*See Fairfield Inv. Fund*, 2021 WL 3477479, at *2.

rejected the Trustee's argument that the safe harbor did not apply because Madoff did not actually

carry out the promised securities transactions with BLMIS's customers. *Id.* at 419–20.

Section 546(e) also applies to a transfer "in connection with *a* securities contract,"

(emphasis added), not just to a transfer *under the* securities contract between the initial transferor

and transferee. If the initial transferee withdrew funds from BLMIS to make a settlement payment

under a securities contract between the initial transferee and the subsequent transferee, then the

withdrawal from BLMIS also would be a settlement payment made "in connection with a securities

contract" between the initial transferee and the subsequent transferee. This plain reading of

Section 546(e) is underscored by the legislative choice to use the decidedly broad phrase "*in

connection with*" instead of narrower wording. *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 12-

MC-115 (JSR), 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), ("[A] broader

reading of the securities contracts covered by the Section 546(e) safe harbor is implied by the

Second Court's decision in *Enron*, which reads Section 546(e) broadly to suggest that a transfer

can be part of a chain of payments that together constitute a settlement payment. By analogy, then,

the definition of a transfer made 'in connection with a securities contract' must be similarly

broad."); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros.

Holdings Inc.*), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("It is proper to construe the phrase 'in

connection with' broadly to mean 'related to.'").

Moreover, as Judge Rakoff stated:

Take, for example, a hypothetical situation in which the Trustee alleges that a
withdrawal of funds by an investment fund from its Madoff Securities customer
account occurred because an investor in that fund sought redemption of its
investment under the terms of its investment contract. Assuming that either the
investment fund or the investor qualifies as a financial institution or financial
participant, and barring other circumstances that may appear on the facts of a given
case, that situation appears to fit within the plain terms of Section 546(e): an initial

transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

*Cohmad*, 2013 WL 1609154, at *9 (footnote omitted); *see Fishman*, 773 F.3d at 422 ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided.").

The definition of "securities contract" under section 741(7) of the Bankruptcy Code is also "broad." *See Fishman*, 773 F.3d at 419. It not only includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), but also "any other agreement or transaction that is similar to an agreement or transaction that is similar to" such a contract, *id.* § 741(7)(A)(vii). *See Fishman*, 773 F.3d at 419 (noting that Congress intended to "sweep broadly" and that "[f]ew words in the English language are as expansive as 'any' and 'similar'"). Accordingly, "the definition of securities contract . . . includes . . . redemption requests." *Cohmad*, 2013 WL 1609154, at *8.

Here, redemption requests were governed by Sentry's Articles of Association. (Kanellopoulos Decl. Ex. 10, at Exhibit F; Kanellopoulos Decl. Ex. 9 ¶¶ 10, 17, 20); *see also Fairfield I*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018) (explaining that the Privy Council "concluded that the terms of the redemption of shares were found in the Articles").[13]

Therefore, the redemption requests that Sentry honored under those Articles are securities contracts within the meaning of Section 546(e), and the payment of the redemption amounts is a settlement payment.

---

[13] This Court may consider the Articles of Association in connection with this motion because, as the basis for the challenged redemption, they are integral to the Complaint. *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir. 2021) ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

B. The Initial Transfers Were Made By or to a Covered Entity

The Initial Transfers were made by or to (or for the benefit of) an entity covered by section

546(e) both because the Initial Transfers were made by a stockbroker and because they were made

to or for the benefit of a financial institution, though either of those facts alone would be sufficient.

1. *The Initial Transfers Were Made By a Stockbroker*

In a prior adversary proceeding in this SIPA case, the District Court concluded:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC,
> clearly engaged in securities transactions . . . [E]ven assuming the truth of the
> allegation that Madoff Securities' investment advisory division never traded
> securities on behalf of clients, Madoff Securities nonetheless qualifies as a
> stockbroker by virtue of the trading conducted by its market making and proprietary
> trading divisions.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (footnote and

citation omitted), *aff'd sub nom.  In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir.

2014).  As the Second Circuit noted on appeal, "[i]t is not disputed [by the Trustee] that BLMIS

was a 'stockbroker' for the purposes of § 546(e)."  *Fishman*, 773 F.3d at 417; see Br. for Pl.-

Appellant Irving H. Picard at i-ii, 5, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 12- 2557 (2d Cir.

May 15, 2013), Dkt. No. 145 (not challenging stockbroker finding on appeal).

2. *The Initial Transfers Were Made To (Or For the Benefit Of) A Financial
   Institution*

Section 101(22) defines "financial institution" to include not only "an entity that is a

commercial or savings bank," but also the customer of such a bank "when [it] is acting as agent or

custodian for a customer . . . in connection with a securities contract."  11 U.S.C. § 101(22)(A).

In *Fairfield III*, this Court held that the Fairfield Funds (Sentry, Sigma, and Lambda) were

"financial institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch

("Citco Bank"), a bank regulated by the Central Bank of the Netherlands and registered with the

Central Bank of Ireland. *Fairfield III*, 2020 WL 7345988, at \*6 & n.11.[14] Citco Bank acted as the Fairfield Funds' agent in connection with the securities contracts under which the BLMIS transfers to Sentry were made. *Id*. at \*7. As this Court found in *Fairfield III*:

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco Bank establishes the necessary agency. It is implausible to infer that Citco Bank made the redemption payments to specific redeemers in specific amounts absent the [Fairfield] Funds' directions to do so. Moreover, Citco Bank accepted those directions by executing the redemption payments. Based on the foregoing, the Funds were customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made, and the Funds were, therefore "financial institutions" within the meaning of 11 U.S.C. § 546(e).

*Id.*, at \*7 (footnote omitted). This Court's holding in *Fairfield III* binds the Trustee because he was in privity with the Fairfield Liquidators. Even if not, there is no reason for this Court to deviate from Judge Bernstein's well-reasoned *Fairfield III* decision.[15]

As conceded in the Amended Complaint, the BSI Defendants are (or were) also banks. Am. Compl. ¶ 56. Therefore, the alleged transfers here were similarly made for the benefit of financial institutions (or their customers). 11 U.S.C. §§ 101(22), 546(e).

---

[14] See De Nederlandsche Bank, Information Detail: Citco Bank Nederland N.V., https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTKF&relationNumber=B0275 (last visited Jun. 21, 2022) (identifying Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited Jun. 20, 2022) (classifying Citco Bank as a "credit institution . . . whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account"). This Court can take judicial notice of information from such public registries. *See Tribune*, 946 F.3d at 78; *Enron Corp. v. Bear, Stearns Int'l Ltd.* (*In re Enron Corp.*), 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).

[15] As described above, the Fairfield Settlement Agreement provides for the sharing of recoveries on the parties' claims for recovery of property that Sentry transferred, cooperation and consultation on bringing those claims, and a joint interest agreement. The trustee's and the Liquidators' agreed joint interest in any such recovered BLMIS customer property constitutes a "preexisting 'substantive legal relationship,'" focused on a successive or concurrent interest in property, of the kind recognized by the Supreme Court to give rise to non-party issue preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). Because the trustee is in privity with the Liquidators in actions to recover alleged BLMIS customer property, such as the actions at issue in *Fairfield III*, and because the issue of Sentry's "financial institution" status was "actually litigated" and "essential" to the final judgments dismissing numerous such actions on the ground of the section 546(e) safe harbor, this Court's finding in *Fairfield III* that Sentry was a "financial institution" in connection with redemption payments from Sentry to its subscribers is binding on the trustee. *See New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001) (stating requirements for issue preclusion).

C.  Sentry's Alleged Knowledge of Madoff's Fraud Does Not Defeat the BSI
Defendants' Ability to Invoke the 546(e) Safe Harbor

The Trustee of course will respond that the safe harbor does not apply here because the

initial transferee, Sentry, allegedly knew of Madoff's fraud and thus knew that there was no actual

"settlement payment" or "securities contract."  This Court recently denied Multi-Strategy Fund

and Banque Syz's motions under Section 546(e) citing, among other things, its prior opinion

construing the rule adopted by Judge Rakoff in *Cohmad* that "'if the Trustee sufficiently alleges

that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities'

fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor.'"  *Fairfield Inv.*

*Fund*, 2021 WL 3477479, at *4–5 (quoting *Cohmad*, 2013 WL 1609154, at *7).  But importantly,

here, the Trustee does not allege that the "transferee from whom he seeks recovery"—*i.e.*, the BSI

Defendants—had knowledge of the fraud.

Further, nothing in the language of Section 546(e) permits depriving an innocent

subsequent transferee who meets all of the requirements of the statute of its ability to invoke the

safe harbor.  The *only* exception to section 546(e) is a claim under section 548(a)(1)(A), which is

inapplicable to most of the transfers here.  *See Silverman v. Actrade Capital, Inc.* (*In re Actrade*

*Fin. Techs. Ltd.*), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent

of the transferor and not the transferee that is relevant") (citations omitted).  Where the Code

creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional

exceptions, even when doing so is motivated by alleged wrongdoing.  *See Law v. Siegel*, 571 U.S.

415, 424–25 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration

of exemptions and exceptions to those exemptions confirms that courts are not authorized to create

additional exceptions."). The courts must adhere to "the plain meaning of the language" of the statute. *See Merit* 138 S. Ct. at 897.[16]

Additionally, even if the "securities contract" between BLMIS and Sentry was voidable, that would not affect the separate securities contracts between Sentry and its investors. As Judge Rakoff ruled in *Cohmad*, even if the initial transferee knew BLMIS was a fraud and was not trading securities, if the initial transferee withdrew funds from BLMIS to make a payment under a securities contract between the initial transferee and the subsequent transferee, then the withdrawal from BLMIS would be a transfer made in connection with the securities contract between the initial transferee (Sentry) and the subsequent transferee (the BSI Defendants), and would not be avoidable. *Cohmad*, 2013 WL 1609154, at *7.

Finally, the judicially-created rule that an initial transferee with actual knowledge of the fraud cannot rely on Section 546(e) should have no bearing on an innocent subsequent transferee's ability to raise the defense. The rationale for Judge Rakoff's holding in *Cohmad* was based on the purpose of the safe harbor—*i.e.*, assuring the finality of settlements of securities transactions and minimizing the securities market disruption caused by bankruptcy proceedings. *Id.* at *4; *see also Gredd v. Bear, Stearns Secs. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002) ("The legislative intent behind section 546(e) was 'to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'") (quoting H.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982), U.S. Code Cong. & Admin. News 1982, 583, 583)). As Judge Rakoff noted, that purpose is "achieved by protecting the reasonable expectations of investors who believed they were signing a securities contract," but not by shielding the transactions of "a transferee who had actual knowledge of the Madoff 'Ponzi'

---

[16] The judicially-created rule that an initial transferee with knowledge of the fraud cannot invoke the safe harbor is itself unsupported by the plain text of Section 546(e).

scheme." *Cohmad*, 2013 WL 1609154, at *4. A finding that *Sentry's* fraud *perpetrated on the subsequent transferee* somehow defeats that <u>*subsequent transferees'*</u> ability to invoke the safe harbor would punish the innocent and achieve the opposite purpose, by disrupting settled securities contracts and undermining the stability of financial markets. *See Enron Creditors Recovery Corp. v. Alfa*, S.A.B. de C.V., 651 F.3d 329, 339 (2d Cir. 2011) ("We see no reason to think that undoing Enron's redemption payments, which involved over a billion dollars and approximately two hundred noteholders, would not also have a substantial and similarly negative effect on the financial markets.").

Therefore, the Court should dismiss all claims asserted against the BSI Defendants that are based on any initial transfer made more than two years before the Filing Date.

## III.    The Amended Complaint Fails to Plausibly Allege that the BSI Defendants Received BLMIS Customer Property

The Trustee must allege facts creating a plausible inference that the redemption payments were subsequent transfers of BLMIS customer property and that "liability necessarily, not only possibly, follows." *Strandberg v. State Farm Mutual Auto Ins. Co.*, No. 2:15-CV-02468 (RCJ), 2016 WL 614401, at *1 (D. Nev. Feb. 16, 2016). In particular, to establish subsequent transferee liability:

> The Trustee must allege facts that support the inference that the funds at issue originated with the BLMIS, and contain the 'necessary vital statistics'—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

*Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015); *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("To satisfy his burden to recover the subsequent transfer, the complaint must allege facts that support the inference that the funds at

issue originated with the debtor, and contain the necessary vital statistics[.]") (Internal quotation marks omitted).

In *Shapiro*, the trustee alleged only generically that (i) BLMIS transferred funds to certain accounts and (ii) the "Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS" to defendants who held an account at BLMIS which was funded largely, if not completely, with subsequent transfers. *Picard v. Shapiro*, Adv. Proc. No. 10-5383 (Bankr. S.D.N.Y. July 8, 2014), Dkt. No. 33, ¶¶ 110, 43. The Court dismissed the complaint because it did not "tie any initial transfer to any subsequent transfer or Subsequent Transferee" and did "not plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent transfers rather than simply keep the initial transfers for themselves." *Shapiro*, 542 B.R. at 119; *see also Angell v. BER Care, Inc* (*In re Caremerica, Inc.*), 409 B.R. 737, 750–51 (Bankr. E.D.N.C. 2009) (court dismissed a preference claim under *Twombly* and *Iqbal* because the trustee's factual allegations included allegations about transfers into and out of an account and amounts received by the supposed transferees, but nothing to tie them together).

Here, the Complaint fails to set forth facts that plausibly support the inference that the Subsequent Transfers actually originated with BLMIS, so as to "tie [the alleged] initial transfers to any subsequent transfer or [alleged] Subsequent Transferee." *Shapiro*, 542 B.R. at 119. Rather, the Amended Complaint merely "allege[s] the initial transfers and assert[s], in conclusory fashion, that the [alleged] subsequent transferee defendants received subsequent transfers." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re BLMIS*), 531 B.R. 439, 474 (Bankr. S.D.N.Y. 2015). The Amended Complaint alleges that during the six years preceding the Filing Date, BLMIS transferred approximately $3 billion to Sentry, Am. Compl. ¶ 78, and that "a portion of"

those transfers was subsequently transferred either directly or indirectly to, or for the benefit of"

the BSI Defendants, *id.* ¶¶ 85, 89. Essentially, the Trustee is asking the Court to make an illogical

assumption that: (1) because BLMIS transferred a large amount of money to Sentry over a long

period of time; (2) any money Sentry transferred to the BSI Defendants must have come from

BLMIS and can be recovered.

These "barebones allegations" are facially implausible. For instance, the Trustee alleges

that BLMIS transferred approximately $3 billion to Sentry. Yet, at the same time he seeks to

"recover," all as alleged subsequent transfers of customer property from Sentry: an aggregate of

approximately $3.4 billion in payments made to dozens of defendants who redeemed from Sentry;

approximately $824 million in payments to Sigma and Lambda, and another approximately $1

billion in payments to individuals and entities connected to FGG. (Kanellopoulos Decl. ¶ 14 &

Ex. 7; First Amended Fairfield Complaint ¶¶ 53, 58). In other words, the Trustee is endeavoring

to recover over $2 billion more than the total amount that the Trustee himself alleges that BLMIS

transferred to Sentry. As such, the Trustee's theory that all of the redemption payments are

customer property is not merely implausible, it is mathematically impossible.

The Trustee's theory further collapses when looking at other details of the alleged

subsequent transfers made by Sentry. As an illustration, pages 18–19 of Exhibit B to the Amended

Complaint show that the first three cash withdrawals (labeled "Check Wire") from Sentry's

BLMIS accounts within the six-year lookback period—namely, the withdrawals that occurred on

May 9, July 11, and July 22, 2003—totaled $120 million. Dkt. No. 116-2 at 18–19.[17] The Trustee

---

[17] Since the statute of limitations under New York's Debtor and Creditor Law for fraudulent conveyances is six years, *see Khan v. Mahia (In re Khan)*, No. 10-46901, 2014 WL 4956676, at *52 (Bankr. E.D.N.Y. Sept. 30, 2014), the Trustee cannot avoid transfers from BLMIS to Fairfield Sentry that occurred before December 11, 2002 (the "lookback period"). Thus, he cannot recover any subsequent transfers of those transfers under Section 550(a). Accordingly, the Court may only consider alleged initial transfers after December 11, 2002 (the first of which was on May 9, 2003) in determining whether an alleged subsequent transfer was in fact a transfer of recoverable customer property; any earlier initial transfers alleged in the Complaint must be excluded from consideration.

34

further alleges that between May 9, 2003 and September 18, 2003, Sentry paid out $192.2 million to other entities, $72.2 million more than it had received from BLMIS and thus more than exhausting those transfers. (Kanellopoulos Decl. ¶ 15). The next alleged transfer from BLMIS to Sentry does not occur until April 1, 2005. *See* Am. Compl. Exhibit B, Dkt. No. 116-2, at 20–22 ("CHECK WIRE" entries). So when the Trustee alleges that the BSI Defendants received approximately $8.8 million in redemptions between October 14, 2003 and March 15, 2005, (Kanellopoulos Decl. ¶ 16), those redemptions could not possibly have been BLMIS customer property because the amount of money Sentry had paid to investors by September 18, 2003 far exceeded the total it took from BLMIS.[18]

According to the Trustee, when Sentry received its first transfer from BLMIS in nearly two years on April 1, 2005 in the amount of $175 million, Sentry three days later paid $200 million to a single recipient. *Id*. ¶ 17. After that transfer, Sentry next received $85 million from BLMIS on July 6, 2005 and paid out at least $114 million to other parties by July 25, 2005, again exhausting all conceivable funds received from BLMIS. *Id*. Despite the absence of available funds according to his own allegations, the Trustee nonetheless seeks to recover approximately $1.9 million received by the BSI Defendants almost a month later on August 15, 2005. *Id.* ¶ 18.

In sum, these illustrations show there is at least $10.7 million in alleged subsequent transfers to the BSI Defendants that could not have contained customer property based on the Trustee's own allegations. How could Sentry have paid out more to defendants than it received from BLMIS? Sentry has stated that "[f]rom time to time, to make Redemption Payments, Sentry

---

[18] That many of these redemptions took place over a year after Sentry last received funds from BLMIS further underscores the implausibility that the redemption payment contains BLMIS "customer property." *Cf. Merkin*, 515 B.R., at 150–51 (inferring linkage where alleged "subsequent transfers took place contemporaneously or shortly after an initial transfer" or at most two or three months later).

35

. . . utilized subscription monies of other investors on hand that were directed for investment in BLMIS." First Amended Complaint ¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, Adv. Pro. No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), Dkt. No. 19. Because "[t]here is an 'obvious alternative explanation'" for the source of the redemption, "that explanation renders [plaintiff's] competing explanation 'conceivable [but not] plausible.'" *Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.*, No. 19-CV-7007 (JPO), 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 570 (2007)).

Therefore, the Court should dismiss the Amended Complaint for failure to plausibly allege that the BSI Defendants received BLMIS customer property.[19]

## IV.    The Trustee's Own Allegations Establish that the BSI Defendants Are Entitled to the Application of the Good Faith Defense

Under section 550(b), a trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the voidability of the transfer.

### A.    The BSI Defendants Gave Value in Exchange for the Redemption Payments

Collier describes what is required to show "value":

> The "value" required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract, analogous to the "value" required under state law to achieve the status of a bona fide purchaser for value. There is no requirement that the value given by the transferee be a reasonable or fair equivalent. The term "value" in this subsection is different from and does not mean value to the debtor[.]

5 Collier on Bankruptcy ¶ 550.03[1] (16th ed. 2021) (footnotes omitted); *accord Picard v. ABN AMRO Bank N.A.* (*In re BLMIS*), Adv. Pro. No. 8-1789 (SMB), 2020 WL 1584491, at *8 (Bankr. S.D.N.Y. Mar. 31, 2020) (quoting the above passage).

---

[19] The Trustee's failure to tie the BSI Defendants' transfers to any particular transfers from BLMIS to Sentry cannot be excused on the ground that the Trustee lacks access to sufficient information, since the Trustee, by virtue of the document-sharing provisions of the Fairfield Settlement Agreement, had access to Sentry's records at the time he filed the original Complaint and for nearly a decade since. *See* Fairfield Settlement Agreement, Fairfield Action, Dkt. No. 69-2, ¶ 14 (Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims").

The Amended Complaint seeks recovery of transfers from the Fairfield Funds for "redemption of equity interests" by the BSI Defendants as "shareholder[s]" in such funds.  Am. Compl. ¶ 88, 91, 95, 98.  In other words, the BSI Defendants tendered their shares in the Fairfield Funds in exchange for the redemption payments at issue in this case.  The surrender of those shares constitutes sufficient "value" under section 550(b) of the Bankruptcy Code.  As British Virgin Islands companies, the funds' corporate relationship with its shareholders is governed by the law of the British Virgin Islands under the internal affairs doctrine.  *Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997); *see Migani*, [2014] UKPC 9, ¶ 10 ("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund").  The Eastern Caribbean Court of Appeal has held that a Sentry investor's surrender of Sentry shares upon Sentry's redemption of the shares for cash gives good consideration to support the exchange.  *Id.* ¶¶ 8, 87; *Quilvest Finance Ltd. v. Fairfield Sentry Ltd.*, Case Nos. HCVAP 2011/041-062.  (Kanellopoulos Decl. Ex. 11, at 9).  Therefore, the Amended Complaint and related proceedings show that the "value" element of the affirmative defense is satisfied.

## B. The BSI Defendants Acted in Good Faith and Could Not Have Discovered Madoff's Fraud Where So Many Others Failed

For the second element, even if the alleged transferee: (1) knew actual facts that; (2) would put it on inquiry notice of the fraudulent purpose underlying a transfer, the transferee still takes the transfer in good faith if; (3) a diligent inquiry would not have discovered the fraudulent purpose of the transfer.  *Citibank, (In re BLMIS)*, 12 F.4th at 178.  The Second Amended Fairfield Complaint establishes that upon a diligent inquiry, neither of the BSI Defendants could have reasonably discovered the fraudulent purpose of the transfers.

The Second Amended Fairfield Complaint alleges that some consultants and market analysts opined, at various times, that BLMIS may have been involved in improper activities.  But

most of those suspicions related to lack of transparency, potential self-dealing, or improper trading activities. Only a very small handful of outliers suspected a Ponzi scheme, while *thousands* of other market participants, many extremely sophisticated, disagreed with these opinions and invested in BLMIS, either directly or through funds like the Fairfield Funds.

Even if a reasonable investor might have suspected that something was amiss at BLMIS, the Second Amended Fairfield Complaint shows that a diligent inquiry could not reasonably have discovered the fraudulent purpose underlying the transfers from BLMIS. The Second Amended Fairfield Complaint alleges that BLMIS operated under a cloak of secrecy and that Sentry's management: "were willing to lie to protect their relationship" with Madoff, ¶ 5; "spun information to pacify existing FGG investors," *id.*; "omitted material information about Madoff from their representations," *id.*; "covered for Madoff in deliberate efforts to get investors and regulators off the scent," *id.* ¶ 6; "suppressed . . . observations about BLMIS's inexplicable operations," *id.* ¶ 7; "protected BLMIS from inquiry," *id.* ¶ 8; "lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing," *id.* ¶ 9; "advanced various stories to attempt to defuse investor concerns," *id.* ¶ 153; "had privileged access to Madoff," *id.* ¶ 162; "prevent[ed] prospective investors from contacting Madoff directly," *id.* ¶ 164; "downplay[ed] Madoff's role," *id.* ¶ 165; "evad[ed] investor inquiries" and "deliberately tried to conceal Madoff's role with the FGG feeder funds," *id.* ¶ 166; "guarded the relationship with Madoff," *id.* ¶ 166; were "unwilling to release" information, ¶ 177; "provided evasive answers," ¶ 183; and in 2004, "scrubbed references to BLMIS from FGG materials to avoid disclosure of Madoff's role," *id.* ¶ 237.

The Second Amended Fairfield Complaint alleges that the SEC began an investigation in 2005 into whether BLMIS was a Ponzi scheme or engaged in other illegal activity, but that the SEC was stymied by the efforts of BLMIS and Sentry insiders to hinder the government

38

investigation through false statements and refusal to hand over responsive documents. *Id.* ¶¶ 236–62. Notably, the Second Amended Fairfield Complaint explicitly argues that these efforts prevented the SEC from "gain[ing] an accurate understanding of FGG's operations and relationship with BLMIS," *id.* ¶ 248; gave "the appearance of cooperating with the SEC [without] disclos[ing] information useful to the SEC's investigation," *id.* ¶ 251; and "mislead[] the SEC to believe that it was FG Bermuda, not BLMIS, that made the investment decisions," *id.* ¶ 255.

If the SEC, with its powerful investigative tools, expansive subpoena powers, and broad resources could not determine the fraud during their investigations, how could a once-or-twice-removed Fairfield Fund investor, which did not even have a direct relationship with BLMIS, do so? As Judge Rakoff pondered, as a practical matter, how might a direct investor even "launch an investigation of his broker's internal practices—and how could he do so anyway?" *Picard v. Katz*, 4625 B.R. 447, 455 (S.D.N.Y. 2011), *vacated and remanded*; *Citibank*, 12 F.4th at 195.

The Trustee's own Fairfield Second Amended Complaint convincingly shows that a diligent inquiry would not have enabled the BSI Defendants to discover the fraudulent purpose of the transfers, and, therefore, the BSI Defendants may avail themselves of the good faith defense, even on a motion to dismiss.

### C.    The BSI Defendants Lacked Knowledge of Voidability

In applying this element of the affirmative defense, the court must test the subsequent transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer. *Brandt v. Horseshoe Hammond, LLC* (*In re Equip. Acq. Res., Inc.*), 803 F.3d 835 (7th Cir. 2015). The courts construe "without knowledge of the voidability of the transfer" the same as good faith, so a transferee who is found to be in good faith is also found to be without knowledge of voidability. As Judge Rakoff noted, "[i]n light of the legislative history, the most plausible reading is that this third requirement is merely one specific type of subjective knowledge required. . . ."

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R.18, 23 n.3 (S.D.N.Y. 2014).

Therefore, this element of the defense also has been established.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Dated: June 24, 2022
      New York, New York

                    /s/ *Adam M. Lavine*

                    **KOBRE & KIM LLP**
                    Zachary D. Rosenbaum
                    Adam M. Lavine
                    Donna (Dong Ni) Xu
                    800 Third Avenue
                    New York, New York 10022
                    Telephone: (212) 488-1200
                    Zachary.Rosenbaum@kobrekim.com
                    Adam.Lavine@kobrekim.com
                    Donna.Xu@kobrekim.com

                    *Attorneys for BSI AG*