**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01677 (CGM) |
| Plaintiff, | |
| v. | |
| SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A. (*f/k/a* SG Private Banking Suisse S.A.), individually and as successor in interest to Societe Generale Private Banking (Lugano-Svizzera) S.A.; SOCGEN NOMINEES (UK) LIMITED; LYXOR ASSET MANAGEMENT INC. (*f/k/a* SG Asset Management, Inc.), as General Partner of SG AM AI Premium Fund | |

L.P.; SG AUDACE ALTERNATIF (*f/k/a*
SGAM AI Audace Alternatif), now acting by
and through its manager, Lyxor Asset
Management S.A.S.; SGAM AI EQUILIBRIUM
FUND (*f/k/a* SGAM Alternative Diversified
Fund), now acting by and through its liquidator,
KPMG Advisory Sarl; LYXOR PREMIUM
FUND (*f/k/a* SGAM Alternative Multi Manager
Diversified Fund), now acting by and through its
trustee, Societe Generale S.A.; SOCIETE
GENERALE S.A., as Trustee for Lyxor
Premium Fund and Successor in Interest to
Banque de Reescompte et de Placement a/k/a
Barep and to Societe Generale Asset
Management Banque d/b/a Barep; SOCIETE
GENERALE LUXEMBOURG (*f/k/a* Societe
Generale Bank & Trust S.A.); OFI MGA
ALPHA PALMARES (*f/k/a* Oval Alpha
Palmares); OVAL PALMARES EUROPLUS;
and UMR SELECT ALTERNATIF;

Defendants.

# TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Contents**

| | | | **Page** |
|---|---|---|---|

PRELIMINARY STATEMENT ............................................................................2

STATEMENT OF FACTS ..................................................................................4

    I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS...............................4

    II.    DEFENDANTS AND THEIR INVESTMENTS IN THE FAIRFIELD FUNDS ..........................................................................................6

ARGUMENT ..................................................................................................10

    I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE PJ DEFENDANTS ..........................................................................10

        A.    The PJ Defendants Purposefully Availed Themselves of the Laws and Privileges of Conducting Business in New York by Investing with the Fairfield Funds ............................................................................12

            1.    The PJ Defendants' Investments in BLMIS through BLMIS Feeder Funds Establish Minimum Contacts .................................13

                a.    *BLI* Establishes this Court's Jurisdiction over the PJ Defendants ........................................................14

                b.    *Walden* Does Not Save the PJ Defendants from this Court's Jurisdiction ...............................................16

            2.    The Forum Selection and Choice of Law Clauses in the Subscription Agreements Are Strong Jurisdictional Contacts.......18

            3.    The U.S.-Based Communications of Certain Defendants with FGG also Establish Minimum Contacts ........................................20

            4.    The PJ Defendants' Purposeful Use of New York Bank Accounts Establishes Specific Jurisdiction....................................22

                 a.    The PJ Defendants Intentionally and Repeatedly Used New York Bank Accounts for their Investments...............22

                 b.    The Trustee's Claims Relate to the PJ Defendants' Use of New York Bank Accounts .............................................25

            5.    The SG Defendants' other Arguments Against Jurisdiction Are Unavailing................................................................26

B.      The Exercise of Personal Jurisdiction Over the PJ Defendants Is
        Reasonable .................................................................................................28

C.      In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery......29

II.     THE TRUSTEE'S COMPLAINT PLEADS THAT THE SG DEFENDANTS
        RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A) .....30

A.      The SG Defendants Misstate the Trustee's Pleading Burden ...................31

B.      The SG Defendants' Tracing Arguments Fail on a Motion to Dismiss.....32

C.      The SG Defendants' Claims of Double Recovery Are Premature ............36

III.    THE TRUSTEE'S COMPLAINT SUFFICIENTLY PLEADS THE
        AVOIDABILITY OF THE FAIRFIELD FUND INITIAL TRANSFERS ...........36

IV.     SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANTS ......39

A.      The Fairfield Funds Had Actual Knowledge of Madoff's Fraud ..............39

B.      The SG Defendants are Precluded from Relitigating the Actual
        Knowledge Exception ................................................................................40

C.      Section 546(e) Does Not Apply Independently to Recovery Actions .......41

V.      FRENCH LAW DOES NOT REQUIRE DISMISSAL OF THE OFI
        DEFENDANTS ................................................................................................46

A.      French Law Permits FCPs to Engage in Litigation ...................................47

B.      The Trustee Has No Objection to the Asset Management Company
        Participating in this Action ........................................................................49

CONCLUSION.....................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC),*
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ............................................................. 30, 31

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,*
    98 F.3d 25 (2d Cir. 1996)................................................................................... 12, 28

*Al Rushaid v. Pictet & Cie,*
    28 N.Y.3d 316, 68 N.E.3d 1 (2016).................................................................. 24, 25

*Am. Casein Co. v. Geiger (In re Geiger),*
    446 B.R. 670 (Bankr. E.D. Pa. 2010) ..................................................................... 37

*Ayyash v. Bank Al-Madina,*
    No. 04 Civ. 9201(GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ..................... 29

*Bartlett v. Societe Generale de Banque Au Liban SAL,*
    No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ................. 23

*Brown v. Fifth Jud. Dist. Drug Task Force,*
    255 F.3d 475 (8th Cir. 2001) .................................................................................. 50

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)............................................................................... 11, 12, 19

*Chase Manhattan Bank v. Banque Generale Du Commerce,*
    No. 96 CIV 5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997)................................. 19

*Chloé v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158 (2d Cir. 2010).......................................................................... 10, 12, 28

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.),*
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) ................................................................... 36

*CutCo Indus., Inc. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986)................................................................................... 21

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014)............................................................................................. 11

*Dandong v. Pinnacle Performance Ltd.,*
    966 F. Supp. 2d 374 (S.D.N.Y. 2013)..................................................................... 22

iii

*Darby v. Pasadena Police Dept.*,
   939 F.2d 311 (5th Cir. 1991) ..................................................... 50

*Del Med. Imaging Corp. v. CR Tech USA, Inc.*,
   2010 WL 1487994 (S.D.N.Y. Apr. 13, 2010) ......................................... 12

*DeMasi v. Benefico*,
   567 F. Supp. 2d 449 (S.D.N.Y. 2008) ............................................... 38

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) ......................................................... 10

*Eldesouky v. Aziz*,
   No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ................... 22

*Ellul v. Congregation of Christian Bros.*,
   2011 WL 1085325 (S.D.N.Y. Mar. 23, 2011) ......................................... 50

*Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   397 F. Supp. 3d 323 (S.D.N.Y. 2019) ........................................... 13, 24

*Fairfield Sentry Ltd. v. Theodore GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
   Adv. No. 10-03496, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ................ 18

*Ferrari v. Cnty. of Suffolk*,
   790 F. Supp. 2d 34 (E.D.N.Y. 2011) ............................................... 39

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
   141 S. Ct. 1017 (2021) ................................................. 19, 25, 26, 27

*Fowler v. Caliber Home Loans, Inc.*,
   277 F. Supp. 3d 1324 (S.D. Fla. 2016) ............................................. 33

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
   991 F.3d 370 (2d Cir. 2021) ....................................................... 49

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
   No. 11-3673(RJS), 2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) ......................... 20

*Gov't Emps. Ins. Co. v. Est. of Sosnov*,
   664 N.Y.S.2d 608, 244 A.D.2d 485 (1997) .......................................... 49

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
   Adv. Pro. Nos. 10-03493 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ..... 34, 36

iv

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005) ................................................................. 12

*Gucci Am., Inc. v. Li*,
   135 F. Supp. 3d 87 (S.D.N.Y. 2015) .................................................... 25

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ............................................................................. 17

*HSH Nordbank AG N.Y. Branch v. Street*,
   No. 11 Civ. 9405(DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012) ............................ 22, 26

*In re Dewey & LeBoeuf LLP*,
   522 B.R. 464 (Bankr. S.D.N.Y. 2014) .................................................. 20

*In re Motors Liquidation Co*,
   565 B.R. 275 (Bankr. S.D.N.Y. 2017) .................................................... 8

*In re Parmalat Sec. Litig.*,
   659 F. Supp. 2d 504 (S.D.N.Y. 2009) ................................................... 22

*In re Picard*,
   917 F.3d 85 (2d Cir. 2019) ........................................... 13, 28, 29, 43

*In re SunEdison, Inc.*,
   620 B.R. 505 (Bankr. S.D.N.Y. 2020) .................................................. 44

*In re Viropharma, Inc.*,
   No. CIV.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ........................... 33

*In re Vivendi Universal S.A. Securities Litigation*,
   605 F. Supp. 2d 570 (S.D.N.Y. 2009) ................................................... 47

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ....................................................................... 11, 26

*Kelley v. Safe Harbor Managed Acct. 101, Ltd.*,
   31 F.4th 1058 (8th Cir. 2022) ........................................................ 42, 45

*Kelley v. Westford Special Situations Master Fund, L.P.*,
   No. 19-cv-1073 (ECT/KMM), 2020 WL 3077151 (D. Minn. June 10, 2020) ............. 33, 34, 35

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009) ................. 29

*Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*,
    No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013) ............................... 40

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327, 984 N.E.2d 893 (2012) .............................................................. 24, 25

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
    843 F. Supp. 2d 191 (D. Mass. 2012) ..................................................................... 38

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ................................................................................... 11

*Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors*
    *Liquidation Co.)*, 565 B.R. 275 (Bankr. S.D.N.Y. 2017) ........................................... 19

*Museum Boutique Intercontinental, Ltd. v. Picasso*,
    886 F. Supp. 1155 (S.D.N.Y. 1995) ....................................................................... 49

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................................... 40

*Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*,
    549 B.R. 56, 67–69 (Bankr. S.D.N.Y. 2016) ...................................................... 24, 25

*OFI Risk Arbitrages v. Cooper Tire & Rubber Company*,
    63 F. Supp. 3d 394 (D. Del. 2014) ........................................................................ 48

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ..................................................................... 41

*Picard v. Banque Syz & Co. SA.*,
    Adv. Pro. No. 11-02149, 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ...................... 2

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ............................................................. *passim*

*Picard v. Bureau of Labor Insurance (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................. *passim*

*Picard v. Ceretti, et al (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ......... 41

*Picard v. Chais (In re BLMIS)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) ................................................................... 29

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
    Adv. Pro. Nos. 10-04398, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012))......... 30, 33, 34

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d. Cir. 2021) ............................................................................... 5

*Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB),
    2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016)............................................ 41

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ................................................................... 29

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ................................................................. 34

*Picard v. Est. of Seymour Epstein (In re BLMIS)*,
    No. 2l-cv-02334 (CM), 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ...................... 44

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021) .................................................... 11, 12, 25, 29

*Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*,
    Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021).... *passim*

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014)................................................................................ 41

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
    Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10, 2014) .......... 15

*Picard v. Lowrey (In re BLMIS)*,
    596 B.R. 451 (S.D.N.Y. 2019)....................................................................... 37, 41

*Picard v. Magnify, Inc. (In re BLMIS)*,
    583 B.R. 829 (Bankr. S.D.N.Y. 2018) ................................................................. 40

*Picard v. Maxam Absolute Return Fund, L.P.*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011)....................................................... 11, 13, 29

*Picard v. Mayer (In re BLMIS)*,
    Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021).......... 31

*Picard v. Mendelow, et al (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ................................................................. 41

*Picard v. Merkin (In re BLMIS)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................. *passim*

*Picard v. Merkin (In re BLMIS)*,
  581 B.R. 370 (Bankr. S.D.N.Y. 2017) ................................................................. 33, 34

*Picard v. Multi-Strategy Fund Ltd.*,
  Adv. Pro. No. 12-01205, 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ...................... 2

*Picard v. Shapiro (In re BLMIS)*,
  542 B.R. 100 (Bankr. S.D.N.Y. 2015) ................................................................. 32, 41

*Picard v. Square One Fund Ltd.*,
  Bench Ruling on Motion to Dismiss, Adv. Pro. No. 10-04330 ................................................. 40

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
  525 B.R. 871 (Bankr. S.D.N.Y. 2015) ................................................................. 21, 23

*Roby v. Corp. of Lloyd's*,
  796 F. Supp. 103 (S.D.N.Y. 1992) ..................................................................... 49

*Roby v. Ocean Power Techs., Inc.*,
  2015 WL 1334320 (D.N.J. Mar. 17, 2015) ............................................................. 47

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ............................................................................ 39

*Rubinbaum LLP v. Related Corp. Partners V, L.P.*,
  154 F. Supp. 2d 481 (S.D.N.Y. 2001) ................................................................. 20

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ............................................................................ 10

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
  48 F. Supp. 3d 675 (S.D.N.Y. 2014) ................................................................. 21

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015) ................................................................. 40

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ................................. 39, 43, 45

*Sherman v. A.J. Pegno Constr. Corp.*,
  528 F. Supp. 2d 320 (S.D.N.Y. 2007) ................................................................. 38

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.),*
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...................................................................... 32

*SIPC v. BLMIS (In re Bernard L. Madoff),*
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ................................................................. 41

*SIPC v. BLMIS (In re Madoff Sec.),*
    501 B.R. 26 (S.D.N.Y. 2013) .......................................................................... 37, 45

*Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.),*
    548 B.R. 300 (Bankr. C.D. Cal. 2016) ................................................................ 33

*SPV OSUS Ltd. v. UBS AG,*
    114 F. Supp. 3d 161 (S.D.N.Y. 2015) ................................................................. 27

*Strauss v. Credit Lyonnaise, S.A.,*
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..................................................................... 24

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) .................................................................................. 19

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ............................................................................................ 40

*United States v. Int'l Longshoremen's Ass'n,*
    518 F. Supp. 2d 422 (E.D.N.Y. 2007) ................................................................ 38

*Walden v. Fiore,*
    571 U.S. 277 (2014) .............................................................................. 16, 17, 20

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016) ................................................................................ 28

*Washington v. U.S. Tennis Ass'n, Inc.,*
    290 F. Supp. 2d 323 (E.D.N.Y. 2003) ................................................................ 49

**Statutes**

11 U.S.C. § 546(e) ................................................................................................ *passim*

11 U.S.C. 548(a)(1)(A) ........................................................................................... 39

11 U.S.C. § 550(a) ................................................................................................ *passim*

15 U.S.C. §§ 78aaa–*lll* ............................................................................................ 1

Article 214 of the French Monetary and Financial Code ......................................... 46

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................ 4, 36

Fed. R. Civ. P. 10(c) ...................................................................................................... 37, 38

Fed. R. Civ. P. 12(b)(2) .................................................................................................... 1

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 1

Fed. R. Civ. P. 12(h) ........................................................................................................ 1

Fed. R. Civ. P. 17(b) ........................................................................................................ 46

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Lyxor Asset** | Lyxor Asset Management Inc. (*f/k/a* SG Asset Management, Inc.), as General Partner of SG AM AI Premium Fund L.P. |
| **Lyxor Premium** | Lyxor Premium Fund (*f/k/a* SGAM Alternative Multi Manager Diversified Fund), now acting by and through its trustee, Societe Generale S.A. |
| **OFI** | OFI MGA Alpha Palmares (*f/k/a* Oval Alpha Palmares) |
| **OFI Defendants** | OFI, Palmares, and UMR |
| **Palmares** | Oval Palmares Europlus |
| **PJ Defendants** | SG Suisse, SG UK, SG Audace, SG Equilibrium, Lyxor Premium, SG, SG Luxembourg, OFI, Palmares, and UMR, which moved to dismiss the Trustee's claims for lack of personal jurisdiction. |
| **SG** | Societe Generale S.A., as Trustee for Lyxor Premium Fund and Successor in Interest to Banque de Reescompte et de Placement a/k/a Barep and to Societe Generale Asset Management Banque d/b/a Barep |
| **SG Audace** | SG Audace Alternatif (*f/k/a* SGAM AI Audace Alternatif), now acting by and through its manager, Lyxor Asset Management S.A.S. |
| **SG Defendants** | SG Suisse, SG UK, Lyxor Asset, SG Audace, SG Equilibrium, Lyxor Premium, SG, and SG Luxembourg |
| **SG Equilibrium** | SGAM AI Equilibrium Fund (*f/k/a* SGAM Alternative Diversified Fund), now acting by and through its liquidator, KPMG Advisory Sarl |
| **SG Lugano** | Societe Generale Private Banking (Lugano-Svizzera) S.A., predecessor in interest to SG Suisse |
| **SG Luxembourg** | Societe Generale Luxembourg (*f/k/a* Societe Generale Bank & Trust S.A.) |
| **SG Premium** | SG AM AI Premium Fund L.P. |
| **SG Suisse** | Société Générale Private Banking (Suisse) S.A. (*f/k/a* SG Private Banking Suisse S.A.), individually and as successor in interest to SG Lugano |
| **SG UK** | Socgen Nominees (UK) Limited |
| **SGAM Funds** | Lyxor Premium, SG Audace, SG Equilibrium, and SG Premium |
| **UMR** | UMR Select Alternatif |

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law and declarations of Kim M. Longo ("Longo Decl.") and Olivier Moriceau ("Moriceau Decl."), in opposition to the two motions to dismiss the Complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(2) and 12(b)(6) of: (i) defendants Société Générale Private Banking (Suisse) S.A. (*f/k/a* SG Private Banking Suisse S.A.) ("SG Suisse"), individually and as successor in interest to Societe Generale Private Banking (Lugano-Svizzera) S.A. ("SG Lugano"); Socgen Nominees (UK) Limited ("SG UK"); Lyxor Asset Management Inc. (*f/k/a* SG Asset Management, Inc.) ("Lyxor Asset"), as General Partner of SG AM AI Premium Fund L.P. ("SG Premium"); SG Audace Alternatif (*f/k/a* SGAM AI Audace Alternatif), now acting by and through its manager, Lyxor Asset Management S.A.S. ("SG Audace"); SGAM AI Equilibrium Fund (*f/k/a* SGAM Alternative Diversified Fund), now acting by and through its liquidator, KPMG Advisory Sarl ("SG Equilibrium"); Lyxor Premium Fund (*f/k/a* SGAM Alternative Multi Manager Diversified Fund), now acting by and through its trustee, Societe Generale S.A. ("Lyxor Premium"); Societe Generale S.A. ("SG"), as Trustee for Lyxor Premium Fund and Successor in Interest to Banque de Reescompte et de Placement a/k/a Barep and to Societe Generale Asset Management Banque d/b/a Barep; and Societe Generale Luxembourg (*f/k/a* Societe Generale Bank & Trust S.A.) ("SG Luxembourg") (collectively, the "SG Defendants"); and (ii) defendants OFI MGA Alpha Palmares (*f/k/a* Oval Alpha Palmares) ("OFI"); Oval Palmares Europlus ("Palmares"); and UMR Select Alternatif ("UMR") (collectively, the "OFI Defendants", and together with the SG Defendants, "Defendants").

### PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, this action seeks to recover approximately $137 million in subsequent transfers that Defendants received from Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and collectively, the "Fairfield Funds"). Defendants for years invested in BLMIS through the Fairfield Funds and other BLMIS feeder funds—investment funds created for the express purpose of feeding their investors' money to BLMIS in New York. Nonetheless, each of the Defendants other than Lyxor Asset (together, the "PJ Defendants") argue that the case should be dismissed because this Court lacks jurisdiction over them.[1] The Defendants also argue that the safe harbor under Section 546(e) bars recovery. In addition, the SG Defendants argue that (i) they did not receive any transfers of customer property and (ii) the Trustee has failed to provide sufficient notice of his claims.[2] Each of these arguments is substantially the same as those recently made by defendants and rejected by this Court in two other subsequent transfer cases. *See Picard v. Multi-Strategy Fund Ltd.*, Adv. Pro. No. 12-01205, 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ("*Multi-Strategy*"); *Picard v. Banque Syz & Co. SA.*, Adv. Pro. No. 11-02149, 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque Syz*"). In addition, the OFI Defendants argue that they lack legal existence and the capacity to be sued under French law. All of Defendants' arguments fail.[3]

---

[1] By not arguing otherwise, Lyxor Asset has conceded that this court has jurisdiction over it. *See* FRCP 12(h).

[2] By not arguing otherwise, the OFI Defendants have conceded that they received transfers of customer property and that the Trustee provided sufficient notice of his claims.

[3] The SG Defendants' Motion to Dismiss is referred to herein as the "SG Motion" and the OFI Defendants' Motion to Dismiss is referred to herein as the "OFI Motion" (together, the "Motions").

First, there is no question that this Court has personal jurisdiction over the PJ Defendants. Each purposefully invested in the Fairfield Funds knowing that BLMIS in New York was the *de facto* investment manager, broker dealer, and custodian of the Fairfield Funds' investments.[4] Each knew that the Fairfield Funds fed substantially all of their assets into BLMIS and that BLMIS was essential to the funds' investments. Investing in BLMIS was the entire point. These facts, plus the additional U.S. contacts discussed herein, establish jurisdiction.

Second, the Trustee has plausibly alleged that the SG Defendants received customer property under Section 550(a) by outlining the relevant pathways through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to the SG Defendants. The Trustee has also alleged the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer received by the SG Defendants. Nothing more is required at this stage of the litigation. In response, the SG Defendants argue that the Trustee must show a dollar-for-dollar accounting at the pleading stage and argue that the Trustee's claims are implausible under an undisclosed, but clearly fact-bound, tracing methodology. The SG Defendants' arguments are plainly inappropriate on a motion to dismiss and run contrary to well established case law in this liquidation.

Third, the Trustee has also plausibly alleged the avoidability of the initial transfers from BLMIS based on the Fairfield Funds' actual knowledge of fraud, and therefore the safe harbor for settlement payments pursuant to securities contracts under Section 546(e) is inapplicable and does not bar recovery from Defendants. Both the SG Defendants and the OFI Defendants assert that *their* knowledge as *subsequent transferees* should determine the avoidability of *initial transfers*

---

[4] Allegations made herein and throughout as to the activities of Defendants, collectively or individually, are meant to include those of predecessors.

3

from BLMIS.  This argument conflicts with the plain language of the statute as well as clear precedent in this SIPA liquidation proceeding.

Fourth, consistent with FRCP 8, the Trustee's Complaint provides a "short and plain statement" showing that the Trustee is entitled to relief.[5]  The SG Defendants' argument to the contrary conflicts with precedent from the District Court, and regardless, this Court may take judicial notice of the operative complaint and its opinion in *Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021), in which the Court held that the Trustee plausibly alleged the avoidability of the initial transfers to the Fairfield Funds.

Finally, French statutes governing investment vehicles such as the OFI Defendants do not, as they contend, make the OFI Defendants immune to lawsuits.  In fact, their own manager, OFI Asset Management, has previously litigated in an unrelated case before a U.S. court on behalf of other OFI funds, as plaintiffs, and submitted a sworn declaration there that it had the authority to do so.

For these reasons, as further detailed below, the Trustee respectfully requests that the Court deny the Motions.

## STATEMENT OF FACTS

## I.     THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008.  *See* Compl. ¶¶ 54, 63, ECF No. 1.[6]  BLMIS had three principal business units: (i) a proprietary trading

---

[5] After the Trustee filed his Complaint against Defendants, the Trustee filed a Second Amended Complaint against the Fairfield Greenwich Group defendants.  *See* Second Amended Complaint, *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

[6] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Societe Generale Private Banking (Suisse) S.A., et al.*, Adv. Pro. No. 12-01677 (CGM) (Bankr. S.D.N.Y.).

business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.* ¶ 54. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 55-57. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶¶ 58-60. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 42.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created to funnel investors' monies into BLMIS. *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022). Each of the SG Defendants and OFI Defendants invested in one or more of the Fairfield Funds, which they knew were BLMIS feeder funds. Compl. ¶¶ 8-25, 31. Certain SG Defendants knowingly invested in BLMIS through other feeder funds as well, including Kingate Global Fund, Ltd. ("Kingate Global").[7] Compl. ¶¶ 8, 17, 25, 31.

---

[7] In light of the Trustee's settlement with Kingate Global and its related entities, the Trustee's claims seeking recovery of Kingate Global subsequent transfers resulting from these investments were dismissed pursuant to a Stipulation and Order entered on April 18, 2022. ECF No. 133.

That stipulation also changed the names of or dismissed certain defendants named in the original complaint, the effect of which (i) dismissed one defendant that only received Kingate Global transfers, (ii) changed certain parties from whom the Fairfield Fund transfers are being sought (though it did not change the total amount of Fairfield Fund transfers at issue), and (iii) dismissed SG AM AI Premium Fund L.P. as a defendant in the case. As to point (iii), Defendant Lyxor Asset is being sued solely in its capacity as a General Partner of SG AM AI Premium Fund L.P., and as such, any discussions as to the Defendants or the SG Defendants, as applicable, is intended to include SG AM AI Premium Fund L.P.

## II.    DEFENDANTS AND THEIR INVESTMENTS IN THE FAIRFIELD FUNDS

Each of the SG Defendants was, during the relevant period, a member of the Societe Generale group of companies, one of the largest foreign banking organizations in the United States, with thousands of U.S.-based employees and a branch office in New York.  Compl. ¶ 36.  Each of the OFI Defendants was, during the relevant period, managed by OFI Asset Management, a more than 50 year old French asset management company with billions of Euros in assets under management.[8]  The OFI Defendants' subscriptions and redemptions were made into and out of Sentry accounts in the name of "[SG Luxembourg] / [OFI Defendant]."  Compl. ¶¶ 21-24.  As such, SG Luxembourg acted as agent to and/or invested in and redeemed from Sentry jointly with the OFI Defendants.

Defendants began investing in the Fairfield Funds in the late 1990s.  Longo Decl., Ex. 1. During the six-year period prior to BLMIS's collapse, (i) each of the Defendants received transfers from Sentry, totaling over $128.6 million in the aggregate, (ii) Defendants SG Suisse and SG Luxembourg received transfers from Sigma, totaling over $2 million in the aggregate, and (iii) Defendant SG Suisse received transfers from Lambda, totaling over $6.2 million.  Compl. ¶¶ 73-75, Exs. E, G, I.  Specifically, Defendants received the following subsequent transfers (via the initial transferee(s) indicated):

| Defendant | Fairfield Fund(s) | Transfers |
|---|---|---|
| SG Suisse (individually) | Sentry | $26,045,522 |
|  | Sigma | $1,841,857 |
|  | Lambda | $6,287,866 |

---

[8] *See* OFI Motion, Declaration of Jean-Pierre Grimaud ("Grimaud Decl."), ¶¶ 1, 3; THE OFI GROUP STORY, available at https://www.ofi-am.fr/corporate/en/our-history (last accessed June 26, 2022).

| SG Suisse (as successor to SG Lugano) | Sentry | $214,541 |
| | Sigma | $112,962 |
| SG UK | Sentry | $3,862,228 |
| Lyxor Asset (as General Partner of SG Premium) | Sentry | $973,253 |
| SG Audace | Sentry | $1,223,229 |
| SG Equilibrium | Sentry | $32,270,698 |
| Lyxor Premium | Sentry | $8,580,866 |
| SG (as successor to Banque de Reescompte et de Placement a/k/a Barep and Societe Generale Asset Management Banque d/b/a Barep) | Sentry | $8,006,419 |
| SG Luxembourg | Sentry | $14,783,132 |
| | Sigma | $135,435 |
| OFI / SG Luxembourg | Sentry | $11,872,316 |
| Palmares / SG Luxembourg | Sentry | $13,732,259 |
| UMR / SG Luxembourg | Sentry | $7,113,675 |

The Fairfield Funds were managed and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership with its principal place of business in New York. *See* Compl. ¶ 4; *Fairfield Inv. Fund*, 2021 WL 3477479, at *9. Sentry was a U.S. dollar-denominated fund that invested all or substantially all of its assets with BLMIS. Compl. ¶ 4; *Picard v. Sentry Limited, et al.*, No. 08-01789 (CGM), Adv. Proc. No. 09-01239, ECF No. 23 (the "*Fairfield Am. Compl.*") ¶¶ 52, 318. Sigma and Lambda acted as foreign currency feeder funds, respectively facilitating Euro and Swiss Franc investments with BLMIS and investing all or substantially all their assets with Sentry. Compl. ¶ 5; *Fairfield Am. Compl.* ¶¶ 52, 57.

As was required for investors in the Fairfield Funds, each Defendant entered into one or more subscription agreements with each of the Fairfield Funds in which it invested. Compl. ¶¶ 8-24. In these agreements, such Defendant acknowledged its sophistication as a "professional

investor." *Id..* ¶ 34. It also agreed to New York choice of law, jurisdiction, and forum clauses. *Id.*, ¶ 33; Longo Decl., Exs. 2, 3. The subscription agreements also incorporated the Fairfield Funds' Information Memoranda ("IMs") or Private Placement Memoranda (together with IMs, "PPMs"), and by signing, investors like Defendants warranted that they had "received and read" a copy of the PPMs. Longo Decl., Exs. 2, 3, 4. The PPMs for each of Sentry, Sigma, and Lambda disclosed how the services of BLMIS were "essential" to the "continued operation" and/or "profitability" of the funds. *Id.*, Ex. 5 at p. 10, Ex. 6 at p. 8, Ex. 7 at p. 17. The PPMs also disclosed BLMIS's multiple roles as the *de facto* investment manager, broker dealer, and custodian for the Fairfield Funds and highlighted the numerous U.S. connections inherent in investing in the Fairfield Funds. With respect to Sentry, as with other investors, each Defendant sent subscription payments to and received redemptions from Sentry's bank account at HSBC in New York (the "HSBC New York Account"). Compl. ¶ 34; Longo Decl., Exs. 2, 8-16. Subscription payments were then deposited into BLMIS's account at JP Morgan Chase Bank in New York. *Fairfield Am. Compl.* ¶ 35.

In addition, all PJ Defendants for which the Trustee has relevant documents designated and used a New York correspondent bank account with which to receive Sentry redemptions and make subscription payments. Specifically:

- SG Suisse designated and used a bank account at Societe Generale's New York branch for its redemptions. Longo Decl., Ex. 17.

- SG Suisse predecessor SG Lugano designated and used a bank account in the name of Euroclear at the Bank of New York in New York for its redemptions. *Id.*, Ex. 19.

- Another SG Suisse predecessor, Bancaire Genève, designated and used a bank account at Citibank in New York for its subscriptions and redemptions.[9] *Id.*, Exs. 11, 13, 18.

---

[9] Under New York law, a successor-in-interest can "step into the jurisdictional shoes" of its predecessor. *See In re Motors Liquidation Co,* 565 B.R. 275, 287-88 (Bankr. S.D.N.Y. 2017) ("In New York, the general rule in such cases

- SG UK designated and used a bank account at Societe Generale's New York branch for its redemptions. *Id.*, Ex. 20.

- SG predecessors (i) Banque de Reescompte et de Placement a/k/a Barep and (ii) Societe Generale Asset Management Banque d/b/a Barep, designated and used a bank account at Societe Generale's New York branch for subscriptions and redemptions. *Id.*, Exs. 2, 21.

- SG Luxembourg designated and used a bank account at Societe Generale's New York branch for its subscriptions and redemptions. *Id.*, Exs. 9, 22.

- OFI and SG Luxembourg designated and used a bank account at Societe Generale's New York branch for redemptions of their joint investments. Compl. ¶ 22; Longo Decl., Ex. 23.

- Palmares and SG Luxembourg designated and used a bank account at Societe Generale's New York branch for redemptions of their joint investments. Compl. ¶ 23; Longo Decl., Ex. 24.

- UMR and SG Luxembourg designated and used a bank account at Societe Generale's New York branch for redemptions of their joint investments. Compl. ¶ 24; Longo Decl., Ex. 25.

With respect to its Sigma transactions, SG Suisse designated the same bank account at Societe Generale's New York branch to receive redemption payments and make subscription payments as it used for Sentry. *Id.*, Ex. 26.

Moreover, as set forth more fully herein, Defendants SG Audace, SG Equilibrium, and Lyxor Premium, as well as SG Premium (whose transfers are now being sought by the Trustee from Defendant Lyxor Asset, its general partner) (together, the "SGAM Funds") communicated on multiple occasions with U.S.-based FGG personnel, as did CBG Compagnie Bancaire Genève (predecessor to Defendant SG Suisse), SG Luxembourg, and Societe Generale's New York-based Global Co-Head of Hedge Fund Risk Management on behalf of the Societe Generale enterprise, including all Defendants. *See infra* at pp. 20-22.

---

is that the successor-in-interest may be subject to jurisdiction based on the activities of its predecessor.") (quotation omitted).

Following BLMIS's collapse, the Trustee filed an adversary proceeding in this SIPA liquidation proceeding against the Fairfield Funds and related defendants to avoid and recover fraudulent transfers of stolen customer property. Compl. ¶ 67. In 2011, the Trustee settled with the Fairfield Funds. *Id.* ¶ 68. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion, but repaid only $70 million to the BLMIS estate. *Id.* Sigma and Lambda separately consented to judgments in the amounts of $752.3 million and $52.9 million, respectively. *Id.* As feeder funds that invested in BLMIS indirectly through Sentry, these amounts represent a portion of Sentry's $3.054 billion in withdrawals from BLMIS. *See Picard v. Fairfield Sentry Ltd. (In Liquidation)*, Adv. No. 09-01239 (CGM) (Bankr. S.D.N.Y. May 18, 2009), ECF Nos. 108 (Lambda Consent Judgment) and 110 (Sigma Consent Judgment). The Trustee then commenced a number of adversary proceedings to recover the approximately $3 billion in missing customer property, including the above-captioned matter.

## **ARGUMENT**

## I.     **THIS COURT HAS PERSONAL JURISDICTION OVER THE PJ DEFENDANTS**

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established solely by allegations." *Id.* at 84–85 (finding "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction"). A plaintiff also may establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits are to be construed in the light most favorable to the plaintiff, resolving all doubts in plaintiff's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

10

Specific jurisdiction exists where the defendant purposely directs its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).[10]  The specific jurisdiction analysis is a two-step inquiry.  First, the court assesses whether the defendant purposefully established "minimum contacts" in the forum, such that the defendant purposefully availed itself of the privilege of conducting activities with the forum.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985).  "The defendant's activities need not have taken place within the forum, and a single transaction with the forum will suffice."  *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011).  Defendant's contacts need only be related to the plaintiff's claims, such as where the "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum."  *In re Fairfield Sentry Ltd.*, 627 B.R. at 566.

Second, the court conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend traditional notions of "fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at 320.  To determine whether jurisdiction is reasonable, courts consider the following:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the shared interest of the states in furthering social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).  Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a

---

[10] General jurisdiction is based on the defendant's general business contacts with the forum and permits a court to exercise jurisdiction where the claims are unrelated to those contacts.  *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014).  Here, the Trustee's claims arise out of the PJ Defendants' specific contacts with the forum and a finding of general jurisdiction is unnecessary.

"compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's contacts establish personal jurisdiction, the court must look at "the totality of the circumstances" rather than analyze each contact in isolation. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also Chloe*, 616 F.3d at 163-64 (analyzing totality of defendants' contracts to determine jurisdiction under New York's long-arm statute and the Due Process Clause); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's contacts* with the forum state must indicate that the exercise of jurisdiction would be proper.").

### A. The PJ Defendants Purposefully Availed Themselves of the Laws and Privileges of Conducting Business in New York by Investing with the Fairfield Funds

The PJ Defendants had numerous contacts with New York and the United States that establish this Court's jurisdiction.[11] They (1) purposefully targeted the New York securities market by investing in the Fairfield Funds (and, as to some Defendants, Kingate Global), knowing that their assets were managed and custodied by BLMIS in New York; (2) agreed to New York jurisdiction, forum selection, service of process, and choice of law provisions related to their investments; (3) engaged in on-going communications with FGG in New York and Miami with

---

[11] The OFI Defendants also contend that the Court lacks personal jurisdiction over them due to their having no legal existence under French law, relying on *Del Med. Imaging Corp. v. CR Tech USA, Inc.*, 2010 WL 1487994, at *4 (S.D.N.Y. Apr. 13, 2010). OFI Motion at 8. This decision is easily distinguished in that it involved a breach of contract and fraudulent inducement action wherein plaintiff had sued the *business name* of an individual as opposed to the individual. *Del Med. Imaging Corp.*, 2010 WL 1487994, at *4. More importantly, the OFI Defendants here merely repackage their erroneous primary argument—that *fonds commun de placement* ("FCPs"), a type of investment vehicle created by French statute, cannot be sued in this or any other action—which the Trustee addresses fully in Section V *infra*.

respect to their investments; and (4) used New York banks to transact with Sentry and Sigma. Many of these contacts independently establish jurisdiction, and the declarations submitted by the PJ Defendants do not assert any facts to the contrary. In their totality, these contacts plainly establish that the PJ Defendants purposefully directed their activities to New York and the United States. *See Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [defendant]'s Agreement-related contacts are considered together, it is clear [the defendant] purposely availed itself of the forum.").

      **1.**      **The PJ Defendants' Investments in BLMIS through BLMIS Feeder Funds Establish Minimum Contacts**

The intentional investment by the PJ Defendants with BLMIS in New York through known BLMIS feeder funds establishes personal jurisdiction over them. Leaving aside their other contacts that support jurisdiction, the PJ Defendants' deliberate targeting of BLMIS and the New York securities market—through entities expressly constituted for that purpose—is dispositive.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also Maxam*, 460 B.R. at 116–20 (finding jurisdiction where defendant knew and intended that funds invested with BLMIS feeder fund would be sent to BLMIS in New York for investment). By executing subscription agreements and affirming that they received and read the Fairfield Funds' PPMs, the PJ Defendants knew that: (i) Sentry invested all or substantially all of its assets with BLMIS, and Sigma and Lambda invested substantially all of their assets in Sentry; (ii) BLMIS performed all investment management duties for these assets; (iii) BLMIS was registered with the U.S. Securities and Exchange Commission; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

(v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. treasury bills assets; (vi) the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS; and (viii) BLMIS was "essential" to the "continued operation" and/or "profitability" of the funds.[12]  *See* Longo Decl., Exs, 5-7.  Under similar facts, this Court in *BNP* found jurisdiction over an investor defendant based on the U.S. contacts inherent in doing business with the Tremont funds.  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) ("*BNP*") (finding *prima facie* showing of jurisdiction "over any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds").

### a.    *BLI* **Establishes this Court's Jurisdiction over the PJ Defendants**

Based on the demonstrated intention to invest in BLMIS in New York through the Fairfield Funds, this Court has already concluded that investors like the PJ Defendants are subject to personal jurisdiction in *Picard v. Bureau of Labor Insurance (In re BLMIS)*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*").  There, as here, the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of dollars in Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *BLI*, 480 B.R. at 506.  There, as here, the subsequent transferee was provided with Sentry's PPMs and executed subscription agreements establishing the investment's BLMIS-centric purpose.  *Id.* at 507–08.  And there, as here, the subsequent transferee argued that the foreseeability of its

---

[12] Defendants SG Equilibrium, SG Suisse, and SG Luxembourg likewise knew, when they invested in Kingate Global, that those investments were also being funneled to New York.  Kingate stated in its Information Memorandum that the fund's assets had been managed since its inception "by a New York based NASD registered broker-dealer…[utilizing] a 'split strike conversion' options strategy" and that such broker-dealer "invests primarily in the United States." *See* Longo Decl., Ex. 41 at pp. ii, 2.

investment ending up in a BLMIS account was insufficient to support personal jurisdiction.  *Id.* at

516-17.  Not only did the Court reject this argument, Judge Lifland called it "disingenuous,"

explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an
> account at BLMIS as a result of happenstance or coincidence.
> Rather, BLI purposefully availed itself of the benefits and
> protections of New York laws by knowing, intending and
> contemplating that the substantial majority of funds invested in
> Fairfield Sentry would be transferred to BLMIS in New York to be
> invested in the New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. No. 08-99000

(SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation

have already "confirmed that defendants who invested directly or indirectly with BLMIS and

received payments from BLMIS as an initial transferee or subsequent transferee of those initial

transfers were subject to the Court's personal jurisdiction"); *Banque Syz* at *3 (holding that

defendant "knowingly directed funds to be invested with New York-based BLMIS through Madoff

Feeder Funds.") (quotation omitted).  As explained by this Court, "BLI intentionally tossed a seed

from abroad to take root and grow as a new tree in the Madoff money orchard in the United States

and reap the benefits therefrom."  *BLI*, 480 B.R. at 506; *see also Multi-Strategy* at *4 (citing same

and holding that "Defendant's alleged contacts with New York are not random, isolated, or

fortuitous."); *Banque Syz* at *4 (same).

Although the Court in *BLI* did reference defendant's additional New York contacts in its

decision—such as BLI's use of a New York bank account for subscriptions and redemptions,

contacts that are also present here—the Court did not rely on these contacts in reaching its holding.

*See BLI*, 480 B.R. at 508.  Rather, the Court was unequivocal throughout its opinion that BLI's

intentional investment with a BLMIS feeder fund expressly designed to funnel those investments

to BLMIS in New York was sufficient to establish personal jurisdiction.  *See BLI*, 480 B.R. at 517

("In a nutshell, BLI invested tens of millions of dollars in Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York, and intended to profit from this U.S.-based investment."). In fact, in addressing BLI's separate argument concerning its New York bank accounts, the Court noted that its decision was not "rooted in the mere existence of these accounts. Instead . . . BLI directed its investment towards the forum State, thereby purposefully availing itself of the benefits and protections of New York laws." *Id.* at 515, n.14.

Because the PJ Defendants are identically situated to the defendant in *BLI* with respect to the fundamental purpose of their investments, *BLI* is controlling and resolves these Defendants' personal jurisdiction defense without the need for inquiry into their additional New York contacts. For SG Equilibrium, SG Suisse, and SG Luxembourg, the evidence that they purposefully targeted the New York securities market is even stronger because these SG Foreign Defendants also invested in Kingate Global—similarly constituted to feed foreign investments directly to BLMIS in New York.[13] *See* Compl. ¶¶ 6, 8, 17, 25, 31. Faced with the obvious weight of *BLI*, the PJ Defendants in their Motions ignore the decision entirely.

> **b.** **Walden Does Not Save the PJ Defendants from this Court's Jurisdiction**

Having failed to even mention *BLI*, the PJ Defendants cite *Walden v. Fiore* to frame the jurisdictional analysis through a false lens of "foreseeability." 571 U.S. 277 (2014). However, the facts and applicable law of *Walden* are significantly different from those here. The defendant in *Walden*, a Georgia police officer, had no purposeful minimum contacts with the forum state of Nevada. *Id.* at 288–89. The officer had "never traveled to, conducted activities within, contacted

---

[13] This Court, in its recent Memorandum Decision in *Multi-Strategy*, stated that despite the similar dismissal in that case of claims related to transfers from Kingate Global, "allegations regarding the Defendant's investment in multiple BLMIS feeder funds lends support to the Trustee's allegations that Defendant purposefully invested in BLMIS." *Multi-Strategy* at *3, n.2.

anyone in, or sent anything or anyone to Nevada," nor was the officer's seizure of funds predicated in any way on the fact that their intended destination was Nevada. *Id.* at 289. Applying the "effects test," the Supreme Court found that the defendant had "formed no jurisdictionally relevant contacts with Nevada" and that he could not be sued in Nevada for an unlawful seizure of money in Georgia merely because he knew the plaintiff resided in Nevada. *Id.* at 289–91. In this regard, the Court simply reaffirmed the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *Id.* at 284 & 289 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

This Court recently determined under similar circumstances that *Walden* was "no assistance to Defendant." *Multi-Strategy* at *4. As a preliminary matter, the Trustee's allegations implicate the Supreme Court's "purposeful availment" framework (not the "effects" test), a concept that the Court in *Walden* did not reference, let alone apply. Nor is the police officer's lack of "any jurisdictionally relevant contacts with Nevada", *Walden,* 571 U.S. at 289, analogous to the PJ Defendants intentionally directing millions of dollars in investments over as long as a decade or more to a New York investment manager, broker dealer, and custodian through feeder funds formed for this express purpose. *Id.* at 290 ("The proper question is . . . whether the defendant's conduct connects him to the forum in a meaningful way."). Consistent with *Walden*, the PJ Defendants' contacts with New York are "intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The PJ Defendants' efforts to downplay their investments' New York destination as just a "foreseeable" consequence rather than a deliberate and purposeful targeting of the forum is the same "disingenuous" argument this Court rejected in *BLI*. This Court should reaffirm *BLI* and hold that these Defendants' purposeful targeting of New York and its laws by "knowing, intending

and contemplating" investing with BLMIS through the Fairfield Funds establishes personal

jurisdiction over the PJ Defendants. *BLI*, 480 B.R. at 517.

### 2.    The Forum Selection and Choice of Law Clauses in the Subscription Agreements Are Strong Jurisdictional Contacts

The Fairfield Funds' subscription agreements further evidence a "strong nexus with New

York" that supports jurisdiction. *See BLI*, 480 B.R. at 517, n.15. *See also* Compl. ¶¶ 33-34.

Subscribers into each of the Fairfield Funds submitted to venue in New York, the jurisdiction of

the New York courts, the service of process from New York courts, and the application of New

York law. *Id.* ¶ 33; Longo Decl., Exs. 2, 3. The PJ Defendants argue that these provisions, and

subscription agreements generally, are irrelevant to jurisdiction because the Trustee is not a party

to the agreements and his claims do not arise under the subscription agreements.[14] SG Motion at

16-17; OFI Motion at 12-14. But the Trustee is not arguing that this Court has jurisdiction based

on these Defendants' consent. Rather, the Fairfield Funds' subscription agreements provide

further evidence that the PJ Defendants purposefully availed themselves of the protections and

benefits of New York. As such, contrary to the PJ Defendants' argument, Judge Bernstein's

decision in the Fairfield Chapter 15 liquidation proceedings, where the Fairfield liquidators did

argue that defendants had consented to personal jurisdiction based on the New York provisions in

subscription agreements, is of no relevance here. *See Fairfield Sentry Ltd. v. Theodore GGC

Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. No. 10-03496, 2018 WL 3756343, at *1 (Bankr.

S.D.N.Y. Aug. 6, 2018) (granting motion to dismiss for lack of personal jurisdiction to the extent

---

[14] The OFI Defendants further argue in their motion that none of the OFI Defendants ever entered into a Sentry subscription agreement because their "custodian of assets" signed the subscription agreements on their behalf. OFI Motion at 14. This is a factual assertion counter to the Trustee's allegations in his Complaint, which must be accepted as true at the pleading stage. Compl. ¶¶ 21-24. This is also inconsistent with Citco records identifying the relevant Sentry subscriber accounts as being in the names of both SG Luxembourg and the particular OFI Defendant. *See* Longo Decl., Exs. 23-25. At best, the OFI Defendants' argument raises fact issues as to their relationship with SG Luxembourg to be addressed after a motion to dismiss.

that personal jurisdiction based "solely" on the forum selection clause in the subscription agreements); *see also Multi-Strategy* at *5; *Banque Syz* at *5.

"[A] choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank v. Banque Generale Du Commerce*, No. 96 CIV 5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *see also Burger King*, 471 U.S. at 482 ("Although such a [choice of law] provision standing alone would be insufficient to confer jurisdiction . . . it reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law."). For example, in *BLI*, the Court, without addressing the issue of whether defendants consented to jurisdiction, found that the clauses in the subscription agreements "further evidenc[e] the strong nexus with New York." 480 B.R. at 517, n.15. Similarly, in *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, the court held that, even if defendant's agreement to New York forum and choice of law provisions did not constitute consent, the provisions helped establish minimum contacts to support specific jurisdiction. 565 B.R. 275, 288–89 (Bankr. S.D.N.Y. 2017) (finding agreement provisions under New York law plus correspondent banking in New York evidenced a relationship "centered in New York").

Moreover, the Fairfield Funds' subscription agreements plainly "relate to" the Trustee's claims. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (finding that plaintiffs' claims related to defendant's in-state activity and rejecting "strict causal

relationship between the defendant's in-state activity and the litigation"). The PJ Defendants' subscriptions in and redemptions from the Fairfield Funds are two sides of the same coin. Because these Defendants' subscription agreements were necessary predicates to their receipt of customer property through Sentry, the subscription agreements are sufficiently related to the Trustee's claims to recover that customer property from the PJ Defendants.

### 3. The U.S.-Based Communications of Certain Defendants with FGG also Establish Minimum Contacts

While physical presence in a forum is not a prerequisite to establishing jurisdiction, "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (citing *Keeton*, 465 U.S. at 773–74). Other types of communications can also be contributing factors for finding personal jurisdiction. *See Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11-3673(RJS), 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012) (communications including emails, phone calls, and video conferences with company in New York subjected defendant to personal jurisdiction); *Rubinbaum LLP v. Related Corp. Partners V, L.P.*, 154 F. Supp. 2d 481, 493 (S.D.N.Y. 2001) (telephone calls with and correspondence sent to investors in New York contributed to a showing of personal jurisdiction); *In re Dewey & LeBoeuf LLP*, 522 B.R. 464, 475 (Bankr. S.D.N.Y. 2014) (personal jurisdiction appropriate where defendant corresponded with partners in New York office of law firm). Defendants have similar U.S. contacts.

Beginning in the fall of 2002, personnel from New York-based Defendant Lyxor Asset, then known as SG Asset Management, Inc., along with other New York based personnel of Societe Generale's asset management business, communicated directly with FGG in New York, and through FGG's agent Caledon Capital Partners LLP, on behalf of the SGAM Funds concerning Sentry. *See* Longo Decl., Exs. 27-33. These communications related to subscription requests and

confirmations, phone calls between Lyxor Asset and FGG personnel in New York, scheduling of

monthly or semi-monthly meetings between Lyxor Asset and FGG in New York, requests for

transparency and receipt of documents related to the fund, and redemptions, including the transfers

that are the subject of the Trustee's complaint.  *Id.*  By such New York communications, meetings,

and conduct of business, Lyxor Asset acted as the SGAM Funds' agent with respect to their

BLMIS feeder fund investments.  *See Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,

525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (conduct of agent is attributed to principal for purposes

of jurisdictional analysis); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)

(finding that jurisdiction based on the acts of agents is determined based on the "realities of the

relationship in question"); *see also Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d

675, 685 (S.D.N.Y. 2014) ("In order to make a prima facie showing of jurisdiction under an agency

theory, the plaintiff does not need to establish a 'formal agency relationship'.").

Beyond the SGAM Funds, the Trustee has documents showing similar email and facsimile

communications with FGG U.S.-based personnel by (i) Defendant SG Luxembourg, with FGG in

New York, concerning a large Sentry subscription in 2006 (Longo Decl., Ex. 34), and

(ii) Defendant SG Suisse predecessor CBG Compagnie Bancaire Genève, with FGG in Miami,

concerning a 2001 Sentry subscription and requests for information on Sentry in 2003 (*Id.*, Exs.

35, 36).  In addition, in October 2007, Societe Generale's New York-based Global Co-Head of

Hedge Fund Risk Management participated in a conference call on Sentry with FGG New York

personnel, and in connection with that call, he requested and received information on both Sentry

and BLMIS.  *Id.*, Exs. 37-38.  In October 2008, he requested and received from FGG New York

personnel a report on Sentry's assets under management.  *Id.*, Ex. 39.  His New York contacts

were undertaken on behalf of the entire Societe Generale enterprise, including all Defendants, as

21

Societe Generale had by 2007 adopted an organization-wide risk management system for its hedge fund investments in recognition of the fact that, as stated in its 2007 French financial market registration forms, "[h]edge funds generate specific risks due to the lack of regulations governing their activities." *Id.*, Ex. 40. This included "the centralization of all risk exposure on hedge funds with the Risk Division which monitors counterparty and market risk on a daily basis." *Id.*[15]

> **4.** **The PJ Defendants' Purposeful Use of New York Bank Accounts Establishes Specific Jurisdiction**

This Court further has jurisdiction because the PJ Defendants purposefully used the New York banking system to subscribe into and redeem from Sentry and, in the case of SG Suisse, Sigma as well.

> **a.** **The PJ Defendants Intentionally and Repeatedly Used New York Bank Accounts for their Investments**

Courts have often held that a defendant's use of a domestic bank account is sufficient to establish personal jurisdiction.[16] *See, e.g.*, *Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271119, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (finding jurisdiction under New York long-arm statute based solely on defendants' use of a New York account to receive fraudulent conveyances at issue); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (finding jurisdiction in

---

[15] Given the capacity in which he was acting, it is self-evident that the actions and knowledge of this senior executive are imputed to the organization as a whole. *See In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 517-18 (S.D.N.Y. 2009) ("Acts performed and knowledge acquired by a corporate officer or agent within the scope of his or her employment are imputed to the corporation."), *aff'd in part*, *vacated in part sub nom. Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 412 F. App'x 325 (2d Cir. 2011).

[16] Certain cases discussed herein address jurisdiction under New York's long-arm statute. Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g.*, *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405(DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous" (citations omitted)).

New York based solely on defendant's use of New York accounts to facilitate alleged fraud).  In this SIPA liquidation proceeding, this Court has also found jurisdiction where initial and subsequent transferee defendants received transfers from U.S. bank accounts.  *See Multi-Strategy* at *4 (finding jurisdiction over subsequent transferee defendant that "sent wiring instructions specifically designating a New York-based bank account to which Defendant directed FGG to wire Defendant's redemption payments from Fairfield Sentry, and from which Defendant was going to fund its subscriptions in Fairfield Sentry") (quotation omitted); *BNP*, 594 B.R. at 191 (finding jurisdiction over subsequent transferee defendants that sent subscriptions to, and received redemptions from, feeder funds' New York bank account); *Igoin,* 525 B.R. at 884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction over initial transferee defendants who received transfers from BLMIS's New York bank account).

Here, without the benefit of any discovery, as detailed at pp. 8-9, *supra*, the Trustee has documents confirming that each of the PJ Defendants other than the SGAM Funds designated and used a U.S. bank account to send subscriptions to and/or receive redemptions from Sentry, with SG Suisse having also designated the same New York bank account to receive redemptions from and send subscriptions to Sigma as it used for Sentry.  Upon information and belief based on their use of U.S.-based Lyxor Asset as agent for their BLMIS-related investment activity, the SGAM Funds likely designated and used U.S. accounts as well.  And all of the PJ Defendants used Sentry's HSBC New York Account for subscriptions and redemptions.  *Id*.  Based on the foregoing case law, these uses of bank accounts alone are sufficient to confer personal jurisdiction.  *See Bartlett v. Societe Generale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *5 n.2 (E.D.N.Y. Nov. 25, 2020) ("A single transaction is sufficient to satisfy this [jurisdictional] requirement, provided the relevant claims arise from that transaction.").

That the accounts were correspondent does not change the analysis.  In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established" provided that such use was "purposeful."  20 N.Y.3d 327, 338, 984 N.E.2d 893, 899 (2012); *see also Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 67–69 (Bankr. S.D.N.Y. 2016) (finding jurisdiction based on designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322–29, 68 N.E.3d 1, 3-10 (2016) (same).  What matters is that the use was "purposeful," and not coincidental or passive. *See Licci*, 984 N.E.2d at 901 (finding jurisdiction where use of correspondent account was not "coincidental," and distinguishing case where defendant passively received funds due entirely to another party's actions).

Here, the PJ Defendants sent written instructions to Sentry (and Sigma, for SG Suisse) to send redemption payments to New York accounts (*see supra*, pp. 8-9), the large majority of which were at Societe Generale's own New York branch licensed to operate under New York banking laws.[17]  This routine use of Societe Generale's New York branch demonstrates a purposeful availment going beyond the use of correspondent accounts in *Licci* and the other cases cited above. *See Strauss v. Credit Lyonnaise*, *S.A.*, 175 F. Supp. 3d 3, 19 (E.D.N.Y. 2016).

The fact that the HSBC New York Account was Sentry's own account also does not change the analysis, because Defendants agreed to use it.  *See Esso*, 397 F. Supp. 3d at 346 ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for

---

[17] *See* https://www.dfs.ny.gov/system/files/documents/2019/01/ea181119_sanctions.pdf ("Societe Generale has been licensed by the Department to operate a foreign bank branch in New York State since 1978") (last accessed June 26, 2022).

reasons related to the underlying dispute.").  That Sentry's subscription agreements provided for
subscribers to use the HSBC New York Account is of no consequence.  By voluntarily investing
in BLMIS through Sentry, the PJ Defendants agreed to use the HSBC New York Account for
subscriptions into, and redemptions from, the fund.  Each transaction was thus a volitional act that
supports jurisdiction.[18]  *See In re Motors Liquidation Co.*, 565 B.R. at 288–89 (finding defendant's
use of a correspondent account to be purposeful even where payment in New York was dictated
by agreement).

Finally, to the extent the PJ Defendants sent and received payments to and from both their
own accounts and the HSBC New York Account numerous times, purposeful availment may be
inferred from the sheer volume of transactions.  *See Licci,* 984 N.E.2d at 901; *Al Rushaid*, 68
N.E.3d at 5–6; *Gucci Am., Inc. v. Li*, 135 F. Supp. 3d 87, 94–96 (S.D.N.Y. 2015).  Here, SG Suisse
alone had 54 Sentry redemptions sent to its New York account.  *See* Compl. ¶ 73, Ex. E.

### b.    The Trustee's Claims Relate to the PJ Defendants' Use of New York Bank Accounts

The PJ Defendants' purposeful use of bank accounts at Societe Generale New York,
Citibank New York, and the Bank of New York, as well as the HSBC New York Account, supports
jurisdiction because the Trustee's claims "arise out of or relate to" the PJ Defendants' use of these
accounts.  As the Supreme Court recently held, this prong does not require a causal relationship.
*See Multi-Strategy* at *4 (citing *Ford Motor*, 141 S. Ct. at 1026); *Banque Syz* at *4 (same).  Rather,
this prong may be satisfied if defendants' conduct involves "financial transactions that touch the
forum."  *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also Arcapita*, 549 B.R. at 68–71
(requiring only that claim is not completely "unmoored" from transaction).  Because the Trustee's

---

[18] It also makes no difference if a Citco entity chose to use the U.S. correspondent account on behalf of Sentry, as
various Citco entities acted as FGG's agents.  *See* cases cited *supra* on p. 21 as to agency.

causes of action in this proceeding relate to the very transfers that came through the accounts, the PJ Defendants' use of these accounts supports jurisdiction. *See, e.g.*, *HSH Nordbank*, 2012 WL 2921875, at *4 (finding "claims against [defendants] arise directly out of the transfer of funds into [defendant's] New York accounts"). Here, as in *Multi-Strategy*, "the Trustee is asserting subsequent transfer claims against Defendant[s] for monies [they] received from [the Fairfield Funds]. …This lawsuit is directly related to [their] investment activities with Fairfield and BLMIS." *Multi-Strategy* at *4, citing *BNP*, 594 B.R. at 191 (finding that the redemption and other payments the defendants received as direct investors in a BLMIS feeder fund arose from New York contacts such as wiring funds in U.S. dollars to New York and receiving redemption payments from a Bank of New York account in New York, and were the proximate cause of the injuries that the Trustee sought to redress).

### 5.   The SG Defendants' other Arguments Against Jurisdiction Are Unavailing

To evade jurisdiction, the SG Defendants in particular argue that the Trustee must allege that "each individual transfer [he] seeks to recover" was received in New York for this Court to have jurisdiction. SG Motion at 12 (citing *BNP*, 594 B.R. at 190). But the SG Defendants misconstrue the requirements for personal jurisdiction and this Court's decision in *BNP*. Courts have personal jurisdiction over *defendants*, not *transfers*. *See, e.g.*, *Int'l Shoe*, 326 U.S. at 316. Likewise, courts must assess the defendants' contacts with the forum, not the transfer's. *BNP*, 594 B.R. at 189 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."). And provided that the court finds that a defendant's minimum contacts with the forum support specific jurisdiction, the court may adjudicate any claims, provided they are sufficiently related to those contacts. *See Ford Motor*, 141 S. Ct. at 1026–28, 1032.

26

This is exactly what this Court did in *BNP*. The Court did not look at each transfer to determine jurisdiction; the Court assessed each defendant, focused on the overall relationship with the initial transferees and determined it had jurisdiction. *BNP*, 594 B.R. at 191 (finding jurisdiction for "any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds" where "[t]he Tremont Funds were managed from offices in New York, and in their capacity as investors, the Defendants sent subscription agreements to New York, wired funds in U.S. dollars to New York, sent redemption requests to New York and received redemption payments from a Bank of New York account in New York") (citations omitted).

Equally unavailing is the SG Defendants' reliance on two cases involving common law claims between contract parties. Unlike *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015), aff'd, 882 F.3d 333 (2d Cir. 2018), the first case they cite, this is not a dispute between two parties about services owed under a foreign contract.[19] This action is brought by a SIPA Trustee in a SIPA liquidation proceeding to recover fraudulent transfers from investors whose transfers of funds to and from U.S. correspondent accounts evidence an intent to direct activity towards the U.S. securities markets (via BLMIS in New York). *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the 'raison d'etre' of the Agreement between BLI and Fairfield Sentry.").

---

[19] The SG Defendants' reliance on *SPV*, which found no specific jurisdiction because plaintiffs' injuries were not caused by defendants' contacts, is questionable following the Supreme Court's decision in *Ford Motor*, which held that causation is not a prerequisite for jurisdiction. 141 S. Ct. at 1026–30. Also, *SPV*'s finding that the defendants' "sporadic or indirect contacts with the United States" did not support specific jurisdiction, which is cited by the SG Defendants in their Motion (*see* SG Motion at 14), is not availing here given the SG Defendants' extensive jurisdictional contacts discussed above.

Likewise, the SG Defendants give undue significance to a list of jurisdictional factors outlined in *Agency Rent A Car Sys., Inc.*, 98 F.3d at 29, the second case they cite. SG Motion at 14. That case was brought by two Avis entities against certain of their licensees and merely sets forth jurisdictional factors which are typically considered in breach of contract claims.

This Court should also reject the SG Defendants' claim that the transfers the Trustee seeks to recover—redemption payments from the Fairfield Funds—were "purely foreign." *See* SG Motion at 3, 15. The SG Defendants base this claim on arguments made by the Fairfield liquidators in a different case that turns on whether the Section 546(e) safe harbor applies to claims brought under B.V.I. law by foreign liquidators in a chapter 15 proceeding—an issue plainly not relevant here. In *this* case, by contrast, the Second Circuit has already found, "These transfers are domestic activity." *In re Picard*, 917 F.3d at 100 ("When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States.").

## B.    The Exercise of Personal Jurisdiction Over the PJ Defendants Is Reasonable

The PJ Defendants fail to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. Indeed, this Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188.

28

This is not that "rare" case.  Just as this Court found compelling in *Multi-Strategy* and *Banque Syz*:  (i) Defendants have actively participated in this Court's litigation for years.  *Multi-Strategy* at *5; *Banque Syz* at *5; (ii) "[They are] represented by U.S. counsel and 'irrevocably' submitted to the jurisdiction of New York courts when [they] signed [their] subscription agreements with the Fairfield Funds." *Id*.; and (iii) "The forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court." *Multi-Strategy* at *5, citing *Maxam*, 460 B.R. at 117; *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *In re Fairfield Sentry Ltd.*, 627 B.R. at 568; *In re Picard*, 917 F.3d at 103 ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").  Accordingly, this Court's exercise of jurisdiction over the PJ Defendants is more than reasonable.

## C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery.  Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction.  *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009).  The Trustee has shown how the PJ Defendants, *inter alia*, purposefully invested with BLMIS through Madoff's feeder funds, had extensive contacts with FGG personnel in the U.S., and relied upon U.S. bank accounts to subscribe into Sentry and Sigma and to receive BLMIS customer property.  *See supra* pp. 5-10.  At a minimum, these facts establish a "threshold showing" of jurisdiction.  *Kiobel,* 2009 WL 3817590, at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

29

## II.    THE TRUSTEE'S COMPLAINT PLEADS THAT THE SG DEFENDANTS RECEIVED BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)

The SG Defendants (but not the OFI Defendants) argue that the Complaint does not adequately plead that they received BLMIS customer property.  But the Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that the SG Defendants received subsequent transfers of BLMIS customer property.

To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor."  *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–150 (Bankr. S.D.N.Y. 2014) ("*Merkin I*").  No tracing analysis is required, as the pleading burden "is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue." *Id*. at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)); *see also Multi-Strategy* at *6.  Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]."  *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019).  In addition, the Trustee must allege "'the necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds." *Multi-Strategy* at *6, citing *BNP*, 594 B.R. at 195.

The Trustee's Complaint meets these requirements.  The Complaint alleges that the SG Defendants received transfers, identified by date and amount in accompanying exhibits, from Sentry, and that Sentry invested all or substantially all of its funds with BLMIS.  Compl. ¶¶ 4, 67-73, Exs. A–E.  The Complaint likewise alleges that certain SG Defendants received transfers, identified by date and amount in accompanying exhibits, from Sigma and/or Lambda, and that

Sigma and Lambda invested all of their funds with Sentry. *Id.* ¶¶ 5, 67-75, Exs. A–I. Thus, the Complaint plausibly alleges that the SG Defendants received subsequent transfers of customer property by (a) outlining the relevant pathway through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to the SG Defendants and (b) providing the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer. Nothing more is required. *See, e.g.*, *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that subsequent transfer claim was not pled "with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover"). As this Court held in *Multi-Strategy* and *Banque Syz*, these "exhibit[s] provide[] [Defendants] with the 'who, when, and how much' of each transfer." *Multi-Strategy* at *10; *Banque Syz* at *12.

### A.     The SG Defendants Misstate the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the relevant pleading burden, the SG Defendants argue for a new one, asserting that the Trustee must tie each subsequent transfer the SG Defendants received to a specific initial transfer from BLMIS. SG Motion at 3, 19-20. However, the Court already rejected this argument in *Merkin I*, where the Court refused to dismiss subsequent transfer claims even though the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). Likewise, the Court already rejected the argument that the Trustee must detail which and what portion of each subsequent transfer comprises customer property. *See Merkin I*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also*

31

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (finding "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either").

The SG Defendants' reliance on *Picard v. Shapiro* is unavailing because *Shapiro* did not change the pleading burden for recovery under Section 550(a). In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and that "upon information and belief" these defendants subsequently transferred this same amount to other defendants. *See Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 104, 109, 119 (Bankr. S.D.N.Y. 2015). However, that complaint *did not detail any* of the necessary vital statistics of the subsequent transfers. *Id*. at 119. There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers, and consequently this Court granted defendants' motion to dismiss the subsequent transfer claim. *Id*. Here, where the Trustee has alleged the vital statistics of each transfer the SG Defendants received, *Shapiro* supports denying the motion to dismiss.

## B.     The SG Defendants' Tracing Arguments Fail on a Motion to Dismiss

The SG Defendants' other customer property arguments are fact-based, tracing arguments inappropriate on a motion to dismiss. First, the SG Defendants claim that some unspecified number of the transfers they received from the Fairfield Funds were comprised of subscription payments from other investors. SG Motion at 21–24. In other words, the SG Defendants argue that Sentry commingled customer property with other funds, and this commingling will defeat the Trustee's ability to trace the transfer of customer property from BLMIS. *Id*. Again, the SG Defendants are wrong. "The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing." *Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073 (ECT/KMM), 2020 WL

3077151, at *4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3) (citation omitted).

Second, the SG Defendants claim that Sentry had already paid other investors with the customer property it received from BLMIS prior to making various of the alleged transfers to the SG Defendants. SG Motion at 23-24. To reach this conclusion, the SG Defendants are in effect applying some undisclosed tracing methodology or methodologies of their choosing (presumably First In, First Out, or "FIFO").[20] But it is for this Court to decide—after fact and expert discovery—the appropriate tracing methodology under the circumstances of this case. *See Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*") ("[T]he Court's selection of an appropriate methodology is committed to the Court's discretion."); *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3, n.7 ("Courts have broad discretion to determine which monies of commingled funds derive from fraudulent sources.").[21] This Court noted in response to a similarly-styled argument in *Multi-Strategy* that it was "not convinced that this is the only method of calculating customer property." *Multi-Strategy* at *10.

This argument is also flawed to the extent it relies on the factual assumption that every subsequent transfer from Sentry preceding those to the SG Defendants was sourced solely by

---

[20] The declaration of the SG Defendants' counsel (Shaiman Decl.) includes three "calculations" of various transfers from BLMIS to Sentry and Sentry to its investors. *See* Shaiman Decl. ¶¶ 9-11, ECF No. 144. These calculations add and subtract transfers from over 90 proceedings, amounts that have in some cases changed since the filing of the Trustee's complaints and with no explanation for the methodology behind the calculations. To this end, the Shaiman Decl. serves as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context." *Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss); *see also Solution Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 334 (Bankr. C.D. Cal. 2016) (assessment of valuation that "almost certainly will require expert testimony" is inappropriate for a motion to dismiss); *In re Viropharma, Inc.*, No. CIV.A. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) ("The [party's] submission of an expert report at [the motion to dismiss] stage is entirely improper.").

[21] This Court has recognized different tracing methodologies offered by the Trustee in this liquidation to assist the trier of fact, including: (1) Last In, First Out (LIFO), (2) First In, First Out (FIFO), (3) Lowest Intermediation Balance Rule (LIBR), (4) Restated Tracing Rules (Restated LIBR), and (5) Proportionality. These "methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer from a commingled fund." *Merkin II*, 581 B.R. at 386.

customer property.  Neither the Complaint nor its exhibits establish this, and at this stage, the

Trustee is not required to plead, much less establish, that an alleged subsequent transfer is

comprised solely of customer property.  *See Kelley*, 2020 WL 3077151, at *4 (where debtors'

funds are commingled with "cash from new subscribing investors," a trustee is not required to

establish transfers "originated solely" with the debtor or even to account for "the exact funds at

issue" on summary judgment).  To the contrary, courts in this District and in this SIPA liquidation

proceeding have denied summary judgment where only an undetermined or small portion of the

subsequent transfer was conceivably traceable to the estate.  *See Charles Ellerin Rev. Tr.*, 2012

WL 892514, at *3 (holding that even at summary judgment, "it is not necessary for the Trustee to

specify what portion of the Subsequent Transfers to [the subsequent transferee] was derived from

BLMIS"); *see also Gowan v. Amaranth Advisors, LLC (In re Dreier LLP)*, Adv. Pro. Nos. 10-

03493 (SMB), 2014 WL 47774, at *14–16 (Bankr. S.D.N.Y. Jan. 3, 2014) (allowing the trustee to

proceed to trial where at most 3.5% of the transfers at issue could be traced to the debtor's Ponzi

scheme).

Moreover, without discovery, the SG Defendants' arguments are premature.  "[I]n a case

such as this one, where 'the Trustee's lack of personal knowledge is compounded with complicated

issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,'

and 'even greater latitude' should be afforded."  *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454

B.R. 317, 329 (Bankr. S.D.N.Y. 2011).  This is one reason why this Court in *Merkin I* denied

defendants' motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved

through the books and records of the defendants."  515 B.R. at 151.  And even after fact discovery,

expert opinion is necessary to determine what portion of the subsequent transfer stemmed from

the initial transfer where the subsequent transfers originated from commingled accounts.  *Merkin*

*II*, 581 B.R. at 386; *see also Kelley*, 2020 WL 3077151, at *5 (denying summary judgment because

trustee introduced expert report and associated documents from which a jury could infer that

defendants received subsequent transfers of customer property).

For the same reasons, this Court should reject the SG Defendants' argument that the

Trustee's claims should be dismissed because "the Trustee has had the very records from Sentry,

Sigma and Lambda that would demonstrate" which transfers contain customer property.  Motion

at 3-4, 21.  The Trustee does not have all of the Fairfield Funds' books and records, and discovery

in the Trustee's actions against the FGG defendants continues.  *See, e.g.*, Stipulated Case Mgmt.

Order, *Picard v. Fairfield Inv. Fund Ltd.*, Ad. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. Dec.

6, 2021), ECF No. 353 (setting November 22, 2022 deadline for fact discovery and August 22,

2023 deadline for expert discovery).

Third, the SG Defendants argue that they could not have received any customer property

because of the amount of time that elapsed between Sentry's receipt of certain initial transfers from

BLMIS and Sentry's subsequent transfers to the SG Defendants that took place during one specific

time period.  SG Motion at 23-24.[22]  This is a variation of the SG Defendants' tracing argument

that the Fairfield Funds transferred BLMIS's customer property to other investors.  Again, this

argument is inappropriate on a motion to dismiss.  And even if it may prove more difficult for the

Trustee to trace all of the subsequent transfers sought here, this is not grounds for dismissal at the

pleading stage.  *See Merkin I*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's

opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because the tracing may

prove difficult); *In re Dreier LLP*, 2014 WL 47774, at *15 ("[T]he [subsequent transferees']

---

[22] To the extent the Court finds it relevant, the SG Defendants conveniently ignore the many alleged transfers in the
Trustee's Complaint where the initial and subsequent transfers are close in time.

speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting [their cross-motion for summary judgment].").

### C.    The SG Defendants' Claims of Double Recovery Are Premature

Finally, the SG Defendants argue that the Trustee's claims are "mathematically impossible" because the Trustee is seeking more money from all of Sentry's subsequent transferees than the fund withdrew from BLMIS.  SG Motion at 21-22.  As this Court has stated, "[t]here is no dispute that the Trustee is limited to 'a single satisfaction' under § 550(a)."  *Multi-Strategy* at *11 (citing § 550(d)).  "He may nevertheless pursue any and all subsequent transferees in order to achieve that satisfaction." *Id*. (citing § 550(a)(2)).  And under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds, without the necessity for allocation among all [the] subsequent transferees."  *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008).  Thus, until the Trustee recovers the full amount of the $3 billion in fraudulent transfers received by Sentry, the Trustee may simultaneously seek recovery from the SG Defendants in this action and from defendants in other actions, even in an aggregate amount that exceeds initial transfers.  *See Fairfield Inv. Fund*, 2021 WL 3477479, at *12. "Calculation of whether the Trustee is fully satisfied is a factual finding to be made by this Court at a later stage of litigation." *Multi-Strategy* at *11.

### III.    THE TRUSTEE'S COMPLAINT SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE FAIRFIELD FUND INITIAL TRANSFERS

The SG Defendants (but not the OFI Defendants) argue that the Trustee's incorporation of the then-operative complaint against the Fairfield Funds violates Rule 8(a)(2)'s requirement to include a "short and plain statement" showing the Trustee is entitled to relief.  SG Motion at 32-33.  However, there is no doubt that the Trustee may incorporate the Fairfield complaint under Rule 10(c) to demonstrate the avoidability of the initial transfers from BLMIS.  As this Court

recently held in *Multi-Strategy*, "pleadings filed in the 'same action' may be properly adopted by reference in other pleadings in that action" and "[t]he Fairfield Complaint was filed in the 'same action' as this adversary proceeding for purposes of Rule 10(c)." *see Multi-Strategy* at *7 (citing *Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010) and collecting cases); *see also In re Geiger*, 446 B.R. at 679 (allowing incorporation by reference under Rule 10(c) of pleadings in different adversary proceeding within the same liquidation because the pleadings "directly relate[d] to, materially affect[ed], and [were] filed in a single bankruptcy case.").

The SG Defendants' argument conflicts with the prior opinion in *SIPC v. BLMIS (In re Madoff Sec.)*, 501 B.R. 26 (S.D.N.Y. 2013), in which the District Court has already found sufficient the Trustee's incorporation by reference of the then-operative Fairfield complaint:

> [T]he Trustee's complaint against Standard Chartered Financial Services incorporates by reference the complaints against Kingate and Fairfield, including the allegations concerning the avoidability of the initial transfers, and further alleges the avoidability of these transfers outright. *See* Standard Chartered Compl. 1143–46, 50–53. Thus, the avoidability of the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes of section 550(a).

*Id.* at 36; *see also Multi-Strategy* at *7; *Banque Syz* at *7 (both following "the district court's instruction"). The SG Defendants were participants in the omnibus withdrawal of the reference related to this decision. *See* Mot. to Withdraw the Reference, ECF No. 28. This decision— allowing for incorporation by reference—is therefore law of the case. *See Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 464 (S.D.N.Y. 2019).

Moreover, even if the Court were to find that the adversary proceedings are separate actions for purposes of Rule 10(c), this Court still can permit incorporation by reference, as the Southern District of New York and other federal courts have done in appropriate circumstances. *See*

37

*Sherman v. A.J. Pegno Constr. Corp.*, 528 F. Supp. 2d 320, 323 n.5 (S.D.N.Y. 2007) (citation

omitted) (interpreting Rule 10(c)'s reference to "another pleading" as not being confined to another

pleading in the same action, and permitting incorporation of entire pleadings in separate cases);

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 214 n.15 (D. Mass.

2012) (holding incorporation by reference appropriate where "the court [was] familiar with the

filings in the other [] case[], which [were] substantially similar to [that] case, and the usual

concerns about inferring arguments from other submissions have less force.").

The case cited by the SG Defendants, *United States v. Int'l Longshoremen's Ass'n*, 518 F.

Supp. 2d 422, is inapposite because, unlike in the instant matter, plaintiff there was incorporating

pleadings by reference in an attempt to add new claims.  *Id*. at 461–66 (E.D.N.Y. 2007) (finding

improper incorporation by reference of pleadings from prior actions to plead entirely new claims

not otherwise alleged in complaint, which did not expressly incorporate the pleadings).  As

recognized by the court, incorporation in that case would have led to confusion and a lack of notice

of the claims asserted.  By contrast, the Trustee here is not seeking to add additional claims, and

the SG Defendants would be hard-pressed to argue they lacked notice that the Trustee was seeking

to avoid the initial transfers to Sentry.

In any case, regardless of incorporation, this Court may take judicial notice of the operative

Second Amended Complaint against Fairfield and its prior decision holding that the complaint

sufficiently alleges the avoidability of the initial transfers from BLMIS.  *See Fairfield Inv. Fund*,

2021 WL 3477479.  On a motion to dismiss, "a court may take judicial notice of prior pleadings,

orders, judgments, and other related documents that appear in the court records of prior litigation

and that relate to the case *sub judice*."  *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4

(E.D.N.Y. 2011).  "Included among such matters are decisions in prior lawsuits."  *DeMasi v.*

*Benefico*, 567 F. Supp. 2d 449, 453 (S.D.N.Y. 2008).  Finally, the fact that the noticed complaint

was filed after this Complaint against the SG Defendants is of no moment.  *See Rothman v. Gregor*,

220 F.3d 81, 91–92 (2d Cir. 2000) (noticing later filed complaint in related proceeding).  Should

the Court accept the SG Defendants' argument and not take judicial notice of the avoidability of

the initial transfers, the Trustee respectfully requests the opportunity to replead.

## IV.    SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANTS

In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12-MC-115, 2013 WL

1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"), the District Court held that an

initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e)

safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year

period referenced in Section 548(a)(1)(A).  In both of their Motions, Defendants argue that Section

546(e) bars all of the Trustee's claims to avoid or recover transfers made by BLMIS prior to the

two-year period, even though the Trustee has pled the Fairfield Funds' actual knowledge.   As

discussed below, Defendants' argument is based on a misreading of Section 546(e) and *Cohmad*,

and this Court has previously rejected this argument in *Multi-Strategy* and *Banque Syz*.

### A.    The Fairfield Funds Had Actual Knowledge of Madoff's Fraud

To begin, both sets of Defendants set forth at length the requirements of Section 546(e)

and how they are supposedly met in this case with respect to the initial transfers from BLMIS.

None of this matters.[23]  As the SG Defendants concede, this Court has previously held that the

---

[23] The Trustee does not concede that any agreements or transfers between the Fairfield Funds and Defendants activate the safe harbor under Section 546(e) or that any transferor or transferee is a financial institution or participant.  Such information is simply not relevant, because whether the initial transfers from BLMIS to Sentry are avoidable turns on Sentry's actual knowledge of fraud at BLMIS.  Among other things, the Trustee does not concede—by alleging that the subsequent transfers were customer property—that the initial transfers were "in connection with" the subscription agreements with Defendants.  The Trustee also does not concede that the initial transfers were made "for the benefit of" Defendants.  The Trustee plainly alleges in the Complaint that Defendants are subsequent transferees, and it is settled law that a defendant cannot be both a subsequent transferee and a party for whose benefit an initial transfer is

Trustee has pled Sentry's actual knowledge of fraud.  *See* SG Motion at 30, n.19; *Multi-Strategy* at *8 (citing *Fairfield Inv. Fund*, 2021 WL 3477479, at *4).[24]  As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from Defendants regardless of whether Sentry and any Defendants qualify as financial institutions, their agreements qualify as securities contracts, or their transfers qualify as settlement payments.[25]

**B.    The SG Defendants are Precluded from Relitigating the Actual Knowledge Exception**

The SG Defendants in particular argue that *Cohmad* is wrong and seek to relitigate whether actual knowledge bars the application of Section 546(e) (SG Motion at 31), but they are precluded from doing so.  The District Court issued *Cohmad* in connection with consolidated proceedings on the application of Section 546(e).  As the SG Defendants concede, *Cohmad* held that a transferee with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e).  *Id.*  The District Court then remanded the relevant cases back to this Court, and this Court has since applied the actual knowledge "exception" on numerous occasions.[26]

---

made.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 474 (Bankr. S.D.N.Y. 2015) (citing cases).

[24] Although the SG Defendants say they disagree with this Court's opinion in *Fairfield Investment Fund*, Motion at 30, n.19, the SG Defendants do not argue that the Trustee has not plausibly alleged the funds' actual knowledge of Madoff's fraud.

[25] Though not necessary to the Court's analysis, we note that Defendants' argument that the Trustee is in privity with the Fairfield liquidators and therefore bound by any rulings in the Fairfield liquidation is incorrect.  *See* SG Motion at 27 n.16; OFI Motion at 23.  Defendants cite no relevant authority for this argument because none exists.  For example, *New Hampshire v. Maine*, 532 U.S. 742 (2001), does not even involve non-party preclusion.  And if *Taylor v. Sturgell*, 553 U.S. 880 (2008), "stands for anything, it is for the need to narrow and regularize the use of preclusion against nonparties."  *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902 (JSR), 2013 WL 12191844, at *11 (S.D.N.Y. Mar. 25, 2013).

[26] *See, e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (applying actual knowledge exception); Bench Ruling on Motion to Dismiss, *Picard v. Square One Fund Ltd.*, Adv. Pro. No. 10-04330 (Bankr. S.D.N.Y. May 29, 2018) (same); *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (same); *Picard v. Mendelow, et al (In re BLMIS)*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 112 (Bankr. S.D.N.Y. 2016) (same); *Shapiro*, 542 B.R. at 100 (same); *Picard v. Ceretti, et al (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *Merkin I*, 515 B.R. at 117 (same).

The SG Defendants participated in the District Court *Cohmad* proceedings. *See* Mot. to Withdraw the Reference, ECF No. 28 (raising Section 546(e) as grounds for withdrawal). Given their participation, the SG Defendants are bound by *Cohmad*, which is law of the case. *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case."); *Picard v. Lowrey (In re BLMIS)*, 596 B.R. 451, 463-64 (S.D.N.Y. 2019) (law of the case doctrine foreclosed relitigating of issue where the district court "considered and rejected the very arguments that defendants now make"), *aff'd sub nom. Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184 (2d Cir. 2020). The SG Defendants did not seek leave to appeal the *Cohmad* decision.

In their Motion, the SG Defendants rely heavily on *Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014). SG Motion at 4, 25, 26, 28-29, 31 n.22. As this Court has recognized, however, the Second Circuit's decision in *Ida Fishman* did not address the actual knowledge exception and, thus, does not warrant its reconsideration. *See Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *10 n.16 (Bankr. S.D.N.Y. Apr. 25, 2016) ("The Court did not address the exception to the safe harbor regarding those investors who had actual knowledge that BLMIS was not trading securities.").

## C.    Section 546(e) Does Not Apply Independently to Recovery Actions

Defendants are also wrong that the Trustee must allege that a subsequent transferee itself had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Specifically, the SG Defendants in particular argue that under *Cohmad*, their agreements with Sentry are the relevant "securities contract" for purposes of Section 546(e) (in lieu of BLMIS's account agreement), and as such, in a Section 550 recovery action against them, the court must look solely to the SG Defendants' (i.e. the *subsequent transferees'*) actual knowledge to determine

41

whether the initial transfer is avoidable.  SG Motion at 29-31.[27]  But *Cohmad* does not stand for

this proposition, and the SG Defendants' argument is just a repackaging of the previously rejected

argument that the Section 546(e) safe harbor should independently apply to recovery actions under

Section 550.  And as this Court recently held, based on the same arguments as Defendants make

here, Defendants "[are] not permitted to raise the safe harbor defense on [their] own behalf as []

subsequent transferee[s]" (*Multi-Strategy* at *10) and the 546(e) "safe harbor is not applicable to

subsequent transfers."  *Multi-Strategy* at *9; *see also Banque Syz* at *9.

    Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not

the recovery of subsequent transfers under Section 550.  *See* 11 U.S.C. § 546(e) ("Notwithstanding

sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer*

. . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see also Multi-Strategy* at

*9, citing *BNP*, 594 B.R. at 197 ("The Trustee does not … 'avoid' the subsequent transfer; he

recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C.

§ 550(a), and the safe harbor does not refer to the recovery claims under section 550."); *Kelley v.*

*Safe Harbor Managed Acct. 101, Ltd.*, 31 F.4th 1058, 1064 n. 5 (8th Cir. 2022) ("*SHMA*") (citing

*BNP*).

    The limitation of the safe harbor to avoidance is consistent with the well-established

principle that "the concepts of avoidance and recovery are separate and distinct."  *In re Madoff*

*Sec.*, 501 B.R. at 30.  It is also consistent with the understanding that the Code's avoidance

provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility

---

[27] The OFI Defendants also argue that the Trustee must plead their actual knowledge but confusingly cite not to *Cohmad*, but to the District Court's "good faith" decision, which has since been overturned by *Citibank*, and mistakenly argue that the Trustee must plead that Defendants lacked good faith by alleging either actual knowledge or willful blindness to the fraud.  OFI Motion at 25-26.

provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See In re Picard*, 917 F.3d at 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section 550.[28] However, in its decision, the court specifically limited the safe harbor to avoidance claims based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9 (applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from Madoff Securities.") (emphasis added). And though the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as "financial institutions" or "financial participants," the decision is clear that the focus of the safe harbor is still on the *initial* transfers. *See id.* at *9.[29] Contrary to Defendants' argument, the District Court did not, in its hypothetical, discuss actual knowledge or indicate that in such circumstances, the initial transferee's actual knowledge should be disregarded.

---

[28] *See* Section 546(e) Briefing Order, *In re Madoff Sec.*, No. 12-MC-115 (S.D.N.Y. May 16, 2012), ECF No. 119 (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

[29] The original point of the *Cohmad* hypothetical was to address the subsequent transferee defendants' argument that if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities agreements under Section 546(e). *Cohmad*, 2013 WL 1609154, at *8. That argument became moot as both the Second Circuit and the District Court determined that each BLMIS customer agreement was a "securities agreement" and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore the Trustee's avoidance claims were subject to Section 546(e).

Based on *Cohmad*, this Court held that Section 546(e) is applicable only to avoidance, not recovery, and, most notably, that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee has adequately pled the initial transferee's actual knowledge. *See BNP*, 594 B.R. at 197; *see also In re SunEdison, Inc.*, 620 B.R. 505, 514 (Bankr. S.D.N.Y. 2020) ("the safe harbor defense only applies by its terms to the initial transfer"). In *BNP*, this Court explicitly rejected the argument being made here that the "*only* way the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the [subsequent transferee defendants] actually knew of the Madoff Ponzi scheme." *BNP*, 594 B.R. 196-97 (emphasis in original). Rather, as explained in *BNP*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee. *Id*. at 197. Like *Cohmad*, *BNP* is law of the case on this issue, and the SG Defendants are bound by both decisions. *See Picard v. Est. of Seymour Epstein (In re BLMIS)*, No. 2l-cv-02334 (CM), 2022 WL 493734, at *12 (S.D.N.Y. Feb. 17, 2022) (finding "in a SIPA liquidation like this one" where different adversary proceedings arise within the same liquidation, that law of the case applies when "prior decisions in an ongoing case either expressly resolve[] an issue or necessarily resolve[] it by implication").

The SG Defendants nevertheless continue to argue that to the extent a party relies on the feeder fund agreements as the relevant "securities agreements" in accordance with *Cohmad*, the Court must look only to the actual knowledge of the subsequent transferee. Motion at 30-31. But as stated above, the District Court did not conclude this, and *BNP* confirmed this was not the case. This Court itself rejected the same arguments in *Multi-Strategy* and *Banque Syz*, holding in each that, "the safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not 'avoiding' a subsequent transfer, 'he recovers the value of the avoided initial transfer from

44

the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550.'" *Multi-Strategy* at *9 (quoting *BNP* at 197); *Banque Syz* at *9 (same).

The SG Defendants' misinterpretation of *Cohmad* would effectively eliminate the point of the actual knowledge exception—which is to restrict all bad actors from hiding behind the safe harbor. *See Cohmad*, 2013 WL 1609154, at *3 (explaining that defendants who knew BLMIS was a Ponzi scheme "must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments.'"). Adopting the SG Defendants' position means the safe harbor would apply even where the initial transferee feeder fund knew there were no securities transactions in need of protection. It would also result in a situation whereby a determination as to the avoidability of an initial transfer would depend upon and vary based on whether there were subsequent transfers, and who received them.

The SG Defendants' interpretation of *Cohmad* would provide a subsequent transferee with more rights than an initial transferee, which is inconsistent with congressional intent on 546(e). *See In re Madoff Sec.*, 501 B.R. at 29 ("Section 550(a) requires that the Trustee show that the transfer he seeks to recover is avoidable in each recovery action, and the subsequent transferee in possession of that transfer may raise any defenses to avoidance available to the initial transferee, as well as any defenses to recovery it may have."). As the Eighth Circuit pointed out in *SHMA* while citing *BNP*, under Section 546(e), "a subsequent transferee is protected *indirectly* to the extent that the initial transfer is not avoidable because of the safe harbor." 31 F.4th at 1064 n.5 (cleaned up; emphasis added).

The SG Defendants also misconstrue *Cohmad*'s holding—which was not a part of the Court's "securities contract" hypothetical—that subsequent transferees with actual knowledge are

also prohibited from benefitting from the safe harbor. *See* SG Motion at 30-31. That holding does

not mean, as the SG Defendants contend, that in order to recover from a subsequent transferee, the

Trustee must plead its actual knowledge. On the contrary, it merely ensures that any defendant

that *doe*s have actual knowledge, including a subsequent transferee, cannot benefit from the safe

harbor (even if the initial transferee is innocent), such that the purpose of the actual knowledge

exception is achieved consistently. *See Cohmad*, 2013 WL 1609154, at *1, *7 ("A defendant

cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds

through a nominal third party and still obtain the protections of Section 546(e)."). This holding

that, like initial transferees, subsequent transferees with actual knowledge cannot benefit from the

safe harbor does not justify affording subsequent transferees expanded protections, such that they

can benefit from the safe harbor despite the initial transferee's actual knowledge.

## V.    FRENCH LAW DOES NOT REQUIRE DISMISSAL OF THE OFI DEFENDANTS

The OFI Defendants contend that, as FCPs under Article 214 of the French Monetary and

Financial Code, they have no legal "personality" or "existence" under French law and that legal

existence is "a prerequisite to having the capacity to be sued" pursuant to FRCP 17(b). OFI Motion

at 3-7. In support of their argument, the OFI Defendants submit the affidavit of Hervé Lecuyer

("Lecuyer Decl.") who opines that an FCP lacks a "legal personality" and "is not a subject of law,"

and therefore has no rights or obligations, cannot act, lacks the ability to enter into contracts, and

may not assume the role of plaintiff or defendant in litigation. Lecuyer Decl. at ¶¶ 18-23.

The OFI Defendants are incorrect. FCPs can sue and be sued and have been named parties

in litigation in U.S. courts. Indeed, as addressed herein, OFI Asset Management—which managed

the OFI Defendants and submitted a declaration in support of the OFI Motion—has previously

argued to a U.S. district court that it had the exclusive right to engage in litigation in the names of

similar FCPs. The OFI Defendants' argument that they cannot act or enter into contracts is also

46

belied by their actions in this case—where they have engaged counsel, who have been actively

representing them since at least 2012. *See, e.g.,* ECF No. 18 (stipulation extending response time);

ECF No. 82 (motion to dismiss based on extraterritoriality); ECF No. 106 (reply brief as to

extraterritoriality).

### A.     French Law Permits FCPs to Engage in Litigation

An FCP engaged in litigation is represented by its asset management company, which by

statute acts on its behalf.  Specifically, FCPs such as the OFI Defendants are created pursuant to

Article 214 of the French code.  OFI Motion at 3; Moriceau Decl. at ¶ 4.[30]  Per this statutory

scheme, FCPs are vehicles for co-ownership of transferable securities.  Moriceau Decl. at ¶ 4.  The

holders of an FCP's "units" cannot act individually to defend or assert their rights or interests.  *Id*.

at ¶ 5.  Instead, an FCP is represented vis-à-vis third parties by a management company, including

in the case of litigation proceedings. *Id*. at ¶ 5.  Accordingly, French law expressly vests an FCP's

asset management company with the authority ("a legal mandate") to act in court on its behalf.  *Id*.

at ¶ 6.

Thus, the OFI Defendants can be sued, and OFI Asset Management can act as their

representative for such purposes.[31]  This is consistent with other legal precedent for litigation by a

management entity on behalf of a foreign investment vehicle.  *See, e.g.*, *Roby v. Ocean Power

Techs., Inc*., 2015 WL 1334320 (D.N.J. Mar. 17, 2015) (holding that the investment manager of a

Cayman Islands limited liability fund had the authority to pursue claims on the fund's behalf and

that the action was properly in the fund's name).

---

[30] The declaration of Olivier Moriceau, a qualified French attorney and expert on relevant French law, is submitted in support of the Trustee's opposition to the OFI Motion.

[31] To this end, the OFI Defendants' citation to *In re Vivendi Universal S.A. Securities Litigation*—in which the court stated that "[l]egal experts from both sides of the debate agree that FCPs do not have legal personality and thus cannot act on their own" (OFI Motion at 6)—is therefore beside the point, as an FCP's management company will act for it.

The OFI Defendants' management company, OFI Asset Management, whose Chief Executive Officer submitted a declaration in support of the OFI Motion (*See* Grimaud Decl. at ¶ 2), has advocated the Trustee's position during litigation before the U.S. District Court for the District of Delaware.  In *OFI Risk Arbitrages v. Cooper Tire & Rubber Company*, 63 F. Supp. 3d 394 (D. Del. 2014), two French FCPs, OFI Risk Arbitrages and OFI Risk Arb Absolu (the "Other OFI Funds"), which were also managed by OFI Asset Management, sought appointment as lead plaintiffs in a securities class action they had filed *in their own names*.  *See id*. at 397-98.  The court granted the Other OFI Funds' motion to be named lead plaintiffs, with OFI Asset Management acting on their behalf.  *Id*. at 411.  The court based its decision in part on declarations submitted by the Other OFI Funds representing that, while FCPs had "no legal personality," OFI Asset Management had an "exclusive right" and "legal mandate" to engage in litigation on their behalf.  *Id*. at 404.  *See* Moriceau Decl., Ex. A.

OFI Asset Management's view at the time of *OFI Risk Arbitrages*—as encapsulated by a declaration submitted to the court by its then-General Secretary Jean-Luc Malafosse ("Malafosse Decl.")[32]—was that, "OFI Asset Management, as asset manager for the OFI Funds, has the exclusive right to manage the OFI Funds and *engage in litigation in their names*."  Malafosse Decl. at ¶ 3 (emphasis added).[33]  The only distinction between *OFI Risk Arbitrages* and the instant matter from OFI Asset Management's perspective appears to be who brought the lawsuit.  The OFI

---

[32] The Malafosse Decl. is submitted for the Court's convenience as Longo Decl., Ex. 42.

[33] The Delaware court quoted this language in its decision. 63 F. Supp. 3d 394, 398.

Defendants cannot have it both ways—free to litigate offensively as plaintiffs suing for damages in the United States, but never having to defend against claims when U.S. parties seek relief.[34]

The authority cited by the OFI Defendants is simply inapposite. *See Gov't Emps. Ins. Co. v. Est. of Sosnov*, 664 N.Y.S.2d 608, 609, 244 A.D.2d 485, 486 (1997) (holding that a proceeding to permanently stay arbitration against the estate of a decedent requires the appointment of a legal representative); *Museum Boutique Intercontinental, Ltd. v. Picasso*, 886 F. Supp. 1155, 1159–60 (S.D.N.Y. 1995) (holding that only the administrator, and not the heir, of a jointly owned estate could engage in litigation related to the estate); *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 106, 111 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1353 (2d Cir. 1993) (finding that under English law, a group of insurance traders could not be sued as a syndicate but rather such traders could be sued individually); *Fund Liquidation Holdings LLC v. Bank of Am. Corp*., 991 F.3d 370, 382–83 (2d Cir. 2021), cert. denied, 142 S. Ct. 757, 211 L. Ed. 2d 475 (2022) (addressing the standing, legal existence and capacity of dissolved entities); *Washington v. U.S. Tennis Ass'n, Inc.,* 290 F. Supp. 2d 323, 325 (E.D.N.Y. 2003) (holding that tennis event was "not an independent entity" that could be sued and deeming the sole defendant in the case to be the association that ran the event).

### B.    The Trustee Has No Objection to the Asset Management Company Participating in this Action

In sum, there is nothing unique in the law that shields the OFI Defendants from being sued. Nonetheless, the Trustee acknowledges that, consistent with French law, the OFI Defendants may seek for their asset management company to participate in this action on their behalf.  Should the OFI Defendants request, or this Court determine, that OFI Asset Management (or any successor

---

[34] Indeed, any such assertion is directly contradicted by a separate declaration submitted in the same case in support of the Other OFI Funds.  There, French law professor Dr. Andrea Pinna opined that the French code provision that confers on an FCP's management company the legal mandate to act on behalf of the FCP involves acting on behalf of the FCP in both plaintiff and defendant capacities.  *See* Moriceau Decl. at ¶ 7.

asset management company) be a named party in this litigation, the Trustee consents and requests

that leave be granted to add such management company as a defendant.[35]

## **CONCLUSION**

The Trustee respectfully requests that the Court deny the SG Motion and the OFI Motion.

Dated: June 28, 2022
New York, New York

*/s/ Howard L. Simon*
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215
Howard L. Simon
(hsimon@windelsmarx.com)
Robert J. Luddy
(rluddy@windelsmarx.com)
Kim M. Longo
(klongo@windelsmarx.com)
John J. Tepedino
(jtepedino@windelsmarx.com)

*Special Counsel for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Chapter 7 Estate of Bernard L. Madoff*

---

[35] The OFI Defendants' own authority suggests that amending to add the correct party is a viable resolution in such circumstances. *See Darby v. Pasadena Police Dept.*, 939 F.2d 311, 314 (5th Cir. 1991) (holding that plaintiff should not be denied an opportunity to amend his pleadings to name the correct party); *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 478 n.2 (8th Cir. 2001) (affirming that defendant could not be sued but noting that the action could be re-filed directly against relevant governmental entities); *Ellul v. Congregation of Christian Bros.*, 2011 WL 1085325, at *3 (S.D.N.Y. Mar. 23, 2011), *aff'd*, 774 F.3d 791 (2d Cir. 2014) (holding that defendant could not be sued, but stating that defendant's constituent organizations *were* subject to suit).

50