# EXHIBIT 7

## FAIRFIELD LAMBDA LIMITED

Maximum Capitalization:  5,000,000 Shares
Minimum Investment:  CHF 400,000

### INFORMATION MEMORANDUM

---

THE DIRECT OR INDIRECT SALE OF SHARES
OF FAIRFIELD LAMBDA LIMITED TO
CITIZENS, NATIONALS OR RESIDENTS OF,
OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED,
CHARTERED OR RESIDENT IN, THE UNITED STATES
OF AMERICA IS EXPRESSLY PROHIBITED.

---

Fairfield Lambda Limited (the "Company") was incorporated in the Territory of the British Virgin Islands.  The Company is soliciting subscriptions for up to 5,000,000 redeemable shares (the "Shares"), denominated in Swiss francs, payable in full at the time of subscription.  The Company initially issued Shares at an initial offering price of CHF 103.0319 per Share on August 1, 1998. As of December 31, 1997, there were 61,464 Shares issued and outstanding with a net asset value of CHF 106.963 per Share.

The date of this Offering Memorandum is July 15, 1997, as amended January 1, 1998.

Investment Manager:  Fairfield Greenwich Limited
                     919 Third Avenue, 11th Floor
                     New York, New York 10022
                     (212) 319-6060

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED                     FGGE000014087
                                                                                          SECSEV0591610

## TABLE OF CONTENTS

SUMMARY ...................................................... 1

THE COMPANY .................................................. 5

MANAGEMENT OF THE COMPANY AND OTHER RELATIONSHIPS ............ 5

INVESTMENT POLICIES .......................................... 8

OFFERING OF THE SHARES ...................................... 11

FEES, COMPENSATION AND EXPENSES .............................. 14

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT .................. 15

RISK FACTORS ................................................ 16

POTENTIAL CONFLICTS OF INTEREST .............................. 22

PRIOR TRADING RESULTS ....................................... 22

DESCRIPTION OF SHARES ....................................... 24

DIVIDEND POLICY ............................................. 25

TRANSFERS, REDEMPTIONS AND TERMINATION ....................... 25

TAX CONSIDERATIONS AND EXCHANGE CONTROL ...................... 27

LEGAL MATTERS ............................................... 28

MISCELLANEOUS ............................................... 28


APPENDIX A –FINANCIAL STATEMENTS OF FAIRFIELD SENTRY LIMITED

APPENDIX B - SUBSCRIPTION DOCUMENTS

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014088

SECSEV0591611

## MUTUAL FUNDS DISCLOSURE

The British Virgin Islands Mutual Funds Act (the "Act") was approved on June 6th 1996 and was implemented on January 2nd 1998 with the aim of regulating Mutual Funds, the Managers and Administrators carrying on business in or from within the Territory of the British Virgin Islands (the "BVI").

Three types of fund, namely Private, Professional and Public Funds (each as defined in the Act) are regulated by the Act and it is intended that Fairfield Lambda Limited (the "Fund"), will apply for recognition under the Act as a Private or a Professional Fund.

A Private Fund is defined as a Mutual Fund whose constitutional documents specify that it will have no more than fifty investors and that any invitation to subscribe for or purchase shares issued by the Mutual Fund will be made on a private basis. There is also a provision for a Mutual Fund to be designated as a Private Fund by regulations.

A Professional Fund is defined as a mutual fund:

a.   the shares of which are made available only to professional investors and the initial investment in which, in respect of the majority of such investors, is not less than one hundred thousand dollars in US currency or its equivalent in any other currency; or

b.   is designated as a professional fund by regulations.

A "Professional Investor" is defined as a person whose ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the fund or a person who has signed a declaration that they have a net worth in excess of $1 million and they consent to being treated as a professional investor.

The Act provides for a Professional Fund to be able to manage or administer its affairs in or from within the Territory for up to fourteen days before being recognized.

To be recognized under the act an annual fee of $350 is payable by the Fund.

Recognition under the Act should not be taken to imply that the Fund has been approved by any regulatory authority in any country such as the United States, the United Kingdom or any other jurisdiction other than the BVI and it is intended that any

-ii-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE000014089

SECSEV0591612

potential shareholders of the Fund, participate on the basis that they can afford to lose all or a substantial portion of their investment.

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014090

SECSEV0591613

## SUMMARY

The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Information Memorandum and, accordingly, should be read in conjunction with such detailed information.

### The Offering

| | |
|---|---|
| Issuer | Fairfield Lambda Limited (the "Company") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Company is located in the BVI. |
| Securities Offered | Shares of the Company's Common Stock, denominated in Swiss francs (the "Shares") were sold on August 1, 1997 (the date of the initial closing of the offering) at an initial offering price of CHF 103.0319 per Share, and thereafter have been sold at a price equal to the Net Asset Value per Share (as defined) as of the date of issuance. The Shares will be offered to subscribers who desire to hedge the currency exposure to the Swiss franc resulting from the Company holding assets (i.e., shares of Fairfield Sentry Limited) denominated in U.S. dollars. |
| Offerees | Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF SHARES." |
| Minimum Subscription | The minimum initial subscription per investor is CHF 400,000, unless the Company deems it advisable to permit subscriptions for a lesser amount. Following his initial investment, a shareholder may make additional investments in amounts of not less than CHF 80,000. |
| Maximum Capitalization | The Company will not accept a subscription |

-1-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014091
SECSEV0591614

tendered for Shares at a time when the number of its outstanding Shares exceed 5,000,000.

| | |
|---|---|
| **Subscription Procedures** | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. |
| **Solicitation of Subscriptions** | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Company or through the assistance of unaffiliated placement agents and money managers. Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich Limited, as Investment Manager. The unaffiliated placement agents and money managers may rebate all or a portion of such fees to their clients. |
| **Business Objective** | The Company will seek to achieve capital of the Company appreciation of its assets by purchasing shares in Fairfield Sentry Limited ("FSL"), a British Virgin Islands corporation, which allocates its assets to an account at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, New York, which employs an options trading strategy described as "split strike conversion". FSL is an affiliate of the Company. FSL issued shares in November 1990 at $200 per share. As of December 31, 1997, its Net Asset Value per share was U.S. $506.35, with total assets of U.S. $985,298,163 (subject to audit). |
| | The Company will allocate a portion of its assets to a nonaffiliated bank who will provide a currency overlay program designed to permanently hedge the currency exposure of the Shareholders with regard to the Swiss franc resulting from the Company holding assets |

-2-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE000014092

SECSEV0591615

denominated in U.S. dollars. In an effort to increase the yield on Shares, so as to defray the cost of the currency hedge program, the Company will utilize leverage to purchase additional shares of FSL. The leverage will be provided through a line of credit provided by the bank effecting the currency hedging transactions (the "Bank"). Obligations to the Bank with respect to the currency hedging and leverage activities will be collateralized through a pledge of the assets underlying the Shares (i.e., the Company's shares in FSL). In order to perfect this pledge of assets, the Company's shares in FSL will be held in the name of the Bank. The Bank will be permitted to take any and all appropriate action with respect to these at any time in the event of a default on the part of the Company with regard to its obligations to the Bank.

| | |
|---|---|
| Investment Manager | Fairfield Greenwich Limited ("FGL" or the "Manager"), a corporation organized under the laws of Cayman Islands, serves as the Company's investment manager. It is also the investment manager of FSL. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the principals of FGL. Mr. Noel is also a Director of the Company (see "MANAGEMENT OF THE COMPANY"). |
| Directors | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Company. They are also the Directors of FSL. |
| Citco | Citco Fund Services (Europe) B.V., an affiliate of Curacao International Trust Company, N.V., acts as administrator, registrar and transfer agent for the Company. |
| Dividend Policy | It is anticipated that the Company will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

-3-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014093

SECSEV0591616

## Sale, Redemption and Exchange Of Shares

| | |
|---|---|
| Redemption at the Option of a Shareholder | A shareholder of the Company, on five (5) business days' notice, may cause his Shares to be redeemed as of the end of any month. |
| Compulsory Redemption | The Company reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| Sales | The Company will offer its Shares on a continuous basis. Subscriptions received during any monthly period will ordinarily be accepted as of the first day of the following month, i.e., subscriptions received between March 1 and March 31 will be accepted as of April 1. |

## Compensation And Expenses

Expenses    The Company's initial organization and offering expenses were approximately $5,000. Such expenses will be paid by the Company and will be amortized among the Company's shareholders, during a period of five years from the date of the initial closing of this offering. The Company will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; and all expenses in maintaining the Company's office and all other expenses incurred in the operation of the Company, if any, including any legal fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Company, as well as all fees and all ordinary and necessary expenses related to the Company's investment and trading activities. Transactional costs will be included in FSL's calculation of profit and loss and therefore will be indirectly borne by the Company. The costs incident to the currency hedging program

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014094

SECSEV0591617

and leverages will be borne by the Company. The Company will not pay the Manager a management fee or performance fee. The Manager will receive the fees incident to the Company's investment program at the FSL level.

## THE COMPANY

### Description

The Company was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Company is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares, or purchase additional Shares, on a monthly basis (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE COMPANY AND OTHER RELATIONSHIPS

### The Company

The Company's Board of Directors has overall management responsibility for the Company, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Company's administrator, registrar and transfer agent, any officers of the Company and other persons or entities with management or administrative responsibilities to the Company. None of the Company's Directors own an equity interest in the Company.

The Directors of the Company are as follows:

**Walter M. Noel, Jr.**, age 67, graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953 and graduated from Harvard Law School in 1959. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice-President of the International Private Banking Department of Citibank, N.A., where he remained until 1977, when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Since 1983,

–5–

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014095

SECSEV0591618

Mr. Noel has been a self-employed investment consultant and, until January 1992, was associated with Fahnestock & Co., Inc., a member firm of the New York Stock Exchange.  From 1993 to 1996, Mr. Noel was a general partner of Fred Kolber & Co. Limited Partnership ("Fred Kolber & Co."), a broker dealer registered with the Securities and Exchange Commission, which was a member of the National Association of Securities Dealers, Inc. and various securities exchanges and clearing organizations.  Until January 1998, Mr. Noel was a general partner of GOF Partners (Limited Partnership), a Connecticut limited partnership ("GOF"), and Greenwich Strategies, L.P. and Greenwich Sentry, L.P., Delaware limited partnerships, which are private investment partnerships offered to United States residents and citizens, whose general partner, Fairfield Greenwich Limited, is the Company's investment manager.  He is a director of Fairfield Sentry Limited ("FSL"), Fairfield International Limited ("FIL"), Advanced Strategies Limited ("Advanced"), Sentry Select Limited ("Sentry Select"), Advanced Pacific Strategies Limited, Glickenhaus International Limited ("GIL") and Monroe Investors Limited ("MIL"), corporations organized under the laws of the British Virgin Islands (the "BVI"), which offer money management services to non-U.S. citizens and residents.  He is an officer and director of Fairfield International Managers, Inc., a Delaware corporation, which until December 31, 1997 was the Company's investment manager and offered a variety of investment management services to the aforementioned BVI corporations and certain of the private investment partnerships noted above, and The Navigation Fund Limited, a Liberian corporation.

**Jan R. Naess**, age 39, received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo.  From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm.  In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989.  In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/ operating and project development company, which merged with Northern Navigation International Limited ("NNI") in 1991.  Mr. Naess is a Vice-President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets and which is the investment manager of The Navigation Fund Limited.  He serves as a Director of FSL, FIL, Sentry Select, GIL and MIL.

**Peter P. Schmid**, age 50, received a Swiss Federal Certificate of Capacity in 1968.  Mr. Schmid was employed by Credit Suisse from 1968 to 1986.  From 1975 to 1977, he was employed in Credit Suisse's

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014096

SECSEV0591619

International Portfolio Management Department in Zurich.  After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the Bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva.  Mr. Schmid has been an independent investment adviser since April 1986.  He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A., Rock Ltd. and Armor S.A.  Mr. Schmid is a Director of Inter Asset Management Inc., FSL, FIL, Sentry Select, GIL and MIL.

<u>The Investment Manager</u>

        The Company's investment manager is Fairfield Greenwich Limited, Inc., a corporation organized under the laws of Cayman Islands ("FGL" or the "Manager"), which was incorporated on October 24, 2001. FGL is the investment manager of FSL, FIL, Advanced and Sentry Select, and the administrative manager of GIL and MIL.  It is responsible for the management of the Company's investment activities, monitoring those investments and maintaining the relationship between the Company and FSL and with its escrow agent, custodian, administrator, registrar and transfer agent.  FGL has delegated the management of the FSL's investment activities to Bernard L. Madoff Investment Securities, a registered broker-dealer in New York, New York, see "INVESTMENT POLICIES".  The Manager maintains an office at 919 Third Avenue, 11th Floor, New York, New York 10022; telephone number (212) 319-6060.  The Directors, officers and principal shareholders of the Manager are Walter M. Noel, Jr. and Jeffrey H. Tucker.  Andres Piedrahita is the beneficial owner of FGL's third shareholder and serves as a consultant to FGL.

        Walter M. Noel, Jr. is the President and a Director of the Manager.  His background is summarized above under "MANAGEMENT OF THE COMPANY AND OTHER RELATIONSHIPS - The Company".

        Jeffrey H. Tucker, age 52, is Vice President and a Director of the Manager.  Mr. Tucker practiced law in New York City from 1970 - 1986. In January of 1987 he joined Fred Kolber & Co., and in September of 1987 he became a general partner of Fred Kolber & Co. which position he occupied until 1996.  Until January 1998, Mr. Tucker was also a general partner of GOF, Greenwich Strategies, L.P. and Greenwich Sentry, L.P. and is presently an officer and director of FIM.

        Andres Piedrahita, age 37, graduated from Boston University's School of Communications in 1981.  Upon graduation from college, Mr. Piedrahita became employed as a financial consultant with Prudential

-7-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014097

SECSEV0591620

Bache Securities Inc. in New York.  From 1987 to 1990, Mr. Piedrahita was a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals.  From 1991 to 1997, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc., a New York corporation, which until December 31, 1997, was the investment manager of Advanced Strategies Limited, Advanced Latin Fund, Ltd., Advanced Pacific Strategies Limited, Dynamic Alternative Strategies Limited and Dynamic Leveraged Strategies Limited, which are British Virgin Islands corporations.

The Manager will not have any beneficial interest in the Company.

Pursuant to the Investment Management Agreement between the Company and the Manager, the Manager is not liable for any error of judgment or for any loss suffered by the Company unless such loss resulted from the Manager's willful misfeasance, bad faith, gross negligence or reckless disregard of its obligations and duties.  See "RISK FACTORS".

## INVESTMENT POLICIES

The Company seeks to obtain capital appreciation of its assets through nontraditional options trading strategies by investing in FSL, which has established a discretionary account for Sentry at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, New York, which utilizes a strategy described as "split strike conversion".  This strategy has defined risk and profit parameters which may be ascertained when a particular position is established. All investment decisions in the account at BLM are effected by persons associated with BLM.  The firm, which employs approximately 200 people, acts primarily as a market maker in stocks and convertible securities. Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange.  Set forth below is a description of the "split strike conversion" strategy.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that together will highly correlate to the S&P 100 Index (the "OEX"), (ii) the sale of out of the money OEX call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money OEX put options.  A call option is out of the money when its strike price is greater than the current price of the stock; a put option is out of the money when the strike

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED
FGGE000014098
SECSEV0591621

price is lower than the current price of the stock. The basket typically consists of approximately 35 stocks in the S&P 100 Index.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an at or out of the money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the OEX puts and calls. The further away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

FSL initially issued shares in November 1990 at $200 per share. As of December 31, 1997, FSL's Net Asset Value per share was U.S. $506.35, with total assets of U.S. $985,298,163 (subject to audit).

FSL was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland, on January 12, 1995 and was issued SEDOL number 0-330-934. There can be no assurance that a trading market in FSL's Shares will develop. The Company's redemption rights in FSL are not affected by FSL obtaining this listing.

Transaction Executions

BLM acts as a principal in connection with its sale of securities to FSL, and the purchase of securities from FSL. BLM acts as a market-maker in the stocks purchased and sold by FSL. These market making activities enable BLM to trade with FSL as principal.

The options transactions executed for the benefit of FSL and, indirectly the Company, are effected in the over-the-counter market and on a registered options exchange. See "POTENTIAL CONFLICTS OF INTEREST".

In an effort to manage the U.S. dollar exposure of the Company's shareholders, the Manager has established an account at a nonaffiliated bank (the "Bank") to hedge the currency exposure of Swiss franc denominated investors resulting from holding assets denominated in U.S. dollars. The account will apply a passive strategy designed to

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014099

SECSEV0591622

immunize investors against dollar declines by continuously hedging the currency exposure utilizing foreign exchange instruments. Obligations owed to the Bank in connection with this account will be collateralized by a pledge of the assets underlying the Shares (i.e., the Company's FSL's shares).

This account may purchase and sell any foreign exchange instruments including forward and options contracts, as deemed appropriate, although forward contracts in the interbank market will be the predominant transaction. Hedging contracts, on a net position basis, will generally be no less than 95%, and will not exceed 105% of the Net Asset Value of the Shares, i.e. the net notional value of hedging positions outstanding in this account will range from 95% to 105% of the Net Asset Value of the Shares.

The cost incident to managing the currency exposure of the shareholders will be reflected in the Net Asset Value of the Shares. In an effort to increase the rate of return on the Shares, to defray the cost of the currency hedging program, the purchase of FSL shares by the Company will be leveraged through a line of credit provided by the Bank. This line of credit, as well as the Company's obligations in the currency trading account, will be collateralized by the pledge of the assets underlying the Shares. To perfect this pledge, the Company's assets will thereby be subject to liquidation at any time by the Bank in the event there is a default by the Company in repaying its obligations to the Bank.

<u>Other Investments</u>

In order to ensure that the Company will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, the Company will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasure Regulations promulgated thereunder. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

The Company may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments (but not money market mutual funds), including repurchase agreements with respect to such obligations. In order to ensure that substantially all of the interest earned by the Company will not be subject to United States

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014100

SECSEV0591623

federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

## OFFERING OF THE SHARES

The Company is offering up to 5,000,000 shares, denominated in Swiss francs (the "Shares"). The initial offering price was CHF 103.0319 per Share for Shares sold on August 1, 1997. The Shares are being offered at a price equal to the Net Asset Value per Share (as defined) on the date of issuance. As of December 31, 1997, there were 61,464 shares issued outstanding with a Net Asset Value of CHF 106.963 per Share (subject to audit). The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Company. See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers."

The minimum initial purchase by each subscriber is CHF 400,000, unless the Company deems it advisable to permit subscriptions for a lesser amount. The Company may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Company in trust and will be deposited by the Company into segregated interest bearing accounts in the Company's name at the Company's escrow agent, Credit Suisse First Boston, Zurich.

The Company will offer its Shares on a continuous basis at a price equal to the Net Asset Value per Share as of the date of issuance of such Shares. Subscriptions received during any monthly period will

-11-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE000014101

SECSEV0591624

be accepted as of the first day of the following month. Thus, for example, subscriptions received between January 1 and January 31 will be accepted as of February 1. The Company reserves the right, in its discretion, to accept any subscription prior to such first day.

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Company or through the assistance of unaffiliated placement agents and money managers, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager. The unaffiliated placement agents and money managers may rebate all or a portion of such fees to their clients.

Net Asset Value Defined

Net Asset Value is defined as the Company's total assets including (i) all cash and cash equivalents, including bank deposits and interest bearing obligations (valued at cost plus accrued interest and discount), and (ii) securities positions (valued at closing prices i.e., the Net Asset Value of its FSL shares), less total liabilities of the Company (utilizing generally accepted accounting principles, consistently applied under the accrual method of accounting), except to the extent set forth below.

(i) In the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Manager shall determine; and

(ii) The amount of any distribution or dividend made shall be a liability of the Company from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and the determination of Net Asset Value shall be made by the Company's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The difference between the Net Asset Value of the Company and the Net Asset Value of FSL will be directly related to the results of, and charges incident to, the currency hedging trading account maintained with respect to the Shares, which may be somewhat offset by

-12-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014102

SECSEV0591625

the use of leverage.

Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Company will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000 and is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Company's responsibility for the prevention of money laundering, the Company will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Company must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Company reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Company may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Share Application Form included in the Subscription Documents which accompany this Offering Memorandum, and indicate the CHF amount of Shares that are being purchased and mail them to Fairfield Lambda Limited, c/o Citco Fund Services (Europe)

-13-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014103

SECSEV0591626

B.V., Telestone 8 - Teleport, Naritaweg 165, 1043 BW Amsterdam, P.O. Box 7241 1007 JE Amsterdam, The Netherlands; fax no.: (31)20-572 2610.

Subscription funds of investors purchasing Shares should be wire transferred to the Company's account at:

Credit Suisse
P.O. Box 590
8021 Zürich Switzerland

Swift Address:                  CRESCHZZ80A
For Account of                  Citco Bank Nederland N.V., Dublin Branch
Account Number:                 Redacted             300 0

For further credit to:   Fairfield Lambda Limited
Account Number:          Redacted             06 02
International Bank Account Number (IBAN): Redacted    8605

In the event a subscriber cannot wire transfer funds, a check payable to "Fairfield Lambda Limited--Escrow Account" in Swiss franc denominated funds for the full purchase price of the Shares should be mailed to the Company with the Share Application Form.

## FEES, COMPENSATION AND EXPENSES

### Start-up Expenses

The initial offering and organization expenses (including legal and accounting fees), of approximately U.S. $5,000, will be paid by the Company. Such expenses will be amortized among the Company's shareholders during a period of five years from the date of the initial closing.

Expenses   The Company will bear all of the continuing offering costs and all other expenses incurred in the operation of the Company, if any, including the ordinary and necessary expenses directly related to its investment and trading activities, (including the costs incident to the currency hedging account and the leverage utilized by the Company) all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Company. Transactional costs will be included in FSL's compensation of profit and loss and will, accordingly, be borne indirectly by the Company.

-14-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED            FGGE000014104

SECSEV0591627

<u>Performance and Management Fees</u>

The Manager does not receive either a performance fee or a management fee from the Company.  The Manager does receive a quarterly performance fee in an amount equal to 20% of the amount of any new high profits i.e., new appreciation, earned by FSL.

<u>Salaries and Other Personnel Expenses</u>

Mr. Noel will not be compensated for serving as a director of the Company, but he and representatives of the Manager will be reimbursed by the Company for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The directors not affiliated with the Management, of which there are at the present time two, will each be paid a fee of $5,000 per annum by the Company together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

### ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) B.V. ("Ciro") and the Company, Citco serves as the administrator for the Company, under the overall direction of the Company's Board of Directors.  As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Company may require, such as: accounting services; maintaining the Company's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Company's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Company, if required.

To the extent that Citco relies on information supplied by the Company, any investee fund of the Company or any brokers engaged by the Company, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations.  Citco shall not be liable for the accuracy of the underlying data provided to it.

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014105

SECSEV0591628

## RISK FACTORS

Among the substantial risk factors involved in a purchase of Shares in the Company are the following:

1. <u>Trading Risks</u>. Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities. A variety of possible actions by various government agencies also can inhibit the profitability of the Company's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Company.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategy utilized on behalf of FSL and the Company. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed on behalf of FSL and the Company cannot always be implemented or effective in reducing losses. The activities undertaken on behalf of the Company will involve a high degree of leverage. Accordingly, a relatively small price movement may result in substantial and immediate losses in excess of the amount committed to the Company's positions. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities or options at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in the market depend in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2. <u>Securities Trading is Speculative</u>. Options, and sometimes, stock prices, are highly volatile. Price movements are

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014106

SECSEV0591629

influenced by, among other things, changing supply and demand relationships, governmental and trade programs and policies, and national and international political and economic events. The value of an option depends largely upon the likelihood of favorable price movements in the underlying interest in relation to the exercise price during the life of the option.

3.    <u>Trading Strategies May Not be Successful</u>.  There can be no assurance that any trading method employed on behalf of FSL and the Company will produce profitable results, and the past performance of FSL and the other funds managed by the Manager and its principals are not necessarily indicative of the future profitability of the Company.

Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.  Increases in margin levels on futures contracts or securities (including options) may occur in the future.  Such increased margin and other potential regulatory changes may adversely impact the trading strategies.  No assurance can be given that the trading techniques and strategies employed on behalf of FSL and the Company will be profitable in the future.

4.    <u>Dependence Upon Principals and Bernard L. Madoff Investment Securities</u>.  The services of Messrs. Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the profitability of an investment in the Company.  If any of their services were no longer available, their absence would have an adverse impact upon an investment in the Company.  The Manager, as manager of FSL, has delegated all investment management duties to Bernard L. Madoff Investment Securities.  As a result, the Company is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

5.    <u>Conflicts of Interest</u>.  The Manager's Directors and Bernard L. Madoff Investment Securities and its principals, are

-17-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014107

SECSEV0591630

presently affiliated with and may in the future form and manage other investment entities (including, without limitation, investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Company. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies and as the commodity pool operator for entities in addition to the Company. Such activities could detract from the time that the Manager and its principals, and Bernard L. Madoff Investment Securities and its principals allocate to the affairs of FSL and the Company.

6. <u>Conflicts of Interest-Transaction Executions</u>. Bernard L. Madoff Investment Securities, in its role as a market-maker, trades with FSL as principal. Bernard L. Madoff Investment Securities also makes the investment decisions on behalf of FSL through a grant of discretionary authority over the FSL's account at Bernard L. Madoff Investment Securities. As a result of this discretionary authority, Bernard L. Madoff Investment Securities has the ability to use FSL's assets to enhance its market making function and no arm's length relationship exists between the FSL and Bernard L. Madoff Investment Securities in the execution of stock and options transactions for FSL's account. In addition, Bernard L. Madoff Investment Securities is usually, if not always, the contra-party in stock and over-the-counter options transactions with FSL.

7. <u>Competition</u>. The securities industry is highly competitive in the United States. Competition from other persons or entities involved in activities similar to those of FSL can restrict the ability of FSL to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than FSL. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of FSL.

8. <u>Regulated Industries</u>. The securities industry is highly regulated. Neither FSL nor the Company will be directly subject to regulation by the SEC, national securities exchanges, or the Federal Reserve Board. However, the SEC regularly reviews the practices and procedures of the securities industry and the marketplace in general, and from time to time revise rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the Federal Reserve Board, the CFTC

-18-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014108

SECSEV0591631

or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 will not adversely impact the Company.

9. <u>Over-the-Counter Options Transactions</u>. A significant portion of the options transactions effected on behalf of FSL utilizes the over-the-counter market for their execution. Trading equity and index options in the over-the-counter market is subject to contra-party credit risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility. Bernard L. Madoff Investment Securities is usually, if not always, the contra-party in such over-the-counter options transactions.

10. <u>Option Buyer's Risk of Loss of Entire Investment</u>. An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

11. <u>Arbitrage Transactions</u>. Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

12. <u>Assignment of Puts or Calls</u>. Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

13. <u>Prohibition of Exercise Rights</u>. The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014109

SECSEV0591632

into their positions until one of the two restrictions has been lifted.

14.   <u>Limitation on Liability of the Manager</u>.   Pursuant to the Investment Management Agreement between the Company and the Manager, the Manager is not responsible for losses arising out of an error of judgment or simple negligence, but is only responsible for losses resulting from willful misfeasance, bad faith, gross negligence or a reckless disregard of its duties and obligations.   Accordingly, Shareholder losses will not be recoverable from the Manager if they resulted from an erroneous decision made in good faith or simple negligence.   In order for a Shareholder to obtain a recovery from the Manager, the Shareholder will have to demonstrate a high degree of misconduct on the part of the Manager.   Such a high burden of proof may serve to effectively insulate the Manager from liability in the event a Shareholder suffers a loss in his investment in the Company.

15.   <u>Exchange Rate Risk</u>.   The Company will maintain its assets in U.S. dollars.   The Company has established an account which will effect transactions in the currency market in an effort to hedge against such risks as they pertain to the Swiss franc, which is anticipated to be the primary currency of the Series S and Series L Shareholders.   There can be no assurance that such transactions will be successful in protecting the Series S and Series L shareholders against this exchange rate risk.

16.   <u>Currency Trading is Speculative</u>.   The Company will engage in currency trading to hedge the exposure of Swiss franc investors holding dollar denominated assets.   These currency markets are highly volatile.   The profitability of the Company's currency hedging account will depend on the ability of its money manager to analyze correctly the currency markets, which are influenced by, among other things, changing supply and demand relationships, governmental, commercial and trade programs and policies, world political and economic events, and changes in interest rates.   In particular, with respect to the Company's currency trading activities, the effect of governmental intervention may be particularly significant in such markets, and such intervention (as well as other factors) may cause a larger number of these markets to move rapidly in the same direction at different times. Additionally, the currency markets may be particularly sensitive to interest-rate fluctuations, thereby contributing to the likelihood of a substantial portion of the Company's open currency positions moving in the same direction at the same time.

17.   <u>Use of Leverage</u>.   The Company will finance a portion of the purchase price of FSL Shares through a line of credit from the bank

-20-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014110

SECSEV0591633

managing the Company's currency trading account (the "Bank"). The Bank will receive a pledge of the assets underlying the Shares as collateral for amounts borrowed under the line of credit and the Company's obligations in the currency trading account. The use of leverage increases the volatility of the Company's performance and makes it possible for the Company to suffer losses on any open position in excess of the assets allocated to such position. In the event the Company is unable to repay all or any portion of its obligations, all or a portion of the assets underlying the Shares (i.e., the Company's FSL shares) may be forfeited.

18. <u>Currency Trading May be Illiquid</u>. The Company may be unable to execute trades at favorable prices, or at all, if the liquidity of the market is not adequate. Illiquidity may result in substantial losses even in the major (and most liquid) currencies to be traded by the Company. Moreover, the Company may effect transactions in currencies which are not traded on organized exchanges and in which there may be a relatively thin volume of trading. The possibility of losses because of illiquidity may be significantly increased in such markets. In illiquid markets, the Company may become unable to execute the trades indicated by its strategy and could incur substantial losses on open positions without being able to liquidate such positions.

19. <u>Forward Trading in Currencies</u>. The Company will engage in a substantial amount of trading in forward contracts on currencies. Forward contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets. Forward trading is substantially unregulated; there is no limitation on the daily price movements of forward contracts. The principals who deal in the forward markets are not required to continue to make markets in the forward contracts they trade. There have been periods during which certain participants in the forward markets have refused to quote prices for forward contracts or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. The Company will trade forward contracts through a limited number of entities, and as a result liquidity problems might be greater in the Company's forward trades than they would be were trades to be placed through a larger number of forward market participants. The imposition of credit controls by governmental authorities might also limit such forward trading to less than that which the manager of the account would otherwise recommend, to the possible detriment of the Company.

In respect of its forward trading, the Company is subject to the risk of the inability or refusal to perform with respect to such

-21-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE000014111

SECSEV0591634

contracts on the part of the principals or agents with or through which the Company trades. Any such failure or refusal, whether due to insolvency, bankruptcy or other causes, could subject the Company to substantial losses. The Company will not be excused from the performance of any forward contracts into which it has entered due to the default of third parties in respect of other forward trades which in the Company's trading strategy were to have substantially offset such contracts.

Currency forwards prices are volatile. Price movements of these contracts are influenced by, among other things: government trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in the currency markets with the specific intent of influencing prices directly.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, its principals, and Bernard L. Madoff Investment Securities and its principals, may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) in the future with substantially the same or different objectives as those of the Company. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Company and Bernard L. Madoff Investment Securities, as the case may be. Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Company's affairs.

## PRIOR TRADING RESULTS

The Company's securities trading activities, are directed by the Manager. The Company's prior trading results are set forth below on a monthly basis from the commencement of trading in August 1997 through December 1997. Thereafter, a capsule performance summary of the prior trading results of FSL since its inception is set forth. The trading results of the other entities for which FGL or its directors have directed trading, or with which they have otherwise been affiliated, may be obtained upon request.

-22-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE000014112

SECSEV0591635

| Period | Beginning Net Asset Value (1) | Additions (2) | With-drawls(3) | Net Profit/ Loss(4) | Ending Equity(5) | Rate of Return(6) | Shares Out-Standing |
|--------|------|------|------|------|------|------|------|
| **1997** | | | | | | | |
| Aug. | 4,728,444 | 598,444 | -0- | 23,218 | 5,350,106 | + 0.49% | 51,673 |
| Sep. | 5,350,106 | 183,037 | -0- | 133,916 | 5,667,058 | + 2.50% | 53,398 |
| Oct. | 5,667,058 | 9,424 | -0- | (45,569) | 5,630,913 | - 0.80% | 53,487 |
| Nov. | 5,630,913 | 650,821 | -0- | 87,280 | 6,369,014 | + 1.55% | 59,575 |
| Dec. | 6,369,014 | 286,639 | 84,535 | 3,271 | 6,574,390 | + 0.05% | 61,464 |

Rate of Return  (5 mos.) +3.81%

## NOTES TO TABLE

1)      Beginning Net Asset Value represents the sum of cash, cash equivalents and equity balances in trading accounts accounted for at fair market value.  Beginning Net Asset Value is the same as the previous reporting period's Ending Equity.

2)      Additions are the sum of capital contributions as of the last day of the reporting period.

3)      Withdrawals are the sum of partial or total withdrawals of capital as of the last day of the reporting period.

4)      Net Profit/Loss is the sum of the profits and losses realized from trading activities during the reporting period net of the quarterly performance fee (20% of new high net profits) paid to the Investment Manager as the investment manager of FSL, which has been allocated monthly for the purposes of this chart.

5)      Ending Equity is the sum of Beginning Net asset Value plus additions, minus withdrawals, and Net Profit/(Loss) for the reporting period.  Ending equity is the Beginning Net Asset Value for the following reporting period.

6)      Rate of Return is calculated by dividing Net Profit/(Loss) for the reporting period by the Beginning Net Asset Value for that reporting period.  The annual rate of return figures which appear at the end of each year are calculated by applying on a compound basis each of the monthly or quarterly rates of returns for such year to the Beginning Net Asset Value as of the beginning of

-23-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014113

SECSEV0591636

such year, not by adding or averaging such monthly or quarterly rates of return.

FSL

FSL allocates its assets to an account at Bernard L. Madoff Investment Securities (not affiliated with the Company's Directors or FGL) which employs a strategy described as "split strike conversion". This strategy has defined risk and profit parameters which may be ascertained when the position is established. The transactions for a typical position would be (i) the purchase of a group or basket of equity securities that together will highly correlate to the S&P 100 Index (the "OEX"), (ii) the sale of out of the money OEX call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money OEX put options. A call option is out of the money when its strike price is greater than the current price of the stock; a put option is out of the money when the strike price is lower than the current price of the stock. The basket typically consists of approximately 35 stocks in the S&P 100 Index. FSL issued its shares at $200 per share. As of December 31, 1997, Net Asset Value Share was U.S. $506.35 (subject to audit).

## Composite Capsule Performance Summary

### Percentage Rate of Return

|       | 1997    | 1996    | 1995    | 1994    | 1993    | 1992    | 1991    | 1990   |
|-------|---------|---------|---------|---------|---------|---------|---------|--------|
| Jan.  | +2.45%  | +1.49%  | +0.92%  | +2.18%  | 0.00%   | +0.49%  | +3.08%  |        |
| Feb.  | +0.73%  | +0.73%  | +0.76%  | -0.36%  | +1.93%  | +2.79%  | +1.46%  |        |
| Mar.  | +0.86%  | +1.23%  | +0.84%  | +1.52%  | +1.86%  | +1.01%  | +0.59%  |        |
| Apr.  | +1.17%  | +0.64%  | +1.69%  | +1.82%  | +0.06%  | +2.86%  | +1.39%  |        |
| May   | +0.63%  | +1.41%  | +1.72%  | +0.51%  | +1.72%  | -0.19%  | +1.88%  |        |
| Jun.  | +1.34%  | +0.22%  | +0.50%  | +0.29%  | +0.86%  | +1.29%  | +0.37%  |        |
| Jul.  | +0.75%  | 1.92%   | +1.08%  | +1.78%  | +0.09%  | 0.00%   | +2.04%  |        |
| Aug.  | +0.35%  | +0.27%  | -0.16%  | +0.42%  | +1.78%  | +0.92%  | +1.07%  |        |
| Sept. | +2.39%  | +1.22%  | +1.70%  | +0.82%  | +0.35%  | +0.40%  | +0.80%  |        |
| Oct.  | +0.56%  | +1.10%  | +1.60%  | +1.88%  | +1.77%  | +1.40%  | +2.82%  |        |
| Nov.  | +1.56%  | +1.57%  | +0.51%  | -0.55%  | +0.26%  | +1.42%  | +0.08%  |        |
| Dec.  | +0.42%  | +0.48%  | +1.10%  | +0.66%  | +0.45%  | +1.43%  | +1.63   | +2.84% |
| Year  | +14.00% | +12.97% | +12.96% | +11.49% | +11.66% | +14.66% | +18.57% | +2.84% |

Current Net Asset Value:          $985,298,163
Worst Monthly Average Drawdown: -0.55% (11/95)
Worst Peak-to-Valley Drawdown:  -0.55% (11/95)
*Annual rate of return figures are calculated by applying the monthly rate of return figures to the beginning net
 asset value for the year on a compounded basis, and not by adding or averaging

-24-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE000014114

SECSEV0591637

the monthly rates of return.
**"Drawdown" means losses experienced over a specified period of time.

## DESCRIPTION OF SHARES

The Company is authorized to issue up to 5,000,000 shares of common stock with a par value of CHF .01 each (the "Shares"). The Company has an authorized share capital of CHF 50,000. The Shares will be issued in book entry form, unless delivery of the Shares in registered form is requested. Shares will not be issued in bearer form. Each Share, when issued, will be fully paid and nonassessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Company on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Company is directed toward achieving capital appreciation, it is anticipated that the Company will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Company's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.

-25-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014115

SECSEV0591638

## TRANSFERS, REDEMPTIONS AND TERMINATION

Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE COMPANY'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH MONTH OF EACH YEAR.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Company for consent and will not be effective until such consent is given by the Company. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Company and any attempt to do so without first obtaining the Company's consent, which may be withheld in the sole and exclusive discretion of the Company, will constitute grounds for compulsory redemption of the Shares concerned as of the next permissible redemption date (as described below) and the imposition of a processing charge of 2% of the Net Asset Value with respect to such redemption. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Company within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.

THE DISPOSITION OF SHARES TO U.S. PERSONS (AS DEFINED UNDER "OFFERING OF SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE COMPANY IS EXPRESSLY PROHIBITED, AND THE COMPANY SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last day of each month of each year, provided that the Company shall be in receipt of written notice of redemption for at least five (5) business days prior to such redemption date. In the Company's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Company to cancel the redemption.

-26-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014116

SECSEV0591639

## Compulsory Redemption

The Company reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or no reason. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

## Redemptions - General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent voluntarily to redeem is not received by the Company within the prescribed period of time, then in the Company's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Company to cancel the redemption. Except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Company from brokers, banks or other persons, payment on redemptions will be made within 30 business days after the redemption date. The Company will not pay interest to the redeeming shareholder on any payment.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Company reserves the right temporarily to suspend any redemption if the effect of substantial redemptions would seriously impair the Company's ability to operate. Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Offering Memorandum.

## Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Company at any time. If the Company's Board of Directors determines that it would be in the best interests of the Company to wind up and dissolve the Company at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014117

SECSEV0591640

## TAX CONSIDERATIONS AND EXCHANGE CONTROL

Under current legislation in the British Virgin Islands (the "BVI"), there should be no income tax, capital gains or withholding tax, estate duty or inheritance tax payable by the Company or its shareholders who are not residents or citizens of the BVI, in respect of their Shares.

There are no exchange control restrictions in the BVI. Accordingly, the Company will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Company's gains from its trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Company expects that it, will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Company from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Company from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Company may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Internal Revenue Code ["Code"]), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Company and (ii) on the redemption of their Shares by the Company. The Company expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE000014118

SECSEV0591641

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Company in the United States by Andrew E. Goldstein, Esq., 909 Third Avenue, 18th Floor, New York, New York 10022.

## MISCELLANEOUS

### Reports and Financial Statements

The Company's fiscal year will end on December 31, except that the Company's final fiscal year will terminate on the date the Company is placed in liquidation. The Company will keep its books on an accrual basis. Audited financial statements of the Company will be mailed to shareholders at their registered addresses, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Company, which will include the Net Asset Value of the Company and the Net Asset Value per Share at the end of the year, and such other information as the Company, in its discretion, determines to be necessary or appropriate. Shareholders also will receive unaudited quarterly letters with respect to the Company's financial performance.

### Documents Available for Inspection

The Company's books of account and all material documents, including copies of the Company's Memorandum of Association and Articles of Association, the Company's Agreement with the Bank and with the Administrator, Registrar and Transfer Agent shall each by kept at the Company's business office in the British Virgin Islands and each shareholder (or any duly consti-tuted designee of a shareholder) shall have, at all times during reasonable business hours, free access to such documents.

-29-

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED
FGGE000014119

SECSEV0591642

APPENDIX A

FINANCIAL STATEMENTS
OF FAIRFIELD SENTRY LIMITED

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014120

SECSEV0591643

## FAIRFIELD LAMBDA LIMITED
## SHARE APPLICATION FORM

Instructions

A.  All subscribers.  Complete pages A-2 and A-3 by (i) filling in the CHF amount of the Shares subscribed to, and (ii) indicating whether the Shares are to be issued in registered form or in the name of a nominee, and page A-6 by providing the requested information.

B.  Subscriptions by Individuals.  If a subscription is by an individual (including more than one), the "Signature Page for Subscription by an Individual" (page A-4) must be completed.

C.  Subscriptions by Entities.  If a subscription is by an entity (trust, partnership, corporation, bank or broker-dealer), the "Signature Page for Subscription by an Entity" (page A-5)  must be completed.

D.  Items to be delivered by All Subscribers.

    (i)  Completed and signed Share Application Form and corresponding signature page.

    (ii)  Wire transfer funds for the full amount of the subscription in Swiss francs only to the Company's account at:

        Credit Suisse
        P.O. Box 590
        8021 Zürich Switzerland

Swift Address:        CRESCHZZ80A
For Account of        Citco Bank Nederland N.V., Dublin Branch
Account Number:      Redacted 300 0

For further credit to:  Fairfield Lambda Limited
Account Number:      Redacted 06 02
International Bank Account Number (IBAN): Redacted 8605

    (iii)  Subscription documents should be delivered or mailed to Fairfield Lambda Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 - Teleport, Naritaweg 165, 1043 BW Amsterdam, 1007 JE Amsterdam, The Netherlands; tel: (31)20 572-2100, fax no.: (31)20-572-2610.

A-1

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE000014121

SECSEV0591644

## SHARE APPLICATION FORM

To:    Fairfield Lambda Limited
       c/o Citco Fund Services (Europe) B.V.
       Telestone 8 - Teleport
       Naritaweg 165
       1043 BW Amsterdam          Telephone No.: (31)20-5722100
       P.O. Box 7241                    Fax No.: (31)20-5722610
       1007 JE Amsterdam
       The Netherlands

       Please fill in the following information:

       The undersigned hereby irrevocably subscribes for and agrees to purchase CHF _____ of the Shares (the "Shares") of Fairfield Lambda Limited (the "Company") upon the terms of the Information Memorandum dated January 1, 1998, as amended, which I/we have received and read.  I/We acknowledge that I am/we are able to afford a shareholding in a speculative venture having the risks and objectives of the Company.

       I/We declare that the Shares hereby subscribed for are not being (i) acquired directly or indirectly by, and (ii) will not be transferred directly or indirectly to, (A) a natural person who is a citizen, national or resident of, or an institution or other entity organized, created, formed, chartered or resident in, the United States of America ("U.S. Person"), (B) an entity as to which any person or entity described in (A) above is, directly or indirectly, a beneficiary, fiduciary, grantor or decedent, or (C) institutions or other entities owned, in whole or in part, directly or indirectly, by the persons or entities described in (A) or (B) above.

       If the subscriber is a bank or broker-dealer, the subscriber hereby represents and warrants, when it is acquiring Shares on behalf of clients for investment purposes, that such clients are not U.S. Persons, that it will notify the Company if it shall come to its knowledge that any such client is or has become a U.S. Person, that it will not at any time knowingly transfer or deliver the Shares or any part thereof or interest therein to a U.S. Person, and that it will not make any transfer thereof in the United States of America, its territories or possessions.

       I/We declare that I/we have a net worth of at least U.S. $1 Million and hereby consent to being treated as a "professional investor" pursuant to the British Virgin Islands Mutual Funds Act.

A-2

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014122

SECSEV0591645

Shares will be held in book entry form on behalf of the subscriber, following acceptance, by the Administrator, Citco Fund Services (Europe) B.V.

Shares Certificates may be issued in the name of the Shareholder or a Nominee.  If this facility is required, please check this box |__| and if nominee registration is required, fill in the name of the nominee:

The undersigned hereby agrees that the assets underlying his/its Shares (the "Pledged Assets") shall be pledged as collateral to the entity extending credit to the Company in connection with the line of credit described in the Information Memorandum (the "Pledgee") for advances made to the Company under a line of credit provided by such Pledgee on account of such Shares and in connection with the currency trading account described in the Information Memorandum.  The undersigned further agrees that such Pledgee may take any and all action with respect to the Pledged Assets, in the event the Company fails to pay any amounts owed to such Pledgee on account of the Shares, without notice, including, but not limited to ordering the sale of any of the Pledged Assets at any time that there is a default in the Company's obligations and applying the proceeds of such sale in payment of any debt owed by the Company, to such Pledgee on account of the Shares, and that any action taken by the Pledgee with respect to such Pledged Assets shall not be deemed a waiver as to any other action available to the Pledgee with respect to such obligations.

The Subscriber hereby designates and appoints Interman Services Limited, through its authorized officers and directors, with full power of substitution, as its true and lawful Proxy and Attorney-in-Fact for the purpose of voting the shares herein subscribed for as said Proxy may determine on any and all matters which may arise at any annual or special meeting of shareholders and upon which such shares could be voted by shareholders present in person at such meeting.  This Proxy may be revoked by the owner of record of the shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any annual meeting or special meeting of shareholders, or by written notice to Citco Fund Services (Europe) B.V., Telestone 8 - Teleport, Naritaweg 165, 1043 BW Amsterdam, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands; tel: (31)20-572-2100 fax no.: (31)20-572-2610.

A-3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE000014123

SECSEV0591646

Signature Page For Subscription by an INDIVIDUAL

SHARES TO BE REGISTERED AS FOLLOWS;

(Check One)

|__|  INDIVIDUAL SUBSCRIBER          |__|  CO-SUBSCRIBERS
                                           (Both signatures required below)

(Please print all information exactly as you wish it to appear on the Company's records.)

_____
(Name of Subscriber)

_____        _____
(Address)                               (Telephone - Days)

_____        _____
(Country of Residence)                  (Telephone - Evenings)

_____
(Name of Co-Subscriber)

_____        _____
(Address)                               (Telephone - Days)

_____        _____
(Country of Residence)                  (Telephone - Evenings)

                                        _____
                                        (Facsimile Transmission
                                              Number)

Dated _____           Signature(s)      of      Individual
                                        Subscriber(s) (Please print name below
                                        each signature):

                                        _____

                                        _____

                                        _____

                                        _____

A-4

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014124

SECSEV0591647

Signature Page For Subscription by an ENTITY

SHARES TO BE REGISTERED AS FOLLOWS:

ENTITY OWNERSHIP - Check form of organization

|___|   CORPORATION - Please include certified resolutions (or similar documents) authorizing signature.

|___|   PARTNERSHIP - Please include a copy of the partnership agreement (or similar document) authorizing signature.

|___|   TRUST - Please include a copy of the trust agreement.

|___|   BANK or BROKER-DEALER - See Page A-2

(Please print all information exactly as you wish it to appear on the Company's records.)

_____     _____
(Name of Subscriber)                (Telephone - Days)

_____     _____
(Address)                           (Telephone - Evenings)

_____     _____
(Country of Formation)              (Facsimile Transmission
                                     Number)

   The undersigned trustee, partner or officer warrants that he has full power and authority from all beneficiaries or partners or from the board of directors of the entity named below to sign this Share Application Form on behalf of the entity and that a purchase of Shares in Fairfield Lambda Limited is not prohibited by the governing documents of the entity.

Dated _____     Signature(s) of Entity Subscriber(s) (Please print name below each signature):

                                   _____
                                   (Name of Entity)

                                   By: _____
                                       (Trustee, partner or authorized corporate officer)

                                   _____
                                   (Name and Title)

                                   By: _____
                                       (Trustee, partner or authorized corporate officer)

                                   _____
                                   (Name and Title)

A-5

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014125

SECSEV0591648

## SUBSCRIPTION INFORMATION

Name and address for Share Registration:

```
Name       :
Address    :
City       :
Country    :
Telephone  :
Facsimile  :
```

Post Address (if other than address of registration):

```
Name       :
Address    :
City       :
Country    :
Telephone  :
Facsimile  :
```

Name and Address of Remitting Bank:

```
Name       :
Address    :
City       :
Country    :
Telephone  :
Facsimile  :
Account #  :
```

Name and Address of Bank for transfers in case of redemptions
(if other than Name & Address of Remitting Bank):

```
Name       :
Address    :
City       :
Country    :
Telephone  :
Facsimile  :
Account #  :
```

A-6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014126

SECSEV0591649

APPENDIX B

SUBSCRIPTION DOCUMENTS

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FAIRFIELD LAMBDA LIMITED

------

REDEMPTION REQUEST FORM

INSTRUCTIONS

This form should be saved and may be used by a shareholder wishing to redeem Shares in the Company.  Redeeming shareholders should complete and return this form, including page B-3.

------

FAIRFIELD LAMBDA LIMITED
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
P.O. Box 7241
1007 JE Amsterdam                          Telephone: (31)20 572-2100
The Netherlands                                  Fax: (31)20 572-2610

_____, 20__

Dear Sirs:

I hereby request redemption, as defined in and subject to all of the terms and conditions of the Information Memorandum dated January 1, 1998, as amended, of Fairfield Lambda Limited (the "Company"), of _____ Shares, representing [part/all] of my Shares in the Company.  I understand that redemption will only be effective as of the close of business on the last day of any calendar month, upon at least five (5) business days prior written notice.  Except as otherwise provided in the Information Memorandum, payment of the redemption proceeds will be made within thirty (30) business days after the effective date of redemption.

I hereby represent and warrant that (i) I am the owner of the Shares of the Company to which this Request relates, with full power and authority to request redemption of such Shares; and (ii) I am not a "U.S. Person" (as that term is defined in the Offering Memorandum).  These Shares are not subject to any pledge or otherwise encumbered in any fashion.  I acknowledge that my redemption will not be effective unless and until the release of the pledge of the assets underlying the Shares held by the entity extending credit to the Company under the line of credit described in the Information Memorandum.  My signature has been guaranteed by a commercial bank acceptable to the Company.

B-1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014128

SECSEV0591651

REDEMPTION REQUEST FORM (continued)

SIGNATURES MUST BE IDENTICAL TO NAME(S) IN
WHICH SHARES ARE REGISTERED

Wire Transfer Instructions (to be completed by redeeming shareholder)

Bank Name and Address:

ABA No.:

Account Name:

Account No.:

_____

PRINT: Name of Registered          Address
       Owner of Shares

ENTITY SHAREHOLDER (OR ASSIGNEE)       INDIVIDUAL SHAREHOLDER(S)
[PARTNERSHIP, CORPORATION OR TRUST]    (OR ASSIGNEE)

_____           _____
By:_____          _____
   [Signature or partner,              [Signature(s) of
 authorized corporate officer          individual(s) or
 or trustee]                        assignee(s)]

_____           _____
  Name and Title                    [Signature(s) of individual(s)
                                    or assignee(s)]

By:_____
      [Signature or partner,
    authorized corporate officer
    or trustee]

_____
  Name and Title

Signature(s) guaranteed by:

_____

B-2

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000014129

SECSEV0591652

Name and address for Share Registration:

```
Name           :
Address        :
City           :
Country        :
Telephone      :
Facsimile      :
```

Post Address (if other than address of registration):

```
Name           :
Address        :
City           :
Country        :
Telephone      :
Facsimile      :
```

Name and Address of Bank for transfer of redemptions:

```
Name           :
Address        :
City           :
Country        :
Telephone      :
Facsimile      :
Account #      :
```

I:\DATA\WPDOCS\08107_00.001\COR_MEMO\97028234

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000014130

SECSEV0591653