**MCKOOL SMITH, P.C.**
395 9th Avenue, 50th Floor
New York, New York 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

*Counsel for Bank Julius Baer & Co. Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | Adv. Pro. No. 08-1789 (SMB) |
| | : | |
| | : | SIPA LIQUIDATION |
| Plaintiff-Applicant, | : | |
| | : | (Substantively Consolidated) |
| v. | : | |
| | : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| Defendant. | : | |

-----------------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : |
| BERNARD L. MADOFF, | : |
| | : |
| Debtor. | : |

-----------------------------------------------------------------X

| | | |
|---|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | : | Adv. Pro. No. 11-2922 (SMB) |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BANK JULIUS BAER & CO. LTD., | : | |
| | : | |
| Defendant. | : | |

-----------------------------------------------------------------X

## DEFENDANT BANK JULIUS BAER & CO. LTD.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT
## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    I.      BACKGROUND ........................................................................................ 2

    II.     THE TRUSTEE'S ACTION AGAINST THE FAIRFIELD FUNDS.................. 3

    III.   THE ACTIONS BROUGHT BY THE FAIRFIELD LIQUIDATORS ................ 4

    IV.   THE PRESENT COMPLAINT AGAINST BJB.................................................. 4

    V.    THE TRUSTEE'S COMPLAINTS AGAINST OTHER ALLEGED
          SUBSEQUENT TRANSFEREES ........................................................................ 5

ARGUMENT ............................................................................................................ 5

    I.      THE COURT LACKS PERSONAL JURISDICTION OVER BJB...................... 5

        A.    BJB Did Not Consent to Personal Jurisdiction in New York .................... 5

        B.    BJB Is Not Subject to General Jurisdiction in New York ......................... 6

        C.    BJB Is Not Subject to Specific Jurisdiction in New York ......................... 6

            1.    Applicable Law................................................................................ 6

            2.    The Trustee's Claim Does Not Arise Out of or Relate to Any
                 Purposeful Conduct of BJB in the United States ............................ 7

                 a.    Knowledge That Fairfield Purported to Invest
                     Subscription Funds with BLMIS Is Insufficient to
                     Establish Jurisdiction .......................................................... 7

                 b.    Receipt of Customer Property Does Not Establish
                     Jurisdiction ......................................................................... 7

                 c.    Sending and Receiving Funds Through a New York
                     Bank Account Is Insufficient to Establish
                     Jurisdiction ..................................................................... 10

                 d.    Alleged Meetings and Communications Involving
                     BJB Are Insufficient to Establish Jurisdiction.................. 12

    II.     THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF THE
         ALLEGED INITIAL TRANSFERS MADE MORE THAN TWO YEARS
         BEFORE THE FILING DATE ............................................................................ 16

A.    The Alleged Initial Transfers Were Made By, to, and for the Benefit of a Covered Entity ................................................................. 17

B.    The Alleged Initial Transfers Were Made in Connection with a Securities Contract and Are Also Settlement Payments ......................... 18

C.    Any Transfers Pre-Dating the Two-Year Pre-Filing Period Are Time-Barred ......................................................................... 19

D.    The Trustee Has Not Alleged that BJB Had Actual Knowledge of Madoff's Fraud ....................................................................... 19

III.    THE SECTION 546(e) SAFE HARBOR SHIELDS ALL OF THE REMAINING ALLEGED INITIAL TRANSFERS ............................................ 22

A.    The Trustee Has Failed to Allege Actual Fraudulent Intent as Required by Section 548(a)(1)(A) and Rule 9(b) ...................................... 22

B.    The Trustee Should Not Be Permitted to Rely on the Ponzi Scheme Presumption to Avoid His Pleading Burden ................................. 23

IV.    THE TRUSTEE HAS FAILED TO PLEAD THE AVOIDABILITY OF THE ALLEGED INITIAL TRANSFERS .......................................................... 24

V.    THE AMENDED COMPLAINT ESTABLISHES BJB'S GOOD FAITH DEFENSE ....................................................................................... 27

A.    Value ....................................................................................... 27

B.    Good Faith .............................................................................. 28

C.    Without Knowledge of Voidability ......................................... 30

VI.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD THAT BJB RECEIVED CUSTOMER PROPERTY ........................................... 30

A.    The Trustee Has Not Plausibly Alleged That Any of the Alleged Subsequent Transfers Contain Customer Property .................................. 30

B.    The Trustee's Amended Complaint Seeks to Recover Transfers Made by Sentry at Times When the Trustee Alleges There Was No Money Left From BLMIS .......................................................... 33

VII.    THE TRUSTEE'S NEW ALLEGATIONS OF ADDITIONAL SUBSEQUENT TRANSFERS DO NOT RELATE BACK TO THE INITIAL PLEADING AND ARE THEREFORE TIME BARRED

CONCLUSION ............................................................................................... 40

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................21, 35, 42

*Atherton v. F.D.I.C.*,
  519 U.S. 213 (1997)....................................................................................................................39

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)...............................................................................................10, 20

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*,
  803 F.3d 835 (7th Cir. 2015) ....................................................................................................41

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)...........................................................................................................10, 11, 13

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014).......................................................................................................................9

*David v. Bifani*,
  No. 07-cv-00122-MEH-BNB, 2007 WL 1216518 (D. Colo. Apr. 24, 2007).........................36

*Fairfield Sentry Ltd. (In Liquidation) v. Migani*,
  [2014] UKPC 9 .............................................................................................................................6

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*,
  2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)............................................................25

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
  26 N.Y.2d 280 (1970) ...........................................................................................................12, 13

*Finn v. Alliance Bank*,
  860 N.W.2d 638 (Minn. 2015)...................................................................................................34

*Giuliano v. Barch*,
  No. 16 CV 0859 (NSR), 2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ...............................12

*Grove Press, Inc. v. Angleton*,
  649 F.2d 121 (2d Cir. 1981)........................................................................................................10

*Hanson v. Denckla*,
  357 U.S. 235 (1958)......................................................................................................................10

iii

*Hau Yin To v. HSBC Holdings, PLC*,
   15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017).........................14, 15, 16, 17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984)...............................................................................................................10, 11

*In re AMR Corp.*,
   567 B.R. 247 (Bankr. S.D.N.Y. 2017)........................................................................................4

*In re Bernard L. Madoff Inv. Sec. LLC*,
   468 B.R. 620 (Bankr. S.D.N.Y 2012).......................................................................................51

*In re Bernard L. Madoff Inv. Sec. LLC*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014)...........................................................................44, 45, 48

*In re Lehman Bros. Holdings Inc.*,
   535 B.R. 608 (Bankr. S.D.N.Y. 2015).......................................................................................10

*In re M. Fabrikant & Sons, Inc.*,
   447 B.R. 170 (Bankr. S.D.N.Y. 2011).......................................................................................50

*In re M. Fabrikant & Sons, Inc.*,
   480 B.R. 480 (S.D.N.Y. 2012)..................................................................................................51

*In re Sledziejoinwski*,
   Case No. 13-22050 (RDD), Case No. 13-22748, 2016 WL 6155929 (Bankr. S.D.N.Y.
   Oct. 21, 2016) ...........................................................................................................................15

*In re Trib. Co. Fraudulent Conv. Litig.*,
   946 F.3d 66 (2d Cir. 2019)........................................................................................................24

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   10 F.4th 147 (2d Cir. 2021).......................................................................................................27

*In re Uplift RX, LLC*,
   625 B.R. 364 (Bankr. S.D. Tex. 2021) ........................................................................50, 51, 53

*Int'l Customs Assocs. v. Ford Motor Co.*,
   893 F. Supp. 1251 (S.D.N.Y. 1995)....................................................................................13, 19

*J.E.T. Advertising Assocs., Inc. v. Lawn King, Inc.*,
   84 A.D.2d 744 (2d Dep't 1981) ................................................................................................12

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018)...............................................................................................................17

*Jonas v. Estate of Leven*,
   116 F. Supp. 3d 314 (S.D.N.Y. 2015).......................................................................................12

iv

*Kennedy v. Mondelez Glob. LLC*,
No. 19-CV-302, 2020 WL 4006197 (E.D.N.Y. July 10, 2020) .............................................48

*Knight v. Standard Chartered Bank*,
531 F. Supp. 3d 755 (S.D.N.Y. 2021) ...........................................................................................9

*Knight v. Standard Chartered Bank*,
531 F. Supp. 3d 767 (S.D.N.Y. 2021) .........................................................................................20

*Law v. Siegel*,
571 U.S. 415 (2014) .....................................................................................................................29

*Leema Enters., Inc. v. Willi*,
575 F. Supp. 1533 (S.D.N.Y. 1983) ............................................................................................15

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
17 Civ. 3793 (PAE), 2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017) ...........................................16

*Lowden v. William M. Mercer, Inc.*,
903 F. Supp. 212 (D. Mass. 1995) ..............................................................................................36

*Lustig v. Weisz & Assocs. (In re Unified Com. Cap., Inc.)*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001) ................................................................................34, 35

*Maranga v. Vira*,
386 F. Supp. 2d 299 (S.D.N.Y. 2005) .........................................................................................18

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
12 N.E.3d 456 (N.Y. 2014) .........................................................................................................17

*McKee Elec. Co. v. Rauland-Borg Corp.*,
20 N.Y.2d 377 (1967) ..................................................................................................................18

*Merit Mgmt. Grp. v. FTI Consulting*,
138 S. Ct. 883 (2018) ..................................................................................................................23

*Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*,
648 F. Supp. 1153 (S.D.N.Y. 1986) ............................................................................................12

*Metals All. Corp. v. Beshay*,
No. 97 CV 3401, 1998 WL 811788 (S.D.N.Y. Nov. 19, 1998) ..................................................19

*Metzeler v. Bouchard Transp. Co., Inc.* (*In re Metzeler* ),
66 B.R. 977 (Bankr. S.D.N.Y. 1986) ..........................................................................................51

*Mortg. Funding Corp. v. Boyer Lake Pointe, LC*,
379 F. Supp. 2d 282 (E.D.N.Y. 2005) .........................................................................................13

v

*Muhammad v. Bethel-Muhammad*,
No. 11-0690-WS-B, 2012 WL 1854315 (S.D. Ala. May 21, 2012).......................................36

*NCUA Bd. v. Morgan Stanley & Co.*,
No. 13 Civ. 6705 (DLC), 2014 WL 1673351 (S.D.N.Y. Apr. 28, 2014) ...............................36

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
No. 08-CV-5023 (CBA) (RLM), 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010)...................36

*Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ..............................................................................32, 33

*Parke-Bernet Galleries, Inc. v. Franklyn*,
26 N.Y.2d 13 (1970) ...........................................................................................................19

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)................................................................................................45

*Phoenix Ancient Art, S.A. v. J. Paul Getty Tr.*,
17 CIV. 241 (ER), 2018 WL 1605985 (S.D.N.Y. Mar. 29, 2018) .........................................20

*Picard v. ABN Amro Bank (Ireland) Ltd.*,
505 B.R. 135 (S.D.N.Y. 2013)...............................................................................................30

*Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*,
12 F.4th 171 (2d Cir. 2021) ...............................................................................33, 34, 35, 42

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014)...............................................................................24, 27, 28

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015)................................................................35, 42, 43

*Quilvest Finance Ltd. v. Fairfield Sentry Ltd.*,
Case Nos. HCVAP 2011/041-052 ...................................................................................39, 41

*RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*,
19 Civ. 10247, 2021 WL 230194 (S.D.N.Y. Jan. 22, 2021)....................................................19

*Roper Starch Worldwide, Inc. v. Reymer & Assocs.*,
2 F. Supp. 2d 470 (S.D.N.Y. 1998)...............................................................................12, 14

*Rosenblatt v. Coutts & Co. AG*,
17 Civ. 3528 (AKH), 2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017).....................................14

*Russello v. United States*,
464 U.S. 16 (1982).................................................................................................................38

*Salahuddin v. Cuomo*,
  861 F.2d 40 (2d Cir. 1988)..................................................................................37

*Sapia v. Home Box Off., Inc.*,
  No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018)..........................................45

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  594 B.R. ...................................................................................................51, 53

*Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
  516 B.R. 18 (S.D.N.Y. 2014)..............................................................................41

*Securities Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Securities LLC*,
  08-01789 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ...............4, 9, 13, 29

*Securities Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Securities LLC*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)........................................................... passim

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
  403 F.3d 43 (2d Cir. 2005)..............................................................................32, 35

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Fairfield Inv. Fund Ltd.)*,
  No. 08-01789, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021)............................. passim

*SIPC v. Bernard L. Madoff Inv. Secs. LLC*,
  2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).......................................27, 28, 30, 31

*SIPC v. Bernard L. Madoff Inv. Secs. LLC*,
  476 B.R. 715 (S.D.N.Y. 2012)..............................................................................25

*SPV Osus Ltd. v. UBS AG*,
  114 F. Supp. 3d 161 (S.D.N.Y. 2015)..................................................................18

*Sullivan v. Kodsi*,
  373 F. Supp. 2d 302 (S.D.N.Y. 2005)..................................................................42

*SunLight Gen. Cap. LLC v. CJS Invs. Inc.*,
  114 A.D.3d 521 (1st Dep't 2014) ......................................................................12

*Tamam v. Fransabank Sal*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010)..................................................................16

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)..........................................................................................26

*United States v. International Longshoremen's Ass'n*,
  518 F. Supp. 2d 422 (E.D.N.Y. 2007) ................................................................37

4864-2031-7736

*Universal Trading & Inv. Co. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. 2012) .................................................................17

*V Cars, LLC v. Israel Corp.*,
    902 F. Supp. 2d 349 (S.D.N.Y. 2012) .............................................................20

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020) .............................................................16

*Walden v. Fiore*,
    571 U.S. 277 (2014) ...................................................................................11, 12

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ...........................................................................10

*Ziparo v. CSX Transp.*,
    15 F. 4th 153 (2d Cir. 2021) ...........................................................................38

**STATUTES**

CPLR § 302 ...............................................................................................................10

CPLR § 302(a)(1) ...............................................................................................10, 18

Fed. R. Bankr. P. 7012 ........................................................................................... iv

Fed R. Civ. P. 8(a) ...............................................................................................3, 37

Fed. R. Civ. P. 8(a)(2) .............................................................................................36

Fed. R. Civ. P. 10(c) ...............................................................................................36

Fed. R. Civ. P. 12(b)(2) and 12(b)(6) ................................................................... iv

Fed. R. Civ. P. 15(c) ..........................................................................................49, 51

Fed. R. Civ. P. 15(c)(1)(b) .......................................................................................50

Fed. R. Civ. P.  15(c)(1)(a) .......................................................................................50

Rule 8(a)(2)'s ...........................................................................................................37

Rule 9(b) ......................................................................................................32, 33, 35

Rule 12(b)(6) ..............................................................................................................4

11 U.S.C. § 101(22)(A) ......................................................................................25, 26

11 U.S.C. § 101(53A)(B) .........................................................................................25

4864-2031-7736

11 U.S.C § 546(e) ................................................................................................ passim

11 U.S.C § 548(a)(1)(A) ......................................................................................... 34

11 U.S.C. § 548(a)(1)(B) ........................................................................................ 38

11 U.S.C. § 550 ...................................................................................................... 42

11 U.S.C. § 550(a) .................................................................................... 23, 30, 32, 49

11 U.S.C. § 550(b) .................................................................................................. 38

11 U.S.C. § 550(f) ............................................................................................ 4, 49, 50

11 U.S.C. § 741(7) .................................................................................................. 27

15 U.S.C. § 78fff-2(c)(3) ........................................................................................ 42

Article 47 of the Swiss Banking Act ....................................................................... 22

Bankruptcy Rule 7004 ............................................................................................ 10

**OTHER AUTHORITIES**

*Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021) ............................................... 38

Defendant Bank Julius Baer & Co. Ltd. ("BJB") submits this memorandum of law in support of its motion to dismiss the Amended Complaint ("Amended Complaint" or "AC") of Irving Picard ("Trustee"), Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), as made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012.

## PRELIMINARY STATEMENT

BJB is among the many victims of Bernard Madoff's infamous Ponzi scheme. Although BJB never had a BLMIS account, it invested on behalf of its clients in Fairfield Sentry Limited ("Sentry"), Fairfield Lambda ("Lambda"), and Fairfield Sigma ("Sigma" and together with Sentry and Lambda, "Fairfield Funds" or "Fairfield"), which invested most (but not all) of their assets with BLMIS. Notwithstanding BJB's lack of involvement in or knowledge of the fraud, the Trustee seeks to claw back over $60 million in alleged redemptions that BJB received, in good faith, from the Fairfield Funds (not BLMIS) in the six years prior to the BLMIS bankruptcy filing.

BJB moves to dismiss the Amended Complaint for six independent reasons. First, this Court lacks personal jurisdiction over BJB, a non-U.S. entity who is not "at home" in New York, and whose alleged U.S. contacts are too scant to support jurisdiction. Second, the Trustee's claims are barred by the safe harbor under Section 546(e) of the Bankruptcy Code, which protects transfers, like the redemptions here, made by or to a stockbroker or financial institution as settlement payments or transfers in connection with a securities contract. Third, the Trustee has failed to plead the essential element of avoidance or avoidability of the alleged initial transfers. Although the Trustee has tried to plug this gap by incorporating into the Amended Complaint the entire complaint from another action, this shortcut violates Fed R. Civ. P. 8(a). Fourth, even if this Court credits the Trustee's incorporation of the other complaint, the pleadings establish a defense of good faith barring the Trustee's claims because they establish that BJB would not have

1

discovered Madoff's fraud. Fifth, the Trustee has not plausibly alleged that BJB is a subsequent

transferee of BLMIS customer property, an essential element of his claim. The Trustee seeks to

recover approximately $5 billion in subsequent transfers from Sentry, even though the underlying

initial transfers to Sentry total only $3 billion. That is more than implausible; it is mathematically

impossible. Sixth, the Amended Complaint alleges millions in new subsequent transfers more than

a decade too late. These newly-added transactions do not relate back to the Original Complaint

("OC") and thus are time barred by the applicable statute of limitations. *See* 11 U.S.C. § 550(f).[1]

## STATEMENT OF FACTS[2]

## I.    Background

The Madoff Ponzi scheme was revealed in December 2008. From the 1990s until BLMIS's

collapse, Sentry sold shares directly to foreign investors. AC ¶¶ 4, 65. Sigma and Lambda were

"currency funds" that accepted investments in foreign denominations and then invested in Sentry.

Sentry, in turn, invested with BLMIS. *Id*. ¶¶ 2-4.

---

[1] BJB acknowledges that the Court has rejected arguments similar to those raised in this motion in related cases. *See Picard v. Banque Lombard Odier & Cie SA* (*In re BLMIS*), Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ("*Banque Lombard Odier*"); *Picard v. Banca Carige S.P.A.* (*In re BLMIS*), Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ("*Banca Carige S.P.A.*"); *Picard v. Bordier & Cie* (*In re BLMIS*), Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022) ("*Bordier & Cie*"); *Picard v. Lloyds TSB Bank PLC* (*In re BLMIS*), Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022) ("*Lloyds TSB Bank*"); *Picard v. Banque SYZ & Co., SA* (*In re BLMIS*), Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque SYZ*"); *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ("*Multi-Strategy Fund*"). BJB advances these arguments because the facts are sufficiently distinguishable to warrant a different outcome or to preserve the arguments for appeal.

[2] These facts are taken from the Complaint, the Trustee's pleadings in other Madoff proceedings and other items of which the Court may take judicial notice. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC* (*Picard v. Fairfield Inv. Fund Ltd.*), No. 08-01789, 2021 WL 3477479, at *2 (Bankr. S.D.N.Y. Aug. 6, 2021) (on motion under Rule 12(b)(6), "'courts must consider … matters of which a court may take judicial notice'") (citations omitted). Here, the Court may take judicial notice of the Trustee's pleadings in other adversary proceedings. *See In re AMR Corp.*, 567 B.R. 247, 250 n.2 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714 (S.D.N.Y. 2019), *aff'd sub nom. In re AMR Corp.*, 834 Fed. Appx. 660 (2d Cir. 2021) (unpublished) ("Judicial notice is appropriate even though the parties' litigation spans several different adversary proceedings in this bankruptcy") (collecting cases).

BJB is a Swiss Bank incorporated under the laws of Switzerland, with its principal place of business in Switzerland. AC ¶ 68. BJB invested with and redeemed shares from the Fairfield Funds. AC ¶ 16. The Trustee does not allege that BJB held an account with BLMIS or ever received money directly from BLMIS. Nor does the Trustee allege that BJB had any knowledge, notice, or suspicion of Madoff's fraud.

## II.    The Trustee's Action Against the Fairfield Funds

On July 20, 2010, the Trustee filed the Fairfield Amended Complaint, naming the Fairfield Funds and additional defendants ("FGG Defendants") associated with the Fairfield Greenwich Group ("FGG"), alleging that BLMIS made approximately $3 billion in initial transfers to Sentry from December 11, 2002 to December 11, 2008. *See also* Second Amended Complaint, *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pr. No. 09-01239 (Bankr. S.D.N.Y.) (the "Fairfield Action"), Docket No. 286 (the "Fairfield SAC") ¶ 315.

On May 9, 2011, the Trustee settled with the Fairfield Liquidators. *See* Settlement Agreement ("Fairfield Settlement"), Fairfield Action, Dkt. No. 69-2 (Halper Decl. Ex. 7). In the Fairfield Settlement, the Trustee and the Fairfield Liquidators "each agree[d] to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims." Fairfield Settlement ¶ 14. "Sharing Claims" includes the present action. *Id.* ¶¶ 4, 7, 11. The parties also agreed to provide "reasonable cooperation and assistance … in connection with the prosecution of the Sharing Claims." *Id.* ¶ 14.

On August 28, 2020, the Trustee filed the Fairfield SAC, seeking to recover, as BLMIS customer property, approximately $1 billion allegedly paid by Sentry to FGG Defendants (*i.e.*, one-third of the total amount of customer property BLMIS allegedly transferred to Sentry). *See* Fairfield SAC Exs. 8, 10, 12, 13-14, 21, Dkt. Nos. 286-8, 286-10, 286-12, 286-13, 286-14, 286-21.

3

### III.    The Actions Brought by the Fairfield Liquidators

Shortly after Madoff's fraud was revealed, the Fairfield Funds entered liquidation in the BVI. Fairfield Settlement at 2-3. The Fairfield Liquidators commenced actions in the BVI against several alleged Fairfield investors seeking repayment of redemptions made prior to BLMIS's collapse. *See* Exhibit G to the Fairfield Settlement ("Settlement Exhibit G"), *Fairfield*, Dkt. No. 69-9 (Halper Decl. Ex. 8), at 6-7; *see also Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani*") (available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf). The Fairfield Liquidators discontinued the BVI litigation following a final appellate decision in April 2014 issued by the U.K. Privy council in favor of defendants. *See Migani*. Starting in April 2010, the Fairfield Liquidators commenced actions in New York against hundreds of Fairfield shareholders, including BJB. *See* Settlement Exhibit G (listing 209 actions as of May 11, 2011).[3]

### IV.    The Present Complaint against BJB

On December 8, 2011, the Trustee commenced this Action seeking over $30 million BJB allegedly received for redeeming Fairfield Funds' shares. Over ten years later, on April 15, 2022, the Trustee filed the Amended Complaint, seeking an additional $27 million in newly alleged transfers, nearly double the amount sought in the Original Complaint.[4] BLMIS made numerous initial transfers over six years to Sentry, totaling approximately $3 billion. AC ¶ 72, Ex. B. On multiple different days during those six years, in 143 separate transactions, approximately $53 million in redemptions were transferred from Sentry to BJB, $11 million from Sentry to Sigma to BJB, and $364 thousand from Sentry to Lambda to BJB (the "Redemptions"). AC ¶¶ 79, 84, 88;

---

[3] This Court may take judicial notice of pleadings in other actions, *see supra* n.2*,* especially here where the Trustee is in privity with the Fairfield Liquidators in actions to recover alleged BLMIS customer property and the Trustee and Fairfield Liquidators have stipulated to a joint interest between them in this respect.

[4] The Amended Complaint alleges $17,691,330 in new subsequent transfers from Sentry to BJB and $9,647,806 from Sentry to Sigma to BJB. *Compare* OC ¶¶ 40, 42 and Exs. C, E *with* AC ¶¶ 79, 84 and Exs. C, E.

Exs. C, E, G. The Trustee does not identify which portions, if any, of the alleged initial transfers from BLMIS to Sentry were subsequently transferred to BJB.

## V.    The Trustee's Complaints Against Other Alleged Subsequent Transferees

In addition to the claims against BJB, the Trustee also filed approximately six dozen actions against other Fairfield investors. In the aggregate, the Trustee seeks to recover approximately $4 billion from defendants who allegedly received redemption payments from Sentry, Fairfield SAC Exs. 5-6, Dkt. Nos. 286-5, 286-6; Halper Decl. Ex. 6, ¶ 10, plus approximately $1 billion in amounts paid by Sentry to the FGG Defendants, Halper Decl. ¶ 11. In sum, the Trustee is seeking roughly $5 billion in alleged subsequent transfers from Sentry, while simultaneously alleging that BLMIS made initial transfers of only $3 billion to Sentry.

## ARGUMENT

### I.    The Court Lacks Personal Jurisdiction Over BJB

#### A.    BJB Did Not Consent to Personal Jurisdiction in New York

The Trustee alleges that BJB submitted to New York law and jurisdiction based on choice of law and forum selection clauses contained in Fairfield's subscription agreements. AC ¶ 21. But the subscription agreements do not control here. In *Migani*, the Privy Council held that redemptions are governed by Sentry's Articles of Association and BVI law, not the subscription agreements. *Migani*, [2014] UKPC 9, ¶¶ 10, 17, 20. Following *Migani*, this Court rejected the Fairfield Liquidators' arguments that foreign defendants consented to personal jurisdiction in the United States by signing Fairfield subscription agreements. *See In re Fairfield Sentry Ltd.*, No. 10-13164, 2018 WL 3756343, at *12 (Bankr. S.D.N.Y. Aug. 6, 2018). And in this Court's recent decisions, it recognized that the subscription agreements cannot "be used as the sole basis for this Court's exercise of personal jurisdiction." *See, e.g., Multi-Strategy Fund*, 2022 WL 2137073, at

5

*11 n.3. Even when considered with the other allegations, the subscription agreements do not establish jurisdiction here.[5]

### B.    BJB Is Not Subject to General Jurisdiction in New York

The Trustee does not, and cannot, allege that this Court has general jurisdiction over BJB. General jurisdiction exists only when the defendant is "at home" in the forum, either by being incorporated under the laws of the forum or having its principal place of business there. *Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014). It is undisputed that BJB is a Swiss bank with its principal office in Zurich, which has not operated a branch in New York since 2006. AC ¶¶ 68-70. "[C]ases in this Circuit have consistently rejected the claim that banks . . . incorporated and with principal places of business abroad, but with branches in the United States—are 'at home' here." *See e.g. Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 766 (S.D.N.Y. 2021).[6]

### C.    BJB Is Not Subject to Specific Jurisdiction in New York

The Trustee bears the burden of establishing personal jurisdiction. *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 618 (Bankr. S.D.N.Y. 2015). He must show both a statutory basis for specific jurisdiction, and that such jurisdiction comports with due process. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327-28, 334 (2d Cir. 2016). Neither requirement is met here.

### 1.    *Applicable Law*

Exercising specific jurisdiction over a nonresident is consistent with due process only if:

(1) the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the

---

[5] The Trustee also suggests that BJB's fee sharing agreement with "FG Limited" establishes personal jurisdiction over BJB because such agreements are "typically" governed by New York law. AC ¶¶ 22-23. Notably, the Trustee does not allege that the particular agreement relating to Sentry is governed by New York law or has a forum selection clause. Nor does the Trustee allege any facts regarding where the agreement was negotiated, where it was to be performed, or how it relates, at all, to the redemptions at issue.

[6] The Trustee also includes conclusory allegations regarding Julius Baer Investment Management LLC ("JBIM"), a separate entity, AC ¶¶ 11-12, 71. JBIM is not a defendant and its contacts cannot establish jurisdiction as to BJB because the Trustee has not pled that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, [BJB]." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981).

6

forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); (2) the plaintiff's claim "arise[s] out of or relate[s] to the foreign corporation's activities in the forum State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); and (3) the exercise of jurisdiction is reasonable under the circumstances, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985). The statutory requirements here are essentially identical.[7] Furthermore, because "[e]ach transfer is a separate claim, . . . the Trustee 'must establish the court's jurisdiction with respect to each [transfer] asserted.'" *Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Securities LLC*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (citing *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018).

> 2. *The Trustee's claim does not arise out of or relate to any purposeful conduct of BJB in the United States*

The alleged contacts identified by the Trustee do not constitute purposeful availment by BJB and bear no substantial connection to the Trustee's claim to recover Redemptions.

> a. Knowledge that Fairfield purported to invest with BLMIS is insufficient to establish jurisdiction.

The Trustee alleges that BJB is subject to personal jurisdiction because it "knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS, via the FGG Feeder Funds" and entered into a retrocession fee agreement with FG Limited, an entity with its principal place of business in New York. AC ¶¶ 16, 22-23. But the law is clear that anticipated performance in New York *by a third party* does not show purposeful availment, even when a foreign defendant contracts *directly* with a forum resident. *Burger King*, 471 U.S. at 478.

---

[7] The Trustee invokes CPLR § 302 and Bankruptcy Rule 7004. AC ¶ 9. CPLR § 302 provides personal jurisdiction over an out-of-state defendant only if: (i) the defendant "transacts any business within the State" and (ii) the plaintiff's claim "arises from" such business activity. CPLR § 302(a)(1). As interpreted by the New York Court of Appeals, CPLR § 302(a)(1) overlaps with the first two requirements of the due process test. *See, e.g., Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-49 (2d Cir. 2007). Similarly, Bankruptcy Rule 7004(f) provides for personal jurisdiction if "the exercise of jurisdiction is consistent with the Constitution and laws of the United States." Thus, under either CPLR § 302(a)(1), or Bankruptcy Rule 7004(f), the statutory analysis largely collapses into the constitutional analysis.

"'[U]nilateral activity' of a third party . . . 'cannot satisfy the requirement of contact with the forum State.'" *Walden v. Fiore*, 571 U.S. 277, 291 (2014)); *see also Helicopteros,* 466 U.S. at 417 (same). The Supreme Court has made clear that specific jurisdiction must be established by "contacts that the 'defendant *himself*' creates with the forum State," *not* by "contacts between the plaintiff (or third parties) and the forum State," and *not* by "the defendant's contacts with persons who reside there." *Walden*, 571 U.S. 284-85 (citations omitted). Thus, the actual or anticipated activities of BLMIS, the Fairfield Funds, or FG Limited in New York are not relevant when determining whether *BJB* engaged in purposeful conduct in New York. Alleging that a defendant *knew* of a third party's "strong forum connections" does not change the analysis. *Id*. at 289 (cleaned up).

Accordingly, courts routinely deny specific jurisdiction over a nonresident based on allegations that the defendant contracted with a New York plaintiff that performed or was expected to perform in New York.[8] As the New York Court of Appeals explained, "[t]he mere receipt by a nonresident of benefit or profit from a contract performed by others in New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under our long-arm statute." *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 285 (1970) (citation omitted).

---

[8] *See, e.g., Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL 1234042, at *9 (S.D.N.Y. Mar. 31, 2017) ("Plaintiff's contention that the Court has personal jurisdiction because Plaintiff performed *his* obligations under the Agreements in New York is also unavailing."); *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 327 (S.D.N.Y. 2015) (allegations that plaintiff "built out an office in New York, hired personnel, and performed trades and analyses here is also unavailing" because "his unilateral activity in the forum state would be insufficient to establish jurisdiction"); *Roper Starch Worldwide, Inc. v. Reymer & Assocs.*, 2 F. Supp. 2d 470, 474 (S.D.N.Y. 1998) (defendant's "knowledge of, and acquiescence in," New York plaintiff's performance in New York under the parties' contract did not suffice to establish personal jurisdiction over nonresident corporation); *Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*, 648 F. Supp. 1153, 1157 (S.D.N.Y. 1986) (performance of parties' contract by New York plaintiff in New York did not subject California defendant to personal jurisdiction); *SunLight Gen. Cap. LLC v. CJS Invs. Inc.*, 114 A.D.3d 521, 522 (1st Dep't 2014) ("Plaintiff's actions within New York" in connection with contract with out-of-state defendant could not "be imputed to [defendant] for jurisdictional purposes"); *J.E.T. Advertising Assocs., Inc. v. Lawn King, Inc.*, 84 A.D.2d 744, 745 (2d Dep't 1981) (no specific jurisdiction because "[a]ll of the New York activities relating to the contract were performed by plaintiff and cannot be attributed to the defendant").

Thus, whether BJB hoped to profit from BLMIS's purported trading activities in New York when it invested in the Fairfield Funds on behalf of clients does nothing to establish that BJB purposefully availed itself of the benefits of New York law.

The pertinent question instead is whether and to what extent the *defendant* performed or was obligated to perform in New York.[9] Here, BJB was simply a nominal investor in Fairfield;[10] there is no allegation that BJB was expected to provide any good, service, or other performance in New York or the United States, meaning there were no "continued and wide-reaching contacts," *Burger King*, 471 U.S. at 479-80, sufficient to establish specific jurisdiction.

> b.      Receipt of customer property does not establish jurisdiction.

The Trustee also asserts jurisdiction based on BJB's alleged knowing receipt of subsequent transfers of BLMIS customer property. AC ¶ 16. Even if the Trustee had adequately alleged that the Redemptions originated from BLMIS (he has not), it is well established that sending or receiving even large payments into or out of New York does not constitute purposeful availment if made to comply with a contract negotiated and executed outside of New York.[11]

For example, in *Hau Yin To*, foreign investors brought suit in New York against foreign

---

[9] *See Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 288 (E.D.N.Y. 2005) ("Plaintiff's business interactions with New York are not at issue when assessing personal jurisdiction. Rather, the Court must evaluate the Defendants' activities and conduct" in New York.); *Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995) ("appropriate focus . . . is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did") (citations omitted), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

[10] The mere fact that BJB was an investor or shareholder in the Fairfield Funds does not change the analysis, because the jurisdictional contacts of a corporation generally are not attributed to an investor unless the investor is an alter ego of the corporation. *See, e.g., Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 283 (1970).

[11] *See Hau Yin To v. HSBC Holdings, PLC*, 15CV3590-LTS-SN, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017), aff'd, 700 F. App'x 66 (2d Cir. 2017) (holding that "communications with and payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction over it"); *Rosenblatt v. Coutts & Co. AG*, 17 Civ. 3528 (AKH), 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (same); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2016) (no purposeful availment where "Foreign Defendants communicated with and transmitted . . . funds to and from BLMIS located in New York" because the "communications and payments were incidental consequences of fulfilling a foreign contract"); *Roper*, 2 F. Supp. 2d at 474-75 (same).

9

HSBC affiliates that acted as administrator, custodian, or payee bank for Madoff feeder funds. Plaintiffs alleged defendants had "directed and transferred hundreds of millions of dollars to and from BLMIS New York." 2017 WL 816136, at *2. But these allegations failed to establish that defendants had "purposefully avail[ed] [themselves] of the privilege of conducting activities within [New York]." *Id*. at *5 (citations omitted). As the District Court explained, "a foreign defendant's communications with a party in New York or sending of monies into New York are not sufficient to establish personal jurisdiction" if the "communications with and payments to New York were made merely to ensure compliance with contract terms negotiated and executed outside of New York." *Id*. (citations omitted). The Second Circuit affirmed. 700 F. App'x 66 (2d Cir. 2017). The same result applies here. The Trustee does not allege BJB negotiated or executed agreements in New York. Moreover, the allegations here are even less compelling since *Hau Yin To* involved transfers directly to and from BLMIS itself, rather than to and from Sentry, a foreign feeder fund.

> c.    Sending and receiving funds through a New York bank account is insufficient to establish jurisdiction.

The Trustee alleges that BJB "directed funds" to and made redemptions from Fairfield through a correspondent bank account in New York. AC ¶¶ 18-20. The "mere maintenance" of a U.S. bank account, or even the "knowing receipt of funds" through such an account, are insufficient to establish personal jurisdiction. *In re Sledziejoinwski,* Case No. 13-22050 (RDD), Case No. 13-22748, 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016); *Leema Enters., Inc. v. Willi,* 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983). It is well established that "payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction."

10

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 17 Civ. 3793 (PAE), 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (cleaned up).

Furthermore, the Trustee's allegation that BJB sent subscription funds through New York is irrelevant because his claim does not "arise out of or relate to" *subscriptions*. Only the *redemptions* are at issue in this case. The Trustee's claim does not relate in any way to the technical details about how the Fairfield Funds received subscription payments.[12]

BJB's use of a New York correspondent bank to collect redemptions is also irrelevant. The mere use of a correspondent account by a foreign bank to clear transfers denominated in U.S. dollars does not confer jurisdiction over the foreign bank. *See Hau Yin To*, 2017 WL 816136, at *5 (rejecting personal jurisdiction over foreign defendants because the transmission of information and funds "to and from BLMIS . . . [was an] incidental consequence[] of fulfilling a foreign contract"); *Hill*, 207 F.Supp. 3d at 339-40 (same); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("[C]ourts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction.") (collecting cases).[13] Here, there is no allegation that the transmission of funds through correspondent accounts is the principal wrong that forms the basis for the Trustee's suit.

---

[12] The crux of the Trustee's claim, and asserted injury, would be exactly the same if Fairfield had used an alternative means of receiving subscription payments from BJB. *See Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 262 (S.D.N.Y. 2020) (no specific jurisdiction over foreign bank defendant based on its use of correspondent bank account in New York for the transfers at issue, where use of the account was not necessary to the Ponzi scheme), *appeal withdrawn*, 2021 WL 4190722 (2d Cir. Apr. 14, 2021).

[13] Hundreds of thousands of foreign dollar transactions valued at over $1.5 trillion are cleared in New York each day. *See generally Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018). Were the incidental use of U.S.-based accounts sufficient to confer personal jurisdiction over foreign entities, New York would become a forum for any foreign commercial dispute, contrary to federal and state policy, merely because global transactions are frequently cleared in U.S. dollars in New York. *See Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 459-60 (N.Y. 2014) ("Our state's interest in the integrity of its banks…is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York."); *see also Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. 2012) ("[C]ourts have long recognized that there are significant policy reasons which caution against the exercise of personal jurisdiction based only on... a correspondent bank account.") (internal quotation marks omitted).

4864-2031-7736

If money passed through a correspondent account in the United States, the use of such account is entirely incidental to the Trustee's claims and accordingly is insufficient to establish jurisdiction. *Hau Yin To,* 2017 WL 816136, at *7 n.6.

> d.      Alleged meetings and communications involving BJB are insufficient to establish jurisdiction.

The Trustee alleges that BJB communicated with Fairfield and BLMIS in New York through BJB's New York branch "in connection with" BJB's investments in the Fairfield Funds, and that foreign-based BJB employees also communicated with Fairfield, albeit in unspecified locations by unspecified means. AC ¶ 11-14. These allegations lack even the minimal specificity required. The Trustee fails to identify anyone who participated in the alleged communications, specify the content, or allege any nexus to the claims at issue, namely the Redemptions.

Because the nature and extent of the alleged communications are essential to the personal jurisdiction analysis, general allegations of communications are clearly inadequate. *See, e.g.*, *SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170-71 (S.D.N.Y. 2015) (no personal jurisdiction where defendants had "only sporadic or indirect contacts with the United States"), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 380, 382 (1967) (fact that Illinois corporation's representatives traveled to New York and spent one day there conferring with plaintiff over contract dispute did not rise to purposeful availment under CPLR § 302(a)(1)). Nor can the Trustee argue that his claims arise out of or relate to these communications because the content of the alleged communications have not been specified.

As the court held in *Hau Yin To*, for example, an out-of-state person communicating into New York with a forum resident, in connection with a contract negotiated and executed outside New York, is not purposeful availment. More generally, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication

from another locale with a party in New York.'" *Maranga v. Vira,* 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)); *Int'l Customs Assocs.*, 893 F. Supp. at 1261 ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (collecting cases); *RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*, 19 Civ. 10247, 2021 WL 230194, at *4 (S.D.N.Y. Jan. 22, 2021) (same).

Instead, "only in cases where the telephone call or communication clearly shows that the defendant intends to project itself into ongoing New York commerce, such as where a defendant directly conducts market activity or securities transactions in New York over the telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile transmissions alone." *Metals All. Corp. v. Beshay*, No. 97 CV 3401, 1998 WL 811788, at *2 (S.D.N.Y. Nov. 19, 1998) (cleaned up) (brackets in original). For example, in *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13 (1970), a California resident participated in a live auction in New York by telephone, thus "project[ing] himself into the auction room," "invok[ing] the benefits and protections of [New York's] laws relating to the conduct of auctions," and establishing personal jurisdiction when the auction house later sued him in New York for failing to pay his winning bids. *Id.* at 18 (cleaned up). In the absence of allegations regarding the location, means, and content of the alleged communications involving BJB's foreign employees, the Trustee has failed to meet his burden.

The Trustee's allegation that the claims "arise from business [BJB] transacted within New York" (AC ¶ 10-14) is also unavailing because the Trustee does not allege any specific nexus between BJB's New York activities and the Redemptions. *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 767 (S.D.N.Y. 2021) (holding that operating a New York branch does not subject a foreign bank to specific jurisdiction without a specific nexus between the New York

13

branch's operations and the claims); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) ("'[a] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'") (cleaned up).

The Trustee's failure to plead any specific facts about the alleged meetings in New York is fatal to his assertion of jurisdiction. *See, e.g., Phoenix Ancient Art, S.A. v. J. Paul Getty Tr.*, 17 CIV. 241 (ER), 2018 WL 1605985, at *13 (S.D.N.Y. Mar. 29, 2018) ("Meetings [in New York] that do not result in the execution of a contract or are not essential to or do not substantially advance the business relationship rarely provide the basis for jurisdiction pursuant to Section 302(a)(1)"); *id.* (holding that even meetings which "rise to the level of 'transacting business' in New York" nonetheless do not establish personal jurisdiction where the "Plaintiffs' claims do not 'arise out of' those contacts" because there is no "'substantial nexus' between the transaction of business and the cause of action alleged."); *V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349, 361–62 (S.D.N.Y. 2012) (finding contacts insufficient where "the only meetings that occurred in New York were 'exploratory,'" nothing was promised, and no agreements were negotiated).

Merely alleging meetings in New York were held "in connection" with BJB's Fairfield investments does not establish the requisite nexus. The Trustee also makes vague conclusory allegations that BJB's New York branch "played essential roles in BJB's FGG Feeder Funds transactions," "were responsible for approving BJB's investments in the FGG Feeder Funds," and, therefore, "primarily established and maintained" the relationship between BJB and Fairfield. AC ¶¶ 11-13. The Trustee alleges no facts whatsoever supporting any of these assertions. It is well established that conclusory allegations should be disregarded. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even if credited, the Trustee nevertheless fails to allege that BJB negotiated or

14

executed Redemptions at the alleged meetings or that the New York branch had (or exercised) any power to approve Redemptions (as opposed to investments).

Indeed, given the timeframe during which the alleged meetings occurred and which the New York branch operated, it is implausible that BJB's New York personnel were responsible for BJB's Fairfield redemptions. Nor has the Trustee pleaded as much for *each* alleged Redemption. *See Sec. Inv'r Protec. Corp.* 594 B.R. at 190 (holding that personal jurisdiction must be established for each subsequent transfer from a BLMIS feeder fund). The Trustee alleges that BJB's New York branch personnel met with Fairfield personnel and Madoff between 1998 and 2003, but omits any detail regarding the subjects discussed. AC ¶ 12. Notably, the alleged meetings predate, in many cases by several years, virtually all of the Redemptions, the first of which was made in May 2003. AC Exs. C, E, G. Moreover, the bulk of Redemptions were made after BJB's New York branch closed in early 2006. AC ¶ 70. Nor is it plausible, given Switzerland's strict privacy and banking secrecy laws, that BJB's New York personnel were handling BJB's Swiss accounts. *See, e.g.,* Article 47 of the Swiss Banking Act.

Because no contacts alleged by the Trustee constitute purposeful, in-forum conduct by BJB, let alone conduct from which the Trustee's claims arose the Trustee has not alleged a *prima facie* case of personal jurisdiction, and his claims against BJB should be dismissed.

## II.    The Section 546(E) Safe Harbor Shields All Of The Alleged Initial Transfers Made More Than Two Years Before The Filing Date

The Trustee's sole claim against BJB is to recover subsequent transfers. But the Trustee may recover subsequent transfers only to the extent that the initial transfer is avoided. 11 U.S.C. § 550(a). "The Code sets out a number of limits on the exercise of these avoiding powers," including the safe harbor of Section 546(e). *Merit Mgmt. Grp. v. FTI Consulting*, 138 S. Ct. 883, 889 (2018). That safe harbor bars the Trustee's claims here.

15

Section 546(e) bars a trustee from avoiding a transfer (other than under section 548(a)(1)(A), which has only a two-year lookback period) if the transfer (1) was made by or to a covered entity such as a stockbroker or financial institution; and (2) was either a settlement payment or a transfer in connection with a securities contract. 11 U.S.C. § 546(e). "[I]n enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality." *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014). "[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A)." *Id.* "Unwinding settled securities transactions . . . would seriously undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) ("*Tribune I*"). "Permitting the clawback of millions, if not billions, of dollars from BLMIS clients . . . would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *Fishman*, 773 F.3d at 420.

In an action to recover a subsequent transfer, the subsequent transferee may assert any defenses to avoidability that the initial transferee could have asserted, including § 546(e). *See Fairfield*, 2021 WL 3477479, at *3. A court can dismiss a complaint based on § 546(e) if its applicability is established on the face of the complaint or documents that are incorporated by reference into, or integral to, the complaint. *See id.* at *2.

A.  The Alleged Initial Transfers Were Made By, To, and for the Benefit of a Covered Entity

A payment is subject to the safe harbor if it is made by, to, or for the benefit of a covered entity, including a "stockbroker" and "financial institution." The Redemption Payments easily

16

meet this requirement in three separate ways. The Code defines "stockbroker" to include entities "engaged in the business of effecting transactions in securities." 11 U.S.C. § 101(53A)(B). As Judge Rakoff held, BLMIS qualifies as a stockbroker under the Code. *See SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) ("[E]ven assuming . . . [Madoff] never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.").

While BLMIS's status as a stockbroker is sufficient to satisfy the "covered entity" requirement, there are two additional, independent bases to reach the same conclusion. *First*, Sentry, as initial transferee, qualifies as a "financial institution" and is therefore a covered entity. Under the Code, a "financial institution" includes the customer of a bank when the bank is "acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). This Court held that Sentry was a "financial institution," because: (1) Sentry was a customer of Citco, a bank regulated by the Central Bank of the Netherlands and registered with the Central Bank of Ireland, and (2) Citco acted as Sentry's agent in connection with the securities contracts underlying Sentry's redemptions to shareholders. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*, 2020 WL 7345988, at *6-8 (Bankr. S.D.N.Y. Dec. 14, 2020).[14]

*Second*, the Trustee has alleged that the initial transfers were made for the benefit of BJB (AC ¶¶ 10, 16), and that BJB is a Swiss bank (AC ¶¶ 3, 68). Thus, BJB is indisputably a "financial institution" within the Code definition, which includes a "commercial or savings bank." 11 U.S.C. § 101(22)(A). Judicially noticeable public registry information confirms that, during the relevant period, BJB was indeed a "bank," (Halper Decl. Exs. 1-5.), and thus a covered entity.

---

[14] That holding is binding on the Trustee because (i) he was in privity with the liquidators, *see supra* n.3, and (ii) the Liquidators brought their suit as fiduciaries for the Trustee. *See generally Taylor v. Sturgell*, 553 U.S. 880 (2008) (discussing elements of collateral estoppel).

17

B.     The Alleged Initial Transfers Were Made in Connection with a Securities Contract
       and Are Also Settlement Payments

The second requirement of the safe harbor is that the payment made by, to, or for the benefit

of a covered entity be a "transfer . . . in connection with a securities contract" or a "settlement

payment." 11 U.S.C. § 546(e). Although a transfer need only fit into one of those two categories

to be protected under the safe harbor, here the alleged initial transfers meet both requirements.

In *Fishman*, the Second Circuit held that § 546(e) shielded transfers from BLMIS to its

account holders because the documents governing BLMIS's customer accounts were "securities

contracts" and payments that BLMIS made to its customers were made "in connection with" such

contracts. 773 F.3d at 417-22. Here, Sentry "maintained direct customer accounts with BLMIS."

AC ¶ 4. The same reasoning therefore applies to the initial transfers to Sentry.

In addition, insofar as the Trustee's theory is that the initial transfers from BLMIS to Sentry

were made to satisfy BJB's redemption requests, those transfers were likewise made "in

connection with" the securities contract that governed BJB's relationship with Sentry, namely

Sentry's Articles of Association. *Migani*, [2014] UKPC 9, ¶ 10 ("[T]he terms of the subscriber's

membership of the Fund, which govern the redemption of its shares . . . are to be found in the

Articles of Association of the Fund").[15] Under the Bankruptcy Code, a "securities contract" is

defined as "a contract for the purchase, sale, or loan of a security; [or] ... any other agreement or

transaction that is similar to [any such] agreement or transaction." 11 U.S.C. § 741(7). As Judge

Rakoff observed, that broad definition "includes, *inter alia*, investment fund subscription

agreements and redemption requests." *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 2013 WL

1609154, at *8 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

---

[15] This Court may consider the Articles of Association in connection with this motion because they are integral to the
Complaint. *See In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 176 (2d Cir. 2021) ("*Tribune II*").

Importantly, § 546(e) does not require that the initial transfer be in connection with a securities contract between the debtor and the initial transferee, so long as it is made "in connection with a securities contract." 11 U.S.C. § 546(e); *see also Fishman*, 773 F.3d at 422 ("[A] transfer can be connected to, and can be made in relation to, multiple documents or purposes simultaneously."). Accordingly, the securities contract between Fairfield and BJB also qualifies. *See Cohmad*, 2013 WL 1609154, at *9 (noting that "hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract" would "fit within the plain terms of Section 546(e)").The Second Circuit held in *Fishman* that BLMIS's payments to its clients also constituted "settlement payments" within the meaning of § 546(e) because they were "transfer[s] of cash or securities made to complete a securities transaction." 773 F.3d at 422 (cleaned up). That reasoning applies equally here, and further brings the alleged redemption within the safe harbor.

C.     Any Transfers Pre-Dating the Two-Year Pre-Filing Period are Time-Barred

Exhibit B to the Amended Complaint sets forth the alleged Initial Transfers, separated into the "Two Year Transfers" and the "Six Year Transfers." Under section 548(a)(1)(A), a trustee may avoid only transfers made within two years before the Filing Date. Any transfer made before that date is protected by § 546(e) and may not be avoided as a matter of law.

D.     The Trustee Has Not Alleged that BJB Had Actual Knowledge of Madoff's Fraud

The Trustee has not alleged that BJB had actual knowledge of Madoff's fraud.[16] That eliminates the only ground upon which the § 546(e) safe harbor could be rendered inapplicable—

---

[16] The facts here are distinguishable from the Court's recent decision, where the Trustee attempted to plead that the defendants had knowledge of Madoff's fraud. *See, e.g., Multi-Strategy Fund*, 2022 WL 2137073, at *3 (Bankr. S.D.N.Y. June 13, 2022) ("[Defendant's president] discussed 'Madoff and the potential ponzi [sic] scheme.'") (sic in original).

*i.e.*, the judicially created rule that a subsequent transferee "who had actual knowledge of Madoff Securities' fraud . . . cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." *Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (quoting *Cohmad*, 2013 WL 1609154, at *7).

Although Section 546(e) does not contain such an exception,[17] the court in *Cohmad* concluded that "if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of [BLMIS's] fraud, that transferee cannot claim the protection of Section 546(e)'s safe harbor." 2013 WL 1609154, at *7. *Cohmad* did not hold that an innocent subsequent transferee cannot seek safe harbor when the initial transferee has actual knowledge of the fraud; that holding would contradict *Cohmad*'s rationale based on the purpose of § 546(e)—*i.e.*, assuring the finality of settlements of securities transactions and minimizing the securities market disruption caused by bankruptcy proceedings. As Judge Rakoff noted, that is "achieved by protecting the reasonable expectations of investors who believed they were signing a securities contract," but not by shielding the transactions of "a transferee who had actual knowledge of the Madoff 'Ponzi' scheme [and therefore] did not have any such expectations." 2013 WL 1609154, at *4. Here, because BJB is not alleged to have had such actual knowledge,[18] § 546(e)'s purpose is "achieved by protecting" their "reasonable expectations" and dismissing the Trustee's claims.

---

[17] BJB maintains that there is no exception in the text of § 546(e) based on a transferee's knowledge and that *Cohmad* was wrongly decided. When a statute like § 546(e) creates a safe harbor, and specifies exceptions, courts are not free to create additional exceptions on policy or equitable grounds. *Law v. Siegel*, 571 U.S. 415, 424-25 (2014). BJB notes its objection to *Cohmad* here to preserve the issue for appeal.

[18] BJB respectfully submits that this Court's recent decisions in *Banque Lombard Odier*, *Bordier & Cie*, *Lloyds TSB Bank*, *Banque SYZ* and *Multi-Strategy Fund* misinterpret Judge Rakoff's decisions on the applicability of the section 546(e) safe harbor to subsequent transferees. *See also Picard v. ABN Amro Bank (Ireland) Ltd.*, 505 B.R. 135, 142 (S.D.N.Y. 2013) ("the Court has found that, in the majority of cases, section 546(e) requires the dismissal of the Trustee's avoidance claims, except those brought under section 548(a)(1)(A) and related recovery claims under section 550(a)"). The Court's recent decisions also contradict its opinion in *Picard v. Fairfield Inv. Fund ltd. (Sec. Inv. Prat. Corp. v. Bernard L. Madoff lnv. Sec. LLC)*, No. 09-01239, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug.6.2021) ("*Fairfield Inv. Fund*"), wherein the Court concluded as to one subsequent transferee that the plaintiff

It is immaterial that in *Fairfield Investment Fund*, this Court held that the Trustee sufficiently alleged actual knowledge on the part of Sentry, the ***initial*** transferee. *Fairfield Inv. Fund*, 2021 WL 3477479, at *4. Sentry's knowledge cannot be imputed to BJB, which dealt with Sentry at arm's length; and the Trustee does not advance any such theory. The sole question is whether the Trustee has pleaded facts that, if proved, would establish ***BJB's*** actual knowledge of Madoff's fraud. In *Fairfield Investment Fund*, this Court carefully differentiated five alleged subsequent transferees against whom the Trustee had sufficiently pleaded such facts from one alleged subsequent transferee against whom "the Trustee has failed to plead individualized factual allegations demonstrating . . . independent actual knowledge of the BLMIS fraud." 2021 WL 3477479, at *6; *see also id.* at *15 (dismissing the individual claims against the latter defendant). *A fortiori*, BJB, against which the Trustee does not even attempt to plead actual knowledge, is entitled to rely on Section 546(e).

Moreover, the "securities contract[s]" that BJB "signed"—and which they reasonably expected § 546(e) to protect—were not BLMIS-Fairfield Sentry customer agreements, *Cohmad*, 2013 WL 1609154, at *3, but rather separate contracts between BJB and Fairfield. AC ¶ 17. The *Cohmad* court recognized that Section 546(e) applies where, as the Trustee has pleaded here, the initial transferee allegedly withdrew funds from BLMIS in order to pay financial institutions to redeem (*i.e.*, repurchase) their shares, pursuant to a separate securities contract between the initial and alleged subsequent transferees—here, the Fairfield Funds' Articles of Association. Because BJB "claim[s] protection under Section 546(e) under [such] a separate securities contract as a . . .

---

"failed to plead individualized factual allegations demonstrating that [she] had independent actual knowledge of the BLMIS fraud," and dismissed all claims against her. *Id*. at *6.

financial institution," *Cohmad*, 2013 WL 1609154, at *10, it is not barred from relying on § 546(e)

absent allegations of *its* actual knowledge of the fraud.

**III.   The Section 546(E) Safe Harbor Shields All Of The Remaining Alleged Initial Transfers**

While § 546(e) bars the Trustee from avoiding all transfers other than actual fraudulent

transfers under § 548(a)(1)(A) made within the two-year lookback period, the Trustee has failed

to allege actual fraudulent intent, and the so-called "Ponzi scheme presumption" does not cure the

pleading deficiencies.

A.    The Trustee Has Failed to Allege Actual Fraudulent Intent as Required by Section 548(a)(1)(A) and Rule 9(b)

The sole statutory exception to § 546(e) is for transfers avoidable under § 548(a)(1)(A),

which has a two-year lookback period. "[W]here § 546(e) applies to the Trustee's claims, the

Trustee may only proceed . . . insofar as he seeks to recover those subsequent transfers under §

550(a) as to which he could have avoided the initial transfer under § 548(a)(1)(A)." *Fairfield*, 2021

WL 3477479, at *4. The Trustee, however, has failed to plead the avoidability of any initial

transfers under section 548(a)(1)(A), and cannot salvage any of his claims from the § 546(e) bar.

Section 548(a)(1)(A) requires the Trustee to plead that BLMIS "made" each "transfer"

challenged under that provision "with actual intent to hinder, delay, or defraud any entity to which

the debtor was or became" indebted "on or after the date that such transfer was made." Because

"'actual intent to hinder, delay or defraud' constitutes fraud, it must be pled with specificity, as

required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l

Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted); *see also Off. Comm. of Unsecured

Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 459–60 (Bankr.

S.D.N.Y. 2006). Under Rule 9(b), "conclusory allegations that do not evidence fraudulent intent

with respect to the specific transfers challenged do not suffice," even if "combined with . . .

22

allegations [about] an alleged overall pattern of inappropriate transfers." *Id.* at 468 (internal quotation marks omitted).

The Amended Complaint lacks any allegations which, if proved, would establish that in making any of the alleged Two Year Transfers, BLMIS acted with the requisite intent to "hinder, delay or defraud" creditors, as opposed to merely honoring its contractual commitments to the Fairfield Funds.[19] The Trustee has pled nothing about BLMIS's intent in making *any* (much less *each*) of the "specific transfers challenged" here, *id.*, and therefore fails to plead avoidability based on actual intent to defraud at all, let alone with the particularity Rule 9(b) requires.

B.    <u>The Trustee Should Not Be Permitted to Rely on the Ponzi Scheme Presumption to Avoid His Pleading Burden</u>

Rather than actually pleading facts establishing the fraudulent intent behind each initial transfer, as required by section 548(a)(1)(A), the Trustee relies upon the presumption "that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt." *Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 201 (2d Cir. 2021) (Menashi, J., concurring) ("*Citibank*"); AC ¶ 1. Although the unchallenged application of the Ponzi scheme presumption has been accepted by this Court and the District Court in actions commenced by the Trustee, Judge Menashi's recent concurring opinion in *Citibank* makes clear that the issue is not settled at the Circuit level.[20] *Id*. at 202.

*First*, § 548(a)(1)(A) does not even mention Ponzi schemes, much less authorize courts to relax the Trustee's pleading burden in such cases. *Second*, fraudulent transfer cases warrant an

---

[19] For example, because transfers intended to return capital to the Fairfield Funds or to satisfy an antecedent debt to them would not have been made with the "actual intent to hinder, delay or defraud" creditors, merely alleging that BLMIS paid money to the Fairfield Funds is insufficient to establish an actually fraudulent transfer.

[20] Although the Second Circuit has on occasion applied the presumption "when its application was uncontested," *Citibank*, 12 F.4th at 202 n.7 (Menashi, J., concurring), it has not sanctioned use of the presumption in any case where the issue was litigated. Nor has the Supreme Court recognized the presumption.

23

"asset-by-asset and transfer-by-transfer" inquiry—one that requires proof of "the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer"—because the statutory focus is "on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (construing Minnesota UFTA provision that is virtually identical to section 548(a)(1)(A)); *see also Citibank*, 12 F.4th at 201 (Menashi, J., concurring).

*Third*, the Ponzi scheme presumption "improperly treats preferences as fraudulent transfers," thereby "obscur[ing] the essential distinction between fraudulent transfers and preferences." *Citibank*, 12 F.4th at 201–02; *accord Lustig v. Weisz & Assocs. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress"). *Fourth*, the Ponzi scheme presumption conflicts with Rule 9(b), which requires particularity in pleading how each transfer was made with actual intent to defraud. *See, e.g., Sharp*, 403 F.3d at 56. If exceptions are to be created, Congress—not the courts—should create them. *See Unified*, 260 B.R. at 350, *cited in Citibank*, 12 F.4th at 202 (Menashi, J., concurring).

Without the Ponzi scheme presumption, the Amended Complaint alleges nothing whatsoever about BLMIS's intent in making specific "Two Year Transfers"—and certainly not that they were made with the requisite actual fraudulent intent.

## IV.    The Trustee Has Failed To Plead The Avoidability Of The Alleged Initial Transfers

To plead a subsequent transfer claim under Section 550(a)(2), the Trustee must allege "that the initial transfer is avoidable." *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) ("*Shapiro*") (citation omitted). The Amended Complaint fails to do so with respect to any of the alleged initial BLMIS-to-Sentry transfers,

24

instead relying on conclusory statements that all such transfers are avoidable, without alleging any supporting facts. AC ¶¶ 77–78. A claim only "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. The Trustee's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

The Trustee has attempted to fill this pleading gap by "incorporat[ing] by reference" the entirety of the 105-page, 406-paragraph Second Fairfield Amended Complaint. AC ¶ 76. Although "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," Fed. R. Civ. P. 10(c), a pleader may not indiscriminately adopt whole pleadings from a different action. *NCUA Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705 (DLC), 2014 WL 1673351, at *9 (S.D.N.Y. Apr. 28, 2014) (striking defense where defendant attempted to "incorporate the affirmative defenses in answers filed by defendants *in other actions* into its answer" (emphasis in original)); *Davis v. Bifani*, No. 07-cv-00122-MEH-BNB, 2007 WL 1216518, at *1 (D. Colo. Apr. 24, 2007) (striking attempt "to incorporate by reference wholesale the allegations in a complaint in a completely separate action"). Courts police the line drawn by Rule 10(c), which authorizes only adopting particular "statement[s] in a pleading," not an entire pleading. *See, e.g.*, *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023 (CBA) (RLM), 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) ("A Rule 10(c) adoption clause that does little more than make wholesale reference to the contents of a prior pleading exemplifies the kind of incorporation that fails to give the requisite guidance to the responding party." (internal quotation marks omitted)).[21]

---

[21] *See also Muhammad v. Bethel-Muhammad*, No. 11-0690-WS-B, 2012 WL 1854315, at *3 n.5 (S.D. Ala. May 21, 2012) (condemning "sweeping reference to . . . 100-page complaint"); *Lowden v. William M. Mercer, Inc.*, 903 F.

25

The Trustee's attempt to incorporate the entire Fairfield Second Amended Complaint violates Fed. R. Civ. P. 8(a)(2), which requires a complaint to "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) serves two important purposes—"to give the adverse party fair notice of the claim asserted so as to enable [it] to answer and prepare for trial" and to avoid "[u]nnecessary prolixity in a pleading [that] places an unjustified burden on the court and the party who must respond to it because they are forced to select the material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (cleaned up). In *United States v. International Longshoremen's Ass'n*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007), Judge Glasser rejected the attempted incorporation of pleadings from several proceedings, holding that the complaint "must be dismissed for failure to comply with Rule 8(a)." *Id*. at 466. The court explained that "[t]he Government's failure to specifically identify which portions of the hundreds of pages of exhibits it intends to incorporate by reference into the Amended Complaint makes it impossible for the Court or the defendants to ascertain the nature and extent of the incorporation," *id.* at 462, and that wholesale incorporation of prior pleadings was "a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a 'short and plain statement of the claim,'" *id.* at 463.

The same is true here. The lengthy "incorporated" Second Fairfield Amended Complaint dwarfs the 21-page, 96-paragraph, single-count Amended Complaint in this action. Indeed, it is filled with allegations and claims asserted against parties other than the Fairfield Funds and that are extraneous to the issues in this case. The Amended Complaint therefore fails to provide fair notice of the facts upon which the Trustee relies to establish his claims.

---

Supp. 212, 216 (D. Mass. 1995) (pleading must "identify which portions of the prior pleadings are adopted").

## V.    The Amended Complaint Establishes BJB'S Good Faith Defense

The Trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the avoidability of the transfer. 11 U.S.C. § 550(b). The Amended Complaint establishes each of these elements and should be dismissed.

### A.    Value

For purposes of the good faith defense, "[t]he 'value' required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract . . . . There is no requirement that the value . . . be a reasonable or fair equivalent. The term 'value' in this subsection is different from and does not mean value to the debtor." *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021) (footnotes omitted). Unlike, for example, 11 U.S.C. § 548(a)(1)(B), which provides that initial transfers may be recovered if the debtor "received less than a reasonably equivalent value in exchange for such transfer," Section 550(b) contains no such language. "Had Congress intended to include [such a] requirement[,] . . . it knew how to do so." *Ziparo v. CSX Transp.*, 15 F. 4th 153, 161 (2d Cir. 2021); *Russello v. United States*, 464 U.S. 16, 23 (1982) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally.") (cleaned up). "In addition, the 'value' element . . . looks to what the transferee gave up, rather than what the transferor received." *Picard v. Fairfield*, 2021 WL 3477479, at *9.

Here the Amended Complaint seeks recovery of transfers from Sentry to BJB, for BJB's redemption of Fairfield shares. Because the Fairfield Funds are BVI companies, their relationship with their shareholders is governed by BVI law under the internal affairs doctrine. *See Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997); *see also Migani*, [2014] UKPC 9, ¶ 10 ("[T]he terms of the subscriber's membership of the Fund, which govern the redemption of its shares … are to be found in the Articles of Association of the Fund"). The Eastern Caribbean Court of Appeal held that an

27

investor's surrender of Sentry shares upon redemption for cash gives good consideration to support the exchange. *Migani*, [2014] UKPC 9, ¶ 7; *Quilvest Finance Ltd. v. Fairfield Sentry Ltd.*, Case Nos. HCVAP 2011/041-052, ¶ 87.[22] Therefore, the Amended Complaint shows that the "value" element of the affirmative defense is satisfied. AC ¶ 2 (alleging BJB received the alleged subsequent transfers by "redeeming shares it owned in BLMIS feeder funds . . .").

B.   Good Faith

The Second Circuit in *Citibank* recently set forth a three-step inquiry for establishing a good-faith defense. 12 F.4th at 191–92. A court must examine (1) "what facts the defendant knew; this is a subjective inquiry and not 'a theory of constructive notice,'" (2) "whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction" and (3) "whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer." *Id.* (cleaned up). Thus, under *Citibank*, even if the transferee (1) knew actual facts that (2) would put it on inquiry notice of the fraudulent purpose underlying the transaction or transfer, the transferee still takes the transfer in good faith if (3) a diligent inquiry would not have discovered the fraudulent purpose of the transfer. The Fairfield Second Amended Complaint—which the Trustee has sought to incorporate in its entirety—shows that a diligent inquiry would not have enabled BJB to discover the fraudulent purpose of BLMIS's transfers.

The Trustee does not allege that BJB in particular had actual knowledge of any facts that would have put BJB on inquiry notice of Madoff's fraud. Instead, the Trustee merely alleges various purported "red flags" that he claims should have alerted investors generally to Madoff's fraud. For instance, the Trustee alleges that consultants and market analysts at various times raised questions about BLMIS's trading and reporting practices. *See, e.g.*, Fairfield SAC ¶ 265. But these

---

[22] The Eastern Caribbean Court of Appeals' decision is available at: https://www.eccourts.org/quilvest-finance-ltd-and-others-v-fairfield-sentry-ltd/.

allegations amount to, at most, a lack of transparency at BLMIS, potential self-dealing, improper trading activities, and deviations from utilizing the SSC trading strategy. None of the inquiries resulting from such questions led to discovery of the BLMIS fraud. Meanwhile, thousands of market participants with varying degrees of sophistication conducted their own diligence and invested with BLMIS, either directly or through funds, all while BLMIS was subject to stringent SEC regulatory oversight and was even investigated by the SEC on a number of occasions—yet never charged with any impropriety. *See*, *e.g.*, Fairfield SAC ¶ 262.

Accordingly, even if BJB actually knew some of these facts (as opposed to having merely constructive knowledge, the standard rejected in *Citibank*), and even if those facts would have put BJB on inquiry notice, the Fairfield Second Amended Complaint establishes that even upon a diligent inquiry, investors could not have discovered the fraudulent purpose of the transfers.

Indeed, even a comprehensive SEC investigation failed to uncover BLMIS's fraud and merely led the SEC to impose additional compliance measures. In pleadings filed in related adversary proceedings, the Trustee has alleged that "[t]he SEC collected documents from Madoff in June 2005," Fairfield SAC ¶ 239, and "[i]n 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally front running the market," Amended Complaint, Fairfield Action, Dkt. No. 23, ¶ 351., but that ultimately, Madoff's "scheme to defraud the SEC succeeded" and "the SEC closed any further investigation of BLMIS," *id.* ¶ 361. The SEC's failure to uncover the scheme—even with its powerful investigative tools, expansive subpoena powers, and substantial resources—establishes that any further diligent inquiry by BJB would not have discovered the fraud.

29

Accordingly, because the Trustee's own allegations establish that a diligent inquiry would not have enabled BJB to discover the fraudulent purpose of the BLMIS transfers, the Amended Complaint establishes BJB's good faith defense.

### C.    Without Knowledge of Voidability

In applying this element of the good faith defense, the Court must test a subsequent transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer. *Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*, 803 F.3d 835, 840 (7th Cir. 2015). Because courts construe "without knowledge of the voidability of the transfer" the same as good faith, this element of the defense is also met. *Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014), *disapproved of on other grounds sub nom. Citibank*, 12 F.4th 171 (2d Cir. 2021) ("In light of the legislative history, the most plausible reading is that this third requirement is merely one specific type of subjective knowledge required.")

## VI.    The Amended Complaint Fails To Adequately Plead That Bjb Received Customer Property

### A.    The Trustee Has Not Plausibly Alleged That Any of the Alleged Subsequent Transfers Contain Customer Property

In order to state a claim under the Securities Investor Protection Act ("SIPA"), the Trustee must plausibly allege that each redemption payment BJB received was a subsequent transfer of BLMIS customer property that had been fraudulently transferred from BLMIS to Fairfield Sentry. *See* 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11"). To state a claim under 11 U.S.C. § 550, the Trustee must allege not just that the initial transfer is avoidable, but also that the initial

transfer was transferred to the subsequent transferee. *Shapiro*, 542 B.R. at 119.[23] And of course, the claim must be "plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In order to set aside subsequent transfers under SIPA, merely alleging—as the Trustee does here—that customer funds were transferred to the subsequent transferee does not suffice. "The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds." *Shapiro*, 542 B.R. at 119 (dismissing as conclusory a subsequent transferee claim, because the complaint "does not tie any initial transfer to any subsequent transfer or Subsequent Transferee.").

As in *Shapiro*, the Trustee's Amended Complaint fails to plead the "necessary vital statistics." Rather, it merely alleges that during the six years preceding the Petition, BLMIS transferred approximately $3 billion to Sentry, and that "Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BJB," both directly and through Sigma and Lambda. AC ¶¶ 79, 83-84, 87-88. The Trustee does not cure this allegation by attaching exhibits listing thousands of transactions recorded in Sentry's accounts at BLMIS, *id.* Ex. B, or exhibits listing alleged subsequent transfers from Sentry to BJB, *id.* Ex. C. To the contrary, the Trustee fails to link the separate exhibits reflecting separate transactions between separate sets of parties. Critically, the Amended Complaint fails to allege which, if any, of the initial transfers of BLMIS customer property were subsequently transferred to BJB. Essentially, the Trustee is asking the Court to infer that because BLMIS transferred a large amount of money to Sentry over a long

---

[23] Equally, New York Debtor and Creditor Law, "permits money damages to be recovered only against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 309 (S.D.N.Y. 2005) (cleaned up).

4864-2031-7736

period of time, then any and all money that went from Sentry to BJB must have come from BLMIS. But the Trustee alleges no factual basis to support this conclusion. In fact, Fairfield did not invest *all* of their money with BLMIS. AC ¶ 17. Moreover, Fairfield often funded redemptions with monies received from other Fairfield investors, i.e., money that BLMIS never held at all and which, by definition, could not have been customer property. *See, e.g.,* Amended Complaint, *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.*, Adv. Pro. No. 10-03636, (Bankr. S.D.N.Y.), Dkt No. 679, ¶138. The claims to recover redemptions from Sigma and Lambda are even more tenuous, as the Trustee merely alleges that approximately $773 million and $52 million of the initial transfers that Sentry received from BLMIS were transferred to Sigma and Lambda, respectively, and approximately $11 million and $364 thousand of that, respectively, was transferred to BJB. AC ¶¶ 83-84, 87-88.

The Trustee's failure to allege the "necessary vital statistics" of the transfers is particularly inexcusable in this case, in which the plaintiff, rather than the defendant, possesses all the records relevant to establishing whether any alleged transfers to BJB contained customer property. As noted above, the Trustee sued and settled with the Liquidators of the Fairfield Funds, who in 2011 stipulated to the entry of judgments in favor of the BLMIS Estate. AC ¶ 73. Pursuant to that Settlement Agreement, the Trustee has had access to Sentry, Sigma, and Lambda's records for over a decade. *See* Fairfield Settlement, ¶ 14 (Halper Decl. Ex. 7) Moreover, the Fairfield Liquidators "agree[d] to provide reasonable cooperation and assistance" to the Trustee "in connection with the prosecution of the Sharing Claims." *Id*. ¶ 14.

Thus, this case is nothing like *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin*"), where this Court granted the Trustee "'greater latitude'" in pleading where the Trustee—having "specifie[d] numerous inter-defendant transfers" showing that

32

"defendants commingled their assets, transferring their funds into and out of each other's accounts"—faced special "difficulties" because "[t]he subsequent transfer claim must ultimately be proved through the books and records of the defendants." *Id.* at 150-51. No latitude is warranted in this case, which does not require disentangling inter-Defendant transfers.

To the contrary, for over a decade, the Trustee has had every piece of data he needs to determine whether an alleged subsequent transfer contains customer property, and from which initial transfer that transfer originates, yet he has failed to so allege—because to do so would lead to the inescapable conclusion that the Trustee is pursuing billions of dollars to which, as a matter of simple math, he is not entitled. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 723 (2d Cir. 2013) (affirming dismissal and finding that "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*, No. 18 CIV. 1317, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (same).

B.  The Trustee's Amended Complaint Seeks to Recover Transfers Made by Sentry at Times When the Trustee Alleges There was no Money Left From BLMIS

The Trustee cannot link initial transfers from BLMIS with subsequent transfers to BJB, and it is clear from the Amended Complaint that such a connection is mathematically impossible based on the facts alleged, both in the aggregate and as to specific transfers. The subsequent transfers that the Trustee seeks to recover vastly exceed the initial transfers from BLMIS. And many specific alleged subsequent transfers were made at times when, according to the Trustee's own allegations, Sentry could not have held any BLMIS money.

In the aggregate, the Trustee alleges subsequent transfers that exceed the alleged initial transfers by $2 billion. He alleges that BLMIS transferred approximately $3 billion to Sentry (AC

33

¶ 77); yet at the same time, he seeks to recover an aggregate of approximately $4 billion of alleged subsequent transfers of that same customer property from BJB and numerous other defendants in parallel adversary proceedings.[24] *See* Fairfield SAC Exs. 5-6; Halper Decl. Ex. 6, ¶ 10. Additionally, the Trustee seeks to recover, as alleged subsequent transfers of customer property from Sentry, another approximately $1 billion in money allegedly paid by Sentry to FGG Defendants. Halper Decl. Ex. ¶ 11. Thus, the Trustee seeks to recover roughly $2 billion more in subsequent transfers than the total amount that the Trustee himself alleges that BLMIS transferred to Sentry. That is not merely implausible, it is impossible.

The implausibility of the Trustee's subsequent transferee claims against BJB are underscored by the fact that the Amended Complaint repeatedly seeks to recover alleged subsequent transfers from BJB during time periods when, according to the Trustee's own pleadings, Sentry had already paid out any customer property received from BLMIS. For example, the Trustee alleges that in the period from December 8, 2002 through March 31, 2005, BLMIS transferred a total of $120 million to Sentry in three separate transfers made between May 9, 2003 and July 22, 2003. AC Ex. B pp. 18-19 ("CHECK WIRE" entries). The Trustee further alleges that from the first BLMIS transfer on May 9, 2003, through September 17, 2003, Sentry paid over $200 million of alleged customer property to redeeming shareholders, including transfers to Sigma, and Lambda. Halper Decl. ¶ 12. Thus, by September 17, 2003, according to the Trustee's complaints, Sentry had paid out all of the potentially recoverable BLMIS funds, and then some.[25] The Trustee alleges that BJB received 29 redemption payments from Sentry from October 2003 through March

---

[24] The Court may take judicial notice of these other proceedings. *See supra* n.2; *see also* Halper Decl. Exs. 6 (excerpting complaints and/or exhibits), 8 (listing Fairfield Redeemer Actions).

[25] Specifically, the Trustee alleges that on May 9, 2003, BLMIS transferred $40 million to Sentry, which was spent by no later than June 2003; on July 11, 2003, BLMIS transferred $55 million to Sentry, which was spent by no later than July 16, 2003; and on July 22, 2003, BLMIS transferred $25 million to Sentry, which was spent by no later than September 2003. *See* AC Ex. B pp. 18-19; Halper Decl. ¶ 12.

2005 (totaling approximately $14 million), but according to his own allegations, those payments cannot possibly include BLMIS customer property. That these redemption payments to BJB took place three to twenty months after Sentry last received funds from BLMIS further underscores the implausibility, if not the impossibility, of any allegation that these redemption payments contain BLMIS customer property. *Cf. Merkin*, 515 B.R. at 150-51 (inferring linkage where alleged "subsequent transfers took place contemporaneously or shortly after an initial transfer," i.e., at most two or three months later).

This is just one of many examples of the Trustee's impossible, internally contradictory allegations that compels dismissal. Importantly, this basis for dismissal does not require any facts outside of the pleadings. Using basic arithmetic and the Trustee's own allegations listing the initial and subsequent transfers by date and amount, it is plain that a number of BJB's redemptions do not plausibly contain *any* amount of BLMIS property because they were made at times when the Fairfield Funds had already distributed the balance of the alleged initial transfers to other subsequent transferees. *See* Halper Decl. ¶ 13. Accordingly, the Trustee's claim must be dismissed as a matter of law. *See Kennedy v. Mondelez Glob. LLC*, No. 19-CV-302, 2020 WL 4006197, at *9 (E.D.N.Y. July 10, 2020) ("where the allegations of a complaint are materially inconsistent with the evidence a plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss.") (citation omitted).

## VII. The Trustee's New Allegations Of Additional Subsequent Transfers Do Not Relate Back To The Initial Pleading And Are Therefore Time Barred

The Trustee's May 15, 2022 Amended Complaint alleges $27,339,136 in new subsequent transfers: $17,691,330 from Sentry to BJB and $9,647,806 from Sentry to Sigma to BJB. *Compare* OC ¶¶ 40, 42 *with* AC ¶¶ 79, 83. These newly-alleged subsequent transfers were added a decade

after the applicable statute of limitations expired on May 9, 2012. As discrete transactions, separate from any common course of conduct alleged against BJB, the newly-alleged subsequent transfers do not relate back to the initial pleading and are therefore time barred under Fed. R. Civ. P. 15(c).

Claims to recover subsequent transfers under 11 U.S.C. § 550(a) must commence within one year after either the avoidance of the initial transfers or the date the case is closed or dismissed. *See Sec. Inv. Prot. Corp.*, 594 B.R. at 210–11 (citing 11 U.S.C. § 550(f)). "A settlement of an avoidance claim represents finality and triggers the one-year period set forth in § 550(f)." *See id.* (citing *SIPC v. BLMIS (In re BLMIS)*, 501 B.R. 26, 32 (S.D.N.Y. 2013), *denying motion to amend*, No. 12 MC 115 (JSR), 2014 WL 465360 (S.D.N.Y. Jan. 14, 2014); *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 522 (Bankr. S.D.N.Y. 2012)). The Trustee settled with the Fairfield Liquidators on May 9, 2011, triggering a statute of limitations that expired on May 9, 2012. *See* Fairfield Settlement.

The Trustee's new claims of additional subsequent transfers are time barred by more than a decade because they do not relate back to the Original Complaint. Because the law providing for the applicable statute of limitations, 11 U.S.C. § 550(f), is silent on relation-back, the court must determine whether the Trustee's new claims relate back under Fed. R. Civ. P. 15(c)(1)(b). Under Rule 15(c)(1)(b), amended pleadings relate back if they arise "out of the conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading." "The 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party . . . by the general fact situation alleged in the original pleading.'" *Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Securities LLC*, 594 B.R. at 210 (citing *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).

36

In order to establish that newly-alleged transfers relate back to the initial pleading, the Trustee must (1) allege in the Amended Complaint "that a common course of conduct encompassed both the Original and Additional Transfers," and (2) allege in the Original Complaint "that the Trustee could pursue avoidance of the Additional Transfers *associated with the course of conduct alleged in the Original Complaint.*" *In re Uplift RX, LLC*, 625 B.R. 364, 376 (Bankr. S.D. Tex. 2021) (denying leave to amend pleading to add new transfers due to futility) (emphasis added). Otherwise, "the Original Complaint could not have put the defendants on notice that the Additional Transfer claims were forthcoming." *Id.* at 377.

Under Second Circuit law, newly-alleged subsequent transfers are separate claims that do not necessarily arise out of the same "conduct, transaction or occurrence." *See In re M. Fabrikant & Sons, Inc.*, 447 B.R. 170, 181–82 (Bankr. S.D.N.Y. 2011), aff'd, 480 B.R. 480 (S.D.N.Y. 2012), aff'd, 541 F. *App'x* 55 (2d Cir. 2013) ("In avoidance litigation, each transfer is treated as a separate transaction for purposes of applying the 'relation back' doctrine."); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. at 210–11 (holding in case seeking subsequent transfers of BLMIS property that "[e]ach transfer is a separate claim"); *Metzeler v. Bouchard Transp. Co., Inc.* (*In re Metzeler* ), 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986) ("Courts have consistently treated preferential transactions as separate and distinct under Rule 15(c) . . . The same should be true of separate fraudulent transfers.").

The Trustee's allegation that the transfers involve property which BLMIS stole "as part of the massive Ponzi scheme perpetuated by Madoff and others," OC ¶ 1, is not enough to establish a common course of conduct. *See also* AC ¶ 1. For example, in *Uplift*, the court held that a trustee's allegation that "Additional Transfers" were part of a "payment scheme" involving subsequent transfers did "not establish that the Additional Transfers were part of the same 'course of

37

conduct.'" *In re Uplift RX, LLC*, 625 B.R. 364, 376 (Bankr. S.D. Tex. 2021) (citing *Securities Inv'r Prot.*, 594 B.R. at 210 (quoting *In re Metzeler*, 66 B.R. at 983 ("[T]he 'mere allegation' that the previously identified transfers and the newly added transfers are 'all . . . fraudulent transfers does not make them part of the same conduct.'")); *see also Fabrikant*, 480 B.R. at 492 ("relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct.").

Other fraudulent transfer cases that properly allege a common course of conduct are instructive here. In *Securities Inv'r Prot.*, the court distinguished two cases finding that newly-alleged transfers related back, *In re Bernard L. Madoff Inv. Sec. LLC*, 468 B.R. 620, 633 (Bankr. S.D.N.Y 2012) and *Adelphia Recovery Trust v. Bank of America, N.A.,* 624 F.Supp.2d 292 (S.D.N.Y. 2009). In *Adelphia*, the initial pleading alleged that the Rigas family, who then controlled Adelphia, entered into agreements with public Adelphia subsidiaries to borrow billions of dollars guaranteed by Adelphia's assets (for which Adelphia was liable), eventually leading to Adelphia filing for bankruptcy. 624 F.Supp.2d at 297. The newly-alleged transfers, like those in the initial pleasing, were payments made to the Rigas family's margin loan debt pursuant to those agreements. *Securities Inv'r Prot.*, 594 B.R. at 211-12. Similarly, in *Madoff*, the newly-added initial transfers (from BLMIS to the defendants, Madoff's family) related to the same fraudulent scheme alleged in the original complaint whereby the defendants allegedly withdrew huge sums of money from BLMIS and treated it as their personal "piggy bank." *Id.* at 211 (citing *Madoff,* 468 B.R. at 623-24)*.* The transfers in both cases were connected by an alleged "common fraudulent scheme or pattern" carried out by the defendants. By contrast, the subsequent transfers in *Securities Inv'r Prot.* were separate transactions involving different "facts and circumstances," in which "the

38

Defendants were not at the center of a common scheme to strip assets from BLMIS, but instead, were looking to payments from third parties," *i.e.* BLMIS feeder funds. *Id.* at 211-12.

The allegations in this case are similarly distinguishable from *Madoff* and *Adelphia*. The trustee alleges no discernable scheme or plan involving BJB or a common course of conduct by BJB. He does not allege that the transfers were redeemed by the same BJB customer, at the same time, for the same amount, for the same reason, or pursuant to the same contract. Indeed, each transfer BJB received from the Fairfield Funds is comprised of discrete redemption requests, made at different times, for different amounts, relating to distinct subscription agreements, purportedly funded by separate initial transfers, requested by various BJB personnel, for different clients, and executed through different platforms, including directly with Sentry and indirectly through Citco entities. Therefore, any assertion by the Trustee "that all the original subsequent transfer claims and the New Subsequent Transfer Claims arose from a 'common core of operative facts' lacks merit." *Sec. Inv. Prot. Corp.*, 594 B.R. at 210–11.

The Trustee's attempt to circumvent the relation-back doctrine by reserving his rights to amend does not save his belated claims. The Trustee stated in the Original Complaint that his investigations were "ongoing" and that he "reserves the right" to add "any additional transfers" and "seek recovery of such additional transfers." OC ¶ 41. These words—which could easily be added to any complaint—do not magically put BJB on notice of the newly-alleged transfers "*associated with the course of conduct alleged in the Original Complaint.*" *In re Uplift RX, LLC*, 625 B.R. at 376 (emphasis added). Indeed, the Trustee used an identical reservation of rights in *Sec. Inv. Prot. Corp.* to no avail:

> The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield BNP Paribas Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

39

Complaint, Adv. Pro. 12-01576, Dkt. No. 1, ¶ 53. The *Sec. Inv. Prot. Corp* court nonetheless held that the newly-alleged subsequent transfers did not relate back and were therefore time barred. 594 B.R. at 210–12. The same finding is warranted here.

### <u>CONCLUSION</u>

For the foregoing reasons, BJB respectfully requests that the Courts dismiss the Complaint in its entirety.

Dated: July 7, 2022
New York, NY

MCKOOL SMITH, P.C.

By */s/* Eric B. Halper
Eric B. Halper

MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
T: (212) 402-9400
F: (212) 402-9444
ehalper@mckoolsmith.com

*Attorneys for Defendant*
*Bank Julius Baer & Co. Ltd.*

4864-2031-7736