# EXHIBIT 2

*English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

# Federal Act
# on Financial Market Infrastructures and Market Conduct in Securities and Derivatives Trading

## (Financial Market Infrastructure Act, FinMIA)

of 19 June 2015 (Status as of 1 August 2021)

*The Federal Assembly of the Swiss Confederation,*

based on Articles 95 and 98 paragraphs 1 and 2 of the Federal Constitution[1], and having considered the Federal Council Dispatch dated 3 September 2014[2],

*decrees:*

## Title 1    General Provisions

### Art. 1    Subject matter and purpose

[1] This Act governs the organisation and operation of financial market infrastructures, and the conduct of financial market participants in securities and derivatives trading.

[2] It aims to ensure the proper functioning and transparency of securities and derivatives markets, the stability of the financial system, the protection of financial market participants and equal treatment of investors.

### Art. 2    Definitions

For the purposes of this Act, the following terms shall have the following meanings:

a.   *Financial market infrastructure:*
1.   a stock exchange (Art. 26 let. b);
2   a multilateral trading facility (Art. 26 let. c);
3.   a central counterparty (Art. 48);
4.   a central securities depository (Art. 61);
5.   a trade repository (Art. 74);
5*a*.[3] a trading facility for DLT securities (DLT trading facility; Art. 73*a*);

AS **2015** 5339

1   SR **101**
2   BBl **2014** 7483
3   Inserted by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

    6.   a payment system (Art. 81).

b.[4]  *Securities:* standardised certificated and uncertificated securities, in particular uncertificated securities in accordance with Article 973*c* of the Code of Obligations[5] (CO) and ledger-based securities in accordance with Article 973*d* of the CO, as well as derivatives and intermediated securities, which are suitable for mass trading.

b[bis].[6]*Distributed ledger technology securities (DLT securities):* securities in the form of:

    1.   Ledger-based securities (Art. 973*d* CO); or

    2.   other uncertificated securities that are held in distributed electronic registers and use technological processes to give the creditors, but not the obligor, power of disposal over the uncertificated security.

c.   *Derivatives or derivatives transactions:* financial contracts whose value depends on one or several underlying assets and which are not cash transactions.

d.   *Participant:* any person making direct use of financial market infrastructure services.

e.   *Indirect participant:* any person making use of financial market infrastructure services indirectly via a participant.

f.   *Listing:* the admission of a security to trading on a stock exchange in accordance with a standardised procedure whereby the stock exchange's requirements regarding issuers and securities are being verified.

g.   *Clearing:* processing steps between the conclusion and the settlement of a transaction, in particular:

    1.   the entry, reconciliation and confirmation of the transaction data;

    2.   the assumption of obligations by a central counterparty or other risk mitigation measures;

    3.   the netting of transactions;

    4.   the reconciliation and confirmation of outstanding payments and securities transfers.

h.   *Settlement:* fulfilment of the obligations entered into upon conclusion of the transaction, namely by transferring funds or securities.

i.   *Public takeover offers:* offers to purchase or exchange shares, participation certificates, profit-sharing certificates or other participation rights (equity

---

4   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

5   SR **220**

6   Inserted by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

securities) which are made publicly to the holders of shares or other equity securities.

j.[7]  *Insider information:* confidential information whose disclosure would significantly affect the prices of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland.

**Art. 3**       Group parent companies and significant group companies

[1] The following are subject to Articles 88 to 92 provided they are not subject to the bankruptcy jurisdiction of the Swiss Financial Market Supervisory Authority (FINMA) within the scope of the supervision of the individual institution:

a.   group parent companies of a financial group which have their registered office in Switzerland;

b.   those group companies which have their registered office in Switzerland and perform significant functions for activities which require authorisation (significant group companies).

[2] The Federal Council shall set the criteria for assessing significance.

[3] FINMA shall identify significant group companies and keep a publicly accessible list of said companies.

**Title 2**        **Financial Market Infrastructures**

**Chapter 1**    **Common Provisions**

**Section 1**
**Authorisation Conditions and Duties for all**
**Financial Market Infrastructures**

**Art. 4**       Duty to obtain authorisation

[1] Financial market infrastructures require authorisation from FINMA.

[2] A payment system requires authorisation from FINMA only if this is necessary for the proper functioning of the financial market or the protection of financial market participants and if the payment system is not operated by a bank.

[3] Financial market infrastructures operated by the Swiss National Bank (SNB) or on its behalf are not subject to FINMA authorisation and supervision within the scope of this activity.

[4] The financial market infrastructure may be entered in the commercial register only after FINMA has issued the authorisation.

---

7   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

Financial Market Infrastructures

**Art. 5**      Authorisation conditions

Anyone who meets the conditions set out in this section and the supplementary conditions that apply to individual financial market infrastructures is entitled to authorisation.

**Art. 6**      Additional requirements for systemically important financial market infrastructures

Systemically important financial market infrastructures (Art. 22) have to meet the requirements set out in section 2 in addition to the conditions detailed in Article 5.

**Art. 7**      Changes in facts

[1] The financial market infrastructure shall notify FINMA of any changes in the facts on which its authorisation or approval is based.

[2] If the changes are of material significance, the financial market infrastructure must obtain prior authorisation or approval from FINMA in order to pursue its activity.

[3] This provision applies by analogy to recognised foreign financial market infrastructures.

**Art. 8**      Organisation

[1] The financial market infrastructure must be a legal entity under Swiss law and have its registered office and head office in Switzerland.

[2] It must establish appropriate corporate management rules and be organised in such a way that it can fulfil its statutory duties. In particular, it must designate specific bodies responsible for its business management, on the one hand, and for its overall management, supervision and control on the other, and define the scope of these bodies' respective powers in such a way as to ensure proper and independent supervision of business management. It shall set out the relevant tasks and authorities in its articles of incorporation and organisational regulations.

[3] It shall identify, measure, control and monitor its risks and organise an effective internal control system. In particular, it shall establish an internal audit function that is independent of the business management body and a compliance department that is separate from operating business units.

**Art. 9**      Guarantee of irreproachable business conduct

[1] The financial market infrastructure and the persons responsible for its administration and management must provide the guarantee of irreproachable business conduct.[8]

---

[8]   German text only amended by Annex No II 18 of the Financial Institutions Act of
       15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).

[2] Moreover, the persons responsible for the administration and management of the financial market infrastructure must enjoy a good reputation and have the specialist qualifications required for their functions.

[3] Qualified participants in a financial market infrastructure must also enjoy a good reputation and ensure that their influence is not detrimental to prudent and sound business activity.

[4] Persons who directly or indirectly hold at least 10% of the share capital or votes or who can significantly influence its business activity in another manner are deemed to be qualified participants in a financial market infrastructure.

[5] Each person must notify FINMA before directly or indirectly acquiring or disposing of a qualified participation in accordance with paragraph 4 in a financial market infrastructure organised under Swiss law. This notification duty also applies if a qualified participation is increased or reduced in such a way as to reach, exceed or fall below the thresholds of 20%, 33% or 50% of the share capital or votes.

[6] The financial market infrastructure shall notify FINMA of the persons who meet the conditions of paragraph 5 as soon as it becomes aware of the same. It must submit a list of its qualified participants to FINMA at least once a year.

### Art. 10   Ancillary services

[1] A legal entity may operate only one financial market infrastructure. The foregoing does not apply to the operation of a multilateral trading facility by a stock exchange.

[2] The provision of ancillary services subject to authorisation or approval by virtue of Article 1 of the Financial Market Supervision Act of 22 June 2007[9] (financial market legislation) must be authorised or approved by FINMA and must be in compliance with the additional authorisation conditions.

[3] If the provision of ancillary services not subject to authorisation or approval by virtue of financial market legislation increases the risks of a financial market infrastructure, FINMA may require organisational measures or the establishment of additional own funds and sufficient liquidity.

### Art. 11   Outsourcing

[1] If a financial market infrastructure wishes to outsource essential services such as risk management, prior approval must be obtained from FINMA. FINMA must consult the SNB beforehand if the financial market infrastructure in question is considered systemically important by the SNB.

[2] The financial market infrastructure shall set out the reciprocal rights and duties in a written agreement with the service provider.

[3] If a financial market infrastructure outsources services, it shall remain responsible for compliance with the duties arising from this Act.

[9]   SR **956.1**

### Art. 12        Minimum capital

1 The minimum capital of the financial market infrastructure must be fully paid up.

2 The Federal Council shall set the amount of the minimum capital.

### Art. 13        Business continuity

1 A financial market infrastructure must have an appropriate strategy to be able to maintain or restore operations in good time in the event of disruptions.

2 If a financial market infrastructure holds participants' assets and positions, it must establish appropriate procedures to ensure that these assets and positions can be transferred or settled immediately in the event of the withdrawal or return of authorisation.

### Art. 14        IT systems

1 A financial market infrastructure shall operate IT systems which:

    a.   ensure fulfilment of the duties arising from this Act and are appropriate for its activities;

    b.   provide for effective emergency arrangements; and

    c.   ensure the continuity of its business activity.

2 It shall provide for measures to protect the integrity and confidentiality of information regarding its participants and their transactions.

### Art. 15        Financial groups

1 If a financial market infrastructure is part of a financial group, FINMA may make its authorisation contingent upon the existence of appropriate consolidated supervision by a financial market supervisory authority.

2 Two or more companies are deemed to be a financial group pursuant to this Act if:

    a.   at least one of them operates as a financial market infrastructure;

    b.   they operate primarily in the financial sector; and

    c.   they form an economic unit or other circumstances suggest that one or more of the companies under individual supervision is *de jure* or *de facto* obliged to provide assistance to group companies.

3 The provisions of the Banking Act of 8 November 1934[10] apply by analogy.

### Art. 16        Protection against confusion and deception

1 The name of the financial market infrastructure must not lead to confusion or deception.

---

10    SR **952.0**

2 The terms «stock exchange», «multilateral trading facility», «MTF», «central counterparty», «CCP», «securities settlement system», «SSS», «central securities depository», «CSD», «trade repository", «TR», «DLT trading system», «DLT trading facility and DLT exchange» may be used in connection with the provision of financial services only to designate a corresponding financial market infrastructure subject to this Act.[11]

### Art. 17    International business

A financial market infrastructure must notify FINMA before:

a.  establishing, acquiring or closing a foreign subsidiary, branch or representative office;

b.  acquiring or surrendering a qualified participation in a foreign company.

### Art. 18    Fair and open access

1 A financial market infrastructure shall ensure fair and open access to its services.

2 It may restrict access to its services:

a.  if this increases safety or efficiency and this effect cannot be achieved with other measures; or

b.  if the features of the potential participant could jeopardise the business operations of the financial market infrastructure or its participants.

### Art. 19    Documentation and retention duties

Financial market infrastructures shall keep records of the services provided, the procedures and processes applied and the activities carried out, and shall retain all records for ten years.

### Art. 20    Prevention of conflicts of interest

Financial market infrastructures shall take effective organisational measures to identify, prevent, settle and monitor conflicts of interest.

### Art. 21    Publication of essential information

1 A financial market infrastructure shall regularly publish all essential information for participants, issuers and the general public, specifically:

a.  information about its organisation;

b.  the participation conditions;

c.  the rights and duties of participants and issuers.

---

11   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

2 It shall take account of recognised international standards in doing so.

## Section 2
## Special Requirements for Systemically Important Financial Market Infrastructures

**Art. 22**        Systemically important financial market infrastructures and business processes

1 Central counterparties, central securities depositories, payment systems and those DLT trading facilities that provide central custody, clearing or settlement services are deemed to be systemically important:[12]

   a.   if their non-availability, arising in particular from technical or operational problems or financial difficulties, can lead to serious losses, liquidity short-falls or operational problems for financial intermediaries or other financial market infrastructures, or can cause serious disruptions on financial markets; or

   b.   if individual participants' payment or delivery difficulties can spill over to other participants or linked financial market infrastructures and can cause these serious losses, liquidity shortfalls or operational problems, or can cause serious disruptions on financial markets.

2 A business process of a financial market infrastructure in accordance with para-graph 1 is systemically important:

   a.   if its non-availability can cause serious losses, liquidity shortfalls or opera-tional problems for financial intermediaries or other financial market infra-structures, or can cause serious disruptions on financial markets; and

   b.   if participants cannot substitute the business process at short notice.

**Art. 23**        Special requirements

1 Systemically important financial market infrastructures must fulfil special re-quirements in order to protect against the risks they pose to the stability of the finan-cial system.

2 The special requirements must take account of recognised international standards. They can relate to the contractual bases, the means of payment used, risk manage-ment, business continuity and IT systems.

3 The SNB shall regulate the details in an ordinance.

4 The SNB may, after consulting FINMA, waive the obligation to meet the special requirements for a systemically important financial market infrastructure registered

---

12    Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

abroad which comes under SNB oversight in accordance with Article 19 paragraph 2 of the Swiss National Bank Act of 3 October 2003[13] (NBA):

    a.   if it is subject to equivalent supervision and oversight abroad; and

    b.   if the competent supervisory and oversight authorities cooperate with the SNB in accordance with Article 21 paragraph 2 of the NBA[14].

### Art. 24     Recovery and resolution plan

[1] A systemically important financial market infrastructure shall draw up a recovery plan that sets out the measures it will use to ensure its stability on a sustainable basis in the event of a crisis and be able to maintain its systemically important business processes.

[2] FINMA shall draw up a resolution plan that describes how the restructuring or winding-up of a systemically important financial market infrastructure that it has ordered can be carried out. It shall consult the SNB about the resolution plan.

[3] A financial market infrastructure shall provide FINMA with the recovery plan and the information necessary for drawing up a resolution plan.

[4] It shall implement the resolution plan measures in a preparatory manner if this is necessary for the uninterrupted maintenance of systemically important business processes.

## Section 3    Authorisation Procedure

### Art. 25

[1] FINMA shall inform the SNB of authorisation requests submitted by central counterparties, central securities depositories, payment systems and those DLT trading facilities that provide central custody, clearing or settlement services.[15]

[2] After consulting FINMA, the SNB shall designate by way of an order the systemically important financial market infrastructures and their systemically important business processes in accordance with Article 22. It shall also define by way of an order which special requirements in accordance with Article 23 the individual systemically important financial market infrastructures have to fulfil and shall assess their compliance.

[3] If a systemically important financial market infrastructure fulfils the special requirements, FINMA shall grant authorisation if the other authorisation conditions are also met.

13   SR **951.11**

14   Now: in accordance with Art. 21 let. b NBA.

15   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

[4] FINMA shall approve a systemically important financial market infrastructure's stabilisation plan in accordance with Article 24 after consulting the SNB.

[5] If the SNB concludes that a financial market infrastructure is not systemically important, it shall inform FINMA. If the general authorisation conditions are met, FINMA shall grant authorisation.

[6] The procedure applies by analogy to requests for recognition submitted by foreign central counterparties.


## Chapter 2
## Trading Venues, Organised Trading Facilities and Power Exchanges
### Section 1      Trading Venues

#### Art. 26      Definitions

For the purposes of this Act:

   a.   *trading venue* means a stock exchange or a multilateral trading facility;

   b.   *stock exchange* means an institution for multilateral securities trading where securities are listed, whose purpose is the simultaneous exchange of bids be-*t*ween several participants and the conclusion of contracts based on non-discretionary rules;

   c.   *multilateral trading facility* means an institution for multilateral securities trading whose purpose is the simultaneous exchange of bids between several participants and the conclusion of contracts based on non-discretionary rules without listing securities.


#### Art. 27      Self-regulation

[1] The trading venue shall establish under FINMA supervision its own regulatory and supervisory organisation which is appropriate for its activity.

[2] The regulatory and supervisory tasks delegated to the trading venue must be carried out by independent bodies. The directors of these bodies must:

   a.   provide the guarantee of irreproachable business conduct;

   b.   enjoy a good reputation; and

   c.   have the specialist qualifications required for their functions.

[3] The selection of the directors under paragraph 2 requires the approval of FINMA.

[4] The trading venue shall submit its regulations and their amendments to FINMA for approval.


#### Art. 28      Organisation of trading

[1] The trading venue shall issue regulations for the organisation of orderly and transparent trading.

2 It shall register all of its orders and transactions in chronological order, as well as the transactions reported to it. In particular, it shall indicate the time, the identity of the participants, the securities traded and their number or nominal value, as well as their price.

### Art. 29    Pre- and post-trade transparency

1 The trading venue shall publish the bid and offer prices for shares and other securities in real time, as well as the sizes of the trading positions at these prices (pre-trading transparency).

2 Moreover, it shall immediately publish information on the transactions carried out on the trading venue and on the transactions conducted outside of the trading venue reported to it for all securities admitted to trading (post-trading transparency). In particular, the price, volume and time of the transactions must be published.

3 Taking account of recognised international standards and legal developments abroad, the Federal Council shall determine:

a.    the other securities subject to pre-trade transparency;

b.    exceptions with regard to pre- and post-trade transparency, particularly in relation to securities transactions involving large volumes or that are executed by the SNB.

### Art. 30    Guarantee of orderly trading

1 A trading venue which operates a technical platform must have a trading facility which guarantees orderly trading even in the event of intense trading activity.

2 It shall take effective measures to prevent disruptions to its trading facility.

### Art. 31    Supervision of trading

1 The trading venue shall supervise price formation and the transactions conducted on the trading venue so that insider trading, price and market manipulation and other violations of statutory and regulatory provisions can be detected. For this purpose, it shall also review the transactions conducted outside of the trading venue that are reported to it or are brought to its attention in any other way.

2 In the event of suspected violations of the law or other irregularities, the body responsible for supervising trading (trading supervisory body) shall notify FINMA. If the violations of the law involve criminal offences, it shall also inform the competent prosecution authority without delay.

3 FINMA, the competent prosecution authority, the Takeover Board and the trading supervisory body shall exchange information which they require within the context of their collaboration and in order to carry out their tasks. They shall use the information received solely to carry out their respective tasks.

### Art. 32        Collaboration between trading supervisory bodies

[1] Swiss supervisory bodies for various trading venues shall regulate the free, reciprocal exchange of trading data by agreement, provided that on the trading venues in question:

   a.   identical securities are admitted to trading; or

   b.   securities are admitted to trading which influence the pricing of securities that are admitted to trading on the other trading venue.

[2] They shall use the data received solely to carry out their respective tasks.

[3] Swiss trading supervisory bodies may agree to the reciprocal exchange of information with foreign trading supervisory bodies, provided that:

   a.   the conditions set out in paragraph 1 are fulfilled; and

   b.   the foreign trading supervisory body in question is subject to a legal duty of confidentiality.

### Art. 33        Suspension of trading

[1] When a stock exchange suspends trading in a security listed on it at the initiative of the issuer or due to extraordinary circumstances, it shall immediately publish its decision.

[2] If trading in a security is suspended, it shall also be suspended on all of the other trading venues where the security in question is admitted to trading.

### Art. 34        Admission of participants

[1] The trading venue shall issue regulations on the admission, duties and exclusion of participants, thereby observing in particular the principle of equal treatment.

[2] The following may be admitted as participants in a stock exchange or a multilateral trading facility:

   a.[16] securities firms in accordance with Article 2 letter d of the Financial Institutions Act of 15 June 2018[17] (FinIA);

   b.   other parties supervised by FINMA in accordance with Article 3 of the Financial Market Supervision Act of 22 June 2007[18] (FINMASA), provided that the trading venue ensures that they fulfil equivalent technical and operational conditions to securities firms;[19]

   c.   foreign participants authorised by FINMA in accordance with Article 40;

   d.   the SNB.

---

[16]   Amended by Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).

[17]   SR **954.1**

[18]   SR **956.1**

[19]   Term in accordance with Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901). This modification has been made throughout the text.

**Art. 35** Admission of securities by a stock exchange

[1] The stock exchange shall issue regulations on the admission of securities to trading, and particularly for the listing of securities.

[2] The regulations shall take account of recognised international standards and in particular shall contain provisions on:

   a.[20] the requirements that apply to the securities and the issuers and the duties of the issuer, its representatives and third parties in connection with the listing or admission of securities to trading;

   b. the publication of information on which investors rely for assessing the characteristics of securities and the quality of the issuer;

   c. the duties of the issuer, its representatives and third parties for the entire duration of the listing or admission of securities to trading;

   d. the obligation, regarding the admission of equity securities and bonds, to comply with Articles 7 and 8[21] of the Federal Act of 16 December 2005[22] on the Licensing and Oversight of Auditors (AOA).

[2bis] The prospectus requirement is governed exclusively by Articles 35–57 of the Financial Services Act of 15 June 2018[23].[24]

[3] The stock exchange shall monitor compliance with the regulations and impose the sanctions provided for contractually in the event of violations.

**Art. 36** Admission of securities by a multilateral trading facility

[1] The multilateral trading facility shall issue regulations on the admission of securities to trading. In particular, it shall set out therein the requirements for the securities and the issuers or third parties in connection with admission to trading.[25]

[2] It shall monitor compliance with the regulations and impose the sanctions provided for contractually in the event of violations.

[3] The prospectus requirement is governed exclusively by Articles 35–57 of the Financial Services Act of 15 June 2018[26].[27]

---

20  Amended by Annex No 5 of the Financial Services Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2019** 4417; BBl **2015** 8901).

21  Art. 8 para. 1 let. b and d never came into force.

22  SR **221.302**

23  SR **950.1**

24  Inserted by Annex No 5 of the Financial Services Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2019** 4417; BBl **2015** 8901).

25  Amended by Annex No 5 of the Financial Services Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2019** 4417; BBl **2015** 8901).

26  SR **950.1**

27  Inserted by Annex No 5 of the Financial Services Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2019** 4417; BBl **2015** 8901).

### Art. 37      Appeal body

[1] The trading venue shall appoint an independent appeal body to which application may be made:

    a.   when a participant is refused admission;

    b.   when a security is refused admission;

    c.   when a participant is excluded;

    d.   when a security is delisted.

[2] It shall govern the organisation of the appeal body and its procedures.

[3] The organisation, the procedural rules and the appointment of the members of the appeal body require the approval of FINMA.

[4] An action may be brought before the civil court after the appeal procedure has been conducted.

### Art. 38      Record-keeping duty of participants

The participants admitted to a trading venue shall keep a record of the orders and transactions they carry out, providing all the details necessary for overseeing and supervising their activity.

### Art. 39      Reporting duty of participants

[1] The participants admitted to a trading venue must report all of the information necessary for transparent securities trading.

[2] FINMA shall determine which information is to be reported to whom and in what form.

[3] The SNB is not subject to the reporting obligation within the framework of carrying out its public duties.

### Art. 40      Authorisation of Foreign Participants

[1] FINMA shall grant authorisation to a foreign participant wishing to participate in a Swiss trading venue but which has no registered office in Switzerland:

    a.   if it is subject to appropriate regulation and supervision;

    b.   if it observes a code of conduct and record-keeping and reporting duties equivalent to the duties set out in Swiss regulations;

    c.   if it ensures that its activities are separate from the activities of any authorised Swiss units; and

    d.   if the competent supervisory authorities:
        1.   do not have any objections to the participant's activity in Switzerland,
        2.   provide FINMA with administrative assistance.

[2] FINMA may reject authorisation if the state in which the foreign participant has its registered office does not grant Swiss participants actual access to its markets or

does not offer them the same competitive opportunities as those granted to domestic trading participants. Any deviating international commitments are reserved.

3 A foreign participant that already participates in a Swiss trading venue shall inform FINMA if it wishes to participate in another Swiss trading venue. In this case, the foreign supervisory authority has to confirm that it has no objection to the expansion of the foreign participant's activity in Switzerland.

4 FINMA authorisation is not required for participation in monetary policy transactions with the SNB.

### Art. 41    Recognition of Foreign Trading Venues

1 Trading venues domiciled abroad must obtain recognition from FINMA before granting Swiss participants supervised by FINMA direct access to their facilities.

2 FINMA shall grant recognition:

a.    if the foreign trading venue is subject to appropriate regulation and supervision; and

b.    if the competent foreign supervisory authorities:

1.    do not have any objections to the cross-border activity of the foreign trading venue,

2.    guarantee that they will inform FINMA if they detect violations of the law or other irregularities on the part of Swiss participants, and

3.    provide FINMA with administrative assistance.

3 A foreign trading venue is deemed recognised if FINMA finds that:

a.    the state in which the trading venue has its registered office regulates and supervises its trading venues adequately; and

b.    the conditions in paragraph 2 letter b are met.

4 FINMA may refuse recognition if the state in which the foreign trading venue has its registered office does not grant Swiss trading venues actual access to its markets or does not offer them the same competitive opportunities as those granted to domestic trading venues. Any deviating international commitments are reserved.

## Section 2    Organised Trading Facilities

### Art. 42    Definition

An organised trading facility is an establishment for:

a.    multilateral trading in securities or other financial instruments whose purpose is the exchange of bids and the conclusion of contracts based on discretionary rules;

b.    multilateral trading in financial instruments other than securities whose purpose is the exchange of bids and the conclusion of contracts based on non-discretionary rules;

    c.   bilateral trading in securities or other financial instruments whose purpose is the exchange of bids.

**Art. 43**      Duty to obtain authorisation or recognition

[1] Anyone who operates an organised trading facility requires authorisation as a bank, securities dealer or DLT trading facility, or authorisation or recognition as a trading venue.[28]

[2] No authorisation is required for the operation of an organised trading facility within a financial group if this is conducted via a legal entity that:

    a.   is controlled directly by a financial market infrastructure; and

    b.   is subject to consolidated FINMA supervision.

**Art. 44**      Organisation and prevention of conflicts of interest

Anyone who operates an organised trading facility must:

    a.   do this separately from the other business activities;

    b.   take effective organisational measures to identify, prevent, settle and monitor conflicts of interest;

    c.   ensure that client interests are comprehensively protected when conducting proprietary transactions on the organised trading facility operated by him.

**Art. 45**      Guarantee of orderly trading

[1] Anyone who operates an organised trading facility must ensure that this guarantees orderly trading even in the event of intense trading activity.

[2] This person shall take effective measures to prevent disruptions to the trading facility.

**Art. 46**      Trading transparency

[1] Anyone who operates an organised trading facility shall publish information on the transactions carried out on the trading facility, in particular the price, volume and time of the transactions.

[2] Taking recognised international standards and foreign legal developments into account, the Federal Council shall regulate exemptions to this publication duty, particularly in relation to securities transactions involving large volumes or that are executed by the SNB.

[3] It may make provision, in line with recognised international standards, for extending the publication duty to pre-trading transparency.

---

[28]   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

Financial Market Infrastructure Act **958.1**

## Section 3    Power Exchanges

#### Art. 47

[1] The Federal Council may adopt provisions which deviate from this Act for exchanges where electricity derivatives are traded and for trading on such exchanges in order to take account of the specific features of the electricity market, particularly so as to safeguard the public interest in a secure power supply.

[2] It may empower FINMA to issue provisions, in agreement with the Federal Electricity Commission, in areas with a restricted scope, namely those that are primarily technical.

## Chapter 3    Central Counterparties
## Section 1    General Provisions

#### Art. 48    Definition

A central counterparty is an entity based on uniform rules and procedures that interposes itself between the counterparties to a securities transaction or other contract involving financial instruments, thereby becoming the buyer to every seller and the seller to every buyer.

#### Art. 49    Collateral

[1] The central counterparty shall require its participants to provide appropriate collateral, particularly in the form of initial margins, variation margins and default fund contributions.

[2] This collateral shall be calculated at least in such a way that:

   a.   a participant's variation margins cover the current credit exposures based on realised market price movements;

   b.   a participant's initial margins will, with a high degree of confidence, cover the potential credit exposures arising for a central counterparty upon the participant's default based on expected market price movements;

   c.   the initial margins, variation margins and default fund contributions will be sufficient to cover the loss resulting under extreme but plausible market conditions from the default of the participant to which the central counterparty has its greatest exposure.

[3] The central counterparty shall accept only liquid collateral with low credit and market risks. It shall value the collateral prudently.

#### Art. 50    Fulfilment of payment obligations

[1] The central counterparty and its participants shall fulfil their mutual payment obligations by transferring sight deposits held with a central bank.

[2] If this is impossible or impractical, they shall use a means of payment which carries low credit and liquidity risks. The central counterparty shall minimise these risks and monitor them on an ongoing basis.

### Art. 51    Capital adequacy and risk diversification

[1] Individually and on a consolidated basis, the central counterparty must have adequate capital and diversify its risk appropriately.

[2] The Federal Council shall set the amount of the capital based on the business activity and the risks, and shall determine the risk diversification requirements.

### Art. 52    Liquidity

[1] The central counterparty must have sufficient liquidity:

   a.   to fulfil its payment obligations in all currencies under extreme but plausible market conditions, even in the event of the default of the participant to which it has its greatest exposure; and

   b.   to be able to duly execute its services and activities.

[2] It shall invest its financial resources solely in cash or in liquid financial instruments with a low market and credit risk.

### Art. 53    Procedure in the event of the default of a participant

[1] The central counterparty shall take measures to limit the credit and liquidity risks in the event of a participant's default.

[2] To cover any losses in the event of a participant's default, it shall use collateral and capital in the following order:

   a.   margins of the defaulting participant;

   b.   default fund contributions of the defaulting participant;

   c.   dedicated capital of the central counterparty;

   d.   default fund contributions of non-defaulting participants.

[3] It shall issue rules governing how more extensive losses are to be covered. It may not:

   a.   use the initial margins of non-defaulting participants to cover losses caused by the default of another participant;

   b.   use the collateral of indirect participants to cover losses caused by the default of a participant or other indirect participant; or

   c.   use an indirect participant's funds in excess of the margin requirement deposited with it in accordance with Article 59 paragraph 3 to cover losses caused by the default of a participant or other indirect participant.

### Art. 54        Segregation

[1] The central counterparty must:

- a.    separate its own assets, receivables and liabilities from the collateral, receivables and liabilities of its participants; and

- b.    separate a participant's collateral, receivables and liabilities from those of other participants.

[2] It shall offer its participants the possibility of:

- a.    separating their own collateral, receivables and liabilities from those of indirect participants;

- b.    keeping and recording the collateral, receivables and liabilities of indirect participants together (omnibus customer accounts) or separately (individual customer accounts).

### Art. 55        Portability

[1] The central counterparty shall ensure that, in the event of a participant's default, the collateral and positions held by the participant on behalf of an indirect participant can be transferred to another participant indicated by the indirect participant.

[2] A participant shall be considered to be in default if:

- a.    it does not meet the admission requirements concerning the participant's financial capacity by the deadline set by the central counterparty; or

- b.    compulsory winding-up proceedings were initiated against it for the purposes of general execution.

## Section 2        Interoperability Agreements

### Art. 56        Non-discriminatory access

[1] Central counterparties may conclude an agreement on the interoperable clearing of financial transactions (interoperability agreement).

[2] A central counterparty is obliged to accept the request of another central counterparty concerning the conclusion of an interoperability agreement, unless the conclusion of such an agreement would jeopardise the security and efficiency of clearing.

### Art. 57        Approval

[1] The conclusion of an interoperability agreement is subject to approval by FINMA.

[2] The interoperability agreement shall be approved if:

- a.    the respective rights and duties of the central counterparties are governed;

- b.    the central counterparties have appropriate procedures and instruments for managing the risks arising from the interoperability agreement;

   c.    the central counterparty will cover the credit and liquidity risks arising from the interoperability agreement by immediately demanding appropriate collateral from the other central counterparty;

   d.    the central counterparties are authorised or recognised by FINMA;

   e.    the authorities responsible for supervising and overseeing the foreign central counterparty collaborate with the competent Swiss authorities.

[3] If a central counterparty involved in the interoperability agreement is systemically important, FINMA shall obtain the SNB's agreement before granting its approval.

[4] If a central counterparty involved in an interoperability agreement extends its activity to a new trading venue without this entailing new risks, the interoperability agreement does not require re-approval.


## Section 3     Participants

### Art. 58     Publication of prices

A central counterparty's participants which render a central counterparty accessible to indirect participants shall publish the prices of the services they provide in connection with clearing.


### Art. 59     Segregation

[1] A central counterparty's participant shall separate the collateral, receivables and liabilities of indirect participants from its own assets and positions with the central counterparty and in its own accounts.

[2] It shall offer indirect participants the possibility of keeping and recording the collateral, receivables and liabilities together with those of other indirect participants (omnibus customer accounts) or separately (individual customer accounts).

[3] If an indirect participant opts for individual client segregation, the participant must deposit all funds in excess of the indirect participant's margin requirement with the central counterparty and distinguish them from the margin of other indirect participants.

[4] A central counterparty's participant shall publish the costs and specifics concerning the level of protection granted by the type of account management under paragraph 2.


## Section 4     Recognition of Foreign Central Counterparties

### Art. 60

[1] A central counterparty registered abroad must obtain FINMA recognition before it:

   a.    grants supervised Swiss participants direct access to its facilities;

    b.    provides services for a Swiss financial market infrastructure;

    c.    enters into an interoperability agreement with a Swiss central counterparty.

2 FINMA shall grant recognition:

    a.    if the foreign central counterparty is subject to appropriate regulation and supervision; and

    b.    if the competent foreign supervisory authorities:

        1.    do not have any objections to the cross-border activity of the foreign central counterparty,

        2.    guarantee that they will inform FINMA if they detect violations of the law or other irregularities on the part of Swiss participants, and

        3.    provide FINMA with administrative assistance.

3 FINMA may refuse recognition if the state in which the foreign central counterparty has its registered office does not grant Swiss central counterparties actual access to its markets or does not offer them the same competitive opportunities as those granted to domestic central counterparties. Any deviating international commitments are reserved.

4 It may exempt a foreign central counterparty from the obligation to obtain recognition provided this does not adversely affect the protective purpose of this Act.


## Chapter 4    Central Securities Depositories
## Section 1    General Provisions


### Art. 61    Definitions

1 A central securities depository is the operator of a central custodian or a securities settlement system.

2 A central custodian is an entity for the central custody of securities and other financial instruments based on uniform rules and procedures.

3 A securities settlement system is an entity for the clearing and settlement of transactions in securities and other financial instruments based on uniform rules and procedures.


### Art. 62    Principles for the custody, recording and transfer of securities

1 The central securities depository shall ensure the proper and lawful custody, recording and transfer of securities.

2 It shall prohibit its participants from overdrawing their securities accounts for securities held in central custody with it.

3 It shall check on a daily basis whether the number of an issuer's securities issued with it is equal to the number of securities recorded in the participants' securities accounts.

[4] It shall specify the time:

a. after which a securities transfer order is irrevocable and may no longer be changed;

b. when a securities transfer is settled.

[5] It shall transfer securities in real time if possible, but at the latest at the end of the value day.

### Art. 63        Settlement deadlines

[1] The central securities depository shall set the deadlines for participants to settle their securities transactions in its system. In doing so, it shall take account in particular of international practices and its participants' needs.

[2] It shall enable its participants to settle transactions within the deadlines it sets.

[3] It shall monitor whether transactions are settled within the allocated deadlines. It shall impose the contractually agreed sanctions in the event of late settlement.

### Art. 64        Collateral

[1] The central securities depository shall use appropriate measures to cover risks arising from the granting of credit.

[2] It shall accept only liquid collateral with low credit and market risks. It shall value the collateral prudently.

### Art. 65        Fulfilment of payment obligations

[1] The central securities depository shall enable the settlement of payments in connection with securities held in custody or recorded with it by transferring sight deposits held with a central bank.

[2] If this is impossible or impractical, it shall use a means of payment which carries no or only low credit and liquidity risks. It shall minimise these risks and monitor them on an ongoing basis.

### Art. 66        Capital adequacy and risk diversification

[1] Individually and on a consolidated basis, the central securities depository must have adequate capital and diversify its risk appropriately.

[2] The Federal Council shall set the amount of the capital based on the business activity and the risks, and shall determine the risk diversification requirements.

### Art. 67        Liquidity

[1] The central securities depository must have sufficient liquidity:

a. to fulfil its payment obligations in all currencies under extreme but plausible market conditions, even in the event of the default of the participant to which it has its greatest exposure; and

    b.   to be able to duly execute its services and activities.

2 It shall invest its financial resources solely in cash or in liquid financial instruments with a low market and credit risk.

### Art. 68       Procedure in the event of the default of a participant

The central securities depository shall provide for measures to limit the credit and liquidity risks that arise in the event of a participant's default.

### Art. 69       Segregation

1 The central securities depository must:

    a.   separate its own assets from the securities of its participants; and

    b.   separate a given participant's securities from those of other participants.

2 It shall offer its participants the possibility of:

    a.   separating their own securities from those of indirect participants;

    b.   keeping and recording the securities of indirect participants together (omnibus customer accounts) or separately (individual customer accounts).

## Section 2    Links between Central Securities Depositories

### Art. 70       Definition

Links between central securities depositories are understood as meaning agreements:

    a.   between central securities depositories regarding the mutual execution of payment and transfer orders (interoperability links);

    b.   regarding the direct or indirect participation of a central securities depository in another central securities depository (access links).

### Art. 71       Approval

1 The establishment of the following links between central securities depositories requires the approval of FINMA:

    a.   interoperability agreements;

    b.   access agreements in which a central securities depository provides services for the other party that it does not provide for other participants.

2 Approval is granted if the central securities depositories:

    a.   apply rules, procedures and controls which allow them to identify, limit and monitor the risks arising from their agreement for their own protection and that of their participants;

    b.   check their records are correct by comparing them; and

   c.    set out in a written agreement their rights and duties, as well as the rights and duties of their participants if appropriate.

[3] If a central securities depository involved in a link between central securities depositories is systemically important, FINMA must obtain the SNB's agreement before granting approval.

### Art. 72     Reporting

The establishment of access links in which a central securities depository provides the same services for the other party as it provides for other participants must be reported to FINMA.

## Section 3     Segregation by Participants

### Art. 73

[1] A central securities depository's participant shall separate the securities, receivables and liabilities of indirect participants from its own assets, receivables and liabilities with the central securities depository and in its own accounts.

[2] It shall offer indirect participants the possibility of keeping and recording securities, receivables and liabilities together with those of other indirect participants (omnibus customer accounts) or separately (individual customer accounts).

[3] If an indirect participant opts for individual client segregation, the participant must deposit all funds in excess of the individual participant's margin requirement with the central securities depository and distinguish them from the margin payments of other indirect participants.

[4] A central securities depository's participant shall publish the costs and specifics concerning the level of protection granted by the type of account management under paragraph 2.

## Chapter 4*a*[29] DLT Trading Facilities

### Art. 73*a*     Definitions

[1] A DLT trading facility is a commercially operated institution for multilateral trading of DLT securities whose purpose is the simultaneous exchange of bids between several participants and the conclusion of contracts based on non-discretionary rules and which meets at least one of the following criteria:

   a.     It admits participants in accordance with Article 73*c* paragraph 2 letter e.

---

[29]   Inserted by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

    b.   It holds DLT securities in central custody based on uniform rules and proce-
       dures.

    c.   It clears and settles transactions in DLT securities based on uniform rules
       and procedures.

2 The criterion of a commercial basis is deemed satisfied by an independent econom-
ic activity pursued on a permanent, for-profit basis.

**Art. 73***b*     Applicability of certain requirements for trading venues

DLT trading facilities are subject to the following requirements for trading venues:

    a.   self-regulation (Art. 27);

    b.   organisation of trading (Art. 28);

    c.   pre- and post-trade transparency (Art. 29);

    d.   guarantee of orderly trading (Art. 30);

    e.   supervision of trading (Art. 31);

    f.   collaboration between trading supervisory bodies (Art. 32);

    g.   suspension of trading (Art. 33 para. 2);

    h.   appeal body (Art. 37).

**Art. 73***c*     Admission of participants and their duties

1 The following may be admitted as participants in a DLT trading facility:

    a.   securities firms as defined in Article 41 of the FinIA[30];

    b.   other parties supervised by FINMA in accordance with Article 3 of the
       FINMASA[31] as well as parties supervised by a foreign authority, provided
       that the DLT trading facility ensures that they fulfil equivalent technical and
       operational conditions to securities firms;

    c.   the SNB;

    d.   the Bank for International Settlements;

    e.   other natural persons and legal entities, provided that they declare that they
       are participating in their own name and for their own account.

2 Participants domiciled in Switzerland must provide FINMA with all information
and documents that it requires to carry out its tasks. The DLT trading facility must
ensure that foreign-domiciled participants provide the relevant information and
documents if FINMA so requires.

3 The provisions on the record-keeping duty (Art. 38) and the reporting duty
(Art. 39) of participants also apply to participants in a DLT trading facility. The
Federal Council may make exceptions for participants under paragraph 1 letter e.

30   SR **954.1**
31   SR **956.1**

[4] The Federal Council shall regulate the details regarding the admission, duties and exclusion of participants.

[5] The DLT trading facility shall issue regulations on the admission, duties and exclusion of participants, thereby observing in particular the principle of equal treatment.

[6] It shall monitor compliance with the regulations and impose the sanctions provided for contractually in the event of violations.

### Art. 73*d*      Admission of DLT securities and other assets

[1] The DLT trading facility shall issue regulations on the admission of DLT securities to trading and to the other services it provides. In particular, it shall set out therein the requirements to be met by the DLT securities and the issuers or third parties in connection with the admission. The duty to publish a prospectus is governed exclusively by Articles 35–57 of the Financial Services Act of 15 June 2018[32].

[2] A DLT trading facility that, in addition to DLT securities, admits other assets to trading or to its other services shall issue regulations on the admission of such assets.

[3] The Federal Council may:

   a.   require that DLT securities be admitted to DLT trading facilities only if they meet certain minimum requirements, in particular as regards their integrity and the availability of public information;

   b.   specify which DLT securities and other assets must not be admitted to DLT trading facilities in order to protect financial market participants or the stability or integrity of the financial system.

[4] The DLT trading facility shall monitor compliance with the regulations and impose the sanctions provided for contractually in the event of violations.

### Art. 73*e*      Additional requirements

[1] For DLT trading facilities that are open to participants under Article 73*c* paragraph 1 letter e, the Federal Council may set requirements for the protection of these participants in addition to the requirements under Articles 73*b*–73*d*.

[2] For DLT trading facilities that provide central custody, clearing and settlement services, the Federal Council shall set requirements in addition to those under Articles 73*a*–73*d*, in particular with regard to:

   a.   the central custody, clearing and settlement of DLT securities;

   b.   collateral;

   c.   capital adequacy;

   d.   risk diversification;

   e.   ancillary services;

   f.   liquidity;

---

[32]   SR **950.1**

g.    procedure in the event of a participant's default;

h.    segregation.

3 The Federal Council shall base the requirements under paragraph 2 on the requirements for central securities depositories (Arts. 61–73).

4 Where necessary in order to take account of technology-specific risks, the Federal Council may authorise FINMA to draw up the requirements under paragraph 2.

5 The competence of the SNB to specify special requirements for systemically important DLT trading facilities by virtue of Article 23 is reserved.

**Art. 73*f***      Easing of requirements for small DLT trading facilities

1 For reasons of proportionality and while taking into account the protective purpose of this Act, the Federal Council may ease the requirements for small DLT trading facilities under Articles 6–21, 27–33 and 37, in particular the requirements on:

a.    separation of the bodies responsible for business management from those responsible for overall management, supervision and control (Art. 8);

b.    the provision of ancillary services not subject to authorisation or approval by virtue of the financial market legislation (Art. 10);

c.    the independence of the self-regulatory organisation (Art. 27 para. 2) and of the appeal body (Art. 37 para. 1).

2 DLT trading facilities are deemed to be small if they pose a low risk in terms of the protection of financial market participants and the proper functioning and stability of the financial system, in particular because the number of participants, the trading volume, the volume of custody assets or the clearing and settlement volume is limited. The Federal Council shall set thresholds.

3 DLT-Handelssysteme, die Erleichterungen nach diesem Artikel erhalten, sind verpflichtet, dies gegenüber ihren Kundinnen und Kunden offenzulegen. Der Bundesrat regelt die Details.

## Chapter 5     Trade Repositories
## Section 1     General Provisions

**Art. 74**      Definition

A trade repository is an entity which collects, manages and retains in a centralised manner the data on derivatives transactions reported to it in accordance with Article 104.

**Art. 75**      Data retention

The trade repository shall record the reported data and retain it for at least ten years after the contract was due.

**Art. 76**      Publication of data

[1] The trade repository shall regularly publish the open positions, transaction volumes and values by derivatives category in aggregated and anonymised form on the basis of the reported data.

[2] It may publish further data provided it is aggregated and anonymised.

**Art. 77**      Data access for Swiss authorities

[1] The trade repository shall grant the following authorities free access to the data they require to perform their tasks:

a.   FINMA;

b.   the SNB;

c.   other Swiss financial market supervisory authorities;

d.   the Federal Electricity Commission.

[2] The Federal Council shall regulate access to data concerning central bank transactions, taking account of recognised international standards.

**Art. 78**      Data access for foreign authorities

[1] The trade repository shall grant a foreign financial market supervisory authority free access to the data it requires to perform its tasks if an agreement regarding cooperation between the competent Swiss and foreign supervisory authorities confirms fulfilment of the following conditions:

a.   The foreign financial market supervisory authority is subject to a statutory confidentiality duty.

b.   Forwarding of the data by the foreign financial market supervisory authority to other foreign authorities is permitted only if, on transfer to a criminal authority, mutual assistance in accordance with the Mutual Assistance Act of 20 March 1981[33] is possible.

c.   The Swiss authorities mentioned in Article 77 paragraph 1 have immediate access to trade repositories in the state of the foreign financial market supervisory authority.

[2] The Federal Council shall regulate access to data concerning central bank transactions, taking account of recognised international standards.

**Art. 79**      Data transmission to private individuals

[1] The trade repository may transmit data to private individuals in aggregated and anonymised form.

[2] The transmission of data to private individuals regarding their own transactions is permitted without restriction.

---

[33]   SR **351.1**

## Section 2    Recognition of Foreign Trade Repositories

### Art. 80

[1] A trade repository registered abroad must obtain recognition from FINMA before accepting reports in accordance with Article 104.

[2] FINMA shall grant recognition:

a.    if the foreign trade repository is subject to appropriate regulation and supervision; and

b.    if the competent foreign supervisory authorities:

1.    do not have any objections to the cross-border activity of the foreign trade repository,

2.    guarantee that they will inform FINMA if they detect violations of the law or other irregularities on the part of Swiss participants,

3.    confirm to the competent Swiss financial market supervisory authority that the conditions set out in Article 78 paragraph 1 letters b and c are fulfilled.

[3] A trade repository is deemed recognised if FINMA finds that:

a.    the state in which the foreign trade repository has its registered office regulates and supervises its trade repositories adequately; and

b.    the conditions in accordance with paragraph 2 letter b are met.

[4] FINMA may refuse recognition if the state in which the foreign trade repository has its registered office does not grant Swiss trade repositories actual access to its markets or does not offer them the same competitive opportunities as those granted to the trade repositories of the state in question. Any deviating international commitments are reserved.

## Chapter 6    Payment Systems

### Art. 81      Definition

A payment system is an entity that clears and settles payment obligations based on uniform rules and procedures.

### Art. 82      Duties

The Federal Council may define specific duties for payment systems, namely in terms of capital adequacy, risk diversification and liquidity, if this is necessary for implementing recognised international standards. The competence of the SNB to specify special requirements for systemically important payment systems by virtue of Article 23 is reserved.

## Chapter 7   Supervision and Oversight

### Art. 83        Responsibilities

1 FINMA is the supervisory authority. Systemically important financial market infrastructures are also subject to oversight by the SNB.

2 FINMA shall supervise compliance with the authorisation conditions and duties insofar as this task is not covered by the SNB by virtue of the oversight of the special requirements in accordance with Article 23.

3 FINMA and the SNB shall jointly carry out their supervisory and oversight activities regarding systemically important financial market infrastructures, regularly exchange information and avoid overlaps in the execution of their tasks. When cooperating with foreign supervisory and oversight authorities, they shall coordinate the discharge of their duties and their communication.

### Art. 84        Auditing

1 Financial market infrastructures and financial groups must instruct an audit firm licensed by the Federal Audit Oversight Authority in accordance with Article 9*a* paragraph 1 AOA[34] to conduct an audit in accordance with Article 24 of the FINMASA[35].

2 They must have their annual accounts, and if applicable their consolidated accounts, audited by an audit firm subject to state oversight in accordance with the ordinary auditing principles set out in the Code of Obligations (CO)[36].

3 FINMA may audit financial market infrastructures directly.

### Art. 85        Suspension of voting rights

FINMA may suspend the voting rights attached to shares or units held by qualified participants in order to enforce Article 9 paragraphs 3 and 5.

### Art. 86        Voluntary authorisation return

1 A financial market infrastructure which wishes to return its authorisation must present a liquidation plan to FINMA for approval.

2 The liquidation plan must contain details on:

    a.   the settlement of financial obligations;
    b.   the funds made available for this purpose;
    c.   the person responsible.

3 A financial market infrastructure is released from supervision by FINMA when it has fulfilled the duties set out in the liquidation plan.

[34]   SR **221.302**
[35]   SR **956.1**
[36]   SR **220**

### Art. 87       Authorisation withdrawal

[1] As a complement to Article 37 FINMASA[37], FINMA may withdraw authorisation or recognition from a financial market infrastructure if it:

  a.    does not use the authorisation within twelve months;

  b.    has not provided services permitted solely with the authorisation during the preceding six months;

  c.    does not comply with the liquidation plan.

[2] The withdrawal of authorisation shall cause the dissolution of the legal entity. FINMA shall designate the liquidator and oversee its activity. The insolvency law provisions in accordance with Chapter 8 remain reserved.

## Chapter 8      Insolvency Law Provisions

### Art. 88       Insolvency measures

[1] Articles 24 to 37 and 37*d* to 37*g*, with the exception of Article 37*g* paragraph 4[bis] of the Banking Act of 8 November 1934[38] apply by analogy for financial market infrastructures unless this Act contains provisions to the contrary.[39]

[2] In the case of systemically important financial market infrastructures, FINMA shall consult the SNB before taking insolvency measures.

### Art. 89       System protection

[1] Insofar as this is possible and to the extent that they are concerned, FINMA shall inform central counterparties, central securities depositories, payment systems and those DLT trading facilities that provide comparable central custody, clearing or settlement services, in Switzerland and abroad, of the insolvency measures it intends to take against a participant and which limit the participant's power of disposal. It shall also inform them of the precise time of entry into effect of the measures.[40]

[2] The orders given to a central counterparty, central securities depository, payment system or a DLT trading facility that provides comparable central custody, clearing or settlement services by a participant against which such an insolvency measure has been taken shall be legally enforceable and binding on third parties if:[41]

---

37    SR **956.1**

38    SR **952.0**

39    Amended by Annex No 3 of the FA of 16 March 2018, in force since 1 Jan. 2019 (AS **2018** 3263; BBl **2017** 4125).

40    Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

41    Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

a.  they were introduced before the measure was ordered and were unalterable in accordance with the rules of the financial market infrastructure; or

b.  they were executed on the business day defined by the rules of the financial market infrastructure during which the measure was ordered and the financial market infrastructure proves that it was not and should not have been aware of the measure being ordered.

[3] Paragraph 2 applies if:

a.  the financial market infrastructure is authorised in Switzerland;

b.  the foreign financial market infrastructure is recognised or supervised in Switzerland and grants Swiss participants direct access to its facilities; or

c.  the participation agreement is subject to Swiss law.

[4] Paragraph 2 applies by analogy to:

a.  financial market infrastructures in accordance with Article 4 paragraph 3;

b.  payment systems that are operated by banks.

**Art. 90**        Primacy of agreements in the event of participant insolvency

[1] Insolvency measures that are ordered against a central counterparty's participant have no effect on previously concluded agreements between the central counterparty and the participant regarding:

a.  the offsetting of receivables, including the agreed method and valuation;

b.  the direct realisation of collateral in the form of securities or other financial instruments whose value can be determined objectively;

c.  the transfer of receivables and liabilities, and collateral in the form of securities, or other financial instruments whose value can be determined objectively.

[2] Following the netting or realisation carried out by the central counterparty in accordance with paragraph 1 letters a and b, the participant's remaining entitlements shall be segregated in favour of its clients and indirect participants.

[3] Measures to the contrary ordered within the scope of the postponement of the termination of contracts by FINMA are reserved.

**Art. 91**        Primacy of agreements in the event of insolvency of
an indirect participant

[1] Insolvency measures that are ordered against a central counterparty's indirect participant have no effect on previously concluded agreements pursuant to Article 90 paragraph 1 letters a to c between the participant and the indirect participant.

[2] Following the netting or realisation carried out by the participant within the meaning of Article 90 paragraph 1 letters a and b, the indirect participant's remaining entitlements shall be segregated in favour of its clients and indirect participants.

[3] Paragraphs 1 and 2 shall also apply to insolvency measures against the indirect participant of another indirect participant.

[4] Measures to the contrary ordered within the scope of the postponement of the termination of contracts by FINMA are reserved.

### Art. 92    Postponement of the termination of contracts

If FINMA postpones the termination of contracts and the exercise of rights to terminate them, it shall take account of the implications for the financial markets and the secure and orderly operation of the affected financial market infrastructure, its participants and other financial market infrastructures associated with it.

## Title 3      Market Conduct
## Chapter 1    Derivatives Trading
## Section 1    General Provisions

### Art. 93    Scope

[1] Subject to the provisions set out below, this chapter applies to financial and non-financial counterparties which have their registered office in Switzerland.

[2] The term financial counterparties means:

   a.   banks in accordance with Article 1 paragraph 1 of the Banking Act of 8 November 1934[42];

   b.[43]   securities firms in accordance with Article 41 FinIA[44];

   c.   insurance and reinsurance companies in accordance with Article 2 paragraph 1 letter a of the Federal Act of 17 December 2004[45] on the Supervision of Insurance Companies;

   d.   parent companies of a financial or insurance group or financial or insurance conglomerate;

   e.[46]   managers of collective assets and fund management companies in accordance with Article 2 paragraph 1 letters c and d FinIA;

   f.   collective investment schemes in accordance with the Collective Investment Schemes Act;

---

42   SR **952.0**
43   Amended by Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).
44   SR **954.1**
45   SR **961.01**
46   Amended by Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).

g.   occupational pension schemes and investment foundations in accordance with Articles 48 to 53*k* of the Federal Act of 25 June 1982[47] on Occupational Old Age, Survivors' and Invalidity Pension Provision.

[3] Non-financial counterparties are companies that are not financial counterparties.

[4] The following establishments shall be subject only to the reporting duty in accordance with Article 104:

a.   multilateral development banks;

b.   organisations, including social security institutions, belonging to the Confederation, cantons or communes or for which the Confederation, canton or commune in question is liable and provided that they are not financial counterparties.

[5] The Federal Council may subject Swiss branches of foreign financial market participants to the provisions of this chapter if they are not subject to any equivalent regulations.

**Art. 94**     Exemptions

[1] This chapter does not apply to:

a.   the Confederation, cantons and communes;

b.   the SNB;

c.   the Bank for International Settlements.

[2] The Federal Council may, for reasons of proportionality and taking account of recognised international standards, exclude other public sector bodies or financial market participants from the scope of this chapter in whole or in part.

[3] The following are not considered to be derivatives in accordance with this chapter:

a.   structured products such as capital-protected products, capped return products and certificates;

b.   securities lending and borrowing;

c.   derivatives transactions relating to goods that:
   1.   must be physically delivered,
   2.   cannot be settled in cash at a party's discretion, and
   3.   are not traded on a trading venue or an organised trading facility.

[4] The Federal Council may exclude derivatives from the provisions of this chapter if this is in keeping with internationally recognised standards.

**Art. 95**     Fulfilment of duties under foreign law

The duties set out in this chapter shall be deemed fulfilled if:

---

[47]   SR **831.40**

a. they are fulfilled under foreign law recognised as being equivalent by FINMA;

b. a foreign financial market infrastructure recognised by FINMA was used to execute the transaction.

### Art. 96    Intra-group flow of information

Counterparties may exchange with their group companies and branches abroad all data necessary for immediate fulfilment of the duties arising from this chapter.

## Section 2    Clearing via a Central Counterparty

### Art. 97    Clearing duty

[1] Counterparties must clear transactions in derivatives in accordance with Article 101 that were not conducted via a trading venue (OTC derivatives transactions) through a central counterparty authorised or recognised by FINMA.

[2] This duty does not apply to transactions with small counterparties or for transactions between such counterparties.

[3] A counterparty may assume that its counterparty's declaration concerning its characteristics is correct insofar as there are no indications to the contrary.

[4] In order to complement the duty detailed in Article 112, the Federal Council may order that all derivatives transactions conducted via a trading venue or organised trading facility must be cleared by a central counterparty authorised or recognised by FINMA.

[5] FINMA may allow clearing by an unrecognised central counterparty in individual cases, provided this does not adversely affect the protective purpose of this Act.

### Art. 98    Small non-financial counterparties

[1] A non-financial counterparty is deemed to be small if all of the rolling averages for its gross positions in relevant outstanding OTC derivatives transactions calculated over 30 working days are below the thresholds.

[2] If one of the average gross positions of an existing small non-financial counterparty calculated in accordance with paragraph 1 exceeds the relevant threshold, said counterparty will no longer be deemed small four months after the threshold is exceeded.

[3] Derivatives transactions intended to reduce risks are not factored into the calculation of the average gross position if they are directly associated with the business activity, liquidity management or asset management of the counterparty or group.

### Art. 99        Small financial counterparties

[1] A financial counterparty is deemed to be small if the rolling average for its gross position in all outstanding OTC derivatives transactions calculated over 30 working days is below the threshold.

[2] If an existing small financial counterparty's average gross position in accordance with paragraph 1 exceeds the threshold, said counterparty will no longer be deemed small four months after the threshold is exceeded.

### Art. 100       Thresholds

[1] Thresholds apply by derivatives category to non-financial counterparties' average gross positions in outstanding OTC derivatives transactions.

[2] A single threshold shall apply to the average gross positions in all outstanding OTC derivatives transactions of financial counterparties.

[3] If the counterparty is part of a fully consolidated group, all of the intra-group OTC derivatives transactions concluded by the counterparty or by other counterparties shall also be factored into the calculation of the average gross positions.

[4] The Federal Council shall determine:

  a.   for non-financial counterparties, the level of the thresholds for each derivatives category and how they are calculated;

  b.   which derivatives transactions of non-financial counterparties are not to be taken into account when calculating the thresholds;

  c.   the threshold for financial counterparties.

### Art. 101       Derivatives concerned

[1] FINMA determines the derivatives which must be cleared via a central counterparty. In so doing, it considers:

  a.   their degree of legal and operational standardisation;

  b.   their liquidity;

  c.   their trading volumes;

  d.   the availability of pricing information in the given category;

  e.   the counterparty risks associated with them.

[2] It shall take account of recognised international standards and foreign legal developments. It may phase in the introduction of the clearing duty by derivatives category.

[3] No clearing duty may be imposed for:

  a.   derivatives that are not cleared by any authorised or recognised central counterparty;

  b.   currency swaps and forward transactions, provided they are settled on a payment versus payment basis.

### Art. 102   Cross-border transactions

The duty to clear through a central counterparty also applies if the foreign counterparty of the Swiss counterparty subject to this duty would be subject to the clearing duty if it had its registered office in Switzerland.

### Art. 103   Intra-group transactions

Derivatives transactions do not have to be cleared via a central counterparty:

a.   if the two counterparties are included in the same full consolidation basis;

b.   if the two counterparties are subject to appropriate centralised risk evaluation, measurement and control procedures; and

c.   if the transactions do not aim to circumvent the clearing duty.

## Section 3   Reporting to a Trade Repository

### Art. 104   Reporting duty

[1] Derivatives transactions must be reported to a trade repository authorised or recognised by FINMA.

[2] The following shall be obliged to report:

a.   in the case of transactions between a financial and a non-financial counterparty: the financial counterparty;

b.   in the case of transactions between two financial counterparties:

1.   the financial counterparty which is not small in accordance with Article 99,

2.   the selling counterparty in the case of a transaction between two financial counterparties or between two small financial counterparties;

c.   the counterparty which has its registered office in Switzerland if the foreign counterparty does not report.

[3] In the event of a transaction between non-financial counterparties, paragraph 2 letters b and c applies by analogy. A transaction between small non-financial counterparties does not have to be reported.

[4] If the transaction is cleared centrally, the report is submitted by the central counterparty. If a recognised foreign central counterparty does not submit reports, the reporting duty shall remain with the counterparties.

[5] Third parties may be involved in reporting.

[6] If there is no trade repository, the Federal Council shall indicate the body to which the report is to be submitted.

**Art. 105**       Timing and content of reports

[1] The report is to be submitted at the latest on the working day following the conclusion, amendment or termination of the derivatives transaction.

[2] For each transaction, the following must be reported as a minimum:

  a.   the identity of the counterparties, particularly their business name and seat;

  b.   the type of transaction;

  c.   the maturity date;

  d.   the nominal value;

  e.   the price;

  f.   the settlement date;

  g.   the currency.

[3] The Federal Council may make provision for the reporting of other details and governs the reporting format.

[4] Reports to a recognised foreign trade repository may include further details. If these consist of personal data, the approval of the person in question is to be obtained.

**Art. 106**       Retention of supporting documents

Counterparties must retain the supporting documents for their derivatives transactions in accordance with the provisions of Article 958*f* CO[48].

## Section 4       Risk Mitigation

**Art. 107**       Duties

[1] OTC derivatives transactions which do not have to be cleared by a central counterparty authorised or recognised by FINMA are subject to the duties set out in this section.

[2] These duties do not apply to:

  a.   derivatives transactions with counterparties in accordance with Article 93 paragraph 4 and Article 94 paragraph 1;

  b.[49]  currency swaps and currency forward transactions, provided they are settled on a payment versus payment basis;

  c.   derivatives transactions voluntarily cleared by a central counterparty authorised or recognised by FINMA.

---

48   SR **220**
49   Amended by Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).

[3] The Federal Council may make provision for further complete or partial exemptions for reasons of proportionality and taking account of recognised international standards.

### Art. 108    Operational and counterparty risk mitigation

Counterparties shall record, observe and mitigate operating risks and counterparty risks associated with derivatives transactions in accordance with Article 107 paragraph 1. In particular, they must:

   a.   confirm the contractual terms of derivatives transactions in a timely manner;

   b.   have procedures for reconciling portfolios and managing the associated risks, except for when the counterparty is a small non-financial counterparty;

   c.   have procedures for identifying and resolving disputes between parties at an early stage;

   d.   regularly, but at least twice per year, perform portfolio compression where this is appropriate to mitigate their counterparty risk and provided they have 500 or more non-centrally cleared OTC derivatives transactions outstanding.

### Art. 109    Valuation of outstanding transactions

[1] Counterparties must value derivatives at current prices (mark to market) on a daily basis.

[2] This duty does not apply to transactions with small counterparties.

[3] Where market conditions prevent marking to market, marking to model shall be used. The valuation models must be appropriate and recognised in practice.

[4] Non-financial counterparties may involve third parties for the valuation.

### Art. 110    Exchange of collateral

[1] Counterparties, with the exception of small non-financial counterparties, shall exchange appropriate collateral.

[2] They must be capable of segregating the collateral from their own assets in an appropriate manner.

[3] Agreements regarding the direct realisation of collateral exchanged in accordance with paragraph 1 whose value can be determined objectively shall remain in force even in foreclosure proceedings and in the case of insolvency measures against the protection seller.

[4] The Federal Council shall regulate the requirements for the exchange of collateral.

### Art. 111    Intra-group transactions

No collateral has to be exchanged:

   a.   if the two counterparties are included in the same full consolidation basis;

b.   if the two counterparties are subject to appropriate centralised risk evaluation, measurement and control procedures;

c.   if there are no legal or factual impediments to the prompt transfer of own funds or the repayment of liabilities; and

d.   if the transactions do not aim to circumvent the duty to exchange collateral.

## Section 5
## Trading via Trading Venues and Organised Trading Facilities

### Art. 112      Duty

[1] Counterparties must trade all derivatives in accordance with Article 113 via:

a.   a trading venue that is authorised or recognised by FINMA; or

b.   the operator of an organised trading facility that is authorised or recognised by FINMA.

[2] This duty does not apply to transactions with small counterparties or for transactions between such counterparties.

### Art. 113      Derivatives concerned

[1] FINMA determines the derivatives which must be traded via a trading venue or a trading facility in accordance with Article 112 paragraph 1. In so doing, it considers:

a.   their degree of legal and operational standardisation;

b.   their liquidity;

c.   their trading volumes;

d.   the availability of pricing information in the given category;

e.   the counterparty risks associated with them.

[2] It shall take account of recognised international standards and foreign legal developments. It may phase in the introduction of the duty to trade via a trading venue or a trading facility, according to derivative category.

[3] No duty to trade in accordance with Article 112 may be imposed for:

a.   derivatives not admitted to trading by a relevant trading venue or trading facility;

b.   currency swaps and forward transactions, provided they are settled on a payment versus payment basis.

### Art. 114      Cross-border transactions

The duty to trade derivatives in accordance with Article 112 also applies if the foreign counterparty of the Swiss counterparty subject to the duty would be subject to the same duty if it had its registered office in Switzerland..

### Art. 115        Intra-group transactions

The duty to trade in accordance with Article 112 does not apply if:

a.    the two counterparties are included in the same full consolidation basis;

b.    the two counterparties are subject to appropriate centralised risk evaluation, measurement and control procedures; and

c.    the transactions do not aim to circumvent the duty.

## Section 6        Auditing

### Art. 116        Responsibilities

[1] The auditors in accordance with Articles 727 and 727*a* CO[50] shall verify the counterparties' compliance with the provisions of this chapter within the framework of their audits.

[2] The auditing of supervised parties is governed by the financial market acts.

[3] Provisions on the supervision and overall supervision of occupational old age, survivors' and invalidity pension provision are reserved.

### Art. 117        Reports and notifications

[1] The audit companies of supervised parties shall report to FINMA.

[2] The duty to notify in accordance with Article 728*c* paragraphs 1 and 2 CO[51] applies to auditors of non-supervised parties in the event of infringements with regard to duties under this chapter.

[3] If the company fails to take appropriate measures despite the auditors' notification, the auditors shall report the infringements to the Federal Department of Finance.

## Chapter 2        Position limits for commodity derivatives

### Art. 118        Position limits

[1] The Federal Council may introduce limits on the size of net positions which a person may hold in commodity derivatives insofar as this is necessary for orderly pricing and settlement as well as for convergence between prices on the derivatives market and on the underlying market. In doing so, it shall take account of recognised international standards and legal developments abroad.

[2] It governs the following for position limits:

a.    the calculation of net positions;

---

50    SR **220**
51    SR **220**

b.  the exemptions for positions which are held for a non-financial counterparty and which serve to reduce the risks directly associated with its business activity, liquidity management or asset management;

c.  the reporting duties required for the transparency of commodity derivatives trading.

3 FINMA shall set position limits for the individual commodity derivatives.

### Art. **119**        Supervision

1 The trading venue shall supervise open positions in order to enforce position limits. It may request each participant to:

a.  grant it access to all information required for enforcing the position limits;

b.  liquidate or reduce positions if the position limits have been exceeded.

2 Paragraph 1 applies by analogy to operators of organised trading facilities and their clients.


## **Chapter 3    Disclosure of Shareholdings**

### **Art. 120**        Notification duty

1 Anyone who directly or indirectly or acting in concert with third parties acquires or disposes of shares or acquisition or sale rights relating to shares of a company with its registered office in Switzerland whose equity securities are listed in whole or in part in Switzerland, or of a company with its registered office abroad whose equity securities are mainly listed in whole or in part in Switzerland, and thereby reaches, falls below or exceeds the thresholds of 3%, 5%, 10%, 15%, 20%, 25%, 33⅓%, 50% or 66⅔% of the voting rights, whether exercisable or not, must notify this to the company and to the stock exchanges on which the equity securities are listed.

2 Financial intermediaries who acquire or dispose of shares or acquisition or sale rights on behalf of third parties are not subject to this notification duty.

3 Anyone who has the discretionary power to exercise the voting rights associated with equity securities in accordance with paragraph 1 is also subject to the notification duty.

4 The following shall be deemed equivalent to an acquisition or disposal:

a.  the initial listing of equity securities;

b.  the conversion of participation certificates or profit-sharing certificates into shares;

c.  the exercise of conversion or acquisition rights;

d.  changes in the share capital; and

e.  the exercise of sale rights.

[5] All procedures that can ultimately confer the voting right to equity securities also constitute an indirect acquisition. This does not apply in the case of powers of attorney granted solely for the purposes of representation at a general meeting.

### Art. 121    Notification duty for organised groups

A group organised pursuant to an agreement or otherwise must comply with the notification duty laid down in Article 120 as a group and shall disclose:

a. its total holdings;

b. the identity of its members;

c. the nature of the agreement;

d. the representation.

### Art. 122    Communication to FINMA

If a company or stock exchange has reason to believe that a shareholder is in violation of the notification duty, it shall inform FINMA of such fact.

### Art. 123    Powers of FINMA

[1] FINMA shall issue provisions on:

a. the scope of the notification duty;

b. the treatment of acquisition and disposal rights;

c. the calculation of voting rights;

d. the time frame within which the notification duty has to be fulfilled;

e. the time frame within which a company has to publish changes to its ownership structure in accordance with Article 120.

[2] FINMA may, for good cause, make provision for exemptions to or easing of the notification or publication duty, particularly if the transactions:

a. are of a short-term nature;

b. are not associated with any intention to exercise the voting right; or

c. are conditional.

[3] Anyone who intends to acquire securities can obtain a ruling from FINMA as to whether or not they will be subject to the notification duty.

### Art. 124    Duty of the company to inform

The company must publish the information which it receives in respect of changes in the voting rights.

## Chapter 4   Public Takeover Offers

### Art. 125   Scope

[1] The provisions of this chapter and Article 163 apply to public takeover offers relating to equity securities of companies (target companies):

   a.   with their registered office in Switzerland whose equity securities are at least partly listed on a stock exchange in Switzerland;

   b.   with their registered office abroad whose equity securities are at least in part mainly listed in Switzerland.

[2] If both Swiss and foreign law are simultaneously applicable to a public takeover offer, the provisions of Swiss law may be relinquished if:

   a.   the application of Swiss law would lead to a conflict with the foreign law; and

   b.   the protection provided by the foreign law to investors is equivalent to that provided by Swiss law.

[3] Companies may, prior to their equity securities being admitted to official listing on a stock exchange in accordance with paragraph 1, state in their articles of incorporation that an offeror shall not be bound by the obligation to make a public takeover offer in accordance with Articles 135 and 163.

[4] A company may at any time adopt a provision in accordance with paragraph 3 in its articles of incorporation, provided that this does not prejudice the interests of shareholders within the meaning of Article 706 CO[52].

### Art. 126   Takeover Board

[1] After consulting the stock exchanges, FINMA shall appoint a board for public takeover offers (Takeover Board). This Board shall consist of expert representatives of securities firms, listed companies and investors. The organisational structure and procedures of the Takeover Board shall be submitted to FINMA for approval.

[2] The provisions which are issued by the Takeover Board in accordance with this Act shall require the approval of FINMA.

[3] The Takeover Board shall check compliance with the provisions applicable to public takeover offers in individual cases.

[4] It shall report to FINMA once a year on its activities.

[5] The Takeover Board may levy fees on the parties involved in takeover proceedings. The Federal Council shall govern the fees. In doing so, it shall take account of the value of the transactions and the degree of difficulty of the proceedings.

[6] The stock exchanges shall bear the costs that are not covered by the fees.

---

[52]   SR **220**

**958.1**

### Art. 127    Duties of the offeror

1 The offeror must publish the offer in a prospectus containing true and complete information.

2 The offeror must treat all holders of equity securities of the same class equally.

3 The offeror's duties shall apply for all who act in concert with it.

### Art. 128    Review of the offer

1 The offeror shall, prior to publication, submit the offer to an audit firm licensed by the Federal Audit Oversight Authority in accordance with Article 9*a* paragraph 1 AOA53 or to a securities firm for review.

2 The reviewing entity shall check whether the offer is in compliance with the law and the implementing provisions.

### Art. 129    Right of withdrawal of the seller

The seller may withdraw a contract or rescind an executed sale if these were concluded or executed on the basis of a prohibited offer.

### Art. 130    Announcement of the result of the offer and extension of the offer period

1 The offeror must publish the result of the offer upon expiry of the offer period.

2 If the conditions of the offer are met, the offeror must extend the offer period for those holders of shares and other equity securities who have not yet accepted the offer.

### Art. 131    Additional provisions

The Takeover Board shall set out additional provisions relating to:

a.   the announcement of an offer prior to its publication;

b.   the contents and the publication of the prospectus as well as the conditions to which an offer can be subjected;

c.   the rules of fairness applicable to public takeover offers;

d.   the review of the offer by an audit firm licensed by the Federal Audit Oversight Authority in accordance with Article 9*a* paragraph 1 AOA54 or a securities firm;

e.   the offer period and any extension thereof, the conditions under which the offer may be withdrawn or modified and the period within which a seller may withdraw;

f.   actions in concert with third parties;

53   SR **221.302**
54   SR **221.302**

g.   its procedures.

### Art. 132     Duties of target companies

[1] The board of directors of the target company (Art. 125 para. 1) shall submit a report to the holders of equity securities setting out its position in relation to the offer. The information in the report must be true and complete. The board of directors of the target company shall publish the report.

[2] From the moment the offer is published until the result is announced, the board of directors of the target company shall not enter into any legal transactions which would have the effect of significantly altering the assets or liabilities of the company. Decisions taken by the general meeting of shareholders are not subject to this restriction and may be implemented irrespective of whether they were adopted before or after publication of the offer.

[3] The Takeover Board shall issue provisions on:

a.   the report to be issued by the board of directors of the target company;

b.   any measures which are aimed in an improper manner at frustrating an offer or preventing it from being successful.

### Art. 133     Competing offers

[1] In the event of competing offers, the holders of equity securities in the target company must be free to choose which offer they accept.

[2] The Takeover Board shall issue provisions relating to competing offers and their effect on the first offer.

### Art. 134     Notification duty

[1] The offeror or anyone who directly, indirectly or in concert with third parties holds a stake of at least 3% of the voting rights, whether exercisable or not, of the target company or, as the case may be, of another company whose equity securities are being offered in exchange must, from the time the offer is published until the expiry of the offer period, notify the Takeover Board and the stock exchanges on which the securities are listed of any acquisition or disposal of equity securities of such company.

[2] A group organised pursuant to an agreement or otherwise shall be subject to this notification duty solely as a group.

[3] The Takeover Board may subject to the same duty anyone who, from the time the offer is published until the expiry of the offer period, acquires or disposes of, directly, indirectly or acting in concert with third parties, a certain percentage of the equity securities of the target company or of another company whose equity securities are being offered in exchange.

[4] If a company or stock exchange has reason to believe that a shareholder is in violation of the notification duty, it shall inform the Takeover Board of such fact.

46

[5] The Takeover Board shall issue rules on the scope, form and time allowed for notification and on the percentage relevant for the application of paragraph 3.

### Art. 135    Duty to make an offer

[1] Anyone who directly, indirectly or acting in concert with third parties acquires equity securities which, added to the equity securities already owned, exceed the threshold of 33⅓% of the voting rights of a target company, whether exercisable or not, must make an offer to acquire all listed equity securities of the company. Target companies may raise this threshold to 49% of voting rights in its articles of incorporation.

[2] The price offered must be at least as high as the higher of the following two amounts:

    a.   the stock exchange price;

    b.   the highest price that the offeror has paid for equity securities of the target company in the preceding twelve months.

[3] If the target company has issued several classes of equity securities, there must be an appropriate relationship among the prices offered for the various classes of equity securities.

[4] FINMA shall issue provisions on the duty to make an offer. The Takeover Board shall have the right to put forward proposals.

[5] If there are sufficient indications that a person has not met the duty to make an offer, the Takeover Board may take the following measures until the duty to make an offer has been clarified or, as appropriate, the duty to make an offer has been fulfilled:

    a.   suspend the voting rights and associated rights of this person; and

    b.   prohibit this person from acquiring further shares or acquisition or disposal rights relating to shares of the target company, be it directly, indirectly or acting in concert with third parties.

### Art. 136    Exemptions from the duty to make an offer

[1] In justified cases, the Takeover Board may grant exemptions from the duty to make an offer, particularly in the following cases:

    a.   where the transfer of voting rights occurs within a group organised pursuant to an agreement or otherwise. In such a case, only the group as such shall be subject to the duty to make an offer;

    b.   where the threshold is exceeded as a result of a decrease in the total number of voting rights of the company;

    c.   where the threshold is exceeded only temporarily;

    d.   where the securities have been acquired without consideration or on exercise of pre-emptive rights pursuant to a share capital increase;

    e.   where the securities have been acquired for reorganisation purposes.

[2] The duty to make an offer does not apply if the voting rights have been acquired as a result of a donation, succession or partition of an estate, matrimonial property law or execution proceedings.

### Art. 137        Cancellation of outstanding equity securities

[1] An offeror who holds more than 98% of the voting rights of the target company on expiry of the offer period may, within three months, petition the court to cancel the outstanding equity securities. For this purpose, the offeror must initiate an action against the company. The remaining shareholders may participate in these proceedings.

[2] The company shall reissue such equity securities and allot them to the offeror either against payment of the offer price or fulfilment of the exchange offer in favour of the holders of the equity securities which have been cancelled.

### Art. 138        Tasks of the Takeover Board

[1] The Takeover Board shall issue the decisions necessary for the enforcement of the provisions of this chapter and its implementing provisions and shall monitor compliance with the statutory and regulatory provisions. It may publish the decisions.

[2] Persons and companies subject to a notification duty in accordance with Article 134, and persons and companies who are entitled to party status in accordance with Article 139 paragraphs 2 and 3 must provide all the information and surrender any documents to the Takeover Board which the latter requires to perform its tasks.

[3] If the Takeover Board becomes aware of violations of the provisions of this chapter or of other irregularities, it shall ensure that an orderly situation is restored and that the irregularities are remedied.

[4] If the Takeover Board becomes aware of any general felonies or misdemeanours or infringements of this Act, it shall promptly notify the competent prosecution authorities.

### Art. 139        Proceedings before the Takeover Board

[1] Subject to the following exemptions, the proceedings of the Takeover Board are governed by the provisions of the Federal Act of 20 December 1968[55] on Administrative Procedure.

[2] In proceedings with regard to public takeover offers, the following have party status:

   a.   the offeror;
   b.   the persons who act in concert with the offeror; and
   c.   the target company.

---

[55]   SR **172.021**

3 Shareholders holding at least 3% of the voting rights of the target company, whether exercisable or not, also qualify as parties if they claim such status from the Takeover Board.

4 The statutory provisions on legal holidays do not apply to proceedings of the Takeover Board regarding public takeover offers.

5 The submission of legal documents by fax or by electronic means is permitted in correspondence with the Takeover Board and is recognised with regard to compliance with time limits.

### Art. 140       Appeal proceeding before FINMA

1 An appeal against decisions of the Takeover Board may be lodged with FINMA within a period of five trading days.

2 The appeal must be made in writing to FINMA and be substantiated. In the event of an appeal, the Takeover Board will forward its files to FINMA.

3 Article 139 paragraphs 1, 4 and 5 apply to the proceeding for appeals lodged with FINMA.

### Art. 141       Appeal proceeding before the Federal Administrative Court

1 An appeal against FINMA rulings regarding public takeover offers may be lodged with the Federal Administrative Court in accordance with the Federal Act of 17 June 2005[56] on the Federal Administrative Court.

2 The appeal must be lodged within ten days of notification of the decision. It has no suspensive effect.

3 The statutory provisions on legal holidays do not apply to proceedings regarding public takeover offers before the Federal Administrative Court.

## Chapter 5    Insider Trading and Market Manipulation

### Art. 142       Exploitation of insider information

1 Any person who has insider information and who knows or should know that it is insider information or who has a recommendation that he or she knows or should know is based on insider information shall behave inadmissibly when he or she:

- a.[57] exploits it to acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or to use derivatives of such securities;

- b.   discloses it to another;

56   SR **173.32**
57   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

c.[58] exploits it to recommend to another to acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or to use derivatives of such securities.

[2] The Federal Council shall issue provisions regarding the admissible use of insider information, in particular in connection with:

a. securities transactions in preparation of a public takeover offer;

b. a special legal status on the part of the recipient of the information.

### Art. 143   Market manipulation

[1] A person behaves inadmissibly when he or she:

a. publicly disseminates information which he or she knows or should know gives false or misleading signals regarding the supply, demand or price of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland;

b. carries out transactions or acquisition or disposal orders which he or she knows or should know give false or misleading signals regarding the supply, demand or price of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland.[59]

[2] The Federal Council shall issue provisions regarding admissible conduct, in particular in connection with:

a. securities transactions for price stabilisation purposes;

b. buyback programmes for a company's own securities.

## Chapter 6   Instruments for Market Supervision

### Art. 144   Suspension of voting rights and purchase ban

If there are sufficient indications that a person has not met the notification duty in accordance with Articles 120 and 121, FINMA may, until the notification duty has been clarified and, as appropriate, the notification duty has been fulfilled:

a. suspend the voting rights and associated rights of this person; and

b. prohibit this person from acquiring further shares or acquisition or sale rights relating to shares of the company in question, be it directly, indirectly or acting in concert with third parties.

---

58   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

59   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

**Art. 145** Supervisory instruments in accordance with the FINMASA

The supervisory instruments detailed in Article 29 paragraphs 1, 30, 32, 34 and 35 FINMASA[60] apply to all persons who contravene Articles 120, 121, 124, 142 or 143 of this Act.

**Art. 146** Duty to provide information

Persons subject to a notification duty in accordance with Article 134, as well as persons who in accordance with Article 139 paragraphs 2 and 3 can have the status of party, must provide all information and surrender any documents to FINMA which the latter requires to perform its tasks.

## Title 4 Criminal Provisions and Final Provisions
## Chapter 1 Criminal Provisions

**Art. 147** Violation of professional secrecy

[1] A custodial sentence not exceeding three years or a monetary penalty shall be imposed on any person who wilfully:

   a. discloses a secret entrusted to them in their capacity as a director or officer, employee, agent or liquidator of a financial market infrastructure or of which they have become aware in said capacity;

   b. attempts to induce a violation of professional secrecy;

   c. discloses to other persons a secret disclosed to them in violation of letter a or exploits such a secret for their own benefit or for the benefit of others.

[2] A custodial sentence not exceeding five years or a monetary penalty shall be imposed on any person who obtains a pecuniary advantage for themselves or another person through an action as detailed in paragraph 1 letter a or c .

[3] A fine not exceeding 250,000 francs shall be imposed on any person who commits the foregoing acts through negligence.[61]

[4] Any person who violates professional secrecy remains liable to prosecution after termination of the official or employment relationship or exercise of the profession.

[5] The federal and cantonal provisions relating to the duty to testify and the duty to provide information to the authorities are reserved.

**Art. 148** Violation of the provisions on protection against confusion and deception and notification duties

A fine not exceeding CHF 500,000 shall be imposed on any person who wilfully:

---

[60] SR **956.1**
[61] Amended by Annex No II 18 of the Financial Institutions Act of 15 June 2018, in force since 1 Jan. 2020 (AS **2018** 5247, **2019** 4631; BBl **2015** 8901).

a.   violates the provision on protection against confusion and deception (Art. 16);

b.   fails to provide the supervisory authorities with the prescribed notifications in accordance with Articles 9 and 17, or does so incorrectly or too late.

**Art. 149**   Violation of the record-keeping and disclosure duties

A fine not exceeding CHF 500,000 shall be imposed on any person who wilfully:

a.   violates the record-keeping duty set out in Article 38;

b.   violates the disclosure duty in accordance with Article 39.

**Art. 150**   Violation of duties regarding derivatives trading

A fine not exceeding CHF 100,000 shall be imposed on any person who wilfully:

a.   violates the clearing duty set out in Article 97;

b.   violates the reporting duty cited in Article 104;

c.   violates the risk mitigation duties cited in Articles 107 to 110;

d.   violates the duty cited in Article 112.

**Art. 151**   Breach of notification duties

[1] A fine not exceeding CHF 10 million shall be imposed on any person who wilfully:

a.   violates the notification duty cited in Article 120 or 121;

b.   as the owner of a qualified participation in a target company, fails to disclose the acquisition or sale of equity securities of that company (Art. 134).

[2] A fine not exceeding CHF 100,000 shall be imposed on persons who commit the foregoing acts through negligence.

**Art. 152**   Breach of the duty to make an offer

A fine not exceeding CHF 10 million shall be imposed on any person who wilfully fails to comply with a legally binding duty to make an offer (Art. 135).

**Art. 153**   Breach of duties by the target company

[1] A fine not exceeding CHF 500,000 shall be imposed on any person who wilfully:

a.   fails to submit the mandatory report to the holders of equity security setting out his or her position in relation to the offer or fails to publish such a report (Art. 132 para. 1);

b.   includes untrue or incomplete information in such report (Art. 132 para. 1).

[2] A fine not exceeding CHF 150,000 shall be imposed on persons who commit the foregoing acts through negligence.

### Art. 154      Exploitation of insider information

[1] A custodial sentence not exceeding three years or a monetary penalty shall be imposed on any person who as a body or a member of a managing or supervisory body of an issuer or of a company controlling or controlled by them, or as a person who due to their holding or activity has legitimate access to insider information, if they gain a pecuniary advantage for themselves or for another with insider information by:

- a.[62] exploiting it to acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or to use derivatives of such securities;
- b.    disclosing it to another;
- c.[63] exploiting it to recommend that another acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or to use derivatives of such securities.

[2] Any person who through an act set out in paragraph 1 gains a pecuniary advantage exceeding one million francs shall be liable to a custodial sentence not exceeding five years or a monetary penalty.

[3] Any person who gains a pecuniary advantage for themselves or for another by exploiting insider information or a recommendation based on insider information disclosed or given to them by a person referred to in paragraph 1 or acquired through a felony or misdemeanour in order to acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or in order to use derivatives of such securities shall be liable to a custodial sentence not exceeding one year or to a monetary penalty.[64]

[4] Any person who is not a person referred to in paragraphs 1 to 3 and yet who gains a pecuniary advantage for themselves or for another by exploiting insider information or a recommendation based on insider information in order to acquire or dispose of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland or to use derivatives of such securities shall be liable to a fine.[65]

---

[62]  Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).
[63]  Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).
[64]  Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).
[65]  Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to Developments in Distributed Ledger Technology, in force since 1 Aug. 2021 (AS **2021** 33, 399; BBl **2020** 233).

### Art. 155        Price manipulation

[1] A custodial sentence not exceeding three years or a monetary penalty shall be imposed on any person who, with the intention of gaining a pecuniary advantage for themselves or for another, substantially influences the price of securities admitted to trading on a trading venue or DLT trading facility which has its registered office in Switzerland in that they:[66]

   a.   disseminate false or misleading information against their better knowledge;

   b.   effect acquisitions and sales of such securities directly or indirectly for the benefit of the same person or persons connected for this purpose.

[2] Any person who through activities set out in paragraph 1 gains a pecuniary advantage of more than one million francs shall be liable to a custodial sentence not exceeding five years or a monetary penalty.

### Art. 156        Jurisdiction

[1] Prosecution and adjudication of acts under Articles 154 and 155 are subject to federal jurisdiction. It is not permitted to transfer jurisdiction for prosecution and adjudication to the cantonal authorities.

[2] The cantons are responsible for the prosecution and adjudication of acts under Article 147.

## Chapter 2      Final Provisions
## Section 1      Implementation

### Art. 157

[1] The Federal Council is responsible for implementation of this Act.

[2] It shall issue the implementing provisions.

## Section 2      Amendment of Other Legislative Instruments

### Art. 158

The amendment of other legislative instruments is set out in the Annex.

---

66   Amended by No I 10 of the FA of 25 Sept. 2020 on the Adaptation of Federal Law to
     Developments in Distributed Ledger Technology, in force since 1 Aug. 2021
     (AS **2021** 33, 399; BBl **2020** 233).

### Section 3      Transitional Provisions

#### Art. 159      Financial market infrastructures

[1] Financial market infrastructures with authorisation or recognition at the time this Act enters into force must submit a new request for authorisation or recognition within one year of this Act coming into force. The authorisation or recognition procedure shall be limited to examination of the new requirements. The financial market infrastructures may continue their activity until the decision on their request is issued.

[2] Financial market infrastructures which are now subject to this Act shall report to FINMA within six months of this Act entering into force. Within one year of its entry into force, they must satisfy the requirements of this Act and submit an authorisation or recognition request to FINMA. They may continue their activity until the authorisation or recognition decision is issued.

[3] In special cases, FINMA may extend the deadlines set out in paragraphs 1 and 2.

#### Art. 160      Foreign participants on a trading venue

Foreign participants on a trading venue which at the time of this Act's entry into force have FINMA authorisation as a foreign stock exchange member do not require new authorisation. They must meet the requirements of this Act within one year of its entry into force.

#### Art. 161      Interoperability agreements

Interoperability agreements existing at the time this Act enters into force do not require re-approval by FINMA.

#### Art. 162      Derivatives trading

The Federal Council shall determine which derivatives transactions still outstanding at the time this Act enters into force shall be subject to the notification and risk mitigation duties.

#### Art. 163      Duty to make an offer

[1] Anyone who, on 1 February 1997, directly, indirectly or acting in concert with third parties held securities which granted him or her more than 33⅓% but less than 50% of the voting rights of a target company must make an offer for all listed equity securities of the company if he or she acquires equity securities and thereby exceeds the threshold of 50% of the voting rights.

[2] Paragraph 1 also applies to holdings which were covered by the provisions on public takeover offers for the first time on 1 May 2013.

## Section 4    Referendum and Commencement

### Art. 164

[1] This Act is subject to an optional referendum.

[2] The Federal Council shall determine the commencement date, subject to paragraph 3.

[3] It shall bring Articles 112 to 115 (duty to trade via a trading venue or organised trading facility) into force only if and when international developments so require.

Commencement date: 1 January 2016[67]
Art. 112–115: 1 August 2017[68]

---

[67]   FCD of 25 Nov. 2015.
[68]   O of 5 July 2017 (AS **2017** 3713).

*Annex*
(Art. 158)

## Amendment of other legislative instruments

The legislative instruments below are amended as follows:

...[69]

---

[69]   The amendments may be consulted under AS **2015** 5339.