**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02493 (CGM) |
| Plaintiff, | |
| v. | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT** |
| ABU DHABI INVESTMENT AUTHORITY, | |
| Defendant. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS...............................4

II.   DEFENDANT AND ITS INVESTMENT IN SENTRY.........................................4

ARGUMENT..............................................................................................................6

I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE CASE
      ...................................................................................................................6

      A.    FSIA Immunity Does Not Apply Based Upon the Third Clause of the
            Commercial Activity Exception ................................................................7

            1.    Defendant's Acts Occurred Outside of the United States...............8

            2.    Defendant's Subscriptions Into and Redemptions From Sentry
                  Constitute "Commercial Activity"..................................................8

            3.    Defendant's Acts Caused a Direct Effect in the United States........9

            4.    OBB Personenverkehr Is Not "Irreconcilable" With BLI .............12

      B.    FSIA Immunity Also Does Not Apply Under the First or Second
            Clauses of the Commercial Activity Exception.........................................14

II.   THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER
      DEFENDANT...............................................................................................15

      A.    Defendant Purposefully Availed Itself of the Laws and Privileges of
            Conducting Business in New York and the United States by Investing
            in Sentry ................................................................................................17

            1.    Defendant's Intentional Investments With BLMIS Through
                  Sentry Establish Minimum Contacts ............................................18

                  a.    BLI and Recent Decisions of this Court Establish this
                        Court's Jurisdiction Over Defendant ................................18

                  b.    Walden Does Not Save Defendant from this Court's
                        Jurisdiction......................................................................20

            2.    Defendant Had Numerous Additional Contacts With The
                  Forum In Connection With Its Sentry Investments .......................21

            3.    The Forum Selection and Choice of Law Clauses in the
                  Subscription Agreements Are Strong Jurisdictional Contacts.......22

4.  Defendant's Purposeful Use of U.S. Bank Accounts Establishes
    Specific Jurisdiction ................................................................... 23

5.  Defendant's Contacts with the Forum are Sufficiently Related
    to the Trustee's Claims ............................................................... 25

B.  The Exercise of Personal Jurisdiction Over Defendant Is Reasonable ...... 26

C.  In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery ...... 27

III.  Section 546(e) Does Not Bar Recovery from Defendant ...................................... 28

A.  Sentry Had Actual Knowledge of Madoff's Fraud .................................... 28

B.  Section 546(e) Does Not Apply Independently to Recovery Actions ....... 29

IV.  THE TRUSTEE SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE
INITIAL TRANSFERS ........................................................................................... 33

V.  THE TRUSTEE'S COMPLAINT STATES A VALID CAUSE OF ACTION
FOR   RECOVERY   OF   BLMIS   CUSTOMER   PROPERTY   UNDER
SECTION 550(a) ..................................................................................................... 35

VI.  THE 550(b) GOOD FAITH DEFENSE IS AN AFFIRMATIVE DEFENSE
AND THUS INAPPROPRIATE AT THE MOTION TO DISMISS STAGE ...... 38

CONCLUSION ........................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*,
 328 F. Supp. 3d 329 (S.D.N.Y. 2018)...................................................23

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
 98 F.3d 25 (2d Cir. 1996).........................................................17

*Al Rushaid v. Pictet & Cie*,
 28 N.Y.3d 316 (2016) ...........................................................24

*Am. Casein Co. v. Geiger (In re Geiger)*,
 446 B.R. 670 (Bankr. E.D. Pa. 2010) ...............................................33

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*,
 948 F.2d 90 (2d Cir. 1991)........................................................11

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*,
 999 F.2d 33 (2d Cir. 1993)....................................................11, 12

*In re Arcapita Bank B.S.C.(C)*,
 No. 21 CIV. 8296 (AKH), 2022 WL 1620307 (S.D.N.Y. May 23, 2022) ..............25

*Aurelius Cap. Partners, LP v. The Republic of Argentina*,
 No. 07 CIV 2715 (TPG), 2009 WL 755231 (S.D.N.Y. Mar. 12, 2009) ................8

*Picard v. Cohmad Secs. Corp.*,
 454 B.R. 317 (Bankr. S.D.N.Y. 2011).................................................37

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985).........................................................16, 17, 23

*Chloé v. Queen Bee of Beverly Hills, LLC*,
 616 F.3d 158 (2d Cir. 2010).....................................................16, 27

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
 393 B.R. 306 (Bankr. W.D.N.Y. 2008) .............................................38

*Dandong v. Pinnacle Performance Ltd.*,
 966 F. Supp. 2d 374 (S.D.N.Y. 2013)...............................................23

*Davis v. Bifani*,
 No. 07-cv-00122-MEH-BNB, 2007 WL 1216518 (D. Colo. Apr. 24, 2007).........34

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)................................................................15

*Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for Galadari*,
    12 F.3d 317 (2d Cir. 1993)................................................................9

*Eldesouky v. Aziz*,
    No. 11–CV–6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ................................23

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019)................................................................25

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    Adv. Pro. No. 10-03496, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ....................23

*Ferrante Equip Co. v. Lasker-Goldman Corp.*,
    26 N.Y.2d 280 (1970)................................................................21

*Filetech S.A. v. France Telecom, S.A.*,
    212 F.Supp.2d 183 (S.D.N.Y. 2001)................................................................11

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)................................................................25, 26

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)................................................................17

*Hanil Bank v. PT. Bank Negara Indonesia (Persero)*,
    148 F.3d 127 (2d Cir. 1998)................................................................10

*HSH Nordbank AG N.Y. Branch v. Street*,
    No. 11 Civ. 9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012)....................16, 23, 26

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................16, 17

*In re Picard,* 917 F.3d 85 (2d Cir. 2019) ................................................................14, 18, 27, 30

*Kelley v. Westford Special Situations Master Fund, L.P.*,
    No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ........................................37, 38

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 Civ. 7618, 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009) ........................................27

*Liberatore v. Calvino*,
    293 A.D.2d 217, 742 N.Y.S.2d 291 (App. Div. 2002) ........................................22

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012)................................................................24

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)..................................................................................17

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017)..................................................................................6

*In re Motors Liquidation Co.*,
    565 B.R. 275 (Bankr. S.D.N.Y. 2017)..............................................................25

*N.Y. Bay Co. Ltd. v. State Bank of Patiala*,
    No. 93 Civ. 6075 (WK), 1994 WL 369406 (S.D.N.Y. July 12, 1994)...................15

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
    No. 08-CV-5023 (CBA) (RLM), 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010)..................34

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015)........................................................................................12, 13

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)..................................................................24, 25, 26

*Picard v. Banca Carige, S.P.A.*,
    Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ...................................................................................2, 19, 26

*Picard v. Banque Lombard Odier & Cie SA*,
    Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ....................................................................................... *passim*

*Picard v. Banque SYZ & Co. SA*,
    Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ....................................................................................... *passim*

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018)..................................................20, 23, 27, 31

*Picard v. Bordier & Cie*,
    Adv. Pro. No. 12-01695 (CGM), 2022 WL2390556 (Bankr. S.D.N.Y. June 30, 2022) .......................................................................................2, 28

*Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012)........................................................ *passim*

*Picard v. Chais (In re BLMIS)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010)..............................................................26

*Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*,
    Adv. Pro. No. 10-04398, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012)................35, 37

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   12 F.4th 171 (2d Cir. 2021) ..................................................................................4, 39

*Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) .............................................................23, 25

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
   627 B.R. 546 (Bankr. S.D.N.Y. 2021) .........................................................16, 17, 26

*Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*,
   Adv. Pro. No. 09-01239, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .............. *passim*

*Picard v. Lloyds TSB Bank, PLC*,
   Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June
   30, 2022) .....................................................................................................2, 28

*Picard v. Maxam Absolute Return Fund, L.P.*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...........................................................16, 27

*Picard v. Merkin (In re BLMIS)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................35, 36, 37, 38

*Picard v. Multi-Strategy Fund Ltd.*,
   Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June
   13, 2022) ................................................................................................. *passim*

*Picard v. Shapiro (In re BLMIS)*,
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) .............................................................36, 37

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992).........................................................................................6

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)................................................................................35

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010)...............................................................................16

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)...................................................................................6, 9, 13

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   531 B.R. 439 (Bankr. S.D.N.Y. 2015)..................................................................29

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*,
   No. 20-CV-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ....................38, 39, 40

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   501 B.R. 26 (S.D.N.Y. 2013)......................................................................30, 32, 33

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ..................................... *passim*

*Sherman v. A.J. Pegno Constr. Corp.*,
528 F. Supp. 2d 320 (S.D.N.Y. 2007)....................................................................34

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
379 B.R. 5 (Bankr. E.D.N.Y. 2007)......................................................................35

*Skanga Energy & Marine Limited v. Arevenca S.A.*,
875 F.Supp.2d 264 (S.D.N.Y. 2012)......................................................................10

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)...............................................................................26

*SunLight Gen. Cap. LLC v. CJS Invs. Inc.*,
114 A.D.3d 521 (1st Dep't 2014) .......................................................................21

*Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*,
647 F.2d 300, 312 (2d Cir. 1981).....................................................................9, 10

*United States v. Int'l Longshoremen's Ass'n*,
518 F. Supp. 2d 422,461–66 (E.D.N.Y. 2007) ......................................................34

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*,
477 F. Supp. 3d 241 (S.D.N.Y. 2020)..................................................................24

*Walden v. Fiore*,
571 U.S. 277 (2014)..........................................................................20, 21, 22

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016)..............................................................................27

*Zim Integrated Shipping Servs. v. Bellwether Design Techs.*,
2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020).......................................................26

**Statutes**

11 U.S.C. § 546.............................................................................................32

11 U.S.C. § 546(e) ................................................................................... *passim*

11 U.S.C. § 550(a) ................................................................................... *passim*

11 U.S.C. § 550(d) .........................................................................................38

28 U.S.C. § 1602..............................................................................................6

28 U.S.C. § 1603(e) ........................................................................................14

28 U.S.C. § 1605.................................................................................................................6

28 U.S.C. § 1605(a)(2)..................................................................................................7, 14

28 U.S.C. § 1606.................................................................................................................6

28 U.S.C. § 1607.................................................................................................................6

**Rules**

Fed. R. Bankr. P. 7004(f).................................................................................................16

N.Y.C.P.L.R. § 302(a)(1).................................................................................................16

Fed. R. Civ. P.10(c).....................................................................................................33, 34

**Other Authorities**

H.R. Rep. No. 94–1487 (1976)...........................................................................................8

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law and the declaration of Keith R. Murphy (the "Declaration" or "Decl.") in opposition to the motion (the "Motion") to dismiss the Complaint (the "Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure (the "Rules") 12(b)(1), (b)(2), and (b)(6), filed by defendant Abu Dhabi Investment Authority ("ADIA" or "Defendant").

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, this action by the Trustee seeks to recover approximately $300,000,000.00 in subsequent transfers that Defendant received from Fairfield Sentry Limited ("Sentry"). Defendant moves to dismiss the Trustee's Complaint, arguing that (i) Defendant is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"); (ii) this Court lacks personal jurisdiction over Defendant; (iii) the safe harbor under Section 546(e) of the Bankruptcy Code bars recovery; (iv) Defendant did not receive transfers of customer property; (v) the Trustee violates Rules 8 and 10 by incorporating by reference the Trustee's complaint against Sentry (the "Fairfield Amended Complaint" or "Fairfield Am. Compl.") to plead avoidability of the initial transfers; and (vi) the Complaint establishes Defendant's Section 550(b) good faith. Other than as to the FSIA, these arguments are substantially the same as those recently made by defendants and rejected by this Court in six other subsequent transfer cases.[1] For the reasons set forth herein, Defendant's arguments fail.

---

[1] *See Picard v. Multi-Strategy Fund Ltd*., Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ("*Multi-Strategy*"); *Picard v. Banque SYZ & Co. SA*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque SYZ*"); *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ("*Lombard*"); *Picard v. Banca Carige, S.P.A.*,

First, this action is not barred under the FSIA.  The FSIA's commercial activity exception applies here, and Defendant is thus not immune from the Court's subject matter jurisdiction.  This exception is applicable not only because Defendant's investments through Sentry with BLMIS in New York and the fraudulent transfers that are the focus of this action constitute commercial activity that had a direct effect in the United States, but also because that commercial activity was carried on in the United States.

Second, this Court has personal jurisdiction over Defendant.  Defendant purposefully invested in Sentry, knowing from Sentry's documents that BLMIS in New York was the *de facto* investment manager, broker-dealer, and custodian of Sentry's investments, that Sentry fed substantially all of its funds into BLMIS, and that BLMIS was essential to the fund's investments. Investing with BLMIS was the entire point.  Defendant also designated and used United States bank accounts to deposit funds with and receive the transfers at issue from Sentry.  These facts, plus multiple additional contacts discussed in detail herein, establish jurisdiction.

Third, because the Trustee has plausibly alleged Sentry's actual knowledge of fraud, under controlling law, the safe harbor for settlement payments or transfers in connection with securities contracts under Section 546(e) is inapplicable and does not bar recovery from Defendant. Defendant's argument—that the Trustee must plead *Defendant's* actual knowledge as opposed to that of Sentry—both misinterprets and directly conflicts with precedent in this case.

Fourth, the Trustee has plausibly alleged that Defendant received customer property under Section 550(a) by outlining the relevant pathways through which customer property was

---

Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ("*Banca Carige*"); *Picard v. Lloyds TSB Bank, PLC,* Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022) ("*Lloyds*"); *Picard v. Bordier & Cie*, Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022) ("*Bordier*").

transferred from BLMIS to Sentry and subsequently to Defendant. The Trustee has also alleged the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer Defendant received. At this stage of the litigation, nothing more is required.

Fifth, the Trustee's incorporation by reference of the Fairfield Amended Complaint is appropriate under Rules 8 and 10(c).[2] Such incorporation represents a practical method for the Trustee to plead avoidance of the initial transfers to Sentry, and Defendant can respond to the allegation just as it would any other paragraph in the Complaint. In any event, this Court may take judicial notice of the operative Second Amended Complaint and its opinion in *Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield Inv. Fund*"), holding that the Trustee plausibly alleged the avoidability of the Sentry transfers.

Sixth, the Section 550(b) "good faith" defense available to subsequent transferees is a fact-intensive affirmative defense that is premature and plainly inappropriate on a motion to dismiss. As this Court recently found in *Banque SYZ*, it is Defendant's burden to plead this affirmative defense in an answer and prove it with evidence; it cannot be established from the face of a complaint. 2022 WL 2135019, at *10.

For these reasons, as further detailed below, the Trustee respectfully requests that the Court deny Defendant's Motion.

---

[2] After the Trustee filed his Complaint against Defendant here, the Trustee filed a Second Amended Complaint ("Second Amended Complaint") against the Fairfield Greenwich Group defendants (collectively, "Fairfield"). *See* Second Amended Complaint, *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

## STATEMENT OF FACTS

### I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008.  Compl.

¶ 23.  BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-

making business; and (iii) an investment advisory business (the "IA Business").  *Id.*  For its IA

Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC

Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's

100 Index, (b) buying put options and selling call options to hedge against price changes in the

underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the

market.  *Id.* ¶¶ 24-25.  In reality, BLMIS operated a Ponzi scheme through its IA Business.  *Id.* ¶¶

16-17; 23-33.  On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  *Id.* ¶ 11.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large

investment funds created for the express purpose of funneling investors' funds into BLMIS.  *See*

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 179 (2d Cir. 2021),

*cert. denied sub nom. Citibank, N.A. v. Picard*, No. 21-1059, 2022 WL 585915 (U.S. Feb. 28,

2022) ("*Citibank*").  Defendant invested in Sentry, which it knew was a Madoff feeder fund.

Compl. ¶¶ 7, 34.

### II.     DEFENDANT AND ITS INVESTMENT IN SENTRY

Defendant ADIA is a sovereign wealth fund responsible for investing the assets of the

Emirate of Abu Dhabi.  Compl. ¶ 3.  Defendant made its initial investment in Sentry on December

30, 1996, in the amount of $78,270,199.  Decl. Ex.1.  Subsequently, between 1997 and 2002,

Defendant made at least four additional subscription payments totaling approximately

$125,000,000. Decl. Exs. 1- 4.[3] By 2003, Defendant was Sentry's single largest investor, holding 8% of Sentry's holdings. Decl. Ex. 5. Prior to BLMIS's collapse, Defendant received approximately $300,000,000.00 in subsequent transfers from Sentry. Compl. ¶ 41, Ex. E.

Sentry was managed by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership with its principal place of business in New York. *Fairfield Inv. Fund*, 2021 WL 3477479, at *9. Sentry was a U.S. dollar-denominated fund that invested 95% of its assets with BLMIS. As was required for investors in Sentry, Defendant entered into subscription agreements with Sentry. Compl. ¶ 7; Decl. Exs. 3- 4. In connection with its subscriptions, Defendant agreed to New York choice of law, jurisdiction, and forum selection clauses. Compl. ¶ 7; Decl. Exs. 4; 8 (p. A-3). The subscription agreements also incorporated Sentry's then-operative Information Memoranda ("IMs") or Private Placement Memoranda (together with IMs, "PPMs"), and by signing, investors like Defendant warranted that they had "received and read" a copy of the PPMs. Decl. Ex. 3. The PPMs disclosed BLMIS's multiple roles as the *de facto* investment manager, broker dealer, and custodian for Sentry and highlighted the numerous U.S. connections inherent in investing in Sentry. Decl. Exs. 6-9. Over the course of its investments, Defendant requested and received current versions of Sentry's long-form subscription agreements and PPMs containing this information. Decl. Exs. 10-11. Defendant also routinely engaged with FGG personnel in New York regarding its Sentry investments via email and other correspondence, telephone calls, and in-person meetings. Compl. ¶ 7; Decl. Exs. 12-32.

Defendant maintained a U.S. bank account in its own name with JPMorgan Chase Bank in Florida (the "JPMorgan Chase Account"), which Defendant designated and used to receive at least

---

[3] The additional $125 million of subscriptions is comprised of three payments of $25 million and one of $50 million. Also, between 1997 and 2005 if not later, Defendant was credited with additional "subscriptions" in smaller amounts, which upon information and belief were either fee rebates or income reinvestments. *See* Decl. Ex.1.

one of its two redemption payments from Sentry. Decl. Ex. 33. As with other Sentry investors, Defendant sent subscription payments to and received redemptions from Sentry's correspondent bank account in New York, which during the time of Defendant's investment was at Republic National Bank of New York and then HSBC Bank USA (together, the "Sentry New York Accounts"). Compl. ¶ 7; Decl. Exs. 6-9. Subscription payments were then deposited into BLMIS's account at JPMorgan Chase Bank in New York. Fairfield Am. Compl. ¶ 35.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. Compl. ¶ 35. In 2011, the Trustee settled with Sentry. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS estate. *Id*. at ¶ 40. The Trustee then commenced a number of adversary proceedings against Defendant and others to recover the approximately $3 billion in stolen customer property.

## **ARGUMENT**

## I.    **THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE CASE**

The FSIA, 28 U.S.C. § 1602, establishes a framework for determining whether a federal court may exercise jurisdiction over a foreign state. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). Under the FSIA, foreign states are "presumptively immune from the jurisdiction of United States courts; unless a specified exception applies[.]" *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Federal courts can exercise subject matter jurisdiction over a foreign state if: (1) at least one of the statutory exceptions outlined in §§ 1605-07 is applicable; and (2) the foreign state has been served with process in accordance with FSIA provisions. *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96 (2d Cir. 2017).

Defendant makes two arguments for dismissal pursuant to the FSIA: (1) it meets the definition of a "foreign state" because it is a government agency; and (2) no FSIA exception is applicable. *See* Motion at. 6-12. Defendant is incorrect. While the Trustee does not dispute that Defendant is a "foreign state" under the FSIA, Compl. ¶ 22, based on established precedent and the facts of this case, Defendant is subject to this Court's jurisdiction under the FSIA's commercial activity exception.

### A.    FSIA Immunity Does Not Apply Based Upon the Third Clause of the Commercial Activity Exception

The FSIA commercial activity exception states that a foreign state shall not be immune from the jurisdiction of United States courts when:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] *upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States*.

28 U.S.C. § 1605(a)(2) (emphasis added).

Defendant asserts that no exception to the FSIA applies here. Motion at 6-12. However, consistent with this Court's decision in another Sentry subsequent transfer case, *Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff)*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*"), the Court has subject matter jurisdiction over this action under the third exception (italicized above), known as the "direct effects clause." The direct effects clause of the commercial activity exception has three prongs: (i) the action is based on an act outside of the United States; (ii) such act was in connection with a commercial activity of the foreign state elsewhere; and (iii) the act caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2). All three prongs of the direct effects clause are satisfied here.

### 1.    Defendant's Acts Occurred Outside of the United States

Defendant affirmatively states in its Motion that its conduct occurred in a territory outside of the United States.  Motion at 10-13.  As such the first prong of the direct effects test is met. Defendant nevertheless argues that this conduct is not what the Trustee's claims are based upon, because Defendant was only a "passive" recipient of the transfers and as such, the only "legally significant acts" for purposes of the Trustee's recovery claims are those of *Sentry*, not Defendant. Motion at 9-10.  However, Defendant's attempt to cast itself as a mere spectator to Sentry's actions is at odds with its own conduct.  As alleged in the Complaint and as supplemented by the Declaration, Defendant signed Sentry subscription agreements, sent out corresponding subscription payments, made redemption requests, and—as Defendant concedes (*see, e.g.*, Motion at 35)—received redemption payments.  As this Court found in *BLI*, this conduct is the relevant "act" for purposes of the Trustee's Section 550 recovery actions.  *See BLI* at 512 (finding that such actions satisfied the first prong of the direct effects clause of the commercial activity exception).

### 2.    Defendant's Subscriptions Into and Redemptions From Sentry Constitute "Commercial Activity"

Consistent with this Court's holding in *BLI*, Defendant's subscriptions into and redemptions from Sentry for purposes of investing with BLMIS in the United States constitute "commercial activity" elsewhere and thus satisfy the second part of the direct effects clause.  *See BLI*, 480 B.R. at 512 (concluding that such actions by BLI were commercial activity because they "did not involve the use of powers peculiar to sovereigns"); *see also Aurelius Cap. Partners, LP v. Republic of Argentina*, No. 07 CIV 2715 (TPG), 2009 WL 755231, at *12 (S.D.N.Y. Mar. 12, 2009), *rev'd and vacated*, 584 F.3d 120 (2d Cir. 2009) (legislative history of the FSIA indicates the act's definition of commercial activity includes investing in securities of an American corporation) (citing H.R. Rep. No. 94-1487, at 16 (1976)).

8

Defendant cites *Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317 (2d Cir. 1993), and *Saudi Arabia v. Nelson* for the contention that its "passive receipt" of Sentry redemptions is "tangential" to the claims and does not constitute "commercial activity" under the FSIA. Motion at 10. However, both cases are inapposite. In *Drexel*, a U.S.-based investment fund sued certain persons charged by the Dubai government with liquidating the estate of a UAE citizen, claiming improper adjudication of the bankruptcy estate. The court declined to apply the commercial activity exception there because the court determined that the claims were based on defendant's "judicial role," and that therefore the only acts relevant to those claims were inherently sovereign in nature. 12 F.3d at 322. Similarly, in *Nelson*, the Supreme Court found that the plaintiff's claims did not relate to commercial acts but rather that the conduct at issue fell under Saudi Arabia's police powers. 507 U.S. at 356. By contrast here, the Trustee's claims, and the investment activity on which they are based, are indisputably "commercial" in nature. And for the reasons addressed above, Defendant's investment activity could hardly be considered "passive" or "tangential" to the Trustee's claims to recover fraudulent transfers of customer property stolen by BLMIS and sent to Defendant.

### 3.      Defendant's Acts Caused a Direct Effect in the United States

Defendant's investments into and redemptions from Sentry directly affected the United States, satisfying the third prong of the direct effects test. The Second Circuit has called for courts to liberally construe what constitutes a "direct effect in the United States" to provide access to courts for plaintiffs who have been wronged. *See, e.g.*, *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir. 1981), *overruled on other grounds by Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009) ("Courts construing either ['direct' or 'in the United States'] should be mindful . . . of Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign

sovereign . . . .") (citation omitted). Courts should inquire whether the United States has an interest

in the action such that "Congress would have wanted an American court to hear the case." *Id*. at

313. To establish a direct effect in the United States, the United States "need not be the location

where the most direct effect is felt, simply a direct effect." *Hanil Bank v. PT. Bank Negara*

*Indonesia, (Persero)*, 148 F.3d 127, 133 (2d Cir. 1998).

In *BLI*, this Court found that:

> [The subsequent transferee's] actions caused a direct effect in the United States by
> causing a two-way flow of funds to and from New York-based BLMIS: *to* BLMIS
> for investment in U.S. Securities and U.S. Treasuries and *from* BLMIS in the form
> of profits from those investments. This flow of funds in the form of subscription
> and redemption payments into and out of BLMIS in the United States via Fairfield
> Sentry was part of a specific investment structure explicitly set forth in the
> Subscription Agreement and the PPMs. These documents stated that: (i) Fairfield
> Sentry was required to invest at least 95% of its assets in the Split Strike Conversion
> Strategy utilized and controlled by BLMIS in New York; (ii) BLMIS was to act as
> sub-custodian of these assets, holding them in segregated accounts in New York;
> and (iii) BLMIS was to invest these assets in U.S. Securities and Treasuries.

*BLI*, 480 B.R. at 513.

Similarly, here, Defendant has caused a direct effect in the United States by creating a

"two-way flow" of hundreds of millions of dollars of subscriptions into and redemptions from

Sentry. *See* Compl. ¶ 41. Sentry's PPMs disclosed New York-based BLMIS's roles as Sentry's

broker-dealer and custodian, that Sentry had delegated management of the company's investment

activities to BLMIS, and that BLMIS purported to invest Sentry's funds in U.S. securities. Decl.

Exs. 6-9. This flow of funds, moreover, relied upon the use of U.S. bank accounts. *See Skanga*

*Energy & Marine Limited v. Arevenca S.A.*, 875 F.Supp.2d 264, 271-72 (S.D.N.Y. 2012) (direct

effects requirement satisfied where the allegations showed that the parties to a transaction,

including the sovereign defendant, contemplated that payment would be made to a U.S. bank

account, such payment was made, and plaintiff's cause of action arose out of that transaction.).[4]

Because this flow of funds to and from BLMIS forms the very basis of the instant lawsuit—

namely, recovery of customer property stolen by BLMIS and fraudulently transferred by BLMIS

to Sentry and subsequently to Defendant—the actions Defendant took in connection therewith are

sufficient to satisfy the direct effects prong. *See BLI*, 480 B.R. at 513-14 (citing *Filetech S.A. v.*

*France Telecom, S.A.*, 212 F.Supp.2d 183, 197 (S.D.N.Y. 2001)) (finding a direct effect because

defendant's movement of money to and from BLMIS was not fortuitous or incidental but rather

"the ultimate objective" and "raison d'etre" of the agreement between defendant and Sentry).

Despite the clear applicability of *BLI*, Defendant nevertheless seeks to downplay the effect

of its actions in the U.S., analogizing its case to two decisions where the only domestic connection

was a financial loss suffered by a U.S. person from a foreign tort. Motion at 11 (citing *Antares*

*Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33 (2d Cir. 1993) ("*Antares II*") and *Antares*

*Aircraft, L.P. v. Fed. Republic of Nigeria*, 948 F.2d 90 (2d Cir. 1991) ("*Antares I*")).

In those cases, the plaintiff, a U.S. limited partnership whose sole asset was a jumbo jet,

sued Nigeria and its agent the Nigerian Airports Authority for improper conversion/extortion after

it was forced to pay defendants airport fees in order for the plane to be released and returned to the

U.S. In *Antares I*, the Second Circuit concluded that the detention of the aircraft in Nigeria did

not cause a direct effect in the United States and that "the mere financial loss suffered by an

American plaintiff … as a result of defendant's conduct abroad" was by itself insufficient to satisfy

the FSIA's direct effect requirement. 948 F.2d at 96. In *Antares II*, the Second Circuit re-affirmed

the dismissal of the plaintiff's suit under the FSIA, reasoning that retention of the aircraft happened

---

[4] As set forth in the Complaint exhibits, the timing of the transfers of BLMIS customer funds to Defendant further evidences the "direct effect" of Defendant's conduct in the U.S.

in Nigeria and thus "all legally significant acts took place in Nigeria" and "[t]here [w]as no evidence that the use of the aircraft was related to substantial commerce with the United States." 999 F.2d at 36. The Second Circuit moreover found that the plaintiff's payment of fees owed in Nigeria from its New York bank account was a "fact without legal significance," given the nature of the suit. *Id*. These two cases are thus nothing like here, where Defendant's activity left an intentional and substantial U.S. footprint. As addressed above, Defendant made and received multiple transfers to and from Sentry and BLMIS in New York, which transfers form the very core of this dispute, and used U.S. bank accounts to do so.

### 4.      *OBB Personenverkehr* **Is Not "Irreconcilable" With** *BLI*

Defendant further attempts to sidestep this Court's decision in *BLI*, arguing that the case is "irreconcilable" with *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), because the Supreme Court in *OBB Personenverkehr* purportedly clarified the "based upon" requirement of the FSIA commercial activity exception. *See* Motion at 11-12. Specifically, Defendant contends that after *OBB Personenverkehr*, the sole relevant conduct and the "gravamen of the suit" under the commercial activity exception is its *receipt* of funds from Sentry, which it erroneously argues is all the Court looked to in *BLI*. Motion at 11-12.

As an initial matter, *OBB Personenverkehr* is factually and legally distinguishable. *OBB Personenverkehr* involved a dispute brought by a U.S. resident against the Austrian state-owned railway alleging negligence, after plaintiff fell onto the tracks at the Innsbruck, Austria train station. *Id.* at 30. The question of subject matter jurisdiction hinged on whether the plaintiff's personal injury suit was "based upon" the sale of an electronic train ticket from a Massachusetts-based travel agent. *Id*. at 35. Importantly, *OBB Personenverkehr* did not implicate or disturb Judge Lifland's *BLI* holding in its explication of the "based upon" requirement of the commercial

12

activity exception.  There is nothing in *OBB Personenverkehr* that supports Defendant's argument

that the Court in *BLI* "focused on the wrong conduct."  Motion at 12.

Defendant's argument also mischaracterizes the holdings in both *OBB Personenverkehr*

and *BLI*.  *OBB Personenverkehr* did not change or newly interpret the "based upon" analysis, as

Defendant implies.  Rather, the Court in *OBB Personenverkehr* cited to the formative case of *Saudi*

*Arabia v. Nelson*—the same decision that guided this Court in *BLI*—in stating that the Court must

look to the "foundation" of a claim or "gravamen" of a complaint to determine direct effect.  In

short, *OBB Personenverkehr* and *BLI* are simply two cases applying the same law to their own

distinct facts and do not conflict.

Finally, even if this Court were to find that it should look beyond purposeful investments

in BLMIS to determine the "foundation" of the Trustee's claims, *BLI* did just that.  In *BLI*, as

analyzed in detail above, the Court made clear that its finding of a direct effect was based on not

only the defendant's investment into BLMIS, but all the money sent back and forth between

BLMIS, Sentry, and the subsequent transferee defendant in furtherance of the defendant's

investment activity, and all the actions the defendant took related to that flow of funds.  As noted

by Judge Lifland in that decision:

> At bottom, this is not a situation where "the ripples caused by an overseas
> transaction manage eventually to reach the shores of the United States." Rather,
> BLI intended to profit from BLMIS in New York through investments in Fairfield
> Sentry. As a result, the United States clearly has an interest in this action such that
> Congress would have wanted an American court to hear the case.

*BLI*, 480 B.R. at 515 (citations omitted).

To this end, the Second Circuit has already instructed that in actions brought under

Section 550(a), like this one, BLMIS's theft and fraudulent transfer of customer property, and any

subsequent transfers that follow, are domestic activity, and the harm to BLMIS's customers

occurred in the U.S.  *See In re Irving H. Picard, Trustee for the Liquidation of BLMIS*, 917 F.3d

85, 98-100 (2d Cir. 2019) (holding that "[w]hen a domestic debtor commits fraud by transferring

property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United

States").  Though not made in the FSIA context, this holding discredits Defendant's argument that

in Section 550(a) actions the investment activity of defendants lacks significant domestic effect.

At a minimum, the domestic nature of the subsequent transfers supports a finding that such

transfers had a direct effect in the United States.

### B.      FSIA Immunity Also Does Not Apply Under the First or Second Clauses of the Commercial Activity Exception

In addition, the Court has subject matter jurisdiction based on the first and second clauses

of the FSIA commercial activity exception.  First, Defendant's commercial activity was "carried

on in the United States."[5] (clause 1).  28 U.S.C. § 1605(a)(2).  Second, at the very least, acts were

"performed in the United States in connection with a commercial activity of the foreign state

elsewhere." (clause 2).  *Id*.[6]

With respect to clause one, Defendant's commercial activity was carried on in the United

States because from subscription to redemption, Defendant intended its funds to be invested in

New York, and its funds went into and came out of New York as it intended.  Decl. Exs. 1-4; 6-9;

33.  The entirety of each of Defendant's transactions with Sentry was centered in New York, as

required by Defendant's subscription agreements with Sentry: Defendant chose to invest in Sentry

with full knowledge that Sentry had to invest at least 95% of its funds in BLMIS in New York; the

agreements required Defendant to wire subscription funds to the Sentry New York Accounts—the

---

[5] *See* 28 USC § 1603(e), which defines this phrase as meaning "commercial activity carried on by such state and having substantial contact with the United States."

[6] Though jurisdiction based on these first and second prongs of the commercial activity exception was briefed by the parties, the Court in *BLI* did not reach the issue because it found that it had subject matter jurisdiction "under at least the third clause of the commercial activity exception." *BLI*, 480 B.R. at 511.

same accounts that Sentry used for sending redemptions—and Defendant used its own JPMorgan
Chase Account in Florida to receive at least one of the two transfers.  *Id.*

Alternatively, even if this Court determined that Defendant's commercial activity was not
carried out domestically, the relevant transfers were "acts" that occurred in the U.S. in connection
with that activity.  Specifically, the transfers are acts that occurred in the U.S. for two reasons.
First, as noted above, the Second Circuit has previously held that the fraudulent transfers of
customer property from BLMIS's bank account are by definition domestic activity.  Second, as
also noted above, Sentry's redemption payments to Defendant were made from Sentry's New York
Accounts to the JPMorgan Chase Account.  *See N.Y. Bay Co. Ltd. v. State Bank of Patiala*, No. 93
Civ. 6075 (WK), 1994 WL 369406, at *4 (S.D.N.Y. July 12, 1994) (holding defendant's receipt
of funds from plaintiff in its New York bank account and defendant's agreement in New York to
convert funds it received to rupees were acts performed in the United States that were related to
defendant's commercial activity in India).  The transfers are moreover "in connection with"
Defendant's commercial activity because the transfers were made due to Defendant's Sentry
investments and redemption requests.

For all of the foregoing reasons, Defendant cannot avail itself of the immunity from subject
matter jurisdiction provided under the FSIA.

## II.    <u>THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANT</u>

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show
a *prima facie* case that personal jurisdiction exists.  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
722 F.3d 81, 86 (2d Cir. 2013).  A *prima facie* showing of jurisdiction "may be established solely
by allegations."  *Id.* at 84-85 (finding "[p]rior to discovery, a plaintiff challenged by a jurisdiction
testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of
jurisdiction"); *see Lombard,* 2022 WL 2387523, at *2 ("At the pre-discovery stage, the allegations

need not be factually supported.") A plaintiff also may establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits are to be construed in the light most favorable to the plaintiff, resolving all doubts in plaintiff's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Specific jurisdiction exists where the defendant purposely directed its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).[7] The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether the defendant purposefully established "minimum contacts" with the forum, such that the defendant purposefully availed itself of the privilege of conducting activities with the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). The defendant's activities need not have taken place within the forum, "and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011). The defendant's contacts need only be related to the plaintiff's claims, such as where the "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (citation and quotation marks omitted).[8]

---

[7] Because the Complaint amply alleges specific jurisdiction, there is no need to reach the issue of general jurisdiction at this time.

[8] The Complaint asserts personal jurisdiction over Defendant under Bankruptcy Rule 7004(f) and New York's long-arm statute. *See* Compl. ¶¶ 7-8. Due to the close overlap between the requirements of due process and the New York long-arm statute, courts engaging in a due process analysis frequently cite long-arm cases. *See, e.g.*, *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) (noting "the personal jurisdiction analysis under CPLR § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous" (citations omitted)).

Second, the court conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. To determine whether jurisdiction is reasonable, courts consider the following:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the shared interest of the states in furthering social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472-73).

In determining whether a defendant's contacts establish personal jurisdiction, the court must look at "the totality of the circumstances" rather than analyze each contact in isolation. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's contacts* with the forum state must indicate that the exercise of jurisdiction would be proper.") (emphasis in original).

### A. Defendant Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York and the United States by Investing in Sentry

Defendant had numerous contacts with the United States that establish this Court's jurisdiction. Defendant (1) purposefully targeted the New York securities market by investing in Sentry, knowing that its assets were managed and custodied by BLMIS in New York; (2) knowingly contacted the forum through communications and visits to New York regarding its Sentry investments; (3) agreed to New York jurisdiction, forum selection, service of process, and

17

choice of law provisions related to its Sentry investments; and (4) designated and used its

JPMorgan Chase Account in Florida to receive at least one Sentry redemption.  Many of these

contacts independently establish jurisdiction.  In their totality, these contacts demonstrate that

Defendant availed itself of the forum.  And because the Trustee's claims in this proceeding arise

out of and relate to Defendant's contacts with the United States, the minimum contacts requirement

is satisfied, and adjudication in the United States is reasonable.

### 1.    Defendant's Intentional Investments With BLMIS Through Sentry Establish Minimum Contacts

Defendant was Sentry's largest investor, and its intentional investments with BLMIS in

New York through Sentry alone establish personal jurisdiction.  As recognized by the Second

Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed

all or substantially all of their assets with Madoff Securities, they knew where their money was

going."  *In re Picard*, 917 F.3d at 105.

Sentry subscribers like Defendant were required to affirm in subscription agreements that

they received and read Sentry's PPM.  Defendant thus knew that: (i) Sentry invested at least 95%

of its assets with BLMIS; (ii) BLMIS performed all investment management duties for these

assets;  (iii) BLMIS  was  registered  with  the  U.S.  Securities  and  Exchange  Commission;

(iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and

executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved

the purchase of U.S. equities, U.S. options, and U.S. Treasury bills; (vi) the decisions regarding

which U.S. securities to purportedly purchase, and when to make such purchases, were made by

BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS; and

(viii) BLMIS was "essential to the continued operation of" Sentry.   *See* Decl. Ex. 6-9.

a.    ***BLI* and Recent Decisions of this Court Establish this Court's Jurisdiction Over Defendant**

Based on Defendant's demonstrated intention to invest with BLMIS through Sentry, this Court concluded a number of years ago that investors like Defendant are subject to personal jurisdiction. *See BLI*, 480 B.R. at 516-18. There, as here, the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of dollars in Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *Id.* at 506. There, as here, the subsequent transferee executed subscription agreements establishing the investment's BLMIS-centric purpose. *Id.* at 507-08. And there, as here, the subsequent transferee argued that the foreseeability of its investment ending up in a BLMIS account was insufficient to support personal jurisdiction. *Id.* at n.14. Not only did the Court reject this argument, Judge Lifland called it "disingenuous," explaining:

> BLI's investments in Fairfield Sentry did not merely "end up" in an account at BLMIS as a result of happenstance or coincidence. Rather, BLI purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market.

*Id.* at 517.

Within the past month, this Court confirmed in four separate decisions that *BLI* likewise establishes personal jurisdiction here. *See generally Multi-Strategy*, *Banque SYZ*, *Banca Carige*, and *Lombard*. In those cases, similar to here, the Trustee asserted allegations as to the purpose of the investment and the defendants' contacts with Sentry for ultimate investment with BLMIS. *See, e.g., Multi-Strategy*, 2022 WL 2137073, at *3-4; *Banque SYZ*, 2022 WL2135019, at *3-4. Based on those allegations, this Court found that "Defendant's alleged contacts with New York [were] not random, isolated, or fortuitous." *Multi-Strategy*, 2022 WL 2137073, at *4; *Banque SYZ*, 2022 WL 2135019, at *4. In *Banca Carige*, this Court further clarified that the Trustee is deemed to

19

have sufficiently alleged jurisdiction "simply by stating that Banca Carige 'knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield Sentry,'" and that "[t]his allegation alone is sufficient to establish a prima facie showing of jurisdiction over Defendant in the pre-discovery stage of litigation."). 2022 WL 2387522, at *2; *see also Lombard*, 2022 WL2387523, at *2 (same).

Defendant is similarly situated to the foregoing defendants. The Trustee's Complaint (¶ 7), as supplemented by the Declaration, makes clear that Defendant knowingly directed its funds to be invested with New York-based BLMIS and that this was the fundamental purpose of its Sentry investment. In short, Defendant "intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506.[9] As such, the foregoing cases are controlling and resolve Defendant's personal jurisdiction defense without any inquiry into its additional U.S. contacts.

### b.     *Walden* Does Not Save Defendant from this Court's Jurisdiction

Seeking to sidestep *BLI*, Defendant cites *Walden v. Fiore,* 571 U.S. 277 (2014), to frame the jurisdictional analysis through a false lens of "foreseeability." Motion at 17-18. However, *Walden* "is no assistance to Defendant." *Multi-Strategy*, 2022 WL 2137073, at * 4. The facts and applicable law of *Walden*, where the "effects test" was employed to assess whether injuries in a tort case arose within the forum based on tortious activity outside of the forum, are significantly different from those here. Under the facts of *this* case—where Defendant has signed agreements expressly indicating its intent to direct custody and control over all of its funds to a specific U.S.

---

[9] Despite its protests to the contrary (Motion at 17-18), Defendant here is thus also similarly situated to the investor defendants in *Picard v. BNP Paribas S.A. (In re BLMIS)* ("*BNP*"), where this Court found jurisdiction based on the U.S. contacts inherent in doing business with BLMIS feeder funds. 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding *prima facie* showing of jurisdiction "over any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds").

broker-dealer in order to knowingly profit from the U.S. securities markets—it has purposefully availed itself of the laws and protections of the United States.

Defendant's efforts to downplay its investments' New York destination as just a "foreseeable" consequence rather than a deliberate and purposeful targeting of the forum is the same "disingenuous" argument this Court rejected in *BLI*. Defendant's efforts to analogize its intentional investing into the U.S. markets to the simple fulfillment of a contract with a party in the forum falls flat for similar reasons. Motion at 17 (citing *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280 (1970), and *SunLight Gen. Cap. LLC v. CJS Invs. Inc.*, 114 A.D.3d 521 (1st Dep't 2014)).

Here, Defendant's contacts with New York were "intertwined with [its] transactions or interactions with the plaintiff or other parties," *Walden*, 571 U.S. at 286, and thus support jurisdiction. The Court should reject Defendant's invitation to ignore the reality and intention of Defendant's activities directed to this forum in a specific effort to profit from conducting business in New York.[10] Here, there is no doubt that Defendant's purposeful targeting of New York by investing with BLMIS through Sentry establishes personal jurisdiction.

## 2. Defendant Had Numerous Additional Contacts With The Forum In Connection With Its Sentry Investments

Defendant also had direct contact with FGG in New York. From 1994 through 2005, Defendant frequently communicated and met in the United States with high-level, New York-based FGG executives regarding its Sentry investments, including Philip Toub, an FGG partner and member of FGG's executive committee; Jeffrey Tucker, one of FGG's founding partners; and

---

[10] Contrary to Defendant's contentions, the Trustee does not concede or take any position as to whether "ADIA obtained [a] benefit from trading securities." Motion at n.6. This is simply not relevant, because Defendant's *intent* to invest in the U.S. is what matters for purposes of the jurisdictional analysis.

Daniel Lipton, FGG's Chief Financial Officer.  Compl. ¶ 7; Decl. Exs. 17-27.  In 2004 Defendant requested a meeting with Bernard Madoff in New York.  Decl. Ex. 13.

Additionally, Defendant regularly communicated with FGG personnel in New York, requesting documents and information.  In response, such personnel provided Defendant with a wide range of internal reports, memoranda, marketing materials, and other documents that among other things detailed Sentry's near total investment in BLMIS's SSC Strategy, and analyzed the purported movements of BLMIS's U.S. securities trading and Sentry's performance.  Decl. Exs. 12; 14-16; 28-31.  Defendant also at least once sent to FGG in New York Defendant's Questionnaire for Hedge Fund Managers to complete and return in connection with Defendant's investments.  Decl. Ex. 32.

The foregoing contacts with New York and FGG related to Defendant's investing and transacting the business at issue in this action are sufficient bases to establish personal jurisdiction. *See Liberatore v. Calvino*, 293 A.D.2d 217, 221, 742 N.Y.S.2d 291 (App. Div. 2002) (holding that jurisdictionally relevant transactions may be found solely on the basis of phone, mail, and electronic communications) (citing cases).  As this Court noted in *Banque SYZ*, "'[a]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State— either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.'"  2022 WL 2137073, at *4 (citing *Walden*, 577 U.S. at 285).

### 3. The Forum Selection and Choice of Law Clauses in the Subscription Agreements Are Strong Jurisdictional Contacts

Defendant's subscription agreements with Sentry further evidence a "strong nexus with New York" that supports jurisdiction.  *See BLI*, 480 B.R. at 517, n.15.  When Defendant invested in Sentry, it was required to sign subscription agreements through which it submitted to venue in New York, the jurisdiction of the New York courts, and the application of New York law.

Defendant argues that these provisions are irrelevant because the Trustee is not a party to the subscription agreements and the Trustee's claims do not arise under the subscription agreements. Motion at 14-15. But the Trustee is not arguing this Court has jurisdiction based on Defendant's consent.[11] Rather, as this Court found in *BLI*, Defendant's agreements to New York venue, jurisdiction, and law further show that Defendant purposefully directed its activities towards New York and provide another strong jurisdictional contact with New York. 480 B.R. at 517; *see also Burger King*, 471 U.S. at 482 ("Although such a [choice of law] provision standing alone would be insufficient to confer jurisdiction . . . it reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.").

### 4.    Defendant's Purposeful Use of U.S. Bank Accounts Establishes Specific Jurisdiction

This Court moreover has jurisdiction because Defendant purposefully used the U.S. banking system to subscribe into and redeem from Sentry.

Courts have often held that a defendant's purposeful use of a domestic bank account is sufficient to establish personal jurisdiction. *See, e.g.*, *Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219, at *6-7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank*, 2012 WL 2921875, at *4 (same); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (same). In this SIPA liquidation proceeding, this Court has similarly found jurisdiction where initial and subsequent transferee defendants invested through and received transfers from U.S. bank accounts. *See BNP*, 594 B.R. at 191 (finding

---

[11] Defendant's reliance on *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329 (S.D.N.Y. 2018) and *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Ch. 15 Case No. 10-13164, Adv. Pro. No. 10-03496, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018), is thus unavailing, as the Trustee is not seeking to enforce the subscription agreement's forum selection clause against Defendant, but is instead noting that the agreements Defendant executed are yet one more jurisdictional contact offered here to establish personal jurisdiction.

jurisdiction over subsequent transferee defendants that sent subscriptions to, and received redemptions from, feeder funds' New York bank account); *Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (finding jurisdiction over initial transferee defendants who received transfers from BLMIS's New York bank account).

Based on the foregoing case law, Defendant's use of its JPMorgan Chase Account and Sentry New York Accounts, described *supra*, alone are sufficient to confer personal jurisdiction over Defendant.[12]

That the Sentry New York Accounts are correspondent does not change the analysis. Courts have held that the use of a correspondent bank account is also sufficient to establish personal jurisdiction. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established" provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012); *see also Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 67-69 (S.D.N.Y. 2016) (finding jurisdiction based on designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322-29 (2016) (same). All that is necessary for "purposeful" use is that it was not coincidental or passive.

---

[12] Defendant cites several authorities for the proposition that a foreign defendant's sending of monies to New York is insufficient to establish personal jurisdiction if those payments were made merely to ensure compliance with contract terms negotiated and executed outside of New York. Motion at 18 (citing cases). Those cases are unavailing. The Trustee's actions do not involve disputes between two parties stemming from services owed under a foreign contract, like the breach of contract, fiduciary duty and other claims at issue in those cases. Rather, these are fraudulent transfer recovery actions by a U.S. SIPA trustee against investors whose transfers of funds to and from U.S. bank or correspondent bank accounts fulfilled the very purpose of their feeder fund agreements, and themselves evidence the defendant's intent to direct activity towards the U.S. securities markets. *See BLI*, 480 B.R. at 513.

*See Licci*, 20 N.Y.3d at 338-39 (distinguishing case where defendant passively received funds due entirely to another party's actions).[13]

Here, the JPMorgan Chase Account was in Defendant's name and Defendant directed Sentry to send at least one of the two redemption payments to this account, making the purposeful use of such account obvious. Defendant's use of the Sentry New York Accounts was also purposeful because Defendant agreed and intended to use those accounts. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.,* 397 F. Supp. 3d 323, 346 (S.D.N.Y. 2019) ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."); *Arcapita*, 549 B.R. at 70 & n.18 ("Because [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant]."). That Sentry's PPMs mandated that subscribers use the Sentry New York Accounts is also irrelevant, because Defendant voluntarily entered into those agreements.[14] *See In re Arcapita Bank B.S.C.(C)*, No. 21 CIV. 8296 (AKH), 2022 WL 1620307, at *6 (S.D.N.Y. May 23, 2022) (defendant's acceptance of contractual term designating New York correspondent account supported finding of personal jurisdiction); *In re Motors Liquidation Co.,* 565 B.R. 275, 288-89 (Bankr. S.D.N.Y. 2017) (finding defendant's use of a correspondent account purposeful even where payment in New York was dictated by agreement).

---

[13] *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 258-64 (S.D.N.Y. 2020), Motion at 19, does not support Defendant's arguments, as the court in *Vazquez* found, after jurisdictional discovery, that the foreign bank defendant did not itself direct the use of the correspondent account; the account was used by mere happenstance. Here, Defendant projected itself into the forum and actively and purposefully used correspondent bank accounts to transact business in New York.

[14] It makes no difference if a Citco entity chose to use the U.S. correspondent account on behalf of Sentry, as various Citco entities acted as FGG's agents. *See Igoin*, 525 B.R. at 884 (conduct of agent is attributed to principal for purposes of jurisdictional analysis).

5.    **Defendant's Contacts with the Forum are Sufficiently Related to the Trustee's Claims**

The Trustee's claims also "arise out of or relate to" Defendant's contacts with the United States. As the Supreme Court recently held, the "arise out of or relate to" test does not require a causal relationship. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026–30 (2021). Rather, this test may be satisfied if the defendant's conduct involves "financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also Arcapita*, 549 B.R. at 68-71 (requiring only that claim is not completely "unmoored" from transaction).

Here, the Trustee is seeking to recover the very transfers that came through the U.S. bank accounts in New York and Florida analyzed above, and thus Defendant's use of these accounts supports jurisdiction. *See, e.g.*, *HSH Nordbank*, 2012 WL 2921875, at *4 (finding "claims against [defendants] arise directly out of the transfer of funds into [defendant's] New York accounts"); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 279 (Bankr. S.D.N.Y. 2010) (finding that defendant's contacts with the forum and the Trustee's claims are "inextricably related"). Similarly, Defendant could not have received the transfers at issue from Sentry without first investing in Sentry and entering into the related agreements. Thus, contrary to Defendant's arguments, the Trustee's allegations as to its U.S. investment activity plainly "relate to" the Trustee's claims. *See, e.g.*, *Banca Carige*, 2022 WL 2387522, at *4 (finding subsequent transfer claims directly related to investment activities). Along with its other contacts as related to its Sentry investments,[15] Defendant should reasonably anticipate that the Trustee's claims would be adjudicated in the United States.

---

[15] These additional contacts—addressed *supra* at pp. 22-23—involved discussions and meetings specifically as to Defendant's Sentry investments and redemptions and thus also plainly relate to the subject of the Trustee's Complaint. This case is therefore distinguishable from those cited by Defendant where the court declined to exercise personal jurisdiction because the contacts were not sufficiently related to the facts in dispute. *See, e.g.*, *Zim Integrated Shipping Servs. v. Bellwether Design Techs.*, 19-CV-3444, 2020 WL 5503557, at *5 (S.D.N.Y. Sept. 10, 2020), Motion at 19. Defendant's reliance on *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 334 (2d Cir. 2018), which found no specific jurisdiction because plaintiff's injury was not caused by defendants' contacts, is also particularly questionable given

26

### B.    The Exercise of Personal Jurisdiction Over Defendant Is Reasonable

Defendant fails to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. Indeed, this Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188.

This is not that "rare" case, and the burden on the Defendant is minimal here. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden); *see also Multi-Strategy*, 2022 WL 2137073, at *5 (finding exercise of jurisdiction reasonable where, as here, defendant had actively participated in the action, was represented by U.S. counsel, and had "irrevocably" submitted to the jurisdiction of New York courts when it signed subscription agreements with FGG). In addition, "[t]he forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court." *Multi-Strategy*, 2022 WL 2137073, at *5; *Banque SYZ*, 2022 WL 2135019, at *5 (same). *See also In re Picard*, 917 F.3d at 103 (noting the "compelling interest in allowing domestic estates

---

the Supreme Court's decision in *Ford Motor*, which held that causation is not a prerequisite for jurisdiction. 141 S. Ct. at 1026–30.

to recover fraudulently transferred property"). Accordingly, this Court's exercise of jurisdiction over Defendant is more than reasonable.

### C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction. *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618, 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009).

## III.    SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANT

In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12-MC-115, 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"), the District Court held that an initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e) safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year period referenced in Section 548(a)(1)(A). Defendant's argument that Section 546(e) bars recovery against it, notwithstanding Sentry's actual knowledge, is based on a misreading of Section 546(e) and *Cohmad* and has been rejected by this Court in *Multi-Strategy*, *Banque SYZ, Lombard, Lloyds*, and *Bordier*.

### A.    Sentry Had Actual Knowledge of Madoff's Fraud

Defendant sets forth at length the requirements of Section 546(e) and how they are presumably met in this case in multiple ways with respect to the initial transfers to Sentry, as established by *Cohmad*. None of this matters.[16] As Defendant concedes, this Court has previously found the Trustee has sufficiently pled that the initial transferee Sentry had actual knowledge of

---

[16] The Trustee does not concede that any agreements or transfers between Sentry and Defendant activate the safe harbor under Section 546(e), including, among other things, whether the initial transfers were in connection with the subscription agreements or were made for the benefit of Defendant. These issues are simply not relevant, because avoidability of the initial transfers turns on Sentry's actual knowledge of fraud at BLMIS.

Madoff's fraud and that such initial transfers are avoidable. Motion at 28 (*citing Fairfield Inv. Fund Ltd.*, 2021 WL 3477479, at *4-5). As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from Defendant, regardless of whether Sentry or Defendant qualify as financial institutions or participants, their agreements qualify as securities contracts, or their transfers qualify as settlement payments.[17]

The actual knowledge exception established in *Cohmad* was issued in connection with consolidated proceedings before the District Court as to the application of Section 546(e), and as Defendant concedes, that decision held that a party with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e). Motion at 26-29 (citing *Cohmad*). Defendant participated in the District Court proceedings and the District Court's review of this issue.[18] As such, Defendant is bound by *Cohmad* and that decision is law of the case.[19]

### B. <u>Section 546(e) Does Not Apply Independently to Recovery Actions</u>

Defendant is incorrect that the Trustee must allege that the subsequent transferee itself had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Specifically, Defendant argues that under *Cohmad*, a defendant's subscription agreement with Sentry may act as the relevant "securities contract" in lieu of BLMIS's account agreement, and as such, in these Section 550 recovery actions, the Court must look solely to that *subsequent transferee's* actual knowledge to determine whether the initial transfer is avoidable. But *Cohmad* does not stand for this proposition, and Defendant's argument is just a repackaging of the

---

[17] Though not necessary to the Court's analysis, Defendant's argument (Motion at 16) that the Trustee is in privity with the Fairfield liquidators and therefore bound by any rulings in the Fairfield liquidation, is incorrect.

[18] *See Picard v. Abu Dhabi Investment Authority*, Adv. Pro. No. 11-02493, Motion to Withdraw the Reference, ECF Nos. 9-10 (Bankr. S.D.N.Y. filed April 2, 2012) (raising Section 546(e) as a grounds for withdrawal).

[19] *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case.").

previously rejected argument that the Section 546(e) safe harbor should independently apply to

recovery actions under Section 550.  And as this Court recently held, based on the same arguments

Defendant makes here, Defendant "is not permitted to raise the safe harbor defense on its own

behalf as a subsequent transferee" and the "safe harbor is not applicable to subsequent transfers."

*Multi-Strategy,* 2022 WL 2137073, at *9-10; *see also Banque SYZ,* 2022 WL 2135019, at *9.

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not

the recovery of subsequent transfers under Section 550.  *See* 11 U.S.C. § 546(e) ("Notwithstanding

sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer*

. . . except under section 548(a)(1)(A) of this title.") (emphasis added).

This limitation on the safe harbor to avoidance actions is consistent with the well-

established principle that "the concepts of avoidance and recovery are separate and distinct."  *Sec.

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 501 B.R. 26, 30 (S.D.N.Y. 2013) (Rakoff,

J.).  It is also consistent with the understanding that the Bankruptcy Code's avoidance provisions

protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision,"

intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting

place."  *See In re Picard,* 917 F.3d at 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for

Section 550 recovery actions against subsequent transferees.  The District Court withdrew the

reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section

550.[20]  However, in its decision, the court specifically limited the safe harbor to avoidance claims

based on the plain language of Section 546(e).  *See Cohmad*, 2013 WL 1609154, at *4, *9

---

[20] *See In re Madoff Securities*, 12-MC-115, Section 546(e) Briefing Order, ECF No. 119 (S.D.N.Y. filed May 16, 2012) (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

(applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); and *id.* at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from Madoff Securities.") (emphasis added).    And though the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as "financial institutions" or "financial participants," the decision is clear that the focus of the safe harbor is still on the *initial* transfers. *See id.* at *9.[21]   Contrary to Defendant's argument, the District Court did not, in its hypothetical, discuss actual knowledge or indicate that in such circumstances, the initial transferee's actual knowledge should be disregarded.

Based on *Cohmad*, this Court held in *BNP* that Section 546(e) is applicable only to avoidance and not recovery, and most notably that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee has adequately pled the initial transferee's actual knowledge. 594 B.R. at 197.   In *BNP*, this Court explicitly rejected the argument being made here—that the "*only* way the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the [subsequent transferee defendants] actually knew of the Madoff Ponzi scheme." 594 B.R. at 196-97 (emphasis in original).   Rather, as explained in *BNP*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee. *Id*. at 197.

---

[21] The original point of the *Cohmad* hypothetical was to address the subsequent transferee defendants' argument that if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities agreements under Section 546(e). *Cohmad,* 2013 WL 1609154, at *8.  That argument became moot as both the Second Circuit and the District Court determined that the BLMIS customer agreement was a "securities agreement", and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore subject to Section 546(e).

Most recently, this Court has repeatedly rejected the same arguments, holding that, notwithstanding the "securities agreement" at issue, "the safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not 'avoiding' a subsequent transfer, 'he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550.'" *See, e.g.,* *Multi-Strategy,* 2022 WL 2137073, at *9 (quoting *BNP* at 197); *Banque SYZ,* 2022 WL 2135019, at *9 (same).

Defendant's misinterpretation of *Cohmad* would mean the safe harbor would apply even where the initial transferee feeder fund knew there were no securities transactions in need of protection, thus effectively eliminating the point of the actual knowledge exception. It would also allow the determination as to avoidability of an initial transfer to vary based on whether there were subsequent transfers, and who received them. It further would provide a subsequent transferee with more rights than an initial transferee, which is inconsistent with congressional intent on 546(e). *See In re Madoff Sec.*, 501 B.R. at 29 ("Section 550(a) requires that the Trustee show that the transfer he seeks to recover is avoidable in each recovery action, and the subsequent transferee in possession of that transfer may raise any defenses to avoidance available to the initial transferee, as well as any defenses to recovery it may have.").

Defendant also misconstrues *Cohmad*'s holding—which was not a part of the Court's "securities contract" hypothetical—that subsequent transferees with actual knowledge are also prohibited from benefitting from the safe harbor. Motion at 27. That holding does not require a trustee to plead a subsequent transferee's actual knowledge. Rather, it merely ensures that any defendant that *doe*s have actual knowledge, including a subsequent transferee, cannot benefit from the safe harbor (even if the initial transferee is innocent), such that the purpose of the actual

knowledge exception is achieved consistently. *See Cohmad*, 2013 WL 1609154, at *1, *7.

Finally, this Court's *Fairfield Inv. Fund* decision does not demand a different result. Motion at 28. Rather, in that case, as this Court has held, the Court "considered [a subsequent transferee's] actual knowledge of BLMIS's fraud only as it related to whether Sentry had actual knowledge of the fraud. The Court never considered whether the subsequent transferees could raise the safe harbor defense on their own behalf, nor could it have, as § 546 is inapplicable to subsequent transferees." *Multi-Strategy,* 2022 WL 2137073*,* at *10; *Banque SYZ,* 2022 WL 2135019, at *10; *Lombard*, 2022 WL 2387523 at *10.

## IV.    **THE TRUSTEE SUFFICIENTLY PLEADS THE AVOIDABILITY OF THE INITIAL TRANSFERS**

Defendant argues that the Trustee's incorporation of the then-operative complaint against Sentry violates Rule 8(a)(2)'s requirement to include a "short and plain statement" showing the Trustee is entitled to relief. Motion at 32-33. However, there is no doubt that the Trustee may incorporate the Fairfield Amended Complaint under Rule 10(c) to demonstrate the avoidability of the initial transfers from BLMIS. As this Court recently held in, among others, *Multi-Strategy*, "pleadings filed in the 'same action' may be properly adopted by reference in other pleadings in that action" and "[t]he Fairfield Complaint was filed in the 'same action' as this adversary proceeding for purposes of Rule 10(c)." *See Multi-Strategy*, 2022 WL 2137073, at *7 (citing *Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010) (allowing incorporation by reference under Rule 10(c) of pleadings in different adversary proceeding within the same liquidation because the pleadings "directly relate[d] to, materially affect[ed], and [were] filed in a single bankruptcy case).

Defendant's argument conflicts with the prior opinion in *Sec. Inv'r Prot. Corp.,* 501 B.R. 26, in which the District Court had already found sufficient the Trustee's incorporation by reference of the then-operative Fairfield complaint:

> [T]he Trustee's complaint against Standard Chartered Financial Services incorporates by reference the complaints against Kingate and Fairfield, including the allegations concerning the avoidability of the initial transfers, and further alleges the avoidability of these transfers outright. *See* Standard Chartered Compl. 1143–46, 50–53. Thus, the avoidability of the transfers from Madoff Securities to Kingate and Fairfield is sufficiently pleaded for purposes of section 550(a).

*Id.* at 36; *see also, e.g., Multi-Strategy*, 2022 WL 2137073, at *7; *Banque SYZ*, 2022 WL 2135019, at *7; *Lombard*, 2022 WL 2387523, at *7 (each following "the district court's instruction"). Defendant was a participant in the omnibus withdrawal of the reference related to this decision. *See* Mot. to Withdraw the Reference, ECF No. 9-10.

Moreover, even if the Court were to find that the adversary proceedings are separate actions for purposes of Rule 10(c)*,* this Court still can permit incorporation by reference, as the Southern District of New York and other federal courts have done in appropriate circumstances. *See*, *e.g.*, *Sherman v. A.J. Pegno Constr. Corp.*, 528 F. Supp. 2d 320, 323 n.5 (S.D.N.Y. 2007) (citation omitted) (interpreting Rule 10(c)'s reference to "another pleading" as not being confined to another pleading in the same action, and permitting incorporation of entire pleadings in separate cases).

The case cited by Defendant, *United States v. Int'l Longshoremen's Ass'n*, is inapposite because, unlike in the instant matter, plaintiff there was incorporating pleadings by reference in an attempt to add brand new claims.[22]    518 F. Supp. 2d 422, 461-66 (E.D.N.Y. 2007) (finding

---

[22] The other cases cited by Defendant are similarly unavailing, as those cases' plaintiffs also sought to add new claims. *See Nycomed U.S. Inc. v. Glenmark Generics Ltd.,* No. 08-CV-5023 (CBA) (RLM), 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) (rejecting plaintiff's attempt to state new claim by incorporating by reference a reply brief he filed in the case which included "no specific factual allegations" supporting the claim); *Davis v. Bifani*, No. 07-cv-00122-MEH-BNB, 2007 WL 1216518, at *1 (D. Colo. Apr. 24, 2007) (holding that plaintiff could not incorporate by reference additional claims in parallel state-court action that were not alleged in the federal court complaint).

34

improper incorporation by reference of pleadings from prior actions to plead entirely new claims not otherwise alleged in complaint, which did not expressly incorporate the pleadings). As recognized by the court, incorporation in that case would have led to confusion and a lack of notice of the claims asserted. By contrast, the Trustee here is not seeking to add additional claims, and Defendant would be hard-pressed to argue it lacked notice that the Trustee was seeking to avoid the initial transfers to Sentry.

In any case, regardless of incorporation, this Court may take judicial notice of the operative Second Amended Complaint against Fairfield and its prior decision holding that the complaint sufficiently alleges the avoidability of the initial transfers from BLMIS. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *7. That the noticed complaint was filed after this Complaint is of no moment. *See Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (noticing later filed complaint in related proceeding). Should the Court accept Defendant's argument and not take such judicial notice, the Trustee respectfully requests the opportunity to replead.

## V.    THE TRUSTEE'S COMPLAINT STATES A VALID CAUSE OF ACTION FOR RECOVERY OF BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a)

The Trustee's Complaint plausibly alleges that Defendant received subsequent transfers of BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149-50 (Bankr. S.D.N.Y. 2014). As the Court recently held, the Trustee is not required to perform a tracing analysis, as Defendant acknowledges (Motion at 29), or to present a "'dollar-for-dollar accounting' of the exact funds' at issue." *Multi-Strategy*, 2022 WL 2137073, at *6; *Banque SYZ*, 2022 WL 2135019, at *7; *see also Merkin*, 515 B.R. at 149-150 (quoting *Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*, Adv. Pro. No. 10-04398, 2012

WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)).  Rather, "the Trustee need only allege

sufficient facts to show the relevant pathways through which the funds were transferred from

BLMIS to [the subsequent transferee]."  *Charles Ellerin Revocable Trust*, 2012 WL 892514, at

*3.  Specifically, the Trustee must allege the "'necessary vital statistics—the who, when, and how

much' of the purported transfers to establish an entity as a subsequent transferee of the funds."

*Merkin*, 515 B.R. at 150 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,

379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).

The Complaint meets these requirements.  The Complaint alleges that Defendant received

transfers, identified by date and amount, from Sentry, and that Sentry invested substantially all of

its funds with BLMIS.  *See* Compl. ¶¶ 2, 34-42; Exs. C, D, E.  The Complaint thus plausibly alleges

that Defendant received subsequent transfers of customer property by outlining the relevant

pathways through which customer property was transferred from BLMIS to Sentry and

subsequently to Defendant, and provides the necessary vital statistics for each of the subsequent

transfers.  Nothing more is required.  *See, e.g.*, *Multi-Strategy*, 2022 WL 2137073, at *6; *Banque

SYZ*, 2022 WL 2135019, at *7.

Unable to argue that the Trustee fails to meet the relevant pleading burden, Defendant

argues for a new one, asserting that the Trustee must tie each subsequent transfer Defendant

received to a specific initial transfer from BLMIS.  Motion at 29-32.  However, in *Merkin*, this

Court refused to dismiss subsequent transfer claims even though the complaint "d[id] not connect

each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS."  *See*

515 B.R. at 150.  And to the extent Defendant is arguing the Trustee must detail which and what

portion of each subsequent transfer comprises customer property, this is also wrong.  515 B.R. at

152-53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable").

Defendant's reliance on this Court's decision in *Picard v. Shapiro* is also unavailing. Motion at 29–31 (citing *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015)). In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS; however, that complaint *did not detail any* of the necessary vital statistics of the subsequent transfers. *See Shapiro,* 542 B.R. at 119. There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers, and consequently this Court granted defendants' motion to dismiss the subsequent transfer claim. *Id*. Here, where the Trustee has alleged the vital statistics of each transfer Defendant received and has set out the investment relationship between Defendant and Sentry, *Shapiro* supports denying the motion to dismiss.

The Trustee is also not required to trace the flow of stolen customer property at the pleading stage. Motion at 31-32. "The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing." *Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073, 2020 WL 3077151, at *4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Revocable Trust*, 2012 WL 892514, at *2). And at this stage of the proceedings, the Trustee is not required to plead, much less establish, that an alleged subsequent transfer is comprised solely of customer property. *See Kelley*, 2020 WL 3077151, at *4 (holding a trustee is not required to establish that the transfers "originated solely" with the debtor or even to account for "the exact funds at issue" on summary judgment).

Moreover, the Trustee is a stranger to the transactions between Sentry and Defendant and is entitled to discovery on this issue. "[I]n a case such as this one, where the Trustee's lack of

personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded." *In re Bernard L. Madoff Inv. Sec. LLC,* 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).[23] And even after fact and expert discovery, there may be fact disputes that require a trial. For example, in the *Merkin* litigation, this Court denied defendants' motion in limine to exclude the Trustee's accounting expert, finding expert testimony at trial "may assist the Court in making its own determination as to the proper methodology." *Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017); *see also Kelley*, 2020 WL 3077151, at \*5 (denying summary judgment after trustee introduced expert report and associated documents from which jury may infer defendants received subsequent transfers from the Petters Ponzi scheme).

Finally, Defendant argues the Trustee's claims are "mathematically impossible" because the Trustee is seeking more money from all subsequent transferees of Sentry than the fund withdrew from BLMIS. Motion at 31-32. As this Court has stated, "[t]here is no dispute that the Trustee is limited to 'a single satisfaction' under § 550(a)." *Multi-Strategy,* 2022 WL 2137073, at \*11 (citing § 550(d)). "He may nevertheless pursue any and all subsequent transferees in order to achieve that satisfaction." *Id*. (citing § 550(a)(2)). And under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds, without the necessity for allocation among all [the] subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008). Thus, until the Trustee recovers the full amount of the approximately $3 billion in fraudulent transfers received by Sentry, the Trustee may

---

[23] Defendant argues that the Trustee has had access to the Fairfield books and records "for over a decade." Motion at 32. This is untrue. The Trustee does not have all of Sentry's books and records, and discovery in the Trustee's actions against the Fairfield management defendants is continuing. *See, e.g.*, Stipulated Case Am. Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.*, Adv. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. May 17, 2022), ECF No. 355 (setting November 22, 2023 deadline for fact discovery and August 23, 2024 deadline for expert discovery).

simultaneously seek recovery from this Defendant and defendants in other actions, even in an aggregate amount that exceeds associated initial transfers.  *See Multi-Strategy*, 2022 WL 2137073, at *11 ("Calculation of whether the Trustee is fully satisfied is a factual finding to be made by this Court at a later stage of litigation."); *Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (same).

## VI.    THE 550(b) GOOD FAITH DEFENSE IS AN AFFIRMATIVE DEFENSE AND THUS INAPPROPRIATE AT THE MOTION TO DISMISS STAGE

Finally, Defendant argues that the Court should dismiss the Complaint because Defendant's purported good faith is clear on the face of the Complaint.  *See* Motion at 37-39.  The Court should reject Defendant's attempt to raise the "good faith" affirmative defense on a motion to dismiss, just as this Court and the District Court recently did in *Banque SYZ* and *ABN Ireland*, respectively.  *See Banque SYZ*, 2022 WL 2135019, at *11; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*, No. 20-CV-02586 (CM), 2022 WL 1304589, at *1 (S.D.N.Y. May 2, 2022) ("*ABN Ireland*").  Like Defendant, the defendants in *Banque SYZ* and *ABN Ireland* argued that their good faith defense was established on the face of the complaint. *Banque SYZ*, 2022 WL 2135019, at *10; *ABN Ireland*, 2022 WL 1304589, at *3.  The Court in those cases concluded that the affirmative defense could not be resolved at the pleading stage.  *Id.* The same result is warranted here.

By their very nature, affirmative defenses are fact-driven and require factual analyses and the presentation of evidence.  Defendant argues that diligent inquiry by it would have been futile in these circumstances.  Motion at 37-39.  Whether Defendant conducted a diligent inquiry, and what they did or would have discovered, requires a factual analysis that is not appropriate at this stage of litigation, particularly with respect to a good faith defense, which turns on questions of the defendant's motivation and intent.  Indeed, in its rejection of the defendants' argument on this point in *ABN Ireland*, the court highlighted that the good faith inquiry notice standard is "a fact-

39

intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees." *ABN Ireland*, 2022 WL 1304589, at *3 (quoting *Citibank*, 12 F.4th at 195); *Banque SYZ*, 2022 WL 2135019, at *11 (same).

Defendant makes similar arguments as to knowledge of voidability and value. Motion at 35-37. But these are also fact-driven affirmative defenses to be addressed later in the litigation. *See Banque SYZ*, 2022 WL 2135019, at *10 (knowledge of voidability "cannot be established in a complaint" as it is the defendant's burden to plead and prove); *Fairfield Inv. Fund*, 2021 WL 3477479, at *9 ("Whether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial.").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion.

40

Dated:  July 11, 2022
       New York, New York

       */s/  David J. Sheehan*

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Eric B. Hiatt
Email: ehiatt@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com
Alexa D'Angelo
Email: adangelo@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Chapter 7*
*Estate of Bernard L. Madoff*

**Windels Marx Lane & Mittendorf, LLP**
156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
Facsimile: (212) 262-1215
Kim M. Longo
Email: klongo@windelsmarx.com

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*