**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Torello H. Calvani
Dean D. Hunt
Farrell Hochmuth
Marie Carlisle

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01577 (CGM) |
| Plaintiff, | |
| v. | |
| UBS EUROPE SE, formerly known as UBS Deutschland AG, as successor in interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor in interest to Dresdner Bank (Schweiz) AG, | |
| Defendants. | |

## AMENDED COMPLAINT

Irving H. Picard ("Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll.* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), by the Trustee's undersigned counsel, for this Amended Complaint against defendant UBS Europe SE ("UBS Europe"), formerly known as UBS Deutschland AG ("UBS Deutschland"), as successor in interest to Dresdner Bank Lateinamerika AG ("DBLA"), and defendant LGT Bank (Switzerland) Ltd. ("LGT Switzerland"), as successor in interest to Dresdner Bank (Schweiz) AG ("Dresdner Schweiz"), alleges the following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Complaint, the Trustee seeks to recover at least $10,392,397 in subsequent transfers of BLMIS customer property made to DBLA and Dresdner Schweiz (collectively, the "Dresdner Defendants") by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma," collectively with Fairfield Sentry, the "Fairfield Funds"). The Fairfield Funds are British Virgin Islands ("BVI") companies that are in liquidation. The Fairfield Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in BLMIS customer accounts and Sigma invested 100% of its assets in Fairfield Sentry.

3.    DBLA received at least $9,296,416 of BLMIS customer property from the Fairfield Funds. It received at least $7,418,486 from Fairfield Sentry, and at least $1,877,930 from Sigma.

4.    Dresdner Schweiz received at least $1,095,980 of BLMIS customer property from Fairfield Sentry.

5.    The customer property was received by DBLA and Dresdner Schweiz by redeeming, at the reported net asset value on the redemption date, shares of the Fairfield Funds previously purchased by DBLA and Dresdner Schweiz from FGG.  The Fairfield Funds were wholly invested in BLMIS.  The purchases and later redemptions of the shares in the Fairfield Funds were governed by the subscription agreements each entered into with the Fairfield Funds. The subscription agreements governed the time, manner, and circumstances under which DBLA and Dresdner Schweiz could make redemptions, and the protocol for valuing the shares at the time of redemption.

6.    The following chart summarizes the subsequent transfers of customer property at issue in this litigation:

|  | Fairfield Sentry* | Sigma | TOTAL |
|---|---|---|---|
| DBLA | $7,418,486 | $1,877,930 | $9,296,416 |
| Dresdner Schweiz | $1,095,980 | $0 | $1,095,981 |
| TOTAL | $8,514,466 | $ 1,877,930 | $10,392,397 |

* Amounts subject to rounding

7.    DBLA and Dresdner Schweiz were sophisticated, international investment entities. When Defendants received the subsequent transfers of BLMIS customer property, each was a subsidiary of Dresdner Bank AG, one of the largest banks in Germany.  According to their respective 2004 annual reports, they were part of a large international banking organization with millions of private and business clients and over 900 offices within Germany and around the world, including in the United States.  The 2004 annual reports also touted their risk analysis and management procedures, as well as their "clearly defined investment process."

3

8.      Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS's investment advisory business (the "IA Business") in New York, to capitalize on its reported consistent returns.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.  Sigma, a Fairfield Sentry sister fund, was a "currency fund," which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.

9.      Fairfield Sentry and Sigma were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership founded by U.S. citizens and residents, Walter Noel and Jeffrey Tucker.  FGG maintained its principal place of business in New York.

10.     DBLA and Dresdner Schweiz purposefully invested in Fairfield Sentry and Sigma in order to profit from BLMIS in New York and this adversary proceeding arises from Defendants' deliberate investment in New York-based funds.

## II.      <u>JURISDICTION AND VENUE</u>

11.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

12.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with

4

Article III of the U.S. Constitution.

13.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

14.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**A.    Defendant UBS Europe**

15.    Defendant UBS Europe is subject to personal jurisdiction in this judicial district as successor in interest to DBLA.  DBLA purposely availed itself of the laws and protections of the United States and the state of New York.

16.    DBLA knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Fairfield Sentry and Sigma.  Specifically, subscription agreements DBLA executed with Fairfield Sentry directed it to wire funds in U.S. dollars to an account with HSBC Bank USA in New York, NY.  In those subscription agreements, DBLA also directed redemptions to be sent to an account in its name at Citibank in New York.  By deliberately directing funds to and from BLMIS through Fairfield Sentry, using bank accounts located in New York, DBLA knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and New York.

17.    DBLA maintained an office in Miami, Florida.  Employees from the Miami office met with FGG personnel and conducted due diligence on the Feeder Funds, Madoff, and BLMIS.

18.    FGG personnel provided DBLA with private placement memoranda ("PPMs") in order to solicit investments in Fairfield Sentry and Sigma.  From the PPMs, DBLA knew that the Fairfield Funds were heavily invested with BLMIS in New York, and that BLMIS purportedly executed Madoff's split-strike conversion investment strategy ("SSC Strategy") by investing Fairfield Sentry's assets in U.S. Standard & Poor's 100 Index ("S&P 100 Index") securities, U.S. options, and U.S. Treasuries, and that all of Sigma's assets were invested in Fairfield Sentry.

5

DBLA also knew BLMIS was registered with the SEC, was located in New York, served as the investment adviser, broker-dealer, and custodian for Fairfield Sentry and Sigma, and that control of Fairfield Sentry's and Sigma's investments rested entirely with BLMIS in New York. DBLA also knew that BLMIS was "essential to the continued operation of" Fairfield Sentry.

19.    Armed with this knowledge, DBLA voluntarily executed Fairfield Sentry subscription agreements in connection with its investments, which incorporated the Fairfield Sentry PPMs by reference. By executing the subscription agreements, DBLA submitted to the jurisdiction of New York. The agreements specified that:

> [A]any suit, action, or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

The agreements further specified that DBLA consented to the service of process out of any New York court in any such Proceeding, the agreements would be "governed and enforced in accordance with the laws of New York," and that Fairfield Sentry was represented by U.S. counsel.

20.    In executing subscription agreements with Fairfield Sentry, DBLA affirmed that it received and read a copy of the Private Placement Memorandum for the fund which provided that "substantially all of the Fund's assets" were under the custody of New York-based BLMIS.

21.    DBLA met with individuals in Fairfield's New York City office regarding its investments and corresponded with those individuals repeatedly by email and telephone about its Sentry investments. Those contacts included emails between DBLA employees Guido Lucke, Katia Gomez, and Christian Kurk and FGG employees Philip Toub, Lourdes Barreneche and Lauren Ross located in FGG's New York office discussing DBLA's investments in the Fairfield Funds. At all times, the DBLA employees knew the FGG employees were located in New York

and intentionally directed their communications, along with their investments, to New York.

22.    DBLA also voluntarily chose to invest in Sigma and executed subscription agreements, which contained choice of law provisions similar to those in the Fairfield Sentry subscription agreements, including choice of law provisions selecting New York law, identifying U.S. counsel for Sigma, agreeing that any litigation related to the subscription agreements may be brought in New York, and submitting to the jurisdiction of the New York Courts. DBLA also communicated with New York-based Fairfield employees about its Sigma investment.

23.    DBLA used New York bank accounts to transfer money to and from Fairfield Sentry. When DBLA executed the Fairfield Sentry subscription agreement in connection with its investments, it agreed that all of the subscription payments from DBLA would be directed to a New York HSBC Bank USA correspondent bank account and ultimately deposited in Fairfield Sentry's bank account. DBLA directed funds to this New York bank account on multiple occasions in connection with investments into Fairfield Sentry.

24.    DBLA also used its Citibank account in New York held in its own name to receive transfers from Fairfield Sentry. In its Fairfield Sentry subscription agreement, DBLA directed that all its redemptions and other payments be sent to this Citibank account in New York only. DBLA used this account to receive $7,418,486 in redemption proceeds from Fairfield Sentry.

25.    Each of the redemptions received by DBLA was a redemption of shares purchased via the subscription agreements, and the terms of those redemptions were expressly governed by the subscription agreement and the PPM which, as noted above, included their submitting to the jurisdiction of the New York court and New York law.

26.    DBLA purposefully directed its investments to New York-based BLMIS, through the Fairfield Funds, using bank accounts located in New York, and consented to the jurisdiction

of the New York Courts, as well as the applicability of New York law. DBLA derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

27.     UBS Europe, as the successor in interest to DBLA, should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") §§ 301 and 302, and Federal Rule of Bankruptcy Procedure 7004 ("Fed. R. Bankr. P.").

**B.     Defendant LGT Switzerland**

28.     Defendant LGT Switzerland is subject to personal jurisdiction in this judicial district as successor in interest to Dresdner Schweiz. Dresdner Schweiz purposely availed itself of the laws and protections of the United States and the state of New York.

29.     Dresdner Schweiz knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Fairfield Sentry. By deliberately directing funds to and from BLMIS through Fairfield Sentry, Dresdner Schweiz knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and New York.

30.     FGG personnel provided Dresdner Schweiz with PPMs in connection with its investments in Fairfield Sentry. From the PPMs, Dresdner Schweiz knew that Fairfield Sentry was heavily invested with BLMIS in New York, and that BLMIS purportedly operated and executed Madoff's SSC Strategy by investing Fairfield Sentry's assets in U.S. S&P 100 Index securities, U.S. options, and U.S. Treasuries. Dresdner Schweiz also knew BLMIS in New York served as the investment adviser, broker-dealer, and custodian for Fairfield Sentry, and that control of Fairfield Sentry's investments rested entirely with BLMIS in New York. Dresdner Schweiz also knew that BLMIS was "essential to the continued operation of" Fairfield Sentry.

31.     Armed with this knowledge, Dresdner Schweiz voluntarily executed Fairfield

8

Sentry subscription agreements in connection with its investments, which incorporated the Fairfield Sentry PPMs by reference. By executing the Fairfield Sentry subscription agreements, Dresdner Schweiz submitted to the jurisdiction of New York. The agreements specified that:

> [A]ny suit, action, or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brough in an inconvenient forum.

The agreements further specified that Dresdner Bank consented to the service of process out of any New York court in any such proceeding, the agreements would be "governed and enforced in accordance with the laws of New York," and that Fairfield Sentry was represented by U.S. counsel.

32.    In executing subscription agreements with Fairfield Sentry, Dresdner Schweiz affirmed that it received and read a copy of the Private Placement Memorandum for the fund which provided that "substantially all of the Fund's assets" were under the custody of New York-based BLMIS.

33.    Each of the redemptions Dresdner Schweiz received was a redemption of shares purchased via the subscription agreements, and the terms of those redemptions were expressly governed by the subscription agreement and the PPM.

34.    Dresdner Schweiz knowingly reached out to New York based FGG personnel to discuss its investments in Fairfield Sentry. Those communications included emails from Xaver Kurzen (OPSF of Dresdner Schweiz), Werner Vogt (Assistant Vice President of Dresdner Schweiz) and Thomas Weckemann (portfolio manager and financial analyst with Dresdner Schweiz) to Lauren Ross located in FGG's New York office regarding its investment in Fairfield Sentry and seeking the retrocession fees owed to Dresdner Schweiz for its investments in the Fairfield Funds. At all times, the Dresdner Schweiz employees knew the FGG employees,

including Ms. Ross, were located in New York and intentionally directed their communications, along with their investments, to New York.

35.    Dresdner Schweiz used New York bank accounts to transfer money to and from Fairfield Sentry. Dresdner Schweiz executed short form Fairfield Sentry subscription agreements in connection with its investments, which incorporated the Sentry Fully Executed Subscription Agreements by reference. In the Sentry Fully Executed Subscription Agreements, signatories agree that investments are to be directed to a New York HSBC Bank USA correspondent bank account in U.S. dollars and ultimately deposited in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.

36.    Dresdner Schweiz also used a New York HSBC Bank USA correspondent bank account to receive transfers from Fairfield Sentry. Pursuant to Dresdner Schweiz's redemption requests, all Dresdner Schweiz's redemptions were directed to this New York HSBC Bank USA account. Dresdner Schweiz used this account to receive $1,095,980 in redemption proceeds from Fairfield Sentry. Dresdner Schweiz directed retrocession fees paid to it by Fairfield Sentry be sent to a bank account held at Dresdner Bank AG, New York Branch.

37.    Dresdner Schweiz purposefully directed its investments to New York-based BLMIS, through the Fairfield Funds, using bank accounts located in New York, and consented to the jurisdiction of the New York Courts, as well as the applicability of New York law. Dresdner Schweiz derived significant revenue from these investments in New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

38.    LGT Switzerland, as the successor to Dresdner Schweiz, also filed claims in the liquidation of BLMIS, thereby consenting to the jurisdiction of this Court for the determination

and adjudication of claims related to its investments in BLMIS.  Specifically, on July 2, 2019,

LGT Switzerland filed Claim Nos. 015023 and 015374, duplicative of one another, seeking to

recover $2,128,043.68 from the BLMIS estate.

39.     LGT Switzerland, as the successor in interest to Dresdner Schweiz, should

reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction

pursuant to N.Y. C.P.L.R. §§ 301 and 302, and Fed. R. Bankr. P. 7004.

## III.    **BACKGROUND**

40.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding against Madoff and BLMIS.  The SEC

complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser

activities of BLMIS.

41.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, *inter ali*a, that BLMIS could not meet its obligations to securities customers as they came

due and its customers needed the protections afforded by SIPA.

42.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered

an order pursuant to SIPA, which, in pertinent part:

a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant
to SIPA § 78eee(b)(3);

b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
SIPA § 78eee(b)(3); and

c.     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

43.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

44.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

45.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *Id.* at 23.  Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

46.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pled guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  Among other things, DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS's investment advisory business ("IA Business") customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.  *Id.* at 46.

47.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records

of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

48.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Joann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

## IV.    THE TRUSTEE'S POWERS AND STANDING

49.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. However, the estate's assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

50.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

51.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

52.    The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.    DEFENDANTS AND RELEVANT NON-PARTIES

53.    Non-party Dresdner Bank AG ("Dresdner") was a German banking company and the parent corporation to DBLA and Dresdner Schweiz.  It was established in 1872, and by 1900 had the largest German branch network.  In May 2009 it was acquired by Commerzbank.

54.    DBLA was a German bank with offices around the world, including Miami, Florida.  In 2005, DBLA sold its banking and wealth management operations to a subsidiary of UBS AG ("UBS"), and UBS merged DBLA into UBS Deutschland.  In 2016, UBS Deutschland AG adopted the legal form of a European stock corporation and changed its name to UBS Europe. Defendant UBS Europe is the successor in interest to DBLA, is a wholly owned subsidiary of UBS, and maintains its headquarters at Bockenheimer Landstrasse 2-4, D-60306 Frankfurt am Main, Germany.  UBS Europe may be served through its counsel of record.

55.    Dresdner Schweiz was a Swiss bank specializing in providing investment advisory and private wealth management services.  In 2009, Commerzbank AG acquired Dresdner Schweiz from Dresdner Bank.  Later in 2009, LGT Group Foundation ("LGT Group") acquired Dresdner Schweiz and by 2010 merged Dresdner Schweiz into Defendant LGT Switzerland, an indirect, wholly owned subsidiary of LGT Group, which is wholly owned by Prince of Liechtenstein Foundation.  LGT Switzerland is the successor in interest to Dresdner Schweiz with a place of business at Lange Gasse 15, P.O. Box, CH-4002, Basel, Switzerland.  LGT Switzerland can be served through its counsel of record.

## VI.   BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

14

56.     Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

57.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continual registration as a securities broker-dealer from January 1, 1960 through December 31, 2008.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

58.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

59.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

60.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

61.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.    THE PONZI SCHEME**

62.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joann Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

63.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

64.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

65.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1.    Madoff's Investment Strategy

66.    BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the SSC Strategy.   For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

67.    All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up BLMIS's proprietary trading business.

17

68.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

69.    From the early 1990's forward, Madoff began telling IA Business customers that BLMIS employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

70.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

71.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

72.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

73.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

74.     If Madoff was putting on the same baskets of equities across *all* BLMIS customer accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

75.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the BLMIS SSC Strategy.

76.     Sophisticated or professional investors knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

## 2.    BLMIS's Fee Structure

77.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM and profits, respectively. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions

of dollars in fees.

### 3.  BLMIS's Market Timing

78.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he achieved market timing by intermittently entering and exiting the market.  During those times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S Treasury Bills or mutual funds invested in Treasury Bills.

79.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time.  Yet this is precisely what BLMIS's customer statements reported.

80.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4.  No Evidence of BLMIS Trading

81.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

82.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### 5.      The Collapse of the Ponzi Scheme

83.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

84.     Based on the Trustee's investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts.  When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.  Customer accounts had not accrued any real profits because virtually no investments were ever made.  At the time the Ponzi scheme came to light in December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

85.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

86.     Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VII.    DEFENDANTS WERE SOPHISTICATED INVESTORS WITH SIGNIFICANT EXPERIENCE IN ASSET MANAGEMENT AND INVESTMENT FUNDS

87.    Defendants and their predecessors, along with the officers, directors, employees, and agents of each, have been active in the global financial services industries for decades.  Each Defendant or its predecessor marketed itself as "one of the leading commercial banks in Germany," represented in "all key financial centres around the globe."  They have considerable experience and expertise in wealth management and investment funds.  In executing PPMs and subscription agreements with the Fairfield Funds, DBLA and Dresdner Schweiz affirmed that each was a sophisticated investor with "such knowledge and experience" necessary to evaluate and assess the risks of investing in the Fairfield Funds.

88.    DBLA was a sophisticated banking entity that touted the attentiveness of its risk management division, explaining in its 2004 annual report that it "identif[ied], independently measur[ed], analyz[ed], monitor[ed] and comment[ed] on market, liquidity, counterparty and operational risks as well as the aggregation of the various risk categories throughout [DBLA]."

89.    According to its 2004 annual report, Dresdner Schweiz had a "clearly defined investment process" and "disciplined investment strategy."  Dresdner Schweiz claimed to "work closely with the portfolio managers" to "continuously monitor and analyse the capital markets in order to identify trends as they emerge . . . .  Investment target performances are systematically monitored and evaluated.  Dresdner Schweiz claimed its "process and results are transparent" and it had a "robust internal control system" to monitor "key risk indicators."

90.    DBLA and Dresdner Schweiz downloaded and reviewed PPMs from the Fairfield Funds and the performance of the funds from the tear sheets available through FGG's website.  A review of the data in the tear sheets demonstrated that the performance of the Fairfield Funds was not correlated to the S&P 100, as purported by the SSC strategy outlined in the Fairfield Funds' PPM.  In fact, the BLMIS returns consistently outperformed the S&P 100 Index, a fact apparent

on the face of the Fairfield Funds' tear sheets.

## VIII.  RECOVERY OF SUBSEQUENT TRANSFERS TO UBS AND LGT SWITZERLAND

91.    The Fairfield Funds received initial transfers of BLMIS Customer Property.  Some of those initial transfers were subsequently transferred directly or indirectly to the Dresdner Defendants.

### A.    Fairfield Funds

#### 1.    *Initial Transfers from BLMIS to Fairfield Sentry*

92.    The Trustee commenced a separate adversary proceeding against the Fairfield Funds and other defendants in the Bankruptcy Court under the caption, *Picard v. Fairfield Investment Fund, Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Sentry Avoidance Action"), in part, seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

93.    Under the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Fairfield Settlement Agreement") and, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

94.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

95.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery

of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

96.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

97.     Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years prior to the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under Bankruptcy Code § 544, the applicable provisions of the New York Fraudulent Conveyance Act ("N.Y. Debt. & Cred. Law"), particularly §§ 273–279, and SIPA, particularly § 78fff-2(c)(3).

98.     Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code section 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

## 2.     *Subsequent Transfers from Fairfield Sentry to UBS Europe*

99.     Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to UBS Europe (the "UBS-Fairfield Sentry Subsequent Transfers").  Based on the Trustee's investigation to date, the UBS-Fairfield Sentry Subsequent Transfers are at least $7,418,486.  A chart setting forth the presently known UBS-Fairfield Sentry Subsequent Transfers by date and amount is attached as Exhibit C.

24

100.    The UBS-Fairfield Sentry Subsequent Transfers are recoverable from UBS Europe under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

101.    The UBS-Fairfield Sentry Subsequent Transfers represent a redemption of equity interest by UBS Europe as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the UBS-Fairfield Sentry Subsequent Transfers to UBS Europe upon redemption of its interests.

102.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the UBS-Fairfield Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3.    *Subsequent Transfers from Fairfield Sentry to Sigma and Subsequently to UBS Europe*

103.     Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Sigma ("Sigma Subsequent Transfers").  A chart setting forth the presently known Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

104.    Thereafter, Sigma transferred at least $1,877,930 to UBS Europe (the "UBS-Sigma Subsequent Transfer," and collectively with the UBS-Fairfield Sentry Subsequent Transfers the "UBS Subsequent Transfers")).  A chart setting forth the presently known UBS-Sigma Subsequent Transfer by date and amount is attached as Exhibit F.

105.    The UBS-Sigma Subsequent Transfer is recoverable from UBS Europe under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

106.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the UBS-Sigma Subsequent

Transfer, and any additional transfers, and (ii) seek recovery of such additional transfers.

    **4.**    ***Subsequent Transfers from Fairfield Sentry to LGT Switzerland***

    107.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to LGT Switzerland (the "LGT-Fairfield Sentry Subsequent Transfers"). Based on the Trustee's investigation to date, the LGT-Fairfield Sentry Subsequent Transfers are at least $1,095,980. A chart setting forth the presently known LGT-Fairfield Sentry Subsequent Transfers by date and amount is attached as Exhibit D.

    108.    The LGT-Fairfield Sentry Subsequent Transfers are recoverable from LGT Switzerland under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

    109.    The LGT-Fairfield Subsequent Transfers represent a redemption of equity interest by LGT Switzerland as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the LGT-Fairfield Subsequent Transfers to LGT Switzerland upon redemption of its interests.

    110.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the LGT-Fairfield Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**COUNT ONE
RECOVERY OF THE UBS
SUBSEQUENT TRANSFERS**

    111.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

    112.    Defendant UBS Europe received the UBS Subsequent Transfers, totaling $9,296,416.

113.    Each of the UBS Subsequent Transfers is recoverable from UBS Europe under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

114.    Each of the UBS Subsequent Transfers was made directly or indirectly to UBS Europe, thus, UBS Europe is an immediate or mediate transferee of the UBS Subsequent Transfers.

115.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against UBS Europe: (a) recovering the UBS Subsequent Transfers, or the value thereof, from UBS Europe for the benefit of the estate of BLMIS; (b) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment; and (c) awarding any other relief as the Court deems appropriate.

## COUNT TWO
## RECOVERY OF THE LGT-FAIRFIELD SENTRY
## SUBSEQUENT TRANSFERS

116.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

117.    Defendant LGT Switzerland received the LGT-Fairfield Sentry Subsequent Transfers, totaling $1,095,980.

118.    Each of the LGT-Fairfield Sentry Subsequent Transfers is recoverable from LGT Switzerland under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

119.    Each of the LGT-Fairfield Sentry Subsequent Transfers was made directly or indirectly to LGT Switzerland.

120.    LGT Switzerland is an immediate or mediate transferee of the LGT-Fairfield Sentry Subsequent Transfers.

121.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LGT

Switzerland: (a) recovering the LGT-Fairfield Sentry Subsequent Transfers, or the value thereof, from LGT Switzerland for the benefit of the estate of BLMIS; (b) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment; and (c) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on the Count in favor of the Trustee and against UBS Europe and LGT Switzerland as follows:

a.  Recovering the Subsequent Transfers, or the value thereof, from UBS Europe and LGT Switzerland for the benefit of the estate;

b.  If UBS Europe or LGT Switzerland challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), Bankruptcy Code §§ 105(a), 544(b), 547(b), 548(a), and 551, and N.Y. Debt. & Cred. Law §§ 273–279, as applicable, and as necessary to recover the Subsequent Transfers pursuant to Bankruptcy Code § 550(a) and (b) and SIPA § 78fff-2(c)(3);

c.  Awarding the Trustee fees and all applicable costs and disbursements of this proceeding;

d.  Awarding the Trustee prejudgment interest from the date on which the subsequent transfers were received by UBS Europe and LGT Switzerland; and

e.  Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: July 13, 2022
     New York, New York

*/s/ David J. Sheehan*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Torello Calvani
Email: tcalvani@bakerlaw.com

**Baker & Hostetler LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717
Dean D. Hunt
Email: dhunt@bakerlaw.com
Farrell A. Hochmuth
Email: fhochmuth@bakerlaw.com
Marie L. Carlisle
Email: mcarlisle@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*