BEFORE THE
HONORABLE CECELIA G. MORRIS, JUDGE OF
THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____

Adv. Pro. No. 12-01565 (CGM)

_____

**IRVING H. PICARD *v.* STANDARD CHARTERED FINANCIAL SERVICES, *et al***

_____

# FINN DECLARATION EXHIBIT E

**PRIVATE DISTRIBUTION AGREEMENT BETWEEN FAIRFIELD GREENWICH LIMITED AND AMERICAN EXPRESS BANK LTD., DATED SEPTEMBER 7, 2006**

Fairfield Greenwich Group

# PRIVATE DISTRIBUTION AGREEMENT

This Agreement executed as of September 7, 2006 between:

1. **AMERICAN EXPRESS BANK LTD.**, acting through its selected offices, subsidiaries and affiliates outside the USA (the "Distributor"), having its registered office at American Express Tower, World Financial Center, New York, NY 10285-2300, USA; and

2. FAIRFIELD GREENWICH LIMITED ("Fairfield") which acts as the placement agent to each of the offshore hedge funds which are listed on Exhibit A hereto, as the same may be amended from time to time (each, a "Fund" and, collectively, the "Funds") with its principal office located at 919 Third Avenue, 39th Floor, New York, NY 10022, USA.

WHEREAS:

(a) Each Fund is an investment vehicle organized outside of the United States and is authorized to issue shares (the "Shares") as described in its confidential offering memorandum, as the same may be amended or supplemented from time to time (each a "Confidential Offering Memorandum").

(b) Fairfield has agreed to appoint the Distributor as a non-exclusive distributor for each Fund in one or more jurisdictions and to enter into an agreement whereby such Distributor agrees to participate in the distribution of the Shares of such Fund to its clients on a private placement basis;

(c) The Distributor undertakes to assume certain responsibilities in relation to the private offering and private sale of each Shares to selected investors ("Investors") and to provide nominee services with respect to those Investors;

(d) Unless indicated otherwise, terms used in the Confidential Offering Memorandum have the same meaning when used in this Agreement;

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

## 1. Appointment

Fairfield appoints the Distributor as a non-exclusive distributor of each Fund's Shares.

The Distributor accepts this appointment on the terms and conditions set forth herein, applicable laws and regulations and in the Confidential Offering Memorandum of each Fund.

## 2. Private Offer and Sale of the Shares

The Distributor will offer and sell the Shares of all the Funds solely on a private basis as follows:

1

a) The Distributor will not make any public offering of the Shares of any of the Funds.

b) The Distributor will not publicly advertise the Funds or their Shares.

c) The Distributor will offer the Shares of any Fund only to those of its clients for which such an investment is suitable.

d) The Distributor will fully comply with all relevant laws, regulations, and practices so as to guarantee that no public offering or distribution of the Shares of any Funds occurs.

e) The Distributor agrees that it will solicit subscriptions only of Investors who have received a copy of the Confidential Offering Memorandum for the Fund in which they intend to invest.

f) The Distributor will fully comply with all provisions contained in this Agreement, the Confidential Offering Memorandum of each Fund and any other documents relating to a Fund as the Fund may provide the Distributor from time to time.

g) The Distributor represents that it will not offer the Shares of any Fund in any jurisdiction in respect of which it is not authorized to offer the Shares.

h) The Distributor represents that it will not offer or sell Shares of any Fund to U.S. Persons and that it will not solicit its customers to purchase Shares of any Fund unless the Distributor has a reasonable belief that such persons are, at the time the solicitation is made, located outside of the United States.

i) The Distributor acknowledges that the Shares of all the Funds are not registered under the United States Securities Act of 1933 of the United States, as amended (the "1933 Act") and that the Funds are not registered as an investment company under the Investment Company Act of 1940, as amended, and the Distributor represents and warrants that it shall not engage in any act or activity that would require the Shares of any Fund or any of the Funds to be so registered.

j) Neither the Distributor nor any of its employees, agents or persons acting on its or their behalf will offer to sell, offer for sale or sell any Shares of any Fund by means of any form of general solicitation or general advertising in the United States or will engage in any directed selling efforts, as defined in Regulation S under the 1933 Act, with respect to the Shares of any Fund.

## 3. Sale of Shares

a) An Investor is deemed to have been introduced to Fairfield if the Distributor notifies Fairfield in writing and Fairfield does not object to the Distributor soliciting such Investor within five working days of delivery to Fairfield of such notice.

b) Orders submitted by the Distributor on behalf of Investors shall be accepted by the Fund only at the Net Asset Value per Share (rounded upwards to the nearest cent) less applicable fees, if any, determined as described in its Confidential Offering Memorandum. All orders are subject to the acceptance of such Fund and such Fund reserves the right in its sole discretion to reject any order. Purchases of Shares of each Fund will be settled only if the relevant subscription documents have been received by its Administrator and payment in full has been wired to and received by its Custodian within the relevant time period set forth in its Confidential Offering Memorandum for acceptance of the order for purchase. Promptly following the finalization of the calculation of the

|   |   |
|---|---|
|   | Net Asset Value per Share of each Fund, its Administrator will send a confirmation to the Distributor. |
| c) | The confirmation will show the number of Shares purchased, the price per Share, the gross amount of each order and the net amount invested. |
| d) | The Distributor agrees to maintain records of its orders to purchase or redeem the Shares of each Fund and to furnish the Fund with copies of such records on request. |
| e) | The Distributor undertakes to forward immediately upon receipt (and in any case not later than the next working day after receipt) all subscription and redemption requests, and, as soon as received, the means of payment relating to the subscriptions, to the Administrator of each Fund on behalf of the Fund. The processing of Investor purchases and redemptions shall be governed by this Agreement and the Confidential Offering Memorandum of each Fund. |
| f) | Fairfield assumes no obligation or responsibility with respect to the qualification of Shares of any Fund or the right to solicit investors in any Fund under the laws of any or jurisdiction. |

**4. Nominee Services**

|   |   |
|---|---|
| a) | The Distributor shall offer Nominee Services to all Investors to which it sells Shares. The Administrator of each Fund shall register all Shares of such Fund sold by the Distributor in the share register of such Fund in the name of the Distributor. Following such registration, the Administrator of each Fund shall confirm such registration to the Distributor and shall provide a copy of such confirmation to the Distributor. With the exception of Investors who have given a discretionary mandate to the Distributor to invest on their behalf, the Distributor undertakes to pass to the Investor or its designated representative all communications, notices, reports and other materials which are issued by each Fund and shall inform the Investor, as required by applicable law, that the Investor has a direct claim to the Shares of such Fund and may, at any time and upon giving reasonable notice, elect to terminate the Nominee arrangement and, subject to receipt by the Administrator of such Fund of satisfactory documentation identifying such Investor, have his shareholding recorded directly on the transfer books of such Fund. For the avoidance of doubt, the Distributor acknowledges that Investors will have a right at all times to exercise title to the Shares held for their benefit through the Nominee. |
| b) | The Distributor will create relevant sub-accounting records and confirm to the Investor that the Shares are held to the Investor's order by the Distributor. |
| c) | Investors may instruct the Distributor with regard to the purchase of additional Shares and with regard to the redemption of Shares and Distributor shall pass the relevant information on to the Administrator of the relevant Fund. |
| d) | The Distributor will forward all notices of shareholders' meetings and annual reports of each Fund and any other reports or notices which it receives to the Investors in such Fund. |

3

## 5. Compensation

The Distributor will be compensated for performance of its responsibilities as provided in Exhibit A hereto.

## 6. Duration and Termination Clauses

a) This Agreement shall take force on the date of execution.

b) This Agreement may be terminated by Fairfield or the Distributor upon 30 days' written notice to the other party.

c) This Agreement shall be terminated with immediate effect if:

   i. any party commits any material breach of this Agreement or commits persistent breaches of this Agreement, and such breach is not remedied within thirty (30) days from the receipt of written notice from the other party requiring it to remedy the same;

   ii. either party becomes prohibited by law or otherwise incapable of performing its obligations or duties under this Agreement;

   iii. any party (i) becomes unable to pay its debts as they fall due or is otherwise adjudged bankrupt or insolvent or enters into any composition or arrangement with or for the benefit of its creditors; (ii) has an examiner, administrator, trustee, official assignee or similar officer appointed to it in respect of its affairs or assets; (iii) has a receiver appointed over all or with respect to any substantial part of its undertaking, assets or revenues; (iv) is the subject of an effective resolution for its winding up except in relation to a voluntary winding up for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the other party; or (v) its the subject of a resolution or a court order for its winding up; or

   iv. any party is fined, sanctioned, or has any license relevant to the performance of its responsibilities under this Agreement suspended or revoked.

Nothing in this Agreement will be construed to limit or waive each Fund's right to require an investor to redeem some or all of its investment in a Fund pursuant to the terms of such Fund's governing documents.

## 7. Sale Documentation, Promotional Materials, Staff Training, and Authorization

a) Consistent with the Distributor's duty to effect only private offers and sales of Shares of any Fund in any jurisdiction, the Distributor will only use such materials as are in conformity with any rule or regulation in force in the relevant jurisdiction and as are furnished by such Fund or which have been approved in advance in writing by such Fund. Each Fund shall be entitled to at least fifteen (15) days in which to perform a prior review of any proposed materials. Further, such materials must be approved, as may be legally required, prior to the use thereof, by the authorities in charge of control and surveillance competent in the relevant jurisdiction. Expenses and responsibilities for translations and production of sale documentation and marketing materials shall be the responsibility of the Distributor.

4

b) To support the sale of the Shares of each Fund, Fairfield will, at least once each calendar year, make available, with respect to each Fund, product introduction, product features and suitability, and product sales training for the Distributor's sales staff. In addition, the Distributor will ensure that such staff are and continue to be authorized and licensed by the appropriate regulatory authorities in the relevant jurisdiction(s) to perform the Distributor's duties hereunder.

## 8. Representations and Undertakings by the Distributor

a) The Distributor represents that it and members of its staff are now, and will remain for the term of this Agreement, duly authorized by all necessary action and licensed to perform the obligations of the Distributor under this Agreement and that, upon execution and delivery hereof, this Agreement will be a valid binding and enforceable obligation of the Distributor.

b) The Distributor represents that it will not do anything that would necessitate the registration or qualification of the Fund or its Shares in any jurisdiction.

c) The Distributor represents that the private placement of the Shares of each Fund is permissible under the local laws and regulations of any jurisdiction in which it will offer such Shares for sale.

d) The Distributor represents that it will offer the Shares of each Fund for sale, and has solicited and will submit offers to buy the Shares, only in compliance with the procedures described in the Confidential Offering Memorandum of such Fund and as may be established by the Fund and its Custodian, and in accordance with applicable law (including any applicable anti-money laundering regulations).

e) The Distributor covenants that, when engaged in the distribution of Shares, it will adopt, implement, and consistently follow compliance-effective and prudent sales practices, and will inquire into, and record and maintain information about, the particulars of each Investor's financial situation and source of funds, such that the Distributor accomplishes effective compliance with the "Know Your Customer" and investment suitability standards of the international investment and share-distribution community.

f) The Distributor covenants that it will train its staff to ensure that prudent and effective measures are continuously implemented to achieve compliance aimed at preventing money laundering and achieving "Know Your Customer" objectives.

g) The Distributor shall make such inquiries and secure such information as will permit it to represent regarding every Investor:

- if a corporate entity, the ultimate beneficial owner(s) is/are properly identified;

- the Investor is eligible to participate in "new issues" as defined under applicable National Association of Securities Dealers, Inc. rules;

- the Investor is not a U.S. Person, as defined in the Confidential Offering Memorandum of each Fund;

- the Investor is not a "benefit plant investor" within the meaning of U.S. Department of Labor Regulation Section 2510.3—101(f);

5

- the Investor has not reproduced, duplicated or delivered the Confidential Offering Memorandum of the relevant Fund to any other person, except to the Investors' professional advisors or as instructed by such Fund;

- the Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the Investor's investment in the Shares of the relevant Fund and is able to bear such risks, and has obtained, in the Investor's judgment, sufficient information from such Fund or its authorized representatives to evaluate the merits and risks of such investment. The Investor has evaluated the risks of investing in the Shares of such Fund and has determined that the Shares are a suitable investment for the Investor;

- the Investor can afford a complete loss of the investment in the Shares of the relevant Fund and can afford to hold the investment in such Shares for an indefinite period of time;

- the Investor is acquiring the Shares of the relevant Fund for its own account, for investment purposes only and not with a view to distribute or resell such Shares in whole or in part;

- the Investor understands the Incentive Fee and its risks, as described more fully in the Confidential Offering Memorandum of the relevant Fund;

- the Investor acknowledges, understands and agrees that the Investment Manager has authority to allocate transaction costs to obtain research and investment management related services, as set forth in the Confidential Offering Memorandum of the relevant Fund;

- the Investor has consulted with his own advisors and is fully informed as to the legal and tax requirements within the Investor's own country (or countries) regarding a purchase of the Shares of the relevant Fund;

- if the Confidential Offering Memorandum of the relevant Fund is issued, circulated or distributed to the Investor in the United Kingdom, the Investor has acknowledged that such Confidential Offering Memorandum has not been approved for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom by an authorised person (as defined there under). The Investor represents and warrants that it a person of the kind to whom such Fund is permitted to communicate financial promotions pursuant to the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, as amended, or otherwise pursuant to an exemption; and

- if the Investor is in Hong Kong, it has acknowledged that it is acquiring the Shares of the relevant Fund for investment purposes only and not with a view to distribute or resell such Shares and it will not offer for sale, resell or otherwise distribute or agree to distribute such Shares within six months from the purchase of such Shares by the Investor. The Investor certifies that it received a copy of the applicable Confidential Offering Memorandum of such Fund or is a company controlled by the recipient of a copy of the applicable Confidential Offering Memorandum of such Fund.

h) The Distributor shall secure the following undertakings from every Investor:

- The Investor will notify the Distributor if such Investor becomes a U.S. Person.

6

- The Investor will not knowingly transfer or deliver Shares or any interest therein to a U.S. Person.

- The Investor will not make any transfer of Shares in the United States, its territories, or its possessions.

- The Investor will notify the Distributor if the Investor ceases to be eligible to invest in "new issues" as defined under applicable National Association of Securities Dealers, Inc rules.

i) The Distributor covenants that it will adhere and comply strictly with the provisions of this Agreement and the Confidential Offering Memorandum of each Fund as well as any applicable laws and/or regulations. In the event that the Distributor fails to meet its obligations hereunder, Fairfield and each affected Fund shall be entitled to take all actions it deems appropriate, including retaining the compensation for the Distributor and causing such to be forfeited.

j) The Distributor covenants that it will do nothing which causes any Fund as an entity itself to be taxable in any jurisdiction.

k) The Distributor covenants that it will take such steps as are necessary to enable it to make the representations listed in item 8(g) above with respect to each Investor, which steps will include having each potential Investor complete a subscription agreement for the relevant Fund.

l) The Distributor will indemnify and hold harmless each Fund and its directors, officers, agents, affiliates and employees from and against any and all losses, claims, damages, expenses or liabilities to which they may become subject as a result of the failure of the Distributor to offer and sell Shares of such Fund in accordance with the terms and conditions set forth in its Confidential Offering Memorandum or to comply with the laws of any jurisdiction in connection with the solicitation of subscriptions for Shares of such Fund by the Distributor or as a result of any material breach by the Distributor of any provision, representation or warranty in this Agreement.

m) The Distributor shall notify any Fund immediately upon becoming aware of any litigation, investigation or proceeding, commenced or threatened, or any claim against the Distributor. The Distributor shall not, without the prior written consent of such Fund, effect any settlement of any such litigation, investigation, proceeding or claim in respect of which an indemnity may be sought hereunder from such Fund unless such settlement includes an unconditional release of such Fund from all liability in respect of such litigation, investigation, proceeding or claim.

n) Each Fund will indemnify and hold harmless the Distributor and its directors, officers, agents, affiliates and employees from and against any and all losses, claims, damages, expenses or liabilities to which they may become subject as a direct result arising out of (i) any omission of a material fact that should have been disclosed in the Confidential Offering Memorandum of such Fund or any other materials prepared by such Fund; (ii) any untrue statement of a material fact in the Confidential Offering Memorandum of such Fund or any advertising materials prepared by such Fund for distribution to Investors, or (iii) material non-compliance with applicable laws in relation to any Confidential Offering Memorandum of such Fund, advertising materials or other documented materials issued by such Fund.

## 9. Representations Regarding the Prevention of Money Laundering

The Distributor will, using its best efforts to prevent the laundering of money:

a) evaluate the reasonableness of the amount of each Investor's subscription in light of knowledge about such Investor's personal assets and business associations and dealings;

b) check the validity, trustworthiness, and integrity of all Investors' subscription moneys, particularly with regard to the source of such moneys, in order to make a reasonable effort to defeat attempts to disguise, cleanse, and recharacterize cash proceeds derived from improper, illegal, and criminal activities, including narcotics dealings, bribes, tax fraud and evasion, and other activities;

c) assist each Fund and its Registrar in monitoring and assessing the normality and abnormality (in respect of any illegal activity) of any increases or decreases by further subscriptions or by redemptions, as well as any connected or shortly subsequent transfers of Shares to third parties;

d) verify and document the identity and address of any and all of the Distributor's Investors investing in Shares of each Fund by applying customer identification requirements. In the case of corporate entities, trusts, or foundations, obtain a certified copy of their constitutional documents and proper evidence of the complete identity of each of their ultimate beneficial owners, as well as the beneficiaries of any trust or foundation;

e) maintain information relating to Investors, including, but not limited to, the information referred to in (a) through (d) above in addition to any other information required by applicable laws and regulations;

f) keep proof of the information in (a) through (d) of this subparagraph and related information and documents available for inspection on demand by each Fund or its Registrar, and provide such documents on request as such Fund or its Registrar deems necessary or advisable to comply with the applicable law;

g) provide upon request such information to each Fund and its Registrar, or any of such Fund's agents as is required by any regulatory, governmental, or judicial authority to maintain such customer information; and

h) generally assist each Fund and its Registrar and effectively discharge their respective obligations in respect of their professional duties to prevent the laundering of monies related to drug trafficking or other criminal activities.

The Distributor represents and warrants that its anti-money laundering procedures and policies comply with all applicable laws of its jurisdiction of registration, the Fund's and Fairfield's jurisdiction of registration and the obligations and guidelines developed by the Financial Action Task Force.

The Distributor hereby acknowledges and agrees that each Fund, or its duly authorised agent has the absolute right in its sole discretion to reject any purchase of Shares of such Fund by or on behalf of any Intermediary Customer where such Fund or its duly authorised agent (i) reasonably believes it is legally obligated to do so or (ii) has requested but not received from the Distributor information that it reasonably believes necessary to fulfill any anti-money laundering or anti-terrorist related obligations applicable to it.

## 10. Representations Regarding the Distributor

The Distributor agrees that it is prohibited from making any representations, expressed or implied, about each Fund that are not specifically authorized under the terms of this Agreement, disclosed in the

8

approved marketing materials of such Fund, or specifically authorized by a representative of the such Fund in advance in writing, which authorization may be withheld at the sole discretion of such Fund.

In soliciting Investors for the Funds and otherwise performing the duties hereunder, the Distributor shall be regarded as an independent agent and marketing representative. The Distributor shall not have any right or authority to create any obligations of any kind on behalf of either the Funds or Fairfield and shall make no representation to any third party to the contrary.

### 11. Use of Names

Each Fund agrees that its use of the "American Express" name and any related American Express logos (a) is subject to the prior written approval of the Distributor, (b) must be consistent with the terms of this Agreement and the services provided hereunder (c) shall be immediately discontinued if used in a manner objected to by the Distributor and (d) will not bring disrepute to, or in any manner damage the goodwill symbolized by them.

### 12. Confidentiality/Data Protection

a) The parties agree to keep confidential all information obtained from or in respect each other under this Agreement and will not divulge such information to any person without the other party's prior written consent; provided that this section 12 does not prohibit the provision of information (i) where so required by law or regulatory body or (ii) to any third party if and to the extent that such information is publicly available at the time of disclosure other than as a breach of this Agreement or any other agreement of confidentiality.

b) Any data provided by the Distributor to any Fund in connection with this Agreement shall remain at all times the sole property of the Distributor. The Funds shall not make use of or disclose any data provided to them in connection with this Agreement in a manner which is not consistent with this Agreement or as otherwise instructed by the Distributor. Each Fund agrees to ensure that the terms and conditions of this Agreement are adhered to by all of its employees.

c) The parties hereto agree to comply with any applicable data protection and privacy legislation, including, without limitation, any legislation of the United States and the European Union.

### 13. Indemnification

a) In addition to the indemnity provided for in Section 8(l), the Distributor will at all times indemnify and hold harmless each Fund against any and all loss, liability, claim, damage or expense (including reasonable attorney's fees) whatsoever suffered or incurred by such Fund (i) due to the gross negligence, fraud, bad faith or willful misconduct of the Distributor or any of its employees, agents, affiliates or other entities acting on its behalf or (ii) due to the failure of the Distributor to pay the purchase price for a subscription when payment is due. This indemnity shall remain in full force and effect regardless of any termination of this Agreement.

b) Each Fund (severally and not jointly) will at all times indemnify and hold harmless the Distributor against any and all loss, liability, claim, damage or expense (including reasonable attorney's fees) whatsoever suffered or incurred by Distributor due to the gross negligence, fraud, bad faith or willful misconduct of such Fund or any of its employees, agents, affiliates or other

9

entities acting on its behalf. This indemnity shall remain in full force and effect regardless of any termination of this Agreement.

## 14. Limitation of Liability

In no event shall either party be liable to the other, for any indirect, special, punitive, incidental, exemplary or consequential damages (including lost profits) arising out of or in connection with this Agreement.

## 15. Assignment of the Agreement

This Agreement shall be binding and shall have effect both for the Funds and for the Distributor and their respective successors, but neither party shall assign this Agreement without the prior written consent of the other party.

## 16. Notices

Any notice hereunder shall be transmitted to the other party by registered mail or by telefax or facsimile transmission. Any such notice shall be deemed to be received (a) if given by registered post, seven (7) days after the same has been posted; and (b) if given by telefax or facsimile transmission, at the same time as it is dispatched, provided, however, that the sending party has received electronic confirmation that such communication was properly transmitted and received by the receiving parties.

## 17. Entire Agreement/ Waiver

This Agreement sets out the entire understanding between the parties hereto and there are no promises, terms, conditions or obligations, oral or written, express or implied, other than those set out in this Agreement. No clause of this Agreement may be modified, annulled or suspended other than by means of a document executed by the parties.

## 18. Applicable Law

This Agreement shall be subject to the laws of the state of New York, United States of America without regard to the conflict of law principles thereof.

## 19. Jurisdiction

The parties hereto submit to the non-exclusive jurisdiction of the State and federal courts sitting in the Southern District of the State of New York, United States of America.

## 20. Language

This Agreement is executed in English. Notwithstanding any differences in translations of this document, the English version shall prevail.

## 21. Counterparts

This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original, but such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement in as many counterparts as there are parties hereto, as of the date first written above.

**AMERICAN EXPRESS BANK LTD.**

By: _____
Name: Sandra Takcic
Title: Senior Director

**FAIRFIELD GREENWICH LIMITED**

By: _____
Name: Daniel E. Lipton
Title: Partner

11

## **EXHIBIT A**

| Name of Fund | Jurisdiction of founding | Mgmt Fee | Perf Fee | Compensation of Management / Performance Fee |
|---|---|---|---|---|
| Fairfield Sentry Limited | British Virgin Islands | 1% | 20% | 50 basis points of the management fee per annum in connection with existing, new and transferred investments from AMERICAN EXPRESS' private banking clients. |
| Fairfield Sigma Limited | British Virgin Islands | 1% | 20% | 50 basis points of the management fee per annum in connection with subscriptions from AMERICAN EXPRESS' private banking clients. |
| Fairfield Manhasset Offshore Fund Ltd. | Cayman Islands | 2% | 20% | 50 basis points of the management fee per annum in connection with subscriptions from AMERICAN EXPRESS' private banking clients. |
| Fairfield Trafalgar Fund, Ltd. | Cayman Islands | 1.5% | 20% | 25 basis points of the management fee per annum in connection with subscriptions from AMERICAN EXPRESS' private banking clients. |
| Fairfield Investment Fund Ltd. | British Virgin Islands | 1% | 0% | 1% management fee per annum (100 basis points) in connection with subscriptions from AMERICAN EXPRESS' private banking clients. |

In relation to subscriptions by clients introduced by the Distributor directly or indirectly, the fees shall be calculated as described above. Payment shall be effected quarterly on the basis of the monthly holdings that the Distributor holds provided, however, that no fees shall be payable for any quarter unless the aggregated value of the accounts introduced by Distributor to all of the Funds listed in this Exhibit A, equals or exceeds $2 million.

The fees will be payable to the Distributor by Fairfield within 30 days from the time that Fairfield get paid.