DAVIS POLK & WARDWELL LLP
Elliot Moskowitz
Andrew Ditchfield
Andrew S. Gehring
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
elliot.moskowitz@davispolk.com
andrew.ditchfield@davispolk.com
andrew.gehring@davispolk.com

*Attorneys for the Eurizon Defendants*

**Hearing Date: September 14, 2022**
**Opposition Date: June 14, 2022**
**Reply Date: July 14, 2022**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> INTESA SANPAOLO SPA (AS SUCCESSOR IN INTEREST TO BANCA INTESA SPA), EURIZON CAPITAL SGR SPA (AS | Adv. Pro. No. 12-01680 (CGM) <br><br> **THE EURIZON DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT** |

SUCCESSOR IN INTEREST TO EURIZON
INVESTIMENTI SGR SPA, F/K/A NEXTRA
INVESTMENT MANAGEMENT SGR SPA,
AND EURIZON ALTERNATIVE
INVESTMENTS SGR SPA, FKA NEXTRA
ALTERNATIVE INVESTMENTS SGR SPA),
EURIZON LOW VOLATILITY F/K/A
NEXTRA LOW VOLATILITY, EURIZON
LOW VOLATILITY II F/K/A NEXTRA LOW
VOLATILITY II, EURIZON LOW
VOLATILITY PB F/K/A NEXTRA LOW
VOLATILITY PB, EURIZON MEDIUM
VOLATILITY F/K/A NEXTRA MEDIUM
VOLATILITY, EURIZON MEDIUM
VOLATILITY II F/K/A NEXTRA MEDIUM
VOLATILITY II, EURIZON TOTAL RETURN
F/K/A NEXTRA TOTAL RETURN,

Defendants.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

    A.    Introduction........................................................................................3

    B.    The Trustee's Fairfield Action...........................................................5

    C.    The Fairfield Liquidators' Actions Against Redeeming Shareholders........6

        1.    The Alleged BLMIS-to-Fairfield Sentry Initial Transfers—
and the Scant Allegations as to Their Alleged Avoidability............7

        2.    The Alleged Subsequent Transfers to the Eurizon
Defendants—and the Scant Allegations That They Were of
Customer Property ...........................................................................8

    D.    The Trustee Has Not Alleged That Any Eurizon Defendant Had
Knowledge of the Madoff/BLMIS Fraud ....................................................9

    E.    The Trustee's Other Fairfield Subsequent Transfer Actions—and the
$2 Billion in Excess Alleged Subsequent Transfers ..................................10

ARGUMENT ..........................................................................................................10

    I.    THE TRUSTEE'S CLAIM IS BARRED BY SECTION 546(e) .......................10

    A.    The Alleged Initial Transfers Were Made by and to Entities Covered
by Section 546(e) ......................................................................................13

        1.    The Alleged Initial Transfers Were Made by a Stockbroker........13

        2.    The Alleged Initial Transfers Were Made to a Financial
Institution .....................................................................................14

    B.    The Alleged Initial Transfers Are Covered by Section 546(e) .................16

        1.    The Fairfield Sentry Initial Transfers Were Made in
Connection with the BLMIS-Fairfield Sentry Account
Agreements, Which Are "Securities Contracts"...........................16

        2.    The Fairfield Sentry Initial Transfers Were "Settlement
Payments" .....................................................................................17

        3.    The Fairfield Sentry Initial Transfers Were Made in
Connection with the Fairfield Sentry Articles of
Association, Which Is a Separate "Securities Contract" ..............18

    C.    The Trustee Has Not Alleged That Any of the Eurizon Defendants
Had Actual Knowledge of the Madoff/BLMIS Fraud ..............................21

    D.    The Section 548(a)(1)(A) Exception Cannot Save the Trustee's
Claim..........................................................................................................23

i

II.    THE TRUSTEE HAS FAILED TO PLEAD THE AVOIDABILITY OF
THE ALLEGED INITIAL TRANSFERS, AND HIS ATTEMPTED
WHOLESALE INCORPORATION OF THE FAIRFIELD AMENDED
COMPLAINT IS IMPROPER.............................................................................25

III.   THE TRUSTEE'S CLAIMS MUST BE DISMISSED FOR FAILURE TO
ADEQUATELY PLEAD THAT THE EURIZON DEFENDANTS ARE
SUBSEQUENT TRANSFEREES OF CUSTOMER PROPERTY...................28

    A.    The Trustee Has Failed to Carry His Pleading Burden.............................28

    B.    It Is Implausible That Alleged Initial Transfers to Fairfield Sentry of
$3 Billion Resulted in Alleged Subsequent Transfers of $5 Billion..........29

    C.    It Is Implausible That Funds Received by the Eurizon Defendants
Were Subsequent Transfers of Initial Transfers Made Fourteen or
More Months Earlier, or When No Money from BLMIS Remained
at Fairfield Sentry When It Made the Transfers ........................................30

CONCLUSION.............................................................................................................35

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*AP Servs., LLP v. Silva*,
  483 B.R. 63 (S.D.N.Y. 2012) .................................................................. 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................... 25, 34

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... 28, 29

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir. 1985) ................................................................ 18

*In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Recoverable Trust)*,
  773 F.3d 411 (2d Cir. 2014) ........................................................... *passim*

*In re Bernard L. Madoff Investment Sec. LLC*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) .............................................. 31, 32

*In re Boston Generating LLC (Holliday v. K Rd. Power Mgmt., LLC)*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020) ..................................................... 20

*In re Caremerica, Inc.*,
  409 B.R. 737 (Bankr. E.D.N.C. 2009) ..................................................... 28

*In re CIL Ltd.*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other grounds*,
  2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) .............................. 11

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) .................................................................. 4

*David v. Bifani*,
  No. 07-cv-00122-MEH-BNB, 2007 WL 1216518 (D. Colo. Apr. 24, 2007) ............ 25

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011) ................................................................ 20

*In re Fairfield Sentry Ltd.*,
  596 B.R. 275 (Bankr. S.D.N.Y. 2018). ..................................................... 19

*In re Fairfield Sentry Ltd.*,
  2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018).................................... 18

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020), *reconsideration denied*,
2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021)..........................................12, 14, 15

*Hinton v. Trans Union, LLC*,
654 F. Supp. 2d 440 (E.D. Va. 2009) ....................................................... 27

*Kirschner v. FitzSimons*,
2022 WL 516021 (U.S. Feb. 22, 2022) ...................................................... 12

*Lowden v. William M. Mercer, Inc.*,
903 F. Supp. 212 (D. Mass. 1995) ............................................................ 26

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018) ......................................................................... 11, 21

*Muhammad v. Bethel-Muhammad*,
2012 WL 1854315 (S.D. Ala. May 21, 2012) ........................................... 26

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021) ............................................. 4

*NCUA Bd. v. Morgan Stanley & Co.*,
2014 WL 1673351 (S.D.N.Y. Apr. 28, 2014) ........................................... 25

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .............................................................................. 16

*In re Nine W. LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) ...................................................... 14

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010) ........................................... 26

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
322 F.3d 147 (2d Cir. 2003) .................................................................. 18

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.*
*(In re Verestar, Inc.)*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...................................................... 24

*Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*,
12 F.4th 171 (2d Cir. 2021) ................................................................... 24

*Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................... 32

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ................................................. 25, 28

*Salahuddin v. Cuomo,*
  861 F.2d 40 (2d Cir. 1988) ........................................................................ 26

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
  403 F.3d 43 (2d Cir. 2005) ........................................................................ 24

*SIPC v. Bernard L. Madoff Inv. Secs. LLC (Picard v. Fairfield Inv. Fund Ltd.),*
  2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ........................................... *passim*

*SIPC v. Bernard L. Madoff Inv. Secs. LLC,*
  2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ................................................... *passim*

*SIPC v. Bernard L. Madoff Inv. Secs. LLC,*
  476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC
  (Picard v. Ida Fishman Recoverable Trust)*, 773 F.3d 411 (2d Cir. 2014) ................ 13

*In re SunEdison, Inc.,*
  620 B.R. 505 (Bankr. S.D.N.Y. 2020) ......................................................... 12

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ............................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ................................................................................. 4

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  946 F.3d 66 (2d Cir. 2019) ............................................................... 12, 14, 19

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  10 F.4th 147 (2d Cir. 2021) ................................................................. 12, 19

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*,
  10 F.4th 147 (2d Cir. 2021), *cert. denied sub nom. Kirschner v. FitzSimons*,
  No. 21-1006, 2022 WL 516021 (U.S. Feb. 22, 2022) ........................................ 12

*U. S. v. Int'l Longshoremen's Ass'n,*
  518 F. Supp. 2d 422 (E.D.N.Y. 2007) ..................................................... 26, 27

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,*
  127 F. Supp. 3d 156 (S.D.N.Y. 2015) .......................................................... 4

## Statutes & Rules

11 U.S.C. § 101(22)(A) ................................................................................ 13, 14

11 U.S.C. § 101(53A)(B) ................................................................................. 13

11 U.S.C. § 546(e) ................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ........................................................... 2, 11, 12, 23, 24

11 U.S.C. § 550 ........................................................................................ 1

11 U.S.C. § 550(a) ................................................................................ 10

11 U.S.C. § 550(a)(1) ........................................................................... 11

11 U.S.C. § 550(a)(2) ...................................................................... 11, 25

11 U.S.C. § 551 .................................................................................... 11

11 U.S.C. § 741(7) ............................................................................... 19

11 U.S.C. § 741(7)(A) .......................................................................... 16

11 U.S.C. § 741(7)(A)(i) ...................................................................... 19

11 U.S.C. § 741(7)(A)(vii) ................................................................... 19

Fed. R. Bankr. P. 7012(b) ...................................................................... 1

Fed. R. Civ. P. 8(a)(2) ..................................................................... 2, 26

Fed. R. Civ. P. 9(b) ............................................................................. 24

Fed. R. Civ. P. 10(c) ..................................................................... 25, 26

Fed. R. Civ. P. 12(b)(6) ............................................................... 1, 4, 12

<u>OTHER AUTHORITIES</u>

Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx ?firmReferenceNumber=C27278 (last visited Apr. 14, 2022) ..........................................14

De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTDG&relationNumber=B0275 (last visited Apr. 14, 2022) ....14

The Eurizon Defendants[1] respectfully submit this memorandum of law and the

accompanying declaration of Andrew Ditchfield (the "Ditchfield Declaration") in support

of their motion to dismiss the Complaint of plaintiff Irving H. Picard (the "Trustee"),

Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Rule

7012(b) of the Federal Rules of Bankruptcy Procedure.

## PRELIMINARY STATEMENT

The Trustee has asserted a single claim under Section 550 of the Bankruptcy

Code (the "Code") to recover from the Eurizon Defendants, as alleged subsequent

transferees, approximately $11.65 million in purported BLMIS customer property.  The

Trustee's claims in this and approximately 80 other adversary proceedings (together, the

"Fairfield Subsequent Transfer Actions") are all predicated on approximately $3 billion

in allegedly avoidable initial transfers from BLMIS to Fairfield Sentry Limited

("Fairfield Sentry").  In the Trustee's pursuit of these claims, he has asserted a right to

"recover" every dollar ever received by anyone from any party with any connection to the

Ponzi scheme run by Madoff through BLMIS.

---

[1] The Complaint (Ditchfield Decl. Ex. 1), ECF No. 1, was filed on May 31, 2012.  It was amended by stipulation and order entered on March 29, 2022 (Ditchfield Decl. Ex. 2), ECF No. 93, to: (i) dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909); and (ii) dismiss various defendants from the proceeding.  Accordingly, the only remaining defendants are Eurizon Capital SGR SpA ("Eurizon Capital"), Eurizon Low Volatility ("Low Volatility"), and Eurizon Medium Volatility ("Medium Volatility") (the "Eurizon Funds") (together with Eurizon Capital, the "Eurizon Defendants").  The Complaint characterizes the Eurizon Funds—the entities that are alleged to have received the subsequent transfers at issue in this action—as "fondo commune investimento," Compl. ¶¶ 25, 28, which is not a legal entity under Italian law. The assets of these funds were managed and promoted by the asset manager, Eurizon Capital.  Moreover, on August 1, 2013, the assets of Medium Volatility were merged into Low Volatility, which is the only fund that exists today and is managed by and acts through Eurizon Capital.  Unless otherwise specified, all "ECF No. __" citations refer to Adv. Pro. No. 12-01680.

The Complaint should be dismissed in its entirety for any of three separate reasons. *First*, the securities safe harbor of Section 546(e) precludes the Trustee from avoiding the alleged initial transfers, thereby affording a complete defense to the Trustee's attempt to recover from the Eurizon Defendants. The Trustee's own Complaint establishes that the alleged initial transfers qualify for this safe harbor because: (i) they were made "in connection with a securities contract" and constituted "settlement payments" within the meaning of Section 546(e), either of which would render them qualified transactions under Section 546(e); and (ii) they were made by and to qualifying entities, including a stockbroker and a financial institution, either of which would suffice under Section 546(e). Further, the Trustee has not alleged that any of the Eurizon Defendants had actual knowledge of the fraud committed by Madoff, rendering irrelevant decisions disqualifying an alleged subsequent transferee from invoking Section 546(e) on the basis of its alleged actual knowledge. Nor has he pleaded that the alleged initial transfers were made with the intent required by Section 548(a)(1)(A) of the Code—which would at most permit him to claw back transfers within that provision's two-year lookback period, but none of the at-issue transfers are within that time frame.

*Second*, the Trustee has failed to plead the avoidability of the alleged initial transfers. The Complaint lacks any factual allegation that, if proven, would establish that essential first element of his cause of action. The Trustee has tried to plug this gap by incorporating into the Complaint his entire 217-page, 798-paragraph (and now superseded) pleading in another action, but the Federal Rules of Civil Procedure disallow that gambit. The indiscriminate adoption of another lengthy pleading into a complaint flouts Rule 8(a)(2)'s "short and plain statement" requirement, and case law condemns the

practice.  Such wholesale incorporation of a pleading that is largely immaterial to this action deprives the Eurizon Defendants of fair notice of the particular allegations against them and imposes on both them and the Court the unfair burden of dealing with an unnecessarily lengthy, extraneous pleading.

*Third*, the Trustee has not plausibly alleged that the Eurizon Defendants are subsequent transferees of BLMIS customer property.  Through pleadings filed in this Court, the Trustee has sought to recover approximately $5 billion in subsequent transfers originating from Fairfield Sentry, even though the supposed underlying initial transfers to Fairfield Sentry total only $3 billion.  That is not merely implausible; it is mathematically impossible.  While studiously avoiding the obvious alternative explanation—that subscription payments received by Fairfield Sentry funded many of its transfers to redeeming shareholders—the Trustee pursues redemption payments made to the Eurizon Defendants as long as 20 months after Fairfield Sentry's most recent receipt of funds from BLMIS, and at times when Fairfield Sentry had already transferred to other recipients all the funds that it had received from BLMIS.  It is not plausible that such transfers to the Eurizon Defendants were of BLMIS customer property.  Nor can the Trustee excuse this fundamental pleading failure by claiming that he lacks the requisite information.  To the contrary, the Trustee has for more than a decade enjoyed full access to all relevant records of Fairfield Sentry, its affiliated funds, and BLMIS.  There is no justification for his pleading failure, and his Complaint should be dismissed.

## BACKGROUND

### A.    Introduction

Fairfield Sentry was an investment fund that sold shares directly to subscribing foreign investors from the 1990s through BLMIS's collapse in December 2008.  *See*

Compl. ¶¶ 2, 6; *see also* Ditchfield Decl. Ex. 3 (First Am. Compl., *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. July 20, 2010) (the "Fairfield Action"), ECF No. 23 (the "Fairfield Amended Complaint") ¶¶ 23, 32–35.[2]  Fairfield Sentry, and its affiliates Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda") (together, the "Fairfield Funds"), were all incorporated in the British Virgin Islands.  Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶¶ 32, 51, 56.

This is one of 81 Fairfield Subsequent Transfer Actions in which the Trustee has sought to recover, as alleged subsequent transfers of BLMIS customer property, payments that defendants received for redeeming their shares in a Fairfield Fund.  *See* Ditchfield Decl. Ex. 4 (Trustee's Twenty-Sixth Interim Report for the Period Apr. 1, 2021 through Sept. 30, 2021, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Oct. 29, 2021), ECF No. 20821) ¶ 229 & Ex. D.  The Trustee's claims in this action are best understood in the context of certain related proceedings—some initiated by the Trustee and others by

---

[2] As this Court has recognized, on a Rule 12(b)(6) motion, "courts must consider," in addition to "the complaint in its entirety" (including exhibits), "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *SIPC v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Fairfield Inv. Fund Ltd.)*, 2021 WL 3477479, at *2 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield Inv. Fund*") (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).  Among the matters subject to judicial notice on this motion are "statements or documents" that "are integral to the complaint," even if not attached to or expressly incorporated by reference in it. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  Considering such material is appropriate because "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint." *Id.* at 48.  Courts also take judicial notice of admissions in the plaintiff's filings in separate actions, *see, e.g., Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2021 WL 3541153, at *4–5 (S.D.N.Y. Aug. 11, 2021); *see also infra* Arg. Pt. I.B.3 n.12, and "documents filed with government entities" and/or "retrieved from official government websites," *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *see also infra* Arg. Pt. I.A.2 n.9.

the Fairfield Funds' British Virgin Islands ("BVI") court-appointed liquidators (the

"Fairfield Liquidators")[3]—that are briefly described below.

### B.    The Trustee's Fairfield Action

On May 18, 2009, the Trustee commenced an action against Fairfield Sentry and

others to avoid and recover more than $3 billion of initial transfers of customer property

that they allegedly had received from BLMIS.  *See* Ditchfield Decl. Ex. 5 (Compl.,

*Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. July 20, 2010)

(the "Fairfield Action"), ECF No. 1 (the "Fairfield Complaint") ¶ 44.  On July 20, 2010,

the Trustee filed the Fairfield Amended Complaint, naming additional defendants,

including several entities and individuals (together, the "FGG Defendants") associated

with the Fairfield Greenwich Group ("FGG"), which had formed, managed, and marketed

the Fairfield Funds.  Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶¶ 20–26.  In the

Fairfield Amended Complaint, the Trustee alleged that BLMIS made approximately $3

billion in initial transfers to Fairfield Sentry during the six-year period before

December 11, 2008 (i.e., the "Filing Date").  *Id.* ¶ 536.

On May 9, 2011, the Trustee and the Fairfield Liquidators entered into a

settlement agreement (the "Fairfield Settlement Agreement").  *See* Ditchfield Decl. Ex. 6

(Fairfield Settlement Agreement).  This Court approved the Fairfield Settlement

Agreement on June 7, 2011, and entered consent judgments (together, the "Consent

Judgments") in favor of the Trustee and against Fairfield Sentry for $3.054 billion,

---

[3] The BVI High Court of Justice entered an order for the liquidation of the Fairfield Funds on July 21, 2009.
Ditchfield Decl. Ex. 6 (Settlement Agreement, Fairfield Action, ECF No. 69-2) ¶ G at 2.

against Fairfield Sigma for $752.3 million, and against Fairfield Lambda for $52.9 million.  *See* Ditchfield Decl. Ex. 7 (Consent Judgments).

In the Fairfield Settlement Agreement, "the Trustee and the Liquidators each agree[d] to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims," which include this action.  Ditchfield Decl. Ex. 6 (Fairfield Settlement Agreement) ¶ 14.  The Trustee and the Fairfield Liquidators also agreed to provide each other with "reasonable cooperation and assistance . . . in connection with the prosecution of the Sharing Claims." *Id.* ¶ 14.  Therefore, the Trustee has had the benefit of the Fairfield Funds' cooperation and full access to their records—including records "relating to, or beneficial to the pursuit of," this action—for over a decade.  *Id.*

On August 28, 2020, the Trustee filed his Second Amended Complaint in the Fairfield Action against defendants that had not previously settled, as well as certain additional defendants.  Ditchfield Decl. Ex. 8 (Second Am. Compl., Fairfield Action, ECF No. 286 ("Fairfield Second Am. Compl.")).  The Trustee thus now seeks to recover from non-settling defendants in the Fairfield Action an additional $1.139 billion in subsequent transfers of BLMIS customer property allegedly paid by Fairfield Sentry to certain FGG Defendants, including transfers stemming from management fees, incentive fees, and other compensation or remuneration.  *See* Ditchfield Decl. Ex. 9 (Exs. 8, 10, 12, 13, 14, and 21 to Fairfield Second Am. Compl., Fairfield Action, ECF Nos. 286-8, 286-10, 286-12, 286-13, 286-14, 286-21).

C.    **The Fairfield Liquidators' Actions Against Redeeming Shareholders**

Commencing in or about April 2010, the Fairfield Liquidators filed actions in New York against hundreds of Fairfield Funds shareholders, seeking to "claw back"

redemption payments. *See* Ditchfield Decl. Ex. 10 (Ex. G to the Fairfield Settlement

Agreement) at 1–5 (listing 209 such actions pending in this Court as of May 9, 2011).

The Complaint in this Action was filed approximately a year later, on May 31, 2012.

> ### 1.    The Alleged BLMIS-to-Fairfield Sentry Initial Transfers—and the Scant Allegations as to Their Alleged Avoidability

The Trustee alleges that, "[d]uring the six years preceding the Filing Date [i.e.,

the date of the filing of the Fairfield Funds' bankruptcy petition, December 11, 2008],

BLMIS made transfers to Fairfield Sentry of approximately $2,985,136,619," which he

asserted was "Customer Property." Compl. ¶ 45. Of this amount, approximately $1.6

billion was allegedly transferred within two years of the Filing Date. *Id.* ¶ 46. The

Trustee pleads that: the "Fairfield Sentry Six Year Initial Transfers . . . are avoidable and

recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273–279 of the

NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3)," *id.* ¶ 45;

the "Fairfield Sentry Two Year Initial Transfers . . . are avoidable and recoverable under

sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273–279 of the NYDCL, and

applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3)," *id.* ¶ 46; and a subset

of the latter transfers, allegedly made during the 90 days preceding the Filing Date

(approximately $1.1 billion), are "avoidable and recoverable under sections 547, 550, and

551" of the Code as well as SIPA, *id.* ¶ 47. The Trustee does not allege that he had

avoided any part of the alleged initial transfers from BLMIS to Fairfield Sentry, nor did

his Consent Judgments against the Fairfield Funds avoid them. *See generally* Ditchfield

Decl. Ex. 7 (Consent Judgments).

As to avoidability, the Trustee pleads merely that he filed the Fairfield Action, "in

which, in part, the Trustee sought to avoid and recover initial transfers of Customer

Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion"
(referring to the Fairfield Amended Complaint), and adds: "*The Trustee incorporates by
reference the allegations contained in the Fairfield Amended Complaint.*"  Compl. ¶ 44
(emphasis added).  The Fairfield Amended Complaint, Ditchfield Decl. Ex. 3, is 217
pages long—not counting its 111 exhibits—and contains 798 paragraphs.  In it, the
Trustee asserts claims against over 40 defendants in addition to the three Fairfield Funds,
and his claims against Fairfield Sentry are based on many grounds other than the
avoidability of the alleged BLMIS-to-Fairfield Sentry initial transfers—e.g., for turnover
and accounting, unjust enrichment, conversion, money had and received, aiding and
abetting fraud and breach of fiduciary duty, and objections to the allowance of claims.
*See id.*

2. **The Alleged Subsequent Transfers to the Eurizon
Defendants—and the Scant Allegations That They Were of
Customer Property**

As alleged by the Trustee: "Eurizon Capital and its predecessors in interest . . .
were the asset management divisions of Banca Intesa SpA and/or joint ventures of Banca
Intesa SpA and Credit Agricole Asset Management . . . , a subsidiary of French bank
Credit Agricole S.A."  Compl. ¶ 3.  Low Volatility and Medium Volatility, the entities
alleged to have received subsequent transfers from BLMIS, are each an Italian "fondo
commune di investimento," or "investment fund."  *See id.* ¶¶ 25, 28.  At all relevant times,
Eurizon Capital was the asset manager of Low Volatility and Medium Volatility and
managed and controlled the assets of the funds.

The Complaint alleges that, on certain dates in the six years before the Filing Date,
Fairfield Sentry transferred approximately (i) $7,913,079 to Low Volatility and
(ii) $3,740,436 to Medium Volatility.  Compl. ¶¶ 50, 51 & Exs. C, D.  The Complaint

does not identify which portions of the alleged BLMIS-to-Fairfield Sentry initial transfers were supposedly subsequently transferred to the Eurizon Funds.  Although exhibits to the Complaint list specific payments that the Trustee claims were subsequent transfers, the Complaint provides no information connecting any particular payment to the claimed initial transfers.  Nor does the Trustee provide any information to enable the Court or the Eurizon Defendants to discern the source(s) of specific transfers from Fairfield Sentry to the Eurizon Funds.  Instead, the Complaint broadly alleges that:

> 50.  A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility . . . . Based on the Trustee's investigation to date, approximately $7,913,079 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Low Volatility . . . .

> 51.  A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Medium Volatility . . . . Based on the Trustee's investigation to date, approximately $3,740,436 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Medium Volatility . . . .

Compl. ¶¶ 50, 51.  The Complaint contains no allegation connecting these claimed subsequent transfers to the alleged initial transfers, and alleges no facts regarding the original source(s) of the funds transferred by Fairfield Sentry to Low Volatility and Medium Volatility.  And despite his decade-long access to the Fairfield Funds' records, availability of Rule 2004 pre-action discovery, and ongoing "investigation," *id.* ¶¶ 36, 41, 50–52, the Trustee never amended his Complaint to supply any such allegations.

### D.    The Trustee Has Not Alleged That Any Eurizon Defendant Had Knowledge of the Madoff/BLMIS Fraud

Nowhere in the Complaint does the Trustee allege that any of the Eurizon Defendants had actual knowledge of the Madoff/BLMIS fraud.

### E.    The Trustee's Other Fairfield Subsequent Transfer Actions—and the $2 Billion in Excess Alleged Subsequent Transfers

As noted, the Trustee has filed 81 Fairfield Subsequent Transfer Actions against defendants that invested in Fairfield Funds.  *See supra* Bkgd. Pt. A.  Based on his most recent pleadings, the Trustee is seeking a total of approximately $3.238 billion in subsequent transfers that defendants allegedly received directly from Fairfield Sentry. *See* Ditchfield Decl. ¶ 18 & Ex. 11.  Separately, in the Fairfield Action, the Trustee has alleged that Fairfield Sentry made subsequent transfers to Fairfield Sigma and Fairfield Lambda in the amounts of approximately $772 million and $52 million, respectively.[4] *See* Ditchfield Decl. Ex. 12 (Exs. 5 and 6 to Fairfield Second Am. Compl., Fairfield Action, ECF Nos. 286-5, 286-6).  And the Trustee has also alleged (and is now seeking to recover) in the Fairfield Action yet another $1.139 billion in subsequent transfers made directly by Fairfield Sentry to certain FGG Defendants.  *See id.* ¶ 19 & Ex. 9.  In all, the Trustee alleges that Fairfield Sentry made approximately $5.201 billion in subsequent transfers of alleged BLMIS customer property, exceeding by approximately $2 billion the sum of all the alleged customer property that the Trustee claims BLMIS transferred to Fairfield Sentry as initial transfers in the six years prior to the Filing Date.  In none of his pleadings has the Trustee explained, or even acknowledged, this discrepancy.

### ARGUMENT

### I.    THE TRUSTEE'S CLAIM IS BARRED BY SECTION 546(e)

The Trustee's sole cause of action is asserted under Section 550(a), which provides that, to the extent a transfer is avoided under enumerated Code provisions, "the

---

[4] The Consent Judgments reflect similar amounts—i.e., $752.3 million against Fairfield Sigma and $52.9 million against Fairfield Lambda.  *See supra* Bkgd. Pt. B; Ditchfield Decl. Ex. 7 (Consent Judgments).

trustee may recover, for the benefit of the estate, the property transferred," or its value,

from "the initial transferee" or any subsequent "transferee of such initial transferee."

11 U.S.C. § 550(a)(1), (2).[5]  However, "[t]he Code sets out a number of limits on the

exercise of these avoiding powers," including the securities safe harbor of Section 546(e).

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018) ("*Merit*").

      Section 546(e) of the Bankruptcy Code bars a trustee from avoiding a transfer

(other than under Section 548(a)(1)(A), which has only a two-year lookback period) if

that transfer, as relevant here, (1) was made "by or to (or for the benefit of)" a covered

entity, such as a stockbroker or financial institution; and (2) was either a settlement

payment or a transfer in connection with a securities contract.  11 U.S.C. § 546(e).[6]  This

safe harbor exemplifies how, "in enacting the Bankruptcy Code, Congress struck careful

balances between the need for an equitable result for the debtor and its creditors, and the

need for finality"—and "[courts] are obliged to respect the balance Congress struck

among these complex competing considerations."  *In re Bernard L. Madoff Inv. Secs.*

*LLC (Picard v. Ida Fishman Revocable Trust)*, 773 F.3d 411, 423 (2d Cir. 2014)

("*Fishman*").  In particular, "by enacting § 546(e), Congress provided that, for a very

broad range of securities-related transfers, the interest in finality is sufficiently important

that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent

---

[5] The Trustee also invokes Section 551, *see* Compl. ¶¶ 45–47, but that section of the Code "does not provide for an independent cause of action." *In re CIL Ltd.*, 582 B.R. 46, 97 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other grounds*, No. 13-11272, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

[6] "Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, as is the case here where the transferee settled with the Trustee, the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against the recovery of those funds." *Fairfield Inv. Fund*, 2021 WL 3477479, at *3; *see also SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

transfers under § 548(a)(1)(A)." *Id.* That is because "[u]nwinding settled securities

transactions . . . would seriously undermine—a substantial understatement—markets in

which certainty, speed, finality and stability are necessary to attract capital." *See In re

Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) ("*Tribune I*").

The "application of Section 546(e) presents a straightforward question of statutory

interpretation of the type that is appropriately resolved on the pleadings." *In re Fairfield

Sentry Ltd.*, 2020 WL 7345988, at *5 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"),

*reconsideration denied*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *In re

Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23,

2019), *aff'd*, 10 F.4th 147, 175–77 (2d Cir. 2021) ("*Tribune II*"), *cert. denied sub nom.

Kirschner v. FitzSimons*, 2022 WL 516021 (U.S. Feb. 22, 2022)). Courts do not hesitate

to dismiss, under Rule 12(b)(6), claims that are barred by Section 546(e).[7]

As explained below, Section 546(e) bars the Trustee's claims against the Eurizon

Defendants because the alleged initial transfers purportedly underpinning those claims

are covered transactions made by and to covered entities, falling squarely within the

statutory safe harbor. Accordingly, Section 546(e) shields the alleged BLMIS-to-

Fairfield Sentry initial transfers from avoidance as a matter of law, and the Trustee

cannot recover from the Eurizon Defendants as alleged subsequent transferees. The

Complaint should be dismissed.

---

[7] *See, e.g.*, *Fishman*, 773 F.3d at 414 (affirming dismissal); *In re SunEdison, Inc.*, 620 B.R. 505 (Bankr. S.D.N.Y. 2020) (granting Rule 12(b)(6) motion); *Fairfield III*, 2020 WL 7345988, at *5–9 (same); *AP Servs., LLP v. Silva*, 483 B.R. 63 (S.D.N.Y. 2012) (same).

## A.    The Alleged Initial Transfers Were Made by and to Entities Covered by Section 546(e)

The Trustee's pleadings amply satisfy Section 546(e)'s "covered entity" requirement—i.e., that either the debtor that made the alleged initial transfer was an entity covered by Section 546(e) or the debtor made the transfer "to (or for the benefit of)" a covered entity.  Although the statute requires the involvement of only one "covered entity," here the requirement is satisfied in two ways—the alleged initial transfer was made (i) by BLMIS, a stockbroker, and (ii) to Fairfield Sentry, a financial institution.[8]

### 1.    The Alleged Initial Transfers Were Made by a Stockbroker

The Code defines "stockbroker" to include entities "engaged in the business of effecting transactions in securities."  11 U.S.C. § 101(53A)(B).  It is far too late for the Trustee to deny that BLMIS falls within this definition.  Judge Rakoff rejected that argument a decade ago in *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd sub nom. Fishman*, explaining that BLMIS "was registered as a stockbroker with the SEC" and "clearly engaged in securities transactions."  *Id.* at 719.  On appeal, the Trustee did not dispute "that BLMIS was a 'stockbroker' for the purposes of § 546(e)."  *Fishman*, 773 F.3d at 417.

---

[8] There is also a *third* covered entity in the alleged chain of transfers.  According to the Trustee, "[a] portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or *for the benefit of*" each Eurizon Fund, and thus also their asset manager Eurizon Capital. Compl. ¶¶ 50, 51 (emphasis added); *see also id.* ¶ 31 (alleging that "each individual Fund Defendant and Eurizon Capital functioned and continue to function as one entity for all of the purposes herein").  Each Eurizon Defendant is clearly a "financial institution" within the Code definition, which includes a "commercial or savings bank" or "trust company."  11 U.S.C. § 101(22)(A).  The Trustee has alleged that the Eurizon Funds are each an Italian *fondo commune investimento*, or an investment fund.  Compl. ¶¶ 3, 25, 28.  And Eurizon Capital is alleged to be a division of a bank and/or a joint venture of banks and investment firms.  *See id.* ¶¶ 3, 24.  Thus, the Eurizon Defendants—for whose benefit, the Trustee has pleaded, the alleged initial transfers were made—were all "financial institutions," yet another basis for dismissal.

The Court can end its "covered entity" analysis here.  The fact that the alleged

initial transfer was made by a "qualifying participant"—here a stockbroker—satisfies that

requirement.  *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 197 (S.D.N.Y.

2020) ("Put simply, the safe harbor applies where two requirements are met: (1) there is a

qualifying transaction . . . and (2) there is *a* qualifying participant." (emphasis added));

*see also Tribune I*, 946 F.3d at 77–81 (applying Section 546(e) safe harbor to at-issue

payments where the corporate Chapter 11 debtor that made the payments was a "financial

institution" and therefore a covered entity).  But, as set forth in the following section,

there is an additional and independently sufficient route to the same conclusion.

### 2.      The Alleged Initial Transfers Were Made to a Financial Institution

The alleged initial transferee Fairfield Sentry fits well within the definition of a

"financial institution," and is therefore an entity covered by Section 546(e).  The Code

defines "financial institution" to include not only "an entity that is a commercial or

savings bank," or a "trust company," but also the customer of a bank "when [the bank] is

acting as agent or custodian for a customer . . . in connection with a securities contract."

11 U.S.C. § 101(22)(A).  *See Tribune I*, 946 F.3d at 78–79 (for purposes of Section

101(22)(A), "customer" must be given its ordinary meaning, including "someone who

buys goods or services" and "a person . . . for whom a bank has agreed to collect items").

In *Fairfield III*, Judge Bernstein held that the Fairfield Funds were "financial institutions"

because they were customers of Citco Bank Nederland N.V. Dublin Branch ("Citco

Bank") (which was a "bank," because it was regulated as such by the Central Bank of the

Netherlands and registered as such with the Central Bank of Ireland, *Fairfield III*, 2020

WL 7345988, at *6 & n.11),[9] and because Citco Bank acted as the Fairfield Funds' agent in connection with the securities contracts pursuant to which the redemption payments were made. *Id.* at *7.

The *Fairfield III* analysis applies with equal force here. The Trustee alleges that the Fairfield Sentry Initial Transfers were made from BLMIS accounts entitled "Citco Global Custody N.V. FBO Fairfield Sentry Ltd." (account numbers 1FN012 and 1FN045). Compl. Ex. B. In the extraterritoriality proffer filed in this action in 2015, ECF No. 67, the Trustee acknowledged Citco Global Custody N.V.'s service as custodian for Fairfield Sentry and the related opening of bank accounts by Fairfield Sentry at Citco Bank, and alleged that FGG personnel "had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities" and "controlled and approved all subscriptions into and redemptions from the fund." *Id.* ¶¶ 90, 92. These allegations confirm that, as this Court held in *Fairfield III*, Citco Bank (a "financial institution") was Fairfield Sentry's agent in connection with the redemptions at issue, such that Fairfield Sentry itself is a "financial institution" within the meaning of Section 546(e). That holding is binding on the Trustee, because he is in privity with the Fairfield Liquidators.[10]

---

[9] *See* De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTDG&relationNumber=B0275 (last visited Apr. 14, 2022) (identifying Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited Apr. 14, 2022) (classifying Citco Bank as a "Credit Institution . . . whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account"). As in *Fairfield III*, the Court can and should take judicial notice of information from such public registries. 2020 WL 7345988, at *6; *see also supra* Bkgd. Pt. A n.2.

[10] In the Fairfield Settlement Agreement, the Trustee and the Fairfield Liquidators agreed to share recoveries on their respective "clawback" claims, including those brought against the Eurizon Defendants; the Fairfield Liquidators must pay the Trustee 15 percent of their net recoveries from all such claims until (….continued)

### B.    The Alleged Initial Transfers Are Covered by Section 546(e)

Section 546(e) shields the alleged initial transfers from BLMIS to Fairfield Sentry from avoidance on three separate grounds, the first two of which were definitively settled by the Second Circuit in *Fishman*.  *First*, these transfers were made "in connection with securities contracts"—i.e., the BLMIS-Fairfield Sentry account agreements.  *Second*, they were "settlement payments" made by BLMIS in response to Fairfield Sentry's requests for withdrawals under those agreements.  *Third*, the Complaint discloses that alleged initial transfers were also made "in connection" with the Fairfield Sentry Articles of Association, which is a separate "securities contract."[11]

### 1.    The Fairfield Sentry Initial Transfers Were Made in Connection with the BLMIS-Fairfield Sentry Account Agreements, Which Are "Securities Contracts"

In *Fishman*, the Second Circuit held that BLMIS's account agreements with customers "satisfy the broad definition of 'securities contracts'" in 11 U.S.C. § 741(7)(A), which applies to Section 546(e).  *Fishman*, 773 F.3d at 418.  The court easily dispatched a series of arguments made by the Trustee, "none" of which it found "persuasive."  *Id.* at 419; *see also id.* at 419–21.  The *Fishman* court then had "little difficulty concluding that

---

(continued….)

the Trustee has been paid $1.924 billion. Ditchfield Decl. Ex. 6 (Fairfield Settlement Agreement) ¶¶ 4, 14. Moreover, they "agree[d] and stipulate[d] that a joint interest exists between them with respect to the Sharing Claims." *Id.* ¶¶ 4, 7, 14.  That joint interest in any such recovered BLMIS customer property constitutes a "pre-existing 'substantive legal relationship,'" focused on a successive or concurrent interest in property, of the kind that gives rise to non-party issue preclusion.  *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008).  Because the Trustee and the Liquidators are in privity with respect to actions to recover alleged BLMIS customer property, such as those at issue in *Fairfield III*, and because the issue of Fairfield Sentry's "financial institution" status was "actually litigated" and "essential" to the final judgments dismissing many such actions based on application of Section 546(e), the *Fairfield III* finding that Fairfield Sentry was a "financial institution" in connection with redemption payments to its investors binds the Trustee.  *See New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001) (stating requirements for issue preclusion).

[11] "[A] transfer can be connected to, and be made in relation to, multiple documents or purposes simultaneously." *Fishman*, 773 F.3d at 422.

the payments BLMIS made to its customers were made 'in connection with' the securities contracts identified above." *Id.* at 421.

The Trustee has pleaded that Fairfield Sentry "had direct customer accounts with BLMIS's investment advisory business," Compl. ¶ 2; *see also* Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶ 33 (listing such accounts), and entered into account agreements with BLMIS, Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶ 33. Just as in *Fishman*, those agreements are "securities contracts," and the BLMIS-to-Fairfield Sentry transfers were made "in connection with" those contracts.

### 2. The Fairfield Sentry Initial Transfers Were "Settlement Payments"

Although *Fishman*'s holding that BLMIS-to-customer payments are transfers "in connection with securities contracts" suffices to "shield the transfers from avoidance," the Second Circuit identified yet "another basis" for protecting those transfers—namely, that they also constitute "settlement payments" under Section 546(e). *Fishman*, 773 F.3d at 421–22. Rejecting the Trustee's argument to the contrary, the Second Circuit held in *Fishman* that "each transfer in respect of" a customer's order or request to withdraw funds from BLMIS "constituted a settlement payment." *Id.* at 422.

Here, the Trustee has alleged that Fairfield Sentry received approximately $3 billion in respect of such withdrawal orders or requests. *See* Compl. ¶¶ 44–49; *see also* Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶ 33. Precisely as in *Fishman*, it is beyond dispute that those are all "settlement payments" for Section 546(e) purposes.

### 3. The Fairfield Sentry Initial Transfers Were Made in Connection with the Fairfield Sentry Articles of Association, Which Is a Separate "Securities Contract"

The Trustee alleges in this action that "portion[s] of the Fairfield Sentry Initial Transfers w[ere] subsequently transferred, either directly or indirectly to, or for the benefit of," the Eurizon Defendants. Compl. ¶¶ 50, 51. The Trustee's theory is that the alleged initial transfers from BLMIS to Fairfield Sentry were made, in part, for the purpose of funding the Eurizon Defendants' redemption requests.[12] Those redemption requests, and the resulting payments that the Trustee now seeks to recover in this action, were—as the UK Privy Council has held—governed by Fairfield Sentry's Articles of Association. *See* Ditchfield Decl. Ex. 13 (*Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, ¶ 10 (explaining that subscribers for shares in the Fairfield Funds entered an agreement that binds them to the terms of the Fund documentation, and holding that "the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund")); *see also In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at \*11 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*") (explaining that the Privy Council "concluded that the terms of the redemption of shares were found in the Articles").

---

[12] The Eurizon Defendants deny that they are subsequent transferees of customer property, and indeed demonstrate in Point III, *infra*, that the Trustee's allegations in support of this theory are implausible and should be dismissed for that reason. Regardless, the Trustee's allegations are admissions that can be used to establish, on this motion, that he has failed to state a claim upon which relief can be granted. *See, e.g.*, *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("[T]he allegations in the Second Amended Complaint are 'judicial admission[s]' by which [the plaintiff] was 'bound throughout the course of the proceeding.'" (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (affirming dismissal of claim because plaintiff was bound by assertion of facts in its complaint))).

It follows that the Fairfield Sentry Articles of Association is a "securities contract" for Section 546(e) purposes.[13]  The definition of "securities contract" in 11 U.S.C. § 741(7) is "broad."  *Fishman*, 773 F.3d at 419.  It not only includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), but also "any other agreement or transaction that is similar to" such a contract, *id.* § 741(7)(A)(vii).  *See Fishman*, 773 F.3d at 419 (noting that Congress intended to "sweep broadly" and that "[f]ew words in the English language are as expansive as 'any' and 'similar'").  A contract providing for redemptions of securities, such as the Fairfield Sentry Articles of Association, surely qualifies.  *See Cohmad*, 2013 WL 1609154, at *8 (noting that the definition of "securities contract" is broad and "includes, *inter alia*, investment fund subscription agreements and *redemption requests*" (emphasis added)); *Tribune I*, 946 F.3d at 80 ("The term 'redemption,' in the securities context, means 'repurchase.'").[14] The law, moreover, does not require "that the securities contract that the transfer is made 'in connection with' must be a securities contract with the debtor."  *Cohmad*, 2013 WL 1609154, at *9.

"Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided."  *Fishman*, 773 F.3d at 422.  The initial transfers, as alleged in the Trustee's pleadings, easily clear that bar, as he asserts that Fairfield Sentry withdrew those funds from BLMIS in order to fund its contractual

---

[13] The Fairfield Sentry Articles of Association (Ditchfield Decl. Ex. 14) may be considered on this motion because, as the document governing the challenged redemptions, it is integral to the Complaint. *See, e.g.*, *Tribune II*, 10 F.4th at 176.

[14] In the Fairfield Liquidators' BVI-law clawback actions, the Liquidators did not dispute, as Judge Bernstein concluded, that redemptions made pursuant to the Articles of Association "were Covered Transactions [under Section 546(e)] because they were settlement payments made in connection with securities contracts." *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 314 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

obligations to alleged subsequent transferees making redemption requests—including the Eurizon Defendants. *See, e.g.*, Ditchfield Decl. Ex. 3 (Fairfield Am. Compl.) ¶ 53 ("[I]n order to pay these redemptions [to Sigma], Fairfield Sentry withdrew funds from its BLMIS accounts."). As pleaded by the Trustee (*see supra* Arg. Pt. I.B.3), such withdrawals from BLMIS are transfers "in connection with" the securities contract between the alleged initial and subsequent transferees.

Judge Rakoff described this very situation in *Cohmad*, imagining "a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its [BLMIS] customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract." 2013 WL 1609154, at *9. Assuming that either the fund or the investor qualifies as a covered entity, "that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was 'made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract.'" *Id.*; *see also In re Boston Generating LLC (Holliday v. K Rd. Power Mgmt., LLC)*, 617 B.R. 442, 487 (Bankr. S.D.N.Y. 2020) (initial transfers that "funded" redemptions of securities "were made in connection with a securities contract"). Judge Rakoff further explained that "[t]o the extent that, for example, an initial transfer from [BLMIS] to an investment fund customer and the subsequent transfer from the investment fund to its redeeming investors may together comprise a 'settlement payment' under *Enron [Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011)], that transfer may fall within the purview of Section 546(e), assuming it meets the statute's other requirements." *Cohmad*, 2013 WL 1609154, at *9 n.5.

In sum, multiple paths lead to one conclusion: the Trustee's own pleadings establish that the alleged Fairfield Sentry Initial Transfers were covered by Section 546(e). Having satisfied the safe harbor's requirements, the Complaint should be dismissed.

### C.    The Trustee Has Not Alleged That Any of the Eurizon Defendants Had Actual Knowledge of the Madoff/BLMIS Fraud

The Trustee has not alleged that any Eurizon Defendant had actual knowledge of the Madoff/BLMIS fraud. *See supra* Bkgd. Pt. D. That renders irrelevant to this adversary proceeding the only possible ground upon which the Section 546(e) safe harbor could be rendered inapplicable—i.e., the judicially created rule that a subsequent transferee "who had actual knowledge of Madoff Securities' fraud . . . cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." *Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (quoting *Cohmad*, 2013 WL 1609154, at *7). Whatever effect that rule might have in other adversary proceedings where (unlike here) the Trustee has pleaded such "actual knowledge," it poses no impediment to granting the Eurizon Defendants' motion to dismiss in this action.

Although Section 546(e) does not contain such an exception (and no such exception should be recognized),[15] the court in *Cohmad* concluded that "if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of [BLMIS's] fraud, that transferee cannot claim the protection of Section

---

[15] As explained herein, the exception created in *Cohmad* to the reach of Section 546(e) is inapplicable to this adversary proceeding, so there is no need for the Court to consider whether it is a correct statutory interpretation. In the event of an appeal, Eurizon Capital preserves the argument that the text of Section 546(e) does not permit courts to craft such a carve-out based on a transferee's alleged knowledge. *See, e.g.*, *Merit*, 138 S. Ct. at 897 (emphasizing adherence to "the plain meaning of the language used in § 546(e)" in interpreting the provision); *Fishman*, 773 F.3d at 423 (courts are "obliged to respect the balance Congress struck" "between the need for an equitable result for the debtor and its creditors, and the need for finality").

546(e)'s safe harbor." 2013 WL 1609154, at *7.  The rationale for that holding was

based on the purpose of the statutory safe harbor—i.e., assuring the finality of settlements

of securities transactions and minimizing the securities market disruption caused by

bankruptcy proceedings.  *See supra* Arg. Pt. I.  As Judge Rakoff noted in *Cohmad*, that

purpose is "achieved by protecting the reasonable expectations of investors who believed

they were signing a securities contract," but not by shielding the transactions of "a

transferee who had actual knowledge of the Madoff 'Ponzi' scheme [and therefore] did

not have any such expectations." 2013 WL 1609154, at *4.  Here, the supposed

transferees "from whom [the Trustee] seeks to recover"—the Eurizon Defendants—are

not alleged to have had such actual knowledge.  Section 546(e)'s purpose is therefore

"achieved by protecting" their "reasonable expectations" and dismissing the Trustee's

claims.

It is immaterial to this analysis that in *Fairfield Investment Fund*, this Court held

that, in a pleading that superseded the Fairfield Amended Complaint, the Trustee

sufficiently alleged actual knowledge on the part of Fairfield Sentry, the *initial* transferee.

*See* 2021 WL 3477479 at *4.  Fairfield Sentry's knowledge cannot be imputed to the

Eurizon Defendants, which dealt with Fairfield Sentry at arm's length; the Trustee does

not even advance any such theory.  The sole question is whether the Trustee has pleaded

facts that, if proved, would establish the Eurizon Defendants' actual knowledge of the

Madoff/BLMIS fraud.  In *Fairfield Investment Fund*, this Court carefully differentiated

five alleged subsequent transferees against whom the Trustee had sufficiently pleaded

such facts from one alleged subsequent transferee against whom "the Trustee has failed

to plead individualized factual allegations demonstrating . . . independent actual

knowledge of the BLMIS fraud." *Id.* at *6; *see also id.* at *15 (dismissing the individual

claims against the latter defendant). Accordingly, the Eurizon Defendants, against which

the Trustee does not even attempt to plead actual knowledge, are entitled to rely on

Section 546(e).

The Eurizon Defendants' position, moreover, is significantly stronger than that of

all the defendants in *Fairfield Investment Fund*. The "securities contract[s]" that the

Eurizon Defendants "signed," *Cohmad*, 2013 WL 1609154, at *3—and which they have

every reasonable expectation Section 546(e) will protect—were not BLMIS-Fairfield

Sentry customer agreements, but rather separate contracts between the Eurizon

Defendants and the Fairfield Funds. The *Cohmad* court recognized that Section 546(e)

applies where, as the Trustee has pleaded here, the initial transferee allegedly withdrew

funds from BLMIS in order to pay its investors to redeem (i.e., repurchase) their shares,

pursuant to a separate securities contract between the initial and alleged subsequent

transferees—here, the Fairfield Sentry Articles of Association. *See supra* Arg. Pt. I.B.3.

Because here both "the investment fund [and] the investor qualif[y] as a financial

institution," this case "fit[s] within the plain terms of Section 546(e)," *Cohmad*, 2013 WL

1609154, at *9, absent allegations of their actual knowledge of the fraud. The Trustee

has made no such allegation, and the Eurizon Defendants are entitled in full to the

protection that Section 546(e) affords.

### D.    The Section 548(a)(1)(A) Exception Cannot Save the Trustee's Claim

The sole statutory exception to the Section 546(e) safe harbor is for transfers

avoidable under Section 548(a)(1)(A), which has a two-year lookback period. "[W]here

§ 546(e) applies to the Trustee's claims, the Trustee may only proceed insofar as he seeks

to recover those subsequent transfers under § 550(a) as to which he could have avoided

23

the initial transfer under § 548(a)(1)(A)." *Fairfield Inv. Fund*, 2021 WL 3477479, at \*4.

The Trustee, however, has failed to plead the avoidability of any initial transfers under

Section 548(a)(1)(A) because he has not pleaded "actual intent to hinder, delay or defraud"

"with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank*

*& Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). The Trustee has, in

fact, pleaded nothing at all about BLMIS's intent in making any (much less each) of the

"specific transfers challenged" here. *Official Comm. of Unsecured Creditors of Verestar,*

*Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y.

2006).[16]

Even if the Trustee had adequately alleged the requisite fraudulent intent, none of

the relevant transfers occurred within two years of the Filing Date. The Trustee alleges

that Fairfield Sentry made three subsequent transfers to the Eurizon Funds: one to Low

Volatility on June 16, 2003, one to Medium Volatility on September 15, 2004, and

another to Low Volatility on March 15, 2005. *See* Compl. Exs. C, D. Thus, the only

BLMIS-to-Fairfield Sentry initial transfers that are relevant to this action must have

occurred prior to March 15, 2005—well in advance of December 11, 2006 and therefore

outside the two-year lookback period of Section 548(a)(1)(A). Accordingly, the Section

548(a)(1)(A) exception to Section 546(e) cannot save the Complaint.

---

[16] It is possible that the Trustee may rely on the so-called "Ponzi scheme presumption" to meet his pleading burden. But as Judge Menashi's recent thoughtful concurring opinion in *Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 202 (2d Cir. 2021) (Menashi, J., concurring) made clear, that issue is not settled at the Circuit level and there are several cogent reasons why the Ponzi scheme presumption represents a "questionable" application of fraudulent transfer statutes. Those reasons include (among many others) that the statute does not even mention Ponzi schemes, much less authorize courts to relax the Trustee's pleading burden in such cases, and that the statutory focus is on individual transfers, rather than any pattern, and therefore requires individualized proof with respect to each transfer.

II.   **THE TRUSTEE HAS FAILED TO PLEAD THE AVOIDABILITY OF THE ALLEGED INITIAL TRANSFERS, AND HIS ATTEMPTED WHOLESALE INCORPORATION OF THE FAIRFIELD AMENDED COMPLAINT IS IMPROPER**

To plead a subsequent transfer claim under Section 550(a)(2), the Trustee must allege "that the initial transfer is avoidable." *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (citation omitted). The Complaint fails to do so with respect to any of the alleged initial BLMIS-to-Fairfield Sentry transfers, instead relying on conclusory statements that all such transfers in a six-year period are avoidable, without alleging any supporting facts. *See* Compl. ¶¶ 45–47. That is insufficient, because a claim only "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The Trustee's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

The Trustee has attempted to fill the massive void at the heart of his Complaint by "incorporat[ing] by reference" the entirety of his 217-page (plus 111 exhibits), 798-paragraph Fairfield Amended Complaint. Compl. ¶ 44. But the Federal Rules do not authorize that pleading stratagem. Although "[a] *statement* in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," Fed. R. Civ. P. 10(c) (emphasis added), a pleader may not indiscriminately adopt whole pleadings from a different action. *See NCUA Bd. v. Morgan Stanley & Co.*, 2014 WL 1673351, at *9 (S.D.N.Y. Apr. 28, 2014) (striking defense where defendant attempted to "incorporate the affirmative defenses in answers filed by defendants *in other actions* into its answer" (emphasis in original)); *David v. Bifani*, 2007 WL 1216518, at *1 (D. Colo. Apr. 24,

2007) (striking attempt "to incorporate by reference wholesale the allegations in a complaint in a completely separate action"). That is because a "Rule 10(c) adoption clause that does little more than make wholesale reference to the contents of a prior pleading exemplifies the kind of incorporation that fails to give the requisite guidance to the responding party." *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) (internal quotation marks omitted).[17]

The Trustee's blunderbuss attempt to incorporate the entire Fairfield Amended Complaint not only ignores the limits of Rule 10(c) but violates Rule 8(a)(2), which requires a complaint to "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) serves two important purposes: "to give the adverse party fair notice of the claim asserted so as to enable [it] to answer and prepare for trial" and to avoid "[u]nnecessary prolixity in a pleading [that] places an unjustified burden on the court and the party who must respond to it because they are forced to select the material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (internal quotation marks omitted). In *United States v. International Longshoremen's Association*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007), Judge Glasser rejected the attempted incorporation, in a civil RICO complaint, of pleadings from several previous proceedings, holding that the complaint "must be dismissed for failure to comply with Rule 8(a)." *Id.* at 467. The court explained that "[t]he Government's failure to specifically identify which portions of the hundreds of pages of exhibits it intends to incorporate by reference into the Amended Complaint makes it impossible for the Court

---

[17] *See also Muhammad v. Bethel-Muhammad*, 2012 WL 1854315, at *3 n.5 (S.D. Ala. May 21, 2012) (condemning "sweeping reference to . . . 100-page complaint"); *Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 216 (D. Mass. 1995) (pleading "must specifically identify which portions of the prior pleadings are adopted").

or the defendants to ascertain the nature and extent of the incorporation," *id.* at 462, and

that wholesale incorporation of prior pleadings was "a blatant violation of Rule 8(a)(2)'s

direction that a civil plaintiff provide a 'short and plain statement of the claim,'" *id.* at

463.

The same is true here.  Apart from its sheer length, the "incorporated" Fairfield

Amended Complaint is brimming with allegations and claims that are asserted against

parties other than Fairfield Sentry and are extraneous to the issues in this case, which was

commenced with a 27-page, 86-paragraph, two-count Complaint.[18]  Moreover, the

Fairfield Amended Complaint has itself been superseded by a further amended pleading.

*See Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 446–47 (E.D. Va. 2009) (granting

motion to dismiss; "wholesale incorporations . . . that seek to incorporate superseded

versions of a complaint, must be examined with special care").  The Trustee has had a

decade in which to amend the Complaint, yet he has not remedied this improper

incorporation.  The Complaint fails to provide fair notice of the facts upon which the

Trustee relies to establish an essential element of his claims: the avoidability of the

alleged initial transfers.  The Complaint should be dismissed.

---

[18] If the Court were to deny the motion to dismiss and uphold the Trustee's pleading tactic, Eurizon Capital
might have to respond, paragraph-by-paragraph, to the allegations in the Fairfield Amended Complaint as
well as those in the Complaint in this adversary proceeding.  In *International Longshoremen*, the court
explained that defendants should not be put to the burden of "decipher[ing] the basic elements of the
Government's claim in this action" from "incorporated" material.  518 F. Supp. 2d at 464.

### III.    THE TRUSTEE'S CLAIMS MUST BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD THAT THE EURIZON DEFENDANTS ARE SUBSEQUENT TRANSFEREES OF CUSTOMER PROPERTY

#### A.    The Trustee Has Failed to Carry His Pleading Burden

To state a claim against an alleged subsequent transferee, the Trustee must "allege facts that support the inference that the funds at issue originated with [] BLMIS, and contain the 'necessary vital statistics'—the 'who, when and how much' of the transfers to establish that an entity was a subsequent transferee of the funds." *Shapiro*, 542 B.R. at 119 (citation omitted). While the Trustee may not be "required to provide a 'dollar-for-dollar accounting' of the exact funds at issue," "barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient." *Id.* Thus, in *Shapiro*, Judge Bernstein dismissed subsequent transfer claims because the complaint failed to "tie any initial transfer to any subsequent transfer or Subsequent Transferee." *Id.*; *accord In re Caremerica, Inc.*, 409 B.R. 737, 750–51 (Bankr. E.D.N.C. 2009) (dismissing preference claim where trustee alleged transfers into and out of an account and the amounts received by alleged transferees, but pleaded nothing to tie the funds together).

The Complaint similarly fails these basic requirements. The Trustee has attached to the Complaint exhibits listing purported BLMIS-to-Fairfield Sentry initial transfers and payments from Fairfield Sentry to the Eurizon Defendants, but nothing in the Complaint or its exhibits "tie[s] any initial transfer to any subsequent transfer or Subsequent Transferee." *Shapiro*, 542 B.R. at 119. The Trustee's allegation that "money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to" each of the Eurizon Funds, Compl. ¶¶ 50, 51, is purely conclusory and insufficient under the standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

28

and *Iqbal*.  *See supra* Arg. Pt. II.  As a result, the Trustee has failed to give the Eurizon

Defendants fair notice of his claim.

### B. It Is Implausible That Alleged Initial Transfers to Fairfield Sentry of $3 Billion Resulted in Alleged Subsequent Transfers of $5 Billion

Instead of alleging "enough facts to state a claim that is plausible on its face,"

*Twombly*, 550 U.S. at 570, the Trustee has filed pleadings that render his subsequent

transfer claim *implausible* under basic principles of arithmetic: BLMIS's alleged initial

transfers of *approximately $3 billion to Fairfield Sentry* cannot have produced, as the

Trustee contends, *over $5 billion* in subsequent transfers *from Fairfield Sentry*—i.e., the

sum of: (a) $3.238 billion paid by Fairfield Sentry directly to defendants in the Fairfield

Subsequent Transfer Actions; (b) $824 million in alleged Fairfield Sentry payments to

Fairfield Sigma and Fairfield Lambda; and (c) $1.139 billion which the Trustee seeks

from FGG Defendants.  *See supra* Bkgd. Pt. E.

The Trustee's pleadings hint at (but fail to forthrightly acknowledge) the obvious:

that transfers from BLMIS were not the exclusive source of funds that Fairfield Sentry

could use to satisfy redemption requests and make other payments.  Among other

potential sources, the alleged subsequent transferees subscribed for Fairfield Sentry

shares over many years and therefore "wired funds to Fairfield Sentry."  Compl. ¶ 8.

That money was sometimes paid out as redemptions.  In fact, in a related proceeding in

this Court, Fairfield Sentry confirmed that it paid redeeming investors with funds that

originated from subscribing investors, not from BLMIS.  *See Fairfield Sentry Ltd. v.

Citco Global Custody NV*, Adv. Pro. 19-01122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF

No. 19, ¶ 6 ("From time to time, to make Redemption Payments, Sentry (and Sigma and

Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized

subscription monies of other investors on hand that were directed for investment in

BLMIS).").

The Trustee has stubbornly failed to recognize this fact, instead choosing to avoid

pleading how (and to what extent) any alleged subsequent transfers are linked to funds

originating with BLMIS, rather than from other sources.  The implausibility of the

premise underlying his inadequate, conclusory pleading—that every cent paid by

Fairfield Sentry to redeeming investors constituted BLMIS customer property—is further

reason to dismiss the Complaint.

> **C.     It Is Implausible That Funds Received by the Eurizon Defendants
> Were Subsequent Transfers of Initial Transfers Made Fourteen or
> More Months Earlier, or When No Money from BLMIS Remained at
> Fairfield Sentry When It Made the Transfers**

Beyond the macro-level implausibility of the Trustee's "customer property"

allegations—exemplified by the unexplained (and indeed, unacknowledged) $2 billion

overall difference between alleged initial and subsequent transfers—the Complaint fails

as well on the micro level with respect to each of the three at-issue transactions.

*First*, Exhibits to the Complaint confirm that the Trustee cannot plausibly make

the requisite link between alleged initial and subsequent transfers.  He seeks to recover

two alleged subsequent transfers—involving approximately 91% of the amount at issue—

made to a Eurizon Defendant well over a year after the most recent alleged initial transfer

from BLMIS to Fairfield Sentry.  Specifically, BLMIS transferred money to Fairfield

Sentry on July 22, 2003 and then not again until April 1, 2005.  *See* Compl. Ex. B at 22,

25 ("CHECK WIRE" entries).  In the interim, one transfer was made from Fairfield

Sentry to Medium Volatility on September 15, 2004 (14 months after the BLMIS transfer)

and another to Low Volatility on March 15, 2005 (20 months after the BLMIS transfer).
*See* Compl. Exs. C, D.

The time elapsed between alleged initial and subsequent transfers is plainly
relevant to the plausibility of the Trustee's "customer property" allegations.  In *In re
Bernard L. Madoff Investment Securities LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014)
("*Merkin*"), this Court denied a motion to dismiss because the alleged subsequent
transfers "took place *contemporaneously or shortly after an initial transfer* identified [in
the complaint], *implying linkage*."  515 B.R. at 150 (emphasis added).  In *Merkin*, the
alleged initial and subsequent transfers occurred between one and 22 days of each other,
and "[g]iven the short amount of time between the first and second transfers, it [was]
reasonable to infer in considering a motion to dismiss that some portion of the first
transfer formed part of the second transfer."  *Id.* at 151.  But the converse is equally true:
given the nature of Fairfield Sentry's business, which involved receiving funds from
many subscribing shareholders and paying funds to many redeeming shareholders, gaps
of up to nearly 20 months between alleged initial and subsequent transfers strongly imply
a *lack of linkage*.

That is particularly so in light of all the information the Trustee has obtained from
the Fairfield Liquidators, enabling him to determine, with respect to any transfer, whether
there is a basis for plausibly alleging the requisite linkage.  As a result, the situation here
is the polar opposite of *Merkin*, where the Trustee was faced with a thicket of alleged
subsequent transfers between and among defendants who "commingled their assets,
transferring their funds into and out of each other's accounts," and the facts were in the
exclusive possession of the defendants, whose records were unavailable to the Trustee

31

when he pleaded his claims. *Id.* at 151. In *Merkin*, that scenario posed "difficulties" for

the Trustee because "[t]he subsequent transfer claim must ultimately be proved through

the books and records of the defendants," in light of "complicated" inter-defendant

transactions "over lengthy periods of time." *Id.* In recognition of the Trustee's case-

specific "handicap," the *Merkin* Court was willing to afford the Trustee "greater latitude"

in pleading." *Id.*; *see also Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Secs.*

*LLC)*, 445 B.R. 206, 236 (Bankr. S.D.N.Y. 2011) ("Whether [the defendants] additionally

received Subsequent Transfers of BLMIS funds from one another is a question to which

they, and they alone, have the requisite information to respond." (emphasis added)).

Here, by stark contrast, there were no inter-defendant transfers, and the proof

relevant to the Trustee's subsequent transfer claims is to be found not in "the books and

records of the defendants," but exclusively in the "books and records" of BLMIS and the

Fairfield Funds. The Trustee has had access to all of that data for over a decade pursuant

to his 2011 Fairfield Settlement Agreement. Yet despite this surfeit of time and

information, the Trustee has failed to plead any facts plausibly connecting the alleged

initial and subsequent transfers.

*Second*, the implausibility of the Trustee's subsequent transferee claims is

confirmed by the fact that all three of the alleged transfers to the Eurizon Defendants

occurred at times when, according to the Trustee's own pleadings, Fairfield Sentry held

***no*** BLMIS-sourced funds. Those transfers occurred when the aggregate amount that

Fairfield Sentry had paid to other redeeming shareholders (including Fairfield Lambda

and Fairfield Sigma) and to the FGG Defendants exceeded what it had by then received

from BLMIS.

32

The Trustee seeks to recover one transfer for $1 million received by Low

Volatility on June 16, 2003 for redeeming its Fairfield Sentry shares, *see* Compl. Ex. C,

but that transfer could not possibly have included BLMIS customer property.  According

to the Trustee, the first BLMIS-to-Fairfield Sentry initial transfer within the six-year

lookback period occurred on May 9, 2003, in the amount of $40 million, and the next

such transfer did not occur until July 11, 2003 (for $55 million).  *See* Compl. Ex. B at 21,

22 ("CHECK WIRE" entries).  The Trustee also alleges that, from May 9, 2003 through

May 20, 2003, Fairfield Sentry transferred approximately $39,904,778 to redeeming

shareholders, including Fairfield Sigma and Fairfield Lambda, and that on May 14, 2003,

Fairfield Sentry transferred approximately $9,725,000 to Fairfield Investment Fund

Limited, one of the FGG Defendants.  *See* Ditchfield Decl. ¶ 20 & Exs. 9, 11, 12, and 15.

As a result, Fairfield Sentry had transferred to others nearly $10 million in excess of what

it had received from BLMIS, and no BLMIS customer property was held by Fairfield

Sentry as of June 16, 2003—the date of the at-issue transfer—or for weeks after.

The same logic applies to the remaining two transfers at issue.  The Trustee

alleges that on July 11 and July 22, 2003, BLMIS transferred a total of $80 million to

Fairfield Sentry, and that the next such transfer did not occur until April 1, 2005 (for

$175 million).  *See* Compl. Ex. B at 22, 25 ("CHECK WIRE" entries).  The Trustee also

alleges that from July 16, 2003 through September 17, 2003, Fairfield Sentry transferred

more than $133 million to redeeming shareholders, including Fairfield Sigma and

Fairfield Lambda—far exceeding the amount of property it had received from BLMIS at

that point.  *See* Ditchfield Decl. ¶ 20 & Exs. 11, 12, and 15.  As a result, no BLMIS

customer property was held by Fairfield Sentry from September 18, 2003 until

33

April 1, 2005.  The Trustee seeks to recover two transfers received in that period by the

Eurizon Defendants for redeeming their Fairfield Sentry shares (one to Medium

Volatility on September 15, 2004, and one to Low Volatility on March 15, 2005, *see*

Compl. Exs. C, D), but they could not possibly have included BLMIS customer property.

The tables below illustrate the flow of funds into and out of Fairfield Sentry

during the relevant time periods:

| Date(s) | BLMIS to Fairfield Sentry | Fairfield Sentry to Third Parties (including Lambda and Sigma) | Fairfield Sentry to FGG Defendants | Fairfield Sentry to Low Volatility and Medium Volatility |
|---|---|---|---|---|
| May 9, 2003 | $40,000,000 | | | |
| May 14–20, 2003 | | $39,904,778 | | |
| May 14, 2003 | | | $9,725,000 | |
| June 16, 2003 | | | | $1,000,000 [to Low Volatility] |
| **Total** | **$40,000,000** | **$49,629,778** | | **$1,000,000** |

| Date(s) | BLMIS to Fairfield Sentry | Fairfield Sentry to Third Parties (including Lambda and Sigma) | Fairfield Sentry to Low Volatility and Medium Volatility |
|---|---|---|---|
| July 11, 2003 | $55,000,000 | | |
| July 16, 2003 | | $81,819,525 | |
| July 22, 2003 | $25,000,000 | | |
| August 15, 2003 & September 17, 2003 | | $51,186,292 | |
| September 15, 2004 | | | $3,740,436 [to Medium Volatility] |
| March 15, 2005 | | | $6,913,079 [to Low Volatility] |
| **Total** | **$80,000,000** | **$133,005,817** | **$10,653,515** |

Far from "nudg[ing] his claims across the line from conceivable to plausible,"

*Iqbal*, 556 U.S. at 680, as he must do to defeat this motion, the Trustee has insisted on

34

pursuing claims that, as his own Complaint establishes, are both inconceivable and

implausible. He has failed to adequately plead that the Eurizon Defendants are

subsequent transferees of BLMIS customer property.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: April 15, 2022                Respectfully Submitted,
      New York, New York

                                      DAVIS POLK & WARDWELL LLP

                                      By: */s/ Andrew Ditchfield*
                                      Elliot Moskowitz
                                      Andrew Ditchfield
                                      Andrew S. Gehring
                                      450 Lexington Avenue
                                      New York, New York 10017
                                      Tel: (212) 450-4000
                                      Fax: (212) 701-5800
                                      elliot.moskowitz@davispolk.com
                                      andrew.ditchfield@davispolk.com
                                      andrew.gehring@davispolk.com

                                      *Attorneys for the Eurizon Defendants*