**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Lead Adv. Pro. No. 10-05354 (CGM) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK N.V. (presently known as NATWEST MARKETS N.V.), | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF FACTS ......................................................................4

I.    THE PONZI SCHEME.....................................................................4

II.   THE TREMONT AND HARLEY FUNDS ...........................................5

III.  DEFENDANT AND ITS TREMONT AND HARLEY TRANSACTIONS .....6

IV.   THE TREMONT SETTLEMENT AND HARLEY JUDGMENT ...............8

ARGUMENT .......................................................................................9

I.    LEGAL STANDARD.......................................................................9

II.   THE TRUSTEE'S SAC PLAUSIBLY ALLEGES THAT DEFENDANT
      RECEIVED STOLEN BLMIS CUSTOMER PROPERTY UNDER SECTION
      550(a) .....................................................................................10

      A.    The Trustee Has Plausibly Alleged That the Subsequent Transfers
            Defendant Received Contained Stolen BLMIS Customer Property.....................11

      B.    The Trustee is Not Required to Tie Each Subsequent Transfer to a
            Particular Initial Transfer at the Pleading Stage .................................12

      C.    Defendant's Additional Fact-Based Arguments Concerning the
            Subsequent Transfers of Collateral are Inappropriate at the Pleading Stage
            and Must Fail ...................................................................13

      D.    Defendant's Additional Fact-Based Arguments Concerning the
            Subsequent Transfers Received as Redemptions are Inappropriate at the
            Pleading Stage and Must Fail ..................................................16

III.  THE TRUSTEE IS NOT BARRED FROM RECOVERING THE
      COLLATERAL PAYMENTS FROM DEFENDANT ON THE THEORY THAT
      DEFENDANT RETURNED THOSE PAYMENTS TO BLMIS ...................19

IV.   SECTIONS 546(E) AND 546(G) OF THE BANKRUPTCY CODE DO NOT
      BAR RECOVERY FROM DEFENDANT ..........................................22

      A.    Section 546(e) Does Not Apply to Any of the Relevant BLMIS Initial
            Transfers Because the Trustee Adequately Pleaded Tremont's Knowledge
            of Madoff's Fraud .............................................................23

i

B.    Section 546(g) Does Not Bar the Trustee's Claims ..............................................28

V.    THE TRUSTEE HAS ADEQUATELY ALLEGED FRAUDULENT INTENT
UNDER SECTION 548(a)(1)(A) OF THE BANKRUPTCY CODE .............................29

A.    The Ponzi Scheme Presumption is Not Overbroad and Appropriately
Establishes Fraudulent Intent With Respect to Transfers Made in
Furtherance of BLMIS's Ponzi Scheme ...............................................................30

1.    The Ponzi Scheme Presumption is Not Overbroad....................................30

B.    The Trustee Has Adequately Alleged Transfers to the Tremont Initial
Transfer Funds and Harley in Furtherance of the Ponzi Scheme .........................33

C.    The Trustee Has Adequately Alleged Fraudulent Intent Through Sufficient
Badges of Fraud ....................................................................................................35

VI.    DEFENDANT'S ARGUMENT THAT THE SAC ESTABLISHES THE GOOD
FAITH DEFENSE AS A MATTER OF LAW MUST ALSO FAIL ...............................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
   599 B.R. 730 (Bankr. S.D.N.Y. 2019) ............................................................................11, 13

*In re Agric. Research and Tech. Grp. Inc.*,
   916 F.2d 528 (9th Cir. 1990) ....................................................................................................39

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................................10

*In re Bayou Grp., LLC*,
   439 B.R. 284 (S.D.N.Y. 2010) .................................................................................................36

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. f/k/a WAM Long/Short
   Fund, L.P. (In re Bayou Grp., LLC)*,
   362 B.R. 624 (Bankr. S.D.N.Y. 2007) ...............................................................................33, 34

*Bear, Stearns Sec. Corp. v. Gredd*,
   275 B.R. 190 (S.D.N.Y. 2002) .................................................................................................19

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
   397 B.R. 1 (S.D.N.Y. 2007) ..............................................................................................33, 34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................................10

*In re Bernard L. Madoff Inv. Sec., LLC*,
   654 F.3d 229 (2d Cir. 2011) .............................................................................................20, 21

*In re Bernard L. Madoff Inv. Sec., LLC*,
   458 B.R. 87 (Bankr. S.D.N.Y. 2011) .......................................................................................34

*In re Bernard L. Madoff Inv. Sec., LLC*,
   No. 20-cv-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ...............................38, 39

*Cargo Partner AG v. Albatrans, Inc*.,
   352 F.3d 41 (2d Cir. 2003) .........................................................................................................9

*In re Churchill Mortg. Inv. Corp.*,
   256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v.
   Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) ..............................................................................32

*Citibank, N.A. v. Bombshell Taxi LLC (In re Hypnotic Taxi LLC)*,
   543 B.R. 365 (Bankr. E.D.N.Y) ...............................................................................................35

*CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
　393 B.R. 306 (Bankr. W.D.N.Y. 2008) ...........................................................16, 17

*Cohen v. UBS Fin. Servs., Inc.*,
　No. 12-CV-02147, 2014 WL 240324 (S.D.N.Y. Jan. 22, 2014) ............................33

*Daly v. Deptula (In re Carrozzella & Richardson)*,
　286 B.R. 480 (D. Ct. 2002)...................................................................................32

*Dery v. United States (In re Bridge)*,
　90 B.R. 839 (E.D. Mich. 1988)..............................................................................18

*Finn v. Alliance Bank*,
　860 N.W.2d 638 (Minn. 2015)..........................................................................31, 32

*Geltzer v. Barish (In re Geltzer)*,
　502 B.R. 760 (S.D.N.Y. 2013)...............................................................................36

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*,
　Adv. Pro. No. 10-03493 (SMB), 2014 WL 47774 (S.D.N.Y. Bankr. Jan. 3,
　2014) .....................................................................................................................18

*Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*,
　310 B.R. 500 (Bankr. S.D.N.Y. 2002) ..............................................................30, 31

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
　601 B.R. 629 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021)............16

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
　408 F.3d 689 (11th Cir. 2005) ...............................................................................18

*In re J.P. Jeanneret Assoc. Inc.*,
　769 F.Supp.2d 340 (S.D.N.Y. Jan. 31, 2011) .........................................................9

*Johnson v. Holder*,
　564 F.3d 95 (2d Cir. 2009)....................................................................................33

*Kelley v. Westford Special Situations Master Fund, L.P.*,
　No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ..............................14

*Leeming v. Dean Witter Reynolds Inc.*,
　676 F. Supp. 541 (S.D.N.Y. 1988) .........................................................................24

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
　260 B.R. 343 (Bankr. W.D.N.Y. 2001) ...................................................................32

*McHale, Jr. v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*,
    439 B.R. 47 (Bankr. S.D.N.Y. 2010), supplemented, 439 B.R. 78 (Bankr.
    S.D.N.Y. 2010) ................................................................................................................31

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
    77 B.R. 843 (D. Utah 1987) ...........................................................................................30

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In
   re Verstar, Inc.)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ..........................................................................35

*Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff Sec.)*,
    505 B.R. 135 (S.D.N.Y. 2013) ......................................................................23, 28, 29

*Picard v. Banca Carige S.P.A.*,
    Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June
    30, 2022) .................................................................................................4, 10, 12

*Picard v. Banque Cantonale Vaudoise*,
    Adv. Pro. No. 12-01694 (CGM), 2022 WL 2761044 (Bankr. S.D.N.Y. July
    14, 2022) .............................................................................................4, 10, 12, 27

*Picard v. Banque Lombard Odier & Cie SA*,
    Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June
    30, 2022) ................................................................................................ *passim*

*Picard v. Banque SYZ & Co., SA*,
    Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June
    14, 2022) ................................................................................................ *passim*

*Picard v. Barclays Bank (Suisee) S.A.*,
    Adv. Pro. No. 11-02569 (CGM), 2022 WL 2799924 (Bankr. S.D.N.Y. July
    15, 2022) .................................................................................................4, 10, 12

*Picard v. Bordier & Cie*,
    Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June
    30, 2022) .................................................................................................4, 10, 12

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11,
    2015) ...................................................................................................24, 25

*Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*,
    Adv. Pro. No. 10-04398 (BRL), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14,
    2012) ...............................................................................................11, 14, 18

*Picard v. Citibank, N.A.*,
    12 F.4th 171 (2d Cir. 2021) ............................................................................. *passim*

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................11

*Picard v. Fairfield Inv. Fund, Ltd. (In re BLMIS)*,
    Adv. Pro. No. 09-01239, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ..........17, 25, 27

*Picard v. JABA Assocs. LP (In re BLMIS)*,
    2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ........................................................37

*Picard v. Lisa Beth Nissenbaum Tr. (In re BLMIS)*,
    2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ........................................................37

*Picard v. Lloyds TSB Bank PLC*,
    Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June
    30, 2022) ...................................................................................................4, 10, 12

*Picard v. Lowrey (In re Bernard L. Madoff)*,
    596 B.R. 451 (S.D.N.Y. 2019), *aff'd sub nom. Picard v. Gettinger*, 976 F.3d
    184 (2d Cir. 2020), *cert. denied sub nom. Gettinger v. Picard*, 141 S. Ct.
    2603, 209 L. Ed. 2d 736 (2021) .......................................................................35, 36

*Picard v. Lustig (In re BLMIS)*,
    568 B.R. 481 (Bankr. S.D.N.Y. 2017) ................................................................20, 21

*Picard v. Mayer*,
    Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct.
    27, 2021) .........................................................................................................12

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................... *passim*

*Picard v. Multi-Strategy Fund Ltd.*,
    Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June
    13, 2022) ........................................................................................................ *passim*

*Picard v. Nelson (In re BLMIS)*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ..................................................................37

*Picard v. Sage Realty*,
    No. 20-CV-10109 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) ................................33

*Picard v. Shapiro (In re BLMIS)*,
    542 B.R. 100 (S.D.N.Y. 2015) ...........................................................................13

*Preterm-Cleveland v. McCloud*,
    994 F.3d 512 (6th Cir. 2021) ............................................................................33

*Rivas v. Bowling Green Assocs., L.P.*,
   No. 13-cv-7812 (PKC), 2014 WL 3694983 (S.D.N.Y. July 24, 2014) ..................................24

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)...........................................................................................9, 10

*Salomon v. Kaiser (In re Kaiser)*,
   722 F.2d 1574 (2d Cir. 1983)...............................................................................................35

*Schneider v. Barnard*,
   508 B.R. 533 (E.D.N.Y. 2014) .............................................................................................30

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*,
   531 B.R. 439 (Bankr. S.D.N.Y. 2015)..................................................................................28

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005)....................................................................................................35

*Silverman v. Meister (In re Agape World, Inc.)*,
   467 B.R. 556 (Bankr. E.D.N.Y. 2012) ..................................................................................31

*SIPC v. Bernard L. Madoff Investment Securities LLC*,
   No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).......................22, 23, 24

*Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*,
   239 F.3d 365, 2000 WL 1741550 (5th Cir. Nov. 7, 2000) ....................................................18

*Stoebner v. Ritchie Cap. Mgmt., LLC (In re Polaroid Corp.)*,
   472 B.R. 22 (Bankr. D. Minn. 2012) ....................................................................................31

*United States* v. *Henshaw*,
   388 F.3d 738 (10th Cir. 2004) ..............................................................................................18

*United States v. Madoff*,
   Case No. 09-CR-213 (DC),................................................................................................5, 34

*United States v. Quintieri*,
   306 F.3d 1217 (2d Cir. 2002)................................................................................................33

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*,
   554 B.R. 635 (S.D.N.Y. 2016)..............................................................................................35

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................................1

11 U.S.C. § 544............................................................................................................... *passim*

11 U.S.C. § 546..........................................................................................................................23

11 U.S.C. § 546(e) ........................................................................................ *passim*

11 U.S.C. § 546(g) ........................................................................................ *passim*

11 U.S.C. § 548(a)(1)(A) .............................................................................. *passim*

11 U.S.C. § 548(c) ............................................................................... 20, 21, 32

11 U.S.C. § 550(a) ................................................................................. 1, 11, 16

11 U.S.C. § 550(b) ........................................................................................ 3, 38

11 U.S.C. § 550(d) ............................................................................................ 16

15 U.S.C. §§ 78aaa-lll ................................................................................ *passim*

15 U.S.C. § 78fff-2(c)(3) .................................................................................... 1

N.Y. Debt. & Cred. Law § 276 ................................................... 3, 30, 31, 32

UFTA § 4(b) ...................................................................................................... 35

**Rules**

Fed. R. Bankr. P. 7012 ...................................................................................... 9

Fed. R. Civ. P. 8(a) .................................................................................... 11, 13

Fed. R. Civ. P. 8(a)(2) ...................................................................................... 10

Fed. R. Civ. P. (9)(b) ............................................................................ 3, 29, 35

Fed. R. Civ. P. 12(b)(6) ........................................................................ 2, 9, 27

**Other Authorities**

5 Collier on Bankruptcy ¶ 548.04[1] .............................................................. 35

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa-lll ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"),

respectfully submits this memorandum of law in opposition to the motion to dismiss (ECF No.

223) (the "Motion") of defendant ABN AMRO Bank N.V. (presently known as NatWest Markets

N.V.) ("Defendant").

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts to recover BLMIS customer property that was

stolen as part of Madoff's Ponzi scheme, under Sections 105(a) and 550(a) of the Bankruptcy Code

and Section 78fff-2(c)(3) of SIPA, this action seeks to recover at least $308,113,826 in subsequent

transfers that Defendant received from various funds managed and controlled by Tremont Group

Holdings, Inc. (the "Tremont Group"), and its management arm, Tremont Partners, Inc. ("Tremont

Partners," and together with the Tremont Group, "Tremont"), and Harley International (Cayman)

Ltd. ("Harley"). In *Picard v. Citibank, N.A.*, the Second Circuit held that the Trustee did not bear

the burden of pleading a transferee's lack of good faith. 12 F.4th 171, 196-97 (2d Cir. 2021). To

recover stolen customer property under Section 550(a), the Trustee need only allege that "the initial

transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, that

the funds at issue originated with the debtor." *Picard v. Multi-Strategy Fund Ltd.*, Adv. Pro. No. 12-

01205 (CGM), 2022 WL 2137073, at *6 (Bankr. S.D.N.Y. June 13, 2022).

The Trustee's Consolidated Second Amended Complaint (the "SAC") easily meets this

pleading standard. The Trustee alleges that the BLMIS initial transfers to Harley and the Tremont

funds Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited"), Rye Select Broad

Market Fund L.P. ("Rye Broad Market," and collectively with Rye Portfolio Limited, the "Rye

Funds"), Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance LDC"), and Rye

Select Broad Market Prime Fund ("Rye Prime Fund," and collectively with the Rye Funds and Rye Insurance LDC, the "Tremont Initial Transfer Funds") that fund the subsequent transfers are all avoidable. The Trustee also pleads the relevant pathways through which these avoidable initial transfers were transferred to Defendant. Nothing more is required at this stage.

Nevertheless, Defendant moves to dismiss the SAC pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)") on five grounds. They are each, however, meritless.

*First*, Defendant argues that the Trustee has not plausibly traced the money that Defendant received to the BLMIS initial transfers. But, at this stage of the litigation, that is not required. Rather, as the Trustee has done here, the SAC need only set forth the relevant pathways through which stolen customer property was transferred from BLMIS to the Tremont Initial Transfer Funds and Harley, and subsequently to Defendant, and the necessary vital statistics (i.e., the "who, when, and how much") for each subsequent transfer Defendant received.

*Second*, Defendant argues that the Trustee cannot recover certain subsequent transfers it received from two Tremont funds because it has already returned that money to BLMIS. However, Defendant bears the burden of establishing this "diminution of the estate" claim, making such an evidence-weighing exercise clearly inappropriate on a motion to dismiss. Moreover, Defendant is attempting to offset its fraudulent transfer liability on the basis that it deposited withdrawals it received from one BLMIS account into a different BLMIS account. This Court rejected a similar argument and Defendant's position would upend the entire net equity scheme, under which this SIPA liquidation proceeding has operated for more than thirteen and one-half years.

*Third*, Defendant argues that the SAC should be dismissed because the safe harbor provisions of Bankruptcy Code Sections 546(e) and 546(g) purportedly bar the Trustee from avoiding the initial transfers from BLMIS to the Tremont Initial Transfer Funds and Harley, from

2

which the Trustee's recovery claims against Defendant are derived. Defendant is again incorrect. Because the majority of relevant BLMIS initial transfers occurred within the two-year lookback period of Section 548(a)(1)(A), the safe harbors do not apply to the majority of the subsequent transfers the Trustee seeks to recover from Defendant. And as to those BLMIS initial transfers beyond two years that could potentially be implicated by the safe harbors, they are not safe harbored by Section 546(e) because the SAC adequately alleges Tremont's knowledge of the fraud. Nor are they safe harbored by Section 546(g), as the District Court has already determined that the safe harbor does not apply in a 2013 decision concerning the applicability of Section 546(g) to the transfers in this adversary proceeding.

*Fourth*, relying in large part on Judge Menashi's concurring opinion in *Citibank*, Defendant argues that the Trustee fails to plead actual fraudulent intent under Section 548(a)(1)(A). Namely, Defendant contends that the "Ponzi scheme presumption" is overbroad and inconsistent with the text and purpose of Section 548(a)(1)(A) and that the Trustee fails to allege BLMIS's intent with respect to each initial transfer as required by Federal Rule of Civil Procedure (9)(b) ("Rule 9(b)"). Contrary to Defendant's assertions, however, this Court and the District Court have repeatedly recognized that the Trustee can rely on the Ponzi scheme presumption to demonstrate BLMIS's fraudulent intent under Bankruptcy Code Sections 544 and 548(a)(1)(A) and New York Debtor and Creditor Law ("DCL") Section 276 where, as here, the Trustee has alleged the initial transfers at issue were made in furtherance of Madoff's Ponzi scheme. In any event, numerous courts in this Circuit have found that BLMIS's actual fraudulent intent has been established independent of the presumption based on the same "badges of fraud" alleged in the SAC here.

*Finally*, Defendant argues that the Section 550(b) "good faith" defense is apparent on the face of the SAC. As this Court recently held in *Picard v. Banque SYZ & Co., SA*, good faith is a

fact-intensive affirmative defense that is premature and inappropriate on a motion to dismiss. Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *11 (Bankr. S.D.N.Y. June 14, 2022).

Many of Defendant's arguments are similar to those made by *Multi-Strategy* and several other subsequent transferee defendants in their motions to dismiss that this Court recently denied.[1] For the reasons this Court articulated in those recent decisions and for the reasons the Trustee sets forth herein, the Trustee respectfully requests that the Court deny Defendant's Motion.

## STATEMENT OF FACTS

### I.    THE PONZI SCHEME

Madoff founded and operated BLMIS out of New York, New York until its collapse in 2008. (SAC ¶¶ 77-79, 106.) BLMIS had three principal units: (i) a proprietary trading desk; (ii) a broker-dealer operation; and (iii) an investment advisory business (the "IA Business"). (*Id.* ¶¶ 79-84.) For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the S&P 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the market. (*Id.* ¶¶ 90-98.) In reality, BLMIS operated a Ponzi scheme through its IA Business using money deposited by customers that BLMIS claimed to invest in securities. (*Id.* ¶¶ 87, 107.) The IA Business had no legitimate business operations and produced no profits or earnings. (*Id.* ¶¶ 87, 107.) All funds received from BLMIS customers were commingled in a single BLMIS

---

[1] *See* Mem. Decision, *Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM), ECF No. 100 (Bankr. S.D.N.Y. July 18, 2022); *Picard v. Barclays Bank (Suisee) S.A.*, Adv. Pro. No. 11-02569 (CGM), 2022 WL 2799924 (Bankr. S.D.N.Y. July 15, 2022); *Picard v. Banque Cantonale Vaudoise*, Adv. Pro. No. 12-01694 (CGM), 2022 WL 2761044 (Bankr. S.D.N.Y. July 14, 2022); *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022); *Picard v. Bordier & Cie*, Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022); *Picard v. Banca Carige S.P.A.*, Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022); *Picard v. Lloyds TSB Bank PLC*, Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022); *Banque SYZ*, 2022 WL 2135019; *Multi-Strategy*, 2022 WL 2137073.

account at JP Morgan Chase Bank. (*Id.* ¶ 88.) These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family, and to prop up BLMIS's proprietary trading business. (*Id.*) BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments. (*Id.* ¶ 91.)

The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments. (*Id.* ¶ 106.) On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. (*Id.* ¶ 19.) At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. (*Id.* ¶ 24.) At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements. (*Id.*) Madoff was assisted by employees and family members, including Frank DiPascali, Irvin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the Ponzi scheme. (*Id.* ¶¶ 25-27.)

## II.    THE TREMONT AND HARLEY FUNDS

Among BLMIS's customers were its "feeder funds"—large investment funds created for the express purpose of funneling their investors' money into BLMIS. *Citibank*, 12 F.4th at 179.

The Tremont Initial Transfer Funds solicited money from clients to invest with BLMIS and they invested all or substantially all of their assets with BLMIS's IA Business. The Tremont Initial

Transfer Funds were operated, managed, and controlled by Tremont from its Rye, New York headquarters. (SAC ¶¶ 38, 42.) Like the Tremont Initial Transfer Funds, Harley also maintained a customer account at BLMIS and was also one of BLMIS's largest feeder funds and sources of investor principal. (*Id*. ¶ 43.) Harley invested all of its assets with BLMIS in New York. (*Id*.) As customers of the IA Business, the Tremont Initial Transfer Funds and Harley received initial transfers of BLMIS customer property that were based on fraudulent and non-existent securities transactions. (*Id*. ¶¶ 39, 43, 83.)

As further described below, Defendant received subsequent transfers of stolen customer property from (i) the Rye Funds, which were two of the Tremont Initial Transfer Funds, (ii) two other funds operated, managed, and controlled by Tremont—Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited") and Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and collectively with XL Portfolio Limited, the "XL Funds")—which received transfers of stolen customer property from the Tremont Initial Transfer Funds that they then transferred to Defendant, and (iii) Harley.

## III.    DEFENDANT AND ITS TREMONT AND HARLEY TRANSACTIONS

Defendant has undergone several corporate changes. ABN AMRO Bank N.V. ("ABN AMRO") was a financial institution organized under the laws of the Netherlands and maintained a number of branches, agencies, offices, or subsidiaries in the U.S., including, at all relevant times, a branch and representative office in New York, New York. (*Id*. ¶ 31.) ABN AMRO received each of the subsequent transfers at issue in this action and was the party to each of the underlying agreements with the XL Funds, Rye Funds, and Harley described below. (*Id*.)

ABN AMRO was a wholly owned subsidiary of ABN AMRO Holding, N.V. ("ABN Holding"), a public company whose shares were traded on several major stock exchanges, including the New York Stock Exchange. (*Id*. ¶ 34.) On October 17, 2007, RFS Holdings B.V.,

which is 97.72% owned by The Royal Bank of Scotland Group plc, purchased the assets and

liabilities of ABN Holding, including subsidiary ABN AMRO. (*Id.*) Until February 6, 2010, when

it changed its name to "The Royal Bank of Scotland N.V." ("RBS N.V."), ABN AMRO continued

its operations, including regarding its BLMIS feeder fund investments, under the ABN AMRO

name. (*Id.* ¶ 36.) On April 30, 2018, RBS N.V. changed its name to NatWest Markets N.V. (*Id.*

¶ 37.)

This action seeks to recover at least $308,113,826 that Defendant received as subsequent

transfers of stolen BLMIS customer property in connection with two sets of transactions, the

"Tremont Transactions" and the "Harley Transaction." (*Id.* ¶¶ 2-12.)

The Tremont Transactions involved at least $286,313,906 of subsequent transfers

Defendant received from the Tremont XL Funds and Rye Funds in connection with two leverage

deals. (*Id.* ¶¶ 3, 6.) Both deals followed the same structure. Each XL Fund was required to

provide cash collateral to Defendant. (*Id.* ¶ 6.) Defendant agreed to provide each XL Fund with

returns generated by the performance of the Rye Funds, based on investments in the Rye Funds

equal to three times the amount of collateral the XL Funds provided to Defendant. (*Id.*) For

structuring the Tremont Transactions, known as "total return swaps," the XL Funds paid Defendant

millions of dollars in fees. (*Id.*) Since Defendant's payment obligations to the XL Funds were

directly tied to performance of the Rye Funds (and BLMIS), Defendant hedged its risk under the

Tremont Transactions by investing three times the value of the collateral it received from the XL

Funds in the Rye Funds, which invested Defendant's funds with BLMIS. (*Id.* ¶ 7.)

Specifically, in September 2006, Defendant entered into a swap agreement with XL

Portfolio Limited. (*Id.* ¶ 8.) Defendant received at least $217 million in collateral payments from

XL Portfolio Limited. XL Portfolio Limited received at least $84,616,573 in BLMIS customer

property from Rye Portfolio Limited and Rye Insurance LDC. (*Id.*) Defendant hedged its exposure by investing three times the collateral value it received from XL Portfolio Limited in Rye Portfolio Limited. (*Id.* ¶ 9.) Defendant redeemed at least $104,464,000 of BLMIS customer property from Rye Portfolio Limited, which Rye Portfolio Limited satisfied by withdrawing funds from its BLMIS customer account. (*Id.*)

In November 2007, Defendant entered into a swap agreement with XL Broad Market. (*Id.* ¶ 10.) Defendant received at least $95,833,333 in collateral payments from XL Broad Market, which originated from fraudulent transfers BLMIS made to, among others, Rye Broad Market and Rye Prime Fund, which in turn transferred the funds to XL Broad Market. (*Id.*) Like the 2006 deal, Defendant hedged its exposure by investing three times the collateral value it received from XL Broad Market in Rye Broad Market. (*Id.* ¶ 11.) Defendant ultimately redeemed at least $1.4 million of BLMIS customer property from Rye Broad Market, which Rye Broad Market satisfied by withdrawing funds from its BLMIS customer account. (*Id.*)

In 2008, Defendant entered into a third leveraged transaction with Harley. (*Id.* ¶ 12.) Under the terms of the Harley deal, Defendant sold to a counterparty the future performance of a 3.7 times levered exposure to Harley, less certain costs. (*Id.*) As with the Tremont Transactions, Defendant hedged its exposure by investing in Harley, and in December 2008, redeemed $21,799,920 in subsequent transfers of customer property, which Harley satisfied by withdrawing funds from its BLMIS customer account. (*Id.*)

## IV.    THE TREMONT SETTLEMENT AND HARLEY JUDGMENT

On December 7, 2010, the Trustee commenced an adversary proceeding against Tremont funds and entities, including the Tremont Initial Transfer Funds, seeking to avoid and recover fraudulent transfers of customer property in the amount of approximately $2.1 billion. (*Id.* ¶ 88.) In 2011, the Trustee settled with the Tremont funds and related persons and entities (the "Tremont

Settlement"). (*Id.* ¶ 90.) As part of the Tremont Settlement, Tremont and certain of its related persons and entities paid $1.025 billion to the BLMIS customer property estate. (*Id.*) The Tremont Settlement specifically provided that the transfers made to the Tremont Initial Transfer Funds were "deemed avoided." (*Id.* ¶ 185.) The Trustee then commenced a number of adversary proceedings against subsequent transferees of the Tremont funds, like Defendant, to recover approximately $1.075 billion in stolen customer property.

On May 12, 2009, the Trustee filed an adversary proceeding against Harley in this Court under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of customer property from BLMIS to Harley in the amount of approximately $1,072,800,000. On November 10, 2010, the Bankruptcy Court entered a default judgment against Harley in the amount of $1,072,820,000. (*Id.* at ECF No. 15. Of this amount, $1,066,800,000 totaled the initial transfers made within the two-year period, between December 11, 2006 and December 11, 2008, to Harley. *Id.* The Trustee has not recovered any monies from Harley. The Trustee has initiated several adversary proceedings against subsequent transferees of the Harley funds, including against Defendant, to recover some or all of the awarded amount of stolen customer property.

## **ARGUMENT**

### I.     **LEGAL STANDARD**

When considering motions to dismiss under Rule 12(b)(6), applicable to adversary proceedings under Fed. R. Bankr. P. 7012, "the Court must liberally construe all claims, accept all factual allegations in the SAC as true, and draw all reasonable inferences" in the Trustee's favor. *In re J.P. Jeanneret Assoc. Inc.*, 769 F.Supp.2d 340, 353 (S.D.N.Y. Jan. 31, 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003)); *see also Roth v. Jennings*, 489 F.3d

499, 510 (2d Cir. 2007).  To survive a motion to dismiss, the pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The allegations need only meet the "plausibility" standard, such that they "'nudge[] [the] claims' . . . 'across the line from conceivable to plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

The SAC sets forth in full the elements of the Trustee's claims, pleading Defendant's receipt of subsequent transfers of stolen customer property and the grounds upon which the Trustee seeks to recover such transfers made to Defendant.  Thus, Defendant's Motion must be denied.

## II.     THE TRUSTEE'S SAC PLAUSIBLY ALLEGES THAT DEFENDANT RECEIVED STOLEN BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)

Defendant contends that the SAC does not plausibly allege that it is a subsequent transferee of stolen BLMIS customer property because it does not tie the transfers that Defendant received to the BLMIS initial transfers.  (Motion at 6.)  In June and July 2022, this Court rejected this type of tracing argument raised by defendants in several other motions to dismiss on the grounds that the Trustee alleged the "vital statistics" of the subsequent transfers and the defendants' fact-based tracing arguments were premature.[2]  For these same reasons, Defendant's tracing arguments should be rejected here.

---

[2] Mem. Decision at *13, *First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM); *Barclays Bank,* 2022 WL 2799924, at *3; *Banque Cantonale*, 2022 WL 2761044, at *4-6; *Banque Lombard*, 2022 WL 2387523, at *10-11; *Bordier & Cie*, 2022 WL 2390556, at *6-7; *Banca Carige*, 2022 WL 2387522, at *7-8; *Lloyds TSB*, 2022 WL 2390551, at *6-7; *Banque SYZ*, 2022 WL 2135019, at *11-12; *Multi-Strategy*, 2022 WL 2137073, at *10-11.

A.    **The Trustee Has Plausibly Alleged That the Subsequent Transfers Defendant Received Contained Stolen BLMIS Customer Property**

The Trustee's SAC states claims for recovery under Section 550(a) by plausibly alleging that Defendant received subsequent transfers of stolen BLMIS customer property.  To meet his pleading burden under Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") for a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds originated with the debtor."  *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149-50 (Bankr. S.D.N.Y. 2014); *see also Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) ("*Cohmad I*") (under Rule 8(a), "Trustee must plead a statement of facts that 'adequately apprises' the [defendant] of the Subsequent Transfers . . . he seeks to recover").  As Defendant acknowledges (Motion at 7), "the Trustee is not required to provide a dollar-for-dollar accounting" of the exact funds at issue.  *Merkin*, 515 B.R. at 150 (quoting *Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*, Adv. Pro. No. 10-04398 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)).  No tracing analysis is required.  Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]."  *Ellerin*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC, (In re 45 John Lofts, LLC),* 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019).  In addition, the Trustee must allege the "'necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds."  *Cohmad I*, 454 B.R. at 340.

The SAC meets these requirements.  The Trustee alleges that Defendant received collateral payments, identified by date and amount, from the Tremont XL Funds (SAC ¶¶ 8, 10, 202, 207; Exs. O-P), that the XL Funds received transfers of stolen customer property to fund those collateral payments, also identified by date and amount, from the Tremont Initial Transfer Funds (SAC ¶¶

200-01, 205-06, Exs. D, G, K, N), and that the Tremont Initial Transfer Funds invested substantially all of their assets with BLMIS (SAC ¶¶ 4, 49).  The SAC further alleges that Defendant received redemption payments, identified by date and amount, from the Tremont Rye Funds and Harley (SAC ¶¶ 9, 11-12, 203, 208, 217, Exs. C, J, S), and that the Rye Funds and Harley invested substantially all or all of their assets with BLMIS (SAC ¶¶ 4, 12, 43, 49, 64).  The SAC therefore plausibly alleges that Defendant's subsequent transfers originated with BLMIS by (i) providing the necessary "vital statistics" of the transfers Defendant received and (ii) outlining the relevant pathways through which stolen customer property was transferred from BLMIS to the Tremont Initial Transfer Funds, XL Funds, and Harley, and subsequently to Defendant.  Nothing more is required at the pleading stage. *See, e.g., Picard v. Mayer*, Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting argument that "claim has not been plead with enough specificity as to how and what [defendant] received" and holding complaint "contains sufficient information regarding which transfers the Trustee is seeking to recover").  As this Court recently held in several of the Trustee's subsequent transfer actions, the Trustee's transfer exhibits provide Defendant with the "who, when, and how much" of each transfer."[3]

### B.    The Trustee is Not Required to Tie Each Subsequent Transfer to a Particular Initial Transfer at the Pleading Stage

Unable to argue that the Trustee failed to meet the relevant pleading burden, Defendant argues for a new, heightened one, asserting that the Trustee must tie each subsequent transfer Defendant received to a "particular 'initial transfer' out of BLMIS."  (Motion at 7, 10 (collateral

---

[3] Mem. Decision at *13, *First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM); *Barclays Bank,* 2022 WL 2799924, at *3; *Banque Cantonale*, 2022 WL 2761044, at *6; *Banque Lombard*, 2022 WL 2387523, at *10; *Bordier & Cie*, 2022 WL 2390556, at *6; *Banca Carige*, 2022 WL 2387522, at *7; *Lloyds TSB Bank*, 2022 WL 2390551, at *6; *Banque SYZ*, 2022 WL 2135019, at *12; *Multi-Strategy*, 2022 WL 2137073, at *10.

payments), 11-12 (redemption payments).)  However, this Court rejected this argument in *Merkin* and refused to dismiss subsequent transfer claims even though the complaint "[did] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." *Merkin*, 515 B.R. at 150; *see also 45 John Lofts*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss").

Defendant's reliance on this Court's decision in *Picard v. Shapiro (In re BLMIS)* (Motion at 7, 12), for its argument is unavailing because *Shapiro* did not change the Trustee's pleading burden.  542 B.R. 100 (Bankr. S.D.N.Y. 2015).  In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and "upon information and belief," these defendants subsequently transferred this same amount to other defendants.  *Id*. at 119.  However, the *Shapiro* Court concluded that the complaint did not detail any of the necessary vital statistics of the subsequent transfers.  *Id.*  There were no allegations regarding the subsequent transferors, the subsequent transferees, or the dates or amounts of the subsequent transfers, and consequently this Court granted defendants' motion to dismiss the subsequent transfer claim.  *Id.*  Here, because the Trustee sets forth the investment relationships between Defendant and the Tremont and Harley funds, as well as the vital statistics of each transfer Defendant received, he has met his pleading burden under Rule 8(a).

### C.    Defendant's Additional Fact-Based Arguments Concerning the Subsequent Transfers of Collateral are Inappropriate at the Pleading Stage and Must Fail

Defendant's additional fact-based tracing arguments concerning the subsequent transfers of collateral received from the Tremont XL Funds fare no better and are inappropriate on a motion to dismiss.

Defendant argues that the SAC "does not allege the existence or non-existence of any fact that would plausibly support the conclusion that the XL Funds funded their collateral payments to

[Defendant] with money received from the [Tremont Initial Transfer Funds] . . . ." (Motion at 8.)

Defendant continues that the SAC allegations that the source of the XL Funds' investment capital

was investors whom they solicited with private placement memoranda contradicts the Trustee's

theory. (*Id.*) Defendant mischaracterizes the SAC allegations. The SAC merely alleges that the

XL Funds issued private placement memoranda to attract potential investors to invest in its swap

deals. (SAC ¶ 41.) It does not allege that any, let alone all, of the money it used to fund its

collateral payments to Defendant came from any such private investors. Rather, the SAC and its

exhibits clearly allege that stolen customer property was withdrawn from BLMIS by the Tremont

Initial Transfer Funds, which then transferred the funds to the XL Funds, which in turn transferred

the funds to Defendant as collateral for the swap agreements. (SAC ¶¶ 187-98, 200-202, 205-07;

Exs. B, D, F-G, K, M-P.)

Defendant also argues that the SAC "omits to allege the amount of capital that the XL

Funds (a) received from [these other] investors just prior to making the collateral payments to

[Defendant], and (b) had on hand at the time." (Motion at 8-9.) Putting aside Defendant's pure

speculation of facts not alleged in the SAC, which should not defeat the Trustee's claims, to the

extent Defendant is attempting to claim that the transfers of collateral were comingled with non-

BLMIS property, this is a factual issue for the court to decide after fact and expert discovery. *See*

*Ellerin*, 2012 WL 892514, at *3 (holding that even at summary judgment, "it is not necessary for

the Trustee to specify what portion of the Subsequent Transfers to [defendant] was derived from

BLMIS"); *see also Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073, 2020

WL 3077151, at *4 (D. Minn. June 10, 2020) (citing *Ellerin*, 2012 WL 892514, at *2) ("The law

does not place such a difficult burden on trustees. The commingling of legitimate funds with funds

transferred from the debtor does not defeat tracing.").

Defendant advances two further arguments concerning the transfers of collateral from XL Portfolio Limited.  Specifically, Defendant claims that $32,330,373 of the XL Portfolio Limited transfers of collateral "could not possibly have been customer property" because 11 of the transfers from the Tremont Initial Transfer Funds to XL Portfolio Limited post-dated the date of the last transfer from XL Portfolio Limited to Defendant.  (Motion at 10.)  Defendant then argues that footnote 1 to the SAC, which states that, "[u]pon complete discovery and review of comprehensive bank records of XL Portfolio Limited, which are not currently available to the Trustee, additional transfers of customer property to XL Portfolio Limited, and/or from XL Portfolio Limited, may be identified," shows that the Trustee has no basis for his allegations concerning the source of the XL Portfolio Limited collateral transfers.  (*Id.*)  Neither argument is persuasive, particularly on a motion to dismiss.

Defendant is making the type of factual arguments that this Court already rejected in *Multi-Strategy* and *Banque SYZ*, where the Court found that the calculation of customer property used to fund a subsequent transfer are fact issues that are better resolved at a later stage of the litigation. *Multi-Strategy*, 2022 WL 2137073, at *10 (rejecting defendant's "attempt[] to make a very intricate factual argument about how millions of dollars might have come from non-BLMIS property" because "calculation of Fairfield Sentry's customer property and what funds it used to make redemption payments are issues of fact better resolved at a later stage of litigation"); *Banque SYZ*, 2022 WL 2135019, at *12 (same).  In addition, rather than being an admission of inadequate pleading, the SAC's footnote indicates that the Trustee's circumstances—that he does not currently have complete discovery of the XL Portfolio Limited bank records—may not allow him to plead each and every BLMIS initial transfer to XL Portfolio Limited and each subsequent transfer from

XL Portfolio Limited to Defendant.[4]  Because of these circumstances, the Trustee is not required

to plead all subsequent transfers to survive a motion to dismiss, but, rather, it is enough that some

of them are sufficiently pleaded.  *See Merkin*, 515 B.R. at 151 ("The Court's conclusion that the

TAC sufficiently pleads at least some subsequent transfers is also informed by the difficulties the

Trustee faces in a case such as this.").

### D.    Defendant's Additional Fact-Based Arguments Concerning the Subsequent Transfers Received as Redemptions are Inappropriate at the Pleading Stage and Must Fail

Defendant next argues that the SAC's failure to tie the $128 million in subsequent transfers

Defendant received as redemptions from its investments in the Tremont Rye Funds and Harley

back to redemptions from BLMIS makes it possible for the Trustee to receive double recovery

from the $1.934 billion in Rye Funds and Harley redemptions from BLMIS.  (Motion at 12.)  This

purported double recovery argument fails at this preliminary stage of the litigation.  *See Multi-

Strategy*, 2022 WL 2137073, at *11 (finding that any concern about Trustee recovering more than

he is entitled to is "unfounded").  There is no dispute that the Trustee is limited to "a single

satisfaction" under Bankruptcy Code Section 550(a), *see id.* citing 11 U.S.C. § 550(d), but the

Trustee "can recover from any combination of [transferees]" up to the amount avoided.  *Helms v.

Metro. Life Ins. Co. (In re O'Malley)*, 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R.

332 (N.D. Ill. 2021).  And under Section 550(a), "a trustee may recover [an avoided] transfer from

a subsequent transferee of those funds, without the necessity for allocation among all [the]

subsequent transferees."  *CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333

---

[4] With respect to the XL Broad Market transfers of collateral, Defendant argues that many of the transactions that the Trustee relies on for the amount of stolen customer property that was transferred to Defendant post-date the last transfer from XL Broad Market to Defendant as well.  (Motion at 10 n. 4.)  However, it is unclear what Defendant is trying to claim here, as the amount of transfers of customer property to XL Broad Market that pre-date the last transfer from XL Broad Market to Defendant sufficiently fund the collateral transfers to Defendant, and Defendant concedes it is not making the same sort of impossibility argument that it is making regarding a portion of the XL Portfolio Limited transfers.  (*Id.*)

(Bankr. W.D.N.Y. 2008). The Trustee may simultaneously seek recovery from Defendant and defendants in other actions in this BLMIS SIPA liquidation proceeding, even in an aggregate amount that exceeds initial transfers. *See Picard v. Fairfield Inv. Fund, Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239, 2021 WL 3477479, at *12 (Bankr. S.D.N.Y. Aug. 6, 2021) (holding Trustee could sue both initial and subsequent transferees for same transfers). "Calculation of whether the Trustee is fully satisfied is a factual finding to be made by this Court at a later stage of litigation." *Multi-Strategy*, 2022 WL 2137073, at *11; *Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (same). Defendant's double recovery argument should be rejected at this premature stage.

Finally, Defendant argues that the SAC is "devoid of any non-conclusory factual allegations" that would lead to the conclusion that the Rye Funds and Harley in fact funded Defendant's redemptions with their own redemptions of customer property from BLMIS. (Motion at 12.) However, the SAC plausibly alleges that the Rye Funds and Harley did not have any assets except customer property. (SAC ¶¶ 4, 12, 43, 49, 64); *see Multi-Strategy*, 2022 WL 2137073, at *10 (finding on similar argument under similar facts that "the Complaint plausibly pleads that Defendant received customer property because Fairfield Sentry did not have other property to give."). Taking all allegations as true and reading them in a light most favorable to the Trustee, the SAC plausibly pleads that Defendant received customer property because the Rye Funds and Harley did not have other property to give.

\*\*\*

Defendant's tracing arguments are not only wrong, but also premature. *See Merkin*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because tracing may prove formidable due to comingling of assets). Courts in this district and in this SIPA liquidation proceeding have denied summary judgment

where only an undetermined or small portion of the subsequent transfer was conceivably traceable

to the estate. *See Ellerin*, 2012 WL 892514, at *2-3 (holding that even at summary judgment, "it

is not necessary for the Trustee to specify what portion of the Subsequent Transfers to [the

subsequent transferees] was derived from BLMIS;" courts should only dismiss such claims

without affording opportunity to conduct discovery "in the rarest of cases."); *Gowan v. Amaranth

Advisors LLC (In re Dreier LLP),* Adv. Pro. No. 10-03493 (SMB), 2014 WL 47774, at *14-16

(S.D.N.Y. Bankr. Jan. 3, 2014) (allowing trustee to proceed to trial where at most 3.5% of transfers

at issue could be traced to debtor's Ponzi scheme).

As this case is still in the nascent pleading stage, it would be premature to cut off the

Trustee's ability to trace the subsequent transfers. The circumstances of the transfers, including

the purpose of the transfers and the parties' intent, are relevant to equitable principles applied to

tracing. *See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 239 F.3d 365,

2000 WL 1741550, at *5 (5th Cir. Nov. 7, 2000), as amended on reh'g (Dec. 11, 2000) (court's

"task here is to look beyond the particular transfers in question to the entire circumstances of the

transactions"). Because money is fungible, "[t]he goal of 'tracing' is not to trace anything at all in

many cases, but rather [to] serve[] as an equitable substitute for the impossibility of specific

identification." *United States* v. *Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (citation omitted).

And "[i]t is undeniable that equity will follow a fund through any number of permutations, and

preserve it for the owner as long as it can be identified." *IBT Int'l, Inc. v. Northern (In re Int'l

Admin. Servs., Inc.)*, 408 F.3d 689, 709 (11th Cir. 2005) (quoting *Dery v. United States (In re

Bridge)*, 90 B.R. 839, 848 (E.D. Mich. 1988)).

III.    **THE TRUSTEE IS NOT BARRED FROM RECOVERING THE COLLATERAL PAYMENTS FROM DEFENDANT ON THE THEORY THAT DEFENDANT RETURNED THOSE PAYMENTS TO BLMIS**

Without citing to any relevant authority, Defendant next contends that the Trustee's claims to recover the transfers of collateral should be dismissed because, according to the SAC, Defendant returned all the collateral payments to BLMIS, purportedly meaning that "the collateral payments have already been 'recovered' from [Defendant]." (Motion at 13.)  Defendant argues that the Trustee is attempting to double dip and "recover" money from Defendant that he simultaneously alleges Defendant already returned to BLMIS.  *Id*.

Defendant's argument is baseless.  The Trustee has not yet recovered any collateral payments from Defendant, a point it does not deny.  Rather, Defendant's argument appears to be a thinly-veiled "diminution of the estate" claim, which is an affirmative defense that requires Defendant to show that the customer property it received was actually returned to the BLMIS estate.  *See Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195-96 (S.D.N.Y. 2002) ("*Bear, Stearns I*").  In *Bear, Stearns I*, the District Court specifically "decline[d] to make 'diminution of the estate' an element of § 548(a)(1)(A)." *Id.* at 196.  Instead, that court recognized an affirmative defense where, unlike here, "the transferred assets were never available to any creditors by operation of federal law . . ." *Id*.  The *Bear, Stearns I* court noted that "the transferee will bear both the ultimate burden of proof as well as the initial burden of production" on this affirmative defense, and set forth three elements the transferee must prove: "that the transfer did not (1) reduce the res that would have been available to any creditor or creditors, (2) 'hinder, delay, or defraud' any creditor or creditors, or (3) have any other adverse impact on any creditor or creditors generally." *Id*.

Here, Defendant did not even try to meet its burden to prove any of these elements, likely because it cannot.  Defendant does not argue that the collateral transfers at issue were unavailable

19

to any creditors by operation of federal law, or otherwise. Nor can they, because the collateral transfers were funded by customer property originating from BLMIS, over which BLMIS had control. *In re Bernard L. Madoff Inv. Sec., LLC*, 654 F.3d 229, 232, 238-39 (2d Cir. 2011). The transfers here are avoidable—to follow through on Defendants' argument would be inequitable to all parties involved.

The factual issues involved in Defendant's argument illustrate exactly why the argument is inappropriate to resolve at the motion to dismiss stage and should be treated as an affirmative defense. *See, e.g., Multi-Strategy*, 2022 WL 2137073, at *10 (finding that "intricate factual argument[s]" are "better resolved at a later stage of litigation."). For example, a tracing analysis would be necessary to determine the extent to which Defendant is impermissibly attempting to collapse two different BLMIS accounts. While Defendant invested funds in Rye Portfolio Limited to hedge its risk under the XL Portfolio Limited swap, the collateral Defendant received from XL Portfolio Limited also was funded by transfers from Rye Insurance LDC, which maintained its own BLMIS account. (SAC ¶¶ 201-202; Ex. N-M.) Similarly, while Defendant invested funds in Rye Broad Market to hedge its risk under the XL Broad Market swap, the collateral Defendant received from XL Broad Market was also funded by transfers from Rye Prime Fund, which also maintained its own BLMIS account. (SAC ¶¶ 206-07; Exs. F-G.) Thus, at least in part, Defendant is seeking to offset its fraudulent transfer liability on the basis that it deposited a withdrawal it received that was derived from one BLMIS account (e.g., Rye Insurance LDC) into a different BLMIS account (e.g., Rye Portfolio Limited). This Court has already rejected a similar argument, explaining that it was inconsistent with Bankruptcy Code Section 548(c) because it would deprive third parties who later made deposits of their rights. *See Picard v. Lustig (In re BLMIS)*, 568 B.R. 481, 487-88 (Bankr. S.D.N.Y. 2017) ("The Funds gave the value through the deposits that the

Lustig Defendants are trying to conscript for their own benefit, and the Funds are entitled to the credit for those deposits under § 548(c)."). Declining to offset defendants' fictitious profits in one BLMIS account against alleged net losses through a separate BLMIS account, this Court stated that "[e]ven if one accepted that the credit arises from the Funds' reinvestment of money traceable back to [defendants'] withdrawals, the reinvestment is still a separate transaction governed by whatever account agreements the Funds had with BLMIS." *Id*. at 490. Likewise, here, Defendant's argument seeks to collapse transactions across separate customer accounts in an attempt to co-opt value from one BLMIS customer account to another.

While Defendant claims that the Trustee's alleged double-dipping is in tension with the Trustee's own "Net Investment Method" (Motion at 13-14), Defendant's argument would upend the entire net equity scheme, the foundation of this SIPA liquidation proceeding, and the law of this case for over a decade. In *In re Bernard L. Madoff Investment Securities, LLC*, the Second Circuit upheld the "Net Investment Method," which requires "that each customer's 'net equity' should be calculated by . . . crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it." 654 F.3d 229, 233 (2d Cir. 2011). That net equity is calculated on an account-by-account basis such that different customers (here, Rye Insurance LDC, Rye Portfolio Limited, Rye Prime Fund, and Rye Broad Market) hold different accounts with different net equities, is a basic tenet of the Net Investment Method.

The net equity in Rye Portfolio Limited's BLMIS account, No. 1FR080, formed the basis for the Trustee's settlement of Rye Portfolio Limited's customer claim. Mot. to Approve Tremont Settlement Agreement, *In re Madoff Sec.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. July 28, 2011), ECF No. 17; Order to Approve Tremont Settlement Agreement at Ex. A,¶ I, *In re Madoff Sec.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. Sept. 22, 2011), ECF No. 38. To now credit

Defendant's deposit into Rye Portfolio Limited against Rye Insurance LDC's withdrawals from

its BLMIS account, No. 1FR010, would require this Court to give a second credit to that deposit

(for Defendant's benefit)—a result that would be inequitable to all defrauded BLMIS customers,

particularly those who have been waiting for more than thirteen and one-half years to receive their

principal back in this SIPA liquidation proceeding.  The same result would occur if Defendant's

deposit into Rye Broad Market was credited against Rye Prime Fund withdrawals from its BLMIS

account.  By attempting to combine transfers and collapse transactions from different entities and

accounts, Defendant seeks to impermissibly change the net equity calculation for its own benefit,

a result not countenanced by SIPA or the Net Investment Method.

## IV.    SECTIONS 546(E) AND 546(G) OF THE BANKRUPTCY CODE DO NOT BAR RECOVERY FROM DEFENDANT

Section 546(e) provides a safe harbor for the avoidance of initial transfers made outside

the two-year period referenced in Section 548(a)(1)(A) that are "settlement payment[s] . . . made

by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . or that [are]

made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in

connection with a securities contract."  *Multi-Strategy*, 2022 WL 2137073, at *8.  In *SIPC v.*

*Bernard L. Madoff Investment Securities LLC*, the District Court held that an initial transferee's

actual knowledge of Madoff's fraud precluded application of the Section 546(e) safe harbor,

thereby allowing the Trustee to avoid initial transfers made by BLMIS prior to the two-year period

referenced in Section 548(a)(1)(A).  No. 12-MC-115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y.

Apr. 15, 2013) ("*Cohmad II*").

Section 546(g) provides a different safe harbor for the avoidance of certain initial transfers

made outside the two-year period referenced in Section 548(a)(1)(A).  Section 546(g) prevents a

trustee from avoiding initial transfers that were made: (i) in connection with a swap agreement;

and (ii) by, to, or for the benefit of, a financial participant.  *Picard v. ABN AMRO Bank (Ireland)*

*Ltd. (In re Madoff Sec.)*, 505 B.R. 135, 142 (S.D.N.Y. 2013).

Misapplying these sections, Defendant claims that "[t]he Trustee cannot avoid ***any*** of the

initial transfers . . . because the Section 546 safe harbors . . . are applicable as a matter of law[]."

(Motion at 14 (emphasis added).)  This is incorrect.  First, Defendant's contentions ignore the fact

that the majority of the relevant BLMIS initial transfers occurred within the two-year period

referenced in Section 548(a)(1)(A) and thus the safe harbors of Section 546 are inapplicable to

those transfers as a matter of law.  (SAC Exs. B-D, F-G, I-K, M-P, R-S.)  Second, Defendant's

contention ignores that while the Section 546(e) safe harbor could relate to collateral and

redemption payments, the Section 546(g) safe harbor can only relate to redemption payments.

*ABN AMRO*, 505 B.R. at 150.  Finally, and significant at this stage of the litigation, Defendant's

position completely ignores that the SAC sufficiently alleges Tremont's actual knowledge of the

fraud, which renders Section 546(e) inapplicable to all of the relevant BLMIS initial transfers, and

that the District Court has already decided that 546(g) does not bar the Trustee from recovering

any of the redemption payments.  *Id.*

A.    **Section 546(e) Does Not Apply to Any of the Relevant BLMIS Initial Transfers
Because the Trustee Adequately Pleaded Tremont's Knowledge of Madoff's
Fraud**

Defendant is not shielded by the safe harbor provided by Section 546(e).  Defendant's

entire argument is premised on the assertion that "[t]he district court has already held that the

Section 546(e) safe harbor protects all of the initial transfers alleged in the [SAC] from avoidance."

(Motion at 16.)  However, in *Cohmad II*, the District Court held that an initial transferee's actual

knowledge of Madoff's fraud precluded application of the Section 546(e) safe harbor, so the

Trustee can avoid transfers made by BLMIS prior to the Section 548(a)(1)(A) two-year period.

2013 WL 1609154, at *1.  Defendant spends pages on the interpretation and application of Section

23

546(e)'s requirements that the transfer be made "in connection with" a securities contract and that

the transfer must be "for the benefit" of a covered entity (Motion at 16-19), but not once does

Defendant mention that initial transferees cannot "prevail on a motion to dismiss some or all of

the Trustee's avoidance claims simply on the basis of the Section 546(e) 'safe harbor' if the Trustee

has alleged that the initial transferee had actual knowledge of Madoff Securities' fraud." *Cohmad*

*II*, 2013 WL 1609154, at *1 (emphasis omitted); *see also Banque Lombard,* 2022 WL 2387523,

at *8 (applying *Cohmad II* initial transferee actual knowledge exception in another subsequent

transferee action); *Multi-Strategy*, 2022 WL 2137073, at *9 (same).  Nor does Defendant contest

that the SAC adequately pleads Tremont's actual knowledge of Madoff's fraud.[5]

Even if it tried, Defendant cannot contest that the SAC contains sufficient allegations of

Tremont's actual knowledge to defeat the Section 546(e) safe harbor defense on a motion to

dismiss.[6]  Actual knowledge requires the Trustee to plead that a defendant had "a high level of

certainty and absence of any substantial doubt regarding the existence of a fact." *Picard v. Ceretti*

*(In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug.

11, 2015) ("*Kingate*") (quoting *Merkin*, 515 B.R. at 139).  Actual knowledge may be proven by

circumstantial evidence.  *Rivas v. Bowling Green Assocs., L.P*., No. 13-cv-7812 (PKC), 2014 WL

3694983, at *2 (S.D.N.Y. July 24, 2014).  It also is difficult to determine as a matter of law.  *See*

*Leeming v. Dean Witter Reynolds Inc.*, 676 F. Supp. 541, 545 (S.D.N.Y. 1988) (acknowledging

that "subjective factual issues" as to actual knowledge were "ill-suited for resolution on a motion

to dismiss").

---

[5] Defendant merely includes a conclusory footnote in a different section of the Motion that addresses the Trustee's pleading burden under Section 548(a)(1)(A) that states, "[a]lthough the relevant intent is the intent of the debtor, the Trustee has also not pled Tremont . . . acted with the requisite intent."  (Motion at 25 n. 12.)

[6] Harley's knowledge of Madoff's fraud is not at issue here, because all of the BLMIS initial transfers that funded Harley's subsequent transfers to Defendant occurred within Section 548(a)(1)(A)'s two-year lookback period. (SAC Exs. R-S.)

The Trustee's allegations of Tremont's actual knowledge closely mirror those against Kingate, as detailed in *Kingate*, and BLMIS's other major feeder fund manager, Fairfield, as detailed in *Fairfield Inv. Fund*. As with Kingate and Fairfield, Tremont was utterly dependent on BLMIS's fraud. Tremont managed one of the largest groups of BLMIS feeder funds, with billions invested at the time of Madoff's arrest. (Tremont Compl. ¶¶ 1-2, 5;[7] SAC ¶ 39.) Various Tremont executives observed that BLMIS accounted for "all of the profits of the firm," that the Tremont feeder funds' "only reason for being" was as feeders into BLMIS, and that BLMIS was Tremont's "crack addiction business." (SAC ¶ 173.) Tremont's parent company similarly concluded that "the economics of Tremont's business [was] Madoff." (*Id.* ¶ 174.) This business yielded Tremont hundreds of millions of dollars in fees, and millions of dollars in compensation to its executives. (*Id.* ¶ 172; Tremont Compl. ¶¶ 14, 31, 58-59, 82, 103-110, 124.) Its chief executives had longstanding, unusually close relationships with Madoff for almost two decades, which Tremont touted in its marketing materials to investors. (SAC ¶¶ 112-114.)

Tremont was continually confronted with warnings from investors and potential investors indicating that BLMIS was a fraud. (*Id.* ¶¶ 115-127.) For example, in April 2001, one investor wrote to Robert Schulman, Tremont's CEO: "I know you are sick of answering this but man is it hot out here with the Bernie fraud rumors." (*Id.* ¶ 115.) Another client questioned "the legitimacy of the whole Bernie thing." (Tremont Compl. ¶ 197.) An internal Tremont email from 2004 suggests that another investor was concerned by Tremont's relationship with BLMIS, stating that there was no transparency there. (*Id.* ¶ 194.) Another investor specifically raised the prospect that BLMIS was a Ponzi scheme. (SAC ¶¶ 122-123.) Over the years, third parties repeatedly

---

[7] The SAC incorporates the factual allegations in the Tremont Complaint by reference and supplements the allegations therein. (SAC ¶ 109; *see also* Complaint, *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (CGM) (Bankr. S.D.N.Y. Dec. 7, 2010), ECF No. 1 ("Tremont Compl.").)

highlighted to Tremont, among other things, BLMIS's impossibly stable returns; its use of a small auditor with no other clients; its lack of a third-party custodian; its unknown counterparties; its failure to charge a management fee; its utter lack of transparency; and the inability to verify assets. (*Id.* ¶¶ 117, 122-124; Tremont Compl. ¶¶ 158, 194-95, 215.)  Tremont's executives knew these warnings evidenced fraud, as revealed by their practice of internally sharing the Barron's and Mar/Hedge articles questioning Madoff's legitimacy after receiving such warnings.  (SAC ¶¶ 116, 125, 127.)

Tremont was also continually confronted with information that BLMIS's trading and performance was neither legitimate nor possible.  (*Id.* ¶¶ 128-29.)  Based on information it received from BLMIS, Tremont knew that daily securities positions and prices BLMIS reported differed from those reported by Bloomberg, and there was insufficient volume for BLMIS to complete its purported securities trades.  (*Id.* ¶ 128; Tremont Compl. ¶¶ 170-74.)  Tremont also knew BLMIS had a history of impossibly consistent positive returns given the SSC Strategy Madoff purported to employ.  (Tremont Compl. ¶¶ 160-64.)   Tremont used BLMIS's impossible trading and performance regularly for years as the centerpiece for its own reports and marketing materials. (SAC ¶¶ 128, 129.)

Tremont also knew that BLMIS had no International Swaps and Derivatives Association (ISDA) agreements in place for its purported OTC options trades, although such agreements were required, and that Madoff had never given Tremont a single counterparty name, although Tremont bore the risk of a counterparty default and those names should have been on every trade confirmation.  (*Id.* ¶ 154; Tremont Compl. ¶ 185.) Moreover, Tremont knew neither the identity of the counterparties to these transactions nor the characteristics and number of such counterparties.  (Tremont Compl. ¶¶ 185, 230.)  At one point, Tremont told an investor that the

counterparties include "typical banks," like JP Morgan, despite JP Morgan itself inquiring as to the identity of the counterparties the month prior. (*Id*. ¶ 190.) Tremont understood BLMIS's options trading was a fiction, as illustrated by its total lack of concern as to counterparty exposure when Lehman Brothers collapsed in 2008. (SAC ¶¶ 166-170.)

By helping conceal it, Tremont was an active and knowing facilitator of the fraud. Tremont consistently excluded Madoff from its own due diligence requirements. (*Id*. ¶¶ 152-157, 158-170.) Tremont employees knew that three things "ya don't ask" about BLMIS were its assets under management, how it generated its purported returns, and its auditors. (*Id*. ¶ 132.) As stated by one employee, Tremont had "no manager due dili[gence] process" for BLMIS. (*Id*. ¶ 135.) Although BLMIS should have been rejected based on Tremont's policy against self-custody and self-clearing alone, it got a pass. (*Id*. ¶¶ 136-141.) Schulman also strictly prohibited anyone other than himself from contacting BLMIS, despite its significance to Tremont's existence. (*Id*. ¶¶ 142-151.)

Tremont similarly prevented investors and even its own auditors from having contact with BLMIS, and it hindered the due diligence efforts of third parties through obstruction and misleading statements. (*Id*. ¶¶ 113, 128, 149-151.) Among the tales Tremont wove were (i) that Madoff's auditors audited other broker-dealers, (ii) that Tremont had verified the existence of BLMIS's assets, and (iii) various fabrications regarding BLMIS's purported options trading, including claiming to have spoken with, and providing actual names and descriptions of, non-existent counterparties. (*Id*. ¶¶ 134, 162-165.)

On factual allegations similar to these, this Court has recently "determined that the Fairfield Complaint[] contains sufficient allegations of Fairfield Sentry's actual knowledge to defeat the [Section 546(e)] safe harbor defense on a Rule 12(b)(6) motion." *E.g., Banque Cantonale*, 2022 WL 2761044, at *5 (citing *Fairfield Inv. Fund*, 2021 WL 3477479, at *4). Accordingly, because

the SAC adequately alleges Tremont's knowledge of Madoff's fraud, Section 546(e) does not bar

avoidance of any of the initial transfers made to the Tremont Initial Transfer Funds, and those

transfers may be recovered from Defendant, regardless of whether BLMIS, Tremont, or Defendant

qualify as financial institutions, their agreements qualify as securities contracts, or their transfers

qualify as settlement payments.[8]

### B.    Section 546(g) Does Not Bar the Trustee's Claims

Defendant's assertion that the District Court in *ABN AMRO* has already held that the

Trustee may not recover the $127,663,920 in redemption payments from Defendant under Section

546(g) (Motion at 22) is incorrect.  Rather, the District Court held that Section 546(g) did not

preclude the Trustee from recovering any of the redemption payments he alleged from Defendant.

On May 15, 2012, the District Court withdrew the reference from this Court regarding the

issue of whether Section 546(g) prevents the Trustee from recovering the relevant transfers in this

and another adversary proceeding.  *ABN AMRO*, 505 B.R. at 137.  The District Court decided that,

while Section 546(g) could protect redemption payments from recovery, the redemption payments

at issue here "appear[ed] to have occurred within the reach-back period of section 548(a)(1)(A),"

and thus did not dismiss those transfers.  *Id*. at 150.  The District Court then returned the case to

---

[8] The Trustee does not concede that any agreements or transfers between the Rye Funds and XL Funds and Defendant activate the safe harbor under Section 546(e) or that any transferor or transferee is a financial participant.  Although Defendant argues that dismissing the Trustee's claims would achieve Section 546(e)'s purpose by "protecting [Defendant's] reasonable expectations" (Motion at 19), such information is simply not relevant, because whether the initial transfers are avoidable turns on Tremont's actual knowledge of fraud at BLMIS, not Defendant's.  *Banque Lombard*, 2022 WL 2387523, at *9.  Among other things, the Trustee does not concede—by alleging that the subsequent transfers were customer property—that the initial transfers were "in connection with" the swap or subscription agreements with Defendant.  A showing that the subsequent transfers can be traced through the "relevant pathways" to the initial transfers is entirely irrelevant to the issue of whether the initial transfers were "in connection with" any transaction or contract between the Rye Funds and XL Funds and Defendant for purposes of application of the securities safe harbor.  The Trustee also does not concede that the initial transfers were made "for the benefit of" Defendant.  The SAC plainly alleges that Defendant is a subsequent transferee, and it is settled law that a defendant cannot be both a subsequent transferee and a party for whose benefit an initial transfer is made.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*, 531 B.R. 439, 474 (Bankr. S.D.N.Y. 2015) (citing cases).

this Court for further proceedings consistent with its decision. *Id*. at 151. Defendant is bound by

the District Court's decision and is precluded from relitigating it on this Motion.[9]

## V.    THE TRUSTEE HAS ADEQUATELY ALLEGED FRAUDULENT INTENT UNDER SECTION 548(A)(1)(A) OF THE BANKRUPTCY CODE

Defendant argues that the initial transfers from BLMIS to the Tremont Initial Transfer

Funds and to Harley are not avoidable because the SAC is "devoid of any allegations, that if proved

would establish that . . . BLMIS acted with the requisite intent to 'hinder, delay or defraud'

creditors" under Section 548(a)(1)(A) of the Bankruptcy Code.   (Motion at 26.)   Defendant

incorrectly claims that the Trustee fails to plead transfer-specific facts related to the transferor's

intent with the specificity required under Rule 9(b) and that the Trustee cannot rely on the general

existence of a Ponzi scheme to establish actual fraudulent intent as to each specific initial transfer.

(*See id*. at 25-27.)

However, as this Court recently held, "[t]he Ponzi scheme presumption is the law of this

Circuit and the Trustee is entitled to rely on it to allege BLMIS' intent."  Mem. Decision at *22,

*First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM).   And the SAC alleges numerous facts

establishing that BLMIS was a Ponzi scheme, including that the money received from investors

was used to pay off other investors—the *sine qua non* of a Ponzi scheme.   (SAC ¶¶ 83-106.)

Contrary to Defendant's assertions, the Trustee appreciates and agrees that the Ponzi scheme

presumption is cabined to transfers made in furtherance of the Ponzi scheme, as was the case for

the initial transfers here that BLMIS made to its IA Business customers, the Tremont Initial

Transfer Funds, and Harley.  (*Id*. ¶¶ 8-12, 190-198, 214.)  Moreover, the Trustee adequately alleges

---

[9] By arguing that Defendant cannot relitigate *ABN AMRO* on this Motion, the Trustee is not agreeing with the District Court's decision that there is no actual knowledge exception to Section 546(g) or that the 546(g) safe harbor should apply to these transactions.  The Trustee continues to reserve his right to appeal *ABN AMRO* at the appropriate time.

badges of fraud sufficient to establish BLMIS's fraudulent intent independent of the Ponzi scheme

presumption.

A.   **The Ponzi Scheme Presumption is Not Overbroad and Appropriately Establishes Fraudulent Intent With Respect to Transfers Made in Furtherance of BLMIS's Ponzi Scheme**

1.   The Ponzi Scheme Presumption is Not Overbroad

Despite Defendant's attempts to pretend the Ponzi scheme presumption is "out-of-Circuit"

law (Motion at 27), it is well-established in this Circuit that as a matter of law, the Ponzi scheme

presumption establishes the debtors' fraudulent intent as required under Bankruptcy Code Sections

544 and 548(a)(1)(A) and DCL Section 276.  Mem. Decision at \*22, *First Gulf Bank*, Adv. Pro.

No. 11-02541 (CGM) (citing cases); *see also Citibank*, 12 F.4th at 181.

Defendant nevertheless argues that the "Ponzi scheme presumption" is overbroad and

inconsistent with the text and purpose of Section 548(a)(1)(A).[10]  Defendant misconstrues the

Trustee's pleadings to mean that applying the Ponzi scheme presumption empowers a trustee to

avoid all of the debtors' payments.  (Motion at 28.)  It does not.  Indeed, many courts have held

that the scope of the Ponzi scheme presumption is limited to transfers related to or in furtherance

of the Ponzi scheme.  *See Schneider v. Barnard*, 508 B.R. 533, 543 (E.D.N.Y. 2014) (discussing

decisions concerning scope of Ponzi scheme presumption).  This is "[b]ecause '[t]he investor pool

is a limited resource and will eventually run dry.'"  *Id*. at 542 (quoting *Merrill v. Abbott (In re*

*Indep. Clearing House Co.),* 77 B.R. 843, 860 (D. Utah 1987)).  "[T]he Ponzi scheme operator

'must know all along, from the very nature of his activities, that investors at the end of the line

will lose their money.'"  *Id*.  Thus, the "only possible inference is that the debtors had the intent to

hinder, delay or defraud future creditors, because they must have known that future creditors would

---

[10] Defendant does not address the Ponzi scheme presumption's applicability to Bankruptcy Code Section 544 or DCL Section 276.  (*See* Motion at 25-30.)

not be paid." *Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 507 (Bankr. S.D.N.Y. 2002). Where this is the case, the Ponzi scheme presumption applies to transfers related to that scheme. *See McHale, Jr. v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010), supplemented, 439 B.R. 78 (Bankr. S.D.N.Y. 2010) ("For the Ponzi scheme presumption to apply, the transfers must have been made in connection with [or in furtherance of] a Ponzi scheme."); *see also Silverman v. Meister (In re Agape World, Inc.)*, 467 B.R. 556, 570 (Bankr. E.D.N.Y. 2012) ("The sole exception to the Ponzi scheme presumption is where the transfers at issue are so unrelated to the Ponzi scheme that the transfers do not serve to further the Ponzi scheme.").

The Ponzi scheme presumption is just that—a presumption that may be rebutted by Defendant. Indeed, the inference resulting from the presumption, which satisfies the intent requirement of Bankruptcy Code Sections 544 and 548(a)(1)(A) and DCL Section 276, can always be rebutted by proof of contrary intent. *See Stoebner v. Ritchie Cap. Mgmt., LLC (In re Polaroid Corp.)*, 472 B.R. 22, 35 (Bankr. D. Minn. 2012) ("[O]nce a trustee has proved the [existence and operation of a Ponzi scheme through a debtor-entity . . . plus the execution of a transfer of property out of the entity in furtherance of the scheme], the defendant in the avoidance action must produce probative, significant evidence that the transferor-debtor *lacked* the intent to take the transferred value away from contemporaneous or future creditors"). The Ponzi scheme presumption creates a rebuttable inference that given the nature of a Ponzi scheme, transfers made in connection with the scheme are made with the requisite fraudulent intent under Sections 544 and 548(a)(1)(A) and DCL Section 276.

Defendant's attempt to cast doubt on the validity of the Ponzi scheme presumption by citing several inapplicable cases that focus on whether the presumption conclusively establishes a

lack of reasonably equivalent value as an element of a *constructive* fraudulent conveyance, or purely as a question of state law, or both, necessarily fails. *See Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (finding that under Minnesota state law existence of Ponzi scheme does not conclusively establish lack of reasonably equivalent value and insolvency as elements of *constructive* fraud claim or preclude finding that debtor lacked actual fraudulent intent); *Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) (addressing recovery of fraudulent conveyance under *constructive fraud* theory in connection with Ponzi scheme, without even mentioning presumption as it applies to *actual fraud* theory); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 488-89 (D. Ct. 2002) (considering whether existence of Ponzi scheme conclusively establishes lack of reasonably equivalent value as element of *constructive* fraud claim under Connecticut state law). And while the court in *In re Churchill Mortg. Inv. Corp.* discussed the presumption's application to both actual and constructive fraud claims under Section 548, it did not raise any questions regarding its application to establish the debtor's fraudulent intent under Section 548(a)(1)(A) or DCL Section 276. 256 B.R. 664, 681 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001). Instead, it only considered the question of value as it relates to the initial transferee's affirmative defense under Section 548(c). *Id*. at 680-84. None of these cases reject the presumption as it applies to Sections 544 and 548(a)(1)(A) of the Bankruptcy Code, or DCL Section 276.

Defendant pretends that law of the case no longer applies here, where the Ponzi scheme presumption has been continually applied by this Court, the District Court, and the Second Circuit in the Trustee's actions. (Motion at 27 n. 14.) Instead, Defendant urges this Court to disregard this settled principle in light of Judge Menashi's concurring opinion in *Citibank*. *See* 12 F.4th at

202 (Menashi, J., concurring). However, the District Court recently recognized that, "[n]otwithstanding Judge Menashi's concerns, 'the Ponzi scheme presumption remains law of this Circuit.'" *See Picard v. Sage Realty*, No. 20-CV-10109 (JFK), 2022 WL 1125643, at *28 (S.D.N.Y. Apr. 15, 2022) (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("*Bear, Stearns II*")). Moreover, *dicta* in a concurring opinion has no precedential effect, and it certainly does not constitute an intervening change of controlling law or provide any other "cogent" or "compelling" reasons to depart from the law of the case. *See, e.g., Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009) ("We may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'") (citing *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)); *Cohen v. UBS Fin. Servs., Inc.*, No. 12-CV-02147, 2014 WL 240324, at *4 (S.D.N.Y. Jan. 22, 2014) (preceding decision was not considered "intervening change in controlling law" when relevant finding was "mere dicta"); *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 567 (6th Cir. 2021) (recognizing that concurring opinion "being dicta, creates no controlling law").

### B. The Trustee Has Adequately Alleged Transfers to the Tremont Initial Transfer Funds and Harley in Furtherance of the Ponzi Scheme

As discussed above, the intent to hinder, delay, or defraud creditors is presumed under the Ponzi scheme presumption where, as here, the Trustee has alleged that (1) BLMIS operated a Ponzi scheme; and (2) the initial transfers made to the Tremont Initial Transfer Funds and Harley were made in furtherance of BLMIS's fraudulent scheme. *See Citibank*, 12 F.4th at 181.

First, the Trustee has alleged that BLMIS operated as a Ponzi scheme. *See Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. f/k/a WAM Long/Short Fund, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (finding "the label 'Ponzi scheme' has

been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.").  The Trustee alleges that Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  (SAC ¶ 83.)  The IA Business had no legitimate business operations and produced no profits or earnings.  (*Id.*)  Indeed, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (*Id.* ¶ 24.)  Several other BLMIS employees were convicted of fraud or other crimes in connection with their participation in the Ponzi scheme.  (*Id.* ¶¶ 25-27.)  These allegations are sufficient to plead that Madoff operated a Ponzi scheme.  *See Bear, Stearns II,* 397 B.R. at 12 (relying on transferor's criminal guilty plea to establish existence of Ponzi scheme); *see also In re Madoff,* 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) ("The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission.").

Second, the Trustee adequately alleges that BLMIS made the initial transfers to the Tremont Initial Transfer Funds and Harley in furtherance of the Ponzi scheme.  The Tremont Initial Transfer Funds and Harley were IA Business customers who invested all or substantially all of their assets with BLMIS's IA Business.  (SAC ¶¶ 39, 43.)  The initial transfers were made to them as IA Business customers and were based on fraudulent and non-existent securities transactions.  (*Id.* ¶¶ 90-91.)  The Trustee alleges that all funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank and were used to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up BLMIS's proprietary trading business.  (*Id.* ¶ 88.)  BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS

customers that typically reflected impossibly consistent gains on the customers' principal

investments. (*Id.* ¶ 91.) In reality, the initial transfers to the Tremont Initial Transfer Funds and

Harley were comprised of stolen customer property. (*Id.* ¶¶ 182-231.) These allegations are

sufficient to establish that BLMIS made the transfers to the Tremont Initial Transfer Funds and

Harley in furtherance of the Ponzi scheme.

### C.    The Trustee Has Adequately Alleged Fraudulent Intent Through Sufficient Badges of Fraud

Even if the Ponzi scheme presumption did not apply in this case, the Trustee has

independently alleged BLMIS's fraudulent intent through "badges of fraud" sufficient to satisfy

Rule 9(b).[11] Courts developed the badges of fraud test to establish fraudulent intent because such

intent "is rarely susceptible to direct proof." *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574,

1582 (2d Cir. 1983). In recognizing these badges, the Second Circuit has acknowledged no one

size fits all, and that "[f]raudulent acts are as varied as the fish in the sea." *Id.* at 1583; *see also*

*Citibank, N.A. v. Bombshell Taxi LLC (In re Hypnotic Taxi LLC)*, 543 B.R. 365, 374 (Bankr.

E.D.N.Y) ("any list of the 'badges of fraud' would be non-exhaustive"). Courts in the Southern

District have identified no fewer than 11 separate badges that are indicative of fraudulent intent.

*See Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R. 635, 653 (S.D.N.Y. 2016) (citing

UFTA § 4(b); 5 Collier on Bankruptcy ¶ 548.04[1]).

In a conclusory fashion, Defendant alleges that the Trustee has failed to meet his pleading

---

[11] Defendant's use of both *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005), and *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006), is misplaced. Both *Sharp* and *Verestar* involved bankruptcy liquidations rather than SIPA liquidations, leading the Second Circuit to recently hold that *Sharp* is specifically inapplicable in this SIPA liquidation proceeding. *See Picard v. Gettinger*, 976 F.3d 184, at 200 (2d Cir. 2020) ("But there exists no such equivalency because *Sharp* involved a bankruptcy liquidation, not a SIPA liquidation.") The pleading deficiencies in *Verestar* did not even involve a Ponzi scheme and the case also has no applicability here. 343 B.R. at 468-70.

burden and then simply moves on to his next argument.[12]  (Motion at 29.)  Defendant's assertion

is baseless and ignores the Trustee's allegations and law of the case in this SIPA liquidation

proceeding.  *See Picard v. Lowrey (In re Bernard L. Madoff)*, 596 B.R. 451, 463 (S.D.N.Y. 2019),

*aff'd sub nom. Picard v. Gettinger*, 976 F.3d 184 (2d Cir. 2020), *cert. denied sub nom. Gettinger*

*v. Picard*, 141 S. Ct. 2603, 209 L. Ed. 2d 736 (2021) (finding that law of case doctrine foreclosed

relitigation of issue where district court "considered and rejected the very arguments that

defendants now make").

The Trustee alleges in the SAC that BLMIS was an operation built on the concealment of

facts and false pretenses.  BLMIS co-mingled customer funds and used them not to purchase

securities, but to make payments to other customers.  (SAC ¶¶ 88-98.)  Madoff admitted that the

IA Business operated as a Ponzi scheme and that none of the securities listed on the BLMIS

customer statements were ever purchased.  (*Id.* ¶ 107.)  The sole proprietor of BLMIS's three-

person accounting firm pleaded guilty to filing false audit reports for BLMIS and false tax returns

for Madoff and others.  (*Id.* ¶ 86.)  Prior to its collapse, BLMIS filed numerous false reports with

the SEC.  (*Id.* ¶¶ 81-88.)

The SAC also sufficiently alleges BLMIS's insolvency at all relevant times.  The IA

Business had no legitimate business operations and produced no profits or earnings.  (*Id.* ¶ 83.)

---

[12] Citing *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760 (S.D.N.Y. 2013), Defendant also argues that the BLMIS initial transfers to the Tremont Initial Transfer Funds and Harley were made with consideration and thus do not qualify for avoidance. (Motion at 29-30.)  However, *Geltzer* is distinguishable.  That case concerned a multi-party settlement agreement where a $4 million investment was divested and returned to an innocent investor.  Rather than suing the transferee and recipient of the $4 million transfer, the Trustee sued another party to the settlement agreement under the theory that he was the beneficiary of the transfer.  The Trustee never alleged the transferee received funds to which he was not entitled nor that the transfer could be avoided as an intentional fraudulent transfer.  Thus, the District Court found the transfer could not be avoided under 548(a)(1)(A). *Geltzer*, 502 B.R. at 771.  Here, BLMIS made the initial transfers to the Tremont Initial Transfer Funds and to Harley based on fraudulent and non-existent securities transactions in furtherance of the Ponzi scheme: "A transfer that constitutes an actual or intentional fraudulent conveyance under Section 548(a)(1)(A) may be avoided in its entirety—as to both invested principal and profits—whether or not the debtor received value in exchange for the transfer." *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010).

The proprietary trading business incurred significant losses and required fraudulent infusions of cash from the IA Business to continue operations. (*Id.* ¶¶ 84, 88.) And at all relevant times, BLMIS's assets were worth less than the value of its liabilities, it could not meet its obligations as they became due, and it had insufficient capital at the time of the initial transfers to the Tremont Initial Transfer Funds and Harley. (*Id.* ¶ 108.)

Numerous courts in this SIPA liquidation proceeding have already found that these facts demonstrate BLMIS's actual fraudulent intent under section 548(a)(1)(A). *See Picard v. JABA Assocs. LP (In re BLMIS)*, 2021 WL 1112342, at *14-15 (S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum Tr. (In re BLMIS)*, 2021 WL 1141638, at *14-15 (S.D.N.Y. Mar. 24, 2021); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019). In these cases, the courts found the Trustee "presented significant evidence" that BLMIS's IA Business did not trade securities on behalf of its customers and it "did not have significant influxes of cash or income apart from customer funds." *JABA Assocs.*, 2021 WL 1112342, at *15; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *15. As a result, the courts found the circumstantial evidence presented satisfied the badges of fraud test. Here, because the Trustee has alleged precisely the same badges of fraud as in those proceedings, he has adequately pled facts to support a finding of BLMIS's actual fraudulent intent.

In addition to the aforementioned badges of fraud, the SAC also alleges the initial transfers were made to organizations with insider relationships to BLMIS. The SAC alleges that senior leadership at Tremont had an unusually close relationship with Madoff (SAC ¶¶ 112-113); they ignored due diligence red flags and shielded BLMIS from third party due diligence (*id.* ¶¶ 130-170); and, perhaps most importantly, they reaped significant financial benefits from the fraud (*id.*

¶¶ 171-175).  In totality, it is clear the SAC alleges badges of fraud sufficient to establish BLMIS's fraudulent intent.

For the foregoing reasons, the Trustee adequately alleges BLMIS's actual intent to hinder, delay, or defraud creditors under Bankruptcy Code Sections 544 and 548(a)(1)(A) and DCL Section 276 with respect to the initial transfers to the Tremont Initial Transfer Funds and Harley and those transfers are therefore avoidable.

## VI.    DEFENDANT'S ARGUMENT THAT THE SAC ESTABLISHES THE GOOD FAITH DEFENSE AS A MATTER OF LAW MUST ALSO FAIL

Defendant's argument that the good faith defense is established on the face of the SAC as a matter of law (Motion at 30-31), must be rejected.  This Court has already determined that, in accordance with *Citibank*, "[t]he burden of proving good faith falls squarely on [Defendant] and this Court cannot make a determination on [Defendant's] affirmative defense until after a fact-intensive inquiry." *Banque SYZ*, 2022 WL 2135019, at *11.  The Court continued that "[d]iscovery is required" to establish this affirmative defense and cannot be decided at the pleading stage.  *Id.*

This Court's holding in *Banque SYZ* is consistent with a recent decision issued by the Southern District of New York.  *Id.* (citing *In re BLMIS, LLC*, No. 20-cv-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ("*ABN Ireland*")).  There, as here, defendants-appellees ABN Ireland argued that their good faith under Bankruptcy Code Section 550(b) was established on the face of the complaint.  The District Court rejected this argument in full.  The District Court clearly stated in its decision that good faith is a fact-intensive inquiry that almost always requires a trial:

> Frankly, [Appellees'] good faith is not apparent from the face of the Proposed Amended Complaint.  Moreover, good faith is an affirmative defense that Appell[ees] bear the burden of proving. The Second Circuit made clear in its decision in *Citibank* that the inquiry notice standard requires "a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently situated transferees."  The Trustee rightfully points out that such a fact-based

determination "can only be made based on the entirety of the factual record after discovery (which has not occurred here), not from isolated documents cherrypicked by Appellees and factual inferences Appellees improperly seek to have drawn in their favor." . . . And even if it wanted to, the Court on this appeal simply does not have the requisite record to make the fact-intensive inquiry that the Second Circuit requires before a court can make a finding of lack of good faith.

*ABN Ireland*, 2022 WL 1304589, at *3 (internal citations omitted).

Defendant fixates on a statement in this Court's prior decision in this adversary proceeding that the Trustee did not satisfy his burden to plead Defendant's willful blindness in part because of special protections they negotiated for in the Tremont Transactions. (Motion at 31.) But, per *Citibank*, willful blindness is not the standard, nor is it the Trustee's burden to negate Defendant's affirmative defense. *Citibank*, 12 F.4th at 195. As is clear from *Citibank*, *Banque SYZ*, and *ABN Ireland*, the determination of what inquiry a reasonable entity in Defendant's circumstances would have conducted can only be made on the entirety of the factual record after discovery, which has not occurred here.[13]

Given the fact-intensive nature of the inquiry, it is unsurprising that Defendant does not cite to a single case where a court dismissed a complaint at the pleading stage based on the good faith defense. To the contrary, courts have observed that the question of good faith under the inquiry notice standard is difficult to resolve even at the summary judgment stage. *In re Agric. Research and Tech. Grp. Inc.*, 916 F.2d 528, 539 (9th Cir. 1990). Good faith is an affirmative defense that is inappropriate on a motion to dismiss and this argument must be again rejected in its entirety.

---

[13] In a footnote, Defendant also argues that the SAC establishes that all of the subsequent transfers at issue were "for value" because they were either received as part of swap transactions in exchange for a promise to pay leveraged returns, or were equity redemptions. (Motion at 30 n.16.) However, *Banque SYZ* similarly held that "value" is a defendant's burden to plead and prove and whether a defendant gave value is a question of fact to be decided at summary judgment or trial. 2022 WL 2135019, at *11.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendant's Motion in its entirety.


Dated: July 22, 2022
      New York, New York

By:   */s/ Patrick T. Campbell*
       **Baker & Hostetler LLP**
       45 Rockefeller Plaza
       New York, New York 10111
       Telephone: 212.589.4200
       Facsimile: 212.589.4201
       David J. Sheehan
       Email: dsheehan@bakerlaw.com
       Patrick T. Campbell
       Email: pcampbell@bakerlaw.com
       Camille C. Bent
       Email: cbent@bakerlaw.com
       Elizabeth G. McCurrach
       Email: emccurrach@bakerlaw.com
       Matthew K. Cowherd
       Email: mcowherd@bakerlaw.com


       *Attorneys for Irving H. Picard, Trustee*
       *for the Substantively Consolidated SIPA*
       *Liquidation of Bernard L. Madoff*
       *Investment Securities LLC and the*
       *Chapter 7 Estate of Bernard L. Madoff*