**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

*Attorneys for the UBS Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>         v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>                    Plaintiff,<br><br>         v.<br><br>UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its | Adv. Proc. No. 10-04285 (CGM) |

Liquidator MAÎTRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE
LA VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole
beneficiary under the Will of THIERRY MAGON
DE LA VILLEHUCHET (a/k/a RENE THIERRY
DE LA VILLEHUCHET), PIERRE
DELANDMETER, THEODORE DUMBAULD,
LUXALPHA SICAV as represented by its
Liquidators MAÎTRE ALAIN RUKAVINA and
PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA
AND PAUL LAPLUME, in their capacities as
liquidators and representatives of LUXALPHA,
GROUPEMENT FINANCIER LTD.,

Defendants.

**UBS DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT....................................................................................1

ARGUMENT .............................................................................................................2

I.    The Trustee Fails to Establish Any Basis for Jurisdiction Over the UBS
Defendants ...................................................................................................2

    A.    The Trustee Misconstrues the Applicable Legal Standard.......................2

    B.    The Trustee Fails to Plead Sufficient Minimum Contacts to
Establish Specific Jurisdiction Over Any of the UBS Defendants ............4

    C.    The Trustee Is Not Entitled to Jurisdictional Discovery ........................11

II.    The Section 546(e) Safe Harbor Shields All of the Alleged Initial
Transfers Made More than Two Years Before the Filing Date .........................12

    A.    The Trustee Concedes that Section 546(e) Applies in the First
Instance ...................................................................................................12

    B.    Any "Knowledge" Exception to Section 546(e)  Would Not Apply
to the UBS Defendants ..........................................................................13

    C.    The SAC Fails to Allege that Any Defendants Had Actual
Knowledge of the Ponzi Scheme ...........................................................14

III.    The Trustee Has Not Plausibly Alleged that the UBS Defendants Were
Subsequent Transferees of Customer Property..................................................16

    A.    Basic Math Undermines the Trustee's Allegations ................................16

    B.    The SAC Fails to Allege Any Receipt of Customer Property by
UBS AG ..................................................................................................18

IV.    The Trustee Has Not Alleged with Particularity Actual Fraudulent Intent
Under Section 548(a)(1)(A) .............................................................................19

CONCLUSION...........................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Girl, LLC v. Zembrka,*
   2021 WL 1699928 (S.D.N.Y. Apr. 28, 2021) ....................................................................5

*APWU v. Potter,*
   343 F.3d 619 (2d Cir. 2003)............................................................................................12

*Bah v. Apple Inc.,*
   2021 WL 4894677 (S.D.N.Y. July 26, 2021)...............................................................2, 3

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.),*
   256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd*, 264 B.R. 303 (S.D.N.Y. 2001)......................19

*Colvin v. Keen,*
   900 F.3d 63 (2d Cir. 2018)..............................................................................................14

*Cromer Finance Ltd. v. Berger,*
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)...............................................................................8

*Daimler AG v. Bauman,*
   571 U.S. 117 (2014) .........................................................................................................7

*Daly v. Deptula (In re Carrozella & Richardson),*
   286 B.R. 480 (D. Conn. 2002) ........................................................................................19

*Daventree Ltd. v. Republic of Azerbaijan,*
   349 F. Supp. 2d 736 (S.D.N.Y. 2004)...............................................................................4

*Deutsch v. JPMorgan Chase & Co.,*
   2019 WL 4805689 (S.D.N.Y. Sept. 30, 2019) ...............................................................13

*Dorfman v. Marriott Int'l Hotels, Inc.,*
   2002 WL 14363 (S.D.N.Y. Jan. 3, 2002).........................................................................11

*Fayetteville Invs. v. Com. Builders, Inc.,*
   936 F.2d 1462 (4th Cir. 1991).........................................................................................17

*Feldman v. Silverleaf Resorts, Inc.,*
   2000 WL 35542530 (E.D.N.Y. Jan. 31, 2000)...............................................................4, 6

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
   141 S. Ct. 1017 (2021).................................................................................................2, 3

*Geltzer v. Barish (In re Geltzer)*,
   502 B.R. 760 (S.D.N.Y. 2013) ......................................................................20

*Geltzer v. Brizinova (In re Brizinova)*,
   592 B.R. 442 (Bankr. E.D.N.Y. 2018) ...........................................................14

*Grove Press, Inc. v. Angleton*,
   649 F.2d 121 (2d Cir. 1981) ..........................................................................11

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) ............................................................................7

*Hawknet, Ltd. v. Overseas Shipping Agencies*,
   590 F.3d 87 (2d Cir. 2009) ...............................................................................6

*Knight v. Standard Chartered Bank*,
   531 F. Supp. 3d 755 (S.D.N.Y. 2021) ..............................................................2

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ....................................................7

*In re Lifetrade Litig.*,
   2021 WL 1178087 (S.D.N.Y. Mar. 29, 2021)...................................................3

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
   260 B.R. 343 (Bankr. W.D.N.Y. 2001) ..........................................................19

*In re Merkin*,
   817 F. Supp. 2d 346 (S.D.N.Y. 2011)..............................................................15

*In re PCH Assocs.*,
   949 F.2d 585 (2d Cir. 1991)............................................................................14

*Picard v. Banca Carige S.P.A (In re Bernard L. Madoff Inv. Sec. LLC)*,
   2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ...................................4, 10

*Picard v. Banque Lombard Odier & Cie SA (In re Bernard L. Madoff Inv. Sec. LLC)*,
   2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022)........................................3

*Picard v. BNP Paribas S.A. (In re Madoff)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...................................................5, 9, 16

*Picard v. Bureau of Lab. Ins. (In re Madoff)*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012)...............................................................9

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   12 F.4th 171 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1209 (2022) .................19, 20

*Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .........................................................17

*Picard v. Greiff (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012) ......................................................................................13

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014)................................................................................... 12, 13

*Picard v. Maxam Absolute Return Fund, L.P.*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011)..........................................................................9, 10

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................................15, 16

*Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) ......................................................2, 4

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) ..............................................................................18

*Piotrowicz v. Techtronic Indus. N. Am., Inc.*,
    2022 WL 2870811 (S.D.N.Y. July 21, 2022).......................................................................3

*Provepharm, Inc. v. Akorn, Inc.*,
    2019 WL 2443185 (E.D.N.Y. June 11, 2019)......................................................................9

*Rothstein v. Am. Int'l Gp., Inc.*,
    837 F.3d 195 (2d Cir. 2016)...........................................................................................14

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013)..........................................................................................17

*Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) .......................................................... 13, 14, 15

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018).........................................................................................3, 7

*To v. HSBC Holdings PLC*,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) ...............3

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................................2

*Winston & Strawn v. Dong Won Sec. Co.*,
    2002 WL 31444625 (S.D.N.Y. Nov. 1, 2002)....................................................................12

*Wiwa v. Royal Dutch Petroleum Co.*,
226 F.3d 88 (2d Cir. 2000)..........................................................................................7, 11

**RULES**

Fed. R. Civ. P. 9(b) ...........................................................................................19, 20

Fed. R. Civ. P. 10(c)................................................................................................17

Defendants UBS AG, UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("**UBS Lux**" or "**UBS SA**"), UBS Fund Services (Luxembourg) S.A. ("**UBSFSL**"), and UBS Third Party Management Company S.A. ("**UBSTPM**") (collectively, the "**UBS Defendants**") respectfully submit this reply in further support of their motion to dismiss the Second Amended Complaint.[1]

## PRELIMINARY STATEMENT

The Trustee grossly overreaches in seeking to sue the UBS Defendants. He claims these foreign defendants are subject to suit here merely because they provided services overseas, under contracts governed by foreign law, to two foreign investment funds that happened to invest *their* money with BLMIS. Rather than explain how the UBS Defendants ever meaningfully contacted the United States in doing so—because he cannot—he relies on meaningless rhetoric about how they supposedly "supported" and "provided the scaffolding for" those separate parties' investment activities, none of which involved the UBS Defendants themselves contacting the United States. The Trustee's rhetoric is no substitute for legitimate jurisdictional allegations. Indeed, if credited, it would expand the scope of this Court's jurisdiction beyond its constitutional breaking point.

Moreover, the Trustee fails to state any viable claims. He cannot avoid application of the section 546(e) safe harbor here because he fails to allege that the UBS Defendants, or any other party relevant to the safe-harbor analysis, had *actual knowledge* of the Madoff fraud. And he fails to state viable subsequent-transfer claims anyway, because (1) as to UBS AG, he does not even allege that it received any transfers, and (2) his own allegations confirm that the transfers he seeks to recover from the other UBS Defendants cannot possibly all constitute customer property.

It may be broad, but the Trustee's authority to pursue claims against foreign defendants like these is not limitless. He seeks to go too far here, and his claims should therefore be dismissed.

---

[1] "*ECF No. __*" refers to Adv. Pro. No. 10-4285. Defined terms in the UBS Defendants' moving brief, ECF No. 286 (cited here as "*Mem.*") are incorporated herein. "*Opp.*" refers to the Trustee's opposition, ECF No. 307.

# ARGUMENT

## I.  The Trustee Fails to Establish Any Basis for Jurisdiction Over the UBS Defendants

### A.    *The Trustee Misconstrues the Applicable Legal Standard*

The Trustee concedes that none of the UBS Defendants[2] is subject to the Court's general jurisdiction.  *See* Opp. at 17–18; Mem. at 11.  Thus, his case for jurisdiction rests solely on principles of specific personal jurisdiction, which require a showing that his claims "arise out of or relate to" each defendant's contacts with the United States.  *Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 2022 WL 2137073, at *4 (Bankr. S.D.N.Y. June 13, 2022) (Morris, J.) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021)); *see Bah v. Apple Inc.*, 2021 WL 4894677, at *2 (S.D.N.Y. July 26, 2021).  That showing must be made "as to each claim"—*i.e.*, each subsequent transfer—based on "suit-related conduct that creates a substantial connection with the forum."  *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 768 (S.D.N.Y. 2021) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

The Trustee pays lip service to these principles, but fundamentally misconstrues them.  He touts the Supreme Court's recent statement in the *Ford* case that the "relates to" prong does not "require[e] proof of . . . a strict causal relationship between the defendant's in-state activity and the litigation." *Ford*, 141 S. Ct. at 1026, *cited in* Opp. at 39.  But he distorts the teachings of *Ford*, falsely claiming that jurisdiction lies for all claims that are in any way "affiliated with the alleged in-state contact," Opp. at 39, regardless of how scattershot or tenuous that contact may be.

In truth, the *Ford* Court made clear that, even if "a strict causal relationship" is not required, "that does not mean anything goes. . . . [T]he phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum.'" *Ford*, 141 S. Ct. at 1026.  "Under *Ford*,

_____

[2]  As addressed in the Memorandum, for purposes of contesting jurisdiction, the term "UBS Defendants" refers only to UBS AG, UBSTPM, and UBSFSL, and not to UBS Lux.  *See* Mem. at 7 n.2.

specific personal jurisdiction still requires a 'relationship among the defendant, the forum, and the litigation'"—in other words, "a 'connection between the plaintiffs' claims and [defendant's] activities in th[e forum].'" *Bah*, 2021 WL 4894677, at *2 (quoting *Ford*, 141 S. Ct. at 1032); *see id.* ("Nowhere did *Ford* abandon the requirement of a relationship between plaintiff's claim and defendant's in-state activity . . . ."). It is the Trustee's burden to make this showing. *Piotrowicz v. Techtronic Indus. N. Am., Inc.*, 2022 WL 2870811, at *5 (S.D.N.Y. July 21, 2022).

The Trustee comes nowhere close to meeting his burden. His case for asserting jurisdiction over the UBS Defendants is based on the amorphous theory that they provided the "scaffolding" for "Luxalpha's and Groupement's investment with BLMIS" by "facilitating" and "receiving" "transfers from foreign investment funds" that took place entirely overseas, and allegations that they engaged in a smattering of random communications with the United States that are not alleged to have had any connection to the subsequent transfers at issue. Opp. at 32–36. Significantly, the Trustee does *not* allege that the UBS Defendants invested a single dollar into BLMIS or any BLMIS feeder fund. Courts have refused to premise jurisdiction on such tenuous, indirect contacts. *See, e.g.*, *In re Lifetrade Litig.*, 2021 WL 1178087, at *3–4 (S.D.N.Y. Mar. 29, 2021) (allegations that defendant "facilitated" transactions through which other entities "received substantial undisclosed fees" were "too tenuous to support the exercise of specific jurisdiction" (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018))); *To v. HSBC Holdings PLC*, 2017 WL 816136, at *7 (S.D.N.Y. Mar. 1, 2017) (no jurisdiction where "the passage of money through the U.S. bank accounts were merely incidental and passive, and not specifically directed by any of the [defendants]"), *aff'd*, 700 F. App'x 66 (2d Cir. 2017).[3]

---

[3]    By contrast, in other recent *BLMIS* cases in which this Court has upheld the Trustee's jurisdictional allegations, defendants had U.S. contacts that were substantially more direct and significant than the UBS Defendants' alleged contacts here. *See, e.g.*, *Picard v. Banque Lombard Odier & Cie SA (In re Bernard L. Madoff Inv. Sec. LLC)*, 2022 WL 2387523, at *3–4 (Bankr. S.D.N.Y. June 30, 2022) (Morris, J.) (subsequent transferee itself "directed

If the Court were to accept the Trustee's theory that merely "facilitating" and "providing the [metaphorical] scaffolding" for Luxalpha and Groupement's transactions is enough, then the reach of U.S. jurisdiction would expand exponentially, without any meaningful boundary. Every foreign party playing any sort of role in another foreign entity's U.S. financial transaction—no matter how incidental, passive, or tangential to that transaction—would be subject to jurisdiction here. It would ensnare everyone from those who maintain the computers the investor uses to carry out its transactions, to those who clean its floors and stock its supplies, to those who provide the *literal* scaffolding for its offices. Under the Trustee's theory, "personal jurisdiction would be almost limitless and would no doubt raise considerable constitutional concerns." *Feldman v. Silverleaf Resorts, Inc.*, 2000 WL 35542530, at *4 (E.D.N.Y. Jan. 31, 2000); *see Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004) (assertion of jurisdiction based on defendants' "facilitat[ion] [of] international financial transactions or money transfers" would, if accepted, "saddle[] the [court's jurisdiction] with an unwarranted breadth"). This Court should reject that jurisdictional overreach and grant the UBS Defendants' motion to dismiss.

**B.    *The Trustee Fails to Plead Sufficient Minimum Contacts to Establish Specific Jurisdiction Over Any of the UBS Defendants***

The Trustee's specific jurisdictional allegations ring just as hollow as his overarching legal theory. They fail to identify any "minimum contacts" by which any of the UBS Defendants "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court []here." *Multi-Strategy Fund*, 2022 WL 2137073, at *3. And despite

---

its investments into [the] Fairfield[ funds], which are managed by [a] New York partnership," and "high level executives of [defendant] met directly with Madoff in 2002 and 2008 in his New York City office"); *Picard v. Banca Carige S.P.A (In re Bernard L. Madoff Inv. Sec. LLC)*, 2022 WL 2387522, at *3–4 (Bankr. S.D.N.Y. June 30, 2022) (Morris, J.) (subsequent transferee itself "invested with New York-based BLMIS through [investment fund]" and the Trustee's subsequent transfer claims were "directly related to [subsequent transferee's] investment activities with Fairfield and BLMIS"); *Multi-Strategy Fund*, 2022 WL 2137073, at *3–4 (Morris, J.) (subsequent transferee itself "met with" Fairfield's managers "in New York" and "invested in the [Fairfield] Funds with the specific purpose of having funds invested with BLMIS in New York").

his rhetoric, the Trustee fails to explain how the UBS Defendants "engage[d] in business 'purposefully directed toward'" the United States—let alone that they did so "with respect to each claim[, *i.e.*, transfer,] asserted." *Am. Girl, LLC v. Zembrka*, 2021 WL 1699928, at *6 (S.D.N.Y. Apr. 28, 2021) (quoting *Ford*, 141 S. Ct. at 1025 ("Plaintiff must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum . . . .")); *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018).

## 1. The Trustee Identifies No Jurisdictionally Significant Contacts Between UBS AG and the United States

To begin, the Trustee fails to address one of the most glaring deficiencies of his pleading: the absence of any allegation that UBS AG ever received even a single subsequent transfer. *See* Mem. at 14; *infra* pp. 18–19; SAC ¶ 333. Without such an allegation, the Trustee can neither state a claim to recover any subsequent transfers from UBS AG nor explain how any such non-existent transfers arise out of or relate to any jurisdictional contacts UBS AG had with the United States.[4]

The few purported contacts the Trustee does cite do not alter the analysis. The Trustee parrots his amorphous allegations that UBS AG was a "sponsor" and "promoter" of Luxalpha, contending that in so doing UBS AG "project[ed] to investors and the [Luxembourg regulator] that it supported and custodied Luxalpha's investments with BLMIS," and that its "association with Luxalpha gave it the imprimatur of one of the world's largest, most sophisticated banks." Opp. at 34; SAC ¶ 168. But he fails to identify any UBS AG *conduct* relating to those roles, let alone any conduct directed to the United States. Rather, he alleges that UBS AG's role as sponsor/promoter concerned dealings with a *Luxembourg* regulator to permit Luxalpha to "operate throughout *the EU*." SAC ¶ 162 (emphasis added). Nor does the Trustee allege any connection between the

---

[4]    The Trustee misleadingly claims UBS AG "received every Luxalpha redemption from BLMIS." Opp. at 33. He knows those transfers all went to an account *maintained by UBS Lux*. *See* ECF No. 112 ¶¶ 8–9; SAC ¶¶ 70, 333.

"imprimatur" of UBS AG's "association with Luxalpha" in Luxembourg and any (unalleged and non-existent) subsequent transfers to UBS AG.  Opp. at 34; *see Bah*, 2021 WL 4894677, at *2.

The Trustee also claims that UBS AG allegedly once tried—unsuccessfully—to conduct a due diligence meeting with BLMIS.  Opp. at 33–34.  That claim is irrelevant.  The Trustee does not and cannot allege that the meeting request had anything to do with any of the subsequent transfers at issue here—or even anything to do with Luxalpha or Groupement—because he admits that it actually related to "another BLMIS-related investment."  SAC ¶ 154; *see Feldman v. Silverleaf Resorts, Inc.*, 2000 WL 35542530, at *4 (E.D.N.Y. Jan. 31, 2000) ("the fact that [defendant] maintains an investment bank account in New York City and sends a corporate officer to New York to meet with investment bankers does not serve as a basis for the Court's exercise of personal jurisdiction").  Citing SAC paragraphs 154–155, the Trustee falsely claims that "UBS AG made the request to expand its BLMIS relationship," Opp. at 34, but those allegations say no such thing, and the Trustee fails to identify any "expanded" relationship that arose as a result.  Indeed, no meeting occurred, because "Madoff refused to meet with" UBS AG.  SAC ¶ 154.

In a final failed bid to undermine UBS AG's jurisdictional objection, the Trustee claims UBS AG "waived its ability to contest personal jurisdiction" by failing to raise a jurisdictional defense when the other UBS Defendants moved to dismiss the Trustee's First Amended Complaint in 2012.  Opp. at 43.  This argument flies in the face of well-settled Second Circuit precedent.

Indeed, "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made."  *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009).  Thus, the Second Circuit has held that "a defendant does not waive a personal jurisdiction argument—even if he [had] not ma[d]e it [earlier in the litigation]—if," as here, "the 'argument that the court lacked jurisdiction over the defendant

6

would have been directly contrary to [then-]controlling precedent in this Circuit.'" *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135–36 (2d Cir. 2014) (alteration omitted).

At the time when the UBS Defendants moved to dismiss the First Amended Complaint, controlling precedent in this Circuit held that a foreign bank with a branch in New York (such as UBS AG) was subject to *general* personal jurisdiction in New York, and thus foreclosed UBS AG from contesting jurisdiction in this case. *Id.* at 136; *see, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 93–95 (2d Cir. 2000). That reality changed entirely when the Supreme Court decided *Daimler AG v. Bauman*, 571 U.S. 117 (2014)—two years *after* the prior motion to dismiss was filed—in which it held that a corporation typically is subject to general jurisdiction *only* in its place of incorporation and its principal place of business. The Supreme Court's abrogation of that long-standing Circuit precedent concerning the scope of general jurisdiction has now afforded UBS AG a basis for challenging jurisdiction that did not exist when the prior motion was filed. Indeed, courts have repeatedly held in the wake of *Daimler* that UBS AG is not subject to general jurisdiction in New York. *See, e.g.*, *SPV OSUS*, 882 F.3d at 343–44.

That fundamental intervening "change in the law of general personal jurisdiction means that" UBS AG has not "waive[d its] personal jurisdictional defense." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *30–31 (S.D.N.Y. Aug. 4, 2015) (defendants had not waived jurisdiction defense where their "decision to refrain from challenging personal jurisdiction in the prior [pre-*Daimler* stages of litigation] was informed at least in part by no-longer-valid precedents that 'a foreign bank with a branch in the forum state was properly subject to general personal jurisdiction'" (alteration omitted)); *see Gucci*, 768 F.3d at 135–36 ("Although the Bank . . . did not argue [in the district court] that the court lacked personal jurisdiction, we . . . conclude that its objection to the exercise of general jurisdiction has not been waived" because its

7

previous motion was made "[p]rior to *Daimler,* [when] controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York *was* properly subject to general personal jurisdiction here.").  Put simply, there was no waiver.

## 2.    The Trustee Identifies No Jurisdictionally Significant Contacts Between UBSFSL and the United States

The Trustee's arguments regarding UBSFSL similarly falter.  The Trustee's opposition is predicated on the argument that UBSFSL, in its capacity as administrator for Luxalpha and Groupement, performed the funds' "'day-to-day' tasks, like calculating the fund's net asset value . . . , receiving the fund's documents and correspondence, setting up its annual general meeting, . . . filing documents with the Luxembourg financial regulator[,] keeping Luxalpha's and Groupement's accounting," and "work[ing] alongside Access" as one of the funds' "service providers."  Opp. at 34–35.  But the Trustee's reliance on all of those alleged tasks fails for one simple reason: *not one of those tasks* is alleged to have been performed in or directed to the United States—let alone to have "related" in any way to any of the subsequent transfers at issue here.  Rather, these alleged tasks were conducted entirely overseas between foreign entities, pursuant to contracts governed by foreign (Luxembourg) law.  *See* Beckerlegge Decl. Ex. 45 (UBSFSL-Luxalpha Central Administration Agmt.); Ex. 46 (UBSFSL-Groupement Administration Agmt.).  That inconvenient reality clearly distinguishes this case from the Trustee's cited authority, *Cromer Finance Ltd. v. Berger*, which held that the offshore fund administrators of an investment fund that "was entirely managed out of New York" and "available to United States investors" were subject to jurisdiction here for purposes of securities fraud claims brought by investors in the fund.  137 F. Supp. 2d 452, 476 (S.D.N.Y. 2001).  Among other relevant U.S. contacts at issue there, the fund administrators sent numerous "letters . . . with enclosed subscription documents to investors in the United States soliciting investors for the Fund," sent "bills to [the Fund manager] in New York for

8

approval," and "made countless mailings to investors or to the agents of investors residing in the United States." *Id.* at 460–61, 476–77. No such allegations are or could be propounded here.[5]

Finally, while UBSFSL (unlike UBS AG) is alleged to have received subsequent transfers, the Trustee does *not* allege that UBSFSL ever sent or received any funds to or from the United States—or even that it ever maintained any bank or brokerage accounts in the United States. Thus, unlike in other *BLMIS*-related cases in which jurisdiction has been upheld, UBSFSL is not itself a fund that "transferr[ed] assets to and from the United States" in order to invest with BLMIS. *See, e.g.*, *supra* note 3 (collecting cases); *see also, e.g.*, *Picard v. Bureau of Lab. Ins. (In re Madoff)*, 480 B.R. 501, 517–18 (Bankr. S.D.N.Y. 2012) (subsequent transferee "invested tens of millions of dollars" in a BLMIS feeder fund "with the specific purpose of having funds invested in BLMIS in New York"); *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 118 (Bankr. S.D.N.Y. 2011) (exercising jurisdiction over fund that "transferr[ed] assets to and from the United States").[6] That critical point of distinction compels a different outcome here.

### 3.    The Trustee Identifies No Jurisdictionally Significant Contacts Between UBSTPM and the United States

The Trustee also fails to connect UBSTPM's conduct to the United States or explain how any alleged subsequent transfers to it "arise out of or relate to" such conduct. He relies on his

---

[5]    The Trustee attempts to bolster his allegations by citing previously undisclosed "records" of a single fax from UBSFSL to BMLIS, and four "apparent" telephone calls between UBSFSL and BMLIS, that supposedly evidence UBSFSL's jurisdictional contacts. Opp. at 36; Beckerlegge Decl. Exs. 17, 49. These records are irrelevant. The Trustee does not claim that any of them "relate to" the subsequent transfers at issue here, and the fax demonstrably does not. Even if they did, this smattering of communications does not show that UBSFSL purposefully directed its foreign fund-administrative activities at the United States. And the Trustee's log of "apparent" phone calls from UBSFSL, *see* Ex. 49—which his counsel apparently prepared from undisclosed and unspecified records for purposes of this litigation—is not properly before the Court, *see Provepharm, Inc. v. Akorn, Inc.*, 2019 WL 2443185, at *8 (E.D.N.Y. June 11, 2019) (rejecting plaintiff's exhibits submitted in opposition to motions to dismiss where it was "not clear from the record that the documents [we]re indisputably authentic or accurate").

[6]    Nor is this case a like *BNP Paribas*, in which the court found jurisdiction over a subsequent transferee whose employees "comprised the Fund Derivatives Group, which operated out of New York; those subsequent transfers arose, for the most part, from the . . . Group's New York contacts"; and that group had a direct relationship with Madoff, including "provid[ing] a $15 million personal line of credit to Madoff." 594 B.R. at 177, 190.

contrived "scaffolding" theory, alleging that UBSTPM "facilitated" "investment activity with BLMIS in New York" by serving as Luxalpha's "portfolio manager." Opp. at 35–36. And he touts UBSTPM's alleged "recei[pt] [of] at least $53.3 million in fees from Luxalpha" for its services. *Id.* at 37. These arguments suffer from the same infirmities as those regarding UBSFSL: the subsequent transfers to UBSTPM were effectuated exclusively between foreign entities under foreign law, based on services performed abroad that are not alleged to have touched the United States, *see* Beckerlegge Decl. Ex. 31 (UBSTPM-Luxalpha Management Co. Services Agmt.); UBSTPM did not receive any funds in the United States; and UBSTPM did not itself "transfer[] assets to and from the United States" in order to invest with BLMIS, *Maxam Absolute Return Fund*, 460 B.R. at 118. The subsequent transfer claims against UBSTPM simply do not relate to any investment activities by UBSTPM. *See Banca Carige S.P.A.*, 2022 WL 2387522, at *3–4.

The Trustee also attempts to premise jurisdiction over UBSTPM on a so-called "agency" theory, claiming that UBS Lux "retained control over UBSTPM with respect to the management of Luxalpha's portfolio," in that "UBSTPM's role as Luxalpha's manager was dictated by the Advisory Committee UBS [Lux] formed." Opp. at 37. Thus, the Trustee claims, UBS Lux's "numerous connections with New York should be imputed to UBSTPM." *Id.*

The Trustee does not articulate a valid "agency" theory of jurisdiction. The Trustee's allegations assert that UBS Lux is the principal and UBSTPM is the agent. *See, e.g.*, *id.* ("UBSTPM's role . . . *was dictated by* the Advisory Committee *UBS [Lux] formed*" (emphases added)); *id.* at 38 ("responsibilities [were] shifted *from* UBS [Lux] *to* UBSTPM" (emphases added)); *id.* (describing "directives [from UBS Lux Advisory Committee] that *UBSTPM* was 'to act upon and implement'" (citation omitted)). Thus, the Trustee seeks to impute the alleged New York contacts of a *principal* (UBS Lux) to a foreign *agent* (UBSTPM). That argument gets the

10

law of agency jurisdiction backwards. As even the Trustee's own cases confirm, a *principal* may be subject to jurisdiction if its *agent* has "acted in [the forum] for the [*principal's*] benefit." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981); *see Dorfman v. Marriott Int'l Hotels, Inc.*, 2002 WL 14363, at *11 (S.D.N.Y. Jan. 3, 2002) ("a corporate parent may act as an agent for a foreign subsidiary, thereby subjecting the latter to jurisdiction in the forum inhabited by the parent"), *cited in* Opp. at 37. The Trustee cites no authority for the proposition that an out-of-state *agent* can be subjected to jurisdiction based on its *principal's* alleged actions within the forum.

Moreover, the Trustee fails to establish that "the activities performed in New York for [the] foreign corporation by [the] agent . . . are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." *Wiwa*, 226 F.3d at 95. The Trustee makes much of an "Advisory Committee" that UBS Lux supposedly formed and that allegedly dictated UBSTPM's duties—yet he alleges nothing about what this Advisory Committee actually did, and does *not* allege that any of its "activities [were] performed in New York" or were at all related to the subsequent transfers at issue here. *Id.* In fact, the SAC does not even mention the Advisory Committee, highlighting its obvious lack of "importance." *Id.*

### C.  *The Trustee Is Not Entitled to Jurisdictional Discovery*

The Trustee's alternative request for jurisdictional discovery should likewise be rejected. The Trustee has conducted probably the most extensive Rule 2004 investigation in the history of the Bankruptcy Code. By his own admission, the trove of documentary and testimonial evidence he has amassed includes "over 11,700 boxes of paper documents and 19,000 media sources containing electronically stored information" culled from the files of BLMIS. Dkt. 127 (Initial Opp.) at 103 n.51. It also includes approximately 60,000 pages of UBS documents and the deposition testimony of a UBS corporate representative, *see* Dkt. 128 (Pergament Decl.) ¶¶ 4, 6, Exs. 46, 64, over 20,000 additional documents produced by the UBS Defendants more recently

11

pursuant to Hague Convention requests, and more than *4.6 million documents* produced by the other Defendants in the case, *see* Dkt. 146-6 (Aug. 7, 2012 Ltr. to Ct.) at 1. Indeed, as the Trustee's own cited cases make clear, the vast breadth of discovery that the Trustee has already amassed here far exceeds the typical scope of "limited" jurisdictional discovery a plaintiff might be permitted in response to a motion to dismiss. *See, e.g.*, Opp. at 46 (citing *Winston & Strawn v. Dong Won Sec. Co.*, 2002 WL 31444625, at *5 (S.D.N.Y. Nov. 1, 2002) (permitting "limited" jurisdictional discovery—confined to 30 days, and consisting only of "one deposition" and "document requests"—where plaintiff had "no . . . documentary evidence" from defendants)). The Trustee has had "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003). He deserves no more.

## II.    The Section 546(e) Safe Harbor Shields All of the Alleged Initial Transfers Made More than Two Years Before the Filing Date

### A.    The Trustee Concedes that Section 546(e) Applies in the First Instance

As the UBS Defendants have explained, the section 546(e) safe harbor shields all of the initial Six-Year Transfers made more than two years before the filing date (i.e., from December 11, 2002 to December 11, 2006). Mem. at 17–28. And the Trustee concedes that section 546(e) applies in the first instance. *See* Opp. at 50 ("[T]he Second Circuit settled the issue of whether section 546(e) applies to limit the avoidance of transfers between BLMIS and its customers long ago.") (citing *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 417 (2d Cir. 2014)). The UBS Defendants have established that the alleged initial transfers from BLMIS to the Fund Defendants qualify for the section 546(e) safe harbor because: (a) they are transfers and settlement payments made "in connection with a securities contract," and (b) they were made by, to, and/or for the benefit of covered entities, including a stockbroker and multiple financial institutions. *See* Mem. at 22–24. The Trustee does not contest these points, and

thus has conceded that the alleged initial transfers satisfy section 546(e)'s requirements. *See, e.g.*, *Deutsch v. JPMorgan Chase & Co.*, 2019 WL 4805689, at *5 (S.D.N.Y. Sept. 30, 2019).

In an effort to muddy the waters, the Trustee now contends that (1) the UBS Defendants cannot utilize section 546(e) based on the so-called "knowledge" exception announced in *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC (In re Madoff Securities)*, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), and (2) he has adequately pleaded that the Fund Defendants had actual knowledge that Madoff was not trading securities. Neither argument is supported by applicable case law or the facts alleged in the SAC.

### B.    *Any "Knowledge" Exception to Section 546(e) Would Not Apply to the UBS Defendants*

The *only* statutory exception to section 546(e) is for recovery of transfers made by a debtor with actual intent to hinder, delay, or defraud creditors under section 548(a)(1)(A). Mem. at 25–28. Nevertheless, the Trustee has repeatedly sought to narrow the scope of the safe harbor.

For example, in *Fishman*, the Trustee argued that section 546(e) "should not apply" to the BLMIS liquidation at all, because that supposedly would "be tantamount to giving legal effect of Madoff's fraud." 773 F.3d at 417. The Second Circuit "rejected these arguments," *id.*, and instead applied the statute as written, *see id.* at 418–23, emphasizing that the Trustee's strained interpretation "risks the very sort of significant market disruption that Congress was concerned with," and that "[t]he clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every reason to avail themselves of all the protections" afforded by section 546(e), *id.* at 420. The Second Circuit declined to create a "Ponzi scheme" or general fraud exception to the safe harbor, beyond the limited and explicit exception under section 548(a)(1)(A). *See id.* at 421–22; *see also Picard v. Greiff (In re Madoff Sec.)*, 476 B.R. 715, 722 (S.D.N.Y. 2012) ("Nothing in the express language

of § 546(e) suggests that it is not designed to protect the legitimate expectations of customers, as well as the securities market in general, even when the stockbroker is engaged in fraud.").

In *Cohmad*, however, the District Court did create a limited, non-statutory, exception to section 546(e) based on a transferee's level of knowledge about the underlying transactions from which the transfer originated. It held that "the Trustee must show, at a minimum, that the transferee had *actual knowledge* that there were no actual securities transactions being conducted." *Cohmad*, 2013 WL 1609154, at *4 (emphasis added); *accord* Opp. at 52 (*Cohmad* "held that a party with actual knowledge of Madoff's fraud cannot claim section 546(e)'s protections.").

The Trustee now advances a similarly tortured reading of *Cohmad*—one that would prohibit *innocent subsequent transferees* from invoking section 546(e) merely because he alleges that the *initial* transferee had actual knowledge of the underlying fraud. Opp. at 50–52. Such arguments have no basis in the *Cohmad* ruling, even if that decision could bind the UBS Defendants.[7] But the Court need not reach that question now because, as discussed below, the SAC fails to allege that *any* of the Defendants had actual knowledge of the Madoff Ponzi scheme.

### C.    *The SAC Fails to Allege that Any Defendants Had Actual Knowledge of the Ponzi Scheme*

Even though the Trustee concedes that section 546(e) would otherwise apply, he asserts that the UBS Defendants cannot avail themselves of the safe harbor given his threadbare

---

[7]    The Trustee asserts that the UBS Defendants are bound by *Cohmad* based on law of the case, Opp. at 52–53, but the UBS Defendants were not party to *Cohmad* and did not join in moving to dismiss, *see* Amended Notice of Motion to Dismiss, *Cohmad*, No. 12-MC-115, ECF 289 (S.D.N.Y. Aug. 10, 2012). The law of the case doctrine "is not a rule that bars courts from reconsidering prior rulings, but is rather 'a discretionary rule of practice [that] generally does not limit a court's power to reconsider an issue.'" *Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)). "[W]hen a court . . . faces the question whether to depart from its own prior ruling, the court has wide discretion to make whichever decision it thinks preferable." *Keen*, 900 F.3d at 73. A "fundamental consideration" in deciding whether to apply law of the case is "whether there is identity of parties between the prior and subsequent matters." *Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442, 455 (Bankr. E.D.N.Y. 2018); *cf. Rothstein v. Am. Int'l Gp., Inc.*, 837 F.3d 195, 204 (2d Cir. 2016) ("one is not bound by a judgment . . . in litigation in which he is not designated as a party"). The absence of such identity here counsels in favor of reconsidering the *Cohmad* exception.

allegations that the Fund Defendants had "actual knowledge" of the Ponzi scheme. *See* Opp. at 52–56. However, the SAC's allegations merely describe "red flags" in connection with Madoff's scheme—not the Defendants' *actual knowledge* of it. Red flags do not equate to actual knowledge.

As Judge Bernstein has held, "actual knowledge" requires nonconclusory allegations that a defendant had "a high level of certainty and absence of any substantial doubt" that BLMIS was not trading securities. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014). This is a more stringent standard than "willful blindness," which "connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence," *id.* at 140, and which even *Cohmad* makes clear is insufficient to avoid the section 546(e) safe harbor, 2013 WL 1609154, at *4 n.2. Further, it is well-established that "allegations of Madoff-related red flags do not adequately plead scienter," which is yet a lesser standard. *See In re Merkin*, 817 F. Supp. 2d 346, 357 (S.D.N.Y. 2011), *vacated in part on other grounds*, 2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015).

Here, the Trustee merely pleads red flags or, at most, willful blindness—but nothing remotely approaching actual knowledge. The Trustee even describes the allegations in the SAC as "allegations . . . that detail the red flags identified as part of the review of Madoff's trading activity." Opp. at 56. For instance, the Trustee relies on allegations that certain Defendants—although *not* the UBS Defendants—"had special access to Madoff as a result of Littaye's close relationship with him," that the BLMIS fund structure violated Luxembourg law, and that Access "deliberately acted to assist Madoff in evading regulatory scrutiny." *Id.* at 54. This Court has previously found similar allegations insufficient, holding that "[a]lthough these allegations . . . imply that [defendants] were willing to overlook legal and regulatory violations to make more

15

money, they do not support the inference that those Defendants believed there was a high probability that BLMIS was not actually trading securities." *BNP Paribas*, 594 B.R. at 199.

Elsewhere, the SAC asserts no more than that Defendants had "reasons for concern" about BLMIS, for example, or were aware that it presented "a fraud risk." SAC ¶¶ 143, 156. Even with respect to the diligence conducted by an Access consultant, the Trustee alleges that he concluded it was possible that BLMIS had simply made "sloppy errors," and that he was simply trying to "inject doubt." *Id.* ¶¶ 235, 270. At most, therefore, even if these allegations could be construed to evince "strong suspicion but *some* level of doubt" about BLMIS—and could potentially qualify as willful blindness (which the UBS Defendants dispute)—they do not constitute the "high level of certainty" required to plead actual knowledge. *Merkin*, 515 B.R. at 139–40.

### III.  The Trustee Has Not Plausibly Alleged that the UBS Defendants Were Subsequent Transferees of Customer Property

#### A.  *Basic Math Undermines the Trustee's Allegations*

The Trustee misconstrues the UBS Defendants' argument that the SAC does not plausibly allege that the UBS Defendants received customer property. Mem. at 36–40. Contrary to the Trustee's gloss, *see* Opp. at 61–63, the issue is not simply that the SAC inadequately alleges that UBS received customer property; rather, it is that the allegations in the SAC make clear that many of the transfers allegedly received by UBS *could not have been* customer property in the first place.

The SAC alleges that UBS Lux received "at least $32.8 million" in Subsequent Transfers for its services as Luxalpha's custodian "from February 2004 to August 2006." SAC ¶ 333(a). As set forth in the table below, however, Exhibit B of the SAC shows that, prior to August 2006, only $16.2 million was transferred to Luxalpha by BLMIS. SAC Ex. B at 1–6.

| Date | Alleged Initial Transfers | Alleged Subsequent Transfers |
|---|---|---|
| 4/1/2004 | $2,200,000 | *"[A]t least **$32.8 million** . . . from February 2004 to August 2006."* SAC ¶ 333(a) (emphasis added). |
| 4/5/2004 | $3,000,000 | |
| 7/6/2004 | $4,000,000 | |
| 8/4/2004 | $4,000,000 | |
| 6/10/2005 | $3,000,000 | |
| **Total:** | **$16,200,000** | |

Thus, even if the *entirety* of the $16.2 million transferred from BLMIS during this period were avoidable and recoverable as a transfer of customer property, it is established from the face of the SAC that at least $16.6 million of the fees described in paragraph 333 are not customer property subject to recovery. The issue is not simply that the Trustee needs to provide more detail to meet his pleading burden. Indeed, no additional detail could cure the implausibility of these allegations because, as a matter of basic math and common sense, at least $16.2 million of the alleged $32.8 million of subsequent transfers to UBS Lux could not possibly constitute customer property.[8]

The Court can dismiss the SAC, at least in part, on this basis alone because Exhibit B to the SAC makes clear that the amounts described in paragraph 333 cannot all be customer property. An exhibit attached to a complaint is part of the pleading "for all purposes." Fed. R. Civ. P. 10(c). "In the event of conflict between the bare allegations of the complaint and any exhibit attached to the complaint, the exhibit prevails." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (cleaned up)).[9] Nor is there any information

---

[8]    Likewise, because the first Initial Transfer to Luxalpha was allegedly in April 2004, any fees allegedly paid to UBS prior to that date could not be customer property and must be dismissed. *See* Mem. at 39–40.

[9]    To be clear, unlike in many of the Fairfield subsequent-transferee cases pending before this Court, the UBS Defendants are not asserting that the Trustee is impermissibly seeking to recover the value of initial transfers from multiple subsequent transferees, which will be remedied by limiting the Trustee to "a single satisfaction." *See, e.g., Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 2021 WL 3477479, at *12 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, J.). Rather, the SAC establishes on its face that the alleged $32.8 million in subsequent transfers to UBS Lux *cannot* be comprised entirely of customer property.

asymmetry that would justify relaxing the pleading standard here, because the Trustee issued Rule 2004 subpoenas to the Defendants and received the documents forming the basis for the SAC.  *See* Opp. at 47 (Trustee "acknowledges" receipt of "some documents" through the Rule 2004 process); *id.* at 65 ("the Trustee did receive some documents pursuant [to] Rule 2004 subpoenas").  The Trustee's allegations informed by that investigation are themselves what compel dismissal here.

### B.    *The SAC Fails to Allege Any Receipt of Customer Property by UBS AG*

The only allegation in the SAC pertaining to UBS AG receiving subsequent transfers is the conclusory allegation that "the Feeder Fund Defendants subsequently transferred some of the Initial Transfers to the . . . UBS Defendants."  SAC ¶ 332.  The Trustee implies that the Court should disregard the corporate separateness of the UBS Defendants to determine that such group pleading sufficiently alleges that UBS AG received subsequent transfers.[10]  It should not.

The Trustee knows he must plead "the 'necessary vital statistics'—the 'who, when, and how much' of the transfers to establish that an entity was a subsequent transferee of the funds." *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015).  Indeed, he purports to allege at least some dates and amounts of Subsequent Transfers to UBS Lux, UBSFSL, and UBSTPM.  *See, e.g.*, SAC ¶ 333(a) ("UBS SA received at least $32.8 million . . . and an additional $6.6 million"); *id.* ¶ 333(b) ("UBSFSL received at least $2.5 million"); *id.* ¶ 333(c) ("UBSTPM received at least $53.3 million").  Yet the SAC is utterly silent about any monies transferred by the Fund Defendants to UBS AG.  Thus, at least with regard to UBS AG, the Trustee is simply wrong to claim that the SAC "alleges the dates ranges, amounts, and bases for those transfers."  Opp. at 63.  This omission is even more glaring because, in an

---

[10]  The Trustee attempts to cure this pleading deficiency by describing UBS AG as "sit[ting] atop a global UBS network 'designed to ensure UBS AG's centralized control of global business strategy and reporting obligations for UBS group companies,'" "Luxalpha's co-sponsor[]," and the like.  Opp. at 66–67.  However, none of these allegations supports a veil-piercing claim or pleads that UBS AG itself received any funds originating at BLMIS.

earlier proposed complaint, the Trustee had included a specific allegation that "UBS AG received at least $4.2 million in recoverable Subsequent Transfers from 2004 through 2008," yet he now deliberately *omits* this allegation in the SAC. *Compare* Proposed Second Amended Complaint, ECF No. 210, ¶ 289(d), *with* SAC ¶ 333. Therefore, the Trustee's claims against UBS AG should be dismissed based on the SAC's failure to allege that UBS AG received Subsequent Transfers.

## IV.    **The Trustee Has Not Alleged with Particularity Actual Fraudulent Intent Under Section 548(a)(1)(A)**

Section 548(a)(1)(A) permits a trustee to avoid a transfer only if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud" creditors. On its face, the statute requires a trustee to plead and prove the actual intent underlying the *specific transfers* at issue, rather than relying exclusively on the general nature of the debtor's enterprise. And as the Trustee seems to concede, such allegations must be pleaded with the particularity demanded by Rule 9(b).

The Trustee fails to allege any transfer-specific facts relevant to BLMIS's actual intent. Citing the Ponzi scheme presumption, he instead relies on allegations about BLMIS's business in general. *See* Opp. at 56–60. [11] As Judge Menashi has noted, applying that judge-made presumption to cases such as this one is, at best, "questionable." *Citibank*, 12 F.4th at 202

---

[11] The Ponzi scheme presumption has been accepted in many cases but is not settled law because the Second Circuit has never applied it in a case where the issue was disputed or "held directly that the presumption is well-founded." *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 202 n.7 (2d Cir. 2021) (Menashi, J., concurring), *cert. denied*, 142 S. Ct. 1209 (2022). Moreover, some Second Circuit courts have noted that "[s]imply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance." *Daly v. Deptula (In re Carrozella & Richardson)*, 286 B.R. 480, 489 (D. Conn. 2002); *see Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001), *aff'd*, 2002 WL 32500567 (W.D.N.Y. June 21, 2002); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680–81 (Bankr. S.D.N.Y. 2000) ("Not every transaction which has the effect of 'exacerbating the harm to creditors by increasing the amount of claims while diminishing the debtor's estate' is a fraudulent conveyance. Section 548 is not a catch-all provision."), *aff'd*, 264 B.R. 303 (S.D.N.Y. 2001).

(Menashi, J., concurring); *see* Mem. at 30–31. The Trustee has no response to the *Citibank* concurrence.[12]

In the alternative, the Trustee claims to satisfy his Rule 9(b) pleading burden by alleging "badges of fraud"—specifically, "BLMIS's concealment of facts, BLMIS's insolvency, and the lack of consideration provided for BLMIS's fictitious transfers to customers" generally. Opp. at 60. But the cited paragraphs of the SAC (¶¶ 28–31, 42–61) do not relate to the "two year" transfers at issue here. For example, the Trustee does not plead at all, much less with particularity, that *those specific transfers* were made without consideration. Nor could he; transfers by which BLMIS simply returned previous investments were made for consideration and are not subject to avoidance. *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (S.D.N.Y. 2013) ("[A] trustee is not permitted to sue innocent investors in a Ponzi scheme under fraudulent transfer law for the return of their principal . . . .").[13] The Trustee fails to allege whether any of the "two year" initial transfers contained fictitious profits (and if so, which ones and to what extent). Merely listing a large number of transfers and asking the Court to assume they were all made with intent to defraud falls well short of the Trustee's pleading burden. His "two year" claims should be dismissed.

---

[12] The Trustee similarly disregards the standard set forth in *Citibank* regarding the applicability of the section 550(b) good faith defense. The Second Circuit made clear that, even if a complaint alleges that a transferee knew facts that would have led a reasonable person to conduct a further inquiry into a debtor-transferor's possible fraud, the court must still examine "whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer." *Citibank*, 12 F.4th at 191–92. As set forth in the Memorandum, Madoff successfully deployed practices that prevented the most sophisticated investors, investigators, and even the SEC from uncovering the scheme. *See* Mem. at 31–35. Even though the Trustee questions the adequacy of the SEC investigation and the Defendants' diligence into BLMIS, *see* Opp. at 71–73, the Trustee does not—and cannot—dispute that Madoff successfully thwarted outside attempts to obtain information about BLMIS that could have uncovered the scheme, and it is because of Madoff's calculated efforts that any diligent inquiry by the Defendants would not have discovered the fraud. Therefore, under *Citibank*, the SAC establishes the UBS Defendants' good faith defense.

[13] *See also Citibank*, 12 F.4th at 203 (Menashi, J., concurring) (noting that BLMIS customers' deposits of principal into their accounts create valid contractual antecedent debts).

## CONCLUSION

For all of the foregoing reasons and those stated in the UBS Defendants' moving papers, the Court should dismiss the Second Amended Complaint in its entirety.

Dated: July 29, 2022              Respectfully Submitted,
      New York, New York        **GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
mking@gibsondunn.com
gherrmann@gibsondunn.com
kmartorana@gibsondunn.com

*Attorneys for the UBS Defendants*