**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Eric R. Fish
Patrick T. Campbell

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and the Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02761 (CGM) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| KBC INVESTMENTS LIMITED, | |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against Defendant KBC Investments Limited ("KBC Investments" or "Defendant"), alleges the following:

I.  **NATURE OF THE PROCEEDING**

1.  This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.  The Trustee seeks to recover at least $86,000,000 in subsequent transfers of BLMIS customer property made to KBC Investments. The BLMIS customer property was transferred from BLMIS to Harley International (Cayman) Limited ("Harley")—a BLMIS feeder fund ("Feeder Fund") that invested all or substantially all of its assets in BLMIS—and subsequently transferred to KBC Investments.

3.  KBC Investments is a private limited company with its registered office in the United Kingdom. KBC Investments is an indirect subsidiary of its ultimate parent KBC Group NV ("KBC Group") and was used by KBC Group and its affiliates—all sophisticated bankers and investment managers—as an offshore investment vehicle to invest with BLMIS through the Harley Feeder Fund.

4.  In 2009, the Trustee filed an adversary proceeding against Harley in this Court, in which the Trustee sought to avoid and recover initial transfers of customer property from BLMIS to Harley. On November 10, 2010, on a motion for summary default judgment, the Court entered judgment against Harley avoiding the initial two-year transfers in the amount of $1,066,800,000

2

under 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code.  The Trustee has not recovered any of the initial transfers, or their value, avoided by the judgment against Harley.

5. The Trustee's current action seeks the recovery of at least $86,000,000 in subsequent transfers of BLMIS customer property that the Defendant received from Harley.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

6. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

7. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

8. Venue in this judicial district is proper under 28 U.S.C. § 1409.

9. This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE AND STANDING

10. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

3

11. On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

12. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a) appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c) removed the case to this Court pursuant to SIPA § 78eee(b)(4).

13. By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

14. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

15. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

16. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

4

guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

17. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

18. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

19. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

5

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

21.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

22.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the United States Securities and Exchange Commission.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

23.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

24. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

25. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

26. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

27. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B. The Ponzi Scheme**

28. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

7

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

29. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

30. To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

31. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

Madoff's Investment Strategy

32. In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split strike conversion strategy ("SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a

8

certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

33.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

34.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

35.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

36.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

37.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

38. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

39. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

40. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

41. If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

42. Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

43. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of

10

its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

44. BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

45. Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

46. As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

47. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

48. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### No Evidence of BLMIS Trading

49. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

50. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### The Collapse Of The Ponzi Scheme

51. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

52. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

53. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V. DEFENDANT AND RELEVANT NON-PARTIES

54. Defendant KBC Investments is a private limited company with its registered office in the United Kingdom. KBC Investments is a subsidiary of its ultimate parent KBC Group.

55. Non-party KBC Financial Products USA Inc. ("KBC USA") was at all relevant times an indirect subsidiary of KBC Group and an affiliate of KBC Investments. KBC USA maintained its headquarters in New York, New York. As discussed below, KBC USA worked closely with KBC Investments and assisted in managing its investments in Harley and other Feeder Funds in New York.

56. Non-party KBC Asset Management Ltd. ("KBCAM") was at all relevant times a corporate affiliate of KBC Investments. Although KBCAM's registered office was located in Ireland, KBC touted its presence in a number of countries, including the United States. Like KBC USA, KBCAM worked closely with KBC Investments and assisted in managing its investments in Feeder Funds in New York.

57. Non-party Harley was a Cayman Islands company that maintained a customer account at BLMIS and was also one of BLMIS's largest feeder funds and sources of investor principal. Harley invested all or substantially all of its assets with BLMIS in New York.

58. Harley did not conduct any meaningful business in the Cayman Islands. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law: "The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." As such,

Harley was registered as an exempt company under Cayman Islands law and was not permitted to solicit investors in the Cayman Islands

59. Harley had no employees or offices of its own. Harley acted primarily through Fix Asset Management Services, Inc. ("FAM"), an institutional fund of funds manager with a principal place of business in New York and incorporated under New York law.

## VI. PERSONAL JURISDICTION

60. KBC Investments is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Harley and other Feeder Funds.

61. KBC Investments knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS. By directing its funds to and from New York-based BLMIS through Harley, KBC Investments knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and New York.

62. KBC Investments knew the following facts about its investments with Harley:

    a. The investment adviser for Harley was BLMIS in New York.

    b. BLMIS in New York was the executing broker for Harley's investments, and BLMIS in New York purportedly operated and executed the SSC Strategy on behalf of Harley.

    c. Madoff's SSC Strategy purportedly involved the purchase and sale of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. equities to purportedly purchase were made by Madoff in New York.

    d. Harley reported in its audited financial statements that 99.99% of its assets were in the custody of BLMIS in New York.

    e. The investments were in U.S. dollars and purportedly invested either directly or indirectly in equity securities and equity index related options.

14

    f.  The entire economic purpose of Harley was to deliver money to BLMIS in New York.

63. In order to invest in Harley, investors were required to execute Harley subscription agreements. By executing the subscription agreements, Harley's investors affirmed having received and carefully read the terms set forth in the Harley Confidential Explanatory Memorandum (the "Harley PPM"). As set forth in the Harley PPM, Harley shareholders, like KBC Investments, agreed that their investments in Harley would be governed by the fund's articles of association ("Harley Articles of Association"). The Harley Articles of Association, in turn, provided that all disputes among Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association.

64. Harley subscription documents also stated that all money from KBC Investments be directed to New York correspondent bank accounts at JP Morgan Chase, New York ("JP Morgan") or the Northern Trust Banking Corporation ("Northern Trust") for ultimate deposit in Harley's bank account. From Harley's bank account, the funds were deposited in BLMIS's account at JP Morgan in New York. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to its Northern Trust bank account in New York.

65. When redeeming from Harley, KBC Investments used its custodian's HSBC Bank USA account in New York to receive transfers from Harley. Harley redemption confirmations indicate that KBC Investments directed all of its Harley redemption payments—totaling three payments over a four month period—to this HSBC Bank USA account in New York.

66. As set forth in the Harley PPM, shareholders like KBC Investments also received copies of the fund's annual audited financial statements. Harley's 2004-2007 audited financial statements explained that BLMIS acted as Harley's custodian, holding virtually all of Harley's assets in New York, and that Harley used a strategy that purportedly required trading "in a basket

15

of U.S. equity securities commonly listed on the S&P 100 Index, equity index related options and U.S. Treasury Bills."

67. As noted above, KBC Investments also worked closely with its U.S. affiliates with respect to its Feeder Fund Investments. In particular, KBC USA and KBCAM worked with KBC Investments and assisted in managing its investments Feeder Fund investments in New York.

68. Employees of KBC USA and KBCAM frequently communicated and attended meetings with Feeder Fund personnel in New York on behalf and for the benefit of KBC Investments. KBC USA and KBCAM shared information learned about Harley, other Feeder Funds, Madoff, and BLMIS with KBC Investments.

69. In addition to Harley, KBC Investments maintained investments in other BLMIS Feeder Funds, including:

   a. Fairfield Sentry Fund Limited ("Fairfield Sentry"), which was operated and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York;

   b. Rye Select Broad Market Portfolio Limited and Rye Select Broad Market XL Portfolio Limited, which were managed by New York-based Tremont Partners, Inc. ("Tremont"), a Delaware corporation; and

   c. Kingate Global Fund Limited, which was operated and controlled by service providers with substantial connections to the United States— Kingate Management Limited and Tremont (Bermuda) Limited. Tremont (Bermuda) Limited, in turn, delegated management responsibilities to Tremont in New York.

70. KBC Group also filed quarterly 13-F reports with the SEC on behalf of KBC Investments beginning in 2008, acknowledging holdings of many U.S. stocks on the New York stock exchange. KBC Investments also maintained a Depository Trust Company Participation Account through the Bank of New York.

16

71. KBC Investments thus derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

72. KBC Investments should therefore reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to NYCPLR § 302 and Federal Rule of Bankruptcy Procedure 7004.

## VII. RECOVERY OF SUBSEQUENT TRANSFERS TO KBC INVESTMENTS

### A. Initial Transfers from BLMIS to Harley

73. The Trustee commenced a separate adversary proceeding against Harley in this Court under the caption, *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187, seeking to avoid and recover initial transfers of customer property from BLMIS to Harley in the approximate amount of $1,072,800,000 (the "Harley Initial Transfers").

74. On July 8, 2009, the Clerk of the Bankruptcy Court made an entry of default against Harley. On November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000, and a default judgment against Harley in the amount of $6,020,000, for a total judgment against Harley in the amount of $1,072,820,000, from which no appeal was taken ("November 10, 2010 Judgment"). The Trustee has not yet recovered any monies as a result of the November 10, 2010 Judgment.

75. Of the Harley Initial Transfers, approximately $1,066,800,000 was transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year Transfers"). Each of the Harley Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

76. Charts setting forth the Harley Initial Transfers by date and amount are attached as Exhibits A and B. The Harley Initial Transfers were and continue to be customer property within

the meaning of SIPA § 78*lll*(4).

77. The November 10, 2010 Judgment resulted in the avoidance of the Harley Initial Transfers. The Trustee filed this action on October 6, 2011, thus timely filing this action within one year of the avoidance of the Harley Initial Transfers.

### B. Subsequent Transfers from Harley to the KBC Investments

78. Prior to the Filing Date, Harley subsequently transferred a portion of the Harley Initial Transfers to KBC Investments. Based on the Trustee's investigation to date, Harley transferred $146,000,000 to KBC Investments, of which at least $86,000,000 consisted of subsequent transfers of customer property ("Subsequent Transfers"). A chart setting forth the presently known Subsequent Transfers is attached as Exhibit C.

79. The Subsequent Transfers are recoverable from KBC Investments under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

80. The Subsequent Transfers represent a redemption of equity interest by KBC Investments as a shareholder in Harley. Because Harley invested all of its assets into the BLMIS Ponzi scheme, Harley was insolvent when it made the Subsequent Transfers to KBC Investments upon redemption of its interests.

81. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE

### RECOVERY OF THE SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550

82. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

83. The Subsequent Transfers are recoverable from KBC Investments under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

84. KBC Investments is an immediate or mediate transferee of the Subsequent Transfers from Harley.

85. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a) and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against KBC Investments: (a) recovering the Subsequent Transfers, or the value thereof, from KBC Investments for the benefit of the estate of BLMIS and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against KBC Investments as follows:

a) Recovering the Subsequent Transfers, or the value thereof, from KBC Investments for the benefit of the estate;

b) If KBC Investments challenges the avoidability of the Harley Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

c) Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by KBC Investments; and

d) Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

|  |  |
|---|---|
| Dated: August 5, 2022<br>New York, New York | */s/ Eric R. Fish*<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Email: dsheehan@bakerlaw.com<br>Eric R. Fish<br>Email: efish@bakerlaw.com<br>Patrick T. Campbell<br>Email: pcampbell@bakerlaw.com<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff* |