JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendant Banque Syz SA*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    *Plaintiff-Applicant,*<br><br>           v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>                    *Defendant.* | Adv. Proc. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF,<br><br>                    *Debtor.* | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    *Plaintiff,*<br><br>           v.<br><br>BANQUE SYZ & CO., SA,<br><br>                    *Defendant.* | Adv. Proc. No. 11-02149 (CGM)<br><br>**BANQUE SYZ SA'S ANSWER TO THE COMPLAINT; DEMAND FOR JURY TRIAL** |

# ANSWER

Defendant Banque Syz SA, formerly known as Banque Syz & Co., SA ("Banque Syz"), answers the claims of Plaintiff Irving H. Picard ("the Trustee") as follows.

## I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to avoid and recover transfers of BLMIS Customer Property[2] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER:** Banque Syz **admits** that the Trustee purports to bring this adversary proceeding as part of the Trustee's efforts to recover BLMIS customer property within the meaning of 15 U.S.C. §§ 78*lll*(4) and that Madoff perpetrated a Ponzi scheme through BLMIS and **denies** the remaining allegations in Paragraph 1.

2.    With this Complaint, the Trustee seeks to recover approximately $73,266,724 in subsequent transfers made to Banque Syz. The subsequent transfers were derived from investments with BLMIS made by Madoff Feeder Funds. A Madoff (or BLMIS) Feeder Fund refers to an investment vehicle that opened customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets.

**ANSWER:** Banque Syz **denies** that the Trustee seeks to recover approximately $73,266,724 in subsequent transfers made to Banque Syz, because the Trustee has dismissed all claims relating to transfers from Kingate Global Fund Ltd.

---

[1] Banque Syz deems the section headings in the Complaint not to constitute allegations of the Complaint. To the extent any section headings are allegations, Banque Syz admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the Complaint.

[2] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

and Kingate Euro Fund Ltd. Banque Syz **admits**, for the limited purpose of referring

to it in this Answer, the definition of "Feeder Fund" contained in the third sentence

of Paragraph 2. Banque Syz **denies** all other allegations of Paragraph 2, including

that Banque Syz received subsequent transfers of customer property from BLMIS or

any Madoff Feeder Fund.

3.    When Banque Syz received the subsequent transfers of BLMIS
Customer Property, it had been a highly respected asset management specialist
based in Switzerland since 1996. See Exhibit A. Banque Syz knew or should have
known of numerous irregularities concerning investing through BLMIS given its
expertise in private banking and institutional asset management and its own
investments in BLMIS.

**ANSWER:**  Banque Syz **admits** that it is an asset management specialist

based in Switzerland since 1996, but otherwise **denies** the allegations in

Paragraph 3.

## II.    <u>JURISDICTION AND VENUE</u>

4.    The Trustee brings this adversary proceeding pursuant to his statutory
authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 544,
547, 548, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et.
seq.* (the "Bankruptcy Code"), and New York Debtor and Creditor Law §§ 273-279, to
obtain avoidable and recoverable transfers received by Banque Syz as a subsequent
transferee of funds originating from BLMIS.

**ANSWER:**  Banque Syz **avers** that the allegations in Paragraph 4 state legal

conclusions to which no response is required. To the extent any further response is

required, Banque Syz **admits** that the Trustee has brought this adversary

proceeding, but **denies** the remaining allegations in Paragraph 4.

5.    This is an adversary proceeding brought in this Court, in which the main
underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA
Case"), is pending. The SIPA Case was originally brought in the United States
District Court for the Southern District of New York (the "District Court") as
*Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et*

*al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

**ANSWER:** Banque Syz **denies** that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4). Banque Syz states that the United States District Court for the Southern District of New York has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A)((iii) and (b)(4) and this Court has jurisdiction over this adversary proceeding to the extent provided in SIPA § 78eee(b)(4). Banque Syz **admits** the remaining allegations in Paragraph 5.

6.      Banque Syz is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Madoff Feeder Funds. Banque Syz knowingly received transfers of Customer Property from BLMIS. The Trustee's investigation to date reveals that Banque Syz obtained this money by withdrawing money from: Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro") (collectively the "Kingate Funds"); Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma")(collectively the "Fairfield Funds") and Rye Select Broad Mkt Fund, LP, ("Tremont"). Banque Syz invested substantial sums with the Kingate Funds, the Fairfield Funds, and on behalf of Tremont which in turn invested nearly all of their funds with BLMIS. By directing its investments and services through the Kingate Funds, the Fairfield Funds and Tremont, which served the dual purpose of funneling money to BLMIS and generating profits therefrom, Banque Syz knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and the State of New York. Banque Syz derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** Banque Syz **denies** the allegations in Paragraph 6.

7.      Banque Syz maintained an account with BLMIS in New York, account number 1FR126, and used New York banks to transfer funds into BLMIS, transferring investor funds to, as well as receiving monies and receipts from, the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703 (the "703 Account").

**ANSWER:**    Banque Syz **admits** that it maintained an account with BLMIS in New York, account number 1FR126, solely in a custodial capacity on behalf of Isos Fund Ltd. and after the transactions that are the subject of this adversary proceeding and that, as is mandatory when a foreign bank makes a transfer of funds in USD, such as to the 703 Account, the transfer had to be made through a US-based correspondent bank, but otherwise **denies** the allegations in Paragraph 7.

8.    Banque Syz filed a Customer Claim in the SIPA Proceeding seeking to recover funds it allegedly lost on its investments in BLMIS, whereby it has submitted to the jurisdiction of this Court.

**ANSWER:**    Banque Syz **admits** that it filed a Customer Claim in the SIPA Proceeding solely in a custodial capacity on behalf of Isos Fund Ltd. Banque Syz **denies** the remaining allegations in Paragraph 8.

9.    Banque Syz should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to N.Y. C.P.L.R. § 302 and Bankruptcy Rule 7004.

**ANSWER:**    Banque Syz **denies** the allegations in Paragraph 9.

10.    This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O).

**ANSWER:**    Banque Syz **admits** this adversary proceeding is of a kind specified as a core proceeding in 28 U.S.C. §§ 157(b)(2)(H) and **denies** the remaining allegations in Paragraph 10. Banque Syz **does not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demands trial by jury** of all issues that may be tried by a jury.

11.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**    Banque Syz **admits** the allegations in Paragraph 11.

## III.   **BACKGROUND**

12.   On the December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, inter alia, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER:**   Banque Syz **admits** on information and belief that Madoff was arrested on or around the Filing Date and that the SEC filed a complaint against BLMIS. Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12, and therefore denies the remaining allegations in Paragraph 12.

13.   On December 12, 2008 The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 13, and therefore **denies** the allegations in Paragraph 13.

14.   On December 15, 2008 under section 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore **denies** the allegations in Paragraph 14.

15. Also on December 15, 2008 Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

    a. appointed the Trustee for the liquidation of the business of BLMIS under SIPA section 78eee(b)(3);

    b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and

    c. removed the case to this Bankruptcy Court under section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore **denies** the allegations in Paragraph 15.

16. By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore **denies** the allegations in Paragraph 16.

17. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009 Madoff was sentenced to 150 years in prison.

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore **denies** the allegations in Paragraph 17.

18.    On August 11, 2009 a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 18, and therefore **denies** the allegations in

Paragraph 18.

## IV.    <u>TRUSTEE'S POWERS AND STANDING</u>

19.    Appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, investigating and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

**ANSWER:**  Banque Syz **avers** that the allegations in Paragraph 19 state

legal conclusions to which no response is required. To the extent any further response

is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 19 and therefore **denies** such allegations.

20.    Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:**  Banque Syz **avers** that the allegations in Paragraph 20 state

legal conclusions to which no response is required. To the extent any further response

is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 20 and therefore **denies** such allegations.

21.    Under SIPA sections 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed
to be the date of the filing of the petition within the meaning of section 548 of the
Bankruptcy Code and the date of commencement of the case within the meaning of
section 544 of the Bankruptcy Code.

**ANSWER:**  Banque Syz **avers** that the allegations in Paragraph 21 state

legal conclusions to which no response is required. To the extent any further response

is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 21 and therefore **denies** such allegations.

22.    The Trustee has standing to bring these claims under section 78fff-1(a)
of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1),
because, among other reasons:

a.    Banque Syz received Customer Property;

b.    BLMIS incurred losses as a result of the claims set forth herein;

c.    BLMIS customers were injured as a result of the conduct detailed
herein;

d.    SIPC has not reimbursed, and statutorily cannot fully reimburse, all
customers for their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of Customer Property, can sue on behalf of the
customer-bailors;

g.    the Trustee is the assignee of claims paid, and to be paid, to customers
of BLMIS who have filed claims in the liquidation proceeding (such
claim-filing customers, collectively, "Accountholders"). As of this date,
the Trustee has received multiple, express unconditional assignments of
applicable Accountholders' causes of action, which actions could have
been asserted against Banque Syz. As assignee, the Trustee stands in
the shoes of persons who have suffered injury in fact and a distinct loss
for which the Trustee is entitled to reimbursement in the form of
monetary damages; the Trustee brings this action on behalf of, among

others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.    the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:**    Banque Syz **avers** that the allegations in Paragraph 22 state legal conclusions to which no response is required. To the extent any further response is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 22 and therefore **denies** such allegations.

## V.    THE DEFENDANT

23.    Defendant Banque Syz is a Société Anonyme formed under the laws of Switzerland with its offices located at Rue du Rhône 30, P.O. Box 5015, CH-1211 Geneva 11, Switzerland.

**ANSWER:**    Banque Syz **admits** the allegations of Paragraph 23, except that its offices are located at Quai des Bergues 1, CH-1201 Geneva, Switzerland, since 2017.

24.    Banque Syz maintained an account with BLMIS, designated account 1FR126. The account was opened on or about March 7, 2007 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options were executed on behalf of Banque Syz and delivered to BLMIS at its headquarters at 855 Third Avenue, New York, New York. This account was still open when Madoff was arrested on December 11, 2008.

**ANSWER:**    Banque Syz **denies** that it maintained an account with BLMIS other than solely in a custodial capacity for Isos Fund Ltd, and **denies** that the documents referenced in Paragraph 24 were executed on behalf of Banque Syz.

10

Banque Syz **lacks knowledge** sufficient to form a belief as to the delivery of the documents listed in Paragraph 24 and therefore further **denies** such allegations.

Banque Syz **admits** the remaining allegations in Paragraph 24.

## VI.   <u>THE PONZI SCHEME</u>

25.   BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and investment advisory.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore **denies** those allegations.

26.   Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore **denies** those allegations.

27.   The second part of the SSC Strategy was the hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding treasury bills. Madoff also told customers that these "round-trips" into the market would occur between six and ten times each year.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 27 and therefore **denies** those allegations.

28.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the split strike conversion strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for IA Business' customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the 703 Account.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 28 and therefore **denies** those allegations.

29.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 29 and therefore **denies** those allegations.

30.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER:**   Banque Syz **admits** upon information and belief that BLMIS

claimed to invest money deposited by customers in securities**,** but otherwise **lacks**

**knowledge** sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 30 and therefore **denies** those allegations.

31.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS Accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 31 and therefore **denies** those allegations.

32.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 32 and therefore **denies** those allegations.

33.     Madoff's scheme continued until December 2008 when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:**   Banque Syz **admits** that BLMIS's business continued until December 2008, but otherwise **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33 and therefore **denies** those allegations.

34.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 34 and therefore **denies** those allegations.

35.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions
of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were
worth less than the value of its liabilities; (ii) it could not meet its obligations as they
came due; and (iii) at the time of the transfers, BLMIS was left with insufficient
capital.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 35 and therefore **denies** those allegations.

**VII.   BANQUE SYZ IS A SIGNIFICANT PLAYER IN THE GLOBAL
        PRIVATE BANKING AND INVESTMENT INDUSTRY AND THUS
        WAS ON INQUIRY NOTICE OF MADOFF'S FRAUDULENT ACTIVITY**

36.     According to its website, Banque Syz, founded in 1996, combines the
independence and service quality of traditional private banking with a clear
commitment to investment performance. Banque Syz's website further states that it
maintains security and transparency and does not engage in any high-risk activities.
See Exhibit A.

**ANSWER:**   Banque Syz **admits** the allegations of Paragraph 36, except that

Exhibit A can no longer be found on its website.

37.     In its brochure, Banque Syz highlights OYSTER, the fund family of
Banque Syz designed to bring its investment expertise to the broad public. Banque
Syz boasts that the OYSTER Fund selects the best managers in the world; managers
who are subject to rigorous checks and ongoing monitoring by a specialized team. See
Exhibit B.

**ANSWER:**   Banque Syz **admits** that it used to highlight OYSTER in its

brochure but otherwise **denies** the allegations of Paragraph 37, as Exhibit B is not

up-to-date and OYSTER is no longer owned by Banque Syz since 2020.

38.     Banque Syz had its own direct account with BLMIS.

**ANSWER:**   Banque Syz **denies** that it had its own direct account with

BLMIS, and states that it maintained an account with BLMIS solely in its custodial

capacity on behalf of Isos Fund Ltd. Banque Syz otherwise **denies** the allegations in

Paragraph 38.

39.    Moreover, Banque Syz solicited its own clients to invest in Madoff Feeder Funds. On information and belief, Banque Syz offered its clients the opportunity to borrow money to increase their positions in the Kingate Funds.

**ANSWER:**  Banque Syz **admits** that, as provider of advisory and asset

management services, investments in funds could be part of the services it provided,

but otherwise **denies** the allegations of Paragraph 39.

40.    On information and belief, Banque Syz advised one of its clients to invest $100,000 in Kingate Euro in 2007. Immediately thereafter, Banque Syz offered to loan that client $500,000 (five times his initial investment) to increase his exposure to Kingate Euro.

**ANSWER:**  The allegations in this paragraph relate to claims arising from

BLMIS transfers to Kingate Funds, which have been dismissed by the Trustee, and

therefore to which no response is required. If any further response is required,

Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the

allegations in Paragraph 40 and therefore **denies** these allegations,

41.    On information and belief, this client never withdrew any money from his Kingate Euro investment. Banque Syz disclaimed all responsibility for his loss.

**ANSWER:**  The allegations in this paragraph relate to claims arising from

BLMIS transfers to Kingate Funds, which have been dismissed by the Trustee, and

therefore to which no response is required. If any further response is required,

Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the

allegations in Paragraph 41 and therefore **denies** these allegations.

42.    Banque Syz' expertise in private banking and institutional asset management, as well as its substantial investments in the Madoff Feeder Funds, provided it access to information about the operations of BLMIS, and therefore

Banque Syz knew or should have known of numerous irregularities concerning investing through BLMIS.

**ANSWER:** Banque Syz **denies** the allegations in Paragraph 42.

## VIII.  THE TRANSFERS

43.     Banque Syz received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, but are named as defendants in other actions brought by the Trustee, including the Kingate Funds, the Fairfield Funds and Tremont– each of which maintained one or more accounts with BLMIS.

**ANSWER:** Banque Syz **denies** the allegations in Paragraph 43.

### A.  THE KINGATE FUNDS

#### 1.  INITIAL TRANSFERS FROM BLMIS TO KINGATE GLOBAL

44.     The Trustee has filed an action against the Kingate Funds to avoid and recover initial transfers of Customer Property, styled as *Picard v. Kingate, et al.*, No. 08-1789 (BRL), Adv. Pro. No. 09-1161 (BRL) (the "Kingate Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Complaint as if fully set forth herein.

45.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

46.     The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

47.     The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided,

16

and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

48.    The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts detailing these transactions are included as Exhibits C and D.

## 2.    SUBSEQUENT TRANSFERS FROM KINGATE GLOBAL TO BANQUE SYZ

49.    Based on the Trustee's investigation to date, approximately $39,975,488 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Banque Syz (the "Kingate Global Subsequent Transfers"). Charts setting forth the presently known Kingate Global Subsequent Transfers are attached as Exhibit E.

50.    The Kingate Complaint seeks to avoid and recover the Kingate Global Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

51.    As set forth in paragraph 49 of this Complaint, a portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Banque Syz and is recoverable from Banque Syz pursuant to section 550 of the Bankruptcy Code.

52.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## 3.    INITIAL TRANSFERS FROM BLMIS TO KINGATE EURO

53.    During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of approximately $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

54.    The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers"). The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property

within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

55.    The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers"). The Kingate Euro Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

56.    The Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "Kingate Euro Initial Transfers." Charts setting forth these transfers are included as Exhibits F and G.

57.    The Kingate Global Initial Transfers and the Kingate Euro Initial Transfers are collectively referred to as the "Kingate Initial Transfers."

## 4.    SUBSEQUENT TRANSFERS FROM KINGATE EURO TO BANQUE SYZ

58.    Based on the Trustee's investigation to date, the equivalent of at least $17,376,966 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Banque Syz (the "Kingate Euro Subsequent Transfers"). A chart setting forth the presently known Kingate Euro Subsequent Transfers is attached as Exhibit H.

59.    The Kingate Complaint seeks to avoid and recover the Kingate Euro Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

60.    As set forth in paragraph 58 of this Complaint, a portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Banque Syz and is recoverable from Banque Syz pursuant to section 550 of the Bankruptcy Code.

61.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Euro Initial Transfers, Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

62.    The Kingate Global Subsequent Transfers and the Kingate Euro Subsequent Transfers are collectively referred to as the "Kingate Subsequent Transfers."

**ANSWER:**    Because the Trustee has dismissed all claims against Banque Syz relating to transfers from BLMIS to the Kingate Funds, as set forth in the *Stipulation and Order* in this adversary proceeding entered December 7, 2021, ECF 147, no response to the allegations in Paragraph 44 through 62 is required. If any further response is required, Banque Syz **denies** the allegations of paragraphs 44 through 62 of the Complaint.

### B.    FAIRFIELD

### 1.    INITIAL TRANSFERS FROM BLMIS TO FAIRFIELD SENTRY

63.    The Trustee filed an action against Fairfield Sentry to avoid and recover initial transfers of Customer Property, styled as *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:**    Banque Syz (a) **admits** that the Trustee filed an action styled as *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (the "**Sentry Action**"), (b) **lacks knowledge** sufficient to form a belief as to which of the three complaints filed in the Sentry Action the Trustee purports to incorporate by reference in the complaint in this action and therefore **denies** such allegations, (c) **denies** that the initial transfers of Customer Property to Sentry the Trustee seeks to avoid and recover in the Sentry Action were avoided or are avoidable, (d) to the extent necessary to support such denial, **denies** for lack of knowledge sufficient to form a belief as to the truth of the allegations, each and every paragraph of each of

the three complaints filed in the Sentry Action that supports the claim that any initial transfers of Customer Property to Sentry are or were avoided or avoidable, and (e) **objects** to the incorporation by reference of, and therefore does not answer, each and every other paragraph and allegation in the three complaints in the Sentry Action and to the inclusion in this adversary proceeding of any issue implicated by any of the three complaints in the Sentry Action other than the issue of the avoidance or avoidability of the initial transfers of Customer Property, but reserves the right to rely on and introduce any allegations in the referenced "Fairfield Amended Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents. To the extent any further response is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 and therefore **denies** such allegations.

64.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Six Year Initial Transfers"). The Fairfield Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and sections 273-279 of New York and Debtor and Creditor Law.

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 64 and therefore **denies** such allegations. Banque Syz **avers** that the remaining allegations in Paragraph 64 state legal conclusions to which no response is required. To the extent that any further response is required, Banque Syz **denies** the allegations in Paragraph 64.

65.    The Fairfield Six Year Initial Transfers include approximately $1.6 billion that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Two Year Initial Transfers"). The Fairfield Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the

alleged timing and amounts of the transfers alleged in Paragraph 65 and therefore

**denies** such allegations. Banque Syz **avers** that the remaining allegations in

Paragraph 65 state legal conclusions to which no response is required. To the extent

that any further response is required, Banque Syz **denies** the allegations in

Paragraph 65.

66.    The Fairfield Six Year Initial Transfers and the Fairfield Two Year Initial Transfers are collectively defined as the "Fairfield Initial Transfers." Charts setting forth these transfers are included as Exhibits I and J.

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 66 and therefore **denies** such allegations.

## 2.    SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO BANQUE SYZ

67.    Based on the Trustee's investigation to date, approximately $15,449,241 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Banque Syz (the "Sentry-Syz Subsequent Transfers"). A chart setting forth the presently known Sentry-Syz Subsequent Transfers is attached as Exhibit K.

**ANSWER:**  Banque Syz **admits** that it received funds from Fairfield Sentry

but **denies** that such funds were in the amounts identified in Exhibit K, **denies** that

any of such funds constitute subsequent transfers of Customer Property or of any

21

other property transferred from BLMIS to Fairfield Sentry, and **denies** any

remaining allegations of Paragraph 67.

68.    The Fairfield Amended Complaint seeks to avoid and recover the Fairfield Sentry Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 68 and therefore **denies** such allegations.

69.    As set forth in paragraph 67 of this Complaint, a portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Banque Syz and is recoverable from Banque Syz pursuant to section 550 of the Bankruptcy Code.

**ANSWER:**    Banque Syz **denies** the allegations of Paragraph 69.

70.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Initial Transfers, Sentry-Syz Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**    Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 70 and therefore **denies** such allegations.

### 3.    <u>SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO FAIRFIELD SIGMA AND SUBSEQUENTLY TO BANQUE SYZ</u>

71.    Based on the Trustee's investigation to date, approximately $752,273,917 of money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of approximately $404,558 was transferred by Fairfield Sigma to Banque Syz (the "Sentry-Sigma Subsequent Transfers"). Charts setting forth the presently known Sentry-Sigma Subsequent Transfers are attached as Exhibits L and M.

**ANSWER:**    Banque Syz **admits** that it received funds from Fairfield Sigma,

but **denies** that such funds were in the amounts identified in Exhibit M and that any

of such funds constitute subsequent transfers of Customer Property or of any other

property, and **lacks knowledge** sufficient to form a belief as to the amounts

identified in Exhibit L and to truth of the allegations of the amounts, if any,

transferred from BLMIS to Fairfield Sentry and from Fairfield Sentry to Fairfield

Sigma and therefore **denies** the remaining allegations in Paragraph 71.

72.    The Fairfield Amended Complaint seeks to avoid and recover the Fairfield Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**   To the extent any further response is required, Banque Syz **lacks**

**knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 72 and therefore **denies** such allegations.

73.    As set forth in paragraph 71 of this Complaint, a portion of the Fairfield Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Banque Syz and is recoverable from Banque Syz pursuant to section 550 of the Bankruptcy Code.

**ANSWER:**   Banque Syz **denies** the allegations of Paragraph 73.

74.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Initial Transfers, Sentry-Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**   Banque Syz **lacks knowledge** sufficient to form a belief as to the

truth of the allegations in Paragraph 74 and therefore **denies** such allegations.

C.    **TREMONT**

1.    **INITIAL TRANSFERS FROM BLMIS TO TREMONT**

75.    The Trustee has filed an action against Tremont to avoid and recover initial transfers of Customer Property, styled as *Picard v. Tremont, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 10-05310 (BRL) (the "Tremont Complaint"). The Trustee incorporates by reference the allegations contained in the Tremont Complaint as if fully set forth herein.

**ANSWER:** Banque Syz (a) **admits** that the Trustee filed an action styled as *Picard v. Tremont, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 10-05310 (the "**Tremont Action**"), (b) **lacks knowledge** sufficient to form a belief as to which of the two complaints filed in the Tremont Action the Trustee purports to incorporate by reference in the complaint in this action and therefore **denies** those allegations, (c) **denies** that the initial transfers of Customer Property to Tremont the Trustee seeks to avoid and recover in the Tremont Action were avoided or are avoidable, (d) to the extent necessary to support such denial, **denies** each and every paragraph of both of the complaints filed in the Tremont Action that supports the claim that any transfers to Tremont are or were avoided or avoidable, and (e) **objects** to the incorporation by reference of, and therefore does not answer, each and every other paragraph and allegation in the two complaints in the Tremont Action and to the inclusion in this adversary proceeding of any issue implicated by either of the two complaints in the Tremont Action other than the issue of the avoidance or avoidability of the initial transfers of Customer Property. To the extent any further response is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75 and therefore **denies** such allegations.

76.    Prior to the Filing Date, BLMIS made transfers to Tremont of approximately $384,140,000 (the "Total Tremont Initial Transfers"). The Total Tremont Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 547, 548, 550 and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, NY CPLR 203(g) and 213(8), and applicable provisions of SIPA, particularly 78fff-2(c)(3).

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers in

Paragraph 76 and therefore **denies** such allegations. Banque Syz **denies** the remaining allegations in Paragraph 76.

77.    The Total Tremont Initial Transfers include approximately $252,000,000 which BLMIS transferred to Tremont during the six years preceding the Filing Date (the "Tremont Six Year Initial Transfers"). The Tremont Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers in Paragraph 77 and therefore **denies** such allegations. Banque Syz **states** that the remaining allegations in Paragraph 77 state legal conclusions to which no response is required. To the extent that any further response is required, Banque Syz **denies** the remaining allegations in Paragraph 77.

78.    The Total Tremont Initial Transfers and the Tremont Six Year Initial Transfers are collectively defined as the "Tremont Initial Transfers." Charts detailing these transactions are included as Exhibits N and O.

**ANSWER:**  Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 78 and therefore **denies** such allegations.

## 2.    SUBSEQUENT TRANSFERS FROM TREMONT TO BANQUE SYZ

79.    Based on the Trustee's investigation to date, approximately $60,471 of the money transferred from BLMIS to Tremont was subsequently transferred by Tremont to Banque Syz as custodial fees (the "Tremont Subsequent Transfers"). A chart setting forth the presently known Tremont Subsequent Transfers is attached as Exhibit P.

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to truth of the allegations in Paragraph 79 and therefore **denies** the allegations of Paragraph 79.

80.    The Tremont Complaint seeks to avoid and recover the Tremont Initial Transfers pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the New York Debtor and Creditor Law, NY CPLR 203(g) and 213(8), and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to truth of the allegations of Paragraph 80 and therefore **denies** such allegations.

81.    As set forth in paragraph 79 of this Complaint, a portion of the Tremont Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Banque Syz, as custodial fees, and is recoverable from Banque Syz pursuant to section 550 of the Bankruptcy Code.

**ANSWER:** Banque Syz **denies** the allegation of Paragraph 81 of the Complaint.

82.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Tremont Initial Transfers, Tremont Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:** Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 82 and therefore **denies** such allegations.

## CUSTOMER CLAIM

83.    Banque Syz filed Customer Claim No. 4677 on or about March 2, 2009 (the "Customer Claim"). To date, the Trustee has yet to determine the Customer Claim.

**ANSWER:** Banque Syz **admits** that it filed Customer Claim No. 4677 solely in its custodial capacity on behalf of Isos Fund Ltd. on or about March 2, 2009. Banque

Syz **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83 and therefore **denies** such allegations.

84.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claim, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to pursue resolution of the Customer Claims, their objections and any other related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

**ANSWER:**  Banque Syz **admits** that on December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claim, and Providing Other Relief and respectfully **refers** this Court to the Order for its contents. Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 and therefore **denies** such allegations.

<u>**COUNT ONE**</u>
<u>**RECOVERY OF SUBSEQUENT TRANSFERS –**</u>
<u>**11 U.S.C. §§ 550 AND 551**</u>

85.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:**  Banque Syz **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

86.    The Trustee has filed lawsuits against the Kingate Funds, Fairfield Sentry and Tremont to avoid and recover the Kingate Initial Transfers, the Fairfield Initial Transfers, and the Tremont Initial Transfers pursuant to sections 544, 547,

548, and 550 of the Bankruptcy Code and sections 273-279 of the New York Debtor and Creditor Law, NY CPLR 203(g) and 213(8), and SIPA § 78fff-2(c)(3).

**ANSWER:** Banque Syz **admits** that the Trustee filed lawsuits against the Kingate Funds, but **avers** that the remaining allegations in Paragraph 86 state legal conclusions to which no response is required. To the extent any further response is required, Banque Syz **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 86 and therefore **denies** such allegations.

87.    Each of the Kingate Initial Transfers, Fairfield Initial Transfers, and the Tremont Initial Transfers are avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code, New York Debtor and Creditor Law sections 273-276, NY CPLR 203(g) and 213(8) and SIPA § 78fff-2(c)(3).

**ANSWER:** Banque Syz **avers** that the allegations in Paragraph 87 state legal conclusions to which no response is required. To the extent a response is required, Banque Syz **denies** the allegations in Paragraph 87.

88.    Banque Syz received the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers totaling the equivalent of approximately $73,266,724 which are recoverable pursuant to Section 550 of the Bankruptcy Code.

**ANSWER:** Banque Syz **avers** that the allegations in Paragraph 88 state legal conclusions to which no response is required. Further, to the extent the allegations in this paragraph relate to claims arising from BLMIS transfers to Kingate Funds, those claims have been dismissed by the Trustee, and therefore no response is required to those allegations. To the extent any further response is required, Banque Syz **denies** the allegations in Paragraph 88.

89.    Each of the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers was made directly or indirectly to, or for the benefit of, Banque Syz.

**ANSWER:**   Banque Syz **denies** that the allegations in Paragraph 89.

90.    Banque Syz was an immediate or mediate transferee of the Kingate Initial Transfers, Fairfield Initial Transfers, and Tremont Initial Transfers.

**ANSWER:**   Banque Syz **denies** the allegations in Paragraph 90.

91.    As a result of the foregoing, pursuant to N.Y. CPLR 203(g), 213(8), New York Debtor and Creditor Law sections 273-279, section 550 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Banque Syz recovering the Kingate Subsequent Transfers, Fairfield Subsequent Transfers, and Tremont Subsequent Transfers or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:**   Banque Syz **avers** that the allegations in Paragraph 91 state legal conclusions to which no response is required. To the extent a response is required, Banque Syz **denies** the allegations in Paragraph 91.

## COUNT TWO
## DISALLOWANCE OF CUSTOMER CLAIM

92.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:**   Banque Syz **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

93.    Banque Syz filed the Customer Claim, which has not yet been determined.

**ANSWER:**   Banque Syz **admits** that it filed the Customer Claim solely in its custodial capacity on behalf of Isos Fund Ltd. and that the Customer Claim has not yet been determined, but otherwise **denies** the allegations in Paragraph 93.

94.    Such Customer Claim should not be allowed pursuant to section 502(d) of the Bankruptcy Code, as Banque Syz, who filed the Customer Claim, is the recipient of subsequent transfers of BLMIS's property which are avoidable and recoverable under sections 544, 547, 548 and/or 550(a) of the Bankruptcy Code, New

York Debtor and Creditor Law sections 273, 274, 275 and 276 and section 78fff-2(c)(3) as set forth above, and Banque Syz has not returned the transfers to the Trustee.

**ANSWER:** Banque Syz **avers** that the allegations in Paragraph 94 state legal conclusions to which no response is required. To the extent a response is required, Banque Syz **admits** it has not transferred any money or other property to the Trustee and **denies** the remaining allegations in Paragraph 94.

### AFFIRMATIVE DEFENSES

#### First Affirmative Defense—Counts One and Two
(Personal Jurisdiction)

1.      This Court lacks personal jurisdiction over Banque Syz for each of the reasons stated in Banque Syz's Memorandum in Support of Its Motion To Dismiss The Complaint, filed on January 28, 2022 in this adversary proceeding, ECF 150, and proceedings thereon, and Banque Syz has **not** consented to a decision by this Court or to this Court's authority to hear and determine this action.

#### Second Affirmative Defense—Counts One and Two
(Failure to State A Claim for Relief)

2.      Each Count of the Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in Banque Syz's Motion To Dismiss The Complaint, filed on January 28, 2022 in this adversary proceeding, ECF 149, and proceedings thereon.

#### Third Affirmative Defense—Counts One and Two
(Dismissed Claims)

3.      The Trustee's claims are barred to the extent they have been dismissed by the Trustee or the Court or are based on allegations that have been dismissed by the Trustee or the Court, including any claims relating to transfers to or from the

Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered December 7, 2021, ECF 147.

### Fourth Affirmative Defense—Count One
(Mere Conduit/Lack of Dominion or Control—Sentry-Syz Subsequent Transfers)

4.    The Trustee's claims are barred because Banque Syz was not a transferee of the Sentry-Syz Subsequent Transfers. To the extent, if any, that Banque Syz received any Sentry-Syz Subsequent Transfer, Banque Syz (a) received each Sentry-Syz Subsequent Transfer in good faith, in its capacity as a bank acting as nominee, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Sentry-Syz Subsequent Transfers or the proceeds thereof or to use the Sentry-Syz Subsequent Transfers or the proceeds thereof for its own purposes; (c) rather, was a mere conduit for its customers; and (d) was obligated to credit the Sentry-Syz Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Sentry-Syz Subsequent Transfers received by Banque Syz for their benefit.

### Fifth Affirmative Defense – Count One
(Mere Conduit/Lack of Dominion or Control—Sentry-Sigma Subsequent Transfers)

5.    The Trustee's claims are barred because Banque Syz was not a transferee of the Sentry-Sigma Subsequent Transfers. To the extent, if any, that Banque Syz received any Sentry-Sigma Subsequent Transfer, Banque Syz (a) received each Sentry-Sigma Subsequent Transfer in good faith, in its capacity as a bank acting as nominee, for the account and benefit of one or more of its customers; (b) did not have dominion or control or the right to assert dominion or control over

the Sentry-Sigma Subsequent Transfers or the proceeds thereof, or to use the Sentry-Syz Subsequent Transfers or the proceeds thereof for its own purposes; (c) rather, was a mere conduit for its customers; and (d) was obligated to credit the Sentry-Sigma Subsequent Transfers or the proceeds thereof to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Sentry-Sigma Subsequent Transfers received by Banque Syz for their benefit.

### Sixth Affirmative Defense—Count One
(Mere Conduit/Lack of Dominion or Control—Tremont Subsequent Transfers)

6.    The Trustee's claims are barred because Banque Syz was not a transferee of the Tremont Subsequent Transfers, if any. To the extent, if any, that Banque Syz received any Tremont Subsequent Transfer for any purpose other than as consideration for custodial services, Banque Syz (a) received each Tremont Subsequent Transfer in good faith, in its capacity as a bank acting as nominee, for the account and benefit of one or more of its customers; (b) did not have dominion or control or the right to assert dominion or control over the Tremont Subsequent Transfers or the proceeds thereof, or to use the Tremont Subsequent Transfers or the proceeds thereof for its own purposes; (c) rather, was a mere conduit for its customers; and (d) was obligated to credit the Tremont Subsequent Transfers or the proceeds thereof to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Tremont Subsequent Transfers received by Banque Syz for their benefit.

**Seventh Affirmative Defense—Count One**
(Section 544(b)—Nonavoidability of Early Tremont Initial Transfers)

7.    To the extent, if any, that Banque Syz received any Tremont Subsequent Transfer of a Tremont Initial Transfer that occurred before December 12, 2002, the Tremont Initial Transfer is not avoidable under section 544(b) of the Bankruptcy Code, because the reach-back period under Sections 273 to 279 of the New York Debtor-Creditor Law (Fraudulent Conveyances) in effect at the time of the Tremont Initial Transfer was six years.

**Eighth Affirmative Defense—Count One**
(Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Sentry-Syz)

8.    To the extent, if any, that Banque Syz received any Sentry-Syz Subsequent Transfers, such Sentry-Syz Subsequent Transfers may not be recovered because Banque Syz took such Sentry-Syz Subsequent Transfers for value and in good faith and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

9.    **Value.** To the extent, if any, that Banque Syz received any Sentry-Syz Subsequent Transfers, Banque Syz took the Sentry-Syz Subsequent Transfers in exchange for Fairfield Sentry's redemption of its own shares from Banque Syz and therefore took for value.

10.    **Good Faith.** Banque Syz began investing in Fairfield Sentry in 2003. At the time each of the Sentry-Syz Subsequent Transfers was made, Banque Syz understood that Fairfield Sentry invested in U.S. securities primarily through an account that Fairfield Sentry held at BLMIS, and had reported consistent, positive, and generally above-market returns, that BLMIS was founded and operated by

33

Bernard L. Madoff, that Madoff was a well-respected member of the investment community and former chair of NASDAQ, that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on investment, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which Banque Syz did not then know to be false.

11.    To the extent, if any, that Banque Syz received any Sentry-Syz Subsequent Transfers, at the time each Sentry-Syz Subsequent Transfers was made, Banque Syz was aware of only the publicly available information about Fairfield Sentry and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Sentry-Syz Subsequent Transfers (if any), Banque Syz did not have access to non-public information regarding BLMIS. Banque Syz handled its Fairfield Sentry account consistent with other industry professionals based on publicly known information about Fairfield Sentry and about BLMIS. Banque Syz did not have any communications with BLMIS or its officers or employees or Madoff on or before the date of the last of the Sentry-Syz Subsequent Transfers (if any). None of the communications Banque Syz had with Fairfield Sentry or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Sentry-Syz Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield

Sentry or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

12.    At no time on or before the date of the last Sentry-Syz Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Banque Syz aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

13.    The Sentry-Syz Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sentry. A reasonable person with the facts in Banque Syz's possession at the time of each of the Sentry-Syz Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Sentry-Syz Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Sentry-Syz Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

14.    A diligent inquiry by Banque Syz would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Banque Syz, and with more access to BLMIS personnel and documentation than Banque Syz, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the

SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Banque Syz did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Sentry-Syz Subsequent Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, solely as custodian, of the Isos Fund Ltd. account in March 2007, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

15.    **Without Knowledge of the Voidability of the Fairfield Initial Transfers.** Banque Syz did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Sentry-Syz Subsequent Transfers (if any).

### Ninth Affirmative Defense—Count One
#### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Sentry-Sigma)

16.    To the extent, if any, that Banque Syz received any Sentry-Sigma Subsequent Transfers, the property received by Banque Syz as part of the Sentry-Sigma Subsequent Transfers may not be recovered because Banque Syz took such Sentry-Sigma Subsequent Transfers for value, in good faith, and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

17.    **Value.** To the extent, if any, that Banque Syz received any Sentry-Sigma Subsequent Transfers, Banque Syz took such Sentry-Sigma Subsequent Transfers in exchange for Sigma's redemption of its own shares from Banque Syz and therefore took for value.

18.    **Good Faith.** Banque Syz began investing in Fairfield Sigma in 2004. At the time each of the Sentry-Sigma Subsequent Transfers was made, Banque Syz understood that Fairfield Sigma invested in U.S. securities primarily through an account that Fairfield Sigma held at BLMIS, and had reported consistent, positive, and generally above-market returns, that BLMIS was founded and operated by Bernard L. Madoff, that Madoff was a well-respected member of the investment community and former chair of NASDAQ, that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on investment, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which Banque Syz did not then know to be false.

19.    To the extent, if any, that Banque Syz received any Sentry-Sigma Subsequent Transfers, at the time each of the Sentry-Sigma Subsequent Transfers was made, Banque Syz was aware of only the publicly available information about Fairfield Sentry and Fairfield Sigma and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Sentry-Sigma Subsequent Transfers (if any), Banque Syz did not have access to non-public information

regarding BLMIS. Banque Syz handled its Fairfield Sigma account consistent with other industry professionals based on publicly known information about Fairfield Sigma and about BLMIS. Banque Syz did not have any communications with BLMIS or its officers or employees or Madoff on or before the date of the last of the Sentry-Sigma Subsequent Transfers (if any). None of the communications Banque Syz had with Fairfield Sigma or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Sentry-Sigma Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sigma or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

20.    At no time on or before the date of the last Sentry-Sigma Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Banque Syz aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sigma or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

21.    The Sentry-Sigma Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sigma. A reasonable person with the facts in Banque Syz's possession at the time of each of the Sentry-Sigma Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Sentry-Sigma

Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Sentry-Sigma Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

22.    A diligent inquiry by Banque Syz would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Banque Syz, and with more access to BLMIS personnel and documentation than Banque Syz, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Banque Syz did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Sentry-Sigma Subsequent Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, solely as custodian, of the Isos Fund Ltd. account in March 2007, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

23.    **Without Knowledge of the Voidability of the Fairfield Initial Transfers.** Banque Syz did not have knowledge of the voidability of the Fairfield

Initial Transfers when it received each of the Sentry-Sigma Subsequent Transfers (if any).

### Tenth Affirmative Defense—Count One
(Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Tremont)

24.    To the extent, if any, that Banque Syz received Tremont Subsequent Transfers, the Tremont Subsequent Transfers may not be recovered from Banque Syz because Banque Syz took for value and in good faith and without knowledge of the voidability of the Tremont Initial Transfers within the meaning of 11 U.S.C. § 550(b).

25.    **Value.** To the extent, if any, that Banque Syz received Tremont Subsequent Transfers, Banque Syz took the Tremont Subsequent Transfers for value.

26.    **Good Faith.** To the extent, if any, that Banque Syz provided consideration related to the Tremont Subsequent Transfer, it provided such consideration in good faith and on terms and conditions customary in the industry.

27.    To the extent, if any, that Banque Syz received Tremont Subsequent Transfers, at the time it received each of the Tremont Subsequent Transfers, Banque Syz was aware of only the publicly available information about Tremont and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Tremont Subsequent Transfers (if any), Banque Syz did not have access to non-public information regarding BLMIS. Banque Syz did not have any communications with BLMIS or its officers or employees or Madoff on or before the date of the last of the Tremont Subsequent Transfers (if any). None of the communications Banque Syz had

with Tremont or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Tremont Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Tremont or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

28.     At no time on or before the date of the last of the Tremont Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Banque Syz aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Tremont or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

29.     To the extent, if any, that Banque Syz received Tremont Subsequent Transfers, the Tremont Subsequent Transfers did not have a fraudulent purpose but were routine transfers. A reasonable person with the facts in Banque Syz's possession at the time of each of the Tremont Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Tremont Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Tremont Subsequent Transfers or the Tremont Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

30.     A diligent inquiry by Banque Syz would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Banque Syz, and with more access to

BLMIS personnel and documentation than Banque Syz, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Banque Syz did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Tremont Initial Transfers or, if there were any fraudulent purpose of the Tremont Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening of the Isos Fund Ltd. account in March 2007, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

31.     **Without Knowledge of the Voidability of the Tremont Initial Transfers.** To the extent, if any, that Banque Syz received Tremont Subsequent Transfers, Banque Syz did not have knowledge of the voidability of the Tremont Initial Transfers when it received the Tremont Subsequent Transfers.

**Eleventh Affirmative Defense—Count One**
<u>(Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—Settlement Payment)</u>

32.     Under section 546(e) of the Bankruptcy Code, the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable because they were settlement payments, as defined in section 101 or 741 of the Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial

institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable, property received by Banque Syz (if any) as part of the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) is not recoverable from Banque Syz. In addition, at the time of the transfer from Fairfield Sentry to Banque Syz, Banque Syz had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Twelfth Affirmative Defense—Count One
<u>(Non-Avoidability of Tremont Initial Transfers Under Section 546(e)—Settlement Payment)</u>

33.    Under section 546(e) of the Bankruptcy Code, the Tremont Initial Transfers are not avoidable because they were settlement payments, as defined in section 101 or 741 of the Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Tremont, which was then a financial institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Tremont Initial Transfers are not avoidable, property received by Banque Syz (if any) as part of the Tremont Initial Transfers is not recoverable from Banque Syz. In addition, at the time of the transfer (if any) from Tremont to Banque Syz, Banque Syz had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Thirteenth Affirmative Defense—Count One
(Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—Securities
Contract)

34.    Under section 546(e) of the Bankruptcy Code, the Fairfield Six-Year
Transfers (excluding the Fairfield Two-Year Transfers) were not avoided and are not
avoidable because they were transfers made before the commencement of the case by
or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry,
which was then a financial institution or financial participant, and, on information
and belief, did not have actual knowledge that BLMIS was not trading securities or
was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in
section 741(7) of the Bankruptcy Code, between BLMIS and Fairfield Sentry or
between Fairfield Sentry and Banque Syz. Because the Fairfield Six-Year Transfers
(excluding the Fairfield Two-Year Transfers) are not avoidable, property received by
Banque Syz (if any) as part of the Fairfield Six-Year Transfers (excluding the
Fairfield Two-Year Transfers) is not recoverable from Banque Syz. In addition, at the
time of the transfer (if any) from Fairfield Sentry to Banque Syz, Banque Syz had no
actual knowledge that BLMIS was not trading securities or that it was a fraud or a
Ponzi scheme.

### Fourteenth Affirmative Defense—Count One
(Non-Avoidability of Tremont Initial Transfers Under Section 546(e)—Securities
Contract)

35.    Under section 546(a) of the Bankruptcy Code, the Tremont Initial
Transfers are not avoidable because they were settlement payments, as defined in
section 101 or 741 of the Bankruptcy Code, made by or to (or for the benefit of) BLMIS,
which was then a stockbroker, or Tremont, which was then a financial institution or

financial participant, and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme, or were transfers made by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Tremont, which was then a financial institution or financial participant, in connection with a securities contract, as defined in section 741(7) of the Bankruptcy Code, between BLMIS and Tremont or between Tremont and Banque Syz, before the commencement of the case. Because the Tremont Initial Transfers are not avoidable, property (if any) received by Banque Syz as part of the Tremont Initial Transfers is not recoverable from Banque Syz. In addition, at the time of the transfer (if any) from Tremont to Banque Syz, Banque Syz had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Fifteenth Affirmative Defense—Count One
#### (Not Customer Property—Fairfield Initial Transfers)

36.    The property, if any, that Banque Syz received from Fairfield Sentry was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield Sentry, and therefore the property is not recoverable by the Trustee from Banque Syz.

### Sixteenth Affirmative Defense—Count One
#### (Not Customer Property—Tremont Initial Transfers)

37.    The property, if any, that Banque Syz received from Tremont was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Tremont, and therefore the property is not recoverable by the Trustee from Banque Syz.

### Seventeenth Affirmative Defense—Count One
#### (Proceeds Not Recoverable—Fairfield Initial Transfers)

38.    In the alternative, to the extent that the property, if any, that Banque

Syz received from Fairfield Sentry or Fairfield Sigma was proceeds of Customer

Property or other property that BLMIS transferred to Fairfield Sentry or Fairfield

Sigma, it is not recoverable by the Trustee from Banque Syz under section 550(a)(2)

of the Bankruptcy Code.

### Eighteenth Affirmative Defense—Count One
#### (Proceeds Not Recoverable—Tremont Initial Transfers)

39.    In the alternative, to the extent that the property, if any, that Banque

Syz received from Tremont was proceeds of Customer Property that BLMIS

transferred to Tremont, it is not recoverable by the Trustee from Banque Syz under

section 550(a)(2) of the Bankruptcy Code.

### Nineteenth Affirmative Defense—Count One
#### (Section 550(d)—Single Satisfaction Fairfield Six-Year Transfers)

40.    Under section 550(d) of the Bankruptcy Code, the trustee may not

recover any subsequent transfer from Banque Syz to the extent he has recovered from

Fairfield Sentry or any other immediate or mediate transferee the amount of the

avoided initial transfer that included the customer property that the trustee alleges

Banque Syz received.

### Twentieth Affirmative Defense—Count One
#### (Section 550(d)—Single Satisfaction Tremont Initial Transfers)

41.    Under section 550(d) of the Bankruptcy Code, the trustee may not

recover any subsequent transfer from Banque Syz to the extent he has recovered from

Tremont or any other immediate or mediate transferee the amount of the avoided

initial transfer that included the customer property that the trustee alleges Banque Syz received.

### Twenty-first Affirmative Defense—Count One
### (Extraterritoriality)

42.     The Trustee's recovery from Banque Syz of any transfer from Fairfield Sentry or Tremont would constitute an impermissible extraterritorial application of U.S. law.

### Twenty-second Affirmative Defense—Count One
### (Comity)

43.     The Trustee's recovery from Banque Syz of any transfer from Fairfield Sentry or Tremont would violate principles of comity.

### Twenty-third Affirmative Defense—Count Two
### (Section 502(d) Not Applicable)

44.     In filing the Customer Claim, Banque Syz acted solely in the separate capacity of custodian for Isos Fund Ltd. and not in its own capacity. The true beneficial owner of the Customer Claim is Isos Fund Ltd. Banque Syz is not liable to the Trustee in its separate capacity as custodian for Isos Fund Ltd. for any property that the Trustee seeks to recover in this adversary proceeding. SIPA § 9(a)(2), 15 U.S.C. § 78fff-3(a)(2), provides "a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity." *Accord* SIPC Rule 101(b), 17 C.F.R. § 300.101(b). Accordingly, section 502(d) of the Bankruptcy Code does not apply to the Customer Claim filed on behalf of Isos Fund Ltd. based on the alleged liability of its custodian Banque Syz to the Trustee.

## DEMAND FOR JURY TRIAL

Banque Syz **does not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demands trial by jury** before the District Court of all issues that may be tried by a jury.

*[Prayer and Signature Page follow on next page]*

**WHEREFORE** Defendant Banque Syz prays that Plaintiff trustee take nothing by his complaint and that the Court grant Banque Syz such other relief, including an award of attorneys' fees, costs, and disbursements, as may be just.

Dated: August 15, 2022                    Respectfully submitted,

By: */s/ Richard Levin*

JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendant Banque Syz SA*