**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　　　Plaintiff-Applicant,<br><br>　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>　　　　　　　　Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>　　　　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br>　　　　　　　　Plaintiff,<br>　　　v.<br><br>ZEPHYROS LIMITED,<br><br>　　　　　　　　Defendant. | Adv. Pro. No. 12-01278 (CGM) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**ZEPHYROS LIMITED'S MOTION TO DISMISS**

William J. Sushon
Daniel S. Shamah
Kayla N. Haran
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

*Attorneys for Zephyros Limited*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND .................................................................................... 3

    A.    Zephyros ................................................................... 4

    B.    The Funds ................................................................. 4

    C.    The Trustee's Actions Against Rye ......................... 4

    D.    The AC and Related Proceedings ............................ 4

LEGAL STANDARD............................................................................. 6

ARGUMENT ........................................................................................ 7

    I.    THE AC DOES NOT PLAUSIBLY ALLEGE THAT THE ZEPHYROS
    REDEMPTIONS WERE BLMIS PROPERTY...................................... 7

    II.    THE TRUSTEE'S OWN PLEADINGS ESTABLISH ZEPHYROS'S
    GOOD-FAITH DEFENSE. ............................................................. 8

    A.    Zephyros Received the Redemptions for Value. ...................... 9

    B.    Zephyros Acted in Good Faith and Could Not Have Discovered
    Madoff's Fraud Where So Many Others Failed. ...................... 9

    III.    BANKRUPTCY CODE SECTION 546(e) BARS THE BULK OF THE
    TRUSTEE'S CLAIMS. ................................................................. 12

    A.    The Initial Transfers Were Made by, to, and for the Benefit of
    Covered Entities.................................................................... 15

    B.    The Alleged Initial Transfers Were Made in Connection with
    Securities Contracts and Were Settlement Payments. .............. 16

    C.    The Trustee Has Not Pleaded Zephyros Had Actual Knowledge of
    the Madoff Fraud. ................................................................. 18

    IV.    THE STATUTE OF LIMITATIONS BARS THE TRUSTEE FROM
    RECOVERING THE NEWLY PLEADED TRANSFER IN THE AC. .............. 19

CONCLUSION.................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 6, 7

*BLD Prods., LLC v. Viacom, Inc.*,
  2011 WL 1327340 (S.D.N.Y. Mar. 31, 2011), *aff'd in relevant part, vacated
  in part, remanded sub nom. BLD Prods., LLC v. Remote Prods., Inc.*, 509 F.
  App'x 81 (2d Cir. 2013)................................................................................. 11

*CLC Creditors' Grantor Tr. v. Howard Sav. Bank (In re Commercial Loan
  Corp.)*,
  2010 WL 1730860 (Bankr. N.D. Ill. Apr. 29, 2010) ...................................... 9

*Dozier v. Deutsche Bank Tr. Co. Americas*,
  2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011)................................................... 3

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*,
  2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)............................... 12, 16

*Gilmore v. Rivera*,
  2014 WL 1998227 (S.D.N.Y. May 14, 2014) ................................................ 11

*Heinert v. Bank of Am. N.A.*,
  835 F. App'x 627 (2d Cir. 2020) .................................................................. 18

*In re Enron Corp.*,
  333 B.R. 205 (Bankr. S.D.N.Y. 2005).............................................................. 9

*In re Fairfield Sentry*,
  596 B.R. 275 (Bankr. S.D.N.Y. 2018)............................................................ 21

*In re Tribune Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019)............................................................................ 17

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  140 S. Ct. 768 (2020)..................................................................................... 18

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)................................................... 3, 19, 20

*Jones v. Bock*,
  549 U.S. 199 (2007)........................................................................................ 11

*Mayle v. Felix*,
  545 U.S. 644 (2005)........................................................................................ 20

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Papasan v. Allain*,
    478 U.S. 265 (1986)................................................................................................ 7

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)................................................................................... 8

*Picard v. ABN Amro Bank (Ireland) Ltd.*,
    505 B.R. 135 (S.D.N.Y. 2013)............................................................................ 14

*Picard v. ABN Amro Bank N.A.*,
    2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ....................................... 1, 9

*Picard v. Banque SYZ & Co. SA*,
    2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022).................................. 1, 13, 14

*Picard v. Citibank, N.A.*,
    12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
    142 S. Ct. 1209 (2022)............................................................................................ 7

*Picard v. Fairfield Inv. Fund Ltd.*,
    2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .................................... passim

*Picard v. Ida Fishman Revocable Tr.*,
    773 F.3d 411 (2d Cir. 2014)....................................................................... 12, 16, 17

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................. 3, 18

*Picard v. Multi-Strategy Fund Ltd.*,
    2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022).................................. 1, 13, 14

*Picard v. Shapiro*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015).............................................................. 7, 8

*Rodriguez v. City of N.Y.*,
    2011 WL 4344057 (S.D.N.Y. Sept. 7, 2011)...................................................... 19

*Rosner v. Bank of China*,
    349 F. App'x 637 (2d Cir. 2009) ......................................................................... 18

*Russello v. United States*,
    464 U.S. 16 (1982)................................................................................................. 9

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) .................................................... 18

*Sapia v. Home Box Off., Inc.*,
    2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018) ...................................................... 8

# TABLE OF AUTHORITIES
### (continued)

Page

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
  2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)................................................................. passim

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
  476 B.R. 715 (S.D.N.Y. 2012)................................................................................................. 15

*Spool v. World Child Int'l Adoption Agency*,
  520 F.3d 178 (2d Cir. 2008)...................................................................................................... 7

*United States ex rel. Kolchinsky v. Moody's Corp.*,
  162 F. Supp. 3d 186 (S.D.N.Y. 2016)..................................................................................... 19

*Ziparo v. CSX Transp.*,
  15 F.4th 153 (2d Cir. 2021) ...................................................................................................... 9

## STATUTES

11 U.S.C. § 101(53A)(A) & (B) ................................................................................................. 15

11 U.S.C. § 546(e) ................................................................................................................ passim

11 U.S.C. § 548(a)(1)(A) ..................................................................................................... 12, 13

11 U.S.C. § 550............................................................................................................................ 1, 7

11 U.S.C. § 550(a) ........................................................................................................................ 7

11 U.S.C. § 550(b) ..................................................................................................................... 2, 9

11 U.S.C. § 550(f) ....................................................................................................................... 19

SIPA § 78fff ................................................................................................................................... 7

SIPA § 78fff-2(c)(3) .................................................................................................................... 7

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* (Richard Levin & Henry J. Sommer eds., 16th ed. 2019)...................... 9

## RULES

Fed. R. Civ. P. 12(b)(6)................................................................................................................. 6

## PRELIMINARY STATEMENT

The most basic pleading requirement under the Federal Rules is that a complaint set forth

a "short and plain" statement of a plausible claim for relief.  The Trustee's AC[1] fails this basic

test because it does not plausibly plead his claims.  On its face, it includes only conclusory

allegations that the Redemption Payments made to Zephyros contained BLMIS customer

property.[2]  The AC should therefore be dismissed.

The AC stems from the Madoff Ponzi scheme and seeks to recover as voidable

subsequent transfers of $95,358,159 from Zephyros under section 550.  But the AC contains only

the most threadbare allegations, specifying the aggregate dollar amounts the Trustee alleges were

---

[1] This Memorandum uses the following definitions: (i) "AC" means the Amended Complaint filed by the Trustee in this action, ECF No. 124, *Picard v. Zephyros Limited*, Adv. Pro. No. 12-01278 (Bankr. S.D.N.Y. June 9, 2022); (ii) "Zephyros" means Defendant Zephyros Limited; (iii) "Trustee" means Plaintiff Irving H. Picard; (iv) "BLMIS" means Bernard L. Madoff Investment Securities LLC; (v) "Rye Select Funds" means collectively Rye Select Broad Market Fund LP (f/k/a American Masters Broad Market Fund, L.P.), Rye Select Broad Market Prime Fund LP (f/k/a American Masters Broad Market Prime Fund, L.P.), and Rye Portfolio Limited; (vi) "Rye" means Rye Portfolio Limited, which is the only fund that the Trustee alleges Zephyros received subsequent transfers from; (vii) "Tremont" means Tremont Group Holdings, Inc. (f/k/a Tremont Capital Management, Inc. f/k/a Tremont Advisers, Inc. and together with its affiliates, including Tremont Partners, Inc. "Tremont Partners"; (viii) "Tremont Complaint" means ECF No. 1 in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (cited herein as "Tremont Compl. ¶ __"); (ix) "Tremont Settlement" means, collectively, (i) the settlement agreement at ECF No. 17-1 and (ii) the order at ECF No. 38-1, each as filed on the docket in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.); (x) the "Fairfield Amended Complaint" means ECF No. 23 in *Picard v. Fairfield Sentry Limited*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (cited herein as "Fairfield Am. Compl. ¶ __"); (xi) "Fairfield Second Amended Complaint" means ECF No. 286 in *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y. Aug. 28, 2020); and (xii) "Redemption Payments" means payments Zephyros allegedly received in exchange for redeeming shares in Rye in the relevant time period, as identified in Ex. C of the AC (the "Redemption Payments").  Unless otherwise specified, all emphasis is added, and all citations and quotations are omitted.

[2] Zephyros acknowledges that this Court recently denied motions to dismiss that included pleading deficiency, customer property, section 546(e), and good-faith arguments in *Multi-Strategy* and *Banque SYZ* and several other subsequent transferee cases.  *See, e.g.*, *Picard v. Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *11 (Bankr. S.D.N.Y. June 13, 2022) ("*Multi-Strategy*"); *Picard v. Banque SYZ & Co. SA*, 2022 WL 2135019, at *12 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque SYZ*").  Nevertheless, each of the arguments Zephyros sets forth in this motion independently serves as a basis for dismissal for the reasons described in the motion.  Unlike in *Banque SYZ*, Zephyros's good faith is apparent on the face of the AC and independently mandates dismissal.  And in *Banque SYZ*, this Court did not address the ruling in *Picard v. ABN Amro Bank N.A.*, 2020 WL 1584491, at *8 (Bankr. S.D.N.Y. Mar. 31, 2020) ("*ABN Amro N.A.*"), which held that surrendering shares in feeder funds for cash constitutes "value" for purposes of section 550(b).  Moreover, the Trustee does not allege transfers from the Fairfield Funds against Zephyros, so there are no precedent rulings establishing that Rye, the only initial transferee here, had actual knowledge.  Finally, Zephyros notes that the defendants in *Multi-Strategy* and *Banque SYZ* have filed motions for interlocutory appeal of this Court's section 546(e) ruling in those cases.

transferred to Zephyros from Rye, and then simply assuming that each of those transfers constituted BLMIS customer property that was the subject of a prior voidable transfer from BLMIS to Rye.

Moreover, the Trustee for the first time in the AC seeks to avoid an additional $22 million transfer that does not relate back to the core operative facts of the original Complaint. The deadline to assert this claim, at the latest, was September 2012, one year after the alleged initial transfers were avoided as part of the Tremont settlement. The Trustee missed that deadline by nearly a decade. That claim is thus barred by the statute of limitations and ought to be dismissed.

The Court should independently dismiss the AC because two defenses are evident from the face of the AC and the Tremont Complaint the AC incorporates. The first is Zephyros's good-faith defense under Bankruptcy Code section 550(b). Establishing this defense requires Zephyros to show only that it (i) provided value to the initial transferee (here, Rye) and (ii) took each transfer without knowledge that BLMIS was a fraudulent enterprise. Both elements are satisfied based solely on the AC's allegations. Decisions in BLMIS cases have long established that share redemptions in BLMIS feeder funds, like Rye, constitute value as a matter of law. And the incorporated Tremont Complaint as well as the Trustee's Amended Fairfield Complaint establish that Zephyros could not plausibly have been expected to uncover Madoff's fraud. Those complaints plead that the feeder funds' management did such an effective job covering up their fraud that even the SEC, with all its investigative powers and the full potency of the federal government, was unable to expose Madoff's scheme. Surely, Zephyros, a foreign bank, could not plausibly be expected to succeed where the U.S. government failed.

The second defense is section 546(e)'s "safe harbor" defense.  That defense bars the Trustee from avoiding a settlement payment or any transfer by, to, or for the benefit of a "financial participant" or a "financial institution" in connection with a securities contract.  Here, there can be no doubt that the Redemption Payments are precisely the kinds of transfers covered by section 546(e) because, among other things, they were made between financial institutions in connection with securities contracts.  Dismissal of the claims under section 546(e)'s safe harbor is therefore warranted, with the exception of claims for *actual* fraudulent transfers occurring within two years before BLMIS's bankruptcy.

This case has been pending for well over a decade and the Trustee has had ample time to remedy the pleading deficiencies in the AC.  For all of the foregoing reasons, the Court should dismiss the AC with prejudice.

## BACKGROUND

For the purpose of this Motion to Dismiss, the facts set forth below are drawn from allegations contained in the AC, which the Defendant neither admits nor concedes.  As explained below, however, many of the Trustee's allegations are contradicted by documents the Trustee expressly relies on and has himself filed in this action.  This Court is not bound by the Trustee's false version of events, and should consider the inconsistencies and contradictions.[3]

---

[3] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (Bernstein, J.) ("*BNP Paribas*") ("court may consider prior iterations of pleadings containing statements inconsistent with the latest version"); *Dozier v. Deutsche Bank Tr. Co. Americas*, 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) (courts "need not accept as true allegations that conflict with a plaintiff's prior allegations"); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)* ("*Merkin*"), 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.").

A. **Zephyros**

Zephyros is a "corporate entity organized under the laws of the Cayman Islands."  AC
¶ 50.  It was "formed by Credit Suisse in August 2003 as a proprietary investment vehicle."  *Id.* ¶
51.  At all relevant times, Zephyros was "100% directly owned by Credit Suisse International
and indirectly owned 100% by CS Group."  *Id*.  Zephyros's purpose was "to provide investors
with a vehicle to invest in hedge funds tracked by the CS/Tremont Index."  *Id*. ¶ 54.

B. **The Funds**

Rye Portfolio Limited ("Rye") is a BLMIS feeder fund that "invested all or substantially
all of [its] assets with BLMIS's investment advisory business."  AC ¶ 2.  Tremont "created,
owned, managed and operated the Rye Select family of BLMIS feeder funds," including Rye.
*Id.*

C. **The Trustee's Actions Against Rye**

In 2011, the Trustee filed a complaint against, and subsequently settled with, the
Liquidators of the Tremont Feeder Funds.  *See generally* Tremont Compl.; Tremont Settlement.
On September 22, 2011, the court approved a settlement between the Trustee and more than a
dozen of the Tremont Feeder Funds, including Rye, that obligated the Tremont Settling
Defendants collectively pay the Trustee $1.025 billion.  Tremont Settlement at 6.

D. **The AC and Related Proceedings**

The Trustee filed his original Complaint against Zephyros on April 5, 2012.  Then, more
than a decade later, the Trustee filed this AC to recover from Zephyros subsequent transfers of
"Customer Property" from BLMIS feeder funds of $95,358,159.  AC ¶ 2.  The AC devotes most
of its allegations to Madoff's Ponzi scheme and transfers from BLMIS to Rye.  *See id*. ¶¶ 18-78.
Rather than pleading facts plausibly to show that the Redemption Payments to Zephyros

included BLMIS customer property, the Trustee instead alleges in conclusory fashion that Rye "subsequently transferred a portion of the Initial Transfers to [Zephyros]." *Id.* ¶ 157.

The Trustee does not identify which portions of these initial transfers from BLMIS to Rye were allegedly later transferred to Zephyros as Redemption Payments. *See id.* Rather, the Trustee vaguely alleges that from "the inception of Rye Portfolio Limited's account with BLMIS to the Filing Date, BLMIS made transfers to Rye … of approximately $620,000,000 (the 'Initial Transfers')." *Id.* ¶ 153. And of the Initial Transfers, "$609,000,000 was transferred to Rye" during the six years preceding the Filing date (the 'Six Year Transfers')." *Id.* And of the Six-Year Transfers, "$350,000,000 was transferred to Rye" during the "two years preceding the Filing Date (the 'Two Year Transfers')." *Id.* ¶ 154. While the AC specifies the amounts,[4] it does not explain how those amounts were determined or how to trace those amounts from BLMIS to Zephyros.

Despite having more than a decade to investigate and amend his complaint, the Trustee does not trace any specific Zephyros redemption to BLMIS in the AC. Rather, the Trustee attaches nearly 15 pages of exhibits listing thousands of transactions among BLMIS and Rye. *See* AC, Ex. B. The exhibit shows that payments came from BLMIS accounts designated for the benefit of Rye, referred to as "BLMIS Account No. IFR080 - Rye Select Broad Market Portfolio Limited." *Id.* And while the AC includes schedules of alleged transfers from Rye to Zephyros (*see* AC, Ex. C), the AC offers no details regarding the source of the funds that comprised these alleged transfers.

---

[4] AC ¶ 157 ("Prior to the Filing Date, Rye … subsequently transferred … $95,385,159" to Zephyros); *see also* AC, Ex. C.

The Trustee also attempts to "incorporate by reference" the Tremont Complaint's allegations without specifying what portions of that complaint he seeks to incorporate. AC ¶ 79. The Tremont Complaint broadly alleges that BLMIS's operations were characterized by secrecy and a lack of transparency, and that Tremont was "provided only vague and inconsistent descriptions by Madoff of the split-strike conversion strategy," and Madoff "refused to explain why and when he would enter and exit the market." Tremont Compl. ¶ 89. Tremont also had a policy "prohibiting investors from meeting Madoff," and on occasions where Madoff did take meetings, he was "known to throw customers and potential customers out of his office if the questions became too controversial." *Id.* ¶ 90. The Trustee further alleged that Madoff repeatedly claimed that "everything being done was pursuant to a proprietary, confidential 'black box' strategy" and Madoff went to "extraordinary lengths to remain cloaked in secrecy." *Id.* ¶¶ 92, 199. These statements from the Tremont Complaint stand in opposition to the Trustee's assertion in the AC that Zephyros had "actual knowledge" of Madoff's fraud. AC ¶ 155. Since the Trustee alleges only that Tremont *should have known* of Madoff's fraud, it is not plausible that Zephyros, a subsequent transferee, could have had actual knowledge. *See* Tremont Compl. ¶¶ 89-199.

## LEGAL STANDARD

A complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief."[5] A claimant's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim

---

[5] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

to relief that is plausible on its face.'"[6]  While the Court must accept well-pleaded factual

allegations as true, it should not accept "legal conclusion[s] couched as factual allegations."[7]

## ARGUMENT

Bankruptcy Code section 550 authorizes a trustee to recover the property *transferred by*

*the debtor* to any transferee (initial or subsequent) "to the extent that a transfer is avoided under

section … 548 … of this title."  11 U.S.C. § 550(a).[8]  This requires the Trustee to plead that the

funds he is attempting to recover from Zephyros are property of the BLMIS estate.  He does not

do so, and therefore fails to state a claim under section 550(a) or section 78fff.

## I.    THE AC DOES NOT PLAUSIBLY ALLEGE THAT THE ZEPHYROS REDEMPTIONS WERE BLMIS PROPERTY.

The AC must be dismissed because it does not plausibly plead that Zephyros received

BLMIS customer property—an indispensable element of the Trustee's claim.[9]

To state a claim under either section 550(a) or section 78fff, the Trustee must plausibly

plead facts showing that the challenged subsequent transfer was estate property.  *See* 11 U.S.C.

§ 550(a) (permitting recovery of estate property from subsequent transferee); SIPA § 78fff-

2(c)(3) ("trustee may recover any property transferred by the debtor which, except for such

transfer, would have been customer property").  In *Shapiro*, this Court described what the

Trustee must plead to assert a subsequent transferee claim:

The Trustee must allege facts that support the inference that the funds at issue

---

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[7] *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) ("Although we construe the pleadings liberally, 'bald assertions and conclusions of law will not suffice.'").

[8] *See also Picard v. Citibank, N.A.*, 12 F.4th 171, 181 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022).

[9] *Picard v. Shapiro*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (to state a claim under 11 U.S.C. § 550, the Trustee "must allege facts that support the inference that the funds at issue originated with the BLMIS, and contain the 'necessary vital statistics'—the 'who, when, and how much' of the transfers to establish that an entity was a subsequent transferee of the funds").

originated with ... BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds.  At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue.  However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.[10]

The AC fails to include these details.  Instead, the Trustee simply asserts that Rye "subsequently transferred a portion of the Initial Transfers to Defendants."  AC ¶ 157.  Exhibit B does not substantiate these allegations:  it instead lists transfers from BLMIS to Rye without tying those transfers to the payment of any redemption request from Zephyros.  The "barebones" allegation that the transfers identified on Exhibit C (which specify the subsequent transfers at issue) originated with BLMIS is insufficient and mandates dismissal.[11]

In sum, the Trustee's failure to allege precisely which transfers to Zephyros include customer property, and from which initial transfer each subsequent transfer originates, mandates dismissal.[12]

## II.    THE TRUSTEE'S OWN PLEADINGS ESTABLISH ZEPHYROS'S GOOD-FAITH DEFENSE.

The AC's claims also fail in their entirety for the independent reason that Zephyros's "good faith" defense under section 550(b), i.e., that Zephyros took for value, in good faith, and

---

[10] *Id.*

[11] *See id.* ("The SAC does not tie any initial transfer to any subsequent transfer or Subsequent Transferee. Moreover, it does not plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent transfers rather than simply keep the initial transfers for themselves.").

[12] *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 709, 723 (2d Cir. 2013) (affirming dismissal and finding that "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc*., 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing a claim where plaintiffs failed precisely to plead necessary facts that were "uniquely in [p]laintiffs' possession").

without knowledge of the voidability of the transfer, is evident from the face of the AC itself. *See* 11 U.S.C. § 550(b).

### A.    Zephyros Received the Redemptions for Value.

The "value" that a subsequent transferee must give to assert the good-faith defense need not be reasonably equivalent.[13]  "Had Congress intended to include a [reasonably equivalent value] requirement in [section 550(b)], it knew how to do so."[14]  Congress did not.  Thus, "value" under section 550(b) is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value"—nothing more than a peppercorn.[15]

Here, it is evident from the AC's face that Zephyros gave value to Rye.  The AC alleges that the transfers at issue were from "subscription agreements," i.e., that Zephyros surrendered interests in Rye in exchange for redemption payments.  AC ¶ 72.  Other BLMIS cases have confirmed that surrendering shares in feeder funds for cash constitutes "value" for purposes of section 550(b).[16]  Thus, section 550(b)'s "value" element is satisfied as a matter of law.

### B.    Zephyros Acted in Good Faith and Could Not Have Discovered Madoff's Fraud Where So Many Others Failed.

The Second Circuit recently held that, in evaluating a claim of good faith, courts must examine three factors:

---

[13] *See, e.g., In re Enron Corp.*, 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005) ("There is no requirement that the value given by the transferee be a reasonable or fair equivalent.") (quoting 5 *Collier on Bankruptcy* ¶ 550.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019)); *CLC Creditors' Grantor Tr. v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 2010 WL 1730860, at *7 n.14 (Bankr. N.D. Ill. Apr. 29, 2010) ("Section 550(b)(1) requires 'value,' not 'reasonably equivalent value' or 'fair market value.'").

[14] *Ziparo v. CSX Transp.*, 15 F.4th 153, 161 (2d Cir. 2021); *see also Russello v. United States*, 464 U.S. 16, 23 (1982) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally.").

[15] *ABN Amro N.A.*, 2020 WL 1584491, at *8 (citing 5 *Collier on Bankruptcy* ¶ 550.03[1], at 550-25).

[16] *See id*. at *9 ("Surrendering equity interests constitutes value for purposes of section 550(b) because it is consideration sufficient to support a simple contract.").

1. "[W]hat facts the defendant actually knew; this is a subjective inquiry, not 'a theory of constructive notice.'"

2. "[W]hether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud."

3. "[W]hether 'diligent inquiry [by the transferee] would have discovered the fraudulent purpose' of the transfer."[17]

Thus, even if a transferee knows actual facts that put it on inquiry notice of a transfer's underlying fraudulent purpose, the transferee still takes the transfer in good faith unless a diligent inquiry would have uncovered that fraudulent purpose.  Here, the AC, together with its incorporation by reference of the Tremont Complaint, alleges facts demonstrating that a diligent inquiry would not have revealed Madoff's fraud, establishing Zephyros's good faith.

In the AC, the Trustee alleges various "red flags" that he suggests should have alerted investors to the fraudulent purposes of BLMIS's transfers to Tremont.  AC ¶¶ 79-150.  These include anecdotes of some investors and market analysts opining, at various times, that BLMIS *may* have been involved in improper activities.  *Id*.  But in its next breath, the Tremont Complaint, another case concerning all of the same facts that the Trustee attempts to incorporate by reference here, alleges that BLMIS's operations were characterized by secrecy and a lack of transparency, and that Tremont was "provided only vague and inconsistent descriptions by Madoff of the split-strike conversion strategy," and Madoff "refused to explain why and when he would enter and exit the market."  Tremont Compl. ¶ 89.  Tremont also had a policy "prohibiting investors from meeting Madoff," and on occasions where Madoff did take meetings, he was "known to throw customers and potential customers out of his office if the questions became too

---

[17] *Citibank*, 12 F.4th at 191-92.

10

controversial." *Id.* ¶ 90. The Trustee further alleged that Madoff repeatedly claimed that "everything being done was pursuant to a proprietary, confidential 'black box' strategy" and Madoff went to "extraordinary lengths to remain cloaked in secrecy." *Id.* ¶¶ 92, 199. These statements from the Tremont Complaint stand in opposition to the Trustee's assertion in the AC that Zephyros had "actual knowledge" of Madoff's fraud. AC ¶ 155.

Moreover, in a nearly identical suit filed by this Trustee, he alleged that these furtive tactics worked. The Fairfield Amended Complaint acknowledges that in 2006, the SEC launched an investigation to determine whether BLMIS was a Ponzi scheme or engaged in other illegal activity, yet even the SEC—with its powerful investigative tools, expansive subpoena powers, and broad resources—was stymied by BLMIS and Sentry insiders seeking to hinder the government investigation. Fairfield Am. Compl. ¶¶ 351, 360–361. Accepting all the facts in that complaint as true, the only plausible inference to draw from the Trustee's pleading is that Zephyros, which lacked the resources and power of one of the federal government's most potent regulatory agencies, could not reasonably have been expected to succeed where all others had failed.[18]

The Fairfield Amended Complaint and the Tremont Complaint thus affirmatively plead facts showing that a diligent inquiry would not have uncovered the transfers' fraudulent purpose, mandating dismissal as a matter of law.[19]

---

[18] *BLD Prods., LLC v. Viacom, Inc.*, 2011 WL 1327340, at *10 (S.D.N.Y. Mar. 31, 2011), *aff'd in relevant part, vacated in part, remanded sub nom. BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81 (2d Cir. 2013) ("[This] Court need not accept factual allegations that are conclusory, implausible, or contradicted by exhibits to a complaint.").

[19] *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground."); *Gilmore v. Rivera*, 2014 WL 1998227, at *2 (S.D.N.Y. May 14, 2014) ("Dismissal under Fed. R. Civ. P. (12)(b)(6) is also proper if an affirmative defense, or other bar to relief, is apparent from the face of the complaint.").

### III.    BANKRUPTCY CODE SECTION 546(e) BARS THE BULK OF THE TRUSTEE'S CLAIMS.

Bankruptcy Code section 546(e) separately mandates dismissal of the Trustee's claims

(other than the intentional fraudulent transfer claim under Bankruptcy Code section

548(a)(1)(A)) to recover transfers made more than two years before BLMIS filed for bankruptcy.

It is appropriate for the Court to consider Zephyros's safe harbor defense at this stage because

"the application of Section 546(e) presents a straightforward question of statutory interpretation

of the type that is appropriately resolved on the pleadings."[20]  Moreover, Zephyros has standing

to assert its defenses under section 546(e) as a subsequent transferee notwithstanding the fact that

Rye, as initial transferee, declined to assert it.[21]

In actions brought by *this* Trustee, the Second Circuit has held that "by enacting § 546(e),

Congress provided that, for a very broad range of securities-related transfers, the interest in

finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except

as actual fraudulent transfers under § 548(a)(1)(A)."[22]  The Second Circuit cautioned that

"[p]ermitting the clawback of millions, if not billions, of dollars from BLMIS clients—many of

whom are institutional investors and feeder funds—would likely cause the very 'displacement'

that Congress hoped to minimize in enacting § 546(e)."[23]

Section 546(e) provides that a trustee may generally not avoid transfers made by, to, or

for the benefit of a covered entity, including a "stockbroker," "financial institution," and

---

[20] *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* ("*Fairfield III*"), 2020 WL 7345988, at *4 (Bankr. S.D.N.Y. Dec. 14, 2020).

[21] *See Picard v. Fairfield Inv. Fund Ltd.*, 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) ("Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, as is the case here ..., the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against recovery of those funds.").

[22] *Picard v. Ida Fishman Revocable Tr.*, 773 F.3d 411, 423 (2d Cir. 2014).

[23] *Id.* at 420.

"financial participant," "in connection with a securities contract" or comprising "settlement

payments." The only statutory exception to this rule is Bankruptcy Code section 548(a)(1)(A),

which allows for recovery of intentional fraudulent transfers made in the two years preceding

bankruptcy. This Court recently held in *Multi-Strategy* and *Banque SYZ* that, while section

546(e) is "inapplicable to subsequent transferees," subsequent transferees may assert an initial

transferee's 546(e) defense if the initial transferee has not done so. [24] Zephyros respectfully

submits that this Court's analysis misinterprets the District Court's decisions on the applicability

of the section 546(e) safe harbor to subsequent transferees, including in actions brought by this

Trustee. The District Court has held, in multiple actions brought by the Trustee seeking to

recover subsequent transfers, that "even if the initial (or mediate) transferee fails to raise a

Section 546(e) defense against the Trustee's avoidance of certain transfers ..., the subsequent

transferee is nonetheless entitled to raise a Section 546(e) defense against recovery of those

funds."[25]

      Judge Rakoff explained that the "one caveat" to the safe harbor's application to a

subsequent transferee was if the "*subsequent transferee*" had "actual knowledge of Madoff

Securities' fraud," which the Trustee has not alleged here.[26] This is different from allowing the

subsequent transferee to assert the initial transferee's defense, because in those circumstances (as

this Court observed in *Multi-Strategy* and *Banque SYZ*) the *initial* transferee's knowledge would

be the relevant inquiry. But Judge Rakoff's decisions make clear that the *subsequent* transferee's

knowledge is the touchstone of the analysis. In *Cohmad*, for example, the defendants included

subsequent transferees of the Fairfield feeder funds whose alleged knowledge of the BLMIS

---

[24] *Multi-Strategy*, 2022 WL 2137073, at *10; *Banque SYZ*, 2022 WL 2135019, at *10.

[25] *SIPC v. Bernard L. Madoff Inv. Sec. LLC* ("*Cohmad*"), 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013).

[26] *Id.*

fraud the Trustee argued defeated application of the safe harbor.[27]  Yet nowhere did Judge

Rakoff in *Cohmad*—or in any of the later decisions applying the safe harbor to subsequent

transfer claims—ever suggest that an innocent subsequent transferee would be deprived of the

safe harbor defense merely because the initial transferee allegedly knew of Madoff's fraud.[28]

*Cohmad* and other cases in which Judge Rakoff held that only the *subsequent* transferee's

knowledge is relevant to its section 546(e) defense are binding on this Court[29] and collaterally

estop the Trustee from attempting to relitigate the issue.[30]

But even if *Cohmad* were interpreted to mean that a subsequent transferee may only raise

the safe harbor as a defense as to the avoidance of the initial transfers, Zephyros would still be

entitled to a section 546(e) defense.  As noted in *Multi-Strategy* and *Banque SYZ*, the Court

already ruled that the Fairfield Amended Complaint alleged actual knowledge of the initial

transferees—the Fairfield Funds—so the subsequent transferees could not raise the safe harbor

defense now.[31]  But there is no such conclusion as it concerns the Rye Select Funds.  The

incorporated Tremont Complaint actually makes clear that the Rye Select Funds did *not* have

actual knowledge of the Madoff fraud.  *See* Tremont Compl.[32]  Therefore, even using the

---

[27] *Id.*

[28] *See id.*; *see also Picard v. ABN Amro Bank (Ireland) Ltd.*, 505 B.R. 135, 142 (S.D.N.Y. 2013) ("[T]he Court has found that, in the majority of cases, section 546(e) requires the dismissal of the Trustee's avoidance claims, except those brought under section 548(a)(1)(A) and *related* recovery claims under section 550(a).").

[29] *Cohmad*, 2013 WL 1609154, at *7; *see also Fairfield*, 2021 WL 3477479, at *6 ("Trustee has failed to plead individualized factual allegations demonstrating that Corina Noel Piedrahita had independent actual knowledge of the BLMIS fraud."); *id.* at *15 (dismissing all claims against Corina Noel Piedrahita in her individual capacity because Trustee failed to plead her actual knowledge of the fraud).

[30] *See id.*

[31] *Multi-Strategy*, 2022 WL 2137073, at *9; *Banque SYZ*, 2022 WL 2135019, at *9.

[32] *See, e.g., id.* ¶¶ 4-166 (Rye was "ignorant of the fraud," did not "perform independent … due diligence" on BLMIS, "blindly rel[ied] on Madoff," "wrongly relied on Madoff's reputation," Rye was "provided only vague or inconsistent descriptions by Madoff of the split-strike conversion strategy," it also "blindly accepted Madoff's representations about the purported [investment] strategy… [and had] very little understanding as to how Madoff was able to capture the extraordinarily consistent returns," Rye was not concerned with "understanding what Madoff really was doing with ... money… [and] buried their collective heads in the proverbial sand," Rye "should have

reasoning of this Court in *Multi-Strategy* and *Banque SYZ*, Zephyros is still entitled to the safe harbor.

As demonstrated below, under *Cohmad* and the District Court's other binding decisions, all Redemption Payments predating December 2006 are anchored in the safe harbor here because they are both (i) transfers "in connection with a securities contract" and "settlement payments," and (ii) made by a "stockbroker," to a "financial institution," for the benefit of a "financial participant." And since neither Rye (as the initial transferee) nor Zephyros (as the subsequent transferee) had actual knowledge of the Madoff fraud, Zephyros is entitled to the safe harbor defense.

### A.   The Initial Transfers Were Made by, to, and for the Benefit of Covered Entities.

A payment is subject to the safe harbor protection if it is made by, to, or for the benefit of a covered entity, including a "stockbroker," "financial institution," and "financial participant." 11 U.S.C. § 546(e). The Redemption Payments meet this requirement in two separate ways, either one of which is sufficient to satisfy the covered entity prong of section 546(e).

*First*, BLMIS is a "stockbroker" under section 546(e). The Bankruptcy Code defines "stockbroker" to include entities "engaged in the business of effecting transactions in securities." 11 U.S.C. § 101(53A)(A) & (B). As Judge Rakoff concluded a decade ago, BLMIS qualifies as a stockbroker under this definition.[33]

---

questioned how Madoff's alleged trades could account for such a high percentage of the total volume traded on the exchanges of a particular stock" but they did not).

[33] *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) ("Thus, even assuming the truth of the allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.").

*Second*, Judge Bernstein has already held that a nearly identical BLMIS feeder fund, the Fairfield Funds, are "financial institutions within the meaning of 11 U.S.C. § 546(e)" as "customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made."[34]  That holding applies with equal force here because the Trustee alleges that the initial transfers were made from BLMIS accounts entitled "BLMIS Account No. IFR080" to Rye, who acted as agents in connection with Zephyros's subscription agreements to which their redemption payments were made.  *See* AC, Ex. B; AC ¶ 72.

### B.    The Alleged Initial Transfers Were Made in Connection with Securities Contracts and Were Settlement Payments.

The safe harbor's second requirement is that the payment made by, to, or for the benefit of a covered entity be (i) a "transfer ... in connection with a securities contract" or (ii) a "settlement payment."  11 U.S.C. § 546(e).  While a transfer need fit into only one of those two categories, the alleged initial transfers here meet both requirements.

***Made in connection with a securities contract.***  The Second Circuit has already held that BLMIS customers' account-opening documents are securities contracts for purposes of section 546(e).[35]  Zephyros "signed a subscription agreement each time it invested in Rye Portfolio Limited."  AC ¶ 72.  And Rye is a BLMIS feeder fund that "invested all or substantially all of their assets with BLMIS's investment advisory business," and thus held securities contracts with BLMIS.  AC ¶ 2.  It follows logically that the initial transfers from Rye's BLMIS accounts were made in connection with those securities contracts.  *See id*.  And as the Second Circuit has held, "Section 546(e) only requires that a covered transfer be broadly related to a 'securities contract,'

---

[34] *Fairfield III*, 2020 WL 7345988, at *7.

[35] *Ida Fishman*, 773 F.3d at 418.

16

not that it be connected to an actual securities transaction."[36]  The Initial Transfers satisfy this "low bar."[37]

The Redemption Payments also qualify under section 546(e) because the redemption requests themselves are "securities contract[s]."  As Judge Rakoff has held, "the definition of a securities contract is in fact much broader [than the Madoff Securities account agreements] and includes, *inter alia*, investment fund subscription agreements *and redemption requests*, margin loans, and total return swaps coupled with a securities sale transaction."[38]  Even the Trustee cannot argue that the Redemption Payments were not made "in connection with" redemption requests.[39]

**Settlement payments.**  The Initial Transfers were also settlement payments.  The Second Circuit already ruled in *Fishman* that "[e]ach time a customer requested a withdrawal from BLMIS ..., each transfer in respect of such an order or request constituted a settlement payment."[40]  That reason equally applies to the Rye redemptions from BLMIS that the Trustee alleges were the initial transfers, and provides additional support for the conclusion that the initial transfers are protected under section 546(e).

---

[36] *Id*. at 420.

[37] *Id.* at 422.

[38] *Cohmad*, 2013 WL 1609154, at *8; *see also id.* at *9 (noting that "hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract" would "fit within the plain terms of Section 546(e): an initial transfer that was 'made by or to (or for the benefit of) a ... financial institution [or] financial participant ... in connection with a securities contract'"); *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 81 (2d Cir. 2019) (as "securities contract" includes a contract for the "repurchase" of a security, or any contract "similar to" a securities contract, "we have no trouble concluding ... [payments] connected to the redemption of shares[] were 'in connection with a securities contract.'").

[39] *See id.*

[40] *Ida Fishman*, 773 F.3d at 422.

### C. The Trustee Has Not Pleaded Zephyros Had Actual Knowledge of the Madoff Fraud.

The Trustee cannot invoke the judicially created exception to the safe harbor for "a subsequent transferee who had actual knowledge of Madoff Securities' fraud."[41]  That's because there is no allegation (not even a conclusory one) that Zephyros had any knowledge, actual or otherwise, of the Madoff fraud.  *See generally* AC.

While this Court ruled that the Fairfield Amended Complaint alleged actual knowledge of the Fairfield Funds, there is no such finding as it concerns Rye.  The incorporated Tremont Complaint makes clear that the Rye Select Funds did not have actual knowledge of the Madoff fraud.  *See* Tremont Compl.[42]  Even the Trustee's new allegations in the AC reflect that a Rye Select Fund manager was "bragg[ing] internally that he taught Madoff how to trade options," which would only make sense if he believed Madoff was, in fact, trading options.  AC ¶ 121.

These allegations do not plead Rye's "actual knowledge" of the Madoff Ponzi scheme; just the opposite.[43]  The AC also does not allege any facts that Zephyros knew of the Madoff

---

[41] *Fairfield*, 2021 WL 3477479, at *4.

[42] *See, e.g.*, *id.* ¶¶ 4-166 (Rye was "ignorant of the fraud" and did not "perform independent … due diligence" on BLMIS; Rye was "blindly relying on Madoff" and "wrongly rel[ying] on Madoff's reputation"; Rye was "provided only vague or inconsistent descriptions by Madoff of the split-strike conversion strategy"; Rye "blindly accepted Madoff's representations about the purported [investment] strategy … [and had] very little understanding as to how Madoff was able to capture the extraordinarily consistent returns"; Rye was not concerned with "understanding what Madoff really was doing with ... money… [and] buried their collective heads in the proverbial sand"; although Rye "should have questioned how Madoff's alleged trades could account for such a high percentage of the total volume traded on the exchanges of a particular stock," it did not).

[43] *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 772–77 (2020) (holding that "to have 'actual knowledge' of a piece of information, one must in fact be aware of it" and distinguishing between actual knowledge and constructive knowledge); *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 631 (2d Cir. 2020) ("'red flags,'… are not the same as actual knowledge"); *Rosner v. Bank of China*, 349 F. App'x 637, 639–40 (2d Cir. 2009) (finding that a defendant bank's "knowing disregard of several indications of fraud… did not amount to … having actual knowledge of the fraudulent scheme"); *Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (similar); *Merkin*, 515 B.R. at 140 (similar); *see also Cohmad*, 2013 WL 1609154, at *6 (holding that the relevant "actual knowledge" that would defeat application of § 546(e) is the knowledge of the party from which the plaintiff seeks to recover, and dismissing claims against the subsequent transferee because plaintiff failed to plead individualized factual allegations demonstrating that the subsequent transferee independently had actual knowledge of the BLMIS fraud).

fraud.[44]  Therefore, the Redemption Payments fall within the safe harbor, and the Trustee's

claims to recover transfers made more than two years before BLMIS filed for bankruptcy must

be dismissed.

## IV.    THE STATUTE OF LIMITATIONS BARS THE TRUSTEE FROM RECOVERING THE NEWLY PLEADED TRANSFER IN THE AC.

Claims to recover "subsequent transfers must be commenced no later than the earlier of

one year after the initial transfer is avoided or the date that the case is closed or dismissed."[45]  A

settlement of "an avoidance claim represents finality and triggers the one-year period set forth in

§ 550(f)."[46]  This Court approved Rye's settlement with the Trustee on September 22, 2011.  *See*

*generally* Tremont Settlement.  Thus, the statute of limitations to file claims to recover

subsequent transfers from the Rye Select funds expired on September 22, 2012.  *See* 11 U.S.C.

§ 550(f).  Where the statute of limitations has expired, a plaintiff is time-barred from asserting

new claims unless those additional claims relate back to the date of an earlier timely pleading.[47]

The AC in this case—filed nearly a decade later, on June 9, 2022—seeks to recover a

new $22 million subsequent transfer.  AC, Ex. C.  Because it was not asserted in September

2012, this new transfer is barred.

Any contention that this newly alleged transfer "relates back" to the claims in the original

Complaint would be wrong.  "[T]he central inquiry is whether adequate notice of the matters

raised in the amended pleading has been given to the opposing party within the statute of

---

[44] *See also Cohmad*, 2013 WL 1609154, at *4–7 (denying safe harbor protection where the Trustee alleged individual defendants' actual knowledge, and where actual knowledge was imputed to defendants through *de facto* partnerships with entities that had actual knowledge, but dismissing claims against one defendant, in her individual capacity, for whom the Trustee failed to allege actual knowledge).

[45] *BNP Paribas*, 594 B.R. at 207 (citing 11 U.S.C. § 550(f)).

[46] *Id.*

[47] *See Rodriguez v. City of N.Y.*, 2011 WL 4344057, at *6 (S.D.N.Y. Sept. 7, 2011); *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 198-200 (S.D.N.Y. 2016).

limitations by the general fact situation alleged in the original pleading."[48]  To relate back to the complaint, the new claim must arise out of "a common 'core of operative facts' uniting the original and newly asserted claims."[49]

As this Court previously explained in the context of avoidance actions, "each preferential and fraudulent transaction is treated separately and distinctly" for relation-back purposes because the "[p]roof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct."[50]  So "a preference action based on one transfer does not put [a] defendant on notice of claims with respect to any other unidentified transfers."[51]  The "mere allegation" that the previously identified transfers and the newly added transfers are "all ... fraudulent transfers does not make them part of the same conduct."[52]  The Court also noted that "there is no indication that, merely because different transactions bear the same label, relation back is to be ordered on the ground that they arise from similar conduct."[53]

Here, the newly alleged transfer occurred on a different date than the originally pleaded transfers and so does not relate back to those transfers.  *See* AC, Ex. C.  The new $22 million alleged transfer from Rye allegedly occurred *two years* before the earliest alleged transfer from Rye in the original Complaint.  *Compare* Compl., Ex. I, *with* AC, Ex. C.  Such "different transfers may involve different evidence relating to ... bad faith because [the fund's] knowledge

---

[48] *Fairfield Inv. Fund*, 2021 WL 3477479, at *12.

[49] *Mayle v. Felix*, 545 U.S. 644, 659 (2005).

[50] *BNP Paribas*, 594 B.R. at 210.

[51] *Id.*

[52] *Id.*

[53] *Id.*

and conduct must be viewed as of the time that it certified the NAV per share."[54]   And evidence

necessary to "trace" the redemption payment to an origination payment from BLMIS may differ

as well.[55]   Thus, the "core of operative facts" concerning this much earlier transfer would likely

be significantly different, and the Trustee has not pleaded facts suggesting otherwise.

The Trustee may argue that this newly alleged transfer relates back to the Trustee's prior

complaints under *Fairfield Investment*.   There, this Court held that newly alleged subsequent

transfers related back to a previous complaint because the Subsequent Transferees "did not take

the funds in good faith or without knowledge of the voidability of the initial transfers."[56]   But the

Trustee in that case sufficiently pleaded that "*all* transfers from BLMIS to the Feeder Funds,

which the Feeder Funds subsequently transferred," to the Subsequent Transferees, "were and

remain Customer Property subject to turnover to the Trustee and/or are avoidable and

recoverable by the Trustee."[57]   Here, in contrast, the Trustee made no allegations in the original

Complaint that Zephyros lacked good faith or had knowledge of the voidability of initial

transfers.   *See* Compl.   And unlike the original pleading in *Fairfield Investment*, there is no

allegation here that *all* transfers from BLMIS to the feeder funds were customer property and are

avoidable.   *Id.*   Accordingly, there was no basis in the original Complaint for Zephyros to

conclude that any additional transfers could be subject to recovery by the Trustee.

---

[54] *In re Fairfield Sentry*, 596 B.R. 275, 292 (Bankr. S.D.N.Y. 2018).

[55] The Amended Complaint alleges that Zephyros "signed subscription agreements each time it invested in Rye." AC ¶ 72. There is no allegation that each subscription agreement was identical, or that the documents to which the Defendants "affirmed having received and read the fund's prospectus" are identical in each instance. *Id.*   Given the passage of time between the newly alleged transfer and the transfers alleged in the Complaint, it is, in fact, highly likely that the documents are not only different pieces of paper, but different in substance as well.

[56] *Fairfield Inv. Fund*, 2021 WL 3477479, at *12.

[57] *Id.*

For these reasons, the newly alleged transfer, which predates all the originally pleaded transfers by two years, is a different claim that would require separate factual inquiries and therefore cannot relate back to the original Complaint. The claim is time-barred and should be dismissed.

## CONCLUSION

The AC falls short of the most basic pleading requirements. The Trustee fails to allege that the funds transferred to Zephyros were BLMIS property. The AC should also be dismissed for the independent reason that it establishes on its face Zephyros's good-faith defense. The Trustee's allegations show that Zephyros received the redemptions for value, acted in good faith, and could not have discovered Madoff's fraud. At a minimum, any potential recovery should be greatly reduced because a bulk of the alleged transfers are barred by Bankruptcy Code section 546(e), and the Trustee has failed to plead that Zephyros had actual knowledge of the Madoff Fraud. And the Trustee's belated attempt to add to the AC a $22 million transfer that occurred two years before any of the alleged transfers in the original Complaint is barred by the statute of limitations.

This lawsuit should be dismissed with prejudice.

Dated: August 15, 2022                           Respectfully Submitted,
New York, New York

**O'MELVENY & MYERS LLP**

By: */s/ William J. Sushon*
         William J. Sushon
         Daniel S. Shamah
         Kayla N. Haran
         7 Times Square
         New York, New York 10036
         Telephone: (212) 326-2000

Facsimile: (212) 326-2061
wsushon@omm.com
dshamah@omm.com
kharan@omm.com

*Attorneys for Defendant Zephyros Limited*