Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Dielai Yang (dyang@fklaw.com)
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Attorneys for Defendant Multi-Strategy Fund Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> MULTI-STRATEGY FUND LIMITED, <br><br> Defendant. | Adv. Pro. No. 12-01205 (CGM) |

## ANSWER TO AMENDED COMPLAINT

## JURY TRIAL DEMANDED

Defendant Multi-Strategy Fund Limited ("Multi-Strategy" or "Defendant"), by

and through its undersigned counsel Friedman Kaplan Seiler & Adelman LLP, hereby answers

the Amended Complaint of plaintiff Irving H. Picard (the "Trustee" or "Plaintiff"), Trustee for

the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Chapter 7

Estate of Bernard L. Madoff, as follows:[1]

1.      This adversary proceeding is part of the Trustee's continuing efforts to
recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part
of the massive Ponzi scheme perpetrated by Madoff and others.

**Response:**      Multi-Strategy denies the allegations of paragraph 1 of the Amended

Complaint, except admits upon information and belief that Madoff perpetrated a Ponzi scheme

and admits that the Trustee purports to bring this adversary proceeding as part of the Trustee's

efforts to recover BLMIS customer property within the meaning of 15 U.S.C. § 78*lll*(4).

2.      With this Amended Complaint, the Trustee seeks to recover a single
subsequent transfer of $25,763,374 in BLMIS customer property that Defendant received
from Fairfield Sentry Limited ("Fairfield Sentry").

---

[1] The introductory paragraph of the Amended Complaint contains the following footnote 1:

> The Trustee's initial complaint names CDP Capital Tactical Alternative Investments
> ("CDP Capital") as a defendant. *See generally* Compl., *Picard v. Multi-Strategy Fund
> Ltd. (In re BLMIS)*, Adv. Pro. No. 12-01205 (CGM) (Bankr. S.D.N.Y. Mar. 22, 2012),
> ECF No. 1. Defendant and CDP Capital represented to the Trustee that Defendant, not
> CDP Capital, received the subsequent transfer of customer property from Fairfield Sentry
> Limited the Trustee seeks to recover with this Amended Complaint. *See* Stipulation,
> *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 12-01205 (CGM)
> (Bankr. S.D.N.Y. Dec. 28, 2021), ECF No. 88, ¶ 2. Based on this representation, the
> Trustee agreed to dismiss his claim against CDP Capital without prejudice. *See id.*

To the extent any response is required to footnote 1, Multi-Strategy denies the third sentence of
footnote 1, avers that paragraph 2 of the Stipulation and Order cited therein referred to "the
Defendants' representation that Multi-Strategy, and not CDP [Capital], received the transfer
from Fairfield Sentry Limited," and otherwise admits the remaining allegations of footnote 1.

3680548.1

**Response:**    Multi-Strategy denies the allegations of paragraph 2 of the Amended

Complaint, except admits that the Trustee seeks to recover a single transfer of $25,763,374 from

Fairfield Sentry to Multi-Strategy.

3.    Defendant invested in Fairfield Sentry and Kingate Global Fund Limited ("Kingate Global" and, with Fairfield Sentry, the "BLMIS Feeder Funds"), knowing that those funds invested all or substantially all of their assets with BLMIS.[2]

**Response:**    Multi-Strategy admits the allegations of paragraph 3 of the Amended

Complaint.

4.    CDP Capital was Defendant's investment manager and directed Defendant's investments in and redemptions from the BLMIS Feeder Funds.

**Response:**    Multi-Strategy admits the allegations of paragraph 4 of the Amended

Complaint, except avers that the full and correct name of "CDP Capital" was CDP Capital –

Tactical Alternative Investments Inc.   Multi-Strategy makes the foregoing response and any

other responses herein on the understanding that the Amended Complaint's allegations

concerning "CDP Capital" refer to that entity.

5.    On February 10, 2005, Mario Therrien—president of CDP Capital and president, director, and authorized signatory of Defendant—met with Simon Ruddick. Ruddick was the managing director of Albourne Partners Limited, an alternative investment consulting firm.  Therrien and Ruddick "discussed Madoff and the potential ponzi [sic] scheme," and Therrien "[g]ot so scared" that less than a week later, Defendant requested redemptions of all its holdings in the BLMIS Feeder Funds.

---

[2] Paragraph 3 of the Amended Complaint contains the following footnote 2:

This Amended Complaint removes claims that have been resolved by the Trustee's Court-approved settlement in *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Aug. 6, 2019), ECF No. 417.  Specifically, pursuant to the single satisfaction rule set forth in 11 U.S.C. § 550(d), the Trustee is not seeking to recover subsequent transfers that Defendant received from Kingate Global.

To the extent any response is required to footnote 2, Multi-Strategy admits the allegations of footnote 2.

3

**Response:** Multi-Strategy admits that Mario Therrien was the president of CDP

Capital and a director and authorized signatory of Defendant at times relevant to the Amended

Complaint; admits that Therrien had a dinner meeting with Simon Ruddick, a managing director

of Albourne Partners Limited, a London-based firm providing research on hedge funds for

institutional investors, on February 10, 2005 in London; admits that during the February 10,

2005 dinner meeting, Ruddick expressed serious concern about Madoff and strongly

recommended that Multi-Strategy redeem its investments in the BLMIS Feeder Funds; avers that

paragraph 5 of the Amended Complaint partially quotes, with alterations, certain words from a

December 12, 2008 email from Therrien to Ruddick concerning the February 10, 2005 dinner

meeting and refers the Court to the email for its true and complete contents; avers that none of

Therrien, CDP Capital, or Multi-Strategy knew as of February 2005, based on Ruddick's views

or otherwise, that Madoff was engaging in fraud or that BLMIS was not actually trading

securities; admits that, after hearing Ruddick's views, Therrien believed, out of an abundance of

caution, that the safest course would be to not carry through with an additional Fairfield Sentry

investment that Therrien had been contemplating for Multi-Strategy before the dinner meeting

and instead to redeem Multi-Strategy's existing investments in the BLMIS Feeder Funds; admits

that following Therrien's return from London to Montreal, on February 14 and 15, 2005, Multi-

Strategy sent a request for redemption of its Fairfield Sentry shares and that on February 17,

2005, Multi-Strategy requested a redemption of its Kingate Global shares; avers that Therrien,

CDP Capital, and Multi-Strategy did not learn that Madoff had been running a Ponzi scheme

until news reports of Madoff's arrest were published on December 11, 2008; and otherwise

denies the allegations of paragraph 5 of the Amended Complaint.

6.   Therrien recounted this course of events the day after Madoff was arrested
in a December 12, 2008 email to Ruddick:

4

I remember a conversation you and I had in February of 2005 in a restaurant of London (reviewed my notes last night).   We had discussed Madoff and the potential ponzi [sic] scheme.  Got so scared on my way back to Montreal that we redeemed on March 31st of 2005.

This is called triangulation my friend… and a little bit of luck.

**Response:**        Multi-Strategy admits that Therrien sent an email to Ruddick on December 12, 2008; admits that paragraph 6 of the Amended Complaint partially quotes, with alterations, the text of the email; refers the Court to the email for its true and complete contents; and otherwise denies the allegations of paragraph 6 of the Amended Complaint.

7.        Defendant was "so scared" BLMIS was operating a Ponzi scheme that it redeemed all of its investments in the BLMIS Feeder Funds at the earliest possible date. For its shares in Kingate Global specifically, Defendant asked for and received a waiver of the required 35-day notice period for redemptions, effectively halving the normal waiting time.

**Response:**        Multi-Strategy denies that any of Therrien, CDP Capital, or Multi-Strategy knew as of February 2005, based on Ruddick's views or otherwise, that Madoff was engaging in fraud or that BLMIS was not actually trading securities; admits that, after hearing Ruddick's views, Therrien believed, out of an abundance of caution, that the safest course would be to not carry through with an additional Fairfield Sentry investment that Therrien had been contemplating for Multi-Strategy before the dinner meeting and instead to redeem Multi-Strategy's existing investments in the BLMIS Feeder Funds; admits that following Therrien's return from London to Montreal, on February 14 and 15, 2005, Multi-Strategy sent a request for redemption of its Fairfield Sentry shares and on February 17, 2005, Multi-Strategy requested a redemption of its Kingate Global shares pursuant to a waiver of the notice period for Kingate Global redemptions; avers that Therrien, CDP Capital, and Multi-Strategy did not learn that Madoff had been running a Ponzi scheme until news reports of Madoff's arrest were published

on December 11, 2008; and otherwise denies the allegations of paragraph 7 of the Amended

Complaint.

8.     Defendant sought to urgently redeem its investments in the BLMIS Feeder
Funds before the scheme inevitably collapsed, despite the fact that this meant Defendant
would, and did, receive the proceeds of a Ponzi scheme.  By doing so before the fraud
was revealed to the public, Defendant not only avoided shouldering the loss associated
with the Ponzi scheme, it received a windfall of over $4 million more than what it
invested in the BLMIS Feeder Funds.

**Response:**     Multi-Strategy denies  the allegations of paragraph 8 of the Amended

Complaint, except admits that Multi-Strategy's redemption payment from Fairfield Sentry

exceeded the purchase price for its Fairfield Sentry shares by $763,373.71.

9.     The Trustee brings this proceeding to recover the subsequent transfer of
BLMIS customer property that Defendant received from Fairfield Sentry for the benefit
of the estate.

**Response:**     Multi-Strategy denies the allegations of paragraph 9 of the Amended

Complaint.

10.     This is an adversary proceeding commenced in this Court, in which the
main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA
Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United
States District Court for the Southern District of New York as *Securities Exchange
Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791
(the "District Court Proceeding"), and has been referred to this Court.  This Court has
jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15
U.S.C. § 78eee(b)(2)(A) and (b)(4).

**Response:**     Multi-Strategy admits the allegations of the first sentence of paragraph 10

of the Amended Complaint; denies knowledge or information sufficient to form a belief as to the

truth of the allegations of the second sentence of paragraph 10; and states that the third sentence

of paragraph 10 states legal conclusions as to which no response is required; but to the extent a

response is required, denies that this Court has jurisdiction to enter a final order or judgment in

this proceeding.

6

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**Response:**     The first sentence of paragraph 11 of the Amended Complaint states legal conclusions as to which no response is required, but to the extent a response is required, Multi-Strategy denies the allegations of the first sentence of paragraph 11.  Multi-Strategy admits that the Trustee consents to entry of final orders or judgments by the Bankruptcy Court if it is determined that the consent of the parties is required for this Court to enter final orders or judgments consistent with Article III of the U.S. Constitution, but states that Multi-Strategy does not so consent.

12.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

**Response:**     Multi-Strategy admits the allegations of paragraph 12 of the Amended Complaint.

13.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**Response:**     Paragraph 13 of the Amended Complaint states legal conclusions to which no response is required, but to the extent a response is required, Multi-Strategy denies the allegations of paragraph 13.

14.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

**Response:**     Multi-Strategy admits upon information and belief the allegations of the first sentence of paragraph 14 of the Amended Complaint, and denies knowledge or information sufficient to form a belief as to the truth of the second sentence of paragraph 14.

15.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection

7

Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 15 of the Amended Complaint, and otherwise refers

the Court to the application by SIPC alleged in paragraph 15 for its true and complete contents.

16.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 16 of the Amended Complaint, and otherwise refers

the Court to the order of Judge Stanton alleged in paragraph 16 for its true and complete

contents.

17.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 17 of the Amended Complaint, and otherwise refers

the Court to the orders alleged in paragraph 17 for their true and complete contents.

18.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 18 of the Amended Complaint, and otherwise refers

the Court to the petition and order alleged in paragraph 18 for their true and complete contents.

8

19.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**Response:**     Multi-Strategy admits upon information and belief that Madoff pleaded

guilty to crimes, otherwise denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 19 of the Amended Complaint, and otherwise refers to the

transcript of the plea hearing alleged in paragraph 19 for its true and complete contents.

20.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 20 of the Amended Complaint, and otherwise refers

the Court to the alleged indictment and plea for their true and correct contents.

21.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 21 of the Amended Complaint, and otherwise refers

the Court to the alleged indictment and plea for their true and correct contents.

22.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 22 of the Amended Complaint.

9

23.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 23 of the Amended Complaint, except denies that the Trustee is seeking to recover BLMIS customer property in this action because the allegations of the Amended Complaint establish that Multi-Strategy did not receive BLMIS customer property.

24.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**Response:**     Paragraph 24 of the Amended Complaint states legal conclusions as to which no response is required.

25.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff- 2(c)(3).

**Response:**     Paragraph 25 of the Amended Complaint states legal conclusions as to which no response is required.

26.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

10

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 26 of the Amended Complaint.

27.    In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority, Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

**Response:**    Multi-Strategy admits that BLMIS was a registered broker-dealer, but

denies knowledge or information sufficient to form a belief as to the truth of the remaining

allegations of paragraph 27 of the Amended Complaint.

28.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units:  a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

**Response:**    Multi-Strategy admits that BLMIS's principal place of business was in

New York, New York, but denies knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of paragraph 28 of the Amended Complaint.

29.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted its IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**Response:**    Multi-Strategy admits that BLMIS's website boasted about the

sophistication and success of its operations, but denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of paragraph 29 of the Amended

Complaint.

30.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 30 of the Amended Complaint.

31.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 31 of the Amended Complaint.

32.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**Response:**    Multi-Strategy admits upon information and belief that Madoff operated a

Ponzi scheme, but denies knowledge or information sufficient to form a belief as to the truth of

the remaining allegations of paragraph 32 of the Amended Complaint.

33.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 33 of the Amended Complaint.

34.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed
Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted
BLMIS's fraudulently reported trading revenues and/or commissions on its financial
statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a
three-person accounting firm based out of a strip mall in Rockland County, New York.
Of the three employees at the firm, one was a licensed CPA, one was an administrative
assistant, and one was a semi-retired accountant living in Florida.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 34 of the Amended Complaint.

35.     On or about November 3, 2009, David Friehling, the sole proprietor of
Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing
false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5
included copies of these fictitious annual audited financial statements prepared by
Friehling & Horowitz.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 35 of the Amended Complaint.

36.     In general, BLMIS purported to execute two primary investment strategies
for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion
strategy (the "SSC Strategy").  For a limited group of BLMIS customers, primarily
consisting of Madoff's close friends and their families, Madoff also purportedly purchased
securities that were held for a certain time and then purportedly sold for a profit.  At all
relevant times, Madoff conducted no legitimate business operations using any of these
strategies.

**Response:**     Multi-Strategy admits upon information and belief, based on offering

memoranda received by Multi-Strategy, that BLMIS purported to execute a so-called "split strike

conversion" investment strategy, and denies knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of paragraph 36 of the Amended Complaint.

37.     All funds received from BLMIS customers were commingled in a single
BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not
used to trade securities, but rather to make distributions to, or payments for, other
customers, to benefit Madoff and his family personally, and to prop up Madoff's
proprietary trading business.

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 37 of the Amended Complaint.

38.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38 of the Amended Complaint.

39.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**Response:**    Multi-Strategy admits upon information and belief, based on offering memoranda received by Multi-Strategy, that at some time prior to Multi-Strategy's investment in Fairfield Sentry, Madoff began purporting to employ the SSC strategy for BLMIS customers, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 39 of the Amended Complaint.

40.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 40 of the Amended Complaint.

41.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**Response:**    Multi-Strategy admits upon information and belief, based on offering memoranda received by Multi-Strategy, that by the time Multi-Strategy invested in Fairfield Sentry, the SSC strategy purportedly involved the types of trades described in paragraph 41 of

14

the Amended Complaint, but denies knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of paragraph 41.

42.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 42 of the Amended Complaint.

43.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 43 of the Amended Complaint.

44.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**Response:**    Multi-Strategy admits the allegations of paragraph 44 of the Amended

Complaint.

45.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 45 of the Amended Complaint.

46.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

15

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 46 of the Amended Complaint.

47.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 47 of the Amended Complaint.

48.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 48 of the Amended Complaint.

49.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 49 of the Amended Complaint.

50.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.  Yet this is precisely what BLMIS's customer statements reported.

16

**Response:** The first sentence of paragraph 50 of the Amended Complaint states legal conclusions as to which no response is necessary. Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 50 of the Amended Complaint.

51. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**Response:** Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 51 of the Amended Complaint.

52. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**Response:** Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 52 of the Amended Complaint.

53. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**Response:** Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 53 of the Amended Complaint.

54. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**Response:** Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 54 of the Amended Complaint.

55. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

17

**Response:**    Multi-Strategy admits upon information and belief that Madoff's Ponzi scheme collapsed in December 2008, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 55 of the Amended Complaint.

56.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 56 of the Amended Complaint.

57.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 57 of the Amended Complaint.

58.    Defendant is a company organized under the laws of the Cayman Islands that invested in Fairfield Sentry and Kingate Global.  Defendant is a wholly owned subsidiary of Caisse de dépôt et placement du Quebec ("Caisse"), and Defendant's address is listed as Caisse's headquarters in Montreal, Canada.

**Response:**    Multi-Strategy admits the allegations of paragraph 58 of the Amended Complaint.

59.    Non-party CDP Capital Tactical Alternative Investments (previously defined as "CDP Capital") was a "société par actions ou compagnie," or joint-stock corporation, organized under the laws of Quebec, Canada.  CDP Capital was Defendant's investment manager at all relevant times.  Like Defendant, CDP Capital was a wholly owned subsidiary of Caisse, and its address was listed as Caisse's headquarters in Montreal, Canada.

**Response:**    Multi-Strategy admits the allegations of paragraph 59 of the Amended Complaint, except that the full and correct name of "CDP Capital" at the times relevant to the Amended Complaint was "CDP Capital – Tactical Alternative Investments Inc." and the form of the entity is referred to in French as a *compagnie*.

60.    Non-party Caisse is a Canadian institutional fund manager—an entity that pools money from various institutions and invests it—with more than CAD 539 billion in total AUM.  Caisse primarily manages public and private pension funds.  Caisse is headquartered at 1000, place Jean-Paul-Riopelle, in Montreal, Quebec.

**Response:**    Multi-Strategy admits that Caisse is a statutorily created entity that serves

as the fund manager for the majority of the public-sector pension and insurance plans of the

Province of Quebec; admits that, through its subsidiaries, Caisse manages various investment

funds whose total assets under management vary from time to time; admits that Caisse is

headquartered at 1000, place Jean-Paul-Riopelle, in Montreal, Quebec; and otherwise denies the

allegations of paragraph 60 of the Amended Complaint.

61.    Non-party Fairfield Sentry was a BLMIS Feeder Fund incorporated in the British Virgin Islands that invested substantially all of its assets with BLMIS in New York.  Despite having a registered address in the British Virgin Islands, Fairfield Sentry had no physical offices, had no employees, and transacted no meaningful business there.

**Response:**    Multi-Strategy admits that Fairfield Sentry was incorporated in the British

Virgin Islands and invested assets with BLMIS, but denies knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of paragraph 61 of the Amended

Complaint.

62.    Non-party Fairfield Greenwich Group ("FGG") was a de facto partnership based in New York.  At all relevant times, Fairfield Sentry was operated almost entirely by personnel at FGG's New York City headquarters, who maintained final control of Fairfield Sentry's bank accounts, relationships with Fairfield Sentry's back office service providers, and Fairfield Sentry's investments with BLMIS.

**Response:**    The first sentence of paragraph 62 of the Amended Complaint states a

legal conclusion as to which no response is required, but to the extent a response is required,

Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the

allegations of that sentence.  Multi-Strategy denies knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of paragraph 62, but reserves the right to rely

on and introduce any allegations in paragraph 62 as opposing party admissions admissible for the

truth of their contents.

63.    Non-party Kingate Global was a BLMIS Feeder Fund that invested
exclusively with BLMIS in New York.  Despite having a registered address in the British
Virgin Islands, Kingate Global had no physical offices, had no employees, and transacted
no meaningful business there.

**Response:**    Multi-Strategy admits that Kingate Global was a British Virgin Islands

fund that invested with BLMIS, and denies knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of paragraph 63 of the Amended Complaint.

64.    Non-party Tremont (Bermuda) Limited, a co-manager of Kingate Global
for approximately ten years, was formed in Bermuda but was managed by employees of
Tremont Partners, Inc., a Connecticut corporation.  The parent company of Tremont
(Bermuda) Limited and Tremont Partners, Inc. was Tremont Group Holdings, Inc., a
Delaware corporation (collectively, "Tremont").

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 64 of the Amended Complaint.

65.    CDP Capital and its officers, directors, employees, and agents acted as
agents for Defendant, and their conduct and knowledge are imputed to their principal,
Defendant.

**Response:**    Paragraph 65 of the Amended Complaint states legal conclusions as to

which no response is required, but to the extent a response is required, Multi-Strategy denies the

allegations of paragraph 65.

66.    CDP Capital was the investment manager for and agent of Defendant. The
agent-principal relationship between CDP Capital and Defendant was exercised through
the acts that CDP Capital's officers, directors, employees, and agents performed on
behalf of Defendant.

**Response:**    Multi-Strategy admits that CDP Capital was the investment manager of

Defendant, states that the remainder of paragraph 66 of the Amended Complaint states legal

conclusions as to which no response is required, but to the extent a response is required, denies

the remaining allegations of paragraph 66.

20

67.    With no officers, directors, or employees separate from CDP Capital, Defendant relied fully on CDP Capital and its officers, directors, employees, and agents to act as decision-makers for Defendant and to conduct Defendant's business.

**Response:**    Multi-Strategy admits the allegations of paragraph 67 of the Amended Complaint.

68.    CDP Capital and its officers, directors, employees, and agents made investment decisions for Defendant and actively directed and controlled the daily activities of Defendant, including its dealings with the BLMIS Feeder Funds.

**Response:**    Multi-Strategy admits the allegations of paragraph 68 of the Amended Complaint.

69.    CDP Capital indicated to the BLMIS Feeder Funds that it was authorized to act on behalf of Defendant, identifying Defendant as a "CDP entity" to FGG and even holding itself out as the "subscriber" in a Kingate Global subscription agreement.

**Response:**    Multi-Strategy admits that CDP Capital acted on its behalf and that CDP Capital is listed as the "subscriber" in a Kingate Global subscription agreement, refers to the subscription agreement for its true and complete contents, and otherwise denies the allegations of paragraph 69 of the Amended Complaint.

70.    On June 22, 2004, a CDP Capital employee emailed FGG's New York-based employee Lauren Ross to inform her that "[t]he CDP entity investing [in Fairfield Sentry] will be on [sic] of our Cayman based offshore Fund-of-Funds by the name of MULTI-STRATEGY FUND LIMITED."

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 70 of the Amended Complaint.

71.    In a subscription agreement for Kingate Global, CDP Capital was listed as the subscriber, while Defendant was identified as the registered shareholder and signed as the relevant entity.  Defendant and CDP Capital were also identified "on [Kingate Global's] books as Multi Strategy Fund (aka CDP Capital)" and as "CDP Tactical (MULTI STRATEGY)."

21

**Response:** Multi-Strategy admits the allegations in the first sentence of paragraph 71 of the Amended Complaint, and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 71.

72.    CDP Capital's Therrien and Joelle Verdon were authorized by Defendant to, and did, give and receive instructions on behalf of Defendant, including making the subscriptions to and redemption from Fairfield Sentry.

**Response:** Multi-Strategy admits the allegations of paragraph 72 of the Amended Complaint.

73.    CDP Capital's investment committee, which included Therrien, was responsible for overseeing Defendant's investments in the BLMIS Feeder Funds.

**Response:** Multi-Strategy admits the allegations of paragraph 73 of the Amended Complaint.

74.    Therrien and Verdon executed two Fairfield Sentry subscription agreements on Defendant's behalf, identifying Defendant as the subscriber and Therrien in his role as president of CDP Capital as the "advisor."

**Response:** Multi-Strategy admits the allegations of paragraph 74 of the Amended Complaint, and refers to the subscription agreements for their true and complete contents.

75.    In a fax dated February 17, 2005, a CDP Capital employee requested a "full and final redemption" as of February 28, 2005 from Kingate Global "on behalf of Multi-Strategy Fund Limited." In the corresponding Kingate Global redemption request form, CDP Capital's address was listed as the mailing address for Defendant.

**Response:** Multi-Strategy admits the allegations of paragraph 75 of the Amended Complaint, and refers to the fax and Kingate Global redemption request form for their true and complete contents.

76.    Therrien himself acted as agent of Defendant in two ways: first, as president, director, and authorized signatory of Defendant, and second, as president of Defendant's advisor, CDP Capital. For example, Therrien executed the subscription agreements through which Defendant invested in Fairfield Sentry in his capacity as Defendant's "Director." In the same agreements, Therrien was identified as Defendant's "Advisor" and CDP Capital was identified as the Advisor's organization or firm.

22

**Response:**     Multi-Strategy admits the allegations of paragraph 76 of the Amended

Complaint.

77.     As "Director" of Defendant, Therrien also executed Defendant's
redemption request forms for both BLMIS Feeder Funds.

**Response:**     Multi-Strategy admits the allegations of paragraph 77 of the Amended

Complaint, and refers to the redemption request forms for their true and complete contents.

78.     CDP Capital's Verdon was an agent for Defendant as well, serving as an
authorized signatory and authorized person in the Fairfield Sentry subscription
agreements and as a signatory in Defendant's redemptions from Fairfield Sentry and
Kingate Global.

**Response:**     Multi-Strategy admits the allegations of paragraph 78 of the Amended

Complaint.

79.     Other CDP Capital personnel acted as agents of Defendant by
corresponding with New York-based FGG and Tremont personnel regarding the BLMIS
Feeder Funds on Defendant's behalf, including sending documents pertaining to
Defendant's subscriptions in and redemptions from the BLMIS Feeder Funds.

**Response:**     Paragraph 79 of the Amended Complaint states legal conclusions as to

which no response is required, but to the extent a response is required, Multi-Strategy denies the

allegations of paragraph 79.

80.     Because CDP Capital and its officers, directors, employees, and agents
performed these and other tasks and functions for Defendant's benefit and acted within
the scope of their agency at the direction of, on behalf of, and/or with the consent of
Defendant, their conduct and knowledge are imputed to their principal, Defendant.

**Response:**     Paragraph 80 of the Amended Complaint states legal conclusions as to

which no response is required, but to the extent a response is required, Multi-Strategy denies the

allegations of paragraph 80.

81.     Defendant and its officers, directors, employees, and agents have been
active in the global financial services industry for decades and have considerable
experience and expertise in wealth management and investment fund distribution.

23

**Response:**    Multi-Strategy admits that CDP Capital and certain of its officers,

directors, employees, and agents have been active in the global financial services industry for

decades and have considerable experience and expertise in asset allocation and asset

management, and otherwise denies the allegations of paragraph 81 of the Amended Complaint.

82.    Defendant and CDP Capital are subsidiaries of Caisse, which has been
recognized as one of North America's leading financial institutions and as the largest
institutional fund manager in Canada.  Caisse was created in 1965 and specializes in
managing assets and providing financing and operational guidance to its clients.  Caisse
had more than CAD 174 billion in AUM in 2004, and by 2005 had more than CAD 216
billion in AUM.

**Response:**    Multi-Strategy admits the allegations of paragraph 82 of the Amended

Complaint.

83.    CDP Capital was the asset manager for Caisse's clients, including
institutional investors.

**Response:**    Multi-Strategy admits that CDP Capital was the asset manager for Multi-

Strategy and Caisse, and otherwise denies the allegations of paragraph 83 of the Amended

Complaint.

84.    CDP Capital was a leader in the investment management industry,
participating in organizations created to provide due diligence instruction and guidance.
For example, in 2004, CDP Capital was a member of the Canadian chapter of the
Alternative Investment Management Association, an organization that provided
publications and other resources to the alternative investment community to "[i]ncrease
investor education[ and] transparency and promote due diligence and related best
practices."

**Response:**    Multi-Strategy denies that CDP Capital was a leader in the investment

management industry and denies knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of paragraph 84 of the Amended Complaint.

85.    CDP Capital's officers, directors, and employees were highly credentialed,
sophisticated, and experienced.  For example, Therrien served as a vice president of
Caisse in addition to his leadership roles at CDP Capital and Defendant, and has worked
at Caisse and its related entities since 1993. Therrien's initial responsibilities at Caisse
included managing a tactical asset allocation strategy, and thereafter he created an

internal global macro hedge fund. As part of his participation in a 2009 hedge fund conference, Therrien was identified on a list of "The Most Influential And Seasoned End-Investors" in the alternative investment industry.

**Response:**    Multi-Strategy admits that CDP Capital had officers, directors, and

employees who were highly credentialed, sophisticated, and experienced, admits the allegations

of the second and third sentences of paragraph 85 of the Amended Complaint, and denies

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of paragraph 85.

86.    Through its officers, directors, employees, and agents, Defendant affirmed in its subscription agreements with the BLMIS Feeder Funds that it was sophisticated and possessed the requisite "knowledge and experience" in financial and business matters to evaluate the risks and merits of investing in those funds.

**Response:**    Multi-Strategy refers to subscription agreements referred to in paragraph

86 of the Amended Complaint for their true and complete contents, and otherwise denies the

allegations of paragraph 86.

87.    Defendant is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York, and knowingly accepted the rights, benefits, and privileges of conducting business in the United States and the state of New York.

**Response:**    Multi-Strategy denies the allegations of paragraph 87 of the Amended

Complaint.

88.    Defendant invested in the BLMIS Feeder Funds with the specific purpose of having funds invested with BLMIS in New York. Defendant knew and intended that its investments in the BLMIS Feeder Funds were ultimately investments with New York-based BLMIS.

**Response:**    Multi-Strategy admits the allegations of paragraph 88 of the Amended

Complaint.

89.    From Defendant's first subscription in Kingate Global no later than 1999 through its subscriptions in Fairfield Sentry beginning in 2004, Defendant purchased shares in the BLMIS Feeder Funds intending to direct funds to New York-based BLMIS.

25

**Response:**    Multi-Strategy admits the allegations of paragraph 89 of the Amended Complaint.

90.    Prior to subscribing to Fairfield Sentry, Defendant affirmed having "received and read" a Fairfield Sentry private placement memorandum (the "PPM"), dated July 1, 2003, which provided that "approximately 95% of the Fund's assets" were under the custody of New York-based BLMIS.

**Response:**    Multi-Strategy admits that prior to subscribing to Fairfield Sentry, it received a Fairfield Sentry private placement memorandum which provided that at least 95% of Fairfield Sentry's assets would be invested by New York-based BLMIS, which would be a sub-custodian of Fairfield Sentry's assets, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 90 of the Amended Complaint.

91.    Shortly after Defendant invested in Fairfield Sentry, Philip Toub, an FGG partner and a member of FGG's executive committee, remarked to others at FGG that Defendant should be "add[ed] to the long list of Madoff addicts who need a fix." Indeed, Therrien later asked Toub about additional capacity for Fairfield Sentry on at least seven occasions.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the first sentence of paragraph 91 of the Amended Complaint, admits that Therrien inquired about Fairfield Sentry's capacity for additional subscriptions more than once, and otherwise denies the allegations of paragraph 91.

92.    Defendant's knowledge and intention that its investments in Fairfield Sentry and Kingate Global were investments with BLMIS are reflected in Defendant's total redemption of its investments in both BLMIS Feeder Funds after Therrien "discussed Madoff and the potential ponzi [sic] scheme" with Ruddick. This is further reflected in a conversation between Therrien and Toub regarding Defendant's redemption from Fairfield Sentry, during which they discussed "the rumors [about] Madoff."

**Response:**    Multi-Strategy admits that it believed that Fairfield Sentry and Kingate Global would primarily invest its subscription payments with BLMIS, admits that Therrien and Ruddick had a discussion about Madoff at a dinner meeting in London in February 2005, denies that it had any knowledge that Madoff engaged in a Ponzi scheme at any time prior to Madoff's

26

arrest in December 2008, and otherwise denies knowledge or information sufficient to form a

belief as to the truth of the allegations of paragraph 92 of the Amended Complaint.

93.     Defendant's knowing and intentional investments with Madoff in New York also explain why CDP Capital personnel asked FGG, in connection with Defendant's Fairfield Sentry investments, for "info that you've got on Madoff," including asking "how Maddoff [sic] made money" and for help "understand[ing] when Maddoff [sic] was invested."

**Response:**     Multi-Strategy admits that it believed Fairfield Sentry primarily invested

its subscription payments with BLMIS, admits that CDP Capital personnel asked FGG for

information FGG had on Madoff, how Madoff made money, and how that money was invested,

and otherwise denies the allegations of paragraph 93 of the Amended Complaint.

94.     Throughout its investments in Kingate Global (including three subscriptions and two redemptions), Defendant and its agents "received, reviewed, and understood" several versions of the Kingate Global information memorandum, which revealed Kingate Global's reliance on "an Investment Advisor who is based in the United States" and "a New York based NASD [National Association of Securities Dealers] registered broker-dealer employing approximately 350 people."

**Response:**     Multi-Strategy admits that it received a version of the Kingate Global

information memorandum that contained some of the language quoted in paragraph 94 of the

Amended Complaint, respectfully refers to that information memorandum and the related

subscription agreement for their true and complete contents, and otherwise denies the allegations

of paragraph 94.

95.     Defendant and its agents undertook purposeful acts aimed at New York and the United States as part of Defendant's BLMIS Feeder Fund investments.

**Response:**     Multi-Strategy denies the allegations of paragraph 95 of the Amended

Complaint.

96.     Defendant's primary contact at FGG was Toub, who managed FGG's relationship with Defendant. Defendant's agents, including Therrien and possibly one or two of his CDP Capital colleagues, met with Toub and other senior FGG personnel at FGG's office in New York shortly after Defendant began investing in Fairfield Sentry. At the meeting, FGG provided Defendant with Fairfield Sentry tear sheets and reports

27

prepared by FGG consultant Gil Berman "to show [Defendant] how [FGG is] monitoring" Fairfield Sentry's performance and to "avoid [Defendant] feeling the need to go see Madoff."

**Response:**       Multi-Strategy admits that Toub was Multi-Strategy's primary contact at

FGG, admits that Therrien and possibly one or two of his CDP Capital colleagues met with Toub

at FGG's office in New York on one occasion and that Therrien was shown a tear sheet, and

otherwise denies knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of paragraph 96 of the Amended Complaint.

   97.  Defendant directed communications to Ross, who was based in FGG's New York headquarters. Within these communications, Defendant sent wiring instructions specifically designating a New York-based bank account to which Defendant directed FGG to wire Defendant's redemption payments from Fairfield Sentry, and from which Defendant was going to fund its subscriptions in Fairfield Sentry.

**Response:**       Multi-Strategy admits that its representatives communicated with Lauren

Ross by email on more than one occasion, admits that Ross's email signature block included the

address of FGG's New York office, and otherwise denies the allegations of paragraph 97 of the

Amended Complaint.

   98.  Defendant's agents traveled to New York on at least one occasion to meet with Tremont personnel regarding Defendant's investment in Kingate Global.

**Response:**       Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 98 of the Amended Complaint.

   99.  Defendant's agents also communicated with Tremont personnel about Defendant's subscriptions in and redemptions from Kingate Global.  This included sending at least one subscription agreement and submitting Defendant's request to have the required notice period for redemptions waived in February 2005 after Therrien's discussion with Ruddick about "Madoff and the potential ponzi [sic] scheme." Defendant's agents knew that the Tremont personnel were in New York and purposely directed communications to them in New York.

**Response:**       Multi-Strategy admits that, in February 2005, after Mario Therrien's

dinner meeting with Simon Ruddick in London, Multi-Strategy cc'ed one Tremont representative

on a redemption notice faxed to Kingate Global's administrator in Bermuda which referred to a

shortening of the notice period for redemptions, and otherwise denies the allegations of

paragraph 99 of the Amended Complaint.

100.    Defendant intended for the funds it invested in the BLMIS Feeder Funds to be used to purchase securities in the United States.  By investing in this way, Defendant purposely undertook investment activities in the United States.

**Response:**    Multi-Strategy admits the allegations of the first sentence of paragraph

100 of the Amended Complaint and otherwise denies the allegations of paragraph 100.

101.    The Fairfield Sentry PPM, which Defendant affirmed having received and read, explained that the SSC Strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of "approximately 35 to 45 stocks in the S&P 100 [Index]," as well as "the sale of out-of-the-money S&P 100 Index call options" and "the purchase of an equivalent number of out-of- the-money S&P 100 Index put options."

**Response:**    Multi-Strategy admits that it received a version of the Fairfield Sentry

PPM that contained the language quoted in paragraph 101 of the Amended Complaint,

respectfully refers to that PPM and the related subscription agreement for their true and complete

contents, and otherwise denies the allegations of paragraph 101 of the Amended Complaint.

102.    The documents provided to Defendant at the meeting with FGG in New York in 2004 confirmed that the SSC Strategy relied upon investments in the United States.  The Fairfield Sentry tear sheets reiterated that Fairfield Sentry's positions typically "will consist of the ownership of 40-50 S&P100 stocks most correlated to that index, the sale of out-of-the-money [call options] on the index and the purchase of out-of-the-money [put options] on the index."

**Response:**    Multi-Strategy admits that FGG showed it a tear sheet that showed

ownership of stocks in the S&P 100 Index, the sale of call options on the S&P 100 Index, and the

purchase of put options on the S&P 100 Index, and otherwise denies knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 102 of the Amended

Complaint.

103.    The Gil Berman reports provided to Defendant at the meeting with FGG in New York also reflected the purported trading activity by BLMIS, including "portfolios

29

of S&P 100 [Index] stocks," S&P 100 Index option puts and calls, and cash positions such as U.S. Treasury Bills. The most recent report drafted by Berman in advance of Defendant's meeting with FGG in New York explicitly referenced "fully invested positions in S&P 100 [Index] split-strike conversions" in the beginning of June 2004.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 103 of the Amended Complaint.

104.    FGG personnel also repeatedly told Defendant's agents that Fairfield Sentry was at times invested in U.S. Treasury Bills, and that Defendant's investment had earned money based on these U.S.-based holdings. This was confirmed in a Fairfield Sentry monthly update sent by New York-based Ross to a CDP Capital employee at the CDP Capital employee's request. The monthly update stated that Fairfield Sentry "was invested in short-dated U.S. Treasury Bills at the end of September [2004] and maintained this position for the entire month [of October 2004]."

**Response:**    Multi-Strategy admits the allegations of the first sentence of paragraph

104 of the Amended Complaint and denies knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of paragraph 104.

105.    FGG also gave CDP Capital personnel information about Fairfield Sentry's "profit attribution" that reflected Fairfield Sentry's U.S.-based investments.

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 105 of the Amended Complaint.

106.    Two Kingate Global information memoranda that Defendant received from Tremont stated that BLMIS's SSC Strategy entailed purportedly "(i) purchasing a basket of thirty (30) to forty (40) large-capitalization S&P 100 [Index] stocks (e.g., General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson & Johnson, etc.) . . . ; (ii) selling out-of-the-money S&P 100 Index call options . . . ; [and] (iii) purchasing out-of-the-money or at-the-money S&P [100] Index put options."

**Response:**    Multi-Strategy admits that it received a version of the Kingate Global

information memorandum that contained some of the language quoted in paragraph 106 of the

Amended Complaint, respectfully refers to the information memorandum for its complete and

accurate contents, and otherwise denies the allegations of paragraph 106.

30

107.    Both of these information memoranda made clear that BLMIS "invests primarily in the United States," and that Kingate Global may "hold cash or invest in cash equivalents," including "obligations of the United States Government," "U.S. Government Securities," and "U.S. Treasury Bills."

**Response:**    Multi-Strategy admits that it received a version of the Kingate Global

information memorandum that contained the language quoted in paragraph 107 of the Amended

Complaint, respectfully refers to the information memorandum for its complete and accurate

contents, and otherwise denies the allegations of paragraph 107.

108.    By executing each of the Fairfield Sentry subscription agreements, Defendant "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding and consent[ed] that service of process as provided by New York law may be made upon [Defendant] in such [p]roceeding."

**Response:**    Multi-Strategy respectfully refers to the Fairfield Sentry subscription

agreements referred to in paragraph 108 of the Amended Complaint for their complete and

accurate contents, and otherwise denies the allegations of paragraph 108.

109.    Defendant also agreed that its investments in Fairfield Sentry would "be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

**Response:**    Multi-Strategy respectfully refers to the Fairfield Sentry subscription

agreements referred to in paragraph 109 of the Amended Complaint for their complete and

accurate contents, avers that its investments in Fairfield Sentry were governed by the laws of the

British Virgin Islands in accordance with Fairfield Sentry's Articles of Association, and

otherwise denies the allegations of paragraph 109.

110.    By executing the Fairfield Sentry subscription agreements, Defendant agreed to direct its investment funds to an HSBC Bank USA correspondent bank account in New York for ultimate deposit in Fairfield Sentry's bank account.  Defendant directed funds to this New York-based HSBC Bank USA account in connection with its investments in Fairfield Sentry.

31

**Response:**    Multi-Strategy refers to the Fairfield Sentry subscription agreements for

their complete and accurate contents, admits that Multi-Strategy directed subscription funds to

Fairfield Sentry's bank account in Dublin, Ireland, denies that it used any New York bank

account in connection with any subscription, and otherwise denies the allegations of

paragraph 110 of the Amended Complaint.

> 111.    Defendant provided wiring instructions to FGG and Tremont directing that
> redemptions from the BLMIS Feeder Funds be "PA[ID] THROUGH" an account at The
> Bank of New York, in New York.  As per Defendant's instructions, Defendant received
> the subsequent transfer from Fairfield Sentry that the Trustee seeks to recover in this
> account.

**Response:**     Multi-Strategy admits that it provided wiring instructions directing

redemption payments from Fairfield Sentry or Kingate Global to be "PA[ID] THROUGH]" a

correspondent account at The Bank of New York, in New York, held by Multi-Strategy's

Canadian bank (Desjardins) for credit to Multi-Strategy's account at Desjardins in Canada,

respectfully refers to the redemption requests and wire transfer instructions for their complete

and accurate contents, denies that Multi-Strategy ever held or used an account at The Bank of

New York or an account in New York, and otherwise denies the allegations of paragraph 111 of

the Amended Complaint.

> 112.    Defendant derived significant revenue from New York and maintained
> minimum contacts and general business contacts with the United States and New York in
> connection with the claims alleged herein.

**Response:**    Multi-Strategy denies the allegations of paragraph 112 of the Amended

Complaint.

> 113.    Defendant, as a result, should reasonably expect to be and is subject to
> personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302
> (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

**Response:**    Multi-Strategy denies the allegations of paragraph 113 of the Amended

Complaint.

114.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd. et al.,* Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**Response:**    Multi-Strategy admits upon information and belief that the Trustee

commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this

Court under the caption, *Picard v. Fairfield Sentry Ltd. et al*., Adv. Pro. No. 09-01239 (CGM),

refers to the pleadings in that proceeding, including their exhibits, for statements of their

complete and accurate contents, and otherwise denies the allegations of paragraph 114 of the

Amended Complaint.

115.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**Response:**    Multi-Strategy admits upon information and belief that the Court approved

the settlement described in paragraph 115 of the Amended Complaint and entered a judgment as

described in paragraph 115 on or about the dates alleged therein, and refers to the referenced

settlement agreement and the referenced judgment for their true and complete contents.

116.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the allegations of paragraph 116 of the Amended Complaint.

117.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

33

**Response:**    Multi-Strategy admits that the Trustee filed a second amended complaint

in the *Fairfield Sentry Ltd.* proceeding on or about the date alleged, respectfully refers to the

referenced second amended complaint, including its exhibits, for a statement of their complete

and accurate contents, and otherwise denies the allegations of paragraph 117 of the Amended

Complaint.

      118.    As alleged in the Second Amended Complaint, Fairfield Sentry received
each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS.
The Trustee incorporates by reference the allegations contained in the Second Amended
Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-
313, and 315-16.

**Response:**    Upon information and belief, Multi-Strategy denies that Fairfield Sentry

had actual knowledge that Madoff or BLMIS were not trading securities or that they were

perpetrating a Ponzi scheme, denies that the referenced Second Amended Complaint sufficiently

alleges Fairfield Sentry's actual knowledge of fraud at BLMIS, denies knowledge or information

sufficient to form a belief as to the truth of any of the other allegations of the referenced Second

Amended Complaint, but reserves the right to rely on and introduce any allegations in the

referenced Second Amended Complaint or its exhibits as opposing party admissions admissible

for the truth of their contents, and otherwise denies the allegations of paragraph 118 of the

Amended Complaint.

      119.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield
Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year
Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section
544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law,
particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**Response:**    Multi-Strategy denies knowledge or information sufficient to form a belief

as to the truth of the first sentence of paragraph 119 of the Amended Complaint, and otherwise

denies the allegations of paragraph 119.

3680548.1

120.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to Defendant (the "Fairfield Sentry Subsequent Transfer"). Based on the Trustee's investigation to date, the Fairfield Sentry Subsequent Transfer totaled $25,763,374. A chart setting forth the presently known Fairfield Sentry Subsequent Transfer is attached as Exhibit C.

**Response:**    Multi-Strategy denies the allegation of paragraph 120 of the Amended Complaint, except admits that it received a $25,763,373.71 redemption payment from Fairfield Sentry.

121.    On March 22, 2012, the Trustee filed this action seeking recovery of the Fairfield Sentry Subsequent Transfer.

**Response:**    Multi-Strategy admits that the Trustee filed this action on March 22, 2012, and otherwise denies the allegations of paragraph 121 of the Amended Complaint.

122.    The Fairfield Sentry Subsequent Transfer is recoverable from Defendant under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff- 2(c)(3).

**Response:**    Multi-Strategy denies the allegations of paragraph 122 of the Amended Complaint.

123.    The Fairfield Sentry Subsequent Transfer represents a redemption of equity interest by Defendant as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry Subsequent Transfer to Defendant upon redemption of Defendant's interests.

**Response:**    Multi-Strategy admits that the redemption payment at issue was a payment it received in redemption of its shares in Fairfield Sentry, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 123 of the Amended Complaint.

124.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial transfers and Fairfield Sentry Subsequent Transfer discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

3680548.1

**Response:**     Multi-Strategy denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 124 of the Amended Complaint.

125.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**Response:**     Multi-Strategy incorporates and reasserts its responses to the allegations of all of the previous paragraphs of the Amended Complaint as though set forth fully herein.

126.    The Fairfield Sentry Subsequent Transfer is recoverable from Defendant under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

**Response:**     Multi-Strategy denies the allegations of paragraph 126 of the Amended Complaint.

127.    Defendant is an immediate or mediate transferee of the Fairfield Sentry Subsequent Transfer from Fairfield Sentry.

**Response:**     Multi-Strategy denies the allegations of paragraph 127 of the Amended Complaint.

128.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the Fairfield Sentry Subsequent Transfer, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**Response:**     Multi-Strategy denies the allegations of paragraph 128 of the Amended Complaint.

## RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF

Multi-Strategy denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against Multi-Strategy or to any of the relief described therein.

## DEFENSES

Without assuming any burden of proof that would otherwise fall upon the Trustee, Multi-Strategy asserts the following defenses.  Multi-Strategy reserves the right to amend this

3680548.1

Answer to assert additional defenses if, through discovery or other investigation, it becomes appropriate to do so.

## FIRST DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))

The alleged subsequent transfer to Multi-Strategy may not be recovered because the alleged initial transfer is subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), in that the alleged initial transfer was (i) made by or to (or for the benefit of) a stockbroker (BLMIS), financial institution (Fairfield Sentry or Multi-Strategy), financial participant (Multi-Strategy), or other covered entity; (ii) a settlement payment and/or a transfer made in connection with a securities contract (between BLMIS and Fairfield Sentry or between Fairfield Sentry and Multi-Strategy); and (iii) made more than two years before the petition date and thus not recoverable under 11 U.S.C. § 548(a)(1)(A).  In addition, at the time of the transfer from Fairfield Sentry to Multi-Strategy, Multi-Strategy had no actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme.

## SECOND DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

The transfer Multi-Strategy received from Fairfield Sentry did not constitute BLMIS customer property.  Upon information and belief, the redemption payment Multi-Strategy received from Fairfield Sentry was sourced from subscription payments made to Fairfield Sentry by Fairfield Sentry investors.  Multi-Strategy's redemption payment could not have come from BLMIS because any prior avoidable transfers from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to other investors or Fairfield Sentry affiliates before Fairfield Sentry made its transfer to Multi-Strategy.

3680548.1

Among other things, the allegations of the Amended Complaint, including the

exhibits thereto and the allegations of the second amended complaint in *Picard v. Fairfield*

*Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y.), and the exhibits thereto that are

incorporated by reference into the Amended Complaint at paragraph 118, establish that any

avoidable transfers from BLMIS received by Fairfield Sentry prior to Multi-Strategy's

redemption were transferred by Fairfield Sentry to persons other than Multi-Strategy prior to the

redemption, and that the redemption payment Multi-Strategy received from Fairfield Sentry thus

could not have included any BLMIS customer property.

### THIRD DEFENSE

### Good Faith (11 U.S.C. § 550(b))

Multi-Strategy took the transfer from Fairfield Sentry for value, in good faith, and

without knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry, and thus

the transfer to Multi-Strategy may not be recovered pursuant to 11 U.S.C. § 550(b).

Multi-Strategy took for value because the transfer was made in exchange for

Multi-Strategy's surrender of its shares in Fairfield Sentry.

Multi-Strategy did not have actual knowledge of any fraudulent purpose behind

the transfer it received.  Multi-Strategy did not know facts that would have prompted a

reasonable person in Multi-Strategy's position to conduct further inquiry into whether there was

any fraudulent purpose behind the transfer.

Even if Multi-Strategy had been on inquiry notice of a possible fraudulent

purpose behind the transfer it received, a diligent inquiry by Multi-Strategy would not have

discovered such a fraudulent purpose.  Other entities, including the United States Securities and

Exchange Commission, with greater investigatory tools and resources than Multi-Strategy, and

38

with more access to BLMIS personnel and documentation than Multi-Strategy, repeatedly

examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008.

Multi-Strategy did not have the ability to compel the production of information from third parties

that would have been necessary to establish that BLMIS was committing fraud.  Diligent inquiry

by Multi-Strategy would not have discovered the fraudulent purpose of the transfer.

Multi-Strategy did not have knowledge of the voidability of the transfers from

BLMIS to Fairfield Sentry.

## FOURTH DEFENSE

### Lack of Subject Matter Jurisdiction
### (U.S. Const. Art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter

final orders or judgment in this proceeding.

## FIFTH DEFENSE

### Lack of Personal Jurisdiction
### (U.S. Const. Amend. V; Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

This Court lacks personal jurisdiction over Multi-Strategy with respect to the

claim herein.

## SIXTH DEFENSE

### Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))

The Amended Complaint fails to state a claim upon which relief can be granted.

## SEVENTH DEFENSE

### No Actual Knowledge by Fairfield Sentry

Upon information and belief, the alleged initial transfers from BLMIS to Fairfield

Sentry are not avoidable or recoverable from Fairfield Sentry under 11 U.S.C. § 546(e) because

Fairfield Sentry had no actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme.

## EIGHTH DEFENSE

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee may not recover the transfer from Fairfield Sentry to Multi-Strategy because he has not avoided the initial transfer from BLMIS to Fairfield Sentry.

## NINTH DEFENSE

### No Ponzi Scheme Presumption

The Trustee may not rely on a "Ponzi scheme presumption" to prove that the initial transfer from BLMIS to Fairfield Sentry that he seeks to recover from Multi-Strategy was made with actual intent to hinder, delay, or defraud any BLMIS creditor.

## TENTH DEFENSE

### Multi-Strategy as Initial Transferee

In the alternative, Fairfield Sentry was a mere conduit, and consequently, the claimed transfer was an initial transfer from BLMIS to Multi-Strategy. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 ECF 115, at 3, 6. As a result, the redemption received by Multi-Strategy was an initial transfer from BLMIS to Multi-Strategy that is subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the transfer is untimely; and Multi-Strategy may retain the amount it received pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because it took the transfer for value and in good faith.

40

## ELEVENTH DEFENSE

### Statute of Limitations

The Trustee's claim is barred by the statute of limitations.

## TWELFTH DEFENSE

### Estoppel

The Trustee's claim is barred by estoppel.

## THIRTEENTH DEFENSE

### Unreasonable Delay

The Trustee's delay in bringing and prosecuting his claim, which was brought more than a decade ago and concerns a transfer made more than 17 years ago, is unreasonable and unfairly prejudices Multi-Strategy's ability to defend itself.

## FOURTEENTH DEFENSE

### Extraterritoriality

The Trustee's recovery of the transfer to Multi-Strategy would constitute an impermissible extraterritorial application of U.S. law.

## FIFTEENTH DEFENSE

### Comity

The Trustee's recovery of the transfer to Multi-Strategy would violate principles of comity.

## SIXTEENTH DEFENSE

### Violation of Due Process (U.S. Const. Amend. V)

The use of the doctrine of law of the case to apply to Multi-Strategy rulings made in other adversary proceedings to which it was not a party and in which it did not participate

41

violates Multi-Strategy's right to due process of law as guaranteed by the Fifth Amendment to

the U.S. Constitution.

## SEVENTEENTH DEFENSE

### Single Satisfaction (11 U.S.C. § 550(d))

Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any subsequent

transfer from Multi-Strategy to the extent he has recovered from Fairfield Sentry or any other

immediate or mediate transferee the amount of the avoided initial transfer that included the

customer property that the Trustee alleges Multi-Strategy received.

## EIGHTEENTH DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent the Trustee recovers from Multi-Strategy, Multi-Strategy reserves

its right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

## JURY DEMAND

Multi-Strategy demands a trial by jury on all issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

Multi-Strategy does not consent to entry of final orders or judgment by the

Bankruptcy Court.

## DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, Multi-Strategy demands judgment dismissing the Amended

Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and

such other relief as the Court deems just and appropriate.

3680548.1

Dated: New York, New York
      August 15, 2022

s/ Robert J. Lack
Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Dielai Yang (dyang@fklaw.com)
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Attorneys for Defendant*
*Multi-Strategy Fund Limited*