**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-05346 (CGM) |
| v. | |
| MERRILL LYNCH INTERNATIONAL, | **AMENDED COMPLAINT** |
| Defendant. | |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA")[1], and the substantively consolidated chapter 7 estate of

Bernard L. Madoff ("Madoff"), by the Trustee's undersigned counsel, for this Amended Complaint

against Merrill Lynch International ("MLI") alleges the following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), stolen as part of the massive Ponzi

scheme perpetrated by Madoff and others and received by MLI before Madoff's arrest on

December 11, 2008.

2.    The Trustee seeks to recover $16,077,730 in subsequent transfers of BLMIS

customer property made to MLI by Fairfield Sentry Limited ("Fairfield Sentry") directly, or

through Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the

"Fairfield Funds").    The total sum transferred to MLI includes: (a) $14,200,000 fraudulently

transferred by BLMIS to Fairfield Sentry and then subsequently transferred to MLI; and

(b) $1,877,730 fraudulently transferred by BLMIS to Fairfield Sentry, then subsequently

transferred from Fairfield Sentry to Fairfield Sigma, and then subsequently transferred from

Fairfield Sigma to MLI.

3.    Fairfield Sentry was the largest of many BLMIS feeder funds—single-purpose

investment funds that pooled their investors' assets to invest with BLMIS's investment advisory

business ("IA Business") in New York.    From November 1990 until Madoff's arrest in December

2008, Fairfield Sentry maintained customer accounts with BLMIS in New York.    Fairfield Sigma

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § _____ and omit reference to title 15, United States Code.

was 100% invested in Fairfield Sentry.  The Fairfield Funds are British Virgin Islands ("BVI")

companies that are in liquidation in the BVI, which were created, operated, and controlled by

Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York.

4.    At all times relevant herein, Merrill Lynch & Co., Inc. ("ML & Co.") was the parent

corporation for all Merrill Lynch entities including Defendant MLI along with various other non-

defendant affiliates and subsidiaries (collectively, "Merrill Lynch").

5.    Beginning in or around 2000, Merrill Lynch barred any investments related to

Madoff and effectively instituted a "No Madoff" policy that extended across entities and groups

within the Merrill Lynch organization.  Merrill Lynch refused to offer any products on BLMIS

funds including Fairfield Sentry.

6.    Fabio Savoldelli, a former executive in Merrill Lynch's New York office and

member of Merrill Lynch's Global Markets & Investment Bank group ("GMI"), and later Merrill

Lynch Investment Managers group ("MLIM"), has spoken publicly about Merrill Lynch's "No

Madoff" protocol, and the directive to "avoid[] investing in anything that had anything to do with

Madoff" as far back as 2001.  As Mr. Savoldelli explained, the prohibition against Madoff trading

was instituted because Merrill Lynch had identified "many, many, many red flags" at BLMIS and

said that "the whole thing smelled."  Due to these concerns, MLI executives noted that "[t]he

decision was taken some time ago that Merrill Lynch does not offer any products on these funds"

and repeatedly refused to offer products on the Madoff funds.

7.    Despite its prohibition, Merrill Lynch and its GMI group, including the following

entities: Merrill Lynch International & Co. C.V., Merrill Lynch & Co. Inc., Merrill Lynch, S.A.,

ML & Co., and MLI were involved in constructing at least nine leveraged products using the

Fairfield Funds as reference funds.  Merrill Lynch would loan investors money, and in return, the

investors would receive a synthetic investment in a basket of funds that was four times (4x) the amount the client contributed to the investment. The client would pay 25% of the total amount to be invested in the basket and Merrill Lynch would loan the client the remaining 75%.

8.    Merrill Lynch, and in particular MLI, intentionally structured the leveraged products both to protect itself against BLMIS's failure and so that Merrill Lynch would profit from fees, rebates, and interest on the loan, protect itself from all risks associated with the investment, and provide additional profits if and when BLMIS failed. Merrill Lynch structured the leveraged products to limit the exposure to the Fairfield Funds to 10% of the leveraged products investment.

9.    Merrill Lynch built into its leveraged products a structure to pass the first 25% of losses relating to the basket of funds onto its clients. Thus, if the investments with the Fairfield Funds, which were capped at 10% of the leveraged product investment, lost their entire value, Merrill was risk-free and suffered no loss because the entirety of the risk was within the range Merrill Lynch had passed on to its clients.

10.    Merrill Lynch also did not fully hedge its position in the Fairfield Funds but instead created a "synthetic short" position with respect to BLMIS of at least $3 million by having MLI take redemptions out of the Fairfield Funds. Merrill Lynch's synthetic short was a profit generator—beyond the typical benefits of leveraged products—because it allowed Merrill Lynch to profit if BLMIS collapsed.

11.    Rather than the shock and outrage that other investors expressed when Madoff's fraud was exposed to the rest of the world on December 11, 2008, Merrill Lynch exhibited a kind of indifference because it knew it had insulated itself from risk. An executive at Merrill Lynch summed up Merrill Lynch's response to the biggest financial fraud in U.S. history: "Not a big

surprise . . . ." And another wrote in an email to his colleagues: "We all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed."

12.     Merrill Lynch was confident that the risk it took on its leveraged products was worthwhile and congratulated itself on its foresight because, as one Merrill Lynch executive remarked, "[b]arring a clawback, the direct result will be positive." In other words, although Merrill Lynch had Madoff exposure, it had ensured that it would come out ahead.

13.     MLI received over $16 million in subsequent transfers of customer property as a result of the leveraged transactions. Through this adversary proceeding, the Trustee seeks to recover those transfers.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

14.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

15.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

16.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

17.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), and 550(a), and other applicable law.

III.    **DEFENDANT AND RELEVANT NON-PARTIES**

18.     Defendant MLI is organized under the laws of the United Kingdom, and its

registered office and business address is 2 King Edward Street, London, United Kingdom EC1A

1HQ.  MLI is a broker and dealer in equity and fixed income securities, loans, and related financial

instruments.  At all times relevant to the allegations in the Amended Complaint, MLI was a wholly

owned subsidiary of ML & Co. and, as per Securities Exchange Commission ("SEC") filings, one

of ML & Co.'s "principal subsidiaries."  MLI is currently a wholly-owned subsidiary of the Bank

of America Corporation.

19.     Non-party ML & Co. was a Delaware corporation with its principal place of

business at 4 World Financial Center, New York, New York 10080.  At all times relevant to this

complaint, ML & Co. was a holding company that, through its numerous subsidiaries and affiliates,

provided financial products and services on a global basis.  ML & Co. and its subsidiaries operated

in over 35 countries, in the geographical regions of the United States, Latin America, Canada,

Pacific Rim, Europe, the Middle East, and Africa.  ML & Co. merged into Bank of America in

October 2013 and no longer exists as a separate legal entity.

20.     To the world, as was stated in ML & Co.'s Guidelines for Business Conduct, which

governs and applies to Merrill Lynch's businesses, "there [was] only one Merrill Lynch."  Merrill

Lynch was an integrated organization that was sub-divided into umbrella groups, which included,

as of 2006: (i) GMI, (ii) Global Private Client Group, and (iii) MLIM, which operated across

entities as a single corporate unit.  Merrill Lynch sought seamless integration of its groups not only

to serve its clients, but also to standardize procedures and share knowledge across the organization.

Each of these groups comprised employees from several Merrill Lynch entities, including MLI, as

well as executives and employees in New York, who communicated and shared information with

each other.

**IV.    PERSONAL JURISDICTION**

21.    MLI is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by undertaking significant commercial activities in New York including, among other things, knowingly directing funds through leveraged transactions to be invested with, and then redeemed from, BLMIS through the Fairfield Funds. By directing investments through the Fairfield Funds, MLI knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

22.    MLI derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

23.    MLI purposefully targeted the New York securities market by investing in the Fairfield Funds, knowing that their assets were managed and custodied by BLMIS in New York. During the relevant period, members of Merrill Lynch's GMI group, which included employees of MLI, along with other Merrill Lynch entities, including New York-based ML & Co., jointly created the various leveraged transactions through which MLI invested in the Fairfield Funds that are the subject of this action.

24.    In order to invest in the Fairfield Funds, MLI entered into subscription agreements that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of the New York courts.

25.    MLI also agreed in executing the subscription agreements, upon investing with Fairfield Sentry, that all subscription payments from MLI to Fairfield Sentry were required to be made in U.S. dollars and sent via Fedwire to Fairfield Sentry's HSBC bank account, located in

New York.  MLI directed funds to this New York-based HSBC bank account in connection with its investments in Fairfield Sentry.

26.    MLI maintained a bank account in New York through which it directed funds, in U.S. dollars, to be invested with or redeemed from BLMIS through Fairfield Sentry.  MLI's account at J.P. Morgan Chase in New York in the name of "MLI Equity Derivatives" received redemption payments for the Fairfield Sentry BLMIS transactions.

27.    MLI agreed when it executed the Fairfield Sentry subscription agreements that it had read and reviewed a copy of Fairfield Sentry's Private Placement Memorandum ("PPM"), which explained that FGG maintained accounts at BLMIS, a U.S. registered broker-dealer that utilized a strategy described as "split strike conversion," which involved the purchase of U.S. securities.

28.    The Fairfield Sentry PPMs, which MLI requested, received, and affirmed that it had received and read, explained that the SSC strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of "approximately 35-50 stocks in the S&P 100 Index," as well as "the sale of out-of-the-money S&P 100 Index call options" and the purchase of an equivalent number of "out-of-the-money S&P 100 Index put options."

29.    The tear sheets provided to MLI by FGG confirmed that the SSC strategy relied upon investments in the United States, reiterating that Fairfield Sentry's positions typically "consist[] of between 40 to 50 stocks in the S&P 100 Index."  Fairfield Sentry's Semi-Annual Update letters, which MLI also received, noted that the SSC strategy "entails the purchase of a basket of large-cap U.S. equities."

30.    MLI knew from the documents it received and reviewed from FGG that BLMIS maintained custody of its investments in Fairfield Sentry in New York.

31.     The Fairfield Sigma PPM, which MLI received and represented that it reviewed and read in its Sigma subscription agreement, contained similar representations regarding the SSC strategy and BLMIS's role as investment advisor, executing broker, and custodian.

32.     Aside from the PPMs, Merrill Lynch's due diligence team was well-aware of BLMIS's concentration of these three roles.  Merrill Lynch was "uncomfortable" with Madoff because it had never encountered a set up like this which flouted the industry "norm" as well as Merrill Lynch's own requirement that any investment sold to its customers have an independent clearinghouse and an independent custodian of investor funds.

33.     Beyond MLI's knowledge and understanding of BLMIS's structure and strategy, MLI also undertook purposeful acts aimed at New York and the United States regarding its investments in Fairfield Sentry and Fairfield Sigma through its communications with FGG in New York, including to Lauren Ross, a Director of Investor Relations, who was based in FGG's New York headquarters.  MLI regularly communicated directly with FGG in New York about its investments, the terms, and negotiations of draft letter agreements.  Ms. Ross is listed on many of MLI's subscription agreements as the person at Fairfield Greenwich Group with whom the MLI's subscriptions were associated.

34.     Within the communications between FGG and MLI, FGG's New York office provided MLI with substantial documentation about the Fairfield Funds and BLMIS's operations. Among the documents MLI received were:

- Tear Sheets representing BLMIS's historical monthly and yearly performance for 1990 through 2008;

- Semi-Annual Updates of BLMIS's performance and comparison to market indices between 1990 and 2008 and audited financials in connection with a due diligence call between MLI representatives and New York-based FGG employees;

- Weekly Fund Reports showing month-to-date performance of BLMIS and indicating that the fund type is split strike conversion;

- Monthly Fund Reports indicating BLMIS's performance and monthly rates of return;

- Prospectuses and offering memoranda that included information concerning BLMIS's strategy, BLMIS employees and their roles, and the operation of BLMIS's investment advisory and broker-dealer business segments;

- Fund presentations and marketing materials regarding BLMIS's strategy, rates of return, and comparisons of BLMIS rates of return over time to market indices;

- Historical NAV information; and

- Track records for Fairfield Sigma's and Fairfield Sentry's returns.

35.    Based on these documents, MLI knew the following facts indicating that they were transacting business in New York in connection with their investments in the Fairfield Funds:

- Fairfield Sentry invested substantially all of its assets with New York-based BLMIS, and Fairfield Sigma invested in Fairfield Sentry;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the SSC Strategy on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to

purportedly purchase, and when to make such purchases, were made by BLMIS in

New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

36.     MLI knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

37.     This Court has personal jurisdiction over MLI pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004.  MLI derived significant revenue from New York and has maintained minimum contacts with New York and the United States in connection with the claims alleged herein.  Thus, this Court has personal jurisdiction over MLI based on its contacts with the United States and New York.

## V.     BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

38.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

39.     In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

40. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

41. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

42. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

43. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B.    THE PONZI SCHEME

44.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

45.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

46.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

47.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

48.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

49.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

50.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

51.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

52.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

53.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

54.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

55.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

56.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

57.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

58.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

59.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

60.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

61.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

62.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at every year end and every quarter

end starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

63.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**BLMIS Execution**

64.     BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including MLI, would know it was statistically impossible.

**No Evidence of BLMIS Trading**

65.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

66.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**The Collapse of the Ponzi Scheme**

67.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

68.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none

of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through

its IA Business operated as a Ponzi scheme.

69.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.     RECOVERY OF SUBSEQUENT TRANSFERS TO MLI

### A.     Initial Transfers from BLMIS to Fairfield Sentry

70.     The Trustee commenced a separate adversary proceeding against Fairfield Sentry

and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv.

Pro. No. 09-01239, seeking to avoid and recover initial transfers of customer property from BLMIS

to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial

Transfers").

71.     By orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a

settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent

judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000

("Judgment Amount") [ECF No. 109].

72.     The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.

The Fairfield Sentry Initial Transfers were and continue to be customer property within the

meaning of SIPA § 78*lll*(4).

73.     On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield*

*Sentry Ltd.* proceeding ("Fairfield Second Amended Complaint") [ECF No. 286] seeking in part

recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry

of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

74.    As set forth in the Fairfield Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Fairfield Second Amended Complaint as if fully set forth herein, including without limitation paragraphs 1-10, 79-313, 315-16.

75.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years prior to the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

76.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code section 548 and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### B.    Subsequent Transfers from Fairfield Sentry to MLI

77.    In connection with the AA Securities products, Fairfield Sentry subsequently transferred prior to the Filing Date a portion of the Fairfield Sentry Initial Transfers to MLI (the "Fairfield Sentry-MLI Subsequent Transfers").  Based on the Trustee's investigation to date, the Fairfield Sentry-MLI Subsequent Transfers to MLI total $14,200,000, at least $3,000,000 of which was part of Merrill Lynch's "synthetic short" of the Fairfield Funds.  A chart setting forth the presently known Fairfield Sentry-MLI Subsequent Transfers is attached as Exhibit C.

78.     On December 8, 2010, the Trustee filed this action seeking recovery of subsequent transfers.

79.     The Fairfield Sentry-MLI Subsequent Transfers are recoverable from MLI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

80.     The Fairfield Sentry-MLI Subsequent Transfers represent a redemption of equity interests by MLI as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-MLI Subsequent Transfers to MLI upon redemption of MLI's interests.

**C.    Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to MLI**

81.     Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached as Exhibit D.

82.     Thereafter, Fairfield Sigma transferred at least $1,877,730 to MLI in connection with the AA Securities products (the "Fairfield Sigma-MLI Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma-MLI Subsequent Transfers is attached as Exhibit E.

83.     The Fairfield Sigma-MLI Subsequent Transfers are recoverable from MLI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

84.     The Fairfield Sigma-MLI Subsequent Transfers represent a redemption of equity interests by MLI as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma

was insolvent when it made the Fairfield Sigma-MLI Subsequent Transfers to MLI upon redemption of MLI's interests.

85.    The Fairfield Sentry-MLI Subsequent Transfers and the Fairfield Sigma-MLI Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

86.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed above, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE
## RECOVERY OF FAIRFIELD SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550(a)

87.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

88.    Each of the Fairfield Subsequent Transfers is recoverable from MLI under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

89.    MLI is an immediate or mediate transferee of the Fairfield Subsequent Transfers from Fairfield Sentry and Fairfield Sigma.

90.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against MLI: (a) recovering the Fairfield Subsequent Transfers, or the value thereof, from MLI for the benefit of the estate of BLMIS; and (b) awarding any other relief the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against MLI as follows:

a)    Recovering the Fairfield Subsequent Transfers, or the value thereof, from MLI for the benefit of the estate;

b)      If MLI challenges the avoidability of the Fairfield Sentry Initial Transfers, the

Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are

avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551

of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as

necessary to recover the Fairfield Subsequent Transfers pursuant to Bankruptcy Code § 550(a)

and (b) and 15 U.S.C. § 78fff-2(c)(3);

c)      Awarding the Trustee prejudgment interest from the date on which the Fairfield

Subsequent Transfers were received by MLI; and

d)      Awarding the Trustee fees and all applicable costs and disbursements, and such

other, further, and different relief as the Court deems just, proper, and equitable.

Dated: August 19, 2022
      New York, New York

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Carrie A. Longstaff
Email: clongstaff@bakerlaw.com
Peter B. Shapiro
Email: pshapiro@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Chapter
7 Estate of Bernard L. Madoff*