**LATHAM & WATKINS LLP**
Christopher R. Harris
Thomas J. Giblin
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for ABN Ireland*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-05355 (CGM) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK (IRELAND), LTD, (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and | |
| ABN AMRO CUSTODIAL SERVICES (IRELAND), LTD (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF ABN IRELAND'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .........................................................................................................4

    A.    Overview...........................................................................................4

    B.    ABN Ireland......................................................................................5

    C.    The Transfers ....................................................................................5

    D.    The Fraud Allegations..........................................................................7

        1.    Madoff's Ponzi Scheme ...............................................................7

        2.    Tremont ...................................................................................7

        3.    ABN Ireland's Due Diligence........................................................7

        4.    Non-Party Affiliates' Due Diligence ...............................................9

    E.    The Adversary Proceeding and Prior Decisions ....................................10

LEGAL STANDARD...................................................................................................12

ARGUMENT ..............................................................................................................13

    A.    The Trustee Cannot Recover the Subsequent Transfers Because He Has Not Alleged that the Initial Transfers Are Avoidable.............................13

        1.    The Statutory Safe Harbors Bar Avoidance of the Initial Transfers Under Section 544 Section 548(a)(1)(B) ..................................13

            **a.**    The Initial Transfers Are Protected by 11 U.S.C. § 546(g)...........13

            **b.**    The Initial Transfers Are Protected by 11 U.S.C. § 546(e)...........16

                (1)    The Initial Transfers Were Made By, To and For the Benefit of Covered Entities.............................................16

                (2)    The Transfers Were Made in Connection with BLMIS-Tremont Contracts, Which Are Securities Contracts ..............................................................18

                (3)    Neither ABN Ireland Nor the Rye Funds Had Actual Knowledge of the BLMIS Fraud...........................18

i

2.      The Trustee Has Not Shown that the Initial Transfers Were Made
        with Actual Intent to Hinder, Delay, or Defraud ......................................21

B.      The Subsequent Transfers Cannot Be Recovered Because the Complaint
        Pleads that Defendants Received the Transfers in Good Faith and for
        Value ............................................................................................................27

        1.      The Transfers Were For Value ..................................................................27

        2.      The Transfers Were Received in Good Faith ...........................................28

                a.      ABN Ireland Was Not on Inquiry Notice ......................................29

                        (1)     The Facts Known to ABN Ireland Would Not Have
                                Put a Reasonable Investor on Inquiry Notice ...................29

                        (2)     The Facts Known to Non-Parties Were Not from the
                                Relevant Time Period and Would Not Have Put a
                                Reasonable Investor on Inquiry Notice Regardless ..........31

                b.      ABN Ireland Conducted Due Diligence that Far Exceeded a
                        "Reasonably Diligent Inquiry" ......................................................33

        3.      The Transfers Were Received Without Knowledge of Voidability ..........37

C.      The Trustee May Not Recover $95.5 Million Because the Initial Transfers
        Did Not Occur Within the Two-Year Statutory Period under §
        548(a)(1)(A) .................................................................................................38

D.      The Complaint Should Be Dismissed with Prejudice ...........................................40

CONCLUSION ....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
2006 WL 1206333 (S.D.N.Y. May 2, 2006) ...................................................20, 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................12

*In re Bernard L. Madoff Inv. Secs. LLC*,
654 F.3d 229 (2d Cir. 2011).....................................................................................22

*In re Bernard L. Madoff Inv. Secs. LLC (In re BLMIS)*,
2022 WL 1304589 (S.D.N.Y. May 2, 2022) ......................................12, 27, 29, 31

*Bombardier Cap., Inc. v. Naske Air GmbH*,
2003 WL 22137989 (S.D.N.Y. Sept. 17, 2003)......................................................24

*Bos. Trading Grp., Inc. v. Burnazos*,
835 F.2d 1504 (1st Cir. 1987)..................................................................................23

*CCEC Asset Mgmt. v. Chem. Bank*,
175 B.R. 629 (Bankr. N.D. Tex. 1994).....................................................................30

*CLC Creditors' Grantor Tr. v. Howard Sav. Bank (In re Com. Loan Corp.)*,
396 B.R. 730 (Bankr. N.D. Ill. 2008) ......................................................................28

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)......................................................................................40

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013)...........................................32, 35, 36

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
333 B.R. 205 (Bankr. S.D.N.Y. 2005)......................................................................27

*Finn v. All. Bank*,
860 N.W.2d 638 (Minn. 2015).................................................................................25

*Henry v. Lehman Com. Paper, Inc. (In re First All. Mortg. Co.)*,
471 F.3d 977 (9th Cir. 2006) ...................................................................................23

*Jones v. Bock*,
   549 U.S. 199 (2007)..................................................................................................12, 27

*In re Kaiser*,
   722 F.2d 1574 (2d Cir. 1983).............................................................................................26

*Lefebvre v. Morgan*,
   234 F. Supp. 3d 445 (S.D.N.Y. 2017)...............................................................................40

*Mendelsohn v. Jacobowitz (In re Jacobs)*,
   394 B.R. 646 (Bankr. E.D.N.Y. 2008)...............................................................................26

*Meoli v. Huntington Nat'l Bank*,
   848 F.3d 716 (6th Cir. 2017) .......................................................................................29, 32

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
   747 F. Supp. 2d 406 (S.D.N.Y. 2010)...............................................................................37

*New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*,
   2008 WL 2115225 (S.D.N.Y. May 16, 2008) ...................................................................26

*Majad ex rel. Nokia Ret. Sav. and Inv. Plan v. Nokia, Inc.*,
   528 F. App'x 52 (2d Cir. 2013) .........................................................................................31

*Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
   322 F.3d 147 (2d Cir. 2003)..............................................................................................12

*Picard v. ABN AMRO Bank (Ireland) Ltd. et al.*,
   2020 WL 401822 (S.D.N.Y. Jan. 23, 2020) ............................................................ *passim*

*Picard v. ABN AMRO Bank (Ireland) Ltd. et al.*,
   505 B.R. 135 (S.D.N.Y. 2013).................................................................................. *passim*

*Picard v. Avellino*,
   557 B.R. 89 (S.D.N.Y. 2016).............................................................................................32

*Picard v. Citibank, N.A.*,
   12 F.4th 171 (2d Cir. 2021) ...................................................................................... *passim*

*Picard v. Fairfield Pagma Assocs.*,
   2022 WL 1110560 (Bankr. S.D.N.Y. Apr. 13, 2022).........................................................22

*Picard v. Fishman*,
   773 F.3d 411 (2d Cir. 2014)................................................................................15, 17, 18

*Picard v. Gettinger*,
   976 F.3d 184 (2d Cir. 2020)..............................................................................................24

*Picard v. Goodman*,
   2022 WL 2015662 (Bankr. S.D.N.Y. June 6, 2022)................................................22

*Picard v. Legacy Cap. Ltd. (In re Bernard L. Madoff Inv. Secs. LLC Litig.)*,
   548 B.R. 13 (Bankr. S.D.N.Y. 2016) ......................................................................32

*Picard v. Miller*,
   631 B.R. 1 (Bankr. S.D.N.Y. 2021) ........................................................................22

*Picard v. Multi-Strategy Fund Ltd.*,
   2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022)..........................12, 13, 19, 20

*Picard v. Shapiro*,
   542 B.R. 100 (Bankr. S.D.N.Y. 2015)......................................................................38

*Redmond v. Brooke Holdings, Inc. (In re Brooke Corp.)*,
   515 B.R. 632 (Bankr. D. Kan. 2014) .......................................................................28

*Rezzonico v. H & R Block., Inc.*,
   182 F.3d 144 (2d Cir. 1999).....................................................................................14

*Rice v. Intercept Pharms., Inc.*,
   2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .............................................................6

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..........................................................18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
   476 B.R. 715 (S.D.N.Y. 2012)...................................................................15, 17, 18

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005).......................................................................... *passim*

*SIPC v. BLMIS (In re Madoff Sec.)*,
   2012 WL 13041475 (S.D.N.Y. May 15, 2012) ........................................................10

*SIPC v. BLMIS (In re Madoff Sec.)*,
   516 B.R. 18 (S.D.N.Y. 2014)....................................................................................11

*In re Unified Com. Cap., Inc.*,
   260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd sub nom.*, 2002 WL 32500567
   (W.D.N.Y. June 21, 2002) ..................................................................................24, 25

*Union Bank v. Wolas*,
   502 U.S. 151 (1991).................................................................................................23

*United States v. GAF Corp.*,
   928 F.2d 1253 (2d Cir. 1991).....................................................................................8

*United States v. Ticchiarelli*,
  171 F.3d 24 (1st Cir. 1999) ............................................................................27

*Universal Home Improvement, Inc. v. Robertson*,
  51 Cal. App. 5th 116 (2020) ..........................................................................23

*In re Verestar, Inc.*,
  343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...........................................................12

## STATUTES

11 U.S.C.
  § 101(22A)(A) ...........................................................................................15, 17
  § 101(53A)(B) ..................................................................................................17
  § 544 ...........................................................................................3, 11, 13, 16
  § 546(e) ...............................................................................................*passim*
  § 546(g) ...............................................................................................*passim*
  § 548 .............................................................................................................13, 23
  § 548(a)(1)(A) ......................................................................................*passim*
  § 548(a)(1)(B) ....................................................................................3, 11, 13
  § 548(a)(A) ...................................................................................................38
  § 550(a) ....................................................................................................11, 13
  § 550(b) ...............................................................................................*passim*
  § 550(b)(1) ...................................................................................................38

15 U.S.C. § 78fff-2(c)(3) .......................................................................21, 22

## RULES

Fed. R. Bankr. P. 2004 .........................................................................8, 10, 40

Fed. R. Civ. P. 9(b) ......................................................................12, 21, 24, 26

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* ¶ 550.03[1] (Richard Levin & Henry J. Sommer eds.,
  16th ed. 2019) ..............................................................................................27

Defendants ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) (n/k/a ABN AMRO Retained Custodial Services (Ireland) Limited) ("ABN Bank") and ABN AMRO Custodial Services (Ireland) Limited (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("ABN Custodial" and together with ABN Bank, "ABN Ireland") respectfully submit this memorandum of law in support of ABN Ireland's motion to dismiss the Second Amended Complaint. ECF No. 205 ("Complaint" or "SAC").

## PRELIMINARY STATEMENT

This case is quite different from those (which all involve unrelated defendants) that this Court has ruled on in recent months and weeks, both factually and because of the existing decisions specific to this case. Factually, the transaction at issue here was a bespoke, complicated swap transaction designed to benefit a particular investment fund and several of its affiliates—without investing in BLMIS—which is thus very different from the cases about entities who received subsequent transfers for their own profit. And legally, this Court and the District Court have already decided or addressed many of the critical issues here, which dictate dismissal.

Pursuant to the swap transaction at issue here, $235.5 million of the $265.5 million the Trustee seeks to recover was collateral, posted by Rye Select Broad Market XL Fund ("Rye XL") in exchange for ABN Ireland's agreement to pay Rye XL a synthetic return designed to simulate the return generated by a different fund, Rye Select Broad Market L.P. (the "Broad Market Fund"), which was invested in BLMIS. ABN Ireland then hedged its exposure to the Rye XL swap— prudently it seemed at the time to a party with no suspicions of fraud, disastrously in retrospect— by investing directly in the Broad Market Fund. After Madoff's scheme collapsed, ABN Ireland retained that collateral in an attempt to stanch its losses on the hedge, recovering merely a fraction of the over $700 million that it had invested in the Broad Market Fund. The remaining $30 million of the $265.5 million at issue was a redemption from its hedge; as Judge Rakoff has previously

1

found, the redemption was not an attempt by ABN Ireland to take profit, but the result of a contractual requirement to downsize the hedge when Rye XL downsized its swap position.

The swap transaction serves to set this case apart from the many others that this Court has decided, because ABN Ireland's decision to hedge the swap transaction required it to put hundreds of millions of dollars of its own money at risk, with no investment upside (other than a relatively tiny service fee); it was merely a hedge to mirror the risk on the swap. This massive investment alone is evidence of ABN Ireland's good faith belief that BLMIS was a sound investment manager who was investing in securities. In addition, the Complaint (in part by incorporating documents produced in pre-complaint discovery) alleges numerous facts of which ABN Ireland was aware, which *confirm* that it lacked any reasonable notice that BLMIS was a fraud. Moreover, the Complaint also alleges that ABN Ireland conducted extensive and thorough due diligence that far exceeded a "reasonable inquiry" into Rye XL and its affiliates, including into BLMIS's role as their investment manager. These detailed factual allegations are unique and establish that ABN Ireland obtained the collateral and redemption in good faith.

In addition to these factual distinctions, the long procedural history of this unique case means that many factual findings and legal conclusions have already been reached. These include:

- That the safe harbor for swap transactions set forth in 11 U.S.C. § 546(g) prevents the Trustee from recovering the $30 million redemption that ABN Ireland received, except to the extent that the initial transfer was made with the actual intent to hinder, defraud, or delay creditors. *Picard v. ABN AMRO Bank (Ireland) Ltd. et al.*, 505 B.R. 135, 150 (S.D.N.Y. 2013) ("*Rakoff Op.*").

- That all initial transfers were in connection with a swap transaction, and that the initial transfer of the $235.5 million in collateral was for the benefit of the Rye Select Broad Market Prime Fund ("Prime Fund" and together with the Broad Market Fund and Rye XL Fund, the "Rye Funds"). *Id.* at 147-48.

- That ABN Ireland did not have actual knowledge that BLMIS was not trading securities. *Picard v. ABN AMRO Bank (Ireland) Ltd. et al.,* 2020 WL 401822, at *12 (S.D.N.Y. Jan. 23, 2020) ("*Bernstein Op.*").

2

- That "[f]ar from turning a blind eye to Madoff's fraud, [ABN Ireland] performed due diligence when working on transactions involving Madoff and BLMIS . . . and ultimately, put its money where its mouth was by investing $470 million of its own funds[.]" *Id.* at *16.

- That ABN Ireland received both sets of transfers—the $235.5 million in collateral and the $30 million redemption—"for value" for the purposes of 11 U.S.C. § 550(b). *Id.* at *4.

In light of the above, the Trustee's attempt to recover these funds cannot survive the pleading stage. For one, the Trustee cannot recover the subsequent transfers (to ABN Ireland) because the initial transfers are not avoidable. They are not avoidable under Section 544 (for state law avoidance claims) or Section 548(a)(1)(B) (for constructively fraudulent transfers) due to the safe harbors available to swap transactions and securities contracts pursuant to Sections 546(g) and 546(e), respectively. And they are not avoidable as actual fraudulent transfers under Section 548(a)(1)(A) because the Trustee has not pleaded, and likely cannot plead, that BLMIS made any of the transfers with actual intent to defraud, hinder, or delay, as that provision requires. Instead, he has relied solely on a legal doctrine—the so-called Ponzi scheme presumption—which has never been adopted by the Second Circuit, the validity of which has been directly questioned, and which even under its own logic should not be applied to the facts here.

Even if the Trustee could establish that the initial transfers are avoidable, the subsequent transfers are not recoverable because his Complaint, including the documents incorporated by reference within it, establishes on its face that ABN Ireland received the transfers for value, in good faith, and without knowledge of Madoff's fraud—entitling ABN Ireland to a full dismissal under 11 U.S.C. § 550(b). The Complaint demonstrates beyond doubt that the facts known to ABN Ireland and its affiliates would not have put a reasonable person on inquiry notice, as the Second Circuit's recent *Citibank* decision requires. The documents incorporated into the Complaint establish in great detail the facts of which ABN Ireland was aware, and which indicated

3

that BLMIS was a legitimate venture with a credible basis for its returns. And even if ABN Ireland had been on inquiry notice of the Ponzi scheme, the Complaint alleges in painstaking detail the extended, searching due diligence that ABN Ireland conducted into the Rye Funds and BLMIS itself; even a fraction of that diligence could be considered a "reasonable inquiry" and, under *Citibank*, entitles ABN Ireland to the protections of Section 550(b) even at the pleading stage.

Finally, even if the initial transfers were avoidable under Section 548(a)(1)(A) and the subsequent transfers were not protected by Section 550(b), $95.5 million of them cannot have come from initial transfers within the two-year lookback period and so are not recoverable. This flaw is different from the argument raised in other defendants' motions to dismiss that an initial transferee's funds did not originate from BLMIS. Although the funds may have all come from BLMIS, the flaw here is that the Complaint establishes that not enough came from BLMIS *after December 11, 2006* and *before* the relevant subsequent transfers.

For these reasons and those that follow, the Complaint should be dismissed, with prejudice.

## **BACKGROUND**

### A.    Overview

This action stems from the efforts of Irving H. Picard (the "Trustee"), as Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), to recover funds that allegedly came from BLMIS. ABN Ireland, like other BLMIS investors, suffered extensive losses upon BLMIS's collapse. As detailed in the Complaint, ABN Ireland has only recovered a portion —approximately 51%—of the over $700 million that it invested in the transaction at issue, making ABN Ireland among the biggest losers from the BLMIS scheme. SAC ¶¶ 216-18.

Nevertheless, the Trustee seeks to recover $265.5 million in subsequent transfers from ABN Ireland. The Trustee alleges that those funds originated with BLMIS before being transferred to ABN Ireland from two funds—$30 million from the Broad Market Fund, which allegedly

4

received that amount from BLMIS, and $235.5 million from the Rye XL Fund, which itself received the funds at issue from the Broad Market Fund and the Prime Fund, which allegedly received that amount from BLMIS.  SAC ¶¶ 2, 267.  The Rye Funds were operated by Tremont Partners, Inc. ("Tremont").  SAC ¶ 2.  ABN Ireland did not directly invest with or receive funds from BLMIS.  *See generally* SAC.

### B.   ABN Ireland

Defendant ABN Bank is an Irish incorporated, subsidiary of ABN AMRO Bank N.V., and operated as Fortis Prime Fund Solutions Bank (Ireland) Limited at all times relevant to the Complaint.  SAC ¶ 78.  Defendant ABN Custodial is also an Irish incorporated, subsidiary of ABN AMRO Bank N.V., and operated as Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd. at all times relevant to the Complaint.  SAC ¶ 79.  Both were entities within the Fortis Bank (Nederland) N.V. corporate structure until that entity merged with ABN AMRO Bank N.V. in 2010.  Although ABN Bank and ABN Custodial were only two of many distinct corporate entities within the Fortis corporate family, the Complaint frequently refers to "Fortis" without distinguishing between the many distinct corporate entities.  *See generally* SAC.

### C.   The Transfers

In 2006, ABN Ireland began discussing a proposed swap transaction with Tremont (the "Swap Transaction").  SAC ¶ 166.  The Rye XL Fund was an investment fund designed to deliver a synthetic return equal to three times the returns of the Broad Market Fund (which had invested all of its assets with BLMIS) without directly investing in BLMIS.  *See* SAC ¶¶ 90, 166, 193-96 (detailing the mechanism and structure of the Swap Transaction).  Under the terms of the Swap Transaction, the Rye XL Fund would deposit collateral with ABN Ireland and ABN Ireland would pay the Rye XL Fund a synthetic return equal to three times the returns that the collateral would have generated had it been invested in the Broad Market Fund instead.  SAC ¶ 193.  To hedge its

exposure, *i.e.* to generate returns exactly equal to its payment obligations to the Rye XL Fund, ABN Ireland invested in the Broad Market Fund itself, in the amount of three times the collateral it received from the Rye XL Fund. SAC ¶ 195. To state the obvious, if ABN Ireland knew BLMIS were a Ponzi scheme doomed to collapse, not only would there be no need to hedge the returns to the Rye XL Fund—because there would be no returns—the hedge itself would have been considered a disastrous investment rather than an economically safe risk management strategy and thus would never have taken place.

In exchange for providing this return to the Rye XL Fund, ABN Ireland received a service fee of 90 basis points over LIBOR; at the time of the swap, it was estimated that the maximum annual return would be about $2.25 million per year. Giblin Decl., Exhibit A, Credit Application Dated Nov. 16, 2006 ("Credit App.") at 3;[1] SAC ¶ 194.

The Rye XL Fund initially provided $10 million in collateral, but that amount grew to $235.5 million by May 2008. SAC ¶ 265. To maintain its hedge, ABN Ireland increased its investment in the Broad Market Fund to three times that amount, or $706.5 million ($471 million net of the collateral). *See* SAC ¶¶ 198, 200, 265, 267. In July 2008, ABN Ireland redeemed $30 million of its investment in the Broad Market Fund (SAC ¶ 260), as a contractually-required reduction triggered when the Rye XL Fund reduced its collateral with ABN Ireland by $10 million. *See Rakoff Op.*, 505 B.R. at 146-47.

---

[1] The Court may properly consider this Credit Application—and other documents the Trustee relies on in the Complaint—on a motion to dismiss, as the Trustee has incorporated it into the Complaint by reference. *See Rice v. Intercept Pharms., Inc.*, 2022 WL 837114, at *4 (S.D.N.Y. Mar. 21, 2022) ("[T]he Second Circuit has long held that a complaint is deemed to include any . . . statements or documents incorporated in it by reference, and that a court may consider documents incorporated in a complaint by reference on a motion [to dismiss]").

### D.    The Fraud Allegations

In support of its claim to recover these transfers, the Complaint asserts certain fraud allegations, focused primarily on Madoff, Tremont, and certain other non-parties.  Tellingly, the Complaint offers few allegations in any way linking ABN Ireland to knowledge of the purported fraud.

#### 1.    Madoff's Ponzi Scheme

As alleged in the Complaint, BLMIS was founded by Bernie Madoff around 1960.  SAC ¶ 47.  Madoff claimed that the consistent success of his BLMIS investment advisory business was due to the "split-strike conversion strategy" and the "convertible arbitrage strategy" he purportedly employed.  SAC ¶ 57.  But beginning in at least 1992, BLMIS falsified its customer records and monthly statements.  SAC ¶ 60.  In reality, BLMIS operated as a Ponzi scheme.  SAC ¶¶ 75-76.  BLMIS was allegedly insolvent at all relevant times.  SAC ¶ 77.

#### 2.    Tremont

The Complaint is replete with allegations that Tremont *should have been* aware of BLMIS's fraud.  But most of the allegations are based on a handful of complaints from individual investors (not Tremont personnel), and none specifically suggest that any fraud was occurring at BLMIS.  Instead, the allegations mainly concern BLMIS's lack of transparency and Tremont's lack of thorough due diligence on BLMIS.  *See, e.g.*, SAC ¶¶ 273-74, 279, 289, 292.  The Trustee does not allege that the Rye Funds had actual knowledge of BLMIS's fraud.  *See* SAC ¶¶ 268-332.

#### 3.    ABN Ireland's Due Diligence

With regard to ABN Ireland, the Trustee essentially alleges that ABN Ireland inferred, or should have inferred, the existence of the fraud because it was a "[s]ophisticated or professional investor[]" (SAC ¶ 67), and because it built certain protections into the Swap Transaction (SAC ¶¶ 190-219).  But the documents incorporated into the Complaint actually show that ABN Ireland

had investigated BLMIS and concluded based on that investigation that it was trading in securities. ABN Ireland performed extensive due diligence in the late summer and fall of 2006 in connection with the Swap Transaction, which included obtaining information "about Tremont and BLMIS from Tremont employees in New York," reviewing "private placement memoranda [provided by Tremont] for Broad Market Fund and Rye XL Fund," and requiring Tremont to complete a "[due diligence questionnaire] on Madoff's operations . . . ."  SAC ¶¶ 166, 168, 173, 175.  That diligence culminated in the submission of a Credit Application in November 2006 to Fortis's Central Credit Committee for approval of the Swap Transaction.  SAC ¶¶ 166-68, 176.  The Credit Application set forth many reasons that the Swap Transaction represented a safe investment, not least of which was that "[t]he performance of Madoff and ultimately the Master Fund is regarded as sustainable" and that Madoff's "chosen strategy . . . has consistently performed."  Ex. A, Credit App. at 3-4; *see also Bernstein Op.*, 2020 WL 401822, at *16.

A few months later (and still prior to the entry of the Swap Transaction), on January 18, 2007, non-party Fortis Prime Fund Solutions USA ("Fortis USA") submitted a Memorandum to the same Credit Committee that evaluated the Swap Transaction, seeking to increase Fortis's "limit for exposure to [BLMIS's] investment strategy[.]"  *See* Giblin Decl., Exhibit B, Credit Committee Memorandum Dated Jan. 18, 2007 ("Credit Comm. Memo.") at 1.[2]  That Credit Committee

---

[2] The Court may consider the Credit Committee Memorandum here because:  (1) the Trustee directly quoted from it in both of his prior complaints, *see* ECF No. 1 ¶¶ 91-94, 97; ECF No. 42 ¶¶ 92, 94-97, the allegations in which remain a binding party admission and appropriate for the Court's consideration, *see United States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991); (2) it is incorporated by reference in the Complaint as among the "memoranda and background materials required to seek numerous levels of corporate approval for the transactions with Tremont's BLMIS Feeder Funds," SAC ¶ 230; (3) it is also incorporated by reference as a summary of the 2006 due diligence that the Trustee references throughout his Complaint as having been presented to Fortis's Central Credit Committee, *see, e.g.*, SAC ¶¶ 18, 232, 237; and (4) it was produced to the Trustee in pre-complaint Rule 2004 discovery, *see* § E, *infra*.

Memorandum described in detail Fortis USA's understanding as to how Madoff's split strike conversation strategy worked, concluded that "there is a clearly discernable basis for the viability of Madoff's investment strategy over time[,]" and recommended approving a $1.5 billion exposure to Madoff. *Id.* at 2.

### 4.    Non-Party Affiliates' Due Diligence

Because the Trustee cannot allege that ABN Ireland was on notice of BLMIS's scheme, the Trustee tacks on allegations about non-party affiliates of its then-parent, Fortis, that date back years before the Swap Transaction. SAC ¶¶ 224-242. But not only are these allegations from an irrelevant time period, but they also fail to show that any of these non-parties (or ABN Ireland) were on notice of the fraud.

For example, the Trustee discusses a 2003 memorandum prepared by non-party MeesPierson, an investment bank acquired by Fortis in 1997. But that memorandum ultimately concluded that BLMIS was an "impressive" organization that could not "afford missteps" and was "regulated from every side." Giblin Decl., Exhibit C MeesPierson Memorandum Dated May 15, 2003 (the "Mees Memo") at 3.

The Trustee also alleges that Mark Geene, an employee of Fortis Multi-Management— another non-party, established as a successor entity to MeesPierson's investment arm in 2006 and legally separate from ABN Ireland—met with, and posed probing questions to, senior Tremont personnel. Those personnel answered Geene's inquiries and provided him with a "due diligence questionnaire" on Madoff in response. SAC ¶ 153. The Trustee raises comparable allegations regarding Cadogan, a non-party entity that was a Fortis "business partner" at the relevant time.[3] SAC ¶ 157. While the Trustee claims that Cadogan had "independently identified numerous red

---

[3] Fortis purchased a 70% interest in Cadogan in November 2006. SAC ¶ 158.

flags of fraud at BLMIS," the Trustee admits that Cadogan identified those "red flags" "[p]rior to partnering with Fortis Multi-Management," in November 2006. SAC ¶ 158-59.

The Trustee also highlights certain emails exchanged by various employees of other, legally separate, non-party Fortis entities that were concerned with trade ticket verification, but never suggested that BLMIS was not actually trading securities. SAC ¶¶ 103, 114, 126.

### E.    The Adversary Proceeding and Prior Decisions

The Trustee chose to expressly cite, or otherwise incorporate by reference, all of the documents cited above in his Complaint, and nearly all were produced to the Trustee by two non-party affiliates of ABN Ireland, Fortis USA and Fortis Prime Fund Solutions (USA) LLC, pursuant to Federal Rule of Bankruptcy 2004. In total, Fortis entities produced 1,444 documents exceeding 18,000 pages, including internal emails, risk reports, spreadsheets, and memoranda analyzing investments with BLMIS and various feeder funds (including the Rye Funds), before the Trustee initiated this adversary proceeding against ABN Ireland in 2010. ECF No. 1; *see also* ECF No. 134 at 3-4 (summarizing Rule 2004 discovery).

In 2012, the District Court (Judge Rakoff) withdrew the reference to the Bankruptcy Court to determine several threshold legal issues, including whether Section 546(g) of the Bankruptcy Code prevented the Trustee from recovering against ABN Ireland, and whether "SIPA and other securities laws alter the standard that the Trustee must meet in order to show that the defendants did not receive transfers in 'good faith.'" *SIPC v. BLMIS (In re Madoff Sec.)*, 2012 WL 13041475, at *2-3 (S.D.N.Y. May 15, 2012). Judge Rakoff held that: all of the initial transfers were "in connection with" the Swap Transaction; that the $30 million redemption was for the benefit of ABN Ireland, which was a financial participant such that the redemption was protected by Section 546(g); and that the $235 million collateral was for the benefit of the Prime Fund, while noting that ABN Ireland had not raised whether Prime Find was a financial participant. *Rakoff Op.*, 505

B.R. at 150.  This decision has not been appealed.  In a later decision, he held that the Trustee in a

SIPA proceeding has the burden to plead lack of good faith and, to meet that standard, the Trustee

must plausibly allege that the defendant in question was willfully blind to Madoff's fraud.  *See*

*SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 21-24 (S.D.N.Y. 2014).  He then returned this

case to the Bankruptcy Court for further proceedings.  Thereafter, the Trustee moved for leave to

file his Second Amended Complaint.  ECF No. 165.  Applying Judge Rakoff's ruling on "good

faith," Judge Bernstein denied leave to amend in January 2020.  *Bernstein Op.*, 2020 WL 401822,

at *16.  The parties stipulated to dismissal and the Trustee appealed to the District Court.

Contemporaneously, the Trustee also appealed cases against Citibank, N.A. and Legacy

Capital Ltd. on the grounds that that the District Court and Bankruptcy Court had applied the

wrong standard for the "good faith" defense.  Following the Second Circuit's decision in that case,

the Trustee sought to vacate Judge Bernstein's January 23, 2020 opinion and remand this case to

the bankruptcy court.  *In Re: Bernard L. Madoff Investment Securities* LLC, No. 20-cv-02586

(S.D.N.Y.), ECF No. 31.  The District Court (Judge McMahon) granted the Trustee's request on

May 2, 2022.  *Id.*, ECF No. 35.

The Trustee filed the SAC on June 17, 2022.  *See* ECF No. 205.  There are two sets of

transfers at issue that occurred shortly before Madoff collapsed:  (1) a $30 million redemption,

(SAC ¶ 260), and (2) the $235.5 million of collateral that ABN Ireland obtained, (*id.* ¶ 265).  The

Trustee seeks to recover both sets of transfers pursuant to 11 U.S.C. § 550(a), on the basis that

they are subject to avoidance as actually fraudulent transfers under 11 U.S.C. § 548(a)(1)(A), as

constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), and as fraudulent transfers

under New York state law, pursuant to 11 U.S.C. § 544.  *See id.* ¶¶ 339, 345 (alleging that initial

transfers were avoidable "under Sections 544 and 548 of the Bankruptcy Code").

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must contain factual allegations sufficient, when accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. The factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The Trustee's claim under Section 548(a)(1)(A) for actual fraud, pursuant to Section 550, must be pleaded under the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Picard v. Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *6 (Bankr. S.D.N.Y. June 13, 2022) (Morris, J.). Under Rule 9(b), "conclusory allegations that do not evidence fraudulent intent with respect to the specific transfers challenged do not suffice," even if "combined with . . . allegations [about] an alleged overall pattern of inappropriate transfers." *In re Verestar, Inc.*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006).

Finally, although receipt in good faith and for value is an affirmative defense on which a defendant bears the burden, *see In re Bernard L. Madoff Inv. Secs. LLC (In re BLMIS)*, 2022 WL 1304589, at *2 (S.D.N.Y. May 2, 2022), like all affirmative defenses, it can be established from the face of the complaint if the Trustee has "plead[ed] himself out of court." *Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 215 (2007) (a case may be dismissed if an affirmative defense appears on the face of the complaint).

## <u>ARGUMENT</u>

**A.      The Trustee Cannot Recover the Subsequent Transfers Because He Has Not Alleged that the Initial Transfers Are Avoidable**

Section 550(a) permits recovery from an "immediate or mediate transferee" only to the extent the initial transfer is avoidable under other sections of the Bankruptcy Code. *See* 11. U.S.C. § 550(a).  The Trustee may not recover any portion of the $265.5 million he seeks here, because avoidance under Section 544 and 548(a)(1)(B) is barred by statutory safe harbors and because he has not adequately alleged that that the initial transfers were avoidable pursuant to Section 548(a)(1)(A) of the Code.  The Complaint must be dismissed for this reason alone.

**1.      The Statutory Safe Harbors Bar Avoidance of the Initial Transfers Under Section 544 Section 548(a)(1)(B)**

The initial transfers are not avoidable under Bankruptcy Code Section 544 (pursuant to New York law) or under Section 548(a)(1)(B) (as constructive fraudulent transfers) because of the statutory safe harbors that Congress passed to prevent against the unwinding of swap transactions and securities contracts, codified in 11 U.S.C. §§ 546(g) and (e), respectively.  ABN Ireland, as a subsequent transferee, can raise the safe harbor defenses at the motion to dismiss stage, even if the initial transferee has not done so.  *See Multi-Strategy Fund*, 2022 WL 2137073, at *8 ("where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers . . . the subsequent transferee is entitled to raise a § 546(e) defense against recovery of those funds") (citation omitted).

**a.      The Initial Transfers Are Protected by 11 U.S.C. § 546(g)**

The safe harbor established in 11 U.S.C. § 546(g) prohibits avoidance of these transfers under Section 544 or as a constructive fraudulent conveyance under Section 548.  The safe harbor provides that, "[n]otwithstanding sections 544 . . . 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial

participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(g).

The application of the safe harbor to the $30 million redemption from Broad Market Fund to ABN Ireland is no longer in dispute. In his February 15, 2013 order (as restated in a written decision on December 26, 2013), Judge Rakoff specifically considered the $30 million redemption at issue here, and held "that section 546(g)'s safe harbor protects the redemption payments . . . from recovery to the extent they cannot be avoided under section 548(a)(1)(A)." *Rakoff Op.*, 505 B.R. at 150. That holding is binding, and this Court cannot "reconsider on remand an issue decided by an appellate court." *Rezzonico v. H & R Block., Inc.*, 182 F.3d 144, 148-49 (2d Cir. 1999) (citation omitted).

In the same opinion, Judge Rakoff also held that the initial transfers of the $235.5 million in collateral had been transferred from BLMIS to the Rye Funds "'in connection with' swap agreements," *Rakoff Op.*, 505 B.R. at 147-48, and "for the benefit" of the Prime Fund, which "withdrew money from [its] Madoff Securities accounts in order to benefit [itself] by receiving leveraged returns on [its] assets" in the swap transaction. *Id.* at 150. These holdings, too, are binding. In that motion ABN Ireland did not raise the issue of whether the Prime Fund was a "financial participant" for purposes of the safe harbor and so Judge Rakoff did not decide whether it was. ABN Ireland is doing so now, and the answer is that the Prime Fund was clearly a financial participant.

The Bankruptcy Code defines "financial participant" as an entity that has security agreements, swaps, and certain other "agreements or transactions with a debtor or any other entity . . . of not less than $100,000,000 in notional or actual principal amount outstanding (aggregated across counterparties)" or "gross mark-to-market positions" of the same amount "on any day

14

during the 15-month period preceding" the petition date.  11 U.S.C. § 101(22A)(A).  Here, the

Prime Fund held an account with BLMIS.  SAC ¶ 88.  As the Trustee explains in his complaint

against Tremont, which he purports to incorporate by reference into the Complaint here, (SAC

¶ 268):  "[F]or each Rye Fund Account, Tremont executed a Customer Agreement, an Option

Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and

Options . . . ."  *In Re: Bernard L. Madoff Investment Securities LLC*, No. 10-br-05310 (Bankr.

S.D.N.Y. Dec. 7, 2010), ECF No. 1 ¶ 260 ("Tremont Compl."); *see also id.* ¶ 261 ("The Account

Agreements were to be performed . . . through securities trading activities that would take place in

New York, New York.").  It has repeatedly been held that such accounts with BLMIS "clearly

qualify as securities contracts."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re

Madoff Sec.)*, 476 B.R. 715, 720 (S.D.N.Y. 2012) ("*Greiff*") ("Account [a]greements . . . to be

performed . . . through securities trading activities" that "authorize[] . . . Madoff . . . to buy, sell

and trade in stocks," and "make numerous references to securities transactions" are "securities

contract[s]"); *see also Picard v. Fishman*, 773 F.3d 411, 418-19 (2d Cir. 2014) ("*Fishman*")

(contracts that establish the "broker-customer relationship," the terms by which the broker will

"acquire or dispose of securities," and "the mutual undertakings between two counterparties that

anticipate executing future securities transactions" qualify as securities contracts).

Through that account, the Prime Fund engaged in at least one transaction in the fifteen

months before the petition date that easily exceeded the $100 million mark-to-market threshold,

and at times during that period maintained a principal balance in that account in excess of $250

million.  *See* ECF No. 205, Ex. D at 2 (showing that the Prime Fund had balance of over $264

million in its BLMIS account before a $475,000,000 withdrawal on March 25, 2008).  This is more

than enough for the Prime Fund to qualify as a "financial participant" under the Bankruptcy Code.[4]

Having been made for the benefit of a financial participant, in connection with the Swap Transaction, the $235.5 million in initial transfers may not be avoided. Notably, Judge Rakoff held that there is no exception to Section 546(g)'s protection based on the knowledge of the initial transferee or the subsequent transferee. *See Rakoff Op.*, 505 B.R. at 142 n.6 ("Unlike section 546(e), the issue of knowledge is irrelevant to the application of section 546(g) in this case.").

Thus, it is settled that Section 546(g) bars avoidance of the initial transfers under Sections 544 or 548(a)(1)(B). Since, as will be shown in Section A.2 below, the Trustee has not pleaded that the initial transfers were made with "actual intent" to defraud under Section 548(a)(1)(A), they cannot be avoided and his attempt to recover the subsequent transfers must be dismissed.

### b.    The Initial Transfers Are Protected by 11 U.S.C. § 546(e)

Similarly, section 546(e) also prevents avoidance of the initial transfers. Section 546(e) provides, in relevant part, that "the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant . . . in connection with a securities contract . . . except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e). All of the transfers at issue here are protected from recovery because the initial transfers qualify for this safe harbor and because neither ABN Ireland nor the Rye Funds had "actual knowledge" of BLMIS's fraud as a matter of law.

### (1)    The Initial Transfers Were Made By, To and For the Benefit of Covered Entities

The first prong of Section 546(e), that the initial transfers must have been made by, to, or

---

[4] The Trustee's complaint against Tremont, incorporated by reference here, (SAC ¶ 268), alleges that Tremont provided BLMIS with over $4 billion, primarily in "loans and 'swap' agreements . . . to leverage and increase Madoff's purported returns[.]" Tremont Compl. ¶¶ 5, 9. Thus, Tremont—which "managed and controlled" the Rye Funds, (SAC ¶ 87)—also qualifies as a financial participant.

for the benefit of a covered entity, is met in several ways. First, the initial transfer was made by a stockbroker: BLMIS. It is beyond dispute that BLMIS was a stockbroker as defined by the Bankruptcy Code.[5] *See Fishman*, 773 F.3d at 417 ("It is not disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e).").

In addition, the initial transfers were made to financial participants: the Prime Fund and the Broad Market Fund. The Prime Fund qualifies as a "financial participant" for the reasons set forth above. *See* § A.1.a, *supra*. And the Broad Market Fund was a financial participant for similar reasons: "[s]ubstantially all of Broad Market Fund's assets were invested directly or indirectly in BLMIS," (SAC ¶ 244), through an account that Broad Market Fund held with BLMIS that was governed by numerous securities contracts (*see* SAC ¶ 89; Tremont Compl. ¶ 260); those contracts constituted securities contracts, *see Greiff*, 476 B.R. at 720; *Fishman*, 773 F.3d at 418 (defining "securities contract" to include "agreements that are similar or related to contracts for the purchase or sale of securities"); and the notional amount of its investment in BLMIS exceeded the $100 million required by Section 101(22A)(A) (SAC ¶ 195 (alleging that the hedge amounted to "three times the initial collateral" in the swap, or $706.5 million)).

Finally, Judge Rakoff also held that the $30 million redemption was made "for the benefit" of ABN Ireland, a financial institution. *See Rakoff Op.*, 505 B.R. at 148 (holding ABN Ireland was a financial institution); *see also id.* at 150 (holding that the redemption was made "for the benefit" of ABN Ireland).

For all of these reasons, ABN Ireland has met the first requirement under Section 546(e).

---

[5] *See* 11 U.S.C. § 101(53A)(B) (defining a "stockbroker" as an entity that is "engaged in the business of effecting transactions in securities").

(2)    **The Transfers Were Made in Connection with BLMIS-Tremont Contracts, Which Are Securities Contracts**

The second prong of Section 546(e) is also easily met, because the initial transfers were "in connection with a securities contract," 11 U.S.C. § 546(e):  the contracts between BLMIS and the Rye Funds, as explained above.  Indeed, several of the exhibits proffered by the Trustee in this case confirm that the Rye Funds maintained accounts with BLMIS, *see, e.g.*, ECF No. 205, Ex. A; *id.* Ex. C, and "make numerous references to securities transactions," mirroring the agreements that qualified as securities contracts in *Greiff*, 476 B.R. at 720; *see also Fishman*, 773 F.3d at 418 (holding "that BLMIS and its customers entered into agreements that satisfy the broad definition of 'securities contracts[.]'").  ABN Ireland has satisfied the second prong of 546(e).

(3)    **Neither ABN Ireland Nor the Rye Funds Had Actual Knowledge of the BLMIS Fraud.**

Finally, the Trustee may not negate the otherwise applicable safe harbor, as he does not and cannot allege that ABN Ireland had actual knowledge of the BLMIS fraud.  The lack of "actual knowledge" is an element of the Trustee's claim on which he bears the burden.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154 at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad II*") ("[T]he subsequent transferee will not be able to prevail on a motion to dismiss . . . on the basis of the Section 546(e) 'safe harbor' *if the Trustee has alleged* that the subsequent transferee had actual knowledge of [BLMIS's] fraud[.]") (emphasis added).  And it is ABN Ireland's knowledge, as the defendant from whom recovery is sought, that is relevant.  *Id.* at *4-5.

ABN Ireland had no such knowledge.  This Court already found that the allegations in the Complaint "do[] not actually plead that [ABN Ireland] subjectively believed that Madoff was not trading securities or segregating assets."  *Bernstein Op.*, 2020 WL 401822, at *12.  Although Judge Bernstein's opinion was vacated due to the Second Circuit's decision in *Citibank* to shift the

18

pleading burden for the affirmative defense of "good faith," that decision did not alleviate the

Trustee's burden to plead that ABN Ireland had "actual knowledge" of BLMIS's fraud in order to

evade the statutory safe harbor; thus, there is no reason to second guess Judge Bernstein's factual

finding in this context. Indeed, it is clearly correct. Nowhere in the Complaint does the Trustee

expressly allege—even conclusorily—that ABN Ireland or anyone affiliated with it knew that

BLMIS was not trading securities or was otherwise operating a fraudulent enterprise. At most, he

(unsuccessfully) alleges that ABN Ireland was on inquiry notice. As Judge Bernstein recognized,

the Complaint merely alleged the existence of the same "red flags" that were well known to all

market participants—allegations that fall far short of actual knowledge. *Id.* at *12 (The Trustee

"tries to create the inference" of belief that BLMIS was a fraud through "reli[ance] on the existence

of red flags . . . but red flags do not imply an awareness of Madoff's fraud because the more

compelling inference as to why Madoff's fraud went undetected for two decades was his

proficiency in covering up his scheme and deceiving the SEC and other financial professionals.").

So too the allegations that ABN Ireland included protections in its contracts with Tremont. SAC

¶¶ 215-19. "[I]f [ABN Ireland] believed that BLMIS was not trading securities, it would also

believe that the indemnifications were worthless." *Bernstein Op.*, 2020 WL 401822, at *15.

ABN Ireland acknowledges that in prior decisions, this Court applied the "actual

knowledge" exception to the knowledge of the *initial* transferees, rather than the subsequent

transferees. *Multi-Strategy Fund*, 2022 WL 2137073, at *8. But even so, the Trustee is unable to

establish that the initial transferees here, the Rye Funds—or their parent, Tremont—had actual

knowledge that BLMIS was not trading in securities.

Indeed, while the Trustee devotes nearly sixteen pages of the Complaint to allegations

which purportedly demonstrate the avoidability of the initial transfer (*see* SAC ¶¶ 268-332), he

conspicuously does not allege that Tremont had "actual knowledge." Nowhere in these allegations

does the concept of actual knowledge appear. *Cf. Multi-Strategy Fund*, 2022 WL 2137073, at *8

(noting that complaint against initial transferee contained multiple verbatim allegations that

defendants "'had actual knowledge of the fraud at BLMIS'"). And this is not because the Trustee

does not know how to level such an allegation or has assumed that this would be stating the

obvious. Merely five paragraphs after his extended discussion about Tremont, the Trustee charges

Kingate Management Limited, an investment fund who has settled with the Trustee, with

"knowledge that Madoff's BLMIS operation was a fraud."[6] SAC ¶ 337.

Nor do the alleged facts amount to the Rye Funds' "actual knowledge" of the fraud. The

Trustee makes great hay from the fact that a handful of Tremont's hundreds of investors expressed

concerns about BLMIS's business model and lack of transparency (*see, e.g.*, SAC ¶¶ 273-285),

and that its auditor noted twenty anomalies between BLMIS's reported prices and Bloomberg's

reported prices, (SAC ¶ 289)—a paltry number for a fund that had "'well in excess of $20 billion'

in AUM," (SAC ¶ 290). He also alleges that Tremont "knew Madoff could not be trading all of

his options on the exchange" due to "the insufficient volume of listed options trades" (SAC ¶ 313),

failed to exercise due diligence into BLMIS, prevented third-parties from doing the same,

"shielded" BLMIS from questions by investors, and failed to conduct due diligence on Madoff's

options counterparties (SAC ¶¶ 292-311, 315-328). Finally, he asserts that executives at Tremont

had "special relationships" with BLMIS and would have been motivated to hide knowledge of his

---

[6] The Trustee alleges that Kingate knew Madoff operated a Ponzi scheme, and that its knowledge
may be "imputed" to Tremont because a Tremont affiliate not otherwise associated with these
transfers, Tremont (Bermuda) Ltd., co-managed Kingate Global. SAC ¶¶ 334-37. This conclusory
allegation fails as a matter of law: the Trustee cannot impute knowledge from one legal entity to
another without alleging that the knowledge was transmitted between the parties. *AIG Glob. Sec.
Lending Corp. v. Banc of Am. Sec. LLC*, 2006 WL 1206333, at *2 (S.D.N.Y. May 2, 2006).

fraud because they profited from his success. SAC ¶¶ 270-72, 329-32. But all this, at most, suggests that Tremont *should have known*—or at least should have investigated—BLMIS. It does not support a conclusion that Tremont *actually knew* that BLMIS was a fraudulent Ponzi scheme.[7]

Because the Trustee has not established that ABN Ireland, the Rye Funds, nor Tremont had actual knowledge of BLMIS's fraud, he has not negated the safe harbor for transactions made in connection with a securities contract. Therefore, the transfers are protected by Section 546(e).

## 2. The Trustee Has Not Shown that the Initial Transfers Were Made with Actual Intent to Hinder, Delay, or Defraud

The initial transfers are also not avoidable under Section 548(a)(1)(A) because BLMIS is not alleged to have had the required state of mind. That provision is crystal clear: the Trustee may *only* avoid a transfer if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud[.]" 11 U.S.C. § 548(a)(1)(A). The burden of actual intent is on the party seeking to avoid the transfer, here the Trustee, and because "it constitutes fraud, it *must be* pled with specificity." *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005).

Here, the Trustee does not allege *at all*, let alone with the particularity required by Rule 9(b), that BLMIS made the transfers with the intent to hinder, delay, or defraud creditors. Nor could he—because the transfers at issue were the result of routine redemptions of the type requested by all of BLMIS's customers as a matter of course. Indeed, like all BLMIS customers, the Rye Funds are *themselves* "deemed to have been a creditor" pursuant to SIPA. 15 U.S.C. § 78fff-2(c)(3). *See also Picard v. Citibank, N.A.("Citibank")*, 12 F.4th 171, 203 (2d Cir. 2021)

---

[7] The Tremont Complaint is not to the contrary. There, the Trustee merely alleges that Tremont was put on "inquiry notice" by the same "red flags" that are insufficient to support a finding that the entity knew BLMIS was not trading securities. *Bernstein Op.*, 2020 WL 401822, at *12. *See, e.g.*, Tremont Compl., ¶ 159 ("[R]ed flags . . . put the Defendants on inquiry notice that Madoff was committing fraud."); ¶ 160 (consistent performance); ¶ 169 (implausible trading volumes); ¶ 194 (lack of transparency). Inquiry notice and "red flags" do not constitute actual knowledge.

(Menashi, J., concurring) (noting Second Circuit precedent treats "investments of principal [into

BLMIS] as valid contractual antecedent debts").   Therefore, what the Trustee alleges is a

repayment of an antecedent debt under SIPA; it is thus "at most a preference between creditors

and did not hinder, delay, or defraud either present or future creditors."  *Sharp*, 403 F.3d at 56-57.

Instead, here the Trustee relies solely on the so-called "Ponzi scheme presumption"—a

presumption of dubious provenance, which has never been adopted by the Second Circuit, and the

application of which has been expressly questioned in a closely related case.  *See Citibank,* 12

F.4th at 200-01.  Under this presumption, the existence of a Ponzi scheme "demonstrates actual

intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have been

made for no purpose other than to hinder, delay, or defraud creditors."  *Id*.  Although this Court

has applied the Ponzi scheme presumption in other cases involving BLMIS,[8] the recent

concurrence by Judge Menashi of the Second Circuit in *Citibank* provides an ample opportunity

to examine both its validity and its application in this specific case.  *Id.* at 181 n.7.  The Ponzi

scheme presumption should not be applied here for a number of reasons.

*First*, the presumption conflates preferences, *i.e.* payments to bona fide creditors, with

fraudulent transfers, *i.e.* payments designed to hide assets from *all* creditors.  This is a SIPA

proceeding.  And under SIPA, as a matter of law, investors receiving a return of principal are

creditors.  15 U.S.C. § 78fff-2(c)(3) (If a transfer of otherwise recoverable property "was made to

a customer or for his benefit, such customer shall be deemed to have been a creditor[.]"); *In re*

*Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) (permitting SIPA customer

to claim "the amount of cash deposited by the customer into his or her BLMIS account, less any

---

[8] *See, e.g.*, *Picard v. Goodman*, 2022 WL 2015662, at *5 (Bankr. S.D.N.Y. June 6, 2022) (Morris,
J.); *Picard v. Fairfield Pagma Assocs.*, 2022 WL 1110560, at *3-4 (Bankr. S.D.N.Y. Apr. 13,
2022) (Morris, J.); *Picard v. Miller*, 631 B.R. 1, 8-9 (Bankr. S.D.N.Y. 2021) (Morris, J.).

amounts withdrawn from it" similar to a creditor with antecedent debt). As then-Judge Breyer has explained: "The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508-9 (1st Cir. 1987) (Breyer, J.) (citations omitted); *see Sharp*, 403 F.3d at 54 (same); *Henry v. Lehman Com. Paper, Inc. (In re First All. Mortg. Co.)*, 471 F.3d 977, 1009 (9th Cir. 2006). "[P]reference provisions," on the other hand, "serve the policy of equality of distribution among creditors of the debtor." *Citibank*, 12 F.4th at 201-02 (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991)). That is, Section 548 was designed to avoid transfers to "non-creditors or colluding creditors, *not* bona fide creditors . . . ." *Citibank*, 12 F.4th at 201-02 (citations omitted) (emphasis added).

The Ponzi scheme presumption improperly collapses that distinction; it presumes that *every* transfer was made with the fraudulent intent to hinder creditors, merely because the transfer "effectively prevents another creditor from collecting on his debt . . . ." *Universal Home Improvement, Inc. v. Robertson*, 51 Cal. App. 5th 116, 126 (2020) (interpreting similar California law). But without allegations that the transferor made the specific transfer with the specific intent to hinder the collection efforts of other creditors—or the "badges" of fraud that courts use to ferret out such intent—the presumption proves nothing except that one creditor was paid ahead of the other. That is the ambit of preference law. *See Bos. Trading Grp.*, 835 F.2d at 1508 (explaining that a payment of funds to creditor A but not paying creditor B "may be unfair to B, but it is not a 'fraudulent conveyance' because it satisfies a debt owed to a person who is, at least, a legitimate creditor."); *Universal Home Improvement*, 51 Cal. App. 5th at 126 ("a transfer on account of a pre-existing debt is not fraudulent as to creditors even if . . . the transfer . . . effectively prevents another creditor from collecting on his debt, and . . . the preferred creditor has knowledge of that

23

reality"); *In re Unified Com. Cap., Inc.*, 260 B.R. 343, 354 (Bankr. W.D.N.Y. 2001), *aff'd sub nom.*, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) (the Ponzi scheme presumption "inappropriately utilize[s] the fraudulent conveyance statutes as a super preference statute").[9]

This Complaint is a prime example of Judge Menashi's concern in *Citibank*: the Trustee does not allege that Madoff, fearing insolvency, moved the assets to the Rye Funds to shield them from other creditors, as is required under "normal principles" of fraudulent conveyance law. The Trustee simply argues that the transfers occurred—thereby avoiding the safe harbors that Congress expressly created to shield payments not only to creditors like the Rye Funds, but also subsequent transfers to other financial industry participants like ABN Ireland, in these very circumstances.

*Second*, the presumption flies in the face of Rule 9(b) by considerably and impermissibly reducing a trustee's pleading burden. Rule 9(b)'s heightened pleading requirements are more than a procedural nicety: the Rule recognizes that labelling a person or entity as a fraudster is a serious accusation, and is meant, among other things, to "provide fair notice of a claim [and] to safeguard a party's reputation from improvident charges of wrongdoing . . . ." *Bombardier Cap., Inc. v. Naske Air GmbH*, 2003 WL 22137989, at *2 (S.D.N.Y. Sept. 17, 2003). The presumption allows a trustee to avoid those safeguards. *See Sharp*, 403 F.3d at 56. Indeed, because pleading and proving *presumed* fraudulent intent is easier than pleading with particularity *actual* fraudulent intent, trustees, like the one here, are able to get past a motion to dismiss on the barest of allegations (or none at all)—entirely defeating the purpose of the safe harbors that Congress created.

---

[9] *Picard v. Gettinger*, 976 F.3d 184 (2d Cir. 2020), on which the Trustee sometimes relies as conferring upon him the authority to discriminate among creditors, is not to the contrary. While that case noted that "SIPA prioritizes customers over general creditors," (*id.* at 198), it does not hold that SIPA confers the Trustee with *carte blanche* to discriminate among customers and deprive them of the protections afforded to recipients of non-fraudulent transfers of their principal (such as the safe harbors discussed *supra*).

*Third*, the Ponzi scheme presumption has no basis whatsoever in the Bankruptcy Code or any other statute. In fact, it contradicts Section 548(a)(1)(A), which requires the Court to analyze the "transfer," not the debtor's underlying enterprise. *See Finn v. All. Bank*, 860 N.W.2d 638, 647 (Minn. 2015) ("The asset-by-asset and transfer-by-transfer nature of the inquiry . . . requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer."). The judicially-created Ponzi scheme presumption, by assuming all redemption payments are paid with the fraudulent intent "to attract new investors" (regardless of the truth of that assumption) essentially casts all creditors as participants in the fraudulent scheme. This is a distortion of the Bankruptcy Code, which is intended to *protect* creditors, not damage them further.

Even if the Ponzi scheme presumption were valid as a general matter, moreover, it should not apply here. The stated reasoning behind the presumption is that "it is unfair, unjust and against public policy for an innocent investor victim of a 'Ponzi' scheme to receive [returns on their investment] when other investors have not recovered all of their principal . . . ." *Unified Com. Cap.*, 260 B.R. at 350-51. That is not what is happening here, where ABN Ireland has recovered only a fraction of its initial investment in the Rye Funds—it is ABN Ireland's recovered *principal*, not *profit*, that the Trustee seeks to claw back. The Trustee's use of the Ponzi scheme presumption is, thus, a perversion of its intended purpose, and this is an independent reason not to apply it here.

For all of these reasons, this Court should not to "forc[e] the square peg facts of a 'Ponzi' scheme into the round holes of the fraudulent conveyance statutes." *Citibank*, 12 F.4th at 202 (quoting *Unified Com. Cap.*, 260 B.R. at 350). And if the Court disregards the Ponzi scheme presumption, as it should, there is no other basis on which to find actual fraudulent intent. The Trustee has not alleged *any* facts to establish that BLMIS made the initial transfers for reasons

25

other than paying out a routine redemption request.  Nor has he pleaded any of the badges of fraud
that courts use to infer fraudulent intent, "*i.e.,* circumstances so commonly associated with
fraudulent transfers that their presence gives rise to an inference of intent." *Sharp*, 403 F.3d at 56
(quotations and citations omitted).  Those include:  (1) a family, friendship, or close associate
relationship between the parties; (2) the debtor's retention of possession, benefit, or use of the
funds; (3) the lack or inadequacy of consideration; (4) the financial condition of the debtor; (5) the
existence or cumulative effect of a pattern or series of transactions, the onset of financial
difficulties, or threats from creditors; and (6) the general chronology of the events and transactions
under inquiry.  *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).  The "flip side of these badges
of fraud is that their absence . . . would constitute evidence that there was suggests *no* intent to
defraud."  *New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, 2008 WL
2115225, at *4 (S.D.N.Y. May 16, 2008) (citation omitted) (emphasis added).

Here, the initial transfers are alleged to be nothing more than payments on routine requests
by the Rye Funds to redeem their investments in BLMIS.  *See* SAC ¶¶ 243-49.  The Rye Funds
are not alleged to have been close associates of BLMIS, *Kaiser*, 722 F.2d 1574; there was no
"prospect of a retention of control" by BLMIS over the transferred funds, *Mendelsohn v.
Jacobowitz (In re Jacobs)*, 394 B.R. 646, 667 (Bankr. E.D.N.Y. 2008); the Rye Funds' redeemed
shares in BLMIS constituted contractual consideration; and nothing else about the chronology or
pattern of the transfers suggested that they were anything more than the types of redemptions made
by any other redeeming customer of BLMIS.  *Certainly* no such allegations have been pleaded
with the specificity required by Rule 9(b).  The Court should dismiss the Trustee's attempt to
invoke Section 548(a)(1)(A) to avoid the transfers here—and thereby reject his attempt to plead
his way around the safe harbors that would otherwise bar his claims.

**B.**     **The Subsequent Transfers Cannot Be Recovered Because the Complaint Pleads that Defendants Received the Transfers in Good Faith and for Value**

Even if the initial transfers were avoidable, Section 550(b) of the Bankruptcy Code provides an additional layer of protection to subsequent transferees:  the trustee may not recover from a transferee that takes for value, in good faith, and without knowledge of the voidability of the transfer avoided.  11 U.S.C. § 550(b).  While Defendants bear the burden to establish this affirmative defense, *see In re BLMIS*, 2022 WL 1304589 at *1, they may do so here because the Trustee's allegations establish on their face that they are entitled to its protection.  *See Jones*, 549 U.S. at 215 (noting an affirmative defense can be "the basis for dismissal for failure to state a claim [if] the allegations in the complaint suffice to establish that ground").

**1.**     **The Transfers Were For Value**

There can be no dispute that ABN Ireland provided value in exchange for the transfers at issue.  Judge Bernstein has already held, in his 2020 opinion, that both sets of transfers—the $30 million redemption and the $235.5 million in collateral—were for value.  *Bernstein Op.*, 2020 WL 401822, at *5.  The Trustee did not challenge this holding on appeal, which should now be considered the law of the case.  *See United States v. Ticchiarelli*, 171 F.3d 24, 29 (1st Cir. 1999) ("[F]indings and conclusions that are not appealed and are not related to the issues on appeal are treated as settled[.]").

This holding is also clearly correct.  Under Section 550(b), value is defined as "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value."  5 *Collier on Bankruptcy* ¶ 550.03[1] at 550-25 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019); *see also Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005). In exchange for the $30 million redemption, ABN Ireland surrendered an equivalent portion of its

27

equity interest in the Broad Market Fund, (SAC ¶ 260); such a surrender constitutes value sufficient to satisfy Section 550(b). *CLC Creditors' Grantor Tr. v. Howard Sav. Bank* (*In re Com. Loan Corp.*), 396 B.R. 730, 744 (Bankr. N.D. Ill. 2008) (holding a sale of stock to be for value even though the relevant corporation was insolvent); *accord Redmond v. Brooke Holdings, Inc.* (*In re Brooke Corp.*), 515 B.R. 632, 641-42 (Bankr. D. Kan. 2014). In exchange for the $235.5 million collateral transfer, ABN Ireland gave value by satisfying its contractual obligations to provide leveraged returns in the Swap Transaction—exactly the value that the Rye Funds desired in exchange for providing collateral. SAC ¶¶ 193-94, 196 (summarizing terms of the Swap Transaction). This too is sufficient consideration to support a simple contract and therefore constitutes value for purposes of Section 550(b). *Bernstein Op.,* 2020 WL 401822 at *5.

### 2.    The Transfers Were Received in Good Faith

ABN Ireland also received the transfers in good faith. In *Citibank*, the Second Circuit laid out a three-step inquiry-notice standard to consider whether a subsequent transferee received a transfer in good faith. 12 F.4th at 191-92. *First*, the Court must examine the facts the transferee subjectively knew. *Id.* at 191. *Second*, the Court must determine whether those facts "would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud." *Id. Third*, the Court "must inquire whether 'diligent inquiry'" by the alleged transferee "'would have discovered the fraudulent purpose' of the transfer." *Id.* at 192 (citation omitted). In other words, a transferee is entitled to the good faith defense if the facts it knew did not put it on inquiry notice *or* if it conducted a "reasonably diligent" investigation. *Id.* at 191-92. "An objective 'reasonable person' standard applies in the second and third steps, namely, in assessing whether (1) the suspicious facts were such that they would have put a reasonable person in the transferee's position on inquiry notice; and (2) the transferee conducted a reasonably diligent investigation after being put on inquiry notice." *Id.* at 192 (citation omitted).

Although in the Trustee's appeal Judge McMahon stated in *dicta* that "ABN Ireland's good

faith is not apparent from the face of the Proposed Amended Complaint,"[10] it is clear that statement

was not meant to be a holding as to whether the Complaint, after considering the many documents

the Trustee chose to incorporate by reference, establishes good faith. *In re BLMIS,* 2022 WL

1304589, at *3. Judge McMahon did not consider those documents but rather spoke only of the

"face" of the Complaint itself, leaving for this Court to "develop" the "record" and "make

findings," based on this Court's "familiar[ity] with the legal issues and facts relevant to this

case[.]" *Id.* at *4. From the allegations in the Complaint, along with the documents the Trustee

chose to incorporate by reference, it is well apparent that ABN Ireland was not on inquiry notice,

and that its diligence was more than reasonable.

### a.    ABN Ireland Was Not on Inquiry Notice

#### (1)    The Facts Known to ABN Ireland Would Not Have Put a Reasonable Investor on Inquiry Notice

The allegations in the Complaint definitively show that the known facts did not put ABN

Ireland on inquiry notice of BLMIS's fraud. For purposes of this analysis, only facts "the

transferee . . . *actually knew*" are relevant because the inquiry is "a subjective inquiry and not a

theory of constructive notice." *Citibank*, 12 F.4th at 191 (internal quotation marks omitted).

Inquiry notice must "signif[y] actual awareness of suspicious facts that would have led a

reasonable transferee, acting diligently, to investigate further and by doing so discover" a debtor-

transferor's fraud. *Citibank*, 12 F.4th at 191 (internal quotation marks and alterations omitted). In

addition, and importantly, the focus must be on the facts and circumstances existing *at the time of*

*the transfer* at issue. *See, e.g.*, *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 730-32 (6th Cir.

---

[10] The District Court expressly framed the two questions on appeal as limited to the pleading burden and standard, not the application thereof. *See In re BLMIS,* 2022 WL 1304589, at *3.

2017) (distinguishing between payments made before and after the transferee gained knowledge that would have put it on inquiry notice); *CCEC Asset Mgmt. v. Chem. Bank*, 175 B.R. 629, 637-39 (Bankr. N.D. Tex. 1994) (same).

The facts known to ABN Ireland *itself* at the time of the Swap Transaction were mundane. It reviewed private placement memoranda (or "PPMs") for the Rye Funds, which contained information about BLMIS's options trading[11] and the market risks inherent in such trading (SAC ¶¶ 173-74); it knew that BLMIS used a "'split-strike conversion' investment strategy" (SAC ¶ 177); and it knew that Tremont had a "six-year investment relationship" with one of its affiliates (SAC ¶ 168). Nothing about these facts would have put a reasonable person on inquiry notice that this investment was, in reality, underpinned by history's largest Ponzi scheme. The analysis should end there.

But the documents incorporated into the Complaint do even more—they show the facts as to which ABN Ireland was actually aware, which to a reasonable investor would show that BLMIS was a credible, legitimate operation with a reasonable basis for its returns. The Credit Application recommended investing in the Rye Funds, in part *because* of Madoff, who "has been successfully executing [the split-strike conversion] strategy since the 1960's and it is understood that over USD 20 bio is traded under this strategy." Ex. A at 3. It explained that "Madoff provide[d] copies of

---

[11] The Trustee argues that Tremont's representation in the PPM that BLMIS "are *expected* to *regularly* consist of arguments **not** traded on an exchange" (SAC ¶ 173 (italics added)), contradicted a statement one of ABN Ireland's affiliates once made, in connection with a different transaction, that BLMIS's options trading "may be effected in the over-the-counter market *or* on a registered options exchange" (SAC ¶ 178 (italics added, other emphasis removed)). But those statements are not even inconsistent; certainly the supposed inconsistency was not enough to put a "reasonable person" on inquiry notice. And ABN Ireland's statement to AIG that the options were traded on an exchange (SAC ¶ 184)—"information" that does not appear to have come from Tremont or BLMIS—occurred in September 2007, *four months* after ABN Ireland had entered into the Swap Transaction. This minor inconsistency is hardly a smoking gun.

individual trade tickets for each and every trade on the brokerage account on a daily basis," allowing the Rye Funds to reconcile the trade tickets and providing assurance about the accuracy of BLMIS's trading data. *Id.* at 4. It noted that Tremont had a long-term relationship with BLMIS, regularly evaluated investment managers as a matter of course, and had also "carried out extensive due diligence on [BLMIS] in line with the Tremont Investment Process." *Id.* at 4. And it further noted that BLMIS included among its clients many major financial institutions, including Wall Street titans such as JP Morgan Chase Investments and Charles Schwab. *Id.* at 8. All of these facts would have kept a reasonable person from being on inquiry notice that BLMIS was a fraud.

> (2)     **The Facts Known to Non-Parties Were Not from the Relevant Time Period and Would Not Have Put a Reasonable Investor on Inquiry Notice Regardless**

Because the Trustee has no damaging information about ABN Ireland's knowledge, the Complaint instead focuses almost exclusively on facts allegedly known to *other Fortis entities*. But the knowledge held by these entities cannot be imputed to ABN Ireland, because the Trustee has not alleged that those "facts" were communicated to ABN Ireland itself. *See Majad ex rel. Nokia Ret. Sav. and Inv. Plan v. Nokia, Inc*., 528 F. App'x 52, 56 (2d Cir. 2013) (holding that "bald contention" that knowledge of parent company's internal operations could be imputed to employees of a subsidiary "is insufficient to withstand a motion to dismiss"); *AIG*, 2006 WL 1206333 at *2 (explaining that "knowledge that [a party's] employees acquired in the course of . . . other transactions, unless actually communicated to the specific employees who made the investment decision[s] . . . is not chargeable" to that party).

Moreover, nearly all of the allegations known to other entities were not contemporaneous with the Swap Transaction and therefore are not relevant to this inquiry—they occurred in 2003 and 2004, while the Swap Transaction occurred in 2007. SAC ¶¶ 5-10 (allegations occurring in 2003); *id.* ¶¶ 97-124 (in 2003 at the latest); *id.* ¶ 126 (in 2004); *id.* ¶ 132 (in 2003). If there were

31

Ponzi scheme suspicions years earlier—and there were not—those would not be relevant to ABN

Ireland's inquiry notice in 2007 and 2008.  *Meoli*, 848 F.3d at 730-32.

Further, even assuming every one of these facts *was* known to ABN Ireland, and *was* from

the relevant time period, they would not have put an reasonable person on inquiry notice of the

fraud.  The Trustee alleges that ABN Ireland or other Fortis entities knew, at one time or another:

- That Fortis did not "have any visibility" into how Madoff segregated and custodied customer assets, (SAC ¶¶ 103-04, 127, 151);

- That Fortis had a lack of insight into the separation, if any, between the front and back offices at BLMIS, (SAC ¶ 114);

- That BLMIS served a double role as custodian and broker dealer, (SAC ¶¶ 126, 150);

- That Fortis was unable to verify trading records and prices, (SAC ¶¶ 127, 132);

- That "BLMIS[ experienced] exceptionally stable returns," (SAC ¶¶ 132, 159);

- That there were theoretical difficulties with BLMIS's execution strategy, including due to the volume of securities transactions required to execute it, (SAC ¶¶ 132, 149, 150, 159); and

- That BLMIS traded options over-the-counter, but Fortis on one occasion, after the swap transaction had been entered into, told a third party that BLMIS traded options on an exchange, (SAC ¶¶ 173, 175, 177-180); *see also* n.11 *supra*.

Each of these facts constitutes nothing more than the "red flags" known to all market

participants, including the SEC with its regulatory mandate and its subpoena power.  *See Picard*

*v. Avellino*, 557 B.R. 89, 115 (S.D.N.Y. 2016) (noting allegations of "several red flags including,

impossibly consistent annual returns, trading impossibilities, impossible options trading volumes"

among others); *Picard v. Legacy Cap. Ltd. (In re Bernard L. Madoff Inv. Secs. LLC Litig.*), 548

B.R. 13, 21 (Bankr. S.D.N.Y. 2016) (listing "red flags" allegedly known to defendant, including

that "BLMIS's Operations Lacked Transparency and Controls"); *Elendow Fund, LLC v. Rye Select*

*Broad Mkt. XL Fund*, 2013 WL 5179064, at *5-6 (S.D.N.Y. Sept. 16, 2013) (detailing alleged "red

flags" known to Tremont and concluding that it "recognized that an investment with Madoff presented a combination of risks and benefits").  Although many of those cases did not deal with an "inquiry notice" standard, the fact is that these so-called "red flags" were widely known to the market as characteristic of BLMIS's unique structure, and would not have put an ordinary person on inquiry notice that it was not trading securities.  That is all the more true when one considers that BLMIS had been operating as a broker-dealer for more than *forty-five years* without incident. SAC ¶ 47.

### b.    ABN Ireland Conducted Due Diligence that Far Exceeded a "Reasonably Diligent Inquiry"

Even if the known facts had placed ABN Ireland on inquiry notice of BLMIS's fraud, the Complaint alleges, in painstaking detail, the extensive and thorough due diligence that ABN Ireland and its affiliates conducted on Tremont and into BLMIS itself leading up to the 2007 Swap Transaction.  Thus, the Trustee has established, on the face of the Complaint and the documents incorporated within it, that ABN Ireland conducted—indeed, *exceeded*—a "reasonably diligent inquiry."  Because Madoff was so canny at hiding his fraud, that inquiry did not reveal—and could not have revealed—BLMIS's fraud, and in fact provided strong evidence to the contrary.

In his 2020 opinion, Judge Bernstein expressly found that ABN AMRO had conducted due diligence, which he cited as evidence that ABN Ireland had not been "willfully blind" to BLMIS's fraud.  *See Bernstein Op.*, 2020 WL 401822, at *16 n.9.  While the standard for "good faith" is no longer willful blindness, the fact that the Complaint alleges ABN Ireland's thoroughly diligent inquiry has not changed.

According to the Complaint, ABN Ireland "employees pursued . . . due diligence about Tremont and BLMIS from Tremont employees in New York" throughout the late summer and fall of 2006.  SAC ¶ 168; *see also Bernstein Op.*, 2020 WL 401822, at *16 (concluding based on the

33

Complaint that ABN Ireland "performed extensive due diligence in the late summer and fall of 2006 in connection with the Swap Transaction" which "culminated in the submission of the Credit Application in November 2006 to Fortis's Central Credit Committee to approve the Swap Transaction"). That diligence included: making direct inquiries to Tremont employees (SAC ¶ 168); requiring Tremont to respond to formal Due Diligence Questionnaires despite its apparent reluctance to complete them, (SAC ¶¶ 152-53, 175); reviewing the PPMs for the Rye Funds (SAC ¶ 173); making internal inquiries about Tremont's relationship with other Fortis entities (SAC ¶ 168); and, ultimately, submitting the results to Fortis's Central Credit Committee in the form of the previously discussed Credit Application  (SAC ¶ 176). The Credit Application "included extensive information about Tremont, BLMIS and the Tremont funds," including that "the Broad Market Fund had an excellent track record," "Tremont was a registered investment advisor with the SEC," "Tremont and the Tremont Group are regarded as 'exemplary and top tier,'" "BLMIS's performance 'is regarded as sustainable,'" and Madoff "ha[d] a 40 year track record in the chosen strategy, executed 10% to 15% of the trades on the NYSE and NASDAQ and ha[d] consistently performed." *Bernstein Op.*, 2020 WL 401822, at *16 (quoting Ex. A at 3-5). Even after the Swap Transaction had been entered into, ABN Ireland arranged for further diligence on behalf of AIG, who was to insure the swap. SAC ¶¶ 181-84. Thus, ABN Ireland's diligence efforts not only failed to reveal evidence of fraud at BLMIS, let alone a risk that BLMIS was not even trading securities, it instead revealed countervailing facts that *bolstered* its conclusion that the Swap Transaction was a sound investment, and that the presence of BLMIS did not present a credit risk.

In January 2007, shortly after that application was submitted to the Credit Committee, in January 2007, Fortis USA also submitted a memorandum to the Credit Committee that argued that Fortis's exposure limits to BLMIS should be *increased*. Ex. B at 2, 4. This memorandum set forth

ample detail about BLMIS's apparent securities trading, including detailed descriptions about how the split strike conversation strategy worked and how the trades were executed, and explained that "[t]he exposure is essentially to the top 50 U.S. equities and to the S&P 100 options market." *Id.* at 2. It concluded, based on the diligence Fortis USA had conducted, that "*there is a clearly discernable basis for the viability of Madoff's investment strategy over time.*" *Id.* (emphasis added). It also acknowledged the reputation and renown of Madoff at the time: that he had been in business since 1960, that his firm "rank[ed] among the top 1% of U.S. Securities Firms"; that he had been "a major figure in the National Association of Securities Dealers (NASD) . . . [and] was chairman of the board of directors of the NASDAQ Stock Market as well as a member of the board of governors of NASD"; and that his "reputation for first-class execution [was]a source of enduring competitive advantage." *Id.* at 2-5. The memorandum concluded that the "review of the trades executed . . . through 2006 indicates that the trading mandate has been implemented effectively and consistently," added that "Risk management continue[d] to monitor the trades and positions on a daily basis," and recommended approval of a $1.5 billion exposure to Madoff. *Id.*

And even if the good faith of non-parties years earlier were somehow relevant, the Trustee's other allegations establish that that those non-parties also conducted extensive due diligence over the years and that that due diligence, too, could not and did not reveal BLMIS's fraud. As ABN Ireland had done, through the course of their extensive due diligence, these non-parties learned of many reasons to believe that BLMIS was trading in securities.

For example, the Trustee alleges that a Fortis Multi-Management employee named Mark Geene conducted extensive due diligence on behalf of that entity in 2006. That diligence included posing several rounds of questions to Tremont, the submission of due diligence questionnaires, and at least one probing meeting with Tremont personnel. SAC ¶¶ 134-155. But although the

35

Trustee alleges that Fortis Multi-Management decided not to invest in Tremont at that time (SAC ¶¶ 156-57), the concerns raised by its diligence were not that BLMIS was fraudulent, but were instead due to "counterparty [*i.e.,* the Rye XL Fund] risk, cost of leverage, [and] liquidity." *Id.*

The Trustee also points to the MeesPierson Memorandum—which been prepared years before at a time when MeesPierson was acting only as "third-party manager" of the investments of Fortis's customers. SAC ¶¶ 131-32. The MeesPierson Memorandum summarized its diligence into BLMIS, including a meeting that employees of that entity had had with Madoff himself. Although the Trustee characterizes the MeesPierson Memorandum as cautionary (*see, e.g.*, SAC ¶ 132), in reality it explained the split-strike conversion strategy in detail, and reported many facts learned in the course of its diligence that led it to conclude that BLMIS was a highly successful investment manager. Among these was Madoff's reputation as "an important/influential person in the American financial world," Ex. C at 3; that "[e]xecution takes place according to the regular rules," *id.* at 2; that his firm had "the lead in technology"; that BLMIS was "regulated from every side," *id.* at 3; and that BLMIS's dual role as a custodian was an asset, not a "red flag," because "by taking care of the custody himself he always has immediate access to all records and knows exactly what is where." *Id.* at 2. Based on all of the information it learned in its due diligence, MeesPierson concluded that BLMIS was an "[i]mpressive company" with "state of the art technology" and one that could not "afford missteps" due to its regulatory environment. *Id.* at 3. Thus, *another* third party's extensive investigation into BLMIS—including a meeting with Madoff itself—did not reveal, and could not have revealed, Madoff's fraud.

The reason, of course, that the multiple investigations the Trustee details in the Complaint failed to reveal Madoff's fraud is not due to any failing on the part of ABN Ireland, the non-party Fortis entities, or any other market participant for that matter. Instead, as other courts have

eloquently explained, the reason "Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals." *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010).

ABN Ireland was no different, and the result was the Swap Transaction at the center of this proceeding. In that transaction, and as a direct result of the diligent inquiry that ABN Ireland conducted into Tremont and BLMIS, ABN Ireland put $706 million (or $471 million net of collateral) of its own money at risk, in exchange for, at most, a few million dollars' worth of service fees. SAC ¶ 194. There is no better evidence in the Complaint, nor that could be revealed in discovery, that ABN Ireland believed that BLMIS was a legitimate, reputable, and sound investment manager. As Judge Bernstein found: "Far from turning a blind eye to Madoff's fraud, [ABN Ireland] performed due diligence when working on transactions involving Madoff and BLMIS as borne out in the Credit Application and ultimately, put its money where its mouth was by investing $470 million of its own funds through the [Swap Transaction]." *Bernstein Op.*, 2020 WL 401822, at *16; *see also id.* at *13 ( "It is simply not plausible for [ABN Ireland] to have entered into the Swap Transaction and invested $470 million of its own funds with BLMIS while at the same time subjectively believing in the high probability that BLMIS was not actually trading securities, was stealing its investors' assets and violating the federal securities laws."). The Complaint leaves no doubt that ABN Ireland performed a diligent inquiry that exceeded what was reasonable for an investment of that magnitude, and therefore, under the standard established in *Citibank*, it received the transfers at issue in good faith.

### 3.    The Transfers Were Received Without Knowledge of Voidability

As discussed in Section A.2, the voidability of the initial transfers is premised on the initial transfers having been made with actual intent to defraud, delay, or hinder creditors—a presumption

37

that the Trustee seeks to establish for no other reason than that BLMIS was a Ponzi scheme. Thus, if the "good faith" prong is met, it obviously follows that ABN Ireland had no knowledge of the Ponzi scheme, and by extension received the transfers "without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). Further, as noted above, there is no basis in the Complaint to revisit Judge Bernstein's factual finding that ABN Ireland did not know—or even believe—that BLMIS was a Ponzi scheme. *See* § A.1.b(3), *supra*. As such, the third and final prong of the "good faith" defense in Section 550(b) is met.

Because the Complaint demonstrates beyond all doubt that ABN Ireland received the subsequent transfers for value, in good faith, and without knowledge of their voidability, the Trustee may not recover them pursuant to Section 550.

### C. The Trustee May Not Recover $95.5 Million Because the Initial Transfers Did Not Occur Within the Two-Year Statutory Period under § 548(a)(1)(A)

Even if the initial transfers were avoidable under Section 548(a)(A), and even if the subsequent transfers were not protected as received in good faith and for value, $95.5 million of those subsequent transfers still could not be recovered because the Complaint establishes they did not derive from initial transfers within the two-year lookback period of Section 548(a)(1)(A). Only initial transfers made "within 2 years before the date of the filing of" the debtor's bankruptcy petition—here, December 11, 2008—may be avoided under this provision. 11 U.S.C. § 548(a)(1)(A). While a trustee may not be "required to provide a 'dollar-for-dollar accounting' of the exact funds at issue," a failure to "tie *any* initial transfer to any subsequent transfer or [s]ubsequent [t]ransferee" is fatal to such a claim. *Picard v. Shapiro*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (emphasis added, citations and alterations omitted). Therefore, the Trustee can only recover subsequent transfers if he has alleged that BLMIS transferred those funds after December 11, 2006. But here, the Trustee seeks to recover approximately $135.5 million in

subsequent transfers from a mere $40 million of initial transfers received from BLMIS after December 11, 2006 and before the subsequent transfers.

Put simply, on December 27, 2006, BLMIS made an initial transfer of $20 million to the Prime Fund, and transferred nothing else to that fund until March 2008.  App. A;[12] SAC Ex. D at 2.  On January 30, 2007, BLMIS made an initial transfer of $20 million to the Broad Market Fund but no other until September 2008.  App. A; SAC Ex. B. at 4.  Between December 27, 2006 and March 2008, each Fund transferred that $20 million to Rye XL (along with much more that they had not received from BLMIS within the two-year lookback).  Thus, as of March 2008, these three funds collectively had only $40 million of potentially avoidable initial transfers from BLMIS.  But between May 2 and September 4, 2007, Rye XL transferred $105.5 million to ABN Ireland, meaning the $40 million of avoidable initial transfers was exhausted, and $65.5 million of that $105.5 million subsequent transfer was not from an avoidable initial transfer.  App. A; SAC Ex. H.  And on July 1, 2008, Broad Market transferred $30 million to ABN Ireland (at a time when it had no potentially avoidable initial transfers left, having already transferred $20 million to Rye XL), so this $30 million subsequent transfer also cannot be from an avoidable initial transfer.  App. A; SAC Ex. G.

Therefore, of this $135.5 million received by ABN Ireland, only $40 million was from initial transfers avoidable under the two-year lookback in Section 548(a)(1)(A).  Judge Rakoff has already expressly held that the $30 million redemption *cannot* be avoided pursuant to any other provision, a holding that is law of the case.  *Rakoff Op.*, 505 B.R. at 150.  And avoidance of the remaining $65.5 million is also barred by the safe harbors in Sections 546(g) and 546(e).  *See* § A.1.  Thus, $95.5 million is not recoverable even if the initial transfers were fraudulent and the

---

[12]  The sequence of initial and subsequent transfers during this period is set forth in Appendix A.

subsequent transfers not protected by Section 550(b); partial dismissal (at least) is therefore warranted on the Trustee's claims to recover those transfers.

### D.    The Complaint Should Be Dismissed with Prejudice

The Trustee's Complaint should be dismissed with prejudice. This is the Trustee's second attempt to amend his complaint: it was first amended in 2012 to incorporate additional allegations derived from his prior Rule 2004 discovery. Even with the benefit of that discovery and the Second Circuit's guidance in *Citibank*, he has still failed to state a claim upon which relief can be granted. He should not receive a third chance. *Lefebvre v. Morgan*, 234 F. Supp. 3d 445, 461 (S.D.N.Y. 2017) ("Because Plaintiff has already amended his Complaint twice . . . but has still failed to state a claim, the Second Amended Complaint is dismissed with prejudice."); *see also Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around").

### CONCLUSION

For each of the foregoing reasons, Plaintiffs' Second Amended Complaint against ABN Ireland should be dismissed in its entirety and with prejudice.

Dated:  August 19, 2022                    Respectfully submitted,
New York, New York

                                           LATHAM & WATKINS LLP

                               By:    /s/ Christopher R. Harris

                                       Christopher R. Harris
                                       Thomas J. Giblin
                                       1271 Avenue of the Americas
                                       New York, New York 10020
                                       Telephone: (212) 906-1200
                                       Facsimile: (212) 751-4864
                                       Email: christopher.harris@lw.com
                                       Email: thomas.giblin@lw.com

                                       *Attorneys for ABN Ireland*