**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-04986 (CGM) |
| SHARON KNEE, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

ARGUMENT .............................................................................................................3

I.    THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE
      CASE ...............................................................................................................3

II.   IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
      SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
      TRUSTEE AS A MATTER OF LAW ..................................................................5

      A.    Legal Standard ........................................................................................5

      B.    The SIPA Scheme ....................................................................................6

            1.    SIPA and SIPC..............................................................................6

            2.    Customer Property Under SIPA.....................................................7

      C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
            Transfers of Fictitious Profits Made by BLMIS to Defendant ...........10

            1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent
                  Intent and in Furtherance of the Fraud......................................11

                  a.    BLMIS Was a Ponzi Scheme.........................................13

                  b.    The Trustee's Experts Confirmed That BLMIS Was a
                        Ponzi Scheme................................................................15

                  c.    The Trustee's Experts Confirmed That BLMIS Paid
                        Redemptions from Customer Funds ...............................18

                  d.    The Trustee's Evidence of "Badges of Fraud"
                        Independently Establishes Actual Intent to Defraud ....20

                  e.    BLMIS's Two-Year Transfers to Defendant Were in
                        Furtherance of the Fraud...............................................21

            2.    BLMIS Made the Transfers to Defendant Within the Two-Year
                  Period .......................................................................................22

            3.    The Transfers Were an Interest of the Debtor in Property........22

i

a.    The Transfers are Customer Property and the Trustee Can Recover Them ...............................................................................23

b.    BLMIS Owned the JPMorgan Accounts Because the IA Business Was Transferred to the LLC in 2001 .............................24

c.    Because the Estates Were Consolidated, the Trustee Can Recover Customer Property Held in The Names of Either the LLC or Madoff .........................................................................30

d.    *Avellino I* Is Wrong ........................................................................32

D.    Defendant Has Not Presented Any Countervailing Evidence ...............................35

III.    DEFENDANT'S DEFENSES CAN BE DETERMINED AS A MATTER OF LAW ................................................................................................................35

IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW ........................................................................................................36

CONCLUSION ............................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
   No. 05 Civ. 9050(LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
   748 F.3d 110 (2d Cir. 2014) ................................................................................................10

*Ahammed v. SIPC*,
   295 F.3d 1100 (10th Cir. 2002) ..........................................................................................34

*Alexander v. Compton*,
   229 F.3d 750 (9th Cir. 2000) ..............................................................................................31

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..............................................................................................................5

*Armstrong v. Collins*,
   No. 01 Civ. 2437(PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ..........................11, 14

*Banner v. Kassow*,
   104 F.3d 352 (2d Cir. 1996) ...............................................................................................20

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.*,
   396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*, *Bayou
   IV*, 439 B.R. 284 .........................................................................................................22, 35

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
   380 F. Supp. 2d 334 (S.D.N.Y. 2005) ..................................................................................6

*In re BLMIS*,
   No. 1:21-cv-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2021) .......................... *passim*

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..........................................................................................................5, 6

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re
   Bayou Grp. LLC)*,
   439 B.R. 284 (S.D.N.Y. 2010) .........................................................................11, 12, 14, 21

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ..............................................................................................12

*Dowden v. Cross Cty. Bank*,
   97 B.R. 503 (E.D. Ark. 1987) ...............................................................................................8

*Emerson v. Maples,*
   59 F.3d 170 (6th Cir. 1995) ................................................................12

*In re FKF 3, LLC,*
   No. 13 Civ. 3601, 2018 WL 5292131 (S.D.N.Y. 2018) ....................................37, 39

*Focht v. Heebner,*
   223 F.3d 1296 (11th Cir. 2000) ...........................................................34

*Geltzer v. Artists Mktg. Corp.,*
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) .....................................................36

*Gowan v. The Patriot Grp.,*
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) .....................................................12

*Gredd v. Bear, Stearns Sec. Corp.,*
   310 B.R. 500 (Bankr. S.D.N.Y. 2002) .....................................................21

*Gredd v. Bear, Stearns Sec. Corp.,*
   359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds,* 397 B.R. 1
   (S.D.N.Y. 2007) .........................................................................21

*Hill v. Spencer Sav. Loan Ass'n,*
   83 B.R. 880 (D.N.J. 1988) ...............................................................9

*Janvey v. Brown,*
   767 F.3d 430 (5th Cir. 2014) ............................................................12

*Janvey v. Democratic Senatorial Campaign Comm., Inc.,*
   712 F.3d 185 (5th Cir. 2013) ............................................................12

*Kirschner v. Fitzsimons,*
   No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. 2017) ....................................21

*Klein v. Cornelius,*
   786 F.3d 1310 (10th Cir. 2015) ..........................................................12

*In re Lehman Bros. Holdings Inc.,*
   445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds,* 478
   B.R. 570 (S.D.N.Y. 2012) ................................................................8

*Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.*),
   280 B.R. 103 (Bankr. E.D. Pa. 2002) ....................................................11

*Martino v. Edison Worldwide Cap. (In re Randy),*
   189 B.R. 425 (Bankr. N.D. Ill. 1995) ................................................11, 12

iv

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................6

*McHale v. Boulder Cap. LLC*,
439 B.R. 47 (S.D.N.Y. 2010) ..............................................................14

*McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*,
439 B.R. 84 (Bankr. S.D.N.Y. 2010) ...................................................37

*Merrill v. Abbott*,
77 B.R. 843 (D. Utah 1987) ..................................................................12

*Moran v. Goldfarb*,
No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ........................11, 14, 37

*In re Motors Liquidation Co.*,
590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019) ..........................................4

*Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. (SHL) Bahrain Islamic Bank*,
633 B.R. 207 (Bankr. S.D.N.Y. 2021) ..................................................38

*Peloro v. United States*,
488 F.3d 163 (3d Cir. 2007) ..................................................................34

*Perez v. Terrestar Corp.*,
No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017) ..........................................4

*Perkins v. Haines*,
661 F.3d 623 (11th Cir. 2011) ..............................................................12

*Picard v. Avellino*,
Adv. Pro. No. 10-05421, 2022 WL 2799905 (Bankr. S.D.N.Y. July 15, 2022) ......3, 11, 32, 37

*Picard v. Avellino*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...............................................23, 32

*Picard v. BAM L.P.*,
608 B.R. 165 (Bankr. S.D.N.Y. 2019) ..................................................18

*Picard v. BAM L.P.*,
624 B.R. 55 (Bankr. S.D.N.Y. 2020) ........................................... *passim*

*Picard v. Chais*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ..................................................13

*Picard v. Citibank, N.A.*,
   12 F.4th 171 (2d Cir. 2021) ................................................................7, 24

*Picard v. Cohen*,
   Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
   25, 2016) ................................................................................11, 24

*Picard v. Cohmad Sec. Corp.*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..................................................11

*Picard v. Est. of James M. Goodman*,
   Adv. Pro. No. 10-04762, 2022 WL 2015662 (Bankr. S.D.N.Y. June 6, 2022) ........................3

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014)..................................................................9

*Picard v. First Gulf Bank*,
   Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July
   18, 2022) ................................................................................12

*Picard v. The Gerald and Barbara Keller Fam. Tr.*,
   634 B.R. 39 (Bankr. S.D.N.Y. 2021).......................................... *passim*

*Picard v. Gettinger*,
   976 F.3d 184 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021)..............................7, 13, 36

*Picard v. Greiff*,
   476 B.R. 715 (S.D.N.Y. 2012)..............................................................13

*Picard v. Ida Fishman Rev. Tr.*,
   773 F.3d 411 (2d Cir. 2014)................................................................13

*Picard v. JABA Assocs. LP*,
   528 F. Supp. 3d 219 (S.D.N.Y. 2021)........................................... *passim*

*Picard v. Ken-Wen Fam. Ltd. P'ship*,
   Adv. Pro. No. 10-04468, 2022 WL 709768 (Bankr. S.D.N.Y. Mar. 9, 2022).........4, 37, 38, 39

*Picard v. Legacy Cap. Ltd.*,
   603 B.R. 682 (Bankr. S.D.N.Y. 2019) ..................................................4, 14

*Picard v. Lisa Beth Nissenbaum Tr.*,
   No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) .................... *passim*

*Picard v. Lowrey*,
   596 B.R. 451 (S.D.N.Y. 2019)..............................................................7, 8

*Picard v. Miller*,
  631 B.R. 1 (Bankr. S.D.N.Y. 2021) ............................................................ *passim*

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) ........................................................ *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
  No. 20-cv-01029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) .................................5

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019)..............................................................................24

*Rosenman Fam., LLC v. Picard*,
  395 F. App'x 766 (2d Cir. 2010) ...................................................................23

*Salomon v. Kaiser (In re Kaiser)*,
  722 F.2d 1574 (2d Cir. 1983)......................................................................20, 21

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ...........................................................................12

*SEC v. F.O. Baroff Co., Inc.*,
  497 F.2d 280 (2d Cir. 1974)............................................................................7

*SEC v. Research Automation Corp.*,
  585 F.2d 31 (2d Cir. 1978)..............................................................................6

*SIPC v. 2427 Parent Corp.*,
  779 F.3d 74 (2d Cir. 2015)..............................................................................6

*SIPC v. BLMIS*,
  496 B.R. 744 (Bankr. S.D.N.Y. 2013) ..............................................................6

*SIPC v. BLMIS (In re Madoff)*,
  522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 2016 WL 183492 (S.D.N.Y. Jan.
  14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017) ..........................................28, 33

*SIPC v. BLMIS (In re BLMIS)*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) ......................7, 13

*SIPC v. BLMIS (In re Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015)............................................................10, 33

*Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*,
  232 F. Supp. 2d 289 (S.D.N.Y. 2002)...............................................................37

*Trefny v. Bear Stearns Sec. Corp.*,
  243 B.R. 300 (S.D. Tex. 1999) ..........................................................................9

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)....................................................................................24

*United States v. Madoff*,
    586 F. Supp. 2d 240 (S.D.N.Y. 2009)......................................................................30

*Wickham Contracting Co. v. Int'l Bhd. of Elec. Workers, AFL-CIO*,
    955 F.2d 831 (2d Cir. 1992).....................................................................................36

*Ying Jing Gan v. N.Y.C.*,
    996 F.2d 522 (2d Cir. 1993).......................................................................................6

**Statutes**

11 U.S.C. § 101(41) ...................................................................................................34

11 U.S.C. § 109(a) .....................................................................................................34

11 U.S.C. § 548(a) .......................................................................................................3

11 U.S.C. § 548(a)(1)(A) ................................................................................9, 10, 22, 24

11 U.S.C. § 550(a)(1) ...................................................................................................3

11 U.S.C. § 551 ...........................................................................................................3

15 U.S.C. § 78ccc(a) ....................................................................................................6

15 U.S.C. § 78ccc(a)(2)(A) ...........................................................................................6

15 U.S.C. § 78ddd(c)(2) ..............................................................................................26

15 U.S.C. § 78fff-1(a) ...................................................................................................9

15 U.S.C. § 78fff-2(c)(3) ..................................................................................... *passim*

15 U.S.C. § 78fff(b) ......................................................................................................7

15 U.S.C. § 78*lll*(4).............................................................................................7, 8, 23

15 U.S.C. § 78*lll*(5)...................................................................................................33

15 U.S.C. § 78*o*(b) ............................................................................................6, 25, 34

28 U.S.C. § 1961 ........................................................................................................38

**Rules**

17 C.F.R. § 240.15b1-3(b) ...........................................................................................26

17 C.F.R. § 240.15c3-3 ........................................................................................8, 9, 23

17 C.F.R. § 240.15c3-3(f) ................................................................................................8

17 C.F.R. § 249.501(a)...................................................................................................25

Fed. R. Bankr. P. 7056 .................................................................................................1, 5

Fed. R. Bankr. P. 7056-1(a) .............................................................................................3

Fed. R. Civ. P. 56(a) ........................................................................................................5

Fed. R. Civ. P. 56(c)(1).....................................................................................................6

Fed. R. Evid. 803(22).....................................................................................................14

Fed. R. Evid. 807 ...........................................................................................................14

## Other Authorities

4 Collier on Bankruptcy ¶ 548.02[5] (15th ed. 1983)....................................................21

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
    (2002)...........................................................................................................................7

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion") under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56 for summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts fraudulently transferred by BLMIS to defendant Sharon Knee (the "Defendant"). The facts underlying this Motion are set forth in the Trustee's Statement of Material Facts Pursuant to Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years preceding the commencement of the SIPA liquidation proceeding (the "Two-Year Period"), Defendant received $1,125,000 in fictitious profits from BLMIS. For decades, BLMIS operated the largest Ponzi scheme in history. In their allocutions, Madoff and BLMIS employees confirmed that BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's collapse in December 2008. The Trustee's experts further confirm that BLMIS was a Ponzi scheme, explain how the Ponzi scheme was executed through manufactured back-dated transactions, and how customer money was used to pay withdrawals to customers in the absence of legitimate trading on behalf of customers. Thus, a *prima facie* case has been established that the transfers to Defendant were made with the intent to hinder, delay, or defraud BLMIS's creditors and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Defendant admits that she received the transfers from BLMIS. Any remaining arguments and defenses have been rejected and resolved in court rulings in the Trustee's favor more than ten times. There is no reason to depart from well-established law of the case.

As there are no material facts in dispute and Defendant cannot surmount the Trustee's *prima facie* case, summary judgment should be granted in favor of the Trustee on Count One of his Complaint against Defendant.

## **BACKGROUND**

Defendant Sharon Knee was a customer of BLMIS's investment advisory business ("IA Business") and held BLMIS Account No. 1ZB272 in her name (the "Knee Account"). Stmt. ¶ 108; Answer ¶ 7, ECF No. 18.[1] The Knee Account was opened on December 18, 1995 with a deposit via check in the amount of $225,000, all representing principal. Stmt. ¶ 125. Subsequent to the initial deposit, there were 22 additional cash deposits via checks into the Knee Account in the aggregate amount of $1,060,000, all representing principal. Stmt. ¶ 126. In sum, these 23 cash deposits provided the Knee Account with a total of $1,285,000 of principal. Stmt. ¶ 127.

During the life of the Knee Account, Defendant made 16 cash withdrawals totaling $2,410,000, which included both principal and fictitious profits. Stmt. ¶ 128. Defendant withdrew $1,125,000 of funds in excess of principal, representing fictitious profits over the life of the Knee Account and within the Two-Year Period. Stmt. ¶¶ 129–30.

Following BLMIS's collapse, Defendant filed a customer claim for the Knee Account. On or about August 28, 2009, the Trustee denied Defendant's customer claim. On December 2, 2010, the Trustee brought this adversary proceeding against Defendant to avoid and recover

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Knee*, Adv. Pro. No. 10-04986 (Bankr. S.D.N.Y.).

fraudulent transfers of fictitious profits. Compl., ECF No. 1. Under sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), the Trustee seeks to avoid and recover $1,125,000 of fictitious profits received by Defendant during the Two-Year Period. Stmt. ¶¶ 109, 130; *see also* Compl. ¶ 37. On September 26, 2012, Defendant answered the Complaint. Answer, ECF No. 18. On October 1, 2013, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew B. Greenblatt, and Lisa M. Collura. Defendant did not depose any of the Trustee's experts and did not serve any affirmative or rebuttal expert reports.

Following discovery, the case was ripe for mediation under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February 16, 2010 Protective Order, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141. The parties entered into mediation before Keith N. Costa but were unsuccessful. *See* Notice of Mediation Referral & Mediator Selection, ECF Nos. 22 & 24; Mediator's Final Report, ECF No. 26. On March 17, 2021, this Court authorized the Trustee to file motions for summary judgment in any pending good faith case without a Local Rule 7056-1(a) pre-motion conference. *See SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Mar. 17, 2021), ECF No. 20440.

## ARGUMENT

## I.    THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE

This Court and the District Court have granted summary judgment in the Trustee's favor multiple times in identical cases. *See Picard v. Avellino*, Adv. Pro. No. 10-05421, 2022 WL 2799905 (Bankr. S.D.N.Y. July 15, 2022) ("*Avellino II*"); *Picard v. Est. of James M. Goodman*, Adv. Pro. No. 10-04762, 2022 WL 2015662 (Bankr. S.D.N.Y. June 6, 2022); Memo. Decision,

*Picard v. Jacob M. Dick Rev Living Tr. DTD 4/6/01*, Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y. June 6, 2022), ECF No. 141; *Picard v. Ken-Wen Fam. Ltd. P'ship*, Adv. Pro. No. 10-04468, 2022 WL 709768 (Bankr. S.D.N.Y. Mar. 9, 2022); *In re BLMIS*, No. 1:21-cv-02334-CM, 2022 WL 493734, at *15 (S.D.N.Y. Feb. 17, 2021) ("*Epstein II*"); *Picard v. The Gerald and Barbara Keller Fam. Tr.*, 634 B.R. 39 (Bankr. S.D.N.Y. 2021); *Picard v. Miller*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Picard v. JABA Assocs. LP*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021); *Picard v. Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("*Epstein I*"); *see also* Judgment, *Picard v. The Est. of Robert Shervyn Savin*, Adv. Pro. No. 10-04889 (CGM) (Bankr. S.D.N.Y. Aug. 16, 2022), ECF No. 126; Judgment, *Picard v. Kuntzman Fam. LLC*, Adv. Pro. No. 10-04752 (Bankr. S.D.N.Y. Aug. 16, 2022), ECF No. 132; Judgment, *Picard v. Doron Tavlin Tr. U/A 2/4/91*, Adv. Pro. No. 10-05312 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 115; Judgment, *Picard v. Stuart Leventhal 2001 Irrevocable Tr.*, Adv. Pro. No. 10-04492 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 75.  Other than the amounts and dates of the transfers, the claims are identical and the record submitted in support is the same as the other motions for summary judgment.

Different adversary proceedings within a SIPA liquidation proceeding are considered "one case" for purposes of law of the case.  *See Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior decisions within this SIPA proceeding constitute law of the case.")); *Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (holding the law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrestar Corp.*,

No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of

the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not

constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017).

There is no reason for this Court to deviate from its prior rulings, or the decisions by

Judge Koeltl in *JABA Associates* and *Nissenbaum* on these very same issues.[2]  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." *JABA Assocs.*, 528 F. Supp. 3d at *n.4 (citing *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 247–48 (1986)); *see also Epstein II*, 2022 WL 493734, at *15.

## II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW

### A.    Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

---

[2] Judge Furman's opinion in *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-01029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021), reserved a single issue for trial—whether the transfers were made by the debtor—but otherwise disposed of all other issues on summary judgment in the Trustee's favor.  Following trial, the jury returned a verdict in favor of the Trustee on the sole remaining issue.  *See Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-01029 (S.D.N.Y. Mar. 7, 2022), ECF No. 132.  Judge Furman also stated that if the jury had not found for the Trustee, he would have granted the Trustee's Rule 50 motion because the evidence "really uniformly pointed in the direction that supported the jury's verdict."  Cremona Decl., Ex. 20 (Tr. at 389:4–16, *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-01029 (S.D.N.Y. Mar. 7, 2022), ECF No. 137).

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324.  "[T]he nonmoving party may . . . not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. N.Y.C.*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-moving party may not oppose summary judgment "on the basis of an unreasonable view of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).  And the non-moving party may not oppose summary judgment "by offering conclusions without supplying supporting arguments or facts in opposition to that motion." *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) (opposing party must provide "concrete particulars" showing that a trial is necessary).

## B.    The SIPA Scheme

### 1.    SIPA and SIPC

Congress enacted SIPA in 1970 to protect customers of failed broker-dealers by "expedit[ing] the return of customer property." *SIPC v. 2427 Parent Corp.*, 779 F.3d 74, 80 (2d Cir. 2015); *SIPC v. BLMIS*, 496 B.R. 744, 748–49 (Bankr. S.D.N.Y. 2013).  The program included the creation of SIPC, a nonprofit, private membership corporation to which registered broker-dealers belong.  The "members" of SIPC include "all persons registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer.  SIPA § 78ccc(a).

When one of its members fails, SIPC initiates a SIPA liquidation proceeding, applicable only to SIPC member firms. *See SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 281 (2d Cir. 1974) (object of SIPA and SIPC is to protect customers in brokerage industry). SIPA authorizes a SIPA trustee to liquidate the business and any assets of the member-broker and recover customer property wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3).

Although a SIPA liquidation proceeding is similar to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives." *SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011); *see also Picard v. Citibank, N.A.*, 12 F.4th 171, 180 (2d Cir. 2021). As the Second Circuit recently explained:

> SIPA thus incorporates the Bankruptcy Code to effectuate its priority scheme, but it does so selectively. Section 78fff(b) makes clear that the Bankruptcy Code applies only to the extent that it is "consistent" with the provisions of SIPA. 15 U.S.C. § 78fff(b). This selective incorporation of the bankruptcy provisions ensures that, when fit together, the individual pieces of SIPA produce a system that functions as intended.

*Picard v. Gettinger*, 976 F.3d 184, 199 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021); *see also* SIPA § 78fff(b) (setting forth that the SIPA liquidation proceeding shall proceed as if conducted under Chapter 7 of Bankruptcy Code to extent consistent with SIPA).

### 2.    Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *Gettinger*, 976 F.3d at 189–90; *Picard v. Lowrey*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019); *Keller Fam. Tr.*, 634 B.R. at 46–47. When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to

7

the broker.  The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers.  *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" refers to property that is held by the broker-dealer but belongs to its customers); *Nelson*, 610 B.R. at 232–33.  Where and how that property is held in reserve is the subject of customer protection rules, promulgated by the SEC, known as Rule 15c3-3.  Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3").  Once a broker-dealer goes into liquidation under SIPA, the Rule 15c3-3 reserve forms the corpus of the failed broker dealer's estate for distribution to customers. The SIPA designation of customer property is the seamless continuation of Rule 15c3-3.  *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Under SIPA, customer property includes securities and cash held for customers under Rule 15c3-3 and assets derived from or traceable to customer property.  SIPA § *78lll*(4).  Once property is entrusted by a customer to a broker-dealer for the purpose of purchasing securities, it remains customer property until it is returned to its rightful owner, regardless of how many hands it passes through.  SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); Rule 15c3-3(f) (providing that Rule 15c3-3 account cannot be subject to bank lien because it consists of customer property); *Dowden v. Cross Cty. Bank*, 97 B.R. 503, 508 (E.D. Ark. 1987) (holding Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property).  SIPA's broad definition of customer property recognizes customers' enduring rights to the property they entrusted to their broker for safekeeping.

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property. *See BAM L.P.*, 624 B.R. at 61–62 ("[M]oney held by a broker on behalf of its customers is not the broker's property under state law."). This means that a SIPA trustee's avoidance and recovery action does not neatly fit into the Bankruptcy Code, which allows trustees to recover a transfer of "an interest in *property of the debtor*." 11 U.S.C. § 548(a)(1)(A) (emphasis added). SIPA corrects this through § 78fff-2(c)(3), which provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property" to the extent that the transfer "is voidable or void" under the Bankruptcy Code, and "[s]uch recovered property shall be treated as customer property" and is "deemed to have been the property of the debtor." SIPA § 78fff-2(c)(3); *see also JABA Assocs.*, 528 F. Supp. 3d at 236; *Nissenbaum Tr.*, 2021 WL 1141638, at *10; *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).

This tailored definition of "property of the debtor" in SIPA is "an intended fiction" by Congress to provide SIPA trustees with expansive authority to marshal assets, wherever located, for the benefit of customers when assets are missing, such as when property is missing from Rule 15c3-3 custodial accounts. SIPA § 78fff-1(a); *Hill v. Spencer Sav. Loan Ass'n*, 83 B.R. 880, 894 (D.N.J. 1988). Section 78fff-2(c)(3) is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *Id*. at 893. The purpose of SIPA § 78fff-2(c)(3) is "to prevent one or more customers from depriving other customers of assets by keeping these assets out of the 'pool' available for distribution to customers on a ratable basis." *Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 322 (S.D. Tex. 1999).

9

### C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendant

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims.  To date, the Trustee has recovered $14.529 billion of approximately $20 billion owed to customers by the estate.  *See* Trustee's Twenty-Seventh Interim Report, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Apr. 29, 2022), ECF No. 21473.  Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendant.  *SIPC v. BLMIS (In re Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendant under 11 U.S.C. § 548(a)(1)(A).  The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014).  This Court has recognized that fictitious profit cases are strict liability cases.  Cremona Decl., Ex. 19 (Tr. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); (Tr. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 85).  This is especially true where, as here, Defendant admits receipt of the Two-Year Transfers.  Stmt. ¶ 109; *see also* Cremona Decl., Ex. 15 (Defendant Sharon Knee's Responses to Trustee's First Set of Requests for Admission Nos. 1–2, 7).

There is no genuine dispute as to the three elements of the Trustee's claim under section 548(a)(1)(A).

1.      **BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent
        and in Furtherance of the Fraud**

Intent to defraud can be established by either showing that the debtor operated a Ponzi

scheme or through a badges of fraud analysis. *See Avellino II*, 2022 WL 2799905, at *5 *JABA*

*Assocs.*, 528 F. Supp. 3d at 236–41; *Nissenbaum Tr.*, 2021 WL 1141638, at *11–15; *Picard v.*

*Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25,

2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all

transfers are deemed to have been made with actual fraudulent intent." (citation omitted); *Picard*

*v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on

the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi

scheme presumption.'").

The Ponzi scheme presumption has been embraced by appellate and district courts across

the country.  It stems from the very nature of a Ponzi scheme, which "'cannot work forever.'"

*Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*, 439 B.R. 284, n.19

(S.D.N.Y. 2010) ("*Bayou IV*") (quoting *Martino v. Edison Worldwide Cap. (In re Randy)*, 189

B.R. 425, 438 (Bankr. N.D. Ill. 1995)).  A Ponzi scheme's operator knows, from the outset, that

"[t]he investor pool is a limited resource and will eventually run dry."  *Armstrong v. Collins*, No.

01 Civ. 2437(PAC), 2010 WL 1141158, at *20–21 (S.D.N.Y. Mar. 24, 2010) (quoting

*Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.*), 280 B.R. 103, 110

(Bankr. E.D. Pa. 2002)).  When it does, the operator knows, "the scheme will collapse and that

those still invested in the enterprise will lose their money."  *Bayou IV*, 439 B.R. at 294 n.19.  The

only reasonable inference is "an intent to defraud future undertakers [investors] from the mere

fact that a debtor was running a Ponzi scheme." *Armstrong*, 2010 WL 1141158, at *21 (quoting

*In re C.F. Foods, L.P.*, 280 B.R. at 110); *see also Moran v. Goldfarb*, No. 09-cv-7667 (RJS),

2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (holding transfers "made in the course of a

Ponzi scheme" could "have been made for no purpose other than to hinder, delay[,] or defraud

creditors" (quoting *Gowan v. The Patriot Grp.*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011))).

Multiple courts of appeals have adopted that presumption. *See Janvey v. Brown*, 767

F.3d 430, 438–39 (5th Cir. 2014); *Emerson v. Maples*, 59 F.3d 170 (6th Cir. 1995); *Scholes v.

Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008);

*Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015); *Perkins v. Haines*, 661 F.3d 623, 626

(11th Cir. 2011); *see also Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM), 2022 WL

3354955, at *10 (Bankr. S.D.N.Y. July 18, 2022) ("The Ponzi scheme presumption is the law of

th[e Second] Circuit and the Trustee is entitled to rely on it to allege BLMIS' intent.").

Courts adopting the presumption have repeatedly explained that it reflects a logical

inference from a debtor's decision to perpetrate a scheme that is "insolvent by definition." *Klein*,

786 F.3d at 1320; *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d

185, 196 (5th Cir. 2013) ("[T]ransfers from a Ponzi scheme are presumptively made with intent

to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'"

(citation omitted)); *Bayou IV*, 439 B.R. at 294 ("'Knowledge to a substantial certainty constitutes

intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to

establish actual intent to defraud." (citation omitted)); *In re Randy*, 189 B.R. at 439 (fraudster's

intent to defraud derives from knowledge "that most investors, certainly the latest among them,

would lose their money if they invested in his scheme"); *Merrill v. Abbott*, 77 B.R. 843, 860 (D.

Utah 1987) ("[A] debtor's knowledge that future investors will not be paid is sufficient to

establish his actual intent to defraud them.").

12

Under either the Ponzi scheme presumption or the badges of fraud analysis, there is no

dispute that BLMIS made the transfers with the intent to hinder, delay, or defraud.

### a.    BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme.  *See Gettinger*, 976 F.3d at 188; *Miller*, 631

B.R. at 9; *Epstein I* at 5.  "The breadth and notoriety of the Madoff Ponzi scheme leave no basis

for disputing the application of the Ponzi scheme presumption . . . , particularly in light of

Madoff's criminal admission."  *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011).

The existence of the scheme has been recognized by the Bankruptcy Court, the District Court,

and the Second Circuit.  *See, e.g.*, *Picard v. Ida Fishman Rev. Tr.*, 773 F.3d 411, 415–16 (2d Cir.

2014); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *In re BLMIS*, 424 B.R. at 125–33.

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff

and BLMIS employees.  Stmt. ¶ 90.  Madoff admitted that he ran a Ponzi scheme through

BLMIS and that he did not execute trades on behalf of his investment advisory business ("IA

Business") clients.  Stmt. ¶¶ 91–98.  Frank DiPascali, Madoff's chief financial officer and co-

conspirator, admitted: "[f]rom at least the early 1990s through December of 2008 . . . [n]o

purchases of [sic] sales of securities were actually taking place in [customers'] accounts."  Stmt.

¶ 99.  DiPascali "used hindsight to file historical prices on stocks then [he] used those prices to

post purchase of [sic] sales to customer accounts as if they had been executed in realtime.  On a

regular basis [he] added fictitious trade data to account statements of certain clients to reflect the

specific rate of earn [sic] return that Bernie Madoff had directed for that client."  Stmt. ¶ 100.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records

as far back as the early 1970s.  Stmt. ¶¶ 101–02.  Kugel provided historical trade data to create

fake trades which, when included on the BLMIS account statements and trade confirmations of

IA Business clients, gave the appearance of profitable trading when no trading had actually

occurred.  Stmt. ¶ 102.  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶ 103.

Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of

the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent

positions in the IA Business accounts for auditors and the Securities and Exchange Commission

("SEC").  Stmt. ¶¶ 104–05.  And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller,

admitted IA Business customer money was funneled to BLMIS's proprietary trading and market-

making businesses to falsely inflate revenue and hide losses.  Stmt. ¶¶ 106–07.

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme, and courts routinely rely on them in granting summary judgment.  *See JABA Assocs.*,

528 F. Supp. 3d at 233–34 ("The various plea allocutions are admissible under Federal Rules of

Evidence 803(22) and 807, as several courts considering this issue in similar contexts have

held."); *Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Moran*, 2012 WL 2930210,

at *4 (granting motion for summary judgment based on plea transcript from related Department

of Justice action where perpetrator admitted under oath to orchestrating the Ponzi scheme);

*Bayou IV*, 439 B.R. at 307–08 (same); *McHale v. Boulder Cap. LLC*, 439 B.R. 47, 72 (S.D.N.Y.

2010); *Armstrong*, 2010 WL 1141158, at *24.

The plea allocutions of Madoff and former BLMIS employees show "there is no genuine

disputed issue of fact that BLMIS was a Ponzi scheme . . . ."  *Legacy Cap. Ltd.*, 603 B.R. at 693;

*JABA Assocs.*, 528 F. Supp. 3d at 237; *Nissenbaum Tr.*, 2021 WL 1141638, at *11 (same).

### b.    The Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that

BLMIS was a Ponzi scheme.  *See* Decl. of Bruce G. Dubinsky, dated August 16, 2022

("Dubinsky Decl."), Attach. A (Dubinsky Report); *see also Nelson*, 610 B.R. at 210–14.  As set

forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary

trading business; (ii) a market-making business; and (iii) the IA Business.  Stmt. ¶ 15.  The

proprietary trading business traded for its own account.  The market-making business made

markets in certain stocks, bonds, warrants and rights.  Stmt. ¶¶ 16–17.  The IA Business

purported to purchase and sell securities on behalf of its customers.  Stmt. ¶ 19.  The proprietary

trading business, the market-making business, and IA Business were units of BLMIS and

operated by Madoff.  Stmt. ¶ 20.  Based on his investigation, Dubinsky concluded that the IA

Business was a fraud and a Ponzi scheme.

BLMIS reported to its IA Business customers, including Defendant, that the money they

deposited with BLMIS was invested in the "split-strike conversion" strategy which involved (a)

investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put

options and selling call options to hedge against price changes in the underlying basket of stocks,

and (c) purchasing U.S. treasury bills when the money was "out of the market."  Stmt. ¶¶ 22, 25;

Cremona Decl., Ex. 9 (Plea Allocution of Bernard L. Madoff) at 25:25–26:18.  Dubinsky

concluded that BLMIS did not execute this strategy on behalf of its IA Business customers,

including for Defendant.  Stmt. ¶¶ 22, 25.

Dubinsky analyzed BLMIS's trading records and determined that as far back as the

1970s, BLMIS used historical trade information to fabricate false trades for IA Business

customers and reported those fake trades on customer statements.  Stmt. ¶¶ 23–58.  Dubinsky's

analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business

customers based on (a) the impossible reported volume of equity trades; (b) impossible equity

and options trades reported outside the daily price range; (c) the low volatility in its reported

daily trading performance compared to the actual market behavior and the performance achieved

by BLMIS in the proprietary trading business unit as measured by the volume weighted average

prices for its sales and purchases; (d) the consistently positive rates of returns that did not

"mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC")

records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options

Clearing Corporation ("OCC") records to confirm the reported IA Business options trades.  Stmt.

¶ 26.  Dubinsky further verified that no treasuries, purportedly part of the split-strike conversion

strategy, were purchased on behalf of IA Business customers.  Stmt. ¶¶ 59–63.

Dubinsky found many instances where the volume that BLMIS claimed to have

purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded

for the entire market.  Stmt. ¶¶ 27–30.  Dubinsky also analyzed the equity and options trades that

were priced outside the daily price range.  Stmt. ¶¶ 31–32.  For the period of 2000-2008,

Dubinsky determined that there were 99,972 equity transactions executed outside the daily

market traded price range, and 34,501 options transactions traded outside of the daily price

range.  *Id*.  The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Stmt. ¶¶

33–37.  Dubinsky also analyzed the volatility of the IA Business's reported average annual rate

of return for the split-strike conversion strategy as compared with the volatility of the annual rate

of return for the two major market indices—the S&P 100 Index and the Dow Jones Industrial

Average.  Stmt. ¶ 38.  Because the IA Business's split-strike conversion strategy was supposedly

engineered around the S&P 100, the IA Business's returns should have performed similarly to the S&P 100 Index. Stmt. ¶ 39. This analysis showed that the volatility in the IA Business rates of return did not mirror the volatility of the rates of return of the major indices. Stmt. ¶¶ 40–42.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC records pertaining to BLMIS's account with the DTC—an organization that clears and settles equity transactions in the U.S. market. Stmt. ¶ 43. Dubinsky's analysis confirmed that the equity securities that were cleared through BLMIS's DTC account were traded by the proprietary trading business; no IA Business trades were cleared through BLMIS's DTC account. Stmt. ¶¶ 44–48. He concluded that the IA Business did not execute the equity trades reflected on the customer statements. Similarly, the options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market. Stmt. ¶¶ 54–57. Based on Dubinsky's analysis of these records, he concluded that BLMIS did not execute the equity trades or conduct any options trading on behalf of its IA Business customers. Stmt. ¶¶ 49–53, 58.

Nor did BLMIS purchase the treasuries it reported to customers. Stmt. ¶¶ 59–60. While BLMIS did purchase treasuries with customer funds, it did so as a way to obtain interest on the customer cash it was holding. Stmt. ¶ 74. The purchases did not match the allocation of T-Bills that appeared on customer statements. Stmt. ¶ 60. Dubinsky's analysis also confirmed that the volume of T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills actually purchased and held by BLMIS. Stmt. ¶¶ 61–63; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual treasuries purchased by BLMIS and documented in the DTC records."). DiPascali, Madoff's right-hand employee,

testified that T-Bills purchased by the IA Business were solely as a cash management tool, that

the T-Bills were not purchased for IA Business customers, and that the T-Bills that appeared on

customer statements were fictitious.  Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37.

For these reasons, this Court has already held that any treasuries purchased were "part of the

ongoing fraud," *Epstein I* at 7, and that "the purchase of treasuries was part of the cash

management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS

into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'"

*Picard v. BAM L.P.*, 608 B.R. 165, 175 n.15 (Bankr. S.D.N.Y. 2019) (citation omitted).

Finally, BLMIS falsely reported paying or crediting customers with $4.3 billion in cash

dividends between 1998 and 2008.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 190–98.

Dubinsky confirmed that BLMIS neither received any monies as a result of trading securities nor

received any dividends on purportedly held securities.  *Id.* ¶ 279.

### c.    The Trustee's Experts Confirmed That BLMIS Paid Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed BLMIS's

books and records.  *See* Decl. of Lisa M. Collura, dated August 22, 2022 ("Collura Decl."),

Attach. A (Collura Knee Report).  Collura's investigation shows that during the ten-year period

before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA

Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account");

JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the

"JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Stmt. ¶

69.  The JPMorgan Accounts were linked commercial business accounts.  Stmt. ¶ 72.  IA

Business customers' cash deposits were deposited and commingled in the 703 Account.  Stmt. ¶

70.  IA Business customer withdrawals were made through the JPMorgan Accounts and the BT

Account, which was a checking account entirely funded by the 703 Account. Stmt. ¶ 71. The

509 Account was a commercial controlled disbursement account that was entirely funded by the

703 Account. *Id.* The money in the 703 Account consisted almost entirely of customer deposits.

Stmt. ¶¶ 72, 87. Dubinsky confirmed that customer funds were deposited and withdrawn from

the JPMorgan Accounts, and that there were no inflows of money as a result of trading securities

or receipt of dividends on purportedly held securities. Stmt. ¶ 76.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into

the 703 Account came directly from IA Business customers. Stmt. ¶ 73. The other three percent

of inflows into the 703 Account came from income earned from cash management activities

including (1) short-term investment activity made directly from the 703 Account (including

overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and treasuries);

and (2) investments of BLMIS customer funds made through bank and brokerage accounts held

in the name of BLMIS or Madoff. Stmt. ¶ 74. Because the short-term investments, including

overnight sweeps, were made directly out of the 703 Account, the source of the money for those

investments was customer funds. Stmt. ¶ 75.

The IA Business did not have any legitimate income-producing activities. The only

source of cash available for the IA Business to pay redemption requests was from cash that other

IA Business customers deposited in the 703 Account. Stmt. ¶ 82. These transactions rendered

BLMIS insolvent. By no later than December 2002, BLMIS's assets totaled approximately

$1.82 billion and its liabilities totaled $11.9 billion. Stmt. ¶ 83. By December 2008, the

customer property on hand at BLMIS was grossly insufficient to pay the claims of its customers.

Stmt. ¶ 84.

Defendant did not offer an expert to rebut the Trustee's experts' opinions that the funds

in the 703 Account consisted of customer money, that customer redemptions were paid with

funds from the 703 Account, or that the IA Business had no source of funds other than customer

money.  Nor did Defendant depose the Trustee's experts or identify any evidence—admissible or

otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi

scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendant

received comprised other customers' deposits.  Accordingly, the undisputed evidence is that the

transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

> **d.      The Trustee's Evidence of "Badges of Fraud" Independently
>          Establishes Actual Intent to Defraud**

The Ponzi presumption aside, the Trustee seeks an independent finding that the Trustee

established BLMIS's actual intent under the badges of fraud analysis.  Courts in this SIPA

liquidation proceeding have found that BLMIS made the transfers with the requisite intent to

defraud under the "badges of fraud" analysis.  *See JABA Assocs.*, 528 F. Supp. 3d at 240–41;

*Nissenbaum Tr.*, 2021 WL 1141638, at *14–15; *Nelson*, 610 B.R. at 235.  The Second Circuit

has recognized the following badges of fraud: (1) the lack or inadequacy of consideration; (2) the

family, friendship or close associate relationship between the parties; (3) the retention of

possession, benefit or use of the property in question; (4) the financial condition of the party

sought to be charged both before and after the transaction in question; (5) the existence or

cumulative effect of a pattern or series of transactions or course of conduct after the incurring of

debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general

chronology of the event and transactions under inquiry.  *See Salomon v. Kaiser (In re Kaiser)*,

722 F.2d 1574, 1582 (2d Cir. 1983); *Banner v. Kassow*, 104 F.3d 352, 352 (2d Cir. 1996).  The

Second Circuit has also recognized that "[c]oncealment of facts and false pretenses by the

transferor" may be a badge of fraud. *In re Kaiser*, 722 F.2d at 1582; *see also* 4 Collier on

Bankruptcy ¶ 548.02[5] at 548–34 to 38 (15th ed. 1983). The existence of several badges can

"constitute conclusive evidence of an actual intent to defraud . . . ." *Kirschner v. Fitzsimons*, No.

12-cv-2652 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. 2017) (noting that the existence of badges

of fraud "focus the inquiry on the circumstances that suggest a conveyance was made with

fraudulent intent" (citation omitted)); *see also Gredd v. Bear, Stearns Sec. Corp.*, 310 B.R. 500,

505, n.3 (Bankr. S.D.N.Y. 2002) (noting that "[b]adges of fraud are circumstances that so

commonly accompany fraudulent transfers that their presence gives rise to an inference of intent

to defraud").

The evidence adduced by the Trustee and set forth above, which has not been

controverted by Defendant, establishes at least three of the badges of fraud, including the

concealment of facts by BLMIS, BLMIS's insolvency at the relevant time, and the lack of

consideration provided for fictitious transfers to customers. *See JABA Assocs.*, 528 F. Supp. 3d

at 241 (citing *Nelson*, 610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate

basis to conclude that the Two-Year Transfers were made with the actual intent to defraud."));

*Nissenbaum Tr.*, 2021 WL 1141638, at *15 (same).

### e.   BLMIS's Two-Year Transfers to Defendant Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme. *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors." *Gredd v. Bear,*

*Stearns Sec. Corp.*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397

B.R. 1 (S.D.N.Y. 2007). This is predicated on the reality that a debtor's failure to honor an investor's withdrawal request "would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.*, 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other grounds*, *Bayou IV*, 439 B.R. at 284. Every redemption payment "*in and of itself* constituted an intentional misrepresentation of fact" of the investor's falsely inflated account statement and "an integral and essential part of the [] fraud." *Id.* Thus, the transfers to Defendant were in furtherance of the fraudulent Ponzi scheme.

### 2. BLMIS Made the Transfers to Defendant Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendant between December 11, 2006 and December 11, 2008. Defendant does not dispute the Trustee's evidence as to the date, receipt, and amount of the transfers the Trustee seeks to avoid and recover. *See* Cremona Decl., Ex. 15 (Defendant Sharon Knee's Responses to Trustee's First Set of Requests for Admission Nos. 1–2, 7).

### 3. The Transfers Were an Interest of the Debtor in Property

The Trustee has met the first element of section 548(a)(1)(A)—that the transfers were an interest of the debtor in property—in three ways. First, he has shown that the transfers at issue comprise customer property which he is authorized to recover under SIPA and the Bankruptcy Code. Second, he has shown that the JPMorgan Accounts were owned by BLMIS at the time of the transfers to Defendant. Third, because the BLMIS SIPA liquidation proceeding and Madoff's chapter 7 estate were substantively consolidated, the Trustee can recover customer property whether held in the name of BLMIS or Madoff.

Defendant may argue that the Trustee has not met the first element of section 548(a)(1)(A) because: (1) the IA Business, including the JPMorgan Accounts from which the fraudulent transfers were made, was not transferred to the LLC in 2001 when Madoff changed the corporate form of his business and (2) *Avellino I* (as defined below) says that the Trustee can only recover transfers made by the LLC, notwithstanding substantive consolidation. Defendant's arguments are wrong as a matter of undisputed fact and law.

> **a.    The Transfers are Customer Property and the Trustee Can Recover Them**

Where the transfers are customer property, the Trustee is entitled to avoid and recover the Two-Year Transfers, regardless of who owned the JPMorgan Accounts. *Epstein II*, 2022 WL 493734, at *15–16; *Keller Fam. Tr.*, 634 B.R. at 46–47; *BAM L.P.*, 624 B.R. at 62.

When IA Business customers sent money to BLMIS for the purpose of purchasing securities, it became "customer property" under SIPA. SIPA § 78*lll*(4); *Rosenman Fam., LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (funds given to BLMIS for the purpose of purchasing securities and deposited in the JPMorgan Account are subject to SIPA); *see also BAM L.P.*, 624 B.R. at 62. Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were composed primarily of customer property and its liabilities were composed primarily of amounts owed to customers. The transfers were made from the JPMorgan Accounts that were functionally used by BLMIS as its Rule 15c3-3 account, which forms the corpus of the fund of customer property under SIPA. Stmt. ¶¶ 69–77, 87–89; 17 C.F.R. § 240.15c3-3.

For at least the ten-year period prior to this SIPA liquidation proceeding, BLMIS bank records show that the JPMorgan Accounts were used as an instrumentality of the fraud for customer deposits and withdrawals—for at least three years while the firm was a sole proprietorship, and for the seven years after it became an LLC. Dubinsky Decl., Attach. A.

(Dubinsky Report) ¶ 279; Collura Decl., Attach. A (Collura Knee Report) ¶¶ 20–27; *BAM L.P.*,
624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the deposits
were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims'
deposits."); *Epstein II*, 2022 WL 493734, at *3 ("Customers like Appellants were paid profits
from customer funds pooled in BLMIS bank accounts."); *see also Citibank*, 12 F.4th at 179
("The customers' funds were commingled in BLMIS's bank account.  When customers withdrew
their 'profits' or principal, BLMIS paid them from this commingled account.  As a result, each
time BLMIS transferred payments to a customer, it was money stolen from other customers.");
*In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds in JPMorgan
account and sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs
Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) (same).

The undisputed facts demonstrate the transfers here are "property transferred by the
debtor which, except for such transfer, would have been customer property" and therefore are
recoverable under SIPA § 78fff-2(c)(3).  Because the funds are indisputably customer property,
BLMIS is deemed under SIPA to have an interest in the transferred customer property, making
the transfers here avoidable under § 548(a)(1)(A) of the Bankruptcy Code.  Stmt. ¶ 89; *Miller*,
631 B.R. at 8; *Keller Fam. Tr.*, 634 B.R. at 46–47; *Cohen*, 2016 WL 1695296, at *5.  Where, as
here, there is no dispute that the Trustee is seeking to recover transfers comprising customer
property, the form of the broker-dealer at the time of transfer is irrelevant.

        **b.**       **BLMIS Owned the JPMorgan Accounts Because the IA
                   Business Was Transferred to the LLC in 2001**

This Court has held numerous times that the transfers made by BLMIS in other prior
identical cases—like the Two Year Transfers here—were recoverable by the Trustee because the
JPMorgan Accounts were the property of BLMIS, not Madoff.  *See Epstein II*, 2022 WL 493734,

24

at *13–16; *Keller Fam. Tr.*, 634 B.R. at 46–47; *Miller*, 631 B.R. at 8; *Epstein I* at 7; *BAM L.P.*,

624 B.R. at 61; *Nelson*, 610 B.R. at 216; *JABA Assocs.*, 528 F. Supp. 3d at 234–36; *Nissenbaum*

*Tr.*, 2021 WL 1141638, at *9.  Any contrary argument from Defendant should be rejected based

on the numerous prior decisions in this liquidation.  In *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD.  As such, the Defendants' customer accounts
> and the Bank Accounts are property of BLMIS and the monies paid
> to Defendants from those Bank Accounts must be turned over to the
> Trustee.

*BAM L.P.*, 624 B.R. at 61; *see also Miller*, 631 B.R. at 16 (same); *Epstein I* at 7 (same).

In *JABA Associates* and *Nissenbaum*, the District Court held:

> Madoff was using the accounts at issue in his capacity as a sole
> proprietor until he reorganized his business as an LLC. When
> Madoff changed the form of his business from a sole proprietorship
> to an LLC, the business retained the same SEC registration number.
> When submitting the Amended Form BD, Madoff noted that the
> [sole proprietorship] [sic] 'will transfer to successor all of
> predecessor's assets and liabilities related to predecessor's business.
> The transfer will not result in any change in ownership or control.' .
> . . And there were no assets or liabilities of the sole proprietorship
> listed as 'not assumed by the successor.' . . . The form also indicated
> that no 'accounts, funds, or securities of customers of the applicant
> are held by or maintained by [any] other person, firm, or
> organization.'

*JABA Assocs.*, 528 F. Supp. 3d at 234–35; *Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same).

BLMIS owned the JPMorgan Accounts at the time of the transfers to Defendant.  Madoff

began operating as a sole proprietorship in the early 1960s under the names of Bernard L.

Madoff and Bernard L. Madoff Investment Securities.  *BAM L.P.*, 624 B.R. at 59.  Under section

78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form BD (the uniform form

for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once registered with the SEC, the

broker-dealer is assigned a registrant number, becomes a member of SIPC, and is required to pay

into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).  In January 1960, the sole

proprietorship filed with the SEC a Form BD under registrant number 8-8132.  Cremona Decl.,

Ex. 1 (1959 Form BD).  Through that registration, the broker-dealer became a member of SIPC

when SIPA was enacted in 1970.  There is no dispute that prior to 2001, the JPMorgan Accounts

were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer

business when he incorporated as an LLC.  Cremona Decl., Ex. 2 (Articles of Organization); *see*

*also Epstein II*, 2022 WL 493734, at *13; *BAM L.P.*, 624 B.R. at 59.  If an entity succeeds to and

continues the business of a broker-dealer previously registered with the SEC, and the succession

is based on a change in the predecessor's form of organization, it files a Form BD Amendment.

SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).  The successor entity continues the business

and SIPC membership of its predecessor.  Thus, BLMIS filed an Amended Form BD with the

SEC in January 2001 to reflect its change in corporate form using the same SEC registrant

number 8-8132; BLMIS did not file a new application for registration.  Cremona Decl., Ex. 3

(Amended Form BD); *see also Epstein II*, 2022 WL 493734, at *13; *BAM L.P.*, 624 B.R. at 60.

Under "BD Successions" of the 2001 Amended Form BD, it asked:  "Briefly describe

details of the succession, including any assets or liabilities not assumed by the successor."

Cremona Decl., Ex. 3 (Amended Form BD at 10–11, *see also* Question 5).  The response was:

"Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and

liabilities related to predecessor's business.  The transfer will not result in any change in

ownership or control."  *Id*.  No assets or liabilities of the sole proprietorship were listed as "not

assumed by the successor."  *Id.*  The 2001 Amended Form BD further certified that no

"accounts, funds, or securities of customers of the *applicant* are held or maintained by such other

26

*person*, firm, or organization." *Id.* (Amended Form BD at 5). BLMIS succeeded to the sole

proprietorship's SEC registrant number 8-8132. Cremona Decl., Ex. 1 (1959 Form BD); Ex. 3

(Amended Form BD at 10).

Upon the filing of the Amended Form BD, the sole proprietorship no longer operated as a

broker-dealer or in any other capacity. Cremona Decl., Ex. 3 (Amended Form BD at 10–11); *see*

*also Epstein II*, 2022 WL 493734, at *13; *BAM L.P.*, 624 B.R. at 60. Indeed, this Court noted

"that this succession provision meant that, without exception, all of the assets and liabilities of

the sole proprietorship were transferred to BLMIS and the sole proprietorship ceased to exist."

*BAM L.P.*, 624 B.R. at 60; *see also Epstein II*, 2022 WL 493734, at *16 ("Madoff's

representations to the SEC in 2001 about the transfer of the entirety of his business, business

property, assets and liabilities to BLMIS is dispositive of that fact, and means that all bank

accounts and customer funds existing at that time were transferred to BLMIS.").

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets. In its Amended and Restated Operating Agreement, BLMIS sets forth Madoff's

intent to transfer all assets—including bank accounts—held by the sole proprietorship to the

LLC, effective January 1, 2001:

> 3. **Purpose.** The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 5 (Amended and Restated Operating Agreement). Consistent with the 2001

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.

The change in corporate form of the IA Business was reflected on BLMIS customer

statements which, after 2001, reflected the name of the LLC on the top left corner. *Compare*

Dubinsky Decl., Attach. A (Dubinsky Report) Figure 7 (Dec. 30, 2000 BLMIS Customer

Statement) *with* Cremona Decl., Ex. 16 (January 31, 2007 BLMIS Customer Statement). Madoff

also made various financial institutions aware of the change in corporate form and referred to the

LCC as the owner of the JPMorgan Accounts in correspondence with JPMorgan regarding the

703 and 509 Accounts.[3] Cremona Decl., Ex. 6 (Letters to Financial Institutions). In addition,

existing BLMIS customers of the IA Business became customers of the LLC. *See* Cremona

Decl., Ex. 17 (BLMIS Customer Agreement). On September 20, 2004, Defendant also executed

a verification of address change form which listed the LLC in the top left corner. Cremona

Decl., Ex. 18 (BLMIS Verification of Address Change). And the JPMorgan Accounts continued

to be used in the same way both prior to and after 2001—to receive customer deposits and to

satisfy customer withdrawal requests. Collura Decl., Ex. A (Collura Knee Report) ¶¶ 20–27.

The sole proprietorship thus had no corporate existence, no SEC registration, no assets,

and no customers after 2001. *See SIPC v. BLMIS (In re Madoff)*, 522 B.R. 41, 60 (Bankr.

S.D.N.Y. 2014), *aff'd*, 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d

Cir. 2017) (finding all Madoff Securities' assets and liabilities were transferred to BLMIS upon

the reorganization to a single member LLC). Moreover, when Madoff did finally register his IA

---

[3] On January 29, 2009, JPMorgan stipulated that it was "currently in possession of Debtor's funds in *accounts in the name of the Debtor*, account numbers . . . 703 [and] 509." *See* Stipulation & Order for Transfer of Funds by J.P. Morgan Chase Bank to Trustee at 3, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Jan. 29, 2009), ECF No. 52-1 (emphasis added); *see also* Answer to Am. Complaint ¶ 200, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (Bankr. S.D.N.Y. Oct. 11, 2013), ECF No. 27 ("JPMorgan admits that the 703 account was in BLMIS's name . . . .").

Business in 2006, he did so not as a sole proprietor but rather through the LLC, using the same SEC registrant number and signing the form on behalf of "Bernard L. Madoff Investment Securities LLC." Cremona Decl., Ex. 4 (2006 Form ADV). Thus, if any doubt remained in 2001 as to whether the LLC succeeded to the IA Business, it was resolved when the IA Business was registered under the LLC in August 2006—before the fraudulent transfers the Trustee seeks to recover were made. *See Epstein II*, 2022 WL 493734, at *16 ("When Madoff did finally register the IA Business in 2006, he registered it as BLMIS, using the same SEC registrant number as BLMIS. The only conclusion that a reasonable trier of fact could reach is that the IA Business was transferred to BLMIS in 2001 with the rest of the business assets and was registered under BLMIS in 2006.").

Defendant may nonetheless argue that various BLMIS and JPMorgan documents indicate Madoff intended to keep the IA Business separate under the name "Bernard L. Madoff Investment Securities." But any "discrepancies Defendants have demonstrated to exist—forms filled out improperly, business names used interchangeably on bank accounts and checks—are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme." *BAM L.P.*, 624 B.R. at 60 (citation omitted); *JABA Assocs.*, 528 F. Supp. 3d at 235 (same); *Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same); *see also Epstein II*, 2022 WL 493734, at *15–16 ("The fact that Chase failed to make the necessary administrative changes to the 703 account for some months after the corporate changes were registered with the SEC raises no genuine issue on that score."). Thus, consistent with prior decisions of this Court, ministerial oversights in BLMIS's recordkeeping are insufficient to create a *genuine* factual dispute as to the ownership of the IA Business.

     **c.**    **Because the Estates Were Consolidated, the Trustee Can**
             **Recover Customer Property Held in The Names of Either the**
             **LLC or Madoff**

After Madoff confessed in December 2008, the Government brought criminal charges

and the SEC filed a civil complaint against Madoff and BLMIS alleging that they were operating

a Ponzi scheme through BLMIS's IA Business.  *United States v. Madoff*, 586 F. Supp. 2d 240

(S.D.N.Y. 2009); Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008),

ECF No. 1.  Because BLMIS was a registered broker-dealer, SIPC obtained a protective decree

finding BLMIS's customers needed the protections of SIPA, placed BLMIS into liquidation,

appointed the Trustee "for the liquidation of the business of the Defendant with all the duties and

powers of a trustee as prescribed in SIPA," and removed the case to the bankruptcy court.  Order

¶ 2, *Madoff*, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("Protective Decree"); SIPC

Application ¶ 2, *id.*, ECF No. 5.

Shortly after the Trustee's appointment, certain creditors filed an involuntary bankruptcy

petition against Madoff, concerned that they would be prejudiced if Madoff's personal estate was

not liquidated alongside the liquidation of the broker-dealer by the SIPA Trustee.  Pet. at 7,

*Madoff*, No. 08-cv-10791 (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court allowed the

chapter 7 case to go forward, to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  Order at 4, *Madoff*,

No. 08-cv-10791 (S.D.N.Y. Apr. 10, 2009), ECF No. 47.  Alan Nisselson was subsequently

appointed chapter 7 Trustee for Madoff.  *See* Notice of Appointment, *In re Madoff*, No. 09-

11893 (CGM) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.

Because Madoff used BLMIS as his personal piggy bank and alter ego, and his only

significant source of income was his draw from BLMIS, which itself came from stolen customer

money, there was no way to separate Madoff's assets from those of the business.  *See* Mem. of

Law, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.

Upon motion by the Trustee, the bankruptcy court substantively consolidated the SIPA

liquidation and the chapter 7 bankruptcy, merging Madoff's chapter 7 estate into the SIPA

proceeding *nunc pro tunc*. All assets and liabilities of the two estates were deemed consolidated

as of December 10, 2008. *See* Order, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y.

June 10, 2009), ECF No. 252 (the "Consolidation Order"). The SIPA Trustee was authorized to

avoid and recover fraudulent transfers of customer property under SIPA *on behalf of the

consolidated estate*. *Id*. ¶ 7 (emphasis added) (stating "the SIPA Trustee is authorized to pursue

claims on behalf of the consolidated estate . . . for, among other things, the avoidance and

recovery of transferred property"). The chapter 7 Trustee had the powers of an ordinary

bankruptcy trustee. *Id*. ¶ 4. The Consolidation Order unified interests in the separate estates,

ensuring that all assets, whether technically Madoff assets or BLMIS assets, flowed into the

consolidated estate to be returned to customers. The Order further provided that, like those of

the SIPA Trustee, the fees and expenses of the chapter 7 Trustee would be paid by SIPC as

opposed to coming out of the estate, thereby maximizing the recoveries for customers. *Id*. ¶ 5.

The Consolidation Order supports the right of the Trustee to recover customer property

transferred from any bank account held by BLMIS or Madoff. The Order preserves the

respective avoidance powers of both the SIPA Trustee and the chapter 7 Trustee, a provision

included in light of caselaw holding that "[a]bsent express preservation of the trustee's avoidance

power, an order of substantive consolidation would ordinarily eliminate that power." *Alexander

v. Compton*, 229 F.3d 750, 768 (9th Cir. 2000). But the preservation of each trustee's respective

powers is not a limit on those powers. The Consolidation Order does not state that the SIPA

Trustee can only recover customer property when held by the LLC; to the contrary, the effect of

the Order is that when the SIPA Trustee exercises that power, he does so on behalf of the

consolidated estate and can recover any customer property held by Madoff *or* the LLC.  *Cf. BAM*

*L.P.*, 624 B.R. at 61 & n.4 (noting that because the chapter 7 case was substantively consolidated

with the SIPA proceeding, the SIPA Trustee should be able to recover fraudulent transfers made

by Madoff's sole proprietorship); *see also Epstein II*, 2022 WL 493734, at *11 ("As repeatedly

and consistently held in this district, the Trustee is a fiduciary who is suing to recover customer

property on behalf of and for the benefit of BLMIS, an insolvent SIPA estate.").

### d.    *Avellino I* Is Wrong

The *Avellino I* decision entered by Judge Bernstein was centered around the fact that the

SIPC Application that commenced the BLMIS liquidation named the member broker-dealer that

was registered with the SEC as of December 2008 under registrant number 8-8132: Bernard L.

Madoff Investment Securities LLC.[4]  *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016)

("*Avellino I*").  In *Avellino I*, Judge Bernstein reasoned that because the SIPC Application and

the Protective Decree named only the LLC (rather than the LLC *and* the defunct predecessor sole

proprietorship), the only "debtor" for purposes of the avoidance and recovery provisions of SIPA

and the Bankruptcy Code was the LLC.  *Id.* at 108–09.  Judge Bernstein also ruled that the

Consolidation Order did not give the SIPA Trustee the power to recover property held in

Madoff's name, nor did the chapter 7 Trustee have the power to recover customer property.  *Id.*

at 109–10.

This interpretation of the Protective Decree and the Consolidation Order is unmoored

from the text of SIPA.  First, because the sole proprietorship ceased to exist some eight years

---

[4] The Trustee's action in *Avellino* is ongoing in this Court, and the Trustee will appeal the portion of the ruling affecting pre-2001 transfers once a final judgment is entered in the case.

prior to the collapse, the only SIPC member that *could have been* named in the Protective Decree was the LLC.  There is no SIPA requirement that a protective decree identify every prior name or form of organization under which the broker-dealer formerly operated (nor would imposing such a requirement extra-statutorily be consistent with SIPA's protective purpose).  The Protective Decree here named the SIPC member and subjected all customer property wherever and whenever held to the special protections of SIPA for the benefit of the broker-dealer's customers.

Second, the Trustee was appointed for the liquidation of the *business* of the broker-dealer.  The facts show that Madoff's business was a continued, uninterrupted one from its inception in 1960, funneling customer property in the same way through the same bank accounts. Collura Decl., Ex. A (Collura Knee Report) ¶¶ 20–27; *see also In re Madoff*, 522 B.R. at 60 ("[T]he incorporation of BLMIS as a limited liability company continued his business without change. . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme."); *JABA Assocs.*, 528 F. Supp. 3d at 227 ("While BLMIS changed from a sole proprietorship to an LLC, many aspects of the business remained the same."); *Nissenbaum Tr.*, 2021 WL 1141638, at *3 (same); *In re Madoff*, 531 B.R. at 485 (finding that "nothing changed" when BLMIS changed to an LLC).  Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Moreover, where the same broker-dealer is continuously registered with the SEC under the same registrant number, its SIPC membership is also continuous.  The term "debtor" has a special definition under SIPA, which controls here: "a *member* of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title."  SIPA

§ 78*lll*(5) (emphasis added); SIPA § 78*fff*(b) (Code applies only to the extent that it is

"consistent" with the provisions of SIPA).  This differs from the Bankruptcy Code, where a

"debtor" is an individual, partnership, or corporation.  11 U.S.C. §§ 109(a), 101(41).  Because

SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is

at risk of failing as the "debtor" in the application for the protective decree.  Thus, registration

under SIPA § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into

liquidation, who the debtor is.  Whether a change in corporate form would or would not change

the "person" who was the debtor in an ordinary bankruptcy proceeding, the debtor in this SIPA

liquidation proceeding is "the member of SIPC" as to which the Protective Decree was brought.

And since SIPA was enacted in 1970, the relevant member of SIPC here has been BLMIS,

whether organized as a sole proprietorship or an LLC.

Additionally, *Avellino I*'s holding that the transfers must emanate from a bank account in

the name of the debtor is not consistent with SIPA and its case law.  SIPA protection is not

conditioned on bank accounts being in the name of the debtor.  For example, it does not matter to

"whom claimants made their checks payable" when they deposited funds "with the debtor."

*Ahammed v. SIPC*, 295 F.3d 1100, 1107 (10th Cir. 2002).  And SIPA protection follows where

"there was 'actual receipt, acquisition or possession of the property of a claimant by the

brokerage firm under liquidation.'"  *Focht v. Heebner*, 223 F.3d 1296, 1302 (11th Cir. 2000)

(citation omitted).  Courts have construed customer property broadly to include funds or assets

held in non-debtor bank accounts.  *See Peloro v. United States*, 488 F.3d 163, 170, 173–74 (3d

Cir. 2007) (finding bearer bonds held by broker-dealer for investor's account that were seized by

FBI prior to deposit into investor account were customer property); Order, *SIPC v. Austin Sec.,*

*Inc.*, Adv. Pro. No. 05-1144 (Bankr. E.D.N.Y. Nov. 20, 2007), ECF No. 89 (allocating to fund of customer property principals' brokerage accounts and proceeds from sales of jewelry).

As long as a SIPA trustee can show that the property in question is customer property received by the broker-dealer that is a member of SIPC, the SIPA trustee has the authority to recover it, wherever it lies. SIPA § 78fff-2(c)(3). Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account. Whatever particular bank account a fraudster chooses to park customer property in or however that bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners. *Id.*; *see also* Consolidation Order.

### D.    Defendant Has Not Presented Any Countervailing Evidence

Defendant cannot come forward with evidence or witnesses to rebut the Trustee's *prima facie* case. The evidence and opinions of the Trustee's expert witnesses and DiPascali's testimony unequivocally demonstrate that BLMIS made the transfers with the intent to defraud (whether because BLMIS was a Ponzi scheme or under the badges of fraud analysis). Defendant can offer only vague assertions or proffers of evidence she would elicit on cross-examination of the Trustee's expert witnesses, which are not sufficient to withstand summary judgment. *See Bayou III*, 396 B.R. at 825 (explaining that conjecture, surmise, or "metaphysical doubt," and self-serving conclusory statements will not defeat summary judgment). Defendant cannot create an issue of material fact where none exists simply because she disagrees. *See Epstein II*, 2022 WL 493734, at *15 (finding appellants offered no evidence or analysis, expert or otherwise, to rebut the testimony of the Trustee's expert, Madoff, and DiPascali).

### III.    DEFENDANT'S DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Having established that BLMIS transferred $1,125,000 in fictitious profits within the Two-Year Period to Defendant with actual fraudulent intent, the Trustee is entitled to avoid and

recover the Two-Year Transfers.  In response, Defendant may raise certain legal defenses, all of

which have been rejected by this Court, and thus do not establish a triable issue of fact to defeat

the Trustee's Motion.  For example, the Second Circuit has ruled that as a matter of law,

Defendant cannot establish that she took the transfers of fictitious profits "for value" because

such false profits were not on account of a valid antecedent debt.  *Gettinger*, 976 F.3d at 199–

200; *see also JABA Assocs.*, 528 F. Supp. 3d at 241–43; *Nissenbaum Tr.*, 2021 WL 1141638, at

*15–16; *BAM L.P.*, 608 B.R. at 180–81.  That ruling is law of the case, requiring dismissal of

Defendant's value defense.

## IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008

(the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s]

normally requires prejudgment interest to compensate for the value over time of the amount

recovered."  *Geltzer v. Artists Mktg. Corp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding

prejudgment interest "[t]o fully and fairly compensate [debtor's] creditors for their loss—not

only of [the amount] that was fraudulently conveyed . . . but of the use of that money").

Prejudgment interest properly "compensates the Trustee for the loss of the use of the Two-Year

Transfers for the years that this litigation has lasted and reduces the profits to [Defendant] from

having withheld the funds."  *JABA Assocs.*, 528 F. Supp. 3d at 246; *Nissenbaum Tr.*, 2021

WL1141638, at *18 (same); *see also BAM L.P.*, 624 B.R. at 63–66.

In awarding prejudgment interest, courts consider "(i) the need to fully compensate the

wronged party for actual damages suffered, (ii) considerations of fairness and the relative

equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other

general principles as are deemed relevant by the court."  *Wickham Contracting Co. v. Int'l Bhd.*

*of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992).  The Trustee has spent over

eleven years litigating this matter.  Fairness requires that the Trustee be made whole with an

award of prejudgment interest to compensate the customer property estate.  Defendant received

funds that did not belong to her and has withheld those funds, preventing them from being

returned to the victims of BLMIS's fraud.  Indeed, the Trustee has been awarded prejudgment

interest numerous times.  *See Avellino II*, 2022 WL 2799905, at *7; *Ken-Wen*, 2022 WL 709768,

at *3–4; *Epstein II*, 2022 WL 493734, at *18–19; *Keller Fam. Tr.*, 634 B.R. at 52–53; *Miller*,

631 B.R. at 17–18; *JABA Assocs.*, 528 F. Supp. 3d at 246; *Nissenbaum Tr.*, 2021 WL 1141638,

at *18; *BAM L.P.*, 624 B.R. at 63–66.  Prejudgment interest is appropriate here for the same

reasons.

 "Courts in the Second Circuit and in this district have recognized that the award of

prejudgment interest is discretionary, and absent a sound reason to deny prejudgment interest,

such interest should be awarded."  *In re FKF 3, LLC*, No. 13 Civ. 3601, 2018 WL 5292131, at

*12 (S.D.N.Y. 2018) (quoting *McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*, 439

B.R. 84, 87 (Bankr. S.D.N.Y. 2010)).  In *BAM L.P.*, this Court awarded prejudgment interest

finding that the "net losers" of BLMIS's Ponzi scheme "are the real victims of Defendants'

dilatory litigation tactics" and "an award of prejudgment interest is essential to the [Trustee's]

collection of customer property."  624 B.R. at 64 (citing *Stanford Square, L.L.C. v. Nomura

Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("[T]he party owing the money has

had the use of the funds he was obligated to have paid, and should be required to pay

compensation by way of interest.")).  Here, while Defendant may have unwittingly invested in a

Ponzi scheme, she "still received money that was never in fact [hers] to spend."  *Moran*, 2012

WL 2930210, at *9.  Defendant has benefitted—and continues to benefit—from the transfers in

37

her possession, to the detriment of other victims. *See Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. (SHL) Bahrain Islamic Bank*, 633 B.R. 207, 212 (Bankr. S.D.N.Y. 2021) (finding that prejudgment interest was appropriate because defendants "have withheld the money owed to the Debtors for close to a decade—and indeed still has not been paid").

The relative equities, entwined with the remedial purpose of SIPA and the circumstances of this liquidation, further weigh in favor of prejudgment interest because the Trustee "has spent time and energy having to defend against legal arguments that have already been decided in these SIPA cases." *Miller*, 631 B.R. at 17; *see also Epstein II*, 2022 WL 493734, at *19 (agreeing with Judge Morris that appellants "insisted on relitigating 'issues that have already been decided by the Court in this case' and forced the Trustee to 'spen[d] time and energy having to defend against legal arguments that have already been decided in these SIPA cases'"). In *Epstein II*, Judge McMahon awarded prejudgment interest on the basis that defendants:

> have done nothing more than regurgitate arguments already made and rejected, without casting the slightest doubt on the evidence that has been the cornerstone of every one of these cases or offering evidence to demonstrate that they are somehow different than everyone else who 'invested' with Bernie Madoff.  They have wasted the Trustee's time and resources and the Court's as well.

2022 WL 493734, at *19.  Most recently, in *Ken-Wen*, this Court awarded prejudgment interest because the Trustee "has spent approximately ten years prosecuting this case and cannot be made whole without an award of prejudgment interest."  2022 WL 709768, at *4.

This Court should also determine that the federal rate applies where the Trustee's claims arise only from federal law. *BAM L.P.*, 624 B.R. at 64.  However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the Filing Date. *Id.* at 65 (citation omitted); *see also Ken-Wen*, 2022 WL 709768, at *4 ("Prejudgment interest is warranted at a rate of 4% from the

SIPA Filing Date."); *Epstein II*, 2022 WL 493734, at \*19 (holding that an "award of prejudgment interest at the prime rate of 4%" was justified); *Keller Fam. Tr.*, 634 B.R. at 53 (holding that 4% interest is consistent with other decisions that have awarded prejudgment interest); *Miller*, 631 B.R. at 17–18 (same); *JABA Assocs.*, 528 F. Supp. 3d at 246 ("The 4% rate compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted."); *Nissenbaum Tr.*, 2021 WL 1141638, at \*17–18 (same).

Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation." *BAM L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 5292131, at \*14); *see also Ken-Wen*, 2022 WL 709768, at \*4 (awarding prejudgment interest from the Filing Date); *Miller*, 631 B.R. at 18 n.13 ("The Court would be willing to consider awarding interest from the date of the SIPA action where the facts warrant it."). Here, prejudgment interest in the amount of 4% from the Filing Date is warranted.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in the Trustee's favor on Count One of the Trustee's Complaint, and enter an order: (1) avoiding $1,125,000 in transfers of fictitious profits that BLMIS made to Defendant within the Two-Year Period; (2) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the rate of 4%; and (3) requiring Defendant to return such transfers or the value thereof.

Dated:  August 24, 2022
           New York, New York

/s/ Nicholas J. Cremona
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*