**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO AG, <br><br> Defendant. | Adv. Pro. No. 12-01209 (CGM) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..............................................................................................4

    I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS..............................4

    II.     BSI, BDG AND THEIR INVESTMENTS IN THE FAIRFIELD FUNDS ...........5

ARGUMENT...................................................................................................................7

    I.      THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT .........7

          A.     BSI and BDG Purposefully Availed Themselves of the Laws and Privileges of Conducting Business in New York by Investing in the Fairfield Funds ........................................................................................10

               1.     BSI's and BDG's Investments in BLMIS Through the Fairfield Funds Establish Minimum Contacts ...............................................10

                    a.     *BLI* and this Court's Recent Decisions Establish this Court's Jurisdiction Over Defendant .................................12

                    b.     Walden Does Not Save Defendant From This Court's Jurisdiction .......................................................................14

               2.     The Forum Selection and Choice of Law Clauses in the Subscription Agreements Are Strong Jurisdictional Contacts.......16

               3.     Purposeful Use of New York Bank Accounts Add to Jurisdictional Contacts .................................................................17

               4.     Other Jurisdictional Contacts Show Purposeful Availment...........20

                      a.     BDG ..............................................................................21

                      b.     BSI ................................................................................22

           B.     Exercise of Personal Jurisdiction is Reasonable ........................................23

    II.     SECTION 546(e) DOES NOT BAR RECOVERY FROM BSI ...........................25

          A.     Sentry Had Actual Knowledge of Madoff's Fraud....................................26

          B.     Section 546(e) Does Not Apply Independently to Recovery Actions .......27

III.    THE TRUSTEE'S COMPLAINT ADEQUATELY PLEADS THAT BSI
AND BDG RECEIVED BLMIS CUSTOMER PROPERTY ...............................30

IV.    THE 550(b) GOOD FAITH DEFENSE IS AN AFFIRMATIVE DEFENSE
AND THUS INAPPROPRIATE AT THE MOTION TO DISMISS STAGE ......34

CONCLUSION.....................................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ............................................................30, 32

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996) ...........................................................................................8

*Aguas Lenders Recovery Grp. v. Suez, S.A.*,
    585 F.3d 696 (2009) .................................................................................................16

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .........................................................................................15, 18

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) .....................................................................15

*Arista Recs. LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) .....................................................................................21

*Ayyash v. Bank Al-Madina*,
    No. 04 Civ. 9201, 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ................................25

*Bristol-Myers Squibb v. Superior Court of Cal., San Francisco Cty.*,
    137 S. Ct. 1773 (2017) .............................................................................................15

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985) .......................................................................................... *passim*

*In re Caremerica*,
    409 B.R. 737 (E.D.N.C. 2009) .................................................................................32

*Chase Manhattan Bank v. Banque Generale Du Com.*,
    No. 96 CIV 5184 (KMW),1997 WL 266968 (S.D.N.Y. May 20, 1997) ................16

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ...............................................................................8, 24

*Colson Servs. Corp. v. Bank of Baltimore*,
    712 F. Supp. 28 (S.D.N.Y. 1989) ............................................................................10

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) .......................................................................8

*Dandong v. Pinnacle Performance Ltd.*,
   966 F. Supp. 2d 374 (S.D.N.Y. 2013)................................................................18

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013).........................................................................7

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..............................................................36

*Eldesouky v. Aziz*,
   No. 11-CV-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014)..................................18

*Esso Expl. Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   397 F. Supp. 3d 323 (S.D.N.Y. 2019)..............................................................10

*Picard v. Fairfield Investment Fund Ltd. (In re BLMIS)*,
   Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6,
   2021) .................................................................................... *passim*

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
   No. 10-13164, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018)......................................17

*Ferrante Equip Co. v. Lasker-Goldman Corp.*,
   26 N.Y.2d 280 (1970) ..........................................................................156

*Ford Motor Co. v. Mont.Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017, 1026 (2021)...................................................................17

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*
   Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, (Bankr.
   S.D.N.Y. Jan. 3, 2014*)* .......................................................................34

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005)..................................................................8, 9

*Hau Yin To v. HSBC Holdings PLC*,
   2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ..........................................................20

*Helms v. Metro. Life Ins. Co. (In re O'Malley)*,
   601 B.R. 629 (Bankr. N.D. Ill. 2019) ...........................................................333

*Hill v. HSBC Bank plc*,
   207 F. Supp. 3d 333 (S.D.N.Y. 2016)............................................................20

*HSH Nordbank AG N.Y. Branch v. Street*,
   No. 11 Civ. 9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012).................................18

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
  893 F. Supp. 1252 (S.D.N.Y. 1995)......................................................23

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)......................................................................8, 9

*Kelley v. Safe Harbor Managed Acct. 101, Ltd.*,
  No. 20-3330, 2022 WL 1177748 (8th Cir. Apr. 21, 2022)..................28

*Kelley v. Westford Special Situations Master Fund, L.P.*,
  No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ..........33

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02 Civ. 7618, 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009) .........25

*Krys v. Sugrue* (*In re Refco Inc. Sec. Litig.*),
  No. 07-MD-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013) ............27

*Leema Enters., Inc. v. Willi*,
  575 F. Supp. 1533 (S.D.N.Y. 1983)......................................................19

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
  2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017) ........................................19

*Licci v. Lebanese Canadian Bank, SAL*,
  20 N.Y.3d 327 (2012) ............................................................................18

*Maranga v. Vira*,
  386 F. Supp. 2d 299 (S.D.N.Y. 2005)....................................................23

*McGee v. Int'l Life Ins. Co.*,
  335 U.S. 220 (1957)..................................................................................8

*McKenna v. Wright*,
  386 F. 3d 432 (2d Cir. 2004)..................................................................36

*Metals Alliance Corp. v. Beshay*,
  No. 97-CV-3401 (SHS), 1998 WL 811788 (S.D.N.Y. Nov. 19, 1998)................23

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)........................................................................9

*In re Motors Liquidation Co*,
  565 B.R. 275 (Bankr. S.D.N.Y. 2017) ....................................................10

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic
  Bank*,
  549 B.R. 56 (S.D.N.Y. 2016)....................................................................18

*O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*,
No. 13-22050, Adv. No. 15-08207, 2016 WL 6155929 (Bankr. S.D.N.Y. Oct.
21, 2016) ................................................................................................................19

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................... *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ........................................................... *passim*

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
12 F.4th 171 (2d Cir. 2021) ...............................................................................4, 35

*Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*
Adv. Pro. Nos. 10-04398 (BRL), 2012 WL 892514, (Bankr. S.D.N.Y. Mar.14,
2012) ..............................................................................................................30, 33

*Picard v. Fairfield Greenwich Grp. (In re Sentry Ltd.)*,
627 B.R. 546 (Bankr. S.D.N.Y. 2021) .................................................................8, 9

*Picard v. JPMorgan Chase & Co.*,
No. 08-99000 (SMB), 2014 WL 5106909 (Bankr. S.D.N.Y. Oct. 10, 2014).........12

*Picard v. Maxam Absolute Return Fund, L.P.*,
460 B.R. 106 (Bankr. S.D.N.Y. 2011) .......................................................8, 14, 24

*Picard v. Mayer (In re BLMIS)*,
Adv. Pro. No. 20-01316 (CGM), 2021 WL 4994435 (Bankr. S.D.N.Y. Oct.
27, 2021) .................................................................................................................7

*Picard v. Merkin (In re BLMIS)*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..................................................................36

*Picard v. Merkin (In re BLMIS)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014)...............................................30, 31, 32, 34

*Picard v. Merkin (In re BLMIS)*,
581 B.R. 370 (Bankr. S.D.N.Y. 2017)..................................................................33

*Picard v. Shapiro (In re BLMIS)*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) .............................................................30,  32

*In re Picard*,
917 F.3d 85 (2d Cir. 2019).......................................................................14, 24, 28

*RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*,
No. 19-CV-10247 (NRB), 2021 WL 230194 (S.D.N.Y. Jan. 22, 2021) .................23

*Rosenblatt v. Coutts & Co. AG*,
  17-CV-3528 (AKH), 2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) .....................................19

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010).................................................................................................7

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015).................................................................................27

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*,
  No. 20-CV-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ...........................3, 35

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*,
  501 B.R. 26 (S.D.N.Y. Oct. 28, 2013)................................................................................28

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................25, 29

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
  379 B.R. 5 (Bankr. E.D.N.Y. 2007)....................................................................................32

*Tamam v. Fransabank SAL*,
  677 F. Supp.2d 720 (S.D.N.Y. 2010).................................................................................19

*Taylor v. Sturgell*,
  533 U.S. 880 (2008)...........................................................................................................27

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019)..................................................................................................8

*Walden v. Fiore*,
  571 U.S. 277 (2014).....................................................................................................14, 15

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)...............................................................................................23

*Zim Integrated Shipping Servs. v. Bellwether Design Techs.*,
  19-CV-3444, 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ...............................................15

**Statutes**

11 U.S.C. § 546(e) .........................................................................................................25, 28

SIPA, 15 U.S.C. §§ 78aaa–*lll* ...............................................................................................1

**Rules**

Federal Rules of Civil Procedure 12(b)(2)...............................................................................1

Federal Rules of Civil Procedure 12(b)(6).........................................................................................1

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"),

respectfully submits this memorandum of law and supporting declaration of Robertson D.

Beckerlegge ("Beckerlegge Decl."), in opposition to BSI AG's ("BSI" or "Defendant"),

individually and as successor to Banca Del Gottardo AG ("BDG") motion to dismiss the Amended

Complaint ("Amended Complaint" or "Am. Compl.") pursuant to Federal Rules of Civil Procedure

12(b)(2) and 12(b)(6) ("Motion" or "Mot.").

## PRELIMINARY STATEMENT

This adversary proceeding is part of the Trustee's continuing efforts in this SIPA

liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's

Ponzi scheme. In this action, the Trustee seeks to recover $60,904,246 in subsequent transfers of

customer property that BSI and BDG received between 2003 and 2008, from Fairfield Sentry

Limited ("Sentry") and Fairfield Sigma Limited ("Sigma" and, together with Sentry, the "Fairfield

Funds").[1] Defendant has moved to dismiss under Federal Rules of Civil Procedure 12(b)(2) and

12(b)(6) on four grounds: (i) this court lacks personal jurisdiction over Defendant; (ii) the safe

harbor under Section 546(e) bars recovery; (iii) BSI and BDG did not receive any transfers of

customer property; and (iv) the Amended Complaint establishes Defendant's good faith pursuant

to Section 550. These arguments are substantially the same as those rejected by this Court in many

---

[1] As the Amended Complaint alleges, BSI acquired BDG in 2008. (Am. Compl. ¶¶ 2, 57-58). BSI and BDG also received approximately $24 million in transfers of BLMIS customer property from Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (together, the "Kingate Funds"). The Trustee is not seeking to recover those transfers in light of the settlement in the Kingate Funds' case. *See* Adv. Pro. No. 09-1161, Dkt. 413, 417. Despite the dismissal of this claim, allegations regarding the investment in multiple BLMIS feeder funds lends support to the Trustee's allegations of purposefully investing in BLMIS. *See Picard v. Multi-Strategy Fund Ltd.*, Adv. Pro. No. 12-01205 (CGM), ECF No. 122 (Main Case ECF No. 21729) (Bankr. S.D.N.Y. June 13, 2022) ("*Multi-Strategy*").

other subsequent transfer cases.[2] For those reasons and for the reasons set forth herein, Defendant's

arguments fail, and the Motion should be denied.

First, there is no question that this Court has personal jurisdiction over Defendant.

Defendant's contacts with the forum (including those of both BSI and BDG) are precisely the type

of minimum contacts courts have found establish and support a finding of specific personal

jurisdiction. As the Trustee alleges, BSI and BDG purposefully invested in the Fairfield Funds,

knowing from the funds' documents that BLMIS in New York was the *de facto* investment

manager, broker-dealer, and custodian of Sentry's (and BSI's and BDG's) investments, that Sigma

was fully invested in Sentry, and that BLMIS was essential to the funds' investments. Although

Defendant attempts to paint a picture of a wholly foreign investment in which BSI and BDG stood

on the sidelines while the Fairfield Funds invested their money in BLMIS, BSI and BDG both

fully intended that their money would be invested with BLMIS. BSI and BDG also contemplated

the jurisdiction of the New York courts in executing subscription agreements with the Fairfield

Funds that contained New York forum selection and choice of law provisions. BSI and BDG also

communicated with representatives of the Fairfield Funds' manager—the Fairfield Greenwich

---

[2] *See, Picard v. Multi-Strategy Fund Limited*, Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073 (Bankr. S.D.N.Y. June 13, 2022) *("Multi-Strategy")*; *Picard v. Banque SYZ & Co. SA*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) *("Banque SYZ")*; *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) *("Lombard")*; *Picard v. Banca Carige, S.P.A.*, Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) *("Banca Carige")*; *Picard v. Lloyds TSB Bank, PLC*, Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022) *("Lloyds")*; *Picard v. Bordier & Cie*, Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022) *("Bordier")*; *Picard v. Banque Cantonale Vaudoise*, Adv. Pro. No. 12-01694 (CGM), 2022 WL 2761044 (Bankr. S.D.N.Y. July 14, 2022) ("Cantonale"); *Picard v. Barclays Bank (Suisse) S.A., et al.*, Adv. Pro. No. 11-02569 (CGM), 2022 WL 2799924 (Bankr. S.D.N.Y. July 15, 2022) ("Barclays"); *Picard v. First Gulf*, Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July 18, 2022); *Picard v. Parson Finance Panama, S.A.*, Adv. Pro. No. 11-02542 (CGM), 2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) *("Parson Finance")*; *Picard v. Meritz*, Adv. Pro. No. 11-02539 (CGM), 2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ("Meritz"); *Picard v. Union Secs. Inv. Tr. Co., Ltd.*, Adv. Pro. No. 12-01211 (CGM), 2022 WL 3572509 (Aug. 18, 2022) *("Union Securities")*; *Picard v. Picard v. The Public Inst. for Social Sec.*, Adv. Pro. No. 12-01002 (CGM), 2022 WL 3458962 (Bankr. S.D.N.Y. Aug. 17, 2022) ("PIFSS"). To avoid repetition and long string cites, the Trustee will avoid citing to all of these decisions, but they all support denial of Defendant's Motion.

Group ("FGG")—located in New York, visited FGG's offices in New York in connection with their investments, and utilized the Fairfield Funds' bank accounts in New York to deposit funds with and receive transfers from the Fairfield Funds.

Second, the Trustee has plausibly alleged the avoidability of the initial transfers from BLMIS based on the initial transferee's actual knowledge of fraud, meaning the safe harbor under Section 546(e) is inapplicable and does not bar recovery. In its Motion, Defendant argues that there is no actual knowledge exception and, in the alternative, Defendant's knowledge as a subsequent transferee should determine the avoidability of the initial transfers from BLMIS. However, these arguments conflict with the plain language of the statute and precedent establishing that Section 546(e) does not independently safe harbor the recovery of avoidable fraudulent transfers from a subsequent transferee.

Third, the Trustee has plausibly alleged that BSI and BDG received customer property under Section 550(a) by outlining the relevant pathways through which customer property was transferred from BLMIS to the Fairfield Funds and subsequently to BSI and BDG. The Trustee has also alleged the necessary vital statistics (*i.e.*, the "who, when, and how much") for each subsequent transfer received. At this stage of the litigation, nothing more is required.

Finally, the section 550(b) "good faith" defense available to subsequent transferees is a fact-intensive affirmative defense that is premature and plainly inappropriate on a motion to dismiss. As the district court recently found*,* it is Defendant's burden to plead this affirmative defense in an answer and prove it with evidence; it cannot be established from the face of a complaint. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.),* No. 20-CV-02586 (CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) ("*ABN Ireland*"); *see also Banque SYZ*, 2022 WL 2135019, at *10; *First Gulf,* 2022 WL 3354955, at *10.

3

For these reasons, the Trustee respectfully requests that the Court deny Defendant's Motion.

## STATEMENT OF FACTS

### I. THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008. Am. Compl. ¶ 23. BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.* ¶ 24. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index; (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks; and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 32; 37; 45. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶¶ 28-53. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 10

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created for the express purpose of funneling investors' funds into BLMIS. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC),* 12 F.4th 171, 179 (2d Cir. 2021), cert. denied sub nom. *Citibank, N.A. v. Picard*, No. 21-1059, 2022 WL 585915 (U.S. Feb. 28, 2022) ("Citibank"). BSI and BDG both invested in the Fairfield Funds, which they knew were Madoff feeder funds. *Id.* ¶¶ 66; 68.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against the Fairfield Funds and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. *Id.* ¶ 78. In 2011, the Trustee settled with the

Fairfield Funds. *Id*. ¶ 79. As part of the settlement, Fairfield Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS estate. *Id.* The Trustee then commenced a number of adversary proceedings to recover the approximately $3 billion in missing customer property, including the above-captioned matter against Defendant.

## II.    BSI, BDG AND THEIR INVESTMENTS IN THE FAIRFIELD FUNDS

BSI is a société anonyme, a type of joint stock corporation, with a place of business in Lugano, Switzerland. *Id*. ¶ 54. Founded in 1873 as Banca della Svizzera Italiana, BSI is now a wholly owned subsidiary of EFG International AG, a global private banking group headquartered in Zurich, Switzerland. *Id.* ¶ 55. EFG International AG acquired BSI in 2016 from Brazilian bank Grupo BTG Pactual SA, which acquired BSI in 2015 from Assicurazioni Generali SpA ("Generali"), a major Italian insurance and financial services company. *Id.* During the relevant time period of this action, BSI was a wholly owned subsidiary of Generali. *Id.*

Prior to its acquisition by BSI in March 2008, BDG was also a société anonyme with a place of business in Lugano, Switzerland and was one of Switzerland's largest private banks. *Id.* ¶ 56. In order to complete the acquisition, BSI created a new société anonyme, retained the BSI AG name, assumed all of the rights and liabilities of BDG, and integrated BDG's operations with BSI's operations. *Id.* ¶ 57.

BSI and BDG each made separate investments in Sentry and Sigma before BSI's acquisition of BDG and both separately received transfers of customer property. *See* Am. Compl. ¶¶ 4, 5, Exs. C-G. Prior to BLMIS's collapse, BSI and BDG collectively received approximately $60,904,246 in subsequent transfers from the Fairfield Funds. *Id*., Exs. C-G.

The Fairfield Funds were managed and controlled by FGG, a *de facto* partnership with its principal place of business in New York. *See id*. ¶ 6; *see also Fairfield Inv. Fund*, 2021 WL 3477479, at *9. Sentry was a U.S. dollar-denominated fund that invested at least 95% of its assets

with BLMIS. *Id.* ¶ 4. Sigma acted as a foreign currency feeder fund, facilitating Euro investments

with BLMIS and invested all or substantially all of its assets with Sentry. *Id.* ¶ 52. Therefore, some

of the subsequent transfers BSI and BDG received were transferred from Sentry to Sigma, and

then to BSI and BDG. *Picard v. Fairfield Sentry Limited, et al.*, Adv. Pro. 09-01239 (CGM), ¶ 318

(ECF No. 23).

BSI and BDG knew they were engaging with an entity in New York when they invested in

the Fairfield Funds and intended those investments to be placed with BLMIS. *Id.* ¶ 64. They also

knew that FGG purported to manage the Fairfield Funds from New York. *Id.* ¶ 67. BSI and BDG

both executed subscription agreements in which they acknowledged that they received and read

the Fairfield Funds' Private Placement Memoranda ("PPMs") and thus knew that BLMIS was the

intended recipient of its investments with the Fairfield Funds. *Id.* ¶ 66. BSI and BDG likewise

knew that BLMIS operated from New York. *Id.* ¶64. Moreover, BSI and BDG sent subscription

payments to and received at least 195 redemptions from Sentry's HSBC Bank USA in New York

(the "HSBC USA Account"). *Id.* ¶ 69-70.

The PPMs explicitly disclosed BLMIS's multiple roles as the investment adviser, broker -

dealer, and custodian for the Fairfield Funds. *Id.*¶ 66. The PPMs also disclosed that BLMIS was

"essential to the continued operation of" Sentry and that BLMIS was the custodian of the Fairfield

Funds' investments with BLMIS. *Id.* ¶ 68. Thus, the PPMs specifically informed investors that

BLMIS—not Fairfield Sentry or their service providers—would have custody of Sentry's assets

in the United States and would execute the funds' purported investment strategy involving the

purchase and sale of U.S. securities. *Id.*

The subscription agreements included additional connections to New York. Each time BSI

and BDG invested in Sentry or Sigma, they signed a subscription agreement through which they

submitted to venue in New York, the jurisdiction of the New York courts, the service of process

out of the New York courts, and the application of New York law. *Id.* ¶ 65. Specifically, they (i)

"agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may

be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts

with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York

court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with

the laws of New York . . . ." *Id*. The Sentry agreements also instructed investors to send

subscription payments to the HSBC USA Account. *Id*. ¶¶ 69-70.

## **ARGUMENT**

## I.   **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT**

This Court has personal jurisdiction over Defendant because: (i) BSI and BDG each had

minimum contacts with the forum such that they purposefully availed themselves of the benefits

and privileges of investing in New York; and (ii) the exercise of jurisdiction over Defendant is

reasonable.

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make

a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ,

S.A.*,722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established

solely by allegations." *Id*. at 85. At the pre-discovery stage, the allegations need not be factually

supported. *See PIFFS*, 2022 WL 3458962, at *5 (citing *Dorchester*, 722 F.3d at 85). A plaintiff

may also establish a *prima facie* case of jurisdiction through affidavits and supporting materials

that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs

Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Picard v. Mayer (In re BLMIS)*, Adv. Pro. No. 20-01316

(CGM), 2021 WL 4994435, at *3 (Bankr. S.D.N.Y. Oct. 27, 2021). These pleadings and affidavits

are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their

favor.'" *PIFSS,* 2022 WL 3458962 at \*5 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Depending on the nature of a defendant's contacts with the forum, a court may exercise general or specific jurisdiction. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001). Specific jurisdiction exists where the defendant purposely directs its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp. (In re Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021) (citing *Cromer*, 137 F. Supp. 2d at 473).

The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether the defendant purposefully established "minimum contacts" in the forum, such that the defendant purposefully availed itself of the privilege of conducting activities with the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). "The defendant's activity need not have taken place within the forum, [citation omitted] and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund*, L.P., 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (citing *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)). Moreover, minimum contacts may be found when a "'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Fairfield Sentry Ltd.,* 627 B.R. at 566 *(*quoting *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.,* 916 F.3d 143, 151 (2d Cir. 2019)). In determining whether a defendant's forum contacts establish personal jurisdiction, the Court must look at "the totality of the circumstances" rather than analyze each contact in isolation. *See, e.g., Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp*., 98 F.3d 25, 29 (2d Cir. 1996); *see also Chloé,* 616 F.3d at 164 (analyzing totality of defendants' contacts to determine jurisdiction under New York's long-arm statute and Due Process Clause)*; Grand River Enters. Six*

8

*Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting

defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts

with the forum state must indicate that the exercise of jurisdiction would be proper." (citation

omitted)).

Second, the Court conducts a "reasonableness" inquiry to determine that its exercise of

jurisdiction will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe*,

326 U.S. at 320. To determine whether jurisdiction is reasonable, courts consider the following

factors:

> (1) the burden that the exercise of Jurisdiction will impose on the
> defendant; (2) the interests of the forum state in adjudicating the
> case; (3) the plaintiff's interest in obtaining convenient and effective
> relief; (4) the interstate judicial system's interest in obtaining the
> most efficient resolution of the controversy; and (5) the shared
> interest of the states in furthering substantive social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citations omitted).

Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant

to present a "compelling case" that jurisdiction would be unreasonable. *In re Sentry Ltd.*, 627 B.R.

at 567 (citing *Burger King*, 471 U.S. at 472–73).

Contrary to Defendant's assertion, the Trustee need not establish this Court's jurisdiction

for each individual transfer he seeks to recover. *See* Mot. at 8. Courts have personal jurisdiction

over *defendants*, not *transfers*.[3] *See, e.g., Int'l Shoe*, 326 U.S. at 316. Regardless, there is nothing

---

[3] Defendant argues each subsequent transfer is a separate claim and so the Trustee must establish the Court's
jurisdiction over Defendant for each individual transfer it seeks to recover. *See* Mot. at 8. Defendant misconstrues the
requirements for personal jurisdiction as well as ignores this court's decision in *Picard v. BNP Paribas S.A (In re
BLMIS)*, 594 B.R. 191 (Bankr. S.D.N.Y. 2018) ("*BNP*"). The Court in *BNP* did not look at each transfer to determine
jurisdiction. The Court assessed each defendant, focused on the overall contacts and relationships with the initial
transferees in New York, and determined it had jurisdiction.

about any particular transfer to BSI or BDG that would change the jurisdictional analysis from any other transfer.[4]

### A.    BSI and BDG Purposefully Availed Themselves of the Laws and Privileges of Conducting Business in New York by Investing in the Fairfield Funds

BSI and BDG each had numerous and substantive contacts with New York that establish this Court's jurisdiction over Defendant. Specifically, BSI and BDG (1) purposefully invested in the Fairfield Funds, whose assets were managed and custodied by BLMIS in New York and placed in U.S. investments; (2) used New York banks to transact with Fairfield Funds; (3) had direct connections with New York through its Sentry and Sigma subscription agreements; and (4) communicated with FGG representatives in New York and visited FGG's New York headquarters. These contacts plainly establish that BSI and BDG purposefully directed their activities to the United States, and specifically New York. *See Esso Expl. Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019) ("When all [defendant]'s Agreement-related contacts are considered together, it is clear [the defendant] purposely availed itself of the forum."). Because the Trustee's claims in this proceeding arise out of and relate to BSI's and BDG's contacts with New York, the minimum contacts requirement is satisfied, and adjudication in New York is reasonable and appropriate.

### 1.    BSI's and BDG's Investments in BLMIS Through the Fairfield Funds Establish Minimum Contacts

BSI's and BDG's intentional investments with BLMIS in New York through known BLMIS feeder funds alone establishes personal jurisdiction. Regardless of their other New York contacts supporting jurisdiction, the deliberate targeting of BLMIS and the New York securities

---

[4] Moreover, a successor-in-interest can "step into the jurisdictional shoes" of its predecessor. *In re Motors Liquidation Co*, 565 B.R. 275, 287 (Bankr. S.D.N.Y. 2017). "The general rule . . . is that the successor-in-interest may be subject to jurisdiction based on the activities of its predecessor" in New York. *Id.* (quoting *Colson Servs. Corp. v. Bank of Baltimore*, 712 F. Supp. 28, 31 (S.D.N.Y. 1989)). BDG's activities and contacts with New York may therefore be attributed to BSI.

market—through entities expressly constituted for that purpose—is dispositive. Specifically, this Court's recent decisions have held that the "Trustee has alleged legally sufficient allegations of jurisdiction simply by stating that [defendants] 'knowingly direct[ed] funds to be invested with New York-based BLMIS.'" *Banca Carige*, 2022 WL 2387522, at *2; *see also Lombard*, 2022 WL 2387523, at *2 (same). The Court concluded that it is sufficient to establish a prima facie showing of jurisdiction over defendants in the pre-discovery stage of litigation. *Id.* An almost identical allegation is included in the Amended Complaint at issue. Am. Compl. ¶ 59.

By executing subscription agreements, BSI and BDG affirmed that they read the Fairfield Funds' PPMs and as a result they knew that: (i) Sigma invested 100% of its assets in Sentry; (ii) Sentry invested at least 95% of its assets with New York-based BLMIS; (iii) BLMIS was registered with the U.S. Securities and Exchange Commission; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; (vi) BLMIS was the custodian of Sentry's investments with BLMIS; and (vii) BLMIS was "essential to the continued operation of" Sentry. Am. Compl. ¶ 68. This Court's recent decisions have found jurisdiction over investor defendants based on the U.S. contacts inherent in doing business with BLMIS feeder funds. *See, e.g.*, *Multi-Strategy*, 2022 WL 2137073, at *5, *Banque SYZ*, 2022 WL 2135019, at *5; *Lombard*, 2022 WL 2387523, at *5, *Banca Carige*, 2022 WL 2387522, at *5. The fact that BSI's and BDG's investments would ultimately be invested with BLMIS in New York was not a mystery; it was the main purpose of investing in the Fairfield Funds.[5]

---

[5] BSI's and BDG's fee sharing agreements are additional factors demonstrating that their relationship with FGG was designed to profit from BLMIS in New York. Am. Compl. ¶ 71.

a.    ***BLI* and This Court's Recent Decisions Establish This Court's
Jurisdiction Over Defendant**

Based on the demonstrated intent to invest with BLMIS through the Fairfield Funds, this

Court has already concluded that investors like BSI and BDG are subject to personal jurisdiction.

*See Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 516-18 (Bankr. S.D.N.Y. 2012)

(Lifland, J.) ("*BLI*"). There, as here, the Trustee's suit was "based upon [the subsequent

transferee's] investment of tens of millions of dollars in Sentry with the specific goal of having

funds invested in BLMIS in New York, with intent to profit therefrom." *Id*. at 506. There, as here,

the subsequent transferee was provided with PPMs and executed subscription agreements

establishing the investment's BLMIS-centric purpose. *Id*. at 507-08; *see also* Am. Compl. ¶ 68.

And there, as here, the subsequent transferee argued that the foreseeability of its investment

"ending up" in a BLMIS account was insufficient to support personal jurisdiction. *Id.* at n.14. Not

only did the Court reject this argument, Judge Lifland called it "disingenuous," explaining that:

> BLI's investments in Sentry did not merely "end up" in an account
> at BLMIS as a result of happenstance or coincidence. Rather, BLI
> purposefully availed itself of the benefits and protections of New
> York laws by knowing, intending and contemplating that the
> substantial majority of funds invested in Sentry would be transferred
> to BLMIS in New York to be invested in the New York securities
> market.

*Id*. at 517; *see also Picard v. JPMorgan Chase & Co.*, No. 08-99000 (SMB), 2014 WL 5106909,

at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts in this liquidation proceeding have already

"confirmed that defendants who invested directly or indirectly with BLMIS and received payments

from BLMIS as initial transferees or as subsequent transferees of those initial transfers were

subject to the Court's personal jurisdiction"). Further, this Court has repeatedly confirmed that *BLI*

establishes jurisdiction in multiple recent decisions. In those cases, similar to here, the Trustee

asserted allegations as to the purpose of the investment and the defendants' contacts with FGG for

12

ultimate investment in BLMIS. *See, e.g., Multi-Strategy*, 2022 WL 2137073, at *3-4; *Banque SYZ*, 2022 WL 2135019, at *3-4; *Banca Carige*, 2022 WL 2387522, at *3-4; *Lombard*, 2022 WL 2387523, at *3-4. Based on those contacts, this Court found that "Defendant's alleged contacts with New York [were] not random, isolated, or fortuitous." *Multi-Strategy*, 2022 WL 2137073, at *4; *Banque SYZ*, 2022 WL 2135019, at *4; *Banca Carige*, 2022 WL 2387522, at *7; *Lombard*, 2022 WL 2387523, at *8.

Defendant's attempts to distinguish its contacts from those in *Multi-Strategy* and *Banque Syz* should be rejected as Defendant focuses on piecemeal issues ignoring the totality and purpose of BSI's and BDG's contacts which are very similar to those in *Multi-Strategy*, *Banque Syz*, and other subsequent transfer cases. *See* Mot. at 22-24. For instance, Defendant cites to the Declaration of Massimo Antonini to show that there was no "profit motive" because BSI did not invest its own money. *See* Mot. at 22 (citing Antonini Decl. ¶ 9, ECF No. 125). Not only is this a question of fact, but it is also incorrect. BSI obviously profited from these investments one way or another, whether it invested its own funds and/or took fees for investing clients' funds. Moreover, BSI and BDG signed the subscription agreements and bear responsibility for the investments. Am. Compl. ¶ 65. BSI's and BDG's contacts are not meaningfully different than those of the defendants in *BLI*, *Multi-Strategy*, *Banque SYZ*, *Banca Carige*, *Lombard,* or others in this SIPA liquidation proceeding whose Rule 12(b)(2) motions have been denied.

Defendant characterizes all of these contacts as the "most incidental of contacts," and posits that there was no purposeful investment in known BLMIS feeder funds in New York. *See* Mot. at 21. But the fact that Sentry and Sigma invested substantially all of their funds in BLMIS contradicts any argument that the investments accidentally ended up in New York. As the Trustee has alleged, the entire purpose of investing in the Fairfield Funds was to invest in BLMIS. Am.

13

Compl. ¶ 59. *See Banca Carige*, 2022 WL 2387522, at *9; *Lombard*, 2022 WL 2387523, at *10.

In short, BSI and BDG "intentionally tossed a seed from abroad to take root and grow as a new

tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480

B.R. at 506.

Defendant also seeks to minimize the fact that it invested in BLMIS feeder funds by

arguing that "while some of the money invested in Sentry may have been transferred to BLMIS,

and some of the redemption payments may have been funded by transfers from BLMIS, that does

not convert the actions of Sentry into actions by the BSI defendants." Mot. at 12. This is a gross

mischaracterization as *substantially all* of Sentry's assets were invested with BLMIS and access

to BLMIS was the entire purpose of investing in the Fairfield Funds. As recognized by the Second

Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed

all or substantially all of their assets with Madoff Securities, they knew where their money was

going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also Maxam*, 460 B.R. at 116-20 (finding

jurisdiction where defendant knew and intended that funds invested with BLMIS feeder funds

would be sent to BLMIS in New York for investment).

### b.    Walden Does Not Save Defendant From This Court's Jurisdiction

Defendant attempts to downplay the importance of the numerous contacts between BSI,

BDG, and the Fairfield Funds, by relying on a misreading of *Walden v. Fiore*, 571 U.S. 277 (2014).

*See* Mot. at 10. The *Walden* Court employed the "effects test" and addressed the foreseeability of

an injury arising within a forum state based on tortious conduct outside that state and found that a

Georgia police officer could not be sued in Nevada for an unlawful seizure of money in Georgia

merely because he knew the plaintiffs resided in Nevada. *Walden*, 571 U.S. at 288-91. *Walden*

simply reaffirms the well-established principle that personal jurisdiction cannot be premised solely

on a plaintiff's unilateral contacts with the forum state. *Id*. at 284. As this Court already has found, *Walden* is of "no assistance to Defendant." *Multi-Strategy*, 2022 WL 2137073, at *4.

By contrast, here, the Trustee is not alleging foreseeability as to the situs of an injury. The Trustee's allegations implicate the Supreme Court's "purposeful availment" framework (not the "effects" test), a concept that the Court in *Walden* did not reference, let alone apply. As in *BLI*, *Multi-Strategy*, *Banque SYZ*, *Banca Carige*, *Lombard*, and other subsequent transfer cases, the Trustee is alleging that BSI and BDG intentionally invested in the Fairfield Funds to reap the benefits of investing with BLMIS in New York and received subsequent transfers (*See, e.g.*, Am. Compl. ¶¶ 59,68). Defendant's efforts to downplay the investments' New York destination as just a "foreseeable" consequence rather than a deliberate and purposeful targeting of the forum is the same "disingenuous" argument this Court rejected in *BLI* and recent decisions. Defendant's efforts to analogize its intentional investing into the U.S. markets to the simple fulfillment of a contract with a party in the forum falls flat for similar reasons. Mot. at 11 (citing *Ferrante Equip Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280 (1970)). Here, BSI's and BDG's contacts with New York were "intertwined with [its] transactions or interactions with the plaintiff or other parties," *Walden*, 571 U.S. at 286, and thus support jurisdiction.[6]

Defendant also cites to various alter ego and veil piercing cases to assert the Trustee has not alleged that Sentry was an alter ego or acted as an agent to impute Sentry's contacts to BSI or BDG. *See* Mot. at 11. Contrary to Defendant's contentions, the Trustee is not alleging jurisdiction exists due to alter ego liability or imputation. Here, BSI and BDG knowingly and purposefully

---

[6] This case is distinguishable from those cited by Defendant where the court declined to exercise personal jurisdiction because the contacts were not sufficiently related to the facts in dispute. Mot. at 9; *See, e.g., In re Amaranth Natural Gas Commodities Litig.,* 587 F. Supp. 2d 513 (S.D.N.Y. 2008); *Zim Integrated Shipping Servs. v. Bellwether Design Techs.*, 19-CV-3444, 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020); *Bristol-Myers Squibb v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016). Unlike these cases, the Trustee cites contacts with New York were in support of BSI's and BDG's Sentry investments that resulted in the transfers at issue.

directed activity into New York. Sentry, Sigma, and FGG were their means to gaining access to

BLMIS, which is far different than any imputation theory.

### 2.    The Forum Selection and Choice of Law Clauses in the Subscription Agreements are Strong Jurisdictional Contacts

The subscription agreements with the Fairfield Funds further evidence a "strong nexus with

New York" supporting jurisdiction. *See BLI*, 480 B.R. at 517, n.15. "[A] choice of law provision

may constitute a 'significant contact' with the forum state" and "is relevant in determining whether

a defendant has purposefully availed itself of a particular forum's laws." *Chase Manhattan Bank

v. Banque Generale Du Com.*, No. 96 CIV 5184 (KMW), 1997 WL 266968, at *2 (S.D.N.Y. May

20, 1997); *see also Burger King*, 471 U.S. at 482. ("Although such a [choice of law] provision

standing alone would be insufficient to confer jurisdiction . . . it reinforced [defendant's] deliberate

affiliation with the forum State and the reasonable foreseeability of possible litigation there.").

BSI and BDG submitted to venue in New York, the jurisdiction of the New York courts,

and the application of New York law through their subscription agreements. Am. Compl. ¶ 65.

Defendant argues that these provisions are irrelevant because the Trustee is not a party to the

agreements and the Trustee's claims do not arise under these agreements.[7] Mot. at 17-18. But, the

Trustee is not arguing that this Court has jurisdiction solely based on these provisions. Rather, as

---

[7] Defendant also argues the PPMs referenced in the subscription agreements do not establish purposeful availment in New York. Mot. at 17 n 8. Defendant is wrong. The PPMs clearly spelled out that an investment in Sentry was a New York-based investment, containing multiple references to the United States and New York throughout. The PPMs explicitly disclosed BLMIS's multiple roles as the de facto investment manager, broker dealer, and custodian for the Fairfield Funds. Also, the PPMs disclosed to BSI and BDG BLMIS's central role in controlling the investment. The *BLI* case referenced by Defendant found "The PPMs clearly highlighted the prominent role of New York-based BLMIS's split strike conversion strategy (the "SSC Strategy") in Fairfield Sentry's investments." *BLI*, 480 B.R. at 506.

In support of its argument, Defendant curiously cites the Second Circuit case of *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696 (2009). That case, however, actually states that non-signatories to forum selection clauses can be bound by them under certain circumstances. *See id.* at 701 ("We find ample support for the conclusion that the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause.").

this Court found in *BLI*, agreements to New York venue, jurisdiction, and law show that a defendant purposefully directed its activities towards New York and provide another strong jurisdictional contact with New York. 480 B.R. at 517; *see also Burger King*, 471 U.S. at 482.[8]

The subscription agreements also plainly "relate to" the Trustee's claims and evidence a strong nexus between this case and New York. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,* 141 S. Ct. 1017, 1026 (2021) (finding that plaintiffs' claims related to defendant's in-state activity and rejecting requirement of a "strict causal relationship between the defendant's in-state activity and the litigation."). BSI's and BDG's subscriptions into and redemptions from the Fairfield Funds are two sides of the same coin. They could not have invested in the Fairfield Funds without executing subscription agreements. Because the subscription agreements were necessary predicates to the receipt of stolen customer property through the Fairfield Funds, the subscription agreements sufficiently relate to the Trustee's claims to recover that stolen customer property.

### 3.    Purposeful Use of New York Bank Accounts Add to Jurisdictional Contacts

The purposeful use of the New York banking system to subscribe into and redeem from the Fairfield Funds is yet one more contact demonstrating an intentional investment in New York. By signing subscription agreements, BSI and BDG agreed to direct their respective payments to an account at HSBC Bank in New York for ultimate deposit into BLMIS's account at JPMorgan Chase Bank NA in New York. Am. Compl. ¶ 70. The HSBC USA Account was also used to receive the redemptions at issue.

---

[8] Defendant's reliance on the treatment of the subscription agreements in *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("Fairfield Liquidators") is erroneous. *See* Mot. at 18. In that case, the Fairfield Liquidators argued that the defendants had consented to personal jurisdiction because they were bound by the New York provisions in the subscription agreements. *Fairfield Liquidators*, 2018 WL 3756343, at *7, 8. As noted above, the Trustee does not argue that BSI or BDG consented to the jurisdiction of this Court solely by virtue of the subscription agreements. Rather, the subscription agreements demonstrate BSI's and BDG's purposeful availment and the reasonableness of jurisdiction. *See Multi-Strategy*, 2022 WL 2137073, at *5 n.3; *Banque SYZ*, 2022 WL 2135019, at *5 n.4.

17

Courts have often held that a defendant's purposeful use of a domestic bank account is sufficient to establish personal jurisdiction. *See*, *e.g.*, *Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219, at *6-7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York longarm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank AG N.Y. Branch v. Street,* No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at *4 (S.D.N.Y. July 18, 2012) (same); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (same).

That the HSBC USA Account was a correspondent bank account does not change the analysis. The New York Court of Appeals has held that a defendant's purposeful use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established." *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (2012). New York Courts have consistently followed this holding. *See Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank,* 549 B.R. 56, 67-69 (S.D.N.Y. 2016); *Al Rushaid v. Pictet & Cie, 28* N.Y.3d 316, 322–29 (2016). What matters is that the use was "purposeful," and not coincidental or passive. *Arcapita,* 549 B.R. 56 at 70 & n.18 (court finding jurisdiction "[b]ecause [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant]"); *Licci*, 20 N.Y.3d at 338–39 (finding jurisdiction where use of correspondent account was not "coincidental," and distinguishing case where defendant passively received funds due entirely to another party's actions).

The use of the New York bank account in connection with the redemptions went beyond "mere maintenance," as BSI and BDG were knowing participants in the underlying transactions and directed the movement of funds through these accounts. Moreover, the cases Defendant cites

are distinguishable. *See, e.g., O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*, No. 13-22050, Adv. No. 15-08207, 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016) (finding no personal jurisdiction based on third-party transfer to defendant sent from U.S.); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (finding that, unlike here, correspondent bank accounts were "unrelated to the fraud alleged"); *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (finding planned payments in connection with a foreign contract to book a venue insufficient to establish specific jurisdiction).[9]

Defendant also argues that because the use of a correspondent bank account was "incidental" to "settle a foreign securities transaction," such use does not give rise to personal jurisdiction. *See* Mot. at 19. Once again, none of the cases relied upon by Defendant apply here because, unlike here, the transactions in those cases were unrelated to the subject matter of the action. *See Tamam v. Fransabank SAL*, 677 F. Supp.2d 720, 727-28 (S.D.N.Y. 2010) ("It is clear that the events giving rise to the physical injuries and deaths for which Plaintiffs seek redress are missile attacks in Israel, not funds transfers in New York"); *Rosenblatt v. Coutts & Co. AG*, 17-CV-3528 (AKH), 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant's act of sending payment to plaintiff's New York bank account pursuant to agreement negotiated and executed in Switzerland, concerning property and funds in Switzerland, and contract subject to Swiss law was not purposeful availment).

Equally unavailing is Defendant's reliance on *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017) and *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 340

---

[9] The cases cited to by Defendant pertaining to disputes between parties arising out of a foreign service contract are inapposite because this action is not analogous to a dispute between parties who entered into a foreign services contract. Rather, this is a SIPA liquidation proceeding to recover fraudulent subsequent transfers from an investor whose investments of funds were made for the sole purpose of profiting from their investment with a New York-based broker-dealer purportedly trading in U.S. securities.

(S.D.N.Y. 2016), where the use of a correspondent account was deemed an "incidental consequence[] of fulfilling a foreign contract." In *BNP*, this Court already determined that this line of cases is not relevant to the Trustee's subsequent transfer actions. *See BNP*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). This is not a dispute between two parties stemming from services owed under a foreign contract, like the breach of fiduciary duty and other claims in *To* and *Hill*. Rather, this is a fraudulent transfer recovery action brought by a SIPA Trustee in a SIPA liquidation proceeding against investors whose transfer of funds between the banks fulfilled the very purpose of their subscription agreements and evidence an intent to direct activity towards the U.S. securities markets. *See BLI*, 480 B.R. at 513-514 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the 'raison d'etre' of the Agreement between BLI and Sentry."). Indeed, the Trustee is seeking to recover the very transfers that came through the U.S. bank accounts in New York. BSI's and BDG's repeated, systematic, and purposeful use of New York bank accounts to direct funds to BLMIS through the Fairfield Funds is sufficient to establish minimum contacts with New York.

### 4.    Other Jurisdictional Contacts Show Purposeful Availment

The Trustee's other allegations regarding BSI's and BDG's contacts with FGG are anything but "boiler plate." *See* Mot. at 15. Indeed, the Amended Complaint includes almost five pages of allegations regarding BSI's and BDG's contacts with New York and the U.S., a selection of which are detailed below. *See* Am. Compl. ¶¶ 59-77.

### a.    BDG

BDG regularly communicated and met with a number of FGG personnel in New York and elsewhere including FGG co-founder, Jeffrey Tucker, regarding BDG's investments in the Fairfield Funds. *Id.* ¶ 62. This is certainly not a "boilerplate" allegation, but rather a factual recitation of contact with FGG personnel in New York.

Defendant also attempts to understate the role of BDG's U.S.-based advisors Richcourt Fund Advisors Inc. ("Richcourt") and Towers Perrin ("Towers"), which BDG used in connection with its investments in the Fairfield Funds. *Id.* ¶ 63. After a meeting with BDG on November 24, 2004, FGG partner Yanko Della Schiava reported that BDG had appointed "Richecourt" as an additional due diligence adviser regarding the Fairfield Funds, and that previously BDG's adviser regarding hedge fund investments had been "Towers in NY." *Id.* Defendant tries to dismiss these contacts as "hearsay statements" from FGG, Mot. at 13, but Trustee may rely on FGG's business records in setting forth his allegations. *See Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 121 (2d Cir. 2010) (finding allegations based on information and belief to have been appropriate because most of them were supported by factual assertions in the exhibits); *PIFSS*, 2022 WL 3458962, at *13 (holding that arguments as to hearsay and lack of foundation related to exhibits in support of opposition were premature and noting that "[i]t is only after discovery that the prima facie showings should be factually supported with admissible evidence."). Moreover, Andrea Russi's Declaration states only that his group would not have hired them and that he has no recollection of them. *See* Russi Decl. ¶¶ 4-5. Tellingly, he does not deny the allegations, and the declaration only raises fact issues for discovery.[10]

---

[10] Indeed, Mr. Russi reportedly participated in the meeting in which "Richecourt" and "Towers in NY" were discussed with FGG. *See* Beckerlegge Decl., Ex. 5.

These contacts and communications demonstrate BDG's clear understanding of the U.S. nature of its investment.

### b.    BSI

Similar to BDG, BSI also regularly communicated with FGG personnel in New York. Am. Compl. ¶ 60. BSI's primary contacts at FGG were New York-based FGG executives, and beginning in 2005, Miami-based Harvey Glover (a former BSI and Genesis Investment Advisors ("Genesis") executive). *Id.* ¶ 74-75. Defendant disputes these allegations, but the allegations are plausibly alleged, and as such. Glover's communications with FGG regarding BSI's investments are relevant jurisdictional contacts. It is not Glover's Genesis contacts that matter, but rather that Glover had ties to BSI prior to BSI's acquisition of BDG and continued to oversee BSI's investment in Sentry and work as BSI's contact while he was in New York and Miami. Beckerlegge Decl. Exs. 1-2.

BSI's use of its wholly owned U.S. subsidiary Thalia SA's ("Thalia") New York office for Sentry investments further demonstrates BSI's purposeful availment of this jurisdiction for its Fairfield Fund investments. Defendant attempts to downplay Thalia's role by arguing that the funds Thalia managed were not invested in BLMIS. *See* Mot. at 14-15. The Trustee does not allege that Thalia actually invested in BLMIS. Rather, BSI used its U.S. subsidiary for advice related to its U.S.-based investment. Am. Compl. ¶ 61. Furthermore, FGG considered New York-based Thalia employee Robert Puccio an "excellent contact" for FGG's relationship with BSI. *Id.* Puccio and Thalia were said to be the "portal to a successful overall relationship with BSI." Beckerlegge Decl. Ex. 2.

Based on the foregoing, the Trustee's allegations as to personal jurisdiction are specific and supported by documentation. *See* Beckerlegge Decl. Exs. 2-5. For example, the Amended Complaint alleges that BSI and BDG communicated and met with FGG personnel, including FGG

co-founder Jeffrey Tucker in New York regarding their investments in the Fairfield Funds. Therefore, the various cases cited by Defendant to support its argument are baseless and inapplicable.[11] *See* Mot. at 15-17. Although Defendant attempts to explain away each of BSI's and BDG's various contacts with the forum, the totality of all of these contacts shows that BSI and BDG purposefully availed themselves of the privileges and laws of New York when investing in BLMIS through the Fairfield Funds.

### B.    Exercise of Personal Jurisdiction Is Reasonable

Defendant fails to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citations omitted). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). "This Court has found that it would be a 'rare' case where the defendant's

---

[11] The cases relied upon by Defendant to support the argument that the Trustee's allegations lack a showing of personal jurisdiction, are easily distinguishable because the center of gravity of the transactions in those cases took place outside of New York. *See, e.g., Maranga v. Vira*, 386 F. Supp. 2d 299 (S.D.N.Y. 2005) (finding no jurisdiction because center of gravity of transaction took place outside New York, but noting that communications into New York can be "sufficient to establish personal jurisdiction if they were related to some transaction that had its 'center of gravity' inside New York, into which a defendant 'projected himself'") (citations omitted); *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1252 (S.D.N.Y. 1995) (finding no New York jurisdiction in a breach of contract action where a substantial part of the contract was to occur in Taiwan and any fees were to be paid were in Taiwanese currency made to a Taiwanese bank account); *RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*, No. 19-CV-10247 (NRB), 2021 WL 230194, (S.D.N.Y. Jan. 22, 2021) (finding no New York jurisdiction in a breach of contract action where the center of gravity of the transaction was outside New York ). Additionally, Defendant cites to *Metals Alliance Corp. v. Beshay*, No. 97-CV-3401 (SHS), 1998 WL 811788 (S.D.N.Y. Nov. 19, 1998) for the proposition that telephone calls and correspondence sent into New York by a non-domiciliary defendant alone is not enough to sustain jurisdiction over a defendant. But here, the Trustee is not alleging that telephone calls and correspondence alone support a finding of jurisdiction. Instead, the Trustee argues that the communications add to the totality of the circumstances demonstrating a New York-centric investment.

minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188.

This is not that "rare" case. Defendant labels its contacts with the forum as the "most incidental of contacts," but as noted above, the contacts were purposeful and relevant to the Trustee's claims against Defendant to recover subsequent transfers of stolen customer property. *See* Mot. at 21. Defendant's argument that the U.S.'s interests are not greater than Switzerland's interest (Mot. at 21 n. 10), disregards the interests of the SIPA Trustee and this Court. This Court has previously held that "[t]he forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court." *Multi-Strategy*, 2022 WL 2137073, at *5; *see also Banque SYZ*, 2022 WL 2135019, at *5 (same); *Lombard*, 2022 WL 2387523, at *5; *Banca Carige*, 2022 WL 2387522, at *4; *see also In re Picard*, 917 F.3d at 103 (noting the "compelling interest in allowing domestic estates to recover fraudulently transferred property").

The burden on Defendant is minimal. Neither litigation costs nor travel inconveniences undermine the strong interest in litigating this matter in this Court. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). Therefore, "Defendant is not burdened by this litigation." *Multi-Strategy*, 2022 WL 2137073, at *5 (noting that the defendant has actively participated in the litigation for over ten years, is represented by competent U.S. counsel, and submitted to the jurisdiction of New York courts in signing subscription agreements); *Banque SYZ*, 2022 WL 2135019, at *5 (same); *Lombard*, 2022 WL 2387523, at *5 (same); *Banca Carige*, 2022 WL 2387522, at *4 (same). Accordingly, this Court's exercise of jurisdiction over Defendant is more than reasonable.

Should the Court find that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. Such discovery may be authorized where a plaintiff has made "a threshold showing" that there is some basis for jurisdiction. *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618, 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009). At a minimum, the facts alleged in the Amended Complaint and discussed herein establish a "threshold showing" of jurisdiction. *Kiobel*, 2009 WL 3817590, at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201, 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction).

## II.    SECTION 546(e) DOES NOT BAR RECOVERY FROM BSI

Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A). *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer . . . except under section 548(a)(1)(A) of this title.") (emphasis added). In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12-MC-115, 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"), the District Court held that an initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e) safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year period referenced in Section 548(a)(1)(A). Defendant's argument that Section 546(e) bars recovery against it, notwithstanding the initial transferee's actual knowledge, is based on a tortured misreading of Section 546(e) and *Cohmad* and has been rejected repeatedly by this Court.

Regardless, the Section 546(e) safe harbor does not apply to the majority of the transfers at issue because they took place well within the two-year period referenced in Section 548(a)(1)(A). *See* Am. Compl., Exs. C– G.

### A.    Sentry Had Actual Knowledge of Madoff's Fraud

Defendant spends significant time setting forth the requirements of Section 546(e) and how they are presumably met in this case with respect to the initial transfers to Sentry, as established by *Cohmad*. None of this matters.[12] This Court has previously found the Trustee has sufficiently pled that the initial transferee, Sentry, had actual knowledge of Madoff's fraud and that such initial transfers are avoidable. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *4–5, *7. This Court also confirmed that its *Fairfield Investment Fund* holding in multiple recent decisions. *See e.g., Multi-Strategy*, 2022 WL 2137073, at 8 ("This Court has already determined that the Fairfield [Second Amended] Complaint contains sufficient allegations of Fairfield Sentry's actual knowledge to defeat the safe harbor defense on a Rule 12(b)(6) motion."); *Banque SYZ*, 2022 WL 2135019, at *9 (same); *Lombard*, 2022 WL 2387523 at *9 (same)). This Court determined that the Fairfield Complaint is replete with allegations demonstrating that Fairfield Sentry had actual knowledge that BLMIS was not trading securities. *See, e.g., Multi-Strategy,* 2022 WL 2137073, at *8 (citing *Fairfield Inv. Fund*, 2021 WL 3477479 at *3-7). As such, Section 546(e) does not bar the avoidance of initial transfers made to Sentry, and those transfers may be recovered from Defendant, regardless of whether Sentry or BSI or BDG qualify as financial institutions, their agreements qualify as securities contracts, or their transfers qualify as settlement payments.[13]

---

[12] The Trustee does not concede that any agreements or transfers at issue activate the safe harbor under Section 546(e), including, among other things, whether the initial transfers were in connection with the subscription agreements or were made for the benefit of BSI and/or BDG. These issues are simply not relevant, because avoidability of the initial transfers turns on the initial transferee's actual knowledge of fraud at BLMIS.

[13] Though not necessary to the Court's analysis, Defendant's argument that the Trustee is in privity with the Fairfield liquidators and therefore bound by any rulings in the Fairfield liquidation, is incorrect. BSI seeks to characterize the Trustee's relationship with the Fairfield Liquidators as a "substantive legal relationship" in an effort to trigger nonparty issue preclusion as it relates to Sentry's qualifications as a "financial institution" within the meaning of Section 546(e). Mot. at 29, n.15. BSI is wrong. Merely sharing an interest in recovering customer property does not equate to the sort of "substantive relationship" required under *Taylor v. Sturgell*, 533 U.S. 880, 894 (2008), to establish nonparty issue preclusion. *See Krys v. Sugrue* (*In re Refco Inc. Sec. Litig*.), No. 07-MD-1902 (JSR), 2013 WL 12191844, at *13 (S.D.N.Y. Mar. 25, 2013) (emphasizing "preclusion of nonparties is an exceptional situation, contrary to the basic presumption that every party is entitled to its day in court").

Further, Defendant is precluded from arguing that *Cohmad* is wrong. The actual knowledge exception established in *Cohmad* was issued in connection with consolidated proceedings before the District Court as to the application of Section 546(e), and that decision held that a party with actual knowledge of Madoff's fraud cannot claim the protections of Section 546(e). Defendant participated in the District Court proceedings and the District Court's review of this issue.[14] As such, Defendant is bound by *Cohmad* and that decision is law of the case.[15]

### B.    Section 546(e) Does Not Apply Independently To Recovery Actions

Defendant is also incorrect that the Trustee must allege that the subsequent transferee itself had actual knowledge in order to invoke the actual knowledge exception to Section 546(e). Specifically, BSI argues that under *Cohmad*, a defendant's subscription agreement with Sentry may operate as the relevant "securities contract" in lieu of BLMIS's account agreement with Sentry, and as such, in these Section 550 recovery actions, the court must look to the *subsequent transferee's* actual knowledge to determine whether the initial transfer is avoidable. Mot. at 30. But *Cohmad* does not stand for this proposition, and Defendant's argument is just a repackaging of the previously rejected argument that the Section 546(e) safe harbor should independently apply to recovery actions under section 550. *See Multi-Strategy*, 2022 WL 2137073, at *9 (finding that a subsequent transferee may only raise the safe harbor as a defense "so far as the avoidance of the initial transfer is concerned" and that the safe harbor is not available as a defense to subsequent transfer claims); *see also Banque SYZ*, 2022 WL 2135019, at *9 (same); *Lombard*, 2022 WL

---

[14] *See Picard v. BSI AG et al.*, Adv. Pro. No. 12-01209, Memorandum of Law in Support of Defendant BSI AG's Motion to Withdraw the Reference to the Bankruptcy Court, ECF No. 4 (Bankr. S.D.N.Y. filed April 17, 2012).

[15] *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case.").

2387523, at *9 (same); *First Gulf*, 2022 WL 3354955, at *9 (same); *Meritz*, 2022 WL 3273044, at *9 (same).

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under section 550. *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see also Multi-Strategy* at 2022 WL 2137073, at *4 (citing *BNP*, 594 B.R. at 191) ("The Trustee does not . . . 'avoid' the subsequent transfer; he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550."); *Kelley v. Safe Harbor Managed Acct. 101, Ltd.*, No. 20-3330, 2022 WL 1177748, at *3 n.5 (8th Cir. Apr. 21, 2022) ("SHMA") (citing *BNP*, 594 B.R. at 197).

This limitation on the applicability of the safe harbor to avoidance actions is consistent with the well-established principle that "the concepts of avoidance and recovery are separate and distinct." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Secs.)*, 501 B.R. 26, 30 (S.D.N.Y. Oct. 28, 2013) (Rakoff, J.) (citation omitted). It is also consistent with the understanding that the Bankruptcy Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See In re Picard*, 917 F.3d at 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section

550.[16] However, in its decision, the District Court specifically limited the safe harbor to avoidance

claims based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9

(applying the "plain terms" of section 546(e)); at *7 (recognizing that subsequent transferees can

raise initial transferees' defenses to *avoidance*); and at *10 ("[B]oth initial transferees and

subsequent transferees are entitled to raise a defense based on the application of section 546(e) to

the *initial* transfer from Madoff Securities.") (emphasis added). And though the District Court

hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial

transferee feeder fund and related agreements and transactions, might under certain circumstances

constitute relevant "securities contracts," and that certain subsequent transferee defendants might

qualify as "financial institutions" or "financial participants," the decision is clear that the focus of

the safe harbor is still on the *initial* transfers. *See id.* at *9.[17]

Based on *Cohmad*, and this Court's recent opinions, Section 546(e) applies only to

avoidance and not recovery, and, most notably, a subsequent transferee cannot assert the

protections of section 546(e) where the Trustee has adequately pled the initial transferee's actual

knowledge. *See Multi-Strategy,* 2022 WL 2137073, at *8; *Banque SYZ,* 2022 WL 2135019, at *8;

*Lombard*, 2022 WL 2387523, at *8; *First Gulf*, 2022 WL 3354955, at *8; *Meritz*, 2022 WL

3273044, at *9; *Cohmad*, 2013 WL 1609154, at *4, *7, *10. Put simply: "Defendant is not

permitted to raise the safe harbor defense on its own behalf as a subsequent transferee." *Multi-*

---

[16] *See* Section 546(e) Briefing Order, *In re Madoff Securities*, 12-MC-115 (S.D.N.Y. filed May 16, 2012), ECF No. 119 (withdrawing the reference on issue of "whether application of section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to section 550").

[17] The original point of the *Cohmad* hypothetical was to address the subsequent transfer defendants' argument that, if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities agreements under section 546(e). *Cohmad*, 2013 WL 1609154, at *8. That argument became moot as both the Second Circuit and the District Court determined that the BLMIS customer agreement was a "securities agreement" and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore subject to section 546(e).

*Strategy*, 2022 WL 2137073, at *10; *Banque SYZ*, 2022 WL 2135019, at *10; *Lombard*, 2022 WL 2387523 at *10; *First Gulf*, 2022 WL 3354955 at *10.

Finally, this Court's *Fairfield Inv. Fund* decision does not demand a different result. Mot. at 24, n. 11. Rather, in that case, as this Court has held, the Court "considered [a subsequent transferee's] actual knowledge of BLMIS's fraud only as it related to whether Sentry had actual knowledge of the fraud. The Court never considered whether the subsequent transferees could raise the safe harbor defense on their own behalf, nor could it have, as § 546 is inapplicable to subsequent transferees." *Multi-Strategy*, 2022 WL 2137073, at *10; *Banque SYZ*, 2022 WL 2135019, at *10; *Lombard*, 2022 WL 2387523 at *10; *First Gulf*, 2022 WL 3354955, at *10; *Meritz*, 2022 WL 3273044, at *10.

## III.   THE TRUSTEE'S COMPLAINT ADEQUATELY PLEADS THAT BSI AND BDG RECEIVED BLMIS CUSTOMER PROPERTY

The Trustee's Complaint states a claim for recovery under Section 550(a)(2) by plausibly alleging that both BSI and BDG received subsequent transfers of stolen BLMIS customer property. To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS),* 515 B.R. 117, 149-50 (Bankr. S.D.N.Y. 2014) (citation omitted). As Defendant acknowledges, (Mot. at 32), "the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue." *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Picard v. Charles Ellerin Revocable Trust (In re BLMIS)* Adv. Pro. Nos. 10-04398 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012); *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC),* 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019). In addition, the Trustee only must allege the "'necessary

vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds." *Merkin*, 515 B.R. at 150 (cleaned up).

The Amended Complaint easily meets these requirements. The Amended Complaint alleges that BSI and BDG received transfers, identified by date and amount, from Sentry, and that Sentry invested substantially all of its funds with BLMIS and received initial transfers from BLMIS. *See* Am. Compl. ¶¶ 2, 85-91; Exs. C-D. The Amended Complaint likewise alleges that BSI and BDG received transfers, identified by date and amount, from Sigma, and that Sigma invested all of its funds with Sentry (who, in turn, invested substantially all of those funds with BLMIS). *Id*. ¶¶ 92-98; Exs. E-G. The Trustee thus sufficiently alleges that BSI and BDG received subsequent transfers of customer property by outlining the relevant pathways through which stolen customer property was transferred from BLMIS to the Fairfield Funds and subsequently to BSI and BDG, and provides the necessary vital statistics (i.e., the "who, when, and how much") for each of the subsequent transfers. Nothing more is required. *See Multi-Strategy*, 2022 WL 2137073, at *10; *Banque SYZ*, 2022 WL 2135019 at *12.

Unable to argue that the Trustee fails to meet the relevant pleading burden, Defendant essentially argues for a new one, asserting that the Trustee must tie each subsequent transfer received by BSI and BDG to a specific initial transfer from BLMIS. *See* Mot. at 33-34. In *Merkin*, however, this Court refused to dismiss subsequent transfer claims even though the complaint "d[id] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS." 515 B.R. at 150; *see also 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). And to the extent Defendant argues that the Trustee must detail which and what portion of each subsequent transfer comprises customer property, this is also wrong. *See Merkin*, 515 B.R.

at 152-53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may

be recoverable"); *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379

B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (finding that "if dollar-for-dollar accounting is not required at

the proof stage, then surely it is not required at the pleading stage either").

Defendant's reliance on the Court's decision in *Picard v. Shapiro* is unavailing because

*Shapiro* did not change the Trustee's pleading burden. *See* Mot. at 32-33 (*citing Picard v. Shapiro

(In re BLMIS),* 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015)). In *Shapiro*, the Trustee alleged that

certain trusts and members of the Shapiro family received approximately $54 million in fraudulent

transfers from BLMIS, and "upon information and belief," these defendants subsequently

transferred this same amount to other defendants. *See Shapiro*, 542 B.R. at 119. However, that

complaint did not detail any of the necessary vital statistics of the subsequent transfers. *Id.* at 119.

There were no allegations regarding the subsequent transferors, the subsequent transferees, or the

dates or amounts of the subsequent transfers, and consequently this Court granted defendants'

motion to dismiss the subsequent transfer claim. *Id.*; *see also In re Caremerica*, 409 B.R. 737, 750-

51 (E.D.N.C. 2009) (ruling that plaintiffs failed to allege reasonable inference that debtors

transferred funds under Section 547 because there were no facts showing the debtors had an

interest in funds that came out of a non-debtor account). Here, the Trustee has alleged the vital

statistics of each transfer BSI and BDG received and set out the investment relationship between

each entity and the Fairfield Funds.

Defendant's fact-based tracing argument regarding "plausibility" fares no better and is

inappropriate for a motion to dismiss. *See Multi-Strategy*, 2022 WL 2137073, at *10-11; *Banque

SYZ*, 2022 WL 2135019, at *12. For example, Defendant asks the question, "how could Sentry

have paid out more to defendants than it received from BLMIS?" Mot. at 35. Defendant's question

is simply another way of arguing that Sentry commingled customer property with other funds, and that this commingling should defeat the Trustee's ability to trace the transfers of customer property from BLMIS. But this argument does not defeat the Trustee's claims at the pleading stage. Defendant even concedes that at least *some* of the transfers it received may have originated with BLMIS, which is all that is necessary at the pleading stage. *See* Mot. at 12. "The calculation of Fairfield Sentry's customer property and what funds it used to make redemption payments are issues of fact better resolved at a later stage of litigation." *Multi-Strategy*, 2022 WL 2137073, at *10; *Banque SYZ*, 2022 WL 2135019, at *12; *Lombard*, 2022 WL 2387523, at *11; *see also Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073, 2020 WL 3077151, at *4 (D. Minn. June 10, 2020) (citing *Charles Ellerin Revocable Trust*, 2012 WL 892514, at *2) ("The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from the debtor does not defeat tracing."). Even after fact discovery, expert opinion will be necessary to determine what portion of the subsequent transfers stemmed from the initial transfers where the subsequent transfers originated from commingled accounts. *Picard v. Merkin (In re BLMIS),* 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017).

There is also no dispute that the Trustee is limited to "a single satisfaction" under Section 550(a), but the Trustee "may nevertheless pursue any and all subsequent transferees in order to achieve that satisfaction." *Multi-Strategy*, 2022 WL 2137073, at *11; *see also Helms v. Metro. Life Ins. Co. (In re O'Malley),* 601 B.R. 629, 656 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021) (noting that the trustee "can recover from any combination of [transferees]" up to the amount avoided). Thus, until the Trustee recovers the full amount of the approximately $3 billion in fraudulent transfers Sentry received, the Trustee may simultaneously seek recovery from Defendant here and from defendants in other actions. *See Multi-Strategy*, 2022 WL 2137073, at

*11 ("Calculation of whether the Trustee is fully satisfied is a factual finding to be made by this Court at a later stage of litigation."); *Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (same).

Defendant also argues that the receipt of customer property is implausible because of the amount of time that elapsed between Sentry's receipt of certain initial transfers from BLMIS and redemptions from Sentry. Mot. at 35 n. 18. As with its prior tracing arguments, this argument is inappropriate on a motion to dismiss. And even if it may prove more difficult for the Trustee to trace all of the subsequent transfers sought here, this is not grounds for dismissal at the pleading stage. *See Merkin*, 515 B.R. at 152 (finding it "premature to cut off the Trustee's opportunity to satisfy his [tracing] burden on a motion to dismiss" merely because the tracing may prove difficult); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP),* Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees'] speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting [their cross-motion for summary judgment].").

Lastly, Defendant asserts that the Trustee has had access to Sentry's records and therefore should have all the relevant information to tie the transfers. *See* Mot. at 36 n.19. However, the Trustee does not have all Sentry's books and records, and discovery in the Trustee's actions against the FGG defendants continues. *See, e.g.,* Stipulated Case Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.,* Ad. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. May 17, 2022), ECF No. 355 (setting November 22, 2023 deadline for fact discovery and August 23, 2024 deadline for expert discovery). Defendant also no doubt has records it can provide on these same transactions.

## IV.    THE 550(b) GOOD FAITH DEFENSE IS AN AFFIRMATIVE DEFENSE AND THUS INAPPROPRIATE AT THE MOTION TO DISMISS STAGE

Finally, Defendant argues that the Court should dismiss the Complaint because BSI and BDG: (1) gave value in exchange for the redemption payments; (2) acted in good faith and could

not have discovered Madoff's fraud; and (3) lacked knowledge of voidability. *See* Mot. at 36-40.

The Court should reject Defendant's improper attempt to raise the "good faith" affirmative defense

on a motion to dismiss, just as this Court and the District Court recently ruled in multiple decisions.

*See ABN Ireland*, 2022 WL 1304589, at *1; *Banque SYZ*, 2022 WL 2135019, at *11; *First Gulf,*

2022 WL 3354955, at *11.

By their very nature, affirmative defenses are fact driven. Although Defendant argues that

diligent inquiry by it would have been futile in these circumstances, Mot. at 38-39, such a

conclusion requires a factual analysis with a presentation of evidence and is not appropriate at this

stage of the litigation. Indeed, in its rejection of the defendants' argument on this point in *ABN*

*Ireland*, the court highlighted that the good faith inquiry notice standard is "a fact-intensive inquiry

to be determined on a case-by-case basis, which naturally takes into account the disparate

circumstances of differently-situated transferees." *ABN Ireland*, 2022 WL 1304589, at *3 (*quoting*

*Citibank*, 12 F.4th at 195); *Banque SYZ*, 2022 WL 2135019, at *11 (same); *First Gulf,* 2022 WL

3354955, at *11 (same).

As such, even if this Court were to consider Defendant's fact-intensive affirmative defense,

there are myriad unknown facts critical to a good faith defense that the Trustee must be given the

opportunity to rebut through discovery. *See ABN Ireland*, No. 20-cv-02586, at *3 ("The Trustee

rightfully points out that such a fact-based determination 'can only be made based on the entirety

of the factual record after discovery (which has not occurred here), not from isolated documents

cherry-picked by Appellees and factual inferences Appellees improperly seek to have drawn in

their favor.'"); *Picard v. Merkin (In re BLMIS),* 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010)

("[W]hether the Moving Defendants acted in good faith when they allegedly accepted hundreds of

millions of dollars in transfers of BLMIS funds is a disputed issue that this Court can properly

determine only upon consideration of all of the relevant evidence obtained through the discovery process."); *In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011) ("Determining the Defendants' good faith is an indisputably factual inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage.").

Defendant does not cite a single case in which a court has granted a motion to dismiss at the pleading stage based on a good faith defense. Moreover, to prevail under this limited exception on a Rule 12(b)(6) motion, Defendant must meet a "more stringent standard" and show not only that "the facts supporting the defense appear on the face of the complaint," but also that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F. 3d 432, 436 (2d Cir. 2004); *see also Drier*, 452 B.R. at 426. Defendant comes nowhere near meeting such a standard. Defendant argues that diligent inquiry would have been futile based on the Trustee's Fairfield Complaint-related allegations and the fact that others did not discover the fraud. But this is pure conjecture which can be easily disputed. BSI and BDG were sophisticated banks and the details of their investigation of Sentry, Sigma and BLMIS require discovery.

Defendant makes similar arguments as to value and knowledge of voidability. Relying on *Fairfield Sentry Ltd. v. Migani [2014] UKPC 9,* Defendant argues that BSI and BDG tendered their shares in the Fairfield Funds in exchange for the redemption payments and that this is considered sufficient value under section 550(b) of the Bankruptcy Code. Mot. at 37. This Court already has addressed this argument, however, finding that "[r]eliance on *Migani* creates a circular argument that brings us back to whether First Gulf Bank 'knew at the time of the redemptions . . . that the redemption prices were based on fictitious assets.'" If First Gulf Bank knew at the time it redeemed its shares that the shares were worthless, then it did not receive the subsequent transfer

funds "for value" as is required under § 550." *First Gulf,* 2022 WL 3354955 at *10 (citing *Fairfield III* at *6 n.7). Defendant contends BSI and BDG lacked knowledge of voidability of the transfer which is "the same as good faith, so a transferee who is found to be in good faith is also found to be without knowledge of voidability." Mot. at 39. But this Court also has found that "if 'good faith' cannot be found on the face of a complaint, the Court must deny the Defendant's motion. Additionally, §550(b)(1) provides a defense to recovery making lack of knowledge Defendant's burden to plead and prove." *Banque SYZ*, 2022 WL 2135019, at *10; *First Gulf*, 2022 WL 3354955, at *11 (same). In any event, "[w]hether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial." *Fairfield Inv. Fund*, 2021 WL 3477479, at *9, *First Gulf*, 2022 WL 3354955 at *11 (same). Based on the foregoing, Defendant's arguments as to a "good faith" or other Section 550(b) affirmative defense are inappropriate at this stage of the litigation and the Court should reject the arguments set forth by Defendant.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny Defendant's Motion.

Dated: August 26, 2022
      New York, New York

*/s/  Robertson D. Beckerlegge*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Michelle R. Usitalo
Email: musitalo@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Chapter 7*
*Estate of Bernard L. Madoff*