**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04986 (CGM) |
| v. | |
| SHARON KNEE, | |
| Defendant. | |

**INTERVENOR SECURITIES INVESTOR PROTECTION CORPORATION'S**
**MEMORANDUM OF LAW IN SUPPORT OF THE TRUSTEE'S MOTION FOR**
**SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................... i

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ......................................................................................................................3

      I.      The History and Principles Underlying SIPA .........................................................3

      II.     SIPA Protects Customers Against the Loss of "Customer Property"
            Entrusted to Their Registered Broker-Dealer .........................................................4

            A.      BLMIS, a registered broker-dealer since 1960, and a SIPC member
                    since 1970, is the Debtor in this SIPA liquidation proceeding ...................5

            B.      "Customer property" under SIPA is broadly defined to enhance
                    investor protection .....................................................................................7

      III.    SIPA's Broad Protection Encompasses Recovery of Customer
            Property Regardless of the Title of the JPMorgan Accounts ................................12

CONCLUSION.................................................................................................................17

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Arizona v. California*, 530 U.S. 392 (2000)...............................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229
    (2d Cir. 2011)...........................................................................................................13

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)................................................................................12, 13

*In re Bernard L. Madoff Inv. Sec. LLC*,
    Case No. 1:21-cv-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2021) .....................7

*De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*,
    669 F.3d 255 (5th Cir. 2012) ...................................................................................... 13-14

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*,
    286 B.R. 109 (Bankr. D. Minn. 2002), *aff'd*, Civ No. 02-4775 RHK,
    2003 WL 1824937 (D. Minn. Apr. 7, 2003),
    *aff'd*, 371 F.3d 397 (8th Cir. 2004)..........................................................................10

*Focht v. Heebner (In re Old Naples Sec., Inc.)*,
    223 F.3d 1296 (11th Cir. 2000) ....................................................................................10

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d Cir. 2004)...........................................................................................4

*Peloro* v. *United States*,
    488 F.3d 163 (3d Cir. 2007)........................................................................................10

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)................................................................ 1, 13, 15-16

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    Adv. Pro. No. 10-05421, 2022 WL 2799905 (Bankr. S.D.N.Y. July 15, 2022) ...........6, 12

*Picard v. BAM L.P. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020)............................................................................14

*Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*,
    12 F.4th 171 (2d Cir. 2021) ..............................................................................4, 6, 8, 11

*Picard v. Doron Tavlin Trust U/A 2/4/91 (In re Bernard L. Madoff Inv. Sec. LLC)*,
    Adv. Pro. No. 10-05312 (Bankr. S.D.N.Y. June 16, 2022) .................................................7

# TABLE OF AUTHORITIES (*continued*)

**CASES**                                                                    **PAGE(S)**

*Picard v. Est. of James M. Goodman (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 10-04762, 2022 WL 2015662 (Bankr. S.D.N.Y. June 6, 2022) .............6, 12

*Picard v. Est. of Seymour Epstein (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y. Jan. 27, 2021) .................................7

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*,
  976 F.3d 184 (2d Cir. 2020)........................................................12, 13

*Picard v. JABA Associates (In re Bernard L. Madoff Inv. Sec. LLC)*,
  528 F. Supp. 3d 219 (S.D.N.Y Mar. 24, 2021),
  *appeal docketed*, 21-872 (2d Cir.)7, 15-16 ....................................... 7, 14, 15-16

*Picard v. Jacob M. Dick Rev Living Tr. DTD 4/6/01 (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y. June 6, 2022) .................................7

*Picard v. JPMorgan Chase & Co., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 10-04932 (Bankr. S.D.N.Y. Oct. 11, 2013)................................11

*Picard v. JPMorgan Chase & Co., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  No. 11-cv-00913 (S.D.N.Y. June 24, 2011) .......................................11

*Picard v. Ken-Wen Fam. Ltd. Partnership (In re Bernard L. Madoff Inv. Sec. LLC)*,
  638 B.R. 41 (Bankr. S.D.N.Y. 2022) .................................................7

*Picard v. Lisa Beth Nissenbaum Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
  No. 20-cv-03140, 2021 WL 1141638, (S.D.N.Y. Mar. 24, 2021)...............................7, 14

*Picard v. Nelson (In re Bernard L. Madoff Inv. Sec. LLC)*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019)...............................................14

*Picard v. RAR Entrepreneurial Fund, Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  No. 20-cv-1029, 2021 WL 827195, (S.D.N.Y. Mar. 3, 2021)...........................14

*Picard v. Stuart Leventhal 2001 Irrevocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 10-04492 (Bankr. S.D.N.Y. June 16, 2022) .................................7

*Picard v. The Gerald and Barbara Keller Family Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
  No. 08-01789 (CGM), 2021 WL 4476811
  (Bankr. S.D.N.Y. Sept. 30, 2021) ...............................................7, 16

*Rosenman Fam., LLC v. Picard*,
  395 F. App'x 766 (2d Cir. 2010) ..................................................11

# TABLE OF AUTHORITIES (*continued*)

**CASES**                                                                                                               **PAGE(S)**

*SEC v. F.O. Baroff Co.*,
 497 F.2d 280 (2d Cir. 1974)................................................................................4

*Sec. Inv'r Prot. Corp. v. Barbour*,
 421 U.S. 412 (1975)......................................................................................4

*Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM
 (Bankr. E.D.N.Y. Nov. 20, 2007) ...............................................................10

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
 463 F.3d 125 (2d Cir. 2006)........................................................................8

*Taylor v. Sturgell*,
 553 U.S. 880 (2008)....................................................................................15

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
 127 F. Supp. 3d 156 (S.D.N.Y. 2015).........................................................7


**STATUTES**

Securities Exchange Act of 1934, 15 U.S.C. §

78*o*(b)..............................................................................................................5
78*o*(b)(1) .........................................................................................................5

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ccc(a)(2)(A)(i)-(iii) ......................................................................................5
78eee(d)............................................................................................................1
78fff(a) .........................................................................................................4, 15
78fff-3 ..............................................................................................................8
78fff-2(c)(3) ...................................................................................5, 8, 12-13, 17
78kkk(g)............................................................................................................8
78*lll*(4)........................................................................................................8, 9, 13
78*lll*(4)(E) .......................................................................................................12

United States Bankruptcy Code, 11 U.S.C. §

548(a)(1)(A)......................................................................................................17

## TABLE OF AUTHORITIES (*continued*)

**OTHER AUTHORITIES**                                                                **PAGE(S)**

17 C.F.R. § 240.

15b1-1 ...................................................................................................................5
15b1-3 ...................................................................................................................5
15b1-3(b)...........................................................................................................5, 15
15c3-3 ...............................................................................................................8, 9


**PUBLICATIONS**

6 COLLIER ON BANKRUPTCY ¶ 749.02[1][a] (16th ed. 2011) .......................................12

Exchange Act Release No. 22,468, 34 SEC Dock. 145 (1985) .......................................6

Exchange Act Release No. 31,661, 53 SEC Dock. 296 (1992) .......................................6

Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972) ..................................8

*Hearings Before the Subcomm. on Consumer Prot. & Fin. of the
        Comm. on Interstate & Foreign Commerce*, 95th Cong.,
        1st Sess. on H.R. 8331, Serial No. 95-77 (Aug. 1–3, 1977) .................................9

Michael P. Jamroz,
        *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002)..................................8

VI LOUIS LOSS, (late), JOEL SELIGMAN & TROY PAREDES,
        SECURITIES REGULATION 8.A.2 (6th ed. 2021) ....................................................5

*Report of the Special Study of the Securities Markets of the Securities and Exchange
        Commission*, H.R. Doc. No. 95, pt. 1 (1st Sess. 1963) .........................................3

*Study of Unsafe and Unsound Practices of Brokers and Dealers,
        Report and Recommendations of the Securities and
        Exchange Commission,* H.R. Doc. No. 92-231 (1971).......................................3, 8

The Securities Investor Protection Corporation ("SIPC")[1] hereby submits this Memorandum of Law in Support of the Trustee's Motion for Summary Judgment, filed by Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll* ("SIPA"),[2] and Bernard L. Madoff ("Madoff"), against Sharon Knee ("Defendant"), a customer of BLMIS. The issue here is whether a Trustee in a SIPA liquidation proceeding can avoid and recover fraudulent transfers of customer property where the customer property was entrusted to the SIPC member broker-dealer for investment in the securities markets but was wrongfully converted and used by the SIPC member in furtherance of a Ponzi scheme, regardless of ownership of the bank account used by the broker-dealer to effectuate transfers for the Ponzi scheme.

## PRELIMINARY STATEMENT

Investor confidence is essential to the health and success of U.S. securities markets. SIPA and complementary Securities and Exchange Commission ("SEC") customer protection rules help bolster that confidence by ensuring that customers receive the maximum protection possible in the event of the failure and liquidation of their SIPC-member broker-dealer.

Since 1960 and until his arrest in 2008, Madoff operated a broker-dealer registered with the SEC, first as a sole proprietorship and, beginning in 2001, as a limited liability company ("LLC"), Bernard L. Madoff Investment Securities LLC.  From its registration in 1960 through 2008, whether as a sole proprietorship or as an LLC, BLMIS had the same SEC registration

---

[1] SIPC is a party-in-interest and a statutory intervenor in all liquidations under the Securities Investor Protection Act. *See* 15 U.S.C. § 78eee(d).

[2] For convenience, further references to SIPA shall omit "15 U.S.C."

number.[3]  Because the firm was continuously one broker-dealer, it is referred to herein as BLMIS, regardless of form.

BLMIS infamously operated a massive Ponzi scheme, enticing customers to open customer accounts with BLMIS with the promise of large and steady profits from securities transactions.  Rather than investing customer property in the securities markets, however, the funds, consisting of customers' stolen money, were deposited and commingled in bank accounts at JPMorgan Chase, N.A. ("JPMorgan"), in account #xxxxxxxxx1509 and account #xxxxxxxxx1703 (the "509 Account" and "703 Account," or together the "JPMorgan Accounts").  BLMIS made payments, from the JPMorgan Accounts, of purported returns to existing BLMIS customers from these commingled funds.  Following Madoff's arrest in December 2008, the District Court entered an order placing BLMIS into liquidation under SIPA, and appointed Irving H. Picard, as Trustee.

Correct allocation of "customer property" in accordance with SIPA and other applicable statutory provisions, rules, and regulations is necessary both to return missing property to customers, and to demonstrate that customer protection under the carefully constructed SIPA program is not just protection in theory, but protection in fact.  This protection includes the recovery of fraudulently transferred or stolen customer property for *pro rata* distribution to all customers.

The Trustee brought this action to avoid and recover fraudulent transfers of fictitious profits, that is, customer property entrusted to BLMIS that was converted or stolen and used in

---

[3] As of 2006, BLMIS was also registered with the SEC as an investment adviser.  Although investors may have been solicited by BLMIS as an investment advisor, their funds were remitted to BLMIS as the broker-dealer for investment in what ultimately were fictitious trades.  Upon receiving their investment monies, the broker-dealer issued to the investors phony confirmation statements of non-existent trades.

furtherance of its Ponzi scheme.  SIPA empowers a Trustee to recover fraudulent transfers of customer property in order to remediate a lapse in the broker-dealer's custodial function, and enhance customer protection.  This enforcement of a failed broker-dealer's custodial function builds trust and confidence in the securities markets.

## ARGUMENT

### I.    The History and Principles Underlying SIPA

SIPA was enacted to address the very situation presented here: the loss of customer property entrusted to a registered securities broker-dealer.  As described in the *Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and Recommendations of the Securities and Exchange Commission*, H.R. Doc. No. 92-231, at 11–12 (1971) ("*SEC Study*"), in the years leading to the enactment of SIPA, little attention was paid to the creation of brokerage back-office automated systems and appropriate staffing of back-offices necessary for maintaining accurate records in real time.  As a consequence, broker-dealers suffered from "an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments." *Id*. at 11.

Furthermore, broker-dealers could use without restraint credit balances of customers, including free credit balances to which the customer was entitled upon demand. *Id*. at 16 (citing to *Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*, H.R. Doc. No. 95, pt. 1, at 393–98 (1st Sess. 1963)).  Broker-dealers increasingly used their customer business to leverage their proprietary business, putting customer property at risk. *Id*. at 51–53.  Because an undue portion of the industry's assets was invested in securities, broker-dealers themselves became vulnerable to market downturn. *Id*. at 18.  By the late 1960s, these circumstances, a lack of automation, and changes in market conditions converged, resulting

in a breakdown in many firms of the control over the possession, custody, location, and delivery

of securities, and the payment of money obligations to customers. *Id*. at 11–12.

The subsequent collapse of multiple broker-dealers led to the enactment of SIPA in 1970,

which was designed to, *inter alia*, "restore investor confidence in the capital markets, and

upgrade the financial responsibility requirements for registered brokers and dealers." *Sec. Inv'r

Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975); *see also Picard v. Citibank (In re Bernard L.

Madoff Inv. Sec. LLC)*, 12 F.4th 171, 180 (2d Cir. 2021) ("*Citibank*") ("Congress enacted SIPA

in 1970 to protect customers of bankrupt broker-dealers."); *SEC v. F.O. Baroff Co.*, 497 F.2d

280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the

public customers of securities dealers from suffering the consequences of financial instability in

the brokerage industry"); *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 84 (2d Cir. 2004)

(identifying SIPA's "statutory goals" as "promoting investor confidence and providing

protection to investors . . . ").

## II.    SIPA Protects Customers Against the Loss of "Customer Property" Entrusted to Their Registered Broker-Dealer

SIPA protects customers of failed broker-dealers through a special liquidation proceeding

which prioritizes customer claims and directs advances of funds from SIPC to cover shortfalls in

customer property, within statutory limits.    A primary objective of a SIPA liquidation

proceeding, and one of the principal responsibilities of a Trustee in a SIPA liquidation

proceeding, is to return customer property entrusted to the SIPC member by customers. *See

SIPA § 78fff(a); Barbour*, 421 U.S. at 416 ("[SIPA] creates a new form of liquidation

proceeding, applicable only to member firms, designed to accomplish the completion of open

transactions and the speedy return of most customer property."); *Citibank*, 12 F.4th at 180

("Picard's goal in this liquidation is to satisfy the allowed customer claims.").    This protection

4

includes the recovery by the Trustee of fraudulently transferred or converted customer property.

SIPA § 78fff-2(c)(3).

Accordingly, to understand the scope of SIPA's protection and recovery provisions, and to evaluate the elements of the Trustee's avoidance action, one must first understand who is the SIPC member, and what is the customer property entrusted to its custody.

### A. BLMIS, a registered broker-dealer since 1960, and a SIPC member since 1970, is the Debtor in this SIPA liquidation proceeding

In order to provide comprehensive protection for investors in the securities markets, SIPC's members consist of nearly all broker-dealers registered under the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  SIPA § 78ccc(a)(2)(A).[4]   A broker-dealer registers with the SEC by filing a Form BD.  § 78o(b)(1); 17 C.F.R. § 240.15b1-1.  "For administrative purposes the [SEC] applies the entity theory to all registrants and applicants for registration, whether they are organized as corporations or partnerships or in some other form."  VI LOUIS LOSS, (late), JOEL SELIGMAN & TROY PAREDES, SECURITIES REGULATION 8.A.2 (6th ed. 2021).[5]

Consistent with this entity theory, a broker-dealer can succeed to and continue the business of a predecessor broker-dealer by filing the appropriate forms with the SEC.  17 C.F.R. § 240.15b1-3.  Where the succession is based solely on a change in corporate form, the successor need only file an amended Form BD on behalf of the predecessor.  § 240.15b1-3(b).  "This amendment shall be deemed an application for registration filed by the predecessor and adopted by the successor."  Id.  Importantly, however, the SEC's succession rules only apply where the successor assumes substantially all the assets and liabilities of the predecessor.  Exchange Act

---

[4]  SIPA identifies narrow exceptions, inapplicable here, to SIPC membership for certain registered broker-dealers. SIPA § 78ccc(a)(2)(A)(i)–(iii).

[5]  http://prod.resource.cch.com/resource/scion/id/Gq50jWw3wzG4K_MXIIgDsNGe3sSkmBxDo 1iSYKqbPtY?cpid=WKUS-Legal-Cheetah&uAppCtx=cheetah

Release No. 22,468, 34 SEC Dock. 154, 159 (1985).  Accordingly, "[t]o ensure that there is a legitimate connection between the predecessor and successor, no entity may rely on the successor rules unless it is acquiring or assuming substantially all of the assets and liabilities of the predecessor's broker-dealer . . . business."  Exchange Act Release No. 31,661, 53 SEC Dock. 296, 297–98 (1992).

At all times, the SIPC member, and the business of the Debtor subject to this SIPA liquidation proceeding, was BLMIS, the broker-dealer registered by Madoff in 1960 with the SEC.  The evidence in this case is clear.  Madoff registered BLMIS as a broker-dealer with the SEC in January 1960 as a sole proprietorship. *See* Decl. of Bruce G. Dubinksy, dated August 16, 2022 ("Dubinsky Decl."), Attach. A ("Dubinsky Report") at ¶ 35.  Upon the enactment of SIPA in 1970, BLMIS became a member of SIPC.

When Madoff converted his business from a sole proprietorship to an LLC in January 2001, the LLC filed an amended Form BD document to inform the SEC (and SIPC, through the SEC) of the nominal change in corporate structure.  Dubinsky Report at ¶ 37 and Declaration of Nicholas J. Cremona ("Cremona Decl.") at Exhibit 3. The brokerage firm's SEC registration number (8-8132) used to identify brokerage firms in the SEC's records, and which has been assigned to the firm since its registration with the SEC in January 1960, remained the same. Cremona Decl., Exhibit 3 at 9. In accordance with SEC requirements, the amended Form BD affirmed that all assets and liabilities related to the predecessor sole proprietorship were transferred to the successor LLC.  *Id.* at 12. Thus, the existence of the SIPC member Madoff used to operate his ongoing Ponzi scheme continued unbroken, but as of 2001, as an LLC.[6]

---

[6] *See Picard v. Avellino*, Adv. Pro. No. 10-05421, 2022 WL 2799905 (Bankr. S.D.N.Y. July 15, 2022) ("*Avellino II*"); *Picard v. Est. of James M. Goodman*, Adv. Pro. No. 10-04762, 2022 WL 2015662 (Bankr. S.D.N.Y. June 6, 2022); Memorandum Decision, *Picard v. Jacob M. Dick Rev*

Importantly, in 2001, when Madoff filed the amended Form BD, he had no registered investment advisory business to report to the regulators; the investment adviser business was not registered until August 2006. Dubinsky Report at ¶ 37.[7]  When Madoff *did* register as an investment adviser, he did so not as a sole proprietor but rather as the LLC, associated with the same SEC registration number used to register the broker-dealer. Cremona Decl, Exhibit 4.[8] Accordingly, even if there is a question about Madoff's original intentions for creating the LLC in 2001, or a doubt about whether the LLC succeeded to the investment advisory business in 2001 (despite the 2001 Form BD and the Trustee's expert witness report), the investment advisory business was indisputably registered under, and operated by, the LLC by the time the two-year transfers at issue in this case were made.

### B.  "Customer property" under SIPA is broadly defined to enhance investor protection

Upon its enactment, SIPA required the SEC to compile a list of unsafe and unsound practices in the securities industry, along with recommendations to eliminate them. *See SEC*

---

*Living Tr. DTD 4/6/01*, Adv. Pro. No. 10-04570 (Bankr. S.D.N.Y. June 6, 2022), ECF No. 141; *Picard v. Ken-Wen Fam. Ltd. P'ship*, 638 B.R. 41 (Bankr. S.D.N.Y. 2022); *In re BLMIS*, No. 1:21-cv-02334-CM, 2022 WL 493734, at *15 (S.D.N.Y. Feb. 17, 2021) ("*Epstein II*"); *Picard v. The Gerald and Barbara Keller Fam. Trust*, 634 B.R. 39 (Bankr. S.D.N.Y. 2021); *Picard v. Miller*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Picard v. JABA Assocs. LP*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021); *Picard v. Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("*Epstein I*"); *see also Judgment*, *Picard v. Doron Tavlin Tr. U/A 2/4/91*, Adv. Pro. No. 10-05312 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 115; Judgment, *Picard v. Stuart Leventhal 2001 Irrevocable Tr.*, Adv. Pro. No. 10-04492 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 75.

[7] *See also* Investment Advisory Firm Summary for Bernard L. Madoff Investment Securities LLC, INVESTMENT ADVISOR PUBLIC DISCLOSURE, https://adviserinfo.sec.gov/firm/summary/2625 (last accessed October 13, 2021); *cf. Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (stating that "[c]ourts routinely take judicial notice of . . . governmental records," including, for example, records in an SEC database).

[8] *See also* https://adviserinfo.sec.gov/firm/summary/2625.

*Study* at 27–30, 42; SIPA § 78kkk(g).  One Rule adopted pursuant to this mandate was SEC Rule 15c3-3, also known as the "Customer Protection Rule,"[9] which required brokerage firms to segregate certain customer property.  *See SEC Study* at 30; *see also* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1070 (2002) ("The rule, which can be loosely described as a 'segregation' rule, divides the customer and proprietary activities of the firm."); 17 C.F.R. § 240.15c3-3.  Together, SIPA and SEC Rule 15c3-3 serve the objective of SIPA "that customer funds and securities not be exposed to risk of loss through broker-dealer insolvency." *See* 37 Fed. Reg. 25,224 at 25,225.  SEC Rule 15c3-3 ensures that customer property remains in custody and available to customers on demand, even if the broker-dealer fails.

Upon a broker-dealer's failure, SIPA ensures that customer property is not lost or diminished during the insolvency process.  SIPA advances this goal "by according those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.'  Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing."  *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) (internal citations omitted).  If the fund of customer property proves insufficient to make the customers whole, SIPC provides protection – subject to statutory limitations – from the SIPC Fund.  SIPA § 78fff-3.  To enhance customer protection, SIPA also empowers the SIPA Trustee to avoid and recover fraudulent transfers of customer property entrusted to the debtor.  SIPA § 78fff-2(c)(3); *see Citibank*, 12 F.4th at 180–81.

The definition of customer property in SIPA § 78*lll*(4) is expansive and mirrors the customer protection rules that govern broker-dealer operations.  In particular, Congress amended

---

[9] Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972).

§ 78*lll*(4) in 1978 to add subpart (E) (originally subpart (D)), to create protections where property had not been properly segregated, or cash deposits had not been properly segregated as required by applicable laws, rules, and regulations – specifically SEC Rule 15c3-3. *See Hearings Before the Subcomm. on Consumer Prot. & Fin. of the Comm. on Interstate & Foreign Commerce*, 95th Cong., 1st Sess. on H.R. 8331, Serial No. 95-77, at 113–14 (Aug. 1–3, 1977) (Report to the Board of Directors of the Securities Investor Protection Corporation of the Special Task Force to Consider Possible Amendments to the Securities Investor Protection Act of 1970).

As amended, SIPA defines "customer property," in pertinent part, as follows:

> The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, *including property unlawfully converted.* The term "customer property" includes –
>
> * * *
>
> (E) any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . . . [emphasis added]

SIPA § 78*lll*(4). SIPC protects customers against the loss of customer property entrusted to a SIPC member, regardless of whether the SIPC member maintains custody of the customer property in accordance with federal law, and even if such property is unlawfully converted.

"Customer property" is broadly defined. In some instances, it may consist of property that otherwise would be characterized as debtor property. Thus, courts have held that the fund of customer property should include, for example, all of the cash in the possession of the debtor when the brokerage fails, including money derived from stock loan transactions with a plaintiff-

creditor;[10] bearer bonds held by a debtor broker-dealer for an investor's account that had been seized by the FBI prior to being deposited into the account;[11] and the personal property of a former principal who engaged in unauthorized trading, including account assets, luxury items, and a television set, as well as the debtor's proprietary brokerage accounts and clearing deposit.[12]

Courts recognize that "SIPA protects claimants who attempt to invest through their brokerage but are defrauded by dishonest brokers." *Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296, 1303 (11th Cir. 2000). In *Old Naples*, a broker representative presented investment opportunities on behalf of a SIPC member broker-dealer but directed wire transfers to a related entity. *Id*. at 1301. The Eleventh Circuit affirmed the lower courts' finding that the investors were customers who had deposited customer property with the broker. *Id*. at 1303. "If an investor intended to have the brokerage purchase securities on her behalf and reasonably followed the broker's instructions regarding payment, she can be considered a 'customer' under SIPA if the brokerage or its agents then misappropriate the funds." *Id*. The court further noted that the customers believed they were dealing with the broker-debtor and that the funds deposited with the related entity were used by or for the broker-debtor. *Id*. at 1303–04.

Similarly, with regard to BLMIS, the Second Circuit has held that the funds deposited in the JPMorgan Accounts constitute customer property because BLMIS received, acquired, and

---

[10] *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 129–32 (Bankr. D. Minn. 2002), *aff'd*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd*, 371 F.3d 397 (8th Cir. 2004).

[11] *Peloro v. United States*, 488 F.3d 163, 173–74 (3d Cir. 2007).

[12] Trustee's Investigatory & Final Reports and Account at 10–18, *Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Oct. 22, 2007) (ECF No. 90); *accord*, Order Granting Motion for Approval of Trustee's Investigatory & Final Reports & Account & For Assignment of Judgment to SIPC, at 1–2, *Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Nov. 20, 2007) (ECF No. 89).

took possession and control of property entrusted by customers to BLMIS for investing in the securities markets, and then deposited the entrusted funds in the JPMorgan Accounts. *See Citibank*, 12 F.4th at 179 ("The customers' funds were commingled in BLMIS's bank account."); *Rosenman Fam., LLC v. Picard*, 395 F. App'x 766, 769 (2d Cir. 2010) (holding that investor funds intended for BLMIS's investment advisory fund and deposited in the JPMorgan Accounts were subject to SIPA); *see also,* Amended Complaint, *Picard v. JPMorgan Chase & Co., et al.*, (*In re Bernard L. Madoff Inv. Sec. LLC*), 1:11-cv-00913, (S.D.N.Y. June 24, 2011), ECF No. 50, *and* Answer to Amended Complaint, *Picard v. JPMorgan Chase & Co., et al.* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 10-04932 (Bankr. S.D.N.Y. Oct. 11, 2013), ECF No. 27 at Introductory Paragraph (defining "BLMIS" as "Bernard L. Madoff Investment Securities LLC"); ¶ 3 ("JPMorgan admits that debits and credits were made to BLMIS's demand deposit account…."); ¶ 200 ("JPMorgan admits that the 703 account was in BLMIS's name…"); ¶ 288 (admitting to debiting $145 million from the 703 Account "at BLMIS's request."); ¶ 306 (admitting to debiting "from BLMIS's account…"); *and* Stipulation and Order for Transfer of Funds by J.P. Morgan Chase Bank to Trustee, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. Jan. 29, 2009), ECF No. 52-1 at 3 ("[T]he J.P. Morgan Chase Bank (the "Bank") currently is in possession of Debtor's funds in accounts in the name of the Debtor, account numbers…703,…509….").

Regardless of ownership of the JPMorgan Accounts, Madoff accepted cash for the securities accounts of customers and pooled these funds in the JPMorgan Accounts for use in his Ponzi scheme. *See* Dubinsky Report at ¶¶ 76, 279-80. The funds were used to satisfy requests for withdrawals by other customers. *Id*. at ¶¶ 28-33, 269-86. *See also Citibank*, 12 F.4th at 179 ("When customers withdrew their 'profits' or principal, BLMIS paid them from this commingled

account. As a result, each time BLMIS transferred payments to a customer, it was money stolen from other customers.") (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011)); *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 198 (2d Cir. 2020) (finding "defendants did not have property rights to the values in excess of principal…"); *Avellino II* at *4   (finding that "the transfers were, in fact, transfers of BLMIS' customer property…"); *and Picard v. Est. of James M. Goodman* at *4 ("All monies transferred from the 509 Account are 'customer property' and are deemed to have been BLMIS's property for purposes of these SIPA cases.").

Thus, under SIPA § 78*lll*(4)(E), the JPMorgan Account funds are customer property, even if BLMIS failed to segregate them in compliance with federal regulations.  A SIPC member's non-compliance with the law does not remove customer property from SIPA's protective scheme, and a fraudulent broker-dealer cannot shield stolen customer property from recovery by a SIPA trustee simply by running the scheme through a bank account held in a different name.

### III.    SIPA's Broad Protection Encompasses Recovery of Customer Property Regardless of the Title of the JPMorgan Accounts

A Trustee's use of the avoidance and recovery provisions to recover fraudulent transfers of customer property is intrinsic to SIPA's priority scheme, protecting customers on a *pro rata* basis.  *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 198–99 (2d Cir. 2020).  As a leading commentary notes, "The overall purpose of . . . [SIPA] § 78fff-2(c)(3) is to prevent one or more customers from depriving other customers of assets by keeping these assets out of the pool available for distribution to customers on a ratable basis."  6 COLLIER ON BANKRUPTCY ¶ 749.02[1][a] at 749-4 (16th ed. 2011) (internal quotation marks omitted).

By defining "customer property" broadly in SIPA § 78*lll*(4), and by explicitly authorizing the recovery of misappropriated customer property in SIPA § 78fff-2(c)(3) – state law property rights notwithstanding – SIPA effectively renders the issue of account ownership irrelevant to the final analysis. *Picard v. Avellino*, 557 B.R. 89, 108–09 (Bankr. S.D.N.Y. 2016) ("*Avellino I*") (stating that while "[t]he customer property invested with BLMIS never became property of Madoff or BLMIS under applicable non-bankruptcy law . . . ," under SIPA "the Trustee can recover the transfers of customer property by BLMIS . . . ."). In other words, the central issue becomes not account ownership but rather property rights: whether the property in the accounts was customer property deposited by Defendant and whether Defendant is entitled to the withdrawals received. *Cf. Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 198 (2d Cir. 2020) ("[Defendants] did not have property rights to the values in excess of principal reflected there"); *id.* at 201 ("BLMIS never traded in securities and, as a result, never generated any legitimate profits. The defendants-appellants therefore had no rights to the transfers . . . .").

The focus on customer property rights is all the more important when a fraudster is involved. A court that focuses on a fraudster's shell game only gives the fraudster a chance to determine the final outcome of his fraudulent scheme. *Cf. In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 238 (reasoning that the SIPA Trustee's Net Investment Method of calculating a customer's net equity entitlement to property "refuses to permit Madoff to arbitrarily decide who wins and who loses" (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 140 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011))). On the other hand, a court that focuses on the identification and return of customer property effectively neutralizes the fraudster's scheming, obfuscation, and misdirection. *See De La Pena Stettner v. Smith (In re IFS Fin.*

*Corp.*), 669 F.3d 255, 262–64 (5th Cir. 2012) ("[R]egardless of its legal title, [the debtor] had the ultimate power to transfer funds to others, who included the [defendants].  That it obscured its power to transfer in an intentionally complicated corporate structure suggests that control is decisive, and that legal title is irrelevant where, as here, a debtor organization has taken care to mask its activities through fictional divisions.").

The Defendant's property was entrusted to the Debtor and commingled in the JPMorgan Accounts.  Madoff's misuse of customer property, whether placing it in a personal account or under his mattress, should not hinder the Trustee's goal of recovering customer property, and maximizing protection for all victims of the scheme.  The Debtor controlled the funds in the JPMorgan Accounts and made the transfers at issue in this case as withdrawals from the Defendant's brokerage account with the Debtor.  It would subvert SIPA if missing customer property could not be recovered simply because of the broker's attempts to put the property beyond the Trustee's reach.  Indeed, as numerous decisions of the Bankruptcy Court and District Court have already held, transfers from the JPMorgan Accounts are transfers of customer property by the Debtor.[13]

---

[13] *See, e.g., Picard v. JABA Associates (In re Bernard L. Madoff Inv. Sec.)*, 528 F. Supp. 3d 219, 235 (S.D.N.Y Mar. 24, 2021), *appeal docketed*, 21-872 (2d Cir.); *Picard v. Lisa Beth Nissenbaum Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 20-cv-03140, 2021 WL 1141638, at *9–10 (S.D.N.Y. Mar. 24, 2021); *Picard v. BAM L.P. (In re Bernard L. Madoff Inv. Sec.)*, 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020); *Picard v. Nelson (In re Bernard L. Madoff Inv. Sec. LLC)*, 610 B.R. 197, 215–16 (Bankr. S.D.N.Y. 2019); *but see Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195, at *12 (S.D.N.Y. Mar. 3, 2021) (denying summary judgment on the issue of "whether the transfer consisted of an interest of the debtor in property"); Jury Verdict, *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-01029 (S.D.N.Y. Mar. 7, 2022), ECF No. 132; *and* Cremona Decl., Ex. 20 (Tr. at 389:4–16, *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-01029 (S.D.N.Y. Mar. 7, 2022), ECF No. 137) (Judge Furman stated that if the jury had not found for the Trustee, he would have granted the Trustee's Rule 50 motion because the evidence "really uniformly pointed in the direction that supported the jury's verdict.").

To the extent this argument conflicts with the Bankruptcy Court's decision in *Avellino I*,
then *Avellino I* was wrongly decided.  *Avellino I* held that the Trustee could not recover transfers
made by the Debtor prior to 2001 when it was a sole proprietorship.  557 B.R. at 110.  This
holding inappropriately siloed the SIPC member debtor to a particular corporate form, rather
than recognizing that SIPA governs the liquidation of the brokerage business of a SIPC member,
which business continues through changes in corporate form.  *See supra*, Section II.A; *compare*
SIPA § 78fff(a) ("The purposes of a liquidation proceeding under this chapter shall be – . . . (4)
to liquidate the business of the debtor.") *with* 17 C.F.R. § 240.15b1-3(b) (providing succession
rules for "a broker or dealer [that] succeeds to and continues the business of a registered
predecessor broker or dealer").[14]

The District Court has held that *Avellino I* does not control here. *See Picard v. JABA
Associates (In re Bernard L. Madoff Inv. Sec.)*, 528 F. Supp. 3d 219, 235 (S.D.N.Y Mar. 24,
2021). A conflict with *Avellino I*, therefore, is not inherent in SIPC's position. This Court, in
*Avellino I* held that fraudulent transfers of customer property made while the Ponzi scheme was
operated through Madoff's sole proprietorship could only be recovered by Madoff's trustee. 557
B.R. at 110.  On the other hand, once Madoff amended his broker-dealer registration to change
his corporate structure to an LLC and then continued to operate the Ponzi scheme through the
LLC, "the Trustee can recover the transfers of customer property by BLMIS." *Id*. at 109.  This
Court delineated between when a fraudulent transfer of customer property was made, either

---

[14] SIPC and the Trustee will have an opportunity to appeal that decision when it becomes final.
Until *Avellino I* is final, neither *res judicata* nor claim preclusion apply. *See Taylor v. Sturgell*,
553 U.S. 880, 892 (2008) ("Under the doctrine of claim preclusion, a final judgment forecloses
successive litigation of the very same claim . . . ." (internal quotation marks omitted)); *Arizona v.
California*, 530 U.S. 392, 414 (2000) ("It is the general rule that issue preclusion attaches only
when an issue of fact or law is actually litigated and determined by a valid and final judgment . .
. ." (internal quotation marks omitted)).

before or after the formation of the LLC.  It did not establish that the investment advisory

business was never part of the LLC.  *See Keller Family Trust*, 2021 WL 4476811, at *3

("*Avellino* does not firmly establish when the IA Business became part of BLMIS. Instead, it

holds that the SIPA Trustee may not recover transfers made by Madoff prior to January 1, 2001,

when the IA Business was indisputably part of Madoff's sole proprietorship . . . ."); *see also*,

*Picard v. JABA Assocs. LP (In re Bernard L. Madoff Inv. Sec. LLC)*, 528 F. Supp. 3d 219, 234-

35 (S.D.N.Y. Mar. 24, 2021), *appeal docketed*, 21-872 (2d Cir.) ("... [T]he Trustee seeks to

recover only the Two-Year Transfers, and the bankruptcy court has already ruled that the Trustee

may avoid and recover these transfers against similarly situated defendants… the IA Business

and the JPMorgan Accounts were property of the LLC."). In *Avellino I*, this Court, in fact,

allowed the Trustee to proceed with claims to avoid transfers of customer property made after

the change in corporate structure in 2001, again, long before the two-year period for recovery at

issue here.  557 B.R. at 95.

Finally, even if Madoff perpetrated the fraud as sole proprietor after creating the LLC, the

express language of SIPA, the Protective Decree and the Bankruptcy Code all make clear that the

District Court properly entered an order substantively consolidating the non-debtors into the

debtor's bankruptcy estate.  More importantly, the Court's orders did not create or assign any

powers to recover "customer property" that the Trustee did not already possess by Federal

statute.  The Trustee had, pursuant to the Protective Decree and SIPA, the power to pursue

customer property fraudulently conveyed by BLMIS.  The Substantive Consolidation Order

merely specified that the Trustee should exercise those statutory powers to recover customer

property upon substantive consolidation of the Madoff estate into the SIPA liquidation

proceeding.  *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. June 10, 2009), ECF No.

252. The Trustee's authority to pursue customer property conveyed by BLMIS and Madoff flows from the Protective Decree entered by the District Court – which created a SIPA liquidation proceeding and appointed Mr. Picard as Trustee for the "business" operated by Madoff as the broker-dealer member of SIPC – regardless of the form that business may have taken.

## CONCLUSION

Put simply, the Defendant had an account with the Debtor, a SIPC member. The withdrawals received from that account with the Debtor were fraudulent transfers of customer property, in furtherance of the Ponzi scheme run through BLMIS, within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A). The SIPA Trustee is entitled to avoid and recover that customer property for *pro rata* distribution to all customers.

For the reasons set forth above and in the SIPA Trustee's Motion for Summary Judgment, SIPC respectfully requests that the Court enter a Judgment in favor of the SIPA Trustee, on behalf of the consolidated estate of Madoff and BLMIS, in the full amount of the Avoidable Transfers, plus prejudgment interest, and for the Trustee's costs.

Dated:  September 2, 2022
       Washington, D.C.

Respectfully submitted,

*/s/ Kevin H. Bell*
KEVIN H. BELL
Senior Associate General Counsel

NATHANAEL S. KELLEY
Associate General Counsel

NICHOLAS G. HALLENBECK
Assistant General Counsel

SECURITIES INVESTOR PROTECTION
CORPORATION
1667 K St., NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 371-8300
Email: kbell@sipc.org

Email: nkelley@sipc.org
Email: nhallenbeck@sipc.org