# EXHIBIT B

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215
Howard L. Simon (hsimon@windelsmarx.com)
Antonio J. Casas (acasas@windelsmarx.com)
John J. Tepedino (jtepedino@windelsmarx.com)

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. _____(BRL) |
| Plaintiff, | **COMPLAINT** |
| v. | |
| BANQUE INTERNATIONALE À LUXEMBOURG S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.), individually and as successor in interest to Dexia Nordic Private Bank S.A.; RBC DEXIA INVESTOR SERVICES BANK S.A.; RBC DEXIA INVESTOR SERVICES TRUST; RBC DEXIA | |

INVESTOR SERVICES ESPAÑA S.A.; and
BANQUE INTERNATIONALE À
LUXEMBOURG (SUISSE) S.A. (*f/k/a* Dexia
Private Bank (Switzerland) Ltd.);

                    Defendants.

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated

liquidation of New York-based Bernard L. Madoff Investment Securities LLC ("BLMIS") and the

estate of Bernard L. Madoff under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§

78aaa *et seq.*, alleges the following for this Complaint against Defendants Banque Internationale à

Luxembourg S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.) ("Dexia Banque"),

individually and as successor in interest to Dexia Nordic Private Bank S.A. ("Dexia Nordic"); RBC

Dexia Investor Services Bank S.A. ("RBC-Dexia"); RBC Dexia Investor Services Trust ("RBC-

Dexia Trust"); RBC Dexia Investor Services España S.A. ("RBC-Dexia España"); and Banque

Internationale à Luxembourg (Suisse) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.) ("Dexia

Banque Suisse"):

## I.      NATURE OF THE ACTION

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff") and others.

2.      The Trustee seeks to recover subsequent transfers of Customer Property from

BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited

("Fairfield Sigma," and, together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global

Fund, Ltd. ("Kingate") and Rye Select Broad Market Portfolio Limited (*f/k/a* American Masters

---

[1] SIPA § 78lll(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

Broad Market Fund II Limited) ("Rye Select") to the Defendants totaling $81,308,596. Charts setting forth the subsequent transfers are attached here as Exhibits E, G, K and P.

3.       The subsequent transfers followed avoidable initial transfers from BLMIS to the Fairfield Funds, Kingate or Rye Select. The Trustee has filed the following actions to avoid these initial transfers: *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), as to the Fairfield Funds; *Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL), Case Nos. 11-CV-07256 (JSR) and 11-CV-07134 (JSR), as to Kingate; and *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (BRL), as to Rye Select, which was part of a family of funds managed by Tremont Group Holdings, Inc. ("Tremont"). The Fairfield, Kingate and Tremont complaints (without exhibits) are attached here as Exhibits A, H and L, respectively.

## II.       **THE TRANSFEREES AND DEFENDANTS**

4.       Initial transferee Fairfield Sentry maintained customer accounts at BLMIS and was one of BLMIS's largest feeder funds. Fairfield Sentry invested all or substantially all of its assets with BLMIS and was managed by New York-based parent Fairfield Greenwich Group ("FGG").

5.       Fairfield Sigma, an affiliate of Fairfield Sentry, acted as a foreign currency feeder fund, facilitating Euro investments with BLMIS. Fairfield Sigma invested 100% of its assets with Fairfield Sentry and was a subsequent transferee of BLMIS transfers by virtue of this relationship. Fairfield Sigma was managed by FGG.

6.       Initial transferee Kingate maintained a customer account at BLMIS and was a large BLMIS feeder fund. Kingate invested all or substantially all of its assets with BLMIS.

7.       Initial transferee Rye Select maintained a customer account at BLMIS and was a large BLMIS feeder fund. Rye Select invested all or substantially all of its assets with BLMIS.

8.       The Fairfield Funds and Kingate are currently in liquidation. Rye Select reportedly has no ongoing investment operations.

9.      Defendant Dexia Banque entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma and Kingate and received subsequent transfers from the feeder funds. Dexia Banque is a *société anonyme* organized under the laws of Luxembourg, and has its principal office at 69 Route d'Esch, L-2953 Luxembourg. Dexia Banque is a successor in interest to Dexia Nordic.

10.     Defendant RBC-Dexia entered into one or more subscription agreements with Fairfield Sentry and Kingate and received subsequent transfers from the feeder funds. RBC-Dexia is a *société anonyme* organized under the laws of Luxembourg, and has its principal office at 14 Porte de France, L-4360 Esch-sur-Alzette, Luxembourg.

11.     Defendant RBC-Dexia Trust entered into one or more subscription agreements with Rye Select and received subsequent transfers from the feeder fund. RBC-Dexia Trust is a trust company organized under the laws of Canada, and has its principal office at 155 Wellington Street West, 10th floor, Toronto, Ontario M5V 3L3, Canada.

12.     Defendants RBC-Dexia and RBC-Dexia Trust are wholly-owned subsidiaries of RBC Dexia Investor Services Limited, a United Kingdom-based holding company and 50/50 joint venture between Dexia Banque and Royal Bank of Canada.

13.     Defendant RBC-Dexia España entered into one or more subscription agreements with Fairfield Sentry and Fairfield Sigma and received subsequent transfers from the feeder funds. RBC-Dexia España is a *sociedad anónima* organized under the laws of Spain, and has its principal office at Fernando el Santo 20, SP-28010 Madrid, Spain. RBC-Dexia España is a wholly-owned subsidiary of Defendant RBC-Dexia.

14.     Dexia Nordic entered into one or more subscription agreements with Kingate and received a subsequent transfer from the feeder fund. Dexia Nordic, a *société anonyme* organized

4

under the laws of Luxembourg that maintained a business address at 18-20 Avenue Marie-Thérèse, L-2132 Luxembourg, deregistered sometime after it received the subsequent transfer.

15.    Defendant Dexia Banque Suisse entered into one or more subscription agreements with Fairfield Sentry and Fairfield Sigma and received subsequent transfers from the feeder funds. Dexia Banque Suisse is a *société anonyme* organized under the laws of Switzerland, and has its principal office at Beethovenstrasse 48, CH-8002 Zurich, Switzerland.  Dexia Banque Suisse is a wholly-owned subsidiary of Defendant Dexia Banque.

## III.    JURISDICTION AND VENUE

16.    The Trustee brings this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), including Sections 105(a), 323(b), 544, 548, 550(a), 551 and 704(a)(1); New York Debtor & Creditor Law ("NYDCL") §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

17.    The main, underlying substantively-consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending in this Court.  The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, Case No. 08-CV-10791 (the "District Court Proceeding").

18.    This Court has jurisdiction over the instant adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

19.    This Court has personal jurisdiction over the Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  Where a federal statute provides for nationwide service of process, as does Rule 7004, a federal court has personal jurisdiction over any defendant with minimum contacts with the United States.

20.    Defendants have the required minimum contacts with the United States under Bankruptcy Rule 7004 either through their own contacts or business dealings, or contacts or business dealings that can be attributed or imputed to them in their capacity as a successor in interest.

21.    Defendants, directly or through acts attributed or imputed to them, purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Fairfield Funds, Kingate or Rye Select, and then receiving transfers from these funds (the subsequent transfers).

22.    Through these investments and receipt of transfers, Defendants, directly or through acts attributed or imputed to them: (i) knowingly accepted the rights, benefits and privileges of conducting business or transactions in the United States and New York; (ii) derived significant revenue from the United States and New York; and (iii) maintained minimum contacts or general business contacts with the United States and New York.

23.    Each Defendant except RBC-Dexia Trust entered into one or more subscription agreements with Fairfield Sentry agreeing not only that New York law would govern their dealings, but also that any related suit, action or proceeding would be brought in New York.  Thus, they agreed to irrevocably submit to the jurisdiction of the New York courts and to forego any claim that the New York courts are an inconvenient forum.

24.    Each of the Fairfield Sentry subscribers certified that it was a professional investor when it entered into the subscription agreements.  The subscription agreements, as well as Fairfield Sentry private placement memoranda, also confirmed that substantially all of the fund's assets would be invested with New York-based BLMIS, a United States-registered broker-dealer that used a non-traditional options trading strategy described as a "split-strike conversion."  These documents

6

deemed BLMIS and its personnel, who were located in New York, "essential" to Fairfield Sentry and its profitability.  Fairfield Sentry instructed its subscribers to send subscription monies to a bank account in New York.

25.     Dexia Banque, RBC-Dexia España and Dexia Banque Suisse entered into one or more subscription agreements with Fairfield Sigma.  The Fairfield Sigma and Fairfield Sentry subscription agreements and private placement memoranda had very similar language, with almost identical provisions confirming that (i) New York law governed, and any suit, action or proceeding would be brought in New York; (ii) the subscriber was a professional investor; and (iii) substantially all of the fund's assets would be invested with BLMIS and its essential New York personnel, including Madoff.

26.     Dexia Banque, RBC-Dexia and Dexia Nordic entered into one or more subscription agreements with Kingate, and sent subscription monies to a New York bank account, as instructed by Kingate.  The Kingate subscription agreements and associated information memoranda did not mention New York-based BLMIS or Madoff by name, but the memoranda confirmed that the fund would have an "Investment Advisor" that was based in New York, invested "primarily" in the United States and used a non-traditional "split-strike conversion" trading strategy – a reference to BLMIS and Madoff.

27.     RBC-Dexia Trust entered into one or more subscription agreements with Rye Select; sent executed subscription agreements to Rye Select's administrator, Tremont Partners, Inc., at a Rye, New York address; and sent subscription monies to a New York bank account, as instructed by Rye Select.  The Rye Select subscription agreements and associated prospectuses also did not mention BLMIS or Madoff by name, but the prospectuses confirmed that the fund would have a "Manager" that used the "split-strike conversion" trading strategy.

28.     The Defendants have other strong ties to the United States and New York apart from the contacts specific to the causes of action in this Complaint.  Royal Bank of Canada, the largest financial institution in Canada and a 50% partner in the joint venture that owns Defendants RBC-Dexia and RBC-Dexia Trust, does extensive business in the U.S. and maintains branch offices at 3 World Financial Center, New York, New York 10281 and 801 Brickell Avenue, Suite 2100, Miami, Florida 33131. These branches are licensed and supervised by the United States Office of the Comptroller of the Currency.  By Royal Bank of Canada's own account:

> RBC affiliates have been active participants in the U.S. financial system since the establishment of RBC's first agency office in the United States in 1899. We have a strong presence in the United States, providing services to U.S. consumers and institutional and corporate clients in 45 states.  RBC operates in the United States as a foreign banking organization that is a bank holding company and a financial holding company under the [Bank Holding Company Act of 1956].

See Royal Bank of Canada comments to the proposed "Volcker Rule" dated February 13, 2012, http://www.sec.gov/comments/s7-41-11/s74111-331.pdf (last visited May 29, 2012).

29.     Dexia S.A. is the Belgian corporate parent of Defendant Dexia Banque.  Dexia S.A. subsidiaries do business in several U.S. states, including through a branch office of wholly-owned subsidiary Dexia Crédit Local located at 445 Park Avenue, New York, New York 10022.

30.     This Court has personal jurisdiction over the Defendants based on their specific and general contacts with the United States and New York.  The Defendants should reasonably expect to be subject to jurisdiction here based on these contacts.

31.     What is more, Defendant RBC-Dexia España has voluntarily subjected itself to this Court's jurisdiction by virtue of having filed customer claims with the Trustee, designated as Claim

#007204 and #007224, respectively, seeking the recovery of funds RBC-Dexia España allegedly lost on its investments with BLMIS.[2]

32.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). Pursuant to Local Bankruptcy Rule 7008-1, the Trustee consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

33.     Venue in this District is proper under 28 U.S.C. § 1409.

## IV.    BACKGROUND

### A.    THE MAIN CASE

34.     Madoff was arrested by federal agents on December 11, 2008 (the "Filing Date") for violation of the criminal securities laws, including for, among other things, securities fraud, investment adviser fraud and mail and wire fraud.  At about the same time, the U.S. Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding against Madoff and BLMIS.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding is still pending.

35.     The Honorable Louis L. Stanton of the District Court entered an order on December 12, 2008 appointing Lee S. Richards as receiver for the assets of BLMIS.

36.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC") under SIPA § 78eee(a)(4)(B).  The SIPC application alleged, among other things, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

---

[2] These claims were previously denied by the Trustee.

37.     Judge Stanton granted the SIPC application and included in the order a SIPA decree (known as the "Protective Decree"), which, in pertinent part:

a.      removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

b.      appointed Baker & Hostetler LLP as counsel[3] to the Trustee under SIPA § 78eee(b)(3); and

c.      removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under SIPA § 78eee(b)(4).

38.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

39.     At a plea hearing on March 12, 2009 in the criminal case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50), Madoff pled guilty to an 11-count criminal information filed against him by the Office of the United States Attorney for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. He further admitted, "[A]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Then District Court Judge Denny Chin sentenced Madoff on June 29, 2009 to 150 years in prison.

40.     Former BLMIS employee Frank DiPascali is awaiting sentencing after pleading guilty on August 11, 2009 to participating in and conspiring to perpetuate the Ponzi scheme. In the case, entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009),

---

[3] This Court later entered an order, on July 16, 2009, also approving the retention of Windels Marx Lane & Mittendorf, LLP as special counsel to the Trustee.

DiPascali admitted that, among other things, the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

41.    Former BLMIS trader David Kugel is also awaiting sentencing after pleading guilty on November 21, 2011 to charges that he participated in the Ponzi scheme. See *United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011). Kugel stated under oath that the Ponzi scheme began in the early 1970s and admitted that he worked with two other BLMIS employees, JoAnn Crupi and Annette Bongiorno, to create false trades.

### B.    TRUSTEE'S POWERS AND STANDING

42.    The Trustee has a responsibility under SIPA to recover and pay out Customer Property to BLMIS customers, assess claims and liquidate any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years and lost. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent the instant case and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

43.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

44.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of Section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of Section 544 of the Bankruptcy Code.

45.    The Trustee has standing to bring the claims in this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); Bankruptcy Code Sections 105(a), 323(b), 544, 547, 548, 550(a), 551 and 704(a)(1); NYDCL §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

## V.    THE PONZI SCHEME

46.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).  By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading and the investment advisory business (the "IA Business").

47.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy (the "SSC Strategy").  Under this strategy, Madoff purported to invest BLMIS customer funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") -- a collection of the 100 largest publicly-traded companies.  Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also claimed he would carefully time purchases and sales to maximize value, and BLMIS customer funds would, intermittently, be out of the equity markets.

48.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and

losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

49.     Madoff told BLMIS customers that, when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.  Madoff also told customers that he would enter and exit the market between six and ten times each year.

50.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious.  Madoff admitted at his plea hearing that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy.  He further admitted (as later confirmed by Frank DiPascali and David Kugel) that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities.  Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

51.     Madoff assured clients and regulators prior to his arrest that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

52.     For all relevant periods, the IA Business was operated as a Ponzi scheme.  The money received from investors was not invested in stocks and options; rather it was used to pay

withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself and his associates and family.

53.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

54.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in a demand, investigation, the filing of a claim and disclosure of the fraud.

55.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

56.     It now appears based upon the Trustee's ongoing investigation that there were more than 8,000 customer accounts at BLMIS over the life of the scheme. BLMIS generated account statements in early December 2008 for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

57.     Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of all transfers, BLMIS was left with insufficient capital.

## VI.    THE TRANSFERS

58.    Fairfield Sentry, Kingate and Rye Select each received initial transfers of Customer Property from BLMIS.  Some or all of those initial transfers were subsequently transferred to, or for the benefit of, the Defendants, either directly or through Fairfield Sigma as set forth in more detail below.

### A.    FAIRFIELD

#### *The Fairfield Action*

59.    The Trustee filed a complaint to avoid and recover initial and subsequent transfers of Customer Property from BLMIS to Fairfield Sentry, Fairfield Sigma and other entities.  See *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL) (the "Fairfield Action").  The Trustee incorporates by reference the allegations in that action as if fully set forth here.  A copy of the Fairfield Amended Complaint (without exhibits) is attached here as Exhibit A.

60.    Pursuant to orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry and certain Fairfield Sentry affiliates, including Fairfield Sigma (the "Settlement Agreement").  As part of the approved resolution, the Bankruptcy Court entered consent judgments for the Trustee in the amount of $3,054,000,000 against Fairfield Sentry and $752,300,000 against Fairfield Sigma.  The judgments represented the settled amount of the Trustee's "Avoiding Power Claims" against Fairfield Sentry and Fairfield Sigma.  See Settlement Agreement (without exhibits), attached here as Exhibit B, at p. 4, section 1.

#### *Initial Transfers from BLMIS to Fairfield Sentry*

61.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers").  The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy

Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

62.    The Fairfield Sentry Six Year Initial Transfers include $1,614,067,088 that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

63.    The Fairfield Sentry Two Year Initial Transfers include $1,134,628,244 that BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

64.    The Fairfield Sentry Six Year Initial Transfers, Fairfield Sentry Two Year Initial Transfers and Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers."   A chart identifying the BLMIS accounts from which the Fairfield Sentry Initial Transfers were made is attached here as Exhibit C.  A chart detailing the transfers is attached here as Exhibit D.

### Subsequent Transfers from Fairfield Sentry to Defendants Dexia Banque, RBC-Dexia, RBC-Dexia España and Dexia Banque Suisse

65.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred directly or indirectly to, or for the benefit of, Defendants Dexia Banque, RBC-Dexia, RBC-Dexia España and Dexia Banque Suisse.  These parties are referred to below as the "Dexia Fairfield Sentry

Defendants" in connection with these subsequent transfers.    The subsequent transfers are recoverable from the Dexia Fairfield Sentry Defendants pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.    Based on the Trustee's investigation to date, $61,515,524 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry directly or indirectly to, or for the benefit of, the Dexia Fairfield Sentry Defendants (the "Fairfield Sentry Subsequent Transfers").    A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached here as Exhibit E.

> *Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and then to Defendants Dexia Banque, RBC-Dexia España and Dexia Banque Suisse*

66.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Sigma to, or for the benefit of, Defendants Dexia Banque, RBC-Dexia España and Dexia Banque Suisse. These parties are referred to below as the "Dexia Fairfield Sigma Defendants" in connection with these subsequent transfers.    The subsequent transfers are recoverable from the Dexia Fairfield Sigma Defendants pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.    Based on the Trustee's investigation to date, $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma.    A chart setting forth those transfers is attached here as Exhibit F.    Fairfield Sigma, in turn, transferred the equivalent of $2,051,538 of the money it received from Fairfield Sentry to, or for the benefit of, the Dexia Fairfield Sigma Defendants (the "Fairfield Sigma Subsequent Transfers").    A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached here as Exhibit G.

67.    The Trustee's investigation is ongoing, and he reserves the right to:  (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers and Fairfield Sigma Subsequent Transfers, and (ii) seek recovery of any additional transfers.

## B.    KINGATE

### The Kingate Action

68.    The Trustee filed a complaint to avoid and recover initial transfers of Customer Property from BLMIS to Kingate and others.  See *Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL) (the "Kingate Action"); see also District Court Case Nos. 11-CV-07256 (JSR) and 11-CV-07134 (JSR).   The Trustee incorporates by reference the allegations in the Kingate complaint as if fully set forth in this Complaint.  A copy of the Kingate Third Amended Complaint (without exhibits) is attached here as Exhibit H.  The Kingate Action is still pending.

### Initial Transfers from BLMIS to Kingate

69.    Over the lifetime of Kingate's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate in the amount of $437,501,112 (the "Kingate Lifetime Initial Transfers").   The Kingate Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3); and N.Y. C.P.L.R. 203(g) and 213(8).

70.    The Kingate Lifetime Initial Transfers include $398,704,065 that BLMIS transferred to Kingate during the six years preceding the Filing Date (the "Kingate Six Year Initial Transfers"). The Kingate Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

71.    The Kingate Six Year Initial Transfers include $163,447,509 that BLMIS transferred to Kingate during the two years preceding the Filing Date (the "Kingate Two Year Initial Transfers").  The Kingate Two Year Initial Transfers were and continue to be Customer Property

within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

72.    The Kingate Two Year Initial Transfers include $101,753,145 that BLMIS transferred to Kingate during the 90 days preceding the Filing Date (the "Kingate Preference Period Initial Transfers"). The Kingate Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

73.    The Kingate Lifetime Initial Transfers, Kingate Six Year Initial Transfers, Kingate Two Year Initial Transfers and Kingate Preference Period Initial Transfers are collectively defined as the "Kingate Initial Transfers." A chart identifying the BLMIS account from which the Kingate Initial Transfers were made is attached here as Exhibit I. A chart detailing the transfers is attached here as Exhibit J.

### Subsequent Transfers from Kingate to Defendants Dexia Banque and RBC-Dexia

74.    A portion of the Kingate Initial Transfers was subsequently transferred directly or indirectly to, or for the benefit of, Defendants Dexia Banque, either directly or through its predecessor Dexia Nordic, and RBC-Dexia. These parties are referred to below as the "Dexia Kingate Defendants" in connection with these subsequent transfers. The subsequent transfers are recoverable from the Dexia Kingate Defendants pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $15,308,488 of the money transferred from BLMIS to Kingate was subsequently transferred by Kingate directly or indirectly to, or for the benefit of, the Dexia Kingate Defendants (the "Kingate Subsequent Transfers"). A chart setting forth the presently known Kingate Subsequent Transfers is attached here as Exhibit K.

75.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Kingate Initial Transfers and Kingate Subsequent Transfers; and (ii) seek recovery of any additional transfers.

### C.    RYE SELECT

#### *The Tremont Action*

76.    The Trustee filed a complaint to avoid and recover initial transfers of Customer Property from BLMIS to Rye Select and others.  See *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (BRL) (the "Tremont Action").  The Trustee incorporates by reference the allegations in the Tremont Action as if fully set forth here.  A copy of the Tremont Complaint (without exhibits) is attached here as Exhibit L.

77.    By Order dated September 22, 2011, the Bankruptcy Court approved a settlement agreement between the Trustee and Rye Select and certain other defendants in the Tremont Action.  As part of this "Tremont Settlement," the Trustee agreed to allow certain customer claims against the BLMIS estate, and Rye Select and the other settling defendants agreed to pay the Trustee $1.025 billion in cash.  See Tremont Settlement Agreement (without exhibits), attached here as Exhibit M at pp. 12-17, ¶¶ 2-6.  The Tremont Settlement expressly states that the settlement payments "shall not, and are not, intended to release, waive, prejudice, or limit the Trustee's rights and ability to pursue any actions or claims, including, but not limited to, recovery actions under Section . . . 550 of the Bankruptcy Code" against subsequent transferees.  *Id*. at p. 13, ¶ 4.

#### *Initial Transfers from BLMIS to Rye Select*

78.    Over the lifetime of Rye Select's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Rye Select in the amount of $628,231,909 (the "Rye Select Lifetime Initial Transfers").  The Rye Select Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under

Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3); and N.Y. C.P.L.R. 203(g) and 213(8).

79.    The Rye Select Lifetime Initial Transfers include $617,944,432 which BLMIS transferred to Rye Select during the six years preceding the Filing Date (the "Rye Select Six Year Initial Transfers").  The Rye Select Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

80.    The Rye Select Six Year Initial Transfers include $354,571,757 that BLMIS transferred to Rye Select during the two years preceding the Filing Date (the "Rye Select Two Year Initial Transfers").  The Rye Select Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

81.    The Rye Select Two Year Initial Transfers include $275,689,103 that BLMIS transferred to Rye Select during the 90 days preceding the Filing Date (the "Rye Select Preference Period Initial Transfers").  The Rye Select Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

82.    The Rye Select Lifetime Initial Transfers, Rye Select Six Year Initial Transfers, Rye Select Two Year Initial Transfers and Rye Select Preference Period Initial Transfers are collectively defined as the "Rye Select Initial Transfers."  A chart identifying the BLMIS account from which

the Rye Select Initial Transfers were made is attached here as Exhibit N. A chart detailing the transfers is attached here as Exhibit O.

### *Subsequent Transfers from Rye Select to Defendant RBC-Dexia Trust*

83.    A portion of the Rye Select Initial Transfers was subsequently transferred directly or indirectly to, or for the benefit of, Defendant RBC-Dexia Trust. The subsequent transfers are recoverable from RBC-Dexia Trust pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $2,433,046 of the money transferred from BLMIS to Rye Select was subsequently transferred by Rye Select directly or indirectly to, or for the benefit of, RBC-Dexia Trust (the "Rye Select Subsequent Transfers"). A chart setting forth the presently known Rye Select Subsequent Transfers is attached here as Exhibit P.

84.    The Trustee's investigation is ongoing, and he reserves the right to: (i) supplement the information on the Rye Select Initial Transfers and Rye Select Subsequent Transfers; and (ii) seek recovery of any additional transfers.

### COUNT ONE
### RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS–
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (Dexia Banque, RBC-Dexia, RBC-Dexia España and Dexia Banque Suisse)

85.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

86.    The Dexia Fairfield Sentry Defendants received the Fairfield Sentry Subsequent Transfers, which totaled at least $61,515,524 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

87.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, a Dexia Fairfield Sentry Defendant.

88.     The Dexia Fairfield Sentry Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

89.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Dexia Fairfield Sentry Defendants recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (Dexia Banque, RBC-Dexia España and Dexia Banque Suisse)

90.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

91.     The Dexia Fairfield Sigma Defendants received the Fairfield Sigma Subsequent Transfers, which totaled at least $2,051,538 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

92.     Each of the Fairfield Sigma Subsequent Transfers was made to, or for the benefit of, a Dexia Fairfield Sigma Defendant.

93.     The Dexia Fairfield Sigma Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

94.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Dexia Fairfield Sigma Defendants recovering the Fairfield Sigma Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## RECOVERY OF KINGATE SUBSEQUENT
## TRANSFERS–11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (Dexia Banque and RBC-Dexia)

95.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

96.     The Dexia Kingate Defendants received the Kingate Subsequent Transfers, which totaled at least $15,308,488 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

97.     Each of the Kingate Subsequent Transfers was made directly or indirectly to, or for the benefit of, a Dexia Kingate Defendant.

98.     The Dexia Kingate Defendants are immediate or mediate transferees of the Kingate Initial Transfers, which are avoidable and recoverable as set forth in the Kingate Action.

99.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Dexia Kingate Defendants recovering the Kingate Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT FOUR
## RECOVERY OF RYE SELECT SUBSEQUENT
## TRANSFERS–11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (RBC-Dexia Trust)

100.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

101.     RBC-Dexia Trust received the Rye Select Subsequent Transfers, which totaled at least $2,433,046 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

102.    Each of the Rye Select Subsequent Transfers was made directly or indirectly to, or for the benefit of, RBC-Dexia Trust.

103.    RBC-Dexia Trust is an immediate or mediate transferee of the Rye Select Initial Transfers, which are avoidable and recoverable as set forth in the Tremont Action.

104.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against RBC-Dexia Trust recovering the Rye Select Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(a)    On the First Claim for Relief, pursuant to Sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), a judgment against the Dexia Fairfield Sentry Defendants recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $61,515,524, for the benefit of the estate of BLMIS;

(b)    On the Second Claim for Relief, pursuant to Sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), a judgment against the Dexia Fairfield Sigma Defendants recovering the Fairfield Sigma Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $2,051,538, for the benefit of the estate of BLMIS;

(c)    On the Third Claim for Relief, pursuant to Sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), a judgment against the Dexia Kingate Defendants recovering the Kingate Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $15,308,488, for the benefit of the estate of BLMIS;

(d)    On the Fourth Claim for Relief, pursuant to Sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), a judgment against RBC-Dexia Trust

recovering the Rye Select Subsequent Transfers, or the value thereof, in an amount to be proven at

trial, but no less than $2,433,046, for the benefit of the estate of BLMIS;

(e)        Awarding the Trustee all applicable fees, interest, costs and disbursements of this

action; and

(f)        Granting the Trustee such other, further and different relief as the Court deems just,

proper and equitable.

Dated: New York, New York
          June 6, 2012

**WINDELS MARX LANE & MITTENDORF, LLP**

/s/ Howard L. Simon
Howard L. Simon (hsimon@windelsmarx.com)
Antonio J. Casas (acasas@windelsmarx.com)
John J. Tepedino (jtepedino@windelsmarx.com)
156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
Facsimile: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and
Bernard L. Madoff*