**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the Substantively*
*Consolidated SIPA Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01699 (CGM) |
| Plaintiff, | |
| v. | |
| ROYAL BANK OF CANADA, individually and as successor in interest to Royal Bank of Canada (Asia) Limited; GUERNROY LIMITED; RBC TRUST COMPANY (JERSEY) LIMITED; BANQUE SYZ S.A., as successor in interest to Royal Bank of Canada (Suisse) S.A.; RBC DOMINION SECURITIES INC.; and RBC ALTERNATIVE ASSETS, L.P., | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................4

I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS...............................4

II.   DEFENDANTS AND THEIR INVESTMENTS IN THE FEEDER
      FUNDS .................................................................................................5

ARGUMENT .......................................................................................................9

I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE PJ
      DEFENDANTS .....................................................................................9

      A.    The PJ Defendants Purposefully Availed Themselves of the
            Laws and Privileges of Conducting Business in the United
            States, and the Trustee's Claims Arise Out of or Relate to Such
            Availment...............................................................................10

            1.    The PJ Defendants' Knowing and Intentional Investments
                  With BLMIS Are Sufficient Grounds for Jurisdiction .................10

                  a.    *BLI* and Recent Decisions of This Court Establish
                        Jurisdiction......................................................................11

                  b.    *Walden* Does Not Save the PJ Defendants ........................12

                  c.    Guernroy's Customer Claims Support Jurisdiction ...........13

            2.    The PJ Defendants Had Numerous Additional Contacts
                  With the Forum in Connection With Their Feeder Fund
                  Investments ...............................................................................14

            3.    The Forum Selection and Choice of Law Clauses in the
                  Subscription Agreements Are Strong Jurisdictional
                  Contacts......................................................................................15

            4.    The PJ Defendants' Purposeful Use of New York Bank
                  Accounts Establishes Jurisdiction................................................16

            5.    The Foregoing Contacts Are "Related to" the Trustee's
                  Claims .........................................................................................19

      B.    The Exercise of Personal Jurisdiction Over the PJ Defendants
            Is Reasonable ..........................................................................20

II.     SECTION 546(E) DOES NOT BAR RECOVERY FROM
        DEFENDANTS ................................................................................21

        A.      The Feeder Funds Had Actual Knowledge of Madoff's Fraud ................21

        B.      Section 546(e) Does Not Apply Independently to Recovery
                Actions ........................................................................22

III.    THE TRUSTEE HAS PLED THAT THE RYE SELECT FUNDS HAD
        ACTUAL KNOWLEDGE.......................................................................26

IV.     THE TRUSTEE HAS PLED THE AVOIDABILITY OF THE INITIAL
        TRANSFERS ..................................................................................33

V.      THE NEW TRANSFERS RELATE BACK TO THE OC ..................................35

        A.      Relevant Legal Standards .........................................................35

        B.      The New Transfers Were Made as Part of the Same Course of
                Conduct as the Transfers Alleged in the OC ...............................36

        C.      The OC Provided Notice to Defendants That the Trustee Would
                Sue for Any Additional Transfers That Were Part of the Same
                Course of Conduct ..............................................................38

CONCLUSION................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292 (S.D.N.Y. 2009) ... 36, 38, 40

*Adler v. Pataki*, 185 F.3d 35 (2d. Cir 1999) ................................................................ 30

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 CIV. 11448 (JGK),
    2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005) ......................................................... 29

*Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016) ...................................................... 17

*Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670 (Bankr. E.D. Pa. 2010) ........................ 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................... 15

*Carbon Inv. Partners, LLC v. Bressler*, No. 20 Civ. 3617 (ER),
    2021 WL 3913526 (S.D.N.Y. Sep. 1, 2021) .......................................................... 33

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) ................................ 9, 20

*Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374 (S.D.N.Y. 2013) ........................ 16

*Davis v. Bifani*, No. 07-cv-00122-MEH-BN,
    2007 WL 1216518 (D. Colo. Apr. 24, 2007) ......................................................... 34

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013) .................................. 9

*Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 CIV. 9865 LMN,
    2011 WL 4058100 (S.D.N.Y. Sep. 1, 2011) .......................................................... 30

*Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ......... 16

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019) .................................................................. 18

*Fairfield Sentry Ltd. v. HSBC Sec. Serv.*, No. 21-cv-10316 (LAP),
    2022 WL 3910679 (S.D.N.Y. Aug. 31, 2022) ....................................................... 21

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    Adv. No. 10-03496, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018),
    *aff'd sub nom. Fairfield Sentry Ltd. v. Citibank, N.A. London*,
    No. 19-CV-3911 (VSB), 2022 WL 3644436 (S.D.N.Y. Aug. 24, 2022) .............................. 16

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ................................ 19

*Goldberg v. Halbert (In re Woodbridge Group of Companies, LLC)*,
    No. 19-51027 (JKS), 2021 WL 5774217 (Bankr. D. Del. Dec. 6, 2021) .............................. 37

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11-3673(RJS),
    2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) ................................................................ 14

*Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ............................................................... 15

*Hau Yin To v. HSBC Holdings, PLC*, 700 Fed. App'x 66 (2d Cir. 2017) .................................. 10

*Henry v. Daytop Village, Inc.*, 42 F.3d 89 (2d. Cir 1994) ......................................................29-30

*Hill v. Oria (In re Juliet Homes, LP)*, No. 07-36424,
    2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011) ................................................36-37, 40

*HSH Nordbank AG N.Y. Branch v. Street,* No. 11 Civ.9405 (DLC),
    2012 WL 2921875 (S.D.N.Y. July 18, 2012) ........................................................... 16, 19-20

*In re Arcapita Bank B.S.C.(C)*, No. 21 CIV. 8296 (AKH),
    2022 WL 1620307 (S.D.N.Y. May 23, 2022) ............................................................ 18

*In re Chaus Sec. Litig.*, 801 F. Supp. 1257 (S.D.N.Y. 1992) ...................................................... 37

*In re Fairfield Sentry Ltd.*, 627 B.R. 546 (Bankr. S.D.N.Y. 2021) ............................................ 19

*In re Motors Liquidation Co.*, 565 B.R. 275 (Bankr. S.D.N.Y. 2017) ........................................ 18

*In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007),
    *aff'd sub nom. Pappas v. Bank of America Corp.*, 309 F. App'x 536 (2d Cir. 2009) ........... 33

*In re Picard,* 917 F.3d 85 (2d Cir. 2019) ..................................................................... 11, 20, 23

*Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................ 29

*Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) ................................................ 17

*Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020) ........................................................ 27

*Mallis v. Bankers Trust Co.*, 717 F.2d 683 (2d Cir. 1983) ......................................................... 33

*Maranga v. Vira*, 386 F. Supp. 2d 299 (S.D.N.Y. 2005) .......................................................... 15

*Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*,
  Adv. Pro. No. 18-50489 (CSS), 2022 WL 2240122 (Bankr. D. Del. June 22, 2022) ....... 29-30

*Muhammad v. Bethel-Muhammad*, No. 11-0690-WS-B,
  2012 WL 1854315 (S.D. Ala. May 21, 2012) ........................................................................ 34

*Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, No. 13-cv-6705 (DLC),
  2014 WL 1673351 (S.D.N.Y. Apr. 28, 2014).......................................................................... 34

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023 (CBA) (RLM),
  2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010) ......................................................................... 34

*Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*,
  549 B.R. 56 (S.D.N.Y. 2016)............................................................................................... 16-17

*Ogier v. UPAC Ins. Fin. (In re Bauer Agency, Inc.)*,
  443 B.R. 918 (Bankr. N.D. Ga. 2011) ..................................................................................... 40

*Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 JS AKT,
  2011 WL 1655575 (E.D.N.Y. May 2, 2011), *aff'd*, 457 F. App'x 40 (2d Cir. 2012) ........... 29

*Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*,
  67 B.R. 304 (Bankr. S.D.N.Y. 1986)........................................................................................ 39

*Picard v. Banca Carige, S.P.A.*, Adv. Pro. No. 11-02570 (CGM),
  2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022).................................................... passim

*Picard v. Banque Cantonale Vaudoise*, Adv. Pro. No. 12-01694 (CGM),
  2022 WL 2761044 (Bankr. S.D.N.Y. July 14, 2022) ......................................................... 2, 34

*Picard v. Banque Lombard Odier & Cie SA,* Adv. Pro. No. 12-01693 (CGM),
  2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022).................................................. 2, 12, 14

*Picard v. Banque SYZ & Co. SA*, Adv. Pro. No. 11-02149 (CGM),
  2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022).................................................. 2, 12, 14

*Picard v. Barclays Bank (Suisse) S.A.*, Adv. Pro. No. 11-02569 (CGM),
  2022 WL 2799924 (Bankr. S.D.N.Y. July 15, 2022) ............................................................... 2

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)................................................................... 12, 18, 24-25

*Picard v. Bordier & Cie*, Adv. Pro. No. 12-01695 (CGM),
  2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022)............................................................... 2

*Picard v. Bureau of Labor Insurance (In re BLMIS)*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................................ 11-12, 16, 19

*Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (CGM),
2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ............................................ 27, 30, 33

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
No. 21-1059, 2022 WL 585915 (U.S. Feb. 28, 2022) .................................... 4-5, 22

*Picard v. Delta Nat'l Bank & Trust Co.*, Adv. Pro. No. 11-02551 (CGM),
2022 WL 3365256 (Bankr. S.D.N.Y. Aug. 12, 2022) ............................................. 2

*Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015) ..................................................................... 18

*Picard v. Estate of Chais (In re BLMIS)*, 445 B.R. 206 (Bankr. S.D.N.Y. 2011) .................. 38-39

*Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM),
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ..................................................... passim

*Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM),
2022 WL 3354955 (Bankr. S.D.N.Y. July 18, 2022) .............................................. 2

*Picard v. Lloyds TSB Bank, PLC,* Adv. Pro. No. 12-01207 (CGM),
2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022).................................... 2, 34-35

*Picard v. Magnify Inc. (In re BLMIS)*, 583 B.R. 829 (Bankr. S.D.N.Y. 2018) ........................... 27

*Picard v. Meritz Fire & Marine Ins. Co. LTD.*, Adv. Pro. No. 11-02539 (CGM),
2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ....................................... 2, 17

*Picard v. Multi-Strategy Fund Ltd.*, 641 B.R. 78 (Bankr. S.D.N.Y. 2022) .......................... passim

*Picard v. Parson Fin. Panama S.A.*, Adv. Pro. No. 11-02542 (CGM),
2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) ................................................ 2, 14, 20-21

*Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620 (Bankr. S.D.N.Y. 2012) ...........35-36, 38-40

*Picard v. Public Inst. for Soc. Sec.*, Adv. Pro. No. 12-01002 (CGM),
2022 WL 3458962 (Bankr. S.D.N.Y. Aug. 17, 2022) ............................................. 2

*Picard v. Square One Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 10-04330 (CGM),
ECF No. 181 (Bankr. S.D.N.Y. May 30, 2019)........................................................ 32

*Picard v. Union Sec. Inv. Trust Co., Ltd.*, Adv. Pro. No. 12-01211 (CGM),
　　2022 WL 3572509 (Bankr. S.D.N.Y. Aug. 18, 2022) (amended) ............................................ 2

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
　　151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................................................... 28-29

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
　　501 B.R. 26 (S.D.N.Y. 2013) ........................................................................... 23, 25, 34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
　　531 B.R. 439 (Bankr. S.D.N.Y. 2015) .......................................................................... 22

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12-MC-115 (JSR),
　　2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) .................................................................. passim

*Sherman v. A.J. Pegno Constr. Corp.*, 528 F. Supp. 2d 320 (S.D.N.Y. 2007) ............................. 34

*Siegel v. Converters Transp., Inc.*, 714 F.2d 213 (2d Cir. 1983) ................................................. 36

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
　　379 B.R. 5 (Bankr. E.D.N.Y. 2007) .............................................................................. 35-36

*United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007) .................. 34

*Walden v. Fiore,* 571 U.S. 277 (2014) ................................................................................ 12-14

**Statutes**

15 U.S.C. §§ 78aaa-*lll* .................................................................................................. 1

11 U.S.C. § 546(e) ................................................................................................ passim

11 U.S.C. § 548(a)(1)(A) .............................................................................................. 21

11 U.S.C. § 550 ................................................................................................... 22-23, 25

11 U.S.C. § 550(a) ............................................................................................... 25, 36

11 U.S.C. § 550(f) .................................................................................................... 2

**Rules**

Fed. R. Civ. P. 8 .................................................................................................. 2, 30

Fed. R. Civ. P. 8(a) ................................................................................................. 3

Fed. R. Civ. P. 8(d)(2) ........................................................................................... 29

Fed. R. Civ. P. 8(d)(3) ........................................................................................... 29

Fed. R. Civ. P. 10 .................................................................................................... 2

Fed. R. Civ. P. 10(c) ......................................................................................... 3, 34

Fed. R. Civ. P. 12(b)(2) ........................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1

Fed. R. Civ. P. 12(h) ............................................................................................... 2

Fed. R. Civ. P. 15 ............................................................................................. 35-36

Fed. R. Civ. P. 15(c)(1)(B) .................................................................................... 35

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law in opposition to the motion (the "Motion") to dismiss the Amended Complaint (the "AC") pursuant to Federal Rules of Civil Procedure (the "Rules") 12(b)(2) and 12(b)(6) filed by Defendants (i) Royal Bank of Canada, individually and as successor in interest to Royal Bank of Canada (Asia) Limited ("RBC Asia"); (ii) Guernroy Limited ("Guernroy"); (iii) RBC Trust Company (Jersey) Limited ("RBC Trust"); (iv) Banque SYZ S.A. ("Banque SYZ"), as successor in interest to Royal Bank of Canada (Suisse) S.A. ("RBC Suisse"); (v) RBC Dominion Securities Inc. ("RBC Dominion"); and (vi) RBC Alternative Assets, L.P. ("RBC Alternative") (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, this action by the Trustee seeks to recover approximately $77 million in subsequent transfers that Defendants received from BLMIS feeder funds Fairfield Sentry Limited ("Sentry"), Rye Select Broad Market Prime Fund ("Rye Prime"), Rye Select Broad Market Portfolio Limited ("Rye Portfolio"), and Rye Select Broad Market Fund LP ("Rye Broad" and, together with Rye Prime and Rye Portfolio, the "Rye Select Funds") (collectively, the "Feeder Funds"). Each of the Defendants other than RBC Alternative (collectively, the "PJ Defendants") argues that this adversary proceeding should be dismissed (or, in the case of Royal Bank of Canada, claims to recover certain transfers should be

---

[1] Allegations made herein as to activities of, or transfers received by, "Defendants" during the relevant time frame are meant to include RBC Asia, as the predecessor in interest to Royal Bank of Canada, and RBC Suisse, as the predecessor in interest to Banque SYZ.

dismissed) because the Court lacks jurisdiction over them.[2]  In addition, all Defendants argue that (i) the safe harbor under Section 546(e) of the Bankruptcy Code bars recovery, and (ii) the Trustee violates Rules 8 and 10 by incorporating by reference the Trustee's Second Amended Complaint against Sentry (the "Fairfield SAC")[3] and the Trustee's Complaint against the Rye Select Funds (the "Tremont Complaint" or "TC"),[4] as supplemented by additional allegations in the AC as to Tremont's actual knowledge (the "Tremont Supplement").   The foregoing arguments are substantially the same as those recently made by defendants and rejected by this Court in other subsequent transfer cases.[5]  Defendants also argue that the newly-alleged subsequent transfers to Defendants RBC Alternative and Guernroy from the Rye Select Funds (the "New Transfers") are barred by the Section 550(f) statute of limitations because they do not relate back to the Trustee's original Complaint (the "OC").  For the reasons set forth herein, Defendants' arguments fail.

---

[2] By not contesting personal jurisdiction, RBC Alternative and, to the extent of its transfers from Rye Prime, Royal Bank of Canada have conceded that this Court has jurisdiction over them.  *See* Rule 12(h).  Consequently, as detailed in the chart on p. 5, *infra*, Defendants are not contesting jurisdiction as to more than $34 million of the approximately $77 million of transfers at issue in this action.

[3] *Picard v. Fairfield Inv. Fund Ltd.*, *et al.*, Adv. Pro. No. 09-01239 (CGM), ECF No. 286 (Bankr. S.D.N.Y. Aug. 28, 2020).

[4] *Picard v. Tremont Group Holdings, Inc.*, *et al.*, Adv. Pro. No. 10-05310 (CGM), ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010).

[5] *See Picard v. Multi-Strategy Fund Ltd.*, 641 B.R. 78 (Bankr. S.D.N.Y. 2022) ("*Multi-Strategy*"); *Picard v. Banque SYZ & Co. SA*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque SYZ*"); *Picard v. Banque Lombard Odier & Cie SA,* Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ("*Lombard*"); *Picard v. Banca Carige, S.P.A.*, Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ("*Carige*"); *Picard v. Lloyds TSB Bank, PLC,* Adv. Pro. No. 12-01207 (CGM), 2022 WL 2390551 (Bankr. S.D.N.Y. June 30, 2022) ("*Lloyds*"); *Picard v. Bordier & Cie*, Adv. Pro. No. 12-01695 (CGM), 2022 WL 2390556 (Bankr. S.D.N.Y. June 30, 2022); *Picard v. Banque Cantonale Vaudoise*, Adv. Pro. No. 12-01694 (CGM), 2022 WL 2761044 (Bankr. S.D.N.Y. July 14, 2022) ("*BCV*"); *Picard v. Barclays Bank (Suisse) S.A.*, Adv. Pro. No. 11-02569 (CGM), 2022 WL 2799924 (Bankr. S.D.N.Y. July 15, 2022); *Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July 18, 2022); *Picard v. Parson Fin. Panama S.A.*, Adv. Pro. No. 11-02542 (CGM), 2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) ("*Parson*"); *Picard v. Union Sec. Inv. Trust Co., Ltd.*, Adv. Pro. No. 12-01211 (CGM), 2022 WL 3572509 (Bankr. S.D.N.Y. Aug. 18, 2022) (amended); *Picard v. Meritz Fire & Marine Ins. Co. LTD.*, Adv. Pro. No. 11-02539 (CGM), 2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ("*Meritz*"); *Picard v. Delta Nat'l Bank & Trust Co.*, Adv. Pro. No. 11-02551 (CGM), 2022 WL 3365256 (Bankr. S.D.N.Y. Aug. 12, 2022); *Picard v. Public Inst. for Soc. Sec.*, Adv. Pro. No. 12-01002 (CGM), 2022 WL 3458962 (Bankr. S.D.N.Y. Aug. 17, 2022).  To avoid repetition and long string cites, the Trustee will avoid citing to all of these decisions, but they all support denial of Defendants' Motion.

First, this Court has personal jurisdiction over the PJ Defendants. The PJ Defendants purposefully invested in Sentry and Rye Portfolio,[6] knowing from the documents of the Feeder Funds that BLMIS in New York was the *de facto* investment manager, broker-dealer, and custodian of the funds' investments. The PJ Defendants also designated and used New York bank accounts to deposit funds with and receive the transfers at issue from Sentry and Rye Portfolio. In addition, in connection with all Defendants' Feeder Fund investments, personnel from the RBC Capital Markets/Alternative Assets group (together with its predecessors, the "RBC Cap/Alt Group") in New York conducted due diligence and risk management on BLMIS and the Feeder Funds, including attending meetings in New York with Madoff and Feeder Fund executives.[7]

Second, the safe harbor for settlement payments or transfers in connection with securities contracts under Section 546(e) is inapplicable and does not bar recovery from Defendants. Defendants' primary argument—that the Trustee must plead *Defendants'* actual knowledge as opposed to that of the Feeder Funds—both misinterprets and directly conflicts with precedent in this SIPA liquidation proceeding. Defendants' contention that the Trustee's allegations as to the Rye Select Funds' actual knowledge in the Tremont Complaint and Tremont Supplement are "inconsistent" is meritless. The Tremont Supplement standing alone, as well as together with the Tremont Complaint, plausibly alleges the Rye Select Funds' actual knowledge of Madoff's fraud.

Third, the Trustee's incorporation of the Fairfield SAC and the Tremont Complaint is appropriate under Rules 8(a) and 10(c). Such incorporation represents a practical method for the Trustee to plead avoidance of the initial transfers to the Feeder Funds, and Defendants can respond to the allegations just as they would any other paragraph in the AC. Defendants' contention that

---

[6] Every PJ Defendant invested in Sentry, and PJ Defendant Guernroy also invested in Rye Portfolio.

[7] As detailed on pp. 7-8, *infra*, the RBC Cap/Alt Group was an RBC business unit responsible for such activities across the RBC enterprise.

incorporation of the Tremont Complaint would result in an "incoherent" pleading relies on their flawed argument as to "inconsistent" allegations and is thus also meritless.

Fourth, the New Transfers relate back to the OC and are therefore not time-barred because they were part of the same course of dealing between Defendants RBC Alternative and Guernroy and the Rye Select Funds as the transfers from these funds to these Defendants alleged in the OC. Moreover, the OC put Defendants on notice that the Trustee was seeking to recover any and all avoidable transfers subsequently transferred to them by the Feeder Funds.

## STATEMENT OF FACTS

## I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008. AC ¶ 17. BLMIS was a securities broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC") beginning in January 1960. *Id.* ¶ 18. BLMIS had three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.* ¶ 19. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the S&P 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the market. *Id.* ¶¶ 30, 32. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶¶ 23-48. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id*. ¶ 4.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds" (including the Feeder Funds at issue here)—large investment funds created for the express purpose of funneling investors' funds into BLMIS. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff*

*Inv. Sec. LLC*), 12 F.4th 171, 179 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, No. 21-1059, 2022 WL 585915 (U.S. Feb. 28, 2022) ("*Citibank*"). Each Defendant invested in one or more Feeder Funds, which it knew were BLMIS feeder funds. AC ¶¶ 68, 71-73. Defendants knowingly invested in BLMIS through other feeder funds as well. *Id.* ¶ 2 n.3.

## II.    DEFENDANTS AND THEIR INVESTMENTS IN THE FEEDER FUNDS

At all relevant times, each Defendant was part of the worldwide Royal Bank of Canada enterprise, a highly sophisticated financial organization operating under the master brand name "RBC" (the enterprise collectively, "RBC"). AC ¶ 3. Defendant Royal Bank of Canada was the 100% indirect parent of each other Defendant. *Id.* ¶¶ 3, 49.

Defendants Royal Bank of Canada, Guernroy, RBC Trust, Banque SYZ, and RBC Dominion (collectively, the "Sentry Transferee Defendants") received transfers from Sentry; Defendant RBC Alternative received transfers from Rye Broad; Defendants Royal Bank of Canada and RBC Alternative received transfers from Rye Prime; and Defendant Guernroy received transfers from Rye Portfolio. *Id.* ¶ 2, Exs. C, F, I, L. Specifically, Defendants received the following subsequent transfers (via the initial transferee(s) indicated):

| Defendant | Feeder Fund(s) | Transfers |
|---|---|---|
| Royal Bank of Canada (individually) | Sentry | $16,458,547 |
| | Rye Prime | $938,000 |
| Royal Bank of Canada (as successor to RBC Asia) | Sentry | $2,672,103 |
| Guernroy | Sentry | $13,025,711 |
| | Rye Portfolio | $4,836,009 |
| RBC Trust | Sentry | $178,459 |
| Banque SYZ (as successor to RBC Suisse) | Sentry | $3,726,744 |
| RBC Dominion | Sentry | $1,958,206 |
| RBC Alternative | Rye Prime | $15,346,605 |
| | Rye Broad | $18,077,260 |

Sentry was owned, managed, and operated by Fairfield Greenwich Group ("FGG"), a *de facto* partnership with its principal place of business in New York. AC ¶ 69; *Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield Inv. Fund*"), at *9. Sentry invested all or substantially all of its assets with BLMIS. AC ¶¶ 2, 163; Fairfield SAC ¶ 89.

The Rye Select Funds were owned, managed, and operated by New York-based Tremont Group Holdings, Inc. (together with predecessors and affiliates, "Tremont"). AC ¶ 70; TC ¶¶ 8, 42, 46-51. Rye Prime and Rye Broad were U.S. entities, registered in Delaware and operating out of Tremont's principal office in New York. AC ¶ 70; TC ¶¶ 35, 37. Rye Portfolio was at all relevant times managed and operated out of that same New York office. AC ¶ 70; TC ¶ 39. The Rye Select Funds invested all or substantially all of their assets with BLMIS. AC ¶¶ 2, 174, 183, 192; TC ¶¶ 36, 38-39.

Each of the Sentry Transferee Defendants entered into one or more subscription agreements with Sentry, in which each such Defendant agreed to New York choice of law, jurisdiction, and forum clauses. AC ¶¶ 66, 71. In these agreements, the Sentry Transferee Defendants affirmed that they had received and read Sentry's Information Memorandum or Private Placement Memorandum (together, "PPMs"). *Id*. ¶ 71. The PPMs disclosed how the services of BLMIS were "essential to the continued operation of" the fund. *Id*. The PPMs also disclosed BLMIS's multiple roles as the *de facto* investment manager, broker-dealer, and custodian for Sentry and highlighted the numerous U.S. connections inherent in investing in Sentry. *Id*.

Similarly, Defendants Royal Bank of Canada, Guernroy, and RBC Alternative entered into one or more subscription agreements with each of the Rye Select Funds in which they were invested. *Id*. ¶ 72. In their Rye Broad and Rye Prime subscription agreements, Royal Bank of

Canada and RBC Alternative agreed to New York choice of law, jurisdiction, and forum clauses. *Id.* ¶ 67. The Rye Select Funds' offering documents and due diligence questionnaires disclosed essentially the same information as the PPMs, including that each fund's investments in U.S. securities would be custodied in New York by a New York investment adviser using the SSC Strategy. *Id.* ¶¶ 72-73.

Except with respect to Rye Portfolio, Defendants sent all of their Feeder Fund subscription payments to, and received all of their redemption payments from, the fund's New York bank account (with respect to Rye Broad and Rye Prime) or New York correspondent account (with respect to Sentry, the "Sentry NY Account"). *Id.* ¶ 79. With respect to Rye Portfolio, beginning at least as early as fall 2006, Defendant Guernroy sent its subscription payments to, and received its redemption payments from, the fund's New York bank account; and prior to that time, upon information and belief, the fund used a New York correspondent account to make redemption payments (together, the "Rye Portfolio NY Accounts"). *Id.* Subscription payments sent by Defendants to the Feeder Funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York. *Id.* ¶¶ 28, 79.

As detailed in the AC, it was each Defendant's practice to use New York bank accounts in either its own or its affiliate's name (collectively, the "RBC NY Accounts") to send subscriptions to and receive redemptions from the Feeder Funds. *Id.* ¶ 78. Based on the Trustee's information to date, each Defendant designated and used an RBC NY Account(s) to send and receive numerous subscriptions and redemptions, totaling hundreds of transfers and tens of millions of dollars in the aggregate, and upon information and belief, Defendants used the RBC NY Accounts for all of their subscriptions and redemptions. *Id.*

In addition, the RBC Cap/Alt Group, an RBC business unit, was responsible for due diligence and risk management for all Defendants' Feeder Fund investments. *Id.* ¶ 74. In connection with such investments, RBC Cap/Alt Group personnel in New York, *inter alia*, (i) met with Madoff in New York in the late 1990s, (ii) met and corresponded with Feeder Fund managers, including meetings in New York with FGG executives and Tremont executives at least once a year from at least 2003 through 2007, and (iii) with respect to Defendants Royal Bank of Canada and RBC Alternative in particular, directly managed and controlled their Feeder Fund investments. *Id.* ¶¶ 74-75.

Defendant Royal Bank of Canada often made Feeder Fund subscriptions, and received redemptions, as "NYROY," a name it used when operating through its New York branch. *Id.* ¶ 76. Royal Bank of Canada also often transacted with Feeder Funds via its agent and wholly-owned U.S. subsidiary, RBC Capital Markets LLC. *Id.* ¶ 77.[8]

Defendant Guernroy filed two customer claims with the Trustee in connection with the BLMIS SIPA liquidation proceeding. *Id.* ¶¶ 64-65.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Sentry and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. *Id.* ¶ 153. In 2011, the Trustee settled with Sentry. *Id.* ¶ 154. As part of the settlement, Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS estate. *Id.*; *Fairfield Inv. Fund*, 2021 WL 3477479, at *3.

Similarly, the Trustee filed an adversary proceeding against the Rye Select Funds and related defendants to avoid and recover fraudulent transfers of customer property in the amount of

---

[8] In light of the foregoing allegations from paragraphs 74-79 of the AC, Defendants' assertion that "there is no allegation that any of the [PJ] Defendants conducted any portion of their trades in the alleged feeder funds domestically" (Motion at 4) is plainly incorrect.

approximately $2.1 billion.  AC ¶¶ 80, 164.  In 2011, the Trustee settled that action, and the

settlement (i) required the settling defendants to pay the Trustee $1.025 billion, (ii) provided that

the initial transfers to the Rye Select Funds and other Tremont funds were "deemed avoided," and

(iii) stated that transfers to subsequent transferee defendants were not recovered with the partial

payment by the settling defendants.  *Id*. ¶¶ 82, 165.

The Trustee then commenced a number of adversary proceedings against Defendants and

others to recover the outstanding stolen customer property.  On December 22, 2021, this Court

entered a Stipulation and Order in which the parties to this action agreed to make changes to the

named defendants (ECF No. 142).  On May 3, 2022, with Defendants' consent, the Trustee filed

the AC, pursuant to the Stipulation and Order entered on March 24, 2022 (ECF No. 143).

## **ARGUMENT**

## I.    **THIS COURT HAS PERSONAL JURISDICTION OVER THE PJ DEFENDANTS**

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only

establish a *prima facie* case that personal jurisdiction exists.  *Dorchester Fin. Sec., Inc. v. Banco

BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).  A *prima facie* showing of jurisdiction "may be

established solely by allegations."  *Id.* at 84-85.  These allegations are to be construed in the light

most favorable to the plaintiff, resolving all doubts in plaintiff's favor.  *See Chloé v. Queen Bee of

Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  This Court has articulated the appropriate

jurisdictional standard in its recent decisions in the Trustee's cases, describing the minimum

contacts necessary to establish the Court's specific jurisdiction over a nonresident defendant.  *See,

e.g.*, *Carige*, 2022 WL 2387522, at *2-5.  Accordingly, the requirements for purposeful availment,

relatedness, and reasonableness will not be repeated at length here.[9]

---

[9] Defendants misstate these requirements in their Motion, where they assert that in order for the Court to exercise
personal jurisdiction, "[t]he defendant must 'seek[] out and initiate[] contact with New York, solicit[] business in New

A.    **The PJ Defendants Purposefully Availed Themselves of the Laws and Privileges of Conducting Business in the United States, and the Trustee's Claims Arise Out of or Relate to Such Availment**

As detailed above and below, the PJ Defendants had numerous contacts with New York that establish this Court's jurisdiction. Many of these contacts independently establish jurisdiction, and based on their totality, jurisdiction unquestionably exists.[10]

1.    **The PJ Defendants' Knowing and Intentional Investments With BLMIS Are Sufficient Grounds for Jurisdiction**

The PJ Defendants knowingly and intentionally directed tens of millions of dollars to BLMIS in New York through Sentry and Rye Portfolio in order to invest in the U.S. securities market.[11] AC ¶¶ 68, 71-73, 78. Such activity constitutes purposeful availment of the forum.

Sentry investors such as the PJ Defendants were required to affirm in subscription agreements that they received and read the PPMs. The PJ Defendants thus knew that: (i) Sentry invested at least 95% of its assets with BLMIS; (ii) BLMIS performed all investment management duties for these assets; (iii) BLMIS was registered as a securities broker-dealer with the SEC; (iv) BLMIS was the executing broker for Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf; (v) BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills; (vi) the decisions regarding

---

York, and establish[] a continuing relationship,'" and "'[a]t a minimum, the defendant must 'on his or her own initiative . . . project himself or herself into the state to engage in a sustained and substantial transaction of business.'" Motion at 8 (quoting *Hau Yin To v. HSBC Holdings, PLC*, 700 Fed. App'x 66, 67 (2d Cir. 2017)). These types of contacts may be sufficient for New York long-arm jurisdiction, but they are not relevant to or necessary for personal jurisdiction in all situations.

[10] The PJ Defendants assert, citing no authority or examples, that "[t]he Trustee group-pleads that his claims against all Defendants 'arise from business they transacted within New York.'" Motion at 4 (quoting AC ¶ 62). As detailed in the AC and herein, the Trustee's allegations are tailored to each Defendant, its factual circumstances, and its Feeder Fund relationships, and the general term "Defendants" is only used when an allegation is true for all Defendants.

[11] Because Defendants are not contesting jurisdiction as to any of the transfers out of Rye Broad or Rye Prime, only Sentry and Rye Portfolio will be addressed in this section. But Defendants' contacts in connection with Rye Broad and Rye Prime still support jurisdiction, because they "lend[] support to the Trustee's allegations that Defendant[s] purposefully invested in BLMIS." *Multi-Strategy*, 641 B.R. at 86 n.2.

which U.S. securities to purportedly purchase, and when to make such purchases, were made solely

by BLMIS in New York; (vii) BLMIS was the custodian of Sentry's investments with BLMIS;

and (viii) BLMIS was "essential to the continued operation of" Sentry.    AC ¶ 71.    Similarly,

Defendant Guernroy entered into one or more subscription agreements with Rye Portfolio, and

Rye Portfolio's offering documents and due diligence questionnaires disclosed essentially the

same information as the PPMs, including that the fund's investments in U.S. securities would be

custodied in New York by a New York investment adviser using the SSC Strategy.  *Id.* ¶¶ 72-73.

As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy

into feeder funds that placed all or substantially all of their assets with Madoff Securities, they

knew where their money was going."  *In re Picard,* 917 F.3d 85, 105 (2d Cir. 2019).

### a.    <u>*BLI* and Recent Decisions of This Court Establish Jurisdiction</u>

Based on a defendant's demonstrated intention to invest with BLMIS through Sentry,

Judge Lifland concluded a number of years ago that Sentry investors such as the PJ Defendants

are subject to personal jurisdiction.  *See Picard v. Bureau of Labor Insurance (In re BLMIS)*, 480

B.R. 501, 516-18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*").    There, as here, the subsequent

transferee argued that the foreseeability of its investment ending up in a BLMIS account was

insufficient to support jurisdiction.  *Id.* at n.14.  Not only did the Court reject this argument, Judge

Lifland called it "disingenuous."  *Id.* at 517 ("BLI's investments in Fairfield Sentry did not merely

'end up' in an account at BLMIS as a result of happenstance or coincidence.").

More recently, this Court has upheld and applied the *BLI* analysis in multiple decisions.

*See, e.g., Multi-Strategy*, 641 B.R. at 86; *Carige*, 2022 WL 2387522, at *3.  In those cases, just as

here, the Trustee asserted allegations as to the purpose of the investment and the defendants'

contacts with Sentry for ultimate investment with BLMIS.  *See, e.g., Multi-Strategy*, 641 B.R. at

86-87.  Based on those allegations, this Court found that "Defendant's alleged contacts with New

11

York [were] not random, isolated, or fortuitous." *Id.* at 87. This Court has further clarified that the Trustee is deemed to have sufficiently alleged jurisdiction "simply by stating that [defendant] 'knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield Sentry,'" and that "[t]his allegation alone is sufficient to establish a prima facie showing of jurisdiction over [d]efendant in the pre-discovery stage of litigation." *Carige*, 2022 WL 2387522, at *2; *Lombard*, 2022 WL2387523, at *2 (same). Moreover, with respect to Rye Portfolio, transferee Guernroy knew it was directing its activity to New York based on, as held by Judge Bernstein, the New York contacts inherent in doing business with the Tremont feeder funds. *See Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) ("*BNP*").

As with the foregoing cases, the AC makes clear that the PJ Defendants knowingly directed their funds to be invested with New York-based BLMIS and that this was the fundamental purpose of their Feeder Fund investments. In short, the PJ Defendants "'intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom.'" *Carige*, 2022 WL 2387522, at *3 (quoting *BLI*, 480 B.R. at 506).

The PJ Defendants attempt to distinguish *Multi-Strategy* and *Banque SYZ* by pointing out allegedly unique jurisdictional allegations made in those cases. Motion at 8-9. As set forth above, this Court has repeatedly held that such allegations are not necessary for jurisdiction over a subsequent transferee defendant. *See, e.g.*, *Carige*, 2022 WL 2387522, at *2. In any event, additional contacts are also present here, including the use of New York bank accounts and in-person meetings with Madoff, FGG, and Tremont in New York.

b.    *Walden* Does Not Save the PJ Defendants

Seeking to sidestep *BLI*, the PJ Defendants cite *Walden v. Fiore,* 571 U.S. 277 (2014), in support of their argument that their "knowledge that the foreign Sentry and Rye Portfolio Limited funds would invest with BLMIS in New York is insufficient as a matter of law to support

jurisdiction." Motion at 10. However, *Walden* is of "no assistance to Defendant." *Multi-Strategy*,

641 B.R. at 87. The facts and applicable law of *Walden*, where the "effects test" was employed to

assess whether injuries in a tort case arose within the forum based on tortious activity outside of

the forum, are significantly different from those here. Under the facts of *this* case—where the PJ

Defendants have signed agreements expressly indicating their intent to direct custody and control

over all of their funds to a specific U.S. broker-dealer in order to knowingly invest in the U.S.

securities markets—they have purposefully availed themselves of the laws and protections of the

United States. The fact that the PJ Defendants invested into BLMIS through the Feeder Funds

rather than directly also does not defeat jurisdiction—the PJ Defendants' contacts with New York

were "intertwined with [their] transactions or interactions with the plaintiff or other parties,"

*Walden*, 571 U.S. at 286, and thus support jurisdiction.[12]

c.    <u>Guernroy's Customer Claims Support Jurisdiction</u>

Guernroy filed two customer claims in this SIPA liquidation proceeding, in connection

with investments it made in another BLMIS feeder fund. AC ¶ 65. The filing of these claims in

BLMIS's SIPA liquidation proceeding further evidences Guernroy's understanding that investing

with BLMIS in New York was the whole point of doing business with a feeder fund. Like

investments with a feeder fund whose transfers are not at issue, these claims are additional New

York contacts that are part of the totality of circumstances supporting jurisdiction. *See Multi-*

*Strategy*, 641 B.R. at 86 n.2.

---

[12] The Court should also reject the PJ Defendants' argument that *Walden* applies here because there is no "meaningful" physical entry by the PJ Defendants into the forum. Motion at 10 (quoting *Walden*, 571 U.S. at 285). The law is clear that physical entry is not a requirement. *See Walden*, 571 U.S. at 285. In any event, the Trustee has alleged physical entry here, by Defendants' use of New York bank accounts, by RBC Cap/Alt Group personnel who acted in New York on behalf of all Defendants, and by Royal Bank of Canada acting through its New York branch and agent.

13

2.    **The PJ Defendants Had Numerous Additional Contacts With the Forum in Connection With Their Feeder Fund Investments**

As detailed in the AC, the PJ Defendants also had a number of direct contacts with the forum related to their Sentry and Rye Portfolio investments.  In connection with such investments, as detailed above, RBC Cap/Alt Group personnel in New York met with Madoff, repeatedly met and corresponded with FGG and Tremont personnel in New York, and managed Royal Bank of Canada's investments.  AC ¶¶ 74-75.  Royal Bank of Canada also often transacted with Sentry via RBC's New York branch or RBC's designated agent and wholly-owned U.S. subsidiary.  *Id.* ¶ 77.

The foregoing contacts with New York related to the PJ Defendants' transactions at issue in this action are a sufficient basis for personal jurisdiction.  *See, e.g.*, *Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11-3673(RJS), 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012) (finding emails, phone calls, and video conferences with company in New York subjected defendant to personal jurisdiction).  This Court has also repeatedly held that such contacts significantly support jurisdiction.  *See Lombard*, 2022 WL 2387523, at *3-4 (crediting allegations that defendant met in-person with Madoff, sent a Sentry subscription agreement to FGG's New York offices, and communicated with FGG employees in New York); *Parson*, 2022 WL 3094092, at *4 (crediting allegations that defendant traveled to the U.S. on multiple occasions "to meet with FGG regarding the investments at issue in this case").  This Court has repeatedly noted that "'[a]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.'"  *E.g., Banque SYZ*, 2022 WL 2135019, at *4 (citing *Walden*, 577 U.S. at 285).

The PJ Defendants contend that the Trustee's allegations regarding the RBC Cap/Alt Group should be disregarded as "conclusory" because the AC does not sufficiently describe the group and its relationship to the PJ Defendants.  Motion at 16.  The PJ Defendants cite no authority

14

for this view, and mischaracterize the AC's allegations.  The AC sets forth that the RBC Cap/Alt Group (i) "was centered in New York, at Royal Bank of Canada's New York branch, and had a global presence," (ii) "was responsible for due diligence and risk management for RBC's hedge fund and other alternative asset investments, including all Defendants' BLMIS feeder fund investments," and (iii) had personnel who "directly managed and controlled Defendants Royal Bank of Canada's and RBC Alternative's BLMIS feeder fund investments."  AC ¶¶ 74-75.  Such allegations are plainly beyond boilerplate and must be accepted as true now.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts must accept factual allegations as true though may reject "threadbare recitals of a cause of action's elements, supported by mere conclusory statements").

The PJ Defendants then devote a single sentence to the argument that "conducting due diligence is not sufficient to establish jurisdiction."  Motion at 16 (citing *Maranga v. Vira*, 386 F. Supp. 2d 299, 309 (S.D.N.Y. 2005); *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136, at *5 (S.D.N.Y. Mar. 1, 2017)).  The cases cited by the PJ Defendants rejected the assertion of jurisdiction not because it was based on due diligence, but because the alleged contacts were limited.  In *Maranga*, for example, the court noted that "[t]here is nothing in the record indicating that [defendant] came to New York to do this due diligence, or engaged in extended telephonic or other electronic contacts with New York financial and banking institutions."  386 F. Supp. 2d at 309.  This blanket statement by the PJ Defendants also ignores *Hau Yin To*'s directive to consider the "nature and quality" of a defendant's contacts, which are robust here.  2017 WL 816136, at *5.

### 3. The Forum Selection and Choice of Law Clauses in the Subscription Agreements Are Strong Jurisdictional Contacts

The PJ Defendants' subscription agreements with Sentry—in which they submitted to New York venue, jurisdiction, and law—further evidence a "strong nexus with New York."  *See BLI*,

480 B.R. at 517 n.15. The Trustee is not invoking these clauses to argue jurisdiction based on the PJ Defendants' consent.[13] Rather, as this Court found in *BLI*, the PJ Defendants' agreements to New York venue, jurisdiction, and law further show they purposefully directed their activities towards New York and provide another strong jurisdictional contact with New York. 480 B.R. at 517.

### 4.    The PJ Defendants' Purposeful Use of New York Bank Accounts Establishes Jurisdiction

That the PJ Defendants chose to use U.S. bank accounts in New York to receive the transfers at issue moreover confers jurisdiction over them. *Off. Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 70 & n.18 (S.D.N.Y. 2016) ("*Arcapita*") ("Because [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant].").

Courts have often held that a defendant's purposeful use of a domestic bank account is sufficient to establish personal jurisdiction. *See, e.g.*, *Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219, at *6-7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ.9405 (DLC), 2012 WL 2921875, at *4 (S.D.N.Y. July 18, 2012) (same); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (same). In this SIPA liquidation proceeding, this Court has similarly found jurisdiction where initial and subsequent transferee defendants invested through and

---

[13] As such, this Court's prior decision in the Fairfield chapter 15 liquidation proceedings, where the Fairfield liquidators argued that defendants had consented to personal jurisdiction based on the forum selection clause in subscription agreements, is of no relevance here. *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. No. 10-03496, 2018 WL 3756343, at *1 (Bankr. S.D.N.Y. Aug. 6, 2018), *aff'd sub nom. Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 3644436, at *8-12 (S.D.N.Y. Aug. 24, 2022).

received transfers from U.S. bank accounts. *See, e.g.*, *Meritz*, 2022 WL 3273044, at *3 ("Where a defendant chooses to use a United States bank account to receive[] funds, exercising personal jurisdiction over the defendant for causes of action relating to those transfers is constitutional."). Based on the foregoing case law, the PJ Defendants' uses of the RBC NY Accounts, the Sentry NY Account, and the Rye Portfolio NY Accounts alone are sufficient to confer personal jurisdiction over the PJ Defendants.

That any of the accounts were or could be correspondent does not change the analysis.[14] Courts have held that the use of a correspondent bank account is also sufficient to establish personal jurisdiction. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established" provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012); *see also Arcapita*, 549 B.R. at 67-69 (finding jurisdiction based on designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322-29 (2016) (same). All that is necessary for "purposeful" use is that it was not coincidental or passive. *See Licci*, 20 N.Y.3d at 338-39. It is therefore also not necessary, as the PJ Defendants argue (Motion at 12), for the Trustee to allege that their uses of the accounts were "'integral' to the illegal acts" at issue.[15]

---

[14] The PJ Defendants appear to assume that the RBC NY Accounts were all correspondent (*see* Motion at 11-13). But the AC does not allege that they were, and this Court is not bound to accept the PJ Defendants' unsubstantiated characterization of the accounts on a motion to dismiss.

[15] Because purposeful use is required, and satisfied here, the Trustee's action does not raise the PJ Defendants' concern that "[c]onferring jurisdiction over foreign entities through their *incidental* use of U.S.-based accounts to effectuate international transactions would have unintentional but significant ramifications." Motion at 13 (citing cases; emphasis added).

Here, the RBC NY Accounts designated and used by the PJ Defendants were in the PJ Defendants' own names or their affiliates' names, making the purposeful use of such accounts obvious. The PJ Defendants' use of the Sentry NY Account and the Rye Portfolio NY Accounts was also purposeful because the PJ Defendants agreed and intended to use those New York accounts. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.,* 397 F. Supp. 3d 323, 346 (S.D.N.Y. 2019) ("[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute."). That Sentry's PPMs and Rye Portfolio's offering documents mandated subscribers to use the New York accounts is also irrelevant, because the PJ Defendants voluntarily entered into the subscription agreements.[16] *See In re Arcapita Bank B.S.C.(C)*, No. 21 CIV. 8296 (AKH), 2022 WL 1620307, at *6 (S.D.N.Y. May 23, 2022) (defendant's acceptance of contractual term designating New York correspondent account supported finding of personal jurisdiction); *In re Motors Liquidation Co.,* 565 B.R. 275, 288-89 (Bankr. S.D.N.Y. 2017) (finding defendant's use of a correspondent account purposeful even where payment in New York was dictated by agreement).

The PJ Defendants cite a number of cases for the proposition that "a foreign defendant is not subject to jurisdiction if it sent or received payment in New York pursuant to a contract executed outside of New York." Motion at 11-13, 11 n.8 (citing cases). This Court has already determined that such cases are not relevant to the Trustee's actions against investors in BLMIS feeder funds. *See BNP*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds."). Unlike the cases the PJ Defendants cite, this

---

[16] It makes no difference if a Citco entity chose to use the Sentry NY Account on behalf of Sentry, as various Citco entities acted as FGG's agents. *See Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (conduct of agent is attributed to principal for purposes of jurisdictional analysis).

action is not a dispute between two parties about services owed under a foreign contract. Rather, it is an action brought by a SIPA Trustee in a SIPA liquidation proceeding to recover fraudulent transfers from investors whose transfers of funds to and from New York were for the sole purpose of investing with a New York-based broker-dealer purportedly trading U.S. securities. *See BLI*, 480 B.R. at 513 ("This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between BLI and Fairfield Sentry.").

Curiously, the PJ Defendants devote a separate section of their brief to the argument that the Trustee "only alleges" that they "maintained bank accounts at JP Morgan Chase," but needed to allege that they "have a physical presence in New York, solicited business in New York, or performed functions relating to the funds in New York." Motion at 14 (citing cases). This argument simply ignores allegations as to Defendants' use of those bank accounts and the other jurisdictional facts discussed above.

### 5.    The Foregoing Contacts Are "Related to" the Trustee's Claims

All of the foregoing contacts by the PJ Defendants are sufficiently related to the Trustee's claims to support jurisdiction. As the Supreme Court recently held, the "relate to" test does not require a causal relationship. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026–30 (2021). Rather, this test may be satisfied if the defendant's conduct involves "financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

The Trustee is seeking to recover the very transfers that came through the New York bank accounts analyzed above, and thus the PJ Defendants' uses of these New York accounts are integral to the Trustee's claims. *See, e.g.*, *HSH Nordbank*, 2012 WL 2921875, at *4 (finding "claims

against [defendants] arise directly out of the transfer of funds into [defendants'] New York accounts").

The PJ Defendants contend that their investment activities, and associated meetings and communications, with the Feeder Funds and BLMIS are irrelevant, because the Trustee's recovery claim "relates to and arises out of" their transfers. Motion at 9-10. They also contend that the subscription agreements are unrelated to the Trustee's claims. Motion at 14-15. But consistent with decisions by this Court, the Trustee's claims are directly related to Defendants' investment activities. *See, e.g., Carige*, 2022 WL 2387522, at *4; *Parson*, 2022 WL 3094092, at *5.

It is also of no consequence that the Fairfield liquidators argued in their chapter 15 cases that Sentry's redemption payments to investors are foreign transactions. Motion at 10, 12 n.9. The Trustee is not in privity with the Fairfield liquidators, and the characterization is in any event at odds with the Second Circuit's decision on extraterritoriality in the Trustee's cases, which concluded that the Trustee's subsequent transfer actions—including this one—seek the recovery of domestic transfers. *See In re Picard*, 917 F.3d at 96-100.

**B.    <u>The Exercise of Personal Jurisdiction Over the PJ Defendants Is Reasonable</u>**

Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165. The PJ Defendants do not specifically challenge reasonableness, but merely assert that jurisdiction would be unreasonable based on their foregoing arguments. Motion at 16-17. The exercise of jurisdiction is more than reasonable here. *See, e.g.*, *Multi-Strategy*, 641 B.R. at 88-89 (finding jurisdiction reasonable where, as here, defendant had actively participated in the action, was represented by U.S. counsel, and had "irrevocably" submitted to the jurisdiction of New York courts when it signed subscription

agreements with Sentry, and "[t]he forum and the Trustee both have a strong interest in litigating

BLMIS adversary proceedings in this Court").

Alternately, the Trustee respectfully requests jurisdictional discovery because, here, the

Trustee has made a threshold showing, and "additional facts to establish personal jurisdiction . . .

lie within Defendants' knowledge."[17]

## II.       SECTION 546(E) DOES NOT BAR RECOVERY FROM DEFENDANTS

In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12-MC-115, 2013 WL

1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"), the District Court held that an

initial transferee's actual knowledge of Madoff's fraud precluded application of the Section 546(e)

safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior to the two-year

period referenced in Section 548(a)(1)(A).  Defendants' argument that Section 546(e) bars

recovery against them, notwithstanding the Feeder Funds' actual knowledge, is based on a

misreading of Section 546(e) and *Cohmad* and has been rejected by this Court in every case where

it was raised to date.  *See, e.g., Parson*, 2022 WL 3094092, at *8.

### A.       The Feeder Funds Had Actual Knowledge of Madoff's Fraud

Defendants set forth at length the requirements of Section 546(e) and how they are

presumably met in this case in multiple ways with respect to the initial transfers to the Feeder

Funds, as established by *Cohmad*.  None of this matters.[18]  As Defendants concede, this Court has

previously found the Trustee has sufficiently pled that the initial transferee Sentry had actual

knowledge of Madoff's fraud and that such initial transfers are avoidable.  Motion at 27 (*citing*

---

[17] *Fairfield Sentry Ltd. v. HSBC Sec. Serv.*, No. 21-cv-10316 (LAP), 2022 WL 3910679, at *8-9 (S.D.N.Y. Aug. 31, 2022) (holding that a plaintiff need not establish a *prima facie* case for jurisdiction to obtain jurisdictional discovery).

[18] The Trustee does not concede that any agreements or transfers between the Feeder Funds and Defendants activate the safe harbor under Section 546(e), including, among other things, whether the initial transfers were in connection with the subscription agreements or were made for the benefit of Defendants.

*Fairfield Inv. Fund Ltd.*, 2021 WL 3477479, at *4).  And as explained in section III below, the

Trustee has also sufficiently pled that the initial transferee Rye Select Funds had actual knowledge.

As such, Section 546(e) does not bar the avoidance of initial transfers made to the Feeder Funds,

and those transfers may be recovered from Defendants, regardless of whether the Feeder Funds or

Defendants qualify as financial institutions or participants, their agreements qualify as securities

contracts, or their transfers qualify as settlement payments.

The actual knowledge exception established in *Cohmad* was issued in connection with

consolidated proceedings before the District Court as to the application of Section 546(e).

Defendants participated in the District Court proceedings and the District Court's review of this

issue.[19]  As such, Defendants are bound by *Cohmad* and that decision is law of the case.[20]

### B.      Section 546(e) Does Not Apply Independently to Recovery Actions

Defendants are incorrect that the Trustee must allege that the subsequent transferee itself

had actual knowledge in order to invoke the actual knowledge exception to Section 546(e).[21]

Specifically, Defendants argue that under *Cohmad*, a defendant's subscription agreement with a

Feeder Fund may act as the relevant "securities contract" in lieu of BLMIS's account agreement,

and as such, in these Section 550 recovery actions, the Court must look solely to that *subsequent*

*transferee's* actual knowledge to determine whether the initial transfer is avoidable.  But *Cohmad*

---

[19] *See Picard v. Royal Bank of Canada, et al.*, Adv. Pro. No. 12-01699 (CGM), Mot. to Withdraw the Reference, ECF Nos. 7-9 (Bankr. S.D.N.Y. filed June 21, 2012) (raising Section 546(e) as a grounds for withdrawal).

[20] *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 466 (Bankr. S.D.N.Y. 2015) ("Those moving defendants that participated in the withdrawal of the reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law of the case.").  Consequently, Defendants are barred from relitigating *Cohmad* in their Motion, and the Court should disregard their arguments.  Motion at 31-33.

[21] The absence of allegations as to Defendants' bad faith in the AC reflects the fact that under *Citibank*, the Trustee no longer has that pleading burden.  However, prior to the change in the pleading burden, the Trustee filed a proposed amended complaint with detailed allegations of Defendants' actual knowledge of Madoff's fraud (ECF No. 113).  The Trustee reserves the right to amend the AC to add such allegations were it determined that Defendants' knowledge is relevant as to the Section 546(e) safe harbor or otherwise.

does not stand for this proposition, and Defendants' argument is just a repackaging of the previously rejected argument that the Section 546(e) safe harbor should independently apply to recovery actions against subsequent transferees under Section 550. And as this Court has held, based on the same arguments Defendants make here, a defendant "is not permitted to raise the safe harbor defense on its own behalf as a subsequent transferee" and the "safe harbor is not applicable to subsequent transfers." *E.g.*, *Multi-Strategy,* 641 B.R. at 94-95.[22]

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550. *See* 11 U.S.C. § 546(e). This limitation on the safe harbor to avoidance actions is consistent with the well-established principle that "the concepts of avoidance and recovery are separate and distinct." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 501 B.R. 26, 30 (S.D.N.Y. 2013) (Rakoff, J.) ("*In re Madoff Sec.*"). It is also consistent with the understanding that the Bankruptcy Code's avoidance provisions protect against depletion of a debtor's estate, while Section 550 is a "utility provision," intended to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See In re Picard,* 917 F.3d at 98.

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference on whether Section 546(e) barred recovery of a subsequent transfer pursuant to Section 550.[23] However, in its decision, the court specifically limited the safe harbor to avoidance claims

---

[22] Defendants argue that in *Multi-Strategy* this Court "acknowledged that Section 546(e) appropriately barred recovery by the Fairfield Sentry Liquidators" of the initial transfers in Sentry's Chapter 15 case, and that that decision should also govern here. Motion at 29. Defendants provide no support for this view, which this Court expressly rejected, holding that the Chapter 15 decision "is not applicable here" because "[t]he Court was not considering the safe harbor's effect on subsequent transfer claims brought under § 550 of the Bankruptcy Code." *Multi-Strategy,* 641 B.R. at 94.

[23] *See In re Madoff Sec.*, 12-MC-115, Section 546(e) Briefing Order, ECF No. 119 (S.D.N.Y. filed May 16, 2012) (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

based on the plain language of Section 546(e). *See Cohmad*, 2013 WL 1609154, at *4, *9 (applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); and *id.* at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from Madoff Securities.") (emphasis added). And though the court hypothesized, in *dicta*, that a subsequent transferee's subscription agreements with the initial transferee feeder fund, and related agreements and transactions, might under certain circumstances constitute relevant "securities contracts," and that certain subsequent transferee defendants might qualify as "financial institutions" or "financial participants," the decision is clear that the focus of the safe harbor is still on the *initial* transfers. *See id.* at *9.[24]  Contrary to Defendants' argument, the District Court did not, in its hypothetical, discuss actual knowledge or indicate that in such circumstances, the initial transferee's actual knowledge should be disregarded.

Based on *Cohmad*, this Court held in *BNP* that Section 546(e) is applicable only to avoidance and not recovery, and most notably that a subsequent transferee cannot assert the protections of Section 546(e) where the Trustee has adequately pled the initial transferee's actual knowledge. 594 B.R. at 197. As explained in *BNP*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee. *Id*. at 197.

Most recently, this Court has repeatedly rejected the same arguments, holding that, notwithstanding the "securities agreement" at issue, "the safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not 'avoiding' a subsequent transfer, 'he

---

[24] The original point of the *Cohmad* hypothetical was to address the subsequent transferee defendants' argument that if necessary, in lieu of the BLMIS customer agreements, their subscription agreements could act as the relevant securities agreements under Section 546(e). *Cohmad*, 2013 WL 1609154, at *8. That argument became moot as both the Second Circuit and the District Court determined that the BLMIS customer agreement was a "securities agreement", and the initial transfers from BLMIS were "settlement payments" notwithstanding that no securities were traded and therefore subject to Section 546(e).

recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. §

550(a), and the safe harbor does not refer to the recovery claims under section 550.'" *See*, *e.g.*,

*Multi-Strategy,* 641 B.R. at 94 (quoting *BNP*, 594 B.R. at 197).

Defendants' misinterpretation of *Cohmad* would mean the safe harbor would apply even

where the initial transferee feeder fund actually knew there were no securities transactions in need

of protection, thus effectively eliminating the point of the actual knowledge exception.  It would

also allow the determination as to avoidability of an initial transfer to vary based on whether there

were subsequent transfers, and who received them.   It further would provide a subsequent

transferee with more rights than an initial transferee, which is inconsistent with congressional

intent. *See In re Madoff Sec.*, 501 B.R. at 29 ("Section 550(a) requires that the Trustee show that

the transfer he seeks to recover is avoidable in each recovery action, and the subsequent transferee

in possession of that transfer may raise any defenses to avoidance available to the initial transferee,

as well as any defenses to recovery it may have.").

Defendants also misconstrue *Cohmad*'s holding—which was not a part of the court's

"securities contract" hypothetical—that subsequent transferees with actual knowledge are also

prohibited from benefitting from the safe harbor.  Motion at 20-22.  That holding does not require

a trustee to plead a subsequent transferee's actual knowledge.  Rather, it merely ensures that any

defendant that *doe*s have actual knowledge, including a subsequent transferee, cannot benefit from

the safe harbor (even if the initial transferee is innocent), such that the purpose of the actual

knowledge exception is achieved consistently.  *See Cohmad*, 2013 WL 1609154, at *1, *7.

Finally, this Court's *Fairfield Inv. Fund* decision does not demand a different result.

Motion at 32 n.24.  Rather, as this Court has repeatedly held, in that case the Court "considered [a

subsequent transferee's] actual knowledge of BLMIS's fraud only as it related to whether Sentry

had actual knowledge of the fraud.  The Court never considered whether the subsequent transferees

could raise the safe harbor defense on their own behalf, nor could it have, as § 546 is inapplicable

to subsequent transferees."  *E.g.*, *Multi-Strategy,* 641 B.R. at 95.

## III.    THE TRUSTEE HAS PLED THAT THE RYE SELECT FUNDS HAD ACTUAL KNOWLEDGE

The AC alleges the Rye Select Funds' actual knowledge of Madoff's fraud by

incorporating by reference the Tremont Complaint and adding the Tremont Supplement.  AC ¶¶

80-152.[25]  Defendants do not meaningfully argue that the totality of the allegations made and

incorporated by reference in the AC inadequately plead Tremont's actual knowledge and

facilitation of the fraud.  Defendants instead focus almost exclusively on the Tremont Complaint

and rely on two illusory arguments: (i) that the Tremont Complaint actually "makes clear that the

Rye Select Funds did *not* have actual knowledge" (Motion at 30-31; emphasis in original) and (ii)

that the allegations in the Tremont Complaint are inconsistent with those in the Tremont

Supplement, rendering the Trustee's allegations "incoherent" and in violation of Federal Rule 8(a)

(Motion at 33-34, 38-39).  Neither argument is supported by the record or the law.

First, the Tremont Complaint pleads various facts that support Tremont's (including the

Rye Select Funds') actual knowledge.  For example, the Tremont Complaint alleges that Tremont

(i) was repeatedly advised of BLMIS trading impossibilities and other indicia of fraud, including

by a client who questioned "the legitimacy of the whole Bernie thing" (TC ¶¶ 158, 194-95, 197,

215); (ii) independently knew of trading impossibilities, including that BLMIS reported having

conducted hundreds of trades for the Rye Select Funds that "took place outside of the range of

---

[25] The Trustee filed the Tremont Complaint in 2010, and the case settled in 2011.  AC ¶¶ 80, 82.  The Tremont Complaint alleged that Tremont and its feeder funds knew or should have known of Madoff's fraud.  TC ¶¶ 10, 15.  In 2013, the District Court decided *Cohmad*, establishing the actual knowledge exception to the application of Section 546(e).  In light of *Cohmad* and because the Tremont case is closed, the Trustee has supplemented the Tremont Complaint with the Tremont Supplement that provides further support for Tremont's actual knowledge.  While the Trustee incorporates the Tremont Complaint, the AC standing alone sufficiently pleads actual knowledge.

stock and options prices for such securities traded in the market on the days in question," and that there was insufficient market volume for BLMIS to conduct its reported equities and options trades (*id.* ¶¶ 165-68, 170-74, 200-03); and (iii) "falsely led others to believe they knew the counterparties" to BLMIS's purported options trades, even though Tremont knew that Madoff inexplicably refused to disclose this information (*id.* ¶ 190).

Defendants disregard these and other incriminating allegations in the Tremont Complaint. Instead, they base their contention that the Tremont Complaint shows a *lack* of actual knowledge entirely on ten cherry-picked statements (Motion at 30-31), none of which are at odds with Tremont and its feeder funds having actual knowledge. To the contrary, the allegations Defendants cite, such as that Tremont blindly relied on Madoff (TC ¶ 9), failed to perform proper due diligence (*id.* ¶¶ 8, 119, 153, 156), and failed to ask questions as to the "many red flags well known to them" (*id.* ¶ 157), plausibly support the inference that Tremont was perpetuating the fraud of which it was aware. *See, e.g.*, *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (CGM), 2015 WL 4734749, at *4, *13 (Bankr. S.D.N.Y. Aug. 11, 2015) (Trustee adequately alleged the Kingate feeder funds' actual knowledge where, among other things, their manager "did not apply its high due diligence standards to BLMIS and acknowledged as much") ("*Kingate*"); *Picard v. Magnify Inc. (In re BLMIS)*, 583 B.R. 829, 843 (Bankr. S.D.N.Y. 2018) (Trustee adequately alleged Magnify investment manager's actual knowledge, where BLMIS stopped generating customer statements for those accounts and otherwise "made it impossible for [manager] to do his job" as to due diligence, raising a "fair inference . . . that both he and Madoff knew that there was no trading activity to oversee."). Here too, the Trustee is entitled to every reasonable inference from these and his other allegations. *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020). It is also particularly difficult to view another allegation Defendants seize upon—that Tremont "was

not concerned with understanding what Madoff really was doing with . . . money" (quote cleaned up) (TC ¶ 195)—as anything but indicative of Tremont's choosing to look away because it knew Madoff was a fraud. It speaks volumes that Defendants resort to misquoting the Tremont Complaint as alleging that the Rye Select Funds were "ignorant of the fraud." Motion at 30 (quoting TC ¶ 4). The Tremont Complaint actually makes a significantly different allegation. It alleges that "*[i]f* the Defendants were ignorant of the fraud, it was because they failed in their due diligence and investment management obligations." TC ¶ 4 (emphasis added). Defendants' argument that the Tremont Complaint "makes clear" that Tremont did not have actual knowledge and undermines the sufficiency of the AC is meritless.

Second, while Defendants forcefully assert that there are contradictions between the Tremont Complaint and the Tremont Supplement, they fail to cite to a single conflicting allegation.[26] Far from contradicting the Tremont Complaint, the Tremont Supplement builds upon the Tremont Complaint by adding, for example, allegations that Tremont was not confronted with a fraud warning from just one investor but was consistently confronted with such warnings from a host of investors and others and that despite this, Tremont routinely and intentionally exempted BLMIS from its rigorous due diligence requirements. *See, e.g.*, AC ¶¶ 86-98 (Tremont investors and other third parties repeatedly raised BLMIS trading impossibilities, indicia of fraud, and fraud warnings with Tremont, including the possibility BLMIS was a Ponzi scheme), ¶¶ 101-06 (Tremont's failure to perform meaningful due diligence on BLMIS was part of an intentional practice of exempting BLMIS from its due diligence standards and prohibiting its employees from asking key questions). The one case Defendants cite, *Rieger v. Drabinsky (In re Livent, Inc.*

---

[26] This is similar to assertions made by subsequent transferees in *Fairfield Inv. Fund* that an earlier complaint contradicted allegations of actual knowledge in a later amended complaint. *See, e.g.*, *Fairfield Inv. Fund*, Adv. Pro. No. 09-01239, ECF No. 305 at 33. This Court nonetheless found that the Trustee had sufficiently plead the Fairfield funds' actual knowledge. *See* 2021 WL 3477479, at *4-7.

*Noteholders Sec. Litig.*), 151 F. Supp. 2d 371 (S.D.N.Y. 2001), does not support their argument. There, the pleadings included blatantly contradictory allegations that plaintiffs had and did not have knowledge of facts essential to their fraud claim. *See id.* at 441. *Rieger* is also the rare case where the contradictory allegations were as to plaintiffs' own state of mind.[27]

Unable to identify any actual contradiction, Defendants argue that the Tremont Complaint and Tremont Supplement are inconsistent, claiming that the two pleadings allege "varying levels of knowledge of the Rye Select Funds that could potentially impact the viability of the Trustee's claims." Motion at 38. But there is nothing inconsistent about any of the allegations in the Tremont Complaint and the allegations in the AC. The Tremont Complaint pleads inquiry notice and the Tremont Supplement pleads actual knowledge, each of which is just a different standard of bad faith.[28] *See, e.g., Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, Adv. Pro. No. 18-50489 (CSS), 2022 WL 2240122, at *21 (Bankr. D. Del. June 22, 2022). Moreover, even if they were inconsistent—which they are not—this is precisely what Rule 8 permits: the pleading of two different theories with inconsistent allegations in the alternative. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."), 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also Henry v.*

---

[27] Typically, even where there is some tension between allegations in a pleading and an amended pleading, courts read the latter as a permissible clarification and refinement of the former. *See, e.g., Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 266 (S.D.N.Y. 2008) (accepting allegations because "[t]he changes between the complaint and amended complaint are, when taken as a whole, not 'blatant' or 'directly contradict[ory],' and can be described as clarifying but, at most, as inconsistent") (citation omitted); *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 CIV. 11448 (JGK), 2005 WL 2385854, at *12 (S.D.N.Y. Sept. 26, 2005) (plaintiffs' amended pleadings added "much more precise" fraud allegations that "resolved" concerns raised by court's prior opinion) (citation omitted); *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 JS AKT, 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011), *aff'd*, 457 F. App'x 40 (2d Cir. 2012) (noting that "there are valid reasons why a plaintiff would amend a complaint in a contradictory fashion," including "acquir[ing] new information through discovery, or its own investigation, that fundamentally alters its theory of the case").

[28] Moreover, by pleading inquiry notice, the Tremont Complaint does not purport to be limiting the extent of Tremont's actual knowledge.

*Daytop Village, Inc.,* 42 F.3d 89, 95-96 (2d. Cir 1994) (explaining that Rule 8 allows a plaintiff to plead inconsistently and that "[t]he inconsistency may lie either in the statement of the facts or in the legal theories adopted") (citation omitted); *Adler v. Pataki*, 185 F.3d 35, 41 (2d. Cir 1999) ("[Rule 8] offers sufficient latitude to construe separate allegations in a complaint as alternative theories . . ."); *Maxus*, 2022 WL 2240122, at * 45.[29]

Finally, and most notably, Defendants do not address the sufficiency of the Trustee's combined actual knowledge allegations in the AC.[30]  Together, the Tremont Complaint and Tremont Supplement allege that Tremont knew numerous facts collectively giving rise to a plausible inference of Tremont's (and the Rye Select Funds') actual knowledge, and facilitation of the fraud—including many of the same facts this Court found sufficient in *Fairfield Inv. Fund* and *Kingate*.  These factual allegations include, *inter alia*, the following:

Fraud Warnings.  Tremont was warned on multiple occasions that BLMIS might be a fraud, including that it might be a Ponzi scheme.  AC ¶¶ 86, 94, 98; TC ¶ 197.

Unknown Counterparties.  Tremont knew that BLMIS had no International Swaps and Derivatives Association agreements in place for its purported OTC options trades, although such agreements were required, and that Madoff had never given Tremont a single counterparty name, although Tremont bore the risk of counterparty default and those names should have been on every trade confirmation.  AC ¶¶ 124-25, 130-33; TC ¶¶ 89, 184-89.  Tremont asked for but was never

---

[29] By contrast, the case Defendants cite as to inconsistent pleading, *Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 CIV. 9865 LMN, 2011 WL 4058100, at *4 (S.D.N.Y. Sep. 1, 2011), does not involve alternative theories, only an effort by plaintiff to introduce contradictory facts in an amended pleading after its complaint had been dismissed.

[30] Defendants almost completely disregard the Tremont Supplement, only addressing a single allegation from its 72 paragraphs, arguing that a Tremont manager's "'brag[ing] internally that he taught Madoff how to trade options' . . . would only make sense if he believed Madoff was, in fact, trading options."  Motion at 31 (quoting AC ¶ 123). Nothing on the face of the allegation is inconsistent with the manager's knowing that BLMIS was not actually trading options.  What is more, read in context, the allegation supports the inference that Tremont had the expertise to know that BLMIS could not have been trading options as reported.  *See* AC ¶ 123.

informed of the characteristics or number of the purported counterparties. AC ¶ 134; TC ¶¶ 185, 230. Nevertheless, Tremont repeatedly lied to others and claimed that Madoff had provided this information—even naming JPMorgan Chase as a counterparty to one investor a mere month after JPMorgan Chase asked Tremont if it knew of any counterparties. AC ¶¶ 132-34; TC ¶ 190.

Impossibilities. Tremont was repeatedly informed by third parties of BLMIS trading impossibilities and other indicia of fraud, including BLMIS's impossibly stable returns, its use of a small auditor with no other clients, its lack of a third-party custodian and that it self-cleared, its unknown counterparties, its failure to charge a management fee, its utter lack of transparency, and the inability to verify its assets. AC ¶¶ 86, 88, 90, 92-93, 97-98, 124-25, 129-32; TC ¶¶ 158, 185, 194-97, 215. Tremont also analyzed BLMIS's reported trading information, which reflected quantitative impossibilities demonstrating that trades could not have taken place. AC ¶¶ 99-100.

Exceptions for Madoff. Tremont intentionally exempted BLMIS from the due diligence requirements it strictly enforced for other managers. AC ¶¶ 101-12. Tremont's CEO prohibited virtually everyone other than himself from contacting BLMIS. AC ¶¶ 104, 113. Tremont employees knew that "ya don't ask" about BLMIS's assets under management, how it generated its purported returns, or its auditor. *Id.* ¶ 103. Tremont's founder admitted post-fraud that when it came to Madoff, Tremont simply threw out the rule book. TC ¶¶ 192-193, 216.

Helping Further the Fraud. Tremont intentionally facilitated BLMIS's fraud, including by aggressively attempting to impede its agents, investors, and even its own auditors from having contact with BLMIS. TC ¶ 90; AC ¶¶ 113-22. Tremont did just enough to ensure that the fraud was not brought to light, such as when it stopped by the place of business of BLMIS's auditor just "to make sure they exist." AC ¶ 106.

Lying to Others. Tremont actively hindered the due diligence efforts of third parties through

31

obfuscation and lies.  TC ¶ 190; AC ¶¶ 122-41.  Among the tales Tremont wove were (i) that BLMIS's auditor audited other broker-dealers, (ii) that Tremont had verified the existence of BLMIS's assets, and (iii) fabrications regarding BLMIS's purported options trading, including with respect to BLMIS's non-existent options counterparties, as set forth above.  TC ¶ 190; AC ¶¶ 122-41.  In the wake of Lehman Brothers' collapse—which upended the entire options market— Tremont did nothing but make up responses to investors, driven solely by a desire to quiet them. AC ¶¶ 140-41.

Access to Madoff.  Tremont had unique access to Madoff, including its CEO visiting BLMIS multiple times throughout the year.  AC ¶ 84; *see Picard v. Square One Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 10-04330 (CGM), ECF No. 181, at 40:8-12 (Bankr. S.D.N.Y. May 30, 2019) ("Generally actual knowledge or at least willful blindness will be inferred where the defendant has access to the usually secretive Madoff and his business . . . and shielded Madoff from third-party inquiries" (citations omitted)).

Dependence on Madoff.  Tremont was utterly dependent on BLMIS's fraud.  Various Tremont executives observed that BLMIS accounted for "all of the profits of the firm," that the Tremont feeder funds' "only reason for being" was as feeders into BLMIS, and that BLMIS was Tremont's "crack addiction business."  AC ¶ 144.  Tremont's parent company similarly concluded that "the economics of Tremont's business [was] Madoff."  *Id.* ¶ 145.  This business yielded Tremont hundreds of millions of dollars in fees, and millions of dollars in compensation to its executives.  *Id.* ¶ 143; TC ¶¶ 14, 31, 58-59, 82, 103-10, 124.  Its chief executives had longstanding, unusually close relationships with Madoff for almost two decades, which Tremont touted in its marketing materials to investors.   AC ¶¶ 83-85.

The above allegations—all of which Defendants ignore—demonstrate that the Trustee has

alleged the Rye Select Funds' actual knowledge. On factual allegations similar to these, this Court determined that the Trustee sufficiently alleged the actual knowledge of two other major BLMIS feeder funds. *Fairfield Inv. Fund*, 2021 WL 3477479, at \*4-7; *Kingate*, 2015 WL 4734749, at \*13-15. Such allegations should also be accepted as true at this stage of the litigation. *See, e.g., Multi-Strategy*, 641 B.R. at 89. "Of course, often '[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud,' so New York courts have emphasized that actual knowledge need not be based on an explicit acknowledgement of the fraud but can be inferred from the allegations in a complaint." *Carbon Inv. Partners, LLC v. Bressler*, No. 20 Civ. 3617 (ER), 2021 WL 3913526, at \*4 (S.D.N.Y. Sep. 1, 2021) (citations omitted).

In addition, the actual knowledge of Kingate Management Limited ("Kingate") is imputable to Tremont. Tremont co-managed, with Kingate, Kingate Global Fund, Ltd. ("Kingate Global"). AC ¶¶ 147-52. This Court has found that the Trustee plausibly alleged Kingate's actual knowledge. *See Kingate*, 2015 WL 4734749, at \*14-15. Defendants ignore these allegations in the AC. Tremont's operating of Kingate Global as co-agent with Kingate is sufficient on its own to support actual knowledge. *See, e.g., In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 590 (S.D.N.Y. 2007), *aff'd sub nom. Pappas v. Bank of America Corp.*, 309 F. App'x 536 (2d Cir. 2009) ("Knowledge of a joint adventurer is imputed to its co-adventurers."); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n. 9 (2d Cir. 1983).

## IV.  **THE TRUSTEE HAS PLED THE AVOIDABILITY OF THE INITIAL TRANSFERS**

Defendants argue that the Court should reject the AC's incorporation by reference of the Fairfield SAC because "[c]ourts have generally held that a pleading in one action may not adopt by reference the pleadings in a different action." Motion at 34. This Court has repeatedly rejected this argument, holding that "pleadings filed in the 'same action' may be properly adopted by

reference in other pleadings in that action," and "[t]he Fairfield Complaint was filed in the 'same action' as this adversary proceeding for purposes of Rule 10(c)." *See, e.g., BCV*, 2022 WL 2761044, at *3 (citing *Am. Casein Co. v. Geiger (In re Geiger)*, 446 B.R. 670, 679 (Bankr. E.D. Pa. 2010)).[31]  Defendants' argument also conflicts with the prior opinion in *In re Madoff Sec.,* in which the District Court had already found sufficient the Trustee's incorporation by reference of the then-operative Fairfield complaint. *See* 501 B.R. at 36; *see also, e.g., Multi-Strategy*, 641 B.R. at 91 (following "the district court's instruction").[32]  Moreover, even if this Court were to find that the adversary proceedings are separate actions for purposes of Rule 10(c)*,* the Court still can permit incorporation by reference, as the District Court and other federal courts have done in appropriate circumstances. *See*, *e.g.*, *Sherman v. A.J. Pegno Constr. Corp.*, 528 F. Supp. 2d 320, 323 n.5 (S.D.N.Y. 2007) (citation omitted).

Defendants also argue that the AC violates Rule 8 because it incorporates the entire Fairfield SAC and does not specify the relevant allegations.  Motion at 35-37 (citing cases).  The cases cited by Defendants—where incorporation led to confusion and a lack of notice of the claims asserted—are inapposite.[33]  Here the Trustee references only one other document—the Fairfield SAC (AC ¶ 157)—and the incorporation is straightforward and its purpose is obvious. *See Lloyds*, 2022 WL 2390551, at *4 (confusion "is not a concern in these proceedings" because defendant

---

[31] Defendants criticize *Geiger*, arguing that its reasoning was based on terminological confusion.  Motion at 35 n.26.  Defendants cite no authority for this view, and in any event the Trustee's argument and this Court's decisions are not exclusively based on *Geiger*.

[32] The cases cited by Defendants, which rejected incorporation of pleadings because the pleadings were from other actions, are thus inapposite.  Motion at 34-35 (citing cases).

[33] Several of the cases are further distinguishable because plaintiffs there were attempting to add brand new claims or defenses. *See Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, No. 13-cv-6705 (DLC), 2014 WL 1673351, at *9 (S.D.N.Y. Apr. 28, 2014); *Davis v. Bifani*, No. 07-cv-00122-MEH-BN, 2007 WL 1216518, at *1 (D. Colo. Apr. 24, 2007); *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023 (CBA) (RLM), 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010); *Muhammad v. Bethel-Muhammad*, No. 11-0690-WS-B, 2012 WL 1854315, at *3 n.5 (S.D. Ala. May 21, 2012); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 461-66 (E.D.N.Y. 2007).

"routinely follows what is happening on a proceeding-wide basis").[34]   And regardless, this Court

may take judicial notice of its decision that the Fairfield SAC sufficiently alleges avoidability of

the BLMIS initial transfers.  *See Fairfield Inv. Fund*, 2021 WL 3477479, at *7.

With respect to the AC's incorporation of the Tremont Complaint, Defendants assert that

it is also inappropriate for all of the foregoing reasons, as well as on account of their contention

that the Tremont Complaint is inconsistent with the Tremont Supplement.   The Trustee has

addressed all of those arguments, *supra*.   Alternately, if the Court determines that incorporation of

either complaint is improper, the Trustee respectfully requests the opportunity to replead.

## V.   THE NEW TRANSFERS RELATE BACK TO THE OC

Contrary to Defendants' arguments, the Trustee's claims to recover the New Transfers are

timely because they relate back to the OC.

### A.   Relevant Legal Standards

Under Rule 15, "[a]n amendment to a pleading relates back to the date of the original

pleading when . . . the amendment asserts a claim or defense that arose out of the conduct,

transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R.

Civ. P. 15(c)(1)(B).

Courts in the Second Circuit, including this Court, have "liberally construed" Rule 15,

which "does not set a high bar for relation back, so long as the claims attempted to be asserted in

the new complaint share a reasonable measure of common ground with the allegations in the

original pleading."   *Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620, 633 (Bankr. S.D.N.Y.

2012) ("*Peter Madoff*") (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,

---

[34] Defendants contend that the Fairfield SAC's allegations concerning defendants other than Sentry are not relevant
to this proceeding (Motion at 37-38), but this Court has already found that the Fairfield SAC as a whole plausibly
alleges the avoidability of the Sentry initial transfers.  *Fairfield Inv. Fund*, 2021 WL 3477479, at *4.

379 B.R. 5, 27 (Bankr. E.D.N.Y. 2007)); *see also Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 215-16 (2d Cir. 1983); *Fairfield Inv. Fund*, 2021 WL 3477479, at *12. This is because "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Fairfield Inv. Fund*, 2021 WL 3477479, at *12 (quoting *Siegel*, 714 F.2d at 217). Thus, "[t]he principal inquiry . . . is whether the general fact situation alleged in the original pleading provides adequate notice to the opposing party of the matters raised in the amended pleading." *Peter Madoff*, 468 B.R. at 633 (quotations omitted).

Additional fraudulent transfer claims against existing defendants relate back to the original pleading where the newly alleged transfers occurred as part of the "same 'course of conduct'" as the originally alleged transfers. *Peter Madoff*, 468 B.R. at 633 (citing *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 334 (S.D.N.Y. 2009)). When examining "conduct" under Rule 15, courts typically analyze whether "the new transfers occurred as part of the same course of conduct as the transfers alleged in the original complaint," and whether "the original complaint g[a]ve sufficient notice to the defendants that the Trustee[] may sue for additional transfers that were part of the same course of conduct[.]" *Hill v. Oria (In re Juliet Homes, LP)*, No. 07-36424, 2011 WL 6817928, at *7 (Bankr. S.D. Tex. Dec. 28, 2011) (citations omitted).

### B. The New Transfers Were Made as Part of the Same Course of Conduct as the Transfers Alleged in the OC

Here, relation back should be permitted because the Trustee has alleged an underlying common course of conduct involving Defendants' investing into and redeeming from Madoff's fraud through BLMIS feeder funds in both the OC and the AC. The New Transfers are subsequent transfers being sought under the same legal theories and as part of the same set of facts as set forth in the OC. Both sets of transfers are being sought under Section 550(a) and are subsequent transfers of customer property received by Defendants from Feeder Funds in connection with the

BLMIS Ponzi scheme—specifically, the New Transfers were made by the Rye Select Funds to

Defendants RBC Alternative and Guernroy.  Thus, any defenses RBC Alternative and Guernroy

might have regarding the New Transfers will likely be the same as or similar to the defenses to the

original transfers.  In sum, the New Transfers are no different in form or substance to the transfers

alleged in the OC, and therefore they relate back.

Courts have found relation back on the grounds that the new amounts sought are part of

the same Ponzi scheme as those originally alleged.  *See, e.g., Goldberg v. Halbert (In re*

*Woodbridge Group of Companies, LLC)*, No. 19-51027 (JKS), 2021 WL 5774217, at \*9-11

(Bankr. D. Del. Dec. 6, 2021) (finding relation back of new claims to recover principal, where

original complaint just sought interest, because "both the initial and amended claims arise from

the Defendant's investment in the Woodbridge Ponzi Scheme," and as an investor defendant was

on notice that any of his transfers might be subject to clawback); *In re Juliet Homes*, 2011 WL

6817928, at \*7 ("The fraudulent transfers alleged in the original complaint, along with the new

transfers alleged in the [proposed amended complaint], are alleged to have been part of this overall

Ponzi scheme.  Both the original and the newly alleged fraudulent transfers therefore arose as part

of the same course of alleged conduct."); *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264

(S.D.N.Y. 1992) (holding allegations in amended complaint related back as part of same basic

scheme even though events were distinct from those alleged in the original complaint).

Here, not only are the New Transfers and those in the OC part of the same Ponzi scheme,

but (i) the relevant defendants, (ii) their investments with BLMIS through and receipt of

subsequent transfers from BLMIS feeder funds, and (iii) the underlying legal basis for seeking the

New Transfers, are all the same as in the OC.  *See Peter Madoff*, 468 B.R. at 633-34 (permitting

relation back where original and amended complaints alleged transfers under the "same legal

theories"); *Adelphia*, 624 F. Supp. 2d at 333-34 (permitting relation back where new transfers related to the same alleged fraudulent loan transactions); *Fairfield Inv. Fund*, 2021 WL 3477479, at *12-13 (permitting relation back for subsequent transferees out of FGG feeder funds where the relevant entities were named as subsequent transferee defendants in the original complaint).

Defendants nevertheless contend that there is no "common core of operative facts" uniting the old and the New Transfers, citing the fact that the transfers occurred on different dates, with many New Transfers taking place earlier than any of the old transfers from the same Feeder Fund. Motion at 20-21.[35] Defendants speculate that as a result, it may be necessary to consider different evidence as to the issues of good faith and tracing, and different underlying subscription agreements, with respect to each set of transfers. *Id.* Defendants cite no authority for the view that this difference in timing precludes the existence of a common core of operative facts, which is not surprising as the case law does not support such a narrow view.

### C.   The OC Provided Notice to Defendants That the Trustee Would Sue for Any Additional Transfers That Were Part of the Same Course of Conduct

The OC also put RBC Alternative and Guernroy on notice that they would be asked to account for the New Transfers.  In the OC, the Trustee indicated his intention to pursue all subsequent transfers to Defendants, including those not known at the time of filing.  As this Court has stated, "[t]he primary consideration in determining whether the proposed amendment to the Complaint should relate back is whether the Complaint put the defendant on notice that additional transfers may be pursued at a later date." *Fairfield Inv. Fund*, 2021 WL 3477479, at *12; *see also*

---

[35] Defendants also argue that six of the New Transfers "were made on dates preceding the six-year look-back period available under the New York Debtor Creditor Law, and thus, cannot be traced to initial transfers that could be avoided." *Id.* at 18-19.  This argument ignores the fact that the Tremont Complaint properly sought avoidance of the full history of initial transfers to the Rye Select Funds pursuant to the New York Debtor and Creditor Law's "discovery rule," which allows causes of action predicated on fraud to be commenced within two years of the date the fraud was or should have been discovered with reasonable diligence.  TC ¶¶ 264-66; *see, e.g., Picard v. Estate of Chais (In re BLMIS)*, 445 B.R. 206, 233 (Bankr. S.D.N.Y. 2011) (authorizing Trustee to seek recovery of full-history transfers).

*Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*, 67 B.R. 304,

306 (Bankr. S.D.N.Y. 1986) ("[I]f the original complaint indicates an intention to pursue all

transactions, the adding of such transactions will relate back.").

For example, in *Fairfield Inv. Fund*, this Court held that the following language in the prior

complaint was sufficient to give defendants notice:

> The money transferred from BLMIS to the Feeder Funds was
> subsequently transferred by the Feeder Funds to the FGG Affiliates
> . . . . These payments from the Feeder Funds constitute subsequent
> transfers of the Initial Transfers from BLMIS to the Feeder Funds.
> Because the FGG Affiliates . . . did not take the funds in good faith
> or without knowledge of the voidability of the initial transfers, all
> transfers from BLMIS to the Feeder Funds, which the Feeder Funds
> subsequently transferred, either directly or indirectly, to the FGG
> Affiliates . . . (the "Subsequent Transfers"), were and remain
> Customer Property subject to turnover to the Trustee and/or are
> avoidable and recoverable by the Trustee.

2021 WL 3477479, at *12. This Court reasoned that the Trustee, as an outsider to the transactions,

need not include every subsequent transfer in the initial complaint:

> [T]he Trustee is an outsider to these transactions and will need
> discovery to identify the specific subsequent transfers by date,
> amount and the manner in which they were effected. The Moving
> Defendants are a group of interrelated individuals and entities . . . .
> Whether they additionally received Subsequent Transfers of BLMIS
> funds from one another is a question to which they, and they alone,
> have the requisite information to respond.

*Id.* at *13 (quoting *Chais*, 445 B.R. at 236).

Here, the OC includes the following allegation: "The Trustee's investigation is ongoing,

and he reserves the right to: (i) supplement the information on the Rye Select Fund Initial Transfers

and Rye Select Fund Subsequent Transfers; and (ii) seek recovery of any additional transfers."

OC ¶ 98. That language is even clearer than the language used in *Fairfield Inv. Fund* as described

above. *See also Peter Madoff*, 468 B.R. at 633-34 (finding sufficient for relation back purposes

language stating "[a]t this time, the Trustee has identified at least $198,743,299 of customer funds"); *Ogier v. UPAC Ins. Fin. (In re Bauer Agency, Inc.)*, 443 B.R. 918, 922 (Bankr. N.D. Ga. 2011) ("The complaint expressly states that the Trustee intends to avoid all transfers that [defendant] received" from the Ponzi scheme "during the relevant time periods."); *In re Juliet Homes*, 2011 WL 6817928, at *7 (finding that defendants were on notice that the trustees would likely view any transfers from debtors as potentially fraudulent in light of the allegations concerning the Ponzi scheme); *Adelphia*, 624 F. Supp. 2d at 333 (permitting relation back where the original pleading sought *all* payments from margin loss).

Defendants attempt to distinguish *Fairfield Inv. Fund* on the grounds that there, the subsequent transferee defendants were alleged to have not taken in good faith, while the OC does not allege the same as to Defendants.  Motion at 19-20.  This purported distinction is baseless.  This Court's decision finding relation back in *Fairfield Inv. Fund* was not based on the Trustee's allegations of lack of good faith, but rather as noted above, on the conclusion that, like here, the defendants "were adequately appraised that the Trustee intended to collect 'all' subsequent transfers that they received." *Fairfield Inv. Fund*, 2021 WL 3477479, at *13.

Based on the Trustee's express allegations in the OC, Defendants here were similarly aware that the Trustee would be continuing his investigation and may identify additional transfers to recover.  *See* OC ¶¶ 86, 92, 97, 110, 115, 120 (stating that the subsequent transfers being sought are those "presently known" and "[b]ased on the Trustee's investigation to date" and that the Trustee is seeking "at least" the amounts alleged therein).  The Trustee therefore not only included the transfers of which he had knowledge, he specifically and unambiguously put Defendants on notice that he would seek to any additional transfers that he later uncovered in his investigation.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests the Court deny the Motion.

Dated:  September 9, 2022
       New York, New York

*/s/ Howard L. Simon*

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215
Howard L. Simon
Email: hsimon@windelsmarx.com
Kim M. Longo
Email: klongo@windelsmarx.com
Alan D. Lawn
Email: alawn@windelsmarx.com

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*