ALLEGAERT BERGER & VOGEL LLP
John F. Zulack
Lauren J. Pincus
David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
Tel. No.: 212-571-0550
Email: jzulack@abv.com
Email: lpincus@abv.com
Email: dshaiman@abv.com

*Attorneys for Defendant Bordier & Cie SCmA*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01695 (CGM) |
| Plaintiff, | |
| v. | |
| BORDIER & CIE, | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| Defendant. | |

Bordier & Cie SCmA ("Bordier"), by its undersigned counsel Allegaert Berger & Vogel LLP, as and for its Answer to the Complaint dated June 6, 2012 of Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff (the "Trustee" or the "Plaintiff") (the "Complaint"), states as follows:[1]

## GENERAL DENIAL

Except as otherwise expressly admitted herein, Bordier denies each and every allegation in the Complaint.  Bordier states that the headings and sub-headings throughout the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, the allegations in the headings and subheadings in the Complaint are denied.  In answering the allegations in the Complaint, Bordier does not intend to waive, and does not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of any of the allegations in the Complaint.  To the extent it is later determined that a response is required to any allegation Bordier avers has been mooted by a prior dismissal of the Trustee's claims, Bordier denies any such allegation.  Bordier expressly reserves the right to amend and/or supplement the Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[2] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

---

[1] Capitalized terms not defined herein have the meaning set forth in the Complaint.

[2] Footnote 1 of the Complaint states: "SIPA § 78*lll*(4) defines 'Customer Property' as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

2

**ANSWER**:    The allegations of paragraph 1 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the

Complaint, except admits that the Plaintiff purports to bring this action as trustee for the

liquidation of BLMIS and the substantively consolidated estate of Bernard L. Madoff ("Madoff")

pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq*, and that

Madoff perpetrated a Ponzi scheme through BLMIS.

2.      With this Complaint, the Trustee seeks to recover approximately
$8,204,307 in subsequent transfers of Customer Property made to Defendant Bordier.  The
subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry
Limited ("Fairfield Sentry"), Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro
Fund Ltd. ("Kingate Euro"), which were Madoff feeder funds (collectively, the "Feeder Funds").
The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the
BVI.  The Feeder Funds had direct customer accounts with BLMIS's investment advisory
business ("IA Business") for the purpose of investing assets with BLMIS.  Each of the Feeder
Funds maintained in excess of 95% of its assets in its BLMIS customer accounts.

**ANSWER**:    The allegations of paragraph 2 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies the allegations in

paragraph 2 of the Complaint except admits that (1) Fairfield Sentry is a BVI company currently

in liquidation in the BVI, and (2) the Trustee seeks to recover approximately $7,928,454 in

alleged subsequent transfers to Bordier.[3]

3.      When Defendant Bordier received the subsequent transfers of BLMIS
Customer Property, Defendant Bordier was a Swiss private bank specializing in asset managing
and securities trading.

---

[3] Pursuant to a Stipulation and Order entered on December 13, 2021, ECF 81 (the "Kingate
Stipulation"), the Trustee's claims to recover alleged subsequent transfers that Bordier allegedly
received from Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. were dismissed (*i.e.*, Count
Two and Count Three of the Complaint, respectively).

**ANSWER**:    Bordier denies the allegations of paragraph 3 except admits that at all relevant times it was a Swiss private bank that provided custody, brokerage, and wealth management services to private and institutional clients.

## II.    JURISDICTION AND VENUE

4.    The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant Bordier as a subsequent transferee of funds originating from BLMIS.

**ANSWER**:    The allegations of paragraph 4 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 4 of the Complaint.

5.    This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending.  The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER**:    The allegations of paragraph 5 contain legal conclusions to which no response is required.  To the extent that a response is required, Bordier denies the allegations of paragraph 5 of the Complaint, except admits that the main substantively consolidated SIPA case (No. 08-01789 (CGM)) is pending in this Court, and denies knowledge or information sufficient to form a belief as to where that case was originally brought.

6.    Defendant Bordier is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds.  Defendant Bordier knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

**ANSWER**:    The allegations of paragraph 6 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 6 of the Complaint.

7.    By directing its investments through Fairfield Sentry a Fairfield Greenwich Group ("FGG") managed feeder funds, Defendant Bordier knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  Upon information and belief, Defendant Bordier entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York.  Defendant Bordier thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**:    The allegations of paragraph 7 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 7, except (1) admits that it entered into a subscription agreement with Fairfield Sentry, and refers the Court to that document for its contents, and (2) admits that, in at least one instance, it wired funds to Fairfield Sentry through a New York bank account in connection with subscriptions in Fairfield Sentry.

8.    Defendant Bordier should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**:    The allegations of paragraph 8 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 8 of the Complaint.

9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**:    The allegations of paragraph 9 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 9 of the Complaint.

10.      Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**:      The allegations of paragraph 10 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 10 of the Complaint.

### III.    **BACKGROUND**

11.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

**ANSWER**:      Bordier denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore denies such allegations, except admits on information and belief that Madoff was arrested on December 11, 2008 and that the SEC filed a complaint against Madoff and BLMIS.

12.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER**:      Bordier denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies such allegations and respectfully refers the Court to the Order dated December 12, 2008, for a complete and accurate statement of its contents.

13.      On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**:      Bordier denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint and therefore denies

such allegations and respectfully refers the Court to the application filed by SIPC referred to in

paragraph 13 of the Complaint for a complete and accurate statement of its contents.

      14.    Also on December 15, 2008, Judge Stanton granted the SIPC application
and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

      a.    removed the receiver and appointed the Trustee for the liquidation
of the business of BLMIS under SIPA § 78eee(b)(3);
      b.    appointed Baker & Hostetler LLP as counsel to the Trustee under
SIPA § 78eee(b)(3); and
      c.    removed the case to the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

      **ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore denies

such allegations and respectfully refers the Court to the Order issued by Judge Stanton dated

December 15, 2008, for a complete and accurate statement of its contents.

      15.    By orders dated December 23, 2008, and February 4, 2009, respectively,
the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested
person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of
BLMIS.

      **ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies

such allegations and respectfully refers the Court to the Orders dated December 23, 2008, and

February 4, 2009, for a complete and accurate statement of their contents.

      16.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case
captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009)
(Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by
the United States Attorney's Office for the Southern District of New York.  At the Plea Hearing,
Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of
[BLMIS]." *Id*. at 23.  Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I
was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150
years in prison.

      **ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies

such allegations, except admits on information and belief that Bernard L. Madoff pled guilty at a

plea hearing on March 12, 2009 (the "Madoff Plea Hearing"), and respectfully refers the Court to

the transcript of that hearing for a complete and accurate statement of its contents.

17.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled
guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on
August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS)
(S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.  Among
other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least
the 1980s.

**ANSWER**:     Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 17 of the Complaint and therefore denies

such allegations, except admits on information and belief that Frank DiPascali pled guilty at a

plea hearing on August 11, 2009, and respectfully refers the Court to the transcript of that

hearing for a complete and accurate statement of its contents.

## IV.    TRUSTEE'S POWER AND STANDING

18.     As Trustee appointed under SIPA, the Trustee is charged with recovering
and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any
other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process
of marshaling BLMIS's assets, and this liquidation is well underway.  However, the estate's
present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars
they invested with BLMIS over the years.  Consequently, the Trustee must use his broad
authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from
individuals and entities that received preferences and fraudulent transfers to the detriment of
defrauded customers whose money was consumed by the Ponzi scheme.  Absent this and other
recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A)
through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:     Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 18 of the Complaint and therefore denies

such allegations, except states that the allegations concerning the Trustee's responsibilities and

authority under SIPA and the Bankruptcy Code contain legal conclusions to which no response is

required.

19.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:     The allegations of paragraph 19 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies the allegations of

paragraph 19 of the Complaint.

20.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**:     The allegations of paragraph 20 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies the allegations of

paragraph 20 of the Complaint.

21.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and receiver transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER**:     The allegations of paragraph 21 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies the allegations of

paragraph 21 of the Complaint.

## V.     <u>THE DEFENDANT</u>

22.     Defendant Bordier is a Swiss private bank that maintains a place of business at Rue de Hollande 16, CH-1204 Geneva, Switzerland.

**ANSWER**:     Bordier denies the allegations in paragraph 22, except admits that

(1) Bordier is a Swiss private bank; (2) Bordier maintained a place of business at Rue de

Hollande 16, CH-1204 Geneva, Switzerland until August 2022; and (3) Bordier maintains a

place of business at Rue Rath 16, CH-1204 Geneva, Switzerland as of the end of August 2022.

## VI.    THE PONZI SCHEME

23.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore denies

such allegations.

24.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies

such allegations.

25.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 25 of the Complaint and therefore denies

such allegations.

26.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The

securities purchases and sales shown in the account statements never occurred, and the profits
reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never made the
investments he promised clients, who believed they were invested with him in the SSC Strategy.
He further admitted that he never purchased any of the securities he claimed to have purchased
for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a
single purchase or sale of securities in connection with the SSC Strategy on any trading platform
on which BLMIS reasonably could have traded securities.  Instead, investors' funds were
principally deposited into the BLMIS account at JPMorgan Chase & Co., Account
#xxxxxxxxxxxx703.

        **ANSWER**:     Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore denies

such allegations and respectfully refers the Court to the transcript of the Madoff Plea Hearing for

a complete and accurate statement of its contents.

        27.     Prior to his arrest, Madoff assured clients and regulators that he purchased
and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than
through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence
that the IA Business ever entered into any OTC options trades on behalf of IA Business account
holders.

        **ANSWER**:     Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore denies

such allegations.

        28.     For all periods relevant hereto, the IA Business was operated as a Ponzi
scheme.  The money received from investors was not invested in stocks and options, but rather
used to pay withdrawals and to make other avoidable transfers.  Madoff also used his customers'
investments to enrich himself, his associates, and his family.

        **ANSWER**:     Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore denies

such allegations.

        29.     The falsified monthly account statements reported that the accounts of the
IA Business customers had made substantial gains, but in reality, due to the siphoning and
diversion of new investments to fulfill payment requests or withdrawals from other BLMIS
accountholders, BLMIS did not have the funds to pay investors for those new investments.
BLMIS only survived as long as it did by using the stolen principal invested by customers to pay
other customers.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore denies

such allegations.

30.    It was essential for BLMIS to honor requests for payments in accordance
with the falsely inflated account statements, because failure to do so promptly could have
resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore denies

such allegations.

31.    Madoff's scheme continued until December 2008, when the requests for
withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the
Ponzi scheme.

**ANSWER**:    Bordier admits that the Ponzi scheme collapsed in December 2008

but denies knowledge or information sufficient to form a belief as to the truth of the allegations

in paragraph 31 of the Complaint and therefore denies such allegations.

32.    Based upon the Trustee's ongoing investigation, it now appears there were
more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December
2008, BLMIS generated account statements for its approximately 4,900 open customer accounts.
When added together, these statements purportedly showed that BLMIS customers had
approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth
only a fraction of that amount.  Customer accounts had not accrued any real profits because
virtually no investments were ever made.  By the time the Ponzi scheme came to light on
December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in
principal.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore denies

such allegations.

33.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of
dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than

the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER:**    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore denies

such allegations.

## VII.    THE TRANSFERS

34.    The Feeder Funds received initial transfers of BLMIS Customer Property. Some or all of those transfers were subsequently transferred directly or indirectly to Defendant Bordier.

**ANSWER**:    Bordier denies the allegations in paragraph 34 of the Complaint.

### A.    Fairfield Sentry

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

35.    The Trustee has filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover the initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**:    The allegations of paragraph 35 refer to proceedings in another

litigation to which Bordier is not a party. Bordier respectfully refers the Court to the docket and

filings in that action for their contents. To the extent a further response is required, Bordier

states that it was never a party to Adv. Pro. No. 09-01239 (the "Fairfield Adversary Proceeding")

and was never served with a copy of the Fairfield Amended Complaint in the Fairfield Adversary

Proceeding. Bordier further objects to the purported wholesale incorporation by reference of a

pleading from another litigation as a violation of Rule 8 of the Federal Rules of Civil Procedure

as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure. To the extent a

further response is required, Bordier denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 35 of the Complaint and therefore denies such

allegations.

36.    During the six years preceding the Filing Date, BLMIS made transfers to
Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers").
The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within
the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and
551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA,
particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 36 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the

Complaint and therefore denies such allegations.

37.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6
billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing
Date (the "Fairfield Sentry Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial
Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and
are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code,
§§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 37 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the

Complaint and therefore denies such allegations.

38.    The Fairfield Sentry Two Year Initial Transfers include approximately
$1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing
Date (the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference
Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA
§ 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy
Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 38 contain legal conclusions to which

no response is required.  To the extent a response is required, Bordier denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the

Complaint and therefore denies such allegations.

39.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two
Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are
collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these
transfers are included as Exhibits A and B.

**ANSWER**:    Bordier denies the allegations of paragraph 39 of the Complaint,

except admits that Exhibits A and B are attached to the Complaint and respectfully refers the

Court to those exhibits for their complete and accurate contents.

40.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011, orders, the
Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the
"Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the
Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield
Sentry in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the
Trustee under the terms of the Settlement Agreement.

**ANSWER**:    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 40 of the Complaint and respectfully refers

the Court to the Settlement Agreement and the June 7, 2011, June 10, 2011, and July 13, 2011,

Orders referenced in paragraph 40 for their complete and accurate contents.

### 2.    Subsequent Transfers from Fairfield Sentry to Defendant Bordier

41.    A portion of the Fairfield Sentry Initial Transfers was subsequently
transferred either directly or indirectly to, or for the benefit of, Defendant Bordier and is
recoverable from Defendant Bordier pursuant to section 550 of the Bankruptcy Code and § 278
of the NYDCL. Based on the Trustee's investigation to date, approximately $7,928,454 of the
money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield
Sentry to Defendant Bordier (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth
the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**ANSWER**:    The allegations of paragraph 41 of the Complaint contain legal

conclusions to which no response is required. To the extent a response is required, Bordier

denies the allegations of paragraph 41 of the Complaint, and respectfully refers the Court to

Exhibit C for its complete and accurate contents.

42.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**    Bordier denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 42 of the Complaint and therefore denies

such allegations.

B.    **Kingate Global**

1.    **Initial Transfers from BLMIS to Kingate Global**

43.    The Trustee has filed an adversary proceeding against Kingate Global, Kingate Euro and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.,* Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Complaint as if fully set forth herein.

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent

transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 43 of the Complaint. To the extent a response is

required, Bordier denies the allegations of paragraph 43 of the Complaint.

44.    Over the lifetime of Kingate Global's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Global of approximately $437,501,112 (the "Kingate Global Lifetime Initial Transfers"). The Kingate Global Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under section 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent

transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 44 of the Complaint. To the extent a response is

required, Bordier denies the allegations of paragraph 44 of the Complaint.

      45.     During the six years preceding the Filing Date, BLMIS made transfers to
Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial
Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer
Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under
sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable
provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

      **ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent

transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 45 of the Complaint. To the extent a response is

required, Bordier denies the allegations of paragraph 45 of the Complaint.

      46.     The Kingate Global Six Year Initial Transfers include approximately
$163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the
Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year
Initial Transfers were and continue to be Customer Property within the meaning of SIPA §
78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the
Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly
SIPA § 78fff-2(c)(3).

      **ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent

transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 46 of the Complaint. To the extent a response is

required, Bordier denies the allegations of paragraph 46 of the Complaint.

      47.     The Kingate Global Two Year Initial Transfers include approximately
$101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the
Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global
Preference Period Initial Transfers were and continue to be Customer Property within the
meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551
of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 47 of the Complaint.  To the extent a response is required, Bordier denies the allegations of paragraph 47 of the Complaint.

48.    The Kingate Global Lifetime Initial Transfers, the Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers."  Charts setting forth these transfers are included as Exhibits D and E.

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 48 of the Complaint.  To the extent a response is required, Bordier denies the allegations of paragraph 48 of the Complaint.

**2.    Subsequent Transfers from Kingate Global to Defendant Bordier**

49.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Bordier, and is recoverable from Defendant Bordier pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $134,959 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Bordier (the "Kingate Global Subsequent Transfers").  A chart setting forth the presently known Kingate Global Subsequent Transfers is attached as Exhibit F.

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 49 of the Complaint.  To the extent a response is required, Bordier denies the allegations of paragraph 49 of the Complaint.

50. The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Two against Bordier related to subsequent transfers allegedly received from Kingate Global [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 50 of the Complaint. To the extent a response is required, Bordier denies the allegations of paragraph 50 of the Complaint.

### C. Kingate Euro

#### 1. Initial Transfers from BLMIS to Kingate Euro

51. During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of approximately $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 51 of the Complaint. To the extent a response is required, Bordier denies the allegations of paragraph 51 of the Complaint.

52. The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers"). The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent

transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 52 of the Complaint.  To the extent a response is

required, Bordier denies the allegations of paragraph 52 of the Complaint.

53.    The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers").  The Kingate Euro Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent

transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 53 of the Complaint.  To the extent a response is

required, Bordier denies the allegations of paragraph 53 of the Complaint.

54.    The Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "Kingate Euro Initial Transfers."  Charts setting forth these transfers are included as Exhibits G and H.

**ANSWER**:    On December 13, 2021, the Court entered a Stipulation and Order

amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent

transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is

required to the allegations of paragraph 54 of the Complaint.  To the extent a response is

required, Bordier denies the allegations of paragraph 54 of the Complaint.

### 2.    Subsequent Transfers from Kingate Euro to Defendant Bordier

55.    A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Bordier and is recoverable from Defendant Bordier pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, the equivalent of at least $140,894 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Defendant Bordier (the "Kingate Euro Subsequent Transfers").  A chart setting forth the presently known Kingate Euro Subsequent Transfers is attached as Exhibit I.

**ANSWER**:      On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 55 of the Complaint.  To the extent a response is required, Bordier denies the allegations of paragraph 55 of the Complaint.

56.      The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Euro Initial Transfers, the Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:      On December 13, 2021, the Court entered a Stipulation and Order amending the Complaint to, *inter alia,* dismiss Count Three against Bordier related to subsequent transfers allegedly received from Kingate Euro [*see* ECF No. 81], accordingly no response is required to the allegations of paragraph 56 of the Complaint.  To the extent a response is required, Bordier denies the allegations of paragraph 56 of the Complaint.

<u>**COUNT ONE**</u>
<u>**RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –**</u>
<u>**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**</u>

57.      The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:      Bordier incorporates and reasserts its responses to the allegations contained in the previous paragraphs of this Complaint as though set forth fully herein.

58.      Defendant Bordier received the Fairfield Sentry Subsequent Transfers, totaling approximately $7,928,454.  The Fairfield Sentry Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:      The allegations of paragraph 58 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations in paragraph 58 of the Complaint.

59.     Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Bordier.

**ANSWER**:     The allegations of paragraph 59 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations in paragraph 59 of the Complaint.

60.     Defendant Bordier is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER**:     The allegations of paragraph 60 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations in paragraph 60 of the Complaint.

61.     As a result of the foregoing, pursuant to section 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Bordier recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:     The allegations of paragraph 61 contain legal conclusions to which no response is required.  To the extent a response is required, Bordier denies the allegations of paragraph 61 of the Complaint.

## <u>RESPONSE TO REQUEST FOR RELIEF</u>

Bordier denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against Bordier.

## <u>AFFIRMATIVE DEFENSES</u>

Bordier asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff.  Bordier reserves the right to assert any other defenses as discovery in this litigation proceeds or any counterclaims of which it may become aware through discovery or other investigation as may be appropriate at a later time.  Further, Bordier reserves the right to amend this Answer to assert other and further

defenses, cross-claims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Trustee's claims are barred to the extent they have been dismissed by the Court or are based on allegations that have been dismissed by the Court.

## THIRD AFFIRMATIVE DEFENSE

The alleged Fairfield Sentry Subsequent Transfers may not be avoided or recovered because Bordier took for value and in good faith within the meaning of 11 U.S.C. § 550(b). Bordier did not have knowledge that BLMIS was not trading securities, did not know facts that would have prompted a reasonable person in Bordier's position to conduct further inquiry into BLMIS's possible fraud, and even if Bordier had conducted a diligent inquiry, it would not have discovered the fraudulent purpose of the Fairfield Sentry Initial Transfers and that BLMIS was not trading securities.

Bordier acted as a broker, custodian, and nominee for its customers with investments tied to the Fairfield Sentry Subsequent Transfers, not for its own account. Bordier had a limited role in the subscription and redemption process. A reasonable person with the facts in Bordier's possession at the time of the Fairfield Sentry Subsequent Transfers would not have been on inquiry notice of the fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if Bordier had been on inquiry notice of the possible fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to

23

conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by Bordier would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with vastly greater investigatory tools and resources than Bordier, and with more access to BLMIS personnel and documentation than Bordier, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008. This includes the United States Securities and Exchange Commission, which began an investigation into BLMIS in 2006, but could not discern BLMIS's fraudulent purpose. Bordier, a foreign entity, did not have the capability of discovering what U.S. federal regulators could not, and Bordier could not have discovered the fraudulent purpose of the Fairfield Sentry Initial Transfers.

## FOURTH AFFIRMATIVE DEFENSE

The alleged Fairfield Sentry Initial Transfers may not be avoided because they were not made with actual intent to defraud and were settlement payments made by or to, or for the benefit of, a financial institution or financial participant or were transfers made by or to, or for the benefit of, a financial institution or financial participant in connection with a securities contract within the meaning of 11 U.S.C. § 546(e).

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendant Bordier hereby demands a jury trial on all claims and issues that may be tried by a jury.

## FINAL ORDER

Bordier objects to the entry of a final order or Judgment against Bordier by the Bankruptcy Court.

24

WHEREFORE, Defendant Bordier requests that this Court dismiss the Complaint with prejudice, award Bordier its costs incurred in connection with this action, and grant such other and further relief as the Court deems just and proper.

Dated: September 12, 2022
        New York, New York

ALLEGAERT BERGER & VOGEL LLP

By: */s/ John F. Zulack*_____
John F. Zulack
Lauren J. Pincus
David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
Tel. No.: 212-571-0550
Email: jzulack@abv.com
Email: lpincus@abv.com
Email: dshaiman@abv.com

*Counsel for Defendant Bordier & Cie SCmA*