**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>                Plaintiff,<br><br>v.<br><br>NATIONAL BANK OF KUWAIT S.A.K. and NBK BANQUE PRIVÉE (SUISSE) S.A.,<br><br>                Defendants. | Adv. Pro. No. 11-02554 (CGM)<br><br><br>**AMENDED COMPLAINT** |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll*

("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"),

by and through his undersigned counsel, for his Amended Complaint against defendants National

Bank of Kuwait S.A.K. ("NBK") and NBK Banque Privée (Suisse) S.A. ("NBK Suisse") (together,

"Defendants"), alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the

massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover $19,175,523 in

subsequent transfers of BLMIS customer property Defendants received from Fairfield Sentry

Limited ("Fairfield Sentry") during the period of July 2007 through November 2008.

3.    Defendant NBK received at least $17,585,510 in subsequent transfers of customer

property from Fairfield Sentry that the Trustee seeks to recover with this Amended Complaint.

4.    Defendant NBK Suisse received at least $1,590,013 in subsequent transfers of

customer property from Fairfield Sentry that the Trustee seeks to recover with this Amended

Complaint.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

5.    This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment

Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

1

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b)
and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

6.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The
Trustee consents to the entry of final orders or judgment by this Court if it is determined that
consent of the parties is required for this Court to enter final orders or judgment consistent with
Article III of the U.S. Constitution.

7.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

8.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11
U.S.C. §§ 105(a) and 550, and other applicable law.

## III.  BACKGROUND, THE TRUSTEE, AND STANDING

9.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for criminal violations of federal securities laws, including securities fraud, investment adviser
fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission
("SEC") commenced the District Court Proceeding.

10.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to
combining its action with an application by the Securities Investor Protection Corporation
("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court
alleging, among other things, that BLMIS could not meet its obligations to securities customers as
they came due and its customers needed the protections afforded by SIPA.

11.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered
an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to
SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA §
78eee(b)(3); and

2

(c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

12.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

13.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

14.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

15.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

16.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

17.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

18.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering, and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

20.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.   THE DEFENDANTS AND NON-PARTIES

### A.   Defendant NBK

21.     Defendant NBK is an international bank organized under the laws of Kuwait with a registered address at P.O. Box 95, Safat, 13001 Kuwait.  In addition to maintaining offices

worldwide, NBK is the largest private sector institution in Kuwait, with a well-established franchise and market leadership in all business segments.

22.    Established in 1952 as the first national bank in Kuwait and the entire Arabian Gulf region, NBK quickly became a financial leader in the Middle East, billing itself as "The Bank You Know and Trust." Throughout the years, NBK built an advanced banking institution and obtained extensive expertise in financial products for both individuals and companies, publicly touting its ability to offer clients a full spectrum of innovative financial and investment services.

23.    In addition to its dominance in the Middle East, NBK had and continues to have a sophisticated global network comprised of 150 branches, subsidiaries, and representative offices in 16 countries on four continents, including a branch in New York. Through this network, NBK provided and continues to provide services, including hedge fund management, private banking, investment banking, and asset management, to consumer, private, corporate, and institutional clients.

24.    According to its 2007 Annual Report, NBK leveraged its "cooperation among business units and greater synergy" to maximize its expertise. The "[c]ollaboration" within business units, specifically private banking, corporate, treasury and investment banking, and across borders enabled NBK to provide a sophisticated and global service.

25.    At all relevant times, NBK worked hand-in-hand with NBK Suisse to effectuate and manage its investments in Fairfield Sentry. NBK Suisse assisted with the day-to-day oversight and administration of NBK's investments in Fairfield Sentry and was authorized and directed to correspond with Fairfield Sentry, negotiate transactions and fees, and otherwise act on behalf of and for the benefit of NBK. Furthermore, NBK Suisse managed an investment committee, which

approved investment decisions on behalf of NBK, including NBK's investments in Fairfield Sentry.

26.     NBK was and continues to be a sophisticated investor with expertise in asset management and investment funds.

**B.     Defendant NBK Suisse**

27.     Defendant NBK Suisse is a wholly owned subsidiary of NBK based in Switzerland with an address at Quai du Mont Blanc 21, P.O. Box 1923, 1211 Geneva, Switzerland.

28.     NBK Suisse was registered in Switzerland in September 1984.  Originally named NBK Finance (SA), from 1984 to 1999, NBK Suisse operated as a financial services provider and independent investment company, managing portfolios for clients based in Kuwait and Saudi Arabia.

29.     In 1999, NBK Suisse obtained a Swiss banking license and became a full-fledged Swiss Bank operating under the name National Bank of Kuwait (Suisse) S.A.

30.     In 2006, NBK Suisse changed its name to NBK Banque Privée (Suisse) S.A. Currently, NBK Suisse offers traditional banking, portfolio management, advisory, and custody services to institutions and high net worth individuals.

31.     NBK Suisse and NBK shared information about BLMIS and Fairfield Sentry, collaborated to conduct their BLMIS-related transactions, and operated as a cohesive unit with respect to their investments in and redemptions from Fairfield Sentry that resulted in the subsequent transfers of customer property at issue here.

32.     NBK Suisse was and continues to be a sophisticated investor with expertise in asset management and investment funds.

### C.    Non-Party Fairfield Greenwich Group

33.    Non-party Fairfield Greenwich Group ("FGG"), founded in 1983 by United States citizen and resident, Walter Noel, is a New York-based *de facto* partnership that created, operated, and controlled Fairfield Sentry.

### D.    Non-Party Fairfield Sentry

34.    Non-party Fairfield Sentry was a BLMIS feeder fund incorporated in the British Virgin Islands ("BVI") that invested substantially all of its assets with BLMIS in New York.  At all relevant times, Fairfield Sentry was operated almost entirely by personnel at FGG's New York City headquarters who maintained final control of Fairfield Sentry's bank accounts, relationships with Fairfield Sentry's back office service providers, and Fairfield Sentry's investments with BLMIS.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

## V.    PERSONAL JURISDICTION

### A.    Defendant NBK

35.    NBK is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York and knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

36.    NBK invested in Fairfield Sentry, which was created, operated, and controlled by FGG, a *de facto* partnership based in New York, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

37.    NBK knew that Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS.

38.    NBK knew that any return on its investments in Fairfield Sentry would be earned in New York through BLMIS purportedly engaging in the purchase and sale of U.S. securities, options, and Treasurys.

39.    By investing in Fairfield Sentry, NBK intentionally directed investments to BLMIS in New York, giving BLMIS custody of substantially all of the assets NBK invested in Fairfield Sentry.

40.    To invest in Fairfield Sentry, NBK executed subscription agreements through which it affirmed having received and read Fairfield Sentry's private placement memorandum ("PPM"). The PPM informed NBK that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Fairfield Sentry's BLMIS investment advisory accounts.

41.    The Fairfield Sentry PPM set forth the roles BLMIS performed on behalf of Fairfield Sentry. Before investing in Fairfield Sentry, NBK received and reviewed the August 14, 2006 Fairfield Sentry PPM, which contained the following terms:

(a)    "[t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM')";

(b)    "BLM is authorized to determine the price and timing of stock and options transactions in [Fairfield Sentry's] account"; and

(c)    "substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of [Fairfield Sentry]."

42.    Moreover, NBK knew from the PPM that Fairfield Sentry's performance depended on BLMIS and its personnel in New York. Specifically, the PPM disclosed that:

(a)    "[t]he services of BLM and its personnel are essential to the continued operation of the Fund [Fairfield Sentry], and its profitability, if any;" and

(b)    "their absence would have an adverse impact upon an investment in the Fund [Fairfield Sentry]."

8

43.    By executing the Fairfield Sentry subscription agreements, NBK voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.

44.    When NBK executed a Fairfield Sentry subscription agreement in March 2007, NBK "irrevocably submit[ed] to the jurisdiction of New York courts" and agreed "that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York" and "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."

45.    The Fairfield Sentry subscription agreements that NBK executed required NBK to direct its subscription payments to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York.

46.    Further, NBK used other New York bank accounts to receive transfers of BLMIS customer property through Fairfield Sentry.  NBK used its custodial bank Euroclear Bank S.A./Fundsettle's account at The Bank of New York in New York to receive redemptions from Fairfield Sentry.  In this account, NBK received at least 28 redemption payments, all of which the Trustee seeks to recover from NBK as subsequent transfers of customer property.

47.    NBK maintains a New York branch, located at 299 Park Avenue, New York, New York, which was central to its investments with Fairfield Sentry.  NBK completed a USA PATRIOT Act Certification warranting that NBK's New York branch is "a resident of the United States at the following street address: 299 Park Avenue, 17th Floor, NY 10171-0023."

48.    In January 2007, NBK negotiated and entered into a Letter of Understanding with New York-based FGG management company Fairfield Greenwich Limited ("FG Limited") that included a New York choice of law provision. FGG partner Daniel Lipton executed the agreement in New York on behalf of FG Limited and sent the executed copy to NBK from FGG's New York headquarters.

49.    According to the terms of the Letter of Understanding, NBK and FG Limited agreed that their relationship was governed by New York law: the "rights and obligations of the parties hereto shall be governed and construed in accordance with the laws of the State of New York." NBK received retrocession payments for placing money with Fairfield Sentry as an incentive for investing. FG Limited paid NBK 40 basis points of the 1% per annum management fee FG Limited charged for investing in Fairfield Sentry. NBK received at least six retrocession payments totaling $451,124 over the 21-month life of NBK's investment in Fairfield Sentry, all of which the Trustee seeks to recover from NBK as subsequent transfers of customer property in this proceeding.

50.    Under the terms of the Letter of Understanding, these retrocession payments were to be paid to an account at NBK's New York branch in the name of "National Bank of Kuwait, New York[.]"

51.    Additionally, under the terms of the Letter of Understanding, notices were to be sent to Dan Lipton at Fairfield Greenwich Limited, 919 Third Avenue, New York, NY 10022 or by telephone or fax at New York telephone numbers.

52.    NBK directed Fairfield Sentry and BLMIS-related activities towards New York. NBK knew Fairfield Sentry was managed and operated from FGG's headquarters in New York. In connection with its Fairfield Sentry investments, NBK directed telephone and email communications regarding its investments in Fairfield Sentry to FGG's New York headquarters.

10

53.    Philip Toub, an FGG partner based in New York, was responsible for managing FGG's relationship with NBK.  Toub operated as NBK's primary contact regarding its investments in and redemptions from Fairfield Sentry.  NBK personnel also communicated with FGG's New York-based representatives Lauren Ross, who served as FGG's Senior Vice President for Investor Relations, and Lina Pava regarding NBK's Fairfield Sentry investments.  Additionally, NBK received marketing materials, PPMs, a Letter of Understanding, subscription agreements, and weekly fund reports on the SSC Strategy's purported performance from FGG's New York office.

54.    NBK is also subject to the jurisdiction of this Court because it filed a customer claim with the Trustee.  In accordance with the claims procedure order, the Trustee determined and denied NBK's customer claim.  In its objection to the Trustee's denial of its claim, NBK indicated its "express purpose" for investing in Fairfield Sentry was to direct assets to BLMIS in New York.  Elsewhere in its objection, NBK maintained that it "may not have 'deposited cash with' BLMIS in the sense of handing it directly to BLMIS, but the facts indisputably show that [NBK] handed [its] cash to [Fairfield Sentry] specifically for deposit with and management by BLMIS."

55.    NBK thus derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

56.    NBK should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

### B.    Defendant NBK Suisse

57.    NBK Suisse is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New

York and knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

58.    NBK Suisse invested in Fairfield Sentry, which was created, operated, and controlled by FGG, a *de facto* partnership based in New York, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

59.    NBK Suisse knew that Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS.

60.    NBK Suisse knew that any return on its investments in Fairfield Sentry would be earned in New York through BLMIS purportedly engaging in the purchase and sale of U.S. securities, options, and Treasurys.

61.    By investing in Fairfield Sentry, NBK Suisse intentionally directed investments to BLMIS in New York, giving BLMIS custody of substantially all of the assets NBK Suisse invested in Fairfield Sentry.

62.    To invest in Fairfield Sentry, NBK Suisse, through its agents, executed subscription agreements through which NBK Suisse affirmed having received and read Fairfield Sentry's PPM. The PPM informed NBK Suisse that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Fairfield Sentry's BLMIS investment advisory accounts.

63.    The Fairfield Sentry PPM set forth the roles BLMIS performed on behalf of Fairfield Sentry.  Before investing in Fairfield Sentry, NBK Suisse received and reviewed the August 14, 2006 Fairfield Sentry PPM, which contained the following terms:

(a)    "[t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM')";

(b)    "BLM is authorized to determine the price and timing of stock and options transactions in [Fairfield Sentry's] account"; and

(c)     "substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of [Fairfield Sentry]."

64.    Moreover, NBK Suisse knew from the PPM that Fairfield Sentry's performance depended on BLMIS and its personnel in New York. Specifically, the PPM disclosed that:

(a)     "[t]he services of BLM and its personnel are essential to the continued operation of the Fund [Fairfield Sentry], and its profitability, if any;" and

(b)     "their absence would have an adverse impact upon an investment in the Fund [Fairfield Sentry]."

65.    By executing Fairfield Sentry subscription agreements through its agents, NBK Suisse voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.

66.    The Fairfield Sentry subscription agreement required NBK Suisse to "irrevocably submit to the jurisdiction of New York courts" and agree "that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York" and "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."

67.    The Fairfield Sentry subscription agreements required NBK Suisse to direct its subscription payments to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.

68.    In October 2008, NBK Suisse negotiated and entered into a Letter of Understanding with New York-based FGG management company FG Limited that included a New York choice of law provision. New York-based FGG Executive Director and Chief Operating Officer Mark McKeefry executed the agreement on behalf of FG Limited.

13

69.    According to the terms of the Letter of Understanding, NBK Suisse and FG Limited agreed that their relationship was governed by New York law: the "rights and obligations of the parties hereto shall be governed and construed in accordance with the laws of the State of New York." Under the agreement, FG Limited paid NBK Suisse for placing money with Fairfield Sentry as an incentive for investing. FG Limited agreed to pay NBK Suisse 40 basis points of the 1% per annum management fee FG Limited charged for investing in Fairfield Sentry.

70.    Under the terms of the Letter of Understanding, these retrocession payments were to be paid to an account at NBK's New York branch in the name of "National Banque Privee Suisse SA[.]"

71.    Additionally, under the terms of the Letter of Understanding, notices were to be sent to Mark McKeefry at Fairfield Greenwich Limited, 55 East 52nd Street 33rd Floor, New York, NY 10055 or by telephone or fax at New York telephone numbers.

72.    NBK Suisse directed its Fairfield Sentry and BLMIS-related activities towards New York. NBK Suisse knew Fairfield Sentry was managed and operated from FGG's headquarters in New York. In connection with its Fairfield Sentry investments, NBK Suisse directed telephone and email communications regarding its investments in Fairfield Sentry to FGG's New York headquarters.

73.    Toub and Pava, who were both based in New York, operated as NBK Suisse's primary contacts regarding its investments in and redemptions from Fairfield Sentry. Additionally, NBK Suisse personnel received PPMs, Letters of Understanding, and subscription documents from FGG's New York office.

74.    NBK Suisse is also subject to the jurisdiction of this Court because it filed a customer claim with the Trustee. In accordance with the claims procedure order, the Trustee

determined and denied NBK Suisse's customer claim.  In its objection to the Trustee's denial of

its claim, NBK Suisse indicated its "express purpose" for investing in Fairfield Sentry was to direct

assets to BLMIS in New York.  Elsewhere in its objection, NBK Suisse maintained that it "may

not have 'deposited cash with' BLMIS in the sense of handing it directly to BLMIS, but the facts

indisputably show that [NBK Suisse] handed [its] cash to [Fairfield Sentry] specifically for deposit

with and management by BLMIS."

75.    NBK Suisse thus derived significant revenue from New York and maintained

minimum contacts and general business contacts with the United States and New York in

connection with the claims alleged herein.

76.    NBK Suisse should therefore reasonably expect to be and is subject to personal

jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003)

and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## VI.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

77.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a

broker dealer with the United States Securities and Exchange Commission.  In 2001, Madoff

changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability

company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter

as its chairman and chief executive.

78.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory Authority

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At

all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership

is contingent on registration of the broker-dealer with the SEC.

79.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

80.    BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

81.    For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

82.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.

At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

83.      At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

84.      BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

85.      To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

86.      On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

<u>Madoff's Investment Strategy</u>

87.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

88.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

89.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s, this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s, the strategy was purportedly used in only a small percentage of BLMIS accounts.

90.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

91.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

92.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

93.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

94.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

95.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

96.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are

no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

97.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

98.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

BLMIS's Fee Structure

99.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

BLMIS's Market Timing

100.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

101.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

102.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

103.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### No Evidence of BLMIS Trading

104.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

105.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

The Collapse of the Ponzi Scheme

106.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

107.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

108.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

109.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

110.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

111.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

112.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

113.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

114.    Of the Judgment Amount, approximately $2,900,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

115.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    Subsequent Transfers from Fairfield Sentry to NBK**

116.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to NBK.  Based on the Trustee's investigation to date, the

subsequent transfers to NBK total $17,585,510 ("NBK Subsequent Transfers"). A chart setting forth the presently known NBK Subsequent Transfers is attached as Exhibit C.

117. On August 25, 2011, the Trustee filed this action seeking recovery of the NBK Subsequent Transfers.

118. The NBK Subsequent Transfers are recoverable from NBK under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

119. The NBK Subsequent Transfers represent a redemption of equity interests by NBK as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the NBK Subsequent Transfers to NBK upon redemption of its interests.

120. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and NBK Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

### C.   Subsequent Transfers from Fairfield Sentry to NBK Suisse

121. Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to NBK Suisse. Based on the Trustee's investigation to date, the subsequent transfers to NBK Suisse total $1,590,013 ("NBK Suisse Subsequent Transfers" and along with the NBK Subsequent Transfers, "Subsequent Transfers"). A chart setting forth the presently known NBK Suisse Subsequent Transfers is attached as Exhibit D.

122. The NBK Suisse Subsequent Transfers are recoverable from NBK Suisse under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

123.    The NBK Suisse Subsequent Transfers represent a redemption of equity interests by NBK Suisse as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the NBK Suisse Subsequent Transfers to NBK Suisse upon redemption of its interests.

124.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and NBK Suisse Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE
## RECOVERY OF THE SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550

125.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

126.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

127.    Defendants are immediate or mediate transferees of the Subsequent Transfers from Fairfield Sentry.

128.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendants as follows:

(a)    Recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate;

(b)    If Defendants challenge the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550 and 15 U.S.C. § 78fff-2(c)(3);

(c)    Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by Defendants; and

(d)    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: July 11, 2022
New York, New York

*/s/ David J. Sheehan*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Elizabeth McCurrach
Email:  emccurrach@bakerlaw.com
David Choi
Email: dchoi@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*