**Hearing Date: January 18, 2023 at 10:00 a.m. (ET)**
**Objection Deadline: November 14, 2022**
**Reply Deadline: December 21, 2022**

**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

*Attorneys for Defendant UBS Europe SE*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Proc. No. 12-01577 (CGM) |
| Plaintiff, | |
| v. | |
| UBS EUROPE SE, formerly known as UBS Deutschland AG, as successor in interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor in interest to Dresdner Bank (Schweiz) AG, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UBS**
**EUROPE SE'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 3

ARGUMENT ............................................................................................................. 5

I.      Applicable Legal Standards ................................................................. 5

II.    The Court Lacks Personal Jurisdiction Over UBS Europe ................... 6

      A.    The Trustee Fails to Plead Any Basis
            for the Court to Exercise Successor Jurisdiction ........................ 7

      B.    The Trustee Alleges No Jurisdictionally Relevant
            Contacts Between UBS Europe and the United States ............... 11

           1.    UBS Europe Is Not Subject to
                 the Court's General Jurisdiction ................................. 11

           2.    UBS Europe Is Not Subject to
                 the Court's Specific Jurisdiction ................................. 12

III.   The Section 546(e) Safe Harbor Shields All of
      The Alleged Subsequent Transfers To DBLA ..................................... 13

      A.    The Alleged Initial Transfers Were Made by or to a Covered Entity ...... 14

      B.    The Alleged Initial Transfers Were Settlement Payments
            Made in Connection With a Securities Contract ..................... 15

           1.    The Alleged Initial Transfers Were Settlement Payments
                 Made in Connection With BLMIS Securities Contracts ............. 15

           2.    The Alleged Initial Transfers Were Made in
                 Connection With Other Securities Contracts ............................. 16

      C.    All of the Relevant Transfers Pre-Date the Two-Year
            Pre-Filing Period and, Therefore, are Time-Barred ................. 18

      D.    Section 546(e) Does Not Contain a "Knowledge" Exception ................ 18

IV.   The Trustee Fails to Allege Facts Establishing That DBLA Was a
      "Mediate or Immediate Transferee" that Exercised "Dominion and
      Control" over Any Initial Transfer—as Opposed to a "Mere  Conduit"
      Bank Acting for and on Behalf of its Client Principals ....................... 20

V.    The Amended Complaint Establishes UBS Europe's Good-Faith Defense ........ 23

      A.    Value ................................................................................... 23

      B.    Good Faith ........................................................................... 24

      C.    Without Knowledge Of Voidability ....................................... 26

CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

CASES

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*,
   96 F. Supp. 3d 182 (S.D.N.Y. 2015).........................................................................5

*AEP-PRI Inc. v. Galtronics Corp*.,
   2013 WL 4400833 (S.D.N.Y. Aug. 13, 2013)..........................................................5

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
   457 F. Supp. 3d 401 (S.D.N.Y. 2020)......................................................................6

*Arabi v. Javaherian*,
   2014 WL 3892098 (E.D.N.Y. May 1, 2014) .........................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................6

*Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*,
   270 F. App'x 52 (2d Cir. 2008) ..............................................................................15

*Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc. (In re Warnaco Grp., Inc.)*,
   2006 WL 278152 (S.D.N.Y. Feb. 2, 2006).......................................................21, 22

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020).......................................7, 8, 10, 12

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
   397 B.R. 1 (S.D.N.Y. 2007).....................................................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................6

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
   838 F.2d 890, 896 (7th Cir. 1988) ...............................................................21, 22, 23

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*,
   803 F.3d 835 (7th Cir. 2015) ..............................................................................26, 27

*Christy v. Alexander & Alexander of N.Y., Inc.*
   *(In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson and Casey)*,
   130 F.3d 52 (2d Cir. 1997)............................................................................2, 3, 21

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014).........................................................................................5, 11, 12

i

*DiStefano v. Carozzi N. Am., Inc.*,
    286 F.3d 81 (2d Cir. 2001)...................................................................................5

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014).............................................................................5, 12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)..........................................................................................5, 6

*ILKB, LLC v. Singh*,
    2021 WL 2312951 (E.D.N.Y. June 7, 2021) ..........................................................8

*King Cnty. v. IKB Deutsche Industriebank AG*,
    769 F. Supp. 2d 309 (S.D.N.Y. 2011)......................................................................5

*Law v. Siegel*,
    571 U.S. 415 (2014)...............................................................................................19

*Lelchook v. Societe Generale De Banque Au Liban SAL*,
    2021 WL 4931845 (E.D.N.Y. Mar. 31, 2021)...........................................7, 10, 11

*Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*,
    33 F.3d 42 (10th Cir. 1994) ...................................................................................22

*Menotte v. United States (In re Custom Contractors, LLC)*,
    745 F.3d 1342 (11th Cir. 2014) .............................................................................22

*Meoli v. Huntington Nat'l Bank*,
    848 F.3d 716 (6th Cir. 2017) .................................................................................22

*Merit Mgmt. Grp. v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018)..............................................................................13, 19, 20

*In re Merkin*,
    817 F. Supp. 2d 346 (S.D.N.Y. 2011), *vacated in part on other grounds*,
    2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015)......................................................19

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 96 (Bankr. Del. 2010) .............................................................................22

*Minnie Rose LLC v. Yu*,
    169 F. Supp. 3d 504 (S.D.N.Y. 2016).......................................................................4

*New York v. Nat'l Serv. Indus., Inc.*,
    460 F.3d 201 (2d Cir. 2006).....................................................................................7

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*,
    848 F.2d 1196 (11th Cir. 1988) .............................................................................22

*Papasan v. Allain*,
478 U.S. 265 (1986)...................................................................................................6

*Picard v. ABN Amro N.A. (In re Madoff)*,
2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) .............................................24

*Picard v. BNP Paribas S.A. (In re Madoff)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)...................................................................20

*Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*,
12 F.4th 171 (2d Cir. 2021) ...................................................................................24

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .............................................14

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014)..............................................................2, 13, 14, 15, 16, 17

*Picard v. The Gerald and Barbara Keller Fam. Tr. (In re Madoff)*,
634 B.R. 39 (Bankr. S.D.N.Y. 2021) ...............................................................2, 21

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001).......................................................................6

*Rupp v. Markgraf*,
95 F.3d 936 (10th Cir. 1996) .................................................................................22

*Schenin v. Micro Cooper Corp.*,
272 F. Supp. 523 (S.D.N.Y. 1967) ...........................................................................8

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
516 B.R. 18 (S.D.N.Y. 2014), *disapproved of on other grounds sub nom. Picard v. Citibank
(In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171 (2d Cir. 2021) ...................................27

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
234 B.R. 293 (Bankr. S.D.N.Y. 1999) .............................................................21, 22

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) .....................................................................19

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715 (S.D.N.Y. 2012),
*aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014).............15

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................................14, 17, 18, 19

*SPV OSUS Ltd. v. UBS AG*,
114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ..........................5, 8

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..........................................................................12

*SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*,
    578 F. Supp. 3d 511 (S.D.N.Y. 2022)..................................................1, 2, 7, 9, 11

*Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*,
    534 F. Supp. 2d 1326 (S.D. Fla. 2008) ...................................................................22

*Tamam v. Fransabank Sal*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)......................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013).......................................................................................5

*In re Trib. Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)........................................................................14, 18, 20

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Tribune Co.*
    *Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016) .....................................22

## STATUTES

11 U.S.C. § 101(53A) ................................................................................................14, 15

11 U.S.C. § 546(e) .............................................................................2, 13, 14, 15, 16, 17, 19

11 U.S.C. § 548(a)(1)(A) ...........................................................................2, 13, 18, 19

11 U.S.C. § 550(a) ...........................................................................................2, 12, 19, 20

11 U.S.C. § 550(b) ........................................................................................................23

11 U.S.C. § 741(7) ........................................................................................................19

11 U.S.C. § 741(7)(A)(i)...........................................................................................16, 18

11 U.S.C. § 741(7)(A)(vii).........................................................................................16, 18

11 U.S.C. § 741(8) ........................................................................................................19

German Transformation Act § 123 ...............................................................................9

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021)....................................................24

Defendant UBS Europe SE ("**UBS Europe**"), formerly known as UBS Deutschland AG ("**UBS Deutschland**"), as alleged successor in interest to Dresdner Bank Lateinamerika AG ("**DBLA**"), respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) (made applicable by Fed. R. Bankr. P. 7012), to dismiss Count One of the Amended Complaint (No. 12-1577, ECF No. 105) (the "**Amended Complaint**")[1] filed on July 14, 2022 by Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") and the chapter 7 Estate of Bernard L. Madoff (the "**Trustee**").

## PRELIMINARY STATEMENT

The Trustee's attempt to recover alleged subsequent transfers from UBS Europe fails for at least four independent reasons.

*First*, the Trustee fails to plead a basis for this Court to exercise "successor jurisdiction" over UBS Europe—that is, a basis upon which the Court could impute the jurisdictional contacts of DBLA to UBS Europe, as the alleged successor-in-interest to DBLA. The exercise of successor personal jurisdiction is permitted only under a narrow set of circumstances: where the predecessor and successor "remain one and the same after some corporate-restructuring event (i.e., a merger or its equivalent)." *SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 536 (S.D.N.Y. 2022). The Trustee does not and cannot meet its burden of pleading facts to show that the 2005 DBLA-UBS transaction satisfies this standard. Instead, the agreements entered into between DBLA and UBS make clear that DBLA merely transferred to UBS Europe the assets comprising the private-banking operations of DBLA's business, which falls far short of a "merger" or "equivalent" fusion of those two distinct entities that could render them "one and the same" for

---

[1] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Amended Complaint.

jurisdiction purposes.  *Id.*  Thus, DBLA's jurisdictional contacts cannot be imputed to UBS Europe, and there is no other basis pleaded for asserting jurisdiction over UBS Europe.

*Second*, even setting aside that jurisdictional infirmity, the Trustee fails to state an actionable claim for relief as against UBS Europe because recovery of the transfers he seeks to recoup is barred by the safe harbor of Bankruptcy Code section 546(e).  Permitting the Trustee to proceed with this litigation would undermine the protection of the securities markets that Congress intended and "cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)."  *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 420 (2d Cir. 2014).  The alleged transfers were "settlement payments" and made in connection with "securities contract[s]," and therefore are subject to 546(e) in all respects.  And the sole exception to section 546(e)—section 548(a)(1)(A)—does not apply here because all of the transfers allegedly made to DBLA were made more than two years before the Filing Date.

*Third*, the Amended Complaint fails to allege facts supporting a plausible inference that DBLA was acting, in connection with these transactions, as anything other than a mere conduit for the customers of its "banking and wealth management operations," Am. Compl. ¶ 54—and, thus, fails to allege that DBLA was itself a transferee of any alleged transfer.  Section 550(a) limits the Trustee's recovery of avoided transfers to a "transferee."  11 U.S.C. § 550(a).  Relying on Second Circuit precedent, this Court has held that a party is considered a transferee only when it exercises "dominion over the money or other asset, the right to put the money to one's own purpose."  *Picard v. The Gerald and Barbara Keller Fam. Tr. (In re Madoff)*, 634 B.R. 39, 49–50 (Bankr. S.D.N.Y. 2021) (Morris, J.) (quoting *Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson and Casey)*, 130 F.3d 52, 57 (2d Cir. 1997)).  Here, there is no allegation that DBLA determined whether or when to invest or redeem clients' shares

in the Fairfield Funds, or otherwise controlled any of the amounts received from those funds. Rather, the Trustee alleges only that DBLA received money from the Fairfield Funds. Am. Compl. ¶¶ 3, 6, 99, 104. The "mere receipt" of money, even if traceable to an initial avoidable transfer, is insufficient to establish liability under section 550(a). *In re Finley*, 130 F.3d at 57.

*Fourth*, the Trustee's claims must be dismissed in any event because the Amended Complaint establishes UBS Europe's good-faith defense as a matter of law—i.e., that a diligent inquiry would not have discovered the fraudulent purpose of BLMIS's alleged initial transfers. Indeed, the Trustee simply wishes away the fact that BLMIS duped thousands of sophisticated customers and operated under the regulatory eye of the SEC, which, even after investigating BLMIS, was unable to unearth Madoff's Ponzi scheme.

## FACTUAL BACKGROUND

The Trustee's claims in this action are based on subsequent transfers of BLMIS customer property allegedly received by the Defendants when "each was a subsidiary of Dresdner Bank AG, one of the largest banks in Germany." Am. Compl. ¶ 7. The Trustee alleges that Fairfield Sentry Limited ("**Sentry**") and Fairfield Sigma Limited ("**Sigma**," and together with Sentry, the "**Fairfield Funds**") had direct customer accounts with BLMIS, and that BLMIS made fraudulent "Initial Transfers" to the Fairfield Funds, which then subsequently transferred "at least $9,296,416" of the Initial Transfers to DBLA (the "**Subsequent Transfers**"). *Id.* ¶¶ 2–3. DBLA allegedly received the Subsequent Transfers "by redeeming, at the reported net asset value on the redemption date, shares of the Fairfield Funds previously purchased." *Id.* ¶ 5. Such purchase and redemptions "were governed by the subscription agreements [DBLA] entered into with the Fairfield Funds." *Id.*

The Trustee alleges that DBLA received Subsequent Transfers of $7,418,486 from Sentry and $1,877,930 from Sigma. *Id.* ¶ 6. None of the Subsequent Transfers allegedly made to DBLA were made within two years of the Filing Date (December 11, 2008). *See* Am. Compl., Exs. C, E.

The Trustee seeks to recover the Subsequent Transfers from UBS Europe "as successor in interest to DBLA." *Id.* ¶ 15. The Amended Complaint alleges that "DBLA sold its banking and wealth management operations to a subsidiary of UBS AG ('UBS'), and UBS merged DBLA into UBS Deutschland" (which later changed its name to UBS Europe). *Id.* ¶ 54. The Trustee's conclusory allegation, however, is manifestly false. As the transaction documents make clear,[2] DBLA's sale of its private banking business was structured as a "hive down," a transaction in which one company (the seller) transfers designated assets or parts of its business to a new subsidiary, followed by the sale of the subsidiary's shares to the buyer. Thus, pursuant to the Hive Down Plan and related agreements governing the transaction, DBLA transferred all assets pertaining to its private banking business in Germany to a newly formed subsidiary ("NewCo"), the shares of which were then purchased, in turn, by UBS Wealth Management AG—as UBS Europe was then known.[3] *See* Ex. 1 (Hive Down Plan) at p. 3.[4]

---

[2] The Court may consider these documents in connection with UBS Europe's motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(2). *See Minnie Rose LLC v. Yu*, 169 F. Supp 3d 504, 510 (S.D.N.Y. 2016) ("courts may rely on additional materials outside the pleading when ruling on 12(b)(2) motions").

[3] In subsequent years, UBS Wealth Management AG twice changed its name and corporate form: first becoming UBS Deutschland, and later UBS Europe, which is the name that the entity has retained to this day. Am. Compl. ¶ 54. For simplicity's sake, throughout this memorandum "UBS Europe" will encompass all references to the then-extant UBS Wealth Management AG and UBS Deutschland.

[4] Unless otherwise indicated, all exhibits cited herein are attached to the Declaration of Marshall R. King.

## ARGUMENT

### I.    Applicable Legal Standards

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction" over "each defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *King Cnty. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 313 (S.D.N.Y. 2011). "Although ambiguities in the pleadings should be resolved in the plaintiff's favor, 'conclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a prima facie showing of jurisdiction.'" *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) (quoting *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010)). "In considering a motion to dismiss under Rule 12(b)(2), the Court may consider extrinsic evidence such as affidavits and other supporting materials." *AEP-PRI Inc. v. Galtronics Corp.*, 2013 WL 4400833, at *3 (S.D.N.Y. Aug. 13, 2013). If "the [extrinsic] documents contradict the allegations of a plaintiff's complaint, the documents control and the court need not accept as true the allegations in the complaint." *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) (alterations omitted).

"In assessing whether a defendant has the requisite 'minimum contacts' with the forum, courts distinguish between 'general' and 'specific' personal jurisdiction." *SPV OSUS Ltd.*, 114 F. Supp. 3d at 167 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)). General jurisdiction "permits a court to hear 'any and all claims' against an entity" that is "'essentially at home'" in the forum. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134–35 (2d Cir. 2014) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Specific jurisdiction, by contrast, permits the court to exercise jurisdiction "only over issues that 'arise out of or relate to the entity's contacts with the forum.'" *Id.* (alterations omitted) (quoting *Helicopteros Nacionales*

*de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  In either case, "[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 407 (S.D.N.Y. 2020).

The Court must dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Moreover, the allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A plausible claim pleads facts "that allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

While the Court must accept well-pled factual allegations as true, it need not accept assertions that are unsupported by factual allegations. *Id.* at 678–79.  Nor must the Court accept "legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely," *Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

## II.    The Court Lacks Personal Jurisdiction Over UBS Europe

The Trustee fails to plead a prima facie case of personal jurisdiction over UBS Europe, either based on successor-inherited jurisdiction or on UBS Europe's own forum contacts. Accordingly, the Amended Complaint should be dismissed in its entirety as against UBS Europe for lack of personal jurisdiction.

6

### A.    *The Trustee Fails to Plead Any Basis for the Court to Exercise Successor Jurisdiction*

The Trustee does not even attempt to allege that UBS Europe is subject to personal jurisdiction in this Court by virtue of its own contacts with the United States. Instead, the Trustee claims only that "UBS Europe is subject to personal jurisdiction in this judicial district as successor in interest to DBLA." Am. Compl. ¶ 15.

The Trustee's attempt to invoke a theory of "successor jurisdiction" here runs afoul of well-settled law. It is predicated on the demonstrably false assumption that the so-called "successor-in-interest" of a business that has changed ownership automatically inherits the jurisdictional contacts of its preceding owner.[5] That is fundamentally wrong. As courts in this Circuit have stated time and again, "[a] successor-in-interest may be subject to jurisdiction based on the activities of its predecessor" *only* in the narrow circumstance "where a predecessor and successor remain one and the same after some corporate-restructuring event (i.e., a merger or its equivalent)." *SUEZ Water N.Y. Inc.*, 578 F. Supp. 3d at 536. By contrast, "where the 'successor' has merely acquired the assets of the predecessor company[,] the jurisdictional contacts are not imputed." *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *16 (E.D.N.Y. Nov. 25, 2020) (alterations omitted). "'Continuity of ownership is the essence of a merger' and is what helps [courts] distinguish a merger from an asset sale." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 211 (2d Cir. 2006) (citation omitted). The party seeking to establish successor

---

[5]    UBS Europe does not concede, and reserves for another day, the question of whether it is a "successor-in-interest" to DBLA for purposes of *liability* on the Trustee's underlying claim. But the law is clear that even where successor liability is established, successor jurisdiction is a different question. *See Lelchook v. Societe Generale De Banque Au Liban SAL*, 2021 WL 4931845, at *2–3 (E.D.N.Y. Mar. 31, 2021*)* (noting that "[successor] [j]urisdiction and liability are of course two distinct considerations," and thus "[w]hile [alleged successor-in-interest] SGBL may be liable for any liability it assumed in the [parties' Sale and Purchase Agreement], that d[id] not address whether SGBL [wa]s subject to jurisdiction in New York").

jurisdiction bears the burden of adducing evidence of continuity of ownership. *See Schenin v. Micro Cooper Corp.*, 272 F. Supp. 523, 526 (S.D.N.Y. 1967).

The Trustee comes nowhere close to meeting that burden here—nor could he. Indeed, his treatment of this issue is limited to a single, bald, erroneous assertion in the Amended Complaint that "in 2005, . . . UBS merged DBLA into UBS [Europe]." Am. Compl. ¶ 54. This "conclusory non-fact-specific jurisdictional allegation" of a purported DBLA-UBS merger unequivocally "does not establish a prima facie showing of [successor] jurisdiction." *SPV OSUS Ltd.*, 114 F. Supp. 3d at 167; *see ILKB, LLC v. Singh*, 2021 WL 2312951, at *3 (E.D.N.Y. June 7, 2021) (holding that successor jurisdiction did not attach where counter-plaintiff's allegations concerning purported merger were "merely conclusory"). The Trustee says nothing else on this matter in the Amended Complaint, nor has he adduced any actual evidence to meet his burden. In fact, the statement that DBLA was involved in any merger with any UBS entity is objectively wrong. Indeed, the allegation of a "merger" between DBLA and UBS Europe conflicts with the concession, in the very same sentence, that DBLA simply sold "its banking and wealth management operations"—and not the entire company—to UBS Europe. Am. Compl. ¶ 54. These significant deficiencies in the Trustee's pleading compel dismissal of the Amended Complaint as against UBS Europe. *See, e.g.*, *Bartlett*, 2020 WL 7089448, at *17 ("Plaintiffs d[id] not allege continuity of ownership" in their amended pleading and therefore "fail[ed] to establish successor-inherited personal jurisdiction over [alleged successor-in-interest entity]"); *Schenin*, 272 F. Supp. at 526 (plaintiff "failed to adduce a single shred of probative evidence that the transaction was anything but an acquisition of assets" and thus "there exist[ed] no basis in law or reason to impute to [alleged successor-in-interest], for jurisdictional purposes, activities of [predecessor entity]").

8

In fact, the contracts governing the DBLA-UBS transaction affirmatively ***disprove*** the Trustee's conclusory "merger" allegation. Under the governing documents, in effectuating the sale of DBLA's private banking business in Germany, DBLA transferred *assets* to a newly formed subsidiary, and UBS Europe then acquired shares of the subsidiary, not DBLA itself. *See* Hive Down Plan at Preamble ("all ***assets*** pertaining to the private clients business . . . shall be transferred in totality to . . . 'NewCo'[] by means of a hive-down," and " immediately after the consummation of the hive-down, the share ***held in NewCo*** shall be transferred to UBS" (emphases added)).

Plainly, this was not a merger. First and foremost, the very essence of a merger is that the "predecessor and successor remain one and the same" post-transaction, *SUEZ Water N.Y. Inc.*, 578 F. Supp. 3d at 536—but here, UBS Europe and DBLA remained entirely separate entities after the transaction was consummated. Indeed, a hive down, by its very nature, is the opposite of a transaction in which predecessor and successor are "one and the same": a hive down is a transfer that "only involves part of the assets" of the transferring company, such as when the company "incorporates a subsidiary and transfers parts of its assets to that subsidiary," and then sells the subsidiary to an acquiring company. Ex. 2 (Rüdiger Veil, *Issues and Challenges in Corporate and Capital Market Law – The German Law on Transformation*, at 6 (2018) (citing German Transformation Act § 123 para. 3)).

And that is precisely what took place here. In accordance with the transaction documents, DBLA effectuated a transfer of only its German private banking division—and only select parts of it at that—to NewCo, while expressly ***excluding*** from the hive down a whole host of assets and other components of DBLA's business that DBLA retained, including the following: "The movable assets attributable to [DBLA's] PB Business Germany, in particular, the entire inventory of PB Business Germany at the Hamburg location," *see* Hive Down Plan § 4.2; numerous

9

"customer relationships" belonging to DBLA, *see id.* § 4.6; the continued use of "the DBLA

company names and logos [] or any variations thereof" (except for a brief period following the

closing date), *id.* § 12.1; and "[t]he use of credit cards currently issued to customers of PB Business

Germany," *id.* § 12.2.[6]

Further, there is simply "no merger where [the] predecessor survives the transaction as a

distinct . . . entity." *Bartlett*, 2020 WL 7089448, at *17.  Here, there is no question that DBLA

survived post-hive down: the very structure of the DBLA hive down contemplated that only

designated parts of its business would be sold, while the rest of the company would remain intact

and continue to survive.  *See* waconsultant, NS Banking, *Dresdner Bank Lateinamerika Sells

Private          Banking          Business          to          UBS          (Dec.          21,          2004),

https://www.nsbanking.com/news/dresdner_bank_lateinamerika_sells_private_banking_business

_to_ubs/ (noting that the non-private banking business components of DBLA would "continue to

work" with one another following the DBLA-UBS transaction); *see, e.g.*, *Lelchook*, 2021 WL

4931845, at *2 ("the transaction d[id] not meet the definition of a merger" where, *inter alia,* the

predecessor "continue[d] to survive").

Moreover, the Trustee has not alleged or adduced any evidence of "continuity of

ownership—*i.e.*, that 'the shareholders of the predecessor corporation became direct or indirect

shareholders of the successor corporation as the result of the successor's purchase of the

predecessor's assets.'" *Bartlett*, 2020 WL 7089448, at *17.  Nor could he do so, because the

---

[6] *Cf. Arabi v. Javaherian*, 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014) (plaintiff had made a "prima facie showing that . . . the successor-in-interest to [predecessor] [wa]s subject to personal jurisdiction in New York," on the bases that, inter alia, "the management and personnel of [successor] are essentially the same as the management and personnel that [predecessor] had;" "[successor] operates its business from the same location as that from which [predecessor] had operated," "the customers and/or customer lists of [successor] are essentially the same that [predecessor] had;" and "[successor] assumed the . . . same assumed name as had been used by [predecessor]").

governing documents did not in any way provide for DBLA's ownership to remain in place post-transaction, or for shareholders of DBLA to receive any ownership interest in UBS Europe as a result of the transaction.

In addition, UBS Europe paid for the acquisition with *cash* rather than its own stock—which is a hallmark of an asset sale. *See* Ex. 3 (UBS 2005 Annual Report) at p. 162 ("[t]he cost of the acquisition was approximately CHF 136 million"); *see, e.g.*, *Lelchook*, 2021 WL 4931845, at *2 ("plaintiffs do not allege continuity of ownership between [alleged successor] and [alleged predecessor] given that it was an all-cash transaction").

Put simply, the Trustee has failed to meet its burden of showing that the "limited circumstances" for imputing DBLA's jurisdictional contacts to UBS Europe exist here, the governing transaction documents categorically refute any such contention, and the Trustee's invocation of successor jurisdiction must therefore be rejected. Further, because the Trustee "offers no alternative basis for the Court to exercise personal jurisdiction over [UBS Europe]," *SUEZ Water N.Y. Inc.*, 578 F. Supp. 3d at 538, this Court should dismiss the Trustee's Amended Complaint against UBS Europe for lack of personal jurisdiction.

**B.**    **The Trustee Alleges No Jurisdictionally Relevant Contacts Between UBS Europe and the United States**

Even if the Trustee had alternatively sought to assert jurisdiction based on **UBS Europe**'s own U.S.-based contacts (which he did not), the result remains the same. The Amended Complaint fails to allege facts demonstrating that this Court may exercise personal jurisdiction over UBS Europe and the Trustee's claim against UBS Europe must therefore be dismissed.

**1.**    **UBS Europe Is Not Subject to the Court's General Jurisdiction**

The facts alleged in the Amended Complaint fail to make out a case for asserting general jurisdiction over UBS Europe. As the Supreme Court made clear in *Daimler AG v. Bauman*, a

11

corporation typically is "at home"—and thus subject to general jurisdiction—only in its place of incorporation and its principal place of business. 571 U.S. at 138. Only in an "exceptional case" can a corporation's operations in another forum be "so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139.

This is no such "exceptional case." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018). UBS Europe is a foreign entity, with its headquarters in Frankfurt, Germany, *see* Am. Compl. ¶ 54, and the Amended Complaint does not allege any contacts between UBS Europe and the United States—let alone such systemic contacts as might suffice to render it "at home" in the United States for purposes of assessing general jurisdiction. That ends the inquiry. Because the Trustee "points to nothing that would render this an exceptional case" in which a foreign corporation is "essentially at home" in the United States, "*Daimler* bars the court's exercise [of] general jurisdiction over [] UBS [Europe]." *SPV Osus Ltd.*, 882 F. 3d at 343.

### 2.    UBS Europe Is Not Subject to the Court's Specific Jurisdiction

Nor can the Court exercise specific jurisdiction over UBS Europe. Specific jurisdiction restricts the court to exercise jurisdiction "only over issues that 'arise out of or relate to the entity's contacts with the forum.'" *Gucci Am.*, 768 F.3d at 134–35. Once again, the Amended Complaint does not include ***a single allegation*** regarding UBS Europe's purported contacts with the United States. *A fortiori*, there is no claim alleged that "arise[s] out of or relate[s] to [UBS Europe's] contacts with the forum," and, thus, no pleaded basis upon which this Court could exercise jurisdiction over UBS Europe in this case. *Bartlett*, 2020 WL 7089448, at *18 (alleged successor-in-interest's "own New York contacts d[id] not confer personal jurisdiction over [plaintiff's] claim" where "[n]one of Plaintiffs' allegations explain[ed] how [alleged successor's] conduct 'arose from' [its] New York contacts").

III.     **The Section 546(e) Safe Harbor Shields All of
         the Alleged Subsequent Transfers to DBLA**

      The Trustee's sole claim against UBS Europe is also barred by the "safe harbor" set forth

in section 546(e) of the Bankruptcy Code.   That claim seeks to recover subsequent transfers

allegedly made to DBLA, pursuant to Bankruptcy Code sections 105(a) and 550(a) and SIPA

section 78fff-2(c)(3) (which permits recovery of a transfer "if and to the extent that such transfer

is voidable or void under the provisions of title 11).   The Trustee may recover subsequently

transferred property, or its value, only to the extent that the initial transfer of such property by the

debtor is avoided under the Bankruptcy Code's avoidance provisions.   11 U.S.C. § 550(a).   "The

Code sets out a number of limits on the exercise of these avoiding powers," including the securities

safe harbor of Section 546(e), which bars all recovery sought by the Trustee here.   *Merit Mgmt.*

*Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018).

      Section 546(e) bars a trustee from avoiding a transfer (other than under section

548(a)(1)(A), which has only a two-year lookback period) if the transfer, *inter alia*, (1) was made

by or to a covered entity such as a stockbroker, financial institution, or financial participant; and

(2) was either a settlement payment or a transfer in connection with a securities contract:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer that is a . . . settlement payment, as defined in
> section 101 or 741 of this title, made by or to (or for the benefit of) a . . .
> stockbroker, financial institution, [or] financial participant, . . . or that is a transfer
> made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or]
> financial participant, . . . in connection with a securities contract, as defined in
> section 741(7), . . . that is made before the commencement of the case, except under
> section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

      "[I]n enacting the Bankruptcy Code, Congress struck careful balances between the need

for an equitable result for the debtor and its creditors, and the need for finality."   *Fishman*, 773

F.3d at 423.   "[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-

related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A)." *Id.* "Unwinding settled securities transactions . . . would seriously undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) ("***Tribune I***"). "Permitting the clawback of millions, if not billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder funds—would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *Fishman*, 773 F.3d at 420.

In an action to recover a subsequent transfer, the subsequent transferee may assert any defenses to avoidability of the initial transfer that the initial transferee could have asserted— including the section 546(e) safe harbor. *See Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*, 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). This is true even in cases where, as here, the alleged initial transferee settled with the Trustee and agreed to a consent judgment. *Id.* Although section 546(e) is an affirmative defense, a court can dismiss a complaint based on section 546(e) if its applicability is established on the face of the complaint or documents that are incorporated by reference into, or integral to, the complaint. *See id.* at *2.

## A.     *The Alleged Initial Transfers Were Made by or to a Covered Entity*

The alleged initial transfers at issue here were made by or to an entity covered by section 546(e) because those transfers were made by a "stockbroker."[7] The Bankruptcy Code defines the term "stockbroker" to include all entities that "engage[] in the business of effecting transactions in

---

[7]    UBS Europe reserves for later consideration, if necessary, the questions of (1) whether the transfers were made "to or for the benefit of" a financial institution because any alleged transfers to the Fairfield Funds were ultimately made to satisfy redemptions made by the funds' investors, which were financial institutions, *see SIPC v. Bernard L. Madoff Inv. Sec. LLC,* 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("***Cohmad***"); and (2) whether the transfers were "made by or to (or for the benefit of) a . . . financial participant," 11 U.S.C. § 546(e).

securities." 11 U.S.C. § 101(53A). The District Court in *Fishman* has already concluded that

BLMIS was a stockbroker:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC, clearly engaged in securities transactions. . . . [E]ven assuming the truth of the allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, ***Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions***.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (emphasis added),

*aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014). On appeal,

the Second Circuit affirmed the District Court's holding: "It is not disputed [by the Trustee] that

BLMIS was a 'stockbroker' for the purposes of § 546(e)." 773 F.3d at 417. These findings are

binding on the Trustee in this proceeding under the doctrine of collateral estoppel. *See Austin v.*

*Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x 52, 54 (2d Cir. 2008) (summary

order) ("[I]f a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third

parties unrelated to the original action can bar the litigant from relitigating that same issue in a

subsequent suit."). Because BLMIS is a "stockbroker," transfers made by BLMIS, including the

Fairfield Sentry Initial Transfers alleged in the Amended Complaint, were made by a covered

entity under section 546(e).

**B.    *The Alleged Initial Transfers Were Settlement Payments Made in Connection with a Securities Contract***

**1.    The Alleged Initial Transfers Were Settlement Payments Made in Connection with BLMIS Securities Contracts**

Section 546(e) applies to transfers from BLMIS to its account holders and shields them

from avoidance, both because the documents governing BLMIS customers' accounts constituted

securities contracts, and because the payments BLMIS made to those customers were made "in

connection with" those contracts and also constituted "settlement payments." *Fishman*, 773 F.3d at 417, 418–23. Either of those reasons would suffice to invoke the safe harbor.

A "securities contract" includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), as well as "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii); *see also Fishman*, 773 F.3d at 417 (section 741(7) "defines 'securities contract' with extraordinary breadth").

In *Fishman*, the Second Circuit held that section 546(e) shielded transfers between BLMIS and its account holders from the Trustee's avoidance powers. 773 F.3d at 417. The Second Circuit concluded that the documents governing BLMIS customers' accounts constituted securities contracts, and that the payments BLMIS made to those customers were made "in connection with" those contracts, and also constituted "settlement payments," *id*. at 418–23, though either of those findings would have independently sufficed to invoke the safe harbor. The Court rejected the Trustee's argument that the safe harbor did not apply because Madoff allegedly did not actually carry out the promised securities transactions. *Id*. at 419–20 ("Section 546(e) only requires that a covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities transaction.").

### 2.    The Alleged Initial Transfers Were Made in Connection with Other Securities Contracts

Even if the BLMIS Account Opening Agreements did not constitute "securities contracts" for purposes of section 546(e)—which they clearly do—the alleged initial transfers are still shielded from avoidance under 546(e) because they were made in connection with the Fairfield Funds' securities contracts with their own investors, including investment fund subscription agreements and redemption requests tendered pursuant thereto.

16

Section 546(e) applies to all transfers made "in connection with a securities contract," not just to a transfer in connection with a securities contract that is entered into between the initial transferor and transferee. If the Fairfield Funds withdrew funds from BLMIS to make payments pursuant to redemption requests or the terms of subscription agreements between them and their respective investors, then the withdrawals from BLMIS also would be a transfer made in connection with the securities contracts between the Fairfield Funds and their investors, and therefore would not be avoidable. As Judge Rakoff stated:

> Take, for example, a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract. Assuming that either the investment fund or the investor qualifies as a financial institution or financial participant, and barring other circumstances that may appear on the facts of a given case, that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

*Cohmad*, 2013 WL 1609154, at *9 (footnote omitted); *see Fishman*, 773 F.3d at 422 ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided.").

The Fairfield Funds entered into "securities contracts" with their investors pursuant to which the transfers were made to the Fairfield Funds, then to the investors, like DBLA, and the Fairfield Funds' relationships with their investors—including in respect of redemption payments—were governed by subscription agreements and associated redemption requests. *See* Am. Compl. ¶ 5 (alleging that "[t]he purchases and later redemptions of the shares in the Fairfield Funds were governed by the subscription agreements each entered into with the Fairfield Funds," and that "[t]he subscription agreements governed the time, manner, and circumstances under which DBLA and Dresdner Schweiz could make redemptions, and the protocol for valuing the shares at the time of redemption."). The definition of "securities contract" includes "a contract for

17

the purchase, sale, or loan of a security" or "any other agreement or transaction that is similar" to

such an agreement. 11 U.S.C. § 741(7)(A)(i), (vii). "The term 'redemption,' in the securities

context, means 'repurchase.'" *Tribune I*, 946 F.3d at 80. And as Judge Rakoff expressly noted in

*Cohmad*, "the definition of a securities contract . . . includes . . . investment fund subscription

agreements and redemption requests." *Cohmad*, 2013 WL 1609154, at *8. Thus, the Fairfield

Funds' agreements with their investors were "securities contracts," and any transfers from BLMIS

to the Fairfield Funds were made "in connection with" those securities contracts.

### C.   *All of the Relevant Transfers Pre-Date the Two-Year Pre-Filing Period and, Therefore, are Time-Barred*

Under section 548(a)(1)(A), a trustee may avoid only transfers made within two years

before the Filing Date (i.e., after December 11, 2006). Any transfer made before that date is

protected by section 546(e) and may not be avoided as a matter of law. Exhibits C and E to the

Amended Complaint set forth the alleged Subsequent Transfers to DBLA and make clear that *all*

of the alleged Subsequent Transfers to DBLA fall outside the two-year limitations period in section

548(a)(1). Thus, section 546(e) bars avoidance and recovery of all of the alleged transfers to

DBLA.

### D.   *Section 546(e) Does Not Contain a "Knowledge" Exception*

The Trustee may argue that section 546(e)'s safe harbor does not apply to UBS Europe

because the Fairfield Funds allegedly knew there was no actual "settlement payment" or "securities

contract" for any of Madoff's fictitious trading. *See Cohmad*, 2013 WL 1609154, at *3. This

argument fails because section 546(e) contains no such "knowledge" exception and, even if it did,

such an exception certainly would not apply to an *innocent subsequent transferee* like DBLA.

*First*, as noted above, even if there was no actual securities contract between BLMIS and

the Fairfield Funds, there still were securities contracts between the Fairfield Funds and their

investors, like DBLA, and there is no allegation that those securities contracts were not real. Thus, even if the Fairfield Funds, as initial transferees, knew that BLMIS was not trading securities, if they withdrew funds from BLMIS to make payments under securities contracts with their investors, then—as Judge Rakoff stated in *Cohmad*—the withdrawal from BLMIS would be a transfer made in connection with the securities contract between the initial transferee (the Fairfield Funds) and a subsequent transferee (DBLA) and would not be avoidable. 2013 WL 1609154, at *7.

*Second*, although the Trustee alleges that the Defendants were sophisticated investors with significant experience in asset management and investment funds, thus implying that DBLA *should have known* of BLMIS's fraud, he fails to allege that DBLA *actually* knew of the fraud. *See* Am. Compl. ¶¶ 87–90. Of course, mere knowledge of red flags about BLMIS says nothing about whether DBLA *knew* that BLMIS was running a multi-billion dollar Ponzi scheme. *See, e.g.*, *In re Merkin*, 817 F. Supp. 2d 346, 357 (S.D.N.Y. 2011) (holding that "allegations of Madoff-related red flags do not adequately plead scienter"), *vacated in part on other grounds*, 2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015).

*Third*, nothing in section 546(e) turns on the knowledge of the transferee. The only exception to section 546(e) is a claim under section 548(a)(1)(A), which involves actual fraudulent intent by the *transferor*. *See Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant"). Nor does knowledge play any role in the definitions of "settlement payment" or "securities contract." *See* 11 U.S.C. § 741(7), (8). Where the Bankruptcy Code creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional exceptions, even when doing so is motivated by a party's alleged wrongdoing. *See Law v. Siegel*, 571 U.S. 415, 424–25 (2014). Courts must adhere to the statute's "plain meaning."

*Merit*, 138 S. Ct. at 897. Permitting transferee knowledge to defeat the safe harbor would be inconsistent with the language and purpose of section 546(e), which reflects a balancing of interests by Congress to avoid "undermin[ing] . . . markets" by "[u]nwinding settled securities transactions." *Tribune I*, 946 F.3d at 90.

IV.     **The Trustee Fails to Allege Facts Establishing That DBLA Was a "Mediate or Immediate Transferee" that Exercised "Dominion and Control" over Any Initial Transfer—as Opposed to a "Mere Conduit" Bank Acting for and on Behalf of Its Client Principals**

Pursuant to Bankruptcy Code section 550(a), a trustee may recover a fraudulent transfer from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). The Trustee contends that UBS Europe (through DBLA) should be deemed an "immediate or mediate" transferee of initial transfers from BLMIS to the Fairfield Funds. Am. Compl. ¶ 114.

To plead a claim against an "immediate or mediate" (i.e., subsequent) transferee, "the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, 'that the funds at issue originated with the debtor.'" *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (citations omitted). "Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a claim to recover the subsequent transfer." *Id.* (citations omitted). To adequately plead a subsequent transfer claim, the Trustee "must allege the 'necessary vital statistics—the who, when, and how much—' of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.* (citations omitted). The Amended Complaint fails to plead a subsequent transfer claim and should therefore be dismissed.

Section 550(a) of the Bankruptcy Code limits recovery of transfers of property of the estate to "*transferee*[s]" of that property. 11 U.S.C. § 550(a) (emphasis added). A mere recipient of

money or other assets is not a transferee. *In re Finley*, 130 F.3d at 57. Rather, the Second Circuit

has adopted the "dominion and control test" pursuant to which a transferee must exercise

"dominion over the money or other asset," meaning "the right to put the money to [its] own

purposes." *Keller Fam. Tr.*, 634 B.R. at 49–50 (citing *In re Finley*, 130 F.3d at 57). Thus, section

550(a) is limited in scope and does not reach "every courier, every bank and every escrow agent"

that may have touched the assets at issue. *In re Finley*, 130 F.3d at 56.[8]

Under the dominion and control test, "mere conduits" of money are not transferees because

a "'mere conduit' . . . has no dominion or control over the asset; rather, it is a party with actual or

constructive possession of the asset before transmitting it to someone else. Mere conduits can do

no more than transmit a transferor-debtor's funds to a transferee." *Authentic Fitness Corp. v.

Dobbs Temp. Help Servs., Inc. (In re Warnaco Grp., Inc.)*, 2006 WL 278152, at *6 (S.D.N.Y. Feb.

2, 2006); *see also Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R.

1, 15 (S.D.N.Y. 2007) ("In other words, just because a party is not a 'mere conduit' in the

prototypical sense of the term—*i.e.*, a party that receives the money merely to pass it on to a third-

party—does not mean that the party has requisite 'dominion and control' over the funds." (citing

*Bonded*, 838 F.2d at 891)).

Rather, in the context of funds delivered to a bank or broker, courts require a showing of

(i) receipt of transferred funds; (ii) the legal right by the bank or broker to control those transferred

funds (i.e., legal control); and (iii) the right by the bank or broker to use those transferred funds

---

[8] This test applies equally to subsequent transferees as it does to initial transferees. *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 313 n.9 (Bankr. S.D.N.Y. 1999) (explaining that "[t]he *Bonded* interpretation of 'transferee' applies not only to initial transferees but to subsequent transferees as well" and that "to qualify as a subsequent transferee, one must have dominion and control over the funds or property one receives" (citing *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988))); *see also Bonded*, 838 F.2d at 896 ("The method we employed . . . to decide that the [b]ank was not an 'initial transferee' governs the question whether entities are subsequent transferees, too.").

for its own purpose (i.e., actual control). *See In re Manhattan Inv. Fund*, 397 B.R. at 15. Thus, a financial institution that only nominally holds the assets of a client will not be considered a transferee under the statute. *See*, *e.g.*, *Bonded*, 838 F.2d at 893 (holding that bank was not an initial transferee because it was contractually obliged to follow its customer's instructions to deposit funds and "held [the customer's] check only for the purpose of fulfilling an instruction to make the funds available to someone else").[9] Even where a bank "use[s] the deposits until the depositor withdraws them," courts have found a lack of dominion and control. *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 726 (6th Cir. 2017) (citation omitted).[10]

Establishing that a defendant is a "transferee" is an essential element of a claim to recover under section 550(a) that courts address at the motion to dismiss stage. *See Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 381–83 (Bankr. S.D.N.Y. 2014) (dismissing "claims asserted against [d]efendants that were sued as conduits or as mere 'holders,' and not beneficial owners, of Lyondell stock"), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016).[11] Accordingly, the Trustee must plead facts

---

[9]    *See also Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 43 (10th Cir. 1994) (bank was not an initial transferee where transferor "exercised complete discretion regarding deposits to and disbursements from the account, and he was entitled to possession of all account funds upon demand"); *Rupp v. Markgraf*, 95 F.3d 936, 942 (10th Cir. 1996) (bank "must (1) actually receive the funds, and (2) have full dominion and control over them for [the bank's] own account, as opposed to receiving them in trust or as agent for someone else").

[10]    *See also Menotte v. United States (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1350 n.6 (11th Cir. 2014) ("[A] party who has nearly unlimited ability to use funds does not, for the purposes of our mere conduit or control test, 'control' those funds when there exists an obligation to provide those funds to a third party."); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199–1200 (11th Cir. 1988).

[11]    *See also Stratton Oakmont, Inc.*, 234 B.R. at 312–15 (granting motion to dismiss in part because, "[a]s the Complaint stands, [defendant] was a mere conduit"); *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102–04 (Bankr. Del. 2010) (finding insufficient pleading that the movant was a "transferee" for purposes of an avoidance action); *Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*, 534 F. Supp. 2d 1326, 1344 (S.D. Fla. 2008) (finding "that [plaintiff] has not stated a claim for fraudulent transfer against [defendant] because at best, [defendant] was the conduit, not the transferee, and because [defendant] is not alleged to have controlled the funds at issue").

sufficient to establish a plausible inference that DBLA qualifies as a transferee under section 550(a). Here, the Amended Complaint's factual allegations fail to plausibly plead that DBLA had dominion and control over any alleged subsequent transfer, and thus fails to plausibly plead an essential element of the Trustee's claim.

Indeed, the Trustee fails to allege facts suggesting DBLA held legal title to any of the money it received from the Fairfield Funds at any time. *See Bonded*, 838 F.2d at 894–96 (holding that a bank was a subsequent transferee only after "it obtained dominion over the funds" when the customer instructed the bank to use the deposited funds to reduce the customer's debt to the bank). Rather, the Trustee alleges only that it seeks to recover transfers received by DBLA in connection with its "banking and wealth management operations" that subsequently were sold to UBS Europe, the only defendant sued in connection with such transfers. Am. Compl. ¶ 54.

Moreover, the Trustee fails to allege that DBLA exercised actual control over any transfer it received. Nor is there any allegation that DBLA had discretion to use for itself any of the transfers it allegedly received. To the contrary, all of the Trustee's factual allegations indicate that the funds were received on behalf of its "private and business [banking] clients" who were beneficiaries of DBLA's "touted . . . 'clearly defined investment process.'" Am. Compl. ¶ 7.

Accordingly, the Amended Complaint fails to allege any facts supporting a plausible inference that DBLA was acting as anything other than a mere conduit in receiving the alleged transfers on behalf of its clients, and therefore fails to plausibly plead that DBLA was a "transferee" subject to liability under Section 550(a).

## V.    **The Amended Complaint Establishes UBS Europe's Good-Faith Defense**

The Trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b). The Amended

Complaint establishes UBS Europe's good faith defense because a diligent inquiry would not have discovered the fraudulent purpose of BLMIS's alleged transfers.

### A.    *Value*

For purposes of the good faith defense, "value" is merely consideration and need not be reasonably equivalent:

> The "value" required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract, analogous to the "value" required under state law to achieve the status of a bona fide purchaser for value. There is no requirement that the value given by the transferee be a reasonable or fair equivalent. The term "value" in this subsection is different from and does not mean value to the debtor.

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021) (footnotes omitted).

According to the Amended Complaint, the alleged transfers were payments to Fairfield Sentry shareholders who subscribed (i.e., gave value) in those funds pursuant to subscription agreements. *See* Am. Compl. ¶¶ 5, 8, 19; *Picard v. ABN Amro N.A. (In re Madoff)*, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020) ("Surrendering equity interests constitutes value for purposes of section 550(b) because it is consideration sufficient to support a simple contract.").

### B.    *Good Faith*

The Second Circuit in *Citibank* recently set forth a three-step inquiry for establishing a good-faith defense. *Picard v. Citibank (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 191–92 (2d Cir. 2021). A court must examine (1) "what facts the defendant knew; this is a subjective inquiry and not a theory of constructive notice," (2) "whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud," and (3) "whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer." *Id.* (cleaned up). Thus, under *Citibank*, even if the transferee (1) knew actual facts that (2) would put it on inquiry notice

24

of the fraudulent purpose underlying the transaction or transfer, the transferee still takes the transfer in good faith if (3) a diligent inquiry would not have discovered the fraudulent purpose of the transfer.  As the face of the Amended Complaint establishes, such is the case here because a diligent inquiry would not have enabled DBLA to discover the fraudulent purpose of BLMIS's transfers.

The Trustee alleges various purported "red flags" that he claims should have alerted investors to the fraudulent purposes of BLMIS's transfers to the Fairfield Funds.  But these allegations amount, at most, to claims regarding a lack of transparency at BLMIS and supposed evidence of potential self-dealing, improper trading activities, and deviations from utilizing the SSC trading strategy.  None of the inquiries resulting from such questions led to discovery of the BLMIS fraud.  Meanwhile, thousands of market participants with varying degrees of sophistication conducted their own diligence and invested with BLMIS, either directly or through funds, all while BLMIS was subject to stringent SEC regulatory oversight and was even investigated by the SEC on a number of occasions—yet was never charged with any impropriety.  *See* ¶¶ 59–61, 84.

Moreover, even if DBLA had had actual knowledge of some of these purported facts (as opposed to mere constructive knowledge of them, the standard rejected in *Citibank*), and even if those facts would have put DBLA on inquiry notice, the Amended Complaint establishes that, even upon a diligent inquiry, investors could not have discovered the fraudulent purpose of the transfers.  As an initial matter, Madoff successfully deployed practices that prevented even the most sophisticated investigators from uncovering his scheme.  For example, in the SEC Complaint filed against Madoff, Ex. 4, No. 08-civ-10791, ECF No. 1 (S.D.N.Y. Dec. 11, 2008), the SEC alleged that "Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS," *id.* ¶ 16, "kept the financial statements for the firm under lock and key, and was

'cryptic' about the firm's investment advisory business when discussing the business with other employees of BMIS," *id.* ¶ 17. These allegations are consistent with those in the Amended Complaint and demonstrate that even a diligent inquiry would not have led to discovery of BLMIS's fraud.

Indeed, even a comprehensive SEC investigation failed to uncover BLMIS's fraud and merely led the SEC to impose additional compliance measures. In pleadings filed in related adversary proceedings, the Trustee has alleged that "[t]he SEC collected documents from Madoff in June 2005," *see* Ex. 6, *Picard v. Fairfield Sentry Limited*, No. 09-01239, ECF No. 286, *Second Amended Complaint* ¶ 239 (Bankr. S.D.N.Y. Aug. 28, 2020), and "[i]n 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally front-running the market," *see* Ex. 5, *id.*, ECF No. 23, *Amended Complaint* ¶ 351 (Bankr. S.D.N.Y. Jul. 20, 2010), but that ultimately, Madoff's "scheme to defraud the SEC succeeded" and "the SEC closed any further investigation of BLMIS," *id.* ¶ 361; *see* Am. Compl. ¶ 59 ("BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register."). The SEC's failure to uncover the scheme—even with its powerful investigative tools, expansive subpoena powers, and substantial resources—establishes that any further diligent inquiry by DBLA would not have discovered the fraud.

Accordingly, because the Trustee's own allegations establish that a diligent inquiry would not have enabled DBLA to discover the fraudulent purpose of the BLMIS transfers, the Amended Complaint establishes UBS Europe's good faith defense.

### C.    *Without Knowledge of Voidability*

In applying this element of the good faith defense, the Court must test a subsequent transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer. *Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*, 803 F.3d 835 (7th Cir. 2015).

Courts construe "without knowledge of the voidability of the transfer" the same as good faith, so a transferee who is found to be in good faith is also found to be without knowledge of voidability. As Judge Rakoff noted, "[i]n light of the legislative history, the most plausible reading is that this third requirement is merely one specific type of subjective knowledge required." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014), *disapproved of on other grounds sub nom. Citibank*, 12 F.4th 171 (2d Cir. 2021). Thus, this element of the good faith defense is also met.

## CONCLUSION

For all of the foregoing reasons, UBS Europe respectfully requests that this Court grant the motion to dismiss the Amended Complaint in its entirety as against UBS Europe, with prejudice, and award UBS Europe such other and further relief as is necessary and just.

Dated: September 15, 2022
New York, New York

Respectfully Submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
mking@gibsondunn.com
gherrmann@gibsondunn.com
kmartorana@gibsondunn.com

*Attorneys for Defendant UBS Europe SE*