

**United Language Group**
1600 Utica Avenue South
Suite 750
Minneapolis, MN 55416
+1 855-7UNITED
legaltranslations@ulgroup.com

| | | |
|---|---|---|
| State of Minnesota | ) | |
| | ) | ss: |
| County of Hennepin | ) | |

## Certificate of Accuracy

This is to certify that the attached

**Hive Down Plan**

originally written in the German language is, to the best of our knowledge and belief, a true, accurate and complete translation into the English language and has been carried out by translators competent to translate from German to English.

Dated: August 13th, 2022

*Braulio Bravo*

_____

Braulio Bravo
Senior Project Manager, Legal Translations
United Language Group

# HIVE-DOWN PLAN

**of**

**DRESDNER BANK LATEINAMERIKA AG**

with registered office in Hamburg,

Business address:

Neuer Jungfernstieg 16

20354 Hamburg

**("DBLA")**

**dated 20 April 2005**

## PREAMBLE

DBLA conducts banking business in the Corporate and Corresponding Banking, Global/Capital Markets and Corporate Items divisions. DBLA also has a Private Banking division, which provides services such as asset management, investment advisory, trust solutions, the establishment of private investment companies, custody and lending. The Private Banking division is divided into four processing centres (including a processing centre for the DBLA subsidiary Dresdner Lateinamerika Financial Advisors LLC ("**DLFA**") at Bear Stearns), which primarily provide services to private customers in Latin American countries. These processing centres cover the private banking business, which is operated through the Hamburg office, the branch in Panama and the branch in Grand Cayman, Cayman Islands, as well as DLFA, Miami, Florida, USA, and its subsidiaries.

DBLA is a wholly owned subsidiary of Dresdner Bank AG and is linked to the latter by means of a control and profit transfer agreement which has been in place since 27 March 1980.

DBLA intends to sell the Private Banking Division to a potential buyer.

In order to carry out the intended sale of the Private Banking Division, those assets of the Private Banking Division which are covered by the provisions of the German Transformation Act ("**UmwG**") are to be transferred in their entirety to a newly founded limited liability company ("**NewCo**") by way of a hive down for the purpose of a new establishment in accordance with the provisions of Section 123(3)(2) of the UmwG.

The business share in NewCo is to be transferred to UBS Wealth Management AG, Frankfurt am Main, immediately after the implementation of the hive down. To this end, DBLA concluded a purchase agreement, an Asset and Share Purchase Agreement ("**SPA**"), with UBS Wealth Management AG on 18 December 2004 by notarial deed No. 3004/2004 executed by the notary Dr. von Kottwitz, and an amendment agreement on 18 April 2005 by notarial deed No. 856/2005 executed by the notary Dr. von Kottwitz.

In light of this, the DBLA declares the following (hereinafter referred to as the "**hive-down plan**"):

- 4 -

## Section 1
## Hive down

1.1    DBLA hereby hives down its assets described below and transfers them in their entirety with all rights and obligations pursuant to Section 123(3)(2) UmwG to the newly founded NewCo as the acquiring company in return for a share in the acquiring company.

1.2    The articles of association of NewCo are attached to this deed as **Annex 1.2**. Pursuant to these Articles of Association, NewCo will operate under the name "UBS Lateinamerika GmbH" and will have its registered office in Hamburg.

1.3    The following individuals are appointed as the first managing directors of NewCo with joint power of representation:

a)    Mr. Richard Voswinckel, born on 24 September 1953, resident at Isestrasse 111, 20149 Hamburg;

b)    Mr Bernd Bertram, born on 17 October 1960, resident at Schwarzenbrooker Weg 15, 22955 Hoisdorf.

1.4    The object of the hive down is the German business of the Private Banking division of DBLA as described below and recorded in the statement of assets and liabilities of the German business of the Private Banking division as at the hive-down date attached as **Annex 1.4** (hereinafter "**hive down statement**"), together with all changes occurring up to the Closing Date (as defined in Section 5.2) (hereinafter "**PB Business Germany**"), including the liability surplus, which shall constitute a receivable for NewCo against DBLA after the implementation of the hive down.

## Section 2
## Customer relationships covered by the hive down

2.1    The PB Business Germany covered by the hive down comprises all business conducted by DBLA with the customers listed by Private Banking Customer Status Code in **Annex 2.1a** and with the other customers listed in **Annex 2.1b** as of the execution date. The transferred business relationships - insofar as they can be accounted for - are included in the hive-down statement according to the status on the hive-down date.

2.2    Subject to Sections 4.1 and 4.5, the hive down shall cover the business relationships of DBLA with the customers specified in Annex 2.1a and Annex 2.1b in each case in full, i.e. with all receivables, liabilities, contingent liabilities - including those vis-à-vis third parties - and other contractual and non-contractual rights and obligations of DBLA.

2.3    The hive down also includes all accessory and non-accessory securities existing under the transferred business relationships.

2.4    Insofar as new customer relationships of DBLA in PB Business Germany in the number ranges 200 to 499 are established or existing customer relationships are changed after the effective date of the hive down up to the execution date, these shall be transferred to NewCo in accordance with the above provisions as they existed on the execution date. Changes in the customer relationship with the DBLA occurring after 1 October 2004 shall be recorded with their effects in PB Business Germany. This also applies to a termination of the customer relationship.

2.5    In addition to the business relationships directly defined by the "Private Banking Customer Status Code", the "Escrow Agreement" of 28 October 2004, in which the DBLA is designated as "Escrow Agent" by several contracting parties, shall also be transferred to NewCo.

## Section 3
### Personnel and material resources covered by the hive down

3.1    Pursuant to Section 613a of the German Civil Code (BGB), the employees working at PB Business Germany, including employees on parental leave or partial retirement, shall be transferred to NewCo. In the list attached as **Annex 3.1a**, the transferring employees - including the above-mentioned dormant employment relationships and early retirement arrangements - are individually listed on the basis of the personnel numbers assigned to them as of the hive-down date. Insofar as personnel changes, which result in employees leaving their respective positions, occur up to the execution date they are not included in the transfer. If new employees assume the positions described in **Annex 3.1b** and are exclusively assigned to the PB Business Germany division, they shall also be included in the transfer.

The transfer also includes pension entitlements or rights and early retirement arrangements for the active employees named in Annex 3.1a, insofar as they have not objected to the transfer. The provisions established in connection with these employment relationships, in particular pension provisions, provisions for special payments and anniversary provisions, shall also be transferred to NewCo. Claims by pensioners and surviving dependants of former employees (including former employees with vested pension rights) shall be retained in full by DBLA.

Insofar as individual employees (including those employees in temporary employment relationships listed in <u>Annex 3.4</u>) who are neither listed in <u>Annex 3.1a</u> nor newly assigned to the positions shown in <u>Annex 3.1b</u> are classified as employees of PB Business Germany by a legally binding ruling and are accordingly covered by the effect of Section 613a BGB, DBLA shall indemnify NewCo against all liabilities, reasonable costs and expenses (including for legal disputes) in connection with these employment relationships. NewCo undertakes to terminate such employment at the earliest possible date. NewCo undertakes to take all necessary and appropriate steps to minimise any liability on the part of DBLA. Furthermore, NewCo hereby authorises DBLA to pursue litigation against the employees bringing the lawsuit and shall assist DBLA in all respects to the extent necessary in doing so.

3.2    The hive down shall also cover the "expatriates" employed by DBLA as set out in **Annex 3.2** who have given their consent to the transfer of their contracts of employment, as well as the pension provisions set up for these expatriates.

3.3    Rights in rem and rights of use to the company cars or fleet cars used by employees covered by the transfer and listed in **Annex 3.3** shall be transferred to NewCo.

3.4    The transfer shall also extend to all temporary employment contracts and other agreements with self-employed persons or third parties listed in **Annex 3.4** which DBLA has concluded in the operating sphere of the PB Business Group up to the hive-down date and which continue to exist on the execution date. Section 2.4 sentence 2 of this hive-down plan shall apply mutatis mutandis to all such agreements concluded or to be concluded with reference to PB Business Germany from the hive-down date until the execution date. In new agreements to be concluded, explicit reference shall be made to the allocation to PB Business Germany wherever possible.

3.5    In particular, the transfer to NewCo includes all contracts with financial advisors, referral agents and external portfolio managers which DBLA has entered into or will enter into by the Completion Date, insofar as they are still in existence on the execution date. A list reflecting the status as of today's date is attached as **Annex 3.5.** Not included in the hive down are all mutual claims existing from already terminated above-mentioned contracts, even if they are exclusively attributable to PB Business Germany.

3.6    Contracts of DBLA with third parties which are not listed in <u>Annex 3.4</u> and <u>Annex 3.5</u> and which are attributable to PB Business Germany shall also be included in the hive down; an exhaustive list of such contracts as of the effective date of the hive down is contained in **Annex 3.6**.

3.7    DBLA shall also transfer all assets and liabilities that do not have to be recognised in the balance sheet or are not eligible for recognition in the balance sheet or are not actually recognised in the balance sheet, which are allocated to PB Business Germany as described above and are listed exhaustively in **Annex 3.7** to NewCo.

### Section 4
### Assets, liabilities, contracts and legal relationships
### excluded from the hive down

The following assets, liabilities, contracts and other rights and obligations of DBLA in relation to PB Business Germany, including the claims and obligations arising from them, are excluded from the hive down:

4.1    All legal relationships and other procedural legal relationships attributable to the PB Business Germany, in particular no civil law lawsuits, dunning proceedings, independent evidence proceedings, proceedings for interim legal protection, enforcement proceedings and fine proceedings as well as other proceedings;

4.2    The movable assets attributable to PB Business Germany, in particular, the entire inventory of PB Business Germany at the Hamburg location;

4.3     Pension expectations and pension expectancy rights of former employees of the DBLA in the PB Business Germany division whose employment contract was terminated prior to the execution date;

4.4     Other employees beyond the scope of Section 3.1;

4.5     All customers with pass-through loans or fiduciary loans as well as any corporate loans pursuant to **Annex 4.5** and customers with the collateral assigned to these loans;

4.6     All customer relationships that are subject to the so-called US W9 status and that are listed in **Annex 4.6.** These customer relationships are to be transferred separately from DBLA to Swiss Financial Advisors AG in Switzerland. Annex 4.6 also contains customer relationships which shall not be transferred to NewCo for compliance reasons.

### Section 5
### Hive-down date

5.1     The hive down shall take place between DBLA and NewCo with effect from 0.00 a.m. on 1 October 2004 (the "**effective hive-down date**"). From this time onwards, the actions of DBLA shall be deemed to have been taken for the account of NewCo insofar as they relate to the PB Business Germany division which has been hived down pursuant to this deed. Accordingly, DBLA and NewCo shall place each other in the same position as if the PB Business Germany business division had already been transferred to NewCo on the effective hive-down date. A separate accounting presentation for the hived-down business division PB Business Germany is not possible for the period between the effective hive-down date and the completion date. Any compensation for this period will not be granted by DBLA.

5.2     The transfer of the items of the assets and liabilities and the other rights and obligations shall take place with in rem effect at the time of the entry of the hive down in the commercial register of the registered office of the DBLA (the "**execution date**").

5.3     If the hive down is not entered in the commercial register of the DBLA by 31 May 2005, notwithstanding Section 5.1, 1 January 2005, midnight shall be deemed to be the hive-down date.

**Section 6**
**Impediments to transfer, obligations to co-operate**

6.1     To the extent that the consent of a creditor, debtor or other third party or the consent of
        an authority is required for the transfer of certain assets and liabilities, contracts, rights
        and other contractual and non-contractual rights and obligations of DBLA, which are
        attributable to PB Business Germany, DBLA and NewCo shall endeavour to procure
        such consent.

6.2     To the extent that certain assets and liabilities, contracts, rights and other contractual
        and non-contractual rights and obligations of DBLA attributable to PB Business
        Germany are not already transferred to NewCo by virtue of statutory universal
        succession as of the execution date, DBLA is obliged to transfer these items by way of
        singular succession for a period of two years after the execution date.

6.3     DBLA shall grant a right of use with respect to the premises in Hamburg which are
        currently being used by PB Business Germany and which are described in more detail
        in **Annex 6.3.** NewCo shall be entitled to use these premises, including electricity, water
        and telecoms, for a period of ten Banking Days after the execution date and shall not be
        required to pay any consideration for such use.

6.4     DBLA shall endeavour to ensure a smooth technical transition of PB- Business-
        Germany to NewCo immediately after the execution date. Immediately after this hive-
        down plan has been completed, DBLA shall make preparations for a transition of PB
        Business Germany in accordance with Section 13 of the SPA, in particular with regard
        to an accounting recording of the customer relationships that are to be transferred. IT
        solutions and other services required for the continuation of PB Business Germany shall
        be made available to NewCo in accordance with Section 13 of the SPA and the
        "Transitional Services Agreement" set out in Annex 13.2 to the SPA.

6.5     To the extent that DBLA receives payments after the execution date in respect of a claim
        against customers of PB Business Germany, former customers of PB Business Germany
        or third parties transferred by way of universal succession or singular succession
        pursuant to Section 6.2, DBLA shall pass on the amounts received in full and without
        delay to NewCo.

6.6    To the extent that NewCo receives payments after the execution date in respect of a claim of DBLA against third parties that has not been transferred by way of universal succession or singular succession pursuant to Section 6.2, NewCo shall transfer the amounts received to DBLA in full and without delay.

6.7    Furthermore, to the legally permissible extent, DBLA shall hand over all documents related to the business relationships transferred pursuant to Section 2.1 to NewCo.

## Section 7
## Mutual indemnity

If and to the extent that DBLA or NewCo are held liable by creditors on the basis of the provisions of Section 133 of the UmwG or other statutory or contractual provisions for liabilities and obligations as well as contingent liabilities which are assigned to the other company in accordance with the provisions of this hive-down plan, the other company shall indemnify the company held liable in regard to such liabilities and obligations as well as contingent liabilities with effect from the first demand.

## Section 8
## Consideration

8.1    As consideration for the assets transferred under this hive-down scheme, DBLA shall obtain the sole participating share in NewCo with a nominal value of EUR 10,000,000.00 free of charge as of the execution date.

8.2    The total value at which the contribution in kind made by DBLA will be accepted by NewCo corresponds to the book value of the transferred assets under commercial law as of the execution date. Furthermore, DBLA shall make a cash payment into an account held by NewCo in the amount of EUR 35,000,0000.00, and this amount shall be credited against the initial contribution. To the extent that the book value of the net assets transferred exceeds the nominal amount of the share granted in return, the difference shall be transferred to the capital reserve pursuant to Section 272 (2) No. 1 of the German Commercial Code (HGB).

**Section 9**
**Special rights and benefits**

9.1    Rights within the meaning of Section 126(1)(7) UmwG have not been and will not be granted. Measures within the meaning of Section 126(1)(7) UmwG have not been provided for.

9.2    Special benefits within the meaning of Section 126(1) No. 8 UmwG have not been and will not be granted.

**Section 10**
**Consequences of the hive down for employees and their representative bodies**

10.1    DBLA employed 841 employees as of the effective hive-down date. The employees individually identified in <u>Annex 3.1a</u> on the basis of the personnel numbers assigned to them are assigned to PB Business Germany and are to be transferred as part of the hive down. With effect from the execution date, the employment relationships of these employees shall be transferred to NewCo with all rights and obligations pursuant to Section 324 UmwG in conjunction with Section 613a(1)(1) BGB, unless the affected employees have objected in writing pursuant to Section 613a(6) BGB within one month after receipt of the notification of the transfer (Section 613a(5) BGB). In the case of an objection, the employees must be prepared for the possibility of termination for operational reasons due to the elimination of their respective positions at DBLA.

The legal status that is in existence on the execution date shall be decisive in regard to the content of the transferred employment relationships. For all regulations dependent on the length of service, the periods of service earned with DBLA and the periods of service recognised by DBLA shall be fully taken into account. Employment contracts cannot be terminated because of the hive down. Furthermore, the position of the transferring employees under termination law does not deteriorate as a result of the hive down for a period of two years from the time it takes effect (Section 323(1) UmwG). In particular, the German Dismissal Protection Act (Kündigungsschutzgesetz, KSchG) shall remain applicable, even if the respective business of NewCo falls below the threshold of Section 23(1) KSchG after the hive down.

10.2    DBLA is a member of the Employers' Association of the Private Banking Industry (Arbeitgeberverband des privaten Bankgewerbes e.V.). NewCo will not be a member of an employers' association. Therefore, the rights and obligations arising from the legal provisions of the collective bargaining agreements for the private banking industry applicable at the time of the transfer for employees bound by collective bargaining agreements by virtue of trade union membership shall become part of the employment

relationship between NewCo and these employees, i.e., they shall be transformed into individual law pursuant to Section 613a(1)(2) of the German Civil Code (BGB). The transformed collective bargaining conditions may not be changed to the detriment of the employees before the expiry of one year after the date of the transfer. If the validity of the collective agreements is based on a contractual reference, the collective agreements referred to at the time of the transfer shall be deemed to be the content of the employment contract pursuant to Section 613a(1)(1) BGB.

10.3    The existing collective bargaining agreements and company agreements in force at DBLA shall continue to apply after the transfer of the business division in accordance with Section 613a(1) BGB.

10.4    The structures of DBLA under labour relations law shall remain unchanged for the time being. For the original DBLA operation being continued at the Hamburg site, the works council elected there shall retain its mandate. For the part of the business hived down to NewCo in the course of the hive down, the works council of DBLA shall exercise a transitional mandate pursuant to Section 21a of the Works Council Constitution Act (BetrVG) until a new works council is elected at NewCo, but for no longer than six months.

10.5    Due to the demerger of operations resulting from the hive down, the management of DBLA concluded a reconciliation of interests with the works council of DBLA on 16 February 2005.

10.6    DBLA will employ approx. 449 employees in Hamburg (including expatriates) from the execution date. Due to the immediate subsequent withdrawal of NewCo from the group, the employees of NewCo transferring to DBLA as a result of this hive-down plan will not be allocated to DBLA. Nevertheless, the obligation to involve the employees in the Supervisory Board shall remain in force at DBLA pursuant to Section 1(1)(1) of the German One-Third Employee Participation Act (Drittelbeteiligungsgesetz).

10.7    As of the execution date, NewCo will employ 52 employees, including 9 expatriates, who will be transferred from DBLA to NewCo. There is therefore no obligation for NewCo to form a supervisory board with employee participation, and NewCo will not form any such supervisory board.

### §11
### Warranty

Any warranties under this hive-down plan are excluded, unless otherwise provided for in this hive-down plan.

## Section 12
## Future Relationship between DBLA and NewCo

12.1    NewCo agrees to cease all use of the DBLA company names and logos set out in **Annex 12.1** or any variations thereof after the expiry of 30 days from the execution date. In this regard, NewCo shall amend all product descriptions, business facilities and premises and all other facilities and documents bearing such trade names and logos. To the extent that the company names or logos listed in Annex 12.1 are used by NewCo in the period of 30 days after the execution date, NewCo shall ensure that such company names and logos are accompanied by an appropriately recognisable reference to the acquirer of the shares in NewCo.

12.2    The use of credit cards currently issued to customers of PB Business Germany and those issued to replace Maestro cards is excluded from NewCo's aforementioned obligation. These credit cards bear the logo of both Dresdner Bank AG and DBLA. Customers will be able to use these credit cards for up to one year after the conclusion of the SPA. NewCo shall indemnify DBLA and Dresdner Bank AG against all damages in connection with the use of the name "Dresdner Bank Lateinamerika" and the logo of Dresdner Bank AG and DBLA on the credit cards.

12.3    NewCo further undertakes to maintain confidentiality with regard to the business secrets of DBLA which have become known to it and to impose this confidentiality obligation on its employees, insofar as these do not concern the PB Business or are connected with the PB Business.

## Section 13
## Effectiveness of the hive down

In order to become effective, this hive-down plan requires the approval of the general meeting of DBLA, as well as the registration of the hive down in the commercial register of the registered office of DBLA after the registration of the newly established NewCo in the commercial register at its future registered office.

## Section 14
## Concluding Provisions / Costs

14.1    Should one or more provisions of this hive-down plan be ineffective, unenforceable or not registrable in the commercial register, this shall not affect the validity of the other provisions of the hive-down plan. In this case, the provision that is ineffective, unenforceable or cannot be entered in the commercial register shall be deemed to be replaced by the provision that is effective, enforceable and can be entered in the commercial register and that comes as close as possible to the economic purpose of the ineffective, unenforceable provision or the provision that cannot be entered in the commercial register. The same shall apply in the event of a loophole.

14.2    Unless otherwise provided in this hive-down plan, all costs of this hive down shall be borne by DBLA.

The following individuals are hereby authorised to act as notarial clerks

Ms Ilona Gätjen,

Ms Alexandra Niehaus-Manhart,

Ms Nuriye Kir,

Ms Gaby Heinrich,

Ms Alexandra Demel,

all with their business address: Neuer Wall 75, 20354 Hamburg,

each individually, to make all declarations still necessary for the execution of this deed.

The authorised representatives are also entitled to amend and repeat the declarations made in this deed.

This power of attorney may only be used before the notary Dr Adam Freiherr von Kottwitz, Hamburg, or his official representative.

- 15 -

The original of these minutes, which remain with me, have been taken down, read to the persons present together with the annexes, insofar as no relief has been provided under Section 14 of the Notarisation Act (BeurkG), approved by them and signed personally by them as follows and also signed and sealed by me, the notary public.

Hamburg, 20 April 2005

_____        _____
            [Signature]                                    [Signature]

Dresdner Bank Lateinamerika AG


        [Signature]      [Initial]              [Stamp]

Dresdner Bank Lateinamerika AG
formerly Deutsch-Südamerikanische Bank AG

# POWER OF ATTORNEY

We, the undersigned Dresdner Bank Lateinamerika AG, Hamburg, ("Issuer of the power of attorney") hereby authorise

1.    Mr Bemd Bertram
      at his place of business: Neuer Jungfemstieg 16, 20354 Hamburg, Germany

2.    Dr Alexander von Kuhlberg
      at his place of business: Neuer Jungfemstieg 16, 20354 Hamburg, Germany

3.    Mr Stefan Britz
      at his place of business: Neuer Jungfemstieg 16, 20354 Hamburg

4.    Dr Hans Diekmann
      at his place of business: Breite Strasse 69, 40213 Düsseldorf

5.    Dr Patrick Nordhues
      at his place of business: Breite Strasse 69, 40213 Düsseldorf

("Authorised Representatives")

each individually, to represent the issuer of the power of attorney

in the notarial conclusion of an amendment agreement between the **issuer of the power of attorney, Dresdner Bank AG**, Frankfurt am Main, and **UBS Wealth Management AG**, Frankfurt am Main, to the Asset and Share Purchase Agreement of 18 December 2004 (deed No. 3004/2004 of the notary Dr Freiherr von Kottwitz, Hamburg) as well as in the notarial conclusion of a hive-down plan for the hive down of the issuer of the power of attorney's German retail banking business to a subsidiary to be newly founded by the issuer of the power of attorney in the legal form of a GmbH.

The authorised representatives are entitled to determine all conditions in connection with the aforesaid and to conclude all contracts, make and accept all declarations, perform all acts and take all measures they deem necessary or appropriate in connection with the aforesaid on behalf of the issuer of the power of attorney. The authorised representatives may also represent the issuer of the power of attorney in dealings with courts, administrative authorities and registers.

Hamburg, 15 April 2005

Dresdner Bank Lateinamerika
Public Limited Company

_____[Signature]_____
Wolfgang Dambmann

_____[Signature]_____
Joachim G. Weichbrodt

<u>No. 1506 of the Roll of Deeds for 2005 H</u>

As a Notary Public in Hamburg, I

Dr jur. Horst Heiner Hellge,

hereby certify the foregoing signatures, executed before me, of the following gentlemen known to me

1.    Wolfgang Dambmann,
      born on 11/03/1949,
2.    Joachim G. Weichbrodt,
      born on ([illegible]/04/1948,

both with the following address: Neuer Jungfernstieg 16, 20354 Hamburg,

acting as a member of the Board of Management with joint power of representation (1.) and as an authorised signatory and holder of joint power of attorney (2.), respectively, of the existing public limited company in Hamburg under the company

**Dresdner Bank Lateinamerika Aktiengesellschaft**
**(formerly Deutsch-Südamerikanische Bank Aktiengesellschaft)**
Address: Neuer Jungfernstieg 16, 20354 Hamburg,
-Hamburg Local Court, HR B 85 24-.

Pursuant to Section 21 of the Federal Code of Notaries, I, the Notary Public, certify, on the basis of today's inspection of the Commercial Register of the Hamburg Local Court - HR B 85 24 - that Mr Wolfgang Dambmann in his capacity as a member of the Executive Board and Mr Joachim G. Weichbrodt in his capacity as an authorised signatory are entitled to jointly represent the aforementioned public limited company.

Hamburg, 15 April 2005

**Cost calculation:**
Limit
Fee: Sections 32, 45      Cost Ordinance EUR    130.00
Fee: Sections 32, 58      Cost Ordinance EUR     30.00
Fee: Sections 32, 150     Cost Ordinance EUR     13.00
Turnover tax 16 %                          EUR     27.68
                                           EUR    200.68

The Notary:                    [Initial]              [Signature]

<u>No. 1506 of the Roll of Deeds for 2005 H</u>

As a Notary Public in Hamburg, I

Dr jur. Horst Heiner Hellge,

hereby certify the foregoing signatures, executed before me, of the following gentlemen known to me

1. Wolfgang Dambmann,
   born on 11/03/1949,
2. Joachim G. Weichbrodt,
   born on ([illegible]/04/1948,

   both with the following address: Neuer Jungfernstieg 16, 20354 Hamburg,

acting as a member of the Board of Management with joint power of representation (1.) and as an authorised signatory and holder of joint power of attorney (2.), respectively, of the existing public limited company in Hamburg under the company

**Dresdner Bank Lateinamerika Aktiengesellschaft**
**(formerly Deutsch-Südamerikanische Bank Aktiengesellschaft)**
Address: Neuer Jungfernstieg 16, 20354 Hamburg,
-Hamburg Local Court, HR B 85 24-.

Pursuant to Section 21 of the Federal Code of Notaries, I, the Notary Public, certify, on the basis of today's inspection of the Commercial Register of the Hamburg Local Court - HR B 85 24 - that Mr Wolfgang Dambmann in his capacity as a member of the Executive Board and Mr Joachim G. Weichbrodt in his capacity as an authorised signatory are entitled to jointly represent the aforementioned public limited company.

Hamburg, 15 April 2005

**Cost calculation:**
Limit

| | | |
|---|---|---|
| Fee: Sections 32, 45 | Cost Ordinance | EUR 130.00 |
| Fee: Sections 32, 58 | Cost Ordinance | EUR 30.00 |
| Fee: Sections 32, 150 | Cost Ordinance | EUR 13.00 |
| Turnover tax 16 % | | EUR 27.68 |
| | | EUR 200.68 |

The Notary:          [Initial]                    [Signature]

AUSGLIEDERUNGSPLAN


der


DRESDNER BANK LATEINAMERIKA AG

mit Sitz in Hamburg,

Geschäftsanschrift:

Neuer Jungfernstieg 16

20354 Hamburg


("DBLA")


vom 20. April 2005

## PRÄAMBEL

Die DBLA betreibt Bankgeschäfte in den Geschäftsbereichen Corporate and Corresponding Banking, Global/Capital Markets, Corporate Items. Die DBLA ist ferner tätig in dem Geschäftsbereich Private Banking, in dem Dienstleistungen wie Vermögensverwaltung, Anlageberatung, Treuhandlösungen, Gründung von Private Investment Companies sowie Depotführung und Kreditgeschäft angeboten werden. Der Geschäftsbereich Private Banking ist unterteilt in vier Buchungszentren (einschließlich eines Buchungszentrums für die DBLA Tochtergesellschaft Dresdner Lateinamerika Financial Advisors LLC ("**DLFA**") bei Bear Stearns), die Dienstleistungen insbesondere für Privatkunden in lateinamerikanischen Ländern anbieten. Diese Buchungszentren halten das Private Banking Geschäft, das durch den Standort Hamburg, durch die Niederlassung in Panama und die Filiale auf Grand Cayman, Cayman Islands sowie die DLFA, Miami, Florida, USA, und deren Tochtergesellschaften betrieben wird.

Die DBLA ist eine 100%ige Tochtergesellschaft der Dresdner Bank AG und mit dieser durch einen seit dem 27. März 1980 bestehenden Beherrschungs- und Gewinnabführungsvertrag verbunden.

Die DBLA beabsichtigt, den Geschäftsbereich Private Banking an einen potentiellen Erwerber zu veräußern.

Zur Durchführung der beabsichtigten Veräußerung des Geschäftsbereichs Private Banking sollen diejenigen Vermögensgegenstände des Geschäftsbereichs Private Banking, die von dem Anwendungsbereich des Umwandlungsgesetzes ("**UmwG**") erfasst werden, im Wege der Ausgliederung zur Neugründung nach den Vorschriften des UmwG (§ 123 Abs. 3 Nr. 2 UmwG) als Gesamtheit auf eine neugegründete GmbH ("**NewCo**") übertragen werden.

Der Geschäftsanteil an NewCo soll unmittelbar nach Durchführung der Ausgliederung an die UBS Wealth Management AG, Frankfurt am Main, übertragen werden. Die DBLA hat dazu am 18. Dezember 2004 mit der UBS Wealth Management AG mit notarieller Urkunde Nr. 3004/2004 des Notars Dr. von Kottwitz einen Kaufvertrag, ein sogenanntes Asset and Share Purchase Agreement ("**SPA**"), sowie am 18. April 2005 mit notarieller Urkunde Nr. 856/2005 des Notars Dr. von Kottwitz eine Änderungsvereinbarung, abgeschlossen.

Dies vorausgeschickt, erklärt die DBLA was folgt (im Folgenden "**Ausgliederungsplan**"):

– 4 –

## § 1
## Ausgliederung

1.1    DBLA gliedert hiermit ihre nachfolgend bezeichneten Vermögensteile aus und über-
trägt sie als Gesamtheit mit allen Rechten und Pflichten gem. § 123 Abs. 3 Nr. 2
UmwG auf die neu zu gründende NewCo als übernehmende Gesellschaft gegen Ge-
währung eines Geschäftsanteils an der übernehmenden Gesellschaft.

1.2    Der Gesellschaftsvertrag von NewCo ist dieser Urkunde als **Anlage 1.2** beigefügt.
Gemäß dieses Gesellschaftsvertrages firmiert NewCo unter "UBS Lateinamerika
GmbH" und hat ihren Sitz in Hamburg.

1.3    Zu gesamtvertretungsberechtigten ersten Geschäftsführern von NewCo werden be-
stellt:

   a)    Herr Richard Voswinckel, geb. am 24. September 1953, wohnhaft Isestrasse
111, 20149 Hamburg;

   b)    Herr Bernd Bertram, geb. am 17. Oktober 1960, wohnhaft Schwarzenbrooker
Weg 15, 22955 Hoisdorf.

1.4    Gegenstand der Ausgliederung ist das deutsche Geschäft des Geschäftsbereichs Pri-
vate Banking der DBLA, wie es im Folgenden beschrieben und in der als **Anlage 1.4**
beigefügten Übersicht über das Aktiv- und Passivvermögen des deutschen Geschäfts
des Geschäftsbereichs Private Banking zum Ausgliederungsstichtag (im Folgenden
**"Ausgliederungsaufstellung"**) erfasst ist, mit allen bis zum Vollzugsdatum (wie in
§ 5.2 definiert) eintretenden Veränderungen (im Folgenden **"PB-Business-
Germany"**), einschließlich des sogenannten Passivüberhangs, der nach Durchführung
der Ausgliederung eine Forderung der NewCo gegen die DBLA begründen soll.

## § 2
## Von der Ausgliederung erfasste Kundenbeziehungen

2.1    Das von der Ausgliederung erfasste PB-Business-Germany umfasst das gesamte Ge-
schäft, das die DBLA mit den in der **Anlage 2.1a** nach Private Banking Customer
Status-Code aufgeschlüsselten Kunden sowie mit den sonstigen in **Anlage 2.1b** auf-
geführten Kunden im Zeitpunkt des Vollzugsdatums betreibt. Die übertragenen Ge-

– 5 –

schäftsbeziehungen sind – soweit bilanzierbar – nach dem Stand zum Ausgliede-
rungsstichtag in die Ausgliederungsaufstellung eingegangen.

2.2    Die Ausgliederung erfasst die Geschäftsbeziehungen der DBLA zu den in Anla-
ge 2.1a und Anlage 2.1b bezeichneten Kunden - vorbehaltlich § 4.1 und § 4.5 - je-
weils vollständig, d.h. mit allen Forderungen, Verbindlichkeiten, Eventualverbind-
lichkeiten – auch soweit diese gegenüber Dritten bestehen – und sonstigen vertragli-
chen und außervertraglichen Rechten und Pflichten der DBLA.

2.3    Die Ausgliederung erfasst ferner alle im Rahmen der übertragenen Geschäftsbezie-
hungen bestehenden akzessorischen und nichtakzessorischen Sicherheiten.

2.4    Soweit nach dem Ausgliederungsstichtag bis zum Vollzugsdatum neue Kundenbezie-
hungen der DBLA im PB-Business-Germany in den Nummernkreisen 200 bis 499
begründet oder bestehende Kundenbeziehungen verändert werden, gehen diese ent-
sprechend den vorstehenden Bestimmungen wie zum Vollzugsdatum bestehend auf
NewCo über. Nach dem 1. Oktober 2004 eintretende Änderungen in der Kundenbe-
ziehung zur DBLA werden mit ihren Wirkungen im PB-Business-Germany erfasst.
Das gilt auch für eine Beendigung der Kundenbeziehung.

2.5    Neben den durch den "Private Banking Customer Status-Code" direkt definierten Ge-
schäftsbeziehungen geht auch das "Escrow Agreement" vom 28. Oktober 2004, in
dem die DBLA von mehreren Vertragspartnern als "Escrow Agent" bestimmt wird,
auf NewCo über.

### § 3
### Von der Ausgliederung erfasste personelle und sachliche Mittel

3.1    Gemäß § 613a BGB gehen die im PB-Business-Germany tätigen Mitarbeiter, ein-
schließlich Mitarbeiter im Erziehungsurlaub oder Altersteilzeit über auf die NewCo.
In der als **Anlage 3.1a** beigefügten Liste sind – bezogen auf den Ausgliederungs-
stichtag – die übergehenden Mitarbeiter – einschließlich der vorstehend genannten ru-
henden Arbeitsverhältnisse und Vorruhestandsregelungen – anhand der ihnen zuge-
ordneten Personalnummern individualisiert. Soweit bis zum Vollzugsdatum perso-
nelle Veränderungen eintreten, aufgrund derer Mitarbeiter aus damit umschriebenen
Funktionen ausscheiden, werden sie von der Übertragung nicht erfasst. Soweit Perso-
nen neu in durch die **Anlage 3.1b** abgebildete Funktionen eintreten und ausschließlich
dem Geschäftsbereich PB-Business-Germany zuzuordnen sind, werden auch sie vom
Übergang erfasst.

– 6 –

Der Übergang umfasst auch Pensionsanwartschaften bzw. -anwartschaftsrechte und Vorruhestandsregelungen für die in Anlage 3.1a genannten aktiven Arbeitnehmer, soweit diese nicht dem Übergang widersprochen haben. Die im Zusammenhang mit diesen Arbeitverhältnissen gebildeten Rückstellungen, insbesondere Pensionsrückstellungen, Rückstellungen für Sonderzahlungen und Jubiläumsrückstellungen werden mit auf die NewCo übertragen. Ansprüche von Pensionären und Hinterbliebenen von ehemaligen Mitarbeitern (einschließlich ausgeschiedener Arbeitnehmer mit unverfallbaren Pensionsanwartschaften) verbleiben in vollem Umfang bei der DBLA.

Soweit einzelne Arbeitnehmer (einschließlich der in Anlage 3.4 aufgeführten Zeitarbeitsverhältnisse), die weder in Anlage 3.1a aufgeführt sind, noch neu in die Anlage 3.1b abgebildeten Funktionen eintreten, durch rechtskräftiges Urteil als Mitarbeiter des PB-Business-Germany eingeordnet werden und dementsprechend von der Wirkung des § 613a BGB erfasst werden, stellt DBLA die NewCo von sämtlichen Verbindlichkeiten, angemessenen Kosten und Auslagen (einschließlich für Rechtsstreitigkeiten) im Zusammenhang mit diesen Arbeitsverhältnissen frei. NewCo verpflichtet sich, diese Arbeitsverhältnisse zum frühestmöglichen Zeitpunkt zu kündigen. NewCo verpflichtet sich, alle notwendigen und gebotenen Schritte zu unternehmen, um eine Haftung der DBLA so gering wie möglich zu halten. Ferner ermächtigt NewCo die DBLA hiermit, den Prozess gegen die klagenden Arbeitnehmer zu führen und wird DBLA, soweit erforderlich, dabei in jeder Hinsicht unterstützen.

3.2     Von der Ausgliederung erfasst werden sollen zudem die sogenannten "Expatriates" der DBLA gemäß **Anlage 3.2**, die ihre Zustimmung zur Übertragung ihrer Arbeitsverhältnisse erklärt haben, sowie die für diese Expatriates gebildeten Pensionsrückstellungen.

3.3     Dingliche Rechte und Nutzungsrechte an den Dienstwagen oder Firmenwagen, die von vom Übergang erfassten Mitarbeitern genutzt werden und in **Anlage 3.3** aufgeführt sind, gehen auf die NewCo über.

3.4     Der Übergang erstreckt sich auch auf alle in **Anlage 3.4** aufgeführten Zeitarbeitsverhältnisse und sonstigen Vereinbarungen mit wirtschaftlich Selbstständigen oder Dritten, die die DBLA bis zum Ausgliederungsstichtag im Funktionsbereich des PB-Business-Germany abgeschlossen hat und die zum Vollzugsdatum fortbestehen. Für alle ab dem Ausgliederungsstichtag bis zum Vollzugsdatum mit Bezug auf das PB-Business-Germany abgeschlossenen oder noch abzuschließenden derartigen Vereinbarungen gilt § 2.4 Satz 2 dieses Ausgliederungsplans entsprechend. In neu abzu-

schließenden Vereinbarungen wird nach Möglichkeit auf die Zuordnung zum PB-Business-Germany ausdrücklich Bezug genommen.

3.5    Insbesondere sind vom Übergang auf die NewCo sämtliche Verträge mit Financial Advisors, Referral Agents und External Portfolio Managers erfasst, die die DBLA abgeschlossen hat oder bis zum Vollzugsdatum abschließen wird, soweit sie zum Vollzugsdatum noch bestehen. Eine Liste, die den Stand zum heutigen Tag wiedergibt, ist als **Anlage 3.5** beigefügt. Nicht von der Ausgliederung erfasst sind sämtliche aus bereits beendeten o.g. Verträgen bestehenden wechselseitigen Ansprüche, auch soweit sie ausschließlich dem PB-Business-Germany zuzuordnen sind.

3.6    Von der Ausgliederung erfasst werden auch diejenigen dem PB-Business-Germany zuzuordnenden Verträge der DBLA mit Dritten, die nicht in der Anlage 3.4 und Anlage 3.5 aufgeführt sind; eine abschließende Auflistung solcher Verträge zum Ausgliederungsstichtag ist in **Anlage 3.6** enthalten.

3.7    Die DBLA überträgt auf die NewCo auch alle nicht bilanzierungspflichtigen oder nicht bilanzierungsfähigen oder tatsächlich nicht bilanzierten Gegenstände des Aktiv- und Passivvermögens, die dem vorstehend beschriebenen PB-Business-Germany zugeordnet sind und abschließend in **Anlage 3.7** aufgeführt sind.

### § 4
### Von der Ausgliederung ausgenommene
### Aktiva, Passiva, Verträge und Rechtsverhältnisse

Von der Ausgliederung ausgenommen sind die nachfolgenden Gegenstände des Aktiv- und Passivvermögens, Verträge sowie sonstigen Rechte und Pflichten von DBLA in Bezug auf das PB-Business-Germany einschließlich der aus ihnen folgenden Ansprüche und Verpflichtungen:

4.1    Sämtliche dem PB-Business-Germany zuzuordnenden, Prozessrechtsverhältnisse und sonstigen verfahrensrechtlichen Rechtsverhältnisse, insbesondere keine zivilrechtlichen Klageverfahren, Mahnverfahren, selbständigen Beweisverfahren, Verfahren im einstweiligen Rechtsschutz, Zwangsvollstreckungsverfahren und Bußgeldverfahren sowie sonstige Verfahren;

4.2    Die dem PB-Business-Germany zuzuordnenden Gegenstände des beweglichen Anlagevermögens, insbesondere das gesamte Inventar des PB-Business-Germany an dem Standort Hamburg;

4.3    Pensionsanwartschaften und Pensionsanwartschaftsrechte früherer Arbeitnehmer der
       DBLA im Bereich PB-Business-Germany, deren Anstellungsvertrag vor dem Voll-
       zugsdatum beendet wurde;

4.4    Weitere über die Regelung in § 3.1 hinausgehende Mitarbeiter;

4.5    Alle Kunden mit sog. Durchleitungskredite oder Fiduciary Loans sowie etwaigen
       Corporate Loans gemäß **Anlage 4.5** sowie Kunden mit den diesen Krediten zugeord-
       neten Sicherheiten;

4.6    Alle Kundenbeziehungen, die dem sogenannten US W9 Status unterliegen und die in
       **Anlage 4.6** aufgeführt sind. Diese Kundenbeziehungen sollen von der DBLA separat
       auf die Swiss Financial Advisors AG in der Schweiz übertragen werden. Anlage 4.6
       enthält ferner Kundenbeziehungen, die aus Gründen der Compliance nicht auf NewCo
       übergehen sollen.

## § 5
### Ausgliederungsstichtag

5.1    Die Ausgliederung erfolgt im Verhältnis zwischen DBLA und NewCo mit Wirkung
       zum 1. Oktober 2004, 0.00 Uhr (der **"Ausgliederungsstichtag"**). Von diesem Zeit-
       punkt an gelten die Handlungen der DBLA, soweit sie den mit dieser Urkunde ausge-
       gliederten Geschäftsbereich PB-Business-Germany betreffen, als für Rechnung der
       NewCo vorgenommen. DBLA und NewCo werden demgemäss einander so stellen,
       als wäre der Geschäftsbereich PB-Business-Germany bereits am Ausgliederungs-
       stichtag auf NewCo übergegangen. Eine separate buchungstechnische Darstellung für
       den ausgegliederten Geschäftsbereich PB-Business-Germany ist für den Zeitraum
       zwischen dem Ausgliederungsstichtag und dem Vollzugsdatum nicht möglich. Ein
       etwaiger Ausgleich für diesen Zeitraum wird durch die DBLA nicht gewährt.

5.2    Die Übertragung der Gegenstände des Aktiv- und Passivvermögens und der sonstigen
       Rechte und Pflichten erfolgt mit dinglicher Wirkung zum Zeitpunkt der Eintragung
       der Ausgliederung in das Handelsregister des Sitzes der DBLA (das **"Vollzugsda-
       tum"**).

5.3    Falls die Ausgliederung nicht bis zum 31. Mai 2005 in das Handelsregister der DBLA
       eingetragen wird, gilt abweichend von § 5.1 der 1. Januar 2005, 00:00 Uhr als Aus-
       gliederungsstichtag.

– 9 –

## § 6
### Übertragungshindernisse, Mitwirkungspflichten

6.1    Soweit für die Übertragung von bestimmten, dem PB-Business-Germany zuzuord-
nenden Gegenständen des Aktiv- und Passivvermögens, Verträgen, Rechten sowie
sonstiger vertraglicher und außervertraglicher Rechte und Pflichten von DBLA die
Zustimmung eines Gläubigers, Schuldners oder sonstiger Dritter oder die Zustim-
mung einer Behörde erforderlich ist, werden sich DBLA und NewCo bemühen, die
Zustimmung zu beschaffen.

6.2    Soweit bestimmte, dem PB-Business-Germany zuzuordnende Gegenstände des Aktiv-
und Passivvermögens, Verträge, Rechte sowie sonstige vertragliche und außerver-
tragliche Rechte und Pflichten der DBLA nicht schon kraft gesetzlicher Gesamt-
rechtsnachfolge zum Vollzugsdatum auf NewCo übergehen, ist DBLA für einen Zeit-
raum von zwei Jahren nach Vollzugsdatum verpflichtet, diese Gegenstände im Wege
der Einzelrechtsnachfolge zu übertragen.

6.3    DBLA wird in Bezug auf die derzeit vom PB-Business-Germany genutzten, in **Anla-
ge 6.3** näher beschriebenen Flächen in Hamburg ein Nutzungsrecht gewähren. NewCo
ist zur Nutzung dieser Räumlichkeiten einschließlich Strom, Wasser und Telekom-
munikation für einen Zeitraum von zehn Bankarbeitstagen nach dem Vollzugsdatum
berechtigt und hat für diese Nutzung keine Gegenleistung zu entrichten.

6.4    DBLA wird sich bemühen, eine reibungslose technische Überleitung des PB-
Business-Germany auf NewCo unmittelbar nach Vollzugsdatum sicherzustellen. Un-
mittelbar nach Abschluss dieses Ausgliederungsplans wird die DBLA nach Maßgabe
des § 13 des SPA Vorbereitungen für eine Überleitung des PB-Business-Germany,
insbesondere im Hinblick auf eine buchungstechnische Erfassung der zu übertragen-
den Kundenbeziehungen, treffen. IT-Lösungen und andere Dienstleistungen, die für
eine Weiterführung des PB-Business-Germany erforderlich sind, werden der NewCo
nach Maßgabe des § 13 SPA und des in Anlage 13.2 zum SPA niedergelegten "Tran-
sitional Services Agreement" zur Verfügung gestellt.

6.5    Soweit DBLA nach dem Vollzugsdatum auf eine im Wege der Gesamtrechtsnachfol-
ge oder der Einzelrechtsnachfolge gemäß § 6.2 übertragene Forderung gegenüber
Kunden des PB-Business-Germany, ehemaligen Kunden des PB-Business-Germany
oder Dritten Zahlungen erhält, so wird DBLA die erlangten Beträge vollständig und
unverzüglich an NewCo weiterleiten.

6.6     Soweit NewCo nach dem Vollzugsdatum auf eine nicht im Wege der Gesamtrechts-
        nachfolge oder der Einzelrechtsnachfolge gemäß § 6.2 übertragene Forderung der
        DBLA gegenüber Dritten Zahlungen erhält, so wird NewCo die erlangten Beträge
        vollständig und unverzüglich an DBLA weiterleiten.

6.7     Ferner wird DBLA, soweit rechtlich zulässig, NewCo sämtliche Dokumente, die in
        Zusammenhang mit den gemäss § 2.1 übertragenen Geschäftsbeziehungen stehen, ü-
        bergeben.

## § 7
### Gegenseitige Freistellung

Wenn und soweit DBLA oder NewCo aufgrund der Bestimmungen in § 133 UmwG oder an-
derer gesetzlicher oder vertraglicher Bestimmungen von Gläubigern für Verbindlichkeiten
und Verpflichtungen sowie aus Haftungsverhältnissen in Anspruch genommen werden, die
nach Maßgabe der Bestimmungen dieses Ausgliederungsplans der jeweils anderen Gesell-
schaft zugeordnet sind, so hat die jeweils andere Gesellschaft die in Anspruch genommene
Gesellschaft von derartigen Verbindlichkeiten und Verpflichtungen sowie Haftungen auf
erstes Anfordern freizustellen.

## § 8
### Gegenleistung

8.1     Als Gegenleistung für das durch diesen Ausgliederungsplan übertragene Vermögen
        erhält DBLA kostenfrei den einzigen ab dem Vollzugsdatum gewinnberechtigten Ge-
        schäftsanteil an NewCo im Nennwert von EUR 10.000.000,00.

8.2     Der Gesamtwert, zu dem die von DBLA erbrachte Sacheinlage von NewCo ange-
        nommen wird, entspricht dem handelsrechtlichen Buchwert des übertragenen Vermö-
        gens zum Vollzugsdatum. Ferner wird die DBLA eine Barzahlung auf ein Konto der
        NewCo in Höhe von EUR 35.000.0000,00 vornehmen, die auf die Stammeinlage an-
        gerechnet werden soll. Soweit der Buchwert des übertragenen Nettovermögens den
        Nennbetrag des dafür gewährten Geschäftsanteils übersteigt, wird der Differenzbetrag
        gemäß § 272 Abs. 2 Nr. 1 HGB in die Kapitalrücklage eingestellt.

## § 9
### Besondere Rechte und Vorteile

9.1 Rechte im Sinne von § 126 Abs. 1 Nr. 7 UmwG wurden und werden nicht gewährt. Maßnahmen im Sinne von § 126 Abs. 1 Nr. 7 UmwG sind nicht vorgesehen.

9.2 Besondere Vorteile im Sinne von § 126 Abs. 1 Nr. 8 UmwG wurden und werden nicht gewährt.

## § 10
### Folgen der Ausgliederung für Arbeitnehmer und ihre Vertretungen

10.1 DBLA beschäftigte zum Ausgliederungsstichtag 841 Arbeitnehmer. Dem im Rahmen der Ausgliederung zu übertragenden PB-Business-Germany sind die in Anlage 3.1a anhand der ihnen zugeordneten Personalnummern individualisierten Arbeitnehmer zugeordnet. Mit Wirkung ab dem Vollzugsdatum gehen die Arbeitsverhältnisse dieser Arbeitnehmer gemäß § 324 UmwG i.V.m. § 613a Abs. 1 Satz 1 BGB mit allen Rechten und Pflichten auf NewCo über, sofern die betroffenen Arbeitnehmer nicht gemäß § 613a Abs. 6 BGB innerhalb eines Monats nach Zugang der Unterrichtung über den Übergang (§ 613a Abs. 5 BGB) schriftlich widersprochen haben. Im Falle des Widerspruchs haben die Arbeitnehmer aufgrund des Wegfalls ihrer Arbeitsplätze bei DBLA mit der Möglichkeit des Ausspruchs einer betriebsbedingten Kündigung zu rechnen.

Für den Inhalt der übergegangenen Arbeitsverhältnisse ist der Rechtszustand maßgeblich, der zum Vollzugsdatum besteht. Bei allen von der Dienstzeit abhängigen Regelungen werden die bei DBLA erdienten und die von ihr anerkannten Dienstzeiten voll angerechnet. Arbeitsverhältnisse können nicht wegen der Ausgliederung gekündigt werden. Außerdem verschlechtert sich die kündigungsrechtliche Stellung der übergehenden Arbeitnehmer aufgrund der Ausgliederung für die Dauer von zwei Jahren ab dem Zeitpunkt ihres Wirksamwerdens nicht (§ 323 Abs. 1 UmwG). Insbesondere bleibt das Kündigungsschutzgesetz (KSchG) anwendbar, auch wenn der jeweilige Betrieb von NewCo nach der Ausgliederung den Schwellenwert des § 23 Abs. 1 KSchG unterschreiten sollte.

10.2 DBLA ist Mitglied des Arbeitgeberverbands des privaten Bankgewerbes e.V. NewCo wird nicht Mitglied in einem Arbeitgeberverband sein. Daher werden die Rechte und Pflichten aus den im Zeitpunkt des Übergangs anwendbaren Rechtsnormen der Tarifverträge für das private Bankgewerbe für kraft Gewerkschaftsmitgliedschaft tarifgebundene Arbeitnehmer Inhalt des Arbeitsverhältnisses zwischen NewCo und diesen

Arbeitnehmern, also gemäß § 613a Abs. 1 Satz 2 BGB in Individualrecht transformiert. Vor Ablauf eines Jahres nach dem Zeitpunkt des Übergangs dürfen die transformierten Tarifbedingungen nicht zum Nachteil der Arbeitnehmer geändert werden. Beruht die Geltung der Tarifverträge auf einer vertraglichen Bezugnahme, so gelten die im Zeitpunkt des Übergangs in Bezug genommenen Tarifverträge als Inhalt des Arbeitsvertrags gemäß § 613a Abs. 1 Satz 1 BGB.

10.3   Die bei DBLA geltenden Betriebsvereinbarungen und Gesamtbetriebsvereinbarungen gelten nach dem Betriebsteilübergang nach Maßgabe von § 613a Abs. 1 BGB fort.

10.4   Die betriebsverfassungsrechtlichen Strukturen der DBLA bleiben zunächst unverändert. Für den an dem Standort Hamburg weitergeführten Ursprungsbetrieb der DBLA behält der dort gewählte Betriebsrat sein Mandat. Für den im Zuge der Ausgliederung auf NewCo abgespaltenen Betriebsteil nimmt der Betriebsrat von DBLA gem. § 21a BetrVG ein Übergangsmandat wahr, bis bei NewCo ein neuer Betriebsrat gewählt wird, längstens jedoch für die Dauer von sechs Monaten.

10.5   Wegen der im Zuge der Ausgliederung anfallenden Betriebsspaltung hat die Geschäftsleitung der DBLA mit dem Betriebsrat der DBLA am 16. Februar 2005 einen Interessenausgleich abgeschlossen.

10.6   DBLA wird in Hamburg (einschließlich der Expatriates) ab dem Vollzugsdatum ca. 449 Mitarbeiter beschäftigen. Aufgrund des unmittelbar nachfolgenden Konzernaustritts der NewCo werden der DBLA die aufgrund dieses Ausgliederungsplans übergehenden Arbeitnehmer der NewCo nicht zugerechnet. Dennoch bleibt bei der DBLA gem. § 1 Abs. 1 Ziffer 1 DrittelbeteiligungsG die Verpflichtung zur Beteiligung der Arbeitnehmer am Aufsichtsrat bestehen.

10.7   NewCo wird ab dem Vollzugsdatum 52 Mitarbeiter inklusive von 9 Expatriates beschäftigen, die von DBLA auf NewCo übergehen. Bei der NewCo besteht damit keine Verpflichtung zur Bildung eines Aufsichtsrats unter Beteiligung der Arbeitnehmer, und NewCo wird einen solchen Aufsichtsrat auch nicht bilden.

## § 11
### Gewährleistung

Jegliche Gewährleistungen nach diesem Ausgliederungsplan sind – sofern in diesem Ausgliederungsplan nicht abweichend geregelt – ausgeschlossen.

– 13 –

## § 12
### Künftiges Verhältnis zwischen DBLA und NewCo

12.1   NewCo verpflichtet sich, nach Ablauf von 30 Tagen nach dem Vollzugsdatum jegliche Verwendung der in **Anlage 12.1** aufgeführten Firmennamen und Logos der DBLA oder etwaiger Variationen hiervon zu unterlassen. NewCo wird im Hinblick hierauf sämtliche Produktbeschreibungen, Geschäftseinrichtungen und Geschäftsräume sowie alle weiteren Einrichtungen und Dokumente, die solche Firmennamen und Logos tragen, ändern. Soweit die in <u>Anlage 12.1</u> aufgeführten Firmennamen oder Logos von NewCo in dem Zeitraum von 30 Tagen nach dem Vollzugsdatum genutzt werden, wird NewCo sicherstellen, dass diese Firmennamen und Logos mit einem entsprechend erkennbaren Hinweis auf den Erwerber der Anteile an der NewCo versehen sind.

12.2   Von der vorstehenden Verpflichtung der NewCo ausgenommen ist die Nutzung von derzeit an Kunden des PB-Business-Germany ausgegebenen Kreditkarten sowie derjenigen, die zum Ersatz der Maestro-Karten ausgegeben werden. Diese Kreditkarten tragen sowohl das Logo der Dresdner Bank AG als auch der DBLA. Die Kunden sollen diese Kreditkarten für die Dauer von bis zu einem Jahr nach dem Closing des SPA nutzen dürfen. NewCo wird DBLA und Dresdner Bank AG von sämtlichen Schäden im Zusammenhang mit der Verwendung der Firma "Dresdner Bank Lateinamerika" und des Logos der Dresdner Bank AG und der DBLA auf den Kreditkarten freistellen.

12.3   NewCo verpflichtet sich ferner, über die ihr bekannt gewordenen Geschäftsgeheimnisse von DBLA Stillschweigen zu wahren und ihren Mitarbeitern diese Vertraulichkeitspflicht aufzuerlegen, soweit diese nicht das PB-Business betreffen oder mit dem PB-Business in Zusammenhang stehen.

## § 13
### Wirksamkeit der Ausgliederung

Dieser Ausgliederungsplan bedarf zu seiner Wirksamkeit der Zustimmung durch die Hauptversammlung von DBLA sowie der Eintragung der Ausgliederung in das Handelsregister des Sitzes der DBLA nach Eintragung der neugegründeten NewCo in das Handelsregister ihres künftigen Sitzes.

– 14 –

## § 14
### Schlussbestimmungen/Kosten

14.1 Sollten eine Bestimmung oder mehrere Bestimmungen dieses Ausgliederungsplans unwirksam, undurchführbar oder nicht in das Handelsregister eintragungsfähig sein, berührt dies die Wirksamkeit des Ausgliederungsplans im übrigen nicht. Die unwirksame, undurchführbare oder im Handelsregister nicht eintragungsfähige Bestimmung ist in diesem Falle als durch diejenige wirksame, durchführbare und im Handelsregister eintragungsfähige Bestimmung ersetzt anzusehen, die dem wirtschaftlichen Zweck der unwirksamen, undurchführbaren bzw. im Handelsregister nicht eintragungsfähigen Bestimmung am nächsten kommt. Gleiches gilt im Fall einer Lücke.

14.2 Soweit in diesem Ausgliederungsplan nicht anders bestimmt, sind sämtliche Kosten dieser Ausgliederung von DBLA zu tragen.

Es werden hiermit bevollmächtigt die Notariatsangestellten

Frau Ilona Gätjen,

Frau Alexandra Niehaus-Manhart,

Frau Nuriye Kir,

Frau Gaby Heinrich,

Frau Alexandra Demel,

sämtlich Geschäftsanschrift: Neuer Wall 75, 20354 Hamburg,

und zwar jede einzeln, alle zum Vollzug dieser Urkunde noch erforderlichen Erklärungen abzugeben.

Die Bevollmächtigten sind auch zur Abänderung und zur Wiederholung der in dieser Urkunde abgegebenen Erklärungen berechtigt.

Von dieser Vollmacht darf nur vor dem Notar Dr. Adam Freiherr von Kottwitz, Hamburg, oder seinem Vertreter im Amt Gebrauch gemacht werden.

– 15 –

Hierüber ist diese in Urschrift bei mir verbleibende Niederschrift aufgenommen, den Erschienenen samt Anlagen, soweit nicht von den Erleichterungen des § 14 BeurkG Gebrauch gemacht wurde oder zur Durchsicht vorgelegt wurden, vorgelesen, von ihnen genehmigt und eigenhändig wie folgt unterschrieben und auch von mir, dem Notar, unterschrieben und besiegelt worden.

Hamburg, den 20. April 2005

Dresdner Bank Lateinamerika AG





Dresdner Bank Lateinamerika AG

vormals Deutsch-Südamerikanische Bank AG

## VOLLMACHT

Hiermit bevollmächtigen wir, die unterzeichnende Dresdner Bank Lateinamerika AG, Hamburg, ("Vollmachtgeberin")

1.   Herrn Bernd Bertram
     dienstansässig: Neuer Jungfernstieg 16, 20354 Hamburg

2.   Herrn Dr. Alexander von Kuhlberg
     dienstansässig: Neuer Jungfernstieg 16, 20354 Hamburg

3.   Herrn Stefan Britz
     dienstansässig: Neuer Jungfernstieg 16, 20354 Hamburg

4.   Herrn Dr. Hans Diekmann
     dienstansässig: Breite Straße 69, 40213 Düsseldorf

5.   Herrn Dr. Patrick Nordhues
     dienstansässig: Breite Straße 69, 40213 Düsseldorf

("Bevollmächtigte")

jeweils einzeln, die Vollmachtgeberin zu vertreten

> beim notariellen Abschluss einer Änderungsvereinbarung zwischen der **Vollmacht-geberin**, der **Dresdner Bank AG**, Frankfurt am Main, und der **UBS Wealth Management AG**, Frankfurt am Main, zum Asset and Share Purchase Agreement vom 18. Dezember 2004 (Urkunde Nr. 3004/2004 des Notars Dr. Freiherr von Kottwitz, Hamburg) sowie beim notariellen Abschluss eines Ausgliederungsplans über die Ausgliederung des deutschen Privatkundengeschäfts der Vollmachtgeberin auf ein von der Vollmachtgeberin neu zu gründendes Tochterunternehmen in der Rechtsform einer GmbH.

9-Vorstand (12.99)

Die Bevollmächtigten sind berechtigt, alle Bedingungen im Zusammenhang mit dem Vorgesagten festzulegen und für die Vollmachtgeberin alle Verträge abzuschließen, alle Erklärungen abzugeben und anzunehmen, alle Handlungen vorzunehmen und alle Maßnahmen zu treffen, die sie im Zusammenhang mit dem Vorgesagten für notwendig oder angebracht erachten. Die Bevollmächtigten können die Vollmachtgeberin auch gegenüber Gerichten, Verwaltungsbehörden und Registern vertreten.

Hamburg, den 15. April 2005

Dresdner Bank Lateinamerika
Aktiengesellschaft

Wolfgang Dambmann

Joachim G. Weichbrodt

<u>Nr. 1506 der Urkundenrolle für 2005 H</u>

Hermit beglaubige ich, der Hamburgische Notar

Dr. jur. Horst Heiner Hellge,

die vorstehenden, vor mir vollzogenen Unterschriften der mir bekannten Herren

1.  Wolfgang Dambmann,
    geb. am 11.03.1949,
2.  Joachim G. Weichbrodt,
    geb. am 01.04.1948,

    beider Anschrift: Neuer Jungfernstieg 16, 20354 Hamburg,

handelnd als gemeinsam vertretungsberechtigtes Vorstandsmitglied (1.) bzw. als
Gesamt-Prokurist (2.) der zu Hamburg unter der Firma

**Dresdner Bank Lateinamerika Aktiengesellschaft**
**(vormals Deutsch-Südamerikanische Bank Aktiengesellschaft)**
Anschrift: Neuer Jungfernstieg 16, 20354 Hamburg,
-Amtgericht Hamburg, HR B 85 24-,

bestehenden Aktiengesellschaft.

Gemäß § 21 Bundesnotarordnung bescheinige ich, der Notar, aufgrund heutiger
Einsicht in das Handelsregister des Amtgerichts Hamburg - HR B 85 24 -, dass Herr
Wolfgang Dambmann in seiner Eigenschaft als Vorstandsmitglied und Herr Joachim
G. Weichbrodt in seiner Eigenschaft als Prokurist berechtigt sind, die vorbezeichnete
Aktiengesellschaft gemeinsam zu vertreten.

Hamburg, den 15. April 2005

**Kostenberechnung:**
Grenzwert
Gebühr: §§ 32, 45    KostO Euro 130,00
Gebühr: §§ 32, 58    KostO Euro   30,00
Gebühr: §§ 32, 150 KostO Euro   13,00
Umsatzsteuer 16 %            Euro   27,68
                             Euro 200,68
                             =========




Der Notar:

Nr. 1506 der Urkundenrolle für 2005 H

Hermit beglaubige ich, der Hamburgische Notar

Dr. jur. Horst Heiner Hellge,

die vorstehenden, vor mir vollzogenen Unterschriften der mir bekannten Herren

1.   Wolfgang Dambmann,
     geb. am 11.03.1949,
2.   Joachim G. Weichbrodt,
     geb. am 01.04.1948,

     beider Anschrift: Neuer Jungfernstieg 16, 20354 Hamburg,

handelnd als gemeinsam vertretungsberechtigtes Vorstandsmitglied (1.) bzw. als
Gesamt-Prokurist (2.) der zu Hamburg unter der Firma

**Dresdner Bank Lateinamerika Aktiengesellschaft**
**(vormals Deutsch-Südamerikanische Bank Aktiengesellschaft)**
Anschrift: Neuer Jungfernstieg 16, 20354 Hamburg,
-Amtsgericht Hamburg, HR B 85 24-,

bestehenden Aktiengesellschaft.

Gemäß § 21 Bundesnotarordnung bescheinige ich, der Notar, aufgrund heutiger
Einsicht in das Handelsregister des Amtsgerichts Hamburg - HR B 85 24 -, dass Herr
Wolfgang Dambmann in seiner Eigenschaft als Vorstandsmitglied und Herr Joachim
G. Weichbrodt in seiner Eigenschaft als Prokurist berechtigt sind, die vorbezeichnete
Aktiengesellschaft gemeinsam zu vertreten.

Hamburg, den 15. April 2005

**Kostenberechnung:**
Grenzwert
Gebühr: §§ 32, 45    KostO Euro 130,00
Gebühr: §§ 32, 58    KostO Euro  30,00
Gebühr: §§ 32, 150  KostO Euro  13,00
Umsatzsteuer 16 %           Euro  27,68
                            Euro 200,68
                            =========



Der Notar: