# Issues and Challenges in Corporate and Capital Market Law: Germany and East Asia

Edited by

HOLGER FLEISCHER, HIDEKI KANDA,
KON SIK KIM, and PETER MÜLBERT

*Max-Planck-Institut
für ausländisches und internationales
Privatrecht*

*Beiträge zum ausländischen
und internationalen Privatrecht*

*121*

Mohr Siebeck

Beiträge zum ausländischen und internationalen Privatrecht

121

Herausgegeben vom

## Max-Planck-Institut für ausländisches und internationales Privatrecht

Direktoren:

Holger Fleischer und Reinhard Zimmermann



# Issues and Challenges
# in Corporate and
# Capital Market Law:
# Germany and East Asia

Edited by

Holger Fleischer, Hideki Kanda,
Kon Sik Kim and Peter Mülbert

Mohr Siebeck

ISBN  978-3-16-156209-9 / eISBN 978-3-16-156210-5
DOI 10.1628/978-3-16-156210-5

ISSN  0340-6709 / eISSN 2568-6577
(Beiträge zum ausländischen und internationalen Privatrecht)

The Deutsche Nationalbibliothek lists this publication in the Deutsche Nationalbibliographie;
detailed bibliographic data are available on the Internet at *http://dnb.dnb.de*.

© 2018  Mohr Siebeck Tübingen. www.mohrsiebeck.com

This book may not be reproduced, in whole or in part, in any form (beyond that permitted by
copyright law) without the publisher's written permission. This applies particularly to reproduc-
tions, translations and storage and processing in electronic systems.

The book was printed on non-aging paper by Gulde-Druck in Tübingen, and bound by Groß-
buchbinderei Spinner in Ottersweier.

Printed in Germany.

## Preface

This volume is based on presentations delivered at a symposium held in March 2016 at the University of Tokyo. The symposium is part of a conference series organized to stimulate the scholarly exchange between company law academics in Germany, China, Japan and South Korea which can be traced back to the late 19th century. The organizers are convinced that this exchange will be very fruitful in solving the challenges for company and capital markets law in the 21st century. A follow-up conference has already taken place in Seoul in March 2017.

We would like to express our gratitude to our Japanese hosts for unforgettable days in Tokyo. Furthermore, we would like to thank all participants for their valuable and much appreciated contributions. Janina Jentz and Jakob Hahn took care of the editing process, their help is gratefully acknowledged. Last but not least, our sincere thanks go to Jocasta Godlieb and Michael Friedman for providing valuable language editing service.

Hamburg, Tokyo, Seoul and Mainz                 *Holger Fleischer*
January 2018                                     *Hideki Kanda*
                                                 *Kon Sik Kim*
                                                 *Peter Mülbert*

# Contents

Preface .................................................................................................... V
Abbreviations ........................................................................................ IX

## *I. Corporate Divisions (or more generally, Umwandlung)*

*Rüdiger Veil*
The German Law on Transformation ............................................................ 3

*Ruoying Chen*
Corporate Division: Rules and Practice in China ........................................ 23

*Hyeok-Joon Rho*
Statutory Corporate Divisions in Korea ...................................................... 45

*Koji Funatsu*
Creditor Protections in Company Splits in Japan ........................................ 69

## *II. Valuation of Shares and Its Procedure*

*Lars Klöhn*
Exit Rights, Shareholder Compensation and the Valuation of Shares in
German Stock Corporation Law .................................................................. 85

*Ok-Rial Song*
Valuation of Shares in Korean Corporate Law ............................................ 97

VIII                                    *Contents*

### *III. Civil Liability of the Company and Its Directors when Financial Statements are False*

*Klaus Ulrich Schmolke*
Civil Liability of the Company and Its Directors for False Financial
Statements under German Law ................................................................. 131

*Li Guo*
General Trends of Misrepresentation Litigation in China ......................... 163

*Sunseop Jung*
Civil Liability of the Company and Its Directors ...................................... 173

*Takahito Kato*
A Recent Transformation of the Japanese Civil Liability System
against Fraudulent Disclosure in Secondary Market .................................. 191

### *IV. Corporate Law Rules on Squeeze-out of Minority Shareholders*

*Jens Koch*
Corporate Law Rules on Squeeze-out of Minority Shareholders................ 207

*Jiangyu Wang*
Squeeze-out (or the Lack Thereof) in the Regulation of Corporate
Mergers in China ...................................................................................... 225

*Moon Hee Choi*
Corporate Law Rules on Squeeze-outs in Korea ....................................... 235

*Eiji Takahashi*
Is the Regime of Japanese Squeeze-out of Minority Shareholders
Constitutional? ......................................................................................... 271

Contributors ............................................................................................. 283

# Abbreviations

| | |
|---|---|
| ADHGB | Allgemeines Deutsches Handelsgesetzbuch |
| AEA | Act on External Audit of Joint Stock Corporations |
| AG | Aktiengesellschaft |
| AktG | Aktiengesetz |
| | |
| BAG | Bundesarbeitsgericht |
| BB | Betriebs-Berater |
| BGB | Bürgerliches Gesetzbuch |
| BGH | Bundesgerichtshof |
| BGHZ | Entscheidungen des Bundesgerichtshofs in Zivilsachen |
| | |
| CEO | Chief Executive Officer |
| CMA | Financial Investment Services and Capital Markets Act |
| CMFIBA | Capital Market and Financial Investment Business Act |
| CPA | Certified Public Accountant |
| CRD | company-recipient-division |
| CSR | Corporate Social Responsibility |
| CSRC | China Securities Regulatory Commission |
| | |
| DB | Der Betrieb |
| DStR | Deutsches Steuerrecht |
| | |
| ECFR | European Company and Financial Law Review |
| ed. | edition |
| EGTC | Estate and Gift Tax Code |
| EU | European Union |
| | |
| FIEA | Financial Instruments and Exchange Act |
| FSC | Financial Services Commission |
| FSS | Financial Supervisory Service |
| FTC | Fair Trade Commission |
| | |
| GmbH | Gesellschaft mit beschränkter Haftung |
| GmbHG | Gesetz betreffend die Gesellschaften mit beschränkter Haftung |
| GMS | General Meeting of Shareholders |
| GPCL | General Principles of Civil Law |
| | |
| HGB | Handelsgesetzbuch |
| | |
| IFRS | International Financial Reporting Standards |
| IPO | initial public offering |

X                                          *Abbreviations*

| | |
|---|---|
| JCA | Japanese Company Act |
| JFSA | Japanese Financial Service Agency |
| | |
| KCC | Korean Commercial Code |
| KCML | Korean Capital Market Law |
| KEGTL | Korean Estate and Gift Tax Law |
| KG | Kommanditgesellschaft |
| KGaA | Kommanditgesellschaft auf Aktien |
| KRX | Korean Stock Exchange |
| | |
| LG | Landgericht |
| LLC | Limited Liability Company |
| LLP | Limited Liability Partnership |
| | |
| M&A | Mergers & Acquisitions |
| MOJ | Ministry of Justice |
| MRFTA | Monopoly Regulation and Fair Trade Act |
| | |
| NJW | Neue juristische Wochenschrift |
| NZG | Neue Zeitschrift für Gesellschaftsrecht |
| | |
| OHG | Offene Handelsgesellschaft |
| OLG | Oberlandesgericht |
| | |
| PRC | People's Republic of China |
| | |
| SFC | Securities and Futures Commission |
| SOEs | State-owned enterprises |
| SpruchG | Gesetz über gesellschaftsrechtliche Spruchverfahren |
| SR | Shareholder resolution |
| SRD | shareholder-recipient-division |
| StGB | Strafgesetzbuch |
| | |
| UK | United Kingdom |
| UmwG | Umwandlungsgesetz |
| US | United States of America |
| | |
| WpHG | Wertpapierhandelsgesetz |
| WpÜG | Wertpapiererwerbs- und Übernahmegesetz |
| | |
| ZGR | Zeitschrift für Unternehmens- und Gesellschaftsrecht |
| ZHR | Zeitschrift für das gesamte Handels- und Wirtschaftsrecht |
| ZIP | Zeitschrift für Wirtschaftsrecht |

# I. Corporate Divisions
## (or more generally, Umwandlung)

# The German Law on Transformation

## Principles and Experiences after 20 Years of the Codification of German Transformation Law

### *Rüdiger Veil*

I.   Introduction ..................................................................................................3
II.  Types of Transformation ..............................................................................5
     1. Merger ...................................................................................................5
     2. Division into Several Enterprises ..........................................................6
     3. Conclusion .............................................................................................7
III. Universal Succession ....................................................................................7
     1. Agreement .............................................................................................7
     2. Entry in Commercial Register ...............................................................8
     3. Conclusion .............................................................................................9
IV.  Protection of Creditors ................................................................................9
     1. Foundations ...........................................................................................9
     2. Claim for Payment of Security ............................................................10
     3. Liability Arising from a Division ........................................................11
     4. Conclusion ...........................................................................................12
V.   Shareholder Protection ..............................................................................13
     1. Foundations .........................................................................................13
     2. Protection *ex-ante* .............................................................................14
     3. Protection *ex-post* .............................................................................16
     4. Evaluation ............................................................................................18
VI.  Outlook .......................................................................................................22

## I. Introduction

In Germany company transformations have long played a major role. The first merger took place in 1831, when several coal mines merged to form the *Vereinigungsgesellschaft für Steinkohlebergbau.*[1] In 1861, the legislator in-

---

[1] R. GOLDSCHMIDT, Die sofortige Verschmelzung (Fusion) von Aktiengesellschaften (Berlin 1930) 5. At that time, a legal basis for a merger did not consist. It had to be approved by the Prussian state.

4                                          *Rüdiger Veil*

troduced the first legal basis for a merger.[2] Since then, numerous reforms have been implemented in order to facilitate company transformation.[3] Thus far, this development has culminated in the codification of transformation law via the Transformation Act of 28 October 1994.[4] The purpose of this Act is to provide suitable procedures for the various forms of transformation and adequately protect minority shareholders as well as creditors.

As a codification of fundamental principles and laws, the German Transformation Act aims to regulate all kinds of mergers, divisions and changes of legal form.[5] Its systematic structure is similar to the German Civil Code (BGB), first providing a general section for all types of transformation followed by general and specific sections for mergers, divisions and the change of the legal form of a company.

This article provides an overview of the different types of transformation, explains which principles apply and analyses the main instruments of shareholder and creditor protection. It concludes with a discussion of whether the German Transformation Act has proven its value in practice as a tool for regulating transformations, by considering the merger between *Deutsche Börse* and *London Stock Exchange* concluded by the management of both companies in 2016, but failed one year later. The focus is on mergers and divisions (split-up, spin-off and hive-down), which are characterised by a transfer of assets and liabilities through so-called universal succession. Hence, the instruments of creditor and shareholder protection are essentially the same. This article does not deal with change of a legal form.[6]

---

[2] Art. 247 ADHGB of 1861 (Allgemeines Deutsches Handelsgesetzbuch – German Trade Code).

[3] Between 1961 and 1991, 12 reforms took place in Germany. Cf. R. VEIL, Umwandlungen in: Bayer/Habersack (eds.), Aktienrecht im Wandel der Zeit, Volume 2 (Tübingen 2007) 1066–1087.

[4] German Transformation Act (Umwandlungsgesetz – UmwG) of 28 October 1994, BGBl. I 1994, p. 3210. The German Federal Ministry of Justice and Consumer Protection in cooperation with juris GmbH provides an English translation of the Act. It is available at: <http://www.gesetze-im-internet.de/englisch_umwg/>.

[5] The UmwG exclusively regulates types of transformation (so-called *numerus clausus* of transformations, cf. § 1 para. 2 UmwG). However, some types of a transformation are not covered by the UmwG. This is particularly true for specific changes of a legal form of a partnership. In addition, transformations by way of singular succession are not precluded by the Transformation Act. See T. DRYGALA, in Lutter (ed.), Umwandlungsgesetz, 5th ed. 2014, § 1 marg. no. 52.

[6] The legal structure of a company may be modified by way of a change of legal form (§ 190 UmwG). This type of transformation preserves the legal identity of the company (so-called "identitätswahrende Umwandlung"). For more detail see T. RAISER/R. VEIL, Recht der Kapitalgesellschaften, (6th ed., Munich 2015) § 67 marg. no. 21–23.

## II. Types of Transformation

*1.  Merger*

The prototype of a transformation is the merger. When merging by way of absorption[7] the assets of one legal entity are transferred to another legal entity,[8] and the entity being acquired is dissolved.[9] Shares in the acquiring legal entity are allotted to the owners of shares in the legal entity being acquired. In contrast, when merging by way of a newly formed legal entity,[10] a new legal entity is formed through allotment of the total assets of two or more legal entities to a separate, newly formed legal entity. As soon as the assets have been allotted to the new entity, the acquired entities are dissolved.

Mergers mostly take place within a group of companies. In practice, the merger of a subsidiary into the parent company *(upstream merger)* is more common, but the merger of a parent company into the subsidiary *(downstream merger)* and the merger of two sister companies *(sidestream merger)* also occur frequently. The merger of two independent companies remains an exception in Germany, although it does occur now and then. The most prominent example is the merger between the *Thyssen AG* and the *Friedrich Krupp AG Hoesch-Krupp* forming the *ThyssenKrupp AG*[11] (so-called merger of equals).

The Transformation Act also provides the possibility of a cross-border merger of companies limited by shares.[12] The key distinguishing feature of such a merger is that at least one of the companies involved must be subject to the laws of another Member State of the EU.[13] However, nowadays owing to a change in preferred practice, large cross-border transactions generally do not take place in accordance with the provisions laid down in the Transformation Act. For example, in case of the current merger between *Deutsche Börse* and the *London Stock Exchange* the management boards have agreed to

---

⁷  § 2 no. 1 and §§ 4 et seq. UmwG.

⁸  Legal entities eligible for mergers are commercial partnerships, companies limited by shares, registered cooperative societies, registered associations, confederations responsible for auditing cooperative societies and mutual insurance companies. See § 3 para. UmwG.

⁹  A merger becomes effective with the entry in the register kept at the registered seat of the acquiring legal entity. See § 20 para. 1 UmwG.

¹⁰  See § 2 no. 2 and §§ 36 et seq. UmwG.

¹¹  The corporations merged in order to meet the challenges of the globalization of plant engineering and steel industry. See OLG Düsseldorf, ZIP 1999 793 und OLG Hamm, ZIP 1999 798.

¹²  §§ 122a–122l UmwG.

¹³  A challenge for cross-border mergers is that different valuation principles apply. See T. Kohl, A Comparison of Valuation Principles in Germany and Internationally, in: Rödder/Bahns/Schönfeld (eds.), Cross-Border Investments with Germany – Tax, Legal and Accounting, In Honour of Deltev J. Piltz (Cologne 2014), 601–612.

combine the businesses under a UK holding company with the shares of Deutsche Börse AG acquired pursuant to a public takeover, and thus outside the purview of the German Transformation Act.[14] The merger between *Linde AG* and the US-American *Praxair Inc.* will be structured in the same way.[15]

### 2. Division into Several Enterprises

The division into several enterprises can take place as a split-up, spin-off or hive-down.[16] In case of a split-up, the legal entity[17] transfers its assets to two or more legal entities. Afterwards it is dissolved. In return, its shareholders are allotted shares of the new legal entities,[18] which either already exist or have been newly formed for this purpose. By contrast, in a spin-off, only a part of the legal entity's assets is transferred to a legal entity either already in existence or newly formed[19] and the legal entity transferring the assets also continues to exist. In return, the shareholders are allotted shares of the acquiring legal entity. A hive-down[20] also only involves part of the assets, but the shares of the acquiring legal entity are allotted to the legal entity transferring its assets (and not its shareholders), creating a clear distinction between spin-offs and hive-downs.

Hive-downs occur, for instance, when an enterprise incorporates a subsidiary and transfers parts of its assets to that subsidiary. Split-ups or spin-offs may be considered when two or more families hold shares of one legal entity and wish to part. Moreover, split-ups and spin-offs take place when an enterprise wants to confine itself to its core business, allowing those parts of the business no longer needed to be sold or taken public. A prominent example is the spin-off of the former Osram division of the *Siemens AG*. As consideration for the spin-off, Siemens shareholders were allocated shares in *Osram Licht AG*.[21]

---

[14] See in more detail below V.4.b).

[15] R. KÖHN, Linde betreibt die Fusion an seinen Aktionären vorbei, Frankfurter Allgemeine Zeitung (FAZ), 20 January 2017, 19.

[16] § 1 para. 1 no. 2 and § 123 UmwG.

[17] The legal entities eligible for a merger may generally also be involved in a split-up, spin-off or hive-down as legal entities transferring assets, as acquiring legal entities, or as newly formed legal entities. See § 124 para. 1UmwG.

[18] § 123 para. 1 UmwG.

[19] § 123 para. 2 UmwG.

[20] § 123 para. 3 UmwG.

[21] For more detail see the joint spin-off report of the management boards of Siemens AG and Osram Licht AG, submitted pursuant to section 127 Transformation Act. The English version of the report is available at: <https://www.siemens.com/investor/pool/en/investor_relations/events/annual_shareholders_meeting/2013/auslage-top-8-spaltungsbericht_final_en.pdf>.

### 3. Conclusion

The German Transformation Act provides the greatest possible degree of freedom when it comes to corporate restructuring and allows almost all conceivable types of company transformation. Companies have made extensive use of the possibilities provided in the Act.[22] For example, in 2004 and 2005, stock corporations were involved in more than 1,000 mergers and about 200 split-ups.[23]

## III. Universal Succession

### 1. Agreement

The legal basis for a merger or a division is an agreement, which stipulates the details of the transformation process.[24] The merger or division agreement is entered into by the management board of the legal entities participating in the transformation. As German law understands mergers and division as structural changes that are decided by the shareholders, the agreement is not effective until a resolution has been passed at a general meeting. Thereby it has not yet become effective.[25] Thus, when a stock corporation is participating in a merger or a division, a resolution via a general meeting is required.

The most important point of the agreement is that the transfer of assets occurs by universal succession. In the event of a merger, all assets and liabilities of the legal entity being acquired are transferred as a whole to the acquiring legal entity. In case of a division, the legal entity may split-off a part of its assets and liabilities and transfer it to the acquiring legal entity.[26] This entails the transfer of liabilities and contracts, including any transferrable rental or lease agreements.

In case of a merger, approval is not required from creditors or contractual partners. This is meanwhile also true for a division. However, in 1994, the German legislature sought to achieve a high level of creditor protection by

---

[22] Official statistics do not exist. However, it can be concluded from publicly available data that mergers and divisions often take place and are an important way of a transformation. Cf. W. BAYER / T. HOFFMANN, Restrukturierung von Aktiengesellschaften durch umwandlungsrechtliche Maßnahmen, AG 2006 R468.

[23] W. BAYER / T. HOFFMANN, Restrukturierung von Aktiengesellschaften durch umwandlungsrechtliche Maßnahmen, AG 2006 R469–R470.

[24] § 5 UmwG (merger) and § 125 UmwG (division) specify the minimum substance of the respective agreement.

[25] The agreement shall enter into force only if the owners of shares in the legal entities involved consent to the agreement by a resolution (See § 13 para. 1 and § 125 UmwG).

[26] § 20 para. 1 no. 1 regarding a merger and § 131 para. 1 no. 1 UmwG regarding a division.

applying the "general rules precluding the transferability of a specific asset and the general rules making the transferability of an object subject to conditions or requirements",[27] with the goal of preventing abuse of a division to the detriment of creditors.

This rule gave rise to a number of difficult questions of interpretation.[28] In particular, whether the transfer of liabilities would require the consent of a creditor was the subject of some controversy.[29] In 2007, the legislature decided to repeal section 132 of the Transformation Act, thus clarifying that a transfer of contracts and liabilities in the course of a division does not require the consent of the contractual partner and creditors, arguing these would be sufficiently protected.[30] In fact, creditors may rely upon different instruments of civil law and corporate law, exercising general rights under civil law, such as the right of termination and the right of withdrawal for frustration. Furthermore, creditors are protected under a specific liability rule under the Transformation Act.[31]

## 2. Entry in Commercial Register

Following the shareholders' resolution, the transformation does not become effective until it has been entered into the Commercial Register. Only then are the assets transferred to the acquiring legal entity. It is also at this point that the shareholders of the acquired legal entity become shareholders of the acquiring legal entity.[32]

Under the Transformation Act, the legal effect of a transformation is irreversible.[33] Hence, a merger or a division cannot be reversed, even if a severe defect of the transformation becomes evident after entry in the commercial register. Though this has been criticised by a number of academics,[34] arguing

---

[27] § 132 UmwG (since repealed).

[28] See in more detail T. RAISER / R. VEIL, Recht der Kapitalgesellschaften, (4th ed., Munich 2006) § 49 marg. nos. 28-30.

[29] According to the former predominant opinion, a number of rights, such as not freely transferable shares (vinkulierte Geschäftsanteile) of a limited liability company (GmbH) and pre-emptive purchase rights could not be transferred. Cf. H. SCHRÖER, in: Semler / Stengel, Umwandlungsgesetz, 1st ed. 2003, § 132 marg. nos. 31-49.

[30] Explanatory remarks governmant draft, Zweites Umwandlungsrechtsänderungsgesetz, BT-Drucks. 16/2919, 19.

[31] See below IV.3.

[32] See § 20 para. 1 no. 3 UmwG regarding a merger and § 131 para. 1 no. 3 UmwG regarding a division.

[33] See § 20 para. 2 and § 132 para. 2 UmwG: Defects of the merger/division will not have repercussions on the effects of its entry in the register.

[34] Cf. K. SCHMIDT, Haftungsrisiken bei "steckengebliebenen" Verschmelzungen?, DB (1996) 1860; R. VEIL, Umwandlung einer Aktiengesellschaft in eine GmbH (Berlin 1996) 163; C. SCHMID, Das umwandlungsrechtliche Unbedenklichkeitsverfahren und die

the rule affects the fundamental rights of a shareholder, the legislature has justified the rule with the argument that it would be scarcely possible to reverse merger or division transactions, particularly after several years.[35] Instead of an *ex post* cancellation of a merger or division, the Transformation Act provides a broad range of *ex ante* protections for shareholders.

### 3. Conclusion

The transfer of assets and liabilities by way of universal succession is an important element of German transformation law and allows a flexible and cost-efficient transformation of companies. However, in cross-border matters (e.g. when real estate is located abroad) the question arises whether foreign law recognises the principle of universal succession. If not, assets have to be transferred individually.[36]

## IV. Protection of Creditors

### 1. Foundations

Under German law, creditors do not have any influence on a transformation. However, both mergers and divisions can be disadvantageous for creditors. With a merger, creditors are confronted with a new debtor. In the case of a division an additional problem arises: the recoverable assets are reduced, as the acquiring legal entity and the legal entity being acquired are generally not limited in how they divide their assets and liabilities.

Hence, a key object of transformation law is to provide necessary protection for creditors. Interestingly, the system of creditor protections in Germany has changed fundamentally from 1897 to 1994. Initially, transformation law required the separation of the property for a certain period of time (six months).[37] This approach was abandoned due to numerous practical difficul-

---

Reversibilität registrierter Verschmelzungsbeschlüsse, ZGR 1997, 510; C. SCHÄFER, Die „Bestandskraft" fehlerhafter Strukturänderungen im Aktien- und Umwandlungsrecht – zu neuen, rechtlich nicht vertretbaren Ausdehnungstendenzen und zu ihrer prinzipiellen Ungeeignetheit, missbräuchliche Anfechtungsklagen einzudämmen, in: Bitter et al. (eds.), Festschrift für Karsten Schmidt (Cologne 2009) 1389 et seq.; C. SCHÄFER, Die Lehre vom fehlerhaften Verband (Tübingen 2002) 181 et seq.

[35] Explanatory remarks government draft, § 20 UmwG, published by J. GANSKE, Umwandlungsrecht (Düsseldorf 1994) 75.

[36] B. GRUNEWALD, in: Lutter, Umwandlungsgesetz, 5th ed. 2014, § 20 marg. no. 11.

[37] R. VEIL in: Bayer/Habersack (eds.), Aktienrecht im Wandel, Vol. 2 (Tübingen 2007) 1059, 1063, 1065, 1070.

ties and unresolved legal issues.[38] Instead, a more flexible system evolved from 1937–1980 and was adopted by the legislature in 1994 for all types of transformations.

First, the Transformation Act requires that a merger or division for the purpose of forming a new entity can be done only if the provisions governing the formation of the acquiring legal entity are respected.[39] Additionally, the Transformation Act provides several protective rules. These are: the obligation to provide security (section 22), special provisions for the protection of holders of non-voting preference shares (section 23) and claims for damages against wrongful acts of board members (section 25). For divisions, the Transformation Act also stipulates that the entities involved in the division are liable for the debts, obligations and responsibilities of the legal entity being acquired (section 133). In the following, I will focus on the most important elements: the claim for provision of security as well as the liability of legal entities involved in a division.

## 2.  *Claim for Payment of Security*

If the creditors of legal entities involved in a merger or division cannot demand satisfaction for their claims, security is to be provided to them, provided they file their claim in writing within six months of the merger being registered.[40] This also applies when their claim is not yet due.[41] Furthermore, creditors must provide credible evidence that the fulfilment of their claim could be jeopardised by the transformation. In the event of either a merger or a division, this requirement might be fulfilled if the acquiring legal entity to which the liability has been transferred is endangered, which may be assumed if the equity capital base is diminished.[42] However, this condition is not satisfied if the acquiring company is simply conducting high-risk business.[43]

The duty to provide security is not an unfair burden on companies as only those creditors who are not sufficiently secured are entitled to it. This protective measure has proven its value in practice. It becomes especially relevant

---

[38] C. BÖTTCHER/H. MEILICKE, Umwandlung, Verschmelzung und Auflösung (Berlin 1937) § 241 marg. no. 1.

[39] This becomes relevant if an insolvent company is involved in a transformation. Cf. E. WÄLZHOLZ, Aktuelle Probleme der Unterbilanz- und Differenzhaftung bei Umwandlungsvorgängen, AG 2006, 469.

[40] § 22 para. 1 and § 125 UmwG.

[41] B. GRUNEWALD in: Lutter, Umwandlungsgesetz, 5th ed. 2014, § 22 marg. no. 9.

[42] B. GRUNEWALD in: Lutter, Umwandlungsgesetz, 5th ed. 2014, § 22 marg. no. 12; O. VOSSIUS, in: Widmann/Mayer, Umwandlungsrecht, May 2016, § 22 marg. no. 29.

[43] B. GRUNEWALD in: Lutter, Umwandlungsgesetz, 5th ed. 2014, § 22 marg. no. 12.

# Contributors

*Ruoying Chen*

Ruoying Chen is Associate Professor and assistant dean at Peking University Law School. She holds a J.S.D. degree from the University of Chicago Law School, an M.Juris Degree from Oxford University and a Bachelor in Law from Peking University (PKU) Law School. Before joining PKU Law School, she taught at the University of Chicago Law School as Visiting Associate Professor, Assistant Professor and as Lecturer in Law and John M. Olin Fellow in Law and Economics. She was also employed full-time for Freshfields Bruckhaus Deringer, a global law firm headquartered in London, for more than five years at its Beijing and Hong Kong offices, where she worked on cross-border M&As and IPOs of Chinese companies in Hong Kong.

*Moon Hee Choi*

Moon Hee Choi is a professor at the Kangwon National University (KNU) School of law where she teaches corporate law and capital market law. She studied law at Hanyang University and got a Ph.D. from Seoul National University (SNU). She has visited various distinguished institutions such as Columbia Law School, Waseda Law School and Ludwig-Maximilians-University of Munich and will visit the University of Tokyo in March 2018. She had worked as a Research Judicial Officer at the Supreme Court of Korea. She currently advices and serves as a member of committee at various institutions such as the Korean Ministry of Justice, the Korean Financial Supervisory Commission and the Korean Listed Companies Association. She has published extensively numerous articles and books in the field of corporate law and capital market law in Korean and English.

*Holger Fleischer*

Dr. iur., Dr. h.c. (Université Paris-Descartes), Dipl.-Kfm., LL.M. (Michigan). Director, Max Planck Institute for Comparative and International Private Law since 2009, Affiliate Professor at Bucerius Law School since 2010, previously Professor at the University of Göttingen (2000–2003) and the University of Bonn (2003–2009). Research associate European Institute of Corporate Governance (ECGI), member of the Académie Internationale de Droit Comparé, member of the EU Commission's Informal Expert Group on European Company Law.

*Kouji Funatsu*

Professor at Doshisha University (since 2015). Visiting scholar at Johannes Gutenberg University-Mainz (2010–2012); Special research fellow of Japanese Financial Service Agency (2015–2016); Professional member of the Financial System Council of Japanese Financial Service Agency (since 2015) (for the reforms of the Banking Act and the Payment Service Act).

*Li Guo*

Li Guo is a Professor of Law and Vice Dean at Peking University Law School, and the chief editor of PKU Journal of Legal Studies. He has also taught and researched at Cornell, Duke,

Freiburg, Sydney, Vanderbilt, Case Western Reserve, and is the recipient of the Humboldt Foundation Fellowship. His scholarly interests cover financial laws, social development and comparative studies. He is a graduate of PKU, Southern Methodist, and Harvard Law School.

### Sunseop Jung

Sunseop Jung is professor of law at Seoul National University (SNU), teaching financial law and securities regulation since 2007. He is a graduate of College of Law, SNU (LLB) and received Ph.D. from the University of Melbourne. From 2015, he is serving as a commissioner of the Financial Services Commission. He has published and edited numerous books and articles in the field of banking and capital markets law. He has been outside director of the Korea Financial Investments Association and the Citibank Korea.

### Hideki Kanda

Hideki Kanda is professor of Law at Gakushuin University Law School from 2016. He was Professor of Law at the University of Tokyo until 2016. Mr Kanda's main areas of specialization include commercial law, corporate law, banking regulation and securities regulation. He also was Visiting Professor of Law at the University of Chicago Law School (1989, 1991, and 1993) and at Harvard Law School (1996). Recent publications include Corporate Law (18th ed, Kobundo, 2016, in Japanese), Comparative Corporate Governance (Oxford University Press, 1998, with Klaus Hopt et al. (eds.)), and Economics of Corporate Law (University of Tokyo Press, 1998, with Yoshiro Miwa and Noriyuki Yanagawa (eds.), in Japanese).

### Hiroyuki Kansaku

Professor of law at the University of Tokyo (2004–). Professor of law at Gakushuin University (1998–2004). Principal areas of interest are corporate law, commercial law, securities and banking regulation, and trust law. Recent publication: Co-author of "Commentary on Japanese Companies Act *(Kaisha-ho Kommentar)*", Corporate Division, Vol. 17 (Shojihomu Press, 2010). Co-editor of "Markt und Staat in einer globaliseirten Wirtschaft" (Mohr Siebeck, 2010) and "Alternde Gesellschaften im Recht" (Mohr Siebeck, 2015). Co-author of "Handbuch Japanisches Handels- und Wirtschaftsrecht" (Carl Heymanns Verlag, 2011). Member of "Financial Council" in Financial Agency of Japan and associate member of "Legislative Council" in the Japan's Ministry of Justice.

### Takahito Kato

Takahito Kato is a Professor of the Graduate Schools for Law and Politics at The University of Tokyo (2017–). He is a member of the Company Law Subcommittee in Legislative Council of the Ministry Justice (Japan) (2017–) and a professional member of the Financial System Council of Financial Services Agency (Japan) (2017–). His field of research includes corporate law, securities law and financial regulation.

### Kon Sik Kim

Kon Sik Kim is Professor of Law at Seoul National University (SNU), teaching corporate law and securities regulation since 1986. A graduate of the SNU College of Law, he got an LL.M. from Harvard, and a J.D. and a Ph.D. from University of Washington. Serving as inaugural dean of the SNU School of Law, he had represented the twenty-five law schools in Korea as president of the Korea Association of Law Schools from 2008 to 2010. He has founded two law journals: the Journal of Korean Law, an English-language journal covering legal issues and developments in Korea, and BFL, a Korean-language law journal specializing in corporate and finance law. In 2013, he served as president of the Korea Com-

mercial Law Association. He has published and edited numerous books and articles in the field of corporate law, including leading treatises on capital market law and corporate law. He has visited various distinguished institutions such as The University of Tokyo and Harvard Law School and will visit NYU Law School (Global Faculty) for Fall 2016. He has extensive experience in advising various institutions such as the Ministry of Justice and Ministry of Finance and Economy in Korea and The University of Tokyo Law School and World Bank. He has been on the board of three large listed firms in Korea. He has extensive experience as expert witness or arbitrator in connection with a variety of litigation and arbitrations, both domestic and international.

### Lars Klöhn

Dr. iur., LL.M. (Harvard) is professor of civil law and business law at Humboldt-University Berlin. He previously held chairs at Ludwig-Maximilians-University Munich (2012–2016) and Philipps-University, Marburg (2008–2012). He is inter alia co-editor of a leading German banking and capital markets law journal and a regular advisor to the German Ministry of Finance.

### Jens Koch

Dr., iur., professor of law. Director of the Institute of Commercial and Economic Law at the Rheinische Friedrich-Wilhelms-University of Bonn, Germany since 2013. Previously professor at the University of Konstanz (2006–2013); Dean of the Law Faculty of the University of Konstanz (2011–2013).

### Peter O. Mülbert

Dr. iur., Professor of Law and Director of the Center for Germain and International Law of Financial Services at the University of Mainz/Germany. Visiting Professor at Harvard Law School (2007, 2011), at the University of Tokyo (2009, 2013) and at Seoul National University (2012, 2016). Member of the Banking Stakeholder Group of the European Banking Authority since 2016. Research Associate at the European Corporate Governance Institute. Member of the management board of Bankrechtliche Vereinigung e.V.

### Hyeok Joon Rho

Prof. Hyeok-Joon Rho got his Ph.D. at Seoul National University, Seoul, Korea. Before he joined Seoul National University School of Law in 2007, he had worked as a practitioner: as a judge of the Seoul Southern District Court for two years and as a senior associate lawyer of the law firm "Woo & Yun" for two years. In addition to his doctoral study in Seoul, he made various academic visits to law schools outside Korea: at Bucerius Law School in Germany as Humboldt research fellow, at Nagoya University School of Law in Japan as visiting professor and at Harvard Law School in the U.S. as visiting scholar. He has worked and published extensively on corporate law and securities law. The list of his selected articles includes "New Squeeze-out Devices as a Part of Corporate Law Reform in Korea" (in English), "Invigorating Shareholder Derivatives Actions in South Korea" (co-authored in English), and "The Stock Corporation and the Business Trust: A Comparison in Terms of Asset Partitioning" (in Korean).

### Klaus Ulrich Schmolke

Professor of private law, commercial, company and business law at the Friedrich-Alexander-University Erlangen-Nuremberg (since April 2013). He studied law at the Universities of Trier, Lausanne and obtained a doctorate (Dr. iur.) at the University of

286                                     *Contributors*

Mainz (2003) as well as an LL.M. at NYU School of Law (2006). Before joining the FAU law faculty he worked as a senior research fellow at the Max Planck Institute for Comparative and International Private Law in Hamburg (2009–2012) and as an acting professor at the Philipps-University of Marburg (2012/13). In 2017 he was a visitor to the faculty of law in the University of Cambridge. Professor Schmolke has worked and published extensively on corporate law and securities law.

*Ok-Rial Song*

Ok-Rial Song is a professor of law at Seoul National University (SNU) School of law, teaching corporate law, commercial law, and economic analysis of law since 2003. A graduate of the SNU college of law, he holds a Master of Law from SNU, and an LL.M. and an S.J.D. from Harvard Law School. He has published a textbook on Korean commercial law, which includes corporate law, and also co-authored a casebook on Korean corporate law. He served as a member of editorial board of the Korean Commercial Law Association and as an editor in chief of the Korean Law and Economics Association. Also, he advised the Korean government on recent corporate law reforms, and has been on the board of several listed firms in Korea. He was a visiting professor of law at Columbia Law School (2006) and at Duke Law School (2017), teaching seminars on corporate law and East Asian law.

*Eiji Takahashi*

Dr. iur. (Göttingen); Dr. iur. (Tōhoku-University, Japan); Magster iur. (Göttingen); LL.M. (Tōhoku-University, Japan). Professor of Osaka City University since 2007; director of Japan Society of Private Law *(Nihonshihōgakkai),* member of Academié Internationale de Droit Comparé/ International Academy of Comparative Law, member of editorial board of Interdisciplinary Journal of Economics and Business Law (IJEBL), member of committee of Japanese State Law Examination *(Shihōshikenkōsaiin),* Co-Editor of 'Recht in Ostasien'.

*Rüdiger Veil*

Rüdiger Veil is a professor for private law and business law at Ludwig Maximilians-University, Munich/Germany, previously at Bucerius Law School, Hamburg (2003–2017). Since 2014, he has been a member of the ESMA Securities and Markets Stakeholder Group. Rüdiger Veil also advises the German Federal Ministry of Finance with special focus regarding the EU financial markets law. He has acted as an expert for the German, Chinese, Russian and European parliament.

*Jiangyu Wang*

Jiangyu Wang (SJD & LLM, University of Pennsylvania; MJur, Oxford; MPhil in Laws, Peking University; LLB, China University of Political Science and Law) is a tenured Associate Professor at the Faculty of Law of the National University of Singapore. He is an Executive Editor of the Asian Journal of Comparative Law (Cambridge University Press) and Deputy Chief Editor of the Chinese Journal of Comparative Law (Oxford University Press). His teaching and research interests include international economic law, international law and international relations, Chinese and comparative corporate and securities law, law and development, and Chinese legal system. He has published extensively in Chinese and international journals on a variety of law and politics related topics, and is a regular contributor to leading newspapers and magazines in Singapore, Hong Kong, and mainland China.