# EXHIBIT A

# Cour d'appel de Paris, 26 novembre 2020, 20/050137

## Cour d'appel de Paris - I7

- N° de RG : 20/050137
- Solution : Déboute le ou les demandeurs de l'ensemble de leurs demandes

Audience publique du jeudi 26 novembre 2020

## Texte intégral

**RÉPUBLIQUE FRANCAISE**
**AU NOM DU PEUPLE FRANCAIS**

Grosses délivrées RÉPUBLIQUE FRANÇAISE
aux parties le : AU NOM DU PEUPLE FRANÇAIS

COUR D'APPEL DE PARIS

Pôle 5 - Chambre 7

ARRÊT DU 26 NOVEMBRE 2020

(no , 17 pages)

Numéro d'inscription au répertoire général : 20/05013 - No Portalis 35L7-V-B7E-CBUX4

Décision déférée à la Cour : décision de l'Autorité des marchés financiers no 220C1034 en date du19 mars 2020

REQUÉRANTS :

Société M14 S.C.
Prise en la personne de son représentant légal Monsieur V... K... en sa qualité de gérant
ayant son siège social sis [...]
[...]

Monsieur V... K...
Président directeur général de K... Group S.A. et associé gérant de la société M14
né le [...] à SAINT-CALAIS (72120)
demeurant [...]
[...]

Monsieur H... K...
Directeur général délégué de K... GROUP SA et associé de la société M14
né le [...] à PARIS 14 (75014)
demeurant29, [...]
[...]

Monsieur W... K...
Directeur général délégué de K... GROUP S.A. et associé de la société M14
né le [...] à PARIS 16 (75016)
demeurant [...]
[...]

Madame L... K...
Directrice générale déléguée de K... GROUP S.A. et associée de la société M14
née le [...] à PARIS 13 (75013)
demeurant [...]
[...]

K... GROUP S.A.
prise en la personne de son représentant légal, Monsieur V... K..., président directeur général
ayant son siège social sis [...]
[...]

Élisant tous domicile au cabinet de Me ETEVENARD
[...]
[...]

Représentés par Me Frédérique ETEVENARD, avocat au barreau de PARIS, toque : K0065
Assistés de Me Quentin LAGIER, et de Me Nicolas CUNTZ, du cabinet CHANGE, avocats au
barreau de PARIS, toque : C0707

DÉFENDERESSES AU RECOURS :

Société IDI S.C.A.
Prise en la personne de ses représentants légaux
ayant son siège social [...]
[...]

Société JG CAPITAL MANAGEMENT S.A.S,
Prise en la personne de ses représentants légaux, **agissant au nom et pour le compte du FCP
JG PARTNERS**
ayant son siège social sis [...]
[...]

Élisant toutes domicile au cabinet TEYTAUD-SALEH
[...]
[...]

Représentées par Me François TEYTAUD de l'AARPI TEYTAUD-SALEH, avocat au barreau de
PARIS, toque : J125
assistées de Me Olivier DIAZ, du cabinet GIDE LOYRETTE NOUEL, avocat au barreau de
PARIS, toque : T03

Société [...]
Agissant par son président
ayant son siège social sis [...]
[...]

Élisant domicile au cabinet LEXAVOUÉ PARIS-VERSAILLES
[...]
[...]

Représentée par Me Matthieu BOCCON GIBOD, de la SELARL LEXAVOUÉ PARIS-
VERSAILLES, avocat au barreau de PARIS, toque : C2477
Assistée de Me Sébastien PRAT, du cabinet BREDIN PRAT, avocat au barreau de PARIS, toque
: T12

EN PRÉSENCE DE :

L'AUTORITÉ DES MARCHÉS FINANCIERS
Prise en la personne de son président
[...]
[...]

représentée par Mme P... U..., dûment mandatée

COMPOSITION DE LA COUR :

L'affaire a été débattue le 22 octobre 2020, en audience publique, devant la Cour composée de :

– Mme Frédérique SCHMIDT, présidente de chambre, présidente,
– Mme Brigitte BRUN-LALLEMAND, présidente de chambre,
– Mme Sylvie TRÉARD, conseillère,

qui en ont délibéré.
GREFFIER, lors des débats : Mme Véronique COUVET

MINISTÈRE PUBLIC : auquel l'affaire a été communiquée et représenté lors des débats par Mme
Madeleine GUIDONI, avocate générale, entendue en son avis.

ARRÊT :

– contradictoire

– rendu par mise à disposition au greffe de la cour, les parties en ayant été préalablement
avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure

civile.

– signé par Mme Frédérique SCHMIDT, présidente de chambre et par Mme Véronique COUVET, greffière à qui la minute du présent arrêt a été remise par le magistrat signataire.


* * * * * * * *


Vu la décision de l'Autorité des marchés financiers no 220C1034 du 19 mars 2020 sur des demandes de mise en œuvre d'une offre publique de retrait visant les actions de la société K... Group ;

Vu la déclaration de recours en annulation et l'exposé des moyens déposés le 27 mars 2020 par les sociétés M14 et K... Group, M. V... K..., M. H... K..., M. W... K... et Mme L... K... ;

Vu les observations écrites en réponse déposées au greffe de la cour le 7 juillet 2020 par la société [...] ;

Vu les observations écrites en réponse déposées au greffe de la cour le 10 juillet 2020 par les sociétés JG Capital Management et IDI ;

Vu les observations écrites déposées au greffe de la cour le 24 juillet 2020 par l'Autorité des marchés financiers ;

Vu les observations en réplique déposées au greffe de la cour le 29 septembre 2020 par la société M14, la société K... Group, M. V... K..., M. H... K..., M. W... K... et Mme L... K... ;

Vu l'avis du ministère public du 20 octobre 2020 communiqué le même jour aux parties ;


*
* *


SOMMAIRE

FAITS ET PROCÉDURE 5

La décision attaquée 5

Le recours en annulation 6

MOTIVATION 7

I. SUR LES MOYENS RELATIFS AUX CONDITIONS DE SEUIL DE L'OPR 7

A. Sur l'application immédiate du nouveau seuil instauré par l'article 75, 3o de la loi PACTE 8

B. Sur la date d'appréciation du seuil 9

II. SUR LES MOYENS RELATIFS AUX ÉLÉMENTS D'APPRÉCIATION VISÉS À L'ALINÉA 2 DE L'ARTICLE 236-1 DU RGAMF 11

III. SUR LE MOYEN TIRÉ DE L'ABSENCE D'EXAMEN DES DEMANDES DE JG CAPITAL MANAGEMENT ET IDI 13

IV. SUR LE MOYEN FONDÉ SUR LE DÉTOURNEMENT DE LA LOI ET L'ABUS DE DROIT 15

V. LES DEMANDES FONDÉES SUR L'ARTICLE 700 DU CODE DE PROCÉDURE CIVILE ET SUR LES DÉPENS 16

*
* *

FAITS ET PROCÉDURE

1.La société K... Group (anciennement dénommée Bricorama S.A.) a été fondée en 1975. Ses actions, négociées initialement sur le marché réglementé Euronext Paris, ont été transférées en 2011 sur le marché Euronext Growth.

2.Son actionnariat majoritaire est composé de :

– M. V... K..., fondateur et directeur général de la société ;
– ses trois enfants H..., W... et L... K... ;
– la société civile M14, que M. V... K... contrôle.

3.En 2000, la SAS [...] (ci-après « [...] ») est entrée au capital au travers du fonds commun de placement « [...] ».

4.La SAS JG Capital Management (agissant en son nom et pour le compte du FCP JG Partners, ci-après « JG Capital Management ») et la société en commandite par actions IDI (ci-après « IDI ») y sont entrées en 2007.

5.La même année, les actionaires majoritaires, qui détenaient 87,50 % du capital et 91,68 % des droits de vote de la société, ont souhaité obtenir le retrait de la cote de la société par une offre publique d'achat simplifiée, qui a échoué.

6.Au 30 mai 2019, les actionnaires majoritaires détenaient 87,29 % du capital et 90,19 % des droits de vote, tandis que les actionnaires minoritaires détenaient chacun une participation en capital de :

– 1,74 % de la société s'agissant de [...] ;
– 6,77 % s'agissant de JG Capital Management ;
– 1,02 % s'agissant d'IDI ;
– un pourcentage de l'ordre de 3 % étant détenu par des petits porteurs.

7.Par lettres des 24 mai et 6 juin 2019, les trois actionnaires minoritaires ont chacun demandé à l'Autorité des Marchés financiers (l'« AMF ») qu'elle requiert du concert familial K... le dépôt d'un projet d'offre publique de retrait (ci-après « OPR ») sur le fondement de l'article 236-1de son règlement général (ci-après le « RGAMF ») pris en application de l'article L.433-4 1,1 du code monétaire et financier, dans sa rédaction issue de la loi no 219-486 du 22 mai 2019 relative à la croissance et à la transformation des entreprises (ci-après la « loi PACTE »).

La décision attaquée

8.Le 19 mars 2020, l'AMF a déclaré recevable la demande présentée par [...], sans examiner celles présentées par les autres actionnaires minoritaires, et a dit que le groupe familial K... devra

procéder au dépôt d'un projet d'OPR visant les actions K... Group dans un délai de trois mois.

9.Au soutien de sa décision, elle a retenu :

« – qu'au 30 mai 2019 le concert familial K... détenait, selon les informations qu'il a transmises à l'AMF, 5 430 723 actions K... Group représentant 10 845 596 droits de vote, soit 87,29 % du capital et 90,10 % des droits de vote de K... Group ;

– que l'actionnaire le plus ancien qui a saisi l'AMF, [...], l'est depuis octobre 2000 et n'est pas intervenu de manière significative sur le titre depuis 2005, sachant qu'il n'a pas répondu à l'offre publique visant K... Group mise en œuvre par le concert familial en 2007 ;

– que la liquidité de l'action K... Group est d'environ 16 000 actions échangées par an, ce qui, sur la base d'un volume cédé représentant 25 % des volumes constatés, de sorte à ne pas impacter trop fortement le marché, représenterait un délai d'environ 27 ans, pour que [...] puisse céder l'intégralité de sa participation, ce qui constitue un délai anormalement long ;

– que si le concert familial K... détient à ce jour, selon les informations qu'il a transmises à l'AMF, 5 430 723 actions K... Group représentant 6 163 393 droits de vote, soit 87,29 % du capital et 84,12 % des droits de vote de K... Group, cette nouvelle circonstance dont il doit être tenu compte, quand bien même la condition de détention par l'actionnaire principal s'apprécie au moment de la saisine de l'AMF, est sans effet sur la liquidité de l'action K... Group dans la mesure où le concert familial est passé sous le seuil de 90 % des droits de vote de cette société par suite de la seule mise au porteur d'actions K... Group qu'il détient, intervenue en octobre 2019 ;

– qu'ainsi la liquidité de l'action K... Group telle que constatée ne permet pas à [...] de céder sa participation dans des conditions normales de délai et de cours, sans que le fait de ne pas avoir apporté ses titres à l'offre publique qui a eu lieu en 2007 ne constitue au cas d'espèce un comportement contraire à l'esprit de l'article 236-1 précité, compte tenu de l'antériorité de cette offre publique (quasiment treize années à ce jour). ».


Le recours en annulation

10.MM V..., H... et W... K..., Mme L... K... ainsi que les sociétés M14 et K... Group (ci-après « les auteurs du recours »), ont formé un recours en annulation de cette décision.

11.Ils demandent à la Cour :

– d'annuler la décision no220C1034 de l'AMF du 17 mars 2020, par laquelle elle a, en application des dispositions des articles L.433-4, I, 1o du code monétaire et financier et 236-1 du RGAMF, demandé au groupe familial K... de procéder au dépôt d'un projet d'offre publique de retrait visant les actions K... Group libellé à des conditions telles qu'il puisse être déclaré conforme, dans un délai fixé à trois mois ;

– de débouter l'AMF, JG Capital Management, l'IDI et [...] de toutes leurs demandes ;

En conséquence,

– de condamner JG Capital Management, l'IDI et [...] à s'acquitter chacun d'une somme de 50.000 euros au profit de la société M14, M. V... K..., M. H... K..., M. W... K..., Mme L... K... et la société K... Group au titre de l'article 700 du code de procédure civile ;

– de condamner l'AMF, JG Capital Management, l'IDI et [...] aux dépens.

12.Ils ont également déposé une requête aux fins de sursis à exécution de la décision contestée, requête dont ils se sont désistés, le délai de trois mois, qui leur a été imparti par cette décision, ayant été suspendu en application de l'ordonnance no2020-306 du 25 mars 2020 relative à la prorogation des délais échus pendant la période d'urgence sanitaire et à l'adaptation des procédures pendant cette même période, d'une part, et l'AMF s'étant engagée à faire courir ce délai à compter du prononcé de l'arrêt au fond en cas de rejet du recours, d'autre part.

13.[...] demande à la Cour de :

– déclarer le recours irrecevable et mal fondé,

Par voie de conséquence :

– confirmer la décision attaquée ;

– débouter les auteurs du recours de leurs demandes ;

– les condamner à lui verser la somme de 50.000 euros en application de l'article 700 du code de procédure civile ;

– les condamner aux dépens, dont distraction au profit de Me Mathieu Boccon-Gibod.

14.JC Capital Management et IDI demandent à la Cour de :

– débouter les demandeurs au recours de leur recours en annulation ;

– les condamner solidairement à payer la somme globale de 50 000 euros à JC Capital Management et IDI au titre de l'article 700 du code de procédure civile ;

– les condamner solidairement aux dépens.

15.L'AMF et le ministère public invitent la Cour à rejeter le recours.


\*
\* \*


MOTIVATION

I. SUR LES MOYENS RELATIFS AUX CONDITIONS DE SEUIL DE L'OPR

16.Il n'est pas contesté qu'à la date de la saisine, les actionnaires minoritaires constituaient « le concert familial K... », au sens de l'article L.233-10 du code de commerce, et que ce dernier détenait, selon les informations qu'il a déclarées à l'AMF le 30 mai 2019, 87,29 % des actions K... Group et 90,19 % des droits de vote.

17.Les auteurs du recours soulignent que depuis 2007, la participation en capital de la société M14 et des autres membres du groupe familial K... n'a quasiment pas varié, qu'elle s'est située globalement à environ 87 % du capital et que le seuil de 90 % des droits de vote n'a été dépassé que très temporairement et de manière négligeable.

18.Ils font valoir qu'une des conditions préalables visées à l'article 236-1 alinéa 1 du RGAMF fait défaut, celle relative au seuil déclencheur d'une OPR que doit atteindre la participation des actionnaires majoritaires, tant selon eux à la date de la saisine de l'AMF qu'à celle de la décision du collège.
A. Sur l'application immédiate du nouveau seuil instauré par l'article 75, 3o de la loi PACTE

19.Les auteurs du recours considèrent que les trois dates visées dans la décision attaquée (le 24 mai 2019, date de la saisine de l'AMF par JC Capital Management et IDI, le 30 mai 2019, date de référence retenue par l'AMF et le 6 juin 2019, date de la saisine de [...]) sont toutes situées avant l'introduction du nouveau seuil d'OPR de 90 % dans la réglementation relative aux conditions d'application et de mise en œuvre de ce type de demandes de retrait. Le seuil de détention de 95 % s'appliquant selon eux toujours à ces dates, la condition relative au franchissement de seuil n'est en l'espèce pas remplie.

20.Ils font valoir que le premier alinéa de l'article 236-1 du RGAMF « fixe les conditions applicables (...) aux demandes de retrait » et que la nouvelle rédaction de cet article n'a été introduite que le 22 juin 2019, suite à la publication de l'arrêté abaissant le seuil de détention du capital ou des droits de vote de 95 à 90 %.

21.L'AMF souligne en réponse que la condition du seuil de détention de 90 % du capital ou des droits de vote était applicable dès l'entrée en vigueur de la loi PACTE qui a modifié l'article L.433-4 du code monétaire et financier, soit le 24 mai 2019, sans qu'il soit besoin d'attendre la publication au journal officiel de l'arrêté modifiant le RGAMF.

22.[...] rappelle, au soutien de cette analyse qu'elle partage, les règles d'application de la loi dans le temps énoncées à l'article 1er du code civil. Elle souligne que l'entrée en vigueur d'une loi nouvelle n'est différée que lorsque son application est impossible en l'absence de mesures réglementaires d'application. Ce principe est consacré par la jurisprudence de l'ordre judiciaire comme de l'ordre administratif, de laquelle il ressort que l'entrée en vigueur de dispositions nouvelles suffisamment précises n'est pas tributaire de l'intervention de dispositions réglementaires d'exécution. Elle fait valoir que le seuil de 90 % étant désormais fixé par la loi, aucune latitude n'est laissée au RGAMF sur ce point.

23.JC Capital Management et IDI ajoutent qu'à la date de saisine de l'AMF, le RGAMF n'avait certes pas encore été mis à jour pour refléter l'abaissement du seuil d'exigibilité résultant de l'entrée en vigueur de la loi PACTE, mais que cette mise à jour ne s'imposait pas en vertu du principe de la hiérarchie des normes, la supériorité de la norme législative par rapport à l'arrêté administratif imposant de lire immédiatement le RGAMF en tenant compte du nouveau seuil abaissé à 90 %. De surcroît, les dispositions de l'article L.433-4 du code monétaire et financier étaient suffisamment claires et précises pour recevoir application dès l'entrée en vigueur de la loi PACTE et sans attendre la mise à jour du RGAMF.

24.Elles observent que la destruction des droits de vote double par le concert majoritaire n'est intervenue qu'en octobre 2019 et font valoir que décaler l'entrée en vigueur du nouveau seuil de 90 % à la date de mise à jour du RGAMF en juin 2019 est sans effet, puisque la condition d'éligibilité demeure satisfaite à cette date.

25.Le ministère public est d'avis que l'AMF a, de façon pertinente, fait application de l'article L.433-4, I, 1o du code monétaire et financier dans sa version en vigueur depuis le 24 mai 2019.

Sur ce, la Cour,

26.L'article 1er du code civil dispose que :

« les lois (...) entrent en vigueur à la date qu'(elles) fixent ou, à défaut, le lendemain de leur publication. Toutefois, l'entrée en vigueur de celles de leurs dispositions dont l'exécution nécessite des mesures d'application est reportée à la date d'entrée en vigueur de ces mesures ».

27.L'article L.433-4 du code monétaire et financier, dans sa rédaction antérieure à la loi PACTE du 22 mai 2019, était ainsi rédigé :

« I. – Le règlement général de l'Autorité des marchés financiers fixe les conditions applicables aux procédures d'offre et de demande de retrait dans les cas suivants :

1o Lorsque le ou les actionnaires majoritaires d'une société dont le siège social est établi en France et dont les actions sont admises aux négociations sur un marché réglementé (...) détiennent de concert, au sens de l'article L.233-10 du code de commerce, une fraction déterminée des droits de vote » (police en gras appliquée par la Cour).

28.Le seuil de détention de titres par le concert majoritaire au-dessus duquel tout actionnaire minoritaire peut solliciter la mise en œuvre d'une offre publique de retrait s'élevait, par application de l'article 236-1 du RGAMF, à 95 % des droits de vote.

29.L'article 75, 3o de la loi PACTE a modifié l'article L. 433-4 du code monétaire et financier de la façon suivante : « la fin du 1o du I est ainsi rédigée : ", au moins 90 % du capital ou des droits de vote" » (police en gras appliquée par la Cour).

30.Ainsi, le seuil de l'article L.433-4 du code monétaire et financier, qui jusqu'alors correspondait à une fraction des droits de vote fixée par voie réglementaire, est désormais fixé par la loi, laquelle a fixé cette fraction à 90 % du capital ou des droits de vote.

31.Par cohérence, l'arrêté ECOT 1917747A du 19 juin 2019 portant homologation de modification du règlement général de l'AMF a abaissé ce seuil de 95 % à 90 % du capital ou des droits de vote aux articles 236-1 à 236-4 du RGAMF.

32.Cette mise à jour de l'article 236-1 du RGAMF a porté uniquement sur le montant et l'assiette du seuil. Le reste de cet article est demeuré inchangé, aucune autre modification n'ayant été apportée aux règles applicables à la procédure d'OPR.

33.L'article 75, 3o de la loi PACTE, en ce qu'il fixe uniquement et directement un nouveau seuil, était suffisamment précis pour pouvoir être immédiatement appliqué, sans qu'il y ait eu lieu d'attendre cette mise à jour. La circonstance que l'article L.433-4 du code monétaire et financier qu'il modifie renvoie au RGAMF pour fixer les autres conditions de mise en œuvre d'une offre publique de retrait n'a pu avoir eu pour effet de reporter la date d'entrée en vigueur du nouveau dispositif, cet article n'emportant pas modification des autres conditions fixées par le RGAMF alors en vigueur.

34.Il s'en déduit que l'abaissement à 90 % du seuil de détention des droits de vote ou du capital par le concert majoritaire au-dessus duquel tout actionnaire minoritaire peut solliciter la mise en œuvre d'une OPR est entré en vigueur le 24 mai 2019, soit le lendemain de la publication de la loi PACTE au journal officiel, en l'absence de toute disposition transitoire contraire prévue par ladite loi.

35.C'est donc à tort que les auteurs du recours soutiennent qu'à la date de saisine de l'AMF, les 24 mai et 6 juin 2019, le seuil de 90 % en capital ou en droits de vote introduit par la loi PACTE n'était pas encore applicable, faute de publication au Journal officiel, à ces dates, de l'arrêté modifiant l'article 236-1 du RGAMF.

36.Le moyen doit être rejeté.


B. Sur la date d'appréciation du seuil

37.Les auteurs du recours font valoir que l'AMF ne pouvait pas écarter la circonstance nouvelle tenant au retour par les actionnaires majoritaires à une détention des droits de vente dans une proportion inférieure à 90 % à la date à laquelle son collège s'est prononcé, le 17 mars 2020.

38.Ils estiment qu'une jurisprudence administrative constante impose à l'administration de tenir compte de tous les éléments de fait à la date de sa décision sous peine d'entacher celle-ci d'une erreur de fait, étant rappelé que les décisions individuelles de l'AMF sont de nature administrative. Ils soulignent que le souci de garantir l'efficacité d'une réglementation ne saurait justifier que l'administration adopte des décisions individuelles illégales.

39.Il doit selon eux être tenu compte du retour sous le seuil suite à la réaction du concert K... « à des demandes d'OPR oportunistes visant à le prendre de vitesse » en raison d'un changement de réglementation, en profitant de l'effet de surprise et alors qu'aucune négociation préalable avec le groupe majoritaire n'est intervenue.

40.Ils relèvent, par ailleurs, que l'AMF ne pouvait écarter cette circonstance nouvelle sur la base d'un motif, la liquidité du marché, qui est sans aucune incidence sur le seuil d'OPR.

41.L'AMF estime en réponse qu'il suffit que le seuil légal de 90 % du capital ou des droits de vote ait été franchi pour qu'elle soit compétente pour apprécier la recevabilité de la demande d'un actionnaire minoritaire de mise en œuvre d'une OPR. A défaut, elle commettrait une faute de nature à engager sa responsabilité.

42.[...] ajoute, que l'article 236-1 du RGAMF « consacre nettement un séquençage » et que son premier alinéa a exclusivement trait à l'exposé des conditions qui subordonnent la recevabilité d'une OPR qualifiées de « conditions formelles préalables » aux termes d'un arrêt de la cour d'appel de Paris du 24 février 1994, et de « conditions préalables d'application » aux termes d'un arrêt de la même cour du 5 février 2002. Or il est selon lui de jurisprudence constante que les conditions de la recevabilité de toute action doivent être appréciées à la date de la saisine du juge de premier degré et que cette appréciation ne peut être remise en cause par l'effet de circonstances postérieures.

43.JC Capital Management et IDI considèrent elles aussi, que la condition relative à une détention supérieure à 90 % du capital ou des droits de vote doit être appréciée à la date de la demande formée par un actionnaire minoritaire auprès de l'AMF. Elles estiment que la circonstance que les actionnaires majoritaires aient ramené leur détention en dessous de 90 % ne permet pas en soi de les s'exonérer du dépôt possible d'une OPR, les événements postérieurs étant examinés dans un second temps, lors de l'examen sur le fond du bien-fondé de la demande d'OPR.

44.Le ministère public observe qu'il ressort tant de la pratique décisionnelle, de la jurisprudence de la Cour que de la doctrine qu'il convient de se placer à la date de la saisine de l'autorité de marché par l'actionnaire minoritaire. Toute autre solution contraire empêcherait la mise en œuvre d'une OPR dans la mesure où il suffirait au majoritaire de réduire son pourcentage de détention avant la décision du collège pour faire échec à l'application des articles L.433-4, I, 1o du code monétaire et financier et 236-1 du RGAMF.

Sur ce, la Cour,

45.Aux termes de l'article 236-1 du RGAMF :

« Lorsque le ou les actionnaires majoritaires détiennent de concert, au sens de l'article L.233-10 du code de commerce, au moins 90 % du capital ou des droits de vote d'une société dont les actions sont admises aux négociations sur un marché réglementé d'un État membre de l'Union européenne ou partie à l'accord sur l'Espace économique européen, y compris la France, ou ont cessé de l'être, le détenteur de titres conférant des droits de vote n'appartenant pas au groupe majoritaire peut demander à l'AMF de requérir du ou des actionnaires majoritaires le dépôt d'un projet d'offre publique de retrait.

Après avoir procédé aux vérifications nécessaires, l'AMF se prononce sur la demande qui lui est présentée au vu notamment des conditions prévalant sur le marché des titres concernés et des éléments d'information apportés par le demandeur.

Si elle déclare la demande recevable, l'AMF la notifie à l'actionnaire ou aux actionnaires majoritaires alors tenus de déposer, dans un délai fixé par l'AMF, un projet d'offre publique de retrait libellé à des conditions telles qu'il puisse être déclaré conforme ».

46.Ce texte permet aux actionnaires minoritaires d'une société de saisir l'AMF d'une demande tendant à la mise en œuvre d'une OPR lorsque les actionnaires majoritaires détiennent de concert 90% du capital ou des droits de vote de cette société.

47.Il pose ainsi une condition qui doit être satisfaite lors de la saisine de l'AMF, et que cette dernière doit examiner, à titre préalable, avant de se prononcer sur la demande au vu notamment des conditions prévalant sur le marché et des éléments fournis par le demandeur, comme le prévoit l'alinéa 2 de ce texte.

48.Ce texte n'impose pas que les conditions de détention du capital ou des droits de vote demeurent inchangées jusqu'à la date à laquelle l'AMF se prononce sur la demande.

49.Ainsi, il faut et il suffit qu'au moment où l'actionnaire minoritaire saisit l'AMF, le niveau de détention du capital ou des droits de vote du concert majoritaire soit d'au moins 90 %, peu important l'évolution ultérieure du niveau de sa participation et son abaissement au dessous du seuil postérieurement à la saisine de l'AMF.

50.L'évolution ultérieure du niveau de cette détention, qui relève de circonstances nouvelles, est indifférente pour apprécier si la condition de détention, nécessaire à la saisine de l'AMF, était bien satisfaite à cette date. La prise en compte de telles circonstances n'intervient, le cas échéant, qu'au stade de l'examen des conditions prévalant sur le marché du titre concerné et des éléments d'information apportés par le demandeur.

51.En l'espèce, l'AMF a vérifié la condition de détention en se référant à la déclaration mensuelle du 30 mai 2019 que le concert familial K... a adressée à ses services conformément à ses obligations déclaratives. Cette déclaration constituait, à une date très proche de celle de la saisine du 24 mai 2019, un élément d'information fiable sur la répartition de la détention du capital et des droits de vote de la société. L'AMF a donc, à juste titre, considéré qu'à la date de sa saisine, la condition de détention était réunie, étant souligné que les auteurs du recours ne contestent pas qu'au 24 mai 2019, les titres détenus par le concert familial K... représentaient au moins 90 % des droits de vote de la société.

52.L'AMF a ensuite apprécié le changement intervenu dans la répartition des droits de vote depuis sa saisine, en recherchant, à la date à laquelle elle a statué, comme elle devait le faire, si celui-ci avait pu avoir une incidence sur les conditions du marché de ce titre.

53.Il s'ensuit que le moyen est mal fondé et doit être rejeté.


II. SUR LES MOYENS RELATIFS AUX ÉLÉMENTS D'APPRÉCIATION VISÉS À L'ALINÉA 2 DE L'ARTICLE 236-1 DU RGAMF


54.L'alinéa 2 de l'article 236-1 du RGAMF dispose :

« Après avoir procédé aux vérifications nécessaires, l'AMF se prononce sur la demande qui lui est présentée au vu notamment des conditions prévalant sur le marché des titres concernés et des éléments d'information apportés par le demandeur. ».

55.Les auteurs du recours estiment que la détention étant fixée en capital mais aussi en droits de vote, le législateur a entendu exclure toute prise en compte de la liquidité du marché du titre pour son appréciation. Ils ajoutent que ce texte n'a pas vocation à permettre à un actionnaire minoritaire d'obtenir une liquidité sur un marché déjà illiquide au moment de son investissement et qui, en outre, le serait resté du fait de ses agissements.

56.L'AMF, [...] et JC Capital Management et IDI font valoir en réponse que l'AMF a appliqué de façon stricte les principes qui gouvernent la matière et s'est conformée à l'article 236-1 du RGAMF. Toute actionnaire minoritaire d'une société cotée peut en effet obtenir le rachat de sa participation en contrepartie d'une indemnisation, dès lors que cet actionnaire minoritaire se trouve dans l'impossibilité de céder sa participation dans des conditions normales de délais et de cours compte tenu des caractéristiques du marché.

57.L'AMF ajoute que c'est à tort que le requérant soutient que la liquidité du marché du titre concerné est une condition étrangère à l'application de l'article 236-1 du RGAMF. Elle souligne en outre que pour reprendre l'expression du Pr G..., l'OPR n'est pas destinée à ouvrir une « session de rattrapage » au profit d'actionnaires ayant refusé d'apporter leurs titres antérieurement. Cependant, la durée de la détention est en l'espèce beaucoup plus importante que celle constatée dans l'affaire Parfival dans laquelle il a été fait droit à la demande d'un minoritaire (CA Paris 8 avril 1998).

58.[...], JC Capital Management, IDI et le Ministère public observent que l'AMF a, conformément à la jurisprudence en la matière, vérifié que les conditions du marché de l'action K... Group sont telles que l'actionnaire minoritaire ne peut céder ses titres dans des conditions normales de cours et de délai. Il est regrettable, souligne [...], que le moyen soulevé « occulte totalement (l)es deux critères fondamentaux » énoncés à l'alinéa 2 de l'article 236-1 du RGAMF.

Sur ce, la Cour,

59.Il résulte des termes des article L.433-4 du code monétaire et financier et 236-1 du RGAMF que la seule réunion des conditions préalables tenant à la cotation du titre et au seuil de détention de concert des actionnaires majoritaires ne suffit pas à rendre obligatoire l'offre publique de retrait. Une telle mesure a pour finalité de permettre à l'actionnaire minoritaire dont le titre a perdu sa liquidité sur un marché rendu étroit par le poids relatif des majoritaires, de sortir de la société dans des conditions normales de cours et de délai. Elle doit donc être justifiée par les caractéristiques du marché considéré et par la situation particulière des minoritaires qui en font la demande.

60.L'AMF, saisie d'une telle demande, doit notamment déterminer s'il est possible au demandeur de céder ses titres sur le marché dans des conditions normales de cours et de délai. Elle doit donc en examiner la liquidité. À cet égard, contrairement à ce que soutiennent les auteurs du recours, le choix de la loi PACTE d'admettre le déclenchement d'une OPR en considération d'un seuil de détention non plus seulement en droits de vote, mais désormais en capital ou en droits de vote, est sans incidence sur la prise en compte de la liquidité du titre, nécessaire pour

apprécier les conditions prévalant sur le marché de ce titre.

61.L'AMF doit également vérifier les conditions d'acquisition des titres pour lesquels l'actionnaire demandeur requiert la possibilité de sortie.

62.En l'espèce, la décision relève que la moyenne des échanges constatés pendant la période de référence de 2017 à 2019 est environ de 16 000 actions. Elle en déduit que, sur la base d'un volume cédé qu'elle a pertinemment évalué à 25 % des volumes constatés pour ne pas impacter trop fortement le marché, la cession de l'intégralité de la participation [...] prendrait 27 ans, ce qui constitue un délai anormalement long.

63.Il est constant par ailleurs qu'entre le 1er janvier 2016 et le 10 mai 2018, la seule transaction quotidienne a été l'achat/vente effectué par le prestataire en charge du contrat de liquidité de K... Group, dans près d'un jour de bourse sur deux.

64.Il peut être observé, à titre complémentaire, que la situation d'illiquidité du titre s'est accentuée dans le temps. Elle n'existait pas jusqu'au milieu des années 2000, soit y compris plusieurs années après l'investissement [...]. L'année 2007 a été certes atypique (536 660 actions échangées), mais le volume annuel en 2008 et 2009 représentait encore 6 à 7 fois le volume de 2019 (81 224 en 2008, 75 640 en 2009, 11 600 en 2019).

65.La décision attaquée a par ailleurs, justement relevé que la diminution du pourcentage de détention des droits de vote du concert familial K... survenu depuis la saisine de l'AMF — née de la seule mise au porteur d'actions K... Group détenues au nominatif par la société M14 emportant la perte des droits de vote double dont elle pouvait se prévaloir en raison de la durée de leur détention au sens de l'article L.225-1 23 du code de commerce — a été sans effet sur la liquidité de l'action K... Group.

66.En conséquence, c'est à juste titre que l'AMF a retenu que la possibilité pour [...] de céder ses titres sur le marché dans des conditions normales de cours et de délai apparaît en l'espèce durablement compromise et sans perspective d'amélioration.

67.En outre, la décision attaquée relève, sans être critiquée sur ce point, que [...], actionnaire depuis octobre 2000, n'est pas intervenu de manière significative sur le titre depuis 2005.

68.Elle indique, de façon pertinente, que le refus de ce minoritaire de répondre à l'offre publique mise en œuvre par les consorts K... en 2007 ne constitue pas un comportement contraire à l'esprit de l'article 236-1 précité en raison de l'antériorité de cette offre de plus de treize années.

69.Il s'en déduit que les conditions prévalant sur le marché des titres concernés et d'acquisition des titres par le demandeur à l'OPR ont été utilement examinés et retenus par l'AMF dans la décision attaquée et qu'est établie en l'espèce l'étroitesse du marché ne permettant pas aux minoritaires de céder leurs actions dans des conditions normales de cours et de délai.

70.Les moyens ne peuvent être accueillis.


III. SUR LE MOYEN TIRÉ DE L'ABSENCE D'EXAMEN DES DEMANDES DE JG CAPITAL MANAGEMENT ET IDI

71.Les auteurs du recours font grief à l'AMF de s'être fondée sur la seule situation de [...] et d'avoir « choisi d'ignorer certains faits pour apprécier véritablement les agissements collectifs des trois actionnaires » qui ne sont « pas compatibles avec l'esprit de l'article 236-1 du RGAMF ».

72.Ils considèrent que l'AMF a évité de statuer sur les demandes de JG Capital Management et de l'IDI alors que le comportement de [...] n'est pas dissociable. Ils allèguent principalement que la position significative de JG Management « avec la bénédiction de [...] » au capital de K... Group, constituée en 2007 au cours d'une offre publique dite « de fermeture », rend toutes leurs demandes illégitimes. [...] ne souhaitait pas selon eux la réussite de l'offre car la réalisation d'un retrait obligatoire aurait conduit à un rachat de ses actions à un prix qui ne le satisfaisait pas et sa participation aurait été dès l'origine destinée à y faire obstacle. Quant à JC Management, il a à l'époque par ses « ramassages » contribué à rendre le marché de plus en plus étroit du fait de ses propres interventions sur le titre, qui ont divisé par deux le flottant. Le changement dans la composition du capital n'est donc pas le résultat d'un renforcement de l'actionnaire majoritaire, cas généralement visé dans les demandes de retrait, mais de JC Management, avec lequel [...] s'est alliée. Le concert K... en déduit que les minoritaires peuvent difficilement se prévaloir d'une situation capitalistique qu'ils connaissaient dès l'origine lorsqu'ils ont fait le choix en 2007 de faire échouer l'offre. Il s'agirait d'une « inversion stupéfiante des responsabilités ».

73.L'AMF considère en réponse que le comportement supposé des JC Capital Management et IDI est « manifestement inopérant au sens de la réglementation applicable » dès lors que l'AMF a opté, comme elle en avait la possibilité, pour le seul examen de la demande de [...].
74.[...] fait valoir que c'est en vain que le concert familial K... « convoque le passé ». Elle observe avoir considéré en 2007 qu'il n'était pas de son intérêt de participer à l'offre publique d'achat initiée par Maison du treizième (société contrôlée par M. V... K...), dans la mesure où elle a estimé que le prix de 52 euros par actions proposée dans l'offre conduisait à une sous-estimation de la société. Elle souligne que cette décision procédait du droit absolu de tout actionnaire de préserver ses intérêts patrimoniaux. Elle estime que cela ne peut la priver en 2019 du bénéfice des règles gouvernant les OPR.

75.Elle ajoute, s'agissant des allégations des auteurs du recours quant à l'existence d'une « coordination complète » des minoritaires dans le dessein de « bloquer le jeu normal du marché », que le concert familial K... n'en apporte aucune démonstration positive et concrète. Au delà de l'absence de preuve de nature à démontrer celle-ci, il n'est ni surprenant ni illicite que des actionnaires minoritaires votent souverainement dans le même sens face à des résolutions destinées à mettre en œuvre des choix stratégiques préjudiciables à leurs intérêts.

76.JC Capital Management et IDI soulignent qu'en réalité, le seul point commun qui les relie à [...] consiste à ne pas avoir apporté leurs actions à une offre de fermeture datant de 2007 et à se retrouver actionnaires minoritaires de K... Group « dont la seule liquidité est celle que le majoritaire peut décider d'offrir à sa guise ». Il est logique, par ailleurs, qu'ils aient tous les trois souhaité bénéficier de l'élargissement des conditions de recevabilité de l'OPR à l'entrée en vigueur de la loi PACTE. La circonstance tenant au fait qu'une OPR bénéficie à un tiers ne rend pas illégitime la demande de l'actionnaire dont la légitimité ne saurait être contestée. Ce raisonnement fait encore moins sens s'agissant d'une décision d'OPR qui bénéficie par sa nature même à l'ensemble des actionnaires minoritaires de K... Group.

***

Sur ce, la Cour,

77.Dès lors que, conformément à l'article 236-1 du RGAMF, l'AMF, après avoir procédé aux vérifications nécessaires, s'est prononcée sur la demande qui lui a été présentée par un actionnaire minoritaire, au vu notamment des conditions prévalant sur le marché des titres concernés et des éléments d'information apportés par le demandeur, et a déclaré la demande d'OPR recevable, elle n'est pas tenue de procéder au même examen concernant les demandes présentées concomitamment par d'autres actionnaires minoritaires tendant aux mêmes fins.

78.La recevabilité de la demande de mise en œuvre d'une OPR présentée par un actionnaire minoritaire profite aux autres demandeurs, à moins qu'il ne soit établi que ces actionnaires ont adopté de concert un comportement contraire à l'esprit de l'article 236-1 du RGAMF.

79.En l'espèce, les auteurs du recours reprochent aux demandeurs à l'OPR d'avoir adopté un tel comportement en faisant valoir que :

– le comportement de [...] ne serait pas « dissociable de celui de JG Capital et de l'IDI » et aurait consisté à « se placer délibérément dans une situation lui permettant, en opérant une coordination complète avec JG Capital Management et l'IDI, de bloquer le jeu normal du marché » ;

– JC Capital Management serait entrée au capital de la société « avec la bénédiction de [...] » ;

– [...] aurait constitué un concert en 2007 avec les deux autres actionnaires minoritaires afin de faire échouer l'offre publique d'achat simplifiée initiée par Maison du treizième et qu'elle se serait comportée en alliée à cette fin ;

– « la prétendue étroitesse du marché qu'elle déplore résulte quasi-exclusivement des interventions de ses deux alliés ».

80.Au soutien de leurs allégations, ils invoquent la lettre de saisine adressé le 6 juin 2019 par [...] à l'AMF aux termes de laquelle la partie intitulée « Investissement de [...] et contexte », que la position qu'elle a exprimée en 2007 « était visiblement partagée par les autres actionnaires minoritaires puisque la famille K... n'a pas été en mesure de mettre en œuvre un retrait de cote de la société ». Or la formulation ainsi employée ne peut valoir démonstration de la « stratégie commune" dénoncée, étant observé de surcroît que la phrase mise en exergue est extraite d'un document de quatre pages qui développe, tout du long, le point de vue autonome de [...].

81.Les deux autres pièces produites aux débats par les auteurs du recours sont le communiqué de K... Group du 25 septembre 2018 relatif à l'assemblée générale mixte du 17 septembre 2018 intitulé « réponse aux questions écrites de la société JG Capital Management » (pièce no10), et la capture d'écran d'une page de l'« info FAQ » du site internet de JG Management « what is a hedge fund ? » (pièce no20), pièces qui ne sont pas de nature à venir utilement en soutien du

moyen.

82.Il ne peut être reproché à des actionnaires minoritaires de voter souverainement dans le même sens lorsqu'ils considèrent que les résolutions déposées lors d'une assemblée générale sont destinées à mettre en œuvre des choix stratégiques qui paraissent préjudiciables à leurs intérêts. La circonstance que les trois actionnaires minoritaires en cause aient souhaité bénéficier de l'élargissement des conditions de recevabilité de l'OPR à l'entrée en vigueur de la loi PACTE ne peut non plus caractériser en elle-même une concertation fautive.

83.Les éléments produits aux débats ne permettent donc pas d'établir l'existence d'une stratégie commune entre [...] et JG Capital Management et IDI caractérisant un comportement concerté des minoritaires contraire à l'esprit de l'article 236-1 du RGAMF.

84.Le moyen, mal fondé, doit être rejeté.

## IV. SUR LE MOYEN FONDÉ SUR LE DÉTOURNEMENT DE LA LOI ET L'ABUS DE DROIT

85.Les auteurs du recours avancent quatre arguments successifs à l'appui de ce moyen. Ils rappellent en premier lieu que la procédure de rachat forcé doit permettre qu'un minoritaire puisse exiger du majoritaire, dans certains cas, qu'il rachète ses titres pour un juste prix. Pour la cour d'appel de Paris (arrêt Cauval du 7 avril 1998), un minoritaire dont le seul objectif est d'obtenir une valorisation maximale de sa participation « détourne de sa finalité la procédure d'offre publique de retrait après avoir artificiellement créé une situation d'illiquidité du titre qu'il invoque à son profit », un tel cas caractérisant un abus de droit. Or JG Capital Management et ses deux alliés se seraient délibérément placés depuis l'offre dans une situation devant leur permettre de bloquer le jeu normal du marché, en contrariété totale avec la finalité de l'OPR et de la loi PACTE, cette dernière ayant eu pour finalité de rendre plus coûteuse une stratégie de blocage. En deuxième lieu, les demandes seraient fondées sur des objectifs étrangers à la procédure de rachat forcé, et en liens avec des cessions d'actifs intervenus un an et demi plus tôt. En troisième lieu, elles serviraient à « contourner le rejet des multiples actions en justice abusives lancées par JC Capital Management ». En quatrième lieu, comme il serait peu probable que les trois minoritaires apportent leurs actions à une OPR, si elle devait être déposée, l'OPR serait abusive car probablement inutile et gravement préjudiciable au concert majoritaire.

86.JC Capital Management et IDI observent en réponse que le concert familial K... semble considérer que le fait que la décision d'OPR leur bénéficie est de nature à « contaminer » celle de [...] en la rendant illégitime. Or ce raisonnement doit être exclu car une demande d'OPR est appréciée en fonction des éléments de fait ou de droit liés à cette demande.

***

Sur ce, la Cour,

87.L'abus de droit relève de la responsabilité civile et suppose donc la démonstration d'une faute.

88.En l'espèce, l'AMF a retenu que la demande de mise en œuvre d'une OPR présentée par [...],

dans le contexte qu'elle a examiné, était recevable et en a justement déduit, pour les motifs déjà exposés, qu'il n'y avait pas lieu d'examiner la situation des autres actionnaires minoritaires dont les demandes tendaient aux mêmes fins.

89. Force est de constater qu'aucune faute dans l'exercice de ce droit n'est démontrée à l'égard de [...] susceptible de remettre en cause le bien fondé de la décision attaquée.

90. En premier lieu, aucun détournement de la finalité de la procédure d'OPR n'est caractérisé. Les auteurs du recours procèdent sur ce point par simple affirmation, sans aucune offre de preuves.

91. En deuxième lieu, il est vain d'invoquer à l'encontre de [...], l'introduction par JG Capital Management d'« actions judiciaires abusives visant à obtenir, par la pression, un rachat de sa participation à des conditions financières exorbitantes », cette situation, à la supposée démontrée, ne le concernant pas.

92. En troisième lieu, ainsi qu'il a déjà été exposé, la stratégie commune alléguée entre [...] et JG Capital Management et IDI n'est pas prouvée. Il est donc vain d'affirmer que JC Capital Management « et ses deux alliés » se seraient délibérément placés depuis 2007 dans une situation devant leur permettre de bloquer le jeu normal du marché.

93. En quatrième et dernier lieu, l'abus ne saurait être caractérisé par un simple argument hypothétique, tenant au fait que l'OPR sera probablement inutile, dès lors que les actionnaires minoritaires refuseront d'apporter leurs actions « dans la mesure où son prix a peu de chance d'être au niveau de leurs prétentions financières sans rapport avec la situation financière de la société ».

94. Aucun élément ne permet en outre de caractériser la violation de l'esprit de la loi PACTE accessoirement alléguée, quand bien même cette dernière viserait, selon le concert familial K..., « à mettre les sociétés cotées hors d'atteinte d'un chantage des actionnaires minoritaires activistes ou d'hedge funds », aucun comportement critiquable n'étant, de fait, établi en l'espèce.

95. Il convient, en conséquence, de rejeter le moyen.

96. Il s'ensuit que le recours du concert familial K... doit être rejeté.


## V. LES DEMANDES FONDÉES SUR L'ARTICLE 700 DU CODE DE PROCÉDURE CIVILE ET SUR LES DÉPENS

97. L'équité ne commande pas qu'il soit fait application des dispositions de l'article 700 du code de procédure civile.

98. Les membres du concert familial K..., parties perdantes, seront condamnés aux dépens.

99. L'article 699 du code de procédure civile dispose que les avocats peuvent, dans les matières où leur ministère est obligatoire, demander que la condamnation aux dépens soit assortie à leur profit du droit de recouvrer directement contre la partie condamnée ceux des dépens dont ils ont

fait l'avance sans avoir reçu provision.

100.L'avocat ne peut donc obtenir le bénéfice de la distraction des dépens que si son ministère est obligatoire, ce qui n'est pas le cas en l'espèce.

101.La demande de ce chef formée par [...] sera en conséquence rejetée.

\*
\* \*

PAR CES MOTIFS

La Cour,

REJETTE le recours formé par la société M14, la société K... Group, M. V... K..., M. H... K..., M. W... K... et Mme L... K... contre la décision de l'Autorité des marchés financiers no 220C1034 du 19 mars 2020 déclarant recevable la demande de mise en œuvre d'une offre publique de retrait visant les actions de la société K... Group présentée par [...] ;

DIT n'y avoir lieu à application de l'article 700 du code de procédure civile ;

CONDAMNE la société M14, la société K... Group, M. V... K..., M. H... K..., M. W... K... et Mme L... K... aux dépens.


LA GREFFIÈRE




Véronique COUVETLA PRÉSIDENTE




Frédérique SCHMIDT
Retourner en haut de la page
**Cour d'appel de Paris, 26 novembre 2020, 20/050137**

- ← **Retour aux résultats**
- ‹ **Résultat précédent**
- **Résultat suivant** ›

- 

- À propos de cette version

- Mentions légales

- Politique de confidentialité

- Plan du site

- Open data et API

- Accessibilité : partiellement conforme

- service-public.fr

- data.gouv.fr

- Code du travail numérique

- gouvernement.fr

- france.fr

Votre avis