# EXHIBIT 4

15098

This Agreement is made as of *the 1st day of April, 19*
between HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.
and HADASSAH MEDICAL RELIEF ASSOCIATION, INC., tax-exempt membership
corporations, organized and existing under the laws of the State of
New York, U.S.A. (hereinafter collectively referred to as "HADASSAH"),
of the one part, and THE HEBREW UNIVERSITY ASSOCIATION, formed under
the Ottoman Law of Associations, and THE HEBREW UNIVERSITY OF
JERUSALEM, a corporation recognized under the Council for Higher
Education Law 5718-1958 (hereinafter collectively referred to as
"THE UNIVERSITY"), of the other part.

WITNESSETH:

PREAMBLE    WHEREAS—

A.    Various agreements, including the agreements on
Affiliation and Relationship of February 17th, 1936, May 24th, 1945,
the Agreements of May 3, 1950, and of January 25, 1956, and other
agreements, have been concluded between HADASSAH and THE UNIVERSITY
for the purpose of providing medical and dental education and research
in Israel and of regulating financial, administrative and other matters
arising therefrom or connected therewith;  and

B.    HADASSAH, THE AMERICAN FRIENDS OF THE HEBREW UNIVERSITY
and THE AMERICAN JEWISH PHYSICIANS COMMITTEE have, by agreement,
including an agreement dated January 22, 1945, organized a joint cam-
paign to raise funds (hereinafter referred to as "THE JOINT FUND")
for the construction of certain buildings required for medical educa-
tion and research (generally described as The Medical School) and
have raised by their joint efforts certain sums toward the erection of
such buildings;  and

C.    The monies raised by the aforementioned JOINT FUND
have since been placed at the disposal of THE UNIVERSITY in accordance
with an agreement dated May 5, 1956 and the memorandum dated May 8,
1956;  and

D.    In order to implement the aforementioned agreements, HADASSAH and THE UNIVERSITY have established a comprehensive network of facilities for education and research in the medical sciences; and

E.    HADASSAH and THE UNIVERSITY have jointly retained the architectural services of Joseph Neufeld for the preparation of plans for THE HADASSAH-HEBREW UNIVERSITY MEDICAL CENTER (hereinafter referred to as "THE MEDICAL CENTER") comprising various buildings and structures to be erected by HADASSAH and by THE UNIVERSITY, respectively, on certain lands situated near Ein Karem in the environs of Jerusalem, and leased to HADASSAH and THE UNIVERSITY, respectively, as hereinafter more particularly described;  and

F.    In view of the public trust involved in the raising of the aforementioned JOINT FUND, and the firm intention of the parties hereto, from the very inception, that the relationship between them shall be placed on a permanent, continuing and exclusive basis, and the desire of the parties to establish clearly their respective rights, interests and obligations in and to their respective facilities used for medical and dental teaching and research at THE MEDICAL CENTER, and in and to any other clinical facilities of HADASSAH that may be used for teaching and research, and in and to any other research or teaching facilities relating to medical sciences that THE UNIVERSITY may develop in the future;

NOW, THEREFORE, HADASSAH and THE UNIVERSITY HAVE MUTUALLY AGREED AS FOLLOWS:-

Section 1.    EXCLUSIVE AND PERMANENT AFFILIATION

(a)    HADASSAH and THE UNIVERSITY hereby affirm and constitute an irrevocable, continuing and exclusive affiliation in respect of the establishment, maintenance and development of THE MEDICAL CENTER and the promotion of education and research in the medical sciences at THE MEDICAL CENTER and elsewhere in Israel.

-2-

Accordingly, neither party shall be at liberty to change the afore-
mentioned relationship, or the exclusive character thereof, or the objects
or functions of THE MEDICAL CENTER or any part thereof, or in any manner
or form to dispose of, or part with the possession of, the same; or so
to deal with any of its own rights or interests therein as may in any way
prejudice or adversely affect the rights or interests of the other party,
without first having previously obtained the written consent thereto of
the latter.

(b) HADASSAH enjoys the status of a tax-exempt organization
under the United States Internal Revenue Code and is bound, in the con-
duct of its affairs, to comply with the laws, rules and regulations
relevant to it. In entering into this agreement, HADASSAH does so in
good faith and belief that all the terms and conditions stated herein
are consistent with the aforementioned obligations.

Section 2.   MEDICAL AND DENTAL EDUCATION AND RESEARCH DEFINED

The term "medical and dental education and research" shall
include —

(a)   Undergraduate teaching of students in the Schools
of Medicine and Dentistry, and any other school that may be
established within the framework of this Agreement;

(b)   Postgraduate training of physicians and dentists,
and postgraduate students of any other schools that may be established
within the framework of this Agreement, in the specialized branches of
their respective professions, as applied in hospital, outpatient de-
partments, community or environment;

(c)   Research in medical sciences, as well as in the basic
and social sciences which form the foundation of medical sciences;

(d)   Research in the clinical fields of medicine and den-
tistry, and other disciplines as applied in hospital, outpatient
departments, or in the community.

— 3 —

Section 3.    THE MEDICAL CENTER

The term "MEDICAL CENTER", for the purposes of this Agreement, shall include all the buildings located and to be located within the area near Ein Karem, in the environs of Jerusalem, as more specifically described in the map attached hereto, and made part hereof, marked Exhibit "A", together with all the facilities and services respectively to be accommodated therein or connected therewith.    In the first phase, THE MEDICAL CENTER will contain the following structures in accordance with the plans prepared by said architect, Joseph Neufeld:

Building 1   —   Auditorium

"   2   —   Medical School Administration and Student Classrooms

"   3   —   Pre-Clinical Laboratories and Clinical Research Laboratories

"   4   —   Students' Laboratories and Library

"   5   —   Clinical Diagnostic Laboratories and Clinical Research Laboratories

"   6)  —   Outpatient Department, to be known as the
    7)      "Rosensohn Clinic"

"   8)  —   Rothschild Hadassah University Hospital
    9)

"   10  —   Emergency Admitting, Kitchen and Laundry

"   11  —   HMO and Hospital Administration

"   12  —   Power Plant

"   13  —   Garage and Workshop

"   14  —   School of Nursing, to be known as the "Henrietta Szold Hadassah School of Nursing"

"   15  —   Maternity Hospital, to be known as the "Felicia and Adolph Leon Maternity Pavilion"

"   16  —   Synagogue

"   17  ——   Autopsy and Morgue

"   18  —   Electric and Power Sub-Station

"   19  —   Sewage Plant

"   20  —   The Dental School, to be known as the "Hebrew University-Hadassah School of Dentistry, Founded by Alpha Omega", and will include the clinical dental departments of Hadassah.

—4—

Section 4.   <u>BUILDINGS AND EQUIPMENT</u>

(a)   (i) Buildings 1 through 5 and Building 20, whether now
in the planning stage, or under construction, or completed, shall be
erected, completed, equipped and furnished by THE **UNIVERSITY** at its
own cost and expense in accordance with plans approved, or to be
approved by the parties hereto, and shall belong to THE UNIVERSITY.

HADASSAH nevertheless undertakes to pay for building costs
only of 1800 *1995* gross square meters in Building No. 5, which area is
to be known as the "Hospital Area of the Medical School", on the
basis of the unit cost per square meter of Building No. 5.   HADASSAH
shall have the use of this area in connection with the Hospital, such
use to be provided for by sub-lease under Section 5(b) hereof.

(ii)   HADASSAH and THE UNIVERSITY have agreed that
the maximum space required for Clinical Research Laboratories shall
not exceed 1400 gross square meters, which space may be located either
in Building No. 5 (in space other than that subleased to HADASSAH, as
aforesaid) or elsewhere in a building belonging to THE UNIVERSITY;
and THE UNIVERSITY agrees to allocate such space in Building No. 5,
or as hereinafter provided, elsewhere in a building belonging to THE
UNIVERSITY;   and HADASSAH agrees to share with THE UNIVERSITY the
building costs only of such Clinical Research Laboratories up to a
maximum of 1400 gross square meters, each party paying 50% of such
cost up to a total not exceeding 700 gross square meters.   In con-
sideration for HADASSAH's agreement, as aforesaid, THE UNIVERSITY
shall sublease to HADASSAH 50% of the space in Building No. 5, used
or allocated for Clinical Research Laboratories, up to a maximum of
700 gross square meters.  The space allocated by THE UNIVERSITY for
Clinical Research Laboratories presently contemplated in Building
No. 5 may at any time, in whole or in part, by agreement between the
parties, be located in or removed to a building belonging to THE UNI-
VERSITY other than Building No. 5.   In such event, if the unit cost
per square meter in such other building is in excess of the unit cost

per square meter in Building No. 5, HADASSAH shall pay 50% of such excess for such number of square meters as will be used for Clinical Research Laboratories in such other building.    In the event that the Clinical Research Laboratories are at any time, in whole or in part, removed to a building, other than Building No. 5, belonging to THE UNIVERSITY, the sublease from THE UNIVERSITY to HADASSAH in Building No. 5, referred to above, shall be substituted by two sub-leases, one covering 50% of the area, if any, continued to be used for Clinical Research Laboratories in Building No. 5, and the second, covering 50% of the area used for Clinical Research Laboratories in the building belonging to THE UNIVERSITY into which the Clinical Research Laboratories, in whole or in part, shall be located.    In the event that the Clinical Research Laboratories are, in whole or in part, moved from Building No. 5 to any other building, the entire cost and expense entailed in such moving will at all times be borne by THE UNIVERSITY.

Should the Clinical Research Laboratories, after having been established in Building No. 5, or elsewhere, be moved at any subse-quent date to another location, HADASSAH will not be called upon, except as aforesaid, to pay again for any space used for Clinical Research Laboratories.

Any space allocated for Clinical Research Laboratories may not be employed for any other purpose without the prior written agree-ment of HADASSAH and THE UNIVERSITY.

(iii)  THE UNIVERSITY agrees that HADASSAH may, at its own cost and expense, add an additional story on Building No. 5 for the purpose of establishing and operating therein an Institute of Ophthalmology and HADASSAH shall at all times have the use of the space contained in such additional story for an Institute of Ophthal-mology, or other purposes connected with the Hospital, such use to be provided for by sublease under Section 5(b) hereof.

(iv)  As part of the clinical services which HADASSAH provides for the Dental School, HADASSAH will transfer to Building

No. 20 (the Dental School) that equipment which is presently in use in the Dental School and will maintain and replace such equipment as needed. The scope and the extent of the Dental School may not be increased or enlarged without the prior written consent of HADASSAH, if such extension or enlargement will require HADASSAH to furnish clinical services beyond the scope and extent of the clinical services rendered by HADASSAH on the date of the signing of this Agreement.

(b)  Buildings 6 through 19 shall be erected, completed, equipped and furnished by HADASSAH in accordance with plans approved or to be approved by the parties hereto, and shall belong to HADASSAH. THE UNIVERSITY, nevertheless, undertakes to pay for 801.80 square meters on the fourth floor of Building No. 6, and for 419.00 square meters on the fourth floor of Building No. 7, on the basis of the unit cost per square meter of Buildings Nos. 6 and 7, respectively.  THE UNIVERSITY's participation in the cost of Buildings Nos 12, 18 and 19 is hereinafter provided for in Section 10 under Financial Participation.

(c)  The parties undertake to honor all outstanding agreements and undertakings with respect to the naming of buildings or designation of areas or sections within buildings, or equipment located therein, heretofore made or given by them in connection with any of said buildings or parts thereof.

(d)  THE UNIVERSITY will furnish at its own cost and expense all requisite fixed equipment within the clinical diagnostic and pre-clinical laboratories.  THE UNIVERSITY and HADASSAH will each pay fifty (50%) percent of the cost and expense of all requisite fixed equipment within the clinical research laboratories.

(e)  HADASSAH will furnish at its own cost and expense all requisite movable equipment for such clinical diagnostic and clinical research laboratories as it operates with its own funds in Buildings 3, 4 and 5, and thereafter will replace all equipment, both movable and fixed as needed.

-7-

(f)   It is agreed that the funds collected by the Joint Fund
campaign conducted by HADASSAH and THE AMERICAN FRIENDS OF THE
HEBREW UNIVERSITY and THE AMERICAN JEWISH PHYSICIANS COMMITTEE
(which campaign came to an end in 1948) and distributed in accord-
ance with the minutes of the meeting of the Board of Management
held in February 1951, a copy of which minutes is attached hereto
and marked Exhibit "B", is final and conclusive upon both parties;
and that neither party has any claim against the other with res-
pect to any of such funds.   It is further agreed that HADASSAH
has no further obligation to THE UNIVERSITY in respect of any
contribution to the construction of the Medical School, except as
herein otherwise provided.

Section 5.   **LAND AND LEASES**

(a)   The right, title and interest of HADASSAH and THE
UNIVERSITY in and to the land originally expropriated by the
Government of Israel for THE MEDICAL CENTER, and leased by the
KEREN KAYEMETH L'ISRAEL to HADASSAH and THE UNIVERSITY, respectively,
shall be in accordance with leases in favor of HADASSAH and THE
UNIVERSITY, respectively, registered in the names of the parties
in the Land Registry Office of the Government of Israel on Septem-
ber 6, 1959, copies of which leases are annexed hereto, marked
Exhibit "D".

(b)   HADASSAH and THE UNIVERSITY agree to sublease to each
other such areas as each of them occupies on the premises leased in
the name of the other, at a nominal rent of IL 1.-, for the use of
every such area and the free access thereto during the whole period
of the KKL lease, and that such subleases shall be executed and duly
registered not later than the       day of       , 196 .  Both parties
agree that such subleases shall be prepared on the general lines of
the KKL leases by Messrs. S. Horowitz & Co., Jerusalem, Advocates,
acting on behalf of both parties, and shall upon registration become
part of this Agreement as if originally set forth herein.

-8-

(c)   Reference is hereby made to the letter agreement between the parties dated March 28, 1960 (copy of which is attached hereto and marked Exhibit "F") and it is agreed the five-year period referred to therein with respect to the provision in Clause 7(2) of the leases from JKL to THE UNIVERSITY and HADASSAH, respectively, shall commence on the 6th day of June, 1961.

(d)   HADASSAH and THE UNIVERSITY undertake that they will not make any structural additions to the structures already completed, or which are in the process of completion, pursuant to the present plans of THE MEDICAL CENTER, and that they will not construct or cause the construction of any new structures, except in pursuance of and in conformity with the master plan of THE MEDICAL CENTER which shall have been agreed upon by both parties.   In no event shall any construction or improvements be made, nor facilities be established, by either party, without the prior written consent of the other thereto.

(e)   For the removal of all doubts, it is hereby declared that, except where otherwise expressly agreed, and then, only to the extent of such agreement, nothing herein contained shall —

(i) affect the obligations undertaken by HADASSAH and THE UNIVERSITY in their respective leases with Keren Kayemeth Leisrael to effect all repairs which may from time to time be required in or to the buildings or structures respectively erected by them in THE MEDICAL CENTER; or

(ii) apply to minor alterations of or additions to any building or structure comprised in THE MEDICAL CENTER, which alterations or additions shall be effected by and at the exclusive cost and expense of the party having erected such building or structure.

-9-

Section 6.    NAMES OF SCHOOLS AND INSTITUTIONS

(a)    The names of HADASSAH and of THE UNIVERSITY shall for all time be associated with THE MEDICAL CENTER, which shall accordingly be known as the "HADASSAH-HEBREW UNIVERSITY MEDICAL CENTER";  the Hospital shall be known as the "ROTHSCHILD HADASSAH-UNIVERSITY HOSPITAL; the Medical School shall be known as the "HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL";  the Dental School shall be known as the "HEBREW UNIVERSITY-HADASSAH SCHOOL OF DENTISTRY, Founded by ALPHA OMEGA"; the Nursing School shall continue to be known as the "HENRIETTA SZOLD HADASSAH SCHOOL OF NURSING" until otherwise agreed upon between HADASSAH and THE UNIVERSITY;  the name of any school, institution or building which may at any time be established or erected within the framework of THE MEDICAL CENTER shall be pre-fixed with the words "HEBREW UNIVERSITY-HADASSAH" or HADASSAH-HEBREW UNIVERSITY", as shall be agreed in advance in writing between THE UNIVERSITY and HADASSAH, it being understood that in the event that no agreement has been reached on the use of the names of both parties, either party may use its own name only, in connection with such school, institution or building, provided that all other terms, conditions and requirements relating to the establishment or erection of any school, institution or building within THE MEDICAL CENTER, as set forth in this Agreement, shall have been complied with.

(b)    The name of no third party shall be attached to any school, institution or building to be erected at THE MEDICAL CENTER without the prior written agreement of HADASSAH and THE UNIVERSITY.

(c)    Only schools, institutions and buildings related to, or for the purpose of, medical education, as defined heretofore in this Agreement, shall be built in THE MEDICAL CENTER, and only with the prior written consent of THE UNIVERSITY and HADASSAH to this effect.

(d)    All of the schools, institutions and buildings, now or hereafter covered by this Agreement, shall be referred to in the manner described above whenever the same shall be mentioned in any

-10-

literature, publicity, scientific or other publication and in any printed matter or correspondence sponsored or issued by or under the authority of or with the approval of HADASSAH or THE UNIVERSITY, as the case may be.    All such references shall also state that the school, institution or building is located in the HADASSAH-HEBREW UNIVERSITY MEDICAL CENTER.

(e)    The facilities and services of THE MEDICAL CENTER shall be available to the various schools hereinbefore mentioned, whether established or to be established upon the terms and conditions herein provided.

Section 7.    UNIVERSITY DESIGNATIONS

HADASSAH and THE UNIVERSITY hereby agree that for all purposes of medical education and research to be pursued by them, whether in THE MEDICAL CENTER or anywhere else in Israel, the clinical facilities of HADASSAH, including those of the Hospital, shall be the only such facilities designated as "university" facilities.    Accordingly —

(a)    neither of the parties hereto shall, without previously obtaining the written consent of the other, enter into agreement with any third party for the purposes of medical education and research, and

(b)    any decision to extend the teaching or research facilities of any of the schools subject to this Agreement to laboratories, clinical departments or hospitals which are not under the management or control of either of the parties hereto, shall be taken and implemented only by the joint written consent of HADASSAH and THE UNIVERSITY. Before making their final decision, THE UNIVERSITY and HADASSAH will seek the advice of the JOINT BOARD OF MANAGEMENT.

Section 8.    INDEPENDENCE OF PARTIES

HADASSAH and THE UNIVERSITY shall each continue their own independent existence and control, and nothing contained in this Agreement shall have the effect of designating or authorizing any

-11-

one of the parties hereto, to act for, or on behalf of, or as
agent of, the other; nor shall anything contained in this
Agreement be construed to affect any activities of HADASSAH, or
of THE UNIVERSITY, not expressly covered by the terms of this
Agreement.

Section 9.  **BUDGETS**

(a)  Except as hereinelsewhere otherwise provided,
THE UNIVERSITY shall supply or obtain all the funds required
for the administration, operation and maintenance of the depart-
ments for the pre-clinical sciences and social sciences, students'
laboratories, the Library, the Auditorium and lecture rooms for
the Schools of Medicine and Dentistry, excluding those sections of
the Departments of Microbiology, Biochemistry and Pathology which
are at present maintained and administered by HADASSAH for the
clinical services.

(b)  Except as hereinelsewhere otherwise provided,
HADASSAH shall supply or obtain all the funds required for the
administration, operation and maintenance of the clinical services
and their research facilities, the Hospital, the Out-Patient
Department, the clinical services in the community and the clinical
dental departments, and the Henrietta Szold Hadassah School of
Nursing.  HADASSAH has in the past made contributions to the main-
tenance and operation of the pre-clinical laboratories.  HADASSAH
may continue to make such contributions in future years in such
amounts and at such times as agreed between the parties.  Such
contributions shall be the subject of separate agreements from
time to time to be made between the parties.  An agreement for
the years February 1, 1960-January 31, 1961, February 1, 1961-
January 31,1962, February 1, 1962-January 31, 1963, February 1,
1963-January 31, 1964, February 1, 1964-January 31, 1965, February 1,
1965-January 31, 1966 and February 1, 1966-January 31, 1967 has been
reached between HADASSAH and THE UNIVERSITY.  A copy thereof is

-12-

attached to this Agreement.    In determining the amount of any contribution which HADASSAH may make, it will take into account the needs and development of the Medical School as well as its own financial capacity. The budget for maintenance and operation of the pre-clinical laboratories for the years in which HADASSAH makes its contribution to such budget, as aforesaid, is subject to prior approval by THE UNIVERSITY and by HADASSAH.

Section 10.    FINANCIAL PARTICIPATION

1.    The amounts payable, respectively, by HADASSAH and THE UNIVERSITY, for the administration of the construction of THE MEDICAL CENTER (through the Building Office), and the construction and equipment of the common facilities and utilities leading to and contained within the area of THE MEDICAL CENTER, shall be determined in accordance with the several formulae set forth below:

(a)    The shares of HADASSAH and THE UNIVERSITY in the total costs of Administration (Building Office) up to the date of the closing of the Building Office, namely, the 1st day of July, 1961, shall be in the proportion which their respective shares in the building costs of THE MEDICAL CENTER shall bear to the total building costs thereof, which costs are to be determined by a final audit.    The term "building costs" as used herein means the actual costs of construction and mechanical installations; fixed equipment; fixed furnishings; site work and installation of utilities.

(b) Architect and Site Architect

(i)    The shares of HADASSAH and of THE UNIVERSITY toward the fees of Mr. Neufeld, Architect, shall be in the proportion which their respective "cost of construction" bears to the total "cost of construction" as the term "cost of construction" is defined in the agreement with the architect, dated December 4, 1952.    HADASSAH

-13-

shall bear no part of any fees of the architect other
than those provided for in the original contract, or
to which it has otherwise agreed; nor shall it bear
any part of any fees in respect of work performed by
the architect for THE UNIVERSITY without prior written
consent of HADASSAH to participate in such fees.   THE
UNIVERSITY shall bear no part of any fees of the
architect other than those provided for in the original
contract or to which it has otherwise agreed; nor shall
it bear any part of any fees in respect of work per-
formed by the architect for HADASSAH without prior
written consent of THE UNIVERSITY to participate in
such fees.

(ii)   The ratio of HADASSAH and of THE UNIVERSITY
in the fees of Mr. Lawrence Halprin, the site architect,
have been fixed in a letter to Mr. Neufeld, dated June 24,
1958, to be 70% for HADASSAH and 30% for THE UNIVERSITY,
and the same is hereby confirmed.

(c)   Mechanical Engineers — Jaros, Baum & Bolles.

The shares of HADASSAH and THE UNIVERSITY in the
total fees of the firm of Jaros, Baum & Bolles of New York,
shall be in the proportion which their respective shares in
the building costs of THE MEDICAL CENTER shall bear to the
total building costs thereof, all of which costs are to be
determined by a final audit.   The term "building costs"
as used herein is defined in 10(a) above.   HADASSAH shall
bear no part of any fees of Jaros, Baum & Bolles other than
those provided for in the original contract, or as otherwise
agreed to; nor shall it bear any part of any fees in res-
pect of work performed by Jaros, Baum & Bolles for THE
UNIVERSITY without prior written consent of HADASSAH to
participate in such fees.

-14-

THE UNIVERSITY shall bear no part of any fees payable to Jaros, Baum & Bolles other than those provided for in the original contract or as otherwise agreed to; nor shall it bear any part of any fees in respect of work performed by Jaros, Baum & Bolles for HADASSAH without prior written consent of THE UNIVERSITY to participate in such fees.

(d)  **Capital Outlay for Site Work**

The cost of site work and landscaping shall be allocated between HADASSAH and THE UNIVERSITY as follows:

(i)  Site Work and Landscaping Inside of Circular Road – HADASSAH and THE UNIVERSITY shall each pay the cost of site work and landscaping of the courtyards between their own buildings; with respect to all other areas — in the proportion of 43 for HADASSAH and 22 for THE UNIVERSITY.  The term "site work and landscaping" as used herein means grading, rough grading and final grading, parking lots, roads, sidewalks, curbs, planting areas, plantings, retaining walls, perimeter walls, ground lighting, drainage, sprinkler system and other costs covered by contract other than courtyards enclosed in whole or in part by buildings.

(ii)  Circular Road — HADASSAH and THE UNIVERSITY shall share in the cost of the circular road in the proportion of 43 for HADASSAH and 22 for THE UNIVERSITY.

(iii) Site Work and Landscaping Outside of Circular Road — The cost of landscaping, if any, outside the circular road shall be borne by the party in whose name the lease covering such land is recorded.   In the event of the subleasing by one of the parties to the other of any such area, the party to whom such sub-lease

is made shall pay for the cost incurred thereto for landscaping of the areas subject to such sub-lease.

(iiii)    Since THE UNIVERSITY cannot commit itself as to when it would be in a position to repay HADASSAH for the sums which it has advanced, HADASSAH and THE UNIVERSITY agree that within three months after the final audit a committee will be appointed and will calculate the amounts which the parties owe each other.    It was also agreed that THE UNIVERSITY will not authorize HADASSAH to contract for any further landscaping on its behalf.    HADASSAH will do its own landscaping and THE UNIVERSITY will do its own — after it has moved into and begins to function in THE MEDICAL CENTER.

With respect to parking lots and roads, inside the circular road, HADASSAH will finance the capital expenditures and THE UNIVERSITY will repay its share on a 43/22 basis, according to the formula as stated above with respect to capital outlays for landscaping.

(e)    Sewage Lines and Sewage Disposal Plant:    HADASSAH and THE UNIVERSITY shall share in the cost of sewage lines and sewage disposal plant in the ratio of 78 for HADASSAH and 22 for THE UNIVERSITY.

(f)    Water Lines — Water Reservoirs.

(i) Water lines to the site — HADASSAH and THE UNIVERSITY shall share in the cost of the water lines to the site in the proportion of 75 for HADASSAH and 25 for THE UNIVERSITY.

(ii) Water Reservoirs.    HADASSAH shall pay the cost of 4 reservoirs, and THE UNIVERSITY shall pay for the cost of 1 reservoir up to the size of 1000 cubic meters.

-16-

(iii) Water Lines (Secondary Water Lines).    On the site from reservoir to reservoir and from same to the buildings, including accessory equipment, pumps, etc., HADASSAH and THE UNIVERSITY shall share in these costs in the proportion of 75 for HADASSAH and 25 for THE UNIVERSITY.

(g) Primary and Secondary Electrical Lines. HADASSAH and THE UNIVERSITY shall share in the cost of the Primary and Secondary electrical lines and accessory equipment in the proportion of 75 for HADASSAH and 25 for THE UNIVERSITY.

(h) Electrical Sub-Station and Transformers. HADASSAH and THE UNIVERSITY shall share in the cost of construction and equipment of the electrical sub-station in the proportion of 75 for HADASSAH and 25 for THE UNIVERSITY.    HADASSAH shall pay for 6 transformers and THE UNIVERSITY shall pay for 2 transformers.

(i) Boiler Power Plant.    The term "boiler power plant" includes the structure housing the plant (Building #12, the definition of which is subject to re-examination and agreement between THE UNIVERSITY and HADASSAH) and mechanical installations (heating, ventilation and plumbing therein) and the equipment and installation of the plant itself.    HADASSAH and THE UNIVERSITY shall share in the cost of the boiler power plant in the proportion of 75 for HADASSAH and 25 for THE UNIVERSITY.

(j) Emergency Diesel Generators.    HADASSAH shall pay for 3 generators and THE UNIVERSITY shall pay for 1 generator.

(k) Telephone Cable and Exchanges - Internal and External.

(1) Cable Lines to the Site and Internal Cables. HADASSAH and THE UNIVERSITY shall share in the cost of

-17-

cable lines to the site and internal cables in the
proportion of 75 for HADASSAH and 25 for THE UNI-
VERSITY.

(ii) Exchanges.  HADASSAH and THE UNIVERSITY
shall each pay for its own exchanges and equipment.

2.    Accounts between THE UNIVERSITY and HADASSAH arising out
of the construction and equipment of THE MEDICAL CENTER shall be settled
between them on the basis of an audit to be made by an Israel accounting
firm to be determined, the audit to be commenced forthwith after the
signing of this Agreement, with the intention that the first audit shall
be completed by June 30, 1963.    It is understood that, with respect to
some items, a series of audits will be necessary due to the delay in
construction of the Medical School.    The cost of the audits shall be
borne by the parties in the proportion of 70% for HADASSAH and 30% for
THE UNIVERSITY.    The auditors' reports and conclusions shall be conclu-
sively binding upon HADASSAH and THE UNIVERSITY.    In the interim, pending
such final settlement of accounts, HADASSAH will pay 70% of costs of con-
struction and equipment and THE UNIVERSITY shall pay 30% of the costs of
construction and equipment.    Any final amounts due and payable by the
parties hereto to each other in pursuance of such final audit shall be
paid not later than _____ months from the date of the completion of said
audit, with interest on outstanding principal at the rate of __5%__ per
annum to the date of payment.

Section 11.    MAINTENANCE AND OPERATION

With regard to maintenance and operation of services and house-
keeping, it is agreed that —

(a) Maintenance of Grounds.    The term "maintenance" includes
personnel services, facilities and equipment connected with gardening,
plantings, cleaning and caring for walks, sidewalks, roads, parking
areas, courts, site lighting, drainage equipment, etc., and watching
and policing.    The term "area" as in this paragraph used refers to
all of the land covered by the leases from KKL to HADASSAH and to THE

-18-

UNIVERSITY.   The term "site" as in this paragraph used includes that
part of the area which is inside or within the circular road.

Until the Medical School is transferred to THE MEDICAL
CENTER and THE UNIVERSITY completes the landscaping of these grounds,
HADASSAH and THE UNIVERSITY will each maintain the grounds on the
parts of the site occupied by each of them.   Thereafter, maintenance
of the grounds in the whole of the site shall be operated by HADASSAH
for the joint account of HADASSAH and THE UNIVERSITY.   All outlays,
costs and expenditures in connection therewith will be apportioned
between HADASSAH and THE UNIVERSITY in the ratio of 43 for HADASSAH
and 22 for THE UNIVERSITY (this ratio may be changed by further develop-
ment and will be adjusted accordingly).   THE UNIVERSITY shall reimburse
HADASSAH its share of the foregoing services within 30 days after receipt
of a monthly statement of account from HADASSAH.   Such statement of
account shall include, in addition to the share of THE UNIVERSITY as
aforesaid, an amount equal to 15% thereof, which is payable to HADASSAH
as reimbursement for overhead expenses.   This percentage is to be re-
viewed after three years.

As regards maintenance of the circular road, this will be
shared between HADASSAH and THE UNIVERSITY at the ratio of 43 for
HADASSAH and 22 for THE UNIVERSITY from the date of the start of opera-
tion of the Medical School.

HADASSAH will maintain the grounds outside the circular
road except that THE UNIVERSITY will pay a proportionate share when-
ever it erects any structure for its own use outside the circular road.

(b)  Maintenance of Buildings and Interiors.   This term
includes minor repairs to structural elements;  window repairs, window
washing;  painting;  minor installations requiring services of plumbers,
electricians, carpenters, etc.;  elevator maintenance and repairs;  dumb-
waiter maintenance and repairs;  boiler maintenance and repairs;  gene-
rator maintenance and repairs;  maintenance and repairs of pumps, tanks,
motors, compressors, generators, filters, and controls thereof, etc.;
maintenance and repairs of air conditioning equipment;  guards in interior

-19-

of buildings.

The foregoing services will be operated and maintained by HADASSAH for the whole of THE MEDICAL CENTER for the joint account of HADASSAH and THE UNIVERSITY, except as otherwise agreed from time to time in writing between the parties.   All outlays, costs and expenditures in connection with the **operation and maintenance of said services** shall be apportioned between HADASSAH and THE UNIVERSITY in proportion to the floor space which each of them occupies in relation to the total floor space of THE MEDICAL CENTER.  THE UNIVERSITY will reimburse HADASSAH its share of the foregoing services within 30 days after receipt of a monthly statement of account from HADASSAH.   Such statement of account shall include, in addition to the share of THE UNIVERSITY as aforesaid, a sum equal to 15% thereof, which is payable to HADASSAH as reimbursement for overhead expenses.

(c) <u>Sewage Disposal Plant</u> - shall be operated by HADASSAH for the joint account of HADASSAH and THE UNIVERSITY.   All outlays, costs and expenditures in connection therewith shall be apportioned between HADASSAH and THE UNIVERSITY in the proportion of 78 for HADASSAH and 22 for THE UNIVERSITY.

(d) <u>Housekeeping</u>.   The term includes maid service, porter services, general cleaning services.   HADASSAH and THE UNIVERSITY will each operate and maintain for its own account its own housekeeping services.

(e) <u>Facilities and services</u> of THE MEDICAL CENTER shall be available to the various schools herein mentioned and such others as may, from time to time, be established in pursuance of this Agreement upon the terms and conditions set forth herein.

(f) <u>Gas, Electricity and Water</u>.   Separate meters shall be installed by HADASSAH and THE UNIVERSITY in the areas under their respective control for gas, electricity and water, and each of them shall pay for such utilities directly to the supplier thereof.



(g) <u>Heat</u>.    HADASSAH will furnish heat and steam and will charge THE UNIVERSITY each month on the basis of cost and overhead as determined by HADASSAH'S and THE UNIVERSITY'S accountants and engineers.

(h) <u>Laundry</u>.    HADASSAH will furnish laundry services and will charge THE UNIVERSITY each month on the basis of cost and overhead (as determined by HADASSAH'S and THE UNIVERSITY'S accountants).

(i) <u>Kitchen and Cafeteria Equipment and Services</u>.    THE UNIVERSITY shall pay HADASSAH a sum equal to _____% of the total cost of kitchen and cafeteria equipment (including major repairs, improvements, additions and replacements) as determined by HADASSAH'S and THE UNIVERSITY'S accountants, and shall pay same in semi-annual installments over a period of 15 years.

With respect to kitchen and cafeteria services to the personnel of THE UNIVERSITY and Medical and Dental students, charges are to be made therefor, and the matter of any surcharges to THE UNIVERSITY, to cover overhead, shall be the subject of a separate agreement between THE UNIVERSITY and HADASSAH.

(j) THE UNIVERSITY and HADASSAH agree to use the facilities of THE MEDICAL CENTER with due and proper care so as to avoid any damage or destruction other than ordinary wear and tear, and they undertake to keep the premises and facilities under their respective control continuously in good condition and repair; and that they will each take and provide all necessary safeguards for safety of personnel using such premises and facilities.

(k) THE UNIVERSITY and HADASSAH shall each maintain proper and adequate insurance on premises and facilities under their respective control.    HADASSAH undertakes to keep fully and adequately insured all facilities under common use for the account of THE UNIVERSITY and HADASSAH and the cost of such insurance is to be borne by HADASSAH and THE UNIVERSITY in such proportions as shall be determined by the accounting firm of Somach, Chaikin & Citron.

-21-

Section 12.    POLICY AND ADMINISTRATION

    I.    Final decisions on matters of policy relating to the spheres of activity in the Schools of Medicine, Dentistry, and any other schools that may be established within the framework of this Agreement, in which THE UNIVERSITY and HADASSAH are jointly concerned, shall be settled by agreement between HADASSAH and THE UNIVERSITY.

    II.    THE JOINT BOARD OF MANAGEMENT

    (a)  HADASSAH and THE UNIVERSITY hereby establish THE JOINT BOARD OF MANAGEMENT for THE HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL and for THE HEBREW UNIVERSITY-HADASSAH SCHOOL OF DENTISTRY, Founded by Alpha Omega (hereinafter referred to as "THE JOINT BOARD").    Subject to the foregoing Part I of this Section, THE JOINT BOARD shall consider all matters affecting the standards and organization of teaching and research in the medical and dental sciences and professions, and any other professional training that may be established within the framework of this Agreement.    It is expected that on matters pertaining to standards and organization of teaching and research THE JOINT BOARD will seek information and advice from the Faculty Board of the Medical School and the Committee of Instruction and Research of the Dental School. *It is expected that on matters pertaining*

    (b)  THE JOINT BOARD shall be responsible to HADASSAH and to THE UNIVERSITY and shall render to HADASSAH and THE UNIVERSITY a written report of its proceedings after each of its meetings.

    THE JOINT BOARD shall meet at least four times in each year and shall keep detailed records of its proceedings, copies whereof are to be sent regularly to HADASSAH and THE UNIVERSITY.

    (c)  THE JOINT BOARD shall communicate its decisions and recommendations to THE UNIVERSITY, to HADASSAH and to THE JOINT ADMINISTRATIVE COMMITTEE hereinafter provided for.

    (d)  It is agreed that THE UNIVERSITY and HADASSAH shall at all times be represented equally in the numerical composition of THE JOINT BOARD.

-22-

THE JOINT BOARD shall consist of the following:

(i) For THE UNIVERSITY: Four persons designated by THE UNIVERSITY; (the President and/or the Vice President and/or the Rector of THE UNIVERSITY shall be included and a senior ranking officer shall be the Chairman).

(ii) For HADASSAH: Four persons designated by HADASSAH; (the Director General of HMO shall be included and shall be the Associate Chairman).

(iii) THE UNIVERSITY and HADASSAH hereby agree on the following additions to THE JOINT BOARD:

(1) In respect of the MEDICAL SCHOOL

Two members designated by the Medical School Faculty:

One a representative of the Pre-Clinical Departments, and

One a representative of the Clinical Departments.

(One of them shall be the Dean of the Medical School.)

THE UNIVERSITY and HADASSAH hereby declare the present Associate Dean of the Medical School who is the principal executive officer of the MEDICAL SCHOOL to be their joint designee. It is agreed that he shall serve on THE JOINT BOARD as the joint designee of both parties so long as he shall hold the position of chief executive officer of the MEDICAL SCHOOL. The membership of any succeeding principal executive officer of the MEDICAL SCHOOL on THE JOINT BOARD shall be subject to agreement by THE UNIVERSITY and HADASSAH.

(2) In respect of the DENTAL SCHOOL

Two members designated by the faculty of the Dental School (until the Dental School shall have attained faculty status, both shall be designated

-23-

by the Committee on Instruction and Research of
the Dental School):

> One a representative of the Pre-Clinical
> Departments, and
>
> One a representative of the Clinical De-
> partments.
>
> (When the Dental School shall have attained
> faculty status, one of them shall be the
> Dean of the Dental School.)

THE UNIVERSITY and HADASSAH hereby declare the
present Director of the Dental School to be their
joint designee.    It is agreed that he shall
serve on THE JOINT BOARD, as the joint designee
of both parties, so long as he shall hold the
position of chief executive officer of the DENTAL
SCHOOL.    The membership of any succeeding princi-
pal executive officer of the DENTAL SCHOOL on
THE JOINT BOARD shall be subject to agreement by
THE UNIVERSITY and HADASSAH.

(3)    Additions to THE JOINT BOARD in respect of other
schools coming within the purview of this Agreement shall
be subject to agreement between THE UNIVERSITY and HADASSAH.

(iv)    THE UNIVERSITY and HADASSAH may jointly
designate not more than two additional persons of special
qualifications to serve at the pleasure of THE UNIVERSITY
and HADASSAH.

(e)    The Chairman, or Associate Chairman, of THE JOINT BOARD,
as the case may be, may, upon request, prevent any vote being taken on
any matter before THE JOINT BOARD, and in such event no action shall be
taken thereon by THE JOINT BOARD.    The particular matter shall in such
event either be tabled or referred to HADASSAH and to THE UNIVERSITY
for final determination by them.    Section 12,II. (e) shall not apply,
however, to Academic Appointments and Promotions, provision for which

-24-

is made in Section 15 of this Agreement.

In the event that all of the members designated by THE UNIVERSITY or by HADASSAH, as the case may be, present at any meeting, shall vote against any particular proposal before the meeting, the objecting party shall have the right to ask that the proposal be referred to the parent organizations and thereupon no action shall be taken by THE JOINT BOARD pending determination by THE UNIVERSITY and HADASSAH.

(f)    Subject to THE JOINT BOARD, teaching and research shall be carried out by the Faculties of the Schools of Medicine and Dentistry, etc. The members of the Faculty shall elect the Dean thereof, in accordance with the procedures of THE UNIVERSITY.    The Director General of HMO shall have the right to ex officio participate in all meetings of each of the Faculties and of any committee thereof.    Moreover, he may be accorded full membership on the Faculty by the Standing Committee of the Senate of THE UNIVERSITY.

(g)    The principal administrative officer of the MEDICAL SCHOOL and of the DENTAL SCHOOL shall be selected and designated by HADASSAH and THE UNIVERSITY.

III.    THE JOINT ADMINISTRATIVE COMMITTEE OF THE HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL.

(a)    THE UNIVERSITY and HADASSAH hereby establish the Joint Administrative Committee of the Hebrew University-Hadassah Medical School (hereinafter referred to as "THE JOINT ADMINISTRATIVE COMMITTEE"), which shall have the following functions:

> To implement the policies, programs and procedures, in respect of teaching and research as promulgated by THE JOINT BOARD, or as determined by HADASSAH and THE UNIVERSITY, as the case may be;  and, to administer the day-to-day operations of the laboratories and other facilities jointly maintained and operated by HADASSAH and THE UNIVERSITY for the Medical School.

(b)    THE JOINT ADMINISTRATIVE COMMITTEE shall function on a day-to-day basis, and meet as often as its business may require.    It shall

keep minutes of its meetings, and same shall be sent regularly to
HADASSAH (via HMO), to THE UNIVERSITY, and to THE JOINT BOARD.
All communications, statements and reports made and issued by THE
JOINT ADMINISTRATIVE COMMITTEE shall be in the name of The Hebrew
University-Hadassah Medical School.

(c)    THE UNIVERSITY and HADASSAH hereby jointly appoint the
following to constitute THE JOINT ADMINISTRATIVE COMMITTEE:

One person designated by THE UNIVERSITY;

One person designated by HADASSAH.

The Dean of the Medical School who shall be the Chairman
of THE JOINT ADMINISTRATIVE COMMITTEE;

The principal administrative officer of the MEDICAL
SCHOOL shall be ex officio a member of THE JOINT
ADMINISTRATIVE COMMITTEE.

IV.    THE JOINT ADMINISTRATIVE COMMITTEE OF THE UNIVERSITY AND
HADASSAH FOR THE SCHOOL OF DENTISTRY:

(a)    THE UNIVERSITY and HADASSAH hereby establish the Joint
Administrative Committee of the Hebrew University-Hadassah School of Dentistry,
Founded by Alpha Omega (hereinafter referred to as "THE JOINT ADMINISTRATIVE
COMMITTEE FOR THE SCHOOL OF DENTISTRY"), which shall have the following
functions:

To implement the policies, programs and procedures, in
respect of teaching and research as promulgated by THE
JOINT BOARD, or as determined by HADASSAH and THE UNIVERSITY,
as the case may be;  and, to administer the day-to-day
operations of the Dental School.

(b)    THE JOINT ADMINISTRATIVE COMMITTEE FOR THE DENTAL
SCHOOL shall function on a day-to-day basis, and meet as often as its
business may require.    It shall keep minutes of its meetings, and same
shall be sent regularly to HADASSAH (via HMO), to THE UNIVERSITY, and to
THE JOINT BOARD.    All communications, statements and reports made and

-26-

issued by THE JOINT ADMINISTRATIVE COMMITTEE FOR THE DENTAL SCHOOL shall be

in the name of The Hebrew University-Hadassah School of Dentistry, Founded

by Alpha Omega.

      (c)    THE UNIVERSITY and HADASSAH hereby jointly appoint the follow-

ing to constitute THE JOINT ADMINISTRATIVE COMMITTEE OF THE SCHOOL OF

DENTISTRY:

          One person designated by THE UNIVERSITY;

          One person designated by HADASSAH;

          The Dean or Associate Dean of The Medical School;

          The Director of the School of Dentistry (or the Dean

          of the Dental School when there shall be a Dean), who

          shall act as Chairman.

      If request is made therefor by the representative of THE UNIVERSITY

or by the representative of HADASSAH, any matter under discussion, either

before or after vote thereon, shall be referred to THE UNIVERSITY and HADASSAH

for final determination by them.

Section 13.   <u>EXCLUSIONS</u>

      I.   All of the services and facilities enumerated below shall, as

heretofore, remain exclusively under the management and control of HADASSAH.

      (a)   Direction and administration of the Henrietta Szold

      Hadassah School of Nursing, the clinical services (including the

      Hospital, the Outpatient Department and Dental Department),

      community health centers and any other services which HADASSAH

      may maintain for the purpose of patient care, service, teaching

      and research;

      (b)   Direction and administration of those parts of the

      Departments of Microbiology, Biochemistry and Pathology presently

      maintained and administered by HADASSAH for the clinical services;

      (c)   Direction and administration of clinical research and

      related laboratories;

      (d)   Any and all services maintained by HADASSAH, not spe-

cifically enumerated as matters to which this Agreement is made
applicable, such as, but not limited to, services to patients,
fellowships to MEDICAL CENTER staff other than physicians,
fellowships and grants to physicians outside THE MEDICAL CENTER,
etc.

II.  All pre-clinical services and facilities presently fully main-
tained by THE UNIVERSITY shall remain exclusively under the management and
control of THE UNIVERSITY.

Section 14.    STANDARDS

In the teaching of students, in the maintenance and operation of
the Hospital, and in the administration of THE MEDICAL CENTER generally,
THE UNIVERSITY and HADASSAH will undertake to maintain such standards as
will attract to their Faculty and staffs the ablest obtainable teachers,
physicians and scientists;  and HADASSAH and THE UNIVERSITY undertake to
maintain such standards as are compatible with the standards maintained by
the highest type of medical schools and hospitals in Europe and in the
United States.

Section 15.    ACADEMIC APPOINTMENTS AND PROMOTIONS

The procedures for academic appointments and promotions in the
Medical School and in the School of Dentistry will be as follows:

(i)    Full academic status will be granted only to full-time
physicians or scientists in the clinical and pre-clinical services of
THE UNIVERSITY and/or HADASSAH, unless otherwise agreed between HADASSAH
and THE UNIVERSITY.

(ii)    Subject to the preceding sub-paragraph, physicians or
scientists not in the service of THE UNIVERSITY or HADASSAH who are
engaged in teaching undergraduate or postgraduate students in the Medical
School, or School of Dentistry, may be granted clinical academic appoint-
ments only.

(iii)    The parties agree that in the best interests of the
Medical School and of the School of Dentistry, it will be their joint

-28-

policy that persons holding senior clinical positions in the Rothschild Hadassah University Hospital or in the clinical dental departments of HADASSAH (which serve the School of Dentistry) shall, as far as possible, also have senior academic rank in the Medical School and in the School of Dentistry.

Clinical personnel and service appointments in the Hospital and Hadassah Medical Organization and in the clinical dental departments shall be made by HADASSAH in accordance with rules and regulations promulgated by HADASSAH from time to time.  Academic appointments and promotions in the Medical School and in the School of Dentistry shall be made in accordance with the rules and procedures promulgated by THE UNI-VERSITY from time to time.  It is agreed and understood that the position of lecturer and above in the clinical departments of the Medical School and in the School of Dentistry may be held only by persons who are in the employ of HADASSAH and to whom HADASSAH has granted tenure of service and only while such service continues in effect.  The initiation of the procedures for academic appointments and promotions with respect to such persons shall be made only after consultation with HADASSAH.  In order to further the intent of the preceding subparagraph, senior clinical positions in the Rothschild Hadassah University Hospital or in the clinical dental departments of HADASSAH (which serve the School of Dentistry) shall be made after consultation with THE UNIVERSITY.

THE UNIVERSITY shall give written notice by registered mail to all members of THE JOINT BOARD stating that the appropriate authorities of THE UNIVERSITY have recommended the granting of academic appointment or promotion to the candidate or candidates named in such notice, stating the nature of the appointment or promotion and other relevant information;  and the appointment or promotion of such candidate or candidates shall be deemed approved by THE JOINT BOARD unless within thirty (30) days from the date of receipt of such notice, one-third of the members of THE JOINT BOARD shall inform THE UNIVERSITY, by registered mail, that they object to such promotion or appointment.  If any member of THE JOINT BOARD shall request that the matter be considered before a meeting of THE JOINT BOARD, a meeting of

THE JOINT BOARD shall thereupon be convened for that purpose.

Letters of appointment to the teaching staff of the Medical School or School of Dentistry shall be issued in the name of the Hebrew University-Hadassah Medical School, or in the name of the Hebrew University-Hadassah School of Dentistry, Founded by Alpha Omega, as the case may be, by the President of THE UNIVERSITY in his capacity as "Chairman of the Joint Board of Management of the Hebrew University-Hadassah Medical School and the Hebrew University-Hadassah School of Dentistry, Founded by Alpha Omega".

Section 16.   TESTAMENTARY GIFTS AND BEQUESTS

Testamentary gifts and bequests made to HADASSAH and/or THE UNIVERSITY in which any reference is made to THE MEDICAL CENTER and/or The Medical School or for MEDICAL CENTER and/or Medical School purposes (including medical research) shall be dealt with in the manner described in a memorandum attached hereto and made part hereof, marked Exhibit "F".

Section 17.   ARBITRATION

All claims, demands, disputes and controversies arising out of this Agreement and the interpretation, performance and breach thereof, shall be submitted to and be determined by arbitration in the following manner:

The party demanding arbitration hereunder shall serve written notice of same on the other party.   Each party shall, by written notice to the other, appoint an arbitrator within fourteen (14) days after notice of arbitration has been given as aforesaid.   In the event that either party shall fail or refuse to name its arbitrator within fourteen (14) days after notice of arbitration upon it, then the Jerusalem District Court shall be empowered to, and is hereby requested to, appoint such arbitrator.   The two arbitrators so appointed shall select a third arbitrator within twenty (20) days after their selection.   If the two arbitrators are unable to agree upon a third arbitrator, then the Jerusalem District Court shall be empowered to, and is hereby requested to, appoint such third arbitrator.   All hearings shall be held in the State of Israel.

The written award of the majority of the arbitrators shall be final and binding upon the parties to this Agreement, and judgment upon the award may be entered in any court having jurisdiction of the parties.

Section 18.    PREVIOUS AGREEMENTS

All agreements and understandings pertaining to THE MEDICAL CENTER heretofore entered into between the parties, except as otherwise provided herein, shall, as of the date of entry into force of this Agreement, be superseded by the provisions of this Agreement.

Section 19.    NOTICE

In every case in which any of the parties is required to give notice in writing to the other party, such notice shall be given by registered mail sent to the following address:

To HADASSAH:

To the President of Hadassah,
65 East 52nd Street,
New York 22, New York, and

To the Director General of HMO,
Jerusalem, Israel

To THE UNIVERSITY:

To the President of The Hebrew University,
Jerusalem, Israel

or to any other address of which either party may notify the other party in writing.

The Post Office receipt regarding the dispatch of a registered letter as aforesaid shall serve as sufficient proof of the dispatch of the notice.

Section 20.    WAIVER

The parties hereto hereby waive and agree to dispense with the necessity of any notarial or other official notice in respect of any breach or default hereunder.

Section 21.    DESIGNATION OF AGREEMENT

This Agreement shall be known as the "AFFILIATION AGREEMENT" between HADASSAH and THE UNIVERSITY.

-31-

## Section 22.   RATIFICATION

This Agreement shall enter into force upon its ratification by the National Board of HADASSAH and by THE UNIVERSITY.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective representatives duly authorized thereunto this

THE HEBREW UNIVERSITY
ASSOCIATION

By _Eliahu Elath_

Eliahu Elath, President

THE HEBREW UNIVERSITY
OF JERUSALEM

By _Eliahu Elath_

Eliahu Elath, President

Yair Aran


HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _Esther Gottesman   Rebecca Shulman_

FN Lola Kramarsky, President


HADASSAH MEDICAL RELIEF ASSOCIA-
TION, INC.

FN _Esther Gottesman   Rebecca Shulman_

Lola Kramarsky, President

SCHEDULE F

## PROCESSING AND DISPOSITION OF TESTAMENTARY BENEFACTIONS

With respect to processing all the categories of testamentary benefactions described in the schedule below, the party first cited or served in any probate or related proceeding shall appear for both parties and shall notify the other party promptly, giving all information and copies of all papers to the other party. The parties shall promptly notify each other and the Joint Board in each case of any testamentary benefaction of which they have received notice in any form.

- - - - - -

| NATURE OF TESTAMENTARY BENEFACTION | DISPOSITION |
|---|---|
| 1. To The University or to Hadassah for a program of the other institution. | 1. To be collected by designee and transferred to the other institution for the specific program. |
| 2. (a) To The University for the Hospital - EARMARKED or UNEARMARKED. | 2. (a) To Hadassah for the Hospital for the EARMARKED purposes or for general purposes, as the case may be. |
| (b) To the Hospital for The University - EARMARKED or UNEARMARKED. | (b) To The University for the EARMARKED purpose or general purpose, as the case may be. |
| 3. To Hadassah for the Medical School - EARMARKED for a program of Hadassah. | 3. To Hadassah for the Medical School for the EARMARKED purposes. |
| 4. To The University for the Medical School - EARMARKED for a program of The University. | 4. To The University for the Medical School for the EARMARKED purposes. |
| 5. (a) To Hadassah for the Medical School-UNEARMARKED; or to The University for the Medical School-UNEARMARKED; or to the Medical School, not designating either Hadassah or The University - UNEARMARKED. | 5. (a) In all cases to the Medical School Building Fund until ceiling of $250,000 is reached pursuant to agreement arrived at Coordinating Committee meeting on August 7, 1952. |
| (b) After the $250,000 ceiling is reached from UNEARMARKED bequests referred to in 5(a), as follows: | |
| (i) To Hadassah for The Medical School-UNEARMARKED. | (i) To Hadassah for any of its Medical School purposes. |
| (ii) To The University for the Medical School-UNEARMARKED. | (ii) To The University for any of its Medical School purposes. |
| (iii) To The Medical School, not designating either Hadassah or The University - UNEARMARKED. | (iii) Disposition to be decided by mutual agreement of Hadassah and The University. |

33

SCHEDULE "F" (Continued)

6. To the Medical School, not designating either Hadassah or The University - EARMARKED for a program of Hadassah or for a program of The University.

6. To the institution which has responsibility for the EARMARKED program in the Medical School.

7. To Hadassah for the Medical Center - UNEARMARKED.

7. To Hadassah for any of its Medical Center purposes.

8. To The University for the Medical Center - UNEARMARKED.

8. To The University for any of its Medical School purposes.

9. To The Medical Center, not designating either Hadassah or The University - UNEARMARKED.

9. In the ratio of:
    2/3 to Hadassah for any of its Medical Center purposes.
    1/3 to The University for any of its Medical School purposes.

10. To The Medical Center, not designating either Hadassah or The University, and EARMARKED for a program of Hadassah in the Medical School or a program of The University in the Medical School.

10. To the institution which has responsibility for the EARMARKED program in the Medical School.

11. To The Medical Center, not designating either Hadassah or The University, and EARMARKED for some scientific or medical program.

11. To whichever institution is responsible for the particular EARMARKED program.

In connection with testamentary benefactions, all disputes and controversies in relation to the foregoing shall be settled by The University and Hadassah.

With respect to gifts or awards by fiduciaries - who exercise their own discretion - if the gift is to Hadassah for the Medical School, Hadassah may use the same for any of its Medical School purposes, including Hadassah's contribution to the Pre-Clinical Budget of the Medical School; if the gift is to The University, The University may use the same for any of its Medical School purposes.

This Schedule is subject to review three years from the date of the Agreement and periodically every three years thereafter.

By _____

For   THE HEBREW UNIVERSITY ASSOCIATION
      THE HEBREW UNIVERSITY OF JERUSALEM

By _____
   For Lola Kramarsky, President

For   HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.
      HADASSAH MEDICAL RELIEF ASSOCIATION, INC.

AGREEMENT between HADASSAH and THE UNIVERSITY Concerning
the Contributions by HADASSAH to the Pre-Clinical Budget
of THE HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL

Pursuant to the provisions of Section 9 (b) of the
Affiliation Agreement between HADASSAH and THE UNIVERSITY,
dated April 1, 1963, and subject to the terms and conditions
herein set forth, HADASSAH and THE UNIVERSITY have agreed as
follows:

1. HADASSAH undertakes to contribute towards the
maintenance and operation of the Pre-Clinical Laboratories of
THE HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL, in Israel Pounds,
in accordance with the following table:

| Period | Amounts Payable In Cash | Amount to be Applied Towards Reduction of The University's Debt To Hadassah | Total Contribution |
|---|---|---|---|
| Feb. 1, 1960– Jan. 31, 1961 | IL. 600,000. | IL. 300,000. | IL. 900,000. |
| Feb. 1, 1961– Jan. 31, 1962 | 600,000. | 300,000. | 900,000. |
| Feb. 1, 1962– Jan. 31, 1963 | 600,000. | 300,000. | 900,000. |
| Feb. 1, 1963– Jan. 31, 1964 | 700,000. | 300,000. | 1,000,000. |
| Feb. 1, 1964– Jan. 31, 1965 | 700,000. | 300,000. | 1,000,000. |
| Feb. 1, 1965– Jan. 31, 1966 | 725,000. | 300,000. | 1,025,000. |
| Feb. 1, 1966– Jan. 31, 1967 | 750,000. | 300,000. | 1,050,000. |

The amount to be applied during each of said periods
toward reduction of THE UNIVERSITY'S debt to HADASSAH is subject
to review as the auditor's reports are received, but should not
in any one year exceed the sum of IL. 300,000.

2. Not later than the first day of March in each of the periods set forth in the table, THE UNIVERSITY will submit to HADASSAH a detailed line by line budget for the maintenance and operation of the Pre-Clinical Laboratories for the ensuing year, so as to enable HADASSAH properly to examine and to evaluate same and to make its observations with respect thereto. The final budget in each year is subject to the prior approval of THE UNIVERSITY and HADASSAH. Submission by THE UNIVERSITY of such proposed budget to the Director General of HMO shall be considered adequate submission to HADASSAH. A copy of the auditor's report for each year during the period of this Agreement will be furnished by THE UNIVERSITY to HADASSAH as soon as such report is available.

3. This Agreement will terminate on January 31, 1967. The parties will consult with each other beginning not later than February 1, 1966, with a view to determining if, and to what extent, and on what terms, HADASSAH will continue to make contributions toward the maintenance and operation of the Pre-Clinical Laboratories of the MEDICAL SCHOOL.

THE HEBREW UNIVERSITY ASSOCIATION

By _____
    Eliahu Elath, President

THE HEBREW UNIVERSITY OF JERUSALEM

By _____
    Eliahu Elath, President

_____
Yair Aran, Administrator

HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.

By _____

_____
For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF ASSOCIATION, INC.

By _____

_____
For Lola Kramarsky, President

COPY                    THE HEBREW UNIVERSITY-HADASSAH MEDICAL SCHOOL                    COPY
                                    BOARD OF MANAGEMENT

21st meeting                                                        February 19, 1951

                                    Present:

Prof. Brodetsky (Chairman)          Dr. Mann
Mrs. Agron                          Prof. Schwabe
Mr. Aran                            Dr. Senator
Dr. Davis                           Dr. Siman(deputizing for Dr.Sheba)
Prof. Dostrovsky                    Prof. Wertheimer
Mrs. Halprin  ) by invitation       Dr. Camrass (Executive Secretary)
Mrs. Rosensohn)                     Mrs. Bartfeld (minutes)
                    Absent:  Mr. Nurock (on leave)
                             Mr. Abrech.

## 1.  Confirmation of Minutes

The minutes of the 20th meeting were confirmed.

The Chairman welcomed Dr. Siman who attended the meeting deputizing for
Dr. Sheba who was unable to participate.

## 2.  Appointment of Dr. Margoliash as Instructor in Experimental Pathology.

The Executive Secretary read the report of the Academic Committee and the
recommendation of Dr. Berenblum, and reported that the appointment had been approved
by the Faculty with 22 affirmative votes and one abstention and had then been un-
animously confirmed by the Standing Committee of the Senate.

There was a brief exchange of opinions on the state of affairs in the Depart-
ment of Experimental Pathology and it was explained that, although Dr. Margoliash
was a promising young scientist whose appointment should be welcomed, there was still
no solution to the problem of finding a director for the department.

Prof. Dostrovsky mentioned in this connection that Dr. Berenblum regularly
visited the Department and actively participated in its work, and that there was
hope that the relationship could be intensified and expanded in the future.

A vote was taken and Dr. Margoliash's appointment was confirmed with 10
affirmative votes and 1 abstention.

## 3.  Announcements

a)  The Executive Secretary reported that a cable had been received from
Dr. Hirsh informing him that the MAB strongly recommended Dr. Jacob Fine, Pro-
fessor of Surgery at Harvard University for membership on the MAB.

Mrs. Rosensohn explained that the MAB had for a long time been looking for
a surgeon to be nominated, and there was general agreement that Dr. Fine was a
most desirable candidate. He was an outstanding surgeon, a man of excellent
reputation and willing to give the MAB all the time it needs.

37

B. of Management
21st meeting

Dr. Mann who had had a long talk with Dr. Fine during his recent stay in the
U.S.A., reported that, in addition to his clinical abilities, he was known as a very
good research worker and a leading personality in many fields. He had been appointed
by the U.S. Army to head the research on shock and blood substitutes for all the U.S.A.

After having heard additional favourable comments from Dr. Davis and Prof.
Wertheimer, the Board of Management unanimously approved Dr. Fine's nomination
as member of the MAB.

b) Additional Floorspace for the MS.

Prof. Dostrovsky briefly summarized the endeavours made by himself and the
MS Buildings and Grounds Committee towards the finding of a suitable building in
Jerusalem which would help to alleviate the acute shortage of floorspace during
the transition period of the next three to five years. There might be a possibility
of renting a wing of the Italian Hospital which would provide spacious accommodation,
but would necessitate the investment of IL 15,000 for repairs.

There followed an exchange of opinions on this point. Mrs. Agron and Dr.Siman,
who both had at some time in the past been connected with negotiations for the rent-
ing of the Italian Hospital on behalf of other institutions, expressed the opinion
that a far greater capital outlay would be needed for repairs. Doubts were expressed
on the advisability of investing a considerable sum for the repair of the wing con-
sidered by the MS, also in view of the strategical position of the building. It was
agreed that the question required further clarification.

Prof. Dostrovsky mentioned other possibilities, inter alia, his negotiat-
ions with Government bodies concerning the evacuation of the building adjacent
to the present MS premises which was now occupied by the Defence Ministry. This
solution would be much preferable, but the chances of obtaining the building
were still uncertain.

Mrs. Rosensohn remarked - and most of those present agreed - that since
the money for the additional floorspace would have to come out of the MS
building fund, the cheapest method of securing space for the transition
period would be the best.

c) Dr. Rosenfeld's Visit.

Dr. Davis announced that a cable had been received by Hadassah announc-
ing that Dr. Rosenfeld was hoping to come to Israel in the first week of March.

d) Final Year Students.

Prof. Dostrovsky announced that the first group of 68 final year students
had concluded their first year of studies and were now sitting for their final
examinations. The Health Ministry had suggested that, in view of the present
shortage of physicians, the students should spend their practical year in
Maabaroth. However, the Faculty was opposed to this proposal and insisted on

38

B. of Management
21st meeting.

the students finishing the whole curriculum before taking up medical work in
Maabaroth and camps.

There was the additional problem of finding a place for the students for
their practical year. Since the hospitals outside Jerusalem, in which these
students had been accommodated during the first year of studies, had under-
taken to take on a new final year group early this year, they would not be
able to accommodate interns as well. The matter was at present under con-
sideration.

### 4. Financial Arrangements between the University and Hadassah re Building Fund.

Dr. Senator reported that several meetings had taken place between Hadassah
and University representatives. A sub-committee, consisting of Mrs. Halprin,
Mrs. Rosensohn, Dr. Davis and himself had been set up and entrusted with the
task of finding out the facts and proposing an agreement about the distribution
of the monies available from the MSC for the building of the Medical School.
The sub-committee had held three meetings and then a memorandum had been elab-
orated which embodied the findings of the committee and its proposals for an
agreement. It was now suggested that the Board of Management give its opinion
on the suggested agreement and recommend it for ratification to the two parent
organisations.

Dr. Senator then offered his comments on the memorandum (which has been
here attached, in its amended form, as an integral part of these minutes).

a) With regard to the monies actually available from the MSC, the total
amount may be somewhat higher as soon as the American Jewish Physicians Com-
mittee would fulfill their outstanding pledge of $100,000 (so far, only the
sums actually collected by the AJPC had been included).

b) The sum of $543,000 constituting pledges from individuals and wel-
fare funds, including the Chicago Welfare Federation, had been put in ac-
cording to an estimate of Mrs. Rosensohn.

c) Concerning the pledges of the two constituent bodies, Hadassah and
the American Friends of the Hebrew University, Dr. Senator briefly reviewed
the events that had led to the pledge of the Friends in the amount of
$500,000 and the difficulties encountered in collecting this amount. As
Hadassah insisted that this pledge must be honoured, but on the other hand
the Friends could not be expected to collect the money in full outside the
University's general fundraising activities, the $500,000 would, in the
last analysis, have to come out of the University's current budget.

On the other hand, Hadassah would have to collect the remainder of
its $1,5 m. pledge, i.e. $828,500 in addition to its new drive for the
hospital for which the goal had been set by the convention at $5,5 m.

At this point Mrs. Rosensohn explained that of these $5,5 m. about
2 m. would be available from reserves and $3,5 m. would have to be col-
lected in a comparatively short time, in addition to the $828,500 for

39

B. of Management
21st meeting.

the Medical School. It was obvious that Hadassah had taken on a very great burden
and that the collection might take at least several years.

Continuing his analysis of the figures given in the memorandum, Dr. Senator
explained that the total amount available to the Medical School would be
$3,770,000 (exclusive of the AJPC pledge of $100,000). Of this, $800,000 would
be needed for the building of a new Outpatient Department, so that in all about
$3 m. would be left for the non-hospital part of the Medical School building, in-
cluding the clinical laboratories wherever they would be built (in the hospital
or in the pre-clinical building).

In reply to an enquiry of the Chairman, whether the area actually required for
the Medical School was taken into account when the total amount was fixed, Dr. Se-
nator reviewed the consultations held in the Hospital Building and Planning Com-
mittee (which would become in due course a joint Building Committee for the Hospital
and the Medical School). At these meetings, Dr. Davis had estimated the require-
ments as follows: Hospital part: 23,500 sq. m.; Clinical laboratories 1,500 sq.m.;
non-hospital part of the Medical School: 6,000 to 7,000 sq. m.

Dr. Senator had opposed this estimate and had pointed out that the so-called
"master plan" which had been worked out in October 1948 by the Building Committee
of the Medical Reference Board headed by Dr. Golub, provided for 17,000 sq. m. for
the hospital part and 15,000 sq. m. for the non-hospital part, exclusive of the OPD
and pre-medical buildings, but including the Ratnoff Building area.

In reply to Dr. Senator's objections, Dr. Davis had explained that in the
light of experience it had been determined that for a 400 bed hospital an area of
about 25,000 sq. m. was required, while it would be possible to build the non-
hospital part with 5,000 to 7,000 sq. m. (exclusive of clinical labs). It had been
agreed, however, that these figures be investigated further.

Reverting to the distribution of the monies available, Dr. Senator then ex-
plained that in working out the agreement as proposed in the memorandum the sub-
committee had been guided by the desire to find a compromise which would satisfy
the legitimate demands of the two parent bodies and the Medical School. It had
therefore been agreed to meet Hadassah's request for allotting the funds for an
Outpatient Department while the remainder of the monies was left to the Uni-
versity for the building of the pre-clinical and clinical laboratories, with
perhaps a small margin also for the pre-medical laboratories.

As to the monies allotted in the past for buildings on Mt. Scopus, it had
been agreed that no charges be made on the present Building Fund and that both
parties would bear their respective losses.

Certain amendments in the wording of the original memorandum as suggested
by Mrs. Rosensohn were then discussed. It was agreed not to mention Hadassah's
desire to collect monies for 450 beds. Both Mrs. Halprin and Mrs. Rosensohn ex-
plained that they hoped to collect the money needed for that number of beds and
would make an effort in that regard, but for the time being they could not bind
themselves to raise more than the funds required for a 400 bed hospital, if
possible during the next 3-5 years.

B. of Management
21st meeting.

A few other minor amendments in the wording of the passages relating to the maintenance budget were then agreed upon.

It was then agreed that the agreement be recommended for ratification by the Hadassah representatives to the National Board and by the University representatives to the University authorities concerned.

The Chairman thanked the sub-committee for its work and expressed his appreciation of what Hadassah had done for the Medical School and was going to do for it in the future.

The discussion then centred round the problem of the building area of the Medical School.

The Chairman reported that he had talked the matter over with Prof. Berenblum who had expressed the opinion that it would be a fatal mistake to build the School on an area that was too small from the very beginning. This would make it impossible to develop and expand a medical school worthy of the name.

Dr. Senator gave an analysis of the figures which, In Dr. Davis' opinion, would be sufficient for the non-hospital part. Dr. Davis argued that at present, the Medical School had some 2,500 sq. m. at its disposal and required another 1,000 sq. m. for the transition period of the next five to ten years. If double this amount viz. 7,000 sq. m. would be built in the new Medical Centre, it could be assumed that this would be sufficient for the next 10 years.

Of the approximately $3 m. available, about half a million should be set aside for equipment and some of the pre-medical area, and of the remaining $2,5 m. it might be assumed that about 10,000 sq. m. (including 1,500 sq. m. for the clinical laboratories) could be built. This was, in Dr. Senator's opinion, an insufficient amount. He had stressed that point at the meetings of the Building Committee and had tried to defend the vital interests of the Medical School. the MS Secretariat was obtaining material on medical schools in the U.S.A. which existed with that amount of floorspace.

Prof. Dostrovsky pointed out that 7,000 sq. m. might perhaps be sufficient for the normal basic requirements of a medical school, but would not meet the specific needs of our country.

In reply to Dr. Senator's objections, Dr. Davis explained that in the light of experience it had been determined that for a 400-bed teaching hospital an area of about 25,000 sq. m. would be required; he would be happy if this area could be reduced. On the other hand, he had seen medical schools where the pre-clinical part was housed in a space of approximately 7,000 sq. m. exclusive of the clinical laboratories. Dr. Davis did not claim that the finest Medical School could be put up in an area of 7,000 sq. m., but if the alternatives were no pre-clincial building at all for 5-10 years, because of the absence of sufficient funds, or a viable medical school today of 7,000 sq. m. which could be expanded according to a master plan, he was certain that most people would prefer 7,000 sq. m. immediately to 12,000 sq. m. which may take ten years to achieve.

B. of Management
21st meeting.

Dr. Davis strongly advocated the elaboration of a new master plan providing for a nucleus of some 7,000 sq. m. and allowing for a gradual expansion according to needs and possibilities. He also reminded the University representatives that the maintenance budget for a large area would be a heavy burden and that they would find it easier to undertake the maintenance for 7,000 sq. m. in the beginning, with a gradual expansion as time went by.

It was also stressed that once the sums in the Medical School Building Campaign had been allotted then no sums would be available from that source for repairs, alterations and enlargement of temporary premises.

The Chairman stressed – and those present agreed – that it was not the object of the present meeting to decide definitely on the amount of floor-space, and that this was a question to be dealt with by the experts and planners in charge of the buildings. It was however made clear by the Hadassah representatives that no more than the sums laid down in the proposed agreement would be forthcoming for Medical School buildings and that additional funds, if required, must be secured by the University from other sources. The possibility of enlisting the help of the Israel Government in this respect was mentioned.

The next meeting was fixed at March 1, 10 a.m.

- - - - - - - -

42

ENCLOSURE TO MINUTES OF THE 21st MEETING OF THE BOARD OF MANAGEMENT.

Amended version adopted by the Board of
Management at its meeting on
February 19. 1951

Conversation on financial arrangements between the Hebrew
University and Hadassah concerning the Medical School
9th and 12th February, 1951.

Present:  Dr. Davis, Mrs. Halprin, Mrs. Rosensohn, Dr. Senator.

I.   After a thorough analysis of the cash receipts and outstanding pledges of the
Joint Medical School Campaign ($4 million) and the Hadassah Campaign (1½million)
and in accordance with the Introductory Note to the agreement between the
Hebrew University and Hadassah regarding the Hebrew University-Hadassah Med-
ical School of Jerusalem, of 1949, ratified by Hadassah and the University in
May 1950, the following figures were ascertained as the probably minimum in-
come from the two campaigns:

a)   The Joint Medical School Campaign
     Cash collections, after deduction of
     administrative expenditure and functional
     expenditure in Israel..........................$ 1,470,000

b)   The Hadassah Campaign
     Cash collections, after deduction
     of expenditure.................................    671,500

     Total cash collections........................          $ 2,141,500

c)   Joint Medical School Campaign
     Pledges from individuals and welfare funds,
     including the Chicago Welfare Federation.......    543,000

     Cash collections estimated at.................            300,000

     Pledge of American Friends (which will eventually
     have to be paid by the University out of its
     general income)...............................            500,000

d)   Hadassah Medical School Campaign
     $1½ million, less $678,500
     already collected.............................            828,500
     of which at least $150,000 is expected
     to be collected in 1951.

     TOTAL AMOUNT TO BE AVAILABLE FROM THE JOINT MEDICAL
     SCHOOL CAMPAIGN AND HADASSAH CAMPAIGNS. THEREFORE       $ 3,770,000

43

II.   The following division of this amount was agreed to by those participating
      in the meetings, to be recommended to their respective organizations:

      a)   $800,000 to Hadassah for the C.P.D.

      b)   The balance to the University for the whole University part
           of the Medical School, including clinical laboratories
           wherever they be built (in the Hospital or preclinical
           building) and a contribution to the premedical part of
           the Medical School.

III.  Hadassah has received for building on Mt. Scopus a sum of nearly
      $750,000.  The University has received for the same purpose $112,000.
      It is agreed that no charges should be made on account of these payments
      to the two organizations and that on the other hand, the two organizations
      will have to bear the respective losses, i.e. Hadassah will have to erect
      a University teaching hospital of not less than 400 beds.  The University
      will have to put up the necessary premedical, preclinical and clinical
      laboratories for the proper functioning of the Medical School.

IV.   A discussion took place on the maintenance budget of the preclinical part
      of the Medical School and its increase in the years to come.  It was
      estimated that the extra budget of the preclinical part of the Medical
      School would gradually have gone up, by the end of the five-year period,
      to something like $400,000.

      Mrs. Halprin and Mrs. Rosensohn expressed the intention to recommend to
      the National Board that Hadassah, before the end of the five-year period,
      favorably consider the continuation of a contribution towards the budget
      of the Medical School.

      While emphasizing that Hadassah could not accept the principle of sharing
      equally with the University in the joint maintenance budget of the Medical
      School, Mrs. Halprin and Mrs. Rosensohn agreed that when the budget of the
      Medical School for 1951/52 would have been drawn up by the end of 1951 and
      when the fundraising situation of Hadassah would have become clear, the
      situation with regard to the joint Medical School budget be discussed.

DWS/bb/r.                                          February 19, 1951.

44

No. of Petition: ........    District: .........
No. of Register: ........    Sub-district: .........
No. of Deed : ........    Town or Village:.........

## AGREEMENT OF LEASE

BETWEEN the KEREN KAYEMETH LE-ISRAEL, Jerusalem, a company registered in Israel (hereinafter referred to as "KKL"), of the one part,

and THE HEBREW UNIVERSITY ASSOCIATION, Jerusalem, an association formed under the Ottoman Law of Societies (hereinafter referred to as "THE UNIVERSITY"), of the other part,

in accordance with the regulations of KKL, whereunder its land may not be sold but shall remain in perpetuity the property of KKL,

made this 6th day of September, 1959.

WHEREAS KKL is the owner of the lands situate near Ein Karem in the environs of Jerusalem, whereupon the Medical Centre of Hadassah and the Hebrew University (hereinafter referred to as "THE MEDICAL CENTRE") is now being erected; and

WHEREAS the said lands comprise -

(a) an area of 22 metric dunams and 740 sq. metres which has been set aside for the buildings known as "the Medical School of the Hebrew University and Hadassah" now being erected by THE UNIVERSITY and for additional buildings or structures which will in future be erected by it for the purposes of THE MEDICAL CENTRE (which area, coloured red on the map attached to this Agreement, is hereinafter referred to as "THE LEASED AREA");

(b) an area of 1174 metric dunams and 886 sq. metres, certain parts of which have been set aside for hospital, out-patient departments, school of nursing buildings and for additional buildings or structures which are now

being and will in future be erected for the
purposes of THE MEDICAL CENTRE by Hadassah, The
Women's Zionist Organization of America, Inc. and
Hadassah Medical Relief Association, Inc. (hereinafter
collectively referred to as "HADASSAH"), while other
parts will be used for development purposes connected
with THE MEDICAL CENTRE: and THE UNIVERSITY has agreed
that that area (coloured green on the said map) be
leased to HADASSAH together with the buildings and
structures which HADASSAH is erecting and will erect
thereon as aforesaid and that under part of THE
LEASED AREA HADASSAH shall have the right to dig a
tunnel for the passage by itself and anybody permitted
by it to and from the said buildings and structures
(which part, coloured black on the said map - or any
other part which may be agreed upon between THE UNI-
VERSITY and HADASSAH - is hereinafter referred to as
"THE TUNNEL");

(c)    an area of 55 metric dunams and 443 sq. metres which
has been set aside for the State road crossing the
area in para. (b) hereinbefore mentioned without
forming part thereof (which area, to be registered
in the name of the State Domain Department, is
coloured yellow on the said map); and

WHEREAS KKL and HADASSAH have agreed that any change or
correction of the agreement of lease which is this day being made
between them in respect of the area buildings and structures
hereinbefore in para. (b) mentioned, or the cancellation of that
agreement, shall require prior consent in writing on the part of
THE UNIVERSITY, and in consideration therefor KKL and THE
UNIVERSITY are prepared to agree that any change or correction of
the present Agreement of Lease, or the cancellation of this

46

Agreement, shall require consent as aforesaid on the part of
HADASSAH; and

WHEREAS THE UNIVERSITY is desirous of taking on lease from
KKL, and KKL is prepared to give on lease to THE UNIVERSITY, THE
LEASED AREA and all the buildings and structures which THE UNIVER-
SITY is erecting and will erect thereon as aforesaid (all of which,
including THE LEASED AREA, are hereinafter referred to as "THE
LEASEHOLD PROPERTY"), on the conditions set out below;

NOW THEREFORE IT IS HEREBY DECLARED AND AGREED AS FOLLOWS:

1.     Subject of lease

KKL hereby leases to THE UNIVERSITY, and THE UNIVERSITY
hereby takes on lease from KKL, THE LEASEHOLD PROPERTY more
particularly described in the Schedule appearing after the clauses
of this Agreement, subject to the right of digging and passage
through THE TUNNEL, as hereinbefore in the Preamble stated.

2.     Period of lease and its extension

The lease hereby granted is for a period of 49 years from
the 1st day of April, 1959, until the 31st day of March, 2008
(inclusive), and upon the termination of that period the lease
will be extended automatically for an additional period of 49
years, and so on as from the termination of each additional period
to the additional period thereafter, unless at least one year before
each such termination THE UNIVERSITY gives to KKL, with the consent
of HADASSAH, written notice of its desire to cancel the lease
(each such period being hereinafter referred to as "THE PERIOD
OF LEASE").

3.     Purposes of the lease

THE LEASEHOLD PROPERTY is destined for the purposes of THE
MEDICAL CENTRE its enlargement and development and for the purposes
connected therewith and with all medical sciences. Without
derogating from the generality of the said purposes THE UNIVERSITY
shall be entitled to execute public works in or on THE LEASED AREA,

47

such as: construction of roads and parking places, laying of sewage
water and electricity networks, plantation of gardens, and the
like.  The said purposes, as well as any other or additional pur-
pose which will be approved by KKL, may be implemented by THE
UNIVERSITY in whole or in part, by stages or simultaneously, in
accordance with the needs of the place or the time, as THE UNIVER-
SITY may decide from time to time.

4.    Use of the leasehold property

(1)  THE UNIVERSITY confirms that it has received from KKL
THE LEASED AREA and declares that as from the date of the signature
of this Agreement it will bear responsibility for THE LEASEHOLD
PROPERTY its preservation and maintenance.  THE UNIVERSITY alone
shall be bound to preserve the boundaries of THE LEASED AREA, and
in the event of trespass it shall immediately take all the neces-
sary steps to restore the boundaries as they were theretofore, and
KKL on its part undertakes to afford THE UNIVERSITY all the necessary
assistance in connection therewith.

(2)  THE UNIVERSITY is entitled to use THE LEASEHOLD
PROPERTY and to deal therewith as if it were the owner thereof, but
shall have to comply with the terms of this Agreement and to abstain
from doing any thing prohibited by those terms.

(3)  At the time of the execution of the works mentioned
in Clause 3 hereof and during THE PERIOD OF LEASE THE UNIVERSITY
shall comply with all the orders, directions and demands of the
Government, the Municipal Council, the Regional Council, the Local
Council and other competent authorities in connection with the
said works and also in connection with the maintenance and use
of THE LEASEHOLD PROPERTY.

(4)  KKL shall bear no responsibility for any offence
which THE UNIVERSITY may commit or for any damage which may be
caused to any third party by reason of the said works or in
connection with the maintenance or use of THE LEASEHOLD PROPERTY,
and any such responsibility shall be borne solely by THE UNIVERSITY.

(5) THE UNIVERSITY shall, at its own expense, execute all the necessary repairs to THE LEASEHOLD PROPERTY, and KKL shall not be responsible for any such repairs.

5.   Value of the leasehold property and payment of rent

(1) For the purposes of the calculation of the rent for THE LEASEHOLD PROPERTY the value of that property shall be equal to the value of THE LEASED AREA only, and such value (including all the expenses which were or may be incurred by KKL in connection with THE LEASED AREA) is fixed by the parties, until a new valuation is made under Clause 6 hereof, at the sum of IL.20.- per metric dunam or at the aggregate sum of IL.454.800 for the whole of THE LEASED AREA.

(2) The said rent per annum shall be at the rate of 1% (one per centum) of the value of THE LEASEHOLD PROPERTY as hereinbefore fixed, that is to say, in the amount of IL.4,550, which amount shall be paid to KKL by THE UNIVERSITY in advance, namely, on the 1st day of April in each year of the lease.

(3) THE UNIVERSITY shall transfer the said rent to KKL or to its order in cash or by cheque or postal order, and all expenses incurred thereby shall be borne by THE UNIVERSITY.

6.   New valuation and arbitration

(1) In each of the following events or at the following times KKL shall be entitled to make a new valuation of THE LEASE-HOLD PROPERTY and to fix in accordance therewith the rent there-after payable therefor.  Such new valuation shall be made -

(a) if and when a change is made in the purposes of the lease, as specified in Clause 3 hereof;

(b) if and when THE UNIVERSITY transfers its rights under this Agreement in accordance with Clause 7 hereof;

(c) upon the expiration of 25 years from the date of the signature of this Agreement, and thereafter at the end of each period of 25 years of THE PERIOD OF LEASE.

49

(2)   In the event of a new valuation as aforesaid the annual rent for THE LEASEHOLD PROPERTY shall be at the rate of 1% (one per centum) of the value of THE LEASED AREA only, as may be fixed by such valuation.

(3)   Immediately after a new valuation as aforesaid KKL shall give notice in writing to THE UNIVERSITY of the amount of the valuation and of the date upon which it shall take effect, and if within 90 days from the date of receipt of the notice THE UNIVERSITY shall not inform KKL of its objection to the said valuation or the said date, it shall pay the rent in accordance with such valuation and as from such date.

(4)   In the event of any objection as aforesaid THE UNIVER-SITY shall indicate simultaneously therewith the name of the arbitrator to be appointed by it for determining the objection, and KKL shall notify THE UNIVERSITY of the name of the arbitrator to be appointed by it.  If within 30 days from the date of the appointment of the last arbitrator the two arbitrators do not reach agreement as to the amount of the valuation and/or the date upon which it shall take effect, each of the parties shall be entitled, within 15 additional days, to apply to the Court for the appoint-ment of a third arbitrator who shall decide between the two in accordance with the provisions of the Arbitration Ordinance.  The costs of the arbitration shall be fixed by the arbitrators.

7.    Transfer of leasehold rights and sub-leasing

(1)   THE UNIVERSITY shall not be entitled to transfer its leasehold right in respect of THE LEASEHOLD PROPERTY or any part thereof or to sub-lease THE LEASEHOLD PROPERTY or any part thereof, unless it has obtained prior consent thereto from KKL in writing and has proved to the satisfaction of KKL that HADASSAH has no objection thereto.  But KKL hereby confirms in advance that for the purposes in Clause 3. hereinbefore mentioned, THE UNIVERSITY shall have the right at any time -

50

(a) without such consent or proof, to effect any transfer or sub-lease as aforesaid to any one of the bodies which are now or may in future be affiliated to THE UNIVERSITY or to a daughter-company which may be formed by THE UNIVERSITY; and KKL hereby undertakes that forthwith upon being so requested by THE UNIVERSITY, it will do all that may be required on its part for carrying such transfer into effect and for the registration thereof in the Land Registry Office;

(b) without such consent as aforesaid, to sub-lease to HADASSAH any part of THE LEASEHOLD PROPERTY on such conditions as may be determined by THE UNIVERSITY and HADASSAH.

(2)  KKL hereby declares that it has cognizance of the agreement between THE UNIVERSITY and HADASSAH in which HADASSAH has undertaken to waive its rights in favour of THE UNIVERSITY in respect of any part of the area in para. (b) of the Preamble hereinbefore mentioned, if and when such part will, within the framework of the master-plan agreed between them, be required by THE UNIVERSITY for the erection of additional buildings or structures connected with THE MEDICAL CENTRE or the various branches of teaching related thereto; provided that THE UNIVERSITY shall give written notice in that behalf to HADASSAH (with copy to KKL) within five years from the date of completion of the first stage of the erection of THE MEDICAL CENTRE in accordance with the said master-plan; and provided further that after the expiration of the said five years HADASSAH shall not be bound to waive its rights in favour of THE UNIVERSITY in respect of any part aforesaid, if and when HADASSAH itself will desire to erect thereon any buildings or structures of its own for the purposes of THE MEDICAL CENTRE;

52

and KKL hereby confirms in advance any transfer of rights and obligations which may be effected by HADASSAH in favour of THE UNIVERSITY in accordance with the above mentioned agreement and undertakes that, forthwith upon being so requested by THE UNIVERSITY and HADASSAH, it will do all that may be required on its part for carrying such transfer into effect and for the registration thereof in the Land Registry Office.

For the purposes of this sub-clause, the date of completion aforesaid will fall on January 1st, 1961.

(3) Any transfer or sub-lease which has been confirmed by KKL in advance, as stated in sub-clause (1) and (2) of this Clause, shall not be deemed to be a transfer of rights for the purposes of Clause 6 hereof.

8.    Payment of Taxes

THE UNIVERSITY shall pay all the Government, municipal and local taxes which may be imposed from time to time upon THE LEASEHOLD PROPERTY insofar as it is not exempt from such payment by law.

9.    Preservation of the Sabbath

THE UNIVERSITY shall cease work on THE LEASEHOLD PROPERTY on Sabbaths and Jewish holidays in accordance with the laws of the State.

Any dispute in connection with this Clause shall be submitted to a single arbitrator to be appointed by agreement of the parties, and in default of such agreement, by the President of the District Court, Jerusalem. The decision of the arbitrator shall be final and binding upon the parties.

10.    Right of KKL to execute works upon the leasehold property

KKL is entitled to lay across THE LEASED AREA, either itself through another body, pipes or channels for water, electricity, gas drainage or sewage, and also to erect electricity poles and to stretch electricity wires upon or over THE LEASED AREA and for that purpose THE UNIVERSITY shall give to KKL, its

workers and officials, or to such other body, its workers and of-
ficials, the possibility of entering upon THE LEASED AREA and carry-
ing out therein the necessary works and repairs; provided that such
works and repairs are carried out in a manner which does not cause
to THE UNIVERSITY or to any person holding under it any disturbance
which can be avoided, and also that KKL shall be responsible that
immediately after the said works or repairs have been carried out,
THE LEASED AREA is as far as possible restored to the condition in
which it was theretofore.

11.   <u>Damage in the event of breach</u>

    If one of the parties commits a breach of any of the pro-
visions of this Agreement, the other party shall be entitled to
claim compensation for any loss or damage caused to it as a result
of such breach as aforesaid.

12.   <u>Change or correction of agreement of lease</u>

    Any change or correction of this Agreement of lease shall
require prior consent in writing on the part of HADASSAH.

13.   <u>Dissolution of The University or cancellation of the lease</u>

    In the event of the dissolution of THE UNIVERSITY or of the
cancellation of the lease by notice under Clause 2 hereof, the rights
and obligations of THE UNIVERSITY hereunder shall devolve to any one
of the bodies which are now or may in future be affiliated to THE
UNIVERSITY or to a daughter-company which may be formed by THE
UNIVERSITY, but such devolution shall not be deemed to be a transfer
of rights for the purposes of Clause 6 hereof.  If the said body
or daughter-company will not agree to accept the devolution, then
the rights of THE UNIVERSITY hereunder shall be deemed to have rever-
ted to KKL, without KKL having to pay compensation to anybody in
connection therewith.

14.   <u>Jurisdiction</u>

    The place of jurisdiction under this Agreement shall be the
Courts in Jerusalem, save for jurisdiction in matters which have to
be submitted to arbitration under Clause 6 or Clause 9 hereof.

53

15.    <u>Notices to the parties</u>

In every case in which any of the parties is required to give notice in writing to the other party, such notice shall be given by registered letter sent to the following address:

to KKL:   Keren Kayemeth Le-Israel, P.O.B. 283, Jerusalem

to THE UNIVERSITY:   The Hebrew University, University Campus, Jerusalem

or to any other address of which either party may notify the other party in writing.

The post office receipt regarding the despatch of a re-gistered letter as aforesaid shall serve as sufficient proof of the despatch of the notice.

16.    <u>Definition of terms</u>

The term "KKL" includes the successors and assigns of KKL.

The term "THE UNIVERSITY" includes the successors of THE UNIVERSITY, and in the special case of Clause 13 hereof, any one of the bodies or the daughter-company mentioned in the said Clause.

17.    <u>Waiver of notarial notices</u>

The parties hereby waive the necessity for sending notarial or other official notices in connection with the breach of any of the provisions of this Agreement.

18.    <u>Headings</u>

In the interpretation of this Agreement or of any of its provisions no reliance shall be placed upon the headings appearing over the Clauses.

19.    <u>Consideration</u>

The rights granted to THE UNIVERSITY by this Agreement are a full and complete consideration for the moneys which THE UNIVERSITY may invest in buildings structures plantations or for an any other investments in THE LEASEHOLD PROPERTY, and also for its obligations under this Agreement.

54

20. <u>Value of provisions</u>

All the provisions of this Agreement are fundamental provisions of equal force.

21. <u>Number of copies</u>

This Agreement is made in four copies, one of which has been delivered to KKL, one to THE UNIVERSITY, one to HADASSAH and one to the Land Registry Office in Jerusalem.

IN WITNESS WHEREOF the parties hereto have hereunto set their hands on the date first above mentioned.

<u>(sgd)  H. Danin</u>           <u>(sgd) Y. Aran, J. Talmon</u>
      for    KKL                       for THE UNIVERSITY

55

LAND REGISTRY OF JERUSALEM

No. of Petition: ........         District: ........
No. of Register: ........         Sub-district: .....
No. of Deed    : ........         Town or Village: .....

## AGREEMENT OF LEASE

BETWEEN the KEREN KAYEMETH LE-ISRAEL, Jerusalem, a company
registered in Israel (hereinafter referred to as "KKL"), of the
one part,

and HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA,
INC. and HADASSAH MEDICAL RELIEF ASSOCIATION, INC., companies
incorporated under the laws of the State of New York, U.S.A.
(hereinafter collectively referred to as "HADASSAH"), of the
other part,

in accordance with the regulations of KKL, whereunder its
land may not be sold out but shall remain in perpetuity the property
of KKL,

made this 6th day of September, 1959,

WHEREAS KKL is the owner of the lands situate near Ein
Karem in the environs of Jerusalem, whereupon the Medical Centre
of Hadassah and the Hebrew University (hereinafter referred to
as "THE MEDICAL CENTRE") is now being erected; and

WHEREAS the said lands comprise –

(a) an area of 1174 metric dunams and 886 sq. metres,
certain parts of which have been set aside for hospital,
outpatient departments, school of nursing buildings
and for additional buildings or structures which are
now being and will in future be erected by HADASSAH
for the purposes of THE MEDICAL CENTRE, while other
parts will be used for development purposes connected
with THE MEDICAL CENTRE (which area, coloured green,
on the map attached to this Agreement as Annex "A",
is hereinafter referred to as "THE LEASED AREA");

56

(b) an area of 22 metric dunams and 740 sq. metres which
has been set aside for the buildings known as "the
Medical School of the Hebrew University and Hadassah"
now being erected by the Hebrew University Association,
Jerusalem (hereinafter referred to as "THE UNIVERSITY")
and for additional buildings or structures which will
in future be erected by THE UNIVERSITY for the purposes
of THE MEDICAL CENTRE; and HADASSAH has agreed that
that area (coloured red on the said map) be leased
to THE UNIVERSITY together with the buildings and
structures which THE UNIVERSITY is erecting and will
erect thereon as aforesaid and that on part of THE
LEASED AREA THE UNIVERSITY and anybody permitted by it
shall have a right of way to and from the said buildings and
structures (which part, coloured blue on the said
map – or any other part which may be agreed upon
between HADASSAH and THE UNIVERSITY – is hereinafter
referred to as "THE APPROACH ROAD");

(c) an area of 55 metric dunams and 443 sq. metres which has
been set aside for the State road crossing THE LEASED
AREA without forming part thereof (which area, to be
registered in the name of the State Domain Department,
is coloured yellow on the said map); and

WHEREAS KKL and THE UNIVERSITY have agreed that any change or
correction of the agreement of lease which is this day being
made between them in respect of the area buildings and structures
hereinbefore in para. (b) mentioned, or the cancellation of that
agreement, shall require prior consent in writing on the part of
HADASSAH, and in consideration therefor KKL and HADASSAH are pre-
pared to agree that any change or correction of the present
Agreement of lease, or the cancellation of this Agreement, shall
require consent as aforesaid on the part of THE UNIVERSITY; and

57

WHEREAS HADASSAH Pg 59 of 80s of taking on lease from KKL,
and KKL is prepared to give on lease to HADASSAH, THE LEASED
AREA and all the buildings and structures which HADASSAH is
erecting and will erect thereon as aforesaid (all of which,
including THE LEASED AREA, are hereinafter referred to as "THE
LEASEHOLD PROPERTY"), on the conditions set out below;

NOW THEREFORE IT IS HEREBY DECLARED AND AGREED AS FOLLOWS:

1.   Subject of lease

KKL hereby leases to HADASSAH, and HADASSAH hereby takes
on lease from KKL, THE LEASEHOLD PROPERTY more particularly
described in the Schedule appearing after the clauses of this
Agreement, subject to the right of way over THE APPROACH ROAD,
as hereinbefore in the Preamble stated.

2.   Period of lease and its extension

The lease hereby granted is for a period of 49 years from
the 1st day of April, 1959, until the 31st day of March, 2008
(inclusive), and upon the termination of that period the lease
will be extended automatically for an additional period of 49
years, and so on as from the termination of each additional
period to the additional period thereafter, unless at least
one year before each such termination HADASSAH gives to KKL, with
the consent of THE UNIVERSITY, written notice of its desire to
cancel the lease (each such period being hereinafter referred to
as "THE PERIOD OF LEASE").

3.   Purposes of the lease

THE LEASEHOLD PROPERTY is destined for the purposes of THE
MEDICAL CENTRE its enlargement and development and for the
purposes connected therewith and with all medical sciences.
Without derogating from the generality of the said purposes
HADASSAH shall be entitled to execute public workers in or on
THE LEASED AREA, such as: construction of roads and parking
places, laying of sewage water and electricity networks,
plantation of gardens, and the like; and also to erect on
THE LEASED AREA, in accordance with the terms of this Agreement,

any dwelling units for the use of such employees of the institu-
tions affiliated to HADASSAH as will for the needs of THE MEDICAL
CENTRE be required to settle there, and in addition thereto - but
on the special conditions agreed upon between KKL and HADASSAH
and contained in the draft attached to this Agreement as Annex
"B" and initialled by the parties for the purpose of identifi-
cation - to erect on any part of THE LEASED AREA a Shikun for
the rest of the employees of the said institutions and for other
settlers. The said purposes, as well as any other or additional
purpose which will be approved by KKL, may be implemented by
HADASSAH in whole or in part, by stages or simultaneously, in
accordance with the needs of the place or the time, as HADASSAH
may decide from time to time.

4.   Use of the leasehold property

     (1) HADASSAH confirms that it has received from KKL THE
LEASED AREA and declares that as from the date of the signature
of this Agreement it will bear responsibility for THE LEASEHOLD
PROPERTY its preservation and maintenance. HADASSAH alone shall
be bound to preserve the boundaries of THE LEASED AREA, and
in the event of trespass it shall immediately take all the
necessary steps to restore the boundaries as they were thereto-
fore, and KKL on its part undertakes to afford HADASSAH all
the necessary assistance in connection therewith.

     (2) HADASSAH is entitled to use THE LEASEHOLD PROPERTY
and to deal therewith as if it were the owner thereof, but shall
have to comply with the terms of this Agreement and to abstain
from doing any thing prohibited by those terms.

     (3) At the time of the execution of the works mentioned in
Clause 3 hereof and during THE PERIOD OF LEASE HADASSAH shall
comply with all the orders, directions and demands of the
Government, the Municipal Council, the Regional Council, the
Local Council and other competent authorities in connection
with the said works and also in connection with the maintenance
and use of THE LEASEHOLD PROPERTY.

(4)  KKL shall bear no responsibility for any offence which HADASSAH may commit or for any damage which may be caused to any third party by reason of the said works or in connection with the maintenance or use of THE LEASEHOLD PROPERTY, and any such responsibility shall be borne solely by HADASSAH.

(5)  HADASSAH shall, at its own expense, execute all the necessary repairs to THE LEASEHOLD PROPERTY, and KKL shall not be responsible for any such repairs.

5.    Value of the leasehold property and payment of rent

(1)  For the purposes of the calculation of the rent for THE LEASEHOLD PROPERTY the value of that property shall be equal to the value of THE LEASED AREA only, and such value (including all the expenses which were or may be incurred by KKL in connection with THE LEASED AREA) is fixed by the parties, until a new valuation is made under Clause 6 hereof, at the sum of IL. 20.- per metric dunam or at the aggregate sum of IL. 23,498.- for the whole of THE LEASED AREA.

(2)  The said rent per annum shall be at the rate of 1% (one per centum) of the value of THE LEASEHOLD PROPERTY as hereinbefore fixed, that is to say, in the amount of IL. 235.-, which amount shall be paid to KKL by HADASSAH in advance, namely, on the 1st day of April in each year of the lease.

(3)  HADASSAH shall transfer the said rent to KKL or to its order in cash or by cheque or postal order, and all expenses incurred thereby shall be borne by HADASSAH.

6.    New valuation and arbitration

(1)  In each of the following events or at the following times KKL shall be entitled to make a new valuation of THE LEASE-HOLD PROPERTY and to fix in accordance therewith the rent thereafter payable therefor.  Such new valuation shall be made -

(a)   if and when a change is made in the purposes of the lease, as specified in Clause 3 hereof;

60

(b) if and when HADASSAH transfers its rights under this
Agreement in accordance with Clause 7 hereof;

(c) upon the expiration of 25 years from the date of the
signature of this Agreement, and thereafter at the end
of each period of 25 years of THE PERIOD OF LEASE.

(2)  In the event of a new valuation as aforesaid the
annual rent for THE LEASEHOLD PROPERTY shall be at the rate of
1% (one per centum) of the value of THE LEASED AREA only, as
may be fixed by such valuation.

(3)  Immediately after a new valuation as aforesaid KKL
shall give notice in writing to HADASSAH of the amount of the
valuation and of the date upon which it shall take effect, and
if within 90 days from the date of receipt of the notice HADASSAH
shall not inform KKL of its objection to the said valuation or
the said date, it shall pay the rent in accordance with such
valuation and as from such date.

(4)  In the event of any objection as aforesaid HADASSAH
shall indicate simultaneously therewith the name of the arbi-
trator to be appointed by it for determining the objection,
and KKL shall notify HADASSAH of the name of the arbitrator to
be appointed by it.  If within 30 days from the date of the
appointment of the last arbitrator the two arbitrators do not
reach agreement as to the amount of the valuation and/or the date
upon which it shall take effect, each of the parties shall be
entitled, within 15 additional days, to apply to the Court for
the appointment of a third arbitrator who shall decide between
the two in accordance with the provisions of the Arbitration
Ordinance.  The costs of the arbitration shall be fixed by the
arbitrators.

7.  <u>Transfer of leasehold rights and sub-leasing</u>

(1)  HADASSAH shall not be entitled to transfer its lease-
hold right in respect of THE LEASEHOLD PROPERTY or any part
thereof or to sub-lease THE LEASEHOLD PROPERTY or any part

61

thereof, unless it has obtained prior consent thereto from KKL
in writing and has proved to the satisfaction of KKL that THE
UNIVERSITY has no objection thereto. But KKL hereby confirms
in advance that, for the purposes in Clause 3 hereinbefore
mentioned, HADASSAH shall have the right at any time -

 (a) without such consent or proof, to effect any transfer
or sub-lease as aforesaid to Hadassah Medical Organiza-
tion, a company registered in Israel, or to any one of
the other bodies which are now or may in future be
affiliated to that organization or to HADASSAH, pro-
vided that if such transfer or sub-lease shall be re-
quired for the erection of a Shikun on part of THE
LEASED AREA, as in Clause 3 hereinbefore stated, then
the special conditions mentioned in the said Clause
shall apply to such part; and KKL hereby undertakes
that forthwith upon being so requested by HADASSAH,
it will do all that may be required on its part for
carrying such transfer into effect and for the regis-
tration thereof in the Land Registry Office;

 (b) without such consent as aforesaid, to sub-lease to THE
UNIVERSITY any part of THE LEASEHOLD PROPERTY on such
conditions as may be determined by HADASSAH and THE
UNIVERSITY.

 (2) KKL hereby declares that it has cognizance of the agree-
ment between HADASSAH and THE UNIVERSITY in which HADASSAH has
undertaken to waive its rights in favour of THE UNIVERSITY in
respect of any part of THE LEASED AREA, if and when such part
will, within the framework of the master-plan agreed between
them, be required by THE UNIVERSITY for the erection of addi-
tional buildings or structures connected with THE MEDICAL CENTRE
or the various branches of teaching related thereto; provided
that THE UNIVERSITY shall give written notice in that behalf
to HADASSAH (with copy to KKL) within five years from the date
of completion of the first stage of the erection of

THE MEDICAL CENTRE in accordance with the said master-plan; and
provided further that after the expiration of the said five years
HADASSAH shall not be bound to waive its rights in favour of THE
UNIVERSITY in respect of any part aforesaid, if and when HADASSAH
itself will desire to erect thereon any buildings or structures
of its own for the purposes of THE MEDICAL CENTRE: and KKL hereby
confirms in advance any transfer of rights and obligations which
may be effected by HADASSAH in favour of THE UNIVERSITY in accor-
dance with the above mentioned agreement and undertakes that,
forthwith upon being so requested by HADASSAH and THE UNIVERSITY,
it will do all that may be required on its part for carrying
such transfer into effect and for the registration thereof in
the Land Registry Office.

For the purposes of this sub-clause, the date of completion
aforesaid will fall on January 1st, 1961.

(3) Any transfer or sub-lease which has been confirmed
by KKL in advance, as stated in sub-clauses (1) and (2) of this
Clause, shall not be deemed to be a transfer of rights for the
purposes of Clause 6 hereof.

8.  Payment of taxes

HADASSAH shall pay all the Government, municipal and local
taxes which may be imposed from time to time upon THE LEASEHOLD
PROPERTY insofar as it is not exempt from such payment by law.

9.  Preservation of the Sabbath

HADASSAH shall cease work on THE LEASEHOLD PROPERTY on
Sabbaths and Jewish holidays in accordance with the laws of the
State.

Any dispute in connection with this Clause shall be sub-
mitted to a single arbitrator to be appointed by agreement of
the parties, and in default of such agreement, by the President
of the District Court, Jerusalem. The decision of the arbitrator
shall be final and binding upon the parties.

63

10. **Right of KKL to execute works upon the leasehold property**

KKL is entitled to lay across THE LEASED AREA, either itself or through another body, pipes or channels for water, electricity, gas, drainage, or sewage, and also to erect electricity poles and to stretch electricity wires upon or over THE LEASED AREA and for that purpose HADASSAH shall give to KKL, its workers and officials, or to such other body, its works and officials, the possibility of entering upon THE LEASED AREA and carrying out therein the necessary works and repairs; provided that such works and repairs are carried out in a manner which does not cause to HADASSAH or to any person holding under it any disturbance which can be avoided, and also that KKL shall be responsible that immediately after the said works or repairs have been carried out, THE LEASED AREA is as far as possible restored to the condition in which it was theretofore.

11. **Damages in the event of breach**

If one of the parties commits a breach of any of the provisions of this Agreement, the other party shall be entitled to claim compensation for any loss or damage caused to it as a result of such breach as aforesaid.

12. **Change or correction of agreement of lease**

Any change or correction of this Agreement of lease shall require prior consent in writing on the part of THE UNIVERSITY.

13. **Dissolution of Hadassah or cancellation of the lease**

In the event of the dissolution of HADASSAH or of the cancellation of the lease by notice under Clause 2 hereof, the rights and obligations of HADASSAH hereunder shall devolve to Hadassah Medical Organization or to any one of the other bodies which are now or may in future be affiliated to that organization or to HADASSAH, but such devolution shall not be deemed to be a transfer of rights for the purposes of Clause 6 hereof. If the said organization or such other body will not agree to accept

the devolution, then the rights of HADASSAH hereunder shall be deemed to have reverted to KKL, without KKL having to pay compensation to anybody in connection therewith.

14. <u>Jurisdiction</u>

The place of jurisdiction under this Agreement shall be the Courts in Jerusalem, save for jurisdiction in matters which have to be submitted to arbitration under Clause 6 or Clause 9 hereof.

15. <u>Notices to the parties</u>

In every case in which any of the parties is required to give notice in writing to the other party, such notice shall be given by registered letter sent to the following address:

     to KKL - Keren Kayemeth Le-Israel, P.O.B. 283, Jerusalem

     to HADASSAH - c/o Hadassah Medical Organization, P.O.B. 499,

           Jerusalem

or to any other address of which either party may notify the other party in writing.

The post office receipt regarding the despatch of a registered letter as aforesaid shall serve as sufficient proof of the despatch of the notice.

16. <u>Definition of terms</u>

The term "KKL" includes the successors and assigns of KKL.

The term "HADASSAH" includes the successors of HADASSAH, and in the special case of Clause 13 hereof, Hadassah Medical Organization or (as the case may be) any other body mentioned in the said Clause.

17. <u>Waiver of notarial notices</u>

The parties hereby waive the necessity for sending notarial or other official notices in connection with the breach of any of the provisions of this Agreement.

18. **Headings**

In the interpretation of this Agreement or of any of its provisions no reliance shall be placed upon the headings appearing over the Clauses.

19. **Consideration**

The rights granted to HADASSAH by this Agreement are a full and complete consideration for the moneys which HADASSAH may invest in buildings structures plantations or for any other investments in THE LEASEHOLD PROPERTY, and also for its obligations under this Agreement.

20. **Value of provisions**

All the provisions of this Agrement are fundamental provisions of equal force.

21. **Number of copies**

This agreement is made in four copies, one of which has been delivered to KKL, one to HADASSAH, one to THE UNIVERSITY, and one to the Land Registry Office in Jerusalem.

IN WITNESS WHEREOF the parties hereto have hereunto set their hands on the date first above mentioned.


(Sgd.) <u>H. Darin</u>               (Sgd.) <u>K.J. Mann, Myriam Granott</u>
       for KKL                              for HADASSAH

HADASSAH - The Women's Zionist Organization of America, Inc.
          65 East 52nd Street
          New York 22, New York

March 28, 1960

The Hebrew University
Jerusalem
Israel

                              Attention: Mr. Aran

Gentlemen:

With reference to the leases registered in the Jerusalem Land
Registry Office on September 6, 1959 which the University and
Hadassah now hold from Keren Kayemeth Leisrael, we hereby agree
at your request that if, in spite of all efforts, we shall fail
to complete by January 1, 1961, the erection of our own buildings
forming part of what is referred to in Clause 7(2) of the above
leases as the first stage of the Medical Center, then the five
years mentioned in that Clause will begin to run as from the
date of the operational opening of the Hospital at the Medical
Center.

Please confirm the above by affixing your signature on the dupli-
cate of this letter which is enclosed herewith.

                         Sincerely yours,

                         (sgd) Miriam Freund

                         National President
                    for  Hadassah, The Women's Zionist
                         Organization of America Inc. and
                         Hadassah Medical Relief
                         Association, Inc.


Confirmed on behalf of the Hebrew University

Jerusalem, this 20 day of April 1960

     (sgd) Yair Aran
By

copy to Keren Kayemeth Leisrael

67



HADASSAH  HEBREW  UNIVERSITY  MEDICAL  CENTER        JERUSALEM, ISRAEL                    JOSEPH  NEUFELD  ARCHITECT, A.I.A., A.H.A., 135 FIFTH AVE.  NEW YORK 3, N.Y.

Law Offices
GUZIK and BOUKSTEIN

Washington Office
Suite 1116 Woodward Building
Telephone Republic 7-0866

Maurice M. Boukstein
Leo Guzik
Edward Goldenberg, Jr.
Lyonel E. Zunz

150 Broadway, New York 38, N.Y.
Cable Address  "Jurisburo"
New York
Worth 2-5600

December 20, 1962

Mrs. Lola Kramarsky, President
Hadassah
65 East 52nd Street
New York 22, N. Y.

Mr. Elishu Elath, President
The Hebrew University
Jerusalem
Israel

Dear Mrs. Kramarsky and Mr. Elath:

The following Minutes and Memoranda of Agreement, made in connection with and relating to certain items in the Affiliation Agreement between The University and Hadassah bearing even date, are herewith sent to you:

1. Memorandum of Agreement between Hadassah and The Hebrew University with respect to the provisions of Section 4 of the Affiliation Agreement (Dental School equipment).

2. Memorandum of Agreement between Hadassah and The University with respect to the provisions of Section 5 of the Affiliation Agreement (Sub-leases).

3. Minute of the meeting between representatives of The University and representatives of Hadassah, held at the office of Hadassah in the City of New York on December 14, 1962 with respect to Section 9 – Budget.

4. Memorandum of Agreement between Hadassah and The University with respect to Section 10 "2" of the Affiliation Agreement.

5. Minute of the Meeting between representatives of The University and representatives of Hadassah held at the office of Hadassah in the City of New York on December 19, 1962, with respect to Section 11 (1) dealing with Kitchen and Cafeteria Equipment and Services.

69

GUZIK and BOUKSTEIN

December 20, 1962

6. Memorandum of Agreement between Hadassah and The
Hebrew University with respect to the provisions of
Section 12 II (d) (iii) (2) of the Affiliation Agreement
relating to a possible future agreement with Alpha Omega
and the effect of such agreement on the composition of
the Joint Board of Management.

7. Minute of the meeting between representatives of The
University and representatives of Hadassah, held at
the office of Hadassah in the City of New York on
December 14, 1962, with respect to Section 15 - Academic
Appointments and Promotions.

8. Memorandum with respect to the Utilization of Proceeds
Derived from Liquidation of Assets.

The following letters, bearing even date, are also enclosed:

1. Letter from Mr. Elath, President of The University, to
Mrs. Kramarsky, President of Hadassah, with respect to
Section 1 (b) of the Affiliation Agreement which deals
with Hadassah's tax-exempt status.

2. Letter from Mr. Elath, President of The University, to
Mrs. Kramarsky, President of Hadassah, with respect to
Section 15 (iii) of the Affiliation Agreement which
deals with academic appointments and promotions.

All of the foregoing documents are part of the complete record
of the Affiliation Agreement.

Sincerely yours,

(sgd)  M. Boukstein

Maurice M. Boukstein

70

MEMORANDUM OF AGREEMENT

Between

HADASSAH

and

THE HEBREW UNIVERSITY

With respect to the Provisions of

Section 4 of the

Affiliation Agreement

I.    In respect of Subsection (a)(i), it is understood and agreed between The University and Hadassah that, notwithstanding anything to the contrary set forth in Section 4 of the Affiliation Agreement of even date concerning the responsibility of The University for the equipment of Building No. 20 (the Dental School), the question remains open and will be determined by a separate agreement.

THE HEBREW UNIVERSITY
ASSOCIATION

By _____
    Eliahu Elath, President


THE HEBREW UNIVERSITY OF
JERUSALEM

By _____
    Eliahu Elath, President

_____
    Yair Aran, Administrator


April 1, 1963

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _____

_____
    For Lola/Kramarsky, President


HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By _____

_____
    For Lola Kramarsky, President

71

# MEMORANDUM OF AGREEMENT

Between

HADASSAH

and

## THE HEBREW UNIVERSITY

With respect to the Provisions of

Section 5 of the

### Affiliation Agreement

It is agreed that the date left in blank in Section 5(b) relating to the execution of registration of the sub-leases between HADASSAH and THE UNIVERSITY will be filled in by Messrs. S. Horowitz & Co., Jerusalem, Advocates, when all the data required for the preparation of the sub-leases are made available to them.

THE HEBREW UNIVERSITY
ASSOCIATION

By _____
Eliahu Elath, President

THE HEBREW UNIVERSITY OF
JERUSALEM

By _____
Eliahu Elath, President

_____
Yair Aran, Administrator

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _____

_____
For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By _____

_____
For Lola Kramarsky, President

April 1, 1963

Representatives of THE UNIVERSITY and Representatives of HADASSAH
Held at the office of HADASSAH in the City of New York
December 14, 1962

Mrs. Charlotte Jacobson, Treasurer of Hadassah, and
Mr. Yair Aran, Administrator of Hebrew University, reported on
the agreement they have reached with respect to financial con-
tributions of Hadassah towards maintenance and operation of
pre-clinical laboratories of the Medical School during the years
February 1, 1960 - January 31, 1967.

| Period | IL. Total Con- tribution | IL. Debt Reduction | IL. Cash Payment |
|---|---|---|---|
| Feb. 1, 1960- Jan. 31, 1961 | 900,000. | 300,000. | 600,000. |
| Feb. 1, 1961- Jan. 31, 1962 | 900,000. | 300,000. | 600,000. |
| Feb. 1, 1962- Jan. 31, 1963 | 900,000. | 300,000. | 600,000. |
| Feb. 1, 1963- Jan. 31, 1964 | 1,000,000. | 300,000. | 700,000. |
| Feb. 1, 1964- Jan. 31, 1965 | 1,000,000. | 300,000. | 700,000. |
| Feb. 1, 1965- Jan. 31, 1966 | 1,025,000. | 300,000. | 725,000. |
| Feb. 1, 1966- Jan. 31, 1967 | 1,050,000. | 300,000. | 750,000. |

Mrs. Lola Kramarsky, President of Hadassah, and
Mr. Eliahu Elath, President of Hebrew University, expressed their
satisfaction that agreement has been reached on this important
matter and thanked Mrs. Jacobson and Mr. Aran for their efforts.

Mr. Elath said that Hebrew University accepts the
position of Hadassah that its contributions toward the mainten-
ance and operation of pre-clinical laboratories is for a fixed
and definite period of time and that in the event that Hadassah
shall, for any reason, come to the conclusion that it is unable
to continue to make such contributions beyond the year ending
January 31, 1967, the failure on the part of Hadassah to make
such contributions shall not be considered as a breach of the
Affiliation Agreement.

Mrs. Kramarsky said that while Hadassah reserves its
position in the manner stated by Mr. Elath, it hopes and expects
that it will continue to make such contributions after January 31,
1967.

THE HEBREW UNIVERSITY
ASSOCIATION

By _____
Eliahu Elath, President

THE HEBREW UNIVERSITY for
JERUSALEM

By _____
Eliahu Elath, President

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _____
For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By _____
For Lola Kramarsky, President

73

MEMORANDUM OF AGREEMENT

between

HADASSAH

and

THE HEBREW UNIVERSITY

With respect to Section 10 "2"

of the Affiliation Agreement


With reference to Section 10 "2" of the Affiliation
Agreement, it is hereby agreed by THE UNIVERSITY and HADASSAH
that the Israel accounting firm of SOMACH, CHAIKIN & CITRON
shall be retained for the purpose of commencing the audits
referred to in said Section; it being understood by the
parties that they may, from time to time, by mutual agreement,
replace the said accounting firm and retain such other Israel
accounting firm as they may mutually determine.


THE HEBREW UNIVERSITY                  HADASSAH, THE WOMEN'S ZIONIST
ASSOCIATION                            ORGANIZATION OF AMERICA, INC.

By _____            By _____
    Eliahu Elath, President               _____
                                          For Lola Kramarsky, President

THE HEBREW UNIVERSITY OF
JERUSALEM                              HADASSAH MEDICAL RELIEF
                                       ASSOCIATION, INC.
By _____
    Eliahu Elath, President            By _____
                                          _____
    _____               For Lola Kramarsky, President
    Yair Aran, Administrator


April 1, 1963

MINUTE OF THE MEETING

Between

Representatives of THE UNIVERSITY

and

Representatives of HADASSAH

Held at the Office of Hadassah

In the City of New York on December 19, 1962.

\*        \*        \*        \*

With respect to Section 11(i) - Kitchen and Cafeteria
Equipment and Services - Mr. Aran stated that The University does
not at present have available the data necessary to enable them
to determine what the percentage chargeable to The University
should be under the terms of said Section and he suggested that
the space provided for the insertion of the percentage in said
Section shall remain unfilled for the time being and shall be
determined by Hadassah and The University as soon as there has
been an opportunity to make the necessary factual study.

Hadassah agreed to Mr. Aran's suggestion.  Therefore,
the percentage will be inserted in the Affiliation Agreement not
later than the        day of            1963.


THE HEBREW UNIVERSITY
ASSOCIATION

By _____
Eliahu Elath, President


THE HEBREW UNIVERSITY OF
JERUSALEM

By _____
Eliahu Elath, President

_____
Yair Aran, Administrator


HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _____

_____
For Lola Kramarsky, President


HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By _____

_____
For Lola Kramarsky, President


75

MEMORANDUM OF AGREEMENT

Between

HADASSAH

and

THE HEBREW UNIVERSITY

With respect to the Provisions of

Section 12 II (d)(iii)(2) of the

Affiliation Agreement

It is agreed between THE UNIVERSITY and HADASSAH that if, as and when an agreement among THE UNIVERSITY, HADASSAH and ALPHA OMEGA, concerning the latter's participation in the School of Dentistry, is entered into by and among all of said parties, then Section 12 II (d)(iii)(2) of the Affiliation Agreement will be amended to the extent required by the provisions of the agreement with ALPHA OMEGA.

THE HEBREW UNIVERSITY
ASSOCIATION

By _____
Eliahu Elath, President

THE HEBREW UNIVERSITY OF
JERUSALEM

By _____
Eliahu Elath, President

_____
Yair Aran, Administrator

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By _____

_____
For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By _____

_____
For Lola Kramarsky, President

April 1, 1963

76

MINUTE OF THE MEETING

Between

Representatives of THE UNIVERSITY
and
Representatives of HADASSAH

Held at the Office of Hadassah
In the City of New York on December 14, 1962.

\*        \*        \*        \*

With respect to Section 15 of the AFFILIATION AGREEMENT,
dealing with academic appointments and promotions, and referring
particularly to the letter which the President of THE UNIVERSITY
is to deliver to the President of HADASSAH in connection
therewith, Mr. Elath said that he has no reason to believe that
the practice described in paragraph numbered "1" as being the
prevailing practice will be changed.

THE HEBREW UNIVERSITY
ASSOCIATION

By_____
Eliahu Elath, President

THE HEBREW UNIVERSITY OF
JERUSALEM

By_____
Eliahu Elath, President

_____
Yair Aran, Administrator

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By_____

For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By_____

For Lola Kramarsky, President

77

MEMORANDUM

WITH RESPECT TO THE UTILIZATION
OF PROCEEDS DERIVED FROM
LIQUIDATION OF ASSETS

\*     \*     \*     \*

It is agreed by THE UNIVERSITY and HADASSAH, that to
the extent that HADASSAH has contributed toward the assets of
THE MEDICAL SCHOOL outside the MEDICAL CENTER, the proceeds
derived from the liquidation of such assets will be used
exclusively for Medical School assets in the MEDICAL CENTER.

THE HEBREW UNIVERSITY
ASSOCIATION

By_____
Eliahu Elath, President

THE HEBREW UNIVERSITY OF
JERUSALEM

By_____
Eliahu Elath, President

_____
Yair Aran, Administrator

HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.

By

_____
For Lola Kramarsky, President

HADASSAH MEDICAL RELIEF
ASSOCIATION, INC.

By

_____
For Lola Kramarsky, President

April 1, 1963

THE HEBREW UNIVERSITY OF JERUSALEM
Jerusalem, Israel

Mrs. Lola Kramarsky
National President, Hadassah
65 East 52nd Street
New York 22, New York

Dear Mrs. Kramarsky:

Reference is made to Section 1 (b) of the Affiliation
Agreement, which reads as follows:

"HADASSAH enjoys the status of a tax exempt
organization under the United States Internal Revenue
Code and is bound, in the conduct of its affairs, to
comply with the laws, rules and regulations relevant
to it. In entering into this Agreement, HADASSAH does
so in good faith and belief that all the terms and
conditions stated herein are consistent with the
aforementioned obligations."

The draft of the Affiliation Agreement, dated 2/1/62,
also contained this additional sentence immediately following
the above, which has been deleted from the final text of the
Agreement, namely:

"In order to protect HADASSAH's status in the
United States, it is the understanding and agreement
of the parties that this Agreement is contingent upon
HADASSAH's responsibility to comply with relevant
New York State and Federal laws, and where the Agree-
ment is inconsistent with said responsibilities the
applicable laws and regulations shall govern and
prevail and the Agreement shall be amended accordingly."

The University is aware that the reason on the part
of Hadassah for including this language in the draft was to serve
notice on the University that the Agreement may require changes
and modifications from time to time should there be Federal or
State legislative enactments or administrative rulings or pro-
cedures which necessitate such changes in order to preserve
the tax-exempt status of Hadassah. The University recognizes
the paramount importance of Hadassah preserving its status as
a tax-exempt organization, entitling it to receive tax
deductible contributions under the terms of applicable United
States laws. Accordingly, the University agrees that, upon
the request of Hadassah at any time, the parties hereto will
promptly consider such proposed changes and modifications in
the Agreement as will be recommended in writing by counsel
designated by Hadassah in order that the tax-exempt status
of Hadassah may not be impaired.

Yours sincerely,

THE HEBREW UNIVERSITY ASSOCIATION

By _____
Eliahu Elath, President

THE HEBREW UNIVERSITY OF JERUSALEM

By _____
Eliahu Elath, President

Yair Aran, Administrator

Jerusalem
April 1, 1963

79