## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| vs. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 21-01190 (CGM) |
| THE HEBREW UNIVERSITY OF JERUSALEM, YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., BEN-GURION UNIVERSITY OF THE NEGEV, B.G. NEGEV TECHNOLOGIES AND APPLICATIONS LTD., THE WEIZMANN INSTITUTE OF SCIENCE, and BAR ILAN UNIVERSITY, | |
| Defendants. | |

### DECLARATION OF PROFESSOR AMIR N. LICHT

I, Amir N. Licht, declare under penalty of perjury under the laws of the United States of America, as follows:

I submit this declaration at the request of Wachtell, Lipton, Rosen & Katz, counsel to defendants in the above-captioned proceeding. The purpose of this declaration is to provide my opinions as an expert on Israeli law regarding the matters discussed below.

1. **Background and Qualifications**

    1.     I am a full professor of law, and former Dean (2005-2009), at the Harry Radzyner Law School, Reichman University, a private non-profit university in Israel.

    2.     My academic expertise lies in the fields of private and commercial law.  I have published extensively on Israeli fiduciary law, corporate law and corporate governance, and securities regulation.  I teach courses on these topics at Reichman University and hold or have held faculty and teaching positions in leading institutions abroad, including the University of California Berkley Law School, Pompeu Fabra University (Barcelona), Católica University of Portugal, IE Law School (Madrid), and City University of Hong Kong.

    3.     I regularly serve as referee for leading academic publishers and journals, including Cambridge University Press, Journal of Finance, Strategic Management Journal, Management Science, Organization Science, Journal of Banking and Finance, and the Journal of Comparative Economics.

    4.     I occasionally advise the Israeli Ministry of Justice and the Israeli Securities Authority on legislative reforms and other issues in my fields of expertise.  I have also provided expert opinions on Israeli law in my fields of expertise in court and arbitration proceedings.

    5.     I hold S.J.D. and LL.M. degrees from Harvard Law School, and an LL.B. and B.A. (Economics) from Tel Aviv University.

    6.     My *curriculum vitae* is appended hereto as Exhibit A.  It includes my qualifications, publications (including all publications authored in the last 10 years), and a list of cases in which I have testified as an expert at trial or at deposition (including all such cases from the previous four years).

7.      I am being compensated by the defendants in this matter at a rate of $550 per hour (plus certain expenses).  My compensation is not dependent in any way on the substance of my testimony or the outcome of this proceeding.

## 2.  Documents Reviewed

8.      For the purpose of preparing this Declaration, including the opinions stated below, I have reviewed the Complaint in this proceeding as well as several declarations being submitted to the Court on behalf of the defendant universities.  I have also reviewed various sources of Israeli law, such as legislation and court decisions.  I note that the translations of certain passages included in this declaration are unofficial, as are the translations of excerpts from Israeli legislation and court decisions.  A list of sources I have relied upon in preparing this declaration is appended as Exhibit B.[1]

## 3.  Factual Background[2]

9.      The defendants in this action are The Hebrew University of Jerusalem ("Hebrew University"), Yissum Research Development Company of The Hebrew University of Jerusalem Ltd. ("Yissum"), Ben-Gurion University of the Negev ("Ben-Gurion"), B.G. Negev Technologies and Applications Ltd. ("B.G. Negev"), Weizmann Institute of Science ("Weizmann"), and Bar Ilan University ("Bar Ilan," and together with Hebrew University, Yissum, Ben-Gurion, B.G. Negev and Weizmann, the "Universities").

10.     The Universities are organizations incorporated in various legal forms under the laws of Israel.

11.     Yeshaya Horowitz Association ("Yeshaya") is a registered Israeli non-profit association.  Yeshaya transferred to defendants substantial funds in support of academic research.

---

[1] In the event that I receive additional documents, including any further submissions by the plaintiff in this action, I may supplement or amend this declaration to address such additional information.

12.     Yair Green ("Green") was Yeshaya's legal counsel and manager.  During all or part of the relevant period, Green was a member of the boards of governors of Ben-Gurion, Weizmann Institute and Hebrew University.[3]

13.     The Complaint identifies certain professors (or, in the case of Hebrew University, other employees) at the Universities who participated in Yeshaya's activities. The professors (or other employees) are alleged to have participated in evaluating and, along with other Yeshaya members, approving funding proposals made to Yeshaya.

**4.   The Legal Questions**

14.     I have been asked to provide my opinion regarding the following questions of Israeli law.

   a.   What are the rules for ascribing conduct and knowledge to a corporate body?

   b.   In light of those rules -

      i.   Is the conduct or knowledge of a member of a university's governing bodies necessarily attributed to the university?

      ii.   Is the conduct or knowledge of a university professor or senior employee necessarily attributed to the university?

   c.   Does Israeli law recognize a concept of "ratification" and, if so, in what circumstances does it apply?

   d.   In what circumstances can the corporate veil of a corporation be pierced so that separate corporate entities are treated as a single entity?

15.     In summary, I answer these questions as follows:

   a.   Israeli law attributes to corporate organizations, including universities, the conduct and knowledge of individual persons if those persons are deemed

---

[2]  I have assumed these facts to be true for purposes of this Declaration.

"organs" of the corporation.  Corporate organs are identified according to "organ theory" in light of their position in the corporate hierarchy (the "hierarchical test") and their role in fulfilling corporate functions (the "functional test").  The primary test is the functional test.

b.  The answer to each of the questions set forth in subsection (b) above is "no."

    i.  In the case of an individual member of a university's board of governors, the application of organ theory under Israeli law does *not* lead to attribution of that board member's conduct or knowledge to the university, unless the university specifically authorizes that individual to undertake an activity for it.  Under Israeli law, a university's board of governors, acting within its authority under governing documents, can serve as a "group organ" of the university.  An individual board member, by contrast, has no authority to bind a university on his or her own absent collective action.  In this case, therefore, Israeli law would not treat Yair Green as an organ or agent of a university based on his role as a member of a board of governors or other governing body.  Green, moreover, would have had no authority to act on behalf of any university — including in relation to his work at Yeshaya — absent the university's specific direction and agreement.

    ii.  In the case of a university professor or senior employee, application of organ theory under Israeli law likewise does not lead to attribution of the professor or employee's conduct or knowledge to the university, unless the professor or employee was performing a core function of the university (for a professor, research and teaching) or the university

---

[3]  At Ben-Gurion, Green was also a member of other governing bodies (the Executive Committee and

5

specifically directed the individual to undertake the relevant activity. Here, to the extent professors decided themselves to become members of Yeshaya and to participate in Yeshaya's grant-making process or other Yeshaya activities, Israeli law would not treat the professors as organs or agents of the Universities. Israeli law also would not treat the senior employees of Hebrew University as university organs to the extent they decided, as private individuals, to join Yeshaya as members and participate in Yeshaya's grant-making or other activities.

c. Israeli law recognizes that a corporation can ratify the acts of an individual who holds himself or herself out as the corporation's agent or organ. However, because ratification is premised on there being *ex post facto* full principal-agent or corporation-organ relations, there can be no ratification where an individual does not hold himself or herself out as an agent/organ of the corporate organization at issue. In the case before the Court, the universities could not have ratified a professor's conduct as a member of Yeshaya and participant in Yeshaya activities unless: (i) the professor purported to act as an agent/organ of the university when he or she participated in Yeshaya, and (ii) the university subsequently took steps to approve and adopt the professor's conduct.

d. Israeli law generally respects the corporate form and the distinct legal personalities of separate corporate organizations. Israeli law only permits the corporate veil to be pierced in extreme circumstances where the corporate form is knowingly abused and disregarded by the relevant organization's shareholders.

---

Investment Committee).

5. **General background on the Israeli legal system**

16.    Israel is a common law system.  It traces its origins to the heritage of the British Mandate in Palestine that was in force until 1948.  The applicable law in Israel thus consists of an amalgam of statutory provisions and case law that adheres to the *stare decisis* principle, i.e. determination of the law on the basis of precedent.[4]  To date, there are still a considerable number of statutes in force that were enacted by the British High Commissioner during the British Mandate and upheld, amended, and consolidated by the Knesset (the Israeli Parliament).  Such statutes are denoted "Ordinances," as opposed to "Laws," the latter denoting post-1948 statutes enacted by the Knesset.

17.    Statutes of particular note in the present context are the Penal Law 5737-1977 ("PL"), the Civil Wrongs Ordinance [New Version] ("CWO"), and the Companies Law 5759-1999 ("CL").  The PL is a Hebrew rendition of the British Mandate's Criminal Law Ordinance, 1936, with numerous subsequent amendments and additions, some of which are substantial, but overall it retains the general character and many of the details of the British source.  The CWO is a Hebrew version of the British Mandate's Civil Wrongs Ordinance, 1944.  Notwithstanding several subsequent amendments, it remains close to its source.  The CL is a modern piece of legislation that replaced the British Mandate's Companies Ordinance, 1929 (which itself dovetailed the United Kingdom's Companies Act 1929).  The CL resembles somewhat the U.K. Companies Act 2006 in laying out a detailed framework for business companies, yet it too retains the general features of English company law.

18.    Additionally, given the value that the Israeli system places on precedent, some of the relevant precedent draws on English case law, and the courts also continue to turn to English, American, and Australian case law for comparative purposes.

---

[4] Basic Law: Adjudication, Section 20.

**6.  What are the rules for ascribing conduct and knowledge to a corporate body?**

*6.1. In general: Rules of attribution*

19.    Every modern legal system that recognizes the concept of non-human legal persons must establish rules for ascribing conduct and knowledge to such persons.  Here, I will focus on corporate legal persons, including business companies, non-profit organizations,[5] public bodies, and so forth, including universities.  For convenience, I will refer to them as "corporations".  Similarly, for brevity, I will refer to "conduct" and "knowledge" to indicate either action or inaction and states of mind in general, respectively.

20.    To my knowledge (and I do not opine on this point), state laws in the United States generally rely on the doctrine of *respondeat superior*, which draws on notions of agency and channels of authority, to impose civil liability on corporations.[6]  The conduct and knowledge of corporate employees are attributed to the company to the extent consistent with that doctrine.

21.    Israeli law does not generally ground corporate liability on the doctrine of *respondeat superior*.  The following section describes Israeli law on the subject in detail.

*6.2. Organ Theory in Israeli law*

22.    Israeli law has a general theory of corporate liability, dubbed "organ theory," which grounds such liability in the conduct and (where applicable) the knowledge of certain individuals who are deemed organs of the corporation.

---

[5] There are several corporate forms for non-profit activities in Israeli law, including a public benefit corporation under the CL, an association (*Amuta*) under the Associations Law, 5740-1980, an Ottoman association under the Ottoman Law on Associations, which predates the British Mandate, and an institution of higher education under the Council for Higher Education Law, 5718-1958.  As noted, the same analysis applies to all of them.

[6] *See* 18B Am. Jur. 2d Corporations § 1812 (2022).

23.     As a preliminary matter, one should note that Israeli law does recognize the doctrine of *respondeat superior* as promulgated in section 13 of the CWO.[7]  The CWO also codifies the doctrine of vicarious liability for torts committed by agents in section 14 thereof.[8]  The Israeli Supreme Court has implemented *respondeat superior* to impose liability on corporate employers a number of times.[9]  Section 14 has also been applied by the Supreme Court, though less frequently.[10]

24.     Drawing on English authorities, the Israeli Supreme Court began in the 1960s to address the possibility of imposing criminal liability on companies by using "the organic theory" (*HaTorah HaOrganit*) as an alternative to the avenues mentioned above.[11]  In tandem, in a 1966 groundbreaking academic article that also drew on English authorities on the organic theory, Aharon Barak - then a Hebrew University faculty member and later a

---

[7] Section 13 of the CWO provides:

13. Liability of Employer

(a) For the purposes of this Ordinance, an employer will be liable for any act committed by his employee –

(1) if he has authorised or ratified that act;

(2) if it is committed by his employee in the course of his employment; Provided that –

(i) an employer will not be liable for any act committed by any person not being another of his employees, to whom his employee has without his authority, express or implied, delegated his duty;

(ii) a person who is compelled by law to use the services of another person, in the choice of whom he has no discretion, is not liable for any act committed by that other in the course of such employment.

(b) An act will be deemed to have been done in the course of an employee's employment if it was done by him in his capacity as an employee and while he was performing the usual duties of and incidental to his employment, notwithstanding that the act was an improper mode of performing an act authorised by the employer; but an act will not be deemed to have been so done if is was done by an employee for his own ends and not on behalf of the employer.

(c) For the purposes of this Section, "act" includes "omission".

[8] Section 14 of the CWO provides:

14. Liability of Principal

For the purposes of this Ordinance, any person who employs an agent, not being his employee, to do any act or class of acts on his behalf will be liable for anything done by such agent in the performance of, and for the manner in which such agent does, such act or class of acts.

[9] *See*, e.g., Civ. App. 338/60 State of Israel v. Madar, 15 P.D. 1569 (1961); Civ. App. 445/88 Kones HaNechasim HaRishmi v. Stiebel, 44(3) P.D. 331 (1990); Civ. App. 8199/01 Ezvon Miro Z.L. v. Miro, 54(2) P.D. 785 (2003); Civ. App. 8027/14 Shorosh v. Shalian (29.11.2015).

[10] *See,* e.g., Civ. App. 502/78 State of Israel v. Nissim, 35(4) P.D. 748 (1981).

[11] *See* Crim. App. 137/79 Schpär, Tussia Cohen & Co. v. Attorney General, 17 P.D. 1905 (1963); Crim. App. 109/72 State of Israel v. Paz, 28(1) P.D. 93 (1973); Crim. App. 137/79 Glant v. State of Israel, 35(3) P.D. 746 (1981).

preeminent legal scholar and Justice and President of the Israeli Supreme Court - advanced a general approach for using the organic theory for imposing civil liability in torts on corporations.[12]  Barak later extended this approach to every legal action in private law, now referring to "organ theory" (*Torat HaOrganim*), which became the standard term and the standard approach for analyzing the liability of corporations.[13]

25.  Israeli organ theory crystallized in the Supreme Court's seminal decision in *Modi'im*, delivered by then Justice Barak.[14]  The case involved a criminal conviction of a company for a traffic offence due to its being the registered owner of a motor vehicle.  As the appellant challenged the very idea of holding the company responsible, the Supreme Court took the opportunity to lay out the theory in detail:

> Over the years, there has developed the "Organ Theory", which is meant to overcome the absence of a human dimension in a company and thus enable it to comply with the law's requirements regarding the existence of human qualities required for imposing responsibility or for granting protection or immunity from responsibility (civil, criminal, or other).  According to this theory - which is not limited to the criminal area but rather applies in all areas - the mental element that exists at the organ is perceived as the mental element of the corporation.  Using this theory one can attribute to the corporation - despite the absence of human qualities - both thought and conduct of the organ, and thus fulfill the provisions of every law (or contract), that conditions a legal outcome on the existence of such qualities. . . .  Organ theory is premised on the assumption that there is a legal norm that refers to the corporation.  According to it certain outcomes emanate (whether they deal with imposing liability, whether they deal with an exemption from or a defense against liability, or whether they deal with another matter), if human qualities are formed in the corporation, such as a criminal thought (knowledge, intent), an active conduct and so forth.  Thus, the corporation could be liable (civilly, criminally, or otherwise) even if the organ himself is not liable.  The corporation's liability for the actions of the organ is not vicarious, and it is not conditioned on the organ's liability.  Indeed, while an employer or a principal is vicariously liable only if the employee or the agent is personally liable (in a material sense), this condition is not required for the corporation's responsibility for the organ's conduct.  The corporation's responsibility for the organ's activity is personal, the organ's actions and thoughts being instrumental for the corporation's ability to comply with the legal norm that should apply to it.  This point highlights a substantial difference between organ theory and vicarious liability.  Organ theory is unique to the corporation, as it aims to provide it with a human dimension that it lacks.  Vicarious liability is not unique to the

---

[12] *See* Aharon Barak, *Ma'amad HaTa'agid BiNezikin*, 22 HAPRAKLIT 198 (1966).

[13] *See* Aharon Barak, *Hok HaShlihut VeTorat HaOrganim*, 2 IYUNEY MISHPAT 302 (1972).

[14] Crim. App. 3027/90 Hevrat Modi'im Binuy U'Fituah v. State of Israel, 45(4) P.D. 364 (1991) ("*Modi'im*").

corporation, and it aims to impose on one person the liability of another, with whom the former has a legal relation (e.g., employer-employee relations) that the law considers relevant. . . .[15]

The fact, that for certain issues we attribute the organ's conduct to the corporation, does mean that the organ's physical existence provides physical existence to the corporation. Indeed, the metaphorical discourse about a "brain", "center of nerves", "alter ego" means only that: when a legal norm requires a human quality (such as thought (knowledge, intent), an active conduct and so forth), then in relation to the forming of such human qualities in the corporation it suffices that those qualities form in the organ. One who wished to make a shortcut and describe the law with a human metaphor would say, that we "attribute" the organ's human qualities to the corporation. There is nothing wrong in such discourse, so long as we always remember, that the "attribution" is but a metaphor, that the corporation has no human qualities, and that the purpose and role of organ theory are only to ensure that a legal norm requiring human qualities shall be applicable in principle to a corporation. Thus, there is no principled reason not to impose liability on a corporation for the committing an offence of manslaughter or battery. The manslaughter or the battery were committed by an organ of the corporation. Metaphorically, one could say that the corporation committed manslaughter or battery. Legally, we would say that criminal-personal liability is imposed on a corporation for active conduct and thought that existed in the organ, in circumstances in which the law considers it appropriate to impose liability on the corporation within which those organs acted. Note: the corporation is responsible for the active conduct and the mental element that formed in the organ, even though in the very same circumstance it might be the case that the corporation is not vicariously liable for an offence committed by an employee or an agent. The reason for this distinction stems from the organ's special nature. He is not merely an employee or an agent. He is a person, that by dint of his status or the substance of his conduct, the law considers his action to be the action of the corporation. *He is a person, who in the eyes of the law is seen as performing a function of the corporation itself.*[16]

26.    As noted by Justice Barak, organ theory applies in principle equally in civil and criminal law. And indeed, shortly after *Modi'im*, the Supreme Court applied organ theory in a civil case called *Zuk Or*.[17]    Organ theory has subsequently become the predominant basis for corporate liability, if not the sole one, as courts have virtually ceased to invoke *respondeat superior* and vicarious liability. The latter doctrines have become essentially obsolete: they were mentioned in less than a handful of cases by the Supreme and

---

[15] *Id.*, at 378-379 (references omitted).

[16] *Id.*, at 381 (emphasis added).

[17] *See* Civ. App. 407/89 Zuk Or Ltd. v. Car Security Ltd. 48(5) P.D. 661 (1994).

District Courts, and even then only as secondary alternatives to organ theory or strictly in *dicta*.[18]

27.      Organ theory as conceived in *Modi'im* was next enshrined in statute - in 1994, in section 23 of the PL, and in 1999, in sections 46, 47, and 53 of the CL. These sections provide, respectively, as follows:

> 23. Extent of criminal liability of a body corporate
>
> (a) A body corporate shall bear criminal liability –
>
> (1) under section 22 [concerning enhanced liability - A.L.], if the offense was committed by a person in the course of the performance of his function in the body corporate;
>
> (2) for an offense that requires proof of criminal intent or negligence, if – under the circumstances of the case and in the light of the position, authority and responsibility of the person in the management of the affairs of the body corporate – the act by which he committed the offense, his criminal intent or his negligence are to be deemed the act, the criminal intent or the negligence of the body corporate.
>
> (b) If the offense was committed by way of omission, when the obligation to perform is directly imposed on the body corporate, then it is immaterial whether the offense can or cannot be related also to a certain officer of the body corporate.
>
> 46. The organs
>
> The company's organs are the general meeting, the board of directors, the general manager and any person whose acts in any given matter are considered by law or by virtue of the articles of association to be the acts of the company with regard to the matter concerned.
>
> 47. Acts of an organ like acts of the company
>
> The acts and intentions of an organ shall be the acts and intentions of the company.
>
> 53. Liability of company in tort
>
> (a) The company shall be directly liable in tort for any civil wrong committed by one of its organs.
>
> (b) Nothing in the provisions of subsection (a) shall derogate from the company's vicarious liability in tort under any law.

---

[18] *See* Civ. App. 9057/07 Appel v. State of Israel (2.4.2012); Civ. C. (Tel Aviv) 211/07 Gamida MedEquip Ltd. v. Fisher Scientific Company L.L.C (5.12.2012).

### 6.3. Who is an organ?

28.     A crucial step in imposing liability on a corporation by ascribing it the conduct and knowledge of its organs is to identify those organs.  Putting to one side institutional organs such as a corporation's general meeting or board of directors, which (as discussed below) proceed through collective action and must comply with conditions set in statues and the bylaws, the main challenge lies in identifying particular individuals who are deemed, legally, to be the corporation's organs.

29.     The statutory provisions cited above set the framework for identifying organs. Section 46 of the CL thus refers to those who "in any given matter are considered by law … with regard to the matter concerned" to be organs.  Section 23 of the PL points, with regard to fault-based offences, to "the circumstances of the case and in the light of the position, authority and responsibility of the person in the management of the affairs of the body corporate."  These tests are cast in general terms in order to encompass the variation of practical circumstances in which the question could arise.

30.     The task of developing more concrete criteria for identifying organs is left to the courts.  Thus, already in *Modi'im*, the Supreme Court ruled that an organ "is a person, who in the eyes of the law is seen as performing a function of the corporation itself."[19]  In *Arad Hashkaot* - a case dealing with breaching disclosure duties to shareholders in a public company - Justice Rivlin said that "the test for determining the identity of the organ whose deeds may be attributable to the company is a functional one and not merely hierarchical."[20]

31.     In *Melisron*, which dealt with knowledge-based securities offences, Justice Rubinstein for the Supreme Court restated the law in light of prior case law and commentary:

> At the center of organ theory stands, of course, the organ – that high ranking long arm of the corporation. In the case law and the scholarship, two alternative tests

---

[19] *Supra*, text to note 16.

[20] Crim. App. 3891/04 Arad Hashkaot U'Fituach Ta'asiya Ltd. v. State of Israel, 60(1) P.D. 294, 349 (2005).

are common for inquiring whether a certain person is to be considered an organ in a particular corporation. The first test, the organizational test, examines whether the individual is an organ according to their formal role and position in the corporation. Thus, the case law recognized "the general assembly of shareholders, members of the board of directors, the CEO and the COO" as clear organs of the corporation.

The second test, the functional test, asks whether the function committed by the particular officer warrants seeing their acts as the acts of the corporation "whatever the hierarchical status of the corporate actor may be".[21]

32.     Justice Rubinstein explicated the functional test as follows:

As for the second test, the question whether the organ acted in the course of their position is not necessarily a simple one. On one extreme, it is obvious that an activity of a clear personal nature, which the organ conducted out of work hours and out of the workplace, is unlikely to be within fulfilling his role. On the other extreme, it is likely that activities that the organ conducted and are inherently related to their position and were executed under instructions from his managers would come under activity within the course of the position.

In the range between the two ends of the spectrum there might be many cases. However, it seems that the approach taken by the case law, and in my view rightly so, is that the range of situations that may come under "in the course of the position" should be broadly interpreted. For example, it was held that when the organ commits the criminal activity on behalf of the corporation but in a manner that was seemingly beyond the scope of the authorization he received, this may not serve as a defense for the corporation against applying organ theory and imposing responsibility on the organization for the organ's actions. Even when the board of directors of the corporation opposed a move made by the organ, the corporation was found criminally responsible for his actions. Simply put, the test is whether the organ generally acted as a "corporation person" rather than a private individual, and should the answer be in the affirmative, this test has been met. …[22]

33.     The key condition for applying organ theory is therefore that an individual person - whether senior in the organizational hierarchy or not - must engage in the affairs of the corporation in order for his or her conduct and knowledge to be considered those of an organ, and hence - of the corporation.  Such engagement must be an affair of the corporation - namely, an activity that is germane to the functioning of the corporation.  Thus the reference to the "functional test."   In addition, as stated in *Melisron*, the individual person must be "fulfilling his role" at the corporation rather than acting as a "private individual."   In a business company, such conduct and knowledge must be related to the company's business.

---

[21]  Crim. App. 99/14 State of Israel v. Melisron, Ltd. (25.12.2014), at para. 115 (references omitted).

[22]  *Id.*, at para. 120 (references omitted).

In a non-profit organization (including a university), they should relate to the mission and operation of that organization.

34.     Although the hierarchical and functional test were described as alternative ones, the functional test, as opposed to a hierarchical test, has come to dominate the legal analysis of whether one is an organ for purposes of Israeli law.  As Justice Rivlin emphasized in *Arad Hashkaot*, the mere fact that one is located high in the corporate hierarchy does not suffice to make one an organ.  That high-ranking person must also satisfy the functional test for attributing his or her conduct and knowledge to the corporation.  That person must operate within the scope and ambit of his or her office in the particular corporation or be specifically authorized to carry out a function of that corporation.

35.     Leading Israeli scholars have helped explain the functional test.  The preeminent criminal law scholar, Prof. S.Z. Feller, whose joint work with Prof. Mordechai Kremnitzer has greatly influenced the drafting of the legislative amendment that introduced section 23 of the PL, wrote as follows:

> From the adjudicated cases it clearly emerges that the direct criminal liability - in contrast to vicarious liability - for regular offences is imposed on the corporation only by dint of commission of the offence by an employee who is considered its "organ", who is authorized to act for it, according to discretion delegated to him by it, as its "other self" - *alter ego* [in Latin in the original - A.L.].
>
> While the rule is clear, describing the "other self" as an organ of the corporation, having central power, having discretion to act independently on behalf of the corporation, and similar indicia, cannot define and limit with ample precision the identity of the organ. …
>
> In order to identify the "identity" of those employees, "organ" theory from civil law is often relied on.  This theory is also relied on when using the "identification" test, since an organ of the corporation is an employee whose activity in the affairs of the corporation is identified with the activity of the corporation itself, due to his power to fulfill the functions of the corporation on behalf of and for it, while employing independent discretion delegated to him by the corporation.[23]

---

[23] S.Z. FELLER, FOUNDATIONS OF CRIMINAL LAW, Vol. 1 707 (1984).

36.     Prof. Mordechai Kremnitzer and Prof. Khalid Ghanayim, in an influential article that was cited with approval, *inter alia*, by the *Melisron* Court,[24] have explained:

> The hierarchical test should not be accepted as a sole test. An organ of the corporation is considered as the brain and *ego* [in Latin in the original - A.L.] of the corporation only when the organ operates according to powers granted to him and the functions for which he was selected. An act of the organ that is totally unrelated to his function in the corporation cannot by the nature of things be an act of the corporation. In such a case, the organ is not identified with the corporation. Thus, for instance, when the manager, while driving to the corporation, runs over and kills a passer-by, one cannot say that the manager is an organ identified with the corporation and that the deadly running over is an act of the corporation. The hierarchical test, therefore, is incompatible with the nature of the corporation and the functions imposed on its organs.[25] …

> In support of the functional test one should say that it does draw a clear distinction between an action of a senior officer in the corporation that falls within the ambit of his function and an action of a senior officer that does not fall within the ambit of his function.[26] …

> In our opinion, neither the hierarchical test nor the functional test should be accepted as sole tests, and a hierarchical-functional test should be adopted, namely: a certain extension of the group of senior office holders, while limiting their being as organs only to acts of theirs, which are done by them as functionaries of the corporation.[27]

37.     Finally, it should be mentioned that Israeli law recognizes an exception to the standard working of organ theory, where an individual who is a corporate organ engages in corporate affairs within the scope of his powers, yet does so against the interest of the corporation - e.g., in a way that is fraudulent to the corporation. In such a case, organ theory

---

[24] *Melison*, *supra* note 21, at para. 115. *See*, similarly, Crim. C. (Tel Aviv) 4368-05-16 State of Israel v. Siemens Israel Ltd. (3.7.2017), at para. 3.2.3.a; Crim. C. (Central) 3933-08-10 State of Israel v. T.R.D. Instrum. Ltd. (16/5/2019), at para. 194.

[25] Mordechai Kremnitzer & Khalid Ghanayim, *The Liability of the Corporation*, in ESSAYS IN HONOR OF CHIEF-JUSTICE M. SHAMGAR (2003, in Hebrew) 33, 87.

[26] *Id.*, at 88.

[27] *Id.*, at 88. *See also* Eli Lederman, *Criminal Responsibility of Organs and Other Senior Officers of a Corporation*, 5 PLILIM 101, 105 (1996) ("In addition to [implementing a hierarchical test], a substantive-functional examination is conducted with regard to the conduct at bar, with a view to determining whether it could be seen as an exercise of corporate power, done for the corporation, within the powers granted to that person, *inter alia*, by the corporate body's foundational document or by another normative source."). This article, too, was cited with approval in the present context in *Melisron*, *supra* note 21, at para. 116.

will not be utilized to attribute conduct or knowledge to the corporation or impose liability on it.[28]  This scenario is outside the present scope.

### 6.4. Group/Collegial Organs

38.     Governing bodies of corporations are organs of those corporations (*see*, e.g., *Modi'im*).  Section 46 of the CL codifies this proposition with regard to the general meeting and the board of directors of companies incorporated under it.

39.     In contrast with individual-person organs, governing bodies consist of multiple persons.  They are "group organs".  In the seminal decision in *Buchbinder*, which dealt with directors' duty of care, President Barak in the Supreme Court said:

> The authorities and powers belong to the board of directors, which is a central organ of the company.  The board is a "multiple-person-organ" consisting of several directors.  It is a "collegial" body that usually operates by a majority of opinions.  Liability in negligence is imposed on every director for his own action in the board.  This liability is individual.  One director is not responsible for the negligence of another.[29]

40.     Citing *Buchbinder*, the Supreme Court in *Z. Bechor* subsequently said:

> A single director, as opposed to the board of directors as a "multiple-person-organ" consisting of several directors, is usually not authorized, by dint of his status, to take action on behalf of the company.  However, it may be possible that a particular director would be authorized by the board of directors to take action on behalf of the company in the framework of a specific authorization.[30]

41.     The upshot is that, absent specific authorization pursuant to a statute (e.g., to file an application to bring a derivative action[31]) or other specific authorization (e.g., under a

---

[28] *See Melison*, *supra* note 21, at para. 118; *Arad Hashkaot*, *supra* note 20, at 350; Crim. App. 5734/91 State of Israel v. Leumi VeShut Bank LeHashkaot Ltd., 49(2) P.D. 4, 29 (1995); Crim. App. 24/77 Pan-Lon Hevra LeHandasa U'LeVinyan Ltd. v. State of Israel, 33(1) P.D. 477, 494 (1979); Civ. App. 7276/07 Official Receiver v. Assurance General de France (28.8.2012), at para. 31.

[29] Civ.App. 610/94 Buchbinder v. Kones HaNechasim HaRishmi, 57(4) P.D. 289, 312 (2003).

[30] Civ. App. 3998/07 Z. Bechor Nihul VeAchzakot Ltd. v. Mimshal Yerushalayim htsn"h Ltd. (6.1.2011), at para. 18 (reference omitted).

[31] Pursuant to section 194(a) of the CL, "[a]ny shareholder and any director of a company (in this Chapter "plaintiff") may file a derivative claim if the provisions of this Article apply."  Those conditions include a certification by the court of the derivative claim and of the applicant - to wit, the board member or the shareholder - as the derivative claimant.  Once certified, but not earlier, that particular director becomes an organ of the company for the particular function of suing derivatively on its behalf.  The Companies Law Bill thus explicated: "[T]he company should be seen as a plaintiff. The shareholder or the sole director is the organ

corporation's governing documents), a single member of a corporation's governing body is *not* the corporation's organ, and that person's knowledge and conduct are *not* ascribed to the corporation. This logic applies to a university as it does to other organizations (regardless of whether the university is a non-profit and regardless of its particular corporate form). In a university, as in the case of a business corporation, the knowledge or conduct of a single member of a board of governors or similar governing body therefore will not be ascribed to the university.

### 6.5. "Unorganic" scenarios

42.    This section demonstrates the working of organ theory in Israeli law in situations where individuals operated beyond or outside the boundaries of the relevant corporate function, leading the courts to rule that their conduct or knowledge cannot be attributed to the corporation. The key principle that emerges from the case law is that an individual is not considered an organ of a corporation where he or she is acting in a personal or private role rather than undertaking his or her delegated responsibilities at the corporation in furtherance of the corporation's function.

43.    A probative example is the Supreme Court's decision in *Gottesdiner*. In that case, military and police servicemen received increased remuneration based on false certificates for completing religious studies that were issued by rabbis (employed by the state) who were aware of the falsehood. In rejecting the servicemen's claim that the rabbis' knowledge should be attributed to the state, Justice Barak-Erez did not rely on the above-mentioned against-the-interest exception. Instead, relying on the functional test within the relevant organization (namely, the state), Justice Barak-Erez applied organ theory and concluded that "in matters of remuneration and eligibility to salary increases, the relevant

---

of the company for the purpose of filing a derivative claim, since the board of directors or the general meeting do not shoulder the task and do not file the claim on behalf of the company." Companies Law Bill, 5756-1995, Bills 2, at p. 74.

organs are the bodies in charge of that function, and not functionaries in the rabbinical area."

The state, accordingly, could not be held liable for the acts of rabbis who were acting outside

the scope of their rabbinical duties within the organization.[32]

44.      In a similar vein, when courts have had to determine the time at which

corporations became aware of a potential cause of action for purposes of starting a limitations

clock, they have sought evidence on the knowledge of individuals who were untainted by the

wrongdoing and could exercise the company's power to sue - namely, those who are legally

empowered to fulfill that particular corporate function.[33]

45.      Based on the discussion above, it should be clear that the same individual can

play different roles, with different conduct-and-knowledge-attribution effects, even with

regard to the same organization, depending on the corporate function and the particular

circumstances.  The same holds *a fortiori* with regard to roles that one fulfills *outside* his or

her organization.  In that context, it is helpful to recall Justice Rubinstein's statement in

*Melison*:  "it is obvious that an activity of a clear personal nature, which the organ conducted

out of work hours and out of the workplace, is unlikely to be within fulfilling his role" at a

corporation.[34]   Israeli law, in short, does not hold a corporation (including a university)

responsible for the personal or private conduct of associated individuals.

46.      The *Boublil* case demonstrates this point.[35]   *Boublil* dealt with criminal

charges for anti-competitive conduct in connection with a massive state project intended to

add reinforced concrete shelters to numerous houses in southern Israel with a view to

---

[32] Crim. App. 7621/14 Gottesdiner v. State of Israel (1.3.2017), at para. 23.

[33] *See* Civ. App. 5017/92 Merkaz HaArgazing Ltd. (in liquidation and receivership) v. Ozer, 51(2) P.D.
200, 212 (1997); Civ. App. 4854/04 Klein v. Balass (14.12.2006), at para. 8; L. Civ. App. 9261/20 Bank
Discount LeIsrael Ltd. v. Joint Stock Company Commercial Bank PrivatBank (25.3.2021), at paras. 14-15, 25;
L. Civ. App. 6737/2021 Harel v. Ness (16.8.2021), at para. 33; L. Civ. App. 1660/18 Ernst & Young Israel Ltd.
v. SkyLax Corporation Ltd. (12.6.2018), at para. 26; Der. Ac. 24701-02-19 Zuk v. Ort Israel (PBC) (8.9.2021),
at para. 59; Der. Ac. 44166-09-19 Ginossar v. Hevrat Hashmal Ltd. (30.9.2021), at paras. 68-69.

[35] *See* Crim. C. 22847-12-10 State of Israel v. Boublil (13.9.2018).

providing protection from rockets fired from the Gaza Strip against Israeli civilians in adjacent communities ("Gaza Envelope").   To achieve this goal in short order, the state issued a two-stage tender, calling for bids from contractors included in a certified contractor list.   Many contractors believed that the tender's pricing was unrealistic.   Consequently, the Association of Contractors and Builders, a non-profit professional organization incorporated as an Ottoman association, facilitated a boycott against the first stage of the tender, which indeed failed.

47.   The Association was convicted after a trial based on the activity of three of its senior officers - the president, the CEO, and the deputy CEO and chair of infrastructure and contract building department - who were found to be organs of the Association.

48.   Among the persons involved in that episode were Poldmir Construction (1986) Ltd., a private company managed by Mr. Poldy Peretz and owned by him and his wife, Miri. Poldmir was among the contractors included in the certified contractor list who participated in the boycott.   Peretz was also a member of the Association's Presidency - a 22-member representative body whose members are elected and serve on a voluntary basis.   He was also a member of management of two departments of the Association.   Poldmir and Peretz were convicted with regard to the first stage in a plea bargain, in which Peretz admitted that he acted as an organ of the Association.

49.   Against this backdrop, the Association was further indicted in connection with the second stage of the tender based on two meetings that took place in the Association's offices and were initiated and coordinated by Peretz.   The state argued that the Association should be convicted because Peretz acted as its organ.   After summarizing the basic rules of organ theory described above, Judge Yoed Hacohen in the District Court of Jerusalem rejected that claim and acquitted the Association, holding that Peretz was not an organ:

> Applying the tests [of organ theory - A.L.] in our case leads to the conclusion that Peretz was not an organ of the Contractor Association in everything regarding the

events around the Gaza Envelope Tender and his deeds cannot be attributed to the
Contractor Association. In the framework of the organizational test we should
examine the formal role of Peretz in the organization. In this respect the Association
Defendants succeeded in showing that from the vantage point of his status and role
Peretz should not be seen as an organ of the Association. *Section 12 of the
Association's bylaws provides that only a decision and holding of the Presidency with
regard to subjects or proposals brought on the agenda by members of the Presidency
shall be binding and will represent the position of the Association.*

Boublil [the Association's president - A.L.] in his testimony emphasized that
section 12 was thus drafted in order to clarify the powers of the different elements in
the Association and to prevent serving elected officials from presenting themselves as
someone who represents the Association and acts on its behalf. By amending the
bylaws it was sought to clearly define who is the body whose decisions represent the
Association's position and to unequivocally clarify that only the Presidency as a body
shall have the power to dictate policy and represent the Association. Defense witness
Raoul Strougo, who today is the president of the Contractor Association by rotation,
testified, too, that *a member of the Presidency cannot represent the Association
unless the Presidency has authorized him to represent it on a particular matter.*
Peretz himself also testified that that was the manner of things.

The Association's Presidency, that Peretz was one of its members, is a broad
body comprising 22 members. All members of the Presidency are publicly elected
volunteers. Peretz and the other Presidency members have been elected to their office
by the voters in the different districts and they represent the position of their voters
and the interests of the district from which they come. Members of the Presidency,
therefore, do not receive remuneration from the Association, they are volunteers and
their role is to represent the interests of their voters such that they are expressed in the
Association's decision. Accordingly, the Association's bylaws clearly provide that
Presidency members can raise subjects for discussion in the Presidency forum but
only a decision of the forum as a whole shall represent the Association's position. All
of this indicates that the organizational test is not fulfilled in our case, Peretz's formal
status in the Association points to the fact that he should not be seen as an organ of
the Association for designating binding policy.

The functional test, too, leads to the conclusion that Peretz is not an organ of
the Association. As part of this test we should examine if the function that Peretz
performed justifies seeing his deeds as the deeds of the Association. As noted, *Peretz
was an elected, volunteer Presidency member. Peretz himself testified that he did not
have a power to make decisions on behalf of the Association*. We saw that from the
point of his formal role Peretz was not granted any powers to make decisions or
discretionary powers, the Accuser did not prove that in practice in what regards the
function that he performed in the Association his power and roles were broader than
those reflected in the bylaws. From the evidence presented to me it emerges that
Peretz's roles in practice boiled down to participating in Presidency meetings and in
meetings of the contractual building department and to raising subjects for discussion
in those meetings.

Granted, the Accuser claimed that Peretz participated as a representative of
the Association in meetings with elements that the Association has worked with and
that he had authority to utilize Association employees who were subject to him but
these allegations cannot lead to the conclusion that Peretz should be considered an
organ of the Association. Indeed Peretz was a member of the Association's
Presidency, he was tied to the Association and even participated in several meetings
that the Accuser indicated, but, the fact that he participated in those isolated meetings

in which other elements from the Association also took part, including professional actors and remunerated officers, does not teach that the function he fulfilled in the Association justifies attributing his deeds to the Association. …

From all that was said it emerges that Peretz did not perform any function that justifies seeing him as an organ of the Association.  The formal definition of his role leads to the conclusion that he should not be seen as an organ. …In this context it should be noted that the fact that Peretz admitted in a plea bargain that he is an organ of the Association is irrelevant for our present discussion.  His admission in this matter, which is a legal matter, does not bind the Association and certainly not the court.  It is an admission concerning a legal question that the court has to decide and the very statement by Peretz that he functioned as an organ of the Association has no weight in this regard. …

Further support for the conclusion that Peretz's deeds should not be attributed to the Association can be found in the manner in which Peretz himself understood the Association's activity and its role in what regards the contractors' move. … These conclusions do not change in light of the fact that Peretz, as we shall see below, signed documents that were part of the contractors' move that was dubbed "The Struggle Staff in the Association".  Those documents will be at the center of the discussion of the second indictment count.  Here I should note that from the evidence it emerges that the Struggle Staff was Peretz's making and not one of any official element in the Association.[36]

50.    *Boublil*, accordingly, shows that an individual member of a corporation's governing or consultative body – in *Boublil*, the Contractor Association's Presidency, but in other cases a board of directors or governors – is not an organ of the corporation merely based on such membership.  Rather, an Israeli court looks to the corporation's organizational documents, such as bylaws, and the scope of such an individual member's authority to bind the corporation is determined based on those documents.  Where a governing body must act collectively (as in *Boublil*, where the bylaws provided that decisions of the Presidency had to be taken at formal meetings by the members), an individual member of the body is not an organ.  Likewise, where the rules and norms of the governing body only permit an individual member to act if the body as a whole "has authorized him to represent it on a particular matter," the member is not an organ absent such authority.[37]

---

[36] *Id.*, at paras. 243-247, 249, 260 (references to evidence omitted; italics supplied).

[37] In the aftermath of *Boublil*, certain convicted defendants from among the other contractors appealed to the Supreme Court, but to my knowledge, the state did not appeal the above decision.

7. **Particular contexts**

51.     Against the backdrop of the doctrinal framework set forth above, the following sections analyze the way Israeli law addresses particular settings.

### 7.1. Is the knowledge of a single member of a university's governing body necessarily attributed to the university?

52.     No.

53.     Israeli law addresses this question by applying organ theory in the manner described above.  The key question, therefore, would be whether the particular member was an organ of the university with regard to the particular activity at issue.

54.     As discussed above, Israeli law recognizes that corporate governing bodies function as "group" or "institutional" organs.  However, as shown by decisions such as *Buchbinder* and *Z. Bechor*, Israeli law does not consider the *individual members* of a governing body – *qua* members and without specific authorization – as organs of the corporate body.  Such individual members, *qua* members, have no capacity to take legal action that would be deemed an action of the corporation or would otherwise bind it.

55.     This proposition was discussed and applied in *Boublil*.  Having found that "Peretz's roles in practice boiled down to participating in Presidency meetings and in meetings of the contractual building department and to raising subjects for discussion in those meetings," and that the governing bylaws did not permit individual Presidency members to act on their own, the court ruled that "[f]rom all that was said it emerges that Peretz did not perform any function that justifies seeing him as an organ of the Association."  Consistent with *Boublil*, an individual member of a corporation's governing body is not an organ if the corporation's governing documents require collective action by that body.

56.     An alternative way to explicate this doctrinal point is to observe that only legal persons have organs whose conduct and knowledge could be attributed to the corporate body.

Governing bodies of corporations are not legal persons in their own right; thus, their constitutive members cannot be deemed organs.

57.    With regard to the case at hand, the above analysis supports the conclusion that Yair Green's status as a member of a University's board of governors or other governing body does not provide a legal basis to attribute his actions or knowledge to that University.[38]

### 7.2. Are the conduct or knowledge of a university professor or a university senior employee necessarily attributed to the university?

58.    No.

59.    To examine this question, an Israeli court will go through the stages of applying organ theory as described above and ask itself if the particular conduct or knowledge of the particular individual took place in his or her capacity as an organ of the university.  In light of *Melisron* and *Arad Hashkaot*, the overarching, predominant test will be the functional test.  The same analysis will be conducted with regard to all types of corporate bodies - business companies (*see*, e.g., *Modi'im*, *Melisron*), non-profit organizations (*see*, e.g., *Ort*, *Boublil*), and public bodies (*see*, e.g., *Gottesdiner*), including universities such as the defendants in this action.

60.    Senior employees - certainly at high levels such as CEO, deputy CEO, president, or equivalent titles for high-echelon positions in the organizational pyramid - fulfill the hierarchical test nearly by default.  The cases and the academic literature summarized above make this point repeatedly (*see*, e.g., *Modi'im*; *Melisron*).  Applying organ theory with regard to these actors will depend crucially on the functional test.

61.    For organ theory to apply and attribute conduct or knowledge to the university, the conduct and knowledge of a particular senior employee must be ones that *he or she* should do or know in carrying out the university's function.  *Gottesdiner* underscores

this point: the court in that case concluded that certain senior employees (in that case, rabbis) could be organs of the State for carrying out religious functions but not for financial functions, such that the conduct and knowledge of those rabbinical organs were not attributed to the State with regard to financial functions. By analogy, in a university, even the most senior employee responsible for academic affairs (often entitled "provost") would not be deemed an organ of the university with regard to non-academic issues, e.g., maintenance of the university's infrastructure.

62.    Furthermore, and importantly, recall that what someone does in his or her personal or private life is not attributable to the corporation, even if that person is considered an organ for other purposes. In *Melisron* Justice Rubinstein mentioned this proposition while referring to activities conducted outside of working hours and outside the workplace. *Boublil* also provides guidance. There, the activities Peretz engaged in - namely, the two meetings that dealt with mobilizing support for the contractors - took place in the Association's premises and related to issues that the Association *could* in principle engage in as part of its functions. Nevertheless, as those meetings were organized as a personal initiative of Peretz and without him being an organ on other grounds, as detailed above, they were not attributed to the Association. They were part of Peretz's private life.

63.    This logic applies *a fortiori* to professors. For purposes of the functional test, which dominates the analysis in this context, professors will be treated as organs, and their conduct and knowledge will be attributed to the university as those of an organ, only with respect to the university functions that *they* undertake - namely, research and teaching at the university. Wrongs done in the course of research or teaching at the university thus would be deemed to be committed by the university.

---

[38]   I have reviewed declarations of Michal Naveh (Weizmann Institute), Tamar Mund (Ben-Gurion), Pepi Yakirevich (Hebrew University), and Professor Dror Frenkel (Bar-Ilan). The facts and statements in those declarations do not change any of my opinions, including as regards Yair Green.

64.     At the same time, under Israeli law, not everything that a professor does or knows and relates to his or her training or expertise can be attributed to his or her university. Many professors (the undersigned included) serve as members of committees that deal with their subjects of expertise outside of their own university work.  Such committees assess research grant applications and distribute research budgets - for instance, committees established by foundation such as the Israel Science Foundation ("ISF") and the Bi-national (U.S.-Israel) Science Foundation ('BSF").  Some professors (the undersigned included) serve on committees that assess academic degree programs or academic accreditation of other institutions that are established by academic regulators such as the Israeli Council for Higher Education (not to mention service on other public committees or in non-governmental organizations to which they are expected to bring their expertise).  Even more professors (the undersigned included) sit on *ad hoc* promotion committees composed by other universities to assess and decide on promotion and/or tenure of their faculty members.  Yet more professors (the undersigned included) write referee reports for promotion committees, academic journals and publishers, etc.   Finally, some professors (the undersigned included) write expert opinions on subjects directly related to their research and teaching.

65.     In all of the above scenarios, organizations *other than* the professor's university seek his or her participation and input because of the professor's expertise and prior work.  Organ theory as applied in Israeli law does not consider the professor an organ of his or her university with regard to activity in those other organizations, and the professor's conduct and knowledge in relation to that activity are not attributable to the university.  The reason is that the professor's activity relating to the other organizations lies beyond the function of the university, and in any case falls outside the professor's role at the university. A professor's voluntary participation in organizations outside the university, which have

26

missions and functions distinct from the university, is properly considered a part of the professor's private or personal life.

66.     The above analysis applies directly to the case at hand.  The activity of the university professors in Yeshaya is not different in any way from the activity of numerous professors in similar institutions that deal with distribution of funds for academic or other public purposes.  At the same time, running Yeshaya, like running any other funding organization, is not a function of any university, including a university that benefits from such funding.  Participating in Yeshaya's grant-making decisions is likewise outside the function of a university, and beyond any professor's role at a university.

67.     There is no legal basis to make Israeli universities liable under organ theory for acts committed in the course of the activities of organizations such as the ISF, BSF, etc.  It is equally unsupportable to make the Universities liable for any acts that took place in Yeshaya.  Israeli law does not support any such result.

## 8.  The doctrine of ratification under Israeli law

68.     Israeli law has a statutory regime for approval, or ratification, of acts done without authorization or while exceeding the scope of authorization.[39]  The doctrine is set forth in two statutory provisions: first, section 6 of the Agency Law, 5725-1965 ("AL), which addresses agents and corporations in general; second, sections 56 and 12 of the CL of 1999, which applies to business companies and public benefit companies incorporated under the CL of 1999.[40]  These sections provide, respectively, as follows:

---

[39] I use the term "approval" as a translation for *ishur*, which is the term used in Israeli legislation, rather than "ratification", which is used for *ishrur*, but these two terms are interchangeable.

[40] The Supreme Court has applied the regime of section 56 to associations (*amutot*) as well, stating that "in the present context there is no room for distinguishing associations from companies, as there is no substantive difference that justifies such a distinction."  Civ. App. 7307/11 Weiss v. Ramat Itri (17.9.2013), at para. 20.  I believe that should the question arise, an Israeli court will apply the CL rules of ratification by analogy to other corporations, in addition to associations.  And regardless, even if the AL ratification rules were applied, the result would be the same.  More generally, recall that organ theory applies uniformly to all types of

6. Act without authorization

(a) If a person acts as an agent of another without having been authorized for it by exceeding his authorization, that other person may, subject to the provision of sub-section (b), approve the act *ex post facto*; and an approval *ex post facto* shall be regarded as authorization *ab initio*, provided that a right acquired by another person *bona fide* for value prior to the approval shall not be prejudiced.

(b) If the third party knew at the time of the act that the agent acts without authorization or in exceeding his authorization, he shall have the choice, as long as he has not become aware of the approval of the act, to consider the agent his counterparty or retract from the act and sue the agent for his damage.

(c) A corporation can approve an act done for it before it was founded, and the provisions of this section shall apply.

56. Act departing from the objectives or without authorization

(a) An act performed for a company which departs from the objectives of the company, or performed without authorization or beyond such authorization, shall be invalid in respect of the company, unless the company approved the act in the ways prescribed in subsection (b), or if the party in respect of whom the act was performed did not know and was not expected to have known of the departure or of the lack of authorization.

(b) *Ex post facto* approval by a company of an act which departs from the objectives of the company shall be granted by the general meeting in a resolution adopted in a majority required for changing the objectives of the company; such approval relating to an unauthorized act or an act which departs from the authorization shall be granted by the organ empowered to grant such authorization.

(c) Approval referred to in subsection (b) shall not prejudice any right acquired by another person *bona fide* for value prior to the grant of the approval.

12. Approval of act

(a) A company may approve the act of a promoter performed on behalf of or in place of the company prior to its incorporation.

(b) Approval *ex post facto* shall be regarded as authorization *ab initio*, provided that no right acquired by any other person (in this Article "a third party") *bona fide* for value prior to the approval, is prejudiced.

69.     The core principle underlying the Israeli regime of ratification is that "an approval *ex post facto* shall be regarded as authorization *ab initio*," which appears explicitly in section 6(a) of the AL and section 12(b) of the CL and implicitly in section 56(a) of the CL. Aharon Barak, in his authoritative treatise on the Agency Law, explains:

---

corporations, as elaborated above.  Fiduciary duties, too, have been similarly applied.  *See*, e.g., Civ. App. 393/08 Sagi v. K'far Bialik (23.2.2010).

When an agent performs an action without authorization vis-à-vis a third party liability is imposed on the one who impersonates as an agent. These outcomes change if the "principal" approves the action *ex post facto*. The *ex post facto* approval is akin to an authorization *ab initio*. Thus, the principal is liable and entitled vis-à-vis the third party, the agent "goes out of the picture", and between the principal and the agent there form legal relations similar to what would have been had there been an authorization *ab initio*, and all of that not from the moment of approval and onward, but retroactively.[41]

The Agency Law—following the tradition of the Common Law —considers the approval as equal to an authorization. Just as the authorization grants representation power to the agent, so does the approval provide the agent with representation power. The difference between the authorization and the approval is expressed in the fact that the approval operates retroactively, whereas the authorization operates prospectively. Thus, at the foundation of the (*ex post*) approval there lies a construct of agency. "An approval *ex post facto* shall be regarded as authorization *ab initio*." This explains the fact that the laws concerning *ex post* approval are an integral part of agency law proper.[42]

70.    Section 6(c) was enacted to resolve a problem that Israeli law had inherited from English law, which does not recognize the concept of company promoter and its power to act for an as-yet-unincorporated corporation that could approve the promoter's acts after it is incorporated and comes into existence. Section 12 thus replaces section 6(c) with regard to business and public benefit companies, yet it has the same legal effect. Section 56 retains the AL's model of the relations between the "agent" and the corporate "principal" as one founded on full agency that is formed *ex post facto*.[43]

71.    Thus, regardless of whether one deals with agents or with corporate organs, the same rules of ratification apply in the relations between them and the ratifying party. In both cases, ratification is premised on a person holding himself or herself out as an agent or an organ that acts beyond his or her authority – and the principal, after learning about that

---

[41] AHARON BARAK, AGENCY LAW Vol. 1 708 (2d ed, 1996) (references omitted).

[42] *Id.*, at 713 (references omitted).

[43] Where the CL departs somewhat from the AL's model has to do with the relations between the potential corporate principal and the third party - an aspect that is irrelevant in the present context. The Supreme Court in *Mafram* explained: "Corporate law has applied, in general, the principles of agency law with respect to exceeding an authorization, though today it adds to the third party a more far reaching protection than that provided by regular agency law. … The assumption of the Companies Law is that to the extent that the organ knew or had to know that his act exceeds the authorization given to him, the company shall be able to turn and sue him, after fulfilling the obligation to the third party." Civ. App. 6991/14 Mafram Sukhnuyot (1999) Ltd. v. Harish VeKatzir 2000 Ltd. (19.5.2016), at paras. 30, 34 (references omitted).

person's conduct, choosing to approve it.  It follows that where someone does *not* purport to act as an agent or an organ, there can be no ratification and, consequently, no principal-agent or corporation-organ relations.

72.    Turning to the case at hand, it is alleged that by accepting and benefiting from funds transferred by Yeshaya, certain Universities ratified the acts of the professors who were members of Yeshaya and participated in Yeshaya's grant-related activities.  This does not hold up under Israeli law.  The professors were not organs of the Universities with respect to their activities in Yeshaya, as discussed above, and I am not aware of allegations that they held themselves out as University organs when they participated in Yeshaya.  Application of such a "ratification" theory would also lead to absurd results that have no basis in Israeli law. If the Universities were deemed to have "ratified" the acts of those at Yeshaya involved in grant approval, then their organs would not be limited to their own professors or employees. Rather, the Yeshaya members would be organs of every university that received funds from Yeshaya during their term in Yeshaya.  This multiple-university organship theory is not coherent and has no basis in Israeli law.

## 9.  Overview of corporate separateness under Israeli law

73.    Israeli law recognizes the legal personality of corporations.  The CL codifies this basic principle as follows:

> 4. Legal personality of a company
>
> A company shall be a legal person having capacity for any right, duty or act consistent with its character and nature as an incorporated body.

74.    Similar statements appear in statutes regarding other types of corporations.[44]

---

[44] *See*, e.g., with regard to non-profit associations (*Amutot*), section 8 of the Associations Law, which provides:

8. The association - a corporation

From the date indicated in the registration certificate as the date of registration the association shall be a corporation, having capacity for any right, duty or legal act.

75.      The same principle applies to corporations in general, including those incorporated under statutes that do not include such declaratory statements.[45]

76.      Israeli law follows the English approach in holding that the duties of corporate fiduciaries are owed to the corporation alone.  Subject to certain exceptions that are not relevant in the present context, such duties are therefore not owed to the company's shareholders.[46]  Neither are such duties owed to other companies in a corporate group, to subsidiaries, etc.  In *Arzan*, Judge Ronen thus said:

> The duty of care of the directors serving on the board of the Arzan International company is vis-à-vis that company alone.  Those directors do not have any duty of care vis-à-vis other companies in the Matok Group, and neither vis-à-vis the subsidiary of Arzan International - Arzan MAM.[47]

77.      Against this backdrop, Israeli corporate law has developed a doctrine of piercing, or lifting, of the corporate veil that originated in decisional law and was later codified in the CL.  Section 6 of the CL provides:

> 6. Lifting the veil
>
> (a)(1) A court may attribute a debt of a company to a shareholder in it, if it found that in the circumstances of the case it is just and right to do so, in the exceptional cases in which the use of the separate legal personality was done in one of the following:
>
> > (a) in a manner that could defraud or prejudice a creditor of the company;
> >
> > (b) in a manner that harms the purpose of the company while taking an unreasonable risk with regard to its ability to pay its debts.,
>
> provided that the shareholder was aware of such use, and having regard to his holdings and his fulfilling of his duties pursuant to sections 192 and 193 and having regard to the company's ability to pay its debts.
>
> > (2) For the purposes of this subsection, one shall be seen as being aware of use as referred to in clause (1)(a) or (b) also if one had suspected about the nature of the conduct or about a likelihood of the existence of the

---

[45] *See*, e.g., with regard to cooperative societies incorporated under the Cooperative Societies Ordinance, Civ. App. 524/88 Pri HaEmek v. S'de Ya'akov, 45(4) P.D. 529 (1991).

[46] *See*, e.g., Civ. App. 3379/06 Baranovich v. Natanson (4.3.2008), at para. 22.  In exceptional circumstances, corporate fiduciaries might owe duties to the minority as a constituency group.  *See* Civ. App. 3417/16 Pinrus Hakhzakot Ltd. v. Goldstein (12.7.2021).

[47] Civ. C. (Tel Aviv) 2193/06 Matok Ephraim U'Vanav Ltd. v. Avivi (2.4.2013), at para. 14.

circumstances, which caused said use, but failed to investigate them, but not if one acted solely negligently.

(b) A court may attribute a quality, right or duty of a shareholder to the company or a right of the company to a shareholder, if it found that in the circumstances of the case, it is just and right to do so while having regard to the purpose of the law or the agreement that are applicable to the case before it.

(c) A court may suspend the right of a shareholder for paying his debt by the company until after the company had paid in full all of its obligations toward other creditors of the company, if it found that the conditions for attributing a debt of the company to the shareholder pursuant to subsection (a) have been fulfilled.

(d) In this section and in section 7, "the court" - the court having jurisdiction to adjudicate the case.

78.    The current text of section 6, which was revamped in a 2005 amendment, conveys two major themes and legislative purposes: on the one hand, granting discretionary authority to courts to adjudicate veil piercing claims based on the facts before them and, on the other hand, narrowing the circumstances in which veil piercing will be permitted to the most exceptional, grave cases of *knowing* abuse of the corporate legal personality for defrauding or purposely prejudicing creditors.

79.    In line with these two themes, the Supreme Court has recognized the possibility of veil piercing in factual settings that are not explicitly covered by the language of section 6 - e.g., where "sister" companies were involved in running a single business and one company's liabilities were attributed to the other.[48]    In tandem, the Supreme Court has summarized the elaborate set of conditions set forth in section 6 into a succinct requirement of "abuse" (*shimush lera'a*).[49]    Moreover, the court has applied this strict requirement, as detailed in section 6(a), also to veil piercing claims under section 6(b) even though the latter's text does not include these conditions.[50]

---

[48] *See* Bagatz 132/15 R-Z Plastic Ltd. v. Ephraimov (5.4.2017).

[49] *See*, e.g., *R-Z Plastic*, *id*,; Civ. App. 4263/04 Kibutz Mishmar HaEmek v. Manor, 63(1) P.D. 548 (2009); Civ. App. 8416/19 Ness v. State of Israel (22.12.2021).

[50] *See* L. Civ. App. 996/17 Texas Hashka'ot Ltd. v. Saperdel Yazamut Ltd (31.8.2017).

80.    Israeli law, in sum, will respect the distinction between a parent and subsidiary, including in the context of universities and affiliated corporate entities, unless there is a sound basis to conclude that the corporate form has been abused in a purposeful way to harm creditors.  Absent such a showing, the corporate form will be respected.  Among other things, the fact that a parent company appoints or designates members of subsidiary's board of directors, benefits from the subsidiary's activities, or coordinates with the subsidiary will not provide a basis to pierce the veil absent the requisite showing of abuse.

Executed on February 10, 2022
Jerusalem, Israel

Professor Amir N. Licht