# EXHIBIT 1

At the District Court                                    <u>C.C.   -12-15</u>
in Tel Aviv

**The Plaintiff:**     **Irving H. Picard**

The trustee for the consolidated liquidation assets of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff himself in accordance with the U.S. Securities Investor Protection Act (SIPA) 15 U.S.C. §§ 78aaa.

Represented by his attorneys Adv. Jonathan Agmon and/or Ady Nordman and/or Eran Soroker and/or other attorneys of Soroker-Agmon, Advocates and Patent Attorneys, whose address for the purpose of service of process is:

8 Hahoshlim Street, P.O. Box 12425, Herzliya 4672408
office@ip-law.co.il
Tel.: 09-9507000; facsimile: 09-9505500

**- Versus -**

**The Defendants:**    1.    **The Hebrew University of Jerusalem, Registration number 500701610**
Mt. Scopus, Jerusalem 9190501

2.    **Yissum Research Development Company of the Hebrew University of Jerusalem Ltd., P.C. 510424534**
Hi-Tech Park, Edmond J. Safra Campus, Givat Ram, Jerusalem 9139002

3.    **Ben-Gurion University of the Negev, Registration No. 500701644**

4.    **B.G. Negev Technologies & Applications Ltd., P.C. 510785207**
Both of the Ben Gurion University, Beer Sheva 8410501

5.    **Weizmann Institute of Science, Registration No. 520016858**

6.    **Yeda Research & Development Co. Ltd., P.C. 510201890**
Both of the Weizmann Institute of Science, 234 Herzl St., Rehovot 7610001

7.    **Bar Ilan University, Registered Association No. 580063683**

L/55001/4420/7990454/1

8.      **Bar Ilan Research and Development Ltd., P.C. 510674104**
        Both of Max and Anna Web St., Bar Ilan University, Ramat Gan 5290002

9.      **Tel Aviv University, Registration No. 759999998**

10.     **Ramot at Tel Aviv University Ltd., P.C. 510667140**
        Both of the Ramat Aviv Campus, Haim Levanon St., Tel Aviv 6997801

11.     **Technion – Israel Institute of Technology Registration No. 500701636**

12.     **The Technion Institute for Research & Development Ltd., Registration No. 557585585**
        Both of the Technion Campus, Haifa 32000

13.     **Chaim Sheba Medical Center at Tel Hashomer, Registration No. 52003786**

14.     **Tel Hashomer Medical Research, Infrastructure and Services Ltd., R.A. 580301992**
        Both of 2 Sheba Rd., Tel Hashomer, Ramat Gan 5262100

15.     **Rambam Medical Center, Registration No. 520037110**

16.     **Rambam Medical Research Foundation (R.A.), Association No. 580300754**
        Both of the Rambam Medical Center,.8 HaAliya HaShniya St., Haifa, 3109601

17.     **Clalit Health Center, Registration No. 589906114**
        of 101 Arlozorov St., Tel Aviv, 6209804

18.     **Schneider Children's Medical Center of Israel, Registration No. 589906114**
        Of the Rabin Medical Center, 14 Kaplan St., Petah Tikva 4920235

19.     **Kaplan Medical Center Registration No.589906114**
        Pasternak Rd., Rehovot 7610001

20.     **The New Jerusalem Foundation for its Residents (R.A.), Association No. 580360402**
        4 Koresh St., Jerusalem 9100701

L/55001/4420/7990454/1

21.    **MIGAL - Galilee Research Institute Ltd., P.C.
510834294**
Southern Industrial Zone, Kiryat Shmona 1101602

22.    **The Jewish People Policy Institute (JPPI), Ltd.
(CIC) P.C. 513235887**
of the Hebrew University of Jerusalem, Sherman
Building, Givat Ram Campus, Jerusalem 9139101

23.    **Jerusalem Spinoza Institute, Association No.
580102838**
of the Van Leer Institute, 43 Jabotinsky St., Jerusalem
9214116

24.    **The Lev Academic Center (R.A.), Association No.
580018281**
21, HaVaad HaLeumi St., Jerusalem, 9372115

25.    **University of Haifa, Registration No. 91007566**

26.    **Carmel - Haifa University Economic Corporation
Ltd., P.C. 513257022**
Both of the University of Haifa, 199 Abba Hushi Blvd.
Mount Carmel, Haifa 3498838

27.    **The Music and Dance Academy Jerusalem (R.A.),
Association No. 580041994**
Of the Hebrew University of Jerusalem, Givat Ram
Campus, Jerusalem 9190401

28.    **Azrieli – College of Engineering Jerusalem, (R.A.),
Association No. 580283729**
26 Shreibom St., Jerusalem 9103501

29.    **Tel Aviv Sourasky Medical Center, Registration No.
520037094**

30.    **Tel Aviv Sourasky Medical Research Foundation,
(R.A.), Association No. 58007102**
Both of the Tel Aviv Sourasky Medical Center, 6
Weizmann St., Tel Aviv 6423906

**Amount of the claim: <u>ILS 366,484,252</u>**

**Nature of the claim**: Financial, accounting

L/55001/4420/7990454/1

# **Complaint**

*"Mr. Madoff's very personal betrayal struck at the rich and the not-so-rich, the elderly living on retirement funds and Social Security, middle-class folks trying to put their kids through college, and ordinary people who worked hard to save their money and who thought they were investing it safely, for themselves and their families.*

*I received letters, and we have heard from, for example, a retired forest worker, a corrections officer, an auto mechanic, a physical therapist, a retired New York City school secretary, who is now 86 years old and widowed, who must deal with the loss of her retirement funds. Their money is gone, leaving only a sense of betrayal."*

(Quoted from the court ruling in the trial of Bernard L. Madoff, June 29, 2009, p. 48, dictum of the Honorable Justice Denny Chin).

These cases represent a drop in the bucket of heart-breaking stories published by the media, of people who lost their life-savings in history's largest fraud – Bernard Madoff's Ponzi scheme.

However, where many were at a loss, and were reduced to bare existence in their old age, others – including leading and well-established research and study institutes in Israel, were unjustly enriched. The facts which establish the cause of claim herein, tell the story of how the money of innocent Madoff victims reached hospitals and universities in Israel, as "donations" and "grants". The spoils of the theft and fraud were laundered through the Defendants, who are now refusing to return of the funds to their legal owners – Madoff's victims. The unique facts of the case at bar, the sort of which was never before heard by the courts in Israel, require unique consideration by the Honorable Court, since the Defendants, wealthy institutes, deny the connection between the funds received thereby and the Madoff scheme, and consequently, refuse to repay the funds which they unlawfully received.

The Honorable Courts is moved to envision, while hearing the case, the images of the direct and indirect victims of the scheme. Those hard-working elderly people, who are now forced to make a living on paltry wages rather than retire; those people in need, whose lives were thrown into turmoil when the charities that supported them collapsed due to Madoff's fraudulent acts; those thousands that even today, almost seven years after the exposure of this affair, have been unable to recover their lives, an effort that is not likely to succeed until justice is made and their misappropriated investments are restituted.

## Introduction

1.    This Complaint pertains to the restitution of funds received by the Defendants as a result of systematic acts of misappropriation of billions of U.S. dollars that were committed for years on end. This is a part of the largest fraud scandal in modern history – the scheme committed by Bernard L. Madoff (**"Madoff"**) and his assistants through the investment house Bernard L. Madoff Investment Securities LLC (**"BLMIS"**). The matrix of fraudulent acts

L/55001/4420/7990454/1

included receipt of funds from investors, creating false representations as if the funds were invested in securities, presentation of handsome "on paper" profits and payment of the "profits" from funds received from other investors whose withdrawals exceeded their deposits; all while systematically misappropriating the money of the deceived investors into the pockets of Madoff and others.

2.      Madoff and BLMIS claimed to be trading securities on behalf of the BLMIS customers in their business as investment consultants, but this, in fact, was a lie. Instead, Madoff and BLMIS created false financial statements and faked account statements which were designed to fool the deceived customers to believe that their deposits were invested in securities trading, while in practice, Madoff and his associates misappropriated such customers' investments in order to maintain the Ponzi scheme, pay withdrawal requests of other investors and fund their lavish lifestyle. For as long as the Ponzi scheme carried on, BLMIS continued to report fictive profits in the accounts of its customers, from falsified "trade" of shares; however, since in fact no purchases or trading of securities was carried out, there were no real profits. All of the fictive "profits" withdrawn by BLMIS customers from their accounts were actually stolen deposit money that belonged to the other deceived customers. Over time, many BLMIS customers withdrew funds in amounts that considerably exceeded their deposits in BLMIS, such that in fact they received funds that were stolen from other people.

3.      While many of BLMIS customers lost all of their savings in the scheme, other customers were enriched as a consequence thereof, and some even knew, or ought to have known of the fraud, or were involved therein to different extents and gained significant amounts at the expense of the deceived BLMIS customers. Over decades, Madoff and others stole billions of U.S. dollars from defrauded BLMIS investors. Furthermore, there were others who benefited indirectly from the fruits of the misappropriation, although they were not directly associated with Madoff or BLMIS.

4.      The Defendants, the majority of whom did not invest any money in BLMIS, were among those who were enriched as a consequence of the fraudulent conduct of Madoff and BLMIS. The Defendants received from the Yeshaya Horowitz Association (**"Yeshaya"**), which is incorporated in Israel, funds as "donations" and "grants", originating from a BLMIS investment house account that was owned by the Association. In this account, that formed a part of the fabric of the Ponzi scheme committed within BLMIS, no securities activity ever took place, and no profits were ever accrued on the initial deposit in the amount of approx. US $3 million, made into the account upon its opening. Nevertheless, Yeshaya withdrew to its bank account outside of the investment house some US $126.5 million, which it distributed to various entities in Israel – including the Defendants. Some US $123 million of the funds withdrawn by Yeshaya from BLMIS, through which it financed its activity and donations, where therefore stolen by Madoff and others, from the deceived customers of BLMIS, and were transferred to Yeshaya with no lawful right.

5.      Yeshaya, whose managers, including its General Counsel , knew that Yeshaya was the owner of a foreign company named Magnify, which was the sole source of the "donations"; made incorrect reports to the remaining members of

L/55001/4420/7990454/1

the Association and the Registrar of Non-Profit Organizations, whereby the "donations" originated from a French citizen named Albert Igoin or a "donor who sought to remain anonymous" and frequently deviated from standard procedure, all in order to conceal the fact that the source of the funds distributed thereby is dubious. Theses managers knew that the "donations" received by Yeshaya for their distribution, *inter alia*, to the Defendants, were "from an unlawful source" or "misappropriated".

6. As shall be specified below, the Defendants were unjustly enriched by misappropriated funds originating from BLMIS, i.e. a result of misappropriation and fraudulent conduct, and with no lawful right, and they must repay the theft.

**The Plaintiff is the trustee for the assets of Madoff and BLMIS in accordance with the U.S. Securities Investor Protection Act**

7. The Plaintiff is the trustee for the consolidated liquidation proceedings of BLMIS and the personal assets of Madoff under the U.S. Securities Investor Protection Act (**"SIPA"**), Chapter 15 of the U.S. Civil Code § 78aaa forth. SIPA was enacted on the historical background of the collapses of investment houses and brokers and the loss of their customers' money, with the goal of protecting investors in securities from losses resulting from such collapses. However, the Law was not intended to insure investors against any loss. Rather, a central goal of the Law is to guarantee that the customers will not lose (within the boundaries set forth by the Law) money and securities which they deposited with the broker, should the broker collapse financially. In view of the fact that the protection afforded to customers derives from a failing broker, the principles of bankruptcy law were also integrated into SIPA in order to protect customers. By virtue of SIPA, the Securities Investor Protection Corporation (**"SIPC"**) was established, a non-profit organization of which most U.S. brokers and traders are members. SIPC determined rules for the handling of bankruptcy proceedings of brokers and traders that are organized under SIPC and are in financial difficulties. In cases of bankruptcy of brokers, a "customers' assets" fund is established under SIPA, separate from the general fund, to be distributed between those of the broker's customers who suffer from a loss resulting from fraud. If the customers' claims for their loss are not fully paid from the funds in the customers' assets fund, SIPC funds are used, within the restrictions of the protection set forth by the Law, in order to supplement for the missing property. In this context, it should be emphasized that since SIPA entered into effect, SIPC funds were used as a substitute, rather than a supplement, for customers' funds that were lost in bankruptcies.

8. The trustee in proceedings under SIPA has the same powers and authorities vis-à-vis the debtor and his assets as those conferred on a trustee in bankruptcy proceedings, and in addition, powers which enable him to carry out the unique bankruptcy proceedings under SIPA. Being a customer within the framework of SIPA entails the privilege of senior status which grants such customer priority over other creditors at the time of the distribution of certain assets which are controlled by the bankruptcy trustee. Claims of customers shall be paid to the highest extent possible out of the funds of the bankrupt broker.

L/55001/4420/7990454/1

Therefore, the broker's customers share on a pro-rate basis, all of the funds of the customers' assets fund as well as all general assets.

9.    On December 15, 2008, the United States District Court for the Southern District of New York, appointed the Plaintiff as the trustee for the liquidation of BLMIS. Thereafter, the assets of Madoff were materially consolidated with those of BLMIS, and the Plaintiff became the trustee for the consolidated assets of Madoff and BLMIS. A report on the acts of the Plaintiff can be viewed at http://www.madofftrustee.com.

10.   The Plaintiff's duty according to his appointment by the court includes the recovery of the assets of BLMIS and Madoff that were transferred to third parties or to customers who withdrew funds beyond the value of their deposits with BLMIS.

      A copy of the Plaintiff's appointment dated December 15, 2008 by the District Court for the Southern District of New York is annexed as **Exhibit "1"** hereto and forms an integral part hereof.

11.   As a result of the Plaintiff's efforts, approx. US $10.911 billion were repaid to the customers' assets fund until October 31, 2015. At the time of the filing of the Complaint herein, the Plaintiff already made a distribution of funds to BLMIS victims, thus repaying more than US $9.17 billion to investors, according to their pro-rata share of investment with BLMIS.

12.   By virtue of the said appointment, *inter alia*, the Plaintiff filed on December 6, 2010 a Complaint against Yeshaya and other defendants, including Yeshaya's General Counsel , Adv. Yair Green (**"Green"**), at the Bankruptcy Court of the Southern District of New York [Picard v. Magnify, Inc., et al. (Adv. Pro. No. 10-05279 SMB)], aiming to recover more than US $154 million which were fraudulently conveyed by BLMIS to Yeshaya and others (the **"Complaint against the Association"** or the **"New York Proceedings"**). The Plaintiff argued within the amended complaint that was filed in the New York Proceedings that Green and other organs of the Defendants in the New York Proceedings knew of the scheme.

      A copy of the statement of claim and the amended statement of claim in the context of the New York Proceedings (with no exhibits) is annexed as **Exhibit "2"** hereto and forms an integral part hereof.

13.   Yeshaya and the other Defendants defy the complaint and are defending against it. Within the New York Proceedings, Yeshaya argued, *inter alia*, that the funds it withdrew from BLMIS were conveyed or "donated" to the Defendants herein, among others. The Defendants were unjustly enriched, since the funds conveyed by Yeshaya to them did not belong to Yeshaya and it was unauthorized to distribute them to others. Since Yeshaya failed to repay the funds and argued that it had lost all of its assets when the scheme was exposed, the Plaintiff follows the chain of transfers of the funds in order to recover the misappropriated money from the Defendants.

L/55001/4420/7990454/1

A copy of the statement of defense on behalf of the Defendants in the context of the New York Proceedings (with no exhibits) is annexed as **Exhibit "3"** hereto and forms an integral part hereof.

14. The Plaintiff addressed the Defendants and required the repayment of the funds which they received unlawfully, which source is misappropriation and fraud, in order to repay such funds to the defrauded BLMIS investors. The Defendants refused the restitution of the funds.

15. Most of the Defendants provided the Plaintiff with almost identical responses, wherein it was argued that they received the funds in good faith and lawfully, that the funds received from Yeshaya were already spent as part of the Defendants' ordinary course of business, and that the Plaintiff is barred from filing a complaint against them.

16. The Plaintiff is fully authorized to sue the Defendants as the recipients of funds originating in misappropriation and deception, and require the repayment of the assets of BLMIS customers that did not belong to Yeshaya, and that Yeshaya could not have distributed to others according to the law.

17. None of the Defendants had claimed that it transferred the illegal funds to third parties. The funds which were unlawfully transferred by Yeshaya to the Defendants were granted as "donations" and the Defendants provided no consideration in return.

18. Pursuant to the law, the Defendants must repay the funds which they received for no consideration, which were stolen from the defrauded BLMIS customers. Therefore, this Complaint is being filed, and remedies are sought thereunder.

19. While the New York Proceedings are still pending, it appears that Yeshaya will not – nor is it in her ability to – repay the misappropriated funds to the Plaintiff. Since Yeshaya argued that it conveyed the funds, *inter alia* to the Defendants, and in view of the close expiration of the statute of limitations, this Complaint is being filed even though the New York Proceedings are yet undecided. If and insofar as the New York Proceedings against Yeshaya shall end by settlement, or the amount of the claim therein shall be reduced, the Plaintiff will amend the Complaint herein or dismiss it, accordingly.

To specify:

## General background – the Madoff Affair

20. From the 1970's, at least, Madoff managed BLMIS as a Ponzi scheme. BLMIS sham managed more than 8,000 customer accounts, in respect of which Madoff claimed to have traded in securities. Madoff undertook to consistently provide his customers with an annual return that usually exceeded the market yield. To that end, Madoff and BLMIS fabricated false financial statements and forged account statements that were intended to fool the innocent customers into believing that their deposits were invested in trade, while in reality, Madoff and his associates misappropriated such customer investments in order to, *inter alia*, use them to pay withdrawal requests of other customers.

L/55001/4420/7990454/1

21.    In reality, BLMIS kept the customers' money intermingled in a single checking account. No securities trading was ever conducted and the investors' "profits" were obtained from funds of later investments. Thus, newer investments funded the falsified "profits" of senior investors. Over time, many of the BLMIS customers withdrew sums that considerably exceeded their deposits with BLMIS, such that they actually received money that was stolen from other people.

22.    Following the 2008 financial crisis, many investors sought to withdraw the funds in their accounts, but as their money was already used to finance the profits of other investors, BLMIS was unable to pay all of the customers' demands for the fictitious profits reported thereby over the years, nor could it pay the original investment amounts, leading to a collapse and exposure of the scheme. Approx. US $17.5 billion were lost in the Madoff scheme. **Madoff himself admitted to his actions** and was sentenced to 150 years in prison.

23.    On August 11, 2009, in a case titled United States v. Di Pascali, Case No. 09-CR-764 (RJS), Frank Di Pascali, a former employee of BLMIS, pleaded guilty in ten charges, including participation in and conspiracy to perform a Ponzi scheme. Di Pascali admitted that no purchase or sale of securities was performed in respect of BLMIS customers, and that the Ponzi scheme began at least in the 1980's.

24.    On November 21, 2011, in a case titled United States v. Kugel, Case No. 10-CR-228 (LTS), David Kugel, a former manager and trader of BLMIS, admitted to have participated in the acts of forgery and fraud, in the context of an indictment that included six charges of securities fraud, forgery of BLMIS data, conspiracy and bank fraud. Kugel admitted to have assisted in the fabricating of forged and backdated trading reports, from as early as the 1970's.

**<u>The Yeshaya Horowitz Association was one of the BLMIS customers that were enriched as a result of the fraud</u>**

25.    Yeshaya was incorporated on December 20, 1988. The declared objectives of the Association are to "*advance and support research in Israel, while particularly emphasizing the advancement of applied scientific research. To fund research and development of applied science and scientific ideas when business financing may not be obtained therefor. To assist young and promising scientists wishing to engage in applied science research*". The registration of Yeshaya was handled by Adv. Yair Green, who since the incorporation of Yeshaya has served, *inter alia*, as its General Counsel. Throughout the years, Green also presented himself as the co-founder of Yeshaya, its driving force and the trustee of Mr. Albert Igoin ("**Igoin**").

A copy of the registration certificate of Yeshaya is annexed as **Exhibit "4"** hereto and forms an integral part hereof.

26.    The Yeshaya Articles of Association (Section 6b) set forth that Yeshaya shall have income from a "special donation" promised by one of its founders, Igoin. The Articles further provided (Section 13d) that Igoin shall be the co-chairman

L/55001/4420/7990454/1

of Yeshaya and member of its scientific board (Section 13)[1], that Igoin shall always be a member of Yeshaya's management and that a representative of Igoin shall serve as Yeshaya's manager (Section 13d).

Additional founders of Yeshaya were: Ms. Ayala Nahir (Igoin's niece who served as Yeshaya's administrative manager and treasurer), Prof. Henri Atlan who served as Yeshaya's chairman ("**Atlan**"), and the late Mr. Yitzhak Amir, the asset manager of the Hebrew University at such time (Defendant 1), who was at the time the asset manager of the Hebrew University (Defendant 1) and who served as Yeshaya's CEO and as Igoin's representative ("**Amir**").

A copy of Yeshaya's Articles of Association (in English) is annexed as **Exhibit "5"** hereto and forms an integral part hereof.

27.  Igoin was a wealthy French citizen. Igoin has been acquainted with Madoff as early as the 1970's and began depositing funds at BLMIS no later than the beginning of the 1980's. The Igoin family held additional accounts with BLMIS, which are unrelated to the case at bar. One account was registered in the name of Ms. Doris Igoin, Igoin's wife, and additional accounts were registered in the name of his daughter – Ms. Laurence Applebaum and his granddaughter, Ms. Emily Applebaum. The Plaintiff argued, in the context of legal proceedings against Laurence and Emily Applebaum in New York, that Igoin's heirs gained fictitious profits totaling millions of U.S. dollars, which should be repaid to the Plaintiff within his position as the trustee for BLMIS.

28.  One of Igoin's means of profit generation from BLMIS was via an offshore company incorporated in Panama in the name of Magnify, Inc. ("**Magnify**"). Magnify was incorporated in 1983 by Igoin through a Swiss attorney named Kurt Brunner ("**Brunner**"). Brunner was appointed as president of Magnify upon the incorporation thereof and presented himself as its sole director in the decisions he made on behalf of the company. Brunner still serves as a director of Magnify.

29.  In 1983, a BLMIS account was opened for Magnify, numbered 105105, that was later changed to 1FN024 (the "**Magnify 024 Account**"), in which Igoin deposited US $3,136,150 out of his own sources. An additional account numbered 105123 (that was later changed to 1FN025) was opened on September 30, 1990 (the "**Magnify 025 Account**") with no deposit of funds from an external source, and it was ostensibly funded from fictive stock trading (collectively, the "**Magnify Accounts**") [2].

30.  No securities trading was carried out in Magnify's BLMIS accounts. Thus, there were no true profits or yields in such accounts. Other than said principal of U.S $3,136,150 deposited by Igoin in the Magnify 024 Account upon the opening thereof, and one other negligible deposit, all records of ostensible

---

[1] The sections of Yeshaya's Articles of Association are not properly enumerated, and the section referring to the scientific board should have been numbered 15.

[2] This was not the only case wherein **BLMIS** and Madoff opened accounts for selective customers, in which **backdated** reports regarding trading in securities were made, in the ostensible value of tens of millions of U.S. dollars.

L/55001/4420/7990454/1

profits in the Magnify Accounts at BLMIS were fictive, forming part of the Ponzi scheme.

31.    After Igoin, the owner of Magnify, founded Yeshaya in 1988, Yeshaya also opened a BLMIS account (account No. 1FN037, the "**Yeshaya's BLMIS Account**")[3]. On March 17, 1989, a sum of approximately US $3,000,000 was transferred to Yeshaya's BLMIS Account by way of an internal transfer from the Magnify 024 Account. To emphasize, part of the said sum included fictitious profits. This sum is almost equivalent to the initial investment amount in the Magnify 024 Account. As aforesaid, no securities trading was conducted in the Magnify Accounts since their opening, and other than a negligible transfer of US $682, there were no additional deposits of funds therein from an outside source. Thus, the amount transferred to Yeshaya's BLMIS Account had set the balance in the Magnify 024 Account to zero.

32.    Minutes from an association meeting of Yeshaya dated March 9, 1989 (i.e. prior to the first transfer of money from the Magnify 024 Account to Yeshaya's BLMIS Account) signatory rights in Yeshaya's account with the "New York broker" were conferred on Nahir, Atlan and Itzhak Amir. The minutes further record that "it is expected that the US $3,000,000 deposited with the New Your broker will reach US $4,000,000 by the end of 1989".

33.    Despite the fact that no additional deposits were made in any of Magnify's Accounts, more than US $123 million were "transferred", in addition, from the Magnify Accounts to Yeshaya's BLMIS Account (by way of internal transfer within BLMIS, i.e. "on paper" and without additional money from an outside source being added). Such transfers ought to have reflected a **negative** balance of a similar amount in the Magnify Accounts, due to the fact that the balance in the Magnify 024 Account zeroed already in 1989, upon the money transfer to Yeshaya's BLMIS Account and since then there were no deposits or gains. Magnify transferred additional millions of U.S. dollars outside of BLMIS, directly or via other affiliated companies as shall be specified below. Nevertheless, the false positive balances reported in the Magnify Accounts continued to grow steadily, even when the Wall Street stock market index S&P 100 dropped. According to the falsified statements of BLMIS, the initial investment deposited by Igoin in 1983 in the Magnify Accounts in the amount of 3,136,150 and the additional deposit in the amount of US $682 (and in total, US $3,136,830), "grew" according to the false records of BLMIS to an imaginary amount of approximately US $800,000,000 within a 25-year period.

34.    Throughout Yeshaya's years of operation, the **sole** origin of the "donations" received by Yeshaya and which were used thereby to finance its operations in Israel, including the remittance of "donations" or "investments" to the Defendants, was Magnify's BLMIS accounts. Since the incorporation of Yeshaya, the transfer of funds was carried out in the following manner: from time to time, "transfers" were made from the Magnify Accounts to Yeshaya's BLMIS Account according to instructions from Green (presumably preceded

---

[3] Upon the opening of the Association's BLMIS account, it was numbered 105119. BLMIS later numbered the account 1FN037.

by Igoin). These were internal transfers from one account to another within BLMIS, i.e. fictive "on paper" transfers only. Fictitious securities trading was reported in Yeshaya's BLMIS Account, generating fictitious profits. However, no securities trading was ever conducted in Yeshaya's BLMIS Account, and therefore the said initial investment and the periodic transfers of fictitious profits from the Magnify Accounts (in which again, as aforesaid, there was no real money but only fictitious, on paper amounts), that did not bear fruit and did not grow. Yeshaya received funds via bank transfers from BLMIS's bank account[4] to its accounts. Yeshaya distributed such funds, real money this time, among various bodies and institutions, including the Defendants. Hence, the funds received by the Defendants did not come from Yeshaya or a "donor" thereof, but rather from the BLMIS fraud, and they are clearly misappropriated funds of the defrauded BLMIS customers.

35.    In view of the aforesaid, Yeshaya was not the owner of, nor was it entitled to, all those millions of U.S. dollars which it withdrew outside of BLMIS and which served it for the financing of its ongoing operations, and in particular the provision of donations which it transferred, *inter alia*, to various public bodies in Israel, including the Defendants. Yeshaya was unjustly enriched at the expense of the innocent BLMIS customers, and it remitted a considerable part of the enrichment money to the Defendants, who in turn were not entitled to the funds received thereby and transferred thereto without the consent of their legal owners – the BLMIS investors.

36.    Moreover, as shall be specified below, the acts and conduct of Yeshaya itself and of its managers, are tainted by bad faith and illegality. This forms another layer of illegitimacy in the chain of the money transfer from the defrauded BLMIS investors until it reached the hands of the Defendants. The last link in this chain is also tainted by unlawfulness pertaining to the crux of the "donation" and "grants" agreements between Yeshaya and the Defendants, which establishes a duty on the Defendants to repay the Plaintiff the misappropriated funds.

## The BLMIS funds reached Yeshaya unlawfully through its General Counsel

37.    According to Brunner, Igoin introduced Green to him in December 1989 as Yeshaya's General Counsel and in the following years, until Igoin's death in January 1995, the control and active management of Magnify were transferred, pursuant to Igoin's instructions, to Green. Green was, and still is, the driving force behind Yeshaya's operations, and holds full control of Magnify. According to documents provided by Brunner, after Igoin's death, in June 1995, Brunner acted, at the behest of Green, to appoint Green himself as Magnify's managing director, and in 1996 Green was appointed as supervisor of Magnify's investment portfolio. Thus, Green acted in several capacities –

---

[4] As aforesaid, BLMIS acted primarily through one sole bank account, in which all of the funds of the investors in BLMIS were deposited in a general "pool" without separate deposits for each individual investor, and from which funds were withdrawn for investors who sought to redeem all or part of their money.

L/55001/4420/7990454/1

the acting manager and investments manager of Magnify, the transferor of the funds on the one hand, and General Counsel of Yeshaya, the recipient of the funds, on the other. Green was also involved in all of the decisions regarding money transfers from Yeshaya to the Defendants, and in addition held public positions in part of the Defendants.

38.   On or about the demise of Igoin, Green created a special personal, social and business relationship with Madoff. Green held several business meetings with Madoff each year, as well as occasional social rendezvous. In addition, many of the instructions issued by Green to Madoff included reasons and explanations pertaining to the requested money transfers from the Magnify Accounts to the Yeshaya BLMIS Account and to other accounts of his associates. In such correspondences, Green often presented himself as acting jointly with Madoff in the management of the accounts "in the name of our mutual interest and goal".

39.   As a result of such relationship between Green and Madoff, five of the BLMIS accounts managed by Green (including the Magnify Accounts that constituted the source of financing of Yeshaya's BLMIS Account), are special accounts (the "**Special Accounts**"). The preferred treatment from Madoff and his employees with respect to the Special Accounts was expressed via several distinguishing characteristics. First of all, three of the Special Accounts were opened without any initial deposit of either cash or securities; the Accounts simply appeared in the books and records of BLMIS, with each one of them demonstrating a positive balance without any funds being deposited therein. After these Accounts were established, BLMIS allowed the owners of the account to withdraw money therefrom, as if funds have been deposited in these accounts. Second, Green and others were allowed to withdraw significant amounts from these accounts, notwithstanding the fact that the deposits therein were minimal. **Approximately $151 million were withdrawn from the accounts of Strand Magnify** (that was exclusively funded by transfers from the Magnify Accounts and a single external deposit of $500,000) **and Yeshaya** (which was exclusively funded by transfers from the Magnify Accounts with no external deposits). All that as opposed to external deposits of approx. $3.7 million.

40.   Third, the Special Accounts were managed outside of the AS400 computer system which was regularly used by BLMIS in order to fabricate securities trading, as was the case with respect to accounts of other BLMIS customers. A designated BLMIS employee handled the Special Accounts, and printed semi-annual reports on the desktop of his personal computer. These semi-annual reports would be prepared before Green's meetings with Madoff, and were hand-delivered to Green on the date of the meeting. There was no other BLMIS customer, including Yeshaya, that received such semi-annual reports. Indeed, BLMIS eventually abandoned any and all references to the creation of forged securities trading in the Special Accounts, and did not even bother to provide fictive reports ostensibly showing that the gains in the Accounts are the result of the "trading" of certain securities. The reports that were issued by BLMIS for the Special Accounts included no information such as trade dates, prices and sums with respect to securities, nor did they include cash

L/55001/4420/7990454/1

transactions in the Special Accounts. Along the years, the semi-annual reports did not identify capital (rights) that was allegedly held in the Special Accounts; rather, they only reflected the Special Accounts' holding of U.S. Treasury Bills at the end of each report period (every half year).

41.  Yeshaya's managers, and particularly Green who controlled the Magnify Accounts and the transfer of funds to the Association after the death of Igoin, and treasurer Nahir who stated that she oversaw Yeshaya's bank accounts as well as Yeshaya's BLMIS Account, and who made monthly recordings in the Association's books of the actions and investments allegedly made for the Association and inspected the falsified documents issued by BLMIS to the Association, knew that the reported amounts and profits originated from fraud and deceit in favor of Yeshaya, including, without limitation, due to the large amounts withdrawn from these accounts, as specified in the New York Proceedings. Such withdrawals by Yeshaya were in fact transfer of real money that was deposited by Madoff's defrauded customers who invested money through BLMIS, from BLMIS to Yeshaya's bank account in Israel. Green and/or Nahir knew, in view of their close connections with Madoff, and since no report had been received in respect of specific securities transactions in the Magnify Accounts, and in view of the enormous withdrawal from the accounts of Magnify and/or Yeshaya, that the reported balance in Yeshaya's Account could not be real. In any event, the withdrawals in the Yeshaya Account exceeded the deposits many times over.

42.  Green, who strictly supervised the Magnify Accounts and who had access to the Yeshaya's BLMIS Account, had access to information from BLMIS including (fabricated) semi-annual reports, statements on the status of the account and reports of ostensible investments that indicate that BLMIS was an organization that was fraudulently managed, that reported trading in securities that could have never been conducted. Nahir also had access and she strictly supervised the documents of Yeshaya's accounts, which included reports on suspicious trading in securities, which at times was impossible. Nahir, and mostly Green – who undertook to manage the financial business of Magnify and Yeshaya and who consulted with investment consultant, both knew that BLMIS was merely a sham, in view, *inter alia*, of a number of factors, the aggregation and the joint weight thereof, as follows:

42.1  The annual return in the accounts of Magnify and Yeshaya at BLMIS, at least for some of the years, were unreasonable under the circumstances. A prominent example is the positive yield that was ostensibly gained in the accounts in 2000 and 2001, during events that caused a plunge in the U.S. financial markets, such as the S&P100 index (the same index that was allegedly used in the implementation of the trading method named split-strike, which Madoff argued to have used) as well as the crash of the dotcom bubble, the devastating impact of the September 11, 2001 terror attacks on the markets and the 2008 recession and mortgage crisis. For example, in 2000, Magnify account 025 "gained" (allegedly and on paper only) more than US $54 million, which reflect an ostensible annual yield of 9%. Yeshaya's BLMIS Account recorded a yield of 14.3% that year. During the same period,

L/55001/4420/7990454/1

the S&P100 index dropped, with a negative yield of 13.4%. Out of a total of 155 months, from January 1996 (just after Green ostensibly received the official control of Magnify's investments and Magnify Accounts) until November 2008 (just before the collapse of BLMIS and the exposure of the scheme), Yeshaya's BLMIS Account demonstrated a negative yield in only 4 months. During the same period, the S&P100 index demonstrated a negative yield in 65 months. As aforesaid, Madoff and BLMIS did not even bother to fabricate fictitious monthly reports in the Magnify Accounts.

42.2   The reports in Yeshaya's BLMIS Account presented impossible scopes of trading in options.

42.3   Reports on alleged investments, which Nahir had received, reviewed and processed their content, often included irregularities such as trading on terms that deviated from the market conditions and a number of transactions that took place, seemingly, on weekends and holidays in which the stock exchanges are closed.

42.4   Opposite to market standards, Madoff did not charge management fees. As Magnify's investment manager, Green ought to have known that Madoff is thus allegedly waiving revenues of millions of U.S. dollars, that any other investment manager would have charged and collected. Instead of charging 1-2% as management fees and 10-20% from the portfolio profits, which is a common commission for the management of investment portfolios, BLMIS charged nothing but a 4-cent commission for each alleged transaction in shares or securities and one U.S. dollar for each option trading contract. By not charging the minimal fees of just 1% as management fees and 10% as performance commission, Madoff "waived" US $4.75 million in management fees and performance commission from Yeshaya alone between 1995 and 2008, and he further "waived" more than US $80 million in potential management fees from Magnify. Since BLMIS did not even bother to fabricate fictitious reports of trading in the Magnify Accounts, the amount due for performance commission which Madoff could have charged for the management of Magnify's "portfolio" cannot be calculated.

43.   Green, as Magnify's investment manager, was exposed to additional "red flags" that indicated that BLMIS was a fraud of Madoff and his associates. Green knew, in view of those indications, that BLMIS was not managed as a legal investment house. These indications include, in addition to the high yields, also the fact that management fees and commissions were not mentioned in the periodic reports prepared for Magnify (nor in other special accounts which were controlled by Green); that the semi-annual reports prepared for Magnify recorded no tax deductions; that Green tried to prevent an audit of the Registrar of Non-Profit Organizations over the Magnify Accounts; that Green received investment consultation and was aware of reports from other investment consultants that warned against Madoff, and against the possibility of a fraud in BLMIS; and more.

L/55001/4420/7990454/1

**Yeshaya was the owner of Magnify – the company which financed all of Yeshaya's activity**

44.    Yeshaya acted contrary to the provisions of the law and in violation of the rules of proper governance in receiving the money from Yeshaya's account in BLMIS (which money was, as aforesaid, the investors' money and not profits on a meager preliminary investment), since Yeshaya was the owner of Magnify – the company which financed all of Yeshaya's activity.

45.    Yeshaya's managers (including its general counsel – Green) were aware that Magnify was owned by Yeshaya. These managers concealed this fact and the source of the illegal money of Magnify from the Registrar of Non-Profit Organizations, *inter alia* in order to avoid an audit of the Registrar of Non-Profit Organizations.

46.    These managers, who signed documents according to which ownership of Magnify was transferred to Yeshaya, consistently stated that the donations came from an anonymous donor, while being aware that this was not the case.

47.    According to documents that Magnify and Brunner delivered to the Plaintiff, on December 14, 1989, approx. one year after the establishment of Yeshaya, all of Magnify's bearer shares were endorsed and delivered to Green in order that he transfer them to Yeshaya.

       Copies of a letter of endorsement and the resolution of Magnify's board of directors regarding endorsement of Magnify's shares to Yeshaya and delivery thereof to Green are attached hereto **as Exhibit "6"** and constitute an integral part hereof.

48.    From the date of the transfer of Magnify's shares to Yeshaya, Yeshaya became the lawful owner of Magnify. Yeshaya thus became the owner of its sole source of "donations". **Yeshaya and its managers – Green, Nahir, Prof. Hanoch Gutfreund ("Gutfreund"), Atlan and Amir concealed this material fact from the Registrar of Non-Profit Organizations, along with other important facts**. As specified below, Yeshaya **submitted false reports before and after Igoin passed away**, according to which the source of the donations was an anonymous donor who wished to remain anonymous (Igoin). Even though Magnify, which was, as aforesaid, owned by Yeshaya and not Igoin, was the source of the donations.

49.    According to the documents that were delivered to the Plaintiff, during the years of its activity, Yeshaya treated Magnify as its own:

       49.1.   On the date of the resolution regarding the transfer of Magnify's shares to Yeshaya, another resolution of Magnify was adopted – to open an account at Bank Hapoalim in Jerusalem. This resolution of Magnify grants a signature right in the said bank account to personnel of Yeshaya – Atlan, Amir and Nahir, and the authority to act to open the account was conferred on Green. Indeed, in a document entitled "General Account Opening Terms and Conditions", Magnify approves Atlan, Nahir and Amir as authorized signatories in the account.

49.2.  In testimony given by Brunner in the proceedings in the New York claim, Brunner declared that from the moment of endorsement of the shares, ownership of Magnify passed to Yeshaya. Brunner further declared that on the date of endorsement of the shares, December 14, 1989, Igoin instructed that from that time forth, it was Green who would be giving instructions to Brunner with respect to Magnify in lieu of Igoin. Brunner further declared that this three-way meeting – Igoin, Green and Brunner – was the last time that he received instructions from Igoin, and from that time he acted according to the exclusive instructions of Green.

49.3.  On May 22, 1990, Yeshaya entered into an agreement with Brunner in which it declared in the first "whereas" that it was the "sole shareholder (in trust) of the shares of Magnify, Inc." According to Brunner's testimony, ownership of the shares was transferred free and clear of any third party right, notwithstanding the words "(in trust)". By virtue of this ownership, Yeshaya appointed Brunner to act as a director of Magnify, subject to its instructions, and retained its power to change the composition of the board of directors of Magnify. The chairman, Atlan, and the CEO of the founder, Amir, who served as Igoin's representative at Yeshaya, signed this agreement on behalf of Yeshaya.

49.4.  According to documents that were delivered to the Plaintiff, in another resolution of Magnify's board of directors of July 2, 1997, it was declared: "the two share certificates…have never been issued nor executed but have been endorsed by the founder of the Company in Blank."

50.  In addition, Yeshaya received from Magnify money that was reported as "donations", whereas in fact these were (fictive) money transfers from the account (which was already, *de facto*, emptied) of a company which was owned by Yeshaya and controlled by Yeshaya's general counsel who was the driving force behind both the association and Magnify. These funds were transferred from the accounts of Magnify in BLMIS to Yeshaya's account, pursuant to instructions which were received from Yeshaya's general counsel. The amount of the "donations" was determined according to the liabilities which Yeshaya assumed, and not the other way around. **Yeshaya was managed with accounting deficits for many years.** In almost each one of the years of its activity, Yeshaya undertook to donate money in an amount higher than the balance that was allegedly in its account in BLMIS. Every year there was a need to transfer money to Yeshaya's account from Magnify's accounts in order to cover such undertakings. Green - Yeshaya's general counsel, who was the manager of Magnify and held full and sole control over its accounts and also controlled the "donations" which Yeshaya gave, *inter alia*, to the Defendants, instructed Madoff several times to transfer money from Magnify's accounts to Yeshaya's account in order to cover liabilities which Yeshaya had already assumed. These were not "donations" but rather planning and management of funds for the purpose of maintaining an accounting balance. Although they were aware of the fact that the amounts of the "donations" that

L/55001/4420/7990454/1

were transferred thereto, from time to time, from Magnify, did not cover all of Yeshaya's liabilities, Green, Nahir and Yeshaya continued to give instructions for withdrawal from Yeshaya's account in BLMIS in the sum total of approx. $126.5 million.

51.    Yeshaya treated Magnify's funds as its own and transferred such funds to its possession according to the liabilities that it had assumed. Had these been real donations, Yeshaya would not have been able to commit to donations to the research institutes, since it could not have known in advance how much money would be received from Magnify in a given year. Yeshaya conducted itself contrary to the rules of proper governance and with a lack of transparency vis-à-vis the Registrar of Non-Profit Organizations.

A copy of a letter from Green, Yeshaya's general counsel, to Madoff, dated December 25, 2002, in which a transfer of money is requested from Magnify to Yeshaya in order to cover its deficits, is attached hereto as **Exhibit "7"** and constitutes an integral part hereof.

52.    When CPA Boaz Gazit, who acted on behalf of the Registrar of Non-Profit Organizations, warned Yeshaya of the deficit, Yeshaya responded that it would try to raise more donations overseas, without disclosing to CPA Gazit that all of the donations came from a single source which is owned thereby and controlled by its general counsel.

53.    Moreover, after Madoff's Ponzi scheme was exposed, and the collapse of BLMIS, Yeshaya entered into voluntary dissolution proceedings. The Plaintiff filed a motion with the Jerusalem District Court, for supervision by the Court of the dissolution proceedings (Dissolution 36370-07-12 **Picard v. Yeshaya Horowitz Association *et al.***), *inter alia* on the grounds that Yeshaya had no financial resources and would be unable to repay the debt owed to the Plaintiff – the stolen money (the "**Voluntary Dissolution Proceedings**"). The Plaintiff asserted in the Voluntary Dissolution Proceedings that Yeshaya began voluntary dissolution with the aim of evading restitution of the money that it had received illegally to the Plaintiff. In its response to supervision of the Voluntary Dissolution Proceedings by the Court, Yeshaya argued (for example in Section 14) that it would be entitled to receive tens of millions of dollars from the Plaintiff by virtue of the (fictive) amounts that appeared in reports with respect to Magnify's 025 account.

Copies of the court documents in the Plaintiff's motion for supervision of the dissolution by the Court (without exhibits) are attached hereto as **Exhibit "8"** and constitute an integral part hereof.

54.    In the various proceedings conducted by the Plaintiff against Yeshaya, Yeshaya raised various, diverse and sometimes contradicting arguments with respect to its ownership and control of Magnify. Yeshaya argued, *inter alia* – and then denied – that it acted as the owner of Magnify in trust. Furthermore, in each and every one of the contradicting arguments raised by Yeshaya, it breached its duty to report its holdings in Magnify to the Registrar of Non-Profit Organizations, an intentional omission which rendered Yeshaya's conduct illegal.

L/55001/4420/7990454/1

55.     In its defense against the Plaintiff's claim in the New York Proceedings, Yeshaya, Green and the other Defendants filed, on January 18, 2012, a Corporate Disclosure Statement (the "**Disclosure Statement**"). In the Disclosure Statement, it was declared that Magnify is held by a trust, with Yeshaya acting as the trustee (i.e. a trustee of Yeshaya's sole source of donations). This representation regarding an ostensible trust stands in contradiction with the acts and representations of Yeshaya and its general counsel throughout the years, as shall be specified below.

56.     Despite the statements in the Disclosure Statement with respect to the "holding in trust" of Magnify, and despite the many documents proving Yeshaya's ownership of Magnify, Yeshaya declared in its response in the Voluntary Dissolution Proceedings that it "**denies altogether, the Petitioner's arguments regarding its being, ostensibly, a trustee for Magnify's assets**".

57.     Yeshaya outdid itself, and in order to excuse its contradicting versions, explained in response to the motion for supervision of the dissolution that by its declarations and the representation made thereby over the years to the effect that Green is Igoin's trustee, it meant that Green is Igoin's "confidant". Such excuses seem ridiculous in view of the fact that Green is an attorney who deals, *inter alia*, with trusts and is presumed to be well acquainted with the difference between a fiduciary, a trustee and a man of confidence, and therefore the significance of his false presentation as a "trustee" was very clear to him.

        Yeshaya further argued that its intention in the Disclosure Statement was that "**the association's trust was reduced only to the <u>holding</u> of Magnify's shares "like a safe at a bank" for the heirs of Albert Igoin – his widow, Doris Igoin, his daughter Lawrence Apfelbaum after her, and his granddaughter Emily Apfelbaum after her (in this order)**". In the proceedings in the claim in New York, Yeshaya filed documents, including a number of notes, allegedly in Igoin's handwriting, in which contradicting and/or unclear instructions appear from the years 1990-1991 with respect to a trust whose terms and conditions as well as existence cannot be proven. According to the date borne by these documents, the alleged instructions of Igoin included therein **<u>postdate</u>** the transfer of the ownership of Magnify to Yeshaya.

58.     While the Plaintiff does not take a position on the issue of whether a trust was created and what its terms and conditions allegedly were, Igoin's heirs asserted that they are not aware of the existence of such a trust.

59.     Moreover, even if a trust was created, this trust of Igoin ended on the day of his demise, January 31, 1995. Yeshaya presented no evidence that following Igoin's death, the trust was renewed by Igoin's heirs, as required by law and as Igoin himself ostensibly also instructed in one of the documents that were disclosed. Yeshaya and Green made no reference at all to Igoin's will in the New York Proceedings or in the Voluntary Dissolution Proceedings before the Jerusalem District Court. There is no proof that a copy of the will was ever presented to them. This fact reveals one of two things – either Green and

L/55001/4420/7990454/1

Yeshaya ignored and breached the provisions of the will, or Magnify and Yeshaya were not mentioned in the will at all – which fact may attest that upon Igoin's death, he did not deem Magnify as his property, but rather as Yeshaya's property.

60. Even if Yeshaya did hold the shares of Magnify in trust, as argued thereby, Yeshaya and the functionaries therein betrayed the trust and it seems that they concealed from Igoin's daughter and granddaughter the existence of Magnify and the *prima facie* right of the heirs to the alleged assets of Magnify. Only after the collapse of BLMIS does it appear that Yeshaya's personnel disclosed to Igoin's heirs the existence of Yeshaya and of Magnify – the asset which ostensibly and according to Yeshaya's argument, belonged to the heirs. Lawrence Apfelbaum denied, at several opportunities, any knowledge of the existence of Magnify and its assets or that she and her daughter were the intended beneficiaries of a trust. Apfelbaum also denied any knowledge of other defendants in the New York Proceedings (aside from family ties with Nahir). Moreover, Yeshaya disclosed to the Plaintiff documents attesting that Yeshaya concealed the existence of Magnify or the fact that there was a trust, allegedly, from Igoin's heirs. If this is true, this too was bad faith conduct on the part of Yeshaya, with no lawful right, and its acts render unlawful the transfers of the money from Magnify to Yeshaya and from Yeshaya to the Defendants. Such unlawfulness goes to the root of the transaction, and for this reason too, as well as the other reasons specified above, the ostensible "donations" and transfers of money to Yeshaya and from Yeshaya on, are null and void.

61. Even if we accept Yeshaya's argument whereby the shares of Magnify were held in trust for the heirs of Igoin, the conduct of Yeshaya is tainted with unlawfulness, since Yeshaya did not keep the "trust" assets separate from its own assets. Thus, for example, in the Voluntary Dissolution Proceedings, Nahir declared that if Magnify would be entitled to money from the Plaintiff due to the collapse of BLMIS and the alleged loss of its holdings (which argument is vehemently denied), the association would be able to continue operating and transferring donations to third parties (Section 12 of Nahir's affidavit in support of Yeshaya's response to the dissolution motion, Exhibit 8). Hence, it appears that Yeshaya deems itself as having interests identical to those of Magnify, and as ostensibly being entitled to receive money which the Plaintiff, in his capacity as trustee, is required *prima facie* to return to Magnify (which is denied), without Yeshaya granting any status or right to Igoin's heirs – the supposed beneficiaries of the trust – in the (denied) funds of Magnify. However, even under the denied trust "script" of Yeshaya, Yeshaya was entitled, at most, to 50% of the profits (of which, as aforesaid, there were none).

62. To wit: Yeshaya did not manage Magnify *de facto*, but rather left it in the hands of its general counsel – Green, who appointed himself as the manager of Magnify, and who treated the "trust" assets as his own, for his personal benefit and for the benefit of people associated with him, including Nahir – the association's treasurer. For example, on July 26, 1996 Green entered into an agreement with Magnify through Brunner, whereby Green would serve as

Magnify's "investment manager" in consideration for fees at the rate of 0.63% of the profits of Magnify in BLMIS. From the moment that Green appointed himself as the "investment manager" of Magnify, Green assumed the responsibility and the duties deriving from this position. Green also appointed himself, through Brunner, as managing director of Magnify and as an authorized signatory thereof, according to resolutions of June 23, 1995, December 29, 1998 and January 11, 1999.

63. Green further instructed the transfer, from Magnify's accounts, of the aggregate sum of $2.845 million to Nahir, ostensibly in accordance with the instructions of Igoin and his widow after him. Green also instructed Brunner, at his own initiative and probably without an instruction from Yeshaya, to adopt a resolution of the board of directors of Magnify and to found a subsidiary of Magnify in the Virgin Islands by the name of Strand International Investment Ltd. ("**Strand**"), which served Green, *inter alia*, for the transfer of money from BLMIS to private accounts of members of Green's family, and others associated with him.

64. Before Igoin's passing in 1995, Igoin transferred from accounts of Magnify to Yeshaya's account in BLMIS approx. $9 million. In addition, only a relatively small amount of $1.2 million (in several transfers, none of which exceeded $200,000) was withdrawn outside of BLMIS. But after Igoin's passing, under Green's control and according to his instructions, Magnify directly withdrew outside of BLMIS approx. $10.8 million to bank accounts held thereby in Jerusalem and in Switzerland. Strand, also under Green's control, withdrew another $11 million outside of BLMIS against a controversial preliminary outside deposit of $500,000 and another approx. $11 million in internal transfers from accounts of Magnify (which were, as aforesaid, at that time completely emptied). The Plaintiff has no evidence of the alleged use and purpose of all of these millions of dollars, but the Plaintiff shall state that some of these funds were transferred to Green himself, and to Green's three children, as well as to Ayala Nahir and her children. Since Magnify and Strand had no visible activity apart from investing in BLMIS and financing Yeshaya. These huge withdrawals also point to Green's bad faith in stripping Magnify of its (denied) assets in order to enrich himself, his family and others.

65. Despite the Plaintiff's requests in the New York Proceedings, Green refuses to provide documents regarding private accounts in Switzerland, to which money was transferred from BLMIS.

66. Beyond the fact that he siphoned millions of dollars for himself and his causes, Green benefitted personally, due to his control of Magnify and the transfers of tens of millions of dollars to the Defendants, since he received special bonuses, status, respect and benefits reserved for genuine philanthropists.

**Yeshaya's managers (including its general counsel) benefitted personally from Yeshaya's ownership of Magnify**

67. Until Igoin's death, Yeshaya's activity was conducted with relative financial moderation. From Yeshaya's establishment at the end of 1988 until Igoin's death at the beginning of 1995, a period of approx. six years, only three

L/55001/4420/7990454/1

transfers were recorded from Magnify's accounts to Yeshaya's account in BLMIS, in the sum of approx. $9 million (on average, approx. $1.5 million each year). The money withdrawals from the BLMIS account of Yeshaya and the "donations" that it gave were accordingly relatively low. As aforesaid, even out of this relatively modest amount, approx. $6 million came from defrauded BLMIS customers, and not from Igoin's own sources[5].

68. Yeshaya's documents at the Registrar of Non-Profit Organizations reveal that after Igoin's death, Green notified the members of Yeshaya at a meeting that was held on June 28, 1995, that based on conversations with Igoin's widow, Ms. Doris Igoin, she intended to continue her husband's donations policy. Green suggested, however, not approaching Ms. Igoin at that stage for additional donations. This meeting was attended by Amir, who was, as aforesaid, Defendant 1's finance manager, and Gutfreund (who was, at that time, the president of Defendant 1). The minutes of another meeting of the association that was ostensibly held on March 26, 1996, stated that Green had told the members of Yeshaya (including Atlan, Nahir, Amir and Gutfreund) that following a conversation that he held with Ms. Igoin, it was agreed that the donations would continue at the same scope as they had been when the late Mr. Igoin was alive. However, on that date, Green, Atlan, Amir, Nahir and Gutfreund were all aware that Yeshaya was the owner of Magnify.

69. The fact that Yeshaya was aware that the wishes of Doris Igoin, if they were indeed expressed by her, were insignificant, is expressed in the fact that in the following years, the "donations" from Magnify to Yeshaya increased outrageously. While according to the pace of the transfer of the funds during Igoin's life the amount of the donations was not supposed to exceed approx. $21 million until the end of 2008, in practice the amount that was transferred (as aforesaid in an internal transfer and on paper only) from Magnify's accounts to Yeshaya's account in BLMIS was almost 6 times greater! From the passing of Igoin and under Green's management and control, Yeshaya's financial activity grew exponentially. Accordingly, the rate of the money "transfers" from Magnify's accounts to Yeshaya's account in BLMIS grew. Thus, in a 14-year period between the beginning of 1995 and the end of 2008, more than $117 million was transferred from Magnify's accounts to Yeshaya's account in BLMIS, even though according to Green's notice to the members of Yeshaya's managing committee, Igoin's widow sought, at most, to continue Igoin's donations policy – not to multiply it several times over.

70. Instead of continuing the "donations" as they had been during Igoin's life, as the minutes of Yeshaya's meetings reflect, in fact Yeshaya's management approved transfers in dramatically higher amounts:

---

[5] The amount of the initial deposit in **Magnify**'s 024 account that was transferred, for the most part, in an internal transfer to Yeshaya's account in **BLMIS** upon the opening thereof as aforesaid, was withdrawn by Yeshaya to its bank account in Jerusalem until 1991, and was granted to a donations recipient in Israel, which is not a defendant in these proceedings.

L/55001/4420/7990454/1



71.    Similarly, in proceedings the Plaintiff instituted against Yeshaya in Israel, Atlan, the Chairman of Yeshaya, stated that Igoin had promised him prior to his passing that donation funds would be consistently and regularly contributed to Yeshaya, as Igoin had set up a fund with Madoff for the purpose of securing a certain annual amount of donations to Yeshaya. In practice, Atlan knew that Yeshaya was the owner of Magnify and that the amounts transferred (by internal transfers at BLMIS from Magnify's accounts to Yeshaya's account with BLMIS, and therefrom to Yeshaya's "real world" bank account) substantially increased after Igoin's passing. In fact, Yeshaya, through Green, took over Magnify's accounts with BLMIS and treated them as its own, transferring funds from one pocket to another as it pleased.

72.    According to the rate of money transfers during Igoin's lifetime, the amount of the donations should not have exceeded $21 million by the end of 2008 ($1.5 million per year, on average). In reality, the sum was six times larger.

**<u>Yeshaya transferred the Defendants funds originating in fraud and theft and such transfers are consequently void</u>**

72.1.    Yeshaya transferred funds originating in misappropriation to many entities in Israel, including the Defendants. As aforesaid, the "real" sum of the initial investment in Magnify was transferred to Yeshaya's BLMIS account (and therefrom to a third party who is not a defendant in this case), and beyond this amount, an additional sum of approx. $123 million was transferred to Yeshaya's bank account and from Yeshaya to others, including the Defendants, which sum had been stolen from defrauded BLMIS investors.

L/55001/4420/7990454/1

73.     As aforesaid, Igoin, the founder of Yeshaya, who was supposedly its donor (through Magnify's accounts with BLMIS), passed away in early1995. In the years that followed Igoin's passing - and particularly after the passing of Igoin's representative in Yeshaya, the founding CEO Amir, in 1997 - most of the founding members of Yeshaya retired from activity in Yeshaya, as did its managers and the members of its institutions. The only office holders that took part in the founding of Yeshaya and are still serving in their office are Green, the general counsel, Nahir, the treasurer, and Atlan, Yeshaya's Chairman – all three of whom were aware, as aforesaid, that the funds received by Yeshaya originated in BLMIS. To replace the retired members of Yeshaya, other academics were added as members, **all of whom were key individuals in the universities to which Yeshaya's donations were transferred**. Among them were Gutfreund and Prof. Ilan Chet of the Hebrew University (Defendant 1), Prof. Bracha Rager of the Ben Gurion University (Defendant 3), Prof. Amnon Caspi of the Bar Ilan University (Defendant 7), and Prof. Yaron Cohen of the Weizmann Institute (Defendant 5), who serve as members and office holders of Yeshaya to this day.

74.     Furthermore, following Igoin's passing, Yeshaya, led by Green, began referring to some of the "donations" and grants transferred thereby to the Defendants as "investments" or "technology transfer agreements". According to the affidavit of the treasurer, Nahir, which was attached to Yeshaya's response to the motion to subject the liquidation to court supervision, as well as publications and interviews held with Green, Yeshaya did not only engage in the promotion of applied research in Israel as specified in its objectives, but also in the promotion of the commercialization of technologies, or according to its own terminology – the "transfer of technologies", in consideration for royalties. Such statements are meant to deceive.

75.     Thus, when during the voluntary liquidation proceedings the Plaintiff argued, in view of the statements of alleged "investments", that Yeshaya was not in fact a not-for-profit association as declared thereby, since it demanded "royalties" for at least some of the funds transferred thereby, Yeshaya responded that the agreements it had made with the commercialization companies should not be deemed as commercial transactions since Yeshaya had undertaken, according to its claim, to re-invest the royalties in the research entities from which it received the payment in return. Hence, by Yeshaya's own admission and claim, at the end of the day the funds concerned were donations for all intents and purposes, which had been made within the ordinary course of research of the relevant Defendants and for no consideration, rather than "investments" for consideration. The so-called "investments" had been based on illegal agreements and the parties had not truly intended "to do business" thereby. In any event, the agreements are void, or should be revoked by this Honorable Court, in view of the fact that their subject-matter is illegal (stolen funds that originated in fraud).

76.     Moreover, there is no evidence that Yeshaya's conduct in the transfer of grants was the typical conduct of an investor in the transfer of technologies. As Defendants 2, 4, 6, 8, 10 and 26, which are technology commercialization companies of the research universities in Israel, are fully aware, agreements

for investment in technology commercialization involve the incorporation of a company whose function is to commercialize the products of knowledge, the execution of an agreement for license to the products of knowledge to such company, the appointment of directors in the company, supervision and the provision of accounts, and more. Documents that Yeshaya has disclosed to the Plaintiff in the New York proceedings do not indicate the performance of any of those acts by Yeshaya. Despite the Plaintiff's request of Yeshaya, Yeshaya has not disclosed to the Plaintiff the agreements it had signed with the Plaintiffs until the date of filing of this suit.

77.     Furthermore, when the Plaintiff addressed the Defendants with a demand for restitution of the funds unlawfully transferred thereto, not one of the Defendants earnestly raised, in written form, the argument that the funds were an "investment" for which consideration had been given. All of the Defendants that responded to the Plaintiff's demand and addressed the issue on its merits, admitted that the funds they had received were donations which were used, according to their designation, for financing academic and applied studies. It is needless to expatiate in order to clarify that no consideration whatsoever had been involved, and certainly no consideration that would deny the Plaintiff's right to recover the funds transferred to that Defendant.

78.     Some nine months prior to the collapse of BLMIS, for an unknown reason, Yeshaya began requesting information from the various Defendants with respect to the status of various projects for which Yeshaya had donated funds. Furthermore, in general meetings of Yeshaya held on April 3, 2008 and July 3, 2008, the minutes attesting to which cannot be found in the Association's file with the Registrar of Associations, Yeshaya decided to return to the research entities only one third of the proceeds to be repaid thereto as "dividend".

**The Defendants have been unjustly enriched at the expense of BLMIS customers**

79.     As aforesaid, since its establishment in 1988, Yeshaya has transferred approx. $126.5 million to various entities and institutions including the Defendants, as shall be specified below, $123,673,185 of which sum came from fictitious profits.

A copy of Yeshaya's financial report for 2008 is attached hereto as **Exhibit "9"** and constitutes an integral part hereof.

80.     Shortly after the collapse of BLMIS and the exposure of Madoff's scheme, the media in Israel reported in detail that Madoff had committed a large-scale Ponzi scheme, among other things, through BLMIS. It was also reported that Yeshaya was one of Madoff's customers. The media also extensively reported that Yeshaya ceased operating after the collapse of BLMIS in early 2009.

81.     Following the exposure of the fraud by Madoff and BLMIS, Yeshaya wrote many entities to which it had transferred funds and notified them that, in view of the collapse of BLMIS, it would no longer be able to transfer donations thereto. Such entities were apparently already aware of what was called the "Madoff affair" and knew, or should have known – following the analyses and explanations as to how a Ponzi scheme is operated, which were published by

the media - that the fact the Yeshaya had "profited" from its investments with BLMIS and had transferred such large amounts to them over the years meant that it had received the money of other investors.

82. Following the exposure of the Madoff scheme, the Plaintiff was appointed trustee for the assets of BLMIS and subsequently trustee for the consolidated assets of Madoff and BLMIS and began acting to recover the funds for the defrauded customers of BLMIS. The duty of Madoff's trustee, under his court appointment, was to organize the assets of BLMIS and Madoff and distribute them fairly and justly to the creditors of BLMIS, first and foremost to the defrauded BLMIS investors whose deposits had been stolen by BLMIS and transferred to others.

83. As hereinafter specified, the Plaintiff addressed the Defendants with a request that they return the funds transferred thereto, but his request was denied. The Defendants argued, *inter alia*, that their receipt of the funds had been lawful and authorized, yet failed to explain how the receipt of stolen funds, which belong to other owners and the misappropriation of which has been admitted by the person responsible therefor, could be by right under law.

84. The Defendants further argued that the Plaintiff had no authority to address them or file a claim against them in Israel. The Defendants failed to provide reasons for this argument, and did not specify to the Plaintiff the law sections or legal precedents on which they relied. This argument too appears to have been asserted outwardly, in bad faith and without legal basis, all with the purpose of attempting to evade the law and the restitution of the misappropriated funds to the defrauded victims of BLMIS.

85. Some of the Defendants also argued, in response to the Plaintiff's request, that after the collapse of BLMIS, Yeshaya failed to transfer to them the full amounts undertaken thereby. To begin with, this argument requires exceptional audacity, since the Defendants had received notice from the Plaintiff about BLMIS's collapse before they raised the claim that the funds that Yeshaya had distributed or had undertaken to transfer to them had not originated in a legal and legitimate source, but rather from funds obtained by misappropriation and fraud. The Defendants did not refrain from demanding the funds supposedly "promised" to them by Yeshaya, despite their awareness of the claim that those were not Yeshaya's funds, but funds that belonged to others. Furthermore, insofar as there is any truth to the Defendants' claim of outstanding accounting between Yeshaya and themselves, the Plaintiff is not party to the dispute, insofar as there is one. Moreover, Yeshaya argued before the Plaintiff during the voluntary liquidation proceedings that all of the entities to which it had undertaken to transfer funds have waived their alleged "right" to continue receiving the donations.

### It would be just in the circumstances of the matter to order full restitution

86. The Defendants' enrichment was directly made at the expense of the defrauded BLMIS customers. Some of these customers were Israeli – private individuals and charitable entities. A large part of the funds "donated" by Yeshaya were directly taken from pensioners dependent on their investments through

26

BLMIS, families with children or charitable entities. The funds concerned were misappropriated and there is a duty to return them to the Plaintiff.

87.  The Defendants have not changed their position for the worse in reliance on Yeshaya's "donations". The ordinary course of action for the Defendants includes the receipt of donations and grants. The Defendants used the funds received from BLMIS in the framework of their ordinary day-to-day conduct. Some of the Defendants even used part of the funds not in the context of a particular project or study, but rather for purposes of administration expenses and overhead and salary payments. Other grants were used to register intellectual property assets that such entities acquired at the expense of the defrauded victims of the Madoff scheme. In view of the Defendants financial position, there is no concern that the sought judgment and restitution of the funds will cause any of the Defendants irreversible damage. On the contrary, many of the Defendants hold the ownership of highly wealthy and successful commercialization entities.

88.  Above and beyond the aforesaid, the Defendants are affluent entities having an annual budget and assets worth multiple millions of dollars. The commercialization and technology transfer companies among the Plaintiffs own intellectual property assets that yield millions in royalties every year. The hospital research funds benefit from generous donations and annual government funding. After the collapse of BLMIS, Israeli media reported that the President of the Technion (Defendant 11) described the millions of dollars the Technion had lost in the Madoff scheme as "negligible" compared with the portfolio of investments and assets owned by the Technion.

89.  The amounts the Defendants are required to return are nothing but a fraction of their annual budget. Indeed, the Defendants may possibly need to deduct such sums from their research or development programs. Still, this would pose no threat to the mere existence and continued activity of the Defendants, whereas the investors that were forced to resort to workfare would perhaps finally be able to retire and enjoy an appropriate pension, for which they saved their entire life, and the financial situation of other innocent investors would be rectified.

## Defendants 1 and 2

90.  Defendant 1 – The Hebrew University of Jerusalem ("**HUJ**") is an institute for learning and research recognized by the Council for Higher Education in Israel ("**CHE**") and budgeted by the State via the Higher Education Planning and Budgeting Committee ("**PBC**").

91.  Defendant 2, ("**Yissum**") is a private company, owned by HUJ. Defendant 2 is the technology transfer company of HUJ. Yissum is responsible for marketing the inventions and IP developed by the researchers and students at HUJ.

92.  HUJ was one of the first institutions which received donations or grants from Yeshaya. Yeshaya transferred at least US $36,105,580, throughout the years since its establishment, to HUJ and Yissum. As detailed above, the source of this money is the deposits of BLMIS clients, which through the Ponzi scheme

of Madoff and BLMIS were fraudulently transferred to Magnify and therefrom to Yeshaya and therefrom to HUJ and Yissum.

HUJ knew, through its organs, that BLMIS was the source of the money it received.

93. HUJ knew, through its various organs, throughout all the years it received donations from Yeshaya, about the ties between Yeshaya and between BLMIS and Madoff, the source of the donations for Yeshaya's activity, Yeshaya's ties to Magnify and the misconduct of Yeshaya. This knowledge precludes HUJ's good faith at the time of receiving the money from Yeshaya and mandates full reimbursement thereof.

94. Additionally, in April 1992 HUJ received the amount of US $300,000, out of the aforesaid amount, directly from BLMIS, apparently from Yeshaya's account with BLMIS. Yeshaya also instructed Madoff to transfer, in that same month, an additional amount of US $1,200,000 to HUJ.

95. Key persons at HUJ served throughout the years as members of Yeshaya's management and were partners in its activity. The first manager of Yeshaya, Yitzhak Amir, OBM, was the asset manager of HUJ. Amir was one of the founders of Yeshaya, a friend and confidant of Igoin. Late in Igoin's life, upon the transfer of the ownership and control of Magnify to Yeshaya, Amir was appointed as an authorized signatory of Magnify's bank account. Amir, who held a senior position in the management of the assets of HUJ, and in parallel served as the CEO of Yeshaya, had the power to act and control the transfers of funds from Magnify to Yeshaya in banks in Israel. Amir, the CEO of Yeshaya and holder of a senior position at HUJ, was a partner to the failure of Yeshaya to report to the Registrar of Non-Profit Organizations on the ownership of Magnify. Amir, and through him the University, knew that Magnify, through its account with BLMIS, was the source of financing for Yeshaya's activity. In practice, Amir himself received money directly from one of Magnify's accounts.

96. HUJ also knew of Yeshaya's misconduct. HUJ, via Gutfreund who was the President of HUJ and a member of Yeshaya's management for many years and until today, was aware of the manner in which Yeshaya distributed the money transferred thereto from Magnify. Yeshaya's work method proves that Gutfreund and the additional members of Yeshaya were aware of the fact that Magnify was the only source of donations for Yeshaya. Thus, the amount of "donations" that Magnify transferred to the Association increased by orders of magnitude after Igoin's death and was determined according to the commitments Yeshaya took upon itself, and not vice versa. During almost every year of its activity after the death of Igoin, Yeshaya committed to donate funds in a higher amount than its account balance at BLMIS. Green, who participated in the fraud, as well as Gutfreund, Atlan and the other members of Yeshaya, knew that almost every year there was a need to transfer additional money to the Yeshaya account from the Magnify account in order to cover such commitments. Gutfreund and Atlan – HUJ people, knew that Green, who was the manager of Magnify, instructed Madoff, a number of times, to transfer money from the Magnify account to the Yeshaya account in order to cover

L/55001/4420/7990454/1

commitments which Yeshaya already took upon itself, contrary to the rules of proper governance and without transparency vis-à-vis the Registrar of Non-Profit Organizations.

97.  Gutfreund and Atlan who were, at least during some of the years, managers and/or members of the Board and/or holders of signatory rights in Yeshaya, knew that Green, who served, *inter alia*, as Yeshaya's General Counsel, provided false information to the Registrar of Non-Profit Organizations; and held, managed and controlled the only asset of the Association – Magnify, even after the death of Albert and Doris Igoin.

<u>HUJ and/or Yissum did not return the money they received unlawfully.</u>

98.  HUJ and Yissum knew already at the end of 2008, as the entire world knew, of the collapse of BLMIS and the exposure of Madoff's fraud and theft. They also knew, from reports in the local press, that Yeshaya supposedly suffered critical "harm" from the loss of its investments with BLMIS. On December 28, 2008, Yeshaya contacted HUJ in writing and gave notice that it would not be able to continue transferring money which it committed to donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to HUJ is attached hereto as **Exhibit "10"**, and constitutes an integral part hereof.

99.  On December 16, 2014, the undersigned, the Plaintiff's attorney, contacted HUJ and presented it with the factual matrix pertaining to the manner through which the university gained the funds of BLMIS's innocent investors.

100. HUJ replied to the letter of the Plaintiff's attorney on December 23, 2014. HUJ claimed in its letter that it was not aware of the ties between Yeshaya and BLMIS. There is no substance to such an argument and it borders on faux innocence. As aforesaid, the ties between Yeshaya and between BLMIS and Madoff were widely reported by the media and were relayed to HUJ directly from Yeshaya. And as aforesaid, HUJ received at least one direct transfer from BLMIS itself.

101. The Plaintiff's attorney replied to HUJ on May 31, 2015, and once again clarified that HUJ used, benefitted from and became enriched by the money it received from Yeshaya, at the expense of others, and is therefore liable for restitution thereof. This obligation applies to HUJ, whether it knew in real time or only knew in retrospect, that this money was unlawfully obtained. HUJ sent the undersigned an additional reply on July 8, 2015, which did not add to the aforesaid, except to deny the Plaintiff's authority to file a claim in Israel and to state that HUJ used the money it received in accordance with an agreement with Yeshaya – which was not attached to the reply of HUJ. The undersigned replied, *inter alia*, that the court in the U.S. ruled that there is no impediment to the Plaintiff's taking action in Israel against the Defendants by virtue of causes of action according to the Israeli law. A copy of the correspondence between the parties was also forwarded to Yissum.

L/55001/4420/7990454/1

Copies of the correspondence between the Plaintiff's attorney and between HUJ and Yissum (without attachments) are attached hereto as **Exhibit "11"** and constitute an integral part hereof.

102.   Although HUJ and Yissum have long since learned that BLMIS was the source of the money they received, namely that it was sourced from fraud and theft, they did not return the stolen money to the Plaintiff until the date of the filing of this Claim.

### Defendants 3 and 4

103.   Defendant 3 – Ben Gurion University of the Negev ("**BGU**") is an institute for learning and research recognized by the CHE and budgeted by the PBC. Defendant 4 – B.G. Negev Technologies & Applications Ltd. **("B.G. Negev")** is a private company owned by BGU. B.G. Negev is the technology transfer company of BGU and responsible for commercializing the IP and inventions of BGU researchers.

104.   Since its establishment in 1988, Yeshaya transferred at least US $18,389,627 to BGU and/or B.G. Negev. The amount of the donations and/or "grants" by Yeshaya to BGU increased tenfolds after Green, Yeshaya's General Counsel, became a member of BGU's Board and a member of BGU's Investment Committee.

<u>BGU knew that BLMIS was the source of the money it received</u>

105.   BGU knew, through Green, about the ties between Yeshaya and between BLMIS and Madoff, the source of the donations for Yeshaya's activity, Yeshaya's ties to Magnify and the misconduct of Yeshaya. As aforesaid, Green served as a member of BGU's Board and in addition served on BGU's Investment Committee, received an honorary doctorate degree from the University in 2006, and was even elected as the Chairman of BGU's Board of Trustees in 2010 – after the Madoff fraud was exposed. In parallel, Green was Yeshaya's General Counsel and defined himself as the driving force behind Yeshaya's activity. Furthermore, at the relevant times, Green was also the manager of Magnify from whose account with BLMIS Yeshaya received the millions of stolen dollars which were transferred, *inter alia*, to BGU and B.G. Negev. The Plaintiff is doubtful of the claim that BGU acted in good faith, in view of the status and positions of Green at BGU, at Yeshaya and at Magnify, Inc., and considering the involvement of Green at each stage of the process of granting the money, i.e. – the transfer of money from Magnify to the Association as the manager of Magnify; Green's knowledge of what occurred in the Magnify accounts with BLMIS and even the management of such accounts; the allocation of money from Yeshaya to BGU as the General Counsel and a key person at Yeshaya; and lastly, requesting donations and receiving money on behalf of BGU as a member of the Board. The knowledge of BGU and B.G. Negev, via Green, precludes their good faith at the time of receiving the money from Yeshaya and mandates full reimbursement thereof.

106.   In addition to the aforesaid, BGU and B.G. Negev knew already at the end of 2008, *inter alia*, through Green's direct involvement and knowledge and from

L/55001/4420/7990454/1

external sources, of the collapse of BLMIS and the exposure of Madoff's fraud and theft. They also knew, from publications in the local press, that Yeshaya supposedly suffered critical "harm" from the loss of its investments with BLMIS.

107. Moreover, after the collapse of BLMIS, Yeshaya contacted BGU in writing and gave notice that it would not be able to continue transferring money thereto, due to the collapse of BLMIS which was the sole source of its resources. In this letter, Yeshaya explicitly stated that BLMIS collapsed as a result of fraud. The President of BGU, Prof. Rivka Carmi, was even interviewed on this matter for the program "The Source" on Channel 10 in December 2012. BGU was and still is well aware of Yeshaya's condition and the connection between the collapse of BLMIS and this condition.

A copy of Yeshaya's letter to BGU is attached hereto as **Exhibit "12"**, and constitutes an integral part hereof.

BGU and B.G. Negev did not return the money they received unlawfully

108. On December 23, 2014, the undersigned, the Plaintiff's attorney, contacted BGU and presented it with the factual matrix pertaining to the manner through which it gained the money of BLMIS's defrauded investors.

109. BGU replied to the letter of the Plaintiff's attorney on December 30, 2014 (a letter dated December 23, 2014). In its letter, BGU claimed, *inter alia*, that it received the donations in good faith and lawfully. As aforesaid, this claim cannot stand especially in view of Green's involvement, in at least three different capacities, in the transfer of the money from Yeshaya to BGU. BGU further claimed that it was not aware of the ties between Yeshaya and BLMIS. There is also no substance to this claim since Green's involvement in the three bodies involved in the transfer of money to BGU, as well as the notices and the information BGU received on this matter, precludes its good faith in the holding of the stolen money in its possession.

110. The Plaintiff's attorney replied to BGU on June 24, 2015, and once again clarified that BGU used, benefitted from and became enriched by the money it received from Yeshaya, at the expense of others, and is therefore liable for restitution thereof. This obligation applies to BGU, whether it knew in real time or only knew in retrospect, that this money was unlawfully obtained. BGU replied again on July 5, 2015, and denied the Plaintiff's authority to launch proceedings against it in Israel. The Plaintiff replied that the court in the U.S. ruled that he may act in Israel according to causes of action from the Israeli law. A copy of the correspondence between the parties was also forwarded to B.G. Negev.

Copies of the correspondence (without attachments) between the Plaintiff's attorney and between BGU and B.G. Negev are attached hereto as **Exhibit "13"** and constitute an integral part hereof.

L/55001/4420/7990454/1

111.    Although BGU and B.G. Negev have long since learned that BLMIS was the source of the money they received, namely that it was sourced from fraud and theft, they did not return the stolen money to the Plaintiff.

**Defendants 5 and 6**

112.    Defendant 5, the Weizmann Institute of Science ("**Weizmann Institute**"), is an institute for learning and research recognized by the CHE and budgeted by the PBC, and its status is that of a research university. Defendant 6, Yeda Research and Development Ltd. ("**Yeda**"), is a private company, wholly owned by the "Yeda Trust" endowment. Yeda is the commercial arm of the Weizmann Institute which holds an exclusive agreement with the Weizmann Institute to commercialize the IP products developed by the scientists of the Weizmann Institute.

113.    Since its establishment in 1988, Yeshaya transferred to the Weizmann Institute and Yeda, donations and grants in the amount of at least US $13,520,880. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to the Weizmann Institute and Yeda.

The Weizmann Institute was familiar, via Green, with the facts pertaining to the source of the donations received

114.    The Weizmann Institute knew, via Green who was a partner to the fraud committed by Madoff, of the ties between Yeshaya and between BLMIS and Madoff, the source of the donations to Yeshaya's activity, Yeshaya's ties to Magnify and the misconduct of Yeshaya. Green, who was a member of the Board of Trustees of the Weizmann Institute at the time of the transfer of the funds from Yeshaya to the Weizmann Institute, was at the same time, *inter alia*, also Yeshaya's General Counsel and the driving force behind the activity of Yeshaya and participated in the making of decisions on the donations to the various institutes, including the Defendants. As aforesaid, Green was also the manager of Magnify, whose account with BLMIS was a channel for the transfer of the stolen money from BLMIS to Yeshaya.

The Weizmann Institute and/or Yeda did not return the money they received unlawfully

115.    On December 28, 2008, Yeshaya contacted the Weizmann Institute in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to the Weizmann Institute is attached hereto as **Exhibit "14"**, and constitutes an integral part hereof.

116.    On December 31, 2014, the undersigned, the Plaintiff's attorney, contacted the Weizmann Institute and presented it with the factual matrix pertaining to the manner through which the institute gained the funds of BLMIS's defrauded investors. The Weizmann Institute replied to the letter of the Plaintiff's attorney on January 11, 2015, and claimed that all of the donations to the

L/55001/4420/7990454/1

Weizmann Institute were lawfully received and used for purposes of scientific research at the institute.

117.  The Plaintiff's attorney replied to the Weizmann Institute on July 7, 2015, and clarified that the Weizmann Institute used the money received from Yeshaya and is therefore liable for restitution thereof. A copy of the correspondence between the parties was also forwarded to Yeda which replied to undersigned's letter on July 6, 2015, and claimed that it never received money from Yeshaya. However, in 2014, Yeshaya wrote to Yeda and claimed that it transferred approx. US $2,615,000 to Yeda, and requested that Yeda provide information on the use made of the said donations.

Copies of the correspondence (without attachments) between the Plaintiff's attorney and between the Weizmann Institute and Yeda are attached hereto as **Exhibit "15"** and constitute an integral part hereof.

118.  Although the Weizmann Institute and Yeda have long since learned that BLMIS was the source of the money they received, namely that it was sourced from theft and fraud, they did not return the money they unlawfully received to the Plaintiff.

## Defendants 7 and 8

119.  Defendant 7, Bar Ilan University ("**BIU**"), is an institute for learning and research recognized by the CHE and budgeted by the PBC. Defendant 8, Bar Ilan Research and Development Co. Ltd. ("**BIR&D**"), is a private company, wholly owned by Defendant 7. Defendant 8 was established to distribute and commercialize the IP developed at BIU, by turning BIU's discoveries into applied products.

120.  Since its establishment in 1988, Yeshaya transferred at least US $10,031,333 to BIU. To the best of knowledge, at least part of this money was applied to expenses for development and commercialization of IP products by BIR&D. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Defendants 7 and 8.

BIU and BIR&D did not return the money they received unlawfully

121.  On December 28, 2008, Yeshaya contacted BIU in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to BIU is attached hereto as **Exhibit "16"**, and constitutes an integral part hereof.

122.  On December 23, 2014, the undersigned, the Plaintiff's attorney, contacted BIU and presented it with the factual matrix pertaining to the manner through which it gained the funds of BLMIS's defrauded investors. BIU replied to the letter of the Plaintiff's attorney on July 7, 2015. BIU, in its letter, claimed that it received the money in good faith and was not aware of the ties between

33

Yeshaya and BLMIS. BIU further stated that the Plaintiff does not have authority to take legal action in Israel. The Plaintiff's attorney replied that the court in the U.S. ruled that the Plaintiff is not barred from acting in Israel according to causes of action in the Israeli law.

Copies of the correspondence (without attachments) between the Plaintiff's attorney and between BIU and BIR&D are attached hereto as **Exhibit "17"** and constitute an integral part hereof.

123.   Although BIU and BIR&D have long since learned that BLMIS was the source of the money they received, namely that it was sourced from fraud and theft, they did not return the stolen money to the Plaintiff.

### Defendants 9 and 10

124.   Defendant 9, Tel Aviv University ("**TAU**"), is an institute for learning and research recognized by the CHE and budgeted by the PBC. Defendant 10 Ramot at Tel Aviv University Ltd. ("**Ramot**"), is a private company, wholly owned by the Tel Aviv University Economic Corporation Ltd., which in turn is a company wholly owned by Defendant 9. Ramot is the engagements center for TAU and its technology transfer company and provides a business and legal framework for inventions, discoveries and IP developed at TAU.

Since its establishment, Yeshaya transferred amounts of at least US $6,510,212 to TAU and Ramot. To the best of knowledge, at least part of this money was transferred to Ramot. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to TAU and Ramot.

TAU and/or Ramot did not return the money they received unlawfully

125.   On December 28, 2008, Yeshaya contacted TAU in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to TAU is attached hereto as **Exhibit "18"**, and constitutes an integral part hereof.

126.   On December 23, 2014, the undersigned, the Plaintiff's attorney, contacted TAU and presented it with the factual matrix pertaining to the manner through which it gained the funds of BLMIS's defrauded investors. TAU replied to the letter of the Plaintiff's attorney on January 21, 2015.

127.   The Plaintiff's attorney replied to TAU on July 7, 2015, and clarified that TAU used, benefitted from and became enriched by money received from Yeshaya, at the expense of others, and is therefore liable for restitution thereof. A copy of the correspondence between the parties was also forwarded to Ramot.

Copies of the correspondence (without attachments) between the Plaintiff's attorney and between TAU and Ramot are attached hereto as **Exhibit "19"** and constitute an integral part hereof.

L/55001/4420/7990454/1

128.  Although TAU and Ramot have long since learned that BLMIS was the source of the money they received, namely that it was sourced from theft and fraud, they did not return the money received unlawfully to the Plaintiff.

**Defendants 11 and 12**

129.  Defendant 11, the Technion – Israel Institute of Technology ("**Technion**"), is an institute for learning and research recognized by the CHE and budgeted by the PBC. Defendant 12 – The Technion Institute for Research & Development Ltd. ("**Technion Institute**") is a wholly owned subsidiary of the Technion. The Technion Institute is the commercial arm of the Technion and the owner and manager of the IP assets developed by Technion researchers.

130.  Since its establishment, Yeshaya transferred to the Technion donations in the amount of at least US $3,999,514. At least part of the aforesaid amount was transferred to the Technion Institute. As aforesaid, the source of the "donations" is the deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Magnify and therefrom to Yeshaya and therefrom to the Technion and the Technion Institute.

131.  For many years the Technion held "investment" accounts with BLMIS, into which it deposited $7.5 million over the years. The amounts that the Technion invested with BLMIS were used in order to finance withdrawals of fictitious profits in other accounts, such as those of Magnify and Yeshaya. After the collapse of BLMIS, on February 11, 2009, the Technion submitted to the Plaintiff, proofs of claim numbered 002016 and 005245, in the amounts of $7,250,184 and $7,677,185.85 respectively (the "**Proofs of Claim**"). Proof of claim no. 002016 was rejected, it being a copy of proof of claim no. 005245. On May 29, 2009, proof of claim no. 005245 was approved, in the amount of $7.5 million, which is the amount that the Technion lost in the scheme. As of the date of filing the Claim, the Plaintiff returned $3,954,425 to the Technion as a partial payment for the proof of claim which was approved.

The Technion and/or the Technion Institute did not return the money they received unlawfully

132.  On December 28, 2008, Yeshaya contacted the Technion in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to the Technion is attached hereto as **Exhibit "20"**, and constitutes an integral part hereof.

133.  On September 29, 2015 and October 29, 2015, the undersigned, the Plaintiff's attorney, contacted the Technion through letters, in which he clarified that the donations which the Technion received from Yeshaya is actually money of BLMIS's defrauded investors, which was stolen from them, and requested restitution thereof. In his letter, the Plaintiff gave notice to the Technion that the amount approved for the Technion in the framework of the claim of proof needs to be offset against the amounts received thereby unlawfully from Yeshaya.

L/55001/4420/7990454/1

134.    The Technion replied on November 15, 2015, and claimed that it received the donations from Yeshaya lawfully and in good faith. The Technion further claimed that it was not at all aware of the financial conduct of Yeshaya or the ties between Yeshaya and Madoff's scheme. The Technion added that the amounts received from Yeshaya were much lower that the amount stated above, and the money was used in accordance with the purposes of the donation.

Copies of the correspondence between the Plaintiff's attorney and the Technion are attached hereto as **Exhibit "21"** and constitute an integral part hereof.

135.    Thus, although the Technion long since learned that BLMIS was the source of the money it received, namely, it never belonged to Yeshaya – the transferor of the money, the Technion and the Technion Institute did not return the money they received unlawfully to the Plaintiff, and they did not agree to offset their proof of claim against the amounts due to the Plaintiff.

### Defendants 13 and 14

136.    Defendant 13, the Sheba Medical Center at Tel Hashomer ("**Sheba**"), is a hospital owned by the State of Israel. Defendant 14 is Sheba's research foundation ("**Sheba Research Foundation**").

137.    Since its establishment, Yeshaya transferred to Sheba and the Sheba Research Foundation donations of at least US $2,349,171. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Defendants 12 and 13.

138.    On December 28, 2008, Yeshaya contacted the Sheba Research Foundation (Defendant 13), in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy of Yeshaya's letter to the Sheba Research Foundation is attached hereto as **Exhibit "22"**, and constitutes an integral part hereof.

139.    On December 31, 2014, the undersigned, the Plaintiff's attorney, contacted Sheba in a letter which presented the Ponzi scheme of Madoff and BLMIS, as well as the money transfer path from BLMIS's defrauded investors to Sheba. Sheba did not reply to the Plaintiff's letters in writing.

Copies of the correspondence (without attachments) sent by the Plaintiff's attorney to Sheba and the Sheba Research Foundation are attached hereto as **Exhibit "23"** and constitute an integral part hereof.

140.    Although Sheba and Sheba Research Foundation have long since learned that BLMIS was the source of the money they received, namely that it was sourced from theft and fraud, the money was not returned to the Plaintiff.

L/55001/4420/7990454/1

**Defendants 15 and 16**

141. Defendant 15, the Rambam Medical Center in Haifa ("**Rambam**"), is a governmental hospital owned by the State of Israel. Defendant 16 is Rambam's research foundation ("**Rambam Research Foundation**").

142. Since its establishment, Yeshaya transferred to Rambam and the Rambam Research Foundation at least US $1,297,000, as donations. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Rambam and the Rambam Research Foundation.

143. On December 31, 2014, the undersigned, the Plaintiff's attorney, contacted Rambam and presented it with the facts pertaining to the manner through which Rambam gained the funds of BLMIS's defrauded investors. Rambam replied on January 26, 2015, that although the fraud committed by Madoff is known to it, Rambam has no knowledge on Yeshaya's involvement in the scheme. It was further claimed that the donations Rambam received were received in good faith and used for its public activity. The Plaintiff's attorney replied to Rambam on July 7, 2015 and clarified that Rambam used, benefitted from and became enriched by the money it received from Yeshaya, and therefore is liable for restitution thereof. A copy of the correspondence between the parties was also forwarded to the Rambam Research Foundation.

     Copies of the correspondence (without attachments) between the Plaintiff's attorney and between Rambam and Rambam Research Foundation are attached hereto as **Exhibit "24"** and constitute an integral part hereof.

144. Although Rambam and Rambam Research Foundation learned that the BLMIS investors were the source of the money they received, namely that it was sourced from theft and fraud, Rambam and Rambam Research Foundation did not return the money to the Plaintiff.

**Defendants 17**

145. Defendant 17 – Clalit Health Services ("**Clalit**") is one of the health funds and the largest supplier of health services in Israel. Clalit owns, *inter alia*, the public hospitals, including Defendants 18 and 19, as well as a chain of hundreds of clinics throughout the country.

146. Since its establishment, Yeshaya transferred to hospitals owned by Clalit, donations totaling at least $US 1,955,000. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Clalit.

**Defendants 18**

147. Defendant 18, Schneider Children's Hospital ("**Schneider**"), is a hospital owned by Clalit, which operates in the framework of the Rabin (formerly Beilinson) Medical Center.

L/55001/4420/7990454/1

148.  Since its establishment, Yeshaya transferred to Schneider, through Clalit, donations of at least US $1,000,000. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Schneider.

149.  On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted Schneider with a letter which presented the manner through which Schneider received the funds of BLMIS's investors. Schneider did not reply to the Plaintiff's letters.

Copies of the correspondence (without attachments) sent by the Plaintiff's attorney to Schneider are attached hereto as **Exhibit "25"** and constitute an integral part hereof.

150.  Although Schneider learned that BLMIS was the source of the donations, namely that it was sourced from theft and fraud, Schneider did not return the money to the Plaintiff, and did not even bother to reply to his letters.

## **Defendants 19**

151.  Defendant 19, Kaplan Medical Center ("**Kaplan**"), is a hospital owned by Clalit. Since its establishment, Yeshaya transferred to Kaplan, through Clalit, donations of at least US $955,000. As aforesaid, a significant share or all of this money is sourced from deposits of BLMIS's clients, which were stolen by BLMIS and unlawfully transferred to Kaplan.

152.  On December 31, 2014, the undersigned, the Plaintiff's attorney, contacted Kaplan and presented it with the facts pertaining to the manner through which Kaplan gained the funds of the BLMIS's defrauded investors. Kaplan's reply arrived in a letter of June 2, 2015 (dated March 23, 2015), from the legal department of Clalit – the owners of Kaplan. In this letter, it is asserted that Kaplan did not receive money from Yeshaya and that the money was apparently transferred to the Ruth Ben Ari Research Foundation at the Institute for AIDS Research.

153.  The Plaintiff's attorney replied to Kaplan and Clalit on July 7, 2015, and clarified that that amounts transferred to Kaplan were in fact designated for AIDS research. However, this research was performed in the framework of Kaplan's AIDS Institute and therefore, the claim to the effect that Kaplan "does not and did not have any connection to and/or ownership of and/or rights" in the stolen money, is not an accurate description of the reality. It was further clarified that even had Kaplan transferred the money to any research foundation, this would not derogate from its liability to return the money received unlawfully. A copy of this letter was also sent to Kaplan's medical research foundation (which is not a defendant here). Kaplan replied on July 21, 2015 that it does not deem itself liable for money transferred to a certain researcher with respect to specific research performed approx. 13 years ago.

Copies of the correspondence between the Plaintiff's attorney and between Kaplan and Clalit are attached hereto as **Exhibit "26"** and constitute an integral part hereof.

L/55001/4420/7990454/1

154. Although Kaplan and Clalit have long since learned that BLMIS was the source of the money that Kaplan received, namely that it was sourced from theft and fraud, the money was not returned to the Plaintiff.

**Defendants 20**

155. Defendant 20 – The New Jerusalem Foundation for its Residents ("**Jerusalem Foundation**"), is a social foundation whose objective is to contribute to the advancement of the capital city.

156. The Jerusalem Foundation received from Yeshaya, donations of $87,628 and another ILS 1,875,984. The source of the donations is the deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to Magnify and therefrom to Yeshaya.

157. On August 20, 2015, the undersigned, the Plaintiff's attorney, contacted the Jerusalem Foundation and informed it that the source of the donations it received from Yeshaya is the funds of BLMIS investors. Until the date of filing of this Claim, no reply was received from the Jerusalem Foundation, and although the Plaintiff informed the Jerusalem Foundation that BLMIS was the source of the money received, namely from fraud and theft, the money was not returned to the Plaintiff.

A copy of the correspondence sent by the Plaintiff's attorney to the Jerusalem Foundation is attached hereto as **Exhibit "27"** and constitutes an integral part hereof.

**Defendants 21**

158. Defendant 21 - MIGAL College - Galilee Scientific Research Institute Ltd. ("**MIGAL**") is an independent research institution which operates in the fields of applied research.

159. Yeshaya transferred to MIGAL donations of at least US $538,750. The source of the donations is the deposits of BLMIS clients, which were stolen by BLMIS and unlawfully transferred to MIGAL.

160. On December 28, 2008, Yeshaya contacted MIGAL in writing and gave notice that it would not be able to continue transferring money which it committed to invest or donate, due to the collapse of BLMIS.

A copy Yeshaya's letter to MIGAL is attached hereto as **Exhibit "28"** and constitutes an integral part hereof.

161. On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted MIGAL and informed it of the factual matrix pertaining to the manner through which it gained funds of BLMIS's investors. MIGAL replied on June 11, and 17, asking for the legal basis of the claim against it. The Plaintiff's attorney replied on June 29, 2015, that MIGAL used, benefitted from and became enriched by money received from Yeshaya, at the expense of others, and that these acts by MIGAL constituted unjust enrichment at the expense of

L/55001/4420/7990454/1

BLMIS's defrauded investors. MIGAL replied on July 29, 2015 and dismissed the Plaintiff's claims.

Copies of the correspondence between the Plaintiff's attorney and MIGAL are attached hereto as **Exhibit "29"** and constitute an integral part hereof.

162.  Although MIGAL long ago learned that BLMIS was the source of the money it received, namely that it was sourced from fraud and theft, the stolen money was not returned to the Plaintiff.

## Defendant 22

163.  Defendant 22 – The Jewish People Policy Institute (Established by The Jewish Agency for Israel) Ltd. (JPPI) is a research institute established by the former journalist Avinoam Bar Yosef, which operates as a Think Tank and is incorporated as a non-profit corporation. The Institute seeks to identify the challenges for the future of the Jewish people and to present them, together with recommendations for policy, to decision makers and leaders.

164.  Since its establishment, Yeshaya transferred to JPPI donations in the amount of at least US $500,000. The source of the donation funds is the money of the BLMIS customers which was stolen by BLMIS and unlawfully transferred to Defendant 22.

165.  On July 27, 2015, the undersigned, the Plaintiff's attorney, contacted JPPI and presented the factual matrix pertaining to the unlawful transfer of funds from the BLMIS investors through Magnify and Yeshaya to JPPI. JPPI answered, on September 24, 2015, that it lawfully received the funds from Yeshaya and fully used them according to an agreement between JPPI and Yeshaya - which was not disclosed nor attached to JPPI's letter. JPPI further claimed that Yeshaya did not transfer to it the full amount of funds it committed to transfer. The undersigned responded on November 1, 2015, and clarified, *inter alia*, that JPPI was enriched at the expense of the deceived BLMIS investors, and therefore it is obligated to return the funds.

Copies of the correspondence between the Plaintiff's attorney and JPPI are annexed as **Exhibit "30"** hereto and form an integral part hereof.

166.  Despite the fact that the fraudulent acts of Madoff and BLMIS were exposed and clarified to JPPI long ago, it continues to holds the moneys it received from Yeshaya, and has not returned the misappropriated funds as directed by the law.

## Defendant 23

167.  Defendant 23 – The Jerusalem Spinoza Institute (the **"Spinoza Institute"**) is an institute for the study of the philosophy of Baruch Spinoza, and other contemporary philosophers, which was established by Professor Yirmiyahu Yovel.

168.  The Spinoza Institute was one of the first institutions to receive donations from Yeshaya, and received an "annuity" of thousands of dollars. Since

40

Yeshaya's establishment, the Spinoza Institute received from Yeshaya donations in the amount of approx. $86,500 plus an additional sum of NIS 586,477. The source of the donation funds is the money of BLMIS customers which was stolen by BLMIS and unlawfully transferred to the Spinoza Institute.

169. The undersigned, the Plaintiff's attorney, contacted the Spinoza Institute in a letter dated October 6, 2015, which was delivered on October 26, 2015, and presented it the manner by which the Spinoza Institute gained the money of the deceived investors of BLMIS.

A copy of the letter sent by the Plaintiff's attorney to the Spinoza Institute is annexed as **Exhibit "31"** hereto and forms an integral part hereof.

170. Until the date of the filing of this Claim, no response was received from the Spinoza Institute to the Plaintiff's letter.

### **Defendant 24**

171. Defendant 24 – The Lev Academic Center, formerly the Jerusalem College of Technology (the **"Lev Center"**) is a higher education institution, which integrates applied academic studies with Torah studies, as a Higher Yeshiva for boys and a College for girls.

172. The Lev Center received from Yeshaya donations in the amount of at least US $164,032. The source of the donation funds is the money of the BLMIS customers which was stolen by BLMIS and unlawfully transferred to the Lev Academic Center.

173. On December 28, 2008, Yeshaya communicated to the Lev Center in writing that it would no longer be able to continue transferring money which it committed to invest or donate, in view of the collapse of BLMIS.

A copy of Yeshaya's letter to the Lev Center is annexed as **Exhibit "32"** hereto and forms an integral part hereof

174. On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted the Lev Center and presented thereto the factual matrix pertaining to the unlawful transfers of money from the BLMIS investors through Magnify and Yeshaya to the Lev Center. The Lev Center replied on June 15, 2015, that it lawfully received the funds from Yeshaya and used them for the financing of its activity, and further that it relied thereon in its engagements with third parties. The undersigned responded that the Lev Center used the funds that it received from Yeshaya, enjoyed them and thus gained enrichment at the expense of others and that such acts constitute unjust enrichment at the expense of the BLMIS investors and therefore the Lev Center is obligated to return them.

Copies of the correspondence between the Plaintiff's attorney and the Lev Center are annexed as **Exhibit "33"** hereto and form an integral part hereof.

L/55001/4420/7990454/1

175.   Although the Lev Center found out long ago that the source of the funds received thereby was BLMIS, i.e. fraud and misappropriation, the misappropriated funds were not returned to the Plaintiff.

**Defendants 25 and 26**

176.   Defendant 25 – the University of Haifa ("**University of Haifa**") is an academic and research institute which is recognized by the CHE and budgeted by the PBC.

Defendant 26 - Carmel - Haifa University Economic Corporation Ltd. ("**Carmel**") is the commercialization company for the products of know-how and intellectual property developed at the University of Haifa, and is wholly owned thereby.

177.   Since its establishment Yeshaya transferred donations to the University of Haifa in the amount of at least US $136,340. To best knowledge, some of said moneys were allocated to Carmel. As aforesaid, the source of such "donation" funds is the deposits of the BLMIS customers which were stolen by BLMIS and unlawfully transferred to Magnify, from Magnify to Yeshaya and therefrom to the University of Haifa and Carmel.

The University of Haifa and/or Carmel did not return the money they received unlawfully

178.   On December 28, 2008, Yeshaya communicated to the University of Haifa in writing that it would no longer be able to continue transferring money which it committed to invest or donate, in view of the collapse of BLMIS.

A copy of Yeshaya's letter to the University of Haifa is annexed as **Exhibit "34"** hereto, and forms an integral part hereof.

179.   On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted the University of Haifa and clarified that the donation funds received from Yeshaya are in fact the money of the deceived investors of BLMIS, which was stolen from them, and asked for the restitution of the funds.

180.   The University of Haifa replied on June 9, 2015, and argued that the Plaintiff is not authorized to sue "secondary beneficiaries" outside of the U.S.A. The undersigned replied to the letter on June 26, 2015, while clarifying that the Plaintiff is not aware of any judicial decision which prevents the Plaintiff from acting outside the U.S.A. against the University of Haifa and Carmel. In a later correspondence, the undersigned clarified that the U.S. Court ruled that there is no impediment to the Plaintiff acting in Israel against the Defendants on causes of action under Israeli law, including unjust enrichment.

Copies of the correspondence between the Plaintiff's attorney and the University of Haifa and Carmel are annexed as **Exhibit "35"** hereto, and form an integral part hereof.

181.   Hence, although the University of Haifa and Carmel found out long ago that the source of the money received thereby was BLMIS, i.e. that such funds are

L/55001/4420/7990454/1

not, and never have been, the property of Yeshaya – the transferor of the money, they did not return the money they received unlawfully to the Plaintiff.

**Defendant 27**

182. Defendant 27 – the Music and Dance Academy Jerusalem (JAMD), is Israel's academy for creation, performance and teaching of music and dance. JAMD is a higher education institution, which is authorized to grant academic degrees.

183. Since its establishment in 1988, Yeshaya transferred to JAMD at least NIS 483,365. The source of the donation funds is the deposits of the BLMIS customers which were stolen by BLMIS and unlawfully transferred to JAMD.

184. On July 27, 2015, the undersigned, the Plaintiff's attorney, contacted JAMD and presented it with the manner by which it gained the money of the deceived investors of BLMIS. JAMD responded on August 15, 2015 that it lawfully received the funds from Yeshaya, and used them for the financing of its activity. JAMD further argued that the Plaintiff is barred from acting against it outside of the U.S.A. The undersigned responded on September 29, 2015, that JAMD used the funds that it received from Yeshaya, enjoyed them and thus gained enrichment at the expense of the BLMIS investors and that such acts constitute unjust enrichment at the expense of the BLMIS investors and therefore JAMD is obligated to return them. The undersigned further added that the Plaintiff is entitled to initiate legal proceedings in Israel according to causes of action under Israeli law.

Copies of the correspondence between the Plaintiff's attorney and JAMD are annexed as **Exhibit "36"** hereto, and form an integral part hereof.

185. Although JAMD found out that the source of the funds received thereby was BLMIS, i.e. fraud and misappropriation, the misappropriated funds were not returned to the Plaintiff.

**Defendant 28**

186. Defendant 28 – Azrieli - College of Engineering Jerusalem (the "**College** ") is an academic studies institution offering a degree in engineering.

187. The College received from Yeshaya donations in the amount of at least US $128,862. The source of the donation funds is the deposits of the BLMIS customers which were stolen by BLMIS and unlawfully transferred to the College.

188. On December 28, 2008, Yeshaya communicated to the College in writing that it would no longer be able to continue transferring money which it committed to invest or donate, in view of the collapse of BLMIS.

A copy of Yeshaya's letter to the College is annexed as **Exhibit "37"** hereto, and forms an integral part hereof.

189. On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted the College and informed it that the source of the donation which it received from

L/55001/4420/7990454/1

Yeshaya is the money of the BLMIS investors. The College replied on June 15, 2015, that it lawfully received the money from Yeshaya, used it for the financing of its activity and further that it relied thereon in its engagements with third parties. The undersigned responded to the College's letter on September 20, 2015, and replied that the College gained unjust enrichment at the expense of the BLMIS investors and therefore the College is obligated to restitute the funds that it received.

Copies of the correspondence between the Plaintiff's attorney and the College are annexed as **Exhibit "38"** hereto and form an integral part hereof.

190.  Although the College found out long ago that the source of the funds received thereby was BLMIS, i.e. fraud and misappropriation, the misappropriated funds were not returned to the Plaintiff.

### **Defendants 29 and 30**

191.  Defendant 29 – Tel Aviv Sourasky Medical Center ("**Sourasky**") is a governmental hospital owned by the Tel Aviv Municipality. Defendant 30 is the research foundation of Sourasky (the "**Sourasky Research Foundation**").

192.  On December 28, 2008, Yeshaya communicated to Sourasky in writing that it would no longer be able to continue transferring money which it committed to invest or donate, in view of the collapse of BLMIS.

A copy of Yeshaya's letter to Sourasky is annexed as **Exhibit "39"** hereto, and forms an integral part hereof.

193.  Since its establishment, Yeshaya transferred to Sourasky and to the Sourasky Research Foundation donations in the amount of US $120,000. The source of a significant part or the entirety of these funds is the deposits of BLMIS customers which were stolen by BLMIS and unlawfully transferred to Sourasky and the Sourasky Research Foundation.

194.  On May 13, 2015, the undersigned, the Plaintiff's attorney, contacted Sourasky and presented the facts pertaining to the manner by which Sourasky gained the money of BLMIS investors. The CEO of Sourasky replied in a one-line letter on June 2, 2015, in which he stated that the Plaintiff's arguments were received by Sourasky with surprise, and are denied thereby. A copy of the correspondence between the parties was forwarded to the Sourasky Research Foundation, Defendant 27, who also replied in a laconic, one-line letter.

Copies of the correspondence between the Plaintiff's attorney and Sourasky and the Sourasky Research Foundation are annexed as **Exhibit "40"** hereto and form an integral part hereof.

195.  Although Sourasky and the Sourasky Research Foundation found out long ago that the source of the money received thereby was BLMIS, i.e. fraud and misappropriation, Sourasky and its research foundation did not return the money to the Plaintiff.

L/55001/4420/7990454/1

**Yeshaya established research centers through which additional funds were funneled to the Defendants**

196. Without any apparent reason, and with no indication that it could fulfill the wishes of the "anonymous donor", Yeshaya established three "research centers" which were never incorporated as legal entities. Through these "centers", called "The Center for Emerging Diseases", "The Center for Complexity Science" and the "IVRI Center", additional funds were funneled to the following Defendants: The Hebrew University and Yissum, Ben Gurion University and B.G. Negev, Weizmann Institute and Yeda, Bar Ilan and BIRAD, Tel Aviv University and Ramot, University of Haifa and Carmel, and the Technion.

197. From documents received by the Plaintiff, it emerges that such centers were managed by Yeshaya's secretaries and were operated from their homes. For example, the address of "The Center for Complexity Science" was at the home of a secretary of Yeshaya, Gili Focht. Ms. Focht also held an e-mail account that was associated with the Center for Complexity Science.

198. The Plaintiff reserves the right to amend the amounts to which it is entitled from the Defendants should it be found that the funds that were transferred to such "centers" were not taken into account in the context of the sums sued hereunder.

**The facts establishing the causes of action were unknown to the Plaintiff at least until December 2008**

199. The relevant causes of action were established each time that Yeshaya transferred funds to any of the Defendants hereunder. However, the facts giving rise to the causes of action were not known to the Plaintiff also long after December 2008, when the Madoff fraud was exposed. In the years following the collapse of BLMIS, the Plaintiff searched for documents, *inter alia*, from Yeshaya, Magnify, and Green, the defendants under the New York claim. The defendants under the New York claim have not yet disclosed all of the documents requested therefrom. These include, *inter alia*, the alleged agreements between Yeshaya and the Defendants hereunder. Madoff, his collaborators and BLMIS saved no effort, time and resources to conceal the fraudulent nature of BLMIS, as explained above. The defendants under the New Your Proceedings invested time, efforts and many resources in order to conceal, blur and refrain from disclosing documents that would have enabled the Plaintiff to grasp the full picture of the acts that took place prior to the collapse of BLMIS.

200. The Plaintiff made an effort to minimize the reliance on public documents, considering the false representations made before the Registrar of Non-Profit Organizations, and consistently requested that relevant documents be delivered in the context of the New York Proceedings. As of this writing, the Plaintiff identified a significant shortfall in the delivery of the documents by Yeshaya, and he continues to request additional documents therefrom. The latest delivery of documents, which took place in September 2015, did not

L/55001/4420/7990454/1

address the missing documents. Hence, the Plaintiff reserves his right to amend the Claim if and when additional documents will be provided.

201. In addition, the Plaintiff and his attorneys have managed approx. 1,000 claims in the U.S.A. pertaining to the collapse of BLMIS. In the circumstances of said constraints, the beginning of the statute of limitations period is deferred.

202. Yeshaya itself argued before the Jerusalem District Court in the context of the voluntary liquidation proceedings, that "no one" could have known about the fraud. While the Plaintiff denies such argument in respect of Yeshaya, Green, Nahir and additional members of Yeshaya, who were among those who positively and subjectively knew about the fraud or suspected it; this argumentation holds true for the Plaintiff and the defrauded BLMIS investors for whom the restitution is sought. This argumentation also holds true for at least some of the Defendants hereunder, while other Defendants were aware of the fraud. However, once the Defendants learned of the fraud, they were to restitute the funds they unlawfully received to the Plaintiff.

203. Moreover, BLMIS itself did not have the relevant knowledge nor the "power to sue", since Madoff who controlled BLMIS, prevented and impeded the corporation from exercising its right to stop the fraud and sue on behalf of BLMIS.

204. Accordingly, despite the fact that the transfers of funds to the Defendants establish causes of action, the beginning of the statute of limitations period for each such cause of action was delayed and deferred until the discovery of the fraud, the removal of Madoff from a controlling position, and the appointment of the Plaintiff as trustee for the assets of Madoff and BLMIS with the ability to exercise the power to sue and with all of the information required in order to file a claim against the Defendants. In view of the foregoing, this Claim is filed before the running of the statute of limitations thereon.

**The causes of action –**

**Unjust enrichment**

205. The Defendants' acts as described above constitute unjust enrichment at the expense of BLMIS, such that the Defendants are required to return the stolen funds to the Plaintiff, who will act to return them to the customers who were deceived by Madoff and his assistants. Section 1 of the Unjust Enrichment Law 5739-1979 prescribes as follows:

> ***"(a) any person who receives, without lawful right, an asset, service or other benefit (the "Beneficiary") from another person (the "Benefactor"), must return the benefit to the Benefactor, and if specific restitution is impossible or unreasonable – pay him the value thereof.***
>
> ***(b) It is irrelevant whether the benefit is the result of an act of the Beneficiary, an act of the Benefactor or otherwise".***

206. Under the law, the unjust enrichment cause of action is established upon the fulfillment of three conditions, which are fulfilled in the case at bar:

206.1. The receipt of an asset, a service or a benefit – the Defendants received from Yeshaya millions of dollars, as specified above.

206.2. The source of enrichment is the grantor – the source of the funds which were received by the Defendants is the deceived customers of BLMIS.

206.3. The enrichment is not under a lawful right – the source of the funds which were received by Yeshaya and transferred to the Defendants is fraud and misappropriation, a part of an illegal mega fraud. In addition, the conduct of Yeshaya, the grantor of funds, in receiving the stolen money and the transfer thereof to the Defendants, was wrongful and contradictory to the law. For that reason too, the transfer of money to the Defendants is unlawful.

207. The Defendants held, and keep holding, the stolen money also after the collapse of BLMIS and the exposure of the Madoff fraud. The Defendants refrained from returning the funds also after Yeshaya contacted some of them and expressly informed them that the source of the money which they received is BLMIS. The Defendants further refused to return the money even after the Plaintiff contacted each and every one of the Defendants with a request of restitution of the funds which were unlawfully transferred, and refrained from returning the amounts which the Plaintiff is entitled to receive in order to distribute them between the deceived investors of BLMIS.

208. Even if there was any substance to the Defendants' argument that they did not know in real time that the source of the money is fraud and theft, an argument which the Plaintiff cannot accept with respect to some of the Defendants, as aforesaid, the lack of knowledge does not "launder" the stolen money which was transferred. A claim of unjust enrichment does not focus on the question whether or not the transfer of money was legal, but rather whether the Defendants were unjustly and unrightfully enriched.

209. Moreover. As soon as the BLMIS scandal was exposed, and the fraud revealed, and in particular after the Defendants have expressly learned that the source of money which they received from Yeshaya was the deceived customers of BLMIS, the Defendants can no longer claim that they hold the money in good faith or that they "have no knowledge" (in the words of some of the Defendants) of the source of money which they received unlawfully. As aforesaid, and as is well known, global as well as Israeli media expansively reported that Yeshaya was one of the BLMIS customers which was allegedly, and according to the information possessed by the media at that time, damaged by the collapse of BLMIS. Indeed, after the collapse of BLMIS, Yeshaya communicated to most of the Defendants in writing and expressly noted that BLMIS collapsed as a result of a fraud. The Defendants were aware, already at the beginning of 2009, that the "donations" which Yeshaya transferred thereto originated from money of other investors.

L/55001/4420/7990454/1

**Void contract and gift**

210. Some of the Defendants claimed in response to the Plaintiff's letters, that they received the funds from Yeshaya according to agreements that refer to "donations" or "grants" or "technology transfers". Such agreements are void or voidable according to the provisions of the specific Gift Law, 5728-1968 and the general Contracts Law (General Part), 5733-1973, since the property (funds) that Yeshaya transferred to the Defendants, did not belong to Yeshaya. The recipients (the Defendants) were mistaken as to the nature of the property that was granted, or, the property was transferred in the context of a void agreement. Accordingly, the Defendants are required to return everything they received in the context of the void agreement to the Plaintiff. It will be just in the circumstances to declare the agreements void, or alternatively to nullify them. In addition, the alleged agreements between Yeshaya and the Defendants were ostensibly prepared by Green's law firm according to Yeshaya's instructions. Green's awareness as to relevant facts pertaining to the fraud, and his involvement therein, cast a heavy shadow of illegitimacy on the agreements and render their execution and performance unlawful, immoral and opposed to public policy.

211. Since the funds received by the Defendants originate from fraud, the agreements for their transfer were unlawful or at the very least were based on a fundamental mutual error which renders the agreements unenforceable and voidable. The Honorable Court is thus moved to declare that the agreements and the transfers thereunder from Yeshaya to the Defendants are void.

212. Similarly, insofar as the Defendants received "donations" or "grants" without a written agreement with Yeshaya, a cause of restitution under the Gift Law, 5728-1968 is established, since a gift is voidable if it is proven that the gift was given by virtue of a mistake, fraud or misleading – as in the case at bar.

213. Insofar as the Defendants believed that they received a gift from Yeshaya, they were fundamentally mistaken in regards to the source and nature of the funds; these were funds that were stolen from the BLMIS victims, which did not lawfully belong to Yeshaya to give away. A gift that was found to have been given as a result of a fundamental error, is voidable under the General Contracts Law. In the unusual circumstances of the case at bar, the Honorable Court is requested to make justice, provide remedy to the victims of BLMIS and Madoff, and order a full restitution of the funds to the Plaintiff.

**Remedies**

214. Therefore, the Honorable Court is moved to summon the Defendants and order them:

214.1. To provide the Plaintiff with full and true accounts of the funds they directly and indirectly received from Yeshaya and each one of its managers and employees;

214.2. To restitute to the Plaintiff the funds which they received unlawfully, as specified below:

L/55001/4420/7990454/1

214.2.1.   Defendants 1 and 2, jointly and severally: restitute to the Plaintiff the amount of US $36,105,580, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.2.   Defendants 3 and 4, jointly and severally: restitute to the Plaintiff the amount of US $18,389,627, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.3.   Defendants 5 and 6, jointly and severally: restitute to the Plaintiff the amount of US $13,520,880, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.4.   Defendants 7 and 8, jointly and severally: restitute to the Plaintiff the amount of US $10,031,333, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment. ,

214.2.5.   Defendants 9 and 10, jointly and severally: restitute to the Plaintiff the amount of US $6,510,212, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.6.   Defendants 11 and 12, jointly and severally: restitute to the Plaintiff the amount of US $3,999,514, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.7.   Defendants 13 and 14, jointly and severally: restitute to the Plaintiff the amount of US $2,349,171, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.8.   Defendants 15 and 16, jointly and severally: restitute to the Plaintiff the amount of US $1,297,000, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.9.   Defendants 17 and 18, jointly and severally: restitute to the Plaintiff the amount of US $1,000,000, in the NIS value thereof on the date of payment, plus interest and linkage

differentials from the date of filing of the Claim until the date of actual payment.

214.2.10.   Defendants 18 and 19, jointly and severally: restitute to the Plaintiff the amount of US $955,000, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.11.   Defendant 20: restitute to the Plaintiff the amount of US $87,628, in the NIS value thereof on the date of payment, plus NIS 1,875,984, all plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.12.   Defendant 21: restitute to the Plaintiff the amount of US $538,750, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.13.   Defendant 22: restitute to the Plaintiff the amount of US $500,000, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.14.   Defendant 23: restitute to the Plaintiff the amount of US $86,500, in the NIS value thereof on the date of payment, plus NIS 586,477, all plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.15.   Defendant 24: restitute to the Plaintiff the amount of US $164,032, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.16.   Defendants 25 and 26, jointly and severally: restitute to the Plaintiff the amount of US $136,340, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.17.   Defendants 27: restitute to the Plaintiff the amount of NIS 483,365 plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

214.2.18.   Defendants 28: restitute to the Plaintiff the amount of US $128,862, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

L/55001/4420/7990454/1

214.2.19. Defendants 29 and 30, jointly and severally: restitute to the Plaintiff the amount of US $120,000, in the NIS value thereof on the date of payment, plus interest and linkage differentials from the date of filing of the Claim until the date of actual payment.

215. The legal arguments herein are argued alternatively or cumulatively, all according to the context and subject-matter thereof.

216. The Plaintiff reserves his right to amend his Complaint and/or any part thereof, including the requested amounts, their height and way of calculation, *inter alia* following the receipt of accounts and the disclosure of all of the documents in the Claim.

217. This Honorable Court has the jurisdiction to hear the Claim and it is the proper venue for the hearing thereof. The causes of action are according to Israeli law, the Claim pertains to transfers of funds that were made in Israel, received in Israel among parties incorporated and residing in Israel, according to contracts (whether written or otherwise, whether void or voidable) that were entered in Israel, that are governed – to best knowledge, by Israeli law. The relevant witnesses on behalf of the Defendants are all situated in Israel. This Honorable Court has the territorial and subject-matter jurisdiction to hear the Claim, considering its essence and the *situs* of some of the Defendants.

**Therefore, the Honorable Court is moved to grant the remedies specified above and charge the Defendants with the costs of the Claim plus legal fees.**


_____                    _____
**Ady Nordman, Adv.**                              **Jonathan Agmon, Adv.**
License no. 17292                                License no. 17010


Soroker - Agmon
Advocates & Patent Attorneys
Counsel to the Plaintiff


Herzliya, today December 9, 2015.