| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | |
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br><center>Plaintiff-Applicant,</center><br><center>v.</center><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br><center>Defendant.</center> | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br><center>Debtor.</center> | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br><center>Plaintiff,</center><br><center>v.</center><br>THE HEBREW UNIVERSITY OF JERUSALEM, YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., BEN-GURION UNIVERSITY OF THE NEGEV, B.G. NEGEV TECHNOLOGIES AND APPLICATIONS LTD., THE WEIZMANN INSTITUTE OF SCIENCE, and BAR ILAN UNIVERSITY,<br><br><center>Defendants.</center> | Adv. Pro. No. 21-01190 (CGM) |

<center>

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

</center>

<div align="right">

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

September 15, 2022

</div>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT ..............................................................................................................5

POINT I.    DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION. ..............5

    A.    Yair Green's conduct and knowledge cannot support specific jurisdiction. ................6

    B.    Assuming (wrongly) that the professors participated in Yeshaya as agents of
        the universities, their actions do not support jurisdiction over the universities............8

        1.    Lack of purposeful U.S. contacts ..........................................................8

        2.    Lack of proximate cause ...................................................................10

        3.    Lack of facts relating to specific transfers ........................................14

    C.    Regardless, the Complaint fails to allege facts showing that the professors
        participated in Yeshaya as agents of the universities.....................................15

        1.    Bar-Ilan University .........................................................................18

        2.    Weizmann Institute of Science .........................................................19

        3.    Ben-Gurion University of the Negev................................................20

        4.    Hebrew University of Jerusalem.......................................................22

        5.    The Technology Companies ..............................................................24

    D.    The Trustee has no viable ratification theory. ............................................26

POINT II.    EVEN IF ANY DEFENDANT HAD MINIMUM CONTACTS WITH THE
        UNITED STATES, THE EXERCISE OF JURISDICTION WOULD BE
        UNREASONABLE. .........................................................................27

POINT III.    THE COMPLAINT FAILS TO STATE A CLAIM ON THE MERITS...................29

    A.    The only remaining issue is a pure question of statutory construction.......................31

    B.    Law-of-the-case does not preclude consideration of defendants' argument. ..............32

    C.    The Trustee's interpretation of Section 550(a) is incorrect. ....................................34

    D.    There is no conflict with SIPA.....................................................................39

E.    The issue presented should be certified for direct Second Circuit review...................39

CONCLUSION .........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Bajaj (In re Med. Mgmt. Grp., LLC)*,
534 B.R. 646 (Bankr. D.S.C. 2015) ...............................................................37 n.24

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ...........................................................................................25

*Associated Producers Ltd* v. *Vanderbilt University*,
76 F. Supp. 3d 154 (D.D.C. 2014) ...............................................................16, 18

*BP P.L.C.* v. *Mayor & City Council of Baltimore*,
141 S. Ct. 1532 (2021) ......................................................................................36

*Burger King Corp.* v. *Rudzewicz*,
471 U.S. 462 (1985) .............................................................................................9

*Central Va. Cmty. Coll.* v. *Katz*,
546 U.S. 356 (2006) .....................................................................................35 n.23

*Charles Schwab Corp.* v. *Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ...........................................................................3, 10, 5

*Chew* v. *Dietrich*,
143 F.3d 24 (2d Cir. 1998) ..................................................................................3

*Colvin* v. *Keen*,
900 F.3d 63 (2d Cir. 2018) ..................................................................................4

*Corrado* v. *N.Y. Unified Ct. Sys.*,
163 F. Supp. 3d 1 (S.D.N.Y. 2016) ..............................................................32 n.20

*Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021) ............................................................................... *passim*

*GEM Advisors, Inc.* v. *Corporación Sidenor, S.A.*,
667 F. Supp. 2d 308 (S.D.N.Y. 2009) .......................................................2, 6, 17 n.13

*Gibbons* v. *Bristol-Myers Squibb Co.*,
919 F.3d 699 (2d Cir. 2019) ..............................................................................36

*GMA Accessories, Inc.* v. *Elec. Wonderland, Inc.*,
2012 WL 13059956 (S.D.N.Y. June 20, 2012) ....................................................32

*IBT Int'l Inc.* v. *Northern (In re Int'l Admin Servs., Inc.)*,
    408 F.3d 689 (11th Cir. 2005) ...................................................37 n.24, 38

*In re AVI, Inc.*,
    389 B.R. 721 (B.A.P. 9th Cir. 2008)....................................................37, 38

*In re Bennett Funding Grp.*,
    336 F.3d 94 (2d Cir. 2003)....................................................................26

*In re Bernard L. Madoff Inv. Secs., LLC*,
    2022 WL 1304589 (S.D.N.Y. May 2, 2022) ................................. *passim*

*In re Brizinova*,
    588 B.R. 311 (Bankr. E.D.N.Y. 2018)..................................................32

*In re Brizinova*,
    592 B.R. 442 (Bankr. E.D.N.Y. 2018)...........................................32 n.20

*In re DeBerry*,
    945 F.3d 943 (5th Cir. 2019) ........................................................39 n.26

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019)...........................................39 n.26

*In re Felt Mfg. Co.*,
    371 B.R. 589 (Bankr. D.N.H. 2007) ..............................................37 n.24

*In re Harnett*,
    558 B.R. 655 (Bankr. D. Conn. 2016) ...........................................35 n.23

*In re HS 45 John LLC*,
    585 B.R. 64 (Bankr. S.D.N.Y. 2018)....................................................32

*In re JVJ Pharmacy Inc.*,
    630 B.R. 388 (S.D.N.Y. 2021)......................................................39 n.26

*In re Lyondell Chem. Co.*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016)..................................................25

*In re M. Fabrikant & Sons, Inc.*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008)..................................................35

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ............................33 n.21, 39 n.26

*In re Mexican Gov't Bonds Antitrust Litig.*,
    2022 WL 950955 (S.D.N.Y. Mar. 30, 2022) .........................................12

*In re Millenium Seacarriers, Inc.*,
  419 F.3d 83 (2d Cir. 2005)........................................................................36 n.23

*In re Motors Liquidation Co.*,
  943 F.3d 125 (2d Cir. 2019)......................................................................32 n.20

*In re Nat'l Audit Def. Network*,
  332 B.R. 896 (Bankr D. Nev. 2005) ........................................................37 n.24

*In re PCH Assocs.*,
  949 F.2d 585 (2d Cir. 1991)..............................................................................34

*In re Phillips*,
  379 B.R. 765 (Bankr. N.D. Ill. 2007) ......................................................37 n.24

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019)........................................................................ *passim*

*In re Richmond Produce Co.*,
  195 B.R. 455 (N.D. Cal. 1996) ................................................................37 n.24

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  946 F.3d 66 (2d Cir. 2019)................................................................................17

*Jam* v. *Int'l Fin. Corp.*,
  139 S.Ct. 759 (2019)..........................................................................................5

*Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*,
  2004 WL 359138 (S.D.N.Y. Feb. 26, 2004)............................................32 n.20

*Law* v. *Siegel*,
  571 U.S. 415 (2014)..........................................................................................35

*Met. Life Ins. Co.* v. *Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)................................................................................27

*Monsanto* v. *United States*,
  348 F.3d 345 (2d Cir. 2003)..............................................................................12

*Nat'l Ass'n of Mfrs.* v. *Dep't of Defense*,
  138 S. Ct. 617 (2018) ...............................................................................35 n.22

*Norex Petroleum Ltd.* v. *Access Indus., Inc.*,
  416 F.3d 146 (2d Cir. 2005)................................................................................8

*Picard* v. *Banque Syz & Co.*,
  2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022).............................8 n.9, 13, 33

*Picard* v. *BNP Paribas, S.A.*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ............................................................ *passim*

*Picard* v. *Bureau of Labor Ins.*,
   480 B.R. 501 (Bankr. S.D.N.Y. 2012) .................................................................8

*Picard* v. *Citibank, N.A.*,
   12 F.4th 171 (2d Cir. 2021) ........................................................................ *passim*

*Picard* v. *Estate of Igoin*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ...............................................................22

*Picard* v. *Gettinger*,
   976 F.3d 184 (2d Cir. 2020) .................................................................... 39 n.25

*Picard* v. *Multi-Strategy Fund Ltd.*,
   641 B.R. 78 (Bankr. S.D.N.Y. 2022) ..............................................8 n.9, 13, 33

*Piper Aircraft Co.* v. *Reyno*,
   454 U.S. 235 (1981) ..........................................................................................28

*RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*,
   566 U.S. 639 (2012) ..........................................................................................35

*SAS Inst. Inc.* v. *Iancu*,
   138 S. Ct. 1348 (2018) ......................................................................................37

*SPV Osus Ltd.* v. *UBS AG*,
   114 F. Supp. 3d 161 (S.D.N.Y. 2013) .............................................3 n.4, 4 n.5, 11

*SPV Osus Ltd.* v. *UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ..................................................................... *passim*

*Sunward Elecs., Inc.* v. *McDonald*,
   362 F.3d 17 (2d Cir. 2004) ...............................................................................15

*U.S. Bank N.A.* v. *Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019) ..............................................................................9

*United States* v. *Diaz*,
   122 F. Supp. 3d 165 (S.D.N.Y. 2015) ..............................................................12

*United States* v. *Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..............................................................12

*United States* v. *Ho*,
   984 F.3d 191 (2d Cir. 2020) ............................................................................35

*Walden* v. *Fiore*,
   571 U.S. 277 (2014) ................................................................................ *passim*

*Westerbeke Corp.* v. *Daihatsu Motor Co.*,
   304 F.3d 200 (2d Cir. 2002) ............................................................... 32 n.20

*Zdanok* v. *Glidden Co.*,
   327 F.2d 944 (2d Cir. 1964) ...................................................................2, 34

**Rules and Statutes**

11 U.S.C. § 349(b)(1)(B) .............................................................................35

11 U.S.C. § 502(d) .......................................................................................35

11 U.S.C. § 544 ......................................................................................14, 31

11 U.S.C. § 546(a) .......................................................................................36

11 U.S.C. § 548 .................................................................................... *passim*

11 U.S.C. § 550 .................................................................................... *passim*

11 U.S.C. § 551 ...........................................................................................35

15 U.S.C. § 78fff-2(c)(3) ................................................................39, 39 n.25

28 U.S.C. § 158(d)(2) ............................................................................31, 40

Fed. R. Civ. P. 12(b) ...................................................................................40

Fed. R. Civ. P. 18(b) ......................................................................30, 31, 38

## PRELIMINARY STATEMENT[1]

As the Trustee's opposition brief confirms, this case is different from the many other Madoff-related cases that raise issues of personal jurisdiction. Unlike those other cases, this case does not arise out of or relate to any defendant's direct or indirect investments in BLMIS or a BLMIS "feeder fund." Nor does it involve any financial transaction by any defendant in the United States. Nor does it involve the use by any defendant of a U.S. bank or bank account.

Instead, the Trustee in this case has sued six Israeli institutions that merely *received* transfers from Yeshaya, a non-profit organization based in Israel — in connection with a grant process that took place entirely in Israel. The defendants did not invest in Yeshaya for the purpose of investing with BLMIS; indeed, they did not invest in Yeshaya at all. Rather, as shown in the opening brief, it was only *Yeshaya* that "purposely availed" itself of this forum by investing with BLMIS. The defendants, in contrast, had no "suit-related," "purposeful" contacts with this forum. *Walden* v. *Fiore*, 571 U.S. 277, 284-85, 288 n.7 (2014).[2] The defendants, moreover, have been defending a separate action by the Trustee in Israel for the last seven years. This duplicative action seeks recovery of the same transfers as the Israeli action, even though the Trustee has continued to sue in Israel where the relevant events occurred.

In the opposition brief, as in the Complaint, the Trustee tries to establish specific jurisdiction in two ways. First, the Trustee alleges that three of the institutions (Ben-Gurion, The Weizmann Institute and Hebrew University) are responsible for the New York contacts of Yair

---

[1] Capitalized terms not defined have the same meanings as in defendants' opening brief. The Trustee's brief is cited as "Tr. Br." For convenience, the defendants are described as "institutions" or "universities," even though they have different corporate forms under Israeli law (as described in the declarations filed with the Court).

[2] The Trustee does not argue that there is general jurisdiction. Tr. Br. 22 n.16.

Green, Yeshaya's legal counsel, because Green was one of many members of their governing boards. As it relates to Green, however, the Trustee's opposition brief refutes itself. The Trustee acknowledges that, even under the broadest of agency tests, the alleged principal has to exercise "some control" over the agent. Tr. Br. 26 (quoting *GEM Advisors, Inc.* v. *Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 318-19 (S.D.N.Y. 2009) (internal quotations omitted)). Here, however, there is no allegation that any university had even the slightest control over Yair Green — an outside lawyer who had no role at the universities other than his board positions. That omission is not surprising: As a matter of law and logic, there is no basis to conclude that an institution has control over its directors, even if the directors (as a group) have control over the institution.

Unable to rely on Yair Green, the Trustee is left to argue that the universities purposely availed themselves of this forum because certain professors, as members of Yeshaya, participated in Yeshaya's grant process in Israel, which allegedly resulted in other people arranging withdrawals from BLMIS. In defending that theory, however, the Trustee imagines and responds to a motion to dismiss that does not resemble the one actually filed. In the imagined motion, defendants' "primary" or "only" argument is that they did not "formally authorize or appoint" professors to Yeshaya, and the defendants are "silent" regarding allegations that they "consented to and controlled" the actions of Yeshaya members. Tr. Br. 1, 25, 27. In the motion actually filed, however, the universities sought dismissal on multiple threshold grounds that do not turn on the agency issue. The universities also made detailed submissions showing that they did *not* "consent to or control" anyone's actions at Yeshaya.

As shown in the opening brief, the Trustee's attempt to predicate personal jurisdiction on the professors' involvement in Yeshaya fails for multiple reasons that do *not* depend on agency.

First, regardless of the professors' agency status, the Complaint fails to allege that any of the professors from Bar-Ilan, Ben-Gurion or the Weizmann Institute — three of four universities — had *any* contacts with the United States, let alone "purposeful" ones.[3]  The *only* connection that the Trustee draws between the professors and this country is that the professors, through their alleged access to Yeshaya's financial statements, could have deduced that Yeshaya derived funds from the U.S.  But under *Walden* and Second Circuit authority, that is not enough for *purposeful* availment.  Indeed, even if the professors could have foreseen that their actions would have an effect in the U.S., "[m]ere foreseeability" does "*not* suffice" for specific jurisdiction.  *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (emphasis added).

Second, in the opposition brief as in the Complaint, the Trustee does not even try to allege that Yeshaya's withdrawals from BLMIS — the source of any injury to BLMIS customers — were proximately caused, or caused at all, by any particular defendant's supposed U.S. contacts.  Under Second Circuit law, where a defendant's U.S. contacts are at most "limited," jurisdiction depends on a causal connection between those contacts and the injury alleged.  *SPV Osus Ltd.* v. *UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) (quoting *Chew* v. *Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).  The Trustee overlooks that Second Circuit authority and suggests — mistakenly — that there is only *district* court authority requiring causation.[4]  The Trustee contends as well that any causation requirement was overruled by *Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021), which held that specific jurisdiction does not

---

[3]  As discussed below, although the Trustee alleges that individuals from Hebrew University had certain New York contacts, those alleged contacts pre-dated the relevant transfers by many years, are not alleged to have caused the relevant transfers, and do not support jurisdiction.

[4]  Tr. Br. 42 (asserting incorrectly that defendants are "[r]elying on *SPV Osus Ltd.* v. *UBS AG*, 114 F. Supp. 3d 161 (S.D.N.Y. 2013)").

"always" require causation, *id.* at 1026.[5]  In *Ford Motor*, however, the Supreme Court made

clear that the lack of a causation requirement in that case was tied to the defendant's

"systematic" and "continuous" physical presence in the forum, precisely what is missing here.

*Id*. at 1027-28 & n.4.  *Ford Motor* is therefore readily reconcilable with Second Circuit law.

And regardless, it is for the Second Circuit to determine if its prior decisions were overruled by

*Ford Motor*.

<u>Third</u>, in the opposition brief as in the Complaint, the Trustee does not allege any

jurisdictional facts relating to the *specific* subsequent transfers at issue.  In a prior *BLMIS*

decision, Judge Bernstein held that, in evaluating personal jurisdiction for purposes of a

fraudulent transfer claim, "each transfer is a separate claim" and the Trustee "must establish the

court's jurisdiction with respect to each claim asserted."  *Picard* v. *BNP Paribas, S.A.*, 594 B.R.

167, 190 (Bankr. S.D.N.Y. 2018).  Here, however, despite Judge Bernstein's ruling in a

proceeding to which the Trustee was a party, the Trustee makes no attempt to establish

jurisdiction on a transfer-by-transfer basis.

The principles above, together and on their own, require dismissal *regardless* of whether

the university professors, when they participated in Yeshaya, acted as agents of the universities.

The lack of a demonstrable agency relationship provides *additional* grounds for dismissal.  As

discussed below, to argue that the professors acted as agents of the universities when they served

as members of Yeshaya, the Trustee has to argue that university professors — when they

participate in organizations outside the university — are necessarily acting as university agents.

That proposition has no support in U.S. (or Israeli) law, and it would lead to absurd results not

---

[5]  Tr. Br. 42-43 (arguing that the district court's decision in *SPV Opus* conflicts with *Ford
Motor*).

only for universities but also for businesses and other organizations whose employees are

involved in charitable institutions.  The Trustee's position also ignores an array of important

facts, including undisputed testimony that the professors acted on their own accord when they

joined Yeshaya and (in many cases) did not even know about Yeshaya's or Green's U.S.

contacts and did not inform their universities of their roles at Yeshaya.

Finally, although the Complaint should be dismissed based on lack of jurisdiction, the

Complaint is also subject to dismissal under Rule 12(b)(6), because the Trustee has failed to

plead facts showing that any initial transfer from BLMIS has been "avoided," as required by

Section 550(a).  In his opposition, the Trustee acknowledges that he cannot rely on the consent

judgment against Yeshaya to prove that initial transfers were avoided.  Tr. Br. 58 n.62.  The

Trustee argues instead that Section 550(a) permits recovery as long as an initial transfer is

"avoid*able*" — regardless of whether the transfer is "avoid*ed*."   That position is contradicted by

the statutory text and two recent decisions of the Second Circuit.  Dismissal is thus required.

## ARGUMENT[6]

## POINT I.     DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION.

Specific jurisdiction will lie only if a defendant's "suit-related," "purposeful" contacts

with the forum "create a substantial connection with the forum."  *Walden*, 571 U.S. at 284-85.  In

the opposition brief, as in the complaint, the Trustee seeks to connect the defendants to BLMIS

---

[6] The Trustee's brief includes a number of false and scandalous allegations against distinguished scientists in Israel.  For example, the Trustee asserts — without any factual support — that the Israeli scientists acted with "the purpose of directing stolen customer money" to academic institutions (Tr. Br. 25), were involved in "laundering" money (*id.* at 2), or sought to "conceal" facts about Yeshaya "from regulators and the public" (*id.* at 12).  There is no basis for those allegations, and therefore they should not have been included in a court filing.  This response will focus on the law and the facts relevant to personal jurisdiction rather than responding to each gratuitous allegation.

(and to the United States) in two ways: (1) through Yair Green, Yeshaya's counsel and the manager of its account at BLMIS, and (2) through university professors or employees who had roles at Yeshaya. Neither set of arguments is persuasive.

### A.    Yair Green's conduct and knowledge cannot support specific jurisdiction.

The Trustee attempts to predicate jurisdiction over Ben-Gurion, The Weizmann Institute and Hebrew University — but not Bar-Ilan — on the actions of Yair Green, a board member of those three institutions. But, even under the Trustee's expansive agency test, there is no basis to impute Green's conduct or knowledge to any university.

The Trustee asserts that, "for purposes of personal jurisdiction," an agency relationship requires both "the knowledge and consent of, the non-resident principal" and "some control" by the principal over the purported agent. Tr. Br. 26 (quoting *GEM Advisors, Inc.* v. *Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 318-19 (S.D.N.Y. 2009)).

The Trustee, however, has not alleged that any university had any control at all over Yair Green. The nexus between Yair Green and three of the universities (again, not Bar-Ilan) is that he sat on those universities' governing boards or committees of those boards. Tr. Br. 19-20; Compl. ¶¶ 195, 198, 239-241, 272-274. Yair Green was not a professor or an employee. As a board member, however, Mr. Green was at most one member of a collective group that governed the universities. There is *nothing* in the Complaint or the opposition brief to suggest that any university had control over Green. That is not surprising: the people who participate in a group that governs a university are by definition not under the university's control.

Specifically, as to Ben-Gurion, the Trustee alleges that Mr. Green was a member of the university's Board of Governors and two committees of the board (the Executive Committee and

Investments Committee).  Tr. Br. 19, 33.[7]  But there is no allegation that Ben-Gurion (the

purported principal) had control over Green (the purported agent).  Likewise, as to The

Weizmann Institute, the Trustee alleges that Green served on Weizmann's Board of Governors,

which is responsible for "controlling the business of Weizmann."  Tr. Br. 19, 21.  But again,

there is no allegation that Weizmann controlled Green in any way.  The same is true for Hebrew

University:  The Trustee asserts that Green served on Hebrew University's Board of Governors,

which had authority to "ratify" financial reports.  Tr. Br. 20.  But there is again no allegation that

Hebrew University had any control over Green.

Accordingly, based on the Trustee's own logic and proposed test, Yair Green's

knowledge and conduct cannot be attributed to any university.[8]

---

[7]  Misquoting the Declaration of Tamar Mund, the Trustee claims that "BGU admits that as a
member of the Investments Committee, Green was responsible for 'overseeing [BGU's]
investment of its assets.'"  Tr. Br. 35 (quoting Mund Decl. ¶ 6).  The declaration actually says
that the Investments Committee was not "responsible for soliciting funds from Yeshaya" and
that, even within the committee's sphere of authority, "no individual member" committee,
including Mr. Green, had "any power" to act other than "collectively."  Mund Decl. ¶ 6.
Regardless, whatever role the committee had, Ben-Gurion is not alleged to have had control over
Green.

[8]  As shown in the opening Declaration of Professor Amir Licht, as well as the Reply Declaration
submitted with this reply brief, Israeli law compels the same result.  *See* Dkt. 26, ¶¶ 39-40, 52-
57; Reply Decl. of Amir Licht ¶¶ 3-9.  As Professor Licht indicates, the Supreme Court of Israel
has stated that a "single director, as opposed to the board of directors as a 'multiple-person
organ' consisting of several directors, is usually not authorized, by dint of his status, to take
action on behalf of the company."  Dkt. 26 ¶¶ 39-40 (quoting Supreme Court).  The Trustee's
Israeli-law declaration provides no basis to conclude otherwise.  Although it asserts that Green's
conduct can be attributed to the universities (Dkt. 38, ¶¶ 8, 29, 38), the declaration offers no legal
analysis to support that assertion and has no answer to the straightforward statements of the
Israeli Supreme Court.  Reply Decl. ¶ 8.

**B.      Assuming (wrongly) that the professors participated in Yeshaya as agents of the universities, their actions do not support jurisdiction over the universities.**

In the opposition brief, the Trustee separately attempts to predicate jurisdiction over the universities on the actions of professors who were members of Yeshaya.  But, in doing so, the Trustee builds and tears down a straw man worthy of the Wizard of Oz.  The Trustee proclaims, on the first page of the opposition, that defendants' "primary" argument against jurisdiction is that they did not "formally authorize or appoint" professors to Yeshaya.  Tr. Br. 1.  Not so.  In the opening brief, defendants put forward multiple threshold grounds for dismissal that do not depend on agency (and, as discussed below, the arguments regarding agency go far beyond the lack of formal appointment).  The Trustee glosses over or buries his responses to those threshold arguments, because there is no cogent response.

**1.      Lack of purposeful U.S. contacts**

First and foremost, the university defendants are not alleged to have had purposeful U.S. contacts related to this suit.  Unlike in cases cited by the Trustee,[9] there is no allegation that those defendants had employees or representatives in New York, traveled to New York for matters relating to this suit, or used a U.S. bank account.[10]  Moreover, again in contrast to the cases cited by the Trustee, including in particular *Picard* v. *Bureau of Labor Ins.*, 480 B.R. 501 (Bankr.

---

[9]  *See, e.g.*, *Picard* v. *Banque Syz & Co.*, 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022), and *Picard* v. *Multi-Strategy Fund Ltd.*, 641 B.R. 78 (Bankr. S.D.N.Y. 2022).

[10]  Jurisdiction must of course be determined on a defendant by defendant basis.  Here, Bar-Ilan, Weizmann Institute and Ben-Gurion are not alleged to have had *any* U.S. contacts relating to Yeshaya.  Individuals associated with Hebrew University are alleged to have met Madoff in New York and in some cases to have submitted withdrawal requests to BLMIS for Yeshaya  (*e.g.*, Compl. ¶¶ 40-41, 43), but those alleged contacts are not alleged to have been related to the transfers at issue.  Thus, the arguments in this brief regarding lack of causation and lack of specific suit-related contacts apply to Hebrew University, as they do to the other defendants.

S.D.N.Y. 2012) ("*BLI*"), none of the defendants here *invested* in Yeshaya "with the specific

goals of having funds invested in BLMIS in New York," *id*. at 517; indeed, the defendants did

not invest in Yeshaya (or directly in BLMIS) at all.  Thus, unlike in the cases where motions to

dismiss have been denied, in this case there was no "purposeful availment" through "knowing,

intending and contemplating" that investments would be made in New York.  *Id*.

Unable to draw the necessary connections between the defendants and this forum, the

Trustee resorts to an exceedingly tenuous theory of jurisdiction.  For at least three of the

universities (Bar-Ilan, Weizmann and Ben-Gurion), the theory appears to be that, because

university professors had *access* to Yeshaya's financial statements — and those financial

statements (available at a registrar's office) had a line item showing that Yeshaya assets were

held at a U.S. broker — the universities could have foreseen that Yeshaya's grants would result

in financial transactions in the U.S.  *See* Tr. Br. 2, 29-30.

Those allegations, taken at face value, do not show purposeful availment.  Under *Walden*,

purposeful availment requires "purposeful contacts" with the forum creating a "substantial

connection with the forum."  *Walden*, 571 U.S. 284-85, 288 n.7.  And under controlling Second

Circuit precedent, "'foreseeability of causing injury in another'" forum — without conduct

"expressly aimed" at that forum — does "not suffice" to establish specific jurisdiction.  883 F.3d

at 87-88 (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474 (1985)); *see also U.S.*

*Bank N.A.* v. *Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) ("Nor is it sufficient for a

plaintiff to show simply that a defendant's actions caused an 'effect' in the forum state where the

defendant has not 'expressly aimed its conduct at the forum[,]' . . . . [or] the fact that harm in the

forum is foreseeable" (internal citations omitted)).

Here, the Trustee's allegations indicate at most that certain professors could have foreseen that Yeshaya's transactions would have an effect in the United States. But under *Charles Schwab*, it is not enough to allege that the conduct at issue had "foreseeable effects" in this forum; for specific jurisdiction, defendants' conduct must be "expressly aimed" at the forum. *Id*. at 87. In this case, however, any assertion that the universities "expressly aimed" their conduct at this forum is both unsupported and facially implausible. Unlike investors in BLMIS feeder funds, who chose to invest in those funds precisely to gain exposure to a New York investment vehicle, the universities — as recipients of grants in Israel — were indifferent to where Yeshaya received or held its assets. They had no reason to "aim" their conduct toward this forum, and there is no well-pleaded allegation that they did so. The Complaint should be dismissed on that threshold basis, as to all defendants but at the very least as to the defendants other than Hebrew University.

## 2.    Lack of proximate cause

The Complaint should also be dismissed — against all defendants — because it does not allege a causal connection between the alleged injuries to BLMIS customers, on the one hand, and any defendant's alleged U.S. contacts, on the other. As set forth in prior *BLMIS* decisions and in the opening brief, "[t]he Second Circuit has established a sliding scale" to determine whether a defendant's in-forum activities are sufficient for the exercise of specific jurisdiction:

> Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*Picard* v. *BNP Paribas, S.A.*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (quoting *SPV Osus*, 882

F.3d at 344); Opening Br. 10, 14.  In *BNP Paribas*, Judge Bernstein applied the Second Circuit's

"sliding scale" to conclude that extensive New York contacts of subsequent transferees

associated with BNP Paribas were the "proximate cause" of withdrawals from BLMIS and thus

of the "injuries that the Trustee seeks to redress."  594 B.R. at 190-91.

Here, unlike in *BNP Paribas*, the Trustee does not even try to allege that any withdrawal

from BLMIS — and thus any injury to BLMIS customers — was caused (proximately or

otherwise) by the conduct of any particular defendant.  In particular, the Trustee does not allege

that the professors associated with any particular university caused, or could cause, Yeshaya to

make any withdrawals from BLMIS, let alone the withdrawals from BLMIS at issue in this

litigation.  *See* Opening Br. 14.  Nor does the Trustee attempt to argue that any of the Israeli

universities had "substantial" or systematic rather than "limited" contacts with the United States

for purposes of the Second Circuit's "sliding scale."

Instead, in opposing dismissal, the Trustee's argument — a legal argument rather than a

factual argument — is that the causation requirement was overruled by the Supreme Court in

*Ford Motor*.  Tr. Br. 42-43.  That argument is wrong.

As an initial matter, the Trustee makes a serious error in asserting that defendants are

"[r]elying on *SPV Osus Ltd.* v. *UBS AG*, 114 F. Supp. 3d 161 (S.D.N.Y. 2013)" to support the

causation requirement.  Tr. Br. 42.  In fact, defendants are relying on the **Second Circuit**

decision, cited above, which affirmed the district court's decision in *SPV Opus*.  In that

controlling appellate decision, the **Second Circuit** held that UBS's contacts with the United

States were "too tenuous" to support jurisdiction in a Madoff-related case, because the harm

suffered by the plaintiff, as a BLMIS account-holder, was not proximately caused by those alleged contacts. *SPV Osus*, 882 F.3d at 339, 344-45.

The Second Circuit's decision in *SPV Osus* (and prior Second Circuit decisions) cannot be disregarded based on *Ford Motor*. For a district or bankruptcy court to disregard a Second Circuit decision, it is not enough for a Supreme Court decision to be in arguable "tension" with that precedent. *Monsanto* v. *United States*, 348 F.3d 345, 351 (2d Cir. 2003). Rather, it must be "all but certain" that the Second Circuit precedent will be overruled based on the Supreme Court's later decision. *E.g.*, *United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004) (Lynch, J.); *see United States* v. *Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (test is whether Supreme Court decision "so undermines [the precedent] that it will almost inevitably be overruled by the Second Circuit").

Here, it is far from "certain" that *SPV Opus* — and earlier cases applying the "sliding scale" approach — will be overruled by the Second Circuit in light of *Ford Motor*. In *Ford Motor*, the Supreme Court held that a "strict causal relationship" was not necessary where a defendant, rather than having limited contacts with the forum as in *SPV Osus*, marketed the allegedly defective products at issue through "every means imaginable" and "systematically served a market" through dozens of dealerships. 141 S. Ct. at 1026-28.[11] There is no conflict, or even tension, between that holding and the law of the Second Circuit. Given Ford Motor's constant physical presence in the relevant forum, there is little doubt that, on the facts presented in *Ford Motor*, the Second Circuit — under the "sliding scale" approach — would not have

---

[11] In reaching that conclusion, the Supreme Court emphasized that it had "never framed the specific jurisdiction inquiry as *always* requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct," *id.* at 1026 (emphasis added), and that it had "long treated isolated or sporadic transactions" differently from "continuous ones." *Id*. at 1028 n.4.

imposed a causation requirement. Here, on the other hand, the causation requirement is entirely appropriate, under Second Circuit law and under *Ford Motor*.

Courts in this district have already concluded that *Ford Motor* does *not* displace Second Circuit law requiring causation. In *In re Mexican Gov't Bonds Antitrust Litigation*, 2022 WL 950955 (S.D.N.Y. Mar. 30, 2022), the district court rejected a motion to reconsider a decision holding that there was no jurisdiction over a defendant whose alleged U.S. contacts did not cause the plaintiff's alleged injury. The court explained that, "[if ]the Second Circuit thinks that" the relationships at issue would be sufficient for jurisdiction, despite the lack of causation, "it is for the Second Circuit to say so," not for a district court, *id*. at *3. The same logic applies here: It is for the Second Circuit to decide whether that Court's "proximate cause" requirement remains applicable to a case such as this one.

In arguing that a showing of causation is no longer necessary after *Ford Motor*, the Trustee invokes this Court's decisions in *Picard* v. *Banque Syz & Co.*, 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022), and *Picard* v. *Multi-Strategy Fund Ltd.*, 641 B.R. 78 (Bankr. S.D.N.Y. 2022). But those cases do not help the Trustee. In both decisions, this Court quoted with approval Judge Bernstein's statement in *BNP Paribas* — which in turn quoted *SPV Opus* — that causation was not required where the defendant had "substantial" contacts with the forum. *Banque Syz*, 2022 WL 2135019, at *4; *Multi-Strategy Fund Ltd.*, 641 B.R. at 88. In both decisions, the Court concluded further that the defendants — in contrast to the defendants here — had such substantial U.S. contacts. Specifically, the defendants invested with BLMIS through feeder funds, had meetings in New York, "wir[ed] funds in U.S. dollars to New York," sent "subscription agreements" and "redemption requests to New York," and received transfers from New York bank accounts. *Id*.

None of those facts are present in this case. Here, as in *SPV Opus* — and unlike in cases

such as *Banque Syz* and *Multi-Strategy Fund Ltd.* — the defendants' U.S. contacts were at best

tenuous and indirect. Accordingly, the Trustee must establish a causal connection between those

contacts and the injury alleged. Since the Trustee has not even tried to allege such a causal

connection, but has instead rested his case on the mistaken notion that the Second Circuit

doctrine has been overruled, the Complaint must be dismissed.

### 3.    Lack of facts relating to specific transfers

The Complaint also needs to be dismissed based on the Trustee's failure to allege any

jurisdictional facts relating to the particular transfers at issue in this case. As explained in the

opening brief, in a prior Madoff-related case, Judge Bernstein held that, when evaluating

personal jurisdiction for purposes of a fraudulent transfer claim, "each transfer is a separate

claim," and the Trustee "must establish the court's jurisdiction with respect to each claim

asserted." *BNP Paribas S.A.*, 594 B.R. at 190 (citing cases); Opening Br. 11, 15-16.

Here, the Trustee makes no attempt to plead jurisdictional facts relating to any particular

challenged transfer. For example, the opposition brief (like the Complaint) does not contend that

particular professors caused or even participated in the approval of the specific subsequent

transfers that the Trustee is seeking to recoup.

Instead, the Trustee appears to argue that Judge Bernstein was wrong in requiring

jurisdiction on a "transfer-by-transfer" basis. Tr. Br. 43. The Trustee, however, was a direct

party to *BNP Paribas* and, as such, is bound by that decision.[12] In any event, Judge Bernstein's

decision in *BNP Paribas* was correct. Under Sections 548(a)(1) and 544(b) of the Bankruptcy

---

[12] The Trustee himself contends that prior *BLMIS* decisions are "law of the case." Tr. Br. 61-62.
While that is not true for non-parties to the prior decisions, it is true for the Trustee. *See* pp. 32-33, *infra*.

Code, the Trustee may avoid a particular "transfer" if the requirements for avoidance are met.

Likewise, under Section 550(a), which governs recovery of avoided transfers, a "transfer" may

be recovered from initial or subsequent transferees, subject to defenses. Under the statute,

therefore, "[e]ach transfer is" indeed "a separate claim," as Judge Bernstein observed. 594 B.R.

at 190. And, under Second Circuit law, a plaintiff "must establish the court's jurisdiction with

respect to *each claim asserted*." *Charles Schwab*, 883 F.3d at 83 (quoting *Sunward Elecs., Inc.*

v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)). The Trustee, therefore has to allege facts

supporting jurisdiction as it relates to *each* challenged transfer. He has not done so.

The Trustee also strains to argue that, in *BNP Paribas*, the Court did not apply the

"transfer-by-transfer" standard that the Court itself articulated. Tr. Br. 43. That is not correct.

In *BNP Paribas*, the Court held that each of the particular transfers at issue resulted from

conduct of BNP Paribas employees *in New York*. As the Court explained, the relevant "transfers

arose out of" BNP Paribas' New York contacts. 594 B.R. at 191-92. Here, in contrast, the

Trustee has drawn no connection between the transfers at issue, on the one hand, and any of the

defendants' conduct, let alone their supposed New York contacts. Dismissal is required for that

reason as well.

**C.      Regardless, the Complaint fails to allege facts showing that the professors participated in Yeshaya as agents of the universities.**

For the reasons set forth above, the Complaint fails to establish personal jurisdiction

without resort to agency principles. The Trustee, however, has also failed to establish that the

relevant professors were agents of their universities when they took part in Yeshaya's grant

process. For that reason as well, the exercise of specific personal jurisdiction over the

universities is not warranted.

The Trustee's allegations of agency should be situated within the relevant context. Each of the university defendants is a large institution. Many people are associated with each university. Yet the university is not always their only affiliation. Professors and other individuals participate in outside activities over which the university does not exercise control.

By way of analogy, the same situation arises at universities and other organizations in the United States. Many professors, lawyers and judges participate in non-profit institutions or organizations. As one example, many law schools hire practicing lawyers or judges to teach classes as adjunct professors. Although those lawyers or judges thereby become affiliated with the law school, that is not their principal affiliation. It would be absurd to claim that, when a lawyer or judge teaches a class, his or her firm — or the judiciary — is bound by everything he or she does or says. That is true even though law firms have knowledge of, and benefit from, their lawyers participating in the outside activities. Likewise, when a university professor — on his or her own accord — becomes involved in a non-profit organization, he or she is not treated as an appointee or agent for the university (absent a specific understanding to that effect).

This basic intuition has been recognized and accepted in the law of personal jurisdiction, including specifically in the professor-university context. In *Associated Producers Ltd* v. *Vanderbilt University*, 76 F. Supp. 3d 154 (D.D.C. 2014), the plaintiff alleged that Vanderbilt University should be responsible for a professor's allegedly defamatory comments made as part of the professor's outside activities. Making strikingly similar allegations to those made by the Trustee here, the plaintiff there alleged, among other things, "Vanderbilt knew of the activity in question engaged in by [the professor], (2) *approved the same*, (3) *indeed encouraged her to carry out those activities because it would benefit the university*, and (4) in carrying out that

activity [the professor] believed it necessary to place the imprimatur of the university behind it by using her business signature block." *Id.* at 166 (emphases added).

The court held those allegations insufficient. None of those allegations "establish[ed] that Defendant Vanderbilt actually 'authorize[d] another to act on [its] behalf,'" as required to establish that the professor was Vanderbilt's agent for purposes of personal jurisdiction. *Id.* at 167; *accord In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 79 (2d Cir. 2019) ("At common law, agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') *that the agent shall act on the principal's behalf and subject to the principal's control*, and the agent manifests assent or otherwise consents so to act." (emphasis added, internal quotations omitted)). The complaint against Vanderbilt was dismissed for lack of a plausible allegation that Vanderbilt actually *controlled* the professor's conduct or that the professor was authorized to act on Vanderbilt's behalf in this outside role. *Id.*

The same logic applies here. Even accepting the Trustee's favored agency test,[13] there is no plausible allegation that any of the universities "controlled" the participation of any of their employees at Yeshaya, or that actual authorization to act on behalf of a university was present with respect to any of the challenged transfers. To the extent there is any doubt on that point, there is sworn testimony in the record demonstrating that no such control or authorization existed, as explained in the opening brief and below.[14]

---

[13] Tr. Br. 26 (arguing that, for jurisdictional purposes, agency requires not only "the knowledge and consent of, the non-resident principal" but also "control" by the principal over the purported agent (quoting *GEM Advisors, Inc.*, 667 F. Supp. 2d at 318-19)).

[14] Israeli law leads to the same result. As shown in the Declaration of Amir Licht, and in the reply declaration submitted with this brief, Israeli law (like U.S. law) supports the common-sense conclusion that university professors can participate in outside organizations without binding their universities or serving as "organs." Licht Decl. (Dkt. No. 26) ¶¶ 62-67; Licht Reply Decl. ¶¶ 7-8.

### 1.    Bar-Ilan University

The jurisdictional case against Bar-Ilan is based entirely on the alleged conduct of

Amnon Caspi, an adjunct professor at Bar-Ilan who allegedly joined Yeshaya in 1995 and served

on its audit committee between 2000 and 2013.  Compl. ¶¶ 284-300; Tr. Br. 32-34.  The Trustee

does not attempt to predicate its case against Bar-Ilan on the actions of Yair Green.

The opposition brief offers nothing of substance to support the conclusion that Bar-Ilan

had actual control over Caspi's work at Yeshaya.  *See* Tr. Br. 32-34.  The evidence of "control"

the Trustee points to is that "Caspi was an employee" (true in all similar agency cases, but

clearly insufficient) and that "a portion of Caspi's salary at Bar Ilan was paid by [Yeshaya]" (a

fact that would appear to lessen Bar-Ilan's control over Caspi's activities at Yeshaya rather than

strengthen it).  The Trustee also points to contracts between Yeshaya and Bar-Ilan negotiated

between Dror Frenkel, as legal advisor to Bar-Ilan, and Yair Green, on behalf of Yeshaya, but

fails to explain the connection between those activities and Professor Caspi.  Indeed, the fact that

the university had to separately authorize its receipt of funds would indicate that Caspi was *not*

already empowered to bind the university or otherwise acting on behalf of the university.  The

Trustee also asserts that Bar-Ilan could in theory have rejected donations from Yeshaya.  Tr.

Br. 34.  But, again, that does not suggest that Bar-Ilan had control over Professor Caspi.  And in

any event, "[t]he right to veto another's decisions does not by itself create the right to give

affirmative directives that action be taken, which is integral to the right of control within

common-law agency."  Restatement (Third) of Agency § 1.01 cmt. f.

In sum, the Trustee has presented no evidence that Bar-Ilan had the power to, or ever did,

control or direct Professor Caspi's actions in his role at Yeshaya for the benefit of Bar-Ilan.  Nor

is there any evidence that Bar-Ilan "actually authorized" Caspi to act *on its behalf* in his separate

role at Yeshaya, as required under the case law.  *Vanderbilt*, 76 F. Supp. 3d at 167.  For those

reasons and those set forth in the opening brief, there is no basis to conclude that Bar-Ilan

"purposely availed" itself of this forum through Professor Caspi, and the claims against Bar-Ilan

must be dismissed.

### 2.    Weizmann Institute of Science

The allegations against Weizmann Institute are focused on Professors Irun Cohen and

Shimon Ullman, and they fail for similar reasons.  Tr. Br. 37-39.  In particular, the Trustee has

failed to show that Weizmann controlled its professors' conduct at Yeshaya or appointed them to

roles at Yeshaya.

As it relates to Weizmann, much of the Trustee's opposition is both generic and (as to

jurisdiction) question-begging.  For example, the Trustee asserts that "Weizmann's professors

and executives . . . participated in countless [Yeshaya] meetings wherein they deliberated on,

voted on, and effectuated grant requests directly benefitting" Weizmann.  Tr. Br. at 37.  Those

allegations, however, do not speak to whether the relevant professors, in their work at Yeshaya,

were under Weizmann's control.  Indeed, *exactly* the same allegations could be made about

grants made to beneficiaries other than Weizmann, including other universities.  Is it the

Trustee's position that Weizmann professors were agents of Weizmann when their activities at

Yeshaya happened to benefit Weizmann, but not when they benefited some other university or

institution?  Or is the Trustee's position that the professors were all-purpose agents of

Weizmann, such that Weizmann is responsible for the entirety of Yeshaya's activities, whether

Weizmann benefited from them or not?  Neither position makes sense, and neither is consistent

with principles of agency law.

The Trustee's specific allegations regarding Professors Cohen and Ullman likewise do

not support a finding that either professor was an agent of Weizmann when he participated in

Yeshaya.  As to Professor Cohen, the Trustee devotes a paragraph (Tr. Br. 38) to alleging that

Professor Cohen participated in Yeshaya grant deliberations and signed letters on behalf of

CSED, a Yeshaya-funded organization that awarded funds to Weizmann in 2000 and 2001

(before the transfers at issue).  Although the Trustee asserts that those letters somehow show

Weizmann's "knowledge and consent" to Cohen's conduct, the Trustee does not argue that they

evidence control, which the Trustee concedes is essential to agency.  Tr. Br. 26.  Professor

Cohen, moreover, has offered unrebutted testimony that he was *not* appointed to Yeshaya by

Weizmann, did not even inform Weizmann of his role at Yeshaya, and instead acted in his own

private capacity.  Cohen Decl. ¶¶ 3-4.[15]

As to Professor Ullman, the Trustee rests on the allegation that, when Professor Ullman

was a member of Yeshaya, Yeshaya's donations to Weizmann increased.  Tr. Br. 38.  But that

does not in any way establish that Weizmann authorized or controlled Professor Ullman's

conduct at Yeshaya.  Professor Ullman has testified that the opposite is true.  Ullman Decl. ¶ 2.

### 3.    Ben-Gurion University of the Negev

The Trustee's allegations about Ben-Gurion are similar to those against Weizmann.  The

Trustee asserts that "BGU's professors and executives . . . participated in countless [Yeshaya]

meetings wherein they deliberated on, voted on, and effectuated grant requests directly

benefitting" Ben-Gurion University.  Tr. Br. 34.  As with the Weizmann Institute, precisely the

same sentence would be true if the beneficiary referenced in that sentence were another

university, including another defendant.  That allegation, and similar allegations showing that

---

[15]  Professor Cohen also testified that he did not participate in evaluating applications involving
his own work, and that "[t]o the extent I sent letters on behalf of CSED regarding grants for
research in which I would personally participate, others at CSED would have reviewed the grant
proposals before I sent the letters."  Cohen Decl. ¶ 10.

Ben-Gurion professors were involved in Yeshaya grant decisions, are again insufficient to demonstrate that Ben-Gurion had control or authority over professors participating in Yeshaya.

The Trustee's allegations regarding Professors Rager and Cohen (for Ben-Gurion) — like the allegations relating to Professors Ullman and Cohen (for Weizmann) — fail to establish an agency relationship under any standard. As to Professor Rager, the Trustee rehashes allegations that she was involved in Yeshaya or CSED grant decisions relating to Ben-Gurion. Tr. Br. 35-36. But those allegations again do not support the inference that Ben-Gurion controlled or authorized Professor Rager's activities. For her part, Professor Rager in her testimony has refuted any claim that she acted at Ben-Gurion's direction. In addition to testifying that she did not evaluate projects in which she was involved, Professor Rager has testified that "Ben-Gurion did not appoint me to Yeshaya, nor did I act as a representative of Ben-Gurion," and that she was "not required to inform, nor did I inform Ben-Gurion of my decision to join Yeshaya." Rager Decl. ¶ 5.

As for Professor Cohen, the Trustee argues merely that Ben-Gurion received funds from Yeshaya while Professor Cohen was associated with the university. That proves nothing. Professor Cohen has testified that, when he acted as a consultant to Ben-Gurion, he "had already joined Yeshaya," "was not acting at Yeshaya as a representative of Ben-Gurion," and "did not take any steps to inform Ben-Gurion that [he] was a member of Yeshaya" or "seek Ben-Gurion's permission." Cohen Decl. (Dkt. No. 24) ¶ 13. Again, the Trustee does not and cannot dispute that testimony, which defeats any claim that Professor Cohen was controlled or directed by Ben-Gurion.

The Trustee's other allegations regarding Ben-Gurion fare no better. The Trustee asserts that Ben-Gurion could reject "funds" from Yeshaya "if it so chose" (Tr. Br. 37), but that has no

bearing on Ben-Gurion's control over Professors Rager or Cohen, and in any case it is the sort of "veto" right that the Restatement of Agency views as insufficient to demonstrate control for agency purposes. *See supra*.[16] The Trustee's unpleaded allegations concerning investments in Fairfield Sentry are likewise irrelevant. Tr. Br. 35. Ben-Gurion's alleged status as a Fairfield Sentry victim does not in any way show that Ben-Gurion purposely availed itself of this forum in connection with transfers from Yeshaya, which had nothing to do with Fairfield. Similarly, the Trustee's unpleaded insinuation that Ben-Gurion filed a Madoff Victim Fund claim in respect of Fairfield Sentry cannot, as a matter of law, support a claim of personal jurisdiction for matters having nothing to do with Fairfield Sentry or that claim. *See Picard* v. *Estate of Igoin*, 525 B.R. 871, 887-88 (Bankr. S.D.N.Y. 2015).

### 4.    Hebrew University of Jerusalem

The agency allegations against Hebrew University of Jerusalem fail largely for similar reasons as the other three universities.

As an initial matter, it should be noted again that the Trustee's allegations regarding Hebrew University have nothing to do with the transfers at issue. Instead, they concern meetings and events that took place in 1997-2000, even though this case concerns transfers made between 2002-2008. Tr. Br. 31-32. Those allegations show that Hebrew University professors and employees were involved in Yeshaya's grant activities prior to 2000; but they do *not* demonstrate

---

[16] The Trustee strains to argue that the declaration of Adv. Tamar Mund (Ben-Gurion's General Counsel) supports his position, quoting Adv. Mund's statement that, "[e]xcept regarding their teaching and research roles at the University, professors of [BGU] do not have the power and authority to act on behalf of the University." Tr. Br. 36 (quoting Mund Decl. ¶ 7). In doing so, the Trustee highlights the words before "at the University" but ignores those critical words and excises the rest of the paragraph, which states unequivocally that Professors Rager and Cohen did *not* at any time "act as a representative of Ben-Gurion" at Yeshaya. Mund Decl. ¶ 7.

that Hebrew University directed those individuals' work at Yeshaya, let alone in the 2002-2008 time period.

Similarly, the various allegations that Yeshaya and Hebrew University entered into agreements with one another (Tr. Br. 32) do not help the Trustee in establishing an agency relationship. The fact that Yeshaya and Hebrew University were *counterparties* does not in any way show that Yeshaya or Yeshaya members acted at Hebrew University's *direction*.

The Trustee spills much ink explaining how individuals associated with Hebrew University were involved in the development of Yeshaya. Tr. Br. 13-15. But that is not the issue. Assuming the Trustee can get past the threshold grounds for dismissal, including lack of causation and lack of allegations regarding the transfers at issue (*supra*, Points I.B), the Trustee needs to establish that the individuals associated with Hebrew University were acting *on the university's behalf* when they participated in Yeshaya. The Trustee has failed to do so. The opposition brief, like the Complaint, offers no specific allegations that the individuals associated with Hebrew University were acting under the university's control, or with the university's authority, when they participated in Yeshaya's activities, including grant decisions.

The Trustee has no answer to the factual record developed on this motion by Hebrew University. Adv. Pepi Yakirevich, the university's General Counsel since 1984, testified that the university never appointed any representative to Yeshaya. Yakirevich Decl. ¶ 17. Moreover, Professor Gutfreund testified that Hebrew University did not appoint him to Yeshaya and did not control or direct his Yeshaya activities; to the contrary, he was "clear in distinguishing" his work at Yeshaya from his work at the university, as detailed in his declaration. Gutfreund Decl. ¶ 10. Professor Gutfreund also explains how Professors Atlan and Amir came to be associated with Yeshaya, and that neither acted on the university's behalf. *Id.* ¶ 11. That record is unrebutted.

### 5.    The Technology Companies

Finally, the Trustee puts forward an entirely unconvincing alter ego theory with respect to

the technology companies (Yissum and B.G. Negev Technologies and Applications Ltd.).  Both

in Israel and in the United States, piercing the corporate veil is an extraordinary act.[17]  Yet the

sum total of the Trustee's case for veil-piercing is contained in just a few conclusory paragraphs.

Here is what the Complaint has to say about Yissum:

> Upon information and belief, The Hebrew University of Jerusalem exercises complete ownership, dominion, and control over Yissum, including control over its business, initiatives, and decision-making, and Yissum's officers are appointed by The Hebrew University of Jerusalem.  Upon information and belief, Yissum's corporate obligations, responsibilities, and liabilities are to its sole owner The Hebrew University of Jerusalem, and Yissum acts as an agent for and/or solely on behalf of The Hebrew University of Jerusalem. Upon information and belief, Yissum's operational funding is provided exclusively by, and solely at the discretion of, The Hebrew University of Jerusalem. Upon information and belief, Yissum's revenue is considered to be the revenue of its parent The Hebrew University of Jerusalem, and Yissum has no other assets aside from those shared with The Hebrew University of Jerusalem.

> Compl. ¶¶ 33-34.

Similarly, for B.G. Negev Technologies and Applications Ltd., the Complaint alleges as

follows:

> At all relevant times, Ben-Gurion University of the Negev and B.G. Negev shared certain directors, officers, personnel, and business operations.  Upon information and belief, Ben-Gurion University of the Negev exercises complete ownership, dominion, and control over B.G. Negev, including control over its business and initiatives and decision making, and B.G. Negev's officers are appointed by Ben-Gurion University of the Negev.  Upon information and belief, B.G. Negev's corporate obligations, responsibilities, and liabilities are to its sole owner, Ben-Gurion University of the Negev, and it acts as an agent for and/or solely on behalf of Ben-Gurion University of the Negev. Upon information and belief, B.G. Negev's

---

[17]  *See* Licht Decl. Dkt. No. 26, ¶ 80.

> operational funding is provided exclusively by, and solely at the
> discretion of, Ben-Gurion University of the Negev. Upon
> information and belief, the revenues of B.G. Negev are considered
> to be the revenues of its parent Ben-Gurion University of the Negev
> and B.G. Negev has no other assets aside from those shared with
> Ben-Gurion University of the Negev.

<div align="right">Compl. ¶¶ 71-72.</div>

Those are *exactly* the type of allegations that constitute "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" — and thus exactly the type of pleading that has been prohibited since *Iqbal*. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The placement of "upon information and belief" in front of these allegations is not the only issue. The broader issue is that the Trustee has simply taken a list of elements and factors for an alter ego determination and asserted, in conclusory fashion, that the elements are met for these two defendants. That does not comply with Rule 8.

Here, moreover, the defendants have submitted undisputed evidence that the universities and technology companies have separate assets and liabilities as well as separate management and governance. Yakirevich Decl. (Dkt. No. 21) ¶ 9; Mund Decl. (Dkt. No. 19) ¶ 8. The defendants have also demonstrated that, to the extent Israeli law is applied to determine whether the veil should be pierced between Israeli organizations, the Trustee has offered no basis to pierce the veil, because Israeli law will respect corporate distinctions unless "the corporate form has been abused in a purposeful way to harm creditors." Licht Decl. Dkt. No. 26, ¶ 80; Licht Reply Decl. ¶ 10.

Although the Trustee makes various new factual allegations in his opposition, those allegations are not in the Complaint. Tr. Br. 44-45. In any event, the thrust of those allegations, which is that the technology companies were wholly owned and controlled subsidiaries, is facially insufficient to support an alter ego theory. *See In re Lyondell Chem. Co.*, 543 B.R. 127,

<div align="center">-25-</div>

145 (Bankr. S.D.N.Y. 2016) ("courts in this circuit have found a *prima facie* showing of alter

ego jurisdiction only where the plaintiff alleged (and in some instances provided evidence), *in*

*addition* to common ownership and overlapping officers and directors, that the subsidiary was

kept undercapitalized, that there was a failure to respect corporate formalities or permit

autonomous decision-making, or both" (emphasis in original)).[18]

**D.    The Trustee has no viable ratification theory.**

The doctrine of ratification adds nothing to this case given the narrow scope of actions

that can be validated retroactively through ratification.  As stated in the Restatement of Agency,

"[a] person may ratify the act of an agent or the act of a person who purported to be an agent but

was not. *When an actor is not an agent and does not purport to be one, the agency-law doctrine*

*of ratification is not a basis on which another person may become subject to the legal*

*consequences of the actor's conduct*."  Restatement (Third) of Agency § 4.03 cmt. b (emphasis

added).  That principle applies here:  None of the professors were acting as agents of the

universities — or purported to be agents of the universities — in the scope of their work at

Yeshaya.  So there was no conduct that could be ratified.

*In re Bennett Funding Group*, 336 F.3d 94 (2d Cir. 2003), is not to the contrary.  Unlike

in *Bennett Funding*, here there are no well-pleaded allegations, and there is no evidence, that the

universities manifested an understanding that the professors, in their work at Yeshaya, were

somehow acting on the universities' behalf.  To the contrary, all four of the universities have

stated their understanding that their professors did *not* act on their behalf at any time.  (See the

declarations of Michael Naveh, Dror Frenkel, Pepi Yakerevich and Tamar Mund.)

---

[18]  *See also* Licht Decl. (Dkt. 26) ¶¶ 73-80.

For those reasons, and those set forth in the opening brief, the Trustee's ratification allegations are unavailing.[19]

**POINT II.**  **EVEN IF ANY DEFENDANT HAD MINIMUM CONTACTS WITH THE UNITED STATES, THE EXERCISE OF JURISDICTION WOULD BE UNREASONABLE.**

If jurisdiction here were somehow to comport with due process, despite all the arguments above, this case would be at the very edge of the jurisdictional limits of the Court.  Jurisdiction would be predicated on actions in Israel taken by Israelis associated with Israeli institutions. Under the "sliding scale" approach adopted by the Second Circuit, the weaker the connection of the defendant with the forum, the greater the importance of the "reasonableness" component of the personal jurisdictional analysis.  *See Met. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

In this case, beyond arguments generally available to foreign defendants forced to litigate in a faraway forum (which are set forth in the opening brief, and are not repeated here), there is an especially compelling reason not to assert jurisdiction:  The Trustee has been seeking to recover the *same* transfers (and others) in a previously filed action in Israel for more than *seven years*.  Although the Trustee justifies his decision to file in Israel based on the state of the law in the United States at the time that action was filed (Tr. Br. 5-6, 52), now that the Second Circuit reversed the district court's decision on extraterritoriality, he has not withdrawn the Israeli lawsuit in favor of this one.  Rather, the Trustee apparently intends to pursue both actions

---

[19]  To the extent Israeli law applies given that the relationships at issue are between Israeli universities and their employees, it leads to the same result.  There is no viable ratification theory.  *See* Licht Decl. (Dkt. 26) ¶ 72; Licht Reply Decl. ¶ 9.

simultaneously, imposing an unusual and unreasonable burden on the Defendants, one that weighs heavily against the exercise of personal jurisdiction.

The Trustee's own analogy to forum-non-conveniens law (Tr. Br. 50) further demonstrates the weakness of the Trustee's arguments (*id*. at 51) regarding the scope of available relief in Israel.  In the context of forum-non-conveniens dismissals, the fact that the elements of a cause of action, or available remedies, are different or less favorable in a foreign forum is not sufficient to hold that a foreign forum is inadequate to hear the dispute. *See Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 416 F.3d 146, 158 (2d Cir. 2005) ("the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies" (internal quotations and alteration omitted)); *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 254 (1981) (forum inadequate only "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all").

So too here:  That the causes of action at issue are different in certain ways, and the damages remedies may be different, is not a basis to find that the Trustee should be entitled to pursue claims in the United States that overlap significantly with the Israeli claims.  Whatever differences may exist between the proceedings, the Trustee is indisputably seeking to recover the same transfers in Israel that he seeks to recover here, based on broadly similar theories.  And there is likewise no dispute that the locus of those transfers, the relevant witnesses, and the relevant documentary evidence are in Israel rather than here.  Thus, as set forth in greater detail in the opening brief, exercise of jurisdiction is unreasonable here even if jurisdiction were to lie (which it does not).

**POINT III.    THE COMPLAINT FAILS TO STATE A CLAIM ON THE MERITS.**

The Complaint should be dismissed for lack of personal jurisdiction.  But if the suit were not dismissed on that basis, it should be dismissed for failure to state a claim.  The Trustee has not alleged that any of the relevant transfers from BLMIS have been "avoided," as required to state a claim for recovery under Section 550(a).

The Second Circuit has stated that Section 550(a) has two elements: "*that the transfer was avoided*, and that the defendant is an initial or subsequent transferee."  *Picard* v. *Citibank*, 12 F.4th 171, 197 (2d Cir. 2021) (emphasis added).  Thus, according to the Second Circuit, "before Picard can recover the funds from [defendants], *he must first avoid* BLMIS's transfers to [defendants]."  *Id.* at 181 (emphasis added); *accord In re Picard*, 917 F.3d 85, 95 (2d Cir. 2019) ("Only once a transfer is avoided may a trustee recover the underlying property.").

In resisting dismissal, the Trustee asks this Court to hold that, despite the Second Circuit's two admonitions that the Trustee "must first avoid" a transfer under Section 548(a)(1) before recovering the transfer from a transferee under Section 550(a), the Trustee does *not* have to "first avoid" the transfer, but instead may seek recovery *without* avoiding the transfer.

Much of the Trustee's response mischaracterizes defendants' argument and invokes decisions addressed to a completely separate issue.

The Trustee's strawman version of our argument — an argument we expressly did not make — is that "a trustee must avoid the transfer against the initial transferee prior to suing subsequent transferees."  Our *actual* argument is "a trustee must avoid the transfer ~~against the initial transferee prior to suing subsequent transferees~~ **before recovering the transfer**."  To be very clear, this issue *has absolutely nothing to do with the difference between an initial transferee and a subsequent transferee*.  As stated in the motion to dismiss, "[w]e do not contend

that there is any requirement to avoid transfers against initial transferees prior to suing subsequent transferees." Opening Br. at 36 (emphasis added).

Rather, the argument is that — because one of the two elements of Section 550(a) is "that the transfer was avoided" (*Citibank*, 12 F.4th at 197) — the Trustee must *either* (1) obtain an avoidance judgment, with binding effect on that transferee, prior to seeking recovery under section 550(a) *or* (2) assert an avoidance action and a section 550(a) action in the same action against that transferee. In the first scenario, the "avoided" element would be satisfied by the judgment in the *prior* proceeding, provided that the requirements of *res judicata* are met. In the second scenario, even though the "avoided" element would not be satisfied at the outset, it would be satisfied upon a successful avoidance action; that is the procedure contemplated by Fed. R. Civ. P. 18(b), which provides that "[a] party may join two claims even though one of them is contingent on the disposition of the other."

Here, however, the Trustee does *not* rely on a prior avoidance action; to the contrary, he *concedes* (as he must) that he is not relying on the consent judgment obtained in the *YHA* action, since that consent judgment has no possible *res judicata* effect on the defendants. Tr. Br. 58 n.62. Nor is the Trustee seeking to avoid the transfers to Yeshaya in this action; he could not, given the time that has passed since the bankruptcy filing. Instead, the Trustee proposes a construction of Section 550(a) in which — rather than having to "avoid" the underlying transfers — he merely has to show that the transfers would have been "avoidable" in a timely-filed action. That, however, is directly at odds with the statutory language and the Second Circuit's guidance.

In addressing this issue, we recognize that the Court is faced with conflicting authorities. As noted above, the Second Circuit has twice stated, in recent *Madoff* decisions, that the Trustee must "first avoid" a transfer before seeking recovery from a transferee. On the other hand, in the

*Consolidated § 550 Ruling*, Judge Rakoff accepted the Trustee's counter-textual position. For the reasons explained below, the Court is not bound, by law-of-the-case or any other doctrine, to follow Judge Rakoff's decision. Instead, the Court should reach the merits and dismiss the Trustee's claim, consistent with the Second Circuit's guidance. Given the divergent authorities within this Circuit, however, the defendants also respectfully submit that the Court certify the question presented for direct appeal. Defendants will stipulate that the requirements for immediate direct review of this question by the Second Circuit have been met, *regardless* of the Court's decision. *See* 28 U.S.C. § 158(d)(2)(A).

## A.     The only remaining issue is a pure question of statutory construction.

The Trustee helpfully narrows the dispute by conceding that he "is not seeking to apply the [Yeshaya] consent judgment offensively against the Defendants." Tr. Br. at 58 n.62. As a result of that concession, the Court does not need to address whether a trustee could use a consent judgment to meet an element of Section 550(a). (As demonstrated in the opening brief, he could not use the consent judgment.) All that is left is a pure question of statutory construction: Does section 550(a) require a transfer to be "avoided" or "avoidable"?

Section 550(a) provides that, "to the extent a transfer is *avoided*" under Section 544 or 548, "the trustee may recover . . . the property transferred" from the initial transferee or subsequent transferee, subject to certain defenses. The Trustee's position, in short, is that "avoided" means "avoidable," which means that in a recovery action against a transferee, he only has to prove that the elements of an avoidance action are met; he never has to obtain a judgment of avoidance against anyone. Defendants' position, in contrast, is that, in Section 550(a), the word "avoided" means "avoided." The Trustee, accordingly, has to procure a judgment that the underlying transfers are "avoided." That can be accomplished by seeking to avoid and recover a transfer in the same action, as explicitly permitted by the Rules of Civil Procedure. *See* Fed. R.

Civ. P. 18(b) ("A party may join two claims even though one of them is contingent on the disposition of the other"); *see* Opening Br. at 40.  It could also be accomplished by presenting a judgment of avoidance from a prior proceeding, consistent with principles of *res judicata*.  Here, however, the Trustee has attempted neither, so the Complaint has to be dismissed for failure to state a claim.

**B.    Law-of-the-case does not preclude consideration of defendants' argument.**

At the threshold, the Trustee invites the Court to invoke the prudential "law of the case" doctrine to dispense with consideration of defendants' argument, including because all *Madoff* adversary proceedings are "one case."  The rationale for the law of the case doctrine is that, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Zdanok* v. *Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964).  Therefore, even within the *same case*, law of the case does not apply to parties added to the case after the decision was made and who therefore never had the opportunity to "battle for" that decision.  *See GMA Accessories, Inc.* v. *Elec. Wonderland, Inc.*, 2012 WL 13059956, at *1 (S.D.N.Y. June 20, 2012) (law of the case does not apply to later-added party who "had no opportunity to litigate, or 'battle for,' a ruling on the issue"); *In re Brizinova*, 588 B.R. 311, 324 (Bankr. E.D.N.Y. 2018) ("In a bankruptcy setting, the law of the case doctrine may apply to different adversary proceedings brought in the same bankruptcy case, provided that all of the requirements of the doctrine - including identity of the parties - are met.").[20]

_____

[20] *Accord Corrado* v. *N.Y. Unified Ct. Sys.*, 163 F. Supp. 3d 1, 16 (S.D.N.Y. 2016) (law of the case "doctrine 'may be properly invoked only if the parties had a full and fair opportunity to litigate the initial determination.'" (quoting *Westerbeke Corp.* v. *Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002))); *Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*, 2004 WL 359138, at *6 (S.D.N.Y. Feb. 26, 2004) ("The law of the case doctrine should not be invoked unless the parties had a 'full and fair' opportunity to litigate the initial determination." (quoting *Westerbeke*, 304 F.3d at 219)); *In re Brizinova*, 592 B.R. 442, 455 (Bankr. E.D.N.Y. 2018) ("As to the question of identity of the parties, courts consistently find that this is necessary for the doctrine to apply");

Of the *Madoff* decisions cited by the Trustee, the few that actually address defendants'

argument are the 2013 *Consolidated § 550 Ruling* and its predecessors, long before defendants

were sued in September 2021.  Those rulings are not entitled to law-of-the-case effect.

By contrast, the decisions issued since September 2021 do not preclude defendants'

argument.  As an initial matter, resolution of defendants' argument does not appear to have been

necessary to any of those decisions, and "[t]he law of the case doctrine does not apply to dicta."

*In re HS 45 John LLC*, 585 B.R. 64, 80 (Bankr. S.D.N.Y. 2018) (internal quotation omitted).

Moreover, the recent decisions provide conflicting guidance.  For example, the Trustee

highlights language from this Court's rulings in *Multi-Strategy* and *Banque Syz*.  A few weeks

before those decisions, however, Judge McMahon wrote that "[t]he Circuit held that the Trustee

discharged his pleading burden as long as he alleged the elements of a *prima facie* claim to

recover subsequent transfers pursuant to Section 550 of the Bankruptcy Code.  Those elements

are '*that the transfer was avoided*, and that the defendant is an initial or subsequent transferee.'"

*In re Bernard L. Madoff Inv. Secs., LLC*, 2022 WL 1304589, at *2 (S.D.N.Y. May 2, 2022)

(quoting and citing *Citibank*, 12 F.4th at 196-97 (emphasis added)).  In addition, although

decided before defendants were sued, the Second Circuit has stated, among other things:  "Only

once a transfer is avoided may a trustee recover the underlying property," *Picard*, 917 F.3d at 95;

"a trustee cannot use § 550(a) to recover property unless the trustee has first avoided a transfer

under one of [the avoidance] provisions," *id.* at 97; "before Picard can recover the funds from

[defendants], he must first avoid BLMIS's transfers to [defendants]," *Citibank*, 12 F.4th at 181;

and "[s]ection 550(a) sets out the elements a trustee must satisfy to recover transferred property:

---

*see also In re Motors Liquidation Co.*, 943 F.3d 125, 131 (2d Cir. 2019) (declining to apply law
of the case to parties not in the case at time of prior ruling).

that the transfer was avoided, and that the defendant is an initial or subsequent transferee," *id.* at

197. The Trustee has to believe that all of those statements are *dicta* too, or else they are

controlling precedent foreclosing his position.[21]

The bottom line is this: the law-of-the-case doctrine, even where applicable, is to be

applied only in the Court's sound discretion. *See Colvin* v. *Keen*, 900 F.3d 63, 68 (2d Cir. 2018)

(law of the case "does not rigidly bind a court to its former decisions, but is only addressed to its

good sense" (quoting *Zdanok*, 327 F.2d at 952-53)). Discretion favors addressing the merits

here. The issue presented is clearly bound for the Second Circuit, and when it considers the

issues, law of the case will be irrelevant. *See In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir.

1991) ("[a]pplication of the [law of the case] doctrine at the bankruptcy court and district court

levels . . . does not preclude *us* from conclusively determining the issue" (emphasis in original)).

The right and most sensible approach, therefore, is for this Court to reach the merits and then to

certify the issue to the Second Circuit.

**C.      The Trustee's interpretation of Section 550(a) is incorrect.**

On the merits, the Trustee does not try to argue that his interpretation of Section 550(a)

is based on the ordinary meaning of the text. The Trustee's non-textual approach is at odds with

Second Circuit law. Under that law, courts "ordinarily assume, absent a clearly expressed

---

[21]  Courts do not seem to agree with the Trustee that the Second Circuit's reasoning in *Picard* or
*Citibank* was *dicta*. In a recent decision, a bankruptcy judge in Delaware stated that the Second
Circuit "*held* that . . . the trustee could not use § 550(a) to recover property unless the trustee first
avoided a transfer under § 548." *In re Maxus Energy Corp.*, 641 B.R. 467, 561 (Bankr. D. Del.
2022) (citing *Picard*, 917 F.3d at 95) (emphasis added). As noted, Judge McMahon also recently
wrote that "[t]he Circuit *held* that the Trustee discharged his pleading burden as long as he
alleged the elements of a *prima facie* claim to recover subsequent transfers pursuant to Section
550 of the Bankruptcy Code. Those elements are 'that the transfer was avoided, and that the
defendant is an initial or subsequent transferee.'" *Madoff*, 2022 WL 1304589, at *2 (emphasis
added).

legislative intention to the contrary, that the legislative purpose is expressed by the ordinary meaning of the words used." *United States* v. *Ho*, 984 F.3d 191, 201-02 (2d Cir. 2020) (quoting *Jam* v. *Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019)). The Bankruptcy Code in particular must be interpreted "clearly and predictably using well established principles of statutory construction." *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U.S. 639, 649 (2012).

The Trustee's position is that "avoided" in Section 550(a) means "subject to avoidance." But, as Judge Bernstein explained before the *Consolidated § 550 Ruling*, "avoided" is clearly not the same as "avoidable." *See In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 741 (Bankr. S.D.N.Y. 2008). For a transfer to be "avoided," there needs to be a judgment of avoidance, not a meritorious argument that could theoretically be presented in favor of avoidance. Under basic principles of statutory construction, the Trustee's position is untenable. As explained by the Supreme Court, "words repeated in different parts of the same statute generally have the same meaning." *Law* v. *Siegel*, 571 U.S. 415, 422 (2014).

Instead, the Trustee's reading imposes different meanings on similar words in the Code. For example, the Trustee's interpretation creates the odd result that he never has to avoid a transfer at all — against anyone — to invoke Section 550(a). Indeed, the Trustee explicitly defends that result, claiming it to be necessary to permit him to settle with an initial transferee that does not wish to admit liability. But that requires the phrase "after the avoidance" in 11 U.S.C. § 550(f) to sometimes mean, for example, "after the voluntary dismissal." *See* Tr. Br. 60-61. And it fits uneasily with § 349(b)(1)(B), § 550(b)-(c), § 502(d), § 551, and even the title of § 550. *See* Opening Br. 32-33 & n.22.[22]

_____

[22]  The Trustee also references legislative history cited in the *Consolidated § 550 Ruling*, but that legislative history is not illuminating. And "ambiguous legislative history cannot trump clear

The Trustee's real argument is that adhering to the ordinary meaning of the term

"avoided" might lead to results the Trustee thinks are absurd.  But "a statute is not 'absurd'

merely because it produces results that a court or litigant finds anomalous or perhaps unwise.  To

the contrary, courts should look beyond a statute's text under the canon against absurdity only

where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where

it is quite impossible that Congress could have intended the result and where the alleged

absurdity is so clear as to be obvious to most anyone."  *Gibbons* v. *Bristol-Myers Squibb Co.*,

919 F.3d 699, 705-06 (2d Cir. 2019) (internal quotation omitted).

The Trustee's principal "absurd result" is that, if defendants' position were accepted, all

transferees would need to be named within the 11 U.S.C. § 546(a) limitations period.  Although

that is not necessarily correct,[23] even if it were, Congress could reasonably have chosen to give

trustees two years to sue transferees.  (Indeed, against the backdrop of this case — where the

Trustee waited *13* years to sue defendants, that policy judgment would appear eminently sound.)

The Trustee also says it is "absurd" that he might be required to litigate against initial transferees

to judgment, rather than settle, before pursuing subsequent transferees.  But that "absurd" result

does not follow from defendants' position.  That result arises only if a trustee seeks to use a

judgment from another case to satisfy Section 550(a)'s "avoided" element.  The Trustee could

---

statutory language."  *Nat'l Ass'n of Mfrs.* v. *Dep't of Defense*, 138 S. Ct. 617, 634 (2018)
(internal quotation omitted).

[23]  Among other things, the avoidance sections of the Code, "'standing alone, operate[] as a mere
declaration of avoidance,' which is an *in rem* adjudication."  *In re Harnett*, 558 B.R. 655, 660
(Bankr. D. Conn. 2016) (quoting *Central Va. Cmty. Coll.* v. *Katz*, 546 U.S. 356, 362 (2006)).  If
the appropriate procedures had been followed (including a diligent effort to locate and notify
interested parties), it may be possible to seek an *in rem* adjudication of avoidance against
unnamed parties.  *See In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 92 (2d Cir. 2005).  Other
doctrines, including the exceptions to *res judicata* and equitable tolling, could also apply to
excuse a trustee from naming all subsequent transferees as defendants in an avoidance action.

seek to satisfy the "avoided" element in a suit against the subsequent transferee itself. In the end, the Trustee's arguments are just policy arguments, and "even the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C.* v. *Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021); *accord SAS Inst., Inc.* v. *Iancu*, 138 S. Ct. 1348, 1358 (2018) ("policy considerations cannot create an ambiguity when the words on the page are clear").

Left with weak arguments, the Trustee relies on cases addressing a strawman argument — that a trustee must avoid a transfer *in a separate action against the initial transferee* prior to suing subsequent transferees — rather than our actual argument. Even if those cases supported the Trustee, there is still "no warrant to ignore clear statutory language on the ground that other courts have done so." *BP P.L.C.*, 141 S. Ct. at 1541 (internal quotation omitted).

But those cases do not support the Trustee. The Trustee's lead non-*Madoff* authority is *In re AVI, Inc.*, 389 B.R. 721, 735-36 (B.A.P. 9th Cir. 2008). *AVI* expressly holds that "avoidance is a necessary precondition to any recovery under § 550," *id.* at 734, just as defendants contend. *AVI* explains that "it is permissible, but not mandatory, to bring an avoidance action and a recovery action in one suit," and that "[t]his is what the trustee did here. The complaint against [*the subsequent transferee*] alleges *§ 549* and *§ 550* in count I. *Thus, the question of avoidance was squarely at issue and necessarily decided.*" *Id.* at 734 & n.19 (emphasis added). In direct contrast to the Trustee here, the trustee in *AVI* asserted an avoidance action against the subsequent transferee, thereby satisfying Section 550(a).[24] What *AVI* held is irrelevant, just as defendants contend, is whether a trustee litigates against the initial transferee. *Id.* at 736.

---

[24] The same is true of many of the Trustee's other cases. *See IBT Int'l Inc.* v. *Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689 (11th Cir. 2005) (trustee simultaneously asserted avoidance and recovery action against subsequent transferee); *In re Richmond Produce Co.*, 195

The Trustee appears to favor *AVI* and some other cases he cites, including *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706 (11th Cir. 2005), because they use the word "avoidable."  But those cases use the word "avoidable" in a different way than the Trustee is using it.  The issue in those cases was whether avoidance and recovery could proceed simultaneously, even though the transfer would not be "avoided" at the start of the case.  For example, *IBT* recognized that the text requires that avoidance must precede recovery, but concluded that "we think Congress contemplated 'to the extent that a transfer is avoided' to be a simultaneous as well as successive process."  *IBT*, 408 F.3d at 703, 707-08.  Thus, the transfer was "avoidable" only in the sense that an avoidance action was pending against that transferee.  Those courts were right that simultaneous avoidance and recovery is permissible, but did not consider that Fed. R. Civ. P. 18(b) permits simultaneous pursuit of "two claims even though one of them is contingent on the disposition of the other," resolving the issue presented in the cases without resort to statutory construction.

By contrast, the Trustee's version of "avoidable" permits dispensing with avoidance.  The cases cited by the Trustee (such as *IBT*) do not support that position, and the position is at odds with the statutory text and Second Circuit cases.

---

B.R. 455 (N.D. Cal. 1996) (same); *Anderson* v. *Bajaj (In re Med. Mgmt. Grp., LLC)*, 534 B.R. 646 (Bankr. D.S.C. 2015) (underlying complaint asserted simultaneous avoidance and recovery); *In re Phillips*, 379 B.R. 765, 786 (Bankr. N.D. Ill. 2007) (not only did trustee assert avoidance and recovery simultaneously, but court notes that "Section 550(a) stands as a recovery statute only and not as a primary avoidance basis for an action, as it will only survive when coupled with the transfer avoidance sections of the Code." (internal quotation omitted); *In re Felt Mfg. Co.*, 371 B.R. 589, 638-39 (Bankr. D.N.H. 2007) (trustee simultaneously asserted avoidance and recovery action); *In re Nat'l Audit Def. Network*, 332 B.R. 896 (Bankr. D. Nev. 2005) (same).

-38-

**D.      There is no conflict with SIPA.**

The Trustee's last ditch argument is that the ordinary meaning would conflict with

SIPA's 15 U.S.C. § 78fff-2(c)(3).  That argument is foreclosed by precedent.  According to the

Second Circuit, "[b]y stating that a SIPA trustee may recover '*to the extent* that such transfer is

voidable or void under [the Bankruptcy Code],' [Section 78fff-2(c)(3)] indicates that a SIPA

trustee's power to avoid and recover transfers under Sections 548 and 550 should be coextensive

with that of an ordinary bankruptcy trustee.'" *Citibank*, 12 F.4th at 192 n.26 (emphasis in

*Citibank*).  Indeed, it is hard to comprehend how a statute that is explicitly limited by the

provisions of the Bankruptcy Code could be in conflict with it.[25]

**E.      The issue presented should be certified for direct Second Circuit review.**

As noted at the outset, this Court is faced with conflicting authorities.  There are two

choices:  The Court can depart from Judge Rakoff's *Consolidated § 550 Ruling*, or the Court can

depart from more recent statements of the Second Circuit (which other courts have followed[26]).

The prudent path forward is to rule on the merits, and then to certify the question for

immediate review in the Second Circuit.  This issue presents a pure question of statutory

interpretation.  The Trustee does not contend that there is a controlling Second Circuit decision

---

[25] *Picard* v. *Gettinger*, 976 F.3d 184 (2d Cir. 2020), is inapposite.  The conflicting provision in *Gettinger* was not 15 U.S.C. § 78fff-2(c)(3), but separate provisions setting out SIPA's priority scheme.  No similar conflict exists here.

[26] *See Madoff*, 2022 WL 1304589, at *2; *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 401 (S.D.N.Y. 2021) ("Because the Transfers must be avoided under section 548(a)(1) before the Trustee can invoke section 550 to seek recovery, the Court begins with the Bankruptcy Court's holding that the Debtor did not receive reasonably equivalent value for the Transfers." (citing *Picard*, 917 F.3d at 98)); *In re Direct Access Partners, LLC*, 602 B.R. 495, 518 (Bankr. S.D.N.Y. 2019) (citing *Picard*, 917 F.3d at 97); *Maxus*, 641 B.R. at 561; *In re DeBerry*, 945 F.3d 943, 946 (5th Cir. 2019) ("To unwind a fraudulent transfer, the trustee must first 'avoid' it.") (citing *Picard*, 917 F.3d at 97).

in his favor; if there were such a decision, it is in defendants' favor. There is clear evidence of a conflict of decisions within this Circuit (and within this case). The issue is also quite important, not just for *Madoff*, but for other bankruptcies. Finally, an appellate decision will either expedite the resolution of various *Madoff* adversary proceedings or put defendants' argument to bed.

In short, the question presented meets the requirements for certification of a direct appeal under 28 U.S.C. § 158(d)(2), regardless of this Court's ruling. Defendants will stipulate that at least one of the circumstances for direct certification is present here. 28 U.S.C. § 158(d)(2)(B).

## CONCLUSION

For the reasons set forth above and in the opening submissions, the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(2) — and otherwise Rule 12(b)(6) — with prejudice.

September 15, 2022

By: /s/ Emil A. Kleinhaus
    Emil A. Kleinhaus
    Michael H. Cassel
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, NY  10019
    (212) 403-1000
    EAKleinhaus@wlrk.com
    MHCassel@wlrk.com

    *Attorneys for Defendants*