KELLNER HERLIHY GETTY & FRIEDMAN, LLP
Douglas A. Kellner, Esq.
470 Park Avenue South, 7th Floor
New York, New York 10016-6951
Telephone: (212) 889-2121
Email: dak@khgflaw.com

*Attorneys for Parson Finance Panama S,A,*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>  Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>  Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>  Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>PARSON FINANCE PANAMA S.A.,<br><br>  Defendant. | Adv. Pro. No. 11-02542 (CGM) |

**ANSWER**

Defendant Parson Finance Panama S.A. ("Parson Finance") answers the claims of

Plaintiff Irving H. Picard ("the Trustee") as follows:

I. **NATURE OF THE ACTION**

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER:** Parson Finance admits that the Trustee brings this adversary proceeding as part of the Trustee's efforts to recover BLMIS customer property within the meaning of 15 U.S.C. §§ 78*lll*(4) and that Madoff perpetrated a Ponzi scheme through BLMIS and denies the remaining allegations in Paragraph 1.

2. With this Complaint, the Trustee seeks to recover approximately $11,089,081 in subsequent transfers of Customer Property made to Defendant Parson. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently in liquidation in the British Virgin Islands ("BVI"). It was a BVI company that had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in its BLMIS customer accounts.

**ANSWER:** Parson Finance admits that the Trustee seeks to recover subsequent transfers from Fairfield Sentry but denies sufficient information to form a belief regarding the remaining allegations in Paragraph 2.

II. **JURISDICTION AND VENUE**

3. The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant Parson as a subsequent transferee of funds originating from BLMIS.

**ANSWER:** Parson Finance avers that the allegations in Paragraph 3 state legal conclusions to which no response is required.

4. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28

2

U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER:** Parson Finance denies that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4). Parson Finance states that the United States District Court for the Southern District of New York has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A)((iii) and (b)(4) and this Court has jurisdiction over this adversary proceeding to the extent provided in SIPA § 78eee(b)(4). Parson Finance admits the remaining allegations in Paragraph 4.

5. Defendant Parson is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry. Defendant Parson knowingly received transfers of Customer Property from BLMIS. The Trustee's investigation to date reveals that Defendant Parson obtained this Customer Property by withdrawing money from Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund. By directing its investment through FGG, Defendant Parson knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant Parson entered into a subscription agreement with Fairfield Sentry under which Defendant Parson submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Defendant Parson thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** Parson Finance denies the allegations in Paragraph 5, except admits that Parson Finance entered into a subscription agreement with Fairfield Sentry and refers to the contents of that agreement for its terms.

6. Defendant Parson should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER:** Parson Finance **denies** the allegations in Paragraph 6.

7. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER:** Parson Finance admits this adversary proceeding is of a kind specified as a core proceeding in 28 U.S.C. §§ 157(b)(2)(H) and denies the remaining allegations in Paragraph 7.

3

Parson Finance does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and demands trial by jury of all issues that may be tried by a jury.

8. Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER:** Parson Finance admits the allegations in Paragraph 8.

### III. BACKGROUND

9. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER:** Parson Finance admits on information and belief that Madoff was arrested on or around the Filing Date and that the SEC filed a complaint against BLMIS. Parson Finance lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9.

10. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11. On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

    a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b. appointed Baker & Hostetler LLP as counsel to the Trustee under

      SIPA § 78eee(b)(3); and

      c.   removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**: Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id*. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

**ANSWER**: Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 15.

## IV.   TRUSTEE'S POWERS AND STANDING

16. As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of

5

marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:** Parson Finance avers that the allegations in Paragraph 16 state legal conclusions to which no response is required.

17. Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:** Parson Finance avers that the allegations in Paragraph 17 state legal conclusions to which no response is required.

18. Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**: Parson Finance avers that the allegations in Paragraph 18 state legal conclusions to which no response is required.

19. The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:** Parson Finance avers that the allegations in Paragraph 19 state legal conclusions to which no response is required.

## V. THE DEFENDANT

20. Defendant Parson is a limited company domiciled in Panama. Defendant Parson's registered agent is Arias, Fabrega y Fabrega, which is located at Plaza 2000, 16th Floor, 50th Street, Panama City, Republic of Panama.

**ANSWER:** Parson Finance admits the allegations of Paragraph 20, except that the offices of Arias, Fabrega y Fabrega are located at PH ARIF A, 9th & 10th Floors, West Boulevard, Santa Maria

6

Business District, Panama, Republic of Panama.

## VI. THE PONZI SCHEME

21. BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 21.

22. Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 22.

23. The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 23.

24. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of

7

BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 24.

25. Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER:** Parson Finance admits upon information and belief that BLMIS claimed to invest money deposited by customers in securities**,** but otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and therefore denies those allegations.

27. The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28. It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 28.

29. Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:** Parson Finance admits that BLMIS's business continued until December 2008, but otherwise lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29, particularly since Parson Finance redeemed all of its shares in Fairfield Sentry in April 2005.

30. Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 30.

31. Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 31.

## VII. THE TRANSFERS

32. Defendant Parson received subsequent transfers of Customer Property from Fairfield Sentry, which maintained customer accounts with BLMIS.

**ANSWER:** Parson Finance admits that it received a single payment from Fairfield Sentry, but denies that such payment was a subsequent transfer of BLMIS property.

9

### A. Initial Transfers From BLMIS To Fairfield Sentry

33. The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:** Parson Finance admits that the Trustee filed an adversary proceeding against Fairfield Sentry and other defendants, but objects to the incorporation by reference of the Fairfield Amended Complaint as a violation of Federal Rule of Civil Procedure 8, applicable pursuant to Bankruptcy Rule of Procedure 7008. To the extent that the Court may allow wholesale incorporation of the allegations in the Fairfield Amended Complaint, Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations and therefore denies such allegations.

34. During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4), are avoidable, and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 34 and therefore denies such allegations. Parson Finance avers that the remaining allegations in Paragraph 34 state legal conclusions to which no response is required. To the extent that any further response is required, Parson Finance denies the allegations in Paragraph 34.

35. The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** In view of lack of any allegation that Parson Finance received any Fairfield Sentry

Two Year Initial Transfers, the allegations in Paragraph 35 are irrelevant to this adversary proceeding. Furthermore, Parson Finance lacks knowledge sufficient to form a belief as to the alleged timing and amounts of the transfers alleged in Paragraph 35 and therefore denies such allegations. Parson Finance **avers** that the remaining allegations in Paragraph 35 state legal conclusions to which no response is required. To the extent that any further response is required, Parson Finance denies the allegations in Paragraph 35.

> 36. The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** In view of lack of any allegation that Parson Finance received any Fairfield Sentry Two Year Initial Transfers, the allegations in Paragraph 36 are irrelevant to this adversary proceeding. Furthermore, Parson Finance lacks knowledge sufficient to form a belief as to the alleged timing and amounts of the transfers alleged in Paragraph 36 and therefore denies such allegations. Parson Finance avers that the remaining allegations in Paragraph 36 state legal conclusions to which no response is required. To the extent that any further response is required, Parson Finance denies the allegations in Paragraph 36.

> 37. The Fairfield Sentry Six Year Initial Transfers, Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are included as Exhibits A and B.

**ANSWER:** Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 37, except that Parson Finance admits that it received a single transfer from Fairfield Sentry in the amount of $11,089,081.40 on or about April 14, 2005, as set forth in Exhibit C to the Adversary Complaint.

> 38. Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement

11

Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER:** Parson Finance admits that there was a Settlement Agreement, and refers to the document for its terms.

### B.    Subsequent Transfers From Fairfield Sentry To Defendant Parson

39. Based on the Trustee's investigation to date, approximately $11,089,081 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Parson (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**ANSWER:** Parson Finance admits that it received a single transfer from Fairfield Sentry in the amount of $11,089,081.40 on or about April 14, 2005, as set forth in Exhibit C to the Adversary Complaint.

40. As set forth in paragraph 39, a portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Parson and is recoverable from Defendant Parson pursuant to section 550 of the Bankruptcy Code.

**ANSWER**: Parson Finance refers to its answer to Paragraphs 37 and 39, above. Parson Finance avers that the allegation in Paragraph 40 states a legal conclusion to which no response is required. To the extent that any further response is required, Parson Finance denies the allegation that such transfer is recoverable.

41. The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**  Parson Finance lacks knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 41 and therefore denies such allegations.

### COUNT ONE
### RECOVERY OF SUBSEQUENT TRANSFERS –11 U.S.C. §§ 550(a) AND 551

42. The Trustee incorporates by reference the allegations contained in the previous

12

paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:** Parson Finance incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

43. Defendant Parson received the Fairfield Sentry Subsequent Transfers, totaling approximately $11,089,081, which are recoverable pursuant to section 550 of the Bankruptcy Code.

**ANSWER**: Parson Finance refers to its answer to Paragraphs 37, 39 and 40, above. Parson Finance avers that the allegation in Paragraph 43 states a legal conclusion to which no response is required. To the extent that any further response is required, Parson Finance denies the allegation that such transfer is recoverable.

44. Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Parson.

**ANSWER:** Parson Finance admits that it received a single transfer from Fairfield Sentry in the amount of $11,089,081.40 on or about April 14, 2005, as set forth in Exhibit C to the Adversary Complaint.

45. Defendant Parson is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER:** Parson Finance admits that it received a single transfer from Fairfield Sentry in the amount of $11,089,081.40 on or about April 14, 2005, as set forth in Exhibit C to the Adversary Complaint.

46. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendant Parson recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

Parson Finance avers that the allegation in Paragraph 46 states a legal conclusion to which no response is required. To the extent that any further response is required, Parson Finance denies the allegation that the BLMIS Trustee is entitled to any recovery.

13

**AFFIRMATIVE DEFENSES**

1. In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, Parson Finance hereby preserves each and every defense at law, in equity or otherwise available under federal and state law, including common law. Further, Parson Finance reserves the right to amend this Answer to assert other and further defenses when and if, in the course of investigation, discovery or preparation for trial, it becomes appropriate to do so. In asserting the following defenses, Parson Finance does not intend to suggest that matters designated herein as "affirmative defenses" are not elements of the Trustee's prima facie case on the Trustee's purported claims or that they are not matters as to which the Trustee bears the burden or proof. These defenses are set forth cumulatively and in the alternative.

**First Affirmative Defense**
(Personal Jurisdiction)

2. This Court lacks personal jurisdiction over Parson Finance for each of the reasons stated in the Memorandum of Law of Parson Finance Panama S.A. in Support of Its Motion To Dismiss, filed on February 18, 2022 in this adversary proceeding (ECF# 93), and proceedings thereon, and Parson Finance has **not** consented to a decision by this Court or to this Court's authority to hear and determine this action.

**Second Affirmative Defense**
(Failure to State A Claim for Relief)

3. The Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated the Memorandum of Law of Parson Finance Panama S.A. in Support of Its Motion To Dismiss, filed on February 18, 2022 in this adversary proceeding (ECF# 93), and proceedings thereon.

**Third Affirmative Defense**
(Section 550(b)—Value, Good Faith, Without Knowledge of Voidability)

4. Parson Finance received the transfer from Fairfield Sentry for value and in good

faith and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b). Consequently, the BLMIS Trustee is not entitled to recover the transfer.

5. **Value.** Parson Finance received the Subsequent Transfer in exchange for Fairfield Sentry's redemption of its own shares from Parson Finance and therefore took for value.

6. **Good Faith.** Parson Finance invested in Fairfield Sentry in 2003. Parson Finance understood that Fairfield Sentry invested in U.S. securities primarily through an account that Fairfield Sentry held at BLMIS, and had reported consistent, positive, and generally above-market returns, that BLMIS was founded and operated by Bernard L. Madoff, that Madoff was a well-respected member of the investment community and former chair of NASDAQ, that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on investment, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which Parson Finance did not then know to be false.

7. When Parson Finance decided to redeem its shares in Fairfield Sentry, Parson Finance was aware of only the publicly available information about Fairfield Sentry and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. Parson Finance did not have access to non-public information regarding BLMIS. Parson Finance handled its Fairfield Sentry account consistent with other industry professionals based on publicly known information about Fairfield Sentry and about BLMIS.

8. At no time on or before April 15, 2005, the date when Parson Finance redeemed its shares in Fairfield Sentry, was any director, officer or employee of Parson Finance aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

9. A diligent inquiry by Parson Finance would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Parson Finance, and with more access to BLMIS personnel and documentation than Parson Finance, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Parson Finance did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Sentry Transfers or, if there were any fraudulent purpose of the Fairfield Sentry Subsequent Transfers (if any), of such fraudulent purpose, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

10. **Without Knowledge of the Voidability of the Fairfield Initial Transfers**. Parson Finance did not have knowledge of the voidability of the Fairfield Initial Transfers when it redeemed its shares in Fairfield Sentry.

**Fourth Affirmative Defense**
(Non-Avoidability Under Section 546(e)—Settlement Payment)

11. Under section 546(e) of the Bankruptcy Code, the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable because they were settlement payments, as defined in section 101 or 741 of the Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Fairfield Six-Year Transfers are not avoidable, the transfer received by Parson Finance from Fairfield Sentry is not recoverable. In addition, at the time of the transfer from Fairfield Sentry to Parson Finance, Parson Finance had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

16

**Fifth Affirmative Defense**
(Non-Avoidability Under Section 546(e)—Securities Contract)

12. Under section 546(e) of the Bankruptcy Code, the transfers from BLMIS to Fairfield Sentry are not avoided and are not avoidable because they were made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant, and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in section 741(7) of the Bankruptcy Code, between BLMIS and Fairfield Sentry or between Fairfield Sentry and Parson Finance. Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable, property received by Parson Finance as part of the Fairfield Six-Year Transfers is not recoverable from Parson Finance. In addition, at the time of the transfer (if any) from Fairfield Sentry to Parson Finance, Parson Finance had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

**Sixth Affirmative Defense**
(Not Customer Property)

13. The transfer Parson Finance received from Fairfield Sentry was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield Sentry, and therefore the property is not recoverable by the Trustee from Parson Finance.

**Seventh Affirmative Defense**
(Proceeds Not Recoverable)

14. In the alternative, to the extent that the property that Parson Finance received from Fairfield Sentry was proceeds of Customer Property or other property that BLMIS transferred to Fairfield Sentry or Fairfield Sigma, it is not recoverable by the Trustee from Parson Finance under section 550(a)(2) of the Bankruptcy Code.

15. In the event that the Court should determine that plaintiff is entitled to any

recovery, the recovery should be offset by $10,000,000—the amount Parson Finance paid for its subscription to the shares of Fairfield Sentry, which were redeemed on or about April 14, 2005.

**Eighth Affirmative Defense**
(Section 550(d)—Single Satisfaction)

16. Under section 550(d) of the Bankruptcy Code, the trustee may not recover any subsequent transfer from Parson Finance to the extent he has recovered from Fairfield Sentry or any other immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that Parson Finance received from Fairfield Sentry.

**Ninth Affirmative Defense**
(Extraterritoriality)

17. The Trustee's recovery from Parson Finance of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

**Tenth Affirmative Defense**
(Comity)

18. The Trustee's recovery from Parson Finance of any transfer from Fairfield Sentry would violate principles of comity.

**Eleventh Affirmative Defense**
(Lack of Fraudulent Intent—NY Debtor Creditor Law § 278)

19. Plaintiff's claims are barred in whole or in part, because the Fairfield Sentry Initial Transfers were taken without actual fraudulent intent and for fair consideration, as provided by New York Debtor and Creditor Law § 278(2).

20. Plaintiff's claims are barred in whole or in part, because the Fairfield Sentry Initial Transfers were taken for fair consideration and without knowledge of the fraud, as provided by New York Debtor and Creditor Law § 278(1).

**Twelvth Affirmative Defense**
(No Ponzi Scheme Presumption)

21. Plaintiff is not entitled to rely on a "Ponzi scheme presumption" to prove that the

initial transfers from BLMIS to Fairfield Sentry that he seeks to recover from Parson Finance were made with actual intent to hinder, delay or defraud any BLMIS creditor.

## DEMAND FOR JURY TRIAL

Parson Finance does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and demands trial by jury before the District Court of all issues that may be tried by a jury.

**WHEREFORE** Defendant Parson Finance prays that Plaintiff trustee take nothing by his complaint and that the Court grant Parson Finance such other relief, including an award of attorneys' fees, costs, and disbursements, as may be just.

Dated: September 30, 2022

        KELLNER HERLIHY GETTY & FRIEDMAN, LLP

By: _/s/ Douglas A. Kellner_
    Douglas A. Kellner
*Attorneys for Defendant Parson Finance Panama S,A,*

470 Park Avenue South—Seventh Floor
New York, New York 10016-6951
Telephone: (212) 889-2121
Email: dak@khgflaw.com