**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02910 (CGM) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| MERRILL LYNCH BANK (SUISSE) SA n/k/a BANK JULIUS BÄR & CO. AG a/k/a BANK JULIUS BAER & CO. LTD., | |
| Defendant. | |

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa–*lll* ("SIPA"),[1] and the substantively consolidated chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, for this Amended Complaint

against Merrill Lynch Bank (Suisse) SA, which dissolved in 2013 after it was acquired by and

merged into Bank Julius Bär & Co. AG a/k/a Bank Julius Baer & Co. Ltd. (with Merrill Lynch

Bank (Suisse) SA, "MLBS"), alleges the following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), stolen as part of the massive Ponzi

scheme perpetrated by Madoff and others and received by MLBS before Madoff's arrest on

December 11, 2008.

2.    The Trustee seeks to recover at least $44,894,275 in subsequent transfers of

BLMIS customer property that MLBS received from Fairfield Sentry Limited ("Fairfield

Sentry") directly, or through Fairfield Sigma Limited ("Fairfield Sigma," and together with

Fairfield Sentry, the "Fairfield Funds").  The total sum transferred to MLBS includes:

(a) $42,980,708 fraudulently transferred by BLMIS to Fairfield Sentry and then subsequently

transferred to MLBS; and (b) $1,913,567 fraudulently transferred by BLMIS to Fairfield Sentry,

then subsequently transferred from Fairfield Sentry to Fairfield Sigma, and then subsequently

transferred from Fairfield Sigma to MLBS.

3.    Fairfield Sentry was the largest of many BLMIS feeder funds—single-purpose

investment funds that pooled their investors' assets to invest with BLMIS's investment advisory

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § _____ and omit reference to title 15, United States
Code.

business ("IA Business") in New York. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained customer accounts with BLMIS in New York. Fairfield Sigma was 100% invested in Fairfield Sentry. The Fairfield Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI, which were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York.

4.      At all times relevant herein, Merrill Lynch & Co., Inc. ("ML & Co.") was the parent corporation for all Merrill Lynch entities including Defendant MLBS along with various other non-defendant affiliates and subsidiaries (collectively with ML & Co., "Merrill Lynch").

5.      Beginning in or around 2000, Merrill Lynch barred any investments related to Madoff and effectively instituted a "No Madoff" policy that extended across entities and groups within the Merrill Lynch organization. Merrill Lynch refused to offer any products on BLMIS funds including Fairfield Sentry.

6.      Fabio Savoldelli, a former executive in Merrill Lynch's New York office and member of Merrill Lynch's Global Markets & Investment Bank group ("GMI Group"), and later Merrill Lynch Investment Managers group ("MLIM Group"), has spoken publicly about Merrill Lynch's "No Madoff" protocol and the directive to "avoid[] investing in anything that had anything to do with Madoff." As Mr. Savoldelli explained, the prohibition against Madoff trading was instituted because Merrill Lynch had identified "many, many, many red flags" at BLMIS and said that "the whole thing smelled." Due to its concerns, Merrill Lynch noted that "[t]he decision was taken some time ago that Merrill Lynch does not offer any products on these funds" and repeatedly refused to offer products on the Madoff funds.

7.      Despite Merrill Lynch's prohibition against investing in BLMIS, MLBS invested in the Fairfield Funds through Merrill Lynch's Global Private Client Group ("GPC Group"),

2

which provided personalized banking services to high net-worth individuals and touted its

"sophisticated investment tools and risk analysis."

## II.     <u>SUBJECT MATTER JURISDICTION AND VENUE</u>

8.       This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities and Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

9.       This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

10.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

11.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), and 550(a), and other applicable law.

## III.     <u>DEFENDANT AND RELEVANT NON-PARTIES</u>

12.      At all times relevant to the allegations in the Amended Complaint, Defendant

MLBS was a Swiss *société anonyme* operating as a private bank and maintaining a place of

business at 13, Route de Florissant, 1211 Geneva, Switzerland.  MLBS was a wholly owned

subsidiary of Merrill Lynch International Bank Limited, which in turn was a wholly owned

subsidiary of ML & Co.  MLBS was also a wholly owned indirect subsidiary of the Bank of

America Corporation.

3

13.     In 2013, Merrill Lynch Bank (Suisse) SA merged with Bank Julius Bär & Co. AG

a/k/a Bank Julius Baer & Co. Ltd. ("Bank Julius").  As part of that merger, upon information and

belief, Merrill Lynch Bank (Suisse) SA was dissolved and its assets and liabilities were taken

over by Bank Julius.  Bank Julius is a limited company that operates as a private bank and is

headquartered in Zurich, Switzerland with its place of business at Bahnhofstrasse 36, 8010

Zurich, Switzerland.

14.     Despite its merger with Bank Julius in 2013, Merrill Lynch Bank (Suisse) SA has

participated in this action through its own counsel since 2012 and has never represented that it is

any entity other than Merrill Lynch Bank (Suisse) SA.

15.     Non-party ML & Co. was a Delaware corporation with its principal place of

business at 4 World Financial Center, New York, New York 10080.  Prior to Merrill Lynch Bank

(Suisse) SA's merger into Bank Julius, ML & Co. was the ultimate parent company of MLBS.

At all times relevant to this complaint, ML & Co. was a holding company that, through its

numerous subsidiaries and affiliates, provided financial products and services on a global basis.

ML & Co. and its subsidiaries operated in over 35 countries, in the geographical regions of the

United States, Latin America, Canada, Pacific Rim, Europe, the Middle East, and Africa.  ML &

Co. merged into Bank of America in October 2013 and is no longer a separate legal entity.

16.     To the world, as was stated in ML & Co.'s Guidelines for Business Conduct,

which governs and applies to Merrill Lynch's businesses, "there [was] only one Merrill Lynch."

Merrill Lynch was an integrated organization internally sub-divided into umbrella groups, which

included, as of at least 2006: (a) GMI Group, (b) GPC Group, and (c) MLIM Group, which

operated across entities as a single corporate unit.  As discussed below, Merrill Lynch acted as an

integrated whole with respect to its investments.  It sought seamless integration of its groups not

4

only to serve its clients, but also to standardize procedures and share knowledge across the

organization. Each of these groups comprised employees from several Merrill Lynch entities,

including MLBS, along with executives and employees in New York, who communicated and

shared information with each other and performed work for MLBS in the United States.

## IV.    **PERSONAL JURISDICTION**

17.    MLBS is subject to personal jurisdiction in this judicial district because it

purposely availed itself of the laws and protections of the United States and the state of New

York by undertaking significant commercial activities in New York, including, among other

things, knowingly directing funds to be invested with, and then redeemed from, New York-based

BLMIS through the Fairfield Funds. By directing investments through the Fairfield Funds,

MLBS knowingly accepted the rights, benefits, and privileges of conducting business and/or

transactions in the United States and New York.

18.    MLBS derived significant revenue from New York and maintained minimum

contacts and/or general business contacts with the United States and New York in connection

with the claims alleged herein.

19.    To invest in the Fairfield Funds, MLBS entered into subscription agreements that

were governed by New York law and included agreements to submit to venue in New York and

the jurisdiction of the New York courts.

20.    In executing the subscription agreements upon investing with Fairfield Sentry,

MLBS also agreed that all subscription payments from MLBS to Fairfield Sentry were required

to be made in U.S. dollars and sent to Fairfield Sentry's HSBC bank account, located in New

York. MLBS directed funds to this New York-based HSBC bank account in connection with its

investments in Fairfield Sentry.

5

21.    MLBS maintained a bank account in its own name in New York through which it directed funds to be invested with or redeemed from BLMIS through Fairfield Sentry. MLBS received most of its redemption payments for the BLMIS transactions from its bank account entitled "Merrill Lynch Bank Suisse SA Geneva," at Northern Trust International Banking Corp. in New York. The Bank of New York in New York also received $2,413,304 for MLBS in redemption payments for the BLMIS transactions.

22.    Certain Fairfield Sentry shares in MLBS's name were held in Merrill Lynch's "house account," operated by the Offshore Operations Office of Financial Data Services, Inc., a Merrill Lynch subsidiary, in Jacksonville, Florida.

23.    MLBS agreed when it executed the Fairfield Sentry subscription agreements that it had read and reviewed a copy of Fairfield Sentry's Private Placement Memorandum ("PPM"), which explained that FGG maintained accounts at BLMIS, a U.S. registered broker-dealer that utilized a strategy described as "split strike conversion" ("the SSC Strategy"), which involved the purchase of U.S. securities.

24.    The Fairfield Sentry PPM, which MLBS received and affirmed that it had received and read, explained that the SSC Strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of "approximately 35-50 stocks in the S&P 100 Index," as well as "the sale of out-of-the-money S&P 100 Index call options" and the purchase of an equivalent number of "out-of-the-money S&P 100 Index put options."

25.    The tear sheets provided to MLBS by FGG confirmed that the SSC Strategy relied upon investments in the United States, reiterating that Fairfield Sentry's positions typically "consist[] of between 40 to 50 stocks in the S&P 100 Index."

26.     MLBS also knew from the documents it received and reviewed from FGG that BLMIS maintained custody of its investments in Fairfield Sentry in New York.

27.     The Fairfield Sigma PPM contained similar representations regarding the SSC Strategy and described BLMIS's role as investment advisor, executing broker, and custodian.

28.     MLBS knew and intended that FGG would invest MLBS's money with BLMIS in New York and undertook purposeful acts aimed at New York as a part of MLBS's BLMIS Fairfield Fund investments.

29.     MLBS representatives directed communications regarding MLBS's investments to representatives of Fairfield Sentry and FGG in New York and the United States, including Jacqueline Harary, who was based in FGG's New York headquarters.  Included in these communications with FGG are questions from MLBS representatives concerning BLMIS's trading activities and responses from FGG with information concerning strategy reviews and tear sheets.

30.     As part of the communications between FGG and MLBS, FGG's New York office provided MLBS with substantial documentation about the Fairfield Funds and BLMIS's operations.  Among the documents MLBS received were:

- Tear Sheets representing BLMIS's historical monthly and yearly performance for 1990 through 2008;
- Responses to questions regarding BLMIS's role as broker;
- Weekly Fund Reports showing month-to-date performance of BLMIS and indicating that the fund type is split strike conversion;
- Monthly Fund Reports indicating BLMIS's performance and monthly rates of return;
- Prospectuses that included information concerning BLMIS's strategy, BLMIS employees and their roles, and the operation of BLMIS's investment advisory and broker-dealer business segments; and
- Fund presentations and marketing materials regarding BLMIS's strategy, rates of return, and comparisons of BLMIS rates of return over time to market indices.

31.     Based on these documents, MLBS knew, among other things, the following facts

indicating that they were transacting business in New York in connection with their investments

in the Fairfield Funds:

- Fairfield Sentry invested substantially all of its assets with New York-based BLMIS, and Fairfield Sigma invested "principally" into Fairfield Sentry;
- BLMIS was registered with the SEC;
- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the SSC Strategy on the funds' behalf;
- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;
- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;
- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and
- BLMIS was "essential to the continued operation of" the Fairfield Funds.

32.     MLBS further engaged in communications with representatives of Fairfield

Sentry and FGG in New York regarding retrocession fees payable to MLBS based on its

Fairfield investments.

33.     MLBS additionally entered into a Customer Agency and Shareholder Services

Agreement Relating to the Private Placement of Funds governed by New York law.  The

agreement provided that FGG would make shares in its funds, including Fairfield Sentry and

Fairfield Sigma, available to MLBS's customers and MLBS would act as agent for its customers

in exchange for fees.

34.     MLBS knew, that by investing with Fairfield Sentry, its activity and investments

were ultimately being directed to BLMIS in New York.

35.     MLBS knowingly received subsequent transfers from BLMIS in the form of

withdrawals, rebates, and fees from the Fairfield Funds.

8

36.     MLBS knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

37.     This Court has personal jurisdiction over MLBS pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004.  MLBS derived significant revenue from New York and has maintained minimum contacts with New York and the United States in connection with the claims alleged herein.  Thus, this Court has personal jurisdiction over MLBS based on its contacts with the United States and New York.

38.     MLBS is also subject to the jurisdiction of this Court because it filed customer claims with the Trustee, thereby invoking the jurisdiction of this Court.  The Trustee has designated the customer claims filed by Defendant MLBS as Claim Nos. 004476, 004477, 004478, 004479, 005241, and 011120.

## V.     BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

39.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

40.     In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC

9

when SIPC was created and continued its membership after 2001 without any change in status.

SIPC membership is contingent on registration of the broker-dealer with the SEC.

41.      For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker dealer operation, and the IA Business.

42.      BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

43.      For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

44.      In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had

over 4,900 active customer accounts with a purported value of approximately $68 billion in

AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

45.      At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

10

no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

46.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

47.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

48.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

11

*Madoff's Investment Strategy*

49.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers: the convertible arbitrage strategy and the SSC Strategy.  For a limited group

of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff

also purportedly purchased securities that were held for a certain time and then purportedly sold

for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any

of these strategies.

50.    All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

51.    The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets.  Investors were told they would gain profits from a change in the expectations

for the stock or convertible security over time.  In the 1970s this strategy represented a

significant portion of the total BLMIS accounts, but by the early 1990s the strategy was

purportedly used in only a small percentage of BLMIS accounts.

52.    From the early 1990s forward, Madoff began telling BLMIS customers that he

employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any

securities for its BLMIS customers.

53.    BLMIS reported falsified trades using backdated trade data on monthly account

statements sent to BLMIS customers that typically reflected impossibly consistent gains on the

customers' principal investments.

12

54.     By 1992, the SSC Strategy purported to involve: (a) the purchase of a group or
basket of equities intended to highly correlate to the S&P 100 Index; (b) the purchase of out-of-
the-money S&P 100 Index put options; and (c) the sale of out-of-the-money S&P 100 Index call
options.

55.     The put options were to limit the downside risk of sizeable price changes in the
basket.  The exercise of put options could not turn losses into gains, but rather could only put a
floor on losses.  By definition, the exercise of a put option should have entailed a loss for
BLMIS.

56.     The sale of call options would partially offset the costs associated with acquiring
puts but would have the detrimental effect of putting a ceiling on gains.  The call options would
make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone
outperform the market, because in a rising market, calls would have been expected to be
exercised by the counterparty.

57.     The simultaneous purchase of puts and sale of calls to hedge a securities position
is commonly referred to as a "collar."  The collar provides downside protection while limiting
the upside.

58.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts,
as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the
market value of the equities in the basket.  For example, to properly implement a collar to hedge
the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the
purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are
no records to substantiate Madoff's sale of call options or purchase of put options in any amount,
much less in billions of notional dollars.

13

59.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

60.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times, significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

61.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

62.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

63.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of

14

reporting.  BLMIS reportedly exited the market completely at every year end and every quarter

end starting in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC

requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market

conditions.  It would be impossible to automatically sell all positions at fixed times, independent

of market conditions, and win almost every time.

64.    BLMIS's practice of exiting the market at fixed times, regardless of market

conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does

not depend on exiting the market in a particular month.

**BLMIS Execution**

65.    BLMIS's execution showed a consistent ability to buy low and sell high, an

ability so uncanny, that any sophisticated or professional investor, including MLBS, would know

it was statistically impossible.

**No Evidence of BLMIS Trading**

66.    There is no record of BLMIS clearing a single purchase or sale of securities in

connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which BLMIS

could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS

traded securities using the SSC Strategy.

67.    All exchange-listed options relating to the companies within the S&P 100 Index,

including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any

exchange-listed options.

*The Collapse of the Ponzi Scheme*

68.     The Ponzi scheme collapsed in December 2008, when BLMIS customers'

requests for redemptions overwhelmed the flow of new investments.

69.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS

through its IA Business operated as a Ponzi scheme.

70.     At all relevant times, BLMIS was insolvent because (a) its assets were worth less

than the value of its liabilities; (b) it could not meet its obligations as they came due; and (c) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    THE MERRILL LYNCH ENTITIES ACTED AS AN INTEGRATED WHOLE AND HAD EXTENSIVE DUE DILIGENCE CAPABILITIES

71.     Merrill Lynch's GPC Group functioned as Merrill Lynch's wealth management

arm and was created to "more fully integrate the U.S. and non-U.S. businesses into a global

organization to bring the full resources of GPC Group together."

72.     As part of GPC Group, MLBS operated "representative offices" in Hong Kong,

Singapore, London, Dubai, and Bahrain.  MLBS's Geneva office served as the "booking center"

for MLBS's Fairfield investments.  GPC Group's Geneva, Hong Kong, and Singapore offices

communicated with, and performed reviews on, FGG, including asking questions regarding

BLMIS's trading strategy and operations.

73.     Merrill Lynch had robust due diligence capabilities and risk management controls

that were centralized across its global network.  Each of the Merrill Lynch umbrella groups had

its own network of committees and sub-groups that worked to coordinate due diligence efforts,

monitor risk to Merrill Lynch, and communicate the results throughout the group.

74.     MLBS touted its "sophisticated investment tools and risk analysis," focusing on its use of standard deviation to measure an investment's volatility and both upside and downside risk.

75.     Merrill Lynch created monthly performance analysis reports on Fairfield Sentry. These reports showed that Fairfield Sentry never experienced a negative year since its inception in December 1990, and rarely had a down month: Fairfield Sentry reported positive returns for 94.33% of its existence, far exceeding the numbers reported by the benchmarks to which it was being compared.

76.     Merrill Lynch's performance analysis reports of Fairfield Sentry also showed Fairfield Sentry's annualized standard deviation and downside deviation, along with other metrics comparing Fairfield Sentry to certain indices.

77.     Standard deviation measures the volatility of a trading strategy and how much variability there has been in the strategy's returns. The higher the standard deviation, the greater the probability of the expected returns deviating from the average return or risk-free rate, and thus greater risk.

78.     Throughout its history, Fairfield Sentry, month in and month out, reported standard deviations that were lower than market indices and its peers. For example, in Merrill Lynch's January 2007 report, Fairfield Sentry reported an annualized standard deviation of 2.50%, significantly lower than all the other indices that Merrill Lynch was comparing it to, which had standard deviations of between 4.09% and 13.16%.

79.     Merrill Lynch also calculated Fairfield Sentry's downside deviation, which is similar to the standard deviation, but measures only returns below the risk-free rate, which in Merrill Lynch's January 2007 report was 4.30%. As with standard deviation, a value of zero for the downside deviation would be the best possible value. Merrill Lynch calculated Fairfield

17

Sentry's downside deviation as 0.60%, which is nearly seven times lower than that of Hedge

Fund Research's Fund of Funds Index, an index of Fairfield Sentry's peers.

80.     Consistent with Fairfield Sentry reporting 94.33% positive months during the life

of the fund, its consistently low downside deviation, as calculated by Merrill Lynch, indicated

that BLMIS had almost entirely eliminated downside risk—a statistical improbability if Madoff

was legitimately trading equities and options.

81.     MLBS knew that Madoff's implausibly unwavering consistency was an anomaly.

In an email regarding Madoff funds including Fairfield Sentry, an MLBS executive described

"[s]everal red flags [that] have been raised since [for]ever around these funds," and that the

"galaxy of [BLMIS] feeders" were "easy to identify" because of their track record of "an annual

compounded return of 8% with almost no volatility."

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO MLBS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

82.     The Trustee commenced a separate adversary proceeding against Fairfield Sentry

and other defendants in this Court, under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv.

Pro. No. 09-01239, seeking to avoid and recover initial transfers of customer property from

BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry

Initial Transfers").

83.     By orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a

settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a

consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of

$3,054,000,000 ("Judgment Amount") [ECF No. 109].

84.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

85.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Fairfield Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

86.    As set forth in the Fairfield Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Fairfield Second Amended Complaint as if fully set forth herein, including without limitation paragraphs 1-10, 79-313, 315-16.

87.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years prior to the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

88.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code section 548 and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

19

**B.    Subsequent Transfers from Fairfield Sentry to MLBS**

89.    Fairfield Sentry subsequently transferred prior to the Filing Date a portion of the

Fairfield Sentry Initial Transfers to MLBS (the "Fairfield Sentry-MLBS Subsequent Transfers").

Based on the Trustee's investigation to date, the Fairfield Sentry-MLBS Subsequent Transfers

total $42,980,708.  A chart setting forth the presently known Fairfield Sentry-MLBS Subsequent

Transfers is attached as Exhibit C.

90.    On November 22, 2011, the Trustee filed this action seeking recovery of

subsequent transfers.

91.    The Fairfield Sentry-MLBS Subsequent Transfers are recoverable from MLBS

under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly

§ 78fff-2(c)(3).

92.    The Fairfield Sentry-MLBS Subsequent Transfers represent a redemption of

equity interests by MLBS as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested

all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent

when it made the Fairfield Sentry-MLBS Subsequent Transfers to MLBS upon redemption of

MLBS's interests.

**C.    Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and
        Subsequently to MLBS**

93.    Prior to the Filing Date, Fairfield Sentry subsequently transferred at least

$789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Fairfield

Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma

Subsequent Transfers is attached as Exhibit D.

94.     Thereafter, Fairfield Sigma transferred at least $1,913,567 to MLBS (the "Fairfield Sigma-MLBS Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma-MLBS Subsequent Transfers is attached as Exhibit E.

95.     The Fairfield Sigma-MLBS Subsequent Transfers are recoverable from MLBS under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

96.     The Fairfield Sigma-MLBS Subsequent Transfers represent a redemption of equity interests by MLBS as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma was insolvent when it made the Fairfield Sigma-MLBS Subsequent Transfers to MLBS upon redemption of MLBS's interests.

97.     The Fairfield Sentry-MLBS Subsequent Transfers and the Fairfield Sigma-MLBS Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

98.     The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (a) supplement the information on the initial and Fairfield Subsequent Transfers discussed above, and any additional transfers; and (b) seek avoidance and recovery of such transfers.

### COUNT ONE
### RECOVERY OF THE FAIRFIELD SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) AND 550(a)

99.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

100.    Each of the Fairfield Subsequent Transfers is recoverable from MLBS under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

101.    MLBS is an immediate or mediate transferee of the Fairfield Subsequent
Transfers from Fairfield Sentry and Fairfield Sigma.

102.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the
Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against
MLBS: (a) recovering the Fairfield Subsequent Transfers, or the value thereof, from MLBS for
the benefit of the estate of BLMIS; and (b) awarding any other relief the Court deems
appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on
Count One in favor of the Trustee and against MLBS as follows:

(a)    Recovering the Fairfield Subsequent Transfers, or the value thereof, from MLBS
for the benefit of the estate;

(b)    If MLBS challenges the avoidability of the Fairfield Sentry Initial Transfers, the
Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers
are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and
551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and
as necessary to recover the Fairfield Subsequent Transfers pursuant to Bankruptcy Code § 550(a)
and (b) and 15 U.S.C. § 78fff-2(c)(3);

(c)    Awarding the Trustee prejudgment interest from the date on which the Fairfield
Subsequent Transfers were received by MLBS; and

(d)    Awarding the Trustee fees and all applicable costs and disbursements, and such
other, further, and different relief as the Court deems just, proper, and equitable.

Dated: October 7, 2022
      New York, New York

/s/ David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
dsheehan@bakerlaw.com
Carrie A. Longstaff
clongstaff@bakerlaw.com
Peter B. Shapiro
pshapiro@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*