**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>         Plaintiff-Applicant, <br><br>     v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>         Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br>         Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>         Plaintiff, <br><br>     v. <br><br> EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M., EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in-interest to Banco Atlántico (Bahamas) Bank & Trust Limited, <br><br>         Defendants. | Adv. Pro. No. 12-01690 (CGM) <br><br> **AMENDED COMPLAINT** |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against EFG Bank S.A., f/k/a EFG Private Bank S.A. ("EFG Bank"), EFG Bank (Monaco) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M. ("EFG Monaco"), and EFG Bank & Trust (Bahamas) Limited ("EFG Bahamas"), as successor-in-interest to Banco Atlántico (Bahamas) Bank & Trust Limited ("Banco Atlántico") (collectively, the "Defendants"), alleges the following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.    The Trustee seeks to recover approximately $298,443,562 in subsequent transfers of BLMIS customer property made to Defendants by Fairfield Sentry Limited ("Fairfield Sentry") directly, or through Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda," and together with Fairfield Sentry and Fairfield Sigma, the "Fairfield Funds"). The Fairfield Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI.

3.    Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained at least 95% of its assets in its BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma and Fairfield Lambda, which each invested 100% of their assets in Fairfield Sentry.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

4.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

5.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

7.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE AND STANDING

8.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

9.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

10.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    c.    removed the case to this Court pursuant to § 78eee(b)(4) of SIPA.

11.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

12.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

13.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

14.     At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a 10-count criminal information charging him with participating in and conspiring to

perpetuate the Ponzi scheme. DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

15.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

16.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

17.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

18.     Pursuant to § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

19.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551 and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

20.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

21.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

22.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

23.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

24.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

25.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

### B.      The Ponzi Scheme

26.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

27.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.   It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.   The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

28.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.   Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.   Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

29.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.   BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.     Madoff's Investment Strategy

30.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").   For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a

certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

31.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

32.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

33.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

34.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

35.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

36.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

37.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

38.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

39.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

40.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the SSC Strategy.

41.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times, significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

2.    BLMIS's Fee Structure

42.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

3.    BLMIS's Market Timing

43.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.  BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every year end and at every quarter end starting in 2003.

44.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of

reporting. BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet, this is precisely what BLMIS's customer statements reported.

45.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4.    BLMIS Execution

46.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5.    No Evidence of BLMIS Trading

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

48.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

6.    The Collapse of the Ponzi Scheme

49.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

50.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

51.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    THE DEFENDANTS

52.    When Defendants received subsequent transfers of BLMIS customer property, Defendants were part of a sophisticated financial entity that provided private banking services and products.

53.    Defendant EFG Bank, formerly known as EFG Private Bank S.A., is an *aktiengesellschaft* incorporated and organized under the laws of Switzerland and located at Bleicherweg 8, 8001 Zurich, Switzerland.

54.    Defendant EFG Monaco, formerly known as EFG Eurofinancière d'Investissements S.A.M., is a *société anonyme* incorporated and organized under the laws of Monaco and located at 15 Avenue d'Ostende, MC 98001, Monaco.

55.    Defendant EFG Bahamas is a Bahamian company located at Goodman's Bay Corporate Centre, 3rd Floor, West Bay Street and Sea View Drive, P.O. Box CB-10956, Nassau, The Bahamas.  In or about 2004, Banco Sabadell acquired EFG Bahamas' predecessor Banco Atlántico.  Subsequently, in or about June 2005, Banco Sabadell entered into an agreement with EFG Bank to transfer its business in the Bahamas to EFG Bahamas.  Upon information and

13

belief, as part of this agreement, EFG Bahamas acquired the assets and liabilities of Banco Atlántico, including Banco Atlántico's bank accounts, and Banco Atlántico was thereafter dissolved. Upon information and belief, after this change in legal ownership and name, EFG Bahamas was the transferee of any subsequent transfers of BLMIS customer property received in the name of Banco Atlántico.

56.    Non-party EFG International AG ("EFG International"), a global private banking group headquartered in Zurich, Switzerland, is the ultimate parent company of each of the Defendants.

57.    Non-party EFG Capital, an indirect subsidiary of EFG International, is incorporated in Delaware with a principal place of business at 701 Brickell Avenue, 9th Floor, Miami, Florida 33131.

## VI.    **IMPUTATION**

58.    EFG Bank, EFG Monaco, EFG Capital, EFG International, and, after the June 2005 acquisition, EFG Bahamas, collectively functioned as one entity for the purposes alleged herein.

59.    EFG Capital advertised its ability to "access our organization's extensive global infrastructure, and bring together the best ideas for [each] portfolio." This global infrastructure included consolidating certain functions across Defendants related to hedge fund research, monitoring, diligence, and ongoing relationships with managers.

60.    As a cooperative network, Defendants maintained significant and continuous operations through EFG Capital. On its website, EFG Capital explained that "EFG Capital . . . together with its affiliated investment advisers are the principal providers of wealth management services in the United States for EFG International."

61.     EFG Capital was responsible for providing U.S. coverage to the Defendants, which included managing the Defendants' relationships with Fairfield Greenwich Group ("FGG"), a *de facto* partnership that created, operated, and controlled the Fairfield Funds.  Sixto Campano, EFG Capital's President, testified that "out of the different EFG offices, [EFG Capital] had the lead relationship with [FGG]."

62.     EFG Capital communicated with BLMIS feeder funds, large investment funds created for the express purpose of funneling investors' funds into BLMIS, including the Fairfield Funds, and aggregated research materials, which EFG Capital then made available to Defendants.  For example, in 2003, EFG Capital shared its concerns about BLMIS's unusual custody arrangement with EFG Bank.

## VII.    PERSONAL JURISDICTION

63.     Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York.

64.     Defendants knowingly directed funds to be invested with New York-based BLMIS through the Fairfield Funds and Kingate Global Fund Limited ("Kingate Global") (collectively, the "BLMIS Feeder Funds").  By directing Defendants' investments through Fairfield Sentry, and EFG Bank's and EFG Monaco's investments in Kingate Global, Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

65.     Defendants were furnished with Fairfield Sentry's private placement memorandum.  Based on the information contained therein, Defendants knew the following facts indicating that it was transacting business in New York by investing in Fairfield Sentry.

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

66.    Through meetings in New York with FGG and/or Madoff, EFG Bank and Banco Atlántico were able to confirm that their investments in the BLMIS Feeder Funds were managed in New York.  EFG Capital also met with FGG in New York on behalf of Defendants.

67.    In February 2003, after visiting the New York office of FGG, EFG Bank's Senior Vice President, Mats Pehrsson, composed a memorandum and disseminated it to EFG Bank and EFG Capital, identifying New York-based BLMIS as the "manager" of Defendants' investments in Fairfield Sentry:

> F.S. [Fairfield Sentry] is managed by Bernard L. Madoff Securities LLC, New York (=MS).  Established in 1960 by Bernard Madoff, MS is a US Broker Dealer and one of the largest market-makers in US equities. . . .  It is located on Third Avenue, a few blocks away from FGG.

68.    Armed with this knowledge, Defendants chose to execute subscription agreements with Fairfield Sentry, further memorializing the connections between Defendants and New York in several ways.

69.     By executing subscription agreements with Fairfield Sentry, Defendants consented to jurisdiction in New York for claims with respect to the subscription agreements and Fairfield Sentry.

70.     Defendants' subscription agreements with Fairfield Sentry also included a New York choice of law provision.

71.     Fairfield Sentry's subscription agreement required Defendants to direct all of their subscription payments to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.

72.     EFG Bank designated an "EFG Bank" account at UBS AG in Stamford, Connecticut to receive the proceeds of redemptions from Fairfield Sentry. EFG Bank then directed and received the proceeds of redemptions from Fairfield Sentry in that same U.S. bank account. At least 29 subsequent transfers from Fairfield Sentry, totaling approximately $18.4 million, were directed to and received in EFG Bank's account at UBS AG in Stamford, Connecticut.

73.     Banco Atlántico selected and used its New York bank account at the Bank of New York to wire subscriptions to and receive redemption proceeds from Fairfield Sentry.

74.     After acquiring Banco Atlántico, EFG Bahamas directed and received redemption proceeds from Fairfield Sentry to and in a New York bank account at the Bank of New York. Between 2003 and 2006, at least 20 subsequent transfers from Fairfield Sentry, totaling approximately $41.5 million, were directed to and received in Banco Atlántico's account at the Bank of New York.

75.     To send subscription payments to Fairfield Sigma, EFG Bank utilized its own account at UBS AG in New York. EFG Bank directed FGG to remit the proceeds of its

redemptions from Fairfield Sigma to an "EFG Bank NY" account at UBS AG in New York, New York.

76.    In connection with their BLMIS Feeder Funds' investments, EFG Bank, EFG Capital, and Banco Atlántico visited and regularly communicated with the Fairfield Funds' New York-based representatives.  For example:

- By 1998, Victor Echevarria (EFG Capital's Chairman) had met with FGG to discuss Fairfield Sentry and its returns.

- In February 2003, Mats Pehrsson (EFG Bank's Senior Vice President) met with FGG at FGG's offices in New York to discuss Fairfield Sentry and review information concerning Madoff, BLMIS, and the SSC Strategy.

- In November 2003, Sergio Miguez Martin (Banco Atlántico's Director General) and Miguel Coello (Banco Atlántico's General Manager) met with FGG at FGG's offices in New York to discuss Fairfield Sentry, Madoff, and BLMIS.

- In February 2004, Jerome Schonbachler (EFG Bank's Senior Vice President) and Romy Cabrera (EFG Capital's hedge fund specialist) met with FGG at FGG's offices in New York to review EFG Bank's existing investments in Fairfield Sentry.

- In February 2005, Mr. Schonbachler of EFG Bank met with FGG at FGG's offices in New York to discuss guaranteed capacity for EFG Bank in various FGG-managed funds, including Fairfield Sentry.

- In May 2006, Mr. Schonbachler of EFG Bank met with FGG's Amit Vijayvergiya at FGG's offices in New York to address questions EFG Bank had regarding Fairfield Sentry.

77.    EFG Bank, EFG Capital, and Banco Atlántico each met with Madoff.  For example:

- In 2005, Mr. Schonbachler of EFG Bank met with Madoff.

- In the late 1990s, Mr. Echevarria of EFG Capital visited BLMIS's office with FGG representatives.  During this visit, Mr. Echevarria discussed the SSC Strategy.

- In November 2003, Sergio Miguez Martin and Miguel Coello of Banco Atlántico met with Madoff and FGG representatives at BLMIS's office in

New York.  This meeting included a discussion of Fairfield Sentry and the SSC Strategy.

78.     Defendants are also subject to the jurisdiction of this Court because Defendants conducted business in New York through EFG Capital, a Delaware corporation that operated from offices in New York and Miami, Florida.

79.     By at least 2003, Defendants' relationships with FGG were managed by EFG Capital in Miami.  Campano, EFG Capital's President, also testified that the relationship between Defendants and Fairfield Sentry was "born in Miami" at EFG Capital.

80.     Representatives from EFG Capital's Miami office coordinated Defendants' transfers to and from the Fairfield Funds by, among other things: (i) executing Fairfield Sentry subscription agreements as "attorneys-in-fact"; (ii) signing Fairfield Lambda redemption requests; (iii) transmitting Fairfield Sigma subscription agreements to FGG in New York; and (iv) corresponding with Defendants regarding FGG, the Fairfield Funds, and BLMIS.  Further, EFG Bank directed duplicates of its Fairfield Sentry account confirmations to EFG Capital in Miami.  And finally, on behalf of Defendants, EFG Capital made multiple visits to BLMIS's offices in New York.

81.     In July 2003, EFG Bank negotiated and entered into a Letter of Understanding with New York-based Fairfield Greenwich Limited, a member of the FGG *de facto* partnership that managed the Fairfield Funds.  The Letter of Understanding provided for a New York choice of law and directed Fairfield Greenwich Limited to pay retrocession fees—an investment incentive FGG provided to large subscribers—to EFG Bank's account at UBS AG Stamford, Connecticut Branch.

82.     By at least 2003, EFG Bank, EFG Capital, and Banco Atlántico were reviewing BLMIS trade confirmations listing BLMIS as a member of SIPC regulated by the SEC.  On

behalf of Defendants, EFG Capital reviewed Fairfield Sentry's BLMIS account opening documents, which specified that the transactions with BLMIS would be subject to the provisions of the Securities Exchange Act and the Commodities Exchange Act, as well as the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

83.    Defendants derived significant revenue from New York, purposefully availed themselves of the benefits of the United States, and otherwise submitted themselves to this Court's jurisdiction for the purposes of this proceeding and in connection with the claims alleged herein.

84.    Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules §§ 301 and 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure 7004.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

85.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court, under the caption, *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

86.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

87.     The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

88.     On August 28, 2020, the Trustee filed a second amended complaint in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (CGM) ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

89.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

90.     Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under § 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

91.     Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under § 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.      Subsequent Transfers from Fairfield Sentry to EFG Bank**

92.      Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to EFG Bank (the "Fairfield Sentry-EFG Bank Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Bank Subsequent Transfers total $187,418,854. A chart setting forth the presently known Fairfield Sentry-EFG Bank Subsequent Transfers is attached as Exhibit C.

93.      On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Sentry-EFG Bank Subsequent Transfers sought in this Amended Complaint.

94.      The Fairfield Sentry-EFG Bank Subsequent Transfers are recoverable from EFG Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

95.      The Fairfield Sentry-EFG Bank Subsequent Transfers represent a redemption of equity interests by EFG Bank as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Bank Subsequent Transfers to EFG Bank upon redemption of its interests.

**C.      Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to EFG Bank**

96.      Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached as Exhibit D.

97.    Thereafter, Fairfield Sigma transferred at least $7,367,027 to EFG Bank (the "Fairfield Sigma-EFG Bank Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma-EFG Bank Subsequent Transfers is attached as Exhibit E.

98.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Sigma-EFG Bank Subsequent Transfers.

99.    The Fairfield Sigma-EFG Bank Subsequent Transfers are recoverable from EFG Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

100.    The Fairfield Sigma-EFG Bank Subsequent Transfers represent a redemption of equity interests by EFG Bank as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-EFG Bank Subsequent Transfers to EFG Bank upon redemption of its interests.

### D.    Subsequent Transfers from Fairfield Sentry to Fairfield Lambda and Subsequently to EFG Bank

101.    Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $55,256,883 of the Fairfield Sentry Initial Transfers directly to Fairfield Lambda ("Lambda Subsequent Transfers").  A chart setting forth the presently known Fairfield Lambda Subsequent Transfers is attached as Exhibit F.

102.    Thereafter, Fairfield Lambda transferred at least $657,379 to EFG Bank (the "Fairfield Lambda-EFG Bank Subsequent Transfers").  A chart setting forth the presently known Fairfield Lambda-EFG Bank Subsequent Transfers is attached as Exhibit G.

103.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Lambda-EFG Bank Subsequent Transfers.

104.    The Fairfield Lambda-EFG Bank Subsequent Transfers are recoverable from EFG Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

105.    The Fairfield Lambda-EFG Bank Subsequent Transfers represent a redemption of equity interests by EFG Bank as a shareholder in Fairfield Lambda.  Because Fairfield Lambda invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Lambda was insolvent when it made the Fairfield Lambda-EFG Bank Subsequent Transfers to EFG Bank upon redemption of its interests.

### E.    Subsequent Transfers from Fairfield Sentry to EFG Monaco

106.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to EFG Monaco (the "Fairfield Sentry-EFG Monaco Subsequent Transfers").  Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Monaco Subsequent Transfers total $5,045,022.  A chart setting forth the presently known Fairfield Sentry-EFG Monaco Subsequent Transfers is attached as Exhibit H.

107.    On June 6, 2012, the Trustee filed this action seeking recovery of the Fairfield Sentry-EFG Monaco Subsequent Transfers.

108.    The Fairfield Sentry-EFG Monaco Subsequent Transfers are recoverable from EFG Monaco under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

109.    The Fairfield Sentry-EFG Monaco Subsequent Transfers represent a redemption of equity interests by EFG Monaco as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Monaco Subsequent Transfers to EFG Monaco upon redemption of its interests.

**F.      Subsequent Transfers from Fairfield Sentry to EFG Bahamas**

110.     Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to EFG Bahamas (the "Fairfield Sentry-EFG Bahamas Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Bahamas Subsequent Transfers total $96,152,343. A chart setting forth the presently known Fairfield Sentry-EFG Bahamas Subsequent Transfers is attached as Exhibit I.

111.     On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Sentry-EFG Bahamas Subsequent Transfers.

112.     The Fairfield Sentry-EFG Bahamas Subsequent Transfers are recoverable from EFG Bahamas under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

113.     The Fairfield Sentry-EFG Bahamas Subsequent Transfers represent a redemption of equity interests by EFG Bahamas as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Bahamas Subsequent Transfers to EFG Bahamas upon redemption of its interests.

**G.      Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to EFG Bahamas**

114.     Prior to the Filing Date, Fairfield Sigma subsequently transferred a portion of the Fairfield Sigma Subsequent Transfers to EFG Bahamas ("Fairfield Sigma-EFG Bahamas Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sigma-EFG Bahamas Subsequent Transfers total at least $1,802,938. A chart setting forth the presently known Fairfield Sigma-EFG Bahamas Subsequent Transfers is attached as Exhibit J.

115.    The Fairfield Sigma-EFG Bahamas Subsequent Transfers are recoverable from EFG Bahamas under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

116.    The Fairfield Sigma-EFG Bahamas Subsequent Transfers represent a redemption of equity interests by EFG Bahamas as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-EFG Bahamas Subsequent Transfers to EFG Bahamas upon redemption of its interests.

117.    The Fairfield Sentry-EFG Bank Subsequent Transfers, the Fairfield Sigma-EFG Bank Subsequent Transfers, the Fairfield Lambda-EFG Bank Subsequent Transfers, the Fairfield Sentry-EFG Bank Monaco Subsequent Transfers, the Fairfield Sentry-EFG Bahamas Subsequent Transfers, and the Fairfield Sigma-EFG Bahamas Subsequent Transfers are collectively defined as the "Subsequent Transfers."

118.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

119.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

120.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

121.    Defendants are immediate or mediate transferees of the Subsequent Transfers from Fairfield Sentry, Fairfield Sigma, and/or Fairfield Lambda.

122.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

---

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendants as follows:

a)    Recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate;

b)    If Defendants challenge the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), §§ 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Deb. & Cred. Law, as applicable, and as necessary to recover the Subsequent Transfers pursuant to § 550 and 15 U.S.C. § 78fff-2(c)(3);

c)    Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by Defendants; and

d)    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: October 14, 2022
New York, New York

/s/ Brian W. Song
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Brian W. Song
Shawn P. Hough

200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Telephone: (614) 462-4732
Facsimile: (614) 462-2616
Douglas A. Vonderhaar

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Chapter 7 Estate of Bernard L.*
*Madoff*