**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01195 (CGM) |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| SIX SIS AG, | |
| Defendant. | |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Second Amended Complaint against defendant SIX SIS AG (*f/k/a* SIS SegaInterSettle AG) ("SIX SIS"), alleges the following:

## I.  NATURE OF THE PROCEEDING

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the massive Ponzi scheme perpetrated by Madoff and others.

2. With this Second Amended Complaint, the Trustee seeks to recover at least $52,653,947 in subsequent transfers of BLMIS customer property made to SIX SIS (the "Subsequent Transfers"). The Subsequent Transfers were obtained by SIX SIS by redeeming shares it owned in BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and, together with Fairfield Sentry, the "Fairfield Funds"). SIX SIS also invested in and received subsequent transfers from Luxalpha SICAV and Groupement Financier Levered Ltd. (together, the "Access Funds"), as well as from Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. (together, the "Kingate Funds" and collectively with the Fairfield Funds and Access Funds, the "Feeder Funds"). Each of the Feeder Funds invested all or substantially all of its assets directly or indirectly with BLMIS's investment advisory business (the "IA Business").

3. The Fairfield Funds were the largest group of BLMIS feeder funds, and were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a New York-based *de*

---

[1] For convenience further references to SIPA will omit title 15 and be cited as SIPA § ____.

2

*facto* partnership. From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS; Sigma was a "currency fund," meaning it accepted subscriptions in euros, converted the money to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry.

## II.     SUBJECT MATTER JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

5.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

7.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    PERSONAL JURISDICTION

8.      SIX SIS is subject to the jurisdiction of the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 7004 and the United States Constitution, as well as section 302 of the New York Civil Practice Law and Rules, because it purposely availed itself of the laws and protections of the United States and the State of New York.

9. The Trustee's claims against SIX SIS arise from business it transacted within New York. SIX SIS derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

10. SIX SIS invested in the Fairfield Funds for the purpose of profiting from BLMIS in New York, and relinquished control over investment decisions and their implementation to Madoff in New York.

11. SIX SIS knowingly directed funds to be invested in, and then redeemed from, New York-based BLMIS via the Fairfield Funds. By transacting with New York-based BLMIS and New York-based FGG, SIX SIS knowingly accepted the rights, benefits, privileges, and responsibilities of conducting business and transactions in the United States and New York.

12. SIX SIS voluntarily executed multiple subscription agreements in connection with its investments in Fairfield Sentry and Sigma. In these agreements, SIX SIS affirmed that it received and read the funds' private placement memoranda ("PPMs"). Based on the PPMs, SIX SIS knew the following facts indicating that it was transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested substantially all of its assets in Fairfield Sentry;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the U.S. Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the split-strike conversion strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills"), and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

4

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

13. The Fairfield Sentry subscription agreements provided that all money for the purchase of Fairfield Sentry shares be directed to a New York correspondent bank account for deposit into Fairfield Sentry's bank account. As set forth above, SIX SIS knew and intended that these funds would be then invested with BLMIS in New York. From Fairfield Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York.

14. SIX SIS directed subscription funds to these New York accounts on at least 35 occasions, if not more, over the course of its investments with Fairfield Sentry.

15. In addition, SIX SIS designated and used a bank account at Brown Brothers Harriman in New York in its own name (the "BBH Account") to receive redemption payments from, as well as remit subscription payments to, Fairfield Sentry. Over the course of its investments with Fairfield Sentry, SIX SIS used the BBH Account to receive at least 47 of the Subsequent Transfers from Fairfield Sentry sought herein (the "Sentry Subsequent Transfers"). SIX SIS likewise used the BBH Account to remit subscription payments on the at least 35 occasions discussed above. SIX SIS also used an HSBC Bank USA correspondent account in New York via Citco Global Custody NV, its agent for both subscriptions and redemptions, to receive additional Sentry Subsequent Transfers. The Sentry Subsequent Transfers thus occurred in New York.

16. In its Fairfield Sentry subscription agreements, SIX SIS submitted to New York jurisdiction, venue, service of process, and law. Specifically, SIX SIS (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

5

IV.     **BACKGROUND, THE TRUSTEE AND STANDING**

17.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

18.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

19.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

   a)   appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

   b)   appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

   c)   removed the case to this Court pursuant to SIPA § 78eee(b)(4).

20.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

21.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

22.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed

6

against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

23. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

24. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

25. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

26. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi

7

scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

27. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

28. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V. BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

29. Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

30. In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

31. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

32. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

33. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

34. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

B. The Ponzi Scheme

35. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by

9

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

36. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

37. To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

38. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

1. Madoff's Investment Strategy

39. In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff

10

also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

40. All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

41. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

42. From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

43. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

44. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

11

45. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

46. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

47. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

48. If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

49. Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

50. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of

its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 2. BLMIS's Fee Structure

51. BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3. BLMIS's Market Timing

52. Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

53. As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

54. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4. BLMIS Execution

55. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5. No Evidence Of BLMIS Trading

56. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

57. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### 6. The Collapse Of The Ponzi Scheme

58. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

59. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

60.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    THE DEFENDANT

61.     SIX SIS is a corporation organized under the laws of Switzerland that maintains a place of business at Baslerstrasse 100, CH-4600 Olten, Switzerland and a place of business at Pfingstweidstrasse 110, 8005 Zürich, Switzerland.

## VII.   RECOVERY OF SUBSEQUENT TRANSFERS TO SIX SIS

### A.    Initial Transfers From BLMIS To Fairfield Sentry

62.     The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

63.     By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

64.     The Fairfield Sentry Initial Transfers are set forth in the attached **Exhibits A** and **B**. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

65.     On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Fairfield Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry

15

of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

66. As alleged in the Fairfield Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Fairfield Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

67. Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

68. Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

B. **Subsequent Transfers From Fairfield Sentry To SIX SIS**

69. Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to SIX SIS. Based on the Trustee's investigation to date, the subsequent transfers to SIX SIS total $39,555,439 (as defined above, the "Sentry Subsequent Transfers"). A chart setting forth the presently known Sentry Subsequent Transfers is attached as **Exhibit C**.

70. On March 22, 2012, the Trustee filed this action seeking recovery of subsequent transfers from the Fairfield Funds.

71. The Sentry Subsequent Transfers are recoverable from SIX SIS under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

72. The Sentry Subsequent Transfers represent redemptions of equity interests by SIX SIS as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Sentry Subsequent Transfers to SIX SIS upon redemptions of its interests.

### C. Subsequent Transfers From Fairfield Sentry To Sigma And Subsequently To SIX SIS

73. Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Sigma. A chart setting forth the presently known such transfers is attached as **Exhibit D**.

74. Thereafter, Sigma transferred at least $13,098,508 to SIX SIS (the "Sigma Subsequent Transfers"). A chart setting forth the presently known Sigma Subsequent Transfers is attached as **Exhibit E**.

75. The Sigma Subsequent Transfers are recoverable from SIX SIS under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

76. The Sigma Subsequent Transfers represent redemptions of equity interests by SIX SIS as a shareholder in Sigma. Because Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Sigma was insolvent when it made the Sigma Subsequent Transfers to SIX SIS upon redemptions of its interests.

77. As defined above, the Sentry Subsequent Transfers and the Sigma Subsequent Transfers are collectively referred to as the "Subsequent Transfers."

78. The Trustee's discovery and investigation in this action and others, including the Fairfield Action, is ongoing. Recent discovery in the Fairfield Action revealed that SIX SIS received additional transfers, for which the Trustee is seeking recovery in this Second Amended Complaint. Ongoing discovery in this action and others, including the Fairfield Action, may reveal additional subsequent transfers to SIX SIS. The Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers, based on continuing discovery in this action and others, including the Fairfield Action; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE
## RECOVERY OF THE SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550

79. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

80. The Subsequent Transfers are recoverable from SIX SIS under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

81. SIX SIS is an immediate or mediate transferee of the Subsequent Transfers from the Fairfield Funds.

82. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against SIX SIS: (a) recovering the Subsequent Transfers, or the value thereof, from SIX SIS for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against SIX SIS as follows:

a) Recovering the Subsequent Transfers, or the value thereof, from SIX SIS for the benefit of the estate;

b) If SIX SIS challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA §78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

c) Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by SIX SIS; and

d) Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: October 17, 2022  
    New York, New York

*/s/ David J. Sheehan*  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Keith R. Murphy

*Attorneys for Irving H. Picard, Trustee*  
*for the Substantively Consolidated SIPA*  
*Liquidation of Bernard L. Madoff*  
*Investment Securities LLC and the Chapter*  
*7 Estate of Bernard L. Madoff*

**Windels Marx Lane & Mittendorf, LLP**  
156 West 56th Street  
New York, New York 10019  
Telephone:  212) 237-1000  
Facsimile: (212) 262-1215  
Kim M. Longo  
Alan D. Lawn

*Special Counsel for Irving H. Picard,
Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and the Chapter
7 Estate of Bernard L. Madoff*