**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
|        Plaintiff-Applicant, | Adv. Pro No. 08-01789 (CGM) |
|    v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
|        Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
|        Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05355 (CGM) |
|        Plaintiff, | |
|    v. | |
| ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
|        Defendants. | |

**TRUSTEE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# Table of Contents

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

   A.  The BLMIS Ponzi Scheme ...................................................................... 3

   B.  The Defendants and Their Transactions with the Tremont Feeder Funds Pursuant to
      Which They Received Subsequent Transfers of Customer Property................................. 4

   C.  PROCEDURAL HISTORY.......................................................................... 5

      1.  The District Court's Withdrawal of the Reference and Relevant Decisions.................... 5

      2.  The Bankruptcy Court's Dismissal of the Trustee's Claims Based on the District
         Court's Good Faith Decision ............................................................... 9

      3.  The Appellate Proceedings On the "Good Faith" Defense .............................. 9

      4.  The District Court's Disposition of the Trustee's Appeal After *Citibank* .................. 12

LEGAL STANDARD.................................................................................. 13

ARGUMENT ......................................................................................... 14

I.    THE SAC ADEQUATELY PLEADS THAT THE TREMONT INITIAL TRANSFERS
     WERE MADE WITH ACTUAL INTENT TO HINDER, DELAY OR DEFRAUD
     CREDITORS ...................................................................................... 14

   A.  The Ponzi Scheme Presumption Is the Law of This Circuit ............................. 15

   B.  The SAC Alleges Facts Sufficient to Establish That BLMIS Was a Ponzi Scheme ........ 16

   C.  The SAC Independently Alleges Fraudulent Intent Through Badges of Fraud................ 18

II.   THE DISTRICT COURT ALREADY HAS DETERMINED THAT DEFENDANTS'
     GOOD FAITH WAS NOT APPARENT ON THE FACE OF THE PSAC...................... 19

   A.  Defendants Are Bound By The District Court's Decision................................ 19

   B.  Even Were the Court to Consider Defendants' Affirmative Defense, They Cannot Meet
      Their Burden of Establishing It From the Face of the SAC ............................. 22

III.  SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY
      FROM DEFENDANTS ........................................................................... 24

IV.   SECTION 546(g) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY
      FROM DEFENDANTS ..................................................................................... 31

   A.   Defendants Are Bound by the District Court's Decision That The $235.5 Million in
        Transfers Related to Collateral For The Swap is Not Protected By 546(g)...................... 31

   B.   Prime Fund Does Not Qualify As A "Financial Participant" ............................................ 32

V.    THE SAC ADEQUATELY PLEADS THAT DEFENDANTS RECEIVED SUBSEQUENT
      TRANSFERS OF STOLEN BLMIS CUSTOMER PROPERTY UNDER SECTION
      550(A) ........................................................................................................... 35

   A.   The SAC Satisfies the Trustee's Pleading Burden with Respect to the Subsequent
        Transfers Defendants Received ........................................................................ 35

   B.   There Are No Tracing Requirements at the Pleading Stage .............................................. 37

   CONCLUSION ................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC),*
   599 B.R. 730 (Bankr. S.D.N.Y. 2019) ..............................................................35, 38

*Ashcroft v. Iqbal,*
   556 U.S. 662, 680 (2009) .....................................................................................14

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp.,*
   *LLC),* 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ............................................16, 28

*Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
   397 B.R. 1, 8 (S.D.N.Y. 2007)..........................................................................15, 24

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 570 (2007) .....................................................................................14

*In re Bernard L. Madoff Inv. Secs. LLC,*
   20-cv-02586 (CM), ECF No. 35, 2022 WL 1304589 (S.D.N.Y. May 2, 2022)..........12, 13, 20

*Citibank, N.A. et al. v. Picard,*
   142 S.Ct. 1209 (2022)...........................................................................................11

*Citibank, N.A. v. Bombshell Taxi LLC (In re Hypnotic Taxi LLC),*
   543 B.R. 365, 374 (Bankr. E.D.N.Y)....................................................................18

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP),*
   2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014)...................................................37

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP),*
   452 B.R. 391, 428 (Bankr. S.D.N.Y. 2011)........................................................15, 22

*Heller v. Goldin Restructuring Fund, L.P.,*
   590 F.Supp.2d 603, 619-623 (S.D.N.Y. 2008) ....................................................28

*In re J.P. Jeanneret Assoc. Inc.,*
   769 F. Supp. 2d 340, 353 (S.D.N.Y. Jan. 31, 2011) ............................................13

*Johnson v. Holder,*
   564 F.3d 95, 99 (2d Cir. 2009)..............................................................................32

*In re Kaiser,*
   722 F.2d 1574 (2d Cir. 1983)................................................................................18

*Kerman v. City of New York*,
374 F.3d 93, 110 (2d Cir. 2004)........................................................................21

*Leeming v. Dean Witter Reynolds Inc.*,
676 F. Supp. 541 (S.D.N.Y. 1988) .....................................................................28

*McKenna v. Wright*,
386 F.3d 432, 436 (2d Cir. 2004).......................................................................22

*Novak v. Kasaks*,
216 F.3d 300, 311 (2d Cir. 2000) .......................................................................28

*Picard v. ABN AMRO Bank (Ireland) Ltd.*,
20-CV-02586 (CM), ECF No. 32 .......................................................................12

*Picard v. ABN AMRO Bank (Ireland) Ltd.*,
505 B.R. 135, 137, 146 (S.D.N.Y. 2013)..............................................8, 26, 27, 32

*Picard v. ABN AMRO Bank (Ireland), Ltd.*,
2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) ...............................................20

*Picard v. Banque Cantonale Vaudoise*,
2022 WL 2761044, at *5 (Bankr. S.D.N.Y. June 30, 2022) ...........................27, 31

*Picard v. Banque Lombard Odier & Cie SA*,
2022 WL 2387523, at *9 (Bankr. S.D.N.Y. June 30, 2022) ...........................25, 27

*Picard v. Banque Syz & Co.*,
2022 WL 2135019, at *11 ..............................................................................21, 25, 27

*Picard v. Barclays Bank (Suisse) S.A.*,
2022 WL 2799924, at *7 (Bankr. S.D.N.Y. July 15, 2022) ...........................25, 27

*Picard v. BNP Paribas S.A.*,
594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018)...........................................14, 25, 27

*Picard v. Ceretti*,
2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015) .........................28, 31

*Picard v. Charles Ellerin Revocable Trust*,
2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012) .......................................35, 38

*Picard v. Citibank, N.A.*,
12 F.4th 171 (2d Cir. 2021) ......................................................................10, 11, 23

*Picard v. Citibank, N.A. et al.*,
2022 WL 4493234, at *4 (Bankr. S.D.N.Y. Sept. 27, 2022) ..............................15

*Picard v. Cohmad Sec. Corp.*,
   454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011) ..................................................................6

*Picard v. Est. of Seymour Epstein*,
   No. 21 Civ. 02334 (CM), 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ...........................16, 27

*Picard v. First Gulf Bank,*
   2022 WL 3354955, at *1 .......................................................................................21

*Picard v. Greiff,*
   476 B.R. 715, 720, 722–23 (S.D.N.Y. 2012) .......................................................6, 7

*Picard v. Ida Fishman Revocable Trust*,
   773 F.3d 411 (2d Cir. 2014) .................................................................................7

*Picard v. JABA Assocs. LP*,
   2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ....................................................19

*Picard v. Katz,*
   462 B.R. 447, 451, 452–53, (S.D.N.Y. 2011) .....................................................6, 7

*Picard v. Keller*,
   No. 21-CV-8678 (JPO), 2022 WL 7219262 (S.D.N.Y. Oct. 6, 2022) ...................16

*Picard v. Legacy Cap. Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
   548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016) ...........................................................14

*Picard v. Legacy Capital Ltd.*,
   603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) ...................................................17

*Picard v. Lisa Beth Nissenbaum Tr.*,
   2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ................................................17, 19

*Picard v. Mayer*,
   2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) ................................36

*Picard v. Merkin*,
   581 B.R. 370 (Bankr. S.D.N.Y. 2017) ...........................................................37, 38

*Picard v. Merkin*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................28, 35, 38, 39

*Picard v. Merkin*,
   440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010) ..........................................................6

*Picard v. Multi-Strategy Fund Ltd.*,
   2022 WL 2137073, at *6 (Bankr. S.D.N.Y. June 13, 2022) ..................1, 25, 27, 35

v

*Picard v. Peter Madoff*,
458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) ..............................................................15

*Picard v. Sage Realty*,
No. 20 CIV. 10057 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) ............................16

*Picard v. Shapiro*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ......................................................................37

*Picard v. Societe Generale*,
Adv. Pro. No. 12-01677, ECF No. 197 (CGM), at 17 (Bankr. S.D.N.Y.
October 7, 2022) .............................................................................................36, 39

*Picard v. Societe Generale Private Banking (Suisse) S.A.*,
2022 WL 4349859 (Bankr. S.D.N.Y. Sep. 19, 2022) ................................25, 26, 31

*Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (CGM) (Bankr.
S.D.N.Y. Dec. 7, 2010) .................................................................................28, 30, 31

*In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
917 F.3d 85 (2d Cir. 2019) ...................................................................................26

*Rivas v. Bowling Green Assocs., L.P.*,
2014 WL 3694983, at *2 (S.D.N.Y. July 24, 2014) ..............................................28

*Roth v. Jennings*,
489 F.3d 499, 510 (2d Cir. 2007) .........................................................................13

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
501 B.R. 26, 31, 35-36 (S.D.N.Y. 2013) ........................................................14, 26

*SIPC v. BLMIS (In re Madoff Sec.)*,
516 B.R. 18, 22-24 (S.D.N.Y. 2014) .......................................................................6

*SIPC v. BLMIS (In re Madoff Sec.)*,
No. 12-MC-0115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)........7, 8, 24, 25, 33, 34

*Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLC)*,
809 F.3d 94, 100 (2d Cir. 2015)............................................................................20

*United States v. Madoff*,
Case No. 09-CR-213 (DC).......................................................................................4

*United States v. Thorn*,
446 F.3d 378, 383 (2d Cir. 2006)..........................................................................19

*United States v. Williams*,
475 F.3d 468, 471 (2d Cir. 2007).........................................................................19

*Weisfelner v. Hoffman (In re Lyondell Chem. Co.)*,
    554 B.R. 635, 653 (S.D.N.Y. 2016)...................................................................18

*Wight v. BankAmerica Corp.*,
    219 F.3d 79, 91-92 (2d Cir. 2000) ....................................................................28

*Yick Man Mui v. United States*,
    614 F.3d 50, 53 (2d Cir. 2010) ....................................................................19, 32

**Statutes**

11 U.S.C. § 101(22A) .........................................................................................32

11 U.S.C. § 105(a) ...............................................................................................1

28 U.S.C. § 158(d)(2)(A) .....................................................................................9

11 U.S.C. § 101(22A) .........................................................................................32

11 U.S.C. § 544 ...................................................................................15, 24, 37

11 U.S.C. § 546(e) ....................................................................................*passim*

11 U.S.C. § 546(g) ....................................................................................*passim*

11 U.S.C. § 548(a)(1)(A) .............................................................................19, 37, 38

11 U.S.C. § 548(c) ....................................................................................5, 6, 10

11 U.S.C. § 550(a) ..............................................................................1, 14, 25, 34

11 U.S.C. § 550(b) ....................................................................................5, 6, 10

New York Debtor and Creditor Law §§ 273-276 .........................................37

New York Debtor and Creditor Law §276 .............................................15, 24

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll*...........................1

Securities Investor Protection Act, 15 U.S.C. §§ 78fff-2(c)(3) ....................1

**Other Authorities**

Fed. R. Bankr. P. 7012 .......................................................................................13

Fed. R. Civ. P. 8(a)(2)........................................................................................14

Fed. R. Civ. P. 9(b) ...............................................................................14, 16, 18

Fed. R. Civ. P. 12(b)(6)..........................................................................................................2, 13, 31

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa-*lll* ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this

memorandum of law in opposition to the motion to dismiss ("Motion") the Trustee's Second

Amended Complaint (ECF No. 205, "SAC") brought by Defendants ABN Amro Bank (Ireland),

Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Limited) ("Fortis Fund Bank") and ABN

Amro Custodial Services (Ireland) Ltd (f/k/a Fortis Prime Fund Solutions Custodial Services

(Ireland) Ltd.) ("Fortis Fund Services," and together with Fortis Fund Bank, the "Defendants").

## PRELIMINARY STATEMENT

As part of the Trustee's efforts to recover BLMIS customer property that was stolen as part

of Madoff's Ponzi scheme, under Sections 105(a) and 550(a) of the Bankruptcy Code and Section

78fff-2(c)(3) of SIPA, this action seeks to recover from Defendants $265.5 million of fraudulently

transferred customer property that was subsequently transferred to them by various BLMIS feeder

funds managed and controlled by Tremont Group Holdings, Inc. ("Tremont").

To recover stolen customer property under Section 550(a), the Trustee need only allege

that "the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial

transferee, that is, that the funds at issue originated with the debtor." *Picard v. Multi-Strategy

Fund Ltd.*, Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073, at *6 (Bankr. S.D.N.Y. June 13,

2022). The SAC easily meets this pleading standard. The Trustee alleges that BLMIS made initial

transfers of customer property to Tremont funds Rye Select Broad Market Fund L.P. ("Broad

Market Fund") and Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") (together, the

"Tremont Initial Transfers"), which were subsequently transferred to a related Tremont entity, Rye

Select Broad Market XL Fund ("Rye XL Fund"), which then subsequently transferred the funds

to Defendants.  The SAC alleges that the Tremont Initial Transfers are all avoidable, and pleads

the relevant pathways through which these avoidable initial transfers were subsequently

transferred to Defendants, and the necessary vital statistics (*i.e.*, the "who, when, and how much")

for each subsequent transfer Defendants received.  Nothing more is required at this stage.

Defendants move to dismiss the SAC pursuant to Federal Rule of Civil Procedure Rule

12(b)(6) on a number of grounds – but almost all of their arguments have already been rejected,

either by the district court in this very case, or by this Court in other decisions involving motions

to dismiss brought by other subsequent transferees.  District Court Judge McMahon expressly

rejected Defendants' argument that their good faith is apparent from the face of the Trustee's

Proposed Second Amended Complaint ("PSAC"),[1] and further held that good faith is a fact-

intensive inquiry that is premature and inappropriate at this stage of the proceedings.  Similarly,

District Court Judge Rakoff has also already determined that the safe harbor of Section 546(g)

applies to the $30 million redemption in this case, and expressly held that the remaining $235.5

million of transfers at issue in the SAC are *not* protected by that safe harbor.  Both of these

decisions by the district court are binding law of the case that precludes Defendants from making

the same legal arguments again here.

This Court and the district court have also rejected challenges similar to Defendants' on

the validity of the Ponzi scheme presumption, and have repeatedly held that the Trustee can rely

on the presumption to demonstrate BLMIS's fraudulent intent.  This Court has also rejected

motions to dismiss based on tracing arguments similar to those made by Defendants here, because

at this stage of the litigation, "dollar-for-dollar" tracing is not required to state a claim to recover

---

[1] As described in more detail below, the PSAC before the district court was virtually identical to
the SAC.

2

subsequent transfers.    And, like this Court's decision regarding Fairfield Sentry's actual knowledge of Madoff's fraud, the SAC here contains similar allegations of Tremont's actual knowledge sufficient to defeat the Defendants' Motion with respect to the Section 546(e) safe harbor.

For the reasons set forth in all of the relevant decisions of this Court and the district court, as well as for the reasons set forth more fully herein, the Trustee respectfully requests that the Court deny Defendants' Motion.

## STATEMENT OF FACTS

### A. The BLMIS Ponzi Scheme

Madoff founded and operated BLMIS from New York, New York until its collapse in 2008.  SAC ¶ 47-48.  BLMIS was a registered broker-dealer in New York (SAC ¶ 48), and purported to operate  three principal units: (i) a proprietary trading desk; (ii) a broker-dealer operation; and (iii) an investment advisory business (the "IA Business").  *Id.* at ¶ 49.  For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (a) investing in a basket of common stocks from the S&P 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. Treasury bills when the money was out of the market. *Id.* at ¶¶ 57, 59, 61.  In reality, BLMIS operated a Ponzi scheme through its IA Business using money deposited by customers that BLMIS claimed to invest in securities.  *Id.* at ¶ 59.  The IA Business had no legitimate business operations and produced no profits or earnings.  *Id.* at ¶ 53. All funds received from BLMIS customers were commingled in a single BLMIS account at JPMorgan Chase Bank.  *Id.* at ¶ 59.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family, and to prop up BLMIS's proprietary trading business.  *Id.* at ¶ 59.  BLMIS reported falsified

trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on their principal investments.  *Id.* at ¶ 60.

The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.  *Id.* at ¶ 75.  On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud.  *Id.* at ¶ 35.  At a plea hearing on March 12, 2009, in *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York.  *Id.* at ¶ 40.  At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS].  *Id.* at ¶ 40.  BLMIS employees and family members, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, among others, pleaded guilty to, or were found guilty of, assisting Madoff in carrying out the Ponzi scheme.  *Id.* at ¶¶ 41-43.

**B.  The Defendants and Their Transactions with the Tremont Feeder Funds Pursuant to Which They Received Subsequent Transfers of Customer Property**

The subsequent transfers at issue were made to Defendants in connection with a swap transaction (the "Swap") Fortis Fund Bank entered into in May 2007 with Rye XL Fund, and a related redemption of Defendants' equity interests in Broad Market Fund.  *Id.* at ¶ 2.  Tremont's Broad Market Fund and Prime Fund were among several investment funds that invested all or substantially all of their assets with BLMIS's IA Business.  *Id.*

Pursuant to the Swap, Fortis Fund Bank agreed to provide Rye XL Fund with an amount equal to three times the return on a hypothetical investment in Broad Market Fund.  *Id.* at ¶¶ 193, 196.  In exchange, Defendant Fortis Fund Bank earned significant revenue from Rye XL Fund in the form of fees and interest.  *Id.* at ¶¶ 194, 196.  Similar to a traditional loan, the Swap required

Rye XL Fund to post collateral with Defendant Fortis Fund Bank. *Id.* at ¶¶ 194, 196-198, 262-263. Between May 2007 and May 2008, Rye XL Fund made subsequent transfers of approximately $235.5 million of customer property it had received (from Broad Market Fund and Prime Fund) to Fortis Fund Bank as collateral for the Swap. *Id.* at ¶¶ 264-265.

Defendant Fortis Fund Bank "hedged" its obligations to pay the returns owed to Rye XL Fund by using the collateral received from Rye XL Fund, together with its own funds equaling two times Rye XL Fund's collateral, to acquire partnership interests in Broad Market Fund (the "Hedge"). *Id.* at ¶¶ 195-196. On July 1, 2008, Fortis Fund Bank made a $30 million redemption from Broad Market Fund, which Broad Market Fund fulfilled by making subsequent transfers of customer property to Fortis Fund Bank and/or Fortis Fund Services.[2] *Id.* at ¶¶ 257-260.

## C. PROCEDURAL HISTORY

Subsequent to the Trustee's commencement of this lawsuit in December 2010,[3] most of the legal issues raised in the Motion have been addressed by this Court, the district court and the Second Circuit, including on withdrawal of the reference and/or on appeal.

### 1. The District Court's Withdrawal of the Reference and Relevant Decisions

#### a.   The District Court's Decision With Respect to the "Good Faith" Defense

Sections 548(c) and 550(b) of the Bankruptcy Code state that initial and subsequent transferees can keep any property fraudulently transferred by a debtor if the transferee took that

---

[2] The SAC alleges Fortis Fund Services entered into a subscription agreement with Broad Market Fund *on behalf* of Fortis Fund Bank. SAC ¶ 258. Although the Broad Market Fund's partnership interests were held in the name of Fortis Fund Services, the actual owner was Fortis Fund Bank. *Id.* The SAC alleges that the $30 million of subsequent transfers related to Fortis Fund Bank's redemption from Broad Market Fund were made to Fortis Fund Bank and/or Fortis Fund Services. SAC ¶ 260.

[3] *See* Complaint, *Picard v. ABN AMRO Bank (Ireland) Ltd.*, Adv. Pro. No. 10-05355, ECF No. 1 (Bankr. S.D.N.Y. Dec. 8, 2010).

property for value and "in good faith." 11 U.S.C. §§ 548(c), 550(b). Defendants in many of the

Trustee's actions moved to dismiss his complaints on good faith grounds, which this Court denied

on the basis that good faith is an affirmative defense to avoidance and recovery of a fraudulent

transfer and therefore need not be addressed in the Trustee's complaints. *See, e.g.*, *Picard v.*

*Cohmad Sec. Corp. (In re BLMIS LLC)*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011) ("*Cohmad*");

*Picard v. Merkin (In re BLMIS LLC)*, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010). The district court

nevertheless withdrew the reference to determine whether SIPA or the federal securities laws alter

the legal standards and pleading burden for the "good faith" defense.

In 2014, the district court held that in a SIPA case, the scienter requirements of "federal

securities laws" are implicated and the standard governing a transferee's good faith defense is not

"inquiry notice," but rather "willful blindness." *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18,

22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*"). The district court also concluded that,

although a transferee has the burden of pleading its affirmative defense of good faith in an

"ordinary bankruptcy proceeding," in a SIPA case, a defendant may succeed on a motion to dismiss

if the Trustee's complaint fails to plausibly allege that a transferee *lacked* good faith. *Id*. at 24.

Accordingly, under the Good Faith Decision, the Trustee was required in his complaint to

affirmatively plead a transferee's willful blindness to the fraud at BLMIS.

b.    The District Court's Decision With Respect to the Safe Harbor of 546(e)

The district court also withdrew the reference to determine whether Section 546(e) of the

Code precluded the Trustee from avoiding and recovering certain fraudulent transfers. *See SIPC*

*v. BLMIS*, No. 12-MC-0115 (JSR) (S.D.N.Y.), ECF Nos. 4, 119, 167, 197, 203, 314.

The district court held in *Picard v. Katz* and *Picard v. Greiff* that Section 546(e) barred

certain of the Trustee's claims to avoid transfers from BLMIS to its customers. 462 B.R. 447, 452–

53 (S.D.N.Y. 2011); 476 B.R. 715, 722–23 (S.D.N.Y. 2012). The district court found that the

transfers from BLMIS were "made *by* or *to* (or for the benefit of) a … stockbroker, in connection with a securities contract." *Katz*, 462 B.R. at 451 (quoting 11 U.S.C. § 546(e)). The court also found that "the account agreements between Madoff Securities and the defendants clearly qualif[ied] as securities contracts," and that "defendants' withdrawals from their accounts constituted 'settlement payments' from a stockbroker." *Greiff*, 476 B.R. at 720. Accordingly, the district court dismissed the Trustee's avoidance claims, except those brought under Section 548(a)(1)(A). *Id*. at 722–23.

After *Greiff*,[4] the district court issued *SIPC v. BLMIS (In re Madoff Sec.)*, No. 12-MC-0115 (JSR), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad II*"), to answer "collateral questions" about the safe harbor that remained in the Trustee's "bad faith" cases. In *Cohmad II*, the district court addressed the issue of whether there was a defense to the application of the 546(e) safe harbor in cases where the Trustee alleged the transferees' "actual knowledge*"* of Madoff's fraud. *Id.* at *1. The district court held:

> Where the Trustee has sought to avoid transfers to an initial transferee, the avoidance of which would otherwise be barred by Section 546(e) under the Court's rulings in *Katz* and *Greiff*, the initial transferee will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" *if* the Trustee has alleged that the initial transferee had actual knowledge of Madoff Securities' fraud[.] *Id.*

The district court noted "the fact that these defendants signed account agreements is meaningless for purposes of Section 546(e)—because if they knew that Madoff Securities was a Ponzi scheme, then they must have known that the transfers they received directly or indirectly from Madoff Securities were not 'settlement payments.'" *Id.* at *3; *see also Katz*, 462 B.R. at 452 n.3 (finding safe harbor did not apply to "Madoff Securities' customers . . . who were actual

---

[4] The Second Circuit affirmed the district court's findings in *Greiff*. *See Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014).

participants in the fraud"). The district court further held that subsequent transferee defendants could raise the initial transferee's defense to avoidance under Section 546(e) if the initial transferee had failed to raise that defense for any reason. *Cohmad II*, 2013 WL 1609154, at *7.

   c. <u>The District Court's Decision With Respect to the Safe Harbor of 546(g)</u>

   The district court also withdrew the reference to determine whether Section 546(g) of the Bankruptcy Code[5] – a safe harbor with respect to transfers in connection with swap transactions – precluded the Trustee from avoiding and recovering the fraudulent transfers in this case and others. *See Picard v. ABN AMRO Bank (Ireland) Ltd.*, 505 B.R. 135, 137 (S.D.N.Y. 2013). In the district court, the Defendants argued that all of the Tremont Initial Transfers at issue in this case were shielded by Section 546(g) as they were "for the benefit of …a financial participant" (Fortis Fund Bank), and the transfers were "in connection with …a[] swap agreement."[6]

   The district court agreed with Defendants that both sets of Tremont Initial Transfers – the $235.5 million related to the collateral, and the $30 million Fortis Fund Bank redeemed from Broad Market Fund – were "in connection with" a swap agreement. *ABN AMRO Bank (Ireland) Ltd.*, 505 B.R. at 146. However, the district court found that only the $30 million in initial transfers to Broad Market Fund in connection with Fortis Fund Bank's redemption of its shares was "*for the benefit of*" Fortis, a *"financial participant." Id.* at 149-150. In contrast, that court found that the Tremont Initial Transfers that related to the $235.5 million collateral for the Swap were <u>not</u> "*for the benefit of*" Fortis Fund Bank as a "financial participant," but instead were for the Tremont

---

[5] Section 546(g) of the Bankruptcy Code provides: "Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement . . . except under section 548(a)(1)(A) of this title."

[6] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint Based on Section 546(g) of the Bankruptcy Code, *Picard v. ABN Amro Bank (Ireland) Ltd.*, 11 Civ. 6877 (JSR) (S.D.N.Y. July 24, 2012), ECF No. 35 at pp. 12-14.

feeder funds' own benefit. *Id.* at 150.

Accordingly, the district court confirmed its "bottom-line" order of February 15, 2013, which held that "section 546(g)'s safe harbor protects the redemption payments, but not the collateral payments, from recovery to the extent they cannot be avoided under section 548(a)(1)(A)." *Id.* at 150.

### 2. The Bankruptcy Court's Dismissal of the Trustee's Claims Based on the District Court's Good Faith Decision

After the district court's decisions on these issues and remand of this case to this Court, the Trustee moved to amend his complaint and attached the PSAC to address the new pleading burden and legal standard the district court had set with respect to the Good Faith defense. *Picard v. ABN AMRO Bank (Ireland) Ltd.*, Adv. Pro. No. 10-05355, ECF Nos. 165, 166-1, Ex. A. The PSAC detailed the Trustee's allegations that Defendants were willfully blind to BLMIS's fraud. Defendants opposed the leave to amend on the ground that the PSAC did not plausibly allege willful blindness. The Court agreed, denied the motion for leave to amend as futile, and dismissed the Trustee's claims against Defendants. *See Picard v. ABN AMRO Bank (Ireland) Ltd.*, 2020 WL 401822.

### 3. The Appellate Proceedings On the "Good Faith" Defense

#### a. Defendants Participated in The *Citibank* Appellate Proceedings

Subsequently, the Trustee filed a timely notice of appeal from the bankruptcy court's judgment and decision. ECF No. 190. Defendants moved the district court for certification of a direct appeal to the Second Circuit pursuant to 28 U.S.C. § 158(d)(2)(A), seeking to have the appeal heard in tandem with two related cases, *Picard v. Citibank N.A.*, No. 19-4282 (2d Cir.) ("*Citibank*"), and *Picard v. Legacy Capital et al.*, No. 19-4283 (2d Cir.) ("*Legacy*") (together, the "Related Appeals") that contested the Good Faith Decision on the ground that they involved

9

"similar and overlapping facts and issues of law."[7]  The district court granted Defendants' motion

for certification of a direct appeal on June 11, 2020.[8]

On June 18, 2020, Defendants petitioned the Second Circuit for direct appeal, and moved

for an expedited decision so that the appeal would be heard in tandem with the Related Appeals.[9]

The Second Circuit denied Defendants' request to have their appeal proceed in tandem with the

Related Appeals, but permitted them to file amicus briefs in the Related Cases, and to "file updated

petitions for leave to appeal" after the resolution of the Related Appeals.[10]

> b.    The Second Circuit's Decision In *Citibank* And *Legacy*

On August 30, 2021, the Second Circuit decided the Related Appeals, ruling in the

Trustee's favor.  *Picard v. Citibank, N.A.*, 12 F.4th 171 (2d Cir. 2021) ("*Citibank* Decision").  The

Court held that good faith is an affirmative defense that defendants bear the burden of establishing,

and that SIPA does not require the Trustee to plead a defendant's lack of good faith.  *Id.* at 196,

200.  The Court also held that a lack of good faith under Sections 548(c) and 550(b) of the

Bankruptcy Code is established by allegations satisfying an inquiry notice standard, and that the

district court erred by imposing a higher willful blindness standard in a SIPA liquidation.  *Id.* at

191-92.

The *Citibank* Decision set forth a three-step test for assessing inquiry notice.  First a court

must examine the facts the transferee knew.  *Id.* at 191.  Second, a court must determine whether

---

[7] Defendants' Motion for Leave to Appeal, *Picard v. ABN AMRO Bank (Ireland) Ltd.*, 20-CV-02586 (CM) (S.D.N.Y Apr. 6, 2020), ECF Nos. 8 and 9.

[8] *See* Order Granting Certification of a Direct Appeal, *Picard v ABN Amro Ireland*, 20-CV-02586 (CM) (S.D.N.Y. June 11, 2020), ECF No. 24.

[9] *See* Motion for Leave to Appeal and Motion to Expedite, *Picard v. ABN AMRO Bank (Ireland) Ltd. et al*, No. 20-1898 (2d Cir.), ECF No. 1 at 6, 10, and ECF No. 2.

[10] *See* Order, *Picard v. ABN AMRO Bank (Ireland) Ltd. et al*, No. 20-1898 (2d Cir. Aug. 4, 2020), ECF No. 42 at 2.

those facts put the transferee on inquiry notice of the fraudulent purpose behind the transaction, specifically "whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud." *Id.* Third, if a court determines a transferee had been put on inquiry notice, the court must also then determine "whether diligent inquiry [by the transferee] would have discovered the fraudulent purpose of the transfer." *Id.* at 192.

The Second Circuit observed that inquiry notice has both subjective and objective elements. The first step is a subjective inquiry into what the transferee knew. *Id.* at 191. A "reasonable person" standard applies to the second and third steps, in which a court determines whether "(1) the suspicious facts were such that they would have put a reasonable person in the transferee's position on inquiry notice; and (2) the transferee conducted a reasonably diligent investigation after being put on inquiry notice." *Id.* at 192. The Court further noted that the adequacy of an investigation is "a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees." *Id.* at 195.

The Court of Appeals accordingly vacated the judgments of this Court in those cases, and remanded them to this Court for further proceedings consistent with its opinion.[11] *Id.* at 200.

### c.    Defendants' Updated Petition For A Direct Appeal Following *Citibank*

Subsequent to the *Citibank* Decision, Defendants filed an updated petition for a direct appeal, seeking to have the Second Circuit decide issues raised for the first time therein. Specifically, Defendants challenged the validity of the "Ponzi scheme presumption," and also

---

[11] Citibank subsequently filed a petition for *certiorari*, which the Supreme Court denied on February 28, 2022. *See Citibank, N.A. et al. v. Picard*, 142 S.Ct. 1209 (2022).

asked the Second Circuit to determine, as a matter of law, that Defendants established their

affirmative defense of good faith under the new inquiry notice standard.[12]  On February 3, 2022,

the Second Circuit denied Defendants' updated petition for a direct appeal as "not warranted," and

issued the mandate returning the case to the district court.[13]

### 4.  The District Court's Disposition of the Trustee's Appeal After *Citibank*

After the case was remanded to the district court, the Trustee briefed his appeal from Judge

Bernstein's decision denying leave to amend the complaint in this case, based on the *Citibank*

Decision's reversal of the relevant pleading burden and legal standard.

In their brief opposing the Trustee's appeal, Defendants specifically requested that the

district court "affirm[] the bankruptcy court's judgment on [an] alternative basis supported by the

record," namely by making a finding that the Defendants' good faith was apparent from the face

of the Trustee's PSAC.[14] Defendants devoted nearly 13 pages of their brief to arguing that their

good faith was demonstrated by the face of the PSAC.  *Id.* at 18-31.

In May 2022, the district court reversed Judge Bernstein's decision and order, finding "[i]t

is indisputable that the *Citibank* decision resolves the issues on appeal in the Trustee's favor."[15]

Specifically, the district court held that it was an error to impose upon the Trustee the burden of

pleading a lack of good faith as part of his *prima facie* case, and an inquiry notice standard, not a

willful blindness standard, was the appropriate standard to determine what constitutes a lack of

---

[12] *See* Updated Petition of Defendants Requesting Permission to Appeal, *Picard v. ABN AMRO Bank (Ireland) Ltd. et al.*, 20-1898 (2d Cir. Oct. 1, 2021), ECF No. 50 at 3-4.

[13] Mandate, *Picard v. ABN AMRO Bank (Ireland) Ltd. et al*, No. 20-1898 (2d Cir. Feb. 3, 2022), ECF No. 84.

[14] Answering Brief of Defendants-Appellees, *Picard v. ABN AMRO Bank (Ireland) Ltd.*, 20-CV-02586 (CM), ECF No. 32 at 3, 13.

[15] *See In re Bernard L. Madoff Inv. Secs. LLC,* 20-cv-02586 (CM), ECF No. 35 at 6, 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022).

good faith. *Id.*

After considering Defendants' alternative argument in support of dismissal – that

Defendants' good faith was apparent from the face of the PSAC – the district court held:

> Frankly, ABN Ireland's good faith is *not* apparent from the face of the [PSAC]. Moreover, good faith is an affirmative defense that Appellants bear the burden of proving. The Second Circuit made clear in its decision in *Citibank* that the inquiry notice standard requires "a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees."

> The Trustee rightfully points out that such a fact-based determination "can only be made based on the entirety of the factual record after discovery (which has not occurred here), not from isolated documents cherry-picked by Defendants and factual inferences Defendants improperly seek to have drawn in their favor." The Trustee points out that the good faith "inquiry notice" standard "is difficult to resolve even at the summary judgment stage" – much less at the pleading stage. Indeed, Defendants do not cite to any case where a court has dismissed a complaint at the pleading stage based on the good faith defense. And even if it wanted to, the Court on this appeal simply does not have the requisite record to make the fact-intensive inquiry that the Second Circuit requires before a court can make a finding of lack of good faith. *Id.* (emphasis added) (citations omitted).

Accordingly, the district court vacated the Court's decision denying the Trustee's motion

for leave to amend his complaint, and remanded the case back to this Court for further proceedings

in accordance with the *Citibank* Decision. *Id.* at *4.

## **LEGAL STANDARD**

When considering motions to dismiss under Rule 12(b)(6), applicable to adversary

proceedings under Fed. R. Bankr. P. 7012, "the Court must liberally construe all claims, accept all

factual allegations in the SAC as true, and draw all reasonable inferences" in the Trustee's favor.

*In re J.P. Jeanneret Assoc. Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. Jan. 31, 2011); *see also Roth

v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). To survive a motion to dismiss, the pleading must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). The allegations need only meet the "plausibility" standard, such that they

"'nudge[] [the] claims' . . . 'across the line from conceivable to plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

To plead a subsequent transfer recovery claim under Section 550(a) of the Bankruptcy Code, the Trustee must "plead that the initial transfer is avoidable and that the defendant is a subsequent transferee of that initial transfer." *Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (quoting *Picard v. Legacy Cap. Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016)); *see Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 31, 35-36 (S.D.N.Y. 2013). The SAC sets forth in full the elements of the Trustee's claims, pleading Defendants' receipt of subsequent transfers of stolen customer property and the grounds upon which the Trustee seeks to recover such transfers made to Defendants. Accordingly, the Defendants' Motion should be denied.

## ARGUMENT

I.    **THE SAC ADEQUATELY PLEADS THAT THE TREMONT INITIAL TRANSFERS WERE MADE WITH ACTUAL INTENT TO HINDER, DELAY OR DEFRAUD CREDITORS**

Defendants assert in their Motion that the Trustee does not allege "*at all*, let alone with the particularity required by Rule 9(b) that BLMIS made the transfers with the intent to hinder, delay or defraud creditors." Def. Mem. at 21. They further argue that, in order to establish the requisite intent, the Trustee relies "solely" on the Ponzi scheme presumption – and they invite the Court to "examine both its validity and its application in this specific case." Def. Mem. at 22-25. Defendants are wrong on all counts.

The Ponzi scheme presumption is the law in this Circuit, and the SAC alleges numerous

facts establishing that BLMIS was a Ponzi scheme and as a result, the Trustee has adequately pled

that the initial transfers were made with the intent to hinder, delay, or defraud creditors by virtue

of this presumption.    Independent of the presumption, the SAC also sufficiently establishes

BLMIS's fraudulent intent by alleging multiple badges of fraud.

### A.    The Ponzi Scheme Presumption Is the Law of This Circuit

The Ponzi scheme presumption "allows courts to presume actual intent to defraud on part

of the operator of the Ponzi scheme." *Picard v. Citibank, N.A. et al.*, Adv. Pro. No. 10-05345

(CGM), 2022 WL 4493234, at \*4 (Bankr. S.D.N.Y. Sept. 27, 2022); *see also Picard v. Peter

Madoff*, 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) ("As a matter of law, the 'Ponzi scheme

presumption' establishes the debtors' fraudulent intent as required" under Bankruptcy Code

Sections 544 and 548(a)(1)(A) and DCL Section 276) (citing *Gowan v. The Patriot Grp., LLC (In

re Dreier LLP)*, 452 B.R. 391, 428 (Bankr. S.D.N.Y. 2011).). The mere existence of a Ponzi

scheme "demonstrates actual intent as a matter of law because transfers made in the course of a

Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud future

creditors." *Citibank,* 2022 WL 4493234, at \*4 (quoting *Bear Stearns Secs. Corp. v. Gredd (In re

Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007).).

Relying on Judge Menashi's concurrence in *Citibank*, Defendants urge this Court to

disregard the well-settled Ponzi scheme presumption, claiming it is "a presumption of dubious

provenance." Def. Mem. at 22-24 (citing *Citibank*, 12 F.4th at 202).    But this Court has already

found Judge Menashi's concurrent opinion "unpersuasive," recognizing that "[t]he Ponzi scheme

presumption does not turn would-be preferences into fraudulent transfers. All the Ponzi scheme

presumption does is save the Trustee and the courts time and resources by presuming that each

transfer was made with actual fraudulent intent." *See Citibank, N.A.*, 2022 WL 4493234, at \*4.

And, as the district court has found, "notwithstanding Judge Menashi's concerns, 'the Ponzi

scheme presumption remains the law of this Circuit.'" *Picard v. Sage Realty*, No. 20-CV- 10057 (JFK), 2022 WL 1125643, at *28 (S.D.N.Y. Apr. 15, 2022); *Picard v. Keller*, No. 21-CV-8678 (JPO), 2022 WL 7219262, at *3 (S.D.N.Y. Oct. 6, 2022) (noting that the district court was bound by the Second Circuit and its majority decisions, affirming this Court's application of Ponzi scheme presumption, despite Judge Menashi's statements in *Citibank*). "Consequently *every court* to opine on the application of the presumption in the context of the BLMIS Ponzi scheme has concluded that 'the Trustee is entitled to the benefit of the Ponzi Scheme Presumption, and so can prove fraudulent intent as a matter of law.'" *Sage Realty*, 2022 WL 1125643, at *28 (quoting *Picard v. Est. of Seymour Epstein (In re BLMIS)*, No. 21 Civ. 02334 (CM), 2022 WL 493734, at *17 (S.D.N.Y. Feb. 17, 2022) (collecting cases)) (emphasis added); *see, e.g.*, *Picard v. Fairfield Pagma Assocs., LP (In re Bernard L. Madoff)*, Adv. Pro. No. 10-05169 (CGM), 640 B.R. 285, 291 (Bankr. S.D.N.Y. Apr. 13, 2022) (finding actual "intent to defraud" at summary judgment was established as BLMIS operated a Ponzi scheme).

**B.    The SAC Alleges Facts Sufficient to Establish That BLMIS Was a Ponzi Scheme**

The detailed factual allegations in the SAC satisfy the Trustee's heightened pleading burden under Rule 9(b) for actual fraudulent intent. *See Picard v. Citibank, N.A.*, 2022 WL 4493234 at *4 ("Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied.")

The SAC alleges that Madoff operated the IA Business as a Ponzi scheme[16] using money deposited by customers that BLMIS claimed to invest in securities.  SAC ¶¶ 53, 57-59.  The IA

---

[16] *See Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (finding "the label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud[]").

Business had no legitimate business operations and produced no profits or earnings. *Id*. at ¶57. Indeed, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at ¶¶ 40, 76. Several other BLMIS employees were convicted of fraud or other crimes in connection with their participation in the Ponzi scheme. *Id*. at ¶¶ 41-43.

The SAC further alleges that all funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank and were used to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up BLMIS's proprietary trading business. *Id.* at ¶ 59. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments. *Id.* at ¶ 60. Madoff himself confessed to operating a Ponzi scheme, for which he was sentenced to 150 years in prison. *Id.* at ¶¶ 40-43.

These allegations, among others, are ample to specifically plead that Madoff operated a Ponzi scheme through his IA Business. *Picard v. Lisa Beth Nissenbaum Trust*, No. 20-cv-3140 (JGK), 2021 WL 1141638, at *15 (S.D.N.Y. Mar. 24, 2021) ("There is no genuine dispute of material fact that BLMIS operated a Ponzi scheme. The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission") (citations and quotation marks omitted).[17]

---

[17]*See also Picard v. Legacy Capital Ltd.*, 603 B.R. at 688-93 (discussing in detail that BLMIS was a Ponzi scheme and that the Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law).

### C. The SAC Independently Alleges Fraudulent Intent Through Badges of Fraud

Independent of the Ponzi scheme presumption, the SAC alleges BLMIS's fraudulent intent through multiple "badges of fraud" sufficient to satisfy Rule 9(b). Courts developed the badges of fraud test to establish fraudulent intent because such intent "is rarely susceptible to direct proof." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). In recognizing these badges, the Second Circuit has acknowledged no one size fits all, and that "[f]raudulent acts are as varied as fish in the sea." *Id.* at 1583; *see also Citibank, N.A. v. Bombshell Taxi LLC (In re Hypnotic Taxi LLC)*, 543 B.R. 365, 374 (Bankr. E.D.N.Y) ("any list of the 'badges of fraud' would be non-exhaustive"). Courts in the Southern District have identified no fewer than eleven separate badges that are indicative of fraudulent intent. *See Weisfelner v. Hofman (In re Lyondell Chem. Co.)*, 554 B.R. 635, 653 (S.D.N.Y. 2016); (citing UFTA § 4(b); 5 Collier on Bankruptcy ¶ 548.04[1]).

Here, the SAC sets forth numerous facts establishing several badges of fraud. BLMIS was an operation built entirely on the concealment of facts and false pretenses. *See generally* SAC ¶¶ 47-77. BLMIS commingled customer funds and used them not to purchase securities, but to make payments to other customers. *Id.* at ¶ 59. The sole proprietor of BLMIS's three-person accounting firm pleaded guilty to filing false audit reports for BLMIS and false tax returns for Madoff and others. *Id.* at ¶¶ 55-56. Prior to its collapse, BLMIS filed numerous false reports with the SEC. *Id.* at ¶¶ 51-52.

The SAC also sufficiently alleges BLMIS's insolvency at all relevant times. *Id.* at ¶ 77. The IA Business had no legitimate business operations and produced no profits or earnings. *Id.* at ¶¶ 53, 57-59. The proprietary trading business incurred significant losses and required fraudulent infusions of cash from the IA Business to continue its operations. *Id.* at ¶ 54. And at all relevant times, BLMIS's assets were worth less than the value of its liabilities, it could not meet its obligations as they became due, and it had insufficient capital at the time of the initial transfers to

the Tremont Initial Transfer Funds.[18]  *Id.* at ¶ 77.

This Court and others have already found that similar facts pleading badges of fraud sufficiently demonstrate BLMIS's actual fraudulent intent under Section 548(a)(1)(A) of the Code. *See Picard v. Citibank,* 2022 WL 4493234 at **4-5; *Picard v. JABA Assocs. LP*, 2021 WL 1112342, at *14–15 (S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *14–15.

## II.  THE DISTRICT COURT ALREADY HAS DETERMINED THAT DEFENDANTS' GOOD FAITH WAS NOT APPARENT ON THE FACE OF THE PSAC

### A.  Defendants Are Bound By The District Court's Decision

The law of the case doctrine "forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings in the same case."  *United States v. Williams*, 475 F.3d 468, 471 (2d Cir. 2007)) (internal citations omitted).  The doctrine "counsels against revisiting ... prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *United States v. Thorn*, 446 F.3d 378, 383 (2d Cir. 2006) (internal citations omitted).  One branch of this doctrine, the mandate rule, precludes "re-litigation in the [lower] court" of any matter "expressly decided" or "impliedly resolved by the appellate court's mandate."  *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010).

On appeal, Defendants asked the district court to affirm the bankruptcy court's denial of

---

[18] The SAC also alleges that the Tremont Initial Transfers were made to organizations with insider relationships to BLMIS.  The SAC alleges that senior leadership at Tremont had an unusually close relationship with Madoff (SAC ¶¶ 270-272, 278), ignored due diligence red flags and shielded BLMIS from third party due diligence (*id.* ¶¶ 273-311), and that they reaped significant financial benefits from the fraud.  *Id.* ¶¶ 329-332.

the Trustee's motion to amend the complaint on an alternative ground, notwithstanding the intervening change in the law created by the *Citibank* Decision.  Specifically, Defendants asked the district court to engage in a *de novo* review of the PSAC and determine that, on its face, the PSAC established Defendants' good faith as a matter of law.  The district court considered Defendants' argument and expressly rejected it.  *Picard v. ABN AMRO Bank (Ireland), Ltd.*, 2022 WL 1304589, at *3.

The district court flatly held that "ABN Ireland's good faith is not apparent from the face of the [PSAC]."  *Id.*  Moreover, it went on to hold that, "even if it wanted to, the Court on this appeal simply does not have the requisite record to make the fact-intensive inquiry that the Second Circuit requires before a court can make a finding of lack of good faith."  *Id.*  The district court noted that under *Citibank*, the inquiry notice standard requires "'a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees,'" and agreed that "the Trustee rightfully points out that such a fact-based determination can only be made based on the entirety of the factual record after discovery (which has not occurred here), not from isolated documents cherry-picked by Defendants and factual inferences Defendants improperly seek to have drawn in their favor."  *Id.* (internal citations and quotations omitted).

The SAC before this court is virtually identical to the PSAC that the district court reviewed and from which it held Defendants' good faith was not apparent,[19] and was insufficient to satisfy

---

[19] *See* Declaration of Regina Griffin dated October 18, 2022, Ex. 1 for a redline of the PSAC against the SAC.  As reflected therein, the only differences between the PSAC and the SAC are not substantive, and were: (i) updates to the Court's filing stamp header, reflecting the differing ECF docket numbers and dates for each of the two complaints (*see*, *e.g.*, *id.* at p. 1); (ii) the deletion of footnote 1 of the PSAC, which noted that, at the time that document was filed, the appeal of the "extraterritoriality issue" was still pending (*see id.* at p. 1, n.1); and (iii) edits to the signatory block and date of the SAC (*id.* at p. 90).

the fact-intensive inquiry required by *Citibank*.  "Where the appellate court has decided a question of law, the lower court on remand lacks discretion to decide that question to the contrary." *Kerman v. City of New York*, 374 F.3d 93, 110 (2d Cir. 2004).[20]

Defendants argue that the district court's ruling is merely dicta. because the only issue appealed by the Trustee was the impact of the *Citibank* Decision.  Def. Mem. at 29.  But Defendants chose to insert this issue into the appeal, asking the district court to consider the precise argument they make here as an alternative ground to affirm the Court's decision. Now that the district court has considered and expressly rejected Defendants' argument, they are bound by that court's decision regardless of how it was raised.  *See, e.g., Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLC)*, 809 F.3d 94, 100 (2d Cir. 2015) (while Second Circuit does not generally do so, "when we *do* consider on appeal arguments raised for the first time below in a motion for reconsideration and remand on the basis of those arguments, the lower court must follow our mandate.").

Indeed, this Court has already recognized the binding nature of the district court's decision with respect to the good faith defense in other adversary proceedings, and has repeatedly held that the assertion of the defense is inappropriate on a motion to dismiss.  *See, e.g., Picard v. Banque Syz & Co.*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *11; *Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955, at *1.

---

[20] The Second Circuit noted in *Kerman* that "when the court of appeals has remanded a case for trial after ruling that summary judgment in favor of a given party was inappropriate because the evidence indicated the existence of genuine issues of material fact to be resolved by the jury, the district court cannot properly, on remand, grant judgment as a matter of law to that party on the basis of trial evidence that is not substantially different". *Id.*

**B. Even Were the Court to Consider Defendants' Affirmative Defense, They Cannot Meet Their Burden of Establishing It From the Face of the SAC**

Even if the Court were to consider Defendants' affirmative defense of good faith, they cannot meet their heightened burden of showing that "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Dreier*, 452 B.R. at 426.

The SAC alleges that years before Defendants entered into the transactions underlying the subsequent transfers at issue, employees from multiple Fortis entities coordinated to provide administrator services and financing to BLMIS feeder fund Harley International (Cayman) Ltd. ("Harley"), a Bahamian fund in which BLMIS served in the triple capacities of investment adviser, broker-dealer, and custodian.  SAC ¶¶ 91-95.  By 2003, employees from multiple Fortis entities had expressed concern that they could not independently verify whether BLMIS actually engaged in the trades it claimed or that BLMIS actually had custody of Harley's assets, and worried about what would happen to those assets "should the broker [BLMIS] go bust."  *Id*. at ¶¶ 96-97, 103-104, 106-107, 110-117.  Fortis sought verification from BLMIS that Harley's funds were "segregated," but employees confirmed that BLMIS's response did *not* provide the assurances they required.  *Id.* at ¶¶ 108-110.

Employees escalated their concerns about BLMIS to Fortis management and recommended BLMIS be replaced as Harley's custodian (*id.* at ¶¶ 111-115), recommended against loaning funds to entities which were investing in BLMIS absent verification of BLMIS's trades (*id.* at ¶¶ 114-117; 126), and even recommended Fortis consider ceasing to provide administrator services to such funds. *Id.* at ¶ 126.  Ultimately Fortis chose not to cease its BLMIS-related transactions; it did, however, heed employees' warnings and changed the legal jurisdiction of the entity providing administrator services to Harley, in order to mitigate Fortis' exposure under Bahamian law for any

22

malfeasance by Madoff.  *Id.* at ¶¶ 111-13, 115, 118-121.

Another Fortis affiliate, Fortis Multi-Management,[21] had separately invested tens of millions of dollars of Fortis customers in Tremont feeder funds.  *Id.* at ¶¶ 130-131.  By 2006 – with almost $70 million of Fortis investor assets under BLMIS's management – Fortis Multi-Management employees were "nervous" and had "apprehensions" about BLMIS that they reported to their management. *Id.* at ¶¶ 133, 142.  After Tremont could not answer basic queries about BLMIS and its options trades (*id.* at ¶¶ 138-41, 146), and a new business partner separately advised Fortis Multi-Management that it had identified numerous red flags of fraud at BLMIS that caused it to have a "No-Madoff" policy (*id.* at ¶¶ 157-62), Fortis Multi-Management redeemed its investments from Tremont's feeder funds.  *Id.* at ¶ 163.  Aware of all of these facts,[22] Fortis Fund Bank entered into the Swap in 2006 pursuant to which it received the subsequent transfers at issue after negotiating built-in protections that would minimize its losses if BLMIS were engaging in fraud or went bankrupt.  *Id.* ¶¶ 197-214.

Based on these allegations, Defendants cannot establish they were *not* "on inquiry notice" of Madoff's fraud.  A transferee is on inquiry notice if the facts it knew "put the transferee on inquiry notice of the fraudulent purpose behind the transaction – that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud."  *Citibank*, 12 F.4th at 191-92; *see also In re*

---

[21] In 2006, Fortis Multi-Management took over the investment book of a predecessor entity called "MeesPierson."  SAC ¶ 133.

[22] This knowledge is attributable to Defendants both:  (i) directly, as some Fortis employees involved in negotiating and obtaining credit approval for the Swap were among the same employees who had sought to minimize Fortis' exposure to the risk of BLMIS's fraud and/or insolvency they had identified in connection with Harley (SAC ¶¶ 103-118, 126, 167, 235-237); and (ii) through imputation under agency principles, including based on the manner in which Fortis entities operated under an "Act as One" policy, and through the global management risk network through which all risks to Fortis entities were shared.  SAC ¶¶ 167, 224-242.

*Manhattan Inv. Fund Ltd.,* 397 B.R. at 22-23 ("the best evidence of what a prudent [party] in the [defendant's position] would have done is what [it] actually did…. its actions clearly show that it had cause to and did investigate further" ). Here, as discussed above, the SAC alleges Fortis was well aware of potential fraud and/or insolvency at BLMIS, and employees' warnings show it had cause to investigate further. *See, e.g.,* SAC ¶¶ 96-97, 103-107, 110-117, 126, 131-133, 138-142, 146, 157-163.

Moreover, Defendants cannot meet their burden of establishing that they conducted a "reasonably diligent inquiry." The SAC alleges that Fortis employees recommended against Fortis continuing to provide administration, custody, financing, or other services to another investor in a BLMIS feeder fund because they recognized the "*Madoff issue*" noting "there is no guarantee that the trades and positions provided by Madoff to Fortis as Administrator are objective and it is not possible to obtain independent confirmations on trades and positions." SAC ¶ 126. Instead of conducting a reasonably diligent inquiry into the "Madoff issue," Fortis instead continued BLMIS-related transactions, moved legal jurisdictions to a place where the laws would not impose liability on Fortis for BLMIS's acts (*Id.* at ¶¶ 110-123), and entered into the Swap after negotiating provisions to limit consequences to Defendants of potential fraud and/or insolvency at BLMIS. *Id.* at ¶¶ 197-214.

## III. SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY FROM DEFENDANTS

In *Cohmad II*, the district court held that an initial transferee's actual knowledge of Madoff's fraud precludes application of the Section 546(e) safe harbor, thereby allowing the Trustee to pursue all of his claims to avoid initial transfers made by BLMIS. These include claims pursuant to Section 544 of the Code and New York Debtor & Creditor Law §276, which permit the Trustee to avoid transfers prior to the two-year period referenced in Section 548(a)(1)(A).

24

Cohmad II, 2013 WL 1609154, at *1, 4-5.  Defendants argue that the safe harbor in Section 546(e)

applies here because the Trustee has not sufficiently alleged that both <u>Defendants</u> and <u>Tremont</u>

had "actual knowledge" of Madoff's fraud.  Def. Mem. at 16-21.

But Defendants' argument is contrary to the plain language of the statute, as well as case

law in this SIPA liquidation proceeding, which makes clear that it is the *initial transferee's* actual

knowledge – and not a subsequent transferee's – that determines whether the Section 546(e) safe

harbor applies.  And the SAC more than sufficiently alleges Tremont's actual knowledge of the

fraud, rendering the safe harbor inapplicable to the Trustee's claims.

## A.  Section 546(e) Does Not Apply Independently to Recovery Actions

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not

the recovery of subsequent transfers under Section 550.  *See* 11 U.S.C. § 546(e) ("Notwithstanding

sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer*

. . . except under section 548(a)(1)(A) of this title.") (emphasis added); *see also Multi-Strategy,*

641 B.R. at 94 ("The safe harbor cannot be used as a defense by the subsequent transferee because

the Trustee is not 'avoiding' a subsequent transfer, 'he recovers the value of the avoided initial

transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not

refer to the recovery claims under section 550.'") (quoting *BNP*, 594 B.R. at 197).[23]

The limitation of the safe harbor to avoidance is consistent with the well-established

principle that "the concepts of avoidance and recovery are separate and distinct."  *Sec. Inv. Prot.*

---

[23] *See also*, *e.g.*, *Banque Syz*, 2022 WL 2135019, at *9 (quoting *BNP* at 197); *Picard v. Banque
Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523, at *9 (Bankr.
S.D.N.Y. June 30, 2022) (same); *Picard v. Barclays Bank (Suisse) S.A.*, Adv. Pro. No. 11-02569
(CGM), 2022 WL 2799924, at *7 (Bankr. S.D.N.Y. July 15, 2022) (same); *Picard v. Societe
Generale Private Banking (Suisse) S.A.*, 2022 WL 4349859, at *7 (Bankr. S.D.N.Y. Sep. 19, 2022)
(same).

*Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 501 B.R. 26, 30 (S.D.N.Y. Oct. 28,

2013).  It is also consistent with the understanding that the Code's avoidance provisions protect

against depletion of a debtor's estate, while Section 550 is merely a "utility provision," intended

to help execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place."

*See In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 98 (2d

Cir. 2019).

        *Cohmad II* confirmed that Section 546(e) does not provide an independent safe harbor for

Section 550 recovery actions against subsequent transferees.  *See Cohmad II*, 2013 WL 1609154,

at *4, *9 (applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent

transferees can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial

transferees and subsequent transferees are entitled to raise a defense based on the application

of Section 546(e) to the *initial* transfer from Madoff Securities.") (emphasis added).  As this Court

recently held, defendants "[are] not permitted to raise the safe harbor defense on [their] own behalf

as [] subsequent transferee[s]" and the 546(e) "safe harbor is not applicable to subsequent

transfers." *Multi-Strategy,* 641 B.R. at 94-95.[24]

        Defendants' argument that it is their "knowledge… that is relevant" to Section 546(e)  (Def.

Mem. at 18-19) ignores the plain language of the statute and conflates avoidance and recovery

under the Bankruptcy Code.   Indeed, the district court in this very case already rejected the same

arguments Defendants made with respect to another safe harbor subsection of Section 546:

namely, Defendants argued to the district court that they, as subsequent transferees, could raise

546(g**)** as a defense to the recovery of their subsequent transfers.  *Picard v. ABN Amro Bank, N.V.*,

---

[24] *See, e.g.*, *Banque Syz*, 2022 WL 2135019, at *9-10; *Lombard Odier*, 2022 WL 2387523, at *9-
10; *Barclays*, 2022 WL 2799924, at *7; *Societe Generale*, 2022 WL 4349859, at *7.

505 B.R. at 143. The district court rejected that argument, finding that "Section 546(g) expressly applies only to the avoidance of transfers and lists the provisions that are affected by its terms—namely, 11 U.S.C. §§ 544, 545, 547, and 548. Section 550 . . . is not included on this list. Where Congress has chosen to exclude a provision from the safe harbor's protection, it is not for this Court to contradict that edict." *Id.*

Based on the same reasoning, this Court has rejected the notion that 546(e) applies to subsequent transfers. *See BNP Paribas S.A.*, 594 B.R. at 197 ("By its terms, the safe harbor[of 546(e) is a defense to the avoidance of the *initial* transfer"); *Multi-Strategy,* 641 B.R. at 94-95 (defendants "[are] not permitted to raise the safe harbor defense on [their] own behalf as [] subsequent transferee[s]" and the 546(e) "safe harbor is not applicable to subsequent transfers").[25] Rather, as explained in *BNP*, a subsequent transferee gets only "indirect" protection from Section 546(e) to the same extent it protects the initial transferee. *BNP Paribas S.A.*, 594 B.R. at 197.

Like *Cohmad II*, *BNP* is law of the case on this issue, and Defendants are bound by both decisions. *See Picard v. Est. of Seymour Epstein (In re BLMIS)*, No. 2l-CV-02334 (CM), 2022 WL 493734, at *12 (finding "in a SIPA liquidation like this one" where different adversary proceedings arise within the same liquidation, law of the case applies when "prior decisions" either expressly resolve[] an issue or necessarily resolve[] it by implication").

## B. Section 546(e) of the Bankruptcy Code Does Not Apply Because the SAC Pleads Tremont's Knowledge of Madoff's Fraud

Contrary to Defendants' assertions, the SAC contains allegations of actual knowledge of

---

[25] *See also Banque Syz*, 2022 WL 2135019, at *9-10; *Lombard Odier*, 2022 WL 2387523, at *9-10; *Lloyds*, 2022 WL 2390551, at *5-6; *Bordier*, 2022 WL 2390556, at *5-6; *Cantonale*, 2022 WL 2761044, at *5-6; *Barclays*, 2022 WL 2799924, at *7; *First Gulf*, 2022 WL 3354955, at *9-10; *Parson*, 2022 WL 3094092, at *9-10; *Meritz*, 2022 WL 3273044, at *9-10; *Union Sec.*, 2022 WL 3572509, at *9-10.

the initial transferees – Tremont's Prime Fund and Broad Market Fund – sufficient to defeat the application of the Section 546(e).

Actual knowledge requires the Trustee to plead that a defendant had "a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4724749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*") (quoting *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) ("*Merkin II*")). Actual knowledge may be proven by circumstantial evidence.[26] *Rivas v. Bowling Green Assocs., L.P.*, no. 13-cv-7812 (PKC), 2014 WL 3694983, at *2 (S.D.N.Y. July 24, 2014). It also is difficult to determine as a matter of law. *See Leeming v. Dean Witter Reynolds Inc.*, 676 F. Supp. 541, 545 (S.D.N.Y. 1988) (acknowledging that "subjective factual issues" as to actual knowledge were "ill-suited for resolution on a motion to dismiss").

The SAC incorporates the factual allegations in the Tremont Complaint by reference and supplements the allegations therein.[27] Collectively, the Trustee's allegations of Tremont's actual knowledge closely mirror those against Kingate, as detailed in *Kingate*, and BLMIS's other major feeder fund manager, Fairfield, as detailed in *Fairfield Inv. Fund*. As with Kingate and Fairfield, Tremont was utterly dependent on BLMIS's fraud. Tremont managed one of the largest groups of BLMIS feeder funds, with billions invested at the time of Madoff's arrest. Tremont Compl. ¶¶

---

[26] Contrary to Defendants' assertion (Def. Mem. at 19-20), a plaintiff need not invoke "magic words" to plead a defendant's state of mind. *See, e.g., Heller v. Goldin Restructuring Fund, L.P.*, 590 F.Supp.2d 603, 619-623 (S.D.N.Y. 2008) (facts demonstrating a strong inference that the defendant acted with the required state of mind are sufficient to withstand a motion to dismiss) (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91-92 (2d Cir. 2000) (noting that a plaintiff "cannot be expected to plead a defendant's actual state of mind" but need only allege facts that "spell[] out circumstances" from which a defendant's knowledge "could be easily inferred") (internal citations omitted).

[27] SAC ¶ 268; *see also* Complaint, *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (CGM) (Bankr. S.D.N.Y. Dec. 7, 2010), ECF No. 1 ("Tremont Compl.").

1-2, 5; SAC ¶ 87. Various Tremont executives observed that BLMIS accounted for "all of the profits of the firm," that the Tremont feeder funds' "only reason for being" was as feeders into BLMIS, and that BLMIS was Tremont's "crack addiction business." SAC ¶ 331. Tremont's parent company similarly concluded that "the economics of Tremont's business [was] Madoff." *Id.* This business yielded Tremont hundreds of millions of dollars in fees, and millions of dollars in compensation to its executives. *Id.* ¶ 330; Tremont Compl. ¶¶ 14, 31, 58-59, 82, 103-110, 124. Its chief executives had longstanding, unusually close relationships with Madoff for almost two decades, which Tremont described as its "competitive edge." SAC ¶¶ 270-272.

Tremont was continually confronted with warnings from investors and potential investors indicating that BLMIS was a fraud. *Id.* at ¶¶ 273-285. For example, in April 2001, one investor wrote to Robert Schulman, Tremont's CEO: "I know you are sick of answering this but man is it hot out here with the Bernie fraud rumors." *Id.* at ¶ 273. One client questioned "the legitimacy of the whole Bernie thing." Tremont Compl. ¶ 197. Another investor specifically raised the prospect that BLMIS was a Ponzi scheme, and peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. SAC ¶¶ 279-280.

Tremont was well aware of information demonstrating BLMIS's trading and performance was neither legitimate nor possible. *Id.* at ¶¶ 288-290. Tremont knew, among other things: daily securities positions and prices BLMIS reported differed from those reported by Bloomberg (*id.* at ¶ 288-289), there was insufficient volume for BLMIS to complete its purported securities trades (Tremont Compl. ¶¶ 170-174), and BLMIS had a history of impossibly consistent positive returns given the SSC Strategy Madoff purported to employ. Tremont Compl. ¶¶ 160-164. Tremont also knew that BLMIS had no International Swaps and Derivatives Association agreements in place

for its purported OTC options trades, a basic requirement for OTC option trades, and that Madoff's trade confirmations did not identify counterparty information that should be on all OTC trade confirmations – despite the fact that Tremont bore the risk of any counterparty default. *Id.* at ¶ 313; Tremont Compl. ¶ 185.

At the same time Tremont used BLMIS's impossible trading and performance for years as the centerpiece for its own reports and marketing materials (SAC ¶¶ 288-290), Tremont shielded BLMIS from its own due diligence requirements. SAC ¶¶ 298-299, 303. Indeed, Tremont prevented investors and even its own auditors from having contact with BLMIS, and hindered the due diligence efforts of third parties through obstruction and by making misleading statements. *Id.* at ¶¶ 307-311. For example, although Tremont knew neither the identity of the counterparties for its purported OTC options transactions nor the characteristics and number of such counterparties (Tremont Compl. ¶¶ 185, 230), Tremont falsely claimed to its investors to have "checked with counterparties to make sure they are trading with [BLMIS] in the relevant instruments," providing fabricated names and descriptions. SAC ¶¶ 320-323. Similarly, Tremont told one investor that the counterparties include "typical banks," like JP Morgan, despite JP Morgan itself inquiring as to the identity of the counterparties the month prior (Tremont Compl. ¶ 190), and in response to another inquiry, confirmed that it had "[a]bsolutely no exposure" to Morgan Stanley or Godman Sachs. SAC ¶ 323. Notably, Tremont understood BLMIS's options trading was a fiction, as illustrated by its total lack of concern as to counterparty exposure when Lehman Brothers collapsed in 2008. SAC ¶¶ 324-327.

By helping conceal Madoff's fraud, Tremont was an active and knowing facilitator of it. On factual allegations similar to these, this Court has recently "determined that the Fairfield Complaint[] contains sufficient allegations of Fairfield Sentry's actual knowledge to defeat the

[Section 546(e)] safe harbor defense on a Rule 12(b)(6) motion." *E.g.*, *Picard v. Banque Cantonale Vaudoise*, Adv. Pro. No. 12-01694, 2022 WL 2761044, at *5 (Bankr. S.D.N.Y. June 30, 2022) (citing *Fairfield Inv. Fund*, 2021 WL 3477479, at *4). As in *Fairfield*, the similar allegations in the SAC adequately alleges Tremont's knowledge of Madoff's fraud and precludes application of Section 546(e).

Moreover, Kingate's knowledge of Madoff's fraud[28] also may be imputed to Tremont because i) Tremont's founder and original CEO, Sandra Manzke, was a founding participant in Kingate Global and its manager, Kingate Management Limited, and introduced Kingate's managers to Madoff in 1993; and ii) Tremont affiliate Tremont (Bermuda) Ltd. was a co-manager of Kingate Global, from which Tremont derived a significant portion of its income. SAC ¶¶ 270, 333-37.[29]

## IV. SECTION 546(g) OF THE BANKRUPTCY CODE DOES NOT BAR RECOVERY FROM DEFENDANTS

### A. Defendants Are Bound by the District Court's Decision That The $235.5 Million in Transfers Related to Collateral For The Swap is Not Protected By 546(g)

On their motions to withdraw the reference and to dismiss the complaint before the district court, Defendants argued that the transfers at issue were protected by Section 546(g) because they were made (1) in connection with a swap transaction, and (2) were for to "or for the benefit" of

---

[28] *Picard v. Ceretti (In re BLMIS)*, 2015 WL 4734749, at *13 ((finding Trustee's complaint sufficiently alleged actual knowledge).

[29] *See Picard v. Societe Generale Private Banking (Suisse) S.A.*, 2022 WL 4349859, at *7 (Bankr. S.D.N.Y. Sep. 19, 2022) ("The Trustee has pled [actual] knowledge in two ways: 1) that certain individuals had actual knowledge of Madoff's fraud, which is imputed to the Fairfield Funds; and 2) that actual knowledge is imputed to the Fairfield Funds through 'FGG,' an alleged 'de facto' partnership.") (quoting *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021).

Defendants as "financial participants."[30]  The district court expressly held that the $235.5 million

(of the $265.5 million) in initial transfers were *not* protected by the safe harbor of Section 546(g).

*Picard v. ABN AMRO BANK (Ireland) Ltd.*, 505 B.R. at 150 ("the Court confirms its bottom-line

order of February 15, 2013, which held that Section 546(g)'s safe harbor protects the redemption

payments, but not the collateral payments from recovery to the extent they cannot be avoided under

section 548(a)(1)(A)").[31]  Dissatisfied with the district court's ruling, Defendants, advance new

arguments in an attempt to shield these transfers from recovery under the safe harbor.

Defendants are precluded by the law of the case doctrine and mandate from relitigating the

applicability of 546(g) here because this issue was already decided and/or impliedly resolved by

the district court.  *See Yick Man Mui*, 614 F.3d at 53.  As Defendants concede (Def. Mem. at 14),

they assert new legal theories as to why Section 546(g) should apply to the $235.5 million in initial

transfers—now changing their theory of who constitutes a "financial participant".  But, "where an

issue was ripe for review at the time of an initial appeal but was nonetheless foregone, it is

considered waived and the law of the case doctrine bars ... an appellate court in a subsequent appeal

from reopening such issues...."  *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (citation

omitted).   As the Second Circuit has recognized, "it would be absurd that a party who has chosen

not to argue a point on a first appeal should stand better as regards the law of the case than one

who had argued and lost." *Id*. (citation omitted).

### B.  Prime Fund Does Not Qualify As A "Financial Participant"

Even if the Court were to permit Defendants to relitigate the applicability of 546(g) to the

---

[30] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended
Complaint Based on Section 546(g) of the Bankruptcy Code, *Picard v. ABN Amro Bank
(Ireland) Ltd.*, 11 Civ. 6877 (JSR) (S.D.N.Y. July 24, 2012), ECF No. 35 at pp. 12-14.

[31] The Trustee reserves his right to appeal this decision at the appropriate time.

$235.5 million in transfers at issue, Defendants' newest argument also fails.

According to Defendants, Section 546(g) applies because the $235.5 million in transfers were made to/for the benefit of Prime Fund, a "financial participant," in connection with a "swap." Def. Mem. at 14-15. Specifically, they assert that Prime Fund falls within the Bankruptcy Code's definition of "financial participant,"[32] by virtue of its customer account with BLMIS, through which Prime Fund engaged in at least one transaction in the 15 months before the petition date that purportedly exceeded the $100 million mark-to-market threshold. Def. Mem. at 15. In other words, Defendants rely on Prime Fund's "securities contracts" with BLMIS to qualify Prime Fund as a "financial participant," within the meaning of Sections 546(g) and 101(22A).

But the district court's reasoning with respect to the "actual knowledge" exception to 546(e) precludes any finding that Prime Fund had *any* "securities contracts" with BLMIS – let alone any mark-to market positions in excess of $100 million. In *Cohmad II*, the district court held that where a Madoff customer had "actual knowledge of Madoff's scheme," the account agreements it signed with BLMIS were meaningless - the customer must have known that the transfers it received were not settlement payments, that the account agreements never led to a securities transaction, and "*that the transfers could not have been made in connection with an actual 'securities contract.'*" *Cohmad II*, 2013 WL 1609154, at *3 (emphasis added). As described above, the SAC alleges facts sufficient to establish that the Tremont and its feeder funds, including Prime Fund, had "actual knowledge" of Madoff's fraud. "Neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the

---

[32] Section 101(22A) of the Bankruptcy Code defines a "financial participant" to include "an entity that, at the time it enters into a securities contract . . . has gross mark-to-market positions of not less than $100 million …in one or more such agreements or transactions with the debtor or any other entity at such time or on any day during the 15-month period preceding the date of the filing of the petition.

securities markets and the reasonable expectations of legitimate investors." *Id.* at *4.

In an attempt to evade the application and resulting effect of the "actual knowledge" exception to their argument, Defendants claim that in its 546(g) decision, the district court held that there was no actual knowledge exception to Section 546(g). Def. Mem. at 16. While the district court found that the actual knowledge exception is irrelevant to the swap transactions at issue, Defendants' new argument that Prime Fund is the "financial participant" for the purposes of 546(g) does *not* hinge on the swap transactions themselves, but rather, on Prime Fund's *securities contracts* with BLMIS. And, as the district court reaffirmed, "[c]ustomers' "good faith" in believing that Madoff Securities was engaging in securities transactions on their behalf was relevant" to whether there was a legitimate securities contract. *Picard v. ABN AMRO BANK.*, 505 B.R. at n.6. Under this reasoning, there were no legitimate securities contracts between Prime Fund and BLMIS to support Defendants' argument.

Just as Prime Fund would be, Defendants are likewise bound by the district court's ruling that initial transferees like Prime Fund, which are alleged to have actual knowledge of Madoff's fraud, must have known that the transfers they received could not have been made in connection with *any* actual "securities contracts." *Cohmad II*, 2013 WL 1609154, at *3-4. Thus, Prime Fund did not have securities contracts with BLMIS or $100 million in mark-to-market positions in its BLMIS account to qualify as a "financial participant" within the meaning of the Code and thus, Defendants cannot invoke the 546(g) safe harbor to protect the $235.5 million in transfers.

V. **THE SAC ADEQUATELY PLEADS THAT DEFENDANTS RECEIVED SUBSEQUENT TRANSFERS OF STOLEN BLMIS CUSTOMER PROPERTY UNDER SECTION 550(A)**

   A. **The SAC Satisfies the Trustee's Pleading Burden with Respect to the Subsequent Transfers Defendants Received**

The SAC adequately states claims for recovery under Section 550(a) by plausibly alleging that Defendants received subsequent transfers of stolen BLMIS customer property.

To plead a subsequent transfer claim, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Merkin II*, 515 B.R. at 149–150. As this Court recently held, the Trustee is not required to perform a tracing analysis, or to present a "dollar-for-dollar accounting of the exact funds at issue." *Multi-Strategy*, 641 B.R. at 90 (quoting *BNP*, 594 B.R. at 195); *Banque Syz*, 2022 WL 2135019, at *7 (same); *see also Merkin II*, 515 B.R. at 149-150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3; *see also 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019). In addition, the Trustee must allege "'the necessary vital statistics—the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds." *Multi-Strategy*, 641 B.R. at 90 (quoting *BNP*, 594 B.R. at 195).

The SAC satisfies these requirements. The SAC alleges that Broad Market Fund and Prime Fund invested substantially all of their assets with BLMIS. SAC ¶¶ 2, 31, 88, 89, 244, 247. It further alleges that BLMIS made initial transfers consisting of stolen customer property to Broad Market Fund in the six year period of $252 million identified by date and amount (SAC ¶ 245 and Exhibits A & B), and that BLMIS made initial transfers consisting of stolen customer property to

35

Prime Fund in the six year period of $945 million, identified by date and amount (SAC ¶ 248 and

Exhibits C & D).  The SAC further alleges that Broad Market Fund made subsequent transfers of

$48,387,616 of customer property to Rye XL Fund between August 31, 2006 and November 21,

2008, identified by date and amount (SAC ¶¶ 251-253 and Ex. E), and that Prime Fund made

subsequent transfers of $292,472,765 of customer property to Rye XL Fund between July 3, 2007

and November 24, 2008, identified by date and amount (SAC ¶¶ 254-256 and Ex. F).

The SAC further alleges that Broad Market Fund made subsequent transfers of $30 million

of customer property to Defendants in connection with Fortis Fund Bank's redemption of shares

in Broad Market Fund identified by date and amount (SAC ¶¶ 257-261 and Ex. G), and that Rye

XL Fund made subsequent transfers of $235.5 million in customer property to Fortis Fund Bank

to increase the collateral for the Swap identified by date and amount (SAC ¶ 262-266 and Exhibit

H).  The SAC therefore plausibly alleges that Defendants' subsequent transfers originated with

BLMIS by (i) providing the necessary "vital statistics" of the transfers Defendant received and (ii)

outlining the relevant pathways through which stolen customer property was transferred from

BLMIS to Prime Fund and Broad Market Fund, and subsequently to Rye XL, and subsequently to

Defendants.  Nothing more is required at the pleading stage.  *See, e.g.*, *Picard v. Mayer*, Adv. Pro.

No. 20-01316 (CGM), 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021) (rejecting

argument that "claim has not been plead with enough specificity as to how and what [defendant]

received" and holding complaint "contains sufficient information regarding which transfers the

Trustee is seeking to recover").

As this Court recently held in a number of decisions, the "exhibit[s] [to the complaint]

provide[] [Defendant] with the 'who, when, and how much' of each transfer." *See, e.g., Picard v.*

*Societe Generale*, Adv. Pro. No. 12-01677, ECF No. 197 (CGM), at 17 (Bankr. S.D.N.Y. October

7, 2022); *Multi-Strategy,* 641 B.R. at 95; *Banque Syz,* 2022 WL 2135019, at *12.

**B. There Are No Tracing Requirements at the Pleading Stage**

Defendants contend that the SAC does not tie the subsequent transfers that Defendants received to initial transfers BLMIS made in the two-year period prior to the filing of the debtor's petition.[33]  Def. Mem. at 38.  But there are no tracing requirements whatsoever to plead a claim to recover subsequent transfers – much less any pleading requirement to trace each subsequent transfer within the two-year period.  All that the Trustee need plead is that the Tremont Initial Transfers are avoidable,[34] the "vital statistics" of the subsequent transfers[35] and the relevant pathways pursuant to which Defendants received them, and this the Trustee has done in detail.

---

[33] The Defendants attach a chart, titled Appendix A, reflecting purported calculations of various transfers from BLMIS to Prime Fund and Broad Market Fund, then from Prime Fund and Broad Market Fund to Rye XL, and then from Rye XL and Broad Market Fund to the Defendants.  *See* Motion at 39.  These calculations add and subtract transfers with no explanation for the methodology behind the calculations.  To this end, Appendix A, and the Motion are improper at this stage as they serve as nothing more than "an attempt to interject improper expert testimony into a Rule 12(b)(6) context."  *Fowler v. Caliber Home Loans, Inc.*, 277 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (declining to consider expert testimony in a motion to dismiss).

[34] The Trustee's claims for avoidance of the Tremont Initial Transfers remain viable.  The Trustee's claims for avoidability of the $235.5 million in initial transfers BLMIS made to Prime Fund and Broad Market Fund relating to collateral for the Swap remain because neither safe harbor of Section 546(e) nor Section 546(g) applies.  The Trustee may therefore seek to avoid these initial transfers pursuant to Section 544 of the Code and Sections 273-276 of the New York Debtor and Creditor Law.  *See* Tremont Compl. ¶¶ 379-452.  The Trustee can also avoid and recover the $30 million of initial transfers related to Defendants' redemption from Broad Market Fund, pursuant to Section 548(a)(1)(A) of the Code, even though the district court held that this amount was subject to the safe harbor of 546(g).  *See supra* at Sections III & IV.

[35] *Picard v. Shapiro,* 542 B.R. 100 (Bankr. S.D.N.Y. 2015), which Defendants cite (Def. Mem. at 38), is distinguishable.  In *Shapiro*, the Trustee alleged that certain trusts and members of the Shapiro family received approximately $54 million in fraudulent transfers from BLMIS, and "upon information and belief," these defendants subsequently transferred this same amount to other defendants.  *Id.* at 119. The Shapiro Court concluded that the complaint there did not detail any of the necessary vital statistics of the subsequent transfers – unlike here, where there are detailed allegations regarding the subsequent transferors, the subsequent transferees, dates and amounts of the subsequent transfers – and consequently granted defendants' motion to dismiss the subsequent transfer claim. *Id.*

*See Merkin*, 515 B.R. at 150 (this Court refusing to dismiss subsequent transfer claims even though the complaint "[did] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS"); *see also 45 John Lofts*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss").

Defendants acknowledge (Def. Mem. at 38) that, at the pleading stage, there is no requirement for the Trustee to provide "dollar-for-dollar accounting" of "the exact funds" at issue.'" *Merkin*, 515 B.R. at 150. Indeed, such detailed tracing is not even required at the summary judgment stage. *Picard v. Charles Ellerin Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012); *Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*, 2014 WL 47774 at * 15 (Bankr. S.D.N.Y. Jan. 3, 2014).

Rather, it is only at trial that the Trustee will present evidence in the form of expert testimony concerning the application of various tracing methodologies, from which the Court will ultimately select the most appropriate one for identifying subsequent transfers based on the facts of this particular case. *Picard v. Merkin*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) (citing *United States v. Henshaw*, 388 F.3d 738, 739 (10th Cir. 2004) ("Adherence to specific equitable principles, including rules concerning tracing analysis, is subject to the equitable discretion of the court")). *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3, n.7 ("Courts have broad discretion to determine which monies of commingled funds derive from fraudulent sources."). Notably the *timing* of each of the different tracing methodologies for identifying subsequent transfers – which "reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer from

a commingled fund"[36] – are all, by definition, inherently different:  Last-In, First-Out; First-In,

First-Out; Lowest Intermediate Balance (and as restated); and Proportionality.  *See, e.g., Merkin*,

581 B.R. at 385.  Until this Court holds a trial – after fact and expert discovery – and determines

the appropriate tracing methodology to apply based on the circumstances of the case, there is

simply no way at this stage of the proceedings for any party to tie each subsequent transfer to any

one initial transfer.

Finally, the Court has already rejected similar fact-intensive arguments in *Multi-Strategy*

and *Banque SYZ*, finding that the calculation of customer property used to fund a subsequent

transfer is a fact issue that is better resolved at a later stage of the litigation.[37]  *See, e.g., Picard v.*

*Societe Generale*, Adv. Pro. No. 12-01677, ECF No. 197 (CGM), at 17; *Picard v. Citibank*, 2022

WL 4493234 at *7.

---

[36] *Id.* (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT
§59 & cmts. (2011)).

[37] *Multi-Strategy*, 2022 WL 2137073, at *10 (rejecting defendant's "attempt[] to make a very
intricate factual argument about how millions of dollars might have come from non-BLMIS
property" because "calculation of Fairfield Sentry's customer property and what funds it used to
make redemption payments are issues of fact better resolved at a later stage of litigation");
*Banque SYZ*, 2022 WL 2135019, at *12 (same).

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendants' Motion in its entirety.

Dated: October 18, 2022              Respectfully submitted,
       New York, New York

                                By:   */s/ Regina Griffin*
                                      **Baker & Hostetler LLP**
                                      45 Rockefeller Plaza
                                      New York, New York 10111
                                      Telephone: 212.589.4200
                                      Facsimile: 212.589.4201
                                      David J. Sheehan
                                      Email: dsheehan@bakerlaw.com
                                      Regina Griffin
                                      Email: rgriffin@bakerlaw.com
                                      Tracy Cole
                                      Email: tcole@bakerlaw.com
                                      Melissa L. Kosack
                                      Email: mkosack@bakerlaw.com
                                      Stacey A. Bell
                                      Email: sbell@bakerlaw.com
                                      Shade I. Quailey
                                      Email: squailey@bakerlaw.com

                                      *Attorneys for Irving H. Picard, Trustee for the*
                                      *Substantively Consolidated SIPA Liquidation of*
                                      *Bernard L. Madoff Investment Securities LLC*
                                      *and the Chapter 7 Estate of Bernard L. Madoff*