# EXHIBIT 1

**Baker & Hostetler LLP**

45 Rockefeller Plaza New York, New York 10111 Telephone: (212) 589-4200 Facsimile: (212) 589-4201 David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (~~SMB~~CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05355 (~~SMB~~CGM) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and | ~~[PROPOSED]~~ **SECOND AMENDED COMPLAINT** |
| ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
| Defendants. | |

10-05386-smb    Doc 166-120    02/22    Amended Complaint    Pg 3 of 145    Proposed First Amended Complaint    06/17/22 09:46:24
5    7/22    Amended
Complaint    Pg 2 of 109

**TABLE OF CONTENTS**        **Page**

I.       NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE ................................................................. 8

III.    BACKGROUND, THE TRUSTEE AND STANDING ............................. 10

IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY ...... 13

       BLMIS ...................................................................................................... 13

       The Ponzi Scheme .................................................................................... 14

       1.      Madoff's Investment Strategy ...................................................... 15

       2.      BLMIS's Fee Structure ................................................................ 17

       3.      BLMIS's Market Timing .............................................................. 18 17

       4.      The Collapse of the Ponzi Scheme .............................................. 19

V.     DEFENDANTS AND RELEVANT NON-DEFENDANTS ...................... 19

       The Fortis Affiliates Worked Together as One Global Entity ................. 19

       Tremont-Related Entities ......................................................................... 21

VI.    IN 2003, FORTIS EMPLOYEES CAUSED FORTIS FUND BAHAMAS AND HARLEY TO MOVE LEGAL JURISDICTIONS TO ESCAPE LIABILITY IF MADOFF WAS A FRAUD. ................................................ 22

       As Harley's Administrator, Fortis Employees Worked Directly with BLMIS, Which Was Harley's Investment Manager, Broker Dealer and Custodian ............ 22

       In 2003 Fortis Employees Were Aware That Under Applicable Bahamian Law Fortis Fund Bahamas Was Responsible For Verifying the Legitimacy of BLMIS       24

       Fortis Employees Acknowledged That Fortis Fund Bahamas Was At Risk Under Bahamian Law Because They Could Not Independently Verify BLMIS's Trades or Custody of Harley's Assets       25

       Instead of Pursuing Independent Verification of BLMIS's Trades And Custody of Assets, Fortis Sought To Eliminate its Legal Duty to Do So by Changing Legal Jurisdictions       27

       Even After Relocating Harley to the Cayman Islands, Fortis Employees Continued to Warn That the Risk of Fraud at BLMIS Posed Risks To Fortis ...... 31

**TABLE OF CONTENTS**

VII.   FORTIS' INVESTMENT ARM REDEEMED INVESTMENTS IN TREMONT BLMIS FEEDER FUNDS BASED ON ITS IDENTIFICATION OF INDICIA OF RED FLAGS OF FRAUD AT BLMIS ............................................................. 32

Tremont Employees Reported in May 2006 That Fortis Multi-Management Was "Nervous About Madoff And Asking Probing Questions About BLMIS That Tremont Employees Could Not Readily Answer     32

Geene's Questions Reveal that Tremont Did Not Know Even the Most Basic, Material Terms About Madoff's Strategy, Trades Or Custodial Arrangements ... 36

Fortis Multi-Management Fully Redeems Its Broad Market Fund Investment After Its Concerns Are Echoed by Its Affiliate Cadogan ......................................... 39

VIII.   IN 2006, FORTIS EMPLOYEES BECAME AWARE OF FURTHER FACTS SUGGESTING THE POTENTIAL FOR FRAUD AT BLMIS ................................. 42

Since 2001, Fortis Was Informed by BLMIS and Tremont that Madoff's Options Trades Took Place OTC, Rather Than over an Exchange   43

The Information Fortis Reported About BLMIS's Options Trades Was Either Vague Or Conflicted With BLMIS's and Tremont's Prior Statements that Options Trades Took Place OTC     44

Even After Entering into the Swap Transaction, Fortis Exhibited Its Willingness to Be Blind to the Conflicting Story About BLMIS's Options Trades     45

IX.   DEFENDANTS PROCEEDED WITH THE SWAP TRANSACTION DESPITE THE HIGH PROBABILITY OF FRAUD AT BLMIS WHERE THEY HAD SPECIAL RIGHTS AND BUILT IN PROTECTIONS TO MINIMIZE FORTIS' RISK OF LOSS. ..................................................................................................... 48

Fortis Enters into the Swap Transaction ................................................... 49

Fortis Obtained "Special Rights" and Built In Protections in the Swap Transactions to Protect Against Potential Fraud and Insolvency at BLMIS ....... 50

1.   The Collateral Provisions Which Protected Fortis .......................... 50

2.   Fortis Fund Bank Obtained A Broad Indemnification Provision in the Swap Transaction to Protect Itself, All Fortis Affiliates, and All Fortis Employees ..................................................................... 51

3.   Fortis Negotiated Special "Claw-Back" Obligations in the Event of a Bankruptcy ..................................................................... 52

166-120    02/22/19    06/15/22    06/17/22 09:46:24
5    7/22    Amended
Complaint

Pg 4 of 109

TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| 4. | Fortis Fund Bank Obtained Priority Redemption Rights in the Event Madoff Was Investigated for Securities Laws Violations Including Fraud | | 53 |
| X. | FORTIS' SPECIAL CONTRACT RIGHTS AND BUILT IN PROTECTIONS ENABLED DEFENDANTS TO RECOVER PROPORTIONATELY MORE OF THEIR LOSSES THAN OTHER TREMONT INVESTORS. | | 55 |
| XI. | AT THE TIME IT ENTERED INTO THE SWAP TRANSACTION, FORTIS WAS IN A FINANCIAL CRISIS, AND HAD A HEIGHTENED RISK TOLERANCE | | 57 |
| XII. | FORTIS' WILLFUL BLINDNESS TO THE HIGH PROBABILITY OF FRAUD AND INSOLVENCY AT BLMIS IS PROPERLY IMPUTED TO DEFENDANTS | | 57 |
| | Fortis Marketed Its Entities as One Institution, Its Employees Acted as One Institution, and the Entities Had One Central Management | | 57 |
| | Fortis Employees from Various Affiliates Worked As Agents of Defendants to Set Up and Execute the BLMIS Feeder Fund Related Transactions and Shared Their Knowledge and Concerns About BLMIS | 60 | |
| | 1. | Employees from Multiple Fortis Affiliates Worked Together To Fulfill Administrator Duties for Harley and Shared Their Concerns About BLMIS | 61 |
| | 2. | Employees from Multiple Fortis Affiliates, Including Those Who Previously Expressed Concerns About BLMIS, Worked Together To Negotiate and Approve the Swap Transaction | 62 |
| | 3. | Fortis Entered Into The Swap Transaction Despite Awareness of Fortis Multi-Management's Interactions With Tremont-Related Entities | 63 |
| XIII. | THE TRANSFERS | | 64 |
| | The Initial Transfers | | 65 |
| | 1. | Broad Market Fund Initial Transfers | 65 |
| | 2. | Prime Fund Initial Transfers | 65 |
| | Rye XL Fund Receives Subsequent Transfers From Both Prime Fund and Broad Market Fund | 66 | |
| | 1. | Subsequent Transfers from Broad Market Fund To Rye XL Fund | 66 |
| | 2. | Subsequent Transfers from Prime Fund To Rye XL Fund | 66 |

10-03789-cgm    Doc 22445   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
166-1   20      02/22/19   Pg 6 of 145   06/17/22 09:46:24
5       7/22    Pg 5 of 109
Amended
Complaint

Pg 5 of 109

**Page**

Subsequent Transfers Received by Defendants .................................................. 67

TABLE OF CONTENTS

1.   Subsequent Transfer Received by Fortis Fund Bank and/or Fortis
     Fund Services By Virtue of Redeeming Its Proprietary Hedge ................... 67

2.   Subsequent Transfers Received By Defendant Fortis Fund Bank By
     Virtue of Broad Market XL Fund Increasing the Size of the Swap
     Transaction ...................................................................................................... 68

Summary of Transfers ..................................................................................... 69

XIV.  THE AVOIDANCE OF THE INITIAL TRANSFERS FROM BLMIS TO
      TREMONT ............................................................................................................ 70

Tremont's Senior Executives Had a Close Relationship With Madoff ............. 71

Tremont Saw and Understood Information Evidencing Madoff Was Engaged in a
Fraud 72

1.   Tremont Received Repeated, Direct Fraud Warnings About Madoff ........... 72

2.   Tremont's Own Reporting Showed that BLMIS Trades Were
     Impossible ....................................................................................................... 75

Tremont Exempted BLMIS From Its High Due Diligence Standards,
Prevented Third Parties From Conducting Their Own Due Diligence and
Fabricated Stories About BLMIS      77

1.   Tremont Consistently Excluded Madoff from its Due Diligence
     Practices ........................................................................................................... 77

2.   BLMIS Failed Tremont's Requirements for Third-Party Oversight yet
     Tremont Made an Exception for Madoff ........................................................ 78

3.   Tremont Consistently Shielded Madoff from Third Parties ......................... 80

4.   Tremont Avoided Questions and Fabricated Answers about BLMIS's
     Purported Options Trading ............................................................................. 81

5.   Divergent Answers on Over-the-Counter/Listed Trading Questions ........... 81

6.   Failure to conduct any diligence on purported options counterparties and
     covering up the truth with fabrications      82

Tremont's Executives Had a Powerful Motive to Hide What They Knew About
BLMIS and Madoff  85

Tremont Co-Managed Kingate Global .............................................................. 86

**Page**

OUNT ONE: RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a)
AND 550(a)     86

OUNT TWO: RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a)
AND 550(a)     86

**TABLE OF CONTENTS**

10-05386-smb   Doc 244   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Main Document
166-1   20      02/22/19   06/17/22   Pg 8 of 145   06/17/22 09:46:24
5            7/22
Second
Amended
Complaint
Pg 7 of
109   96

Irving H. Picard (the **"Trustee"**), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("**BLMIS**"), and the substantively consolidated estate of Bernard L.

Madoff ("**Madoff**"), individually, under the Securities Investor Protection Act ("**SIPA**"), 15

U.S.C. §§ 78aaa–*lll*, as and for this Second Amended Complaint against ABN AMRO Bank

(Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions (Ireland) Ltd.) (n/k/a ABN AMRO Retained

Custodial Services (Ireland) Limited) ("**Fortis Fund Bank**") and ABN AMRO Custodial

Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.)

("**Fortis Fund Services**," and together with Fortis Fund Bank, the "**Defendants**"), alleges as

follows.

## I.  NATURE OF THE ACTION

1.  This adversary proceeding is part of the Trustee's efforts to recover BLMIS

"**customer property**," as defined by SIPA § 78*lll*(4) that was stolen as part of the massive Ponzi

scheme Madoff perpetrated through BLMIS's investment advisory business (the "**IA Business**").

2.  Through this action, the Trustee seeks to recover $265,500,000 in subsequent

transfers ("**Subsequent Transfers**") that Defendants received from Rye Select Broad Market

Fund

L.P. ("**Broad Market Fund**") by redeeming shares they owned or partnership interests they held

in Broad Market Fund; and from Rye Select Broad Market XL Fund ("**Rye XL Fund**"),[1] both of

---

[1] The Trustee reserves the right to amend this Proposed Second Amended Complaint to pursue the claims dismissed by the Extraterritoriality Decision should that decision be overturned in whole or relevant part by the Trustee's pending appeal. *See Sec. Investor Prot. Corp. v. BLMIS (In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) (dismissing transfers Defendants received from Kingate Global Fund Limited on the basis of international comity); *see also In re Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Inv. Secs. LLC*, No. 17-02292, ECF Nos. 496, 497 (2d Cir. Jan. 10, 2018).

10-05386-smb    Doc 166-120    Filed 02/22/19    Entered 02/22/19 06:54:55    Exhibit A
Amended Complaint    Pg 8 of 10906

which were operated by Tremont Partners, Inc. ("**Tremont**"). Tremont's funds were among
several investment funds that invested all or substantially all of their assets with BLMIS's IA
Business ("**BLMIS Feeder Funds**"). Defendant received the Subsequent Transfers at issue in

1

connection with a swap transaction with Second Fund and a related redemption of their equity

interests in Broad Market Fund (the "**Swap Transaction**").

3.      Defendants were part of a global financial institution with employees, entities and

business groups who worked together as one unified entity ("**Fortis**") to provide services to

clients

1

worldwide including, among other things, financing, hedge fund services, and asset management services.

4.     Years before Fortis Fund Bank entered into the transactions at issue, employees from across various Fortis affiliates worked together to carry out multiple profitable transactions involving BLMIS. As a result of these transactions, Fortis was well-positioned to learn as much information as possible about BLMIS's purported trading strategy, trading, and custody operations. Since at least 2003, Fortis employees from various affiliates recognized there was a high probability that BLMIS might be defrauding its customers, and that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customer's assets. Rather than confirming its various employees' suspicions about BLMIS, Fortis turned a blind eye to the potential fraud at BLMIS to continue profiting from Madoff-related transactions where Fortis perceived it could minimize or shift the risk of loss away from Fortis.

5.     Since the 1990s, a Fortis affiliate, Fortis Prime Fund Solutions (Bahamas) Limited ("**Fortis Fund Bahamas**") officially contracted to provide administrator services to Harley International (Cayman) Ltd. ("**Harley**"), another BLMIS Feeder Fund. Notwithstanding that the agreements for those services were officially between Fortis Fund Bahamas and Harley, Fortis employees from various Fortis entities participated in providing those administrator services to Harley.

6.      Because Madoff served as Harley's investment advisor, broker-dealer and custodian, Fortis employees regularly communicated directly with BLMIS and its employees about Harley's investment account.

7.      By 2003, Fortis employees had become increasingly concerned about their inability to obtain independent verification to confirm Madoff's trades or that he in fact had in his

possession the cash and securities reported on Harley's customer statements. Internally, employees dubbed this problem the "Madoff issue."

8.      At the time, Bahamian law governed both Harley and Fortis Fund Bahamas. Fortis employees recognized that under that law, Fortis Fund Bahamas as administrator was responsible for the acts of Harley's custodian, BLMIS. As such, Fortis employees acknowledged that Fortis Fund Bahamas had a duty to verify Madoff's trades and custody of Harley's assets. Without verification, employees warned that Fortis had to be "very careful" in how it proceeded, because Fortis Fund Bahamas could be responsible for any misconduct Madoff might commit that could harm the Harley fund.

9.      Fortis employees escalated their concerns about BLMIS to senior management and internal bank committees, urging action to reduce or eliminate any liability to Fortis in case their concerns about Madoff turned out to be warranted. Specifically, employees insisted that Fortis should not provide financing to investors who planned to invest the funds with Madoff unless Fortis could get some form of assurance from BLMIS concerning Madoff's trades and custody of customer assets. Employees also urged that Fortis should insist that BLMIS be replaced as Harley's custodian.

10.     Fortis Fund Bahamas never received acceptable assurances from BLMIS. And despite the fact that employees understood Fortis Fund Bahamas had a duty under Bahamian law

to independently verify Madoff's trades and custody of Harley's assets or else face legal

responsibility for any fraud by BLMIS, Fortis took no further steps to seek that verification.

Instead, Fortis sought to eliminate that legal duty by taking the extraordinary step of moving the

legal jurisdiction of Fortis Fund Bahamas as well as the Harley fund itself out of the Bahamas to

the Cayman Islands – where the laws did not impose legal responsibility on Fortis for Madoff's acts as custodian.

11.     This highly irregular, affirmative action by Fortis not only demonstrates the high degree of probability of fraud at BLMIS that Fortis employees saw, it demonstrates Fortis' willful blindness where it perceived the risk of loss to Fortis could be shifted or minimized.

12.     Also prior to the Swap Transaction, Fortis' asset management arm Fortis Multi-Management Investments ("**Fortis Multi-Management**") became aware of additional facts which heightened the probability that Madoff might be engaging in fraud.

13.     Fortis Multi-Management's predecessor had in 2001 selected Tremont's Madoff Feeder Funds to manage tens of millions of dollars of Fortis customers' investments, aware that Madoff was ultimately the funds' investment manager, broker dealer, and custodian.

14.     In May 2006, Fortis Multi-Management informed Tremont it had been internally discussing its investments with Madoff "at length," "especially the opaque structure/process" surrounding BLMIS, and requested a meeting with both Tremont and BLMIS personnel. Tremont could not get Madoff to agree to meet with Fortis Multi-Management, and so a meeting was held just between Tremont and Fortis Multi-Management to discuss BLMIS. After that meeting, Tremont reported that Fortis Multi-Management executives were "nervous" about Madoff, reporting their "apprehensions" back to the head of Fortis Multi-Management. Tremont personnel

stated that they needed to get Fortis Multi-Management "comfortable with Madoff" or they could lose their $70 million investment and the accompanying management fee.

      15.      Throughout the summer and fall of 2006, Fortis Multi-Management continued to ask Tremont detailed due diligence questions about BLMIS's operations. Fortis Multi-Management came to learn that, not only did Tremont not have a full diligence report on BLMIS,

but in fact, Tremont personnel did not appear to possess even minimal information about the logistics of Madoff's trades and operations, or material terms of its own options trades.

16.     Dissatisfied with Tremont's inability to answer its questions about BLMIS, by October 2006, Fortis Multi-Management informed Tremont that it would not be making an allocation into Tremont's new leveraged fund. Subsequently, Fortis Multi-Management withdrew the entirety of its existing investment in Tremont's BLMIS Feeder Funds after its own concerns about Madoff were echoed by a new business partner Fortis acquired in November 2006, Cadogan Management ("**Cadogan**"). Cadogan had independently identified red flags at BLMIS that led it to be "highly skeptical" of Madoff to the point that it had a policy against investing any customer assets in Madoff Feeder Funds. Cadogan brought that policy with it to Fortis Multi-Management, and it was later confirmed that both Fortis Multi-Management and Cadogan had collectively decided that Fortis Multi-Management had to fully redeem its investments with Tremont's BLMIS Feeder Funds because of their mutual concerns about BLMIS.

17.     Because Fortis Multi-Management had selected Madoff (through Tremont) to manage its customers' investments, it had a duty of care in making that selection; it could not eliminate liability to its investors should concerns about the risk of fraud at BLMIS be realized. Fortis Multi-Management redeemed its entire investment.

18.     Thus, before Fortis Fund Bank entered into the Swap Transaction in 2007, Fortis was already aware of the high risk of fraud at BLMIS from its prior experiences involving Harley and Tremont, as well as from the warnings of its new business partner, Cadogan. Fortis claimed in marketing materials and public filings that all of its entities and affiliates "Act as One" company, and that its "global risk management framework" was specifically designed to "facilitate the communication of risk-related actions throughout Fortis." That global risk management framework

included a "global risk database" and a hierarchy of credit and risk committees that worked together to evaluate the potential transactions of every Fortis affiliate and business group. Accordingly, the potential risks of fraud at BLMIS previously identified by Fortis employees and affiliates were communicated and discussed as part of Fortis' internal procedures, including the global risk management evaluation of the potential Swap Transaction.

19.     Furthermore, the Fortis employees involved in negotiating and procuring approval for the Swap Transaction were some of the same employees who had years earlier warned Fortis management against Madoff transactions, and who had been instrumental in causing Fortis to move Harley's legal jurisdiction to avoid potential liability for any malfeasance by Madoff.

20.     The probability of fraud at BLMIS was heightened when, in the course of conducting diligence on the Swap Transaction, Fortis employees began reporting information about Madoff's options trades that contradicted what BLMIS itself told Fortis years earlier, as well as what Tremont was contemporaneously telling Fortis Fund Bank and other investors, including Fortis Multi-Management.

21.     Already aware of the high probability of fraud at BLMIS, Fortis employees now knew that the story about where Madoff traded options for his customers was shifting and contradicted what BLMIS itself told Fortis years earlier, and what Tremont was

contemporaneously telling Fortis and other investors. Rather than inquiring about the inconsistencies and verifying where the options trades took place, Fortis chose to blind itself to the high probability of fraud at BLMIS and entered into the Swap Transaction, hedging its obligations by investing in Broad Market Fund – but not before first obtaining certain special rights and built- in protections that would minimize Defendants' losses if BLMIS were in fact engaging in fraud.

22.    The special rights and built-in protection Fortis obtained in the Swap Transaction included: collateral rights to cash that ensured that one-third of any funds Fortis Fund Bank exposed to Madoff would be Tremont's funds and not Fortis'; an indemnification provision covering liability and attorneys' fees should Fortis, or any of its affiliates or employees become involved in any investigation or lawsuit arising out of the Swap Transaction or its investment in Broad Market Fund; and a prescient "Claw-back Obligation," requiring Tremont to reimburse Fortis for any liability it may incur as a result of an action brought under insolvency law. Fortis also came to enjoy the special right to early redemption of its investments in Broad Market Fund ahead of other investors in the very specific event that Madoff should come under investigation for breach of securities laws or regulations. These special protections Fortis obtained in the Swap Transaction were not enjoyed by most individual Tremont investors.

23.    At the time it entered into the Swap Transaction in 2007, Fortis was not simply a global financial institution — it was a global financial institution in serious financial crisis. In a subsequent class action lawsuit against Fortis, shareholders alleged that at the time, the Fortis organization, its executives and directors had misled investors and failed to disclose material information about the dire financial condition of the bank. The shareholder plaintiffs further alleged that prior to its collapse, Fortis falsely minimized the high level of risk to which Fortis had exposed itself, to bolster the appearance of stability and profitability. That lawsuit and other

related suits against Fortis and its executives reportedly settled on a global basis for $1.3 billion in 2016.

24.    At the time Defendants received the Subsequent Transfers, it appears that Fortis' global risk-benefit decision making process tolerated a far higher degree of risk than it was willing to admit.

## II.     JURISDICTION AND VENUE

25.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "**SIPA Proceeding**"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "**District Court Proceeding**") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

26.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

27.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

28.      This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 544(b), 548, 550(a) and 551, and other applicable law.

29.      Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly investing and receiving funds through Tremont's New York-based Broad Market Fund and Rye XL Fund, both of which were formed under the laws of

Delaware and had a principal place of business in Rye, New York. Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

30.     The documents governing the Swap Transaction contained a New York choice of law provision, through which Fortis Fund Bank also irrevocably and explicitly agreed to the "non-

exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City." Fortis Fund Bank further "waive[d] any objection . . . to the laying of venue . . . and further waive[d] the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party." Additionally, as part of the Swap Transaction, Defendant Fortis Fund Services entered into a subscription agreement with Broad Market Fund to purchase shares on behalf of Defendant Fortis Fund Bank. Pursuant to the subscription agreement, Defendants explicitly agreed to submit to New York jurisdiction. Defendant Fortis Fund Services submitted redemption requests to Broad Market Fund on behalf of Defendant Fortis Fund Bank.

31.     Defendants received the Subsequent Transfers of BLMIS customer property from Broad Market Fund and Rye XL Fund into Defendant Fortis Fund Bank's New York bank account.

32.     BLMIS was a New York-based broker-dealer registered with the U.S. Securities and Exchange Commission ("**SEC**"). Defendants knew that BLMIS purported to generate its outsized returns by investing in U.S.-regulated entities in the Standard & Poor's 100 Index ("**S&P 100 Index**") that were listed on the New York Stock Exchange, and in other U.S. securities. Defendants knew BLMIS was subject to U.S. securities law and regulations and took steps to protect its investment if BLMIS were to be investigated or convicted for violations thereof.

33.     Additionally, at all relevant times, Defendants maintained significant business operations in New York. For example, Defendants' employees met with representatives of Tremont and BLMIS in New York to conduct due diligence on BLMIS, Tremont feeder funds and Harley. At all relevant times, Defendants worked closely and acted through Fortis' New York entities, Fortis Financial Services LLC and Fortis Prime Fund Solutions USA ("**Fortis Fund**

USA"). Defendants authorized and directed Fortis Fund USA to conduct due diligence, negotiate transactions, and act on their behalf.

34.     After Madoff's arrest, Defendant Fortis Fund Bank filed claims against certain of Tremont's Madoff Feeder Funds to recover its transfers to those funds in a consolidated class action in District Court commenced by Tremont investors involving the various Tremont funds, *In re Tremont Sec. Law, State Law and Ins. Litig.*, No. 1:08-cv-11117-TPG (S.D.N.Y.) (the "**Tremont Class Action**").

## III.     BACKGROUND, THE TRUSTEE AND STANDING

35.     On December 11, 2008 (the "**Filing Date**"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

36.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("**SIPC**"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

37.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS

pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

38.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

39.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

40.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

*41.*    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

*42.*    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded

guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

43.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

44.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

45.     In accordance with SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

46.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers

under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and

78fff- 2(c)(3).

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

<u>BLMIS</u>

47.    Madoff founded BLMIS in or about 1960 as a sole proprietorship. In 2001, Madoff registered BLMIS as a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as a sole member, and thereafter as its chairman and chief executive.

48.    In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008. On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date. SIPC membership is contingent on registration of the broker-dealer with the SEC.

49.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

50.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC,

which forced Madoff to register.

51.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

52.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total assets under management of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management. At all times, BLMIS's Form ADVs were publicly available.

The Ponzi Scheme

53.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

54.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus

required fraudulent infusions of cash from the IA Business to continue operating.

55.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed
Friehling & Horowitz, CPA, P.C. as its auditor, which accepted BLMIS's fraudulently reported
trading revenues and/or commissions on its financial statements and other regulatory reports that
BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall
in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA,
one employee was an administrative assistant, and one was a semi-retired accountant living in
Florida.

56.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling
& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for
Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these
fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1.    Madoff's Investment Strategy

57.    BLMIS purported to execute two primary investment strategies for IA Business
customers: the convertible arbitrage strategy and the split strike conversion strategy ("**SSC
strategy**"). For a limited group of IA Business customers, primarily consisting of Madoff's close
friends and their families, Madoff also purportedly purchased securities that were held for a
certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no
legitimate business operations using any of these strategies.

58.    The convertible arbitrage investment strategy was supposed to generate profits by
taking advantage of the pricing mismatches that can occur between the equity and bond/preferred
equity markets. Investors were told they would gain profits from a change in the expectations for
the stock or convertible security over time. In the 1970s this strategy represented a significant

portion of the total IA Business accounts, but by the early 1990s the strategy was

purportedly used in only a small percentage of IA Business accounts.

59.     From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

60.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

61.     The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the **"Basket"**) intended to highly correlate to the S&P 100 Index, (ii) the purchase of out- of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

62.     The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option would entail a loss for BLMIS.

63.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

64.     The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar." The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

65. For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket. For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

66. Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

67. Sophisticated or professional investors, including the Defendants knew that Madoff could not be using the SSC strategy because his returns drastically outperformed the market. Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also post gains that exceeded (at times, significantly) the S&P 100 Index's performance. Such results were impossible if BLMIS had actually been implementing the SSC strategy.

### 2. BLMIS's Fee Structure

68. BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management, but by using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.    BLMIS's Market Timing

69.    Madoff also lied to customers when he told them that he carefully timed securities

purchases and sales to maximize value. Madoff explained that he achieved market timing by

intermittently taking customer funds out of the market. During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury securities ("**Treasury Bills**") or mutual funds invested in Treasury Bills.

70.     BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including the Defendants, could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

71.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time. Yet this is precisely what BLMIS's customer statements reported.

72.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

73.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which

BLMIS could

have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

74.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("**OCC**"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### 4.    *The Collapse of the Ponzi Scheme*

75.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

76.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

77.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    DEFENDANTS AND RELEVANT NON-DEFENDANTS

### The Fortis Affiliates Worked Together as One Global Entity

78.    Defendant Fortis Fund Bank is a company incorporated in 2003 with its principal place of business at Fortis House Park Lane, Spencer Dock, Dublin, Ireland. On July 5, 2010, "Fortis Prime Fund Solutions Bank (Ireland) Limited" changed its name to "ABN AMRO Bank (Ireland) Limited" and now operates as a subsidiary of ABN AMRO Bank N.V.

79.    Defendant Fortis Fund Services is a company incorporated in 1995 with its principal place of business at Fortis House Park Lane, Spencer Dock, Dublin, Ireland. On July 5,

2010, "Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd" changed its name

to "ABN

AMRO Custodial Services (Ireland) Ltd." Fortis Fund Services also operates as a subsidiary of ABN AMRO Bank N.V.

80.     Defendants are part of Fortis, a global financial institution whose numerous employees, entities and business groups worked together to provide a menu of banking services to Fortis' clients worldwide.

81.     In 1997, Fortis purchased MeesPierson N.V., a Netherlands based investment bank with offices all over the world, from ABN AMRO. Although MeesPierson N.V. became a wholly owned subsidiary of Fortis Bank SA/N.V., the entities continued to operate under the MeesPierson name for several years.

82.     In 2000, Fortis began to bring the MeesPierson entities under the Fortis name. Defendants, who were then both under the MeesPierson name, were rebranded as Fortis entities. In 2004, as part of the global institution transition to Fortis Fund Solutions, Defendants rebranded as Fortis Prime Fund Solutions Bank (Ireland) Limited and Fortis Prime Fund Solutions Custodial Service (Ireland) Limited.

83.     In 2005, Fortis formally unified all of its onshore and offshore fund service entities, including Defendants, which had already been working together for years, under the umbrella of Fortis Fund Solutions. Fortis formalized the coordination of its services, announcing that it "bundled all Fortis' fund services—both onshore and offshore—to form a single unit called Prime Fund Solutions" that offered the fund industry "a combination of administration, custody, banking and financial capabilities." Fortis marketed Fortis Fund Solutions as a "one stop shop" to "limit the amount of service providers with which [clients] must liaise to **one—Fortis**." (emphasis added).

08-01789-cgm   Doc 22449-1   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb          02/22/1900 07:48:36-145 06/17/22 09:46:24

Doc
166-120
5

Second
Amended
Complaint

Pg 47 of
10996

84.     Fortis also began to rebrand the MeesPierson entities and businesses in other branches of the bank. In 2006, MeesPierson's investment in Tremont's Broad Market Fund was consolidated into Fortis Multi-Management.

85.     As described more fully below, regardless of which Fortis affiliate was officially the party to a particular transaction involving BLMIS, employees across various Fortis affiliates worked together as one business to carry out those transactions.

                    Tremont-Related Entities

86.     Non-party Tremont Partners, Inc. (previously defined as "**Tremont**") is a Connecticut corporation with its principal place of business at 555 Theodore Fremd Avenue, Rye, New York 10580. Tremont is the asset management arm of Tremont Group Holdings, Inc. Tremont is an investment adviser registered with the SEC under the Investment Advisers Act of 1940.

87.     Tremont managed and controlled all of the Tremont feeder funds. At all relevant times, the funds were dominated and controlled by Tremont, which managed each of the funds' day-to-day operations, investment management and decision-making from its principal place of business in Rye, New York.

88.     Non-party Rye Select Broad Market Prime Fund, L.P. ("**Prime Fund**"), is a Delaware limited partnership organized in May 1997. Prime Fund had a direct account with BLMIS that opened in 1997, with account number 1C1260.

89.     Non-party Broad Market Fund is a Delaware limited partnership organized in May 1994. It maintained a direct account with BLMIS, which opened in 1994 with account number 1T0027. Broad Market Fund used a New York bank account at the Bank of New York to make the transfers identified in this Complaint.

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
Doc 166-120   02/22/1900   Pg 49 of 145   06/17/22 09:46:24
5-smb   Second
166-120   Amended
5   Complaint
Pg 48 of
10996

90.     Non-party Rye XL Fund is a Delaware limited partnership formed on July 13,
2006, whose goal was to provide investors with returns equal to approximately three times those
of Broad Market Fund. Rye XL Fund used a New York bank account at the Bank of New York
to make transfers identified in this Complaint.

## VI.   IN 2003, FORTIS EMPLOYEES CAUSED FORTIS FUND BAHAMAS AND HARLEY TO MOVE LEGAL JURISDICTIONS TO ESCAPE LIABILITY IF MADOFF WAS A FRAUD

### As Harley's Administrator, Fortis Employees Worked Directly with BLMIS, Which Was Harley's Investment Manager, Broker Dealer and Custodian

91.     Since at least the mid-1990s, Fortis employees, working collectively across
various Fortis affiliates, provided a number of services to the hedge fund industry, including
administrator and custodian services, as well as financing.

92.     When Harley was formed in 1996, Fortis Fund Bahamas entered into an
agreement to serve as the fund's administrator. As Harley's administrator, Fortis Fund Bahamas
was responsible for many day-to-day administrative duties on behalf of Harley, including among
others: effecting redemptions; computing the net asset value of the fund ("**NAV**"); account
maintenance; distributions; answering the questions of the auditors; and conducting due
diligence on behalf of the fund.

93.     While Fortis Fund Bahamas served as Harley's administrator, BLMIS served
Harley in the triple role of investment advisor, broker-dealer and custodian.

94.     Fortis Fund Bahamas' employees did not perform the administrator's duties for
Harley alone. Rather, Harley's administration tasks were performed in concert by employees
from multiple Fortis entities, including Defendants, Fortis Fund Bahamas, and Fortis Fund
Solutions entities in the Cayman Islands, Isle of Man, U.S. and Defendants' parent, Fortis Bank
N.V.

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb        02/22/1900 09:50:04   Pg 50 of 145   06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 49 of
10996

95.     Employees from these Fortis entities worked collaboratively on behalf of Fortis

Fund Bahamas, communicating directly with BLMIS employees and meeting with Madoff and

employees at BLMIS's offices in New York from at least 2001 through 2008.

96.     The Fortis employees who provided these hedge fund services to Harley and other

funds were sophisticated financial industry professionals. Their internal communications indicate

their awareness of the unique nature of BLMIS's structure as an investment fund: specifically,

that unlike just about any other fund at the time, there was not a single independent party

involved anywhere in the chain of services BLMIS was purportedly providing for customers.

While the securities industry occasionally saw a financial institution serving in dual roles (such

as serving both an investment adviser and a broker, or a broker/dealer and a self-custodian), it

was unusual, if not unique to BLMIS, that all three roles of investment adviser, broker/dealer and

custodian were fulfilled by the same entity.

97.     By 2003, Fortis employees had become substantially concerned about their

inability to independently verify whether BLMIS had custody of Harley's assets and whether it

was actually engaging in the trades that appeared on Harley's customer statements. Fortis

employees internally identified questions for Madoff and his employees about BLMIS's

investment strategy, trade executions, trade processing, how BLMIS cleared its securities

transactions, and how BLMIS custodied investors' cash. As discussed below, to the extent Fortis

posed these questions to BLMIS, the answers Madoff and his employees gave were evasive,

uninformative, and most notably, contained not a single shred of fact-based detail that could

enable Fortis to actually verify BLMIS's trades and custody of customer assets.

08-01789-cgm Doc 22449 Filed 10/18/22 Entered 10/18/22 20:09:56 Exhibit 1
5-smb 02/22/1900 79:51:39:145 06/17/22 09:46:24
Doc
166-120
5
Pg 50 of
10596

In 2003 Fortis Employees Were Aware That Under Applicable Bahamian Law
Fortis Fund Bahamas Was Responsible For Verifying the Legitimacy of BLMIS

98. Harley and Fortis Fund Bahamas were both domiciled in the Bahamas and were subject to Bahamian investment regulations and the authority of the Securities Commission of the Bahamas.

99. In 2003, Fortis employees knew that the Bahamas had passed stricter regulations governing the administration of investment funds, the Investment Funds Act and the Investment Funds Regulations. Among other things, these Bahamian laws required administrators such as Fortis Fund Bahamas to verify that all of a fund's service providers – including the fund's custodian – were "fit and proper."

100. The regulations also imposed on administrators such as Fortis Fund Bahamas ongoing obligations to report, in writing, to the Bahamas Securities Commission if it "knows or has reason to believe" that "an investment fund …. (c) is carrying on business in a manner that is or is likely to be prejudicial to investors or creditors of the investment fund."

101. Under the foregoing regulations, Fortis Fund Bahamas was obligated to report to the Bahamas Securities Commission if it even had **suspicions** that Harley's custodian – Madoff – was improperly carrying out his duties on behalf of the fund.

102. Violations of the Bahamian Investment Funds Act and Investment Funds Regulations were punishable by censure, fine, disgorgement of profits or unjust enrichment, restitution, court order, and suspension, revocation or reclassification of the administrator's license.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900 Pg 52 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 51 of
10596

Fortis Employees Acknowledged That Fortis Fund Bahamas Was At Risk Under
Bahamian Law Because They Could Not Independently Verify BLMIS's Trades
or Custody of Harley's Assets

103.    Against the backdrop of the new Bahamian regulations, in July 2003, a Fortis
executive, Sue Novo (COO of Fortis Fund Solutions, Managing Director of Fortis Fund Isle of
Man), wrote an email to Brenda Buckley (the Global Head of Financing and Risk at Fortis Funds
worldwide and Managing Director of Defendant Fortis Fund Bank) about concerns that Buckley
had raised about BLMIS that appeared to question what steps Fortis should take as Harley's
administrator given Madoff's unique setup that created the capacity for fraud. Novo wrote to
Buckley: "You have quite rightly raised the issue of broker dealer accounts [BLMIS] and how
[Fortis] can work with them within our principles." Novo told Buckley that she believed Fortis
could continue to provide administrator services to Harley, but in order to do so, she indicated
Fortis needed greater visibility into BLMIS's trading and custody operations. Novo wrote "we
probably should be trade blotter matching and also we need to consider the 'control' of the assets
with regard to segregation versus pooled accounts, restrictions on money movement/transfers,
Insurance cover for the assets should the broker go bust, in particular if we have a lien/charge
over them."

104.    Novo's email identified that Fortis Fund Bahamas did not have any visibility into
how Madoff actually purported to segregate customer assets. Her email revealed her concern that
Fortis could face exposure under Bahamian laws if BLMIS was not in fact segregating its
customer's assets as it claimed to be doing. In the event BLMIS became the subject of
bankruptcy or another legal proceeding, BLMIS creditors or others third parties could potentially
attach Harley's assets to satisfy their own claims.

Pg 53 of 145
Second
Amended
Complaint
Pg 52 of
10996

105.    In that same email, Novo warned however that Fortis, as Harley's administrator, was responsible under Bahamian law for, among other things, any misconduct by the Fund's custodian, Madoff:

> All in all if these Funds [Harley and other BLMIS feeder funds] still fall under Bahamas securities commission for the present, then irrespective of anything else we need to be very careful, in that the responsibilities of the Administrator are very onerous, with somewhat of an overall responsibility for the Fund, responsibility to the investors, responsibility for the actions of the Directors and I believe in the latest legislation, responsibility for Custodian [BLMIS].

106.    In follow-up emails to Buckley later that day, Novo pointed out further details about which Fortis lacked any visibility into BLMIS's operations. Novo identified that Fortis employees could not independently verify prices of BLMIS's "over the counter" option trades. She also noted that while Fortis Fund Bahamas prepared the monthly NAV for Harley based on information provided by BLMIS on customer statements, BLMIS itself did not sign off on the NAV. Implicit in her email was the fact that Fortis Fund Bahamas was relying completely on BLMIS's representations as to what assets it actually held for Harley and for computing the current value of their worth. Novo further confirmed that she continued to have concerns about what happens to Harley's investments, "in particular if anything happens to the broker [BLMIS]. We should also have confirmation as to how the Harley assets are held with the broker eg. Segregated/pooled account and my comment below viz insurance is probably also valid as well."

107.    This email exchange was circulated to numerous other Fortis employees, including Rhonda Eldridge (Managing Director of Fortis Funds Group; Director of Fortis Funds Bahamas and Fortis USA; member of Fortis internal credit committees) in New York.

108.    The next day on July 24, 2003, Eldridge sent a letter directly to BLMIS formally requesting that BLMIS confirm to Fortis Fund Bahamas that it acted as agent for Harley, and that

26

10-05352-smb   Doc 166-120   Filed 02/22/19   Entered 07/54 of 445   06/17/22 09:46:24
Second
Amended
Complaint
Pg 53 of
10996

Harley's funds were "segregated" from BLMIS's own assets or other customers' assets. Fortis Fund Bahamas also requested that BLMIS provide a "SAS 70 Report" – which at the time, was an industry standard audit report that was prepared by service providers such as broker dealers and custodians with respect to what controls they had in place to, among other things, protect its customers' securities from fraud.

109.    One week later, BLMIS employee Frank DiPascali sent a letter in response to Eldridge's requests that contained only the empty assurance that "all security positions held are segregated for the exclusive benefit of Harley International Limited." DiPascali's response contained no other detailed information about BLMIS's trading or custody operations that would enable Fortis Fund Bahamas to independently verify that Harley's assets were actually segregated from BLMIS's funds or those of other customers.

<u>Instead of Pursuing Independent Verification of BLMIS's Trades And Custody of Assets, Fortis Sought To Eliminate its Legal Duty to Do So by Changing Legal Jurisdictions</u>

110.    In an email chain dated between August 29 and September 1, 2003, Eldridge, Buckley and other Fortis employees confirmed that DiPascali's response to their requests did not provide the assurances and information Fortis employees required in order to independently verify BLMIS's trades and custody of Harley's assets. These employees also discussed at length Fortis' options going forward with respect to Harley if they ultimately did not receive the necessary assurances from BLMIS.

111.    Another Fortis employee, Roger Hanson (Regional Manager of Prime Fund Solutions for North America and Caribbean), wrote to Buckley on August 29, 2003 that it was his view that, in light of the fact that Fortis could not obtain information from Madoff that would enable it to verify Madoff's trades and custody of Harley's assets, Fortis should seek to "change"

08-01789-cgm   Doc 22449-1   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
1:08-13739   Doc 22445-smb   Filed 02/22/19   06/17/22 09:46:24   Main Document
Pg 55 of 145
Doc 166-120
5
Second Amended Complaint
Pg 54 of
109 96

the formal administrator of Harley from Fortis Fund Bahamas to Fortis Prime Fund Solutions

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb       02/22/1900 Pg 55 of 145  06/17/22 09:46:24
Doc
166-120
5

Pg 55 of
10996

Second
Amended
Complaint

(Cayman) Limited ("**Fortis Fund Cayman**"). He noted that changing jurisdictions of the administrator would require Fortis Fund Bahamas to first obtain the consent of a Harley investor who had made a loan to the fund.

112. Hanson continued to list the options available to Fortis under the circumstances. One option was to have Defendants' parent company, Fortis Bank N.V., lend money to the Harley investor to repay the pre-existing loans to facilitate the change in legal jurisdictions. But if the jurisdiction change could not be accomplished in this manner, Hanson forcefully stated that Fortis Fund Bahamas had to resign as Harley's administrator:

> Finally, someone in Head Office needs to confirm that Fortis N.V. is satisfied that we can lend money to [redacted] who in turn invest in Harley which is managed by a broker dealer [BLMIS] with no independent custodian. If this is not forthcoming then we need not take any further action other than to see if we can get the admin transferred without making the promises to [redacted]. If that is not possible we will have no alternative than to resign from the engagement.

113. Buckley responded to Hanson in an email dated September 1, 2003. Her email confirmed that no one at Fortis had obtained the information Fortis Fund Bahamas needed from Madoff to independently reconcile the purported trades on Harley's customer statements. Buckley also indicated that, under those circumstances, she agreed with Hanson that Fortis had no choice but to seek to change the administrator's jurisdiction away from the Bahamas.

114. But Buckley insisted that Fortis Bank N.V. should not lend any of its **own** money to Harley's investor in order to facilitate the jurisdiction change because Fortis could not actually confirm BLMIS's trades or custody of Harley's assets:

> I am still extremely uncomfortable with giving financing to [Redacted] and now possibly [redacted] given their investment in Harley and the broker dealer relationship with Madoff. Before this option can be considered further we will need some assurance of how the front and back office are separated in Madoff and if two separate streams of trade information can be provided, that will

28

08-01789-smb    Doc 166-120    02/22/1900    Second Amended Complaint    Pg 57 of 145    06/17/22 09:46:24    Exhibit 1
5    5    10996

allow independent reconciliation of trades in Harley. Without this,
I do not support financing by Fortis to [Redacted].

115.    In her email, Buckley noted that she had reported her concerns to senior

management personnel and other members of Fortis' Investment Bank Credit Committee. She

also wrote that:

> [I]f financing is to be considered seriously then I think he should
> be asked to put pressure on Madoff to give the assurances we need
> or else appoint another custodian to Harley. I would agree
> therefore that the only option at present is to proceed with the
> transfer of administrator (and possibly pitch [to replace BLMIS]
> for the custodian work.)

116.    A senior Fortis executive responded to Buckley's analysis, "I do agree, this must

be addressed properly."

117.    Buckley's email (and her fellow executive's responses to it) establish that Fortis

believed that being able to independently verify that Madoff had custody of customers' assets

and was engaging in the trades he claimed was a **gating** issue to be resolved before Fortis could

even consider extending financing to Madoff investors. Buckley's statement – that if Fortis

cannot get the necessary "assurances" from Madoff that Fortis' only option was to insist that

Madoff use an independent custodian for Harley – shows the strong suspicion that BLMIS did

not have custody of Harley's assets or that he was not engaging in the trades he reported.

118.    Madoff never gave Fortis or any of its entities the assurances Buckley and others

needed, nor did Fortis seek further independent verification of Madoff's trades or custody of

Harley's assets. This is evidenced by the fact that Fortis instead decided to transfer the

administration of Harley from Fortis Fund Bahamas to Fortis Fund Cayman, just before the new

Bahamian regulations were to take effect.

119.    But moving the administration duties for Harley to a Fortis entity outside of the

Bahamas did not, by itself, eliminate the operation of Bahamian law. If Harley and its feeder funds

remained in the Bahamas, any Fortis entity performing administrative services – from whatever jurisdiction – would continue to be subject to the Bahamian laws and remain responsible for any misdeeds by Madoff as Harley's investment adviser, broker-dealer and custodian. Fortis employees determined that in order for a Fortis entity to continue as Harley's administrator without risk of liability for potential fraud by Madoff, the jurisdiction of the **entire** Harley fund would need to be transferred.

120. Transferring Harley's jurisdiction was not simple. Some of Harley's feeder funds' investors and their lenders would only agree to the change if, among other things, Fortis agreed to reimburse the parties' expenses. Ultimately, Fortis agreed to reimburse up to $25,000 of their expenses.

121. Effective October 2003, Fortis transferred the administration of Harley from Fortis Fund Bahamas to Fortis Fund Cayman. Harley, its feeder funds, and Harley's investment manager likewise changed their jurisdiction to the Cayman Islands. In December 2003, Harley – then known as Harley International Ltd. – officially changed its name to Harley International (Cayman) Ltd.

122. By moving Harley's legal jurisdiction and domicile, Fortis tried to avoid confirming its suspicion – that Madoff may not actually engage in the trades he purported to or even have custody of Harley's assets – while at the same time attempting to eliminate any potential legal liability for administering the fund should that prove to be the case.

123. Notably, Fortis Fund Bahamas did not report to the Bahamas Securities Commission the concerns Fortis employees shared internally about Madoff, either before or after the jurisdiction of Harley was moved to the Cayman Islands.

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb   02/22/1900 3:60:36:144   Pg 60 of 145   06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 59 of
10996

124.    Because Fortis was operating as a single unified global operation, the same
employees who were involved in the jurisdictional transfer of Harley and related Fortis
administrator services to the Cayman Islands were also involved in negotiating and obtaining
approval for the Swap Transaction on behalf of Defendants several years later.

<u>Even After Relocating Harley to the Cayman Islands, Fortis Employees
Continued to Warn That the Risk of Fraud at BLMIS Posed Risks To Fortis</u>

125.    Emails between the same Fortis employees discussed above reveal their ongoing
concerns about the continued potential risk of fraud at BLMIS.

126.    In a July 26, 2004 email, Eldridge forwarded an "Excerpt from Compliance
Committee meeting" to another senior Fortis employee. The discussion in the excerpt concerned
whether Fortis entities should continue providing administration, custody, financing or other
services to another investor in Harley:

> As stated in earlier correspondence it appears that Madoff who acts
> as the Broker Dealers as well as the Custodian for Harley
> effectively is the investment manager of the Harley Fund. The
> formal investment manager [REDACTED] in practice only acts as
> a nominee director. **Madoff's double role implies that there is no
> guarantee that the trades and positions provided by Madoff to
> Fortis as Administrator are objective and it is not possible to
> obtain independent confirmations on trades and positions.**
>
> Compliance/Legal Fortis Curacao has recommended negatively on
> the requested due to the Madoff issue, in particularly given the size
> of the increased limit [of financing] . . .
>
> The **IBCoCo** [Investment Banking Compliance Committee] deems
> it however remarkable that:
>
>                          ***
>
> • Cayman/Curacao and London apparently disagree on whether to
> keep providing administration services to [Redacted] given the
> Madoff issue stated above
>
> Given the above, the committee is not comfortable with accepting
> the client as presented, especially as a credit proposal in the
> pipeline for an increase to USD 160 mln. (emphasis added).

08-01789-cgm    Doc 22449-1  Filed 10/18/22  Entered 10/18/22 20:09:56    Exhibit 1
5-smb         02/22/1900  Pg 61 of 145         06/17/22 09:46:24
Doc
166-120
5
Pg 60 of
10996
Second
Amended
Complaint

127.    A full year after moving legal jurisdictions, the Legal and Compliance
Department of Fortis Fund Curacao recommended **against** Fortis continuing to provide services
or financing to any BLMIS feeder funds because of the "**Madoff Issue**": namely, Fortis' inability
to confirm that BLMIS had custody of the assets it claimed to have or that Madoff executed the
trades he reported on customer statements.

128.    For the same reason, Fortis' Investment Banking Compliance Committee refused
to sign off on an application to accept a new client seeking financing to invest in Harley.

129.    Notwithstanding internal warnings about the risk posed to Fortis by the potential
for fraud at BLMIS, Fortis Fund Cayman continued to serve as Harley's administrator until 2008,
when Madoff confessed to the Ponzi scheme.

## VII.    FORTIS' INVESTMENT ARM REDEEMED INVESTMENTS IN TREMONT BLMIS FEEDER FUNDS BASED ON ITS IDENTIFICATION OF INDICIA OF RED FLAGS OF FRAUD AT BLMIS

### Tremont Employees Reported in May 2006 That Fortis Multi-Management Was "Nervous About Madoff And Asking Probing Questions About BLMIS That Tremont Employees Could Not Readily Answer

130.    In addition to Fortis' relationship to BLMIS in connection with Harley and other
BLMIS Feeder Funds, beginning in 2001, Fortis' investment management arm had selected
BLMIS to manage tens of millions of dollars of Fortis customers' investments through
Tremont's BLMIS Feeder Funds.

131.    MeesPierson was a third-party manager of the investments of Fortis customers.
As such, MeesPierson owed a duty of care to its investors to exercise diligence in the selection of
any investment manager – which in this case was ultimately BLMIS through Tremont's BLMIS
Feeder Funds. Because Tremont had selected Madoff to manage its investors' assets, Tremont in
turn owed those same duties of care.

32

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900 79:62:04:45 06/17/22 09:46:24
Doc
166-120
5
Pg 61 of
10996

Second
Amended
Complaint

132.     In May 2003, MeesPierson employees met with Madoff and identified additional indicia of fraud at BLMIS that they noted in an internal memorandum in a May 15, 2003 memorandum (the "**Mees Memo**"). Among other things, they noted Madoff's secrecy and "zero transparency"; BLMIS's exceptionally stable returns; the fact that these returns were inconsistent with the split strike conversion strategy Madoff purported to execute; the fact that Madoff left all investor relations to the likes of Tremont and Fairfield and hardly granted direct meetings with end investors; and, of course, the continuing fact that BLMIS's trades and assets could not be verified. MeesPierson recognized that the questions they identified went to the legality of Madoff's operations and whether BLMIS had been engaging in broker-dealer "wrongdoing." Nonetheless, these exceptionally stable returns meant that Tremont remained profitable.

133.     In 2006, newly-formed Fortis division Fortis Multi-Management assumed control of MeesPierson's investment book, including its customers' investment in Tremont's Feeder Funds, which had grown to over $70 million. In a press release, the bank announced that "Fortis is combining all the existing multi-manager elements of its business, notably those of the Mees Pierson private banking arm and the retail funds business of Fortis Investments" in a new unit, Fortis Multi-Management.

134.     In May 2006, Mark Geene of Fortis Multi-Management emailed Tremont and informed it that Fortis had been internally discussing its investments with Madoff "at length," "especially the opaque structure/process" surrounding BLMIS and wished to meet with both Tremont and BLMIS personnel. MeesPierson had previously entered into a separate contract with Tremont whereby Tremont agreed to prepare due diligence and operational risk reports for Fortis Multi-Management, and to arrange meetings and onsite due diligence visits with managers.

33

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900 70:63:04:45    Pg 63 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 62 of
10996

135.    Despite Tremont's contractual obligation to set up meetings with investment managers such as Madoff, Tremont employees informed Geene they could not get Madoff to agree to meet, and that Fortis Multi-Management had to settle for a meeting with Tremont executives instead.

136.    On May 19, 2006, Geene met with senior Tremont personnel in Rye, New York to pose questions that Fortis Multi-Management had hoped to ask Madoff directly. Geene was a seasoned securities investment manager with a decade-long background analyzing investment strategies, monitoring management activities, and teaching graduate courses on hedge funds and equities. Prior to taking a position at Fortis Multi-Management, Geene spent eight years working at pension fund managers in the Netherlands where he focused on the "strategic use of derivatives/protection strategies" and "risk budgeting."

137.    Ahead of the meeting between Tremont and Fortis Multi-Management, Geene forwarded to Tremont written questions he wished to discuss about Madoff's operations. Among other things, Geene questioned BLMIS's purported trading model, including what he perceived as Madoff's inconsistent implementation of the split strike conversion strategy, asking: "If he [Madoff] can so quickly and efficiently put his trades on just ahead of market rally, why doesn't he also close out his positions as quickly once the rally has played out and book the gains? (i.e. they [Fortis Multi-Management] thought he'd be a much more active trader)." Fortis Multi-Management understood that the "precise" market timing advantage that Madoff claimed enabled him to reap his consistent returns was not being implemented equally when buying and selling. These questions show that Geene perceived that Madoff was leaving profits on the table in timing his equity sales, which was counter-intuitive to all investment advisors' primary goal to maximize investor gains.

08-01789-cgm    Doc 22449-1    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb        02/22/1900    Pg 64 of 145    06/17/22 09:46:24
Doc
166-1
5
Pg 63 of
10996

138.    Geene also asked whether Madoff had "collateral arrangements with his option counterparties? (Mark apparently used to trade options for a pension account and believes Madoff's size is a concern – he used Goldman going bankrupt in a 'what if' scenario)."

139.    This last question by Geene related to a major component of Madoff's purported "split-strike" strategy which involved the purchase and sale of put and call options to purportedly hedge customers' equity securities trades, in order to limit any losses on customers' equity trades. Geene understood that options trades can take place in the marketplace in one of two ways: (i) over an exchange, or (ii) over the counter ("**OTC**"). If options are purchased over an exchange, then the exchange itself guarantees that the options' obligations will be performed. In an OTC options trade, the trade is a private contract between two counterparties, and no one guarantees the performance of either counterparty to the trade.

140.    The flexibility for parties to negotiate their own terms in an OTC trade comes at the price of corresponding risk to an investor that the counterparty may fail to fulfill its obligations under the option to buy or sell the specified equity at the agreed upon strike price for whatever reason – for instance, the counterparty reneges on the trade, creditors attach the options as party of the company's assets, or, in the extreme scenario, the counterparty goes bankrupt.

141.    Geene's question was directed at finding out what collateral arrangements Madoff had with the options counterparties to protect BLMIS's investors' assets in the event of default. If BLMIS had twenty billion dollars in assets under management (as was speculated previously in the Mees Memo), Madoff needed to trade an enormous volume of options to hedge his investors' equity trades. Trading that volume exposed BLMIS's investors' assets to massive risk in the event that a major counterparty went bankrupt and failed to perform its option obligations – as for example Lehman Brothers did in 2008.

1-Doc 22445 Filed Filed 10/18/22 Entered Entered 10/18/22 20:09:56 Exhibit 1
5-smb         02/22/1906 Pg 65 of 145  06/17/22 09:46:24
Doc
166-120
5                Second
                Amended
                Complaint

142.   Tremont's inability to answer basic questions about Madoff's purported investment strategy apparently did not sit well with Geene. One Tremont executive described the meeting as "challenging." Another recounted:

> One issue came very clear – they [Fortis Multi-Management] recently were in New York to meet managers, among those, Madoff. We didn't get them access to Madoff, and held a meeting internally instead. The results of that meeting left them **nervous** (we didn't talk details) and they went back and explained their **apprehensions** with Eric. They have $70m with Madoff, and we derive over $1m in fee from this. My suggestion was two-fold. First in the short run, lets [*sic*] get them **comfortable with Madoff**, via Bob and Cynthia. Second, lets [*sic*] facilitate a meeting in the Madoff offices. (emphasis added)

143.   Subsequently, Tremont employees reported internally that Geene's questions required "additional support" from Tremont executives to answer.

> Geene's Questions Reveal that Tremont Did Not Know Even the Most Basic, Material Terms About Madoff's Strategy, Trades Or Custodial Arrangements

144.   Leading up to an August 2006 conference call, Geene emailed Tremont a list of questions about Madoff, his split strike conversion strategy, OTC options trading process, and custodial arrangements that Fortis Multi-Management still wanted answered.

145.   Parties to OTC options transactions typically use standardized agreements prepared by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). These ISDA agreements provide standard material terms of OTC options contracts, including the underlying obligations of the parties, price, amount of securities, timing of payments, provisions governing the exchange of collateral, events of default and termination events. In the absence of an ISDA agreement, the parties must negotiate these terms specifically for each transaction.

146.   Geene's questions to Tremont went to the heart of ascertaining some of these material terms of Madoff's purported OTC options trades. Tremont's inability to answer Fortis

36

Multi-Management,30 basic questions about securities transactions to which Tremont was a party

08-01789-cgm  Doc 22449  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
Doc 166-120
5-smb   02/22/1900  Pg 67 of 145   06/17/22 09:46:24
Second
Amended
Complaint
Pg 66 of
10996

– and for which it owed fiduciary duties of diligence and care to its investors – was of concern to an experienced derivatives trader such as Geene.

147.  For example, in August 2006, Geene questioned Tremont about Madoff's collateral arrangements with options counterparties, asking for "details with respect to collateral [*sic*]: how often exchanged (daily/weekly), how conservative are the haircuts, does Madoff use minimum [thresholds] and why does Tremont not see the exchange of collateral [*sic*]?"

148.  Geene knew that, as the account holder of the options in question, Tremont itself should have been directly exchanging collateral with the counterparty. Geene's observation indicates Fortis Multi-Management was concerned that Tremont itself did not observe or appear to understand how this basic OTC trade logistic was carried out with respect to Tremont's own options trades. Indeed, Tremont did not appear to even know what the terms of collateral were. This apparent absence of a necessary and fundamental component of OTC options trades suggests that they were not happening at all.

149.  Geene also appeared to struggle to understand how BLMIS could possibly trade the volume of options Madoff needed to hedge his investors' purported equities trades. Geene continued to seek basic information about the basic components and logistics of Madoff's option trades. For example, he asked Tremont:

> Option grid: do the investment banks quote for puts as well as calls and on both sides (buy/sell)? How will he hedge the basis risk: for instance when hitting Goldman for puts with 2B he cannot instanteniously [*sic*] trade 2B in equities the same second: does he average is [*sic*], is he using his time slicing methodology (still: basis risk (or alpha??) remains. Does he have to do calls with the same investment bank (later that day based upon the same grid?)?

150.  Geene also asked Tremont's CEO if he could "elaborate a bit on the 'hiding of trades' between Feeder trades and Madoff Securities trades as he has to trade for the Feeder before his own trading." It appears that Geene was probing for any verifiable details to confirm

the

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb          02/22/1900 769 of 145   06/17/22 09:46:24
Doc
166-1 20
5

Second
Amended
Complaint

Pg 68 of
109 96

suspicion that Madoff's trading activities might involve a conflict of interest (between his duty to

maximize his IA customers' returns before earning profits for BLMIS on the broker-dealer

trades) or potential illegal activity.

151.   Geene informed Tremont that he wanted a third-party opinion letter that "in case

of a default [bankruptcy] of Madoff Sec, the Feeder accounts cannot be touched (Bob mentioned

the Depository Account) => …clear indication of separation." This question again targets the

very issue that Fortis employee Novo had previously been concerned with in connection with

Harley: that Fortis had no verifiable details about how Madoff "custodied" customers' assets,

except for BLMIS's empty assurances that they were "segregated," and thus had no ability to

assess what could happen to customers' assets if BLMIS went "bust."

152.   In addition, in August 2006 Geene requested that Tremont provide Fortis Multi-

Management with a full due diligence report for Madoff. Due diligence questionnaires

(**"DDQs"**) are materials typically prepared by a fund that contain critical, basic information

requested by potential investors to consider when determining whether to invest. Tremont had a

contractual obligation to Fortis Multi-Management to provide such DDQs on various managers,

and in fact, in July 2006, Tremont did provide Geene with more than a dozen such reports on

different managers.

153.   But in response to Fortis Multi-Management's request for a full DDQ on Madoff,

Tremont employees acknowledged internally in August 2006 that "[w]e cannot do that for

Madoff." It took another four months for Tremont to prepare and complete a full DDQ on

BLMIS and provide it to Geene at Fortis Multi-Management. But even then, Tremont personnel

advised that the DDQ on BLMIS would not be as fulsome as other diligence reports Tremont had

provided to Fortis Multi-Management for different managers.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 70 of 145    06/17/22 09:46:24
Doc
166-120
5                                          Second
                                           Amended
                                           Complaint
                                           Pg 69 of
                                           10996

154. At this point in 2006, Tremont had over $2 billion invested with BLMIS, and according to Tremont, Fortis Multi-Management was contemplating a further investment in a new leveraged Tremont fund. Geene knew that Tremont could not provide one of its standard DDQs on Madoff or answer basic questions about Madoff's operations – ranging from mundane logistics about how securities transactions operate in the real world, to material terms that were required in investors' securities contracts. These facts were indicative that Tremont had not fulfilled its due diligence duties to its investors – particularly given that Geene was asking these very same questions in the pursuit of fulfilling Fortis Multi-Management's own duties of diligence and care to its investors.

155. Moreover, Fortis Multi-Management was aware that Tremont itself had a potential conflict of interest. The Mees Memo prepared by Fortis Multi-Management's predecessors in 2003 and Tremont's private placement memoranda made clear that BLMIS itself was earning no fees for serving as investment advisor and custodian services, aside from minimal commissions Madoff charged for trades, while Tremont itself was earning substantial percentage management fees as a result of their Feeder Fund arrangements with BLMIS.

<u>Fortis Multi-Management Fully Redeems Its Broad Market Fund Investment
After Its Concerns Are Echoed by Its Affiliate Cadogan</u>

156. By early October 2006, Mark Geene and others at Fortis Multi-Management made it clear that they were dissatisfied with Tremont's inability to answer their questions about Madoff and his operations. In an internal Tremont email dated October 9, 2006, Johnston informed CEO Schulman and others that "MeesPierson [Fortis Multi-Management] may now not be investing in XL after all (concerns with counterparty risk, cost of leverage, liquidity)."

157. Not only did Fortis Multi-Management decline to proceed to invest in Tremont's new leveraged fund, but it also proceeded to redeem the entirety of its existing investments with

Tremont after a new business partner, Cadogan, echoed Fortis Multi-Management's suspicions about BLMIS.

158.    As part of Fortis' strategy to expand the services it could offer clients, in 2006, Fortis purchased a U.S. management company that would allow it to conduct its hedge fund due diligence in-house rather than rely on third parties such as Tremont. In November 2006, Fortis acquired a 70% interest in New York-based Cadogan. Like many other Fortis entities, Madoff's business troubled Cadogan. Cadogan described Madoff as a "'black box' investment dilemma … a phenomenal long-term track record but … meaningful access to meaningful information [was] unavailable."

159.    Prior to partnering with Fortis Multi-Management, Cadogan had independently identified numerous red flags of fraud at BLMIS, including many of the same red flags identified by numerous other Fortis employees over the years. In correspondence to its investors, Cadogan set out some of the reasons that it was "highly skeptical" of Madoff:

     i.   the competitive difficulties of the space;
    ii.   the apparent mismatch between Madoff's supposed AUM and the size of the options market which would need to accommodate this capital;
   iii.   the immense implied net revenues given the estimated AUM and the reported results;
   iv.   the extraordinary complexity and opacity of the Madoff investment vehicles;
    v.   the lack of any spin-off of senior personnel over the years; and,
   vi.   the smoothness of returns relative to other traders in the area.

160.    Cadogan's list looked substantially the same as the Mees Memo, Fortis employees' concerns articulated in connection with Harley, and Fortis Multi-Management's observations and questions. None of these entities' personnel could understand Madoff's purported returns, the volume and mechanics of options trades that he would need to make given the billions of dollars of assets he purportedly managed and, most importantly, the lack of transparency into Madoff's business.

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb        02/22/1900 07:39:45         06/17/22 09:46:24
Doc                    Second
166-120                Amended
5                      Complaint
               Pg 71 of
               10996

161.    Cadogan, likewise, was concerned by what it called the "intellectual mismatch" between Madoff's purported returns and operations and those of his competitors, so much so that it had a policy against investing in any BLMIS Feeder Funds.

162.    In December 2006, Geene confirmed Cadogan's anti-Madoff policy to employees at another BLMIS Feeder Fund, Kingate Global Fund Ltd. According to an internal email, Geene told a Kingate Global executive that it would be "politically difficult" for Fortis Multi-Management to invest in another BLMIS Feeder Fund in light of Cadogan's anti-Madoff policy.

163.    In February 2007, Fortis Multi-Management redeemed in full the remaining $56 million it had invested in Broad Market Fund. In December 2008, Cadogan wrote to investors that both Cadogan and Fortis Multi-Management had, after discussion, unanimously decided to redeem from the Tremont Feeder Fund because of "[t]he unwillingness of the Madoff organization to provide sufficient transparency to evaluate the investment and other merits of that portfolio's investment."

164.    In this instance, Fortis Multi-Management had a duty to its investors that it could not eliminate in the same way Fortis had sought to do by changing the legal jurisdiction of the Fortis affiliate providing administrator services to Harley. Fortis Multi-Management had to terminate its customers' investment with BLMIS where it could not shift the potential risk away from itself in the event Madoff was engaging in fraud.

165.    Fortis operated as a single unified global operation, and had a "global risk management framework" that was specifically designed to "facilitate the communication of risk-related actions throughout Fortis." The potential risks of fraud at BLMIS previously identified by Fortis employees and affiliates were shared as part of Fortis' global risk management evaluation of the potential Swap Transaction.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb        02/22/1900 07:33:44    Pg 73 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 72 of
10996

**VIII.  IN 2006, FORTIS EMPLOYEES BECAME AWARE OF FURTHER
FACTS SUGGESTING THE POTENTIAL FOR FRAUD AT BLMIS**

166.    The proposed Swap Transaction was negotiated with Tremont in 2006, and obligated Fortis Fund Bank to pay to Tremont's Broad Market XL Fund three times the amount of returns the Broad Market Fund generated – whose returns were based entirely on its BLMIS investments. Accordingly, Fortis' internal procedures required it to conduct due diligence with respect to Madoff's investment strategy, and the results of that diligence were to be set forth in a credit application that would be presented to internal Fortis credit committees for approval.

167.    Among the Fortis employees working on the proposed Swap Transaction were Buckley and Eldridge, who years earlier expressed concerns to senior management about BLMIS and caused Fortis to move Harley's legal jurisdiction in order to avoid liability for any malfeasance by Madoff. These Fortis employees, senior management and internal credit committees brought to the proposed Swap Transaction all of their pre-existing personal knowledge about BLMIS, its purported trading strategy and operations, and the potential risk for fraud at Madoff that they had identified years earlier.

168.    Throughout late summer and fall of 2006, while working on the Swap Transaction, Fortis employees (including key Fortis Fund Solutions employees in New York) pursued further due diligence about Tremont and BLMIS from Tremont employees in New York. While making those due diligence inquiries to Tremont, Fortis Fund Solutions employees were aware of Fortis Multi-Management's six-year investment relationship with Tremont. Because both entities reported to the same internal credit committees, Fortis Fund Solutions sought details about this relationship from Tremont.

169.    In the course of conducting due diligence on the proposed Swap Transaction, Fortis employees became directly aware of still further compounding facts which heightened the

08-01789-cgm / 10-03635-cgm   Doc 52244 / Doc 1655-smb   Filed 10/18/22 / Filed 02/22/19   Entered 10/18/22 20:09:56 / Pg 74 of 145   Exhibit 1 / 06/17/22 09:46:24

Second Amended Complaint Pg 73 of 109/96

risk of

08-01789-smb  Doc 166-120  Filed 02/22/19  Pg 75 of 145  06/17/22 09:46:24
Second
Amended
Complaint
109

fraud at BLMIS. Specifically, Fortis employees reported information about the mechanics of Madoff's options trades that was contradicted not only by what BLMIS employees had directly informed Fortis years earlier, but also by what Tremont itself was contemporaneously telling Fortis and other investors.

<u>Since 2001, Fortis Was Informed by BLMIS and Tremont that Madoff's Options Trades Took Place OTC, Rather Than over an Exchange</u>

170.    Before it ever undertook any due diligence in connection with the Swap Transaction in 2006, Fortis employees were told by BLMIS employees that all of Madoff's options trades purportedly took place OTC.

171.    In May 2001, in connection with Fortis's administration of Harley, Fortis Fund Bahamas sent a fax to BLMIS requesting "[a] list of counter-parties for the OTC S&P 100 options." Fortis clearly asked for this information to assess the creditworthiness of Madoff's options counterparties.

172.    In response, BLMIS confirmed the options trades took place OTC, but refused to provide further specific details other than to state that the counterparties to its options trades were "major financial institutions," asserting that "[t]his information is considered confidential and proprietary."

173.    In October 2006, in response to Fortis Fund USA's diligence request in connection with the proposed Swap Transaction, Tremont sent Fortis private placement memoranda for Broad Market Fund and Rye XL Fund, both dated September 1, 2006 (the "**PPMs**"). The PPMs made it clear to Fortis that the options that would be purchased or sold by Madoff on behalf of the Broad Market Fund "are expected to regularly consist of instruments **not** traded on an exchange" – in other words, the options trades would take place OTC.

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb         02/22/1900 Pg 76 of 145   06/17/22 09:46:24
Doc
166-120
5

Second
Amended
Complaint
Pg 75 of
10996

174.    The PPMs Tremont sent Fortis also laid out in detail the special risks involved in OTC trading, warning that the "risk of nonperformance by the [counterparty] may be greater" than exchange-traded instruments. Likewise, Tremont warned potential investors that its funds' ability to buy or sell OTC options could be somewhat more difficult than exchange-traded instruments.

175.    Likewise, the DDQ on Madoff's operations that Tremont prepared at Fortis Multi-Management's request dated November 30, 2006 also expressly stated that BLMIS executed "all option trades" OTC. Like Tremont's PPMs, Tremont's DDQ also provided detailed warnings to potential investors about the risks of potential counterparty default on the options trades – a warning that would not be necessary were the trades to take place on an exchange.

The Information Fortis Reported About BLMIS's Options Trades Was Either Vague Or Conflicted With BLMIS's and Tremont's Prior Statements that Options Trades Took Place OTC

176.    After Fortis completed its due diligence inquiries with Tremont at the end of November 2006, a credit proposal application for the Swap Transaction with Rye XL Fund and Broad Market Fund was drafted (the **"Rye XL Fund Credit Proposal Application"**) for submission to Fortis' Central Credit Committee at the request of Laurence Headlam, an employee of Fortis Fund USA.

177.    Although the Rye XL Fund Credit Proposal Application contained some details about Madoff's "split-strike conversion" investment strategy for the credit committee to consider, notably absent were **any** details about the market in which BLMIS traded its options. This omission is striking given that Fortis employees had been informed by BLMIS directly since 2001 that BLMIS traded options exclusively OTC, and this fact had been confirmed just recently in September and November 2006 by Tremont's PPMs and DDQs. This manner of

44

trading options, which would create counterparty risk, would be highly relevant to a credit committee.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb         02/22/1900    Pg 78 of 145    06/17/22 09:46:24
Doc
166-120
5
Pg 77 of
10996
Second
Amended
Complaint

178.    Only one and a half months later, in January 2007, the Fortis Fund USA team of employees under Headlam's direction drafted a second credit application for another proposed swap transaction related to another BLMIS Feeder Fund (unrelated to Tremont). Unlike the Rye XL Fund Credit Proposal Application prepared only weeks earlier, the second credit application prepared by Fortis provided specific details about where BLMIS purportedly conducted its options trades. Specifically, in this credit application Fortis stated that BLMIS's options trades "may be effected in the over-the-counter market **or on a registered options exchange**." (emphasis added)

179.    This statement that BLMIS might trade options both OTC **and** over an exchange was contradicted by BLMIS's representations to Fortis employees for years, as well as Tremont's most contemporaneous PPMs and DDQ in 2006, which stated that BLMIS's trades took place OTC with confidential counterparties that BLMIS refused to disclose.

180.    Fortis employees were now aware that a critical piece of information about a party they suspected of fraud was shifting and contradictory to what Fortis had been informed of previously. Rather than inquiring about the inconsistencies and verifying where the options trades took place, Fortis chose to blind itself to all of the facts suggesting a high probability of fraud at BLMIS. Fortis decided to enter into the Swap Transaction and to hedge its obligations by investing in Broad Market Fund – but not before first obtaining certain special rights and built-in protections that would minimize Defendants' losses if BLMIS were in fact engaging in fraud as discussed in more detail below.

> Even After Entering into the Swap Transaction, Fortis Exhibited Its Willingness
> to Be Blind to the Conflicting Story About BLMIS's Options Trades

181.    By the fall of 2007, Fortis employees observed in emails that the financial markets were in a state of "turmoil." Fortis Fund Services' Risk Management team had shifted some of

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb          02/22/1900  Pg 79 of 145        06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 78 of
10996

Fortis Fund Bank's $1 billion Madoff risk exposure to other parties. Accordingly, Fortis sought to negotiate a credit default swap with AIG Financial Products (**"AIG"**).

182.    As the potential issuer of the credit default swap, AIG would be acting as insurer of Fortis' exposure to Madoff through Tremont. Accordingly, AIG conducted its own due diligence of Tremont and Madoff to assess the risk of the proposed credit default swap transaction with Fortis.

183.    In an email dated September 19, 2007, Fortis Fund USA employees forwarded to various Fortis employees a list of four questions AIG had about Madoff, including a pointed question about where Madoff traded his options:

> Understand that Madoff trades only exchange listed equities. In terms of Options trading, however, does Madoff trade only exchange listed or both exchange listed and OTC?

184.    Employees at Fortis responded to AIG that "Madoff only trades exchange listed options."

185.    Once again, this representation Fortis made to AIG – that Madoff trades options only on an exchange was contradicted by the information Fortis had received from both BLMIS and Tremont since at least 2001 – that Madoff traded options OTC. Fortis' representation to AIG is also at odds with what Fortis reported in the second credit application prepared in early 2007, that Madoff's options trades took place either OTC **or** over an exchange. Fortis was now advising a third party – AIG – of a third story: that BLMIS's options trades took place only on an exchange.

186.    This version of facts concerning Madoff's options trades was more likely to satisfy AIG given the market turmoil at that time, and the real risk that existed in late 2007 that large counterparties to OTC options – such as Lehman Brothers – might go bankrupt and default

on their

08-01789-cgm   Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb        02/22/1900   Pg 81 of 145   06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 80 of
10996

obligations. If BLMIS's options were exclusively "exchange traded," this would eliminate counterparty risk because the exchange itself would guarantee the performance of the options.

187.    Fortis' statements to AIG that Madoff traded options only over an exchange was inconsistent with what Tremont was telling others contemporaneously. In a November 2007 email exchange, an HSBC employee wrote to Darren Johnston of Tremont: "is it your understanding that [Madoff's] index options are OTC or exchange traded? I guess we were under the impression that they were OTC but we think we may be wrong." Tremont confirmed that Tremont's "understanding is also that they are OTC."

188.    Fortis' representations to AIG that Madoff traded options only over an exchange were also inconsistent with the new options "story" that Madoff himself had made up and was beginning to tell investors and auditors at about the same time. Frank DiPascali (one of Madoff's chief lieutenants at BLMIS), testified at a criminal trial involving BLMIS employees in 2014 and 2015, and said that he and Madoff had a discussion about the economic turmoil in 2008 and the huge increase in counterparty risk. DiPascali testified that Madoff told him that they could no longer take the chance that a feeder fund auditor would be comfortable with Madoff continuing to state that "the opposite side of these option trades are institutional derivative desks all over the world. Back in that day … if you dropped the term 'institutional derivative desks' of global financial firms, it was impressive. In 2008 it was toxic." Instead, Madoff made up a new story about the options, claiming that the counterparties to the trades were large private individual customers of Madoff's who put up treasurys with Madoff as collateral for their obligations under the options trades.

189.    When Fortis entered into the Swap Transaction, it did so knowing that its employees had previously expressed their concern that Madoff was not actually trading and/or

08-01789-cgm 08-01789-smb Doc 5244 Doc 166-120 5 Filed 10/18/22 02/22/1906 Entered 10/18/22 20:09:56 06/17/22 09:46:24 Exhibit 1

did

Second Amended Complaint Pg 81 of 10996

Pg 82 of 145

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 83 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 82 of
10996

not have custody of customer assets, and further, that Fortis had a duty to confirm these facts, but ultimately Fortis deliberately chose not to do so. That pre-existing willful blindness was now compounded by Fortis' decision to enter into the Swap Transaction while ignoring the fact that that it also now was aware that previous representations made by both BLMIS and Tremont about a material part of BLMIS's investment trading strategy were being contradicted. This contradiction is a further exhibition of willful blindness regarding the possibility of fraud at BLMIS.

## IX.    DEFENDANTS PROCEEDED WITH THE SWAP TRANSACTION DESPITE THE HIGH PROBABILITY OF FRAUD AT BLMIS WHERE THEY HAD SPECIAL RIGHTS AND BUILT IN PROTECTIONS TO MINIMIZE FORTIS' RISK OF LOSS

190.    By 2006, when Fortis was contemplating the Swap Transaction, Fortis' concerns about the risks of fraud and/or insolvency at BLMIS had caused it to: (i) move the legal jurisdiction for both the Fortis entity serving as administrator and the entire Harley fund from the Bahamas to the Cayman Islands to escape potential liability for possible malfeasance by Madoff as Harley's custodian; (ii) repeatedly discuss Fortis' employees' concerns and objections to continuing involvement with BLMIS-related transactions; and (iii) decide to redeem the entirety of Fortis Multi-Management's investments with Tremont.

191.    The high probability of fraud at BLMIS was only further heightened in 2006, when Fortis became aware of the conflicting stories about BLMIS's purported options trades.

192.    Defendants and its Fortis affiliates consciously chose to ignore accumulating indicia of fraud, and proceed with the Swap Transaction in May 2007, where it perceived that it could minimize or shift the risk of any loss to Fortis. This time, Fortis sought to protect itself through "Special Rights" and other built-in contractual provisions that other individual Tremont investors did not have.

48

08-01789-smb   Doc 166-120   Filed 02/22/1906   Pg 83 of 10996   06/17/22 09:46:24

Fortis Enters into the Swap Transaction

193.    On May 2, 2007, Fortis Fund Bank entered into the Swap Transaction. Under the

Swap Transaction, Fortis Fund Bank was obligated to pay Broad Market XL Fund returns

generated by Broad Market Fund, based on a hypothetical investment in Broad Market Fund

equal to three times the amount of collateral Broad Market XL Fund deposited with Fortis Fund

Bank.

194.    Under the terms of the Swap Transaction, Rye XL was obligated to pay Fortis

Fund Bank various types of fees and interest which included, but was not limited to, the spread

on the floating interest rate charged to Broad Market XL Fund based on the collateral deposited

with Fortis Fund Bank. At the peak of the Swap Transaction, Defendant Fortis Fund Bank earned

millions of dollars in fees on the spread of the floating interest rate alone.

195.    Under the Swap Transaction, Fortis Fund Bank was free to generate the returns

owed to Broad Market XL Fund as it saw fit. It could have invested the collateral in other hedge

funds, bonds, or even its own operations. Fortis made the proprietary and voluntary decision to

hedge its risk under the Swap Transaction by investing three times the initial collateral it

received from Rye XL Fund in Broad Market Fund (the **"Hedge"**).

196.     Below is a chart showing the Swap Transaction and the Hedge:

Fortis Obtained "Special Rights" and Built In Protections in the Swap
Transactions to Protect Against Potential Fraud and Insolvency at BLMIS

### 1. The Collateral Provisions Which Protected Fortis

197.     The Swap Transaction built in protection for Fortis in the form of provisions that

required Broad Market XL Fund to post collateral in the form of cash with Defendant Fortis

Fund Bank. On May 2, 2007, Broad Market XL Fund provided Fortis Fund Bank with $10

million of initial collateral. Upon information and belief, Broad Market XL Fund used BLMIS

Customer Property subsequently transferred to it from initial transferees Prime Fund and/or

Broad Market Fund to fund this $10 million of initial collateral.

198.     Under the terms of the Swap Transaction, Broad Market XL Fund could increase

or "upsize" the value of the swap by providing additional collateral to Fortis up to one third (1/3)

of the maximum notional amount of the swap. Broad Market XL Fund did just that in 2007 and

2008 when it transferred additional amounts of collateral to Fortis Fund Bank to increase the Equity Notional Value of the trade. Fortis Fund Bank, in turn, invested that collateral plus two times the value of the collateral, directly into Broad Market Fund as part of the Hedge.

199.    The collateral provisions of the Swap Transaction agreements by their very nature gave Fortis Fund Bank a special protection that other Rye XL Fund swap counterparties did not have. The collateral arrangement granted Fortis Fund Bank a "first priority continuing security interest in, lien on and right of Set-off" in the cash transferred to Fortis Fund Bank as collateral in the event Rye XL Fund "fails to pay in full any of its Obligations that are then due."

200.    Thus, one-third of any amount that Fortis invested in Broad Market Fund – and thereby exposed to risk of fraud at BLMIS – would not be Fortis' own money but in fact was the cash that Rye XL Fund was obligated to give to Fortis as collateral under the terms of the Swap Agreement. While Broad Market Fund's other individual investors' entire investments were at risk of fraud at BLMIS, Fortis Fund Bank itself was putting at risk of loss only two-thirds of the amount it would ultimately invest in Broad Market Fund.

**2.    *Fortis Fund Bank Obtained A Broad Indemnification Provision in the Swap Transaction to Protect Itself, All Fortis Affiliates, and All Fortis Employees***

201.    The Swap Transaction Fortis Fund Bank negotiated had a significant and broad indemnification provision that was designed to require Rye XL to hold Fortis Fund Bank, its affiliates and employees harmless in the event of any action proceeding, or investigation relating to the Swap Transaction.

202.    The May 2, 2007 Schedule to the ISDA Master Agreement between Fortis Fund Bank and Rye XL provided:

> **Indemnification.** In the event that [Fortis Fund Bank] or any of its Affiliates becomes involved in any capacity in any action, proceeding or investigation brought by or against any person . . . in

51

10-05311-smb    Doc 166-120    02/22/1900    Second Amended Complaint    06/17/22 09:46:24
5    Pg 86 of 10996

connection with any matter referred to in this Agreement or any Transaction, [Rye XL] shall reimburse [Fortis Fund Bank] or such Affiliate for its reasonable legal and other out-of-pocket expenses (including the cost of any investigation and preparation) incurred in connection therewith within ten (10) days of receipt of notice of such expenses, and shall indemnify and hold [Fortis Fund Bank] or such Affiliate harmless . . . against any out-of-pocket losses, claims, damages or liabilities to which [Fortis Fund Bank] or such Affiliate may become subject in connection with any such action, proceeding or investigation.

203.    Notably, when the Swap Transaction was amended in January 2008, the indemnification provision was modified to make it expressly clear that the provision extended to all members, directors, officers, agents, employees and controlling persons of Fortis Fund Bank and all of Fortis' affiliates.

204.    The indemnification provision requires Rye XL Fund to protect all Fortis entities and their employees against any potential liability (as well as to reimburse their attorneys' fees and other expenses on ten days' notice) in the event that such Fortis persons became involved in any investigation or proceeding involving BLMIS or Tremont.

### 3.    Fortis Negotiated Special "Claw-Back" Obligations in the Event of a Bankruptcy

205.    In a prescient manner that demonstrates Fortis' assessment of the high probability of fraud and insolvency at BLMIS, Fortis also negotiated for itself in the trade confirmation executed in connection with the Swap Transaction a very special protection against any potential losses it might incur in connection with any "Claw-back" avoidance actions.

206.    Section 12 of the trade confirmation expressly provided that Rye XL Fund understood that Fortis Fund Bank may, but was not required, to hedge its obligations under the swap by investing in Broad Market Fund. Fortis Fund Bank proceeded to so hedge its obligations by investing in Broad Market Fund.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb       02/22/1900    Pg 88 of 145    06/17/22 09:46:24
Doc
166-120
5
Pg 87 of
10996

Second
Amended
Complaint

207.    Section 13 of that same trade confirmation set forth protections Rye XL Fund owed to Fortis Fund Bank in the event of a "Claw-back" lawsuit:

**Claw-back Obligations:**

> In the event that a Holder of Interests [Fortis Fund Bank] would be required to return all or any portion of any payment received with respect to any investment in the Fund [Broad Market Fund] (whether pursuant to the terms of the investment in the Fund, any insolvency law, regulation, court order or otherwise ("**Claw-back Obligation"**), then notwithstanding anything herein to the contrary, Party B [Rye XL Fund] will, upon demand by Party A [Fortis Fund Bank], pay to Party A [Fortis Fund Bank] an amount in cash equal to such Claw-back Obligation.

208.    Both Fortis and Tremont were sophisticated, financial industry professionals who had the assistance of counsel in negotiating the Swap Transaction. This Claw-back Obligation which the parties negotiated demonstrates that they anticipated there was the potential risk that BLMIS or Broad Market Fund could end up in bankruptcy and that Fortis Fund Bank could conceivably be sued in a claw-back action just like this very one to recover funds Defendants received in connection with its investment in Broad Market Fund. Indeed, Fortis employees Buckley and Novo had both discussed steps that should be taken to protect Fortis in the event BLMIS could go bankrupt.

209.    The Claw-back Obligation survives the termination of the agreement between Rye XL Fund and Fortis Fund Bank.

210.    Notably, other individual Tremont investors do not have the same "Claw-back" protections that Fortis Fund Bank obtained from Tremont.

> ### 4.    *Fortis Fund Bank Obtained Priority Redemption Rights in the Event Madoff Was Investigated for Securities Laws Violations Including Fraud*

211.    At the same time it entered into the Swap Transaction, Fortis Fund Bank also

signed a side letter agreement with Broad Market Fund dated May 2, 2007 that applied to any investments

08-01789-cgm    Doc 22445    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb           02/22/1900 or 145           06/17/22 09:46:24
Doc
166-120
5
Pg 89 of
10996
Second
Amended
Complaint
79 90 of 145

Fortis Fund Bank made in the fund to hedge its obligations under the Swap Transaction. That side letter agreement contained a "most favored nations" clause that required Broad Market Fund to offer Fortis Fund Bank the most favorable rights of liquidity or redemption from the fund that were afforded to any other investor.

212.    The most favored nation provision was triggered at the latest on September 1, 2007, when Tremont entered into an agreement with another leverage provider, ABN AMRO Bank N.V., presently known as the Royal Bank of Scotland ("**ABN/RBS**"). That agreement provided ABN/RBS with a "special redemption event," and enhanced liquidity rights ahead of all other investors – notably in the specific instance that BLMIS became the subject of an investigation, which would clearly cover the events that transpired around Madoff's Ponzi scheme. In that event, Tremont had agreed to provide ABN/RBS with the right to redeem half of its investment on five days' notice – notably which was 31 days faster than all other individual Tremont investors' right to redemption.

213.    Subsequently, Broad Market Fund received this same early redemption right to Fortis Fund Bank in the event BLMIS became subject to an investigation through an amended side letter agreement dated January 30, 2008, under the title "Special Rights:"

Special Rights:

***

**Special Redemption Events**

Upon the occurrence of any of the following events ("**Special Redemption Events**"), the Limited Partner may request and/or (as applicable) redemption of its Interest in the Fund on five Business Days prior written notice to the Administr

(g)$_5$   If the Manager [BLMIS] becomes the subject of a formal investigation by a U.S. court, governmental or regulatory body or agency related to a specific breach of a U.S. securities law or regulation and the effect of such a breach would, as reasonably

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb            02/22/1900    Pg 92 of 145    06/17/22 09:46:24
Doc                            Second
166-120                        Amended
5                              Complaint
                               Pg 91 of
                               11990

determined by the Calculation Agent, have a material adverse effect on the Manager [BLMIS] and its ability to conduct its investment management business, the Limited Partner may reduce its investment by no more than 33%.

214. Fortis's receipt of this Special "Early Redemption" right as the result of a most favored nations clause was in and of itself a red flag of fraud. Upon receiving that, Fortis was on notice that another party anticipated that Madoff would come under investigation by federal regulators for securities fraud or other illegal conduct and had gone to the length of demanding contractual protections from Tremont.

## X. FORTIS' SPECIAL CONTRACT RIGHTS AND BUILT IN PROTECTIONS ENABLED DEFENDANTS TO RECOVER PROPORTIONATELY MORE OF THEIR LOSSES THAN OTHER TREMONT INVESTORS

215. Fortis obtained "Special Rights" and built in protections in the Swap Transaction to protect it against losses in the event of fraud at BLMIS — including the likelihood that Madoff was not making the trades he reported to make and BLMIS was not holding the assets it claimed. And when this fraud was confirmed and revealed in December 2008, at least some of the built-in protections worked as anticipated.

216. Based on the collateral provisions set forth in the Swap Transaction documents, Rye XL Fund was required to provide Fortis Fund Bank with 33% of the total dollar amount to be invested in Broad Market by Fortis Fund Bank. Fortis Fund Bank was granted a "first priority continuing security interest in, lien on and right of Set-off against" that cash collateral. Thus, when BLMIS was exposed as a fraud in December 2008, Fortis was already in possession of at least $231.7 million in collateral from Rye XL Fund (representing 1/3 of the total $695 million Fortis Fund Bank claimed to have invested in two of Tremont's BLMIS Feeder Funds as of December 2008). By operation of the collateral provision and related termination provisions in the Swap Transaction documents, when BLMIS ultimately collapsed in 2008, Fortis was

08-01789-cgm 08-01789-smb Doc 522449 Doc 166-120 5 Filed 10/18/22 Filed 02/22/1906 Entered 10/18/22 20:09:56 06/17/22 09:46:24 Exhibit 1 Exhibit A

automatically

Pg 93 of 145

Second Amended Complaint Pg 92 of 10996

repaid 1/3 of its entire investment, and was more than 33% whole on its losses ahead of all other individual investors.

217.    Additionally, Defendant Fortis Fund Bank has, according to publicly available documents, received substantial additional recoveries through distributions it received in the Tremont Class Action. On March 18, 2016, class counsel in the Tremont Class Action informed the District Court that they would make an initial distribution to investors of approximately $757 million on March 30, 2016, that was funded by the Trustee's distribution on Tremont's claim from this liquidation proceeding. Based on the proportional share of losses claimed by Fortis Fund Bank in filings submitted in the Tremont Class Action, the Trustee has calculated that Defendant received an estimated $129,930,851.03 from that distribution.

218.    Thus, based on publicly available settlement information, on information and belief, Fortis to date has recovered more than $334,930,851.03 of its investments in the Tremont Funds, which represents 51% of its claimed losses. Notably, this does not include any future additional recoveries Fortis may obtain by virtue of ongoing recovery efforts.

219.    One "Special Right" that Fortis obtained in the Swap Transaction that may not have operated as was anticipated was the Early Redemption right in the event of an investigation of Madoff for securities law violations. The reason for this was simply because of the sudden and unexpected way in which Madoff turned himself in to the FBI and immediately confessed to running a Ponzi scheme at BLMIS, followed by the SEC's immediate commencement of this liquidation proceeding. Fortis Fund Bank simply did not have sufficient time to submit a five-day notice for this Special Redemption Event. Had there even been one week's additional time, Fortis Fund Bank's Special Redemption Rights could have resulted in the recovery of a substantial percentage of its funds before any individual investors recovered even their first

56

dollar of losses.

08-01789-cgm   Doc 22449  Filed 10/18/22  Entered 10/18/22 20:09:56   Exhibit 1
Doc 166-120
5-smb     02/22/1900 79:36:3445 06/17/22 09:46:24
Second
Amended
Complaint
Pg 95 of
109 96

XI.   AT THE TIME IT ENTERED INTO THE SWAP TRANSACTION, FORTIS
WAS IN A FINANCIAL CRISIS, AND HAD A HEIGHTENED RISK
TOLERANCE

220.   By 2007 when Fortis Fund Bank entered into the Swap Transaction, Fortis was struggling as a global financial institution.

221.   In a class action filed against Fortis by shareholders in 2009, the plaintiffs alleged that from 2007 to 2008, Fortis and certain of its executive officers and/or directors misrepresented and failed to disclose material information concerning the bank's worsening financial condition. The shareholder plaintiffs further alleged that prior to its collapse, Fortis sought to mitigate its distress by misrepresenting about the risk of its transactions and investments, with the purpose of falsely bolstering the appearance of profitability.

222.   Ultimately, Fortis' financial crisis ended in a government bailout in September 2008, and the subsequent break up and sale of the financial institution's assets. According to Fortis shareholders, when the Dutch government bailed out Fortis in late 2008, investors lost up to 90% of the value of their shares. The claims resulted in extensive criminal investigations and proceedings by authorities in the Netherlands and Belgium. The class actions against Fortis and its executives were reportedly resolved in a global settlement for $1.3 billion in 2016.

223.   These circumstances would create a powerful motivation for Fortis to deliberately avoid examining facts suggesting fraud at BLMIS, in order to enter into the Swap Transaction that would generate what was apparently desperately needed revenue in the short term.

XII.   FORTIS' WILLFUL BLINDNESS TO THE HIGH PROBABILITY OF FRAUD
AND INSOLVENCY AT BLMIS IS PROPERLY IMPUTED TO
DEFENDANTS

Fortis Marketed Its Entities as One Institution, Its Employees Acted as One
Institution, and the Entities Had One Central Management

224.   In 2005, Fortis was a global financial institution with employees, entities and

57

business groups who from their strategic locations around the world, worked together and acted

as agents for one another to provide services to Fortis' clients worldwide. In its 2005 public Annual Review, Fortis described this activity as its "'Act as One' philosophy" to "operate as one company with a strong identity." The Fortis entities that "acted as one" with regard to the transactions at issue here included entities across all its divisions: (1) the Retail Banking division, which provided banking and financial services to individuals; (2) the Merchant and Private Bank division, which handled the bank's financial products and services, specializing in fund administration and lending, and (3) the Investment Bank division, called Fortis Investments, which provided wealth management services to high net worth individuals.

225.    In 2005, Fortis announced that it had "bundled all Fortis' fund services—both onshore and offshore—to form a single unit" – Fortis Fund Solutions – that offered the fund industry "a combination of administration, custody, banking and financial capabilities." Fortis Fund Solutions was comprised of entities in thirteen jurisdictions all over the globe that were ultimately all subsidiaries of Fortis Bank SA/N.V. Together they carried out Fortis' hedge fund services, namely structuring and managing transactions.

226.    Fortis Fund Solutions employees operated their business with complete disregard for formal corporate affiliate lines and referred to themselves and their business as one Fortis entity. Defendant Fortis Fund Bank served as the headquarters of the Prime Fund Solutions family and was central to its decision-making process.

227.    Fortis Fund Solutions sat in the Merchant and Private Bank division. MeesPierson, later known as Fortis Multi-Management, was part of Fortis Investments. Fortis Multi- Management itself was a product of crossover, as it was "created through a merger of Fortis Investments' existing business with operations from Fortis group's commercial and private banking arm," according to a press release.

58

228.    Public filings noted that all of Fortis' business activity was carried out under the

bank's "global risk management framework" that was designed to "facilitate the communication

of risk-related actions throughout Fortis." The framework included "one global risk database"

and a hierarchy of credit and risk committees that worked together to evaluate potential

transactions. Every Fortis entity and affiliate was subject to this central reporting hierarchy. As

demonstrated in the following chart, taken from Fortis' 2005 Annual Review and Financial

Statement, all of Fortis' regional risk committees reported to credit committees run by the

Investment Bank, Merchant and Private Bank, or Retail Bank. Those committees, in turn,

reported to central corporate committees, like the Central Credit Committee, and ultimately to

Fortis' board of directors. No matter which division they sat in, all of the bank's entities reported

to the same centralized committee.

08-01789-cgm Doc 22449 Filed 10/18/22 Entered 10/18/22 20:09:56 Exhibit 1
Doc 166-1 20 5
02/22/1900 14:55 06/17/22 09:46:24
Second Amended Complaint
Pg 99 of 10096
Pg 100 of 145

<u>Fortis Employees from Various Affiliates Worked As Agents of Defendants to
Set Up and Execute the BLMIS Feeder Fund Related Transactions and Shared
Their Knowledge and Concerns About BLMIS</u>

229.  Executing the "Act as One" philosophy and using the "global risk management framework," employees from numerous Fortis affiliates across divisions worked together to carry out all responsibilities for the bank's BLMIS-related transactions. No BLMIS-related transaction was set up or carried out by employees of a single Fortis entity acting alone.

230.  In conducting the Madoff-related transactions at issue, employees, officers and directors from various Fortis affiliates worked on behalf of the unified Fortis within the scope of their authority as Fortis' agents. They did so by, among other things:

08-01789-smb   Doc 166-120   Filed 02/22/1900   Pg 100 of 109
Second Amended Complaint

    i.   meeting and/or communicating with Madoff and other BLMIS employees and officers in connection with their administrator duties for Harley;

    ii.   exercising discretion to knowingly invest funds with BLMIS through the Swap Transaction with Tremont's BLMIS Feeder Funds;

    iii.   monitoring the performance of BLMIS;

    iv.   conducting due diligence on BLMIS and Tremont;

    v.   preparing credit applications, memoranda and background materials required to seek numerous levels of corporate approval for the transactions with Tremont's BLMIS Feeder Funds;

    vi.   participating in the necessary credit and approval committees, responsible for determining whether to enter into the transactions with Tremont's BLMIS Feeder Funds;

    vii.   negotiating the transactions with Tremont; and

    viii.   communicating with Tremont's BLMIS Feeder Funds regarding investments and redemptions.

231. Employees from Defendants and other Fortis entities routinely communicated across entity lines about information and concerns about BLMIS that they had gathered in the course of their various duties on behalf of Fortis.

232. As mandated by Fortis' central risk policies, the Fortis employees' concerns about Madoff made their way up the chain of Fortis' credit committees including local credit committees in the Cayman Islands, Curacao and UK and the Investment Bank Compliance and Central Credit Committees.

       *1.*     ***Employees from Multiple Fortis Affiliates Worked Together To Fulfill Administrator Duties for Harley and Shared Their Concerns About BLMIS***

233. The administration of Harley exemplifies the unified manner in which the Fortis business operated. Employees of the Fortis entities operated collectively even before the Bank officially announced the formation of the one "Fortis Prime Fund Solutions."

234. On paper, Fortis Fund Bahamas was the legal administrator to Harley. Fortis' internal documents, however, reveal that a great deal of the work conducted by Fortis employees

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 102 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 101 of
10996

as administrator to Harley was performed by employees from various Fortis affiliates, including Defendants, Fortis Bank N.V., Fortis Fund USA, Fortis Fund Cayman, Fortis Prime Fund Solutions (Isle of Man) and Fortis (Isle of Man) Nominees Limited ("Fortis Fund IOM"), and Fortis Fund Services (Curaçao) NV ("Fortis Fund Curacao").

### 2. Employees from Multiple Fortis Affiliates, Including Those Who Previously Expressed Concerns About BLMIS, Worked Together To Negotiate and Approve the Swap Transaction

235.    Many of the same Fortis employees who had in 2003 shared and/or learned of colleagues' concerns about BLMIS were directly involved in the Swap Transaction.

236.    While Fortis Fund Bank was the legal entity that officially entered into the Swap Transaction, like Fortis' work for Harley, the Swap Transaction was the result of work by employees from multiple Fortis entities including Defendant Fortis Fund Bank, Fortis Fund USA, Fortis Bank NV, Fortis Fund IOM, Fortis Fund Cayman, and Fortis Fund London. For example:

    i.   The Swap Transaction was initiated and negotiated by Fortis Fund USA under Headlam, including the initial client and credit applications submitted to Fortis' credit committees in November 2006;

    ii.   Risk advice came from employees from Defendant, Fortis Fund USA, and Fortis Fund Cayman.

    iii.   Legal opinions were provided by employees of Fortis Fund Cayman and Fortis Fund IOM.

237.    In accordance with Fortis Fund Bank policy, the Swap Transaction crisscrossed the circuit of Fortis credit committees, which were staffed with employees from various entities and business groups across the bank, who acted as agents for the Defendants in connection with the Swap Transaction. Critically, several of the credit committee members who ultimately approved the Swap Transaction were the **very same** Fortis employees who had previously shared their serious concerns and objections about BLMIS. For example, Brenda Buckley was the

Chairperson of the Dublin Credit Committee in 2007 and 2008 when the Swap Transaction was

negotiated and

08-01789-cgm   Doc 22449-1   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb         02/22/1900   Pg 104 of 145   06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 103 of
10996

signed, the Chairperson of the Fortis Fund Risk Committee, and was also involved when the Swap Transaction proceeded to Fortis' Merchant Banking Credit Committee. When the Swap Transaction proceeded to Fortis' Central Credit Committee, which then contacted Fortis' Executive Board for ultimate approval over liquidity and capital issues, Eldridge corresponded with the Executive Board for final approval.

> **3.    Fortis Entered Into The Swap Transaction Despite Awareness of Fortis Multi-Management's Interactions With Tremont-Related Entities**

238.   When Fortis caused the Defendants to enter into the Swap Transaction in 2007, it was aware of the full history of Fortis' involvement with the BLMIS Feeder Funds, and the concerns about fraud that had developed based on these activities.

239.   For example, in 2006, when Defendants and other Fortis employees were conducting diligence with respect to the potential Swap Transaction, Fortis Fund employees in Luxembourg were simultaneously servicing Fortis Multi-Management's investment in Broad Market Fund. At that time, Fortis Luxembourg was a member of Fortis Fund Services and was under the leadership of Defendant Fortis Fund Bank (the head of Fortis Fund Services). Fortis Fund Solutions employees in Luxembourg also corresponded with Tremont and Fortis Multi-Management directly to obtain financial documents.

240.   In an August 31, 2006 email, while working on the Swap Transaction, Fortis Fund USA requested that Tremont provide detail about the transaction between Fortis Multi-Management and Tremont because, as it told Tremont, Fortis' compliance and credit committees looked more favorably on investments linked to "[e]xisting relationships." On information and belief, Fortis employees did proceed to reach out to Fortis Multi-Management for information about its investment in Broad Market Fund that would assist in facilitating the preparation of

63

08-01789-cgm  Doc 22449  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
5-smb        02/22/1900  Pg 105 of 145  06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 104 of
109 96

materials that would be considered by Fortis' compliance and credit committee in evaluating the Swap Transaction.

241.   Internal Tremont emails also indicated that Fortis Fund Solutions and MeesPierson/Fortis Multi-Management shared decision-makers, in particular that Fortis Fund Solutions employees had "overlap to the alternative team" which included MeesPierson/Fortis Multi-Management. In 2006, when Fortis Multi-Management began to consider terminating its relationship with Tremont, Tremont employees discussed informing Fortis personnel. A Tremont employee wrote in an email dated September 27, 2006 that the "cost" of Fortis Multi-Management terminating its agreement with Tremont should "be communicated to Mees and ideally find its way to the people at Fortis" which "[s]hould be enough for [MeesPierson] to reconsider the implications of termination."

242.   The indemnification protections Fortis negotiated in the ISDA governing the Swap Transaction further demonstrate that Fortis recognized its employees actually functioned as agents for one another. Rye XL Fund agreed to indemnify not only Fortis Fund Bank (the swap counterparty), but also any of its affiliates, and their respective managers, directors, employees and agents. This broad protection underscored Fortis' concern that an employee nominally employed by a different legal entity could be found liable or become involved in litigation related to the Swap Transaction because of the overlapping duties and work flow at Fortis.

## XIII.   THE TRANSFERS

243.   Two Tremont BLMIS Feeder Funds, Prime Fund and Broad Market Fund, received initial transfers of BLMIS Customer Property. As set forth herein, a portion of those initial transfers was subsequently transferred directly or indirectly to the Defendants.

The Initial Transfers

### 1.    *Broad Market Fund Initial Transfers*

244.    Broad Market Fund held a direct account with BLMIS that opened in 1994 with account number 1T0027. Substantially all of Broad Market Fund's assets were invested directly or indirectly in BLMIS or with other Tremont BLMIS Feeder Funds that provided returns based upon BLMIS's performance.

245.    During the six years preceding the Filing Date, BLMIS made transfers to Broad Market Fund of approximately $252 million (the **"Broad Market Fund Initial Transfers"**). $60 million of the Broad Market Fund Initial Transfers was transferred during the two years preceding the Filing Date, $40 million of which was transferred during the 90 days preceding the Filing Date. (*See* Exhibits A & B)

246.    The Broad Market Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273–279 of the N.Y. Debt. & Cred. Law, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

### 2.    *Prime Fund Initial Transfers*

247.    Prime Fund held a direct account with BLMIS that opened in 1997 with account number 1C1260. During the time period relevant to this action, substantially all of Prime Fund's assets were invested directly or indirectly in BLMIS or with other of Tremont's BLMIS Feeder Funds that provided returns based upon BLMIS's performance, including, but not limited to, Rye XL Fund.

248.    During the six years preceding the Filing Date, BLMIS made transfers to Prime Fund of approximately $945 million, of which $495 million was transferred during the two years

08-01789-cgm Doc 22445 Filed 10/18/22 Entered 10/18/22 20:09:56 Exhibit 1
5-smb 02/22/1900 Pg 107 of 145 06/17/22 09:46:24
166-120 Amended
5 Complaint
Pg 106 of
10996

preceding the Filing Date (the "**Prime Fund Initial Transfers**"). The Prime Fund Initial Transfers

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb          02/22/1900    Pg 108 of 145    06/17/22 09:46:24
Doc
166-120
5

Second
Amended
Complaint
Pg 107 of
10996

were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are

avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code,

sections 237–279 of the N.Y. Debt. & Cred. Law, and applicable provisions of SIPA,

particularly, SIPA § 78fff-2(c)(3). (*See* Exhibits C & D)

249.     The Trustee's investigation is ongoing and the Trustee reserves the right to: (i)

supplement the information on the Broad Market Initial Transfers, Prime Fund Initial Transfers,

and any additional transfers, and (ii) seek recovery of such additional transfers.

> Rye XL Fund Receives Subsequent Transfers From Both Prime Fund and Broad
> Market Fund

250.     Portions of both the Prime Fund Initial Transfers and the Broad Market Fund

Initial Transfers were subsequently transferred to Rye XL Fund, as set forth more fully below.

### 1.     *Subsequent Transfers from Broad Market Fund To Rye XL Fund*

251.     Beginning no later than August 2006, Broad Market Fund began transferring the

Broad Market Initial Transfers to Rye XL Fund for purposes of investing in Rye XL Fund.

252.     Between August 31, 2006 and November 21, 2008, Broad Market Fund transferred

$48,387,616 of Customer Property to Rye XL Fund as investments in the form of subscription

payments, all of which was sourced from the Broad Market Fund Initial Transfers (the **"Broad**

**Market Fund-Rye XL Fund Subsequent Transfers"**). (*See* Exhibit E)

253.     The Trustee's investigation is ongoing and the Trustee reserves the right to: (i)

supplement the information on the Broad Market Fund-Rye XL Fund Subsequent Transfers, and

any additional transfers, and (ii) seek recovery of such additional transfers.

### 2.     *Subsequent Transfers from Prime Fund To Rye XL Fund*

254.     Beginning no later than July 2007, Prime Fund began transferring portions of the

Prime Fund Initial Transfers to Rye XL Fund for purposes of investing in Rye XL Fund.

5-smb   02/22/190   06/17/22 09:46:24
166-120
5
Second Amended
Complaint
Pg 108 of
109 96
Exhibit 1

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
          -smb        02/22/1900    Pg 110 of 145    06/17/22 09:46:24
Doc
166-120
5
          Pg 109 of
          10996

255.    Between July 3, 2007 and November 24, 2008, Prime Fund transferred

$292,472,765 of Customer Property to Rye XL Fund as investments in the form of subscription

payments as set forth below (the **"Prime Fund-Rye XL Fund Subsequent Transfers"**). (*See*

Exhibit F)

256.    The Trustee's investigation is ongoing and the Trustee reserves the right to: (i)

supplement the information on the Prime Fund-Rye XL Fund Subsequent Transfers, and any

additional transfers, and (ii) seek recovery of such additional transfers.

<u>Subsequent Transfers Received by Defendants</u>

### 1. *Subsequent Transfer Received by Fortis Fund Bank and/or Fortis Fund Services By Virtue of Redeeming Its Proprietary Hedge*

257.    As set forth in the Swap Transaction agreements, Defendant Fortis Fund Bank

was an investor in Broad Market Fund and was free to redeem its Broad Market Fund shares as it

wished. The investments in, and redemptions from, Broad Market Fund made by Fortis Fund

Bank and/or Defendant Fortis Fund Services as part of the Hedge were a proprietary trading

position and were not required or mandated by the Swap Transaction.

258.    As part of the Hedge, Fortis Fund Services entered into a subscription agreement

with Broad Market Fund on behalf of Defendant Fortis Fund Bank. Although Fortis Fund

Services was the registered subscriber of the Broad Market Fund partnership interests, the actual

owner was Fortis Fund Bank. Further, even though the Broad Market Fund partnership interests

were held in the name of Fortis Fund Services, all subscription funds were wired from Fortis

Fund Bank's Northern Trust Bank New York account.

259.    The Broad Market Fund-Defendants Subsequent Transfer, defined below,

represents equity interests (either as shareholders or partners) by Defendants in Broad Market

Fund. Because Broad Market Fund invested all or substantially all of its assets into the BLMIS

67

Ponzi scheme, Broad Market Fund was insolvent when it made the Broad Market Fund-Defendants Subsequent Transfer upon the redemptions of Defendants' interests.

260.    On July 1, 2008, Defendant Fortis Fund Bank made the proprietary decision—independent of its Swap Transaction with Rye XL Fund—to redeem $30 million from Broad Market Fund. Upon information and belief, to fulfill Fortis Fund Bank's redemption request, Broad Market Fund transferred a portion of the Broad Market Initial Transfers, in the amount of $30 million of BLMIS Customer Property to Fortis Fund Bank and/or Fortis Fund Services, and is recoverable from Defendant Fortis Fund Bank pursuant to § 550 of the Bankruptcy Code and § 278 of the NYDCL. (the **"Broad Market Fund-Defendants Subsequent Transfer"**). (*See* Exhibit G)

261.    The Trustee's investigation is ongoing, and the Trustee reserves the right to:

(i)    supplement the information on the Broad Market Fund-Defendants Subsequent Transfer, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 2.    *Subsequent Transfers Received By Defendant Fortis Fund Bank By Virtue of Broad Market XL Fund Increasing the Size of the Swap Transaction*

262.    Upon information and belief, after entering the Swap Transaction, Rye XL Fund subsequently and independently decided to use the subscription payments and subsequent transfers it received from its investors, including, but not limited to, the BLMIS Customer Property it received from Prime Fund and/or Broad Market Fund, to deposit collateral with Defendant Fortis Fund Bank.

263.    Pursuant to the terms of the Swap Transaction, Rye XL Fund could increase or "upsize" the value of the swap transaction by providing Fortis Fund Bank with additional collateral.

10-05311-smb   Doc 166-120   Filed 02/22/1900   Entered 06/17/22 09:46:24   Exhibit A Second Amended Complaint Pg 111 of 10996

264.     Upon information and belief, in 2007 and 2008, Rye XL Fund transferred the
BLMIS Customer Property it received from Prime Fund and/or Broad Market Fund, as detailed
above, to Defendant Fortis Fund Bank to increase the collateral and, therefore, the overall size of
the Swap Transaction.

265.     From May 2, 2007 to May 1, 2008, Rye XL Fund increased the Swap Transaction.
Based on the Trustee's investigation to date, approximately $235,500,000 of the Broad Market-
Rye XL Subsequent Transfers and/or Prime Fund– Rye XL Subsequent Transfers was transferred
by Rye XL Fund to Defendant Fortis Fund Bank, and is recoverable from Defendant Fortis Fund
Bank pursuant to § 550 of the Bankruptcy Code and § 278 of the NYDCL. (the "**Rye XL-Fortis
Fund Bank Subsequent Transfers**"). (*See also* Exhibit H)

266.     The Trustee's investigation is ongoing, and the Trustee reserves the right to:
(i)     supplement the information on the Rye XL-Fortis Fund Bank Subsequent Transfers, and
any additional transfers, and (ii) seek recovery of such additional transfers.

                    Summary of Transfers

267.     Taken all together, the below chart shows the subsequent transfers of BLMIS
Customer Property from Tremont's BLMIS Feeder Funds to Broad Market Fund and Prime Fund
to Rye XL Fund, and the subsequent transfers of BLMIS Customer Property from Rye XL Fund
to the Defendants.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb          02/22/1900 11:13 of 145 06/17/22 09:46:24
Doc
166-1 20
5
                              Second
                              Amended
                              Complaint
                              Pg 112 of
                              109 96

## XIV. THE AVOIDANCE OF THE INITIAL TRANSFERS FROM BLMIS TO TREMONT

268.    On December 7, 2010, the Trustee filed a complaint commencing an adversary proceeding against, among others, Tremont Group, its management arm, Tremont Partners, Inc. ("Tremont Partners," and together with Tremont Group, "Tremont"), and several Tremont BLMIS Feeder Funds invested wholly or in part with BLMIS, seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property under SIPA (the **"Tremont Complaint").**[21] The Trustee incorporates by reference the factual allegations in the Tremont Complaint, as supplemented below.

269.    In a September 22, 2011 order, this Court approved a settlement between the Trustee and more than a dozen of the Tremont BLMIS Feeder Funds, their affiliates, and a former chief executive (collectively, the **"Tremont Settling Defendants"**) that obligated the Tremont Settling Defendants to pay the Trustee $1.025 billion for the benefit of the customer property estate

---

25.    [21] *Picard v. Tremont Group Holdings, Inc. et al. (In re Bernard L. Madoff Inv. Secs., LLC),* Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010).

08-01789-cgm   Doc 22449-1   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
Doc 166-120   02/22/1900 11:40:55   06/17/22 09:46:24
5-smb
5
Second
Amended
Complaint
Pg 113 of
10996
Pg 114 of 145

(the **"Tremont Settlement"**). The Tremont Settlement also permitted the Trustee to pursue the recovery of subsequent transfers until the estate was made whole. The Tremont Settlement also specifically provides that the transfers made to the Tremont BLMIS Feeder Funds were "deemed avoided."

<u>Tremont's Senior Executives Had a Close Relationship With Madoff</u>

270.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, and helped select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held various high-level positions, including president, co-CEO, and ultimately sole CEO. Manzke and Schulman had regular contact with Madoff, including at least quarterly visits to BLMIS.

271.    Schulman had a special relationship with Madoff, which Tremont described as its "competitive edge." At least once, Madoff even sought Schulman's advice and counsel on individual hiring decisions at BLMIS. Tremont vice president Chris Cichella told a potential investor in June 2006 that Schulman was "intimately familiar" with Madoff based on "a 10+ year relationship."

272.    Investors took notice of the relationship between Schulman and Madoff. For example, a prospective investor who met with Tremont in May 2007 referenced the "friendly relationship between Bob and Bernie" and noted that, "[f]or Tremont, it goes back to the relationship between Bob Schulman [CEO Tremont] and Bernie. Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

71

08-01789-cgm  Doc 22449  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
5-smb      02/22/1900  Pg 115 of 145  06/17/22 09:46:24
Doc
166-120
5
Pg 114 of
10996
Second
Amended
Complaint

Tremont Saw and Understood Information Evidencing Madoff Was Engaged in a
Fraud

*1.      Tremont Received Repeated, Direct Fraud Warnings About Madoff*

273.     Tremont received warnings of BLMIS's fraudulent operation from clients as early
as April 2001, when an investor in the Broad Market Fund and Prime Fund wrote to Schulman:
"I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors."
The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used
such a "small" firm as its auditor.

274.     On April 25, 2003, sales vice president and Tremont Investment Committee
member Jim Mitchell relayed to Schulman a discussion Mitchell had with another concerned
investor about "associating Madoff with broker-dealer wrongdoing of late." The following
month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes
(which he shared with Tremont), characterized BLMIS's operation as "controversial" and
expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors;
(ii) that BLMIS charged no management fees; (iii) Madoff's going to cash at every year end; (iv)
the absence of a third party custodian; and (vi) BLMIS's "exceptionally stable" returns "with
only 7 negative months since 1990."

275.     Mitchell, obviously aware of these concerns, retained these notes and years later
forwarded them to Tremont vice president and manager responsible for product line management
and oversight Darren Johnston, cautioning to keep them secret: "Don't attach this – but it's an
interesting set of notes from a meeting years back…."

276.     In March 2004, the investor who emailed Schulman in 2001 about the "Bernie
fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments,
explaining:

My motivation for doing this is not due to some new buzz out there for me you know that is a sustained in but rather that I can no longer

08-01789-cgm  Doc 22449  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
Pg 117 of 145
Doc 166-120
5

Second Amended Complaint
Pg 116 of
10996

08-01789-cgm  Doc 22449-Filed Filed 10/18/22 Entered 10/18/22 20:09:56  Exhibit 1
5-smb    02/22/190  Pg 117 of 145  06/17/22 09:46:24

ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past . . .

277.   When Madoff's scheme collapsed, the investor sent an email expressing his view that Tremont had information that BLMIS was a fraud, saying, "HOLY SH## !!!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and that "Bob Schulman & all the feeder groups could be going to jail over this…." (Emphasis in original.)

278.   In May 2004, Cichella emailed senior vice president Rob Rosenbaum that investment advisory firm RogersCasey (where Manzke had been a partner and other Tremont personnel previously worked) was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ." RogersCasey's notes explained,

> [a]lthough Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . The Madoff exposure is a potential disaster. Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.

279.   In March 2007, representatives from Tremont's potential client, Agile Group ("**Agile**"), while conducting due diligence, met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh. Agile's notes from the meeting (the "**Agile Notes**") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of

08-01789-cgm  Doc 22445-1  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
5-smb      02/22/1900  Pg 118 of 145  06/17/22 09:46:24
Doc
166-120
5
Pg 117 of
10996

counterparties to the purported options transactions, BLMIS's assets under management ("**AUM**"), BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

280.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS was a fraud and whether it could be a Ponzi scheme. Tremont told Agile that it had always been able to redeem large dollar amounts on demand, prompting Agile to write, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

281.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Tremont chose not to go on record, but instead Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

282.    As set forth in the Tremont Complaint, beginning in October 2007, another Tremont Feeder Fund investor repeatedly complained to Schulman that there were inexplicable differences between his returns and those of a family member who had a direct account at BLMIS, beyond those attributable to fee differences. The investor forwarded to Schulman an email from that family member that stated, "Makes me concerned about the legitamacy [sic] of the whole Bernie thing."

283.    In 2006, Tremont sought an agreement with Citibank (together with its affiliates, **"Citi"**) to create a leveraged Tremont feeder fund. Various Citi representatives informed Johnston (who, in turn, informed Schulman and others at Tremont) that Citi's risk team refused to approve the deal due to "fundamental roadblocks to their sr. risk management people,"

including "how

10-05524-smb    Doc 166-120    Filed 02/22/1905    Entered Second Amended Complaint    06/17/22 09:46:24
                                Pg 119 of 10996

Madoff executes his volume of options" and that Madoff, not a third party, had custody of the trading accounts, which as discussed below, was a problem for many would-be Tremont investors.

284.     ABN AMRO Bank N.V. sought BLMIS fraud protection in connection with the renegotiation of a 2006 swap agreement under which ABN provided leverage to certain Tremont BLMIS Feeder Funds (the **"ABN Swap"**). Once that agreement was in effect, ABN began to receive copies of BLMIS's monthly statements and trade confirmations. After analyzing these records, ABN reported to Johnston, Kelly, and head of product management and investment advisory board member Stuart Pologe that ABN had "trust" issues with Madoff, which it termed "a key issue in the transaction." Because of this, ABN demanded a modification of the ABN Swap to grant it the right to redeem expeditiously its investments if Madoff came under investigation. Johnston wrote to Schulman and others at Tremont that ABN's proposed (and later accepted) modification was "to cover fraud."

285.     Tremont senior management repeatedly chose to ignore warnings that Madoff's trading might not be real. As late as October 2008, Tremont sales rep Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor believed Madoff was "probably a pyramid structure."

### 2.     *Tremont's Own Reporting Showed that BLMIS Trades Were Impossible*

286.     As alleged in the Tremont Complaint and below, despite exempting BLMIS from the due diligence it conducted on other managers, Tremont nevertheless had abundant facts demonstrating that BLMIS reported fictitious trades.

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 121 of 145    06/17/22 09:46:24
Doc
166-1
5
Pg 120 of
109

20

Second
Amended
Complaint

96

287.    Tremont prepared reports regarding the Tremont BLMIS Feeder Funds'
performance on a regular basis. Those reports, and the documents on which they were based,
facially disclosed impossible trading.

288.    Tremont regularly received from BLMIS customer statements, trade tickets, and
other information. According to Johnston, Tremont "monitor[s] all trade activity (we receive
each trade confirmation), we send position reports to RiskMetrics so we may analyze exposures,
and [Schulman] has regular dialogue with Bernie." Tremont executives, such as Johnston, vice
president of Investor Services Harry Hodges, and others reviewed BLMIS's statements and other
data, and checked the purported trades' prices against the securities' daily highs and lows against
third-party sources, including Bloomberg.

289.    Tremont's senior management prepared monthly analytic summaries based on
these BLMIS documents, which showed that Tremont knew the positions and prices BLMIS
reported differed from prices Bloomberg reported. In 2006, Tremont's auditor similarly found
and reported to Tremont more than 20 such differences.

290.    Tremont also estimated the amount BLMIS had in AUM and calculated whether
or not there was sufficient volume in each instrument for Madoff to be able to execute such
trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM by May
2003, and that it "monitored all trade activity," Tremont must have seen dozens, if not hundreds,
of trades in which there was insufficient volume for Madoff to complete the transactions.

291.    For example, on June 20, 2003, Madoff purportedly traded stocks for the Tremont
Feeder Fund accounts, including American International Group, PepsiCo, and Wal-Mart. By
extrapolating these Tremont accounts' value as a percentage of BLMIS's estimated AUM during
the prior month, as it said it did, Tremont would have seen that BLMIS's traded volume in these

Doc
166-120
5

Second
Amended
Complaint
Pg 121 of
10996

stocks would have been 161%, 150%, and 148% of the market's reported volumes, respectively. In all, on just one day, Tremont would have seen Madoff purported to trade more than 100% of the reported volume in 18 different stocks, each a glaring impossibility.

> Tremont Exempted BLMIS From Its High Due Diligence Standards, Prevented Third Parties From Conducting Their Own Due Diligence and Fabricated Stories About BLMIS

### 1. Tremont Consistently Excluded Madoff from its Due Diligence Practices

292.    The vast majority of Tremont's business involved placing its clients' assets with third-party managers. With respect to most of them, Tremont implemented due diligence procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

293.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff. Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

294.    Despite these claims and fraud warnings, Tremont exempted BLMIS from its due diligence standards. To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email that three of the most critical questions about Madoff's operations "ya don't ask": (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) who Madoff's auditors were. Tremont's executives deliberately prevented any transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.

295.    According to the SEC, Schulman conducted the due diligence on Madoff but on

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 123 of 145    06/17/22 09:46:24

Pg 122 of
40996

no other managers. The SEC concluded that because "Schulman conducted the due diligence, he

would be able to control what areas and information [was] reviewed or not reviewed." This was

an "outlier" in Tremont's procedures. In her notes, Agile's Quish wrote this was strange, finding

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb            02/22/1900     Pg 124 of 145     06/17/22 09:46:24
Doc
166-120                                            Second
5                                                  Amended
                                                   Complaint
                    Pg 123 of
                    109 96

that it was "as if the friendly relationship between Bob and Bernie is enough to cement" billions in business between Tremont and BLMIS.

296.    Tremont also conducted no due diligence on Friehling & Horowitz, in contrast to its written due diligence policies and procedures, in which Tremont reported it would speak with a fund's auditor. Tremont's top investment managers knew, as set forth in a 2006 internal memo, that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers."

297.    Johnston told Agile in 2007 that an unnamed Tremont representative had visited Friehling & Horowitz just a few months before, "to make sure they exist," a pitiful swat at diligence. The SEC found that Tremont's due diligence materials turned over to the Commission "did not reveal any evidence of conversations with Madoff's auditors."

298.    In August 2006, Chief Investment Officer Cynthia Nicoll raised the need to conduct "full due diligence" on BLMIS, but research director Thomas Sandlow told her, "We cannot do that for Madoff."

299.    In an unusually candid response to one strategic consulting firm, Tremont's Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

### 2.    BLMIS Failed Tremont's Requirements for Third-Party Oversight yet Tremont Made an Exception for Madoff

300.    Tremont's senior management knew BLMIS deviated from Tremont's own due diligence requirements and well-established industry practice by acting as investment adviser, prime broker and custodian of its clients' assets, while also using a virtually unknown auditor in a

Doc
166-120
5
5-smb        02/22/19 06:11:25 3 of 45 06/17/22 09:46:24
Second
Amended
Complaint
10996

Rockland County strip mall, Friehling & Horowitz, and that as a result, BLMIS could be faking its securities holdings, customers statements, and trade tickets.

301.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical. For example, in June 2008, Tremont rejected a manager with whom it was considering investing because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

302.    After Madoff's arrest, the SEC investigated Tremont and found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

303.    Tremont knowingly made BLMIS the sole exception to its requirement of third-party oversight of its money managers.

304.    Tremont executives, including Johnston, Cichella, and Mitchell were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell replied, "What is your telephone number?"

305.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid."

10-03789-cgm 08-01789-smb Doc 5244 166-1 20 5 Filed 10/18/22 02/22/1900 Entered 10/18/22 20:09:56 06/17/22 09:46:24 Exhibit 1 Pg 126 of 145

Second Amended Complaint Pg 125 of 109 96

Cichella

08-01789-smb   Doc 166-1   02/22/1900   Pg 127 of 145   06/17/22 09:46:24
Doc 166-1
5
Second
Amended
Complaint
Pg 126 of
10996

replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form [so] … it would be great if you could convince them" that the assets existed.

306.    On or about October 1, 2008, Tremont senior management met with the managers of competing BLMIS feeder fund Fairfield Sentry Limited concerning a possible investment with BLMIS through Fairfield Sentry. Tremont's notes acknowledged that Fairfield Sentry also did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Tremont nevertheless determined that an investment would be acceptable, solely because it was a Madoff feeder, stating: "Given the structure of the Madoff relationship, this investment requires an exception approval from the Investment Committee."

### 3.    Tremont Consistently Shielded Madoff from Third Parties

307.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman resounded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.) On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Ray Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

308.    In swap agreements with three leverage-provider banks, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

309.   Tremont even restricted which of its employees could contact BLMIS. In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Soares], [Schulman] AND [Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

310.   Tremont even refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, Ernst & Young (**"EY"**). In May 2006, internal Tremont emails discussing EY's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff."

311.   This deliberate shielding of Madoff continued when Tremont replaced EY with KPMG and reported to potential clients that "there is no contact" between KPMG and BLMIS.

### 4.   *Tremont Avoided Questions and Fabricated Answers about BLMIS's Purported Options Trading*

312.   Madoff purportedly purchased put options to hedge equity risk and sold call options to help pay for the put options. Tremont's senior management knew that the options trades were a central part of the SSC Strategy. In response to evidence on the face of BLMIS's trade tickets that the options were suspect, Tremont sought to hide the issues and evidence from investors through deflection and fabrication.

### 5.   *Divergent Answers on Over-the-Counter/Listed Trading Questions*

313.   As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options OTC as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were exchange-traded, and (ii) the lack of

Second Amended Complaint

08-01789-cgm  Doc 22445  Filed 10/18/22  Entered 10/18/22 20:09:56  Exhibit 1
Doc 166-120    Pg 130 of 145
5-smb    02/22/1900  Pg 130 of 145   06/17/22 09:46:24
Second
Amended
Complaint
Pg 129 of
10996

information that should be on all OTC trade confirmations. Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties—a basic requirement for all OTC option trades. Tremont further knew Madoff could not be trading all of his options on the exchange, in light of the insufficient volume of listed options trades to support BLMIS's AUM. As explained above, Tremont senior management, including Hodges, reviewed and analyzed the BLMIS trade tickets.

314.  Rather than openly acknowledge these impossibilities, Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

315.  For example, a Prime Fund and Broad Market Fund DDQ from November 2006 stated that "all options [] are executed over the counter." In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Broad Market Fund's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

### 6. Failure to conduct any diligence on purported options counterparties and covering up the truth with fabrications

316.  Tremont similarly failed to conduct any diligence as to the lack of OTC counterparties on BLMIS's trade confirmations, knowing there was no legitimate explanation.

317.  Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds. This meant that Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties. Tremont senior management knew that if one or more counterparties defaulted on an OTC put option that BLMIS attempted to exercise, that default would leave

82

Tremont Feeder Funds directly exposed to

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb    02/22/1900    Pg 132 of 145    06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 131 of
40996

318.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk, but Tremont never took the first step of getting the purported counterparties' names.

319.    Third parties, including Citi, one of Tremont's leverage providers (and home to one of the world's largest options trading desks) questioned Madoff's purported OTC trading. Tremont acknowledged the lack of counterparty information and anomalies regarding the supposed counterparties was a "critical issue" for Citi. In a March 24, 2006 email, Kelly told Schulman that Citi had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not disclosed that to us."

320.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed as needed to pacify others. In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that Broad Market Fund had 12 counterparties, "which Madoff must use in relation to his put options trades." In March 2007, senior management told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it." In a deposition, Schulman finally admitted that Tremont never tried to identify any purported counterparties.

321.    In a June 2007 email, Kelly told JPMorgan Chase (**"JPM"**), which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named Goldman Sachs and JPM among them, all clear fabrications.

322.    In April 2008, Johnston told Albourne Partners, a consulting company conducting diligence on Prime Fund for its clients, that Tremont "has checked with counterparties to make

sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments." This was

08-01789-cgm    Doc 22449    Filed 10/18/22    Entered 10/18/22 20:09:56    Exhibit 1
5-smb         02/22/1900         Pg 134 of 145    06/17/22 09:46:24
Doc
166-120
5
Pg 133 of
109 96

an obvious lie, given that Tremont had no counterparty names, and as the world now knows, there were no verifiable counterparties to contact.

323.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which were further fabrications.

324.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman") – one of the largest OTC derivatives counterparties at the time – led to industry and investor panic. Many Tremont clients understandably worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

325.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC option positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont BLMIS Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear, Stearns defaulted, "then the option (otc) is gone." Upon learning of Lehman's demise, however, Tremont never appears to have even asked Madoff about this sudden and potentially business-destroying counterparty exposure.

326.    Tremont instead worked to avoid and deceive investors. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

327.    Mitchell crafted an answer to investors asking whether the Tremont BLMIS Feeder Funds had Lehman risk, stating internally that "the line we should follow is that … [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply,

84

Johnston went a step further, indicating his certainty that the "answer is 'no exposure.'" These statements

were misleading by implying Tremont knew of actual counterparty arrangements and could assure investors that Tremont's counterparties presented no risk.

328.    To date, Lehman is the largest bankruptcy in the history of the entire world. It is beyond reason that Tremont would view Lehman's collapse as a non-event vis-à-vis its BLMIS accounts, its investors' inquiries as an annoyance, and a total lack of effect on its investments as legitimate, if Tremont's senior management actually believed its BLMIS options positions were real. The knowledge of Tremont's officers and directors acquired either directly, or through authorizing and adopting the findings of senior management, is imputed to Tremont.

<u>Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff</u>

329.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. The Tremont BLMIS Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont BLMIS Feeder Funds' AUM increasing rapidly. For example, from its inception in January 1994 to November 2008, Broad Market Fund's AUM increased from $5.9 million to approximately $2.4 billion, a 407-fold increase.

330.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

331.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm." Cichella said Prime Fund's "only reason for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack addiction business." Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff."

08-01789-cgm   Doc 22445   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb        02/22/1900   Pg 137 of 145   06/17/22 09:46:24
Doc
166-120
5
Second
Amended
Complaint
Pg 136 of
10996

332.    Tremont did nothing more to earn its fees through its BLMIS Feeder Funds than provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee . . . . We make a lot of money off this." As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

### Tremont Co-Managed Kingate Global

333.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, **"Kingate"**).[32] Manzke introduced Ceretti and Grosso to Madoff in 1993 and was a Kingate Global director and manager from 1995 until 2004.

334.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud. Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. (**"Tremont Bermuda"**) co-managed Kingate Global and split its management fees, which provided Tremont with a significant portion of its income. From 2002 to 2006, for example, Kingate Global earnings comprised 17% of Tremont's BLMIS-derived revenues. Between 1998 and 2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

335.    Under several agreements the parties entered together, Tremont Bermuda assisted "Co-Manager Kingate … in the performance of its duties under the Kingate Co-Manager Agreement and managing the investment and reinvestment of the assets of [Kingate Global] …."

336.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global

---

26.    [32] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global Fund, Ltd. and concerning the role of Kingate Management Limited are incorporated by reference. *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Sec's)*, 09-01161 (SMB) (Bankr. S.D.N.Y.) (ECF No. 100).



through their conduct and the operation of the various agreements entered into by the parties.

08-01789-cgm    Doc 22449   Filed 10/18/22   Entered 10/18/22 20:09:56    Exhibit 1
5-smb          02/22/1900              Pg 139 of 145    06/17/22 09:46:24
Doc                        Second
166-120                    Amended
5                          Complaint
                           Pg 138 of
                           10996

337.     Kingate's knowledge that Madoff's BLMIS operation was a fraud, and that many of the entries in the statements and trade confirmations depicted trades that could not have occurred may be imputed to Tremont.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a)<br>FORTIS FUND BANK AND/OR FORTIS FUND SERVICES

338.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

339.     Each of the Broad Market Fund Initial Transfers is avoidable under sections 544 and 548 of the Bankruptcy code, and applicable provisions of N.Y. Debt. & Cred. Law, particularly §§ 273–279, and of SIPA, particularly § 78fff-2(c)(3).

340.     The Broad Market Fund-Defendant Subsequent Transfer was made directly or indirectly to Fortis Fund Bank or Fortis Fund Services.

341.     Fortis Fund Bank and/or Fortis Fund Services is the immediate or mediate transferees of the avoidable Broad Market Fund Initial Transfers.

342.     The Broad Market Fund-Defendant Subsequent Transfer was received by Fortis Fund Bank and/or Fortis Fund Services at a time when they were willfully blind to circumstances suggesting a high probability of fraud at BLMIS in that it was not trading securities in connection with the IA Business.

343.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Fortis Fund Bank and/or Fortis Fund Services (a) recovering the Broad Market-Defendant Subsequent Transfer, or the value thereof, from Fortis Fund Bank and/or Fortis Fund Services for

the benefit of the BLMIS estate; (b) directing Fortis Fund Bank and/or Fortis Fund Services to

disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Fortis Fund Bank and/or Fortis Fund Services related to or arising from, or concerning the Broad Market-Defendant Subsequent Transfer; (c) awarding attorneys' fees, costs, prejudgment interest from Fortis Fund Bank and/or Fortis Fund Services; and any other relief the Court deems just and appropriate.

## COUNT TWO

### RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a) FORTIS FUND BANK

344.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

345.     Each of the Broad Market Fund Initial Transfers and Prime Fund Initial Transfers is avoidable under sections 544 and 548 of the Bankruptcy code, and applicable provisions of N.Y. Debt. & Cred. Law, particularly sections 273–279, and of section 78fff-2(c)(3) of SIPA.

346.     Each of the Rye XL Fund-Fortis Fund Bank Subsequent Transfers is recoverable from Fortis Fund Bank under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78ff-2(c)(3).

347.     Each of the Rye XL Fund-Fortis Fund Bank Subsequent Transfers was made directly or indirectly to Defendant Fortis Fund Bank.

348.     Defendant Fortis Fund Bank is an immediate or mediate transferee of the Broad Market Fund Initial Transfers and Prime Fund Initial Transfers.

349.     Each of the Rye XL Fund-Fortis Fund Bank Subsequent Transfers was received by Fortis Bank and/or at a time when they were willfully blind to circumstances suggesting a high probability of fraud at BLMIS in that it was not trading securities in connection with the IA

88

Business.

Doc 166-1 205-smb

Filed 02/22/1900 Pg 142 of 145 06/17/22 09:46:24

Second Amended Complaint

Pg 141 of 10996

10-05345-smb    Doc 166-120    Filed 02/22/1906/17/22 09:46:24    Second
                                                    Amended
                                                    Complaint
                                                    Pg 142 of
                                                    10996

350.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the
Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment (a)
recovering the Rye XL Fund-Fortis Fund Bank Subsequent Transfers, or the value thereof, from
Defendant Fortis Bank for the benefit of the BLMIS estate; (b) directing Defendant Fortis Fund
Bank, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all
management fees, incentive fees or other compensation and/or remuneration received by the
Defendants related to or arising from, or concerning the Rye XL Fund-Fortis Fund Bank
Subsequent Transfers; (c) composing a constructive trust over the Rye XL Fund-Fortis Fund
Bank Subsequent Transfers, or their proceeds, product or offspring, in favor of the Trustee; and
(d) awarding attorneys' fees, costs, prejudgment interest and any other relief the Court deems just
and appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor
of the Trustee and against Defendants as follows:

(i)    On the First Claim for Relief, pursuant to §§ 105(a) and 550(a) of the
Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment against the Defendants: (a) recovering
the Broad Market Fund Subsequent Transfers, or the value thereof, from the Defendants for the
benefit of the BLMIS estate; (b) directing the Defendants, to the extent allowable by law, to
disgorge to the Trustee all profits, including any and all management fees, incentive fees or other
compensation and/or remuneration, received by the Defendants related to or arising from, or
concerning the Broad Market Fund Subsequent Transfers; (c) imposing a constructive trust over
the Broad Market Fund Subsequent Transfers, or their proceeds, product or offspring, in favor of
the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief the
Court deems just and appropriate;

08-01789-cgm   Doc 22445   Filed 10/18/22   Entered 10/18/22 20:09:56   Exhibit 1
5-smb          02/22/1900   Pg 144 of 145   06/17/22 09:46:24
Doc                         Second
166-120                     Amended
5                           Complaint
                            Pg 143 of
                            10996

(ii)  On the Second Claim for Relief, pursuant to §§ 105(a) and 550(a) of the

Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment against Defendant Fortis Fund Bank:

(a)  recovering the Rye XL Fund-Fortis Fund Bank Subsequent Transfers, or the value thereof, from Defendant Fortis Bank for the benefit of the BLMIS estate; (b) directing Defendant Fortis Fund Bank, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Defendant Fortis Bank related to or arising from, or concerning the Rye XL Fund-Fortis Fund Bank Subsequent Transfers; (c) imposing a constructive trust over the Rye XL Fund-Fortis Fund Bank Subsequent Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (d) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

Dated: New York, New
       York          _____
   June 17, 2019 2022

/s/ Regina Griffin

BAKER & HOSTETLER LLP 45
Rockefeller Plaza New York,
New York 10111 Telephone:
(212) 589-4200 Facsimile:
(212) 589-4201 David J.
Sheehan Email:
dsheehan@bakerlaw.com
Regina Griffin Email:
rgriffin@bakerlaw.com Tracy
L. Cole Email:
tcole@bakerlaw.com

A.  Mackenna White
Email: awhite@bakerlaw.com Elizabeth
Urda McCurrach Email:
emccurrach@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the
Chapter 7 Estate of Bernard L. Madoff*

Document comparison by Workshare 10.0 on Monday, October 17, 2022
12:33:07 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\cmaldonado\Desktop\Proposed Second Amended Complaint.pdf |
| Description | Proposed Second Amended Complaint |
| Document 2 ID | file://C:\Users\cmaldonado\Desktop\Fortis SAC.pdf |
| Description | Fortis SAC |
| Rendering set | BH Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 673 |
| Deletions | 573 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 1246 |